Hearing Date and Time: March 19, 2008 at 10:00 a.m.
Objection Deadline: March 12, 2008 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

 - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
              :
 In re          : Chapter 11
              :
DELPHI CORPORATION, et al., : Case No. 05-44481 (RDD)
              :
      Debtors. : (Jointly Administered)
              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FOURTH SUPPLEMENT TO KECP MOTION (DOCKET NO. 213)
SEEKING AUTHORITY TO CONTINUE SHORT-TERM AT-RISK
PERFORMANCE PAYMENT PROGRAM ("AIP") FOR FIRST HALF OF 2008

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this fourth supplement to their Motion For Order Under §§ 105 And 363 Authorizing The Debtors To Implement A Key Employee Compensation Program (Docket No. 213), dated October 13, 2005 (the "Fourth Supplement"). The relief sought in this Fourth Supplement is limited to a continuation of the Debtors' short-term at-risk performance payment program (the "AIP") for the six-month period starting January 1, 2008 and ending June 30, 2008, including approval of the Debtors' financial targets and payout curves for that period. Under paragraph five of this Court's Third Supplemental Order Under 11 U.S.C. §§ 105 And 363 Authorizing Debtors To Continue Short Term At-Risk Performance Payment Program ("AIP") For Second Half Of 2007 (Docket No. 10428), dated October 2, 2007, the Executive Development and Compensation Committee of Delphi's Board of Directors (the "Compensation Committee") has the sole authority to make determinations regarding the AIP with respect to performance periods beginning on or after January 1, 2008. The Debtors are nevertheless seeking this Court's approval to continue the AIP out of an abundance of caution and because they have not yet emerged from chapter 11 protection.

        1.        The design of the AIP for the first half of 2008 is essentially the same as that approved by this Court in February 2006 (for the first half of 2006), July 2006 (second half of 2006), March 2007 (first half of 2007), and October 2007 (second half of 2007), and is similar to that underlying the Short-Term Incentive Plan (the "STIP") included in the Debtors' post-emergence Management Compensation Plan (the "MCP") that was approved by this Court in January 2008. The AIP is a market-competitive program that provides at-risk incentive-compensation opportunities linked to corporate- and division-level financial targets derived from

2

the Debtors' current Budget Business Plan (the "BBP") and to each eligible employee's individual performance.  As in prior periods, the terms and conditions of the AIP were approved by the independent, disinterested members of the Compensation Committee.

        2.        The principal terms and conditions of the AIP for the first half of 2008 are as follows:

        (a)        <u>Covered Employees</u>.  The AIP applies to all of the Debtors' employees holding executive positions in the United States during the first half of 2008 (collectively, the "Covered Employees"), including the Executive Chairman of Delphi's Board of Directors (the "Board").  As of February 22, 2008, there were approximately 442 Covered Employees, including 21 members of the Delphi Strategy Board (the "DSB"), Delphi's top policymaking group.

        (b)        <u>Financial Targets</u>.  The AIP will not generate incentive-compensation opportunities unless the Debtors meet or exceed established corporate- or division-level financial targets that were derived from the BBP and were reviewed and approved by the Compensation Committee.  Delphi's corporate-level target is measured in earnings before interest, taxes, depreciation, amortization, and restructuring items ("EBITDAR"), and is set at $871.7 million.  The targets at the division level, which are measured in operating income (which excludes interest and taxes) before depreciation, amortization, and restructuring items ("OIBDAR"), are as follows:  (i) Powertrain, $180.2 million, (ii) Steering, $43.6 million, (iii) Thermal, $91.1 million, (iv) Electronics and Safety, $232.0 million, (v) Electrical and Electronic Architecture, $262.6 million, (vi) Product and Service Solutions, $23.7 million, and (vii) Automotive Holdings Group, $11.7 million.

        (c)        <u>Target Mix</u>.  If a Covered Employee's responsibilities are limited to the corporate level, 100% of his or her incentive-compensation opportunity will be determined based on Delphi's corporate-level EBITDAR performance.  For all other Covered Employees, 50% of the opportunity will be determined based on Delphi's corporate-level EBITDAR performance and 50% will be determined based on the relevant division's OIBDAR performance.

        (d)        <u>Incentive-Compensation Opportunities</u>.  A Covered Employee's target incentive-compensation opportunity – i.e., the opportunity associated with financial performance equal to 100% of the applicable target or targets – is based on the Covered Employee's level of responsibility.  Opportunities increase as the Debtors' financial performance increases until they reach a cap of 150% of the target opportunity for DSB members and 200% of the target opportunity for all other Covered Employees.  The aggregate target opportunities under the AIP for the first half of 2008 are approximately $21.2 million and the aggregate maximum opportunities are approximately $39.1 million.

