**Hearing Date And Time: March 19, 2008 at 10:00 a.m.**
**Objection Deadline: March 12, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 1121(d) EXTENDING
DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE
AND SOLICIT ACCEPTANCES OF REORGANIZATION PLAN

("SIXTH § 1121(d) EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 1121(d) further extending the Debtors' exclusive periods within which to file and solicit acceptances of a plan of reorganization, and respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.  On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the

2

First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

4. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5. The statutory predicate for the relief requested herein is section 1121(d) of the Bankruptcy Code, as amended and in effect on October 8, 2005.

B.  Current Business Operations Of The Debtors

6. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-

---

[1] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

3

U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

7.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.  Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

C.    Events Leading To The Chapter 11 Filing

9.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

10.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

12.     On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.     Confirmation Of The Debtors' Plan Of Reorganization

13.     The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order.  With the Plan confirmed, the Debtors are focusing their efforts on satisfying the conditions for the Plan to become effective and allow them to

6

emerge from chapter 11. The Debtors anticipate having the Plan become effective as soon as reasonably practicable.

14. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

15. As set forth in the Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan (Docket No. 11565) entered by this Court on December 20, 2007, the Debtors have the exclusive right to file one or more reorganization plans through and including March 31, 2008 (the "Plan Proposal Period") and the exclusive right to solicit and obtain acceptances for those plans through and including May 31, 2008 (the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods"). As noted above, the Debtors did in fact file a plan, solicit acceptances of that plan, and obtain confirmation of it. The Confirmation Order became final on February 4, 2008.

16. Because the Court may confirm only one plan of reorganization, see 11 U.S.C. § 1129(c), no other plan of reorganization may now be filed in these cases.

Therefore, it is solely out of an abundance of caution that the Debtors move to extend the Exclusive Periods to prevent any lapse in exclusivity.

17. The Debtors seek entry of an order further extending the Plan Proposal Period through and including May 31, 2008 and the Solicitation Period through and including July 31, 2008 without prejudice to the Debtors' right to seek further extensions of the Exclusive Periods. Although the Debtors are requesting a two-month extension,[4] the Debtors nonetheless anticipate having the Plan become effective as soon as reasonably practicable.

Basis For Relief

18. The Exclusive Periods are intended to afford chapter 11 debtors a full and fair opportunity to rehabilitate their businesses and to negotiate, propose, confirm, and consummate a reorganization plan without the deterioration and disruption of their businesses that might be caused by the filing of competing reorganization plans by non-debtor parties.

19. A further prophylactic extension of the Exclusive Periods is justified here by the significant progress the Debtors have made toward emerging from chapter 11 since they last sought an extension of the Exclusive Periods. The Debtors have developed, solicited, and achieved confirmation of a reorganization plan that was accepted by 81% of their creditors and 78% of their stockholders. Upon the effective date of the Plan, comprehensive settlements with GM, Delphi's U.S. labor unions, and other settling parties

---

[4] The Debtors sought five- and six-month extensions in their first four motions and a three-month extension in their fifth motion to extend the Exclusive Periods.

8

will be implemented. All of this was the result of diligent work by the Debtors over many months.

20. The Debtors' efforts were affected by severe dislocations in the capital markets that began late in the second quarter of 2007 and that have continued through the first quarter of 2008. This turbulence in the capital markets was a principal cause of the delay in the Debtors' emergence from chapter 11 before the end of 2007. And the continued turbulence constitutes an additional factor justifying a further extension of the Exclusive Periods. Moreover, as further detailed below, the Debtors have accomplished numerous other tasks related to many different aspects of the case in an effort to emerge from chapter 11 protection. The unresolved contingencies relating to fully committed exit financing and the size and complexity of the Debtors' cases also justify a further extension of the Exclusive Periods.

Applicable Authority

21. Section 1121(d) of the Bankruptcy Code permits the court to extend a debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

11 U.S.C. § 1121(d). The court in <u>In re McLean Industries, Inc.</u>, 87 B.R. 830 (Bankr. S.D.N.Y. 1987), identified the following factors as relevant to the determination of "cause" to extend a debtor's Exclusive Periods:

    (a)    the existence of good-faith progress toward reorganization;

9

      (b)    existence of an unresolved contingency;

      (c)    the size and complexity of the debtor's case;

      (d)    a finding that the debtor is not seeking to extend exclusivity to pressure creditors "to accede to [the Debtor's] reorganization demands"; and

      (e)    the fact that the debtor is paying its bills as they come due.

