Exhibit "A" - Modified Bench Ruling

THE COURT:  Okay.  All right.  I have before me a motion by Automodular Assemblies, Inc., and two affiliates, which, in its current form, is to allow and direct payment of an administrative expense claim.  It originally also sought to compel assumption or rejection of the executory contracts upon which the administrative expense claim is based, but pursuant to their chapter 11 plan, the debtors have sought to assume those contracts.  So that portion of the motion is moot.

In seeking to compel payment of a disputed administrative claim, Automodular has the burden of proof to demonstrate administrative expense priority, to show that its services were both necessary and beneficial and of a post-petition nature.  See In re Bethlehem Steel Corporation, 479 F.3d. 167, 172 (2d Cir. 2007), as well as In re Drexel Burnham Lambert Group Inc., 134 B.R. 482, 489, (Bankr. S.D.N.Y. 1991).

Generally speaking, and I don't believe the debtors would dispute that this is the case here, the proper measure of an administrative expense for purposes of the "benefit to the estate" requirement is based upon the price contained in the agreement that the parties have negotiated.  But the debtors hotly dispute whether under

their agreements with Automodular the amounts claimed by Automodular are, in fact, due and owing.

The two relevant agreements are, first, a series of purchase orders attached as Exhibit A to Christopher Dell's declaration in support of Automodular's motion, which provide for the purchase by a Delphi subsidiary, Delphi Thermal and Interior, of various parts from Automodular, and, second, a long-term contract between Delphi Automotive Systems and Delphi Thermal and Interior, as buyer, and Automodular, as seller, pertaining to the purchase by Delphi of parts from an Ontario plant.

The first contract, which I'll refer to as the U.S. contract, expressly incorporates by its terms the "general terms and conditions" of Delphi, which are attached also to Mr. Dell's declaration, falling immediately behind the Ontario contract at Exhibit C. The Ontario contract also expressly incorporates, with one revision found in paragraph 6 that's irrelevant to this dispute, the "general terms and conditions."

Both contracts are very clearly requirements contracts. The purchase orders are so labeled and provide for the purchase of roughly a hundred percent – "approximately a hundred percent" -- of Delphi's requirements from Automodular. The Ontario contract also

2

is a standard form requirements contract providing in the first paragraph that seller agrees to sell and buyer agrees to purchase approximately one hundred percent of buyer's production and service requirements for the following products.

The two most significant issues raised by Automodular's motion both pertain to the proper interpretation of these two agreements -- again, both of which incorporate the "general terms and conditions" of Delphi -- as they pertain to reductions in Delphi's requirements under the agreements. Under Michigan law, which I believe applies here (it expressly applies under the U.S. contract), the primary goal in the construction or interpretation of any contract is to honor the parties' intent. The Court must "look for the intent of the parties in the words used in the instrument." Where the words used by the parties are clear and unambiguous, the Court "does not have a right to make a different contract for the parties or to look to extrinsic testimony to determine their intent." <u>UAW-GM Human Resource Center v. KSL Recreation Corp.</u>, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998). This also is a statement of the general common law rule of contract interpretation.

Consequently, in determining the issue that I've

just identified, I've reviewed the contracts and asked myself whether their words are so clear and unambiguous as to provide the answer as to the parties' intent. And I have concluded that that is, in fact, the case.

Let me first note that Michigan law does contain a backdrop to this general contract interpretation principle, which is that, under Michigan law, common law governs a contract for services, including a requirements contract, and a requirements contract is one in which the quantity term is not fixed at the time of contracting and the parties agree will be the buyer's needs or requirements for a specific commodity or service over the life of the contract. See J & B Sausage Co. v. Dep't of Management & Budget, 2007 WL 28409, at *3 (Mich. Ct. App. Jan. 4, 2007). As set forth in that case, Michigan law clearly recognizes the validity of requirements contracts. Indeed, under Michigan law a party's requirements may be reduced to zero without constituting a breach of contract, if that reduction in requirements is in good faith and based on a valid business judgment and not in an effort to avoid the output contract or agreement. See Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1126 (3d Cir. 1992). See also Wiseco., Inc. v. Johnson Controls Inc., 155 Fed. App. 815, 817 (6th Cir. 2005), which collects cases and finds

4

that the majority of courts have permitted good faith reductions in requirements contracts even though the reductions may be highly disproportionate to stated estimates.

Here Automodular has made no allegation of bad faith. And it appears clear from the record that the reduction in the volume of the debtors' requirements was due to a decision by the debtors' buyer, GM, to reduce the number of parts that it needed from Delphi, including by eliminating one vehicle line, not as a result of the debtors' bad faith.

Automodular does not quarrel with this generally well settled law (except in one limited respect which I don't accept, which is that Delphi owed some additional duty to Automodular, given Automodular's investment, not to reduce its requirements without compensation under the common law. I believe the case cited for that proposition by Automodular, Schawk, Inc. v. Donruss Trading Cards, Inc., 746 N.E.2d 18 (Ill. Ct. App. 2001), does not stand for that proposition).

What Automodular bases its claims upon, however, is a specific provision of the "general terms," Section 3, entitled "Specification, Design and Scope Changes." That provision states "buyer may, at any time, require seller to

5

implement changes to the specifications or design of the goods or to the scope of any services or work covered by this contract, including work related to inspection, testing or quality control.  While buyer will endeavor to discuss any such changes with seller as early as practical, seller will promptly implement such changes.  Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including buyer's payment of reasonable costs of modifications to seller's equipment necessary to implement such changes."

Automodular contends that when Delphi and Delphi Thermal reduced their requirements, as stated in the two agreements, they changed the scope of the services or work covered by the contract.  It should be clear, however -- the record is clear -- that except as I'll note in connection with one minor issue involving foam pads and screws, the reduction in requirements did not entail any change to the product that was being assembled and delivered pursuant to the requirements contract.

Automodular contends that the reduction in the amount of volume or the amount of requirements constitutes, as I noted, a change in "scope of services or work covered."  I conclude, however, that when one reads the contract as a whole, particularly noting that it's a

6

requirements contract pursuant to which specific parts would be delivered at specific prices, this interpretation is clearly not what the parties intended.  I say that primarily because of sections of the "general terms and conditions" preceding Section 3 -- Section 2.5, as well as 2.7.

        Section 2.5 provides that "deliveries will be made in the quantities, on the dates and at the times specified by the buyer in this contract or any subsequent releases or instructions buyer issues under this contract." Continuing to the last relevant provision of this paragraph, the parties agree that "if the requirements of buyer's customers or market, economic or other conditions require changes in delivery schedules, buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling seller to a price adjustment or other compensation."  In other words, the buyer controls the timing of deliveries and quantities of specified product, without a change in seller's compensation.

        Section 2.7 provides, further, that "buyer may provide seller with estimates, forecasts or projections of its future anticipated volume or quantity requirements for goods.  Seller acknowledges that any such forecasts are

7

provided for informational purposes only, and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guarantee or commitment of any kind or nature, express or implied, regarding any such forecasts provided to seller, including with respect to the accuracy or completeness of such forecasts."

      Automodular argues that notwithstanding that language in Sections 2.5 and 2.7 and the fact that the volume forecasts provided in the Ontario contract are specifically labeled "estimate," the parties agreed that a specific number of goods in a specific sequence with a specific guaranteed cost to Automodular would be provided, and that if that cost varied by more than ten percent Automodular would be compensated for it. Now, the problem with this argument is that that supposed agreement appears nowhere in the contracts and runs contrary to the open-ended language of section 2.5 as well as the general nature of a requirements contract and the express language of paragraph 2.7, which makes it absolutely clear that buyer makes no commitment as to any provision of a specific forecast of anticipated volume of goods.

      Given the integration provision of paragraph 29

8

of the "general terms" -- which are, again, expressly incorporated in both the U.S. and Ontario contracts -- the inquiry should end there, and there's no basis for looking beyond it to parole evidence.  See Cook v. Little Caesar Enterprises, Inc., 210 F.3d 653, 656 (6th Cir. 2000).  To adopt a contrary reading of the agreement, that is to read it, as Automodular would suggest, to provide for an equitable adjustment in price whenever there would be a material change in Delphi's requirements would run completely counter to the other terms of the agreement that I've quoted.  I believe it would also, in the case of the Ontario agreement, run counter to paragraph 3 thereof, which specifically provides for set pricing per unit, as set forth on the attached Exhibit A, and states that "no price increases will be made on account of, among other things, any increases in seller's labor, materials, overhead and other costs."

As noted by Mr. Dell during his testimony, and also in Automodular's papers, the calculation of Automodular's administrative claim for what Automodular terms "de-rating," as well as the alleged partial termination because of the elimination of one vehicle model by GM leading to termination of parts for the GM X231 part in 2007, is based upon changed labor calculations for

9

running the assembly as well as the time cost of money. And again, I believe that the parties clearly provided that neither such costs are properly chargeable as a result of a reduction in Delphi's requirements, which Mr. Dell acknowledged during cross-examination was the result of, or the proper way to look at, the termination of the part for the GM X231 in light of GM's decision and the continued production of that part, nevertheless, for Delphi's remaining, albeit reduced, requirements. Thus, consequently, I believe, in each case all that occurred in respect of the second approximately 322,000 dollar claim of Automodular was a reduction of Delphi's requirements, which it bargained to be treated as I've described already.

The parties also dispute some related claims, and I'll go through those in order now, although I should reiterate before doing so that in each case the burden is on Automodular to establish the proper amount of each of these claims.

The first issue is an additional part that GM required to be added to the product it had ordered from Delphi and, therefore, Delphi required to be added by Automodular -- a foam pad. The dispute here is over the proper amount attributable, on an equitable basis under Section 3 of the "general terms and conditions," to the

10

addition of this new part to the assemblage.  That is, Delphi acknowledges that this change would, indeed, be a change to the "scope" originally bargained for since the part itself requires an additional step for assembly.

The evidence is clear that effective January 2006 Automodular contended that its service cost that's properly compensable under paragraph 3 would be five cents per foam pad or per part to represent the additional labor involved in the assemblage.  On the same calculation basis, however, it subsequently raised the amount to 11.8 cents, but it apparently did so retroactively to the date that it originally, on the same theory, was prepared to take five cents.

First, to the extent that any of this cost is attributable to a pre-petition period, which I don't believe to be the case, but if any of it is attributable to a pre-petition period, it's not compensable as an administrative expense until the debtor actually assumes the agreement.

As far as the post-petition expense incurred is concerned, the compensable amount should reflect the actual costs at the time that the work was done, and consequently it appears to me, on its face, that Automodular's claim is overstated by more than two times, at least for some period

11

in question. It's Automodular's burden to prove what the proper amount is, and it has clearly failed to do that. So this claim is denied without prejudice to establish the proper amount on a basis that reflects the actual cost during the time that the additional services and the assemblage involving the foam pad were undertaken.

Secondly, Delphi has sought a recoupment or refund under the agreements, which it has the right to do, generally, for savings undertaken by Automodular in respect of something called a "grease application." The parties acknowledge that the proper calculation of this amount is approximately 183,000 dollars and that it is a savings that Automodular has received. Apparently Automodular contends that, notwithstanding their agreement on the amount, no provision of the contracts at issue provide for passing on the savings to Delphi. To the contrary, I believe that paragraph 5 of the Ontario contract does provide for passing on such savings as long as they were obtained pursuant to the "creative improvement plan" referred to in that paragraph.

It was Mr. Dell's testimony that the grease application was included in the discussions and implementation of the creative improvement plan. And I believe this is a quote in response to one of my questions

12

as to whether the savings resulted as that plan "bore fruit" approximately one year later.  Consequently, I believe that it is covered by paragraph 5, the "savings initiative" provision of the Ontario agreement and, therefore, that the credit is due under the contract.

There is also a dispute over an additional screw that clearly would be a change in scope under the "general terms."  Delphi, apparently, is waiting to see whether in fact Automodular has incurred this cost, as opposed merely to being billed for it by Automodular's supplier.  I don't believe that Automodular has sustained its burden to show that it has incurred the cost.  Mr. Dell conceded there is no direct evidence of Automodular having paid its supplier for the screws at issue.  However, I'm sure that if and when it shows Delphi that it in fact has done so and that the cost is reasonable, Delphi will pay for it under Section 3.  So again, I'll deny this request without prejudice.

Finally, the motion seeks payment of so-called short charges of roughly 6,000 dollars, which Mr. Dell could not explain the basis for or locate in the one exhibit, Exhibit K to his declaration, purporting to show that such charges were owing.  Thus again I believe that Automodular has not sustained its burden to show that these

charges are, in fact, owing on a postpetition basis.

So let me recap: the motion is denied, although I believe the debtors will take to heart my comments on the two items where further proof may establish an amount owing under Section 3 of the "general terms and conditions." In sum, in respect again of the so-called "de-rating/requirements contract" issues, I conclude that these agreements are clearly requirements contracts and that the "general terms and conditions" make it very clear in Sections 2.5 and 2.7, that the buyer is not to bear the monetary cost of a reduction in its requirements.

The explanation offered by Automodular of Section 2.5 of the "general terms," that it applies only to a temporary shutdown of a line or other force majeure-like conditions, is clearly belied by the plain terms of that paragraph, which go far beyond such a specific limitation. And I will not read into such language any such limitations but, rather, will read Section 3 of the "general terms" to be consistent with the contract as a whole. Clearly, Section 3 must be read so as not to operate at cross purposes with the whole contract, and the only reading that is consistent, given the broad language of sections 2.5 and 2.7 (as well as paragraph 3 of the Ontario Contract, which specifically provides that no price increase will be made

14

on account of Automodular's labor, materials, overhead and other costs -- which I think properly describes the labor and time-value-of-money costs upon which Automodular bases its "de-rating" claims) is the reading that I have adopted. It seems, therefore, clear to me under Section 3 of the "general terms" that the "changes to specifications or design of the goods or to the scope of any services or work covered by the contract, including work related to inspection, testing or quality control," all go to services as well as other costs incurred by seller in dealing with changes to the nature of the goods bargained for as opposed to the amount of those goods or buyer's delivery schedules.

     So, Mr. Butler, you can submit an order to that effect.