Hearing Date & Time: March 7, 2008 at 10:00 a.m. prevailing Eastern time
Response Deadline: March 6, 2008 at 5:00 p.m. prevailing Eastern time

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

            - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
            In re                             :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
            Debtors.                          :        (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION UNDER 11 U.S.C. § 1142(b) AND FED. R. BANKR. P. 3020(d)
FOR IMPLEMENTATION OF DEBTORS' CONFIRMED PLAN OF REORGANIZATION

("SECTION 1142(b) MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby move the Court pursuant to 11 U.S.C. § 1142(b) for an order facilitating the consummation of the First Amended Joint Plan of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, as confirmed by the Court on January 25, 2008 (the "Plan") pursuant to the Confirmation Order, which became a final order on February 4, 2008.  In support thereof, the Debtors respectfully represent as follows:

Preliminary Statement

1.      The Plan is the product of more than two years of multi-party negotiations and agreements among the Debtors, the Debtors' Statutory Committees, the Debtors' principal labor unions, GM, the plaintiffs in the multidistrict ERISA and securities litigation, and the Plan Investors,[1] among others.  The Plan incorporates critical "milestone" agreements with the unions and GM that, taken together with the execution of the Debtors' other transformation initiatives, should allow Delphi to compete and grow its global automotive parts business upon emergence from chapter 11.  The Plan also incorporates the Delphi-Appaloosa Equity Purchase and Commitment Agreement (the "EPCA"), pursuant to which the Plan Investors have agreed to invest up to $2.55 billion of equity financing in reorganized Delphi.  The EPCA is itself an agreement that was developed through a process that involved intense negotiations and, at times, litigation during the past 18 months.  Taken as a whole, the complexity of the arrangements

---

[1]     All capitalized terms not otherwise defined herein have the meanings set forth in the Plan except that the term "Plan Investors" shall not include Goldman Sachs when such term is used herein to describe positions of or actions of the Plan Investors that require relief from the Court because Goldman Sachs has advised the Debtors in a letter dated February 27, 2008 attached hereto as Exhibit A that, under the present circumstances, including Goldman Sachs' understanding of the Debtors' financing proposal, Goldman Sachs will fund its commitments under the EPCA assuming that the other Plan Investors close and fund under the EPCA.

contemplated in the Plan, as well as the effort and sacrifices required to achieve these arrangements, cannot be overstated.

2.     The importance to Delphi and its stakeholders of consummating the Plan in a timely fashion is paramount. If the Plan were not timely consummated, Delphi's pathway out of chapter 11 would be cast in substantial doubt, and the results of all of the efforts, resources, and sacrifices offered up thus far in these cases would be in jeopardy. In such circumstances, Delphi would likely be required to reevaluate substantially all of the "milestone" agreements entered into during these chapter 11 cases. Practically, however, none of these theoretically adverse circumstances should have to be addressed by Delphi and its stakeholders. Delphi is poised to consummate its Plan on a timely basis assuming two events. First, the re-launch of the syndication of its exit financing facilities with GM's increased participation is successful. Second, the Plan Investors, in fact, use their reasonable best efforts to take all actions, and do all things, reasonably necessary, proper, or advisable to cooperate with Delphi and to consummate and make effective the transactions contemplated by the Plan including the EPCA as required by section 6(d) of the EPCA. The Debtors believe that the probability of the first assumption being realized (i.e., successful completion of exit financing) will be substantially increased by the realization of the second assumption (i.e., proactive cooperation and supportive actions on the part of the Plan Investors).

3.     Throughout the plan formulation, confirmation, and consummation process, the Debtors have themselves focused on using their reasonable best efforts to take all actions, and do all things, reasonably necessary, proper, or advisable to consummate and make effective the transactions contemplated by the Plan including the EPCA. These actions include working with Delphi's lead arrangers and consulting with Delphi's major stakeholders (including

the Plan Investors, GM, and the Statutory Committees) to develop an approach to Delphi's exit

financing facilities that the Debtors believe should result in the requisite exit financing being

made available to the Debtors on a timely basis.

4.        The Debtors now believe that conditions exist that will allow them to

obtain the necessary funding and proceed to consummate the Plan.[2]  This is so, in large part,

because of the extraordinary leadership recently provided by GM.  As described in detail below,

GM is now prepared to participate in Delphi's exit financing with more than $2 billion in funding

on terms superior to those that Delphi otherwise may be able to obtain.  Indeed, GM's

participation greatly increases the likelihood that Delphi will secure total exit financing to fund

the Plan and at the same time remain in compliance with the 2008 interest expense condition

contained in the EPCA.  The participation of GM in the exit financing facilities during this

difficult time in the credit markets benefits all of Delphi's stakeholders, including the Plan

Investors.

5.        Unfortunately, on February 24, 2008, ADAH asserted in writing that GM's

participation in the exit financing – on below-market terms from the Debtors' perspective –

resulted in exit financing that was non-compliant and inconsistent with the EPCA, including,

among other provisions, sections 5(p) and 5(t) of the EPCA, and is not the "Debt Financing"

contemplated by the EPCA.  ADAH also reserved all of its rights and cautioned the Debtors

---

[2]        On February 26, 2008, the Bankruptcy Court approved an order under Bankruptcy Code section 363(b) and
Bankruptcy Rule 9019 authorizing (a) an extension until March 31, 2008 for Delphi to perform its obligations
under the Pension Funding Waivers and (b) an increase of $10 million in the amounts outstanding under letters
of credit that Delphi has provided to the PBGC in connection with the Pension Funding Waivers.  On
February 27, 2008, the Internal Revenue Service issued an extension through March 31, 2008 of the Pension
Funding Waivers, and thus, the material Delphi-centric event risks disclosed at the Confirmation Hearing
should not begin to occur prior to March 31, 2008.  At that time, if the Plan is not consummated and no further
extensions or waivers were obtained, among other matters, the Pension Funding Waivers would expire, the
UAW could strike GM and Delphi under certain specified conditions, ADAH could terminate the EPCA, and
GM could terminate the GSA and MRA if the EPCA had been terminated.  On February 28, 2008, ADAH
agreed in writing to waive this termination right through April 4, 2008.

about their disclosure obligations to the proposed bank syndicate and under applicable securities laws relating to ADAH's communication to the Debtors.  Although Delphi delayed the planned re-launch of the exit financing to attempt consensually to resolve any concerns that the Plan Investors might have, ADAH informed the Bankruptcy Court that five of the six Plan Investors (excluding Goldman Sachs) share the same view and they have not withdrawn that view as of the time of the filing of this Motion.  Nevertheless, in order for the Debtors to be in a position to consummate the Plan on or before April 4, 2008, the Debtors must now move forward with the re-launch of the exit financing and the filings necessary to effectuate and commence the rights offerings contemplated under the Plan.  The timetable literally has no margin for error or slippage, and the Debtors must seek this Court's intervention and assistance in consummating the Plan as contemplated and authorized by section 1142(b) of the Bankruptcy Code.

6.      As described more fully herein, ADAH's assertions as to GM's proposed participation in Delphi's exit financing are without merit.  GM is providing the pathway to Delphi's successful emergence from chapter 11, and there is no basis in the Plan (including the EPCA), the law, or in common sense for ADAH to suggest that GM's support has rendered the exit financing not in compliance with the Plan (including the EPCA).  The Court should reject ADAH's interpretation of the EPCA.  To do otherwise would perpetuate a continuing material uncertainty that likely could impair or completely frustrate the Debtors' ability to syndicate and close their exit financing facilities on a timely basis, thus making ADAH's prophecy that the Debtors cannot consummate the Plan self-fulfilling.

7.      Although the prosecution of this Motion against the Debtors' own Plan Investors and presumptive largest equity stakeholders in the reorganized Company is difficult and awkward, it is self-evident that the Debtors are duty bound as fiduciaries to seek relief from

the Court pursuant to section 1142 of the Bankruptcy Code based on the positions taken by

ADAH with respect to the proposed exit financing.  Should the Court provide this needed clarity

and direction to the parties, the Debtors believe they will be able to move forward with all of

their stakeholders, including the Plan Investors, to consummate the Plan on a timely basis.

Background

A.    The Chapter 11 Filings

8.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors now operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

9.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders.

10.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket

No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of

Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket

No. 9264).  On December 10, 2007, the Debtors filed the Plan (Docket No. 11386) and the First

Amended Disclosure Statement with respect to the Plan  (Docket No. 11388) (the "Disclosure

Statement").  The Court entered an order approving the adequacy of the Disclosure Statement

and granting the related solicitation procedures motion on December 10, 2007 (Docket No.

11389) (the "Solicitation Procedures Order").  On January 25, 2008, the Court entered an order

confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which

became a final order on February 4, 2008.

11.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

12.    The statutory predicates for the relief requested herein are section 1142(b)

of the Bankruptcy Code and rule 3020(d) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

13.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately

$13.7 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.

14.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major automotive original equipment manufacturer ("OEM").

---

[3]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its
    worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

15.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, more than half of Delphi's revenue is generated from non-GM sources.

C.     Events Leading To The Chapter 11 Filing

16.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.  In 2005, Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  In 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

17.     The Debtors believe that the Company's financial performance deteriorated because of (a) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Debtors from exiting non-profitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs, (b) a competitive vehicle production environment for domestic OEMs resulting in a reduction of GM's annual U.S. production and related pricing pressures, and (c) increasing commodity prices.

8

18.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

19.     On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.     The Debtors' Plan Of Reorganization

20.     The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases.  The GSA and the MRA provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order.  With the Plan confirmed, the Debtors

are focusing their efforts on satisfying the conditions for the Plan to become effective and allow

them to emerge from chapter 11. Currently, the Debtors expect to emerge from chapter 11 as

soon as reasonably practicable.

21.     The Debtors expect to emerge from the reorganization as a stronger, more

financially sound business with viable U.S. operations that are well positioned to advance global

enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to

deliver high-quality products to its customers globally. Additionally, the Company will preserve

and continue the strategic growth of its non-U.S. operations and maintain its prominence as the

world's premier auto supplier.

22.     On November 16, 2007, the Court entered an order authorizing the

Debtors to enter into a "commercially reasonable best efforts" engagement letter and fee letter

with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc.

(the "Lead Arrangers") in connection with an exit financing arrangement. At the time the

Company anticipated that the financing would consist of: (i) a senior secured first-lien asset-

based revolving credit facility in an aggregate principal amount of $1.6 billion (the "ABL

Facility"); (ii) a senior secured first-lien term facility in an aggregate amount of $3.7 billion (the

"First-Lien Loan"); and (iii) a senior secured second-lien term facility in the amount of

$1.5 billion (the "Second-Lien Loan"), of which up to $750 million would be in the form of a

note issued to GM in connection with the distributions contemplated under the Plan.

23.     On January 9, 2008, Delphi announced the commencement of the

syndication of its exit financing package to support the Debtors' planned emergence from

chapter 11 reorganization. Primarily as a result of improved operating performance and lower

than forecast capital expenditures for the 2007 fiscal year, Delphi reduced its planned exit

facilities from the previously announced $6.8 billion authorized by this Court to approximately

$6.1 billion.  Specifically, Delphi reduced the Second-Lien Loan from $1.5 billion to

$825 million, of which up to $750 million would be in the form of a note issued to GM in

connection with the distributions contemplated under the Plan.  At the time of the financing

launch in January, Delphi discussed with the Plan Investors this reduction in the amount of the

financing to be sought (going so far as to briefly delay the launch of the exit financing in order to

complete those discussions).

        24.    Pursuant to the Plan, which was confirmed with the participation and

concurrence of the Plan Investors, the Debtors are to "receive the proceeds of the Exit Financing

Arrangements, in the aggregate amount necessary to implement the Plan within the terms and

conditions previously approved by the Bankruptcy Court as described in the exit financing

engagement letter and term sheet attached [to the Plan] as Exhibit 7.14, as such term sheet may

be amended, modified or supplemented . . . ."  (Plan art. 7.14.)  The Plan, as confirmed, consists

of the Plan and all Plan Exhibits, which include, among other agreements, the MRA, GSA,

EPCA, and the union MOUs.  Relevant to exit financing, the EPCA requires that the amount of

the exit financing be "sufficient" to fund the Plan (EPCA § 9(a)(xix)) and additionally requires

that Delphi "demonstrate[], to the reasonable satisfaction of ADAH, that the pro forma interest

(cash or noncash) expense for the Company during 2008 on the Company's Indebtedness will not

exceed $585 million . . ." (EPCA § 9(a)(xx)).

        25.    During the syndication process in January 2008, it became apparent to

Delphi and the Lead Arrangers that the likelihood of consummation of the syndication in its

proposed amount, structure, and terms would be improved by GM's participation, pursuant to

which GM would purchase up to $2 billion of the First-Lien Loan and, if necessary, all of the

$825 million Second-Lien Loan without any original issue discount ("OID") and at an interest rate calculated to ensure compliance with the EPCA interest expense limitation. The aggregate effect of GM's exit financing participation will result in GM holding an up-to-$2 billion first-lien note and an up-to-$825 million second-lien note, and receiving at least $175 million in cash. GM's position in the First-Lien Loan will be junior to that of other lenders and will be subject to voting restrictions during any time period in which it holds $1 billion or more in first-lien financing. In the reasonable view of Delphi and its Lead Arrangers, this increased GM participation will allow the Debtors to obtain the remaining exit financing required to consummate the Plan.

26. On February 6, 2008, Delphi, GM, ADAH, and their respective representatives met to discuss the proposal for GM's enhanced participation in the Exit Financing Arrangements (the "Proposal") as summarized in a draft term sheet. Subsequently, in a February 13, 2008 letter (the "February 13 Letter," a copy of which is attached hereto as Exhibit B), ADAH on behalf of the Plan Investors (other than Goldman Sachs) identified their various concerns with that Proposal. Delphi responded to that letter on February 20, 2008 (a copy of which response is attached hereto as Exhibit C), explaining why the concerns of the Plan Investors (other than Goldman Sachs) were unfounded and requesting that the Plan Investors proceed with their reasonable best efforts to take all actions, and do all things, reasonably necessary, proper, or advisable to cooperate with the Debtors and to consummate and make effective the transactions contemplated by the EPCA and the Plan.[4]

---

[4]    Certain portions of Exhibit C and Exhibit D have been redacted in the publicly-filed Motion as they contain Highly Confidential information regarding proposed terms of the re-launch of the Debtors' exit financing, which has not yet occurred.

27.    Delphi planned to move forward by re-launching its exit financing facilities with GM's increased participation on February 26, 2008.  See Lenders Presentation, a copy of which is attached hereto as Exhibit D.  In a February 24, 2008 letter (the "February 24 Letter," a copy of which is attached hereto as Exhibit E), however, ADAH asserted that the Proposal is "non-compliant, and inconsistent, with the EPCA" and admonished Delphi to carefully consider its disclosure obligations to the proposed bank syndicate and under federal securities laws.  Realizing the potential impact of ADAH's letter, Delphi requested by letter (a copy of which is attached hereto as Exhibit F) that ADAH withdraw the February 24 Letter and use its reasonable best efforts to support the Debtors' efforts to procure exit financing, close the EPCA, and consummate the Plan.  ADAH has refused to withdraw its February 24 Letter, and continues to stand by its unsupported position as to the compliance of Delphi's exit financing.  See correspondence attached hereto as Exhibit G.  Accordingly, Delphi seeks an order under 11 U.S.C. § 1142(b) implementing the Plan by interpreting the Plan (including the EPCA) with respect to the Proposal and directing each of the Plan Investors to use its reasonable best efforts to cause consummation of Plan.

<u>Applicable Authority</u>

28.    Section 1142 of the Bankruptcy Code provides that "**[t]he court may direct** the debtor and **any other necessary party** to execute or deliver . . . any instrument required to effect a transfer of property dealt with by a confirmed plan, and **to perform any other act**, including the satisfaction of any lien, **that is necessary for the consummation of the plan**." 11 U.S.C. § 1142(b) (emphasis supplied).  "Court[s] ha[ve] broad authority under §§ 105 and 1142(b) of the Bankruptcy Code to order parties to comply with reorganization plans." In re Goldblatt Bros., Inc., 132 B.R. 736, 741 (Bankr. N.D. Ill. 1991).  "In a sense, these sections

codify the bankruptcy court's inherent power to enforce its own orders." In re Chateaugay Corp.,
213 B.R. 633, 640 (S.D.N.Y. 1997). "Section 1142 . . . codifies the Bankruptcy Court's equitable
powers. . . . Courts have thus generally held that [section 1142 does] not give Bankruptcy
Judges authority to modify a confirmed Plan, rather, [it gives] Bankruptcy Judges authority to
perform acts related to the implementation and execution of a plan that are otherwise provided
for in the Bankruptcy Code." In re Baker, No. CV05-3487(CPS), 2005 WL 2105802, at *5
(E.D.N.Y. Aug. 31, 2005).

        29.    The power to enforce a confirmation order and plan necessarily includes
the power to interpret and construe the order and plan. Thus, a "bankruptcy court retains post-
confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise
over a bankruptcy plan of reorganization." See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie
Retail, Inc.), 304 F.3d 223, 230 (2d Cir. 2002) (affirming decision granting section 1142(b)
motion that requested order enjoining third party action in violation of confirmation order)
(citing Back v. LTV Corp. (In re Chateaugay Corp.), 213 B.R. 633, 640 (S.D.N.Y. 1997); In re
Johns-Manville Corp., 97 B.R. 174, 179-80 (Bankr. S.D.N.Y. 1989)).

        30.    Moreover, section 1142(b) "expressly authorizes the court to direct a
recalcitrant debtor or other party to perform acts necessary to consummate the plan." In re
Riverside Nursing Home, 137 B.R. 134 (Bankr. S.D.N.Y. 1992) (citing In re Goldblatt, 132 B.R.
at 741), aff'd sub nom. Riverside Nursing Home v. N. Metro. Residential Health Care Facility,
Inc., 977 B.R. 78 (2d Cir. 1992). This authority includes directing a debtor to sign a receiver
agreement, see Riverside Nursing Home, 977 F.2d at 81, and directing third party investors to
fund a confirmed plan. In Official Unsecured Creditors Committee of Erie Hilton Joint Venture
v. Siskind (In re Erie Hilton Joint Venture), 137 B.R. 165 (W.D. Pa. 1992), the court found that a

group of investors had committed to invest cash to fund a proposed plan of reorganization. When certain investors failed to provide their committed funds after plan confirmation, the court held that under section 1142(b) it retained jurisdiction to oversee execution of the confirmed plan and that the "[c]onfirmed [p]lan must be read so as to include the provisions of all documents which were confirmed together to form the contract." Id. at 170-71. "Thus, the Bankruptcy Code contains the requisite basis for the Court to interpret the [c]onfirmed [p]lan and to compel the Defendants to fund the [c]onfirmed [p]lan . . . ." Id. at 170; see also Paul v. Monts, 906 F.2d 1468, 1476 n.10 (10th Cir. 1990) (remedies for investor's failure to provide capital required by plan included compelling contribution under section 1142(b)). Section 1142, therefore, provides bankruptcy courts with the power to direct third parties to take all actions required by a confirmed plan of reorganization to consummate the plan.[5]

Basis For Relief

F.      The Proposed Exit Financing Complies With The Plan

31.     The Plan that the Court confirmed on January 25, 2008 included a provision that would allow Delphi the flexibility to obtain exit financing within the terms of the

---

[5]      Although the creditors' committee in Erie Hilton Joint Venture elected to seek to compel the investors to fund the plan by filing a complaint, see 137 B.R. at 166, 169, the Second Circuit in Riverside Nursing Home affirmed an order of the bankruptcy court which had permitted the third party to seek by application a section 1142(b) order compelling the debtor to sign a receiver agreement. See 977 F.2d at 79; see also Petrie Retail, Inc., 304 F.3d at 227 (affirming order that granted asset purchaser's motion in aid of consummation of plan and enjoined landlord's action in nonbankruptcy forum in contravention of sale order); Paul, 906 F.2d at 1476 n.10 (remedies for investor's failure to provide capital required by plan included section 1142(b) motion to compel contribution); Fed. R. Bankr. P. 3020(d) ("Notwithstanding the entry of the order of confirmation, the court may issue any other orders necessary to administer the estate."). Such relief may be granted sua sponte or on motion of a party-in-interest. In Jordan v. Attalla Golf & Country Club, Inc. (Attalla Golf & Country Club, Inc.), 181 B.R. 611 (Bankr. N.D. Ala. 1995), the bankruptcy court noted with respect to a section 1142(b) motion that "[t]he relief sought by the plaintiff does not fall into the traditional 'equitable relief' that would require a trial. The proponent merely seeks to enforce an order of the Court. Congress provided the bankruptcy courts power to implement a plan." Id. at 614. Because the court "may issue any other orders necessary to administer the estate" under Fed. R. Bankr. P. 3020(d), "[t]hese powers may be invoked sua sponte by the court, so certainly a party may ask the court to invoke these powers without the filing of adversary proceeding." Id.

exit financing approved by this Court on November 16, 2007 (Docket No. 10960).  Specifically,

section 7.14 of the Plan provides:

> On the Effective Date, the Reorganized Debtors shall receive the proceeds of the
> Exit Financing Arrangements, in the aggregate amount necessary to implement
> the Plan and within the terms of the conditions previously approved by the
> Bankruptcy Court as described in the exit financing engagement letter and term
> sheet attached hereto as Exhibit 7.14, as such term sheet may be amended,
> modified, or supplemented, to repay the DIP Facility Revolver Claims, the DIP
> Facility First Priority Term Claims, and the DIP Facility Second Priority Term
> Claims, make other payments required to be made on the Effective Date, satisfy
> the conditions of the Investment Agreement, and conduct their post-
> reorganization operations.  The Reorganized Debtors may execute all documents
> and enter into all agreements as may be necessary and appropriate in connection
> with the Exit Financing Arrangements.

32.    The Plan itself places only two express constraints on the exit financing:

that it be in an amount sufficient to implement the Plan and that it be within the terms of the

conditions previously approved by the Bankruptcy Court.  There can be no dispute that the

currently contemplated exit financing package is sufficient to fund the Plan.  The Court made

this finding in the Confirmation Order (see Confirmation Order ¶ X ("The Court finds that the

Plan is feasible, notwithstanding that a firm commitment for exit financing was not entered into

as of the Confirmation Hearing.")), and the aggregate dollar amount of financing contemplated

by the Proposal is the same amount contemplated at the time of confirmation.  Moreover, the

terms of the Proposal, including the up-to-$2 billion originating from GM, are within the terms

of the conditions previously approved by the Bankruptcy Court and were designed to comply

with the interest expense cap provision of the EPCA.  Consequently, the parameters of the

contemplated exit financing fall within the terms of the confirmed Plan and no amendment to the

Plan is necessary to allow Delphi to consummate the exit financing arrangements.

33.    Likewise, under the terms of the Proposal, the GSA does not require

amendment.  Under the confirmed Plan, GM is to receive junior preferred convertible stock with

a liquidation preference of $1.073 billion, $750 million in cash, up to $750 million in a second-lien note, and a $1.5 billion note in exchange for GM's assumption of certain pension liabilities (to be payable within ten days of the section 414(l) transfer date). Through these transactions and distributions under the Plan, GM would receive $2.25 billion in cash, a $750 million second-lien note, and junior preferred convertible stock.

34.    GM is converting some of the cash it receives through the Plan into an up-to-$2 billion note and has also agreed to take on additional second-lien debt if that debt is not otherwise placed in the market. The Plan requires that the Debtors and GM execute the 414(l) transfer, the Debtors repay the 414(l) Note within ten days of the transfer, the Debtors make a $750 million cash distribution to GM, and the Debtors distribute a $750 million second-lien note to GM. Through a series of steps[6] that give effect to the Plan provisions and the Proposal, the aggregate effect of GM agreeing to such participation in Delphi's exit financing is that GM will be left with at least $175 million in cash, an up-to-$2 billion tranche of the exit financing, and a second-lien note. Consequently, the distributions made by Delphi to GM conform to the terms of the Plan and the requirements of the GSA.[7]

G.    The Proposed Exit Financing Complies With The EPCA

35.    The Proposal satisfies the requirements of the EPCA because it does not alter the amount of exit financing previously deemed sufficient by the Plan Investors and it

---

[6]    After effectuating the 414(l) transfer, Delphi will issue the 414(l) Note to GM, as required by the Plan. Consistent with the Plan and the GSA, the 414(l) Note will be repaid immediately upon Delphi's receipt of the exit financing. Delphi will also distribute, pursuant to the Plan, $750 million in cash to GM and a second-lien note in the amount of $750 million. To the extent that Delphi is unable to place additional second-lien debt in the marketplace, Delphi will issue to GM an additional second-lien note in the amount of up to $75 million, with the corresponding amount of cash flowing back to Delphi. GM will also receive the junior preferred convertible stock.

[7]    Even if the net distribution after giving effect to GM's participation in the exit financing could be viewed as a Plan change, GM is consenting to the change (which essentially replaces cash for a note of up to $2.0 billion on terms that are very favorable to the Debtors) and the change is not to the detriment of other creditors.

17

provides for aggregate interest expense for 2008 that is within the agreed limitation.[8] The EPCA does not specify necessary terms for the Company's exit financing but rather provides two principal closing conditions that the exit financing must meet. First, like the Plan, the EPCA requires that the amount of the exit financing be "sufficient" to fund the Plan. (EPCA § 9(a)(xix).) Second, the EPCA requires that the Company's aggregate interest expense for 2008 not exceed $585 million. (EPCA § 9(a)(xx).) Nothing in the EPCA requires "broad" syndication[9] or prohibits GM's participation in the Company's exit financing.

      (i)      The Amount Of Financing Is Unchanged And Remains Sufficient

      36.      The Proposal does not change the aggregate amount of financing and ADAH does not seriously contend that the Proposal fails to meet the "sufficiency" test. The EPCA requires only that the exit financing be "sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan." (EPCA § 9(a) (xix).) Although ADAH recently stated in the February 13 Letter that they "continue to be very concerned that the Proposal would leave the Company underfinanced, especially in light of recent market turmoil and economic forecasts" (Exhibit B at 2), the aggregate dollar amount sought in the exit financing has not changed since the Court confirmed the Plan and determined that it was feasible.

---

[8]    The $585 million interest rate limitation for aggregate interest expense in 2008 is designed to capture actual economic costs to the Debtors accruing from and after the Effective Date (pro-rated for the number of post-emergence days in calendar year 2008). This limitation does not apply to interest accretion associated with or related to pre-emergence interest expense (such as interest accreting under the DIP facility) or to fresh start accounting occurring in connection with the Effective Date of the Plan.

[9]    See Exhibit B at 2.

37.    ADAH's only specific claim related to "sufficiency" – that "the exit financing required by the EPCA do[es] not include [OID]"[10] – is without merit.  It is nonsensical to refer to a particular term as having been omitted from "the exit financing required by the EPCA" because, as discussed above, the EPCA does not specify necessary terms for the Company's exit financing beyond the "sufficiency" and "interest expense" conditions.  The 10% OID term for the publicly syndicated debt does not conflict with any condition of the EPCA. Indeed, Section 9(a)(xx) of the EPCA clearly recognizes that the exit financing was likely to include OID by specifically providing that "pro forma interest expense shall be computed in accordance with GAAP and shall include cash and non-cash components, including, for example, accretion of discounts and amortization of related fees."  Moreover, the Financing Letter also expressly contemplated that the term facilities might include OID.  The letter provides that the Company may choose to increase the amount of First-Lien Loan, or draw from the ABL Facility, in an amount equal to any such "upfront fees or original issue discount."  Exhibit H at A 3-4.

(ii)    The Proposal Assures Compliance With The Interest Expense Condition

38.    ADAH also does not expressly contend that the Proposal fails to meet the "interest expense" condition, which requires the Company to "demonstrate[], to the reasonable satisfaction of ADAH, that the pro forma interest (cash or noncash) expense for the Company during 2008 on the Company's Indebtedness will not exceed $585 million . . . ."  (EPCA § 9(a)(xx).)  Indeed, the Proposal contemplates discounting GM's interest rate to the extent necessary to bring the Company's total interest expense within the cap.  This mechanism

---

[10]    See Exhibit B at 2.

essentially ensures the Proposal's compliance with the "interest expense" condition because compliance risk is allocated to GM and not the Plan Investors.[11]

       (iii)     <u>The Proposal Does Not Breach EPCA Representations, Warranties, Or Covenants</u>

       39.     Contrary to ADAH's assertions, the Proposal also does not violate any of the other representations, warranties, or covenants contained in the EPCA. In its February 24 Letter, ADAH primarily contends that the Proposal would breach two covenants in the EPCA. First, ADAH contends that section 5(p) prohibits GM's participation in the exit financing because it would constitute a non-ordinary-course agreement between GM and the Company that would be prohibited under the EPCA. Second, ADAH contends that any deviation from the indicative terms contained in the Financing Letter breaches section 5(t) of the EPCA.

       (a)     <u>The EPCA Does Not Prohibit GM's Participation In Exit Financing</u>

       40.     Although the EPCA does not expressly prohibit GM's participation in the Company's exit financing, ADAH contends that the Proposal violates the covenant in the EPCA relating to the GM Settlement. Section 5(p) of the EPCA provides that "[t]he Company has delivered to ADAH" the documents constituting the "GM Settlement" and "shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Plan Investors' proposed investment in the Company." When read in context,

---

[11]    In the February 13 Letter, ADAH also states that they "do not believe that amortizing the OID over four years is appropriate," (<u>Exhibit B</u> at 2), because ADAH would prefer that amortization of OID be accelerated from the seven-year term of the loan (i.e., what GAAP would require) to an arbitrary period of one to two years. ADAH's approach would have the effect of increasing the amount of OID that would fall within the 2008 interest expense limitation by 3.5x to 7x. Sophisticated parties could have provided for this non-GAAP treatment, but did not. In an effort to accommodate the Plan Investors, the Proposal does amortize the OID on the $1.7 billion facility over a four-year period and comprehends such amortization when setting the interest rate on GM's up to $2 billion note. Given the anticipated seven-year term of the facility and the corresponding seven-year amortization pursuant to GAAP, the proposed amortization of OID over four years is a substantial concession to the Plan Investors not required by the EPCA. In any event, there are no circumstances in which the EPCA can be interpreted to require accelerated OID amortization on a non-GAAP basis.

section 5(p) was designed to protect the Plan Investors and the Company from unfavorable

amendments to the GM Settlement or GM's procurement of non-ordinary course agreements that

benefited GM to the detriment of the Plan Investors and the Company.  Nevertheless, ADAH

apparently now contends that GM is precluded from participating in the Company's exit

financing because to do so would constitute a GM agreement that was intended to be

comprehended within the scope of section 5(p) and, if so comprehended, would be outside the

ordinary course of business.  See Exhibit E at 1.  In fact, however, neither GM's participation in

the exit financing nor its acceptance of the notes in lieu of cash requires any amendment to the

GSA, MRA, or Plan or, for that matter, any other kind of agreement that would be

comprehended within the scope of section 5(p).  ADAH's arguments to the contrary must fail.

41.     There is also no basis to construe section 5(p) to prohibit GM from

providing financing to the Company on terms more favorable than the terms of the proposed $1.7

billion public tranche of the First-Lien Loan.  To the extent GM's participation in the exit

financing is viewed as affecting GM's treatment under the Plan, such treatment is uniformly less

favorable to GM and more favorable to the Debtors.  Under the proposed exit financing facilities,

GM would purchase up to $2 billion of first-lien financing and increase its second-lien financing

participation from $750 million to up to $825 million – effectively providing the Company with

up to $2.075 billion of the cash the Company must distribute to GM in connection with

consummation of the Plan and potentially reducing the cash portion of GM's recovery to as little

as $175 million.  GM's portion of the exit financing would be funded under materially less

favorable terms than the $1.7 billion publicly financed tranche because it will be junior, will not

have OID, will bear an interest rate sufficiently discounted to ensure compliance with the interest

expense limit in the EPCA, and will include significant voting restrictions during any time period in which GM holds $1 billion or more in first-lien financing.

(b)    The EPCA Does Not Incorporate Particular Financing Terms

42.    ADAH apparently contends that the terms "Bank Financing" and "Debt Financing" as defined in section 3(qq) of the EPCA and referenced in section 5(t) of the EPCA import into the EPCA the indicative terms of the Financing Letter because section 3(qq) defines these terms with reference to the Financing Letter.  Carried to its logical conclusion, ADAH's argument is that the Company must obtain the exact financing terms described in the Financing Letter, including a $1.6 billion ABL Facility, a $3.7 billion First-Lien Loan, and a $1.5 billion Second-Lien Loan, of which up to $750 million would be in the form of a note issued to GM.  Under this theory, GM's provision of up to $2.0 billion of first-lien financing and up to $825 million in second-lien financing is "not the Debt Financing" contemplated in section 3(qq) of the EPCA and is "non-compliant, and inconsistent, with" section 5(t) of the EPCA.  Exhibit E at 1.

43.    ADAH's assertions fail on several levels.  First, the plain language of section 5(t) itself contemplates that the financing described in the Financing Letter might change.  The simple fact that the financings contemplated by the Financing Letter have changed does not result in a breach of the covenant.  Second, the Financing Letter that the Company entered into with the Lead Arrangers was on a "commercially reasonable best efforts basis."  The nature of a "best efforts" syndication fundamentally means that the loans described in the Financing Letter could be subject to change.  See Standard & Poor's, A Guide to the Loan Market (October 2007), p. 8 ("A 'best-efforts' syndication is one for which the arranger group commits to underwrite less than the entire amount of the loan, leaving the credit to the vicissitudes of the market.  If the loan is undersubscribed, the credit may not close -- or may need major surgery to clear the market.").

ADAH cannot claim now that any change to the financing terms described in the Financing

Letter would breach an EPCA covenant when those terms were contemplated on a best efforts

basis.

44.    As discussed above, the EPCA requires only that the exit financing be in

an amount sufficient to fund the Plan and at an interest expense within the limitation established

in the EPCA.  Likewise, the EPCA contains a financing provision that requires Delphi to have

undrawn availability of at least $1.4 billion on its revolver.  See EPCA § 9(a)(xix).  This

provision illustrates the fact that the Plan Investors negotiated specific terms of the financing

arrangements into the EPCA in those instances that were both desirable and they were able to

obtain the Debtors' concurrence.  They cannot now successfully sustain the argument that the

Court should overlook the actual construction of the EPCA in which some financing terms are

included and others are excluded.  Indeed, the only way that ADAH can successfully assert that

the Proposal (including GM's participation in the exit financing) would result in a breach of the

representation in section 3(qq) or the covenant in section 5(t) is for the Court to accede to

ADAH's plea to ignore the plain construction of the EPCA.

45.    In sum, the Proposal meets the EPCA's express conditions for exit

financing because it provides sufficient financing to fund the Plan and achieves an aggregate

interest expense for 2008 that is within the $585 million cap.  Neither the Plan nor the EPCA

requires broad syndication of the exit financing or prohibits GM's participation in exit financing.

<u>Relief Requested</u>

46.    For the foregoing reasons, the Debtors respectfully request that the Court

enter an order pursuant to 11 U.S.C. § 1142(b) and Fed. R. Bankr. P. 3020(d) implementing the

Debtors' confirmed Plan by (i) finding that the terms of the Debtors' proposed exit financing

comply with the Plan and the EPCA, including without limitation article 7.14 of the Plan and

sections 3(qq), 5(p), and 5(t) of the EPCA, and, if consummated, would satisfy the conditions to

the effectiveness of the Plan and EPCA, respectively, in article 12.2(a) of the Plan,

sections 9(a)(xix) and 9(a)(xx) of the EPCA, and any other relevant provision of the Plan, EPCA,

or both; (ii) directing the Plan Investors, and each of them, in accordance with section 6(d) of the

EPCA, to use their reasonable best efforts to take all actions, and do all things, reasonably

necessary, proper, or advisable on their part under the EPCA and applicable laws to cooperate

with Delphi and to consummate and make effective all transactions contemplated by the EPCA

and the Plan, including the syndication and closing of the exit financing arrangements, funding

and closing of the EPCA, and all other transactions necessary to consummate the Plan; and

(iii) conducting, pursuant to sections 105 and 1142(b) of the Bankruptcy Code, periodic

Chambers conferences to receive reports from the Debtors, the Statutory Committees, the Plan

Investors, and GM regarding their reasonable best efforts to consummate the Plan and related

matters.

Notice Of Motion

47.    Notice of this Motion has been provided pursuant to the Court's

instructions during chambers conferences held on February 26, 27, and 28, 2008, and in

accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr.

P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice,

Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883)

(the "Supplemental Case Management Order"), and the Tenth Supplemental Order Under

11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014

Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

24

Administrative Procedures, entered February 4, 2008 (Docket No. 12487).  In addition, the

Debtors have complied with the Supplemental Case Management Order with respect to the filing

of this Motion and the need for expedited relief.  In light of the nature of the relief requested, the

Debtors submit that no other or further notice is necessary.

Memorandum Of Law

48.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) interpreting the Plan as described in paragraph 46 hereof, (ii) directing that the Plan Investors use reasonable best efforts to cause consummation of Plan, (iii) scheduling and conducting further Chambers conferences pursuant to sections 105 and 1142(b) of the Bankruptcy Code, and (iv) granting the Debtors such other and further relief as is just.

Dated:       New York, New York
             March 5, 2008

                              SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP


                      By:      /s/ John Wm. Butler, Jr.
                              John Wm. Butler, Jr. (JB 4711)
                              Albert L. Hogan, III (AH 8807)
                              Ron E. Meisler (RM 3026)
                      333 West Wacker Drive, Suite 2100
                      Chicago, Illinois 60606
                      (312) 407-0700

                                      - and -


                      By:      /s/ Kayalyn A. Marafioti
                              Kayalyn A. Marafioti (KM 9632)
                              Thomas J. Matz (TM 5986)
                      Four Times Square
                      New York, New York 10036
                      (212) 735-3000

                      Attorneys for Delphi Corporation, et al.,
                        Debtors and Debtors-in-Possession