**EXHIBIT H**

J.P. MORGAN SECURITIES INC.
JPMORGAN CHASE BANK, N.A.
270 Park Avenue
New York, New York 10017

CITIGROUP GLOBAL MARKETS INC.
388 Greenwich Street
20th Floor
New York, New York 10013

November 3, 2007

$5,300,000,000 Senior Secured First-Lien Credit Facilities
$1,500,000,000 Senior Secured Second-Lien Term Facility
Engagement Letter

Delphi Corporation
5725 Delphi Drive
Troy, MI 48098

Attention:    John Sheehan
              Vice President & Chief Restructuring Officer

Ladies and Gentlemen:

        You have advised J.P. Morgan Securities Inc. ("JPMorgan"), JPMorgan Chase Bank,
N.A. ("JPMorgan Chase Bank"; together with JPMorgan, the "JPMorgan Parties") and Citigroup (as
defined below and, together with the JPMorgan Parties, the "Engagement Parties" or "we" or "us") that
Delphi Corporation, a Delaware corporation (the "Borrower"), and certain of its subsidiaries (collectively,
the "Debtors") have commenced voluntary cases under Chapter 11 of Title 11 of the United States Code,
11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for
the Southern District of New York (the "Bankruptcy Court"), Case No. 05-44481 (the "Cases"). You
have further advised that you expect the Debtors to be reorganized pursuant to a Chapter 11 plan of
reorganization to be filed in the Cases (the "Plan of Reorganization"). In connection therewith, you have
further advised that the Borrower intends to obtain $6.05 billion in debt financing to be made available to
the Borrower on the effective date of the Plan of Reorganization (the "Plan Effective Date") to finance in
part the distributions to be made thereunder, to pay the fees and expenses associated therewith and for
working capital and general corporate purposes of the Borrower and its subsidiaries (the "Plan Financing
Requirements") and to issue to General Motors Corporation or one of its affiliates (collectively, "GM")
up to $750 million under a note as part of the distributions under the Plan of Reorganization. For
purposes of this letter agreement, "Citigroup" shall mean Citigroup Global Markets Inc., Citibank, N.A.,
Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citigroup shall
determine to be appropriate to provide the services and the commitments contemplated herein.

        You have further advised that the total consideration necessary for the Plan Financing
Requirements is intended to be provided through (a) a senior secured first-lien asset-based revolving
credit facility in an aggregate principal amount of $1.6 billion (the "ABL Facility"), (b) a senior secured
first-lien term facility in an aggregate principal amount of $3.7 billion plus the Backstop Amount (as

Engagement Letter

defined in Exhibit A hereto) (the "<u>First-Lien Term Facility</u>"; together with the ABL Facility, the "<u>First-Lien Credit Facilities</u>"), (c) a senior secured second-lien term facility in an aggregate principal amount of $1.5 billion (the "<u>Second-Lien Term Facility</u>"; the First-Lien Term Facility and the Second-Lien Term Facility, collectively, the "<u>Term Facilities</u>"; the First-Lien Credit Facilities and the Second-Lien Term Facility, collectively, the "<u>Credit Facilities</u>"), of which up to $750 million will be in the form of a note issued to GM (the "<u>GM Notes</u>") in connection with the distributions under the Plan of Reorganization, and (d) the proceeds from (i) an equity investment and rights offering of a combined amount of not less than $2.55 billion (the "<u>Cash Equity Infusion</u>") backstopped by investors (the "Plan Sponsors"), and pursuant to a plan (the "Equity Plan"), reasonably acceptable to the Lead Arrangers.

In that connection, you have requested that (i) JPMorgan and Citigroup agree to structure, arrange and syndicate the Credit Facilities, (ii) JPMorgan Chase Bank serve as administrative agent for each of the Credit Facilities and as collateral agent for the ABL Facility and (iii) JPMorgan Chase Bank and Citigroup (collectively, the "<u>Initial Lenders</u>") each commit to provide a portion of the aggregate principal amount of the ABL Facility.

Each of JPMorgan and Citigroup is pleased to advise you of its agreement to use commercially reasonable best efforts to assemble a syndicate of financial institutions identified by us in consultation with and reasonably acceptable to you for each of the Credit Facilities (the "<u>Lenders</u>"). Furthermore, (i) each of JPMorgan and Citigroup is pleased to advise you that it is willing to act as a joint lead arranger and joint bookrunner (each, a "<u>Lead Title Capacity</u>") for the Credit Facilities (in such capacities, collectively, the "<u>Lead Arrangers</u>"), (ii) JPMorgan Chase Bank is pleased to advise you that it is willing to act as sole administrative agent for each of the Credit Facilities and as collateral agent for the ABL Facility and (iii) each of the Initial Lenders is pleased to advise you of its commitment to provide $200 million in aggregate principal amount of the ABL Facility.  The commitment of each of the Initial Lenders to the ABL Facility is subject to the remainder of the ABL Facility being subscribed to by other Lenders pursuant to commitments in form and substance reasonably satisfactory to the Lead Arrangers. The foregoing agreements and commitments are made upon the terms and subject to the conditions set forth or referred to in this Engagement Letter and the Summary of Terms and Conditions and Annex of Availability Conditions attached as Exhibits A and B hereto (collectively, the "<u>Term Sheets</u>").

It is agreed that JPMorgan will act as the lead "left" Lead Arranger in respect of the Credit Facilities, that Citigroup will act as a Lead Arranger in respect of the Credit Facilities, and that JPMorgan Chase Bank will act as the sole administrative agent for each of the Credit Facilities and as the sole collateral agent for the ABL Facility.  It is furthermore agreed that JPMorgan Chase Bank, in consultation with you, will appoint another institution reasonably acceptable to you to serve as collateral agent for each of the Term Facilities.  You agree that no other bookrunners, agents, co-agents or arrangers will be appointed, no other titles will be awarded and no compensation (other than (i) that expressly contemplated by the Term Sheets and Fee Letters referred to below and (ii) customary fees payable in consideration of collateral monitoring services under the Term Facilities) will be paid in connection with the Credit Facilities unless you and we shall so agree; <u>provided</u>, that you may appoint up to two additional financial institutions as joint bookrunners in respect of the Credit Facilities and award other agent titles in respect of each Credit Facility to other financial institutions, so long as (i) the identity of each such other financial institution is reasonably satisfactory to the Lead Arrangers, (ii) each such other financial institution appointed as a joint bookrunner shall have committed to provide a portion of the ABL Facility which, expressed as a percentage of the aggregate commitments of all Lenders accorded a Lead Title Capacity, shall be at least equal to such financial institution's share of the economics awarded in respect of Lead Title Capacities, (iii) no such other financial institution shall receive greater aggregate economics in connection with the Credit Facilities than any of the Engagement Parties, and (iv) JPMorgan is given top left lead placement on any marketing materials prepared in connection with the Credit Facilities.  It is anticipated that the principal documentation for the Credit Facilities will be signed by the Lenders prior to

Engagement Letter

the closing thereof on the Plan Effective Date in order to provide certainty for the financing provided thereby, subject to the Lead Arrangers' satisfaction with the commitments received on such basis.

We intend to commence syndication efforts promptly, and you agree actively to assist us in completing a syndication satisfactory to us and you. Such assistance shall include (a) your using commercially reasonable efforts to ensure that the syndication efforts benefit materially from your existing banking relationships, (b) direct contact between senior management and advisors of the Borrower and the proposed Lenders, (c) as set forth in the next paragraph, reasonable assistance from the Borrower in the preparation of materials to be used in connection with the syndication (collectively, with the Term Sheets, the "Information Materials"), (d) the hosting, by us and your senior management, of one or more meetings of prospective Lenders at mutually acceptable times and places and (e) your using commercially reasonable efforts to ensure that, no later than 25 days prior to the date definitive principal documentation for the Credit Facilities is entered into, the Borrower shall have received a corporate credit rating and a rating of each Term Facility by Moody's Investors Service, Inc. and Standard & Poor's Ratings Group.

You will assist us in preparing Information Materials, including Confidential Information Memoranda, for distribution to prospective Lenders. If requested, you also will assist us in preparing an additional version of the Information Materials (the "Public-Side Version") to be used by prospective Lenders' public-side employees and representatives ("Public-Siders") who do not wish to receive material non-public information (within the meaning of United States federal securities laws) with respect to the Borrower or its affiliates and any of their respective securities ("MNPI") and who may be engaged in investment and other market related activities with respect to any such entity's securities or loans. Before distribution of any Information Materials, you agree to execute and deliver to us (i) a letter in which you authorize distribution of the Information Materials to a prospective Lender's employees willing to receive MNPI ("Private-Siders") and (ii) a separate letter in which you authorize distribution of the Public-Side Version to Public-Siders and represent that no MNPI is contained therein.

The Borrower agrees that the following documents may be distributed to both Private-Siders and Public-Siders, unless the Borrower advises the Lead Arrangers in writing (including by email) within a reasonable time prior to their intended distribution that such materials should only be distributed to Private-Siders: (a) administrative materials prepared by the Engagement Parties for prospective Lenders (such as a lender meeting invitation, lender allocation, if any, and funding and closing memoranda), (b) notification of changes in the terms of the Credit Facilities and (c) other materials intended for prospective Lenders after the initial distribution of Information Materials. If you advise us that any of the foregoing should be distributed only to Private-Siders, then Public-Siders will not receive such materials without further discussions with you. The Borrower hereby authorizes the Engagement Parties to distribute drafts of definitive documentation with respect to the Credit Facilities to Private-Siders and Public-Siders.

The Lead Arrangers will manage, in consultation with you, all aspects of the syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders, so long as such decisions are reasonably acceptable to the Borrower. Neither of the Lead Arrangers, in such capacity, will have any responsibility other than to arrange the syndication as set forth herein and in no event shall be subject to any fiduciary or other implied duties. Additionally, the Borrower acknowledges and agrees that neither of the Lead Arrangers, in such capacity, is advising the Borrower as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent

Engagement Letter

investigation and appraisal of the transactions contemplated hereby, and neither of the Lead Arrangers shall have any responsibility or liability to the Borrower with respect thereto.

To assist us in our syndication efforts, you agree to use commercially reasonable efforts to prepare and provide to us all information with respect to the Borrower, the Plan of Reorganization and the other transactions contemplated hereby, including all financial information and projections (the "Projections"), as we may reasonably request in connection with the arrangement and syndication of the Credit Facilities. You hereby represent and covenant that to the best of your knowledge (a) all written information other than the Projections (the "Information") that has been or will be made available to us by you or any of your representatives is or will be, when furnished and taken as a whole, complete and correct in all material respects and does not or will not, when furnished and taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections that have been or will be made available to us by you or any of your representatives have been or will be prepared in good faith based upon assumptions that were reasonable as of the date of the preparation of such Projections (it being understood that the Projections are subject to significant uncertainties and contingencies, many of which are beyond the Borrower's control, and that no assurance can be given that the Projections will be realized). You understand that in arranging and syndicating the Credit Facilities we may use and rely on the Information and Projections without independent verification thereof.

As consideration for the commitments and agreements of the Engagement Parties hereunder, you agree to cause to be paid the nonrefundable fees described in any fee letter dated the date hereof and delivered herewith (the "Fee Letter"; together with the Engagement Letter, the Term Sheets and related letter agreements, the "Engagement Papers").

Each Engagement Party's commitments and agreements hereunder are subject to: (a) there not occurring any development or event that has had or is reasonably expected to have a material adverse effect on the business, financial condition, operations or assets of the Borrower and its subsidiaries, taken as a whole; (b) such Engagement Party's satisfaction that prior to and during the syndication of the Credit Facilities there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf of the Borrower or any of its affiliates (other than the Borrower's syndication, issuance or refinancing of (i) European receivables facilities, (ii) other existing non-U.S. debt facilities, (iii) the extension and refinancing of certain indebtedness arising under the Existing DIP Agreement (as defined in Exhibit A hereto) in accordance with the terms of that certain third amendment thereto and (iv) other debt facilities or debt securities that are not material (as determined by the Lead Arrangers in their reasonable discretion); (c) the Lead Arrangers having been afforded a period of at least 30 days after the completion of the Confidential Information Memoranda to syndicate the Credit Facilities (which period shall exclude the period commencing on (and including) December 24, 2007 and ending on (and including) January 1, 2008); (d) the closing of the Credit Facilities on or before April 30, 2008; and (e) the other conditions set forth in the Term Sheets. Those matters that are not covered by the provisions hereof and of the Term Sheets are subject to the approval and agreement of the Engagement Parties and the Borrower.

You agree (a) to indemnify and hold harmless the Engagement Parties, their affiliates and their respective directors, employees, advisors, and agents (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Engagement Letter, the Credit Facilities, the use of the proceeds thereof or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, and to reimburse each indemnified person upon demand for any reasonable and documented legal or other

expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they arise from the bad faith, willful misconduct or gross negligence of, or material breach of this Engagement Letter by, such indemnified person or any of its affiliates or its or their respective directors, employees, advisors, or agents; (b) in the event that the initial funding under any of the Credit Facilities is consummated, to reimburse each Engagement Party and its affiliates on demand for all reasonable and documented out-of-pocket expenses (including due diligence, appraisal and environmental review expenses, syndication expenses, consultant's fees and expenses, travel expenses, and reasonable fees, charges and disbursements of counsel to the Lead Arrangers and Administrative Agent (as identified in the Term Sheets) and of a single local counsel to such Lead Arrangers and Administrative Agent in each relevant jurisdiction (and, in each case, of additional counsel in the event that there is a determination in good faith that a conflict of interest between the Indemnified Parties exists)) and all reasonable and documented fees and expenses associated with field examinations (including the allocated expenses of field examinations conducted by any of the Lead Arrangers and their respective affiliates) incurred in connection with the Credit Facilities and any related documentation (including the Engagement Papers and the definitive financing documentation) or the administration, amendment, modification or waiver thereof; and (c) in the event the initial funding of the Credit Facilities is not consummated, to reimburse each Engagement Party on demand for (i) all reasonable and documented fees, charges and disbursements of counsel to the Lead Arrangers and the Administrative Agent (as identified in the Term Sheets), in each case, and of a single counsel in each relevant jurisdiction (and, in each case, of additional counsel in the event that there is a determination in good faith that a conflict of interest between the Indemnified Parties exists) and (ii) all reasonable and documented fees and expenses of any field examinations and appraisals conducted after the date hereof incurred in connection with the Credit Facilities and any related documentation (including the Engagement Papers and the definitive financing documentation) or the administration, amendment, modification or waiver thereof up to an aggregate amount, for clauses (i) and (ii) above of this clause (c), of $500,000. No indemnified person shall be liable for any damages arising from the unauthorized use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages arise from the bad faith, gross negligence or willful misconduct of such indemnified person. In addition, no indemnified person shall be liable for any special, indirect, consequential or punitive damages in connection with the Credit Facilities.

        You acknowledge that each Engagement Party and its affiliates (the term "Engagement Party" as used below in this paragraph and the following paragraph being understood to include such affiliates) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. In addition to the limitations set forth in the following paragraph, no Engagement Party will use confidential information obtained from you by virtue of the transactions contemplated hereby or its other relationships with you in connection with the performance by such Engagement Party of services for other companies, and no Engagement Party will furnish any such information to other companies. You also acknowledge that no Engagement Party has any obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies. You further acknowledge that JPMorgan is a full service securities firm and JPMorgan may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of the Borrower and its affiliates and of other companies that may be the subject of the transactions contemplated by the Engagement Papers.

        The Engagement Parties will use all confidential information provided to them by or on behalf of you or any of your respective subsidiaries hereunder solely for the purpose of providing the services which are the subject of this Engagement Letter, the Term Sheets and the Fee Letters and shall

Engagement Letter

treat confidentially all such information; provided that nothing herein shall prevent any Engagement Party from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Engagement Party, to the extent permitted by law, agrees to inform you promptly thereof), (b) upon the request or demand of any regulatory authority having jurisdiction or purporting to have jurisdiction over such Engagement Party or any of its affiliates, (c) to the extent that such information becomes publicly available other than by reason of improper disclosure by such Engagement Party or any of its affiliates, (d) to the extent that such information is received by such Engagement Party from a third party that is not to such Engagement Party's knowledge subject to confidentiality obligations to the Borrower, (e) to the extent that such information is independently developed by such Engagement Party or any of its affiliates, (f) to such Engagement Party's affiliates and its and their officers, directors, employees, partners, legal counsel, independent auditors and other experts or agents who need to know such information in connection with the Transactions and are informed of the confidential nature of such information, (g) to potential Lenders, participants or assignees and any potential direct or indirect contractual counterparties to any swap or derivative transaction relating to the Borrower and its obligations under each Credit Facility who are informed of the confidential nature of such information and have agreed to keep such information confidential or (h) for purposes of establishing a "due diligence" defense. The Engagement Parties' obligations under this paragraph shall automatically terminate and be superseded by the confidentiality provisions in the definitive documentation relating to each Credit Facility; and otherwise, the confidentiality obligations of the Engagement Parties hereunder shall, in any event, terminate on the second anniversary of the date hereof.

Each Engagement Party may employ the services of its affiliates in providing certain services hereunder and, in connection with the provision of such services, may exchange with such affiliates information concerning you and the other companies that may be the subject of the transactions contemplated by the Engagement Papers, and, to the extent so employed, such affiliates shall be entitled to the benefits afforded such Engagement Party hereunder. Any such performance of or exercise of rights of each Engagement Party through any of its affiliates shall not relieve such Engagement Party from any of its obligations hereunder.

This Engagement Letter shall not be assignable by any party hereto (other than to reorganized Delphi Corporation on the Plan Effective Date) without the prior written consent of the Borrower and each Engagement Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons. This Engagement Letter may not be amended or waived except by an instrument in writing signed by you and each Engagement Party. This Engagement Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Engagement Letter by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. The Engagement Letter and the Fee Letters are the only agreements that have been entered into among us with respect to the Credit Facilities and set forth the entire understanding of the parties with respect thereto.

This Engagement Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. The Borrower consents to the nonexclusive jurisdiction and venue of the state or federal courts located in the City of New York (including the Bankruptcy Court). Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, (a) any objection that it may now or hereafter have to the laying of venue of any such legal proceeding in the state or federal courts located in the City of New York and (b) any right it may have to a trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party

related to or arising out of this Engagement Letter, the Term Sheets, the transactions contemplated hereby or the performance of services hereunder.

This Engagement Letter is delivered to you on the understanding that neither the Engagement Papers nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person (including, without limitation, other potential providers or arrangers of financing) except (i) that this Engagement Letter, the Term Sheets, the Fee Letters and the terms and substance thereof may be disclosed to (a) the Plan Sponsors and GM and each of their and your respective officers, agents and advisors who are directly involved in the consideration of this matter or (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law (in which case you agree to inform us promptly thereof), (ii) this Engagement Letter, the Term Sheets and, to the extent necessary, a statement summarizing the aggregate amount of fees payable under the Fee Letters may be disclosed to the providers of the Cash Equity Infusion and each of their officers, agents and advisors who are directly involved in the consideration of this matter, (iii) this Engagement Letter, the Term Sheets (except for provisions therein pertaining to pricing, fees and prepayment premia, if any, unless redacted in a manner reasonably satisfactory to you and us; any such omitted or redacted information, collectively, the "Excluded Information") and, to the extent necessary, a statement summarizing the aggregate amount of fees payable under the Fee Letters may be filed with the Bankruptcy Court pursuant to a motion seeking authority for the Borrower to enter into the Engagement Papers, (iv) the Borrower may make public disclosure of the existence and amount of each Engagement Party's commitment hereunder and of each Engagement Party's identity as collateral agent, administrative agent, lead arranger, book manager or other title, as the case may be and (v) subject to the immediately following sentence hereof, the Excluded Information and the Fee Letters may be disclosed to any statutory committees appointed in the Cases, the Office of the United States Trustee and other third parties as directed by the Bankruptcy Court.  You agree to take such reasonable actions as shall be required to prevent the Excluded Information and the contents of the Fee Letters from becoming publicly available including, without limitation, by the filing of a motion or an ex parte request pursuant to Sections 105(a) and 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 seeking an order of the Bankruptcy Court authorizing the Debtors to file the Excluded Information and the Fee Letters under seal.

Each of the Engagement Parties hereby notifies you that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower and each Guarantor (as defined in the Term Sheets), which information includes names and addresses and other information that will allow such Engagement Party to identify the Borrower and each Guarantor in accordance with the Patriot Act.

The compensation, reimbursement, indemnification and confidentiality provisions contained herein and in the other Engagement Papers and any other provision herein or therein which by its terms expressly survives the termination of this Engagement Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Engagement Letter or the commitments hereunder; provided that your obligations under the Engagement Papers, other than with respect to confidentiality and cooperation with syndication of the Credit Facilities, shall automatically terminate and be superseded by the definitive documentation relating to each Credit Facility upon the effectiveness thereof, and you shall be released from all liability in connection therewith at such time.

We understand that your obligations hereunder and under the Fee Letters are subject to the entry of an order by the Bankruptcy Court authorizing the Borrower to enter into this Engagement Letter, the Fee Letters and any related agreements (the "Approval Order").  This offer shall automatically expire if executed counterparts of each of the Engagement Papers are not returned to us not later than one

business day after the Approval Order has been entered by the Bankruptcy Court, which date shall not, in any event, be later than 5:00 p.m., New York City, on November 30, 2007.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

J.P. MORGAN SECURITIES INC.

By:_____
Name:
Title:

JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:

CITIGROUP GLOBAL MARKETS INC.

By:_____
Name:
Title:

Accepted and agreed to as of
the date first above written:

DELPHI CORPORATION

By:_____
    Name:
    Title:

DELPHI CORPORATION
SENIOR SECURED CREDIT FACILITIES
Summary of Terms and Conditions

———————————

Unless otherwise defined herein, capitalized terms are used herein as defined in the Engagement Letter.  Set forth below are the terms and conditions for the Credit Facilities which would be available upon the Plan Effective Date.

1.   PARTIES

Borrower:

Reorganized Delphi Corporation, a Delaware corporation, upon the Plan Effective Date (the "U.S. Borrower").

In addition, the First-Lien Euro Term Facility (as defined below) may be borrowed by a wholly owned European subsidiary of the U.S. Borrower that is reasonably acceptable to the Arrangers (such subsidiary, the "Additional Borrower").

The term "Borrower" shall mean (a) in respect of or related to the ABL Facility, the First-Lien U.S. Term Facility (as defined below) and the Second-Lien Term Facility, the U.S. Borrower and (b) in respect of or related to the First-Lien Euro Term Facility, the U.S. Borrower and the Additional Borrower, collectively.

Guarantors:

All obligations of the U.S. Borrower in respect of the Credit Facilities (including, without limitation, its guarantee of the First-Lien Euro Term Facility) and any obligations of any U.S. Loan Party (as defined below) arising out of cash management, interest protection or other hedging arrangements entered into with the Administrative Agent or any Lender under the ABL Facility or any affiliate of any of the foregoing (collectively, the "Other Liabilities") will be unconditionally guaranteed by each of the U.S. Borrower's direct and indirect, existing and future wholly-owned domestic subsidiaries (other than (i) any subsidiary that is a "controlled foreign corporation" (a "CFC") under Section 957 of the Internal Revenue Code to the extent such guarantee would result in a material tax liability, (ii) subsidiaries with attributable assets and EBITDA not exceeding aggregate materiality thresholds to be agreed, (iii) any special purpose vehicle established in connection with a permitted securitization or factoring facility and (iv) any other subsidiary if the entering into such guarantee would cause it to breach any applicable law, regulations or contractual provisions) (collectively, the "U.S. Guarantors"; the U.S. Borrower and the U.S. Guarantors, collectively, the "U.S. Loan Parties").

All obligations of the Additional Borrower in respect of the First-Lien Euro Term Facility will be unconditionally guaranteed by (A) the U.S. Borrower and (B) the direct parent

Term Sheet – Credit Facilities

company of the Additional Borrower (the "Euro Parent Guarantor"; the Additional Borrower and the Euro Parent Guarantor, collectively, the "Non-U.S. Loan Parties"; the U.S. Guarantors and the Euro Parent Guarantor, collectively, the "Guarantors"; and the U.S. Loan Parties and the Non-U.S. Loan Parties, collectively, the "Loan Parties").

Notwithstanding the foregoing, subsidiaries may be excluded from the guarantee requirements under the Credit Documentation in circumstances where the U.S. Borrower and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby.

| | |
|---|---|
| Joint Lead Arrangers and Joint Bookrunners: | J.P. Morgan Securities Inc. and Citigroup (in such capacities, the "Arrangers"). |
| Administrative Agent: | JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank" and, in such capacity, the "Administrative Agent"). |
| Collateral Agent | JPMorgan Chase Bank will act as the collateral agent for the ABL Facility (in such capacity, the "ABL Collateral Agent"). JPMorgan Chase Bank, in consultation with you, will appoint another institution reasonably acceptable to you to serve as collateral agent for the First-Lien Term Facility (such collateral agent in such capacity, the "First-Lien Collateral Agent") and another institution reasonably acceptable to you to serve as the collateral agent for the Second-Lien Term Facility (such collateral agent in such capacity, the "Second-Lien Collateral Agent"; the ABL Collateral Agent, the First-Lien Collateral Agent and the Second-Lien Collateral Agent, collectively, the "Collateral Agents" and, together with the Administrative Agent, the "Agents"). |
| Lenders: | A syndicate of banks, financial institutions and other entities arranged by the Arrangers and reasonably acceptable to the U.S. Borrower (collectively, the "Lenders"). It is anticipated that the Lenders will execute and deliver the Credit Documentation (as defined below) in advance of the Closing Date (as defined below). |

2.    **TYPES AND AMOUNTS OF SENIOR SECURED CREDIT FACILITIES**

A.   **First-Lien Term Facility**

| | |
|---|---|
| Type and Amount: | A seven-year first-lien term loan facility (the "First-Lien Term Facility"; the commitments thereunder, the "First-Lien Term Commitments"; the loans thereunder, the "First-Lien Term Loans") in the amount of $3.7 billion plus the Backstop Amount (as defined below), such aggregate amount to be allocated |

Term Sheet – Credit Facilities

among (a) a U.S. term loan facility to be made available to the U.S. Borrower (the "First-Lien U.S. Term Facility"; the loans thereunder, the "First-Lien U.S. Term Loans"), and (b) a Euro term loan facility in an aggregate principal amount of the Euro equivalent of up to $750 million, to be made available to the Additional Borrower (the "First-Lien Euro Term Facility"; the loans thereunder, the "First-Lien Euro Term Loans"). Commencing after all First-Lien Term Commitments have been utilized, terminated or expired, the First-Lien Term Loans shall be repayable in equal consecutive quarterly installments of 0.25% per quarter until the maturity date with a final payment on the maturity date equal to the remaining unpaid balance of the First-Lien Term Loans.

In the U.S. Borrower's sole discretion and without duplication of the amount referred to in the proviso under the heading "Availability" in Section 2.C. below, the First-Lien Term Facility may be increased in an amount (the "Backstop Amount") equal to any financing shortfall reflecting upfront fees or original issue discount in respect of the gross cash proceeds expected to be received from the Term Facilities on the Closing Date in accordance with the terms hereof.

Availability:
The First-Lien Term Loans shall be made in a single drawing on the Closing Date (as defined below). Amounts repaid or prepaid under the First-Lien Term Facility may not be reborrowed. Borrowings under the First-Lien U.S. Term Facility shall be denominated in U.S. Dollars. Borrowings under the First-Lien Euro Term Facility shall be denominated in Euro.

Maturity:
The date that is seven years after the Signing Date (as defined below).

Purpose:
The proceeds of the First-Lien Term Loans shall be used to refinance outstanding indebtedness of the Borrower and its subsidiaries under the Revolving Credit, Term Loan and Guaranty Agreement, dated as of January 9, 2007 (as amended, supplemented or otherwise modified from time to time, the "Existing DIP Agreement"), and to finance claims and other costs and expenses incurred in connection with emerging from bankruptcy.

B.    Second-Lien Term Facility

Type and Amount:
An eight-year second-lien term loan facility (the "Second-Lien Term Facility" and, together with the First-Lien Term Facility, the "Term Facilities") in the amount of $1.5 billion (subject to the next succeeding paragraph) (the commitments thereunder, the "Second-Lien Term Commitments" and, together with the First-Lien Term Commitments, the "Term Commitments"; the

Term Sheet – Credit Facilities

loans thereunder, the "Second-Lien Term Loans" and, together with the First-Lien Term Loans, the "Term Loans"). The Second-Lien Term Loans shall be repayable in full on the maturity date.

GM will receive a note of up to $750 million under the Second-Lien Term Facility in connection with the distributions under the Plan of Reorganization as provided for under the Second-Lien Term Facility. To the extent the Arrangers allocate additional commitments in excess of $750 million of the aggregate principal amount of the Second-Lien Term Facility, up to $500 million of the note under the Second-Lien Term Facility issued to GM may be reduced by the amount of such excess.

|  |  |
|---|---|
| Availability: | The Second-Lien Term Loans shall be made in a single drawing on the Closing Date. Amounts repaid or prepaid under the Second-Lien Term Facility may not be reborrowed. |
| Maturity: | The date that is eight years after the Signing Date. |
| Purpose: | The proceeds of the Second-Lien Term Loans shall be used to finance distributions under the Plan of Reorganization, to pay fees and expenses associated therewith and for working capital and general corporate purposes of the Borrower and its subsidiaries. |

C.    **ABL Facility**

|  |  |
|---|---|
| Type and Amount: | A six-year first-lien revolving facility (the "ABL Facility"; the commitments thereunder, the "ABL Commitments" and, together with the Term Commitments, the "Commitments") in the amount of $1.6 billion (the loans thereunder, together with (unless the context otherwise requires) the Swingline Loans referred to below, the "ABL Loans"; and together with the Term Loans, the "Loans"). |
| Availability: | The ABL Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the date that is six years after the Signing Date (the "ABL Termination Date"). No ABL Loans shall be made on the Closing Date; provided that, at the U.S. Borrower's discretion, ABL Loans shall be permitted on the Closing Date up to an amount equal to any financing shortfall reflecting upfront fees or original issue discount in respect of the gross cash proceeds expected to be received from the Term Facilities on the Closing Date in accordance with the terms hereof. The ABL Facility will be available for the roll-over, replacement or back-stop of existing letters of credit in an amount to be determined. |

Term Sheet – Credit Facilities

Loans under the ABL Facility will be available to the Borrower in U.S. dollars. Furthermore, a sub-facility in an amount to be agreed will be available to the Borrower in Euros. Lenders under the ABL Facility will not be required to provide commitments in respect of such sub-facility on a pro rata basis.

| | |
|---|---|
| Maturity: | The ABL Termination Date. |
| Funding of Loans: | Loans under the ABL Facility shall be funded with advances from Lenders with ABL Commitments. |

Letters of Credit:

A portion of the ABL Facility of $500 million shall be available for the issuance of letters of credit (the "Letters of Credit") by JPMorgan Chase Bank or up to two other Lenders under the ABL Facility designated by the Borrower and reasonably acceptable to the Administrative Agent (each, in such capacity, the "Issuing Lender"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance and (b) five business days prior to the ABL Termination Date (or such later date to be agreed, subject to cash collateral and/or backstop arrangements reasonably satisfactory to the Issuing Lenders), provided that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of ABL Loans) on the same business day (or on the next business day if notice of such drawing is received after 10:00 a.m.). To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the ABL Facility shall be irrevocably and unconditionally obligated to fund participations in the reimbursement obligations on a pro rata basis.

Swingline Loans:

A portion of the ABL Facility of $250 million shall be available for swingline loans (the "Swingline Loans") from JPMorgan Chase Bank and other designated Lenders under the ABL Facility on same-day notice. Any Swingline Loans will reduce availability under the ABL Facility on a dollar-for-dollar basis. Each Lender under the ABL Facility shall be unconditionally and irrevocably required to purchase, under certain circumstances, a pro rata participation in each Swingline Loan.

Purpose:

Extensions of credit under the ABL Facility shall be used to finance the working capital needs and general corporate purposes of the Borrower and its subsidiaries (including the roll-over, replacement or back-stop of existing letters of credit in an amount to be determined). The ABL Facility shall not be used to finance distributions to be made under the Plan of

Term Sheet – Credit Facilities

Reorganization.

Borrowing Base:    For purposes hereof, "Borrowing Base" shall mean the sum of
(a) the sum of (i) 100% of eligible domestic cash and cash
equivalents (collectively, the "Cash Component"), plus (ii) 85%
of eligible domestic accounts receivable and eligible foreign
accounts receivable, excluding those owing from General
Motors Corporation and its affiliates (collectively, "GM") (the
"Non-GM Accounts Receivable Component"), provided that no
more than $100 million of the Non-GM Accounts Receivable
Component may consist of foreign accounts receivable, plus
(iii) an amount equal to the lesser of (A) 85% of eligible
accounts receivable owing from GM (the "GM Accounts
Receivable Component" and, together with the Non-GM
Accounts Receivable Component, the "Accounts Receivable
Component") and (B) 25% (or, commencing January 1, 2010,
20%) of the sum of the Accounts Receivable Component and
the Inventory Component (as defined below) inclusive of the
GM Accounts Receivables Component and net of applicable
reserves, plus (iv) the lesser of (A) 75% of eligible domestic
inventory (valued at cost (FIFO)) and (B) 85% of the net orderly
liquidation value (based on the most recent third party appraisal)
of domestic inventory (the "Inventory Component" and,
together with the Cash Component and the Accounts Receivable
Component, collectively, the "Current Asset Borrowing Base
Component"); plus (b) an amount equal to the lesser of (i) the
sum of (A) 80% of the net orderly liquidation value (based on
the most recent third party appraisal) of eligible machinery and
equipment, plus (B) 75% of the fair market value of eligible real
estate (based on the most recent third party appraisals) and (ii)
30% (or in 2009 and thereafter, 25%) of the Borrowing Base
inclusive of the PP&E Borrowing Base Component
(collectively, the "PP&E Borrowing Base Component"); minus
(c) applicable reserves.  Borrowing Base eligibility standards
and reserves shall be usual and customary to facilities of this
type (including, without limitation, reserves determined by the
Administrative Agent in its Permitted Discretion to be
appropriate to reflect reasonably anticipated Other Liabilities
exceeding $100 million in the aggregate), and each may be
fixed and revised from time to time by the Administrative Agent
in its Permitted Discretion (as defined below).  "Permitted
Discretion" means a determination made in good faith and in the
exercise of reasonable (from the perspective of a secured asset-
based lender) business judgment.  Notwithstanding the
foregoing, the Borrowing Base shall be defined in a manner to
allow, on a projected basis as determined on the Signing Date,
for Availability on the Closing Date of $1.6 billion.

The Borrowing Base shall be computed on a monthly basis
pursuant to a borrowing base certificate (a "Borrowing Base
Certificate") to be delivered by the Borrower to the

Term Sheet – Credit Facilities

Administrative Agent. Borrowing Base Certificates shall be computed and delivered on a weekly basis during any Special Reporting Period (as defined below).

"Special Reporting Period" means (a) any period from the date Availability (as defined below) shall have been less than $300 million for five consecutive business days to the date Availability shall have been at least $300 million for 30 consecutive calendar days or (b) upon the occurrence of any payment or bankruptcy default or event of default, the period that such default or event of default shall be continuing. "Availability" shall mean, at any time, the excess of (a) the lesser of (i) the ABL Commitments and (ii) the Borrowing Base as then in effect, over (b) the sum of (i) the aggregate principal amount of all ABL Loans and Swingline Loans then outstanding and (ii) the aggregate amount available to be drawn under all Letters of Credit under the ABL Facility outstanding at such time or drawn and not yet reimbursed.

The Administrative Agent shall arrange appraisals of the net orderly liquidation value of the inventory and machinery and equipment and of the fair market value of the real estate included in the Borrowing Base and field examinations of the accounts receivable, inventory and related working capital matters and financial information of the Loan Parties and of their related data processing and other systems, in each case annually (and more frequently, in the Administrative Agent's reasonable discretion, during a Special Reporting Period, but in any event, no more than four appraisals and four field examinations in any year).

| | |
|---|---|
| Uncommitted Incremental ABL Facility: | Provided that no default or event of default is then existing or would arise therefrom, the Borrower, at its option, may request that the ABL Commitments be increased (any such increase, an "Incremental Revolving Facility") by an amount not to exceed $100 million in the aggregate with any other Incremental Revolving Facilities; provided, that no Lender will be required to participate in any such Incremental Revolving Facility without its consent. |

The terms of each Incremental Revolving Facility shall be identical to the ABL Facility and each Incremental Revolving Facility shall upon its effectiveness be added to (and be made a part of) the ABL Facility, provided that, with respect to any Incremental Revolving Facility, the Applicable Margin (as defined below) in respect of any Availability amount may not exceed the Applicable Margin in respect of such Availability amount under the original ABL Facility by more than 50 basis points without an adjustment to such Applicable Margin under

Term Sheet – Credit Facilities

the original ABL Facility so that it is not more than 50 basis points below such Applicable Margin under the Incremental Revolving Facility.

No Incremental Revolving Facility shall become effective unless (i) so long as a Cash Dominion Period is in effect, the Loan Parties have demonstrated, to the reasonable satisfaction of the Administrative Agent, that both before and after giving effect to such Incremental Revolving Facility and any credit extensions and investments made in connection therewith, the Borrower shall be in compliance with the Fixed Charge Coverage Ratio (as defined below) on a pro forma basis as of the last day of the then most recently ended fiscal quarter, (ii) no default or event of default under the ABL Facility exists or would exist after giving effect thereto and (iii) the representations and warranties under the ABL Facility shall be true and correct in all material respects.

The Credit Documentation regarding the ABL Facility will be amended to give effect to each Incremental Revolving Facility by documentation executed by the financial institution or financial institutions making the commitments with respect thereto (including new Lenders with the consent of the Borrower and the Administrative Agent under the ABL Facility), the Administrative Agent under the ABL Facility and the Borrower, and without the consent of any other Lender.

3.    <u>CERTAIN PAYMENT PROVISIONS</u>

Fees and Interest Rates:                As set forth on Annex I.

Optional Prepayments and
Commitment Reductions:               Loans may be prepaid and Commitments may be reduced by the Borrower in minimum amounts to be agreed upon ███████ ██████████████████████████████████ Optional prepayments of the Term Loans shall be applied, <u>first,</u> to the prepayment of the First-Lien Term Loans and, <u>second,</u> to the prepayment of the Second-Lien Term Loans, and shall be subject to the intercreditor agreement referred to below. Optional prepayments of the Term Loans shall be applied to installments thereof as directed by the Borrower.  Optional prepayments of the Term Loans may not be reborrowed.

Mandatory Prepayments and
Term Commitment Reductions:           The following amounts shall be applied to prepay the Term Loans or permanently reduce the Term Commitments ████ ██████████████████████████████████:

Term Sheet – Credit Facilities

(a) 100% of the net proceeds of any incurrence of debt (other than permitted debt) after the Closing Date of the Borrower or any of its subsidiaries.

(b) 100% of the net proceeds of any sale or other disposition (including as a result of casualty or condemnation) by the Borrower or any of its subsidiaries of any assets (in excess of an amount to be agreed) to the extent such proceeds are in excess of any reduction to the Borrowing Base as a result of such asset sale or disposition as determined on a pro forma basis at the time of, and after giving effect to, such asset sale or disposition and are not required to be applied to the prepayment of ABL Loans, and except for sales of inventory and other assets or obsolete or worn-out property, in each case, in the ordinary course of business, the assets constituting Automotive Holdings Group (excluding related material foreign assets), the steering assets and certain other assets to be agreed, and subject to customary exceptions (including reinvestment rights for up to 18 months) to be agreed upon.

(c) 50% of excess cash flow (with a definition to be mutually agreed, the "Excess Cash Flow") for each fiscal year of the Borrower, with step downs to be agreed based on the achievement of a leverage test to be agreed; provided, that any voluntary prepayments (including loans under the ABL Facility to the extent ABL Commitments are permanently reduced by the amount of such prepayments) made during such fiscal year shall be credited against excess cash flow prepayment obligations on a dollar-for-dollar basis.

The amounts described above shall be applied, first, to prepay the First-Lien Term Loans or to permanently reduce the First-Lien Term Commitments and, second, to prepay the Second-Lien Term Loans or to permanently reduce the Second-Lien Term Commitments, and shall be subject to the intercreditor agreement referred to below.

Mandatory prepayments of the First-Lien Term Loans shall be applied, first, to scheduled installments thereof occurring within the next 12 months in direct order of maturity and, second, ratably to the remaining installments thereof.  Mandatory prepayments of the Term Loans may not be reborrowed.

Any Lender holding Term Loans may elect not to accept a mandatory prepayment (each a "Declining Lender").  Any prepayment amount declined by a Declining Lender under the First-Lien Term Facility shall be offered, first, to the non-Declining Lenders under such First-Lien Term Facility.  To the extent such prepayment amounts are not accepted by such non-Declining Lenders, such prepayment amount shall be offered, second, to the Lenders under the Second-Lien Term Facility.

Term Sheet – Credit Facilities

To the extent such prepayment amounts are not accepted by such Lenders under the Second-Lien Term Facility, subject to the terms of the intercreditor agreement referred to below, such amounts may be retained by the Borrower for general corporate purposes of the Borrower and its subsidiaries.

The Borrower shall also be required to offer to prepay Second-Lien Term Loans upon the occurrence of a change of control (the definition of which is to be agreed upon), subject to a prepayment premium of ██.

The ABL Loans shall be prepaid (without a corresponding reduction of commitments) with the net proceeds of any sale or other disposition (including as a result of casualty or condemnation) by the Borrower or any of its subsidiaries of any ABL Facility Priority Collateral in excess of an amount to be agreed to the extent that, at the time of and after giving effect to, such asset sale disposition, on a pro forma basis, the extensions of credit outstanding under the ABL Facility at such time in the aggregate exceed (i) the amount of the ABL Commitments or (ii) the then-current Borrowing Base.

Furthermore, the ABL Loans shall be prepaid, or the Letters of Credit under the ABL Facility shall be replaced or cash collateralized in an amount equal to 100% (or, in the case of Letters of Credit denominated in foreign currencies, 103%) of the amount available to be drawn thereunder or drawn and not yet reimbursed, to the extent such extensions of credit at any time in the aggregate exceed (i) the amount of the ABL Commitments or (ii) the then-current Borrowing Base.



Term Sheet – Credit Facilities

4. <u>COLLATERAL</u>

ABL Collateral:

The obligations of each U.S. Loan Party in respect of the ABL Facility and any Other Liabilities shall be secured by (a) a perfected first priority security interest in, and lien on all of each U.S. Loan Party's (i) accounts receivable, (ii) inventory, (iii) machinery and equipment, (iv) owned real estate, (v) chattel paper, instruments and documents relating to the foregoing, (vi) payment intangibles constituting proceeds of the foregoing, (vii) deposit accounts, (viii) letter of credit rights and supporting obligations relating to any of the foregoing, (ix) cash and cash equivalents, (x) books and records relating to any of the foregoing, and (xi) products and proceeds of the foregoing other than the Term Loan Priority Collateral (as defined below) (the "<u>ABL Facility Priority Collateral</u>") and (b) a perfected third priority security interest in, and lien on all other tangible and intangible assets of each U.S. Loan Party (other than ABL Facility Priority Collateral), including, without limitation (i) the capital stock held by such U.S. Loan Party of the Borrower's direct or indirect, existing or future domestic subsidiaries (excluding CFCs) and, limited to 65% of all of such outstanding capital stock, the capital stock of the Borrower's direct or indirect, existing or future first tier foreign subsidiaries and CFCs, (ii) all intercompany notes issued by and advances made to the Borrower's direct or indirect, existing or future foreign subsidiaries owing to such U.S. Loan Party, (iii) intellectual property, (iv) chattel paper, instruments and documents relating to the foregoing, (v) payment intangibles constituting proceeds of the foregoing and (vi) all products and proceeds of the foregoing other than the ABL Facility Priority Collateral (the "<u>U.S. Term Loan Priority Collateral</u>"; the U.S. Term Loan Priority Collateral and the ABL Priority Collateral, collectively, the "<u>U.S. Collateral</u>").

First-Lien Term Collateral:

The obligations of each U.S. Loan Party in respect of the First-Lien Term Facility shall be secured by (a) a perfected first priority security interest in, and a lien on, all U.S. Term Loan Priority Collateral and (b) a perfected second priority security interest in, and a lien on, all ABL Facility Priority Collateral.

The obligations of each Non-U.S. Loan Party in respect of the First-Lien Euro Term Facility shall be secured by (a) a perfected first priority security interest in and lien on certain tangible and intangible assets of such Loan Party to be agreed (including, without limitation, 100% of the outstanding capital stock of the Additional Borrower, the capital stock of the Additional Borrower's direct subsidiaries and all of the intercompany notes held by such Loan Party), <u>provided</u>, that non-U.S. Collateral shall not be required, (A) if the provision thereof would reasonably be expected to result in additional tax costs to the Borrower or any of its affiliates or (B) if the Borrower and the

Term Sheet – Credit Facilities

Administrative Agent under the First-Lien Term Facility agree that the costs of obtaining any such non-U.S. Collateral are excessive in relation to the benefits provided (collectively, the "Non-U.S. Term Loan Priority Collateral" and, together with the U.S. Term Loan Priority Collateral, the "Term Loan Priority Collateral"; the Term Loan Priority Collateral and the ABL Priority Collateral, collectively, the "Collateral"); and (b) a perfected second priority security interest in, and a lien on, all ABL Facility Priority Collateral.  It is understood and agreed that neither the ABL Facility nor the First-Lien U.S. Term Facility nor the Second-Lien Term Facility shall be secured by any Non-U.S. Term Loan Priority Collateral.

| | |
|---|---|
| First-Lien Term Collateral Sharing: | The Credit Documentation for the First-Lien Term Facility shall include provision to insure ratable recoveries for the Lenders participating in the First-Lien U.S. Term Loans and for those participating in the First-Lien Euro Term Loans following any acceleration of the First-Lien Term Loans. |
| Second-Lien Term Collateral: | The obligations of each Loan Party under the Second-Lien Term Facility shall be secured by (a) a perfected second priority security interest in, and a lien on, all U.S. Term Loan Priority Collateral and (b) a perfected third priority security interest in, and a lien on, all ABL Facility Priority Collateral. |
| Excluded Assets: | Notwithstanding anything herein to the contrary, the Collateral shall exclude the following: (i) fee owned real properties with a value of less than an amount to be agreed (with any required mortgages being permitted to be delivered post-closing in accordance with paragraph (i) of Exhibit B) and all leasehold interests, (ii) motor vehicles and other assets subject to certificates of title, letter of credit rights and certain commercial tort claims, (iii) pledges and security interests prohibited by law or prohibited by contractual anti-assignment clauses not overridden by the UCC or other applicable law or with respect to assets in which security interests or pledges cannot be granted without the consent of one or more third parties or governmental entities (and not overridden by the UCC or other applicable law) and (iv) those assets as to which the Administrative Agent under each Credit Facility and the U.S. Borrower agree that the costs of obtaining such a security interest or perfection thereof are excessive in relation to the value to the Lenders under such Credit Facility of the security to be afforded thereby. |
| | The Credit Documentation will provide for the release of liens in connection with receivables and other assets to be sold into permitted securitization and factoring facilities. |
| Intercreditor Agreement: | The lien priority, relative rights and other creditors' rights issues in respect of the Credit Facilities will be set forth in an |

intercreditor agreement, which shall be in form and substance reasonably acceptable to the Arrangers, the Borrower and the Agents under each Credit Facility. The intercreditor agreement shall, among other things to be determined by the Arrangers and the Agents under each Credit Facility, document the "silent" status of the liens securing any Credit Facility at second or third priority. The intercreditor agreement will, among other things, provide that (i) each secured party holding a lien on any of the U.S. Collateral with superior priority over the lien of any other secured party on such U.S. Collateral (such secured party, with regard to such other secured party solely in respect of such portion of the U.S. Collateral, a "Superior Priority Lienholder" and a "Inferior Priority Lienholder", respectively) will have an absolute block on the ability of Inferior Priority Lienholders to exercise lien-related remedies, (ii) the Inferior Priority Lienholders will not object to the value of the Superior Priority Lienholders' claims, (iii) the Inferior Priority Lienholders will not object to the Superior Priority Lienholders' adequate protection, (iv) the Inferior Priority Lienholders will not seek adequate protection other than (A) replacement liens junior to the liens of the Superior Priority Lienholders, (B) accrual (but not, in the case of the Second-Lien Term Facility, the current payment) of interest, and (C) current payment of expenses, and (v) the secured parties under the Second-Priority Term Facility will not object to a "debtor-in-possession" financing.

In particular, the intercreditor agreement will provide, among other things, that, (i) so long as any obligations are outstanding under the ABL Facility, the ABL Collateral Agent will control at all times all remedies and other actions related to the ABL Facility Priority Collateral, and neither the secured parties under the First-Lien Term Facility nor the secured parties under the Second-Lien Term Facility will be entitled to take any action with respect to the ABL Facility Priority Collateral, (ii) so long as any obligations are outstanding under the First-Lien Term Facility, the First-Lien Collateral Agent will control at all times all remedies and other actions related to the U.S. Term Loan Priority Collateral, and neither the secured parties under the Second-Lien Term Facility nor the secured parties under the ABL Facility will be entitled to take any action with respect to the U.S. Term Loan Priority Collateral, (iii) after all obligations under the First-Lien Term Facility have been indefeasibly paid in full and so long as any obligations are outstanding in respect of the Second-Lien Term Facility, the Second-Lien Collateral Agent will control at all times all remedies and other actions related to the U.S. Term Loan Priority Collateral, and the secured parties under the ABL Facility will not be entitled to take any action with respect to the U.S. Term Loan Priority Collateral and (iv) after all obligations under the ABL Facility have been indefeasibly paid in full and so long as any obligations are outstanding under the First-Lien Term Facility,

Term Sheet – Credit Facilities

the First-Lien Collateral Agent will control at all times all remedies and other actions related to the ABL Facility Priority Collateral, and the secured parties under the Second-Lien Term Facility will not be entitled to take any action with respect to the ABL Facility Priority Collateral.

The intercreditor agreement will further provide for a waiver by GM as a Lender under the Second-Lien Term Facility of any right of set-off it may have in respect of any Loan Party's obligations owing to GM under the Second-Lien Term Facility.

5.    <u>CASH DOMINION</u>:    Account control agreements, in form and substance reasonably satisfactory to the Administrative Agent under the ABL Facility and the Borrower, on the Loan Parties' primary concentration accounts maintained with institutions other than the Administrative Agent under the ABL Facility within 90 days after the Signing Date, subject to extensions approved by the Administrative Agent under the ABL Facility in its sole discretion. During a Cash Dominion Period (as defined below), amounts in controlled accounts will be swept on a daily basis into a core concentration account maintained with the Administrative Agent under the ABL Facility, subject to customary exceptions and thresholds. Collections which are received into such core concentration account shall be used to reduce amounts owing under the ABL Facility (without a corresponding reduction in the commitments thereunder).

"<u>Cash Dominion Period</u>" means (a) any period from the date Availability shall have been less than $200 million for five consecutive business days to the date Availability shall have been at least $200 million for 30 consecutive calendar days or (b) upon the occurrence of any payment or bankruptcy default or event of default, the period that such default or event of default shall be continuing.

6.    <u>CERTAIN CONDITIONS</u>

Initial Conditions:    The availability of the Credit Facilities shall be conditioned upon the satisfaction of the conditions set forth in Exhibit B (the date upon which all such conditions precedent shall have been satisfied or waived, the "<u>Closing Date</u>") on or prior to April 30, 2008. The Credit Documentation for the Credit Facilities shall not contain (a) any conditions precedent other than the conditions precedent expressly set forth herein and in Exhibit B or (b) any representation or warranty, affirmative or negative covenant or event of default not set forth herein, the accuracy, compliance or absence, respectively, of or with which would be a condition to the initial borrowing under the Credit Facilities. All of the representations and warranties shall be made on, and as a condition to, the Signing Date (as defined below).

Notwithstanding anything in this Engagement Letter, the Fee Letter, the Credit Documentation or any other letter agreement or other undertaking concerning the financing contemplated hereunder to the contrary, the only representations relating to the U.S. Borrower, its subsidiaries and their businesses the making of which shall be a condition to availability of the Credit Facilities on the Closing Date shall be the representations and warranties set forth herein relating to corporate existence, corporate power and authority, the enforceability of the Credit Documentation, Federal Reserve margin regulations, the Investment Company Act, use of proceeds and solvency.

On-Going Conditions:      The making of each extension of credit under any Credit Facility shall be conditioned upon (a) the accuracy in all material respects of all representations and warranties in the documentation (the "Credit Documentation") with respect to such Credit Facility (including, without limitation, the material adverse change and litigation representations), (b) there being no default or event of default in existence under such Credit Facility at the time of, or after giving effect to the making of, such extension of credit and (c) in the case of the ABL Facility, after giving effect to the making of such extension of credit, the total extensions of credit under the ABL Facility shall not exceed the lesser of the aggregate ABL Commitments or Borrowing Base then in effect.  As used herein and in the Credit Documentation for each Credit Facility a "material adverse change" shall mean any development or event since the Closing Date that has had or is reasonably expected to have a material adverse effect on (i) the business, financial condition, operations or assets of the Borrower and its subsidiaries taken as a whole or (ii) the validity or enforceability of any of such Credit Documentation or the rights and remedies of the Administrative Agent and the Lenders thereunder.

7.    CERTAIN DOCUMENTATION MATTERS

The Credit Documentation will include separate credit agreements for (x) the ABL Facility, (y) the First-Lien Term Facility and (z) the Second-Lien Term Facility (each, a "Credit Agreement").  Each Credit Agreement will be entered into on a date mutually agreed among the Borrower, the Arrangers and the Lenders (the "Signing Date") and will include forms of the other Credit Documentation.

The Credit Documentation for each Credit Facility shall contain representations, warranties, covenants and events of default (in each case, applicable to the Borrower and its subsidiaries) substantially similar to those under the Existing DIP Agreement, subject to customary exceptions, baskets and materiality qualifiers and appropriate adjustments to the negative and financial covenants for the Term Facilities as mutually agreed,

Term Sheet – Credit Facilities

including, without limitation:

| | |
|---|---|
| **Representations and Warranties:** | Financial statements (including pro forma financial statements) and, under the ABL Facility, Borrowing Base Certificates; absence of undisclosed liabilities; no material adverse change; corporate existence; compliance with law; corporate power and authority; enforceability of such Credit Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; insurance; ERISA; Investment Company Act and other regulations; subsidiaries; use of proceeds; environmental matters; accuracy of disclosure; creation and perfection of security interests; and solvency. |
| **Affirmative Covenants:** | Delivery of annual and quarterly financial statements, annual projections, officers' certificates, under the ABL Facility, monthly collateral reporting (including agings and inventory reports) and borrowing base certificates (subject to more frequent delivery during any Special Reporting Period), and, under each Credit Facility, other information reasonably requested by the Administrative Agent under such Credit Facility (at the request of a Lender thereunder); payment of taxes and other material obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws (including environmental laws); maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records (including, under the ABL Facility, periodic third-party field examinations and inventory, machinery, equipment and real estate appraisals); notices of defaults, litigation and other material events; further assurances (including, without limitation, with respect to security interests in after-acquired property); and agreement to obtain interest rate protection for three years in an amount and manner reasonably satisfactory to the Administrative Agent. |
| **Financial Covenants:** | Solely in respect of the ABL Facility, a minimum fixed charge coverage ratio (to be defined) of 1.01:1.00 (the "<u>Fixed Charge Coverage Ratio</u>") to be triggered in the event that, and to remain in effect at all times during a Cash Dominion Period. |
| | Solely in respect of the Term Facilities, minimum interest coverage ratio and maximum total leverage ratio at levels to be agreed.  Such financial covenants will use ratios to be determined using an approximate cushion of 25% and 33⅓% for the First-Lien Term Facility and the Second-Lien Term Facility, respectively, on projected EBITDA. |
| | Financial covenants will be calculated on a consolidated basis |

Term Sheet – Credit Facilities

for the U.S. Borrower and its subsidiaries.

Negative Covenants:    Limitations on: indebtedness (including guarantee obligations, securitizations and factoring lines); liens; mergers, consolidations, liquidations and dissolutions; sales of assets (with exceptions to be agreed including, but not limited to, (i) the sale of all or a portion of the assets constituting Automotive Holdings Group and the steering assets, (ii) a general basket for asset sales in an aggregate amount per fiscal year of $125 million (which proceeds shall not be required to prepay the Credit Facilities), (iii) with respect to each Credit Facility, a general basket for asset sales in an aggregate amount over the term of such Credit Facility equal to 15% of the U.S. Borrower's consolidated total assets, subject, in the case of this clause (iii), to the application of proceeds from such asset sales to mandatory prepayments of the Credit Facilities (subject to reinvestment rights) and (iv) with respect to each Credit Facility, a general basket for asset sales in an aggregate amount over the term of such Credit Facility equal to 10% of the U.S. Borrower's consolidated total assets, subject in the case of this clause (iv), to the application of proceeds from such asset sales to mandatory prepayments of the Credit Facilities without giving effect to reinvestment rights); dividends and other payments in respect of capital stock; capital expenditures (provided that the permitted capital expenditure levels for each fiscal year will be determined using an approximate 20% cushion on projected capital expenditures and will permit carry-over in amounts to be agreed); acquisitions, investments, loans and advances; payments and modifications of preferred or convertible stock, subordinated debt or, with respect to the First-Lien Credit Facilities, the Second-Lien Credit Facility or any refinancing debt in respect thereof (subject to a basket and other exceptions to be agreed, including, without limitation, subject to customary payment conditions, redemptions, payments and other distributions required in respect of the Series A, B and C preferred stock, in each case in accordance with the terms thereof); transactions with affiliates (with exceptions to permit transactions with GM and the Plan Sponsors in connection with the Plan of Reorganization); changes in fiscal year; negative pledge clauses and clauses restricting subsidiary distributions (with exceptions to be agreed for certain debt of foreign subsidiaries); and changes in lines of business.

Negative Covenants for the Second-Lien Term Facility shall be similar to those for the First-Lien Credit Facility, but shall provide for greater flexibility. Unless an event of default shall have occurred and be continuing under the ABL Facility, compliance with the negative covenants for the ABL Facility restricting mergers, consolidations, liquidations, and dissolutions, sales of assets, acquisitions, investments, loans and advances shall not be required if, on a pro forma basis after

Term Sheet – Credit Facilities

giving effect to any such transactions, Availability shall be equal to or greater than $500 million.

The negative covenants under each Credit Facility restricting debt and liens will, among other things, permit (i) debt of and liens on the assets of foreign subsidiaries in the amount thereof existing on the Closing Date (which is estimated to be in the range of $700 million to $800 million) and (ii) additional debt of and liens on the assets of foreign subsidiaries in an aggregate amount equal to $250 million, which basket shall be subject to growth to a maximum amount of $700 million based on the achievement of performance parameters to be agreed.

The negative covenants under each Credit Facility will furthermore permit dividends and other payments in respect of capital stock (including, without limitation, the Series A, B and C preferred stock) and, beginning in 2009, payments with respect to the Second-Lien Term Facility subject to certain limitations, including (i) a basket in an amount to be agreed plus a growth basket, which growth basket shall be accessible so long as the pro forma total leverage ratio at the time of, and after giving effect to, the subject payment is less than 3.0x, (ii) no default or event of default under such Credit Facility at the time of, or after giving effect to, the subject payment, (iii) pro forma compliance with the financial covenants under such Credit Facility and (iv) with respect to the ABL Facility, on a pro forma basis after giving effect to the subject payment, Availability shall be equal to or greater than $500 million.  The growth basket will be based on 25% of the Borrower's Excess Cash Flow for each fiscal year commencing with 2009 (with a step-up to 50% so long as the pro forma total leverage ratio is less than 2.5x).

Notwithstanding anything herein to the contrary, the covenants under the Credit Documentation shall be subject to exceptions for corporate and other restructuring-related transactions in order to effect the Plan of Reorganization and the international restructuring previously described to the Lead Arrangers; provided that any changes to the plans for such international restructuring shall not have been modified in any material respect that is adverse to the Lenders.

| | |
|---|---|
| Events of Default: | Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); with respect to the First-Lien Credit Facilities, cross-default and, with respect to the Second-Lien Term Facility, cross-payment default and cross-acceleration to material indebtedness (provided that (i) the ABL Facility shall include a "stand-still" |

Term Sheet – Credit Facilities

period in respect of any default under the First-Lien Term Facility resulting in a cross-default under the ABL Facility expiring on the earlier of 45 days thereafter and the date on which the Lenders thereunder accelerate the First-Lien Term Loans and (ii) the First-Lien Term Facility shall include a "stand-still" period in respect of any default under the ABL Facility resulting in a cross-default under the First-Lien Term Facility expiring on the earlier of 45 days thereafter and the date on which the Lenders thereunder accelerate the ABL Loans); bankruptcy events; certain ERISA events; material monetary judgments; actual or asserted invalidity of any guarantee, security document or lien subordination provisions or non-perfection of security interest in each case with respect to a material portion of the Collateral; and, with respect to the First-Lien Credit Facilities, a change of control (the definition of which is to be agreed upon).  Events of Default for the Second-Lien Term Facility shall be similar to those for the First-Lien Priority Term Facility, but shall, if applicable, provide for higher thresholds and longer grace periods.

Voting:

Amendments and waivers with respect to the respective Credit Documentation for each Credit Facility shall require the approval of Lenders holding more than 50% of the aggregate amount of the unused Commitments and extensions of credit under such Credit Facility (the "Required Lenders", but subject in the case of the Second-Lien Term Facility, to the provisions of the second succeeding paragraph below), except that (a) the consent of each Lender under such Credit Facility directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of any amortization or final maturity of any Loan thereunder, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's Commitment thereunder, (b) the consent of 100% of the Lenders under such Credit Facility shall be required with respect to (i) reductions of any of the voting percentages under such Credit Documentation, (ii) releases of all or substantially all the collateral securing such Credit Facility (other than collateral sold or otherwise disposed of in transactions permitted under such Credit Documentation) and (iii) releases of all or substantially all of the Guarantors in respect of such Credit Facility and (c) the consent of Lenders holding more than 66.6% of the ABL Facility shall be required with respect to any amendment or waiver that would increase advance rates, add new asset categories to the Borrowing Base or otherwise cause the Borrowing Base or availability under the ABL Facility to be increased.

The Credit Documentation for each Credit Facility shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent

Term Sheet – Credit Facilities

of all relevant Lenders or of all Lenders directly affected thereby so long as Lenders holding more than 50% of such Credit Facility shall have consented thereto.

The Credit Documentation for the Second-Lien Term Facility shall provide that at any time that GM holds more than $500 million (net of original issue discount) in aggregate principal amount of the Second-Lien Term Loans or Second-Lien Term Commitments, any matter requiring the approval of the Required Lenders under the Second-Lien Term Facility shall require only the following approvals to be effective: (1) if GM votes in favor of the matter, the approval of Lenders holding at least one-third of the Second-Lien Term Loans or Second-Lien Term Commitments not held by GM; or (2) if GM does not vote in favor or the matter, the approval of at least two-thirds of the Second-Lien Term Loans or Second-Lien Term Commitments not held by GM.

|                              |                              |
|------------------------------|------------------------------|
| Assignments and Participations: | The Lenders shall be permitted to assign all or a portion of their Loans and Commitments under each Credit Facility with the consent, not to be unreasonably withheld, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund under such Credit Facility or (ii) a payment or bankruptcy event of default has occurred and is continuing under such Credit Facility and (b) the Administrative Agent under such Credit Facility, unless a Term Loan or a Term Commitment is being assigned to an existing Lender, an affiliate of a Lender or an approved fund under such Credit Facility. Non-pro rata assignments shall be permitted.  In the case of partial assignments under any Credit Facility (other than to another Lender, an affiliate of a Lender or an approved fund under such Credit Facility), the minimum assignment amount shall be $1 million (in the case of the Term Loans) and $5 million (in the case of the ABL Facility), in each case unless otherwise agreed by the Borrower and the Administrative Agent under such Credit Facility.  The applicable Administrative Agent shall receive a processing and recordation fee of $3,500 in connection with all assignments from the assigning or assignee Lender.  The Lenders shall also be permitted to sell participations in their Loans.  Voting rights of participants shall be limited to those matters set forth in clause (a) under "Voting" with respect to which the affirmative vote of the Lender from which it purchased its participation would be required.  Pledges of Loans in accordance with applicable law shall be permitted without restriction.  Notwithstanding the foregoing, it is understood that the GM Note shall be subject to a 6 month lock-up from the effectiveness of the Plan of Reorganization, provided however that, during such lock-up period, GM shall not be restricted from selling second lien notes if such notes are sold to investors at a price at least equal to par less any original |

Term Sheet – Credit Facilities

issue discount (the "Threshold Price"), or below the Threshold Price, if GM makes a pro rata payment to the other holders of the Second-Lien Term Facility equal to the product of (x) the absolute difference (measured in basis points) between the actual price at which GM Notes are sold by GM and the Threshold Price and (y) the face amount of the Second-Lien Term Facility held by others prior to giving effect to the sale of the GM Notes.

Yield Protection:

The Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for customary "breakage costs" in respect of Eurodollar Loans (as defined in Annex I).

Expenses and Indemnification:

The Borrower shall pay (a) all reasonable out-of-pocket expenses of the Agents and the Arrangers associated with the syndication of the Credit Facilities and the preparation, execution, delivery and administration of the Credit Documentation and any amendment or waiver with respect thereto (including the reasonable and documented fees, disbursements and other charges of transaction counsel identified below and of a single local counsel in each relevant jurisdiction), (b) all out-of-pocket expenses of the Agents and the Lenders (including the reasonable and documented fees, disbursements and other charges of one transaction counsel for the Agents and the Lenders taken as a whole and of a single local counsel in each relevant jurisdiction (and, in each case, of additional counsel in the event that there is a determination in good faith that a conflict of interest exists)) in connection with the enforcement of the Credit Documentation and (c) fees and expenses associated with collateral monitoring, field examinations, appraisals and environmental reviews (including the allocated expenses of field examinations conducted by the Arrangers and their affiliates) and, with the consent of the U.S. Borrower, fees and expenses of other advisors and professionals engaged by the Administrative Agent under the ABL Facility or the Arrangers.

The Agents, the Arrangers and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they arise from the bad faith, gross negligence or willful misconduct of, or a material breach of the Credit Documentation by, the relevant indemnified person or its affiliates or its or their respective officers, directors, employees,

Term Sheet – Credit Facilities

| | |
|---|---|
| | advisors or agents. |
| Governing Law and Forum: | State of New York. |
| Counsel to the Administrative Agent and the Arrangers: | Simpson Thacher & Bartlett LLP. |

## INTEREST AND CERTAIN FEES

| | |
|---|---|
| Interest Rate Options: | The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Eurodollar Rate (or, to the extent such Loans are denominated in Euro, the EURIBOR Rate) plus the Applicable Margin; provided, that all Swingline Loans shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin. |

As used herein:

"ABR" means the higher of (i) the rate of interest publicly announced by JPMorgan Chase Bank as its prime rate in effect at its principal office in New York City (the "Prime Rate") and (ii) the federal funds effective rate from time to time plus 0.5%.

"Applicable Margin" means an amount presently anticipated based on current market conditions to be (a) with respect to ABL Loans (including Swingline Loans), initially, (i) ▮ in the case of ABR Loans and (ii) ▮ in the case of Eurodollar Loans and EURIBOR Loans, (b) with respect to First-Priority Term Loans, (i) ▮ in the case of ABR Loans and (ii) ▮ in the case of Eurodollar Loans and EURIBOR Loans and (c) with respect to Second-Priority Term Loans, (i) ▮ in the case of ABR Loans and (ii) ▮ in the case of Eurodollar Loans. The foregoing margins applicable to ABL Loans shall be subject to adjustment after one full fiscal quarter after the Closing Date based upon Availability to amounts presently anticipated based on current market conditions to be the amounts set forth on the pricing grid annexed hereto as Annex I-A.

"Eurodollar Rate" means the rate (adjusted for any statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits appearing on Reuters Page LIBOR 01.

"EURIBOR Rate" means the rate (adjusted for any statutory reserve requirements for eurocurrency liabilities) determined by the Banking Federation of the European Union for the relevant period appearing on Reuters Page EURIBOR 01.

Eurodollar Rate and EURIBOR Rate borrowings may be made for interest periods of 1, 2, 3 or 6 and, if agreed to by the Lenders, 9 or 12 months, as selected by the Borrower.

| | |
|---|---|
| Interest Payment Dates: | In the case of Loans bearing interest based upon the ABR ("ABR Loans"), quarterly in arrears. |

Term Sheet – Credit Facilities

In the case of Loans bearing interest based upon the Eurodollar Rate ("Eurodollar Loans") or the EURIBOR Rate ("EURIBOR Loans") on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period.

**Commitment Fees:**

The Borrower shall initially pay a commitment fee at a rate per annum presently anticipated based on current market conditions to be in the range of ███ to ███ calculated on the average daily unused portion of the ABL Facility following the Signing Date, payable in arrears on the Closing Date Date (or such earlier date on which the ABL Commitments shall have been terminated) and quarterly thereafter; provided that the commitment fee payable in respect of unused ABL Commitments prior to the Closing Date, with respect to each Lender that is also a lender under the Existing DIP Agreement, shall be calculated on the amount by which such Lender's ABL Commitment exceeds the amount of its aggregate commitments under the Existing DIP Agreement. Swingline Loans shall, for purposes of the commitment fee calculations only, not be deemed to be a utilization of the ABL Facility. The foregoing commitment fee rate shall be subject to adjustment after one full fiscal quarter after the Closing Date based upon Availability to the rate presently anticipated based on current market conditions to be the rate set forth on the pricing grid annexed hereto as Annex I-A.

The Borrower shall pay a commitment fee calculated at a rate per annum equal to the First-Lien Commitment Fee Rate (as defined below) on the daily unused portion of the First-Lien Term Commitments following the Signing Date, payable in arrears on the Closing Date (or such earlier date on which the First-Lien Term Commitments shall have been terminated). The "First-Lien Commitment Fee Rate" shall equal a rate of ███



The Borrower shall pay a commitment fee calculated at a rate per annum equal to the Second-Lien Commitment Fee Rate (as defined below) on the daily unused portion of the Second-Lien Term Commitments following the Signing Date, payable in arrears on the Closing Date (or such earlier date on which the Second-Lien Term Commitments shall have been terminated). The "Second-Lien Commitment Fee Rate" shall equal a rate of



Letter of Credit Fees:

The Borrower shall pay a fee on all outstanding Letters of Credit under the ABL Facility at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the ABL Facility on the face amount of each such Letter of Credit. Such fee shall be shared ratably among the Lenders participating in the ABL Facility and shall be payable quarterly in arrears.

A fronting fee in an amount to be agreed with the Issuing Lender but, in any event, not to exceed ███% per annum on the face amount of each Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account. In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account.

Default Rate:

At any time when the Borrower is in default in the payment of any amount of principal or interest due under the Credit Facilities, such overdue amount shall bear interest at 2% above the rate otherwise applicable thereto. Overdue fees and other amounts shall bear interest at 2% above the rate applicable to the relevant ABR Loans.

Rate and Fee Basis:

All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual days elapsed.

Term Sheet – Credit Facilities

A-I-4

Annex I-A

| Excess Availability | Applicable Margin for ABR Loans | Applicable Margin for Eurodollar Loans | Commitment Fee Rate |
|---|---|---|---|
| Greater than $1.0 billion | ███ | ███ | ██████ |
| Greater than or equal to $500 million and less than or equal to $1.0 billion | ███ | ███ | ██████ |
| Less than $500 million | ███ | ███ | ██████ |

Term Sheet – Credit Facilities

### DELPHI CORPORATION
### SENIOR SECURED CREDIT FACILITIES
Annex of Availability Conditions

———————————

The availability of the Credit Facilities, in addition to the conditions set forth in Exhibit A, shall be subject to the satisfaction or waiver of the following conditions. Capitalized terms used but not defined herein have the meanings given in said Exhibit A.

(a) The Bankruptcy Court shall have entered an order confirming the Plan of Reorganization and the related disclosure statement, which order (i) shall be in form and substance reasonably satisfactory to the Arrangers and (ii) shall be in full force and effect and shall not have been reversed or modified and shall not be stayed or subject to a motion to stay, no appeal or petition for review, rehearing or certiorari with respect thereto shall be pending. The terms and conditions of the Plan of Reorganization (including the global settlement agreement and master restructuring agreement attached thereto as exhibits) and the related disclosure statement as approved by the Bankruptcy Court shall be reasonably satisfactory to the Arrangers (it being understood that the terms and conditions of the Plan of Reorganization (including the global settlement agreement and master restructuring agreement attached thereto as exhibits) filed with the Bankruptcy Court on September 6, 2007, and the related disclosure statement filed with the Bankruptcy Court on September 6, 2007 as modified pursuant to the contemplated amendment thereof filed with the Bankruptcy Court on October 29, 2007 are satisfactory to the Arrangers) and shall comply in all material respects with the requirements therefor in the Equity Plan. No provision of the Plan of Reorganization shall have been amended, supplemented or otherwise modified in any material respect that is adverse to the Lenders in any material respect without the prior written consent of the Arrangers (which consent shall not be unreasonably withheld or delayed). The effective date under the Plan of Reorganization shall have occurred (and all conditions precedent thereto as set forth therein shall have been satisfied or waived with the consent of the Arrangers). The documentation to effect the Plan of Reorganization (including, without limitation, the Equity Plan) shall have terms and conditions reasonably satisfactory to the Arrangers, and no material provision of such documentation shall have been waived, amended, supplemented or otherwise modified in any material respect that is adverse to the Lenders in any material respect without the consent of the Arrangers (which consent shall not be unreasonably withheld or delayed). The capitalization, structure and equity ownership of each Loan Party, the organizational documents and senior management of the Loan Parties after the Plan of Reorganization becomes effective shall be consistent with the requirements of the Equity Plan.

(b) Each Administrative Agent shall have received reasonably satisfactory evidence that all obligations under the Existing DIP Agreement shall have been (or substantially concurrently will be) repaid in full in cash, the Existing DIP Agreement and all commitments thereunder shall have been (or substantially concurrently will be) terminated and all liens and security interests related thereto shall have been (or substantially concurrently will be) terminated or released.

(c) As a condition to availability of each Credit Facility, the conditions to availability of each other Credit Facility shall have been satisfied or waived. The Cash Equity Infusion shall have been consummated, and not less than $2.550 billion of the cash proceeds

therefrom shall have been provided to the Borrower for the purposes and on the terms and conditions set forth in the Plan of Reorganization and the Equity Plan.

(d)  Each Loan Party shall have executed and delivered separate Credit Documentation (including a credit agreement, guarantee and collateral agreements, an intercreditor agreement, reasonably satisfactory mortgages and other security agreements, documents and instruments) for each Credit Facility, and each Agent shall have executed and delivered an intercreditor agreement, in each case in form and substance reasonably satisfactory to each Agent.

(e)  The Lenders, each Administrative Agent and the Arrangers shall have received all fees and invoiced expenses required to be paid on or before the Closing Date.

(f)  The Lenders shall have received (i) audited consolidated financial statements of the Borrower for the three most recent fiscal years and (ii) unaudited consolidated financial statements of the Borrower for each fiscal quarter ended after the latest fiscal year referred to in clause (i) above and unaudited consolidated financial statements for the same period of the prior fiscal year.

(g)  The Lenders shall have received a pro forma consolidated balance sheet of the Borrower as at the date of the most recent balance sheet delivered pursuant to the preceding paragraph and a pro forma statement of operations for the 12-month period ending on such date, in each case adjusted to give effect to the (i) incurrence of the Credit Facilities and any other indebtedness to be incurred pursuant to the Plan of Reorganization and the use of proceeds thereof, (ii) the consummation of the Plan of Reorganization and (iii) the payment of fees and expenses in connection with the foregoing, as if such transactions had occurred on such date or on the first day of such period, as applicable, prepared in accordance GAAP and consistent in all material respects with information previously provided by the Borrower.

(h)  All actions necessary (including obtaining lien searches) to establish that each Collateral Agent will have perfected first, second and third priority (as applicable) security interests in the Collateral shall have been taken, and, in connection with real estate collateral, such Collateral Agent shall have received reasonably satisfactory mortgages, title insurance policies, surveys and other customary documentation to the extent reasonably requested by it (collectively, the "Real Estate Collateral Deliverables"); provided, that to the extent any Real Estate Collateral Deliverable may not be delivered prior to the Closing Date without undue burden or expense and without the taking of any action that goes beyond commercial reasonableness, then the delivery of such Real Estate Collateral Deliverable shall not constitute a condition precedent to the availability of the Credit Facilities if the Loan Parties agree to deliver such Real Estate Collateral Deliverable (including related legal opinions) within a mutually agreed period of time after the Closing Date; and provided, further, that with respect to any non-U.S. Collateral, the security interest in which may not be perfected by the filing of a UCC financing statement, if the perfection of each Collateral Agent's security interest in such Collateral may not be accomplished prior to the Closing Date without undue burden or expense and without the taking of any action that goes beyond commercial reasonableness, then the delivery of documents and instruments for perfection of such security interests shall not constitute a condition precedent to the availability of the Credit Facilities if the Loan Parties agree to deliver or cause to be delivered such documents and instruments, and

509265-1038-11618-NY03.2627030

take or cause to be taken such other actions as may be required to perfect such security interests within a mutually agreed period of time after the Closing Date.

(i)  Each Administrative Agent shall have received and be reasonably satisfied with an environmental review with respect to certain real property owned or leased by the Borrower and its subsidiaries.

(j)  Subject to paragraph (h) above, each Administrative Agent shall have received such legal opinions (including opinions (i) from counsel to the Borrower, and (ii) from such special and local counsel as may be reasonably required by the Administrative Agent), certificates (including a solvency certificate), documents and other instruments (including insurance certificates, loss payable and additional insured endorsements, landlord/mortgagee/bailee waivers, consignment or similar filings and deposit account control agreements) reasonably satisfactory to each Administrative Agent and its counsel as are customary for transactions of this type or as it may reasonably request.

(k)  The Borrower shall be in pro forma compliance with the financial covenants under Existing DIP Agreement (as in effect on the date of this Engagement Letter) immediately prior to the Closing Date, and the Administrative Agent shall have received a certificate signed by a responsible officer of the Borrower, dated of the Closing Date, with respect thereto.

(l)  As a condition to the availability of the ABL Facility, the Administrative Agent thereunder shall have received, and shall be reasonably satisfied with, appraisals of the inventory, machinery and equipment and real estate of the Loan Parties from appraisers reasonably satisfactory to, and engaged directly by, the Administrative Agent (such appraisers to have no direct or indirect interest, financial or otherwise, in the property or transaction); such Administrative Agent or its designee shall have conducted a reasonably satisfactory field examination of the accounts receivable, inventory and related working capital matters and financial information of the Loan Parties and of their related data processing and other systems; and such Administrative Agent shall have received a Borrowing Base Certificate dated as of the end of the most recently ended month for which the relevant information is available, but in no event later that the date that is 45 days prior to the Closing Date with customary supporting documentation and supplemental reporting to be agreed upon.