<u>Exhibit A - Modified Bench Ruling</u>

THE COURT:  Okay.  All right.  I have before me a motion by
the United States on behalf of the Equal Employment
Opportunity Commission, or the EEOC, to deem a proof of
pre-petition claim filed in these chapter 11 cases, claim
number 16727, timely filed.  That motion is necessary
because the bar date in these chapter 11 cases was July 31,
2006 and the EEOC proof of claim was filed on October 16,
2007.  The U.S.'s motion is made pursuant to Bankruptcy
Rule 9006(b)(1) and the case law interpreting that rule,
first and foremost, <u>Pioneer Investment Services Co. v.
Brunswick Associates Ltd. Partnership</u>, 507 U.S. 380 (1993).
The general standard for determining such a motion was set
forth in the <u>Pioneer Investment Services</u> case, but the
Court is also guided by the Second Circuit's interpretation
and application of that standard in <u>Midland Cogeneration
Venture Ltd. Partnership v. Enron</u> (<u>In re Enron</u>), 419 F.3d
115 (2d Cir. 2005).

        The standard is generally well settled.
Bankruptcy Rule 9006(b)(1) permits a claimant to file a
late proof of claim if the failure to submit a timely proof
of claim was due to "excusable neglect."  The burden of
proving excusable neglect is on the claimant seeking to
extend the bar date.  <u>In re R.H. Macy & Co.</u>, 161 B.R. 355,

360 (Bankr. S.D.N.Y. 1993).  The Supreme Court in Pioneer developed a two-step test to determine whether a late filing was due to excusable neglect.  First, the movant must show that its failure to file a timely claim constituted "neglect," as opposed to willfulness or a knowing omission, neglect generally being attributed to a movant's inadvertent mistake, negligence, or simple carelessness.  507 U.S. at 387-88.  After establishing neglect, as opposed to willfulness or a knowledge of the bar date and the failure to show any unknowing basis for neglecting it, the movant must show by a preponderance of the evidence that the neglect was "excusable."  That analysis is to be undertaken on a case-by-case basis, that is, based on the particular facts of the case, although the Court is to be guided by and make the determination balancing the following factors: the danger of prejudice to the debtor, the length of the delay and whether or not it would impact the case, the reason for the delay, in particular whether the delay was within the control of the movant, and finally, whether the movant acted in good faith.  Id. at 395.

In the Midland Cogeneration case the Second Circuit, in upholding the lower court's determination that a late filed proof of claim would not be deemed timely

2

filed, stated, "We have 'taken a hard line' in applying the
*Pioneer* test. *Silivanch v. Celebrity Cruises Inc.*, 333
F.3d 355, 368 (2d Cir. 2003). In a 'typical' case, 'three
of the *Pioneer* factors -- the length of the delay, the
danger of prejudice, and the movant's good faith 'usually
weigh in favor of the party seeking the extension.' *Id.* at
366. We noted, though, that 'we and other circuits have
focused on the third factor, 'the reason for the delay,
including whether it was within the reasonable control of
the movant.' *Id.* And we cautioned 'that the equities will
rarely if ever favor a party who fails to follow the clear
dictates of a court rule' and 'that where the rule is
entirely clear, we continue to expect that a party claiming
excusable neglect will, in the ordinary course, lose under
the *Pioneer* test.' *Id.* at 366-67." That quotation appears
in the Midland Cogeneration case at 419 F.3d at 122-23.
See also In re Musicland Holding Corp., 356 B.R. 603
(Bankr. S.D.N.Y. 2006), in which Chief Bankruptcy Judge
Bernstein stated that the Second Circuit focuses on the
reason for the delay in determining excusable neglect under
Pioneer and that the other factors are relevant only in
close cases.

Strict enforcement of a bar date is no mere and
unimportant procedural matter in a chapter 11 case. The

bar date and the consequent filing of claims before the bar

date allow a debtor-in-possession, such as these debtors,

to evaluate the claims against the estate and formulate and

negotiate a plan that relates to the claims, as filed.  In

re Drexel Burnham Lambert Group, Inc., 148 B.R. 1002, 1008-

10 (Bankr. S.D.N.Y. 1993).  Allowing late filed claims,

especially after the plan is confirmed, generally subjects

debtors to prejudice because they would have to renegotiate

the many settlements (in this case, at least) that form,

generally speaking, the basis for the chapter 11 plan,

which are negotiated and ultimately set forth for the Court

to consider in light of the claims timely asserted against

the estate.  Again see Drexel Burnham, 148 B.R. 1008-10;

see also Midland Cogeneration, 419 F.3d at 129.

Furthermore, allowing a late claim to be filed

that might materially alter the distribution to creditors

would prejudice the creditors who relied on their projected

distribution when voting to accept or reject the plan.  Id.

Given the importance of collecting all of the allowable

claims against the estate in one forum to permit the

parties to proceed to consider a chapter 11 plan in light

of those claims, Congress defined the term "claim" in the

Bankruptcy Code extremely broadly.  As set forth in Section

101(5) of the Bankruptcy Code, the term "claim" means "a

right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured," and "a right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."

In this chapter 11 case, the reasonable projected allowed amount of unsecured claims against the debtors' estates took on even more significance during the plan process than in most chapter 11 cases.  That is because over a year ago it became clear that the debtors, to achieve all of the various goals that they wanted to achieve in the case, including the preservation on a frozen basis of their pension plan, needed outside investors to agree to commit to invest a considerable amount of money -- well over two billion dollars -- in the debtors pursuant to a plan of reorganization.  Part of that investment decision, as negotiated with the plan investors and the official unsecured creditors and shareholders committees and other interested parties, was a cap on the allowed amount, or allowable amount, of unsecured claims as of the effective date of the plan.  As ultimately negotiated in

the so-called EPCA agreement, that cap was 1.45 billion

dollars, as so specified in the agreement.  At the

confirmation hearing in this case, which began on January

17 of this year, the Court took testimony on the debtors'

ability to satisfy that cap.  At the time of the

confirmation hearing as set forth in that testimony

pursuant to the debtors' analysis, and ultimately as found

in the Court's determination of timely filed claims that

would meet the definition of claim in the EPCA cap, the

debtors satisfied the cap by only approximately two million

dollars.  Subsequently, I have continued to implement the

Court-approved process for dealing with objected-to claims

and there have been further rulings on claims as well as

further settlements.  As set forth in the deposition of Mr.

Unrue -- who has primarily responsibility as an officer of

the debtors for the claim liquidation process -- taking

into account only timely filed claims, the debtors are now

approximately twenty-four million dollars under the EPCA

cap.  And again, under the EPCA, the debtors will not be

able to obtain the outside investment, and consequently

under their chapter 11 plan (which I confirmed by what is

now a final order in January of this year) they will not be

able to emerge from chapter 11 unless they remain under

that cap.  But, of course, the cap is only an added example

of the importance of timely compliance with the bar date in
these particular cases.  In addition, as generally speaking
in most chapter 11 cases (as recognized by <u>Drexel</u> and by
the Second Circuit in <u>Midland</u>), the parties-in-interests'
assessment of properly allowable claims formed the critical
backdrop for the plan's proposal, negotiation and,
ultimately, confirmation by the Court, whether or not the
plan expressly conditioned its effectiveness on a claims
cap.

The material facts underlying the present motion
under Rule 9006(b) are not, as I see it, contested.  The
EEOC, through Ms. Malloy's declaration, primarily alleges
that on or about August 28, 2006 a former employee of one
of the debtors, Stanley Straughter, contacted the EEOC
regarding a potential claim for discrimination against
Delphi.  He was a temporary Delphi employee hired post-
petition and terminated post-petition allegedly, he
believed, in violation of the ADA.  He believed that he was
terminated improperly based upon Delphi's sick leave
policy, which apparently required employees who called in
sick to execute a release that would allow Delphi, or at
least the entity employing Mr. Straughter, to obtain
medical records relating not just to the employee's reason
for taking sick days but also to the employee's entire

medical history.

Ms. Malloy's declaration, which is Exhibit 1 in the record, then states that an investigator for the EEOC, Ms. Carlo, after sending Mr. Straughter a questionnaire to complete and receiving back the questionnaire, drafted a charge of discrimination for Mr. Straughter's signature, which she sent to him on or about September 13, 2006. She subsequently discussed that charge with him and sent a revised charge to him on September 18, 2006. I take it that the "charge" referred to in Ms. Malloy's declaration is the type of "charge" referred in 42 U.S.C. Section 2000E-5.

On September 22, 2006, Mr. Straughter formally filed his complaint of discrimination with the EEOC, Index Number 525-2006-01314. And on October 2, 2006, the EEOC forwarded the charge to Delphi for a response. Before continuing, I should note, although I think my references to the dates makes this obvious, that all of these dates, including the date upon which the EEOC first learned of Mr. Straughter's concerns about discrimination, were after the bar date. Again, that date was July 31, 2006.

On November 6, 2006 Delphi responded to the charge. According to Ms. Malloy's declaration at paragraph 11, the response "essentially admit[ed] the factual

allegations of Straughter's complaint, but contend[ed] that
he could not demonstrate a prima facie case of retaliation
in violation of the ADA.  Relying on EEOC guidance that an
employer 'may ask an employee to justify his/her use of
sick leave by providing a doctor's note or other
explanation, as long it has a policy or practice of
requiring all employees...to do so,' Delphi argued that it
was permitted to require its employees to execute a release
so that the company could obtain medical records and speak
with personal physicians."  Delphi's specific response is
attached as Exhibit H to Ms. Malloy's affidavit, in which
on page 2, Delphi says "because Delphi requires this of all
employees it was within the EEOC's guidelines."  The U.S.
has stated at oral argument that Delphi's policy was, on
its face, violative of the ADA.  It therefore appears to
me, notwithstanding the fact that Mr. Straughter was a
post-petition employee, that Delphi's November 2, 2006
response -- were one to assume, as of course the EEOC does,
that Delphi's policy was violative of the ADA on its face -
- provided sufficient information for the EEOC to
reasonably infer that Delphi's policy extended also to
those who were employed during the pre-petition period,
since the response referred to a practice required of "all"
employees.

In any event, as noted in paragraphs 12-14 of Ms.
Malloy's declaration, and in particular the first sentence
of paragraph 14 of her declaration, the EEOC continued to
seek further information from Delphi "to investigate the
claim of discrimination." (Emphasis added.)  Eventually,
having received sufficient information to satisfy its
internal deliberative process according to Ms. Malloy, on
or about May 22, 2007 the EEOC issued a letter of
determination, which, in relevant part, took the position
that Delphi subjected Straughter and a class of employees
nationwide to an unlawful policy of making disability-
related inquiries that are not job related and consistent
with business necessity, in violation of the ADA.  The next
day, May 23,2007, the EEOC contacted Delphi to begin
conciliation efforts, as contemplated by 42 U.S.C. Section
2000E-5, which were not fruitful since there was a
fundamental disagreement between Delphi and the EEOC as to
the underlying premise that Delphi had breached the ADA.
Malloy Decl. paragraphs 18-19.  Confirming that those
efforts had failed on June 19, 2007, the EEOC forwarded the
case to the New York district office for determination of
whether an enforcement action should be filed in the U.S.
District Court. Malloy Decl. paragraph 20.

Ms. Malloy's declaration, as well as her

deposition testimony, referred to the EEOC's Regional

Attorneys Manual, which outlines the steps that the EEOC

must take before filing a Federal District Court action, as

contemplated by 42 U.S.C. 2000E-5, to enforce its rights

and remedies under the ADA.  And her declaration states

that after going through the steps in the Manual, the EEOC

filed a complaint on behalf of a class of Delphi employees

in the U.S. District Court for the Western District of New

York on or about September 28, 2007, just over three months

after conciliation efforts had failed.  Malloy Decl.

paragraphs 21-22.  The EEOC takes the position here that

that was a timely and rapid process under its statute and

the Regional Attorney's Manual.  And as far as this matter

is concerned, which deals with relief from the bar date,

not the District Court action, Delphi appears to me not to

have disputed the contention that the EEOC timely commenced

the District Court action.  Roughly three weeks later, on

October 16, 2007, the EEOC filed the claim at issue here in

the bankruptcy case, which, again, is roughly thirteen

months since the date that it learned of Mr. Straughter's

concern and a little under twelve months after the date

that Delphi first responded to the charge.

        In addition, the record before me reflects that

no employee of Delphi asserted a claim for which one could

arguably contend any element included a breach of the ADA

or a violation of the ADA on this type of basis,

notwithstanding the notice of the bar date provided to

known present and former employees, as well as the wide

publication notice that was provided (and of course, this

being a very prominent chapter 11 case prominently

involving labor issues, the Court can reasonably infer that

present and former employees who did not receive actual

notice would have been aware of the case, making

publication notice even more than usually meaningful).  As

I said at oral argument, I also believe that the basis, the

underlying factual basis, for this type of claim is not

counter-intuitive or esoteric.  The litigation of the basis

of the claim might be, but the fundamental facts underlying

the claim are such that one would assume an employee with a

grievance would assert such a grievance -- that is,

Delphi's alleged requirement to provide access to an

employee's medical records in connection with sick leave is

obviously a very sensitive and potentially offensive

subject to individual employees.  Nevertheless, as noted,

the record, I believe, is undisputed that there are no

timely filed pre-petition claims by employees based on such

facts.  The EEOC's proof of claim appears to seek monetary

relief on behalf of the employees themselves.  And the

debtors have cited case law that stands for the proposition
that where the EEOC is seeking such monetary relief, as
opposed to prospective injunctive relief, it is subject to
claim preclusion if the relevant employee's claims have
already been decided or precluded.  See EEOC v. Jefferson
Dental Clinics, PA, 478 F.3d 690, 696-99 (5th Cir. 2007);
see also O'Loughlin v. County of Orange, 229 F.3d 871 (9th
Cir. 2007), in which an individual's monetary ADA claim was
deemed discharged in Orange County's bankruptcy case even
though the employee's "right to sue" letter was received
post-discharge.

        The argument made by the EEOC in its motion and
in the exhibits offered up by the EEOC, including Ms.
Malloy's declaration, for why Rule 9006(b)(1) should apply
here is two-fold.  First, the EEOC contends that since it
is conceded that it learned of the claim after the bar
date, it should be excused from complying with the bar
date.  Secondly, it contends that the requirements of its
own deliberative practices and procedures for determining
whether it had a properly assertible claim precluded it
from filing the proof of claim until the date that it did,
or until a relatively short time after the date that it
would have been so precluded.

        The first argument, given the facts that I've

recited, clearly is inadequate as it sidesteps the real
issue: the EEOC does not adequately address the delay
between the date it learned it had a claim and the date it
eventually filed its proof of claim.  Under the two-step
analysis set forth in Pioneer, the failure to file a proof
of claim until over a year after learning of the claim
would need to be justified, first, as an act of "neglect"
as opposed to a conscious decision, or a decision that was
made with knowledge of the existence of the bar date, and,
second, assuming that that hurdle were surmounted in favor
of the EEOC, under Pioneer and Midland Cogeneration's
balancing test, with respect to which the EEOC has the
burden of proof, by showing that such neglect was
"excusable."  Except as perhaps set forth in oral argument
today, the EEOC has not begun to carry its burden to show
"neglect" for its year-long delay.  Ms. Malloy's
declaration and her deposition transcript reflect that she
did not know when or would not say when she began her
involvement in this matter, although, ultimately, with a
considerable amount of prying, we learned that her
involvement apparently went back to sometime before May 22,
2007, but after December 2006.  In any event, though,
neither from her personal knowledge nor from her
familiarity with the file and what others have told her,

has she offered a reason for the EEOC's delay in filing a
proof of claim after it prepared Mr. Straughter's charge,
such as, for example, any of the types of excuses set forth
by the Supreme Court or provided by example by the Supreme
Court in Pioneer, or the absence of notice of the bar date.
In any event, the declaration and deposition of Mr.
Gershbein show that the debtors provided sufficient notice
of the bar date to the U.S., as well as, of course, of the
bar date order referred to in the bar date notice, and that
there was no return of that notice to the debtors as
undeliverable.  Under the case law, that establishes a
strong presumption of the receipt of notice, which very
clearly has not been rebutted here.  See In re Dana Corp.,
2007, W.L. 1577763, page 4 (Bankr. S.D.N.Y. 2007), and In
re R.H. Macy & Co., Inc., 161 B.R. 355, 359 (Bankr.
S.D.N.Y. 1993).  Indeed, and I will come back to discuss
this testimony in more detail, in her deposition, Ms.
Malloy was asked two questions, the answers to which are
instructive regarding the issue of "neglect."  First,
"Q.  Did you need to get advance authorization from the
commissioner or at EEOC headquarters in Washington prior to
filing your proofs of claim, that is the proofs of claim in
this case?"
"A.  No."

Next question.

"Q.   What authorizations do you need to file a proof of claim in a bankruptcy case on behalf of the EEOC?"

"A.   I'm not aware of any particular authorizations that we require."

She was also asked, as the EEOC's witness testifying in support of excusable neglect --

"Q.   Are there any other bases of excusable neglect, other than in your memorandum, that the EEOC filed, of which you are aware?" Dep. Tr. 34-35.

"A.   I think the memorandum covers it, including the fact that Mr. Straughter did not even come to the EEOC, I believe it was after the bar date already passed at that time, and his claim, in any event, is not a pre-petition claim."  Dep. Tr. 62.

Thus, Ms. Malloy has not offered evidence of "neglect" showing why the EEOC waited approximately a year to file the claim after Mr. Straughter came to the EEOC and Delphi responded to the charge.

Moreover, even if the EEOC could be said to have proven that its delay stemmed from "neglect" as opposed to a conscious omission or choice, it has not shown that such neglect would be "excusable."  And again, I point out that to my mind for purposes the Bankruptcy Code's definition

of a "claim" under 101(5), the EEOC would have believed

that there was a basis for asserting a pre-petition "claim"

at least as early as November 2006, and it acknowledges

that it made a formal "determination" on May 22, 2006.

Nevertheless, the EEOC contends that the delay between any

of those dates and the date it eventually filed the proof

of claim was "excusable" because it had to assure itself of

the merits of the claim and go through a conciliation

process.  The case law dealing with analogous situations is

to the contrary, and clearly supports the debtors'

position.  See, for example, In re Calpine Corp., 2007 W.L.

4326738, pages 6-7 (S.D.N.Y 2007), holding that a six-month

delay between the date when one could be said to have had

to file a proof of claim and the date that it was actually

filed was not excusable neglect, and noting that the

claimant had the ability to file supplemental proofs of

claim at any time to amplify their claim (as opposed to

asserting a new type of claim) and did not offer any

explanation of why no such supplements were filed until

such a late date.  See also In re Northwest Airlines Corp.,

2007 W.L. 498295, page 3 (Bankr. S.D.N.Y. 2007), in which

the Court stated "movant cannot properly ground its

excusable neglect argument on the fact that it conducted an

investigation and tried to resolve the issues in good faith

negotiations.  All of this could be done after a filing is first made and rights are preserved."  A similar point was made in In re Enron Corp., 2007 W.L. 294114 (Bankr. S.D.N.Y. 2007), in which the movant sought leave to file a late proof of claim approximately twenty months after the bar date, stating that it was not sure before then that it had a pre-petition guarantee claim against the debtor because it did not have an executed copy of the guarantee notwithstanding a diligent search.  Bankruptcy Judge Gonzalez disagreed.  Noting again that the most important factor in the Pioneer analysis is the reason for the delay, the Court found that the creditor had failed to carry its burden.  In addition to noting that the creditor had a means to obtain information in the bankruptcy case by invoking the intervention of the Court under Bankruptcy Rule 2004, Judge Gonzalez found that it also could have filed a proof of claim without a copy of the executed guarantee without committing perjury, and that, in fact, the bar date order permitted it to file a protective claim and explain why a copy of the guarantee was not available. See also In re New York Trap Rock Corp., 153 B.R. 648 (Bankr. S.D.N.Y. 1993), in which Bankruptcy Judge Schwartzberg denied a Rule 9006(b) motion on the basis of prejudice to the debtor, as well as untimeliness, while the

movant had been pursing non-bankruptcy remedies in the face
of a bar date.

As far as the "reason for the delay" argument is
concerned, as well as the issue of "prejudice," I conclude
that the facts here are at least as, if not more,
compelling than the foregoing cases.  The debtors here were
clearly reorganizing, unlike in Enron.  Moreover, I've
noted the particular nature of prejudice here over and
beyond the prejudice recognized in the Enron case that I've
just discussed as well as in New York Trap Rock whenever
new claims are asserted after a plan has been filed and
negotiated and confirmed -- that extra prejudice here being
the cap on claims for purposes of the EPCA and the debtors'
ability to emerge from chapter 11, which is premised on the
EPCA actually closing.  Moreover, at least on this record,
the EEOC has not explained why it could not have filed a
protective proof of claim, particularly given the fact that
it had formed the belief that there was a claim at least by
May 22, 2006, and arguably -- or more than arguably --
would have been able to do so at least by November 2006.
This is particularly so given the fact that the bar date
order itself recognizes, in paragraph 4, limitations on who
may review the supporting documentation in any proof of
claim (which is over and above any rights that a claimant,

such as the EEOC, would have under Section 107 of the
Bankruptcy Code to obtain additional confidentiality
protection, which this Court has repeatedly granted in this
case, not only to the debtors but also to third parties,
whenever they made a reasonable case that information
covered by 107 would be implicated in a public filing).  In
other words, far too much happened in the year before the
EEOC filed its proof of claim for the debtors not to be
prejudiced by permitting the claim to be filed now, and the
EEOC's submissions do not offer any meaningful excuse for
such delay.

As I previously noted, however, the EEOC's
counsel contended at oral argument – although, I believe,
contrary to the reasonable inference one can draw from the
deposition testimony of Ms. Malloy quoted earlier, which
was defended by the same counsel -- that the EEOC's statute
governing how it needs to process "charges" and bring
enforcement actions in the District Court, nevertheless
precluded the EEOC from filing a proof of claim in the
bankruptcy case.  Again, see 42 U.S.C. Section 2000E-5,
which sets forth a process for the EEOC to review "charges"
by persons aggrieved under the statute, as well as the
process for proceeding with a civil action.  In particular,
it was contended during oral argument that under 42 U.S.C.

Section 2000E-5(b), which provides that "charges" shall not be made public by the Commission, the EEOC was precluded from filing a proof of claim in the bankruptcy case, and that the process set forth in Section (f)(1) of the statute including the process for going through conciliation before the Commission can bring a civil action, also precluded the Commission from filing a proof of claim.

Neither counsel nor Ms. Malloy, who is an attorney for the EEOC, have been able to tell me whether, indeed, the EEOC follows a practice generally in bankruptcy cases of not filing proofs of claim, even as a protective matter, until it has commenced a civil action.  Although the EEOC has the burden of proof, they acknowledge, instead, that they know nothing about how the EEOC deals with proofs of claim in chapter 11 cases, except in respect of Ms. Malloy's own personal knowledge of this case, which, of course, as a factual matter, begs the question since the claim here was filed only after the filing of the complaint in the Western District of New York, although, again, Ms. Malloy's deposition testimony does suggest that the EEOC's delay in filing the claim resulted from its desire to comply with 42 U.S.C. 2000E-5.

I've reviewed the statute, as well as the regulations, 29 C.F.R. 1600 et seq., and I believe based

upon that review, including the regulation specifying what

must be set forth in a "charge," 29 C.F.R. Section 1601.12,

that the requirements set forth in 42 U.S.C. Section 2000E-

5 would not, contrary to the EEOC's suggestion, reasonably

be read to preclude it from filing a proof of claim in this

case before the commencement of the District Court

litigation.  The EEOC made no effort in this case to seek

direction from the Court on this issue, moreover, but

merely waited until after the District Court litigation was

filed to file the proof of claim.  Given the definition of

"claim" in the Bankruptcy Code and the important purposes

of that broad definition, I believe that what Congress had

in mind there was far more extensive than either the

definition of "charge" or a "civil action" in 42 U.S.C.

Section 2000E-5, and that to the extent the EEOC's

prolonged failure to file the proof of claim even

constituted neglect, which I have serious doubts about, as

opposed to a conscious decision, the EEOC's neglect is not

excusable.  The asserted reason for the delay, first, is a

unilateral legal interpretation that is contrary to the

Bankruptcy Code's definition of "claim."  Frankly the

argument appears to have been generated this morning at

oral argument and clearly is contrary to Ms. Malloy's

answers about the EEOC bankruptcy claim process in her

deposition and concededly unsupported by any evidence of
the EEOC's practice in other bankruptcy cases.

Secondly, there would indeed be prejudice here.
This is an unliquidated claim, and it would be difficult to
liquidate promptly.  And it is contended that the parties
have discussed -- and even if it were not contended, the
Court would take into account the fact that -- the
liquidation of the claim might involve, even on an
estimation basis, a request for withdrawal of the reference
under 28 U.S.C. § 157, which would further delay the
liquidation of the claim.  Thus, the claim implicates the
EPCA cap and would not be quickly resolved, over and above
the normal prejudice to the chapter 11 plan having been
proposed, negotiated, voted on and confirmed under the
reasonable assumption that the claim did not exist.

This Court has dealt with several requests to
extend the bar date in these cases, and, consistent with
Midland, has generally taken a hard line with those
requests and denied them.  In addition to the effect of
this claim on the EPCA cap and the premises under which the
parties negotiated and voted on and the Court confirmed the
chapter 11 plan, therefore, it appears to me that other
late filed claims could come out of the woodwork, as well,
at this point if the Court were to, under the present

facts, grant the motion here.  So the prejudice is three-
fold: first, directly because it's not clear to me that
this claim on its own would be liquidated in time to
preclude an assertion of a default under the EPCA, and,
secondly, that such liquidation would not necessarily
result in an amount under the cap based on Mr. Unrue's
declaration and deposition testimony, in which he said that
there were a handful, at least, of other unliquidated and
partially liquidated claims that were filed on a timely
basis.  And then thirdly, there is the prejudice generally,
which is harder to quantify but I believe still exists,
that by opening the door by granting a motion on this shaky
foundation, I would encourage other late claimants to seek
relief under Rule 9006 or to seek reconsideration of the
Court's prior orders denying them relief under Rule 9006.

        Finally, I note here, as an independent concern,
the point I made some time ago, which is that no individual
employee or former employee, all of whom I believe had
adequate notice of the bar date, filed a claim that could
be construed to assert this type of claim, which the EEOC
is asserting on behalf of such a class.  By analogy, and I
believe it's a very close analogy, therefore, I believe
that the reluctance of courts in this district to certify
classes for purposes of class proofs of claim under

Bankruptcy Rule 7023 and Federal Rule 23 is instructive.
As Chief Bankruptcy Judge Bernstein has noted, where the
request for class certification comes after a bar date has
been established and has passed, bankruptcy law
considerations argue strongly against granting the motion
for certification.  See In re Musicland Holding Corp., 362
B.R. 644, 654-56 (Bankr. S.D.N.Y. 2007) (citing In re
Jamesway Corp., 1997 Bankr. Lexis 825, page 10 (Bankr.
S.D.N.Y. June 11, 1997), and In re Sacred Heart Hosp. of
Norristown, 177 B.R. 16, 24 (Bankr. E.D. P.A. 1995)).  See
also Judge Rakoff's decision In re Ephedra Prods. Liab.
Litig., 329 B.R. 1 (S.D.N.Y 2005), in which Judge Rakoff
examined the timing of the request for class certification
and found that the late date of the request -- in essence
arriving in connection with the impending hearing on
confirmation of the debtors' plan -- precluded the grant of
the motion.  I believe it would similarly undermine my bar
date order to let in a class claim on behalf of people who
did not file pre-petition claims for the very same claim
before the bar date, under these particular circumstances,
at least.

        So for those reasons I'll deny the motion.  Mr.
Lyons, you can submit an order to that effect.  You don't
need to settle it but you should provide counsel for the

EEOC with a copy when you give it to the Court.  As I often

do when I give a long bench ruling, I'll go over the

transcript of this matter, not only for typos and mis-

citations or incorrect spellings of names and case names,

but also for my grammar and additional points that I may or

may not want to make.  But the gist of my ruling and the

reasons for it won't change.

      MR. LYONS:  Thank you, Your Honor.  I did clarify

that proof of claim 16727 is actually the claim that was

filed on behalf of the other pre-petition claimants.  Claim

number 16728 was actually the administrative expense

request filed by Mr. Straughter.

      THE COURT:  And that's not objected to on the

basis of timeliness?

      MR. LYONS:  Correct.  So that one would clearly

remain -- survive Your Honor's ruling.  It's 16727 that

would be disallowed and expunged.

      THE COURT:  Right.  The pre-petition claim.

      MR. LYONS:  Correct.

      THE COURT:  Okay.  All right.

      MR. LYONS:  Thank you, Your Honor.

    (Proceedings concluded at 12:57 p.m.)