# **EXHIBIT 3**



Contract No. 02JABS5CPU5J

# Services & Use Agreement

**Customer Address**

| Name<br>Delphi Automotive Systems, LLC | | |
|---|---|---|
| Street Address<br>408 Dana Av | | |
| City<br>Warren | State<br>Ohio | Zip<br>44486 |
| Site Contact<br>Lee Villers | Telephone No<br>330-373-7813 | County<br>Trumbull |

**Billing Address**

| Name<br>Delphi Automotive Systems, LLC | | |
|---|---|---|
| Street Address<br>P.O. Box 431, Sta 93M | | |
| City<br>Warren | State<br>Ohio | Zip<br>44486 |
| Billing Contact<br>Jeff Zeigler | Telephone No.<br>330-373-4829 | Fax No.<br>330-373-3096 |

## Terms of Agreement

| | |
|---|---|
| Initial Term | 60 months |
| Equipment Payment | $29,204.73 |
| Services Payment | $ 9,552.75 |
| Centurion Payment | $ 9,697.79 |
| Total Monthly Payment | $48,455.27 |

This Services and Use Agreement is made and entered into this 15th day of May, 2003 by and between United Telephone Company of Ohio ("Sprint") and the Customer named above ("Customer"). This Services and Use Agreement consists of this page, Attachments A and B, Schedules A, B, C, and D and other schedules as identified on Attachment B, and Addenda (as amended and supplemented, collectively, the "Agreement").

Subject to the terms and conditions of this Agreement, Sprint will provide certain Equipment (including any software) identified on Attachment A and those Services identified on Attachment B for use by the Customer in accordance with the terms and conditions set forth in Schedules A, B, C, and D. The Total Monthly Payment set forth above, which includes the Equipment Payment and the Services Payment, does not include other charges for telephone or other services, which also appear on the Customer's telephone bill.

CUSTOMER REPRESENTS AND WARRANTS THAT THE EQUIPMENT WILL BE USED FOR ONLY BUSINESS PURPOSES. CUSTOMER ACKNOWLEDGES BY ITS SIGNATURE THAT IT HAS READ AND UNDERSTANDS ALL TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, ALL ATTACHMENTS AND SCHEDULES.

Each party has caused this Agreement to be executed by its duly authorized representative on the date set forth below its signature but effective as of the date set forth above. This Agreement is not binding until signed by an authorized representative of SPRINT at its headquarters.

AGREED:

Sprint

By: _[signature]_

Print Name: Ralph Hodge by Joanne Jones by Michael Frank

Title: President - BWM

Date: 6/26/2003

Address for Notices:

Sales Administration
Mail Code: OHMANJ0101
Facsimile No.: (419) 756-8185

Delphi Automotive Systems, LLC
Customer

By: _[signature]_

Print Name: BETTE WALKER

Title: EXECUTIVE DIRECTOR of Global Business Services & Operations

Date: 6/25/2003

Address for Notices:

Delphi Automotive Systems, LLC
Attn: John Nolan
1450 Long Lake Rd
Troy, MI 48098

Revised 05/15/03 ABF

1

**Contract No. 02JABS5CPU5J**

## Attachment A

**Installation Address**

| Name | | |
|---|---|---|
| Delphi Automotive Systems, LLC | | |
| Street Addresses | | |
| 4551 Research Parkway Av, 1265 North River Road 500 W. Main St. Cortland | | |
| City | State | Zip |
| Warren | Ohio | 44486 |
| Installation Contact | Telephone No. | Customer PO # |
| Lee Villers | 330-373-7813 | P1S |

### Equipment List

| Quantity | Item Description |
|---|---|
| 1 | **Option 81C - 1265 North River Road** |
| 1717 | Meridian M3902 Basic, Rel. 3, Charcoal |
| 195 | Meridian M3904 Rel 3, Charcoal |
| 2 | Meridian Integrated Conference Bridge (62 Port Card) |
| 1 | Meridian Integrated Conference Bridge (24 Port Card) |
| 29 | Analog Message Waiting Line Cards (16 Port) |
| 124 | Digital Line Cards (16 Port) |
| 7 | Dual Port DTI/PRI Package |
| 2 | ITG 2.0 Trunk - SM & Lg Sys. |
| 6 | ITG 2.1 Trunk W/O DCHIP & NTP |
| 3 | Universal Trunk Cards (8 Ports each) |
| 1 | Alpha UPS 4-Hours |
| 1 | **Call Pilot - 2500 Users** |
| 1 | Optivity |
| 25 | Meridian M3905, Rel 3, Charcoal |
| | |
| 1 | **Option 11C   4551 Research Parkway - CSE Test Center** |
| 144 | Meridian M3902 Basic, Rel. 3, Charcoal |
| 36 | Meridian M3904, Rel 3, Charcoal |
| 3 | Analog Message Waiting Line Card (16 Port) |
| 12 | Digital Line Card (16 Ports) |
| 1 | Universal Trunk Card (8 Ports each) |
| | |
| 1 | **Option 11C   500 W. Main St.  Cortland, Ohio** |
| 48 | Meridian M3902 Basic, Rel. 3, Charcoal |
| 12 | Meridian M3904, Rel 3, Charcoal |
| 1 | Analog Message Waiting Line Card (16 Port) |
| 4 | Digital Line Card (16 Ports) |
| 1 | Universal Trunk Card (8 Ports each) |

**Contract No. 02JABS5CPU5J**

## Attachment B

Installation Address

| Name | | |
|---|---|---|
| Delphi Automotive Systems, LLC | | |
| Street Address | | |
| 4551 Research Parkway Av, | | |
| 1265 North River Road | | |
| 500 W. Main St. | | |
| Cortland | | |
| City | State | Zip |
| Warren | Ohio | 44486 |
| Billing Contact | Telephone | |
| Jeff Ziegler | No. | 330-373-4829 |

SERVICE. Sprint will provide to Customer those Service(s) identified below at the service address listed above.

| Type of Service | Recurring Monthly Rate* | Non-Recurring Charge* |
|---|---|---|
| (6) ISDN-PRI - 1265 North River Road | $5,571.30 | $ 145.00 |
| (1) DS3 - North River Road | $1,935.35 | $ 0.00 |
| (1) ISDN-PRI - 500 W. Main St Cortland | $1,117.55 | $ 125.00 |
| (1) ISDN-PRI - 4551 Research Pkwy | $928.55 | $ 0.00 |

*Rates quoted are subject to change in accordance with Tariff changes (see Section 7 of the Agreement) and/or approval by appropriate regulatory agencies with whom this contract must be filed. Non-Recurring Charge(s) is not included in the Services Charge set forth on page one of this Agreement and will be billed separately on Customer's telephone bill. Recurring Monthly Rates are included as part of the Total Monthly Payment specified on page one of this Agreement.

☒ Centurion Maintenance

NOTE:
1. <u>Centurion Maintenance</u> services are offered in accordance with the additional terms and conditions of Schedule D.
2. <u>TARIFFS.</u> Tariff refers to Company's Tariffs filed with, and approved by, respective federal and/or state regulatory commissions. Tariffs applicable to the Service(s) may be modified from time-to-time. Customer may discontinue any tariffed Service provided hereunder without termination liability if, without the consent of Customer, Sprint voluntarily initiates and obtains the effectiveness of tariff changes in the prices, terms, and conditions for the Services provided in a way that materially and adversely effects Customer prices and quoted rights hereunder (an "Adverse Tariff Revision"), provided that Customer exercises its right to do so upon thirty (30) days' written notice, given within thirty (30) days of learning of Sprint's tariff filing.

Revised 05/15/03 ABF                                    3



Schedule A
Additional Terms of Agreement
Contract No: 02JABS5CPU5J
Customer: Delphi Automotive Systems, LLC

**1. Delivery and Installation.** Sprint shall deliver, install and test the Equipment and any associated software (collectively, "Equipment") described on Attachment A, Equipment List, at the location described in the Equipment List ("Installation Site"). Installation and testing shall comply with all applicable laws and regulations. The installation shall include the necessary labor, supervision, tools and equipment, technical and professional services, cabling and associated hardware as required, and site clean up. All of the work shall be in conformance with manufacturer's specifications. Customer's responsibilities with respect to installation are as described in Schedule B, Customer's Responsibilities.

**2. Customer Acceptance.** Sprint shall certify in writing to Customer that the installation and testing of Equipment has been completed and that the installed Equipment is in good working order and has been connected to the telephone switched network, all in conformance with manufacturer's specifications and Customer's Statement of Work which is attached as Schedule D to this Agreement. Customer shall inspect the Equipment within ten (10) calendar days of its receipt of the certification. If it finds the foregoing statement to be correct, it shall within ten (10) calendar days execute Sprint's Certificate of Customer Acceptance or notify Sprint in writing as to any reasons for rejection. However, if Customer rejects the Equipment because it does not comply with the foregoing, Sprint shall have the right to cure any defects within a reasonable time, taking into account the necessity of procuring replacement Equipment or parts and correcting or modifying the installation of the Equipment and submit a new certification.

**3. Cancellation Fee.** In the event the Customer repudiates this Agreement or gives notice of cancellation or otherwise breaches this Agreement prior to delivery of the Equipment, Customer shall pay to Sprint, upon demand, a sum equal to the greater of six (6) monthly Equipment Payments stated on page one of this Agreement or any actual damages incurred by Sprint as cancellation fee, and not as a penalty. In the event of cancellation after the Equipment is delivered but prior to acceptance, Customer shall be liable for an amount equal to Sprint's Loss (as defined in Section 20) less any Advance Payment. In any event of cancellation, Sprint will retain any Advance Payment.

**4. Additional Conditions Precedent.** INTENTIONALLY DELETED.

**5. Term and Renewal.** (a) The Initial Term of this Agreement shall commence on the acceptance date set forth in the Certificate of Customer Acceptance ("Acceptance Date") and continue for the number of months designated as the Initial Term on page one of this Agreement. Thereafter, this Agreement shall be automatically renewed unless and until (i) either party gives the other not less than one hundred eighty (180) days prior written notice of termination of this Agreement or (ii) Customer and Sprint have agreed upon a renewal of the Initial Term for a fixed period pursuant to subsection (b) hereof. Any automatic renewal of the Initial Term shall be on the same terms and conditions as set forth on the first page of this Agreement including, without limitation, the Total Monthly Payment. "Term" shall mean the Initial Term and any renewal or extension thereof.

(b) Customer shall notify Sprint in writing not less than 180 days prior to the end of the Initial Term if Customer intends to renew the Term of the Contract for a specified period of time at an amount equal to the fair market rental value, in continued use, of the Equipment for such time period at the end of the Initial Term. Within 30 days of receipt of such notice, Sprint shall provide to Customer the amount of the new Total Monthly Payment based on such fair market rental, in continued use, and Customer shall have 30 days from receipt of such notice to elect to renew the Contract for such period and on such terms and conditions as provided in Sprint's notice. In the event Customer and Sprint are unable to agree on the fair market rental, within thirty days after delivery of the renewal notice, the fair market rental, in continued use, will be determined promptly by an independent appraiser mutually selected by Customer and Sprint, or failing such agreement, by a panel of three (3) such appraisers, one selected by Customer and Sprint and a thired selected by the first two appraisers. The determination of the fair market rental, in continued use, of the joint independent appraiser or the average of the three numbers provided by the panel of three (3) appraisers, will be conclusive and binding on the parties. The cost of any such appraisals will be paid equally by Customer and Sprint.

**6. Services.** Sprint shall provide those network services, if any, as described on Attachment B ("Services") during the Term of this Agreement. These Services will be provided in accordance with the applicable Sprint Tariffs or Schedule attached to this Agreement. Sprint shall assure that Services, if any, provided under this Agreement shall operate as specified in the tariff provisions or the terms and conditions pertaining to such Services and will make any repairs necessary to assure such continued operation. In the event of a conflict between the Sprint Tariff, a Schedule or this Agreement, the Tariff will control.

**7. Payment.** Customer shall pay the Equipment Payment and the Services Payment (if any) during the Term of this Agreement commencing on the Acceptance Date. The billing for the Monthly Payment will be included in the Customer's telephone bill from Sprint. Customer shall pay Sprint such charges and other invoices in accordance with its Multilateral Netting System ("MNS-2"), which provides, on average, that payment shall be on the second day of the second month following receipt of Sprint's invoice.

The Equipment Payment is based on Customer's use of the Equipment described in Attachment A. The Services Payment, if any, is based on Customer's purchase of the specific Services described in Attachment B. If the prices for Equipment and/or Services are increased or decreased as a result of job change orders before or after the Acceptance Date, the Equipment Payment and/or the Services Payment, as applicable, shall be adjusted as in the final Modification Agreement. If the tariff rate(s) for Services changes, Customer will be billed for the Services at the new rate as permitted in the applicable tariff.

**8. Taxes and Fees.** If a taxing jurisdiction requires sales tax be paid at the commencement of this Agreement and Customer elects not to pay the up front sales tax but to have it included in the Equipment Payment, Sprint will finance it as part of the Equipment Payments. Sales and use taxes

Revised 05/15/03 ABF

4

imposed during the Term of this Agreement on the Equipment and/or Equipment Payments will be added to the Equipment Payments, if applicable. Sales taxes will be added to the Services Payments, if applicable. Notwithstanding the foregoing, if Customer provides Sprint with a copy of a valid Direct Pay Permit from the State of Ohio prior to the commencement of this Agreement, Customer agrees that it will timely report and pay all applicable sales and use taxes to the appropriate taxing authority. Sprint will not pay such taxes and seek reimbursement from Customer. If requested by Sprint, Customer will provide Sprint with copies of such filings and evidence of payment.

9. **Title, Personal Property, Inspection and UCC's.** Title to the Equipment shall at all times remain in Sprint or its Assignee (as defined in Section 18). The Equipment shall at all times remain personal property even if it is attached to real property or any improvements thereon. At Customer's expense, Customer shall at all times (a) keep the Equipment free and clear of all liens and encumbrances except for those arising through Sprint, and (b) otherwise cooperate to defend Sprint's interest in the Equipment and to maintain the status of the Equipment as personal property. Customer authorizes Sprint and its Assignee and their agent(s) to sign UCC financing statements on behalf of Customer and to file financing statements without Customer's signature, at Sprint's expense. Sprint will or will cause its Assignee's to terminate any such financing statements promptly after all amounts due and owing under this Contract have been paid in full. Customer acknowledges that it is not purchasing the Equipment and is not acquiring any rights in the Equipment other than the right to use the Equipment for the Term. The filing of any financing statements shall not be deemed evidence of any contrary intent but of an attempt to protect Sprint's rights and title to the Equipment.
Sprint represents, warrants and covenants that so long as Customer is not in default of any of its obligations under this Agreement, neither Sprint nor any assignee of Sprint shall interfere with Customer's quiet use and enjoyment of the Products and Services during the term of this Agreement. Customer acknowledges that it is not purchasing the Equipment and is not acquiring any rights in the Equipment other than the right to use the Equipment for the Term.

10. **Maintenance/Warranty.** Except for any maintenance obligations specifically undertaken by Sprint hereunder, the Customer is required to keep the Equipment in good repair, condition and working order, except for ordinary wear and tear, and in compliance with all applicable manuals. The manufacturer of the Equipment warrants that the Equipment will be free from defects in material and workmanship and will conform to the manufacturer's specifications during the manufacturer's warranty period. Sprint or its subcontractor shall provide maintenance in accordance with the manufacturer's warranty. Maintenance shall be provided in accordance with the terms of a Sprint Centurion Maintenance Agreement provided by Sprint at the rate designated on Attachment B and included as part of the Services Payment of this Agreement. A copy of the Sprint Centurion Maintenance Agreement is attached herein as Schedule D.

Any repair or service performed pursuant to Customer's request, which is not covered pursuant Sprint's obligation to maintain or warrant the Equipment shall be billed at Sprint's then current rates and charges.

At all times during the Term, Customer shall use the Equipment for its designated purpose and in compliance with all applicable laws and keep the Equipment in its possession and control and shall not permit the Equipment to be moved from the Installation Site without Sprint's prior written consent. Further, Customer shall not allow anyone other than Sprint authorized maintenance technicians to maintain or otherwise repair, adjust or relocate the Equipment.

Sprint's obligation to maintain and warrant the Equipment shall not extend to any Equipment which has been subjected to misuse, neglect, accident, abuse, failure or surge of electric power, failure of environmental control, improper repair or service by persons other than Sprint or its contractors, electrical storms, lightning or failures resulting from other extrinsic causes. Should any defects covered by this maintenance/warranty obligation appear within the Term of this Agreement, Customer shall notify Sprint and Sprint shall have a reasonable time to cure such defect. Sprint shall, at its option, repair or replace the defective part or parts at its expense. Repair or replacement parts, which shall be furnished on an exchange basis, may be new or used with equivalent-to-new performance. Returned parts shall become the property of Sprint. Any Equipment installed in connection with warranty or maintenance service or manufacturer's upgrades provided at no charge to Customer shall be the property of Sprint. The obligation to repair or replace defective or failed Equipment shall be the Customer's sole remedy with respect to the maintenance/warranty obligation.

For each breach of the service levels defined in the Sprint Centurion Maintenance Agreement for the equipment and services listed in Attachment A, Sprint will credit Customer an amount equal to one day (prorated) of the monthly payments. For each failure of any regulated services listed in Attachment B with duration greater than one hour, Sprint will credit Customer with an amount equal to one day (prorated) of the monthly payment. Customer must request such credits in writing and credit will appear within the next two billing cycles from the date of the request.
EXCEPT FOR ANY WARRANTY EXPRESSLY MADE IN THIS AGREEMENT, SPRINT HAS NOT MADE, AND DOES NOT HEREBY MAKE ANY REPRESENTATION, WARRANTY, OR COVENANT, WRITTEN OR ORAL, STATUTORY, EXPRESS, OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE DESIGN, QUALITY, CAPACITY, MATERIAL, WORKMANSHIP, OPERATION, CONDITION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, HIDDEN OR LATENT DEFECTS, OR AS TO ANY PATENT, COPYRIGHT, OR TRADEMARK INFRINGEMENT. CUSTOMER USES THE EQUIPMENT "AS IS, WHERE IS".

11. **Customer's Obligations.** CUSTOMER'S OBLIGATIONS HEREUNDER WITH RESPECT TO THE EQUIPMENT AND ANY PAYMENT RELATIVE TO THE EQUIPMENT INCLUDING, WITHOUT LIMITATION, THE EQUIPMENT PAYMENTS, ARE ABSOLUTE, UNCONDITIONAL AND NON-CANCELABLE, AND NOT SUBJECT TO ANY DELAY, REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM OR RECOUPMENT FOR ANY REASON WHATSOEVER INCLUDING, WITHOUT LIMITATION, WARRANTY, MAINTENANCE OR OTHER PERFORMANCE ISSUES.

12. **Insurance.** At its expense, Customer shall keep the Equipment insured against all risks of loss and damage for an amount equal to the installed replacement cost of the Equipment with Sprint or its Assignee named as a loss payee. Customer shall, upon request, furnish satisfactory evidence that such insurance coverage is in effect. Customer may self-insure for such coverage with prior written consent of Sprint and any Assignee, which consent shall not be unreasonably withheld.

Sprint consents to Customer self-insuring with respect to the above coverages. However, in the event Customer ceases to be self-insured, Customer will obtain the insurance in compliance with the provisions of this Section.

**13. Casualty.** If any Equipment, in whole or in part, is lost, stolen, damaged, or destroyed, or is taken in any condemnation or similar proceeding (an "Event of Loss"), Customer shall immediately notify Sprint. Customer shall, at its option immediately (a) place the affected Equipment in good condition and working order, (b) replace the affected item with like Equipment or software in good condition and transfer clear title and any sublicense to Sprint or (c) pay to Sprint, within thirty (30) days of the Event of Loss, an amount equal to the Stipulated Loss Value ("SLV") as defined below for such affected Equipment plus any other unpaid amounts then due under this Agreement. If an Event of Loss occurs as to part of the Equipment for which the SLV is paid, a pro rata amount of the Equipment Payment shall abate from the date the SLV payment is received by Sprint. Upon payment of the SLV, title to the applicable Equipment and the sublicense to the applicable software shall pass to Customer with no warranties, subject to the rights, if any, of the insurer.

The SLV shall be an amount equal to all future Equipment Payments from the last payment date for which the Equipment Payment has been paid to the end of the Term, plus an amount equal to Sprint's reasonable estimate of the fair market value of the Equipment as of the scheduled expiration of the Term, which amounts are discounted to present value at a simple interest rate of five percent (5%) per annum ("Discount Rate") or if such rate is not permitted by law, then at the lowest permitted rate. If Sprint receives any insurance proceeds, Sprint shall apply such proceeds to Customer's outstanding obligations with any remaining sums to be delivered to Customer. Services, which are dependent on Equipment no longer in service due to an Event of Loss, shall be terminated. Other Services shall continue to be provided and the Services Payment and the Total Monthly Payment adjusted accordingly.

**14. Additional Equipment.** Without the prior written consent of Sprint, Customer shall not allow connection of any other central processor or telephone common equipment to the Equipment or modify or alter the Equipment. During the Term of this Agreement, Customer may request that Sprint purchase additional equipment selected by Customer ("Additional Equipment") and/or provide additional Services ("Additional Services"). Sprint's agreement to purchase Additional Equipment and include it under the terms and conditions of this Agreement and/or to provide Additional Services are subject to the condition that the amount payable with respect to the Additional Equipment shall not be less than $1,000 and is subject to satisfactory credit review of Customer's credit and is offered on a co-terminus basis with the Agreement. The Total Monthly Payment for any Additional Equipment and/or Additional Services shall be as agreed upon by Sprint and Customer. Any additions made shall be only at the written request of Customer by way of a Purchase Order that will be governed by the terms and conditions of this Agreement.

**15. Software License.** INTENTIONALLY DELETED.

**16. LIMITATION OF LIABILITY.**

16.1  Consequential Damages. SUBJECT TO SECTION 16.3, NEITHER CUSTOMER NOR SPRINT SHALL BE LIABLE FOR, NOR WILL THE MEASURE OF DAMAGES INCLUDE, ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OR AMOUNTS FOR LOSS OF INCOME, PROFITS OR SAVING ARISING OUT OF OR RELATING TO CUSTOMER'S OR SPRINT'S PERFORMANCE UNDER THIS AGREEMENT.

16.2  Punitive Damages. EXCEPT AS PROHIBITED BY LAW, EACH PARTY WAIVES ANY RIGHTS IT MAY HAVE TO CLAIM OR RECOVER ANY EXEMPLARY OR PUNITIVE DAMAGES. EACH PARTY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT TO WHICH THESE GENERAL PROVISIONS RELATE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION. THE PROVISIONS OF THIS SECTION HAVE BEEN FULLY DISCLOSED TO THE PARTIES AND THE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

16.3  Exclusions. The exclusions of liability set forth in Sections, 16.1 and 16.2 of this Agreement are not applicable to paragraphs 10 and 15.

16.4  Limitation of Liability. EXCEPT AS IS STATED IN PARAGRAPHS 10 and 15, SPRINT SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS) SUSTAINED OR INCURRED IN CONNECTION WITH OR ARISING OUT OF THE EQUIPMENT OR SERVICES FURNISHED OR TO BE FURNISHED BY SPRINT UNDER THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT INCLUDING NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, AND WHETHER OR NOT SUCH DAMAGES WERE FORESEEN OR UNFORESEEN. IN NO EVENT SHALL SPRINT BE LIABLE FOR DAMAGES, LOSSES OR EXPENSES OF ANY NATURE WHATSOEVER THAT MAY RESULT FROM THE FRAUDULENT USE OF EQUIPMENT OR SERVICES PROVIDED HEREUNDER.

**17. Indemnity.**

17.1  Indemnity by Customer. Customer shall indemnify, defend and hold harmless Sprint and its Affiliates, and its successors and assigns, and its officers, directors, employees, subcontractors, consultants, representatives and agents, from and against any and all losses, damages, injuries (including death), causes of action, claims, liabilities, penalties, interest, additional taxes, demands and expenses, including reasonable legal fees and expenses, of any kind or nature arising out of, or resulting from, any claim or allegation of a third party relating to; (i) the inaccuracy or untruthfulness of any representation or warranty made by Customer under this Agreement; (ii) Customer noncompliance with any duties or obligations to Sprint under the Agreement or a breach of its covenants; and (iii) Customer's use or operation of the Equipment or violation of the Software sublicense. Customer shall also indemnify Sprint from any cost and expenses incurred in connection with the enforcement of this Section 17.1.

17.2  Indemnity by Sprint. Sprint shall indemnify, defend and hold harmless Customer and its Affiliates, its successors and assigns, and its officers, directors, employees, subcontractors, consultants, representatives and agents, from and against any and all losses, damages, injuries (including death), causes of action, claims, liabilities, penalties, interest, additional taxes, demands and expenses, including reasonable legal fees and expenses, of any kind or nature arising out of, or resulting

from; (i) Sprint's negligent or intentional misconduct related to its performance of this Agreement, except in each case to the extent caused by the gross negligence or willful misconduct of Customer or Customer's employees or agents; or (ii) the inaccuracy or untruthfulness of any representation made by Sprint under the Agreement; or (iii) the breach of any warranty made by Sprint under the Agreement. Sprint shall also indemnify Customer from any costs and expenses incurred in connection with the enforcement of this Section 17.2.

17.3    Intellectual Property Indemnification and Injunction of Software Use.

Sprint will defend, indemnify and hold Customer harmless against third party claims and pay all court-awarded damages and/or any negotiated settlement based on an allegation that the Equipment or the Services, as provided by Sprint under this Agreement, infringe any patent, misappropriate any trade-secret or infringe any copyright or trademark, conditioned upon Customer: 1) providing prompt written notice to Sprint of such claim, 2) providing Sprint sole authority for handling, defending and settling the claim, 3) providing, at Sprint's expense, information and assistance for the claim's defense and settlement and 4) not, through itself or its agents, employees and other representatives, taking any steps that might impair Sprint's defense or settlement of the claim, including making admissions or settling with the third party. Notwithstanding the foregoing, Customer's continued operation of its business in the normal course after receiving notice of a claim will not be considered taking steps that may impair Sprint's defense or settlement of such claim, unless and until Sprint, under the paragraph below, replaces or modifies the Equipment or directs Customer to return the Equipment. Customer may participate, at its own expense, in the defense of a claim through counsel of its own choosing so long as Customer satisfies conditions 1 through 4 above.
For any third party claim that Sprint receives (either directly or through notice from Customer), or to minimize the potential for a claim, Sprint will at its option and expense either: 1) procure the right for Customer to continue using the Equipment; 2) replace or modify the Equipment with comparable Equipment; or 3) direct Customer to return such Equipment to Sprint within 30 days of receiving such direction from Sprint, and, if Customer does so, the order relating to such returned Equipment will terminate.

Sprint does not have any obligation to Customer under this section to the extent that the infringement is due to:

1.   Customer's modification of the Equipment other than as authorized by Sprint;

2.   Customer's use of the Equipment not in conformity with the Sprint's instructions, including Customer's failure to use the Equipment with the most recent software upgrade made available by Sprint; or

3.   any combination of the Equipment with any other equipment not provided by Sprint unless expressly authorized by Sprint.

17.4    Indemnification procedures.

(a)   If any civil, criminal, administrative or investigative action or proceeding (each, a "Claim") is commenced against a Party entitled to indemnification under Sections 17.1, 17.2 or 17.3 (an "Indemnified Party"), notice thereof shall be given to the Party that is obligated to provide indemnification (the "Indemnifying Party") as promptly as practicable. After such notice, the Indemnifying Party shall be entitled, if it so elects in a notice delivered to the Indemnified Party not less than ten (10) days prior to the date on which a response to such Claim is due, to immediately take control of the defense and investigation of such Claim and to employ and engage attorneys of its sole choice to handle and defend the same, at the Indemnifying Party's sole cost and expense. After notice by the Indemnifying Party to the Indemnified Party of its election to assume full control of the defense of any such Claim, the Indemnifying Party shall not be liable to the Indemnified Party for any legal expenses incurred thereafter by the Indemnified Party in connection with the defense of that Claim.

(b) The Indemnified Party shall cooperate in all reasonable respects with the Indemnifying Party and its attorneys in the investigation, trial and defense of such Claim and any appeal arising there from; provided, however, that the Indemnified Party may, at its own cost and expense, participate, through its attorneys or otherwise, in such investigation, trial and defense of such Claim and any appeal arising there from.

(c) If the Indemnifying Party does not assume full control over the defense of a Claim, the Indemnifying Party shall have the right to defend the Claim in such manner as; it may deem appropriate, at the cost and expense of the Indemnifying Party.

(d) No settlement of a Claim that involves a remedy other than the payment of money by the Indemnifying Party shall be entered into without the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed. Any settlement entered into by the Indemnifying Party shall include a full release of any claims against the Indemnified Party.

18. **Assignment.** Except with respect to the Services, Sprint may, with notice to Customer, sell, assign, grant a security interest in, or pledge its interest in all or a portion of the Equipment and/or this Agreement and any amounts payable hereunder to General Electric Capital Corporation ("Assignee"). Assignee may transfer and reassign all or a portion of the Equipment to another third party assignee with notice to the Customer, such consent to not be unreasonably withheld Customer shall, if directed, pay the Equipment Payments and/or Service Payments and other amounts due hereunder as may be assigned to an Assignee even if less than the Total Monthly Payments have been assigned. ASSIGNEE SHALL NOT BE RESPONSIBLE FOR SPRINT'S PERFORMANCE OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, THE DELIVERY AND INSTALLATION OF THE EQUIPMENT, OR THE PERFORMANCE OF ANY MAINTENANCE OR SERVICE OBLIGATIONS. ASSIGNEE SHALL NOT BE RESPONSIBLE FOR ANY DAMAGES RELATIVE THERETO. CUSTOMER SHALL NOT ASSERT AGAINST ANY SUCH ASSIGNEE ANY CLAIM OR COUNTERCLAIM, DEFENSE, SETOFF, RECOUPMENT OR OTHER RIGHT, WHICH CUSTOMER MAY HAVE AGAINST SPRINT OR ANY OTHER PERSON. WITHOUT SPRINT'S OR ASSIGNEE'S PRIOR WRITTEN CONSENT, CUSTOMER SHALL NOT ASSIGN, SUBLEASE, TRANSFER, PLEDGE, MORTGAGE OR OTHERWISE ENCUMBER ("TRANSFER") THE EQUIPMENT OR THIS AGREEMENT OR ANY OF ITS RIGHTS HEREIN OR PERMIT ANY LEVY, LIEN OR ENCUMBRANCE THEREON. Any attempted non-consensual Transfer by Customer shall be void ab initio. No transfer shall relieve Customer of any of its obligations under this Agreement.

19. **Default.** Any of the following shall constitute an Event of Default:  (a) Customer fails to pay when due any Total Monthly Payment or other amount payable hereunder that is not paid within ten (10) days of Customer's receipt of written

notice of nonpayment; (b) a party fails to perform any other material term or other agreement herein or given in connection with this Agreement that continues uncured for twenty (20) days after receipt of written notice thereof; (c) the inaccuracy of any material representation or warranty made by a party in connection with this Agreement and the continuation thereof for thirty (30) days or more; (d) Customer attempts to make a Transfer (as defined in Section 18) without the prior written consent of Sprint or Assignee (as applicable) which consent shall not be unreasonably withheld; (e) a party dissolves or ceases to do business as a going concern; (f) a party sells all or substantially all of its assets, merges or consolidates with or into, or reorganizes with any entity; (g) a party becomes insolvent, makes an assignment for the benefit of creditors, files a voluntary petition or has an involuntary petition filed or action commenced against it under the United States Bankruptcy Code or any similar federal or state law.

**20. Remedies.** If an Event of Default has occurred, Sprint or Customer (as applicable) shall have the right to exercise one or more of the following remedies set forth below. The non defaulting party may terminate and/or declare an Event of Default hereunder..) If an Event of Default occurs as to Customer, Sprint may recover from Customer (a) all Monthly Payments and any amounts then due and unpaid and (b) all Equipment Payments and Service Payments, if any, and other amounts to become due, by acceleration or otherwise (plus, if the Equipment is not returned in accordance with Section 21, an amount equal to Sprint's reasonable estimate of the fair market value of the Equipment at the end of the applicable Term.) The amounts described in the preceding sentence) shall be present valued at the Discount Rate or, if such rate is not permitted by law, then at the lowest permitted rate. The amounts set forth in subsections (a) and (b) above shall be the agreed upon damages ("Sprint's Loss"). Sprint may demand the Customer return any Equipment to Sprint in the manner provided in Section 21; and take possession of, render unusable, or disable any Equipment wherever located, with or without demand or notice or any court order or any process by law.

Upon repossession or return of Equipment, Sprint shall have the right to sell, lease or otherwise dispose of the Equipment, with or without notice and by public or private bid, and shall apply the net proceeds thereof, if any, toward Sprint's Loss but only after deducting from such proceeds (a) in the case of any reletting of the Equipment, the rent due for any period beyond the scheduled expiration of this Agreement; (b) in the case of sale, the estimated fair market value of the Equipment as of the scheduled expiration of the Term of this Agreement, and (c) all expenses including, without limitation, reasonable attorneys' fees incurred in enforcement of any remedy.

**21. Return of Equipment.** At Sprint's request upon (a) the occurrence of an Event of Default, or (b) the expiration or termination of this Agreement, the Customer shall, at its own risk and sole expense, within thirty (30) calendar days return the Equipment to Sprint, or as otherwise directed by Sprint in writing, by properly removing, disassembling and packing it for shipment, loading it on board a carrier acceptable to Sprint and shipping the same to a destination in the continental United States specified by Sprint, freight and insurance prepaid. The returned Equipment shall be in the same condition and operating order as existed when received ordinary wear and tear excepted. If Customer does not immediately return the Equipment to Sprint, Customer shall pay on demand, an amount equal to the then Equipment Payment prorated on a daily basis for each day from and including the termination or expiration date of this Agreement through and including the day Customer ships the Equipment. Customer shall pay, upon written demand, any amount necessary to place the Equipment in good repair, condition and working order, ordinary wear and tear excepted. Any alterations or modifications must be removed prior to the return of the Equipment. If not removed, title to such alterations or modifications shall pass to Sprint. Customer understands and agrees that it will be Customer's sole responsibility to provide alternative telephone Equipment to meet Customer's needs when Equipment covered by this Agreement is removed.

**22. Compliance with Law.** INTENTIONALLY DELETED.

**23. Force Majeure.** Except for Customer's obligations to make payments, which shall not be excused, neither Party shall be subject to liability for failure to perform any of its obligations under this Agreement if such failure is due to force majeure, which shall be deemed to include, without limitation, fire, storms, floods, riots, strikes, lockouts and other labor difficulties, freight embargoes, delays of carriers or suppliers, inability to secure fuel or power, acts of God, acts of war or hostilities of any nature, or laws, rules or regulations of the United States of America affecting the conduct of such Party's business, or to any other cause beyond such Party's reasonable control, The Party that is unable to fulfill its obligations due to any such contingency shall promptly give notice to the other Party with details of such contingency, within a reasonable time after the occurrence of such contingency. The obligations of the Party given such notice shall be suspended, insofar as such Party is affected by such contingency, but only for so long as the contingency and the Party's inability to fulfill its obligations shall continue.

**24. Representations And Warranties.**

24.1    Mutual Representations and Warranties. Each Party warrants to the other that: (i) it has full power and authority and has taken all corporate or other necessary action to enter into and perform this Agreement; (ii) the execution and performance by it of its obligations under this Agreement will not violate any laws or constitute a breach of, or conflict with, any terms of organization documents or any other agreement or arrangement, whether written or oral, by which it is bound; and (iii) the individual(s) executing this Agreement has been given authority to bind the Party on whose behalf they are signing and acknowledges that this Agreement creates a legal, valid and binding obligation, enforceable in accordance with its terms;

24.2    Representations and Warranties. Each Party represents and warrants that (i) there are no suits pending, of which the Party is aware, against it which, if decided adversely to it would directly or indirectly affect or impair the rights and interests of it in the Equipment or the ability of it to perform its obligations hereunder; and (ii) each Party shall comply with all applicable laws, regulations and ordinances in its performance of this Agreement.

24.3    Sprint Representations and Warranties. Sprint represents and warrants that:
   (a)    Compliance with Laws. Sprint shall comply with all laws where failure to do so would have a material adverse effect on its performance under this Agreement or on Customer's business.
   (b)    Right to Grant Licenses. Sprint has full legal right and authority to grant to Customer the license(s) granted in this Agreement.
   (d)    No Malicious Code.    As of the time of installation of any Software or Developed Software delivered under this Agreement or any enhancement or update of the Software or Developed Software does not

and will not contain any Malicious Code except as disclosed in writing.

    (e)    <u>Date Compliance</u>. Any Software of Developed Software delivered under this Agreement is fully date compliant except as disclosed in writing.

Each Party expressly represents and warrants that: (a) it is duly organized, validly existing, and in good standing under the laws of its State of formation and in good standing in any jurisdiction (b) it has the power and authority to execute, deliver, and perform this Agreement; (c) the person executing this Agreement has been given authority to bind and this Agreement constitutes a legally binding and enforceable obligation  (d) the execution, delivery, and performance of this Agreement is not and will not be in contravention of, and will not result in a breach of, any of the terms of organizational documents or any agreements or other instruments to which  is a party or under which it is bound; (e) there are no suits pending, or to Parties

**25. Notices.** Any notice required or permitted to be given under any of the provisions of this Agreement or governing law shall be given in writing and shall be hand delivered, sent by first class mail, postage prepaid or sent by overnight courier service, to the other party at its address on page one of this Agreement or any address later provided to the other party. Such notices shall be effective upon receipt by the other party.

**26. Attorney's Fees.** The unsuccessful party in any action or proceeding between the parties will pay for all reasonable and necessary costs, expenses, and reasonable outside attorneys' fees incurred by the prevailing party in enforcing the terms and conditions of this Agreement. The term 'prevailing party' as used herein will include without limitation a party who utilizes legal counsel and brings or defends an action, suit, or judicial or administrative proceeding involving an alleged breach or default under this Agreement and, if the plaintiff, obtains substantially the relief sought (whether by award or judgment) or, if the defendant, the plaintiff fails to substantially obtain the relief sought.  In the event neither party can be considered the prevailing party, the judge will have the discretion to equitably apportion costs and attorneys' fees and expenses.

**27. Governing Law**  **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS WHERE THE NETWORK SERVICE IS PROVIDED FOR THE REGULATED SERVICES AS LISTED IN ATTACHMENT B. THOSE NONREGULATED SERVICES OUTLINED IN ATTACHMENT A SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF MICHIGAN.**

**BOTH PARTIES WAIVE ALL RIGHTS TO A JURY TRIAL.**

**28. Purchase Orders.** Any purchase order issued by any party shall be deemed to have been issued for its own purchasing, accounting and other record keeping purposes only and shall not be deemed to be a part of this Agreement. This document is a use agreement not a purchase agreement.

**29. Miscellaneous.** (a) Any delay or failure by Sprint to enforce its rights under this Agreement does not prevent Sprint from enforcing its rights at a later time (b) all of Customer's indemnities, waivers, liabilities and duties and all of Sprint's disclaimers survive the expiration of termination of this Agreement, (c) if any provision is held to be invalid or unenforceable, the validity or enforceability of the remaining provisions shall not in any way be affected or impaired.

**30. Whole Agreement.** This Agreement, together with all Attachments and Schedules thereto represents the entire agreement between the parties on the subject matter hereof and is the final and complete agreement of the parties. The parties have not made or relied upon any representations or other agreements not specifically set forth herein in making this Agreement. Any amendment to this Agreement must be in writing and signed by both parties.



Schedule B
Customer's Responsibilities
Contract No: 02JABS5CPU5J
Delphi Automotive
Systems, LLC

**A. CUSTOMER'S RESPONSIBILITIES WITH RESPECT TO ACCOMMODATION OF SPRINT'S EMPLOYEES OR AGENTS SHALL INCLUDE, BUT NOT NECESSARILY BE LIMITED TO:**

1. During installation and warranty work, unlimited access to the Customer's premises will be required for Sprint, its employees or agents during normal working hours of 8:00 a.m. to 5:00 p.m., Monday through Friday and any other times reasonably requested by Sprint (excluding agreed holidays). Where Customer introduces any other work time requirements, Customer agrees to accept added charges as mutually agreed upon by Customer and Sprint.

2. The Customer in accordance with all-applicable laws and regulations shall provide normal safe working conditions for Sprint employees.

3. Where the nature of the Equipment installation requires that Sprint employees have access to areas of the premises not controlled by the Customer, the Customer shall arrange for access to said areas on the same basis as A.1 and A.2 above.

4. Customer shall be responsible for obtaining any licenses, permits, consents or approvals from any federal, state or local government, which may be necessary to install, possess, own or operate the Equipment.

**B. RESPONSIBILITIES OF THE CUSTOMER WITH RESPECT TO THE TELEPHONE EQUIPMENT ROOM AND CUSTOMER FACILITY**

1. The room at the Installation Site where the Equipment is to be installed ("Telephone Equipment Room") shall not be used for any purpose other than telephone equipment including the Equipment.

2. The Telephone Equipment Room must be kept dry, not subject to excessive heat or vibration from machinery, and must be free of explosive or corrosive atmospheres.

3. Air conditioning systems must be extended to the Telephone Equipment Room.

4. Pipes carrying water or other fluids should not pass through the Telephone Equipment Room or over consoles.

5. Should unsatisfactory conditions arise affecting the Telephone Equipment Room after the Equipment is in operation, Customer will be requested to make corrective changes as directed by Sprint for the duration of this Agreement. Failure to take such necessary action will result in the cancellation of all warranty coverage provided by the Agreement.

6. All building and electrical work in the Telephone Equipment Room and console location must be substantially completed before the Equipment is delivered to the job.

7. Customer shall provide heating/cooling as required from the start of the job and thereafter Telephone Equipment Room temperature must be maintained within the limit of 55 degrees Fahrenheit and 90 degrees Fahrenheit, twenty-four (24) hours a day, seven (7) days a week with relative humidity of thirty to fifty percent (30% to 50%).

8. Sprint will not be responsible for the performance of the Equipment if the Customer has equipment on site or is in close proximity to the site that generates Radio Frequency Interference (RFI).

9. To prevent access by unauthorized persons, Customer shall provide a lock on the Telephone Equipment Room door and make a key conveniently available to Sprint's personnel. The Customer shall be responsible for protection of all material, tools and Equipment placed on the premises by Sprint.

10. A stranded copper wire, a minimum #6 AWG, must be made available in the Telephone Equipment Room and within twenty feet of the proposed Installation Site. This wire must be bonded to the building earth ground and power neutral ground with the ground resistance to be 5 ohms or less at the Telephone Equipment Room.

11. The Customer as indicated on floor plan must provide AC electric service. Leads shall be separately fused at the nearest fuse panel. Voltage variations shall not exceed + or – five percent (5%) or a constant voltage transformer may be required at Customer's expense.

12. Electrical power shall be furnished during the installation period continuously during the hours of 8:00 A.M. to 5:00 P.M., Monday through Friday, and at such other periods as may be required by Sprint to meet the Customer's service date. Thereafter power shall be continuous twenty-four (24) hours per day.

13. Lighting fixtures and 120-volt duplex convenience outlets will be required in the Telephone Equipment Room and other Equipment areas as indicated on Sprint's floor plan. Where the Equipment is fed from 120 volts, single phase (see B.11), and the convenience outlets in the Telephone Equipment Room shall be fed from the same side of the 120/240-volt distribution.

14. Sprint shall be responsible for depositing trash, scrap, used packing materials, etc., resulting from the installation in a workmanlike manner at a point designated by the Customer for this purpose on Customer's premises. Ultimate removal and disposal shall be the responsibility of the Customer.

**C. INSTRUCTIONS TO AND RESPONSIBILITIES OF THE CUSTOMER WITH RESPECT TO CABLE AND WIRING FACILITIES WHEN SPRINT HAS AGREED TO PERFORM CABLING AND WIRING AS SET FORTH IN THE DESCRIPTION OF EQUIPMENT.**

1. It is not always necessary to place full conduit for telephone cabling. Sprint requires a means to place wire and cable in the building without damage to existing walls, ceilings, partitions, etc., but will endeavor to use whatever method is acceptable under local code or building requirements.

2. Sprint reserves the right to review the type, size and method of conduit, or access provision so that house cabling may be carried out without undue difficulty and the Total Monthly Payment is contingent upon provision of such conduit or access work to Sprint's satisfaction. Customer as specified on Sprint's floor plan drawings shall provide any holes and sleeves required through walls and floors.

3. Where vertical cable runs are to be placed without conduit, Customer must provide adequate means of support for cables such as walls, cable leaders, tie bars in risers, etc.

4. Customer shall provide terminal boxes in accordance with the attached floor plan drawing. Terminal boxes may be flush or surface mounted. Unless otherwise specified, Customer shall provide one ½" conduit from each terminal box to the Telephone Equipment Room.

5. Customer shall provide ¾" plywood backboards in the required sizes for mounting Equipment in the locations specified on the floor plan drawing.

6. Where the nature of the installation requires that wire or cable be run above false ceilings or in air plenums **where local building codes require the use** of fire resistant cables, Customer agrees to accept added charges for Teflon type cabling and wiring.



Schedule C

## Statement of Work

3.1.1 Overview of 60 Month project:

Sprint to perform the following services.  <u>Note: All on-site workers must be Union.</u>

Facilities Review
- Work with Delphi to inspect and approve, in writing, rooms for PBX equipment, including but not limited to environmental conditions (heating/cooling, humidity, etc.), weight support requirements, electrical, etc.

Frame Verification
- ID each pair on the wire wrap, 66- or 110-block
- ID the exact location of that out in the plant of that pair
- ID of multi-appearances of the same phone number at different locations
- ID of Tele-horn devices
  - There are approximately 300 Tele-horns (which work off a pair of wires)

Phones
- Perform Station Reviews to determine phone type and quantity. All listed phone quantities and percentages are estimates; actual numbers will be determined during this phase of the project.
- Maintain all current phone numbers and 4-digit dialing plan in place at time of cutover. No numbers will be required to change unless specifically mutually agreed to by Sprint and Delphi in writing.
- Detail of phones - Digital/Analog require phone number label only.
- Place phone at desk location
  - Phone Types are M3902, M3904, M3905 & M8004
  - Office phones to be mainly digital, plant phones mainly analog
    - Current estimates are 80% digital, 20% analog
- Document phone numbers, jack numbers, locations, cable-pairs on wire-wrap or tap block
- Provide Training & User Documentation

Cutover of stations (Test and Tag)
- Running jumpers from the 66-blocks that placed in the half-tap, to the 66-blocks that the Sprint technician places from the Nortel equipment.
- Half-tap house cables to new 66-block frames.
  - Sprint to identify the phones that are currently digital (will not be able to half-tap them until the night of the cut)
    - Less than 300 digital phones on Centrex
  - At North River Road and Dana Street for the half-tap there are currently 3M splice modules to which another module could be added to do the half-tap.
  - Sprint will need to place the half-tap cables approximate 70 feet.
  - Sprint will terminate the cables on 66-blocks
  - Customer will need to mount and provide plywood at all required locations.
  - Sprint to provide 66-blocks, cable, and half-tap modules.
- Cutover of voice stations to CAT-5 structured wire (where applicable)
- Test phones after cutover
- Work with Delphi to finalize termination of current Centrex contract after cutover

3.1.2 Site-by-site project information

North River Road Complex
- Plant 11 Centrex Room, Buildings 10 Through Plant 15, Engineering and Research building
- Note: There are over 100 remote terminals/IDF's in this complex.

Will have the following equipment
- 2450 Stations (approximately)
- One *Option 81C* with 148-port MICB
- Six PRI's
- 12 T-1's on the SONET network or other network
- Call Pilot (2500-user level)
- Current voice-mail system: Octel – Ariea 350
  - 35 ports
  - 1256 mailboxes
  - Software release 1.2
  - Delphi and Sprint to define any required programming changes to the voice mail system in preparation for PBX integration

Work that will need to be completed:
- Frame Verification
  - Currently on wire wrap
    - Approximately 7,000 pairs
    - Half-tap house cables to new 66-block frame.
  - E&R MDF/IDF Wiring and CAT-5 cutover
    - First floor: Place two 100-pair cables approximate 70-feet.
      - To be placed up the wall in the IDF into the drop ceiling, across about 25-feet and down onto the relay rack.
      - Terminate Rack-end of the 100-pair cable with 110-blocks and the wall-side on 66-Blocks.
      - Run jumpers
      - Cutover
    - Second Floor: Place two 100-pair cables approximate 70-feet.
      - To be placed up the wall in the IDF into the drop ceiling, across about 25-feet and down onto the relay rack.
      - Terminate Rack-end of the 100-pair cable with 110-blocks and the wall-side on 66-Blocks.
      - Run jumpers (actual two jumper at the IDF side)
      - Cutover
    - Plant 11 Phone Room to E&R Building: Run 16 100-pair cables.
      - To be placed from the Plant 11 phone room through the conduit in the "tunnel" to E&R
      - Terminate, Run jumpers, & Cutover
- Perform Station Reviews to determine phone type and quantity.
- Detail phones
- Placement of phones
- Cutover of stations (Test and Tag)
- Test phones after cutover
- Document phone numbers, jack numbers, locations, cable-pairs on wire-wrap or tap block
- Provide Training & User Documentation


Plant 45 - Cortland
- Note: There are 4 remote IDF's

Will have the following equipment
- 80 Stations (approximately)
- One Option 11C
- One PRI Circuit
- One T-1 on the SONET network.

Work that will need to be completed:
- Frame Verification
  - Currently on wire wrap
    - Approximately 300 pairs
    - Half-tap house cables to new 66-block frame.
- Perform Station Reviews to determine phone type and quantity.
- Detail phones
- Placement of phones
- Cutover of stations (Test and Tag)
- Test phones after cutover
- Document phone numbers, jack numbers, locations, cable-pairs on wire-wrap or tap block
- Provide Training & User Documentation

CSE Test Center - 4551 Research Parkway, Champion
- Note: There are 2 remote IDF's

Will have the following equipment
- 220 Stations (approximately)
- One Option 11C
- One PRI Circuit
- One T-1 on the SONET network.

Work that will need to be completed:
- Frame Verification
  - Currently on wire wrap
    - Approximately 300 pairs
    - Half-tap house cables to new 66-block frame.
- Perform Station Reviews to determine phone type and quantity.
- Detail phones
- Placement of phones
- Cutover of stations (Test and Tag)
- Test phones after cutover

- Document phone numbers, jack numbers, locations, cable-pairs on wire-wrap or tap block
- Provide Training & User Documentation

Plant 47 - Western Reserve Port Authority
- This location to be converted from point-to-point T-1's with NRR to SONET network during current project cutover (or when SONET ring is installed and operational at all effected sites, if earlier)
- Other work at this location per separate agreements

Valley Building
*No work in this building

World Headquarters
*No work in this building

Youngstown Road Technical Center
*No work in this building

Space Center
*No work in this building
There are some phones fed there today by cable pairs to the CO.



**Centurion Service Agreement**

**Custom Extended Plan**

**Additional Terms and Conditions**

Schedule D

IN CONSIDERATION of the payments made to Sprint by Customer in accordance with Section 5 of Schedule A, Sprint shall provide Service, as defined below, for the specified equipment listed in Exhibit A per the terms and conditions contained herein.

**1 DEFINITIONS**
1.1  Business Hours - means 8:00 a.m. to 5:00 p.m., local time, Monday through Friday, excluding Sprint observed holidays.
1.2  Covered Hours -
   a) For the Standard Plan covered hours means 8:00 a.m. to 5:00 p.m., local time, Monday through Friday, excluding Sprint observed holidays.
   b) For the Extended Plan and "Best Value" Plan, covered hours means 24 hours a day, 365 days a year. The "Best Value" Plan can only be purchased at the time of sale of the equipment.
1.3  Equipment - refers to the hardware and software to be covered by this Agreement as listed in Exhibit A.
1.4  Maintenance Release - means an incremental release of Software that provides maintenance fixes and may provide additional Software features.
1.5  Major Release - means a release of Software that provides additional Software features and/or functions.
1.6  Major Outage - a malfunction consisting of one or more of the following conditions:
   a) Complete failure of the system. No incoming or outgoing communications to or from the Customer's premise;
   b) No internal communications within the system;
   c) Inoperative attendant console;
   d) Inoperative message accounting system;
   e) 20% of all telephones out of service;
   f) 20% of all trunk circuits out of service; or
   g) Severe loss of network operation or severely impaired network performance for a sustained period of time.
1.7  Minor Outage - a "non-emergency", defined as any malfunction other than that of a Major Outage.
1.8  Remote Work - activities performed without a Sprint employee or Sprint contractor on Customer's site.
1.9  Response time - means the time interval between when a trouble call is made to Sprint's National Business Operations Center (by the appropriate Customer personnel or by an automatic notification system) and the time Sprint service personnel begin analyzing the system in search of the cause of the trouble (remotely or on-site).
1.10 Service - means the services provided by Sprint to Customer under this Agreement.
1.11 Software - means the machine-readable object code software programs licensed to Customer.

**2 TERM**
INTENTIONALLY DELETED.

**3 PAYMENT**
INTENTIONALLY DELETED.

**4 SCOPE OF SERVICE**
4.1 Service responsibilities of Sprint:
   a) Sprint will use commercially reasonable efforts to provide two (2) hour response time, remote or on-site, for Major Outage requests during Covered Hours.
   b) Sprint will use commercially reasonable efforts to provide next-business-day response time, remote or on-site, for Minor Outages, provided both the call and determination that service is required has been made before 4:00 p.m. local time the prior day.
   c) Sprint will provide parts, labor, and material required to maintain Equipment in compliance with manufacturer's service specifications. Replacement parts will be, at Sprint's sole discretion, either new or of like-new quality.
   d) Sprint will ensure that all labor and services will be performed in a workmanlike manner, and in accordance with recognized industry standards.
   e) Sprint will install all manufacturer supplied mandatory engineering change notices.

Revised 05/15/03 ABF                    15

    f) Sprint will provide assistance by telephone, facsimile, or electronic mail for information related to Equipment configuration and troubleshooting.
- g) Sprint will generate work-around solutions to reported Software problems using reasonable commercial efforts.
- h) Sprint will provide one (1) PBX preventive maintenance service call annually upon Customer request.
- i) Sprint will provide two (2) hours of PBX end-user training annually upon Customer request.
- j) Sprint will provide other optional services as agreed to on the Exhibit A.

4.2 Service responsibilities of Customer:
a) Customer will provide reasonable access to the Equipment through the Internet or via modem such that problems may be diagnosed and corrected remotely. This includes providing a dedicated local telephone line.
    b) Customer will purchase and use the then-most-current or the immediately-prior (if supported by the manufacturer) Major Release of Software for the Equipment.
    c) Customer will purchase and use the latest release of Software if necessary to correct a reported Software problem.
    d) Customer will identify each problem report as either a Major or Minor Outage using the definitions described above.
    e) Customer agrees to back up Software images and configurations on a regularly scheduled basis and to provide such images and configurations to Sprint personnel in connection with Service activities.

4.3 Services not covered by this Agreement:
    a) Services to resolve software or hardware problems resulting from products provided by parties other than Sprint or causes beyond the control of Sprint.
    b) Service of attached, related, collateral or ancillary equipment or software not covered by this Agreement or not listed in Exhibit A.
    c) Making Customer specified software changes such as scripting or other customized application development.
    d) Making Customer specified hardware changes, adding or removing accessories, attachments or other devices, or moving or relocating the Equipment.
    e) Any hardware and/or software upgrades, including any hardware upgrade required to run new or updated software.
    f) Repair or replacement of lost or stolen parts or materials.
    g) Repair or replacement of parts, materials, or software damaged through accident, negligence, abuse, misuse, failure of electrical power, air conditioning or humidity control, riot or other civil disturbance, strike or other labor trouble, sabotage, fire, flood, lightning or electrical storms, or other acts of God.
    h) Repairing damage caused by service of Equipment by persons other than Sprint, or its authorized contractors.
    i) Work on any Equipment that is not located at the site address provided on Exhibit A

## 5 MOVES, ADDS, CHANGES AND BILLABLE SERVICE CALLS

All moves, adds and changes ("MAC") plus any services beyond those listed in Section 4.1 are Billable Service Calls. Sprint shall have the option to accept or decline requests for performance of such Billable Service Calls. Should Sprint accept a request to perform such a Billable Service Call, the services will be billed at the negotiated rate of $69.00 per hour during Business Hours. Evenings, weekends, and Sprint Holiday will be billed at the rate of $103.50 per hour with a minimum billing of $207.00.

Overtime Rate: All Billable Service Calls performed outside of Business Hours will billed at then-current Centurion Overtime Labor Rates.

Service Charge: A service charge to cover Sprint's travel time will be waived for each billable site visit.

Expedite Fees: An expedite fee will be applied whenever the Customer requests that Sprint expedite Services beyond normal response times. The charge will be at the then-current Centurion Expedite Fee Rates.

Rules with respect to Billing Increments, Billing Minimums, MAC Response Times, Centurion Labor Rates and others will be applied and may be adjusted from time to time.

## 6 ADDITIONAL EQUIPMENT

Customer may, for an additional fee, add equipment for coverage under this Agreement, provided, however, Sprint has the right to inspect such equipment to determine whether it is in acceptable condition. Sprint, in its sole discretion, may exclude any such equipment which it believes cannot be properly and/or economically maintained. All repairs, adjustments or upgrades necessary to bring Customer's equipment to a condition acceptable to Sprint shall be made at the Customer's cost and expense prior to adding it to this Agreement. For any accepted additional equipment, Sprint shall update the Customer record detailing all added equipment and the additional fee.

## 7 GENERAL TERMS AND CONDITIONS

7.1 Customer site must be located within 125 miles of a Sprint service center.

Revised 05/15/03 ABF                          16

7.2 Customer will maintain environmental conditions at the site in accordance with specifications established by the manufacturer of the Equipment.

7.3 Customer will maintain a clean, dust-free, ventilated environment with a temperature range of 55 degrees - 90 degrees Fahrenheit and 30% - 50% relative humidity.

7.4 Customer agrees to provide electric current and outlets, and local telephone extension (or toll free domestic and international access to Sprint) for the use of service personnel in the Equipment's physical location.

7.5 Customer will furnish Sprint employees and subcontractors full and free access to the Equipment to make inspections, tests or repairs, subject to Customer's reasonable internal security requirements.

7.6 Customer will provide necessary openings and ducts for cable and conductors in floors and walls, and floor plans and/or prints showing the location of such openings and ducts. The floor plan and/or prints will also show the locations and types of Equipment installed.

7.7 Services under this Agreement performed by Sprint employees and subcontractors will be accomplished only in a safe working environment which complies with state and federal regulations and law. Sprint has not included any charges or any expenses associated with handling, dealing with, removing or disposing of any hazardous materials at the site. In the event that hazardous materials are encountered in the performance of this Agreement, Sprint shall cease performance of Services that would necessitate exposure to such hazardous materials until the hazardous materials are removed and immediately notify Customer of the existence of such hazardous materials. Sprint shall be excused from the performance of this Agreement until such time as the hazardous material situation is resolved.

7.8 Customer will provide all electrical work external to the Equipment plus installation of communication facilities or connections.

7.9 Customer will be responsible for all ground wire connections to Customer's premises and electrical outlets.

7.10 Unless otherwise agreed to in writing, Customer shall obtain any necessary consents, approvals, licenses, and permits for Service of the Equipment on the premises where the Equipment is installed. Customer shall defend, indemnify and hold harmless Sprint, together with its officers, agents and employees, against all damages, claims, liabilities or expenses (including reasonable attorneys' fees, court costs, and allocated in-house counsel legal expenses) arising out of or resulting in any way from Customer's failure to obtain such permits, licenses, consents, or the like.

## 8 PROPERTY OF SPRINT

Customer acknowledges that Sprint may install a data collection device and other Sprint equipment at Customer's location to be used in performing services hereunder. All such property and equipment shall remain the property of Sprint. At the expiration or termination of this Agreement, Sprint shall be entitled to enter Customer's premises to remove all Sprint property or equipment.

## 9 ABORTED SERVICE CALL

In the event Sprint dispatches a representative to Customer's site but is unable to perform Service through no fault caused by Sprint, the Customer will be charged a Service Charge plus one (1) hour labor at Sprint's then current Centurion Labor Rates.

## 10 SUBCONTRACTING

Sprint may, at its option, subcontract services provided to Customer. Such subcontract will not release Sprint from any of its obligations. Non-union employees may be utilized by Sprint.

## 11 DISASTER RECOVERY

Customer recognizes that the use of computer products entails a substantial risk of loss of magnetically stored data, and that industry standards dictate the systematic use of products which provide comprehensive backup of data so as to prevent such loss. Accordingly, Sprint does not assume any risk of loss of Customer's magnetically stored data in any way related to or resulting from the services, product, equipment, or systems provided by Sprint or any handling of magnetically stored data by Sprint. Customer hereby releases Sprint from any liability for loss of magnetically stored data from any and all causes.

Customer recognizes that industry standards dictate the development of a Disaster Recovery Plan for all mission critical business operations. In the telecommunications industry this includes, but is not limited to, data backup, power backup, power/surge protection, spare system parts, system redundancy, site redundancy, escalation procedures, emergency support agreements with hardware and software vendors, public network based call forwarding to alternate locations, and documented recovery policies and procedures. Customer understands that developing and testing a Disaster Recovery Plan is Customer's responsibility and is not a service provided by Sprint.

The disclaimer of liability for damages will not be affected if any remedy provided shall fail of its essential purpose. Customer accepts this disclaimer of liability for damages as part of the bargain for Services and understands the price of the Services would be higher if Sprint were requested to bear additional liability for such damages.

Revised 05/15/03 ABF                                17

**12 INTELLECTUAL PROPERTY OWNERSHIP**
INTENTIONALLY DELETED.

**13 LIMITED WARRANTY**
INTENTIONALLY DELETED.

**14 LIMITATION OF LIABILITY**
INTENTIONALLY DELETED.

**15 FORCE MAJEURE**
INTENTIONALLY DELETED.

**16 DISPUTE RESOLUTION**
INTENTIONALLY DELETED.

**17 NOTICES**
INTENTIONALLY DELETED.

**18 TERMINATION**
INTENTIONALLY DELETED.

**19 SPRINT AS AN INDEPENDENT CONTRACTOR**
Sprint is an independent contractor for all purposes and at all times. Sprint has the responsibility for, and control over, the means and details of performing the Services. Sprint will supervise its employees and set the hours of work, policies and procedures for its personnel. As an independent contractor, neither Sprint nor Sprint's staff is, or shall be deemed, Customer's employees. In its capacity as an independent contractor, Sprint agrees and represents, and Customer agrees, that Sprint has the right to perform Services for others during the term of this Agreement. Nothing contained herein will be construed as creating any agency, partnership, joint venture or other form of joint enterprise between the parties.

**20 NO WAIVER**
INTENTIONALLY DELETED.

**21 SEVERABILITY**
INTENTIONALLY DELETED.

**22 ASSIGNMENT**
INTENTIONALLY DELETED.

**23 GOVERNING LAW**
INTENTIONALLY DELETED.

**24 TITLES**
Titles, headings and table of contents of articles and sections of this Agreement have been inserted for convenience of reference only. They shall not define, modify or restrict the meaning of interpretation of the terms of provisions of this Agreement.