Hearing Date & Time: March 7, 2008 at 10:00 a.m. prevailing Eastern time
Response Deadline: March 6, 2008 at 5:00 p.m. prevailing Eastern time

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000
James L. Bromley
Jeffrey A. Rosenthal

*Attorneys for UBS Securities LLC*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
Terence K. McLaughlin
Rachel C. Strickland
J. Houston Goddard

*Attorneys for Pardus DPH Holding LLP*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
Leslie G. Fagen
Andrew N. Rosenberg

*Attorneys for Merrill Lynch, Pierce, Fenner &
Smith Inc.*

KAYE SCHOLER LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000
Myron Kirschbaum
Lynn Toby Fisher
Benjamin Mintz
Sapna W. Palla

*Attorneys for Harbinger Del-Auto Investment
Company, Ltd.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                :     Chapter 11

In re                         :

                        :     Case No. 05-44481 (RDD)

DELPHI CORPORATION, et al.,   :

                        :     (Jointly Administered)

           Debtors.        :

                        :
------------------------------------------------------------------- X

## CO-INVESTORS' MEMORANDUM OF LAW IN OPPOSITION TO DEBTORS' EXPEDITED MOTION UNDER 11 U.S.C. § 1142(b) AND FED. R. BANKR. P. 3020(d) FOR IMPLEMENTATION OF DEBTORS' CONFIRMED PLAN OF REORGANIZATION

## **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ................................................................................................................... 3

A.    The Motion Was Improperly Brought And Should Be Converted Into
An Adversary Proceeding ........................................................................................ 3

B.    The Financing Proposal Violates Section 5(p)(ii) Of The EPCA ........................... 6

C.    The Financing Proposal Violates Section 5(p)(iii) Of The EPCA ......................... 12

D.    The Proposed Modifications To The Financing Letter Violate
Section 5(t) Of The EPCA ...................................................................................... 13

E.    The Debtors' Request For Specific Performance Must Be Denied ........................ 14

CONCLUSION.............................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Am. Express Bank Ltd. v. Uniroyal, Inc.,
164 A.D.2d 275 (N.Y.A.D. 1st Dep't 1990),
appeal denied 569 N.Y.S. 2d 611 (1991)...............................................................    10

Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.,
No. 04 Civ. 10014 (PKL), 2006 WL 1493132 (S.D.N.Y. May 31, 2006)..........................    15

Bourne v. Walt Disney Co.,
68 F.3d 621 (2d Cir. 1995)................................................................................    11

Britestarr Homes, Inc. v. City of New York (In re Britestarr Homes, Inc.),
368 B.R. 106 (Bankr. D. Conn. 2007) .................................................................    5

Broadway Bldg. II L.P. v. Mincks (In re Broadway Bldg. II L.P.),
22 Fed. Appx. 859 (9th Cir. 2001)......................................................................    4-5

Cascade Energy & Metals Corp. v. Banks (In re Cascade Energy & Metals Corp.),
956 F.2d 935 (10th Cir. 1992) ...........................................................................    5

County of Suffolk v. Alcorn,
266 F.3d 131 (2d Cir. 2001)...............................................................................    11

In re Emerald Casino, Inc.,
334 B.R. 378 (N.D. Ill. 2005) ............................................................................    4

In re Lavigne,
114 F.3d 379 (2d Cir. 1997)...............................................................................    11

In re Riverside Nursing Home,
137 B.R. 134 (Bankr. S.D.N.Y. 1992) affirmed,
Riverside Nursing Home v. N. Metro. Residential Health Care Facility, Inc.,
977 F.2d 78 (2d Cir. 1992)................................................................................    5

In re Terracor,
86 B.R. 671 (D. Utah 1988)..............................................................................    4, 5

Int'l Fidelity Ins. Co. v. County of Rockland,
98 F. Supp. 2d 400 (S.D.N.Y. 2000)...................................................................    9

Krumme v. WestPoint Stevens Inc.,
238 F.3d 133 (2d Cir. 2000)..............................................................................    11

**Page(s)**

LTV Corp. v. Back (In re Chateaugay Corp.),
201 B.R. 48 (Bankr. S.D.N.Y. 1996) .................................................................. 3, 5

New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.
(In re Dairy Mart Convenience Stores, Inc.),
351 F.3d 86 (2d Cir. 2003).................................................................................. 3

Official Unsecured Creditors' Comm. of Erie Hilton Joint Venture v. Siskind
(In re Erie Hilton Joint Venture),
137 B.R. 165 (Bankr. W.D. Pa. 1992) ................................................................ 6

Official Unsecured Creditors' Comm. of Erie Hilton Joint Venture v. Siskind
(In re Erie Hilton Joint Venture),
145 B.R. 215 (Bankr. W.D. Pa. 1992) ................................................................ 6, 16

Paul v. Monts,
906 F.2d 1468 (10th Cir. 1990) .......................................................................... 6

Reefer & Gen. Shipping Co. v. Great White Fleet, Ltd.,
922 F. Supp. 935 (S.D.N.Y. 1996), aff'd, 107 F.3d 4 (2d Cir. 1997)................ 9

Roger J. Au & Son, Inc. v. Aetna Cas. & Surety Co.
(In re Roger J. Au & Son, Inc.),
123 B.R. 31 (Bankr. N.D. Ohio 1990) ................................................................ 3

Ruttenberg v. Davidge Data Sys. Corp.,
215 A.D.2d 191 (N.Y.A.D. 1st Dep't 1995)....................................................... 10

Snowville Farms, LLC v. Barnes Banking Co. (In re Snowville Farms, LLC),
368 B.R. 85, 2007 WL 1302154 (10th Cir. BAP May 4, 2007)......................... 3

United Rentals, Inc. v. RAM Holdings, Inc.,
937 A.2d 810 (Del. Ch. 2007)............................................................................. 16

Van Wagner Adver. Corp. v. S & M Enters.,
67 N.Y.2d 186 (1986) ......................................................................................... 15

Village of Rosemont v. Jaffe,
482 F.3d 926 (7th Cir. 2007) .............................................................................. 3

Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner &

Smith Inc., UBS Securities LLC and Pardus DPH Holding LLC (collectively, the "Co-

Investors") respectfully submit this Memorandum of Law in opposition to the Expedited Motion

Under 11 U.S.C. § 1142(b) and Fed. R. Bankr. P. 3020(d) for Implementation of Debtors'

Confirmed Plan of Reorganization, dated March 5, 2008 (the "Motion") of Delphi Corporation

(together with its affiliated debtors and debtors-in-possession, the "Company" or the

"Debtors").[1]

## <u>PRELIMINARY STATEMENT</u>

While the Debtors' Motion is flawed for numerous reasons – addressed in more

detail in the ADAH Response – the Co-Investors submit this brief memorandum to focus the

Court on five specific shortcomings each of which independently compels the denial of the

Motion.  Among other infirmities, the relief requested by the Debtors fails to recognize (i) the

Plan Investors' fundamental due process rights to develop and offer evidence in an adversary

proceeding to support what must be a fact-intensive inquiry for the Motion to be granted, which

may not be substituted by a motion under Section 1142(b) of the Bankruptcy Code; (ii) Section

5(p)(ii) of the Equity Purchase and Commitment Agreement's (the "EPCA") unequivocal

prohibition against <u>any</u> new agreement between the Debtors and General Motors Corporation

("GM") that "is outside the ordinary course of business;" (iii) that the new GM proposal will

have an impermissible, "material impact on the [Plan] Investors' proposed investment in the

---

[1]    The Co-Investors join in and hereby incorporate the Response of A-D Acquisition Holdings, LLC
("ADAH") to the Expedited Motion Under 11 U.S.C. § 1142(b) and Fed. R. Bankr. P. 3020(d) for
Implementation of Debtors' Confirmed Plan of Reorganization, dated March 6, 2008 (the
"ADAH Response").  All terms not defined herein shall have the same meaning as in the ADAH
Response.  The Co-Investors also join in ADAH's Emergency Motion for a Continuance and an
Order Vacating the Order to Show Cause.

Company," in violation of Section 5(p)(iii) of the EPCA; (iv) that the wholesale scrapping of the terms of the Financing Letter in lieu of a drastically different financing proposal constitutes an amendment and modification that is adverse to both the Plan Investors and the Company in violation of Section 5(t) of the EPCA; and (v) that specific performance is not an available remedy under the terms of the EPCA.

The Co-Investors do agree with the Debtors on one particular issue – this Court can dispose of the Motion based upon the unambiguous language of the EPCA:  Section 5(p)(ii). There is no possible dispute that the Financing Proposal constitutes a new agreement with GM that is outside the ordinary course of business; indeed, the Debtors never allege the contrary.  On that issue alone, the Debtors' Motion must be denied.

However, even were the Court to disagree that the unambiguous language quoted above compels the denial of the Motion, whether the Debtors have satisfied the numerous conditions in the EPCA and the Plan – including Section 5(p)(iii) – so plainly presents issues of fact that, on the record before the Court, the Debtors' requested relief simply cannot be granted.[2]

Finally, irrespective of how the Court rules on the merits of the Motion, or the manner in which it is considered, notwithstanding the Debtors' prayer for relief, specific performance is not available to the Debtors.  To use the words in the Disclosure Statement itself: the EPCA "expressly caps the Plan Investors' liability for breach thereof at $100 million prior to approval of the Disclosure Statement, and there is no specific performance provision.  Thus, an attempt to 'enforce' the [EPCA] against the wishes of the Plan Investors, even if successful, would yield a maximum recovery of $100 million."  Disclosure Statement at DS-121 (attached

---

[2]    While there are several bases to deny the Motion outright, even if the Court does not deny the Motion, at the very least it should convert the Motion into an adversary proceeding and set an adequate schedule for discovery and a trial consistent with due process.

2

as Exhibit 12 to the Declaration of Gregory Pryor, dated March 6, 2008 ("Pryor Decl.")

(emphasis added).[3]

## ARGUMENT

**A.**     **The Motion Was Improperly Brought And Should
Be Converted Into An Adversary Proceeding**

The Debtors erroneously rely on 11 U.S.C. § 1142 in making the Motion.

Although Section 1142(b) does provide for orders directing necessary parties to perform acts that

are "necessary for the consummation of the plan," the threshold question is what "the plan"

requires. "The clear intent of Section 1142(b) … is to assure that the terms and provisions of a

confirmed chapter 11 plan are carried out until the plan is completed and the final decree is

entered closing the case." LTV Corp. v. Back (In re Chateaugay Corp.), 201 B.R. 48, 66 (Bankr.

S.D.N.Y. 1996) (emphasis supplied).

Like the more frequently cited Section 105(a), Section 1142(b) "does not operate

on a stand-alone basis," New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re

Dairy Mart Convenience Stores, Inc.), 351 F.3d 86, 92 (2d Cir. 2003), and it is well-settled that

this provision "does not confer any substantive rights on a party apart from whatever the plan

provides." Village of Rosemont v. Jaffe, 482 F.3d 926, 935 (7th Cir. 2007); accord Snowville

Farms, LLC v. Barnes Banking Co. (In re Snowville Farms, LLC), 368 B.R. 85, 2007 WL

1302154, at *4 (10th Cir. BAP May 4, 2007) ("As in contract interpretation, the court cannot

supply terms or create an obligation which does not exist under the plan itself.").

Here, the requirement that the Plan Investors make a $2.55 billion equity

investment in the reorganized Company is explicitly "[p]ursuant and subject to the terms and

---

[3]     This limitation was raised to $250 million after December 10, 2007.

conditions of the [EPCA]." Plan, § 7.11 (Pryor Decl. Ex. 32). That funding commitment under

the EPCA does not arise unless and until certain conditions have occurred and the Debtors have

satisfied their covenant requirements, a showing that the Debtors do not make, and cannot even

claim to have made, absent an evidentiary hearing. These terms were explicitly bargained for,

and Section 1142(b) cannot be used to alter those terms if the Debtors cannot satisfy all of the

conditions under the EPCA. See In re Emerald Casino, Inc., 334 B.R. 378, 387 (N.D. Ill. 2005)

(no award of specific performance of alleged commitments contained in letter agreement

incorporated by reference in reorganization plan, where conditions set forth in letter agreement

failed), aff'd sub nom., Village of Rosemont, 482 F.3d 926 (7th Cir. 2007).[4]

  In seeking to deny the Plan Investors the rights afforded to defendants in

adversary proceedings, including the right to plead counterclaims and defenses as well as thirty

days to answer, see Fed. R. Bankr. P. 7012(a), as well as any opportunity for adequate notice or

discovery on a dispute of such magnitude, the Motion notably avoids addressing the standard for

determining whether an adversary proceeding or a contested matter is the appropriate mechanism

to resolve a dispute. See In re Terracor, 86 B.R. 671, 675 n.10 (D. Utah 1988) (stating that

courts should balance "[c]oncerns of equity and procedural due process … against the underlying

concern of the Code that cases move forward in as expeditious a manner as possible").

  While there is no question – as the Debtors have found – that in certain

circumstances motions under Section 1142(b) are appropriate, that is not the issue. Other

disputes have been required to be litigated as adversary proceedings. See Broadway Bldg. II

L.P. v. Mincks (In re Broadway Bldg. II L.P.), 22 Fed. Appx. 859, 860 (9th Cir. 2001)

---

[4]  Paragraph 53 of the Confirmation Order makes clear that neither the Plan nor the Confirmation Order "shall alter, amend, or modify the rights of the Plan Investors under the [EPCA]." (Pryor Decl. Ex. 18).

(bankruptcy court denied motion under Section 1142(b) and held that debtor must bring

adversary action); see also Cascade Energy & Metals Corp. v. Banks (In re Cascade Energy &

Metals Corp.), 956 F.2d 935, 936-37 (10th Cir. 1992); Britestarr Homes, Inc. v. City of New

York (In re Britestarr Homes, Inc.), 368 B.R. 106, 107 (Bankr. D. Conn. 2007); LTV Corp., 201

B.R. at 66; Roger J. Au & Son, Inc. v. Aetna Cas. & Surety Co. (In re Roger J. Au & Son, Inc.),

123 B.R. 31, 33 (Bankr. N.D. Ohio 1990).  The key question ignored by the Debtors is which

procedure is appropriate under the circumstances here.  The answer is obvious – balancing equity

and due process concerns against prudent docket management weighs heavily in favor of an

adversary proceeding here.[5]

Critically, this is not one of "those routine and simple matters" to be treated as

contested matters.  In re Terracor, 86 B.R. at 675 n.10.  This is nowhere more evident than in

comparison to the case on which the Debtors most heavily rely, In re Riverside Nursing Home,

137 B.R. 134 (Bankr. S.D.N.Y. 1992), aff'd sub nom., Riverside Nursing Home v. N. Metro.

Residential Health Care Facility, Inc., 977 F.2d 78 (2d Cir. 1992).  In stark contrast to the

disagreement regarding the satisfaction of numerous covenants and conditions in the 81-page

EPCA here (many of which have undeniably not been satisfied yet), and the purely advisory

opinion sought by the Debtors with respect to their proposed $1.7 billion financing (not a penny

of which has yet been raised), the court described the dispute in Riverside Nursing Home as one

regarding the debtor's performance of a "ministerial task," id. at 138, that was not subject to

terms and conditions.

---

[5]    The fact that specific performance is unavailable (as discussed below) strongly militates in favor
of equity and due process over speed.

Indeed, notwithstanding the implication in the Debtors' Motion, the court in

Official Unsecured Creditors' Committee of Erie Hilton Joint Venture v. Siskind (In re Erie

Hilton Joint Venture), 137 B.R. 165 (Bankr. W.D. Pa. 1992) ("Erie Hilton I"), not only did not

compel funding, but the dispute was brought by adversary proceeding, not by motion under

Section 1142(b).  The reference to Section 1142(b) – seized upon in the Motion, see Mot. ¶ 30 –

was that the Court had post-confirmation jurisdiction over the adversary proceeding, not that the

dispute could be brought as a simple contested matter as the Debtors seek to do here.[6]  Likewise,

despite the Debtors' citation to dicta in Paul v. Monts, 906 F.2d 1468 (10th Cir. 1990) (per

curiam), that "persons disappointed by the failure of a reorganization plan" may file a motion to

compel under Section 1142(b), id. at 1476, see Mot. ¶ 30 & n.5, that case too involved an

adversary proceeding.  906 F.2d at 1471.  Indeed, the Co-Investors are not aware of a single case

– nor have the Debtors cited one – in which a bankruptcy court actually accepted jurisdiction

under Section 1142(b) in the absence of an adversary proceeding over a dispute regarding an

alleged funding obligation.  In sum, Section 1142(b) cannot be used as an end-run around both

the requirement for an adversary proceeding and the absence of a specific performance provision

in the EPCA.

**B.      The Financing Proposal Violates Section 5(p)(ii) Of The EPCA**

Regardless of the procedural posture of the dispute, the Financing Proposal

violates the clear language of Section 5(p)(ii) of the EPCA, which provides that "the Company

shall not enter into any other agreement with GM that … is outside the ordinary course of

---

[6]      Ultimately, after concluding that it had jurisdiction over the adversary proceeding, the court there
rejected the creditor committee's attempt to compel funding and granted summary judgment to
the defendants.  See Official Unsecured Creditors' Comm. of Erie Hilton Joint Venture v. Siskind
(In re Erie Hilton Joint Venture), 145 B.R. 215, 219 (Bankr. W.D. Pa. 1992) ("Erie Hilton II").

business."  Even the Debtors do not attempt to argue that the Financing Proposal is in the

ordinary course of business, instead choosing to dodge the plain language of this provision in

favor of some cobbled-together intent and purposes argument that cannot be divined from the

four corners of the EPCA.  See Mot. ¶¶ 40-41.

Despite clear language to the contrary, the Debtors argue that Section 5(p) of the

EPCA "was designed to protect the Plan Investors and the Company from unfavorable

amendments to the GM Settlement or GM's procurement of non-ordinary course agreements that

benefited GM to the detriment of the Plan Investors and the Company."  Mot. ¶ 40.  This is

implausible.  The Debtors themselves acknowledge that the EPCA is "an agreement that was

developed through a process that involved intense negotiations and, at times, litigation during the

past 18 months."  Id. ¶ 1.  Despite this, the Debtors would have this Court boil this voluminous

agreement with multiple amendments and exhibits down to what the Debtors now contend is the

gist of certain provisions.

Regardless of the Debtors' newfound interpretation of what Section 5(p) "was

designed to protect" (which is unsupported by facts and which the Co-Investors dispute), the

plain language of Section 5(p) has three independent prohibitions with respect to any new GM

agreement, only two of which permit a qualitative analysis of the terms of such agreement.  It

states that "[o]ther than the GM Amendments, the Company shall not enter into any other

agreement with GM that:

     (i)     is materially inconsistent with this Agreement and the Plan,

     (ii)     is outside the ordinary course of business or

     (iii)     the terms of which would have a material impact on the [Plan] Investors'
                proposed investment in the Company" EPCA §5(p) (emphasis supplied).

7

While the Co-Investors believe that discovery and an evidentiary hearing will establish that the Financing Proposal would have a material impact on the Plan Investors' proposed investment in violation of Section 5(p)(iii) (discussed below), the plain language of Section 5(p)(ii) does not permit such a qualitative, fact-driven analysis. If any new agreement with GM is outside the ordinary course of business, the EPCA flat-out prohibits it (unless, of course, the Plan Investors elect to waive Section 5(p)(ii), which they have the right to do or not to do). A multi-billion dollar secured loan from an automobile manufacturer simply cannot be in the ordinary course of business.

In writing Section 5(p)(ii) out of the EPCA entirely, the Debtors' argument flies in the face of even the most basic tenets of contract law.

First, not only did the parties to the EPCA know precisely how to limit conditions so they only apply if violations thereof would have a "material adverse impact" or would be "inconsistent with the EPCA," when the parties intended to place such a qualification on a condition, but they even knew how to do so with respect to "ordinary course of business" restrictions. Thus, in marked contrast to Section 5(p)(ii), Section 5(n) provides that "the Company and its Subsidiaries shall carry on their businesses in the ordinary course (subject to any actions which are <u>consistent</u> with the … Business Plan)" (emphasis added). <u>See also</u> EPCA, §§ 3(m)(vii) (restricting transfers of assets "except for (A) sales of inventory in the ordinary course of business <u>consistent</u> with past practice") (emphasis added); 5(n)(iv) (similar with respect to encumbrance of property); 5(n)(v) (similar with respect to transactions between the Company and Subsidiaries). (Pryor Decl. Ex. 1). Yet, notably, no such qualifier was placed on the "ordinary course of business" requirement of Section 5(p)(ii). Just a small sampling of the

many other conditions in the EPCA that were qualitatively limited with respect to consistency or

adverse impact include the following:

- Section 5(p)(iii) – prohibiting an agreement with GM, the terms of which "would have a material impact on the [Plan] Investors' proposed investment in the Company."

- Section 5(t) – preventing the Company from making changes to the Debt Financing that are "adverse" to the Plan Investors or the Company.

- Section 5(n)(vi) – prohibiting modifications to collective bargaining agreements "inconsistent" with the Transformation Plan or the Business Plan.

- Section 5(n)(ii) – barring intercompany transactions and financing activities except those which are "consistent" with, inter alia, the Company's existing financing.

- Section 3(m)(viii) – prohibiting acquisitions "except in a manner consistent with" the Transformation Plan or the Business Plan.

- Section 9(a)(vi) – limiting definition of "Change of Recommendation" to circumstances in which the action is taken "in a manner adverse to the [Plan] Investors."

It is a well-established principle of contract law that when sophisticated parties

include certain language in one portion of a contract, its exclusion from other sections of the

contract is deemed intentional.  Int'l Fidelity Ins. Co. v. County of Rockland, 98 F. Supp. 2d 400,

412 (S.D.N.Y. 2000) ("Sophisticated lawyers … must be presumed to know how to use parallel

construction and identical wording to impart identical meaning when they intend to do so, and

how to use different words and construction to establish distinctions in meaning."); Reefer &

Gen. Shipping Co. v. Great White Fleet, Ltd., 922 F. Supp. 935, 940 (S.D.N.Y. 1996), aff'd,

107 F.3d 4 (2d Cir. 1997) ("Absent express provision to the contrary, contractual terms should be

construed uniformly throughout the agreement.").  The force of this argument is all the stronger

in light of the fact that the limiting language absent from Section 5(p)(ii) is present in the very

next clause of the same Section.

9

Accordingly, because Section 5(p)(ii) by its plain terms flatly prohibits the Company from entering into _any_ transactions with GM outside the ordinary course of business – whether adverse to the interests of the Plan Investors or not – the Debtors' request that this Court import additional qualifications into Section 5(p)(ii) or ignore it altogether must be rejected.[7]

Second, accepting the Debtors' invitation to limit the scope of Section 5(p)(ii) only to those non-ordinary course agreements that adversely affect the Plan Investors effectively deletes the provision entirely from the contract, since Section 5(p)(iii) already contains such a limitation with respect to all GM agreements.

It is black-letter law that a contract must be interpreted in such a way that full meaning and effect is given to all of its provisions.  Am. Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 277 (N.Y.A.D. 1st Dep't 1990), appeal denied 569 N.Y.S. 2d 611 (1991).  As a result, interpretations that leave portions of a contract without force and effect are strongly disfavored.  Ruttenberg v. Davidge Data Sys. Corp., 215 A.D.2d 191, 196 (N.Y.A.D. 1st Dep't 1995).

When these well-settled rules of contract construction are applied to the EPCA, it is immediately apparent that the Debtors' interpretation is simply a brazen attempt to ignore a portion of the contract that they are unable to satisfy.  Whether the Debtors like the provision or

---

[7]     While the parties' motivation is irrelevant in the face of such an unambiguous provision, it was quite logical for the parties to have drafted Section 5(p) as they did.  While Sections 5(p)(i) and 5(p)(iii) require factual analysis with respect to any agreement with GM that is in the ordinary course of business – subjecting such ordinary course agreements to requirements of consistency with the EPCA and the Plan and not adversely impacting the Plan Investors – they agreed that non-ordinary course agreements were per se prohibited so as to avoid precisely this type of dispute.  Because the Financing Proposal is outside the ordinary course of business, the Debtors must either abandon it or persuade the Plan Investors to accept it, but the parties did not allow for the Court to make the qualitative analysis that they authorized exclusively for ordinary course agreements under Sections 5(p)(i) and 5(p)(iii).

not, New York law demands that the Court give effect to Section 5(p)(ii) without turning to extrinsic evidence.  County of Suffolk v. Alcorn, 266 F.3d 131, 138 (2d Cir. 2001) ("Under New York law. . ., if a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.")(internal citations omitted).

Even were the Court to disagree with this plain reading of Section 5(p)(ii), the Debtors can only prevail if they establish that the plain meaning of the provision is that it does include the limiting language that is in fact absent.  The Court certainly would have no basis to accept the Debtors' suggestion that the EPCA unambiguously limits Section 5(p)(ii) given the absence of any such words.  At the very least, the Court would have to find an ambiguity and hold an evidentiary hearing because, in such circumstances, determining the proper interpretation of the contract is a question of fact and extrinsic evidence of the parties' intentions would be admissible.  Bourne v. Walt Disney Co., 68 F.3d 621, 629 (2d Cir. 1995).[8]  In connection with such a hearing, the Co-Investors would seek (and ADAH has sought) discovery relating to such extrinsic evidence.[9]

---

[8]     Under New York law, a "contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."  Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138-39 (2d Cir. 2000)(internal citations and quotations omitted).

[9]     Even were the Debtors to assert that GM provides billions of dollars of financing in the ordinary course of business – which is nowhere found in the Motion – they could not satisfy either "ordinary course" test that has evolved under Section 363(b)(1) of the Bankruptcy Code, and certainly not in the absence of a factual record.  See In re Lavigne, 114 F.3d 379, 384 (2d Cir. 1997) ("vertical test" examines whether the economic risks of the transaction are of a different nature than typically accepted); id. at 385 ("horizontal test" compares the debtor's business to other like businesses to examine whether transaction is of a type other similar businesses would engage in as ordinary business).  It would be absurd for the Debtors to allege either that GM ordinarily provides such financing to its suppliers, that other businesses similar to the Company

(continued . . . )

11

C.      **The Financing Proposal Violates Section 5(p)(iii) Of The EPCA**

      The Financing Proposal also violates Section 5(p)(iii) of the EPCA, which provides that "the Company shall not enter into any other agreement with GM … the terms of which would have a material impact on the [Plan] Investors' proposed investment in the Company."  Wholly apart from the Debtors' contention that the EPCA is unambiguous, whether the Financing Proposal materially impacts the Plan Investors' proposed investment is plainly a question of fact, an issue ignored entirely in the Motion.  In this regard, material impact is not merely – as the Debtors suggest – whether the terms of such financing are more or less favorable than otherwise available, but also the potential impact of GM's role with respect to such financing, in light of the fact that the Debtors' own business plan relies on the fundamental need to reduce the Debtors' relationship with and dependence on GM.  This issue may not be resolved by a simple comparison of financing terms, although the Co-Investors would also offer evidence that the total package of financing currently contemplated by the Debtors is, in fact, materially worse than that presented in the Financing Letter.[10]

      A trial on this issue would likely involve expert testimony and other evidence that the Financing Proposal would materially impact the Plan Investors and the Company insofar as, inter alia, the extraordinary concentration of debt with GM, the Company's largest customer, would be contrary to the Company's stated goal (emphasized in the Company's disclosure

---

      ordinarily receive such financing from their customers, or that the economic risks of a multi-billion dollar debt financing are typical in customer-supplier relationships.  The lack of even a bare allegation of such removes any factual question and warrants denial of the Motion.

[10]    It bears emphasis that although the Debtors' Motion focuses on a comparison between the Financing Proposal and the financing terms otherwise presently available to the Debtors (which are generally believed to be non-existent), the analysis under Section 5(p)(iii) in fact requires a comparison between the Financing Proposal and the financing contemplated by the EPCA, meaning those terms set forth in the Financing Letter.

statements and bank presentations) of reducing its reliance on and exposure to GM. If afforded a

meaningful opportunity consistent with their rights to conduct discovery, retain experts to report

to the Court and participate in an evidentiary hearing, the Co-Investors are confident that they

will be able to establish that the Financing Proposal materially impacts the Plan Investors'

investment, and therefore violates Section 5(p)(iii) of the EPCA.

**D.      The Proposed Modifications To The Financing
          Letter Violate Section 5(t) Of The EPCA_____**

        Section 5(t) of the EPCA unambiguously provides that the Debtors "shall not

permit any amendment or modification to be made to, or any waiver of any provision or remedy

under, in each case, to the extent adverse to the Company or the [Plan] Investors, the Financing

Letter."

        For several reasons, the Financing Proposal violates Section 5(t) of the EPCA.

These include, without limitation, the material alteration of the interest rate terms; the proposed

issuance of original issue discount debt without increasing the amount of the First Lien Term

Facility, as specifically required by the Financing Letter; and the deficiency in the amount of the

Second Lien Debt. The Financing Letter did not contemplate that GM would participate in the

First Lien Term Facility – while there are specific provisions relating to GM with respect to the

Second Lien Term Facility (e.g., voting limitations, six-month lock-up, waiver of set-off rights)

in the Financing Letter, there are no such GM-specific provisions with respect to the First Lien

Term Facility in the Financing Letter, which obviously would make no sense were GM free to

participate in the First Lien Term Facility.

        Taken together, the Financing Proposal presents a very different picture than that

contemplated by the Financing Letter. The Plan Investors agreed to purchase the equity subject

to the terms and conditions of the EPCA; they bargained for a company that was to be financed

13

in a very specific way.  They did not agree to blindly fund $2.55 billion for new equity if the markets did not open to the exit financing set forth in the Financing Letter.  See ADAH Response ¶ 27 (discussing testimony concerning market risk at hearing to approve December 2007 amendments to the EPCA).  Indeed, if permitted, the Co-Investors will demonstrate that compliance with the terms of the Financing Letter, from their perspective, was crucial not only with respect to the quantitative measures it required but also as a test of the acceptability to the market of the Debtors' post-reorganization financial situation under the circumstances prevailing at the time of exit.

While it should be clear on the face of the documents that the Financing Proposal differs materially from the Financing Letter in a manner adverse to the Plan Investors' interests, and that a reorganization built around the Financing Proposal presents a far more precarious scenario than that contemplated by the Financing Letter, at a minimum Section 5(t) presents issues of fact that cannot be resolved in the Debtors' favor without discovery and an evidentiary hearing.  If given a full and fair opportunity to conduct discovery and litigate this issue, the Co-Investors would present evidence, including expert testimony, on the parties' intent concerning the Financing Letter, the relative impact of the Financing Proposal compared to that contemplated by the Financing Letter, and the implications for the Debtors and the Plan Investors of the abandonment of financing on the terms set forth in the Financing Letter.  Section 5(t) is simply not satisfied, as the Debtors would have it, by any financing of any quality that is "in an amount sufficient to fund the Plan."

**E.**     **The Debtors' Request For Specific Performance Must Be Denied**

Even were all conditions and covenants satisfied (which they are undeniably not), the EPCA is not susceptible to the Debtors' thinly veiled claim for specific performance by the Plan Investors.  See EPCA, § 11(b)(x) ("[T]he aggregate liability of all of the [Plan] Investors

under this Agreement for any reason (under any legal theory), including for any willful breach, for any act or omission occurring after [December 10, 2007] shall not exceed $250 million.") (Pryor Decl. Ex. 12).[11]  It is a fundamental principle of New York law that where monetary damages are adequate to protect the <u>expectation</u> interest of the allegedly injured party, specific performance may not be obtained.  <u>Van Wagner Adver. Corp. v. S & M Enters.</u>, 67 N.Y.2d 186, 189 (1986); <u>Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.</u>, No. 04 Civ. 10014 (PKL), 2006 WL 1493132, at *8 (S.D.N.Y. May 31, 2006) ("In general, specific performance will not be ordered where money damages 'would be adequate to protect the expectation interest of the injured party.'") (quoting <u>Sokoloff v. Harriman Estates Dev. Corp.</u>, 96 N.Y.2d 409, 415 (2001)). The "expectation interest" of the Debtors could not be clearer – it was for the receipt of up to $250 million even in the event of a willful breach by the Plan Investors.

Indeed, it is remarkable that the Debtors would even force the Plan Investors to litigate this issue given the concession in the Disclosure Statement that the EPCA "expressly caps the Plan Investors' liability for breach thereof at $100 million prior to approval of the Disclosure Statement, and <u>there is no specific performance provision</u>. Thus, an attempt to 'enforce' the [EPCA] against the wishes of the Plan Investors, even if successful, would yield a maximum recovery of $100 million."  Disclosure Statement at DS-121 (emphasis added) (Pryor Decl. Ex. 12).[12]

Moreover, to the extent the Court finds any ambiguity as to whether the EPCA's limitation on liability bars an order of specific performance, not only is the Debtors' admission in

---

[11]    While craftily avoiding the phrase "specific performance," paragraph 46 of the Motion seeks a Court order directing the Plan Investors "to consummate and make effective all transactions contemplated by the EPCA and the Plan, including … funding and closing of the EPCA."

[12]    As noted above, this amount was increased to $250 million after December 10, 2007.

the Disclosure Statement compelling evidence, but the evidence presented to the Court with the

ADAH Response shows that earlier drafts of the EPCA did contain a provision entitling the

Company and the Plan Investors to specific performance, but the parties negotiated for its

deletion.  See ADAH Response ¶¶ 8-9; United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d

810, 832 (Del. Ch. 2007) (where merger agreement contained conflicting provisions as to the

remedy available, analyzing the negotiating history to help determine that specific performance

was unavailable).  At the very least, if an ambiguity existed, an evidentiary hearing would be

necessary to determine whether the parties intended, contrary to their own record statements, that

specific performance would be available under the EPCA.

Finally, it is noteworthy that the Debtors have been unable to find a single case –

nor have the Co-Investors – in which a court compelled investors to fund a confirmed plan.

While the Motion implies that such was the case in Erie Hilton I, Mot. ¶ 30, in fact summary

judgment was ultimately granted to the non-funding defendants.  Erie Hilton II, 145 B.R. at

219.[13]

---

[13]    While wholly irrelevant to the issues presented by the Motion – whether the Court can find
without an evidentiary hearing that all of the conditions to the EPCA have been satisfied and
whether the Court is empowered to order specific performance notwithstanding the parties'
contractual agreement – the Debtors have sought to impugn the Plan Investors by alleging (in
correspondence which the Debtors have filed publicly, at status conferences, in discovery
requests and in their Motion) without basis or attribution that at least one of them may have
engaged in short selling of the Debtors' securities for the purpose of betting on the failure of the
reorganization.  See Mot. Ex. F at 4-5.  This outrageous and spurious charge, designed to distract
attention from the Debtors' utter inability to meet their burden of proof on the Motion, has been
thoroughly refuted in correspondence each Co-Investor has delivered to the Debtors and
representations they hereby make to the Court.

## **CONCLUSION**

For the foregoing reasons and those set forth in the ADAH Response, the Motion

should be denied with prejudice.

Dated:  New York, New York
        March 6, 2008

                    Respectfully submitted,

                    CLEARY GOTTLIEB STEEN
                    & HAMILTON LLP

                    By:_____/s/ Jeffrey A. Rosenthal_____
                        James L. Bromley
                        Jeffrey A. Rosenthal
                        Members of the Firm
                    One Liberty Plaza
                    New York, New York 10006
                    (212) 225-2000

                    Attorneys for UBS Securities LLC

                    WILLKIE FARR & GALLAGHER LLP

                    By:_____/s/ Terence K. McLaughlin____
                    Terence K. McLaughlin
                    Rachel C. Strickland
                    J. Houston Goddard
                    787 Seventh Avenue
                    New York, New York 10019
                    (212) 728-8000

                    Attorneys for Pardus DPH Holding LLP

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By:_____/s/ Leslie G. Fagen_____
    Leslie G. Fagen
    Andrew N. Rosenberg
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Attorneys for Merrill Lynch, Pierce, Fenner &
Smith Inc.

KAYE SCHOLER LLP

By:_____/s/ Myron Kirschbaum_____
    Myron Kirschbaum
    Lynn Toby Fisher
    Benjamin Mintz
    Sapna W. Palla
425 Park Avenue
New York, New York 10022
(212) 836-8000

Attorneys for Harbinger Del-Auto Investment
Company, Ltd.