Hearing Date & Time:  March 7, 2008 at 10:00 a.m. prevailing Eastern time

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :
    In re              :    Chapter 11
                     :
DELPHI CORPORATION, et al.,  :    Case No. 05-44481 (RDD)
                     :
            Debtors.  :    (Jointly Administered)
                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF EXPEDITED MOTION
UNDER 11 U.S.C. § 1142(b) AND FED. R. BANKR. P. 3020(d)  FOR
IMPLEMENTATION OF DEBTORS' CONFIRMED PLAN OF REORGANIZATION**

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this omnibus reply (the "Reply") to (i) Emergency Motion of A-D Acquisition

Holdings, LLC For (I) A Continuance And (II) An Order Vacating The Order To Show Cause

(Docket Nos. 12990 and 12994) (the "Continuance Motion"); (ii) Response Of A-D Acquisition

Holdings, LLC To The Expedited Motion Under 11 U.S.C. § 1142(b) and Fed. R. Bankr. P.

3020(d) For Implementation Of Debtors' Confirmed Plan of Reorganization (Docket No. ____)

("ADAH Response"); and (iii) Co-Investors Memorandum Of Law In Opposition To Debtors'

Expedited Motion Under 11 U.S.C. § 1142(b) and Fed. R. Bankr. P. 3020(d) For Implementation

Of Debtors' Confirmed Plan of Reorganization (Docket No. 12991) ("Co-Investors Response").

<u>Preliminary Statement</u>

1.      The Motion seeks narrow and tailored relief.  The response of the Plan

Investors (other than Goldman Sachs) reflect either their fundamental misreading of the Motion,

or their calculated strategy to turn a simple legal question into a burdensome and time-

consuming exposition on matters that are not at issue, and are irrelevant for these purposes.

Most notably, the questions of whether or not the Plan Investors can be ordered to specifically

perform their funding obligations under the EPCA, or whether the current dispute gives rise to

damages under the EPCA, are simply not at issue.  Those questions may arise in the future but

are irrelevant to the current Motion.  Similarly, in light of the unambiguous terms of the EPCA,

the Plan Investors' voluminous evidentiary presentation is all beside the point.  The EPCA is not

ambiguous and the Plan Investors do not assert otherwise.

2.      What is at issue in the Motion is the Debtors' request that the Court direct

the Plan Investors to perform their obligations under the confirmed Plan (which includes the

EPCA) in light of the fact that the Plan Investors are incorrectly asserting that the Debtors' exit

financing proposal does not comply with the EPCA.  The Plan Investors' claim that these

circumstances are beyond the Court's ability to remedy ignores the immediate and tangible harm

that their actions are causing.  ADAH must be aware of the implications of the assertions in the

February 24 letter on the Debtors' ability to re-launch and syndicate the exit financing.  The fact

that ADAH sent the letter near midnight on the day before the Debtors planned to announce the

re-launch of their exit financing syndication, and expressly urged the Debtors to consider their

disclosure obligations underscores that fact.  The Debtors require and are entitled to the Court's

assistance under Section 1142 to interpret the Plan including the EPCA so that the exit financing

may proceed.

          3.      Unfortunately, the Plan Investors' actions suggest that they are motivated

that ADAH's February 24 assertion and their subsequent conduct and pleadings will result in the

Debtors inability to satisfy the conditions to close under the EPCA.  If this is so, then these errant

assertions and conduct may be the mechanism that will allow them to abandon this transaction,

and this Plan, free from cost.  Section 1142 provides ample authority to remedy this problem.  As

the Debtors have made clear, this is an awkward and difficult Motion.[1]  Thus, the limited relief

that the Debtors seek is the answer to a precise question, and the resolution to a present and

precise problem.

---

[1]      In their Motion, the Debtors sought not to inflame the situation by attacking the Plan Investors, but rather sought only narrow relief involving the interpretation of the Plan, including the EPCA.  Yet, in their responses, the Plan Investors have inexplicably and inappropriately attacked the Debtors and the credibility and truthfulness of their representatives without any basis.  Moreover, in the Co-Investors Response (p. 16, n.13) they reference an investigation being conducted by the Company.  This investigation involves a whistleblower-type complaint from a stakeholder who alleged direct knowledge of inappropriate conduct relating to at least one investor.  The Company was careful to state that it was not the Company making such allegations but rather was investigating the allegations as the fiduciary of the Debtors' estates.  The Debtors' conflicts counsel, Togut, Segal & Segal, LLP, requested certain information from the Plan Investors and the investigation is ongoing.

4.      To the extent that the Plan Investors' Responses address the actual narrow issue in controversy, their arguments are entirely unpersuasive. When the EPCA is taken as a whole – as required by New York law on interpretation of contracts – the EPCA provides no support for the Plan Investors' assertion that GM's participation in Delphi's exit financing is prohibited. The EPCA contains clear and simple terms regarding the conditions on the Debtors' exit financing. It must be sufficient to fund the Plan, and it must result in an interest expense no greater than $585 million in 2008. There is no limitation on GM's ability to participate; there is no interest rate (as opposed to interest expense) provision; there is no discussion of a prohibition on OID in the facility (to the contrary, the interest rate limitation contemplates OID). Moreover, the Financing Letter is clearly written to permit Delphi's lead arrangers to syndicate the exit financing on a commercially reasonable basis and references only indicative terms while also discussing the potential for changes to those terms, such as inclusion of OID and modified interest rates. Similarly, the Plan and Confirmation Order – both approved by the Plan Investors pursuant to the EPCA – contemplate an evolving financing structure that is sufficient to fund the Plan and meet the conditions of EPCA. The Plan Investors' complaints about the Debtors' proposed exit financing flow from conditions they now hope to impose, but which do not exist in the EPCA (essentially, that not a single term in the Financing Letter may change).

A.      The Court Should Deny The Motion For Continuance

5.      In the Continuance Motion, ADAH argues primarily that (i) ADAH received inadequate notice of the hearing; (ii) the Debtors' failed to demonstrate exigent circumstances; and (iii) the procedures established by the Court are prejudicial to ADAH. The Court should reject each of these arguments.

6.      <u>Notice</u>.  ADAH concedes that it and the other Plan Investors have been

evaluating the terms of GM's enhanced participation in the Debtors' exit financing since at least

February 8, 2008 (<u>see</u> Exhibit B to the Section 1142(b) Motion), and that the current Proposal "is

substantially identical to the proposal delivered to ADAH on February 8, 2008." (Exhibit E to

the Section 1142(b) Motion.)  Following receipt of ADAH's February 24 letter, which created

the issue at bar by effectively preventing the re-launch of the exit financing, the Debtors

informed ADAH on February 25, 2008 that they would likely seek relief by a motion under

Section 1142, and, at counsel's request, even provided to counsel for the Plan Investors a draft of

the Section 1142(b) Motion on Thursday, February 28, 2008 that was substantially similar to the

final version filed six days later.  ADAH's argument that it lacked time to prepare for the hearing

is further belied by its submission of over 100 pages of answering papers and declarations.

Consequently, there is simply no credible argument that ADAH received inadequate notice of the

matters raised in the Section 1142(b) Motion.

7.      <u>Exigent Circumstances</u>.  The Court already found "cause" to have the

hearing heard on an expedited basis based on the Affidavit Of Kayalyn A. Marafioti.  <u>See</u> Order

to Show Cause Why Debtors' Expedited Motion Under 11 U.S.C. § 1142(b) and Fed. R. Bankr.

P. 3020 (d) for Implementation of Debtors' Confirmed Plan of Reorganization Should Not Be

Granted (Docket No. 12977).  ADAH has the right to terminate the EPCA if, by April 4, 2008,

the Closing Date has not occurred.  In light of the April 4, 2008 deadline, the Debtors must re-

launch the exit financing and take the necessary steps to commence the rights offering required

by the Plan early in the week of Monday, March 10, 2008, to meet the deadlines in the EPCA.

Although ADAH suggests that the Debtors simply disclose the dispute in the Registration

Statement and Lender Presentation, the Debtors believe that without clarification from the Court

under Section 1142, ADAH's February 24 letter and subsequent conduct and pleadings would essentially render the exit financing syndication effort futile.

8.    <u>Fair Procedures</u>.  The Court has ordered that the 1142(b) hearing on March 7, 2008 will be conducted on a non-evidentiary basis.  The Court's decision to proceed on this track is prudent because if the contract's language is unambiguous, it can be interpreted as a matter of law without the need for or cost of discovery.  <u>See, e.g.</u>, <u>VKK Corp. v. NFL</u>, 244 F.3d 114, 129 (2d Cir. 2001) ("Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide. . . .  Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous.").  If a court finds that the contract is ambiguous, it may accept extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.  <u>See</u> <u>Morgan Stanley Group Inc. v. New England Ins. Co.</u>, 225 F.3d 270, 275-76 (2d Cir. 2000).  Accordingly, if this Court determines the language of the EPCA is ambiguous, such that extrinsic evidence and discovery are required to interpret its various provisions, the Court's procedures contemplate further time for discovery and factual development.  Thus, all of ADAH's rights in this regard will be preserved.

B.    <u>The Court Has The Power To Resolve This Dispute Under Section 1142</u>

9.    The Plan Investors assert that the Court lacks the power under section 1142(b) of the Bankruptcy Code to grant the relief sought in the Motion.  That relief, however, is quite narrow and limited to interpreting the terms of a confirmed plan to resolve a specific dispute between the parties and compelling the Plan Investors to perform in accordance with the Court's resolution of that dispute.  In the Second Circuit, bankruptcy courts indisputably have the power to interpret, and resolve disputes over, the terms of a confirmed plan.  <u>See</u> <u>Luan Investment S.E. v. Franklin 145 Corp.</u> (In re Petrie Retail Inc.), 304 F.3d 223, 230 (2d Cir. 2002)

6

("As bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own

orders, particularly when disputes arise over a bankruptcy plan of reorganization).  And the Plan

Investors themselves acknowledge that section 1142(b) "empowers the bankruptcy court to

enforce the unperformed terms of a confirmed plan."  Thus, this Court has the power to interpret

the Plan to resolve this dispute and to enter an order directing the Plan Investors to act in

accordance with its interpretation.

10.     And the Court may do so upon motion of the Debtors.  The Plan Investors

rely on In re Terracor, 86 B.R. 671, 675 (D. Utah 1988), for the proposition that the court must

use a balancing test to determine whether a motion or adversary proceeding is permitted.  Co-

Investor Response at 4.  Although Bankruptcy Rule 9014 contemplates that a dispute brought by

motion may be made subject to adversary proceeding rules to satisfy any Due Process or other

concerns, the Terracor decision imposes a test not found within the Second Circuit and which

would generate unwarranted uncertainty about how to initiate a request for relief under

section 1142(b).  If such a balancing test were required here, however, the circumstances support

proceeding by motion.  The Motion seeks judicial review limited to the four corners of the Plan

and a four-page term sheet, but at a time when the Debtors must resolve this dispute within the

next few days.  The Plan Investors' ability to respond effectively to this dispute is illustrated by

their filing of two briefs totaling 100- plus pages plus submission of supporting declarations and

documents.  No adversary proceeding is warranted under these circumstances.

C.     When evaluated under New York law, The EPCA
       Provides No Support For The Plan Investors' Positions

11.     In interpreting the words and phrases of a contract, courts must do so in a

manner that gives meaning to all of the contract's provisions and the general purpose of the

agreement.  See Allendale Mut. Ins. Co. v. Excess Ins. Co., 992 F. Supp. 271, 274 (S.D.N.Y.

1997) ("Fundamental contract law requires the parties' intent to be discerned by reading the contract as a whole, and by considering all its clauses together to determine if and to what extent one may modify, explain or limit another."); Empire Props. Corp. v. Mfrs. Trust Co., 43 N.E.2d 25, 28 (N.Y. 1942) ("A written contract 'will be read as a whole and every part will be interpreted with reference to the whole; and if possible will be so interpreted as to give effect to its general purpose.'" (citation omitted)); Sunrise Mall Assocs. v. Import Alley of Sunrise Mall, Inc., 211 A.D.2d 711, 711 (N.Y. App. Div. 1995) ("In construing a contract, the document must be read as a whole to determine the parties' purpose and intent . . . giving a practical interpretation to the language employed so that the parties' reasonable expectations are realized.").

12.    Furthermore, as explained by the New York Court of Appeals: "The meaning of a writing may be distorted where undue force is given to single words or phrases. We read the writing as a whole. We seek to give each clause its intended purpose in the promotion of the primary and dominant purpose of the contract." Empire Props. Corp., 43 N.E.2d at 248 (interpreting a trust indenture and eschewing an overly literal construction of conditions to sale in favor of a construction that comported with the overriding purpose of the contract, which was to facilitate sales); see Adams v. Suozzi, 433 F.3d 220, 223 (2d Cir. 2005) (relying on Empire and finding that a condition precedent with no literal deadline, when read in context of the entire contract, unambiguously was governed by other deadlines set forth in other paragraphs of the contract).

(i)    Section 5(p) Does Not Apply To Exit Financing

13.    As with any contract interpretation under New York law, determining the scope of Section 5(p) requires the Court to consider the EPCA as a whole.  When section 5(p) is

8

read in context, as it must be, it clearly is aimed at prohibiting two types of agreements: (i) unfavorable amendments to the GM Settlement or (ii) GM's procurement of commercial agreements outside the ordinary course of business. (Motion at ¶ 40.) The proposed exit financing clearly does not relate to the GM Settlement. Moreover, as discussed in the Motion, the proposed exit financing meets the two requirements of exit financing set forth in the EPCA, namely, that the amount of exist financing must be sufficient and that the Debtors aggregate interest expense for 2008 not exceed $585 million. Any reasonable interpretation of Section 5(p) under New York law cannot apply to any such agreement.

14.     In fact, the logical flaw in the Plan Investors' reasoning is illustrated by their implicit assumption that the Debtors' exit financing proposal must be structured as an "agreement" between Delphi and GM. In fact, GM's participation in Delphi's exit financing is likely to be structured through an agreement with Delphi's lead arrangers as they fulfill their arrangement and syndication responsibilities to the Debtors. From a commercial perspective, GM's intention to participate in the exit financing is nothing more than an "advance order" for the "syndication book" that is not precluded in any way by the EPCA. The Debtors note in the Motion that no amendments are required to the GSA or the MRA on account of GM's decision to participate in Delphi's exit financing.

(ii)     Section 5(t) Does Not Import Specific Financing Terms

15.     As set forth in the Motion, the Debtors believe the EPCA unambiguously calls for exit financing that is (i) sufficient to fund the plan, and (ii) within the cap on interest expense. The Debtors addressed ADAH's argument that the ECPA requires specific financing terms in the Motion (pp. 22-23.) Because the EPCA points to a best efforts financing letter, which by its nature contemplates flexibility based on market conditions, there is no reasonable

reading of the EPCA that can import the indicative terms of the financing letter as fixed and absolute conditions.

16.     Furthermore, the Court must read the Financing Letter, EPCA, and confirmed Plan as agreements coordinated to effectuate the Plan.  None of the agreements can function in a vacuum or on a stand-alone basis.  It follows, then, that Financing Letter cannot be deemed to be a static document, frozen in place on November 3, 2007, impossible to amend.  Nor can section 5(t) of the EPCA be read to prohibit amendments to the Financing Letter.  The Court approved the terms of the best efforts financing letter on November 16, 2007.  The Court next approved the EPCA on December 10, 2007, subsequent to a hearing in which the Plan Investors' primary concern was the EPCA's interest rate cap provision.  Finally, on January 25, 2008, the Court approved the Plan, including the modifications to article 7.14 pursuant to which the Reorganized Debtors were to receive proceeds from the Exit Financing Arrangements (as may be amended, modified, or supplemented) in the amount necessary to implement the Plan within terms and conditions previously approved by this Court and sufficient to, among other things, satisfy the terms of the EPCA.  By the terms of section 9(a)(xxviii) of the EPCA, the Plan Investors approved the Plan and the Confirmation Order.  Through these sequential events, it is clear that the Debtors and the Plan Investors anticipated amendments to the Financing Arrangements that would give effect to the Plan (including the EPCA).

<u>Conclusion</u>

17.     For the reasons set forth above and in the Motion, the Debtors' request for relief should be granted.

10

Dated:      New York, New York
              March 7, 2008

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP


By:    /s/ John Wm. Butler, Jr.
        John Wm. Butler, Jr. (JB 4711)
        John K. Lyons (JL 4951)
        Albert L. Hogan, III (AH 8807)
        Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –


By:    /s/ Kayalyn A. Marafioti
        Kayalyn A. Marafioti (KM 9632)
        Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

11