**Bidding Procedures Hearing Date And Time: March 19, 2008 at 10:00 a.m.**
**Bidding Procedures Objection Deadline: March 17, 2008 at 4:00 p.m.**
**Sale Hearing Date And Time: April 30, 2008 at 10:00 a.m.**
**Sale Hearing Objection Deadline: April 23, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :
     In re                    :     Chapter 11
                        :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                        :
            Debtors.     :     (Jointly Administered)
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363 AND 1146 AND FED. R. BANKR. P. 2002, 6004, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE BY DELPHI AUTOMOTIVE SYSTEMS LLC OF CERTAIN MACHINERY, EQUIPMENT, AND INVENTORY PRIMARILY USED IN DAS LLC'S KETTERING DAMPER BUSINESS FREE AND CLEAR OF LIENS AND (II) ENTRY INTO LEASE AGREEMENT IN CONNECTION THEREWITH

("KETTERING SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for orders under 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr. P. 2002, 6004, and 9014 (a)(i) approving the bidding procedures set forth herein and attached hereto as Exhibit A (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of certain assets of Delphi Automotive Systems LLC ("DAS LLC" or the "Seller") comprising certain assets used in the U.S. damper business[1] (the "Acquired Assets"), including, without limitation, the machinery, equipment, and inventory primarily used and located at DAS LLC's damper manufacturing facility in Kettering, Ohio for approximately $18.8 million and other consideration, as such purchase price may be adjusted based on Inventory Value (as defined below) at closing and (ii) entry into a lease agreement in connection with the Sale.  The Acquired Assets are being sold free and clear of liens pursuant to the Asset Purchase Agreement (the "Agreement")[2] dated March 7, 2008 by and among the Seller and Tenneco Automotive Operating Company Inc. (the "Purchaser") or to the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid.  The Seller is not assigning any executory contracts in connection with the Sale.  In support of this Motion, the Seller respectfully represents as follows:

---

[1]    The U.S. damper business provides passive twin-tube dampers, passive twin-tube struts, and  related modules for GM and its affiliates in the United States, Canada, and Mexico.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this
Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.
§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their
businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections
1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,
2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official
committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official
committee of equity holders.

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization
Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.
9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi
Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).
Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of
Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-
Possession  (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with
respect to the Plan  (Docket No. 11388) (the "Disclosure Statement").  The Court entered an
order approving the adequacy of the Disclosure Statement and granting the related solicitation
procedures motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court
entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation
Order"), which became a final order on February 4, 2008.

4.       This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein

are sections 363 and 1146 of the Bankruptcy Code and rules 2002, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.       Current Business Operations Of The Debtors

5.       Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately

$13.7 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.[4]

6.       The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

7.       Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

---

[3]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its
       worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[4]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
       automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
       proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
       receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
       which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
       2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
       footprint and to lower its overall cost structure.

4

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

        8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[5] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

        9.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

---

[5]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable

solution to their current pension situation.

E.    Confirmation Of The Debtors' Plan Of Reorganization

12.    The confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases.

The Global Settlement Agreement and the Master Restructuring Agreement provide for a

6

comprehensive settlement with GM, and both agreements were approved by this Court in the

Confirmation Order.  With the Plan confirmed, the Debtors are focusing their efforts on

satisfying the conditions for the Plan to become effective and allow them to emerge from chapter

11.  The Debtors anticipate having the Plan become effective as soon as reasonably practicable.

13.     Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

14.     By this Motion, the Seller seeks approval for the sale of the Acquired

Assets to the Purchaser, subject to additional competitive bidding pursuant to the proposed

Bidding Procedures attached as <u>Exhibit A</u> hereto.  To effect the sale, the Seller seeks entry of

two types of relief.  First, at the omnibus hearing to be held on March 19, 2008, the Seller will

seek entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding

Procedures Order") approving the Bidding Procedures, certain notice procedures, and certain bid

protections to be provided to the Purchaser pursuant to the Agreement and as described more

fully herein.  Second, subject to the terms of the Bidding Procedures Order, at the omnibus

hearing to be held on April 30, 2008, the Seller will seek entry of an order substantially in the

form attached hereto as <u>Exhibit C</u> (the "Sale Approval Order") authorizing and approving the

Sale to the Purchaser or to the Successful Bidder, as the case may be.

15.     As more fully set forth below, after a comprehensive strategic review, the

Seller believes that the Sale represents its best opportunity under the circumstances to maximize

the underlying core value of the Acquired Assets.  Therefore, the Sale is in the best interests of

its estate and its stakeholders.

Basis For Relief

F.      The Kettering Equipment

16.      The Seller operates certain manufacturing and subassembly facilities in

Kettering, Ohio.  The Kettering facility provides a variety of shock absorbers (dampers) and

related damper modules to GM and other customers for North American vehicle applications.  In

2007, the net revenues of the Kettering damper business exceeded $100 million.  The Kettering

damper business currently employs approximately 420 active hourly employees represented by

the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers –

Communications Workers of America and its Local Union Number 755 (the "IUE-CWA") and

approximately 140 salaried employees connected to the product line.

G.      Events Leading To The Sale

17.      On March 31, 2006, the Debtors announced the five key tenets of their

transformation plan, one of which was to streamline their product portfolio by identifying non-

core product lines that do not fit into their future strategic framework.  Because the Kettering

business, which is a subset of the Debtors' ride dynamics business, does not fit within the

Debtors' anticipated product portfolio, the Seller has determined to divest the Acquired Assets

and has worked with GM to develop a resourcing plan.

18.      Because GM has independently resourced the passive dampers and

damper modules manufactured at the Kettering facility to the Purchaser, the Seller and the

Purchaser have been negotiating agreements related to the Sale of the Acquired Assets.  Because

the Acquired Assets have limited use other than manufacturing parts designed for use in GM

vehicles, the Sale to the Purchaser is clearly the best means for attaining the maximum value for

8

the Acquired Assets.  The Seller's alternatives for divesting the Acquired Assets are a wind-down of the Kettering damper business, which would be costly and result in no revenue for the Seller's estate, or liquidating the Acquired Assets, which would not yield value comparable to the Sale. The parties have thus been coordinating the transition of designated programs and determining which machinery and equipment, related supplies, tools, and inventory is required to effect a smooth transition.  Both parties determined that maintaining the manufacturing at the Kettering facility was the best alternative for minimizing transition risk.  The Kettering damper business occupies less than half of the larger building in which it is located, however, and that building is owned by the Seller.  Accordingly, the Seller decided to lease the necessary portion of the building to the Purchaser, as described in more detail below.  The form of the proposed lease to the Purchaser is attached to the Agreement as Exhibit A (the "Lease").

19.    The Seller, in its business judgment, concluded that the proposal from the Purchaser, which formed the basis of the Agreement attached hereto as Exhibit D, offered the most advantageous terms and the greatest economic benefit to the Seller for the Acquired Assets. The Purchaser's offer is currently the highest and best offer, providing the highest amount of consideration for the Acquired Assets.

H.    The Agreement

20.    Pursuant to the Agreement, the Seller would sell the Acquired Assets to the Purchaser for approximately $18.8 million and other consideration (the "Initial Purchase Price"), which would be adjusted to reflect the cost of useable and merchantable inventory existing as of the Closing Date (the "Inventory Value").[6]  The Acquired Assets would be sold free and clear of all liens (including tax liens and any statutory or common law liens, possessory

---

[6]    The Initial Purchase Price contemplates an Inventory Value of approximately $10.2 million, and the Initial Purchase Price will be adjusted to the extent that the final Inventory Value is less or more than $10.2 million, as set forth in the Agreement.

or otherwise), charges, pledges, security interests, conditional sale agreements or other title

retention agreements, leases, mortgages, security interests, options, or other encumbrances

(including the filing of, or agreement to give, any financing statement under the Uniform

Commercial Code of any jurisdiction) and any monetary amounts which are secured by any lien

(collectively, the "Liens").

       21.     The significant terms of the Agreement are as follows:[7]

       (a)     <u>General Terms</u>.  The Purchaser would acquire the Acquired Assets, consisting solely of the machinery, inventory, and other personal property identified on the schedules to the Agreement, through an asset sale.[8]

       (b)     <u>Bankruptcy Court Approval</u>.  The Sale of the Acquired Assets would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

       (c)     <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.  At the Closing, the Seller and the Purchaser would also enter into the Lease for a portion of the Kettering facility for an initial lease period of seven years.

       (d)     <u>Purchase Price</u>.  The purchase price to be paid by the Purchaser would be approximately $18.8 million for the Acquired Assets as adjusted to reflect the Inventory Value (the "Purchase Price").

       (e)     <u>Deposit Escrow</u>.  No later than March 10, 2008, the Purchaser will place $942,000.00 (5% of the Initial Purchase Price) into an escrow account.  Upon Closing, or if the Agreement is terminated prior to Closing because of the Purchaser's failure to consummate the Sale (on the terms as provided in the Agreement), the Seller would be entitled to the funds in the escrow account.  Any such payment would constitute the Seller's sole recourse in such event prior to the date of the Auction (as defined below).  Upon any breach by the Purchaser on or after the Auction date, the Seller would be entitled to all available remedies in law or equity.

       (f)     <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Seller would provide certain standard representations and warranties relating to the Sale of the

---

[7]   In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of the Agreement are controlling.

[8]   Copies of the schedules and exhibits to the Agreement are available upon request to parties-in-interest who can show that they would be affected by the relief requested by this Motion and who execute a confidentiality agreement acceptable to the Debtors.

Acquired Assets and the Purchaser would provide representations and warranties generally standard in a transaction of this type. The representations and warranties of the Seller and the Purchaser would expire 90 days after the Closing Date, except that (i) the parties' representations with respect to corporate authority would survive for one year after the Closing Date and (ii) the Purchaser's representation with respect to inducement, reliance, and independent assessment would survive indefinitely.

   (g) <u>Covenants</u>. The Lease would be executed and delivered by the Seller to the Purchaser, and all other agreements and transactions contemplated under the Agreement or any additional agreement to be performed by the Seller on or before the Closing would be performed in all material respects. Prior to the Closing Date, the Seller would also be required to, among other things, use and operate the Acquired Assets in the ordinary course of business and maintain, repair, and replace the Acquired Assets as previously done in the ordinary course of business. The Seller would agree not to (i) sell, lease, transfer, or assign any of the Acquired Assets, except for the sale of Inventory in the Ordinary Course of Business (ii) in connection with the Applicable Employees, (A) grant any increase in compensation or benefits, except for increases (1) required by applicable Law or the terms of any Collective Bargaining Agreement and (2) in salary for non-management employees in the Ordinary Course of Business, (B) grant any increase in severance or termination pay, (C) enter into or materially amend any employment, consulting, indemnification, severance, or termination agreement, (D) establish, adopt, enter into, or materially amend any Benefit Plan, except as required by applicable Law or the terms of any Collective Bargaining Agreement, or (E) take any action to accelerate any payments, rights, or benefits, or make any material determinations not in the Ordinary Course of Business, under any Collective Bargaining Agreement, or Benefit Plan, or (iii) agree, whether in writing or otherwise, or announce an intention or negotiate to do anything in violation of these two negative covenants. The covenants of the Seller and the Purchaser would expire at various times after the Closing Date, or once they are performed. Further, for a period of five years after the Closing, the Seller would be prohibited from taking certain actions which would place it in competition with the Purchaser with respect to the Kettering damper business. The Seller would also agree to provide top mounts to the Purchaser through December 31, 2008 at the prices set forth in a schedule to the Agreement. The Purchaser would covenant to maintain no fewer than 200 hourly manufacturing jobs at the Kettering facility through October 12, 2011.

   (h) <u>Indemnity</u>. Under the Agreement, the Purchaser would be obligated to indemnify the Seller on account of certain losses resulting from or arising out of (i) any breach in any representation or warranty of Purchaser contained in the Agreement, (ii) a breach of any covenant to be performed by Purchaser contained in the Agreement or any Ancillary Agreement, or (iii) Purchaser's use or operation of any of the Acquired Assets after the Closing. The Seller would be obligated to indemnify the Purchaser on account of (i) retained liabilities, (ii) the excluded assets, (iii) a material breach of any covenant to be performed by Seller contained in the Agreement, or (iv) a breach of any representation or warranty of Seller contained in the Agreement. However, the Seller's indemnification obligations with respect to breaches of representations and warranties would be limited to indemnification claims that are identified to the Seller on or before 90 days after the Closing, except for indemnification claims made with respect to corporate authority matters, which claims would have to be identified to Seller on or before the first anniversary of the Closing. Further, the Seller would

11

not be obligated to the Purchaser for indemnifiable losses related to a breach of a representation or warranty until the aggregate amount of such claims exceeds $300,000 and such indemnification is capped in the maximum amount of $1.2 million.  The Seller's indemnity obligations for a material breach of any covenant would not be so capped, and would expire as the particular covenant expires under its terms or is performed by the Seller.

   (i) Closing Conditions.  In addition to certain other customary closing conditions relating to the Court's approvals and regulatory matters, the obligation of the parties to close the Sale would be subject to the satisfaction of the following conditions: (i) the performance in all respects by the Seller and the Purchaser of their covenants under the Agreement and (ii) the accuracy of the Seller's and Purchaser's representations and warranties in all material respects.  Furthermore, the obligation of the Purchaser and the Seller to close the Sale would be subject to (a) the Purchaser's delivery to the Seller of the Initial Purchase Price, less the Deposit, and (b) the execution by the Seller and IUE-CWA of a written agreement providing that the Seller has satisfied all of its obligations relating to all applicable IUE-CWA-Delphi collectively bargained "Sale of the Business" and successor provisions.  The Seller's obligation to consummate the Sale would be conditioned on: (a) the valid execution and delivery of the GM Supply Agreement; (b) execution by the Seller, the Purchaser, the IUE-CWA and GM of a satisfactory Memorandum of Understanding regarding the effects of the transaction upon bargaining unit members; and (c) the Purchaser's securing environmental insurance on terms satisfactory to the Purchaser in its reasonable discretion.

   (j) Termination.  The Agreement could be terminated prior to closing in the following circumstances: (i) upon mutual written consent of the Seller and the Purchaser, (ii) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if closing does not occur within 60 days after entry of the Sale Approval Order for any reason, (iii) by either party, if the Seller consummates an Alternative Transaction (defined below), (iv) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if this Court has not entered the Sale Approval Order on or before May 23, 2008, or (v) by the Purchaser or the Seller upon written notice, provided the terminating party is not in material breach of any of its obligations under the Agreement, if (A) the non-terminating party has breached or failed to perform any of its obligations under the Agreement, which breach is not cured within 30 days after written notice thereof, or is incapable of being cured by the breaching party or (B) a material adverse effect has occurred.

   (k) Break-Up Fee.  If the Seller, within 12 months of entry into the Agreement, sells, transfers, or otherwise disposes of all or substantially all or a material portion of the Acquired Assets in a transaction or a series of related transactions with one or more persons other than Purchaser in accordance with the Bidding Procedures (an "Alternative Transaction"), then the Seller would, upon consummation of the Alternative Transaction, pay the Buyer the sum of $565,304.00 (the "Break-Up Fee"), which is approximately 3.0% of the Initial Purchase Price.

   (l) Expense Reimbursement.  If the Agreement is terminated because either (i) the Court has not entered the Sale Approval Order on or before May 23, 2008, (ii) the Closing does not occur within 60 days of entry of the Sale Approval Order (and the Purchaser

has not failed to enter into the GM Supply Agreement or the Effects MOU), or (iii) the Seller materially fails to perform any of its covenants or obligations under the Agreement and such breach is not cured within 30 days of notice of such breach, the Seller would be required to reimburse the Purchaser's reasonable, actual out-of-pocket fees and expenses incurred in connection with the investigation or negotiation of the transactions contemplated by the Agreement up to an amount equal to $750,000 (the "Expense Reimbursement"), or approximately 3.9% of the Initial Purchase Price. The Expense Reimbursement would be immediately earned upon termination and payable promptly after invoiced by the Buyer, except that if the Seller in good faith believed that the amount of the Expense Reimbursement sought was not reasonable, then the Seller would have the right to seek the review of this Court before paying such amount. If the Buyer becomes entitled to the Break-Up Fee or the Expense Reimbursement, as the case may be, then the Break-Up Fee or the Expense Reimbursement would be the sole remedy of the Buyer for the breach by the Seller of the terms of the Agreement. The Seller may be liable for either the Break-Up Fee or the Expense Reimbursement as described above, but not both.

       (m)   <u>Transfer Taxes</u>. The Purchaser is liable for all stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes, or similar charges arising out of or incurred in connection with the Agreement if such taxes or charges are not found exempt under section 1146 of the Bankruptcy Code.

I.    <u>The Lease</u>

       22.    As discussed above, the Kettering damper business is conducted in an within a building of approximately 2.2 million square feet.   Under the terms of the Lease, the Seller would lease an area of approximately 930,000 square feet (the "Premises") of the building to the Purchaser for an initial period of seven years.  In addition, the Purchaser would have the option to renew the lease for four additional lease periods of five years each.

       23.    To facilitate the Sale of the Acquired Assets, the rent payable under the initial Lease term would escalate through the term of the Lease, with no rent payable in the first year and rent increasing by approximately $232,000 annually for each year thereafter.  Should the Purchaser elect to exercise the renewal options provided in the Lease, the rent would be determined at then-prevailing market rates for comparable premises in the Kettering area.  The Purchaser would also be responsible for its share of utilities, taxes, insurance, and maintenance

for the site (other than the portions Delphi continues to occupy), as calculated under the terms of
the Lease.

24.    In addition, the Lease would require the Purchaser, by September 30,
2009, to separate the Premises from the remainder of the building in which it is situated by
construction of a new permanent exterior wall.  This separation would also include the separation
of utilities serving the Premises and would be performed at the expense of the Purchaser.  The
anticipated significant cost in performing this separation was an additional factor considered by
the parties in determining to set the rent for the Premises on an escalating basis.

25.    The terms of the Lease were negotiated by the parties in a good faith and
arm's length manner.  Moreover, in negotiating the terms of the Lease with the Purchaser, the
Seller took into account the value of the Sale on an aggregate basis, including the terms of the
Lease.  Aside from the clear benefits of selling the Acquired Assets under the terms of the
Agreement, the Lease ensures that the Kettering damper business will continue to be conducted
at the Kettering facility for a number of years to come, which is beneficial and important not
only to the local community but also to the IUE-CWA, which represents the employees of the
Kettering damper business.

J.    Workforce Provisions

26.    The Agreement provides that the Purchaser will offer employment to no
fewer than 30 salaried employees (subject to reduction for pre-Closing departures).  Such
salaried employees would be offered compensation and benefits that are substantially
comparable in the aggregate to the compensation and benefits offered prior to closing.  Prior to
tendering such offers to salaried employees, the Purchaser would provide the Seller information
to satisfy the Seller that this "substantially comparable in the aggregate" requirement is met.  If
not met, the Purchaser would have the opportunity to cure any deficiency.  If Seller, in its sole

14

discretion, determines that Purchaser has still not met this standard, the affected employee will

be so advised and given the option of either receiving severance benefits from Seller in

accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees (and

barred from employment by Purchaser for five years in accordance with the Agreement) or

accepting Purchaser's offer of employment and waiving eligibility for any severance benefits

from Seller.

   27. The significant terms of the Agreement, with respect to hourly or salaried

employees, as applicable, are as follows:[9]

   (a) <u>Collective Bargaining Agreements</u>.  The Purchaser would not
assume the terms and conditions of any of the IUE-CWA-Delphi collective bargaining
agreements applicable at the Kettering facility.  The Purchaser has entered into an August 5, 2007
collective bargaining agreement with the IUE-CWA (the "Purchaser CBA").  The Tenneco CBA
would govern the employment by the Purchaser of the Kettering hourly employees, subject to
possible modification by a memorandum of understanding between Delphi, the Purchaser, GM
and the IUE-CWA regarding the effects of the sale upon bargaining unit members (the "Effects
MOU").

   (b) <u>Inactive Employees</u>.  Employees not active as of the closing due to
disability, family medical leave, or other approved leaves of absence, or certain seniority
employees on layoff (the "Inactive Employees") would remain the Seller's responsibility until the
Inactive Employees returned to active employment in accordance with the Seller's leave policies
or collective bargaining agreement leave and layoff/recall provisions, as applicable.  When an
Inactive Employee is ready to return to work, or the Purchaser has need to increase the workforce,
the Purchaser would offer employment to such Inactive Employee.

   (c) <u>Employee Benefit Plans</u>.  All employees transferred to the
Purchaser as of the Closing, and such employees' dependents and beneficiaries, would cease to
participate in and be eligible for benefits under the Seller's benefit plans.  Transferred salaried
employees, and their dependents and beneficiaries, would commence participation in and become
eligible for benefits under the Purchaser's employee benefits plans.  Inactive Employees who
would become employees of the Purchaser, and their dependents and beneficiaries, would cease
to participate in and be eligible for benefits under the Seller's benefit plans as of the date on which
such Inactive Employee became an employee of the Purchaser.  Transferred hourly employees,
and their dependents and beneficiaries would commence participation in and become eligible for
benefits under the Purchaser's employee benefits plans in accordance with the Purchaser CBA.

---

[9] Potential bidders should note that Section 3.2 of the Agreement addresses, among other things, the terms and
conditions of employment of IUE-CWA-represented employees, and these issues remain subject to the parties'
rights and obligations related to bargaining with the IUE-CWA.

(d)    <u>Grievances</u>.  The Seller would retain liability for labor grievances and arbitration proceedings arising from alleged violations of the Collective Bargaining Agreements occurring prior to the Closing.

K.    <u>Bidding Procedures</u>

28.    The Sale of the Acquired Assets would be subject to higher or otherwise better offers pursuant to the Bidding Procedures.  The Seller believes that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Acquired Assets for the benefit of the Seller's estate, its stakeholders, and other interested parties. Accordingly, the Seller seeks approval of the Bidding Procedures for the Sale of the Acquired Assets.

29.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and this Court's approval thereof (collectively, the "Bidding Process").

30.    The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> are as follows:[10]

(a)    <u>Assets To Be Sold</u>:  The assets proposed to be sold are the Acquired Assets.

(b)    <u>Free Of Any And All Liens</u>: The Acquired Assets are to be sold free and clear of any Liens.

(c)    <u>Participation Requirements</u>:  To ensure that only bidders with a serious interest in the purchase of the Acquired Assets participate in the Bidding Process, the Bidding Procedures provide for minimal requirements for a potential bidder to become a "Qualified Bidder": (i) executing a confidentiality agreement in form and substance satisfactory to the Seller, (ii) providing the Seller with certain financial assurances as to such bidder's ability to close a transaction, (iii) submitting a preliminary proposal reflecting the purchase price range,

---

[10]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary have the meanings ascribed to them in the Bidding Procedures.

any Acquired Assets expected to be excluded, the structure and financing of the transaction, any anticipated regulatory approvals, the anticipated time frame and any anticipated impediments to obtaining such approvals, any additional conditions to closing that the qualified bidder may wish to impose, and the nature and extent of any due diligence it may wish to conduct and the date by which such due diligence would be completed, and (iv) delivering a good faith deposit in the amount equal to 5% of the Purchase Price (the "Good Faith Deposit") .

(d)     Due Diligence:  All Qualified Bidders would be afforded an opportunity to participate in the diligence process.  The Seller would coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.  Any additional due diligence shall not continue after the Bid Deadline.

(e)     Bid Deadline:  A bid deadline of 11:00 a.m. (prevailing Eastern time) on April 10, 2008 (the "Bid Deadline") would be established.  The Seller could extend the Bid Deadline once or successively, but would not be obligated to do so.  If the Seller extends the Bid Deadline, it would promptly notify all Qualified Bidders of such extension.

(f)     Break-up Fee:  In the event that the Seller terminates the Agreement to consummate an Alternative Transaction and consummates an Alternative Transaction within 12 months of entry into the Agreement, the Seller would pay the Purchaser the Break-Up Fee within five Business Days after consummation of the Alternative Transaction.  Notwithstanding the foregoing, the Purchaser would not be entitled to a Break-Up Fee if the Purchaser were in material breach of the Agreement or the Bidding Procedures.

(g)     Bid Requirements:  All bids would be required to include the following documents: (i) a letter stating that the bidder's offer would be irrevocable until two business days after the Closing, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a Good Faith Deposit, (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction, and (v) written evidence that the bidder has negotiated a ratified, executed successor collective bargaining agreement with the IUE-CWA or that the bidder is prepared to assume the Seller's current collective bargaining agreement with the IUE-CWA.

(h)     Qualified Bids:  To be deemed a "Qualified Bid," a bid would be required to be received by the Bid Deadline and, among other things, would be required to (i) be on terms and conditions that are substantially similar to, and are not materially more burdensome or conditional to the Seller than those contained in the Agreement, (ii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) have a value greater than the purchase price reflected in the Agreement, and the amount of the Break-Up Fee, plus $500,000.00 initially, and in increments of $250,000.00 for any subsequent bid, (iv) not be conditioned on any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment, (v) contain acknowledgements and representations as set forth in the Bidding Procedures, and (vi) include a commitment to consummate the purchase of the Acquired Assets within not more than fifteen days after entry of the Court's order approving such purchase.  The Seller would have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

17

(i)    <u>Conduct Of Auction</u>: If the Seller receives at least one Qualified Bid in addition to that of the Purchaser, it would conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on or before April 14, 2008, or such later time as the Seller notifies all Qualified Bidders who have submitted Qualified Bids, in accordance with the procedures outlined in the Bidding Procedures, which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two Business Days prior to the Auction, each Qualified Bidder with a Qualified Bid would be required to inform the Seller whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Seller would be required to provide such bidders attending the auction with copies of the Qualified Bid or combination of Qualified Bids which the Seller then believes is the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders would be entitled to be present for all subsequent bids, and (iv) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $250,000.00 and conclude after each participating bidder has had the opportunity to submit one or more additional subsequent bids.

(j)    <u>Selection Of Successful Bid</u>:  As soon as practicable after the conclusion of the Auction, the Seller would review each Qualified Bid and identify the highest or otherwise best offer(s) for the Acquired Assets (the "Successful Bid") and the bidder(s) making such bid(s) (the "Successful Bidder(s)").  The Seller would sell the Acquired Assets for the highest or otherwise best Qualified Bid or combination of Qualified Bids and the transaction would be consummated as soon as reasonably practicable following the approval of such Qualified Bid by the Court.

(k)    <u>Sale Hearing</u>: The Sale Hearing would be scheduled for April 30, 2008 at 10:00 a.m. (prevailing Eastern time) and the Sale Hearing could be adjourned or rescheduled by the Seller without notice other than by an announcement of the adjourned date at the Sale Hearing.  If no Qualified Bids other than that of the Purchaser are received, the Seller would proceed with the sale of the Acquired Assets to the Purchaser following entry of such order.  If the Seller receives additional Qualified Bids, then at the Sale Hearing, the Seller would seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  A bid would not be deemed accepted by the Seller unless and until approved by the Court.  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and the Seller would be permitted to effectuate a sale to the Alternate Bidder without further order of the Court.

(l)    <u>Return Of Good Faith Deposits</u>: The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) would be held and all Qualified Bids would remain open until two business days following the Closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the Good Faith Deposit submitted by the Successful Bidder, together with interest thereon, if any, would be applied against the payment of the Purchase Price upon Closing of the Sale to the Successful Bidder.  If a Successful Bidder failed to consummate an approved sale, the Seller would not have any obligation to return such Good Faith Deposit and such deposit would irrevocably become property of the Seller.  Subject to the preceding sentence, on the Return Date, the Seller would return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

(m)  Reservation Of Rights:  The Seller, after consultation with, among others, the Creditors' Committee: (i) could determine which Qualified Bid, if any, would be the highest or otherwise best offer and (ii) could reject, at any time, any bid (other than the Purchaser's bid) that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Seller, including the Seller and its estate and its stakeholders, and as determined by the Seller in its sole discretion.

L.    Bid Protections

31.    The Purchaser has expended, and likely will continue to expend, considerable time, money, and energy pursuing the Sale and has engaged in extended arm's length and good faith negotiations regarding a possible sale.  The Agreement is the culmination of these efforts.

32.    In recognition of this expenditure of time, energy, and resources, the Seller has agreed to provide certain bid protections to the Purchaser, including the Break-Up Fee and the Expense Reimbursement (the "Bid Protections").  Specifically, the Agreement provides for, and the Seller respectfully requests that the Bidding Procedures Order approve, the Break-Up Fee payable by the Seller to the Purchaser in the amount of $565,304.00, or 3.0% of the Initial Purchase Price, if the Seller terminates the Agreement to close an Alternative Transaction and the Seller consummates an Alternative Transaction within 12 months of entry into the Agreement.

33.    In addition, the Seller respectfully requests this Court's approval of the term in the Agreement providing for reimbursement of the Purchaser's reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement in an amount no greater than $750,000, or 3.9% of the Initial Purchase Price.  The Purchaser may be entitled to the Break-Up Fee or the Expense Reimbursement, but not both.

34.    The Seller believes that the proposed Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation

undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's efforts would maximize the value of the Acquired Assets for the benefit of all stakeholders, whether as a result of consummating the Sale pursuant to the Agreement or making the highest or otherwise best offer to be submitted at any Auction.

35.     The Purchaser is unwilling to keep open its offer to purchase the Acquired Assets under the terms of the Agreement unless this Court authorizes payment of the Bid Protections.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, the Seller may lose the opportunity to obtain what it believes to be the highest and best offer for the Acquired Assets. This is particularly true with respect to the Acquired Assets because GM has agreed to resource the damper business conducted at the Kettering facility to the Purchaser, and the Purchaser can accordingly make the best and highest use of the Acquired Assets.  The Auction, however, is a competitive mechanism designed to test whether any alternative use for the Acquired Assets, including without limitation liquidation value, would yield a higher or better return for the Seller.  Approving the Bid Protections will commit the Purchaser to serve as the stalking horse bidder under the Agreement, and the Purchaser's bid would serve to start any additional bidding for the Acquired Assets at a fair and reasonable purchase price.

36.     Payment of the Break-Up Fee will not diminish the Seller's estate.  The Seller would not expect to pay the Break-Up Fee unless it does so to accept an alternative Successful Bid, which would result in even greater value to the Seller's estate and its stakeholders.  The Seller thus requests that this Court authorize payment of the Break-Up Fee pursuant to the terms and conditions of the Agreement.

M.     Notice Of Sale Hearing

20

37.      Within five days after entry of the Bidding Procedures Order (the "Mailing Date"), the Seller (or its agent) proposes to serve the Motion, the Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the U.S. Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity Committee, (v) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months, (vi) all entities known to have asserted any Lien, claim, interest, or encumbrance in or upon the Acquired Assets, (vii) all federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) the United States Attorney's office, (ix) the United States Department of Justice, (x) the Securities and Exchange Commission, (xi) the Internal Revenue Service, (xii) all entities on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order")), and (xiii) such other entities as are required to be served with notices under the Supplemental Case Management Order.

38.      The Seller also proposes pursuant to Fed. R. Bankr. P. 2002(l) and 2002(d) to publish a notice of the Sale in a form substantially similar to the form annexed hereto as Exhibit E in the Wall Street Journal (International Edition), the New York Times, and the Dayton Daily News within five days of entry of the Bidding Procedures Order or as soon as practicable thereafter.  The Seller requests that such publication notice be deemed proper notice to any other interested parties whose identities are unknown to the Seller.

21

Applicable Authority

N.        Approval Of Bidding Procedures

39.        Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D.

Del. 1991).

40.        The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b)

motion is a summary proceeding, intended merely as a means to "efficiently review the . . .

debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is

not the time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098-

99.

41.        Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company."  Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re

Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing

22

the proposed exercise of a debtor's business judgment have the burden of rebutting the

presumption of validity." Id.  To satisfy its burden, it is not enough for an objector simply to

raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections." Lionel, 722 F.2d at 1071.

42.    As a rule, the debtor's business judgment "should be approved by the court

unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo.

1991)).  As set forth above, the Seller has sound business justifications for pursuing a sale

process at this time.  Because GM has agreed to resource the majority of the damper business

conducted at the Kettering facility to the Purchaser, the Sale of the Acquired Assets to the

Purchaser will ensure a seamless transition of operations and minimize interruption to the

Kettering facility.  In addition, the sale of the Acquired Assets as a whole and in contemplation

of the Purchaser's supply of the damper components to GM will generate value substantially

higher than if the Seller wound down the Kettering damper business.

43.    The Seller submits that the Bidding Procedures would encourage

competitive bidding because the Purchaser would not have entered into the Agreement without

such provisions.  The Bidding Procedures have thus induced a bid that otherwise would not have

been made.  Finally, the mere existence of the Bidding Procedures permits the Seller to insist that

competing bids be materially higher or otherwise better than the Agreement, which will produce

a clear benefit to the Seller, its estate, its stakeholders, and all other parties-in-interest.

44.    A prospective purchaser of assets from a chapter 11 debtor may be

reluctant to make an offer because it knows that even if it reaches agreement with the debtor, its

offer will be subject to a higher bid by another party.  Pre-approved bidding procedures address

23

these concerns by assuring initial bidders that any auction procedure will be predictable and

reasonable.  Thus, the Seller submits that the use of the Bidding Procedures also reflects sound

business judgment.

O.    Entry Into The Lease

45.    As set forth above, the Seller has sound business justification for entering

into the Lease.  Entry into the Lease is a closing requirement under the Agreement, and the

advantageous Sale of the Acquired Assets would not be possible if the Seller did not lease the

required portion of the Kettering facility to the Purchaser on the terms provided in the Lease.

Moreover, the Lease was negotiated by the parties in a good faith and arm's length manner.  The

Seller accordingly submits that the decision to enter into the Lease is supported by sound

business judgment.

P.    Sale Of The Acquired Assets Free And Clear Of Liens

46.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)  applicable nonbankruptcy law permits sale of such property free and clear of such
interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is sold is great that the
aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled in a legal or equitable proceeding, to accept a
money satisfaction of such interest.

11 U.S.C. § 363(f).

47.    Therefore, section 363(f) permits the Seller to sell the Acquired Assets

free and clear of Liens.  Each Lien that is not the result of an assumed liability satisfies at least

one of the five conditions of 11 U.S.C. § 363(f), and the Seller submits that any such Lien will be

adequately protected by attachment to the net proceeds of the Sale, subject to any claims and

defenses the Seller may possess with respect thereto.  Accordingly, the Seller requests that the

Acquired Assets be transferred to the Purchaser or the Successful Bidder(s), as the case may be,

free and clear of all Liens.

Q.    The Purchaser Is A Good Faith Purchaser Pursuant To
      Section 363(m) Of The Bankruptcy Code And The Transaction
      Contemplated By The Agreement Should Carry The
      Protections Of Section 363(n) Of The Bankruptcy Code

48.    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under
subsection (b) or (c) of this section of a sale or lease of property does not
affect the validity of a sale or lease under such authorization to an entity
that purchased or leased such property in good faith, whether or not such
entity knew of the pendency of the appeal, unless such authorization and
such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci held that the

good faith of a purchaser is shown by the integrity of his conduct during
the course of the sale proceedings; where there is a lack of such integrity,
a good faith finding may not be made.  A purchaser's good faith is lost by
'fraud, collusion between the purchaser and other bidders or the trustee, or
an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir.

1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen

Int'l Airlines Inc. v. Pan Am Corp. (In re Pam Am Corp.), Case Nos. 91 Civ. 8319 (LMM) to 91

Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); In re Sasson Jeans, Inc., 90

B.R. 608, 610 (S.D.N.Y. 1988).

49.    Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

The trustee may avoid a sale under this section if the sale price was
controlled by an agreement among potential bidders at such sale, or may

recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

50.     The Seller submits, and will present evidence at the Sale Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction.  Throughout the negotiations, the Purchaser has at all times acted in good faith.  Moreover, to the extent that the assets are sold to a Successful Bidder, it will be because of a well-planned competitive process and intense negotiations at arm's length to be conducted at an Auction.  As a result of the foregoing, the Seller requests that the Court make a finding that the Purchase Price to be paid by the Purchaser constitutes reasonably equivalent value and fair consideration under any applicable law.

51.     The Seller, therefore, requests that this Court make a finding that the Purchaser has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Further, the Seller requests that this Court make a finding that the asset purchase agreement reached as a result of the Bidding Procedures necessarily will comprise an arm's length, intensely-negotiated transaction entitled to the protections of section 363(m) of the Bankruptcy Code.  Because the Seller has shown that the Purchaser's successful bid is not the product of fraud or collusion between the Purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders, the Seller further requests that this Court make a finding that the transactions contemplated by the Agreement are not avoidable under section 363(n) of the Bankruptcy Code.

R.     Approval Of The Bid Protections

52.     Bidding incentives encourage potential bidders to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11

26

process.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992)

(bidding incentives may "be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (citation

omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.

In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has

seriously argued the inapplicability of the business judgment test, and if any such argument had

been made, the Court would be compelled . . . to reject it."); In re Bethlehem Steel Corp., Case

No. 02 Civ. 2854 (MBM), 2003 WL 21738964 at *8 n.13 (S.D.N.Y. July 28, 2003) (the court

should approve agreements providing bidding incentives "unless they are unreasonable or appear

more likely to chill the bidding process than to enhance it").  One court, explaining the force of

the business judgment rule in this context, stated "the business judgment rule does not become

inapplicable simply because a court decides a break-up fee is too large."  In re Integrated

Resources, 147 B.R. at 660.

       53.     In this district, courts have established a three part-test for determining

when to permit bidding incentives.  The three factors are: "whether (i) the relationship of parties

who negotiated breakup fee is tainted by self-dealing or manipulation, (ii) the fee hampers, rather

than encourages, bidding, and (iii) the amount of the fee is unreasonable relative to purchase

price." Id.

       54.     Here, the Seller seeks authority to utilize the Bidding Process and Bid

Protections in the event that the Purchaser is not ultimately the Successful Bidder or must

increase the Purchaser 's bid price to become the Successful Bidder.  The Bid Protections are fair

and reasonable in amount, particularly in view of the efforts previously made and to be made by

the Purchaser and the risk to the Purchaser of being used as a stalking horse.  Moreover, any

payment under the proposed Bid Protections – either the $565,304.00 Break-Up Fee

(approximately 3.0% of the Initial Purchase Price) or the $750,000 Expense Reimbursement

(approximately 3.9% of the Initial Purchase Price) – not only constitutes a fair and reasonable

percentage of a proposed purchase price, but is within the range that is customary for similar

transactions of this type in the bankruptcy context.  See, e.g., In re Allegiance Telecom, Inc.,

Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense

reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG)

(Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior transaction); In re

Genuity Inc., Case No. 02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if

court approved alternative transaction); In re PSINet, Inc., Case No. 01-13213 (REG) (Bankr.

S.D.N.Y. 2001) (permitting 4.28% break-up fee in the event that seller consummated transaction

with alternative bidder); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001)

(allowing break up fee ranging from 1.3% to 4.25% depending on value of alternative

transaction).  In addition, the payment of the Break-Up Fee or the Expense Reimbursement, as

the case may be, is reasonable in light of the significant investment in time and resources that the

Purchaser would have contributed as the stalking horse bidder.

       55.     The Seller submits that the Bidding Procedures and the Bid Protections

have encouraged competitive bidding because the Purchaser would not have entered into the

Agreement without such provisions.  The Bidding Procedures and the Bid Protections have thus

induced a bid that otherwise would not have been made.  Finally, the mere existence of the

Bidding Procedures and Bid Protections permits the Seller to insist that competing bids be

materially higher or otherwise better than the Agreement, which would produce a clear benefit to

the Seller, its estate, and its stakeholders.

S.        Relief From Transfer Taxes Under Section 1146(c) Of The Bankruptcy Code

56.        Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  11 U.S.C. § 1146(c).

57.        As set forth above, as part of their transformation plan, the Debtors have identified non-core product lines, including the U.S. damper business, that do not fit into the company's future strategic framework, and have planned to sell or wind-down these product lines.  As mentioned above, on January 25, 2008, the Debtors confirmed their Plan, and the order confirming the Plan became final and non-appealable on February 4, 2008.  Section 7.30 of the Plan provides that:

> Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, shall not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

The Second Circuit has upheld the application of the section 1146(c) exemption in a case in which the debtor sold property post-confirmation.  In re Jacoby-Bender, Inc., 758 F.2d 840, 841 (2d Cir. 1985).  In light of the foregoing, the Selling Debtor Entities submit that the Sale should be exempt under section 1146(c) of the Bankruptcy Code from any stamp, transfer, sales, recording, or similar taxes.

T.    <u>Conclusion</u>

58.    The Seller submits that the relief requested in this Motion, including the Bidding Procedures, Bid Protections, and notice procedures are in the best interests of the Seller's estate and will maximize value for all stakeholders.  The Seller will further show at the Sale Hearing that the entry approving the Sale of the Acquired Assets of the Seller free and clear of Liens to the Purchaser or to the Successful Bidder, as the case may be, are likewise in the best interests of the Seller's estate and will maximize value for all stakeholders.

### Notice

59.     Notice of this Motion has been provided in accordance with the Supplemental Case Management Order and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487).  Further, after entry of the Bidding Procedures Order, notice with respect to the Motion and Sale would be provided in accordance with the notice procedures described herein.  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[11]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

60.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Seller respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[11]    The Debtors have noticed this Motion for the omnibus hearing on March 19, 2008.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on March 19, 2008.  Because this Motion is being filed on less than 20 days' notice, parties-in-interest will have until March 17, 2008 to file an objection to entry of the Bidding Procedures Order.

31

WHEREFORE the Seller respectfully requests that this Court enter an order (a)(i) approving the Bidding Procedures, (ii) granting certain bid protections, (iii) approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) authorizing and approving (i) the Sale of the Acquired Assets by the Seller free and clear of Liens to the Purchaser or to the Successful Bidder and (ii) entry into the Lease, and (c) granting them such other and further relief as is just.

Dated:      New York, New York
            March 7, 2008

                        SKADDEN, ARPS, SLATE, MEAGHER
                        & FLOM LLP

                        By:    /s/ John Wm. Butler, Jr.
                               John Wm. Butler, Jr. (JB 4711)
                               Albert L. Hogan III (AH 8807)
                               Ron E. Meisler (RM 3026)
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois 60606
                        (312) 407-0700

                                - and -

                        By:    /s/ Kayalyn A. Marafioti
                               Kayalyn A. Marafioti (KM 9632)
                               Thomas J. Matz (TM 5986)
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                         Debtors and Debtors-in-Possession

## Exhibit A

**Bidding Procedures**

**<u>Exhibit B</u>**

**Bidding Procedures Order**

**<u>Exhibit C</u>**

**Sale Approval Order**

## **Exhibit D**

**Asset Purchase Agreement**

**<u>Exhibit E</u>**

**Publication Notice**