**Hearing Date And Time: March 19, 2008 at 10:00 a.m.**
**Objection Deadline: March 17, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                     :
    In re                                        :    Chapter 11
                                                :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                                                :
                                                :    (Jointly Administered)
                 Debtors.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a) AND 365 AND FED.
R. BANKR. P. 6006 (I) ESTABLISHING PROCEDURES FOR ASSUMPTION AND
ASSIGNMENT OF CERTAIN OMITTED EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION WITH SALE OF DEBTORS' STEERING AND HALFSHAFT
<u>BUSINESS AND (II) AUTHORIZING RECOVERY OF EXCESS DISCOUNT RIGHTS</u>

("OMITTED CONTRACTS ASSUMPTION PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for an order under 11 U.S.C. §§ 105(a) and 365 (i) establishing procedures for the assumption and assignment of certain omitted prepetition executory contracts and unexpired leases (the "Omitted Contracts," as further defined below) related to the Debtors' sale of their steering and halfshaft business (the "Steering Business") to Steering Solutions Corporation and certain of its affiliates (collectively, the "Buyers") and (ii) authorizing the recovery of Excess Discount Rights (as defined below) related to Omitted Contracts. In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi

2

Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389) (the "Solicitation Procedures Order"). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

    4.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    5.  The statutory predicates for the relief requested herein are sections 105(a) and 365 of the Bankruptcy Code and rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

    6.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company

---

[1] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

3

business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

7.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

9.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however,

---

[2]  On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

10.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

D.  The Debtors' Transformation Plan

12. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.  Confirmation Of The Debtors' Plan Of Reorganization

13. The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement (the "MRA") provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order. With the Plan confirmed, the Debtors are focusing their efforts on satisfying the conditions for the Plan to become effective and allow them to emerge from chapter 11. The Debtors anticipate having the Plan become effective as soon as reasonably practicable.

14. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of

6

its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

15.    By this Motion, the Debtors seek entry of an order establishing procedures for the assumption and assignment of the Omitted Contracts to the Buyers (the "Omitted Contracts Assumption Procedures"). In addition, the Debtors seek authority to recover Excess Discount Rights, if any, related to Omitted Contracts.

Basis For Relief

16.    The Debtors believe that the Omitted Contracts Assumption Procedures set forth in detail below are necessary to enable the Debtors to assume and assign certain prepetition executory contracts and unexpired leases related to the Steering Business prior to closing of the sale, which contracts and leases have not been identified as contracts required by the Buyers in operation of the Steering Business, but of which applicable counterparties have yet been provided notice. The relief requested is critical because the Omitted Contracts to be assumed and assigned to the Buyers are important to the operation of the Steering Business. Additionally, the Debtors note that some creditors have the ability participate in Delphi's discount rights offering on account of claims that include the same prepetition liabilities that will be satisfied by the cure of defaults upon assumption of the Omitted Contracts. The number of shares to be received by each creditor has already been calculated and finalized. Accordingly, upon payment of cure to the counterparties to the Omitted Contracts, it is likely that some or all of underlying claims will be satisfied. To avoid paying twice on the same claim, the Debtors also seek authority to recover the value of these discount rights that are distributed on account of defaults otherwise satisfied by the payment of a Cure Amount.

F.     The Omitted Contracts Assumption Procedures

17.    On February 25, 2008, this Court entered an order authorizing and approving the sale of the Steering Business to the Buyers pursuant to a Master Sale and Purchase Agreement (the "Agreement") by and between the Buyers and certain selling Debtor entities (the "Selling Debtor Entities")[4] and non-Debtor selling affiliates (Docket No. 12868) (the "Steering Sale Approval Order").  The Steering Sale Approval Order also approved the assumption and assignment of certain prepetition executory contracts and unexpired leases to the Buyers.[5]

18.    Following entry of the Steering Sale Approval Order, the Selling Debtor Entities and the Buyers began the process of preparing for consummation of the transactions contemplated by the Agreement, including the planning of an orderly transition of the Steering Business to the Buyers.  During that process, the Selling Debtor Entities determined that certain contracts had inadvertently been excluded from the list of agreements to be assumed by the Selling Debtor Entities and assigned to the Buyers.  As a result, the contract counterparties to these Omitted Contracts have not yet received a notice of assumption and assignment nor a notice of cure amount related to the Omitted Contracts.  The Selling Debtor Entities seek authority to assume and assign the Omitted Contracts pursuant and subject to the procedures set forth below.

19.    The Selling Debtor Entities propose to serve on each non-Debtor counterparty to an Omitted Contract a notice substantially in the form attached hereto as Exhibit

---

[4]  Under the Agreement (as defined in this paragraph 17), the Selling Debtor Entities include Delphi, Delphi Automotive Systems LLC, Delphi China LLC, Delphi Automotive Systems (Holding), Inc. ("DASHI"), and Delphi Technologies, Inc.  Certain assets would be sold under the Agreement or under ancillary agreements by non-Debtor affiliates of the Selling Debtor Entities listed on Schedule 1 to the Agreement.

[5]  The Sale Approval Order adjourned the hearing on the Steering Sale Motion as it pertains to unresolved contract-related objections (the "Adjourned Objections") to March 19, 2008, and further provided that any findings and conclusions and decretal paragraphs in the Steering Sale Approval Order pertaining to the assumed and assigned contracts did not apply to the contracts covered by the Adjourned Objections.  This Motion does not relate to the Adjourned Objections.

8

A (the "Omitted Contract Notice"). The Omitted Contract Notice states the Selling Debtor Entities' intention to assume and assign the Omitted Contract to the Buyers. In addition, the Omitted Contract Notice states the cure amount that the Selling Debtor Entities believe is necessary to assume the contract or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount").

20. The Debtors propose that any objection to an Omitted Contract Notice, including to the Cure Amount, would be required to be filed within ten days of mailing of the Omitted Contract Notice and served as set forth in the Omitted Contract Notice, and would be required to state, with specificity, (a) the legal and factual grounds upon which the objection is based and (b) to the extent the counterparty disputes the Debtors' proposed Cure Amount, the Cure Amount the counterparty alleges is owed by the Debtors. The counterparty's objection would be required to include appropriate documentation in support of its objection and alleged Cure Amount.

21. If an objection to the assumption and assignment of an Omitted Contract is timely filed and received, and such objection is not otherwise resolved or withdrawn, a hearing with respect to the objection would be held on April 30, 2008 or such date and time as the Court may schedule. If no objection is timely received, the Selling Debtor Entities would have authority to assume such contract and assign it to the Buyers. In this circumstance, the Debtors' proposed Cure Amount set forth in the Omitted Contract Notice would be controlling notwithstanding anything to the contrary in any Omitted Contract or other document, and the non-Debtor party to the Omitted Contract would be forever barred from asserting any other claims against the Selling Debtor Entities, or the Buyers or the property of any of them, as to such Omitted Contract.

9

22. The Selling Debtor Entities would pay all allowed Cure Amounts in cash. The Omitted Contracts would be assumed at the <u>earlier</u> of (a) the Debtors' emergence from these chapter 11 cases (the "Effective Date"), in which case cure would be paid at the same time as cure is being paid to counterparties whose contracts are being assumed pursuant to the Plan, or (b) the closing of the sale of the Steering Business (the "Closing Date"), in which case cure would be paid at the same time as cure is being paid to counterparties whose contracts are being assumed pursuant to the Sale Approval Order. Under either scenario, the Omitted Contracts would be assigned to the Buyers on the Closing Date. If there is a dispute as to a Cure Amount that cannot be resolved consensually among the parties, then the Debtors would appear before this Court on April 30, 2008 to seek a judicial determination of the dispute. To the extent adjudicated, the Debtors would have the right to reject the Omitted Contract for a period of five days after entry of a final order establishing a Cure Amount in excess of that provided by the Debtors.

23. In conclusion, the Debtors believe that the Omitted Contracts Assumption Procedures allow for adequate notice of, and the resolution of any disputes regarding, the assumption and assignment of the Omitted Contracts to the Buyers, and are in the best interest of the Debtors and their estates, creditors, and stakeholders.

G.   Recovery Of Excess Discount Rights

24. Under the Debtors' proposed Omitted Contracts Assumption Procedures, the Debtors anticipate paying Cure Amounts related to Omitted Contracts after Delphi commences the discounts rights offering contemplated by the Plan (the "Discount Rights Offering"). Indeed, the Discount Rights Offering is scheduled to commence prior to the Debtors' emergence from chapter 11. Many counterparties (or their assignees) to Omitted Contracts, however, are holders of unsecured claims that include the same defaults that will be cured

10

through payment of the Cure Amounts. This presents a problem: the holders of such claims will be afforded the opportunity to receive discount rights (related to an unsecured claim) even though a cash cure payment (related to the assumption of an Omitted Contract) will be made on account of the same prepetition default. To avoid a double recovery, the Debtors seek authority to adjust a creditor's distribution under the Plan to account for any excess discount rights (the "Excess Discount Rights") related to Omitted Contracts.

        25.      This Court has already established similar procedures in connection with the Discount Rights Offering. Indeed, on January 23, 2008, this Court entered an Order Under 11 U.S.C. §§ 105(a) And 502(c) Estimating Or Provisionally Allowing Certain Unreconciled Claims Solely For Purposes Of Administration Of Discount Rights Offering (the "Rights Offering Estimation Order") (Docket No. 12334). Under the Rights Offering Estimation Order and solely for purposes of administering the Discount Rights Offering in accordance with the Plan, this Court estimated and temporarily allowed certain claims in an amount certain. Recognizing that the provisional allowance or estimation may result in a particular claimant receiving more discount rights than such claimant should have received based on the ultimate allowed amount of its claim and such rights are transferred or exercised, the Rights Offering Estimation Order provides that in the Reorganized Debtors[6] sole discretion, the Reorganized Debtors shall be authorized but not directed to withhold an amount of New Common Stock (at Plan value) from the ultimate direct distribution to such claimant. Additionally, to the extent the value of the direct grant of New Common Stock is less than the value of the Excess Discount Rights, and the Reorganized Debtors elect in their sole discretion to pursue such payment, the Rights Offering Estimation Order provides that such claimant shall remit payment to the

---

[6]    Capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to them in the Plan.

11

Reorganized Debtors upon written demand in an amount equal to the value of the Excess Discount Rights in excess of the value of the New Common Stock withheld by the Reorganized Debtors.

26.  The rationale behind these provisions in the Rights Offering Estimation Order is applicable here as well – avoiding double payment for the same default. Accordingly, the proposed order provides a similar mechanism to that employed in the Rights Offering Estimation Order. Specifically, the proposed order provides that if a claimant with a claim related to an Omitted Contract receives Excess Discount Rights, then the Reorganized Debtors, in their sole discretion, will (a) withhold an amount of New Common Stock (at Plan value) equivalent to the value of the Excess Discount Rights (at Plan value) from the ultimate distribution to such counterparty and, to the extent necessary, (b) require such counterparty to remit payment to the Reorganized Debtors in an amount equal to the Excess Discount Rights in excess of the value of the New Common Stock withheld.

Applicable Authority

H.  The Assumption And Assignment Of The Omitted Contracts

27.  Section 8.4 of the Plan contemplates that this Court may enter a post-confirmation order authorizing the assumption and assignment of executory contracts in connection with a divestiture transaction, and that the Debtors would be permitted to assign an assumed contract subsequent to the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the divestiture-related order. Section 365(f)(2) of the Bankruptcy Code provides that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –

> (A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

28.     Under section 365(a) of the Bankruptcy Code a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor. It provides:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee –
>
> (A)  cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)  provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

29.     Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction." EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993) (presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds). Courts have consistently held that the phrase does not require total assurances. See In re Natco Indus., Inc.,

13

54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (although no single solution will satisfy every case, the required assurance will fall "considerably short of an absolute guaranty of performance"). In fact, adequate assurance has been provided by demonstrating the Buyers' financial health and experience in managing the type of enterprise or property assigned. See In re Bygraph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

30.    To the extent that any defaults exist under any prepetition executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Purchased Assets or any portion thereof, the Selling Debtor Entities would cure any such default. As set forth above, since its founding in 1995, Platinum has acquired more than 75 businesses with more than $23 billion in aggregate annual revenue at the time of acquisition. Upon Closing, it is expected that the Buyers will have the financial resources to perform under the Omitted Contracts. Moreover, if necessary, the Selling Debtor Entities will adduce facts at the hearing on any objection to an Omitted Contract Notice demonstrating the financial wherewithal of the Buyers, their experience in the industry, and their willingness and ability to perform under the contracts to be assumed and assigned to them.

31.    The hearing on any objection to an Omitted Contract Notice, therefore, will provide this Court and other parties-in-interest ample opportunity to evaluate and, if necessary, challenge the ability of the Buyers to provide adequate assurance of future performance under the applicable Omitted Contracts. This Court therefore should have a

sufficient basis to authorize the Selling Debtor Entities to assume and assign the Omitted Contracts as set forth in the Agreement.

I.  Recovery Of Excess Discount Rights

32.  There is sufficient authority to allow the Debtors to recover any Excess Discount Rights related to the Omitted Contracts. Section 105(a) of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Section 101(5) of the Bankruptcy Code, in pertinent part, defines a claim as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). A fundamental policy of the Bankruptcy Code is to provide "equitable distribution among all creditors of the same class." Juniper Devel. Group v. Kahn (In re Hemingway Transp., Inc.), 993 F.2d 915, 923 (1st Cir.), cert. denied, 510 U.S. 914 (1993). It is axiomatic that creditors are not entitled to multiple recoveries for a single liability against a debtor. Once the Debtors pay a Cure Amount in connection with an Omitted Contract, the counterparty to such Omitted Contract will no longer have a "claim" related to that Cure Amount. Thus, the Debtors have proposed for the recovery of any Excess Discount Rights related to the Omitted Contracts to ensure that no creditor is unjustly enriched and to preserve this fundamental policy of the Bankruptcy Code.

J.  Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6006

33.  Bankruptcy Rule 6006(d) provides: "An order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Courts in this district have waived these ten-day stays upon a showing of business need. See In re Adelphia Commc'ns

15

Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).  In general, courts will grant waivers when doing so is important to the debtor's financial health.  See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving ten-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No. 00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

        34.     As noted above, the Debtors believe that the authority to assume assign the Omitted Contracts to the Buyers is critical.  To do this, the Debtors will have to serve notices as soon as possible to give counterparties sufficient time to evaluate and, if necessary, respond to such notices prior to the earlier of the Effective Date and the Closing Date.  Accordingly, the Debtors believe that it is imperative that the relief requested in this Motion be effective immediately upon entry of an order authorizing the assignment and that cause therefore exists for this Court to waive the ten-day stay provided by Bankruptcy Rule 6006.

Notice Of Motion

        35.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487). The Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[7] In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

36. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[7] The Debtors have noticed this Motion for the omnibus hearing on March 19, 2008. In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing. The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on March 19, 2008. Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until March 17, 2008 to file an objection the relief requested herein.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) approving the assumption and assignment, pursuant to the Omitted Contracts Assumption Procedures, of the Omitted Contracts to the Buyers, (b) authorizing the recovery of Excess Discount Rights related to Omitted Contracts, and (c) granting them such other and further relief as is just.

Dated: New York, New York
March 7, 2008

          SKADDEN, ARPS, SLATE, MEAGHER
           & FLOM LLP

          By:   /s/ John Wm. Butler, Jr.
              John Wm. Butler, Jr. (JB 4711)
              John K. Lyons (JL 4951)
              Ron E. Meisler (RM 3026)
          333 West Wacker Drive, Suite 2100
          Chicago, Illinois 60606
          (312) 407-0700

                   - and -

          By:   /s/ Kayalyn A. Marafioti
              Kayalyn A. Marafioti (KM 9632)
              Thomas J. Matz (TM 5986)
          Four Times Square
          New York, New York 10036
          (212) 735-3000

          Attorneys for Delphi Corporation, et al.,
            Debtors and Debtors-in-Possession