1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET. AL


       Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          January 11, 2008

          10:30 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2   SUFFICIENCY HEARING re Debtors' Objection to Proofs of Claim

3   Nos. 14070 and 14245 Pursuant to Debtors' (i)Third Omnibus

4   Objection (Substantive) Pursuant to 11 U.S.C. Section 502(b)

5   and Fed. R. Bankr. P. 3007 to Certain (a)Claims with

6   Insufficient Documentation; (b)Claims Unsubstantiated by

7   Debtors' Books and Records;; and (c)Claims Subject to

8   Modification and (ii)Motion to Estimate Contingent and

9   Unliquidated Claims Pursuant to 11 U.S.C. Section 502(c).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed By:  Lisa Bar-Leib

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                        516-608-2400

3

1

2    A P P E A R A N C E S:

3    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

4         Attorneys for Debtors

5         333 West Wacker Drive

6         Chicago, IL 60606

7

8    BY:   JOHN K. LYONS, ESQ.

9          LISA B. DIAZ, ESQ.

10

11   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

12        Attorneys for Debtors

13        Four Times Square

14        New York, NY 10036

15

16   BY:   THOMAS J. MATZ, ESQ.

17

18   HONIGMAN MILLER SCHWARTZ AND COHN LLP

19        Attorneys for Lightsource/Guide Corporation

20        2290 First National Building

21        660 Woodward Avenue

22        Detroit, MI 48226

23

24   BY:   LAWRENCE J. MURPHY, ESQ.

25

4

1                  P R O C E E D I N G S

2          THE COURT:  Okay.  Good morning.  Delphi Corporation.

3          MR. LYONS:  Good morning, Your Honor.  John Lyons on

4    behalf of Delphi.  And here in the courtroom with me, I have

5    Tom Matz and Lisa Diaz from Skadden and Karen Kraft and Dean

6    Unruh from Delphi.  Your Honor, all the matters are uncontested

7    except for one.  I do have a chart of the uncontested ones for

8    your review so you can see the numbers so we can pass through

9    those quickly.

10         THE COURT:  Okay.  That's fine if you want to hand

11   that up.

12         MR. LYONS:  And as we did yesterday, Your Honor, I'm

13   happy to respond if you have any questions to the uncontested

14   stipulations that are on the agenda.

15         THE COURT:  Well, again, the stipulations themselves

16   list the amounts at issue.

17         MR. LYONS:  Just the amount at issue, yes.

18         THE COURT:  Let me just look at your chart here.

19         MR. LYONS:  And in the instance of AIG, there is a

20   capped estimate.  So it's not an allowed amount, it's just an

21   estimated amount.

22         THE COURT:  Okay.  All right.  So I'll review those

23   stipulations shortly and confident they'll be signed.

24         MR. LYONS:  Okay.  Thank you, Your Honor.  With that,

25   we have the Lightsource matter and I'll yield the podium to

5

1   counsel for Lightsource.

2        MR. MURPHY:  Good morning, Your Honor.  Lawrence

3   Murphy of Honigman Miller Schwartz and Cohn.  I'm here on

4   behalf of Lightsource Parent Corporation and Guide Corporation

5   claimants in this matter.

6        THE COURT:  Good morning.

7        MR. MURPHY:  Your Honor, we're here today on a

8   sufficiency hearing on the claims submitted by Guide and

9   Lightsource.  This was noticed by Delphi and based on papers

10  arguing that a no-third party beneficiary's clause in a master

11  separation agreement somehow bars the claim asserted here.

12  Again, it's a sufficiency hearing so the standard is similar to

13  a motion to dismiss.  We believe, Your Honor, that's a high

14  burden for Delphi to establish.  We believe there's more than a

15  sufficient basis to a claims objection hearing and through

16  discovery of this matter.

17        To start, Your Honor, the argument made by Delphi

18  essentially asks the Court to look at a -- just one piece of

19  what's a rather simple jigsaw puzzle to put together.  And that

20  piece would be like a monochromatic border piece.  And they're

21  saying take this piece and this is what the agreement says.

22  It's not the correct way to interpret the master separation

23  agreement.  The clear provisions of the agreement when read

24  together established that Delphi assumed the obligations of

25  General Motors under the Lightsource formation agreement

6

1    attached as Exhibit A to our submission.

2            Your Honor, let's begin by the little bit of history.

3    The master separation agreement was dated December 22, 1998.

4    Shortly before that, on September 29th, 1998, the Lightsource

5    formation agreement was entered between General Motors and

6    Lightsource.  Under that agreement, the business of Guide was

7    divested from GM.  Guide was part of the Delphi Automotive

8    Group of companies within General Motors.  But it was divested

9    before the master separation agreement was entered into two

10   months beforehand.  That agreement, in paragraph 14.3, states

11   that it "shall be binding upon and inured to the benefit of

12   each of the parties and their respective successors and

13   permitted assigns".  14.3 also provides in the formation

14   agreement, Your Honor, that "GM may assign without prior

15   consent of Lightsource Guide any or all of its rights,

16   interests and obligations under the Lightsource agreement if

17   those interests are transferred to a corporation or other

18   business entity to which all or substantially all of the assets

19   of Delphi Automotive is sold or transferred".  Clearly, at the

20   time of the LFA, there was a contemplation by GM that it was

21   going to divest that group of companies and it gave itself the

22   right to unilaterally assign its obligations under the LFA to

23   Delphi.  Just historical information that's relevant here.

24           The master separation agreement, again, when read --

25   its provisions are read as a whole, very simply establish that

7

1     that agreement is a divestiture agreement that was specifically

2     recognized and assumed by Delphi here in the MSA.  And that is

3     as -- I don't want to repeat everything in the brief, Your

4     Honor, but I do think it's important to look at Section 2.02 of

5     the MSA where under "Assumption of Liabilities", there's a

6     provision relating to divested businesses.  And it says that

7     Delphi "shall with respect to the businesses and operations

8     divested by the automotive systems business assume all

9     liabilities of GM related thereto".

10            Now looking at the definition section earlier in the

11    MSA, Your Honor, and this is important, the Delphi Automotive

12    Systems business includes businesses that were divested by GM

13    owners -- means, the business -- I'm sorry, let me just read

14    from the agreement.  "Delphi Automotive Systems business means

15    the business conducted by the Delphi Automotive Systems sector

16    of GM at any time on or before the contribution date."  That is

17    the date of the agreement.  And under subparagraph 3 in that

18    definition, it states that "all business operations that were

19    conducted at any time in the past by the Delphi Automotive

20    Systems sector of GM or by any predecessor of such sector but

21    were discontinued or disposed of prior to the date of the

22    Delphi financial statements other than by transfer or

23    disposition to any other sector of GM."

24            So, clearly, Guide was a divested business of this

25    group prior to the date of this agreement.  It was

8

1    contemplated -- it's part of the definition of that agreement.

2    And there is also a definition of the Liabilities with a

3    capital L in the "Divested Business" section under the

4    "Assumption of Liabilities" in 2.02.  It says that "Delphi

5    shall assume all of the liabilities and they shall include

6    without limitation the obligation to satisfy all of the

7    obligations of GM under the various agreement pursuant to which

8    the Delphi Automotive Systems business effected such

9    divestitures."  And that's defined as a divestiture agreement.

10    Again, Your Honor, the definitional section a couple

11    of pages earlier defines those liabilities that were assumed by

12    Delphi to include -- and it's a very broad definition of any

13    and all liabilities and it includes the word "contract" right

14    in there.  So in Section 2.02 where there's an "Assumption of

15    Liabilities", it relates to the Delphi Automotive divestiture

16    agreements.  It relates to liabilities which is defined as

17    contracts of General Motors relating to those businesses.  And

18    there's a clear contemplation of an assignment of that

19    agreement and its liabilities.

20    In addition, there was an employee matters agreement

21    entered into between GM and Delphi which is attached to our

22    filing for this sufficiency hearing as Exhibit B, which under

23    Section paragraph 3(a), Your Honor, it states that "for

24    employees who are to become Delphi employees or Delphi-

25    terminated employees as of the effective time, Delphi, except

9

1    as set forth in Schedule I of the MSA and/or Delphi benefit

2    plans, shall assume all employment related responsibility,

3    obligation or liability of GM regardless of when incurred

4    except as expressly stated in this paragraph 3(a)."  Now

5    that -- the Delphi-terminated employees are defined in the U.S.

6    Employee Matters Agreement as an individual who is not

7    currently a Delphi employee but whose last employment in the GM

8    controlled group of corporations was with Delphi, a Delphi

9    business unit or a Delphi business unit controlled or

10   associated business.

11          Your Honor, what we had here was a divestiture of the

12   Delphi group of corporations from General Motors back in

13   December of 1999.  It was contemplated that the split would

14   result in Delphi being responsible for the business and

15   liabilities of Delphi's businesses including Delphi businesses

16   that had been previously divested by GM out of that group.  So

17   that included Guide.  And it was clearly contemplated for in

18   the agreement in both the sections of the agreement, the

19   definitions of the agreement and in a separate employee matters

20   agreement.  There was an absolute clear intent by the parties

21   for Delphi to assume the liabilities of that contract.  And as

22   I cited to the Court earlier, that contract, the Lightsource

23   formation agreement, says that it shall be binding upon and

24   inured to the benefit of the successors and the permitted

25   assigns.

10

1          THE COURT:  Well, was the contract assigned or was it

2    simply assumed?  Or does it matter?  Is there a distinction

3    between those two terms.

4          MR. MURPHY:  I think actually the language is an

5    "assumption" of the contract, Your Honor.  They assumed all

6    liabilities of that contract.  And they did not agree --

7    there's no agreement to reimburse GM for the cost related to

8    those things.  They assumed the contracts by the terms of the

9    separation agreement.

10          THE COURT:  And they allocated responsibility for

11   paying pursuing to Schedule I which listed the Lightsource

12   agreement?

13          MR. MURPHY:  Correct, Your Honor.  It is named there

14   as well.  I mean, it was clearly in the contemplation of the

15   parties.  It was an agreement that was there that Delphi had to

16   consider and review as part of its due diligence.  And it

17   expressly agreed to assume the obligations under that contract.

18   And those obligations included the OPEB reimbursement

19   liability.  To accept the argument being made here at the

20   sufficiency hearing that simply a no third party beneficiary

21   boiler plate clause obviates its responsibilities to divested

22   businesses would undercut specific and clear provisions in the

23   contract, multiple provisions in these agreements that relate

24   to the separation of GM and Delphi.

25          That, Your Honor, is the crux of the claims here.  I

11

1    think there's more than a sufficient basis for finding that

2    this matter should proceed to a claims hearing and through

3    discovery.

4            THE COURT:  Well, let me go to that statement just

5    made which is that 9.05 is simply a boiler plate provision that

6    should be overridden by the specific assumption of

7    responsibility to pay for the obligations of GM to Lightsource.

8    Why would be overridden by the references to the Lightsource

9    formation agreement?

10           MR. MURPHY:  It would be overridden because it would

11   render those provisions a nullity.  The idea here is --

12           THE COURT:  Why would it render them a nullity?

13           MR. MURPHY:  Because --

14           THE COURT:  I mean, if GM doesn't receive -- if GM

15   receives notice that Delphi isn't paying Lightsource, can't it

16   enforce this agreement because Lightsource will go after GM,

17   won't it?

18           MR. MURPHY:  I think that --

19           THE COURT:  GM is still responsible to Lightsource,

20   in other words.

21           MR. MURPHY:  GM had the right unilaterally, under the

22   Lightsource formation agreement, to without consent of Guide to

23   assign those obligations to Delphi.  It's a specific provision

24   in that agreement.

25           THE COURT:  But is -- so Lightsource takes the view

12

1   that GM's not responsible for payment of OPEB?

2          MR. MURPHY:  Lightsource has not made a claim against

3   General Motors for those.  And I --

4          THE COURT:  I mean, the general rule is that an

5   assignor is still liable if it makes an assignment.

6          MR. MURPHY:  And if General Motors --

7          THE COURT:  And I don't think paragraph 14.3 changes

8   that general rule or modifies that general rule.  It just says

9   that GM can do that.

10          MR. MURPHY:  Your Honor, if General Motors remains

11   liable under that contract, it still does not alleviate

12   Delphi's responsibility as the assignee of those obligations.

13          THE COURT:  No, but the question is to whom.

14          MR. MURPHY:  To the other contracting party --

15          THE COURT:  But that's GM.

16          MR. MURPHY:  -- which was, in this case, Lightsource.

17          THE COURT:  Well, but the contracting party is GM,

18   isn't it?  That's where -- I mean, I'm going back to your

19   statement that 9.05 would render a nullity the assumption of

20   liability language.

21          MR. MURPHY:  It would allow Delphi to escape having

22   to live up to what it expressly agreed to in those provisions.

23   I mean, what the Court is --

24          THE COURT:  But let me ask you that.  Why is that?  I

25   mean, you -- Lightsource has filed a claim in Delphi's

13

1   bankruptcy case as a result of the fact that it has not been

2   paid for certain OPEB.  And, you know, they're asserting it has

3   an unliquidated claim for contingent breach going forward.  GM

4   filed a claim in Delphi's bankruptcy case based upon the master

5   separation agreement and Delphi's failure to pay, among other

6   things, this obligation to Lightsource which Delphi undertook

7   to assume under the master separation agreement.  So GM will

8   collect on that claim under Delphi's theory of this motion or

9   this claim objection.  And Lightsource not only will get or

10  keep its claim against GM, but GM will be financially

11  recompensed for the very liability that Delphi assumed by the

12  liability to pay Lightsource.

13          MR. MURPHY:  Your Honor, the evidence relating to

14  General Motors and the scope of General Motors' claim were not

15  raised in connection with this sufficiency hearing.  I cannot

16  tell you specifically if General Motors made a claim under the

17  Lightsource financial agreement to -- in this proceeding.  I'm

18  representing Guide and Lightsource and that was not raised --

19  what Your Honor just mentioned was not raised as part of the

20  basis for a sufficiency by Delphi here today.  Even if it were

21  a correct statement, the case law cited in our response to

22  Delphi shows that when an assignee agrees to assume any

23  obligations, a direct obligation by the assignee to Lightsource

24  arose.

25          THE COURT:  But again, that goes to my question.  Is

14

1    Delphi really the assignee?  Was there anything to assign here

2    or did it simply assume the obligation?

3             MR. MURPHY:  They assigned the contract and the

4    obligations under that contract to Delphi.  Your Honor, the

5    purpose --

6             THE COURT:  Well, what contract was assigned?

7             MR. MURPHY:  The Lightsource financial agreement.

8    The --

9             THE COURT:  And where does that say that in the

10   master separation agreement?

11            MR. MURPHY:  It is in the definition of -- Section

12   2.02(b) "Divestiture Agreements".

13            THE COURT:  But isn't that an assumption of

14   liabilities under the agreements?  I'm not -- I'm raising this

15   to you 'cause I'm not sure whether in fact it makes a

16   difference but I don't -- I mean, this is a little different

17   than a case where Delphi is getting anything other than a

18   liability.  This is a case where Delphi is just getting a

19   liability under this contract, right?  Are they getting an

20   assignment of anything?

21            MR. MURPHY:  Here's where -- here, Your Honor, is

22   what happened was General Motors and Delphi were parting ways.

23   There was an agreement put into place, the master separation

24   agreement, which was to split these two companies apart, not

25   keep them together and there was a definition of what's going

15

1    into the Delphi camp and what's staying with General Motors.

2    Now here the OPEB obligations, these employees were deemed

3    under these agreements, including the employee matters

4    agreement, by definition, to be former Delphi employees.  So

5    what the deal was, Your Honor, is that this is a simple math

6    number.  If somebody had ten years of seniority with Delphi

7    before the Guide/Lightsource formation agreement and that

8    person stayed at Guide for another ten years, there would be a

9    fifty/fifty split because of the accrued benefits for the first

10   ten years while it was still a Delphi employee.  So what

11   General Motors and Delphi agreed to here was you're responsible

12   for the accrued benefits of your former employees.  And Delphi

13   said we will take on that responsibility as defined in this

14   agreement.  They did not agree to reimburse GM; there's no such

15   language to that effect.  There was a split of these companies

16   and their responsibilities relating to the Delphi Automotive

17   Group whether it was as existed at that time or as it related

18   to businesses that had been divested from that group prior to

19   their agreement.

20            THE COURT:  No, I know.  But I'm going back just

21   simply to the proposition that you stated in your supplement

22   where you cite Corbin, where you say that the assignee of a

23   contract who assumes the liabilities under a contract takes

24   those liabilities.  And I guess -- I don't see a contract being

25   assigned here.  I just see an assumption of liabilities.

16

1          MR. MURPHY:  Okay.  If you look  under the definition

2    of Liabilities, capital L, in the master separation agreement,

3    it includes -- it says the word "contracts" right in there.

4          THE COURT:  No, but liabilities under the contracts.

5          MR. MURPHY:  Your Honor, I guess I don't read it that

6    way.  But let me look at the --

7          THE COURT:  Well, liabilities is by definition an

8    obligation.  It's not an asset.  A contract is an asset.

9          MR. MURPHY:  Right.  And so they agree to assume all

10   commitments and obligations arising out of any contract.

11         THE COURT:  No, I understand that.

12         MR. MURPHY:  Okay.  And the --

13         THE COURT:  I'm just going to the citation of the

14   case law now.  And --

15         MR. MURPHY:  And the case law I cited, Your Honor,

16   includes language "an assignee of a contract who assumes the

17   obligations of a contract imposed on the assignor becomes

18   directly liable on the contract to the other contracting

19   parties".

20         THE COURT:  I know.  And the point of that is to vary

21   the general rule which is that when you assign a contract and

22   there's not an assumption, you're only taking liabilities going

23   forward not retroactively.  But it all is premised upon the

24   assignment of a contract.  And ongoing executory contract where

25   there's performance on both sides.  Here, Delphi just assumed a

17

1    liability because there wasn't anything to perform going

2    forward by both parties.  It's just -- you know, we assumed the

3    liability.  So I guess the question is how are those cases

4    really relevant.  I mean, I think what Corbin again is talking

5    about there is explaining an exception to the general rule

6    which is when you take an assignment without extra language,

7    just like when you buy a business without extra language,

8    you're only taking on the obligations after the closing date.

9            MR. MURPHY:  Unless agreed otherwise which is what

10   they did here.

11           THE COURT:  But they didn't have an assignment.  I

12   guess that's my -- that's my point.  I think the cases -- it's

13   kind of apples and oranges.  The proposition that he states in

14   Section 9.06 of this treatise is really dealing with a

15   different legal issue which is what is the status or what is

16   the obligation of the assignee of a contract.

17           But that being said, I guess the ultimate point is,

18   and maybe this is why this is irrelevant, doesn't that case law

19   even if you say that you are an assignee -- let's assume for a

20   moment that Delphi was an assignee here as opposed to just

21   agreeing to take liabilities.  Whether or not they take on the

22   liabilities going forward depends upon the language of the

23   contract.  And whether they assume and how they assume that

24   responsibility -- and I guess that's what I want to focus again

25   on on 9.05.  Why is 9.05 again trumped by the other specific

18

1    references to the obligations under the Lightsource formation

2    agreement?

3              MR. MURPHY:  Because read -- as I stated earlier,

4    when you put the pieces all together, you go from the

5    provisions and the definitions of these agreements, it is clear

6    that they were going to be responsible for the former divested

7    businesses of Delphi group.  To read the --

8              THE COURT:  Well, I understand they're going to be

9    responsible for it.  The question is to whom.  And doesn't 9.05

10   say we're going to be responsible for it but not to any third

11   party?

12             MR. MURPHY:  Well, first of all, Your Honor, if that

13   were the case, the contract would have said that.  It wouldn't

14   have said they will assume all liabilities.  It would have said

15   we will reimburse General Motors for all liabilities arising

16   out of.

17             THE COURT:  But why --

18             MR. MURPHY:  That's not what the contract says.

19             THE COURT:  But why do they have to say it that way?

20   Why can't they simply say it this way as opposed to setting up

21   an indemnification mechanism?

22             MR. MURPHY:  Because I think the intent of the

23   parties which arises from looking at all of the definitions and

24   the provisions in both the employee matters agreement and the

25   master separation agreement makes it clear it would -- the

19

1    intent was to break apart General Motors and the Delphi

2    Automotive business.  So all of the definitions relating to

3    what that business is talks about the current and former

4    business units of Delphi and the current and former employees

5    of Delphi.  So Delphi, had it divested Guide after the master

6    separation agreement, there wouldn't be any argument.  It would

7    have been clearly a Delphi spin-off business and it would have

8    been responsible for whatever the contract between Delphi and

9    that Guide would have been.  But here, there was a

10   contemplation that Guide had already been spun off.  Delphi

11   knew that, acknowledged it in the agreement and agreed -- the

12   parties agreed to treat it as if it had been separated as part

13   of the Delphi master separation agreement.  That's the intent

14   of the parties that it's clear from all of the definitions to

15   look at the employee matters agreement and its definitions and

16   the master separation --

17          THE COURT:  But if that were the case, why didn't GM

18   go to Lightsource or Guide and say we want you to agree that

19   after this closing of the master separation agreement, you will

20   look solely to Delphi.

21          MR. MURPHY:  Well, it, in effect, did by preserving

22   the unilateral right -- when you look at the Lightsource

23   formation agreement, Your Honor, it says that the permitted

24   assigns agree to become obligated under that contract.  That's

25   language we can't forget about here.  If, you know, they

20

1    assumed those obligations of that contract -- look to that

2    contract and see what it says.  It says that the people to whom

3    this is assigned are liable under that contract.  Now GM, at

4    that time, told Guide by the way, you know, you've got a right

5    to say no except if we transfer this to the Delphi Automotive

6    Group as part of the divestiture which was ongoing at the time.

7    So GM did in effect tell Lightsource at the time this was

8    happening and going to happen to this agreement.

9           THE COURT:  But it didn't -- but are you contending

10   that that paragraph, paragraph 14.3 of the LFA absolves GM of

11   any liability to Lightsource?

12          MR. MURPHY:  Your Honor, I'm not taking a position as

13   to whether or not -- whether it does or not.  The point here is

14   that it doesn't absolve Delphi.  If there's two avenues of

15   recovery against two different potential parties, that doesn't

16   mean it inures to Delphi's benefit.

17          THE COURT:  No, I understand that.  But I'm trying to

18   see how this relates to your statement that it's clear from

19   this set of transactions that the purpose of the master

20   separation agreement, the intent of the parties, was to

21   separate Delphi from GM including in respect of this business

22   which was transferred shortly before the separation.  And I'm

23   having a hard time seeing why that's dispositive on the point

24   of saying that it's clear that Lightsource would have a direct

25   claim against Delphi under this agreement.  I could see a

21

1    little more cogency to that argument if in fact the separation

2    was such that GM would have no liability to Lightsource but

3    that doesn't seem to be the case.

4         MR. MURPHY:  I don't -- GM could very well make that

5    argument, Your Honor.  If Guide brings a claim against General

6    Motors, they very well could make that based on that provision.

7    But I'm not going to stand here and tell you that that argument

8    going to succeed against my client.  I don't know.  But there

9    is clearly an argument that General Motors could make, that at

10   the time of the Lightsource formation agreement, Guide, you

11   knew we were going to assign this contract.  You knew this was

12   going on.  This was a major deal.  Delphi was an ongoing thing

13   that was consummated two months later and we reserved the right

14   to without your prior written consent to sign this contract.

15   And you agreed to it, Guide.  Now that's an argument that GM

16   could make.  I'm not saying it's a winner clearly on the record

17   here, Your Honor, but that's an argument that could be made to

18   prevent or Lightsource from getting any recovery.  And what I'm

19   asking the Court to do is -- you know, I think the parties

20   agree under the general construction of contract law here is to

21   take a look at the contract as a whole.  All of the provisions

22   of the master separation agreement, the Lightsource formation

23   agreement and the employee matters agreement and give them a

24   fact where it was clear that these businesses were going their

25   separate ways.  That is part of the deal that got benefits and

22

1    liabilities.  Delphi received benefits and liabilities.  And

2    this was just one piece of it.  But it was clear that by the

3    intent of the parties of the contract that divested businesses

4    and divestiture agreements were going to go over to Delphi.

5    And that's why that language appears in there.  And if Delphi

6    can just sit back and go oh, no, no, no, we didn't really take

7    any of that stuff on, all the previously divested businesses,

8    well, those are third parties, we really don't have to do

9    anything.  You have to go back to GM for that.  That renders

10   all of those provisions really surpluses and gives benefit to a

11   boiler plate.

12            THE COURT:  Well, that I don't understand.  I mean,

13   if you have a right against GM, why are they surplusage?

14            MR. MURPHY:  I think that Guide could make a claim

15   against GM, Your Honor, but I don't know if it will be

16   successful based on the transfer.

17            THE COURT:  No, I understand that.  But if in fact

18   Lightsource or Guide -- and, just for the record, I want to

19   make sure, they're not two claims here.  Whoever has the claim

20   has the claim.

21            MR. MURPHY:  Correct, Your Honor.

22            THE COURT:  All right.

23            MR. MURPHY:  It's -- what happened was Lightsource

24   assigned

25            THE COURT:  Right.

23

1          MR. MURPHY:  -- the claim to Guide.  And if there was

2     a stipulation to one way or the other, one of the claims would

3     go away.

4          THE COURT:  Okay.  But if, in fact -- and I'll just

5     use the word "Lightsource" instead of "Guide".

6          MR. MURPHY:  Okay.

7          THE COURT:  If Lightsource has -- still has a claim

8     against GM, then it seems to me that the argument goes by the

9     boards then that you have to interpret the agreement as

10    switching and giving Lightsource the right to sue Delphi

11    directly because it'd be out of luck, it couldn't sue GM

12    anymore.

13         MR. MURPHY:  And GM may make that argument, Your

14    Honor.  And then we would be left without a remedy.  And the

15    point here, Your Honor, is that there is ample case law

16    supporting the proposition that Delphi is obligated directly to

17    Lightsource under that case law by expressly assuming that

18    contract.

19         THE COURT:  But don't you have to look at the terms

20    of the contract in each case to see what was specific, what was

21    general and the like?

22         MR. MURPHY:  Yes.  And the point in many of the cases

23    that we've cited in the Court is that these specifics should

24    govern the general.  Many contracts include this boiler plate

25    language.  It could have applied to any number of things.  You

24

1    know, other suppliers who are supplying parts or contractors

2    who are providing services to these plants, any number of third

3    parties that are out there so that this third party boiler

4    plate language appears in many contracts.

5            THE COURT:  Well, let's look at 9.05 then.

6            MR. MURPHY:  Okay.

7            THE COURT:  And in particular, what do you make of

8    the last clause of it?  The one that reads "except for Article

9    V which is intended to be for the benefit of the persons

10   provided for therein and may be enforced by such persons".

11   Isn't that a specific limitation on 9.05?

12           MR. MURPHY:  It is.

13           THE COURT:  So doesn't that pretty clearly suggest

14   that that's the only specific limitation on 9.05 since it's

15   right in there, "Except for"?

16           MR. MURPHY:  Again, Your Honor, if there was -- it is

17   a limitation on 9.05, clearly.  And it relates to

18   indemnification.  And it still -- whether it was a

19   draftsmanship issue or otherwise, there are still obligations

20   under this agreement that were assumed by Delphi that were not

21   indemnification obligations.  All of the divestiture

22   agreements, the liabilities and everything else were taken by

23   Delphi to -- to say that they've got -- you know, look to GM

24   for all this stuff is clearly contrary to what the intent was

25   when they separated these businesses.  GM did not intend --

25

1          THE COURT:  But how do I see that from the contract?

2          MR. MURPHY:  Because of the definitions, Your Honor.

3    There was a -- the parties recognized that Delphi had business

4    units that had been previously divested by General Motors and

5    it specifically agreed that those liabilities, along with the

6    liabilities of the existing Delphi business, would be split off

7    onto the Delphi table.

8          THE COURT:  But isn't this pretty much on all fours

9    with the Nationwide case?

10         MR. MURPHY:  No.  The Nationwide case, Your Honor, is

11   -- we don't know what the specifics of the contract were,

12   number one.

13         THE COURT:  Well, they cite -- they describe the

14   language.  In fact, Nationwide was a party to the contract.

15         MR. MURPHY:  All right.  And what that language says,

16   Your Honor, in the Nationwide case, is that Nationwide could

17   not pay to its insureds directly without the prior written

18   consent of the party that had agreed to reimburse it.  So there

19   was a difference in that contract.

20         THE COURT:  Well, did that have any bearing on the

21   Court's ruling whatsoever?  Didn't the Court simply quote the

22   third party beneficiary language?

23         MR. MURPHY:  Your Honor, it wasn't faced with this

24   case.  My point, Your Honor, is the contract was different.

25   And the difference is --

26

1          THE COURT:  But how is it different?  I don't

2    understand.

3          MR. MURPHY:  It's very important here because that

4    contract contemplated Nationwide remaining liable to the

5    insureds.  And the party who accepted that obligation said to

6    Nationwide you have to talk to us first.  If you want to come

7    to us for reimbursement, before you pay those people, you have

8    to get our permission.  So there was a contemplation by the

9    parties in the contract in that case that Nationwide would

10   remain responsible.

11         THE COURT:  But --

12         MR. MURPHY:  There is no -- there's nothing similar

13   to that at all here.

14         THE COURT:  Did that point get discussed at all by

15   the second circuit?

16         MR. MURPHY:  It wasn't relevant to that case.  It's

17   relevant here.

18         THE COURT:  But if it's -- I would think it would be

19   because you're just saying that that's what was guiding them as

20   opposed to the language that they did rely on which is exactly

21   the same language that's here except that language didn't have

22   the exception I just quoted.

23         MR. MURPHY:  Well, to begin with, we have to look at

24   this contract governs this case.

25         THE COURT:  Right.  No, I agree with that.

27

1         MR. MURPHY:  And that case appears to be -- can be

2    argued as similar to this case.  But so can -- and that's not a

3    precedent to this case is -- New York law decided by a

4    different circuit.

5         THE COURT:  I understand.

6         MR. MURPHY:  We've cited opinions from Delaware and

7    otherwise it could also be argued the same where there are --

8    what the Courts held in our cases was that the specific

9    provisions overrode the boiler plate general.  So what my point

10   is with respect to Nationwide --

11        THE COURT:  But let's turn to those --

12        MR. MURPHY:  -- is it's distinguishable.

13        THE COURT:  -- okay?  I want to make sure I'm --

14   we're focusing on that.

15        MR. MURPHY:  Okay.  We're looking at the Nationwide

16   case?

17        THE COURT:  Well, no.  I want to go to the cases

18   you're relying on.

19        MR. MURPHY:  Okay.

20        THE COURT:  The main one, I guess, is the Caldwell

21   Trucking case, right, the third circuit one?  Now maybe

22   that's -- I mean, I thought that was the main one you were

23   relying on but -- although that's not -- not Delaware law

24   either.  It's New Jersey law.  But that's the one where the

25   Court made the distinction between the specific language of the

28

1    contract and the general language of the -- of successors and

2    assigns.  No other parties are deemed to beneficiary.  And

3    there, I think -- I mean, this is on page 18 after quoting that

4    language, the third circuit said "The general boiler plate

5    language, however, must yield to the specific direction of

6    paragraph 1.05 that anything contained herein to the contrary

7    notwithstanding, i.e., notwithstanding the boiler plate

8    language, Pullman agrees to assume."  And I think that's

9    missing from the master separation agreement.  That cross-

10   referenced "anything herein to the contrary notwithstanding".

11   So I'm not sure -- I mean, are there other cases where, you

12   know, absent some language like that, the third party

13   beneficiary language doesn't apply?

14          MR. MURPHY:  Well, I think that the divestiture

15   agreement here, the master separation agreement, is unique.  I

16   didn't find any case law that had -- nor did Delphi, I believe

17   -- that had exactly the same language in this as we have in

18   this case.

19          THE COURT:  Right.

20          MR. MURPHY:  But my point, Your Honor, is that

21   multiple provisions of the contract when read plainly support

22   our position.  And for purposes of a sufficiency hearing, we

23   meet that burden.

24          THE COURT:  But let's go through that again.  Why is

25   that?  I want to make sure I understand why they support your

29

1    position.

2         MR. MURPHY:  If there was no intent by General Motors

3    to push -- put that liability over to Delphi, why would there

4    be a definition that expressly includes "previously divested

5    businesses"?

6         THE COURT:  No, I understand that they intended --

7    it's very clear that they intended Delphi to be responsible for

8    paying that liability.

9         MR. MURPHY:  Right.  And through -- and I'm sorry,

10   throughout the MSA and its attachments, they're very clear, you

11   know, you're going to pay us back if this happens or you'll pay

12   us back if that happens.  And there's a delineation of those

13   things.  But in these cases with respect to those businesses,

14   there is not a specific General Motors is going to pay these

15   and you have an obligation to reimburse us.  It was simply --

16   it's almost as if they're going to argue that General Motors

17   continued to maintain some responsibility to the core Delphi

18   business that was spun off at that time.

19        THE COURT:  Okay.

20        MR. MURPHY:  And here --

21        THE COURT:  Well, wait, let's stop there 'cause I

22   want -- this is an important point.  You're saying that -- let

23   me turn to it.  You're saying that there are other provisions

24   of the agreement pursuant to which Delphi, instead of assuming

25   a liability, indemnified GM for a liability?

30

1        MR. MURPHY:  I think that they -- in the divested

2   business at the end, they talk about a Schedule I which doesn't

3   relate to this -- the OPEB reimbursement.

4        THE COURT:  I'm sorry, let me -- where are you now?

5        MR. MURPHY:  I'm sorry, Your Honor.  MSA Section

6   2.02, Assumption of Liabilities.

7        THE COURT:  Okay, right.

8        MR. MURPHY:  "Responsibility for certain obligations

9   relating to certain divestitures shall be allocated between the

10  parties as set forth in Schedule I."

11       THE COURT:  Right.

12       MR. MURPHY:  So there was some specific obligations

13  retained as defined in Schedule I.  So it was contemplated

14  that --

15       THE COURT:  Right.  But Schedule I lists the LFA as

16  going to Delphi.

17       MR. MURPHY:  It lists the LFA as going to Delphi.

18  But I think Schedule I speaks to other obligations than the --

19  they're going to handle certain aspects of the LFA differently

20  than the transferred obligations.

21       THE COURT:  Well, where -- let me make sure -- I --

22  as far as Schedule I is concerned, that says that Delphi shall

23  not assume or Delphi shall assume -- it doesn't talk about

24  indemnification.

25       MR. MURPHY:  Okay.  And so what they would argue is

31

1    using their -- they would argue Schedule I is a nullity then

2    because there'd be some third party beneficiary there.  I mean,

3    I just --

4              THE COURT:  No, I don't follow that.

5              MR. MURPHY:  I guess the point is is that the

6    divested assets, the OPEB obligations, went to Delphi.  And

7    there was a specific consideration of those in Schedule I --

8              THE COURT:  No.  They'll agree with you on that.

9    Delphi is liable for those obligations.  The question is liable

10   to whom.

11             MR. MURPHY:  And if they -- they're liable to Guide

12   because they expressly assumed those obligations.

13             THE COURT:  No, but what in the agreement shows that?

14             MR. MURPHY:  Section --

15             THE COURT:  You're saying that if you look at the

16   agreement as a whole --

17             MR. MURPHY:  Right.

18             THE COURT:  -- which obviously I'm supposed to, what

19   shows me that it is an obligation not to GM but to Lightsource?

20             MR. MURPHY:  Well, okay.  "The liabilities assumed by

21   Delphi shall assume without limitation the obligation to

22   satisfy all of the obligations of GM under the various

23   agreements."  Now the obligation of GM under the Lightsource

24   agreement was to pay Guide, to pay Guide.  That's the

25   obligation they assumed.  They assumed it; it was there.  They

32

1   had the agreement.  They could read it for themselves.  The

2   agreement, the LFA itself, says that an assignee is liable

3   under that agreement and this says they're liable.  What was

4   the obligation of GM?  The obligation of GM was to pay the OPEB

5   obligations for the period of time that these people were

6   employees prior to the divestiture.

7         THE COURT:  Okay, but --

8         MR. MURPHY:  So they assumed those liabilities.

9         THE COURT:  That's fine.  There's an obligation to

10  pay.  That's the nature of the obligation is to pay --

11        MR. MURPHY:  To pay Guide.

12        THE COURT:  To pay Guide.

13        MR. MURPHY:  GM didn't -- right.  So the point --

14        THE COURT:  So if Guide isn't paid, GM enforces this

15  agreement.

16        MR. MURPHY:  If GM accepts responsibility to

17  Lightsource.

18        THE COURT:  Right.

19        MR. MURPHY:  Which is a presumption that I think is

20  really beyond the scope of this proceeding.  We have an

21  agreement where Delphi agreed -- I mean, there might be two

22  sources of recovery.  But the point is is that under this

23  agreement --

24        THE COURT:  No.  Again, I'm just trying to -- I'm

25  trying to see, again, what provisions of this agreement make it

33

1    clear that the party to enforce the agreement is not only GM

2    but also Lightsource?

3            MR. MURPHY:  There is no specific provision that says

4    Lightsource can sue Delphi.  Certainly, Your Honor --

5            THE COURT:  Right.

6            MR. MURPHY:  -- and I'm not going to make that

7    argument.  What the agreement clearly states, though, is that

8    they assumed these contracts.  They stepped in as General

9    Motors, as a party to those contracts.  They became responsible

10    for the previously divested business units.  So they are

11    responsible directly to Guide.  I mean, it's to --

12            THE COURT:  Well, I guess that's the step that I'm

13    missing --

14            MR. MURPHY:  Well, the step is supported by --

15            THE COURT:  -- particularly in light of 9.05.

16            MR. MURPHY:  Right.  Well, the path is laid in

17    Section 2.02.  Delphi, through the definitions of Delphi

18    Automotive Systems business, which I read earlier, the

19    definition of liabilities, and the specific language in the

20    contract they agreed to assume itself and the employee matters

21    agreement which also talks specifically about Delphi-terminated

22    employees.  There's a clear intent of the parties --

23            THE COURT:  All right.  But let me go to one of the

24    main cases you cite, which is this Royal Indemnity Company

25    versus Alexander Industries.  It's the Delaware Supreme Court

34

1    one, 211 A.2d 919.  And that was a surety contract where the

2    contractor that would be in Lightsource's position was

3    referenced and the Court says citing -- there were statements

4    on securities -- that where a surety for a contractor -- this

5    is on page 552 -- "where a surety for a contractor or on a

6    construction contract agrees in terms with the owner that the

7    contractor will pay for labor and materials or guarantees to

8    the owner the promise of the contractor to pay for labor and

9    materials.  Those furnishing labor and materials have a right

10   against the surety as third party beneficiaries of the sureties

11   contract unless the sureties contract in terms disclaims

12   liability to such persons."  And then it goes on to cite this

13   Dravo-Doyle case where it says "the bonds conditions were the

14   same as the present ones but the surety escaped liability

15   because the principal's contract in plain words limited third

16   party beneficiaries to those who had liens."  And then they say

17   "we are of the opinion that the majority rule is logical and

18   correct.  The surety assumed the contractor's responsibility to

19   perform its contract including payment for material and labor.

20   Clearly, that promise standing alone without limiting language

21   shows an intent to benefit those who've supplied materials and

22   labor."  Then they say "we see no injustice in this result

23   especially since the parties" -- that is, the people standing

24   in the shoes of GM and Delphi -- "had they in fact intended the

25   contrary could easily have avoided the result by inserting a

35

1  few words in the bond itself."  And I guess my question is why

2  isn't 9.05 equivalent to those few words?

3         MR. MURPHY:  The -- I don't think the -- 9.05 again,

4  Your Honor, is contrary to the specific language from the prior

5  parts of the agreement.  To say --

6         THE COURT:  But the whole rest of that opinion was to

7  say even though you have specific language, even though the

8  bond refers to the contractor says you'll pay if the -- if it's

9  triggered.  And here it would be triggered by the OPEB

10  liability just coming due.  You can get around that with a no

11  third party beneficiary's provision.

12         MR. MURPHY:  And, in effect, what we're arguing here,

13  Your Honor, is that Delphi is seeking to use that provision to

14  bar all third parties whether intended or otherwise.

15         THE COURT:  Right.

16         MR. MURPHY:  It's not just a limited exception for

17  certain parties as it was in this case.

18         THE COURT:  But how --

19         MR. MURPHY:  They're saying everybody.

20         THE COURT:  But how is that language ambiguous on

21  that point?

22         MR. MURPHY:  Because -- okay.  The difference is

23  accepting Delphi's argument would bar everybody from recovering

24  into Delphi.

25         THE COURT:  Right.

36

1          MR. MURPHY:  In that Royal Indemnity case, there was

2    a class that was clearly intended to be covered and there was

3    an exception to it.

4          THE COURT:  Right.

5          MR. MURPHY:  But here they would be rendering a

6    nullity.  All of the language of the assumption under the

7    vested business and everything else --

8          THE COURT:  But wouldn't that have been the case in

9    the other one, too?  I mean, except for the ones who had liens?

10         MR. MURPHY:  Well, if they had said we agree to pay

11   everybody in one paragraph and then they relied on this third

12   party provision rendering paragraph 1 of the agreement a

13   nullity, what was the contract?

14         THE COURT:  Because it means that the agreement runs

15   just to GM.

16         MR. MURPHY:  And that's not the intent of this

17   contract.

18         THE COURT:  Why?

19         MR. MURPHY:  There's nothing -- because if --

20         THE COURT:  In the light of that case law and in

21   light of this provision.

22         MR. MURPHY:  If the parties --

23         THE COURT:  That's where I don't see.  I don't see

24   that.

25         MR. MURPHY:  Okay.  If the parties intended General

37

1    Motors to remain responsible for all of its obligations --

2            THE COURT:  No.  Not responsible.  As between them.

3    Not responsible as between them.

4            MR. MURPHY:  There is no mechanism in this contract

5    for GM to be reimbursed.  Why would there be multiple millions

6    of dollars of liabilities that General Motors is going to stay

7    on the hook for and not express -- if the parties intended

8    something that vast --

9            THE COURT:  But why wouldn't they be -- you don't

10    have to be reimbursed.  You just sue for breach of contract.

11    You didn't pay.  You agreed to pay.  You assumed my liability.

12    You breached that contract.  It's a simple contract claim.  You

13    don't have to worry indemnity law or contribution law.  It's a

14    breach claim.  And I'll give you one consequence.  Instead of

15    under 502(e) of the Bankruptcy Code where contribution and

16    indemnity claims are disallowed until they become liquidated,

17    you could say this is a breach claim.  You breached the

18    contract.

19            MR. MURPHY:  Delphi --

20            THE COURT:  And it's allowed under the Bankruptcy

21    Code.

22            MR. MURPHY:  Under the contract -- under the

23    Lightsource financial agreement, Delphi could look back at GM

24    under those circumstances and say you assigned your rights

25    under that contract to us.  You have no right to sue us.  Under

38

1    a different fact pattern.

2              THE COURT:  I don't follow you.

3              MR. MURPHY:  Let's say, I was standing here on behalf

4    of GM and not Guide.

5              THE COURT:  Right.

6              MR. MURPHY:  They could -- there would be an

7    argument -- there could be an argument under the Lightsource

8    financial agreement, look, GM, you assigned all of your rights

9    to us.  Our obligation is to Guide, not to you.  We stepped

10   into your shoes under this master separation agreement.

11             THE COURT:  I don't follow that.

12             MR. MURPHY:  The point is they would -- they could

13   make the argument that their liability for the OPEB obligations

14   runs to the other contracting party, Guide/Lightsource.  Delphi

15   would make that -- could make that argument in defense to

16   General Motors under the MSA.

17             THE COURT:  But that's why they have this agreement

18   where Delphi says --

19             MR. MURPHY:  Exactly.

20             THE COURT:  -- we assume your liability.  So, you

21   know --

22             MR. MURPHY:  And so --

23             THE COURT:  -- GM --

24             MR. MURPHY:  And so General Motors paid for the OPEB

25   reimbursement liability to Guide and in turn then sued Delphi.

39

1    Could Delphi not use the language that I'm standing here today

2    talking about?

3            THE COURT:  Absolutely.  They covered --

4            MR. MURPHY:  To defend itself.

5            THE COURT:  GM covered --

6            MR. MURPHY:  No.  It would say to GM you know, you

7    don't have any rights on it.  You shouldn't have paid that.  It

8    was our obligation.  You paid it as a volunteer.

9            THE COURT:  All right.  That's the -- that goes back

10   to the point that I definitely want to ask Mr. Lyons about

11   which is if I believe that there is at least an argument that

12   GM is not liable anymore, how does that affect the

13   interpretation of this contract?  But leave that aside,

14   clearly, GM has contracted with Delphi in this agreement for

15   Delphi to pay these liabilities and can sue on the contract if

16   Delphi doesn't do it.

17           MR. MURPHY:  What he contracted with was for Delphi

18   to assume the contracts.

19           THE COURT:  Right.  And to pay the --

20           MR. MURPHY:  To take over, yes.  To take over as the

21   contracting party.

22           THE COURT:  Right.

23           MR. MURPHY:  It would step into the shoes of General

24   Motors with the direct responsibility to a former Delphi

25   business unit.

40

1            THE COURT:  Right.

2            MR. MURPHY:  See, that was -- Delphi stood and said

3   we will accept responsibilities for our existing businesses and

4   we'll also accept responsibility for the previously divested --

5            THE COURT:  No.  I know, I got that.  I'm just -- I

6   guess, I'm still -- don't see why 9.05 doesn't preclude anyone

7   other than GM from asserting those rights.

8            MR. MURPHY:  To the extent that it divested business

9   units isn't a third party, perhaps by definition.  Your Honor,

10  there's any number of reasons --

11           THE COURT:  But why wouldn't it be a third party?

12           MR. MURPHY:  It's a divested business unit of Delphi.

13  It is part of the Delphi agreement.  It is by definition.  So

14  the Delphi business units that were part of Delphi, Guide

15  should be, by interpretation, covered by that umbrella.

16           THE COURT:  But it's not a party to this agreement.

17           MR. MURPHY:  Not a signatory, no.  But the definition

18  of the Delphi business itself includes Guide in this case.

19  When they were separating --

20           THE COURT:  Well, wait --

21           MR. MURPHY:  When General Motors was separating --

22           THE COURT:  I'm sorry.

23           MR. MURPHY:  -- itself from the Delphi business --

24           THE COURT:  In the agreement?

25           MR. MURPHY:  Yes.

41

1          THE COURT:  Okay.

2          MR. MURPHY:  The definition of Delphi Automotive

3  Systems Business, it includes all of the existing business of

4  Delphi as well as the business previously conducted by Delphi.

5          THE COURT:  Okay.  But that doesn't make it a party,

6  does it?

7          MR. MURPHY:  It makes it by definition a part of the

8  consideration of this contract.

9          THE COURT:  No.  I'm just focusing on 9.05 --

10         MR. MURPHY:  I understand that, Your Honor.

11         THE COURT:  -- in trying to understand --

12         MR. MURPHY:  And the focus -- the problem is --

13         THE COURT:  where it might be ambiguous or where it

14  might be read in favor of not applying or not restricting --

15         MR. MURPHY:  The problem is that there is --

16         THE COURT:  -- the obligation under a 2.02(b).

17         MR. MURPHY:  The problem is that 9.05, in our

18  reading, Your Honor, is contrary to the definitions, the

19  obligations and everything else.

20         THE COURT:  But how?  You got to walk me through

21  that.  How is it contrary to the definitions?

22         MR. MURPHY:  Because they have -- the Delphi

23  Automotive business that Delphi is now responsible for included

24  the LFA.  It took over that contract and became directly

25  obligated to Guide.  That's the difference.  It's a direct

42

1    obligation.

2            THE COURT:  Okay.  But let's just work through the

3    language.  "This agreement shall be binding and upon and inure

4    solely to the benefit of each party hereto" -- that wouldn't

5    apply to Lightsource -- "and their legal representatives and

6    successors" -- they're not a legal representative.  Let's put a

7    pin on "successors" for a second and we'll come back to that.

8            MR. MURPHY:  Right.

9            THE COURT:  "And each subsidiary" -- it's not a

10   subsidiary, is it, under the definition?

11           MR. MURPHY:  No.  It is a divested business.

12           THE COURT:  Okay.  And it's not an affiliate of the

13   parties hereto so would it be a successor?  I don't think it's

14   a successor 'cause it was divested before --

15           MR. MURPHY:  That language is in contrast to the

16   Lightsource -- the LFA provision, the LFA provision which

17   states that the LFA is binding upon the permitted assigns to

18   this contract.  So --

19           THE COURT:  All right.  But this doesn't say -- if

20   this said "this agreement shall be binding and upon and inure

21   solely to the benefit of each party hereto and their assigns",

22   I understand your point.  But it doesn't say that.

23           MR. MURPHY:  My point is -- here's my point, Your

24   Honor.  Looking at the 2.02 which is the specific language in

25   the contract dealing with what was to become Delphi's

43

1   responsibility.  Okay?

2           THE COURT:  Right.

3           MR. MURPHY:  They agreed specifically to assume the

4   LFA.  And that contract says, specifically, if you are an

5   assign of this contract, you are bound by it.  "This agreement

6   shall be binding upon the permitted assigns."  They agreed

7   pursuant to the MSA to be bound by the LFA.  There's a very

8   specific trail --

9           THE COURT:  Well, that goes back to my question.  Is

10  this really an assignment of the contract as opposed to an

11  assumption of liabilities under the contract?  There's no asset

12  that's being assigned.  It's just a liability.

13          MR. MURPHY:  And liabilities in this case are defined

14  as including contracts.

15          THE COURT:  No.  They're not.

16          MR. MURPHY:  And including --

17          THE COURT:  They're not.  They're defined as

18  obligations.  There's no reference to a contract.  We went

19  through that language.

20          MR. MURPHY:  Okay.  Again, Your Honor, I think the

21  definition of the Delphi -- here.  Delphi liabilities -- on the

22  previous page, again, in the definitional section of the MSA --

23  are defined as all the liabilities of GM that are expressly

24  provided by this agreement or any ancillary agreement to be

25  transferred to and assumed by Delphi.

44

1          THE COURT:  Right.

2          MR. MURPHY:  I mean, another -- I mean, there's

3   numerous provisions of this contract whereby Delphi agreed to

4   take over this contract and become directly liable.

5          THE COURT:  All right.  Other than the fact that

6   Delphi is taking over liabilities, what in this provision,

7   9.05, is either ambiguous or wouldn't limit who could sue on

8   those liabilities?

9          MR. MURPHY:  When a contract is assumed, as here, by

10  Delphi, the other contracting party, Guide.  It's our position

11  that they are obligated directly to Guide Lightsource in this

12  case pursuant to their assumption of that contract.  There's

13  the definitions of Delphi Automotive Systems Group, the

14  previously divested businesses.  There's any number of things

15  that show the clear intent of the parties that because Guide

16  was a former Delphi business unit that Delphi is responsible

17  for it.  Not General Motors --

18         THE COURT:  Okay.

19         MR. MURPHY:  -- in the first instance.

20         THE COURT:  All right.

21         MR. MURPHY:  That was -- GM and Delphi were going to

22  go their separate ways on those and not remain entangled like

23  this.

24         THE COURT:  Okay.

25         MR. MURPHY:  Thank you, Your Honor.

45

1          THE COURT:  Thanks.  Well, let me ask you the

2   question I said I'd ask you.  Does it matter as far as the

3   debtors' objection, in this context, is concerned whether GM is

4   still liable to Lightsource or not?

5          MR. LYONS:  Your Honor, no.  I mean, I have no idea

6   why we're dancing around the issue of whether Lightsource has a

7   claim against GM.  Your Honor, if you look at the bottom of

8   14.3, under their theory that there is an assignment and

9   there's nothing -- nothing indicating there's an assignment of

10  the agreement.  Let's read through 14.3 'cause I think it

11  becomes really clear -- and actually kind of a silly argument

12  to suggest that they could have assigned this agreement to

13  Delphi under the terms of the LFA.  It says -- and this is --

14  I'm reading from the bottom of 14.3, Your Honor, and that's --

15          THE COURT:  Let me just turn to it.

16          MR. LYONS:  Yeah.  That's, I believe it's Exhibit B-1

17  to the Lightsource response.

18          THE COURT:  Right.  Okay.

19          MR. LYONS:  Okay.  It says "GM may assign without

20  prior consent of NewCo this agreement and any other rights."

21  Okay?  So they can't just assign a right.  As Your Honor

22  identified, you assign a contract, you assume a liability.  So

23  if you're going to assign anything, you got to assign the

24  entire agreement.  Your Honor, there's a duty to pay warrants

25  to GM under the LFA.  There's a duty to have flowback

46

1    obligations, that Lightsource has the ability to flow back

2    employees to GM.  Delphi didn't take on those obligations.

3    Delphi never got warrants.  The agreement clearly was not

4    assigned.  And also, Your Honor, if you look at the last

5    sentence of 14.3 -- I think this answers your question.  Even

6    if there was an assignment, what the status of GM's obligations

7    are to Lightsource.  It says "notwithstanding any assignment

8    permitted by this Section 14.3" --

9              THE COURT:  I'm sorry, where are we now?

10             MR. LYONS:  It's the last sentence of 14.3, Your

11   Honor.  "Notwithstanding any such assignment permitted by this

12   Section 14.3, GM shall remain liable for all of its respective

13   obligations hereunder."

14             THE COURT:  Okay.

15             MR. LYONS:  But, Your Honor, going back to Section

16   9.5, Delphi and GM, very sophisticated parties -- one could

17   imagine how many teams of lawyers worked on this agreement made

18   it bell clear exactly what the Royal Indemnity Court suggested

19   to the parties to have a very clear no third party

20   beneficiaries clause.  This clause is, frankly, the clearest

21   clause that I've seen when you look at the other case law.  It

22   says "this MSA shall be binding and inure solely to the benefit

23   of each party hereto and nothing in the MSA" -- okay?  So it

24   supersedes all the other provisions -- "express or implied" -

25             THE COURT:  That was the same language in the

47

1    insurance case.

2              MR. LYONS:  Yes, Your Honor.  It's a very broad,

3    broad, clear and unambiguous no third part beneficiaries

4    clause.  Because the fact of the matter, Your Honor, this was

5    an agreement -- it was an agreement between GM and Delphi.

6    This is not an atypical type of agreement in an acquisition,

7    Your Honor, where the parties just look to each other to

8    determine who has to pay and indemnify the other for certain

9    obligations.  But that doesn't invite the entire world to be

10   able to sue one of the other parties in light of a no third

11   beneficiaries clause.  So the intent is clear.  It's

12   unambiguous.  That's what the parties negotiated and that's

13   what they agreed to.

14             The Lightsource funding agreement, Your Honor,

15   there's no -- nothing in the record that Delphi ever took an

16   assignment of this agreement.  Nothing.  As Your Honor

17   recognized, we freely admit Delphi was on the hook for the

18   Lightsource funding to GM.  And that obligation, Your Honor,

19   that obligation actually has been --

20             THE COURT:  Okay.

21             MR. LYONS:  -- is part of the GM global settlement

22   agreement.  We've resolved all the issues pending confirmation

23   of the plan, obviously, of all the OPEB obligations including

24   those for divested businesses.  So, you're right.  That is

25   being resolved between GM and Delphi.

48

1        So, frankly, I'm just puzzled --

2        THE COURT:  Can I just take a break?

3        MR. LYONS:  Certainly.

4        THE COURT:  Just to -- for my staff for about five

5    minutes.

6        MR. LYONS:  Certainly, Your Honor.

7        THE COURT:  Okay.  Thanks.

8        (Recess from 11:36 a.m. until 11:49 a.m.)

9        THE COURT:  Okay.  We're back on the record in

10   Delphi, and you can go ahead, Mr. Lyons.

11       MR. LYONS:  Your Honor, I really have nothing more to

12   say.  You know, again, we believe the clear and unambiguous

13   language of 9.04 precludes any kind of claim from Lightsource

14   directly against Delphi with respect to the OPEB, The

15   Lightsource OPEB liability.

16       THE COURT:  Okay.  Thank you.  I actually -- I had a

17   question of you, Mr. Murphy.

18       MR. MURPHY:  Yes, Your Honor.

19       THE COURT:  I want to make sure I understand this

20   point.  In your supplemental filings that came in the other

21   day, you referenced the -- I'll find it just a second, sorry.

22   Here it is.  The EM agreement that's attached to -- the US

23   employee matters agreement --

24       MR. MURPHY:  Yes.

25       THE COURT:  -- that's attached to Exhibit -- as an

49

1    exhibit to that supplemental response.

2          MR. MURPHY:  Yes.

3          THE COURT:  And you say that, you know, leaving aside

4    any issues as to whether 9.05 of the master separation

5    agreement does or doesn't limit third party's right to assert

6    claims under the master separation agreement, Lightsource would

7    have a claim under the EM agreement that's not limited by the

8    no third party beneficiaries provision of that agreement,

9    paragraph 14, and I just want to make sure I underst -- what's

10   the basis for that argument?

11         MR. MURPHY:  The employee matters agreement

12   relates -- as defined in paragraph 3.a, relates to all

13   employment-related responsibilities, obligations or liabilities

14   of GM regardless of when incurred.  And payment of OPEB

15   obligations are part of what I would -- would be characterized

16   as all employment-related obligations.

17         THE COURT:  Right.

18         MR. MURPHY:  And the Delphi-terminated employees are

19   defined as those employees who are -- used to be part of Delphi

20   prior to the date of the agreement.

21         THE COURT:  Right.

22         MR. MURPHY:  So under that employee matters

23   agreement, they agreed to become obligated to those employees.

24   I mean, the word --

25         THE COURT:  Okay.

50

1        MR. MURPHY:  -- the language used in here isn't just

2    liabilities.  They're assuming obligation.

3        THE COURT:  But why -- but you go on to say that

4    paragraph 14 doesn't limit that, the no third party

5    beneficiaries language.

6        MR. MURPHY:  Well, could they not stand as and be

7    employees or third parties?  They didn't sign this agreement, I

8    don't have to pay them either?  I don't have to pay anything.

9        THE COURT:  Well, no, because there's a specific

10   exception in 14 which says that provided that any rights to be

11   provided under the Delphi employee benefit plans or their

12   successors pursuant to this EM agreement in the attached

13   schedule shall be enforceable by the participants thereunder.

14   So there is an exception for people who are participants in the

15   Delphi employee benefit plan.

16       MR. MURPHY:  Right, and, Your Honor, the point I

17   wanted about to make about the EMSA and LFA is that, you know,

18   it's not just liabilities but it's obligations.  That's a word

19   that's used; it means something else, and what was the

20   obligation?  It was the obligation to pay to the other party.

21   Here, the other thing, there is a basis for -- on a different

22   matter, for Guide to make a claim against Delphi.  That would

23   be for under a noncompete clause, for example.  In 2.02, on the

24   matters of divested businesses, there is an express agreement

25   by Delphi to honor any noncompete provisions by GM entered into

51

1    with these former divested units.  So if it violated a

2    noncompete clause it could be -- it would have -- could be

3    liable to Guide.

4            And that is contemplated also in the LFA between

5    Guide and GM.  It's -- the assignment provision says GM can

6    assign this to any Delphi --

7            THE COURT:  But is that -- does the proof of claim

8    cover noncompete breach?

9            MR. MURPHY:  It's the intent of the parties whether

10   there was an obligation directly by Delphi to Guide.

11           THE COURT:  No, but I'm just focusing --

12           MR. MURPHY:  The argument is not related to the

13   claim; it's related to the interpretation of the contract.  And

14   the point was GM had the ability to give -- to assume -- have

15   Delphi assume the obligations and liabilities of the LFA

16   provided that Delphi also agreed to the noncompete clause that

17   was in the LFA, and it did do that in Section 2.02.  There is

18   an agreement by Delphi to honor noncompete clauses entered into

19   by GM.

20           THE COURT:  I mean, not specifically but by

21   implication.

22           MR. MURPHY:  Specifically.

23           THE COURT:  2.02 doesn't refer to noncompete clauses,

24   does it?

25           MR. MURPHY:  I apologize, Your Honor, you're correct.

52

1    That is in the Delphi -- definition of what is a Delphi

2    liability, and it includes covenants not to compete entered

3    into by GM prior to the contribution date.

4              THE COURT:  Okay, but I don't -- I'm just focusing on

5    this one argument that was made in the supplemental response

6    filed the other day, which that, leaving aside the master

7    separation agreement --

8              MR. MURPHY:  Okay.

9              THE COURT:  -- the employee matters agreement gives

10   Lightsource the ability to have a claim against Delphi.

11             MR. MURPHY:  Correct.

12             THE COURT:  And why doesn't the no third party

13   beneficiaries provision of that agreement similarly say that,

14   although Delphi may have an obligation or a liability under the

15   EM agreement, that only the signatories and participants in the

16   Delphi employee benefit plans have the right to assert any

17   remedies with respect to employment compensation benefits or

18   other terms and conditions of any persons?  Why wouldn't that

19   similarly mean that Lightsource would not have a direct claim

20   against Delphi?

21             MR. MURPHY:  The participants of that agreement are

22   Delphi-terminated employees, which are defined as

23   Guide/Lightsource employees.

24             THE COURT:  But that's not --

25             MR. MURPHY:  And if it's -- if they are assuming --

53

1          THE COURT:  I'm sorry, the employees are defined --

2          MR. MURPHY:  -- Delphi didn't pay those employees

3    these OPEB obligations; Lightsource/Guide had to pay them.  So

4    under the EM agreement, they're obligated to make those

5    payments and they did not do so, so that's the claim, the

6    direct claim.  There's -- they failed to honor their obligation

7    under the employee matters agreement to the Delphi-terminated

8    employees who have --

9          THE COURT:  Well, but -- okay, let's go back and look

10   at the defined term, Delphi employee benefit plans.  Does that

11   cover the OPEB liability?

12         MR. MURPHY:  Which provision are you referring to,

13   Your Honor?

14         THE COURT:  Well, in Section 14 -- or paragraph 14,

15   it has this exception for participants in the uppercase Delphi

16   Employee Benefit Plans.

17         MR. MURPHY:  It's at 10.a.

18         THE COURT:  Okay.

19      (Pause in proceedings)

20         THE COURT:  Okay.

21         MR. MURPHY:  The Delphi benefit plans cover the

22   provisions of benefits to employees of divested units.

23         THE COURT:  Right.

24         MR. MURPHY:  And, again, Lightsource and Guide are

25   divested units.

54

1          THE COURT:  All right.  But is Lightsource a

2    participant in those plans?

3          MR. MURPHY:  I don't know if there's a definition of

4    participant, Your Honor.  There's, again, an obli --

5          THE COURT:  It's not a defined term but, I mean, it

6    isn't, is it?

7          MR. MURPHY:  What Delphi is responsible for --

8    responsible for payment for the divested plans.

9          THE COURT:  But the participants are the former

10   employees.

11         MR. MURPHY:  To which Guide/Lightsource had to pay

12   based on Delphi's failure to pay.  So they've got an obligation

13   that -- to Guide/Lightsource because they failed to pay  those

14   -- I mean, Guide/Lightsource is responsible directly for those

15   employees, and then now looking to Delphi to reimburse those

16   costs because they failed to honor the employee matters

17   agreement.  And its only exception to that is to the extent the

18   parties are unable to arrange with an applicable third party,

19   such as a buyer of a divested unit for a direct payment of

20   benefits.  That's not the case here.  It was not -- GM was not

21   unable to assign those obligations; it did.  It dealt with

22   those obligations with the Guide divestiture in the LFA and it

23   transferred them to Delphi.

24         THE COURT:  Okay.  Mr. Lyons, what's your response to

25   that point?7

55

1          MR. LYONS:  Your Honor, Lightsource isn't a

2     participant.  I mean, if there is some -- they participate in

3     the Delphi benefit plans, that's what 10.a says, and moreover,

4     if you look further down, Your Honor, it says that the parties

5     would arrange for a third party provider, but if they couldn't,

6     then Delphi would agree to reimburse GM for any amounts.

7          So, again, that goes back to the two-party nature of

8     the agreement that GM -- that Delphi would give GM a

9     reimbursement for any amount.  So, you know, Your Honor, I

10    don't think there's any way to distinguish.  I mean, again, the

11    no third party beneficiaries clause is still -- does not give

12    any other party -- there's -- you know, there's nothing that --

13    in the record that Lightsource is a participant, and therefore,

14    you know, that does not constitute a basis to show there's some

15    direct claim Lightsource has against Delphi.

16         THE COURT:  Well, what if -- I mean, if Lightsource

17    paid on their behalf, wouldn't they be subrogated?

18         MR. LYONS:  Well, Your Honor, I mean, they may have

19    their other plans.  I mean, again, the obligation, as this

20    shows, between -- that GM and Delphi agree was to reimburse GM

21    for that amount.

22         THE COURT:  But that's only if they're unable to

23    arrange with an applicable third party for direct payment.

24         MR. LYONS:  Right, Your Honor.  I think what

25    Lightsource is asserting here in this case, our OPEB rights

56

1    accrued under Lightsource's benefit plans.  It's not what was

2    accruing under -- or which qualified to be paid under Delphi's

3    benefit plans, so there's the distinction there.  Lightsource

4    has brought a claim on behalf of Lightsource under its benefit

5    plans.

6            THE COURT:  But this paragraph 10.a says the Delphi

7    benefit plan shall also cover the provision of benefits for

8    employees of divested units, which were formerly Delphi

9    operations to the extent that the GM benefit plans cover the

10   provision of benefits for such divested employees as of the

11   effective time.  And then there's another exception for certain

12   divested employees who've retired before the effective time.

13           MR. LYONS:  But, Your Honor, if you look at that,

14   though, they speak in terms of the GM benefit plans.  At the

15   time of the spin-off, Lightsource had the -- or prior to the

16   spin-off actually, the GM benefit plans -- and, again,

17   Your Honor, I'm looking at just the contract here --

18           THE COURT:  Right, what you're saying is the GM

19   benefit --

20           MR. LYONS:  -- with The Lightsource.

21           THE COURT:  -- the GM benefit plans do not cover the

22   provision of benefits for such divested employees because

23   that's really a separate thing, that's The Lightsource benefit

24   plans covering --

25           MR. LYONS:  Right, who have retired from GM, right,

57

1   before October 1, 1999, which is the date of the divestiture.

2   　　　　THE COURT:  Well, that -- I thought -- is that a

3   different -- let me walk through this with you.  Parsing

4   through this sentence, the Delphi benefit plan shall also cover

5   the provision of benefits for employees of divested units which

6   were formerly Delphi operations.  So far that would apply to --

7   　　　　MR. LYONS:  Right.

8   　　　　THE COURT:  -- to The Lightsource OPEB, to the extent

9   that the GM benefit plans cover the provision of benefits for

10  such divested employees.  Now, you're telling me that the GM

11  benefit plans don't cover Lightsource's employees because they

12  had their own plan?

13  　　　　MR. LYONS:  You know, Your Honor, I mean, I'm looking

14  at the document.  I'm going through the language along with

15  you.

16  　　　　THE COURT:  Right, well, let's look at the definition

17  of GM benefit plans, which doesn't jump out.  Have you all been

18  able to find where GM benefit plans is defined?

19  　　　　MR. LYONS:  Your Honor, it might be helpful to look

20  at their claim, The Lightsource's claim.

21  　　　　THE COURT:  Yeah?  Okay.

22  　　　　MR. LYONS:  And this might clarify why these claims

23  don't come through the Delphi employee benefit plans.

24  　　　　THE COURT:  Okay.

25  　　　　MR. LYONS:  And I refer you to page -- that's

58

1   actually the first summary page of the proof of claim, which is

2   attached --

3           THE COURT:  Right.

4           MR. LYONS:  -- to the supplemental response.

5           THE COURT:  Right.

6           MR. LYONS:  It says pursuant to Section 6.71(d) of

7   the LFA, Lightsource agreed to provide certain of its employees

8   GM-comparable post-employment retiree health, life insurance

9   benefits.

10          THE COURT:  Okay.  So that was a Lightsource --

11          MR. LYONS:  Exactly.

12          THE COURT:  -- obligation.

13          MR. LYONS:  And pursuant to Section 6.71(e) of the

14  LFA, GM agreed to reimburse Lightsource annually for a portion

15  of that cost of the OPEB obligations.

16          THE COURT:  So, again, then, you are saying that this

17  language, to the extent that the GM benefit plans cover the

18  provision of benefits for such divested employees would not --

19  would take The Lightsource -- would not -- that would take this

20  definition -- it wouldn't apply to The Lightsource people?

21          MR. LYONS:  Yes.

22          THE COURT:  And then I guess you're also -- were you

23  also saying something else, which is that -- then goes on,

24  except that the GM benefit plans, to the extent applicable,

25  will continue to cover such divested employees who have retired

59

1   from GM on or before the effective time or for our employees on

2   or before October 1, 1999.  So --

3          MR. LYONS:  So GM would keep those.

4          THE COURT:  But if someone ret -- but if for some

5   reason The Lightsource employees were covered by GM benefit

6   plans, then for retirees after those two dates Delphi would be

7   assuming that liability and giving those employees, under

8   paragraph 14, the right to sue, if in fact they were covered by

9   a GM benefit plan.  I guess that's right, right?  That that's

10  implicit in the narrow definition of the exception?

11     (Pause in proceedings)

12         MR. LYONS:  I'm sorry, Your Honor, let me -- what was

13  the question again?

14         THE COURT:  I answered it myself.

15         MR. LYONS:  Okay.

16         THE COURT:  The term GM benefit plan, although

17  capitalized, doesn't seem to be defined here.  I think it's

18  used for the first time on page 3 in paragraph 4.a.  It's not

19  in the list of defined terms.

20     (Pause)

21         MR. LYONS:  Let me just look at one thing.

22         THE COURT:  And it's not -- it doesn't appear to be

23  defined in the master separation agreement either.

24     (Pause)

25         THE COURT:  Does anyone see where it might be

60

1  defined?

2        (Pause)

3        MR. LYONS:  See, I guess, you know, one of the other

4  comments, Your Honor, if you look at the exclusion to Section

5  14 --

6        THE COURT:  Right.

7        MR. LYONS:  It says by the participants thereunder.

8  The fact that Delphi may have extended, you know, the coverage,

9  you know, to cover the provision of benefits to employees of

10  another company, that doesn't mean they're a participant in the

11  Delphi benefit plan because the Delphi benefit plan is only

12  applicable to Delphi employees.

13        THE COURT:  Well, is it?  I don't think that's right

14  under 10.a.  10.a says the Delphi benefit plan shall also cover

15  the provision of benefits for employees of divested units.  I

16  don't know, I mean, you're saying that's not a definitional

17  provision, that's a covenant they shall also cover?

18        MR. LYONS:  Yes, I mean, exactly.

19        THE COURT:  You shall include them in --

20        MR. LYONS:  And reimburse GM for any such amounts.  I

21  mean, they're not employees of Delphi, Your Honor.  It's all

22  tied into the reimbursement obligation with GM.

23        THE COURT:  Well, so that the -- I guess what you're

24  saying is that these employees, these divested employees, to

25  the extent that the GM benefit plans covered them, would be

61

1  included contractually into or under the Delphi benefit plans?

2  They'd be beneficiaries of those plans, that was the covenant?

3          MR. LYONS:  No.

4          THE COURT:  No?

5          MR. LYONS:  No.

6          THE COURT:  Okay.

7          MR. LYONS:  I mean, Your Honor, Delphi doesn't have

8  on its rolls Lightsource employees for its benefit plans.

9          THE COURT:  I know, but this sentence says the Delphi

10 benefit plans shall also cover the provision of benefits for

11 employees of divested units.

12         MR. LYONS:  And that goes into the GM-Delphi

13 reimbursement obligation.

14         THE COURT:  Which were formerly Delphi operations.

15         MR. LYONS:  It's a liability between -- that Delphi

16 did assume.  I mean, no question Delphi assumed that liability

17 but it only is obligated to pay GM as a reimbursement.

18         THE COURT:  Well, but let's take that -- let's walk

19 that through.  There's a covenant to include them if they're

20 includable.

21         MR. LYONS:  To cover the liability, to cover the

22 provision of benefits for employees.  Your Honor, if you look

23 at --

24         THE COURT:  Well, doesn't it --

25         MR. LYONS:  If you look at the terms of paragraph 14,

62

1    it speaks in terms of participants.

2            THE COURT:  Yeah.

3            MR. LYONS:  Paragraph 10 doesn't say that employees

4    are participants in the Delphi benefit plan.  And, Your Honor,

5    I'm sure if we get Delphi's, you know, benefits lawyers here, I

6    think as a matter of law you can't be a participant in the

7    Delphi benefit plan; however, clearly that Delphi is liable for

8    those benefits to GM under the reimbursement obligation.  So I

9    think that's actually entirely consistent with how the MSA was

10   set up as well as the employee matters agreement.

11           THE COURT:  Well, let's walk through this other

12   language here to see if that corresponds to what you're saying.

13   To the extent the parties are unable to arrange with an

14   applicable third party for direct payment of benefits or

15   transfer of obligation -- I see.  So you're saying -- yeah, I

16   understand your point.

17           MR. LYONS:  Yeah, I mean, it's not a participant.

18           THE COURT:  It's not going to be paid through the

19   plan, then the plan trustees would ensure for the payment.

20   It's going to be paid separately as if they were part of the

21   plan but they're not.

22           MR. LYONS:  Right, Your Honor, I mean there's no

23   question that a Lightsource employee -- and there's been

24   nothing to the record to show or anything in any of the

25   documents to state that a Lightsource employee is a participant

63

1    in a Delphi benefit plan.  That's what the no  party -- third

2    party beneficiaries clause speaks --

3           THE COURT:  Well, but I'm not sure that's dispositive

4    because you could -- if you had agreed to make them a

5    participant, then you couldn't divest them from it by breaching

6    that agreement.  But what you're really saying is that you

7    didn't agree to make them a participate in the first place.

8           MR. LYONS:  No, we agreed to cover the liability

9    through the reimbursement obligation to GM.

10          THE COURT:  Okay.

11          MR. LYONS:  And moreover, Your Honor, that's not the

12   Light -- Lightsource is not -- has not claimed that they're a

13   participant in the Delphi benefit plan --

14          THE COURT:  No.

15          MR. LYONS:  -- within the definition of the --

16          THE COURT:  I understand that but there's -- this

17   really just came up at oral argument.

18          MR. LYONS:  Understood.  But I think it's pretty

19   clear --

20          THE COURT:  But what Mr. Murphy is saying is that

21   they are subrogated to participants in the plan and you're

22   saying no, they're not subrogated to participants, they're

23   not -- they never were meant to be participants and so you

24   can't be subrogated to a participant if they weren't meant to

25   be a participant in the first place.

64

1          MR. LYONS:  Precisely, because, you know -- and,

2   again, to be a participant you have to be a Delphi employee.

3          THE COURT:  Okay.

4          MR. LYONS:  Anything else?

5          THE COURT:  No.  Do you have anything to say on that

6   particular point, Mr. Murphy?

7          MR. MURPHY:  Your Honor, just briefly, the argument

8   that the only obligation would be to GM for reimbursement only

9   applies in the circumstance, as Your Honor read, if they were

10  unable to -- GM was unable to arrange with the buyer of the

11  divested unit to pay those.  And so, here, Lightsource and

12  Guide did pay those employees these benefits but that doesn't

13  relieve Delphi from the obligation to pay.

14         THE COURT:  But Delphi didn't arrange to do that.

15         MR. MURPHY:  It says GM can arrange to do it.

16         THE COURT:  But --

17         MR. MURPHY:  To the extent that there's --

18         THE COURT:  -- there was no arrangement, was there?

19         MR. MURPHY:  In the divested --

20         THE COURT:  There's no arrangement.

21         MR. MURPHY:  In the divested units, you know, there

22  was a provision for GM to be responsible for OPEB to the extent

23  that these employees were employees of Delphi for a period of

24  the pro rata shares of their years worked.  So that

25  reimbursement obligation, that responsibility for paying those

65

1   obligations at the time of the LF A was for GM, and under the

2   employee matters agreement, Delphi agreed to pay those OPEB

3   obligations to divested units.

4          THE COURT:  Yeah, but that doesn't -- I guess, that's

5   a separate point you're making, then, in saying that these

6   people really should have been participants.  You're just

7   saying that there's no reimbursement obligation to GM because

8   by --

9          MR. MURPHY:  They're arguing that there was some

10  limitation.  The only time that they had to pay GM directly was

11  if they were unable to find somebody else to pay these

12  employees, then GM would have continued to pay them, which it

13  didn't.

14         THE COURT:  And what somebody else did they find to

15  pay the employee?

16         MR. MURPHY:  The buyer.

17         THE COURT:  What buyer?

18         MR. MURPHY:  Lightsource/Guide was the entity that

19  took the asset and paid the obligations that Delphi assumed it

20  was supposed to be paid.  It says --

21         THE COURT:  That wasn't arranged.  That's as a

22  consequence of a breach, you're saying.

23         MR. MURPHY:  I think the obligation was for GM to

24  reimburse those payments, so the obligation would -- The

25  Lightsource was to make those payments.  It agreed, as the

66

1      buyer, to make those payments.

2              THE COURT:  Okay.

3              MR. LYONS:  And so Delphi was obligated to --

4              THE COURT:  All right.

5              MR. MURPHY:  -- pay for those.

6              THE COURT:  But that would -- but, again, that -- to

7      me, that just confirms the argument Mr. Lyons was making, that

8      these people are not participants in the plan; they are people

9      who are entitled to money as if they had been participants, but

10     they weren't participants.

11             MR. MURPHY:  Again, Your Honor, I think that he's

12     making the argument without the -- which you said that came up

13     today, without the support of his employee benefits lawyers,

14     and I stand here --

15             THE COURT:  No, but it's from the language.  But if

16     you read through the language, that seems to be --

17             MR. MURPHY:  It may be, Your Honor.

18             THE COURT:  Well, I mean, I --

19             MR. MURPHY:  I mean, I think the point is -- for

20     purposes of sufficiency, is there a question here that should

21     let this matter unfold?

22             THE COURT:  But I don't see -- I mean, that's why I'm

23     giving you the chance to respond to it.  It seems to me that

24     that's an entirely logical and plain meaning reading of that

25     paragraph, that there's no -- there is no alternative reading.

67

1    You wouldn't be going through those hoops if instead they were

2    supposed to be just folded into the plan as if they were

3    participants.

4            MR. MURPHY:  They were obligated to pay those

5    benefits.  They agreed to pay benefits --

6            THE COURT:  Right, I agree with that.

7            MR. MURPHY:  -- to Delphi employees, the Delphi-

8    terminated employees.

9            THE COURT:  Right.

10           MR. MURPHY:  And those terminated employees included

11   the vested --

12           THE COURT:  No, I agree with all of that.

13           MR. LYONS:  Okay.

14           THE COURT:  I agree with all of that.  Okay, all

15   right.  I have before me the debtor's objection to the claim

16   asserted against them by two related entities, Lightsource

17   Parent Corporation and Guide Corporation.  It's clear from the

18   parties' pleadings and remarks at oral argument that the two

19   claims together constitute one claim.  If the claims were to be

20   allowed, in other words, Delphi Corporation would make one

21   payment that would cover the amount asserted without

22   duplication and the two claimants would divide up that amount

23   between themselves.

24           The claim is asserted in both liquidated and

25   unliquidated amounts as set forth in the proof of claim and

68

1     then in the supplemental pleadings filed by Lightsource, and

2     when I refer to Lightsource throughout I mean both Lightsource

3     and Guide.

4              In the proof of claim, Lightsource contends that it

5     entered into an agreement in September of 1998 called the

6     Lightsource Formation Agreement, or LFA, pursuant to which the

7     parties, that is, GM, General Motors Corporation, and

8     Lightsource, agreed to form Lightsource Parent Corporation to

9     which GM transferred to Lightsource certain assets described in

10    the LFA essentially comprising GM's vehicle lighting business.

11             As set forth in the proof of claim, pursuant to

12    Section 6.71(d) of the LFA, Lightsource agreed to provide

13    certain of its employees with GM-comparable post-employment,

14    that is, retiree health care and life insurance benefits, OPEB

15    obligations.  And then pursuant to 6.71(e) of the LFA, GM

16    agreed to reimburse Lightsource for the portion of the cost of

17    those OPEB obligations which, again, Lightsource had agreed to

18    undertake.

19             In December of 1998, GM entered into another

20    agreement, the master separation agreement, or MSA, with Delphi

21    Corporation and other subsidiaries and affiliates of Delphi,

22    including Delphi Automotive Systems, LLC, pursuant to which GM

23    spun off Delphi, which had operated as a division of GM, and

24    related business units.  That agreement, as I said before, was

25    between GM and the Delphi parties.  Lightsource and Guide were

69

1    not a party to that agreement.

2        Pursuant to Section 2.02(b) of the master separation

3    agreement, Delphi agreed with GM to assume all liabilities of

4    GM related to the business and operations divested by the

5    Delphi Automotive Systems business.  Liabilities is defined in

6    the MSA as any and all debts, liabilities, guarantees,

7    assurances, commitments and obligations, whether fixed,

8    contingent or absolute, asserted or unasserted, matured or

9    unmatured, liquidated or unliquidated, accrued or not accrued,

10   known or unknown, due or to become due, whenever or however

11   arising, including without limitation whether arising out of

12   any contract or tort based on negligence or strict liability,

13   and whether or not the same would be required by generally

14   accepted accounting principles to be reflected in financial

15   statements or disclosed in the notes thereto.

16       The assumed liabilities, for purposes of this

17   hearing, which is, as the parties have noted, a so-called

18   sufficiency hearing on the legal sufficiency on its face of

19   Lightsource's claim, would include the reimbursement liability

20   that GM undertook under Section 6.17(e) of the LFA to

21   Lightsource to reimburse Lightsource's payment of OPEB

22   obligations.

23       Section 2.02(b) had some exceptions to the

24   liabilities of divested operations that were to be assumed but

25   stated in its concluding clause, provided further, however,

70

1   that notwithstanding the foregoing or any other provision of

2   this agreement or any ancillary agreement, responsibility for

3   certain obligations related to certain divestitures shall be

4   allocated between the parties as set forth in Schedule I

5   hereto.

6          Schedule I to the MSA provides specifically in

7   paragraph 2 that Delphi shall assume any restructuring and

8   support payments -- excuse me, subsidies and supplements

9   relating to the businesses divested to Lightsource Parent

10  Corporation.

11         Lightsource therefore contends that, pursuant to

12  2.02(b), it may assert its claim in respect of unpaid OPEB

13  obligations, not only against GM but also against the debtors.

14  It bolsters its argument in two ways.  First, it contends that,

15  pursuant to Section 14.3 of the Lighthouse (sic) formation

16  agreement, it agreed that, quote, "GM may assign without the

17  prior written consent of NewCo," i.e., Lightsource, "this

18  agreement and any or all of its rights, interests and

19  obligations hereunder to a corporation or other business entity

20  to which all or substantially all of the assets of Delphi

21  Automotive is sold or otherwise transferred, provided such

22  transferee agrees in writing to be bound by Section 11.8

23  herein," which was a noncompete provision.  It contends that,

24  by the assumption of liabilities under 2.02(b), which includes

25  obligations, Delphi agreed in writing to be bound by

71

1   Section 11.8, although it didn't specifically do so, i.e.,

2   specifically refer to that section, and therefore that this MSA

3   agreement in general and 2.02 in particular constitutes an

4   assignment of the LFA to Delphi.

5          Secondly, Lightsource contends that, pursuant to a

6   related agreement that was entered into in connection with the

7   master separation agreement, Delphi and GM agreed that Delphi

8   would be responsible for and shall pay the liabilities and

9   expenses under the Delphi benefit plans with respect to Delphi

10  employees and further that the Delphi benefit plans shall also

11  cover the provision of benefits for employees of divested

12  units, which were formerly Delphi operations.  That, arguably,

13  would cover an obligation to provide for benefits to the

14  Lightsource employees in respect of their OPEB.

15         Again, that agreement which is set forth in an

16  agreement entitled US Employee Matters Agreement was not one to

17  which Lightsource or Guide was a party but rather one between

18  GM and Delphi Automotive Systems Corporation.  The paragraph

19  that I was referring to is paragraph 10.a of that agreement.

20         The debtors, for purposes of this sufficiency

21  hearing, do not dispute that Delphi assumed the OPEB liability.

22  They contend, however, that the only party who can enforce that

23  agreement, and consequently the only party with a claim against

24  Delphi, is the party to that assumption agreement, whether it's

25  the master separation agreement or the US employee matters

72

1    agreement, or the US employee agreement, GM.  It relies for

2    that proposition primarily upon Section 9.09 of the master

3    separation agreement, which provides this agreement shall be

4    binding upon and inure solely to the benefit of each party

5    hereto and their legal representatives and successors and each

6    subsidiary and each affiliate of the parties hereto, and

7    nothing in this agreement, express or implied, is intended to

8    confer upon any other person any rights or remedies of any

9    nature whatsoever under or by reason of this agreement, except

10   for Article 5, which is intended to be for the benefit of the

11   persons provided for therein and may be enforced by such

12   persons.

13          When one turns to Article 5, one can see from it

14   that, in addition to the parties to the MSA, their legal

15   representatives and successors and assigns, the additional

16   parties referred to therein would not include Lightsource or

17   Guide but rather a limited group of indemnities who would be

18   Representatives, upper case R, of the parties and their

19   successors to this agreement.

20          In addition, in respect of the assumed obligations

21   under the US employee matters agreement, the debtors rely upon

22   Section 14 of that agreement headed No Third Party

23   Beneficiaries, which states no provision in this EM agreement

24   or in any schedule, including any attachment thereto, shall

25   confer upon any person, other than the signatories hereto, any

73

1    rights or remedies with respect to the employment compensation

2    benefits or other terms and conditions of employment of any

3    persons, provided that any rights to be provided under the

4    Delphi employee benefit plans or their successors pursuant to

5    this EM agreement and the attached schedule shall be

6    enforceable by the participants thereunder.

7         The parties generally agree upon the applicable law,

8    which is, by choice of the parties under the master separation

9    agreement, the law of Delaware.  They also generally agree on

10   what the law of Delaware says.

11        And finally, it is the Court's view that on the

12   applicable issues before me, the law of Delaware is consistent

13   with the general common law, including as set forth in

14   decisions by courts from other jurisdictions cited by the

15   parties interpreting the law, the common law, of those

16   jurisdictions or jurisdictions outside of Delaware.

17        The issue as framed by the parties, again, is

18   whether, pursuant to the plain and unambiguous terms of the

19   contracts at issue, the provisions of those contracts relied

20   upon by Delphi, namely 9.05 of the MSA and 14 of the employee

21   matters agreement, limit or preclude Lightsource's ability

22   directly to assert a claim based upon Delphi's assumption of

23   liabilities under those respective agreements against Delphi.

24        Lightsource contends that because it is specifically

25   referred to in the MSA and reasonably specifically referred to

74

1    in the employee matters agreement, that those specific

2    references, pursuant to which Delphi assumed liability for OPEB

3    obligations of Lightsource, trump the provisions of 9.05 and 14

4    of the two respective agreements.  Sometimes this is referred

5    to by Lightsource as a more specific provision modifying and

6    defeating a more general provision.  Sometimes it is referred

7    to as an argument based on the proposition that the more

8    specific provision must lead one to interpret the no third

9    party language to apply to others who are not specifically

10   dealt with in the contract.

11          In addition, Lightsource contends that GM assigned

12   the contract to Delphi and that, as an assignee who has

13   specifically assumed liability, Delphi is, under the common law

14   of Delaware as well as the general common law elsewhere,

15   responsible directly to Lightsource.

16          Let me address that latter point first because I

17   believe it is a red herring.  Under the MSA, GM agreed with

18   Delphi that Delphi would assume liabilities to Lightsource or,

19   in the words of the proviso to Section 2.02(b), the

20   responsibility for such obligations would be allocated as

21   between the parties, i.e., GM and Delphi, to Delphi, as set

22   forth on Schedule 1.

23          It does not appear to me from reading the MSA that

24   its plain terms suggest that GM assigned the entire Lightsource

25   formation agreement, both its benefits and its burdens, to

75

1    Delphi.  It was permitted to do either of those two things, in

2    my view, under paragraph 14.3 of the LFA, which says, again, in

3    addition, after the closing, GM may assign without the prior

4    written consent of NewCo this agreement and any or all of its

5    rights, interest and obligations hereunder.  I believe that

6    what occurred here, as made clear from reading the documents,

7    is that GM assigned some of its obligations under the agreement

8    to Delphi.

9            In addition, paragraph 14.3 makes it clear that,

10   quote, "Notwithstanding any such assignment permitted by this

11   Section 14.3, GM, Guide and Lightsource shall, in each case,

12   remain liable for all of its respective obligations hereunder."

13   That's important because it has been suggested by Lightsource

14   that Delphi's interpretation of the MSA and the employee

15   matters agreement would render Lightsource remediless, i.e., it

16   would not have a claim against GM anymore for breach of the

17   OPEB reimbursement obligation in 6.7 of the LFA, and therefore

18   it would be irrational to construe the MSA as not giving it a

19   direct right against Delphi under Section 2.02(b).

20           To the contrary, it seems to me that GM and

21   Lightsource in paragraph 14.3 of the LFA made it clear that

22   GM's reimbursement obligation would survive, notwithstanding

23   even a full assignment, let alone an agreement that Delphi

24   would assume certain liabilities.

25           Consequently, it is perfectly rational to interpret

76

1    the MSA as providing that GM would have a claim against Delphi

2    for breach of its assumption agreement, which would be

3    triggered by the nonpayment of the obligations that GM

4    independently owes under the LFA in respect of OPEB.

5         But the key element of textual analysis here involves

6    reading, in the case of the MSA, paragraphs 2.02(b) and 9.05,

7    to determine, in fact, which paragraph limits the other.  That

8    is because the case law is clear that, where two parties agree

9    that one party will assume or pay the liability of the other,

10   the party holding the original liability may have standing to

11   bring a direct claim against the assuming party, provided that

12   the parties' agreement, that is the agreement between the

13   original obligor and the assuming party, makes it clear that

14   the third party would have that right.

15        Generally speaking, under the law of Delaware,

16   reference to the specific assumption of a liability in an

17   agreement between two parties would give the party who has that

18   claim standing to sue the assuming party directly.  But that

19   proposition is qualified.  Where there is, however, limiting

20   language in the agreement, it would preclude such a direct

21   right.  That language controls.  This general proposition is

22   set forth in Royal Indemnity Co. v. Alexander Industries, Inc.,

23   211 A.2d 919, Delaware Supreme Court (1965), in which the Court

24   said, again, "standing alone without limiting language", close

25   quote.  Words of assumption show an intent to benefit those who

77

1    have supplied materials and labor and that the promise thus

2    confers upon such parties a right of action as third party

3    beneficiaries.

4            The Court made that distinction perfectly clear in

5    the next sentence when it said we see no injustice in this

6    result, especially since the parties, had they in fact intended

7    the contrary, could easily have avoided the result by inserting

8    a few words in the bond itself to limit third party standing.

9            The cases relied upon by Lightsource in its papers

10   all stand for that general proposition, and indeed Lightsource

11   acknowledges in its supplemental response dated January 8, 2008

12   as much.

13           In discussing the debtor's reliance on Corbin on

14   Contracts, Section 777 at 25, which states if two contracting

15   parties expressly provide that some parties will be benefited

16   by performance shall have no legally enforceable right, the

17   Court should effectuate the express intent by denying the third

18   party any direct remedy.  And then the supplementary response

19   goes on to state Corbin is merely restating in context the

20   principle that the specifics should govern the general.  If a

21   contract by its general terms confers rights on third parties

22   but such third parties are specifically excluded, then no

23   rights should attach, which is clearly a correct statement of

24   the law and is borne out by the various cases relied upon by

25   Lightsource.

78

1        For example, its primary case, Caldwell Trucking PRP

2   v. Rexon Technology Corp., 421 F.3d 234 (3rd Cir. 2005),

3   involved a similar issue where there was a successor -in-assign

4   provision that stated the terms and conditions of this

5   agreement shall inure to the benefit of and be binding upon the

6   respective successors and assigns of the parties hereto,

7   provided that no person, firm or entity, other than the parties

8   hereto, their respective successors and assigns shall be deemed

9   a beneficiary of any of the representations, warranties or

10  covenants contained here.

11       The Court there noted, however, at page 18 of the

12  Lexis printout, the general boilerplate language, however, must

13  yield to the specific direction of paragraph 105, which was a

14  specific assumption of liabilities provision, that, quote,

15  "Anything contained herein to the contrary notwithstanding,

16  Pullman agrees to assume all liabilities," etcetera.

17       Obviously, that introductory clause, notwithstanding

18  anything contained herein to the contrary, would in respect of

19  the assumption vitiate or narrow the scope of the general

20  successor-in-assign provision of the agreement so that it would

21  not apply to that specific assumption.

22       Similarly, in the Ladish Company, Inc. v. Armco Inc.

23  case, from the court of appeals of Wisconsin, 514 N.W.2d 724

24  (1993), the Court found a general no third party beneficiary

25  language trumped by a provision that stated that the specific

79

1    obligations under the acquisition agreement to defend and

2    indemnify this, quote, "surviving companies" make the surviving

3    companies and, under the express terms of the acquisition

4    agreement, their respective successors and assigns intended

5    third party beneficiaries since the specific indemnification

6    rights went to the surviving companies, one of whom was a

7    plaintiff.

8            Again, I want to make it clear I'm dealing with cases

9    here, as I believe is appropriate, that reference the specific

10   context of assumption language in an agreement between two

11   other parties that contain no third party beneficiary language.

12   I do not believe cases pertaining to assignments of contracts

13   apply here since the entire contract was not assigned.  But

14   even where an entire contract is assigned, limiting language

15   would preclude the conferring of direct liability on a third

16   party.

17           Turning to the specific language at issue, I conclude

18   that Section 9.05 is not trumped by the assumption of liability

19   provision of 2.02(a) of the master separation agreement.  First

20   and perhaps most important, Section 2.0(a) (sic) -- I'm sorry,

21   (b), does not contain the similar -- or the clause or a similar

22   clause as found in the agreement that I just quoted that

23   says -- or that would say, notwithstanding any other provision

24   of this agreement.  Secondly, Section 9.05 is clear on its face

25   and clearly applies on its face to all the provisions of the

80

1    MSA, with one specifically articulated exception.

2            It's carefully drafted.  It excludes from those who

3    may benefit from the agreement assigns or -- I'm sorry, and

4    assigns.  Secondly, it is worded very broadly.  It states that

5    nothing in this agreement, literally the flip side of the

6    notwithstanding language that I quoted earlier, "nothing in

7    this agreement, express or implied" -- that is, it refers to

8    the express provisions of this agreement as well as any sort of

9    implied right that one might otherwise want to assert -- "is

10   intended to confer upon any other person any rights or remedies

11   of any nature whatsoever under or by reason of this agreement.

12           Almost the same language was found by the Sixth

13   Circuit in Nationwide Mutual Insurance Co. v. Home Insurance

14   Co., 150 F.3d 545, to deprive a specifically identified

15   potential beneficiary of the ability to bring a direct claim

16   under an agreement.  In that case, the assumption agreement

17   provided nothing in this assumption agreement, express or

18   implied, is intended or shall be construed to confer upon or

19   give to any person, firm or corporation, other than the parties

20   hereto, any rights or remedies under or by reason of this

21   assumption agreement, or any term, provision, condition,

22   undertaking, warranty, representation, indemnity, covenant or

23   agreement contained therein.

24           Going one step further, there is another provision in

25   Section 9.05 that makes that conclusion even more clear, that

81

1    is, the last clause of Section 9.05 lists a specific exception

2    to the foregoing prohibition on third party reliance on the

3    express or implied terms of the agreement, and, that is, except

4    for Article 5, as I noted earlier, that exception, however, by

5    its plain terms, does not apply to Lightsource.

6         In construing the agreement as a whole, one would

7    expect that if the parties intended by their plain language to

8    include any other exception, i.e., for example, parties with

9    liabilities that would be covered by 2.02(b), they would have

10   included it in this clause, and obviously they did not.

11        The Delaware courts, as well as the courts in every

12   other jurisdiction, hold that the plain meaning of a contract

13   establishes the parties' intentions.  As I noted before, the

14   Delaware courts also hold that the parties' expressed

15   intentions will govern whether a third party to the agreement

16   has direct rights under the agreement.

17        Given the unambiguous language that I just quoted, in

18   the absence of any clear rationale why that language is

19   contrary to logic or reason, and indeed, recognizing that the

20   language is consistent with an agreement between GM and Delphi,

21   that leaves Lightsource with its original direct source of

22   recovery as well as now an indirect source of recovery through

23   GM's enforcement of this agreement.  I conclude that, as a

24   matter of law, Lightsource cannot assert a claim under the

25   master separation agreement.

82

1          A similar legal analysis pertains to the interplay of

2     paragraphs 10.a and 14 of the US employee matters agreement.

3     The no third party beneficiary provision of the US employee

4     matters agreement is also broadly worded to make it clear that

5     no provision in this EM agreement or in any schedule, including

6     any attachment thereto, shall confer upon any person, other

7     than the signatories hereto, any rights or remedies with

8     respect to -- I'll skip other terms that are irrelevant,

9     benefits of any persons.

10          Similarly, with the last clause of Section 9.05,

11     paragraph 14 also has a proviso giving certain third parties

12     rights notwithstanding the foregoing language.  It says,

13     provided that any rights to be provided under the Delphi

14     employee benefit plans or their successors, pursuant to this EM

15     agreement and the attached schedule, shall be enforceable by

16     the participants thereunder.  Again, if GM and Delphi

17     included -- or intended, excuse me, to exempt Lightsource from

18     the reach of paragraph 14, they knew how to do it since they

19     did it in the last clause of that paragraph for participants in

20     the Delphi employee benefit plans.  Lightsource itself is

21     clearly not a participant in a Delphi benefit plan and

22     therefore would not be exempt from the reach of paragraph 14.

23          It was suggested at oral argument that conceivably

24     Lightsource's employees who are owed by it OPEB guaranteed by

25     GM under the MSA might fit within the proviso to paragraph 14,

83

1    and if in fact Lightsource paid the claims of those

2    participants or those employees, it might be subrogated to

3    them.   To determine whether the plain language of the US

4    Employee -- or Master Employee Separation -- let me get the

5    title right, the US employee matters agreement would support

6    such an argument in any respect, one has to turn to paragraph

7    10.a.   Having read that paragraph, I conclude to the contrary

8    that its plain language actually confirms that the only logical

9    reading of the exception to paragraph 14 excludes Lightsource

10   and its present and former employees or those pursuant to which

11   Lightsource in the LFA agreed to pay OPEB obligations.

12          Paragraph 10.a states Delphi shall pay the

13   liabilities and expenses under the Delphi benefit plans with

14   respect to Delphi employees.   Then it goes on to state, the

15   Delphi benefit plans shall also cover the provision of benefits

16   for employees of divested units which were formerly Delphi

17   operations to the extent that the GM benefit plans cover the

18   provision of benefits for such divested employees as of the

19   effective time.   It then states some exceptions to that, which

20   I believe are, for purposes of this matter, irrelevant.

21          Then it states, to the extent the parties, i.e., GM

22   and Delphi, are unable to arrange with an applicable third

23   party, such as a buyer of a divested unit, for direct payment

24   of benefits or transfer of obligation, Delphi agrees to

25   reimburse GM for any such amounts.

84

1          Reading that language pursuant to its plain terms, it

2     is clear to me that Delphi undertook not to include employees

3     of divested units in the Delphi benefit plans as participants

4     in that plan but rather to cover the provision of benefits to

5     them, that is, cover the payment of their benefits, including

6     OPEB, and that if it could not arrange to do so with an

7     applicable third party, such as a buyer of a divested unit,

8     i.e., Lightsource, for direct payment, it would reimburse GM

9     for any such amounts.

10         It appears clear to me, therefore, that under

11    paragraph 14's proviso, the employees owed OPEB, or former

12    employees, would not be participants, quote, "in the Delphi

13    employee benefit plans", and therefore those former employees

14    of the Delphi division before the spin-off would come within

15    the reach of the no third party beneficiaries paragraph 14.

16    And under the case law that I have described, it's clear that

17    the parties intended, pursuant to that paragraph, with no

18    countervailing intention set forth in the agreement, that,

19    while Delphi would be responsible to GM for making the payments

20    under 10.a, it would not be directly responsible to any third

21    party, including Lightsource or Lightsource's employees.  And

22    consequently, the only party who can, under these

23    circumstances, assert a claim against Delphi is GM, and

24    consequently Lightsource and/or Guide may not do so.

25         For those reasons, I'll grant Delphi's objection to

85

1  the claims filed by Lightsource and Guide.  So, Mr. Lyons, you

2  can submit an order to that effect.

3          MR. LYONS:  Thank you, Your Honor, I will.  I don't

4  think there are any further matters, Your Honor.

5          THE COURT:  Okay, thank you.

6          MR. LYONS:  Thank you.

7          THE COURT:  Let me say, and you've heard it too, that

8  when I give a long bench ruling, I review it.  I review the

9  transcript and I may edit it.  It may become an attachment as

10 edited or I may be satisfied with the ruling itself, but the

11 ruling won't change, just the words in the ruling may change,

12 as frequently happens when you give an oral ruling.  You'd

13 rather -- it reads somewhat differently, and that may be the

14 case here, but the gist of the ruling won't change.

15         MR. LYONS:  Thank you, Your Honor.

16         (Whereupon these proceedings were concluded at 1:13

17 p.m.)

18

19

20

21

22

23

24

25

86

```
 1

 2                         I N D E X

 3

 4                       R U L I N G S

 5    DESCRIPTION                            PAGE    LINE

 6    Debtors' objections to claims filed by   84      25

 7    Lightsource and Guide Corporation granted

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                          516-608-2400

87

1

2                    C E R T I F I C A T I O N

3

4      I Lisa Bar-Leib, court-approved transcriber, certify that the

5      foregoing is a correct transcript from the official electronic

6      sound recording of the proceedings in the above-entitled

7      matter.

8

9                                      January 15, 2008

10     Signature of Transcriber           Date

11

12     Lisa Bar-Leib

13     typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25