1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 05-44482-rdd

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DELPHI CORPORATION,

9

10         Debtor.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              February 26, 2008

19              10:23 AM

20

21    B E F O R E:

22    HON. ROBERT D. DRAIN

23    U.S. BANKRUPTCY JUDGE

24

25

2

1   HEARING re motion to authorize expedited motion under 11 U.S.C.

2   Section 363 and Fed. R. Bankr. R. 9019 for order authorizing

3   debtors' performance under modified pension funding waivers

4   issued by United States Internal Revenue Services and related

5   letters of credit issued by Delphi Corporation to Pension

6   Benefit Guaranty Corporation  (related document(s)[10726],

7   [8117]) filed by John Wm. Butler, Jr., on behalf of Delphi

8   Corporation.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Pnina Eilberg

3

1

2

3    A P P E A R A N C E S :

4    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

5         Attorneys for Debtors

6         333 West Wacker Drive

7         Chicago, IL 60606

8

9    BY:   JOHN WM. BUTLER, JR., ESQ.

10

11

12    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

13         Attorneys for Debtors

14         Four Times Square

15         New York, NY 10036

16

17    BY:   KAYALYN A. MARAFIOTI, ESQ.

18         ADLAI S. HARDIN, III, ESQ.

19

20

21

22

23

24

25

4

```
 1    DREIER LLP

 2          Attorneys for Nine Counterparties

 3          499 Park Avenue

 4          New York, NY 10022

 5

 6    BY:   ANTHONY B. STUMBO, ESQ.

 7          IRA S. SACKS, ESQ.

 8          MAURA I. RUSSELL, ESQ.

 9

10

11    MORRITT, HOCK, HAMROFF & HOROWITZ, LLP

12          Attorneys for Robin Industries

13          400 Garden City Plaza

14          Garden City, NY 11530

15

16    BY:   LESLIE A. BERKOFF, ESQ.

17

18

19    MCDERMOTT WILL & EMERY LLP

20          Attorneys for Temic/Motorola

21          340 Madison Avenue

22          New York, NY 10173

23

24    BY:   JAMES M. SULLIVAN, ESQ.

25
```

```
                                                              5

1    RICHARDS KIBBE & ORBE LLP

2         Attorneys for Blue Angel Claims LLC & Midtown Claims LLC

3         One World Financial Center

4         New York, NY 10281

5

6    BY:   KEITH N. SAMBUR, ESQ.

7

8

9    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

10        Attorneys for ASM, Argo & Contrarian

11        1633 Broadway

12        New York, NY 10019

13

14   BY:   ADAM L. SHIFF, ESQ.

15         DANIEL N. ZINMAN, ESQ.

16

17

18   TOGUT SEGAL & SEGAL, LLP

19        Attorneys for Creditors' Committee

20        One Penn Plaza

21        New York, New York 10119

22

23   BY:   NEIL BERGER, ESQ.

24

25
```

6

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Okay.  Delphi Corporation.
 3              MR. BUTLER:  Your Honor, good morning.  Jack Butler,
 4     Kayalyn Marafioti and Ron Meisler on behalf of -- from Skadden
 5     Arps on behalf of Delphi Corporation for a continuation of a
 6     matter from the omnibus hearing last week and two other matters
 7     that are set forth on a non-omnibus hearing agenda that's been
 8     filed by the Court.  And we'd like to take the matters in the
 9     order on the agenda.
10              THE COURT:  Okay.  That's fine.
11              MR. BUTLER:  Your Honor.  Matter number one on the
12     agenda for today is the debtor's expedited motion dealing with
13     approval of the IRS pension funding waiver motion extension.
14     This is filed at docket number 15856.  This is, Your Honor, a
15     continuation of matters that have been before the Court on --
16     two prior occasions we've been before Your Honor dealing with
17     funding waivers involving the internal revenue service and the
18     Pension Benefit Guaranty Corporation.
19              On those two earlier occasions first, on May 31,
20     2007, at docket number 8117 and secondly at October 27th of
21     last year at docket number 10726, Your Honor has approved
22     transactions by the debtors in which we entered into with the
23     IRS and the PBGC for funding waivers.
24              We're back before Your Honor today, pursuant to an
25     order to show cause that Your Honor signed yesterday at docket
```

7

1    number 12865 that was consented to by counsel to the creditors'

2    committee for this special hearing on an additional extension

3    through March 31st of those waivers.

4            To be clear, Your Honor, we have reached agreement

5    with the PBGC under the terms under which they will recommend

6    to the IRS that the formal waivers be granted.  As I think Your

7    Honor's aware, it is the Internal Revenue Service that has the

8    exclusive authority to actually issue the formal pension

9    funding waivers.  We are not in receipt of those waivers yet.

10   We anticipate that they'll be received tomorrow or Thursday.

11   We have no indication or expectation that they will not be

12   issued, based on the recommendations made to the IRS by the

13   PBGC, who I believe is participating by telephonic -- in a

14   telephonic conference this morning.

15           The terms under which these would be extended, from

16   February 29th through March 31st is that the debtors would

17   extend the letters of credit previously provided to the PBGC

18   from March 15, 2008 through and including April 15, 2008.  And

19   that we would increase the aggregate amount outstanding, under

20   those letters of credit, by ten million dollars.

21           THE COURT:  And the -- and the trigger for drawing a

22   letter of credit is the -- is what?

23           MR. BUTLER:  Is it would be the expiration of the

24   waiver without the plan being consummated.

25           THE COURT:  Okay.

8

1           MR. BUTLER:  And, Your Honor, we -- I wanted to say

2    on this record that the debtors are very appreciative of the

3    continued support of the government in eliminating this event

4    risk that otherwise would have occurred on February 29th that

5    would have made it very difficult to consummate the plan.  And

6    when I say eliminated, we've eliminated it for the month of

7    February.  It moves forward to the March 31 time frame.  The

8    debtors have previously said publicly that they intend to

9    emerge from Chapter 11 by the end of the first quarter.  That

10   continues to be our target and goal and we are taking the steps

11   necessary, in the debtors' belief to actually effectuate that

12   emergence.  So our hope is that we won't need to be back here

13   for further waiver discussions involving the PBGC if we're able

14   to consummate the plan over the next forty days or so.

15           Your Honor, this was done on expedited notice but as

16   I think Your Honor's aware from last week's chambers conference

17   we have consulted with both our statutory committees pretty

18   carefully in connection with General Motors, with the plan

19   investors.  I don't think any of the principal stakeholders

20   have any objection to the relief that we're seeking today.

21           THE COURT:  Okay.  Does anyone want to speak to this

22   motion?  All right.  I will grant the motion.  First, as to

23   notice, the significance of the termination date for the

24   present waiver, February 29th, was obvious to everyone in this

25   case.  And I think it was obvious to everyone in this case that

9

1   the debtor would be working on a potential extension.

2   Certainly, as you alluded to Mr. Butler, the principal

3   stakeholders and parties in interest in the case were aware of

4   those discussions with the PBGC and the Court was made aware of

5   them in your -- in the chambers conference room last week.

6   I've concluded, therefore, that the notice was proper.

7           Secondly, the price for the waiver, to my mind, is

8   appropriate in light of the limited duration of the waiver and

9   I think that's born out by the fact that the committees and GM

10  have not raised any objection.  But it strikes me as an

11  appropriate price and is in the best interest of the debtors

12  and their estates and creditors and shareholders.  And I note

13  that the PGBC has acted swiftly and, I think, in a very

14  sophisticated way and that, again, the agreement reached is

15  fair and reasonable.  So I'll approve it.

16          MR. BUTLER:  Thank you very much, Your Honor.

17  Your Honor, the remaining two items on the agenda relate to

18  the -- to the cure notices.

19          THE COURT:  Let me just say, you mentioned, and I

20  believe that this is the case, that counsel for the PBGC is on

21  the phone, Ms. Segal?

22          MS. SEGAL:  Hello.

23          THE COURT:  Yes.  You needn't stay on.  If you want

24  to you certainly can but the rest of this hearing won't involve

25  your matter.

10

1        MS. SEGAL:  Okay.  We will drop off.  Thank you.

2        THE COURT:  Okay.  Thank you.

3        MS. SEGAL:  Bye.

4        THE COURT:  Bye.

5        MR. BUTLER:  Your Honor, matter number two on the

6    agenda is the non-conforming cure notice motion filed at docket

7    number 12615 that was the subject of an extensive contested

8    hearing last week, and this is the continuation of that hearing

9    and I'll address that in just a moment.

10        There is, also, matter number three on agenda is the

11   Temic Automotive motion for an order extending time to elect at

12   docket number 12827.  Your Honor, indicated they could file

13   that motion by the close of business on Friday.  The debtors

14   did not object to that.  They did file -- we filed our response

15   and Mr. Berger will be representing the debtors in connection

16   with that matter when we get to it.

17        With respect to the motion to strike non-conforming

18   cure notices, Your Honor, you may recall that when we were here

19   last week we indicated that there were 314 cure amount notices

20   that were subject to the motion to strike.  A hundred and

21   sixty-eight of those notices were the subject of specific

22   objections and I went through them in some detail during the

23   contested hearing last week.  A hundred and forty-six of those

24   notices were not contested and therefore those have been

25   included on Exhibit A to the proposed order disposing of -- of

11

1    the portion of the hearing that was dealt with last week, that

2    we've presented to chambers and circulated to the parties.

3         Of the 168 notices that were the subject of the

4    contested hearing, Your Honor gave guidance to the debtors and

5    the parties after hearing argument in the contested hearing.

6    And based on the evidentiary record that was completed last

7    week, that the debtors should review the notices and accept

8    those notices that met certain guidelines that Your Honor

9    placed on the record last week.

10        We have done that -- completed that review and there

11   are an additional fifty-nine notices that were previously

12   contested that we have now withdrawn our objection to, in

13   accordance with Your Honor's guidance, and those are included

14   on Exhibit B to the proposed order.  And those will be -- and

15   the order provides that we will honor those and we're

16   authorized to honor those notices as submitted, notwithstanding

17   the fact that they may have not strictly conformed to the

18   solicitation procedures order or prior rulings of the Court.

19        That left 109 notices.  The 109 notices that are

20   still the subject of this contested hearing are, in every

21   instance, notices that were executed by someone other than the

22   contract counterparty and for which there was no evidence of

23   authority by that counterparty to sign for the -- for the third

24   party to sign the notice provided to the debtors and filed with

25   the claims agent by January 14, 2008.  And that, Your Honor,

1    was three days after the deadline.  You had indicated in your

2    guidance last week that you would presume that anything that

3    was received within twenty-four hours, that would be on January

4    12th vis-a-vis the January 11th timeline.  Our deadline was,

5    presumptively, acceptable under Pioneer.  And then later in one

6    of your -- in the colloquy on the record, you mentioned the

7    January 14th date, Monday, to actually have gotten that

8    documentation.  So we presumed, for purposes of our analysis,

9    that anything we received by Monday, January 14, 2008 in which

10   there was evidence of an authority to act, pursuant to a

11   separate agreement, we did not require it be notarized.  We did

12   not -- we listened to each of the items Your Honor indicated.

13          So as to these 109 notices, another way of saying

14   them, Your Honor, is if we were looking at them on

15   January 12th -- excuse me on January 15th -- on Tuesday the

16   15th of January, we would be looking at 109 notices signed by

17   someone other than the counterparty for which there was no

18   evidence of authority for that party to have signed them and

19   that's what's the subject of this particular hearing.

20          We have -- and all of those are listed on Appendix C

21   to the proposed order.  So at least, Your Honor, as we talked

22   about on the record last week, our intention had been to

23   present this order to you for entry and that we dispose of,

24   essentially, all of the matters we dealt with last week and

25   preserves, pursuant to the order 109 notices for a Pioneer type

13

1    hearing today.  The evidentiary record on this matter was

2    closed last week, at the time of the hearing.  I think you're

3    going to hear today that there are some parties that have gone

4    out and obtained some new evidence and may want to try to --

5    and new affidavits and may want to try to introduce them.  And

6    we can deal with them as those parties seek to do that.

7            But, Your Honor, we would like to -- I'll make one

8    other comment about this, by the way.  For clarity of the

9    record we talked about -- in the fifty-nine that are in

10   Exhibit B that we have accepted, we had talked about those

11   constituting -- including -- being inclusive of what was viewed

12   as, sort of, last week in the record the seventeen pure

13   parties.  Pure -- we called them pure counterparties.  They

14   were the seventeen counterparties which had various problems

15   associated with their filing.  But both the objection was filed

16   by the counterparty and the notice was filed by the

17   counterparty.  And Your Honor may recall that we agreed and

18   Your Honor guided us to accept those notices and -- including

19   accepting the watermark signature -- signatures on the

20   watermarks and other things as it relates to those parties.

21           When we went back and examined them, over the

22   weekend, and went through all the notices, it turns out that

23   four of those seventeen turned out not to be actually part of

24   that pure group.  Four of those notices, in fact, were not

25   signed by counterparties they were signed by claims traders.

1    So the Methode notices at docket -- which were objections

2    number 12696 and 12710, that notice was actually signed by a

3    representative of Blue Angel.  Schaffer, at docket number 12712

4    was signed by a representative of Contrarian.  And Robin

5    Industries, at 12684, was signed by a representative of Silver

6    Point not by the counterparties.  So they -- those are included

7    within the 109 today.  There was no evidence about that.  They

8    weren't -- I just want to make clear on the record that we

9    maintain the principal that the so-called, you know, pure

10   objections -- a counterparty who had signed the notices.  Maybe

11   they were non-conforming and timely filed objections, Your

12   Honor had, essentially, guided us to accept those.  We did

13   that.  It turned out there were thirteen of those, not

14   seventeen.

15           THE COURT:  Okay.  Let me just ask you a couple of

16   questions.  I -- I didn't see these -- this on the exhibit and

17   I just wanted to focus on it.  Clarion Corporation, are they --

18   have you resolved matters with them or are they --

19           MR. BUTLER:  Yes.  Yes, Clarion's resolved.

20           THE COURT:  Clarion's resolved.  Okay.  And at last

21   week's hearing ASM was represented to have -- in -- in respect

22   of at least most of the cure notices, have filed one with an

23   executed letter agreement from the original contract party, the

24   counterparty.  So --

25           MR. BUTLER:  Your Honor, those that were -- those

15

1  that had those agreements we accepted and those who didn't, we

2  did not.

3          THE COURT:  Okay.  So the ASMs that appear on the --

4  the chart are -- you -- you've broken out those two groups?

5          MR. BUTLER:  Correct.

6          THE COURT:  Okay.  So that where there was an

7  indication of a counterparties authorization filed with the --

8  with the cure notice within the time frame --

9          MR. BUTLER:  Correct.  So, for example, ASM provided

10  some purported evidence of authority on January 17th.

11          THE COURT:  Right.

12          MR. BUTLER:  That was six days after the deadline and

13  three days after the presumptive deadline you gave us, so we

14  did not accept those.  That's part of the 109.

15          THE COURT:  But if it came in -- they said it came

16  in, I guess, on Monday or Sunday.

17          MR. BUTLER:  If we had it on the 14th -- anything we

18  had by January 14th was accepted.

19          THE COURT:  Okay.

20          MR. BUTLER:  The bright line we drew, Your Honor,

21  based on all the guidance you gave us was, we accepted

22  everything except those notices for which the counterparty did

23  not sign and we did not have evidence of a third party's right

24  to sign provided to us by Monday the 14th.

25          THE COURT:  Okay.

16

1          MR. BUTLER:  That was the -- that was, in our mind,

2     the clear bright line.  And that left 109 notices for people to

3     come here today and try to convince you that something after

4     the 14th or some other basis --

5          THE COURT:  Right.

6          MR. BUTLER:  -- was acceptable.

7          THE COURT:  All right.  So, in some, then, you've --

8     or the debtors have done their due diligence on the facts as to

9     what fit within my guidance from last Thursday and what didn't.

10          MR. BUTLER:  Correct.

11          THE COURT:  And your charts on the proposed order

12     reflect that due diligence?

13          MR. BUTLER:  They do, Your Honor.  And there are only

14     eleven objections left.  Ten of them that we objected to.  And

15     that would be -- I already talked about Robin Industries and

16     Methode.  The Midtown Claims LLC objection at docket

17     number 12708 remains outstanding.  Blue Angel, which joined in

18     the Methode one I just talked to you about earlier, remains

19     outstanding.  Schaffer Canada I already spoke to you about,

20     remains outstanding.  There was some ARGO Partners claim

21     notices at docket number 12719 that remain outstanding.

22          There are certain objections of Silver Point at

23     docket number 12721 that remain outstanding.  Most of them have

24     been accepted now but there are some that remain outstanding.

25     The ASM Capital notices that did not comply, as we've just

17

1    described, at docket number 12723 remain outstanding.  And

2    certain notices with Contrarian Funds at 12724 remain

3    outstanding.

4         Those ten objections are the only objections that

5    remain outstanding that have not otherwise been dealt with.

6    And then there is the Temic Automotive one, objection number

7    12722 which really wasn't an objection because we didn't seek

8    any relief against them.  And that was expressed in the motion

9    that is on the docket that Mr. Berger's going to be dealing

10   with separately at agenda item number 3.

11        THE COURT:  All right.  Well, let's deal with that

12   one at the end and let me -- let me hear from the parties on

13   the list of ten.

14        MR. BUTLER:  So, Your Honor, with respect to just

15   this order we would move to have the order, Your Honor enter

16   this order which deals with last week's hearing understanding

17   that that means that there's 109 to be dealt with in a separate

18   order today.

19        THE COURT:  Okay.

20        MR. SACKS:  Good morning, Your Honor.  Ira Sacks from

21   Dreier representing now nine specific remaining counterparties.

22   Eight that had their notices executed by Silver Point under the

23   assignment of claim and one which was executed by McDermott

24   Will as attorney in fact.

25        All of those, and it is correct that none of those

18

1    had attached at the time, before January 14th, evidence of

2    authority.  And we do reserve the arguments we made last week

3    as to why that wasn't necessary.

4            This has, however, as counsel referred to reduced the

5    amount that is still in dispute with respect to our clients

6    from over 15.3 million down to about 2.15 million.

7            All of these non-objections that were -- of these

8    nine notices that were sent in were objections to the cure

9    amount.  None of them, therefore, made an effective cash versus

10   plan consideration election.  And I think that's important,

11   Your Honor, with respect to the pioneer issue because we

12   submit, at least, with respect to that that there's absolutely,

13   to this date, no prejudice to the debtors.  And with respect to

14   all of these nine, on February 14 or 15, a fully executed, what

15   we called last week, ratification power of attorney was

16   executed ratifying the notices effective back to January 11th.

17   And that was done as soon as these parties learned that there

18   was some issue which was right after the motion that the

19   debtors made on February 11th.

20           Your Honor, we don't believe that the issue really is

21   a Pioneer issue.  We think the issue is a ratification issue.

22   And -- and we think that the ratification that has been

23   submitted on February 14 and 15 should be effective for the

24   reasons that we set forth in our prior papers.  We have, as

25   counsel did refer to, in connection with the Pioneer aspect of

1    this, because we didn't do this as a Pioneer issue, submitted

2    eight very brief declarations that were filed last night.  I

3    don't actually think they're necessary with respect to

4    considering the Pioneer issue but each of them does explain

5    that each of the -- that eight of the nine counterparties, the

6    ones that Silver Point signed on behalf of, believe that since

7    the only issue was objecting to the cure amount, that that was

8    an amount issue where they had ceded authority to Silver Point

9    under the assignment of claim.  I know Your Honor has ruled

10   differently about that but with respect to the Pioneer issue.

11        The -- doing that was in good faith.  It explains the

12   reason why they waited until somebody told them they were wrong

13   to fix it.  And -- and we do believe that, particularly since

14   the only issue was the cure amount, that both the original

15   election signed by Silver Point or by McDermott Will as

16   attorney in fact, were effective, number one.  And number two,

17   in the absence of demonstrated prejudice to the debtors, up to

18   this very moment or surely up to February 14 or 15 when the

19   ratification powers of attorney were submitted, that that

20   passes muster under Pioneer.

21        Your Honor, we also have some specific comments on

22   the form of order.  Does Your Honor want to hear those now or

23   do you want to hold those till after?

24        THE COURT:  No, I'll hear them now.

25        MR. SACKS:  Okay.  With respect to paragraph 8 of the

1    order, which -- which deals with the striking of duplicate

2    notices, we don't have a problem with real duplicate notices

3    being stricken but the way this is phrased it says if that

4    there's more than one cure notice with respect to a particular

5    purchase order or a similar contract or lease.  Well, with

6    respect to many of the assumable contracts or leases there are

7    numerous purchase orders listed.  As long as we're not talking

8    about striking something that isn't a true duplicate we don't

9    have a problem.  But I think the way it's phrased, you could

10   wind up with purchase orders under a single assumable contract

11   which are multiple and legitimately multiple and scheduled by

12   the debtors as multiple, being stricken and we think that at

13   least that language needs to be clarified.  The concept we

14   don't object to.

15          With respect to paragraph 10 of the proposed order,

16   Your Honor, in the even that there is something that our

17   clients will want to appeal, although we don't have a

18   particular problem with the substance of paragraph 10, we would

19   want at least that paragraph of this order subject to a stay

20   pending appeal so that our appeal rights aren't mooted by the

21   rights offering.

22          And that's all we had, Your Honor.

23          MR. BUTLER:  Your Honor, I mean, as appears in number

24   8, I mean, it is only that authority that is only for things

25   that are duplicate and the notices -- the purchase orders were

21

1    all bunched on the notices, the cure notices.  This wouldn't be

2    an opportunity for us to be able to strike individual purchase

3    orders.

4         MR. SACKS:  We were just concerned --

5         MR. BUTLER:  That's not what it says and that's not

6    what we would do.

7         MR. SACKS:  We were just concerned with the phrasing

8    of the or in the -- in that sentence.  I'm not suggesting that

9    the debtors were trying to do something untoward, I'm only

10   suggesting that it was open to such an interpretation and we'd

11   like the language fixed.

12        MR. BUTLER:  In our view the language says what it

13   says and it clearly talks about duplicates.  It's not -- it's a

14   duplicate -- the authority goes to strike duplicates.  It

15   doesn't say we can go strike purchase orders.

16        THE COURT:  Well, if it's an assumable contract with

17   multiple purchase orders it would include all the purchase

18   orders under the contract because you can't assume, in part --

19        MR. BUTLER:  Right.  I mean, that's --

20        THE COURT:  I -- I think it's clear.

21        MR. SACKS:  All right.  With that explanation on it,

22   that's fine.

23        THE COURT:  Okay.  On the other point -- I don't

24   understand, if your clients haven't made an election why does

25   ten even matter, as far as a stay pending appeal?

22

1          MR. SACKS:  Your Honor, if the -- if the notices are

2     rejected, that has the effect of being forced into the plan

3     consideration basket.  If the notice is effective, I'm not

4     going to have anything to appeal.  But if the cure notice that

5     we submitted is deemed to be improperly submitted, then we've

6     waived the right to object, as I understand the notice and

7     what's on the notice and the procedure, we've waived the right

8     to object to the cure amount and we get plain consideration.

9     And that's why paragraph ten has an impact on us.

10          MR. BUTLER:  This whole exercise has been about

11     paragraph 10, Your Honor.  We need to have a final

12     determination in order to be able to execute the rights

13     offering.

14          THE COURT:  When you say -- I'm still going to back

15     to your statement that your clients didn't elect cash on the

16     form.

17          MR. SACKS:  We weren't -- the form said that if

18     you're objecting to the cure amount skip the election and go to

19     part 3.  But the form also -- which -- which is why you never

20     get to the issue of whether you're electing cash or plain

21     consideration, according to the very form we filled out.

22          THE COURT:  Okay.

23          MR. SACKS:  Thank you, Your Honor.

24          MR. BUTLER:  Your Honor, I just -- I just want the

25     record, if I may --

23

1        THE COURT:  I'm just going to -- I mean, I appreciate

2   we had a fairly lengthy argument on the distinctions that I

3   made last week but doesn't the point you just made highlight

4   why those distinctions are important and why this is really

5   governed by 365 as opposed to 3001?

6        MR. SACKS:  Your Honor, it's for purposes of today,

7   you know, while preserving the arguments that we made last

8   time, we're assuming that it's governed by 365.  But we do

9   think, in terms of the Pioneer factors which are the reasons

10  for the delay and the good faith of the purchases, those good

11  faith with contract counterparties -- those people believe that

12  since this only dealt with cure amount and -- that that was

13  something that they had delegated and assigned by -- as

14  attorney in fact and as agent to Silver Point to sign.

15       MR. BUTLER:  Those were non-deligable under the

16  solicitation procedures order.

17       THE COURT:  Well that --

18       MR. BUTLER:  The notices sent to them were very clear

19  they needed to make those decisions.  It didn't say call up

20  your friendly claims trader.

21       MR. SACKS:  Your Honor, I understand that that's what

22  Your Honor has ruled and I understand that that's what --

23       THE COURT:  No, but it goes to the Pioneer point too,

24  which is why didn't they get it?  Why didn't they understand

25  the notice?

24

1          MR. SACKS:  Your Honor, you know, it's -- it's

2    different people -- many people have read that notice the wrong

3    way.  And -- and I'm not -- and that -- and I think the fact of

4    that and the number of objections speak to that, Your Honor.

5    The number of contract counterparties that read it wrong speak

6    to that.  And we have submitted eight declarations on the

7    subject.  They're very brief.  We think they will --

8          THE COURT:  Are the declarants here?

9          MR. SACKS:  No, they're not, Your Honor.

10          THE COURT:  All right.  They're all worded exactly

11    the same?

12          MR. SACKS:  They were slightly different.  They were

13    close to the same.

14          THE COURT:  They have different -- different names

15    for the counterparties.

16          MR. SACKS:  No, they -- some of them were changed,

17    some of them slightly and some of the more.

18          THE COURT:  Okay.

19          MR. BUTLER:  Your Honor, the only other point I

20    wanted to make clear so the record's clear on this is, counsel

21    made a good point about how you skip on the form if you object

22    to the cure amount to step 3.  And the reason for that is,

23    under the procedures, if somebody objects to the cure amount

24    the default payment -- form of payment for that is cash.

25          THE COURT:  Right.

25

1      MR. BUTLER:  It's not that they're being -- so all

2   the people -- so to the extent that a claims purchaser decided

3   to check a box that disputed the claim amount, by doing that it

4   automatically was a cash election.  And I just want to be

5   clear -- the record's clear on that.  It's not that there was a

6   process skipped and the reason for that, obviously, is because

7   if someone's disputing a claim amount we can, for purposes of

8   the -- of plan currency be able to sort out the rights offering

9   calculations that need to be made here.  And it's for that same

10   reason that paragraph 10 is so important to the debtors.

11      THE COURT:  Okay.

12      MR. ZINMAN:  Good morning, Your Honor.

13   Daniel Zinman, Kasowitz Benson Torres & Friedman for ASM, Argo

14   and Contrarian.  I'll start with ASM if that's all right,

15   Your Honor.

16      THE COURT:  Sure.

17      MR. ZINMAN:  The debtors, earlier, stated that with

18   respect to each of the letters and conformed signature

19   originals.  If you might recall, ASM obtained a letter from

20   numerous of its transferors indicating that ASM had the

21   authority and also obtained a countersignature, essentially,

22   next to theirs on a copy of the original with the bar code.

23      With respect to that package that was sent by e-mail

24   on the 11th and received on Monday the 14th of January, the

25   debtors stated that they are recognizing them.  I think that is

26

1    not completely accurate with respect to three specific assignee

2    transferors.  And they are specifically WXP Inc, where the cure

3    amount, I believe, is approximately 542,000 dollars.  Westbrook

4    Manufacturing, Inc., with a cure amount of approximately 23,355

5    dollars and Viking Plastics with a cure amount of just over

6    1,000.  Each of those are attached to Exhibit D to the

7    declaration of Mr. Wolfe, who is in the courtroom if there's

8    any questions, and those were actually sent in on the 11th.

9            I might also add --

10           THE COURT:  Well, let's cover -- is that right?

11           MR. BUTLER:  We're trying to check, Your Honor.

12           THE COURT:  Okay.  All right.

13           MR. ZINMAN:  And for the record, I -- I stand

14    corrected.  Viking Plastic is 15,000, I apologize.  But, at any

15    rate, the -- I did try to raise this with the debtors last

16    night with one of their colleagues.  Perhaps, you know, there's

17    a short time period between when we received --

18           MR. BUTLER:  Your Honor, we've actually looked, we

19    don't have the evidence he's suggesting so we can look at those

20    three in the recess.  Again, we don't have the evidence he's

21    suggesting.

22           MR. ZINMAN:  I'm happy to show it to them at a

23    recess, Your Honor.

24           THE COURT:  Okay.

25           MR. ZINMAN:  We can deal with that separately.  And

27

1    there was also one that we had thought was in the motion, I

2    guess we can deal with this in a recess as well, that didn't

3    appear to be on any of the schedules to the exhibits to the

4    order.  And that would be Syn-Tech Limited.  We think there are

5    two claims by Syn-Tech Limited one of which is listed on

6    Exhibit B one of which is not but I'm happy to address that

7    separately and we'll come back if necessary.

8              THE COURT:  Well, but you have a cure notice for

9    both?

10             MR. ZINMAN:  Yes, Your Honor.

11             THE COURT:  Both purchase orders or whatever?

12             MR. ZINMAN:  Yes, Your Honor.  I think part of the

13   confusion might have been the name because the letter makes

14   clear that Viking Plastic -- that Syn-Tech changed its name and

15   has an FKA in the letter.

16             THE COURT:  Okay.

17             MR. ZINMAN:  And I'm not sure that they signed it in

18   that fashion.

19             THE COURT:  All right.  But -- but you're saying that

20   with regard to those four, you have documents that show the

21   submission not only by ASM within the applicable time frame but

22   also a letter or direction that was also submitted during that

23   period by the counterparty?

24             MR. ZINMAN:  Correct, Your Honor.

25             THE COURT:  Okay.

1          MR. ZINMAN:  Now, there are another fifteen

2     transferors, counting by transferor or cure claim that were

3     received by ASM on the 16th and sent out by express mail for

4     receipt by KCC on January 17th.  And there is also two others

5     that were received on January 22nd and January 23rd.  And it's

6     those that I'd like to address briefly.

7          The Pioneer case defines neglect as saying -- the

8     Supreme Court said it encompasses both simple, faultless

9     submissions to act, more commonly omissions caused by

10    carelessness.  And by excluding -- by including excusable

11    neglect in Rule 2006 the Court said, "Congress plainly

12    contemplated that the Courts would be permitted, where

13    appropriate, to accept late filings caused by inadvertence,

14    mistake or carelessness as well as by intervening circumstances

15    beyond the party's control."  That's at 507 U.S. at 388.

16         Your Honor, in the Pioneer case there was a late

17    filed proof of claim.  And the excuse given by the --

18    essentially by the party is advice of counsel.  And the excuse

19    given by counsel was, well it was buried in the 341 notice

20    instead of the separate bar date notice so we didn't see it,

21    essentially.  And the Supreme Court said, that constituted

22    excusable neglect.  And as I'm about to discuss, given that

23    standard, I think that ASM, certainly with respect to the

24    fifteen received on January 17 and perhaps with respect to the

25    other two later would fall within that -- would certainly fall

1    within excusable neglect.

2         The procedure -- the Supreme Court said that it was

3    significant that the notice of the bar date provided by the

4    Bankruptcy Court in this case was outside the ordinary course

5    in bankruptcy cases.  I think it's safe to say -- I think it's

6    safe to say that this is pretty -- this cure notice process is

7    pretty unusual.  The election itself is unusual.  There's, kind

8    of, a default settlement, if you don't submit something you

9    default to stock, that seems pretty unusual.  The fact that the

10   stock has a materially less value than the cash, if the stock

11   was worth what the cash was worth we wouldn't be here.

12        The non-existence of any cases on 365 versus 3001(e)

13   and transfer agreements, I know Your Honor has ruled on that,

14   but in terms of just thinking about Pioneer you think about

15   what did -- the reasonableness of what the parties did at the

16   time.  ItÆs not like there's a whole body of case law like

17   there would be, for example, with late filed proofs of claim.

18        The fact that the solicitation procedures order does

19   not specifically address whether counterparty can chose to

20   authorize another on its behalf, nor the issue of the need to

21   provide the authorization, right?

22        THE COURT:  Well, let's just stop on that.  First of

23   all, when was the motion for the solicitation procedures

24   served?

25        MR. ZINMAN:  I believe -- actually I have no idea.  I

30

1    defer to debtors' counsel.  Was it September?

2          MR. BUTLER:  No it was served in -- yes, September,

3    the beginning of September.

4          THE COURT:  Okay.

5          MR. BUTLER:  Of 2007.

6          THE COURT:  You've read that motion, right?

7          MR. ZINMAN:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MR. ZINMAN:  Your Honor, to address -

10          THE COURT:  And you read the statement that -- in the

11   order that claims purchaser shall have no rights or recourse

12   against the debtor with respect to the cure?

13         MR. ZINMAN:  Yes, Your Honor.  I would submit, Your

14   Honor, that at least with respect to this hearing, ASM has

15   obtained a power of attorney and therefore can act on behalf

16   of --

17         THE COURT:  I'm just talking about confusion.

18   Mr. Shiff didn't seem to be particularly confused when he

19   showed up and argued on -- on the tenth, right?

20         MR. ZINMAN:  That's correct, Your Honor.  If -- if

21   you'll bear with me for a minute, I will address that

22   specifically.  My point was simply that there's no huge body of

23   case law on -- on this question.

24         THE COURT:  Maybe that's why the debtors went and got

25   an order.

31

1        MR. ZINMAN:  Your Honor, the order doesn't, for

2   example, provide that the authority by which someone can act as

3   an attorney in fact, for example, has to be provided with the

4   cure notice.  That's not in there.  So there is some room for

5   some error here.  Again, we're talking about excusable neglect.

6   Clearly, in light of Your Honor's rulings that, you know, one

7   can say that there was error.  The question is whether it's

8   excusable.

9        Now the elements specifically, if we could go through

10  the elements of Pioneer, I think they strongly support ASM's

11  position.  First of all the danger of the prejudice to the

12  debtor.  We're talking about a matter of a few days as to about

13  a million dollars.  Those fifteen that were received on January

14  17th total about a million dollars worth of claims, cure

15  claims.  An amount that, I think it's safe to say, is not

16  material to the debtors.

17       And Your Honor mentioned, at the last hearing, the

18  need for the debtors to prepare for confirmation in light of

19  the timing of all this.  One million in cash versus stock is

20  not an issue that I would think would have affected

21  confirmation one way or the other, feasibility or any other

22  way.  The debtors were, in fact, already on notice.  ASM had

23  provided the debtors with timely signature by ASM on the

24  election notice understanding that Your Honor has ruled that

25  that's not effective.  But the point being that -- and ASM had

32

1    provided the letters for numerous others so it couldn't have

2    come as a great shock that a few others might trickle in.  As

3    to several others, it did take a few days but they, you know --

4    again, the debtors had some -- should have some expectation

5    that they were coming.

6            The other -- another element, the length of the delay

7    and the impact in judicial proceedings.  The letters and

8    countersigned election notices at issue were received by the

9    debtors on January 17th.  The first day of the confirmation

10   hearing, and nearly a week before Your Honor confirmed the plan

11   on the record, the debtors have clearly figured out what claim

12   notices are what and how they apply and to what claims.  And

13   this -- I can't imagine that this could ever delay emergence.

14   Of course we still don't know -- parenthetically I might add we

15   don't know whether -- when and if emergence will happen.

16           Now, another one is the reason for the delay and that

17   gets to the heart of what Your Honor was questioning earlier.

18   And if -- a moment, I just want to go through some -- a few

19   facts quickly as to -- to try and explain that ASM took every

20   reasonable step that it could come up with to satisfy what was

21   required here based on its read of the situation.

22           On January 2nd or 3rd, ASM sent a letter to all of

23   their counterparties asking their counterparties to contact or

24   the transferors to contact ASM immediately if they receive or

25   have already received an election notice.  On January 4, which

33

1    is a Friday a week before the deadline, late in the evening,

2    after several weeks of requesting this firm, my firm, finally

3    received a list of what notices were sent to whom.

4           On January 7, the following Monday, ASM immediately

5    began contacting each of its applicable transferors to try and

6    obtain those notices and have them executed in what it thought

7    was proper.  At this point, ASM believed that it had the right

8    to execute the cure notices based on the transfer agreements

9    that it had.  In fact the fact that ASM got the original

10   notices with the bar code from the debtors' counterparties does

11   suggest that at least the counterparties agreed that ASM had

12   that authority.  And in at least two instances the

13   counterparties insisted that they could not, under the

14   agreement, had no right and refused to execute the original

15   notices.

16          THE COURT:  Where is that in the record?

17          MR. ZINMAN:  I think that is in the declaration, Your

18   Honor, and it was in a footnote, if you'll bear with me one

19   moment.  It's footnote number 2 and it refers to Fuji Bank

20   Fukoku South, that's -- as one company and Sigman Cohen Corp.

21   (ph.).  There was no case or ruling from this Court at that

22   point that would suggest that ASM's signature, as assignee of

23   the cure claim, with the transferor's consent would not be

24   enforceable.  There's no ruling, there's no --

25          THE COURT:  When did the motion to amend the order

34

1    start being prepared?

2            MR. ZINMAN:  It was about -- it was about at this

3    time when once -- at this point, when ASM realized that they

4    would have trouble getting all of the forms in on time that we

5    realized that we needed more time to get that done and that's

6    why the motion was filed, not just on behalf of ASM but

7    obviously on behalf of several others.

8            The primary purpose, the number one purpose was to

9    obtain more time to get it done.  We also asked for other

10   relief but that was --

11           THE COURT:  Including the ability to sign the form

12   themselves.

13           MR. ZINMAN:  Correct, Your Honor.  When Your Honor

14   ruled that that was not -- that that wasn't going to work, at

15   that hearing, and didn't give us extra time ASM, that evening,

16   immediately formulated the letter and sent it out and got a

17   lot, frankly, within one day to be able to send -- within

18   twenty-four hours wrote the letter, drafted it, got twenty or

19   twenty-one parties to sign it.  Several others just took more

20   time.  They may not have been available that day.  They may

21   have needed to get internal approval within their company

22   which, for some large companies, I'm sure we're all aware,

23   sometimes takes a few days.

24           And ASM acted with as much haste as was possible to

25   get as many of these in as quickly as possible.  Given the

35

1   foregoing --

2          THE COURT:  I just -- could we go back to something?

3          MR. ZINMAN:  Sure.

4          THE COURT:  Where is the order confusing?

5          MR. ZINMAN:  Your Honor, it says that the

6   counterparty must sign.  It does not say the counterparty

7   cannot delegate or assign the authority to assign on it's

8   behalf to another.  I mean, we've all --

9          THE COURT:  Why don't we walk through the order?

10          MR. ZINMAN:  I believe, Your Honor, that we would be

11   focusing on paragraph 43 of the order.  The second sentence of

12   paragraph 43 says, "Parties wishing to object to the assumption

13   of their contracts under the terms set forth in the cure amount

14   notice shall be required to return the cure amount notice in

15   accordance with the instructions provided therein so as to be

16   received by the undersigned counsel and the debtors by the

17   deadline."

18          THE COURT:  Okay.  And what's ambiguous about that?

19          MR. ZINMAN:  Well, it says parties wishing to object.

20   It doesn't say that the parties can't act -- I mean we've all,

21   as practicing attorneys, on occasion have signed proofs of

22   claim on behalf of some of our clients.

23          THE COURT:  Well, I imagine if -- if one of the

24   contract parties had their attorney sign on behalf of that

25   party, the debtors would accept it.  This is a little

36

1   different.

2           MR. ZINMAN:  Your Honor, under our agreements, and I

3   understand that -- I'm not trying to re-argue the underlying

4   rule if this goes to --

5           THE COURT:  No, but we're talking about confusion

6   here.  I'm just trying to figure out what was confusing.

7           MR. ZINMAN:  Your Honor, under our agreements both --

8   in each of these cases that we're talking about, both the

9   counterparty, the transferor, and ASM thought that the

10  agreements provided that -- that ASM had that authority to

11  sign -- to fill out the election on their behalf.

12          THE COURT:  But what, in the order, would have led

13  them to -- to believe that?

14          MR. ZINMAN:  I think my point, Your Honor, is there's

15  nothing in the order, specifically, which says that you can't

16  assign the authority.  There's nothing in the order that says

17  that there's no power of -- that powers of attorney have to

18  be -- forms have to be provided, you know, along with the

19  notice form.  And so there was -- so there was some room here,

20  Your Honor to -- I mean, I understand Your Honor has ruled that

21  the order means something different but this is --

22          THE COURT:  Well, I just want you to explain to me,

23  particularly in light of paragraph 44 which does specifically

24  address claims purchases who obviously, in their proof of claim

25  forms, get powers of attorney.

37

1          MR. ZINMAN:  Correct, Your Honor.  But when you --

2     there's a -- it's almost like a different hat that you're

3     wearing.  When you're acting as a claims transferor -- for

4     example, if the claim transferor did not have a power of

5     attorney -- I'm sorry, the claims transferee, the claims

6     trader, did not have the power of attorney and signed on the

7     behalf, that would be one thing.  But in this case they did.

8     And it's -- Your Honor, we are their agent in this respect.

9     And both -- the only person disputing that is not the parties

10    to the underlying agreement but the debtors.  Your Honor, the

11    debtors in their opposition that was filed about a week ago

12    argued that this would, somehow, open the flood gates.

13         THE COURT:  Well, I'm still on this point.  Let's

14    turn to the notice then which is Exhibit O to the order.  The

15    notice was addressed to counterparty, correct, consistent with

16    the order?

17         MR. ZINMAN:  Yes, Your Honor.

18         THE COURT:  Okay.  And doesn't it say you must return

19    this form?

20         MR. ZINMAN:  It doesn't say that the you could not

21    include an agent on your behalf, Your Honor.

22         MR. SAMBUR:  Your Honor, I'm sorry to interrupt.

23    Keith Sambur from Richards Kibbe and Orbe --

24         THE COURT:  No, I'm still going through this.

25         MR. SAMBUR:  No, I just didn't want to leave this

38

 1    point to have to argue --

 2            THE COURT:  No, I'm not -- we're not going to leave

 3    the point.

 4            MR. SAMBUR:  Okay.  Thank you.

 5            THE COURT:  Let's turn to the next notice, the notice

 6    to holders, assignees, transferees and purchasers of claims.

 7    What's ambiguous about this one?

 8            MR. ZINMAN:  Your Honor, it does not -- it doesn't

 9    list it -- there are a lot of -- there's a lot of information

10    that's not in there.  It doesn't list which -- it's a blanket

11    statement that does -- that some claims, we're not telling you

12    which ones, may be subject to cures.  We're not telling you

13    who, what counterparty or what transferor they would be, what

14    purchase order and we're not going to tell you how much.  And

15    it also doesn't seem to specifically address and say that if

16    you are an agent we're not going to respect that.

17            MR. BUTLER:  Your Honor, may I be heard on this

18    point?  For the past week the debtors said, Your Honor, that

19    what we want, fundamentally, from this hearing is guidance and

20    a determination what to do and we'll accept it and move on to

21    the rights offering and that is our primary goal here.  And so,

22    however you rule on these issues we'll implement them.

23            But having said that, this particular line of

24    argument is, you know, extraordinarily distressing to the

25    debtors when it comes from the members of the ad hoc trade

39

1    committee.  The members of the ad hoc trade committee and

2    Mr. Zinman's firm participated in the disclosure statement

3    hearing, were potential objectors, settled with the debtors

4    conclusively on the record of the disclosure statement hearing

5    and approved this order on behalf of all of their clients.

6    This is not a Pioneer type arrangement.  This particular set of

7    objectors appeared, participated in the disclosure statement

8    hearing process where potential objectors negotiated a

9    resolution on behalf of all their clients and agreed to the

10   terms of this order and the notices.  And for them to come in

11   now and say oh, they should say something else or they could

12   have said something else, all right, is, to the debtors,

13   particularly offensive.  I understand parties that didn't do

14   that, but they did.  They were there, they participated and

15   they settled.  And this Court should not permit settling

16   parties who appeared in front of Your Honor, agreed to a

17   document to now come in and attack the very document that they

18   agreed to.  And the reality is that we're here today because

19   the claims trading community chose to ignore Your Honor's

20   order.  They chose to ignore these notices.  They chose to

21   ignore the plain language that says you, as claim traders, will

22   have no rights or recourse against the debtors.  They chose to

23   ignore paragraph 43 and they wanted to do their own thing.

24   Then they came -- then the ad hoc committee, in an act which we

25   thought was, at the time and we told them we thought was

40

1    offensive, brought on an emergency motion in January 10th to

2    again try to attack the thing they had settled about and they

3    lost that hearing.  And Your Honor overruled them on those

4    issues.  And still then they persevered and ignored the order.

5            That's not Pioneer, Your Honor.  That's not excusable

6    neglect.  The fact of the matter is that they have known since

7    September 6th that the debtors had identified these as issues,

8    that we asked Your Honor to address them.  We spent several

9    months in the disclosure statement process and solicitation

10   process.  It culminated an order Your Honor entered on December

11   10th, this order.  They participated in it.  They settled with

12   respect to it.  They should now be held to it, Your Honor.

13           MR. ZINMAN:  Your Honor, if I may be heard on those

14   comments, briefly?

15           THE COURT:  Okay.

16           MR. ZINMAN:  First of all, when we cut our deal it

17   was with -- to stand down on the disclosure statement and the

18   plan it was with the understanding that the debtors would

19   reconcile claims.  We viewed that as including payments made on

20   behalf of or related to claims including cure notices.  Now, I

21   understand Your Honor has ruled that that's not a connection,

22   that 365 is different.  But it was our understanding, at the

23   very least, I mean, Your Honor, if we had received not on Jan -

24   - late on the evening Friday, January 4th, after weeks of

25   asking, the list of the counterparties.  If we had received

41

1    that just a week earlier, we wouldn't be here.

2              MR. BUTLER:  Excuse me.  You know who your own

3    counterparties are.  They're your counterparties; we don't have

4    to tell you who they are.

5              MR. ZINMAN:  Your Honor, further, the accusation that

6    we ignored the order after the 10th is absolutely inaccurate.

7    We -- the evidence shows, at least by Your Honor's rule with

8    respect to seventeen or twenty or whatever the actual number

9    is, that those would be enforceable.  And ASM tried everything

10   it could in the twenty-four hours that were had before --

11   between Your Honor's ruling and the deadline to send something

12   by hand in California, tried everything it could to try and get

13   that done.  There was not sufficient time to have the

14   counterparties ask for a duplicate original, have them sign all

15   the duplicate originals and get them in by hand to KCC by --

16   within twenty-four hours.  We did -- ASM did everything that it

17   could within their -- to try and satisfy the order.

18             THE COURT:  I guess my question is why -- why is it

19   really a twenty-four hour issue.  It seemed pretty obvious to

20   me that all you needed to do was get an authorization from the

21   client -- I'm sorry, from the counterparty.

22             MR. ZINMAN:  Your Honor, that's what we did.  The

23   question is how fast we could get those authorizations?  I

24   mean --

25             THE COURT:  But -- but -- I mean it was --

42

1          MR. ZINMAN:  There was certainly -- there was oral

2     communications in advance of that but, you know, we felt that a

3     written communication would be necessary to satisfy Your Honor

4     and the debtors.

5          MR. BUTLER:  Your Honor --

6          MR. ZINMAN:  And we tried to get those as quickly as

7     possible, as soon as we realized that that was necessary.

8          MR. BUTLER:  Your Honor, the debtors believe that

9     it's patently clear from the order and from the ad hoc

10    committee's participation in this case that at least as the ad

11    hoc committee, and we believe all of these claims purchasers,

12    when this order was entered on December 10th, if they -- if

13    they wanted to keep control of the process and make this

14    argument they were attorney in fact, which frankly, I think,

15    was a high-risk argument to begin with based on the order

16    because it required them coming in and having Your Honor

17    interpret your order to agree that they would get -- it would

18    be more expansive than the actual words.  The words of these

19    notices and the words of the order say contract counterparty.

20    You have, and we respect it, expanded that to be a more

21    expansive interpretation.  They could not have reasonably

22    relied, on December 10th when you entered this order, that you

23    would do that.

24          On December 10th these claims traders could have, had

25    they chosen to do it, sent a notice out to all of their

43

1    clients, they knew who they were, and said now that this

2    order's entered, which we participated in negotiating, and it's

3    entered -- and it's the order of the case and you're going to

4    get these notices, please give us a letter of direction, please

5    do whatever we're going to do, work all that stuff out.  That

6    process started -- could have started on December 10th.

7            For whatever reason, Mr. Zinman wants to say that the

8    relevant starting date is January 10th after their emergency

9    motion was denied.  It was not.  It was December 10th.  That's

10   when the order was entered.  They had actual knowledge of it

11   through their lawyers who agreed to it on their behalf.

12   Presumably Mr. Zinman did not settle the objections on

13   December 10th without the authority of his clients.  So

14   presumably they made a reasoned decision to settle their

15   objections on December 10th.  And they are bound by the order

16   that they agreed to.

17           So, from the debtor's perspective this would all have

18   been avoided, frankly all of this would have been avoided had

19   the -- had the claims traders recognized what they were

20   purchasing to begin with when the debtors recognized there was

21   going to be this problem back in September and we put it in the

22   solicitation procedures so it could be addressed head on.  Had

23   the claims purchasers decided to honor the order, we wouldn't

24   be here.  This is all about non-conformance to the order and

25   trying to convince Your Honor to amend the order after the

44

1    fact.

2            MR. ZINMAN:  Your Honor, I go back to what the

3    Supreme Court said excusable neglect or neglect means.  It

4    includes omissions caused by carelessness.  I mean --

5            THE COURT:  Well, the Second Circuit is -- has put a

6    gloss on that that's pretty clear.

7            MR. ZINMAN:  Your Honor, we're not -- we're not

8    trying to argue, at this point.  We are not trying to argue

9    that these actions mean that Your Honor should, under the order

10   itself, allow these cure notices to be enforceable.  We're

11   asking for standard under excusable neglect.  I'm trying to

12   come up with the reason and the excuses as to why this

13   happened.

14           THE COURT:  Right.  And, I guess my issue is I'm

15   still not --

16           MR. ZINMAN:  We were not alone.  ASM is not alone, as

17   Your Honor has seen over the last two -- this hearing and the

18   prior hearing, in -- in not getting this order completely right

19   under Your Honor's ruling.

20           THE COURT:  But, you know, let me go back to an

21   exchange that Mr. Shiff and I had during his -- his argument on

22   the 10th.  First of all under Section 365, the debtor has to

23   cure all defaults pre and post-petition.  Your clients bought

24   pre-petition receivables, right?  They didn't know what post-

25   petition defaults there were?

45

1          MR. ZINMAN:  If I can just confirm that, Your Honor.

2          THE COURT:  I mean, that's what Mr. Shiff said in

3     his -- in oral argument.

4          MR. ZINMAN:  Your Honor, that's correct.

5          THE COURT:  All right.  And what was assigned, I've

6     read a number of the assignment forms they all seem to be

7     consistent, is the right in respect of that pre-petition

8     receivable, all of those rights.

9          MR. ZINMAN:  Correct, Your Honor.

10          THE COURT:  All right.  But the notice covers cure

11     claims, which is pre and post.

12          MR. ZINMAN:  Your Honor, I'm not actually aware of

13     whether the actual notices at issue here, these fifteen we're

14     talking about, encompassed any post-petition defaults.

15          THE COURT:  Your clients didn't know.  Because when

16     we went through this point at oral argument, and this is

17     starting at page 69, Mr. Shiff says, "There's a dispute between

18     the debtor and the non-debtor contract party as to the amounts,

19     the amounts that need to be paid as cure.

20          "THE COURT:  Right."

21          "MR. SHIFF:  The procedures have a process by which

22     that person's supposed to file an objection post effective

23     date."

24          "THE COURT:  Right."

25          "MR. SHIFF:  It gets reconciled and then ultimately,

46

1    after a final order, amounts that are reserved on behalf of the

2    claim get paid.  So what we're suggesting is this should be

3    treated no differently."

4            "THE COURT:  But what?  The transcript submits what?

5    But what do you put in your response to the cure notice.  What

6    would your clients put in in their cure notice?  They don't

7    know because they only have part of the equation."

8            "MR. SHIFF:  In some cases we don't know."

9            "THE COURT:  So how could they put it in?"  And then

10   he, kind of, starts hemming and hawing and says we'd like to

11   get more information from the client.  It's not just

12   information about the election it's about the information as to

13   what you actually put in the cure notice.  And the only one who

14   really knows that, who has all of the information is the

15   counterparty.  And to get it in drips and drabs or just as a

16   guess just, you know, fundamentally doesn't work.  It just

17   doesn't work.  And that's why, I guess, I go back to my

18   question on a Pioneer analysis, which is why didn't the claims

19   purchasers, either when the original order which is, you know,

20   as Mr. Butler says your clients negotiated.  And of course they

21   purchased these claims.  That was their function.  They were

22   the ad hoc trade committee or the other claim purchasers get on

23   their horse right away and deal with their counterparties about

24   this.  It's always been a mystery to me.  They know what they

25   bought.  They know where their counterparties are.  They have

47

1   the rights from the counterparties.  All they needed to do was

2   get some instructions from them.  And yet I'm hearing about

3   this, you know sort of, we don't know what to do Judge we just

4   want more time on the day that the elections are due.  It just

5   doesn't -- that to me seems like inexcusable neglect.  I mean,

6   why should the debtors and the Court be subject to that when

7   there's -- when there's a full month to get your act together?

8            MR. ZINMAN:  Your Honor, look, we admit that we

9   need -- that we need to work with the non-debtor counterparties

10  on the numbers.  Part of the problem that Mr. Shiff was

11  articulating at that time was that we had only just received,

12  less than a week earlier, an exact list of which ones were

13  being assumed.

14           THE COURT:  But you knew who your counterparties

15  were.

16           MR. ZINMAN:  Your Honor, it takes -- we're talking

17  about hundreds of claims.  It takes a certain amount of time

18  to -- the cure notices refer to purchase orders which are the

19  debtors' purchase order numbers.  The counterparties generally

20  have their own internal numbering system for the same purchase

21  orders; they would do it by invoice number.  And it takes a

22  certain amount of time to reconcile those.  I think in most

23  cases there really isn't a disagreement as to the amount.

24           ASM had 350, I'm told, cure claim notices -- I guess

25  claims -- total claims that were purchased that potentially

48

1    could have been subject to this.  Only a week before we found

2    out which ones.  Your Honor --

3            THE COURT:  No, but how many -- how many contract

4    parties were on that 350?

5            MR. ZINMAN:  I think each party had a contract with

6    the debtor.  I'm not sure whether --

7            THE COURT:  They were all different parties, 350

8    different parties?

9            MR. ZINMAN:  If you'll bear with me just one moment,

10   Your Honor.  I don't -- I'm told there's about 325.  There are

11   a few repeats but generally they're all different.

12           THE COURT:  And when did ASM notify those parties

13   that they better start focusing on the cure amount?

14           MR. ZINMAN:  My understanding, Your Honor, is that

15   most of them were contacted around January 2nd.  Your Honor,

16   obviously we would would all --

17           THE COURT:  Someone's -- your colleague is waiving

18   his --

19           MR. SHIFF:  Yeah.  No, no, no.  I just wanted -- can

20   I correct on the record?  I believe the notice went out -- the

21   actual notice went out on December 21st.  We received word of

22   the actual notices going out; we immediately started calling

23   our 250 creditors.  But you're talking about December 24th

24   starting to call them.  So over that holiday week we did reach

25   out to the 350.  We wrote a letter to all creditors and

49

1    (indiscernible).

2          MR. ZINMAN:  I apologize.  Thank you for the --

3    allowing him to correct the record.

4          Your Honor, obviously in retrospect it would have

5    been better to do what you're suggesting, that -- it didn't

6    happen and what happened, happened.  And we submit that given

7    the circumstances in this case, the amount at stake, the good

8    faith of ASM to try and comply as best as it could, we submit

9    that the debt would constitute excusable neglect in this case.

10   And it's only -- the bottom line is, it's a couple of days.

11         I do have some other comments to the order, Your

12   Honor.  Bear with me a minute, I've got to find it.  Okay.

13   Paragraph 7, Your Honor, which states that basically, provides

14   that the debtors are not required party other than the

15   counterparty in connection with the assumption of an executory

16   contract or unexpired lease.  That is relief that they're

17   requesting which goes beyond the scope of the motion to strike.

18   The motion to strike strikes instructions attached to certain

19   notices that were sent in that were listed on schedule 1 to the

20   motion and which are encompassed by paragraph 2 -- 3 of the

21   order.  None of which affect ASM.

22         The motion didn't address this issue.  The

23   solicitation procedures order says that the debtors are

24   authorized but not directed to pay the counterparties any -- I

25   think saying anything else, at this point, is inappropriate

50

1    absent the specific motion on that subject.

2            THE COURT:  All right.  But wasn't that covered by

3    paragraph 3 of the original order -- 43?

4            MR. BUTLER:  Yes, Your Honor.  I believe it's covered

5    by paragraph 43.  And the reason we -- we asked -- we put it in

6    this order and discussed it in our motion to strike is the fact

7    that people wrote in instructions -- the claims traders wrote

8    instructions in --

9            THE COURT:  No, but -- but 43 says the debtors are

10   authorized by not direct to remit and resolve uncontested or

11   adjudicated distributions --

12           MR. BUTLER:  Right.

13           THE COURT:  -- on account or cure to the contract

14   party.

15           MR. BUTLER:  Right.  And we dealt with this at the

16   last hearing.

17           THE COURT:  Right.

18           MR. BUTLER:  The fact of the matter --

19           THE COURT:  I don't see why you needed to say it

20   again, is my point.  I mean, it was said before and there's no

21   motion for reconsideration and I don't see why --

22           MR. BUTLER:  As long as, Your Honor, there's no

23   question in this record that we are going to ignore those

24   instructions and follow paragraph 43.

25           THE COURT:  Okay.

51

1        MR. ZINMAN:  Thank you, Your Honor.  With respect to

2    paragraph -- bear with me -- 9, there is -- seems to be a bit

3    of an inconsistency here, Your Honor.  Paragraph 9 reserves the

4    debtors' rights to make further objections to the notices that

5    are listed on Exhibit B.  Yet, maybe I misheard him; Mr. Butler

6    earlier said that we would honor those.  I would submit that,

7    you know, if they had another objection, shouldn't they --

8        THE COURT:  No, they don't honor them.  They -- this

9    just lets them get into the dispute mechanism.

10       MR. ZINMAN:  I'm actually referring to the election

11   not the -- not the objection, Your Honor.  The cash stock

12   issue, putting aside the amount of the cure claim.

13       THE COURT:  Well, why don't you address that?

14       MR. BUTLER:  Your Honor, the point -- we said this, I

15   think, even in the motion, this was -- we -- the motion was

16   intended, when we filed it, we reserved all of our rights

17   except for these, the same thing we do on claims, we reserve

18   all of our rights going forward.  I mean, as a practical

19   matter, I don't think we're going to bring another motion to

20   strike.  We're going with -- for filing the S-1 and starting

21   the rights offering next week.  So it would be impractical for

22   us to do this.  But clearly we're not agreeing to the amount,

23   you know, necessarily that the amounts of cure, at the end of

24   the day, are -- if they're inconsistent with our books and

25   records.  So it's just a reservation of rights here, I think,

52

1    nothing more than that.

2            THE COURT:  Okay.

3            MR. ZINMAN:  Your Honor, paragraph 11 of the order,

4    the last sentence states, "Nothing contained herein shall

5    constitute nor it shall be deemed to constitute the recognition

6    of any cure dispute asserted against any of the debtors."  I'm

7    just not completely certain what impact that would have on law

8    of the case or I'm not sure where that -- what that's trying to

9    address.  If it's addressing the cure amount, the issue that's

10   open --

11           THE COURT:  I think -- I think it is.

12           MR. ZINMAN:  -- then it should be reserved as to both

13   sides, not just the debtors but also the parties that are

14   subject to the motion.  I mean, if it's an open issue, it's an

15   open issue.

16           THE COURT:  Well, it does say that.  It doesn't --

17           MR. ZINMAN:  Oh, right.  Your Honor, you are correct.

18           THE COURT:  Okay.

19           MR. ZINMAN:  With that -- with that qualification,

20   I'd like to briefly, very, very briefly, I promise, address

21   Argo and Contrarian.

22           THE COURT:  Okay.

23           MR. ZINMAN:  I believe that you will hear from others

24   with similar -- and already have heard with others, perhaps,

25   with similar issues that they've raised.  And I understand Your

53

1    Honor's prior ruling and we stand by our earlier position and

2    would stand that we can rely on the forms but understand your

3    earlier -- Your Honor's earlier decision and join in the

4    arguments made by others.  And would argue that those

5    constitute excusable neglect as I believe others may argue

6    today.

7            THE COURT:  Okay.  Well, let me just make sure as

8    to -- I think I have this right but let me make sure.  As to --

9    as far as Argo's concerned, dealt with sixteen transfer claims?

10           MR. ZINMAN:  That's correct, Your Honor.  Fourteen

11   are --

12           THE COURT:  Fourteen Argo just -- Argo submitted the

13   notices on its own?

14           MR. ZINMAN:  Yeah, copies.  Copies, Your Honor, that

15   Argo created and two were on the original notice forms.

16           THE COURT:  Okay.  And --

17           MR. ZINMAN:  With respect to Contrarian, Your Honor,

18   I believe that they were -- all the ones remaining at issue are

19   duplicate forms created by Contrarian.

20           THE COURT:  Which is twenty -- twenty-one.

21           MR. ZINMAN:  I think it's twenty-three, Your Honor.

22   It would be in paragraph 27 of the declaration of

23   Elisa Mimola (ph.) of Contrarian.

24           THE COURT:  Did -- and I forget, did Contrarian

25   attach its assignment forms?

54

1          MR. ZINMAN:  No, I don't believe so.  I think they

2    were on file attached to their 3001(e)s which have been filed,

3    you know, periodically throughout the case.

4          THE COURT:  And -- and Argo did attach its forms?

5          MR. ZINMAN:  No, Your Honor.

6          THE COURT:  It didn't.

7          MR. ZINMAN:  They did not.

8          THE COURT:  Okay.  Okay.  When I say forms, I mean

9    they didn't attach the assignment.

10          MR. ZINMAN:  Yes, Your Honor.  That's what I

11    understood.

12          THE COURT:  Okay.  Okay.  And on -- on this point --

13    on Silver Point, for the one that had the McDermott filed, that

14    was filed on behalf of Silver Point, right?

15          MR. SACKS:  It was filed on behalf of Arias (ph.)

16    Your Honor, directly.  It was an original form.  McDermott was

17    outside counsel to Arias, it filed it for them.

18          THE COURT:  Okay.

19          MR. SACKS:  Silver Point is the ultimate assignee of

20    that but it was not filed by Silver Point.  Silver Point was

21    not involved in that.

22          THE COURT:  No, but McDermott -- did McDermott

23    purport to act on behalf of Silver Point or on behalf of --

24          MR. SACKS:  No.  On behalf of Arias, Your Honor.

25          MR. BUTLER:  And when we did our investigation with

55

1    McDermott, we asked if they were acting as attorney at law, as

2    counsel to the counterparty and they said no, they were acting

3    as attorney in fact.  In every instance, Your Honor, where a

4    law firm told us they were acting on behalf of the counterparty

5    as their counsel, we accepted it.  That was the distinction

6    here.

7         MR. SULLIVAN:  Your Honor, James Sullivan from

8    McDermott.  I'm not -- I don't represent Arais.  I know our

9    Chicago office does represent Arais or has represented Arias in

10   connection with the case, for what it's worth.  So it has acted

11   as counsel of record on behalf of Arais in connection with

12   Delphi.

13        MR. SACKS:  Your Honor, one other point, and it's

14   very brief.  It just -- we did talk about it a lot last time.

15   In connection with Pioneer, I think Your Honor should at least

16   take into consideration the failure to comply with Rule 97 --

17        THE COURT:  All right.  Before you get to that point.

18        MR. SACKS:  Okay.

19        THE COURT:  On the other, the ones filed directly by

20   Silver Point, did they attach their assignment?

21        MR. SACKS:  No, Your Honor.

22        THE COURT:  Okay.  Remind me again, where is the

23   McDermott filed instruction?

24        MR. SACKS:  It is part of Exhibit I of the

25   objection -- of our objection.

56

1          THE COURT:  Okay.

2          MR. SACKS:  And with respect to Exhibit I, Your

3    Honor, of our objection, although the assignments are attached

4    as part of Exhibit I, they were not attached to what was

5    actually submitted.

6          THE COURT:  Right.  Okay.

7          MR. ZINMAN:  Your Honor, I just -- after we -- after

8    I sat down my colleague -- Mr. Shiff and I conferred and I

9    realized I got it backwards with respect to Argo and Contrarian

10   and I just wanted the record to be clear.  Argo filed their

11   assignment agreements attached to the 3001(e)s.  Contrarian

12   simply filed the 3001(e)s without the assignment.  And

13   neither -- neither --

14         THE COURT:  But it's with the 3001s not with the

15   cure --

16         MR. ZINMAN:  Correct.  And neither were sent to KCC.

17         THE COURT:  All right.  Okay.  Okay.  All right.

18   Okay.  Other -- other objectors?

19         MR. SAMBUR:  Yes, Your Honor.  Keith Sambur,

20   Richards, Kibbe & Orbe appearing on behalf of Blue Angel Claims

21   and Midtown Claims.

22         I'm not going to go into a lot of the Pioneer

23   factors, which Mr. Zinman has articulately laid out.  I just

24   wanted to point out a few differences between my client's

25   situation and those that have already been put before Your

57

1    Honor.

2             Again, to be clear, neither Midtown Claims nor Blue

3    Angel Claims were part of the ad hoc trade committee.  We did

4    not join in or appear in that -- that committee's motion which

5    was heard before Your Honor on January 10th.  In fact, the cure

6    notices, the original cure notices, that were submitted on

7    behalf of Methode, Palma and Kimball, respectively, were

8    actually received by KCC on January 9th and the record does

9    reflect that.

10            THE COURT:  I'm sorry, go through that again.  Say

11   that again?

12            MR. SAMBUR:  Sure.  Sorry.  My clients had, in fact,

13   submitted --

14            THE COURT:  You don't have to -- we can pick you up

15   without bending over.

16            MR. SAMBUR:  Thank you, it's a lot more comfortable

17   that way.  My -- my clients had, in fact, on behalf of Methode,

18   Palma and Kimball distributed cure notices to KCC, the debtor's

19   claims agent.  Which, in fact, were stamped received on January

20   9th and were not part of, in any way, the motion brought before

21   Your Honor on January 10th.  They were also not part of any

22   relief requested or any settlement at the solicitation

23   procedures order hearing.  And I just wanted to make that clear

24   for the record.

25            In addition, Your Honor, at this time I just would

58

1   like to introduce into evidence some correspondence between

2   attorneys from -- from my firm, including myself, and attorneys

3   from Methode.  And in addition, letters directly from Methode,

4   from Palma and Kimball to the debtors evidencing that my client

5   was acting under powers of attorney and authorized agent

6   status.  To be clear, these were not submitted with or attached

7   to the cure notices and they were not submitted by the January

8   4th deadline that Your Honor indicated last week.

9           THE COURT:  Well, January 14th.

10          MR. SAMBUR:  Sorry, January 14th deadline that Your

11  Honor had indicated last week.  However, Your Honor, in light

12  of the factors set forth in Pioneer, the fact that in Pioneer

13  there was a twenty day lapse.  And because there was no

14  prejudice the Court -- the Court agreed that the twenty days

15  was not prejudicial and therefore the twenty day lapse in

16  filing was not an absolute bar to filing the proof of claim.

17  And because, as I will set forth in a minute, there still

18  exists, to this day, no prejudice to the debtor.  We don't --

19  we see no reason why specific documentation that Your Honor

20  indicated should be accepted by the debtors, could not be

21  accepted -- excuse me, that we submitted to the debtors, prior

22  to today and including today, should not be accepted.

23          And we do have documentation that we submitted to the

24  debtors on February 4th and February 5th and prior -- February

25  4th and February 5th indicating that my clients were acting as

59

1    authorized agent, attorney in fact.  And these were sent by

2    both Methode and Palma to the contract counterparties at issue.

3    If I may present those to Your Honor for consideration.

4              THE COURT:  Are those -- were those part of the

5    evidence that was admitted last week?

6              MR. SAMBUR:  No, Your Honor.  They're not.  I would

7    just -- I would just note, for your consideration, that again

8    these are communications that took place -- that the debtors

9    are aware of, prior to the date hereof and based upon Your

10   Honor's prior comments at the hearing last Thursday, which

11   indicated that no documentation needed to be submitted based

12   upon a showing under Pioneer.  We did not submit those prior to

13   this hearing.  I do have copies available for the debtors if

14   they'd like.  I'd give them a few minutes to read through them.

15   I'm not, in any way, suggesting that, you know -- I think,

16   again Your Honor, it speaks to whether or not there is

17   excusable neglect here.  There are comments, you know, again

18   phone calls made to the debtors seeking to determine the proper

19   cure amount prior to the notices being submitted.  Those were

20   made --

21             THE COURT:  Well, wait.  That's in these documents

22   too?

23             MR. SAMBUR:  No, no.  Obviously not, Your Honor.  But

24   there's e-mail to confirm debtors' counsel --

25             THE COURT:  But is that -- where is that?

60

1          MR. SAMBUR:  It just goes to show, Your Honor --

2          THE COURT:  No, no.  Where is that?

3          MR. SAMBUR:  I have the documentation here,

4    Your Honor.  Again, I think it just goes to show -- to show --

5          THE COURT:  Well, why don't you -- in the first

6    instance, why don't you show it to Mr. Butler --

7          MR. SAMBUR:  Sure.

8          THE COURT:  -- and I'll consider whether I'll do

9    anything with it or not --

10          MR. SAMBUR:  Sure.

11          THE COURT:  -- but I'd rather see what it is first.

12          MR. BUTLER:  Yeah, Your Honor, I would note that

13    counsel had this last week before the evidentiary record was

14    closed in this contested hearing.  I don't know why we're being

15    asked to consider it now at the continued hearing, just having

16    it handed to us in open court.

17          THE COURT:  Okay.

18          MR. BUTLER:  I mean, just -- Your Honor, the point of

19    prejudice, for the claims purchaser to suggest there's no

20    prejudice to the debtors is absolutely wrong.  Being in this

21    courtroom right now is prejudicial to the debtors.  Having

22    spent two -- having spent days preparing for these hearings is

23    prejudicial to the debtors.  There's been a huge amount of

24    cost, expense and attention all because they didn't follow the

25    solicitation procedures order.  So to suggest that there's no

61

1      prejudice to the debtor or to the Court or to the other

2      stakeholders in this case I think is just plain wrong.

3              MR. SAMBUR:  Your Honor, if I just may address that

4      point while Mr. Butler is considering the papers that I have

5      first provided him.

6              I think it was Your Honor who suggested that if there

7      was in fact a dispute, that -- that he anticipated that the

8      parties would work it out, out of court.  I believe, Your Honor

9      even used the word --

10             THE COURT:  Well, no I didn't -- I said if there was

11     a dispute within the parameters of what I said --

12             MR. SAMBUR:  Sure.

13             THE COURT:  -- they should work it out, they should

14     work it out.

15             MR. SAMBUR:  Sure.

16             THE COURT:  They should perform their due diligence

17     and --

18             MR. SAMBUR:  Sure.  Agreed, Your Honor.  And I think

19     the documentary evidence that I'd like to submit shows that,

20     again, both Palma and Methode tried to work that out with the

21     debtors and Kimball tried to work that out with the debtors out

22     of court.  They suggested -- they asked what documentation the

23     debtors would like to see.  They told them that they had this

24     documentation.  Where should we provide it?  What would you

25     like to see?

62

1          THE COURT:  I&m sorry.  You're, kind of, mixing

2     apples and oranges here.  Are you suggesting that the documents

3     that you just provided to Mr. Butler go to show that your

4     clients cure notices fall within the category of what I said I

5     would in all likelihood grant a -- a Pioneer request?

6          MR. SAMBUR:  Your Honor, you targeted the deadline of

7     January 14th.  Admittedly documents were sent on February 5th

8     and February 4th which evidence both Palma and Methode's --

9          THE COURT:  Okay.

10          MR. SAMBUR:  -- indication that my client was acting

11     as an authorized agent, attorney in fact and ratified that.

12          THE COURT:  Okay.

13          MR. SAMBUR:  We're just seeking to extend that

14     January 4th deadline to include this documentation which the

15     debtors were previously in receipt of.

16          THE COURT:  Okay.  I understand that.

17          MR. SAMBUR:  Thank you, Your Honor.  Just --

18          MR. BUTLER:  Your Honor, just so we can take care of

19     this.  I mean, I don't know what other people are going to try

20     and submit evidence but if Mr. Sambur thinks this is important

21     to his case, I'm not going to stand in the way of this being

22     put into evidence.  It would be marked Exhibit 44.

23     (Communications submitted by Mr. Sambur were hereby received as

24     Exhibit 44 for identification, as of this date.)

25          THE COURT:  Okay.  That's fine.

63

1          MR. SAMBUR:  May I present a copy to Your Honor?

2          THE COURT:  Sure.

3          MR. SAMBUR:  Thank you.

4          MR. SACKS:  Your Honor, may I recall before that the

5     debtors' object to the declarations we filed last night?

6          MR. BUTLER:  Yeah, I do object to those because they

7     created them over the last -- between the time of the last

8     hearing and now, Your Honor.  I mean, I think that's different.

9          THE COURT:  I --

10         MR. BUTLER:  They manufactured the evidence over the

11    last four days.

12         THE COURT:  I -- I agree.  And the declarants aren't

13    here.  I mean, my rule is to take declarations when people are

14    here to testify.  And I would want to hear from them as to

15    their confusion and their beliefs.  And it's just a statement

16    that is not subject to cross examination and it's wasn't

17    even -- I mean, and it was made after the fact, in light of, I

18    think, the hearing on the 21st.

19         MR. SACKS:  Your Honor, the reason that it was made

20    after the fact -- and I understand Your Honor's ruling.  The

21    reason it was made after the fact was, we did not view this, as

22    I said this morning, as a Pioneer --

23         THE COURT:  No, I understand but they -- but, I mean,

24    I think that -- and that's fine.  But if -- if they're being

25    offered into evidence for Pioneer purposes I would want to have

64

1    the parties have an opportunity to cross examine the people as

2    to why they felt that they were confused.  And why -- what, you

3    know, the basis for their belief.  And these are all legitimate

4    questions under Pioneer and I would ask them if -- if no one

5    else did.  So, I -- I can't --

6            MR. SACKS:  Your Honor, given the accelerated nature

7    of this where we didn't get the final list of whose declaration

8    they actually needed until 4:15 this morning.  I think

9    that's -- I think that's unfair but I understand Your Honor's

10    ruling.  Not a single declarant whose declaration was put in at

11    the last hearing was here to testify.

12            THE COURT:  No one asked to cross examine them.

13    Okay.

14            MR. SAMBUR:  Thank you, Your Honor.  Just to

15    review -- to go back, I know Your Honor had spoken about

16    ambiguity earlier and I just wanted to raise two points in

17    relation to my client before moving on to the specific

18    documentation and issues of prejudice.  The first point being

19    that, again notwithstanding Your Honor's prior ruling with

20    respect to paragraphs 43 and 44 of the solicitation procedures

21    order.  Again, Your Honor, my clients were acting under the

22    belief that their powers of attorney set forth in their

23    purchase agreements did, in fact, provide them with the

24    necessary authority to submit the documentation on behalf of

25    the contract counterparties.

65

1          THE COURT:  Did they really think -- I mean, where's

2     the evidence that they even thought about it?

3          MR. SAMBUR:  Again, Your Honor, these were pre-

4     petition claims.  And as it set forth on the actual cure

5     notice --

6          THE COURT:  No, but where -- where's the information

7     that they even thought about this issue?  I mean, where's

8     the -- where's the evidence that this issue was even something

9     that they even considered?

10          MR. SAMBUR:  Again, I believe it was not just -- not

11     just my client but the actual contract counterparty who sent

12     the notice to my client believing that it was actually my

13     client's duty and obligation.  And because the proceeds that

14     were going to be paid --

15          THE COURT:  And that's -- and that's based on -- on

16     what in the record -- is it -- am I right, your clients

17     submitted the original forms with the bar code?

18          MR. SAMBUR:  That's absolutely correct, Your Honor.

19     They submitted original forms with the bar code that they

20     received from the contract counterparties themselves after

21     conversations with those contract counterparties about the

22     appropriate course of action.

23          THE COURT:  Well, no, wait.  Is that in the record?

24          MR. SAMBUR:  No, Your Honor.  Other than -- no, Your

25     Honor, we've submitted no evidence as to that, again, other

66

1    than the fact --

2            THE COURT:  You're asking me that I confer that since

3    it was sent to them --

4            MR. SAMBUR:  Yes.

5            THE COURT:  -- that they -- that --

6            MR. SAMBUR:  Yes.

7            THE COURT:  -- there must have been some reason, some

8    meeting of the minds as to why it was sent.

9            MR. SAMBUR:  Sure.  And other -- other than the fact,

10   Your Honor, that an attorney from Methode, Mr. Tim McFadden,

11   did appear in court on the hearing on Thursday.  Flew in from

12   Chicago and stated on the record that our clients did confer

13   and that my client was an authorized agent and attorney in fact

14   with respect to this cure notice.  In addition,

15   Mr. Chappell Philips was also -- appeared telephonically during

16   the hearing, would have -- would have indicated the same had he

17   ever been asked the question.  Again, there is -- I have plenty

18   of -- again, I've got a number of documentation back and forth,

19   phone calls, etcetera, with these various parties indicating

20   that, again, my client was acting as an authorized agent, could

21   not determine the appropriate cure notice and simply rejected

22   the cure amount in order to give the --

23           THE COURT:  Well, let's -- let's go to that point

24   again.

25           MR. SAMBUR:  Sure.  Again, I think this points out an

67

1    ambiguity in the -- in the notice.

2          THE COURT:  They couldn't -- I'm sorry, they

3    couldn't -- when you say they couldn't determine the

4    appropriate cure notice, what do you mean?

5          MR. SAMBUR:  The cure notice was received and it set

6    out, as explained by counsel previously, a number of purchase

7    orders.

8          THE COURT:  Right.

9          MR. SAMBUR:  Up until -- actually, I spoke with

10   Methode's counsel before Thursday's hearing, he was just

11   able -- their client was finally able to reconcile their own

12   internal numbers versus the purchase order schedule by Delphi

13   because from what I understand, Your Honor, the purchase orders

14   that were actually scheduled listed -- were internal reference

15   numbers and were not readily identifible by the contract

16   counterparties.  We -- we -- actually their first e-mail that I

17   included in my exhibit evidences phone calls that I had

18   identifying myself as a purchaser of this claim, owning the

19   claim number, contacting debtors' counsel in order to attempt

20   to reconcile this cure amount.  That could not be done within

21   the time period to return these notices.  We, in fact,

22   contacted the contract counterparty after that and after

23   receiving instruction from the debtor that they would probably

24   recommend filing -- filing a rejection in order to give the

25   parties time to sort out the correct amount.

68

1          MR. BUTLER:  I'm sorry.  Who are you saying made a

2    representation to you as to how you should make a

3    determination?

4          MR. SAMBUR:  Mr. Matthew Gartner (ph.).  And, you

5    know, just for the record, in no way indicating that -- that

6    Mr. Gartner or any other member of the law firm -- of Skadden

7    Arps representing the debtors is not forthcoming.  It's just

8    that, Your Honor -- and did not attempt to work with us at all.

9          MR. BUTLER:  Do you have any evidence about that?

10    Because that's not what your exhibit says.  Do you have any

11    evidence to that allegation?

12          MR. SAMBUR:  I have an old voicemail that I do not

13    have here.  If you object to it then it could be stricken from

14    the record.

15          MR. BUTLER:  I object.

16          MR. SAMBUR:  I think -- I think this evidence,

17    though, sets forth my state of mind -- the declarant's state of

18    mind after those follow-up conversations.  And again, no

19    response saying you're not -- you're not permitted to submit

20    these, I cannot answer questions for you.

21          THE COURT:  Well, wait.  There's a -- there's an

22    e-mail here to you, of course it's January 21.

23          MR. SAMBUR:  Yes, Your Honor.  In response to an

24    e-mail by another associate in my firm, Casey Boil (ph.).  He

25    was following up and the associate from Skadden indicates that

69

1      they cannot, necessarily, confirm that the notice would be

2      processed and accepted.  He says it must generally be made by

3      the contract counterparty unless there is a valid power of

4      attorney or other authorization attached to the notice.

5              THE COURT:  Authorizing --

6              MR. SAMBUR:  Authorizing another party to execute the

7      form.  This would be a case by case analysis.  As soon as --

8      Your Honor, as soon as we received that e-mail repeated phone

9      calls were made to the debtor.  I would note that there's a

10     sixth day lapse between their response to my -- to my

11     associates inquiry and the debtor's response.

12             MR. BUTLER:  Right.

13             MR. SAMBUR:  Immediate phone calls -- and I

14     understand that they were in preparation for the actual

15     confirmation hearing, which was incredibly important; I'm not

16     trying to downplay that.  I think, Your Honor, it just goes to,

17     again, why we have not submitted -- why we had not submitted

18     documentation prior to February 4th and February 5th, which was

19     as soon as this e-mail was received, phone calls to debtors'

20     counsel, again, trying to determine what documentation they

21     wanted, indicating that we could provide it.  We believed it

22     was effective when we submitted the notice.  Again, follow-up

23     e-mails on January 31st -- excuse me, January 30th and 31st,

24     again attaching the actual cure notices asking what could be

25     done.  Indicating to the debtors that we did in fact believe

70

1    that we were acting under authority in our -- you know, we had

2    authority to act and would provide appropriate documentation

3    just asking what was required which culminated, after that, in

4    a February 4th and February 5th letters sent by Palma and

5    Methode, respectively.  Again, affirming -- what we believe was

6    affirming and ratifying my client's actions.

7            Again, there was follow-up e-mails and phone calls

8    after that again asking the debtors what position they were

9    going to take, if we could enter into any form of stipulation,

10   what documentation could be provided.  Again, I think this goes

11   to two facts, one, our attempt to provide the debtors with the

12   documentation that they wanted and two, speaks to our good

13   faith belief that when we submitted these cure notices we were

14   acting under -- properly acting under the Federal Rules of

15   Bankruptcy Procedure which were not mentioned or there was no

16   indication that you could not act under those under the

17   solicitation procedures motion or order.  Those also were not

18   in the cure notice.  It stated nowhere in the cure notice that

19   Federal Rule of Bankruptcy Procedure 9010(a) would not apply.

20   And my clients did, in fact, have a good faith basis for

21   submitting the cure notices on behalf of Palma, Kimball and

22   Methode without providing documentation.

23           THE COURT:  Well, I -- let me -- let me ask you about

24   that because looking at the notices they're all signed by

25   Midtown Claims or Blue Angel Claims, as the case may be, as

71

1  assignee of not as attorney in fact for or attorney at law

2  for -- well, it wouldn't be attorney at law for -- attorney in

3  fact for these parties; they're all signed as assignee for.

4  　　　　MR. SAMBUR:  Understood, Your Honor.  But I believe

5  that the documentation that we've subsequently provided

6  within -- within, I believe, an acceptable time period in

7  accordance with Pioneer, did provide proper evidence that my --

8  my clients were acting as attorney in fact and authorized agent

9  for these parties.  And again -- again, I just go back to the

10  solicitation procedures order which, again --

11  　　　　THE COURT:  Which said assignees don't have any

12  rights.

13  　　　　MR. SAMBUR:  It said that claims purchasers have no

14  rights or remedies with respect to any monies that were going

15  to be paid on behalf of the cure notice.  Again, I think

16  there's two different hats here.  When my client was putting

17  on, sort of, the hat of authorizing --

18  　　　　THE COURT:  When they actually signed the form.

19  　　　　MR. SAMBUR:  They were signing as attorney in fact,

20  authorized agent.

21  　　　　THE COURT:  That's not how they signed it.

22  　　　　MR. SAMBUR:  Your Honor, admittedly, I think that

23  they could have been a little bit clearer.  But again, I think

24  that just goes to -- I think --

25  　　　　THE COURT:  Yeah.  I think that that's a fair

72

1    statement since they signed exactly in the opposite capacity as

2    the one you want them to sign in --

3             MR. SAMBUR:  Again, I think they did provide

4    documentation.  Again, I believe they're failure to sign as

5    attorney-in-fact could be classified as carelessness under the

6    circumstances.  And I would just pause at that.  Again, within

7    an acceptable time period as set forth in Pioneer, they did in

8    fact provide documentary evidence that they were acting as

9    authorized agent and attorney-in-fact.  And if the

10   solicitation -- again, just going back to their good faith

11   and --

12            THE COURT:  Is it your client's view that they read

13   the solicitation procedures order and were confused by it or

14   they didn't read it at all?

15            MR. SAMBUR:  No, not at all, Your Honor.  I think

16   this is a case where they looked at the cure notice.  And

17   again, this is a point that hasn't been paid so before I

18   answer, I just want to make this one point which is the cure

19   notice -- the solicitation procedures order was not

20   disseminated, not attached to the cure notice.  And I do not

21   believe that actually the parties that were receiving a cure

22   notice had appendix to that, the solicitation procedures order.

23   And if that was so vital, if that was so pivotal in

24   interpreting the actual notice, then I think one would

25   anticipate -- and again, going back to cure -- back to Pioneer

73

1    of what is normal, what is ordinary, this was not an ordinary

2    process.  And if this solicitation procedures order was so

3    critical to interpret any of this notice and submitting it

4    correctly, it should have been attached to that.  So that when

5    my client actually received the notice before it took any

6    action, it would have been forced to confront the solicitation

7    procedures order.  Nowhere on the solicitation -- excuse me, on

8    the cure notice does it state you should read -- you know, you

9    should read carefully the solicitation procedures order.  It

10   indicates that the notice was approved in connection with it.

11   It indicates the docket number.  But it doesn't go to far as a

12   ballot which says you should carefully consider the

13   solicitation procedures order.  You should carefully consider

14   the plan which, again, clients were being asked to contemplate

15   receiving this amount in stock as opposed to cash even though

16   they didn't receive these documents.

17          THE COURT:  Well, but does the notice --

18          MR. SAMBUR:  And again, I think that created some

19   ambiguity.

20          THE COURT:  Does the notice have any election form on

21   it that your clients got?

22          MR. SAMBUR:  Again, my clients were forwarded

23   original notices.

24          THE COURT:  But the notice they got didn't have an

25   election form?

74

1          MR. SAMBUR:  They did, in fact, receive a separate

2     notice, Your Honor.  But again, they were acting under these

3     notices as attorney-in-fact.  And that notice that they

4     received, the Exhibit P -- again, I have no indication that the

5     solicitation procedures order was disseminated along with that

6     notice as well.  And again, it goes back to the prior point

7     which is if this was so pivotal, then it should have been

8     included.  And it wasn't.

9          THE COURT:  Okay.

10         MR. BUTLER:  Your Honor, in response to just a couple

11    of observations.  One, the solicitation procedures order was

12    sent to all creditors in this case and all of them got that.

13    Every one of the counter parties received the solicitation

14    procedures order and had it -- and it was sent out in

15    connection with the solicitation procedures as Your Honor

16    required.  So they all had it.

17         THE COURT:  Because it was for the disclosure

18    statement.

19         MR. BUTLER:  Exa -- it was with the disclosure

20    statement.  It was also sent to every creditor in this case and

21    every stockholder in this case received the solicitation

22    procedures order, the actual order itself.  Mr. Sambur is just

23    plain wrong.

24         Number two, with respect to the notices they

25    received, again, we are here.  The entire Exhibit 44 -- I

75

1    believe it's been marked now 44, Mr. Sambur's package, which

2    begins with exchanges between his firm and colleagues in my

3    firm and which, as Your Honor notes, that they were told -- and

4    these are all for the most part after the fact notices.  The

5    only part of this is a reconciliation e-mail back on January

6    4th.  But in terms of the attempt by them to mitigate the fact

7    that they had not filed the solicitation procedures order,

8    these documents -- you can see, Your Honor, they keep moving

9    the story.  They signed document -- they signed the claims and

10    filed them as assignee.  There's no evidence about the

11    circumstance in which they procured the originals from their

12    counterparties.  But in violation of the solicitation

13    procedures order, they procured them from the counterparties,

14    they signed them as assignee -- that is the only thing before

15    the Court as evidence.  And then you go through this package

16    and by the end of the package, you have -- there are letters

17    dated in February from some of the outside law firms to me, in

18    fact, saying gee, I should consider the fact they were

19    authorized after the fact.  And then finally, the final set of

20    documents here are affidavit -- powers of attorney that were

21    executed on February 25th.  You know, today's the 26th.  They

22    were executed yesterday.  So they were manufactured in the

23    middle of this hearing.  I mean, you know -- now admitted into

24    evidence.  I don't know what effect that power of attorney has

25    that was signed -- that was introduced after the evidentiary

76

1    record in this case was closed.  It comes right down to the

2    fact -- all of this comes down to the fact that this issue, the

3    distinction between Section 365 of the Bankruptcy Code and

4    claims purchasers' rights or interests as they acquire pre-

5    petition claims was an issue that the debtors identified with

6    other parties-in-interest and with their statutory committees

7    last summer.  And we prepared the solicitation procedures

8    package, we prepared the motion seeking to move forward with

9    this, we recognized these issues, we called them out, parties-

10   in-interest received notice of that process, including Mr.

11   Sambur's clients, during the course of the solicitation

12   procedures hearing because those notices were very widely

13   disbursed of the motion back on September 6th, again, to all

14   parties-in-interest in this case.  And these notices were

15   approved by Your Honor.  And they're very clear on their face.

16   All of the arguments here that have been made by all of these

17   counsel are made because they want Your Honor to ignore the

18   plain language of paragraphs 43 and 44 of your prior orders and

19   to ignore the notices that were put in place.  What Mr.

20   Sambur's clients should have done is when they consulted, as

21   he's testified, because he has no evidence to back it up -- as

22   he's testified that there were consultations between his

23   clients and the contract counterparties, what they should have

24   done is what some others did.  They consulted and the contract

25   counterparties submitted an appropriate notice which is what

77

1    the solicitation procedures order dealt with.  Remember, we're

2    dealing here now, out of 1700 notices we sent out, we're

3    dealing now with a hundred or so that, after Your Honor's prior

4    guidance, that are clearly not conforming.  And they are not

5    conforming because claims purchasers chose at their own expense

6    and risk to ignore Your Honor's order.  They chose to do it

7    another way.  And now they've come in and said oh, but for

8    this, but for that.  And now we're talking excusable neglect.

9    How is it excusable neglect to blatantly and intentionally

10   violate a federal bankruptcy court order?  I just don't get it,

11   Your Honor.

12           THE COURT:  What should I take away from the fact

13   that Midtown and Blue Angel submitted the bar-coded form?

14           MR. BUTLER:  Clearly, Your Honor, you can take --

15   there was an unsubstantiated conversation between the

16   counterparty and Blue Angel where that form ended up in their

17   hands.  That -- and there was only one original bar-coded form,

18   original form.  But that is not evidence, Your Honor.  I

19   believe the fact they have that -- the inferences are

20   sufficient to say that they had the authority to interfere with

21   the 365 relationship.  I don't believe there's anything in the

22   order that authorized the counterparty to do that.  You know,

23   we have moved so far away from what the order was that dealt

24   with solicitation procedures which basically said 365

25   counterparties have to deal with these notices and claims

78

1    agents have no direct rights but we'll give you the courtesy of

2    knowing so that you can consult with your counterparties when

3    they submit the notice.  That was the formulaic approach to

4    this on December 10th at the solicitation -- when this order

5    was entered and on September 6th when we procured the motion,

6    when we filed the motion seeking the authority.  Because we

7    recognized this issue.  And this is not -- as the evidence in

8    the January 10th hearing indicated, and we put evidence in the

9    record and Your Honor is aware of it, this is not a new issue.

10    There have been commentators that have written about this

11    specific issue and the risk the claim purchasers take when they

12    purchase accounts receivable that are associated with long term

13    agreements that then get assumed.  Because what happens under

14    the law is you cure under 365 and you move to strike the claim

15    and the claim is stricken from the claims register by separate

16    motion.  That's the procedure.  And they have bought something

17    that has no value.  That's their risk.  All right?  That's

18    their risk.  And their obligation is to deal with their

19    counterparties on that.  It's not to put the debtors through

20    the kind of process we've now been subjected to which we've

21    tried to avoid by anticipating this in advance in getting a

22    very clear order and direction from Your Honor on December

23    10th.

24            MR. SAMBUR:  Your Honor, two observations with

25    respect to the question you just asked Mr. Butler.  One, with

79

1    respect to Silver Point and McDermott, they submitted the

2    original forms also with respect to the Silver Point

3    counterparties that Silver Point signed for and the McDermott

4    Araias form.  And I think Your Honor's question with  the --

5    the answer to Your Honor's question is somebody thought that

6    was the right way to do it.  And there's no -- and I

7    understanding there's nothing in the record as to whether it's

8    the counterparty, the person who signed or both.  But somebody

9    thought that was right.  And the election itself was very --

10   and what was happening, what was chosen by the counterparty and

11   the signature was very clear and has since been ratified or

12   made plain.

13            MR. SACKS:  And I just want to speak --

14            MR. BUTLER:  I'm sorry.  Let me just finish one

15   thing.  I want to deal with the McDermott Will issue, Your

16   Honor.  We have -- there's been a statement made on the record

17   by a partner at McDermott Will that they in fact represent

18   this -- the counterparty.  And I respect that statement.  If,

19   in fact, they -- and I think Your Honor, based on that

20   statement, can draw the inference that they were acting as

21   attorneys at law not attorneys-in-fact on that.  It was our

22   practice that if an attorney representing a party executed on

23   behalf of the party, like a pleading, this form, we would

24   accept it.  So based on that representation on the record, the

25   debtors I don't think have any issue with that particular

80

1    Silver Point form.

2             THE COURT:  Okay.

3             MR. BUTLER:  Because I think that, you know, there's

4    an enormous difference between someone acting as counsel --

5             THE COURT:  Counsel for Silver Point as opposed to

6    counsel for the --

7             MR. BUTLER:  Right.  That's a different issue.  That

8    was a different issue.  When, you know -- we had our exchange

9    last week about Silver Point's counsel appearing on behalf of

10   all these other folks.  That's quite different than someone's

11   traditional lawyer and I accept the representation by a member

12   of the McDermott firm that they, in fact, represent the

13   counterparty and have for the purposes of this case.

14            THE COURT:  Okay.

15            MR. SAMBUR:  Your Honor, if I could just

16            THE COURT:  Sure.

17            MR. SAMBUR:  -- address some of those points that Mr.

18   Butler had just made.  First, with respect to the issue of

19   commentators have written extensively on the subject and that

20   my clients should have known that they were not purchasing

21   these cure amounts, I think when you actually read the

22   commentator -- this is just --

23            THE COURT:  But I don't think you have to -- I guess

24   that issue, to my mind, is a very secondary issue because the

25   order says what it says and the forms say what they say.  And I

81

1    just -- it seems to me that people were taking a real chance, a

2    big chance, by not following them.  That's what I just don't

3    understand here.  And I think that there is certainly a

4    potential here for optionality on this point.

5              MR. SAMBUR:  I think, Your Honor, that --

6              THE COURT:  If the stock had gone up as opposed to

7    down then you're covered by the counterparty that didn't object

8    and therefore gets the stock.  Whereas, if the stock goes down

9    and you'd rather have cash, you're covered by the claims

10   purchaser 'cause now there's an objection and the claims

11   purchaser gets cash.  So, I mean, it just seems to me that it

12   is very convenient to not pay attention to the orders.

13             MR. SAMBUR:  Again, Your Honor, I just think that

14   with respect to what the commentators write and it goes to the

15   good faith -- a good faith --

16             THE COURT:  No, but I'd like to address the other

17   point.  I still don't understand -- did you read the order?

18             MR. SAMBUR:  Yes, Your Honor.

19             THE COURT:  When it came out?  I mean, before the

20   deadline?

21             MR. SAMBUR:  Your Honor, I was not sent a copy of

22   that order.  I reviewed the notice.  And again, looking at the

23   order, I did not have any indication to believe that Rule 9010

24   did not apply and that my clients could not act as attorney-in-

25   fact or authorize the agents.  And under 9010(a) -- and again,

                                                                      82

1      this actually buttresses the point that the debtors had made

2      which, again, contract counterparties were not creditors.

3      These were not claims.  9010(c) didn't apply.  9010(a) applied

4      but no evidence was necessary.  That was the -- sort of

5      direction that we -- that's what we read from the procedures,

6      from the notice itself.  Had it been clear on there that actual

7      prohibition which said only contract counterparties may return

8      this form.  Then obviously we would have sent back this

9      documentation at the very last -- you know, prior to the

10     deadline through the contract counterparty and said you have to

11     fill this out.  Thanks for sending us the original but you have

12     to fill it out.  The point is also that faced with the

13     deadline, faced with what the debtors considered --

14            THE COURT:  You know, there's a lot of case law that

15     says -- and that's why they have the exception in 9010 for

16     proofs of claim, balance -- there's a lot of case law that says

17     that filling out a proof of claim is an act constituting the

18     practice of law.  And I would think perhaps objecting to a cure

19     claim would also be one.  So why does 9010(a) so clearly apply?

20            MR. SAMBUR:  Again, Your Honor, I don't think today

21     we're addressing why it applies or my clients --

22            THE COURT:  No.  But we're addressing what people

23     would reasonably think.

24            MR. SAMBUR:  Sure.  Again --

25            THE COURT:  I mean, again, you have Mr. Shiff's

83

1    point.  You're responding to a formal notice, that this is what

2    we believe a cure claim is, setting up a litigation.  And just

3    to sort of willy nilly say well, I don't know but I'm going to

4    object.

5            MR. SAMBUR:  Sure.

6            THE COURT:  You know, how should a non-attorney named

7    Blue Angel have the right to do that under 9010(a)?

8            MR. SAMBUR:  Again, it did not believe that this was

9    considered the authorized practice of law by submitting this

10   documentation.

11           THE COURT:  Even though it establishes the framework

12   for an objection over litigatable issue.

13           MR. SAMBUR:  I think, Your Honor, again, going back

14   to the actual cure notice, it did not require any substantive

15   pleading.  And here's, I think, where part of the confusion

16   was.  It said if you reject the cure notice thirty days after

17   the effective date, you will have to file a substantive

18   pleading with the Court stating with particularity why, in

19   fact, you object.  And I think that would have obviously been

20   construed as the practice of law.  But completing this cure

21   notice, which was a general election, which again, as Mr.

22   Zinman pointed out not ordinary course, even for mega cases,

23   which required a derivation from the general rule that

24   administrative expenses must be paid in cash, the cure amounts

25   must be paid in cash.  There was going to be a derivation to

84

1    that and it was put forth via negative notice.  And I think

2    when you factor all these things in, I think there was

3    ambiguity.  It was formed on a basis of good faith.  And my

4    client subsequently attempted to provide documentation.  And

5    again, as Your Honor points out -- pointed out last week, there

6    are some parties that didn't submit originals.  There's other

7    parties that just today have evidence that they were acting as

8    attorney-in-law, that they were not the actual contract

9    counterparty.  And there's inconsistent results being applied.

10   And I think that speaks to the ambiguity.  And just as there

11   was no prejudice last week when Your Honor indicated that the

12   debtor should accept non-originals, there still exists no

13   prejudice today.  This order will not even go final until ten

14   days from today.  So I don't see what the harm is in going back

15   to the February 4th and February 5th letters or even the

16   letters of yesterday, the powers of attorney ratifying the

17   prior acts as there has been no prejudice to date.

18           THE COURT:  How are you and Palma and Methode intend

19   to deal with the contract assumption issue?

20           MR. SAMBUR:  If there is cash received or

21   subscription rights received -- and, again, I think this goes

22   to a point to cure notice and a point earlier about the

23   ambiguity which was the cure notice stated that these were only

24   for pre-petition arrearages which was clearly purchased in the

25   documents.  We're not talking about any post-petition defaults.

1    We're clearly talking about pre-petition receivables that were

2    subject to cure.  And that's, again -- that's why, I think,

3    this clearly fit within our power of attorney and why my client

4    believed it fit within the power of attorney.

5            THE COURT:  What -- I don't understand.

6            MR. SAMBUR:  I believe, Your Honor, that there is a

7    question raised as to whether or not these were payments due

8    for post-petition purchase orders or post-petition amounts that

9    were past due and whether we could separate those from what my

10   client purchased and what was actually due for post-petition

11   transactions.  These amounts that were on the cure notice were

12   only for pre-petition arrearages and clearly fit within the

13   definition of "claim" under our purchase agreement which,

14   again, led to the belief that --

15           THE COURT:  But how does the debtor know --

16           MR. SAMBUR:  Again, I think --

17           THE COURT:  -- that the non-response is going to

18   cover both types of objections, pre and post?

19           MR. SAMBUR:  There was no post-petition covered by

20   this.

21           THE COURT:  The debtor doesn't know.  That's the

22   whole point of the notice.

23           MR. SAMBUR:  The debtor stated in the notice that it

24   only --

25           THE COURT:  I know.  And the party has the right to

86

1    object.

2            MR. SAMBUR:  Sure.  And that -- the party who was

3    going to object was Methode, was Palmer, was Kimball.  Once

4    they determined what the actual amount was.  But we never even

5    got to that step of what we believe was even electing cash or

6    stock because, as the debtor admitted, that was an ambiguity in

7    the notice.  And we never got to the point of even filing a

8    substantive objection.

9            THE COURT:  But I guess that's the point.  It didn't

10   know what the amount was so it just objected.  But it didn't

11   object; it let its assignee of the pre-petition amount object.

12   So how do we know how to reconcile that in the future?  You're

13   saying -- there's a general objection, right, to the cure

14   notice?

15           MR. SAMBUR:  I would characterize it again as a

16   rejection to the cure amount --

17           THE COURT:  Right.

18           MR. SAMBUR:  -- that the parties who did not

19   attend --

20           THE COURT:  Okay.  There's a rejection to the cure

21   amount.

22           MR. SAMBUR:  Yes.

23           THE COURT:  And the proof of -- the power of attorney

24   goes to the pre-petition amount, right?  So who's rejecting --

25   and how does the debtor know that the rejection is just as to

1    the pre-petition amount?

2             MR. SAMBUR:  This notice only covered pre-petition

3    amounts, Your Honor.

4             THE COURT:  No, it does -- why do you say?

5             MR. SAMBUR:  It says in the cure notice specifically

6    that the notice is only with respect to pre-petition

7    arrearages.

8             THE COURT:  Where?

9             MR. SAMBUR:  Sorry.  Let me just --

10            MR. BUTLER:  No.  Your Honor, I will point -- on

11   para -- if you look at paragraph O in -- the actual cure amount

12   on the notices does reply to the pre-petition amount.

13            THE COURT:  But that's what the debtors say it is.

14            MR. BUTLER:  Correct.

15            THE COURT:  But the notice gives you the opportunity

16   to object to the amount pre or post, doesn't it?

17            MR. SAMBUR:  Absolutely it does not, Your Honor.

18            THE COURT:  It doesn't?

19            MR. SAMBUR:  And the procedures set forth in the --

20   if you look -- underneath the box, Your Honor, it says "The

21   debtors' records reflect the amounts owing for pre-petition

22   arrearages as set forth on Schedule 1" which is defined as the

23   cure amount.  Which means they were only talking --

24            THE COURT:  I'm sorry.  What are you reading off of?

25            MR. SAMBUR:  Sorry.  The box on the front page of the

88

1    cure notice.  Underneath that box, the first sentence says "The

2    debtors reflect the amounts owing for pre-petition

3    arrearages" --

4              THE COURT:  I'm sorry.  Are you reading from Exhibit

5    O to the --

6              MR. BUTLER:  Correct, correct.

7              MR. SAMBUR:  Correct.  Sorry, Your Honor.

8              MR. SACKS:  And he's correct.  Near the bottom, Your

9    Honor, Schedule 1 is the cure amount.

10             THE COURT:  Oh, right.  Right.

11             MR. SAMBUR:  Yes, yes.  And you define it as the cure

12   amount.

13             MR. BUTLER:  Yeah.

14             MR. SAMBUR:  Step 1 says "Do you agree with this cure

15   amount or not?  Yes or no."  If you disagree, you skip step 2

16   and go to step 3 which indicates that you must file an

17   objection with respect to the cure amount.  It's only speaking

18   with respect to the cure amount.  It's only speaking with

19   respect to pre-petition arrearages.  The following paragraph at

20   the end, right above step 4 on the last page, Your Honor, page

21   3, it says if there is a dispute regarding the nature amount of

22   any cure, the ability of reorganized debtor to or any assignee

23   to provide adequate assurance or any other rights with respect

24   to this cure notice, that it's sep -- you have a right to bring

25   an objection separate and apart from this notice.  This notice

89

1      was only with respect to pre-petition arrearages.  It was only

2      with respect to the receivables that my client purchased that

3      the debtors were aware they purchased.  And they've

4      acknowledged they purchased both through the filing of 3001(e)

5      and through their Exhibit P.

6              MR. BUTLER:  Your Honor, the notice that was sent out

7      with respect to the pre-petition amounts is because that's what

8      the debtors believed was the only thing amount owed.  Does not

9      mean that the 365 party would not have a different view.  I

10     mean, the -- what Mr. Sambur is trying to do here is go back

11     and separate these notices and the order from paragraph 43

12     which, basically, was very clear, is not ambiguous.  And, you

13     know, Mr. Sambur can make whatever argument he wants.  He

14     shouldn't construe -- I never said on this record that these

15     notices were ambiguous which is what you said in your argument

16     a few minutes ago.  The debtors do not believe there's any

17     ambiguity in these notices whatsoever.  And I explained to Your

18     Honor earlier the reason you skip step 2 if you object to the

19     cure amount is because the -- it goes into the process where

20     there's only a cash determination because it's decided later

21     outside of the rights offering.  There is -- you know, we keep

22     going round and round and making every argument we can.  Mr.

23     Sam -- neither Mr. Sambur nor any other party can get away from

24     paragraphs 43 and 44 of your order, Your Honor, which are not

25     ambiguous.  They are clear.  We can go back and read the words

1    of paragraph 43.  You can read the words of the notice.  You

2    means you.  You doesn't mean somebody else.  When paragraph 43

3    says that the counterparties to supply contracts will act under

4    paragraph 43, Mr. Sambur seems to think that what we need to

5    say is it's the counterparties and then list all the people it

6    can't be.  The order says the counterparties.  And such

7    parties.  Not the assignees of such parties.  And his clients

8    are the assignees of such parties.

9              THE COURT:  Okay.

10             MR. SAMBUR:  Again, Your Honor, I think just -- just

11   goes back to good faith.  You meant you, did not exclude

12   assignees, did not exclude powers of attorney.  We believed we

13   were acting properly under the bankruptcy rules, under power of

14   attorney with respect to these cure amounts.  And in no way was

15   this an attempt at interference.  This was simply trying to

16   submit cure notices in a timely fashion.  There has been

17   parties who have acted through you being -- not you, the

18   contract counterparty, but you being the claims purchaser or

19   attorney-in-fact or attorney-at-law but provided documentation,

20   provided evidence as late as today that Your Honor has agreed

21   and the debtors have agreed should be acceptable.  And I

22   don't -- I just -- again, I just don't see where the

23   distinction is between allowing non-originals, between allowing

24   "you" not meaning "you" but if you provide evidence but we

25   didn't request the evidence but if you provided it by January

1    14th shouldn't it mean "you" being my clients who submitted

2    documentary evidence on February 4th and February 5th, followed

3    that up on several occasions requesting what other

4    information --

5         THE COURT:  Well, but I guess the difference is that

6    by that point, the debtors have prepared for and had the

7    confirmation hearing and I approved confirmation of the plan.

8    That's the distinction.

9         MR. SAMBUR:  Your Honor, I just -- again, because if

10   there is an objection here, the debtors would now know the

11   final cash payment until thirty days after the effective date

12   anyway.  So I don't see what impact that has on the

13   confirmation hearing in addition to the arguments that Mr.

14   Zinman made earlier, which was each one of these separate cure

15   notices represents, at best, a negligible and immaterial

16   amount.  And again, we're talking about out of 314 -- I believe

17   if I've tallied this correctly, 314 objections to these cure

18   notices and 100 and -- let's say, 50 or 140 or so which, again,

19   parties have stated there was ambiguity.  That's why they filed

20   responses.  Or they attempted the best they could to comply, to

21   follow the instructions.  And that some submitted non-originals

22   in their best efforts and that some simply provided evidence

23   after the fact because they believed that they were complying.

24   It's just a matter of degree.  And I don't -- I just -- I don't

25   see why my clients should not fit within that Pioneer standard

92

1    if other parties have in similar circumstances.

2          MR. BUTLER:  Your Honor, this will be my final

3    comment.  I think it's our motion so we get to finish the

4    argument unless Your Honor wants to hear more from us.  And the

5    only other thing I want to simply observe here is that Mr.

6    Sambur suggests that there's being discriminatory justice

7    passed out here.  I don't think that is a fair inference on the

8    record at all.  What we -- as we sit here today, the order that

9    we're asking Your Honor to enter would, aside from these 109,

10   would draw a bright line for notices that were filed by -- no

11   later than the 14th of January and that had attached to them

12   authority for the signature that was appended to it.  Those are

13   all -- and I don't agree with Mr. Sambur because I got up and

14   said that I'll accept the fact the McDermott Will was in fact

15   the lawyers to the one --

16         THE COURT:  The counterparty.

17         MR. BUTLER:  -- counterparty changes that analysis at

18   all.  I just -- you know, the fact is that had not been

19   asserted.  And if it is, it is.  We're going to recognize

20   counsel that after their clients in these circumstances.  So

21   what's happened here, and Mr. Sambur has done a very good job

22   over the course of the last month and a half, or two months, to

23   try to dig his clients out of the hole they made for themselves

24   by not following the order.  And he sent lots of -- he's

25   produced lots of documents.  He's created lots of powers of

93

1    attorney.  He's gotten lots of letters written.  He has written

2    lots of e-mails, all of them after the fact and none of them

3    which changed the fundamental fact that his clients did not

4    follow the solicitation procedures order.  And we've heard his

5    arguments as to why that is and Your Honor can determine, from

6    the debtors' perspective, if Your Honor believes that they've

7    made their case on the evidentiary record before you, we'll

8    respect the ruling and move on.

9           THE COURT:  Did you have a response to my point about

10    optionality?

11          MR. SAMBUR:  I'm sorry, Your Honor.  If you could

12    just clarify.

13          THE COURT:  That if you kind of do it arguably right

14    in the stock -- that you preserve the option depending on

15    whether the stock goes up or down.

16          MR. SAMBUR:  I believe what -- I believe what you're

17    referring to, Your Honor, is if we -- if our contract

18    counterparty received a stock rather than cash, we would sort

19    of have an option to either --

20          THE COURT:  No, no.  I'm saying that by not filling

21    out the form exactly as contemplated by the order you kind of

22    have the option to say whether the form's right or not.  And

23    you can wait as long as you reasonably want to on that point to

24    see which is the best alternative.

25          MR. SAMBUR:  Certainly, Your Honor, in this case we

1    had e-mails and, again, calls reaching out to debtors' counsel

2    which indicated as early as January 16th and phone calls

3    thereafter indicating that we weren't trying to preserve an

4    optionality here.  And, in fact, what we're trying to do is

5    just get this form accepted in the manner that it was

6    submitted.  And if that is the case and if the Court were to

7    accept this in the manner submitted, we would have deemed to

8    reject the cure notice.  And the amount would be paid in cash

9    as opposed to stock.  And I don't think there's any question

10   here, Your Honor.  And as the debtors themselves have

11   indicated, this really is a cash issue because of the perceived

12   value of the stock.

13            THE COURT:  Well, but let me -- but again, assume for

14   the moment that between the date that Blue Angel submitted

15   these forms as assignee and the date that we're at today, the

16   stock market continued on in its very healthy cheerful way of

17   last summer.  Would you say if the debtors said well, you know,

18   they made the election.  They should take cash.  Would you say

19   oh, yeah, we did?  Are you telling me that?  Or isn't there

20   some room to maneuver there and say we didn't really.  We

21   didn't know it.  And how can -- you know, you got this order.

22   How can you say that you can extend the order then say that we

23   didn't elect cash?

24            MR. SAMBUR:  I mean, I think what you're referring to

25   is we'd actually be on opposite sides.

95

1           THE COURT:  Yeah.

2           MR. SAMBUR:  It'd be the debtors who'd be saying --

3           THE COURT:  I understand.

4           MR. SAMBUR:  And, you know, I think the only response

5      to that is cash is always worth a hundred percent of its value.

6      It's always going to be worth that cure amount.  And the stock

7      just --

8           MR. SACKS:  Your Honor --

9           THE COURT:  All right.  I hear your answer.

10          MR. SACKS:  Your Honor, I think there's nothing in

11     the record to suggest that optionality, number one.  Number

12     two, the estoppel would be so clear in the circumstance, just

13     so clear.  I mean, it's the parties who submitted the original

14     cure notices would be so clearly estoped from the optionality

15     in addition to the fact that it really is just conjuring up,

16     with all respect to the Court, conjuring some mal motive.

17          MR. ZINMAN:  Your Honor, I might add that the price

18     differential between the value of the stock and the cash was so

19     great to make that possibility almost nonexistent at the time

20     that we're talking about.  Further, at the January 10th

21     hearing, Mr. Shiff made clear that all of our clients wanted

22     cash.  So at least with respect to ASM and the others, it was

23     clear what we were asking for.  And even if the other estoppel

24     -- and I agree with counsel --

25          THE COURT:  No.  ASM was clear from the start.

96

1        MR. ZINMAN:  Yeah.

2        THE COURT:  And the other two.

3        MR. ZINMAN:  As long as -- if I can just raise a

4   couple two --

5        THE COURT:  Well, before we get to that, are there

6   other -- someone has been standing up very patiently behind you

7   all.  Before Mr. Butler says he doesn't want to make any more

8   points, we should hear from her, too.

9        MS. BERKOFF:  Thank you, Your Honor.  I was getting

10  some exercise.  It was fine.  Leslie Berkoff, Moritt, Hock,

11  Hamroff & Horowitz, Your Honor.  We represent Robin Industries.

12  To the extent that Robin Industries sold its pre-petition claim

13  to Silver Point, those arguments are addressed.  They're

14  touched on in our papers; I'm not going to repeat them.

15  They've been gone over at length.  But some of the commentary

16  and arguments that have just come forth sort of highlighted the

17  second half of our objection and, if you would, our concern.

18        Robin Industries had a post-petition obligation that

19  it believed it was due at the point in time that these notices

20  went out.  It did read that notice to reflect a pre-petition

21  number that the debtor believed was due, disagreed with the

22  number but Silver Point is addressing that and the post-

23  petition number in time.  And we filed an objection which, I

24  believe, is going to be heard on March 19th to the assumption

25  and cure obligations.  And we've talked about what the impact

97

1    of the notice that went out is.  And this is somewhat ancillary

2    to the hearing.  But my concern is that when we're talking

3    about -- there's two concerns.  The first is, when we're

4    talking about the fact that the debtors sent out a notice

5    identifying a pre-petition obligation and there was a post due,

6    that we would have been responsible for responding to other

7    than filing the objection, the pleading that we did.  There's a

8    concern.  And perhaps that's best or more appropriately

9    addressed on the 19th.

10            THE COURT:  No, no.  I think the notice is clear on

11   that point.

12            MS. BERKOFF:  Oh.  To the extent that you believe

13   that it's blocking the post-petition amount or the pre-petition

14   amount?  That it's just fixing the pre-petition amount?

15            THE COURT:  Pre-petition.

16            MS. BERKOFF:  Okay.

17            THE COURT:  But I still have the question how did the

18   parties -- I mean, now the debtor and the counterparty deal

19   with this other than directly?  You know, how did -- there's a

20   third party injected into it.  Isn't that really the

21   counterparty's issue?

22            MS. BERKOFF:  I'm not looking, Your Honor -- I

23   guess -- and I apologize, I'm really trying to deal with the

24   ancillary issue.  I don't want to deal with the Silver Point

25   issue.  I feel that we've --

1          THE COURT:  Well, I know.  But I'm asking you to.

2          MS. BERKOFF:  You're asking me to.  Well, to the best

3     that I can tell you factually and I apologize.  I am local

4     counsel not main counsel

5          THE COURT:  Okay.

6          MS. BERKOFF:  -- so I'm not as steeped as it.  There

7     were communications to the best of my knowledge and we provided

8     Silver Point with the information that they would have needed

9     to respond to that.  That's how it was addressed.

10         THE COURT:  No.  But I'm saying as far as the purpose

11    of this notice, which was in connection with an assumption

12    under Section 365, all the rights derived from 365 which is a

13    package of rights that the non-debtor counterparty to the

14    contract has cure, both pre and post, or adequate assurance of

15    prompt cure, adequate assurance of future performance and

16    whether the parties want to negotiate the underlying business

17    terms of their agreement going forward -- and I guess -- how is

18    the debtor to deal with that package if it has to deal with

19    potentially multiple assignees?  I mean, we have this case with

20    Credit Suisse assigned to Blue Angel and either Blue Angel may

21    well assign to Marlita (ph.) Dietrich, you know?  Who knows?

22         MS. BERKOFF:  If you're talking about the

23    practicality of it and you're looking for the input to the

24    extent that we dealt with the process, Your Honor, when we

25    negotiate the sale and assignments, we delineate between the

1    responsibilities and identify that -- it's a pre-petition

2    number.  The package of the business terms, the assumption, the

3    going forward obligations -- and for that reason that's why

4    Robin Industries is still here.  It's concern of future

5    obligations under the ongoing contracts that they not be

6    affected by what's going on, that they be dealt with solely by

7    the business terms.  Those exist.  And to the extent that the

8    question is how can the debtor deal with two parties, if you

9    would, the pre -- I think it's -- in my view, why is it any

10   different than the fact that they have to deal with five

11   million creditors.  You have numbers; it's a number issue.  On

12   the assignee issue --

13            THE COURT:  Well, except 365 talks about the trustee

14   dealing with the contract.  Anyway --

15            MS. BERKOFF:  All right.  I'm not -- I'm not --

16            THE COURT:  I appreciate it.  That's not why you

17   stood up.  I was just curious.

18            MS. BERKOFF:  No.  It's not -- but the point, if I

19   can just get back to it, is just to clarify --

20            THE COURT:  You're not -- you're not precluded by the

21   fact that the objection that was -- the cure objection was just

22   as to the pre-petition amount.

23            MS. BERKOFF:  Right.  And thank you very much, Your

24   Honor.  That was our concern.  And we'll deal with the

25   substance of that, I assume, on the 19th.

100

1        MR. BUTLER:  Yes, we will.

2        THE COURT:  Okay.  Are there any other parties

3   besides the three who have spoken here?  Okay.

4        MR. BUTLER:  Your Honor, I thought I said last thing

5   but counsel -- the various counsels keep coming up with

6   additional arguments and so I need to make one comment that Mr.

7   Zinman just spoke to.  And he made a statement that's not

8   supported in the evidence and I just want to simply say he made

9   a statement that made it sound like it was a factual view that

10  the value of a cash distribution here is more valuable than

11  plan currency.  That would not be what the evidence was in the

12  confirmation hearing.  It is what -- you know, it sort of is

13  what it is.  I assume that because he represents a claims

14  trader, they're looking at not an intrinsic value but looking

15  at the current trading values.  I have no idea what the basis

16  of his statement is.  But the fact of the matter is under the

17  plan, a cash election does not get interest for two and a half

18  years, post-petition interest.  And a plan currency election

19  gets -- the face amount of that claim gets a post-petition

20  interest for a -- you know, roughly, two and a half year

21  period.  And if ultimately at the end of the day, the plan

22  value that Your Honor found to be reasonable when you found the

23  plan to be feasible in the confirmation hearing is ultimately

24  realized in these cases.  And the intrinsic value of this -- of

25  the debtors prevails as the debtors believe that it will.

101

1    Ultimately, the ultimate value that -- of those who elected

2    plan currency may well have ended up at the end of the day

3    being a superior decision.  So I just don't want this record

4    and that statement to in any way be viewed as being agreed to

5    by the debtors.  The debtors rely on and will stand on the

6    confirmation record that was made as it relates to valuation.

7            MR. SAMBUR:  Your Honor, I just wanted to address

8    your question to previous counsel regarding who is going to

9    sort out objections with the debtors if these notices are, in

10   fact, accepted.  And both my clients, Blue Angel and Midtown

11   Claims, indicated after filing these notices with KCC that they

12   were going to have no further action with respect to the

13   notices, that any objections going forward were going to be

14   made by Methode, Palmer and Kimball, respectively.

15           THE COURT:  Notwithstanding the powers of attorney.

16           MR. SAMBUR:  We indicated actually --

17           THE COURT:  So they had to give them back -- they

18   gave them back again?

19           MR. SAMBUR:  Actually, Your Honor, that's exactly

20   what we did.  In our letter we said, to extent necessary, we

21   hereby waive our power of attorney so that you can enforce

22   these claims --

23           THE COURT:  Doesn't that, like, undercut the whole --

24   doesn't that show why this is prejudice, why this is a big

25   deal?

1          MR. SAMBUR:  Again, Your Honor, I think that if there

2     was evidence necessary at that time for these parties to work

3     out the proper amounts, that accuracy is what we're really

4     looking at, then that documentation could have and would have

5     been provided.

6          THE COURT:  Okay.

7          MR. ZINMAN:  Two very, very quick points, Your Honor.

8     First of all, on behalf of each of our clients, I wanted to, on

9     the record, join in the arguments made by various -- other

10    objectors here.  And secondly, I wanted to just point out a

11    distinction between prior counsel's clients and ASM, that

12    although we do have some that ASM signed, what we're primarily

13    talking about here is not an issue of signatures but an issue

14    of timing.

15         THE COURT:  It's the timing issue, right.

16         MR. ZINMAN:  Correct, Your Honor.  And, in fact, two

17    is for signatures -- there's uncontroverted testimony that two

18    transferors refused to sign the transferor notices, the

19    original notices because they felt that that authority was

20    specifically granted to ASM under the agreements.  And, in

21    fact, the transfer agreements provide that all notices should

22    be forwarded to ASM.  And counsel for the debtors made an

23    argument at one point that there was -- you know, that each of

24    the parties, ASM included, intended to violate the order.

25    There's no evidence that there was intent to violate the order.

103

1    The evidence says that maybe they didn't comply with the order,

2    as Your Honor's ruled, but there's no -- that's different from

3    saying there's an intent, as if we sat down, figured out what

4    the order which Your Honor ruled and thought you know, this is

5    what the order says but we're not going to do it anyways.

6          THE COURT:  Okay.  All right.  Pursuant to a motion

7    that was dated September 6th, 2007, the debtors in these

8    Chapter 11 cases sought approval of several procedures in

9    related forms of notice pertaining to their efforts to emerge

10   from Chapter 11.  The motion sought approval for timing and

11   form of notice of the hearing on the disclosure statement,

12   procedures for the temporary allowance of certain claims,

13   setting a hearing date for plan confirmation and procedures for

14   filing objections to a plan and solicitation of ballots on a

15   plan and procedures for resolving disputes about post-petition

16   interest claims and reclamation claims and, as relevant here,

17   procedures for dealing with claims by parties to as yet

18   unassumed executory contracts with regard to a requirement of

19   Section 365(b)(1) of the Bankruptcy Code that before the debtor

20   can be authorized to assume an executory contract or lease, the

21   debtor must cure or provide adequate assurance of prompt cure

22   of defaults under such contract.  That motion was ultimately

23   granted pursuant to an order dated December 10th, 2007 which is

24   referred to as the solicitation procedures order.

25          As regards the motion itself, the relief sought in

1    respect of cure claim procedures was governed by paragraphs 83

2    through 87 under the upper case heading "Cure Claim

3    Procedures".  It explains the rationale for the request which

4    is, first, to set up a method for determining cure claims with

5    appropriate notice; and, second, to allow those who would have

6    cure claims the choice of participating in treatment afforded

7    to general unsecured creditors under the plan or,

8    alternatively, to elect to receive cash.  If the former option

9    applied, then the contract party would receive post-petition

10   interest in respect of its secured claim.  And the cure claim

11   plus the interest would be paid in plan currency as ultimately

12   provided in the plan that would be stock in the reorganized

13   debtors.  If the counterparty elected to receive cash instead,

14   it would not receive post-petition interest for the roughly two

15   years that the debtors were in Chapter 11 in respect of its

16   pre-petition cure claim.

17          The motion, in paragraphs 84 through 87, made it

18   clear that the party the debtors were dealing with was the

19   nondebtor contract counterparty to the supply contracts.

20   That's made clear by the repeated references to the

21   counterparty in paragraphs 84 and 85 and 86.  In particular,

22   paragraph 87 -- I'm sorry, paragraph 85 states "The cure amount

23   notice provides that if the counterparty agrees with the

24   debtors' stated cure amount, it may choose the treatment for

25   its cure claim.  If the counterparty disagrees with the cured

1      claim amount, the counterparty would be required to so mark and

2      return the cure amount notice by November 9, 2007."  As an

3      aside, that date was later extended to January 11th, 2008.  And

4      then continuing on with the motion, "And such party must

5      subsequently file a substantive objection to the cure claim

6      amount.  If the counterparty makes no election or does not

7      indicate that it will dispute the cure claim, then such

8      counterparty would be given the plan currency."  The motion

9      then says "The debtors propose to send the cure amount notice

10     to the supply contract counterparties on or before October

11     29th, 2007."  Again, that date was extended.  Finally, it said

12     "The plan provides, and the cure amount notice makes clear,

13     that the cure claim amount will be paid directly to the

14     contract party and not to the current holder of a claim

15     underlying the cured claim amount, if any."

16            It's quite clear when reading the motion that the

17     debtors' intent was to have the notice and the election all go

18     to and be exercisable by the contract counterparty.  That's

19     really no surprise because that's generally how the assumption

20     of executory contracts works.  Under Section 365(a) and (b),

21     the debtor deals with the party to the contract unless, of

22     course, that party has assigned the entire contract to a third

23     party in connection with the assumption and must establish that

24     it has cured or provided adequate assurance of prompt cure that

25     it's provided compensation or adequate assurance of prompt

106

1    compensation for any actual pecuniary loss resulting from the

2    default and provides adequate assurance of future performance

3    under the contract.  In addition, it's Hornbrook law that the

4    debtor can assume only the entire agreement absent the consent

5    of a nondebtor party to the contract.  It's also customary,

6    however, in connection with assumption motions for parties to

7    discuss whether as an addition to the debtors' agreement to

8    assume the contract which generally prefers the nondebtor

9    contract party because it provides for payment of pre-petition

10   amounts owing in full as opposed to smaller bankruptcy dollars,

11   that the parties open up the issue of whether any terms would

12   be modified in return for that generally preferable treatment.

13         For the same reason or similar reasons, i.e., that

14   the contract is viewed as an asset as well as a liability, pre-

15   petition claims under nonassumed executory contracts generally

16   are not treated as claims for purposes of Section 502 of the

17   Code because the contract has not yet been assumed or rejected.

18   If it is assumed, the cure amount gets treated under

19   365(b)(1)(a).  If it's rejected, both Section 365 and 502 have

20   a separate provision that specifies that the rejection claim is

21   treated as a pre-petition claim.  But that's only after

22   rejection.

23         So generally, in Chapter 11 cases, there's no issue

24   as to who the debtor properly should be dealing with as far as

25   providing notice of assumption or rejection and working out

1    either by negotiation or litigation the requirements of Section

2    365(b).

3              Here, however, as noted, the debtor wanted to provide

4    parties to executory contracts the option of electing plan

5    treatment.  I note that given the right to post-petition

6    interest the option reflects the fact that assumption of the

7    agreement here was not necessarily tantamount to preferring a

8    contract party whose agreement was being assumed over the other

9    unsecured creditors holding pre-petition claims because of

10   those creditors' right to post-petition interest.

11             In addition, in the order that was negotiated with,

12   among others, the members of the ad hoc trade creditors'

13   committee and for which -- or in connection with which there

14   was a settlement entered into that resulted in their agreement

15   to the solicitation procedures order and, among other things,

16   the debtors' agreement to pay a specified -- or agreed to the

17   amount of a specified amount of attorneys' fees for the ad hoc

18   committee, a procedure not only dealing with the election but

19   also for providing additional courtesy notice to claims

20   purchasers, the claims purchasers included the members of the

21   ad hoc committee who were not trade creditors in the sense of

22   having extended trade credit or provided goods and services but

23   had instead purchased trade claims and accounts receivables.

24             The order approving the solicitation procedures

25   covers cure claim procedures in paragraphs 44 -- I'm sorry, 43

1    through 45.  Paragraph 43 approves the form of notice which is

2    attached as Exhibit O to the contract counterparties, to the

3    supply agreements that the debtors intend to assume.  It also

4    states "Parties wishing to object to the assumption of their

5    contracts under the terms set forth in the cure amount notice

6    shall be required to return the cure amount notice in

7    accordance with the instructions provided therein so as to be

8    received by the specified deadline."  And then provides that

9    "Such objecting parties shall also be required to subsequently

10   file a substantive objection to the cure claim amount and/or

11   assumption of their contract on or before the date that is

12   thirty days following the effective date of the plan.  The cure

13   assumption dispute shall then be resolved following the

14   effective date of the plan."  It also provides, as the motion

15   sought, that "The debtors are authorized but not directed to

16   emit resolved uncontested or adjudicated distributions on

17   account of cure directly to the contract party whose contract

18   is being assumed or assumed and assigned."

19        Nothing in paragraph 43, therefore, suggests that

20   anyone other than the contract counterparty should return the

21   operative cure amount notice form attached as Exhibit O.

22        Paragraph 44 states "The debtors shall be authorized

23   to provide a notice to holders, assignees, transferees and

24   purchasers of claims of cure procedures established under

25   solicitation procedures order, the form of which is attached as

109

1    Exhibit P, to parties that may have purchased claims from

2    certain of the debtors' material supply agreement

3    counterparties who have been provided with a cure payment

4    election, pursuant to the cure amount notice", the cure amount

5    notice being, again, Exhibit O to the order.

6         The order then goes on to say "This shall be the only

7    notice the debtors shall be required to provide to these

8    purchasers with respect to cure and these purchasers shall have

9    no rights or recourse against the debtors with respect to the

10   cure."  It then goes on to say, in paragraph 45, that for those

11   counterparties, i.e., the contract counterparties, who receive

12   a cure amount notice for whom the debtors have multiple

13   addresses, the debtors shall be authorized to transmit a form

14   of notice, attached as Exhibit Q, which essentially acts as a

15   warning listing the other addresses that the debtors have so

16   that if, in fact, the recipient doesn't know about the context

17   of the matter, he or she can look at the other addresses and

18   are addresses that hopefully find someone who does.

19        In most Chapter 11 cases -- in fact, all of the

20   Chapter 11 cases that I've presided over, the normal process

21   would be simply to have Exhibit O or its equivalent sent out in

22   connection with a motion to assume a contract.  And the Exhibit

23   P notice was truly, in my view, something that was an added --

24   I won't say courtesy 'cause I assume it was bargained for by

25   the ad hoc committee, but an addition simply to alert those who

110

1    might have purchased accounts receivable that would constitute

2    cures so that they could contact their assignor to coordinate a

3    response by the assignor.

4           The Court heard nothing more about those portions of

5    the solicitation procedures order until a motion was filed

6    seeking an entry of an order to show cause by three --

7    actually, by more than three -- several members of the ad hoc

8    trade committee on or around January 8th, 2008, well beyond the

9    date when the cure notices were sent out by the debtors.  That

10   motion sought relief from paragraphs 43 and 44 of the

11   solicitation procedures order.  And the Court held a hearing on

12   the motion on January 10th, 2008.

13          The record of the hearing and the Court's bench

14   ruling is attached as an exhibit and is relevant to parties'

15   knowledge and understanding of how the cure claim procedures

16   were supposed to work.  In essence, the movants sought relief

17   to do a number of things.  First, they sought more time to

18   arrange for the submission of responses to the cure notices.

19   Second, they sought authority to file them directly as opposed

20   to having the counterparties file them.  And third, they sought

21   some ability to make a provision or a protective objection not

22   knowing the exact amount of cure that would properly be owing

23   under the pre-petition arrangements.  They acknowledged they

24   knew who their assignors were but they said it was difficult to

25   reach them all.  They also acknowledged that they didn't know

111

1    in most, if not all, cases on what basis to object to the cure

2    notice, i.e., what the proper amount should be.  It wasn't

3    clear to me then whether in fact that was based upon their own

4    failure to reconcile the amounts in conjunction with their

5    assignors or for some other reason.  But it did become quite

6    clear during the hearing that there was a distinct and

7    important rationale behind the procedure that the debtor had

8    obtained approval for as part of the solicitation procedures

9    order.  And that was that, because of the requirements of

10   Section 365(b), the debtor needed to deal with the contract

11   party to these important supply agreements.  And that absent

12   unusual circumstances, it should be required to have to deal

13   with more than the party to those contracts under Section

14   365(b).

15           I left room in my ruling for, under appropriate

16   circumstances, to recognize some play in the joints in that

17   important underlying policy.  For example, I noted that if

18   there was a request that was not timely honored for a new

19   original ballot that the contract party could submit then there

20   might be a rationale for a motion either under Pioneer and 9006

21   or, potentially, Rule 60.  But it was clear then that the

22   debtors were still receiving responses to the cure notices and

23   that the actual facts would not become clear until after the

24   deadline.

25           So I, therefore, denied the ad hoc -- the members of

112

1    the ad hoc committee's motion for modification of the

2    solicitation procedures order given the importance of the

3    debtors dealing directly with the contract counterparties and

4    the structure of Section 365 as opposed to the claim that's

5    created under 502 of the Code when a contract is rejected.

6            It so happened that, in fact, even at that late date

7    the movants' counterparties or the movants' assignors, in large

8    measure, did end up complying with the Court's order and

9    submitting a proper response to the cure claim notice.  But a

10   number didn't.  The debtors, therefore, filed a motion to

11   strike non-conforming cure claim notices.  I held a hearing on

12   that motion last week on February 21.  It was responded to by

13   roughly 180 objections out of a far greater number of parties

14   whose notices were covered by the motion to strike.  And it

15   appeared to me, after having reviewed the objections and based

16   on the record of that hearing, that a number of the objections

17   were well taken either in the sense that they were in

18   substantial conformity with the solicitation procedures order

19   or that they would pass muster under Pioneer Investment

20   Services Company v. Brunswick Associates Limited Partnership,

21   507 U.S. 380 (1993) including, as interpreted by the Second

22   Circuit, in, among other cases, Midland Cogeneration Venture

23   Limited Partnership v. Enron, In re Enron, 419 F.3d 115

24   (2nd Cir. 2005).

25           That is, in each case where a counterparty timely

113

1    filed a response to the cure notice or the response to the cure

2    notice was timely filed with a suitable direction by the

3    counterparty that the entity signing it on behalf was indeed

4    signing it on its behalf, I concluded that the motion to strike

5    should not be granted.  I also concluded that given that the

6    hearing on confirmation of the debtors' plan did not begin

7    until January 17th and that -- which was a Wednesday, and that

8    the deadline for filing the response to the cure notices was

9    Friday the 11th, that responses received by the following

10   Monday would be suitably in compliance to meet Pioneer.

11        Where I believed, however, that the debtors' motion

12   was well taken is in respect of circumstances that have been

13   covered primarily today in today's hearing although I should

14   say that it appears that at least in two respects as set forth

15   on today's record, one, the notice filed by the law firm

16   McDermott Will on behalf of a counterparty and also as

17   clarified in respect of -- on the record, of three ASM claims

18   provided that the debtors can confirm that they also met the

19   criterion that I outlined on last Thursday.  Those four claims

20   in the aggregate or those four responses in the aggregate would

21   be accepted from the relief sought in the motion to strike.

22        But as to all of the other objectors that it

23   remained, the distinction is as follows in each of the other

24   cases.  What was filed within the time that I said would pass

25   muster was a notice that was not signed by the contract

114

1    counterparty and did not have attached to it a direction by the

2    contract counterparty, that the party submitting the response

3    to the notice was authorized to do so on behalf of the contract

4    counterparty.  Specifically, the remaining so-called Silver

5    Point assignee responses were filed by Silver Point, a claims

6    purchaser, without any indication that the contract

7    counterparties had so authorized Silver Point to do so and  no

8    -- in particular, no signature from such parties.  The same is

9    true of the Argo assignee notices, the Contrarian assignee

10   notices and the Blue Angel and Midtown assignee notices.

11        The one exception to this is the notices -- the

12   remaining notices filed by ASM.  The record shows that fifteen

13   of such notices were filed with appropriate signed instruction

14   by the contract counterparty that ASM was authorized to act on

15   its behalf.  However, it appears that those notices were

16   filed -- were received on January 17th, the day of the start of

17   the confirmation hearing.  In addition, certain other notices

18   were received on January 22nd and 23rd.

19        The distinction over the authority to act, to my

20   mind, is a significant one as I've laid out already now for the

21   third time.  What I've not pointed out in any prior ruling,

22   however, is that the distinction was importantly underlain --

23   or underlied by the solicitation procedures order which made a

24   distinction in paragraphs 43 and 44 between the counterparties

25   who were authorized and directed to file the response to the

115

1    notice in Exhibit O in paragraph 43.  And assignees and claim

2    purchasers like Silver Point, ASM, Argo, Contrarian, Blue Angel

3    and Midtown, who were very clearly to be given only the

4    courtesy notice, attached as Exhibit P, and told, in my mind,

5    in very clear terms, in paragraph 44, that they would have no

6    rights or recourse against the debtors with respect to cure.

7         This certainly seemed to be the reading that the

8    parties who made the motion that I decided on January 10th were

9    taking.  And I believe any reasonable person who had read the

10   order would take that reading as well.  And, as noted at oral

11   argument, the solicitation procedures order went out to every

12   creditor because it covered the fundamental issues of the

13   debtors' procedure for emerging from Chapter 11, ultimately, in

14   terms of the confirmation hearing.

15        Moreover, the solicitations procedures order is very

16   clearly referenced repeatedly in the forms of notice attached

17   thereto as Exhibit O and Exhibit P.  So that if one had any

18   question whatsoever about who should be sending in the notice,

19   one could go online, onto the docket, and read the order.

20        Notwithstanding that, the various remaining claims

21   purchasers have argued that their submission with no timely

22   submission of any authority to do so by their assignees, the

23   debtors' counterparties, of a cure claim form should be

24   recognized either as a matter of law or pursuant to Rule 9006

25   and Pioneer because the neglect to comply with the solicitation

1    procedures order and the cure notices was attributable to

2    excusable neglect.

3         I think we're at the point where the claim purchasers

4    acknowledge that the notice sent to contract counterparties

5    pursuant to the solicitation procedures order, that is, the

6    notice attached as Exhibit O to that order, was directed to

7    those counterparties and directed those counterparties to

8    return the form.  Certainly, that appears to me to be clear

9    from the notice itself which says you must return this form in

10   the envelope provided by the date provided and provides in the

11   election yes, I agree with the cure amount or no, I disagree

12   with the cure amount.  And yes, I request payment of my cure

13   amount in cash or I request payment of my cure amount on the

14   distribution date in plan currency.  I also believe it's

15   conceded at this point, but even if it wasn't, I believe it's

16   inescapable that the courtesy notice attached as Exhibit P to

17   the solicitation procedures order, that is, the notice to

18   holders, assignees, transferees and purchasers of claims which

19   has no election provisions in it whatsoever and refers to the

20   counterparties receiving the cure notice and states that this

21   is the only notice that you, i.e., the assignees, transferees

22   and purchasers of claims will receive would understand that it

23   was the counterparties who were supposed to return the claim

24   notice.

25         Nevertheless, it is alleged that because the

1    transferors of the pre-petition receivables by the contract

2    counterparties to the claim purchasers included powers of

3    attorney that the transferees and claims purchasers reasonably

4    believed or at least should be excused from believing that they

5    would have the authority to fill out the counterparty cure

6    notice and send it in without any further indication to the

7    debtor that they were authorized to do so.

8           I've read, I believe, all of the powers of attorney

9    that have been attached as exhibits.  And I note that,

10   generally speaking, they deal with the claim that was assigned

11   and that nowhere do they refer to any rights under Section 365.

12   Nevertheless, most of them do provide for a power of attorney

13   in respect of the assigned or transferred claim rights, which

14   include in one shape or another claims, causes of action and/or

15   other rights and benefits arising under or relating to the

16   claim.  So it is true that arguably the contract counterparty

17   did provide the claim transferees with a power of attorney to

18   deal with such issues notwithstanding the absence of any

19   mention of Section 365.

20          One would very clearly come to the conclusion,

21   however, that whether or not the debtors had access to such

22   assignment agreements with their powers of attorney -- and the

23   record is clear that in some instances the debtors did not

24   because they were not filed with the notices under Rule 3001 --

25   the debtors obtained an order for important reasons and valid

1    reasons, as I said before, that directed the process to run

2    through the contract counterparties.  The rationale for that

3    has been, I believe, well set forth in the record of this

4    hearing and my prior rulings.

5            Under Rule 9006 and Pioneer, the Second Circuit has

6    been clear as stated in Midland Cogeneration Venture, "We have

7    taken a hard line in applying the Pioneer test.  In a typical

8    case, three of the Pioneer factors, the length of delay, the

9    danger of prejudice, and the movant's good faith usually weigh

10   in favor of the parties seeking the extension.  We've noted,

11   though, that we and other circuits have focused on the third

12   factor, the reason for the delay, including whether it was

13   within the reasonable control of the movant and we caution that

14   the equities will rarely, if ever, favor a party who fails to

15   file the clear dictates of a Court rule and that where the rule

16   is entirely clear, we continue to expect that a party claiming

17   excusable neglect will in the ordinary course lose under the

18   Pioneer test."  419 F.3d at 122-123 quoting Silivanch v.

19   Celebrity Cruises, Inc., 333 F.3d 355 (2nd Cir. 2003).  See

20   also In re Musicland Holding Corporation, 356 B.R. 603 (Bankr.

21   S.D.N.Y. 2006) where Chief Judge -- Chief Bankruptcy Judge

22   Bernstein, in citing the Midland Cogeneration case, states that

23   the Second Circuit focuses on the reason for the delay in

24   determining excusable neglect under Pioneer and that the other

25   factors are relevant only in close cases.

1    Before turning to the reason for the delay, I should

2    note, however, that I do not minimize, by any means, the

3    adverse affect of the relief that the claim purchasers would

4    here seek to obtain on the debtors.  It would, in essence,

5    throw a monkey wrench into the procedures that the debtors had

6    sought to have approved and that were approved and that all the

7    parties in the case, except for these parties, operated under

8    or have accepted, which is again that the debtor deals with its

9    contract party under Section 365.  Indeed, the rationale behind

10   that policy is highlighted by Midtown and Blue Angel's

11   agreement to have a power of attorney for the limited period it

12   takes to assert a claim and then, again, to turn over the

13   process to their assignor, the contract party, going forward.

14       The debtor reasonably relied upon what it believed it

15   obtained in the solicitation procedures order, which is the

16   right to deal with and hear from the contract party in

17   connection with the cure notices.  Now I've ruled that it's

18   appropriate for it to accept the contract party's instructions

19   if they came back with a cure notice.  But where that did not

20   occur, I believe that the debtor is indeed prejudiced.  I also

21   believe that there is or was room -- I'm not saying that this

22   was actually done, but there was room for abusing noncompliance

23   with the solicitation procedures order and notices to preserve

24   optionality for the claims purchasers as to whether they would

25   take cash or stock, although, as far as ASM, Argo and

120

1    Contrarian were concerned, their counsel went on record as

2    stating without any qualifications that their clients would

3    definitely take cash before the deadline during the hearing on

4    their order to show cause request.

5         The delay factor is also significant to my mind.  The

6    hearing on confirmation of the debtors' plan started on January

7    17th and resulted in ultimately an unopposed -- or at least

8    unappealed from confirmation order which is now final.  In

9    approaching a confirmation hearing, it's no secret that

10   multiple parties in a debtors' case try to finalize their

11   positions and their negotiations based upon the landscape as

12   they reasonably perceive it at the time.  Those negotiations

13   continue on through the confirmation hearing itself.  And it

14   was reasonable for the parties to assume as they were resolving

15   their outstanding differences over confirmation that the

16   solicitation procedures order would be complied with.  This is

17   more than just a projection of the debtors' cash needs although

18   that's significant.  And although this is a large case, I

19   believe that differences in excess of a million dollars in the

20   aggregate between cash and stock are still meaningful.  To my

21   mind, a million dollars is always meaningful.  But it goes

22   beyond just projecting the debtors' cash needs.

23        Again, compliance with the solicitation procedures

24   order, particularly after the hearing on January 10th, is

25   something that I believe all of the parties who had not

121

1    resolved their disputes over confirmation until the

2    confirmation hearing, and there were many, could reasonably

3    rely upon, as should the debtors have been entitled to

4    reasonably rely upon.

5         So, it seems to me two of the factors listed by

6    Pioneer, even though under Midland Cogeneration and the other

7    case law in the second circuit, those factors generally take a

8    back seat to the reason for the delay, are clearly not -- are

9    not clearly in favor of the claim purchasers here and, in fact,

10   to my mind, tilt more in favor of the debtors.

11        As far as the reason for the delay is concerned, I

12   would simply reiterate that it appears to me that the

13   solicitation procedures order and the two notices are clear as

14   to who was supposed to file the form.  And the focus clearly

15   was even more clear, which is that the contract counterparty

16   needs to be the party dealing with the debtor.  This was

17   reiterated several times in the July -- I'm sorry, in the

18   January 10th hearing.

19        It's argued, nevertheless, that certain contract

20   counterparties must have been confused because they sent their

21   original notice form directly to the claim purchasers to be

22   submitted by the claim purchasers.  I am asked to draw an

23   inference because there is no direct testimony as to confusion

24   that such an act indicates confusion.

25        It's also suggested by Blue Angel and Midtown that

1    they acted promptly to correct the situation, as did, it is

2    argued, Silver Point, although it appears that Blue Angel acted

3    a little faster, starting to deal with the debtors on February

4    4th and February 5th of 2008 after the confirmation hearing,

5    showing powers of attorney and the like, and attempting to

6    correct the impression that the forms submitted by Blue Angel

7    and Midland (sic), which were signed by them as assignee and

8    not attorney, either in fact or at law or under 9010(c), were

9    in fact acting as attorney-in-fact.

10           Nevertheless, I conclude, given what I believe to be

11    the clarity of the order and the notices, that the reason for

12    the delay was within the reasonable control of ASM, Argo,

13    Contrarian, Silver Point, Blue Angel and Midtown, and that when

14    considered in light of the other three factors as well, there

15    would not be a basis, with one exception which I'll address,

16    for extending time to correct the improperly submitted forms.

17    The one exception to this, I believe, is ASM in respect of the

18    transfers received by the debtors on January 17th, date of the

19    start of the confirmation hearing.  I believe that, given the

20    fact that ASM had attached to those documents the direction by

21    the contract counterparties, that the date of the start of the

22    confirmation hearing would not be unduly prejudicial to the

23    debtors, again, in light of the fact that the counterparty

24    itself was clearly, at that point, evidencing its direction to

25    look to ASM as being properly authorized to do so.

123

1          So, with that exception, I believe that the remaining

2     aspects of the motion to strike should be granted and that the

3     objectors should not be given additional time on the basis of

4     excusable neglect.

5          As far as the order is concerned, I think we've been

6     over the relevant provisions and I think the record is clear on

7     that point.  The record is clear as to the intention of

8     paragraph 9 as well as paragraph 11, and I also believe as far

9     as paragraph 8 is concerned with regard to duplicate notices

10    being true duplicates, and also the deletion of paragraph 7,

11    since it's unnecessary given the grant of -- in paragraph, I

12    believe it's 46, of the solicitation procedures order.

13          MR. BUTLER:  Your Honor, what we would propose to do,

14    if it's acceptable to the Court, is submit a further order with

15    respect to the rulings today.  I think that some parties have

16    indicated they want to take a -- they may choose to take an

17    appeal from that order.  The order -- I don't think there's

18    anything that people intend to appeal from the -- with these

19    changes from the order dealing with last week's hearing because

20    that provided that Exhibit -- that the contested matters are

21    simply scheduled for hearing today.  So we can --

22          THE COURT:  All right.  So you're going to submit two

23    orders?

24          MR. BUTLER:  Yeah, one order that dealt with last

25    week's hearing, as we've circulated to the parties, and then

124

1    one order that deals with the --

2            THE COURT:  The only thing I would sugge -- I would

3    suggest perhaps that you do three --

4            MR. BUTLER:  -- Okay.

5            THE COURT:  -- because there were four claims -- five

6    claims dealt with today, or five groups of claims.  The four

7    claims that I mentioned at the beginning, the one McDermott one

8    and the -- well, you still have to do your due diligence and

9    let's see.

10           MR. BUTLER:  Right, we have to check those.  If those

11   are correct, Your Honor, we --

12           THE COURT:  And then also the fifteen that were filed

13   by the 17th.

14           MR. BUTLER:  Right.  Your Honor, with respect to

15   those four you mentioned, the -- we'll do that.  We'll submit

16   that in that way, Your Honor.

17           THE COURT:  Okay.  All right.

18           MR. BUTLER:  Thank you.  Your Honor, I think that

19   leaves us with one final matter, that is, the Temic motion that

20   was filed outside of our motion to strike.  It's the Temic

21   Automotive motion for order extending time to elect, docket

22   number 12827, and Mr. Berger is handling that on behalf of the

23   debtors.

24           THE COURT:  If other people wish to leave at this

25   point, they are certainly free to.

125

1           (Pause)

2                   MR. BERGER:  Thank you, Your Honor.

3                   MR. SULLIVAN:  Your Honor, can I suggest that we

4     take, like, a couple-minute break just so that I can use the

5     restroom?  Is that okay?

6                   THE COURT:  That's a good idea.  In fact, I'd be

7     happy to break for lunch.  You can do your -- one of the

8     Skadden people or the company people can do the due diligence

9     on the ASM ones, and I can come back at 2:30, if that's

10    acceptable too.  Is that all right?

11                  MR. SPEAKER:  Thanks, Judge.

12                  THE COURT:  Okay.

13          (Recess from 1:41 until 2:41 PM)

14                  THE COURT:  Okay.  All set.  So we're back on the

15    record in Delphi.

16                  MR. BERGER:  Good afternoon, Judge.  Neil Berger,

17    Togut, Segal & Segal.  The last matter on Your Honor's agenda

18    for the Delphi case today is the motion by Temic Automotive,

19    motion for an order extending the time to elect at docket

20    12827.  I represent the debtors regarding that motion, and

21    McDermott Will & Emery is here to prosecute the motion.

22                  THE COURT:  Okay.

23                  MR. SULLIVAN:  Thank you, Your Honor.  If it's all

24    right, do you mind if I stay here?

25                  THE COURT:  That's fine.

126

1    MR. SULLIVAN:  Okay.  Your Honor, I guess before we

2    even really get to the whole Pioneer issue and whether or not

3    there was excusable neglect, the first issue was, was there

4    actual notice to Temic?  Paragraph 23 of Delphi --

5    THE COURT:  Can I interrupt you just for a second?  I

6    take it, per the papers, but I just want to make sure of this,

7    is there any dispute that Temic is an actual assignee of the

8    contract, as opposed to a claim purchaser or, you know, a

9    purchaser of just a portion of the --

10    MR. BERGER:  Temic is a counterparty, not an

11    assignee.

12    THE COURT:  Okay.  Well -- okay, it's a counterparty

13    at this point in --

14    MR. BERGER:  Yes.

15    THE COURT:  -- the contract.  Okay.  Go ahead.

16    MR. SULLIVAN:  Thank you, Your Honor.  Paragraph 23

17    of Delphi's objection cites a number of cases for the

18    proposition that there is a presumption that an addressee

19    receives a properly mailed item when the sender presents proof

20    that it is properly addressed, stamped and deposited in the

21    mail.  Delphi failed to meet its burden.  First of all, despite

22    numerous requests for copies of the notice allegedly served on

23    Temic, Delphi hasn't produced them.  Thus, there is absolutely

24    no evidence in the record that they even exist.

25    Secondly, contrary to Paragraph of the Unrue

127

1    declaration and footnote 3 of the Gershbein declaration, the

2    service addresses the debtors provided to KCC, the noticing

3    agent, was an alleged Remit DUNS number.  That alleged Remit

4    DUNS number is not the quote, unquote "main address and point

5    of contact for Temic" as is purported in the Gershbein and

6    Unrue declaration.  These Remit DUNS numbers were not provided

7    to Delphi by Temic, and the debtors do not dispute that the

8    main address and point of contact for its business with Temic

9    is Temic's national headquarters in Deer Park, Illinois.  The

10   Deer Park, Illinois address was clearly identified in all

11   relevant invoices at all relevant times.  You can look at

12   Exhibit 3 to Delphi's objection, which attaches the specific

13   invoices at issue here.  You can also look at Paragraph 10 of

14   the Patton declaration submitted in connection with the motion,

15   as well as Exhibit 3 to the Patton declaration, which attach

16   copies of invoices throughout the period of time.

17        And Delphi offers absolutely no explanation or

18   justification for its failure to attempt service at this

19   address.  The solicitation procedures require Delphi to serve

20   Temic "at addresses in the debtors' books and records," and

21   that's a quote.  Quote, unquote, "at addresses in the debtors'

22   books and records," and that such notice, quote, unquote,

23   "shall satisfy the debtors' noticing obligations".  And I refer

24   you to Paragraph 45 of the solicitation procedures order.

25   Given the only address clearly marked on Temic's invoices is

1    the Deer Park, Illinois address and that that address is

2    undisputed to be its national headquarters, such address was in

3    Delphi's books and records and Delphi had an affirmative

4    obligation under the solicitation procedures order to serve

5    Temic at the Deer Park, Illinois address.

6              THE COURT:  The bills have the 75 Remittance Drive

7    address, don't they?  Please mail payment to 75 Remittance

8    Drive?

9              MR. SULLIVAN:  That's with respect to payment, but on

10   the bottom of the invoice, Your Honor -- and certainly they

11   never sent it to that address either, Your Honor.  So it's not

12   like we're quibbling about, you know, they sent it to one of

13   the addresses listed on the invoice.

14             THE COURT:  Well, the affidavit of service says they

15   sent it to that one, right?

16             MR. SULLIVAN:  No, it does not.

17             THE COURT:  To 75 Remittance?

18             MR. SULLIVAN:  It does not, Your Honor.

19             THE COURT:  Okay.  Let me just double-check.  Okay.

20             MR. SULLIVAN:  And contrary to Paragraphs 32 through

21   35 of Delphi's objection, the proof of claim reclamation notice

22   and correspondence regarding the same are relevant because each

23   of these items references the POs that are the subject of the

24   plan cure notice.  And, again, each reference is only the Deer

25   Park address.  Further, Delphi cannot claim that it was not

1    aware that Temic took over those POs from Motorola because it

2    purported to notice Temic, not Motorola, with respect to those

3    POs.

4          The notices sent to a large multinational company

5    would need to be addressed to a specific person or at least to

6    a department to be deemed properly addressed, even if the

7    notices which were sent to these other tertiary addresses would

8    be accepted.  It's evidenced by the fact that similarly

9    deficient notices were sent to other clients of McDermott,

10   including Timken, Linear Technology and National Semiconductor.

11   But I was forced to request duplicate originals for each of

12   those companies because the notices had not been received, and

13   I refer you to Exhibit 2 to Delphi's objection which evidences

14   that fact.  There's an e-mail exchange between myself and

15   Delphi's counsel, which recorded --

16          THE COURT:  Was there a reason why Temic wasn't

17   covered by that?

18          MR. SULLIVAN:  I was not representing Temic, Your

19   Honor.  I was not counsel of record for Temic.

20          THE COURT:  Okay.

21          MR. SULLIVAN:  Your Honor, contrary to Delphi's

22   argument, Delphi was not served on Temic at four Temic

23   addresses.  The first address referenced is the Northbrook,

24   Illinois address.  That is a lab.  It's undisputed that that is

25   not the main address or the primary point of contact.

1    According to the certificate of service, only one of the two

2    notices was purportedly served at that address, not both as set

3    forth in the objection filed by Delphi.

4           The second address, the Nogales, Mexico address, is a

5    manufacturing facility in Mexico.  Again, not the main address

6    or the primary point of contact.  According to the certificate

7    of service, only the other of the two notices was purportedly

8    served here.  And this particular notice is not even relevant

9    to the dispute because it pertains to a -- you know, it has a

10    cure amount of zero.  So the only one that we're talking about

11    was the one purportedly sent to the Northbrook, Illinois

12    address.

13           The Farmington Hills, Michigan address -- there's no

14    dispute that Temic hasn't been at that address in many months.

15    That was never the main address or primary point of contact for

16    Temic.  And it is sheer luck that Temic eventually received a

17    notice in connection with another matter; that's the steering

18    sale cure notice that was sent in connection with the steering

19    sale -- the sale of the steering business, and that that was

20    received thirteen days after it was allegedly -- well, I guess

21    it was served since we eventually got it.  And the fact that

22    the steering sale cure notice does not -- the fact that they

23    got the steering sale cure notice does not mean that it

24    received the plan cure notice.  In fact, it may prove the

25    opposite because Temic filed an objection to the steering sale

131

1     cure notice on the same day that it received it, on February

2     5th.  And it is likely, therefore, that Temic would also have

3     objected to the plan cure notice, had it received one.  There

4     is no indication in the certificate of service which of the two

5     plan cure notices was allegedly sent to this address, the

6     Farmington Hills, Michigan.  If both were served at this

7     address, the address would have been listed twice on the

8     certificate of service, as was done for other contract

9     counterparties where there was more than one PO.

10            Therefore, there is no way to tell from reviewing a

11     certificate of service whether it was the certificate of

12     service -- I'm sorry, the plan cure notice which is relevant

13     here that was served at that -- purported to have been served

14     at that address, or the one which is not relevant here.

15            With respect to the Elma, New York address, again,

16     this is a manufacturing facility.  It's undisputed that this is

17     not the main address or the primary point of contact for Temic.

18     Again, there is no indication in the certificate of service

19     which of the two plan cure notices was allegedly sent to this

20     address, the relevant or the irrelevant one.

21            Delphi's argument that this address was the correct

22     one because the relevant invoices state that the goods were

23     shipped from Elma is nonsensical.  The invoices say quote,

24     unquote "shipped from Elma" and nothing else.  There is no Elma

25     address on the invoices.  Accordingly, there is no evidence in

132

1    the record that the relevant notice was served at any of these

2    addresses other than the Northbrook, Illinois address.

3           Further, Your Honor, contrary to Delphi's arguments,

4    Paragraph 2 of the Patton declaration clearly states that Temic

5    did not receive the plan cure notices, not just that they

6    hadn't seen them.  Delphi has not produced any evidence as to

7    whether or not any of the notices allegedly sent to Temic were

8    returned as undelivered, and I think the silence on that point

9    speaks volumes, Your Honor.

10          Further, it's clear that the debtors could have

11   exercised means, given the importance of this issue, to ensure

12   that the notices would be received.  They could have used

13   certified mail or fax or by e-mail to the primary contact, but

14   they chose not to do so.

15          For all of the above reasons, the presumption of

16   service of the plan cure notice is not warranted in this case.

17          Further, Your Honor, contrary to the arguments of

18   Delphi, Temic had no duty to proactively ask Delphi if a plan

19   cure notice had been served upon it.  Temic had no idea whether

20   Delphi intended to assume or reject the agreements and to be

21   permitted to wait to receive a notice before being obligated to

22   act on it.  Accordingly, Temic did not willfully ignore a

23   requirement, as Delphi suggests in Paragraph 41 of its

24   objection.  There is no evidence that Temic has acted in bad

25   faith in this matter.

133

1          Imposing a duty to act on Temic would eviscerate

2    Delphi's noticing obligation.  In any case, as I just

3    mentioned, I was not counsel of record for Temic at that time

4    and could not be expected to have requested such a notice at

5    the time.  I made similar requests for other clients.

6          And it is unclear why Delphi even mentions in its

7    objection the fact that I argued on behalf of Timken, not

8    Temic, at the January 17, 2008 confirmation hearing, which

9    post-dated the January 11, 2008 deadline by six days.

10    Paragraph 6 of the Court-approved steering cure notice, Your

11    Honor, dated January 23, 2008 says that the cure would be in

12    the form of cash unless the sale does not close until after the

13    plan effective date, in which case Temic would have the ability

14    to make an election for a separate plan cure notice that quote,

15    unquote "will be served on counterparties".  It did not

16    reference a previously served plan cure notice, implying that

17    one would be served in the future.  Delphi is obligated to

18    honor Paragraph 6 of the steering cure notice by serving such a

19    notice after the date of the steering cure notice.

20          Further, Your Honor, Paragraph 5 to Exhibit C to the

21    order approving a disclosure statement suggests that if it did

22    not receive a plan cure notice, Temic would have forty-five

23    days after entry of an order confirming the plan to request a

24    cure payment, again, leading Temic to believe that the fact

25    that it did not receive any notice was not something should be

134

1    taken as being unusual.

2         Your Honor, further, Temic acted promptly upon

3    learning of the alleged service of the notices.  Counsel for

4    Temic promptly reached out to Delphi's counsel, Togut, Segal &

5    Segal, after eventually being served with a steering cure

6    notice, and it promptly filed an objection immediately after

7    receiving that notice.  And it asked Togut, Segal & Segal how

8    it could go about electing to receive cash.  I mean, perhaps

9    that particular point is moot at this point based upon some of

10   the representations that Mr. Butler made here today that just

11   the mere fact that an objection is filed to a cure notice means

12   that that party will receive cash.  So perhaps, you know, at a

13   minimum, one could think that, at least no later than February

14   5th, 2008, Temic asserted its rights and objected to the cure

15   notice.  And, at that point, certainly it should have been

16   deemed to have elected to receive the cash payment,

17   notwithstanding the fact that Delphi has yet to produce

18   evidence that any cure notice -- plan cure notice, actually,

19   exists with respect to Temic.

20        Further, Your Honor, any delay was minimal, and given

21   that this litigation is being addressed in conjunction with

22   similar disputes involving other parties, the impact of any

23   delay upon the debtors' Chapter 11 cases is minimal.

24        Your Honor, further, it's important to note that

25   there is really no prejudice to Delphi in connection with this

135

1    matter.  Delphi had already prepared to pay Temic a cure in

2    cash if the sale of the steering business occurs before

3    emergence.  And there is no explanation by Delphi of how they

4    would be prejudiced if Temic was also paid in cash if the

5    closing occurs after emergence.

6         The exit financing and rights offering are not really

7    relevant here, Your Honor, because the exit lenders and/or the

8    investors must assume that payment of cures and cash is

9    possible given that the cure will automatically be paid in cash

10   if the closing of the steering business occurs before

11   emergence.

12        Further, Your Honor, there is really no floodgate

13   argument here either because it is not fair to grant Temic

14   relief and not other parties, where other parties were put on

15   notice of this issue as a result of Delphi's motion to strike

16   and Temic's pleadings and response.  Yet, no others have come

17   forward seeking similar relief.

18        Temic should not be held to -- as I mentioned

19   already, to an excusable neglect standard because it never

20   actually got the notice, therefore there was really no neglect.

21   Given the importance of the dollars at issue, Delphi could have

22   taken a few extra steps to make sure that parties were notified

23   and counsel of record received a copy of the notice.  But even

24   if Temic were held to an excusable neglect standard, Your

25   Honor, for the reasons previously stated, we believe that Temic

136

1    has adequately met that threshold.

2            THE COURT:  Well, let me just look at one thing.

3    McDermott was counsel of record, though, weren't they, for

4    Temic?

5            MR. SULLIVAN:  McDermott Will & Emery was, but

6    somebody from my Chicago office was representing Temic at the

7    time, not James Sullivan or anyone from the New York office.

8            THE COURT:  All right.  Okay.  Mr. Berger, let me

9    just cut to one point quickly.  Paragraph 45 of the

10   solicitation procedures order --

11           MR. BERGER:  Yes, Judge.

12           THE COURT:  -- says that transmission of this

13   proposed notice, i.e., the notice where there are multiple

14   addresses, is applicable, together with the cure amount notice

15   to addresses in the debtors' current books and records, shall

16   satisfy the debtors' noticing obligations.

17           MR. BERGER:  Yes, Judge.

18           THE COURT:  And was it sent to the addresses in the

19   debtors' current books and records?

20           MR. BERGER:  In fact, it was.  I have a witness with

21   me today as to all the addresses that were sent to the plans

22   (sic) and to counsel.  We believe that we satisfied our

23   obligations under the solicitation procedures order.  As to a

24   strong presumption of receipt, we rely upon the presumption of

25   receipt to all of those addresses but for Northbrook, and if

137

1     Your Honor needs testimony, I'm prepared to put that on.

2              But yes, Your Honor, at last week's hearing the

3     evidentiary record was closed.  Introduced into evidence as

4     Exhibits 1 and 2 are the declarations of Dean Unrue, who

5     specifically said that the addresses used and transmitted to

6     KCC for service of plan cure notices were addresses contained

7     in the debtors' books and records.  And Mr. Gershbein, who took

8     the stand and was cross examined by McDermott Will, submitted

9     an affidavit of service, which is before the Court today.

10             THE COURT:  But there are bills attached to the

11    Patton affidavit that include the Remittance Drive and Deer

12    Park addresses on them.

13             MR. BERGER:  There are three separate references to

14    addresses to Temic in the invoices, Your Honor.  I note that

15    those invoices post-date entry of the solicitation procedures

16    order, but those have three different addresses.  There's a

17    remit to.  At the bottom there's a legend for, generally

18    corporate headquarters, and there's also ship from Elma, and

19    Elma is one of the addresses that the debtors sent a plan cure

20    notice to.  Rather than -- I'm prepared to spend time on the

21    different plant locations but I think Your Honor touched upon a

22    central point here, which is the KCC affidavit at Exhibit E.

23    Pages 15, 22 and 27 specifically reference notices that were

24    sent to the McDermott Will Emery firm, four separate notices.

25    That was the exhibit under Exhibit P to the solicitation

138

1    procedures order.  That notice isn't specific to any

2    counterparty purchase order or location.  What that notice

3    says, Your Honor, is that you have an interest in some type of

4    material supply agreement.  The debtors are intending to assume

5    of all their material supply agreements.  An original plan cure

6    notice has been sent somewhere other than where you're

7    receiving this notice and you're on notice that you need to do

8    something about it.  So McDermott Will & Emery did act

9    admittedly in response to that notice.  They took credit this

10   morning and one credit for being attorney of record for.

11           THE COURT:  No, I appreciate that but the bill -- and

12   I appreciate it's a February bill, but it says please mail

13   payment to 75 Remittance Drive.  You know, I just -- I mean, I

14   guess that's the -- I mean, is that where the debtor sends

15   payment and has -- I mean, that's the issue for me.  Is that in

16   the debtors' books and records, that address?

17           MR. BERGER:  I can take a moment, Your Honor, but I

18   would observe that Paragraph 45 of the solicitation procedures

19   order doesn't require Delphi to serve counterparties at every

20   location where a counterparty may maintain a presence.  There

21   are multibillion dollar corporations that are counterparties

22   that have literally hundreds of locations throughout the world.

23   Delphi isn't under an obligation to serve plan cure notices,

24   courtesy copy notices, to all of those addresses.  Delphi needs

25   to look at its books and records, which it did, find addresses

1    for counterparties and serve notice at those addresses.  And

2    those addresses are presumed to have received -- are in receipt

3    of notices.  Counsel of record is presumed to have received

4    notice of record.

5            So, Your Honor, Temic seems to be arguing that there

6    is an obligation in this solicitation procedures order that we

7    serve every address for a counterparty, and that simply doesn't

8    exist in Your Honor's order.  This is -- again, this is an

9    issue of notice, not perfect service.  Temic was put on notice,

10   various forms of notice, that material supply agreements were

11   being assumed and that there was a need to act in reply.

12   Specifically, in response to a couple of points that counsel

13   makes, I was contacted by McDermott Will & Emery not until

14   about February 19th or February 20th, and my advice was you

15   need to file some type of a motion.  And the response was we've

16   heard that before.  It wasn't until Your Honor told McDermott

17   Will & Emery to file a motion last week that it filed a motion

18   on Friday.  Temic, through its agent and counsel, acts as an

19   agent for a counterparty in this case, knew of the debtors'

20   intent to assume material supply agreements when the debtors

21   filed their motion to approve the disclosure statement, and the

22   disclosure statement order, known as the solicitation

23   procedures order, was entered and when notice was sent out.

24           There is a point to us raising the issue of McDermott

25   Will & Emery appearing at the January 17 confirmation hearing

1   because McDermott Will appeared before this Court specifically

2   arguing a cure issue pursuant to Article 8 of the plan and, as

3   to that client, was seeking retroactive interest payments.

4   What counsel's appearance, counsel for Temic, has demonstrated

5   that day is a familiarity with the procedures at play in this

6   case.

7           Your Honor, I have a witness here I can -- I'm sorry,

8   just a moment please.  Your Honor, I do note that Delphi, in

9   its ordinary course, doesn't require invoices, and it's

10  unlikely that we -- it's highly unlikely that we issue checks.

11  Most of Delphi's payments go by EFT, electronic funds transfer.

12  So, to the extent that there is a remit to, and I know that --

13  I noticed that this invoice isn't authenticated, we think that

14  for the other reasons and for the reasons I've just stated that

15  the remit to address is not dispositive.

16          THE COURT:  The address in the contract is what?

17          MR. BERGER:  Farmington Hills, Michigan, same address

18  that Temic received notice of the steering cure notice,

19  received it, had it forwarded to in-house counsel and returned

20  to Delphi with an objection.

21          MR. SULLIVAN:  Your Honor, there's absolutely no

22  evidence of that in the record.  I'm not aware of any such

23  contract with any such notice.

24          MR. BERGER:  Your Honor, I can call the witness today

25  and have a copy of the purchase order marked.

141

1          THE COURT:  Okay.  Well, why don't you do that?

2          MR. BERGER:  All right.  First, Your Honor, if I can

3    call Mr. Evan Gershbein to the stand to address briefly one

4    issue raised by counsel.

5          THE COURT:  Before you do, is Mr. Patton here?

6          MR. SULLIVAN:  Your Honor, he couldn't be here.  He

7    said, you know, if Your Honor would allow it, he would be

8    available to testify telephonically.  I'm not sure whether

9    Your Honor would allow that, but unfortunately, because of the

10   very short constrained timeframe of this, he wasn't able to be

11   here today.

12         THE COURT:  Okay.  Do you want to cross examine

13   Mr. Patton?

14         MR. BERGER:  I think that the -- no, Your Honor.  I

15   think the affidavit is insufficient on its face.

16         THE COURT:  Okay.  Would you raise your right hand,

17   please?

18      (Witness duly sworn.)

19         THE COURT:  And, for the record, would you spell your

20   name?

21         THE WITNESS:  My name is Evan Gershbein, E-V-A-N

22   G-E-R-S-H-B-E-I-N.

23         THE COURT:  Okay.

24   DIRECT EXAMINATION

25   BY MR. BERGER:

142

1    Q.    Good afternoon, Mr. Gershbein.  I'm Neil Berger, attorneys

2    for -- conflicts counsel for Delphi.  Mr. Gershbein, do you

3    recall submitting a declaration in connection with the debtors'

4    motion to strike?

5    A.    I do.

6    Q.    Do you recall submitting an affidavit of service in

7    connection with the debtors' application to provide notice of

8    the plan cure notices to the counterparties?

9    A.    I do.

10            MR. BERGER:  Your Honor, may I approach the witness?

11            THE COURT:  Yes.

12            MR. BERGER:  Your Honor, I'm referring to Exhibit 40

13   of the evidentiary record, last week's hearing, which is

14   Mr. Gershbein's affidavit of service.  Your Honor, if I could

15   take the copy from the witness.  I have a different copy.

16            THE COURT:  Okay.  All right, you can go ahead.

17            MR. BERGER:  Thank you, Judge.

18   Q.    Mr. Gershbein, are you familiar with this affidavit of

19   service?

20   A.    Yes.

21   Q.    Can you generally describe to the Court what this

22   affidavit attests to?

23   A.    This is actually a different copy, I'm sorry.

24   Q.    Sorry.

25   A.    Thank you.  To answer your question, this is the affidavit

143

1   of service for the service on December 21st, 2007 for the cure

2   amount notice and related cure notices.

3   Q.   Very good.  Would you please turn your attention to

4   Exhibit A, page 178?

5   A.   Okay.

6   Q.   Does that page make any reference to Temic Automotive

7   North America?

8   A.   It makes reference to Temic Automotive of North EFT.

9   Q.   And this is your affidavit of service?

10   A.   It is.

11   Q.   Can you describe what your reference to Temic Automotive

12   of North America on this page describes?

13   A.   There's two entries for two different notices.  I can read

14   the addresses.  Temic Automotive of North EFT, 4000 Commercial

15   Avenue, Northbrook, Illinois 60062, and Temic Automotive of

16   North EFT-1, Patricio Lote 6 Park in San Carlo, Nogales Son.,

17   84090 Mexico.

18   Q.   Would you please turn your attention next to Exhibit C,

19   page 77?

20   A.   Okay.

21   Q.   You there?

22   A.   Yes.

23   Q.   Is there any reference to Temic on that page,

24   Mr. Gershbein?

25   A.   Yes.

144

1    Q.   Can you describe what your entries on this page describe?

2    A.   This is the exhibit for the duplicate notices that were

3    sent to Temic Automotive of North EFT and Temic Automotive of

4    North EFT-1.

5    Q.   And could you please read into the record the address for

6    the first reference?

7    A.   Temic Automotive of North EFT, Temic Automotive North

8    America, 37101 Corporate Drive, Farmington Hills, Michigan

9    48331.

10   Q.   And from this entry are you able to discern what was

11   mailed to that address?

12   A.   It was a complimentary cure notice.

13   Q.   All right.  And the next address, if you would read it

14   into the record.

15   A.   Temic Automotive of North EFT-1, Temic Automotive North

16   America, 611 Jameson Road, Elma, New York 14059-9566.

17   Q.   Would you please now turn your attention to Exhibit E of

18   your affidavit?

19   A.   Okay.

20   Q.   I'm starting in reverse, error.  Would you please turn --

21   reverse order.  Would you please turn to page 27?

22   A.   Okay.

23   Q.   Can you describe to the Court what this Exhibit E pertains

24   to?

25   A.   This pertains to the claims holder cure notice, or the

145

1    transferee notice.

2    Q.    And then the -- I'm sorry, at the end of Exhibit E, there

3    is a copy of the notice.  Sorry, it's Exhibit F.  Is that the

4    notice that went to the parties in Exhibit E?

5    A.    That's correct.

6    Q.    Okay.  Back to page 27, do you see a reference to

7    McDermott Will & Emery anywhere on that page?

8    A.    I do.

9    Q.    Could you tell the judge what you see there?

10   A.    I see two entries for McDermott Will & Emery LLP.

11   Q.    And, as with -- is McDermott Will & Emery the addressee of

12   those two addresses for those two entries?

13   A.    They are the -- they are the recipient.

14   Q.    And is it drawn to the attention of anyone at McDermott

15   Will & Emery?

16   A.    James M. Sullivan, Esquire.

17   Q.    All right.  Back to Exhibit A, Mr. Gershbein, as to the

18   first entries, Exhibit A, page 178, does KCC track returned

19   mail of the plan cure notices?

20   A.    We do.

21   Q.    And you're familiar with those books and records?

22   A.    Yes.

23   Q.    Okay.  As to the address for Temic North America in

24   Nogales, Mexico, is there any record of returned mail for that

25   plan cure notice?

146

1    A.    There is not.

2    Q.    Okay.  Turning to Exhibit C, page 77, you reference a

3    courtesy notice to Temic at Farmington Hills, Michigan.  Is

4    that correct?

5    A.    I do.

6    Q.    Is there any record in KCC's books and records to indicate

7    that the complimentary cure notice that was sent to that

8    address was returned?

9    A.    There is none.

10   Q.    And as to Temic Automotive at 611 Jameson Road in Elma,

11   New York, same question:  is there any record at KCC in KCC's

12   books and records that the complimentary cure notice that was

13   sent to that address was returned?

14   A.    There is none.

15   Q.    All right.  Now I'm turning back to Exhibit E to the

16   notices that were sent to McDermott Will & Emery.  Is there

17   anything in the KCC books and records to indicate that any of

18   the plan cure notices that were sent to McDermott Will & Emery

19   were returned?

20   A.    There is none.

21            MR. BERGER:  All right.  I have nothing else for this

22   witness.

23            THE COURT:  Okay.  Any questions?

24            MR. SULLIVAN:  Yes, Your Honor, just a few.

25   CROSS EXAMINATION

147

1    BY MR. SULLIVAN:

2    Q.   What are you looking at in order to determine whether or

3    not any of the notices were returned?

4    A.   I just looked at it last night, so --

5    Q.   What did you look at last night?

6    A.   I looked at our most current version of our returned mail

7    tracking list.

8    Q.   Did you bring that with you today?

9    A.   I -- I looked at an electronic copy.  I didn't --

10   Q.   So you're going off of memory?

11   A.   Yes.

12   Q.   Okay.  So, there's no -- but you have a document; you just

13   didn't bring it with you?

14   A.   We have documents, yes.

15   Q.   But you didn't bring it with you?

16   A.   No.  I mean, it's just an Excel file, so --

17   Q.   With respect to Exhibit C that you were just discussing,

18   the complimentary cure notice, you were referring to a page, I

19   think, 77.

20   A.   All right.

21   Q.   How do you know which notice was sent to each of those

22   addresses?

23   A.   You can't tell by this service list but I do know because

24   I also looked at that last night.

25   Q.   What did you look at last night?

148

1    A.    Well, we did the mailing.  The addresses on this list

2    relate to the purchase orders on the underlying cure amount

3    notice, and so I'm able to refer by the purchase order number

4    and our merged files that were used to create this notice as to

5    what exact notice went to these addresses.

6    Q.    Again, you didn't bring that with you today, did you?

7    A.    No.

8    Q.    Okay.  And you're not testifying that both notices went to

9    each of these addresses on Exhibit C, are you?

10   A.    I'm not.

11   Q.    In fact, that's not what happened, correct?

12   A.    That's right.  That's not what happened.

13   Q.    Okay.  So, the statements in the debtors' objection that

14   each of the notices are served at both of those addresses,

15   that's just wrong, right?

16   A.    I don't recall hearing that.

17           MR. BERGER:  Your Honor, I object to the question.

18   That's my statement on behalf of the debtors, not

19   Mr. Gershbein's statement.

20           THE COURT:  But your testimony is that the actual

21   cure notice went to the ones on Exhibit A?

22           THE WITNESS:  Exactly, yes.

23           THE COURT:  And the complimentary notice went to the

24   one on Exhibit E?

25           THE WITNESS:  C.

149

1          THE COURT:  C?

2          THE WITNESS:  Right.

3          THE COURT:  As well as E?

4          THE WITNESS:  E is the generic transferee notice.

5          THE COURT:  The generic one?

6          THE WITNESS:  Right.

7          THE COURT:  Okay.

8          MR. SULLIVAN:  Okay, the ge -- I'm sorry, I didn't

9    mean to interject.

10          THE COURT:  So the one on C is the multiple address

11   notice?

12          THE WITNESS:  That's right.

13          THE COURT:  All right.

14          THE WITNESS:  It's the notice --

15          THE COURT:  What's referred to as a notice form Q on

16   the order?

17          THE WITNESS:  It's the one with the watermarks

18   version as an exhibit of the cure amount notice itself.

19          THE COURT:  Right.  Okay.

20   BY MR. SULLIVAN:

21   Q.   Okay.  All right.  Just to be clear, because I just want

22   to make sure -- because I think it's important, there were two

23   notices referenced in Exhibit A, correct?

24   A.   Yes.

25   Q.   All right.  And you're not testifying today that each one

150

1    of those notices in Exhibit A was served at each of the

2    addresses in Exhibit C, correct?

3    A.    That is correct.

4    Q.    That didn't happen here, right?

5    A.    That's right.  It did not.

6    Q.    Okay.  And you didn't bring anything with you in court

7    today to tell you -- to figure out which notice went to which

8    of those complimentary addresses, right, which of the notices

9    in Exhibit A?  So if I point to the first notice in Exhibit A,

10   referenced, you don't know whether it went to the first address

11   or the second address, do you, in reference to Exhibit C?

12   A.    Not by this list, no.

13   Q.    So we don't know whether -- if I'm referring to, on

14   Exhibit A, the one that went to -- allegedly went to the lab in

15   Northbrook, Illinois, you don't know whether that was allegedly

16   also sent to the address in Elma or the address in Farmington

17   Hills, right?

18   A.    I do know from reviewing my files last night.

19   Q.    And what -- so what -- but you have nothing here with you

20   today, right?

21   A.    That's correct.

22   Q.    Okay.  And based upon your memory from what you looked at

23   last night, the notice that went to Farmington Hills -- I'm

24   sorry, not Farmington, Northbrook, Illinois, that did not go to

25   the Elma address, did it?

151

1    A.    It did not.

2    Q.    Okay.  So, at best, maybe it went to this Farmington Hills

3    address?

4    A.    That's -- based on my memory, that's the address it went

5    to.

6    Q.    Okay.  So the Elma address is the one that's identified as

7    a ship to on the invoice but the notice wasn't actually sent to

8    that address, correct?

9    A.    I -- I don't know what was identified as a ship to.

10           THE COURT:  Well, what did Elma get then?

11           THE WITNESS:  They would have gotten, then, the

12   address that -- the notice that went to Mexico, to the Mexican

13   address.

14           THE COURT:  To the multiple address that listed just

15   Mexico on the watermark?

16           THE WITNESS:  No.

17           MR. SULLIVAN:  I think I can probably clear this up

18   for you, Your Honor.

19   Q.    There are two -- one of the invoices -- one of the POs

20   referenced in Exhibit A, the one that went to Mexico, next to

21   it has a dollar denomination of zero, correct?

22   A.    I would have to take a look at the notice.

23   Q.    You can look at the notice.  It's Exhibit A, page 178.

24   A.    The one that went to the Mexico address has a zero dollar

25   purchase order.

152

1    Q.    Right.  And just so Your Honor is clear, that's not an

2    issue here today.  The only one that's allegedly -- the only

3    one that's at issue here today is the one with an actual dollar

4    figure of the two point some odd million dollars that allegedly

5    went to the Northbrook, Illinois address, okay.  So that -- the

6    only other address that that notice was sent to was the

7    complimentary address in Farmington Hills, Michigan, right?

8    A.    That's -- the -- that notice, as an exhibit to the

9    complimentary notice, went to the address in Farmington Hills.

10   Q.    All right.

11          MR. SULLIVAN:  And just so Your Honor -- just to

12   remind Your Honor, that's the address where it's undisputed

13   that Temic no longer has a facility there, okay.  So --

14          MR. BERGER:  Your Honor, objection.  That's counsel

15   testifying.

16   Q.    I'll direct you to Exhibit E.  I think you were looking at

17   page 27?

18   A.    Okay.

19   Q.    Okay.  You testified a short while ago about two notices

20   that were sent attention of James Sullivan, correct?

21   A.    That's correct.

22   Q.    And the party name is Silver Point?

23   A.    The party name is SPCP Group LLC as agent for Silver Point

24   Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd.

25   Q.    Right.  And McDermott Will & Emery and James Sullivan

153

1    don't represent Silver Point, do they?

2    A.    I would not know.

3    Q.    And you're not alleging that a copy of the Temic notice

4    was attached to a notice that was sent to McDermott Will &

5    Emery to the direction of Silver Point?  You're not alleging

6    that that was -- that a copy of the Temic cure notice was

7    attached to that, were you?

8    A.    Exhibit E is the generic transferee notice that's listed

9    in Exhibit F.

10   Q.    So it doesn't reference Temic at all, does it?

11   A.    It would not.

12        THE COURT:  Would it reference Silver Point or would

13   it --

14        THE WITNESS:  It -- it would be exactly as it's

15   written on this service list.

16        THE COURT:  So it would represent the Silver Point

17   entity, reference it?

18        THE WITNESS:  That's true.

19   Q.    Okay.  So it wouldn't put McDermott Will & Emery on notice

20   that anything went to Temic, would it?

21   A.    I wouldn't know what it would put them on notice for.  I

22   know what was sent to them and what address it was sent to and

23   how the address label looked.  I'm not sure what notice that

24   provides them.

25   Q.    So you don't know?

154

1    A.   No.

2           MR. SULLIVAN:  I'm not sure this if is the right

3    witness for it, Your Honor.  Perhaps there's another witness at

4    Delphi, which I could show it to.  I -- you know --

5           THE COURT:  Well, why don't you try?

6           MR. SULLIVAN:  Okay.

7           MR. SULLIVAN:  I don't know how you want to reference

8    it.

9           THE COURT:  Well, are you looking to introduce it or

10   just to -- as a demonstrative or refresh his recollection?

11          MR. SULLIVAN:  Well, I guess we could play it that

12   way and go through it.

13          THE COURT:  Why don't you ask the witness if he's

14   familiar with it?

15          MR. SULLIVAN:  Okay.

16   Q.   Can you -- are you -- can you take a look at what I just

17   handed to you?  It purports to be a number of invoices

18   between --

19          MR. BERGER:  I'm sorry, Your Honor.  Before you

20   address this witness, I'd like to know what you're referring

21   to.

22          MR. SULLIVAN:  It's the -- it's just the invoice that

23   I just handed to Your Honor.

24          THE COURT:  It's the bills that are attached to the

25   motion.

155

1          MR. SULLIVAN:  Your Honor, these actually aren't

2    attached to the motion.  There were some that were attached to

3    the motion but counsel for Delphi raised an objection about

4    the --

5          THE COURT:  Oh, I see.

6          MR. SULLIVAN:  -- timing of the invoices.

7          THE COURT:  I see.  So it's similar invoices.

8    They're not --

9          MR. SULLIVAN:  Similar invoices referencing the same

10   PO but a slightly earlier time period, just in order to deal

11   with the objection that Delphi raised with respect to the

12   timing of it.  It's worth noting that Paragraph 10 of the

13   declaration submitted by Mr. Patton specifically states that

14   the billing invoices at all relevant times periods had the same

15   Deer Park address.  There's also the invoices where --

16         THE COURT:  Okay, you --

17         MR. SULLIVAN:  Okay.  I apologize, Your Honor.  I

18   didn't mean to belabor the point.

19         MR. BERGER:  I think the first question is whether or

20   not the witness has ever --

21         THE COURT:  Exactly --

22         MR. BERGER:  -- seen it and is familiar with it.

23         THE COURT:  -- is the witness familiar with these

24   documents?

25   BY MR. SULLIVAN:

156

1    Q.    Are you familiar with -- have you ever reviewed any of the

2    invoices, Delphi invoices, in connection with preparing your

3    notice list?

4    A.    No.

5    Q.    Did you review any books and records of Delphi in

6    connection with putting together the service list?

7    A.    I'm not sure what you mean by books and records.  I

8    received the addresses that are listed on the service list from

9    Delphi.

10   Q.    So Delphi just provided you with addresses but didn't ask

11   you to review books and records in order to determine which

12   addresses to send the notices to?

13          MR. BERGER:  Your Honor, I think this line of

14   questioning is outside the direct testimony.  Mr. Gershbein was

15   specifically asked about the particular addresses.

16          THE COURT:  Well, I think it's fair to ask him where

17   he got them from.

18          MR. BERGER:  Very good.

19   A.    Can you repeat the question?

20   Q.    So you were just provided with addresses?  You weren't

21   provided with copies of Delphi business records to review in

22   order to determine where to send the notices to, correct?

23   A.    That's correct.

24          THE COURT:  Any -- is that it?

25          MR. SULLIVAN:  Yeah, nothing else right now,

157

1    Your Honor.

2             THE COURT:  Any redirect?

3             MR. BERGER:  Yes, just briefly.

4    REDIRECT EXAMINATION

5    BY MR. BERGER:

6    Q.    Mr. Gershbein, back to Exhibit E, if you would turn to

7    page 27.

8    A.    Yes.

9    Q.    The column address number 1, does that denote where the

10   notice was sent?

11   A.    That's the first line of the address label.

12   Q.    Very good.  And as to the two to McDermott Will, can you

13   tell the Court the first line in that address?

14   A.    The first line in the address?  The first line in the name

15   field?

16   Q.    Yes.

17   A.    SPCP Group, LLC, as agent.

18   Q.    I'm sorry.  I was --

19   A.    The first notice name would be McDermott Will & Emery LLP.

20   Q.    That's my question, thank you.  And the form of notice

21   that was sent to the parties in Exhibit E, that's the one

22   attached to Exhibit F --

23   A.    That's correct.

24   Q.    -- that we're referring to.  And that's a generic notice?

25   A.    That's correct.

158

1    Q.   Did any of those notices specifically reference a

2    particular purchase order?

3    A.   They did not.

4    Q.   Did they particularly reference a particular contract

5    counterparty?

6    A.   They did not.

7    Q.   And --

8         THE COURT:  But I thought you said they referenced

9    Silver Point, though.

10        THE WITNESS:  The address label on the envelope.

11        THE COURT:  Okay, even though it went to McDermott

12   Will?

13        THE WITNESS:  Right.

14        THE COURT:  Okay.

15        THE WITNESS:  The contents of the envelope are all

16   the same for all of them.

17        THE COURT:  Okay.

18        MR. BERGER:  Your Honor, I have nothing else for this

19   witness.

20        THE COURT:  Just let me make sure I understand.  The

21   two plus million dollar cure notice, not the one that was

22   attached to the Mexico mailing but the other one, that went

23   only to the Farmington Hills address?

24        THE WITNESS:  That's right.  That's the -- that

25   Farmington -- Farmington Hills address is associated with the

1    purchase order number for that.

2           THE COURT:  Did anyone -- did any of the other

3    mailings, the other three that are referred to in the exhibits

4    to your affidavit of mailing, did any of those other mailings

5    refer to that purchase order or to that contract?

6           THE WITNESS:  Two of the mailings referred to that

7    purchase order and the other two mailing referred to the other

8    purchase order.

9           THE COURT:  And which were the two that referred to

10   that purchase order?

11          THE WITNESS:  So the -- in Exhibit A, the one to the

12   Illinois address, referred to that purchase order, and then the

13   complimentary -- the related complimentary cure notice -- to

14   the Farmington Hills it referred to.

15          THE COURT:  Okay.  Okay.  Okay, anymore questions?

16   Okay --

17          MR. SULLIVAN:  No, Your Honor.

18          THE COURT:  -- you can step down, sir.

19          MR. BERGER:  Your Honor, I have a few short questions

20   for the next witness, Dean Unrue.

21          THE COURT:  Okay.

22          MR. BERGER:  Mr. Unrue?

23       (Witness duly sworn.)

24          THE COURT:  Could you spell your name for the record?

25          THE WITNESS:  It's Dean, and Unrue, U-N-R-U-E.

1              MR. BERGER:  Your Honor, may I approach the witness?

2              THE COURT:  Yes.

3      (Purchase order with Temic Automotive of North America was

4      hereby marked as Debtor's Exhibit 1 for identification, as of

5      this date.)

6              MR. BERGER:  Your Honor, I'm marking an Exhibit.

7              THE COURT:  Okay.  What are you marking it, Exhibit

8      number 1?

9              MR. BERGER:  Yup.  Thank you, Judge.

10             MR. SULLIVAN:  Can you just give me one minute to

11     just take a quick look at it?

12             MR. BERGER:  Yes.

13        (Pause)

14             MR. BERGER:  Counsel, I won't go beyond the first

15     page.

16        (Pause)

17             MR. SULLIVAN:  Okay.  Thank you.

18     DIRECT EXAMINATION

19     BY MR. BERGER:

20     Q.   Mr. Unrue, you just heard Mr. Gershbein testify as to

21     certain addresses in his affidavit of service for Temic?

22     A.   Yes.

23     Q.   Are those addresses comprised of information contained in

24     the debtors' books and records?

25     A.   That's correct.

161

1   Q.   I've shown you a document that's been marked as Exhibit 1.

2   Do you have that document in front of you?

3   A.   Yes.

4   Q.   Do you recognize this document?

5   A.   Yes.

6   Q.   Can you tell the Court what this document is?

7   A.   This is a purchase order with Temic Automotive of North

8   America.

9   Q.   Is there an address for Temic Automotive on the first page

10  of it?

11  A.   Yes, there is.

12  Q.   Would you read into the record the address?

13  A.   Temic Automotive of North America, Inc., 37101 Corporate

14  Drive, Farmington Hills, Michigan 48331.

15  Q.   And just to the right of that and in a slightly shaded

16  box, could you please read into the record the text that

17  appears below the legend invoice to?

18  A.   Yes.  It says, "Invoiceless purchase order.  Do not mail

19  invoice."

20  Q.   All right.  On the bottom of this page, the last full

21  paragraph that begins with the word "this", would you please

22  read that language into the record?

23  A.   Yes.  "This purchase order is an invoiceless purchase

24  order.  Do not send an invoice.  Payment will be based on

25  receipt records.  Any questions concerning payment should be

162

1    directed to the supplier relations at phone number (248) 874-

2    4636."

3    Q.   Very good.  Earlier, counsel for Temic referred to certain

4    invoices unauthenticated but still before the Court with

5    language that has please remit payment to, and has 75

6    Remittance Drive street.  Based upon the language you just read

7    into the record, would there have been any reason why Delphi

8    would have mailed checks or otherwise sent mail to the remit to

9    address?

10   A.   The remit to address on the invoice?

11   Q.   Yes.

12   A.   No.

13   Q.   And the address here and the other addresses that you've

14   testified were in the debtors' books and records and in your

15   declaration, did you state that that was among the forms of

16   information that provided KCC for service of the plan cure

17   notices?

18   A.   That's correct.

19   Q.   Very good.

20          MR. BERGER:  I have nothing else for this witness,

21   Judge.

22          THE COURT:  Okay.  Cross?

23          MR. SULLIVAN:  Thank you, Your Honor.

24   CROSS EXAMINATION

25   BY MR. SULLIVAN:

163

1   Q.   These purchase orders, how are they sent to Temic?

2   A.   I don't know.

3   Q.   You don't know?  Has Delphi been receiving goods from

4   Temic that it's ordered?

5   A.   I -- I -- I don't know the answer to that.  I would assume

6   so.

7   Q.   Okay.  So you don't know whether or not this was actually

8   mailed to the Farmington Hills address, right?

9   A.   The purchase order itself?

10  Q.   Right.

11  A.   No, I don't.

12  Q.   Okay.  Are you aware that Temic no longer has a facility

13  at the Farmington Hills address?

14  A.   No, I'm not aware of that.

15  Q.   If somebody at Delphi had questions or a dispute regarding

16  an invoice, who would they call?

17  A.   I'm sorry, I didn't hear the question.  Could you repeat

18  it?

19  Q.   Sure.  If somebody at Delphi had questions or a dispute

20  regarding an invoice or a purchase order, such as this one, who

21  would they call?

22  A.   If they had questions regarding the purchase order, I

23  would assume they would call the number directed at the bottom

24  of this purchase order.  If they had questions regarding the

25  invoice, I assume they would contact our accounts payable.

164

1   Q.   Which phone number are you talking about?

2   A.   The one that's listed on the bottom of the purchase order.

3   Q.   Which one?

4   A.   It says "be directed to supplier relations at (248) 874-

5   4636".

6   Q.   Isn't that a Delphi phone number?

7   A.   I -- I don't know.

8   Q.   You don't know?

9   A.   I would assume so.

10  Q.   What personal knowledge do you have about this purchase

11  order at all?

12  A.   We received a file of all our assumable contracts from our

13  global supply management group, and I received a file of the

14  purchase orders that are assumable.

15  Q.   Do you have any familiarity with the business relationship

16  between Delphi and Temic?

17  A.   No.

18  Q.   Is there anybody in this courtroom who does?

19  A.   Not that I'm aware of.

20  Q.   When was this purchase order sent?

21           MR. BERGER:  Your Honor, I'm sorry.

22  A.   I think --

23           MR. BERGER:  I'm sorry.  I object to the question.

24  He's asked whether or not he knew whether or not it was sent.

25  He said he did not know.

165

1         THE COURT:  Okay.  I guess it's been asked and

2    answered.

3    Q.   So you can't tell, then, from reviewing the purchase

4    order?

5    A.   I'm not in global supply management.  My function was to

6    implement the solicitation procedures order and receive

7    contracts from GSM and develop the cure amounts associated with

8    those contracts, use the addresses in our books and records and

9    forward the file to KCC.

10   Q.   You don't know where the Farmington Hills address came

11   from, whether that was supplied by Temic or whether it was

12   somebody at Delphi?

13   A.   The Farmer -- Farmington Hills address is an address

14   that's in our books and records.

15   Q.   Do you know where the address came from, though?

16   A.   The address that I used to send the file to KCC came from

17   our books and records.

18   Q.   I'm talking about do you know where the address on this

19   purchase order came from?

20   A.   The typewritten address?  No, I don't.

21   Q.   There's also a -- before you, there's a series of invoices

22   there to your right.  Have you ever seen those before or

23   anything like it?

24   A.   No, I have not.

25   Q.   So, assuming that those invoices had been received by

166

1    Delphi, wouldn't that be part of Delphi's business records?

2            MR. BERGER:  Excuse me, Your Honor, asking the

3    witness to speculate.

4            THE COURT:  True.  I think -- you and I and

5    Mr. Berger can talk about that, but he wouldn't have anything

6    to add to that.

7            MR. SULLIVAN:  Okay.

8    Q.   I mean, I could certainly refer you to Exhibit 3, which is

9    attached to the debtor's objection, which are the actual

10   invoices at issue.

11           THE COURT:  No, but it's the same point.

12           MR. SULLIVAN:  Okay.

13           THE COURT:  When you -- Mr. Unrue, when you requested

14   of the operations people to provide the contact information or

15   address information for the contract counterparties, did you

16   ask for any invoices?

17           THE WITNESS:  We didn't ask for invoices, no.

18           THE COURT:  And why was that?

19           THE WITNESS:  Because we wanted to use the address of

20   record in our purchasing system and we wanted to be consistent

21   and use the Remit DUNS, which is the address of record in our

22   purchasing system, and any other addresses that were in our

23   books and records.

24           THE COURT:  Okay.

25   Q.   And the Remit DUNS address, that wasn't provided to Delphi

167

1    by the supplier, was it?

2    A.    The Remit DUNS address is the address that's in our books

3    and records.

4    Q.    Right, but you did not obtain that from the supplier,

5    correct?

6    A.    I obtained it from our internal systems.

7    Q.    And you don't know who inputted that address into your

8    systems, correct?

9    A.    I know that it's the address of record on the purchase

10   orders that are in our books and records.

11          THE COURT:   In other words, it comes off the purchase

12   orders?

13          THE WITNESS:   That's correct.

14   Q.    All right.  And you don't know where those addresses came

15   from or why Delphi chose to use those addresses on the purchase

16   orders?

17          MR. BERGER:   Your Honor, asked and answered.

18          THE COURT:   Well, you can -- go ahead and answer

19   that.

20   A.    Well, I was just going to say that I know that the

21   addresses we used that were supplied to KCC came from our

22   purchasing system.  They were the addresses associated with the

23   contracts that are in question.

24   Q.    Right.  But what I'm saying is you don't know how they got

25   into your purchasing system in the first place?

168

1    A.    I would assume by our purchasing people.

2    Q.    But you don't know?

3    A.    No.

4              THE COURT:  Any more questions?

5              MR. SULLIVAN:  Not right now, Your Honor.

6              THE COURT:  Any redirect?

7              MR. BERGER:  Your Honor, just a short redirect.

8    REDIRECT EXAMINATION

9    BY MR. BERGER:

10   Q.    Mr. Unrue, counsel for Temic harps on whether or not you

11   were provided invoices.  Does Delphi ordinarily use an invoice

12   billing system for payment of goods received?

13   A.    No.

14   Q.    And what system do they use -- does Delphi use?

15   A.    The -- the payment is triggered upon the delivery of the

16   goods.

17   Q.    All right.  So invoices are irrelevant for purposes of

18   payment once goods are received?

19   A.    That's correct.  That's right.

20             MR. BERGER:  Nothing further for this witness, Judge.

21             THE COURT:  Okay.  You can step down, sir.

22             MR. BERGER:  Your Honor, may I address the Court?

23             THE COURT:  Sure.

24             MR. BERGER:  Your Honor --

25             THE COURT:  You don't have any other witnesses,

169

1    right?

2            MR. BERGER:  No, Your Honor.

3            THE COURT:  Okay.

4            MR. BERGER:  No, no other witnesses.

5            THE COURT:  Okay.

6            MR. BERGER:  Your Honor, Temic improperly frames its

7    argument as whether or not service was made in a fashion that

8    it would prefer or in some perfected way.  The debtors

9    satisfied their notice obligations, as required by the

10   solicitation procedures order.  Temic seems to argue that the

11   solicitation procedures order somehow requires the debtors to

12   have served plan cure notices to corporate headquarters in each

13   and every location of each and every one of its materials

14   contract counterparties.  No such obligation exists in the

15   solicitation procedures orders.  The aim of the solicitation

16   procedures orders was to put counterparties on notice that the

17   debtors were seeking to assume material supply agreements and

18   that there was a legal court order obligation to respond.  The

19   debtors did their best under the solicitation procedures order

20   and sent four plan cure notices to Temic, two pertaining to

21   this plan cure notice.  As to the Farmington Hills address, we

22   rely upon a presumption of receipt.  Not as to Northbrook but

23   as to all of the addresses that we sent plan cure notices,

24   including the one attached as Exhibit F to the Gershbein

25   affidavit, we do rely upon the presumption of receipt.

170

1          There is no affidavit by any employee from
2    Farmington, the Mexico operation or the Elma operation to deny
3    receipt.  The only affidavit --
4          THE COURT:  But the Farmington and Elma got notice of
5    a different contract, right?
6          MR. BERGER:  No.  Farmington, the testimony --
7          THE COURT:  Oh, I'm sorry, Elma and Mexico.
8          MR. BERGER:  Elma got something else, and I'll
9    address that point.
10         THE COURT:  Elma and Mexico, that's what I mean.
11         MR. BERGER:  I'll address that.
12         THE COURT:  Right.
13         MR. BERGER:  Farmington was sent a watermarked copy
14   of the plan cure notice for this plan cure notice.
15         THE COURT:  But their point there is that Farmington
16   was closed.
17         MR. BERGER:  I understand their point, Your Honor,
18   but what they haven't controverted and what they readily admit
19   is that the steering plan cure not -- the steering cure notice
20   went to that address, was received, sent to in-house counsel
21   and returned to the debtors with an objection within about six
22   or seven days.  That's set forth in their objections to the
23   motion to strike and incorporated into their motion for -- the
24   motion that's before this Court now.
25         As to those addresses, Your Honor, Temic is presumed

171

1   to have received notice of the debtors' intent to assume Temic

2   contracts at, at least, three of the four locations.  Temic's

3   counsel has been actively involved in the disclosure statement

4   and plan confirmation process.  McDermott Will was served with

5   at least two, and it appears four, generic courtesy notices

6   that put McDermott Will on notice that material supply

7   agreements were going to be assumed by the debtors.

8          THE COURT:  But ones that -- where Silver Point was

9   involved, right?

10          MR. BERGER:  Well, the address on the outside label

11  may have said Silver Point, but McDermott Will was counsel of

12  record for a number of material supply counterparties.  And, as

13  we've set forth in our response and as counsel admitted into

14  the evidentiary record, counsel affirmatively reached out to

15  the debtors and sought duplicate copies of plan cure notices.

16  Counsel said that he spoke to each of his clients and that he

17  wanted duplicate cure notices.  In response, the debtors, that

18  same day, said send us a list of all your clients for whom you

19  want cure notices.  Counsel sent back an e-mail to the Skadden

20  firm listing clients but not Temic.  The debtors had no reason

21  based upon that e-mail exchange that anything other than

22  receipt occurred for Temic for this purchase order.

23          Counsel received the notice sent to it pursuant to

24  Paragraph 44; he was put on notice.  And it's our position,

25  Your Honor, that Temic did have, through its agent in this

172

1    court, actual knowledge of the deadlines and procedures for the

2    cure notice.

3            THE COURT:  The ones for Timken and the like where

4    you asked for more information, those were Silver Point

5    related, were they?

6            MR. SULLIVAN:  No, Your Honor.

7            THE COURT:  Okay.

8            MR. SULLIVAN:  Well, I mean, Timken did sell its --

9    no -- yeah, Timken did sell its claim to Silver Point.

10           THE COURT:  But at that time, or was it -- I mean,

11   were you -- did the --

12           MR. SULLIVAN:  I never represented Silver Point, if

13   that's what you're asking me.

14           THE COURT:  I guess that's what I'm asking.  Did the

15   appearance of the Silver Point sub on the envelope, was that

16   what triggered your inquiry, or was it just --

17           MR. SULLIVAN:  No.

18           THE COURT:  -- you thought I generally ought to ask

19   about this because --

20           MR. SULLIVAN:  Ask about it because my clients were

21   interested in knowing about it and I was --

22           THE COURT:  Okay.

23           MR. SULLIVAN:  -- you know.

24           THE COURT:  Okay.  Okay.

25           MR. BERGER:  The last comment is, as acknowledged by

1    counsel, he was counsel of record for this particular material

2    supply counterparty when that notice was served, and he made

3    those inquiries.  I do take exception, once again, to the

4    notion that I somehow impeded Temic's ability to receive

5    duplicate copies of -- duplicate original plan cure notices.  I

6    wasn't contacted by the McDermott Will office until the

7    earliest on this issue, February 19.  It's our position,

8    Your Honor, that McDermott Will is the attorney of record and

9    has been involved in this case, has been actually aware of

10   these procedures since at least when the motion to approve the

11   solicitation procedures order was sought, when the order was

12   entered, when counsel appeared at the confirmation hearing and

13   thereafter.

14            THE COURT:  Well, what is your response to

15   Mr. Sullivan's point that, because of the interplay of the

16   steering business procedures, this is really a different level,

17   a much less and significant level, of prejudice than the others

18   because you don't have to do anything about the --

19            MR. BERGER:  The election.

20            THE COURT:  -- the election in light of that?

21            MR. BERGER:  Your Honor, I think that's a different

22   issue.  I think that's a -- it's a different issue.  I think

23   that it did receive the plan cure notice and made ref -- I'm

24   sorry, they did receive the steering cure notice, made

25   reference to the fact that a plan cure notice was out there.

174

1    And they returned that as early as February 5th, it having been

2    served at the end of January.

3            THE COURT:  But it's the same receivable, right?

4    It's the same two million?

5            MR. BERGER:  It's the same receivable, and what's at

6    play, Your Honor, is two million dollars.  Temic has preserved

7    its ability to receive cash if the deal -- the steering

8    divestiture closes pre-emergence.  What it's seeking to do is

9    now elect to receive cash if that divestiture closes post-

10   emergence.

11           THE COURT:  And when is the steering business closure

12   supposed to happen?

13           MR. BERGER:  It's targeted for end of March.

14           THE COURT:  Well, as far as the S-1, though, you

15   can't really include this in the S-1 because of that

16   uncertainty, right?

17           MR. BERGER:  The Temic?

18           THE COURT:  Yeah.

19           MR. BERGER:  Correct.

20           THE COURT:  All right.

21           MR. BERGER:  Right.  And that's the prejudice, Your

22   Honor.  It's the prejudice --

23           THE COURT:  No.  Well, I -- but I'm saying you'd have

24   that issue anyway.

25           MR. BERGER:  Not if they foreclose from electing cash

175

1    under the plan for failure to obtain and return a plan cure

2    notice.

3            THE COURT:  Well, no, I thought that if they -- they

4    had the second opportunity in connection with the steering

5    business, so you have to reserve the cash anyway.

6            MR. BERGER:  If the sale closes pre-emergence, not at

7    the sale.

8            THE COURT:  No, but that's why I'm saying I don't see

9    how you can -- you know, it's like Barry Bonge (ph.).  You

10   would have to include it in the S-1 with an asterisk, wouldn't

11   you, because you may end up paying him in cash anyway?

12           MR. BERGER:  He may get cash anyway if it closes.

13           THE COURT:  So, it's not like locking --

14           MR. BERGER:  If it closes pre-emergence, yes,

15   Your Honor.

16           THE COURT:  So, I mean, it does seem to me to be

17   different in that sense.

18           MR. BERGER:  Your Honor, I think our argument also

19   goes to a different point.

20           THE COURT:  Well, I'm sorry.  But what about

21   Mr. Sullivan's point that the steering notice kind of gave him

22   a separate chance anyway, separate and apart from the -- not

23   linked to the closing of the steering business?

24           MR. BERGER:  It doesn't give him a second -- a

25   separate chance for --

176

1            THE COURT:  Were you making that -- maybe you weren't

2    making that --

3            MR. SULLIVAN:  I was making that point, Your Honor --

4            THE COURT:  All right.

5            MR. SULLIVAN:  -- because the notice specifically

6    says -- it uses --

7            THE COURT:  I thought you were.

8            MR. SULLIVAN:  It uses the word will, which means

9    that you're going to get -- we're going to get another notice.

10   It doesn't refer to any notice that was previously sent.

11           THE COURT:  But isn't that tied to the steering

12   business closure, that that notice is for the steering business

13   if it closes before the effective date?

14           MR. SULLIVAN:  Well, we've gotten that notice already

15   and so we've already been told we're going to get cash if it

16   closes before the effective date.

17           THE COURT:  Okay.

18           MR. SULLIVAN:  So if --

19           THE COURT:  But you're expecting another notice?

20           MR. SULLIVAN:  Well, the notice specifically says

21   that if for some reason it doesn't close before the effective

22   date, you're going to get another notice.  That's what it says.

23   And it says you're going to get a plan cure notice.  It says

24   will.  It doesn't say, you know, refer back to one you

25   previously got.

177

1          MR. BERGER:  Your Honor, it does not say that.

2          MR. SULLIVAN:  It does.  I can --

3          MR. BERGER:  It does not say that.

4          THE COURT:  Well, do you have it?

5          MR. SULLIVAN:  Yes, I do, Your Honor --

6          THE COURT:  Okay.

7          MR. SULLIVAN:  -- and I can quote it to you --

8          THE COURT:  All right.

9          MR. SULLIVAN:  -- if you like, or I can hand it up.

10          THE COURT:  Well, let me look at it.

11          MR. SULLIVAN:  It was attached to the objection in

12   connection with the hearing this past Thursday as Exhibit,

13   either 1 or A; I believe 1.

14       (Pause)

15          MR. SULLIVAN:  I apologize, Your Honor.  It's not

16   stapled.  It's --

17          THE COURT:  It's all right.

18          MR. SULLIVAN:  On the first page, you'll see there.

19   It's fastened all together.  Specifically, I'll direct you to

20   Paragraph 6.

21          THE COURT:  But is -- I mean -- the --

22          MR. BERGER:  Your Honor, can I help here?

23          THE COURT:  It says that they'll serve the plan cure

24   notice in a time and manner specified under their proposed plan

25   of reorganization.  Isn't that the solicitation procedures

178

1    order notice?  I mean, doesn't that make it clear?  I mean,

2    there's nothing else, right?

3          MR. SULLIVAN:  Well, then why use the word will,

4    though?  It's very confusing if that's what it means.  It

5    should have said -- it should have referred to the one that was

6    previously served then.

7          THE COURT:  Well, but there's only -- there's no

8    other plan.  I mean, this is it.  There's nothing else --

9          MR. SULLIVAN:  Right, but at that point in time we

10   weren't even aware that there was this notice that was

11   purportedly served on us, so we were just assuming that we

12   would be getting one in the future.

13         MR. BERGER:  Your Honor, I think that's contradicted

14   by facts in evidence.  McDermott Will had already received a

15   complimentary plan cure notice.  They already knew that there

16   was already one plan that was being solicited and that material

17   supply contracts were being assumed pursuant to notices that

18   were issued pursuant to the plans in the solicitation

19   procedures order.

20         THE COURT:  Okay.

21         MR. SULLIVAN:  Yeah, but Mr. Berger's not test --

22   Mr. Berger is not implying that every single cred -- contract

23   party received it, a plan cure notice.

24         MR. BERGER:  No, but --

25         THE COURT:  No, but they knew that -- they certainly

179

1    got notice of the plan.  I mean, there's -- every contract

2    party got notice of the plan confirmation --

3              MR. SULLIVAN:  Well, that's for sure.

4              THE COURT:  -- and in the solicitation procedures

5    order.  And just it's hard for me to --

6              MR. SULLIVAN:  Well, that's for sure, but

7    certainly -- I mean, even the procedures order itself refers to

8    the possibility of notices being done after the plan effective

9    date.  It talks about responding within forty-five days of the

10   effective date of the plan.

11             THE COURT:  No, but --

12             MR. SULLIVAN:  It's different, Your Honor.

13             THE COURT:  -- I think you're kind of barking up the

14   wrong tree on this one.  Is there anything in the record about

15   when exactly the Farmington office was closed?

16             MR. SULLIVAN:  Yes, Your Honor.

17             MR. BERGER:  Your Honor, if there is, I haven't seen

18   it.

19             MR. SULLIVAN:  There's some declarations.  There's

20   two declarations.  Paragraph 7 of the declaration, which was

21   filed on February 19th, says --

22             THE COURT:  This is the Patton one?

23             MR. SULLIVAN:  Pardon me?

24             THE COURT:  Okay.

25             MR. SULLIVAN:  It says the debtors also sent their

1    notice of cure amount with respect to executory contract or

2    unexpired lease to be assumed and assigned in connection with

3    the sale of steering and halfshaft business to 37101 Corporate

4    Drive, Farmington Hills, Michigan, which is the old address of

5    one of Temic's offices.  This office was closed months ago and

6    a new tenant is now renting the space.  And there's probably a

7    similar kind of --

8             THE COURT:  Patton says the same thing, but it

9    doesn't -- it's not particularly specific as to when it was

10   closed.

11            MR. SULLIVAN:  I mean, I could certainly find -- you

12   know, get that information for you if you want, but certainly I

13   think the tenor of the declaration is that it was -- you know,

14   months ago doesn't -- you know, it was within the timeframe

15   that we're talking about, so it's certainly -- this is more

16   than -- is only about a month ago as this notice was sent,

17   so --

18            THE COURT:  There's nothing about Temic providing any

19   notice to the debtor that the office has changed, the

20   headquarters has changed?

21            MR. SULLIVAN:  You know, Your Honor -- I mean, I wish

22   there was a Delphi businessperson here that I could examine.

23            THE COURT:  No, no, but, I mean, usually when a

24   company changes -- closes its headquarters, they make

25   provision --

181

1       MR. SULLIVAN:  Right, Your Honor, but this isn't a

2  head --

3       THE COURT:  -- with --

4       MR. SULLIVAN:  -- the headquarters was always the

5  Deer Park address; Delphi knows it.  They have no excuse for

6  not serving the notice at the Deer Park address.  You know,

7  this address has been the one -- you know, Motorola used it,

8  then when Temic bought the business nobody moved seats.

9  Everyone stayed in their seat.  It was still the Deer Park

10  address.  So they can't come back here now and say we didn't

11  know where to send it.  It's been the same address forever and

12  the businesspeople know it.  If they have questions or

13  disputes, they don't call any other address; they call the

14  headquarters, and that's stated in the declarations,

15  Your Honor.

16       MR. BERGER:  Your Honor, may I respond to this point?

17  There is nothing specific in the record as to when the

18  Farmington Hills office was closed.  Both declarations refer to

19  months ago.  Temic bears the burden to rebut the presumption.

20  There is nothing in the record presented by Temic to show that

21  Delphi was notified at all that the Farmington Hills office was

22  closed.  There's also nothing in the record to demonstrate what

23  Temic, a large company, did to provide for notifying the postal

24  service, its current tenant or other employees who might be at

25  that address what to do with the mail.

182

1          THE COURT:  Okay.  I suggested last Thursday that

2     Mr. Sullivan do this on short notice because I thought it was

3     tied into the S-1.  I still don't see how it is.  I mean, if

4     they have a right to the cash, you're going to be issuing fewer

5     shares.

6          MR. BUTLER:  Your Honor, may I address that point?

7     For purposes of the rights offering, we have to create,

8     essentially tonight, a file of who is -- of what the -- who is

9     entitled to get a rights certificate.  That, you know, if Temic

10    elects cash, then they don't have a right to the rights

11    certificate.  If they -- if they're not permitted, they have

12    not elected cash, then they will be in the rights offering file

13    and they will get a rights certificate.  There is a finite

14    number of rights.  There is a finite number of --

15         THE COURT:  But they have a separate right to get

16    cash because of the steering business motion.

17         MR. BUTLER:  Yes, and that may very well -- but that

18    doesn't change, Your Honor, the -- right now, their general

19    right is the right -- under the plan is a right -- it may very

20    well be that they'll be able to get cash from steering, but the

21    reality is that the right as to --

22         THE COURT:  Well, what happens to those rights, then,

23    after they get the cash from steering?

24         MR. BUTLER:  It won't be exercised.  They'll simply

25    be paid the cash.  But that'll be post-rights offering.  I

183

1    mean, when they get the rights, but I mean -- it'll be after

2    the rights offering's over with, Your Honor.  We need to

3    know -- we just simply need to know, as the debtor -- that's

4    why I don't think it's an asterisk in the S-1, Your Honor.  I

5    understand Your Honor said that.  We have to have a finite

6    number of these are the parties who are going to get rights

7    certificates; this is the amount they're going to get in terms

8    of the rights certificate. We have to do -- Mr. Unrue, who is

9    present in court today, has to do all of those calculations.

10         THE COURT:  But what I'm saying is, is it necessarily

11   that they're going to get them, though?

12         MR. BUTLER:  Well, they'll get the rights because

13   remember, Your Honor, the way in which the confirmation order

14   and the plan are written --

15         THE COURT:  But they'll -- but it --

16         MR. BUTLER:  -- parties get rights as of the -- you

17   know, as -- it's presumed that if you're entitled to get a

18   right at a presumed time, you get it.

19         THE COURT:  But you -- they only get the rights on

20   the effective date.

21         MR. BUTLER:  No.

22         THE COURT:  Well, no, I'm sorry.  They -- what --

23   then -- but if they have -- then they -- how do you avoid the

24   double recovery issue?

25         MR. BUTLER:  Well, Your Honor, obviously there won't

184

1    be a -- we would address the double recovery if you got cash at

2    the end of the day.  We're not -- we would not, presumably, and

3    I mean we're working on the mechanics on all this stuff out.

4    This is not a perfect world.  That would be what happens post-

5    exercise of the rights offer.  We're not going to permit double

6    recoveries under the plan.  And I -- you know, and I haven't --

7    I'm not close enough to this particular issue, because I didn't

8    prepare for it, to understand whether their claim in the

9    steering and their claim under these notices are identical.  I

10   just don't know the answer to that.  The Court may and

11   Mr. Berger may; I don't.  What I do know is that, with respect

12   to all of the dispositions that are going on, divestitures are

13   going on, and where there are cure rights that are to be paid

14   in cash under those specific orders because they're closing

15   before emergence, the ones that we knew about ahead of time, we

16   were able to solve the problem because of the rights offering.

17   The ones that are going on contemporaneously, we've gone

18   through this cure process. They've gotten the notices under the

19   plan for the cure because we have to understand whether or not

20   they are participating in the rights offering.  That's been the

21   key here, you know.  And certainly -- I mean, you know, the --

22        THE COURT:  But under one realistic scenario they

23   wouldn't be because they have the right under the steering

24   order to get cash if the steering deal closes by --

25        MR. BUTLER:  By March 31st.

185

1          THE COURT:  -- by March 31.

2          MR. BUTLER:  Right, which may or may not happen.

3          THE COURT:  No, I understand that, but I guess --

4   maybe Mr. Sheehan can explain this.

5          MR. BUTLER:  So all I'm trying to say, Your Honor, is

6   the purpose of getting this determination now is because we

7   need to understand, you know -- put it another way, absent

8   Your Honor granting Temic the right to make this election now,

9   late, and presuming they would make the election in cash, which

10  is why I assume that they're here, absent that, we will, when

11  we finish the rights file tonight, grant them rights in the

12  amount of this cure.  I mean, and when I say the amount of the

13  cure, they'll be -- it's whatever the right percentage is.

14         THE COURT:  Right.

15         MR. BUTLER:  But they will go into the rights file

16  that Mr. Unrue is working on.  So what we need to understand

17  from Your Honor --

18         THE COURT:  But then what happens if the steering

19  deal closes?

20         MR. BUTLER:  Well, that's another set of issues,

21  Your Honor.

22         THE COURT:  No, but I think I need to know because if

23  it's capable of being unwound, then maybe this thing doesn't

24  have to be heard on such a short timeframe.  I mean, if it is

25  capable of being unwound, then I can hear it sometime before

186

1    the 31st and you all can explore what I guess is a key issue,

2    which is did Temic do anything to let anybody know to forward

3    the mail?

4            MR. BUTLER:  Your Honor, I would take the position

5    that actually it's two different things, and I'm not trying to

6    be hypertechnical here.  We can't redo the rights offering.

7    Once it's out there, it's out there and we have to comply with

8    the S-1 rules.  And, so, ultimately --

9            THE COURT:  No, I don't mean --

10           MR. BUTLER:  -- if Your Honor does not rule today in

11    Temic's favor, this motion, in my view, will be moot --

12           THE COURT:  But there's somehow --

13           MR. BUTLER:  -- because --

14           THE COURT:  -- though, you have to prevent a double

15    recovery.

16           MR. BUTLER:  Yeah.  I understand that.  I understand

17    that problem and I can't stand here before you and tell you how

18    I'm going to address it with the divesters.  I have a long list

19    of things we have to do to get ready for closing, Your Honor.

20    I'm going to be very -- I'm just being very open, Your Honor.

21    I can't tell you exactly -- I will tell you this:  there will

22    not be a double recovery.  You know, I think the mechanic may

23    well be that we would reduce any cash recovery from the value

24    they had already exercised in connection with their rights, but

25    I don't want to speculate.  I can't give you a reasoned answer

187

1    as to what mechanic we have thought about to prevent double

2    recovery with divestitures as a unique group of people in that

3    category.  But that doesn't change the problem we have today,

4    which is who participates in the rights offering and who

5    doesn't?  If Your Honor does not grant them a motion today,

6    they will participate in the rights offering, or they'll have

7    the opportunity to because it's self-executing.

8              THE COURT:  Okay.

9              MR. BUTLER:  I mean, that's all I --

10             THE COURT:  Anything else?

11             MR. SULLIVAN:  I mean, if the debtors want a

12   resolution today they can always withdraw their objection.

13             THE COURT:  Well, no, I mean that -- I don't think

14   that works either.

15             MR. BERGER:  Your Honor, I don't think that works for

16   purposes of today or any future motions by other parties.

17             MR. SULLIVAN:  Your Honor, can I make a few comments

18   based upon the response from Mr. Berger, or --

19             THE COURT:  Briefly, yeah.

20             MR. SULLIVAN:  Okay.  And I think I heard it

21   correctly but I'm not positive, but I heard Mr. Berger say that

22   he was not relying upon the presumption of service with respect

23   to the Northbrook, Illinois address, and that's the only

24   address which, you know, they have a decent argument that, you

25   know, maybe it was sent.  So, if you're not relying upon the

188

1    presumption for that address, then they really don't have --

2    they're not entitled to any presumption at all.

3            THE COURT:  Well, did you say that?

4            MR. BERGER:  I did say that, Judge.  I'm relying upon

5    the presumption of receipt of Farmington Hills in the debtor's

6    satisfaction of its obligation of the solicitation procedures

7    order and the presumption of receipt by McDermott Will & Emery.

8            THE COURT:  And the Northbrook, Illinois because why?

9            MR. BERGER:  Because, although it is a correct

10    address, Your Honor --

11            THE COURT:  It's the lab, and it's not on the

12    contract.

13            MR. BERGER:  It's not only the lab and they're not on

14    the contract.  Immediately before we came to court, as we were

15    preparing for this, we came across evidence that that envelope

16    was returned to KCC.  So I'm not relying upon the presumption

17    of receipt --

18            THE COURT:  Okay.

19            MR. SULLIVAN:  -- which calls into question some of

20    the testimony we heard earlier today, but --

21            MR. BERGER:  But, Your Honor, it does not.  I was

22    very particular not to ask the witness whether or not mail was

23    returned at that address and I was very particular introducing

24    that testimony, and thereafter that I was not relying upon the

25    presumption of receipt at that address.

189

1          MR. SULLIVAN:  So the only evidence of the receipt of

2     this notice is in an address in which Temic does not have a

3     facility anymore, Your Honor, and somebody else is there.  It

4     was just by sheer luck that we got it the last time after

5     thirteen days, not the five or six that Mr. Berger is talking

6     about.  And it's not in evidence here today and I'm not going

7     to cast dispersions on Mr. Berger.  You know, maybe he didn't

8     have direct communications with McDermott until the 19th, which

9     is the date that the -- our objection was filed in connection

10    with the past hearing.  But certainly there were communications

11    going on between members of his firm and our firm much, much

12    earlier.

13         THE COURT:  Well, how do I know it's just by sheer

14    luck?  I mean, again, normally when people close down an office

15    they make provision to have stuff sent to a new office, right?

16         MR. SULLIVAN:  Yeah.  I mean, I know -- I don't know

17    if the presumption applies when you're talking about forwarded

18    mail, but I can tell you, having been through a move fairly

19    recently ourselves from Rockefeller Center to Madison Avenue, a

20    good amount of the mail that was forwarded I didn't get for

21    months later or sometimes not at all.  I think there's

22    definitely -- you know, there -- you know, when they're picking

23    and choosing which mails to forward and which to not, I think

24    the presumption goes way downhill, Your Honor, from that

25    perspective.

1          So, you know, certainly from our perspective we

2    obviously acknowledge that we got the notice with respect to

3    the steering sale.  Admittedly it took thirteen days to get it

4    but we eventually got it, but we did not get it with respect to

5    the plan cure notice.

6          So, therefore, there's really no evidence in the

7    record that we got it, and they can't -- in our opinion, they

8    can't rely upon the presumption with respect to any address

9    because the only address upon (sic) which it allegedly went was

10   an address in which we have a facility.

11         It's also in dispute -- they didn't dispute the fact

12   that the primary address where the parties do business is the

13   Deer Park, Illinois address and that that is our national

14   headquarters.  There's really no explanation why they didn't

15   send notice there, and I think the solicitation procedures

16   order requires that.

17         THE COURT:  But, what -- I mean -- the evidence of

18   that is in -- is where?

19         MR. SULLIVAN:  Of which the -- well, the declarations

20   certainly discuss, for example --

21         THE COURT:  You're relying on Paragraph 24 of

22   Patton's affidavit?

23         MR. SULLIVAN:  Yes, Your Honor.  So we'd primarily

24   rely upon Paragraph 24.  Plus, we attached numerous examples of

25   other correspondence between the parties, including the

1    reclamation notice, the proof of claim, the invoices, and I'm

2    sure, you know, if we had more time, we could probably produce

3    an abundance of additional evidence as well.  But I'm sure if

4    you had a businessperson here from Delphi, and I know -- and

5    unfortunately we don't, I'm sure they would acknowledge that

6    the parties that they do business with is at the Deer --

7    primarily do business with is at the Deer Park address.

8            And, you know, contrary to what Mr. Berger said,

9    we're not saying that they should serve us in every single

10   place where we have a facility.  That's not what we're saying.

11   We're only saying that they should have served us at the place

12   where our primary business is, our headquarters.  If they had

13   served us there, we wouldn't have any quabble (sic) about, you

14   know, whether or not they had served it at any of these other

15   addresses.

16           THE COURT:  Okay.  Just very briefly, Mr. Berger.

17           MR. BERGER:  Your Honor, the declaration and

18   affidavit submitted by Mr. Patton are well after service was

19   made.  There's nothing in evidence about notice of change of

20   address.  The witnesses that testified today -- those

21   declarations are in the evidentiary record.  They show that

22   Delphi used information, addresses in its books and records, an

23   affidavit of service on file.  It is Temic's burden to rebut

24   the presumption of receipt at any of the addresses other than

25   Northbrook where notices were sent, including its agent.

1          MR. SULLIVAN:  One other additional point,

2     Your Honor.  I believe -- I apologize.  I believe the first

3     pleading in the case that was filed on behalf of Temic by

4     McDermott was the February 5th objection in connection with the

5     steering sale business.  I don't think there's anything of

6     record having -- you know, saying that McDermott represented

7     Temic prior to that date.

8          MR. BERGER:  Your Honor, I'm sorry to have to stand

9     again.  I have been litigating with McDermott Will in

10    connection with the Motorola/Temic claim.  The caption on these

11    documents are McDermott Will Chicago, McDermott Will New York.

12    I think the import, if I'm hearing it correctly, is that New

13    York McDermott shouldn't be responsible for actions or inaction

14    of Chicago.  It simply doesn't carry weight.  They're an agent

15    for a claimant in this case and they're responsible no matter

16    where the partner in that representation sits.

17         MR. SULLIVAN:  That really wasn't the argument I was

18    making, Your Honor.

19         THE COURT:  All right.  I have before me a motion by

20    Temic Automotive North America in respect of its request under

21    Rule 9006 of the Bankruptcy Rules and Pioneer Investment

22    Services Company v. Brunswick Associates Limited Partnership,

23    507 U.S. 380 (1993) for extension of its time to respond to a

24    cure notice required to be sent by the debtors under the

25    Court's solicitation procedures order dated December 10, 2007

1    to those parties, those nondebtor contract parties, with whom

2    the debtors intended to assume the executory contracts between

3    the parties.

4            The first contention by Temic is that it really

5    doesn't need to get to the Pioneer factors because it never

6    received the relevant cure notice.  The record shows that the

7    relevant cure notice, which pertained to a two plus million

8    dollar cure claim, was sent to a Farmington Hills location,

9    which was the address on Delphi's purchase order in connection

10   with the contract.  The purchase order is dated September 10,

11   2001.  No specific reference to that cure claim was sent

12   anywhere else to Temic, although a courtesy copy notice,

13   generic, was sent to Temic's law firm, McDermott Will & Emery,

14   at least the firm that had appeared on behalf of Temic in the

15   Chapter 11 case that alerted McDermott Will generally that the

16   debtor was intending to assume executory contracts and send out

17   a cure notice related thereto to parties to which a client of

18   McDermott might have a relationship.

19           Before turning to the Farmington Hills notice, I

20   should say two things about the notice that was sent to

21   McDermott Will.  First, it was the notice attached to the

22   solicitation procedures order as Exhibit P.  That is, it was

23   the notice to holders, assignees, transferees and purchasers of

24   claims of cure procedures.  Temic itself didn't fall into that

25   category; it's an actual contract party.

194

1          Secondly, the notice itself didn't refer to this but

2    the envelope in which the notice was enclosed referred

3    specifically to a claims purchaser, a subsidiary, Silver Point

4    Capital, so that the recipient of that notice might assume that

5    the notice pertains to a claim purchaser's need to speak to its

6    assignor, and B, that the specific claim purchaser that

7    triggered this was Silver Point Capital, which otherwise had

8    nothing to do with this matter.

9          And finally, the notice was sent not to McDermott

10   Will's Chicago office, which was the office primarily dealing

11   with the debtor in the Chapter 11 case on behalf of Temic, but

12   rather to McDermott Will's New York office.  I think,

13   notwithstanding that fact, if the notice had been either

14   broader, i.e., referring to your clients may have contracts

15   that are being assumed as opposed to pertaining just to claims

16   purchasers and assignees and transferees, or if it had not even

17   referred specifically to Silver Point, it may have been

18   incumbent upon McDermott Will's New York office to get in touch

19   with the Chicago Office.  But given those other two facts, I

20   think that, as a practical matter, it wasn't an effective

21   notice or certainly it would be notice to which one would argue

22   that the excusable neglect doctrine would apply.

23          So then the issue is what is the import of the notice

24   being sent to Farmington Hills?  I accept Mr. Gershbein's

25   testimony and his affidavit of service that the notice in fact

195

1    was sent to Farmington Hills.  And it is clear under the case

2    law in this circuit and elsewhere that notice is presumed to

3    have been properly sent if it's properly addressed, stamped and

4    deposited in the mail system, as Mr. Gershbein has testified.

5    See In re R.H. Macy & Co., Inc., 161 B.R. 355, 359 (Bankr.

6    S.D.N.Y. 1993), as well as In re Dana Corporation, 2007,

7    WL 1577763 at 4 (Bankr. S.D.N.Y. 2007).  A claimant needs to

8    submit clear and convincing evidence to overcome the

9    presumption of delivery, such as, for example, showing an

10   incorrect address or a returned letter or the like, neither of

11   which appears here.  Again, see Dana Corporation as well as

12   In re Randbre, R-A-N-D-B-R-E, Corporation, 66 B.R. 482, 485

13   (Bankr. S.D.N.Y. 1986).

14          So I believe notice was sent.  The issue, though, is

15   whether, although it was properly sent, whether it went to

16   Temic, and that is because Temic has stated in that

17   uncontroverted affidavit by Mr. Patton that it had closed its

18   Farmington office months ago and therefore was not there to

19   receive the notice.

20          The debtor states however that, notwithstanding such

21   closure, the debtors' subsequent notice of a cure claim right

22   and assumption and assignment right in respect of the same

23   contract, I believe, was clearly received when it was sent to

24   the Farmington Hills address because the cure claim notice was

25   sent back appropriately marked by Temic in connection with that

1     steering claim matter.

2              And there is nothing in addition in Mr. Patton's

3     affidavit or anything else I can see in the record as to

4     whether Temic took any steps to ensure that letters received by

5     it, including legal notices of this kind, would get forwarded

6     to it, notwithstanding the closure of its Farmington Hills

7     office.  Temic also argues that the debtor should have sent the

8     notice to what it describes as its headquarters, but I note

9     that the purchase order which governs the parties' relationship

10    has the Farmington Hills address on it, and I accept

11    Mr. Unrue's testimony that there was no reason to look beyond

12    that purchase order, in particular, not to take into account

13    any of the invoices that Temic has offered up because the

14    parties' relations are not governed by the invoices but rather

15    the parties would pay or arrange for payment as provided in the

16    purchase order.  Nor is there any evidence that Temic notified

17    the debtors that it had changed the address that's listed on

18    the purchase order, notwithstanding the apparent fact that it

19    was well aware of the debtors' Chapter 11 case.

20             To my mind, that leaves the parties in the realm of

21    excusable neglect as opposed to never having received notice in

22    the first place.  As I noted earlier today, in the second

23    circuit the Courts have taken a hard line in applying the

24    Pioneer test, as the second circuit said in Midland

25    Cogeneration Venture Ltd. Partnership v. Enron, 419 F.3d 115 at

197

1    366 through 68 (2d Cir. 2005).  In a typical case, three of the

2    Pioneer factors, the length of the delay, the danger of

3    prejudice and the movant's good faith, usually weigh in favor

4    of the parties seeking the extension.  The Court noted, though,

5    that we and other circuits have focused on a third factor, the

6    reason for the delay, including whether it was within the

7    reasonable control of the movant.  And we cautioned that the

8    equities will rarely, if ever, favor a party who fails to

9    follow the clear dictates of a court rule, and that where the

10   rule is entirely clear we continue to expect that a party

11   claiming excusable neglect will, in the ordinary course, lose

12   under the Pioneer test.

13           The second circuit was there quoting Silivanch v.

14   Celebrity Cruises, Inc., 333 F.3d 355, 368 (2d Cir. 2003).  See

15   also In re Musicland Holding Corporation, 356 B.R. 603 (Bankr.

16   S.D.N.Y. 2006), in which Chief Bankruptcy Judge Bernstein noted

17   that, in determining excusable neglect under Pioneer, the

18   reason for the delay is the Court's primary focus.  Any other

19   factors are relevant only in close cases.

20           I think, given the uncontroverted testimony, that the

21   contract party here, Temic, in fact was not in its offices when

22   the notice was sent in Farmington Hills.  This is a close case.

23   Arguably, Temic should have introduced more evidence today that

24   it did -- it took normal and rudimentary steps to ensure that

25   it would get forwarded appropriate notices from the Farmington

198

1    Hills office.  On the other hand, because of exigencies in the

2    Chapter 11 case, in particular, the need for the debtors to

3    file their S-1, according to the debtors, by the end of this

4    week, the issues had to be brought on, on very short notice.

5         It is true that the Pioneer issue was only raised at

6    my direction as of last Thursday, but Temic did respond,

7    apparently.  Well, it did respond to the debtors' motion to

8    strike cure notices that had been brought on for a hearing on

9    the 21st with an objection that was timely filed to that

10   motion.

11        So, it seems to me that there is some balance there

12   as to whether Temic acted diligently or not and whether Temic

13   has been through -- shoehorned into a case where it can't put

14   his best proof forward on short notice.

15        As far as prejudice to the debtor is concerned, as

16   noted at oral argument, it's conceivable, in fact, more than

17   conceivable that this issue ultimately is moved and that the

18   steering business sale order contemplated the ability of

19   contract parties, like Temic, to get a cure claim paid in cash

20   as opposed to in stock with post-petition interests.  And it is

21   the cash payment that Temic wants.

22        So, while I accept that the debtors have to fish or

23   cut bait as to what they put in their S-1 this week, ultimately

24   it's conceivable that, as an economic matter, this issue, as

25   far as Temic is concerned, will never really surface, assuming

1      that the steering business closes before March 31st.

2              It appears to me that Temic acted in good faith.  I

3      have already addressed the length of the delay where there is

4      some fault to be had on Temic's part, but it's not overriding.

5      So, given all of that, it seems to me that, in the absence of

6      additional prejudice to the debtor and the fact that the one

7      key notice did go to a location where Temic no longer conducted

8      business, that Temic's motion should be granted.  So,

9      Mr. Sullivan, you can submit an order to that effect.

10             MR. SULLIVAN:  Thank you, Your Honor.  I appreciate

11     it.

12             MR. BUTLER:  Your Honor, one other, just, matter

13     which would help us in the administrative purposes of

14     Mr. Sullivan.  I assume on this record Mr. Sullivan's client is

15     electing cash, not wanting to participate in the rights

16     offering.

17             MR. SULLIVAN:  Yes, Your Honor.

18             MR. BUTLER:  And therefore, in the form of order, if

19     it can be reflected that it will be deemed to have made a cash

20     election as of the bar date, and we will reflect that in the

21     rights offering file.

22             MR. SULLIVAN:  Yes, Your Honor.

23             THE COURT:  You don't have to take any further

24     actions to make any election.  It's been done.

25             MR. SULLIVAN:  Great.  Thank you, Your Honor.

200

1           THE COURT:  Okay.

2           MR. BERGER:  Thank you, Judge.

3           THE COURT:  Okay.  All right.

4       (Whereupon this hearing was concluded at 4:32 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

201

1

2                                    I N D E X

3

4        WITNESS                EXAMINATION BY        PAGE

5        Evan Gershbein         Mr. Berger           142

6        Evan Gershbein         Mr. Sullivan         147

7        Evan Gershbein         Mr. Berger           157

8        Dean Unrue             Mr. Berger           160

9        Dean Unrue             Mr. Sullivan         163

10       Dean Unrue             Mr.  Berger          168

11

12                                 E X H I B I T S

13       DEBTOR'S               DESCRIPTION          PAGE

14       44                     Communications        62

15                              Submitted by

16                              Mr. Sambur

17       1                      Purchase order       160

18                              with Temic

19                              Automotive of

20                              North America

21

22

23

24

25

202

1                              RULINGS

2                                      Page            Line

3        IRS Pension Funding            8               22

4        Waiver Motion Granted

5

6        Debtor's Motion to Strike     123             1

7        Non-conforming Cure

8        Notice with Regard to

9        Solicitation Procedures

10       Order Granted

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

203

1

2                          C E R T I F I C A T I O N

3

4      I, Pnina Eilberg, court approved transcriber, certify that the

5      foregoing is a correct transcript from the official electronic

6      sound recording of the proceedings in the above-entitled

7      matter.

8

9      _____ February 28, 2008

10     Signature of Transcriber              Date

11

12     Pnina Eilberg

13     typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25