WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
J. Christopher Shore (JCS-6031)
Douglas P. Baumstein (DB-1948)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)

ATTORNEYS FOR A-D ACQUISITION HOLDINGS, LLC

Delphi Legal Information Hotline:
Toll Free: (800) 718 – 530
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Delphi Corporation, <u>et al.</u>, | Case No. 05-44481 |
| Debtors. | Jointly Administered |

**RESPONSE OF A-D ACQUISITION HOLDINGS, LLC**
**TO THE EXPEDITED MOTION UNDER 11 U.S.C. § 1142(b)**
**AND FED. R. BANKR. P. 3020(D) FOR IMPLEMENTATION**
**OF DEBTORS' CONFIRMED PLAN OF REORGANIZATION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 10

COUNTER-STATEMENT OF FACTS ...................................................................... 15

    *A.   The EPCA's Remedies Provision Does Not Provide For Specific Performance*.......... 16

    *B.   The Parties Agreed That The Terms Of The Financing Letter Were Incorporated Into The EPCA Financing Condition* ..................................................................... 20
        1.   The Changes To The EPCA Over Time Show That The Parties Agreed To Specific Interest Rate Terms In Order To Minimize Open Issues ................................ 20
        2.   The Bargained-For Deal Was That The Debtors Would Bear The Market Risk Of Obtaining Conforming Financing ................................................................. 23

    *C.   The Debtors' Unsuccessful Attempt To Raise Reduced Financing And Subsequent Events*................................................................................................................. 26

    *D.   The Debtors Propose The Financing Proposal And Threaten Suit*............................... 28

    *E.   The Plan Investors Have Not Consented To The Scheduling Of The Motion And Have Sought Discovery In Connection Therewith* ..................................................... 33

ARGUMENT................................................................................................................ 35

I.    THE COURT MAY NOT GRANT THE DEBTORS THE DECLARATIONS THEY SEEK................................................................................................................ 35

    *A.   The Motion Does Not Present A Justiciable Case Or Controversy As Required By The Constitution*............................................................................................. 36

    *B.   Section 1142 Does Not Grant The Court Power To Grant The Declaration Sought By The Debtors*.................................................................................................. 42
        1.   Section 1142(b) Of The Bankruptcy Code Permits The Court Only To Enforce The Terms Of The Plan And Does Not Permit The Court To Declare Or Rewrite The Terms Of The EPCA ................................................................................ 43
        2.   The Debtors Are Not Permitted To Rewrite The EPCA In The Guise Of Enforcing The Confirmation Order And Plan, And Thus, The Motion Must Be Denied ................ 46

II.    EVEN IF THIS COURT HAD JURISDICTION TO "INTERPRET" THE EPCA ON THIS RECORD, THE DEBTORS ARE NOT ENTITLED TO THE DECLARATIONS THEY SEEK ................................................................................................................ 50

    *A.   GM's Participation In The Financing Proposal Violates Section 5(p) Of The EPCA*. 50

    *B.   A Condition Precedent Of The EPCA Is That Delphi Obtain Financing On The Terms Of The Financing Letter And The Financing Proposal Is Not On The Terms Indicated In The Financing Letter*.................................................................................. 53

1.   The Financing Proposal Materially Alters Interest Rate Terms Under The Financing Letter..................................................................................................................... 54

2.   The Financing Proposal Material Alters The Amount Of Debt Proceeds Contemplated In The Financing Letter And The EPCA.............................................. 55

3.   The Financing Proposal Seeks To Raise The Wrong Amount of Second Lien Debt 56

4.   The Financing Proposal Does Not Provide The Type Of Syndication Specified In The Financing Letter............................................................................................... 58

C.   None of Delphi's "Evidence" Provides This Court With A Sufficient Factual Record to Grant the Motion.......................................................................................................... 59

III.    DELPHI FAILS TO ESTABLISH ANY BASIS WHATSOEVER FOR AN ORDER MANDATING THE USE OF BEST EFFORTS BY ANY PARTY TO THE EPCA .............. 62

A.   In Seeking an Order Requiring Performance, Delphi Has Failed To Show A Breach Of The EPCA............................................................................................................. 64

C.   The Debtors Agreed That There Is An Adequate Remedy At Law And The EPCA Does Not Permit The Remedy Of Specific Performance for Any Breach Thereof....................... 67

D.   To The Extent That The Relief Requested Is An Injunction, That Request Would Constitute An Impermissible Prior Restraint On Free Speech............................................ 70

IV.    IN OBTAINING EITHER FORM OF RELIEF REQUESTED, DELPHI MUST PROCEED BY ADVERSARY PROCEEDING.................................................................... 72

CONCLUSION ............................................................................................................ 76

# TABLE OF AUTHORITIES

## FEDERAL CASES

Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, No. 04 Civ.
  10014(PKL), 2006 WL 1493132 (S.D.N.Y. May 31, 2006) ......................................55

Aetna Life Insurance Co. of Hartford, Conn. v. Haworth, 300 U.S. 227 (1937).........28, 29

In re Allegiance Telecom, Inc., 356 B.R. 93 (Bankr. S.D.N.Y. 2006) ..............................62

America Airlines, Inc. v. Wolens, 513 U.S. 219 (1995)......................................................56

Back v. LTV Corp. (In re Chateaugay Corp.), 213 B.R. 633 (S.D.N.Y. 1997)...........36, 66

In re Baker, No. CV05-3487(CPS), 2005 WL 2105802 (E.D.N.Y. Aug. 31, 2005) ...36, 41

Baltimore County v. IHS Liquidating LLC (In re Integrated Healthcare Services,
  Inc.), Nos. 00-389-MFW, 03-1057, 2006 WL 543876 (D. Del. Mar. 6, 2006) 66, 67, 68

Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963).......................................................63

Berger v. United States, 87 F.3d 60 (2d Cir. 1996) ..........................................................53

Bernstein v. Felske, 533 N.Y.S.2d 538 (2d Dept. 1988) ...................................................57

Buffalo Crushed Stone, Inc. v. R.J. Corman R.R. Corp., No. 97-CV-0875E 2001
  WL 392075 (W.D.N.Y. Apr. 10, 2001) .........................................................................57

Broadway Bldg. II L.P. v. Mincks (In re Broadway Bldg. II L.P.), 22 Fed. Appx.
  859, 860 (9th Cir. 2001)..................................................................................................67

Burke v. Steinmann, No. 03 Civ. 1390, 2004 WL 1117891 (S.D.N.Y. 2004) .................58

Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175 (1968)......................63

In re Commercial W. Finance Corp., 761 F.2d 1329 (9th Cir. 1985)...............................68

Dinkins v. General Aniline & Film Corp., 214 F. Supp. 276 (S.D.N.Y. 1962)................64

Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394 (S.D.N.Y. 2002), ..............29, 30

In re Dycoal, Inc., 327 B.R. 220 (Bankr. W.D. Pa. 2005) ..........................................30, 35,
  66

In re Friedman, 184 B.R. 883 (Bankr. N.D.N.Y. 1994) ...................................................68

Goodman v. Phillip R. Curtis Enterprises, Inc., 809 F.2d 228 (4th Cir. 1987) ................36

Graham v. Modern Steel Treating Co. (In re Modern Steel Treating Co.), No. 91
     C 5747, 1992 WL 82966, (N.D. Ill. Apr. 1, 1992......................................................41

Hellstrom v. U.S. Department of Veterans Affairs, 201 F.3d 94 (2d Cir. 2000)..............52

(In re Erie Hilton Joint Venture), 137 B.R. 165 (Bankr. W.D. Pa. 1992) ...................36, 41

In re Johns-Manville Corp., 97 B.R. 174 (Bankr. S.D.N.Y. 1989)............................35, 36

In re Murray Industries, Inc. v. Federal Ins. Co. (In re Murray Industries, Inc.),
     122 B.R. 135 (Bankr. M.D. Fla. 1990) .................................................................32, 33

Jordan v. Attalla Golf & Country Club, Inc. (In re Attalla Golf & Country Club),
     181 B.R. 611 (Bankr. N.D. Ala. 1995)........................................................................66

Kaplan v. Helenhart Novelty Corp., 182 F.2d 311 (2d Cir. 1950) .....................................64

Krenger v. Pennsylvania R. Co., 174 F.2d 556 (2d Cir. 1949)...........................................61

LTV Corp. v. Back (In re Chateaugay Corp.), 201 B.R. 48 (Bankr. S.D.N.Y.
     1996) ......................................................................................................................36, 67

Litho Prestige, Division of Unimedia Group, Inc. v. News America Publ'g, Inc.,
     652 F. Supp. 804 (S.D.N.Y. 1986) ..............................................................................56

Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.),304 F.3d
     223 (2d Cir. 2002).............................................................................................38, 39,66

McDarren v. Marvel Entertainment Group, Inc., No. 94 Civ. 0910, 1995 WL
     214482 (S.D.N.Y. Apr. 11, 1995).................................................................................58

McDonald's Corp. v. Hinksman, No. Civ.A92-CV-3187 DGT, 1999 WL 441468
     (E.D.N.Y. May 28, 1999) .............................................................................................57

Mid-West Conveyor Co. v. Jervis B. Webb Co., Civ. A. No. 93-2539, 1994 WL
     133008 (D. Kan. Mar. 21, 1994)...................................................................................63

MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus Communications, Inc.), 262
     B.R. 893 (D. Del. 2001).................................................................................................68

Md. Casualty Co. v. Pac. Coal Oil Co., 312 U.S. 270 (1941) ...........................................29

Meloff v. New York Life Insurance Co., 51 F.3d 372 (2d Cir. 1995)..............................52

Metropolitan Opera Associate Inc. v. Local 100, Hotel Employees, 239 F.3d 172
     (2d Cir. 2001)................................................................................................................65

Mikohn Gaming Corp. v. Acres Gaming, Inc., 165 F.3d 891 (Fed. Cir. 1998)..............64

In re Modern Steel Treating Co., 130 B.R. 60 (Bankr. N.D. Ill. 1991), ..........................41

Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp., 269 F.
    Supp. 2d 206 (S.D.N.Y. 2003)...........................................................................55

N. Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982)..............28

In re National Serv. Corp., 742 F.2d 859 (5th Cir. 1984)...........................................63, 64

Nebraska Press Association v. Stuart, 427 U.S. 539 (1976)............................................64

Official Unsecured Creditors' Committee of Erie Hilton Joint Venture v. Siskind
    (In re Erie Hilton Joint Venture), 145 B.R. 215 (Bankr. W.D. Ill. 1992)...................41

Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10 (2d Cir. 1993)....................28, 29

In re One Canandaigua Properties, Inc., 140 B.R. 616 (Bankr. W.D.N.Y. 1992).............31

Official Comm. of Unsecured Creditors v. United States (In re Antonelli), Nos.
    91-4-0254, 92-A-0134, 1992 WL 435879 (Bankr. D. Md. Nov. 6, 1992) ...........31, 32

Organization for a Better Austin v. Keefe, 402 U.S. 415 (1971) .......................................63

Paul v. Monts, 906 F.2d 1468 (10th Cir. 1990) ..................................................................66

Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41 (2d Cir. 1996) ..........................................65

Pinnacle Books, Inc. v. Harlequin Enterprise, Ltd., 519 F. Supp. 118 (S.D.N.Y.
    1981) ........................................................................................................................57

In re Pratt, No. 06-12410, 2007 WL 2413010 (Bankr. N.D. Ind. 2007)...........................69

R/S Associate v. N.Y. Job Development Authority, 98 N.Y.2d 29 (2002) .......................44

Riverside Marketing, LLC v. Signaturecard, Inc., 425 F. Supp. 2d 523 (S.D.N.Y.
    2006) ........................................................................................................................62

Riverside Nursing Home v. N. Metro. Residential Health Care Facility, Inc., 977
    F.2d 78 (2d Cir. 1992).................................................................................37, 66

In re Riverside Nursing Home, 137 B.R. 134 (Bankr. S.D.N.Y. 1992) ............................66

Scott-Macon Sec., Inc. v. Zoltek Cos., No. 04 Civ. 2124, 2005 WL 1138476,
    (S.D.N.Y. May 12, 2005)...........................................................................................60

Simonetti Development Ltd. v. Hillard Development Corp. (In re Hillard Development Corp.), 238 B.R. 857 (Bankr. S.D. Fla. 1999)......................................67

In re Smith, 103 B.R. 392 (N.D.N.Y. 1988) ................................................................68

In re Snowville Farms, LLC, Nos. UT-06-034, 2007 WL 1302154 (B.A.P. 10th Cir. May 4, 2007).....................................................................................................42

In re Spiegel Inc., No. 03-11540(BRL), 2007 WL 201112 (Bankr. S.D.N.Y. Jan. 23, 2007) ...............................................................................................................37

Starter Corp. v. Converse, Inc., 170 F.3d 286 (2d Cir. 1999)......................................65

In re Stonegate Sec. Serv., Ltd., 56 B.R. 1014 (N.D. Ill. 1986) ...................................63

Sutera v. Schering Corp., 73 F.3d 13 (2d Cir. 1995) ...................................................52

In re Taylor, 289 B.R. 379 (Bankr. N.D. Ind. 2003).....................................................69

Terwilliger v. Terwilliger, 206 F.3d 240 (2d Cir. 2000)...............................................42

The Bank of N.Y. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 307 B.R. 432 (Bankr. S.D.N.Y. 2004)...................................................28, 29, 30, 31

Thomas v. Union Carbide Agriculture Prod. Co., 473 U.S. 568 (1985)........................30

Towers Charter & Marine Corp. v. Cadillac Insurance Co., 894 F.2d 516 (2d Cir. 1990) ........................................................................................................56

In re Trans World Airlines, Inc., 169 B.R. 91 (Bankr. D. Del. 1994) ......................33, 34

Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506 (2d Cir. 1989)...........53

U.S. Airways Group, Inc. v. British Airway PLC, 989 F. Supp. 482 (S.D.N.Y. 1997) ..........................................................................................................58

In re U.S. Brass Corp., 301 F.3d 296 (5th Cir. 2002) ..................................................35

Vestron, Inc. v. National Geographic Society, 750 F. Supp. 586 (S.D.N.Y. 1990) ..........60

Village of Rosemont v. Jaffe, 482 F.3d 926 (7th Cir. 2007), ...............................35, 36, 40

Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775 (2d Cir. 1994) ..............................65

In re Warde Electric Contracting, Inc., 308 B.R. 659 (S.D.N.Y. 2004) ..........................68

In re Wild Lilly, Inc., 51 B.R. 963 (Bankr. S.D.N.Y. 1985)...........................................68

Wilmington Trust Co. v. Solutia, Inc. (In re Solutia, Inc.), No. 03-17949, No. 05-
   10843, 2007 WL 1302609 (Bankr. S.D.N.Y. May 1, 2007)......................................41

Zenith Electrics Corp. v. Exzec, Inc., 182 F.3d 1340 (Fed. Cir. 1999) ...........................64

### STATE CASES

Ashokan Water Services, Inc. v. New Start, LLC, 807 N.Y.S.2d 550 (N.Y. Civ.
   Ct. 2006) .........................................................................................................58, 60

Cho v. 401-403 57th St. Realty Corp., 752 N.Y.S.2d 55 (1st Dep't 2002).................56, 57

Greenfield v. Philles Records, Inc., 98 N.Y.2d 562 (2002)..............................................44

Kroboth v. Brent, 625 N.Y.S.2d 748 (3d Dep't 1995) .....................................................58

Lieber v. Wexler, 369 N.Y.S.2d 992 (N.Y. Civ. Ct. 1975) ..............................................57

Reiss v. Finance Performance Corp., 97 N.Y.2d 195 (2001) ...........................................44

Ruttenberg v. Davidge Data System Corp., 626 N.Y.S.2d 174 (1st Dep't 1995) ..............54

Starrett Acquisition, Inc. v. Starrett Corp., 664 N.Y.S.2d 1020 (N.Y. Sup. Ct.
   1997) ...............................................................................................................61

Strauss Paper Co. v. RSA Exec. Search, Inc., 688 N.Y.S.2d 641 (2d Dept. 1999)...........57

Thur v. IPCO Corp., 569 N.Y.S.2d 713 (1st Dept. 1991)................................................64

Timberline Development LLC v. Kronman, 702 N.Y.S.2d 237 (1st Dep't 2000).............57

United Rentals, Inc., v. RAM Holdings, Inc., 937 A.2d 810 (Del. Ch. 2007)..................62

Van Wagner Adver. Corp. v. S & M. Enterprises, 67 N.Y.2d 186 (1986)........................56

W.W.W. Associate, Inc. v. Giancontieri, 77 N.Y.2d 157 (1990) ......................................45

Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d 352 (N.Y. 2003).............................60

### STATUTES

11 U.S.C. §§ 105(a), 363(b), 503(b) ...............................................................................39

11 U.S.C. § 1112.............................................................................................................66

11 U.S.C. § 1127(b) ..................................................................................66

28 U.S.C. § 2201 ......................................................................................28

Fed. R. Civ. P. 65 (d) ..............................................................................65

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
J. Christopher Shore (JCS-6031)
Douglas P. Baumstein (DB-1948)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)

ATTORNEYS FOR A-D ACQUISITION HOLDINGS, LLC

Delphi Legal Information Hotline:
Toll Free:  (800) 718 – 530
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Delphi Corporation, <u>et al.</u>, | Case No. 05-44481 |
| Debtors. | Jointly Administered |

**RESPONSE OF A-D ACQUISITION HOLDINGS, LLC
TO THE EXPEDITED MOTION UNDER 11 U.S.C. § 1142(b)
AND FED. R. BANKR. P. 3020(D) FOR IMPLEMENTATION
<u>OF DEBTORS' CONFIRMED PLAN OF REORGANIZATION</u>**

A-D Acquisition Holdings, LLC ("ADAH"), for its response to the Expedited Motion

Under 11 U.S.C. § 1142(b) And Fed. R. Bankr. P. 3020(d) For Implementation Of Debtors'

Confirmed Plan Of Reorganization (the "Motion") Of Delphi Corporation (together with its

affiliated debtors and debtors-in-possession, "Delphi" or the "Debtors"), respectfully represents

as follows:

NEWYORK 6518319 v7 (2K)

## PRELIMINARY STATEMENT

1.     ADAH recognizes the Court's frustration with the lack of closure in these cases and the desire to assist in clearing a path to Delphi's emergence from chapter 11. Indeed, at this moment, ADAH and the other Plan Investors[1] that are parties to the EPCA[2] continue to work to find a consensual basis on which these cases can move forward and Delphi can exit as a robust enterprise with an appropriate capitalization. Those discussions will continue and perhaps may bear fruit once all necessary parties engage on the salient issues. The Motion, however, is certainly not about building consensus and unfortunately may not even be about seeking a solution. At best, it is a recognition by Delphi's board, management and advisors that Delphi's only path to emergence requires the Court to create for Delphi rights and remedies – such as specific performance – that it was unable to obtain in negotiations with the Plan Investors many months ago. At worst, this action is a regrettable manifestation of Delphi's conviction that, notwithstanding the present dispute, no viable path to emergence presently exists and Delphi may need to remain in the protective cloak of chapter 11 while the domestic credit markets remain troubled. In that latter instance, the Motion is nothing more than a mechanism for directing blame at potential investors that are rightly insistent on protecting their negotiated contractual rights and away from those who granted those rights in the first instance.

2.     Notwithstanding the rhetoric in the Motion, this action and its invocation of federal court jurisdiction, for better or worse, is about the law and the EPCA. For, despite the Plan Investors' willingness to maintain flexibility throughout this process and provide

---

[1] Except where otherwise indicated, the term "Plan Investors" refers to ADAH, Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith, Incorporated, UBS Securities LLC, Goldman Sachs & Co. ("Goldman Sachs"), and Pardus DPH LLC, collectively.

[2] For ease of reference, throughout this response, the term "EPCA" is used, as the context requires, to describe individually or collectively, the various iterations of the investment agreement between ADAH and its various co-investors (including a party that was a co-investor under prior iterations of the EPCA but is not now a Plan Investor) and Delphi, which investment agreements all provided for the infusion of equity financing by ADAH and its co-investors into Delphi pursuant to a confirmed plan of reorganization, subject to certain terms and conditions as set forth therein.

concessions when the parties are operating in a consensual setting, we are now operating in a contested federal judicial proceeding. The demarcation between the conference room and the courtroom must be maintained—there is a contract here, governed by New York law, that establishes distinct rights, rules and remedies, and the Court must interpret those rules within the confines of contract law. Viewed through that lens, the Motion simply asks the Court to do things which are patently impermissible, including:

- expressing an unconstitutional advisory opinion regarding the meaning of a contract subject to material unfulfilled contingencies;

- unconstitutionally restraining in advance a contracting party from privately expressing its good faith beliefs as to whether or not a contract is being performed;

- depriving litigants of discovery or any material formal notice and then seeking resolution of contested factual issues without reference to any record evidence;

- requiring litigants to respond on one day's formal notice to litigate a highly complex motion, even though the moving party's own reluctance about publicly disclosing the existence of the dispute is the root cause of the delay;

- entering an order of specific performance without first finding a manifest breach of contract and satisfaction of all other contract conditions, all without conducting an adversary proceeding in accordance with Part VII of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules");

- using Section 1142 of the Bankruptcy Code to reform a contract or otherwise require a party to refrain from taking actions explicitly permitted by that contract, and

- ignoring the plain meaning of a contract in favor of one that would provide the moving party with rights it was specifically unable to obtain in negotiations.

On this last point, we remind the Court that the EPCA is not without a history, that each provision has a genesis in a detailed course of events and that, as the one party who has been driving this process from the start, ADAH is entitled to rely on the hard-fought contractual rights embedded in the deal that it negotiated. The Motion is necessarily premised on divorcing any context from the genesis of the EPCA, in particular two incontrovertible deal protections obtained by ADAH which are memorialized in that contract: (1) as a matter of fact and law, the current EPCA is not a contract that can be specifically performed—all parties agreed that, even in the worst case scenario, each would be exposed solely to a capped quantum of damages for any breach of a performance obligation, and (2) the current EPCA emanated from a very specific business deal cut between principals for the parties in which, in exchange for commitments made in December 2007, Delphi was given one chance, with a confirmation order in hand, to obtain exit financing on the specific terms indicated in the Financing Letter.[3]

3.    There is no dispute here that Delphi could not obtain the financing explicitly set forth in the Financing Letter from the market at large ( **REDACTED**

**REDACTED** . Rather, according to the Motion itself, Delphi can only obtain exit financing by resorting to a very different financing premised upon (i) a portion of the debt being issued at a substantial discount **REDACTED** and (ii) the bulk of the remaining debt being sold on a subsidized basis to General Motors Corporation ("GM"). This financing simply is not the one which Delphi is required to deliver. Nothing in the EPCA permits Delphi to obtain financing on terms "similar to" but worse than the Financing Letter,

**REDACTED**

Nor does that contract permit Delphi to enter into <u>any</u> agreement with GM that is

---

[3] The term "Financing Letter" refers to the "best efforts" financing letter attached as Exhibti 7.14 to the Debtors plan of reorganization (the "Plan") confirmed by the Court by order entered January 25, 2008 (the "Confirmation Order").

either outside the ordinary course or adverse to the Plan Investors. In short, Delphi is required to

deliver the financing set forth in the Financing Letter. It can not, and that should end the matter.

    4.    Nor can the Court, on the record before it, resolve any of the factual issues

necessary to grant Delphi the relief it seeks. Such materially disputed factual issues include:

- Is GM's agreement to provide $2.0 billion of first lien financing an "ordinary course" agreement within the meaning of section 5(p) of the EPCA?

- Is GM's agreement to provide $2.0 billion of first lien financing "materially inconsistent with the EPCA, the Plan and the Financing Letter" as set forth in section 5(p)?

- Does GM's agreement to provide $2.0 billion of first lien financing have a "material impact" on the Plan Investors' proposed investment as prohibited in section 5(p)?

- What effect will GM's participation in the Financing Proposal have on the Debtors' ability to execute on the business plan post-Effective Date?

- Is the Financing Proposal "on the terms indicated" in the Financing Letter within the meaning of section 3(qq) of the EPCA?

- What does the obligation to obtain the debt financing "on the terms indicated" in the Financing Letter mean, and how does the obligation relate to those of the previous EPCAs that the debt financing would be at prevailing market terms?

- Will a declaration by the Court, over the objection of the Plan Investors, provide a reasonable assurance that Delphi can, in fact, raise the financing contemplated in the Financing Proposal or are the parties simply talking about pure hypotheticals?

- Did the parties intend that specific performance of the "reasonable best efforts" provision, or any other provision of the EPCA, would be an available remedy in the event of a willful breach?

- What type of conduct is covered by the obligation to provide "reasonable best efforts" in section 6(d) of the EPCA, and are there external standards by which to evaluate what constitutes such efforts?

- Have any of the Plan Investors "willfully" breached the "reasonable best efforts" provision of the EPCA?

- Did Delphi agree, prior to confirmation, that GM could or would purchase a material portion of the first lien debt, and if so, what is the effect of Delphi's concealment of such fact from the Court and the Plan Investors at confirmation?



- Was the Plan Investors' willingness to permit Delphi to go to market in early January with a reduced second lien financing an enforceable waiver of their rights later to insist upon the full financing contemplated under the EPCA, particularly if the facts and circumstances had changed?

- In what other ways is the Financing Proposal "adverse" to the Plan Investors within the meaning of section 5(t) of the EPCA?

A rulings on any of these issues would require the Court to venture impermissibly far outside the record, and would be manifestly unfair to ADAH and the other Plan Investors.

    5.    Leaving aside for a moment the lack of any legitimate legal basis for the relief requested and the obvious need for fact finding precluded by the procedural posture of the Motion, the central problem with the Motion is that its fundamental premise -- that litigation can lead to an effective date closing -- is simply wrong. This proceeding cannot fix the credit markets, cannot make Delphi a viable candidate for exit from chapter 11, cannot convince either side that their subjective beliefs about the underlying deal are somehow invalid and cannot reform the parties' objective contractual arrangements. Certainly, were this a plenary proceeding which followed the appropriate procedures, the Court could eventually assign liability and award damages up to either side's cap resulting from a failed closing. Indeed, the day may come when the Court is called upon to determine why the transactions contemplated by EPCA did not close, and we believe that such a proceeding will demonstrate that Delphi is in the wrong. But, nothing about an award of damages at some point in the future will *ab initio* make a closing occur or allow Delphi to exit. The relief requested in the Motion simply asks too much—essentially requesting that the Court look past the Constitution, the Bankruptcy Code, the Bankruptcy Rules, the EPCA and all common sense—in the unfounded hope that a few judicious words of interpretation on a day or two's notice might spur resolution. Delphi simply cannot get there from here. The Court should decline the invitation to issue an advisory opinion, decline to enjoin

any party from expressing any views as to the meaning and effect of the EPCA, deny the Motion

and refocus the parties on reaching consensus or, in the absence of that, maximizing value in

these cases in whatever form that might take.

## COUNTER-STATEMENT OF FACTS

6.      Given the time constraints in responding to the Motion, we are simply not able to

recreate all relevant facts leading up to the present dispute.  That said, in evaluating the Motion's

dual request for an order requiring the Plan Investors to exercise best efforts and an order

determining that certain potential events satisfy conditions in the EPCA, the Court should keep

in mind that the EPCA, in its current iteration, is a product of lengthy negotiations based on

expressed understandings of the parties throughout.  Key terms concerning relevant issues here,

such as the definitiveness of the financing obligations and the unavailability of orders of specific

performance, were reached in larger negotiating contexts and the resolution and parties'

understanding of the agreements reached have been objectively manifested in multiple ways, all

of which are a necessary part of the record on this Motion.  These limited facts, all of which are

proffered to show the good faith of ADAH's insistence on an evidentiary hearing, are recited

below.

**A.      The EPCA's Remedies Provision Does Not Provide For Specific Performance**

7.      At page 24 of the Motion, Delphi requests that this Court enter an order directing

the Plan Investors to comply with their best efforts obligations to close the deal contemplated by

the EPCA.  The unavailability of such relief, however, was expressly the subject of the parties'

negotiations and the EPCA itself.  Section 11(b) of the EPCA, which sets forth the remedies

available under the EPCA, states in relevant part:

> Other than with respect to <u>Sections 2(h), 2(i)</u> and <u>Sections
> 10</u> through <u>18</u>, which shall continue and survive any termination of
> this Agreement, (i) . . . the Company (both as Debtors-in-posses-
> sion or the reorganized Debtors), may not assert some claim

> against any Investor, in either case, arising from this Agreement
> other than for willful breach, and (ii) the . . . Company (both as
> Debtors-in-possession or the reorganized Debtors) hereby releases
> the Investors from any such claims.    Notwithstanding the
> foregoing . . . (x) the aggregate liability of all of the Investors
> under this Agreement for any reason (under any legal theory)
> including for any willful breach occurring after the Disclosure
> Statement Approval Date shall not exceed $250 million.

(Pryor Decl. Ex. 1)[4]  (emphasis added).

8.    Section 11(b) of the EPCA is identical to section 11(b) of the December 18, 2006

EPCA (the "December 18 EPCA").  (Pryor Decl. Ex. 8).  A December 2, 2006 draft of that prior

EPCA, sent by Colin Diamond of White & Case to Skadden Arps, contained a very different

remedies provision:

> Section 20 – Specific Performance.  The parties acknowledge and
> agree that any breach of the terms of this Agreement would give
> rise to irreparable harm for which money damages would not be an
> adequate remedy, and, accordingly, the parties agree that, in addi-
> tion to any other remedies, each will be entitled to enforce the
> terms of this Agreement by a decree of specific performance
> without the necessity of proving the inadequacy of money damages
> as a remedy and without the necessity of posting bond.

(Pryor Decl. Ex. 3).

9.    That same provision was included in a December 5, 2006 draft sent by Adlai

Hardin of Skadden Arps to White & Case.  (Pryor Decl. Ex. 4).  On December 7, 2006, however,

Greg Pryor of White & Case sent a draft EPCA that deleted the specific performance provision.

(Id. Ex. 5).  On December 9, 2006, Mr. Hardin sent a draft re-inserting the specific performance

clause (now as Section 21).  (Id. Ex. 6).  On December 10, 2006, Mr. Diamond circulated a draft

which once again deleted the specific performance clause.  (Id. Ex. 7). As Mr. Pryor notes in his

declaration, the purpose of removing the specific performance right was to correct for "a severe

---

[4] Citations to "Pryor Decl." are to the Declaration of Gregory Pryor, dated March 6, 2008, submitted herewith.
Citations to "Bolin Decl." are to the Declaration of James Bolin, dated March 6, 2008, submitted herewith.  Both
declarations are proffered to the Court to set forth the detailed factual nature of the dispute framed by the 1142
Motion.

imbalance in the deal structure" in which the Plan Investors would expose themselves to up to

$2.5 billion in damages whereas Delphi was exposed only to a break-up fee. (Pryor Decl. ¶ 6).

Thereafter, no version of the EPCA (including the one before the Court) contained a specific

performance provision. That history reflects the clear agreement of the parties that specific

performance was not an available remedy for breach. Instead, negotiations focused exclusively

on reaching an agreement whereby each side capped all "liability" at an identified quantum of

damages only in the event of a willful breach. (Pryor Decl. 7)

10.    In fact, the transaction contemplated under the EPCA was intentionally structured

in such a way so as to prevent certain Plan Investors from ever being called upon to perform

unwillingly. ADAH is an acquisition vehicle, created solely for purposes of the EPCA and

financed solely by a commitment letter from its parent, Appaloosa Management LP, up to $250

million. Similarly, Harbinger Del-Auto Investment Company Ltd. and Pardus DPH LLC are

capitalized by commitment letters in the amount of $38,944,000 and $33,593,000, respectively.

This structure represents a commonly used means of structuring an equity investment deal such

that an equity investor can cap its performance liability at a single quantum of damages and

avoid being compelled to purchase (and run) a particular target company. (Pryor Decl. ¶ 3).

This structure was specifically negotiated among the parties and fully understood and agreed by

Delphi and its counsel.

11.    Further, the cap for "any liability" to a potential award of damages in the EPCA

has been fully understood by Delphi. On multiple occasions while this Court was in the process

of approving the ECPA, Delphi admitted that specific performance was not an available remedy

for breach. In its papers seeking authorization to enter into the December amendments (filed

before they were approved) and in the Disclosure Statement (filed thereafter), Delphi explained

why it felt compelled to enter into the December amendments to the EPCA rather than seek to

compel a closing of the August 3, 2007 EPCA:

> Absent the Investment Agreement Amendment, pursuant to which the Plan Investors approved the Disclosure Statement and the Plan (and the principal underlying building blocks thereof), the Debtors would have been left to either attempt to satisfy the closing conditions of the Investment Agreement or to litigate with the Plan Investors under a legal theory such as anticipatory breach. However, even if the Debtors were successful in such litigation against the Plan Investors, the Investment Agreement expressly caps the Plan Investors' liability for breach thereof at $100 million prior to approval of the Disclosure Statement, **and there is no specific performance provision.** Thus, an attempt to "enforce" the Investment Agreement against the wishes of the Plan Investors, even if successful, would yield a maximum recovery of $100 million to the Estates and would materially delay the Debtors' emergence from chapter 11 requiring the Debtors to manage the inherent uncertainties associated with the loss of the Plan Investors, pursuit of material litigation, and delay in emergence from chapter 11.

Disclosure Statement at 121 (emphasis added). (Pryor Decl. Ex. 12). Indeed, the statement in

the Disclosure Statement was added by Skadden Arps, and not at the request of the Plan

Investors. (Pryor Decl. Ex. 13)

      12.     Similarly, the Debtors' counsel, Jack Butler, admitted on the record that remedies

for breach of the EPCA were limited to damages:

> Mr. Miller has testified to, I believe, in his declaration directly, the bookends we talked about was, you know--you--if there's a termination event here, if this thing blows up, and, you know, and we go to war with Appaloosa, somebody is going to probably pay a hundred million dollars. Either we're going to be able to convince you, who is probably going to have to make that decision, that they -- that they intentionally breached, in which case their damages are limited at a hundred million dollars. Or they will be able to convince you that we breached and it's not an alternative transaction capped at eighty some odd million it's a breach under the agreements and it's actionable at a hundred million.

Amended EPCA Hr'g Tr., Dec. 6, 2007 at 251:1-12 (emphasis added). (Pryor Decl. Ex. 14).

**REDACTED**

**REDACTED**

**REDACTED**

Miller Dep. Tr., Nov. 26, 2007, 44:16 – 45:4 (emphasis added) (Pryor Decl. Ex. 15).

      14.     Each of these statements was made at a time when the EPCA was in either an unapproved or nascent stage. Had Delphi expressed any view that specific performance was an available remedy, ADAH would have insisted that the unavailability of specific performance be clarified even further in the EPCA or would not have consented to moving forward. (Bolin Decl. ¶ 6). In light of the foregoing, then, there should be no doubt that the ability of any party to the EPCA to compel performance of any covenant was waived at the outset.

     **B.**     **The Parties Agreed That The Terms Of The Financing Letter Were Incorporated Into The EPCA Financing Condition**

      15.     As its other form of relief in the Motion, Delphi seeks an order of the Court interpreting provisions of the EPCA that relate to whether the Proposed Financing satisfies the EPCA's conditions to closing. Those conditions have a history as well that is entirely relevant to the Court's consideration of the Motion.

    1.      **The Changes To The EPCA Over Time Show
That The Parties Agreed To Specific Interest
Rate Terms In Order To Minimize Open Issues**

16.     The negotiating record and changes to the EPCA over time make clear that the

requirement in the current EPCA that Delphi obtain the financing on the specific terms of the

Financing Letter represented an agreed-upon change from previous iterations.  As set forth

below, both Delphi and the Plan Investors reached consensus that past iterations of the EPCA

had been too indefinite on the terms of acceptable exit financing and that the EPCA needed to

have as much clarity as possible, including by requiring that any financing be on the specific

"terms indicated" in the Financing Letter.  Accordingly, the Plan Investors bargained for a

transaction in which Delphi was required to obtain exit financing on specific financing terms set

forth in the Financing Letter and with a pro forma interest expense cap linking the bank

financing with Delphi's other post-emergence debt.[5]  (Pryor Decl. ¶ 8).

17.     Over a one year period beginning in December 2006 and concluding in December

2007, successive iterations of the EPCA clearly illustrate that the parties' agreement concerning

the required debt financing moved from open, market-dependent terms to clearly enumerated

terms.  In that regard, the first agreement reached, the December 18, 2006 EPCA, clearly placed

interest rate risk on the investors. (Pryor Decl. Ex. 8).  Specifically, the debt financing

requirement in the 2006 EPCA required only that such financing would be raised "on then

prevailing market terms with respect to the applicable interest rate, redemption provisions and

fees…." (December 18, 2006 EPCA § 5(t)).  Notably, the closing condition related to the debt

financing only required that the proceeds of the debt financing fully fund the transaction.

---

[5] The Debtors have argued that the only two requirements concerning the required debt financing are that it be "in
an amount sufficient to implement the Plan" and that it meet the interest rate cap in section 9(a)(xx) of the EPCA.
(Motion ¶ 32)  The rate cap was but one condition that worked in conjunction with the requirements of obtaining the
debt financing on the terms indicated.  This is not to say that the interest rate covenant was not important.  Because
the interest rates in the Financing Letter were based on margins over prevailing rates (such as EURIBOR), an
increase in prevailing rates would have brought the interest rate cap into play.

(December 18, 2006 EPCA § 9(a)(xix)).  The December 18 EPCA, however, was terminated by the Debtors on July 7, 2007.  (Pryor Decl. ¶ 10).

18.    For the most part, the variable nature of the exit financing conditions in the December 18, 2006 EPCA remained unchanged when the Court approved the EPCA on August 3, 2007 (the "August 3, 2007 EPCA") (Pryor Decl. Ex. 1).  As approved at that time, the August 3, 2007 EPCA required only that Delphi obtain financing "on then prevailing market terms with respect to the interest rate, redemption provisions and fees."  (August 3, 2007 EPCA § 5(t)). Nevertheless, because of, inter alia, dislocations in the credit market, it became clear to all parties that the transactions contemplated by August 3, 2007 EPCA could not be completed.

19.    On October 29, 2007, certain amendments to the August 3, 2007 EPCA were agreed upon between Delphi and some of the Plan Investors (the "October 29, 2007 EPCA") (Pryor Decl. Ex. 10).  By that time, it was clear that the credit market difficulties were likely to continue and, in negotiating the amendments, the parties sought to add definitive parameters to establish the conditions precedent in the EPCA in more concrete terms.  (Pryor Decl. ¶ 12)  The October 29, 2007 EPCA amendment did not permit Delphi to raise any debt financing on any prevailing market terms.  Rather, the parties agreed that the debt financing would be "on the terms indicated" in a financing letter.  (October 29, 2007 EPCA § 3(qq)).  In addition, for the first time the Debtors covenanted that they would "not permit any amendment or modification to be made to, or any waiver of any provisions or remedy under, in each case, to the extent adverse to the Company or the Investors, the Financing Letter . . . ."  (October 29, 2007 EPCA § 5(t)). Accordingly, by October 29, 2007, the parties to the EPCA had shifted from an agreement that exit financing could be obtained on market prevailing terms to an agreement upon clear "terms indicated" in a financing letter that could not be amended in a manner adverse to the investors. (Pryor Decl. ¶ 12).

20.    The import of the requirement that the financing be "on the terms indicated" in
the Financing Letter was, as a factual matter, mutually understood by the parties and expressed
clearly during the negotiation leading up to the October 29, 2007 EPCA. For example, a draft of
the Financing Letter was circulated to ADAH on or about October 26, 2007 which omitted the
specific interest rates on the various tranches of debt. (Pryor Decl. ¶ 13) In response, the Plan
Investors expressed their view that the failure to set forth such interest rates was insufficient
because the EPCA required that the economic terms be spelled out and agreed upon.

21.    Specifically, in an email dated October 27, 2007, Charles Alm, of White & Case,
wrote to, inter alia, Eric Cochran and Daniel Ganitsky of Skadden Arps, that the Financing Letter
needed to state explicit interest rates for purposes of the EPCA: "interest rates and commitment
fees need to be agreed, or this letter doesn't work for purposes of the EPCA, because the key
economic term of the debt is not set forth and the EPCA says the Company will get the financing
set forth in the commitment letter . . . ." (Pryor Decl. Ex. 11) (emphasis added). Delphi's
concurrence with that understanding was then evidenced by the fact that the Financing Letter
was revised to set forth specific interest rates and the other material economic terms of the debt .

22.    The October 29, 2007 EPCA also contained two additional closing conditions
further establishing the parameters of appropriate exit financing. First, Delphi was required to
have at least $1.4 billion in undrawn availability on its ABL facility at the time of closing.
(October 29, 2007 EPCA § 9(a)(xix)(B)). Second, Delphi could not have over $575 million in
interest expenses for fiscal year 2008. (October 29, 2007 EPCA § 9(a)(xx)).

23.    After the October 29, 2007 EPCA terminated pursuant to its terms, the parties
entered into further amendments on November 14, 2007. Such amendments did not materially
alter the financing conditions present in the October 29 amendments.

24.     The changes to the financing conditions introduced in the October 29, 2007

EPCA have largely been carried through to the current EPCA.  Thus, in the current version,

Delphi is required by section 9(a)(xix) to obtain proceeds of the "Debt Financings" which are, in

turn, carefully defined in section 3(qq) to be "on the terms indicated" in the Financing Letter.  As

further protection to the Plan Investors, Delphi is not permitted to approve "any amendment or

modification to be made, or any waiver of any provision or remedy under" the Financing Letter

that is "adverse" to the rights of the Plan Investors.  (EPCA § 5(t)).

### 2.     The Bargained-For Deal Was That The Debtors Would Bear The Market Risk Of Obtaining Conforming Financing

25.     As was the case with the October discussions, the parties' negotiations in the

November/December, 2007 timeframe were conducted with all parties' understanding that

Delphi was operating in difficult credit markets.  This is evidenced by, among other things, the

inability of Delphi to obtain a "firm commitment" financing letter from its lead arrangers.



REDACTED

27.    David Tepper testified to the importance of the credit markets to the proposed
investment at the hearing approving the December 2007 amendments to the EPCA.  Mr. Tepper
noted that, based on the uncertainty of current economic conditions, an additional $10 million of
annual interest expense could result in "400 million, 500 million, 600 million, 700 million, [800]
million, in that ballpark of difference . . . to the value of the company." (Dec. 6, 2007 Hr'g Tr.
158:16-25)  Based upon that expression, Delphi could not reasonably have understood that it was
free to agree to any interest rates that were adverse to those set forth in the Financing Letter.

REDACTED



31.      Once again, had Delphi expressed contrary views in this timeframe – such as its

current view that subsidized financing with deferred interest and issuance of first lien debt at

distressed interest rates satisfies the financing conditions – ADAH would have insisted on

clarifying language or refused to move forward with the December amendments.

C.   **The Debtors' Unsuccessful Attempt To
Raise Reduced Financing And Subsequent Events**

32.   Following the parties' entry into the December 2007 amendments, the Debtors

distributed the Disclosure Statement with the EPCA and Financing Letter attached.  Appendix C

to the Disclosure Statement set forth the expected debt structure and interest rates of the Debtors

post-emergence.  Specifically, Delphi disclosed that it expected:

- A $1.6 billion revolving credit facility at an interest rate of LIBOR +225 to serve as supplemental liquidity for general operating purposes;

- $4.5 billion of exit financing facilities comprised of a $3.7 billion funded term loan at an interest rate of LIBOR +375 and a $0.75 billion second lien note at a 9.5% interest rate to be raised in the capital markets; and

- A $0.75 billion second lien note to GM at a 9.5% interest rate to satisfy a portion of the GM Claim.

(Disclosure Statement, App. C at 6 - 7)  Similarly, the sources and uses disclosed by Delphi in

the Disclosure Statement showed that it expected to receive in cash at the Effective Date the full

face value of the first lien and second lien loans.  (Disclosure Statement, App. C at 9)  (Pryor

Decl. Ex. 12).



REDACTED

    The Plan Investors were never asked to waive rights under or amend the EPCA or the Financing Letter, and did not agree to such waiver or amendment. (Id.) On January 9, Delphi began to market that exit financing. (Id., ¶ 9)

    34.    The confirmation hearing commenced on January 17, 2008. In support of confirmation,

REDACTED

    In the Confirmation Order, the Court approved and made its feasibility determination based upon this evidence. (Pryor Decl. Ex. 18 at 15).

REDACTED

    35.    At the confirmation hearing, on January 17, 2008, the Court asked Mr. Sheehan directly, "knowing what you know today with regard to [the raising of exit financing], have there been any developments in connection with that process between the date of your declaration and today, that would alter your view as to the likely outcome of that process?"  Mr. Sheehan testified in response, "[t]he short answer to that question is no Your Honor." (Confirmation Hr'g Tr: 57:18-25, Jan. 17, 2008)  (Pryor Decl. Ex. 19).

    36.    At this time, significant factual issues exist as to Mr. Sheehan's testimony at confirmation, in particular whether, as of January 17, 2008, Delphi had any reasonable

expectation as to raising any financing, whether the credit markets were in fact a "bloodbath," and whether Delphi had already discussed GM's potential subsidization of a material portion of the first lien exit financing.

37.     Ultimately, Delphi was unsuccessful in its efforts to obtain the financing commitments on the terms pursuant to which the Plan Investors had permitted Delphi to market the financing. (Bolin Decl. ¶ 8).

**D.     The Debtors Propose The Financing Proposal And Threaten Suit**

38.     On or about January 30, 2008, after the initial marketing had failed, Delphi then approached ADAH with an exit financing proposal that included GM's participation in the first lien financing in an amount of $2.0 billion and first lien financing of $1.7 billion to be raised in the credit markets. (Bolin Decl. ¶ 9)

REDACTED

_____ Delphi and GM promised to take such comments under consideration and to consider other proposals or alternatives. (Id.)  In a separate meeting between counsel for ADAH and counsel for Delphi, at the February 6 meeting, counsel for Delphi threatened to pursue a litigation remedy, if necessary, to spur specific performance of the EPCA.

39.

REDACTED

REDACTED

REDACTED

REDACTED

(Bolin Decl., Ex. 2).  Notably, although one might expect that there might have been other ways to structure GM's participation to address Plan Investor concerns, <u>GM has never agreed to any additional terms or protection since February 7, 2008.</u>

40.     At Delphi's request, the Plan Investors (other than Goldman Sachs)[6] met to discuss the Financing Proposal and Delphi's litigation threats.  On February 13, 2008, the Plan Investors (other than Goldman Sachs) provided their preliminary business response.  Specifically, as set forth in the February 13, 2008 letter, they identified the following major concerns:

- • Notwithstanding the terms of the exit financing required by the EPCA, the Financing Proposal contemplated substantial OID, reducing both the cash proceeds generated from the financing and negatively impacting Delphi's overall liquidity with higher interest on the first and second lien facilities.

---

[6] Because of the threat of litigation made by the Debtors at the February 6, 2008 meeting, the Plan Investors deemed it advisable that the parties enter a common interest agreement to discuss responses to the Delphi proposal and to consider the effect of the litigation alternative.  Because Goldman Sachs would not enter into such agreement, it did not participate in the discussions concerning the Financing Proposal.

- The Financing Proposal would leave Delphi underfinanced, especially in light of recent market turmoil and economic forecasts.

- The Financing Proposal would adversely affect Delphi and the Plan Investors by materially increasing and concentrating GM's ongoing influence and control.

- The Financing Proposal contemplated that the interest on the various tranches of debt would be at rates significantly higher than those required under the EPCA.

(Bolin Decl. Ex 3).

41.    Based on mounting available information since the Plan Investors permitted Delphi to go to market with a reduced second lien financing in mid-January 2008, ADAH believes that the total amount of capital set forth in the EPCA is in fact needed to support Delphi's liquidity position.



REDACTED

REDACTED

REDACTED



E.   **The Plan Investors Have Not Consented To The Scheduling Of
The Motion And Have Sought Discovery In Connection Therewith**

45.   On February 20, 2008, without substantially addressing any of the foregoing
material concerns, the Debtors responded to the February 13, 2008 letter. (Pryor Decl. Ex. 21)

46.   On Saturday, February 23, 2008, Delphi then circulated proposed marketing
materials with respect to the re-launch of its exit financing and, consistent with EPCA § 5(t),
afforded ADAH an opportunity to comment. In the covering email, Delphi indicated that it
intended to issue a press release (announcing the re-launch of its exit financing) on the next
business day, the morning of Monday, February 25, 2008.

47.   On Sunday evening, February 24, 2008, in a good faith effort to avoid assertions
that it had consented to the release, ADAH informed Delphi that it believed that the Financing
Proposal was not compliant with the EPCA. (Bolin Decl. ¶ 21).

48.   Following the February 24, 2008 letter from ADAH to Delphi, Delphi's counsel
sought an immediate "off the record" status conference on February 26, 2008. On Monday,
February 25, 2008, Delphi sent a letter to ADAH in which it asserted, inter alia, that ADAH's
letter of February 24, 2008 was, itself, a failure to use "best efforts" to support the transactions
contemplated under the EPCA and requested that ADAH withdraw its February 24, 2008 letter.
Subsequent "off the record" status conferences were held on February 27 and 28. On February
28, Delphi's counsel then transmitted a draft of the Motion on an outside "attorney's eyes only"
basis. The next day, February 29, 2008, ADAH sent a letter reiterating its lack of consent to
proceeding with the Motion on an expedited basis (first contained in a February 27, 2008 letter)
and enclosing draft discovery which would be served if the Motion were filed. (Pryor Decl. Exs.

24, 25).  ADAH also sought access to the Draft Motion so that its principals could assist further in preparing a response based on a review of the Motion.

49.     On March 4, 2008, at the Debtors' request, a fourth "off the record" chambers conference was held.  In its cover letter to the Court, sent ten minutes before the conference, Delphi stated that it did not intend to produce discovery and that it would seek agreement to permit clients to review the Motion on a confidential basis.  ADAH executed a new confidentiality agreement around 5:15 p.m. on March 4, at which time ADAH finally saw the Draft Motion.

## ARGUMENT

50.    The Debtors seek two form of relief in the Motion.  First, the Debtors seek a

declaratory judgment that a proposed exit financing package, which they have not obtained and

cannot show they can obtain, complies with the Plan and the EPCA.  Second, although they

make no argument or factual showing indicating they are entitled to it, the Debtors seek an order

"directing the Plan Investors . . . to use their reasonable best efforts to take all actions . . . to

cooperate with Delphi and to consummate and make effective all transactions contemplated by

the EPCA and the Plan, including the syndication and closing of the exit financing arrangements,

funding and closing of the EPCA, and all other transactions necessary to consummate the Plan."

(Motion ¶ 46)  Neither form of relief is available to Delphi on this record or any record that it

could develop for this Court.

**I.**

## THE COURT MAY NOT GRANT THE
## DEBTORS THE DECLARATIONS THEY SEEK

51.    As their primary form of relief, the Debtors seek an order declaring that the

Financing Proposal is compliant with the EPCA.  (Motion ¶ 46)  The Court must deny that relief.

First, such order would amount to a Constitutionally prohibited advisory opinion as to the

consequences of moving forward with an as-of-yet uncommitted financing on the assumption

that it could be obtained and that, thereafter, every other presently unfulfilled condition to close

the EPCA will be timely satisfied.  Second, section 1142 of the Bankruptcy Code does not permit

the Debtors to seek relief that is either unavailable under the Constitution or the parties' express

contract.  Rather, that provision only preserves the Court's right to act in a post-confirmation

setting, which is not disputed here.  Third, the Debtors are simply wrong about the requirements

of the EPCA.  That agreement makes clear that (a) the GM Proposal upon which the Financing

Proposal is premised is flatly prohibited as an agreement, inter alia, outside the ordinary course

and (b) the Plan Investors are entitled to insist that Delphi obtain exit financing on the terms

indicated in the Financing Letter and need not accept any of the adverse terms of the newly

Proposed Financing.

> **A.    The Motion Does Not Present A Justiciable Case
> Or Controversy As Required By The Constitution**

52.     The United States Constitution limits the jurisdiction of federal courts to actual

"cases" or "controversies." U.S. Const. art. III, § 2, cl. 1; The Bank of N.Y. v. Adelphia

Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 307 B.R. 432, 436-37 (Bankr. S.D.N.Y.

2004) (citing Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 238-239

(1937)).[7]  Similarly, under the Federal Declaratory Judgment Act, Congress has authorized

declaratory judgments only "[i]n . . . case[s] of actual controversy." Olin Corp. v. Consol.

Aluminum Corp., 5 F.3d 10, 17 (2d Cir. 1993) (quoting 28 U.S.C. § 2201).[8]  Thus, for a court to

have subject matter jurisdiction over a declaratory judgment action, there must be "a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and reality

to warrant the issuance of a declaratory judgment." Md. Cas. Co. v. Pac. Coal Oil Co., 312

U.S. 270, 273 (1941); Olin Corp., 5 F.3d at 17 (quoting Maryland Casualty).

---

[7] "Although bankruptcy courts are not Article III courts, they are subject to the jurisdictional constraints of Article III to the extent that they exercise the judicial power of the United States." Adelphia, 307 B.R. at 436 n.5 (citing In re Trans World Airlines, Inc., 169 B.R. 91, 93-94 (Bankr. D. Del. 1994)); see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 76 (1982) ("Nor can we discern any persuasive reason, in logic, history, or the Constitution, why the bankruptcy courts here established lie beyond the reach of Art. III.").

[8] With exceptions not relevant here, the Federal Declaratory Judgments Act provides, in pertinent part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (emphasis added). Courts have repeatedly stressed that the Federal Declaratory Judgment Act was drafted with the constitutional restrictions of Article III in mind and, as such, "is operative only in respect to controversies which are such in the constitutional sense . . . . Thus the operation of the Declaratory Judgment Act is procedural only." See, e.g., Adelphia, 307 B.R. at 437 (quoting Aetna, 300 U.S. at 240-41)). Stated differently, the Federal Declaratory Judgment Act "provides no independent basis for subject matter jurisdiction." Id. (citing Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 752 (2d Cir. 1996)).

53.      In distinguishing between abstract, hypothetical or academic questions and real

and substantial controversies, "[t]he Supreme Court has stressed not only that the controversy

must be sufficiently real and immediate, <u>allowing specific and conclusive relief</u>, but that it must

also be ripe for adjudication." <u>Dow Jones & Co.</u> v. <u>Harrods, Ltd.</u>, 237 F. Supp. 2d 394, 406-07

(S.D.N.Y. 2002) (emphasis added) (explaining and quoting from <u>Pub. Serv. Comm'n of Utah</u>

v. <u>Wycoff Co.</u>, 344 U.S. 237 (1952)), <u>aff'd</u>, 346 F.3d 357 (2d Cir. 2003); <u>see also</u> <u>Adelphia</u>, 307

B.R. at 437 (quoting <u>Dow Jones</u>); <u>Aetna</u>, 300 U.S. at 240-41 ("The controversy . . . must be a

real and substantial controversy admitting of specific relief through a decree of a conclusive

character, <u>as distinguished from an opinion advising what the law would be upon a hypothetical</u>

<u>set of facts</u>." (emphasis added)).    The Supreme Court has further clarified that "[t]he

disagreement must not be nebulous or contingent but must have taken a fixed and final shape so

that a court can see what legal issues it is deciding, what effect its decision will have on its

adversaries, <u>and some useful purpose to be achieved in deciding them</u>." <u>Dow Jones</u>, 237

F. Supp. 2d at 406 (quoting <u>Wycoff</u>, 344 U.S. at 244).

54.      In a similar vein, the Second Circuit has explained that

> "a touchstone to guide the probe for sufficient immediacy and
> reality is whether the declaratory relief sought relates to a dispute
> where the alleged liability has already accrued or the threatened
> risk occurred, or rather <u>whether the feared legal consequence</u>
> <u>remains a mere possibility, or even probability of some</u>
> <u>contingency that may or may not come to pass</u>."

<u>Id.</u> at 406-07 (citing <u>Muller</u> v. <u>Olin Mathieson Chem. Corp.</u>, 404 F.2 501 (2d Cir. 1968)).    As

noted by the Southern District of New York in <u>Dow Jones</u>, "central to the ripeness requirement is

that courts <u>should not endeavor to resolve contingencies that may or may not occur as expected</u>

<u>or may not happen at all</u>." <u>Id.</u> at 407 n.39 (emphasis added) (citing <u>Thomas</u> v. <u>Union Carbide</u>

<u>Agric. Prod. Co.</u>, 473 U.S. 568, 580-81 (1985)); <u>see also</u> <u>Adelphia</u>, 307 B.R. at 438 (quoting

<u>Dow Jones</u>).    That an unripe decision may be helpful for the implementation of a debtors' plan of

reorganization is of no moment. See In re Dycoal, Inc., 327 B.R. 220, 228 (Bankr. W.D. Pa.
2005) (denying debtors request for declaratory relief, and stating that "[t]hat the successful
implementation of the Plan, is based, in large part, on a present adjudication [of the controversy]
. . .does not alter the . . . conclusion that the Plaintiffs' . . . request for declaratory relief is not
ripe for adjudication.").

      55.    Consistent with the authorities cited above, courts have repeatedly held that
declaratory relief is unavailable where, as here, the purported controversy between parties is not
concretely presented, but rather based on the occurrence of speculative future contingencies.  In
Adelphia, for example, certain holders of subordinated debt commenced an adversary proceeding
seeking a declaratory judgment with respect to their rights under the indenture covering their
notes.  307 B.R. at 433-34.  The adversary proceeding, which was filed prior to the filing of a
plan of reorganization, sought a ruling as to whether provisions of the indenture—which
generally required holders of senior debt to be paid in full before any distribution could be made
to holders of subordinated debt—would apply to plan distributions made in stock, rather than
cash or debt securities.  Id. at 434.  In response to motions to dismiss filed by certain creditor
constituencies, the Court held that the declaratory judgment action failed to satisfy the "case or
controversy" and ripeness requirements, and thus dismissed the adversary proceeding for lack of
subject matter jurisdiction.  Id. at 434-35.

      56.    Although in Adelphia the debtors' plan was not filed at the time the adversary
proceeding was commenced, it was filed prior to the bankruptcy court's ruling.  Notwithstanding
the filing of the plan or the court's recognition that it was "very much the type of plan that the
Sub Debt holders feared, and that they contend[ed] [was] . . . violative of the requirements of the
Sub Debt Indenture," the court held that numerous uncertainties remained with respect to the
case—including, among other things, whether the Debtors would continue to propose the plan in

question, whether the plan would secure acceptances of the requisite number of creditors, and

whether the plan would be amended in a way that addressed the concerns raised by the

subordinated noteholders—all of which would make a declaratory judgment purely advisory and

thus improper under Article III of the Constitution. Id. at 436.  Stressing the contingent nature of

the facts before it, the bankruptcy court noted as follows:

> even assuming, *arguendo*, that this Court decided the issues the
> Sub Debt holders want this Court now to consider, and decided
> them in the Sub Debt's favor, there are a multitude of scenarios
> under which all of this would have turned out to be an idle
> exercise, or the wrong exercise, <u>because later factual developments
> changed or eliminated the issues to be decided</u>.

Id. (emphasis added); see also, e.g., In re One Canandaigua Props., Inc., 140 B.R. 616, 616-18

(Bankr. W.D.N.Y. 1992) (holding that dispute with respect to the debtor's proposed

classification scheme was not ripe for adjudication where the numerous contingencies, including

the debtor's potential inability to obtain the requisite acceptance of one impaired class or a

determination that the plan was not feasible, could render any declaratory relief purely advisory).

57.     Similarly, in <u>Official Comm. of Unsecured Creditors</u> v. <u>United States (In re</u>

<u>Antonelli)</u>, the Court found unripe the creditor committee's complaint seeking a declaratory

judgment regarding certain post-confirmation tax liabilities. Nos. 91-4-0254, 92-A-0134, 1992

WL 435879, at *1 (Bankr. D. Md. Nov. 6, 1992).  More specifically, the complaint, which was

filed prior to the confirmation of the debtors' plan of reorganization, sought a ruling as to

whether various parties in interest, including the holders of allowed claims, would be exempt

from any stamp or transfer taxes in connection with the transfer of property to and by the

liquidating trust that was to be created under the proposed plan. Id.  In holding that a declaratory

judgment would be barred under the Constitution as an improper advisory opinion, the court

stressed that numerous contingencies—including, among other things, the confirmation of the

debtors' plan of reorganization, the transfer of the debtors' assets to the liquidating trust, the

solicitation of prospective buyers, and the consummation of transactions for the sale of assets to

such buyers—would have to be resolved before the tax implications of the proposed transfers

could be adjudicated. Id. at *3. Based on the speculative outcome of these future contingencies,

the court held that it was not empowered to issue a ruling under the "case" or "controversy"

requirement of Article III. Id.

58.    Finally, as in Adelphia and Antonelli, the Court in In re Murray Industries, Inc.

v. Federal Ins. Co. (In re Murray Industries, Inc.) found unripe the debtor's adversary proceeding

seeking a declaration that its insurance policy would provide coverage in the event it pursued

certain claims against its former officers and directors. 122 B.R. 135, 136 (Bankr. M.D. Fla.

1990). There, the debtor's insurer filed a motion to dismiss based, among other things, on the

lack of any justiciable case or controversy between the parties. Id. at 136-37. In granting the

insurer's motion, the court stressed that the debtor's complaint presented only a hypothetical

controversy, as numerous facts required for a legal determination—including the filing of a

complaint by the debtors and a final determination regarding the liability of the former directors

and officers—remained speculative, remote and contingent. Id. 137. Although the court

recognized "the reluctance of the Debtor to undertake complex and expensive litigation to

recover damages . . . if there is no likelihood that they will ever be able to collect," it stressed

that it simply could not "grant a declaratory judgment based on the hypothetical facts before it."

Id.; see also In re Trans World Airlines, Inc., 169 B.R. 91, 95 (Bankr. D. Del. 1994) (finding

unripe the debtor and its unsecured creditor committee's motion to approve a union settlement,

holding "the fact that the order would apply only if certain events and conditions arise,

eventualities which may never happen, weighs in favor of finding the issue non-justiciable.").

59.    Here, even a cursory review of the Motion makes plain that the declaratory relief

requested would require the Court to assume numerous facts that (i) remain contingent, (ii) are

subject to change, and, worse yet, (iii) are wholly interdependent in that the non-occurrence of

one causes the non-occurrence of all. Specifically, even assuming the ability of Delphi to satisfy

every other condition to the EPCA (a fact in material dispute), the terms of the Financing

Proposal which Delphi argues satisfy the financing and interest conditions contained in sections

9(a)(xix) and (xx) of the EPCA remain completely malleable. Delphi offers no evidence of

having entered into any definitive agreements with GM or any would-be lenders regarding the

Financing Proposal. Apparently, then, Delphi is not barred from materially modifying the terms

of the Financing Proposal or, indeed, from abandoning those transactions and entering into

different financing arrangements altogether.

> 60.    The inappropriateness of a declaratory judgment here is only exacerbated by

Delphi's recent Annual Report, see Delphi Corp., Annual Report (Form 10-K) (February 19,

2008), discussing the contingent nature of its exit financing efforts:

> Effectiveness of the Amended Plan is subject to a number of
> conditions, including the completion of the transactions
> contemplated by the EPCA, the entry of certain orders by the Court
> and the obtaining of exit financing. . . . There can be no assurances
> that such exit financing will be obtained or such other conditions
> will be satisfied, and we cannot assure you that the Amended Plan
> will become effective on the terms described herein or at all.

Id. at 6 (emphasis added); see also id. at 22 (same), 54 (same), 120 (same), and 43-44

> ("The U.S. and global credit markets currently are challenging and
> in particular the market for leveraged loans is marked by
> substantial uncertainty and a significant decline in capacity.
> Delphi is in discussions with the Investors and GM regarding
> implementation of exit financing. There can be no assurances as to
> whether such exit financing can be obtained.")

Id.

> 61.    Similarly, in Delphi's recent Motion For Order Under 11 U.S.C. § 1121(d)

Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of

Reorganization Plan (the "Exclusivity Motion"), filed on February 28, 2007, Delphi admits,

indeed relies upon, the contingent nature of the Financing Proposal in seeking an extension of exclusivity:

> The unresolved contingencies relating to fully committed exit financing and the size and complexity of the Debtors' cases also justify a further extension of the Exclusive Periods.

(Exclusivity Motion ¶ 20). Delphi further states that its procurement of "fully committed exit financing that will support implementation of the Plan and consummate all of the transactions contemplated by the Plan and Delphi's investment agreement" is an "important contingency." (Id. ¶ 29).

62.    In short, as a Constitutional matter, the Debtors cannot properly have this Court declare (i) if they enter into a final agreement with respect to the Financing Proposal (on terms identical to those presented to the Court); and (ii) if the Plan Investors reject such financing; and (iii) if each and every condition to the effectiveness of the Plan has been satisfied or waived; and (iv) if each and every condition to closing under the EPCA is satisfied or waived, the Plan Investors would be compelled to perform. For this reason alone, the declaratory aspect of the Motion should be denied for lack of subject matter jurisdiction.

**B.    Section 1142 Does Not Grant The Court Power
To Grant The Declaration Sought By The Debtors**

63.    In perhaps a recognition that a direct invocation of the Federal Declaratory Judgment Act would flag the manifest Constitutional problems with the Motion, Delphi has styled the Motion as one for entry of an order in aid of consummation of the Plan pursuant to section 1142(b) of the Bankruptcy Code. That Code provision, however, provides no independent basis for relief and certainly does not expand the constitutional jurisdiction of the federal courts.

1.    **Section 1142(b) Of The Bankruptcy Code Permits The Court Only To Enforce The Terms Of The Plan And Does Not Permit The Court To Declare Or Rewrite The Terms Of The EPCA**

64.    Section 1142(b) of the Bankruptcy Code provides:

> The court may direct the debtor and any other necessary party to execute and deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, <u>that is necessary for the consummation of the plan.</u>

11 U.S.C. § 1142(b) (emphasis added). On its face, Section 1142 says nothing about having a Court "declare" the parties' rights. Instead, it speaks only to requiring parties (and not courts) to "perform acts." Significantly, at least one court has commented that section 1142(b) does not grant the bankruptcy court the authority to grant declaratory relief of the type sought here:

> 11 U.S.C. § 1142(b) only authorizes the Court to 'direct the debtor and any other necessary party' to take particular actions. It does not provide authorization for a grant of declaratory relief.

<u>In re Dycoal, Inc.</u>, 327 B.R. 220, 227, n.4 (Bankr. W.D. Pa. 2005).

65.    Where Delphi trips up here is in viewing Section 1142(b) as an independent form of relief, rather than an enabling statute. By its terms, section 1142(b) of the Bankruptcy Code only "empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan." <u>Vill. of Rosemont</u> v. <u>Jaffe</u>, 482 F.3d 926, 935 (7th Cir. 2007) (quoting <u>In re U.S. Brass Corp.</u>, 301 F.3d 296, 306 (5th Cir. 2002)), aff'g <u>In re Emerald Casino, Inc.</u>, 334 B.R. 378 (N.D. Ill. 2005). Section 1142(b) gives a bankruptcy court the "authority to perform acts related to implementation and execution of a plan that are otherwise provided for in the Bankruptcy Code." <u>In re Baker</u>, No. CV05-3487(CPS), 2005 WL 2105802, at *5 (E.D.N.Y. Aug. 31, 2005) (see <u>Goodman</u> v. <u>Phillip R. Curtis Enters., Inc.</u>, 809 F.2d 228, 232-33 (4th Cir. 1987)). However, section 1142(b) of the Bankruptcy Code does not confer substantive rights on a party apart from what a confirmed plan of reorganization provides. <u>See</u> <u>Vill. of Rosement</u>, 482 F.3d at 935 (citing

U.S. Brass).  As a result, a court may not utilize section 1142(b) to alter the terms of a plan to

create obligations that do not otherwise exist under that plan.  Emerald Casino, 334 B.R. at 396

("Section 1142(b) provides courts with authority to direct a party to act only if the confirmed

plan 'so requires and … properly sets forth the agreement of the parties.'") (quoting (In re Erie

Hilton Joint Venture), 137 B.R. 165, 170 (Bankr. W.D. Pa. 1992) (hereinafter, "Erie Hilton I")).

To read section 1142(b) too broadly as conferring on bankruptcy courts "authority to order any

act necessary for consummation of a plan, [would result in] the [section] 1127 restriction against

sua sponte modifications be[ing] rendered meaningless."  In re CV05-3487, Baker, 2005 WL

2105802, at *6.

66.     The intent of section 1142(b) of the Bankruptcy Code is "to assure that the terms

and provisions of a confirmed chapter 11 plan are carried out until the plan is completed and the

final decree is entered closing the case."  LTV Corp. v. Back (In re Chateaugay Corp., 201 B.R.

48, 66 (Bankr. S.D.N.Y. 1996) (citing In re Johns-Manville Corp., 97 B.R. 174, 180

(Bankr. S.D.N.Y. 1989)), aff'd in part sub nom., Back v. LTV Corp. (In re Chateaugay Corp.),

213 B.R. 633 (S.D.N.Y. 1997).  Consistent with that purpose, "Section 1142(b), in particular,

vests the Court with authority to oversee implementation of the plan and retain jurisdiction for

acts necessary for the consummation of the plan."  In re Johns-Manville Corp., No. 82 B 11656,

2004 WL 1876046, *26 (Bankr. S.D.N.Y. Apr. 17, 2004), rev'd on other grounds, 340 B.R. 49

(S.D.N.Y. 2006), aff'd, 476 F.3d 118 (2d Cir. 2007).  In instances in which Courts have applied

section 1142(b), it has acted to implement the terms of the confirmed plan at issue—not to alter

the terms thereof or parties' obligations with respect thereto, and certainly not to declare how it

might act if a long series of contingencies were to unfold.  See, e.g., In re Spiegel Inc., No. 03-

11540(BRL), 2007 WL 201112, *6 (Bankr. S.D.N.Y. Jan. 23, 2007) (enjoining taxing authority

from taking post-confirmation actions to collect discharged claim contrary to the debtor's confirmed plan of reorganization).

67.    The Second Circuit has not addressed the scope of section 1142(b) of the Bankruptcy Code at length. In <u>Riverside Nursing Home</u> v. <u>N. Metro. Residential Health Care Facility, Inc.</u>, the Court affirmed the district court's decision affirming the bankruptcy court's order directing the debtor to enter into a receivership agreement where the debtor's consent to the appointment of a voluntary receiver was specifically contemplated by the debtor's confirmed plan of reorganization. 977 F.2d 78, 81 (2d Cir. 1992). The Second Circuit stated:

> The Plan . . . clearly contemplated that Riverside would consent to the appointment of a receiver approved by the Health Department and the bankruptcy court, and to any underlying agreement pursuant to Section 2810 between that receiver and the Health Department. . . . Thus, Riverside cannot now challenge the Plan as an agreement to agree.  Nor can Riverside refuse to sign the agreement.  Chief Judge Brieant acted within his statutory powers in directing Riverside to sign.

<u>Id.</u> at 80-81 (citing 11 U.S.C. § 1142(b)).  Also, in <u>Luan Investment S.E.</u> v. <u>Franklin 145 Corp. (In re Petrie Retail, Inc.)</u>, the Second Circuit affirmed the district court's decision affirming the bankruptcy court's order granting the motion of an assignee for an order enforcing a specific injunction incorporate into a plan that enjoined the debtor's former lessor from seeking to collect from the assignee certain pre-assignment amounts due under the lease assigned by the debtor. 304 F.3d 223, 232 (2d Cir. 2002). Those amounts were liabilities retained by the debtor under the order approving the sale of the debtor's assets, which order was incorporated by reference in the order confirming the debtor's plan. <u>Id.</u> at 226.  In both of these decisions, the Second Circuit affirmed lower court decisions applying section 1142(b) of the Bankruptcy Code to enforce according to its terms, a specific plan provision (<u>i.e.</u>, the discharge injunction) or a specific injunction incorporated into the order confirming the plan (<u>i.e.</u>, the sale order's injunction as to excluded liabilities).  In neither case did the Second Circuit sanction the rewriting of the plan or

express general opinions as to the meaning and effect of a plan, as the Debtors would have the Court do here.

2.    <strong>The Debtors Are Not Permitted To Rewrite The<br>
EPCA In The Guise Of Enforcing The Confirmation<br>
<u>Order And Plan, And Thus, The Motion Must Be Denied</u></strong>

68.    Delphi then seeks to sidestep the problems regarding the limits of section 1142(b) by appealing generally to the notion that a Court may interpret its own orders, such as the Confirmation Order. (Motion at 14). The problem with that approach is that Delphi has it backwards. The Confirmation Order does <u>not</u> control the relationship between the Plan Investors and Delphi. The EPCA does. As noted in the Plan:

> All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein . . . . To the extent any Exhibit is inconsistent with the terms of this Plan and unless otherwise provided for in the Confirmation Order, the terms of the Exhibit shall control as to the transactions contemplated thereby and the terms of the Plan shall control as to any Plan provision that may be required under the Exhibit <u>other than the provisions of Section 9 of the [EPCA], which controls in all respects</u>.    (Plan Art. I.F (emphasis added)).

* * *

> Notwithstanding anything herein to the contrary or the affirmative vote to accept the Plan submitted by any Plan Investor, nothing contained in the Plan shall alter, amend or modify the rights of the Plan Investors under the [EPCA] unless such alteration, amendment, or modification has been agreed to in writing by each Plan Investor. (<u>Id.</u> Art. 14.4.)

* * *

> On the Effective Date, the Reorganized Debtors shall receive the proceeds of the Exit Financing Arrangements, in the aggregate amount necessary to implement the Plan and within the terms and conditions previously approved by the Bankruptcy Court as described in the exit financing engagement letter and term sheet attached hereto as <u>Exhibit 7.14</u>, as such term sheet may be amended, modified, or supplemented, to repay the DIP Facility Revolver Claims, the DIP Facility Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments

required on the Effective Date, <u>satisfy the conditions of the</u> <u>[EPCA]</u>, and conduct their post-reorganization operations.

<u>Id.</u> Art. 7.14 (emphasis added).

69.     With respect to the EPCA, the orders approving the EPCA and the Exit

Financing, the Confirmation Order similarly provides:

> Notwithstanding any provision in this Confirmation Order, the [EPCA] is valid, binding, in full force and effect in accordance with its terms, and constitutes an obligation of the parties thereto fully enforceable on its terms, and is not amended in any way hereby. Confirmation Order ¶ 32.

* * *

> Neither the confirmation of the Plan nor anything set forth in this Confirmation Order shall modify the following previous orders of the Court, except to the extent contemplated in such orders: . . . (e) Order Authorizing Delphi-Appaloosa Equity Purchase and Commitment Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a), entered August 2, 2007 (Docket No. 8856), (f) Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Delphi-Appaloosa Equity Purchase and Commitment Agreement Amendment, entered December 10, 2007 (Docket No. 11382) . . . . <u>Id.</u> ¶ 61.

* * *

> [T]he Court's previous orders dated August 2, 2007 and December 10, 2007 authorizing and approving the Debtors' entrance into the Delphi-Appaloosa Equity Purchase and Commitment Agreement and subsequent amendment thereto (Docket Nos. 8856 and 11382), . . . are incorporated herein by reference. <u>Id.</u> ¶ PP.

* * *

> The provisions of Article 7.14 of the Plan are approved in their entirety.  Specifically, on the Effective Date, the Reorganized Debtors shall receive the proceeds of the Exit Financing on the terms as set forth in the exit financing engagement letter and term sheet attached to the Plan as Exhibit 7.14, as such term sheet may be amended, modified, or supplemented in accordance with the Plan (<u>subject to the consents of third parties</u>, if any, as may be required by the Plan.).

<u>Id.</u> ¶ 20 (emphasis added).

70.    The foregoing provisions of the Plan and Confirmation Order make clear that (i)
the terms of the EPCA can not be, and were not, altered, amended or modified by the Plan or the
Confirmation Order, (ii) the terms of the EPCA, and particularly the conditions to consummation
of the transactions contemplated by the EPCA set forth in section 9 thereof, "trump" the terms of
the Plan, (iii) the EPCA is effective and fully enforceable "in accordance with its terms," (iv) the
debt financing must be obtained on the terms set forth in the EPCA (which in turn refers to the
Financing Letter), (v) the terms of the EPCA cannot be modified or supplemented without the
consent of the Plan Investors, and (vi) the Exit Financing must "satisfy the conditions of the
EPCA[.]"

71.    Given the foregoing, in all instances, the Court must look to the EPCA and
interpret the EPCA; the Plan and Confirmation Order have no material role here.  As to that
contract, the Debtors cannot rewrite the EPCA consistent with section 1142(b) of the Bankruptcy
Code or the applicable New York law on contracts.  See Vill. of Rosemont, 482 F.3d at 935
(refusing to enforce, under section 1142(b), letter waiving unsatisfied conditions set forth in prior
letter incorporated into confirmed plan, where later letter was issued after confirmation, and thus,
was not part of confirmed plan but, instead, altered the terms thereof); In re Baker, 2005 WL
2105802, at *6 (concluding that order directing post-confirmation sale of property at auction,
where reorganized debtor had failed to sell property in accordance with confirmed plan, was not
authorized by section 1142(b) but, instead, a post-confirmation modification pursuant to section
1127); Official Unsecured Creditors' Comm. of Erie Hilton Joint Venture v. Siskind (In re Erie
Hilton Joint Venture), 145 B.R. 215, 219 (Bankr. W.D. Ill. 1992) (hereinafter "Erie Hilton II")
(in adversary proceeding, denying summary judgment motion by which committee sought order
compelling prospective investors to fund confirmed plan of reorganization where court
concluded that committee had failed to proffer any affirmative evidence that prospective

investors actually agreed to fund confirmed plan);[9] In re Modern Steel Treating Co., 130 B.R.

60, 65-66 (Bankr. N.D. Ill. 1991) (declining to order non-debtor to enter into agreement with

debtor where proposed agreement contained conditions and requirements not mentioned in plan

or disclosure statement), aff'd, Graham v. Modern Steel Treating Co. (In re Modern Steel

Treating Co.), No. 91 C 5747, 1992 WL 82966, *6 (N.D. Ill. Apr. 1, 1992); Wilmington Trust

Co. v. Solutia, Inc. (In re Solutia, Inc.), No. 03-17949, No. 05-10843, 2007 WL 1302609, at *11

(Bankr. S.D.N.Y. May 1, 2007) (when dealing with an unambiguous contact, "the Court must

look to the actual terms of the contractual arrangement between the parties and not equity to

determine [the] matter"); Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) ("A court

may neither rewrite, under the guise of interpretation, a term of the contract when the term is

clear and unambiguous . . . nor redraft a contract to accord with its instinct for the dispensation

of equity upon the facts of a given case.") (citations omitted).  Given that the relief the Debtors

seek is inconsistent with the Plan, the Confirmation Order and the EPCA, and not authorized by

the Bankruptcy Code, the Motion should be denied.  See, e.g., In re Snowville Farms, LLC, Nos.

UT-06-034, 2007 WL 1302154 (B.A.P. 10th Cir. May 4, 2007).[10]

---

[9] The Debtors imply by their citation to the prior decision of the bankruptcy court for the Western District of Illinois (the "Illinois Bankruptcy Court") in Erie Hilton I that the Illinois Bankruptcy Court was willing to compel prospective investors to fund the confirmed plan at issue.  See Motion ¶ 30. In fact, in Erie Hilton I, after holding that it had the power under section 1142(b) to compel the prospective investors to invest in the event the committee demonstrated those investors were required to do so by the confirmed plan, 137 B.R. at 170, the Illinois Bankruptcy Court denied the prospective investors motion to dismiss the committee's complaint stating:

> The Complaint will not be dismissed for failure to state a claim on which relief can be granted.  It appears that the Committee would be entitled to Summary judgment but for the following questions of fact-whether the Defendants had knowledge of or agreed to the Confirmed Plan.

Id. at 171 (emphasis added).  The Illinois Bankruptcy Court's subsequent decision in Erie Hilton II makes clear that the committee was unable to satisfy its burden with respect to that question of fact, and thus, the Illinois Bankruptcy Court refused to order the prospective investors to finance the confirmed plan.  Erie Hilton II, 145 B.R. at 219 ("Future circumstances were to dictate the level of contributions, if any, by the Defendants. In the absence of any funding commitments, the Confirmed Plan has collapsed.").

[10] In Snowville Farms, the Tenth Circuit Bankruptcy Appellate Panel was confronted with a situation similar to the instant case.  Specifically, the debtor, Snowville Farms, had sought and obtained entry by the bankruptcy court of an

## II.

### EVEN IF THIS COURT HAD JURISDICTION TO "INTERPRET" THE EPCA ON THIS RECORD, THE DEBTORS ARE NOT ENTITLED TO THE DECLARATIONS THEY SEEK

72.    Although the Motion should be denied as procedurally and constitutionally

improper, it also should be denied because the declarations Delphi seeks from the Court are

simply wrong in at least two material respects.

### A.    GM's Participation In The Financing Proposal Violates Section 5(p) Of The EPCA

73.    First, the EPCA places severe constraints on Delphi's ability to enter into any

agreements with GM.  In section 5(p), Delphi covenanted, in relevant part,

---

order confirming its plan of reorganization. Id. at *1. The debtor's confirmed plan provided that the debtor would pay one secured lender, Barnes, $550,000 out of the proceeds of the sale of its year 2005 crops, the proceeds of any Farm Service Agency ("FSA") loans obtained, and any drought relief funds paid to the debtor. Id. The plan also provided that the debtor would pay its second secured lender $320,0000. Id. The debtor failed to make either payment because it failed to sell sufficient crops to make the required payments. Id. Instead, the debtor sought a loan from the FSA in the amount of $380,000 secured by its crops to make a *partial* payment to Barnes under its plan. Id. In order to obtain the loan, the debtor was required to obtain a lien waiver from Barnes. Id. The debtor's plan made no mention of the secured creditors having to provide lien waivers in order to receive distributions under the plan. Id. Following a request by the debtor, Barnes refused to sign a lien waiver because of ambiguities contained therein and because Barnes feared execution of the lien waiver might breach the terms of an intercreditor agreement between Barnes and the debtor's other secured lender. Id. at *2. Thereafter, the debtor requested that its second secured lender execute a lien waiver, and it also refused. Id. The debtor then filed a motion for an order enforcing the plan under section 1142(b) of the Bankruptcy Code and argued that the FSA loan was contemplated by the plan, and thus, the debtor's secured lenders breached the plan by refusing to execute the required lien waivers. Id. The bankruptcy court denied the motion after concluding that the plan did not mention that either secured lender would be required to subordinate, release or waive its liens. Id. The court refused to find that the secured lenders had breached the plan. Id. The Bankruptcy Appellate Panel affirmed the bankruptcy court's denial of the debtor's motion stating:

> [T]he court should refrain from issuing orders directing third parties to take action unless the action is directly called for by the terms of the plan or is necessary to allow the plan to be implemented.  Nor should a party be required to execute an agreement unless the significant terms of the agreement have been set forth in the plan.  Section 1142(b) does not confer substantive rights, but it allows the bankruptcy court to enforce unperformed terms of a confirmed plan.  The court cannot compel the execution of a document if there is no agreement on the terms or if the terms remain uncertain.  As in contract interpretation, the court cannot supply terms or create an obligation which does not exist under the plan itself.  Section 1142(b) provides courts with authority to direct action only if the plan "so requires and … properly sets forth the agreement of the parties."

Id. at *4 (footnotes omitted).

> Other than the GM Amendments, <u>the Company shall not enter into</u>
> <u>any other agreement with GM that (i) is materially inconsistent</u>
> <u>with this Agreement, the Plan Terms and the Plan, (ii) is outside</u>
> <u>the ordinary course of business **or** (iii) the terms of which would</u>
> <u>have a material impact on the Investors' proposed investment in</u>
> <u>the Company.</u> The Company has not entered into any material
> written agreements between or among the Company or any of its
> Subsidiaries and GM or any of its Subsidiaries directly relating to
> the Plan or the GM Settlement or the performance of the
> Transaction Agreements, and any such written agreements
> hereafter entered into will be disclosed promptly to ADAH.

(emphasis added).

74.    Delphi has admitted that GM's participation in the Financing Proposal will be

pursuant to an "agreement." Indeed, in the February 20, 2008 letter to the Plan Investors

(Motion Ex. C), Delphi notes that "GM has agreed" to make certain concessions and to provide

certain financing. The timing, extent and definitiveness of that "agreement," however, remains

to be seen in discovery.

75.    From ADAH's perspective, there can be no reasonable dispute that any

commitment by GM to fund $2.0 billion of first lien financing is "outside the ordinary course of

business." Certainly, the Debtors have offered no evidence that the agreement <u>is</u> in the ordinary

course, and, in any event, that is a contention that ADAH would materially dispute.

Accordingly, under the clear terms of section 5(p)(ii), the Motion must be denied. <u>See</u> <u>R/S</u>

<u>Assoc.</u> v. <u>N.Y. Job Dev. Auth.</u>, 98 N.Y.2d 29, 32-33 (2002) ("We have long adhered to the

sound rule in the construction of contracts that where the language is clear, unequivocal and

unambiguous, the contract is to be interpreted by its own language.").

76.    Delphi's only response to the foregoing is its entirely unsupported arguments that

"section 5(p) was designed to protect the Plan Investors and the Company from unfavorable

amendments to the GM settlement or GM's procurement of non-ordinary course agreements that

benefited GM to the detriment of the Plan Investors and the Company," and that GM's

agreement to provide $2.0 billion of first lien financing is not "the kind of agreement that would be comprehended in the scope of section 5(p)." (Motion ¶ 40) ADAH disputes those assertions of fact. No "kind" of agreement with GM was discussed in negotiations or is enumerated within the prohibitions of section 5(p) and there is no need to determine what section 5(p) "was designed to protect." Rather, the clear and unambiguous terms of 5(p) apply to "any other . . . agreement with GM." The Debtors' search for some unspoken "design" or qualitative limitation of the "kind of agreement" covered violates the most basic rules of contract construction. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569-570 (2002) ("The best evidence of what parties to a written agreement intend is what they say in their writing. . .Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms," and "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.); Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199 (2001) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."); W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 162-163 (1990) ("[B]efore looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract.")

77.    This is not just about "ordinary course" though. Section 5(p) also prohibits entry of any GM agreement that "(i)...materially inconsistent with this Agreement, the Plan Terms and the Plan, . . . or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company." (EPCA § 5(p) (emphasis added)) First, as a matter of fact, the terms of the Financing Proposal would have a "material impact on the [Plan] Investors' proposed investment."

REDACTED



78.    Second, GM's participation in the Financing Proposal is "materially inconsistent" with the EPCA because the EPCA requires that Delphi receive the proceeds of the "Debt Financing" on the terms indicated in the Financing Letter. As noted below, the Financing Letter in fact contemplates that the debt would be raised from a "syndicate of financial institutions," which GM is not. (The adverse consequences of GM not being a "financial institution" are also discussed infra.)

**B.    A Condition Precedent Of The EPCA Is That
Delphi Obtain Financing On The Terms Of The
Financing Letter And The Financing Proposal Is
Not On The Terms Indicated In The Financing Letter**

79.    Even if the Financing Proposal did not run afoul of Section 5(p), it nevertheless would be inconsistent with section 9(a)(xix) of the EPCA, which requires as a condition precedent to any closing that "the Company shall have received the proceeds of the Debt Financings and the Rights Offering . . . ." (emphasis added). Section 3(qq), entitled "Debt Financing," states, in relevant part,

> The Company has delivered to ADAH a correct and complete copy of an executed "best efforts" financing letter (the **"Financing Letter"** from J.P. Morgan Securities, Inc., JP Morgan Chase Bank, N.A. and Citigroup Global Markets Inc., dated November 3, 2007 and as filed with the Bankruptcy Court on November 16, 2007 (*on the terms indicated*, the **"Bank Financing"** and, together with the GM Debt (as defined below), the **"Debt Financing"**).

(italics added).  Thus, the unambiguous reading of these two provisions in conjunction is that receipt of the Debt Financing "on the terms indicated" in the Financing Letter attached to the EPCA is expressly a condition to close.

80.    Section 5(t) of the EPCA further prohibits certain amendments or modifications to the Financing Letter.  It states, in relevant part, that the Debtors "shall not permit any amendment or modification to be made to, or any waiver of any provision or remedy under, in each case, to the extent adverse to the Company or the Investors, the Financing Letter . . . ."  (EPCA, § 5(t)).  Significantly, there is no materiality threshold that applies to the question of whether any modification is adverse.  Indeed, the parties knew how to quantify materiality when they wanted to -- sections 1(c)(vii), 3(a), 3(f), 3(g),3(m)(ii), 3(m)(vi), 3(o), 3(p), 3(r), 3(s), 3(t), 3(w), 3(x), 3(z)(ii), 9(a)(xvi), 9(c)(iv) of the EPCA, for example use the phrase "materially adverse."  Under general contract principles, then, even immaterial adverse changes to the Financing Letter would trigger section 5(t).

81.    This immateriality point need not be debated here, though, as the Financing Proposal contains at least four amendments that are materially adverse to the Plan Investors.

### 1.    The Financing Proposal Materially Alters Interest Rate Terms Under The Financing Letter

82.    Annex I of the Financing Letter sets forth the material terms concerning interest and certain fees.





83.    On this issue, the parties each clearly understood that obtaining the interest rates identified in the Financing Letter was a necessary condition to be satisfied.  Specifically, during negotiations, ADAH communicated to Delphi that the Financing Letter had to specify the exact interest rates to be obtained:

> interest rates and commitment fees need to be agreed, or this letter doesn't work for purposes of the EPCA, because the key economic term of the debt is not set forth and the EPCA says the Company will get the financing set forth in the commitment letter . . . ."

Pryor Decl. Ex. 13.  Delphi, did not disagree with this formulation, but rather obtained indicative rates from the lead arrangers so that it was clear that what the terms of the financing were for purposes of the EPCA.  A financing with interest rates significantly higher than the ones set forth in the Financing Letter simply does not satisfy the conditions the EPCA that a modification not be "adverse."

### 2.    The Financing Proposal Material Alters The Amount Of Debt Proceeds Contemplated In The Financing Letter And The EPCA



REDACTED

85.    Delphi seeks to detract from this reduction in financing proceeds by noting in the Motion that OID "was contemplated" in the Financing Letter. (Motion ¶ 37). Beyond avoiding the question "how much OID was contemplated?" the Financing Letter makes clear that proceeds from debt financings had to remain constant. Specifically the Financing Letter states that "the First Lien Term Facility may be increased in an amount . . . equal to any financing shortfall reflecting . . . original issue discount with respect of the gross cash proceeds expected to be received from the Term Facilities on the Closing Date in accordance with the terms hereof." (Pryor Decl. Ex. 2 at 1-2). In other words, while Delphi could issue debt on an OID basis (though, as a matter of fact to be developed in discovery, the parties never discussed or contemplated a 10-plus percent discount), it had to make up any lost debt raising in the first lien financing by increasing the size of the facility. No such provision exists in the Proposed Financing.

### 3.    The Financing Proposal Seeks To Raise The Wrong Amount of Second Lien Debt

86.    The Financing Proposal is, on its face, also adverse in the amount of financing contemplated from the Second Lien Financing. The terms indicated in the Financing Letter unequivocally require the Debtor to raise $1.5 billion of Second Lien financing. (See Pryor Ex. 2, at 1-2 ("You have further advised that the total consideration necessary for the Plan Financing Requirements is intended to be provided through . . . (c) a senior secured second-lien term facility in an aggregate principal amount of $1.5 billion.")). The Financing Proposal, however, proposes to raise only $825 million. Instead of addressing that discrepancy head on, Delphi forges ahead on the unsupported assumption that excess liquidity is not necessary (a decidedly factual inquiry) and that the Court has already approved the Plan based upon reduced Second

Lien financing. That argument, however, once again confuses Plan issues with EPCA issues.

Although the Plan Investors permitted, consistent with its good faith dealings with Delphi, a

testing of the market in early January with second lien financing reduced to $825 million, that

launch failed, and the parties are back to the EPCA.

87.     As a legal matter, the Plan Investors' prior consent is <u>not</u> an enforceable waiver of

their rights to require Delphi to obtain the full amount of financing required under the EPCA.

Specifically, Section 18 of the EPCA states unequivocally that any changes to, and any waiver

under, the EPCA must be made in a signed writing and that delay in asserting rights is not a

waiver. It states, in relevant part:

> This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court. No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.

No such amendment or waiver was ever reached and the Debtors do not argue otherwise.

Rather, they state only that the Plan Investors "previously deemed sufficient" the decreased

financing. (Motion ¶ 35) Per the EPCA, such conduct is not a waiver of the Plan Investors'

right to insist on full compliance. (EPCA § 18)

88.     Although not relevant to the issue of an enforceable waiver, several factors since

confirmation have convinced the Plan Investors that the contractually-agreed upon financing,

including the entire $1.5 billion of second lien debt, currently represents the appropriate

capitalization for Delphi. <u>First</u>, general downturns in the automotive markets and the overall

economy have further made clear that, in order to assure the viability of Delphi, every bit of liquidity that can be obtained is necessary. (See supra at ¶ 42). Second, recent turmoil in the equity markets have resulted in Delphi experiencing pension funding shortfalls adversely affecting the business. (See supra at ¶ 44). Third, the continued disturbances in the credit markets have shown that Delphi needs every dollar of liquidity it can obtain. (See supra at ¶ 41). Fourth, the perspective gained by the Plan Investors' review of Delphi's fourth quarter financials has further led them to conclude that the amount of financing contemplated under the EPCA is necessary. (See supra at ¶ 43).[11]

### 4. The Financing Proposal Does Not Provide The Type Of Syndication Specified In The Financing Letter

89.    Finally, the Financing Proposal is, as a result of GM's contemplated participation, also an adverse change from the express provision in the Financing Letter stating that the arrangers will "assemble a syndicate of financial institutions." First, GM, of course, is not a financial institution and that fact, while obvious, is material here. For example, as this Court has perhaps appreciated, borrowers have a keen interest in the composition of their bank group. Lenders with divergent interests, such as vulture funds or large customers, may have specific motives that impact a borrower's ability to obtain consents and waivers or otherwise obtain new or additional financing. Here, a customer with deep relationships with Delphi, GM will, perhaps understandably, have other interests beyond its position in the loan, which may well impact Delphi going forward.

---

[11] Moreover, the Motion leaves open the possibility that the Court, the Plan Investors and other stakeholders may have been misled concerning Delphi's financing efforts at the time the financing was first marketed. In the Motion, Delphi alleged that GM's potential participation in the first lien was broached "during the syndication process in January 2008." (Motion ¶ 25) Although the confirmation hearing was concluded on January 18, 2008, and Mr. Sheehan testified that Delphi expected financing commitments by January 23, 2008, there was never any indication that GM's proposed participation was broached before or after the failure to obtain commitments on January 23. To be clear, the Plan Investors would have raised their concerns immediately had such issue arisen, as evidenced by their quick reaction when GM's participation was first suggested to them in February.

90.      <u>Second</u>, GM is not an ordinary customer.  It is Delphi's largest customer, former

parent and will be its largest shareholder.



**C.      None of Delphi's "Evidence" Provides This Court
         With A Sufficient Factual Record to Grant the Motion**

91.      There is no dispute here that, because Delphi has refused to provide any discovery

and instead has "elected" to proceed with the Motion on a non-evidentiary basis, this Court

cannot resolve any disputed factual issues.[12]  Specifically, the Court cannot on this record resolve

any of the myriad of fact questions raised in paragraph 3, <u>supra</u>.  To the extent that there are any

factual issues raised by the Motion, it is reversible error to grant the Motion without affording

the Plan Investors an opportunity for discovery.  <u>See</u> <u>Hellstrom</u> v. <u>U.S. Dep't of Veterans</u>

---

[12] The concept of a "non-evidentiary" motion is a misnomer here, in that the Motion contains a number of exhibits, apparently offered for the truth of the matter asserted, as well as numerous, unsupported statements of fact.  ADAH objects to the notion that Delphi can control the proceedings and its discovery obligations by filing a motion and immediately requesting a non-evidentiary hearing, and does not consent to moving forward here on that basis.

Affairs, 201 F.3d 94, 97 (2d Cir. 2000) (vacating district court's order granting summary judgment and holding that the order was premature as the non-moving party had not had an opportunity to take discovery); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375-76 (2d Cir. 1995) (vacating district court's order granting summary judgment and finding that district court had been "over-hasty in granting judgment" where non-moving party had not been given "ample opportunity for discovery"); Sutera v. Schering Corp., 73 F.3d 13, 18 (2d Cir. 1995) (vacating district court's order granting summary judgment where the order had been entered before any discovery had taken place, and holding that "A party opposing a motion for summary judgment 'must have 'had the opportunity to discover information that is essential to his opposition' to the motion'" (quoting Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989))); Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) (reversing district court's order granting summary judgment to plaintiff and finding that "The District Court correctly noted that '[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof,' then summary judgment is appropriate.' . . . However, the district court did not wait until 'after discovery' to grant summary judgment" (citations omitted)).

92.     At best, Delphi has tried to skirt the "absence of facts" issue by asserting that the Court has already determined certain facts necessary for the adjudication of the Motion in connection with confirmation. (Motion at 15-17). As an initial matter, findings is a confirmation order as to whether a plan is "feasible" is not the same analysis at all as to whether changes to the Financing Letter are adverse to the Plan Investors. Further, Delphi is simply wrong when it say the terms of the Financing Proposal were "approved" by the Court and that "the aggregate dollar amount of financing contemplated by the Proposal is the same amount contemplated at the time of confirmation." (Motion ¶ 32). **REDACTED**

**REDACTED**

(Pryor Decl. Ex. 17)  The Financing Proposal, however, contemplates that Delphi will receive at least $170 million less as a result of the OID on the $1.7 billion of non-GM first lien debt. Additionally, the indicative interest rates set forth in Exhibit C to the Disclosure Statement are substantially below the anticipated rates under the Financing Proposal.  Nor was the prospect of GM's participation ever brought to the Court's attention, although, again, the Motion leaves open the possibility that such participation was already under discussion before confirmation.  (Motion ¶ 25).

93.    Similarly, Delphi's argument that section 5(t) has not been triggered because the underlying Financing Letter is on a "commercially reasonable best efforts basis" is without merit.  (Motion at ¶ 43)  The "best efforts" nature of the financing was designed to protect the arrangers, not broaden the flexibility of the debtors to obtain financing that deviated materially from the Financing Letter.  Section 5(t) of the EPCA mandates that any adverse changes resulting from the underwriters' failure to achieve the terms in the Financing Letter would have to be consented to by the Plan Investors:

> The Company . . . shall not permit any amendment or modification to be made to, or any waiver of any provision or remedy under, in each case to the extend adverse to the Company of the Investors, the Financing Letter . . .

In other words, notwithstanding any "best efforts" obligations of the arrangers, the EPCA was deliberately drafted to protect the Plan Investors from Delphi agreeing to any potential adverse modifications (without regard to materiality) which Delphi might seek to obtain in exit financing. The present radical change in the structure of the financing set forth in the Financing Letter, i.e., moving from the attempted marketing of $3.7 billion of first lien financing and $1.5 billion of

second lien financing to marketing $1.7 billion of first lien financing and $825 million of second

lien financing, is clearly a modification the Financing Letter and, at minimum, there is factual

dispute whether such change is adverse.  Moreover, the Debtors' reading that the "best efforts"

nature of the Financing Letter meant that any financing could be obtained would render

meaningless the provision in 5(t) preventing modifications of the Financing Letter, in violation

of the cardinal rule of construction that every term should be read so as to give it effect.

Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 175, 177-78 (1st Dep't 1995) ("It is a

recognized rule of construction that a court should not adopt an interpretation which will operate

to leave a provision of a contract without force and effect.").  In any event, the determination of

"adversity" is a factual question that cannot be resolved on this record.

### III.

### DELPHI FAILS TO ESTABLISH ANY
### BASIS WHATSOEVER FOR AN ORDER MANDATING
### THE USE OF BEST EFFORTS BY ANY PARTY TO THE EPCA

94.     As its second form of relief, Delphi seeks an order "directing the Plan Investors,

and each of them, in accordance with section 6(d) of the EPCA, to use their reasonable best

efforts to take all actions, and do all things, reasonably necessary, proper, or advisable on their

part under the EPCA and applicable laws to cooperate with Delphi and to consummate and make

effective all transactions contemplated by the EPCA and the Plan, including the syndication and

closing of the exit financing arrangements, funding and closing of the EPCA, and all other

transactions necessary to consummate the Plan."  (Motion ¶ 46)  Although the Motion is entirely

vague as to whether Delphi seeks an injunction or an order of specific performance, we address

both herein.

95.     On the issue of specific performance, under New York law, a party can only be

compelled to perform its contractual obligations if (1) there is a valid contract; (2) the moving

party has substantially performed under the contract and is willing and able to perform its

remaining obligations; (3) the opposing party is able to perform its obligations; and (4) the

moving party has no adequate remedy at law. Morgan Stanley High Yield Sec., Inc. v. Seven

Circle Gaming Corp., 269 F. Supp. 2d 206, 221 (S.D.N.Y. 2003); Aristocrat Leisure Ltd. v.

Deutsche Bank Trust Co. Americas, No. 04 Civ. 10014(PKL), 2006 WL 1493132, at *7, n.11

(S.D.N.Y. May 31, 2006). Specific performance of a contract is proper only where damages are

not an adequate remedy to compensate the non-defaulting party and equitable relief would not

impose a disproportionate burden on the defaulting party. Van Wagner Adver. Corp. v. S & M.

Enters., 67 N.Y.2d 186, 189 (1986); Cho v. 401-403 57th St. Realty Corp., 752 N.Y.S.2d 55, 57

(1st Dep't 2002).

96.    Putting aside contracts for the sale of real property, damages are an inadequate

remedy where a court cannot arrive at a legal measure of damages with a sufficient degree of

certainty. Id.; Litho Prestige, Div. of Unimedia Group, Inc. v. News Am. Publ'g, Inc., 652 F.

Supp. 804, 809 (S.D.N.Y. 1986) (denying motion for preliminary injunction) ("Before specific

performance may [be] ordered, remedies at law first should be determined to be incomplete and

inadequate to accomplish substantial justice. The specific performance remedy thus remains

largely limited to contracts where the traditional remedy of damages is inappropriate because the

unusual goods or services involved are difficult to value.") (internal quotations and citations

omitted). It is well settled that the imposition of an equitable remedy must not itself work an

inequity, and that specific performance should not be an undue hardship. Van Wagner, 67

N.Y.2d at 195 (citation omitted). The remedy of specific performance should rarely be granted

where the subject matter of the contract is personal, rather than real, property. See Towers

Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 523 (2d Cir. 1990) ("Specific

performance is rarely granted where the subject of the contract is not real property.") (applying

New York law); see also Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 249 (1995) ("Other [policy choices that our contract system has made] are . . . that a breach of contract entitles the aggrieved party to expectation damages most of the time, but specific performance only rarely.") (citations omitted).

**A.    In Seeking an Order Requiring Performance,
Delphi Has Failed To Show A Breach Of The EPCA**

97.    The *sine qua non* of any action for specific performance is a breach of the underlying contract. Buffalo Crushed Stone, Inc. v. R.J. Corman R.R. Corp., No. 97-CV-0875E 2001 WL 392075, *5 n. 11 (W.D.N.Y. Apr. 10, 2001) ("To the extent that plaintiff alleges a claim for specific performance-a discretionary remedy which is an alternative to the award of damages as a means of enforcing a contract-, whether or not such is ultimately cognizable depends upon its success on its breach of contract claims."); Cho v. 401-403 57th Street Realty Corp., 752 N.Y.S. 2d 55, 57 (1st Dept. 2002) ("specific performance is an equitable remedy for a breach of contract, rather than a separate cause of action."). Here, Delphi asserts that, by privately voicing their dissatisfaction with what it believes to be the contractually non-compliant Financing Proposal, the Plan Investors have breached their obligation to use their "reasonable best efforts to take all actions . . . to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement." (Motion at ¶ 46) The syllogism with respect to breach fails as a matter of fact and law.

98.    As a general matter, in the absence of any clear guidelines as to what actions are contemplated thereby, a best efforts clause is not enforceable by Court order as a matter of New York law. See Strauss Paper Co. v. RSA Exec. Search, Inc., 688 N.Y.S.2d 641 (2d Dept. 1999) (refusing to enforce a "best efforts" clause without guidelines as to its meaning); Bernstein v. Felske, 533 N.Y.S.2d 538 (2d Dept. 1988); McDonald's Corp. v. Hinksman, No. Civ.A92-CV-3187 DGT, 1999 WL 441468, at *12 (E.D.N.Y. May 28, 1999); Timberline Dev. LLC v.

Kronman, 702 N.Y.S.2d 237, 239-40 (1st Dep't 2000) (agreement to use "best efforts" to obtain

bankruptcy court approval unenforceable); Lieber v. Wexler, 369 N.Y.S.2d 992, 993 (N.Y. Civ.

Ct. 1975) (agreement to use "best efforts" to correct certain complaints unenforceable); Pinnacle

Books, Inc. v. Harlequin Enter., Ltd., 519 F. Supp. 118, 121 (S.D.N.Y. 1981) ("[Defendant] is

correct ... in arguing that the 'best efforts' clause is unenforceable because its terms are too

vague. 'Best Efforts' or similar clauses, like any other contractual agreement, must set forth in

definite and certain terms every material element of the contemplated bargain."). The "best

efforts" provision of the EPCA provides no guidelines as to the type of conduct it contemplates.

      99.     Some courts have held that "best efforts" clauses may be enforced in the absence

of articulated criteria if "external standards or circumstances impart a reasonable degree of

certainty to the meaning of the phrase 'best efforts.'" See, e.g., McDarren v. Marvel Entm't

Group, Inc., No. 94 Civ. 0910, 1995 WL 214482, at *4 (S.D.N.Y. Apr. 11, 1995); Ashokan

Water Servs., Inc. v. New Start, LLC, 807 N.Y.S.2d 550, 553 (N.Y. Civ. Ct. 2006). Under such

circumstances, however, courts have recognized that any ruling as to "whether a ['best efforts']

obligation has been fulfilled will almost invariably . . . involve a question of fact." See, e.g.,

Kroboth v. Brent, 625 N.Y.S.2d 748 (3d Dep't 1995) (emphasis added) (denying motion for

summary judgment with respect to "best efforts" clause); see also McDarren, 1995 WL 214482,

at *4 (same); Burke v. Steinmann, No. 03 Civ. 1390, 2004 WL 1117891, at *7 (S.D.N.Y. 2004)

(same); U.S. Airways Group, Inc. v. British Airway PLC, 989 F. Supp. 482, 491 (S.D.N.Y.

1997) (denying motion to dismiss, noting that "the precise meaning of the 'best efforts'

provision, and whether BA breached the provision, are factual issues that cannot be resolved on

the face of the complaint.") (citing McDarren)). Here, in addition to the fact that the EPCA

specifies nothing about how a party satisfies best efforts, there is no factual record offered by the

Debtors as to how that provision has been breached or what "best efforts" specifically requires.

100.    At best, Delphi's only specific claim of breach of the EPCA is that ADAH's

private assertion of concerns about the EPCA-compliance of the Financing Proposal runs afoul

of the EPCA's reasonable best efforts obligations.  As an initial matter, no evidence has been

offered to support a claim that the private assertion was an actionable "willful" act.[13]  Further,

the Plan Investors' right to express their subjective concerns was specifically contemplated under

the EPCA and has been repeatedly called upon by Delphi.[14]  Specifically, section 5(t) requires,

inter alia, that "[t]he Company shall keep ADAH informed on a reasonably current basis in

reasonable detail of the status of its efforts to arrange the Debt Financing . . . ."  Further, Section

5(t) specifically grants ADAH the right to comment on exit financing marketing materials, and

obligates Delphi to consider such comments:

> The Company will (i) provide to ADAH and its counsel a copy of
> all marketing information, term sheets, commitment letters and
> agreements related to the Debt Financing and a reasonable
> opportunity to review and comment on such documents prior to
> such document being distributed, executed or delivered or filed
> with the Bankruptcy Court, (ii) duly consider in good faith any
> comments of ADAH and its counsel consistent with the
> Agreement, the Preferred Term Sheet and the Plan Terms and any
> other reasonable comments of ADAH and its counsel and shall not
> reject such comments without first discussing the reasons therefor
> with ADAH or its counsel and giving due consideration to the
> views of ADAH and its counsel . . .

(emphasis added).

101.    Given the foregoing, ADAH's right to express its views is contractually

mandated.  Without ever acknowledging that fact, Delphi simply assumes that certain

expressions of views as to the exit financing marketing materials, specifically ADAH's letter of

February 24, 2008 and the letter of certain Plan Investors on February 13, 2008, can be a

---

[13] As explained infra, only "willful" breaches of the EPCA are actionable in the first instance.

[14] For example, ADAH's February 24, 2008 letter pointing out that the Financing Proposal is inconsistent with the EPCA was sent in direct response to Delphi's solicitation of comments to marketing materials prepared in contemplation of Delphi's re-launch of its exit financing based on the Financing Proposal pursuant to Section 5(t) of the EPCA. (Bolin Decl. Ex. 3).

violation of the Plan Investors' best efforts obligations.[15]  That assumption is contrary to the law

under New York law; a best efforts provision may not be used to deny the rights of the party

under the contract.  See Ashokan, 807 N.Y.S.2d at 556 ("A best efforts requirement must be

reconciled with other clauses in the contract to the extent possible, not used as a basis for

negating them.") (emphasis added) (citing Vestron, Inc. v. Nat'l Geographic Soc'y, 750 F. Supp.

586, 593 (S.D.N.Y. 1990), and Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d 352, 358

(N.Y. 2003)); cf. Scott-Macon Sec., Inc. v. Zoltek Cos., No. 04  Civ. 2124, 2005 WL 1138476, at

*14 (S.D.N.Y. May 12, 2005) (a party is "entitled to give 'reasonable consideration to its own

interests' in determining an appropriate course of action to reach the desired result," and "may"

exercise discretion, within its good faith business judgment, in devising a strategy for achieving

its ultimate goal.").

**B.    The Debtors Agreed That There Is An Adequate
Remedy At Law And The EPCA Does Not Permit The
Remedy Of Specific Performance for Any Breach Thereof**

102.    Perhaps most important to the specific performance discourse is the fact that

Delphi has expressly waived its right to seek that remedy.  Even assuming a breach and

satisfaction of other conditions (as to which the Court has no record evidence), the remedy for a

best efforts violation cannot be an order directing compliance.  As noted supra, the parties have

agreed that damages, and not specific performance or an injunction, represent the adequate

remedy for breach of any covenant of the EPCA.  Section 11(b) of the EPCA, which sets forth

the remedies, states in relevant part:

> Other than with respect to Sections 2(h), 2(i) and 2(j) and Sections
> 10 through 18, which shall continue and survive any termination of
> this Agreement, (i) . . . the Company (both as Debtors-in-

---

[15] Significantly, although the Debtors clearly disagree with the Plan Investors over their interpretation of the EPCA,
the Debtors do not and cannot assert, that the Plan Investors' views are facially frivolous.  Because they concede that
the Plan Investors' interpretation is colorable (indeed, it is correct), the Debtors cannot assert that the mere
expression of the Plan Investors' interpretation is a violation of their best efforts obligation.

> possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the . . . Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims.    Notwithstanding the foregoing . . . (x) <u>the aggregate liability</u> of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million. . . .

(emphasis added).

103.    The use of the phrase "aggregate liability" in section 11(b) as well as the negotiating history cited above at ¶¶ 8-14 (including a crystal-clear explanation in pleadings filed by Delphi) make clear that the sole liability for either side is for damages.  Indeed, the use of the broad term "liability" instead of the narrower term "damages" in Section 11(b) shows that the provision covered all potential relief, including equitable forms.  For example, in <u>Krenger</u> v. <u>Pennsylvania R. Co.</u>, the Second Circuit analyzed the meaning of the word "liability" as used in the Federal Employers' Liability Act and, citing the "inclusive nature" of the phrase "any liability," noted that "[h]ad a restricted meaning been intended, it would surely have been simple, indeed, to limit the statutory provision to the duty to pay damages[.]"  174 F.2d 556, 558-59 (2d Cir. 1949).  The Second Circuit held that the meaning of the term "liability" "is quite differentiated from a mere duty to pay damages and serves as the correlative of power and the opposite of immunity or exemption."  <u>Id.</u>  Moreover, here, the "aggregate liability" applies to "any claim" for "any reason" and under "any legal theory," leaving no doubt that the cap covered any potential claim of breach.

104.    Additionally, where as here, sophisticated parties do not include a specific performance provision and have agreed as to the adequacy of damages, the courts will not find that equitable relief is available.  See <u>Starrett Acquisition, Inc.</u> v. <u>Starrett Corp.</u>, 664 N.Y.S.2d 1020, 1021 (N.Y. Sup. Ct. 1997) (where "the Merger Agreement does not contain the usual

provision by which parties agree that there would be irreparable harm in the event of a breach,"

the Court held that it could not find irreparable harm "where the parties have agreed that

damages, whether limited or liquidated, are adequate."); see also In re Allegiance Telecom, Inc.,

356 B.R. 93, 99 (Bankr. S.D.N.Y. 2006) (When a contract is negotiated between "sophisticated,

counseled business people negotiating at arm's length . . . courts should be extremely reluctant to

interpret an agreement as impliedly stating something which the parties have neglected to

specifically include. . . . Adherence to the plain language of [the contract], and the refusal to

modify it to correct what might have been [one party's] bad bargain or unilateral mistake is

particularly appropriate given the parties' general commercial sophistication. . . . If these parties

really intended something different from the plain language of the [contract] pertaining to that

aspect of the transaction, it can be assumed that they would have written it."). Id. at 102.

105.    Finally, the negotiation history (supra at ¶¶ 8-14) makes clear that specific

performance was contemplated by the parties, but ultimately was rejected in favor of Section

11(b).  In such circumstance, a presumption is given that the omitted provision was not intended.

See Riverside Marketing, LLC v. Signaturecard, Inc., 425 F. Supp. 2d 523, 532 (S.D.N.Y. 2006)

(finding that discussed, but omitted remedy provision, could not be established. "[A] draft of the

original Member Agreement contained a buy out provision, which the parties removed from their

final contract; thus Riverside was aware of such an option and decided to undertake the risk of

reaching a different bargain. Riverside cannot revise history and attempt to insert such a

provision into the contract; it cannot achieve through litigation that which it did not achieve

through negotiation.") (internal citations omitted).  Moreover, given such history, had Delphi

believed that specific performance was nevertheless available under the EPCA, it would have

been obligated to state that view pursuant to the "forthright negotiator principle." See United

Rentals, Inc., v. RAM Holdings, Inc., 937 A.2d 810 (Del. Ch. 2007).

C.    **To The Extent That The Relief Requested Is An Injunction, That Request Would Constitute An Impermissible Prior Restraint On Free Speech**

106.    As noted, there is some issue here as to whether Delphi is seeking an order of specific performance (i.e., a post-breach remedy) or an injunction (a preliminary relief to prevent a breach).  Leaving aside that Delphi has complied with none of the procedures to obtain an injunction (at a minimum, a complaint, a motion, an evidentiary hearing and a bond), this Court cannot grant one.  As noted, the Debtors' only specific allegation that the Plan Investors have not employed "reasonable best efforts" is their claim that Investors "disrupt[ed] the re-launch of the exit financing by asserting that the Proposal is 'non-compliant and inconsistent with the EPCA,'" and by refusing to withdraw their objections, Investors have not complied with their duty to employ reasonable best efforts.  (Motion ¶ 27)  Because the order sought by Debtors is apparently intended then to force the Plan Investors to withdraw private assertions of their legal rights under the EPCA, it would constitute an impermissible prior restraint on speech in violation of the Plan Investors' First Amendment rights.

107.    A party's expression of its good faith view of its contractual rights, which is the speech as issue here, is non-commercial free speech.  See Mid-West Conveyor Co. v. Jervis B. Webb Co., Civ. A. No. 93-2539, 1994 WL 133008, *2-4 (D. Kan. Mar. 21, 1994); see also In re Nat'l Serv. Corp., 742 F.2d 859, 860-62 (5th Cir. 1984) (order enjoining creditor's public statements that debtor did not pay his suppliers determined to be unlawful prior restraint); In re Stonegate Sec. Serv., Ltd., 56 B.R. 1014, 1019-20 (N.D. Ill. 1986) (same).  As such, any order limiting the Plan Investors' rights to assert its interpretation of the EPCA would be a "prior restraint on expression [which] comes . . . with a 'heavy presumption' against its constitutional validity." Org. for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971) (quoting Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 181 (1968)); see also Bantam Books,

Inc. v. Sullivan, 372 U.S. 58, 70 (1963). Indeed, prior restraints are "the most serious and the

least tolerable infringement on First Amendment rights." Nebraska Press Ass'n v. Stuart, 427

U.S. 539, 559 (1976). Thus, even if the private expression of the Plan Investors' views is

harmful to the Debtors, the Court cannot enjoin the Plan Investors from expressing them. See In

re Nat'l Serv. Corp., 742 F.2d at 862 ("[M]ere fact that [debtor] would be damaged by

[creditor's] dissemination of the message, however, does not warrant a prior restraint.").

108.    Similarly, the Plan Investors' mere good faith expression of their rights, even if

those views may ultimately be determined to be wrong, are not a cognizable basis upon which to

state a claim for an injunction. See, e.g., Kaplan v. Helenhart Novelty Corp., 182 F.2d 311, 314

(2d Cir. 1950) ("[I]t is not an actionable wrong for one in good faith to make plain to

whomsoever he will that it is his purpose to insist upon what he believes to be his legal rights,

even though he may misconceive what those rights are.); Dinkins v. Gen. Aniline & Film Corp.,

214 F. Supp. 276, 280 (S.D.N.Y. 1962) (defendant "committed no actionable wrong" by

expressing its good faith belief that plaintiff's acts would result in violation of his fiduciary

obligation under their contract); Thur v. IPCO Corp., 569 N.Y.S.2d 713, 715 (1st Dept. 1991)

(good faith threat of legal action in letter not "actionable wrong"). Thus, the right of a party to

make known its intent to assert legal rights it believes in good faith it has, even though the party

may be mistaken, is well established. See, e.g., Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d

1340, 1353 (Fed. Cir. 1999); Mikohn Gaming Corp. v. Acres Gaming, Inc., 165 F.3d 891, 897

(Fed. Cir. 1998) ("[A] patentee, acting in good faith on its belief as to the nature and scope of its

rights, is fully permitted to press those rights even though he may misconceive what those rights

are.").

109.    On a related issue, to the extent any injunction here would order the Plan

Investors to use "best efforts" in connection with the Financing Proposal, it would be

impermissibly vague. Pursuant to Fed. R. Civ. P. 65 (d), an injunction must be specific in its

terms. See Fed. R. Civ. P. 65(d) ("Every order granting an injunction and restraining order must .

. . state its terms specifically; and . . . describe in reasonable detail . . . the act or acts restrained or

required). Unless injunctions are narrowly tailored to give notice of the specific legal violations

being targeted, they must be vacated. See Metro. Opera Assoc. Inc. v. Local 100, Hotel

Employees, 239 F.3d 172, 176-78 (2d Cir. 2001) (broad injunction, which failed to give

defendant adequate notice of conduct being enjoined, was vacated); Starter Corp. v. Converse,

Inc., 170 F.3d 286, 299-300 (2d Cir. 1999) (overbroad injunction vacated); Peregrine Myanmar

Ltd. v. Segal, 89 F.3d 41, 50 (2d Cir. 1996) (vacating vague and broad injunction; "injunctive

relief should be narrowly tailored to fit specific legal violations."); Waldman Publ'g Corp. v.

Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994) (same).

**IV.**

**TO OBTAIN EITHER FORM OF RELIEF REQUESTED,
DELPHI MUST PROCEED BY ADVERSARY PROCEEDING**

110.    Leaving all else aside, the Motion should be denied as procedurally improper

because the relief actually sought by the Debtors—a declaratory judgment and specific

performance (or an injunction)—can only be sought in an adversary proceeding. See Fed. R.

Bankr. P. 7001 ("An adversary proceeding is governed by the rules of this Part VII. The

following are adversary proceedings: . . . (7) a proceeding to obtain an injunction or other

equitable relief, . . . (9) a proceeding to obtain a declaratory judgment relating to any of the

foregoing . . . .").

111.    Section 1142(b) of the Bankruptcy Code is not, as the Debtors would like the

Court to conclude, a statutory exception to Bankruptcy Rule 7001. Rather, section 1142(b) is

merely a codification of the Court's already-existing equitable powers, see Back, 213 B.R. at 640

("In a sense, [sections 1142 and 105] codify the bankruptcy court's inherent power to enforce its

own order."), a subset of which may only be exercised in the procedural forum of an adversary

proceeding.  See <u>Baltimore County</u> v. <u>IHS Liquidating LLC (In re Integrated Healthcare Servs.,</u>

<u>Inc.)</u>, Nos. 00-389-MFW, 03-1057, 2006 WL 543876, at *3 (D. Del. Mar. 6, 2006)

> ("Here, the bankruptcy court concluded that an adversary
> proceeding was not necessary because the Liquidating LLC's
> motion was merely a request for the court to 'interpret the terms of
> the Plan and enter an order confirming that that's what it says.'
> However, the characterization does not match the substance of the
> order itself, in which Baltimore County is specifically 'directed to
> record any transfer documents,' and 'prohibited from seeking or
> requiring payment of Transfer Taxes.' . . . As such, the dispute
> should have been resolved in an adversary proceeding.")

(citations omitted); <u>see also</u> <u>In re Dycoal</u>, 327 B.R. at 226 ("11 U.S.C. § 1142(b) does not

provide the Court with authority to grant declaratory relief that would be at odds with that which

can be granted via § 505(a)(1)-in fact, the Court questions whether § 1142(b) can provide

authority for the grant of any type of declaratory relief.") (footnote omitted).[16]

---

[16] In footnote 4 of the Motion, Delphi attempts to downplay the procedural infirmity of the Motion by citing four decisions that Delphi asserts stand for the proposition that equitable relief may be sought pursuant to section 1142(b) by motion rather than by adversary proceeding. <u>First</u>, it points to the Second Circuit's decision in <u>Riverside Nursing</u>. Although Delphi is correct in its assertion that the Second Circuit affirmed the decision of the bankruptcy court granting an application for an order compelling the principal of the debtor to execute a receivership agreement where the plan at issue specifically contemplated the debtor's consent to the appointment of a receiver, 977 F.2d at 80-81, it is clear from the Second Circuit's opinion that no interested party raised the issue of whether the relief sought should have been sought in an adversary proceeding rather than by motion.

<u>Second</u>, <u>Petrie Retail</u>, the Second Circuit affirmed the bankruptcy court's order pursuant to section 1142(b), which enforced an already existing plan injunction. 304 F.3d at 230 ("[T]he plan consummation motion sought enforcement of a pre-existing injunction issued as part of the bankruptcy court's sale order and confirmation order."). As is clear from the text of Bankruptcy Rule 7001, a proceeding to obtain an injunction or other equitable relief where a chapter 11 plan already provides for such relief need <u>not</u> be brought as an adversary proceeding. <u>See</u> Fed. R. Bankr. P. 7001 ("The following are adversary proceedings: . . . (7) a proceeding to obtain an injunction other than equitable relief, <u>except</u> when a . . . chapter 11 . . . plan provides for the relief[.]") (emphasis added). Here, no provision for such equitable relief exists in the Plan.

<u>Third</u>, Delphi cites <u>Paul</u> v. <u>Monts</u>, 906 F.2d 1468 (10th Cir. 1990), for the proposition that the "remedies for investor's failure to provide capital required by plan included section 1142(b) motion to compel contribution[.]" Motion, at 15 n.4. Specifically, it cites footnote 10 of the Tenth Circuit's opinion, which states, in its entirety, that, "[t]hese remedies include filing a motion to compel implementation of a confirmation plan under 11 U.S.C. § 1142(b); attempting to modify the plan under 11 U.S.C. § 1127(b); or converting the proceeding to one under Chapter 7 pursuant to 11 U.S.C. § 1112." <u>Id.</u> at 1476 n.10. Although <u>Paul</u> v. <u>Monts</u> did involve a breach of contract claim brought by a chapter 7 trustee against an anticipated participant in a failed chapter 11 plan, the footnote to which Delphi refers was not addressed to the remedies available to the chapter 7 trustee in that case but, instead, to other provisions of the Bankruptcy Code, which may provide other avenues of relief to persons disappointed by the

112.    The Debtors' insistence that this action be brought under Section 1142 misses the

point. The issue in the instant case is not whether relief under section 1142(b) can ever be

sought by motion; the issue is whether, under the circumstances of this case, the particular relief

the Debtors seek is properly sought by motion, and more specifically, a motion to be heard on

expedited notice. Oftentimes, relief under section 1142(b) is, or is required to be, sought by

adversary proceeding. See, e.g., Broadway Bldg. II L.P. v. Mincks (In re Broadway Bldg. II

L.P.), 22 Fed. Appx. 859, 860 (9th Cir. 2001) (referring to bankruptcy court's denial of motion

under section 1142(b) and holding that debtor must bring adversary action); Integrated Health

Servs., 2006 WL 543876, at *3; Simonetti Dev. Ltd. v. Hillard Dev. Corp. (In re Hillard Dev.

Corp.), 238 B.R. 857, 861 (Bankr. S.D. Fla. 1999) (adversary proceeding to compel debtor to

execute promissory note and mortgage modification agreements); LTV Corp., 201 B.R. at 66.

113.    Where a party seeks equitable relief and declaratory relief related thereto—both

forms of relief specified in Rule 7001—that relief should be sought in an adversary proceeding

unless the other party consents and no prejudice will be suffered as a result. See In re Warde

Elec. Contracting, Inc., 308 B.R. 659, 660 (S.D.N.Y. 2004) ("A bankruptcy court presiding over

a contested matter may rule on claims that should have been brought in an adversary proceeding

when no objection to going forward in that posture is raised and no procedural prejudice

---

failure of a reorganization plan." Id. at 1476 (footnote omitted). This is clear from the language of the footnote—how would a post-confirmation motion to modify a plan or a motion to convert a case to one under chapter 7 ever provide a basis upon which to compel a proposed plan participant to participate in the consummation of a chapter 11 plan?

Finally, Delphi cites Jordan v. Attalla Golf & Country Club, Inc. (In re Attalla Golf & Country Club), 181 B.R. 611, 614 (Bankr. N.D. Ala. 1995) which relies heavily on the Second Circuit's decision in Riverside Nursing. For the reasons discussed above, Riverside Nursing does not support the proposition that relief that may otherwise only be sought in an adversary proceeding may be sought by motion pursuant to section 1142(b) when sought in aid of consummation of a confirmed plan. The court in Jordan, like the court in Riverside Nursing, was asked to order a party to perform what could only be described as a "ministerial task." In re Riverside Nursing Home, 137 B.R. 134, 138 (Bankr. S.D.N.Y. 1992). The debtor's principal was simply required to sign the documents necessary to effect the sale of the debtor's property as set forth in the debtor's confirmed liquidating plan. Jordan, 181 B.R. at 615 ("The proponent's motion to compel the debtor to execute the [sic] any and all necessary papers is granted, and the debtor, through its president, is hereby ordered to execute the deed, the bill of sale, and any and all documents to effect the conveyance stated in the plan forthwith[.]" The relief requested here can hardly be considered ministerial.

results.") (citation omitted); In re Friedman, 184 B.R. 883, 887 (Bankr. N.D.N.Y. 1994)

(discussing prejudice); In re Wild Lilly, Inc., 51 B.R. 963, 964 n.1 (Bankr. S.D.N.Y. 1985)

(discussing consent).

114.    By seeking to proceed in their quest for equitable and declaratory relief on an

expedited basis by motion initiating a contested matter, Delphi has severely prejudiced the Plan

Investors' ability to mount an adequate defense to the Motion, as discussed above. In addition,

ADAH does not consent to this matter being heard as a contested matter. The due process rights

of the Plan Investors are not protected by the expedited procedure advocated by the Debtors. As

a result, any relief granted in Delphi's favor including the right to conduct discovery would

constitute error. See Integrated Healthcare Servs., 2006 WL 543876, at *3 ("[A] bankruptcy

court's erroneous conclusion that a dispute need not be resolved in an adversary proceeding may

be a ground for reversal.") (citing MFS Telecom, Inc. v. Motorola, Inc. (In re Conxus

Commc'ns, Inc.), 262 B.R. 893, 899 (D. Del. 2001)); see also In re Commercial W. Fin. Corp.,

761 F.2d 1329, 1338-39 (9th Cir. 1985) (reversing confirmation order for, inter alia, failure to

follow rules of bankruptcy procedure governing adversary proceedings); In re Smith, 103 B.R.

392, 394 (N.D.N.Y. 1988) (quoting Commercial W. Fin. Corp., 761 F.2d at 1336-38). Cf. In re

Minton, No. 05-18767, 2006 WL 533352, at *1-2 (Bankr. N.D. Ind. 2006) (denying motion for

failure to comply with the bankruptcy rules regarding notice and the opportunity to be heard); In

re Pratt, No. 06-12410, 2007 WL 2413010, at *2 (Bankr. N.D. Ind. 2007) ("[T]he public also has

a right to expect that the court will follow the proper procedures and that it will not consciously

ignore those requirements by validating procedural short cuts." (citing In re Taylor, 289 B.R.

379, 388-89 (Bankr. N.D. Ind. 2003))).

115.    The insistence on proceeding by adversary here is not simply a question of form

over substance. First, as opposed to a motion, a complaint requires the rigor of pleading causes

of action with plain specificity in a manner that provides the basis for issue preclusion at a later date. Thus, for example, were the Motion to be a complaint, Delphi (and each of the statutory committees) would be required to bring all issues in dispute to the Court's attention (including all alleged breaches of the EPCA) or be barred from asserting those claims at a later date. Second, the adversary proceeding form will permit the Plan Investors to answer the basic allegations against them and assert counterclaims against Delphi, such as a breach of Section 9(a)(v) of the EPCA, which prohibits Delphi proceeding with any Alternate Transaction. Finally, the adversary form will provide clear-cut deadlines and responsibilities of the parties relating to the resolution of the dispute. It will provide for discovery, motions to dismiss, summary proceedings, preliminary relief and trial practice. Given all the foregoing, to the extent the Court does not deny the Motion with prejudice (as requested) it should deny the Motion without prejudice, deem the Motion a complaint and require entry of a scheduling order specifying the progress of the proceeding.

## CONCLUSION

WHEREFORE, for the foregoing reasons, ADAH respectfully requests that the Court deny the Motion and grant such other and further relief as the Court deems appropriate and just.

Dated: March 6, 2008
New York, New York

By: /s/ Douglas P. Baumstein

WHITE & CASE LLP
J. Christopher Shore  (JCS-6031)
Douglas P. Baumstein (DB-1948)
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200

Thomas E Lauria (Admitted *Pro Hac Vice)*
Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
(305) 371-2700

ATTORNEYS FOR ADAH