WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
J. Christopher Shore (JCS-6031)
Douglas P. Baumstein (DB-1948)

Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Thomas E Lauria (Admitted *Pro Hac Vice*)

ATTORNEYS FOR A-D ACQUISITION HOLDINGS, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Delphi Corporation, <u>et al.</u>, | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

# DECLARATION OF GREGORY PRYOR

I, GREGORY PRYOR, declare as follows:

1. I am a member of the firm of White & Case LLP, counsel for A-D Acquisition Holdings, LLC ("ADAH"). I submit this declaration in support of ADAH's response to the Expedited Motion Under 11 U.S.C. § 1142(b) and Fed. R. Bankr. P. 3020(d) for Implementation of Debtors' Confirmed Plan of Reorganization (the "Motion") of Delphi Corporation ("Delphi" and, together with its affiliated debtors and debtors-in-possession, the "Debtors").

2. On behalf of ADAH, I participated in the negotiation of the Equity Purchase and Commitment Agreement, dated as of August 3, 2007, as amended on December 10, 2007 (the "EPCA"). <u>See</u> Ex. 1 annexed hereto. I also reviewed and commented on the financing letter, dated November 3, 2007, which sets forth the terms and conditions of the "Bank Financing" (as

such term is defined in the EPCA) that Delphi is required to obtain under the EPCA (the "Financing Letter"). See Ex. 2 annexed hereto.

3. ADAH is an acquisition vehicle created for the purpose of consummating the transactions contemplated by the EPCA. It is the beneficiary of an equity commitment letter from Appaloosa Management L.P. ("AMLP"). I am not aware of any other assets of ADAH. The liability of AMLP under the equity commitment letter is, by its terms, limited to monetary damages which are capped at a maximum of $250 million. Under no circumstances shall the liability of AMLP under the equity commitment letter, or for breach of the commitment letter, exceed $250 million. Using an acquisition vehicle supported by an equity commitment letter with a limit on liability is a common method of structuring an equity investment so that the equity investor can cap its liability to a single quantum of damages and avoid being compelled to purchase (and run) a particular company. Moreover, this structure was specifically negotiated with counsel for Delphi and was well understood and accepted by them.

A.  The Parties To The EPCA Negotiated and Agreed to Eliminate The Remedy of Specific Performance.

4. During the negotiations concerning a prior version of the EPCA (which ultimately was terminated by Delphi and superseded by the EPCA) in which I personally participated, Delphi and the Plan Investors specifically negotiated and agreed and understood that specific performance would not be an available remedy under the EPCA for any party.

5. A December 2, 2006 draft of the EPCA sent to Skadden Arps included the following section 20:

> Section 20. Specific Performance. The parties acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy, and, accordingly, the parties agree that, in addi-

>   tion to any other remedies, each will be entitled to enforce the
>   terms of this Agreement by a decree of specific performance
>   without the necessity of proving the inadequacy of money damages
>   as a remedy and without the necessity of posting bond.

See Ex. 3 annexed hereto. This same provision was included in a December 5, 2006 draft sent by Adlai Hardin of Skadden Arps to White & Case. See Ex. 4 annexed hereto.

      6.      On December 7, 2006, however, I sent back to Skadden Arps a draft EPCA excluding the specific performance provision. The deletion of the specific performance provision was highlighted in the blacklined version sent to Skadden Arps. The draft deleted the specific performance provision based on ADAH's view of a severe imbalance in the deal structure. See Ex. 5 annexed hereto. During the negotiations, Delphi insisted that it should be able to terminate the EPCA to pursue an alternative transaction, or even willfully breach the EPCA, and only be required to pay a $100 million alternative transaction fee, but there would be no similar ability for the Plan Investors to terminate on a "capped liability" basis. If specific performance were available to Delphi, Delphi could force the Investors to consummate the transaction at a cost potentially over $2.5 billion to the Investors.

      7.      On December 9, 2006, Mr. Hardin sent to White & Case a draft re-inserting the Specific Performance clause (now as Section 21). See Ex. 6 annexed hereto. On December 10, 2006, Colin Diamond, from White & Case, on my instruction, circulated a draft which once again deleted the Specific Performance clause. See Ex. 7 annexed hereto. Thereafter, no version of the EPCA (including the one before the Court) contained a specific performance provision. Instead, negotiations focused exclusively on reaching an agreement whereby each side relinquished its ability to pursue any claim against each other except for willful breach, released each other from any such claims, and expressly limited the aggregate liability under the EPCA for any reason (including for willful breach) to a specified capped amount. The removal of the

specific performance provision and the agreement to a cap on liability were specifically negotiated during this time period with counsel for Delphi.

B.     Evolution to Specific Bank Financing Terms

8.     During the course of the discussions about the current EPCA, I engaged in conversations with Eric Cochran of Skadden Arps during which we agreed that, as a general matter, the EPCA should be drafted to reduce the conditionality inherent in previous versions as much as possible. In particular we discussed the debt financing covenant, Section 5(t), and the definition of what constituted the "Debt Financing" for purposes of the EPCA. I expressed to Mr. Cochran ADAH's view that it was important to tighten what had previously been a loose and undefined covenant. I explained that a tightened provision would benefit all parties by ensuring that we all knew exactly what we were agreeing to, thereby reducing the opportunity for disputes. Accordingly, ADAH bargained for a transaction with specific financing terms and with a pro forma interest expense cap linking the bank financing with Delphi's other post-emergence debt. ADAH also negotiated other protections to ensure an appropriate capitalization structure for Delphi, including changes to Section 9(a)(xix), Sections 9(a)(xxii) and 9(a)(xxvii).

9.     Over a one year period beginning in December 2006 and concluding in December 2007, successive iterations of the EPCA illustrate that the parties' agreement concerning the required debt financing moved from loosely specified terms to clearly enumerated terms, providing additional protections to the Plan Investors.

    i.     Earlier Iterations Of The EPCA Were Not Specific As To The Terms Of The Financing.

10.     The first EPCA, executed on December 18, 2006 (the "December 18 EPCA"), placed interest rate and certain other risks on the investors. See Ex. 8 annexed hereto. The covenant (Section 5(t)) establishing the exit financing that must be obtained provided only that

such financing would be raised "on then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees…." December 18 EPCA § 5(t).  Significantly, however, Delphi also assumed a measure of risk because the other terms of the debt financing would have to be on terms that were acceptable to ADAH; although there was a reasonableness standard attached to that approval right.  The December 18 EPCA was terminated by the Debtors on July 7, 2007.

11.    The next EPCA, executed on August 3, 2007 (the "August 3 EPCA"), required exit financing "on then-prevailing market terms with respect to the interest rate, redemption provisions and fees and otherwise to be on terms that are acceptable to ADAH not to be unreasonably withheld."  In the August 3 EPCA, Delphi sought to reduce its risk and negotiated for a complicated termination right in certain circumstances if Delphi proposed debt financing to ADAH and ADAH either did not respond to the proposal or determined the proposal to be unacceptable and did not provide for alternative financing.  The August 3 EPCA, therefore, continued to embody significant uncertainty for all parties. August 3 EPCA § 5(t).  See Ex. 9 annexed hereto.  Nevertheless, it ultimately became clear to all parties that the transactions contemplated by the August 3 EPCA could not be completed on the terms and conditions in the August 3 EPCA.  The parties, thereafter, engaged in negotiations regarding amendments to the August 3 EPCA, culminating in the December 10, 2007 amendments.

    ii.    In Negotiating Later Amendments, The Parties Agreed To Specific Financing Terms.

12.    By October 29, 2007, Delphi and certain of the Investors (as defined in the EPCA) agreed on the terms of an amendment to the August 3 EPCA that was embodied in a proposal that was requested by Delphi and made by the Investors (as defined in the EPCA) to

Delphi on October 29, 2007 (the "October 29 EPCA").  See Ex. 10 annexed hereto.  In negotiating the October 29 EPCA, the parties sought to reduce conditionality and establish obligations and conditions precedent with respect to financing and other matters in the EPCA in more concrete terms.   Unlike the December 18 EPCA and the August 3 EPCA, the October 29 EPCA did not permit exit financing on prevailing market terms and was no longer subject to the reasonable discretion of ADAH.  Rather, the parties agreed that the "Debt Financing" that was required was defined to be "on the terms indicated" in a financing letter.  October 29 EPCA § 3(qq).  Moreover, Section 5(t) for the first time stated that the debt financing to be obtained was the Bank Financing (as defined by reference to the terms of the financing letter) and the GM financing set forth on Exhibit E, in each case "on the terms and conditions described in the Financing Letter and in Exhibit E . . . ."  October 29 EPCA 5(t).  The insertion of these terms, which I drafted, was intended to negate any possibility that the "best efforts" nature of the financing letter provided leeway to Delphi and its lead arrangers to arrange for financing on any terms the market would bear, and clarified that it was the specific financing terms (including amount, interest rate, prepayments, etc.) set forth in the Financing Letter that must be obtained to satisfy the covenant and the condition.  In addition, for the first time the Debtors agreed that they would "not permit any amendment or modification to be made to, or any waiver of any provisions or remedy under, in each case, to the extent adverse to the Company or the Investors, the Financing Letter…." October 29 EPCA 5(t).  Although, ADAH relinquished its discretionary right to approve terms of the debt financing provision contained in the August 3 EPCA in the interest of greater certainty, it did not do so in exchange for a debt financing covenant that would allow Delphi to implement any exit financing that the market would bear.  Instead, the intent of the changed language was to clearly delineate the debt financing that would have to be

implemented to satisfy the terms of the October 29 EPCA.  The uncertainty of the prior versions was eliminated in favor of certainty for all parties.  This is clear from the language of the October 29 EPCA.  The language of the defined term "Debt Financing" in Section 3(qq) references the specific terms of the Financing Letter - an unconventional way to refer to a defined term in a contract (as indicated by the fact that prior definitions of the term "Debt Financing" in the August 3 EPCA and in the December 18 EPCA have no such reference).  Additionally, it is clear that ADAH was intently focused on Delphi's debt and equity capitalization upon emergence and required that several new conditions be included to ensure that the debt and equity capitalization was clearly delineated at closing.  October 29 EPCA Sections 9(a)(xix), 9(a)(xx) and 9(a)(xxii).  There was, at the time of these negotiations and afterward, no doubt that the deal as structured required Delphi to obtain the exact financing set forth in the Financing Letter unless (i) the change was not adverse to the Plan Investors or (ii) the Plan Investors consented in writing.

        13.    For example, a draft of the Financing Letter circulated to ADAH on October 26, 2007 omitted the interest rates that would be applicable to the loans in the Financing Letter.  In response, I made sure to record ADAH's view that the failure to set forth such interest rates was not appropriate because the EPCA required that the economic terms be spelled out and agreed upon.  Specifically, in an email dated October 27, 2007, written at my request and on which I was copied, Charles Alm of White & Case wrote to Eric Cochran and Daniel Ganitsky of Skadden Arps that the Financing Letter needed explicitly to state specific interest rates for purposes of the EPCA: "<u>interest rates and commitment fees need to be agreed</u>, or this letter doesn't work for purposes of the EPCA, because the key economic term of the debt is not set

forth and the EPCA says the Company will get the financing set forth in the commitment letter . . . ." (emphasis added).  See Ex. 11 annexed hereto.

14.    The October 29 EPCA also contained three additional closing conditions further establishing the parameters of Delphi's capitalization.  First, the Debtors were required to have at least $1.4 billion in undrawn availability at the time of closing.  October 29 EPCA § 9(a)(xix)(B).  Second, Delphi was permitted up to $575 million in *pro forma* interest expense for fiscal year 2008 in connection with all "Indebtedness" (as defined in the EPCA); not just the exit financing.  October 29 EPCA § 9(a)(xx).  Third, the aggregate amount of all trade and other unsecured claims could be no more than $1.45 billion, but if this condition were waived, there would be certain adjustments to the shares of common stock to be issued to the Investors (as defined in the EPCA).  October 29 EPCA 9(a)(xxii).  The inclusion of these new conditions exemplifies the desire of ADAH and the Investors (as defined in the EPCA) to lock down the equity and debt capitalization of Delphi in the closing conditions.  Moreover, such changes are inconsistent with any argument that Section 5(t) could have been revised in a manner that provides more latitude and uncertainty than it had previously.

15.    After the proposal containing the October 29 EPCA terminated pursuant to its terms, the parties entered into further amendments on November 14, 2007.  Such amendments did not materially alter Sections 3(qq), 5(t), 9(a)(xix), 9(a)(xx) or 9(a)(xxii) as they existed in the October 29 EPCA in a manner relevant to the above discussion (although the *pro forma* interest cap increased to $585 million and the parties negotiated certain parameters regarding undrawn availability under the asset backed revolving loan facility).

16.    The changes described above that were introduced in the October 29 EPCA have largely been carried through to the current EPCA amendment, dated December 10, 2007.  Thus,

currently, the "Debt Financing" referred to in Section 5(t) and in Section 9(a)(xix) is required to be "on the terms indicated" in the Financing Letter and as further protection to the Plan Investors, the Debtors are not permitted to approve "any amendment or modification to be made, or any waiver of any provision or remedy under" the Financing Letter that is adverse to the rights of the Investors (as defined in the EPCA). EPCA §§ 3(qq), 5(t). These are the provisions which I negotiated precisely for the specific purpose of memorializing the fact that Delphi had to obtain a very specific exit financing package.

### Documents Relevant to Response Brief

1. Annexed hereto as Exhibit 1 is a true and correct copy of the EPCA dated August 3, 2007 as amended by the EPCA amendments dated December 10, 2007.

2. Annexed hereto as Exhibit 2 is a true and correct copy of what Delphi has represented to be the Financing Letter from J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A. and Citigroup Global Markets Inc. to Delphi dated November 3, 2007.

3. Annexed hereto as Exhibit 3 is a true and correct copy of the relevant pages of a draft EPCA emailed from Colin Diamond to Eric Cochran, et al., on December 2, 2006.

4. Annexed hereto as Exhibit 4 is a true and correct copy of the relevant pages of a draft EPCA emailed from Adlai Hardin to Gregory Pryor, et al., on December 5, 2006.

5. Annexed hereto as Exhibit 5 is a true and correct copy of the relevant pages of a draft EPCA emailed from Gregory Pryor to Eric Cochran, et al., on December 7, 2006.

6. Annexed hereto as Exhibit 6 is a true and correct copy of the relevant pages of a draft EPCA emailed from Adlai Hardin to Gregory Pryor, et al., on December 9, 2006.

7. Annexed hereto as Exhibit 7 is a true and correct copy of the relevant pages of a draft EPCA emailed from Colin Diamond to Eric Cochran, et al., on December 10, 2006.

8. Annexed hereto as Exhibit 8 is a true and correct copy of the EPCA dated December 18, 2006.

9. Annexed hereto as Exhibit 9 is a true and correct copy of the EPCA dated August 3, 2007.

10. Annexed hereto as Exhibit 10 is a true and correct copy of the October 29 EPCA.

11. Annexed hereto as Exhibit 11 is a true and correct copy of an email from Charles Alm to Eric Cochran and Daniel Ganitsky dated October 27, 2007.

12. Annexed hereto as Exhibit 12 is a true and correct copy of the relevant pages of the First Amended Disclosure Statement to the First Amended Plan of Reorganization.

13. Annexed hereto as Exhibit 13 is a true and correct copy of an email from Nathan Stuart, dated December 9, 2007 and relevant portions of the attachement "Disclosure Statement.pdf."

14. Annexed hereto as Exhibit 14 is a true and correct copy of the relevant pages of the transcript of the EPCA hearing on December 6, 2007.

15. Annexed hereto as Exhibit 15 is a true and correct copy of the relevant pages of the transcript of the deposition of Robert S. Miller on November 26, 2007.

16. Annexed hereto as Exhibit 16 is a true and correct copy of the relevant pages of Appendix C (Financial Projections) to the First Amended Disclosure Statement to the First Amended Plan of Reorganization.

17. Annexed hereto as Exhibit 17 is a true and correct copy of the declaration of John Sheehan dated January 13, 2008.

18. Annexed hereto as Exhibit 18 is a true and correct copy of the relevant pages of the order confirming the First Amended Plan of Reorganization entered January 25, 2008.

19.     Annexed hereto as Exhibit 19 is a true and correct copy of the relevant pages of the transcript of the confirmation hearing on January 17, 2008.

20.     Annexed hereto as Exhibit 20 is a true and correct copy of the updated financial information emailed by Delphi to ADAH on February 20, 2008.

21.     Annexed hereto as Exhibit 21 is a true and correct copy of the letter from John Butler to Thomas Lauria dated February 20, 2008.

22.     Annexed hereto as Exhibit 22 is a true and correct copy of the letter from John Butler to Thomas Lauria dated February 25, 2008.

23.     Annexed hereto as Exhibit 23 is a true and correct copy of the letter from Douglas Baumstein to Albert Hogan dated February 27, 2008.

24.     Annexed hereto as Exhibit 24 is a true and correct copy of the letter from Albert Hogan to Thomas Lauria, J. Christopher Shore, and Douglas Baumstein dated February 28, 2008.

25.     Annexed hereto as Exhibit 25 is a true and correct copy of the letter from J. Christopher Shore to Albert Hogan dated February 29, 2008.

26.     Annexed hereto as Exhibit 26 is a true and correct copy of the relevant pages of the Sixth § 1121(d) Exclusivity Extension Motion filed February 28, 2008.

27.     Annexed hereto as Exhibit 27 is a true and correct copy of the relevant pages of Delphi's Form 10-K for the fiscal year ended December 31, 2007.

28.     Annexed hereto as Exhibit 28 is a true and correct copy of the article titled, "Vehicle Sales Fell by 10% Last Month," from The New York Times dated March 4, 2008.

29.     Annexed hereto as Exhibit 29 is a true and correct copy of the executed equity commitment letter dated December 10, 2007 from Appaloosa Management L.P.

30. Annexed hereto as Exhibit 30 is a true and correct copy of the executed equity commitment letter dated December 10, 2007 from Harbinger Capital Partners Master Fund I, Ltd.

31. Annexed hereto as Exhibit 31 is a true and correct copy of the executed equity commitment letter dated December 10, 2007 from Pardus Special Opportunities Master Fund L.P.

32. Annexed hereto as Exhibit 32 is a true and correct copy of the relevant pages of the First Amended Joint Plan of Reorganization.

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated: March 6, 2008
New York, New York

_____
Gregory Pryor