SCHEDULE 1

| Defined Term | Section |
|---|---|
| ADAH | Preamble |
| Additional Investor Agreement | Section 2 (k) |
| Affiliate | Section 2 (a) |
| Agreement | Preamble |
| Alternate Transaction | Section 9 (a)(v) |
| Alternate Transaction Agreement | Section 9 (a)(v) |
| Alternate Transaction Fee | Section 12 (g) |
| Alternative Financing | Section 2 (b) |
| Amended and Restated Constituent Documents | Section 8 (c) |
| Appaloosa | Recitals |
| Approval Motion | Recitals |
| Approval Order | Recitals |
| Arrangement Fee | Section 2 (h)(iii) |
| Assuming Investor | Section 11 (b) |
| Available Investor Shares | Section 2 (b) |
| Bank Financing | Section 3 (qq) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 3 (b)(i) |
| Basic Subscription Period | Section 1 (c)(ii) |
| Breaching Investor | Section 11 (b) |
| Business Day | Section 1 (c)(iv) |
| Business Plan | Section 5 (s) |
| Capital Structure Date | Section 3 (d) |
| Cerberus | Recitals |
| Change of Recommendation | Section 9 (a)(vi) |
| Chapter 11 Cases | Recitals |
| Closing Date | Section 2 (d) |
| Closing Date Outside Date | Section 12 (d)(iii) |
| Code | Section 3 (z)(ii) |
| Commission | Section 1 (c)(ii) |
| Commitment Fees | Section 2 (h)(ii) |
| Commitment Parties | Recitals |
| Company | Preamble |
| Company ERISA Affiliate | Section 3 (z)(ii) |
| Company Plans | Section 3 (z)(i) |
| Company SEC Documents | Section 3 (j) |
| Confirmation Order | Section 9 (a)(vii) |
| Confirmed Plan | Section 9 (a)(ix) |
| Consideration Period | Section 12 (f)(ii) |
| Cure Period | Section 9 (a)(xxviii)(C)(3) |
| Debt Financing | Section 3 (qq) |
| Debtors | Recitals |

| Defined Term | Section |
|---|---|
| Delivered Investment Documents | Section 9(a)(xxviii)(A)(i) |
| Determination Date | Section 1 (c)(vi) |
| DGCL | Section 3 (oo) |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Recitals |
| Disinterested Director | Section 8 (c) |
| Dolce | Recitals |
| Draft Business Plan | Section 3 (m)(vii) |
| Effective Date | Section 1 (c)(iv) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Excess Shares | Section 9 (a)(xxii) |
| Exchange Act | Section 3 (i) |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iv) |
| E&Y | Section 3 (q) |
| Final Approval Order | Section 9 (a)(i) |
| Financing Letter | Section 3 (qq) |
| Financing Order | Section 2 (j) |
| GAAP | Section 3 (i) |
| GM | Recitals |
| GM Debt | Section 5 (t) |
| GM Settlement | Section 5 (p) |
| GS | Preamble |
| Harbinger | Preamble |
| Harbinger Fund | Recitals |
| HSR Act | Section 3 (g) |
| Indebtedness | Section 9 (a)(xxvii) |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| Investment Decision Package | Section 3 (k)(iii) |
| Investor | Preamble |
| Investor Default | Section 2 (b) |
| Investor Disclosure Letter | Section 4 |
| Investors | Preamble |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k)(iv) |
| IUE-CWA | Section 3 (pp) |
| IUE-CWA MOU | Section 3 (pp) |

| Defined Term | Section |
|---|---|
| knowledge of the Company | Section 22 |
| Labor MOUs | Section 3 (pp) |
| Limited Termination | Section 12 (d) |
| Losses | Section 10 (a) |
| Material Adverse Effect | Section 3 (a) |
| Material Investment Documents | Section 9 (a)(xxviii) |
| Maximum Number | Section 2 (a) |
| Merrill | Preamble |
| Money Laundering Laws | Section 3 (ee) |
| Monthly Financial Statements | Section 5 (r) |
| Multiemployer Plans | Section 3 (z)(ii) |
| Net Amount | Section 9 (a)(xxvii) |
| New Common Stock | Section 1 (a) |
| OFAC | Section 3 (ff) |
| Option | Section 3 (d) |
| Options | Section 3 (d) |
| Original Agreement | Recitals |
| Original Approval Motion | Recitals |
| Original Approval Order | Recitals |
| Original Investors | Recitals |
| Original PSA | Recitals |
| Over-Subscription Privilege | Section 1 (c)(iii) |
| Pardus | Preamble |
| Plan | Recitals |
| Preferred Commitment Fee | Section 2 (h)(i) |
| Preferred Shares | Section 2 (a) |
| Preferred Term Sheet | Section 1 (b) |
| Preliminary Rights Offering Prospectus | Section 3 (k)(v) |
| Proceedings | Section 10 (a) |
| Purchase Notice | Section 1 (c)(vi) |
| Purchase Price | Section 1 (a) |
| Registration Rights Agreement | Section 8 (c) |
| Related Purchaser | Section 2 (a) |
| Relevant Date | Section 9 (a)(xxviii)(A)(i) |
| Resale Registration Documents | Section 8 (c) |
| Resale Registration Statement | Section 8 (c) |
| Restricted Period | Section 5 (j) |
| Right | Section 1 (a) |
| Rights Distribution Date | Section 1 (c)(ii) |
| Rights Exercise Period | Section 1 (c)(iv) |
| Rights Offering | Section 1 (a) |
| Rights Offering Prospectus | Section 3 (k)(ii) |
| Rights Offering Registration Statement | Section 3 (k)(i) |
| Satisfaction Notice | Section 1 (c)(vi) |

| Defined Term | Section |
|---|---|
| Securities Act | Section 1 (c)(ii) |
| Securities Act Effective Date | Section 3 (k)(vi) |
| Series A Certificate of Designations | Section 2 (a)(iii) |
| Series A Preferred Stock | Section 2 (a)(iii) |
| Series A Purchase Price | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |
| Subscription Agent | Section 1 (c)(iv) |
| Subsequent Approval Date | Recitals |
| Subsequent Approval Motion | Recitals |
| Subsequent Approval Order | Recitals |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vi) |
| UAW | Section 3 (pp) |
| UAW MOUs | Section 3 (pp) |
| UBS | Preamble |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 3 (pp) |
| USW MOUs | Section 3 (pp) |

**SCHEDULE 2**

| Investor | Direct Subscription Shares | Direct Subscription Shares Purchase Price | Maximum Backstop Shares | Maximum Backstop Shares Purchase Price | Maximum Total Common Shares | Maximum Total Common Shares Purchase Price | Series A Preferred Stock[1] | Purchase Price | Series B Preferred Stock[2] | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAH | 1,761,978.57 | $67,638,517.92 | 15,856,905.29 | $608,746,631.59 | 17,618,784.36 | $676,385,149.51 | 9,478,887 | $400,009,031.40 | - | $ - | $1,076,394,180.91 |
| Del-Auto | 702,503.81 | $26,972,576.37 | 6,323,344.00 | $242,753,175.46 | 7,025,937.81 | $269,725,751.83 | - | - | 2,994,366.82 | $127,500,139.41 | $397,225,891.24 |
| Merrill | 265,346.92 | $10,186,668.26 | 2,388,122.17 | $91,680,009.86 | 2,653,469.09 | $101,866,678.12 | - | - | 1,526,539.95 | $65,000,071.07 | $166,866,749.19 |
| UBS | 265,346.92 | $10,186,668.26 | 2,388,122.17 | $91,680,009.86 | 2,653,469.09 | $101,866,678.12 | - | - | 1,526,539.95 | $65,000,071.07 | $166,866,749.19 |
| GS | 950,768.23 | $36,499,992.35 | 8,556,913.67 | $328,499,915.13 | 9,507,681.90 | $364,999,907.48 | - | - | 821,983.050 | $35,000,038.27 | $399,999,945.75 |
| Pardus | 612,544.55 | $23,515,583.27 | 5,512,900.70 | $211,640,257.15 | 6,125,445.25 | $235,155,842.42 | - | - | 2,526,662.22 | $107,500,117.54 | $342,655,959.96 |
| Total | 4,558,479.00 | $175,000,008.43 | 41,026,309.00 | $1,574,999,999.05 | 45,584,788.00 | $1,750,000,007.48 | 9,478,887 | $400,009,031.40 | 9,394,692.000 | $400,000,437.36 | $2,550,009,476.24 |

Proportionate Share of Preferred Commitment Fee:

| Investor | |
|---|---|
| ADAH | 50.4861% |
| Del-Auto | 15.9375% |
| Merrill | 8.1250% |
| UBS | 8.1250% |
| GS | 3.8889% |
| Pardus | 13.4375% |
| Total | 100% |

Proportionate Share of Standby Commitment Fee:

| Investor | |
|---|---|
| ADAH | 40.3977% |
| Del-Auto | 15.4712% |
| Merrill | 6.0769% |
| UBS | 6.0769% |
| GS | 18.5397% |
| Pardus | 13.4375% |
| Total | 100% |

Proportionate Share of Alternate Transaction Fee[3]:

| Investor | If full Commitment Fee received | If remaining 50% of Commitment Fee not received |
|---|---|---|
| ADAH | 54.3750% | 50.62% |
| Del-Auto | 15.9375% | 13.83% |
| Merrill | 8.1250% | 7.64% |
| UBS | 8.1250% | 7.64% |
| GS | 0% | 4.85% |

Parties
Total

13.4375%
100%

13.4375%
100%

**EXHIBIT A**

**Summary of Terms of Preferred Stock**

**SUMMARY OF TERMS OF
SERIES A-1 PREFERRED STOCK,
SERIES A-2 PREFERRED STOCK,
AND SERIES B PREFERRED STOCK**

*Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch, Pierce, Fenner & Smith Incorporated., UBS Securities, Goldman, Sachs & Co. and Pardus Special Opportunities Master Fund L.P. The investment is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, any party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. No party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

| | |
|---|---|
| **Issuer:** | Delphi Corporation (the *"Company"*), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the *"Bankruptcy Case"*) pending in the United States Bankruptcy Court for the Southern District of New York. |
| **Investors:** | Entities or funds controlled by Appaloosa Management (*"Appaloosa"*), Harbinger Capital Partners (*"Harbinger"*), Merrill Lynch, Pierce, Fenner & Smith Incorporated (*"Merrill"*), UBS Securities (*"UBS"*), Goldman, Sachs & Co. (*"GS"*) and Pardus Special Opportunities Master Fund L.P. (*"Pardus"* and together with Harbinger, Merrill, UBS and GS, the *"Co-Lead Investors"*), with the Series B Preferred Stock to be purchased by the Co-Lead Investors allocated as follows: (a) Harbinger—31.875%; (b) Merrill—16.25%; (c) UBS—16.25%; (d) GS—8.75%; and (e) Pardus—26.875%. Appaloosa or any Permitted Holder (as defined below) shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A-1 Preferred Stock (as defined below). Appaloosa, Harbinger, Merrill, UBS, GS and Pardus are collectively referred to as the *"Investors."* |
| **Securities to be Issued:** | Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the *"Series A-1 Preferred Stock"*). The Series A-1 Preferred Stock shall convert to Series A-2 Preferred Stock (the *"Series A-2 Preferred Stock"* and, together with the Series A-1 Preferred Stock, the *"Series A Preferred Stock"*) in certain circumstances described in this term sheet.<br><br>Series B Senior Convertible Preferred Stock, par value $0.01 per share |

(the *"Series B Preferred Stock"* and, together with the Series A Preferred Stock, the *"Preferred Stock"*).

The Series B Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except as specifically set forth below.

The Series A-2 Preferred Stock shall be identical in all respect to the Series A-1 Preferred Stock except it shall not have Voting Rights and Governance Rights (as defined below).

The (i) Series A-1 Preferred Stock and the shares of Common Stock underlying such Series A-1 Preferred Stock may not be, directly or indirectly, sold, transferred, assigned, pledged, donated, or otherwise encumbered or disposed of by any Series A Preferred Stock Holder (as defined below), during the two years following the effective date (the *"Effective Date"*) of the Company's plan of reorganization in the Bankruptcy case (the *"Plan"*) other than in whole pursuant to a sale of the Company (as defined below) (provided, however, that in any sale of Series A-1 Preferred Stock in connection with a sale of the Company, the seller of the Series A-1 Preferred Stock may receive consideration with a value no greater than the greater of (i) the fair market value of the Series A-1 Preferred Stock (or a preferred security of equivalent economic value), such fair market value not to reflect the value of the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock, and (ii) the Liquidation Value) and (ii) Series B Preferred Stock and the shares of Common Stock underlying such Series B Preferred Stock, or any interest or participation therein may not be, directly or indirectly, sold, transferred, assigned, pledged or otherwise encumbered or disposed of (including by exercise of any registration rights) during the ninety days following the Effective Date other than in whole pursuant to a sale of the Company (each of (i) and (ii), the *"Transfer Restriction"*). A *"sale of the Company"* means the sale of the Company to a party or parties other than, and not including, Appaloosa or any affiliate of Appaloosa (for this purpose, an "affiliate" of Appaloosa shall not include any company in which a fund managed by Appaloosa or its affiliates invests and does not control) pursuant to which such party or parties acquire (i) the capital stock of the Company possessing the voting power under normal circumstances to elect a majority of the Company's Board of Directors (whether by merger, consolidation or sale or transfer of the Company's capital stock) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

**Purchase of Preferred Stock:**  At the Effective Date, (i) Appaloosa will purchase all of the 9,478,887 shares of Series A-1 Preferred Stock for an aggregate purchase price of $400 million and (ii) the Co-Lead Investors shall purchase all of the 9,394,092 shares of Series B Preferred Stock, for an aggregate purchase price of $400 million. The aggregate stated value of the Series A-1 Preferred Stock shall be $400 million and the aggregate stated value of

the Series B Preferred Stock shall be $400 million (in each case, the *"Stated Value"*).

**Mandatory Conversion into Common Stock:**

The Company shall convert into Common Stock all, but not less than all, of the (i) Series A Preferred Stock on the first date the Mandatory Conversion Requirements are satisfied (but in no event earlier than August 31, 2012[1]) at the Conversion Price (as defined below) of the Series A Preferred Stock in effect on such conversion date, and (ii) Series B Preferred Stock on the first day the Mandatory Conversion Requirements are satisfied (but in no event earlier than the third anniversary of the Effective Date) at the Conversion Price (as defined below) of the Series B Preferred Stock in effect on such conversion date.

The *"Mandatory Conversion Requirements"* set forth in this section are as follows: (i) the closing price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be equal to or greater than $81.61 per share and (ii) the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock.

The Company will provide each Preferred Stock Holder (as defined below) with notice of conversion at least five (5) business days prior to the date of conversion.

The holders of the Series A Preferred Stock (the *"Series A Preferred Stock Holders"* and each, a *"Series A Preferred Stock Holder"*) will agree not to take any action to delay or prevent such registration statement from becoming effective.

**Liquidation Rights:**

In the event of any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, the holders of Preferred Stock (the *"Preferred Stock Holders"* and each, a *"Preferred Stock Holder"*) shall receive, in exchange for each share, out of legally available assets of the Company, (A) a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the *"Liquidation Value"*) and (B) a non-preferential amount (if any) in cash (the *"Common Equivalent Amount"*) equal to (i) the amount that Preferred Stock Holder would have received pursuant to the liquidation if it had converted its Preferred Stock into Common Stock immediately prior to the liquidation minus (ii) any amounts received pursuant to (A)(i) and (ii) hereof (the Stated Value and dividends and distributions). For the avoidance of doubt, this paragraph should operate so that in the event of a liquidation, dissolution or winding up of the business of the Company, a Preferred Stock Holder

---

[1] Assumes emergence by February 29, 2008. Conversion date to be adjusted day-by-day to reflect any later date.

3

shall receive a total amount, in cash, equal to the greater of: (i) the Liquidation Value and (ii) the amount that a Preferred Stock Holder would have received pursuant to the liquidation, dissolution or winding up of the business if it converted its Preferred Stock into Common Stock immediately prior to the liquidation.

**Ranking:**

The Series A Preferred Stock and the Series B Preferred Stock shall rank *pari passu* with respect to any distributions upon liquidation, dissolution or winding up of the Company. The Preferred Stock will rank senior to any other class or series of capital stock of the Company ("*Junior Stock*") with respect to any distributions upon liquidation, dissolution or winding up of the Company.

While any bankruptcy event is pending: (i) there shall be no dividends or other distributions on shares of Junior Stock or any purchase, redemption, retirement or other acquisition for value or other payment in respect of Junior Stock unless the Preferred Stock has been paid its Liquidation Value in full, (ii) there shall be no such dividends, distributions, purchases, redemptions, retirement, acquisitions or payments on Junior Stock in each case in cash unless the Preferred Stock has first been paid in full its Liquidation Value and (iii) there shall be no dividends or other distributions on Series A Preferred Stock or Series B Preferred Stock or any purchase, redemption, retirement or other acquisition for value or other payment in respect of Series A Preferred Stock or Series B Preferred Stock unless each of the Series A Preferred Stock and Series B Preferred Stock shall receive the same securities and the same percentage mix of consideration in respect of any such payment, dividend or distribution.

**Conversion of Preferred Stock into Common Stock:**

Each share of Preferred Stock shall be convertible at any time, without any payment by the Preferred Stock Holder, into a number of shares of Common Stock equal to (i) the Liquidation Value <u>divided by</u> (ii) the Conversion Price. The Conversion Price shall initially be $42.20, with respect to the Series A Preferred Stock, and $42.58 with respect to the Series B Preferred Stock, in each case subject to adjustment from time to time pursuant to the anti-dilution provisions of the Preferred Stock (as so adjusted, the "*Conversion Price*"). The anti-dilution provisions will contain customary provisions with respect to stock splits, recombinations and stock dividends and customary weighted average anti-dilution provisions in the event of, among other things, the issuance of rights, options or convertible securities with an exercise or conversion or exchange price below the Conversion Price, the issuance of additional shares at a price less than the Conversion Price and other similar occurrences.

| | |
|---|---|
| **Conversion of Series A-1 Preferred Stock Into Series A-2 Preferred Stock:** | If (a) Appaloosa or any Permitted Holder (as defined below) sells, transfers, assigns, pledges, donates or otherwise encumbers to any person other than a Permitted Holder, or converts into Common Stock, shares of Series A-1 Preferred Stock with an aggregate Liquidation Value in excess of $100 million, or (b) David Tepper no longer controls Appaloosa and James Bolin is no longer an executive officer of Appaloosa, then all the shares of Series A-1 Preferred Stock shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof; provided, that with respect to clause (a), no such conversion shall be effective until the Company has in effect a registration statement covering resales of the Common Stock issuable upon conversion of the Preferred Stock. The Series A Preferred Stock Holders will agree not to take any action to delay or prevent such registration statement from becoming effective. |

If Appaloosa transfers shares of Series A-1 Preferred Stock to any person other than an affiliate of Appaloosa (such affiliate being a *"Permitted Holder"*), then all the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock without any action on the part of the holder thereof.

The direct or indirect transfer of ownership interests in any Permitted Holder that owns shares of Series A-1 Preferred Stock such that such Permitted Holder ceases to be an affiliate of Appaloosa shall constitute a transfer of such Series A-1 Preferred Stock to a person other than a Permitted Holder for the purpose of this provision.

Each event described above in the previous two paragraphs of this section "Conversion of Series A Preferred Stock into Series A-2 Preferred Stock" is referred to as a *"Series A-2 Conversion Event."*

Subject to compliance with applicable securities laws and the Transfer Restriction, shares of Preferred Stock will be freely transferable.

| | |
|---|---|
| **Dividends:** | Each Preferred Stock Holder shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of 7.5% of the Liquidation Value thereof, with respect to the Series A Preferred Stock, and 3.25% of the Liquidation Value thereof, with respect to the Series B Preferred Stock, in each case payable quarterly in cash as declared by the Company's Board. Unpaid dividends shall accrue. In addition, if any dividends are declared and paid on the Common Stock, the Series A Preferred Stock shall be entitled to receive, in addition to the dividend on the Series A Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the Series A Preferred Stock had it been converted immediately prior to the record date for such dividend. |

**Preference with
Respect to
Dividends:**

Each Preferred Stock Holder shall, prior to the payment of any dividend
or distribution in respect of any Junior Stock, be entitled to be paid in
full the dividends and distributions payable in respect of the Preferred
Stock.

**Restriction on
Redemptions of
Junior Stock:**

So long as shares of Series A Preferred Stock having a Liquidation Value
of $200 million or more remain outstanding, the Company shall not and
shall not permit any of its subsidiaries to, purchase, redeem or otherwise
acquire for value any Junior Stock, except, so long as no bankruptcy
event is pending, for (i) customary provisions with respect to repurchase
of employee equity upon termination of employment, (ii) purchases,
redemptions or other acquisitions for value of Common Stock not to
exceed $50 million in any calendar year, and (iii) the mandatory
redemption of outstanding shares of the Company's Series C Convertible
Preferred Stock in accordance with the terms and conditions, and in the
amounts, set forth on the Summary of Terms of Series C Preferred Stock
attached as Annex I to this Exhibit A.

**Governance –
Board of
Directors:**

A committee (the *"Search Committee"*) shall be appointed consisting of
one (1) representative of Appaloosa, one (1) representative of the
Company, being the Company's lead director (currently John Opie), one
(1) representative of the Unsecured Creditors Committee, being David
Daigle, one (1) representative of the Co-Lead Investors other than UBS,
GS and Merrill (who shall be determined by Appaloosa), and one (1)
representative of the Equity Committee reasonably acceptable to the
other members of the Search Committee. Each member of the Search
Committee shall be entitled to require the Search Committee to interview
any person to serve as a director unless such proposed candidate is
rejected by each of the Appaloosa representative, the Company
representative and the representative of the Unsecured Creditors'
Committee. The entire Search Committee shall be entitled to participate
in such interview and in a discussion of such potential director following
such interview.

The board of directors of the Company shall consist of nine (9) directors
(which number shall not be expanded at all times that the Series A-1
Preferred Stock has Series A-1 Board Rights (as defined below)), three
(3) of whom (who shall be Class III Directors) shall initially be
nominated by Appaloosa and elected at the time of emergence from
Chapter 11 by the Series A Preferred Stock Holders (and thereafter shall
be elected directly by the Series A Preferred Stock Holders) (the "Series
A Directors"), one (1) of whom (who shall be a Class I Director) shall be
the Executive Chairman selected as described below under "Executive
Chairman", one (1) of whom (who shall be a Class I Director) shall be
the Chief Executive Officer, one (1) of whom (who shall be a Class II
Director) shall initially be selected by the Co-Lead Investor
representative on the Search Committee with the approval of either the
Company or the Unsecured Creditors' Committee (the "Joint Investor

Director"), one (1) of whom (who shall be a Class I Director) shall
initially be selected by the Unsecured Creditors' Committee and two (2)
of whom (who shall be Class II Directors) shall initially be selected by
the Unsecured Creditors' Committee (such directors selected by the
Unsecured Creditors' Committee and the Joint Investor Director, being
the "Common Directors"). For the avoidance of doubt, all directors
selected in accordance with this paragraph, shall have been interviewed
and/or discussed by the Search Committee. Each director so selected
shall be appointed to the initial Board of Directors of the Company
unless at least three members of the following four members of the
Search Committee objects to the appointment of such individual: the
Appaloosa representative, the Company representative; the
representative of the Unsecured Creditors' Committee; and the
representative of the Equity Committee. Initially, the Board shall be
comprised of (a) six (6) directors who satisfy all applicable independence
requirements of the relevant stock exchange on which it is expected the
Common Stock would be traded and (b) six (6) directors who are
independent from the Investors; provided, that the requirements of this
sentence may be waived by the unanimous consent of the Company,
Appaloosa and the Unsecured Creditors Committee. Additionally, the
Joint Investor Director must be independent from the Investors.

Directors initially will be placed as set forth above in three (3) classes:
directors in the first class will have an initial term expiring at the annual
meeting of stockholders to be held in 2009 (each a "Class I Director"),
directors in the second class will have an initial term expiring at the
annual meeting of stockholders to be held in 2010 (each a "Class II
Director"), and directors in the final class will have an initial term
expiring at the annual meeting of stockholders to be held in 2011 (each a
"Class III Director"). After the expiration of each initial term of each
class of directors, the directors will thereafter each have a one year term
elected annually.

Following the initial election of the Executive Chairman and the Chief
Executive Officer, the Executive Chairman and Chief Executive Officer
shall be nominated for election to the Board by the Nominating and
Corporate Governance Committee of the Board and elected to the board
by the holders of the Common Stock and the Preferred Stock, voting as a
class. The Executive Chairman of the Board shall be selected as
described below under "Executive Chairman." The initial Chief
Executive Officer shall be Rodney O'Neal, who shall become the Chief
Executive Officer and President not later than the effective date of the
Plan.

After the initial selection of the Series A Directors, until the earlier of the
expiration of the term of the Class III Directors and the conversion of all
Series A-1 Preferred Stock to Series A-2 Preferred Stock or Common
Stock, (a) the Series A Preferred Stock shall continue to directly elect

(including removal and replacement) the Series A Directors subject to the ability of the Nominating and Corporate Governance Committee to, by majority vote, veto the selection of up to two proposed Series A Directors for each Series A director position on the Board and (b) the number of directors on the board of directors may not be increased. The rights of Series A-1 Preferred Stock described in this paragraph are referred to as "Series A-1 Board Rights". Upon the earlier of such date, the Series A-1 Directors shall serve out their remaining term and thereafter be treated as Common Directors.

After the initial selection of the Common Directors, the nominees for election of the Common Directors shall be determined by the Nominating and Corporate Governance Committee of the Company's Board of Directors, with the Series A Directors on such committee not entitled to vote on such determination at any time the Series A-1 Preferred Stock retains Series A-1 Board Rights, and recommended to the Company's Board of Directors for nomination by the Board. Only holders of Common Stock, Series B Preferred Stock and Series A Preferred Stock that is not entitled to Series A Board Rights shall be entitled to vote on the election of the Common Directors.

The Search Committee shall determine by majority vote the Committee assignments of the initial Board of Directors; provided, that for the initial Board and at all times thereafter that the Series A-1 Preferred Stock retains Series A-1 Board Rights at least one Series A Director shall be on all committees of the Board and a Series A Director shall constitute the Chairman of the Compensation Committee of the Board; provided, further, that so long as the Series A-1 Preferred Stock retains Series A-1 Board Rights, the Series A Directors shall not constitute a majority of the Nominating and Corporate Governance Committee. Committee assignments shall be subject to all applicable independence and qualification requirements for directors including those of the relevant stock exchange on which the Common Stock is expected to be traded. Pursuant to a stockholders' agreement or other arrangements, the Company shall maintain that composition.

**Governance – Executive Chairman:**

The Executive Chairman shall initially be selected by majority vote of the Search Committee, which must include the approval of the representatives of Appaloosa and the Unsecured Creditors' Committee. Any successor Executive Chairman shall be selected by the Nominating and Corporate Governance Committee of the Board, subject (but only for so long as any of the Series A-1 Preferred Stock remains outstanding) to the approval of the Series A-1 Preferred Stock Holders. Upon approval, such candidate shall be recommended by the Nominating and Corporate Governance Committee to the Company's Board of Directors for appointment as the Executive Chairman and nomination to the Board. The Preferred Stock Holders will vote on the candidate's election to the Board on an as-converted basis together with holders of Common Stock.

Notwithstanding the foregoing, if there shall occur any vacancy in the office of the Executive Chairman during the initial one (1) year term, the successor Executive Chairman shall be nominated by the Series A-1 Preferred Stock Holders (but only for so long any of as the Series A-1 Preferred Stock remains outstanding) subject to the approval of the Nominating and Corporate Governance Committee of the Board.

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the Series A-1 Preferred Stock Holders with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the Series A-1 Preferred Stock Holders may remove the Executive Chairman and/or Chief Executive Officer as a director, subject to applicable law. The employment agreement of the Chief Executive Officer will provide that if the Chief Executive Officer is not elected as a member of the Company's Board, the Chief Executive Officer may resign for "cause" or "good reason".

The special rights of the Series A-1 Preferred Stock referred to in "Governance – Board of Directors" and in this "Executive Chairman" section are referred to as the *Governance Rights*.

| | |
|---|---|
| **Governance – Voting Rights:** | Except with respect to the election of directors, who shall be elected as specified above, the Preferred Stock Holders shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders. |

The Series A-1 Preferred Stock Holders shall be entitled to propose individuals for appointment as Chief Executive Officer and Chief Financial Officer, subject to a vote of the Board. The Series A-1

Preferred Stock Holders shall also have the non-exclusive right to propose the termination of the Executive Chairman (but only during the initial one (1) year term of the Executive Chairman and only for so long as the Series A-1 Preferred Stock remains outstanding), the Chief Executive Officer and Chief Financial Officer, in each case, subject to a vote of the Board. If the Series A Preferred Stock Holders propose the appointment or termination of the Chief Executive Officer or Chief Financial Officer, the Board shall convene and vote on such proposal within ten (10) days of the Board's receipt of notice from the Series A-1 Preferred Stock Holders; provided, that the then current Chief Executive Officer shall not be entitled to vote on either the appointment or termination of the Chief Executive Officer and shall not be entitled to vote on the termination of the Chief Financial Officer.

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the Series A-1 Preferred Stock Holders with at least 20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the Series A-1 Preferred Stock Holders, written notice from all of the Series A-1 Preferred Stock Holders that they object to such action:

- any action to liquidate the Company;

- any amendment of the charter or bylaws that adversely affects the Series A Preferred Stock (any expansion of the Board of Directors would be deemed adverse); or

- at all times that the Series A Preferred Stock is subject to the Transfer Restriction:

  - a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

  - any merger or consolidation involving a change of control of the Company; or

  - any acquisition of or investment in any other person or entity having a value in excess of $250 million in any twelve-month period after the Issue Date.

The approval rights set forth above shall be in addition to the other rights set forth above and any voting rights to which the Series A Preferred Stock Holders are entitled above and under Delaware law.

The special rights of the Series A-1 Preferred Stock described above in this section "Governance – Voting Rights" are referred to as the "*Voting Rights*". The Series A-1 Preferred Stock Holders shall have no Voting

Rights after no shares of Series A-1 Preferred Stock are outstanding.

Appaloosa and the Permitted Holders shall not receive, in exchange for the exercise or non-exercise of voting or other rights in connection with any transaction subject to Voting Rights, any compensation or remuneration; provided, that this restriction shall not prohibit the reimbursement of expenses incurred by Appaloosa or any Permitted Holders and shall not prohibit the payment of fees by the Company to Appaloosa or any Permitted Holder if the Company has engaged Appaloosa or its affiliates as an advisor or consultant in connection with any such transaction.

**Change of Control:** In a merger or consolidation, or sale of the Company, involving a change of control of the Company (a *"Change of Control Transaction"*), each holder of Series A Preferred Stock may elect to require (the *"Series A Change of Control Put"*) that such holder's shares of Series A Preferred Stock be redeemed by the Company for consideration payable in cash and/or freely tradable marketable securities with a fair market value equal to the greater of (i) the fair market value of the Series A Preferred Stock (provided that such fair market value shall be determined without ascribing any value to the Voting Rights and Governance Rights attributable to the Series A-1 Preferred Stock) and (ii) the Liquidation Value.  In a Change of Control Transaction, each holder of Series B Preferred Stock may elect to require (the *"Series B Change of Control Put"* and, together with the Series A Change of Control Put, the *"Change of Control Put"*) that such holder's shares of Series B Preferred Stock be redeemed by the Company for consideration payable in cash and/or freely tradable marketable securities with a fair market value equal to the greater of (i) the fair market value of the Series B Preferred Stock and (ii) the Liquidation Value; provided, that each holder of Series B Preferred Stock who elects to exercise its Series B Change of Control Put shall receive the same securities and the same percentage mix of consideration as received by each holder of Series A Preferred Stock upon exercise of the Series A Change of Control Put in connection with such Change of Control Transaction.  For the purpose of this provision, equity securities that are listed on a national securities exchange and debt that is registered, or 144A debt instruments which contain customary A/B exchange registration rights, shall be marketable securities.

In the event of a Change of Control Put where all or a part of the consideration to be received is marketable securities, the fair market value of such securities shall be determined as follows:

- If the consideration to be received is an existing publicly traded security, the fair market value shall reasonably be determined based on the market value of such security.
- If the consideration to be received is not an existing publicly traded security, the fair market value (taking into account the liquidity of such security) shall reasonably be determined by the

board of directors of the Company in good faith. If the holders of the Preferred Stock object to the valuation of the board of directors, they may request that an appraisal be conducted to determine the fair market value of the consideration (taking into account the liquidity of such security). If such a request is made, the determination of the fair market value of the consideration shall be made by a nationally recognized investment banking, appraisal or valuation firm selected by the holders of the Series A and B Preferred Stock. If such holders cannot agree on a mutually acceptable appraisal firm, then the holders of the Series A Preferred Stock, on the one hand, and the Series B Preferred Stock, on the other hand, shall each choose one appraisal firm and the respective chosen firms shall agree on another appraisal firm which shall make the determination. The cost of such appraisal shall be borne by the Company.

- The determination of the fair market value of the consideration received in a Change of Control Transaction shall be determined within appropriate time periods to be agreed upon.

The Company shall not enter into a Change of Control Transaction unless adequate provision is made to ensure that holders of the Preferred Stock will receive the consideration referred to above in connection with such Change of Control Transaction.

**Reservation of Unissued Stock:**    The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock.

**Transferability:**    The Series A Preferred Stock Holders may sell or otherwise transfer such stock as follows:

- to any Permitted Holder; or

- subject to the Transfer Restriction, to any other person; *provided, however,* that upon any such transfer, the shares of Series A-1 Preferred Stock so transferred shall automatically convert into Series A-2 Preferred Stock.

**Registration Rights:**    Each and any Investor, Related Purchaser (as such term is defined in the Equity Purchase and Commitment Agreement among the Company and the Investors (as amended, the *"EPCA"*)), Ultimate Purchaser (as such term is defined in the EPCA), and their affiliates or assignee or transferee of Registrable Securities (as defined below) (collectively, the *"Holders"*) shall be entitled to registration rights as set forth below. The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions.

Demand Registrations. Subject to the Transfer Restriction, the Investors and their respective affiliates (including Related Purchasers) shall be entitled to an aggregate of five (5) demand registrations with respect to Registrable Securities, in addition to any shelf registration statement required by the EPCA with respect to Registrable Securities (which shelf registration shall be renewed or remain available for at least three years or, if longer, so long as the Company is not eligible to use Form S-3); provided, that all but one such demand right requires the prior written consent of Appaloosa and the one demand not requiring the consent of Appaloosa shall be at the request of the Investors and their respective affiliates (including Related Purchasers) holding a majority of the shares of Series B Preferred Stock; provided, further, that following the time that the Company is eligible to use Form S-3, the Investors and their respective affiliates (including Related Purchasers) shall be entitled to an unlimited number of demand registrations with respect to Registrable Securities (without the need for Appaloosa's consent). Any demand registration may, at the option of the Investors and their respective affiliates (including Related Purchasers) be a "shelf" registration pursuant to Rule 415 under the Securities Act of 1933. All registrations will be subject to customary "windows."

Piggyback Registrations. In addition, subject to the Transfer Restriction, the Holders shall be entitled to unlimited piggyback registration rights with respect to Registrable Securities, subject to customary cut-back provisions.

Registrable Securities: "*Registrable Securities*" shall mean and include (i) any shares of Series A-2 Preferred Stock, Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock, any other shares of Common Stock (including shares acquired in the rights offering or upon the exercise of preemptive rights) and any additional securities issued or distributed by way of a dividend or other distribution in respect of any such securities, in each case, held by any Holder, and (ii) any shares of Common Stock issuable upon conversion of the Company's Series C Preferred Stock and any additional securities issued or distributed by way of dividend or distribution in respect of any such shares of Common Stock. Securities shall cease to be Registrable Securities upon sale to the public pursuant to a registration statement or Rule 144, or when all shares held by a Holder may be transferred without restriction pursuant to Rule 144(k).

Expenses. All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, all fees and expenses of one counsel for any holders selling Registrable Securities in connection with any such registration.

**Preemptive**          So long as shares of Series A-1 Preferred Stock having a Liquidation

| | |
|---|---|
| **Rights:** | Value of $250 million or more remain outstanding, the Preferred Stock Holders shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions. |
| **Commitment Fee:** | (a) A commitment fee of 2.25% of total commitment shall be earned by and payable to the Investors and (b) an additional arrangement fee of 0.25% of total commitment shall be earned by and payable to Appaloosa, all as provided for in the EPCA. |
| **Standstill** | For a period of five (5) years from the Closing Date, Appaloosa will not (a) acquire, offer or propose to acquire, solicit an offer to sell or donate or agree to acquire, or enter into any arrangement or undertaking to acquire, directly or indirectly, by purchase, gift or otherwise, record or direct or indirect beneficial ownership (as such term is defined in Rule 13d-3 of the Exchange Act) of more than 25% of the Company's common stock or any direct or indirect rights, warrants or options to acquire record or direct or indirect beneficial ownership of more than 25% of the Company's common stock or (b) sell, transfer, pledge, dispose, distribute or assign (*"Transfer"*) to any person in a single transaction, Company Common Stock or any securities convertible into or exchangeable for or representing the right to acquire the Company's Common Stock (*"Common Stock Equivalents"*) representing more than 15% of the Company's then issued and outstanding (on a fully diluted basis) Common Stock; provided, that Appaloosa shall be permitted to Transfer the Company's Common Stock or Common Stock Equivalents (i) to Permitted Holders, (ii) as part of a broadly distributed public offering effected in accordance with an effective registration statement, (iii) in a sale of the Company, (iv) pursuant to any tender or exchange offer or (v) as otherwise approved by (A) during the initial three year term of the Series A Directors, a majority of Directors who are not Series A Directors or (B) after the initial three year term of the Series A Directors, a majority of the Directors (customary exceptions shall apply for Transfers to partners, stockholders, family members and trusts and Transfers pursuant to the laws of succession, distribution and descent). |
| **Stockholders Agreement:** | Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by ADAH and the Company on the Effective Date. |
| **Governing Law:** | State of Delaware |

ANNEX I to
EXHIBIT A

## SUMMARY OF TERMS OF SERIES C PREFERRED STOCK

*Set forth below is a summary of indicative terms for the preferred stock of Delphi Corporation to be issued to General Motors Corporation pursuant to a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code. No party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

| | |
|---|---|
| **Issuer:** | Delphi Corporation (the "**Company**"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "**Bankruptcy Case**") pending in the United States Bankruptcy Court for the Southern District of New York. |
| **Series C Preferred Stock Holder:** | General Motors Corporation ("**GM**"). |
| **Securities to be Issued:** | 16,508,176 shares of Series C Convertible Preferred Stock, par value $0.01 per share, (as such amount may be reduced in accordance with the Terms of Section 7.15(b) of the Company's Plan of Reorganization, the "**Series C Preferred Stock**") with a stated value of $65.00 per share (the "**Stated Value**"). |
| **Mandatory Conversion into Common Stock:** | The Company shall convert into Common Stock all, but not less than all, of the Series C Preferred Stock on the first day the Mandatory Conversion Requirements are satisfied (but in no event earlier than the third anniversary of the Effective Date) at the Conversion Price (as defined below) of the Series C Preferred Stock in effect on such conversion date. |
| | The "Mandatory Conversion Requirements" set forth in this section are as follows: (i) the closing price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be equal to or greater than $81.61 per share and (ii) the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Series C Preferred Stock. |
| | The Company will provide the Series C Preferred Stock Holder with notice of conversion at least five (5) business days prior to the date of |

conversion.

The Series C Preferred Stock Holder will agree not to take any action to delay or prevent such registration statement from becoming effective.

**Liquidation Preference:** In the event of any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary, each share of Series C Preferred Stock shall receive, out of legally available assets of the Company, a preferential distribution in cash in an amount equal to the Stated Value plus any unpaid dividends to which it is entitled. Consolidation or merger or sale of all or substantially all of the assets of the Company shall not be a liquidation, dissolution or winding up of the Company.

**Ranking:** Junior to the Company's Series A-1 Senior Convertible Preferred Stock, Series A-2 Senior Convertible Preferred Stock and Series B Senior Convertible Preferred Stock (the *"Senior Preferred Stock"*) with respect to any distributions upon liquidation, dissolution or winding up of the Company.   Senior to Common Stock with respect to any distributions upon liquidation, dissolution, winding up of the Company.   The Company shall be permitted to issue new capital stock that is senior to or pari passu with the Series C Preferred Stock with respect to distributions upon liquidation, dissolution or winding up and other rights.

While any bankruptcy event is pending:   (i) there shall be no dividends or other distributions on shares of Common Stock or other securities that do not, by their terms, rank senior to or pari passu with the Series C Preferred Stock (*"Junior Stock"*) or any purchase, redemption, retirement or other acquisition for value or other payment in respect of Junior Stock unless the Series C Preferred Stock is paid its Stated Value plus any dividends to which it is entitled in full; and (ii) there shall be no such dividends, distributions, purchases, redemptions, retirement, acquisitions or payments on Junior Stock in each case in cash unless the Series C Preferred Stock has first been paid in full in cash its Stated Value plus any unpaid dividends to which it is entitled.

**Conversion of Preferred Stock into Common Stock:** Each share of Series C Preferred Stock shall be convertible at any time, without any payment by the Series C Preferred Stock Holder, into a number of shares of Common Stock equal to (i) the Stated Value divided by (ii) the Conversion Price.   The Conversion Price shall initially be $65.00, subject to adjustment from time to time pursuant to the anti-dilution provisions of the Series C Preferred Stock (as so adjusted, the *"Conversion Price"*).   The anti-dilution provisions will be identical to the anti-dilution protection afforded to the Series B

2

Senior Convertible Preferred Stock.[3]  Any unpaid dividends to which the Series C Preferred Stock is entitled shall be paid upon any such conversion.

Any Series C Preferred Stock held by GM or its affiliates that is converted into Common Stock, whether pursuant to this section or the section entitled "Mandatory Conversion into Common Stock," shall be converted into shares of Common Stock which, so long as such shares are held by GM or its affiliates, cannot be voted other than with respect to a merger, consolidation or sale of the Company involving a change of control of the Company (a **"*Change of Control Transaction*"**) in which the consideration to be paid for all Common Stock, including such shares of Common Stock held by GM or its affiliates, is not (i) equal to or greater than $65.00 per share of such Common Stock (with such $65.00 per share consideration to be proportionally adjusted to reflect any stock splits or stock recombinations effecting such shares of Common Stock) and (ii) paid in full in cash (the **"*Stated Consideration*"**); provided, that upon the transfer by GM or its affiliates of such Common Stock to a transferee that is not GM or an affiliate of GM, the restriction on voting such Common Stock shall no longer apply.

| | |
|---|---|
| **Dividends:** | None, except that if any dividends are declared and paid on the Common Stock, each share of Series C Preferred Stock shall be entitled to receive the dividends that would have been payable on the number of shares of Common Stock that would have been issued with respect to such share had it been converted into Common Stock immediately prior to the record date for such dividend (**"*Dividend Participation*"**).  At such time as the Company has declared and paid four consecutive quarterly cash dividends on Common Stock and paid the Dividend Participation in full on the Series C Preferred Stock, the Series C Preferred Stock shall no longer be entitled to Dividend Participation. |
| **Voting Rights:** | The Series C Preferred Stock will not have any voting rights, except with respect to a Change of Control Transaction in which the consideration to be paid to all Common Stock, including the Common Stock into which the Series C Preferred Stock is convertible, is not at least equal to the Stated Consideration; provided, that nothing shall prohibit the Series C Preferred Stock from being voted in any manner |

---

[3]    If a "Fundamental Change" occurs (*i.e.*, merger, consolidation, asset sale, etc.) in which all or substantially all Common Stock is exchanged for or converted into stock, other securities, cash or assets, the Senior Preferred Stock has the right upon any subsequent conversion to receive the kind and amount of stock, other securities, cash and assets that it would have received if it had been converted immediately prior thereto.    Series C Preferred Stock will also get this.

to the extent required by Section 242(b)(2) of the Delaware General
Corporation Law.   With respect to such a transaction, each share of
Series C Preferred Stock shall be entitled to a number of votes equal to
the votes that it would otherwise have on an "as converted" basis.
Upon a transfer by GM or its affiliates of the Series C Preferred Stock
to someone other than GM or its affiliates in which there is no
automatic conversion into Common Stock, as provided below under
"Transferability," the Series C Preferred Stock will vote, on an "as
converted" basis, together with the holders of the Common Stock, on
all matters submitted to the holders of Common Stock.

**Mandatory
Redemption:**

So long as no bankruptcy event is pending, the Company shall redeem
up to $1 billion of outstanding Series C Preferred Stock to the extent of
the proceeds received from exercise, within the six months following
the effective date of the Company's plan of reorganization, of the six-
month warrants to be issued to the existing Common Stock holders
pursuant to the Company's plan of reorganization.   Any such
redemption of shares of Series C Preferred Stock shall be by payment
in cash equal to the Stated Value plus any unpaid dividends to which it
is entitled.

**Transferability:**

Upon any direct or indirect sale, transfer, assignment, pledge or other
disposition (a "*Transfer*") of any Series C Preferred Stock (other than
a Transfer to an affiliate of GM or any Transfer completed at a time
when there is a pending acceleration under the Company's exit
financing facility or any refinancing thereof), such Transferred Series
C Preferred Stock shall automatically be converted into Common
Stock at the then applicable Conversion Price.

The Series C Preferred Stock and the shares of Common Stock
underlying such Series C Preferred Stock, or any interest or
participation therein shall be subject to the same 90-day transfer
restriction applicable to Series B Senior Convertible Preferred Stock.

**Amendments:**

No provision of the certificate of designations for the Series C
Preferred Stock may be repealed or amended in any respect unless
such repeal or amendment is approved by the affirmative vote of the
holders of a majority in aggregate Stated Value of the then outstanding
Series C Preferred Stock.

**Registration Rights:**

GM shall be a party to the Registration Rights Agreement to which the
holders of the Senior Preferred Stock are a party and GM and its
affiliates shall be entitled to the same registration rights with respect to
Common Stock underlying Series C Preferred Stock, which shall be
deemed to be registrable securities, as are available with respect to the
shares of Common Stock underlying the Series B Preferred Stock

4

(other than with respect to the demand registration granted to holders of a majority of shares of Series B Preferred Stock).   As a party to the Registration Rights Agreement, GM and its affiliates shall also be entitled to one demand registration (without the consent of any holders of the Senior Preferred Stock) in addition to the demand registrations after the Company is eligible to use Form S-3; provided, however, that any transferees of the shares of Common Stock underlying the Series C Preferred Stock, other than GM or an affiliate of GM, shall not be entitled to such demand registration (but shall be entitled to piggyback rights under the Registration Rights Agreement, subject to customary cutback provisions).

**EXHIBIT B**

**The Plan**

**EXHIBIT C**

**Disclosure Statement**

**EXHIBIT D**

**[Reserved]**

EXHIBIT E

The terms of the GM Note shall be determined as follows:

o   2nd lien exit financing of $1.5 billion (net of OID[1]) having a maturity of 8 years
    from the date of initial issuance, and issued under a single credit facility, allocated
    as follows:

    ▪   At least $750 million (net of OID) in a note with market clearing terms
        and covenants acceptable to Delphi to be raised from a third-party
        financing source prior to emergence.  All cash proceeds from the 2nd lien
        financing to be paid to GM.[2]

    ▪   $750 million (net of OID), as reduced by any cash proceeds above $750
        million as referred to above or as reduced below, in a note provided to GM
        having the same terms as provided in connection with the third-party
        financing.  The 2nd lien credit agreement will provide that at any time that
        GM holds more than $500 million (net of OID) of the Notes that any
        matter requiring approval of less than 100% of the Noteholders shall
        require the following approvals to be effective: (1) if GM votes in favor of
        the matter, the approval of at least one-third of the non-GM Noteholders
        (determined by principal amount); or (2) if GM does not vote in favor of
        the matter, the approval of at least two-thirds of the non-GM Noteholders
        (determined by principal amount).  No other special voting rights shall be
        included in the 2nd lien credit agreement.

    ▪   Third party financing source (i.e., the initial purchaser or underwriter) will
        have the right, through the emergence date, to replace GM on up to $500
        million (net of OID) of the note being provided to GM in which case cash
        in the amount of any such replacement shall be paid to GM and its note
        (net of OID) shall be reduced by such amount.

    ▪   If the 1st lien exit financing is greater than $3.7 billion (net of OID), an
        amount of cash equal to such excess (the "Excess Amount") will be paid
        to GM as part of its recovery and the 2nd lien financing will be reduced by
        such amount (with at least 50% of the remaining 2nd lien financing
        allocated to the third party financing source), provided that the sum of (i)
        undrawn availability plus any open letters of credit up to $100 million
        pursuant to an ABL revolving credit facility and (ii) Delphi's pro forma
        consolidated cash as of the Effective Date (excluding the Excess Amount
        and after giving pro forma effect to the $1.5 billion cash payment to GM
        in connection with the 414(l) transaction) (the "Liquidity Amount") is at
        least $3.189 billion.  In the event that the Liquidity Amount is less than
        $3.189 billion, then any Excess Amount shall be retained by Delphi up to
        the point that the amount of such Excess Amount retained plus the
        Liquidity Amount equals $3.189 billion and the remaining amount shall be

paid to GM and the 2nd lien financing will be reduced by such amount
paid to GM as provided above.

o    Delphi shall, and Appaloosa acknowledges that Delphi shall, use its commercially
reasonable efforts to sell up to $1.5 billion of 2nd lien notes to third parties. To the
extent Delphi does not raise $1.5 billion of second lien financing through its exit
financing process, GM to receive a fee equivalent to that which Delphi is paying
to its Lead Arrangers and syndicate members, including, without limitation, all
placement, commitment and closing fees, in connection with such exit financing,
pro rata based on the amount of the 2nd lien note issued to GM.

o    GM shall not have registration rights with respect to the GM Note.

o    As provided for in Section 7.18(b) of the Plan, six month warrants for $1,000
million of common stock will be issued to equity holders with a per share strike
price equal to the liquidation preference of the Series C Preferred Stock.  The
proceeds from such issuance will be allocated: (i) first to redeem any outstanding
Series C Preferred Stock at the preferred liquidation preference value thereof and
(ii) then to redeem GM's 2nd lien notes at par including accrued and unpaid
interest

o    Subject to the following sentence, the collateral and guarantee package for the 2nd
lien financing will be substantially the same as that for the 1st lien financing.  The
2nd lien facility shall not have a lien on the assets (other than the stock of the first
tier foreign subsidiaries) solely securing the European portions of the 1st lien
facility.

o    The GM Note shall be subject to a 6 month lock-up from the effectiveness of the
Plan of Reorganization, provided however that, during such lock-up period, GM
shall not be restricted from selling second lien notes if such notes are sold to
investors at a price at least equal to par less any original issue discount (the
"Threshold Price"), or below the Threshold Price, if GM makes a pro rata
payment to the other holders of 2nd lien notes equal to the product of (i) the
absolute difference (measured in basis points) between the actual price at which
GM notes are sold by GM and the Threshold Price and (ii) the face amount of the
2nd lien notes held by others prior to giving effect to the sale of the GM notes.

**EXHIBIT F**

### Net Debt Test

**Net Debt as of Closing**

**Pension, GM-related and other cash (sources) / uses:**

Pension Catch-up Contribution
Pension Normal Cost Reimbursement
OPEB Cash Cost Reimbursement - 2007 and 2008 through Closing
Pricedown True-up - 2007 and 2008 through Closing
Retro UAW Wage Subsidy - 2007 and 2008 through Closing
Retro UAW Wage Subsidy (Q4 2006)
IUE Wage Subsidy Reimbursement
IUE Deal - GM OPEB Payment
OPEB Payment - Splinter Payments
2007 Restructuring Cash Cost Variance - actual versus BBP
Total Adjustments

**Adjusted Net Debt as of Closing**

Maximum Amount of Adjusted Net Debt per EPCA Covenant
**EPCA Covenant Net Debt in Excess/(Shortfall) of Adj. Net Debt**