# EXHIBIT 8

EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (this "Agreement"), dated as of January __, 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("ADAH"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("Harbinger"), Dolce Investments LLC ("Dolce"), a limited liability company formed under the laws of the State of Delaware, Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("Merrill"), UBS Securities LLC, a Delaware limited liability company ("UBS"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company").  ADAH, Harbinger, Dolce, Merrill and UBS are each individually referred to herein as an "Investor" and collectively as the "Investors".  Capitalized terms used in the agreement have the meanings assigned thereto in the sections indicated on Schedule 1 hereto.

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "Debtors") commenced jointly administered cases (the "Chapter 11 Cases") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Company intends to propose and submit to the Bankruptcy Court for its approval a plan of reorganization for the Debtors that is consistent with this Agreement and the PSA;

WHEREAS, the Company has requested that the Investors participate in the plan of reorganization, and the Investors are willing to participate in the plan of reorganization, on the terms and subject to the conditions contained in this Agreement;

WHEREAS, the Company has filed a motion and supporting papers (the "Initial Approval Motion") seeking an order of the Bankruptcy Court (the "Initial Approval Order") (i) approving and authorizing the Company to enter into this Agreement, (ii) authorizing the payment of the Commitment Fees, the Alternate Transaction Fee and the Transaction Expenses provided for herein, and (iii) approving and authorizing the Company to enter into the PSA, and the Bankruptcy Court has entered the Initial Approval Order; and

WHEREAS, each of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd. and Cerberus Capital Management, L.P. (collectively, the "Commitment Parties") will provide, on the date hereof, commitment letters addressed to ADAH, Harbinger, and Dolce, respectively, and the Company whereby each Commitment Party will confirm its commitment to provide equity financing to ADAH, Harbinger and Dolce, respectively, on the terms and subject to the limitations set forth in the commitment letters.

NEWYORK 5908887 (2K)

  (l) <u>Legal Proceedings</u>.  There are no actions, suits or proceedings to which the Investor is a party or to which any property of the Investor is the subject that, individually or in the aggregate, has or, if determined adversely to the Investor, would reasonably be expected to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement and no such actions, suits or proceedings are threatened or, to the knowledge of the Investor, contemplated and, to the knowledge of the Investor, no investigations are threatened by any governmental or regulatory authority or threatened by others that has or would reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

  (m) <u>No Broker's Fees</u>.  The Investor is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Company for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

  (n) <u>No Undisclosed Written Agreements</u>.  The Investor has not entered into any material written agreements between or among the Investors directly relating to such Investor's Investor Shares or the performance of the Transaction Agreements, and any such written agreement hereafter entered into will be disclosed promptly to the Company.

  (o) <u>Available Funds</u>.  To the extent the Investor is ADAH, Dolce or Harbinger, the Investor has provided the Company with a true and complete copy of an executed commitment letter from the parties signatory thereto to provide equity financing to such Investor (the "<u>Equity Commitment Letter</u>").  Each such Investor represents as to itself that its Equity Commitment Letter is in full force and effect and is a valid and binding obligation of the parties thereto enforceable in accordance with its terms except as the enforcement thereof is subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors rights and to general equitable principles.  The Equity Commitment Letters are not subject to any condition or contingency with respect to financing that is not set forth in such letter other than the terms and conditions of this Agreement.

5. <u>Additional Covenants of the Company</u>.  The Company agrees with each of the Investors as set forth below.

  (a) <u>Initial Approval Motion and Initial Approval Order</u>.  The Company agrees that it shall use reasonable best efforts to cause the Initial Approval Order to become a Final Approval Order as soon as practicable following the filing of the Approval Motion.

  (b) <u>Plan and Disclosure Statement</u>.  The Company shall authorize, execute, file with the Bankruptcy Court and seek confirmation of, a Plan (and a related disclosure

NEWYORK 5908887 (2K)     -34-

  (vi) enter into any new, or amend or supplement any existing, collective bargaining agreement, which is inconsistent with the Transformation Plan, this Agreement, the PSA, the Plan and the GM Settlement; or

  (vii) authorize any of, or commit or agree to take any of, the foregoing actions.

(o) Actions Regarding Conditions.  During the period from the date of this Agreement to the Closing Date, the Company shall not take any action or omit to take any action that would reasonably be expected to result in the conditions to the Agreement set forth in Section 9 not being satisfied.

(p) GM Settlement.  The Company shall use its reasonable best efforts to agree on, prior to January 31, 2007, a settlement agreement (the "GM Settlement") between the Company and GM that is consistent with this Agreement, the PSA and the Plan, and satisfactory to each of ADAH and Dolce in its sole discretion.  The Company will (i) provide to the Investors and their respective counsel a copy of the GM Settlement and a reasonable opportunity to review and comment on such documents prior to such documents being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of each of ADAH and Dolce and their respective counsel consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of each of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.  The Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement, the PSA and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company.

(q) Access to Information.  Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall (and shall cause its Subsidiaries to) afford the Investors (and any prospective Ultimate Purchaser that executes a confidentiality agreement reasonably acceptable to the Company, which agreement will provide that, unless otherwise determined by the Company, all contact between such Ultimate Purchaser and the Company shall be through ADAH or Dolce) and their directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, reasonable access, throughout the period prior to the Closing Date, to its employees, properties, books, contracts and records and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to the Investors all information concerning its business, properties and personnel as may reasonably be requested by any Investor; provided, that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the Company shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information

of the Company or any of its Subsidiaries or (iii) to violate any laws; provided, further, that the Company shall deliver to the Investors a schedule setting in forth in reasonable detail a description of any information not provided to the Investors pursuant to subclauses (i) through (iii) above.  All requests for information and access made pursuant to this Section 5(q) shall be directed to the Chief Restructuring Officer or such other person as may be designated by such person.

(r)    Financial Information.  For each month, beginning November 2006 until the Closing Date, the Company shall provide to each Investor an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for the month then ended within 30 days of the end of such month (the "Monthly Financial Statements").  The Monthly Financial Statements, except as indicated therein, shall be prepared in accordance with the Company's normal financial reporting practices.  The Monthly Financial Statements shall fairly present in all material respects the financial position, results of operations and cash flows  of the Company and its Subsidiaries as of the dates indicated and for the periods specified.

(s)    Business Plan and Disclosure Letter.  The Company shall use its commercially reasonable efforts to provide to the Investors as soon as practicable a final five-year business plan approved by the Company's board of directors and prepared in good faith and based on reasonable assumptions, which business plan shall provide for the amount of EBITDA for each of fiscal years 2007 through 2011 (the "Business Plan"); provided, that the Company shall not be required to deliver and neither ADAH nor Dolce shall be required to approve or accept for consideration by them any Business Plan that does not reflect a final and binding GM Settlement.  The Company shall deliver with the Business Plan a Disclosure Letter which provides for exceptions from the representations and warranties of the Company in Section 3.

(t)    Financing Assistance.  The Company and its Subsidiaries shall obtain the debt financing from financing sources reasonably satisfactory to Dolce and ADAH and in amounts sufficient to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan, such financing to be on then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees, and otherwise to be on terms that are acceptable to each of ADAH and Dolce not to be unreasonably withheld (the "Debt Financing").  Subject to applicable regulatory or NASD requirements, Merrill Lynch, Pierce, Fenner & Smith, Incorporated and UBS Securities LLC (or their Affiliates) shall be entitled to participate in such Debt Financing on market terms.  The Company and its Subsidiaries shall execute and deliver any commitment letters, underwriting or placement agreements, registration statements, pledge and security documents, other definitive financing documents, or other requested certificates or documents necessary or desirable to obtain the Debt Financing.  The Company will (i) provide to the Investors and their respective counsel a copy of all marketing information, term sheets,

        commitment letters and agreements related to the Debt Financing and a reasonable opportunity to review and comment on such documents prior to such document being distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in good faith any comments of the Investors and their respective counsel consistent with the Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of the Investors and their respective counsel and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel, and (iii) keep the Investors reasonably informed on a timely basis of developments in connection with the Debt Financing and provide the Investors with an opportunity to attend and participate in meetings and/or roadshows with potential providers of the Debt Financing.

   (u)    Labor Agreements.  The Company and its Subsidiaries shall use their reasonable best efforts to enter into (A) tentative labor agreements with each of The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America ("IUE-CWA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (the "USW") that each of ADAH and Dolce shall have approved in its sole discretion and which adequately address, among other things, the following matters:  (i) permit achievement of the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan (including plant closings, asset dispositions and resolution of union claims), (ii) permit achievement of the Business Plan and the EBITDA Target; and (B) an agreement that GM will be responsible for certain hourly labor costs (compensation, benefits and other labor costs) acceptable to each of ADAH and Dolce in each of its sole discretion at certain of the Company's facilities.  The Company will (i) provide to the Investors and their respective counsel a copy of any labor agreement and a reasonable opportunity to review and comment on such document prior to such document being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of the Investors and their respective counsel consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.

   (v)    Other Actions by the Company.

        (i)    Existing Shareholder Rights Plan.  The Company and the Board of Directors of the Company (A) has taken all necessary action to amend the Existing Shareholder Rights Plan to provide that none of the Investors (including any Related Purchaser or Ultimate Purchaser) shall be deemed an "Acquiring Person" as defined in the Existing Shareholder Rights Plan

      Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Investors or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any governmental entity in connection with the transactions contemplated by this Agreement or the Plan.  In exercising the foregoing rights, each of the Company and the Investors shall act reasonably and as promptly as practicable.

9.     Conditions to the Obligations of the Parties.

    (a)     Subject to Section 9(b), the obligations of each of the Investors hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Closing Date of each of the following conditions:

        (i)     Initial Approval Order.  The Initial Approval Order shall have become a Final Approval Order.  "Final Approval Order" shall mean an Initial Approval Order of the Bankruptcy Court, which has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, seek certiorari or request reargument or further review or rehearing has expired and no appeal, petition for certiorari or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought or to which the request was made and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

        (ii)     Approval of Plan. To the extent that the material terms of the following have a material impact on the Investors' proposed investment in the Company, each of ADAH and Dolce shall be reasonably satisfied with, prior to filing with the Bankruptcy Court: (i) the Plan and any related documents, agreements or arrangements, (A) the terms of which are consistent in all material respects with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement, (B) that provide for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from any liability for participation in the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan to the fullest extent permitted under applicable law and (C) that have conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (ii) a Disclosure Statement that is consistent in all material respects with the Plan, this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (iii) a Confirmation Order,  that is consistent in all material respects with the provisions of the Plan, this Agreement, the Preferred Term Sheet, the

in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(xviii) EBITDA.  Each of ADAH and Dolce shall be reasonably satisfied that the Company will achieve EBITDA at least equal to the 2008 EBITDA Amount in 2008 and $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA) (the "EBITDA Target").

(xix) Financing.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(xx) Labor Agreements.  Each of ADAH and Dolce shall have been presented with and approved, in its sole discretion, on or before the Specified Date, tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand.  Such tentative labor agreements as so approved shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion.  The parties to the tentative labor agreements shall have performed and complied with all of their respective covenants and agreements contained in such tentative labor agreements approved by each of ADAH and Dolce in all material respects through the Closing Date.

(xxi) Management Compensation. The Company shall have (i) entered into employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH and Dolce); and (ii) resolved any claims of former executive officers, or executive officer's that have resigned or been terminated, on terms acceptable to each of ADAH and Dolce or otherwise ordered by the Bankruptcy Court.

(xxii) Shareholders Agreement.  The Company shall have entered into the Shareholders Agreement with ADAH and Dolce in accordance with Section 8(c)(iii);

the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel in any jurisdiction, approved by the Investors, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

    (c)    The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld).  If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this Section 10.  Notwithstanding anything in this Section 10 to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses aggregating in excess of $250,000 in connection with investigating, responding to or defending any Proceedings in connection with which it is entitled to indemnification or contribution pursuant to this Section 10, the Indemnifying Party shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than (x) 60 days after receipt by the Indemnifying Party of such request for reimbursement and (y) 30 days after receipt by the Indemnified Party of the material terms of such settlement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

    (d)    All amounts paid by the Company to an Indemnified Person under this Section 10 shall, to the extent the transactions contemplated hereby or the Plan are consummated and to the extent permitted by applicable law, be treated as adjustments to Purchase Price for all Tax purposes.

11.    Survival of Representations and Warranties, Etc.

    (a)    The representations and warranties made in this Agreement shall not survive the Closing Date.  Other than Sections 2(b), 2(c), 2(e), 2(h), 2(i), 2(j), 2(k), 5(e), 5(f),

5(j), 5(k), 5(l), 5(m), 10, 11, 13, 14, 15, 16, 18 and 20, which shall survive the Closing Date in accordance with their terms (except Section 5(l) which shall survive for 90 days following the Closing Date), the covenants contained in this Agreement shall not survive the Closing Date.

(b)  Other than with respect to Sections 2(h), 2(i) and 2(j) and Sections 10 through 18, which shall continue and survive any termination of this Agreement, (i) none of the Investors may assert any claim against the Company (both as Debtors-in-possession or the reorganized Debtors), and the Company (both as Debtors-in-possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the Investors hereby release the Company (both as Debtors-in-possession and the reorganized Debtors) from any such claims, and the Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims.  Notwithstanding the foregoing (w) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, (x) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million, (y) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, and (z) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million.  The Investors and the Company acknowledge that such liability under subclauses (w) and (x) shall be on a several and not joint basis with respect to any willful breach occurring on or prior to the Due Diligence Expiration Date.  The Investors and the Company acknowledge and agree that such liability under subclauses (w) and (x) shall be on a joint and several basis with respect to any willful breach occurring after the Due Diligence Expiration Date; provided, that the aggregate liability of Harbinger shall not exceed $38,442,731, the aggregate liability of Merrill shall not exceed $32,038,546 and the aggregate liability of UBS shall not exceed $25,743,392. Subject to the terms, conditions and limitation set forth in this Section 11(b), (i) the joint and several obligations referred to in the immediately preceding sentence mean that each Investor (an "Assuming Investor") assumes liability on a joint and several basis for any willful breach of this Agreement by any other Investor (a "Breaching Investor"), whether or not the Assuming Investor has breached this Agreement or is in any way responsible for such willful breach by the Breaching Investor and (ii) the Assuming Investors' obligations shall be a commitment to assure payment, not collection.  Under no circumstances shall any Investor be liable to the Company (as Debtors-in-possession or reorganized Debtors) for any punitive damages under this Agreement or any Equity Commitment Letter.  Under no circumstances shall the Company (both as Debtors-in-possession and

reorganized Debtors) be liable to any Investor for any punitive damages under this Agreement.

12.  Termination.

This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)  by mutual written consent of the Company and both of ADAH and Dolce;

(b)  by any Investor if any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(c)  by any party to this Agreement if (i) any statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority or any judgment, injunction, decree or order of any federal, state or foreign court shall have become final and non-appealable, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA or the GM Settlement or (ii) the PSA shall have been terminated in accordance with its terms; provided, that the right to terminate this Agreement under this Section 12(c)(ii) shall not be available to any party whose breach of the PSA is the cause of the termination of the PSA;

(d)  by ADAH or Dolce upon written notice to the Company and each other Investor:

(i)  if the Initial Approval Order has not become a Final Approval Order on or prior to the earlier of (A) the tenth (10th) day after the Bankruptcy Court enters the Initial Approval Order, or, if such day is not a Business Day, the next Business Day and (B) January 22, 2007; provided, that notice of termination pursuant to this Section 12(d)(i) must be given on or prior to February 28, 2007;

(ii)  prior to the later of (A) January 31, 2007 and (B) the date that is twenty (20) calendar days after the date on which the Company has delivered to each Investor both the Business Plan reflecting the GM Settlement and the Disclosure Letter (such date, the "Due Diligence Expiration Date"), if any Investor is not satisfied in its sole discretion with (x) the results of its due diligence investigation of the Company and its Subsidiaries, the Disclosure Letter and the Business Plan (the "Due Diligence Investigation") or (y) the terms of the Shareholders Agreement, Registration Rights Agreement, the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2