# EXHIBIT 14

05-44481-rdd    Doc 13074-12    Filed 03/11/08    Entered 03/11/08 13:37:42    Exhibit 14
Pg 1 of 6

05-44481-rdd    Doc 13074-12    Filed 03/11/08    Entered 03/11/08 13:37:42    Exhibit 14
                                    Pg 2 of 6

1

1  
2  **UNITED STATES BANKRUPTCY COURT**  
3  **SOUTHERN DISTRICT OF NEW YORK**  
4  **Case No. 05-44481**  
5  - - - - - - - - - - - - - - - - - - - - - -x  
6  **In the Matter of:**  
7  
8  **DELPHI CORPORATION, ET AL.,**  
9  
10          **Debtor.**  
11  
12  - - - - - - - - - - - - - - - - - - - - - -x  
13  
14          U.S. Bankruptcy Court  
15          One Bowling Green  
16          New York, New York  
17  
18          December 6, 2007  
19          10:28 a.m.  
20  
21  **B E F O R E:**  
22  **HON. ROBERT D. DRAIN**  
23  **U.S. BANKRUPTCY JUDGE**  
24  
25

1   objection and I don't have any questions for the witness.

2            THE COURT:  Is there any objection to that?

3            MR. FOX:  No objection, Your Honor.

4            THE COURT:  Okay.  I had a question.  Mr. Tepper, you

5   answered a couple of questions earlier about the condition in

6   the December 3rd EPCA that interest expense be a certain dollar

7   amount, are you aware of the creditors committee limited

8   objection on that point?

9            THE WITNESS:  I've heard something about it; I don't

10  know the exact objection.

11           THE COURT:  They -- they believe it should be

12  another, roughly, eighty million, am I right on that?

13           MR. ISENMAN:  Forty-five.

14           THE COURT:  Forty-five million, excuse me.

15           MR. ISENMAN:  Forty, sorry.

16           THE COURT:  Forty.  Were the interest expense at that

17  level, what would be the downside effect on the equity, the

18  reorganization equity that --

19           THE WITNESS:  Well we, initially set the interest

20  expense -- it was because of what the initial bank feedback

21  was, that it should be under 600 million, is what I believe

22  that feedback was from the banks in this deal.  And we had

23  originally talked about 560 before and then we raised it to

24  575.  And this last deal we went back and pushed people to get

25  to 585 so this -- as far as history of it is concerned.  I

1   guess our view is that it becomes -- the interest burden

2   becomes to high given the incredible uncertainty we have in the

3   next year or two, number one.  And because of that high

4   uncertainty, it has an oversize effect on the equity, because

5   you can jeopardize -- you know, if I think about one thing at

6   night it's whether -- whether there's too much debt here and

7   too much interest to begin with.  And it concerns me.

8          THE COURT:  Well, the unsecured creditors are getting

9   equity now too; they're not getting any cash.  I would

10  understand their argument -- I'd be a lot less sympathetic to

11  their argument if they were getting cash because they would be

12  loading the debt on the company but they're getting the equity.

13  And that raises the concern in my mind that there's -- there's,

14  perhaps, more option value in that condition then there is

15  downside that the plan investors are protecting against.

16         THE WITNESS:  Well, if you -- if you -- you know,

17  look I -- I guess if you want to say that, you know, every ten

18  million of additional interest expense is so moldable on the

19  value of the business, decrease of the value of the business,

20  you could go that way strictly.  But the question is, in this

21  environment of uncertain economic conditions it just becomes a

22  little bit more, in my view.  So, you know, whether it's, you

23  know, 400 million, 500 million, 600 million, 700 million, eight

24  hundred million, in that ballpark of difference, that would be

25  the difference, you know, to the value of the company.

250

1   was a little window in the -- things got a little better in the
2   middle of the fall and now it's gotten worse again.
3           The fact of the matter is that when you look at it,
4   what maybe optional, maybe there was an opportunity for a self-
5   funded plan here. There's no any testimony here, none put in
6   by the objectors, that suggests there's any possibility of
7   doing a self-funded plan here. And not a single self-funded
8   plan proposal has been presented to the debtors. In fact, the
9   testimony was no other proposal has been presented.
10          And oh, by the way, the Highland led group which is
11  represented in court today and who filed an objection which is
12  now being prosecuted for today, that group -- they're not
13  hindered by the lockups. They told -- the testimony was that
14  they told -- Mr. Miller testified they were going to present
15  him with a proposal, they didn't. Maybe they will. But not as
16  we sit here today.
17          THE COURT: Well, now, you said earlier and I believe
18  one of your witnesses said that the debtors were precluded from
19  terminating the agreement. That's not entirely true. You can
20  terminate there's just a cost to doing it.
21          MR. BUTLER: Well, we could breach the agreement,
22  Your Honor. I mean the fact of the matter is -- and that's why
23  the (indiscernible, coughing) from our perspective and we'll
24  talk about corporate governance in just a few minutes, the
25  bookends that the board of directors had in mind, what

251

1  Mr. Miller has testified to, I believe, in his declaration
2  directly, the bookends we talked about was, you know -- you --
3  if there's a termination event here, if this thing blows up,
4  and, you know, and we go to war with Appaloosa, somebody is
5  going to probably pay a hundred million dollars.  Either we're
6  going to be able to convince you, who is probably going to have
7  to make that decision, that they -- that they intentionally
8  breached, in which case their damages are limited at a hundred
9  million dollars.  Or they will be able to convince you that we
10 breached and it's not an alternative transaction capped at
11 eighty some odd million it's a breach under the agreements and
12 it's actionable at a hundred million.
13         So the bookends are, if we get into a war with these
14 plan investors that somebody is going to pay, probably, a
15 hundred million dollars.  We'll figure out over the next couple
16 of years who that is, and in the meantime we will not have any
17 plan investors to negotiate with and the syndicate -- the
18 syndicate established in Exhibits 131 and 132 are released.
19 And they're released in what the company has testified to,
20 Mr. Sheehan testified and Mr. Miller testified to and
21 Mr. Resnick testified, particularly as the company's investment
22 banker, are the most turbulent markets in memory.  And
23 Mr. Tepper testified about the volatility of the market and the
24 impact on price.  That -- those are the factors people consider
25 -- the debtors considered in thinking about the business