# EXHIBIT 27

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2007

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission file number: **1-14787**

# DELPHI CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **38-3430473** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **5725 Delphi Drive, Troy, Michigan** | **48098** |
| (Address of principal executive offices) | (Zip Code) |

**(248) 813-2000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: None
Securities registered pursuant to Section 12(g) of the Act:

**Title of class**

Common Stock, $0.01 par value per share (including the associated Preferred Share Purchase Rights)
6½% senior notes due May 1, 2009
7⅛% debentures due May 1, 2029
8¼% Cumulative Trust Preferred Stock of Delphi Trust I

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐    No ☑.

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☑.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check One):

Large accelerated filer ☑        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☑.

As of June 29, 2007, the aggregate market value of the registrant's Common Stock, $0.01 par value per share, held by non-affiliates of the registrant, was approximately $1.3 billion. The closing price of the Common Stock on June 29, 2007 as reported on Pink Sheets, LLC, a quotation service for over the counter securities, was $2.37 per share. As of June 29, 2007, the number of shares outstanding of the registrant's Common Stock was 561,781,590 shares.

The number of shares outstanding of the registrant's Common Stock, $0.01 par value per share as of January 31, 2008, was 563,477,461.

### DOCUMENTS INCORPORATED BY REFERENCE
Not applicable.

### Website Access to Company's Reports

Delphi's internet website address is www.delphi.com. Our Annual Reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to section 13(a) or 15(d) of the Exchange Act are available free of charge through our website as soon as reasonably practicable after they are electronically filed with, or furnished to, the Securities and Exchange Commission.

that the current dynamics of the capital markets prompted Delphi to consider whether amendments to the Plan filed on September 6 might be necessary. Delphi commenced its Disclosure Statement hearing on October 3, 2007, and after resolving certain objections, requested that the hearing continue on October 25, 2007. During October and November, the Court granted additional requests by Delphi to further continue the hearing on the adequacy of the Disclosure Statement to allow Delphi to negotiate potential amendments to the Plan and the related agreements with its stakeholders, including the comprehensive agreements reached with GM and the Equity Purchase and Commitment Agreement ("EPCA") between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus") and Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"), dated August 3, 2007 and ultimately amended on December 10, 2007. On December 3, 2007, Delphi filed further potential amendments to the Plan, the comprehensive agreements reached with GM, the EPCA, and the related Disclosure Statement and on December 4, 2007 Delphi announced that it had reached agreement in principle on these amendments with the Creditors' Committee, the Equity Committee, GM, and the Investors. After a hearing on the adequacy of the proposed Disclosure Statement on December 6 and 7, 2007, on December 10, 2007, Delphi filed its first amended joint Plan of Reorganization ("Amended Plan") and its first amended Disclosure Statement with respect to the Amended Plan ("Amended Disclosure Statement"). The Court entered an order approving the adequacy of the Amended Disclosure Statement on December 10, 2007. After entry of the order approving the Amended Disclosure Statement, Delphi began solicitation of votes on the Amended Plan. On January 16, 2008, Delphi filed further modifications to the Amended Plan. Additional modifications are set forth in Exhibit A to the Confirmation Order entered by the Court on January 25, 2008, after conclusion of a hearing on confirmation of the Amended Plan that took place on January 17, 18, and 22, 2008.

In accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP"), the cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Amended Plan, the U.S. labor agreements, and the comprehensive settlement agreements with GM become effective. The Amended Plan and agreements will significantly impact Delphi's accounting for its pension plans, post-retirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

Effectiveness of the Amended Plan is subject to a number of conditions, including the completion of the transactions contemplated by the EPCA, the entry of certain orders by the Court and the obtaining of exit financing. The transactions contemplated by the EPCA also are subject to a number of conditions. On November 6, 2007, the Court entered an order authorizing the Debtors to enter into and perform all obligations under a "best efforts" engagement letter and fee letter with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A. and Citigroup Global Markets Inc., in connection with an exit financing arrangement comprised of: (i) a senior secured first lien asset-based revolving credit facility in an aggregate principal amount of $1.6 billion; (ii) a senior secured first-lien term facility in an aggregate amount of $3.7 billion; and (iii) a senior secured second-lien term facility in the amount of $1.5 billion. There can be no assurances that such exit financing will be obtained or such other conditions will be satisfied, and we cannot assure you that the Amended Plan will become effective on the terms described herein or at all. For a discussion of certain risks and uncertainties related to the Debtors' chapter 11 cases and reorganization objectives refer to Item 1A. Risk Factors in this Annual Report.

If the Amended Plan does not become effective as described herein, no assurance can be given as to what values, if any, will be ascribed in the chapter 11 cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. If certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by a company's equity security holders and notwithstanding the fact that such equity security holders do not receive or retain any property on account of their equity interests under the plan. Accordingly, the Company urges that appropriate caution be exercised

utilize NOLs and other tax attributes following a Section 382 ownership change. We expect that we will undergo a Section 382 ownership change upon the implementation of the Amended Plan and, consequently, our ability to utilize our NOLs and other tax attributes will be limited. In this regard, it should be noted that we have previously recorded a full valuation allowance against our U.S. deferred tax assets with respect to these tax attributes. Certain special rules applicable to ownership changes that occur in bankruptcy may be available, however, to limit the consequences of such an ownership change. If we were to undergo a Section 382 ownership change prior to or after implementation of the Amended Plan, our NOLs and other tax attributes may be limited to a greater extent or in some cases eliminated. While we believe that we have not undergone any Section 382 ownership change to date, we cannot give you any assurance that we will not undergo a Section 382 ownership change prior to or after implementation of the Amended Plan.

*We May Not Be Able To Obtain Sufficient Exit Financing To Support Our Amended Plan.*

As discussed above, effectiveness of our plan of reorganization and consummation of the transactions contemplated by the EPCA are subject to a number of conditions, including obtaining exit financing. It is expected that on the effective date of the Amended Plan our debtor-in-possession financing will be replaced with approximately $6.1 billion of new exit financing, which we anticipate will consist of first lien financing of $3.7 billion, second lien financing of $825 million, and an asset based revolving credit facility of $1.6 billion, substantially all of which is expected to be undrawn at emergence from chapter 11. There can be no assurances that such exit financing can be obtained. The EPCA further provides the Investors certain rights to review the terms of the exit financing we obtain in light of the financing and other related conditions and covenants of the EPCA, including a limitation that the Company's pro forma interest expense during 2008 with respect to the Company's total indebtedness, as defined in the EPCA, will not exceed $585 million. See Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, Plan of Reorganization and Transformation Plan, Equity Purchase and Commitment Agreement for more information.

**Business Environment and Economic Conditions**

*The Cyclical Nature Of Automotive Sales And Production Can Adversely Affect Our Business.*

Our business is directly related to automotive sales and automotive vehicle production by our customers. Automotive sales and production are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences as well as changes in interest rate levels, consumer confidence and fuel costs. In addition, automotive sales and production can be affected by labor relations issues, regulatory requirements, trade agreements and other factors. Any significant economic decline that results in a reduction in automotive sales and production by our customers will have a material adverse effect on our business, results of operations and financial condition.

Our sales are also affected by inventory levels and VMs production levels. We cannot predict when VMs will decide to either build or reduce inventory levels or whether new inventory levels will approximate historical inventory levels. This may result in variability in our sales and financial condition. Uncertainty regarding inventory levels may be exacerbated by favorable consumer financing programs initiated by VMs which may accelerate sales that otherwise would occur in future periods. We also have historically experienced sales declines during the VMs scheduled shut-downs or shut-downs resulting from unforeseen events. Continued uncertainty and other unexpected fluctuations could have a material adverse effect on our business and financial condition.

*Drop In The Market Share And Changes In Product Mix Offered By Our Customers Can Impact Our Revenues.*

The mix of vehicle offerings by our VM customers also impacts our sales. A decrease in consumer demand for specific types of vehicles where Delphi has traditionally provided significant content could have a significant effect on our business and financial condition. Our sales of products in adjacent markets to our customers also depend on the success of these customers retaining their market share. In addition, we may not be able to adapt our product offerings to meet changing consumer preferences and our customers' supply

22

"Investors"). On December 3, 2007, Delphi filed further potential amendments to the Plan, the comprehensive agreements reached with GM, the July EPCA, and the related Disclosure Statement and on December 4, 2007 Delphi announced that it had reached agreement in principle on these amendments with the Creditors' Committee, the Equity Committee, GM, and the Investors. On December 10, 2007, Delphi and the Investors entered into an amendment to the July EPCA (together with the July EPCA, the "EPCA"). After a hearing on the adequacy of the proposed Disclosure Statement on December 6 and 7, 2007, on December 10, 2007, Delphi filed its first amended joint Plan of Reorganization ("Amended Plan") and its first amended Disclosure Statement with respect to the Amended Plan ("Amended Disclosure Statement"). The Court entered an order approving the adequacy of the Amended Disclosure Statement on December 10, 2007. After entry of the order approving the Amended Disclosure Statement, Delphi began solicitation of votes on the Amended Plan. On January 16, 2006, Delphi filed further modifications to the Amended Plan. Additional modifications are set forth in Exhibit A to the Confirmation Order which was entered on January 25, 2008. On January 16, 2008, Delphi announced that the voting results, which are summarized below, had been filed with the Court. A hearing on confirmation of the Amended Plan took place on January 17, 18, and 22, 2008. The Court entered the order confirming the Amended Plan on January 25, 2008, and that order became final on February 4, 2008. In order to consummate the Amended Plan several conditions precedent set forth in section 12.2 of the Amended Plan must be satisfied or waived in accordance with section 12.3 of the Amended Plan. The remaining conditions to be satisfied subsequent to receipt of the order confirming the Amended Plan include:

- Delphi must have entered into the exit financing arrangements and all conditions precedent to the consummation thereof must have been waived or satisfied.

- The settlement agreement documents with GM must have become effective in accordance with their terms, and GM must have received the consideration from Delphi pursuant to the terms of the settlement agreement.

- No request for revocation of the order confirming the Amended Plan under section 1144 of the Bankruptcy Code may have been made, or, if made, may remain pending.

- Each exhibit, document, or agreement to be executed in connection with the Amended Plan must be in form and substance reasonably acceptable to Delphi.

- All conditions to the effectiveness of the EPCA must have been satisfied or waived.

- The aggregate amount of all "Trade and Other Unsecured Claims" (as defined in the Amended Plan) that have been asserted or scheduled but not yet disallowed must have been allowed or estimated for distribution purposes by the Court to be no more than $1.45 billion, excluding all applicable accrued postpetition interest thereon.

While Delphi is working to satisfy the conditions set forth above there can be no assurances that all conditions to the consummation of the Amended Plan will be satisfied in a timely manner. Delphi's ability to satisfy the conditions set forth above is affected by the substantial uncertainty and a significant decline in capacity in the credit markets and operational challenges due to the overall climate in the U.S. automotive industry. Refer to the rest of this Item 7 and Item 1A. Risk Factors, Risk Factors Specifically Related to our Current Reorganization Cases Under Chapter 11 of the U.S. Bankruptcy Code and Business Environment and Economic Conditions for further discussions. In the event that one or more conditions cannot be satisfied in a timely manner, it is likely that Delphi and certain of its U.S. subsidiaries would continue as "debtors-in-possession" in chapter 11, until one of the following occurs: the order confirming the Amended Plan is modified, a further amended plan of reorganization is confirmed or other dispositive action is taken. In addition, in the event the Amended Plan is not consummated, approvals obtained in connection with the confirmation of the Amended Plan, may become null and void, including:

- Court approval of the GM settlement and restructuring agreements.

- Court approval and approval by the U.S. District Court for the Eastern District of Michigan of the settlement agreements reached with plaintiffs in the securities and Employee Retirement Income Security Act multidistrict litigation.

43

- The Court's entry of orders, authorizing the assumption and rejection of unexpired leases and executory contracts by Delphi as contemplated by Article 8.1 of the Amended Plan.

In the event the Amended Plan does not become effective and the approvals obtained in connection therewith will become null and void, Delphi likely would engage in alternate actions in furtherance of its transformation plan, including working with its stakeholders to review and revise the Amended Plan to reflect the change in circumstances. There can be no assurances that Delphi would be successful in these alternative actions or any other actions necessary in the event the Amended Plan is not consummated or the orders confirming the Amended Plan or other related approvals will become null and void.

In addition, the Refinanced DIP Credit Facility (as defined in this Item 7) currently has a maturity date of July 1, 2008. If Delphi is not able to emerge from chapter 11 prior to this maturity date, Delphi would seek to either extend the term of that facility or seek alternative sources of financing. If this were to occur, there can be no assurances that Delphi would be able to extend this facility prior to maturity or otherwise obtain alternative sources of financing. The failure to secure such extension or alternative source of financing would materially adversely impact our business, financial condition and operating results by severely restricting our liquidity. See also Item 1A. Risk Factors, Risk Factors Specifically Related to our Current Reorganization Cases Under Chapter 11 of the U.S. Bankruptcy Code, and Debt.

In the event the conditions to the EPCA have not been satisfied or waived (and absent revisions) prior to March 31, 2008, the terms of the EPCA provide that Delphi and an affiliate of Appaloosa each will have the unilateral right to terminate the EPCA. In addition, absent revisions to the settlement and restructuring agreements with GM, these agreements may be terminated by Delphi or GM if the effective date of the Amended Plan has not occurred by March 31, 2008 and the EPCA has been terminated prior thereto. However, if the effective date of the Amended Plan has not occurred by March 31, 2008 and the EPCA has not been terminated by such date the agreements with GM may be terminated by Delphi or GM on the earlier of the termination of the EPCA or April 30, 2008.

Delphi is working to satisfy or obtain waivers with respect to the principal conditions in the EPCA and GM settlement and restructuring agreements but there can be no assurances that it can satisfy all conditions or obtain necessary waivers or amendments. These conditions include conditions relating to exit financing and certain funding waivers applicable to Delphi's U.S. pension obligations. With respect to the exit financing conditions contained in the Amended Plan and EPCA, it is expected that on the effective date of the Amended Plan our existing debtor-in-possession financing will be replaced with approximately $6.1 billion of new exit financing. However, the U.S. and global credit markets currently are challenging and in particular the market for leveraged loans is marked by substantial uncertainty and a significant decline in capacity. Delphi is in discussions with the Investors and GM regarding implementation of exit financing. There can be no assurances as to whether such exit financing can be obtained. On February 12, 2008, GM confirmed that it is exploring alternatives with Delphi in the event that the planned financing level is not achieved. Refer to Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, Plan of Reorganization and Transformation Plan, Equity Purchase and Commitment Agreement for more information.

In addition, with respect to implementing the transfer of certain of Delphi's unfunded pension obligations to a pension plan sponsored by GM, the Internal Revenue Service ("IRS") and Pension Benefit Guaranty Corporation ("PBGC") have agreed to certain waivers that are necessary for the transfers to proceed, which waivers are conditioned upon Delphi emerging from chapter 11 by February 29, 2008. Delphi currently does not believe that it will emerge by such date and is discussing a possible extension of such waivers with the IRS and PBGC through at least March 31, 2008. If Delphi does not emerge from chapter 11 on or before the expiration of the conditional waivers, there can be no assurance that Delphi will be able to negotiate a revised funding plan with the IRS and PBGC, that GM will agree that any revised funding plan satisfies the conditions to consummation of the other transactions called for by the global settlement and restructuring agreements, or that any plan agreed to will not result in the need for substantially greater cash contributions or that Delphi will be able to satisfy such increased obligations. If the Amended Plan, including the settlement agreements reached with GM, does not become effective and the transactions contemplated thereby are not consummated such that Delphi does not emerge from chapter 11 on or before the expiration of the conditional

The foregoing description of the EPCA does not purport to be complete and is qualified in its entirety by reference to the July EPCA, which is filed as an exhibit to the quarterly report, for the quarter ended June 30, 2007, and the EPCA Amendment filed as an exhibit to the Company's Current Report on Form 8-K/A dated December 12, 2007.

There can be no assurances that the Debtors will be successful in achieving their objectives. Effectiveness of the Amended Plan is subject to a number of conditions, including the completion of the transactions contemplated by the EPCA (which are in turn subject to a number of conditions noted above), the entry of certain orders by the Court and the obtaining of exit financing. There can be no assurances that such exit financing will be obtained or such other conditions will be satisfied, and we cannot assure that the Amended Plan will become effective on the terms described herein or at all. In accordance with U.S. GAAP, the cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Amended Plan, as the U.S. labor agreements, the GSA, and the MRA become effective. The Amended Plan and agreements will significantly impact Delphi's accounting for its pension plans, post-retirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

There are a number of risks and uncertainties inherent in the chapter 11 process, including those detailed in Part I, Item 1A. Risk Factors in this Annual Report. In addition, we cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding our future prospects will not materially hinder our ongoing business activities and our ability to operate, fund and execute our business plan by impairing relations with existing and potential customers; negatively impacting our ability to attract, retain and compensate key executives and associates and to retain employees generally; limiting our ability to obtain trade credit; and impairing present and future relationships with vendors and service providers.

**DASE Liquidation**

Delphi's Chapter 11 Filings related solely to its U.S. operations as Delphi's operations outside the United States generally have positive cash flow. Nevertheless, Delphi has been seeking and will continue to seek to optimize its global manufacturing footprint to lower its overall cost structure by focusing on strategic product lines where it has significant competitive and technological advantages and selling or winding down non-core product lines. In particular, in February 2007, Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), announced the planned closure of its sole operation at the Puerto Real site in Cadiz, Spain. The closure of this facility is consistent with Delphi's transformation plan previously announced in March 2006. The facility, which had approximately 1,600 employees, was the primary holding of DASE.

On March 20, 2007, DASE filed a petition for Concurso, or bankruptcy under Spanish law, exclusively for that legal entity. In an order dated April 13, 2007, the Spanish court declared DASE to be in voluntary Concurso, which provides DASE support by managing the process of closing the Puerto Real site in Cadiz, Spain in accordance with applicable Spanish law. The Spanish court subsequently appointed three receivers of DASE (the "DASE Receivers"). During the Concurso process, DASE commenced negotiations on a social plan and a collective layoff procedure related to the separation allowance with the unions representing the affected employees. On July 4, 2007, DASE, the DASE Receivers, and the workers' councils and unions representing the affected employees reached a settlement on a social plan of €120 million (then approximately $161 million) for a separation allowance of approximately 45 days of salary per year of service to each employee (the "Separation Plan"). Delphi concluded that it was in its best interests to voluntarily provide the €120 million to DASE as well as additional funds to DASE in an amount not to exceed €10 million (then approximately $14 million) for the purpose of funding payment of the claims of DASE's other creditors.

As a result of the Spanish court declaring DASE to be in Concurso and the subsequent appointment of the DASE Receivers, Delphi no longer possesses effective control over DASE and has de-consolidated the

also has agreed to pay out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. In no event, however, shall the Company's aggregate liability under the EPCA, including any liability for willful breach, exceed $250 million.

The EPCA also includes certain corporate governance provisions for the reorganized Company, each of which has been incorporated into Delphi's Amended Plan. The reorganized Company will be governed initially by a nine-member, classified Board of Directors consisting of the Company's Chief Executive Officer and President ("CEO"), and Executive Chairman, three members nominated by Appaloosa, three members nominated by the statutory creditors' committee, and one member nominated by the co-lead investor representative on a search committee with the approval of either the Company or the statutory creditors' committee. As part of the new corporate governance structure, the current Company's Board of Directors along with the Investors, mutually agreed that Rodney O'Neal will continue as CEO of the reorganized Company. Subject to certain conditions, six of the nine directors will be required to be independent from the reorganized Company under applicable exchange rules and independent of the Investors.

A five-member search committee will select the Company's post-emergence Executive Chairman, have veto rights over all directors nominated by the Investors and statutory committees, and appoint initial directors to the committees of the Company's Board of Directors. The search committee consists of a representative from the Company's Board of Directors, a representative of each of the Company's two statutory committees, a representative from Appaloosa and a representative of the other co-investors (other than UBS, Goldman and Merrill). Appaloosa, through its proposed preferred stock ownership, will have certain veto rights regarding extraordinary corporate actions, such as change of control transactions and acquisitions or investments in excess of $250 million in any twelve-month period after issuance of the preferred stock.

Executive compensation for the reorganized company must be on market terms, must be reasonably satisfactory to Appaloosa, and the overall executive compensation plan design must be described in the Company's disclosure statement and incorporated into the Plan.

The EPCA incorporates Delphi's earlier commitment to preserve its salaried and hourly defined benefit U.S. pension plans and to fund required contributions to the plans that were not made in full as permitted under the Bankruptcy Code. In particular, as more fully outlined in the agreement, the effectiveness and consummation of the transactions contemplated by the EPCA are subject to a number of conditions precedent, including, among others, agreement on certain key documents and those conditions relating to financing of the emergence transactions.

The foregoing description of the EPCA does not purport to be complete and is qualified in its entirety by reference to the July EPCA, which is filed as an exhibit to the quarterly report, for the quarter ended June 30, 2007, and the EPCA Amendment filed as an exhibit to the Company's Current Report on Form 8-K/A dated December 12, 2007.

There can be no assurances that the Debtors will be successful in achieving their objectives. Effectiveness of the Amended Plan is subject to a number of conditions, including the completion of the transactions contemplated by the EPCA (which are in turn subject to a number of conditions), the entry of certain orders by the Court and the obtaining of exit financing. There can be no assurances that such exit financing will be obtained or such other conditions will be satisfied, and we cannot assure that the Amended Plan will become effective on the terms described herein or at all. In accordance with U.S. GAAP, the cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Amended Plan, as the U.S. labor agreements, the GSA, and the MRA become effective. The Amended Plan and agreements will significantly impact Delphi's accounting for its pension plans, post-retirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

There are a number of risks and uncertainties inherent in the chapter 11 process, including those detailed in Part I, Item 1A. Risk Factors in this Annual Report. In addition, we cannot assure that potential adverse