TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for Delphi Corporation, et al.,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Richard Milin (RM-7755)

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2689

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                       :
                                                             :    Chapter 11
DELPHI CORPORATION, *et al.*,                                :    Case No. 05-44481 (RDD)
                                                             :    (Jointly Administered)
                            Debtors.                         :
-------------------------------------------------------------x

**APPLICATION FOR AN ORDER AUTHORIZING THE DEBTORS
TO ISSUE SUBPOENAS DIRECTING EXPEDITED ORAL EXAMINATIONS
OF, AND PRODUCTION OF DOCUMENTS BY, CERTAIN PLAN
INVESTORS AND ADDITIONAL INVESTORS PURSUANT TO
<u>RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE</u>**

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

    Delphi Corporation ("Delphi") and the other Debtors and Debtors-in-Possession in the above-captioned cases (together, the "Debtors"), by their conflicts counsel Togut, Segal & Segal LLP (the "Togut Firm"), respectfully make this Application (the "Application") for an Order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Debtors to issue subpoenas directing expedited oral examinations of, and production of documents by,

certain Plan Investors and Additional Investors as identified on the annexed Exhibit "1" pertaining to the Debtors' investigation of information that the Debtors received from a stakeholder who alleged direct knowledge of inappropriate conduct relating to at least one Investor involved in the Debtors' consummation of their First Amended Joint Plan of Reorganization (the "Plan").[1]

## INTRODUCTION

1. The Debtors are working to consummate their confirmed Plan. The Plan is the product of more than two years of negotiations and resulting agreements among the Debtors, the Debtors' Statutory Committees, the Debtors' principal labor unions, General Motors Corporation ("GM"), the plaintiffs in multidistrict ERISA and securities litigation, and the Plan Investors, among others.  The Plan incorporates "milestone" agreements with the unions and GM that, when taken together with the execution of the Debtors' other transformation initiatives, should allow the Debtors to compete and grow its global automotive parts business upon emergence from Chapter 11.

2. Consummation of the Plan is premised upon consummation of the Equity Purchase and Commitment Agreement (the "EPCA") pursuant to which certain investors (the "Plan Investors") have agreed to invest up to $2.55 billion of equity financing in reorganized Delphi.  The EPCA developed and was later amended through a process that involved intense negotiations and, at times, litigation during the past eighteen months.

3. Delphi recently received information from a stakeholder who alleged direct knowledge of inappropriate conduct relating to at least one Plan Investor

---

[1] All capitalized terms not otherwise defined herein have the meanings set forth in the Plan.

2

or Additional Investor (together, the "Investors") involved with the Debtors' efforts to consummate the Plan (the "Conduct Under Investigation"). The stakeholder's information included allegations that one or more Investors may have been trading in or shorting one or more of Delphi's outstanding public securities. The Debtors have also been advised that these Investors may currently have material unrealized or realized gains on these investments. The Debtors have been further advised that one or more of these Investors may have communicated with the Debtors' lead Plan Investor or its representatives concerning scenarios or courses of conduct pursuant to which the EPCA would not be consummated or funded to the detriment of the Debtors and their stakeholders.

4.     The Debtors have no information that trading activity occurred with the use of material non-public information or that the Debtors' lead Plan Investor participated in such conduct. Based on the Debtors' investigation to date, which is in a preliminary stage and remains substantially incomplete, at least six Investors have either acknowledged some short-selling activity or have refused to cooperate with the Debtors' investigation. The Investor identified by the information provided to the Debtors is included within this group. None of the Plan Investors, who are signatories to the EPCA, have refused to cooperate with the Debtors' investigation or have acknowledged significant short-selling activity for their own account except pursuant to an asserted contractual waiver and behind an ethical wall.

5.     Before seeking this Court's assistance, the Debtors wrote to each Investor to request information concerning their own activities. Although most Investors cooperated to some degree with the Debtors' investigation, many did not provide all of the information requested, and some Investors refused to cooperate at all. Moreover, many of the Investors objected to providing some of the documents and

3

information the Debtors requested because the Debtors had not yet obtained formal Court authorization for their inquiries.

6.   The Debtors believe they are unlikely to obtain the information they need through voluntary cooperation alone and that Bankruptcy Rule 2004 relief is necessary and appropriate.

7.   By this Application, the Debtors seek entry of the Order annexed as Exhibit "2" pursuant to Federal Rule of Civil Procedure 45 and Bankruptcy Rules 2004(c) and 9016 authorizing, but not requiring, the Debtors to issue subpoenas to compel each Investor to (a) produce documents concerning the Conduct Under Investigation to the Togut Firm on an expedited schedule, provided that the subpoenas shall not require that documents be produced less than three business days after the date on which the Investor is served with the subpoena, and (b) appear for oral examination under oath, provided that the date of the examination shall not be less than two business days after the date on which the Investor is served with the subpoena.

## BACKGROUND

A.   The Chapter 11 Cases

8.   On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its subsidiaries each filed voluntary petitions in this Court for reorganization relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*.  On October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions in this Court for reorganization relief under Chapter 11 of the Bankruptcy Code.

9.   The Debtors continue to operate their businesses and manage their properties.  This Court entered Orders directing the joint administration of the Debtors' Chapter 11 cases (Docket Nos. 28 and 404).

4

10. No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

11. On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) and First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

12. This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

13. The statutory predicates for the relief requested herein are section 105(a) of the Bankruptcy Code and Bankruptcy Rule 2004.

B.     Current Business Operations Of The Debtors

14.    As of December 31, 2007, Delphi and its subsidiaries and affiliates had global assets of approximately $13.7 billion and global net sales of $22.3 billion.[2]  At the time of its Chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not Chapter 11 debtors and have continued their business operations without supervision from the Court.[3]

15.    Delphi is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  Delphi supplies products to nearly every major global automotive original equipment manufacturer.

C.     Events Leading To The Chapter 11 Filing

16.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the company has suffered losses.

17.    The Debtors believe that Delphi's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and

---

[2] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[3] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

operational restrictions preventing the Debtors from exiting unprofitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

    18. In light of these factors, the Debtors determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Debtors commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. <u>The Debtors' Transformation Plan</u>

    19. On March 31, 2006, the Debtors outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to Delphi; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Debtors' organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.        <u>Confirmation Of The Debtors' Plan Of Reorganization</u>

20.        The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order. With the Plan confirmed, the Debtors are focusing their efforts on satisfying the conditions for the Plan to become effective and allow them to emerge from Chapter 11. The Debtors seek to have the Plan become effective as soon as reasonably practicable.

21.        Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the company seeks to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## RELIEF REQUESTED

22.        Delphi requests entry of the Order annexed as Exhibit "2" authorizing the Debtors to serve subpoenas directing each of the Investors to provide expedited documents, information and testimony concerning the Conduct Under Investigation.

23.        Bankruptcy Rule 2004(a) expressly authorizes this Court to order examination of an entity upon the request of a party in interest. *See* Bankruptcy Rule 2004(a). The scope of the examination is intended to be broad and may relate to any of

8

"the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate…" Bankruptcy Rule 2004(b).

24.     Bankruptcy Rule 2004 examinations are appropriate for revealing the nature and extent of the bankruptcy estate and for "discovering assets, examining transactions, and determining whether wrongdoing has occurred." *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (citations omitted).  In this regard, Courts have recognized that Rule 2004 examinations are broad and unfettered and may even be in the nature of "fishing expeditions." *Id.*; *see also* 9 Collier on Bankruptcy ¶¶ 2004.01-2004.02 (15th ed. 2007).

25.     Here, an examination pursuant to Bankruptcy Rule 2004 is necessary and appropriate because the Debtors have received information from a stakeholder who alleged direct knowledge of inappropriate conduct relating to at least one Investor in connection with the Debtors' consummation of the Plan.  To the extent that any Investor's conduct delays, makes difficult or interferes with consummation of the Plan in violation of the Investors' contractual or fiduciary duties or duties of good faith, it relates directly to the property, liabilities and financial condition of the debtor and plainly may affect the administration of the Debtors' estates. *See*, *e.g.*, Bankruptcy Rule 2004(b); *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 708 (Bankr. S.D.N.Y. 1991); *In re Sun Med. Mgmt., Inc.*, 104 B.R. 522, 524 (Bankr. M.D. Ga. 1989).

26.     The only basis for objecting to a Rule 2004 examination by the affected party may be a claim of abuse or harassment, or that the matters that are the subject of the examination are unrelated to the affairs of the Debtors. *See In re Mittco,*

9

*Inc.*, 44 B.R. 35, 36 (Bankr. E.D. Wisc. 1984);  *In re Johns-Manville Corp.*, 42 B.R. 362, 364 (S.D.N.Y. 1984).

27.  Such an objection to the Debtors' proposed Order would plainly be without merit.  The subject of the examination is directly related to the Debtors' affairs for the reasons just stated, and having been informed of what may be inappropriate conduct relevant to consummation of the Debtors' Plan, the Debtors have ample reason to investigate.

28.  Further, the Debtors are not abusing or harassing the Investors – the Debtors filed this Application reluctantly, and only after determining that the Investors' voluntary cooperation would not suffice to provide the Debtors with the information they need and requested.  In addition, if an Investor lacks documents or information concerning inappropriate or apparently inappropriate conduct by itself or another Investor, responding to a subpoena from the Debtors should not be burdensome.

29.  The proposed Order authorizes the Debtors to conduct oral examinations because oral examinations are likely to prove a more efficient and less burdensome method of investigation at this time as to some issues and Investors than requests for written disclosures such as interrogatories or requests for admission.

30.  The Debtors' proposed Order authorizes the Debtors to serve document requests because documents may be necessary both to evaluate information the Investors disclose and to streamline oral examinations by setting out the key facts in advance.

31.  The proposed Order's deadlines for responding to the Debtors' subpoenas are warranted given the circumstances of the Debtors' cases and the fact that the Plan includes releases of potential claims.  Further, the Debtors have already asked

the Investors to gather the documents and information they seek in letters sent on February 29, 2008.

        32.     The Proposed Order authorizes the filing of proofs of service and other documents relevant to implementation or enforcement of the Order under seal to preserve the confidentiality of certain non-public information such as the identity of the Additional Investors. The Debtors have been provided with the Additional Investors' identities and certain information concerning the Conduct Under Investigation subject to asserted contractual or other duties of confidentiality. These asserted duties would preclude the Debtors from disclosing the identities or information absent a Court determination that confidential treatment is not required. Further, the Debtors have been informed that the asserted duties of confidentiality are premised on the disclosing entities' concern to protect confidential commercial information concerning their trading activities and the Debtors themselves believe that disclosure of the Additional Investors' identities at this time would not be in the best interests of the Debtors' estates. Consequently, the proposed Order's provision for filing under seal falls within the scope of the Court's power to protect information from disclosure under § 107(b)(1) of the Bankruptcy Code.

        33.     Finally, the proposed Order preserves the Debtors' right to seek additional documents, information and testimony from Investors and others to the extent that proves necessary.

## WAIVER OF REQUIREMENT FOR
## SEPARATE MEMORANDUM OF LAW

        34.     The legal authorities upon which this request for relief is based are set forth above. Consequently, the Debtors respectfully request that the Court waive the requirement for the filing of a separate memorandum of law in support hereof.

35. No prior application for the relief requested herein has been made by the Debtors to this or any other Court.

**WHEREFORE**, the Debtors request the entry of the annexed Order, and such other and further relief as is just and proper.

DATED:   New York, New York
         March 14, 2008

          TOGUT, SEGAL & SEGAL LLP
          Conflicts Counsel for
          Delphi Corporation, et al.
          By:

          /s/ Albert Togut
          ALBERT TOGUT (AT-9759)
          NEIL BERGER (NB-3599)
          RICHARD K. MILIN (RM-7755)
          One Penn Plaza - Suite 3335
          New York, New York  10119
          (212) 594-5000