Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4    ----------------------------x

5                                 :

6    In re                        :    Chapter 11

7    DELPHI CORPORATION, et al.,  :    Case No. 05-44481

8            Debtors.             :

9                                 :

10   ----------------------------x

11

12           RECORD OF PROCEEDINGS held at the

13   Bearings Business Auction of the Debtor, taken

14   before GREG S. WEILAND, CSR, pursuant to the Federal

15   Rules of Civil Procedure for the United States

16   Bankruptcy Court, at Suite 1900, 333 West Wacker

17   Drive, in the City of Chicago, Cook County,

18   Illinois, commencing at 7:44 o'clock p.m., on the

19   19th day of February, 2008.

20

21

22

23

24

Page 2

```
 1    PRESENT:

 2         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 3         333 West Wacker Drive

 4         Chicago, Illinois 60606-1285

 5         (312) 407-0700

 6         BY: MR. JOHN K. LYONS

 7             MR. BRIAN M. FERN

 8             MR. ERIC J. HOWE

 9         E-mail: jlyonsch@skadden.com

10                       On behalf of the Debtors;

11

12         JONES DAY

13         77 West Wacker Drive

14         Chicago, Illinois 60601-1692

15         (312) 782-3939

16         BY: MR. BRAD B. ERENS

17             MR. ADAM R. SCHAEFFER

18         E-mail: bberens@jonesday.com

19                 aschaeffer@jonesday.com

20                       On behalf of ND Acquisition

21                       Corp.;

22

23

24
```

```
 1   PRESENT (CONTINUED):

 2        BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

 3        200 West Madison Street

 4        Suite 3900

 5        Chicago, Illinois 60606

 6        (312) 984-3100

 7        BY: MR. WILLIAM J. BARRETT

 8        E-mail: william.barrett@bfkn.com

 9                    On behalf of WND Acquisition;

10

11        WINSTON & STRAWN LLP

12        35 West Wacker Drive

13        Chicago, Illinois 60601-9703

14        (312) 558-3715

15        BY: MR. MARK K. THOMAS

16        E-mail: mkthomas@winston.com

17                    On behalf of Kyklos Inc.

18

19

20

21

22

23

24
```

1        MR. LYONS:  Good evening.  My name is

2   John Lyons of Skadden Arps Slate Meagher & Flom LLP.

3   Skadden is counsel to Delphi Corporation and its

4   affiliated debtors and debtors in possession in

5   their Chapter 11 cases which are pending in the

6   United States Bankruptcy Court for the Southern

7   District of New York before the Honorable Robert D.

8   Drain and are being jointly administered under Case

9   Number 05-44481.

10       On January 15, 2008, Delphi filed a motion

11  seeking approval of certain bidding procedures and

12  certain bid protections from the stalking horse

13  bidder ND Acquisition Corp. and approval of the sale

14  of substantially all of the assets of the bearings

15  business to ND Acquisition Corp. pursuant to a Sale

16  and Purchase Agreement dated January 15, 2008, by

17  and between Delphi Automotive Systems LLC and

18  ND Acquisition Corp. subject to completion of a

19  competitive bidding process.  I will refer to the

20  motion as the Sale Motion.  The Sale Motion was

21  entered on the docket as Docket Entry Number 12104.

22       After a hearing held on January 25th,

23  2008, the Court entered an order approving certain

24  bidding procedures.  The order was entered on

1   January 25th, 2008, at Docket Number 12355.  I

2   will refer to this order as the Bidding Procedures

3   Order.

4          This is the time and the place for the

5   auction of the assets of the bearings business

6   pursuant to that Bidding Procedures Order.

7          As you are aware, we have a court reporter

8   here.  This auction is being transcribed, and we

9   will file a complete transcript of this auction with

10  the Bankruptcy Court before commencement of the sale

11  hearing.

12         Initially I will describe the procedures

13  that are going to be used for today's auction and

14  enter certain matters into the record.

15         First, we have premarked 10 exhibits to be

16  entered into the record.  When you checked in this

17  morning, each of you should have received a binder

18  containing the first nine of the ten exhibits.

19         Marked as Exhibit Number 1 is the

20  expedited motion for orders under 11 U.S.C. Sections

21  363, 365 and 1146 and Bankruptcy Rule 2002, 6004,

22  6006 and 9014 approving bidding procedures, granting

23  certain bid protections, approving form and manner

24  of sale notices and setting the sale hearing date

1    and authorizing and approving sale of debtors'

2    assets primarily used in connection with the

3    bearings business free and clear of liens, claims

4    and encumbrances, assumption and assignment of

5    certain executory contracts and unexpired leases and

6    assumption of certain liabilities.  That's Docket

7    Number 12104.

8          Marked as Exhibit Number 2 is a

9    black-lined proposed order under 11 U.S.C. 363, 365

10   and 1146 and Federal Bankruptcy Procedures 2002,

11   6004, 6006 and 9014 authorizing and approving sale

12   of certain of debtors' assets comprised of

13   substantially all of the assets primarily used in

14   the debtors' bearings business free and clear of

15   liens, claims and encumbrances, assumption and

16   assignment of certain executory contracts and

17   unexpired leases and assumption of certain

18   liabilities.

19         Marked as Exhibit Number 3 is the Bidding

20   Procedures Order that I mentioned earlier.

21         Marked as Exhibit Number 4 is the bid

22   submitted by ND Acquisition Corp. that was attached

23   to the Sale Motion except for one schedule,

24   Schedule 4.1.17, which is in the binder as Exhibit

1    Number 4 but was inadvertently not included in the

2    bid attached to the Sale Motion, and we will make

3    available copies of that schedule for any of the

4    parties' review should they so request.  This

5    exhibit includes the Sale and Purchase Agreement

6    dated January 15, 2008, including disclosure

7    schedules thereto as of the date of the

8    ND Acquisition Corp. agreement.

9          Marked as Exhibit Number 5 is the bid

10   submitted by WND Acquisition Company LLC, who I will

11   subsequently refer to as WND.  This exhibit includes

12   the following items:  A letter dated February 11,

13   2008, from Gary E. Wetzel; a marked copy of the Sale

14   and Purchase Agreement reflecting modifications from

15   the Sale and Purchase Agreement between

16   ND acquisition and Delphi Automotive Systems LLC

17   dated January 15, 2008, including marked schedules

18   and exhibits thereto; Sale and Purchase Agreement

19   dated February 12th, 2008, by and between

20   WND Acquisition Company LLC and Delphi Automotive

21   Systems LLC, including schedules and exhibits

22   thereto; a February 7, 2008 letter from LaSalle

23   Bank; and finally, a February 11, 2008 letter from

24   General Motors Corporation.

1          Marked as Exhibit Number 6 is the bid

2     submitted by Kyklos, Inc., who I will refer to as

3     Kyklos.  This exhibit includes the following items:

4     A letter dated February 11, 2008, from

5     George Thanopoulos; a February 11, 2008 marked copy

6     of the Sale and Purchase Agreement reflecting

7     modifications from the Sale and Purchase Agreement

8     between ND Acquisition and Delphi Automotive Systems

9     dated January 15, 2008; a February 13, 2008 marked

10    copy of the Sale and Purchase Agreement reflecting

11    modifications from Kyklos' February 11, 2008 Sale

12    and Purchase Agreement; a Sale and Purchase

13    Agreement dated February 13, 2008, by and between

14    Kyklos and Delphi Automotive Systems including

15    schedules thereto; and various letters evidencing

16    commitment related to the Kyklos bid; and a

17    February 11, 2008 letter from General Motors

18    Corporation.

19          Marked as Exhibit Number 7 in the binder

20    is the letter from ND Acquisition Corp. to Delphi

21    dated February 13, 2008, waiving condition to its

22    obligations under Section 7.2.5 of the Sale and

23    Purchase Agreement.

24          Marked as Exhibit Number 8 is the

1   February 13, 2008 letter evidencing the commitment

2   relating to ND Acquisition Corp.'s bid.

3           Marked as Exhibit Number 9 is the

4   February 12, 2008 letter from General Motors

5   Corporation relating to ND Acquisition Corp.'s bid.

6           And then marked as Exhibit Number 10 is

7   the sign-in sheet, which is being circulated and

8   will be copied and provided to all the parties here.

9           As everyone here is aware, competing

10  proposals for the assets of the bearings business

11  were to have been received by Delphi, its advisors,

12  the advisors to the Official Committee of Unsecured

13  Creditors and the advisors to the agents for the

14  post-petition lenders by the bid deadline, which was

15  extended to February 13, 2008, by Delphi pursuant to

16  the Bidding Procedures Order and the Sale and

17  Purchase Agreement with ND Acquisition.

18          On February 13, 2008, two competing bids

19  had been received, one by WND and the other by

20  Kyklos.  After independent evaluation by Delphi and

21  its advisors and in accordance with the Bidding

22  Procedures Order, Delphi determined that both the

23  WND competing proposal and the Kyklos competing

24  proposal were qualified bids as defined in the

1    bidding procedures attached as Exhibit 1 to the

2    Bidding Procedures Order.  Therefore, on

3    February 14, 2008, my colleague Brian Fern and I

4    contacted all parties entitled to attend this

5    auction by e-mail including ND Acquisition, WND,

6    Kyklos, the creditors' committee, the equity

7    committee, the UAW, and the agent for the

8    post-petition lenders and advised them that an

9    auction would be going forward.

10            As agreed to by Delphi and ND Acquisition

11    and as reflected in the Bidding Procedures Order,

12    because a qualified bid was received on or before

13    the bid deadline, ND Acquisition is not entitled to

14    receive the breakup fee or expense reimbursement set

15    forth in the ND Acquisition agreement or participate

16    in the auction unless among other things it waives

17    the financing contingency set forth in Section 7.2.5

18    of that agreement.  On February 13, 2008,

19    ND Acquisition sent Delphi a letter waiving that

20    Section 7.2.5 financing contingency.

21            After reviewing the bids of

22    ND Acquisition, WND and Kyklos, on February 14,

23    2008, Delphi with the assistance of its advisors

24    concluded that the WND bid was the highest or

1   otherwise best offer submitted prior to the auction,

2   and I'll define that as the lead bid, and in

3   accordance with the bid procedures, Delphi

4   distributed clean and red-lined versions of the Sale

5   and Purchase Agreement between WND and Delphi,

6   including schedules and exhibits thereto, WND's bid

7   letter and GM's approval letter.

8          There are no other parties who have

9   submitted a qualified bid, and therefore, pursuant

10  to the bidding procedures, only ND Acquisition, WND

11  and Kyklos are entitled to bid for the bearings

12  business at today's auction.

13         As each of you know, each of the bidders

14  has been assigned their own conference room to use

15  for caucusing in private.  The creditors' committee

16  and its advisors are sharing this room, and all the

17  other bidders have their own rooms.

18         We're going to shortly open the floor to

19  allow an opportunity for additional competing bids

20  to be made by the qualified bidders, and each party

21  will have the opportunity to improve its bid or

22  otherwise make any comments on the record if such

23  party desires to announce publicly.

24         I'm not going to read into the record all

1    the procedures in the bidding procedures.  Those

2    have been attached to and are part of the Bidding

3    Procedures Order.

4              Before we begin bidding, I remind the

5    parties that additional bids are to be made in at

6    least $250,000 increments.  There are no additional

7    procedures at this time.

8              We encourage ND Acquisition, WND and

9    Kyklos to put forth on the table today your highest

10   and best bid, and we will do everything we can to

11   provide each of you with guidance about any issues

12   that we or the creditor constituencies may have as

13   they relate to your respective bids.

14             When either bidder desires to make any

15   further bid, we will recess the auction and meet

16   privately with our constituencies to consult with

17   them.  After that and as quickly as possible,

18   depending upon time, Delphi and its advisors will

19   meet, deliberate and determine in the exercise of

20   its business judgment which party it believes to be

21   the successful bidder as defined in the bidding

22   procedures and which party will be the alternate

23   bidder.

24             At that point, Delphi will advise the

1    parties of the bid that has been determined to be

2    the successful bid and the bid that has been

3    determined to be the alternative bid, and Delphi

4    will formally close the auction at that time.

5              Just as a reminder, no bid is deemed to be

6    accepted until the Bankruptcy Court approves that

7    bid at the sale hearing and an order to that effect

8    is entered by the Bankruptcy Court.

9              Okay.  We would like each of the three

10   bidders to designate a representative to speak on

11   that party's behalf when and if you decide you want

12   to speak on the record for purposes of the auction.

13             Therefore, I'll ask the designated

14   representative from each bidder to state his or her

15   name and the title for the record and affirm that

16   such person is authorized, the authorized

17   representative of that party for purposes of the

18   auction.

19             First, ND Acquisition?

20             MR. ERENS:  Brad Erens, E-r-e-n-s, from

21   the firm of Jones Day.  I will be the authorized

22   representative.

23             MR. LYONS:  WND Acquisition?

24             MR. BARRETT:  William Barrett from the

Page 14

1    firm of Barack Ferrazzano Kirschbaum & Nagelberg.  I

2    will be the authorized representative for

3    WND Acquisition.

4              MR. LYONS:  Thank you.

5              Kyklos?

6              MR. THOMAS:  Mark Thomas, Winston & Strawn

7    Chicago, designated representative for Kyklos, Inc.

8              MR. LYONS:  Okay.  I would also ask at

9    this time each of the designated bidder

10   representatives that they have the full authority to

11   speak for the company that you represent.

12             First of all, Mr. Erens?

13             MR. ERENS:  I do.

14             MR. LYONS:  Mr. Barrett?

15             MR. BARRETT:  I do.

16             MR. LYONS:  And Mr. Thomas?

17             MR. THOMAS:  Yes.

18             MR. LYONS:  Please confirm that your

19   participation at the auction and anything you say on

20   behalf of your company is with the full authority of

21   the company and binding on your company.

22             First of all, Mr. Erens?

23             MR. ERENS:  Yes.

24             MR. LYONS:  Mr. Barrett?

Page 15

1          MR. BARRETT:  Yes.

2          MR. LYONS:  And Mr. Thomas?

3          MR. THOMAS:  Yes.

4          MR. LYONS:  Okay.  Please confirm pursuant

5   to the bidding procedures and on behalf of your

6   company that your company is not engaged in any

7   collusion with respect to the bidding process for

8   the sale.

9          Mr. Erens?

10          MR. ERENS:  Not to my knowledge.

11          MR. LYONS:  Mr. Barrett?

12          MR. BARRETT:  That's true.

13          MR. LYONS:  That is true that they have

14   not?

15          MR. BARRETT:  That they have not engaged

16   in any collusion with respect to the sale.

17          MR. LYONS:  Mr. Thomas?

18          MR. THOMAS:  We have not engaged in any

19   collusion.

20          MR. LYONS:  Thank you.  We also believe it

21   would be helpful for the primary creditor

22   constituencies and the creditors' committee who are

23   present today to be free to ask any questions on the

24   record to ensure that the terms put on the record by

1    the bidders are clear and fully understand by the

2    parties.   Therefore, we welcome your participation.

3              Okay.  At this point I would ask

4    ND Acquisition that Mr. Erens can affirm to the best

5    of his knowledge that Exhibit Number 4 contains the

6    Sale and Purchase Agreement dated January 15, 2008,

7    as agreed by and between Delphi Automotive Systems

8    LLC and ND Acquisition and that they are the

9    schedules to that bid to the best of your knowledge.

10             MR. ERENS:  I would say in response to

11   that question that our Asset Purchase Agreement was

12   filed with the Bankruptcy Court and that document

13   reflects the Asset Purchase Agreement that was

14   agreed to but did not include the schedules and

15   exhibits.

16             We did do a cursory review of the

17   schedules and exhibits in the binder.  They appear

18   to be what was agreed to, but I can't say we have

19   done a line by line, and I guess our agreement would

20   be subject to certain manifest error or errors

21   compared to what was finally agreed.

22             MR. LYONS:  Okay.  Thank you.  I would ask

23   Mr. Barrett if he can affirm to the best of his

24   knowledge that Exhibit Number 5 represents WND's

1    offer dated February 12th, 2008, for the bearings

2    business.

3              MR. BARRETT:  I can affirm that Exhibit

4    Number 5 constitutes our offer.  I note that

5    Exhibit 5-C, which is the executed copy of the Sale

6    and Purchase Agreement, appears not to include the

7    exhibits and schedules.  However, marked copies of

8    those that are different from the ND agreement are

9    included in Exhibit 5-B.

10             MR. LYONS:  Okay.

11             MR. BARRETT:  And obviously again barring

12   any manifest error, I affirm that this is the

13   document we submitted as our bid.

14             MR. LYONS:  Okay.  So your bid then

15   constitutes Exhibit 5 and 5-B?

16             MR. BARRETT:  That's right.

17             MR. LYONS:  Okay.  I would ask Mr. Thomas

18   to affirm to the best of his knowledge that Exhibit

19   Number 11 represents Kyklos' offer dated

20   February 19, 2008, for the bearings business.

21             MR. THOMAS:  I think it's Exhibit 6.

22             MR. LYONS:  I'm sorry, Exhibit 6,

23   Mr. Thomas.

24             MR. THOMAS:  Yes.  However, I believe that

1    the schedules and exhibits were tendered to you

2    separately and are not in this document.

3         MR. LYONS:  Understood.  But Exhibit 6 was

4    the offer dated February 19, 2008, to the best of

5    your knowledge?

6         MR. THOMAS:  February 11.

7         MR. LYONS:  I'm sorry, February 11th.

8    Okay.  Thank you.

9         MR. ERENS:  John, I'd also say that our

10   offer includes the other items you referenced

11   already, our equity commitment letter, financing

12   waiver and approval letter.

13        MR. LYONS:  Yes, I'm coming to that in a

14   second.

15        Okay.  Does any party have any objection

16   to the auction or sale process?

17        First of all, ND Acquisition?

18        MR. ERENS:  Subject to what unfolds coming

19   forward, I would say not to date.

20        MR. LYONS:  But as of right at this

21   moment?

22        MR. ERENS:  With a reservation of what

23   happens going forward.

24        MR. LYONS:  Okay.  But as of right now

1    there are no objections?

2              MR. ERENS:  That's correct.

3              MR. LYONS:  Okay.  WND Acquisition?

4              MR. BARRETT:  As of right now there are no

5    objections.

6              MR. LYONS:  And Kyklos?

7              MR. THOMAS:  The same.

8              MR. LYONS:  Thank you.

9              MR. ERENS:  John, I'm sorry, I guess I

10   would say, I'm not sure this is directly in response

11   to your question, but it is the position of

12   ND Acquisition that our bid as filed with the Court

13   is better than the WND bid that the debtor and the

14   committee chose as the lead bid.

15             MR. LYONS:  Understood.

16             Delphi's position is that a bidder's

17   participation by submitting a subsequent bid in the

18   auction will waive any objection or claim relating

19   to the bidding process and including any objection

20   or claim that any other bid does not constitute a

21   qualified bid or successful bid, both as defined in

22   the bidding procedures.

23             Can each of the parties confirm that by

24   submitting a subsequent bid that you're waiving any

Page 20

1    such objection or claim?

2              First of all, ND Acquisition?

3              MR. ERENS:  I apologize, I'm not sure I

4    followed all that.  By submitting a subsequent bid

5    we're waiving what?

6              MR. LYONS:  You're waiving any objection

7    or claim with respect to the sale process by

8    submitting a subsequent bid at this auction.

9              MR. ERENS:  I'm sorry, one minute.

10             I'm not quite sure how to respond to that,

11   but I guess what I'll say is that if we submit a

12   subsequent bid, it will be with whatever

13   reservations we may indicate at the time and that it

14   is probable but subject to further reservations that

15   we will not object to the process up to that time.

16             MR. LYONS:  Okay.  Can I at least ask if

17   you do submit a subsequent bid you make as part of

18   that bid any reservation, put any reservation on the

19   record?

20             MR. ERENS:  I guess what you're saying,

21   and this is fair, that if we make a subsequent bid

22   and are silent, then it is a waiver.  If we make

23   reservations, then those will be taken into account.

24             MR. LYONS:  Thank you.  And the same is

1    true for WND Acquisition?

2              MR. BARRETT:  The same would be true for

3    WND Acquisition.

4              MR. LYONS:  And is the same true for

5    Kyklos?

6              MR. THOMAS:  That would be fine.

7              MR. ERENS:  We, by the way, are not

8    waiving the position again, to the extent this is an

9    objection, that we believe our current bid is still

10   better than the WND bid.

11             MR. LYONS:  Understood.

12             ND Acquisition, do you confirm that

13   ND Acquisition amended its January 15th bid to

14   include the documents set forth in Exhibits 7, 8 and

15   9 in the exhibit binder that are not inconsistent

16   therewith and that such agreement, again that's

17   including Exhibits 7, 8 and 9, now constitutes

18   ND Acquisition's current bid?

19             MR. ERENS:  That is correct.

20             John, you made one statement earlier.  I

21   just wonder if this is an appropriate time to

22   clarify.  The document speaks for itself and that

23   document is the Bidding Procedures Order.  You said

24   that ND Acquisition would be entitled to a breakup

1   fee if among other things it waived its financing

2   contingency.

3             MR. LYONS:  Yes.

4             MR. ERENS:  To the extent the among other

5   things referenced are the Asset Purchase Agreement,

6   we would not disagree with that.  To the extent the

7   Bidding Procedure Order changes, the document speaks

8   for itself.  The only requirement was we waive the

9   contingency on financing.  Those are the only

10  changes.

11            MR. LYONS:  I understand your position.

12  What I just want to have you confirm though, that

13  you did waive the financing contingency.

14            MR. ERENS:  That is correct, and our view

15  is as a result we are fully entitled to the breakup

16  fee and expense reimbursement per the Asset Purchase

17  Agreement.

18            MR. LYONS:  Okay.  Very good.  Understood.

19            Okay.  Before we begin bidding, I want to

20  make a few clarifications.

21            First, the debtors have concluded that

22  it's highly unlikely that a competitive operating

23  agreement with the UAW will be entered prior to

24  closing, so Delphi has evaluated each of the bids

1    under that assumption.

2           As a result, Delphi ascribes a value of

3    18.2 million to ND Acquisition's current opening

4    bid, a value of 18.45 million to WND Acquisition's

5    current opening bid, and a value of 17.221 million

6    to Kyklos' current opening bid, which again is the

7    bid that was submitted before the bidding deadline.

8           Delphi has deducted 1.5 million to reflect

9    the $1.5 million breakup fee approved by the

10   Bankruptcy Court payable to ND Acquisition if the

11   breakup fee obligation is triggered.  Thus, if and

12   when ND Acquisition makes a subsequent bid, Delphi

13   will automatically credit the breakup fee to

14   ND Acquisition's bid.  ND Acquisition does not need

15   to include the breakup fee in its bid.

16          Delphi has, however, not given any credit

17   for the expense reimbursement provision because the

18   other two bidders, Kyklos and WND Acquisition, have

19   committed to pay in addition to the purchase price

20   the amount of the expense reimbursement up to

21   $1 million as provided in the Bidding Procedures

22   Order.

23          Second, to be clear, in accordance with

24   the bidding procedure, submission of a subsequent

Page 24

1    bid by either bidder constitutes an irrevocable

2    offer to purchase the bearings business at the price

3    and terms and conditions of the subsequent bid, and

4    such bid must remain open through two business days

5    after closing of the sale.  Delphi intends to seek

6    court approval of and will enforce both the highest

7    bid, the successful bid, and the next highest

8    alternative bid, which is the alternative bid.

9              Thus, for example, if Bidder X submits a

10   bid of $48 million in the first round, topped by

11   Bidder Y with a bid of 50 million, and Bidder X

12   subsequently submits a higher bid of 52 million, and

13   Bidder Y submits a final winning bid of 54 million,

14   Delphi will seek approval of and will be able to

15   close on both the highest bid of 54 million with

16   Bidder Y, and if unable to close on this bid, Delphi

17   would close the next highest bid of 52 million with

18   Bidder X without need for further court approval.

19             Do the bidders clearly understand and

20   confirm this requirement?

21             First, ND Acquisition?

22             MR. ERENS:  Are your statements referring

23   only to subsequent overbids?

24             MR. LYONS:  It is, yes, subsequent

Page 25

1    overbids.

2              MR. ERENS:  So your statements don't refer

3    to the current ND Acquisition bid?

4              MR. LYONS:  That is correct.  Again, I

5    think for that we can have a separate confirmation,

6    but just under this example, do you confirm that

7    that's ND Acquisition's understanding?

8              MR. ERENS:  Yes, that's fine.

9              MR. LYONS:  WND Acquisition?

10             MR. BARRETT:  Yes.

11             MR. LYONS:  And Kyklos?

12             MR. THOMAS:  John, on behalf of Kyklos, I

13   think we need to supplement and clarify the record

14   in a certain respect.

15             Exhibit 6 was the bid that Kyklos

16   submitted on February 11th.  That bid was

17   supplemented on February 13th, and subsequent to

18   the supplementation on February 13th, on

19   February 14th we received a letter from Delphi

20   that determined that the bid as supplemented

21   constitutes a qualified bid under the bearings

22   Bidding Procedures Order.

23             I'd like this letter from Delphi to be

24   Exhibit 11, and it clarifies that there was a

1    supplemental February 13th bid that's not in this

2    binder with a modified contract that was deemed a

3    qualified bid by Delphi.

4            MR. LYONS:  Okay.  Let me confirm.  I

5    thought the February 13th was in the binder.

6            Yes, it's under Exhibit C.

7            MR. THOMAS:  Okay.  I still I think for

8    clarification in the record would like as Exhibit 11

9    the February 14th letter.

10           MR. LYONS:  We will make it part of the

11   record.

12           Would you like to see a copy of this

13   before we mark it?

14           MR. SCHAEFFER:  Yes.  We have not seen it.

15           MR. LYONS:  Okay.  We would like to mark

16   that as Exhibit 11.

17           Okay.  We're now going to be ready to open

18   up the floor for subsequent bids.  As we've

19   indicated earlier, Delphi has determined that the

20   WND Acquisition bid is the lead bidder going into

21   this auction.  Furthermore, Delphi views any

22   differences in terms between the WND bid and the

23   ND Acquisition bid as not being material.  As a

24   result, WND's bid is $250,000 higher in Delphi's

1    view.

2               And therefore, first I would like to ask

3    ND Acquisition, does ND Acquisition wish to submit a

4    competing bid under the bidding procedures?

5               MR. ERENS:  Actually I wanted one

6    clarification before we answer that.  My

7    understanding is WND had a provision in its contract

8    that provided that if ND Acquisition did not

9    participate in the auction the purchase price would

10   be reduced.  I assume it's all parties'

11   understanding and agreement that we are

12   participating in the auction so that their price is

13   the higher price, not the lower price.

14              MR. LYONS:  We could confirm with

15   ND Acquisition.  It's certainly the debtors' view

16   that ND Acquisition is participating in the auction.

17              Can we get a confirmation from

18   WND Acquisition that they believe --

19              MR. ERENS:  To be clear, that's whether or

20   not we make a subsequent bid.

21              MR. LYONS:  I understand.  Can we get that

22   confirmation?

23              MR. BARRETT:  From what we have seen, it

24   is apparent to us that the higher bid controls.  If

1    there are no other bids placed here today, we

2    reserve our rights, but from basically what we see

3    today, we believe the higher bid controls.

4            MR. LYONS:  But can you confirm on the

5    record that ND Acquisition in your view is

6    participating in the auction?

7            MR. BARRETT:  I haven't heard them make a

8    bid yet.

9            MR. ERENS:  Well, the obvious difficulty

10   is we're not sure what your bid is.

11           MR. BARRETT:  I think I'm not going to

12   waive or commit forever the argument that they have

13   or have not participated in the auction.  Again, it

14   appears to us that the conditions in our bid for the

15   higher price have been satisfied.

16           MR. LYONS:  It is Delphi's position that

17   you are participating in the auction.

18           MR. ERENS:  Okay.  The second question is,

19   and maybe you stated this and I missed it and I

20   apologize, is the debtor saying that the current WND

21   bid is exactly what was provided to us on whatever

22   date that was and there have been no modifications?

23           MR. LYONS:  That is correct.  And

24   furthermore, I ask WND to confirm that as well.

1           MR. BARRETT:   The current bid is the bid

2    submitted on I think February 12th that is part of

3    Exhibit 5 in the exhibit binder.

4           MR. ERENS:   Okay.   One minute.

5           We would like a five-minute recess.   Thank

6    you.

7           MR. LYONS:   Okay.   Very good.

8                  (Whereupon, a short recess was

9                   taken.)

10          MR. LYONS:   Before we hear from

11   ND Acquisition, I do want to confirm just in case

12   there's an ambiguity, WND and Kyklos, when I valued

13   the bid, that does not include the one and a half

14   million dollar breakup fee which both bidders will

15   pay in the event that they are the successful

16   bidder.

17          Can WND confirm that?

18          MR. BARRETT:   We understood that.

19          MR. LYONS:   Kyklos?

20          MR. THOMAS:   Tell me, what do you mean by

21   that?

22          MR. LYONS:   Earlier I had stated how

23   Delphi valued the bid, and I had valued or Delphi

24   had valued the WND bid at $18,450,000.   That does

1    not include the one and a half million dollars that

2    will in addition have to be paid by WND should it be

3    the successful bidder.  The 18.45 is net of the

4    breakup fee.

5            MR. THOMAS:  Okay.  I follow you.

6            MR. LYONS:  Do you understand?

7            MR. THOMAS:  Yes.

8            MR. LYONS:  Thank you.  So again, any bid

9    that Kyklos may submit will be net of the breakup

10   fee which Kyklos will undertake to pay in the event

11   that Kyklos is the successful bidder.

12           MR. THOMAS:  Any bid we may submit will be

13   in accordance with the APA, and the numbers are what

14   they are, and what you do with that bid in terms of

15   paying a breakup fee or not is your issue, not our

16   issue.

17           MR. LYONS:  I guess what I'm saying, in

18   order to compare apples to apples, any amount that

19   Kyklos would submit as a bid, added onto that would

20   be one and a half million dollars to pay for the

21   breakup fee in accordance with the APA, just to be

22   apples to apples.

23           MR. THOMAS:  John, I'm not sure I can --

24   I'm not sure I can answer the question.  We will

1   be -- any subsequent bids will be based on an APA

2   based on a provision, you know, with a purchase

3   price, and we will be adding to that and you'll be

4   doing your deduction and netting the breakup fee.

5   In other words, the breakup fee is already sort of

6   part of the initial qualified bid that we made.

7          MR. LYONS:  To be apples to apples to make

8   sure there's no confusion, the purchase price for

9   the current lead bid, WND, would be 18.45 million

10  plus 1.5 million, plus again an additional amount to

11  pay expense reimbursement up to $1 million.

12          So the purchase price would be

13  19.95 million plus an additional amount up to

14  $1 million to pay the expense reimbursement of a

15  stalking horse if we close with a purchaser other

16  than the stalking horse.

17          MR. THOMAS:  John, I think the bid that

18  was qualified has a purchase price of in

19  Section 3.2.1 from Kyklos $45,950,000, quote, plus

20  the expense reimbursement, closed quote.  However

21  you got to value that bid at 17.2, you know, with

22  the deduction of the breakup fee is -- you can apply

23  it however you want to be apples to apples, but if

24  we make subsequent bids, we will be in effect

Page 32

1    adjusting the 45,950,000 purchase price.  However

2    you value it, you value it, but that's the number

3    that would change in our APA.

4            MR. LYONS:  Understood, understood.  When

5    we get to whether Kyklos submits a bid, why don't we

6    take that up at that time just to make sure there's

7    clarification so everybody understands what the bid

8    is.

9            Okay.  Back to ND Acquisition, do you wish

10    to submit a competing bid versus the lead bid of

11    WND?

12            MR. ERENS:  Based on our understanding

13    that the current WND bid is exactly as in the

14    binder, there has been no subsequent amendments,

15    ND Acquisition is passing at this point without

16    prejudice to its right to make a subsequent bid

17    later in the auction.

18            MR. LYONS:  Understood.  Okay.  I turn to

19    Kyklos.

20            Would Kyklos like to submit a competing

21    bid in response to the lead bid of WND?

22            MR. THOMAS:  Yes.  John, Mark Thomas on

23    behalf of Kyklos.  I just would like the record to

24    reflect that it is 8:40 p.m.  We started this

1    auction at about 7:45 p.m.  Kyklos has been here at

2    these offices since 10:00 o'clock a.m. and has spent

3    that time negotiating the Asset Purchase Agreement

4    that was submitted by us on February 13th, which

5    is Exhibit 6-C, in good faith with the debtors and

6    Delphi and have reached a bunch of modifications to

7    that purchase agreement.

8             That Asset Purchase Agreement was a

9    qualified bid as evidenced by Exhibit 11 of this

10   record, and the bid was submitted in connection with

11   a bid letter, which is Exhibit 6-A of this record,

12   and Exhibit 6-A which is the Kyklos bid letter

13   provides, and I quote, please be further advised

14   that the bid evidenced by the marked agreement is

15   irrevocable until two business days after the

16   conclusion of the sale hearing, closed quote.

17            Kyklos is ready, willing and able to

18   submit a new bid based upon a marked Asset Purchase

19   Agreement, but any bid that we submit will only be

20   made in conjunction with the bid letter dated

21   February 11th, Exhibit 6-A, which provides that

22   our bid is irrevocable and open until two business

23   days after the conclusion of the sale hearing.  We

24   will not submit a bid that is open longer than the

Page 34

1    time period set forth in our February 11th bid

2    letter.

3           MR. LYONS:  Do you wish to submit a bid?

4           MR. THOMAS:  Only in accordance with the

5    provisions set forth in our February 11th bid

6    letter, which was qualified by Exhibit 11.

7           MR. LYONS:  Okay.  We're going to take a

8    recess.

9                    (Whereupon, a short recess was

10                   taken.)

11          MR. LYONS:  In order to understand Kyklos'

12   request and be able to assess it, we need to

13   understand what the terms of the bid will be.

14          Does Kyklos intend to submit the bid

15   subject to the reservation that Kyklos will maintain

16   that the bid will be irrevocable through two

17   business days after the sale hearing?

18          MR. THOMAS:  John, Mark Thomas on behalf

19   of Kyklos.  For the record, Kyklos is willing to

20   submit a marked Sale and Purchase Agreement that

21   would constitute an increase in the bid that was the

22   qualified bid that is part of Exhibit 6, I believe

23   6-C of the record.

24          We are only willing to submit that bid in

1    accordance with the terms of our February 11th bid

2    letter, which provides that any bid would be open

3    and irrevocable until two business days after the

4    conclusion of the sale hearing.

5              Now, sale hearing is defined in our bid

6    letter as referenced in the bid procedures order as

7    February 21st, so Kyklos is willing to submit a

8    modified Sale and Purchase Agreement that will

9    remain open and irrevocable until Monday,

10   February 25th, which is two business days after

11   the sale hearing, provided, however, that if Kyklos

12   is chosen as the successful bidder at the conclusion

13   of this auction, our bid will remain open and

14   irrevocable until the latter of Monday,

15   February 25th or two business days after an

16   adjourned sale hearing if that sale hearing occurs

17   on March 19.

18             MR. LYONS:  Okay.  Would you like to mark

19   your marked agreement as Exhibit 11 for the record?

20             MR. THOMAS:  It would be Exhibit 12.

21             MR. LYONS:  I'm sorry, Exhibit 12.

22             MR. THOMAS:  Exhibit 12, for the record,

23   and I will tender it to the court reporter, John.

24   It is a red-lined Sale and Purchase Agreement that

1    we've been working on with your colleagues.

2              There are two handwritten changes.  The

3    first handwritten change is on the front page.  The

4    date is handwritten as February 19th.  And

5    similarly on the first page, the date is handwritten

6    changed to February 19th.

7              So I will submit this as Exhibit 12.  We

8    don't have a clean version.

9              MR. LYONS:  Okay.  Now, are there going to

10   be other documents, other ancillary agreements

11   submitted in addition to the marked agreement to

12   complete the record as to what Kyklos' bid is?

13             MR. THOMAS:  I believe that there is a

14   revised and agreed upon transition services

15   agreement that does not yet have the schedule

16   attached to it, but I think the agreement has been

17   negotiated.  I don't know if we have the clean

18   version.

19             MR. NEVERIL:  We've provided that to the

20   sellers and have not received it back.

21             MR. LYONS:  I suggest the following.

22   Let's take a very short recess to have all the

23   components of the new revised bid, make copies for

24   the other parties to review, and then we will take a

1   recess once we mark the new bid into the record so

2   we can consider it and so the other parties can

3   consider it in whether or not to formulate their own

4   competing bid.

5           MR. BARRETT:  John, I have a question.

6   Will the seller advise the parties of how it values

7   this bid since the earlier bid was valued less than

8   what was necessary for a qualified bid?

9           MR. LYONS:  We need to deliberate and

10  decide exactly how we view that bid.  We need to

11  review it first, so we will report back on the

12  record how we do so or if we do so.

13          Let's take a short recess to make sure we

14  have all the components of the bid.

15                      (Whereupon, a short recess was

16                      taken.)

17          MR. LYONS:  Back on the record.

18          Delphi has determined to adjourn the

19  auction until 11:00 a.m. tomorrow.

20          Do any of the parties have any objection

21  to that?

22          MR. ERENS:  Central?

23          MR. LYONS:  11:00 a.m. Central, yes.

24          WND, any objections?

Page 38

1          MR. BARRETT:  None.

2          MR. ERENS:  None.

3          MR. THOMAS:  Not really.

4          MR. LYONS:  Okay.  We will endeavor to get

5     out to the parties marked versions of what we

6     anticipate will be the bid submitted by Kyklos

7     tomorrow by e-mail tonight so it will give you an

8     opportunity to view the red-lined changes against

9     the lead bid and also against the stalking horse

10    bid, so you'll get it tonight or tomorrow morning,

11    but we will try to get that out tonight, and then if

12    there are any changes to that, we will go through it

13    on the record tomorrow morning.

14          That's it.

15                    (Whereupon, the proceeding was

16                    adjourned at 10:20 p.m.)

17

18

19

20

21

22

23

24

Page 39

1              C E R T I F I C A T E

2    STATE OF ILLINOIS      )

                            )  SS:

3    COUNTY OF C O O K      )

4              The within and foregoing proceeding was

5    reported in shorthand by GREG S. WEILAND, CSR,

6    within and for the County of Cook and State of

7    Illinois, on the 19th day of February, 2008, at the

8    hour of 7:44 p.m., at 333 West Wacker Drive,

9    Suite 1900, in the City of Chicago, Cook County,

10   Illinois.

11             The proceedings were taken down in

12   shorthand by the undersigned, acting as

13   stenographer; and the within and foregoing is a

14   true, correct and complete record of all of the

15   proceedings had at the time and place hereinabove

16   referred to.

17             The undersigned is not interested in the

18   within case, nor of kin or counsel to any of the

19   parties.

20             Witness my official signature and seal as

21   Notary Public in and for Cook County, Illinois, on

22   this 26th day of February, 2008.

23   _____

     GREG S. WEILAND, CSR

24   License No. 084-003472

1                         INDEX

2    February 19th, 2008

3                       EXHIBITS

4    NUMBER               DESCRIPTION                   PAGE

5    1          Expedited Motion for Orders under          5

6               11 U.S.C. Sections 363, 365, and

7               1146 and Federal Rule of

8               Bankruptcy Procedure 2002, 6004,

9               6006 and 9014(A)(I) Approving

10              Bidding Procedures, (II) Granting

11              Certain Bid Protections, (III)

12              Approving Form and Manner of Sale

13              Notices, and (IV) Setting Sale

14              Hearing Date and (B) Authorizing

15              and Approving (I) Sale of Debtors'

16              Assets Primarily Used in Debtors'

17              Bearings Business Free and Clear

18              of Liens, Claims, and

19              Encumbrances, (II) Assumption and

20              Assignment of Certain Executory

21              Contracts and Unexpired Leases,

22              and (III) Assumption of Certain

23              Liabilities

24

Page 41

1                    EXHIBITS (CONTINUED)

2      NUMBER              DESCRIPTION                PAGE

3      2         Order Under 11 U.S.C. Sections         6

4                363, 365, and 1146 and Federal

5                Rule of Bankruptcy Procedure 2002,

6                6004, 6006 and 9014 Authorizing

7                and Approving (I) Sale of Certain

8                of Debtors' Assets Comprising

9                Substantially All Assets Primarily

10               Used in Debtors' Bearings Business

11               Free and Clear of Liens, Claims,

12               Interests, and Encumbrances, (II)

13               Assumption and Assignment of

14               Certain Executory Contracts and

15               Unexpired Leases, and (III)

16               Assumption of Certain Liabilities

17

18

19

20

21

22

23

24

Page 42

1              EXHIBITS (CONTINUED)

2    NUMBER            DESCRIPTION              PAGE

3    3       Order Under 11 U.S.C. Section 363      6

4            and Federal Rule of Bankruptcy

5            Procedures 2002 and 9014 (I)

6            Approving Bidding Procedures, (II)

7            Granting Certain Bid Protections,

8            (III) Approving Form and Manner of

9            Sale Notices, and (IV) Setting

10           Sale Hearing Date in Connection

11           with Sale of Debtors' Bearings

12           Business

13   4       Sale and Purchase Agreement by and     6

14           between Delphi Automotive Systems

15           LLC and ND Acquisition Corporation

16           dated as of January 15, 2008

17   5-A     Letter dated February 11, 2008         7

18   5-B     Sale and Purchase Agreement by and     7

19           between Delphi Automotive Systems

20           LLC and WND Acquisition Company

21           LLC dated as of February 15, 2008

22

23

24

Page 43

| | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | EXHIBITS (CONTINUED) | |
| 2 | NUMBER | DESCRIPTION | PAGE |
| 3 | 5-C | Sale and Purchase Agreement by and | 7 |
| 4 | | between Delphi Automotive Systems | |
| 5 | | LLC and WND Acquisition Company | |
| 6 | | LLC dated as of February 12, 2008 | |
| 7 | 5-D | Letter dated February 7, 2008 | 7 |
| 8 | 5-E | Letter dated February 11, 2008 | 7 |
| 9 | 6-A | Letter dated February 11, 2008 | 8 |
| 10 | 6-B | Document comparison done by | 8 |
| 11 | | Workshare DeltaView on Monday, | |
| 12 | | February 11, 2008 | |
| 13 | 6-C | Sale and Purchase Agreement by and | 8 |
| 14 | | Between Delphi Automotive Systems | |
| 15 | | LLC and Kyklos, Inc., dated as of | |
| 16 | | February 13, 2008 | |
| 17 | 6-D | Sale and Purchase Agreement by and | 8 |
| 18 | | Between Delphi Automotive Systems | |
| 19 | | LLC and Kyklos, Inc., dated as of | |
| 20 | | February 13, 2008 | |
| 21 | 6-E | Letter dated February 11, 2008 | 8 |
| 22 | 6-F | Letter dated February 11, 2008 | 8 |
| 23 | 7 | Letter dated February 13, 2008 | 8 |
| 24 | 8 | Letter dated February 13, 2008 | 8 |

1               EXHIBITS (CONTINUED)

2    NUMBER            DESCRIPTION                PAGE

3    9          Letter dated February 12, 2008      9

4    10         Sign-In Sheet                       9

5    11         Letter dated February 14, 2008     26

6    12         Red-lined Sale and Purchase        36

7               Agreement

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 45

1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE SOUTHERN DISTRICT OF NEW YORK

3       --------------------------------x

4                                      :

5       In re                          : Chapter 11

6       DELPHI CORPORATION, et al.,    :  Case No. 05-44481

7            Debtors.                  :

8                                      :

9       --------------------------------x

10

11              RECORD OF PROCEEDINGS held at the

12      Bearings Business Auction of the Debtor, taken

13      before JANET L. ROBBINS, CSR, pursuant to the

14      Federal Rules of Civil Procedure for the United

15      States Bankruptcy Court, at Suite 1900, 333 West

16      Wacker Drive, in the City of Chicago, Cook County,

17      Illinois, commencing at 12:25 p.m., on the 20th day

18      of February, 2008.

19

20

21

22

23

24

Page 46

1   PRESENT:

2        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3        333 West Wacker Drive

4        Chicago, Illinois  60606-1285

5        (312) 407-0700

6        BY:  MR. JOHN K. LYONS

7             MR. BRIAN M. FERN

8             MR. ERIC J. HOWE

9        E-mail: Jlyonsch@skadden.com

10                       On behalf of the Debtors;

11

12       JONES DAY

13       77 West Wacker Drive

14       Chicago, Illinois  60601-1692

15       (312) 782-3939

16       BY:  MR. BRAD B. ERENS

17            MR. ADAM R. SCHAEFFER

18       E-mail:  bberens@jonesday.com

19               aschaeffer@jonesday.com

20                       On behalf of ND Acquisition

21                       Corp.;

22

23

24

1    PRESENT (CONTINUED):

2         BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

3         200 West Madison Street

4         Suite 3900

5         Chicago, Illinois  60606

6         (312) 984-3100

7         BY:  MR. WILLIAM J. BARRETT

8         E-mail:  william.barrett@bfkn.com

9                        On behalf of WND Acquisition;

10

11        WINSTON & STRAWN LLP

12        35 West Wacker Drive

13        Chicago, Illinois  60601-9703

14        (312) 558-3715

15        BY:  MR. MARK K. THOMAS

16        E-mail: Mkthomas@winston.com

17                        On behalf of Kyklos Inc.

18

19

20

21

22

23

24

1        MR. LYONS:  Good afternoon.  Welcome back.

2    The sale hearing regarding the Bearings Business is

3    now continuing.  We last left the auction hearing

4    with Delphi and Kyklos to review a bid that Kyklos

5    submitted, which I understand from Kyklos will be

6    marked as Exhibit 12 to be entered into the record.

7            Mr. Thomas, do you want to explain

8    Exhibit 12?

9        MR. THOMAS:  Yes.  Thank you.  Mark Thomas, on

10   behalf of Kyklos, Inc.

11            Exhibit 12, I'm going to walk through

12   it.  There are several components of it.  But as

13   discussed last night on the record, Kyklos is going

14   to submit a subsequent bid pursuant to Exhibit 12.

15   This subsequent bid evidenced by Exhibit 12 is being

16   submitted in conjunction with our February 11 bid

17   letter, which is Exhibit 6A, and it's being

18   submitted in conjunction with the terms that we put

19   on the record last night before the adjournment.

20            The bid consists of Exhibit 12A, which

21   is a modified sale and purchase agreement dated

22   February 19th from Kyklos.  Exhibit 12B is a black

23   line of the modified February 19th agreement against

24   the February 13th sale and purchase agreement

1   submitted by Kyklos.

2            Exhibit 12C is a red lined marked

3   version of the Kyklos sale and purchase agreement

4   against the WND Acquisition agreement, which was

5   identified as the high bid at the commencement of

6   the auction.  And Exhibit 12D are marked red lined

7   exhibits and schedules reflecting -- exhibits and

8   schedules which are part of the Kyklos 12A

9   subsequent bid marked against exhibits and schedules

10  submitted by the stalking horse bidder.

11           Now, we understand that these marked

12  agreements were circulated last night by Skadden to

13  the qualified bidders and that the qualified bidders

14  have received this package.

15           12A, the modified sale and purchase

16  agreement, is the result of extensive arm's length

17  negotiations between Kyklos and the debtors.  The

18  negotiations commenced with our February 11th bid,

19  resulted in a revised bid on February 13th and have

20  continued literally around the clock over the past

21  24 hours to result in Section -- I'm sorry,

22  Schedule -- Exhibit 12A, which is the modified sale

23  and purchase agreement.

24           Kyklos believes that it has met all of

1    the requests that the debtors made to us in

2    conjunction with modifications to the bid.

3              To further evidence speed and certainty

4    of closing, we have waived Section 7.2.4 of the bid,

5    which was the General Motors conditions to closing.

6    We've increased the purchase price in 3.1 by

7    $250,000, which is the increment required under the

8    bidding procedures.

9              We think this bid matches and beats all

10   contractual terms in all bids.  And we believe that

11   our bid, we have the human and capital resources to

12   quickly move forward with a closing.  We have

13   experience in 363 sales and in operational

14   turnarounds, and we've got a management team that is

15   ready to take this business and run with it.

16              I'll tender to court reporter

17   Exhibit 12.

18        MR. LYONS:  Could you mark that as Exhibit 12.

19              (WHEREUPON, a certain document was

20              marked Exhibit Nos. 12A, 12B, 12C

21              and 12D for identification.)

22        MR. LYONS:  If we can have a moment just so we

23   can review Exhibit 12.

24        MR. THOMAS:  John, if I may, there's, I think,

1   an important point of clarification I should raise

2   on the record, and that is with respect to the

3   waiver of the General Motors conditions in Section

4   7.2.4, Kyklos has, in fact, reached an agreement, an

5   executed supply agreement, with General Motors

6   subject, of course, to Kyklos ultimately being the

7   successful bidder and approved by the bankruptcy

8   court as a sale hearing.

9        MR. LYONS:  Do we have someone here from

10  General Motors who can speak on General Motors'

11  behalf?

12       MR. GORMAN:  Frank Gorman on behalf of General

13  Motors Corporation.  The representation is correct,

14  there is a signed component supply agreement

15  contingent on the closing between General Motors

16  Corporation and Kyklos.

17       MR. LYONS:  Thank you.

18                 (WHEREUPON, there was a pause

19                  in the proceedings.)

20       MR. LYONS:  The debtors have had an

21  opportunity to review Exhibit 12, and the debtors

22  can confirm that that was the version of the MSPA

23  that was circulated to the parties last night.

24                 Furthermore, the debtors confirm receipt

1    of that bid.  Based upon the terms, the debtors

2    ascribe a -- and I will say a preliminary value,

3    since we still need to complete the full process,

4    including the determination of a successful bidder,

5    but a preliminary value of $18.7 million.  And I can

6    go through of how we arrived at that number and then

7    answer any questions that you may have.

8            Originally, the debtors valued the

9    February 13th Kyklos bid at $17.221 million.  That

10   is primarily based upon the inclusion of language in

11   the old 6.7E and 6.62 of the Kyklos MSPA, which

12   addressed certain salaried OPEB obligations as well

13   as the sharing of transfer taxes.

14           In the revised Exhibit 12, those

15   provisions have been modified and/or eliminated.  So

16   in the debtors' view, the previous amounts that were

17   discounted from their -- from their bid have been

18   removed.  So the 17.221, based upon the changes

19   and/or elimination of language in those two

20   provisions, would now pull even to the WND bid with

21   a value of $18.45 million.

22           Also in Exhibit 12, Kyklos has increased

23   the purchase price by $250,000.  They've raised the

24   purchase price from $45,950,000 to $46,200,000.

1           As I previously stated on the record,

2     the debtors view the ability to obtain a competitive

3     operating agreement as being very remote before

4     closing.  So we have, in essence, netted the $26

5     million against that purchase price.  So when all

6     things considered, everything added together, the

7     debtors value the bid at $18.7 million.

8           With respect to terms, the debtors

9     believe on balance the terms of Exhibit 12 are more

10    favorable than the WND bid or even the previous

11    stalking horse bid by ND Acquisition primarily

12    because of the elimination of the two closing

13    conditions in 7.2.4 as well as 7.2.6.  So, again,

14    the terms in the debtors view are superior and the

15    price under the MSPA is $250,000 higher.

16          So at this point, I would invite WND in

17    the first instance, does WND wish to submit a

18    competing bid?

19       MR. BARRETT:  John, William Barrett from WND.

20    We will ask to caucus in a few minutes to consider

21    that, but I do have a few questions I'd like to ask.

22          Is there any discount applied or

23    consideration given to the fact that the bid is

24    submitted under the February 11th, 2008 letter which

1   includes a provision contrary to the bidding

2   requirements that the bid is revocable unless -- I'm

3   paraphrasing here, but unless -- it's revocable

4   after two days from the sale hearing?

5        MR. LYONS:  The debtors have not ascribed a

6   monetary amount to that.  We are reserving on that

7   issue.  That certainly will be reviewed in the

8   context of reviewing bids that are submitted at this

9   auction.

10       MR. BARRETT:  Last night we heard from counsel

11  for the bidder that they had, in fact, agreed to

12  modify that sentence in the February 11th, 2008

13  letter, I recall, making a distinction between --

14  perhaps between whether or not it was the winning

15  bid out of the auction or an auction at bid.

16            Is there anything in writing that other

17  bidders can look at that tells us what the current

18  language is that would replace the sentence in the

19  February 11th letter?

20       MR. LYONS:  I do not believe so.  I believe

21  Mr. Thomas stated that on the record last night.

22            Would you like a clarification from

23  Mr. Thomas?

24       MR. BARRETT:  We would like a clarification or

1    something in writing, even just an e-mail or

2    something that we can look at in writing.

3         MR. LYONS:  Mr. Thomas, could you restate

4    that?

5         MR. THOMAS:  Yes.  First of all, we've been

6    told that the sale hearing, which was originally set

7    for tomorrow, February 21st, is being adjourned.

8    It's not going to go forward tomorrow.  It is being

9    adjourned to March 19th.

10             So to clarify, Exhibit 12, the

11   subsequent bid, is submitted in conjunction and

12   connection with the February 11 bid letter,

13   Exhibit 6A.  And so long as the Kyklos bid is chosen

14   as the successful bidder, it will remain open and

15   irrevocable until two business days after the

16   adjourned sale hearing of March 19th.

17        MR. LYONS:  And should Kyklos not be chosen as

18   the successful bidder, the bid will remain

19   irrevocable through the close of business on

20   February 25th?

21        MR. THOMAS:  Yes.

22        MR. BARRETT:  I have another question and

23   clarification.  Just to confirm that Exhibit 8.2.3

24   to the Kyklos offer is the transition services

Page 56

1    agreement and that Schedule A to that exhibit is not

2    yet complete, am I correct?

3         MR. LYONS:  I believe that is accurate.  Maybe

4    Mr. Thomas can also confirm that.

5         MR. THOMAS:  That is accurate.

6         MR. BARRETT:  Then I want to confirm, John,

7    because you said that that -- since the copy we were

8    to have received by e-mail early this morning, that

9    there are no changes to the bid that was tendered as

10   Exhibit 12 including the exhibits?

11        MR. LYONS:  I can confirm that there have been

12   no changes.

13        MR. BARRETT:  Thank you.  We would like to

14   caucus -- one moment, please.

15        MR. LYONS:  Sure.

16                    (WHEREUPON, there was a pause

17                     in the proceedings.)

18        MR. BARRETT:  We just have one question.

19   There appears to be some bracketed language in the

20   bid that is Exhibit 12.  Do we understand that that

21   bracketed language part of the contract or does that

22   indicate matters that still need to be negotiated?

23        MR. LYONS:  Can you direct us to some

24   reference?

Page 57

 1        MR. BARRETT:  John, without taking -- we'll

 2   have to pass that for now.

 3        MR. LYONS:  Okay.  Very good.  Shall we resume

 4   in ten minutes, 15 minutes, half an hour?

 5        MR. BARRETT:  I think at least a half hour.

 6        MR. LYONS:  Okay.  Let's resume in a half an

 7   hour.

 8        MR. THOMAS:  John, just one thing for the

 9   record, and I'm just going to do this once so

10   we don't have to do it, in terms of

11   characterizations made by other bidders regarding

12   our bid in our February 11th bid letter, I'm not

13   going to burden the record, but we disagree with any

14   characterizations that would suggest that our bid

15   was not in accordance with the bid procedures and is

16   not otherwise a qualified bid pursuant to the

17   debtors' discretion, which are set forth in those

18   bid procedures.

19        MR. LYONS:  And all parties' rights are

20   reserved on that issue.

21        MR. THOMAS:  Thank you.

22        MR. LYONS:  We'll resume in a half hour.

23              (WHEREUPON, a recess was had.)

24        MR. LYONS:  Back on the record.

1          We will resume the auction for the

2    Bearings Business.  The last bid has been submitted

3    by Kyklos, which is reflected as Exhibit 12 to the

4    auction record.

5          I ask WND, does it wish to submit a

6    competing bid under the auction procedures?

7          MR. BARRETT:  John, William Barrett for WND

8    Acquisition Company.  Yes, we do wish to submit a

9    competing bid.  This bid is submitted under our

10   February 11th cover letter to which we made the

11   changes.  If I could hand up to you what I've marked

12   as Exhibit 13A, which is a clean copy of the bid,

13   and 13B, which is a marked copy.  I would like to

14   make a few comments regarding the bid.

15         MR. LYONS:  Very good.  Thank you.

16                (WHEREUPON, certain documents were

17                marked Exhibit Nos. 13A and 13B for

18                identification.)

19         MR. BARRETT:  In making this bid, WND has

20   adopted the form of agreement that was proposed by

21   Kyklos in its last bid, and the marked copy, which I

22   have passed to each of the other bidders, is showing

23   changes against the last Kyklos bid.

24                Other than changes of names and some

1    similar minor changes, there are essentially three

2    changes in this bid from the last Kyklos bid, and

3    that's in Section 3.1.5, the amount of the deposit.

4    The deposit amount has been doubled from $750,000 to

5    $1.5 million, payable upon designation of WND as the

6    successful bidder.

7              There is a small typo in Section 3.1.5,

8    which I corrected by hand, in the exhibit and the

9    ones I've handed out.

10             In addition to Section 3.2.1, the

11   purchase price has been increased by a half million

12   dollars to $46.7 million, and an additional covenant

13   in Section 6.23, an obligation on the part of the

14   buyer, WND, to enter into a supply agreement with

15   General Motors on terms and conditions substantially

16   similar to those that exist between Kyklos and

17   General Motors.

18             We have not had time to assemble

19   exhibits and schedules, but we would adopt those of

20   Kyklos as well.

21        MR. LYONS:  We would like to take a very short

22   adjournment so we can read through the red line.  I

23   don't expect it to be longer than five minutes.

24                  (WHEREUPON, a recess was had.)

Page 60

1          MR. LYONS:  Back on the record.

2                The debtors have reviewed Exhibit 13,

3     and the debtors ascribe a preliminary value of that

4     bid to be $19.2 million.  Again, the debtors reserve

5     the right to review all factors at the conclusion of

6     the bidding process in determining who the

7     successful bidder will be, including closing risk

8     and other factors.

9                Again, the preliminary valuation was

10    derived from the increase of $500,000, in addition

11    to the purchase price set forth on Exhibit 12.

12    Also, there's a betterment in terms regarding the

13    irrevocability of the bid.

14                I would like to confirm, though, with

15    WND:  Do you confirm that the bid is irrevocable two

16    business days after closing?

17          MR. BARRETT:  That's right.

18          MR. LYONS:  Thank you.  Also, the debtors feel

19    the increase in the deposit is a betterment to the

20    bid, although there is no monetary amount associated

21    with this, but it will be viewed in connection with

22    assessing closing risk at the conclusion of the

23    process.

24                With that, I would invite ND

Page 61

1    Acquisition, if they have a competing proposal to

2    the bid submitted by WND reflected as Exhibit 13.

3            MR. ERENS:  Before we answer that, a couple of

4    clarifying questions.  In connection with the Kyklos

5    bid, it was announced on the record that Kyklos had

6    an executed supply agreement with General Motors.  I

7    did not hear anything to that effect in connection

8    with the WND bid.  We would ask:  Does WND have an

9    executed supply agreement with General Motors?

10           MR. BARRETT:  Not at this moment.

11           MR. ERENS:  I'm sorry, I could not hear.

12           MR. BARRETT:  Not at this moment.

13           MR. ERENS:  ND Acquisition would respectfully

14   pass at this point without prejudice to bid later in

15   the auction.

16           MR. LYONS:  Very good.  Does Kyklos wish to

17   submit a competing bid in response to the WND bid

18   reflected at Exhibit 13?

19           MR. THOMAS:  We want to take a recess.

20           MR. LYONS:  Very good.

21                  (WHEREUPON, a recess was had.)

22           MR. LYONS:  We will resume the auction.  As we

23   left it, I believe, Mr. Thomas, I had asked whether

24   Kyklos would like to submit a competing bid in

1    response to WND's bid reflected as Exhibit 13.

2         MR. THOMAS:   Thank you, John.   On behalf of

3    Kyklos, we, for the record, disagree with Delphi's

4    preliminary conclusion that the bid of WND in

5    Exhibit 13 is higher or otherwise better than the

6    Kyklos bid.   We believe that the bid of Kyklos as

7    set forth in Exhibit 12 is higher or otherwise

8    better and in the best interest of the estate

9    because there is zero risk that our bid will not

10   close.   We have finished our agreements with GM.

11   And there is great risk to the estate that,

12   notwithstanding the increase in the deposit which

13   would be the limitation of damages if there is not a

14   closing of the WND bid, that there will not be a

15   closing of a GM supply agreement on terms and

16   conditions substantially similar to the Kyklos

17   supply agreement.

18             Kyklos is in a unique situation.   It's a

19   forging business.   We have a confidentiality

20   provision such that our agreement with GM is not

21   able to be shared or given to anybody else.

22             Additionally, in the event that that

23   agreement is found by WND to contain terms that

24   would be uneconomicable for them such that the

Page 63

1    business could not be profitably operated, the

2    estate will be in a situation where the proposed

3    buyer, WND, does not close and there will be no

4    backup bidders.  We are not willing to be a backup

5    bidder.  And we believe that granting an option in

6    these circumstances is inappropriate and we will

7    stand on the bid reflected in Exhibit 12.

8         MR. LYONS:  So no further bids from Kyklos?

9         MR. THOMAS:  Correct.

10        MR. LYONS:  I'll pass back to ND Acquisition.

11   Does ND Acquisition wish to submit a competing bid

12   in response to Exhibit No. 13?

13        MR. ERENS:  We'd like to recess for a short

14   period.

15        MR. LYONS:  Very good.

16             (WHEREUPON, a recess was had.)

17        MR. LYONS:  The Bearings Auction is resumed.

18             As we left it, ND Acquisition, do you

19   wish to make a competing bid to Exhibit 13, which is

20   the last bid submitted by WND?

21        MR. ERENS:  Before I answer that, one

22   question:  Our understanding is that the WND bid has

23   not changed from the prior time it was made at this

24   auction and that there's still no supply agreement

Page 64

1    executed between WND and GM?

2         MR. BARRETT:  That's correct.

3         MR. ERENS:  Thank you.  At this time, ND

4    Acquisition would like to pass without prejudice to

5    bid again if this auction continues or if the debtor

6    takes a bid other than the WND bid to court.  And

7    when I say "auction continues," that would be in

8    form or substance, whether it's at this current

9    auction or something that is similar to an auction

10   from here through the sale hearing.

11        MR. LYONS:  Okay.  We'd like to take a recess.

12             (WHEREUPON, a recess was had.)

13        MR. LYONS:  We're resuming the Bearings

14   Auction.  Currently there are two bids on the table,

15   Exhibit 12, which is the bid of Kyklos, and also

16   Exhibit 13, which is the last bid of WND.

17             Does any bidder wish to make any further

18   bids?

19             First of all, WND?

20        MR. BARRETT:  No.

21        MR. LYONS:  ND Acquisition?

22        MR. ERENS:  Not at this time, no.

23        MR. LYONS:  And Kyklos?

24        MR. THOMAS:  No.

Page 65

1          MR. ERENS:  We would request, however -- this

2     is ND Acquisition -- that we be able to speak with

3     WND at this time at the request of the debtor.

4          MR. LYONS:  The debtors will give you

5     permission.  I'd like to put a short time limit on

6     it.  So could we adjourn for ten minutes and then

7     report back?

8          MR. THOMAS:  Before we adjourn, John, with

9     respect to that, I have a few things:  One is

10    there's nothing in the bidding procedures order or

11    the bidding procedures that authorizes qualified

12    bidders during the commencement of an auction to

13    join together and talk about any joint bid.

14          In the event that ND Acquisition seeks

15    to revoke its stalking horse bid and revoke that

16    offer to contemplate a different type of offer, then

17    they should revoke the bid.  I still don't think

18    it's an appropriate exercise of discretion.  It's

19    outside the bidding procedures.  There's nothing

20    that says qualified bidders can get together and

21    submit a joint bid.  They shouldn't be entitled to

22    any break-up fee or expense reimbursement if they're

23    walking away from a bid to consider another bid.

24          And I think, frankly, after being here

Page 66

1    for 24 hours starting at 10 yesterday and going

2    through 10 o'clock at night, starting again today at

3    11, here we are at 9 o'clock at night, it's

4    completely inappropriate at this stage to allow

5    these people to get together and try to figure out

6    how they're going to share profits and losses, who's

7    going to do the capital expenditures that are

8    needed, who's going to fund the working capital and

9    likewise.  So I don't think it's authorized under

10   the bidding procedures.

11            You can make procedural rules but

12   certainly not changes in qualified bids and how

13   they're submitted.

14       MR. LYONS:  Duly noted.  The debtors may take

15   issue, but at this point, I think it's premature.  I

16   think we need to determine whether there will be a

17   joint bid.  So let's take a ten-minute recess and

18   then report back.

19            (WHEREUPON, a recess was had.)

20       MR. LYONS:  We're going to resume the auction.

21   Is there a joint competitive bid between Resilience

22   and WND for the Bearings Business?

23       MR. ERENS:  No, there is no such bid.  We do

24   thank the debtor for accommodating our request.  We

1    have no further bids at this time.

2         MR. BARRETT:  John, that's true, there is no

3    joint bid.  Wanxiang does believe that its bid is

4    the best bid economically.

5              I would also like to note, as the public

6    bidder has, that Wanxiang has a global relationship

7    with General Motors, that Wanxiang today supplies

8    the same wheel hub as made in the Sandusky plant by

9    using GM qualified forgings, which are made by

10   Wanxiang --

11        THE COURT REPORTER:  I'm sorry, I can't hear

12   you.  You have to bring your voice up.

13        MR. BARRETT:  I'll repeat it.  That Wanxiang

14   had observed that it has made what it believes is

15   the best bid here today, that it enjoys a worldwide

16   relationship with General Motors, that particular

17   wheel hub that is made in the Sandusky plant is made

18   by Wanxiang in China from forgings that it makes in

19   its own plant.

20              Thank you.

21        MR. LYONS:  One second.  Off the record.

22              (WHEREUPON, there was a pause

23              in the proceedings.)

24        MR. LYONS:  Okay.  Having no further competing

1    bids, we're going to close the bidding portion of

2    the auction and the debtors are going to retire to

3    deliberate and determine which bid is the successful

4    bid and which bid is the alternate bid.  So we'll be

5    back.  Why don't we take a 15 -- how about a

6    20-minute recess.

7                    (WHEREUPON, a recess was had.)

8         MR. LYONS:  The auction is resumed.  One

9    clarification for the record.  There are references

10   in the reps and warranties and the covenants "as of

11   the date hereof" or "the date of this agreement."

12   The debtors will confirm that means the date of the

13   Kyklos bid, which is February 19th.

14        MR. THOMAS:  19th, and that would be for all

15   purposes under the agreement.

16        MR. LYONS:  Whenever it refers to the date

17   hereof --

18        MR. THOMAS:  Yes.

19        MR. LYONS:  -- or the agreement.  Is that

20   enough?

21        MR. NEVERIL:  I'm just making sure that's not

22   just what are classically called covenants or reps

23   and warranties.  It's for all purposes under the

24   contract.

1        MR. THOMAS:  Wherever it appears in the

2   agreement.

3        MR. LYONS:  Whenever it refers to the

4   agreement, the date hereof; the date of the bid is

5   as of February 19th, 2008?

6        MR. THOMAS:  Let me try it my way.  I'm sorry,

7   Mark Thomas on behalf of Kyklos.  The Kyklos bid is

8   Exhibit 12.

9        MR. LYONS:  Yes.

10        MR. THOMAS:  In that sale and purchase

11   agreement in various places, the words, quote, "as

12   of the date hereof," close quote, or, quote, "as of

13   the date of this agreement," close quote, appear.

14   The clarification is that whenever those words

15   appear in our Exhibit 12, those words will be deemed

16   to be February 19th, 2008.

17        MR. LYONS:  The debtors will confirm that.

18        MR. THOMAS:  Thank you.

19        MR. LYONS:  Okay.  We are now here to announce

20   who the successful bidder and who the alternate

21   bidder is.  Pursuant to the bidding procedures, the

22   debtors, in consultation with their financial

23   advisors as well as in consultation with the

24   creditors committee advisors, have reviewed the

1    terms of Exhibit 13, the WND bid, Exhibit 12, the

2    Kyklos bid, as well as the stalking horse bid

3    submitted by ND Acquisition.

4             In the exercise of its judgment, the

5    debtors concluded that the Kyklos bid under

6    Exhibit 12 is the successful bid.  Furthermore, they

7    have concluded that the WND bid, which is marked as

8    Exhibit 13, is the alternate bid.

9             The debtors did take into account a

10   number of factors that were mentioned in the bidding

11   procedures.  A very primary importance was the

12   closing risk associated with the bids.  And in light

13   of the executed supply agreement with GM, that was

14   very important in assessing that closing risk and

15   the ultimate determination as to who the successful

16   bid is.

17            Does any one else have anything to say

18   for the record?

19            Hearing nothing, the auction is

20   concluded and thank you so much for your patience

21   and your attendance at this auction.

22        MR. THOMAS:  Thank you.

23        MR. BARRETT:  Thank you.

24                 (WHEREUPON, a certain document was

1                    marked Exhibit No. 14 for

2                    identification.)

3                    (WHEREUPON, the auction concluded at

4                    10:32 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 72

1    STATE OF ILLINOIS   )

2                        ) SS:

3    COUNTY OF C O O K   )

4            I, JANET L. ROBBINS, a Certified Shorthand

5    Reporter of the State of Illinois, do hereby certify

6    that I reported in shorthand the proceedings had at

7    the Bearings Business Auction, and that the

8    foregoing is a true, complete and correct transcript

9    of the proceedings of said Bearings Business Auction

10   as appears from my stenographic notes so taken and

11   transcribed under my personal direction.

12           IN WITNESS WHEREOF, I do hereunto set my

13   hand at Chicago, Illinois, this 27th day of

14   February, 2008.

15

16

17                   Certified Shorthand Reporter

18

19   C.S.R. Certificate No. 84-2207

20

21

22

23

24

Page 73

1                        I N D E X
2   EXHIBITS:         DESCRIPTION              PG      LN
    No. 12A           Kyklos 2/19/08           50      21
3                     Modified Sale and
                      Purchase Agreement
4   No. 12B           Kyklos Black Line        50      21
                      of the 2/19/08
5                     Modified Sale and
                      Purchase Agreement
6   No. 12C           Red lined marked         50      21
                      version of the
7                     Kyklos 2/19/08 Sale
                      and Purchase
8                     Agreement against
                      the WND Acquisition
9                     Agreement
    No. 12D           Marked red lined         50      21
10                    exhibits and
                      schedules of the
11                    Kyklos 12A
                      subsequent bid
12                    marked against
                      exhibits and
13                    schedules submitted
                      by the stalking
14                    horse bidder
    No. 13A           Clean copy of WND        58      17
15                    Acquisition bid
    No. 13B           Marked copy of WND       58      17
16                    Acquisition bid
    No. 14            2/20/08 Sign-In          71       1
17                    Sheet for the
                      Bearings Auction
18
19
20
21
22
23
24