

**VIA EMAIL**
Stephen H. Olsen (stephen.h.olsen@delphi.com)
Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Dear Steve:

Resilience Capital Partners, Wanxiang America Corporation and  Bearing Technologies, Ltd. have pooled their resources and expertise in their continued interest in Delphi Corporation's Sandusky, Ohio wheel bearings operation (the "Bearings Business").  Enclosed herewith is a revised purchase agreement contemplating the acquisition of the Bearings Business which we are prepared to execute.  We have also included a redline copy over the agreement in place between Delphi Corporation ("Delphi") and Kyklos, Inc. ("Kyklos").

As you can see from the enclosed purchase agreement, our current offer contemplates a purchase price exceeding Kyklos' offer by $2.8 million.  Because we contemplate using ND Acquisition Corporation ("ND Acquisition") to acquire the Bearings Business, Delphi would not be required to pay a break-up fee in the event a deal is consummated with our group.  Thus, the actual value to the estate of accepting the enclosed bid would be $4.3 million over Kyklos' bid.  Assuming that a competitive operating agreement is not reached by the anticipated close date, the enclosed bid contemplates more than a 20% greater recovery to the Delphi estate over the Kyklos bid.

In addition, our revised bid contemplates a total deposit of $5 million, more than $4 million greater than Kyklos' deposit.  In order to achieve the $5 million deposit, we would propose submitting an additional $3.5 million to be pooled with the $1.5 million currently deposited with the escrow agent to secure the existing bids of ND Acquisition and WND Acquisition Company, LLC.

Other than these improvements, our current bid is identical to Kyklos' bid, including that our bid contains no contingencies for financing or reaching agreement with General Motors.

Importantly, our group has contacted General Motors in order to secure a component supply agreement.  We believe that the offer we proposed to General Motors is more favorable to General Motors than the agreement General Motors reached with Kyklos.  We are thus optimistic that we will be able to successfully negotiate a supply agreement with General Motors in the coming weeks.  We believe that our proposed contracts with General Motors will provide short term certainty and long term stability General Motors requires for its bearing supply needs, along with an economic incentive more favorable than offered by any other bidder.

Our group is well-capitalized and has the necessary experience to diversify and grow the Bearings Business on a global basis and successfully operate the Bearings Business for many years to come.  Our group is fully committed to building a long-term viable business capable of delivering the highest quality, lowest cost automotive wheel bearings to its customers for many years.

Resilience and its partners in this venture bring considerable leadership and are uniquely qualified to provide strategic direction to grow this business for the foreseeable future. The leadership and oversight that our group will bring to the Bearings Business includes some of the most highly recognizable operational and managerial talent in the automotive industry, including Joe Gorman (former Chairman and CEO of TRW), Edward Crawford (Chairman and CEO of Park Ohio Industries), Dan T. Moore (CEO of Dan T. Moore Companies), Monte Ahuja (Chairman and CEO of TranStar Industries), Phil Odeen (former Chairman of TRW) and James Boland (Former Vice Chairman of Ernst and Young, Director of Goodyear Tire and Rubber and Director of Sherwin-Williams). We also intend to bring in an operational improvement team from a well-known consulting firm to assist management in its capital planning, turnaround efforts and build-out of the organization.

Our group also includes the vast experience and expertise of Wanxiang America. As you are aware, Wanxiang America is the U.S. arm of the Chinese auto parts maker Wanxiang Group Corp., one of the top companies in China. The company employs more than 40,000 people worldwide and has annual revenues in excess of $4.2 billion. The company supplies universal joints, bearings and CV joints to customers in more than 40 countries around the world and has customer service for the United States, Canada, South America and Europe. Pin Ni, President of Wanxiang America, has successfully led Wanxiang's acquisition and operation of several automotive parts manufacturers for over a decade.

Furthermore, our group also includes Bearing Technologies, Ltd., an automotive aftermarket manufacturer and private labeler of wheel hub assemblies, clutch release, racing, repair and industrial bearings. Bearing Technologies also manufactures and exclusively supplies drive shaft center support bearings at the OEM level. Bearing Technologies will play a critical role in helping the new company diversify its customer base and maintain viability well into the future. For nearly two decades, Bearing Technologies has been providing high-quality wheel bearings and hub assemblies for the North American automotive aftermarket. The company's key customers include: Timken, Bosch, SKF, Federal-Mogul, Dana and G&B distribution. In 2007, the company reported revenues exceeding $80 million and is led by twenty-year bearing industry veteran Laz Tromler. Over the last two years, Tromler has made a concerted effort to assemble a highly talented and energetic management team which includes former management from some of the world's most respected manufacturing companies, including Timken, GE, Sherwin-Williams, SKF and Parker Hannifin.

The combined efforts, expertise and wherewithal of Resilience, Wanxiang and Bearing Technologies provides the greatest operational, manufacturing and financial longevity for the Bearings Business and for General Motors.

While you have named Kyklos the successful bidder following the auction, you retain the right to terminate Kyklos' offer "at any time before entry of an order of the Court approving a Qualified Bid" if it deems the bid to be "inadequate or insufficient [or] contrary to the best interests of [Delphi's] estates." (Order Approving Bidding Procedures ¶ 2; *see also* Delphi Corporation Bearings Business Bidding Procedures p. 8.) The hearing to consider the sale of the Bearings Business to the current "successful" bidder is set for March 19, 2008. (Proposed Twenty-Eighth Omnibus Hearing Agenda.) Thus, you may reject Kyklos' bid at any point prior to (at the earliest) March 19 in the event that bid is no longer in the best interests of the estate. Given the financial terms of our renewed bid, we believe the current bid will no longer be in the best interests of the Debtor's estate.

We do appreciate your time and consideration in evaluating our offer and will look forward to hearing from you.

Regards,


Steven H. Rosen
Managing Partner
Resilience Capital Partners

Enc.

cc:  Pin Ni, Wanxiang America Corporation
     Laz Tromler, Bearing Technologies, Ltd.
     Michael Riela

~~EXECUTION COPY~~JD DRAFT 3/4/08

SALE AND PURCHASE AGREEMENT

BY AND BETWEEN

DELPHI AUTOMOTIVE SYSTEMS LLC

AND

~~KYKLOS, INC.~~

ND ACQUISITION CORPORATION

DATED AS OF

~~FEBRUARY 19,~~MARCH ___, 2008

~~Error! Unknown document property name.~~CHI ~~1633861~~1635983v1

# TABLE OF CONTENTS

1. **DEFINITIONS.** ............................................................................1
   1.1 **Certain Defined Terms** ....................................................1
   1.2 **Other Interpretive Provisions** ........................................15
2. **PURCHASE AND SALE.** ..........................................................15
   2.1 **Transfers by Sellers and their Affiliates.** ........................15
   2.2 **Assumption of Liabilities** ...............................................18
   2.3 **Future Liabilities** ............................................................18
   2.4 **Retained Liabilities** .........................................................19
   2.5 **Deferred Items.** ...............................................................20
3. **PURCHASE PRICE; ADJUSTMENT; ALLOCATION.** ..................21
   3.1 **Deposit Amount** ..............................................................21
   3.2 **Purchase Price** ................................................................21
   3.3 **Inventory Adjustment** .....................................................23
   3.4 **Facilities and Non-Billable Tooling Adjustment** ..............25
   3.5 **Escrow** ............................................................................25
   3.6 **Allocation of Purchase Price.** ..........................................26
   3.7 **Prorations** .......................................................................26
4. **REPRESENTATIONS AND WARRANTIES OF SELLERS.** ..........27
   4.1 **Organization** ...................................................................27
   4.2 **Authorization; Enforceability** ..........................................27
   4.3 **RESERVED.** .....................................................................28
   4.4 **Financial Statements** ......................................................28
   4.5 **No Conflicts or Approvals** ...............................................28
   4.6 **Sufficiency of Acquired Assets** .......................................29
   4.7 **Compliance with Law; Permits** ........................................29
   4.8 **Proceedings** ...................................................................29
   4.9 **Absence of Certain Changes** ..........................................29
   4.10 **Tax Matters** ....................................................................29
   4.11 **Employees** ......................................................................29
   4.12 **Intellectual Property.** ......................................................31
   4.13 **Contracts.** .......................................................................31
   4.14 **Environmental Matters** ...................................................33
   4.15 **Insurance** ........................................................................34
   4.16 **Personal Property Assets, Inventory.** ..............................34
   4.17 **Real Property** ..................................................................34
   4.18 **No Brokers' Fees** ............................................................34
   4.19 **Product Claims** .............................................................34~~34~~**35**
   4.20 **No Other Representations or Warranties** ........................35
   4.21 **Fair Disclosure** ...............................................................35
   4.22 **Survival** ...........................................................................35
5. **REPRESENTATIONS AND WARRANTIES OF BUYER** .............35
   5.1 **Organization** ...................................................................35
   5.2 **Authorization; Enforceability** ..........................................35
   5.3 **No Conflicts or Approvals** ...............................................36
   5.4 **Proceedings** ...................................................................36
   5.5 **Solvency** ..........................................................................36

|  | 5.6 | Anti-Money Laundering | 36 |
|  | 5.7 | RESERVED | 37 |
|  | 5.8 | No Inducement or Reliance; Independent Assessment | 37 |
|  | 5.9 | Financial Ability | 37 |
|  | 5.10 | No Brokers' Fees | 37 |
|  | 5.11 | Compliance with Laws | 37 |
|  | 5.12 | Adequate Assurance of Future Performance | 3738 |
| 6. |  | COVENANTS AND AGREEMENTS. | 38 |
|  | 6.1 | Conduct of Business between Signing and Closing | 38 |
|  | 6.2 | Bankruptcy Actions | 39 |
|  | 6.3 | Assumed Contracts; Cure Amounts | 40 |
|  | 6.4 | Performance Under Contracts | 40 |
|  | 6.5 | Non-Competition | 4041 |
|  | 6.6 | Tax Matters; Cooperation | 41 |
|  | 6.7 | Employees; Benefit Plans; Labor Matters | 42 |
|  | 6.8 | Contact with Seller Employees, Customers and Suppliers | 4748 |
|  | 6.9 | Technical Documentation | 48 |
|  | 6.10 | Books and Records and Litigation Assistance From and After Closing | 48 |
|  | 6.11 | Corporate Names | 4950 |
|  | 6.12 | Intellectual Property Licenses | 50 |
|  | 6.13 | Post-Closing Obligations | 51 |
|  | 6.14 | RESERVED | 51 |
|  | 6.15 | Further Actions | 51 |
|  | 6.16 | Further Assurances | 5152 |
|  | 6.17 | Shared Items Transferred to Buyer | 52 |
|  | 6.18 | Buyer's Financing Activities | 52 |
|  | 6.19 | Customs Duties | 52 |
|  | 6.20 | Environmental Access | 5253 |
|  | 6.21 | Permit Transfers | 53 |
|  | 6.22 | Confidentiality | 53 |
| 7. |  | CONDITIONS TO CLOSING. | 5354 |
|  | 7.1 | Conditions to Obligations of Sellers and Buyer | 54 |
|  | 7.2 | Conditions to Obligations of Buyer | 54 |
|  | 7.3 | Conditions to Obligations of Sellers | 55 |
| 8. |  | CLOSING | 55 |
|  | 8.1 | Closing Time and Date | 5556 |
|  | 8.2 | Ancillary Agreements | 56 |
|  | 8.3 | Sellers' Deliveries at Closing | 56 |
|  | 8.4 | Buyer's Deliveries at Closing | 57 |
| 9. |  | TERMINATION | 57 |
|  | 9.1 | Termination | 57 |
|  | 9.2 | Procedure and Effect of Termination | 58 |
| 10. |  | BANKRUPTCY MATTERS | 5859 |
|  | 10.1 | Sale Hearing | 5859 |
| 11. |  | LIABILITY, INDEMNIFICATION | 5859 |
|  | 11.1 | LIMITATIONS OF LIABILITY | 5859 |
|  | 11.2 | Survival | 5859 |
|  | 11.3 | Indemnification | 5859 |

| | | |
|---|---|---|
| **11.4** | **Environmental Matters; Exclusive Remedy** | ~~58~~**61** |
| **11.5** | **Product Claims** | ~~58~~**66** |
| **11.6** | **Indemnification Procedure** | ~~58~~**66** |
| **11.7** | **Mitigation** | ~~58~~**67** |
| **11.8** | **Dispute Resolution** | ~~58~~**67** |
| **12.** | **MISCELLANEOUS** | ~~58~~**68** |
| **12.1** | **Fees and Expenses** | ~~58~~**68** |
| **12.2** | **Bulk Sales Laws** | ~~58~~**68** |
| **12.3** | **Payments in Dollars** | ~~58~~**68** |
| **12.4** | **Amendment** | ~~58~~**68** |
| **12.5** | **Assignment** | ~~58~~**68** |
| **12.6** | **Waiver** | ~~58~~**68** |
| **12.7** | **Notices** | ~~58~~**68** |
| **12.8** | **Entire Agreement** | ~~58~~**69** |
| **12.9** | **Counterparts** | ~~58~~**69** |
| **12.10** | **Publicity** | ~~58~~**69** |
| **12.11** | **Headings** | ~~58~~**70** |
| **12.12** | **Severability** | ~~58~~**70** |
| **12.13** | **Third Parties** | ~~58~~**70** |
| **12.14** | **Governing Law** | ~~58~~**70** |
| **12.15** | **Venue and Retention of Jurisdiction** | ~~58~~**70** |
| **12.16** | **No Right of Setoff** | ~~58~~**70** |
| **12.17** | **Risk of Loss** | ~~58~~**70** |
| **12.18** | **Enforcement of Agreement** | ~~58~~**70** |
| **12.19** | **Bankruptcy Court Approval** | ~~58~~**70** |

# SALE AND PURCHASE AGREEMENT

**THIS SALE AND PURCHASE AGREEMENT** (the "**Agreement**"), dated as of ~~February 19,~~**March    ,** **2008** between **DELPHI AUTOMOTIVE SYSTEMS LLC,** a Delaware limited liability company ("**Delphi**"), the other entities set forth on Schedule 1 (each a "**Seller**" and together with Delphi, "**Sellers**"), and ~~KYKLOS, INC.~~**ND ACQUISITION CORPORATION,** a Delaware corporation ("**Buyer**"):

**WHEREAS,** Delphi and its Affiliates (as hereinafter defined) are engaged in the Business (as hereinafter defined);

**WHEREAS,** the Sellers own the Acquired Assets (as hereinafter defined);

**WHEREAS,** on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates (as hereinafter defined) filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq. (as then amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

**WHEREAS,** as contemplated by Sections 363, 365 and 1146 of the Bankruptcy Code, the Sellers desire to sell to the Buyer all of their rights, titles and interests in and to the Acquired Assets (as hereinafter defined), and Buyer desires to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, the Parties agree:

## 1.    DEFINITIONS.

**1.1    Certain Defined Terms**.  As used in this Agreement, the following terms have the meanings set forth below or in the sections referred to below:

"**365-Day Post-Closing Period**" – Section 3.2.4.

"**365-Day Termination Cost**" – Section 3.2.4.

"**Accounts Payable**" means all trade accounts payable and other obligations to pay suppliers and third parties to the extent arising from the conduct of the Business or relating to the Acquired Assets, including intercompany payables and all trade accounts payable set forth on the Reference Balance Sheet to the extent not settled prior to the Closing Date.

"**Accounts Receivable**" means all trade accounts receivable and other rights to payment from customers to the extent arising from the conduct of the Business or relating to the Acquired Assets, including Intercompany Receivables and all other accounts or notes receivable and the full benefit of all security for such accounts or notes, including the trade accounts receivable set forth on the Reference Balance Sheet to the extent not paid prior to the Closing Date.

"**Acquired Assets**" – Section 2.1.1.

"**Administrative Assets**" mean books, records and other administrative assets primarily used or held for use in the Business, including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, photographs, production data, sales materials and records, purchasing materials and records, personnel records of employees, billing records, accounting records, other financial records and sale order files; provided, however, that Administrative Assets does not include Intellectual Property or Technical Documentation.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.  For purposes of this definition, "control" means ownership of more than fifty percent (50%) of the shares or other equity interest and having power to elect a majority of the members of the board of directors or similar body governing the affairs of such Person.

"**Agreement**" means this Sale and Purchase Agreement (including the Schedules and Exhibits referred to herein, each of which is incorporated herein by reference), as amended, modified or supplemented from time to time.

"**Allocation**" – Section 3.6.1.

"**Ancillary Agreements**" means the agreements referred to in Section 8.2.

"**Assumed Liabilities**" – Section 2.2.

"**Assumed Contracts**" – Section 6.3.1.

"**Auction**" means the auction of the Business to be held in accordance with the Bidding Procedures Order.

"**Bankruptcy Cases**" – Recitals.

"**Bankruptcy Code**" – Recitals.

"**Bankruptcy Court**" – Recitals.

"**Bankruptcy Rules**" mean the U.S. Federal Rules of Bankruptcy Procedure.

"**Benchmark Inventory Amount**" means an amount to be agreed to in good faith between Buyer and Sellers as soon as practicable after the date hereof.

"**Benefit Guarantee Term Sheet**" - Section 6.7.1.C.

"**Bidding Procedures**" mean the bidding procedures approved by the Bankruptcy Court with respect to the auction and sale of the Business.

"**Bidding Procedures Order**" means the January 25, 2008 order of the Bankruptcy Court approving the Bidding Procedures and certain provisions of this Agreement.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

"**Business**" means the design, testing, manufacture, development, marketing and sale of the Products by the Sellers at the Manufacturing Facility.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Buyer Employee Benefit Plans**" means Buyer's pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

"**Buyer Parent**" means ~~Hephaestus Holdings, Inc.~~ **The Resilience Fund II, L.P.**

"**Buyer**" – Recitals.

"**Cap Amount**" – Section 11.3.2.B.

"**Capital Procurement Agreement**" means the Capital Procurement Agreement dated June 6, 2007 by and between GM and Delphi Corporation.

"**Cash**" means the sum of cash, cash equivalents and liquid investments plus all deposited but uncleared bank deposits and less all outstanding checks and electronic payments of the Business.

"**Claims**" mean all Losses, Liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" – Section 8.1.

"**Closing Date**" – Section 8.1.

"**Closing Inventory Statement**" means the statement of Inventory of the Business (as adjusted in accordance with this Agreement) as of 11:59 P.M. (Eastern Standard Time) on the Closing Date, which statement will be prepared and delivered in accordance with Section 3.3.

"**Collective Bargaining Agreements**" mean all collective bargaining agreements with any labor union representing Transferred Employees (including material local agreements, amendments, supplements, letters and memoranda of understanding of any kind).

"**Competent Authority**" means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

"**Competitive Business**" – Section 6.5.1.

3

"**Competitive Operating Agreement**" means a collective bargaining agreement between the Sellers or Buyer, as applicable, and the UAW Local 913 providing substantially the terms set forth in Schedule 1.1.C.

"**Confidential Information Memorandum**" means the Confidential Information Memoranda dated June 2007, relating to the Business.

"**Confidentiality Agreement**" means the confidentiality agreement between KPS~~Resilience~~ Capital Partners, ~~LP~~ **LLC** and Delphi relating to the Sale, dated July 12, 2007.

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, or the expiration or termination of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated by this Agreement.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, leases, product warranty or service agreements and other binding commitments, agreements, arrangements and undertakings of any nature.

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications therefore; and (v) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Corporate Trademark Rights**" means Trademark Rights used both in the Business and in other businesses conducted directly or indirectly by Delphi.

"**CPA Firm**" – Section 3.3.1.C.

"**Cure Amounts**" mean all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment to Buyer of the Assumed Contracts under the Sale Approval Order.

"**Data Room**" means the data room(s) in which the documents and information related to the Business and the Acquired Assets were disclosed to Buyer and Buyer Parent's representatives and counsel.

"**Debt Obligations**", as applied to any Person, mean obligations for borrowed money as evidenced by bonds, debentures, notes, financing or capital (as opposed to operating) leases and other similar instruments, and all guaranties of such obligations.

"**Deductible Amount**" - Section 11.3.2.B.

"**Deferred Items**" – Section 2.5.1.

"**Delphi**" – Recitals.

"**Delphi HRP**" - Section 6.7.1.C.

"**Deposit Amount**" – Section 3.1.

"**Deposit Escrow Agreement**" means the Deposit Escrow Agreement referred to in Section 8.2.2, dated as of the date hereof, executed by and among Buyer, Delphi and Escrow Agent concurrently with this Agreement.

"**Effects MOU**" – Section 7.1.6.

"**Emergence Date**" – Section. 3.5.

"**Employees**" means Hourly Employees and Salaried Employees.

"**Encumbrance**" means: with respect to the Acquired Assets any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over personal property).

"**Environment**" means the following media (whether individually or commingled): indoor or outdoor air, water, surface water, groundwater (whether an aquifer or water below the surface of the ground), and ground (whether at the surface or below the surface), soil, soil gas, and sediment.

"**Environmental Claim**" means any claim, cause of action, governmental information request, notice of potential responsibility, investigation or written notice by any Governmental Authority arising under any Environmental Law and any notice, claim or cause of action alleging Liability by any other person or entity under any Environmental Law, the common law or other Law, including those arising out of, based on or resulting from: (i) the Release of any Hazardous Materials on or migrating from the Manufacturing Facility or related to the Business; or (ii) any violation, or alleged violation, of any Environmental Law.

"**Environmental Compliance Matter**" means an event, condition, activity, practice, action or omission at the Manufacturing Facility or with respect to the Business which gives rise to an actual or alleged breach or violation of an Environmental Law or an Environmental Permit.

"**Environmental Contamination**" means the Release of a Hazardous Material at, in, under, on, about or migrating to or from the Manufacturing Facility.

"**Environmental Damages**" means Losses arising out of an actual or alleged violation under an Environmental Law or relating to the Remediation of a Release of any Hazardous Material, but in all cases (other than when in respect of a third party claim), excluding Losses deemed consequential or loss of profit, and also excluding expenses of investigating information solely for the purposes of making an Indemnification Claim under this Agreement.

"**Environmental Escrow Agent**" means the escrow agent identified in the Environmental Escrow Agreement.

Error! Unknown document property name.
CHI 1633861635983v1

"**Environmental Escrow Agreement**" means the escrow agreement substantially in the form of Exhibit 8.2.9.

"**Environmental Escrow Amount**" - Section 3.5.

"**Environmental Laws**" means all Laws relating to a Release or threatened Release of Hazardous Materials into the Environment or the exposure of any person to Hazardous Materials (but excluding the Occupational Health and Safety Act and similar worker safety Laws applying to employees) or protection of the Environment or natural resources.

"**Environmental Matters**" - Section 11.4.1.D.

"**Environmental Permits**" mean any licenses, Permits, Consents, authorizations and approvals issued by any Governmental Authority and required to be obtained under Environmental Laws in respect of the Acquired Assets or for the conduct and the operation of the Business.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means the escrow agent under the Deposit Escrow Agreement.

"**Escrow Period**" - Section 3.5.

"**Estimated Inventory Adjustment**" – Section 3.3.2.

"**Estimated Inventory Amount**" – Section 3.3.2.

"**Excluded Assets**" – Section 2.1.2.

"**Excluded Software**" means the Software identified on Schedule 2.1.2.M.

"~~**Expense Reimbursement**~~" ~~- means Delphi's obligation to reimburse the Stalking-horse Buyer for its reasonable, actual out-of-pocket fees and expenses incurred in connection with the investigation or negotiation of the transactions contemplated by the Sale and Purchase Agreement, dated January 15, 2008, by and between Delphi and the Stalking-horse Buyer (the "Stalking-horse APA"), provided that (i) the Stalking-horse Buyer has waived the financing contingency in Section 7.2.5 of the Stalking-horse APA and is not then in breach of such agreement or the Bidding Procedures and (ii) such reimbursement shall be capped at $1,000,000.~~

"**Facilities and Non-Billable Tooling**" means all Seller payments to vendors made between July 1, 2007 and the Closing, and presented and accepted for payment within fifteen Business Days after the Closing, for procurement of machinery and non customer re-billable tooling related to the Capital Procurement Agreement.

"**Facilities and Non-Rebillable Tooling Peg Amount**" means the amount of Three Million Five Hundred Thirty-Seven Thousand Dollars ($3,537,000).

"**Facilities and Non-Rebillable Tooling Statement –** Section 3.4.1.

6

"**Filing Affiliates**" mean Delphi and the following Affiliates of Delphi, each of which are included in the Bankruptcy Cases and operate certain portions of the Business or are Sellers: Delphi Corporation and Delphi Technologies, Inc.

"**Final Inventory Statement**" – Section 3.3.1.C.

"**Financial Statements**" – Section 4.4.

"**Future Liabilities**" – Section 2.3.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time.

"**GM**" – Section 7.2.4

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**Grievances**" - Section 6.7.9.

"**Hazardous Materials**" means any element, compound, mixture, solution, substance, chemical, material, constituent, waste, pollutant or contaminant which is listed, defined or regulated under an Environmental Law or an Environmental Permit, including petroleum or any fraction thereof or any petroleum-based or petroleum-derived substance, polychlorinated biphenyls, asbestos or asbestos-containing materials, leaded paint or any other material or substance which has the characteristics of being explosive, infectious, carcinogenic, mutagenic, toxic, noxious, radioactive, flammable, corrosive or caustic (whether solid, liquid or gaseous).

"**Headcount Price Adjustment**" – Section 3.2.3.

"**Headcount Reduction Cost Adjustment**" – Section 3.2.4.

"**Hourly Employees**" means the hourly employees represented by the UAW employed at the Manufacturing Facility who are employed by Sellers in the Business in the United States immediately prior to the Closing and identified on Schedule 4.11.1.

"**Hourly Workforce**" means the total number of Hourly Employees employed at the Manufacturing Facility at the time specified.

7

"**Hourly Workforce Benchmark**" means the total number of Hourly Employees employed at the Manufacturing Facility on the date on which a Competitive Operating Agreement has been executed and becomes effective.

"**Inactive Employees**" – Section 6.7.3.A.

"**Indemnifiable Losses**" – Section 11.3.1.

"**Indemnification Claim**" – Section 11.6.

"**Indemnity Escrow Agent**" means the escrow agent identified in the Indemnity Escrow Agreement.

"**Indemnity Escrow Agreement**" means the escrow agreement substantially in the form of Exhibit 8.2.6.

"**Indemnity Escrow Amount**" – Section 3.5.

"**Individual Claim Amount**" – Section 11.3.2.B.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets and Know-How.

"**Intercompany Receivables**" mean the right of any Seller or its Affiliates to payment and performance of any Liabilities of the Business.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, supplies and other inventory, primarily used or held for use in the Business wherever located.

"**Inventory Adjustment Escrow Agent**" means the escrow agent identified in the Inventory Adjustment Escrow Agreement.

"**Inventory Adjustment Escrow Agreement**" means the escrow agreement substantially in the form of Exhibit 8.2.7.

"**Inventory Adjustment Escrow Amount**" – Section 3.5.

"**Know-How**" means proprietary technical and business knowledge and information, regardless of whether recorded and, if recorded, regardless of the media in which it is recorded, such knowledge and information including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Knowledge of Buyer**" or "**Buyer's Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.A.

Error! Unknown document property name.
CHI 1633861 1635983v1

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, Permits, Consents, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order.

"**Leased Hourly Employees**" - Section 6.7.1.C.

"**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet, including those arising under any Law, Claim, Environmental Claim, Consent, Governmental Approval, Governmental Order, Contract, Environmental Permit or otherwise.

"**Licensed Intellectual Property**" means Sellers' rights with respect to Intellectual Property (exclusive of Software) licensed or sublicensed to Sellers from a third party, and that is used principally by the Business, except that Licensed Intellectual Property does not include Sublicensed Intellectual Property.

"**Losses**" mean any and all Claims, Liabilities, losses, damages, Environmental Claims, Environmental Damages, contribution, cost recovery, response costs, removal costs, oversight costs, natural resource damages, medical monitoring, fines, penalties and costs (in each case including reasonable out-of-pocket expenses (including reasonable attorneys', accountants', technical consultants', engineers' and experts' fees and expenses)).

"**Management Presentations**" mean the presentations, expert meetings, site visits and question and answer sessions, provided by Delphi and Sellers (and their advisers and counsel) to Buyer Parent and the Buyer (and their advisers and counsel), with respect to the Business, the Acquired Assets and the in view of the transactions contemplated herein.

"**Manufacturing Facility**" means the Business' manufacturing facilities located at 2509 Hayes Avenue, Sandusky, Ohio.

"**Material Adverse Effect**" means any change, occurrence or development that has a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers hereunder), results of operations or financial condition of the Business, taken as a whole, but excludes any effect: (i) resulting from general economic or business conditions; (ii) affecting companies in its industry or its markets generally; (iii) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (iv) that is cured before the date of any termination of this Agreement by Buyer pursuant to Section 9.1 hereof; (v) resulting from increases in energy, electricity, natural gas, oil, steel, aluminum, other raw materials or other operating costs; (vi) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of the Business; (vii) resulting from any act or omission of any Seller taken with the prior consent of any Buyer; (viii) resulting from any actions required under this Agreement to obtain any Consent; (ix) resulting from  any action approved by the

Error! Unknown document property name.
CHI 1633861 1635983 v1

Bankruptcy Court; (x) resulting from any act of God or other *force majeure* type event; (xi) resulting from the regulatory status of any Buyer, or (xii) resulting from acts of war or terrorism, whether or not directed at the Business or Buyer.

"**Material Contracts**" – Section 4.13.1.

"**Notice**" - Section 11.8.

"**Objection**" – Section 3.3.1.B.

"**OEM**" means automotive original equipment manufacturer.

"**OFAC**" – Section 5.6.

"**Ordinary Course of Business**" means, in all material respects, the usual, regular and ordinary course of a business consistent with the past practice thereof, provided that where the Sellers' past practices were modified following filing of the Bankruptcy Cases, such term means the ordinary course consistent with custom and practice of the Sellers from and after the Petition Date to the extent consistent with orders issued by the Bankruptcy Court in the Bankruptcy Cases.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Owned Intellectual Property**" means Intellectual Property in and to which Sellers hold, or have a right to hold, in whole or in part, any right, title and interest.

"**Owned Real Property**" – Section 4.17.

"**Party(ies)**" means Delphi, Sellers and/or Buyer.

"**Patent Rights**" mean: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any invention disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents and patent applications (including provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions; and (iv) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Permanently Terminated**" means, with respect to an Hourly Employee, (a) such individual's employment will have been terminated in order to achieve greater efficiency in accordance with the Competitive Operating Agreement due to reduced job classifications or Work Practice Changes and (b) at the time of termination, Buyer or Sellers, as applicable, do not intend to replace such individual with any other employee, whether a new hire or existing employee. An Hourly Employee that is terminated, laid off or otherwise ceases employment

10

due to volume reductions or decreased production shall not be considered Permanently Terminated.

"**Permits**" – Section 4.7.

"**Permitted Encumbrance**" means: (i) purchase money security interests securing obligations totaling no more than $800,000 in the aggregate arising in the Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government contracts contained in the Acquired Assets; (iii) security interests securing obligations totaling no more than $800,000 in the aggregate relating to vendor tooling arising in the Ordinary Course of Business; (iv) prior to the Closing only, Encumbrances in favor of any Sellers' pre-Petition Date secured lenders and post-Petition Date secured lenders which, upon Closing, will attach to the proceeds of the Sale attributable to the sale of the assets of the Filing Affiliates in the same order and priority that the Encumbrances attached to the assets of the Filing Affiliates, subject to all existing defenses and other objections (it being understood that the foregoing Encumbrances described in this clause (iv) shall not be Permitted Encumbrances at or after Closing); (v) any Encumbrance that may be created by or on behalf of Buyer and; (vi) in relation to Owned Real Property: (a) Encumbrances relating to any current real estate or ad valorem taxes or assessments not yet delinquent or being contested in good faith by appropriate Proceedings; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged in the Ordinary Course of Business prior to Closing; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose, the existence of which, individually or in the aggregate, would not materially interfere with or materially affect the use of, occupancy of or marketability of title to the Owned Real Property; (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Owned Real Property that would not adversely affect access to such Owned Real Property; (e) easements, covenants, restrictions and other encumbrances of public record, the existence of which, individually or in the aggregate, would not materially interfere with or materially affect the use of, occupancy of or marketability of title to the Owned Real Property; and (f) such other Encumbrances, the existence of which, in the aggregate, would not materially interfere with or materially affect the use, occupancy or marketability of title to the respective underlying asset to which such Encumbrances relate as used on the Closing Date.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Personal Property**" means tangible personal property other than Inventory primarily used or held for use in the Business, including production machinery, equipment (including that new machinery, tooling and equipment described on Exhibit A of the Capital Procurement Agreement which has been delivered as of the Closing Date), tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other information technology assets, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Owned Real Property, at the place of business of a vendor or elsewhere; provided, however, that the Personal Property does not include Intellectual Property or Technical Documentation.

11

"**Petition Date**" – Recitals.

"**Post-Closing Environmental Compliance Matter**" means an Environmental Compliance Matter occurring after the Closing.

"**Post-Closing Environmental Contamination**" means Environmental Contamination occurring after the Closing.

"**Pre-Closing Environmental Compliance Matter**" means an Environmental Compliance Matter occurring prior to the Closing.

"**Pre-Closing Environmental Contamination**" means Environmental Contamination occurring prior to the Closing.

"**Pre-Closing Work Practice Price Adjustment**" – Section 3.2.2.

"**Pre-Petition Contracts**" mean the Contracts of the Filing Affiliates relating to the Business entered into before the Petition Date.

"**Proceeding**" means any action, claim, demand, suit, proceeding, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority.

"**Product(s)**" means the wheel bearings and roller clutches included in Delphi's global bearings business.

"**Product Claims**" mean all Liabilities arising out of, resulting from, or relating to product warranty or product returns with respect to Products, including all Liabilities arising from, caused by or related to any obligation to implement any replacement, field fix, retrofit, modification or recall campaign with respect to any Product that was made, manufactured, assembled, installed, sold, leased or licensed by Sellers.

"**Productive Inventory**" means Inventory consisting of finished goods, work-in-process or raw materials.

"**Purchase Price**" – Section 3.2.1.

"**Purchased Intellectual Property**" means the Owned Intellectual Property that is used principally in the Business, including the Intellectual Property listed in <u>Schedule 4.12.1.A</u> and <u>Schedule 4.12.1.B</u>.

"**Qualified Bid**" has the meaning given to such term in the Bidding Procedures Order.

"**Reference Balance Sheet**" – Section 4.4.

"**Release**" means any release, spilling, emitting, leaking, pumping, injection, deposit, leaching, migrating, pouring, emptying, escaping, dumping, discarding, abandonment, disposal, placement, burial or discharge of any Hazardous Materials at, in, onto, under or through the Owned Real Property or the Environment (including, without limitation, the abandonment or

Error! Unknown document property name.
CHI ~~16338611635983~~v1

discarding of barrels, containers and other closed receptacles containing any Hazardous Materials).

"**Relevant Items**" – Section 3.3.1.B.

"**Remedial Works**" means the legally required works, designs, investigations, Remediation and activities carried out by a Party in relation to Environmental Contamination or Environmental Compliance Matters, but excluding expenses of investigating information solely for the purposes of making an Indemnification Claim under this Agreement.

"**Remediation**" means any legally required investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure, or post-closure operation and maintenance activities in connection with the suspected, threatened or actual Release of Hazardous Materials.

"**Remediation Standards**" means standards which are: (i) the minimum Remediation criteria or standards required under Environmental Laws, including but not limited to the use of risk assessment methodologies where permitted; and (ii) applicable to industrial use.

"**Remedy**" - Section 11.4.5.A.

"**Response**" - Section 11.8.

"**Retained Liabilities**" - Section 2.4.

"**Retiree Eligible Salaried Transferred Employees**" - Section 6.7.4.E.

"**Return Date**" - Section 10.11.

"**Salaried Employees**" means the salaried employees and hourly non-union employees who are employed by Sellers primarily in the Business in the United States immediately prior to the Closing and identified on Schedule 4.11.1.

"**Sale**" means the sale, assignment and transfer of the Acquired Assets from Sellers to Buyer in accordance with this Agreement.

"**Sale Approval Order**" means the order of the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code, authorizing and approving, among other things, the Sale free and clear of all Encumbrances on Acquired Assets sold by a Filing Affiliate, other than Permitted Encumbrances, substantially in the form attached hereto as Exhibit 10.1.B.

"**Sale Hearing**" has the meaning given to such term in the Bidding Procedures Order.

"**Sale Motion**" means the motion filed by the Filing Affiliates with the Bankruptcy Court for entry of the Sale Approval Order.

"**SDN List**" – Section 5.6.

"**Seller Employee Benefit Plans**" means Sellers' pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization,

13

severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

"**Seller(s)**" means Delphi and the Sellers set forth on <u>Schedule 1</u>.

"**Seller Employees**" means all Salaried Employees and Hourly Employees listed on <u>Schedule 4.11.1</u>, except for Inactive Employees.

"**Shared Intellectual Property**" means Owned Intellectual Property (other than Corporate Trademark Rights and Excluded Software) that is used in the Business and in one or more other businesses conducted directly or indirectly by Delphi or an Affiliate but is not used principally in the Business.

"**Significant Customer(s)**" – Section 4.13.3.

"**Significant Supplier(s)**" – Section 4.13.4.

"**Software**" means computer software and programs, including source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"~~**Stalking-horse APA**~~" – ~~definition of Expense Reimbursement.~~

"~~**Stalking-horse Buyer**~~" ~~means ND Acquisition Corporation, a Delaware corporation.~~

"**Sublicensed Intellectual Property**" means Sellers' rights with respect to the Intellectual Property listed in <u>Schedule 6.12.1</u> and any other Intellectual Property (exclusive of Software) licensed or sublicensed to Sellers from a third party, and that is used by the Business but is not used principally by the Business.

"**Supplemental Agreement**" means the UAW-Delphi Supplement Agreement dated April 4, 2004.

"**Tax**" or "**Taxes**" means any taxes of any kind, including but not limited to those measured on, measured by or referred to as, income, alternative or add-on minimum, gross receipts, escheat, capital, capital gains, sales, use, *ad valorem*, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property, environmental or windfall profits taxes, customs, duties or similar fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"**Tax Claim**" means any Claim related to Tax or Taxes.

"**Tax Return**" means any return, report, declaration, form, election letter, statement or other information required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

~~Error! Unknown document property name.~~
CHI ~~1633864~~1635983v1

"**Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of the Business or used principally in the Business, in each case pertaining to the design or manufacture of the Products.

"**Third Party**" or "**third party**" means any person not a Party, Buyer, Seller or a Competent Authority.

"**Total Termination Cost**" means, with respect to the time period specified, all costs and expenses incurred by or scheduled to be incurred by Buyer in order to Permanently Terminate Hourly Employees in the 365-day period following the Closing Date, including, but not limited to, severance, ratification or other bonuses allocated to all Union employees (including those to be terminated and those not to be terminated).

"**Trade Secrets**" mean: (i) all forms and types of financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and regardless of whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and (ii) confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); and (iii) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" mean: (i) trademarks, trade names and service marks; (ii) the goodwill associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; and (iv) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transfer Taxes**" - Section 6.6.2.

"**Transferred Employee**" - Section 6.7.1.

"**Transition Services Agreement**" - Section 8.2.3.

"**UAW**" means the International Union, United Automobile, Aerospace and Agricultural Works of America, including UAW Local Number 913.

"**UAW Local Number 913**" means the local bargaining unit at the Manufacturing Facility.

"**Union(s)**" means the UAW.

"**WND Acquisition**" means WND Acquisition Company, LLC.

"**Work Practice Changes**" mean the changes to work practices at the Manufacturing Facility as set forth in <u>Schedule 1.1.D.</u>

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

**1.2**      **Other Interpretive Provisions**.      The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.   The words "include", "includes" and "including" are deemed to be followed by the phrase "without limitation."   The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms.   Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.   Except as otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the lawful money of the United States of America.

**2.**      **PURCHASE AND SALE.**

  **2.1**      **Transfers by Sellers and their Affiliates**.

    **2.1.1**  **Purchase and Sale of the Acquired Assets**.   Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, the Sellers will sell, transfer, assign, convey and deliver to the Buyer, and the Buyer will purchase, accept and acquire from the Sellers, free and clear of all Encumbrances except Permitted Encumbrances, all of Sellers' rights, titles and interests in and to the assets and properties described in the next sentence (collectively, the "**Acquired Assets**"), subject in each case to Section 2.1.3.   The Acquired Assets consist of all of the non-cash assets owned, used or held principally in the Business (except for the Excluded Assets), including: Owned Real Property, Personal Property, Inventory, Contracts, Administrative Assets, Permits, Consents, Environmental Permits, Purchased Intellectual Property and Technical Documentation.   Except for the Acquired Assets, the Sellers will retain all other assets, properties, rights and interests owned, used or held by the Sellers.

    **2.1.2**  **Excluded Assets**.   Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties and assets will not be included in the Acquired Assets (the "**Excluded Assets**"):

      **A.** **Third Party Assets**.   Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by an OEM or any other third party, including third party bailed assets used in the Business and located at the Manufacturing Facility, all as set forth on Schedule 2.1.2.A, provided however, that any Contracts or other rights the Sellers have pertaining to such third party bailed or leased assets will be transferred as part of the Acquired Assets.

      **B.** **Intellectual Property**.   Corporate Trademark Rights and Shared Intellectual Property (subject to the limited rights granted to the Buyer pursuant to Sections 6.11 and 6.12).

      **C.** **Financial Assets**.   All Cash and Accounts Receivable of the Business as of Closing.

      **D.** **Insurance**.   Insurance coverage and insurance policies relating to the operations of the Business, including any and all claims and rights

16

thereunder and the proceeds thereof and all prepaid insurance premiums; provided, however, that Buyer will receive the benefit of all such claims and rights under third party property and casualty policies arising subsequent to the date of this Agreement and prior to the Closing.

**E. Records.**  Subject to Section 6.10.3 herein, any books, records and other materials that any Seller is required by Law to retain, all Tax Returns of any Seller for time periods prior to Closing, and related work papers, and all "Delphi" marked sales and promotional materials and brochures.

**F. Claims.**  All claims, defenses, causes of action or claims of any kind relating to either Excluded Assets or Retained Liabilities.

**G. Tax Refunds.**  All refunds or credits of or against any Taxes paid by or on behalf of any Seller with respect to any period ending on or prior to the Closing Date.

**H. Bankruptcy Rights.**  All of the rights and claims of the Filing Affiliates under the Bankruptcy Code Sections 544 through 551, inclusive, 553, and 558 and any related actions, including any and all proceeds of the foregoing.

**I. Personnel Records.**  All work histories, personnel and medical records of employees and former employees of any Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, the Buyer will be provided the originals of all personnel and medical records of all Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if Sellers so elect.  All such personnel and medical records of Transferred Employees are books and records governed by Section 6.10 of this Agreement.  Upon written request of Sellers (or an Affiliate of Sellers), Buyer will promptly return or cause to be returned any and all of these records to Sellers (or an Affiliate of Sellers as directed) at which time Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the Buyer with copies of the personnel and medical records of such employees.  If an employee objects to provision of personnel or medical records to any Buyer, the records will not be provided, except that Sellers will provide such records to the extent Sellers determine that provision of the records to such Buyer over the objections by the employee is permitted by the applicable local law without adverse consequences to Sellers or to any Affiliate of Sellers.

**J. Privileged Information and Materials.**  Information and materials protected by the attorney-client privilege (or its equivalent in jurisdictions outside the United States).

**K. Reserved.**

**L. Common Delphi Services.**  Subject to the provisions of the Transition Services Agreement, common Delphi services, if any, including

Error! Unknown document property name.
CHI 1633861 1635983v1

legal, insurance, accounting, finance, tax and information technology and support.

**M. <u>Inventory and Other Assets</u>.**  (i) All products, rights, properties, assets and businesses of the Business which will have been transferred or disposed of by Sellers prior to the date hereof, and all Inventory of the Business transferred or disposed of by Sellers prior to Closing, in each case, in the Ordinary Course of Business; (ii) any immaterial document, information, Permit, Contract or Intellectual Property or any other asset listed on <u>Schedule 2.1.2.M</u>, in each case, the transfer of which is prohibited by any Law; (iii) all computer hardware, equipment, Software and other assets listed on <u>Schedule 2.1.2.M</u>; and (iv) Vehicles assigned to Seller Employees under the applicable Seller's company vehicle program and pooled vehicles.

**N. <u>Cadiz Assets</u>.**  All assets formerly used in and located at Sellers' Cadiz, Spain facilities.

**2.1.3  <u>Post-Closing Asset Deliveries</u>.**  Should Sellers or Buyer, in their reasonable discretion, determine after the Closing that books, records or other materials or assets constituting Acquired Assets are still in the possession of Sellers or any of their Affiliates, Sellers will or will cause such Affiliates to promptly deliver them to Buyer at no cost to Buyer.  Should Sellers or Buyer, in their reasonable discretion, determine after the Closing that books, records or other materials or assets constituting Excluded Assets were delivered to Buyer, Buyer will promptly return them to Sellers at no cost to Sellers.

**2.2     <u>Assumption of Liabilities</u>.**  Other than the Retained Liabilities, the Buyer will assume, and will thereafter pay, perform and discharge as and when due, and will be liable with respect to (i) the following Liabilities of the Sellers, whether arising before, on or after the Closing Date, arising out of, relating to or incurred in connection with the Business and (ii) any Liabilities otherwise assumed by Buyer pursuant to the terms of this Agreement or by operation of Law pursuant to the Sale Approval Order (collectively, the "**Assumed Liabilities**"):

**2.2.1  ~~2.1.4~~** All Liabilities of the Sellers arising under any Contracts, licenses, Permits, Environmental Permits, Consents, Governmental Approvals or Orders, leases and other agreements included in the Acquired Assets and assigned or otherwise transferred to Buyer pursuant to the terms of this Agreement; and other obligations relating to any Buyer's ownership or use of the Acquired Assets (provided that Buyer is not assuming any Liabilities under any Permits, Environmental Permits, Consents, Governmental Approvals or Orders for any acts or omissions prior to the Closing Date, and any Liabilities arising under any Environmental Permits relating to Pre-Closing Environmental Contamination, including any corrective action obligations, shall not be considered Assumed Liabilities); and

**2.2.2  ~~2.1.5~~** All deferred revenue obligations incurred in the Ordinary Course of Business, including all such obligations to fulfill orders relating to Products of the Business outstanding on the Closing Date and Buyer shall be entitled to all payments for such fulfilled orders.

**2.3     <u>Future Liabilities</u>.**  Notwithstanding anything herein to the contrary, other than the Retained Liabilities, and subject to Section 3.7, on and after the Closing Date the Buyer will pay, perform and discharge as and when due, and will be liable with respect to the following

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

Liabilities arising on or after the Closing, arising out of, relating to or incurred in connection with Buyer's conduct of the Business after the Closing, or by operation of Law pursuant to the Sale Approval Order (collectively, excluding Retained Liabilities, the "**Future Liabilities**"):

**2.3.1**   ~~2.1.6~~ All Liabilities relating to the Acquired Assets including Claims and other obligations relating to any Buyer's ownership or use of the Acquired Assets;

**2.3.2**   ~~2.1.7~~ All Liabilities arising out of, resulting from, or relating to product warranty or product return with respect to Products sold on or after Closing;

**2.3.3**   ~~2.1.8~~ All Liabilities in the nature of general, automobile and product liability for Claims made for injury to persons and/or property arising from, caused by or arising out of the design, manufacture or assembly of any Product sold on or after Closing (regardless of whether any such Products are designed or manufactured before or after Closing), and any Liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products;

**2.3.4**   ~~2.1.9~~ Liabilities with respect to Transferred Employees except as otherwise set forth in Sections 3.2, 6.7 and 11.3.2;

**2.3.5**   ~~2.1.10~~ Any and all Environmental Claims, Environmental Contamination, or Environmental Damages relating to Post-Closing Environmental Contamination or Post-Closing Environmental Compliance Matters;

**2.3.6**   ~~2.1.11~~ Any and all Tax Liabilities, to the extent that they arise out of or relate to  periods or portions thereof beginning after the Closing Date; and

**2.3.7**   ~~2.1.12~~ All Liabilities that Buyer agrees to pay for or be responsible for pursuant to the terms of this Agreement or any Ancillary Agreement or as required by operation of Law pursuant to the Sale Approval Order.

**2.4**   **Retained Liabilities.**  Notwithstanding anything to the contrary, Buyer will not assume or be deemed to have assumed, and will have no Liability with respect thereto, any Liabilities of any Seller (other than the Assumed Liabilities and Future Liabilities) and such Seller will continue to be responsible for such Liabilities (collectively, "**Retained Liabilities**"). The Retained Liabilities include, but are not limited to:

**2.4.1**   ~~2.1.13~~ Accounts Payable of the Business as of Closing;

**2.4.2**   ~~2.1.14~~ All Liabilities in the nature of general and automobile Liability arising before Closing, and product liability, including any Liability for Claims made for injury to persons and/or property, arising from, caused by or arising out of the manufacture or assembly of any Product before Closing, and any liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products sold before the Closing.

**2.4.3**   ~~2.1.15~~ Any and all Environmental Claims, Environmental Contamination, Environmental Damages or Liabilities relating to Pre-Closing Environmental Contamination or Pre-Closing Environmental Compliance Matters.

19

**2.4.4**   ~~2.1.16~~ All Liabilities pertaining to acts or omissions of Sellers' current or former employees for periods prior to the Closing;

**2.4.5**   ~~2.1.17~~ All Liabilities under any Seller Employee Benefit Plan sponsored or maintained by Sellers or any of the Sellers' Affiliates;

**2.4.6**   ~~2.1.18~~ All Tax Liabilities arising out of or relating to periods or portions thereof ending on or before the Closing Date;

**2.4.7**   ~~2.1.19~~ Any Claim of Sellers arising prior to the Closing Date for administrative fees and expenses that are "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code;

**2.4.8**   ~~2.1.20~~ All Liabilities related to the Excluded Assets;

**2.4.9**   ~~2.1.21~~ Except as expressly provided in Section 2.2, any Liability of the Sellers arising out of, relating to, or incurred in connection with the businesses retained by the Sellers and which are not arising out of, relating to or incurred in connection with the Business;

**2.4.10** ~~2.1.22~~ All Liabilities arising out of, resulting from, or relating to product warranty or product return with respect to Products sold before the Closing, including all Liabilities arising from, caused by or arising out of any obligation to implement any replacement, field fix, retrofit, modification or recall campaign with respect to any Product that was manufactured, assembled, installed, sold leased or licensed by Sellers, provided, however, that Buyer will service any such recall or warranty claim on Sellers' behalf and Sellers will reimburse Buyer (at cost) for all Product Claims pursuant to Section 11.5; and

**2.4.11** ~~2.1.23~~ All Liabilities that Sellers (or any of them) agree to pay or be responsible for pursuant to the terms of this Agreement or any Ancillary Agreement or as required by operation of Law pursuant to the Sale Approval Order, including, without limitation, Cure Amounts relating to Assumed Contracts.

**2.5**    ~~2.2~~ **Deferred Items.**

**2.5.1**   ~~2.2.1~~ **Non-Assignability.**   To the extent that any Contract or Permit included in the Acquired Assets is not capable of being assigned (whether pursuant to Section 365 of the Bankruptcy Code or, if inapplicable, then pursuant to the terms of such Contract or other applicable law) to Buyer at the Closing without the Consent of the issuer thereof or the other party thereto or any third party (or a Governmental Authority), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law ("**Deferred Item(s)**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained.

**2.5.2**   ~~2.2.2~~ **Efforts to Obtain Necessary Consents.**   The applicable Seller will, at its expense, use commercially reasonable efforts, and the applicable Buyer will, at its expense, cooperate with Sellers, to obtain the necessary Consents and to resolve the impracticalities of assignment referred to in Section 2.5.1 before the Closing.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983 v1

**2.5.3** ~~2.2.3~~ **If Consents Cannot be Obtained.**    To the extent that the Consents referred to in Section 2.5.1 are not obtained by the applicable Seller, or until the impracticalities of assignment referred to therein are resolved, Sellers' sole responsibility with respect to such matters, notwithstanding Section 2.1.2, will be to use, during the twelve (12) month period commencing with the Closing, commercially reasonable efforts to: (i) provide to Buyer the benefits of any Deferred Item; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyer, without incurring any financial obligation to Buyer; and (iii) enforce for the account of Buyer and at the cost of Buyer any rights of Sellers arising from any Deferred Item referred to in Section 2.5.1 against such issuer thereof or other party or parties thereto.

**2.5.4** ~~2.2.4~~ **Obligation of Buyer to Perform.**    To the extent that Buyer is provided the benefits pursuant to Section 2.5.3 of any Deferred Item, Buyer will perform, on behalf of Sellers, for the benefit of the issuer thereof or the other party or parties thereto (including payment obligations) the obligations of Sellers thereunder or in connection therewith to the extent arising out of the Business and if Buyer will fail to perform to the extent required herein, Sellers, without waiving any rights or remedies that they may have under this Agreement or applicable Laws, may suspend their performance under Section 2.5.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or Sellers may perform at Buyer's sole cost and expense, in which case Buyer will reimburse Sellers' costs of such performance immediately upon receipt of an invoice therefore.

**2.5.5** ~~2.2.5~~ **Resolution of Impediments.**    Once the previously unattained Consent is obtained or other impediment to assignment or transfer resolved, the applicable Deferred Item shall be deemed to have been automatically assigned and/or transferred to the Buyer on the terms set forth in this Agreement with respect to the other Acquired Assets transferred at the Closing.

**3.**    **PURCHASE PRICE; ADJUSTMENT; ALLOCATION.**

**3.1**    **Deposit Amount.**    On or before ~~11:00 A.M. (prevailing Eastern time), February 11, 2008, Buyer delivered~~**the second Business Day following execution of this Agreement, Buyer will deliver** to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement ~~Seven~~**Three Million, Five** Hundred ~~Fifty~~ Thousand Dollars ($~~750,000.00~~**3,500,000.00**) in immediately available funds (such amount, together with the interest and earnings accrued thereon prior to the Closing~~,~~ **and all amounts Buyer deposited with the Escrow Agent pursuant to the Sale and Purchase Agreement by and between Buyer and Delphi dated January 15, 2008 and all amounts WND Acquisition deposited with the Escrow Agent pursuant to the Sale and Purchase Agreement by and between WND Acquisition and Delphi dated February 20, 2008,** the "**Deposit Amount**"), to be held by the Escrow Agent**,** in an interest bearing account reasonably acceptable to Buyer to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures (which procedures will be set forth in the Deposit Escrow Agreement):

**3.1.1**    Delphi ~~and~~**,** Buyer **and WND Acquisition** will jointly instruct the Escrow Agent to deliver the Deposit Amount on the Closing Date, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement;

~~Error! Unknown document property name.~~
CHI ~~1633861~~**1635983**v1

**3.1.2**   Upon a material breach by Buyer of this Agreement which results in termination of this Agreement in accordance with the termination provisions set forth in Article 9, Delphi ~~and~~, Buyer **and WND Acquisition** will jointly instruct the Escrow Agent to deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement, to be retained by Delphi; or

**3.1.3**   Upon termination of this Agreement in accordance with the termination provisions set forth in Article 9 for any reason other than a Buyer breach, then, on the date which is three (3) Business Days after such termination, Delphi ~~and~~, Buyer **and WND Acquisition** will jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Buyer in the Deposit Escrow Agreement, to be retained by Buyer.

**3.1.4**   The forfeiture of a portion of the Deposit Amount or the entire Deposit Amount, if so required by this Agreement, shall be the sole and exclusive remedy of the Sellers or their bankruptcy estates, whether at law or in equity, for any breach by Buyer or any of its Affiliates of the terms and conditions of this Agreement.  The Parties agree that the amounts payable pursuant to this Section 3.1.4 shall be in the nature of liquidated damages.

**3.2**        **Purchase Price**.

**3.2.1**   Subject to the terms and conditions of this Agreement, on the Closing Date, in consideration of the Sale, Buyer will pay to Delphi or the Sellers designated by Delphi, by wire transfer in immediately available funds, an amount equal to Forty-~~Six~~**Nine** Million~~, Two Hundred Thousand~~ Dollars ($~~46,200,000) plus the Expense Reimbursement~~**49,000,000)** subject to (i) the Pre-Closing Work Practice Price Adjustment, (ii) the Headcount Price Adjustment, (iii) the Headcount Reduction Cost Adjustment, and (iv) the Estimated Inventory Adjustment (the "**Purchase Price**"), less the Deposit Amount and the aggregate of any amounts delivered to the Environmental Escrow Agent, Indemnity Escrow Agent and Inventory Adjustment Escrow Agent pursuant to Section 3.5.

**3.2.2**   In the event that, prior to the Closing, a Competitive Operating Agreement has not yet (a) been executed or (b) become effective, Buyer will be entitled to a downward adjustment of the Purchase Price in the amount of twenty-six million dollars ($26,000,000.00) (the "**Pre-Closing Work Practice Price Adjustment**").

**3.2.3**   Subject to the adjustments set forth in Section 3.2.4, in the event Buyer is entitled to the Pre-Closing Work Practice Price Adjustment, Sellers will be entitled to an upward price adjustment of (i) $100,000 for each Hourly Employee Permanently Terminated prior to Closing and, (ii) $75,000 for each Hourly Employee Permanently Terminated between 1 and 365 days following the Closing Date (the "**Headcount Price Adjustment**"), provided that Sellers shall not be entitled to such Headcount Price Adjustment unless, prior to or within one year after the Closing Date, a Competitive Operating Agreement has (a) been executed and (b) become effective.

**3.2.4**   The Sellers will bear (a) the entire cost of achieving reductions to the Hourly Workforce pursuant to any agreement to reduce the Hourly Workforce reached prior to the Closing Date, whether such cost is to be paid prior to or after the Closing,

22

and (b) the full cost of the employee wages and benefits with respect to employees to be terminated within 365 days after the Closing (less any subsidy Buyer actually receives from GM on account of each such employee).  As set forth below in this Section 3.2.4, the Buyer and Sellers will each bear a portion of the cost of reductions to the Hourly Workforce pursuant to agreements reached following the Closing Date.  Following the execution of a Competitive Operating Agreement, the Purchase Price will be adjusted downward to the extent that the average cost to Permanently Terminate Hourly Employees in the 365-day period following the Closing incurred by Buyer exceeds $25,000 (the "**Headcount Reduction Cost Adjustment**").  Following the execution of a Competitive Operating Agreement, the Headcount Reduction Cost Adjustment for the 365-day period immediately following the Closing (the "**365-Day Post-Closing Period**") will be calculated by subtracting (i) the product of (x) $25,000 and (y) the total number of Hourly Employees to be Permanently Terminated pursuant to a Competitive Operating Agreement reached during the 365-Day Post-Closing Period from (ii) the Total Termination Cost with respect to Hourly Employees to be Permanently Terminated pursuant to agreement reached during the 365-Day Post-Closing Period (the "**365-Day Termination Cost**").  Notwithstanding the foregoing, this Section 3.2.4 (except for the first sentence) shall only apply to Hourly Employees Permanently Terminated due to reduced job classifications or Work Practice Changes pursuant to the Competitive Operating Agreement.

      **3.2.5**  The Headcount Price Adjustment and Headcount Reduction Cost Adjustment, if any, will be paid as follows:

      (i) At the Closing, if a Competitive Operating Agreement has been executed and become effective, the Purchase Price will be adjusted upward by the product of (a) $100,000.00 and (b) the difference between the Hourly Workforce Benchmark and the Hourly Workforce on the Closing Date to the extent such difference consists of Hourly Employees Permanently Terminated due to reduced job classifications or Work Practice Changes pursuant to the Competitive Operating Agreement; and

      (ii) On the second anniversary of Closing Date, if a Competitive Operating Agreement has been executed and become effective on or prior to 365 days after the Closing Date, then on such date or as soon as practicable thereafter, the Buyer will pay to the Sellers (a) the product of (x) $75,000 and (y) the difference between the Hourly Workforce Benchmark and the Hourly Workforce on the day that is 365 days after the Closing Date, to the extent such difference consists of Hourly Employees Permanently Terminated due to reduced job classifications or Work Practice Changes pursuant to the Competitive Operating Agreement, less (b) the 365-Day Termination Cost.

    **3.3**      **Inventory Adjustment.**  If the value of Inventory reflected in the Final Inventory Statement is less than the Estimated Inventory Amount, Delphi will pay to Buyer an amount equal to such deficiency.  If the value of Inventory reflected in the Final Inventory Statement is greater than the Estimated Inventory Amount, Buyer will pay to Delphi an amount equal to such excess.  Such deficiency or excess payment will be paid in immediately available funds within three (3) Business Days after the ultimate determination of the Final Inventory Statement as provided in this Section 3.3.

23

### 3.3.1    ~~3.2.6~~ Preparation of Closing Inventory Statement.

**A.** Within sixty (60) days after the Closing Date, Buyer will prepare and deliver to Delphi a Closing Inventory Statement.  The Closing Inventory Statement will be based on a physical inventory of the Inventory of the Business, and utilizing a methodology, and accounting therefore, in accordance with GAAP, to be taken by the Buyer, at its sole cost and expense, and the Seller shall be given opportunity to observe such physical inventory,  within fifteen (15) Business Days after the Closing Date, consistent with past practice, except that, with respect to Productive Inventory, any such Inventory reasonably expected not to be used within one (1) year after Closing will be deemed to have no value.  Buyer will, after Closing and pending agreement or final determination of the Closing Inventory Statement, allow Delphi and its Affiliates and their accountants, agents and advisers such access to the Business, all relevant employees and all relevant records, information and other documentation (and will, upon request, provide copies thereof) as is reasonably necessary to enable, confirm and verify the Closing Inventory Statement and to settle the Final Inventory Statement, including access to and the services of key personnel.

**B.** Delphi will, within thirty (30) days after the delivery by Buyer of the Closing Inventory Statement, complete its review of such statement.  If Delphi disagrees with the Closing Inventory Statement, Delphi will, on or before the last day of such thirty (30) day period, inform Buyer in writing (the "**Objection**") of disagreements which on an item by item basis (individually) or in relation to a series of related items in the aggregate, exceed $100,000 (collectively, "**Relevant Items**").  Any Objection will specify in reasonable detail the nature of any disagreement so asserted, and include all supporting schedules, analyses, working papers and other documentation.  If: (i) no such Objection has been timely provided to Buyer; or (ii) the sum of all Relevant Items fails to exceed $100,000, then: (a) the Closing Inventory Statement will be deemed to be the Final Inventory Statement; and (b) Buyer's calculations will be final and binding on the Parties of all items therein.

**C.** Buyer will then have thirty (30) days following the date it receives the Objection to review and respond to the Objection.  If Delphi and Buyer are unable to resolve all of their disagreements with respect to the determination of the foregoing items by the fifteenth (15th) day following Buyer's response thereto, after having used their good faith efforts to reach a resolution, they will refer their remaining differences to a mutually agreed upon independent third party certified public accounting firm (the "**CPA Firm**"), who will, acting as experts in accounting and not as arbitrators, determine on a basis consistent with the requirements of Section 3.3, and only with respect to the specific Relevant Items remaining disputed, whether and to what extent, if any, the Closing Inventory Statement requires adjustment.  Delphi and Buyer will request the CPA Firm to use its commercially reasonable efforts to render its determination within thirty (30) days.  In resolving any disputed item, the CPA Firm: (i) will be bound by the principles set forth in this Section 3.3 and Schedule 3.3.1.C; (ii) will limit its review to matters specifically set forth in the Objection that remain disputed; and (iii) will not assign a value to any item greater than the greatest value for such item claimed by either Party or less

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

than the smallest value for such item claimed by either Party.  The CPA Firm's determination will be conclusive and binding upon Sellers and Buyer.  Delphi and Buyer will make reasonably available to the CPA Firm all relevant books and records, any work papers (including those of the Parties' respective accountants subject to any conditions such accountants may impose) and supporting documentation relating to the Closing Inventory Statement, and all other items reasonably requested by the CPA Firm.  The "**Final Inventory Statement**" will be: (i) the Closing Inventory Statement if the Parties so agree or if so determined in accordance with Section 3.3.2; or (ii) if an Objection is made under Section 3.3.2, the Closing Inventory Statement, as adjusted pursuant to the agreement of the Parties, or as adjusted by the CPA Firm.  The fees, costs and expenses of the CPA Firm under this Section 3.3.1: (i) will be borne by Delphi in the proportion that the aggregate dollar amount of such disputed items so submitted that are unsuccessfully disputed by Delphi (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted; and (ii) will be borne by Buyer in the  proportion that the aggregate dollar amount of such disputed items so submitted that are successfully disputed by Delphi (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted. Whether any dispute is resolved by agreement among the Parties or by the CPA Firm, changes to the Closing Inventory Statement may be made only for items as to which Delphi have taken exception in the Objection.  Each Party will bear its own expenses incurred in this dispute resolution process, including fees of its accountants, attorneys and other agents.

**3.3.2**    ~~3.2.7~~ **Preparation of the Estimated Inventory Amount.**  No more than twenty-one days prior to the Closing, Sellers will conduct a physical inventory of the Inventory of the Business (in which Buyer and its advisors shall be permitted to observe and participate) and utilizing a methodology, and accounting therefore, in accordance with GAAP, prepare a statement of such Inventory.  The value of the Inventory as set forth in such statement, which value shall be reasonably acceptable to Buyer, shall be the "**Estimated Inventory Amount**."  In the event the Sellers and Buyer cannot agree prior to the Closing on the Estimated Inventory Amount, notwithstanding their good faith efforts to do so, the Estimated Inventory Amount shall be the mid-point between Sellers' proposed Estimated Inventory Amount and Buyer's proposed Estimated Inventory Amount.  The Purchase Price will be (i) adjusted downward to the extent the Benchmark Inventory Amount exceeds the Estimated Inventory Amount <u>or</u> (ii) adjusted upward to the extent the Estimated Inventory Amount exceeds the Benchmark Inventory Amount.  Such upward or downward adjustment is the "**Estimated Inventory Adjustment**."

**3.4**    **Facilities and Non-Billable Tooling Adjustment.**  If the value of Facilities and Non-Billable Tooling reflected in the Facilities and Non-Billable Tooling Statement is less than the Facilities and Non-Billable Tooling Peg Amount, Delphi will pay to Buyer an amount equal to such deficiency.   If the value of Facilities and Non-Billable Tooling reflected in the Facilities and Non-Billable Tooling Statement is greater than the Facilities and Non-Billable Tooling Peg Amount, Buyer will pay to Delphi an amount equal to such excess.  Such deficiency or excess payment will be paid in immediately available funds within three (3) Business Days after the ultimate determination of the Facilities and Non-Billable Tooling Statement.

**3.4.1**    ~~3.2.8~~ **Preparation of Facilities and Non-Rebillable Tooling Statement.**  Within forty-five (45) calendar days of the Closing Date, Delphi will prepare

25

and deliver to Buyer a Facilities and Non-Rebillable Tooling Statement. The Facilities and Non-Rebillable Tooling Statement will set forth the Facilities and Non-Rebillable Tooling and will provide a listing of such payments, with vendor name, receipt number, and dollar amount as of Closing Date. If requested, Buyer will be provided a copy of specific receipt for each vendor payment and evidence of presentment and acceptance of payment. Within forty-five (45) calendar days after receipt of the Facilities and Non-Rebillable Tooling Statement, Buyer will identify in writing to Delphi any disputes with the Facilities and Non-Rebillable Tooling Statement. If no such correspondence takes place, the Facilities and Non-Rebillable Tooling Statement will be deemed final and the deficiency or excess payment described in Section 3.4 will be due. If there are any irreconcilable differences, the Parties will utilize the Dispute Resolution as the method to resolve any such difference.

     **3.5**     **Escrow.** Provided the Closing is on or after the effective date of the Filing Affiliates' confirmed plan of reorganization (the "**Emergence Date**"), Buyer shall deliver to Sellers the Purchase Price in accordance with Section 3.2.1 of this Agreement. If, however, the Closing is before the Emergence Date, at Closing, Buyer shall deliver to (i) the Environmental Escrow Agent, pursuant to the Environmental Escrow Agreement, Five Hundred Thousand Dollars ($500,000) of the Purchase Price (the "**Environmental Escrow Amount**") to be held by the Environmental Escrow Agent, in an interest bearing account, as collateral to secure the rights of the Buyer under Section ~~11.4.6~~ **[NTD: Environmental Escrow Agreement will provide that Sellers may draw on Environmental Escrow Amount to pay out-of-pocket costs incurred, as incurred, by Sellers in performing their obligations under Section 11.4.6.].**11.4.6, (ii) the Indemnity Escrow Agent pursuant to the Indemnity Escrow Agreement Two Million Dollars ($2,000,000.00) of the Purchase Price (the "**Indemnity Escrow Amount**") to be held by the Indemnity Escrow Agent, in an interest bearing account, as collateral to secure the rights of the Buyer under Article 11 hereof, and (iii) Buyer shall deliver to the Inventory Adjustment Escrow Agent pursuant to the Inventory Adjustment Escrow Agreement Five Hundred Thousand Dollars ($500,000.00) of the Purchase Price (the "**Inventory Adjustment Escrow Amount**") to be held by the Inventory Adjustment Escrow Agent in an interest bearing account, as collateral to secure the rights of the Buyer under Section 3.3. The Environmental Escrow Amount, the Indemnity Escrow Amount and the Inventory Adjustment Escrow Amount shall be held pursuant to the provisions of the Environmental Escrow Agreement, the Indemnity Escrow Agreement and the Inventory Adjustment Escrow Agreement, respectively. Subject to the terms of the Indemnity Escrow Agreement, the Indemnity Escrow Amount will be held by the Indemnity Escrow Agent from the Closing Date until the third anniversary of the Closing Date (the "**Escrow Period**"); provided, however, that in the event the Emergence Date occurs during the Escrow Period, the Indemnity Escrow Agent shall immediately deliver the Indemnity Escrow Amount to the Sellers and thereafter, the Sellers' obligations under Article 11, if any, shall be the sole responsibility of post-reorganization Delphi through the applicable periods set forth in Article 11. Subject to the terms of the Environmental Escrow Agreement, the Environmental Escrow Amount will be held by the Environmental Escrow Agent from the Closing Date until the Seller provides Buyer with a written certification by a competent environmental consultant that Seller has completed the Specific Remedial Works in accordance with all relevant standards required under applicable Environmental Laws and the remedial standards specified in this Agreement, subject to Buyer's review and approval of the certification, which approval shall not be unreasonably withheld or delayed. The Inventory Adjustment Escrow Amount shall be held pursuant to the provisions of the Inventory Adjustment Escrow Agreement by the Inventory Adjustment Escrow Agent from the Closing Date until the earlier of (y) the date which is one hundred fifty (150) days after the Closing Date (less any disputed Relevant Items, which will be

~~Error! Unknown document property name.~~
CHI ~~1633861~~**1635983**v1

retained by the Inventory Adjustment Escrow Agent until resolution of such Relevant Items), or (z) the date of any payment provided for in the first paragraph of Section 3.3 of this Agreement. The costs and expenses of each of the Environmental Escrow Agent, Indemnity Escrow Agent and Inventory Adjustment Escrow Agent, will be paid from and borne solely by the Environmental Escrow Amount, Indemnity Escrow Amount and Inventory Adjustment Escrow Amount, respectively.

**3.6**        ~~3.3~~ **Allocation of Purchase Price.**

**3.6.1**   ~~3.3.1~~ The Parties agree to allocate the Purchase Price (i.e., both the Purchase Price and any adjustments thereto) among the Business and the agreements provided herein for transfer of the Business to Buyer and its Affiliates, for all purposes (including financial, accounting and tax purposes) (the "**Allocation**") in a manner consistent with the Allocation Schedule attached as <u>Schedule 3.6.1</u>; and

**3.6.2**   ~~3.3.2~~ Buyer and Sellers will each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue Code (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law. Delphi will provide Buyer and Buyer will provide Delphi with a copy of any information required to be furnished to the Secretary of the Treasury under Internal Revenue Code Section 1060.

**3.7**      **Prorations.**  Notwithstanding anything in this Agreement to the contrary:

**3.7.1**   ~~3.3.3~~ To the extent that any Seller makes any payment relating to the Business prior to, on or following the Closing Date with respect to any item listed in Section 3.7.2 below relating to periods or portion thereof beginning after the Closing Date, Buyer will reimburse Sellers on a per diem basis; and

**3.7.2**   ~~3.3.4~~ To the extent Buyer is required to make any payment relating to the Business following the Closing Date with respect to any item listed below relating to periods or portions thereof ending on or prior to the Closing Date, Sellers will reimburse Buyer on a per diem basis, in each case for the following:

**A.** Personal, real property and other ad valorem Taxes, sales and use Taxes and all other Taxes relating to the Acquired Assets, allocated in accordance with local custom;

**B.** Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Business;

**C.** Electric, fuel, gas, telephone and other utility charges;

**D.** Regarding Business Employees, payroll expenses (excluding vacation pay) and other employee-related payments (of whatsoever kind) or assessments and installments on special benefit assessments;

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983 v1

**E.** Reimbursable employee business expenses of Transferred Employees; and

**F.** Payments and charges due pursuant to any Contract other than pursuant to Collective Bargaining Agreements, Employee Benefit Plans and employee payroll-related items except as set forth in Section 6.6, Permit, commitment or other binding arrangement to which Sellers are a party or is obligated and which are being assumed by Buyer pursuant to this Agreement.

**3.7.3** ~~3.3.5~~ The Parties will agree to a mechanism for such reimbursements as soon as practicable following the date hereof.

## 4. <u>REPRESENTATIONS AND WARRANTIES OF SELLERS.</u>

Each Seller represents and warrants, as of the date hereof and of the Closing Date, severally and not jointly, to Buyer with respect to the subject matter of such representations and warranties to the extent it relates to such Seller, as follows:

**4.1** **Organization.** Each Seller is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization. Each Seller has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed to do business and in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement.

**4.2** **Authorization; Enforceability.** Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, as applicable, each Seller has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements. Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, if applicable, the execution and delivery of this Agreement and the Ancillary Agreements by Delphi and each Seller that is a party to any of such agreements, and the performance by each of them of their respective obligations under any of such agreements, in the case of Delphi have been, and in the case of the other Sellers, prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Seller. This Agreement has been duly executed and delivered by Delphi, and the Ancillary Agreements will be duly executed and delivered by Delphi and each Seller, as applicable, and, assuming due authorization, execution and delivery by Buyer, constitutes, or will constitute, a valid and binding agreement of Delphi and each Seller, as applicable, enforceable against each of them in accordance with their respective terms, except: (a) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect any by general equitable principles relating to enforceability, and (b) that, unless otherwise set forth in the Bidding Procedures Order, enforceability of all other provisions of this Agreement is subject to entry and approval of the Sale Approval Order.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

**4.3**        **4.1 RESERVED.**

**4.4**        **Financial Statements.**  Schedule 4.4.1 sets forth (a) the unaudited, pro-forma balance sheet of the Business as of December 31, 2006 (such balance sheet, the "**Reference Balance Sheet**") and the related unaudited, pro-forma statement of income for the year ended December 31, 2006, and (b) the unaudited, pro-forma balance sheet of the Business as of September 30, 2007 and the related unaudited, pro-forma statement of income for the nine month period ended September 30, 2007 in each case including Sellers' pro-forma adjustments.  (The foregoing balance sheets and income statements of the Business are referred to as "**Financial Statements**").  Except as set forth on Schedule 4.4.2, the Financial Statements: (i) are true in all material respects; (ii) were prepared from statements prepared and used by Sellers in the ordinary course of managing the Business; and (iii) present fairly in all material respects, the assets, liabilities, financial position and results of operations of the Business on a pro-forma basis recognizing that the Acquired Assets comprising the Business have not been operated as separate "stand alone" entities within Delphi, as of the dates and for the respective periods covered, and, as a result, the Business has been allocated certain charges and credits as discussed in the notes accompanying the Financial Statements and as otherwise described in Schedule 4.4.2.

**4.5**        **No Conflicts or Approvals.**  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, except as set forth on Schedule 4.5, the execution, delivery and performance of this Agreement and of the Ancillary Agreements by Delphi and each Seller that is a party do not: (i) violate, conflict with or result in a breach by any of Delphi or Sellers of the Organizational Documents of any of Delphi or Sellers; (ii) violate or result in a material breach of any Governmental Order or Law applicable to any of Delphi or Sellers or any of their respective properties or assets; (iii) result in a breach of, constitute a default under, create in any party the right to accelerate, terminate, adversely modify or cancel, or result in the acceleration of, any obligation of the Sellers under any Material Contracts; or (iv) require any Governmental Approval, except as set forth in this Agreement and in each case for consents, approvals, authorizations of, declarations or filings with the Bankruptcy Court, except; (x) as would not, individually or in the aggregate, have a Material Adverse Effect or a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement; or (y) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

**4.6**        **Sufficiency of Acquired Assets.**

**4.6.1**    **4.1.1** As of the Closing, the Sellers will have good and marketable title to or a valid leasehold interest in all of the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances.

**4.6.2**    **4.1.2** Except for the Excluded Assets:  the Acquired Assets conveyed to Buyer at Closing, together with (i) the Intellectual Property rights to be licensed from Sellers to Buyer pursuant to Section 6.12, and (ii) the assets used to produce the general corporate services that are currently provided by Sellers to the Business, including those described in the Transition Services Agreement or any Ancillary Agreement, comprise all of the rights and assets reasonably necessary to carry on the Business in all material respects as it is now being conducted.

**4.7**        **Compliance with Law; Permits.**  Except as set forth on Schedule 4.7, since January 1, 1999, to the Knowledge of the Sellers, the Business has been and is currently

Error! Unknown document property name.
CHI 1633861 1635983v1

in material compliance with all Laws.  To the Knowledge of Sellers, the Sellers possess all licenses, consents, approvals, permits and other Governmental Approvals ("**Permits**") necessary to own, lease and operate the Acquired Assets as currently owned, leased and operated by the Business, except where the failure to have such Permits would not have a Material Adverse Effect.  This Section 4.7 shall not apply to compliance with Environmental Laws and Environmental Permits, which is covered by Section 4.14.

**4.8**      **Proceedings.**  Except for claims raised in connection with the pendency of the Bankruptcy Cases, and for the Claims and other items set forth in Schedule 4.8, (and except with respect to compliance with Environmental Laws, which is covered by Section 4.14), within the three (3) years immediately preceding the Closing Date, there have been no material Proceedings against the Business or any of the Acquired Assets, and there are no pending or, to the Knowledge of Sellers, threatened Proceedings against the Business or any of the Acquired Assets.

**4.9**      **Absence of Certain Changes**.  Except as set forth in Schedule 4.9.1 or as otherwise contemplated or expressly permitted by this Agreement, since September 30, 2007: (i) the Business has been conducted only in the Ordinary Course of Business; and (ii) there has not been any change or development in or affecting the Business that has had, or would have, a Material Adverse Effect.

**4.10**      **Tax Matters.**   The Sellers have withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any Employee.

**4.11**      **Employees.**  Regarding the Business:

**4.11.1**    ~~4.1.3~~ Schedule 4.11.1 contains a list of all Seller Employees, including for all Seller Employees: (i) each such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's current annual base rate of compensation; (vi) each person's date of hire; and, if applicable (vii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, separation pay agreement, etc.) to the extent permitted to be disclosed under applicable Law (including local privacy laws);

**4.11.2**    ~~4.1.4~~ Schedule 4.11.2 sets forth a list of each Seller Employee Benefit Plan applicable to Seller Employees.  Schedule 4.11.2 separately identifies each Seller Employee Benefit Plan that is, as of the Closing Date, required to be provided to Hourly Employees pursuant to the terms of the Collective Bargaining Agreements immediately prior to the Closing Date;

**4.11.3**    ~~4.1.5~~ Copies of the following materials have been delivered or made available to Buyer with respect to each Seller Employee Benefit Plan to the extent applicable: (i) current plan documents; and (ii) current agreements and other documents relating to the funding or payment of benefits; and

**4.11.4**    ~~4.1.6~~ Except as: (i) set forth in Schedule 4.11.4; and (ii) routine claims for benefits by participants and beneficiaries, there are no pending or, to the Knowledge

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

of Sellers, threatened Proceedings with respect to any Seller Employee Benefit Plans that would result in a Liability that would have a Material Adverse Effect.

**4.11.5** ~~4.1.7~~ **Collective Bargaining Agreements.** Schedule 4.11.5 lists all or substantially all Collective Bargaining Agreements. Each Seller has given access or delivered to Buyer true, correct and complete copies of each of the Collective Bargaining Agreements. Except as disclosed on Schedule 4.11.5, each Seller is in compliance with each Collective Bargaining Agreement.

**4.11.6** ~~4.1.8~~ **Grievances, Labor Negotiations.** Except as disclosed on Schedule 4.11.6, or as reflected in the Collective Bargaining Agreements, with respect to the Business: (i) there is no labor strike, dispute, slowdown or stoppage actually pending or, to Sellers' Knowledge, threatened against or involving Sellers; (ii) no Seller has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity relating to any of its employees; and (iii) no Grievances relating to any employee of Sellers are pending as of the Closing.

**4.11.7** ~~4.1.9~~ **Labor/Employment Claims.** Sellers are in compliance with all applicable labor and employment Laws in connection with the operation of the Business and the Acquired Assets. Except as set forth on Schedule 4.11.7, there are no pending or threatened Claims against Sellers whether under applicable Laws, employment agreements or otherwise asserted by any present Employee or former Employee or any other Person as relates to the Business, including claims on account of or for: (a) wages or salary for any period other than the current payroll period; (b) any amount of vacation pay or pay in lieu of vacation or time off; (c) violations of Laws pertaining to payment of wages and fair labor standards, including but not limited to maximum work hours, minimum wages and overtime pay, other than overtime pay for work done during the current payroll period; (d) violations of Laws pertaining to employee relations, civil rights, employment discrimination, affirmative action, or fair employment practices; (e) violations of Laws pertaining to labor relations, unfair labor practices, union security or union membership, (f) violations of Laws pertaining to immigration or employment eligibility; or (g) violations of Laws pertaining to occupational health and safety or workers' compensation; and, to Sellers' Knowledge, there are no such claims which have yet to be asserted. Except as set forth on Schedule 4.11.7, there are no pending or threatened investigations by any Governmental Authority with respect to any alleged violation of labor or employment Laws in connection with the operation of the Business or the Acquired Assets. No Seller is subject to any consent decree or formal or informal settlement agreement with any Governmental Authority pursuant to any labor or employment Laws.

## 4.12    ~~4.2~~ Intellectual Property.

**4.12.1** ~~4.2.1~~ Schedule 4.12.1.A and Schedule 4.12.1.B, respectively, list all patents and patent applications and all trademark registrations and applications therefor included in the Purchased Intellectual Property. Except: (i) as set forth in Schedules 4.12.1.A and 4.12.1.B or (ii) rights to any patent or patent application filed in Europe retained by employee-inventors pursuant to European Law, and subject to Permitted Encumbrances and the rights and limitations established by the Material Contracts, Sellers own the entire right, title and interest in such patents, patent applications,

Error! Unknown document property name.
CHI ~~1633861~~1635983v1

trademark registrations and applications, and have the right to transfer Sellers' right, title and interest in them as set forth in this Agreement.

**4.12.2** ~~4.2.2~~ Subject to Permitted Encumbrances and the rights and limitations established by the Material Contracts, Sellers own or otherwise have the right to transfer all other Purchased Intellectual Property and license the Shared Intellectual Property as set forth in this Agreement.

**4.12.3** ~~4.2.3~~ Except as set forth in Schedule 4.12.3, Sellers have no Knowledge of any actual, or any allegation by any third party of, Intellectual Property infringement or misappropriation, resulting from the operation of the Business during the last two (2) years, that would have a Material Adverse Effect.

**4.12.4** ~~4.2.4~~ Except as set forth in Schedule 4.12.4, Sellers have no Knowledge of any infringement of the Purchased Intellectual Property.

**4.13** ~~4.3~~ **Contracts.**

**4.13.1** ~~4.3.1~~ Schedule 4.13.1 sets forth a list of each of the following Contracts to which any of the Sellers with respect to the Business, is party or by which any of them is bound as of the Closing Date and that are included in the Acquired Assets, other than Seller Employee Benefit Plans (collectively, the "**Material Contracts**"):

> **A.** Partnership, joint venture agreements or other agreements involving a sharing of profits or expenses by the relevant Seller party thereto with respect to the Business;

> **B.** Indentures, mortgages, loan agreements, capital leases, security agreements or other agreements for the incurrence of Debt Obligations, other than letters of credit, overdrafts and other current-account credit facilities entered into in the Ordinary Course of Business, in each case exceeding $500,000;

> **C.** Guarantees of the obligations of other Persons involving the potential expenditure by the Sellers in respect of the Business after the date of this Agreement of more than $500,000 in any instance;

> **D.** Contracts (other than Contracts providing for the non-exclusive license of Intellectual Property to prospective suppliers or customers relating to the development of Products) under which any Seller has licensed material Purchased Intellectual Property to, or material Licensed Intellectual Property from, any other Person;

> **E.** Contracts involving the expenditure by the Sellers in respect of the Business of more than $500,000 in any instance for the purchase of materials, supplies, equipment or services, excluding any such contracts that are terminable by the Sellers without penalty on not more than one hundred eighty (180) days notice;

Error! Unknown document property name.
CHI ~~1633861~~1635983v1

**F.** Contracts providing that a Seller in respect of the Business will receive future payments aggregating more than $500,000 per annum or $2,000,000 in the aggregate prior to the expiration of such Contract;

**G.** Each Contract the performance of which is reasonably expected to involve payment or receipt by the Business of aggregate consideration in excess of $500,000 in the twelve month period immediately following the date hereof and in excess of $2,000,000 prior to expiration thereof; and

**H.** Each Contract that contains any non-compete provision or other similar covenant restricting the Business from competing with any other Person or engaging in any line of business.

**4.13.2** ~~4.3.2~~ Except as set forth in Schedule 4.13.2, and other than with respect to monetary defaults by Sellers under Material Contracts that are curable by payment of all Cure Amounts, if applicable, to the Knowledge of Sellers: (i) no event has occurred that constitutes (or with notice or lapse of time would constitute) a default (except with respect to defaults that need not be cured under Section 365 of the Bankruptcy Code for Sellers to assume and assign such Material Contracts to Buyer, if applicable) that would have a Material Adverse Effect by: (a) any Seller under any Material Contract; or (b) to the Knowledge of Sellers, any other party to any Material Contract; (ii) there are no material unresolved disputes under any of the Material Contracts; (iii) the assignment of any Material Contract pursuant to this Agreement will not result in termination of, or result in a right of termination under, any such Material Contract, or bring into operation any other provision thereof, (iv) each Material Contract is in full force and effect; and (v) to Sellers' Knowledge, no notice of termination or default has been issued with respect to any Material Contract.

**4.13.3** ~~4.3.3~~ Set forth on Schedule 4.13.3 is a list of the top five (5) customers (**"Significant Customers"**) of the Business as of December 31, 2006 and December 31, 2007 in each case setting forth for each the amount of gross revenue received in 2006 and in 2007. Each Seller has received no written notice, and has no Knowledge, that any Significant Customer will cease to do business with the Business or substantially reduce either the purchase of products from the Business or the pricing thereof. Buyer acknowledges that the foregoing shall not be deemed a guarantee of customer volumes or pricing.

**4.13.4** ~~4.3.4~~ Set forth on Schedule 4.13.4 is a list of the top five (5) suppliers (**"Significant Suppliers"**) of the Business as of December 31, 2006 and December 31, 2007 in each case setting forth for each the amount of gross purchases in 2006 and in 2007. Each Seller has received no written notice, and has no Knowledge, that any Significant Supplier will cease to do business with the Business or substantially reduce sale of products to the Business or increase the pricing thereof. Buyer acknowledges that the foregoing shall not be deemed a guarantee of supplier volumes or pricing.

**4.14    Environmental Matters.** Except as disclosed in Schedule 4.14, to the Knowledge of the Sellers:

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

**4.14.1**    ~~4.3.5~~ The Sellers with respect to the Acquired Assets and the Business are, and have been for the past five (5) years, in material compliance with all applicable Environmental Laws and with Environmental Permits;

**4.14.2**    ~~4.3.6~~ The Sellers have not received any written notice, from a Governmental Authority, alleging that the Owned Real Property, the Acquired Assets or the Business as currently operated violates in any material respects, or is subject to any material liability under, any Environmental Laws or Environmental Permits;

**4.14.3**    ~~4.3.7~~ The Sellers have not received, and are not aware of the issuance of any pending or threatened material Environmental Claim with respect to the Owned Real Property, the Acquired Assets or the Business;

**4.14.4**    ~~4.3.8~~ There has been: (i) no Release of Hazardous Materials on, at, under or migrating to or from any Owned Real Property in concentrations exceeding legally applicable and relevant standards for the Owned Real Property as currently used or otherwise in concentrations likely to give rise to Environmental Damages; and (ii) no notice or request for information from any Governmental Authority under 42 U.S.C. §9601 et seq. of any Release of Hazardous Materials that was generated or used by the Business;

**4.14.5**    ~~4.3.9~~ This Section 4.14 contains the sole and exclusive representations and warranties of Sellers in this Agreement with respect to Environmental Matters pertaining to the Business and to the Owned Real Property and Acquired Assets;

**4.14.6**    ~~4.3.10~~ Sellers have delivered or otherwise made available to Buyer copies of any Phase I or Phase II environmental assessments and any material reports, Governmental Authorities' inspection reports, studies, analyses or test results or material correspondence with Governmental Authorities in the possession or control of any Seller pertaining to Hazardous Materials in, at, on, beneath or adjacent to any Owned Real Property, or non-privileged reports regarding the Sellers' compliance with Environmental Laws in connection with the Business, the Owned Real Property or the Acquired Assets; and

**4.14.7**    ~~4.3.11~~ (i)  A list of all material Permits required under Environmental Law  to operate the Business as currently operated at the Owned Real Property is set forth in Schedule 4.14; and

(ii) Sellers have timely filed applications for renewal of such Permits at the Owned Real Property.

**4.15**    **Insurance.**  Schedule 4.15 contains a complete and correct list, in all material respects, of all material policies of insurance covering any of the assets primarily used in or relating to the Business, other than Excluded Assets, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder.  All such policies are outstanding and in full force and effect.

**4.16**    ~~4.4~~ **Personal Property Assets, Inventory.**

**4.16.1**    ~~4.4.1~~ Except as set forth on Schedule 4.16.1, the Sellers have good and marketable title to, or hold by valid and existing lease or license, all Personal Property reflected as assets on the Reference Balance Sheet or acquired after December 31, 2006, except with respect to assets disposed of in the Ordinary Course of Business since such date and, from and after the date hereof, in accordance with this Agreement.

**4.16.2**    ~~4.4.2~~ The Sellers, with respect to the Acquired Assets, will own, or have valid leasehold interests in, all Personal Property and Inventory being transferred to Buyer under this Agreement, and to Sellers' Knowledge, all transferred Personal Property used by the Business are in such condition (considering age and purpose for which they are used) as to enable the Business to be conducted as currently conducted.

**4.16.3**    ~~4.4.3~~ Except to the extent identified in Schedule 4.16.3, the Inventory included in the Acquired Assets will, as of the Closing, be located at the Owned Real Property.   All Productive Inventory included in the Acquired Assets is saleable and usable in the ordinary course, except for such Inventory as to which an adjustment is made in the Closing Inventory Statement, and no Inventory is excess, damaged or obsolete.  Excess inventory is, in the case of non-service parts,  Inventory that exceeds the volume of inventory releases from customers in the prior thirteen (13) weeks, and, in the case of service parts and aftermarket, Inventory that exceeds the volume of inventory releases from customers in the prior fifty-two (52) weeks.

**4.16.4**    ~~4.4.4~~ Schedule 4.16.4 sets forth a list of substantially all machinery, equipment and capitalized tools with a book value greater than $100,000 included in the Acquired Assets.

**4.17**    **Real Property.**    Schedule 4.17 lists all real property owned which constitutes Acquired Assets (the "**Owned Real Property**").  With respect to each such parcel of the Owned Real Property and except as otherwise specified on Schedule 4.17 and except where the failure of any of the following to be true and correct would not have a Material Adverse Effect, the identified owner has good and marketable fee simple title to the parcel of the Owned Real Property, free and clear of any Encumbrances, except for Permitted Encumbrances.

**4.18**    **No Brokers' Fees.**    Sellers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Buyer would be liable.

**4.19**    **Product Claims.**    Schedule 4.19 lists all Product Claims, and all Claims in respect of any product warranty or product return or recall arising out of or relating to Products, during the three (3) years immediately preceding the Closing Date.

**4.20**    **No Other Representations or Warranties.**    Except for the representations and warranties contained in this Article 4, the Sellers make no other express or implied representation or warranty to Buyer, and in particular but without limitation, no Seller is making any representations with respect to any plan(s) of Buyer for the future conduct of the Business, or any implied warranties of merchantability or fitness for a particular purpose.  For avoidance of doubt, except as set forth in this Article 4, no warranty or representation is given on the contents of the documents provided in due diligence or with respect to the information contained in the Confidential Information Memorandum, Data Room, management presentations, reports or any

35

financial forecasts or projections or other information furnished by Delphi or any Seller or their officers, directors, employees, agents or representatives or in any other documents or other information not contained in this Agreement or the Ancillary Agreements.

**4.21    Fair Disclosure.**  Any matter disclosed in any Schedule to this Agreement will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations, warranties or Schedules contain a reference to such Schedule, so long as it is reasonably apparent that such matter also applies to such other representations and warranties.  Sellers acknowledge that a Liability that is a Retained Liability under Section 2.4 hereof shall remain a Retained Liability for which Buyer is entitled to indemnification under Section 11.3.2 regardless of whether such Liability is disclosed in a Schedule to this Agreement.

**4.22    Survival.**  Each of the foregoing representations and warranties will expire on the first anniversary of the Closing Date, other than the representations and warranties contained in Sections 4.14 and 4.19, which will expire on the third anniversary of the Closing Date and the representations and warranties contained in Sections 4.2, 4.6.1, 4.10 and 4.18, which shall survive indefinitely.

## 5.    REPRESENTATIONS AND WARRANTIES OF BUYER.

The Buyer hereby represents and warrants to Sellers, as of the date hereof and of the Closing Date, as follows:

**5.1    Organization.**  The Buyer is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.  The Buyer has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

**5.2    Authorization; Enforceability.**  Buyer has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and the Ancillary Agreements to which Buyer is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.  The execution and delivery of this Agreement and the Ancillary Agreements by the Buyer, and the performance of its obligations under any such agreement, will be duly authorized by all necessary corporate action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and the Ancillary Agreements will be duly executed and delivered by the Buyer and, assuming due authorization, execution and delivery by Sellers, constitutes, or will constitute, a valid and binding agreement of the Buyer, enforceable against it in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

**5.3    No Conflicts or Approvals.**  The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements and the consummation by Buyer of the

Error! Unknown document property name.
CHI 1633861 1635983 v1

transactions contemplated hereby and thereby do not and will not: (i) violate, conflict with or result in a breach by Buyer of the Organizational Documents of Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument to which Buyer or its properties or assets may be bound; or (iii) violate or result in a breach of any Governmental Order or Law applicable to Buyer or its properties or assets, require any Governmental Approval, except, with respect to the foregoing clauses (ii) and (iii) above, as would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

**5.4**     **Proceedings.**  There are no Proceedings pending or, to the Knowledge of Buyer, threatened against the Buyer that would reasonably be expected to restrain, delay or inhibit the ability of Buyer to consummate the transactions contemplated by this Agreement. The Buyer is not subject to any Governmental Order that would reasonably be expected to restrain, delay or otherwise inhibit the ability of Buyer to consummate the transactions contemplated by this Agreement.

**5.5**     **Solvency.**   As of immediately following the consummation of the transactions contemplated by this Agreement at Closing: (i) the Buyer will be not insolvent; (ii) none of the Buyer or the other legal entities constituting the Business will have unreasonably small capital; (iii) none of the Buyer or the Business will have accrued debts beyond its ability to pay such debts as they become due; (iv) the capital of Buyer and the other legal entities constituting the Business will not be impaired; and (v) Buyer individually and in the aggregate will have capital that it reasonably believes is sufficient to continue the Business as a going concern.

**5.6**     **Anti-Money Laundering.**   Buyer is in compliance with: (i) all applicable provisions of  the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Buyer operates or does business.  Neither any Buyer nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and no Buyer is affiliated in any way with, or providing financial or material support to, any such persons or entities.  Buyer agrees that should Buyer or Buyer Parent, or any of their directors, officers or affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Buyer will inform Delphi in writing immediately.

**5.7**     **RESERVED**.

Error! Unknown document property name.
CHI 16338611635983v1

**5.8**　　**No Inducement or Reliance; Independent Assessment.**　Except in the event of fraud or intentional misrepresentation:

　　**5.8.1**　~~4.4.5~~ With respect to  the Acquired Assets, the Business or any other rights or obligations to be transferred hereunder or pursuant hereto, Buyer has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Delphi, any of its Affiliates, or any agent, employee, attorney or other representative of Delphi representing or purporting to represent Delphi or any Seller that are not expressly set forth herein (including the Schedules and Exhibits hereto and thereto), whether or not any such representations, warranties or statements were made in writing or orally, and none of Delphi, any Affiliate of Delphi, or any agent, employee, attorney, other representative of Delphi or other Person will have or be subject to any Liability to Buyer or any other Person resulting from the distribution to Buyer, or Buyer's use of, any such information, including the Confidential Information Memorandum and any information, documents or material made available in the Data Room or any Management Presentations or in any other form in expectation of the transactions contemplated by this Agreement.

　　**5.8.2**　~~4.4.6~~ Buyer acknowledges that it has made its own assessment of the present condition and the future prospects of the Business and is sufficiently experienced to make an informed judgment with respect thereto.  Buyer acknowledges that, except as set forth in Article 4, neither Delphi nor any of its Affiliates has made any warranty, express or implied, as to the prospects of the Business or its profitability for Buyer, or with respect to any forecasts, projections or business plans prepared by or on behalf of Delphi and delivered to Buyer in connection with Buyer's review of the Business and the negotiation and the execution of this Agreement.

　　**5.9**　　**Financial Ability.**　Buyer ~~Parent~~ has the financial ability and ~~Buyer~~ will have available at Closing sufficient Cash in immediately available funds to pay the Purchase Price and all later adjustments thereto, and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement at Closing.  In particular, Buyer has delivered to Sellers an equity commitment letter from Buyer Parent demonstrating Buyer Parent's agreement to fund **a portion of** the Purchase Price.

　　**5.10**　　**No Brokers' Fees.**　Buyer has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Sellers would be liable.

　　**5.11**　　**Compliance with Laws.**　Buyer is in compliance with all Laws applicable to Buyer, except with respect to those violations that would not reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Buyer from consummating the transactions contemplated by this Agreement.

　　**5.12**　　**Adequate Assurance of Future Performance.**　Buyer has provided or will be able to provide, at or prior to Closing, adequate assurance of its future performance under each Assumed Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed Contract, provided, however, that in the event the Bankruptcy Court enters an order requiring the Buyer to undertake action in order to

38

demonstrate such adequate assurance with respect to a particular contract, the Buyer may elect instead to have Sellers remove such contract from the list of Assumed Contracts.

**6.**    ~~5.~~  **COVENANTS AND AGREEMENTS.**

**6.1**    **Conduct of Business between Signing and Closing**.

**6.1.1**    ~~5.1.1~~  Except as: (i) required by this Agreement; (ii) disclosed on Schedule 6.1.1; (iii) required by, arising out of, relating to or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; or (iv) required by any changes of applicable Laws; from and after the date of this Agreement and until the Closing, Delphi will cause the Sellers to (a) conduct the operations of the Business in the Ordinary Course of Business, (b) use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relationships with the Business, (c) maintain all contracts with respect to development and purchase of machinery, equipment and tooling, including the items set forth on Schedule 6.1.1(a), and (d) maintain all machinery, equipment and tooling in the Ordinary Course of Business.  Except: (x) as contemplated by this Agreement or as disclosed on Schedule 6.1.1(b); or (y) as required by, arising out of, relating to or resulting from the Bankruptcy Cases (including consensual resolutions between Delphi and any of the Unions and an approved plan of reorganization) or otherwise approved by the Bankruptcy Court, from and after the date of this Agreement and until the Closing, Delphi will cause the Sellers to refrain from doing any of the following without the prior written consent of Buyer (which consent will not be unreasonably withheld or delayed):

**A.** Sell or otherwise dispose of Acquired Assets (including any assets that would be Acquired Assets if owned, used or held by any Sellers as of the Closing), excluding sales of tooling to customers, sales of Inventory and sales of receivables to financial institutions or credit collection agencies, in each case in the Ordinary Course of Business;

**B.** Incur, assume or guarantee any Debt Obligation that would become an Assumed Liability;

**C.** Incur any Encumbrance on any material Acquired Assets, in each case, other than Permitted Encumbrances;

**D.** Increase the cash compensation of the Transferred Employees other than: (i) in the Ordinary Course of Business; or (ii) as required by Law;

**E.** Make any material change in the accounting methods or practices followed by the Business (other than such changes that are: (i) required by Law; (ii) made in conformance with GAAP; or (iii) required in connection with the preparation of the Financial Statements);

**F.** Terminate or make any material amendment, or any other amendment that would or would reasonably be expected to be adverse to the Business, to a Material Contract;

Error! Unknown document property name.
CHI ~~1633861~~1635983v1

**G.** Terminate or make any material amendment, or any other amendment that would or would reasonably be expected to be adverse to the Business, to a Collective Bargaining Agreement;

**H.** Fail to maintain insurance in a manner consistent with Sellers' past practice;

**I.** Waive any material rights relating to the Business other than in the Ordinary Course of Business; or

**J.** Agree or commit to do any of the foregoing.

**6.2**        **Bankruptcy Actions**.

**6.2.1**    ~~5.1.2~~ RESERVED.

**6.2.2**    ~~5.1.3~~ Sellers and Buyer shall use their commercially reasonable efforts to have the Bankruptcy Court enter the Sale Approval Order as and when contemplated by the Bidding Procedures Order, including providing testimony as required at any hearing before the Bankruptcy Court.

**6.2.3**    ~~5.1.4~~ The Sellers shall comply with all requirements of the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the sale of the Acquired Assets (including the assumption and assignment to Buyer of the Assumed Contracts) to Buyer pursuant to this Agreement.  Notice of the hearings on the request for entry of the Bidding Procedures Order and the Sale Approval Order, notice of any hearings at which objections to proposed cure amounts or other issues regarding the proposed assumption and assignment of the Contracts as contemplated by this Agreement and notice of the deadline for all objections to entry of the Bidding Procedures Order, the Sale Approval Order or any other order related thereto has been or shall be, as the case may be, properly served by the Sellers in accordance with all applicable Bankruptcy Rules and all applicable local rules and standing orders of the Bankruptcy Court on all parties required to receive such notices, including, without limitation, all parties who have asserted Encumbrances in the Acquired Assets, all parties to Contracts transferred pursuant to this Agreement, counsel to any statutory committee appointed in the Bankruptcy Cases, the Office of the United States Trustee for the Southern District of New York, all indenture trustees for debt issued by the Sellers, all parties filing notices of appearance or requests for papers in any of the Bankruptcy Cases, the Internal Revenue Service, all federal, state, and local regulatory or taxing authorities or recording offices that have a reasonably known interest in the relief contemplated under the Sale Approval Order, including the U.S. Environmental Protection Agency and any applicable state environmental agency, the Pension Benefit Guaranty Corporation, and, to the extent required, each of each Seller's creditors.  In addition, notice of the hearing on Delphi's request for entry of the Sale Approval Order and the objection deadline for such hearing has been given by the Sellers, in the form of notice approved by the Bankruptcy Court, by publication of a notice in the Wall Street Journal National Edition and the Detroit Free Press in accordance with the Bidding Procedures Order.  The Sellers shall strictly comply with the Bidding Procedures Order.

**6.2.4**    ~~5.1.5~~ Sellers shall cause their indemnification and other post-Closing obligations under this Agreement and the Ancillary Agreements to be borne by (i) the

Error! Unknown document property name.
CHI ~~1633861~~1635983v1

Filing Affiliates' successor in interest or (ii) Delphi on and after the Emergence Date as provided in paragraph 36 of the Sale Approval Order.

### 6.3    Assumed Contracts; Cure Amounts.

**6.3.1**  ~~5.1.6~~ Pursuant to the Bidding Procedures Order, the Bankruptcy Court has approved certain procedures related to the assignment of certain Pre-Petition Contracts to Buyer, notice of which has been provided by Delphi to all non-Debtor parties in accordance with the applicable Bankruptcy Rules and the Bidding Procedures Order.  To the extent notice of Seller's intent to assign the Pre-Petition Contracts listed on Schedule 6.3.1 (collectively, the "**Assumed Contracts**") to Buyer has not been previously provided, then no later than as soon as practicable after the Auction Delphi will pursuant to motion move to assume and assign to Buyer such omitted Assumed Contracts and will provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court.  Seller will pay Cure Amounts as agreed to by Delphi and each party to an Assumed Contract or, absent such agreement, by order of Bankruptcy Court in the time and manner specified by the Sale Approval Order.

**6.3.2**  ~~5.1.7~~ Sellers and Buyer shall use commercially reasonable efforts to have included in the Sale Approval Order an authorization for Sellers to assume and assign to Buyer the Assumed Contracts.  To the extent the Sale Approval Order does not authorize the assignment and assumption the Assumed Contracts, Sellers shall by motion obtain a separate order authorizing such assignment and assumption.

**6.3.3**  ~~5.1.8~~ RESERVED.

**6.3.4**  ~~5.1.9~~ Notwithstanding anything to the contrary in this Agreement or otherwise, the Buyer shall have the right (i) through Closing to amend Schedule 6.3.1 hereto to delete any Assumed Contract; and (ii) through Closing to amend Schedule 6.3.1 hereto to add any Pre-Petition Contract related to the operation of the Business to this list of Assumed Contracts.  Sellers shall use reasonably commercial efforts to assist Buyer in making its determination as to whether to delete from Schedule 6.3.1 any Assumed Contracts, including, without limitation, providing Buyer with copies of all such Assumed Contracts and all amendments or supplements thereto and providing Buyer with access to, and contact and other information it possesses, with respect to all third parties to such Assumed Contracts.

### 6.4    Performance Under Contracts.

Subject to the terms and conditions of this Agreement, Buyer shall, from and after the Closing Date, (a) assume all obligations and liabilities of Sellers that constitute Assumed Liabilities and Future Liabilities under the Contracts that are transferred to Buyer at Closing; and (b) use commercially reasonable efforts to satisfy the Assumed Liabilities and Future Liabilities related to each of the Contracts that are transferred to Buyer at Closing as Acquired Assets.

### 6.5    Non-Competition.

**6.5.1**  ~~5.1.10~~ Delphi undertakes and agrees with Buyer that from the Closing Date and through December 31, 2012, except with the consent of Buyer, Delphi will not, and will procure that each Affiliate of Delphi will not, either on its own account or in

41

conjunction with or on behalf of any person, firm or company, whether by sales, marketing or other activities, carry on or be engaged, whether as a shareholder, director, employee, partner or agent in carrying on any business which is engaged in the design, development, manufacture, remanufacture or sale of Products as carried on by the Business at the Closing Date (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 6.5.1 will not prohibit, in any way: (i) the acquisition of a controlling interest or merger with any Person, or a division or business unit thereof, which is not primarily engaged in a Competitive Business, provided that Delphi will use commercially reasonable efforts to divest, as soon as practicable after such acquisition or merger, any portion of the Business of such Person that constitutes a Competitive Business, if the Competitive Business accounts for more than fifteen (10%) percent of the sales of the acquired business; (ii) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of a non-controlling ownership interest in any Person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen (10%) percent or less of the sales or fifteen (10%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater); (iii) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of less than five (5%) percent of the publicly traded stock of any Person engaged in a Competitive Business; (iv) provision of consulting services to, the license of any technology that Delphi or any Delphi Affiliate owns or has license to use to, or the financing (on its own behalf or on behalf of any other Person) of any Person for the purpose of designing or manufacturing on behalf of Delphi or any Delphi Affiliate or selling to Delphi or any Delphi Affiliate components and parts for automotive applications; (v) consistent with Delphi's troubled supplier practices, any direct or indirect activities of Delphi or any Delphi Affiliate to advise, operate, manage or finance a troubled supplier of Delphi or its Affiliates; or (vi) any business or activity conducted by Delphi or any Affiliate, joint venture, subsidiary or division of Delphi (excluding the Business) and any natural extensions thereof as of the Closing Date (each of which will be deemed not to breach this Section 6.5.1), including:(a) any activity conducted using the Excluded Assets; and (b) the design, development, manufacture, remanufacture or sale of the Excluded Products.

**6.5.2** ~~5.1.11~~ In the event that the covenants contained in Section 6.5.1 are more restrictive than permitted by Law, the Parties agree that the covenants contained in Section 6.5.1 will be enforceable and enforced to the extent permitted by Law.

### 6.6    Tax Matters; Cooperation.

**6.6.1** ~~5.1.12~~ The Party that is the owner of the Acquired Assets as of December 31 of a particular year shall (i) be responsible for filing applicable Ohio Inter-County Returns of Taxable Business Property due the following year, regardless of whether the due date for such returns is prior to, on or after the Closing, and (ii) make all payments required with respect to any such returns.  Any property Taxes paid with respect to the Tax year of the Closing shall be prorated in accordance with Section 3.7 hereof.

**6.6.2** ~~5.1.13~~ Sellers and Buyer will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers, and deliveries to be made to the Buyer hereunder from any transfer, documentary, sales, use, registration, recording, stamp, value-added and other such taxes (including all applicable real estate transfer taxes, but excluding any taxes based on or attributable to

42

income or gains) and related fees (including notarial fees as well as any penalties, interest and additions to tax) ("**Transfer Taxes**") payable in connection with such sale, conveyance, assignments, transfers and, deliveries, to the extent provided in the Sale Approval Order, in accordance with Section 1146(c) of the Bankruptcy Code.   If Bankruptcy Court approval is granted for such exemption, then any instrument transferring the acquired assets to the Buyer will contain the following endorsement:

> Because this **[instrument]** has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of **[Seller]**, it is exempt from the imposition and payment of all stamp taxes or other similar taxes pursuant to 11 U.S.C. § 1146(c).

To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Sale Approval Order, such Transfer Taxes arising out of or incurred in connection with this Agreement will be borne solely by Buyer.  The party that is legally required to file a Tax Return relating to Transfer Taxes will be responsible for preparing and timely filing such Tax Return.  Delphi will prepare the Transfer Tax returns for which Delphi is responsible as soon as is practicable and provide the Buyer with a copy to review.  Buyer agrees to provide Delphi with comments and the amount of transfer tax to be paid in sufficient time to enable Delphi to timely file the return and pay the Transfer Tax.

**6.6.3**  ~~5.1.14~~  Delphi and Buyer will cooperate in connection with: (i) the preparation and filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets.  Such cooperation includes direct access to accounting and finance personnel.

**6.7**     **Employees; Benefit Plans; Labor Matters**.

**6.7.1**  ~~5.1.15~~  **Seller Employees**.   Sellers and Buyer will collectively update Schedule 4.11.1 as of the day prior to Closing:

**A.** Subject to Sections 6.7.1.B, Section 6.7.1.C and Section 6.6.3, effective as of the Closing, the Buyer will offer employment to all Seller Employees, with such new employment to commence (if accepted, whether by reporting to work or otherwise) with effect from the Closing.  Any Seller Employee who accepts Buyer's offer of employment and commences employment with Buyer shall thereupon be referred to herein as a "**Transferred Employee**."

**B.** Buyer shall offer all Transferred Employees designated on Schedule 4.11.1 as Salaried Employees compensation and benefits that are substantially comparable in the aggregate to the compensation and benefits that would have been provided by Sellers to such Salaried Employees if such Salaried Employees were employed by Sellers as of Sellers' substantial consummation of its plan of reorganzation; provided, however, in the event the Closing occurs after the substantial consummation of Sellers' plan of regorganization, the compensation and benefits offered by Buyer shall be substantially comparable in the aggregate to the compensation and benefits

Error! Unknown document property name.
CHI ~~1633864~~1635983v1

offered by Sellers to such Salaried Employees immediately prior to Closing. Schedule 6.7.1.B describes the compensation and benefits to be offered by Sellers upon its substantial consummation of its plan of reorganization. Prior to tendering such offers, Buyer will provide Sellers with information sufficient to satisfy Sellers that such offers meet the "substantially comparable in the aggregate" requirement and advise Buyer accordingly. If Buyer's offers do not meet this requirement, Buyer will have an opportunity to cure any deficiency. Sellers' satisfaction that Buyer's offers meet this requirement will not be unreasonably withheld. For all such Transferred Salaried Employees, Buyer will maintain such level of compensation and benefits for a minimum of twelve (12) months following the Closing Date.

**C.** Schedule 6.7.1.C lists the Hourly Employees who, as of the Closing Date, are or may become eligible for traditional pension benefits under the Delphi Hourly-Rate Employees Pension Plan ("**Delphi HRP**"), including any pension benefits other than cash balance benefits provided in accordance with the Individual Retirement Plan provisions of the Delphi HRP. Sellers will continue to employ the Hourly Employees listed on Schedule 6.7.1.C and will lease such Hourly Employees (hereinafter "**Leased Hourly Employees**") to Buyer until such time as benefit accruals under the Delphi HRP are frozen in accordance with the "**Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee**" that is attached as Attachment B of the 2007 UAW-Delphi-GM Memorandum of Understanding – Delphi Restructuring dated June 22, 2007 (hereinafter the "**Benefit Guarantee Term Sheet**"), but in no event for a period longer than nine (9) months following Closing unless Buyer agrees otherwise (which agreement Buyer may withhold in its sole discretion). Subject to the preceding sentence, once the Delphi HRP is frozen in accordance with the Benefit Guarantee Term Sheet, Buyer will offer employment to the Leased Hourly Employees, and each such Leased Hourly Employee who accepts Buyer's offer and commences employment with Buyer will thereupon become a Transferred Employee. For and in relation to the lease period, Buyer will pay Sellers, with respect to the Leased Hourly Employees, an amount equal to **[$32.47]** per hour worked for production employees and **[$58.62]** for skilled trades employees.

**6.7.2** ~~5.1.16~~ **Collective Bargaining Agreements.** Unless Buyer is otherwise able to negotiate a new CBA with the UAW prior to Closing, Buyer will assume the terms and conditions of the following Collective Bargaining Agreements: (i) the UAW-Delphi Collective Bargaining Agreements applicable at the Manufacturing Facility, in each case as modified by: (a) any Bankruptcy Court Proceedings; (b) any consensual agreement reached between Sellers and the UAW or an approved plan of reorganization in connection with the Bankruptcy Cases; and (c) the Effects MOU. The Parties agree that, to the maximum extent possible, this Agreement will be interpreted in a manner consistent with the Effects MOU; however, if any provision of the Effects MOU is inconsistent with any of the terms of this Agreement, the provisions of the Effects MOU will govern. Buyer will recognize the seniority status of all Seller Employees who are employed in accordance with a Collective Bargaining Agreement for all purposes of continued employment with Buyer.

44

**6.7.3    5.1.17  Inactive Employees.**

**A.** Employees who are not active employees as of the Closing due to disability, family medical leave or other approved leave of absence as set forth on Schedule 6.7.3 ("**Inactive Employees**") will remain Sellers' responsibility until such employee is ready to return to active employment in accordance with Sellers' leave policies or collective bargaining agreement, as applicable.

**B.** When an Inactive Employee is ready to return to active status in accordance with Sellers' leave policies, Buyer will offer employment to such individual in accordance with Section 6.7.1 and, provided such individual accepts Buyer's offer of employment, such individual will be considered a Transferred Employee as of such date.  In the event that an employee is seeking to return to active employment from a medical-based leave, such individual's fitness for active employment must be approved by both Sellers and Buyer; provided that such process does not violate any applicable Collective Bargaining Agreement or Law.

**C.** If Sellers and Buyer do not agree as to an individual's fitness for active employment, the issue will be submitted to a mutually agreed upon independent medical evaluator, whose determination will be final and binding on the Parties.  The cost of such independent medical evaluation will be shared equally by the Parties.

**6.7.4    Employee Benefit Plans.**

**A.** **D.**  Except as set forth in Section 6.7.4.E below, Transferred Employees and their dependents and beneficiaries shall cease to participate in and to be eligible for benefits under the Seller Employee Benefit Plans (other than vested pension benefits) as of the Closing.  Inactive Employees, who become Transferred Employees pursuant to the provisions of Section 6.7.3, and their dependents and beneficiaries will cease participation in and eligibility for benefits under the Seller Employee Benefit Plans (other than vested pension benefits) as of the date on which such Inactive Employees become Transferred Employees. Notwithstanding the preceding sentences, the Seller Employee Benefit Plans which are welfare plans as defined under ERISA will retain liability for all claims incurred by the Transferred Employees and their dependents and beneficiaries prior to the Closing, (or prior to the date on which an Inactive Employee becomes a Transferred Employee, as applicable), including claims which are not submitted until after the Closing (or the date on which an Inactive Employee becomes a Transferred Employee, as applicable).  A claim will be deemed incurred, as applicable:

(i)    On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

(ii)    On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

Error! Unknown document property name.
CHI 1633861 1635983 v1

(iii)   On the date immediately following a Transferred Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

**B.**   ~~E.~~  Buyer will not assume any Seller Employee Benefit Plans or any other Liabilities relating to any Seller Employee Benefit Plan, including:

(i)   Any employee benefit plan to which Sellers or any of their subsidiaries have incurred or expect to incur liability, direct or indirect, contingent or otherwise, under Title IV of ERISA with respect to the termination of, or withdrawal from, any Seller Employee Benefit Plan; or

(ii)   Any accumulated funding deficiency (as defined in Section 302 of ERISA) that has occurred, exists or is reasonably expected to occur with respect to any Seller Employee Benefit Plan subject to Title IV of ERISA with respect to which Sellers or any of their Affiliates have or may have any Liability, direct or indirect, contingent or otherwise.

**C.**   ~~F.~~  Transferred Employees, other than those who are Inactive Employees as of the Closing, and their dependents and beneficiaries will commence participation in and be eligible for benefits under the Buyer Employee Benefit Plans as of the Closing.  Inactive Employees who become Transferred Employees pursuant to Section 6.7.3 and their dependents and beneficiaries will commence participation in and eligibility for benefits under the Buyer Employee Benefit Plans as of the date on which such inactive Employees become Transferred Employees.

**D.**   ~~G.~~  Buyer will recognize a Transferred Employee's pre-Closing credited service with Sellers for eligibility and vesting purposes but not benefit accrual purposes with respect to any Buyer Employee Benefit Plans.  However, in no case will credited service be recognized under this provision if such recognition will cause a duplication of compensation or benefits as between Sellers and Buyer.

**E.**   ~~H.~~  Notwithstanding anything to the contrary, Sellers shall retain and be responsible for all Liabilities relating to post-retirement health and welfare coverage for Transferred Employees who are (i) designated on Schedule 4.11.1 as Salaried Employees and (ii) eligible to retire and receive such coverage as of the Closing Date (collectively the "**Retiree Eligible Salaried Transferred Employees**").   Each Retiree Eligible Salaried Transferred Employee shall be eligible to elect post-retirement health or welfare coverage under the applicable Seller Employee Benefit Plan at the time of such Retiree Eligible Salaried Transferred Employee's retirement with Buyer.  Any such post-retirement health or welfare coverage provided by Sellers shall be subject in all respects to the terms and conditions of the applicable Seller Employee Benefit Plan as in effect from time to time.

**6.7.5**   ~~5.1.18~~ RESERVED.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

**6.7.6** ~~5.1.19~~ **COBRA.** Sellers will retain responsibility for all Liabilities for claims of the Transferred Employees (or a dependent thereof who becomes a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Internal Revenue Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Internal Revenue Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs prior to or as the result of the Closing.

**6.7.7** ~~5.1.20~~ **WARN Act.** Sellers will be responsible for all notice obligations and liabilities relating to WARN Act or other similar notice Laws, if any, arising from any Plant Closing or Mass Layoff taking place prior to Closing or with regard to any Plant Closing or Mass Layoff relating solely to the Leased Hourly Employees. Buyer will be responsible for all notice obligations and liabilities relating to WARN Act or other similar notice Laws, if any, arising from any Plant Closing or Mass Layoff taking place after the Closing, except for those relating to the Leased Hourly Employees.

**6.7.8** ~~5.1.21~~ **Workers' Compensation.** Sellers will retain all Liabilities for workers' compensation related to injuries or illnesses incurred by Transferred Employees prior to the Closing. Buyer will assume all Liabilities for workers' compensation related to injuries or illnesses incurred by Transferred Employees on or after the Closing.

**6.7.9** ~~5.1.22~~ **Grievances.** Sellers will retain responsibility to administer and all Liabilities for labor grievances and arbitration proceedings (collectively the "**Grievances**") involving claims of Transferred Employees filed prior to the Closing and claims based upon acts or omissions occurring prior to Closing. Buyer will administer and bear all Liabilities for Grievances involving claims of Transferred Employees filed after the Closing, based upon acts or omissions occurring after the Closing. Subject to the terms outlined in this Section 6.7.9, Buyer agrees to administer Grievances filed after the Closing and/or involving claims based upon acts or omissions occurring prior to Closing provided that Sellers will be responsible for any monetary Liabilities for such grievances. To the extent the administration or resolution of any Grievances requires both the Buyer's and Sellers' participation, the following apply:

**A.** Buyer and Sellers will cooperate in the defense of the Grievances;

**B.** Buyer will not settle any Grievance without Sellers' consent if such settlement will result in Liabilities for Sellers. Such consent will not be unreasonably withheld;

**C.** Sellers will not settle any Grievance without Buyer's consent if such settlement will result in Liabilities for Buyer. Such consent will not be unreasonably withheld;

**D.** If the seniority of an employee is reinstated as a result of the disposition of a Grievance or Governmental Order, Buyer will reinstate the employee as if such employee had been a Transferred Employee as of the Closing;

**E.** For Transferred Employees who have been continuously employed, back pay Liabilities to the extent relating to an event, occurrence or cause of

action arising prior to the Closing will be allocated to Sellers.  Liabilities to the extent relating to an event, occurrence or cause of action arising subsequent to the Closing in connection with acts or omissions after the Closing will be allocated to Buyer;

**F.**  For employees who become Transferred Employees because they are reinstated through the grievance procedure, back pay Liability will be allocated to Sellers;

**G.**  The Parties will discuss treatment of Grievances involving unusual circumstances or events that continue before and after the Closing;

**H.**  If either party withholds consent to a settlement or processing of a Grievance recommended by the other party or elects to continue to defend the Grievance, then such party will be liable for the portion of the Liabilities resulting from the ultimate disposition of such Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended and rejected; and

**I.**  With regard to any Grievance relating to Leased Hourly Employees, if the occurrence giving rise to the Grievance is within the control of Sellers, then Sellers shall have responsibility to administer such Grievance and will be responsible for any Liabilities for such Grievance.  If the occurrence giving rise to the Grievance relating to any Leased Hourly Employee is within the control of Buyer, then Buyer shall have responsibility to administer such Grievance and will be responsible for any Liabilities for such Grievance.

**6.7.10** ~~5.1.23~~ **Vacation; Profit Sharing.**  Regardless of the vesting date, Sellers will be responsible for the amount of all accrued and unutilized vacation pay and any profit sharing or incentive compensation of Transferred Employees due for the calendar year in which the Closing occurs on a pro rata basis using the number of days worked by the Transferred Employees for Sellers in that calendar year.

**6.7.11** ~~5.1.24~~ **Cooperation.**  Sellers and Buyer will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 6.7.

**6.7.12** ~~5.1.25~~ **Union Notifications.**  Sellers and Buyer will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, unions and relevant government agencies and governmental officials concerning the transactions contemplated by this Agreement.

**6.7.13** ~~5.1.26~~ **Effect of Section 6.7.**  No provision in this Section 6.7 shall (i) create any third-party beneficiary or other rights in any Seller employee or former Seller employee (including any beneficiary or dependent thereof) or any other Person other than the parties hereto and their respective successors and permitted assigns, (ii) constitute or create an employment agreement for any current or former Seller employee or any Transferred Employee or (iii) constitute or be deemed to constitute an amendment to any Seller Employee Benefit Plan or Buyer Employee Benefit Plan.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983 v1

**6.8** **Contact with Seller Employees, Customers and Suppliers.** Prior to the Closing, except in the ordinary course as a supplier to certain customers and without discussing the Sale, Buyer and its Affiliates and their respective representatives will contact and communicate with the Seller Employees, customers, suppliers and licensors of the Business in connection with the transactions contemplated by this Agreement only with the prior consent of Delphi, which consent, except with respect to GM, may be conditioned upon a designee of Delphi being present at any such meeting or conference. Notwithstanding anything in this Section 6.8 to the contrary, Buyer is not required to seek Delphi's consent before contacting or communicating with GM or the UAW with respect to any matter related to Buyer's potential operation of the Business.

**6.9** **Technical Documentation.** Sellers have delivered, or will deliver on or before the Closing, to the Buyer, a copy of all Technical Documentation included in the Acquired Assets. For a period of not less than ten (10) years commencing at the Closing, Buyer will use reasonable efforts to maintain all Technical Documentation applicable to Product design, test, release and validation at a location at which it will be reasonably accessible to Delphi upon request. During such ten (10) year period, Buyer will not destroy or give up possession of the final copy of such Technical Documentation without offering Delphi the opportunity to obtain a copy of such documentation at Delphi's expense but without any payment to Buyer.

**6.10** **Books and Records and Litigation Assistance From and After Closing**.

**6.10.1** ~~5.1.27~~ Buyer will use commercially reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files delivered to Buyer by Sellers and their Affiliates pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing Date, or for any longer period as may be required by any Law, Governmental Order or in connection with any ongoing litigation, audit or appeal of Taxes, or Tax examination, at Buyer's sole cost and expense. During such period, Buyer will: (i) provide Sellers with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of each facility included within the Business; and (ii) make such books and records available to Sellers and their Affiliates as may be reasonably required by Sellers and their Affiliates in connection with any legal proceedings against or governmental investigations of Sellers and their Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Sellers and their Affiliates, the Business or the Acquired Assets. Sellers or their Affiliates will reimburse Buyer for the reasonable out-of-pocket expenses incurred in connection with any request by Sellers to make available records pursuant to the foregoing sentence. In the event Buyer wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, it will first give not less than ninety (90) days' prior written notice to Sellers, and Sellers will have the right, at its option, upon prior written notice given to Buyer within sixty (60) days of receipt of Buyer's notice, to take possession of said records within ninety (90) days after the date of Buyer's notice to Sellers hereunder.

**6.10.2** ~~5.1.28~~ Buyer will, from time to time, at the reasonable request of Sellers, cooperate fully with Sellers in providing Sellers and their Affiliates (as appropriate) (to the extent possible through Transferred Employees) with technical assistance and information in respect to any claims brought by third parties against Sellers and their Affiliates involving the conduct of the Business prior to Closing, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. In particular, Buyer, for itself and on

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

behalf of its Affiliates, agrees with respect to such claims to: (i) retain all documents required to be maintained by Law and all documents that may be reasonably required to establish due care or to otherwise assist Sellers and their Affiliates in pursuing, contesting or defending such claims; (ii) make available their documents and records in connection with any pursuit, contest or defense, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Buyer and its Affiliates must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Buyer must notify Sellers of the existence of such privileged documents); and (b) Sellers and their Affiliates will agree to keep confidential documents and records that are confidential or are subject to trade secret protection); (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Buyer's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Sellers and their Affiliates in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; and (v) make available facilities and exemplar parts for the sole and limited use of assisting Sellers and their Affiliates in the contest or defense.  Sellers will reimburse Buyer and its Affiliates for their reasonable, actual out-of-pocket costs (travel, employee time (other than for clerical services), hotels, etc.) of providing such foregoing services.

      **6.10.3** ~~5.1.29~~ Sellers will use commercially reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files not delivered to Buyer pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing Date, or for any longer period as may be required by any Law, Governmental Order or in connection with any ongoing litigation, audit or appeal of Taxes, or Tax examination, at Sellers' sole cost and expense.  During such period, Sellers will: (i) provide Buyer with such documents and information (including copies of any documents or other materials that are principally related to the Business but were Excluded Assets under Section 2.1.2.E) as necessary, consistent with past practice, to complete the accounting books and records of each facility included within the Business, or as may be necessary, in Buyer's reasonable judgment, to operate the Business as currently operated; and (ii) make such books and records available to Buyer and its Affiliates as may be reasonably required by Buyer and its Affiliates in connection with any legal proceedings against or governmental investigations of Buyer or its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Buyer and its Affiliates, the Business or the Acquired Assets. Buyer or its Affiliates will reimburse Sellers for the reasonable out-of-pocket expenses incurred in connection with any request by Buyer to make available records pursuant to the foregoing sentence.  In the event Sellers wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, it will first give not less than ninety (90) days' prior written notice to Buyer, and Buyer will have the right, at its option, upon prior written notice given to Sellers within sixty (60) days of receipt of Sellers' notice, to

take possession of said records within ninety (90) days after the date of Sellers' notice to Buyer hereunder.

### 6.11    Corporate Names.

6.11.1 ~~5.1.30~~ Buyer will have the right (including the right to authorize its relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi for a period of no more than one hundred fifty (150) days after the Closing Date in a manner consistent with past practice of the Business and the name and reputation associated therewith, provided that Buyer and its Affiliates will clearly indicate to recipients of such written materials that the Business is owned by Buyer and its Affiliates and is no longer affiliated with, and Buyer and its Affiliates do not represent, the Sellers or any Affiliate of any Seller.

6.11.2 ~~5.1.31~~ After such one hundred fifty (150) day period, Buyer will neither use nor permit or the Business to use the name "Delphi" and any trademarks, trade names, brandmarks, brand names, trade dress or logos relating or confusingly similar thereto (including on any signs, billboards, advertising materials, telephone listings, web sites, labels, stationery, office forms, packaging or other materials) in connection with the Business or otherwise.

6.11.3 ~~5.1.32~~ Each of the Parties acknowledges and agrees that the remedy at Law for any breach of the requirements of this Section 6.11 would be inadequate, and agrees and consents that without intending to limit any additional remedies that may be available, temporary and permanent injunctive and other equitable relief may be granted without proof of actual damage or inadequacy of legal remedy in any Proceeding which may be brought to enforce any of the provisions of this Section 6.11.

### 6.12    Intellectual Property Licenses.

6.12.1    ~~5.1.33~~ License to Buyer.  Delphi, on behalf of itself and its Affiliates, hereby grants to Buyer, as of the Closing Date, a worldwide, perpetual, fully paid, royalty free, non-exclusive license to use (and to sublicense as provided in Section 6.12.3) the Shared Intellectual Property to develop, manufacture, have made (including sub-contract manufacturing) use, import, export, offer to sell and sell Products, and services of the type provided by the Business, and in each case, reasonable expansions thereof, and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, subject to any restrictions arising from rights granted to third parties prior to January 1, 1999. Further, Delphi, on behalf of itself and its Affiliates, hereby grants to Buyer, as of the Closing Date, a worldwide, perpetual, fully paid, royalty free, non-exclusive sub-license to use (and to sublicense as provided in Section 6.12.3), to the extent permitted by and subject to the terms and conditions of the contracts listed in Schedule 6.12.1, any Sublicensed Intellectual Property needed to develop, manufacture, have made (including sub-contract manufacturing), import, export, offer to sell and sell Products, and services of the type provided by the Business, and reasonable expansion thereof, and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith.  The license and

51

sub-license granted to Buyer under this Section 6.12.1 is transferable to a purchaser of all or substantially all of the Business.

**6.12.2**    ~~5.1.34~~ **License to Sellers.**    Buyer, on behalf of itself and its Affiliates, hereby grants to Sellers as of the Closing Date, a worldwide, perpetual, paid-up, royalty free, non-exclusive license to develop, manufacture, have made (including subcontract manufacturing), use, import, export, offer to sell and sell products and services of the type provided by Sellers and their Affiliates as of the Closing Date (other than the Products, or services of the type provided by the Business), and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, using any Purchased Intellectual Property licensed pursuant to this Section 6.12.2, subject to any restrictions arising from rights granted to third parties prior to the Closing Date.

**6.12.3**    ~~5.1.35~~ **Further Understandings.**    The licenses granted above in this Section 6.12: (i) include the right for the licensed party to sub-license to any of its Affiliates, to its and their successors, and to suppliers, customers and others in connection with the conduct of the businesses contemplated by this Agreement; and (ii) do not include any right to use any Trademark Rights.

**6.13**    **Post-Closing Obligations.** Buyer agrees to take any and all commercially reasonable actions necessary to cause Delphi and its Affiliates to be absolutely and unconditionally relieved on or prior to the Closing Date of all Liabilities and obligations arising out of the letters of credit, performance bonds and other similar items issued and outstanding in connection with the Business and assumed by Buyer pursuant to this Agreement, and Buyer will indemnify Delphi and its Affiliates against any Losses of any kind whatsoever with respect to such Liabilities and obligations.

**6.14**    **RESERVED**.

**6.15**    **Further Actions**.

**6.15.1**    ~~5.1.36~~ Within three (3) Business Days after the entry of an unstayed Sale Approval Order by the Bankruptcy Court, the Parties will use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable under Law to consummate the transactions contemplated hereby.  In furtherance of the foregoing, the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with the transactions contemplated by this Agreement.

**6.15.2**    ~~5.1.37~~ At all times prior to the Closing: (i) Delphi will notify Buyer in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any of them becoming aware of the same; and (ii) Buyer will notify Delphi in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any of them becoming aware of the same.

**6.15.3**    ~~5.1.38~~ Between the date hereof and the Closing, Sellers shall (i) afford to Buyer and its representatives and advisors (including its potential lenders) full and

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

free access to all of the Acquired Assets and all of Sellers' Employees and former employees of the Business; provided such access will be during normal business hours and such other times as are reasonable and will be structured so as to not unreasonably interfere with the conduct of the Business; and (ii) provide to Buyer and its representatives and advisors, promptly upon Buyer's request, copies of all books, records, documents and information included in the Acquired Assets.

**6.16    Further Assurances.**  If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, the parties hereto shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby; provided that, to the extent not indemnified or required hereunder the cost of such action or of such instruments and documents related thereto shall be borne by the party requesting them.  The foregoing covenant will survive the Closing of the transactions contemplated herein.

**6.17    Shared Items Transferred to Buyer.**  With respect to any contracts for goods or services included in the Acquired Assets and that are used by both the Business and other operations of Delphi or its Affiliates that are set forth on <u>Schedule 6.17</u>, and that will be transferred to Buyer at Closing, Buyer will provide Sellers with the benefits of such contracts in substantially the same manner described in Section 2.5 above regarding Deferred Items, and Delphi will cause Sellers to reimburse Buyer for such benefits in substantially the manner described in Section 2.5, until the earlier of such time as separate contracts for such goods or services have been agreed between the applicable Seller and the other Party or Parties to such contract or contracts, or until the termination of such contract or contracts.

**6.18    Buyer's Financing Activities**.

**6.18.1    5.1.39** Buyer acknowledges and agrees that Sellers and their Affiliates have no responsibility for any financing that Buyer may raise in connection with the transactions contemplated hereby including with respect to any offering materials and other documents prepared by or on behalf of or utilized by Buyer or its  Affiliates, or Buyer's financing sources, in connection with Buyer's financing activities in connection with the transactions contemplated hereby which include any information provided by Sellers or any of their Affiliates.

**6.18.2    5.1.40** Buyer will take, or cause to be taken, all actions and will do, or cause to be done, all things necessary, proper or advisable to: (i) enter into definitive financing agreements with respect to any financing required to consummate the Sale, so that such agreements are in effect as promptly as practicable but in any event no later than the Closing Date; and (ii) consummate such financing at or prior to Closing, provided that the terms of such financing is satisfactory to Buyer.

**6.18.3    5.1.41** Buyer has delivered to Sellers an equity commitment letter from Buyer Parent demonstrating Buyer Parent's agreement to fund the Purchase Price.

**6.19    Customs Duties.**  The Buyer expressly agrees to reimburse Sellers for all customs-related duties, fees and associated costs incurred by Sellers on behalf of Buyer following the Closing, including all such duties, fees and costs incurred in connection with co-

Error! Unknown document property name.
CHI 1633861 1635983v1

loaded containers that clear customs intentionally or unintentionally under Sellers' importer/exporter identification numbers and bonds/guarantees post-Closing.

> **6.20** **Environmental Access.** Prior to Closing, Buyer is permitted to perform reasonable environmental due diligence assessments and compliance audits of the Owner Real Property, the Acquired Assets and the Business which may include Phase I and Phase II assessments. Buyer will share its final reports (or the most recent draft reports if no final reports are prepared) with Sellers as soon as they are available under an appropriate, separate confidentiality agreement.

> **6.21** **Permit Transfers.** Sellers shall assist and cooperate with Buyer with respect to the transfer of or application for any Environmental Permits listed pursuant to Section 4.14.8 that require transfer to Buyer or procurement of new Permits by Buyer in connection with the transaction contemplated hereby.

> **6.22** **Confidentiality.**

> **6.22.1** ~~5.1.42~~ Subject to Section 6.12.2 of this Agreement, from and after the Closing, Sellers shall not, and shall cause their Affiliates not to, without first obtaining the written consent of Buyer (which consent shall not be unreasonably withheld), directly or indirectly, reveal, report, disclose or use any information primarily related to the Business (but excluding all information related to Taxes, Tax Claims, or Tax Returns) (collectively, the "Confidential Information"), whether furnished before or after the Closing, whether documentary, electronic or oral, whether labeled or otherwise identified as confidential, and regardless of the form of communication or the manner in which it is or was furnished. Notwithstanding the foregoing, Sellers and their Affiliates may disclose such Confidential Information as they determine in good faith and upon the written advice of independent, outside counsel is required by Law, but only to the extent so required (in which event Sellers and their Affiliates shall consult in advance with Buyer regarding the nature, extent and form of such disclosure). If Sellers or their Affiliates are requested or required (by oral questions, interrogatories, requests for information or other documents in legal proceedings, subpoena, civil investigative demand or any other similar process) to disclose any Confidential Information, Sellers and their Affiliates shall provide Buyer with prompt written notice (but in any event not less than ten (10) days advance notice) of any such request or requirement so that Buyer shall have an opportunity to seek a protective order or other appropriate remedy. If Buyer provides a written waiver of such Sellers' and Affiliates' obligations to comply with any portion of this **Section 6.22** with respect to a specific request or requirement, such Seller or Affiliate shall disclose only that portion of the Confidential Information or other information that is specifically permitted by such waiver and that is necessary to disclose in order to comply with such request or requirement. Notwithstanding the foregoing, in the event that Buyer is required to disclose any Confidential Information, Sellers and their Affiliates shall exercise their commercially reasonable efforts to preserve the confidentiality of such Confidential Information, including by cooperating with Buyer to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such Confidential Information, as reasonably requested by Buyer. Further notwithstanding the foregoing, Confidential Information does not include information which (a) is or becomes generally available to the public other than as a result of a breach of this Section 6.22.1 by Sellers or their Affiliates, (b) becomes available by Law or Contract to Sellers or their Affiliates on a nonconfidential basis from a person who is not prohibited from disclosing such information to Sellers or their Affiliates, or (c) is

54

independently developed by employees of Sellers or their Affiliates who have not had access to the information.

**6.22.2** ~~5.1.43~~ Effective as of the Closing, all provisions of the Confidentiality Agreement **[other than clause 4]** shall terminate and shall no longer be enforceable against any party thereto.

## **7.** ~~6.~~ **CONDITIONS TO CLOSING.**

**7.1** **Conditions to Obligations of Sellers and Buyer.** The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by both Parties at or prior to the Closing Date of the following conditions precedent:

**7.1.1** ~~6.1.1~~ **Sale Approval Order and Bidding Procedures Order.** The Sale Approval Order and Bidding Procedures Order will be entered by the Bankruptcy Court and will not be subject to a stay or injunction.

**7.1.2** ~~6.1.2~~ **No Law, Judgments, etc.** No provisions of any applicable Law or Governmental Order that restrains, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement will be in effect (each Party taking any and all steps required by Section 6.15 of this Agreement).

**7.1.3** ~~6.1.3~~ **Governmental Approvals.** All required Governmental Approvals regarding the Sale will have been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings will have expired or been terminated.

**7.1.4** ~~6.1.4~~ **RESERVED.**

**7.1.5** ~~6.1.5~~ **RESERVED.**

**7.1.6** ~~6.1.6~~ **Seller CBAs.** Buyer's assumption, in accordance with Section 6.7.2, of existing UAW-Delphi Collective Bargaining Agreements applicable to the Sandusky, Ohio sites, as may be modified by: (i) agreement between Buyer and the UAW; (ii) U.S. Bankruptcy Court proceedings, including Delphi's Section 1113 and 1114 motion, consensual resolution between Delphi and the UAW, or an approved plan of reorganization, if applicable; and (iii) a Memorandum of Understanding between Delphi and the UAW regarding the effects of the Sale upon bargaining unit members (the "**Effects MOU**").

**7.1.7** ~~6.1.7~~ **No Material Adverse Effect.** Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing at Closing.

**7.2** **Conditions to Obligations of Buyer.** The obligation of Buyer to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Buyer):

**7.2.1** ~~6.1.8~~ **Accuracy of Warranties.** Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and

warranties of Sellers contained in Article 4 of this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) will be true and correct as of the Closing Date as if made on and as of such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time) except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect on a Seller or a Seller's ability to consummate the transactions contemplated by this Agreement.

**7.2.2** ~~6.1.9~~ **Performance of Covenants.** Sellers will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing.

**7.2.3** ~~6.1.10~~ **Delivery of Ancillary Agreements.** Sellers will have delivered duly executed copies of each of the Ancillary Agreements.

**7.2.4** ~~6.1.11~~ **RESERVED.**

**7.2.5** ~~6.1.12~~ **RESERVED.**

**7.2.6** ~~6.1.13~~ **No Material Adverse Effect .** Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing affecting the Business.

**7.2.7** ~~6.1.14~~ **RESERVED.**

**7.2.8** ~~6.1.15~~ **Permit Transfers.** All Permits, Environmental Permits and other authorizations necessary for the lawful conduct of the Business shall have been transferred or reissued, as applicable, to Buyer if legally required to enable Buyer to continue the permitted activity, unless the same may be transferred or reissued, as applicable, under applicable Law after the Closing.

**7.3** **Conditions to Obligations of Sellers.** Except as otherwise permitted by this Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

**7.3.1** ~~6.1.16~~ **Accuracy of Warranties.** The representations and warranties of Buyer contained in Article 5 of this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date if made on and as of such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

**7.3.2** ~~6.1.17~~ **Performance of Covenants.** Buyer and its Affiliates will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

**7.3.3** ~~6.1.18~~ **Delivery of Ancillary Agreements.**  Buyer will have delivered duly executed copies of each of the Ancillary Agreements.

CLOSING.

**7.4** **Closing Time and Date.**  Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of the transactions contemplated by this Agreement will take place at the offices of Delphi at 10:00 a.m. on the second Business Day after the conditions set forth in Article 7 will have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree (the "**Closing Date**").  For tax and accounting purposes, the effective time of the transaction will be 11:59 p.m. Eastern time on the Closing Date.

**7.5** **Ancillary Agreements.**  At or prior to the Closing, the Sellers will duly execute and deliver to the Buyer, and the Buyer will duly execute and deliver to Sellers, each of the following agreements (each of the agreements and instruments referred to in Sections 8.2, 8.3 and 8.4 is an "**Ancillary Agreement**" and are collectively, "**Ancillary Agreements**") to which they are to be a party:

**7.5.1** ~~6.1.19~~ A Patent Assignment substantially in the form of Exhibit 8.2.1.A and a Trademark Assignment substantially in the form of Exhibit 8.2.1.B, as well as any other instruments necessary to transfer the Purchased Intellectual Property;

**7.5.2** ~~6.1.20~~ The Deposit Escrow Agreement, substantially in the form set forth in Exhibit 8.2.2;

**7.5.3** ~~6.1.21~~ The Transition Services Agreement, substantially in the form set forth in Exhibit 8.2.3;

**7.5.4** ~~6.1.22~~ The Bills of Sale, substantially in the form set forth in Exhibit 8.2.4;

**7.5.5** ~~6.1.23~~ The Assignment and Assumption Agreements, substantially in the form set forth in Exhibit 8.2.5;

**7.5.6** ~~6.1.24~~ The Indemnity Escrow Agreement substantially in the form set forth in Exhibit 8.2.6;

**7.5.7** ~~6.1.25~~ The Inventory Adjustment Escrow Agreement substantially in the form set forth in Exhibit 8.2.7;

**7.5.8** ~~6.1.26~~ The Sensor Supply Agreement substantially in the form set forth in Exhibit 8.2.8; and

**7.5.9** ~~6.1.27~~ The Environmental Escrow Agreement substantially in the form set forth in Exhibit 8.2.9.

**7.6** **Sellers' Deliveries at Closing.**  At or prior to the Closing, the appropriate Seller will deliver or cause to be delivered to the relevant Buyer:

**7.6.1**  ~~6.1.28~~ Quit claim deed for the Owned Real Property, substantially in the form of <u>Exhibit 8.3.1</u> or such other form of conveyance in substance equivalent to such form of deed;

**7.6.2**  ~~6.1.29~~ Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order;

**7.6.3**  ~~6.1.30~~ An officer's certificate, dated as of the Closing Date, executed on behalf of Sellers, certifying that the conditions specified in Section 7.2 have been fulfilled; and

**7.6.4**  ~~6.1.31~~ All other documents and papers reasonably requested by Buyer to transfer title to the Acquired Assets in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements.

**7.7**  **Buyer's Deliveries at Closing.**  At or prior to the Closing, Buyer will deliver or cause to be delivered to Delphi and each Seller designated by Delphi the following:

**7.7.1**  ~~6.1.32~~ The balance of the Purchase Price by wire transfer of immediately available funds to an account or accounts designated by Delphi; and

**7.7.2**  ~~6.1.33~~ An officer's certificate, dated as of the Closing Date, executed on behalf of Buyer, certifying that the conditions specified in Section 7.3 have been fulfilled.

## 8. TERMINATION.

**8.1**  **Termination.**  This Agreement may be terminated at any time prior to the Closing:

**8.1.1**  ~~6.1.34~~ By the mutual written consent of Delphi and Buyer.

**8.1.2**  ~~6.1.35~~ By either Party:

**A.** Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Closing will not have occurred within forty-five (45) days after entry of the Sale Approval Order for any reason other than a failure of the conditions set forth in Sections 7.1.2 or 7.1.3, <u>provided, however</u>, this period shall be automatically extended (i) for an additional thirty (30) days if a Competitive Operating Agreement has been executed by either or both of the Parties and the UAW, but has not been fully implemented, and (ii) for up to an additional sixty (60) days (a) if any required Governmental Approvals regarding the Sale have not then been granted in writing by the appropriate Governmental Authorities or the waiting period with respect to any such filings has not then expired or been terminated or (b) if, by Seller's and Buyer's mutual agreement, such additional time is necessary to facilitate the necessary transition planning required to separate the Business from Seller.

**B.** Provided the terminating Party is not in material breach of its obligations under this Agreement, if any Governmental Authority of competent jurisdiction (other than the Bankruptcy Court) has issued a Governmental

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

Order or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby and such Governmental Order or other action has become final and nonappealable, or in the reasonable opinion of the terminating Party is likely to become final and nonappealable.

**C.** Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Bankruptcy Court has not entered the Sale Approval Order, on or before March 31, 2008, or if such Sale Approval Order, as of March 31, 2008, is subject to a stay or injunction on such date.

**8.1.3** ~~6.1.36~~ By Buyer, upon written notice to Delphi and provided that Buyer is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if:

**A.** Any of Sellers has breached or failed to perform in any respect any of its representations, warranties, covenants or other agreements contained in this Agreement or

**B.** If a Material Adverse Effect has occurred, so long as such event is continuing at the time of any such termination and not reasonably capable of being cured within forty-five (45) days after entry of the Sale Approval Order or the date of this Agreement, whichever is earlier.

**8.1.4** ~~6.1.37~~ By Delphi, upon written notice to Buyer and provided that Delphi is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if Buyer has breached or failed to perform in any material respect any of its obligations or covenants contained in this Agreement, and such breach or failure to perform: (i) is not cured within thirty (30) days after written notice thereof or, in the case where the date or period of time specified for performance has lapsed, promptly following written notice thereof from the non-breaching party; or (ii) is incapable of being cured by Buyer.

**8.2** **Procedure and Effect of Termination.** In the event of the termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof will forthwith be given to all other Parties. If this Agreement is terminated and the transactions contemplated by this Agreement are abandoned as provided herein:

**8.2.1** ~~6.1.38~~ Buyer will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**8.2.2** ~~6.1.39~~ The provisions of the Confidentiality Agreement will continue in full force and effect;

**8.2.3** ~~6.1.40~~ In the event this Agreement is terminated pursuant to Sections 9.1.2.A, 9.1.2.C, or 9.1.3, then in addition to the Buyer's right to a return of the Deposit Amount as provided in Section 9.2.5 and notwithstanding anything to the contrary contained in this Agreement, including the provisions of Article II, Buyer shall be entitled to assert or exercise any rights or remedies available to Buyer by law, in equity, or otherwise, including the recovery of damages; provided, however, that any such

59

damages, if any, shall not exceed an amount equal to the sum of (i) Buyer's reasonable, actual, out-of-pocket fees and expenses (including reasonable attorneys' fees and expenses, fees and expenses of its financial advisors and fees and expenses of other consultants) incurred in connection with the investigation and negotiation of the transactions contemplated by this Agreement, in an amount not to exceed one million dollars ($1,000,000.00), plus (ii) one million five hundred thousand dollars ($1,500,000.00).

     **8.2.4** ~~6.1.41~~ The following sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: (i) Article 9 (Termination); and (ii) Sections 3.1 (Deposit Amount), 12.1 (Fees and Expenses), 12.5 (Assignment), 12.6 (Waiver), 12.7 (Notices), 12.8 (Entire Agreement), 12.10 (Publicity), 12.14 (Governing Law) and 12.15 (Venue and Retention of Jurisdiction); and

     No Party to this Agreement will have any Liability under this Agreement to any other Party except: (i) that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, and (ii) as contemplated by Section 9.2.2 above.

     **8.2.5** ~~6.1.42~~ In addition to the amounts set forth in Section 9.2.3, in the event this Agreement is terminated pursuant to Section 9.1.1, 9.1.2 or 9.1.3, Buyer shall be entitled to a return of the Deposit Amount.

**9.**    **BANKRUPTCY MATTERS.**

     **9.1**    **Sale Hearing.**  The Sale Hearing will be held before the Honorable Judge Robert Drain on ~~February 21,~~**March 19,** 2008 at 10:00 a.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled by Delphi, with Buyer's consent not to be unreasonably withheld, subject to Bankruptcy Court Approval, as necessary, without further notice by an announcement of the adjourned date at the Sale Hearing.

**10.**    **LIABILITY, INDEMNIFICATION.**

     **10.1**    **LIMITATIONS OF LIABILITY.**  NO PARTY UNDERTAKES ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES, EXCEPT IN EACH CASE, WHERE SUCH DAMAGES ARE IN RESPECT OF A THIRD PARTY CLAIM; DELPHI WILL NOT BE LIABLE FOR ANY, AND BUYER ASSUMES LIABILITY FOR ALL PERSONAL INJURY AND PROPERTY DAMAGE CAUSED BY BUYER'S INVESTIGATION AND EXAMINATION OF THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES AND FUTURE LIABILITIES; AND BUYER ACKNOWLEDGES THAT, EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE BEING SOLD IN THEIR PRESENT STATE AND CONDITION, "AS IS, WHERE IS," WITH ALL FAULTS, AND BUYER IS PURCHASING AND ACQUIRING SUCH ACQUIRED ASSETS ON THAT BASIS PURSUANT TO BUYER'S OWN INVESTIGATION AND EXAMINATION AFTER HAVING BEEN PROVIDED WITH AN ADEQUATE OPPORTUNITY AND ACCESS TO SUCH ACQUIRED ASSETS TO COMPLETE SUCH INVESTIGATION OR EXAMINATION.

~~Error! Unknown document property name.~~
CHI ~~1633861~~**1635983**v1

**10.2**    **Survival.**  Except with respect to (a) representations and warranties of the Sellers, which shall expire in accordance with Section 4.22, and (b) the representations and warranties of Buyer, which shall survive until the first anniversary of the Closing, the provisions of this Agreement shall survive indefinitely.

**10.3**    **Indemnification.**  Except as may be expressly set forth in this Agreement or in an Ancillary Agreement, no Seller or Buyer will be required to indemnify any other party to any of such agreements.

**10.3.1**    ~~6.1.43~~  **Buyer's Indemnification of Delphi.**    From and after the Closing, Buyer will defend and hold harmless Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents from and against all Losses actually incurred by Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents, including in connection with any actions, suits, demands, assessments, judgments and settlements ("**Indemnifiable Losses**") relating to, resulting from or arising out of any (i) Assumed Liability, except for such Indemnifiable Losses the basis of which constitute a breach of a representation or warranty included in Article 4 hereof; (ii) Future Liability; (iii) any employment rights of any of the Transferred Employees or any other person employed by Buyer on or after the Closing for any Claims relating to or arising from events occurring on or after the Closing; (iv) Buyer's failure to comply with any of its obligations under Section 6.7 of this Agreement; or (v) Buyer's breach of any representation, warranty or covenant provided under Articles 5 or 6 of this Agreement (disregarding with respect to determining whether a representation or warranty has been breached for purposes of this Section 11.3.1, any materiality or Material Adverse Effect qualifiers); provided, however, that Buyer's obligation to indemnify for Indemnifiable Losses shall apply only to those Claims which are notified to Buyer on or before the third (3rd) anniversary of the Closing Date, except for Claims relating to a breach of any representations or warranties of Buyer, which must be notified to Buyer on or before the first (1st) anniversary of the Closing Date.

**10.3.2**    ~~6.1.44~~  **Sellers' Indemnification of Buyer.**    Subject to the limitations set forth in this Article 11, from and after the Closing, each Seller of Acquired Assets will, solely with respect to the Acquired Assets sold by such Seller and related Retained Liabilities and/or covenants, severally and not jointly indemnify, defend and hold harmless Buyer and its Affiliates and their respective directors, officers, employees, partners, advisors, representatives and agents from and against all Indemnifiable Losses relating to, resulting from or arising out of (i) any Retained Liability (including any Liabilities associated with Excluded Assets); (ii) any employment rights of any Transferred Employees or any other person employed by Sellers prior to the Closing for any Claims relating to or arising from events occurring prior to the Closing; (iii) Sellers' breach of any representation, warranty or covenant under this Agreement, disregarding with respect to determining whether a representation or warranty has been breached for purposes of this Section 11.3.2, any materiality or Material Adverse Effect qualifiers; or (iv) any Permitted Encumbrances identified in clauses (i) or (ii) of the definition thereof.

**A.**  Sellers' obligation to indemnify for Indemnifiable Losses shall apply only to those Claims which are notified to a Seller on or before the first (1st) anniversary of the Closing Date with the exception of any Claims for indemnification (i) made pursuant to Sections 11.4 or 11.5 or for breach of Section 4.10, which shall be notified to a Seller on or before the third (3rd)

anniversary of the Closing Date and (ii) in respect of any Retained Liability or breach of Section 4.6.1, which may be notified to a Seller at any time after the Closing.

**B.** Except in each case as provided below, no Seller shall be liable for Indemnifiable Losses pursuant to this Section 11.3.2 until: (i) an individual claim or occurrence is greater than Ten Thousand Dollars ($10,000.00) ("**Individual Claim Amount**"); and (ii) the amount of all Indemnifiable Losses (which exceeds the Individual Claim Amount) in the aggregate exceeds Two Hundred Thousand Dollars ($200,000.00) ("**Deductible Amount**"), after which point Seller(s) will be obligated to indemnify Buyer from and against Indemnifiable Losses exceeding the Individual Claim Amounts that are in excess of the Deductible Amount until the aggregate amount of Indemnifiable Losses indemnified by the combined Sellers reaches an amount equal to Two Million Five Hundred Thousand Dollars ($2,500,000) (the "**Cap Amount**"), after which point Seller(s) will have no further obligation with respect to Indemnifiable Losses under this Agreement.  Buyer agrees that, from and after the Closing, the indemnification provided in this Section 11.3.2 is the exclusive monetary remedy for a breach by Seller(s) of any agreement or covenant contained in this Agreement or against Seller(s) for any applicable Retained Liabilities or Excluded Assets.  Notwithstanding anything to the contrary, Indemnifiable Losses and Liabilities relating to, resulting from or arising out of any Retained Liabilities (including, without limitation, any Environmental Claims, Pre-Closing Environmental Contamination or Pre-Closing Environmental Compliance Matters, and any Environmental Damages or Liabilities arising out of or relating thereto) or Excluded Asset or breach of any covenant hereof or of Section 4.6.1 shall not be subject to, or count against, the Individual Claim Amount, Deductible Amount or the Cap Amount.

**C.** In calculating amounts payable hereunder, the amount of any Indemnifiable Losses shall be determined without duplication of any other Losses for which a Claim has been paid by Sellers, i.e., an indemnified Party may not recover more than once for a particular identifiable Loss.

**10.4** **Environmental Matters; Exclusive Remedy**.

**10.4.1** ~~6.1.45~~ Indemnification of Sellers and Buyer.

**A.** Subject to the provisions of this Agreement, each Seller shall indemnify the appropriate Buyer for Environmental Damages, Environmental Claims and Liabilities arising from Pre-Closing Environmental Contamination and Pre-Closing Environmental Compliance Matters except to the extent exacerbated by the negligent actions of the Buyer.

**B.** Subject to the provisions of this Agreement, Buyer shall indemnify Sellers for Environmental Damages, Environmental Claims and Liabilities arising from Post-Closing Environmental Contamination and Post-Closing Environmental Compliance Matters except to the extent exacerbated by the negligent actions of the Sellers.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

**C.** Subject to the provisions of this Agreement, including, without limitation, the next sentence, for those Environmental Damages, Environmental Claims and Liabilities arising from circumstances that may be considered both: (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination; or (ii) Pre-Closing Environmental Compliance Matters and Post-Closing Environmental Compliance Matters, such Environmental Damages, Environmental Claims and Liabilities shall be allocated between the Parties in proportion to the extent that the Releases of or noncompliance underlying such Environmental Damages, Environmental Claims and Liabilities arose out of pre- or post-Closing facts, events and circumstances, and each Party shall indemnify the other for its share as determined by such allocation.

**D.** Section 11.6 shall apply to any disputes between the Parties as to Environmental Claims, Pre-Closing Environmental Contamination, Pre-Closing Environmental Compliance Matters, Post-Closing Environmental Contaminations, and Post-Closing Environmental Compliance Matters (collectively, "**Environmental Matters**").

**10.4.2**    6.1.46 **Limitations on Liability.**   Claims relating to Environmental Matters are subject to the limitations of this Section 11.4.2 and to the Deductible Amounts and Cap Amounts of Section 11.3.2.  Sellers shall not be liable under this Agreement for:

**A.** In the case of Environmental Claims arising from Pre-Closing Environmental Compliance Matters, unless written notice of such Claim has been served on the non-claiming Party on or before three (3) years following the Closing Date;

**B.** In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination, unless written notice of such Claim has been served on the non-claiming Party on or before three (3) years following the Closing Date;

**C.** The incremental incurred cost and expense to meet a Remediation Standard under Environmental Law that is more stringent or sensitive than that applicable to the type of use in effect at or before Closing (e.g., industrial use);

**D.** For the costs of any Remedial Work or Remedy undertaken by a claiming Party voluntarily which is not required by Law, Environmental Permit or Governmental Order;

**E.** In the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Contamination: (i) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are reasonably necessary to avert the emergency; and (ii) the reasonable costs and expenses

Error! Unknown document property name.
CHI 1633861 1635983 v1

of all steps taken pursuant to the duty to mitigate contained in this Section 11.4.2.E shall be deemed to be Environmental Damages;

**F.** Where, subject to Section G, below, and insofar as the Parties agree to treat all Pre-Closing investigations of the environmental condition of the Manufacturing Facility as confidential, for any Environmental Damages Claims to the extent that such Claims would not have arisen or were increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors volunteering or disclosing such confidential information to any relevant Competent Authority or Third Party (other than to lenders providing financing to Buyer, or to potential future buyers in connection with any subsequent sale of the Acquired Assets) without the prior written consent of the non-claiming Party; and

**G.** The following shall not be deemed to be or to have been volunteering or disclosing or information for the purpose of Section F;

(i)    Where the disclosure is required by any Law (including any Environmental Law, Environmental Permit or Governmental Order);

(ii)    Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated;

(iii)    Where the information is clearly in the public domain through no fault of the claiming Party; or

(iv)    Where the non-claiming Party has given prior written approval to the disclosure.

**10.4.3    ~~6.1.47~~ Buyer Release of All Environmental Claims Against General Motors Corporation.**  Buyer on behalf of itself and its successors and assigns, agrees to waive and forever release, any and all claims it or they may have against the General Motors Corporation, and its successors and assignees, for any Environmental Claims, Environmental Contamination, Environmental Damages, Pre-Closing Environmental Contamination, Pre-Closing Environmental Compliance Matters, and any other claims under any Environmental Laws (including but not limited to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 as amended thereafter and the rules promulgated and amended thereafter, and Ohio Revised Code Chapter 3746 and the rules promulgated thereunder and amended thereafter) associated with GM's prior ownership, use or operation of the Acquired Assets, including the Owned Real Property and Manufacturing Facility, and Sellers' ownership, use or operation of the Acquired Assets, including the Owned Real Property and Manufacturing Facility.

**10.4.4    ~~6.1.48~~ Exclusive Remedy.**  The sole remedy of the Parties for any Claim for damages relating to Environmental Matters resulting or arising in any manner from or with respect to any dispute arising from or related to this Agreement or the transactions contemplated hereby shall be a Claim made pursuant to, and subject to the limitations of, this Article 11.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

**10.4.5    ~~6.1.49~~ Remediation of Environmental Damage.**

**A.** Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of an Environmental Compliance Matter for such Environmental Contamination ("**Remedy**") to no less but no more than the Remediation Standards allowed by applicable Environmental Laws; such Remedial Works may be determined, in compliance with applicable Environmental Laws and Remediation Standards using risk assessment and related risk evaluation methods. Remedial Work may be conducted using the most cost-effective and reasonable methods of investigation, corrective measures, remediation, abatement, and/or containment (including, to the extent reasonably necessary, the use of institutional and engineering controls or deed restrictions on the use of the Owned Real Property as set forth in Exhibit 8.3.1, provided that such controls do not unreasonably prevent or inhibit any uses of the Owned Real Property for commercial or industrial purposes, including any construction or expansion for industrial or commercial use and operations).

**B.** The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, conduct such Remedy in a reasonably expeditious manner.

**C.** The conduct of a Remedy shall be as follows:

(i)    The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party shall adopt where such comments do not materially increase any cost or liability of the Remedy (unless such increase is necessary to comply with applicable Environmental Law);

(ii)    When requested, the claiming Party shall reasonably cooperate with the non-claiming Party in any communications with the appropriate Competent Authority;

(iii)    Where the Sellers are the non-claiming Party, Sellers will take all reasonable steps to avoid interfering with Buyer's operation or use of the Manufacturing Facility, and Buyer will reasonably cooperate with Sellers including providing access to the Manufacturing Facility during normal business hours and the use of utilities, including reimbursement by Sellers of Buyer's actual cost and expense for the utilities in the conduct of the Remedy, provided that Sellers shall promptly repair, restore or reimburse Buyer for any damages or other costs incurred by Buyer as a result of providing such access;

(iv)    Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983 v1

Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy;

(v)    The claiming Party shall have the right to observe all Remedial Work and to take split samples at the claiming Party's cost and expenses; and

(vi)    The conduct of the Remedy shall be deemed complete when, as the case may be:

(1)    The non-claiming Party has fully implemented the legally required Remedy and has received subsequent written approval regarding the Remedy by a Competent Authority (except to the extent any reopeners contained in any such approval are triggered); or

(2)    Where approval or other oversight by a Competent Authority is not required by Environmental Law and subject to Section 11.4.5.A of this Agreement, the legally required Remedy meets the Remediation Standards which are allowed by applicable Environmental Laws.

## 10.4.6    6.1.50    Remediation of Specific Recognized Environmental Conditions.

**A.** Sellers agree to retain responsibility for the "Specific Recognized Environmental Conditions" at the Manufacturing Facility as set forth herein. The Specific Recognized Environmental Conditions are:

(i)    free product plume in the groundwater relating to the free product detected at the Former Water Production Well, which Well is depicted on Exhibit 11.4.6;

(ii)    free product plume in the groundwater relating to the free product detected at the Former Quench Pit, which Pit is depicted on Exhibit 11.4.6; and

(iii)    chlorinated solvent contamination plume relating to the chlorinated solvents detected in Monitoring Well No. MW -303, which Well is depicted on Exhibit 11.4.6.

**B.** Sellers agree to perform the following tasks to address the Specific Recognized Environmental Conditions:  (i) for the Former Production Well and Former Quench Pit, to remove all free product to the extent technically feasible and technically practicable; and (ii) for the MW-303 chlorinated solvent compounds, to achieve risk-based remedial criteria based upon U.S. Environmental Protection Agency's Risk Assessment Guidance for Superfund commonly know as "**RAGS**") considering the continued industrial use of the Owned Real Property (collectively the "**Specific Remedial Works**") provided that a target lifetime cancer risk of $10^{-5}$ shall be applied to the risk assessment.

Error! Unknown document property name.
CHI 16338611635983v1

For the purpose of Section 11.4.6, "free product" means non-aqueous phase liquid that exceeds one-eighth inch (1/8") in thickness.

**C.** The Specific Remedial Works for the Specific Recognized Environmental Conditions shall be conducted to comply with Section 11.4.6 and shall be: (i) with respect to 11.4.6.A(iii), determined using risk assessment and related risk evaluation methods provided by the U.S. Environmental Protection Agency consistent with RAGS provided that a target lifetime cancer risk of $10^{-5}$ shall be applied to the risk assessment; and (ii) conducted using the most cost-effective and reasonable methods of investigation, corrective measures, remediation, abatement, and/or containment (including, to the extent reasonably necessary, the use of institutional and engineering controls or deed restrictions on the use of the Owned Real Property as set forth in Exhibit 8.3.1, provided that such controls do not unreasonably prevent or inhibit any uses of the Owned Real Property for commercial or industrial purposes, including any construction or expansion for industrial or commercial use and operations)..

**D.** The Sellers' obligation for the Specific Remedial Works for the Specific Recognized Environmental Conditions shall be deemed complete when Sellers provide Buyer with a written certification by a competent environmental consultant that Sellers have completed the Specific Remedial Works, subject to Buyer's review and approval of the certification which approval shall not be unreasonably withheld or delayed.

**E.** Sellers agree to conduct the Specific Remedial Works of the Specific Recognized Environmental Conditions in a reasonably expeditious manner, and the requirements of Section 11.4.5(C)(i)(ii)(iii)(iv) and (v) of this Agreement shall apply to the conduct of the Specific Remedial Works by Sellers.

**F.** Buyer agrees that the Owned Real Property shall be subjected to the deed restriction set forth in the form of Exhibit 8.3.1.

**G.** Sellers, at their sole cost and expense, shall perform a risk assessment at the Manufacturing Facility in accordance with RAGS (provided that a target lifetime cancer risk of $10^{-5}$ shall be applied) to determine if any of the areas of interest identified in the Field Investigation Report dated January 4, 2007, and the Field Investigation Report for Field Event #2, dated November 2, 2007, pose an unacceptable risk to human health. Sellers' performance of this risk assessment shall have no effect on Sellers' obligations under this Agreement.

**H.** Notwithstanding any other provision in this Agreement to the contrary, Sellers' obligations under Section 11.4.6 shall not be subject to the limitations of Section 11.4.2 (except for 11.4.2.F), Section 11.4.5.A, 11.4.5.B., or 11.4.5.C(vi), or any of the limitations of 11.3.2, except for the Cap Amount.

Error! Unknown document property name.
CHI 1633861635983v1

**10.5**    **Product Claims.**  Each Seller shall indemnify the appropriate Buyer for any Indemnifiable Losses with respect to any Product Claim, provided that notice of such Indemnifiable Loss is provided to Seller on or before the third anniversary of the Closing.

**10.6**    **Indemnification Procedure.**  The obligations of any indemnifying Party to indemnify any indemnified Party under Sections 11.3.1, 11.3.2, 11.4.1 or 11.5 with respect to Indemnifiable Losses resulting from the assertion of liability by third parties (including Governmental Entities) (an "**Indemnification Claim**"), shall be subject to the following terms and conditions:

**10.6.1**    ~~6.1.51~~ Any Party against whom any Indemnification Claim is asserted shall give the Party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of this Section 11.6.1), and the indemnifying Party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified Party. Failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying Party's obligations under this Article 11, except to the extent that the indemnifying Party is actually prejudiced by such failure to give prompt written notice. Any written notice delivered by the indemnified Party to the indemnifying Party seeking indemnification pursuant to this Agreement with respect to Indemnifiable Losses shall set forth, with as much specificity as is reasonably practicable, the basis of the claim for Indemnifiable Losses, the sections of this Agreement which form the basis for the claim, copies of all material non-privileged written materials relating to such claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Losses that have been or may be sustained by the indemnified Party.  The indemnified Party shall, and shall cause its employees and representatives to, cooperate with the indemnifying Party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying Party with all available information and documents concerning such Indemnification Claim. If the indemnifying Party, within ninety (90) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified Party against whom such claim has been made shall (upon further written notice to the indemnifying Party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying Party, subject to the right of the indemnifying Party to assume the defense of such Indemnification Claim at any time prior to settlement, compromise or final determination thereof upon written notice to the indemnified Party.

**10.6.2**    ~~6.1.52~~ Anything in this Section 11.6 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

**10.6.3**    ~~6.1.53~~ **Indemnification Payments.**  All payments under this Article 11 shall be treated as adjustments to the Purchase Price.

~~Error! Unknown document property name.~~
CHI ~~1633861~~1635983v1

**10.7** **Mitigation.** Notwithstanding any other provision of this Agreement, each Party shall have a duty to mitigate, in accordance with applicable Law, any Losses it incurs with respect to which such Party has a right of indemnification from another Party hereunder.

**10.8** **Dispute Resolution.** Sellers and Buyer will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each party. If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute. Within fifteen (15) business days after receipt of the Notice, the receiving Party shall submit to the other a written response (the "**Response**"). The Notice and the Response shall include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the Parties. Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or Response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one Party to the other will be honored promptly. All negotiations pursuant to this Section 11.8 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

## 11. MISCELLANEOUS.

**11.1** **Fees and Expenses.** Except as otherwise provided in the Ancillary Agreements, Delphi, on behalf of Sellers, on the one hand, and Buyer, on the other hand, will each bear its own expenses and the expenses of its Affiliates in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated hereby, including their respective brokers' or finders' fees and all fees and expenses of their respective counsel, auditors, consultants and other representatives. Buyer will be solely responsible for all expenses in connection with its due diligence review of the Business, including, without limitation, surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, UCC lien and other searches. Buyer and Sellers will split equally any cost in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.

**11.2** **Bulk Sales Laws.** Buyer waives compliance by Delphi and Sellers with any applicable bulk sales Law.

**11.3** **Payments in Dollars.** Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. Dollars in same day or immediately available funds.

**11.4** **Amendment.** This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of the Parties.

**11.5** **Assignment.** This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party, provided, that no assignment of any rights or obligations hereunder will be made by any Seller or Buyer without the written consent of the other Party, except (i) the assignment of this Agreement by a Filing Affiliate to its successor

entity following and in connection with such Filing Affiliate's emergence from Chapter 11 (which assignment will not require the other Party's consent) and (ii) the assignment of this Agreement by Buyer to any of its Affiliates, any lender of the Buyer or any purchaser of all or substantially all of the assets of the Business.

**11.6    Waiver.**  Any waiver by Sellers or Buyer of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

**11.7    Notices.**  Any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes: (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

| | |
|---|---|
| **If to any Buyer:** | ~~Kyklos, Inc~~**The Resilience Fund II, L.P.** |
| | ~~39475 13 Mile Road~~ |
| | ~~Suite 105~~ |
| | ~~Novi, MI 48377~~ |
| | |
| | ~~Attn:  George Thanopoulos~~ |
| | **25201 Chagrin Boulevard, Suite 360** |
| | **Beachwood, Ohio 44122** |
| | **Attn:  Steven Rosen and Bassem Mansour** |
| | Tel.:  ~~248-479-2700~~**(216) 292-0200** |
| | Fax No.:  ~~248-479-2711~~**(216) 292-4750** |
| | |
| **With a copy to:** | ~~Jenner & Block LLP~~**Jones Day** |
| | ~~330 N. Wabash Ave~~ |
| | **77 W. Wacker** |
| | Chicago, Illinois ~~60611~~**60601** |
| | Attn: ~~Edward J. Neveril~~**Walter S. Holzer** |
| | Tel.:  (312) ~~923-4530~~**782-3939** |
| | Fax No.: (312) ~~840-7530~~**782-8585** |
| | |
| **If to Delphi:** | **DELPHI CORPORATION** |
| | 5725 Delphi Drive |
| | Troy, Michigan 48098 |
| | Attn:  Fred J. Bellar III |
| | Fax No.: |

~~Error! Unknown document property name.~~
CHI ~~16338611~~**1635983**v1

**With a copy to:**     **DELPHI CORPORATION**
                        5725 Delphi Drive
                        Troy, Michigan 48098
                        Attn: Deputy General Counsel -
                              Transactional & Restructuring
                        Fax No.:  248-813-2491

provided, however, if either Party will have designated a different addressee by notice, then to the last addressee so designated.

**11.8     Entire Agreement.**     This Agreement, together with the Ancillary Agreements, contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof and thereof.

**11.9     Counterparts.**     This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures will be treated as originals.

**11.10     Publicity.**     Except as required by Law (and then only after prior consultation with the other Party) or in connection with the Bankruptcy Cases, neither Party (nor any of the other Buyer and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party (not to be unreasonably withheld, delayed or conditioned).

**11.11     Headings.**     The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

**11.12     Severability.**     The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable: (i) a suitable and equitable provision will be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**11.13     Third Parties.**     Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates and their respective permitted successors or assigns, and those Persons entitled to indemnification under Sections 11.3.1 and 11.3.2, any Claims, rights or remedies under or by reason of this Agreement.

**11.14     Governing Law.**  This Agreement will in all respects be governed by and construed in accordance with the laws of the State of New York, and to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**11.15**   **Venue and Retention of Jurisdiction.**   The Parties irrevocably and unconditionally submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agree not to commence any litigation relating thereto, during such time period, except in the Bankruptcy Court).

**11.16**   **No Right of Setoff.**   Neither Party nor any of its Affiliates may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it under this Agreement or any Ancillary Agreement against any amounts owed under this Agreement or any Ancillary Agreement by such Person to the other Party or any of such other Party's Affiliates.

**11.17**   **Risk of Loss.**   Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

**11.18**   **Enforcement of Agreement.**   The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**11.19**   **Bankruptcy Court Approval.**   Except for those sections of the Agreement expressly approved under the Bidding Procedures Order, the Parties' obligations hereunder are expressly subject to entry of the Sale Approval Order.

*[Remainder of the page left intentionally blank.]*

~~Error! Unknown document property name.~~
CHI ~~1633861~~**1635983**v1

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By:_____

      Name:     **Fred J. Bellar III**
      Title:      **Executive Director M&A**

**DELPHI TECHNOLOGIES, INC.**

By:_____

      Name: **Fred J. Bellar III**
      Title:   **Executive Director M&A**

**DELPHI CORPORATION**

By:_____

      Name: _____
      Title:   _____

**~~KYKLOS, INC.~~**

**<u>ND ACQUISITION CORPORATION</u>**

By:_____

      Name:      ~~George Thanopoulos~~<u>Steven Rosen</u>
      ~~Title:~~ ~~Chief Executive Officer~~

      <u>Title:</u><u>Vice President and Treasurer</u>

**Agreed as to the provisions of Article 3.1:**

**WND ACQUISITION COMPANY, LLC**
**By:  Venture Equities Management, Inc., its
       sole member**

**By:**
    **Name: Pin Ni**
    **Title:   President**

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Detail of Sellers and Buyer |
| Schedule 1.1.A | Buyer's Knowledge |
| Schedule 1.1.B | Sellers' Knowledge |
| Schedule 1.1.C | Competitive Operating Agreement |
| Schedule 1.1.D | Work Practice Changes |
| Schedule 2.1.2.A | Third Party Assets |
| Schedule 2.1.2.M | Excluded Computer Hardware, Equipment, Software and Other Assets |
| Schedule 3.3.1.C | Principles Regarding Inventory Values |
| Schedule 3.6.1 | Allocation |
| Schedule 4.4.1 | Financial Statements |
| Schedule 4.4.2 | Exceptions to GAAP |
| Schedule 4.5 | No Conflicts or Approvals |
| Schedule 4.7 | Noncompliance with Law |
| Schedule 4.8 | Proceedings against Sellers |
| Schedule 4.9.1 | Absence of Certain Changes |
| Schedule 4.11.1 | Transferred Employees |
| Schedule 4.11.2 | Employee Benefit Plans |
| Schedule 4.11.4 | Proceedings relating to Seller Employee Benefit Plans |
| Schedule 4.11.5 | Collective Bargaining Agreements |
| Schedule 4.11.6 | Labor Relations |
| Schedule 4.11.7 | Labor/Employment Claims |
| Schedule 4.12.1.A | Patents |
| Schedule 4.12.1.B | Trademarks |
| Schedule 4.12.3 | Allegations of Third Party of Intellectual Property |
| Schedule 4.12.4 | Infringement of the Purchased Intellectual Property |
| Schedule 4.13.1 | Material Contracts |
| Schedule 4.13.2 | Default/Post-Petition Contracts |
| Schedule 4.13.3 | Significant Customers |
| Schedule 4.13.4 | Significant Suppliers |
| Schedule 4.14 | Environmental Matters |
| Schedule 4.15 | Insurance |
| Schedule 4.16.1 | Defects in Title for Personal Property Assets |
| Schedule 4.16.3 | Other Inventory Locations |
| Schedule 4.16.4 | Machinery, Equipment and Capitalized Tools |
| Schedule 4.17 | Owned Real Property |
| Schedule 4.19 | Product Claims |
| Schedule 6.1.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 6.1.1.(a) | Schedule from Capital Procurement Agreement |
| Schedule 6.1.1.(b) | Assets to be Disposed |
| Schedule 6.3.1 | Assumed Contracts |
| Schedule 6.7.1.B | Compensation and Benefits |
| Schedule 6.7.1.C | Leased Employees |
| Schedule 6.7.3 | Inactive Employees |
| Schedule 6.12.1 | Sub-Licensed Intellectual Property Contracts |
| Schedule 6.17 | Shared Items |

## EXHIBITS

Exhibit 8.2.1.A        Patent Assignment
Exhibit 8.2.1.B        Trademark Assignment
Exhibit 8.2.2          Deposit Escrow Agreement
Exhibit 8.2.3          Transition Services Agreement
Exhibit 8.2.4          Bills of Sale
Exhibit 8.2.5          Assignment and Assumption Agreements
Exhibit 8.2.6          Indemnity Escrow Agreement
Exhibit 8.2.7          Inventory Adjustment Escrow Agreement
Exhibit 8.2.8          Sensor Supply Agreement
Exhibit 8.2.9          Environmental Escrow Agreement
Exhibit 8.3.1          Deed for Owned Real Property
Exhibit 10.1.A         Form of Bidding Procedures Order
Exhibit 10.1.B         Form of Sale Approval Order
Exhibit 11.4.6         Remediation of Specific Recognized Environmental Conditions

## ~~SCHEDULE 1~~

### ~~DETAILS OF SELLERS AND BUYER~~

| | ~~ASSET~~ | | ~~SELLER~~ | ~~BUYER~~ |
|---|---|---|---|---|
| ~~MANUFACTURING FACILITY:~~ | | | | |
| ~~Sandusky, Ohio~~ | ~~Asset~~ | | ~~Delphi Automotive Systems LLC, a Delaware limited liability company~~ | |
| | | | | |
| ~~TECHNOLOGY:~~ | | | | |
| ~~Troy, Michigan~~ | ~~Asset~~ | | ~~Delphi Technologies, Inc., a Delaware corporation~~ | |
| | | | ~~Delphi Corporation, a Delaware corporation~~ | |

Document comparison done by DeltaView on Wednesday, March 05, 2008 10:13:52 AM

| Input: | |
|---|---|
| Document 1 | interwovenSite://CHI/CHI/1633861/1 |
| Document 2 | interwovenSite://CHI/CHI/1635983/1 |
| Rendering set | JD Blackline |

| Legend: |
|---|
| **Insertion** |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| ~~Moved deletion~~ |

| Inserted cell | |
|---|---|
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 92 |
| Deletions | 278 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 370 |