**Hearing Date And Time:  March 31, 2008 at 10:00 a.m.**
**Objection Deadline:  March 27, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

EXPEDITED MOTION UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 9019 FOR
SUPPLEMENTAL ORDER AUTHORIZING DEBTORS' PERFORMANCE UNDER
MODIFIED PENSION FUNDING WAIVERS ISSUED BY UNITED STATES INTERNAL
REVENUE SERVICE AND RELATED LETTERS OF CREDIT ISSUED BY
<u>DELPHI CORPORATION TO PENSION BENEFIT GUARANTY CORPORATION</u>

("SUPPLEMENTAL IRS PENSION FUNDING WAIVER EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), submit this expedited motion (the "Motion") under 11 U.S.C. § 363 and Fed. R. Bankr. P. 9019 for entry of a supplemental order authorizing the Debtors' performance under modified pension funding waivers (the "Pension Funding Waivers") issued by the United States Internal Revenue Service (the "IRS") and related letters of credit provided by Delphi to the Pension Benefit Guaranty Corporation ("PBGC") in connection with the Pension Funding Waivers and respectfully represent as follows:

## Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).  Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of

2

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

       4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

       5.      The statutory predicates for the relief requested herein are section 363 of the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

       6.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

---

[1]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso

       7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

       8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, more than half of Delphi's revenue is generated from non-GM sources.

C.     <u>Events Leading To The Chapter 11 Filing</u>

       9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] In 2005, Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. In 2006 the Debtors incurred a

---

receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

          10.      The Debtors believe that the Company's financial performance deteriorated because of (a) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Debtors from exiting non-profitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs, (b) a competitive vehicle production environment for domestic OEMs resulting in a reduction of GM's annual U.S. production and related pricing pressures, and (c) increasing commodity prices.

          11.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.      <u>The Debtors' Transformation Plan</u>

          12.      On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their

5

salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.      The Debtors' Plan Of Reorganization

    13.    The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The GSA and the MRA provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order.  With the Plan confirmed, the Debtors are focusing their efforts on satisfying the conditions for the Plan to become effective and allow them to emerge from chapter 11.  Currently, the Debtors continue to expect that they will emerge from chapter 11 during the first quarter of 2008.

    14.    The Debtors expect to emerge from the reorganization as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

    15.    By this Motion, the Debtors seek entry of a supplemental order under Bankruptcy Code section 363(b) and Bankruptcy Rule 9019 authorizing (a) a further extension, until April 7, 2008, for Delphi to perform its obligations under the Pension Funding Waivers and (b) an increase of $2.5 million in the amounts outstanding under letters of credit that Delphi has provided to the PBGC in connection with the Pension Funding Waivers and an extension of the letters of credit through April 22, 2008.

6

Basis For Relief

F.    The First Pension Funding Waivers (Plan Year Ended September 30, 2006)

16.    Delphi maintains two separate Pension Plans for its employees: one for salaried workers (the "Salaried Plan") and one for hourly workers (the "Hourly Plan"). The Debtors' funding obligations under the Pension Plans are governed by the Internal Revenue Code (the "IRC") and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"). Under the IRC and ERISA, the Debtors are required to meet certain minimum funding standards for the Pension Plans.[4]

17.    Since the Debtors sought reorganization relief under chapter 11 of the Bankruptcy Code, they have been making "normal cost" contributions to the Pension Plans, i.e., contributions that reflect the amounts related to service provided by plan participants post-filing. These "normal cost" contributions are less than the minimum funding requirements established under the IRC and ERISA. As a result, if additional amounts are not contributed within eight and one-half months after the end of the plan year for which the contributions are due, an accumulated funding deficiency arises, which could result in certain excise tax penalties under the IRC. For the plan year ended September 30, 2006, the Debtors anticipated that if the Pension Plans were not funded in accordance with IRC and ERISA minimum funding requirements by June 15, 2007, the IRS likely would have asserted that there was a funding deficiency of at least $1.25 billion in the Pension Plans for that plan year, and the IRS might have asserted a total potential excise tax after June 15, 2007 of more than $1.4 billion.

---

[4]    Delphi has smaller pension plans at three of its Debtor subsidiaries. With the support of their Statutory Committees and the New Plan Investors, the Debtors have contributed the amounts required by ERISA so that the subsidiary plans do not have any accumulated funding deficiencies.

7

18.     Although the Debtors disputed, and continue to dispute, that the IRS could properly levy certain excise tax penalties against the Debtors, the Debtors applied to the IRS for pension funding waivers for the Hourly Plan and Salaried Plan for the plan year ended September 30, 2006.  On May 1, 2007, the IRS agreed to grant pension funding waivers (the "First Waivers") under which the Debtors preempted any such dispute with the IRS over the penalties by (a) extending the June 15, 2007 funding deadline for the plan year ended September 30, 2006, thereby avoiding any accumulated funding deficiency for that year, and (b) settling the IRS's excise tax claims for the plan year ended September 30, 2005, in exchange for the Debtors' commitment to make an accelerated contribution of $10 million to Delphi's Hourly Plan upon the Debtors' emergence from chapter 11.  The $10 million contribution would be deductible by Delphi and credited towards any required contributions for the plan year ended September 30, 2007.  Delphi also agreed to make a second $10 million contribution to Delphi's Hourly Plan as partial pre-payment of Delphi's post-emergence minimum funding obligations.  This $10 million accelerated contribution also would be deductible by Delphi and credited towards any required contributions for the plan year ended September 30, 2007.

19.     Equally important, the First Waivers facilitate the Debtors' intention to transfer certain pension obligations applicable to the Hourly Plan to GM under section 414(l) of the IRC, as set forth in the original plan framework support agreement which the Debtors announced on December 18, 2006 (the "Original Plan Framework Support Agreement").  Under section 414(l) of the IRC, obligations in a pension plan can be transferred to another pension plan without negative tax implications if certain conditions are met.  The Debtors' Plan contemplates that Delphi will make a section 414(l) transfer to a GM pension plan of approximately $1.5 billion of Hourly Plan net liabilities.

8

20. On May 31, 2007, this Court entered an order (the "IRS Pension Funding Waiver Order") (Docket No. 8117) authorizing Delphi to (a) perform under the First Waivers issued by the IRS and (b) provide letters of credit to the PBGC in connection with the First Waivers in the amount of (i) $100 million with respect to Delphi's Hourly Plan and (ii) $50 million with respect to Delphi's Salaried Plan.[5]

21. Under the First Waivers, the IRS agreed to waive the minimum funding requirements for the plan year ended September 30, 2006 subject to certain conditions. The terms of the First Waivers provided in part that (a) Delphi had to file a chapter 11 plan of reorganization by July 31, 2007 and (b) Delphi had to satisfy any minimum funding requirements by the effective date of a plan of reorganization no later than November 15, 2007.

22. On July 13, 2007, the IRS modified the First Waivers at Delphi's request by extending the dates by which Delphi was required to file its plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 29, 2008, respectively.

G. <u>The Second Pension Funding Waiver (Plan Year Ended September 30, 2007)</u>

23. On August 3, 2007, Delphi applied to the IRS for a waiver of its minimum funding obligations concerning the Hourly Plan for the plan year ended September 30, 2007 (the "Second Wavier," and together with the First Waivers, the "Pension Funding Waivers"). The primary purpose of the Second Waiver was to facilitate the Debtors' effort to transfer certain hourly pension obligations to GM under section 414(l) of the IRC, as set forth in the Debtors' Plan. As reflected in Section 7.22 of the Plan, this transfer is an essential aspect of the Debtors' efforts to reorganize successfully with the full and voluntary participation of its U.S. labor unions and other key constituencies.

---

[5] The Second Waiver has no effect on the PBGC's interest in the $100 million letter of credit with respect to the Delphi Hourly Plan that was provided by the Debtors in connection with the First Waivers.

9

24. A funding waiver for the plan year ended September 30, 2007 is necessary to make the section 414(l) transfer economically efficient for the Debtors. Under the IRC and ERISA funding standards, a section 414(l) transfer implemented during a plan year is not fully reflected on the pension plan's books in the same way that a cash contribution would be recognized. As a result, even if pension liabilities under the Hourly Plan were transferred to GM, the Debtors would have to make cash contributions to the Hourly Plan for the plan year ended September 30, 2007, as though a significant portion of the transferred liabilities remained in the Hourly Plan. Absent the Second Waiver, these redundant cash contributions would result in projected overfunding of the Hourly Plan. The Second Waiver allows the Debtors to avoid this economically inefficient outcome by deferring the date on which funding contributions are due to the Hourly Plan and to implicitly reflect in the delayed contributions the funding relief that results from the section 414(l) transfer.

25. On September 28, 2007, the IRS agreed to grant the Second Waiver subject to certain conditions contained in the waiver ruling letter. The terms of the Second Waiver provide in part that (a) Delphi must file a chapter 11 plan by December 31, 2007, (b) Delphi must satisfy any minimum funding requirements for the plan year ended September 30, 2007 within five days following the effective date of the plan of reorganization, which must occur no later than February 29, 2008, and (c) Delphi must contribute $20 million to the Hourly Plan within five days following the effective date of the plan of reorganization, in addition to the $20 million accelerated contributions required under the First Waivers.

26. In addition, the terms of the Second Waiver, like those of the First Waiver applicable to the Hourly Plan, require Delphi to make contributions to the Hourly Plan following emergence to bring the plan's funding up to date as though neither the First or Second Waiver

10

had been granted. Delphi is required to estimate and contribute approximately three-quarters of the amount necessary to satisfy this condition within five days following the effective date of the plan of reorganization, with the remaining quarter deposited into escrow. Within five months following the effective date of the plan of reorganization, Delphi must calculate the precise amount necessary to bring the Hourly Plan's funding up to date and make an appropriate true-up contribution from the escrow account and general assets if necessary. Any unused escrow will be returned to Delphi immediately following this true-up.

27.    On October 4, 2007, the IRS made conforming amendments to the First Waivers at Delphi's request so that they are generally consistent with the conditions to the Second Waiver.

28.    On October 26, 2007, this Court entered an order (the "IRS Second Pension Funding Waiver Order") (Docket No. 10726) authorizing Delphi to perform under the Second Waiver issued by the IRS.

29.    Under section 7.22 of the Plan, the Debtors will transfer certain net underfunded pension obligations pursuant to the IRC section 414(l) transfer. Furthermore, no earlier than January 2, 2008, and no later than five days after the Effective Date, Reorganized Delphi will contribute cash to the pension plans sufficient to meet ERISA minimum funding contributions not covered by the IRC section 414(l) transfer, and upon that contribution, replacement liens, if any, granted to the PBGC on assets owned by any Debtor will be discharged. Nothing in the Plan or Confirmation Order has any effect on the First Waivers or Second Waiver. (Conf. Order. ¶ BBB, at 33).

H.      <u>The February 2008 Modifications To The Pension Funding Waivers</u>

        30.      By their terms, both Pension Funding Waivers would have expired if Delphi has not emerged from chapter 11 by February 29, 2008. If the Pension Funding Waivers had been permitted to expire, the Debtors could have faced the assertion of a total potential excise tax claim for the plan year ended September 30, 2006 of more than $1.4 billion. In addition, for the plan year ended September 30, 2007, the Debtors would have had to make redundant cash contributions which would result in projected overfunding of the Hourly Plan.

        31.      When it became clear that the Debtors were unlikely to emerge from chapter 11 by February 29, 2008, the Debtors initiated discussions with the IRS and the PBGC concerning an extension of the expiration date for the Pension Funding Waivers. These negotiations were productive and fruitful. Having followed the Debtors' progress through these chapter 11 cases closely, the IRS and the PBGC expressed support both for the Debtors' reorganization and for the Debtors' commitment to resolving the issues affecting their pension plans prior to the commencement of these chapter 11 cases. On January 31, 2008, Delphi applied to the IRS to extend the Pension Funding Waivers.

        32.      In response to Delphi's application, and as a result of the parties' negotiations, the IRS agreed to modify the Pension Funding Waivers by extending the date by which Delphi was required to emerge from chapter 11 from February 29, 2008 to March 31, 2008. In exchange, Delphi agreed to extend the letters of credit previously provided to the PBGC for the benefit of Delphi's pension plans from March 15, 2008 through and including April 15, 2008 and to increase the aggregate amount outstanding under such letters of credit by $10 million.

33. In keeping with these discussions, on February 25, 2008, Delphi filed the Expedited Motion Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 9019 for Order Authorizing Debtors' Performance Under Modified Pension Funding Waivers Issued by United States Internal Revenue Service and Related Letters of Credit Issued by Delphi Corporation to Pension Benefit Guaranty Corporation (the "IRS Pension Funding Waiver Extension Motion") (Docket No. 12856), pursuant to which Delphi sought this Court's authorization to perform its obligations under the modified Pension Funding Waivers. No objections to the IRS Pension Funding Waiver Extension Motion were filed. On February 27, 2008, this Court entered an order granting the IRS Pension Funding Waiver Extension Motion. (Docket No. 12887).

I. The Supplemental Modifications To The Pension Funding Waivers

34. It now appears that the Plan is unlikely to become effective by March 31, 2008. Accordingly, Delphi has applied to the IRS for a supplemental extension of the Pension Funding Waivers until April 7, 2008. In consideration for the supplemental extension, Delphi has offered to extend the letters of credit previously provided to the PBGC for the benefit of Delphi's pension plans from April 15, 2008 through and including April 22, 2008 and to increase the aggregate amount outstanding under such letters of credit by an additional $2.5 million.

35. Given the PBGC's ongoing support of the Debtors' reorganization and their commitment to their pension plans, and in light of the parties' recent discussions of the Debtors' proposal for a supplemental extension, the Debtors anticipate that the PBGC will support the Debtors' proposal. The Debtors further anticipate that the IRS – which retains sole authority to grant a supplemental extension of the Pension Funding Waivers – after taking into account the PBGC's recommendation and conducting its own independent analysis, will authorize the supplemental extension.

36. As of the filing of this Motion, the IRS has not formally approved the proposal. Nevertheless, in light of the existing expiration date for the Pension Funding Waivers, the Debtors have determined to seek approval from this Court to perform the obligations they would incur in connection with a supplemental extension subject to the terms described above if the IRS were to approve such an extension. Both the PBGC and the IRS have established strong records of support for the Debtors' reorganization, within the confines of their statutory obligations. The Debtors believe that their proposal for a supplemental extension of the Pension Funding Waivers falls well within the statutory mandate of both of these agencies and therefore believe that their application will be accepted.

## Applicable Authority

### I. The Debtors Have Exercised Sound Business Judgment

37. Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Use of estate property outside the ordinary course of business if the debtor demonstrates a sound business justification for it. See, e.g., In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); In re Del. Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

38. The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must resist becoming "arbiter of disputes between creditors and the estate." In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended as a means

14

to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial." Orion Pictures, 4 F.3d at 1098-99.

39.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, an objector must "produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

40.     As a rule, a debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

41.     As set forth above, Delphi has sound business justification for performing under Pension Funding Waivers subject to the modifications described herein. As modified, the Pension Funding Waivers are necessary to ensure that the section 414(l) transfer of the Hourly Plan described above economically efficient for the Debtors. Absent the Pension Funding Waivers as modified, the Debtors could be required to make cash contributions to the Hourly Plan for the plan year ended September 30, 2007 which would result in projected overfunding of the Hourly Plan. Moreover, the modifications to the Pension Funding Waivers will facilitate a consensual resolution of the Debtors' pension obligations that will allow Delphi to emerge from

15

chapter 11 successfully. Finally, the Debtors negotiated the modifications to the Pension Funding Waivers with the IRS and the PBGC at arm's length and in good faith.

J.  The Court Should Approve The Settlement Set Forth In The Agreement

42.  Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankruptcy Rule 9019(a). Settlements and compromises are "a normal part of the process of reorganization," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

43.  Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate. See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Commc'ns, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained. Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Cent. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979)); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983).

44.  The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the

16

best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b)  the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.  TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

45. Courts in this district have further elaborated on these factors to consider: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the proportion of the class members who do not object or who affirmatively support the proposed settlement, (d) the competency and experience of counsel who support the settlement, (e) the relative benefits to be received by individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (g) the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion.  Adelphia Commc'ns, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

46. The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances.  See Adelphia Commc'ns, 327 B.R. at 159-60; Penn Cent., 596 F.2d at 1114.  Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'"  In re Telesphere Commc'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994).  To that end, courts

17

should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" Adelphia Commc'ns, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994).

47.    Delphi's performance under the Pension Funding Waivers as modified should be authorized under Bankruptcy Rule 9019(a) because the settlement terms contained therein are fair and equitable, fall well within the range of reasonableness, and are in the best interests of the Debtors and their estates.  The modified Pension Funding Waivers will allow the Debtors to avoid redundant cash contributions to the Hourly Plan that would result in projected overfunding of the Hourly Plan while incurring minimal relative additional costs.  This settlement will also assist the Debtors in their goal outlined in the Debtors' proposed Plan to effect the economically efficient transfer of certain pension obligations applicable to the Hourly Plan to GM under section 414(l) of the IRC.  This resolution is a key component of the Debtors' transformation plan and their successful emergence from chapter 11.  For these reasons, the Debtors' performance under the terms of the Pension Funding Waivers as modified serve the best interests of the Debtors' estates and will maximize value for all stakeholders as described above.

## Notice Of Motion

48.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487).  The Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[6]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

49.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[6] The Debtors have noticed this Motion for March 31, 2008.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on March 31, 2008.  Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until March 27, 2008 to file an objection the relief requested herein.

WHEREFORE the Debtors respectfully request that this Court enter an order (i) authorizing, but not directing, Delphi to perform under the Pension Funding Waivers subject to the modifications described herein and (ii) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         March 21, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession