1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.,


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York


                February 21, 2008

                10:10 a.m.


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1   Bearings Sale Motion: Expedited Motion for Orders Under 11

2   U.S.C. Sections 363, 365 and 1146 and Fed. R. Bankr. P. 2002,

3   6004, 6006 and 9014(a)

4

5   Fifth Removal Deadline Extension Motion: Motion to Further

6   Extend Time Period Within Which Debtors May Remove Actions

7   Under 28 U.S.C. Section 1452 and Fed. R. Bankr. P. 9006 and

8   9027

9

10  Fourth 365(d)(4) Deadline Extension Motion: Motion to Further

11  Extend Time Period Within Which Debtors May Remove Actions

12  Under 28 U.S.C. Section 1452 and Fed. R. Bankr. P. 9006 and

13  9027

14

15  Automodular Motion to Compel Assumption or Rejection of

16  Executory Contracts and to Allow Payment of Administrative

17  Expense Claim

18

19  Employees' Motion to Vacate Automatic Stay: Motion to Vacate

20  Automatic Stay for Cause to Commence Action in N.D. Alabama

21

22  Steering Sale Motion: Motion to Approve Expedited Motion for

23  Orders Under 11 U.S.C. Sections 363, 365 and 1146 and Fed R.

24  Bankr. P. 2002, 6004, 6006 and 9014(a)

25

3

1    Twenty-fifth Omnibus Claims Objection Pursuant to 11 U.S.C.

2    Section 502(b) and Fed. R. Bankr. P. 3007

3

4    Debtors' Expedited Motion to Strike Non-Conforming Cure Amount

5    Notices and Improper Objections Pursuant to Solicitation

6    Procedures Order, Confirmation Order, Plan of Reorganization,

7    11 U.S.C. Section 105(a) and Fed. R. Bankr. P. 9010

8

9    FEE APPLICATIONS OF:

10    Quinn Emanuel Urquhart Oliver & Hedges, LLP

11    Thompson Hine, LLP

12    Dickinson Wright, PLLC

13    Latham & Watkins, LLP

14    Mesirow Financial Consulting, LLC

15    Steven Hall & Partners, LLC

16    Buck Consultants, LLC

17    Howard & Howard Attorneys, PC

18    Covington & Burling, LLP

19    Price Heneveld Cooper DeWitt & Litton, LLP

20    Shearman & Sterling, LLP

21    W.Y. Campbell & Company

22    Fried Frank Harris Shriver & Jacobson, LLP

23    Groom Law Group

24    Togut Segal & Segal, LLP

25    O'Melveny & Myers, LLP

4

1    Jaeckle Fleischmann & Mugel, LLP

2    FTI Consulting, Inc.

3    Skadden Arps Slate Meagher & Flom, LLP

4    Cadwalader Wickersham & Taft, LLP

5    Jefferies & Company, Inc.

6    Ernst & Young, LLP

7    KPMG LLP

8    Rothschild Inc.

9    Warner Stevens, LLP

10   Houlihan Lokey Howard & Zukin Capital

11   Jones Lang LaSalle Americas, Inc.

12   Wilmer Cutler Pickering Hale & Dorr, LLP

13   Butzel Long, P.C.

14   Rader Fishman & Grauer, PLLC

15   Ivins Phillips & Barker Chartered

16   Banner & Witcoff, Ltd.

17   Cantor Colburn LLP

18   Mayer Brown LLP

19   Dykema Gossett PLLC

20   Deloitte & Touche, LLP

21   PricewaterhouseCoopers LLP

22   Legal Cost Control, Inc.

23   DLA Piper US LLP

24   Blake Cassels & Graydon LLP

25

5

```
 1   A P P E A R A N C E S :

 2   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

 3       Attorneys for Debtor

 4       333 West Wacker Drive

 5       Chicago, Illinois 60606

 6

 7   BY:  JOHN WM. BUTLER, JR., ESQ.

 8       ALBERT L. HOGAN, III, ESQ.

 9

10

11   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

12       Attorneys for Debtor

13       Four Times Square

14       New York, New York 10036

15

16   BY:  KAYALYN A. MARAFIOTI, ESQ.

17

18

19   U.S. DEPARTMENT OF JUSTICE

20   OFFICE OF THE U.S. TRUSTEE

21       33 Whitehall Street

22       New York, New York 10004

23

24   BY:  ALICIA M. LEONHARD, ESQ.

25
```

6

1    MCDERMOTT WILL & EMERY, LLP

2         Attorneys for Linear Technology, Temic

3         840 Madison Avenue

4         New York, New York 10173

5

6    BY:  JAMES M. SULLIVAN, ESQ.

7

8

9    MEYERS LAW GROUP, P.C.

10        44 Montgomery Street

11        San Francisco, CA 94104

12

13   BY:  MERLE C. MEYERS, ESQ.

14

15

16   SONNENSCHEIN NATH & ROSENTHAL, LLP

17        Attorneys for Molex

18        1221 Avenue of the Americas

19        New York, New York 10020

20

21   BY:  MATTHEW B. STEIN, ESQ.

22

23

24

25

7

1    LAW OFFICES OF DAVID P. MARTIN, LLC

2        Attorneys for Mueller, Gargis, Livingston

3        519 Energy Center Blvd.

4        Northport, Alabama 35473

5

6    BY:  DAVID P. MARTIN, ESQ.

7

8

9    WARNER STEVENS, LLP

10       31 Commerce Street

11       Fort Worth, Texas 76102

12

13   BY:  DAVID T. COHEN, ESQ.

14

15

16   MORITT HOCK HAMROFF & HOROWITZ, LLP

17       Attorney for Robin Industries

18       400 Garden City Plaza

19       Garden City, New York 11530

20

21   BY:  LEE J. MENDELSON, ESQ.

22

23

24

25

8

1  THALER & GERTLER, LLP

2      Attorneys for Mueller, Gargis, Livingston

3      90 Merrick Avenue

4      East Meadow, New York 11554

5

6  BY:  ANDREW M. THALER, ESQ.

7

8

9  RICHARD KIBBE & ORBE, LLP

10      Attorneys for Blue Angel, Midtown

11      One World Financial Center

12      New York, New York 10281

13

14  BY:  KEITH N. SAMBUR, ESQ.

15

16

17  LOCKE LORD BISSELL & LIDDELL, LLP

18      Attorneys for Methode Electronics, Inc.

19      111 South Wacker Drive

20      Chicago, Illinois 60606

21

22  BY:  TIMOTHY S. MCFADDEN, ESQ.

23

24

25

9

1   MCCARTER & ENGLISH, LLP

2       Attorneys for Automodular

3       245 Park Avenue

4       New York, New York 10167

5

6   BY:  EDUARDO J. GLAS, ESQ.

7

8

9   ARMSTRONG TEASDALE, LLP

10       Attorneys for Spartech Corporation,

11        Spartech Polycom

12       One Metropolitan Square

13       St. Louis, Missouri 63102

14

15   BY:  DAVID L. GOING, ESQ.

16

17

18   DAY PITNEY, LLP

19       Attorneys for MacArthur Corp.

20       PO Box 1945

21       Morristown, New Jersey 07962

22

23   BY:  RICHARD M. METH, ESQ.

24

25

10

1  BARNES & THORNBURG, LLP

2      Attorneys for Clarion Corporation

3      11 South Meridian Street

4      Indianapolis, Indiana 46204

5

6  BY:  MICHAEL K. MCCRORY, ESQ.

7

8

9  DREIER, LLP

10     Attorneys for Twenty Counterparties

11     499 Park Avenue

12     New York, New York 10022

13

14  BY:  IRA S. SACKS, ESQ.

15      MAURA I. RUSSELL, ESQ.

16      ANTHONY B. STUMBO, ESQ

17

18

19  KIRKLAND & ELLIS, LLP

20      777 South Figueroa Street

21      Los Angeles, CA 90017

22

23  BY:  RICHARD L. WYNNE, ESQ.

24

25

```
 1    KASOWITZ BENSON TORRES & FRIEDMAN, LLP

 2        Attorneys for Contrarian, Argo, ASM

 3        1633 Broadway

 4        New York, New York 10019

 5

 6    BY:  ADAM L. SHIFF, ESQ.

 7        DANIEL A. FLIMAN, ESQ.

 8

 9

10    FRIEDMAN FRANK HARRIS SHRIVER & JACOBSON, LLP

11        One New York Plaza

12        New York, New York 10004

13

14    BY:  BONNIE STEINGART, ESQ.

15        RICHARD SLIVINSKI, ESQ.

16

17

18    ALSTON & BIRD, LLP

19        Attorneys for Furukawa

20        90 Park Avenue

21        New York, New York 10016

22

23    BY:  MARTIN BUNIN, ESQ.

24

25
```

12

1    TOGUT SEGAL & SEGAL, LLP

2         Attorneys for Creditors' Committee

3         One Penn Plaza

4         New York, New York 10119

5

6    BY:  NEIL BERGER, ESQ.

7

8

9    QUARLES & BRADY, LLP

10        Attorneys for Semi Conductor Component, LLC

11        One South Church Avenue

12        Tucson, Arizona 85701

13

14   BY:  KASEY C. NYE, ESQ.

15        (Telephonically)

16

17

18   DYKEMA GOSSETT, PLLC

19        Attorneys for Federal Screw

20        39577 Woodward Avenue

21        Bloomfield Hills, Michigan 48304

22

23   BY:  BRENDAN G. BEST, ESQ.

24        (Telephonically)

25

13

1   KIMBALL ELECTRONICS

2

3   BY:  CHAPPELL PHILLIPS, ESQ.

4       (Telephonically)

5

6   CLARK HILL, PLC

7       Attorneys for Millennium Industries

8

9   BY:  JOEL D. APPELBAUM, ESQ.

10      (Telephonically)

11

12

13   VINSON & ELKINS, LLP

14      Attorneys for Marathon Capital Holdings

15      2001 Ross Avenue

16      Dallas, Texas 75201

17

18   BY:  WILLIAM WALLANDER, ESQ.

19      (Telephonically)

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.  Okay.  Delphi

3     Corporation.

4          MR. BUTLER:  Your Honor, Jack Butler, Kayalyn

5     Marafioti and Al Hogan from Skadden Arps, here on behalf of

6     Delphi Corporation twenty-eight omnibus hearing.

7          Your Honor, we have filed a proposed agenda setting

8     forth the matters scheduled for today.  Including the fee

9     applications there are forty-eight matters on the agenda.  We

10    propose to take them in the order on the agenda.

11         THE COURT:  Okay.  I understood from one of my clerks

12    that there was a request that the chambers conference be this

13    afternoon?

14         MR. BUTLER:  Yes, Your Honor.  The chambers

15    conference that we were -- I think the request was to be at

16    2:30 after your other matter.

17         THE COURT:  Okay.  So if there are people who are

18    here just for that you can be excused, since that will happen

19    at 2:30.

20         MR. BUTLER:  Your Honor, I think chambers had given

21    some confirmation to us that you had agreed to the 2:30, so

22    some folks already left.

23         THE COURT:  All right.  Very well.  Okay.  So let's

24    go through the agenda then.

25         MR. BUTLER:  Thank you, Your Honor.  Your Honor,

15

1   matter number 1 on the agenda is the Bearings Sale Motion, at

2   docket number 12104.  Just a brief report on this.  We're

3   asking Your Honor to adjourn this matter for a final hearing at

4   the March 19th omnibus hearing.  The reason for that is that

5   there has been, in fact, in this transaction and auction that

6   ran several days and completed just around midnight last night,

7   after running for about two and a half days.  And the

8   successful bidder is KYKLOS, a KPS subsidiary, who bid 250,000

9   dollars over the minimum bid.  The bid value was 18.7 million

10  net of the breakup fee and expense reimbursement to the

11  stalking horse.  The stalking horse was not successful as

12  either the successful bidder or the backup bidder in connection

13  with this.

14        Very significantly, in connection with this

15  successful bid, the closing conditions regarding a GM supply

16  agreement were removed.  They, in fact, were able to negotiate

17  and execute a supply agreement with General Motors.  General

18  Motors and representatives of the committees participated in

19  the auction, and this successful bidder therefore has removed

20  the primary closing condition.

21        The backup bidder is Ynaxiang, Y-N-A-X-I-A-N-G.  They

22  actually had a -- made a bid that 500,000 dollars higher than

23  the successful bid.  But in the view of the company, as

24  supported by the committees, it represented an unacceptable

25  high level of closing risks based on communications from

1    General Motors that it did not believe that it would be able to

2    enter into a supply agreement with that bidder.  The creditors'

3    committee participated and concurred with these decisions.  We

4    are now, as is our custom in these disposition transactions,

5    there'll be a follow on objection to anyone who wants to object

6    to the conduct of the auction and to other matters relating to

7    the sale hearing.  And we would propose to have the hearing

8    occur on March 19th.

9         THE COURT:  Okay.  And that date doesn't present any

10   problems with the winning bid?

11        MR. BUTLER:  No.  I'm told that that is -- that's --

12   that they expect that's going to happen.

13        THE COURT:  Okay.  All right.  So that will be

14   adjourned to that date.

15        MR. BUTLER:  Thank you, Your Honor.  Your Honor, now

16   moving to the non-contested calendar.  There are two matters

17   that are on the non-contested calendar.  The first matter is

18   matter number 2 on the agenda, is the Fifth Removal Deadline

19   Extension Motion, at docket number 12471.  And item number 3 is

20   the Fourth 365(d)(4) Deadline Extension, at docket number

21   12472.

22        In each of these cases we have asked Your Honor to --

23   and I should indicate these are uncontested.  We have asked

24   Your Honor to extend the date until the earlier of certain

25   dates in the future, including the date -- the effective date

1    of a plan of reorganization.  And there is -- the calendar date

2    is also I believe May -- in the case of the 365(d)(4) is May

3    31, 2008, so it will be the earlier of those two.  These have

4    been filed, as the pleadings indicated, as precautionary

5    matters to maintain these -- the flexibility associated with

6    these statutory extensions in the event that there is any delay

7    in going effective on the plan.  And -- but we're still relying

8    on the plan.  As Your Honor knows, we have under the plan made

9    decisions about executory contracts and would, upon the

10   effective date, continue with those elections.  But in the

11   event that -- we're still a fiduciary here, in the event that

12   there's a delay in consummating the plan, and we were to allow

13   these periods to lapse, it will be difficult then to come back

14   to the Court on those issues.  So that's why we're asking for

15   the relief that's -- the limited relief that's set forth in

16   each of these procedural motions.

17          THE COURT:  Okay.  Does anyone have anything to say

18   on either of these two motions?  All right.  I'll grant the

19   motion to extend the time to remove for the reasons stated in

20   the motion.  And we'll do the same for the motion for extension

21   of the time under Section 365(d)(4).  As you said, this one

22   really is held on suspenders since the debtors have already

23   indicated their intention to assume these leases under their

24   plan, and as I view it, this is just to cover a potential gap

25   between the date for assumption that currently exists and the

18

1    date for resolving cure objections and the like.  So I'll grant

2    that motion as well.

3         MR. BUTLER:  Thank you, Your Honor.  Your Honor,

4    moving to the contested hearing docket now, the first matter is

5    the Automodular Motion to Compel Assumption or Rejection of

6    Expense Contract and to Allow Payment of Administrative Expense

7    Claims, this is at docket number 11180.  And what we're here

8    for today primarily is the contested hearing with respect to

9    the administrative claim that is being asserted by Automodular.

10   Before turning to the testimony that --

11        THE COURT:  I'm sorry, Mr. Butler.  As I understood

12   it, the sale motion that's on for today -- or is that at this

13   point contested?

14        MR. BUTLER:  There are contested matters but there's

15   no -- I think there is no contest, Your Honor, to the actual

16   sale itself.  You want to turn to that first?

17        THE COURT:  I thought since there may be people here

18   for that and I think that will take a lot shorter than the

19   Automodular and lift stay matters.  And maybe we can just go

20   ahead with that one.

21        MR. BUTLER:  Okay.  Let me then turn to matter number

22   6 --

23        THE COURT:  The Steering Sale Motion.

24        MR. BUTLER:  The Steering Sale Motion, and that is at

25   docket number 11390.  This, Your Honor, is a request for

19

1   approval of the sale of these assets to Steering Solutions

2   Corporation and certain of its affiliates.  And this, as Your

3   Honor may recall, from the Bid Procedures Motion, involved

4   several forms of consideration that approximate, in the debtors

5   estimation, a total transaction value of approximately 447

6   million.  That would include an assumption of liabilities and

7   restructuring costs borne by Steering Solutions in the

8   approximate range of 190 million dollars, and a transaction

9   facilitation payments involving General Motors in the amount of

10  257 million dollars, plus certain additional expenses that

11  could be estimated up to approximately sixty-five million

12  dollars.  It would otherwise be Delphi's obligations under the

13  proposed purchase agreement.

14       This is a transaction, Your Honor, for which there

15  was no auction, and so we're here now for a final sale.  As a

16  result, the breakup fee issues are inapplicable.  The bid

17  deadline was January 18th.  There was no auction held on

18  January 28th because no qualified bid was received at that

19  time.

20       Your Honor, in connection with the record here, there

21  are -- we have submitted Exhibit books, there are fifty-seven

22  exhibits supporting the evidentiary record here.  They include

23  Exhibit 1, which is John Sheehan's declaration.  And then the

24  pleadings in this case, the notices with respect to executory

25  contracts, the various objections and cure notices which I'll

20

1    address in a few moments, and the affidavits of service that

2    are set forth indicating that the appropriate service was made

3    in conjunction with Your Honor's earlier orders.  Your Honor,

4    I'd move admission of Exhibits 1 through 57 into the record.

5         THE COURT:  Okay.  Are there any objections to the

6    admission of those exhibits?  All right.

7    (Sheehan Declaration and Pleading Documents were hereby

8    received as Debtors' Exhibits 1 through 57 for identification,

9    as of this date.)

10        MR. BUTLER:  Your Honor, with respect to Exhibit 1,

11   Mr. Sheehan's declaration, I would present Mr. Sheehan for any

12   cross examination people and parties may have, or any questions

13   the Court may have regarding the transaction.

14        THE COURT:  Okay.  Does anyone want to cross examine

15   Mr. Sheehan on his declaration in support of this sale?  All

16   right.  I have no questions either.

17        MR. BUTLER:  Thank you, Your Honor.  Your Honor, I'm

18   also advised that overnight, in preparing for the hearing, we

19   added some additional exhibits involving withdrawals, which are

20   Exhibits 57 through 63, and there was a letter objection

21   received overnight from Gevelot Extrusion, which I don't

22   believe is docketed.  We wanted to put that in the record as

23   well, and I'll address it in a few minutes, as Exhibit Number

24   64.

25        THE COURT:  Okay.  I'm not sure I've seen that one.

21

1          MR. BUTLER:  I'll get a copy for the Court.

2          THE COURT:  And the withdrawals are withdrawals of

3     what?

4          MR. BUTLER:  Of various objections that have been

5     filed.

6          THE COURT:  Okay.

7          MR. BUTLER:  They are already admitted.  So I'd like

8     to admit also 58 through 64 into the record.

9          THE COURT:  All right.  Any objection to that?  All

10    right.  Those will be admitted.

11    (Withdrawals were hereby received as Debtors' Exhibits 58

12    through 64 for identification, as of this date.)

13         MR. BUTLER:  Your Honor, now turning to where we

14    stand on the actual objections.  Your Honor, may recall that

15    there was an actual objection to the sale filed by Maricopa,

16    which was resolved earlier, and they've withdrawn that.  And

17    that is otherwise as resolved and we don't have to deal with

18    that at this point in time.

19         On January 23 of this year, we filed and served 883

20    cure notices and 1,502 notices of assumption or assignment

21    pursuant to the bidding procedures.  And we then found some

22    additional contracts.  Subsequent to that time on January 30th,

23    we sent out eight additional notices of assumption or

24    assignment to the contract parties, which did not receive the

25    initial notice and some additional cure notice at that time.

1          Your Honor, with respect to the objections that we

2     have received, we have received forty-two objections including

3     amended objections to the notices of assumption or assignment

4     and the cure notices.  And then we also received an objection

5     from Timken Ltd. to contract related language in the proposed

6     sale order.  And they have certain issues with the form of the

7     order.  What we have decided to do, with your permission, is to

8     do what we have done in some of the other major sales, which is

9     to adjourn the cure notice objections that were filed by -- as

10    I say forty-two of them filed by thirty-seven parties, those

11    that have not been resolved.  We would adjourn those to the

12    March 19th hearing.  We'd also adjourn the Timken Ltd.

13    objection.  In the form of order we provided the Court we've

14    accepted out, as Your Honor's done in prior sale orders,

15    certain provisions of the order as it relates to those

16    adjourned objections that we would deal with at the next

17    hearing.

18         THE COURT:  Okay.  And these are literally cure

19    objections, they're not objections ultimately to adequate

20    assurance and future performance or to assignment, they're just

21    dispute over the amount of the cure?

22         MR. BUTLER:  I think that's substantially correct,

23    Your Honor.  There are some -- there are some -- for example,

24    the Timken objection relates to a statement they want to make

25    sure that all their rates are preserved and all our rights are

23

1    preserved and we weren't going to put specific -- that kind of

2    language in the order.  We understand the rights are preserved

3    in the interim.  But -- so there are things that actually

4    approach some other areas of the order but none that I think

5    would affect materially the proposed transaction.

6         THE COURT:  Okay.

7         MR. BUTLER:  And I think we'll be able to move

8    forward and resolve -- in our response yesterday that we filed,

9    we summarized those objections.  And what we had done a number

10   of those had been withdrawn, some have been resolved, and we'd

11   expect to continue to negotiate on those between now and March

12   19th as we have in other cases.

13        THE COURT:  Okay.

14        MR. BUTLER:  I think, Your Honor, in terms of the

15   record, I think with the matters in evidence and with their

16   omnibus reply that we filed yesterday and Mr. Sheehan's

17   affidavit, I think that is an adequate record for Your Honor to

18   consider the motion.  I don't believe there are any parties

19   present in the courtroom today that want to pursue objections

20   today.

21        THE COURT:  All right.

22        MR. BUTLER:  But we'll find out.

23        THE COURT:  The one that you referenced, right, I

24   haven't seen the letter objection.

25        MR. BUTLER:  Yes.  I'll locate it, one second, Your

24

1    Honor.

2          THE COURT:  Okay.

3          MR. BUTLER:  I think in the binder we provided Your

4    Honor, Volume III, it's Exhibit 63, the very last exhibit --

5    64, excuse me.  But I can hand up an extra copy.

6          THE COURT:  No, I have it.

7          (Pause in proceedings)

8          THE COURT:  All right.  So this looks like it's a

9    cure objection too.  They raise the issue as to the amount

10   owing.

11         MR. BUTLER:  Yes, Your Honor.

12         THE COURT:  Okay.

13         MR. BUTLER:  And, Your Honor, I also agreed with one

14   of the -- we agreed with one of the objector parties in

15   resolution of their objection to make a brief statement on the

16   record, which I'd like to read into the record.

17         THE COURT:  Okay.

18         MR. BUTLER:  Which is -- this is with respect to the

19   objection of Means Industries.  And the statement is as

20   follows:  "In addition to those purchase orders which the

21   selling debtor entities served an assumption and/or assignment

22   notice on or about January 23, 2008, the selling debtor

23   entities will assign the following four additional post-

24   petition purchase orders to the buyer: SAG9F15I5794,

25   SAG9FI7295, 450202184 and 450619882.  The purchase orders will

1   be assumed and are assigned along with the terms and conditions

2   incorporated therein."  And that resolves the concerns of Means

3   Industries.

4         THE COURT:  Okay.

5         MR. BUTLER:  All right.  I think unless -- at this

6   point, Your Honor, I sort of see if there are any party

7   objectors who want to talk about their positions.

8         THE COURT:  Okay.

9         MR. BUNIN:  Good morning, Your Honor.

10        THE COURT:  Good morning.

11        MR. BUNIN:  Mary Bunin, from Alston & Bird for

12  Furukawa Electric.  Furukawa Electric filed an objection to the

13  notice of cures.  It's claim is -- there's about a 170,000

14  dollar difference between the debtors' amount and Furukawa's

15  amount, 2.6 million and 2.8 million approximately.

16        In connection with the adjournment, Furukawa

17  attempted to get a clarification with respect to how the

18  ultimate cure amount determined by Your Honor would be paid.  W

19  have not gotten that clarification and I'd like to ask the

20  Court to address the debtors to make it.

21        The notice of cure amount under 363 specifies that if

22  the closing of the sale occurs before emergence the cure

23  amounts would be paid in cash.  It says that -- further, if the

24  emergence occurs before the closing then the contracts will be

25  assumed pursuant to the plan cure notice, as opposed to the 363

1    cure notice.  And the counterparties will have the right to

2    elect cash or plan currency.  However, the plan cure amount

3    notice does not provide for an election of cash or currency

4    where there's a disagreement and the Court will ultimately

5    determine the amount.  We would like a clarification on the

6    record, that states that with respect to the plan cure notice

7    that if there's a -- when the Furukawa Electric cure amount is

8    determined by the Court Furukawa will have the ability to get

9    paid in cash if it so chooses at that time.

10         THE COURT:  Well, what did Furukawa elect when it got

11   the notice?

12         MR. BUNIN:  The way the notice is drafted, it

13   disagreed with the cure amount.  And then you skip to step 3,

14   the disagreement is step 1, step 2 is requesting cure amount in

15   cash or a claim currency, step 3 talks about objections.  So if

16   you disagree with the cure amount you don't make the election

17   on the notice of cure amount.  Furukawa did properly, I am

18   informed, fill out, complete and return the form.  It does wish

19   ultimately to be paid in cash when the amount is determined.

20         THE COURT:  Did it make an election when it returned

21   the form?

22         MR. BUNIN:  It did not.  But the way the form is

23   drafted it's not supposed to make an election if there's a

24   disagreement as to amount.  The request for the election is in

25   step 2 and the instructions on the form say skip step 2 if you

27

1    disagree with the cure amount listed.

2        THE COURT:  Okay.

3        MR. BERGER:  Your Honor, having spent a few minutes

4    with Mr. Bunin and the client, there's a small delta in the

5    amount of the Furukawa claim.  We're working it out.  I presume

6    it's going to be allowed -- I'm sorry, resolved.  And if it is,

7    his client is able to elect to receive cash.

8        THE COURT:  Okay.

9        MR. BUNIN:  I just want to be sure that I understood

10   Mr. Berger correctly.  He said if it's worked out we'll be able

11   to elect cash.  I'd like -- what I'm looking for is a

12   clarification that Furukawa can elect cash whether the matter

13   is resolved by settlement or by Your Honor.

14       MR. BERGER:  I'm sorry to have been imprecise, Your

15   Honor.  The number is fixed either by an adjudication by Your

16   Honor or by settlement, the cash is available.

17       THE COURT:  Okay.  Mr. Berger so often works things

18   out, that's how he thinks.

19       MR. BUTLER:  Your Honor, I think the only -- and I

20   think counsel for the purchasers are present in the courtroom

21   today and they have agreed to the form of order we've submitted

22   to Your Honor as well, in connection with the sale.

23       THE COURT:  Okay.  And that's the revised form that I

24   got recently?

25       MR. BUTLER:  Yes, Your Honor.

28

1        THE COURT:  All right.  Okay.  Does anyone else have

2   anything to say on this motion to sell the Steering business?

3        UNIDENTIFIED ATTORNEY:  Your Honor, I'd just like to

4   announce to the Court, that the creditors' committee supports

5   the sale as proposed by the debtor.

6        THE COURT:  Okay.  All right.  I will approve the

7   sale based upon the affirmants and the motion, including the

8   exhibits and Mr. Sheehan's declaration among them.  And the

9   order will get entered promptly.  Obviously the cure issues

10  will be resolved over the next month or so and if they're not

11  resolved I'll have hearing on the unresolved ones at the next

12  omnibus hearing.

13       MR. BUTLER:  Thank you, Your Honor.

14       THE COURT:  Okay.  Do you want -- while we're moving

15  along, do you want to go to the omnibus claims objection too,

16  which I --

17       MR. BUTLER:  Sure.

18       THE COURT:  -- understand at this point is unopposed

19  also, at least as far as the relief that's being sought.

20       MR. BUTLER:  Sure.  Your Honor, matter number 7 on

21  the agenda is the Twenty-Fifth Omnibus Claims Objection, it's

22  docket number 12288.  This particular objection had ten proofs

23  of claim with the subject to the objection.  One response was

24  filed with respect to one proof of claim, leaving nine proofs

25  of claim to be before Your Honor today for potential action by

29

1    the Court.  In connection with the relief requested today, Your

2    Honor, with respect to the uncontested portions of the twenty-

3    fifth omnibus claims objection, we're seeking relief with

4    respect to nine claims asserting liquidating damages of

5    approximately 2.6 million.  We're asking the Court to expunge

6    six of these claims, that is six of the nine claims, with an

7    asserted claim amount of approximately 600,000 dollars.  With

8    respect to the remaining three claims, that assert

9    approximately two million dollars, we're asking Your Honor to

10   modify the indemnity of the debtor against which the proofs of

11   claim asserted and the class under the amount of the claim,

12   which would reduce the asserted amount of these claims to

13   approximately 1.9 million dollars, that's a reduction of more

14   than 100,000 dollars, but it's consistent with the debtors'

15   reconciliation of the claims.  And so, Your Honor, we would ask

16   for that relief with respect to those nine claims.  The one

17   claim that was objected to would move on to the claims track as

18   has been our custom in these cases.

19        THE COURT:  Okay.  Does anyone have anything to say

20   on the objections to the nine claims that the debtors are

21   proceeding with today?  All right.  Based on the statements in

22   the objections and the fact that there has been no opposition

23   to those objections I'll grant the relief sought today as to

24   those nine claims.

25        MR. BUTLER:  Thank you, Your Honor.  And as has been

30

1   our customer, we did send out particularized notice to this

2   objection and we will send out particularized notice of Your

3   Honor's determinations.

4        THE COURT:  Okay.  Very well.  Then I think there may

5   be people here also on the fee applications who wouldn't

6   otherwise be here.  So why don't we turn to those interim

7   applications.

8        MR. BUTLER:  Okay.  Your Honor, items 9 through 48

9   are interim fee applications for professionals with respect to

10  the sixth fee application period.  A total of forty

11  professionals timely submitted applications with respect to the

12  sixth fee application period.  All these professionals were

13  retained in the cases by either the debtors, the unsecured

14  creditors' committee, or the equity committee, or enter of the

15  joint fee review committee, for that matter.  There is and

16  continues to be one professional firm that's been retained in

17  the cases that's not yet filed fee applications, that's the

18  Krull & Moring law firm, they're anti-trust counsel of the

19  debtors.  They were retained on March 9, 2006, at docket number

20  2773.  That retention has bee on a contingent fee basis,

21  they've yet to submit invoices to us.  And that's the

22  explanation for their lack of a fee application.

23       Your Honor, no objections have been filed to any of

24  the interim fee applications that are before the Court today.

25  And each professional, with respect to each fee application

31

1   before the Court, has received -- reached a consensual

2   agreement concerning this application with the fee committee.

3   As has been the case in the past, the fee committees legal fee

4   order, LCC, has provided reports and analysis of the fee

5   applications to the applicants and to the fee committee.  The

6   applicants have had an opportunity to consider the

7   recommendations and to respond to the fee committee, and then

8   there has been an independent discussion between the fee

9   committee and each applicant to reach a consensual resolutions.

10   And I believe Ms. Leonhard is here to speak on behalf of the

11   fee committee at this time.

12        MS. LEONHARD:  Yes.  Good morning, Your Honor.

13   Alicia Leonhard for the United States Trustee.  On behalf of

14   the fee committee I'd like to affirm what Mr. Butler stated.

15   We had a very positive and consensual agreements of all of the

16   fee applications.  And the fee committee would like to thank

17   all the professionals for their cooperation.

18        THE COURT:  Okay.  And I note, based on the chart,

19   that the cooperation, is one way to put it, was significant

20   here.  There were significant reductions by a number of firms.

21        MS. LEONHARD:  That's correct, Your Honor.  Overall,

22   there's approximately seven percent reduction in the fees for

23   the sub period.  So, as I said, we really thank everybody for

24   their consideration.

25        THE COURT:  Okay.

32

1          MS. LEONHARD:  Your Honor, may I be excused after you

2     rule?

3          THE COURT:  Yes.  And I think anyone who is here just

4     on this matter can be excused.

5          MR. BUTLER:  Your Honor, we do have a proposed form

6     of order that is in the form that we have used for the prior

7     fee applications, which includes the recommendations of the fee

8     committee and blanks for Your Honor's determinations as to each

9     professional.  There's also a provision which we've discussed

10    with the Court, I think at a prior hearing or status

11    conference, but I want to state on the record.  Which is the

12    debtors did notify all the professionals and I don't think

13    anyone's objected to it, and consulted with the fee committee

14    regarding the seventh fee application period, which would have

15    concluded on the date that Your Honor entered the confirmation

16    order of January 25th of this year.  And the order, if Your

17    Honor decides to approve the form that's been submitted,

18    provides that the fee app -- interim fee applications for the

19    seventh period would be suspended and no one would file those

20    fee applications.  They instead would incorporate those -- that

21    period in the final fee application.  The holdbacks would be

22    then held to the final fee hearing, as Your Honor would have a

23    holdback to consider at the time you consider final fee

24    applications and make judgments about the case taken as a

25    whole.  And that will alleviate from the debtors' perspective

33

1   the expense that the debtor ends up paying for of all these fee

2   applications being prepared at a time when we're going to go

3   through a final fee application process, hopefully in the next

4   few months in any event.

5          THE COURT:  Okay.

6          MR. BUTLER:  So that's the other piece of that.  And

7   the last point I should make, which I believe has the support

8   of the fee committee, it was their recommendation I believe

9   that the order does provide that the holdbacks, with respect to

10  the sixth fee application period, would be released.

11         THE COURT:  All right.  Does anyone have anything to

12  say on the interim applications?  Okay.  As I've noted with

13  regard to prior applications, I have relied heavily on the fee

14  committee, which is both diligent and sophisticated.  That

15  being said, and also noting that these were interim

16  applications, based on my review of the primary ones, and I

17  confess I didn't go through applications beyond primary

18  professionals, I believe the amount as ultimately sought here

19  are reasonable on an interim basis and I'll enter that order.

20         MR. BUTLER:  Thank you, Your Honor.  Your Honor, I

21  think that leaves us with matters 4, 5 and 8 --

22         THE COURT:  Yes.

23         MR. BUTLER:  -- on the agenda.  Do you have a

24  preference now you'd like to take those?

25         THE COURT:  However you want to proceed.

34

1        MR. BUTLER:  All right.  I will then -- why don't we

2    go back then and take them in agenda order.  And that would

3    take us back to item number 4, which is the Automodular

4    Administrative Claim Contested Hearing, at docket number 11180.

5    Before ceding the podium to counsel for the claimant to present

6    their case, because they have the burden in this contested

7    hearing, I do want to cover the evidentiary matters that are in

8    the record.  We have met and conferred between the debtors and

9    Automodular, and there have been -- there are, I believe -- and

10   I just want to get my exhibit book here.  There are, I believe,

11   ninety-two exhibits.

12       (Pause in proceedings)

13       MR. BUTLER:  I just want to verify, Your Honor, there

14   are ninety-five tabs in your exhibit book here, there are only

15   ninety-two exhibits.  I just wanted to confirm that.

16       Your Honor, this is a joint exhibit book and includes

17   the evidence -- the documentary evidence that parties intent to

18   rely on in this matter.  As indicated, the exhibits are

19   numbered 1 through 92, and they include several declarations

20   and affidavits on behalf of both the debtor and Automodular's

21   witnesses.

22       With respect to the meet and confer that's been

23   conducted, I should make the following statements:  First, both

24   parties reserve the right to object to any documents submitted

25   depending on the specific usage of the evidence at the hearing.

35

1   Second, the debtors objected to certain paragraphs of the

2   Michael Blair at tab 5, and certain paragraphs of the

3   Christopher Dell declaration at tab 7.  These are proposed

4   witnesses for the movant.  Based on Rule 602, lack of personal

5   knowledge and Rule 701, improper lay opinion testimony, the

6   debtors and Automodular have agreed that Automodular offer the

7   testimony in the paragraphs I'll call out to Your Honor, as

8   statements of fact as perceived by the witnesses.  On that

9   basis, the debtors will withdraw their objections to the

10  exhibits.  And the paragraphs implicated in the Michael Blair

11  declaration at Exhibit 5 are at paragraphs 17, 18, 23 and 34.

12  and the paragraphs implicated at the Christopher Dell

13  declaration in Exhibit 7 are at paragraphs 6, 9 and 11.

14       The third point, Your Honor, is that the debtors also

15  objected on hearsay grounds under Rule 2802, to various letters

16  and e-mails that are included, and Exhibit 5 at tabs R, W, X,

17  at Exhibit 7, tabs M, N, and R.  The parties have agreed that

18  Automodular are introducing these documents for non-hearsay

19  purposes, that is for purpose other than the for the truth of

20  the matters asserted, and therefore, will withdraw our

21  objection with respect to those and have them admitted on that

22  basis, if that's acceptable to Your Honor.

23       Fourth, the debtors have objected on hearsay grounds

24  to certain change of scope forms purportedly issued by General

25  Motors.  These are included in Exhibit 5 at tabs J, O, W, at

1    Exhibit 7 at tabs F, G, and M of the joint exhibit binder.  And

2    we also have objected to paragraphs 37, 43, 44, and 46 of the

3    Michael Blair declaration that refers to these forms.  The

4    issue I think here, Your Honor, is that while we don't object

5    to the extent that the evidence is going to be introduced for

6    non-hearsay purposes, our understanding is that he movant

7    intends to actually submit these exhibits as out-of-court

8    statements offered for the truth of the matter asserted in

9    those documents and in those statements.  I think the point, as

10   I understand it, that they're trying to make in this contested

11   hearing with respect to that evidence, is that General Motors

12   considered the changes reflected in those firms as affirmative

13   proof.  GM considers the changes to the work that Automodular

14   performs for Delphi under the Automodular/Delphi contracts at

15   issue here to be changes in scope.  We do not agree with that,

16   and we would maintain our objection as to whether these can be

17   introduced, you know, for the truth of the matter asserted

18   under these circumstances.  So that objection will need to be

19   dealt with, Your Honor, at the appropriate time.  Automodular

20   has their own arguments on that which they can present when we

21   decide -- when you decide you want to deal with those.

22        And finally, Automodular has objected under Rule 602,

23   a lack of personal knowledge in the hearsay rule, of the

24   paragraphs 6 and 7 of one of our declarants, Greg Connolly, at

25   Exhibit 9 in his declaration.  We have offered to introduce the

1   testimony of those paragraphs as consisting of statements of

2   fact as perceived by the witnesses, much like their original --

3   their responses to certain of our objections.  The debtors do

4   not believe that any hearsay is present in the testimony, but

5   propose the testimony be offered for non-hearsay purposes.

6   However, Automodular has not accepted our offer, so that matter

7   remains unresolved.

8        Subject to those matters I have just indicated, which

9   is Automodular's objection to the Greg Connolly declaration, to

10  the paragraph 6 and 7, and the debtors' objection to the GM

11  scope documents, Your Honor, we have resolved the evidentiary

12  objections and we would jointly move with the Automodular that

13  these be submitted into the evidentiary record and that would

14  be the exhibits through Exhibit Number 93.

15       THE COURT:  Okay.  Well, why don't we deal then with

16  the two objections?  I guess the first one is the GM that was

17  just --

18       MR. BUTLER:  Okay.  Your Honor, I think I've stated

19  our objection on the record.  Is we have objected to the six

20  specific sub exhibits in the four paragraphs to the Michael

21  Blair declaration as we believe that they are hearsay.  And

22  while we would conceded they can be introduced for non-hearsay

23  purposes, they cannot be, we believe, in this trial based on

24  this record admitted for the truth of the evidence as they're

25  trying to assert.  And I think its undisputed that the scope

38

1    change forms were issued by General Motors to Automodular and

2    that Automodular's has performed work for GM under at least one

3    contract that's directly between Automodular and GM, to which

4    the debtors aren't even a party.  And there is -- Automodular

5    does perform additional work for GM on the same vehicles and at

6    the assembly plants under separate contracts for Delphi.

7    Theses provisions -- there are certain provisions of our

8    contracts at issue here.  But interpreting a GM/Automodular

9    contract is not at issue, and GM is not here.  And without -- I

10   just don't see how this can come in on a non-hearsay basis, and

11   that's why we've objected to those specific paragraphs and to

12   those specific items.

13        THE COURT:  Okay.

14        MR. GLAS:  Good morning, Your Honor.  Eduardo Glas

15   from McCarter & English on behalf of Automodular.

16        THE COURT:  Good morning.

17        MR. GLAS:  The documents at issue are entitled Scope

18   Change Forms, they were issued by GM and they were sent to

19   Automodular.  There is no dispute that they came from GM and

20   that Automodular received them.  The -- we believe that the

21   documents fall under one of the hearsay exceptions, that is

22   Federal Rule of Evidence 80315.  It's a statement that is

23   contained in the document affecting an interest in property.

24   This is the property of GM affecting its contracts with

25   suppliers like Automodular and Delphi.  And moreover, the

1   dealings with those contracts has been consistent with the

2   truth of the statement that is presented on the face of the

3   document.

4        THE COURT:  Say that again.

5        MR. GLAS:  What happened subsequently to the date of

6   the document, when the document was issued, has been consistent

7   with the truth of the statement that are in the document.  And

8   that is the line rates in the General Motor plans went down,

9   were affected, the number of shifts as well, and there is no

10  dispute to that, and GM called that a change in "scope."

11       THE COURT:  But I don't -- is the contract between

12  your client and GM in evidence?

13       MR. GLAS:  No, Your Honor.  But there is more than

14  one contract here.

15       THE COURT:  No.  But --

16       MR. GLAS:  There is -- there is --

17       THE COURT:  The point is that depending on the

18  language of your contract with GM the use of the word "scope"

19  may be completely different than how it's intended in the

20  contract between Delphi Thermal and your client.

21       MR. GLAS:  I understand --

22       THE COURT:  I mean, without having that contract, I

                                                          De

                                                          l

                                                          e

23  don't see how one can -- can know how it affects an interest in

24  property.

25       MR. GLAS:  Well, the -- the interest in property

1    would be the interest in GM's property.

2         THE COURT:  I understand.  But the contract with GM

3    isn't in evidence, so I don't know how it affects the interest

4    in property.

5         MR. GLAS:  Maybe I can explain that.  The line rate

6    changes are expenses and they are not --

                                                    De

                                                     l

                                                     e

7         THE COURT:  I understand they're expenses.  But

8    you're offering it to bolster an interpretation of the word

9    "scope" as used in the contract between Delphi Thermal and

10   Automodular.  Without seeing how the word "scope," if at all,

                                                    De

                                                     l

                                                     e

11   appears in the GM contract that's referenced in those notices,

12   it's -- there's no anchor, there's nothing to tie it to.

13        MR. GLAS:  Well, I would submit to the Court that

14   this is also evidence of industry practice, as GM is part of

15   the industry and that's why the industry --

16        THE COURT:  No.  That's a whole different kettle of

17   fish.  I'm not going to accept -- admit this for any indication

18   of the definition of the word "scope" as used in the contracts

19   at issue.

20        MR. GLAS:  Okay.  Then we will accept the debtors'

21   agreement to use these documents not for hearsay purposes.

22        THE COURT:  Okay.  That's fine.  So then there's

23   the -- it was at paragraph 6 and 7 of the Connolly declaration,

24   is that the --

25        MR. BUTLER:  That's the other -- we had offered the

1    same -- the same deal that they -- well, we don't think there's

2    a hearsay here, we offer to admit these for statements of fact

3    as perceived by the witnesses in the same way we had settled

4    out our objections to Mr. Blair's and Mr. Dell's declaration.

5    That was acceptable to Automodular but the reverse apparently

6    is not.

7        MR. GLAS:  The problem with those two paragraphs,

8    Your Honor, is that Mr. Connolly was deposed and he admitted

9    that he had no personal knowledge of what a scope change is.

10   And he went into his -- these two paragraphs and made

11   statements that were not based on his personal knowledge but on

12   what he had gleaned from talking to a person by the name of

13   Doug McGleen (ph.) in the purchasing department.

14       THE COURT:  Well, is the whole text of 6 and the

15   whole text of 7 outside of his personal knowledge?

16       MR. GLAS:  Let me just get my --

17       (Pause in proceedings)

18       MR. GLAS:  He states in paragraph 6, Your Honor,

19   "These types of design changes are often consider changes in

20   scope under Delphi's general terms and conditions if they

21   require a supplier to provide additional services."  I asked

22   him specifically and he says, "He has no knowledge of what is

23   Delphi's determination of what is considered a change of

24   scope."  I ask him what the basis of that statement was and he

25   replied that --

42

1        THE COURT:  This statement -- this sentence that you

2   just read to me?

3        MR. GLAS:  Yes, I believe so.

4        THE COURT:  Okay.

5        MR. GLAS:  I would have to check on the deposition

6   transcript, but yes.  Essentially, his testimony was that

7   changes of scope were outside of his expertise and that he had

8   relied on what he had been told by Mr. McGleen.

9        MR. BUTLER:  But, Your Honor, that's what witnesses

10  in a corporation do.  This is not a one-man shop.  And we've

11  agreed that this would not be admitted for hearsay -- you know,

12  for this -- it would be admitted for the perception of the

13  witness.  But it is, I think, true and not contested, that Mr.

14  Connolly consulted with whatever other parties within Delphi

15  Corporation and that's his understanding.  And that's all that

16  it says, nothing more than that.  And its probative for what

17  value it is what it is.  But I don't think it ought to be

18  excluded.

19       MR. GLAS:  I would just add, Your Honor, to that that

20  they don't want to designate Mr. Connolly as a 30(b)(6)

21  witness.

22       THE COURT:  Well, is there a 30(b)(6) witness.  I

23  don't understa --

24       MR. BUTLER:  I'm not sure what he means -- I didn't

25  deal with the depositions directly, I'm not quite sure what the

43

1    import of his statement is.  These were the two witnesses that

2    were produced in connection with the litigation.

3        THE COURT:  I'm going to admit this paragraph.  It

4    actually can be read to be consistent with what you've

5    summarized to me.  He doesn't say in this sentence that these

6    are the only types of changes that would be considered to be

7    changes in scope.  But he says that these have been -- these

8    types have been considered to be changes in scope and --

9        MR. GLAS:  But he specifically said the position,

10   Your Honor, that he doesn't know what a change of scope is

11   under the contracts.

12       THE COURT:  Well, you're going to have to show that

13   to me then.

14       MR. GLAS:  Okay.

15       THE COURT:  I think you've also said that he relied

16   upon someone else who told him that it was -- this is what the

17   debtor does as far as change in scope.

18       (Pause in proceedings)

19       MR. BUTLER:  Your Honor, I think -- you want his

20   declaration, his deposition?

21       THE COURT:  You could stay over there too, you don't

22   have to come to the podium if you want, to just use that

23   microphone.

24       MR. GLAS:  Okay.  Thank you.

25       (Pause in proceedings)

1        MR. GLAS:  Okay.  At page 13 Mr. Connolly --

2        THE COURT:  What exhibit?

3        MR. BUTLER:  Exhibit 35, Your Honor, I believe.

4        THE COURT:  And you said page 13?

5        MR. GLAS:  Yes.

6        THE COURT:  Okay.

7        (Pause in proceedings)

8        MR. GLAS:  Also, Your Honor, on pages 48 it says --

9    the question was:

10   "Q. And how the GM changes specifications that only change in

11   scope that Delphi recognizes."

12   "A. Again, my job focused on problem solving where there was

13   determined to be a change.  What was determined to be a chance

14   in scope by Delphi is not in my job expertise."

15       MR. BUTLER:  I'm sorry, what page number are you at,

16   I'm not tracking?

17       MR. GLAS:  On page 48 the -- on the transcript

18   pagination, but it is page 40 and 41 at the bottom.

19       MR. BUTLER:  Okay.  Your Honor, I believe if we're

20   going to read this then you really need to read pages 41 really

21   through 49 or 50, there's this whole line of questioning about

22   this.

23       MR. GLAS:  Correct.

24       MR. BUTLER:  It's not just one response.

25       MR. GLAS:  Yes.  I think if that is right throughout

1    it consistently says that scope changes are not his expertise.

2         MR. BUTLER:  I disagree.  I think what he actually

3    says is that he doesn't make the scope change decision of

4    whether something is covered within a change of scope.  He says

5    he provides information to and consults with purchasing.  And I

6    think he actually testifies in here of what his views are on

7    scope actually, but he indicates decisions are made by the

8    purchasing department.

9         MR. BUTLER:  Your Honor, I would point --

10        THE COURT:  I'm just reading it.

11        (Pause in proceedings)

12        THE COURT:  Okay.

13        MR. BUTLER:  The point I made, Your Honor, just to

14   say it, Exhibit 35 is coming in its entirety into evidence

15   without objection.  And I think that read within -- read in the

16   context of Exhibit 35 there's nothing objectionable in Mr.

17   Connolly's declaration.  I don't believe it -- in light of

18   what's already in the record, agreed to by counsel, I think we

19   offered that those paragraphs would come in only as the

20   perception of the witness, not for the truth of the matter

21   asserted.

22        THE COURT:  Well, it doesn't mean a whole lot if he

23   doesn't -- I understand.  What Mr. Butler is saying, it doesn't

24   really mean much, if anything, on that basis, given the

25   deposition.

46

1       MR. GLAS:  Okay.  Fine, if he agrees that it doesn't
2   mean much, that's fine with me.
3       THE COURT:  I mean, I think -- I think given the
4   limitation that the debtors are willing to impose on these two
5   paragraphs they can be admitted for what they're worth.  But
6   again, given the witness's statements about his role in the
7   determination process, it's my view they're not worth -- as far
8   as the comments about scope are concerned because there are

                                                        De
                                                         l
                                                         e

9   other statements in here as well -- they're certainly qualified    De
                                                                        l
                                                                        e
                                                                        t

10  by what he's saying in his deposition.
11      MR. GLAS:  Yeah.
12      THE COURT:  All right.  So on that basis I'll admit
13  the Connolly declaration.
14      MR. BUTLER:  Again, Your Honor, then on a -- just so
15  we've got the record clear then, everything is in 1 through 93,
16  with the exception of the declarations that will be subject to
17  cross examination and the G -- those six GM documents, Exhibit
18  5, J, O, W, Exhibits 7, F, G and M.
19      THE COURT:  Well, they're in --
20      MR. GLAS:  No, they're in --
21      THE COURT:  -- but not for the truth of the matter
22  asserted therein.
23      MR. BUTLER:  Correct.  Thank you, Your Honor.
24      THE COURT:  Mr. Glas, before you get started, I --
25  I'd like to get an update from both of you, I guess, as to

47

1  where you stand on what I view as I guess the less significant
2  or peripheral issues here, which are the -- the aspects of
3  Automodular's claim that don't go to either -- in the debtors'
4  statement, "lost volume" or as Automodular says "decreased
5  scope".  And so I'm focusing on the labels and clip and the

De
l
e

6  foam pad, and the grease application primarily.  Have those
7  been narrowed at all at this point?
8       MR. GLAS:  I'm sorry, Your Honor?
9       THE COURT:  Have those disputes or those issues been
10  narrowed or are they still as dealt with in the papers?
11      MR. GLAS:  I think there has been some narrowing of
12  the issues on the exchange rate.  I think that now Delphi has
13  agreed on the formula for the exchange rate.  I'm not quite I
14  understood what the disagreement was about the formula.  But
15  the -- that has been apparently resolved.
16      THE COURT:  Well, the disagreement was over what it

De
l
e

17  applied to.
18      MR. GLAS:  Yeah.  Well, that was a reason
19  disagreement because the exchange rate went back to the
20  beginning of 2006, before all of the changes in scope took
21  place.
22      THE COURT:  But as far as what it's applied to that's
23  still an open issue?
24      MR. GLAS:  That is correct, Your Honor.
25      THE COURT:  Okay.  All right.

48

1          MR. GLAS:  And I think one small issue was resolved
2    with respect to short payments, which is about 5,000 dollars.
3          THE COURT:  Okay.

                                              De
                                               l
                                               e

4          MR. GLAS:  And that has been paid.  The foam pad, I
5    think that the debtors concede that they owe money on that but
6    that we haven't come to an agreement on the price for that.
7          THE COURT:  Okay.  All right.
8          MR. GLAS:  And I think they also concede that they
9    owe money on the labels and clips of -- he may have some there
10   that I just learned during the depositions recently.  And so
11   most of issues are still there.  Even with the resolution of
12   the exchange rate formula, there is still monies owed even if

                                              De
                                               l
                                               e

13   you are not by the de-rate adjustments.
14         THE COURT:  All right.  So you can go ahead then.
15         MR. GLAS:  Before I start, Your Honor, we filed a
16   reply brief yesterday.  I don't know if --
17         THE COURT:  I saw it.
18         MR. GLAS:  Okay.  I had another copy for Your Honor.
19         THE COURT:  I read it.
20         MR. GLAS:  Your Honor -- I'm sure Your Honor has read
21   the papers and this is -- this is a contract dispute about the
22   rights and obligations of the parties are.
23         THE COURT:  Well, let me ask you.  Before we get into
24   this, this has been marked out as an evidentiary hearing.  And
25   let me tell you my general inclination, which is that with

49

1    regard to the interpretation of the contract and the -- in
2    particular Sections 2 and 3 of it, my inclination is not to
3    hear testimony because I believe the contract speaks for
4    itself.  But I believe I would need to hear testimony or
5    evidence in respect of the other issues that you just went
6    through, quantification of the other damages.  It's my practice
7    to go right to the evidence, so that the witnesses don't hear
8    their counsel's summary of the argument.  So, so -- frankly, do
9    either of your two witnesses -- other than the summary

Dele

10   spreadsheet that's attached to one of the declarations, do your
11   witnesses say anything about the quantification about the other

Dele

12   -- the other damages for the labels and clip, the foam pad, the
13   grease application and how the exchange rate damages were
14   calculated?
15         MR. GLAS:  Well, they can explain the spreadsheets,
16   Your Honor, they'll explain the details.
17         THE COURT:  I just want to note -- as I understand
18   it, I think that's what they had.  So do the debtors wish to
19   cross examine them on any of those points?
20         MR. HOGAN:  Your Honor, the claim with respect to
21   termination or retermination damages, does Your Honor --
22         THE COURT:  No, I think that's covered by the
23   contract.  The GMX231?
24         MR. HOGAN:  Yes, sir.
25         THE COURT:  No, I think -- my inclination is the

50

1    contract speaks for itself on those points.

2        MR. HOGAN:  Very good.  Judge, I would have -- I

3    would have a few questions just to bring out a few points with

4    respect to Mr. Dell.  I don't have any questions for Mr. Blair.

5        THE COURT:  And they're on the damages issues so on

6    the other aspect as opposed to "scope" versus "requirements."

7        MR. HOGAN:  Yes, I would try to carve that up and

8    go --

9        THE COURT:  And if you could persuade me that I

10   should look behind the contracts I'll call them back up again.

11   But based on my review of the contracts, I don't believe you

12   need to.  So who do you want to cross examine.

13       MR. HOGAN:  I'd like to speak with Mr. Dell, it will

14   be very brief.

15       THE COURT:  Okay.  Mr. Dell.

16   (Witness is sworn)

17       THE COURT:  And just for the record would you spell

18   your name.

19       THE WITNESS:  Christopher Dell, C-H-R-I-S-T-O-P-H-E-

20   R, last name Dell, D-E-L-L.

21       THE COURT:  Okay.

22   CROSS EXAMINATION BY

23   MR. HOGAN:

24   **Q.  Good morning, Mr. Dell.**

25   **A.  Good morning.**

51

1    Q.  By the way, this is Al Hogan from Skadden Arps for the
2    debtors.  Mr. Dell, I want to speak with you just very briefly
3    about the currency rate adjustment claim that Automodular
4    raised.  You heard your counsel just a few seconds ago that
5    indicate that there has been general agreement between the
6    debtors and Automodular with respect to the formula to be
7    applied, is that correct?
8    A.  Yes.
9    Q.  The dispute -- the difference between the parties right
10   now with respect to the currency adjustment is that Automodular

        De
        l
        e

11   has continued to include adjustments for de-rate adjustments,
12   is that right?
13   A.  Yes.
14   Q.  And you've continued to include in the price your proposed

        De
        l
        e

15   resolution of the foam pad issue, is that correct?
16   A.  Correct.
17   Q.  And you've continued to include some cost component with
18   respect to the grease application that's still disputed among
19   the parties, is that also right?
20   A.  That's correct.
21   Q.  Okay.  You have no problem with the formula as you and
22   Delphi have now agreed to, correct?
23   A.  Yes, that's correct.

        De
        l
        e

24   Q.  I want to talk for a minute about the foam pad issue.
25   This issue relates to a change into the components that was

52

1  requested by General Motors, correct?
2  A.  Would you repeat that?

De
l
e

3  Q.  Sure.  The foam pad was something that was requested to be
4  added to the product by the ultimate customer, General Motors,
5  correct?
6  A.  That is correct.
7  Q.  And Automodular's claim for damages in this case, with

De
l
e

8  respect to the foam pad, is to take your current cost quote to
9  Delphi and apply that retroactively to the time when you began

De
l
e

10  applying the foam pad, is that right?
11  A.  That is correct.
12  Q.  And you current cost quote to Delphi is 11.8 cents per

De
l
e

13  foam pad, is that right?
14  A.  Yes.
15  Q.  Now, who gets to determine what an equitable price

De
l
e

16  increase is for this foam pad?
17  A.  Both parties.
18  Q.  Can I ask you to take a look really quickly at tab 13,
19  which is the Delphi terms and conditions.  And, sir, you're
20  familiar with clause 3 of this general terms and conditions,
21  correct?
22  A.  Yes.
23  Q.  And do you see down the third sentence of what is clause
24  3, the clause is titled Specification Design and Scope Changes,

De
l
e

25  right?  And we all agree in this case, that the foam pad is a

53

1   scope change, correct?
2   A.  Correct.
3   Q.  Okay.  The third sentence of that clause, what that reads
4   is "that buyer will equitably determine any adjustment in price
5   or delivery schedules resulting from such changes," do you see
6   that?
7   A.  Yes.
8   Q.  Okay.  So it's Delphi in this case that is going to
                                                        De
                                                        l
                                                        e

9   equitably determine what the foam pad price is, right?
10  A.  I believe so.
11  Q.  Okay.  Now, let's talk about what Delphi has to work with.
                                                        De
                                                        l
                                                        e

12  Okay.  Delphi currently is proposing a foam price per piece of
13  five cents per pad, is that your understanding?
14  A.  No.
15  Q.  Okay.  Well, back in December of 2005, Delphi asked
                                                        De
                                                        l
                                                        e

16  Automodular for pricing information on this foam pad
17  application, that's certainly correct, right?
18  A.  That's correct.
19  Q.  And you provided costing information with respect to how
                                                        De
                                                        l
                                                        e

20  much this foam pad would cost, right?
21  A.  That is correct.
22  Q.  And the information that you provided at that time was a
                                                        De
                                                        l
                                                        e

23  price of five cents per foam pad, is that right?
24  A.  It was five cents per vehicle.
25  Q.  Right.

54

1   A.  And let's take a look, if we could, at tab 9-I, just to
2   make sure we see that.  Exhibit 9 tab I to that exhibit.  And
3   that is a document that's dated December 8, 2005 from someone
4   at Automodular, correct?
5   A.  That is correct.
6   Q.  And you are listed as a cc on that letter, correct?
7   A.  Correct.
8   Q.  And this indicates that, as we just discussed, the cost

De
l
e

9   for the foam pad, that Automodular was talking about to Delphi,
10  is five cents per pad, right?
11  A.  At that time.
12  Q.  Right.  Now, it's also the case that with respect to this

De
l
e

13  foam pad Delphi and Automodular work together to figure out how

De
l
e

14  to minimize the labor required to put this foam pad on,
15  correct?
16  A.  Not to my knowledge.
17  Q.  Not to your knowledge.  So you have no reason to dispute
18  that Delphi helped try to figure out how to minimize the labor
19  costs?
20  A.  No.
21  Q.  Okay.  Do you know, as a result of whoever did whatever
22  work, are there any additional manpower required for this phone
23  pad?
24  A.  Yes.
25  Q.  There is?  Can you describe that for us?

55

```
 1   A.  The seconds to install the foam pad.
 2   Q.  And how many seconds does that take?
 3   A.  I don't know.
 4   Q.  Seven seconds, does that sound about right?
 5   A.  It could.
 6   Q.  Okay.  Is Delphi paying for the labor costs with respect
                                                            De
                                                            l
                                                            e

 7   to the foam pads?
 8       MR. HOGAN:  I'm sorry, strike that.
                                                            De
                                                            l
                                                            e

 9   Q.  Is Delphi paying for the material costs for the foam pad?
10   A.  Yes.
                                                            De
                                                            l
                                                            e
                                                            t

11   Q.  Now, your current bid is 11.8 cents per foam pad, right?
12   A.  Correct.
13   Q.  We've covered that.  But the fact is between the December
14   bid that we just looked at and your current bid, Mr. Dell,
15   you're not aware of any information that Automodular didn't
16   have or didn't consider back in December 2005, isn't that
17   correct?
18   A.  No.
19   Q.  Do you remember your deposition was taken in this case
20   just a few days ago?
21   A.  Yes.
22   Q.  And did my colleague, Mr. McDonald, ask you what change --
23   what's the difference in the information between December 25
24   and October 26th in October 2006, and this is at page 157 of
25   your deposition.
```

56

1    "Q. What information did you have access to that was not

2    considered previously?"

3    "A. I don't know."

4    Q.  Is that the question that was asked and the answer that

5    you gave at your deposition?

6    A.  Yes.

7    Q.  Okay.  I want to talk about the debit memo issue, you're

8    familiar with that issue, sir?

9    A.  Yes.

10    Q.  And in general terms Automodular's claim is that Delphi

11    took a debit memo of approximately 180,000 dollars and that was

12    improper, correct?

13    A.  We did not agree with it.

14    Q.  And the way you put that is interesting, because what I

15    really want to get at, I'm going to try to cut to the chase

16    here, is that you don't really have any problem with the way

17    that that figure was calculated, do you?

18    A.  No, I provided that information.

19    Q.  Good point.  Just so to be very clear, what happened was

20    you and Delphi sat down and did a contract with you and you

21    actually determined that as to the grease application, putting

22    everything else aside, you'd been overcharging Delphi for that

23    grease, is that fair?

24    A.  The cost estimated was less.

25    Q.  And putting everything else aside, you agree that the cost

57

1    estimated the difference was about 183,000 dollars after some

2    netting, correct?  You don't quibble with that calculation?

3    A.  That's correct.

4    Q.  I want to talk for just a second about the additional

5    screw -- the additional screw issue, this is a small dollar

6    issue but it's 10,000 dollars or so so I'll take a minute.

7    You're support for that is a letter that you supplied from the

8    supplier of the screw, correct?

9    A.  Correct.  I believe so.

10    Q.  All right.  Now, has Automodular actually paid the

11    increased cost for that screw?

12    A.  I believe so.

13    Q.  Do you know one way or the other?

14    A.  I don't know personally.

15    Q.  Have you seen any invoices reflecting that Automodular

16    paid that increased cost?

17    A.  No.

18    Q.  You certainly haven't attached any invoices reflecting

19    that to your declaration, correct?

20    A.  That is correct.

21    Q.  And to your knowledge no one's provided those invoices to

22    Delphi, right?

23    A.  Not to my knowledge.

24    Q.  I want to take a look at the miscellaneous charge issue.

25    I'm sorry.  If counsel, if this claim is obviated, I'm not

58

1    aware of it, but I want to direct you to paragraph 26 of your

2    declaration, which is tab 7 of the exhibit binder.  Do you have

3    paragraph 26 in front of you, sir?

4    A.  Yes, I do.

5    Q.  And this reference is roughly a 6,000 dollar charge with

6    respect to an unauthorized deduction according to Automodular,

7    do you see that?

8    A.  Yes.

9    Q.  And in support for that you reference Exhibit K to your

10    declaration, do you see that?

11    A.  Yes.

12    Q.  Okay.  Let's take a look at Exhibit K.  Do you see Exhibit

13    K?

14    A.  Yes.

15    Q.  Now, are you aware of any other documentation that you've

16    offered in support of this 6,000 dollar claim?

17    A.  No.

18    Q.  Can you tell me how, looking at these two pages of

19    invoices, you can discern that Delphi improperly charged

20    Automodular 5,000 or 6,000 dollars for anything?

21    A.  Can you repeat the question?

22    Q.  Sure.  Looking at these invoices, can you tell how Delphi

23    improperly charged Automodular 6,000 dollars for anything?

24    A.  I believe we were charging Delphi.

25    Q.  Okay.  Can you tell -- how do these pages relate to the

1   6,000 dollar claim, where's the number of 6,000 on here?

2   A.  I don't know.

3   Q.  Do you know what the first page refers to when it says,

4   "rubber coming out of dial for vent?"

5   A.  No.

6   Q.  Do you know what the second page relates to when it says

7   forklift service?

8   A.  No.

9   Q.  I want to --

10       MR. HOGAN:  Your Honor, I want to spend just a few

11  moments on the early termination clause, but I won't be

12  offended if you cut me off and tell me that you don't need to

13  hear any of this.  All right.

14       THE COURT:  Well, when you say -- I thought you were

15  assuming the contract, so that's why I didn't think these early

16  terminations were relevant here.

17       MR. HOGAN:  The way -- frankly, Judge, the way that

18  the claim was worded is awkward.  Our position is nothing has

19  been terminated with respect to our contract with Automodular.

20       THE COURT:  Right.  So I didn't see why early

21  termination -- your early termination option was relevant.

22       MR. HOGAN:  Judge, we don't -- we don't think it's

23  relevant, we don't think it's a proper claim if everybody

24  agrees that those same part numbers are still being produced in

De

l

e

25  order but just in lower volume, I'm happy to not proceed with

60

1    this line of questioning.

2         THE COURT:  Well, I mean, I -- I -- I mean, I just

3    didn't see the argument, I didn't see the basis for the

4    argument.  I thought it was just -- it was made at a time when

5    the contract was neither assumed nor rejected.  So I thought

6    that that's why they were making it.  But today I thought it's

7    irrelevant because the debtors have agreed to assume the

8    contract.  So you wouldn't be relying on a termination

9    provision.

10         MR. GLAS:  May I -- Your Honor, I think there is some

11   confusion on that point.  The early termination refers to the

12   fact that the long-term agreement in Canada was supposed to run

13   for five years.  And it encompassed a series of GM model cars.

14   And one of those cars was terminated before the five-year

15   conclusion of the contract.

16         THE COURT:  All right.  You can ask him about it.

17         MR. HOGAN:  I'll be very brief, Your Honor.  I think

18   I'll cut to the main point.

19         THE COURT:  Okay.

20   BY MR. HOGAN:

21   **Q.  The claims with respect to termination, that relates to**

22   **the termination of the Monte Carlo product line, is that**

23   **correct?  Do you understand that?**

24   **A.  Yeah.  The 231 vehicle.**

25   **Q.  The 231 vehicle.  Now, what did Delphi terminate?**

61

1    A.  Delphi did not terminate anything.  GM terminated the --

2    Q.  Right.  And so, in fact, what happened as a result of

3    General Motors terminating the Monte Carlo product line was

4    that Delphi's requirements for certain parts decreased,

5    correct?

6    A.  Decreased?

7    Q.  Decreased.

8    A.  We no longer provided CRFMs for the 231, correct.

9    Q.  So you believe -- for the 231, but also the part number as

10   to the CRFM itself, you continued to supply those because

11   they're good in other cars, correct?

12   A.  The CRFMs can be used in other vehicles, correct.

13   Q.  And, in fact, the CRFM that was used in the Monte Carlo is

14   used in other vehicles, right?

15   A.  I believe so.

16   Q.  So you continued to supply that same part for use, say for

17   instance, in the Impala product line as well, right?

18   A.  Correct.

19   Q.  So this boils down to a reduction in Delphi's requirements

20   based on its customer's termination of the model, correct?

21   A.  Can you repeat that?

22   Q.  This boils down to a reduction in Delphi's requirements

23   for that same part because of a model change at General Motors,

24   right?

25   A.  It wasn't a model change it was a --

62

1   Q.   A model elimination?

2   A.   Yes.

3   Q.   The contract remains in force, correct?

4   A.   Correct.

5   Q.   You continued to ship product under the contract, correct?

6   A.   Correct.

7   Q.   Okay.

8           MR. HOGAN:   Judge, I think with that I covered all of

9   the other claims other than the contract interpretation terms.

10  I have no further questions subject to redirect.

11          THE COURT:   Any redirect?

12          MR. GLAS:   Yes, Your Honor.   Can I do it from here?

13          THE COURT:   Yes.

14          MR. GLAS:   Thank you.

15  REDIRECT EXAMINATION BY

16  MR. GLAS:

17  Q.   Mr. Dell, could you please turn to tab 13, the general

18  terms and conditions?   And I would direct you to Section 3.

19  Mr. Hogan just asked you who sets the equitable adjustment to

20  the price, do you remember that?

21  A.   Yes.

22  Q.   What happens when the seller does not agree with the price

23  adjustment proposed by the buyer?

24  A.   I believe we continue to supply and negotiate in good

25  faith.

63

```
 1   Q.  That's right.  Did that happen here?
 2   A.  No.
 3   Q.  Let me rephrase that.  You continued to supply, correct?
 4   A.  Correct.
                                                   De
                                                    l
                                                    e
                                                    t

 5   Q.  And did Delphi negotiate with you on this foam pad?
 6   A.  No.
 7   Q.  Price?
 8   A.  No.
 9   Q.  Now, you provided a quote of 11.8 cents to Delphi,
10   correct?
11   A.  Correct.
12   Q.  And you analyzed the cost at Automodular for that quote?
13   A.  Correct.
14   Q.  And could you explain here what went into your analysis?
                                                   De
                                                    l
                                                    e

15   A.  Basically, the value added at the time to install the foam
16   pad.  As well as the risk associated with installation of the
                                                   De
                                                    l
                                                    e

17   foam pad and insuring that it's a quali -- that it's installed
18   properly and the quality metrics have been enforced.
19   Q.  And based on that analysis, you determined it was worth
20   11.8 cents?
21   A.  Correct.
22   Q.  Now, Mr. Hogan just asked you about the debit memo.  What
23   was exactly -- how did the debit memo -- how was it issued?
24   A.  I believe GM -- not GM, I'm sorry, correct that.  I
25   believe Delphi issued the debit memo to -- against our account,
```

1   a payment account.

2   Q.  Is there anything in your contracts with Delphi that

3   obligates you to share a cost savings with Delphi?

4   A.  No.

5   Q.  Did you propose to Delphi to give them a credit for -- to

6   give them a credit for the -- let me restate that.  What was

De

l

e

7   underlining the credit memo?

8   A.  Can you repeat that?

9   Q.  Yes.  What was -- was there a cost associated with the

10  credit memo, that underlined the credit memo?

11  A.  Are you referring to the debit memo?

12  Q.  Yes, I'm sorry.  The debit memo.

13  A.  Was there a cost underlined with it?

14  Q.  Yes.

15  A.  Yes.  I believe it was 186,000.

16  Q.  And where do those dollar amounts come from?

17  A.  They came from a spreadsheet that I provided, portions of

18  the spreadsheet I provided.

19  Q.  But what specific part or process that you were providing

20  for Delphi gave rise to your spreadsheet and analysis?

21  A.  Spreadsheet and to negotiate this changes to date.

22  Q.  Was there a -- let me ask you this way.  Was the debit

De

l

e

23  memo based on the grease application to the parts that you were

24  assembling?

25  A.  I believe it was the grease application as well as labels

65

1   and clips.

2   Q.  Oh, okay.

3   A.  I think there was a small portion of the clips included in

4   the --

5   Q.  Okay.  So did you propose to Delphi to take these credits

6   for the application of the grease?

7   A.  Yes.

8   Q.  Can you explain in what context you proposed Delphi to

9   take that credit?

10  A.  In exchange of the other outstanding issues that we had

De
l
e

11  associated with de-rate in exchange at the time.

12  Q.  Now, and again, I want to ask you to make it clear.  Was

13  there anything in the contract that obligated you to share --

14  I'm sorry.  The credit that you were proposing for Delphi was

15  it a cost that you determined could be saved in the process of

16  assembling the CRFMs?

17  A.  It could be saved?

18  Q.  That it was -- you did not need as much materials or

19  application of these grease, is that correct?

20  A.  No.  It was the cost estimated for the Nigo (ph.) grease

21  versus the actual cost.

22  Q.  Okay.  Now, the cost estimated for the Nigo grease, was

23  that part of your original price to Delphi?

24  A.  That is correct.

25  Q.  And Delphi accepted that price, correct?

66

1  A.  That is correct.

2  Q.  And Delphi is taking the position here that that price is

3  fixed, correct?

4  A.  Yes.

5  Q.  And is there anything, again, in the contract that

6  obligates Automodular to share a cost saving like less

7  application of grease with Delphi?

8  A.  No.

9  Q.  Now, let me ask you about the claim for the screws.  Did

10  Delphi ever ask Automodular for invoices showing the payment

11  being increased in the cost of the screws?

12  A.  Not to my knowledge.

13  Q.  Did you -- Automodular provide Delphi with a letter from

14  the screw manufacturer informing about the increase in price?

15  A.  Yes.

16  Q.  And this screw manufacturer also provided the same type of

17  screws for your other facility in Canada, correct?

18  A.  That is correct.

19  Q.  And the facility in Canada also incurred an increase in

20  cost from purchasing the same screw, correct?

21  A.  That is correct.

22  Q.  Did Delphi agree to the increased price of the screw in

23  Canada?

24  A.  Yes.

25  Q.  Did Delphi agree to the increased price of the screw in

67

1    Ohio?

2    A.  No.

3    Q.  Now, if you could turn, please, to -- it's your -- if you

4    look at tab 9 -- tab 11 is the, I believe, the long-term

5    agreement.  Did you find it?

6    A.  Yes.

7    Q.  Now, this agreement was for to provide CRFMs in Canada,

8    correct?

9    A.  That is correct.

10   Q.  And did the -- the agreement had a five-year term,

11   correct?

12   A.  That is correct.

13   Q.  And if you look at the Exhibit A, attached to the

14   agreement, does it not have a schedule for five years for all

15   the parts that are going to be purchased?

16   A.  That is correct.

17   Q.  And is the part for the Monte Carlo part of that schedule?

18   A.  Yes.

19   Q.  And could you please indicate which one of those parts in

20   Exhibit A is the one for the Monte Carlo?

21   A.  I don't know.

22   Q.  Okay.  And when you enter into a contract, you got an

23   expectation that the five-year schedule would be fulfilled,

24   correct?

25   A.  That is correct.

68

1   Q.  And your termination charges are based on the inability to

2   amortize your investment over the five years, correct?

3   A.  That is correct.

4        MR. GLAS:  I don't have anything further, Your Honor.

5        THE COURT:  Okay.  Any brief recross?

6        MR. HOGAN:  Judge, I do.  One thing.

7   RECROSS EXAMINATION BY

8   MR. HOGAN:

9   Q.  Sir, do you still have Exhibit 11 in front of you?

10  A.  Yes, I do.

11  Q.  That was the long-term contract to (indiscernible - away

12  from microphone), correct?

13  A.  That is correct.

14  Q.  And the grease application also related to that Oshawa

15  operation, correct?

16  A.  That is correct.

17  Q.  So it would be governed by this long-term contract,

18  correct?

19  A.  Correct.

20  Q.  Counsel asked you three times if there was anything in the

21  contract requiring you to share cost savings with Delphi, do

22  you remember that testimony?

23  A.  That is correct.

24  Q.  Can you look at Section 5 of the long-term contract with

25  me?

69

1    A.  Yes.

2    Q.  Are you there?

3    A.  Yep.

4    Q.  And that's titled Savings Initiatives, correct?

5    A.  Correct.

6    Q.  And it says "buyer and seller will work together to

7    implement cost savings?"

8    A.  Correct.

9    Q.  And then the last sentence of that first paragraph says

10   "seller agrees to reduce the per-unit price of each product on

11   account of any savings in accordance with this plan," correct?

12   A.  That is correct.

13   Q.  Does that refresh your recollection that you actually do

14   have an obligation to share cost savings with Delphi?

15   A.  We actually participated in the creative improvement plan

16   shortly after the LTA was initiated.  And we did complete that

17   improvement plan then.

18   Q.  But it's correct that you do have an obligation to share

19   cost savings with Delphi, right?

20   A.  In that creative improvement plan, correct.

21   Q.  Okay.  Thank you.

22        MR. HOGAN:  Nothing further, Judge.

23        THE COURT:  What -- was the savings on the grease

                                                     De

                                                      l

                                                      e

24   application something covered by the creative improvement plan?

25        THE WITNESS:  It was reviewed at the time.

70

1        THE COURT:  Okay.  I had a question.  I think I heard

2   you say that the basis for the 11.8 cent quote was

3   Automodular's assessment of value added and risks associated

4   with proper installation of the part, is that right?

5        THE WITNESS:  Correct.

6        THE COURT:  What do you mean by value added?

De

l

e

7        THE WITNESS:  The time it takes to install the foam

8   pad.

9        THE COURT:  Well, it's based on time as opposed to

10  value then?  The parts worth -- when I think of value added I

11  think that something is worth more because of something that's

12  been done to it.

13       THE WITNESS:  Value added in our assembly type

14  service that we provide is considered time.

15       THE COURT:  Okay.  So you did an assessment of the

16  time cost of installing the -- installing the part?

17       THE WITNESS:  Correct.

18       THE COURT:  And then what's the basis for the risk

19  assessment?

20       THE WITNESS:  Well, if we don't install the part

21  correctly we can be at risk for the consequences.

22       THE COURT:  But how do you put a dollar figure on

23  that, per part?

24       THE WITNESS:  It's based off just an understanding of

25  the work that's involved.  So if there is more work there's

1      more work.  If there's less work there's less risk.

2            THE COURT:  Well, okay.

3            THE WITNESS:  I don't have a math calculation

4      precisely of that.

5            THE COURT:  But it's not based on any sort of cost

6      experience then of the part going wrong?

7            THE WITNESS:  It's based off our assembly experience.

8            THE COURT:  What was the basis for the five cent

9      proposal?

10            THE WITNESS:  It was based off the same thing.

11            THE COURT:  The same calculations?

12            THE WITNESS:  Roughly the same calculations,

13      different period of time.

14            THE COURT:  Okay.  Do you have any -- do either of

15      you have any questions on that exchange?

16            MR. GLAS:  Just one brief question.

17      FURTHER REDIRECT EXAMINATION BY

18      MR. GLAS:

19      **Q.  You said that the -- Automodular participated in the cost**

20      **improvement plan and that the costs were reviewed at the time,**

21      **correct?**

22      **A.  That is correct.**

23      **Q.  And the costs were accepted by Delphi at that time, is**

24      **that correct?**

25      **A.  That is correct.**

72

1   Q.  And that cost included the grease application cost, is
2   that correct?
3   A.  That is correct.
4   Q.  And after that cost initiative plan ended, is that
5   correct?
6   A.  Yes.  The exercise ended.
7   Q.  Okay.  So there were -- outside the cost initiative plan
8   there was no obligation to share in cost saving, is that right?
9         MR. HOGAN:  Objection, leading, Judge.
10        THE COURT:  You should rephrase the question.
11        MR. GLAS:  Yeah.
12  Q.  Was there an obligation to share costs outside the cost --
13  the improvement plan?
14        MR. HOGAN:  Also objection, legal conclusion, Judge.
15        THE COURT:  Well, let me ask it this way.  You said
16  that the grease application was one of the elements identified
17  in the creative improvement plan?

18        THE WITNESS:  The grease application was taken in

19  account of all our costs in the creative improvement plan.
20        THE COURT:  Okay.  Do you know then why it wouldn't
21  be included in the savings provision of paragraph 5 of the
22  long-term contract?
23        THE WITNESS:  I believe that paragraph 5 was in
24  conjunction with the creative plan that was established and
25  both parties, Automodular and Delphi, went through that plan.

1    I believe it ends when that plan was completed.

2         THE COURT:  So you're saying although it was covered

3    by the plan this cost was outside of it?

4         THE WITNESS:  No.  The cost was included at the time

5    of the plan, the savings was identified a year later for the

6    Nigo grease.

De

l

e

t

7         THE COURT:  Well, did it just fall into your lap or

8    how did it --

9         THE WITNESS:  Through our discussions with Delphi, we

10   attempted to review those costs associated with it to come to

11   an agreement on all the outstanding issues.  And we did a

12   thorough analysis of the costs associated with, not just the

13   Nigo grease, but other purchase parts.  And the outcome was

14   that Nigo grease was a significant increase, but there were

15   other parts at the time, too, that had an increase as well.  So

16   it was a purchase part component of the entire contract.

17        THE COURT:  So that -- is it fair to say, then, that

18   the analysis bore fruit about a year later with regard to this

19   aspect of it, the grease aspect?

20        THE WITNESS:  That is correct.

21        THE COURT:  Okay.  You can step down, sir.

22        THE WITNESS:  Yeah.  Thank you.

23        THE COURT:  Okay.  Did you wish to cross examine the

24   other witness?

25        MR. HOGAN:  Judge, I have no questions for the other

74

1  witness.
2        THE COURT:  Okay.  Well, why don't I hear oral
3  argument then?  Unless --
4        MR. HOGAN:  Your Honor, the debtors have two
5  witnesses that they have also offered through declarations.
6        THE COURT:  Do you want to cross examine either of
7  the debtors' witnesses?
8        MR. GLAS:  Yes, Your Honor.
9        MR. BUTLER:  Your Honor, I would point out that
10  depositions of both have been admitted into evidence.
11        THE COURT:  All right.
12        MR. GLAS:  If the transcripts are allowed into
13  evidence then I don't think I need to cross them.
14        THE COURT:  Okay.  Very well.  All right.  So then
15  let me hear oral argument and in particular if you can point me
16  to, in respect to the issues we've just been discussing, the
17  evidence that has not been brought out on the examination
18  bearing on the damages issues, and, of course, on the contract

De
l
e

19  interpretation issues.  The so-called "de-
20  rating"/"requirements" contract issues.
21        MR. GLAS:  I think, Your Honor, the binders are very
22  comprehensive and cover all the documentary evidence in this
23  case.  And I think that there's no dispute here that there were

De
l
e

24  de-rates, there were changes in shifts and the dispute really
25  is what is a change in the scope of services.  And for that we

1    submitted the declarations of Mr. Blair and Mr. Dell on that

2    point and the contracts are extremely sketchy.  Delphi's

3    position was that the purchase orders together with the general

4    terms and conditions are the whole contract here.  But neither

5    of those two documents say what the services are really.  And

6    since they don't say what the services are it's very difficult

7    to determine what the scope of services that was originally

8    contracted is, if you look only at those two documents.

9    Therefore, any changes to that undetermined scope of services,

10   it just cannot be determined by looking at those two documents,

11   the purchase orders and the general terms and conditions.

12        Delphi representatives were deposed and Delphi is

13   submitting declarations.  They admitted that they don't know

14   either -- one admitted that he didn't know what the scope -- a

15   change in the scope of services was.  And the other one, after

16   reading part of F-3, of the general terms and conditions,

17   acknowledge that the phrasing of that section cover more than

18   just design changes that Delphi is claiming that is a scope

19   change.  I think that in order to determine what is a scope

20   change, the Court needs to look at what the requests for quotes

21   were, it needs to look at what the billings were.  And when the

22   Court does that Automodular's bids were for a specific number

23   of shifts, a specific terms with respect to jobs per hour, and

24   all those things were changed, and there is no dispute about

                                                            De

                                                             l

                                                             e

25   that.  There was a de-rate, there were shift reductions and in

1   some cases, the lines were worked at a faster speed.  All that,
2   in Automodular's view changed the scope of the service.  The
3   service is very particular, and quite fascinating in my view.
4   I didn't know much about the industry before this matter.  But

                                                            De
                                                             l
                                                             e

5   the services have to be provided in a just-in-time basis, it
6   requires a lot of synchronization between the Automodular line
7   and the ultimate customer here, GM line of manufacturing.  And
8   the changes Automodular bid for work at a specific requirements
9   and those requirements were changed, and the service -- the
10  nature of the services changed.  And that's why Automodular is
11  entitled to a price adjustment.
12        There is a second element to that, is that
13  Automodular has been deprived of its contractual rights with

                                                            De
                                                             l
                                                             e

14  respect to the de-rates, because the contract indicates that in
15  the event of a change of scope the price has to be adjusted.
16  And if the parties do not agree they have to -- they have to
17  meet and confer and try to resolve their dispute.  That didn't
18  happen here.  Delphi refused to meet with Automodular and
19  discuss any possibility of a change to the price in this case.
20        I think that it's also indicative of what happened
21  here, is that the ultimate customer, GM, called the changes in
22  the line a change in scope, of the work that had to be provided
23  by the suppliers.  And the declarations of the witnesses
24  supplied by Delphi indicate that you have never seen such
25  documents from GM.  Now, during the de-positions they

77

1    acknowledge that normally GM doesn't send those forms to this

2    specific two witnesses' departments.  One witness was in the

3    purchasing department, the other one was in some type of

4    support engineering department.  And the -- I believe it was

5    both witnesses that testified that the forms that GM would send

6    would normally go to the sales department of Delphi.  So there

7    is no surprise there if neither of these two witnesses has seen

8    the change in scope form from GM.

9        THE COURT:  Is there anything in the record to

10   indicate that GM sent that notice knowing the terms of the

11   Delphi/Automodular agreement?

12       MR. GLAS:  The agreements are not referenced in the

13   form, Your Honor.  But the -- I don't think there is any reason

14   to suspect that Automodular was a unique supplier that got this

15   form.

16       THE COURT:  Is there any evidence in the record to

17   show that GM would permit Delphi to pass on any additional

18   costs that it would incur on a change in scope like this to GM?

19   So that in sending that notice GM would be, in effect, sending

20   itself a bill?

21       MR. GLAS:  Well, there is evidence that that

22   happened, not with Delphi but the Automodular witnesses

23   testified that upon receipt of similar notices from GM they

24   were -- they received compensation for the change of scope.

25       THE COURT:  No, but from GM not --

78

1       MR. GLAS:  Yes, from GM.  Correct, but in that
2    cases --
3       THE COURT:  Were those cases -- where they had a
4    contract with GM?
5       MR. GLAS:  Yes.  There was a direct contract with GM.
6       THE COURT:  And is that contract in the record?
7       MR. GLAS:  That contract is not in the record.  Not
8    the contract -- the document itself is not.
9       THE COURT:  But am I right, there's nothing in the
10   record to suggest that by sending those notices regarding the
11   part to be made for Delphi, GM understood that it would be
12   incurring any liability?
13      MR. GLAS:  Well, if you look at the -- at the
14   notices, I think that they refer to the possibility of price
15   adjustments.  In one case I believe they ask for a decrease in
16   price.  And but as one of our witnesses testified, that is
17   quite common, that even the change of scope may result in
18   actually an increase in cost, GM would ask in any event for a
19   price decrease.
20      THE COURT:  Okay.  What do you make of paragraph 2.5
21   of the general terms, which says that "if the requirements of
                                        De
                                        l
                                        e

22   buyer's customers or market, economic or other conditions
                                        De
                                        l
                                        e

23   require changes in delivery schedules, buyer may change the
24   rate of schedule shipments or direct temporary suspension of
                                        De
                                        l
                                        e

25   scheduled shipments without entitling seller to a price

1   adjustment or other compensation"?

2          MR. GLAS:  Yes, Your Honor, that was addressed in the

3   deposition of Mr. Blair.  And Mr. Blair testified that this was

4   a pretty standard clause that referred to events like a strike,

5   a temporary suspension of the line, given some production

6   difficulties.  And so the way this works is that Automodular

7   received the orders and has to fill them within a very short

8   window of time, like two hours or so.  So if it comes a time

9   when the GM line has to stop, given some production

10  difficulties that they are experiencing, then the deliveries

11  will be -- Automodular will not be delivering the parts that

12  it's assembling because the GM plant is stopped and there will

13  be all of a sudden a backlog.  There is no inventory in this

14  business.  And so that's what clause 2.5 refers to, this

                                                        De
                                                        l
                                                        e

15  temporary suspension of work --

16          THE COURT:  Do you think --

17          MR. GLAS:  -- and they are not deemed by Automodular

18  a scope change.  Automodular will eat those costs as Mr. Blair

19  explained --

                                                        De
                                                        l
                                                        e
                                                        t

20          THE COURT:  Excuse me.

21          MR. GLAS:  Yes, Your Honor.

22          THE COURT:  All right.  Never mind.  You can go

23  ahead.

24          MR. GLAS:  And I believe that the debtors made

25  another argument based on another section of, I believe, the

80

1    long-term agreement that said no price increases would be

2    allowed as a result of increases in labor or overhead.  But

3    Your Honor should be clear that Automodular is not claiming

4    here that its labor costs increased or its overhead increased.

5    It's simply the -- Automodular is seeking a price increase here

6    without any changes to its cost really, the costs have remained

7    the same, but the changes that Automodular has to make require

8    a change in price.

9          THE COURT:  That's based on the amortization on a

10   shorter timeframe, correct?

11         MR. GLAS:  Well, not only that, Your Honor, but all

12   of a sudden the people on the line are working more hours, at a

13   higher rate.

14         THE COURT:  Well, why isn't that labor costs?

15         MR. GLAS:  The amount that Automodular -- it is a

16   labor cost, but it's a different type of labor costs.  It's not

17   that Automodular has to pay them more because of a collective

18   bargaining agreement that tells them that the rate to the

19   workers is now twenty dollars instead of ten.  The dollars that

20   are being paid to the workers are the same but they are doing

21   more work and the costs are increasing.

22         THE COURT:  Why isn't that overhead?

23         MR. GLAS:  That is not overhead.  The overhead -- the

24   Automodular has exactly the same plant, exactly the same phone

25   lines, it hasn't added any phones, any equipment to any of

81

1  this.  It has to rebalance the way the line operates, that's

2  why   the --

3      THE COURT:  But the phone lines would be materials.

4  Overhead is something else.

5      MR. GLAS:  No, no.  I'm talking about overhead, Your

6  Honor.  You said --

7      THE COURT:  I know, but you seem to be talking about

8  materials.  You said there's no more additional material.

9      MR. GLAS:  No, I did not say that.  I think Your

10 Honor misheard me.  There are no additional fixed costs.

11 Automodular has the same fixed costs where it produces one

12 widget or 20,000.  And I think that the other argument that the

De

l

e

13 debtor has presented here is based on the integration clause in

14 the general terms and conditions.  But that is really something

15 that -- it's a misplaced argument.  The contracts on their face

16 are not integrated.  It's just impossible to tell what

17 Automodular is supposed to do by looking at those contracts.

18     THE COURT:  I don't -- I guess I had a problem with

19 that point.  The contracts specify a certain price per item and

20 they specify that it's going to be 100 percent of the

21 requirements.  And there's an adjustment for a change in

22 services and the like.  But what else -- I don't understand

23 what else you need.  I mean --

24     MR. GLAS:  Well, it doesn't say --

25     THE COURT:  I think what you're saying is you think

82

1  they're different contracts because you want to have other
2  provisions in them.  But the contracts -- if you have these
3  contracts you know what you're supposed to do.

                                                De
                                                l
                                                e

4          MR. GLAS:  The parties know what they're supposed to
5  do because they had negotiations.  And in the case of
6  Automodular, I believe that those documents that were exchanged

                                                De
                                                l
                                                e

7  before the purchaser orders were issued are part of the deal
8  between the two parties.  And Your Honor is correct, the
9  contract has -- the purchase order has a price and it indicates
10 that it's for 100 percent of the requirement.  It doesn't say
11 how is Automodular supposed to -- what service is Automodular
12 providing for that price and for that product.
13         THE COURT:  It's to provide the parts, that's the
14 service.
15         MR. GLAS:  But they -- and who owns the parts and
16 who --
17         THE COURT:  That's covered by the general terms.
18         MR. GLAS:  I don't think --

                                                De
                                                l
                                                e

19         THE COURT:  The general terms deal with consignment
20 issues and buyer's property.
21         MR. GLAS:  It doesn't deal with the sequencing of the
22 manufacturing process here.  It doesn't deal with a lot of
23 terms, Your Honor.
24         THE COURT:  What do you mean by the sequencing of the

                                                De
                                                l
                                                e

25 manufacturing process?

83

1        MR. GLAS:  Where does it say in the purchase order

2   that these parts had been -- had to be delivered with

3   sequencing such that they are received by General Motors at the

De

l

e

4   time they are needed?  When the car is going through the

5   assembly line, it doesn't say that.  It doesn't say anything

6   about the manufacturing or the assembling process.  And that's

7   the key service.

8        THE COURT:  You don't think the warranty covers that?

9        MR. GLAS:  No.

10       THE COURT:  Why?

11       MR. GLAS:  I'm sorry, Your Honor is looking at what

12  tab?

13       THE COURT:  Section 7.

14       MR. GLAS:  In general terms and conditions?

15       THE COURT:  Yes.

16       (Pause in proceedings)

17       THE COURT:  As well as 2.6.

18       MR. GLAS:  I don't think this covers it, Your Honor.

19       THE COURT:  As well as 2.6 because if "the seller

20  fails to have goods ready for shipment in time to meet buyer's

21  delivery schedules using the method of transportation

22  originally specified, then seller will ship on a premium

23  basis."

24       MR. GLAS:  Your Honor, these are general terms and

25  conditions that generally cover the purchase of goods.  We're

84

1    not selling goods, we're providing a service.

2         THE COURT:  Really.  Okay.

3         MR. GLAS:  So just to summarize, Your Honor, I think

4    you have to go outside the four corners of this agreement in

5    order to determine what services are being provided.  And then

6    decide whether there was a change in the scope of the services

7    that were contracted.  And we believe that there was.  And

8    that's why the motion should be granted.

9         THE COURT:  Okay.

10        MR. BUTLER:  Your Honor, I'm focusing on just a

11   couple of exhibits and a relatively brief argument here.

12   The -- this is a contested hearing in which Automodular is

13   asking Your Honor to find that the debtors owe varying amounts

14   of money on nine separate claims that would be -- they claim

15   are administrative claims and that Your Honor should order

16   debtors to pay, in cash, to -- before an effective date of a

17   plan, to Automodular.  Automodular has the burdens here in

18   terms of this contested hearing and the debtors assert that

19   they have failed to meet those burdens with respect to each of

20   the nine claims.  Those nine claims, according to Automodular,

21   arise from purported breaches of contracts with DAS LLC for

22   work performed at two Automodular locations, one in Lordstown,

23   Ohio and the other in Oshawa, Ontario Canada.

24        The first of these nine claims is a claim that there

25   are a contractual entitlement to a per piece price increase to

1    account for costs associated with reductions in volume and

2    speed of the production line.  They've estimated those amounts

3    at approximately 1. -- between 1.35 million dollars.  As I'll

4    mention in a few moments in pointing to Exhibits 11 and 13,

5    these are, in fact, specious claims because this is a

6    requirements contract and the -- and it's an integrated

7    contract and the debtors have performed in connection with the

8    contract, and the contract is not, in accordance with its

De

l

e

9    terms, require any compensation for volume-related adjustments

10   to Automodular.

11        The second of the nine claims is actually a dressed-

12   up volume claim.  It is titled or captioned a claim of 322,000

13   dollars for early termination of production at the Ontario

14   facility for assemblies for use in a vehicle that GM ceased to

15   manufacture at the close of the 2007 model year, and that will

16   be Exhibit 11, and that was that Exhibit -- A to Exhibit 11 of

17   the long-term contract, which I'll discuss just briefly in a

18   few minutes.

19        Again, this is a requirements contract, it's clear on

20   the face of it is, and that is not for termination by the

21   debtors of anything, but as Your Honor observed during oral

22   argument that is actually for the -- a termination by GM of a

23   particular requirement and not by -- and then ultimately the

24   debtors were no longer supplying and therefore its suppliers no

25   longer supplying with respect to that terminated vehicle model.

1        The six other claims, which I'll address very briefly
2   at the end of this, range for amounts from 191 dollars to
3   183,000 dollars, in which Automodular's got the burden of proof
4   on this record to establish that those amounts are owed.  And

De
l
e

5   we don't believe that they have, for the reasons I'll mention,
6   sustained that.
7        Now, let me address if I can the second of the nine
8   claims.  And that is the claim dealing with the alleged
9   termination damages of 322,000 dollars.  If you look at Exhibit
10  11, paragraph 5 of Exhibit 11, provides very clearly that under
11  that long-term contract there will be purchase orders and the
12  general terms and conditions will apply.  There is an amendment
13  to those terms and conditions which -- in paragraph 5 of
14  Exhibit 11 says that "the buyer's right to terminate for
15  convenience under the general terms and conditions will not be
16  applicable until a date certain under this agreement until July
17  1, 2006."  And so there's a specific amendment to those terms
18  and conditions that otherwise apply in their entirety.  If you
19  look at the terms and conditions, which is Exhibit 13, and look
20  specifically at paragraph 29, there is an agreed paragraph
21  between Automodular and Delphi in which there's acknowledgement

De
l
e

22  that this represents the entire agreement, that's an

De
l
e

23  integration clause, and it says the purchase orders, and the
24  contract, and these terms and conditions represent the entire
25  agreement of the parties.  And I would argue there's no

87

1    ambiguity in this agreement or anything that would require the
2    debtor or the Court to consider parol evidence or to look
3    outside of the four corners of the document.
4        If you look at the general terms and conditions as --
5    and I would ask the Court obviously -- I'm not quite sure what
6    Mr. Glas' view is and how somehow these terms and conditions
7    don't apply because they're not providing goods, they're

8    providing services-- in fact, as it relates to this claim, they

9    signed a piece of paper saying that they apply, their signature
10   is on the piece of paper.  So they clearly apply.  And on the
11   terms and conditions, when you look at them in just paragraphs
12   1, acceptance, there's an acknowledgement by Automodular that
13   these are incorporated into the long-term agreement, and they
14   have agreed that any additions and changes will be in writing,
15   and there's even specific limitations on how those changes can,
16   in fact, be made.
17       As Your Honor pointed out 2.5, 2.7 and 3 are all
18   relevant here.  2.5 is the delivery schedule which Your Honor
19   asked about in oral argument, and the last sentence of 2.5 is
20   what makes this -- 2.5 is what makes this a requirements
21   contract, because it states quite clearly that if the

22   requirements of buyers customers or market, economic or other
23   conditions require changes than we can -- the buyer can change
24   the rate of scheduled shipments or direct temporary suspension

25   without entitling seller [that would be Automodular] to a price

88

1    adjustment or other compensation.  If you look at Exhibit A, to
2    the long-term agreement it says right on it "estimated" demand.
3    And it has definitions relating to "estimated" demand.  And 2.7
4    of the volume of the terms and conditions which are
5    incorporated by paragraph 6 of the long-term contract, which is

Delete

6    Exhibit 11, says that buyer [that is Delphi] can provide          Delet

7    Automodular, the seller, with estimates, forecasts or
8    projections of anticipated volume or quantity requirements for

Delete

9    goods.  And it goes on to say "buyer makes no representation,     De
                                                                         let

10   warranty, guarantee or commitment of any kind or nature,
11   express or implied, regarding any such forecast provided to
12   seller, including with respect to the accuracy or completeness
13   of the forecasts."  And 11.25 says that if requirements change
14   then these forecasts will change.  What happened here, General
15   Motors decided to stop producing a line of vehicles.  That line
16   of vehicles, the item in Exhibit A, which was a forecast by its
17   -- what it says on the piece of paper, that forecast changed
18   and there is no basis at all, when you read the terms and
19   conditions, understand that this is a requirements agreement
20   under Michigan law, and look at the long-term contract, there's
21   no basis to assert any damages for the 322,000 dollars.  That's

Delete

22   in fact expressly what paragraph 2.5 clearly states that         Delet

23   Automodular agreed they were not entitled to receive.  And that
24   can't be any argument about the four corners, there there's a
25   signed document.  And Delphi's practice, as Your Honor knows,

1   is in long-term agreements we get signed contracts.  In
2   agreements that are not long-term it's the purchase order and
3   the terms and conditions that are integrated together that
4   apply, without the necessity of a signed contract.  And you say
5   how does that bind Automodular, and the answer is it's in the
6   course of their performance of the contract.  The custom in
7   this industry is that if you perform under purchase orders,
8   then you are bound by the general terms and conditions which
9   are incorporated specifically in every purchase order and by
10  the terms of the purchase order.  So turning to the first
11  claim, the 1.35 million dollar claim, there is, I think, no
12  question but that all of their claim here is volume related.
13  They talked about the speed of the line, about the number of
14  shifts required, about the amount of products that have to be
15  delivered.  And in each of these issues they are controlled by
16  2.5 and 2.7 of the requirements nature of the contract.

                                                        De
                                                        l
                                                        e

17  Automodular's argument that it's entitled to a price increase
18  because the drop in production volume increases a per piece

                                                        De
                                                        l
                                                        e

19  cost simply flies in the face of the written agreement.  And I
20  know Your Honor's considered this in other contexts in other
21  hearings in this case.  Just to briefly say it, the -- and that
22  is that under Michigan law there is no question that Michigan
23  courts recognize the validity of requirement contracts,
24  including in the context of both goods and services agreements.
25  In our papers we cited the J&B Sausage Company case from the

90

1    Michigan Court of Appeals, January 4, 2007.  It's also very

De
l
e

2    clear under Michigan law that -- which is the law that governs

De
l
e

3    these particular contracts -- that when the contract language
4    is clear and unambiguous irrespective of whether the contract
5    party thinks it's unfavorable to them, that language is

De
l
e

6    reflective of the parties intent as a matter of law.  And in
7    our papers we cited Quality Products at 666 Northwest Reporter
8    2d at 259.  Very clearly making, you know, understanding that
9    there is explicit exclusion of volume guarantees in the general
10   terms and conditions of this transaction between Delphi and
11   Automodular.  I would also point out that applicable law here,
12   because these issues have all been litigated and the case law

De
l
e

13   here is very solid on these subject, the fact of the matter is,    De
l
e
t

14   that when you have an exclusion, explicitly, and there are no
15   volume guarantees in these general terms and conditions, the
16   case law provides that volumes under requirements contracts are
17   not certain in any respect.  Meaning, that Automodular has no
18   right to rely on those.  And the only real carve out to that is
19   the absence of bad faith.  And there's not a scintilla of
20   evidence in this record asserting bad faith by Delphi.  And
21   it's very clear that a buyer does not breech a requirements
22   contract by -- by -- even if it orders, according to the case
23   law, nothing under the contract if that's, in fact, what the
24   requirements ultimately are.  And that case, the Tigg

De
l
e

25   corporation case also in our papers went up to the Third

1      Circuit and was affirmed by the Third Circuit.

2          So I think, Your Honor, when we look at what is

3      clearly the relevant documents, the purchase orders they

4      performed under, the terms and conditions, I don't think you

5      need to look much beyond Section 1, Section 2.5 and Section

6      2.7.  What is clear is that Section 3, the specification design

7      and scope changes, just simply does not apply.  A reduction in

8      volume is not a scope change.  It's not changing the widget

9      that's being manufactured.  That's not what this is about.

10     This is about the fact that there were less cooling units that

11     needed to be produced, you know, either by a rate basis or

12     there was just enough demand -- less of enough demand that you

13     just simply didn't need to have the -- the same number of

14     shares.  Those are not scope changes in any respect.

15         Now, Your Honor asked, briefly, and otherwise I'm

16     going to rely on our papers as it relates to those two major

17     arguments.  With respect to the -- the other six claims for the

18     miscellaneous items, Your Honor, I don't believe that this

19     record supports Automodular's secondary claims.  We believe

20     that they're inflated, that they're unsubstantiated and we

21     don't believe the record supports that they're entitled to a

22     credit for the debit memo for the overcharges by grease.  I

23     think there's admission in this record that they, in fact,

24     did -- it was an overcharge of 183,000 dollars.  I don't

25     think -- I think the testimony's uncontroverted in that

1  respect.

2         There is, on the currency exchange rate, that matter

3  is still a matter of discussion between the parties.  I --

4  the -- I don't think there's any basis, in this record, for

5  Your Honor to determine that 156,000 dollars is owed.  The

6  debtor has acknowledged that there's a formula that ought to be

7  applied there and there may be some amount owed in the future

8  but it's premature for determination now.

9         And I would also point out, Your Honor, that some of

10  these claims, and they're smaller claims and I'm not going to

11  spend much time on them, there are about 15,000 dollars of

12  these claims that arise under pre-petition contracts.  And

13  until the point they're assumed, there will be a cure payment

14  at the point of an effective date of a plan, those would be

15  pre-petition claims not administrative claims.  So some of

16  these miscellaneous claims are pre-petition in nature in any

17  event and would not be subject to administrative claim

18  treatment here, which is what this motion is about.

19         Your Honor, unless you have any other questions, I'll

20  simply rely on the record.

21         THE COURT:  Okay. Thank you.  Anything else?

22         MR. GLAS:  Just briefly, Your Honor.  I think it's

23  clear on the record that there is a shortfall on the exchange

24  rate.  They haven't paid it since 2006.  They have acknowledged

25  that -- they've never explained why they never paid it since

1    2006.

2         The -- I think the record is also clear on the path

3    that they acknowledge that they owe money on that and the

4    question is how much.  And I think that Mr. Dell's testimony

5    should suffice with respect to Automodular's claim with that

6    respect.

7         And the -- the other issue is the -- the scope

8    change.  And I'm not going to belabor the Court's time too much

9    on that but the -- I think it's worth noting that even Delphi's

10   witness, Mr. Bowman, acknowledged that it was impossible to

11   determine what services needed to be provided under this

12   contract by looking at the purchase order and the general terms

13   and conditions.  So -- so this -- you know, there might be an

14   integration clause but it is not an integrated contract.  And

15   we believe that there was a scope change --

16        THE COURT:  But the -- I still don't understand.  You

17   say they bargained for services as opposed to getting specific

18   products?

19        MR. GLAS:  Absolutely.

20        THE COURT:  Where is that said anywhere in the

21   contract?

22        MR. GLAS:  Exactly.

23        THE COURT:  No, where -- but I -- that's my point,

24   where does it say that in the contract, that they bargained for

25   services.

94

1      MR. GLAS:  That's what this is all about, Your Honor.

2  This is -- this is --

3      THE COURT:  No, maybe I'm not being clear.  Did they

4  agree to pay your clients for their services?

5      MR. GLAS:  Yes.  This is the price --

6      THE COURT:  Not -- not per unit?

7      MR. GLAS:  It was -- the price was based on the

8  service for assembling the unit.

9      THE COURT:  Well, I guess my question to you is,

10  maybe it made sense for Mr. Bowman to say that he didn't know

11  what services would be required because that's not what they

12  were paying for.  They were paying for what was produced, as

13  opposed to the services.

14      MR. GLAS:  No, no.  Mr. Bowman -- Mr. Bowman knew

15  what services were being provided.  And -- and he knew that

16  Automodular is an assembler.  Assembly is providing a service.

17  Automodular doesn't own the parts, doesn't sell the parts.

18  Automodular simply puts them together.  It is for that reason

19  that Automodular is paid.

20      THE COURT:  Okay.  All right.  I have before me a

21  motion by Automodular Assemblies, Inc., and two affiliates.

22  Which, in its current form, is to allow and direct payment of

23  an administrative expense claim.  It originally also sought to

24  compel assumption or rejection of the executory contracts upon

25  which the administrative expense claim is based.  But pursuant

95

1    to their chapter 11 plan, the debtors have sought to assume

2    those contracts.  So that portion of the motion is moot.

3        In seeking to compel payment of a disputed

4    administrative claim, Automodular has the burden of proof to

5    demonstrate administrative expense priority to show that its

6    services were both necessary, beneficial and of a post-petition

7    nature.  See in re Bethlehem Steel Corporation, 479 F.3d. 167-

8    172, (2nd Cir. 2007) and as well as in re Drexel Burnham

9    Lambert Group Inc., 134 B.R. 482, 489, (Bankr. S.D.N.Y. 1991).

10       Generally speaking, and I don't believe the debtors

11   would dispute this, is the case here.  The proper measure of an

12   administrative expense is benefit to the estate is based upon

13   the agreement that the parties have negotiated.  But the

14   debtors hotly dispute whether under their agreements with

15   Automodular; the amounts claimed by Automodular are, in fact,

16   due and owing.

17       The two relevant agreements are first, a series of

18   purchase orders attached as Exhibit A to Christopher Dell's

19   declaration or affidavit in support of Automodular's motion,

20   which provide for the purchase by a Delphi subsidiary,

21   Delphi Thermal and Interior, of various parts from Automodular.

22   And second, a long-term contract between

23   Delphi Automotive Systems and Delphi Thermal and Interior as

24   buyer and Automodular as seller, pertaining to the purchase by

25   Delphi of parts from an Ontario plant.

96

1        The first contract, which I'll refer to as a U.S.

2    contract, expressly incorporates by its terms the general terms

3    and conditions of Delphi, which are attached also to Mr. Dell's

4    affidavit, falling immediately behind the Ontario contract at

5    Exhibit C.  The Ontario contract also expressly incorporates,

6    with one revision found in paragraph 6 that's irrelevant to

7    this dispute, the general terms and conditions.

8        Both contracts are very clearly requirements

9    contracts.  The purchase orders are so labeled and provide for

10   the purchase of roughly a hundred percent -- approximately a

11   hundred percent of Delphi's requirements from Automodular.  The

12   Ontario contract also is a standard form requirements contract

13   providing in the first paragraph that seller agrees to sell and

14   buyer agrees to purchase approximately one hundred percent of

15   buyer's production and service requirements for the following

16   products.

17       The two most significant issues raised by

18   Automodular's motion, both pertain to the proper interpretation

19   of these two agreements.  Again, both of them incorporating the

20   general terms and conditions of Delphi as they pertain to

21   reductions in Delphi's requirements under the agreements.

22   Under Michigan law, which I believe applies here, it expressly

23   applies under the U.S. contract, the primary goal in the

24   construction or interpretation of any contract is to honor the

25   parties' intent.  The Court must "look for the intent of the

1   parties in the words used in the instrument."  Where the words

2   used by the parties are clear and unambiguous, the Court "does

3   not have a right to make a different contract for the parties

4   or to look to extrinsic testimony to determine their intent."

5   UAW-GM Human Resource Center v. KSL REC. Corp, 579 N.W.2nd 411,

6   414 (Mich. App. 1998).

7        Consequently, in determining the issues that I've

8   just identified, I've reviewed the contracts and asked myself

9   whether their words are so clear and unambiguous as to provide

10  the answer as to the party's intent.  And I have concluded that

11  that is, in fact, the case.  Let me first note that Michigan

12  law does contain a backdrop to this general contract

13  interpretation principal, which is that, under Michigan law,

14  common law governs a contract for services including a

15  requirements contract and a requirements contract is one in

16  which the quantity term is not fixed at the time of contracting

17  and the parties agree will be the buyer's needs or requirements

18  of a specific commodity or service over the life of the

19  contract.  See J & B Sausage Company v. Department of

20  Management and Budget, 2007 W.L. 28409 at Page 3, (Mich. App.

21  January 4, 2007).

22       As set forth in that case, Michigan law clearly

23  recognized the validity of requirements contracts.  Indeed,

24  under Michigan law a party's requirements may be reduced to

25  zero without constituting a breach of contract, if that

1   reduction in requirements is in good faith and based on a sound

2   business judgment and not in an effort to avoid the output

3   contract or agreement.  See TIGG, T-I-G-G, Corporation v. Dow

4   Corning Corporation, 962 F.2d. 1119, 1126 (3rd Cir. 1992).

5        Here there's been no allegation of bad faith made by

6   Automodular.  And it appears clear from the record that the

7   reduction in the volume of the debtors' requirements was due to

8   a decision by the debtors' buyer, GM, to reduce the number of

9   parts that it needed, including by eliminating one vehicle

10  line.  See also Wise Co., Inc., v. Johnson Controls Inc., 155

11  Fed App 815, 817 (6th Cir. 2005), which collects cases and

12  finds that the majority of Courts have permitted good faith

13  reductions in requirements contracts even though the reductions

14  may be highly disproportionate to stated estimates.

15       Automodular does not quarrel with this generally well

16  settled law, except in one limited respect which I don't except

17  which is that debtor owed some additional duty to Automodular

18  given Automodular's investment not to reduce it's requirements

19  without compensation under the common law.  I believe the case

20  cited for that proposition by Automodular does not stand for

21  that proposition.

22       What Automodular basis it's claims upon, however, is

23  a specific provision of the general terms, Section 3, entitled

24  Specification, Design and Scope Changes.  That provision

25  states, buyer may, at any time, require seller to implement

99

1    changes to the specifications or design of the goods or to the

2    scope of any services or work covered by this contract

3    including work related to inspection, testing or quality

4    control.  While buyer will endeavor to discuss any such changes

5    with seller as early as practical, seller will promptly

6    implement such changes.  Buyer will equitably determine any

7    adjustment in price or delivery schedules resulting from such

8    changes, including buyer's payment of reasonable cost of

9    modifications to seller's equipment necessary to implement such

10   changes.

11          Automodular contends that when Delphi and

12   Delphi Thermal reduced their requirements, as stated in the two

13   agreements, they changed the scope of the services or work

14   covered by the contract.  It should be clear -- the record is

15   clear that except as I'll note in connection with one minor

16   issue involving foam pads and screws, the reduction in

17   requirements did not entail any change to the product that was

18   being assembled and delivered pursuant to the requirements

19   contract.

20          Automodular contends that the reduction in the amount

21   of volume or the amount of requirements constitutes, as I

22   noted, a change in scope of services or work covered.  I

23   conclude, however, that when one reads the contract as a whole,

24   particularly noting that it's a requirements contract pursuant

25   to which specific parts would be delivered at specific prices,

100

1   this interpretation is clearly not what the parties intended.

2   I say that primarily because of the immediately preceding

3   section of the general terms and conditions, Section 2.5 as

4   well as 2.7.

5       Section 2.5 provides that deliveries will be made in

6   the quantities on the dates and at the times specified by the

7   buyer in the contract or any subsequent releases or

8   instructions the buyer issues under this contract.  Continuing

9   on to the relevant provisions of this paragraph, the parties

10  agree that if the requirements of buyers' customers or market,

11  economic or other conditions require changes in delivery

12  schedules buyer may change the rate of scheduled shipments or

13  direct temporary suspension of scheduled shipments without

14  entitling seller to a price adjustment or other compensation.

15      Section 2.7 provides that buyer may provide seller

16  with estimates, forecasts or projections of its future

17  anticipated volume or quantity requirements of goods.  Seller

18  acknowledges that any such forecasts are provided for

19  informational purposes only.  And like any other forward

20  looking projections, are based on a number of economic and

21  business factors, variables and assumptions some or all of

22  which may change over time.  Buyer makes no representation,

23  warranty, guarantee or commitment of any kind or nature,

24  expressed or implied, regarding any such forecasts provided to

25  seller, including with respect to the accuracy or completeness

1    of such forecasts.

2         It is Automodular's argument that notwithstanding

3    that language and the fact that the forecast provided in the

4    Ontario contract are specifically labeled estimated, that the

5    parties agreed that a specific number of goods in a specific

6    sequence with a specific guaranteed cost to Automodular would

7    be provided.  And that if that cost varied by more than ten

8    percent Automodular would be compensated for it.  Now, the

9    problem with this argument is that that supposed agreement

10   appears nowhere in the contracts and runs contrary to paragraph

11   2.5 as well as the general nature of a Court requirements

12   contract and the expressed language of paragraph 2.7 which

13   makes it absolutely clear that buyer makes no commitment as to

14   any provision of a specific forecast of anticipated volume of

15   goods.

16        Given the integration provision of paragraph 29 of

17   the general terms, which is, again, expressly -- which are,

18   again, expressly incorporated in both the U.S. and Ontario

19   contract, the inquiry should end there.  And there's no basis

20   for looking beyond it to parole evidence, see

21   Cook v. Little Caesar Enterprises, Inc., 210 F.3d, 653, 656

22   (6th Cir. 2000).  To adopt a contrary reading of the agreement,

23   that is to read it as Automodular would suggest, to provide for

24   an equitable adjustment in price whenever there would be a

25   material change in Delphi's requirements would run completely

102

1    counter to the other terms of the agreement that I've quoted.

2    I believe it would also, in the case of the Ontario agreement,

3    run counter to paragraph 3 which specifically provides for set

4    pricing per unit as set forth on the attached Exhibit A.  And

5    states that no price increases will be made on account of,

6    among other things, any increases in seller's labor, materials,

7    overhead and other costs.

8         As noted by Mr. Dell, and also in the papers, the

9    calculation of Automodular's administrative claims for what is

10    termed D-rating, as well as the alleged partial termination

11    because of the elimination of one vehicle by -- or one vehicle

12    model by GM leading to termination of parts for the GM X231

13    part in 2007 is based upon different time calculations for

14    running the assembly as well as the time cost of money.  And

15    again, I believe that the parties clearly provided that neither

16    such cost are properly chargeable as a result of a reduction in

17    Delphi's requirements, which Mr. Dell acknowledged was the

18    result or the proper way to look at the termination of the part

19    for the GM X231 in light of GM's decision.  And is further

20    acknowledgment that the part was still being produced, albeit

21    at a lower volume.  And that consequently, I believe, in each

22    case all that occurred was a reduction of Delphi's requirements

23    which it bargained to be treated as I've described already.

24         The parties also dispute some related claims and I'll

25    go through those in order now, although I should reiterate that

103

1    in each case the burden is upon Automodular to establish the

2    proper amount of these claims.

3        The first issue is an additional part that GM

4    required to be added to the product and therefore Delphi

5    required it to be added, a foam pad.  The dispute here is over

6    the proper amount attributable, on an equitable basis, under

7    paragraph 3 of the general terms and conditions.  That is,

8    Delphi acknowledges that this change would, indeed, be a change

9    to the scope originally bargained for since the part itself

10   requires an additional step for assembly.

11       The evidence is clear that effective January 2006

12   Automodular contended that it's cost that's properly

13   compensable under paragraph 3 would be five cents per foam pad

14   or per part to represent the addition of labor involved in the

15   assemblage.  On the same calculation basis, it subsequently

16   raised the amount to 11.8 cents but it apparently did so

17   retroactively to the date that it originally, on the same

18   theory, was prepared to take five cents.

19       First, to the extent that any of this cost is

20   attributable to a pre-petition period, which I don't believe to

21   be the case, but if any of it is attributable to a pre-petition

22   period it's not compensable as an administrative expense until

23   the debtor actually assumes the agreement.

24       As far as the post-petition expense incurred, the

25   amount should reflect the actual costs at the time that the

1    work was done and consequently it appears to me, on its face,

2    that Automodular's claim is overstated by more than two times,

3    at least for some period in question.  It's -- it's obligation

4    or it's burden rather to prove what the proper amount is, and

5    it has clearly failed to do that.  So this claim is denied

6    without prejudice to establish the proper amount on a basis

7    that reflects the actual cost during the time that the services

8    and the assemblage was undertaken.

9        Secondly, Delphi has sought a recoupment or refund

10   under the agreements, which it has the right to do generally,

11   for savings undertaken by Automodular in respect of something

12   called a grease application.  The parties acknowledge that the

13   proper calculation of this amount is approximately 183,000

14   dollars and that it is a savings that Automodular has received.

15   Apparently Automodular contends that notwithstanding their

16   agreement on the amount that no provision of the contracts at

17   issue provide for passing on the savings to Delphi.  To the

18   contrary, I believe that paragraph 5 of the Ontario contract

19   does provide for passing on such savings as long as it's

20   undertaken pursuant to the creative improvement plan referred

21   to in that paragraph.

22       It was Mr. Dell's testimony that the grease

23   application was included in the discussions and implementation

24   of the credit improvement plan.  And I believe this is a quote

25   in response to one of my questions, that the savings resulted

105

1      as that plan bore fruit, approximately one year later.

2      Consequently, I believe that it is covered by paragraph 5, the

3      savings initiative provision of the Ontario agreement.

4           There is a dispute over an additional screw that

5      clearly would be a change in scope, under the general terms.

6      Delphi, apparently, is waiting to see whether in fact

7      Automodular has incurred this cost as opposed to being billed

8      for it.  I don't believe that Automodular sustained its burden

9      to show that it has incurred the cost.  However, I'm sure that

10     if and when it shows Delphi that it in fact has done so and

11     that the cost is reasonable, that Delphi will pay for it under

12     paragraph 3.  So again, I'll deny this request without

13     prejudice.

14          Finally, the motion seeks payment of so-called short

15     charges of roughly 6,000 dollars, which Mr. Dell could not

16     explain the basis for or locate in the one exhibit, Exhibit K

17     to his declaration, purporting to show that such charges were

18     owing.  Thus again, I believe that Automodular has not

19     sustained its burden to show that these charges are, in fact,

20     owing on a post-petition basis.

21          So let me recap, the motion is denied, although I

22     believe the debtors will take to heart my comments on the two

23     items where further proof may establish an amount owing under

24     paragraph 3 of the general terms and conditions.  And some, in

25     respect again of the so-called D-rating/requirements contract

106

1   issues, I concluded that this -- these agreements are clearly

2   requirements contracts and that the general terms and

3   conditions makes it very clear in paragraphs 2.5 and 2.7, that

4   the buyer is not to bear the monetary cost of a reduction in

5   its requirements.

6           The explanation offered by Automodular of 2.5 of the

7   general terms that it applies only to a shutdown of a line or

8   other, sort of, forced measure conditions is clearly belied by

9   the plain terms of that paragraph which go far beyond such a

10  specific limitation.  And I will not read into such language

11  any such limitations but rather will read paragraph 3 to be

12  consistent with such language.  It seems, therefore, clear to

13  me under paragraph 3, that the changes to specifications or

14  design of the goods or to the scope of any services or work

15  covered by the contract, including work related to inspection,

16  testing or quality control, all go to services as well as other

17  costs incurred by seller in dealing with changes to the nature

18  of the goods bargained for as opposed to the amount of those

19  goods or delivery schedules.

20          So, Mr. Butler, you can submit an order to that

21  effect.

22          MR. BUTLER:  Thank you, Your Honor.

23          THE COURT:  My guess is that most of the people here

24  are here on the cure issue.

25          MR. BUTLER:  I think that's right, Your Honor.

1    There's probably just one party here on the --

2        THE COURT:  Maybe we can turn to that one, then?

3        MR. BUTLER:  Sure.

4    (Pause in proceedings)

5        MR. BUTLER:  Your Honor, the next matter on the

6    agenda that we're taking up is matter number 8.  It is the

7    debtors' expedited motion to strike non-conforming cure amounts

8    and related cure notices.  It's filed at docket number 12615.

9        Let me start, Your Honor, by giving some context to

10   this motion.  The debtors sent out, in connection with cure

11   claims, some 1,700 notices.  And they -- and they sent them out

12   as Your Honor recalls, from the litigated hearing with the ad

13   hoc trade committee back on January 10th of this year.

14   Pursuant to the term -- the specific terms of the solicitation

15   procedures order that was approved back in December that set

16   forth the procedures for cure as that order was reaffirmed by

17   Your Honor on January 10th, we sent out these notices to the

18   counterparties to the executory contracts.  We also sent out

19   duplicate notices to those parties at various addresses and we

20   sent out an informational notice based on the claims register

21   to claims traders that may have acquired an interest in a

22   receivable under those contracts even though they had not

23   assigned -- they have not been assigned a contract and had no

24   performance obligations under it and were, in the debtors'

25   view, as we litigated back on January 10th, at risk in the

108

1    event that the debtors decided to assume, under 365 and cure,

2    that was a matter between the debtors and the counterparties

3    and any issues between the counterparties and the claims

4    purchasers were really between those two parties, not the

5    debtors and not to be determined inside this courtroom.

6        Of the 1,700 notices that we sent out, we received

7    approximately 733 notices back.   419 of those notices were not

8    included in the motion to strike.   So there were 419 notices in

9    the amount of about 107 million dollars that appeared on their

10   face to be appropriately executed and were accepted by the

11   debtors.   There were forty-nine original bar-coded notices that

12   were returned that were included within the motion to strike

13   because they were deemed to be non-conforming by the debtors

14   for various reasons I'll discuss in a moment.   And there were

15   other -- 265 other non-conforming notices that were included on

16   the -- on the -- the objection.

17        In terms of the actual -- and that would be a for a

18   total of -- of 314 notices that were included in the motion to

19   strike.   Of those 314 notices that were objected to by the

20   debtors, the parties to whom a 146 notices of -- to strike --

21   were due to be struck, were directed did not object.   There

22   were --

23        THE COURT:   I'm sorry, go through that again.

24        MR. BUTLER:   I'll say of the 314 notices that were

25   included in the motion to strike --

109

1          THE COURT:  Right.

2          MR. BUTLER:  The creditors or parties who filed 146

3     of those notices --

4          THE COURT:  I see.

5          MR. BUTLER:  -- did not object to the motion to

6     strike.

7          THE COURT:  Right.  Okay.

8          MR. BUTLER:  And we will seek relief with respect to

9     those notices.

10         In addition, there were 168 notices where persons

11    filed -- where one or more parties filed an objection

12    contesting the debtors' motion to strike.  And that -- the 168

13    notices form the basis of this contested hearing.

14         Interestingly, of those 168 notices only seventeen of

15    them -- only seventeen of the 168 involve notices signed by a

16    counterparty where the objection to the motion to strike was

17    filed by the counterparty.  Every other one, the other 140 -- I

18    guess 151, involve some permutation of involvement by trade

19    claimants or trade purchasers who either signed the notice,

20    purported to sign the notices attorney of fact without a power

21    of attorney, filed the objection or took other action.  And

22    I'll try and summarize this clearly.  But there's only

23    seventeen that were filed by a counterparty and -- and the

24    counterparty is complaining, today, about the debtors' motion

25    to strike.

110

1       When you look at the objections that the debtors

2   included in the motion to strike, only three categories of

3   objections are relevant to today's contested hearing.  Those

4   are objections contained on schedules 2, 3 and 6 to the motion.

5   Of the -- of the 168 notices, and there's -- there were thirty-

6   nine notices that were included on schedule 2 and that was the

7   notice where we complained -- the debtors complained about an

8   improperly executed cure amount notice.  There was something on

9   the face of the notice that appeared to the debtors to be not

10  in accordance with the solicitation and procedures order.

11      There were 107 notices that were non-original cure

12  amount notices.  The original solicitation procedures order

13  required that the original notice be submitted to the claims

14  agent.  And there were forty-two notices that were untimely,

15  that is not filed in accordance with the time bars set forth in

16  the court's orders.

17      Now, if you add those three numbers up, 39, 107 and

18  42, you'll find that they add up to 188 not 168.  And the

19  reason they add up to that is because there are eleven notices

20  that were included both on schedule 2 and schedule 3, so you

21  double count them if you will.  And there were nine that were

22  also included -- that were included on schedule 6 as well as on

23  schedule either two or three.  So that is to say, Your Honor,

24  that there are -- there were some that were objected to for

25  more than one reason and put on more than one schedule.  So

111

1    it's 168 notices that are subject to the contested hearing but

2    the reasons for them are, as I indicated, those three

3    categories.

4         The -- we took a look, and I want to, sort of, try to

5    put this -- and by the way, I should deal right at the outset

6    with one of the -- these 168 notices are included in twenty-

7    four objections that are still before the Court.  And of those

8    twenty-four objections, one of the objection, the objection of

9    Temic or Temic Automotive North America, Inc., and Motorola,

10   Inc, which is filed at docket number 12722, was a response

11   filed but we didn't, in the motion to strike, seek to strike

12   any notice they filed.  They simply argue that they should be

13   entitled to file the notice, a cure notice, on some basis.

14   That has nothing to do with today's contested hearing to the

15   extent that they believe they have some right and in court

16   they're going to need to proceed by motion. But they're not --

17   we're not seeking any affirmative relief against that objector

18   today.  So there is no basis to proceed with the objection at

19   docket number 12722 involving them.

20        As I indicated, Your Honor, and I just want to go

21   through these, there are seventeen notices that actually were

22   filed by specific counterparties that had specific problems

23   with our motion to strike and they are as follows:  Clarion

24   Corporation at docket number 12679 filed it's -- as a

25   counterparty filed a notice and it's objecting to our view that

112

1    their claim should not be honored or it should be struck

2    because it was filed on a non-original cure amount basis.

3         Automodular Corporation, at docket number 12680 has

4    the same complaint.  Elks Automotive, at docket number 12688

5    has two notices that are a scheduled three objections, the non-

6    original cure amount notices.  Robbins -- excuse me, that's not

7    right.  McArthur Corporation at docket number 12705, same

8    issue, one notice a schedule 3 problem.  Spartech Corporation

9    and Spartech Polycom, docket number 12711, one notices we've

10   objected to on two grounds in both schedule 2 and schedule 3.

11        Nubia, Inc. (ph.), at docket number 12714, a schedule

12   3 problem.  Unifrax I, LLC, at docket number 12720 also a

13   schedule 3 problem.  Federal Screw Works at docket number 12725

14   has a one notice in a schedule 3 problem.  Linear Technology,

15   at docket number 12729 has one notice that's a schedule 6

16   problem.  And Lifetime Industries, Inc., which is undocketed,

17   we received it and a I don't have a docket number for it, and

18   that is a schedule 3 problem.

19        If you take that specific group of parties, there are

20   seventeen notices for those specific objectors that aggregate

21   if Your Honor was to permit them to proceed with their cures or

22   at least not grant the motion to strike as to those seventeen,

23   that's approximately 3.2 million dollars in cure that would

24   ultimately need to be dealt with in the cure process.

25        From the debtors' perspective, Your Honor, we put --

113

1    while we think we have legitimate basis under schedules 2, 3

2    and 6, to have filed the objections, we acknowledge that there

3    are -- Your Honor may conclude from a procedural basis that the

4    folks who in fact are counterparties filed notices, filed

5    objections to the motion to strike and demonstrated in their

6    papers, in some cases on argument for excusable neglect or

7    asserting other bases for relief, they -- the debtors' believe

8    that the Court should consider that -- those separately from

9    the balance of the objectors.

10       The balance of the objectors, Your Honor, in the

11   debtors' view  all go back to the January 10th ruling by Your

12   Honor.  They go back first to the solicitation of procedures

13   order which said these are not -- claims traders are not

14   supposed to be in this business the counterparties are.  And

15   second, because that's what the solicitation procedures order

16   provided.  And second, the January 10th hearing, I mean,

17   incredibly to me three of the objections that are filed today

18   are filed by members of the ad hoc trade committee who were

19   before Your Honor represented at the January 10th hearing and

20   who are subject, directly subject, to the ruling in that

21   contested hearing.  And those would -- those would involve

22   the -- let me get them correctly here, Argo partners at docket

23   number 12719, Contrarian Capital which filed objection under

24   Contrarian Funds LLC at docket number 12724 and ASM Capital

25   which filed an objection at docket number 12723.  These are,

1   admittedly, not the counterparties and were represented by

2   counsel in the January 10th emergency hearing where there was

3   relief sought and denied by the Court for them to file these

4   notices in the first instance.

5         The remaining objections are filed either by a claims

6   purchaser in violation of the solicitation procedures order and

7   what we believe to be the law of the case, that is your

8   January 10th ruling or they are purportedly filed on behalf of

9   a -- of a counterparty but the claims trader is the one who

10  filed it.  So that we have any number of instances where the

11  objector either -- where in some instances the objection is

12  signed by the counterparty but the notice is signed from the

13  claims purchaser.  The objection and the -- and the claims --

14  the notice are signed by the claims purchaser.  In certain

15  instances the attorney for the claims purchaser alleges that he

16  or she is attorney in fact, not attorney at law but attorney in

17  fact for the underlying -- for the underlying counterparty.

18  And we'll seek, in this hearing, to submit evidence that was

19  created, in our view, after the fact, certainly way after the

20  January 10th hearing and after the deadlines for submitting

21  these things that -- to suggest that they somehow are acting as

22  attorneys in fact for the -- for the parties.

23        From the debtors' perspective, at the end of the day,

24  Your Honor, there are two interests here that are significant

25  to us.  The first -- three actually.  The first is maintaining

115

1    the integrity of the solicitation of procedures order and Your

2    Honor's earlier -- earlier January 10th ruling on this.  The

3    second is the fact, and we acknowledge this, that what's going

4    on here is claims purchasers are trying to actually take action

5    here to be paid in cash.  And there is, at issue today, putting

6    aside the 3.2 million dollars that would be implicated in the

7    seventeen -- what I call, sort of, if you will, pure

8    counterparties.  There's about thirty-seven million dollars at

9    issue here in terms of the claims purchasers and whether they

10   can make the assertions they're trying to seek.

11        And so, to the extent Your Honor is inclined to

12   either try to modify the solicitation procedures order, which

13   is a final order or modify Your Honor's earlier ruling, I

14   simply point out that that has a real cash cost to the estate

15   of upwards of as much as thirty-seven million dollars.  And the

16   third issue we have, which is important to the debtors, is

17   we -- you know -- as much as anything we need finality here.

18   We need a ruling because we have to -- we intend to file the S1

19   in connection with the -- with the rights offering next week

20   and proceed with the rights offering in due course.  And we

21   need to know the numbers in order to be able to know -- we have

22   to have the rights offering filed because we have to create the

23   rights certificates, we need to know who to send them to.

24        And so, we need to -- and that is implicated in this,

25   as the motion indicates, as well, understanding where we are in

116

1    those.  So -- and we also, I think, have the prior interest we

2    had in the January 10th hearing of -- of in fact enforcing the

3    debtors' prerogatives under Section 365 to deal with

4    counterparties when it comes to cure and not with alleged

5    purchasers of -- of cure rights, which we don't think is

6    permissible under the bankruptcy code.

7         So that, Your Honor, is, sort of, a summary of where

8    we are and how to proceed here.  There are -- I think that the

9    issues here are, in some respects, more limited than the flurry

10   of paper suggests because I think there are, as I've said,

11   three sets of objections.  It was -- schedule 2 properly

12   executed, schedule 3, if somebody made a photocopy or submitted

13   a non-watermark or created their own cure amounts but it was a

14   non-original is Your Honor going to instruct us to honor those?

15   And schedule 6 was something untimely, which goes into the

16   whole issue of presumably of whether there was a -- some basis

17   for the excusable neglect for it being untimely under the

18   order.

19        From the debtors' perspective, obviously, there is no

20   excusable neglect for someone who was entitled in the first

21   instance to file a cure notice.  Excusable neglect -- you never

22   get to excusable neglect because they weren't entitled to file

23   the notice to begin with.  It doesn't matter whether it was

24   five minutes late, thirty minutes late or five days late.  If

25   they weren't entitled under the solicitation procedures order

117

1    to file a notice, then the rest of this doesn't matter.

2         The -- in terms of the -- the evidentiary record

3    here, there are lots of documents that people have wanted to

4    submit in connection with this.  I believe we have a joint

5    index that, I think, and I'll be correct by my colleagues, is

6    uncontested at this point.  There are -- there are --

7         MR. SACKS:  I don't think -- we haven't seen that

8    yet.

9         MR. BUTLER:  Okay.  Well, let me just find out.

10   Excuse me one second, Your Honor.

11       (Pause in proceedings)

12        MR. BUTLER:  I thought some people -- let me just

13   summarize, Your Honor, what it is.  I believe that the thirty-

14   six items are nothing more than the motion, the declarations,

15   all of the responses and objections filed by all the objectors

16   and the two depositions --

17        THE COURT:  Including the exhibits?

18        MR. BUTLER:  Yes.

19        THE COURT:  That were attached to the objections?

20        MR. BUTLER:  Yes.

21        THE COURT:  Okay.

22        MR. BUTLER:  And the -- and the two objections -- the

23   two depositions of the debtors' witnesses that were taken

24   yesterday, Exhibits 35 and 36.

25        THE COURT:  Okay.

118

1      MR. BUTLER:  I don't think this is controversial.  I

2  apologize if an individual has not seen them.

3      MR. SACKS:  We represent twenty of the

4  counterparties.  We would also like, as part of the evidentiary

5  record, the January 8 affidavit of service of cure notices.  I

6  have excerpts from it which I was going to cross examine based

7  on it, but I don't need to if we can just deem that part of the

8  record.

9      THE COURT:  It's -- it's filed with the Court so --

10  I'm happy to make that part of the record.

11      MR. SACKS:  Thank you, Judge.

12      MR. BUTLER:  So we do without --

13      THE COURT:  Just add that to make it Exhibit 37.

14      MR. BUTLER:  Exhibit 37.

15      THE COURT:  Exhibit 37, yeah.

16      MR. BUTLER:  I'm sorry, Your Honor.  My people have

17  updated things -- somebody made that request earlier and that

18  was actually made -- the exhibit numbers have gone through --

19  have been a little bit -- there were additional objections

20  filed which takes us up, apparently, to all the way to Exhibit

21  37 not 35 for -- and 38 and 39 are the two depositions of

22  Messrs. Gershbein and Unrue and 40 is -- Exhibit 40 is the

23  affidavit of service that the gentleman asked.

24      THE COURT:  Okay.

25      MR. BUTLER:  So I actually, at this point, unless

119

1    there's objection, move for admission of Exhibit 1 through 40,

2    including those exhibits.

3         THE COURT:  Okay.  Hearing no objection I'll -- I'll

4    admit those as exhibits so numbered.

5    (Exhibits 1-40 were hereby received for identification, as of

6    this date.)

7

8         MR. BUTLER:  And we should probably get the

9    evidentiary record out of the way and then figure out how to

10   work through the notices.  I have a suggestion for Your Honor,

11   for the court.  There is -- admitted in the record are both the

12   declarations of Mr. Gershbein and Mr. Unrue and their

13   depositions, all of which are now in evidence.  Your Honor, I

14   guess I'll take them sequentially.  Mr. Gershbein's declaration

15   is Exhibit 1 and the deposition is Exhibit 38.  With the

16   deposition having gone into evidence, I guess the question is

17   whether anyone wishes to cross examine Mr. Gershbein or

18   Your Honor has any questions.

19        THE COURT:  Okay.  Does anyone wish to cross examine

20   Mr. Gershbein?

21        MR. BUTLER:  Just give me a second, please.

22        THE COURT:  Does anyone wish to cross examine

23   Mr. Gershbein?

24        MR. SACKS:  No, Your Honor.

25        THE COURT:  Okay.

120

1          MR. BUTLER:  Apparently there's one person who does.

2          THE COURT:  Okay.  So Mr. Gershbein, would you come

3     up to the stand, please?

4          (Witness is sworn)

5          THE COURT:  And for the record, could you spell your

6     name?

7          THE WITNESS:  Evan, E-V-A-N, Gershbein, G-E-R-S-H-B-

8     E-I-N.

9          THE COURT:  Okay.  Thanks.  Okay.  You can go ahead.

10         MR. SULLIVAN:  I only have two copies, Your Honor, so

11    I apologize for that.

12         THE COURT:  Is it in -- is it one of the exhibits in

13    the record?

14         MR. SULLIVAN:  It's not.

15         THE COURT:  Okay.

16         MR. SULLIVAN:  It's not something that's really

17    controversial at all.

18         THE COURT:  All right.  So you're not looking to

19    introduce it?

20         MR. SULLIVAN:  I was actually -- I was -- it

21    clarifies an issue that was raised in one of the declarations.

22    I don't think it's really -- it just basically confirms the

23    dates that we actually got the notice.

24         MR. BUTLER:  Can I ask who you're representing.

25         MR. SULLIVAN:  I apologize, Your Honor.  I

121

1   represent -- in connection with this objection I'm representing

2   Linear Technologies.

3        THE COURT:  Okay.  Okay.

4        MR. BUTLER:  Okay.  You're not representing Timken,

5   correct?

6        MR. SULLIVAN:  Not -- Timken doesn't have any -- is

7   not relevant for this proceeding.

8        MR. BUTLER:  The reason I'm asking you is, you've

9   given us a document marked with Timken on it.

10       MR. SULLIVAN:  If you keep reading there's a few

11  parties on there.

12       MR. BUTLER:  All right.  Okay.

13       MR. SULLIVAN:  It's only relevant as it pertains

14  to --

15       THE COURT:  All right.  So you can go ahead.

16       MR. SULLIVAN:  I appreciate it, Your Honor.

17  CROSS EXAMINATION BY

18  MR. SULLIVAN:

19  **Q.  Mr. Gershbein I'm handing you an e-mail which you sent to**

20  **me back on January 7th of 2008, do you recognize that?**

21  **A.  Yes.**

22  **Q.  Okay.  And that's -- in that e-mail you forwarded to me**

23  **duplicate, originals of cure notices with respect to, among**

24  **others, Linear Technologies, correct?  Right there were**

25  **creditors and Linear Technologies was one of those?**

1   A.  It actually lists four names here and Linear Technologies

2   is one of them.

3   Q.  Okay.  And the reason why you sent those to me was because

4   based upon conversations that I had with counsel for Delphi,

5   Eric Howe, I had indicated to him that those clients of mine

6   hadn't received the notices that were purportedly sent out on

7   December 21, 2007, correct?

8   A.  I'm sorry --

9       MR. BUTLER:  Objection.  I don't know who's

10  testifying here.

11      THE COURT:  Well -- no, he can -- it's cross

12  examination, he can ask that.

13      THE WITNESS:  I'm sorry, I didn't understand the

14  question.

15  BY MR. SULLIVAN:

16  Q.  The reason why you sent those duplicate originals to me

17  was because I had had conversations with Eric Howe indicating

18  that none of those clients had received the cure notices which

19  you had purportedly sent on December 21, 2007, correct?

20  A.  I do not know about your conversations with Eric Howe.

21  It's obvious that I sent them to you upon a request for

22  original duplicate notices.  I -- I would have to check my

23  records and see who requested it for me to send it to you.

24  Q.  Okay. But it was pursuant to -- it was pursuant to a

25  request because the originals had not been received, correct?

123

1   A.  I don't know if the originals were received but I received

2   a request to send original duplicate notices.

3   Q.  So you're not sure why you sent the originals -- duplicate

4   originals, is that what you're testifying?

5   A.  I presume that you did not have them.

6   Q.  Okay.  And what's the date -- what date and time of that

7   e-mail?

8   A.  It's January 7, 2008, 5:43 PM.

9   Q.  Okay.

10      MR. SULLIVAN:  I have no other questions, Your Honor.

11      THE COURT:  Okay.  Any re-direct?

12      MR. BUTLER:  No, Your Honor.

13      THE COURT:  Okay.  You can step down, sir.

14      MR. SULLIVAN:  Your Honor, can I offer that up into

15  evidence?  I know that it wasn't on the exhibit list.

16      THE COURT:  the e-mail?

17      MR. BUTLER:  I don't have a problem with it, Your

18  Honor.

19      THE COURT:  All right.  Make it 41 then.

20      MR. BUTLER:  We'll mark the e-mail as 41.  While

21  we're marking things, Your Honor, so this is the Gershbein,

22  January 7th, '08 e-mail and attachments which we'll mark as 41.

23  In addition, Your Honor, Counsel to Lifetime, you made a remark

24  in the summary I made at the beginning of this hearing I

25  referred to Lifetime and they -- they're -- while it was in the

124

1    summary I gave you it was not in the -- because it was received

2    late last night, it was not included in the exhibits and

3    they've asked that to be marked as Exhibit 42.  We have no

4    objection.

5         THE COURT:  Okay. That's fine.

6    (E-mail of Mr. Gershbein was hereby received as Debtors'

7    Exhibit 41 for identification, as of this date.)

8    (Summary from Counsel for Lifetime was hereby received as

9    Debtors' Exhibit 42 for identification, as of this date.)

10        MR. BUTLER:  All right.  Now, turning to Mr. Unrue,

11   whose declaration is at Exhibit 2 and deposition is admitted as

12   Exhibit 39.  The debtors will present Mr. Unrue for any cross

13   examination by the parties or questions by the Court.

14        THE COURT:  Does anyone want to cross examine Mr.

15   Unrue?  I'm sorry, where is his declaration?  What is the

16   number, again?

17        MR. BUTLER:  Exhibit 2, Your Honor.  Mr. Gershbein

18   should be number 1 and Mr. Unrue should be number 2, I hope.

19        THE COURT:  All right.  I don't have any questions of

20   him either.

21        MR. BUTLER:  do you need the declaration?

22        THE COURT:  It'd be good to have it.  If you could

23   just give me a loose copy.

24        MR. BUTLER:  Here's a loose copy.  Your Honor, I

25   think, and I'll ask if any other party has any evidence that we

125

1   want to admit, we don't have anything other than the evidence

2   we've put in here and the declarations which have now been

3   admitted into evidence as it relates to the evidentiary record.

4   I'll ask if any other parties have any evidence that needs to

5   go in that's not already in through Exhibits 1 through 42.

6         MR. BEST:  Good afternoon, Your Honor, this Brendan

7   Best representing Federal Screw Works.

8         THE COURT:  Yes.

9         MR. BEST:  I have a -- just a point of clarification.

10   There are, I believe, perhaps two certificates of service, one

11   that was referenced in Mr. Gershbein's declaration regarding

12   the service of the original cure notices.  I would like a

13   clarification of that to be part of the record and also I

14   searched but could not find a filed certificate of service for

15   the duplicate or the copy cure notices on the docket and if

16   that is on the docket, I would also ask for clarification

17   whether that's part of the record.

18         MR. BUTLER:  It is part of the record.  It's Exhibit

19   40.  It's docket number 11773 and that covered all of the

20   things that you just asked about.

21         MR. BEST:  When I looked at 11773, I did not see a

22   reference to the copies.  It wasn't, sort of, broken down at

23   least by my reading, I could be wrong.

24         MR. BUTLER:  The first is the notice of cure amount,

25   the original notice of cure amount.  The second was a notice to

126

1   contract counterparties with multiple addresses, that was the

2   duplicate.  And the third was the notice to holders, assignees

3   and purchasers of claims.

4        MR. BEST:  Okay.

5        MR. BUTLER:  Three separate schedules.

6        THE COURT:  Okay.

7        MR. SCHIFF:  Your Honor, Adam Schiff of Kasowitz

8   Benson Torres & Friedman on behalf of Argo, ASM and Contrarian.

9   I just want to confirm, because there seems to be a little bit

10  of an inconsistency with what was said and what was on the

11  piece of paper.  As to the declaration submitted by Argo, it

12  specifically lists including Exhibits A through S thereto.  On

13  the declarations filed by ASM and by Contrarian, which are

14  listed here, it doesn't specifically reference including the

15  exhibits and we just want to confirm that those are also being

16  admitted and are part of the record.

17       THE COURT:  All of the exhibits are --

18       MR. SCHIFF:  Okay.  I just don't want there to be,

19  like, an interpretation issue because it says it with one and

20  doesn't say it with others.

21       THE COURT:  All the exhibits to every objection are

22  admitted.

23       MR. SCHIFF:  Thank you, Your Honor.

24       MR. BUTLER:  Can I have one moment, Your Honor?

25       THE COURT:  Yes.

127

1       (Pause in proceedings)

2       MR. SULLIVAN:  Your Honor, again I apologize,

3   James Sullivan of McDermott Will & Emery on behalf of Linear

4   Technology.  There are two additional e-mails between myself

5   and/or my associate Nava Hazzan, which I was copied.  These e-

6   mails pertain to the cure notices involving Linear Technology

7   and it just lends additional background information to the

8   facts which are indicated in the declaration that I submitted

9   in connection with Linear Technologies' objection.  The dates

10  and stuff are set forth in the objection but I just thought it

11  would be helpful if the Court had these to just, kind of,

12  provide a little context.

13      MR. BUTLER:  Your Honor, these are e-mail exchanges

14  between the two law firms.  I'm not sure that they're relevant

15  but I'm not going to object to them if Your Honor wants to take

16  them in.

17      THE COURT:  All right.  Well, I haven't seen them.

18  Have you had a chance to look at them?

19      MR. BUTLER:  I just looked through them.  I mean -- I

20  -- they are what they are.  They're communications between two

21  lawyers.

22      THE COURT:  Okay.  So these aren't object.

23      MR. BUTLER:  I'm not going to object.

24      THE COURT:  All right.  So they'll be admitted.

25      MR. SULLIVAN:  Thank you, Your Honor.

128

1          MR. BUTLER:  All right, Your Honor.  So we would

2     mark -- just so the record's clear, the January 4th e-mail from

3     my colleague, Mr. Howe, and the January 5th e-mail from my --

4     also from my colleague, Mr. Howe, those e-mails would be

5     collectively marked as Exhibit 43.  Yes, 43.

6     (E-mails from Mr. Howe was hereby received as Debtors' Exhibit

7     43 for identification, as of this date.)

8          THE COURT:  Okay.

9          MR. BUTLER:  Okay.  Is there any other documentary

10    evidence that any objector has that they want to go into the

11    record.

12         MR. NYE:  A point of clarification, this is

13    Kasey Nye of Quarles & Brady representing Semi Conductor.  I

14    had filed a request for judicial notice yesterday evening and I

15    just wanted to clarify that one of the items was Dennis

16    O'Kerrin's (ph.) request for notice filed by my law firm on

17    October 19, 2005 at docket number 365, I just want a

18    clarification that that was in the record.

19         THE COURT:  I don't know but if it was filed in the

20    case I'll take judicial notice of it.

21         MR. NYE:  Thank you.

22         THE COURT:  I don't believe it's part of the exhibit

23    book but I'll take judicial notice of it.

24         MR. NYE:  Thank you, Your Honor.

25         MR. BUTLER:  All right.  Are there -- is there

1    anything else any other party has that they want to go into the

2    evidentiary record.  All right.  Then, Your Honor, I would move

3    the evidentiary record be closed and we'll move to argument.

4         THE COURT:  Okay.  Let's do that.

5         MR. BUTLER:  All right.  Your Honor, the -- I think

6    there are three groups to deal with here and I'm going to

7    suggest we, sort of take them in that order.  The first is the

8    deal with what I will call the pure counterparties.  That is

9    counterparties who signed the notices.  We filed the motion to

10   strike, they filed a motion to object or an objection to our

11   motion to strike.  Seventeen of the 168 notices involved those.

12   I indicated on the record already who those parties were and

13   what the -- the objections were.  And we stand by our

14   objections, Your Honor, with respect to that and I think it

15   might makes sense to just ask those parties if they want to

16   address the Court and I can just run through the list.

17        THE COURT:  Well -- well, before doing that, most of

18   these are on the basis that the original form was not

19   submitted, the one with the bar code on it.

20        MR. BUTLER:  Correct.  A hundred and seven, counting

21   duplicates, 107 of the -- if I --

22        THE COURT:  But most of these seventeen, I'm talking

23   about most of the seventeen fall into that category.

24        MR. BUTLER:  Correct, Your Honor.  Most of the

25   seventeen do.  Exactly.  Oh, yes, of that group most of the

130

1    seventeen says they didn't file the original notice that was

2    sent to them.

3        THE COURT:  Right.  Now, the -- the form was -- the

4    notice was very clear.  The notice said file the original.

5        MR. BUTLER:  Right.  And the order said it too.

6        THE COURT:  And the order said.  I guess, before

7    getting into whether someone has an excuse for not filing the

8    original or disputes with the debtor that in fact they did file

9    the original, I -- I'd like to hear first the purpose of this

10   provision because I'm not quite sure how it applies,

11   necessarily, to original holders -- to counterparties.

12       MR. BUTLER:  The purpose -- the original purpose of

13   this, Your Honor, was knowing that we were going to send out

14   1,700 notices that were going to implicate a couple hundred

15   million dollars of cures and understanding that notice, under

16   the solicitation procedures order, involved, among other

17   things, selecting between plan currency and -- potentially plan

18   currency and a cash payment and either foregoing the interest

19   calculation or not, the debtors believe that this was -- from

20   the beginning and made the case at the solicitation procedures

21   hearing that these notices were quite important and that the

22   actual form we did not want to get, I won't say that they're

23   the same as money but they were -- we considered something of

24   value, we wanted to track them so they -- the originals were

25   color coded and bar coded so that the -- nobody got more than

131

1    one original.  So there were 1,700 originals created.  We

2    wanted to get those back.  We wanted to be able to track them.

3    Mr. Unrue, in his declaration, describes the confusion created

4    by having multiple claims on the same basis.

5         As it turned out, people simply manufactured forms.

6    And so --

7         THE COURT:  But -- but the rationale was to make sure

8    that the right entity --

9         MR. BUTLER:  Right

10        THE COURT:  -- was making the election and returning

11   the -- returning the cure amount disputed if that --

12        MR. BUTLER:  Correct.

13        THE COURT:  -- was their issue.

14        MR. BUTLER:  And making sure that the right party --

15   that the counterparty only had one of those forms not -- we

16   weren't looking at them to submit seven of them.

17        THE COURT:  Right.

18        MR. BUTLER:  And we sent them -- that's why, under

19   the procedures that are approved in the solicitation procedures

20   orders we said look, if we had ten addresses for them we sent

21   the original to what we believed to be the appropriate address

22   and we sent nine copies of it watermarked, you know, don't file

23   this one to every other address we had.  You know, so that they

24   would get notice of it and said be sure to file the original.

25        THE COURT:  So, with regard to these fifteen or so of

132

1    the counterparties, has there been any prejudice to the debtor

2    on that basis?  I mean the debtors know, I guess, at this point

3    that these are the right parties, is that right?

4        MR. BUTLER:  Yeah, we do know that these are the

5    correct parties, Your Honor.

6        THE COURT:  And as far as duplications are concerned,

7    do these -- were more than one notice filed for these people?

8        MR. BUTLER:  In some cases the answer is yes.

9        THE COURT:  But that's been gone through?

10        MR. BUTLER:  But I believe Mr. Unrue, who has been --

11    who has long experience with the claims administration process.

12    Mr. Unrue's here, he's also responsible for the claims -- the

13    cure process.  I think he would concede to the Court that given

14    the volume of these seventeen that the debtors can sort that

15    out.

16        THE COURT:  Is that right?

17        MR. UNRUE:  Yes, it is.

18        THE COURT:  Okay.  All right.  Now, I was writing

19    fast enough, one of these, you said, was improperly executed by

20    --

21        MR. BUTLER:  Yeah.  There was a Spartech --

22        THE COURT:  Spartech, yes.

23        MR. BUTLER:  -- we listed it as a schedule -- there

24    was actually --

25        THE COURT:  It's both three and two.

133

1          MR. BUTLER:  Right.  Correct.  Right.

2          THE COURT:  So when you say improperly executed, in

3   what way was it improperly executed.

4          MR. BUTLER:  I have to look at that particular claim,

5   Your Honor.

6          THE COURT:  Okay.  Are you here for Spartech, sir?

7          MR. GOING:  Yes, Your Honor.  David Going from

8   Armstrong Teasdale in St. Louis, Missouri, representing

9   Spartech and Spartech Polycom.

10         THE COURT:  Okay.

11         MR. BUTLER:  The package that was received, Your

12  Honor, didn't have a signature -- wasn't signed.

13         THE COURT:  All right.

14         MR. BUTLER:  The form came in --

15         THE COURT:  Do you dispute that or --

16         MR. GOING:  Your Honor, we learned about that

17  yesterday morning at 8:30.  We actually obtained a declaration

18  from a Daniel Adler at Spartech who was the one who actually

19  filled out the form, took it to the CFO, watched him sign it,

20  put it in a FedEx pouch and overnighted it.  We've tendered

21  that.  I believe it is identified as Exhibit 23B.

22         THE COURT:  Okay.

23         MR. GOING:  So we do dispute it.  We believe --

24         THE COURT:  So there's an evidentiary issue as to

25  whether it was signed or not?

134

1        MR. BUTLER:  Well, I don't think there's evidentiary

2    as to whether it was signed.  It's just that they -- I don't

3    know.  Are you asserting it was signed because we have one that

4    has no signature?

5        MR. GOING:  Yes, we -- actually what they -- what the

6    debtor says they received at KCC is a mish mash of a bunch of

7    documents some of which have handwriting on the top, but there

8    is no signature.  That's why we tendered the declaration, to --

9    to bring clarity to the issue that we actually put it in a

10   FedEx pouch and delivered as an executed document.  And

11   attached to the declaration of Daniel Adler is, in fact, the

12   document -- copies of the document she put into that pouch, one

13   of which is the executed signature page by Randy Martin who is

14   the CFO.

15       MR. BUTLER:  And Your Honor, I've consulted with Mr.

16   Sheehan and others about this, I mean, from our perspective --

17   the debtors believe we're obliged to carry out the solicitation

18   procedures order and Your Honor's prior rulings.  And so we

19   filed objections we did based on a good faith analysis of what

20   those issues are.  We don't have any particular issue.  If Your

21   Honor's prepared to find here, based on this record and on the

22   affidavit submitted, that -- that it is the same as having the

23   signature, I don't know that, you know, I think we'd understand

24   that.  We're talking about pure notices, what I'll call notices

25   by counterparties or objections by counterparties where the

135

1    counterparties provide evidence to Your Honor and Your Honor

2    decides that's sufficient, I think we would understand that

3    ruling.

4              THE COURT:  Okay.

5              MR. BUTLER:  The --

6              THE COURT:  Well, let me -- let me move on then to --

7    I'm not ruling yet but I'm moving on to the last group, and

8    maybe it's just one, actually, based on my notes which is there

9    was one -- I guess it was Linear --

10             MR. BUTLER:  Right.

11             THE COURT:  -- that was allegedly untimely and I know

12   Mr. Sullivan's going to contend that he didn't get enough

13   notice of it, if he's still here.  There he is.  But -- and

14   this -- this goes, I guess, for all of the -- all of the ones

15   that we're dealing with today.  As far as Linear is concerned

16   did -- did Linear make the cash election?

17             MR. BUTLER:  I believe they did.

18             MR. SULLIVAN:  Yes, Your Honor.

19             THE COURT:  Okay.

20             MR. SULLIVAN:  And that's the only issue that we have

21   with it.  We don't have any issue with respect to the cure

22   amount Your Honor.

23             THE COURT:  All right.  What -- what, sort of,

24   reliance, if any, did the debtor place on -- on the fact that

25   it didn't have the form on a timely basis?

1        MR. BUTLER:  Well, Your Honor, the reliance we

2   replaced is the fact that once we got -- and you may recall

3   that some of this was discussed at the confirmation hearing,

4   some have been discussed with our exit lenders and -- and plan

5   investors and others, subsequently.  The fact is we had

6   original estimates about what the -- I indicated to you the

7   cure notices that had everybody chosen to elect cash would have

8   been upwards of 200 million dollars.  The fact that we got

9   conforming notices in that were totaling substantially less

10  than that, probably sixty to seventy million dollars less than

11  that, that fact has been taken into consideration in

12  discussions with our exit lenders, our -- the lead arrangers,

13  with our plan investors in information we provided to our

14  committees in trying to sort out how we emerge.  As Your Honor

15  has pointed out in at least two or three other contexts in

16  recent weeks in rulings you've made from the bench, cash for

17  this company is material.  It's material to all stakeholders.

18       And so, the real question is on behalf of anyone who

19  is seeking to get paid in cash here, you know -- you know, is

20  the Court going to permit them to, essentially, not file --

21  absent some other showing not follow the rules that applied to

22  everybody else?  I mean, and your orders, the powers of the

23  Court.  I mean, just to say it the solicitation procedures

24  motion and the notice of it was served on all creditors in this

25  case.  It was -- it was the subject of a disclosure statement

137

1    hearing that commenced on October 3rd and continued through

2    till mid-November or early -- I think December 6th was when it

3    was finally decided.  And the -- you know, so -- the reliance

4    is that we do believe, and Mr. Sheehan would tell you here,

5    Your Honor, if you wanted to discuss it with him on the record;

6    he would tell you that we do view -- there is a, I think,

7    detrimental reliance by the debtors as to what we think the

8    cash payments are in the aggregate with respect to this

9    election that was provided.

10        THE COURT:  When -- when are you filing the S1?

11        MR. BUTLER:  Next week.

12        THE COURT:  At what time next week?  I mean, what day

13   next week?

14        MR. BUTLER:  We are -- I don't know that I want to

15   say that publicly but we're trying to do it early in the week,

16   Your Honor.

17        THE COURT:  Okay.  And am I right that the -- there

18   would be time to alter the amount somewhat of the rights

19   offering while the S1 is pending or am I wrong on that?

20        MR. BUTLER:  No, no.  We'd have to amend that -- we

21   have to know -- we have to submit -- I mean, as I understand

22   it, I'm not the technical expert on this as far as the rights

23   offering folks.  But I think we need to understand what the

24   numbers are.  We could alter it but we'd have to amend it and

25   then it would be a delay.  We're actually filing a notice, an

138

1    amendment and a request to go immediately effective.

2         THE COURT:  Okay.

3         MR. BUTLER:  And -- and -- because we intend to -- to

4    launch the rights offering on our present time table, very

5    early in March.

6         THE COURT:  Okay.

7         MR. SHIFF:  Your Honor, if I may for one second.  I

8    know you'll hear from us later with respect to our specific

9    issues.  As to the timeliness issue, there is some deposition

10   transcript information we can put in later.  I just -- I know

11   the Court asked the question so obviously Mr. Butler had to

12   answer it appropriately, as he did.  I would just ask that that

13   not be taken into evidence here, rather just, you know,

14   colloquy with Mr. Butler.  You know, there's no evidence as to

15   who relied on what, when, etcetera.  I mean, that was simply, I

16   think -- he answered the question which he had to do but I just

17   thought that it shouldn't be part of the evidentiary record

18   here.

19        THE COURT:  Well, I mean, I did have a hearing

20   including -- on confirmation that included --

21        MR. SHIFF:  Your Honor, if it's the record already,

22   certainly.

23        THE COURT:  Okay.

24        MR. SHIFF:  To that extent there's no problem.

25        THE COURT:  That included the amount of cash the

1  debtors were planning on having on emergence and they're

2  sources and uses of cash.  Okay.  Mr. Sullivan, well, why don't

3  you come up.  But how -- how untimely was this notice?

4       MR. SULLIVAN:  Your Honor, it was thirteen hours

5  late.  The notice was due 7 PM on a Friday, they received it

6  8:46 AM on Saturday.  I doubt they even finished going through

7  all the -- all the forms that they received by that time.

8       THE COURT:  Okay.  Have you made a request under

9  Pioneer?

10       MR. SULLIVAN:  Yes, Your Honor.

11       THE COURT:  Okay.  That's set forth -- when did you

12  file that?

13       MR. SULLIVAN:  It's set forth in the objection.

14       THE COURT:  And that was -- when was that filed?

15       MR. SULLIVAN:  It's one of the exhibits.  It's --

16       THE COURT:  No, I -- just -- just the date.  When did

17  you make the objection?

18       MR. SULLIVAN:  The -- I think it was on the objection

19  deadline which was a couple of days ago, I guess.

20       THE COURT:  Okay.  Okay.

21       MR. SULLIVAN:  Your Honor, as is -- was indicated --

22  I mean, I don't want to -- if you've read through the papers

23  thoroughly, and I don't mean to repeat this, but, you know, the

24  client's position is that it never got the notice.  It didn't

25  get the -- it got a copy of it the first time only because I

1    proactively asked Skadden, debtors' counsel, if any notices had

2    been sent with respect to any of my clients because I called my

3    clients and none of them go it.  So I finally got copies of

4    them on -- on January 4th.  I didn't get the duplicate

5    originals until January 7th, which if you exclude the date that

6    they actually had to be there because in order to get it there

7    you're going to have overnight it the night before, that really

8    only leaves you four -- four business days, Your Honor, to get

9    it in.

10       THE COURT:  Is there -- is there anything wrong with

11    the address in the affidavit of service?

12       MR. SULLIVAN:  I don't believe so but with respect to

13    Linear Technologies the addresses were -- were with other --

14    with other clients there were problems with the addresses.

15       THE COURT:  No, but I'm talking about Linear.

16       MR. SULLIVAN:  I don't believe there was any problem

17    with that address.  I can -- I can tell you that in connection

18    with, you know, at Linear Technologies there's one in-house

19    counsel who had an operation in December so he was out of the

20    office on medical leave for about a month.  And, you know, he

21    didn't end up returning to the office until January 14th, after

22    this time.  The letter was not addressed to anyone

23    specifically.  This is a multi-billion dollar company.  So the

24    fact that, you know, a notice was sent to a very large company

25    with no, you know, no addressee to it it's not surprising.  I

1    can't imagine if somebody sent a letter to the Court just

2    addressed U.S. Bankruptcy Court, you know, New York, New York,

3    you can imagine how long it would take to get Your Honor if

4    pertained to yourself.  I know the same thing in connection

5    with our own law firm, if we get a legal notice I may not get

6    it if it's not addressed to somebody specifically, it may take

7    a month for me to get it.  So I have a signed declaration in

8    the record indicating that no one at Linear received the

9    notice.

10         THE COURT:  Is there a notice provision in the

11    agreement?

12         MR. SULLIVAN:  In connection with what agreement,

13    Your Honor?

14         THE COURT:  The executory contract.  Is there a

15    notice provision in that?

16         MR. SULLIVAN:  Not that I'm aware of.  I don't think

17    so.

18         THE COURT:  Okay.  All right.

19         MR. BUTLER:  So, Your Honor, I think, unless any of

20    the other -- I can just repeat them -- the seventeen that we

21    admit in this category are just, very quickly, notices relating

22    to Clarion Corporation, Automodular Corporation, Alps

23    Automotive, McArthur Corporation, Spartech, Nubia (ph.),

24    Unifrax, Federal Screw Works, Linear Technology and Lifetime

25    Industries, Inc.

142

1          THE COURT:  All right.

2          MR. BUTLER:  And so as to those counsel, does anyone

3     else want to make any statements?

4          THE COURT:  Well, before -- before you do, let me --

5     let me just tell you, my -- my strong though preliminary

6     inclination is that for all of those -- of these entities that

7     the debtor contends did not file an original, my view would be

8     to, nevertheless, have it be counted.  As far as the unsigned

9     one is concerned, I would have that view also to have it be

10    counted.  And I know there's a dispute as to whether it was

11    signed or not but I would have it in and counted.

12         I need to hear more, in connection with the other --

13    other objections for motions to strike with regard to the

14    Linear one.  But I think that's the only one that's contended

15    to have been on time.

16         MR. BUTLER:  Yes, Your Honor.

17         THE COURT:  So, you -- in all likelihood you all have

18    won so you could speak if you want to but there's already a

19    downside if you do.

20         MR. STEIN:  Your Honor, you'll see why in a minute.

21         THE COURT:  Okay.

22         MR. STEIN:  Matthew Stein, Sonnenschein Nath &

23    Rosenthal on behalf of Molex.  I believe we were a counterparty

24    that did file an objection and we should be included in one of

25    the seventeen.

1          MR. BUTLER:  You are.

2          THE COURT:  I think --

3          MR. STEIN:  We are.

4          THE COURT:  I think he said Mulex.

5          MR. BUTLER:  No, no, no.  Molex is not and Molex is

6     not because the underlying notice was filed by TPG Credit

7     Opportunities Fund.

8          MR. STEIN:  And notice?

9          MR. BUTLER:  So we have you in a different category

10    We're not forgetting you.

11         THE COURT:  Okay.

12         MR. BUTLER:  We just --

13         THE COURT:  Just save that one.  Just save that one.

14    And I'll remember Linear.  I have to give a ruling on that

15    later.  I'm going to hear some more before I rule on that

16    issue.

17         MR. BUTLER:  All right.  So that group then --

18         THE COURT:  My strong inclination is -- is to deny

19    the request as to -- as to everyone other than Linear.  One of

20    the -- one of the issues I'm dealing -- I'm grappling with, as

21    far as Linear is concerned, is a timing issue under Pioneer and

22    how much notice needs to be given in respect of a request under

23    Pioneer.  And I think that plays into the issues of prejudice

24    and the debtors' plans going forward, including what you want

25    to do next week so that's why I'm still on the fence on Linear.

144

1          MR. BUTLER:  All right.  Your Honor, the next -- may

2     I move to the next group?

3          THE COURT:  Yes.

4          MR. BUTLER:  The next group that we think would be

5     appropriate to take up would be the -- the notices and there --

6     and these -- of the 168 notices, about 122 of them relate to

7     three members of the ad hoc committee.  Contrarian has twenty-

8     three notices at issue.  Argo has fifteen notices at issue and

9     ASM has eighty-four notices at issue.

10         You know, our view with -- the debtors' strong view

11    with respect to these three is they are absolutely bound by

12    Your Honor's ruling on January 10th at which this law firm

13    represented them and sought -- sought to have different

14    procedures put in place.  Your Honor denied that request,

15    indicated they were not entitled to file these notices and

16    therefore, I believe, as it relates to those parties their

17    objections should be overruled before we get to the merits on

18    any aspect of it.

19         THE COURT:  Okay.

20         MR. SHIFF:  Your Honor, Adam Shiff of Kasowitz Benson

21    Torres & Friedman on behalf of the three entities that were

22    just mentioned.  I'm happy to address the merits but on that

23    first point, I think the Court was very clear in court that day

24    that you did not have the transfer agreements or powers of

25    attorney before you and that when those were part of the

1    evidentiary record, that is something that you would consider.

2    I think on both pages 93 and 95 of the transcript you made it

3    very clear that one, go ahead, sort of, do your best that you

4    can with respect to forms; go get your people to do it.  Then I

5    understand you may be back here because maybe there wont' be a

6    conflict.  Maybe everything will get done.  And, I think,

7    specifically you did reference that the powers of attorney and

8    transfer agreements, which are now part of the evidentiary

9    record, were not part of that record.  And secondarily, you

10   invited us to come back and deal with whatever may or may not

11   be in dispute.  So I don't think there's any bases to say

12   because we had asked for some prophylactic over arching relief

13   to say hey give us authority to do all this stuff, which the

14   Court denied, in any way prejudices us today having followed

15   the procedures the best we can, which we'll talk about, having

16   submitted the proper forms now to the Court and getting the

17   determination that such claims are either appropriate or not

18   appropriate as the Court determines.

19            THE COURT:  Okay.

20            MR. BUTLER:  Your Honor, that's -- they did not

21   follow the procedure.  Your Honor's ruling was that, as I

22   understood it, ruling was that these notices could be filed by

23   cure parties not by --

24            THE COURT:  But if they -- if they got a proper

25   authorization to do it from the cure party under 9014, I would

146

1    think that that would be the equivalent of the cure party

2    filing it themselves.

3        MR. BUTLER:  Well Your Honor, I mean our view on that

4    is that could well be a violation of our supply agreement and

5    not enforceable.  These -- as Your Honor ruled in that thing,

6    365 deals with not just cure it deals with terms under which

7    things will be negotiated.

8        THE COURT:  No, I -- but that's a separate issue.  I

9    mean, I think what I'm focusing on now is -- is the very narrow

10   point which is whether -- not whether but to what extent are

11   these three entities bound by my ruling.  In fact, everyone

12   else too because I think that's there's a law of the case

13   issue.

14       MR. BUTLER:  We're going to get to that later.

15       THE COURT:  But -- but my -- my belief is that what I

16   -- what I told Mr. Shiff was that I did not want, and I didn't

17   think they had the right to, to have the purchasers who were

18   not assignees of the contract they were just purchasers of a

19   portion of the claim, to get in between the debtor and the

20   contract party.  However, if the contract party took

21   appropriate action, then that would be -- and I told them that

22   was something that they should try to accomplish -- that would

23   be sufficient.  Now that -- it brings the question what the

24   appropriate action is but it seems to me that I left that issue

25   open in that ruling.  I didn't -- I didn't preclude them from

1    taking an action that would properly evidence the -- the

2    counterparty's desires vis-a-vis cure.  Now, I guess if in fact

3    the counterparty has done something contrary to another

4    agreement you have with them, that -- that may raise an issue.

5    But I think as far as the issue preclusive effect of my ruling,

6    I don't think you could take it so far as to say that only the

7    counterparty had to file the notice or the response to the

8    notice.  They had to file something, arguably.  But -- so I

9    don't think they're necessarily precluded.

10        MR. BUTLER:  Well then, Your Honor, the question

11   is -- and then we can group Contrarian, Argo and ASM back with

12   everybody else because the other 150 notices --

13        THE COURT:  Well, there is -- there is, obviously,

14   still an issue about Pioneer.  And -- and they may end up being

15   different because of their involvement before but -- but I

16   don't think it's necessarily on a strict issue preclusion

17   basis.  It may be just as far as balancing the pioneer factors.

18   So while you're saying you're to group them with everybody else

19   they may still, ultimately, be different because obviously they

20   were really focused on this issue and, you know, they may have

21   excuses or reasons why the things didn't get filed or they got

22   filed the way they did.  But I'm not immediately lumping them

23   in with everyone else.

24        MR. BUTLER:  Well Your Honor, then the question, I

25   think, from the debtors' perspective in terms of how we move

148

1    from here, there are 151 notices still, putting aside the

2    seventeen, that are the subject then of the contested hearing.

3    And it seems to me the question is, of 151 notices what is Your

4    Honor going to require in order for a -- a notice not executed

5    by the contract counterparty in order for that to be a valid

6    notice to then go through and talk about the two, three and

7    four issues.  Because the -- it seems to me that, you know,

8    that from the company's perspective, you know, that, you know,

9    we need some guidance from Your Honor as to what it is that

10   claims originally were required to do in order for them to be

11   able to step into shoes.  In our view, when we actually thought

12   we had won this on the 10th, Your Honor.  I'm a little

13   concerned about Your Honor may be modifying your prior ruling.

14   But I thought that law is pretty clear that 365 does not permit

15   purchasers to -- to interfere with the cure and contract

16   assumption relationship between --

17         THE COURT:  I --

18         MR. BUTLER:  -- the debtors and a contract party.

19         THE COURT:  It seems to me that if the contract party

20   has -- has enabled the timely notification of the debtor with

21   the proper power of attorney, under 9014, then they've, you

22   know, they've done what they need to do.

23         MR. BUTLER:  So maybe the Court --

24         THE COURT:  I mean, it -- the exception that I was

25   taking to your -- to your issue of preclusion argument is -- is

1    a narrow one.  I -- I believe that the scheme enacted as part

2    of 365 is that the debtor deals with the contract party.  But I

3    -- I think that the contract party can make it clear to the

4    debtor that it is properly authorized a third party to deal in

5    its stead in that negotiation or that motion, 365 motion.  If

6    there's proper evidence of that, and I think it's more than

7    just an assignment form, and I don't mean a contract assignment

8    form I mean, you know, a claim assignment form.  It can be a

9    contract assignment form or it can be, I think, a proper power

10   of attorney.

11        MR. BUTLER:  I think we -- I don't think anybody in

12   this courtroom is asserting that they had the supply agreement

13   assigned to them.  So I think we can put that aside.

14        THE COURT:  So I think we're talking about an

15   appropriate power of attorney from these people.

16        MR. BUTLER:  So maybe the question then -- the way to

17   proceed on this, Your Honor, is to run -- run through the

18   objecting parties and just ask who is asserting that they have

19   evidence that they have powers of attorney that were executed

20   in accordance with 9014 prior to the submission of the form, is

21   that the question, Your Honor?

22        MR. SACKS:  Your Honor, Ira Sacks on behalf of twenty

23   contract counterparties.  I think the question is a little bit

24   broader than that.  I think that if you heard from some of the

25   counterparties as to what they did both on the 11th and after

1    the 11th to make it very plain that the person who signed,

2    whether it be an attorney because an attorney is different --

3    an attorney signing is different, as Your Honor knows, under

4    9010(a) than the requirement of a power of attorney under

5    9010(c).  I think it still would be useful for Your Honor to

6    hear exactly where each of us are because it will illustrate

7    the issues.  And there's also -- and there's also another over-

8    arching issue which is the total failure of the debtor to

9    comply with Local Rule 9078-1.  Which, if they had complied

10   with many of these signing issues wouldn't have arisen.

11       If they had filed the certificate of service, the

12   affidavit of service, within three days of December 21, people

13   would have known where to look for these forms.  People

14   wouldn't have been running around like chickens without heads

15   on the 9th, 10th and 11th.  And people wouldn't have had to

16   look and say okay fine I don't have enough time I need to

17   authorize somebody else to sign for me.  And that -- and that

18   is the overarching issue that I think the Court needs to deal

19   with, which is that it's very clear that 9078-1 wasn't complied

20   with.

21       THE COURT:  Well, it's interesting because Mr. Shiff

22   didn't even raise that issue when he argued with me.  He said

23   he didn't know who his assigned counterparties were.

24       MR. SACKS:  Well, I --

25       THE COURT:  So you could -- you could convince me

151

1   that this was an earth shattering event but I think you have a

2   record to deal with on that score.

3       MR. SACKS:  Your Honor, we're not part of the ad hoc

4   committee and we -- and we were asking, and it's in the

5   affidavit and it's in the record, we were asking KCC, starting

6   on January 4th, to give us the list of who got these notices

7   and where.  That list is contained in the affidavit of service

8   that Mr. Gershbein filed.

9       THE COURT:  All right.  I -- that's fine.  But I

10  guess I would like to hear from the objectors and -- and this

11  is only as to those who have filed something on a timely basis.

12  I'll deal with the untimely issue later.  But it's to those who

13  filed on a timely basis, what is the evidence they -- they

14  provide that the debtor and the Court should be relying on what

15  the filed as opposed to the inaction or filing of their

16  counterpart.

17      MR. BUTLER:  Your Honor -- excuse me one moment.  In

18  that -- with respect to that, we filed in our omnibus reply, as

19  Exhibit 5 to it, an analysis of whether or not a valid power of

20  attorney was filed, prepared, as to every one of these.  And at

21  least as to our analysis concludes that none of them filed

22  valid powers of attorney, based on the analysis set forth in

23  our omnibus reply.  So perhaps that can -- they can -- if

24  people speak to it, they can speak to that chart.

25      MR. SACKS:  Your Honor, I'm happy to speak to that as

1   well.

2          THE COURT:  Okay.

3          MR. SACKS:  Ira Sacks from Dreier LLP, we represent

4   twenty contract counterparties totaling 15.3 million dollars.

5          THE COURT:  Well, wait.  Do you represent the

6   counterparties?

7          MR. SACKS:  For this purpose we represent the

8   counterparties.  We also represent --

9          THE COURT:  Well, no, let me make sure I understand

10  that.

11         MR. SACKS:  We represent the counterparties, Your

12  Honor.

13         MR. BUTLER:  Your Honor, they also represent Silver

14  Point who is --

15         MR. SACKS:  I was just going to say that, Your Honor.

16         MR. BUTLER:  -- who is the trade purchaser who is

17  also an additional plan investor.

18         THE COURT:  No.  No.  When you say you represent the

19  counterparties, do you actually represent the party to the

20  contract with the debtor?

21         MR. SACKS:  For purposes of this hearing, yes Your

22  Honor.

23         THE COURT:  They have authorized you to represent

24  them?

25         MR. SACKS:  Absolutely.

153

1          THE COURT:  And you've filed a 2019 to that effect?

2          MR. SACKS:  I don't believe so.  But we have filed --

3     we have filed the -- we have filed powers of attorney

4     authorizing us to act and its part of the record.

5          MR. BUTLER:  But not timely.

6          MR. SACKS:  Well --

7          THE COURT:  Well, no, I'm just talking about who he's

8     appearing for today.

9          MR. SACKS:  We are appearing for those parties today.

10    The powers of attorney authorizing us to act for them, for all

11    twenty of these, are part of the record.  Those powers of

12    attorney were signed after January 11th when we found out there

13    was an issue about this.  And we absolutely represent

14    Silver Point, Your Honor, but not for purposes of today.

15         And, you know, just to put this in context because I

16    do think the 9078 issue is an important issue and I don't -- I

17    don't know why Mr. Shiff didn't raise it, I only know that it's

18    an important issue and we raised it in our objection.

19         THE COURT:  I think Mr. Rosner was -- well, never

20    mind.

21         MR. SACKS:  But because of the way the solicitation

22    procedure order allowed these notices to be addressed, many

23    people didn't get them until the last minute.  And that left,

24    at least our -- most of our twenty contract counterparties with

25    the impossibility of directly signing and returning the

154

1    original notices.  As a result, on January 10 we asked --

2    Dreier New York asked for an extension from the debtor and that

3    was rejected.

4         In an attempt to meet the January 11 deadline, with

5    respect to eleven of the clients, a letter was executed

6    authorizing Dreier to sign as attorney in fact for those

7    parties.  Each of the authorization letters, and they're part

8    of the record Your Honor, directed Dreier how to complete the

9    form including whether the contract counterparty accepted or

10   disputed the cure amount and whether they wanted to elect cash

11   or plain consideration.  Each authorization letter was clear

12   and unambiguous.  Dreier signed on behalf of those contract

13   counterparties and attached the authorization letter.

14        Now, we believe, under 9010(a) that that's enough.

15   But to avoid any issue about it powers of attorney have been

16   executed by those eleven counterparties.  Powers of attorney

17   fully consistent with 9010(c).  Those are also in the record.

18   Those specifically ratify the cure notices as executed by

19   Dreier and take effect retroactively to January 11th.

20        THE COURT:  Well, let me make sure I -- I -- some of

21   the clients -- some of the counterparties didn't sign the --

22        MR. SACKS:  Of our twenty, eleven were signed by

23   Dreier as attorney in fact, one was signed by McDermott Will &

24   Emery as attorney in fact and eight were signed by Silver Point

25   as -- as agent and power of attorney.

155

1          MR. BUTLER:  But not as attorney at law, correct?

2    You as a lawyer were acting as an attorney in fact, is that

3    what you're saying?

4          MR. SACKS:  We were given --

5          MR. BUTLER:  I'm just asking -- I'm trying to find

6    out which rule you're operating under.  Are you appearing in

7    court today as a lawyer?

8          MR. SACKS:  Today I'm appearing as a lawyer.

9          THE COURT:  No, I -- I'm focusing now on what

10   happened on January 11th.

11         MR. SACKS:  On January 11th we signed as attorney in

12   fact.  The authorization to appear today is not as attorney in

13   fact it's as attorney at law.  But on January 11th we signed as

14   attorney in fact pursuant to authorization letters to resolve

15   any issues --

16         THE COURT:  But that was as to eleven of the twenty?

17         MR. SACKS:  Eleven of the twenty.

18         THE COURT:  Okay.  What about the other nine?

19         MR. SACKS:  As to one of the others, it was similar,

20   which is that McDermott Will & Emery signed.

21         THE COURT:  And they had the same letter from the --

22   the counterparty?

23         MR. SACKS:  I don't believe so, Your Honor.  But

24   perhaps McDermott can talk to that.  Excuse me one second,

25   Your Honor.  They did not have a letter, Your Honor, but there

156

1   has been a ratification dated roughly around the 14th of

2   February --

3        THE COURT:  Okay.

4        MR. SACKS:  -- in the record.  With respect to --

5        THE COURT:  And that --

6        MR. SACKS:  -- with respect to --

7        THE COURT:  And then the other eight?

8        MR. SACKS:  The other eight were signed by Silver

9   Point as agent with the power of attorney under the claims

10  transfer agreement.  Those also were ratified by the eight

11  counterparties, subsequent to that, retroactive back to January

12  11th.

13       THE COURT:  Well, what was -- what was the power of

14  attorney under the claims transfer agreement?

15       MR. SACKS:  The claims transfer agreement has a

16  typical power -- appointing agency and power of attorney for --

17  I forget the exact language.

18       MR. BUTLER:  Your Honor, while he's looking for the

19  language, there's no -- I'm not aware of any provision in a

20  power of attorney in an accounts receivable purchase agreement

21  that would give the right for that party to act as agent with

22  respect to a 365 cure.

23       MR. SACKS:  Which is why rely on the ratification,

24  Your Honor.  It's -- the issue here is -- is why is it that the

25  debtor gets to assume these contracts and not pay for them.

1       MR. BUTLER:  No, we do.  We get --

2       MR. SACKS:  Excuse me, Your Honor.  I didn't

3  interrupt counsel.  It's -- what's very clear in these notices

4  under 365 is who's on it, who did it, what they wanted to do

5  and that the person signing for them was authorized to sign for

6  them if not on the day --

7       THE COURT:  Well, excuse me, not on the date that it

8  was submitted.

9       MR. SACKS:  Well, I believe that with respect to the

10  Dreier signatures, yes on the date.  And I would also submit

11  this goes to my point about Local Rule 9078 that's won, Your

12  Honor, this whole fire drill wouldn't have happened if on

13  December 26th or December 27th the affidavit of service had bee

14  filed.  Because if it had been filed then each of these

15  contract counterparties would have known where the letter --

16  where the notice was sent because that's on there, whether it

17  was addressed to anybody and --

18       THE COURT:  Well --

19       MR. SACKS:  -- and Rule 9078 is one where it's

20  mandatory.  It doesn't say may file.

21       THE COURT:  I guess I'm -- it seems to me you're

22  begging the question a little bit.  I mean, they got the

23  notice, didn't they?

24       MR. SACKS:  They got the notice too late to do

25  anything about it.  Too late to do it the way that --

158

1          THE COURT:  How do -- how do we know that?

2          MR. SACKS:  It's in the record, Your Honor, with

3     respect to what we did to try.  It's in the --

4          THE COURT:  No, but when did -- when did the

5     counterparties get the notice?

6          MR. SACKS:  Many of them got it on the 10th and the

7     11th.

8          THE COURT:  And how do we know that?

9          MR. SACKS:  It is in the objection that we filed.  I

10    mean, part of this --

11         THE COURT:  All right.  I -- I --

12         MR. SACKS:  -- part of this is the nature of this

13    whole fire drill.

14         THE COURT:  Is that based on their affidavit or on

15    something other than that?

16         MR. SACKS: It's something other than that.  But the

17    fact of the matter is --

18         THE COURT:  NO, but what it is?  What's it based on?

19         MR. SACKS:  It's based -- look, Your Honor, in the

20    scheme of things what we wound up with was we put in an

21    objection in a timely matter.  We made a Pioneer motion in a

22    timely manner with respect to the circuit --

23         THE COURT:  Can you just answer my question?  Was it

24    because it was served late?

25         MR. SACKS:  No.

159

1        THE COURT:  Or was it because of a self-serving

2   affidavit that says I didn't get it, because the law is

3   different on one or the other.

4        MR. SACKS:  Your Honor --

5        THE COURT:  The law is very clear; a self-serving

6   affidavit that says I didn't get it usually doesn't override an

7   affidavit of service.

8        MR. SACKS:  I don't have any issue with the affidavit

9   of service and therefore I'm sure it was served in a timely

10  manner.

11       THE COURT:  Okay.

12       MR. SACKS:  It was served -- but the fact of the

13  matter is, as belt to suspenders, which is why we believe Local

14  Rule 9078 requires the filing of the affidavit of service.  If

15  it had been filed -- Your Honor, this was over the Christmas

16  holiday, I understand that.  This was addressed the way Your

17  Honor said to address it, I understand that.  But it would have

18  been possible to find these things far more quickly if the

19  affidavit of service had been filed as is mandated by --

20       THE COURT:  You're talking about -- about the -- now,

21  which client of yours are you talking about finding this thing?

22  Right now you're talking about Silver Point, right, not the --

23       MR. SACKS:  No.

24       THE COURT:  -- not the contract parties?

25       MR. SACKS:  Neither the contract parties nor Silver

160

1  Point new, and Silver Point called, and this isn't an affidavit

2  directed at --

3          THE COURT:  How could they not know.  You just said

4  you have no problem with the affidavit of service.

5          MR. SACKS:  The affidavit of service wasn't filed

6  until the 8th, Your Honor.

7          THE COURT:  No, you have no problem that it was

8  served when it was supposed to be served.

9          MR. SACKS:  Yes, the question is when people actually

10 got the notices, Your Honor, the cure notices.

11         THE COURT:  I'm going to say this one more time.  Do

12 you have some proof, besides the self-serving affidavit, that

13 the counterparties got the notice some time that suggests that

14 it wasn't served when it was supposed to be served?

15         MR. SACKS:  No, Your Honor.

16         THE COURT:  All right.  So when you say that the

17 failure to file the affidavit of service within three days of

18 the service made it hard for people to know that they were

19 being served, who are you referring to when you say people, not

20 the counterparties, right?  Because they were served.

21         MR. SACKS:  Your Honor, they were served but as has

22 already been made part of the record, because of the way the

23 service was effected, in compliance with the solicitation

24 procedures order, but over the Christmas holiday, not directed

25 to a specific person, which is what the affidavit of service

161

1  says, it took a while for these things to flow up.  It just

2  did.  And I'm not -- I'm not being critical of the solicitation

3  procedures order.  I'm not seeking to re-write that and I'm not

4  saying that it wasn't served on the 21st.

5       THE COURT:  Flow up to whom?

6       MR. SACKS:  Flow up to the person who needed to sign

7  it, if it was going to be signed by the contract

8  counterparties.

9       THE COURT:  And you say that person would have --

10 would have looked for an affidavit of service when it wasn't

11 looking for receipt of this document in the first place?

12      MR. SACKS:  Your Honor --

13      THE COURT:  Wasn't sending an e-mail to the -- to

14 the -- to his companies saying you know the debtor made this

15 motion to assume anyone who gets it send it to the general

16 counsel?

17      MR. SACKS:  When Silver Point asked, in order to

18 figure out whether any of this --

19      THE COURT:  I'm not talking about Silver Point; I'm

20 talking about the counterparties.

21      MR. SACKS:  With respect to the counterparties, no --

22 quite frankly Your Honor, without the affidavit of service

23 until some -- until this cure notice flowed up onto somebody's

24 desk, which it didn't do with respect to --

25      THE COURT:  You're assuming that the counterparties

162

1    going to look for the affidavit of service?

2         MR. SACKS:  The counterparties would have known about

3    the affidavit of service.

4         THE COURT:  And you're assuming they would have

5    looked for that but they wouldn't have looked and they wouldn't

6    have instructed their organization to send us a notice from

7    Delphi?

8         MR. SACKS:  I can tell you why the counterparties

9    would have known about it if there was an affidavit of service

10   because Silver Point was looking for it and would have told

11   them.

12        THE COURT:  All right.

13        MR. SACKS:  And that's in an affidavit.

14        THE COURT:  Okay.

15        MR. SACKS:  Your Honor, I think the real issue here

16   is -- is why with ratified and clear -- with proper power of

17   attorney ratified signatures, proper elections very clear, why

18   this puts these counterparties, these twenty clients any

19   different than the other seventeen that counsel is talking

20   about.  The issue here is did somebody comply substantially

21   with Your Honor's solicitation procedures order.  And I submit

22   that all twenty of my clients did.  They submitted the form,

23   there's only one issue which I'll get to later with the non-

24   original form, they submitted the original form.  They were

25   signed by an attorney in fact or by someone else who they

163

1   believed was authorized at the time and if not was ratified

2   thereafter at a point when there is no prejudice at this point

3   to the debtors.

4        THE COURT:  How is the Silver Point signature

5   authorization?

6        MR. SACKS:  The Silver -- I'm sorry, Your Honor?

7        THE COURT:  How is the Silver Point signature

8   authorization?  What authority were they given?

9        MR. SACKS:  The first -- the first one or the

10  ratification?

11       THE COURT:  The first one.

12       MR. SACKS:  It was just in the claims -- in the

13  claims transfer agreement, Your Honor.

14       THE COURT:  Okay.  So they weren't given a general

15  power of attorney to deal with the --

16       MR. SACKS:  That's correct.

17       THE COURT:  But now the ratification is after the

18  deadline, right?

19       MR. SACKS:  The ratification is after the deadline

20  but ratifies the signature and it's -- and it was when we

21  knew -- when we first learned that there was an issue about

22  this, when the motion was made.

23       THE COURT:  So your clients would have reacted to an

24  affidavit of service but didn't know about the motion made by

25  Mr. Shiff's clients?

164

1        MR. SACKS: Your Honor, you ruled on Mr. Shiff's

2    motion.  And the issue wasn't whether we submitted -- Silver

3    Point didn't submit --

4        THE COURT:  Didn't Silver Point do exactly what Mr.

5    Shiff wanted to do?

6        MR. SACKS:  I don't believe so.

7        THE COURT:  How did it differ?

8        MR. SACKS:  I believe that Silver Point thought it

9    was authorized to sign on behalf of the contract counterparties

10   who authorized them to sign.  It's not that the contract --

11   these eight other counterparties --

12       THE COURT:  They're relying on the same general form

13   that Shiff's client did, aren't they?

14       MR. SACKS:  These eight contract counterparties had

15   sent the original forms to Silver Point believing that Silver

16   Point should sign them.  And by the time Silver Point got them,

17   and this is in the affidavit from Silver Point, it was too late

18   to send them back and say no, you've got to do it the other

19   way.  But I -- I do believe the mandatory nature of Rule 9078-1

20   Your Honor is not something that Your Honor should ignore.

21   It's there for a reason.  It's there for a reason which would

22   have been -- which would have been salutary in this

23   circumstance.

24       THE COURT:  Okay.

25       MR. BUTLER:  So, Your Honor, we're still dealing

165

1  with -- we've heard from Silver Point and -- I mean, I'm still

2  unclear and I think the record's unclear about who and how --

3  who Dreier represents here.  There's no 2019 on file.  I don't

4  know -- I thought counsel said that he had an attorney in fact

5  designation under 9010(c) which would not authorize them to

6  represent them as attorney at law here.  You know --

7      THE COURT:  I thought you said that you're authorized

8  under (a) to represent them here.

9      MR. SACKS:  We are authorized to represent them here

10  today, yes.

11      THE COURT:  Under 9010(a)?

12      MR. SACKS:  Yes.

13      THE COURT:  Okay.

14      MR. SACKS:  Not -- not as to the original signatures.

15      THE COURT:  No, I -- just to represent them here

16  today in court.

17      MR. SACKS:  Yes.  Here today in court, yes.

18      MR. BUTLER:  I'm sorry, I guess the question is who

19  else wants to say that they have some authority, you know, that

20  would be contrary to what we've said in Exhibit 5 to our reply.

21      THE COURT:  Okay.

22      MR. MCFADDEN:  Your Honor, Tim McFadden on behalf of

23  Methode Electronics.  Methode Electronics is a contract

24  counterparty, was subject to a cure claim.  Methode -- assigned

25  its -- its claims to First Accredit Liens (ph.), subsequently

166

1    they assigned the claim to Blue Angel Claims LLC.  We have

2    filed an objection.  The sole basis for the debtors' objection

3    to Methode's cure claim is that it was improperly executed by a

4    third party.

5         In Methode's instance the claims transfer agreement,

6    which is in the record as an exhibit to our objection, granted

7    a broad power of attorney.

8         THE COURT:  Can you read it?

9         MR. MCFADDEN:  I'm sorry?

10        THE COURT:  Can you read it to me?

11        MR. MCFADDEN:  Certainly.

12        MR. SAMBUR:  I'm sorry, Your Honor.  Keith Sambur of

13   Richards Kibbe & Orbe representing Blue Angel Claims.  We filed

14   a joinder to Methode's limited objection.

15        I think prior to reading the actual power of attorney

16   it might be important to actually also read what we've

17   purchased which indicates that the power of attorney applies

18   not only to the claim but also to the cure amount.

19        MR. BUTLER:  How can you purchase a cure?

20        MR. SAMBUR:  I'm sorry?

21        MR. BUTLER:  How can you purchase a cure?

22        MR. SAMBUR:  We purchased a claim.  Any amount, any

23   receivables related thereto, those were paid in cash, plan

24   currency or any other form of consideration.  We took, I guess

25   if you will, an assignment of the accounts receivable as the

1    debtors made clear in their cure notice, Your Honor.  The cure

2    was simply related to pre-petition arrearages under the

3    contracts which our clients purchased.  We did not ask nor at

4    any time did we request the debtors pay anybody else other than

5    the contract counterparty.

6         Under the broad power of attorney --

7         THE COURT:  Well -- why don't -- I'd like to hear

8    what it said.

9         MR. MCFADDEN:  Again, going back to Your Honor's

10   question, our -- paragraph 11 of the claims transfer agreement

11   states that seller, Methode Electronics, hereby irrevocably

12   appoints buyer as it's true and lawful attorney and authorizes

13   buyer to act in seller's name, place in stead, demand to/for

14   compromise and recover all such sums of money which are or may

15   hereafter become due and payable for or an account of each

16   claim of seller here and assigned.

17        The seller hereby grants under buyer full authority

18   to do all things necessary to enforce the claim and seller's

19   rights there under.  Seller agrees that the powers granted into

20   this paragraph are discretionary in nature and exercisable at

21   the sole option of buyer.  Buyer shall have no obligation to

22   prove, defend or take affirmative action with respect to

23   approving the validity or the amount of the claim.

24        THE COURT:  So what is your response to the debtors'

25   argument that 365 isn't dealing with a claim?

168

1       MR. SAMBUR:  Again, Your Honor, under -- under our

2  claim purchase agreement we bought not only the claim but also

3  the cure amounts.  They have offered no evidence --0

4       THE COURT:  It doesn't -- that's not what I just

5  heard.

6       MR. SAMBUR:  That said the word claim but it's not

7  used the word claim as that's defined in the Bankruptcy Code,

8  Your Honor.  It says defined --

9       THE COURT:  Do you have the ability to negotiate on

10  behalf of -- what is it --

11       MR. MCFADDEN:  Methode Electronics.

12       THE COURT:  -- Methode on behalf of assumption and

13  assignment of the contract?

14       MR. SAMBUR:  I believe under this broad power of

15  attorney we would, Your Honor.  And -- and again, I think

16  that's also --

17       THE COURT:  So if the debtor offers you -- what is

18  the amount of the cure?

19       MR. MCFADDEN:  An aggregate of 4.2 million --

20       THE COURT:  So if the debtor offers you 4.2 million

21  in cash you can revise the terms of the contract so that the

22  debtor makes up that 4.2 million in future performance?

23       MR. SAMBUR:  I believe, Your Honor, under the power

24  of attorney that's been granted here.

25       THE COURT:  Does Methode agree with that?

169

1        MR. MCFADDEN:  Methode -- Methode continues to

2   perform under the contract.

3        THE COURT:  But -- but did you confer upon Blue Angel

4   the ability to modify the terms of the contract going forward?

5        MR. MCFADDEN:  Our -- Methode's contract?

6        THE COURT:  Yes.

7        MR. MCFADDEN:  No.

8        MR. SAMBUR:  Your Honor, there was never any -- also,

9   again, going back to the cure notice, there wasn't any attempt

10  to renegotiate or remodify the contract.  The debtors state in

11  the cure notice, which is in the record, that this amount is

12  for pre-petition arrearages.

13       THE COURT:  I'm just talking about authority to deal

14  with 365.

15       MR. SAMBUR:  And the power of attorney, however, does

16  not delve into that area of 365.  It talks about payments.

17       THE COURT:  Okay.

18       MR. SAMBUR:  It doesn't talk about other contractual

19  rights.  We have not -- we have not attempted to interfere in

20  any way with the contractual rights --

21       THE COURT:  Was this power of attorney filed with the

22  cure notice?

23       MR. SAMBUR:  No, Your Honor.  It's our position,

24  under Rule 9010(a) that this is not a judicially filed

25  document.  And if you read 9010(a) it's -- there's no

1    requirement that a party need evidence it's a power of attorney

2    to act in this situation.  There's a case in the Fifth Circuit

3    Court of Appeals which we cited in our pleadings, it states

4    very clearly that there's a reason that documents such as these

5    need not be filed by the Court in this instance because -- for

6    the efficiency and ease of administration of the case.

7        I'd also like to point out that the debtors have not

8    made any argument under 9010(c) as to why that rule is

9    applicable here.  Quite to the contrary, they've taken the

10   position throughout these proceedings, Your Honor, that cure

11   amounts do not represent claims and the parties that are

12   holding them, the contract counterparties, are not creditors.

13   By its very clear nature, Your Honor, Rule 9010(c) only applies

14   to creditors and there is simply no reason to believe that we

15   have to document or evidence our power of attorney to act in

16   this case.  If the debtors wanted such evidence or believe that

17   these documents, which are not judicially filed and do not

18   constitute the practice of law upon submission, were to be

19   subject to those rules they should have clearly stated so in --

20       THE COURT:  But doesn't the order say that?

21       MR. SAMBUR:  No, it doesn't.

22       THE COURT:  The solicitation procedures order deals

23   with that issue.

24       MR. SAMBUR:  Your Honor, I do not believe it does.

25   The solicitation procedures order simply states that a contract

1    counterparty is the party to return these forms.  It doesn't

2    say that -- and as Your Honor pointed out that the contract

3    counterparty cannot properly delegate or authorize another

4    party as its attorney in fact or authorized agent to file these

5    documents.

6         THE COURT:  But -- but -- but where is it -- but it

7    hasn't done anything.  It didn't -- it itself didn't do

8    anything as part of the -- of the return of the forms.

9         MR. SAMBUR:  Actually, Your Honor, I would say that's

10   not true because Methode did, in fact, receive the original and

11   forwarded it along to my client who then engaged in a

12   discussion as to whether that cure amount is accurate and

13   discussed, simultaneously, about how that form should be

14   returned.

15        MR. MCFADDEN:  That's right.  The creation of all

16   these bar coded originals prevents -- would have prevented an

17   improper party from interfering with the contract

18   counterparties demands here.  So if the purpose of the original

19   bar code --

20        THE COURT:  Well, was the bar coded original the one

21   that was returned?

22        MR. SAMBUR:  Absolutely, Your Honor.

23        MR. MCFADDEN:  That's right.  So there's no concern

24   of non-interference with -- with contract counterparties and

25   with the value of the vendors because of the bar coded

172

1    originals.

2        THE COURT:  What's your response on that point?

3        MR. BUTLER:  Two points, Your Honor.  The

4    solicitation procedures order says that -- it says a lot more

5    than what counsel just said.  It says that the counterparties

6    are the ones that need to submit it.  And it says that the

7    debtors have no liability to and will not pay -- and shall not

8    pay the cure to anyone other than the counterparty.  That's

9    what the order says.  Which is -- I'm totally for this because

10   we wanted to keep this out of this case, as people try to argue

11   as to what rights they have or don't have.  It was precisely to

12   avoid this kind of a hearing and more like them.  As we try to

13   figure -- go forward and try to emerge.  And, Your Honor, from

14   my perspective I -- it's not clear to me at all -- Methode just

15   acknowledged that they did not assign the contract, they were

16   performing under the contract.  Cure relates to the contract.

17   They acknowledged they got the receipt, why they didn't sign it

18   is beyond me but they chose not to.  And they didn't give any

19   evidence of their right -- of the right of the third party to

20   sign it.  If you look at our -- line 219 of our Exhibit 5, they

21   haven't done anything to -- what they're relying on is the

22   power of attorney in an accounts receivable claims purchase

23   agreement.  Which Your Honor, I believe, already ruled back in

24   January is not -- has no relationship to and does not cover

25   365.

173

1          THE COURT:  I did do that.  Well, as a practical

2    matter, I mean, Methode's standing here.  They could give Blue

3    Angel, unless Blue Angel sold it to someone else, they could

4    give someone a 9010(c) power of attorney today.  And Silver

5    Point's argument is basically, except as to the nine that they

6    filed, essentially it comes down to the same thing which is we

7    fixed it all after the fact.  What is the debtors' response on

8    that?

9          MR. BUTLER:  I think Your Honor has to decide whether

10   we're going to enforce the procedures order or not and whether

11   we're going to -- you know, whether we're going to let people

12   cure things after the fact or not.  From -- you know, I

13   indicated earlier we had three or four goals in this.  And, you

14   know, the priority goal I have is to get a clear ruling from

15   the Court what we're supposed to do before the rights offering,

16   that's most important, I think.

17         Secondary to that is preserving the integrity of the

18   solicitation procedures process.  Because there's other people,

19   you know, who didn't file -- you know, who didn't file

20   responses to these objections because they recognized that they

21   didn't qualify.  And what we have here are people trying to --

22   to get the rules changed so that their claims, and it's not

23   insignificant, just to say it Your Honor, if Silver Point as an

24   additional plan investor if their rights are -- if their

25   arguments here are all accepted, the cash amount for claims

174

1    will go up by fifteen million dollars.  That's the -- that's

2    the total amount of what their claims are.  And, you know, at

3    the end of the day, Your Honor, I think we just need to

4    understand what the instructions of the Court are.

5         THE COURT:  Okay.  Where do your -- do you have one

6    or do you have all nine of the letters -- no I'm talking to

7    Silver Point's counsel.  What tab is that on the record?

8         MR. SACKS:  The claim assignments are the defendants'

9    exhibits and I don't know which number --

10        THE COURT:  No, I don't mean the claim assignments.

11   I mean the power of attorney, the direction to let --

12        MR. SACKS:  The power of attorney --

13        THE COURT:  -- Dreier file the nine.

14        MR. SACKS:  Well, those were actually attached to

15   what was filed.  Those were letters of authorization.  And

16   that's attached to the actual cure notices that were filed.

17        THE COURT:  No.  I'm --

18        MS. RUSSELL:  Your Honor --

19        THE COURT:  -- just saying where in the -- where in

20   the exhibit book do they --

21        MS. RUSSELL:  Your Honor, if I may?  Maura Russell of

22   Dreier LLP.  I do have more specific information to tie to the

23   schedule.  Schedule II, that was submitted by the debtor in

24   conjunction with the declaration of Mr. -- the gentleman from

25   KCC.  I apologize, I'm having -- Mr. Gershbein.  I believe

175

1  those are the schedules to the actual motion with the details.

2  I have this --

3          THE COURT:  I want to read the letter, the power of

4  attorney that was attached to the --

5          MS. RUSSELL:  To the cure notice.

6          THE COURT:  To the cure notice.

7          MS. RUSSELL:  Yes, Your Honor.  If we can look for --

8  perhaps Mr. Butler would provide some assistance on -- I don't

9  have the set in front of me -- to --

10         MR. BUTLER:  Exhibit 31, I believe, is the -- we're

11 looking for the --

12         MS. RUSSELL:  In Schedule 2, tab number 11.  That is

13 the Siro Industries cure notice.  And attached to that cure

14 notice would be on --

15         MR. BUTLER:  Exhibit 2.

16         MS. RUSSELL:  It's Schedule 2 to the -- of your

17 motion.  Again, I apologize, Your Honor.  It's -- wherever the

18 exact --

19         THE COURT:  No.  But this is the summary.

20         MS. RUSSELL:  No, no.  The actual cure notices were

21 attached.  I received binders yesterday that I looked at where

22 they had copies of the actual cure notices.  Alternatively,

23 Your Honor --

24         THE COURT:  I don't have that -- Schedule 2 doesn't

25 have -- to the motion.  It just has a summary.

176

1          MS. RUSSELL:  In our objection, Your Honor, then --

2     they appear twice in the record in our objection --

3          THE COURT:  Okay.

4          MS. RUSSELL:  -- which is an eviden --

5          THE COURT:  No.  I have that.  What exhibit is it?

6          MR. SACKS:  Exhibit G, Your Honor.

7          THE COURT:  G, okay.  Let me just turn to that.  Can

8     you hand me a copy of that?  These exhibits all have exhibits

9     within them.

10         MR. BUTLER:  Your Honor, I can give you a sample of

11    it.  This is an example, Your Honor, of -- these are all

12    unnotarized, not in compliance with Rule 9010.  It's a good

13    example.  I think we agree, counsel agree, it's the form of

14    letter that was used.  I think we stipulate to that.

15         THE COURT:  This is the Siro Industries?

16         MR. BUTLER:  Yeah.  That's one of the nine.

17         THE COURT:  Right.

18         MR. BUTLER:  I think they're all very similar.  All

19    very similar.  And these letters were attached to the original

20    cure notices, Your Honor.

21         THE COURT:  Okay.

22         (Pause in proceedings)

23         THE COURT:  Okay.  So that the debtors' problem with

24    this is that it's not notarized.

25         MR. BUTLER:  It's not in compliance with 9010, Your

1   Honor.  And the que -- I want to be clear on this from my

2   perspective.  I sort of said it again.  There's a cash cost

3   associated with the debtors, forty million in the aggregate --

4        THE COURT:  No.  I --

5        MR. BUTLER:  And there's -- knowing what we need to

6   do for the rights offering.

7        THE COURT:  No.  This is -- and I appreciate we've

8   been jumping around.

9        MR. BUTLER:  Yeah.

10        THE COURT:  I see a distinction potentially between

11   the people who did not submit something like this on a timely

12   basis and those who are looking to retroactively validate what

13   they did.  I think all of the points about reliance, the cash,

14   etcetera, can be made as to the retroactive validation efforts.

15   This was filed timely and attached to the election.  It

16   doesn't -- it does not technically comply with 9010(c).  But I

17   think as far as prejudice is concerned, it's a little different

18   than the other ones.

19        MR. BUTLER:  And, Your Honor, I think in all of

20   these -- I just consulted with Mr. Sheehan during part of the

21   colloquy and just sort of say it, from the company's

22   perspective, what we called out in the motion to strike were

23   all the things that were noncompliant as a matter of law.

24        THE COURT:  Right.

25        MR. BUTLER:  -- up and down the board and we treated

1    everybody equally.  And it was, frankly, for the company to do

2    that because some people who are very close to the company got

3    very unhappy with the company when we called it out based on

4    what the rules are.  And our view here, what we said at the

5    beginning of this hearing is, to the extent Your Honor -- for

6    example, like the seventeen you've already said I'm inclined to

7    allow, if Your Honor is prepared to say that's good enough even

8    though it doesn't comply, the debtors are okay with that.

9    We're not -- there's not another agenda here other than to call

10   out to the Court the things that don't comply with Your Honor's

11   prior orders and don't comply with the rules and with the Code.

12   And ultimately, if the Court says yeah, but in my judgment this

13   is good enough or whatever factors Your Honor -- we understand

14   that.  And we'll accept it.

15        THE COURT:  Well, I mean, again, for those people who

16   made the Pioneer type request, and that includes Dreier, it

17   seems to me that if the company was on notice from a

18   counterparty like this with a -- you know, saying you can act

19   as my attorney-in-fact, then if that happened before the

20   deadline and certainly before the confirmation hearing, it's a

21   different analysis, I think, unless you were going out and

22   raising the money before then.  And you weren't, I don't think.

23        MR. BUTLER:  No.  We're --

24        THE COURT:  It's a different analysis.

25        MR. BUTLER:  We wish -- I wish I could make that

179

1    argument, Your Honor.

2        THE COURT:  It's a different analysis than under

3    Pioneer saying, you know, we're trying to dot the i's after

4    that fact, after the deadline.  Now maybe as far as Linear's

5    concerns and say it was a twelfth hour delay or less --

6        MR. SACKS:  Your Honor, we have a twenty to twenty-

7    six minute delay also with respect to five of our clients.

8        THE COURT:  With these same letters?

9        MR. SACKS:  Except that the -- with the same

10    letter -- well, some of them were -- one of them was Silver

11    Pointe and four of them were Dreier.  But the messenger who

12    left the Dreier Santa Monica office, his car broke -- the --

13    not car brakes.  It's the --

14        THE COURT:  Map Quest broke down.

15        MR. SACKS:  The moped broke down.  They had to call

16    another messenger and he got there between twenty and twenty-

17    six minutes late.  And so --

18        THE COURT:  On Friday?

19        MR. SACKS:  On that Friday.  It got there at -- our

20    messenger said 4:20; KCC said 4:26.

21        MR. BUTLER:  As we, I think, advised Silver Pointe,

22    we would expect that if the only infirmity is a twenty-six

23    minute delay that Your Honor -- it's our obligation to call out

24    the fact that it wasn't timely filed.  That's what the order

25    requires us to do.  We could see Your Honor saying that's fine.

180

1    I think the other question is whether or not, as I said, all

2    right, you know, is a claims purchaser entitled to file this.

3    So if Your Honor says Silver Pointe's entitled to file or

4    Dreier's entitled to file, we understand that.  That's a --

5        THE COURT:  Well, they're not entitled to file just

6    based upon their claim purchase document for some assumed role.

7    But if they file with the claim -- I'm sorry.  If they file

8    with the notice an authorization letter and you're able to

9    ascertain reasonably that it does come from the counterparty,

10   it seems to me that that's probably something that would fall

11   within Pioneer.  I don't know how many of these beyond the

12   fourteen --

13       MR. BUTLER:  They were --

14       THE COURT:  -- would -- I'm not talking about your

15   clients anymore.  You know, fall within that group as far as

16   the other objectors are concerned --

17       MR. BUTLER:  I think, candidly, in terms of the

18   documentation, I believe that based on Your Honor's guidance

19   right now and documents I've looked at, I think the Dreier firm

20   did the best job.  I mean, I think they've in fact filed

21   something contemporaneously albeit noncompliant with the rules,

22   they filed something.  I doubt -- you know, different people

23   will be in different categories here.  A number of people tried

24   to do things after the fact just to sort of button things up.

25   And I think, you know, we're just trying to get a series of

181

1    guidelines.  We're happy, Your Honor, if you tell us what the

2    guidelines are, we're happy to go through and, you know, sort

3    of 168 notices and try and sort things out with people.  We're

4    just trying to get guidance from Your Honor as to what we

5    should be -- you know, you would want us to honor and what you

6    want us not to honor.  The one that we can't do --

7         THE COURT:  Just looking back.  The confirmation

8    hearing was the 17th, right?

9         MR. BUTLER:  17th, 18th and Your Honor ruled on the

10   22nd, I believe, which was the day after Martin Luther King

11   Day.

12        THE COURT:  All right.

13        MR. SHIFF:  Your Honor, would you like to hear

14   from --

15        THE COURT:  Yes.

16        MR. SHIFF:  -- another set, so to speak?

17        THE COURT:  Okay.

18        MR. SHIFF:  Thank you.  For the record, Adam Shiff of

19   Kasowitz Benson Torres and Friedman on behalf of Contrarian,

20   Argo and ASM.  And I think similar to some of the other

21   speakers because we're dealing both with three different

22   clients as well as three different -- you know, multiple sets

23   of claims and cure claims, not everyone falls into the same

24   bucket.  I think the one that probably makes sense to deal with

25   first, though, in light of the most recent remarks about the

182

1    Dreier firm doing it so well would be ASM.  Now in ASM's case,

2    and this is all set forth in the affidavit that's been filed on

3    behalf of ASM, ASM probably did a little too much is what they

4    did.  They initially sent in conforming notices signed by

5    themselves.  On the day --

6           THE COURT:  Well, but that wasn't conforming.

7           MR. SHIFF:  Not in conform -- okay.  They attempted

8    to conform them.

9           THE COURT:  All right.

10          MR. SHIFF:  Let's use that term.  But I don't even

11   think that's relevant given what they subsequently did.  On the

12   day of the -- that Friday, they timely sent by e-mail the bar

13   coded notices signed by ASM as well as by the contract

14   counterparty, timely, and included in that transmission a

15   letter, a power of attorney letter, from the contract

16   counterparty saying, you know, we signed it, too, but this is

17   to clarify ASM had authority to sign that.  That was all

18   delivered by e-mail timely.  Incidentally, although there is a

19   general requirement in the notice that you have to return this

20   form, unlike some other notices I've seen, I haven't seen

21   anything about e-mail is never allowed.  But they certainly

22   were on notice of it before the deadline.  And then on that

23   Friday they sent by overnight messenger -- you know, FedEx type

24   of delivery which, I believe, the actual -- call them the

25   original originals -- which were received, I believe, on

183

1    Monday.  So in terms of this group -- I mean, they also have

2    the issue with their powers of attorney onto their documents.

3    But I don't know if you even have to get there.  I think based

4    on what we're hearing so far, this group timely filed, signed

5    by the contract counterparty, together with the power of

6    attorney, by e-mail timely followed up with the FedEx.  I mean,

7    I think -- and that's --

8         THE COURT:  What about the other two?

9         MR. SHIFF:  The other two fall into a different

10   bucket, Your Honor.  The other two are Contrarian and Argo.  In

11   Contrarian's case, I think similar to what he had heard here,

12   Contrarian has very broad language and it's --

13        THE COURT:  That's not going to fly.

14        MR. SHIFF:  Your Honor, we would ask that you read

15   it.

16        THE COURT:  No.  I already ruled on this.  I'm not

17   going to do a claims purchase form.  Unless you're going to

18   tell me that you have the power to negotiate the assignment of

19   the contract or the assumption of the contract, it's apples and

20   oranges.

21        MR. SHIFF:  Your Honor, these agreements specifically

22   are not limited to things like unsecured claims, assuming

23   there's a distinction between unsecured claims and a cured

24   claim which we had colloquy on last time.  But I know that's

25   the way that Your Honor believes.  This clearly gives to the

184

1   buyer "all causes of action or other rights held by seller

2   whether against the debtor or against any other party in

3   connection with the claim arising under" -- which is lower case

4   c -- "arising under in connection with all agreements,

5   invoices, purchase orders or other documents executed or

6   delivered in connection with such claim."  Similar language, I

7   think, to what you've heard here when you said technical

8   discrepancies.

9        THE COURT:  That's not going to fly.  It's not the

10   same as dealing with an assignment or an assumption of the

11   contract.  They didn't agree to give you that right.

12        MR. SHIFF:  Your Honor, respectfully, I think that's

13   what this section says.

14        THE COURT:  Well, all right, I disagree with that.  I

15   did rule on that already.  So --

16        MR. SHIFF:  It was on that one today?

17        THE COURT:  -- what else did they do?

18        MR. SHIFF:  In the case of Contrarian, they relied

19   upon these transfer agreements which were on public file.  We

20   asked the Court to read them.

21        THE COURT:  Okay.

22        MR. SHIFF:  In Argo Partners case -- in Argo Partners

23   case, they have two notices -- they again have a form which I

24   will not read to you, I'd ask the Court to read it.  We do

25   believe it conveys the authority on cure claims.  What Argo,

185

1   though, in addition, which I think they have -- Argo, I

2   believe, has sixteen claims that are in dispute.  In the case

3   of two of those, the actual creditor or what you would call the

4   non-debtor contract party sent to Argo the form which Argo then

5   executed.  So the difference being they were in addition to

6   having the rights under this power of attorney, they were also

7   actually specifically given the form by the contract

8   counterparty to sign it.  In no way would they then be

9   interfering with any relationship or other cure problem 'cause

10  they -- we think under the agreement specifically vested but by

11  their actions vested with them the authority to go ahead and

12  file the cure claim notices.  So they have fourteen which rely

13  upon the power of attorney language which we think is

14  sufficient and two --

15       THE COURT:  Well, how does it give them the authority

16  to file it --

17       MR. SHIFF:  Well, I mean --

18       THE COURT:  -- under the order?

19       MR. SHIFF:  Under the order?  Well, Your Honor, we

20  believe under the order --

21       THE COURT:  I mean, this happened after the hearing,

22  right?

23       MR. SHIFF:  Some of -- the hearing was --

24       THE COURT:  Why didn't they just sign it?  It would

25  have been so simple.  Why --

1          MR. SHIFF:  The contract counterparties?

2          THE COURT:  Yeah.

3          MR. SHIFF:  Well, in these two instances, for

4    example -- I mean, I'm speculating.  I don't know if these do.

5    They had -- we already had them in our hands.  We couldn't get

6    it back to them to sign it.  Your Honor, the hearing was the

7    day before -- it was on a Thursday.  And the deadline was a

8    Friday afternoon in California.

9          THE COURT:  Well, so then factually no different.

10   You had the same form that you had when you had the hearing?

11   There was nothing changed.

12         MR. SHIFF:  Well, ASM certainly --

13         THE COURT:  No.  I'm talking about Argo.

14         MR. SHIFF:  With respect to Argo -- well, the

15   difference is, Your Honor, at the hearing we did not --

16         THE COURT:  I ruled.  That's the only difference.

17         MR. SHIFF:  Well, Your Honor, you didn't rule on the

18   form.  You didn't read the forms.  We didn't present them to

19   Your Honor.

20         THE COURT:  No.  You said you had the form and I said

21   get them to sign it.  And they didn't sign it.

22         MR. SHIFF:  No.  Your Honor, what I'm saying is you

23   didn't rule -- we didn't believe you ruled on the specific

24   power of attorney assignment of claim form --

25         THE COURT:  But they didn't give you --

187

1          MR. SHIFF:  -- because we hadn't submitted it to you

2     at that time.  And what we were submitting to you now are those

3     forms and we'd just -- we ask the Court rather than to rely

4     upon generally how these forms work, just to read those forms.

5     We think it can base us these rights.  I know you don't need me

6     to read it into the record.  That's going to belabor this

7     hearing and I know you've been here for a long time.

8          THE COURT:  All right.

9          MR. SHIFF:  And then as to ASM, I think I already

10    described --

11         THE COURT:  No, I understand ASM.

12         MR. SHIFF:  -- what their situation is.  I mean, if

13    there's anything more you need as to them, I'm happy to --

14         THE COURT:  No.

15         MR. SHIFF:  -- go with that.

16         THE COURT:  I think -- okay.  I think that's

17    sufficient.

18         MR. SAMBUR:  Your Honor, Keith Sambur again.  I'm

19    also here today on behalf of Midtown Claims.  On the phone is

20    Chappell Phillips, in house counsel at Kimball Electronics,

21    which is one of the contract counterparties that is subject to

22    the motion to strike.  We've also submitted a response as

23    attorney-in-fact for Palma Tool & Dye.  Again, Your Honor, we

24    want to stress that we submitted original cure notices that has

25    the unique identifiers that enable the debtors to match the

188

1    cure notices up with the correct contract counterparty.  We

2    submit these not under our power -- power of attorney in our

3    purchase agreement which included cure amounts.  But we also

4    did so after consultation with and after consulting with

5    Methode, Kimball and Palma respectively.  The fact that we --

6    the fact that the debtors have originals in their hands is

7    clear evidence that we had authority to act.  And if you look

8    under 9010(a) the language is clear that an attorney in fact

9    for an authorized agent may act as long as it is not carrying

10   out the practice of law.

11       Again Your Honor, but submitting these cure notices

12   my clients were not engaged in the practice of law.  And the

13   rule is clear, that they had -- they had the ability to submit

14   these cure notices without providing -- without the duty or

15   obligation to provide the debtor with any evidence.  If the

16   debtors requested evidence and if the debtors wanted to

17   override Rule 9010(a) they should have requested such relief in

18   the solicitation procedures motion.

19       THE COURT:  No, but the evidence today -- the

20   evidence you have is -- is the power of attorney in the claims

21   purchase, right?

22       MR. SAMBUR:  That is correct, Your Honor.

23       THE COURT:  That's what you're relying on?

24       MR. SAMBUR:  Well, I mean, as far as documentary

25   evidence, yes.  I think they're also acting as the authorized

1   agent which is evidenced by the fact that the debtors are in

2   possession of the cure notices.  And Your Honor -- excuse me

3   for one second.  I also come back to Rule 9010(a) which does

4   not require you to submit evidence, at any time, if you're not

5   engaged in the practice of law.  And the debtors have not made

6   any showing as to why 9010(a) requires submission of evidence.

7   And again, Your Honor, 9010(c) which they relied upon only

8   relates to creditors.  And I think this Court and the debtors

9   have made clear that contract counterparties are not creditors.

10  The rule is clear and unambiguous, 9010(c) doesn't apply when

11  in the realm of 9010(a) and we are not required to submit any

12  evidence.  If the debtors would like evidence and they don't

13  feel that the original is sufficient, we have today counsel for

14  both Methode and Kimball who, again, have never objected to our

15  submitting these notices and in fact directed us to submit

16  these notices on their behalf.

17      MR. BUTLER:  Your Honor, may I respond?  This is the

18  same argument dressed up a different way of people who did not

19  get a written power of attorney as Your Honor -- assuming Your

20  Honor held that out of the January 10th hearing.  The fact that

21  an original form shows up with someone else's name on it, other

22  than the counterparty, doesn't make it a conforming notice and

23  doesn't imply any authority.

24      And I would point out, the solicitation procedures

25  order says that the counterparty is to sign and submit that

190

1   order.  That's what the order says.  It doesn't say that the

2   claims purchaser is supposed to and the authority that they

3   would rely on, whether they gave it to us under 9010(a) or (c)

4   the authority they're relying on is authority in a claims

5   purchase agreement about an account receivable.

6           As we litigated on January 10th, as our papers

7   indicate, the law, I think, is pretty clear that what happens

8   here procedurally, when we cure if there are claims in the

9   claims docket that relate to pre-petition accounts receivable,

10  we will move to strike those claims.  And I believe Your Honor

11  will grant that motion.  Those claims are worthless once we --

12  once we do the cure.  And the solicitation procedures order

13  said, precisely to avoid all of this, said that we -- we would

14  deal with the counterparty and the counterparty would

15  receive -- it also clearly says the counterparty receives the

16  cure payment.  The debtors are directed to pay -- are

17  authorized to pay the counterparty, Mr. Shiff keeps reminding

18  me, and the same order says that we have no responsibility or

19  obligation of any kind to claims purchasers.  That's what the

20  solicitation procedures order says.  And so -- you know, I

21  think -- I think counsel's argument here is no different than

22  the argument made by a couple of the other claims traders who

23  are relying on a general power of attorney in a claim purchase

24  agreement.

25          MR. SAMBUR:  Your Honor, paragraph 43 of the

191

1    solicitation procedures order which Mr. Butler has referred to,

2    states, and I quote "Parties wishing to object the assumption

3    of their contracts under the terms set forth in the cure amount

4    notice shall be required to return the cure amount notice in

5    accordance with the instructions provided herein."

6         THE COURT:  Who does that -- under your assignment

7    agreement who is referenced by the word their, T-H-E-I-R, in

8    that paragraph?  Do you have the contract?  Does Blue Angel

9    have the contract?

10        MR. SAMBUR:  No, Your Honor.  But what my point is

11   that the debtors are reading this provision to say contract

12   parties and only contract counterparties, not their powers of

13   attorney, not their attorneys in fact and not their authorized

14   agents.

15        Again, if the debtors wanted to preclude any other

16   party acting at the direction or at the request of a contract

17   counterparty to submit these notices, they should have clearly

18   stated so.  Your Honor, the debtors created this notice.  They

19   drafted the notice, they came up with the language.  If it's

20   going to be interpreted --

21        THE COURT:  How is it -- how is it --

22        MR. SAMBUR:  -- it should be interpreted against the

23   debtors and not against the contract --

24        THE COURT:  How is that ambiguous?  I don't -- I

25   mean --

192

1        MR. SAMBUR:  It would have been very clear, Your

2   Honor, if it had simply said contract counterparties and not

3   their attorneys in fact or not their authorized agents and

4   attorneys.  The Bankruptcy Rules specifically provide that

5   another party can act through a power of attorney or authorized

6   agent.  If the debtor wanted to override those rules and not

7   have them apply to these notices that relief should have been

8   requested in a solicitation procedures motion and granted as

9   part of the order.  But it was not.  Therefore, there's no

10  reason to believe that a contract counterparty could not have

11  designated a third party to submit on its behalf.

12       There's also no signature block, Your Honor.  There's

13  also no certification and signature block of this cure notice

14  as would appear in ballots stating that the party executed does

15  in fact have power and authority to execute the document and is

16  in fact the contract counterparty.  Again, this could have

17  clearly resolved all issues relating to this matter.  The

18  debtors failed to include that in these cure notices.

19       MR. BUTLER:  Your Honor, paragraph 43, which is

20  Your Honor's order --

21       THE COURT:  Well, wait.  It says sign and return.

22       MR. BUTLER:  Right.

23       THE COURT:  It doesn't say sign with your agent -- it

24  only has one form, company name by -- it doesn't have -- it

25  doesn't permit the agent to sign.

193

1        MR. SAMBUR:  If I'm understanding correctly, Your

2   Honor, you're saying that powers of attorney or authorized

3   agents were not permitted to submit these cure notices, which I

4   believe would be overriding Rule 9010 of the Bankruptcy Rules.

5   And if that was the case and if that was the intent, why wasn't

6   it clearly stated?  Because why wasn't that relief requested?

7        THE COURT:   All right.   Are there any parties who

8   somehow fall somewhere in the spectrum between what I'll refer

9   to as the ASM Dreier group, and by Dreier I mean the people who

10  are Dreier have the -- have the letters.   And the Contrarian

11  Argo group?

12        MR. STEIN:  Your Honor, Matthew Stein, Sonnenschein

13  Nath and Rosenthal on behalf of Molex.   I'll refer the Court to

14  Exhibit 25 and 25A for proof that we are one of the seventeen

15  who is a counterparty who signed the objection and the

16  counterparty who signed the notice.

17        MR. BUTLER:  Just one moment, Your Honor.

18     (Pause in proceedings)

19        MR. BUTLER:  Your Honor, I think -- we've taken a

20  look at the exhibit, we would agree with that.   The debtors

21  would agree that they should be part of that seventeen.

22        THE COURT:  Okay.   And this was timely received?

23        MR. STEIN:  Thank you.

24        MR. BUTLER:  Yes, these were both -- these were both

25  schedule 3 issues, Your Honor.   This was not a schedule 2 or

194

1    schedule 6 problem.  This showed up because there was

2    information that suggested that TBG Credit was associated with

3    Molex.  And I think in the representation that's not the case.

4    Is that not the case?  Did you just make a representation --

5    TBG Credit Opportunities Fund is not associated with the --

6    with anything that was submitted, the objection -- excuse me --

7    the objection or the underlying notice?

8         MR. STEIN:  That's correct, Your Honor.

9         THE COURT:  All right.

10        MR. BUTLER:  We'll take counsel's representation,

11   Your Honor.

12        THE COURT:  Okay.

13        MR. STEIN:  Thank you.

14        MR. MENDELSON:  Your Honor, Lee Mendelson, of Morrit

15   Hock Hamroff & Horowitz on behalf of Robin Industries.  We

16   would fall under, I guess, one of the Silver Point issues but

17   we have another issue that we wanted to have clarified and that

18   concerns the fact that the claim that is the subject of this

19   motion -- currently there are both unpaid pre and post-petition

20   obligations under the particular purchase order that are at

21   issue.  And what we wanted to make sure was that the --

22   whatever the Court decides with respect to the portion that's

23   before the Court today would not affect any post-petition

24   obligations that would be owed under that purchase order

25   regardless of whether there's an assumption or an assumption

1   and assignment.

2        THE COURT:  That's -- that's -- I think that's the

3   whole point of the debtor's motion, right?  Is that you're

4   dealing with the counterparties including in regard to post-

5   petition performance and any issues dealing with the assumption

6   and assignment or assumption in this case of the contract.  So

7   I -- I mean, is that right?

8        MR. BUTLER:  Yes, Your Honor.

9        THE COURT:  So, those -- those 365 issues are not

10  affected by this.

11       MR. MENDELSON:  That's fine, Your Honor.

12       THE COURT:  Okay.  Anyone else?  All right.  I --

13       (Pause in proceedings)

14       THE COURT:  All right.  What I'm going to do is give

15  you guidance on this because I think part of the pioneer

16  analysis is -- if there's no agreement is going to require some

17  further hearing and I -- I frankly, where it's somewhat

18  uncomfortable in the procedural context in which people have

19  made their requests under -- under Pioneer in response to

20  the -- to the motion -- in response to the motion to strike.

21  So I'm going to give you guidance on -- on where I believe I

22  will come out on this.  And if we -- if you're unable to

23  resolve it consistent with that guidance, I'll hear you again

24  on Tuesday at 10.  And the focus there will be on the Pioneer

25  factors because I think the guidance is going to cover the rest

196

1    of it.

2         I believe that where a party has submitted, timely, a

3    response form that has the counterparty's signature to it that

4    that's sufficient even if that party also signed it -- even if

5    the claims trader signed it as well.  If there's, you know, a

6    twenty-four hour delay, if it's untimely by -- by twenty-four

7    hours, it would seem to me that Pioneer would be satisfied.

8    The confirmation hearing wasn't until the 17th.  I know you

9    were all preparing for that but I'm assuming that you would

10   have time if it had been submitted over the weekend, to have

11   dealt with it on Monday or Tuesday as far as your preparation

12   for that hearing.

13        So, it would seem to me that the ASM folks who e-

14   mailed their response timely and got their other document in

15   Monday morning, I would rely on the e-mail and that would be

16   sufficient.  As I heard Mr. Shiff, and of course I haven't

17   verified everything he said and that would be something the

18   debtors will be doing over the next couple of days.  But if in

19   fact that was the case and what they submitted included the

20   counterparty's signature, then I would assume that that would

21   either past muster without even having to get to Pioneer or

22   under Pioneer would past muster.

23        Similarly, I think that the letter that was attached

24   to the nine Dreier and Traub forms plus the other -- the other

25   ones that were submitted twenty-five minutes late or whatever

1    it was, would satisfy under Pioneer.  I think that consistent

2    with that Mr. Sullivan's client, Linear would also past muster

3    under Pioneer given the fact that it came in on Saturday,

4    assuming that it did.

5        But I have -- continue to believe that the purpose

6    for the solicitation of procedures order was clearly set forth

7    in the order and it was to distinguish between situation where

8    a debtor is assuming a contract and dealing with the

9    counterparty under Section 365 as a consequence from the

10    general situation where the debtor is not assuming the contract

11    and it's just an account receivable.  I do not believe that a

12    power of attorney is a part of an account receivable purchase

13    is sufficient particularly where it's not filed in the face of

14    an order that contemplates the counterparty submitting it.

15        And I don't believe this is a situation where 9010(a)

16    would apply.  I believe that this was dealt with at the January

17    hearing and that the clear direction by the Court then was that

18    the claims purchasers needed to get written submission,

19    preferably directly but at least in terms of an attachment to

20    the -- to the form from the counterparty.  And absent that and

21    absent a correction of that problem by the end of the weekend,

22    I am going to have a very hard time, on this record at this

23    date, recognizing a request under Pioneer to retroactively

24    authorize that.

25        The debtor, as I outlined in the January 10th ruling,

198

1    is dealing with a regime under Section 365 it's not 502 claim

2    regime.  And the purpose of the solicitation procedures cure

3    notice procedures was to fit into that regime as a -- as a

4    courtesy the debtors provided extra notices to other parties.

5    But it -- the relationship goes beyond the cure amount in terms

6    of a 365 motion, as I detailed on January 10th.  It goes to

7    adequate assurance of future performance, potential

8    modification of contract terms going forward and performance by

9    the debtor directly with the contract counterparty.

10        Now, part of that performance can be, if the contract

11   permits, that the counterparty instructing the debtor to look

12   to someone else to perform this.  But the cure procedures were

13   established with a specific purpose in mind which was to have a

14   deadline to enable the debtor to prepare for the confirmation

15   hearing and make its cash projections and make a showing on

16   feasibility.  And these purposes are not fulfilled by -- after

17   the fact attempts to provide authorization.  Particularly where

18   the issue was dealt with in papers filed before the 10th and

19   hashed out on the 10th.  And where, I'm assuming, that the --

20   as I did on the 10th, that if the parties really had an

21   agreement that enabled the claim purchaser to act they would

22   certainly be able to get their counterparty to so indicate in a

23   timely fashion.

24        So that's where I would come out.  I think the

25   debtors need to look at the documents submitted to see when

1    they were submitted and -- and what was set forth in them.  But

2    I would not require a -- you know, a notarized letter.  The

3    Dreier Traub letter isn't notarized but I think it's signed by

4    the -- the counterparty and I think that's sufficient.

5         MR. BUTLER:  Your Honor, also, I'm assuming -- I just

6    want to make sure I've got this clear on the record, that if we

7    determine a notice otherwise past muster in connection with the

8    guidance you've given us today so that we agree with the party

9    who submitted the notice that we will recognize it, I'm

10   assuming that you would -- you're giving us the guidance to

11   accept a legible copy of the original --

12        THE COURT:  Yes.

13        MR. BUTLER:  -- as well as the original?

14        THE COURT:  Well, as long as it has the bar code.

15        MR. BUTLER:  Bar code?

16        THE COURT:  Yeah.

17        MR. BUTLER:  Okay.  Okay.  So it's got -- as long as

18   it has the bar code on it.

19        THE COURT:  Right.

20        MR. BUTLER:  We will --

21        THE COURT:  But I don't think that something signed

22   by a non-counterparty that has the bar code on it is conforming

23   with my order.  I don't think that's what was contemplated by

24   the order.

25        MR. BUTLER:  Your Honor, what we would propose to do

200

1    is submit the -- we will end up -- what I propose to do is by 4

2    o'clock on Monday we will submit to chambers and circulate to

3    counsel a draft order that does the following things, it

4    will -- if Your Honor's prepared to do it, grant the motion to

5    strike as to the 146 non-contesting notice holders, which are

6    here.  It will withdraw the debtor's motion to strike with

7    respect to all of the 168 notices that meet the guidance here

8    that we -- that we can verify over the weekend working with the

9    counterparties.  And it will schedule for hearing -- schedule

10   the remaining for 10 o'clock -- the remaining -- 10 o'clock on

11   Tuesday the remaining contested matters.

12        THE COURT:  Right.  But that's really a Pioneer

13   hearing.

14        MR. BUTLER:  Right.

15        MR. SHIFF:  Your Honor, there was one other aspect of

16   the motion I don't think got dealt with today because we were

17   probably dealing with some bigger issues.  And that, I think,

18   was prong one of the motion where there was -- assuming there

19   is a validly submitted ballot as described herein, a number of

20   people are the counterparties, assuming those are the right

21   people, requested that payments go directly to the --

22        THE COURT:  It seems to me that if the contract

23   between the debtor and the counterparty permits it, and the

24   counterparty instructs the debtor in writing to do it, the

25   debtor can pay the -- the claim purchaser.

201

1          MR. BUTLER:  Your Honor, I'm just --

2          THE COURT:  But if the contract doesn't permit it or

3     if the debtor's not instructed in writing to do it in a timely

4     fashion then I don't -- then I shouldn't get in the middle of

5     that.

6          MR. SHIFF:  Well, I guess one of the questions there

7     would be --

8          MR. BUTLER:  Your Honor, I'm sorry.  Mr. Shiff, just

9     one second.  I'll just say right now, given our payment

10    systems, which are designed to pay our contract counterparties,

11    you know, I don't believe that, you know, it is productive to

12    anybody here to have us be -- be taking, you know, sort of

13    counter instructions.  Our general terms and conditions, those

14    contracts, those supply agreements, do not provide for third

15    party payments.

16         THE COURT:  Well, if they don't then they can --

17         MR. BUTLER:  They just clearly do not.

18         THE COURT:  Well, then it's not going to happen.

19         MR. SHIFF:  Okay, Your Honor.  I mean, because in the

20    face of a specific direction from the recipient he says either

21    I changed my address or pay it to my friend or pay it to this

22    one and I don't see what the issue would be.

23         THE COURT:  I just go by the contract.  If the

24    contract directs payment in one place and doesn't permit other

25    payment then -- then they shouldn't --

1        MR. SHIFF:  Well, I'm sure the contract is written as

2   most contracts, you know, I'm going to pay you for your

3   services and then --

4        THE COURT:  I don't know.  It's up to the debtor to

5   make that determination.

6        MR. SHIFF:  Thank you, Your Honor.

7        MR. SAMBUR:  Your Honor, I'm sorry, one other

8   additional point of clarification, if I may?  Much of your

9   guidance spoke to the hearing that occurred on January 10th.

10  My clients were not part of that hearing, did not have counsel

11  representing them at the hearing.  And in addition, Your Honor,

12  as is needed in the evidentiary record, had submitted -- KCC

13  had actually received those notices on January 9th.  And it

14  seems that guidance is being applied with respect to that

15  hearing to my clients even though Your Honor had not issued any

16  guidance whatsoever by the time that those cure notices --

17       THE COURT:  Who received the notices on January 9th?

18       MR. SAMBUR:  On January 9th, Your Honor, my -- KCC

19  had received the cure notices that my clients had sent --

20       MR. BUTLER:  Signed by -- signed by a credit

21  purchaser.

22       MR. SAMBUR:  It's two different issues.  Much, I

23  believe, of Your Honor's guidance had, I believe, that much of

24  Your Honor's guidance is speaking about was the record that was

25  made clear on the 10th.  My clients had already submitted and

203

1    in fact KCC had already received those -- those notices on the

2    9th, prior to any filing of a motion or any hearing on the

3    issue.  I would just -- I would --

4         THE COURT:  All right.

5         MR. SAMBUR:  I would just like some guidance as to

6    whether in fact Your Honor's ruling should apply or if that is

7    a fact that Your Honor -- that Your Honor would consider any

8    subsequent requests.

9         THE COURT:  What's -- I'm not saying that you're

10   bound by my January 10th ruling.  Okay.  I'm saying that your

11   client may have looked at it, it may have paid attention to it,

12   I don't know.

13        MR. SAMBUR:  But again, Your Honor --

14        THE COURT:  And that's something you can bring up on

15   Tuesday as far as the Pioneer factors are concerned.

16        MR. BUTLER:  But Your Honor, from our perspective --

17   the debtor's perspective, they're bound by the solicitation

18   procedures order which they --

19        THE COURT:  Well, I -- I agree.  And by this ruling.

20        MR. SAMBUR:  And again, it's our position that the

21   solicitation procedures order --

22        THE COURT:   I understand your position.  I don't

23   agree with it.

24        MR. SAMBUR:  That's a problem.

25        THE COURT:  And I laid out the reasons why on

204

1    January 10th.

2         MR. SACKS:  Your Honor, you're not expecting any

3    additional submissions with respect to --

4         THE COURT:  No.  The real focus is on the -- would be

5    on the Pioneer factors.  You know, if -- if someone, it turns

6    out, submitted their thing on Monday night or Tuesday morning,

7    you know, I might -- that sort of thing.

8         MR. BUTLER:  Your Honor, I will also -- and you ruled

9    it earlier, it wasn't in the summary.  I'll just, sort of, say

10   it to calm some people in.  We will -- included in things that

11   will be withdrawn will be the -- as to the seventeen, the, sort

12   of, original ones we talked about up front.

13        THE COURT:  Right.  Correct.

14        MR. BUTLER:  And that would be -- that will be

15   covered.

16        THE COURT:  Correct.

17        MR. BUTLER:  Okay.  I think --

18        THE COURT:  And that -- the seventeen plus -- plus

19   your client, Mobus (ph.)

20        MR. SACKS:  Molex.

21        THE COURT:  Molex, right.

22        MR. BUTLER:  All right.  I think, Your Honor, we have

23   the instructions and we understand how to proceed on that.

24        THE COURT:  Okay.

25        MR. BUTLER:  Now, as to the rest of the -- we have

205

1    one more matter left on this, Your Honor.  How do you want to

2    do it?  I know you've got a chambers conference and you've got

3    another matter.

4         THE COURT:  Well, I have another matter -- just a

5    second.  The matter before me is uncontested.  I'd like to get

6    that out of the way.  If I could do that and you can catch your

7    breath and then I'll come right back.  I think it'll take ten

8    minutes at most.

9         MR. BUTLER:  Does it make sense, because I -- could I

10   see counsel to the -- who is counsel for the one remaining

11   contested matter?  Can I talk to you for a second?  I think,

12   Your Honor, maybe we could take the chambers conference and

13   then we can get more people out of the court.  I'm going to see

14   if they'll do that.

15        THE COURT:  I'm sorry, say what?

16        MR. BUTLER:  Take the chambers conference after that?

17        THE COURT:  Yes.

18        MR. BUTLER:  And then --

19        THE COURT:  Yeah.  But let me take the USEY motion.

20        (Recess from 3:19 p.m. to 4:29 p.m.)

21        THE COURT:  Please be seated.  Okay.  Back on the

22   record in Delphi Corporation.

23        MR. BUTLER:  Your Honor, with respect to matter

24   number 8, the non-conforming cure notice motion, there was one

25   other matter counsel wanted to raise --

1          THE COURT:  Oh, okay.

2          MR. BUTLER:  -- relating to that matter.

3          MR. SULLIVAN:  Thank you, Your Honor.  In the haste,

4    I tried to interrupt Mr. Butler before we broke but we never

5    addressed the Temic issue.  I'm not sure if you had an

6    opportunity to read that, but Temic's situation was that it

7    never received a copy of the notice, the plan cure notice, Your

8    Honor.  One of the -- there were two co -- two notices --

9          THE COURT:  I think it just needs to make a motion.

10   I don't think it's really covered by the debtors' motion.  So

11   you just need to tee it up.

12         MR. SULLIVAN:  Okay.  We were trying --

13         THE COURT:  I'll hear it on short notice if you want

14   to put it on short notice.

15         MR. SULLIVAN:  Could we have it ret -- is there still

16   going to be that hearing on Tuesday?  Could we have it heard on

17   Tuesday?

18         THE COURT:  Well, I don't know.  It depends on -- is

19   it any different than what you put in the papers?

20         MR. SULLIVAN:  I don't believe it's going to be any

21   different than what we've already put in our objection, Your

22   Honor.

23         MR. BUTLER:  Your Honor, if they file a motion by 5

24   o'clock tomorrow, we'll be ready.

25         THE COURT:  Okay.  I'll hear it on Tuesday if it's

1    not resolved.

2          MR. SULLIVAN:  All right.  Thank you, Your Honor.

3          THE COURT:  Okay.  I mean, ultimately, it's a Pioneer

4    motion.

5          MR. SULLIVAN:  Right.  And we still --

6          THE COURT:  The debtors say they sent the notice and

7    you say you didn't get it and I'll hear it --

8          MR. SULLIVAN:  And we still haven't gotten it.  We've

9    asked for the notice and they haven't given us one.

10         THE COURT:  Well, it doesn't really matter now.

11         MR. SULLIVAN:  Yeah.  Okay.  Thank you, Your Honor.

12         MR. BUTLER:  Your Honor, the final matter on the

13    omnibus agenda for today is matter number 5, the employees'

14    motion to vacate the automatic stay.  This is a motion to

15    vacate the stay to commence another action in the Northern

16    District of Alabama filed by Jimmy Mueller, David Gargis and

17    Keith Livingston at dockets number 11350 and 11631.  We oppose

18    the relief requested, believe that the exclusive jurisdiction

19    with respect to this matter lies here in the bankruptcy court

20    and we'll address that after the motion's presented by counsel.

21         THE COURT:  Okay.

22         MR. THALER:  Thank you, Mr. Butler.  Good afternoon,

23    Your Honor.  Andrew Thaler, Thaler & Gertler.  We are attorneys

24    for Jimmy Mueller, David Gargis and Keith Livingston.

25         First, Your Honor, I'd like to handle a housekeeping

208

1    matter if I might.  Alabama counsel, David Martin, is present

2    here today.  We submitted an application and a proposed order

3    for him to be admitted pro hac vice as of yesterday.  And when

4    I checked the order hadn't been signed.  The check had been

5    sent in.

6        THE COURT:  That's fine.  He can appear.

7        MR. THALER:  Thank you, Your Honor.  Your Honor, as

8    stated by Mr. Butler, this is a motion to vacate the automatic

9    stay to commence an action in the Alabama district court for

10   the purpose of changing the employment status of these three

11   employees from salaried employees to hourly employees.  Your

12   Honor, as it was indicated in the initial papers that were

13   filed, we brought this motion in an abundance of caution so

14   that we were not stepping on anybody's toes.  And someone

15   thought that the stay did have to be vacated but we're of the

16   position that the stay does not apply because employee benefit

17   plans do not fall under the protection of Section 363 automatic

18   stay because the employer, in our view, has no property

19   interest in the employee benefit plan which would be the source

20   of the funds that would compensate these individuals if their

21   employment status was changed from salary to hourly.

22       Just so the Court has some idea of the situation that

23   these individuals find themselves in, Mr. Mueller and Mr.

24   Gargis are both twenty-three year employees at Delphi.  They

25   had started out originally as hourly employees.  In fact, each

1    of them had worked fourteen years as hourly employees.

2    Similarly, Mr. Livingston has worked for the company for

3    twenty-two years and he started out as an hourly employee as

4    well, worked eleven years as an hourly employee.

5        Mr. Martin will be able to address in greater detail

6    later but I wanted to set forth the facts, Your Honor, that

7    Delphi approached these individuals at some point, identified

8    them as good employees and asked that they change from hourly

9    status to salaried status with assurances that their pension

10   would be protected, that their years of service would be

11   protected.  In fact, there was a history of other employees who

12   had switched back from salaried to hourly.  So these

13   individuals always felt and expected and believed they have

14   rights under ERISA and otherwise to elect to move from salaried

15   employee status to hourly status.  And, in fact, that is what

16   they sought to do after the bankruptcy petition had been filed

17   at a point in time in 2006.  They started the process.  They

18   made the appropriate notifications and applications, if you

19   will, to Delphi and Delphi did not act on those requests and

20   indicated that they had to do a number of different things as

21   part of the administrative procedure which, I understand, had

22   to be exhausted before they would be entitled to bring the suit

23   which they now seek to bring.  As I understand it, it wasn't

24   until some time in August of 2007 that indications were that

25   the determination was that these people were going to be denied

1    and it was not going to be reconsidered.

2         Essentially, in a nutshell, Your Honor, these

3    employees don't seek to change the UAW agreement which was

4    referred to or GM agreements or other things.  All they seek is

5    to be included with the other parties who were given those

6    rights as hourly employees.  They never received any

7    notification that their rights were otherwise going to be

8    impaired by other things that were going on in this case.  They

9    were following the rules and the procedures.  And up until the

10   point that they were denied, there was no recourse for them to

11   start a suit or do anything else.  In fact, for this reason

12   because they were seeking equitable claims only for an

13   injunction compelling Delphi to transfer them from salaried to

14   hourly employees, they never filed any claims because they

15   don't seek any money from the -- they don't seek any money from

16   the debtor.

17        As Your Honor knows, under 362(d) of the Bankruptcy

18   Code, clause includes a lack of adequate protection of an

19   interested property.  I know that Delphi argues in their papers

20   that we've not established that there's any cause.  We believe

21   that there is cause in a situation where the debtor is unable

22   to afford adequate protection to the movant.  And in this case,

23   they're unable to provide adequate protection to the movant

24   because they don't control nor are the assets in the pension

25   plan assets of the bankruptcy estate.

211

1      THE COURT:  No.  But isn't this just a dispute over
2  what forum that this litigation takes place in?  If it doesn't
3  take place in Alabama, it'll take place here.
4      MR. THALER:  Yes, Your Honor.
5      THE COURT:  So it's not like you're protecting
                                                De
                                                 l
                                                 e

6  property; it's just you're trying to decide which court should
7  decide the issue.
8      MR. THALER:  That's a fair statement, Your Honor.
9  Essentially then, if I can just follow through on the thought
10  and we'll follow up on the other issue that you raised, Your
11  Honor, ERISA does not permit the district court to issue an
12  injunction solely against the plan in order to allow these
13  people to receive the benefits to which they claim that they're
14  entitled.
15      THE COURT:  But again, the relief set forth in the
16  complaint says that you want an order retransferring you to --
17  the claimants -- to the plan.  But then it also says "for an
18  order entering injunctive relief requiring Delphi to allow each
19  of the plaintiffs the same benefits to which hourly employees
20  are allowed and have been allowed."  And the debtors are saying
                                                De
                                                 l
                                                 e

21  that goes beyond the pension plan and what's really behind this    De
                                                                        l
                                                                        e
                                                                        t

22  is that the three individuals want to be included within the
23  GM/UAW settlement, the buyout settlement.  It's not just a
24  pension plan issue.
25      MR. THALER:  The attrition program, yes.

1          THE COURT:  Yes.  The attrition program.

2          MR. THALER:  Right.  Our argument is that the impact

3    that the debtor is claiming will take place here is really not

4    definite.  It's speculative.  It really isn't material as it

5    affects the bankruptcy estate.  And for that reason, they

6    should be allowed to proceed against the -- primarily against

7    the pension plan but name the debtors as a party only for the

8    injunctive relief portion that would be necessary to effectuate

9    the relief.  I think that is the Tycheson (ph.) case which I

10   cited in our papers and the Bennett case, as well, the stay was

11   lifted against an employer seeking additional benefits under

12   ERISA because it has not been shown that inevitably have an

13   adverse impact upon the bankruptcy estate.  And we don't

14   believe that the debtor has established that there will be

15   materially adverse impact on the bankruptcy estate if the

16   action were permitted to proceed in the Alabama district court.

17         THE COURT:  If these gentlemen quit today before

18   they've obtained the status of hourly workers, do they lose the

19   right to various things?

20         MR. THALER:  I believe so --

21         THE COURT:  I mean, I'm not asking you to concede

22   that they could be held to that position.  But assuming for the

23   moment that they could be held to still be salaried employees,

24   would they lose rights if they quit?

25         MR. THALER:  I would defer to Mr. Martin on that

1    issue, if I could, Your Honor.

2        MR. MARTIN:  Your Honor, I'll stay here if that's all

3    right.

4        THE COURT:  That's fine.

5        MR. MARTIN:  David Martin, David P. Martin LLC for

6    the movant employees.  Your Honor, two employees are seeking

7    health benefits.  That's the other benefits that they would be

8    allowed.  The other employee does not get health benefits.

9    That would be Keith Livingston.  Basically, if they quit today,

10   we would still seek for equity to do what should have been done

11   in the past and retroactively --

12       THE COURT:  No.  That's what I'm saying.  I'm not

13   asking you to concede that -- your position that it should have

14   been done.  But I'm saying that if --

15       MR. MARTIN:  No.  I think that they would still have

16   a legal right to pursue an equitable claim even if their

17   employment was terminated today.

18       THE COURT:  Right.  But there's a difference.  It

19   would be an equitable right as opposed to a right under --

20       MR. MARTIN:  A legal -- as opposed to a legal right.

21       THE COURT:  -- a legal right.  And I read it a couple

22   times now, the wherefore clause of the complaint is not clear -

23   - is the relief you're seeking, does it include the full

24   benefit of their transfer?  I mean, in effect their transfer to

25   being hourly employees?

214

1          MR. MARTIN:  Yes, Your Honor.  We're asking them to

2    be treated as if they had been allowed to retransfer at the

3    time they requested to be retransferred.  The reason why

4    there's no impact on Delphi, however, is because GM has an

5    obligation to pay for those health benefits and life insurance

6    benefits, as a matter of fact, is what I read last night.  And

7    Delphi does not.  It all has to -- as a matter of fact, these

8    representations originally were made -- these promises,

9    assurances, these representations were made by GM.  And when

10   Delphi split from GM, they assumed all of GM's obligations

11   including the right and ability to retransfer under certain

12   necessary conditions.

13         THE COURT:  Is that at all modified by the GM

14   settlement agreement?

15         MR. MARTIN:  I haven't seen anything that has

16   modified it yet, Your Honor.  And there's not been anything

17   established with the reply that would indicate that there is

18   something in the agreement that has a deleterious effect on

19   Delphi.

20         THE COURT:  Okay.  Thanks.

21         MR. THALER:  Thank you, Your Honor.  So you have some

22   idea how these individuals will be impacted, for instance, Mr.

23   Mueller, as a salaried employee, would receive a monthly

24   pension payment of 436 dollars as opposed to 2283 dollars on a

25   monthly basis if he were an hourly employee.  Similarly, Mr.

215

1    Gargis would go from 509 dollars to the same amount, 22 --

2        THE COURT:  Does the argument change if the pension

3    plan's underfunded?

4        MR. THALER:  Again, I would defer to Mr. Martin.  But

5    I understand that the pension plan is not underfunded but I

6    couldn't speak with a --

7        MR. MARTIN:  Your Honor, the evidence is that both

8    the GM pension plan and the Delphi pension plan are overfunded.

9    They've made excellent investments.  And --

10       THE COURT:  Well, they've asked for, their current

11   waiver goes through the end of the month, funding waiver.

12       MR. MARTIN:  As I understood it, it was published in

13   recent newspaper accounts that Delphi was actually seeking to

14   obtain a loan from the Delphi pension fund, the hourly pension

15   fund.  And so it would appear that there is 4.1 billion that

16   was not going to be immediately paid out if there's going to be

17   equity in the company bought the pension plan.

18       The fact of the matter is these employees were

19   trapped by this situation.  If ERISA did not exist and was not

20   applicable in this situation, then a cause of action under

21   Alabama would have arisen and it would have been called the

22   seat.  When a fiduciary has an obligation to communicate that

23   it is not longer going to carry out what its predecessor had

24   guaranteed and promised, that's called a seat.  That was not

25   made known.  And these employees did not know that they ought

1    to retransfer until they heard that Delphi had filed

2    bankruptcy.  And as they investigated the pension plans and how

3    they would pay out, they realized they were going to lose their

4    years of hourly service with the company and so they

5    immediately then sought to protect their rights and retransfer.

6              THE COURT:  Okay.

7              MR. THALER:  Your Honor, we did address in the papers

8    the Sonnax (ph.) factors.  We've gone through where we believe

9    in the balancing of the harms to the respective parties that we

10   believe that the detriments to the employees as opposed to what

11   impact this would have on the debtor weighs in favor of the

12   employees.

13             THE COURT:  Well, again, I guess I -- there's no

14   litigation commenced.

15             MR. THALER:  Correct.

16             THE COURT:  This is a draft complaint.  There's been

17   no activity in Alabama.  There -- it's not like they're going

18   to be precluded from a request for relief, I don't think.  It's

19   just a question of where it should take place.  So I guess I --

20   I'm kind of -- I understood if you were literally precluded

21   from seeking relief that would be an issue.  But I'm just

22   having a hard time seeing why the balance of the harms requires

23   some court in Alabama to be saddled with trying to figure out

24   what's entailed in the GM settlement and what's involved with

25   Delphi's pension plan.  I mean, I -- unfortunately, or

1    actually, it's been interesting, but unfortunately, I've had to

2    think about those issues for the last two years.  And the

3    debtors point out that both the settlement agreement with GM

4    and issues pertaining to the plan's funding would be subject to

5    my jurisdiction.  So I just -- I don't understand why it's

6    important to start new litigation somewhere else on this.

7            MR. THALER:  I guess Mr. Martin could address some

8    issues with regard to the location of witnesses and --

9            MR. MARTIN:  Your Honor, there's very, very few

10   employees that fall into this category.  We only know of four.

11   And the reason why is because it's unique to the Huntsville

12   plant.  This plant is slated to be shut down entirely in a

13   year.  There are quite a few witnesses and individuals whose

14   depositions would need to be taken rather quickly and who would

15   need to be able to testify live in order for the Court to

16   assess the credibility of the witnesses.  Being able to get

17   those witnesses to the state of New York for the purposes of

18   testimony is cost prohibitive to our clients.  We have three

19   basically working class individuals, maybe upper middle class,

20   and the cost of litigation in an inconvenient form is an

21   unnecessary and unfair expense to them.  There isn't any issue

22   as to the equitable relief sought.  Once that right to be

23   retransferred arises, they fall back under the jurisdiction of

24   this Court so far as this Court continues to maintain

25   jurisdiction of the pension plan.  We're seeking a very narrow

218

1    aspect of relief, the right to transfer, the right for

2    equitable relief to go back and do what should have been done.

3    The monetary impact has got to be miniscule.  The impact on the

4    debtor is unclear if there's any impact at all.  I don't see

5    any impact foreseeably on the debtor other than they have to

6    hire counsel in the state of Alabama.  But they already have

7    regular counsel in the state of Alabama by virtue of the fact

8    that they've had a plant there for years.

9         THE COURT:  Well, can't they take the depositions

10   there?

11        MR. MARTIN:  We can take the depositions there, Your

12   Honor.  But in this type of a case, a breach of fiduciary duty

13   claim, you're trying to establish matters by the testimony of

14   witnesses and the credibility of those witnesses is important.

15   You know, it's possible that I suppose we could videotape all

16   those depositions, but as the Court knows actual live testimony

17   is a much better gauge of assessing the credibility of

18   witnesses as opposed to mirror deposition transcript or even a

19   video.  We strongly feel that while this Court is certainly

20   capable of hearing an ERISA matter, given the fact that it has

21   unique credibility issues, it would impose an unfair burden and

22   expense on our clients to have numerous witnesses have to come

23   to this forum in order to give live testimony.  It would be

24   cost prohibitive for them.

25        THE COURT:  But isn't this largely a documentary

1    case?  Aren't you -- you attach the exhibit?

2        MR. MARTIN:  No, Your Honor.  With a breach of

3    fiduciary duty claim, one of the relative issues is the

4    inconsistent actions of the debtor, in this case, Delphi.  And

5    if they had allowed numerous other individuals to retransfer,

6    well, the fiduciary is acting in an inconsistent manner and the

7    Court then would lower the standard of review in assessing the

8    fiduciary's actions.

9        THE COURT:  In what capacity is Delphi a fiduciary

10   for these individuals?

11       MR. MARTIN:  Your Honor, technically, Delphi is the

12   plan administrator, the actual named plan administrator.

13       THE COURT:  But you're seeking relief beyond the

14   pension plan.  You're seeking relief first and foremost to say

15   that they can --

16       MR. MARTIN:  This is a right that arises in

17   connection with the pension plan agreement, Your Honor.  It's

18   part of the collective bargaining agreement and it also is a

19   part of the agreement now that the union has negotiated with

20   Delphi regarding the special attrition program.  Mr. Livingston

21   is unique because he has no right to health benefits so he is

22   purely seeking his pension benefit.  And so the arguments

23   that --

24       THE COURT:  But is he really -- that's not what the

25   complaint says.  He's not -- that's why I went through that

220

1   question with you.  He's seeking more than that.  He wants to

2   be --

3          MR. MARTIN:  There is nothing --

4          THE COURT:  -- treated as a non-salaried employee so

5   he can take the buyout.

6          MR. MARTIN:  From that approach, yes, Your Honor.  He

7   is trying to obtain his -- there is no other recourse that he

8   has, Your Honor.  There is no other recourse that he has.  His

9   employment will soon end.  He has no other recourse other than

10  to argue I ought to have equitably been allowed to retransfer.

11  Before this agreement was even negotiated, I tried to

12  retransfer.  And Delphi said no.

13         THE COURT:  Well, I guess --

14         MR. MARTIN:  If anybody should bear anything, it

15  should not be our clients because they sought to do what they

16  were required to do before there was any negotiated agreement,

17  before matters progressed to this stage whatsoever.  They had

18  sought twice to fill out all appropriate paperwork to

19  retransfer.  And Delphi decided they weren't going to honor the

20  obligations that had been passed on to them from GM.

21         THE COURT:  Let me just look at one thing for a

22  second.  Don't your clients rely on this Exhibit A letter from

23  1991?

24         MR. MARTIN:  Yes, Your Honor.  That's part of the

25  practice that had been going on as --

221

1      THE COURT:  So, but how -- in what capacity is GM a

2  fiduciary here?

3      MR. MARTIN:  GM was the plan administrator at that

4  time.

5      THE COURT:  Does this letter say anything -- I mean,

6  is --

7      MR. MARTIN:  Delphi --

8      THE COURT:  This is by H.J. Krieger, director of

9  salaried personnel.  It doesn't strike me as a pension plan

10  letter as opposed to a letter that says it's part of your

11  agreement to transfer to salary, you have these two options,

12  including electing to attain the "ability" -- I don't know why

13  they put that in quotes but "ability" to return to hourly.

14      MR. MARTIN:  Your Honor, it does affect pension plan

15  matters.  Harry --

16      THE COURT:  All I'm asking is if in that -- is it

17  your view that in every capacity, Delphi, as a successor to GM

18  here, is a fiduciary, an ERISA fiduciary?

19      MR. MARTIN:  Okay.  Yes, ultimately.  They are an

20  ERISA fiduciary.  The actual named plan administrator for the

21  hourly pension plan is the employee benefits committee.

22  Technically, we could file suit just against the employee

23  benefits committee.  We didn't feel like that would be well

24  advised.  And Alabama court may say well, this actually

25  implicates Delphi because the members of the employee benefits

222

1   committee are appointed by Delphi.  Hence, we're bringing it to

2   this Court's attention to avoid a back and forth trading of

3   this case and unnecessary litigation.  We feel like we could

4   proceed without the Court granting the automatic stay but the

5   employee benefits committee is composed of employees of Delphi

6   with discretion to make decisions.

7          THE COURT:  I'm asking a different question.

8          MR. MARTIN:  I'm sorry.

9          THE COURT:  I understand that one element of the

10  relief you're seeking involves the pension plan.  And I wasn't

11  faulting you for not suing the members of the committee as

12  opposed to proposing this through Delphi.  But my question was,

13  it seemed to me that you were seeking relief beyond pension

14  plan relief and including under this Exhibit A letter.  And my

15  question is, is all the relief that's being sought against

16  Delphi relief where it's alleged that Delphi is an ERISA

17  fiduciary as opposed to a successor to someone who may have

18  agreed as a contractual matter to let these people switch?

19         MR. MARTIN:  Yes.

20         THE COURT:  Okay.  And why is that?

21         MR. MARTIN:  They're an ERISA fiduciary from the

22  standpoint of they're responsible for making that fiduciary

23  decision.  We also have letters from GM and we invited GM into

24  this situation -- letters from GM indicating that they would do

25  what they needed to do after Delphi provided direction.  Delphi

223

1    had to give the direction.  That's all we're seeking.

2    Direction from Delphi.  The monetary obligations fall on others

3    besides Delphi.

4        THE COURT:  Okay.  All right.  Anything else?

5        MR. THALER:  I have nothing further to add at this

6    point, Your Honor.

7        THE COURT:  Okay.

8        MR. BUTLER:  Your Honor, I believe this motion has a

9    number of misconceptions associated with it.  First, what

10   appears to be happening here is the movants appear to be

11   grieved that after nine, ten, thirteen years, respectively, as

12   salaried employees that they believe that there's been a breach

13   of a contractual commitment by Delphi as a successor to General

14   Motors, that they should be entitled to go back to hourly

15   status regardless of Delphi's employees' needs.  And our view

16   is we can best ascertain it's solely for the purpose of

17   participating in the attrition program and other benefits

18   available to hourly workers.

19       The -- it also appears that they did not file a proof

20   of claim against Delphi and that they missed the bar date,

21   which is long past in this case.  And the assertion during oral

22   argument here is that somehow they're not creditors of Delphi

23   and have no claim against Delphi so they didn't have to file a

24   claim.  And I don't get that, frankly.  They, I think, having

25   missed the bar date and having not being able to -- and

224

1    frankly, having much of these issues having been sorted out in

2    the Chapter 11 case where they did not come to defend their

3    interests, having a final plan, for example, that makes very

4    clear that the -- under the confirmation order that their

5    claims vis-a-vis GM are going to be released if the plan is

6    consummated.  The confirmation order and the plan are quite

7    clear on that.

8         The MOU which -- the releases in the MOU at the UAW

9    become final on plan consummation plan time.  And paragraph

10   9(a) of that agreement provides that all employees and former

11   employees of Delphi, represented or formerly represented by the

12   UAW, shall waive and release and be deemed to have waived and

13   released a whole variety of other issues.  I mean, there are --

14   the plan is implicated here, the MOU is implicated here, the

15   attrition order is implicated here.  And as to those matters,

                                                                De

                                                                 l

                                                                 e

16   you have exclusive jurisdiction.  No other court has any

17   jurisdiction to address those issues.  No other Court has any

18   jurisdiction to address the claims they have against Delphi.

19   If they have claims, they should have either filed the claims

20   or somehow under the bar date order asserted that they didn't

21   have to file claims.  Your Honor may recall there was some kind

22   of employee claims that were accepted from the bar date order.

23   Whether they could fashion a persuasive argument to the Court

24   on that, I don't know.  I don't think they could.  But they

25   have missed the bar date.  They have -- the things that they

225

1    really want to get -- this is not an equitable case.  They want

2    money.

3         THE COURT:  Well, let me ask you.  I believe the

4    strongest argument that the movants make here is that, like the

5    situation where the stay is lifted to permit an injured party

6    to proceed solely against insurance, that the stay should be

7    lifted here because the debtor is not adversely impacted, that

8    a third party will be paying the cost.  What's your response to

De

l

e

9    that?

10        MR. BUTLER:  But that's not the case.  The third --

11   GM's not funding all the attrition programs here that they want

12   the benefit of.  As you remember, Delphi funded a portion of

13   those programs.  Some of the payments were shared fifty/fifty.

14   Some of the payments were paid by GM.  Other payments were paid

15   exclusively by Delphi.  There's a question as to where they

16   would fit in the benefit guaranty, if at all, under the benefit

17   guaranty program in which case that GM wouldn't be responsible

18   for any of their obligations.  It's unclear to me what rights

19   they would have.

20        What is clear to me is that GM isn't going to be

21   obligated to them to do anything because GM gets a release as

22   it relates to these kinds of claims.  The very kind of claim

23   they're bringing now vis-a-vis GM is going to be released under

24   the GM settlement agreement for all the contributions GM is

25   making on this case.  GM's position in this case was quite

226

1    clear.  I do all the things I'm doing under the GSA and that's

2    it.  I'm done.  Nothing else.  And that's what this Court

3    confirmed.  That's what was approved here.  And that -- if we

4    consummate the plan is what's going to happen.

5         Similarly, with the UAW.  The UAW entered into very

6    favorable agreements and part of the consideration was that

7    that was it.  That was the transaction and everybody -- all

8    other claims, how ever people want to make them up, for anyone

9    who was ever represented by the UAW are waived.  That becomes

10   final on the effective date of the plan.  Assuming that these

11   parties filing appropriate papers in this Court could ever --

12   which has exclusive jurisdiction over these matters -- could

13   ever navigate through any of those issues -- and it's unclear

14   to me how they're able to do that because it is a money case.

15   They want money.  They're not looking for equity here.  And

16   ultimately if they do that and they can get through the bar

17   date issues and they can get through all the other release

18   issues, where they have failed to protect their rights over the

19   two and a half years, if they're able to do that, then the

20   potential payor of at least a portion if not a substantial

21   portion of their claims may well be Delphi itself as I

22   understand the claims.  And the complaint is not particularly

23   clear on some of these points.

24        And our view, Your Honor, is if they're -- if they

25   believe they have a claim, there's nothing that can prevent

1    them from filing an adversary proceeding in this Court.

2    They're entitled to do that.  This is the Court that has

3    jurisdiction over all these matters and we'll defend it.  But,

4    you know, when you talk about the concept that they should be

5    able to go to Alabama -- I mean, just running through the

6    Sonnax factors -- I mean, I can run through the twelve of them

7    but we did a Sonnax analysis here and they don't prevail really

8    on any of them.  I mean, you know, whether relief will result

9    in a partial complete resolution of the issues.  The answer to

10   that question is no because the resolution of any issues -- the

11   Alabama court cannot take on the issues relating to the

12   UAW/MOU, the plan, the other matters.  You have exclusive

13   jurisdiction over those issues.  That waives against granting

14   relief.  You know, is there a lack of connection with or

15   interference with the bankruptcy case?  Answer is no.  You

16   couldn't have a closer connection.  They're arguing the

17   benefits -- they say to you on this record in this oral

18   argument our clients want the special attrition program.  That

19   was fashioned in this Court with Your Honor approving it by the

20   parties in this court as a creature of this case.  That's not

21   something for the Alabama district court.  If they think they

22   have rights under that attrition program, they need to come

23   here.  I have serious doubts that they have that right.  That

24   waives against granting relief.  You know, whether a

25   specialized tribunal with the necessary expertise has been

228

1    established through a cause of action.  Alabama district court

2    is a court of general jurisdiction.

3         It is -- and I don't accept -- Your Honor may believe

4    that this is an ERISA case.  I sure don't think it is.  I don't

5    think there's any aspect of this is really ERISA related.  If

6    it is, it's a collateral issue at best.  This is about how

7    people, you know, argue breach of contract or breach of an

8    agreement or a commitment and somehow that allows them to get

9    money damages from the company.  Whether the debtors' insurer

10   is accepting full responsibility, that's not applicable.  It's

11   not -- and I understand your argument is there somebody else.

12   Is GM stepping in those shoes?  And I think it's entirely

13   unclear on this clear how much of anything GM will pay under

14   the attrition program particularly when under, as I think Your

15   Honor's aware, those programs had specific cutoffs and specific

16   dates.  The amounts under those programs have been determined

17   and they have been paid to the extent they had a payment

18   responsibility.  All right?  And what these folks are, I think,

19   trying to get in place is to say no, somehow put us back in

20   there before the date.  Turn the clock back two years and allow

21   us to get into those programs.

22        You know, whether the action primarily involves third

23   parties, I think the answer here is no.  They've tried to craft

24   the case for whatever strategic reasons to suggest Delphi's not

25   in the middle of it.  But they're actually -- at the end of the

1    day, they did what they had to do which they want to sue

2    Delphi.  'Cause we're in the middle of all of this.  You know,

3    whether litigation of the form would prejudice the interest of

4    other creditors.  I think clearly the answer to that is yes.

5    All of these issues here they're raising directly affect the

6    stakeholders in this case.  Whether the judgment arising from

7    the other action sub -- equitable subordination.  It's not.

8         And I could go on, Your Honor.  I mean, there's

9    not -- I honestly believe sincerely there's not a single Sonnax

10   factor here that even when you get to impact on the stay in the

11   parties and the balance of the harms, there's nothing that

12   prevents them from filing an action in this court if they have

13   the ability to proceed.  And, Your Honor, if they have a

14   legitimate claim that under Rule 11 they can file a legitimate

15   adversary proceeding, you know, then they can complete it and

16   we'll defend it.  But I do not believe that there is any basis

17   for the Court under Sonnax granting the relief that they seek.

18   Thank you, Your Honor.

19        MR. MARTIN:  Your Honor, David Martin again for the

20   movant employees.  May I address the Court?

21        THE COURT:  Yes.

22        MR. MARTIN:  I am dumbfounded by the statement that

23   this is not an ERISA case.  I am absolutely dumbfounded.  Your

24   Honor, this is an ERISA case.  Under United States Supreme

25   Court precedent, when there's a plan that's been established

230

1   and there's a summary plan description in place and that

2   summary plan description yields pension benefits, that is an

3   ERISA case.  In this instance --

4        THE COURT:  But you're not seeking relief solely in

5   respect to the pension plan, right?

6        MR. MARTIN:  As to Keith Livingston, yes, we are.  As

7   to the other two, we're seeking relief that is attendant to the

8   relief allowed by the pension plan.

9        THE COURT:  But in your reply dated February 19th,

10  you say that, paragraph 21, Keith Livingston as a salaried

11  employee is entitled to a lump sum of 57,000 dollars.  However

12  as an hourly employee, he's entitled to a lump sum of 140,000

13  dollars.  And Gargis is entitled to a monthly benefit.  And

14  Mueller is entitled to a monthly benefit.

15       MR. MARTIN:  We're comparing and contrasting strictly

16  the pension plan payouts, the lower amounts being the salary

17  pension plan payout, which, again, that entity is not before

18  this Court either, versus the hourly pension plan payout.

19  We're contrasting them.  Had they known and been allowed the

20  ability and right to retransfer, this issue wouldn't even be

21  here.  As a matter of fact, the statement that they didn't file

22  a claim is very puzzling as well because the claims did not

23  accrue until long after the bar date.  How can you file a claim

24  for something that you haven't yet been denied?

25       THE COURT:  But it's based on a pre-petition

1    agreement, right?

2        MR. MARTIN:  No.  It's based on a fiduciary duty that

3    was assumed by GM and passed on.  When it comes down to --

4        THE COURT:  So I should just disregard Exhibit A?

5    It's not part of this case?  Never will be in the future?

6        MR. MARTIN:  Your Honor, Exhibit A is part of the

7    case but it's not the sole agreement.  --

8        THE COURT:  Well, is it --

9        MR. MARTIN:  That was part of the affirmation --

10        THE COURT:  Is it anything?  Is it just totally

11    irrelevant?

12        MR. MARTIN:  No, Your Honor.  It's part of an

13    affirmation as to what was going on.  The problem that we have

14    here is we don't have a contract per se that spells out all the

15    terms.  What we have is a practice.  What we have is a practice

16    whereby GM was inducing employees to switch and trade and they

17    were supposed to be protected in that switch.

18        THE COURT:  And that practice started --

19        MR. MARTIN:  And that practice is established by the

20    testimony of numerous different employees along with GM

21    employees, along with Delphi employees, along with that

22    documents.

23        THE COURT:  And none of that --

24        MR. MARTIN:  That document has provided --

25        THE COURT:  None of that testimony is involving pre-

232

1    petition activity?  It must, because it's GM.
2        MR. MARTIN:  All of it involves pre-petition
3    practices.  As far as when do you have a claim, you don't have
4    a claim until you know you have a problem.
5        THE COURT:  Really?
6        MR. MARTIN:  Well, as far as the monetary claim --

7        THE COURT:  And you think that's what the Second

8    Circuit said in LTV and Chateaugay?
9        MR. MARTIN:  I'm sorry?

10       THE COURT:  Do you think that's the Second Circuit

11   view?
12       MR. MARTIN:  Well, all of these matters arose of

13   course in the Eleventh Circuit, Your Honor.  And I'm not

14   familiar with Second Circuit law.  And I'll completely concede

15   that fact.  The fact of the matter is, Your Honor, until --
16       THE COURT:  Do you -- but honestly, I mean, other

17   than Frenville, which the Third Circuit has drastically cut

18   back on, do you have any law to the effect that a contingent
19   claim is no less a claim than a --
20       MR. MARTIN:  If it was a contingent claim against the debtor, I
21   would agree if it was a contingent claim against the debtor.
22   However, Your Honor, we're saying they failed to take an action
23   not failed to pay us money.  The fact of the matter is the
24   monetary amount due to be paid out is from the pension plan
25   which eleventh circuit --

233

1      THE COURT:  Well, wait.  Are your clients looking for

2  anything in respect of the employee attrition that went to non-

3  salaried employees?  Are they looking for any -- are they

4  waiving that right?

5      MR. MARTIN:  Waiving the right to participate in the

6  attrition program?

7      THE COURT:  Right.

8      MR. MARTIN:  No, Your Honor.  They can't waive that

9  right because there are no other options that have been

10  afforded to them by Delphi.

11      THE COURT:  But --

12      MR. MARTIN:  If there was an option, we would be glad

13  to consider it.

14      THE COURT:  But how is that an ERISA matter?  The

15  attrition program is just a buyout to get people to leave.

16      MR. MARTIN:  It nonetheless is part of a pension plan

17  agreement.  It implicates the pension plan which is backed up

18  by the Pension Benefit Guaranty Corporation.

19      THE COURT:  How does it implicate the pension plan?

20      MR. MARTIN:  Because all the benefits are due to be

21  paid from the pension plan.  Excuse me --

22      THE COURT:  What --

23      MR. MARTIN:  All of the pension benefits are due to

24  be paid by the pension plans in question.

25      THE COURT:  I'm talking about the attrition money.

234

1    Where does that money come from?

2        MR. MARTIN:  The attrition money, as I've understood

3    the agreements is money that Delphi decided to put into the

4    situation although it's not entirely clear to me that it's

5    necessary due to the funding of the pension plans as they

6    currently exist.  Nonetheless, it's money they agreed to do in

7    connection with their agreement with the union.  All right?

8        MR. BUTLER:  Your Honor, just so the record can be

9    clear on this.  There is not a dime of money paid under the

10   attrition program that came from pension plans.

11       THE COURT:  I know.  And I don't think an Alabama

12   court should be told the opposite, which is why someone who

13   knows about it should keep the case.  So that an Alabama court

14   doesn't have to wade through it as opposed to having --

15       MR. MARTIN:  Your Honor, I --

16       THE COURT:  -- this Court already having waded

17   through it --

18       MR. MARTIN:  Your Honor --

19       THE COURT:  -- several months ago.

20       MR. MARTIN:  I understand --

21       THE COURT:  I mean, you're just pulling this out of

22   your hat.  I've heard enough.  I've heard enough.

23       I have before me a motion by Jimmy Mueller, David

24   Gargis and Keith Livingston for relief from the automatic stay

25   under Section 362(a)(1) and (a)(3) which I conclude does apply

235

1    here because the debtors are necessary parties, not mere

De

l

e

2    nominal parties but necessary parties to the complaint that the

3    movants want to bring for relief from the stay to bring a

4    complaint in the Northern District of Alabama, seeking as set

5    forth in the exhibit to the notice of motion "an order and/or

6    injunctive relief requiring Delphi to retransfer each of the

7    plaintiffs to Delphi hourly rate employee pension plan

8    retroactive to the date of each plaintiff's request to be so

9    transferred.  Secondly, for an order and/or injunctive relief

10   requiring Delphi to allow each of the plaintiffs the same

11   benefits to which hourly employees are allowed and have been

12   allowed since the date of each request for retransfer.  And

13   (c), for an order requiring that Delphi not penalize or

14   discriminate against the plaintiffs for having transferred to

15   salary employment or for retransferring to hourly employment."

16       At oral argument, it was clarified that this relief,

17   in essence, seeks to have a declaration that the employees have

18   the right to transfer from being salaried employees to hourly

19   employees.  It was also clarified at oral argument that these

20   employees expect to participate in the attrition program funded

21   in part by the debtors and in part by GM for hourly workers

22   that the Court previously approved and which has previously

23   been implemented.  Indeed, counsel for the movants stated that

24   this was really the only relief they could seek, the only

25   relief available to them.

236

1   The movants contend that they have an interest in
2   property, but ultimately it seems to me that, first and

De
l
e

3   foremost, the movants have an interest, either at law or under
4   a contract or both, all deriving from the pre-petition period.
5   Nonetheless, they have not filed a proof of claim in the case.
6   They contend that the appropriate standard to be applied, and
7   the debtors agree with them in this situation where they seek
8   to bring post-petition litigation in respect of pre-petition
9   rights, not to enforce a lien but arguably to get them closer

De
l
e

10   to a property interest, is set forth by the Second Circuit in        De

l
t

11   In re Sonnax, 907 F.2d 1280 (2nd Cir. 1990).  Second Circuit in
12   that case listed twelve factors which may, under appropriate

De
l
e

13   circumstances, be properly considered by a court for a request
14   of this nature.
15   Before going through the factors, I should reiterate
16   a couple of points.  First, as I stated, no litigation is
17   proceeding in Alabama at this point.  Indeed, the motion seeks

De
l
e

18   leave to commence such litigation.  So no court outside of this
19   Court has considered any of the issues raised by the ultimate
20   relief to be sought by these parties as set forth in their

De
l
e

21   complaint and as amplified at oral argument.
22   Secondly, the relief that these parties ultimately
23   wish to seek implicates and necessarily requires interpretation
24   of the bar date order established by this Court setting a bar

De
l
e

25   date for filing claims; the MOU/settlement agreement with GM        De

237

1    entered into by the debtors that's a fundamental underpinning
                                                                    De
                                                                    l
                                                                    e

2    of the debtors' Chapter 11 plan; arguably of the settlement
3    agreements between the debtors and their unions, which is
                                                                    De
                                                                    l
                                                                    e

4    another fundamental foundation of the debtors' Chapter 11 plan;
5    and the debtors' Chapter 11 plan and the confirmation order
6    confirming that plan -- those documents would need to be
7    considered to provide complete relief here or to consider the
8    movants' request for relief, ultimately because they set forth
9    whether and what circumstances individuals are entitled to
10    participate in employee attrition programs that form an
11    integral part of those agreements, the amount that the debtors
12    might have to pay in respect of those programs and the releases
13    that the third parties partially funding those programs and the
14    debtors received under the plan and those programs.  Because of
15    the fundamental importance of those settlements and obviously
16    because of the fundamental importance of the plan, this Court
17    retained exclusive jurisdiction to interpret the settlements
18    and the plan.  It has jurisdiction to interpret the plan.
19          I believe also a fundamental bankruptcy issue is
20    raised by the fact that these individuals did not file a proof
                                                                    De
                                                                    l
                                                                    e

21    of claim and the passing of the bar date, and whether and in      De
                                                                        l
                                                                        e
                                                                        t

22    fact the relief they're seeking, to the extent it requires or
23    would seek payment under or on an equitable basis consistent
24    with the employee attrition program would constitute a claim
25    under Section 1015(b)(4)(a) that would be barred at this point

1   or not.  See generally, In re Chateaugay Corporation, 89 F.3d
2   942, 951 (2nd Cir. 1991) as well as In re Chateaugay

                                              De

                                              l

                                              e

3   Corporation, 944 F. 2d 997, 1004-1005 (2nd Cir. 1991), and,        De

                                              l

                                              e

                                              t

4   finally, In re Manville Forest Products Corporation, 225 B.R.
5   862, 866-867, 868 (Bankr. S.D.N.Y. 1998).
6        I also believe that this is not, as I said before,
7   the type of complaint that seeks to sue the debtor only as a
8   nominal party or only in its capacity as a fiduciary.  It is
9   true that one of the claims for relief under the complaint
10  pertains to obtaining rights under the pension plan.  But
11  unlike those who are willing to go only against an insurance
12  policy, these movants are clearly not prepared to waive their
13  rights against the debtor or against the attrition program.  In
14  fact, again, it was stated that that was the fundamental and
15  only right that they would be entitled to.
16       Moreover, it is not at all clear to this Court that
17  the pension plan claim, to the extent it would be granted or
18  allowed, is money good or not subject to any releases under the
19  plan.  So when weighing the Sonnax factors, it appears clear to
20  me that relief by the Court in Alabama would not result in a
21  complete resolution of the matter, that it would interfere with
22  the bankruptcy case and that, most importantly, the interests
23  of judicial economy and expeditious and economical resolution
24  of the issues raised by the proposed complaint would call for
25  the matter to be decided here, given the Court's familiarity

1   with the plan, the confirmation order, the GM MOU, the union

2   settlements and the Court's orders approving those settlements

3   as well as the attrition programs and, finally, the Court's

4   expertise in respect of what constitutes a claim and remedies

5   that are available to a  debtor -- I'm sorry, to a movant who

6   has not filed a proof of claim.

7        Given the relief that's being sought here, which is

8   based upon a contract dated 1991, February 4, that refers

9   nowhere to a pension plan, and the general request in the

10   complaint to be treated as a hourly employee, I believe that

11   the relief that is sought here involves the debtor as more than

12   a fiduciary or a nominal party.  And consequently, the stay

13   should not be lifted to involve another forum in those types of

14   disputes.  I don't believe that the cost involved to the

15   movants, where the depositions can take place in Alabama,

16   offset the other factors whereby far greater costs, I believe,

17   would be undertaken by having a confused and piecemeal

18   resolution of these issues by having them raised first in one

De
l
e

19   court and then potentially in this Court.

20        So, Mr. Butler, you can submit an order denying the

21   motion.

22        MR. SACKS:  Thank you, Your Honor.

23        THE COURT:  Of course, that doesn't preclude by any

24   means these movants seeking relief here, although obviously the

25   debtor is free to raise whatever defenses it wishes to,

240

1    including not only on the merits but also under the bar date

2    order and the orders confirming the plan and approving the

3    various settlements, the MOUs and attrition program that I

4    referred to.

5         MR. BUTLER:  Thank you, Your Honor.  We'll prepare

6    that.  Your Honor, that completes the items on the agenda for

7    this -- the omnibus agenda of -- just a word of appreciation

8    for the Court and its staff, it's been a long day.  We

9    appreciate, from the debtors' perspective, being able to

10   address the matters we need to as we sort of continue to move

11   along in the emergency timeline.

12        THE COURT:  Okay.  All right.  Thank you.

13        MR. SACKS:  Thank you, Your Honor.

14        (Proceedings concluded at 5:24 p.m.)

15

16

17

18

19

20

21

22

23

24

25

241

```
 1                    I N D E X

 2

 3   WITNESS          EXAMINATION BY         PAGE

 4   Christopher Dell   Mr. Hogan            50

 5   Christopher Dell   Mr. Glas             62

 6   Christopher Dell   Mr. Hogan            68

 7   Mr. Gershbein      Mr. Sullivan         121

 8

 9                    E X H I B I T S

10   DEBTORS'         DESCRIPTION            PAGE

11   1 through 57     Sheehan Declaration      20

12                    and Pleading Documents

13   58 through 64    Withdrawals              21

14   1 through 40                            119

15   41               E-mail of Mr. Gershbein  124

16   42               Summary from Counsel for 124

17                    Lifetime

18   43               E-mails from Mr. Howe     128

19

20

21

22

23

24

25              I N D E X (continued)
```

242

1

2                              RULINGS

3                                      Page Line

4   Motion to Extend Time to Remove Granted       17   19

5

6   Motion for Extension of Time Under            17   19

7   Section 365(d)(4) Granted

8

9   Steering Sale Motion Approved                 28   6

10

11  Relief Granted to Nine Claims of the          29   24

12  Twenty-Fifth Omnibus Objection Claims

13

14  Interim Fee Applications Granted              33   19

15

16  Motion of Automodular is Denied               105 22

17

18  Mueller, Gargis & Livingston's Motion to      239 14

19  Vacate Automatic Stay Denied

20

21

22

23

24

25

243

1                        C E R T I F I C A T I O N

2

3    I, Esther Accardi, court approved transcriber, certify that the

4    foregoing is a correct transcript from the official electronic

5    sound recording of the proceedings in the above-entitled

6    matter, except where, as indicated, the Court has modified its

7    bench ruling.

8

9    _____ February 25, 2008

10   Signature of Transcriber              Date

11

12   ESTHER ACCARDI

13   typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25