3

(e) <u>Payout Curves</u>.  The payout curves for the first half of 2008 are attached to this Fourth Supplement as <u>Exhibit B</u>.  Under those curves, the maximum incentive-compensation opportunities are associated with corporate-level EBITDAR performance of at least $1.2927 billion and the following division-level OIBDAR performance:  (i) Powertrain, at least $273.1 million, (ii) Steering, at least $90.3 million, (iii) Thermal, at least $131.8 million, (iv) Electronics and Safety, at least $321.4 million, (v) Electrical and Electronic Architecture, at least $368.4 million, (vi) Product and Service Solutions, at least $49.3 million, and (vii) Automotive Holdings Group, at least $48.3 million.

(f) <u>Adjustment Protocol</u>.  The BBP and the AIP financial targets incorporate assumptions concerning the financial impact of several items, including, for example, the Debtors' agreements with their labor unions and General Motors Corporation ("GM").  To ensure that incentive compensation is not affected in a positive or negative manner based on those agreements, the Debtors will make adjustments on a dollar-for-dollar basis to the extent the actual financial impact of the agreements differs from the assumptions.  Thus, consistent with prior periods, the Covered Employees will not receive incentive compensation based on cost savings achieved through those agreements.  The adjustment methodologies are set forth in the adjustment protocol attached to this Fourth Supplement as <u>Exhibit C</u> (the "Adjustment Protocol").  The Adjustment Protocol will also govern any adjustments arising from (i) the Debtors' divestiture of substantially all of the assets comprising their cockpits and interior systems and integrated closure systems businesses (the "Interiors and Closures Businesses") and their steering and halfshaft business (the "Steering Business") or (ii) adjustments to the BBP for the period from January 1, 2008 through the date of emergence as a result of the Debtors' continued operation in chapter 11 reorganization during that period.[1]  In addition, the post-emergence Compensation Committee will have the authority to make other adjustments if it determines that such adjustments are in Delphi's best interest so as to preserve the incentive features of the plan.[2]

---

[1] This Court approved the Debtors' sale of the Interiors and Closures Businesses, which fall within the Automotive Holdings Group division, and the Steering Business, which accounts for all or substantially all of the Steering division, in December 2007 and February 2008, respectively.  (<u>See</u> Docket No. 11579; Docket No. 12868.)  The adjustment protocol contemplates adjustments related to these businesses that will provide prorated incentive-compensation opportunities according to when the divestitures are completed.

[2] Under the AIP as implemented in some of the earlier performance periods, the Official Committee of Unsecured Creditors (the "Creditors' Committee") had the right to make certain adjustments after reviewing the Debtors' financial results.  (<u>See</u> Docket No. 4660 ¶ 3; Docket No. 10428 ¶ 4.)  That feature of the AIP will be replaced post-emergence with a grant of adjustment authority to the Compensation Committee because the Creditors' Committee will cease to exist when the Debtors emerge from chapter 11.  (<u>See</u> Docket No. 12359 ¶ 52.)

(g)     Individual Performance.  The actual amount of incentive compensation paid to a Covered Employee will depend on his or her individual performance during the first half of 2008.  The performance of DSB members will be reviewed by Robert S. "Steve" Miller or Rodney O'Neal, Delphi's Chief Executive Officer, as well as the Compensation Committee.  With respect to all other Covered Employees, the reviews will be conducted by the Covered Employee's supervisor.  Any Covered Employee who is designated a poor performer or otherwise does not meet expectations will not receive any incentive compensation.  In other cases, a Covered Employee's incentive compensation can be adjusted downward to a minimum of zero or upward to a maximum of the applicable cap of 150% or 200% of the Covered Employee's target opportunity.  The net impact of the adjustments cannot result in aggregate payments that exceed the aggregate earned opportunities, and an adjustment to a DSB member's incentive compensation cannot be funded by or fund an adjustment to the incentive compensation of a Covered Employee who is not a DSB member.

(h)     Prophylactic Measures.  The AIP includes a prophylactic measure that prevents Covered Employees who engage in misconduct from benefiting under the AIP, including Covered Employees who fail to act in good faith and in a manner consistent with the Debtors' best interests.  The prophylactic measure is set out in full in paragraph 10 of this Court's Order Under 11 U.S.C. §§ 105 And 363 Authorizing The Debtors To Implement A Short-Term Annual Incentive Program (Docket No. 2441), dated February 17, 2006.

3.     On four occasions, this Court has authorized the Debtors to implement the AIP under terms and conditions that are essentially the same as those outlined above.  Each time, this Court found that the Debtors had exercised reasonable business judgment in seeking to implement the AIP and that the Debtors had proposed the AIP in good faith.  (See Docket No. 2441 ¶¶ B-C; Docket No. 4660 ¶¶ A-B; Docket No. 7474 ¶¶ A-B; Docket No. 10428 ¶¶ A-B.)  This Court also found each time that the AIP was in all respects fair and reasonable, that it was in the best interests of the Debtors and their estates, creditors, stakeholders, and other parties-in-interest, and that it was necessary to the Debtors' reorganization efforts.  (See Docket No. 2441 ¶¶ C, E; Docket No. 4660 ¶¶ B-C; Docket No. 7474 ¶¶ B-C; Docket No. 10428 ¶¶ B-C.)

4.     The MCP, which sets forth the Debtors' post-emergence compensation structure, also includes at-risk short-term incentive-compensation opportunities.  The STIP portion of the MCP is similar to the AIP in that it will provide eligible employees, including

5

executives, with opportunities that are tied to annual financial goals established by the Compensation Committee. (See Docket No. 11386 Ex. 7.8.) In addition, like the AIP, the STIP provides that the amount of any incentive compensation paid to an eligible employee will depend on the employee's individual performance as evaluated by the Compensation Committee, Delphi's chief executive officer, and/or the employee's direct supervisor. (See id.) The Compensation Committee ratified the MCP on December 28, 2007, and the MCP was attached to the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Amended Plan"), as Exhibit 7.8.[3]

        5.      At-risk short-term incentive-compensation opportunities – along with salary, benefits, and at-risk long-term incentive-compensation opportunities – were an essential element of the Covered Employees' total compensation from the time of Delphi's separation from GM in 1999 until the Debtors filed their voluntary petitions for reorganization relief in October 2005. During these cases, at-risk short-term incentive-compensation opportunities – but not at-risk long-term incentive-compensation opportunities – have continued as an essential element of total compensation through the AIP from January 1, 2006 through December 31, 2007. And under the MCP, at-risk short-term incentive-compensation opportunities will remain an essential element of total compensation following the Debtors' emergence from chapter 11 through the STIP. In this Fourth Supplement, the Debtors seek to preserve these opportunities in the interim period between confirmation of the Amended Plan and emergence. Without this relief, the total compensation of the Covered Employees will include only salary and benefits, with no at-risk

---

[3]     The Debtors filed the MCP with the Amended Plan on December 10, 2007 (see Docket No. 11386), a supplement to the MCP on December 28, 2007 (see Docket No. 11608), and modifications to the MCP on January 16, 2008 (see Docket No. 12165), and they further modified the MCP based on this Court's comments at the confirmation hearing regarding the Amended Plan (see Docket No. 12359).

6

incentive-compensation elements whatsoever.  As this Court has found in connection with earlier performance periods, and as no party has seriously disputed at any point in these cases, this would place the compensation structure of the Covered Employees well below market-competitive levels.

    6.  The Debtors seek the authority to continue the AIP for the first half of 2008 under 11 U.S.C. § 363(b)(1), which allows a debtor-in-possession to use estate property other than in the ordinary course of business after notice and a hearing if any party objects.  See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir. 1997).  In prior hearings, this Court has applied a two-part standard in reviewing the AIP under section 363(b)(1).  (See Docket No. 3414 at 241:15-242:18; Docket No. 4996 at 97:19-97:22; Docket No. 7557 at 83:22-84:22; Docket No. 11057 at 115:15-115:22, 116:20-116:23.)  The first part asks "whether th[e] program is in any way tainted by self-dealing or is, instead, the product of the advice of independent advisors and . . . ultimate decision-making by an independent board," as well as "whether it has been appropriately vetted with the other constituents in the case."  (Docket No. 3414 at 241:16-242:1.)  The second part involves an examination of the program "in the light of whether it makes good business sense."  (Id. at 242:3-242:8.)

    7.  In making these determinations, this Court has looked to the business-judgment factors set forth in In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006).  (See Docket No. 7557 at 84:24-85:14.)  Those factors are:

- Is there a reasonable relationship between the program and the results to be obtained – i.e, in the case of a performance incentive, is the program calculated to achieve the desired performance?  Dana, 358 B.R. at 576.

- Is the cost of the program reasonable in the context of the debtor's assets, liabilities, and earning potential?  Id.

- Is the scope of the program fair and reasonable?  Does it apply to all employees?  Does it discriminate unfairly?  Id. at 577.

7

- Is the program consistent with industry standards?  <u>Id.</u>

- What were the due-diligence efforts of the debtor in investigating the need for a program, analyzing which employees need to be incentivized, what is available, and what is generally applicable in a particular industry?  <u>Id.</u>

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?  <u>Id.</u>

8. The Debtors' request to continue the AIP for the six-month period starting January 1, 2008 and ending June 30, 2008 easily satisfies the requirements of section 363(b)(1). With respect to the first part of the standard set out above, the AIP is the result of a process that involves multiple tiers of independent review that is sufficient to defeat any suggestion of bad faith or improper self-dealing.  As part of that process, the AIP was submitted to and reviewed by the Compensation Committee, which is responsible for discharging the Board's responsibilities relating to all aspects of director and officer and other executive compensation. The Compensation Committee is composed of three independent, disinterested members of the Board – Craig G. Naylor (chairman), John D. Englar, and Raymond J. Milchovich – who are not covered by the AIP.  The Compensation Committee voted in favor of continuing the AIP for the first half of 2008 and approved the terms and conditions of the AIP, including the financial targets and payout curves, at its meeting on February 27, 2008.

9. The Debtors' proposal to continue the AIP for the first half of 2008 is undergoing an additional layer of review by the Creditors' Committee.  As in prior periods, the Debtors are providing data to the Creditors' Committee concerning the Debtors' financial targets, payout curves, and other aspects of the AIP.  Vetting the AIP with the Compensation Committee and the Creditors' Committee provides for review by independent actors and assures that the AIP is not tainted in any way by improper insider self-dealing.  It is also consistent with the Debtors' past practice in these cases.  Accordingly, this Court should find, as it has in connection with the

8

Debtors' requests with respect to four prior performance periods, that the Debtors' proposal to continue the AIP for the first half of 2008 is made in good faith on an arms' length basis, and that it is informed by independent judgment.

10.     As for the second part of the standard – whether the Debtors' proposal makes good business sense – the Debtors have made the reasonable business judgment that continuing the AIP for the first half of 2008 is a critical step toward achieving the Debtors' objective of providing market-competitive compensation to their entire workforce, including the Covered Employees.  Delphi's most recent comprehensive statement of its goals with respect to executive compensation was set forth in the philosophy and strategy adopted by the Compensation Committee in December 2007 and included in the Amended Plan as part of the MCP.  (See Docket No. 11386 Ex. 7.8.)  As set forth in that statement, Delphi's compensation goals take into account the competitive marketplace, including by seeking to provide total direct compensation – the sum of salary, short-term incentive opportunities, and long-term incentive opportunities – that is at the market median at planned levels of performance and above the market median when performance exceeds planned levels.  (See id.)  They also include linking compensation opportunities to performance-based incentives such as the achievement of financial goals, and providing flexibility to recognize, differentiate, and reward individual performance.  (See id.)

11.     The AIP is tailored to these purposes and is within the range of competitive practice.  The executive-compensation structure offered by the Debtors' competitors in the automotive industry and other peers generally includes salary, benefits, short-term incentive opportunities, and long-term incentive opportunities.  The Debtors' historical and future structures involve those same four elements, and there is no dispute that the design of the AIP is

9

in line with market practice. Without the at-risk short-term incentive-compensation opportunities provided under the AIP, the Covered Employees' compensation during the first half of 2008 will be limited to salary and benefits. As the Debtors have demonstrated in connection with earlier performance periods, a compensation structure without at-risk short- or long-term incentive-compensation opportunities is not competitive with the compensation structures offered by Delphi's peer companies in the marketplace, and would place the Debtors' compensation structure in the bottom quartile as compared with its peers. In short, the AIP is calculated to achieve the Debtors' reasonable compensation objectives of providing market-competitive compensation and at-risk compensation opportunities that are tied directly to the Debtors' financial targets and each executive's individual performance in a manner that is consistent with the Debtors' compensation philosophy and strategy.

    12.  In terms of the scope of coverage of the AIP, it is fair and reasonable that all of the Debtors' executives are eligible in the first instance because that is the population that will experience a significant competitive shortfall if compensation is limited to salary and benefits. Within the executive population, the AIP draws appropriate distinctions based on each executive's level of responsibility and contributions to the Debtors' success through its apportionment of opportunities, reviews of individual performance and accompanying adjustments in compensation, and, in more serious cases, the escrow and "clawback" features of the prophylactic measure. The fact that the AIP does not cover other segments of the Debtors' workforce, such as hourly employees represented by labor unions, does not constitute unfair discrimination because there is no evidence that providing at-risk short-term incentive-compensation opportunities to those segments is necessary to bring their compensation within the range of competitive market practice.

13. The financial targets for the first half of 2008 are reasonable and appropriate as well. Consistent with prior periods, Delphi's corporate-level EBITDAR target was not developed specifically for compensation purposes, but rather was derived from Delphi's business plan that was attached to the Debtors' First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, as Appendix C (the "POR-BP"). (See Docket No. 11388 App. C.) In setting the EBITDAR target for the first half of 2008, the Debtors made adjustments based on (i) the addition of earnings forecasted for the Steering division that were not included in the POR-BP because the POR-BP assumed that the Steering Business would be sold as of December 31, 2007, (ii) a change in accounting treatment with respect to the gain/loss on the Debtors' sale of the Steering Business, and (iii) the Debtors' current expectations regarding the timing of their earnings in 2008.

14. At the division level, the Debtors' OIBDAR targets were derived from the divisions' operating income under the BBP for the first half of 2008. As with the corporate-level EBITDAR target, the OIBDAR targets were not the result of a special process related to the AIP, but rather are drawn from the same BBP used by the Debtors in managing the day-to-day operations of their businesses.

15. The overall cost of the AIP is reasonable in the context of the Debtors' assets, liabilities, and earning potential. Again, the aggregate target opportunities available under the AIP are approximately $21.2 million. This represents approximately 0.22% of the Debtors' total assets of $9.752 billion as of December 31, 2007 and approximately 0.09% of the Debtors'

total liabilities of $23.224 billion as of that date.[4] With respect to potential earnings, the aggregate target opportunity of approximately $21.2 million amounts to approximately 2.4% of Delphi's corporate-level EBITDAR target of $871.7 million, and the aggregate maximum opportunity of approximately $39.1 million is approximately 3.0% of the $1.2927 billion in EBITDAR associated with the maximum opportunity. When viewed from an incremental perspective, moving from target to maximum results in an additional $421.0 million in EBITDAR and increases the available AIP opportunities by approximately $17.9 million, or approximately 4.3% of the additional EBITDAR.[5] All of the major constituents in these cases will benefit if the Debtors meet or exceed their financial targets for the first half of 2008, particularly if the Debtors' performance places them at or near the top of the AIP payout curves. The opportunities provided under the AIP are reasonable in relation to the Debtors' financial condition and the magnitude of their financial targets, and they provide the Covered Employees with an incentive to achieve performance that is in the best interests of the Debtors and their estates, creditors, and other stakeholders.

---

[4] The Debtors' total assets and liabilities are drawn from the condensed combined debtors-in-possession balance sheet in Delphi's annual report for the fiscal year ended December 31, 2007 as filed by Delphi with the United States Securities and Exchange Commission on Form 10-K on February 19, 2008.

[5] This illustration assumes that achieving the maximum EBITDAR target will result in the aggregate maximum opportunity, which is not necessarily the case. Most Covered Employees' opportunities are based on a mix of corporate- and division-level performance. Thus, if Delphi reaches its maximum EBITDAR target and at least one division does not achieve its maximum OIBDAR target, the aggregate earned opportunity will be less than the aggregate maximum opportunity.

12

WHEREFORE, the Debtors respectfully request that this Court enter an order in substantially the same form as the form of Fourth Supplemental Order Under 11 U.S.C. §§ 105 And 363 Authorizing Debtors To Continue Short-Term At-Risk Performance Payment Program ("AIP") For First Half Of 2008 attached to this Fourth Supplement as <u>Exhibit A</u>, and grant the Debtors such other and further relief as is just.

Dated:  New York, New York
        February 28, 2008

         SKADDEN, ARPS, SLATE, MEAGHER
          & FLOM LLP

         By: <u>/s/ John Wm. Butler, Jr.</u>
            John Wm. Butler, Jr. (JB 4711)
            John K. Lyons (JL 4951)
            Albert L. Hogan, III (AH 8807)
            Ron E. Meisler (RM 3026)
         333 West Wacker Drive, Suite 2100
         Chicago, Illinois 60606
         (312) 407-0700

                - and -

         By: <u>/s/ Kayalyn A. Marafioti</u>
            Kayalyn A. Marafioti (KM 9632)
            Thomas J. Matz (TM 5986)
         Four Times Square
         New York, New York 10036
         (212) 735-3000

         Attorneys for Delphi Corporation, <u>et al.</u>,
          Debtors and Debtors-in-Possession

13