Id. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) (stating that not all factors "are relevant in every case" and court has discretion to "decide which factors are relevant and give the appropriate weight to each").

    22.    In other cases of similar size and complexity to the Debtors' cases, courts have extended the debtors' exclusive rights to propose a plan of reorganization for periods similar to those requested by the Debtors. See, e.g., In re Kaiser Aluminum Corp., Case No. 02-10429 (Bankr. D. Del. 2002) (extensions of approximately 43 months); In re UAL Corp., Case No. 02-B48141 (Bankr. N.D. Ill. 2002) (extensions of approximately 29 months). In this case, based upon the preceding factors and in line with other cases of similar size and complexity, sufficient cause exists for a two-month extension of the Exclusive Periods for a total extension of 28 months.

F.    The Debtors Have Made Good-Faith Progress Toward Reorganization

    23.    An extension of a debtor's exclusive periods is justified by a debtor's progress in resolving issues facing its creditors and estates. McLean Indus., 87 B.R. at 834; In re AMKO Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). The Debtors' progress in these cases thus far is significant and compels a further extension of the Exclusive Periods.

        (i)      <u>Plan Confirmation</u>

        24.      The Debtors' good-faith progress towards reorganization is most convincingly demonstrated by entry of the Confirmation Order on January 25, 2008. At least one court has noted that "cause may be measured by a more lenient standard in the determination to grant an enlargement of time in which to gain acceptances to a <u>filed</u> plan." <u>Gaines v. Perkins</u> (In re Perkins), 71 B.R. 294, 299 (W.D. Tenn. 1987) (emphasis added); <u>see also</u> <u>In re Express One International, Inc.</u>, 194 B.R. 98 (Bankr. E.D. Tex. 1996) (denying motion to terminate and granting motion to extend exclusivity based in part on debtors' filing of plan and disclosure statement and imminent hearing on disclosure statement).

        25.      The Plan is the product of a series of intense negotiations involving the Debtors, the Plan investors, the statutory committees, and GM. As a result of objections to the confirmation of the Plan, the Debtors also negotiated with various other stakeholders and amended certain provisions of the Plan to obtain confirmation. All of these accommodations represent the Debtors' continuing efforts to emerge from chapter 11 protection as quickly as possible so that they can maximize value for all their stakeholders. The Debtors are proceeding rapidly to satisfy all conditions to the effectiveness of the Plan.

        (ii)     <u>Claims Reconciliation</u>

        26.      One of the conditions in the Plan is that "Trade and Other Unsecured Claims," as defined in Article 1.212 of the Plan, may not exceed $1.45 billion. Although creditors have filed more than 16,750 proofs of claim asserting approximately $34.0 billion in liquidated amounts plus certain unliquidated amounts, the Debtors have made significant strides in the claims reconciliation process. As of February 28, 2008, the

Debtors have objected to approximately 13,800 claims asserting nearly $10.7 billion (plus additional unliquidated amounts) and this Court has granted relief with respect to approximately $10.2 billion in asserted liquidated claims (plus additional unliquidated claims). Thus, the Debtors have successfully reduced the aggregate amount of Trade and Other Unsecured Claims below the $1.45 billion amount set by the Plan.

   (iii) <u>Other Key Accomplishments</u>

27. In addition to the foregoing, since the Debtors last sought an extension of the Exclusivity Periods, the Debtors have also, among other things:

  (a) provided notice of intent to cure those material supply agreements that the Debtors intend to assume pursuant to the Plan;

  (b) filed Amendment No. 1 to the Form S-1 with the Securities and Exchange Commission;

  (c) obtained court approval for members of the statutory committees to have the opportunity to participate in the syndication of the exit financing;

  (d) conducted meetings in New York and London to open the syndication of the exit financing;

  (e) obtained an order estimating or provisionally allowing certain unreconciled claims for the purposes of administering the discount rights offering;

  (f) obtained court approval of the fourth 365(d)(4) contract extension motion and the fifth removal deadline extension motion;

  (g) filed an adversary proceeding against the United States to obtain a refund on behalf of the Debtors and certain of their employees of certain payroll taxes paid to the Internal Revenue Service;

  (h) filed the Form 10-K for the year ending December 31, 2007;

    (i)  entered into an agreement to sell the bearings business;

    (j)  obtained court approval of the sale of the interiors and closures business;

    (k)  obtained court approval of the sale of the steering business; and

    (l)  filed four omnibus claims objections.

  28.  In summary, the Debtors are making significant, good-faith progress toward their reorganization.

G.  Unresolved Contingencies Still Exist

  29.  Courts have also cited the need to resolve an important contingency as justification for extending a debtor's exclusive periods. Although the Court has confirmed the Debtors' Plan, the Debtors must still procure fully committed exit financing that will support implementation of the Plan and consummate all of the transactions contemplated by the Plan and Delphi's investment agreement with its Plan investors. The tasks of securing such exit financing and satisfying all other conditions to the effectiveness of the Plan and investment agreement are significant for both their magnitude and complexity and amply satisfy the contingency component described in the McLean test.

H.  These Cases Are Large And Complex

  30.  The size and complexity of the Debtors' chapter 11 cases alone constitute sufficient cause to extend the Exclusive Periods. See, e.g., In re Texaco Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987); In re United Press Int'l, Inc., 60 B.R. 265, 270 (Bankr. D.D.C. 1986) ($40 million company granted extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan.").

13

These and other authorities show that in large, complex chapter 11 cases, courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, formulate a long-term business plan, and timely obtain confirmation of a plan of reorganization.

31.     The Debtors' cases are indisputably large and the multi-lateral and the multi-dimensional scope of actions that must be taken to address Delphi's restructuring requirements are exceedingly complex.  A review of certain basic statistics noted above makes the foregoing conclusion self-evident.  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods under the foregoing authorities.  Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous significant issues that are unique to the automobile industry (an industry which, as a whole, is in distress) and some that affect most large businesses that rely on the capital markets.  The extension of the exclusive periods is necessary to continue progress in addressing these complexities.

I.      The Debtors Are Using Exclusivity For A Proper Purpose

32.     Courts have denied extensions of exclusive periods when plan negotiations among parties in interest have broken down and the continuation of exclusivity would merely give the debtor unfair bargaining leverage over the other parties in interest.  See Teachers Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in the Woods), 10 B.R. 338, 345 (E.D. Mich. 1981).  Here, the Debtors' request for an

14

extension of the Exclusive Periods is not a negotiation tactic.  To the contrary, the Plan provides for full payment at Plan value to creditors and a distribution for equity holders.  Moreover, the Debtors' stakeholders voted to accept the Plan.

J.      The Debtors Are Paying Their Bills As They Come Due

33.     Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency.  See In re Ravenna Indus., Inc., 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982).  The Debtors are paying their bills as they come due, including the statutory fees paid quarterly to the United States Trustee.  The Debtors have extended the maturity date of their $4.5 billion debtor-in-possession financing facility to July 1, 2008, which provides additional comfort to creditors and other stakeholders that the Debtors will continue to meet their obligations as they come due.

K.      The Debtors Have Shown Cause To Further Extend The Exclusive Periods

34.     As shown above, the Debtors have made significant and productive strides in these chapter 11 cases.  Based on this progress and all the other applicable factors, sufficient cause exists to extend the Exclusive Periods without prejudice to the Debtors' rights to seek a further extension.  There is no harm in granting the requested extensions now because they will be without prejudice to the right of any party to request a termination of exclusivity for cause at any time under section 1121(d) of the Bankruptcy Code.  Accordingly, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

Notice

35.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

36.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) extending the Debtors' exclusive periods (i) to file a plan of reorganization through and including May 31, 2008 and (ii) to solicit acceptance of a plan of reorganization through and including July 31, 2008 and (b) granting the Debtors such other further relief as is just.

Dated:   New York, New York
         February 28, 2008

                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP

                By:   */s/ John Wm. Butler, Jr.*
                      John Wm. Butler, Jr. (JB 4711)
                      George N. Panagakis (GP 0770)
                      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

                - and –

                By:   */s/ Kayalyn A. Marafioti*
                      Kayalyn A. Marafioti (KM 9632)
                      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession