IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :
       In re                 :    Chapter 11
                        :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                        :
              Debtors.    :    (Jointly Administered)
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

     I, Elizabeth Adam, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

     On March 21, 2008, I caused to be served the documents listed below upon the parties listed on Exhibit A hereto via postage pre-paid U.S. mail:

1) Order Under 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr. P. 2002 and 9014 (I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form and Manner of Sale Notices, and (IV) Setting Sale Hearing Date in Connection with Sale of Kettering Machinery, Equipment and Inventory ("Kettering Asset Bidding Procedures Order") (Docket No. 13188) [a copy of which is attached hereto as Exhibit B]

2) Expedited Motion for Order Under 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr P. 2002, 6004, and 9014 (A)(I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form and Manner of Sale Notices, and (IV) Setting Sale Hearing Date and (B) Authorizing and Approving (I) Sale by Delphi Automotive Systems LLC of Certain Machinery, Equipment, and Inventory Primarily Used in DAS LLC's Kettering Damper Business Free and Clear of Liens and (II) Entry into Lease Agreement in Connection Therewith ("Kettering Sale Motion") [a copy of which is attached hereto as Exhibit C]

3) Asset Purchase Agreement By and Between Delphi Automotive Systems LLC and Tenneco Automotive Operating Company Inc [a copy of which is attached hereto as Exhibit D]

4) [Proposed] Order Under 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr P. 2002, 6004, and 9014 Authorizing and Approving (I) Sale by Delphi Automotive Systems LLC of Certain Machinery, Equipment, and Inventory Primarily Used

at Debtors' Kettering Facility Free and Clear of Liens and (II) Entry into Lease Agreement in Connection Therewith [a copy of which is attached hereto as <u>Exhibit E</u>]

On March 24, 2008, I caused to be served the documents listed below upon the parties listed on <u>Exhibit F</u> hereto via electronic notification:

5) Order Under 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr. P. 2002 and 9014 (I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form and Manner of Sale Notices, and (IV) Setting Sale Hearing Date in Connection with Sale of Kettering Machinery, Equipment and Inventory ("Kettering Asset Bidding Procedures Order") (Docket No. 13188) [a copy of which is attached hereto as <u>Exhibit B</u>]

6) Expedited Motion for Order Under 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr P. 2002, 6004, and 9014 (A)(I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form and Manner of Sale Notices, and (IV) Setting Sale Hearing Date and (B) Authorizing and Approving (I) Sale by Delphi Automotive Systems LLC of Certain Machinery, Equipment, and Inventory Primarily Used in DAS LLC's Kettering Damper Business Free and Clear of Liens and (II) Entry into Lease Agreement in Connection Therewith ("Kettering Sale Motion") [a copy of which is attached hereto as <u>Exhibit C</u>]

7) Asset Purchase Agreement By and Between Delphi Automotive Systems LLC and Tenneco Automotive Operating Company Inc [a copy of which is attached hereto as <u>Exhibit D</u>]

8) [Proposed] Order Under 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr P. 2002, 6004, and 9014 Authorizing and Approving (I) Sale by Delphi Automotive Systems LLC of Certain Machinery, Equipment, and Inventory Primarily Used at Debtors' Kettering Facility Free and Clear of Liens and (II) Entry into Lease Agreement in Connection Therewith [a copy of which is attached hereto as <u>Exhibit E</u>]

Dated: March 26, 2008

_____/s/ Elizabeth Adam_____
Elizabeth Adam

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 26th day of March, 2008, by
Elizabeth Adam, proved to me on the basis of satisfactory evidence to be the person who
appeared before me.

Signature: _____/s/ Vanessa R. Quiñones_____

Commission Expires:_____3/20/11_____

# EXHIBIT A

Pg 5 of 215
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L. Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com sliviri@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | gianni.russello@jpmorgan.com susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

3/21/2008 10:28 AM
Master Service List US Mail

Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thacher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | | | Creditor Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

3/21/2008 10:28 AM
Master Service List US Mail

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | 610-230-3064 | Counsel to Airgas, Inc. |
| Akebono Corporation North America | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | Vice President of Administration for Akebono Corporation |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | 212-692-8251 | |
| APS Clearing, Inc. | Andy Leinhoff Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | 313-496-1200 | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bingham McHale LLP | Michael J Alerding | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | 317-635-8900 | Counsel to Universal Tool & Engineering co., Inc. and M.G. Corporation |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | 212-826-8800 | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | 615-321-0555 | Counsel to Averitt Express, Inc. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | 937-223-8177 | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-8898 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | 248-576-5741 | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 4

3/21/2008 10:28 AM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|------------------|
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | 212-682-4940 | Counsel to Tyz-All Plastics, Inc.; Co-Counsel to Tower Automotive, Inc. |
| Dykema Gossett PLLC | Brendan G Best Esq | 39577 Woodward Ave Ste 300 | | Bloomfield Hills | MI | 48304 | 248-203-0523 | Attorneys for Tremond City Barrel Fill PRP Group |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | 312-346-7500 | Counsel to Aluminum International, Inc. |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | Counsel to Ryder Integrated Logistics, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Heller Ehrman LLP | Carren Shulman | Times Square Tower | Seven Times Square | New York | NY | 10036 | 212-832-8300 | Counsel to @Road, Inc. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | 248-723-0396 | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | 678-384-7000 | Counsel to Vanguard Distributors, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | 419-255-4300 | Counsel to ZF Group North America Operations, Inc. |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | 212-808-7800 | Counsel to the Pension Benefit Guaranty Corporation |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | 212-556-2100 | Counsel to KPMG LLP |
| Klett Rooney Lieber & Schorling | DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | (302) 552-4200 | Counsel to Entergy |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | (302) 552-4200 | Counsel to Entergy |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | 212-906-1200 | UCC Professional |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | 214-880-0089 | Counsel to Dallas County and Tarrant County |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | 312-443-0370 | Counsel to Methode Electronics, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 4

3/21/2008 10:28 AM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | 312-443-1832 | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-947-8304 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | 804-775-1178 | Counsel to Siemens Logistics Assembly Systems, Inc. |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | 410-385-3418 | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | 908-722-0700 | Counsel to Rotor Clip Company, Inc. |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | Counsel to WL. Ross & Co., LLC |
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | Counsel to Ambrake Corporation; Akebono Corporation |
| Pickrel Shaeffer & Ebeling | Sarah B. Carter Esq | 2700 Kettering Tower | | Dayton | OH | 45423 | | |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | 973-621-3200 | Counsel to Jason Incorporated, Sackner Products Division |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | 312-207-1000 | Counsel to Infineon Technologies North America Corporation |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | 248-540-3340 | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | Counsel to Means Industries |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | 860-251-5811 | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 4

3/21/2008 10:28 AM
US MAIL

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | 201-930-7483 | Counsel to Sony Electronics, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | 248-352-4700 | Counsel to Bing Metals Group, Inc.; Gentral Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | 202-424-7500 | Attorneys for Sanders Lead Co., Inc. |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | 212-603-2000 | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | Conflicts counsel to Debtors |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy | Allied Industrial and Service Workers, Intl Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center Suite 807 | Pittsburgh | PA | 15222 | 412-562-2549 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | 614-464-6422 | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | 614-464-8322 | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | 817-810-5250 | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | 714-966-1000 | Counsel to Toshiba America Electronic Components, Inc. |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | 512-370-2800 | Counsel to National Instruments Corporation |
| WL Ross & Co., LLC | Stephen Toy | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | Counsel to WL Ross & Co., LLC |

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---------|---------|----------|----------|------|-------|-----|---------|
| Adair Co Mo | Adair Co Collector | County Courthouse | 106 W Washington St | Kirksville | MO | 63501 | |
| Adams County In | Adams County Treasurer | 313 W Jefferson St | | Decatur | IN | 46733 | |
| Addison Village Of | Treasurer | 211 N Steer St | | Addison | MI | 49220 | |
| Adrian City Of Lenawee | Treasurers Office | 100 E Church St | | Adrian | MI | 49221 | |
| AIG-CET Capital Management | Rossen Hadjiev - Director | Stratos Office Center | ul. Storupki 5 (5th floor) | Warsaw | | PL-00-546 | Poland |
| Aiken Co Sc | Aiken Co Tax Treasurer | PO Box 636 | | Aiken | SC | 29802 | |
| Alabama Department Of Revenue | Business Privilege Tax Unit | PO Box 327431 | | Montgomery | AL | 36132-7431 | |
| Alabama Department Of Revenue | Individual & Corporate Tax Division | Corporate Income Section | PO Box 327430 | Montgomery | AL | 36132-7430 | |
| Alabama Dept Of Revenue | Sales Use & Business Tax Division | PO Box 327710 | | Montgomery | AL | 36132 | |
| Alabama Etowah County | Sales Tax Division Lgrec Inc | PO Box 1324 | | Hartselle | AL | 35640 | |
| Alameda County Tax Collector | | 1221 Oak St Room 131 | | Oakland | CA | 94612 | |
| Alatax | | PO Box 830725 | | Birminham | AL | 35683 | |
| Alief Isd Tx | Alief Isd Tax Office | 14051 Bellaire Blvd | | Houston | TX | 77803 | |
| Allen County In | Treasurer Of Allen County | PO Box 2540 | | Fort Wayne | IN | 46801 | |
| Allen County Treasurer | | PO Box 123 | | Lima | OH | 45802 | |
| Allen County Treasurer | | One East Main St Room 100 | | Fort Wayne | IN | 46801-2540 | |
| Alma City Of Gratiot | | 525 E Superior St | Box 278 | Alma | MI | 48801 | |
| Anderson Co Sc | Anderson Co Treasurer | PO Box 8002 | | Anderson | SC | 29622 | |
| Anderson Co Tn | Anderson County Trustee | 101 N Main St | Room 203 | Clinton | TN | 37716 | |
| Angelina Co Tx | Angelina Co Tax Assessor Collector | PO Box 1344 | | Lufkin | TX | 75902 | |
| Angelina County | John P Dillman | Linebarger Goggan Blair & Sampson | PO Box 3064 | Houston | TX | 77253-3064 | |
| Annual Report Processing Center | Secretary Of State North Dakota | 600 E Blvd Ave Dept 108 | PO Box 5513 | Bismarck | ND | 58506-5513 | |
| Arizona Corporation Commission | C/o Annual Reports | Corporations Division | 1300 W Washington | Phoenix | AZ | 85007-2929 | |
| Arizona Department Of Revenue | | PO Box 29079 | | Phoenix | AZ | 85038-9079 | |
| Arkansas Secretary Of State | Business And Commercial Services | PO Box 8014 | | Little Rock | AR | 72203-8014 | |
| Arvin Meritor | Attn General Counsel | 894 Maplelawn Dr | | Troy | MI | 48084 | |
| Arvin Meritor | Nick Exton | Attn General Counsel | 2135 W Maple Rd | Troy | MI | 48084 | |
| Ashtabula County Treasurer | | 25 W Jefferson St | | Jefferson | OH | 44047 | |
| Autauga County Al | Autauga County Revenue Commissioner | 218 North Court St | | Prattville | AL | 36067 | |
| Baldwin County Al | Baldwin County Revenue Commissioner | PO Box 1549 | | Bay Minette | AL | 36507 | |
| Bangor Twp Bay | Treasurer | 180 State Pk Dr | | Bay City | MI | 48706 | |
| Bartholomew County In | Bartholomew County Treasurer | PO Box 1986 | | Columbus | IN | 47202 | |
| Bay City City Of Bay | Treasurer | 301 Washington Ave | | Bay City | MI | 48708 | |
| Bay County Tax Collector | Co Jerry W Gerde Esq | 239 E 4th St | | Panama City | FL | 32401 | |
| Bd Of Ed South Western City Sch Dst | Treasurer | 3805 Marlane Dr | | Grove City | OH | 43123 | |
| Bedford Co Tn | Bedford County Trustee | 102 North Side Square | | Shelbyville | TN | 37160 | |
| Ben Hill County Ga | Ben Hill County Tax Commissioner | PO Box 1393 | | Fitzgerald | GA | 31750 | |
| Berkley City Of Oakland | | 3338 Coolidge Hwy | | Berkley | MI | 48072 | |
| Bexar Co Tx | Bexar Co Tax Assessor / Collector | PO Box 2903 | | San Antonio | TX | 78299 | |
| Bexar County | David G Aelvoet | Linebarger Goggan Blair & Sampson | 711 Navarro Ste 300 | San Antonio | TX | 78205 | |
| Blackford County In | Blackford County Treasurer | PO Box 453 | | Hartford City | IN | 47348 | |
| Board Of County Commissioners Of Jo | Johnson County Legal Dept | Johnson County Admin Bldg | 111 S Cherry St Ste 3200 | Olathe | KS | 66061-3441 | |
| Board Of Equalization | | PO Box 942879 | | Sacramento | CA | 94279 | |
| Boone Co Ky | Boone County Sheriff | PO Box 198 | | Burlington | KY | 41005 | |
| Boulder Co Co | Boulder County Treasurer | PO Box 471 | | Boulder | CO | 80306 | |
| Boulder County Treasurer | Bob Hullinghorst | PO Box 471 | | Boulder | CO | 80306 | |
| Bourbon Co Ky | Bourbon County Sheriff | 301 Main St | | Paris | KY | 40361 | |
| Bowie Independent School District | Andrew Dylan Wood | Ray Wood & Bonilla Llp | PO Box 165001 | Austin | TX | 78716 | |
| Brevard County Tax Collector | | PO Box 2020 | | Titusville | FL | 32781 | |
| Brighton City Of Livingston | Treasurer | 200 N First St | | Brighton | MI | 48116 | |
| Brighton Twp Livingston | Treasurer | 4363 Buno Rd | | Brighton | MI | 48114 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 16

3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Brownsville Isd | Diane W Sanders Linebarger Goggan Blair & San | 1949 South Ih 35 | PO Box 17428 7428 | Austin | TX | 78760-7428 | |
| Brownsville Isd Tx | Brownsville Isd Tax Office | PO Box 4050 | | Brownsville | TX | 78523 | |
| Buena Vista Twp Saginaw | Buena Vista Twp Treasurer | 1160 S Outer Dr | | Saginaw | MI | 48601 | |
| Bureau Of Customs Border Protection | Commisioner | Department Of Homeland Security | 1300 Pennsylvania Ave Nw | Washington | DC | 20229 | |
| Burkburnett Independent School District | Harold Lerew | Perdue Brandon Fielder Collins & Mo | PO Box 8188 | Wichita Falls | TX | 76307 | |
| Burkburnett Isd Tx | Burkburnett Isd Tax Office | PO Box 608 | | Burkburnett | TX | 76364 | |
| Burton City Of Genesee | Treasurer | 4303 S Ctr Rd | | Burton | MI | 48519 | |
| Butler Co Ky | Butler County Sheriff | PO Box 100 | | Morgantown | KY | 42261 | |
| Butler Co Mo | Butler Co Courthouse | 100 N Main | | Poplar Bluff | MO | 63901 | |
| Butler County Treasurer | Government Services Building | 315 High St 10th Fl | | Hamilton | OH | 45011 | |
| Byron Twp Kent | Treasurer | 8085 Byron Ctr Ave Sw | | Byron Ctr | MI | 49315 | |
| Cabarrus Co Nc | Cabarrus Co Tax Collector | 65 Church St Se | | Concord | NC | 28026 | |
| California Secretary Of State | Statement Of Information Unit | PO Box 944230 | | Sacramento | CA | 94244-2300 | |
| Cameron Co Tx | Cameron Co Tax Assessor/collector | PO Box 952 | | Brownsville | TX | 78522 | |
| Cameron County | Diane W Sanders Linebarger Goggan Blair & San | 1949 South Ih 35 78741 | PO Box 17428 | Austin | TX | 78760-7428 | |
| Campbell Co Va | County Of Campbell Treasurer | PO Box 37 | | Rustburg | VA | 24588 | |
| Campbell County Treasurers Office | | PO Box 37 | | Rustburg | VA | 24588 | |
| Canada Border Service Agency | Mr Alain Jolicoeur | 191 Laurier Ave West | 15th Fl | Ottawa | ON | K1A 0L8 | Canada |
| Canada Customs And Revenue Agency | | 275 Pope Rd Ste 103 | | Summerside Pe | | C1N 6A2 | Canada |
| Canton Twp | Treasurer | PO Box 87010 | | Canton | MI | 48187 | |
| Carlyle Group | Mike Stewart | Attn General Counsel | | Washington | DC | 20004-2505 | |
| Carolyn P Bowers Montgomery County | Trustee | PO Box 1005 | | Clarksville | TN | 37041 | |
| Carrollton Farmers Branch Independen | Andrea Sheehan | Law Offices Of Robert E Luna P C | 4411 N Central Expressway | Dallas | TX | 75205 | |
| Carrollton Farmers Branch Isd Tx | School Tax Assessor / Collector | PO Box 110611 | | Carrollton | TX | 75011 | |
| Cass County In | Cass County Treasurer | 200 Court Pk | | Logansport | IN | 46947 | |
| Catawba Co Nc | Catawba Co Tax Collector | PO Box 368 | | Newton | NC | 28658 | |
| Cca Municipal Income Tax | | 1701 Lakeside Ave | | Cleveland | OH | 44114-1179 | |
| Charter Township Of Brighton | Harris & Literski | 822 E Grand River | | Brighton | MI | 48116 | |
| Chelsea | | 305 S Main St | Ste 100 | Chelsea | MI | 48118 | |
| Cherokee Co Ga | Cherokee Bd Of Collector | 100 North St | | Canton | GA | 30114 | |
| Chesterfield Co Sc | Chesterfield Co Tax Treasurer | PO Box 750 | | Chesterfield | SC | 29709 | |
| Chris Hughes Okaloosa County Tax Co | Philip A Bates Pa | PO Box 1390 | | Pensacola | FL | 32591-1390 | |
| Christian Co Ky | Christian County Sheriff | 501 S Main St | | Hopkinsville | KY | 42240 | |
| Cincinnati Income Tax Division | | 805 Central Ave | Ste 600 | Cincinnati | OH | 45202-5756 | |
| City & County Of Denver Co | Treasury Division | 144 W Colfax Ave / PO Box 17420 | | Denver | CO | 80217 | |
| City And County Of Denver Treasury | Attn Karen Katros Bankruptcy Analys | Mcnichols Civic Ctr Bldg | 144 W Colfax Ave Room 384 | Denver | CO | 80202-5391 | |
| City If Bristol Ct | City If Bristol Tax Collector | PO Box 1040 | | Bistol | CT | 06011 | |
| City Income Tax | Room G 29 | 142 W Michigan Ave | | Lansing | MI | 48933-1697 | |
| City Of Akron Ohio | Income Tax Division | 1 Cascade Plaza 11th Fl | | Akron | OH | 44308-1100 | |
| City Of Bowling Green Ky | Treasury Division | PO Box 430 | | Bowling Green | KY | 42102-0430 | |
| City Of Brookhaven Ms | City Tax Collector | PO Box 560 | | Brookhaven | MS | 39602 | |
| City Of Brownsville Tn | City Clerk | PO Box 375 | | Brownsville | TN | 38012 | |
| City Of Chester Ct | City Of Chester Tax Collector | PO Box 314 | | Chester | CT | 06412 | |
| City Of Clinton Tn | Clinton City Recorder | 100 Bowling St | City Hall | Clinton | TN | 37716 | |
| City Of Columbia | | 707 N Main St | | Columbia | TN | 38401 | |
| City Of Columbia Ms | City Of Columbia Tax Office | 201 2nd St | | Columbia | MS | 39429 | |
| City Of Coopersville | Law Weathers & Richardson Pc | 333 Bridge St Ste 800 | | Grand Rapids | MI | 49504 | |
| City Of Dayton | Attn Tax Collections | City Of Dayton Finance Department | 101 W Third St | Dayton | OH | 45402 | |
| City Of Dayton | Department Of Finance | Division Of Revenue & Taxation | PO Box 1830 | Dayton | OH | 45401-1830 | |
| City Of Dayton Income Tax | | PO Box 2806 | | Dayton | OH | 45401-2806 | |
| City Of Dearborn | James J Oconnor Treasurer | City Hall | 13615 Michigan Ave | Dearborn | MI | | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                    Page 2 of 16                    3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| City Of Derby Ct | City Of Derby | 35 5th St | City Hall | Derby | CT | 06418 | |
| City Of Dry Ridge Ky | City Of Dry Ridge | PO Box 145 | 31 Broadway | Dry Ridge | KY | 41035 | |
| City Of Dunn Nc | City Of Dunn Tax Collector | PO Box 1107 | | Dunn | NC | 28335 | |
| City Of El Paso | David G Aelvoet | Linebarger Goggan Blair & Sampson | 711 Navarro Ste 300 | San Antonio | TX | 78205 | |
| City Of Fitzerald Ga | City Of Fitzgerald | Minicipal Building | 116 N Johnston St | Fitzgerald | GA | 31750 | |
| City Of Flint | Douglas Bingaman | 1101 S Saginaw St | | Flint | MI | 48502 | |
| City Of Flint Eft | Douglas M Philpott | 503 S Saginaw St Ste 1415 | | Flint | MI | 48502 | |
| City Of Franklin | Tax Collector | PO Box 705 | | Franklin | TN | 37065 | |
| City Of Franklin Tn | City Of Franklin | Property Tax Office | 109 3rd Ave S Ste 143 | Franklin | TN | 37064 | |
| City Of Gallatin Tn | Gallatin City Recorder | 132 W Main St | Room 111 | Gallatin | TN | 37066 | |
| City Of Germantown Tn | City Of Germantown | PO Box 38809 | | Germantown | TN | 38183 | |
| City Of Gordonsville Tennessee | Jamie D Winkler Esq Bellar & Winkler | 212 Main St N | PO Box 332 | Carthage | TN | 37030 | |
| City Of Gordonsville Tn | Gordonsville City Clerk | PO Box 357 | 105 S Main St | Gordonsville | TN | 38563 | |
| City Of Harlingen | Diane W Sanders Linebarger Goggan Blair & San | 1949 South Ih 35 78741 | PO Box 17428 | Austin | TX | 78760-7428 | |
| City Of Harlingen Tx | Harlingen Tax Office | 305 E Jackson Ste 102 | PO Box 1343 | Harlingen | TX | 78551 | |
| City Of Hazlehurst Ms | City Of Hazlehurst Tax Office | PO Box 314 | | Hazlehurst | MS | 39083 | |
| City Of Henderson Ky | City Of Henderson Collector | PO Box 716 | | Henderson | KY | 42419 | |
| City Of Hendersonville Tn | City Of Hendersonville | Property Tax Collector | One Executive Pk Dr | Hendersonville | TN | 37075 | |
| City Of Jasper Ga | City Of Jasper Tax Dept | 200 Burnt Mountain Rd | | Jasper | GA | 30143 | |
| City Of Kettering Tax Division | | PO Box 293100 | | Kettering | OH | 45429-9100 | |
| City Of Knoxville Tn | City Of Knoxville | PO Box 59031 | | Knoxville | TN | 37950 | |
| City Of Lake City | City Of Lake City Tax Dept | 5455 Jonesboro Rd | | Lake City | GA | 30260 | |
| City Of Laredo | C O Laura L Gomez | 212 Flores Ave | | Laredo | TX | 78040 | |
| City Of Laredo Tx | City Of Laredo Tax Assessor | / Collector | PO Box 6548 | Laredo | TX | 78042 | |
| City Of Lebanon Tn | Commissioner Of Finance | 200 Castle Heights Ave | | Lebanon | TN | 37087 | |
| City Of Lockport Ny | City Of Lockport | 1 Locks Plaza | | Lockport | NY | 14094 | |
| City Of Lordstown Ohio | | 1455 Salt Springs Rd | | Warren | OH | 44481 | |
| City Of Lynchburg Va | City Of Lynchburg | PO Box 9000 | | Lynchburg | VA | 24505 | |
| City Of Mcallen Tx | City Of Mcallen Tax Office | PO Box 3786 | | Mcallen | TX | 78502 | |
| City Of Monroe Mo | City Of Monroe City | PO Box 67 | | Monroe | MO | 63456 | |
| City Of Moraine | Department Of Taxation | 4200 Dryden Rd | | Moraine | OH | 45439-1495 | |
| City Of N Kansas Mo | City Hall / City Collector | PO Box 7468 | 2010 Howell St | N Kansas City | MO | 64116 | |
| City Of Naugatuck Ct | City Of Naugatuck Tax Collector | 229 Church St | | Naugatuck | CT | 06770 | |
| City Of New Brunswick Nj | City Of New Brunswick | 78 Bayard St | | New Brunswick | NJ | 08901 | |
| City Of North Kansas City | | 2010 Howell St | | North Kansas City | MO | 64116 | |
| City Of Norwich Ct | City Of Norwich Tax Collector | 100 Broadway | | Norwich | CT | 06360 | |
| City Of Oak Creek Wi | City Of Oak Creek | 8640 S Howell Ave | | Oak Creek | WI | 53154 | |
| City Of Poplar Bluff Mo | City Of Poplar Bluff Mo | 191 Oak St | | Poplar Bluff | MO | 63901 | |
| City Of Portland | | 111 Sw Columbia St | Ste 600 | Portland | OR | 97201-5840 | |
| City Of Portland Tn | Portland Tax Collector | 100 S Russell | | Portland | TN | 37148 | |
| City Of Pulaski | | PO Box 633 | | Pulaski | TN | 38478 | |
| City Of Radford Va | Treasurer City Of Radford | 619 2nd St | Room 164 | Radford | VA | 24141 | |
| City Of Rochester Ny | City Of Rochester Treasurer | 30 Church St | | Rochester | NY | 14614 | |
| City Of San Marcos | Diane W Sanders Linebarger Goggan Blair & San | 1949 South Ih 35 78741 | PO Box 17428 | Austin | TX | 78760-7428 | |
| City Of Selmer Tn | City Tax Collector | 144 N 2nd St | | Selmer | TN | 38375 | |
| City Of Shelbyville Tn | Shelbyville Treasurer | 201 N Spring St | | Shelbyville | TN | 37160 | |
| City Of Southington Ct | City Of Southington Tax Collector | PO Box 579 | | Southington | CT | 06489 | |
| City Of Toledo | Division Of Taxation | One Government Ctr Ste 2070 | | Toledo | OH | 43604-2280 | |
| City Of Torrington Ct | City Of Torrington Tax Collector | PO Box 839 | | Torrington | CT | 06790 | |
| City Of Tuscaloosa | Revenue Dept | PO Box 2089 | | Tuscaloosa | AL | 35603 | |
| City Of Vandalia | | 333 James E Bohanan Memorial Dr | | Vandalia | OH | 45377 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                                          Page 3 of 16                                3/26/2008 2:29 AM
                                                                                              Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| City Of Walker | Income Tax Administrator | PO Box 153 | | Grand Rapids | MI | 49501-0153 | |
| City Of Warren Income Tax | | PO Box 230 | | Warren | OH | 44482 | |
| City Of Waterbury Ct | City Of Waterbury Tax Collector | PO Box 2556 | | Waterbury | CT | 06723 | |
| City Of Watertown Ct | City Of Watertown Tax Collector | PO Box 224 | | Watertown | CT | 06795 | |
| City Of Wentzville Mo | City Collector | 310 W Pearce Blvd | | Wentzville | MO | 63385 | |
| City Of Wichita Falls Tx | Director Of Finance | City Of Wichita Falls | PO Box 1431 | Wichita Falls | TX | 76307 | |
| Clark Co Nv | Clark County Assessor | 500 S Grand Central Pkwy | PO Box 551401 | Las Vegas | NV | 89155 | |
| Clark Co Wa | Clark County Treasurer | PO Box 9808 | | Vancouver | WA | 98666 | |
| Clark County Ar | Clark County Courthouse | 401 Clay St | | Arkadelphia | AR | 71923 | |
| Clark County Treasurer | | 31 N Limestone St | PO Box 1305 | Springfield | OH | 45502 | |
| Clay Co Mo | Clay County Collector | PO Box 219808 | | Kansas City | MO | 64121 | |
| Clayton County Ga | Clayton County Tax Commissioner | 121 S Mcdonough St | Courthouse Annex 3 2nd Fl | Jonesboro | GA | 30236 | |
| Cleveland Co Nc | Cleveland Co Tax Collector | PO Box 370 | | Shelby | NC | 28151 | |
| Clinton City Recorder | | 100 Bowling St City Hall | | Clinton | TN | 37716 | |
| Clinton County In | Clinton County Treasurer | 220 Courthouse Sq | | Frankfort | IN | 46041 | |
| Clio City Of Genesee | City Treasurer | 505 W Vienna St | | Clio | MI | 48420 | |
| Cobb County Ga | Cobb County Tax Commissioner | 100 Cherokee St | Ste 250 | Marietta | GA | 30090 | |
| Collector Of Revenue | | 41 S Central Ave | | Clayton | MO | 63105 | |
| Collin Co Tx | Collin Co Tax Assessor / Collector | PO Box 8006 | | Mckinney | TX | 75070 | |
| Collin County Tax | Gay Mccall Isaacks Et Al | 777 E 15th St | | Plano | TX | 75074 | |
| Colorado Department Of Revenue | | | | Denver | CO | 80261-0006 | |
| Columbiana County Treasurer | | PO Box 469 | | Lisbon | OH | 44432-1255 | |
| Comal Co Tx | Comal Co Tax Assessor / Collector | 311445 | | New Braunfels | TX | 78131 | |
| Commissioner Of Revenue Services | Department Of Revenue Services | PO Box 2936 | | Hartford | CT | 06104-2936 | |
| Commonwealth Of Kentucky Departme | Wendy L Stephens Kentucky Department Of Reve | 100 Fair Oaks 5th Fl | PO Box 491 | Frankfort | KY | 40602-0491 | |
| Commonwealth Of Massachusetts Dep | Anne Chan | Bankruptcy Unit Mdor | PO Box 9564 | Boston | MA | 02114-9564 | |
| Comptroller Of Maryland | | Revenue Administration Division | | Annapolis | MD | 21411-0001 | |
| Comptroller Of Public Accounts | Texas Sales & Use Tax Division | 111 E 17th St | | Austin | TX | 78774 | |
| Connecticut Department Of Revenue S | C&e Division Bankruptcy Section | 25 Sigourney St | | Hartford | CT | 06106-5032 | |
| Connecticut Secretary Of State | Document Review | 30 Trinity St PO Box 150470 | | Hartford | CT | 06106-0470 | |
| Continental Tevis | William Kozyra - VP NA Operations | Continental Teves, Inc. | One Continental Drive | Auburn Hills | MI | 48326 | |
| Contra Costa County Collector | | PO Box 631 | | Martinez | CA | 94553 | |
| Coopersville City Of Ottawa | | 289 Danforth St | | Coopersville | MI | 49404 | |
| Copiah County | Tax Collector | PO Box 705 | | Hazlehurst | MS | 39083 | |
| Corporation Income Tax Section | | PO Box 919 | | Little Rock | AR | 72203-0919 | |
| Corporation Tax Return Processing | Iowa Department Of Revenue | PO Box 10468 | | Des Moines | IA | 50306-0468 | |
| County Of Comal | Mccreary Veselka Bragg & Allen Pc | 5929 Balcones Dr Ste 200 | PO Box 26990 | Austin | TX | 78755 | |
| County Of Denton | | 5929 Balcones Dr Ste 200 | PO Box 26990 | Austin | TX | 78755 | |
| County Of Hays | Mccreary Veselka Bragg & Allen Pc | 5929 Balcones Dr Ste 200 | PO Box 26990 | Austin | TX | 78755 | |
| County Of San Bernardino | Office Of The Tax Collector | 172 W 3rd St | | San Bernardino | CA | 92415 | |
| County Of Santa Clara | Tax Collector | County Government Ctr E Wing | 70 W Hedding St | San Jose | CA | 95110 | |
| County Of Tuscaloosa | Use Tax Return | PO Box 20738 | | Tuscaloosa | AL | 35402 | |
| Crawford County Treasurer | | PO Box 565 | | Bucyrus | OH | 44820 | |
| Customs Counsel Us & Canada | Chet Wilson Delphi Corporation | 5825 Delphi Dr | M/c 480 410 228 | Troy | MI | 48098 | |
| Cuyahoga County Treasurer | | 1219 Ontario St Rm 112 | | Cleveland | OH | 44113-1697 | |
| Cypress Fairbanks Isd | John P Dillman | Linebarger Goggan Blair & Sampson | PO Box 3064 | Houston | TX | 77253-3064 | |
| Dallas County | Elizabeth Weller | Linebarger Goggan Blair & Sampson | 2323 Bryan St Ste 1600 | Dallas | TX | 75201 | |
| Dallas County Tx | Dallas County Tax Assessor | / Collector | 500 Elm St | Dallas | TX | 75202 | |
| Darke County Treasurer | | 504 S Broadway | | Greenville | OH | 45331 | |
| Davidson Co Tn | Davidson County Trustee | 800 2nd Ave N | Ste 2 | Nashville | TN | 37201 | |
| Daviess Co Ky | Daviess County Sheriff | 212 St Ann St | | Owensboro | KY | 42303 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                                                     Page 4 of 16                                     3/26/2008 2:29 AM
                                                                                                Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Dc Office Of Tax & Revenue | Corporation Estimated Franchise Tax | PO Box 96019 | | Washington | DC | 20090-6019 | |
| Dc Office Of Tax & Revenue | | 6th Fl 941 North Capitol St Ne | | Washington | DC | 20002-4265 | |
| Dc Treasurer | Dept Of Consumer And Regulatory Affairs Busine | Licensing Admin PO Box 92300 | Corporations Division PO Box 92300 | Washington | DC | 20090 | |
| Dearborn City Of Wayne | | PO Box 4000 | | Dearborn | MI | 48126 | |
| Dearborn Countyin | Dearborn County Treasurer | 215b W High St | New Adminstration Bldg | Lawrenceburg | IN | 47025 | |
| Dekalb County Al | Dekalb County Revenue Commissioner | 206 Grand Ave Sw | | Fort Payne | AL | 35967 | |
| Dekalb County In | Dekalb County Treasurer | 100 S Main St Courthouse | | Auburn | IN | 46706 | |
| Delaware County In | Delaware County Treasurer | 100 W Main St | Room 102 | Muncie | IN | 47305 | |
| Delaware County In | Delaware County Treasurer | 100 W Main St | Room 102 | Muncie | IN | 47305 | |
| Delaware County Treasurer | | 91 N Sandusky St | | Delaware | OH | 43015 | |
| Delaware County Treasurer | | 91 N Sandusky St | | Delaware | OH | 43015-1799 | |
| Delaware Division Of Revenue | | PO Box 8719 | | Wilmington | DE | 19899-8719 | |
| Delaware Division Of Revenue | | PO Box 8751 | | Wilmington | DE | 19899-8751 | |
| Delta Twp Eaton | Treasurer | 7710 W Saginaw Hwy | | Lansing | MI | 48917 | |
| Denton Co Tx | Denton Co Tax Assessor/collector | PO Box 1249 | | Denton | TX | 76202 | |
| Department Of Justice | Michael Garcia | 1 St. Andrews Plaza | | New York | NY | 10007 | |
| Department Of Licensing | | PO Box 9048 | | Olympia | WA | 98507-9048 | |
| Department Of Revenue Services | | PO Box 2974 | | Hartford | CT | 06104-2974 | |
| Department Of The Treasury Internal R | Internal Revenue Service | 290 Broadway 5th Fl | | New York | NY | 10007 | |
| Detroit City Income Tax | | 2 Woodward | Room B 3 | Detroit | MI | 48226 | |
| Detroit City Of Wayne | Department 268301 | City Of Detroit Property Tax | PO Box 55000 | Detroit | MI | 48255 | |
| Director Department | Office Of The Illinois State Treasu | 1 West Old State Capitol Plaza | | Springfield | IL | 62701 | |
| Director Of Finance | City Of Elizabethtown | PO Box 550 | | Elizabethtown | KY | 42702-0550 | |
| Division Of Corporations | Annual Report Section | PO Box 6850 | | Tallahassee | FL | 32314 | |
| Division Of Corporations | Nys Department Of State | 41 State St | | Albany | NY | 12231-0002 | |
| Donetta Davidson Secretary Of State | Department Of State | 1560 Broadway Ste 200 | | Denver | CO | 80202 | |
| Doug Belden Hillsborough County Tax | Attn Doug Belden | 601 E Kennedy Blvd 14th Fl | | Tampa | FL | 33602 | |
| Dubois County In | Dubois County Treasurer | 1 Courthouse Sq | | Jasper | IN | 47546 | |
| Dyer Co Tn | Dyer County Trustee | PO Box 1360 | Courthouse | Dyersburg | TN | 38025 | |
| Dyer County Trustee | C O J Michael Gauldin | PO Box 220 | | Dyersburg | TN | 38025 | |
| East Tawas City Of | Treasurer | 760 Newman | PO Box 672 | East Tawas | MI | 48730 | |
| Edgefield Co Sc | Edgefield Co Treasurer | PO Box 22 | | Edgefield | SC | 29824 | |
| El Paso County Tx | El Paso Co Tax Assessor /collector | PO Box 313 | | El Paso | TX | 79999 | |
| Elkhart County In | Elkhart County Treasurer | 117 N 2nd St | Room 201 | Goshen | IN | 46526 | |
| ENVIRONMENTAL PROTECTION AGENCY | MARCUS C PEACOCK | DEPUTY ADMINISTRATOR | ARIEL RIOS BUILDING | 1200 PENNSYLVANIA AVE NW WASHINGTON | DC | 20460 | |
| ENVIRONMENTAL PROTECTION AGENCY | | ARIEL RIOS BUILDING | 1200 PENNSYLVANIA AVE NW | WASHINGTON | DC | 20460 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 1 | | 1 CONGRESS ST SUITE 1100 | | BOSTON | MA | 02114-2023 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 10 | | 1200 SIXTH AVENUE | | SEATTLE | WA | 98101 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 2 | | 290 BROADWAY | | NEW YORK | NY | 10007-1866 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 3 | | 1650 ARCH STREET | | PHILADELPHIA | PA | 19103-2029 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 4 | | ATLANTA FEDERAL CENTER | 61 FORSYTH STREET SW | ATLANTA | GA | 30303-3104 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 5 | | 77 WEST JACKSON BOULEVARD | | CHICAGO | IL | 60604-3507 | |

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---------|---------|----------|----------|------|-------|-----|---------|
| ENVIRONMENTAL PROTECTION AGENCY REGION 6 | | FOUNTAIN PLACE 12TH FLOOR STE 1200 | 1445 ROSS AVE | DALLAS | TX | 75202-2733 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 7 | | 901 NORTH 5TH STREET | | KANSAS CITY | KS | 66101 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 8 | | 999 18TH STREET SUITE 500 | | DENVER | CO | 80202-2466 | |
| ENVIRONMENTAL PROTECTION AGENCY REGION 9 | | 75 HAWTHORNE STREET | | SAN FRANSISCO | CA | 94105 | |
| EPA HAZARDOUS SUBSTANCE SF | | RELIABLE EQUIPMENT MI | ACCT NO 05297T126A SITE LE | PO BOX 70753 | CHICAGO | IL | 60673 | |
| EPA HAZARDOUS SUBSTANCE SF RELIABLE EQUIPMENT MI | | ACCT NO 05297T126A SITE LE | PO BOX 70753 | CHICAGO | IL | 60673 | |
| EPA HAZARDOUS SUBSTANCE SUPERF | | C\O MELLON BANK RM 153 2713 | 3 MELLON BANK CTR | PITTSBURGH | PA | 15259 | |
| EPA HAZARDOUS SUBSTANCE SUPERFUND | | US EPA RGN IV  SUPERFUND ACCTG | PO BOX 100142 | ATLANTA | GA | 30384 | |
| EPA TRI DATA PROCESSING | | PO BOX 1513 | | LANTHAM | MD | 20703 | |
| Erie County Treasurer | | 247 Columbus | | Sandusky | OH | 44870 | |
| Essexville City Of Bay | | | | Essexville | MI | | |
| Etowah County Al | Etowah County Revenue Commissioner | 800 Forrest Ave | Room G 15 | Gadsden | AL | 35901 | |
| Fairfield County Treasurer | | 210 East Main St | Room 206 | Lancaster | OH | 43130 | |
| Fayette County Ga | Fayette County Tax Commissioner | PO Box 70 | | Fayetteville | GA | 30214 | |
| Fayette County In | Fayette County Treasurer | Courthouse | | Connersville | IN | 47331 | |
| Fenton City Of | Treasurer | 301 S Leroy St | | Fenton | MI | 48430 | |
| Finanzamt Bonn Innenstadt | | Welschnonnenstr 15 | | Bonn | | 53111 | Germany |
| Flint Charter Twp | Treasurer | 1490 S Dye Rd | | Flint | MI | 48532 | |
| Flint City Of Genesee | Treasurer | PO Box 2056 | | Flint | MI | 48501 | |
| Florida Department Of Revenue | | 5050 W Tennessee St | | Tallahassee | FL | 32399 | |
| Florida Department Of State | Division Of Corporations | PO Box 6478 | | Tallahassee | FL | 32314 | |
| For Fenner( India ) Ltd. | ( Kallol Roy ) | Link House | 4th floor 3 | Bahadur Shah Zafar Marg | New Delhi | 110 002 | India |
| Forrest Butch Freeman Oklahoma County Treasurer | | 320 Robert S Kerr Rm 307 | | Oklahoma City | OK | 73102 | |
| Forsyth Twp Marquette | | | | Gwinn | MI | | |
| Franchise Tax Board | | PO Box 942857 | | Sacramento | CA | 94257-0500 | |
| Franklin Co Mo | Franklin Co Collector | 300 E Main St | Room 103 | Union | MO | 63084 | |
| Franklin County Ohio Treasurer | | 373 S High St 17th Fl | | Columbus | OH | 43215 | |
| Fulton County Ga | Fulton County Tax Commissioner | PO Box 105052 | | Atlanta | GA | 30348 | |
| Fulton County In | Fulton County Treasurer | 125 E 9th St | | Rochester | IN | 46975 | |
| Gaston Co Nc | Gaston Co Tax Collector | Drawer M | | Gaston | NC | 27832 | |
| Genesee Twp/genesee Co Genesee | Treasurer | 7244 N Genesee Rd | | Genesee | MI | 48437 | |
| Georgia Department Of Revenue | Department Of Revenue Compliance Division | Bankruptcy Section | PO Box 161108 | Atlanta | GA | 30321 | |
| Georgia Income Tax Division | | PO Box 49432 | | Atlanta | GA | 30359-1432 | |
| Gibson County In | Gibson County Treasurer | 101 N Main St | | Princeton | IN | 47670 | |
| Giles Co Tn | Giles County Trustee | PO Box 678 | Courthouse | Pulaski | TN | 38478 | |
| Gleyn Twilla | City Tax Collector | 425 W Court St | | Dyersburg | TN | 38024 | |
| Grand Blanc Twp Genesee | | 5371 S Saginaw St | Box 1833 | Grand Blanc | MI | 48480 | |
| Grand Rapids Income Tax Department | | PO Box 347 | | Grand Rapids | MI | 49501-0347 | |
| Grant Co Ky | Grant County Sheriff | 101 N Main St | Courthouse | Williamston | KY | 41097 | |
| Grayson County | F R Young Jr Treasurer | PO Box 127 | | Independence | VA | 24348 | |
| Green Oak Twp | Treasurer | 10001 Silver Lake Rd | | Brighton | MI | 48116 | |
| Greene Co Nc | Greene Co Tax Collector | 229 Kingold Blvd | Ste B | Snow Hill | NC | 28580 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 16

3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Greene Co Tn | Greene County Trustee | PO Box 115 | | Greeneville | TN | 37744 | |
| Greenwood Co Sc | Greenwood Co Tax Treasurer | 528 Monument St | R 101 | Greenwood | SC | 29646 | |
| Guiltford Co Nc | Guilford Co Tax Dept | PO Box 3328 | | Greensboro | NC | 27402 | |
| Gwinnett Co Ga | Gwinnett Bd Of Collector | 75 Langley Dr | | Lawrenceville | GA | 30045 | |
| Habersham County Ga | Habersham County Tax Commissioner | 555 Monroe St | Unit 25 | Clarkesville | GA | 30523 | |
| Haldex Traction AB | Ulf Herlin Vice President, Sales & Marketing | Box 505 | | Landskrona | | SE-261 24 | Sweden |
| Hamilton Co Tn | Hamilton County Trustee | 210 7th St | Room 210 | Chattanooga | TN | 37402 | |
| Hamilton County In | Hamilton County Treasurer | 33 N 9th St 112 | Old Courthouse | Noblesville | IN | 46060 | |
| Hamilton County Treasurer | | 138 E Court St | Room 408 | Cincinnati | OH | 45202 | |
| Hardin Co Ky | Hardin County Sheriff | 100 Public Square | Ste 101 | Elizabethtown | KY | 42701 | |
| Harlingen Cisd | Diane W Sanders Linebarger Goggan Blair & San | 1949 S Ih 35 78741 | PO Box 17428 | Austin | TX | 78760-7428 | |
| Harnett Co Nc | Harnett Co Tax Collector | Po 58509 | | Charlotte | NC | 28258 | |
| Harris Co Tx | Harris Co Tax Assessor / Collector | PO Box 4622 | | Houston | TX | 77210 | |
| Harris County City Of Houston | John P Dillman | Linebarger Goggan Blair & Sampson | PO Box 3064 | Houston | TX | 77253-3064 | |
| Hawes Twp | Treasurer | 1369 N Gehres Rd | | Lincoln | MI | 48742 | |
| Hawkins Co Tn | Hawkins County Trustee | 110 E Main St | Room 203 | Rogersville | TN | 37857 | |
| Hays Co Tx | Hays Co Tax Assessor / Collector | 102 N Lbj Dr | | San Marcos | TX | 78666 | |
| Haywood Co Tn | Haywood County Trustee | Courthouse | | Brownsville | TN | 38012 | |
| Henderson Co Ky | Henderson County Sheriff | 20 N Main St | Courthouse | Henderson | KY | 42420 | |
| Hendricks County In | Hendricks County Treasurer | 355 S Washington St | Ste 215 | Danville | IN | 46122 | |
| Henry County In | Henry County Treasurer | 101 S Main St | | New Castle | IN | 47362 | |
| Hidalgo Co Tx | Hidalgo County Tax Assessor | / Collector | PO Box 4290 | Edinburg | TX | 78540 | |
| Hidalgo County | Diane W Sanders | Linebarger Goggan Blair & Sampson | 1949 South Ih 35 78741 PO Box 1742 | Austin | TX | 78760-7428 | |
| Hillsborough County Tax Collector | | PO Box 172920 | | Tampa | FL | 33602 | |
| Hinds Co Ms | Hinds Co Tax Collector | PO Box 1727 | | Jackson | MS | 39215 | |
| Hinds County Tax Collector | | PO Box 1727 | Add Chg 1 08 04 Cp | Jackson | MS | 39215-1727 | |
| Hitachi | Hiroshi Kaneko | The Bridgeford Group, Inc. | 445 Park Ave. 20th Fl. | New York | NY | 10022 | |
| Hitachi | Richard Kelly, Managing Director | The Bridgeford Group, Inc. | 445 Park Ave. 20th Fl. | New York | NY | 10022 | |
| Howard County In | Howard County Treasurer | 226 N Main St | 2nd Fl | Kokomo | IN | 46901 | |
| Howard County Indiana | Michael K Mccrory | Barnes & Thornburg Llp | 11 South Meridian St | Indianapolis | IN | 46204 | |
| Huntington County In | Huntington County Treasurer | 201 N Jefferson | Room 104 | Huntington | IN | 46750 | |
| Huron County Treasurer | Huron County Auditors Office | 16 East Main St | | Norwalk | OH | 44857 | |
| Illinois Department Of Revenue | | PO Box 19008 | | Springfield | IL | 62794-9008 | |
| Illinois State Treasurer Unclaimed Property Div | | PO Box 19496 | | Springfield | IL | 62794-9496 | |
| Income Tax Office | | 1315 S Washington | | Saginaw | MI | 48601 | |
| Income Tax Office | | PO Box 727 | 333 Je Bohanen Memorial Dr | Vandalia | OH | 45377-0727 | |
| Indiana Department Of Revenue | Bankruptcy Section Room N 203 | 100 N Senate Ave | | Indianapolis | IN | 46204 | |
| Indiana Department Of Revenue | | PO Box 7218 | | Indianapolis | IN | 46207 | |
| Indiana Secretary Of State | | 302 W Washington St | Room E 018 | Indianapolis | IN | 46204 | |
| Indiana Secretary Of State | | PO Box 7097 | | Indianapolis | IN | 46207 | |
| Internal Revenue Service | Insolvency | 290 Broadway 5th Fl | | New York | NY | 10007 | |
| International Steel Solutions | Alberto Satine Managing Director | 181 Bennett Drive | | Pulaski | TN | 38478 | |
| International Steel Solutions | Frantz Estereicher Managing Director | 181 Bennett Drive | | Pulaski | TN | 38478 | |
| Jackson Co Mo | Jackson County | Manager Of Finance | PO Box 219747 | Kansas City | MO | 64121 | |
| Jackson Co Ms | Jackson Co Tax Collector | Courthouse | PO Box 998 | Pascagoula | MS | 39567 | |
| Jackson County | Manager Of Finance | Collection Department | 415 E 12th St | Kansas City | MO | 64106-8401 | |
| Jasper County In | Jasper County Treasurer | 115 W Washington St | Ste 201 | Rensselaer | IN | 47978 | |
| Jay County In | Jay County Treasurer | 120 Court St | | Poerland | IN | 47371 | |
| Jefferson Co Ky | Jefferson County Sheriff | PO Box 70300 | | Louisville | KY | 40270 | |
| Jennings County In | Jennings County Treasurer | Government Ctr | PO Box 368 | Vernon | IN | 47282 | |
| Jesse White Secretary Of State | Department Of Business Services | 501 S 2nd St | | Springfield | IL | 62756-5510 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                    Page 7 of 16

3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Joe G Tedder Tax Collector | | PO Box 1189 | | Bartow | FL | 33830 | |
| Johnson Co Mo | Johnson Co Collector | 300 N Holden | Ste 201 | Warrensburg | MO | 64039 | |
| Johnson County In | Johnson County Treasurer | Courthue Annex | 86 W Court St | Franklin | IN | 46131 | |
| Johnson County Ks | Johnson County Treasurer | 111 S Cherry St | Ste 1500 | Olather | KS | 66061 | |
| Johnson County Treasurer Courthouse Annex | | 86 W Court St | | Franklin | IN | 46131 | |
| Johnston Co Nc | Johnston Co Tax Collector | PO Box 451 | | Smithfield | NC | 27577 | |
| Jones Co Ms | Jones Co Tax Collector | PO Box 511 | | Laurel | MS | 39441 | |
| Judy Pitts Revenue Commissioner Eto | Etowah County Courthouse | 800 Forrest Ave Rm 5 | | Gadsden | AL | 35901 | |
| Kansas Corporate Tax | Kansas Department Of Revenue | 913 Sw Harrison St | | Topeka | KS | 66699-4000 | |
| Kansas Department Of Revenue | Sales Tax Division | 915 Sw Harrison St | | Topeka | KS | 66625 | |
| Kansas Secretary Of State | Memorial Hall 1st Fl | 120 S W 10th Ave | | Topeka | KS | 66612-1594 | |
| Ken Burton Jr Cfc | Tax Collector Manatee County | PO Box 25300 | | Bradenton | FL | 34206-5300 | |
| Kentucky Department Of Revenue | | | | Frankfurt | KY | 40619-0007 | |
| Kentucky Revenue Cabinet | | | | Frankfurt | KY | 40620 | |
| Killam Development Ltd | | PO Box 499 | | Laredo | TX | 78042 | |
| King Co Wa | King County Tax Collector | 500 4th Ave | Room 600 | Seattle | WA | 98104 | |
| King County Tax Collector Room 600 | | 500 4th Ave | | Seattle | WA | 98104-2340 | |
| Knox Co Tn | Knox County Trustee | PO Box 70 | | Knoxville | TN | 37901 | |
| Knox County Trustee | Mike Lowe Knox Co Trustee C O Attorney Dean E | Hodges Doughty Carson Pllc | PO Box 869 | Knoxville | TN | 37901-0869 | |
| Kosciusko County In | Kosciusko County Treasurer | 100 W Ctr St | | Warsaw | IN | 46580 | |
| Lagrange County In | Lagrange County Treasurer | 114 W Michigan St | Ste 4 | Lagrange | IN | 46761 | |
| Lake County Treasurer | | 105 Main St | | Painesville | OH | 44077 | |
| Lakeview Local Sch Dst Board Of Educ | Treasurer | 300 Hillman Dr | | Cortland | OH | 44410 | |
| Lansing City Of Eaton | Treasurer | 1st Fl City Hall | 124 W Michigan Ave | Lansing | MI | 48933 | |
| Laporte County In | Laporte County Treasurer | PO Box J | | Michigan City | IN | 46361 | |
| Laporte County In | Laporte County Treasurer | 813 Lincolnway Ste 205 | | Laporte | IN | 46360-3491 | |
| Laurens Co Sc | Laurens Co Taxtreasurer | PO Box 1049 | | Laurens | SC | 29360 | |
| Lawrence Co Ky | Lawrence County Sheriff | PO Box 38 | | Louisa | KY | 41230 | |
| Lawrence County In | Lawrence County Treasurer | 916 15th St | Ste 27 | Bedford | IN | 47421 | |
| Lee Co Nc | Lee Co Tax Collector | PO Box 1968 | | Sanford | NC | 27331 | |
| Lexington Co Sc | Lesington Co Treasurer | Dept Of Treasurer | PO Box 3000 | Lexington | SC | 29071 | |
| Lexington County | | 212 S Lake Dr | | Lexington | SC | 29072 | |
| Lexington Fayette Urban County Gover | Lexington Fayette | Urban County Government | PO Box 1333 | Lexington | KY | 40588 | |
| Limestone County Al | Limestone County Revenue Commissioner | 200 W Washington St | County Courthouse 2nd Fl | Athens | AL | 35611 | |
| Limestone County Revenue Commissioner | | 100 S Clinton St Ste A | | Athens | AL | 35611 | |
| Lincoln Co Ms | Lincoln County Tax Collector | 301 South 1st St | Room 109 | Brookhaven | MS | 39601 | |
| Lincoln County Tax | | 301 South 1st Room 109 | | Brookhaven | MS | 39601 | |
| Lockport City School District Ny | Lockport City School District | School Tax Collector | 1 Locks Plaza | Lockport | NY | 14094 | |
| Logan Co Ky | Logan County Sheriff | PO Box 113 | | Russellville | KY | 42276 | |
| Logan County Ar | Logan County Tax Collector | Logan County Courthouse | 25 West Walnut | Paris | AR | 72855 | |
| Logan County Treasurer | | 100 South Madriver St | Room 104 | Bellefontaine | OH | 43311 | |
| Lorain County Treasurer | | 226 Middle Ave | | Elyria | OH | 44035 | |
| Los Angeles County Collector | | PO Box 54027 | | Los Angeles | CA | 90054 | |
| Los Angeles County Treasurer And Tax | Revenue And Enforcement | PO Box 54110 | | Los Angeles | CA | | |
| Louisiana Department Of Revenue | Eft Processing | PO Box 4018 | | Baton Rouge | LA | 70821-4018 | |
| Louisiana Secretary Of State | Commercial Division | PO Box 94125 | | Baton Rouge | LA | 70804-9125 | |
| Louisville Jefferson County Metro Gove | Jefferson County Attorneys Office | Fiscal Court Building | 531 Court Pl Ste 1001 | Louisville | KY | 40202 | |
| Lowndes C Ms | Lowndes Co Tax Collector | PO Box 1077 | | Columbus | MS | 39703 | |
| Lubbock Central Appraisal District | Laura J Monroe | Perdue Brandon Fielder Collins & Mo | PO Box 817 | Lubbock | TX | 79408-0817 | |
| Lubbock Co Tx | Lubbock Co Tax Assessor /collector | PO Box 10568 | | Lubbock | TX | 79408 | |
| Lucas County Treasurer | | One Government Ctr 500 | | Toledo | OH | 43604 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                   Page 8 of 16                   3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---------|---------|----------|----------|------|-------|-----|---------|
| Lula Lunsford Huff Muscogee County T | Tax Commissioner | PO Box 1441 | | Columbus | GA | 31902-1441 | |
| Lumpkin Co Ga | Lumpkin Bd Of Collector | 99 Courthouse Hill | | Dahlonega | GA | 30533 | |
| Lynda Hall Tax Collector Madison County Courthouse | | 100 Northside Sq | | Huntsville | AL | 95808 | |
| Macon Co Nc | Macon Co Tax Collector | 5 West St | | Franklin | NC | 28734 | |
| Madison Co Ky | Madison County Sheriff | 101 West Main St | | Richmond | KY | 40475 | |
| Madison Co Ms | Madison Co Tax Collector | PO Box 113 | | Canton | MS | 39046 | |
| Madison Co Tn | Madison County Trustee | 100 E Main | Rm 107 | Jackson | TN | 38301 | |
| Madison County Al | Madison County Collector | 100 Northside Square | County Courthouse | Huntsville | AL | 35801 | |
| Madison County In | Madison County Treasurer | 16 E 9th St | | Anderson | IN | 46016 | |
| Madison County Indiana Treasurer | C O Thomas M Beeman | 33 W 10th St Ste 200 | | Anderson | IN | 46016 | |
| Madison Heights City Of Oakland | | 300 W 13 Mile Rd | | Madison Heights | MI | 48071 | |
| Madison Twp Lenawee | Lenawee County Treasurer | 301 N Main St Old Courthouse | | Adrian | MI | 49221 | |
| Magneti Marelli | Eugenio Razelli President and CEO | Attn General Counsel | Viale Aldo Borletti 61/63 | Corbetta | Milano | 20011 | Italy |
| Magneti Marelli Holding S.p.A. | Sergio Garue Senior V.P. Customers and Business Development | Attn General Counsel | Viale Aldo Borletti 61/63 | Corbetta | Milano | 20011 | Italy |
| Manager Of Finance | Jackson County Manager Of Finance | Bankruptcy 415 E 12th St | | Kansas City | MO | 64106 | |
| Manatee Tax County Collector | | PO Box 25300 | | Sarasota | FL | 25300 | |
| Maricopa Co Az | Maricopa County Treasurer | PO Box 78574 | | Phoenix | AZ | 85062 | |
| Maricopa County Treasurers Office | Barbara Lee Caldwell | Herbert Schenk Pc | 4742 N 24th St Ste 100 | Phoenix | AZ | 85016 | |
| Marion Co Ky | Marion County Sheriff | 102 W Main St | Courthouse | Lebanon | KY | 40033 | |
| Marion Co Ms | Marion Co Tax Collector | 250 Board St | Ste 3 | Columbia | MS | 39429 | |
| Marion Co Sc | Marion Co Tax Treasurer | PO Box 275 | | Marion | SC | 29571 | |
| Marion Co Treasurer | | PO Box 275 | | Marion | SC | 29571 | |
| Marion County In | Marion County Treasurer | 200 E Washington St Rm 1001 | | Indianapolis | IN | 46204 | |
| Marion County Tax Collector | | PO Box 970 | | Ocala | FL | 34478-0970 | |
| Marshall County Al | Marshall County Revenue Commissioner | Marshall County Courthouse | 424 Blount Ave Ste 124 | Guntersville | AL | 35976 | |
| Marshall County In | Marshall County Treasurer | 112 W Jefferson St | Room 206 | Plymouth | IN | 46563 | |
| Massachusetts Department Of Revenue | | PO Box 7025 | | Boston | MA | 02204 | |
| Mathews Local School District | | 4434 B Warren Sharon Rd | | Vienna | OH | 44473 | |
| Maury Co Tn | Maury County Trustee | One Public Square | | Columbia | TN | 38401 | |
| Maury County Trustee | | One Public Square | | Columbia | TN | 38401 | |
| Mcdonald County Collector Cloteel Atkins | | Box 725 | | Pineville | MO | 64856 | |
| Mcnairy Co Tn | Mcnairy County Trustee | Courthouse | | Selmer | TN | 38375 | |
| Medina County Treasurer | | 144 N Broadway St | | Medina | OH | 44256 | |
| Metropolitan Trustee Tn | Metropolitan Trustee | PO Box 305012 | | Nashville | TN | 37230 | |
| Miami County Treasurer | | 201 W Main St | Safety Building | Troy | OH | 45373-3263 | |
| Miami Dade County Tax Collector | C O Metro Dade County Paralegal Uni | 140 W Flagler St Ste 1403 | | Miami | FL | 33130 | |
| Mich Dept Of Labor & Economic Growt | Bureau Of Commercial Services | Corp Div | PO Box 30768 | Lansing | MI | 48909 | |
| Michigan Department Of Treasury | | PO Box 30059 | | Lansing | MI | 48909 | |
| Michigan Dept Of Labor & Economic G | Bureau Of Commercial Services | Corp Div | PO Box 30702 | Lansing | MI | 48909 | |
| Milford Township | Milford Township Treasurer | 1100 Atlantic | | Milford | MI | 48381 | |
| Minnesota Department Of Revenue | Corporate Estimated Tax | Mail Station 1260 | | St Paul | MN | 55145-1260 | |
| Minnesota Revenue | | Mail Station 1250 | | St Paul | MN | 55145-1250 | |
| Mississippi Corporate Tax Division | | PO Box 1033 | | Jackson | MS | 39215-1033 | |
| Mississippi State Tax Commission | Bankruptcy Section | PO Box 23338 | | Jackson | MS | 39225-3338 | |
| Mississippi Tax Commission | Use Tax Return | PO Box 960 | | Jackson | MS | 39205 | |
| Missouri Department Of Revenue | | PO Box 700 | | Jefferson City | MO | 65105-0700 | |
| Monitor Township Treasurer | | 2483 Midland Rd | | Bay City | MI | 48706 | |
| Monitor Twp | Treasurer | 2483 Midland Rd | | Bay City | MI | 48706 | |
| Monroe Co Mo | Monroe Co Collector | 300 N Main | PO Box 245 | Paris | MO | 65275 | |
| Monroe Co Ny | Monroe County Treasurer | PO Box 14420 | | Rochester | NY | 14614 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                                    Page 9 of 16                    Combined Kettering Motion special parties
3/26/2008 2:29 AM

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Monroe County In | Monroe County Treasurer | Courthuse Room 204 | | Bloomington | IN | 47404 | |
| Monroe County Treasurer | | 101 N Main St | Room 21 | Woodsfield | OH | 43793 | |
| Montague Co Tx | Montague Co Tax Assessor Collector | PO Box 8 | | Montague | TX | 76251 | |
| Montague County | Elizabeth Weller | Linebarger Goggan Blair & Sampson | 2323 Bryan St Ste 1600 | Dallas | TX | 75201 | |
| Montgomery Co Tn | Montgomery County Trustees Office | 350 Pageant Ln | Ste 101 A | Clarksville | TN | 37041 | |
| Montgomery Co Tx | Montgomery Co Tax Assessor / Collector | PO Box 201582 | PO Box 2233 | Houston | TX | 77216 | |
| Montgomery Co Va | County Of Montgomery | 755 Roanoke St | Ste 1b | Christianburg | VA | 24073 | |
| Montgomery County | John P Dillman | Linebarger Goggan Blair & Sampson | PO Box 3064 | Houston | TX | 77253-3064 | |
| Montgomery County Al | Montgomery County Collector | PO Box 1667 | | Montgomery | AL | 36102 | |
| Montgomery County Treasurer | | PO Box 817600 | | Dayton | OH | 45481 | |
| Montgomery County Treasurer | | PO Box 972 | | Dayton | OH | 45422-0475 | |
| Montgomery County Treasurer | | 451 W Third St | | Dayton | OH | 45422-0476 | |
| Morgan County Al | Morgan County Tax Collector | PO Box 696 | | Decatur | AL | 35602 | |
| Morgan County Revenue Commissione | Amanda G Scott Cpa | PO Box 696 | | Decatur | AL | 35602 | |
| Muscogee County Ga | Muscogee County Tax Commissioner | PO Box 1441 | | Columbus | GA | 31902 | |
| Nacogdoches Co Tx | Nacogdoches C Tax Assessor | / Collector | 216 W Hospital St | Nacogdoches | TX | 75961 | |
| Nacogdoches County Cad | | 220 W Hospital St | | Nacogdoches | TX | 75963-1668 | |
| Nebraska Department Of Revenue | Attn Bankruptcy Unit | PO Box 94818 | | Lincoln | NE | 68509-4818 | |
| Nemaha County Ks | Nemaha County Treasurer | 607 Nemaha St | PO Box 233 | Seneca | KS | 66538 | |
| Nemaha County Treasurer | | 607 Nemaha | PO Box 233 | Seneca | KS | 66538 | |
| Nevada Legal Press | | 3301 S Malibou Ave | | Pahrump | NV | 89048-6489 | |
| New Hampshire Department Of State | Annual Reports | PO Box 9529 | | Manchester | NH | 03108-9529 | |
| New Jersey Sales Tax | Division Of Taxation | PO Box 999 | | Trenton | NJ | 08646 | |
| New Mexico Taxation & Revenue Dept | Corporate Income & Franchise Tax | PO Box 25127 | | Santa Fe | NM | 87504-5127 | |
| New York State Department Of Taxatio | Bankruptcy Section | PO Box 5300 | | Albany | NY | 12205-0300 | |
| New York State Sales Tax Processing | | PO Box 1208 | | New York | NY | 10116 | |
| Newton Co Ms | Newton Co Tax Collector | PO Box 7 | | Decatur | MS | 39327 | |
| Newton County In | Newton County Treasurer | Courthouse | | Kentland | IN | 47951 | |
| Nh Dept Of Revenue Administration | Document Processing Division | PO Box 637 | | Concord | NH | 03302-0637 | |
| Niles City Income Tax Department | | 34 W State St | | Niles | OH | 44446 | |
| Nj Department Of Treasury Unclaimed | Property | PO Box 214 | | Trenton | NJ | 08646-0214 | |
| Noble County In | Noble County Treasurer | 101 N Orange St | | Albion | IN | 46701 | |
| Nomura Securities International, Inc | Hiromasa Irie Director | Attn General Counsel | 2 World Financial Ctr Bldg B 17th Fl | New York | NY | 10281 | |
| North Carolina Dept Of Revenue | | PO Box 25000 | | Raleigh | NC | 27640-0500 | |
| North Carolina Secretary Of State | Corporations Division | PO Box 29525 | | Raleigh | NC | 27626-0525 | |
| North Muskegon City Of Muskegon | | 1502 Ruddiman Dr | | North Muskegon | MI | 49445 | |
| Novi City Of Oakland | Tax Collection Processing | Drawer 3050 | PO Box 79001 | Detroit | MI | 48279 | |
| Nueces Co Tx | Nueces Co Tax Assessor / Collector | PO Box 2810 | | Corpus Christi | TX | 78403 | |
| Nueces County | Diane W Sanders Linebarger Goggan Blair & San | 1949 S Ih 35 78741 | PO Box 17428 | Austin | TX | 78760-7428 | |
| Nys Corporation Tax | Processing Unit | PO Box 22038 | | Albany | NY | 12201-2038 | |
| Nys Estimated Corporation Tax | Processing Unit | PO Box 22109 | | Albany | NY | 12201-2109 | |
| Oak Park City Of Oakland | City Treasurer | 13600 Oak Pk Blvd | | Oak Pk | MI | 48237 | |
| Oconee Co Sc | Oconee Co Tax Treasurer | PO Box 429 | | Walhalla | SC | 29691 | |
| Office Of Secretary Of State | Annual Registration Filings | PO Box 23038 | | Columbus | GA | 31902-3038 | |
| Office Of Tax & Revenue | | PO Box 601 | | Washington | DC | 20044-0601 | |
| Office Of Tax Commissioner | | 600 E Blvd Ave | Dept 127 | Bismarck | ND | 58505-0599 | |
| Ohio Department Of Revenue | | PO Box 16561 | | Columbus | OH | 43216 | |
| Ohio Department Of Taxation | Rebecca L Daum | 30 E Broad St | | Columbus | OH | 43215 | |
| Ohio Department Of Taxation | | PO Box 27 | | Columbus | OH | 43216-0027 | |
| Ohio Department Of Taxation | | PO Box 804 | | Columbus | OH | 43216-0804 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                    Page 10 of 16                    3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Ohio Environmental Protection Agency | | 347 N. Dunbridge Road | | Bowling Green | OH | 43402 | |
| Ohio Treasurer Of State | | PO Box 182101 | | Columbus | OH | 43218-2101 | |
| Okaloosa County Tax Collector | | PO Box 1029 | | Crestview | FL | 32536 | |
| Oklahoma County Ok | Oklahoma County Treasurer | PO Box 268875 | | Oklahoma City | OK | 73126 | |
| Oklahoma Secretary Of State | | 2300 N Lincoln Blvd Room 101 | | Oklahoma City | OK | 73105-4897 | |
| Oklahoma Tax Commission | | PO Box 26800 | | Oklahoma City | OK | 73126-0800 | |
| Orange County Collector | | PO Box 1982 | | Santa Ana | CA | 92702 | |
| Orange County Treasurer Tax Collector | | PO Box 1438 | | Santa Ana | CA | 92702 | |
| Oregon Department Of Revenue | | PO Box 14790 | | Salem | OR | 97309-0470 | |
| Oregon Secretary Of State | Corporation Division | PO Box 4353 | | Portland | OR | 97208-4353 | |
| Orion Twp Oakland | | 2525 Joslyn Rd | | Lake Orion | MI | 48360 | |
| Ottawa County Treasurer | | 315 Madison | | Port Clinton | OH | 43452 | |
| Oxford Twp Oakland | Treasurer | 18 W Burdick St | | Oxford | MI | 48371 | |
| Pa Department Of Revenue | Bureau Of Corporation Taxes | Dept 280427 | | Harrisburg | PA | 17128-0427 | |
| Palm Beach County Tax Collector | Tangible Personal Property | PO Box 3353 | | West Palm Beach | FL | 33402 | |
| Palm Beach County Tax Collector | | PO Box 3715 | | West Palm Beach | FL | 33402-3715 | |
| Parker Co Tx | | Parker Co Tax Assessor / Collector | 1108 Santa Fe Dr | Weatherford | TX | 76086 | |
| Pennsylvania Department Of Revenue | Bankruptcy Division | PO Box 280946 | | Harrisburg | PA | 17128-0946 | |
| Peyton C Cochrane Tax Collector | | 714 Greensboro Ave Rm 124 | | Tuscaloosa | AL | 35401 | |
| Pickaway County Treasurer | Court House | 207 South Court St | | Circleville | OH | 43113 | |
| Pickens County Ga | Pickens County Tax Commissioner | 35 West Church St | Ste 100 | Jasper | GA | 30143 | |
| Pima Co Az | | Pima County Treasurer | 115 N Church Ave | Tucson | AZ | 85701 | |
| Pima County Treasurer Pima County A | Pima County Attorneys Office Civil | 32 N Stone Ave Ste 2100 | | Tucson | AZ | 85701 | |
| Pinal County Treasurer | Dolores J Doolittle | PO Box 729 | | Florence | AZ | 85232-0729 | |
| Pinellas County Tax Collector | | PO Box 10832 | | Clearwater | FL | 33757 | |
| Platinum Equity, LLC | Jordan Roker | 360 North Crescent Drive | South Building | Beverly Hills | CA | 90210 | |
| Plymouth Twp Wayne | Treasurer | PO Box 8040 | | Plymouth | MI | 48170 | |
| Poland Sp. z o.o.  FA Krosno | Leszek Waliszewski Pierre Mellinger - President and CEO | Stratos Office Center | ul. Storupki 5 (5th floor) | Warsaw | | PL-00-546 | Poland |
| Polk County Tax Collector | | PO Box 1189 | | Lakeland | FL | 33831 | |
| Pontiac City Of Oakland | | PO Box 431406 | | Pontiac | MI | 48343 | |
| Pope County Ar | Pope County Tax Collector | 100 West Main St | | Russellville | AR | 72801 | |
| Portage County Treasurer | | 449 S Meridian 1st Fl | PO Box 1217 | Ravenna | OH | 44266 | |
| Prairie County Ar | Prairie County Sheriff / Collector | PO Box 1021 | | Des Arc | AR | 72040 | |
| Prince Georges County Maryland | C O Meyers Rodbell And Rosenbaum Pa | 6801 Kenilworth Ave Ste 400 | | Riverdale | MD | 20737-1385 | |
| Rankin Co Ms | Rankin County Tax Collector | 211 E Govt St | Ste B | Brandon | MS | 39042 | |
| Rankin County | | 211 E Govt St | Ste B | Brandon | MS | 39042 | |
| Ray Valdes Seminole County Tax Collector | | 1101 E First St | PO Box 630 | Sanford | FL | 32772 | |
| Ripley County In | Ripley County Treasurer | PO Box 176 | | Versailles | IN | 47042 | |
| Riverside County Collector | | P O 12005 | | Riverside | CA | 92502 | |
| Robertson Co Tn | Robertson County Trustee | 515 S Brown St | | Springfield | TN | 37172 | |
| Rochester Hills City Of Oakland | Drawer 7783 | PO Box 79001 | | Detroit | MI | 48279 | |
| Rogers County Treasurer | | PO Box 699 | | Claremore | OK | 74018 | |
| Ronald A Leggett Collector Of Rev | Ronald A Leggett Collector Of Reven | 109 City Hall | | St Louis | MO | 63103 | |
| Roseville City Of Macomb | City Treasurer | PO Box 290 | | Roseville | MI | 48066 | |
| Royal Oak City Of Oakland | Treasurers Office | PO Box 64 | | Royal Oak | MI | 48066 | |
| Russell Co Va | Russell Co Treasurer | PO Box 121 | | Lebanon | VA | 24266 | |
| Saginaw City Of Saginaw | Treasurer | 1315 S Washington Ave | | Saginaw | MI | 48601 | |
| Saint Johns City Of Clinton | | PO Box 477 | | Saint Johns | MI | 48879 | |
| Saint Johns County Tax Collector | | PO Box 9001 | | Saint Augustine | FL | 32085 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 16

3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Salis Inc Formerly Colonial Tax Compli | Chris Albrecht | 300 Colonial Ctr Pkwy Ste 300 | | Roswell | GA | 30076 | |
| San Benito Cisd | Diane W Sanders Linebarger Goggan Blair & San | 1949 S Ih 35 78741 | PO Box 17428 | Austin | TX | 78760-7428 | |
| San Benito Isd Tx | San Benito Cisd Tax Office | 152 E Rowson St | | San Benito | TX | 78586 | |
| San Bernardino County Collector | | 172 W Third St 1st Fl | | San Bernardino | CA | 92415 | |
| San Diego County Collector | | PO Box 129009 | | San Diego | CA | 92112 | |
| San Joaquin County Collector | | PO Box 2169 | | Stockton | CA | 95201 | |
| San Marcos Cisd | Diane W Sanders Linebarger Goggan Blair & San | 1949 South Ih 35 78741 | PO Box 17428 | Austin | TX | 78760-7428 | |
| Santa Clara County Collector | County Government Ctr E Wing | 70 W Hedding St | | San Jose | CA | 95110 | |
| Santa Rosa County Tax Collector | Attn Cindy Grimes Delinquent Tax De | PO Box 7100 | | Milton | FL | 32572 | |
| Sarasota County Tax Collector | | 101 Washington Blvd S | | Sarasota | FL | 34236 | |
| Sc Department Of Revenue | | Corporation Return | | Columbia | SC | 29214-0100 | |
| Scott County In | Scott County Treasurer | 1 E Mcclain Ave | Room 140 | Scottsburg | IN | 47170 | |
| Screven County Ga | Screven County Tax Commissioner | PO Box 86 | | Sylvania | GA | 30467 | |
| Secretary Of State | | 202 N Carson St | | Carson City | NV | 89701-4201 | |
| Secretary Of State | | 1500 11th St | PO Box 944230 | Sacramento | CA | 94244-2300 | |
| Seminole County Tax Collector | | PO Box 630 | | Sanford | FL | 32772 | |
| Seneca Partners | Sidney Del Gaurdio Michael C. Skaff | 300 Park Street, Ste. 400 | | Birmingham | MI | 48009 | |
| Shelby Co Tn | Shelby County Trustee | PO Box 2751 | | Memphis | TN | 38101 | |
| Shelby County In | Shelby County Treasurer | 25 W Polk St | Room 102 | Shelbyville | IN | 46176 | |
| Shelby County Trustee | | PO Box 2751 | | Memphis | TN | 38101-2751 | |
| Shelby Twp Macomb | Treasurer | 52700 Van Dyke | | Shelby Twp | MI | 48316 | |
| Showa | Hidefumi Kasagi Exec. Managing Director | Attn General Counsel | 1 14 1 Fujiwara cho | Gyoda City | Saitama | 361-8506 | Japan |
| Showa | Yoshitaka Terazawa - MD Sales | Attn General Counsel | 1 14 1 Fujiwara cho | Gyoda City | Saitama | 361-8506 | Japan |
| Smith Co Ms | Smith County Tax Collector | PO Box 157 | | Raleigh | MS | 39153 | |
| Smith Co Tn | Smith County Trustee | 122 Turner High | Ste 104 | Carthage | TN | 37030 | |
| Smith Co Trustee | | 122 Turner High Cir Ste 104 | | Carthage | TN | 37030 | |
| Smith County Trustee | Jamie D Winkler | PO Box 332 | | Carthage | TN | 37030 | |
| South Carolina Dept Of Revenue | | Corporation | | Columbia | SC | 29214-0006 | |
| Spalding County Ga | Spalding County Tax Commissioner | PO Box 509 | | Griffin | GA | 30224 | |
| Spartanburg Co Sc | Spartanburg Co Treasurer | PO Box 5807 | | Spartanburg | SC | 29304 | |
| Spartanburg Co Tax Collector | Glenda Qwright | Drawer 3060 | | Spartanburg | SC | 29304 | |
| St Charles Co Mo | St Charles Co Tax Collector | 201 N Second St | Room 134 | St Charles | MO | 63301 | |
| St Charles County Collector | | 201 N Second St Rm 134 | | St Charles | MO | 63301-2789 | |
| St Johns County Tax Collector | Dennis W Hollingsworth | PO Box 9001 | | St Augustine | FL | 32085-9001 | |
| St Joseph County In | St Joseph County Treasurer | 227 W Jefferson Blvd | | South Bend | IN | 46601 | |
| St Louis Co Mo | St Louis Co Government | Collector Of Revenue | PO Box 11491 | St Louis | MO | 63105 | |
| Stanly Co Nc | Stanly Co Tax Collector | 201 S 2nd St | | Albemarle | NC | 28001 | |
| Starpoint Ny | Starpoint Tax Collector | PO Box 3000 | | Buffalo | NY | 14240 | |
| State Corporation Commission | Clerks Office | PO Box 85577 | | Richmond | VA | 23285-5577 | |
| State Of Alabama Department Of Reve | Legal Division | PO Box 320001 | | Montgomery | AL | 36132-0001 | |
| State Of Colorado | Division Of Insurance | 1560 Broadway Ste 850 | | Denver | CO | 80202 | |
| State Of Delaware | Division Of Corporations | PO Box 74072 | | Baltimore | MD | 21274-4072 | |
| State Of Georgia | Department Of Revenue | PO Box 105284 | | Atlanta | GA | 30348 | |
| State Of Louisiana | Louisiana Department Of Revenue | PO Box 66658 | | Baton Rouge | LA | 70896 | |
| State Of Louisiana Department Of Revenue | | PO Box 66658 | | Baton Rouge | LA | 70896 | |
| State Of Maryland Comptroller Of Trea | Mary T Carr | State Office Bldg Rm 409 | 301 W Preston St | Baltimore | MD | 21201 | |
| State Of Maryland Md | Maryland State Dept Of Assessments & Taxation | Personal Property Division | 301 W Preston St | Baltimore | MD | 21201 | |
| State Of Michigan | Department Of Treasury | PO Box 77003 | | Detroit | MI | 48277 | |
| State Of Michigan | Motor Fuel Tax Division | Department 77692 | | Detroit | MI | 48277 | |
| State Of Michigan | Sales & Use Tax Division | PO Box 77003 | | Detroit | MI | 48277 | |
| State Of Michigan Department Of Treas | Attn Peggy A Housner Assistant Attorney General | Cadillac Pl | 3030 W Grand Blvd Ste 10 200 | Detroit | MI | 48202 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                                         Page 12 of 16

3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---------|---------|----------|----------|------|-------|-----|---------|
| State Of Michigan Department Of Trea | Peggy A Housner | Department Of Treasury Revenue Ag | PO Box 30456 | Lansing | MI | 48909-7955 | |
| State Of New Jersey | Bureau Of Commercial Recording | PO Box 34089 | | Newark | NJ | 07189-0001 | |
| State Of New Jersey | Division Of Taxation | Compliance Activity | PO Box 245 | Trenton | NJ | 08695 | |
| State Of New Jersey | Division Of Taxation | Revenue Processing Ctr | PO Box 666 | Trenton | NJ | 08646-0666 | |
| State Of New Jersey Department Of Tr | Division Of Taxation | PO Box 245 | | Trenton | NJ | 08695-0245 | |
| State Of New Jersey Division Of Taxati | Compliance Activity | PO Box 245 | | Trenton | NJ | 08695 | |
| State Of New Mexico Taxation And Revenue Department | | PO Box 8575 | | Albuquerque | NM | 87198-8575 | |
| State Of Wisconsin Department Of Revenue | | PO Box 8901 | | Madison | WI | 53708-8901 | |
| State Processing Center | | PO Box 6100 | | Albany | NY | 12261-0001 | |
| Sterling Heights City Of | Property Taxes | PO Box 55000 | | Detroit | MI | 48255 | |
| Steuben County In | Steuben County Treasurer | 317 S Wayne St | Room 2k | Angola | IN | 46703 | |
| Sturgis City Of Saint Joseph | | Treasurers Office | | Sturgis | MI | 49091 | |
| Summit County Treasurer | John A Donofrio Marvin D Evans Assistant Prose | Summit County Prosecutors Office Ta | 220 S Balch Ste 220 | Akron | OH | 44302-1606 | |
| Summit County Treasurer | Ohio Building | 175 S Main St Ste 320 | | Akron | OH | 44308 | |
| Sumner Co Tn | Sumner County Treasurer | 355 N Belvedere Dr | Room 107 | Gallatin | TN | 37066 | |
| Sumner County Trustee | | 355 Belvedere Dr Rm 107 | | Gallatin | TN | 37066 | |
| Switzerland County In | Switzerland County Treasurer | 212 W Main St Courthouse | | Vevay | IN | 47043 | |
| Sylvan Twp Washtenaw | Treasurer | 18027 Old Us 12 | | Chelsea | MI | 48118 | |
| Tarrant Co Tx | Tarrant County Co Tax Assessor | PO Box 961018 | | Fort Worth | TX | 76161 | |
| Tarrant County | Elizabeth Weller | Linebarger Goggan Blair & Sampson | 2323 Bryan St Ste 1600 | Dallas | TX | 75201 | |
| Tawas City City Of Iosco | Treasurer | PO Box 568 | | Tawas City | MI | 48764 | |
| Tax Collector | Tax Collector Town Of Watertown | PO Box 224 | | Watertown | CT | 06795 | |
| Tax Collector Pinellas County | Attn Betty A Gramley Tax Manager | PO Box 2943 | | Clearwater | FL | 33757-2943 | |
| Tax Collector Santa Clara County | Deborah Nichols County Administration Building | 70 W Hedding St | East Wing 6th Fl | San Jose | CA | 95110-1767 | |
| Tax Collector Santa Rosa County | Attn Carol Watford Supervisor Delin | PO Box 7100 | | Milton | FL | 32572 | |
| Tax Collector Santa Rosa County | Attn Cindy Grimes Delinquent Tax De | Robert Mcclure Santa Rosa Tax Colle | PO Box 7100 | Milton | FL | 32572 | |
| Tax Commissioner Of The State Of Ohio | | 30 E Broad St | | Columbus | OH | 43215 | |
| Taxation And Revenue Department | | PO Box 630 | | Santa Fe | NM | 87504-0630 | |
| Taylor Co Ga | Taylor County Tax Commissioner | PO Box 446 | | Butler | GA | 31006 | |
| Temasek Holdings (Private) Limited | Chua Eu Jin - Director, Legal & Regulations | 60B Orchard Road # 06-18 Tower 2 | The Atrium @ Orchard | Singapore | | 238891 | Singapore |
| Temasek Holdings Pte Ltd | HENG Teck Yong - Asst. Director - Investment | | Two Pacific Place Suite 1806 | 88 Queensway | Hong Kong | | |
| Temasek Holdings Pte Ltd | Zhao Chenning - Director - Investment | | Two Pacific Place Suite 1806 | 88 Queensway | Hong Kong | | |
| Tenneco | General Counsel | 500 N Field Dr | | Lake Forest | IL | 60045 | |
| Tennessee Department Of Revenue | Andrew Jackson State Office Bldg | 500 Deaderick Stret | | Nashville | TN | 37242 | |
| Tennessee Department Of Revenue | Attorney General | PO Box 20207 | | Nashville | TN | 37202-0207 | |
| Tennessee Secretary Of State | Annual Report | 312 Eighth Ave North 6th Fl | William R Snodgrass Tower | Nashville | TN | 37243 | |
| Terrell County Ga | Terrell County Tax Commissioner | PO Box 484 | | Dawson | GA | 31742 | |
| Texas Comptroller Of Public Accounts | Office Of The Attorney General | Bankruptcy Collections Division | PO Box 12548 | Austin | TX | 78711-2548 | |
| Texas Comptroller Of Public Accounts | Office Of The Attorney General | Bankruptcy Collection Division | PO Box 12548 | Austin | TX | 78711-2548 | |
| The Bridgeford Group, Inc. | Hiroshi Kaneko | 445 Park Ave. 20th Fl. | | New York | NY | 10022 | |
| The Commonwealth Of Massachusetts | Secretary Of The Commonwealth | One Ashburton Pl | | Boston | MA | 02108-1512 | |
| Tippecanoe County In | Tippecanoe County Treasurer | 20 N 3rd St | | Lafayette | IN | 47901 | |
| Tipton County In | Tipton County Treasurer | Courthouse | | Tipton | IN | 46072 | |
| Torch Hill Partners, The Carlyle Group, The McLean Group | Emerson Carr | 2126 Darcy Green Place | | Silver Spring | MD | 20910-1169 | |
| Town Of Berlin Ct | Town Of Berlin Tax Collector | 240 Kensington Rd | | Berlin | CT | 06037 | |
| Town Of Burlington | | PO Box 376 | | Burlington | MA | 01803 | |
| Town Of Coaling Alabama | Alatax | 3001 Second Ave South | | Birmingham | AL | 35233 | |
| Town Of Decatur Ms | Town Of Decatur Ms | PO Box 307 | | Decatur | MS | 39327 | |
| Town Of Hingham Ma | Town Of Hingham | 210 Central St | | Hingham | MA | 02043 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)
Page 13 of 16
3/26/2008 2:29 AM
Combined Kettering Motion special parties

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Town Of Lebanon Va | Town Of Lebanon | 244 W Main St | | Lebanon | VA | 24266 | |
| Town Of Lockport Ny | Town Of Lockport | Receiver Of Taxes | PO Box 4610 | Buffalo | NY | 14240 | |
| Town Of Snow Hill Nc | Town Of Snow Hill Tax Collector | 201 North Greene St | | Snow Hill | NC | 28580 | |
| Town Of South Windsor Ct | Town Of South Windsor | Collector Of Revenue | PO Box 30002 | Hartford | CT | 06150 | |
| Traverse City Of Grand Traverse | City Treasurer | Governmental Ctr | 400 Boardman Ave | Traverse City | MI | 49684 | |
| Travis Co Tx | Travis Co Tax Assessor /collector | PO Box 970 | | Austin | TX | 78767 | |
| Treasurer City Of Flint | Income Tax Office | PO Box 1800 | | Flint | MI | 48501-1800 | |
| Treasurer City Of Pontiac | Income Tax Division | 47450 Woodward Ave | | Pontiac | MI | 48342 | |
| Treasurer Of Kosciusko County | | 100 W Ctr St | | Warsaw | IN | 46580 | |
| Treasurer Of Tipton County | | Courthouse | | Tipton | IN | 46072 | |
| Treasurer Of Vigo County | David Crockett | PO Box 1466 | | Indianapolis | IN | 46206-1466 | |
| Trey Grayson | Secretary Of State | PO Box 1150 | | Frankfort | KY | 40602-1150 | |
| Troup County Ga | Troup County Tax Commissioner | 100 Ridley Ave | | La Grange | GA | 30240 | |
| Troy City Of Oakland | Drawer 0101 | PO Box 33321 | | Detroit | MI | 48232 | |
| Trumbull County Treasurer | | 160 High St Nw | | Warren | OH | 44481-1090 | |
| TRW | Phil Cunningham VP - Business Development | 12001 Tech Center Dr | | Livonia | MI | 48150 | |
| Tuscaloosa County Al | Tuscaloosa County Tax Collector | 714 Greensboro Ave | Room 124 | Tuscaloosa | AL | 35401 | |
| U S Customs And Border Protection | | 6650 Telecom Dr | PO Box 68911 | Indianapolis | IN | 46268 | |
| Unemployment Insurance Agency Dept | State Of Michigan | 3024 W Grand Blvd Ste 11 500 | | Detroit | MI | 48202-6024 | |
| United Independent School District | C O Ornelas Castillo & Ornelas Pllc | 401 East Hillside Rd 2nd Fl | | Laredo | TX | 78041 | |
| United Isd Tx | United Isd Tax Assessor / Collector | 3501 E Saunders | | Laredo | TX | 78041 | |
| United States Council For International Business | | 1212 Ave Of The Americas | | New York | NY | 10036-1689 | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY | | K W ZANK\TRUST DIV A\C5115114 | 611 WOODWARD AVE | | DETROIT | MI | 48226 |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY - REGION 5 | BLAURA RIPLEYSPRFUND EACT SECT | 77 WEST JACKSON BLVD | | CHICAGO | IL | 60604 | |
| US Attorney - Southern District of Ohio | Dayton | 200 W. Second Street | Suite 602 | Dayton, OH | OH | 45402 | |
| US Attorneys Office | Michael Garcia | 1 St. Andrews Plaza | | New York | NY | 10007 | |
| Us Customs And Border Protection | Robert B Hamilton Jr Director Reven | 6650 Telecom Dr | PO Box 68911 | Indianapolis | IN | 46268 | |
| US ENVIRONMENTAL PROTECTION AGENCY | DAVID J KENNEDY | ASSISTANT US ATTORNEY SDNY | 86 CHAMBERS ST 3RD FL | NEW YORK | NY | 10007 | |
| US ENVIRONMENTAL PROTECTION AGENCY | SUPERFUND PAYMENTS | CINCINNATI FINANCE CENTER | PO BOX 979076 | ST. LOUIS | MO | 63197-9000 | |
| US ENVIRONMENTAL PROTECTION AGENCY  REGION 5 | | PO BOX 70753 | | CHICAGO | IL | 60673 | |
| US ENVIRONMENTAL PROTECTION AGENCY REGION 2 | JANE M KENNY | REGIONAL ADMINISTRATOR | 290 BROADWAY | 26TH FLOOR | NEW YORK | NY | 10007 |
| US EPA | DIANA EMBIL | REGION 5 77 WEST JACKSON BLVD | | CHICAGO | IL | 60604-3590 | |
| US EPA | REGINALD PALLESEN | REGION 5 77 WEST JACKSON BLVD | | CHICAGO | IL | 60604-3590 | |
| US EPA | TOM NASH | REGION 5 77 WEST JACKSON BLVD | | CHICAGO | IL | 60604-3590 | |
| US EPA | | C/O RTP FINANCE | MAIL DROP D143-02 | DURHAM | NC | 27711 | |
| US EPA | | | | ANN ARBOR | MI | 48105 | |
| US EPA - REGION 3 | | 1650 ARCH ST | (3PM52) | PHILADELPHIA | PA | 19103-2029 | |

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---------|---------|----------|----------|------|-------|-----|---------|
| US EPA - REGION 4 ATLANTA FEDERAL CENTER | | 61 FORSYTH ST SW | | ATLANTA | GA | 30303-3104 | |
| US EPA - REGION 5 | WILLIAM D MESSENGER | 77 WEST JACKSON BLVD | | CHICAGO | IL | 60604-3590 | |
| US EPA - REGION 8 | | 999 18TH ST | SUITE 200 | DENVER | CO | 80202-2466 | |
| US EPA MAIL CODE 6205J | | 1200 PENNSYLVANIA AVENUE NORTHWEST | | WASHINGTON | DC | 20460 | |
| USEPA REGION IV | GAIL GINSBERG REG ADMIN | 77 W JACKSON | | CHICAGO | IL | 60604 | |
| Utah Division Of Corporations & Commercial Code | | PO Box 25125 | | Salt Lake City | UT | 84125-0125 | |
| Utah State Tax Commission | | 210 North 1950 West | | Salt Lake City | UT | 84134-0180 | |
| Valwood Improvement Authority Tx | Valwood Improvement Authority Tx | 1430 Valwood Pkwy | Ste 160 | Carrollton | TX | 75006 | |
| Van Buren Co Tn | Van Buren County Trustee | PO Box 176 | | Spencer | TN | 38585 | |
| Van Buren Twp Wayne | Treasurer | 46425 Tyler Rd | | Belleville | MI | 48111 | |
| Vandalia City Of Oh | | 333 James E Bohanan Memorial Dr | | Vandalia | OH | 45377 | |
| Vanderburgh County In | Vanderburgh County Collector | 1 Nw Ml King Jr Blvd | 210 | Evansville | IN | 47708 | |
| Vassar City Of Tuscola | Treasurers Office | 287 E Huron Ave | | Vassar | MI | 48768 | |
| Ventura County Collector | | 800 South Victoria Ave | | Ventura | CA | 93009 | |
| Vermont Department Of Taxes | | 109 State St | | Montpelier | VT | 05609-1401 | |
| Vigo County In | Vigo County Treasurer | 191 Oak St | Vigo County Annex | Terre Haute | IN | 47807 | |
| Virginia Department Of Taxation | Taxing Authority Consulting Service | PO Box 2156 | | Richmond | VA | 23218-2156 | |
| Virginia Department Of Taxation | | PO Box 1500 | | Richmond | VA | 23218-1500 | |
| Wabash County In | Wabash County Treasurer | Courthouse 1 W Hill St | Ste 4b | Wabash | IN | 46992 | |
| Wake Co Nc | Wake Co Tax Collector | PO Box 2331 | | Raleigh | NC | 27602 | |
| Walthall Co Ms | Walthall Co Tax Collector | 200 Ball Ave | | Tylertown | MS | 39667 | |
| Warren City Of Macomb | Treasurer | PO Box 2113 | | Warren | MI | 48090 | |
| Warren Co Ky | Warren County Sheriff | 429 E 10th St | Courthouse | Bowling Green | KY | 42101 | |
| Warren County Ga | Warren County Tax Commissioner | PO Box 189 | | Warrenton | GA | 30828 | |
| Warren County Tax Commissioner | | PO Box 189 | | Warrenton | GA | 30828-0189 | |
| Washington Co Ky | Washington County Sheriff | PO Box 127 | | Springfield | KY | 40069 | |
| Washington Co Ms | Washington Co Tax Collector | PO Box 9 | | Greenville | MS | 38702 | |
| Washington County In | Washington County Treasurer | 99 Public Sq | Ste 101 | Salem | IN | 47167 | |
| Watertown Twp Clinton | Treasurer | 12803 South Wacousta Rd | | Grand Ledge | MI | 48837 | |
| Wayne County In | Wayne County Treasurer | 401 E Main St | County Adminstration Blgd | Richmond | IN | 47374 | |
| Wayne Twp Cass | Treasurer | 51327 Atwood Rd | | Dowagiac | MI | 49047 | |
| Webb County Tx | Webb County Tax Assessor /collector | PO Box 420128 | | Laredo | TX | 78042 | |
| Webber Co Ut | Weber County Assessor | PO Box 9700 | | Ogden | UT | 84409 | |
| Wells County In | Wells County Collector | 102 W Market St | Ste 204 | Bluffton | IN | 46714 | |
| White Co Tn | White County Trustee | 1 East Bockman Way | Room 102 | Sparta | TN | 38583 | |
| Whitley County In | Whitley County Treasurer | 2nd Fl Courthouse | | Columbia City | IN | 46725 | |
| Wichita County Burkburnett Independe | Harold Lerew | Perdue Brandon Fielder Collins & Mo | PO Box 8188 | Wichita Falls | TX | 76307 | |
| Wichita County Tx | Wichita County Tax Assessor | / Collector | PO Box 1471 | Wichita Falls | TX | 76307 | |
| Williamson Co Tn | Williamson County Trustee | 1320 W Main St Ste 3 | PO Box 1365 | Franklin | TN | 37065 | |
| Wilson Co Nc | Wilson Co Tax Collector | PO Box 1162 | | Wilson | NC | 27894 | |
| Wilson Co Tn | Wilson County Trustee | PO Box 865 | | Lebanon | TN | 37088 | |
| Wisconsin Department Of Revenue | James Polkowski | 2135 Rimrock Rd | | Madison | WI | 53713 | |
| Wisconsin Department Of Revenue | | PO Box 93389 | | Milwaukee | WI | 53293 | |
| Wisconsin Department Of Revenue | | PO Box 8908 | | Madison | WI | 53708-8908 | |
| Wisconsin Dept Of Financial Inst | Div Of Corporate And Consumer Svcs | PO Box 7846 | | Madison | WI | 53707-7846 | |
| Woodstock Twp Lenawee | Treasurer | 6486 Devils Lake Hwy | | Addison | MI | 49220 | |
| Wv Secretary Of State | | Bldg 1 Rm 157 K | 1900 Kanawha Blvd East | Charleston | WV | 225305 | |

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| Wv State Tax Department | Internal Auditing Division | PO Box 2666 | | Charleston | WV | 25330-2666 | |
| Wv State Tax Department | Rd Eft | PO Box 11895 | | Charleston | WV | 25339-1895 | |
| Wv State Treasurers Office | | One Players Club Dr | | Charleston | WV | 25311 | |
| Wyandotte County Ks | Wyandotte County Treasurer | 710 N 7th St | 2nd Fl | Kansas City | KS | 66101 | |
| Wyoming City Of Kent | Treasurers Office | 1155 28th St Sw | PO Box 905 | Wyoming | MI | 49509 | |
| Yazoo Co Ms | Yazoo County Tax Collector | PO Box 108 | | Yazoo | MS | 39194 | |
| York Co Sc | York Co Tax Treasurer | PO Box 116 | | York | SC | 29745 | |
| York County Tax Collector | | 1070 Heckle Beva Box 14 | | Rock Hill | SC | 29732-2863 | |
| ZF | Julio Caspari - President of ZF Group NAO | 15811 Centennial Drive | | Northfield | MI | 48168 | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 16 of 16

3/26/2008 2:29 AM
Combined Kettering Motion special parties

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re                                     :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                          Debtors.        :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 363 AND 1146 AND FED. R. BANKR. P.
2002 AND 9014 (I) APPROVING BIDDING PROCEDURES, (II)
GRANTING CERTAIN BID PROTECTIONS, (III) APPROVING
FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING
SALE HEARING DATE IN CONNECTION WITH SALE OF
KETTERING MACHINERY, EQUIPMENT AND INVENTORY

("KETTERING ASSET BIDDING PROCEDURES ORDER")

Upon the expedited motion, dated March 7, 2008 (the "Motion"), of

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for

orders pursuant to 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr. P. 2002, 6004, and

9014 (i) approving the bidding procedures set forth herein and attached hereto as Exhibit

1 (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the

form and manner of sale notices, and (iv) setting a sale hearing date (the "Sale Hearing")

in connection with the sale (the "Sale") of certain assets of Delphi Automotive Systems

LLC ("DAS LLC" or the "Seller") comprising certain assets used in the Seller's U.S.

damper business (the "Acquired Assets"), including, without limitation, the machinery,

equipment, and inventory primarily used and located at DAS LLC's damper

manufacturing facility in Kettering, Ohio for approximately $18.8 million and other



consideration, as such purchase price may be adjusted based on Inventory Value (as defined below) at closing and (ii) entry into a lease agreement in connection with the Sale; and upon the Limited Objection Of IUE-CWA And Affiliated Local 755 (Docket No. 13140) (the "Objection");  and upon the record of the March 19, 2008 Hearing on the Motion; and after due deliberation thereon, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[1]

A.    The Court has jurisdiction over this matter and over the property of the Debtors and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334.

B.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O).

C.    The IUE-CWA withdrew the Objection without prejudice on the record at the Hearing.

D.    The relief requested in the Motion is in the best interests of the Seller, its estate, its stakeholder, and other parties-in-interest.

E.    The notice given by the Seller of the Motion and the Hearing constitutes due and sufficient notice thereof.

F.    The Seller has articulated good and sufficient reasons for the Court to (i) approve the Bidding Procedures, (ii) grant certain bid protections as provided in the Agreement and in this order, (iii) approve the manner of notice of the Motion and the Sale Hearing, (iv) approve the form of notice of the Motion and the Sale Hearing to be distributed to stakeholders and other parties-in-interest, including prospective bidders,

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

and (v) set the Sale Hearing.

G.    The Break-Up Fee[2] or the Expense Reimbursement may be paid in accordance with the terms, conditions, and limitations of the Agreement as modified by this order (together, the "Bid Protections") and (i) if triggered, shall be deemed an actual and necessary cost and expense of preserving the Seller's estate, within the meaning of sections 503 and 507(b) of the Bankruptcy Code, (ii) are of substantial benefit to the Seller's estates, (iii) are reasonable and appropriate, including in light of the size and nature of the Sale and the efforts that have been and will be expended by the Purchaser notwithstanding that the proposed Sale is subject to higher or better offers for the Acquired Assets, (iv) were negotiated by the parties at arms' length and in good faith, and (v) are necessary to ensure that the Purchaser will continue to pursue its proposed acquisition of the Acquired Assets.  The Bid Protections were a material inducement for, and condition of, the Purchaser 's entry into the Agreement.  The Purchaser is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement unless it is assured of payment of the Bid Protections.  Thus, assurance to the Purchaser of payment of the Bid Protections promoted more competitive bidding by inducing the Purchaser to hold its bid open.  Without the Bid Protections, other bidding would have been limited.  Further, because the Bid Protections induced the Purchaser to research the value of the Acquired Assets and to submit a bid that will serve as a minimum or floor bid on which other bidders can rely, the Purchaser has provided a benefit to the Seller's estate by increasing the likelihood that the price at which the Acquired Assets are sold will reflect their true worth.  Finally, absent authorization of the

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

3

Bid Protections, the Seller may lose the opportunity to obtain the highest or otherwise best available offer for the Acquired Assets.

H.    The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Acquired Assets.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

Bidding Procedures

1.    The Bidding Procedures, as set forth on Exhibit 1 attached hereto and incorporated herein by reference as if fully set forth herein, are hereby approved and shall govern all proceedings relating to the Agreement and any subsequent bids for the Acquired Assets and the Auction, if applicable.

2.    The Seller may: (a) determine, in its business judgment, which Qualified Bid is the highest or otherwise best offer, (b) consult with the representative of any official committee or significant constituency in connection with the Bidding Procedures, and (c) reject at any time, before entry of an order of the Court approving a Qualified Bid, any bid (other than the Purchaser's bid) which, in the Seller's sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Seller, its estate, and its stakeholders.  The Seller is authorized (x) to terminate the Bidding Process or the Auction at any time if it determines, in its business judgment, that the Bidding Process will not maximize the value of the Acquired Assets to be realized by the Seller's estate and (y) seek Bankruptcy Court approval of the Agreement with Purchaser.

4

<u>Sale Hearing</u>

3.    Subject to paragraph 5 below, the Court shall hold a Sale Hearing on

**April 30, 2008 at 10:00 a.m**. (prevailing Eastern time) in the United States Bankruptcy

Court for the Southern District of New York, One Bowling Green, Room 610, New York,

New York 10004, at which time the Court shall consider the sale aspect of the Motion.

Objections to the Motion, if any, shall be filed and served no later than 4:00 p.m.

(prevailing Eastern time) on April 23, 2008 (the "Objection Deadline").

4.    The failure of any objecting person or entity to timely file its objection

by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter,

of any objection to the Motion, the Sale, the Auction, or the Seller's consummation and

performance of the Agreement (including the transfer of the Acquired Assets free and

clear of liens), if authorized by the Court.

5.    The Sale Hearing may be adjourned by the Debtors from time to time

without further notice to creditors or parties-in-interest other than by announcement of

the adjournment in open court or on the Court's calendar on the date scheduled for the

Sale Hearing or any adjourned date.

<u>Break-Up Fee</u>

6.    The Bid Protections, as more fully described in the Motion and the

Agreement, but as modified herein, are hereby approved.  The Seller shall be authorized

to pay the Bid Protections to the Purchaser in accordance with the terms of the

Agreement without further order of the Court; <u>provided</u>, <u>however</u>, that, notwithstanding

any provision in the Agreement or the Motion to the contrary, no expense reimbursement

shall be paid if the Agreement is terminated by the Purchaser because the Bankruptcy

Court has not entered the Sale Approval Order due to the Debtors' emergence from

chapter 11; provided, further, however, that, notwithstanding any provision of the

Agreement or the Motion to the contrary, no expense reimbursement shall be paid if the

Agreement is terminated by the Seller because the closing has not occurred by September

30, 2008 and all conditions other than the entry of a Sale Approval Order have been

satisfied.

Notice

7.    Notice of the Motion and the Sale Hearing shall be good and

sufficient, and no other or further notice shall be required, if given as follows:

(a)    Notice Of Sale Hearing.  Within five days after entry of this order, the Seller (or its agent) shall serve the Motion, the Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months, (ii) all entities known to have asserted any lien in or upon the Acquired Assets, (iii) all federal, state, and local regulatory or taxing authorities which have a reasonably known interest in the relief requested by the Motion, (iv) the United States Attorney's office, (v) the United States Department of Justice, (vi) the Securities and Exchange Commission, (vii) the Internal Revenue Service, (viii) all entities which filed a notice of appearance or request for notice in these cases, and (ix) counsel to the official committee of unsecured creditors and the official committee of equity security holders appointed in these cases.

(b)    Publication Notice.  Within five days after entry of this order, or as soon thereafter as is practicable, the Debtors or their agents shall publish notice of the Sale substantially in the form of the notice attached hereto as Exhibit 2 in the Wall Street Journal, the New York Times, and the Dayton Daily News.

8.    This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this order.

6

        9.   The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules

for the United States Bankruptcy Court for the Southern District of New York for the

service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated:    New York, New York
           March 20, 2008

                        /s/Robert D. Drain
                        UNITED STATES BANKRUPTCY JUDGE

Exhibit 1

## DELPHI AUTOMOTIVE SYSTEMS LLC
## KETTERING ASSET BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of certain assets of Delphi Automotive Systems LLC ("DAS LLC" or the "Seller") comprising certain assets used in the Seller's U.S. damper business (the "Acquired Assets"), including, without limitation, the machinery, equipment, and inventory primarily used and located at DAS LLC's damper manufacturing facility in Kettering, Ohio for approximately $18.8 million and other consideration, as such purchase price may be adjusted based on Inventory Value (as defined below) at closing. On March 7, 2008, the Seller executed that certain Asset Purchase Agreement (together with any amendments thereto, the "Agreement") with Tenneco Automotive Operating Company Inc. (the "Purchaser"). The transactions contemplated by the Agreement are subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined herein) pursuant to section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code"), and certain other closing conditions.

On March 7, 2008, the Seller and certain of its affiliates (collectively, the "Debtors") filed a Motion For Orders Under 11 U.S.C. §§ 363 And 1146 And Fed. R. Bankr. P. 2002, 6004, And 9014 (a) (i) Approving Bidding Procedures, (ii) Granting Certain Bid Protections, (iii) Approving Form And Manner Of Sale Notices, And (iv) Setting Sale Hearing Date And (b) Authorizing And Approving (i) the Sale by Delphi Automotive System LLC Of Certain Machinery, Equipment, And Inventory Primarily Used At The Debtors' Kettering Facility Free And Clear Of Liens and (ii) entry into a lease agreement in connection therewith (the "Sale Motion"). On _____, 2008, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 2002 And 9014 (I) Approving Bidding Procedures, (II) Granting Certain Bid Protections, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date In Connection With Sale Of Kettering Machinery, Equipment, And Inventory (the "Bidding Procedures Order").

Pursuant to the Bidding Procedures Order, the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Seller to enter into and perform under the Agreement on April 30, 2008.

All capitalized terms used but not otherwise defined in these Bidding Procedures have the meanings ascribed to them in the Agreement.

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Qualified, the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined herein), the ultimate selection of the Successful Bidder(s) (as defined herein), and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process"). The Seller intends to consult with, among others, the official committee of unsecured creditors (the "Creditors' Committee") throughout the Bidding Process. In the event that the Seller and any other party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

## Assets To Be Sold

The assets proposed to be sold include substantially all of the assets primarily used at the Kettering facility, including machinery, equipment, and inventory of the Seller (the "Acquired Assets").

## Free Of Any And All Liens

Except to the extent otherwise set forth in the Agreement or the relevant purchase agreement of a Successful Bidder, as applicable, all of the Seller's right, title, and interest in and to the Acquired Assets, or any portion thereof, to be acquired will be sold free and clear of any lien (including tax liens and any statutory or common law liens, possessory or otherwise), charge, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option, or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction) (the "Liens") and any monetary amounts which are secured by any Lien.

## Participation Requirements

Unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Delphi, to participate in the bidding process, each person (a "Potential Bidder"), other than the Purchaser, must deliver (unless previously delivered) to the Seller and its counsel at the addresses provided below:

(a) An executed confidentiality agreement in form and substance acceptable to the Seller;

(b) Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets, current audited financial statements of the equity holders of the Potential Bidder who must guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement as may be acceptable to the Seller and its financial advisors;

(c) A preliminary (non-binding) written proposal regarding (i) the purchase price, (ii) any assets and/or equity interests expected to be excluded, (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing of the Purchase Price (as defined in the Agreement) and the requisite financial assurances), (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame, and any anticipated impediments for obtaining such approvals, (v) any conditions to closing that it may wish to impose in addition to those set forth in the Agreement, and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence must be completed; and

2

(d) A good faith deposit in the amount equal to 5% of the Initial Purchase Price (the "Good Faith Deposit").

A Potential Bidder who delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of such Potential Bidder to consummate the Sale, if selected as a successful bidder, and who the Seller determines in its sole discretion is likely (based on availability of financing, experience, and other considerations) to be able to consummate the Sale within the time frame provided by the Agreement, will be deemed a "Qualified Bidder."  As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Seller will determine, and will notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder.  At the same time when the Seller notifies the Potential Bidder that it is a Qualified Bidder, the Seller will allow the Qualified Bidder to begin to commence due diligence with respect to the Acquired Assets as provided below.  Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

## Due Diligence

The Seller will afford each Qualified Bidder due diligence access to the Acquired Assets. Due diligence access may include such management presentations as may be scheduled by the Seller, access to data rooms, on-site inspections, and such other matters as a Qualified Bidder may request and as to which the Seller, in their sole discretion, may agree.  The Seller will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  Any additional due diligence may not continue after the Bid Deadline.  The Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  Neither the Seller nor any of its affiliates (or any of its respective representatives) will be obligated to furnish any information relating to Acquired Assets to any person other than to Qualified Bidders which make an acceptable preliminary proposal.

Each Qualified Bidder will be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets or the completeness of any information provided in connection therewith, the Bidding Process, or the Auction (as defined herein), except as expressly stated in the definitive agreement with the Successful Bidder approved by the Bankruptcy Court.

## Bid Deadline

A Qualified Bidder, other than the Purchaser, which desires to make a bid must deliver written copies of its bid to:  Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098, Attention: Director, Mergers & Acquisitions, with copies to:  (i) Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan, 48098, Attention: Karen J. Craft,

Managing Restructuring Counsel; (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: Ron E. Meisler and T. Kellan Grant; (iii) counsel to the Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Robert J. Rosenberg and Mark A. Broude; (iv) the Creditors' Committee's financial advisor, Mesirow Financial Consulting LLC, 666 Third Avenue, 21st Floor, New York, New York 10017, Attention: Ben Pickering; (v) counsel for the Debtors' postpetition credit facility, Davis, Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald Bernstein and Brian Resnick; and (vi) the Purchaser, Tenneco Automotive Operating Company, Inc., c/o Tenneco Inc., 500 North Field Drive, Lake Forest, Illinois 60045, Attention: General Counsel, with a copy to Purchaser's counsel, Mayer Brown LLP, 71 South Wacker Drive, Chicago, Illinois 60606, Attention: Jodi Simala, so as to be received not later than 11:00 a.m. (prevailing Eastern time) on April 10, 2008 (the "Bid Deadline"). The Seller may extend the Bid Deadline once or successively, but is not obligated to do so. If the Seller extends the Bid Deadline, it must promptly notify all Qualified Bidders of such extension. As soon as reasonably practicable following receipt of each Qualified Bid, the Seller must deliver complete copies of all items and information enumerated in the section below entitled bid requirements to counsel for the official committee of equity security holders (the "Equity Committee").

Potential bidders should note that Section 3.2 of the Agreement addresses, among other things, the terms and conditions of employment of IUE-CWA-represented employees, and these issues remain subject to the parties' rights and obligations related to bargaining with the IUE-CWA.

## Bid Requirements

All bids must include the following documents (the "Required Bid Documents"):

(a) A letter stating that the bidder's offer is irrevocable until two Business Days after the closing of the Sale of the Acquired Assets.

(b) An executed copy of the Agreement and related agreements, including the Lease Agreement and any other Ancillary Agreements, together with all schedules, marked to show those amendments and modifications to such agreement that the Qualified Bidder proposes, including the Purchase Price (as defined in the Agreement) (a "Marked Agreement").

(c) The Good Faith Deposit in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to the Seller in its sole discretion) payable to the order of the Seller (or such other party as the Seller may determine) in an amount equal to 5% of the Initial Purchase Price.

(d) Written evidence of a commitment for financing, or other evidence of ability to consummate the proposed transactions that is satisfactory to the Seller and its advisors.

(e) Written evidence that the bidder has negotiated a ratified, executed successor collective bargaining agreement with the IUE-CWA or that the bidder is prepared to assume the Seller's current collective bargaining agreement with the IUE-CWA.

4

## Qualified Bids

A bid will be considered only if the bid:

(a)  is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Seller than, those contained in the Agreement;

(b)  is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder;

(c)  proposes a transaction that the Seller determines, in its sole discretion, has a value, either individually or, in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price and the amount of the Break-Up Fee, plus (i) in the case of the initial Qualified Bid, $500,000.00, and (ii) in the case of any subsequent Qualified Bids, $250,000.00 over the immediately-preceding highest Qualified Bid;

(d)  is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment;

(e)  an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, the completeness of any information provided in connection therewith, or the Auction, except as expressly stated in the Agreement or the Marked Agreement;

(f)  includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required governmental or regulatory approvals) within not more than fifteen days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within ten days after entry of such order; and

(g)  is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that the Seller will have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.  Notwithstanding the foregoing, the Purchaser will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than that of the Purchaser is referred to as a "Subsequent Bid."

If the Seller does not receive any Qualified Bids other than the Agreement received from the Purchaser, the Seller will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

## Bid Protection

Recognizing the Purchaser's expenditure of time, energy, and resources, the Seller has agreed to provide certain bidding protections to the Purchaser. Specifically, the Seller has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor which all other potential bids must exceed. As a result, the Seller has agreed that if the Seller terminates the Agreement to close an alternative transaction and sell the Acquired Assets to a Successful Bidder other than the Purchaser, the Seller will, in certain circumstances, be obligated to pay the Purchaser a Break-Up Fee. The payment of the Break-Up Fee or the Expense Reimbursement (as applicable) will be governed by the provisions of the Agreement and the Bidding Procedures Order.

## Auction

If the Seller receives at least one Qualified Bid in addition to the Agreement, the Seller will conduct an auction (the "Auction") of the Acquired Assets upon notice to all Qualified Bidders which have submitted Qualified Bids at 10:00 a.m. (prevailing Eastern time) on or before April 14, 2008, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606 or Four Times Square, New York, New York 10036 (at theSeller's election), or such later time or other place as the Seller may notify all Qualified Bidders which have submitted Qualified Bids (but in no event later than the second Business Day prior to the Sale Hearing) in accordance with the following procedures:

(a) Only the Seller, Purchaser, any representative of the Creditors' Committee and the Equityholders' Committee, any representative of Seller's secured lender (and the legal and financial advisers to each of the foregoing), any representative of GM, and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only the Purchaser and the other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

(b) At least two Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Seller whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Seller shall provide copies of the Qualified Bid or combination of Qualified Bids which the Seller believes is the highest or otherwise best offer going into the Auction (the "Lead Bid") to all Qualified Bidders who have informed the Seller of their intent to participate in the Auction. Notwithstanding this determination of the Lead Bid, the Seller reserves the right, in its sole discretion, to determine which bid, or subsequent bid, is the Successful bid (as defined below), following the conclusion of the Auction based upon a number of factors and other considerations.

(c)   All bidders will be entitled to be present for all Subsequent Bids with the understanding
      that the true identity of each bidder will be fully disclosed to all other bidders and that all
      material terms of each Subsequent Bid will be fully disclosed to all other bidders
      throughout the entire Auction.

(d)   The Seller may employ and announce at the Auction additional procedural rules that are
      reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent
      Bids) for conducting the Auction, provided that such rules are not inconsistent with these
      Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered
      in connection herewith.

(e)   Bidding at the Auction will begin with the highest or otherwise best Qualified Bid or
      combination of Qualified Bids and continue in minimum increments of $250,000.00
      higher than the previous bid or bids.  The Auction will continue in one or more rounds of
      bidding and will conclude after each participating bidder has had the opportunity to
      submit one or more additional Subsequent Bids with full knowledge and written
      confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the
      value of the consideration provided by Subsequent Bids (including any Subsequent Bid
      by Purchaser), the Seller will give effect to any Break-Up Fee as well as any assets to be
      retained by the Seller.

## Selection Of Successful Bid

At the conclusion of the Auction, or as soon thereafter as practicable, the Seller, in
consultation with its financial advisors, will: (i) review each Qualified Bid on the basis of
financial and contractual terms and the factors relevant to the sale process, including those
factors affecting the speed and certainty of consummating the sale, and (ii) identify the highest or
otherwise best offer(s) for the Acquired Assets received at the Auction (the "Successful Bid" and
the bidder(s) making such bid, the "Successful Bidder(s)").

The Seller will sell the Acquired Assets for the highest or otherwise best Qualified Bid to
the Successful Bidder upon the approval of such Qualified Bid by the Bankruptcy Court after the
Sale Hearing.  If, after an Auction in which the Purchaser:  (i) has bid an amount in excess of the
consideration currently provided for in the Agreement with respect to the transactions
contemplated under the Agreement and (ii) is the Successful Bidder, the Purchaser must, at the
Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to:
(a) the amount of the Successful Bid less (b) the Break-Up Fee.

The Seller's presentation of a particular Qualified Bid to the Bankruptcy Court for
approval does not constitute the Seller's acceptance of the bid.  The Seller will be deemed to have
accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

## The Sale Hearing

The Bankruptcy Court will conduct a Sale Hearing on April 30, 2008 at 10:00 a.m.
(prevailing Eastern time).

7

The Sale Hearing will take place before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004. The Sale Hearing may be adjourned or rescheduled by the Seller without notice other than by an announcement of the adjourned date at the Sale Hearing.

If the Seller does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to the Purchaser following entry of the Sale Approval Order. If the Seller does receive additional Qualified Bids, then at the Sale Hearing the Seller will seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "Alternate Bid(s)," and such bidder(s), the "Alternate Bidder(s)"). The Seller's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) will not constitute the Seller's acceptance of either or any such bid(s), which acceptance will occur only upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing. Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either the Seller or the Successful Bidder or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and the Seller will be permitted to effectuate a sale to the Alternate Bidder(s) subject to the terms of the Alternate Bid(s) of such Alternate Bidder(s) without further order of the Bankruptcy Court.

## Return Of Good Faith Deposits

Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two Business Days following the closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the Good Faith Deposit submitted by the Successful Bidder(s), together with interest thereon, if any, will be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s). If a Successful Bidder fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, the Seller will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of the Seller. Subject to the preceding sentence, on the Return Date, the Seller will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon, if any.

## Reservations Of Rights

The Seller, after consultation with, among others, the Creditors' Committee: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject at any time any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (c) contrary to the best interests of the Seller, its estate, and its stakeholders as determined by the Seller in its sole discretion.

Exhibit 2

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

       In re                       :     Chapter 11
                                :

DELPHI CORPORATION, <u>et al.</u>,      :     Case No. 05-44481 (RDD)
                                :

               Debtor.     :     (Jointly Administered)
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>NOTICE OF SALE OF CERTAIN ASSETS AT AUCTION</u>

PLEASE TAKE NOTICE THAT:

       1.      Pursuant to the Order Under 11 U.S.C. §§ 363 And 1146 And Fed. R. Bankr.
P. 2002 And 9014 (I) Approving Bidding Procedures, (II) Granting Certain Bid Protections,
(III) Approving Form And Manner Of Sale Notices, And (IV) Setting Sale Hearing Date In
Connection With Sale Of Kettering Facility Machinery, Equipment, And Inventory (the
"Bidding Procedures Order") entered by the United States Bankruptcy Court for the Southern
District of New York (the "Bankruptcy Court") on _____, 2008, Delphi Automotive
Systems LLC (the "Seller") has entered into an Asset Purchase Agreement with Tenneco
Automotive Operating Company Inc. for the purchase of certain assets used in the U.S.
damper business, including the machinery, equipment, and inventory primarily used and
located at Seller's damper manufacturing facility in Kettering, Ohio (the "Acquired Assets").

       2.      All interested parties are invited to make an offer to purchase the Acquired
Assets in accordance with the terms and conditions approved by the Bankruptcy Court (the
"Bidding Procedures") by delivering such offer to (i) Delphi Automotive Systems LLC, 5725
Delphi Drive, Troy, Michigan, 48098, Attention: Karen J. Craft, Managing Restructuring
Counsel; (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West
Wacker Drive, Chicago, Illinois 60601-1285, Attention: Ron E. Meisler and T. Kellan Grant;
(iii) counsel to the official committee of unsecured creditors (the "Creditors' Committee"),
Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Robert
J. Rosenberg and Mark A. Broude; (iv) the Creditors' Committee's financial advisor, Mesirow
Financial Consulting LLC, 666 Third Avenue, 21st Floor, New York, New York 10017,
Attention: Ben Pickering; and (v) counsel for the Debtors' postpetition credit facility, Davis,
Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald
Bernstein and Brian Resnick, so as to be received not later than **11:00 a.m.** (prevailing
Eastern time) on **April 10, 2008.** Pursuant to the Bidding Procedures, the Seller may conduct
an auction for the Acquired Assets (the "Auction") beginning at **10:00 a.m.** (prevailing
Eastern time) on **April 14, 2008** at the offices of Skadden, Arps, Slate, Meagher & Flom

LLP, Four Times Square, New York, New York 10036 or 333 West Wacker Drive, Chicago, Illinois 60606, at the Seller's election.

3.    Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.  A copy of the Bidding Procedures is available by contacting the undersigned counsel to the Seller or by accessing Delphi's Legal Information Website, www.delphidocket.com.

4.    The Bankruptcy Court will conduct a hearing to approve the sale of the Acquired Assets on **April 30, 2008** at **10:00 a.m.** (prevailing Eastern time).

5.    The Sale Hearing will take place before the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004. Such hearing may be adjourned without notice other than an adjournment in open court.

6.    Objections, if any, to the proposed sale must be filed and served in accordance with the Bidding Procedures Order, and **actually received** no later than **4:00 p.m.** (prevailing Eastern time) on **April 23, 2008.**

7.    This notice is qualified in its entirety by the Bidding Procedures Order.

Dated: New York, New York
        ____, 2008

                        BY ORDER OF THE COURT

                        John Wm. Butler, Jr. (JB 4711)
                        John K. Lyons (JL 4951)
                        Ron E. Meisler (RM 3026)
                        SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois  60606
                        (312) 407-0700

                            - and -

                        Kayalyn A. Marafioti (KM 9632)
                        Thomas J. Matz (TM 5986)
                        SKADDEN, ARPS, SLATE, MEAGHER
                            & FLOM LLP
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                            Debtors and Debtors-in-Possession

2

# EXHIBIT C

**Bidding Procedures Hearing Date And Time: March 19, 2008 at 10:00 a.m.**
**Bidding Procedures Objection Deadline: March 17, 2008 at 4:00 p.m.**
**Sale Hearing Date And Time: April 30, 2008 at 10:00 a.m.**
**Sale Hearing Objection Deadline: April 23, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
        In re                                 :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
                        Debtors.              :        (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363 AND 1146 AND FED. R. BANKR. P. 2002,
6004, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN BID
PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING SALE
HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE BY DELPHI AUTOMOTIVE
SYSTEMS LLC OF CERTAIN MACHINERY, EQUIPMENT, AND INVENTORY PRIMARILY USED IN DAS
LLC'S KETTERING DAMPER BUSINESS FREE AND CLEAR OF LIENS AND
(II) ENTRY INTO LEASE AGREEMENT IN CONNECTION THEREWITH

("KETTERING SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for orders under 11 U.S.C. §§ 363 and 1146 and Fed. R. Bankr. P. 2002, 6004, and 9014 (a)(i) approving the bidding procedures set forth herein and attached hereto as Exhibit A (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of certain assets of Delphi Automotive Systems LLC ("DAS LLC" or the "Seller") comprising certain assets used in the U.S. damper business[1] (the "Acquired Assets"), including, without limitation, the machinery, equipment, and inventory primarily used and located at DAS LLC's damper manufacturing facility in Kettering, Ohio for approximately $18.8 million and other consideration, as such purchase price may be adjusted based on Inventory Value (as defined below) at closing and (ii) entry into a lease agreement in connection with the Sale.  The Acquired Assets are being sold free and clear of liens pursuant to the Asset Purchase Agreement (the "Agreement")[2] dated March 7, 2008 by and among the Seller and Tenneco Automotive Operating Company Inc. (the "Purchaser") or to the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid.  The Seller is not assigning any executory contracts in connection with the Sale.  In support of this Motion, the Seller respectfully represents as follows:

---

[1]     The U.S. damper business provides passive twin-tube dampers, passive twin-tube struts, and related modules for GM and its affiliates in the United States, Canada, and Mexico.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

2

<u>Background</u>

A.        <u>The Chapter 11 Filings</u>

1.        On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.        No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders.

3.        On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi

Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).

Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession  (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan  (Docket No. 11388) (the "Disclosure Statement").  The Court entered an

order approving the adequacy of the Disclosure Statement and granting the related solicitation

procedures motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court

entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation

Order"), which became a final order on February 4, 2008.

3

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are sections 363 and 1146 of the Bankruptcy Code and rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[4]

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

7.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

---

[3]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[4]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[5]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

9.      The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

---

[5]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
      valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
      calendar year 2004 was $482 million.

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

    10.  In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.  The Debtors' Transformation Plan

    11.  On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable

solution to their current pension situation.

E.  Confirmation Of The Debtors' Plan Of Reorganization

    12.  The confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases.

The Global Settlement Agreement and the Master Restructuring Agreement provide for a

comprehensive settlement with GM, and both agreements were approved by this Court in the

Confirmation Order. With the Plan confirmed, the Debtors are focusing their efforts on

satisfying the conditions for the Plan to become effective and allow them to emerge from chapter

11. The Debtors anticipate having the Plan become effective as soon as reasonably practicable.

13.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally. Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

14.    By this Motion, the Seller seeks approval for the sale of the Acquired

Assets to the Purchaser, subject to additional competitive bidding pursuant to the proposed

Bidding Procedures attached as <u>Exhibit A</u> hereto. To effect the sale, the Seller seeks entry of

two types of relief. First, at the omnibus hearing to be held on March 19, 2008, the Seller will

seek entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding

Procedures Order") approving the Bidding Procedures, certain notice procedures, and certain bid

protections to be provided to the Purchaser pursuant to the Agreement and as described more

fully herein. Second, subject to the terms of the Bidding Procedures Order, at the omnibus

hearing to be held on April 30, 2008, the Seller will seek entry of an order substantially in the

form attached hereto as <u>Exhibit C</u> (the "Sale Approval Order") authorizing and approving the

Sale to the Purchaser or to the Successful Bidder, as the case may be.

15.    As more fully set forth below, after a comprehensive strategic review, the

Seller believes that the Sale represents its best opportunity under the circumstances to maximize

7

the underlying core value of the Acquired Assets.  Therefore, the Sale is in the best interests of

its estate and its stakeholders.

Basis For Relief

F.      The Kettering Equipment

16.      The Seller operates certain manufacturing and subassembly facilities in

Kettering, Ohio.  The Kettering facility provides a variety of shock absorbers (dampers) and

related damper modules to GM and other customers for North American vehicle applications.  In

2007, the net revenues of the Kettering damper business exceeded $100 million.  The Kettering

damper business currently employs approximately 420 active hourly employees represented by

the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers –

Communications Workers of America and its Local Union Number 755 (the "IUE-CWA") and

approximately 140 salaried employees connected to the product line.

G.      Events Leading To The Sale

17.      On March 31, 2006, the Debtors announced the five key tenets of their

transformation plan, one of which was to streamline their product portfolio by identifying non-

core product lines that do not fit into their future strategic framework.  Because the Kettering

business, which is a subset of the Debtors' ride dynamics business, does not fit within the

Debtors' anticipated product portfolio, the Seller has determined to divest the Acquired Assets

and has worked with GM to develop a resourcing plan.

18.      Because GM has independently resourced the passive dampers and

damper modules manufactured at the Kettering facility to the Purchaser, the Seller and the

Purchaser have been negotiating agreements related to the Sale of the Acquired Assets.  Because

the Acquired Assets have limited use other than manufacturing parts designed for use in GM

vehicles, the Sale to the Purchaser is clearly the best means for attaining the maximum value for

8

the Acquired Assets.  The Seller's alternatives for divesting the Acquired Assets are a wind-down

of the Kettering damper business, which would be costly and result in no revenue for the Seller's

estate, or liquidating the Acquired Assets, which would not yield value comparable to the Sale.

The parties have thus been coordinating the transition of designated programs and determining

which machinery and equipment, related supplies, tools, and inventory is required to effect a

smooth transition.  Both parties determined that maintaining the manufacturing at the Kettering

facility was the best alternative for minimizing transition risk.  The Kettering damper business

occupies less than half of the larger building in which it is located, however, and that building is

owned by the Seller.  Accordingly, the Seller decided to lease the necessary portion of the

building to the Purchaser, as described in more detail below.  The form of the proposed lease to

the Purchaser is attached to the Agreement as Exhibit A (the "Lease").

> 19.    The Seller, in its business judgment, concluded that the proposal from the

Purchaser, which formed the basis of the Agreement attached hereto as Exhibit D, offered the

most advantageous terms and the greatest economic benefit to the Seller for the Acquired Assets.

The Purchaser's offer is currently the highest and best offer, providing the highest amount of

consideration for the Acquired Assets.

H.    The Agreement

> 20.    Pursuant to the Agreement, the Seller would sell the Acquired Assets to

the Purchaser for approximately $18.8 million and other consideration (the "Initial Purchase

Price"), which would be adjusted to reflect the cost of useable and merchantable inventory

existing as of the Closing Date (the "Inventory Value").[6]  The Acquired Assets would be sold

free and clear of all liens (including tax liens and any statutory or common law liens, possessory

---

[6]    The Initial Purchase Price contemplates an Inventory Value of approximately $10.2 million, and the Initial
Purchase Price will be adjusted to the extent that the final Inventory Value is less or more than $10.2 million, as
set forth in the Agreement.

9

or otherwise), charges, pledges, security interests, conditional sale agreements or other title

retention agreements, leases, mortgages, security interests, options, or other encumbrances

(including the filing of, or agreement to give, any financing statement under the Uniform

Commercial Code of any jurisdiction) and any monetary amounts which are secured by any lien

(collectively, the "Liens").

21.    The significant terms of the Agreement are as follows:[7]

(a)    General Terms.  The Purchaser would acquire the Acquired Assets,
consisting solely of the machinery, inventory, and other personal property identified on the
schedules to the Agreement, through an asset sale.[8]

(b)    Bankruptcy Court Approval.  The Sale of the Acquired Assets would be
subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

(c)    Documentation.  The Sale would be effected pursuant to the Agreement
and related documentation.  At the Closing, the Seller and the Purchaser would also enter into the
Lease for a portion of the Kettering facility for an initial lease period of seven years.

(d)    Purchase Price.  The purchase price to be paid by the Purchaser would be
approximately $18.8 million for the Acquired Assets as adjusted to reflect the Inventory Value
(the "Purchase Price").

(e)    Deposit Escrow.  No later than March 10, 2008, the Purchaser will place
$942,000.00 (5% of the Initial Purchase Price) into an escrow account.  Upon Closing, or if the
Agreement is terminated prior to Closing because of the Purchaser's failure to consummate the
Sale (on the terms as provided in the Agreement), the Seller would be entitled to the funds in the
escrow account.  Any such payment would constitute the Seller's sole recourse in such event
prior to the date of the Auction (as defined below).  Upon any breach by the Purchaser on or after
the Auction date, the Seller would be entitled to all available remedies in law or equity.

(f)    Representations And Warranties.  Pursuant to the Agreement, the Seller
would provide certain standard representations and warranties relating to the Sale of the

---

[7]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of
the Agreement are controlling.

[8]    Copies of the schedules and exhibits to the Agreement are available upon request to parties-in-interest who can
show that they would be affected by the relief requested by this Motion and who execute a confidentiality
agreement acceptable to the Debtors.

Acquired Assets and the Purchaser would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Seller and the Purchaser would expire 90 days after the Closing Date, except that (i) the parties' representations with respect to corporate authority would survive for one year after the Closing Date and (ii) the Purchaser's representation with respect to inducement, reliance, and independent assessment would survive indefinitely.

      (g)     Covenants.  The Lease would be executed and delivered by the Seller to the Purchaser, and all other agreements and transactions contemplated under the Agreement or any additional agreement to be performed by the Seller on or before the Closing would be performed in all material respects.  Prior to the Closing Date, the Seller would also be required to, among other things, use and operate the Acquired Assets in the ordinary course of business and maintain, repair, and replace the Acquired Assets as previously done in the ordinary course of business.  The Seller would agree not to (i) sell, lease, transfer, or assign any of the Acquired Assets, except for the sale of Inventory in the Ordinary Course of Business (ii) in connection with the Applicable Employees, (A) grant any increase in compensation or benefits, except for increases (1) required by applicable Law or the terms of any Collective Bargaining Agreement and (2) in salary for non-management employees in the Ordinary Course of Business, (B) grant any increase in severance or termination pay, (C) enter into or materially amend any employment, consulting, indemnification, severance, or termination agreement, (D) establish, adopt, enter into, or materially amend any Benefit Plan, except as required by applicable Law or the terms of any Collective Bargaining Agreement, or (E) take any action to accelerate any payments, rights, or benefits, or make any material determinations not in the Ordinary Course of Business, under any Collective Bargaining Agreement, or Benefit Plan, or (iii) agree, whether in writing or otherwise, or announce an intention or negotiate to do anything in violation of these two negative covenants.  The covenants of the Seller and the Purchaser would expire at various times after the Closing Date, or once they are performed.  Further, for a period of five years after the Closing, the Seller would be prohibited from taking certain actions which would place it in competition with the Purchaser with respect to the Kettering damper business.  The Seller would also agree to provide top mounts to the Purchaser through December 31, 2008 at the prices set forth in a schedule to the Agreement.  The Purchaser would covenant to maintain no fewer than 200 hourly manufacturing jobs at the Kettering facility through October 12, 2011.

      (h)     Indemnity.  Under the Agreement, the Purchaser would be obligated to indemnify the Seller on account of certain losses resulting from or arising out of (i) any breach in any representation or warranty of Purchaser contained in the Agreement, (ii) a breach of any covenant to be performed by Purchaser contained in the Agreement or any Ancillary Agreement, or (iii) Purchaser's use or operation of any of the Acquired Assets after the Closing.  The Seller would be obligated to indemnify the Purchaser on account of (i) retained liabilities, (ii) the excluded assets, (iii) a material breach of any covenant to be performed by Seller contained in the Agreement, or (iv) a breach of any representation or warranty of Seller contained in the Agreement.  However, the Seller's indemnification obligations with respect to breaches of representations and warranties would be limited to indemnification claims that are identified to the Seller on or before 90 days after the Closing, except for indemnification claims made with respect to corporate authority matters, which claims would have to be identified to Seller on or before the first anniversary of the Closing.  Further, the Seller would

11

not be obligated to the Purchaser for indemnifiable losses related to a breach of a representation or warranty until the aggregate amount of such claims exceeds $300,000 and such indemnification is capped in the maximum amount of $1.2 million. The Seller's indemnity obligations for a material breach of any covenant would not be so capped, and would expire as the particular covenant expires under its terms or is performed by the Seller.

(i)     Closing Conditions. In addition to certain other customary closing conditions relating to the Court's approvals and regulatory matters, the obligation of the parties to close the Sale would be subject to the satisfaction of the following conditions: (i) the performance in all respects by the Seller and the Purchaser of their covenants under the Agreement and (ii) the accuracy of the Seller's and Purchaser's representations and warranties in all material respects. Furthermore, the obligation of the Purchaser and the Seller to close the Sale would be subject to (a) the Purchaser's delivery to the Seller of the Initial Purchase Price, less the Deposit, and (b) the execution by the Seller and IUE-CWA of a written agreement providing that the Seller has satisfied all of its obligations relating to all applicable IUE-CWA-Delphi collectively bargained "Sale of the Business" and successor provisions. The Seller's obligation to consummate the Sale would be conditioned on: (a) the valid execution and delivery of the GM Supply Agreement; (b) execution by the Seller, the Purchaser, the IUE-CWA and GM of a satisfactory Memorandum of Understanding regarding the effects of the transaction upon bargaining unit members; and (c) the Purchaser's securing environmental insurance on terms satisfactory to the Purchaser in its reasonable discretion.

(j)     Termination. The Agreement could be terminated prior to closing in the following circumstances: (i) upon mutual written consent of the Seller and the Purchaser, (ii) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if closing does not occur within 60 days after entry of the Sale Approval Order for any reason, (iii) by either party, if the Seller consummates an Alternative Transaction (defined below), (iv) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if this Court has not entered the Sale Approval Order on or before May 23, 2008, or (v) by the Purchaser or the Seller upon written notice, provided the terminating party is not in material breach of any of its obligations under the Agreement, if (A) the non-terminating party has breached or failed to perform any of its obligations under the Agreement, which breach is not cured within 30 days after written notice thereof, or is incapable of being cured by the breaching party or (B) a material adverse effect has occurred.

(k)     Break-Up Fee. If the Seller, within 12 months of entry into the Agreement, sells, transfers, or otherwise disposes of all or substantially all or a material portion of the Acquired Assets in a transaction or a series of related transactions with one or more persons other than Purchaser in accordance with the Bidding Procedures (an "Alternative Transaction"), then the Seller would, upon consummation of the Alternative Transaction, pay the Buyer the sum of $565,304.00 (the "Break-Up Fee"), which is approximately 3.0% of the Initial Purchase Price.

(l)     Expense Reimbursement. If the Agreement is terminated because either (i) the Court has not entered the Sale Approval Order on or before May 23, 2008, (ii) the Closing does not occur within 60 days of entry of the Sale Approval Order (and the Purchaser

12

has not failed to enter into the GM Supply Agreement or the Effects MOU), or (iii) the Seller
materially fails to perform any of its covenants or obligations under the Agreement and such
breach is not cured within 30 days of notice of such breach, the Seller would be required to
reimburse the Purchaser's reasonable, actual out-of-pocket fees and expenses incurred in
connection with the investigation or negotiation of the transactions contemplated by the
Agreement up to an amount equal to $750,000 (the "Expense Reimbursement"), or
approximately 3.9% of the Initial Purchase Price.  The Expense Reimbursement would be
immediately earned upon termination and payable promptly after invoiced by the Buyer,
except that if the Seller in good faith believed that the amount of the Expense Reimbursement
sought was not reasonable, then the Seller would have the right to seek the review of this Court
before paying such amount.  If the Buyer becomes entitled to the Break-Up Fee or the Expense
Reimbursement, as the case may be, then the Break-Up Fee or the Expense Reimbursement
would be the sole remedy of the Buyer for the breach by the Seller of the terms of the
Agreement.  The Seller may be liable for either the Break-Up Fee or the Expense
Reimbursement as described above, but not both.

     (m)   <u>Transfer Taxes</u>.  The Purchaser is liable for all stamp taxes, transfer taxes,
use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes, or similar charges
arising out of or incurred in connection with the Agreement if such taxes or charges are not
found exempt under section 1146 of the Bankruptcy Code.

I.    <u>The Lease</u>

     22.   As discussed above, the Kettering damper business is conducted in an

within a building of approximately 2.2 million square feet.   Under the terms of the Lease, the

Seller would lease an area of approximately 930,000 square feet (the "Premises") of the building

to the Purchaser for an initial period of seven years.  In addition, the Purchaser would have the

option to renew the lease for four additional lease periods of five years each.

     23.   To facilitate the Sale of the Acquired Assets, the rent payable under the

initial Lease term would escalate through the term of the Lease, with no rent payable in the first

year and rent increasing by approximately $232,000 annually for each year thereafter.  Should

the Purchaser elect to exercise the renewal options provided in the Lease, the rent would be

determined at then-prevailing market rates for comparable premises in the Kettering area.  The

Purchaser would also be responsible for its share of utilities, taxes, insurance, and maintenance

for the site (other than the portions Delphi continues to occupy), as calculated under the terms of the Lease.

24.    In addition, the Lease would require the Purchaser, by September 30, 2009, to separate the Premises from the remainder of the building in which it is situated by construction of a new permanent exterior wall.  This separation would also include the separation of utilities serving the Premises and would be performed at the expense of the Purchaser.  The anticipated significant cost in performing this separation was an additional factor considered by the parties in determining to set the rent for the Premises on an escalating basis.

25.    The terms of the Lease were negotiated by the parties in a good faith and arm's length manner.  Moreover, in negotiating the terms of the Lease with the Purchaser, the Seller took into account the value of the Sale on an aggregate basis, including the terms of the Lease.  Aside from the clear benefits of selling the Acquired Assets under the terms of the Agreement, the Lease ensures that the Kettering damper business will continue to be conducted at the Kettering facility for a number of years to come, which is beneficial and important not only to the local community but also to the IUE-CWA, which represents the employees of the Kettering damper business.

J.    Workforce Provisions

26.    The Agreement provides that the Purchaser will offer employment to no fewer than 30 salaried employees (subject to reduction for pre-Closing departures).  Such salaried employees would be offered compensation and benefits that are substantially comparable in the aggregate to the compensation and benefits offered prior to closing.  Prior to tendering such offers to salaried employees, the Purchaser would provide the Seller information to satisfy the Seller that this "substantially comparable in the aggregate" requirement is met.  If not met, the Purchaser would have the opportunity to cure any deficiency.  If Seller, in its sole

14

discretion, determines that Purchaser has still not met this standard, the affected employee will

be so advised and given the option of either receiving severance benefits from Seller in

accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees (and

barred from employment by Purchaser for five years in accordance with the Agreement) or

accepting Purchaser's offer of employment and waiving eligibility for any severance benefits

from Seller.

        27.     The significant terms of the Agreement, with respect to hourly or salaried

employees, as applicable, are as follows:[9]

        (a)    Collective Bargaining Agreements.  The Purchaser would not
assume the terms and conditions of any of the IUE-CWA-Delphi collective bargaining
agreements applicable at the Kettering facility.  The Purchaser has entered into an August 5, 2007
collective bargaining agreement with the IUE-CWA (the "Purchaser CBA").  The Tenneco CBA
would govern the employment by the Purchaser of the Kettering hourly employees, subject to
possible modification by a memorandum of understanding between Delphi, the Purchaser, GM
and the IUE-CWA regarding the effects of the sale upon bargaining unit members (the "Effects
MOU").

        (b)    Inactive Employees.  Employees not active as of the closing due to
disability, family medical leave, or other approved leaves of absence, or certain seniority
employees on layoff (the "Inactive Employees") would remain the Seller's responsibility until the
Inactive Employees returned to active employment in accordance with the Seller's leave policies
or collective bargaining agreement leave and layoff/recall provisions, as applicable.  When an
Inactive Employee is ready to return to work, or the Purchaser has need to increase the workforce,
the Purchaser would offer employment to such Inactive Employee.

        (c)    Employee Benefit Plans.  All employees transferred to the
Purchaser as of the Closing, and such employees' dependents and beneficiaries, would cease to
participate in and be eligible for benefits under the Seller's benefit plans.  Transferred salaried
employees, and their dependents and beneficiaries, would commence participation in and become
eligible for benefits under the Purchaser's employee benefits plans.  Inactive Employees who
would become employees of the Purchaser, and their dependents and beneficiaries, would cease
to participate in and be eligible for benefits under the Seller's benefit plans as of the date on which
such Inactive Employee became an employee of the Purchaser.  Transferred hourly employees,
and their dependents and beneficiaries would commence participation in and become eligible for
benefits under the Purchaser's employee benefits plans in accordance with the Purchaser CBA.

---

[9]    Potential bidders should note that Section 3.2 of the Agreement addresses, among other things, the terms and
conditions of employment of IUE-CWA-represented employees, and these issues remain subject to the parties'
rights and obligations related to bargaining with the IUE-CWA.

        (d)    <u>Grievances</u>.  The Seller would retain liability for labor grievances and arbitration proceedings arising from alleged violations of the Collective Bargaining Agreements occurring prior to the Closing.

K.    <u>Bidding Procedures</u>

        28.    The Sale of the Acquired Assets would be subject to higher or otherwise better offers pursuant to the Bidding Procedures.  The Seller believes that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Acquired Assets for the benefit of the Seller's estate, its stakeholders, and other interested parties. Accordingly, the Seller seeks approval of the Bidding Procedures for the Sale of the Acquired Assets.

        29.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and this Court's approval thereof (collectively, the "Bidding Process").

        30.    The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> are as follows:[10]

        (a)    <u>Assets To Be Sold</u>:  The assets proposed to be sold are the Acquired Assets.

        (b)    <u>Free Of Any And All Liens</u>: The Acquired Assets are to be sold free and clear of any Liens.

        (c)    <u>Participation Requirements</u>:  To ensure that only bidders with a serious interest in the purchase of the Acquired Assets participate in the Bidding Process, the Bidding Procedures provide for minimal requirements for a potential bidder to become a "Qualified Bidder": (i) executing a confidentiality agreement in form and substance satisfactory to the Seller, (ii) providing the Seller with certain financial assurances as to such bidder's ability to close a transaction, (iii) submitting a preliminary proposal reflecting the purchase price range,

---

[10]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary have the meanings ascribed to them in the Bidding Procedures.

any Acquired Assets expected to be excluded, the structure and financing of the transaction, any anticipated regulatory approvals, the anticipated time frame and any anticipated impediments to obtaining such approvals, any additional conditions to closing that the qualified bidder may wish to impose, and the nature and extent of any due diligence it may wish to conduct and the date by which such due diligence would be completed, and (iv) delivering a good faith deposit in the amount equal to 5% of the Purchase Price (the "Good Faith Deposit") .

       (d)    <u>Due Diligence</u>:  All Qualified Bidders would be afforded an opportunity to participate in the diligence process.  The Seller would coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.  Any additional due diligence shall not continue after the Bid Deadline.

       (e)    <u>Bid Deadline</u>:  A bid deadline of 11:00 a.m. (prevailing Eastern time) on April 10, 2008 (the "Bid Deadline") would be established.  The Seller could extend the Bid Deadline once or successively, but would not be obligated to do so.  If the Seller extends the Bid Deadline, it would promptly notify all Qualified Bidders of such extension.

       (f)    <u>Break-up Fee</u>:  In the event that the Seller terminates the Agreement to consummate an Alternative Transaction and consummates an Alternative Transaction within 12 months of entry into the Agreement, the Seller would pay the Purchaser the Break-Up Fee within five Business Days after consummation of the Alternative Transaction.  Notwithstanding the foregoing, the Purchaser would not be entitled to a Break-Up Fee if the Purchaser were in material breach of the Agreement or the Bidding Procedures.

       (g)    <u>Bid Requirements</u>:  All bids would be required to include the following documents: (i) a letter stating that the bidder's offer would be irrevocable until two business days after the Closing, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a Good Faith Deposit, (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction, and (v) written evidence that the bidder has negotiated a ratified, executed successor collective bargaining agreement with the IUE-CWA or that the bidder is prepared to assume the Seller's current collective bargaining agreement with the IUE-CWA.

       (h)    <u>Qualified Bids</u>: To be deemed a "Qualified Bid," a bid would be required to be received by the Bid Deadline and, among other things, would be required to (i) be on terms and conditions that are substantially similar to, and are not materially more burdensome or conditional to the Seller than those contained in the Agreement, (ii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) have a value greater than the purchase price reflected in the Agreement, and the amount of the Break-Up Fee, plus $500,000.00 initially, and in increments of $250,000.00 for any subsequent bid, (iv) not be conditioned on any bid protections, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment, (v) contain acknowledgements and representations as set forth in the Bidding Procedures, and (vi) include a commitment to consummate the purchase of the Acquired Assets within not more than fifteen days after entry of the Court's order approving such purchase.  The Seller would have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

(i)    Conduct Of Auction: If the Seller receives at least one Qualified Bid in addition to that of the Purchaser, it would conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on or before April 14, 2008, or such later time as the Seller notifies all Qualified Bidders who have submitted Qualified Bids, in accordance with the procedures outlined in the Bidding Procedures, which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two Business Days prior to the Auction, each Qualified Bidder with a Qualified Bid would be required to inform the Seller whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Seller would be required to provide such bidders attending the auction with copies of the Qualified Bid or combination of Qualified Bids which the Seller then believes is the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders would be entitled to be present for all subsequent bids, and (iv) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $250,000.00 and conclude after each participating bidder has had the opportunity to submit one or more additional subsequent bids.

(j)    Selection Of Successful Bid: As soon as practicable after the conclusion of the Auction, the Seller would review each Qualified Bid and identify the highest or otherwise best offer(s) for the Acquired Assets (the "Successful Bid") and the bidder(s) making such bid(s) (the "Successful Bidder(s)"). The Seller would sell the Acquired Assets for the highest or otherwise best Qualified Bid or combination of Qualified Bids and the transaction would be consummated as soon as reasonably practicable following the approval of such Qualified Bid by the Court.

(k)    Sale Hearing: The Sale Hearing would be scheduled for April 30, 2008 at 10:00 a.m. (prevailing Eastern time) and the Sale Hearing could be adjourned or rescheduled by the Seller without notice other than by an announcement of the adjourned date at the Sale Hearing. If no Qualified Bids other than that of the Purchaser are received, the Seller would proceed with the sale of the Acquired Assets to the Purchaser following entry of such order. If the Seller receives additional Qualified Bids, then at the Sale Hearing, the Seller would seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder"). A bid would not be deemed accepted by the Seller unless and until approved by the Court. Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and the Seller would be permitted to effectuate a sale to the Alternate Bidder without further order of the Court.

(l)    Return Of Good Faith Deposits: The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) would be held and all Qualified Bids would remain open until two business days following the Closing of the Sale (the "Return Date"). Notwithstanding the foregoing, the Good Faith Deposit submitted by the Successful Bidder, together with interest thereon, if any, would be applied against the payment of the Purchase Price upon Closing of the Sale to the Successful Bidder. If a Successful Bidder failed to consummate an approved sale, the Seller would not have any obligation to return such Good Faith Deposit and such deposit would irrevocably become property of the Seller. Subject to the preceding sentence, on the Return Date, the Seller would return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

18

(m)    Reservation Of Rights:  The Seller, after consultation with, among others, the Creditors' Committee: (i) could determine which Qualified Bid, if any, would be the highest or otherwise best offer and (ii) could reject, at any time, any bid (other than the Purchaser's bid) that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Seller, including the Seller and its estate and its stakeholders, and as determined by the Seller in its sole discretion.

L.    Bid Protections

31.    The Purchaser has expended, and likely will continue to expend, considerable time, money, and energy pursuing the Sale and has engaged in extended arm's length and good faith negotiations regarding a possible sale.  The Agreement is the culmination of these efforts.

32.    In recognition of this expenditure of time, energy, and resources, the Seller has agreed to provide certain bid protections to the Purchaser, including the Break-Up Fee and the Expense Reimbursement (the "Bid Protections").  Specifically, the Agreement provides for, and the Seller respectfully requests that the Bidding Procedures Order approve, the Break-Up Fee payable by the Seller to the Purchaser in the amount of $565,304.00, or 3.0% of the Initial Purchase Price, if the Seller terminates the Agreement to close an Alternative Transaction and the Seller consummates an Alternative Transaction within 12 months of entry into the Agreement.

33.    In addition, the Seller respectfully requests this Court's approval of the term in the Agreement providing for reimbursement of the Purchaser's reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement in an amount no greater than $750,000, or 3.9% of the Initial Purchase Price.  The Purchaser may be entitled to the Break-Up Fee or the Expense Reimbursement, but not both.

34.    The Seller believes that the proposed Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation

19

undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's

efforts would maximize the value of the Acquired Assets for the benefit of all stakeholders,

whether as a result of consummating the Sale pursuant to the Agreement or making the highest

or otherwise best offer to be submitted at any Auction.

35.    The Purchaser is unwilling to keep open its offer to purchase the Acquired

Assets under the terms of the Agreement unless this Court authorizes payment of the Bid

Protections.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid

Protections, the Seller may lose the opportunity to obtain what it believes to be the highest and

best offer for the Acquired Assets. This is particularly true with respect to the Acquired Assets

because GM has agreed to resource the damper business conducted at the Kettering facility to the

Purchaser, and the Purchaser can accordingly make the best and highest use of the Acquired

Assets.  The Auction, however, is a competitive mechanism designed to test whether any

alternative use for the Acquired Assets, including without limitation liquidation value, would

yield a higher or better return for the Seller.  Approving the Bid Protections will commit the

Purchaser to serve as the stalking horse bidder under the Agreement, and the Purchaser's bid

would serve to start any additional bidding for the Acquired Assets at a fair and reasonable

purchase price.

36.    Payment of the Break-Up Fee will not diminish the Seller's estate.  The

Seller would not expect to pay the Break-Up Fee unless it does so to accept an alternative

Successful Bid, which would result in even greater value to the Seller's's estate and its

stakeholders.  The Seller thus requests that this Court authorize payment of the Break-Up Fee

pursuant to the terms and conditions of the Agreement.


M.    <u>Notice Of Sale Hearing</u>

20

37.        Within five days after entry of the Bidding Procedures Order (the "Mailing Date"), the Seller (or its agent) proposes to serve the Motion, the Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by first-class mail, postage prepaid, upon (i) the U.S. Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity Committee, (v) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months, (vi) all entities known to have asserted any Lien, claim, interest, or encumbrance in or upon the Acquired Assets, (vii) all federal, state, and local regulatory or taxing authorities or recording offices, including but not limited to environmental regulatory authorities, which have a reasonably known interest in the relief requested by the Motion, (viii) the United States Attorney's office, (ix) the United States Department of Justice, (x) the Securities and Exchange Commission, (xi) the Internal Revenue Service, (xii) all entities on the Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case Management Order")), and (xiii) such other entities as are required to be served with notices under the Supplemental Case Management Order.

38.        The Seller also proposes pursuant to Fed. R. Bankr. P. 2002(l) and 2002(d) to publish a notice of the Sale in a form substantially similar to the form annexed hereto as Exhibit E in the Wall Street Journal (International Edition), the New York Times, and the Dayton Daily News within five days of entry of the Bidding Procedures Order or as soon as practicable thereafter.  The Seller requests that such publication notice be deemed proper notice to any other interested parties whose identities are unknown to the Seller.

21

Applicable Authority

N.      Approval Of Bidding Procedures

39.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-179 (D.

Del. 1991).

40.     The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b)

motion is a summary proceeding, intended merely as a means to "efficiently review the . . .

debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is

not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Id. at 1098-

99.

41.     Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company."  Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re

Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing

22

the proposed exercise of a debtor's business judgment have the burden of rebutting the

presumption of validity." Id.  To satisfy its burden, it is not enough for an objector simply to

raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections." Lionel, 722 F.2d at 1071.

42.    As a rule, the debtor's business judgment "should be approved by the court

unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo.

1991)).  As set forth above, the Seller has sound business justifications for pursuing a sale

process at this time.  Because GM has agreed to resource the majority of the damper business

conducted at the Kettering facility to the Purchaser, the Sale of the Acquired Assets to the

Purchaser will ensure a seamless transition of operations and minimize interruption to the

Kettering facility.  In addition, the sale of the Acquired Assets as a whole and in contemplation

of the Purchaser's supply of the damper components to GM will generate value substantially

higher than if the Seller wound down the Kettering damper business.

43.    The Seller submits that the Bidding Procedures would encourage

competitive bidding because the Purchaser would not have entered into the Agreement without

such provisions.  The Bidding Procedures have thus induced a bid that otherwise would not have

been made.  Finally, the mere existence of the Bidding Procedures permits the Seller to insist that

competing bids be materially higher or otherwise better than the Agreement, which will produce

a clear benefit to the Seller, its estate, its stakeholders, and all other parties-in-interest.

44.    A prospective purchaser of assets from a chapter 11 debtor may be

reluctant to make an offer because it knows that even if it reaches agreement with the debtor, its

offer will be subject to a higher bid by another party.  Pre-approved bidding procedures address

23

these concerns by assuring initial bidders that any auction procedure will be predictable and

reasonable.  Thus, the Seller submits that the use of the Bidding Procedures also reflects sound

business judgment.

O.    Entry Into The Lease

45.    As set forth above, the Seller has sound business justification for entering

into the Lease.  Entry into the Lease is a closing requirement under the Agreement, and the

advantageous Sale of the Acquired Assets would not be possible if the Seller did not lease the

required portion of the Kettering facility to the Purchaser on the terms provided in the Lease.

Moreover, the Lease was negotiated by the parties in a good faith and arm's length manner.  The

Seller accordingly submits that the decision to enter into the Lease is supported by sound

business judgment.

P.    Sale Of The Acquired Assets Free And Clear Of Liens

46.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)  applicable nonbankruptcy law permits sale of such property free and clear of such
interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is sold is great that the
aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled in a legal or equitable proceeding, to accept a
money satisfaction of such interest.

11 U.S.C. § 363(f).

47.    Therefore, section 363(f) permits the Seller to sell the Acquired Assets

free and clear of Liens.  Each Lien that is not the result of an assumed liability satisfies at least

one of the five conditions of 11 U.S.C. § 363(f), and the Seller submits that any such Lien will be

24

adequately protected by attachment to the net proceeds of the Sale, subject to any claims and

defenses the Seller may possess with respect thereto.  Accordingly, the Seller requests that the

Acquired Assets be transferred to the Purchaser or the Successful Bidder(s), as the case may be,

free and clear of all Liens.

Q.    The Purchaser Is A Good Faith Purchaser Pursuant To
      Section 363(m) Of The Bankruptcy Code And The Transaction
      Contemplated By The Agreement Should Carry The
      <u>Protections Of Section 363(n) Of The Bankruptcy Code</u>

      48.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in <u>In re Gucci</u> held that the

> good faith of a purchaser is shown by the integrity of his conduct during
> the course of the sale proceedings; where there is a lack of such integrity,
> a good faith finding may not be made.  A purchaser's good faith is lost by
> 'fraud, collusion between the purchaser and other bidders or the trustee, or
> an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting <u>In re Rock Industries Machinery Corp.</u>, 572 F.2d 1195, 1198 (7th Cir.

1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))); <u>see</u> <u>also</u> <u>Evergreen</u>

<u>Int'l Airlines Inc. v. Pan Am Corp.</u> (In re Pam Am Corp.), Case Nos. 91 Civ. 8319 (LMM) to 91

Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); <u>In re Sasson Jeans, Inc.</u>, 90

B.R. 608, 610 (S.D.N.Y. 1988).

      49.    Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

> The trustee may avoid a sale under this section if the sale price was
> controlled by an agreement among potential bidders at such sale, or may

25

recover from a party to such agreement any amount by which the value of
the property sold exceeds the price at which such sale was consummated,
and may recover any costs, attorneys' fees, or expenses incurred in
avoiding such sale or recovering such amount.

50.     The Seller submits, and will present evidence at the Sale Hearing, that the

Agreement reflects an intensely negotiated, arm's length transaction.  Throughout the

negotiations, the Purchaser has at all times acted in good faith.  Moreover, to the extent that the

assets are sold to a Successful Bidder, it will be because of a well-planned competitive process

and intense negotiations at arm's length to be conducted at an Auction.  As a result of the

foregoing, the Seller requests that the Court make a finding that the Purchase Price to be paid by

the Purchaser constitutes reasonably equivalent value and fair consideration under any applicable

law.

51.     The Seller, therefore, requests that this Court make a finding that the

Purchaser has purchased the Acquired Assets in good faith within the meaning of section 363(m)

of the Bankruptcy Code.  Further, the Seller requests that this Court make a finding that the asset

purchase agreement reached as a result of the Bidding Procedures necessarily will comprise an

arm's length, intensely-negotiated transaction entitled to the protections of section 363(m) of the

Bankruptcy Code.  Because the Seller has shown that the Purchaser's successful bid is not the

product of fraud or collusion between the Purchaser and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders, the Seller further requests that this

Court make a finding that the transactions contemplated by the Agreement are not avoidable

under section 363(n) of the Bankruptcy Code.

R.     Approval Of The Bid Protections

52.     Bidding incentives encourage potential bidders to invest the requisite time,

money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to

the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11

26

process.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992)

(bidding incentives may "be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (citation

omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.

In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has

seriously argued the inapplicability of the business judgment test, and if any such argument had

been made, the Court would be compelled . . . to reject it."); In re Bethlehem Steel Corp., Case

No. 02 Civ. 2854 (MBM), 2003 WL 21738964 at *8 n.13 (S.D.N.Y. July 28, 2003) (the court

should approve agreements providing bidding incentives "unless they are unreasonable or appear

more likely to chill the bidding process than to enhance it").  One court, explaining the force of

the business judgment rule in this context, stated "the business judgment rule does not become

inapplicable simply because a court decides a break-up fee is too large."  In re Integrated

Resources, 147 B.R. at 660.

      53.     In this district, courts have established a three part-test for determining

when to permit bidding incentives.  The three factors are: "whether (i) the relationship of parties

who negotiated breakup fee is tainted by self-dealing or manipulation, (ii) the fee hampers, rather

than encourages, bidding, and (iii) the amount of the fee is unreasonable relative to purchase

price." Id.

      54.     Here, the Seller seeks authority to utilize the Bidding Process and Bid

Protections in the event that the Purchaser is not ultimately the Successful Bidder or must

increase the Purchaser 's bid price to become the Successful Bidder.  The Bid Protections are fair

and reasonable in amount, particularly in view of the efforts previously made and to be made by

the Purchaser and the risk to the Purchaser of being used as a stalking horse.  Moreover, any

payment under the proposed Bid Protections – either the $565,304.00 Break-Up Fee

(approximately 3.0% of the Initial Purchase Price) or the $750,000 Expense Reimbursement

(approximately 3.9% of the Initial Purchase Price) – not only constitutes a fair and reasonable

percentage of a proposed purchase price, but is within the range that is customary for similar

transactions of this type in the bankruptcy context.  See, e.g., In re Allegiance Telecom, Inc.,

Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense

reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG)

(Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior transaction); In re

Genuity Inc., Case No. 02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if

court approved alternative transaction); In re PSINet, Inc., Case No. 01-13213 (REG) (Bankr.

S.D.N.Y. 2001) (permitting 4.28% break-up fee in the event that seller consummated transaction

with alternative bidder); In re Teligent, Inc., Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001)

(allowing break up fee ranging from 1.3% to 4.25% depending on value of alternative

transaction).  In addition, the payment of the Break-Up Fee or the Expense Reimbursement, as

the case may be, is reasonable in light of the significant investment in time and resources that the

Purchaser would have contributed as the stalking horse bidder.

55.    The Seller submits that the Bidding Procedures and the Bid Protections

have encouraged competitive bidding because the Purchaser would not have entered into the

Agreement without such provisions.  The Bidding Procedures and the Bid Protections have thus

induced a bid that otherwise would not have been made.  Finally, the mere existence of the

Bidding Procedures and Bid Protections permits the Seller to insist that competing bids be

materially higher or otherwise better than the Agreement, which would produce a clear benefit to

the Seller, its estate, and its stakeholders.

28

S.    Relief From Transfer Taxes Under Section 1146(c) Of The Bankruptcy Code

56.    Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer, or

exchange of a security, or the making or delivery of an instrument of transfer under a plan

confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax

or similar tax."  11 U.S.C. § 1146(c).

57.    As set forth above, as part of their transformation plan, the Debtors have

identified non-core product lines, including the U.S. damper business, that do not fit into the

company's future strategic framework, and have planned to sell or wind-down these product

lines.  As mentioned above, on January 25, 2008, the Debtors confirmed their Plan, and the order

confirming the Plan became final and non-appealable on February 4, 2008.  Section 7.30 of the

Plan provides that:

> Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a
> Debtor to a Reorganized Debtor or to any other Person or entity pursuant
> to this Plan, or any agreement regarding the transfer of title to or
> ownership of any of the Debtors' real or personal property, shall not be
> subject to any stamp taxes and any other similar tax or governmental
> assessment to the fullest extent contemplated by section 1146(c) of the
> Bankruptcy Code, and the Confirmation Order shall direct the appropriate
> state or local governmental officials or agents to forego the collection of
> any such tax or governmental assessment and to accept for filing and
> recordation any of the foregoing instruments or other documents without
> the payment of any such tax or governmental assessment.

The Second Circuit has upheld the application of the section 1146(c) exemption in a case in

which the debtor sold property post-confirmation.  In re Jacoby-Bender, Inc., 758 F.2d 840, 841

(2d Cir. 1985).  In light of the foregoing, the Selling Debtor Entities submit that the Sale should

be exempt under section 1146(c) of the Bankruptcy Code from any stamp, transfer, sales,

recording, or similar taxes.

T.    <u>Conclusion</u>

58.    The Seller submits that the relief requested in this Motion, including the Bidding Procedures, Bid Protections, and notice procedures are in the best interests of the Seller's estate and will maximize value for all stakeholders.  The Seller will further show at the Sale Hearing that the entry approving the Sale of the Acquired Assets of the Seller free and clear of Liens to the Purchaser or to the Successful Bidder, as the case may be, are likewise in the best interests of the Seller's estate and will maximize value for all stakeholders.

## Notice

59.     Notice of this Motion has been provided in accordance with the Supplemental Case Management Order and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487).  Further, after entry of the Bidding Procedures Order, notice with respect to the Motion and Sale would be provided in accordance with the notice procedures described herein.  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[11]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

60.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Seller respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[11]    The Debtors have noticed this Motion for the omnibus hearing on March 19, 2008.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on March 19, 2008.  Because this Motion is being filed on less than 20 days' notice, parties-in-interest will have until March 17, 2008 to file an objection to entry of the Bidding Procedures Order.

WHEREFORE the Seller respectfully requests that this Court enter an order (a)(i) approving the Bidding Procedures, (ii) granting certain bid protections, (iii) approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) authorizing and approving (i) the Sale of the Acquired Assets by the Seller free and clear of Liens to the Purchaser or to the Successful Bidder and (ii) entry into the Lease, and (c) granting them such other and further relief as is just.

Dated:    New York, New York
          March 7, 2008

                    SKADDEN, ARPS, SLATE, MEAGHER
                    & FLOM LLP

                    By:    /s/ John Wm. Butler, Jr.
                        John Wm. Butler, Jr. (JB 4711)
                        Albert L. Hogan III (AH 8807)
                        Ron E. Meisler (RM 3026)
                    333 West Wacker Drive, Suite 2100
                    Chicago, Illinois 60606
                    (312) 407-0700

                            - and -

                    By:    /s/ Kayalyn A. Marafioti
                        Kayalyn A. Marafioti (KM 9632)
                        Thomas J. Matz (TM 5986)
                    Four Times Square
                    New York, New York 10036
                    (212) 735-3000

                    Attorneys for Delphi Corporation, et al.,
                      Debtors and Debtors-in-Possession

32

## Exhibit A

**Bidding Procedures**

**Exhibit B**

**Bidding Procedures Order**

**<u>Exhibit C</u>**

**Sale Approval Order**

**Exhibit D**

**Asset Purchase Agreement**

## Exhibit E

**Publication Notice**

# EXHIBIT D

Execution Copy

**ASSET PURCHASE AGREEMENT**
**BY AND BETWEEN**

**DELPHI AUTOMOTIVE SYSTEMS LLC**

**AND**

**TENNECO AUTOMOTIVE OPERATING COMPANY INC.**


**DATED:  March 7, 2008**

# TABLE OF CONTENTS

**Page**

1.    CONVEYANCE OF THE ACQUIRED ASSETS ................................................................9

    1.1    Acquired Assets Transaction ....................................................................9

    1.2    Excluded Assets ........................................................................................9

    1.3    Post-Closing Asset Deliveries ................................................................10

    1.4    No Assumption of Liabilities by Purchaser; Retained Liabilities .........11

    1.5    Additional Assets .....................................................................................11

    1.6    Kettering Lease Agreement .....................................................................11

    1.7    Warranty and Service Parts .....................................................................11

    1.8    Delivery of Certain Documentation ........................................................11

    1.9    Non-Compete and Non-Solicitation ........................................................12

2.    PURCHASE PRICE .....................................................................................................13

    2.1    Purchase Price for Acquired Assets ........................................................13

    2.2    Payment of Purchase Price ......................................................................13

    2.3    Deposit Amount ........................................................................................14

3.    EMPLOYEE MATTERS ...............................................................................................15

    3.1    Salaried Employees ..................................................................................15

    3.2    Transferred Hourly Employees ...............................................................17

    3.3    Other Matters ...........................................................................................18

    3.4    Due Diligence ...........................................................................................19

4.    CERTAIN TRANSITION SERVICES ..........................................................................19

5.    REPRESENTATIONS AND WARRANTIES ...............................................................20

    5.1    Warranties of Seller .................................................................................20

    5.2    Warranties of Purchaser ..........................................................................23

    5.3    Fair Disclosure .........................................................................................24

6.    CONDITIONS TO CLOSING .......................................................................................25

    6.1    Conditions to Obligations of Seller and Purchaser ...............................25

    6.2    Conditions to Obligations of Purchaser .................................................25

    6.3    Conditions to Obligations of Seller ........................................................26

7.    CLOSING .....................................................................................................................26

    7.1    Closing Date .............................................................................................26

    7.2    Kettering Lease Agreement .....................................................................26

    7.3    Seller's Deliveries ....................................................................................26

# TABLE OF CONTENTS
(continued)

Page

|  |  | | |
|---|---|---|---|
| | 7.4 | Purchaser's Deliveries | 27 |
| 8. | | CERTAIN ADDITIONAL COVENANTS | 27 |
| | 8.1 | Operations Pending Closing | 27 |
| | 8.2 | Cooperation; Efforts and Actions to Cause Closing | 27 |
| | 8.3 | Jobs Covenant | 28 |
| | 8.4 | Purchaser's Access | 28 |
| 9. | | BANKRUPTCY ACTIONS | 28 |
| | 9.1 | Orders | 28 |
| | 9.2 | Bidding Procedures | 28 |
| | 9.3 | Break-up Fee and Expense Reimbursement | 35 |
| 10. | | TERMINATION | 35 |
| | 10.1 | Termination as to Specific Assets | 35 |
| | 10.2 | General Termination | 35 |
| | 10.3 | Termination By Seller | 36 |
| | 10.4 | Termination By Purchaser | 36 |
| | 10.5 | Effect of Termination | 36 |
| 11. | | INDEMNIFICATION | 37 |
| | 11.1 | Survival | 37 |
| | 11.2 | Seller's Agreement to Indemnify | 37 |
| | 11.3 | Purchaser's Agreement to Indemnify | 37 |
| | 11.4 | Limitations on Agreements to Indemnify | 37 |
| | 11.5 | Claims | 38 |
| | 11.6 | Treatments of Payments | 40 |
| 12. | | MISCELLANEOUS | 40 |
| | 12.1 | Notices | 40 |
| | 12.2 | Bulk Sales Laws | 41 |
| | 12.3 | Assignment | 41 |
| | 12.4 | Entire Agreement | 41 |
| | 12.5 | Waiver | 42 |
| | 12.6 | Severability | 42 |
| | 12.7 | Amendment | 42 |
| | 12.8 | Expenses | 42 |

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 12.9 | Third Parties | 42 |
| 12.10 | Headings | 42 |
| 12.11 | Counterparts | 43 |
| 12.12 | Governing Law | 43 |
| 12.13 | Public Announcements | 43 |
| 12.14 | Sales or Transfer Taxes | 43 |
| 12.15 | Venue and Jurisdiction | 43 |
| 12.16 | Risk of Loss | 43 |
| 12.17 | Enforcement of Agreement | 43 |
| 12.18 | Dispute Resolution | 44 |
| 12.19 | Further Assurances | 44 |
| 12.20 | No Right of Setoff | 44 |
| 12.21 | Dollar Amounts | 44 |
| 12.22 | Bankruptcy Court Approval | 44 |
| 12.23 | Miscellaneous Definitional Provisions | 44 |
| 12.24 | Jury Trial Waiver | 45 |

Execution Copy

# ASSET PURCHASE AGREEMENT

Delphi Automotive Systems LLC, a Delaware limited liability company ("**Seller**"), and Tenneco Automotive Operating Company Inc., a Delaware corporation ("**Purchaser**"), enter into this Asset Purchase Agreement on March 7, 2008.

## RECITALS:

A.      On October 8, 2005 (the "**Petition Date**"), Seller and certain of its affiliates filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as then amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

B.      Seller, along with certain affiliated companies, continues to operate as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

C.      Seller desires to sell to Purchaser all right, title and interest of Seller in and to the Acquired Assets (as defined below), and Purchaser desires to make such purchase subject to the terms and conditions set forth in this Agreement, and as authorized under Sections 105 and 363 of the Bankruptcy Code.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

## DEFINITIONS

The following terms, as used in this Agreement, have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**Acquired Assets**" means only the following assets:

A.      the Machinery & Equipment set forth on Schedule A;

B.      the Inventory set forth on Schedule B that is held by Seller as of the Closing Date; and

C.      the  Other Personal Property, including the personal property set forth on Schedule C.

"**Additional Assets**" has the meaning set forth in Section 1.5.

"**Affiliate**" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such specified Person.  For purposes of this definition, control means ownership of at least fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Asset Purchase Agreement, including all Schedules and Exhibits, as the same may be amended from time to time in accordance with its terms.

**"Alternate Bid(s)"** has the meaning set forth in <u>Section 9.2.J</u>.

**"Alternate Bidder(s)"** has the meaning set forth in <u>Section 9.2.J</u>.

**"Alternative Transaction"** has the meaning set forth in <u>Section 9.3.A</u>.

**"Ancillary Agreements"** means the Bill of Sale, Kettering Lease Agreement and each other agreement entered into between Seller (or any of its Affiliates), on the one hand, and Purchaser (or any of its Affiliates), on the other hand, at or in connection with the Closing, but excluding purchase orders, if any, entered into pursuant to either <u>Section 1.7</u> or <u>Article 4</u>.

**"Auction"** has the meaning set forth in <u>Section 9.2.H</u>.

**"August 5, 2007 IUE-CWA-Tenneco CBA"** has the meaning set forth in <u>Section 3.2.D</u>.

**"Bankruptcy Cases"** has the meaning set forth in the Recitals.

**"Bankruptcy Code"** has the meaning set forth in the Recitals.

**"Bankruptcy Court"** has the meaning set forth in the Recitals.

**"Basket"** has the meaning set forth in <u>Section 11.4.D</u>.

**"Bid Deadline"** has the meaning set forth in <u>Section 9.2.C</u>.

**"Bid Requirements"** has the meaning set forth in <u>Section 9.2.C</u>.

**"Bidding Procedures"** has the meaning set forth in <u>Section 9.2.A</u>.

**"Bidding Procedures Order"** means a Governmental Order or Governmental Orders (as defined below) of the Bankruptcy Court (including all schedules and exhibits thereto), approving the Bidding Procedures, which shall be in form and substance reasonably satisfactory to Purchaser.

**"Bidding Process"** has the meaning set forth in <u>Section 9.2.A</u>.

**"Break-Up Fee"** has the meaning set forth in <u>Section 9.3.A</u>.

**"Business Day"** means any day other than a Saturday, a Sunday or a day on which banks in Detroit, Michigan or Chicago, Illinois are authorized or obligated by Law or executive order to close.

**"Closing"** has the meaning set forth in <u>Section 7.1</u>.

**"Closing Date"** means the date of Closing.

**"Collective Bargaining Agreements"** means all collectively bargained agreements entered into by Seller or its Affiliates with the IUE-CWA International and/or its Local 755 applicable to the Kettering Facility and/or the Seller IUE-CWA represented bargaining unit members at the Kettering Facility (including without limitation local agreements, amendments, supplements, letters, supplemental agreements, benefit plans, and memoranda of understanding of any kind) in effect from time to time.

**"Competitive Activity"** has the meaning set forth in Section 1.9.A.

**"Consent"** means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person.

**"Defending Party"** has the meaning set forth in Section 12.18.

**"Delayed Transfer Date"** has the meaning set forth in Section 3.2.C.

**"Delphi HRP"** has the meaning set forth in Section 3.2.D.

**"Delphi Corporation Separation Allowance Plan for U.S. Salaried Employees"** means the salaried separation allowance plan of Seller and its Affiliates in the form provided to Purchaser prior to the date hereof.

**"Demanding Party"** has the meaning set forth in Section 12.18.

**"Deposit"** has the meaning set forth in Section 2.3.A.

**"Deposit Escrow Agent"** means JP Morgan Chase Bank, National Association.

**"Deposit Escrow Agreement"** means the Deposit Escrow Agreement entered into among Seller, Purchaser and the Deposit Escrow Agent as of the date of this Agreement in the form attached hereto as Exhibit 2.3.

**"Effects MOU"** means any memorandum of understanding or other agreement among Purchaser, GM, Seller and the IUE-CWA and/or its Local 755 regarding the effects of the transactions contemplated hereby upon the IUE-CWA Kettering Facility bargaining unit members.

**"Employee Severance Amount"** means, as to any Transferred Salaried Employee, the amount representing separation pay as set forth next to such employee's name on Schedule 3.1.A.

**"Equityholders' Committee"** has the meaning set forth in Section 9.2.C.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

**"Expense Reimbursement"** has the meaning set forth in Section 9.3.B.

**"Excluded Assets"** means assets not included in the Acquired Assets, as set forth in Section 1.2.

**"Excluded Salaried Employees"** has the meaning set forth in Section 3.1.C.

**"Final Inventory Valuation"** has the meaning set forth in Section 2.2.C.

**"GM"** means General Motors Corporation.

**"GM-Delphi License Agreement"** means that certain License Agreement between Seller and GM dated as of September 6, 2007.

3

**"GM Supply Agreement"** means an agreement between GM and Purchaser, in form and substance satisfactory to Purchaser in its sole discretion, pursuant to which GM agrees to purchase from Purchaser Products manufactured by Purchaser at the Kettering Facility and pursuant to which GM licenses to Purchaser and Purchaser has been granted access to all intellectual property necessary for Purchaser to manufacture Products at the Kettering Facility in accordance with the requirements of GM and its Affiliates.

**"Good Faith Deposit"** has the meaning set forth in <u>Section 9.2.E(iii)</u>.

**"Governmental Authority"** means any United States, foreign, federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision and any supranational organization of sovereign states exercising such functions for such sovereign states.

**"Governmental Order"** means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority affecting such Person or any of its properties.

**"Indemnitee"** means the Person or Persons entitled to, or claiming a right to, indemnification under <u>Article 11</u>.

**"Indemnitor"** means the Person or Persons obligated, or claimed by the Indemnitee to be obligated, to provide indemnification under <u>Article 11</u>.

**"Independent Accounting Firm"** means KPMG LLP or a nationally recognized independent accounting firm mutually agreeable to Seller and Purchaser.

**"Initial Inventory Valuation"** has the meaning set forth in <u>Section 2.2.B</u>.

**"Initial Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

**"Inventory"** means all of Seller's finished goods, raw materials, work-in-process and purchased component parts inventories related to the Products produced or scheduled to be produced at the Kettering Facility and which are in Seller's possession or control as of the Closing Date, wherever located, including Inventory owned by Seller and in the possession of outside processors as of the Closing Date (together with all rights of Seller or its Affiliates against suppliers of such Inventory).  The Inventory as of the date of this Agreement is set forth on <u>Schedule B</u> to this Agreement.

**"Inventory Value"** means Seller's cost for "useable" and "merchantable" Inventory existing as of the Closing Date and sold to Purchaser pursuant to this Agreement, as determined in accordance with the Inventory Valuation Principles.  (Burden rate to be applied is the actual burden rate at time of the physical Inventory count and further including premiums associated with the twin-tube build ahead.)

**"Inventory Valuation Principles"** are United States generally accepted accounting principles, subject to the following:  (a) except for one-time buys and special build-ups and for agreed service support inventories, in each case set forth on <u>Schedule D</u> (which Schedule D to be provided after signing subject to mutual review and agreement), "useable" means not obsolete and reasonably usable by Purchaser in manufacturing Products in quantities not to exceed GM's outstanding unsatisfied releases as of the Closing Date or forecasted requirements for a period of ninety  (90) days from the Closing Date, including releases related to any protection of

4

supply initiative, (b) "merchantable" means merchantable as that term is defined in U.C.C. §2-314, in conformance with applicable GM purchase order or supply contract specifications, reasonably applied, and not rusted, damaged or deteriorated such that it cannot reasonably be used in the Ordinary Course of Business without processing or preparation not normally done in the Ordinary Course of Business and (c) for all purposes of such principles,  Seller's standard manufacturing cost shall be used.

**"IUE-CWA"** means International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America and its Local Union Number 755.

**"Jobs Covenant"** has the meaning given in Section 8.3.

**"Kettering Facility"** means Seller's facility of approximately 147 acres located at 2000 Forrer Boulevard, Kettering, Ohio, including the land and buildings thereon.

**"Kettering Lease Agreement"** means a lease agreement in the form attached hereto as Exhibit A pursuant to which Seller will lease to Purchaser a portion of the Kettering Facility.

**"Laws"** means any and all laws, ordinances, codes, standards, administrative rulings, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any applicable Governmental Authority, including any Governmental Order.

**"Leased Premises"** means that portion of the Kettering Facility that is to be leased to Purchaser pursuant to the Kettering Lease Agreement.

**"Liability"** means any and all direct or indirect liabilities, indebtedness, obligations, expenses, claims, Losses, damages, deficiencies, guaranties or endorsements of or by any Person, absolute or contingent, accrued or unaccrued, due or to become due, liquidated or unliquidated, known or unknown.

**"Lien"** means any lien (including tax liens and any statutory or common law liens, possessory or otherwise), charge, pledge, security interest, conditional sale agreement or other title retention agreement, lease, license, right of first refusal, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction) and any monetary amounts which are secured by any Lien.

**"Loss"** means all out-of-pocket losses, liabilities, costs, claims, damages, and expenses(including reasonable attorneys' fees and expenses).

**"Machinery & Equipment"** means the machinery and equipment and other personal property set forth on Schedule A.

**"Marked Agreements"** has the meaning set forth in Section 9.2.E(ii).

**"Material Adverse Effect"** means any change or event  that has  a material adverse effect on the Acquired Assets taken as a whole or a material adverse effect on the Leased Premises taken as whole, except any change or event resulting from, relating to or arising out of: (i) any act or omission of a Seller taken with the prior written consent of the Purchaser; (ii) any action taken by Seller or Purchaser or any of their respective representatives required by the terms of this Agreement; (iii) general business or economic conditions; (iv) conditions affecting the industry and markets in which Purchaser and Seller generally operate; (v) increases in energy,

electricity, natural gas, raw materials or other operating costs; (vi) changes resulting from any action required by the Bankruptcy Court; (vii) national or international political or social conditions, including the engagement by the United States in hostilities whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any such countries; (viii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (ix) changes in United States generally accepted accounting principles; (x) changes in any Law; (xi) any existing event, occurrence or circumstance listed in any Schedule to this Agreement as of the date hereof; or (xii) any adverse change in or effect on the Acquired Assets that is cured, in its entirety, by Seller, before the earlier of (1) the Closing Date, and (2) the date on which this Agreement is terminated pursuant to Section 10 hereof.

**"Nondisclosure Agreement"** means the nondisclosure and confidentiality letter agreement dated August 23, 2006, as amended, executed by Purchaser and Delphi Corporation.

**"Notice"** has the meaning set forth in Section 12.18.

**"OFAC"** has the meaning set forth in Section 5.2.I.

**"Orders"** has the meaning set forth in Section 5.1.B.

**"Ordinary Course of Business"** means, with respect to the use and operation of the Acquired Assets, consistent with custom and practice of Seller prior to the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases.

**"Organizational Documents"** means: (a) the articles of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the articles or certificate of organization and the operating agreement or other document intended to govern the structure and/or internal affairs of a limited liability company; (e) any charter, agreement, indenture, or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to the foregoing.

**"Other Personal Property"** means all of the following owned by Seller which are used or associated with the manufacture or shipment of the Products or the use or operation of the Leased Premises or the other Acquired Assets:  Spare Parts and Crib Items; disposable and non-disposable dunnage (including in-plant racking and containers and all shipping containers and dunnage at the Leased Premises or in the possession of customers or outside processors, to the extent such items are used primarily in the manufacture, processing or shipment of the Products); Supplies; any warranties given by the manufacturers or suppliers of any Acquired Assets (but only to the extent such warranties are assignable under otherwise applicable Law without assumption under, if applicable, Section 365 of the Bankruptcy Code); the assets described on Schedule C; and office furniture and office equipment located at the Leased Premises, in each case, to the extent that they exist on the Closing Date.  For certainty, Other Personal Property does not include any Excluded Assets or any assets that are within the description of any other assets included in categories "A" or "B" of the definition of Acquired Assets.

**"Other Product Facilities"** means any facility owned or operated by Seller or any Affiliate of Seller, other than the Kettering Facility.

**"Party"** means Purchaser or Seller and **"Parties"** means Purchaser and Seller collectively.

**"Person"** means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

**"Petition Date"** has the meaning set forth in the Recitals.

**"Potential Bidder"** has the meaning set forth in Section 9.2.B.

**"Pre-Closing Product Liabilities"** means any Liabilities for death, bodily injury or property damage arising with respect to the Products manufactured by or on behalf of Seller or any of its Affiliates prior to the Closing Date (regardless of when such Product was sold), however arising.

**"Proceeding"** means any action, suit, litigation, arbitration, investigation or similar proceeding (including any civil, criminal, administrative or applicable proceeding) whether at Law or in equity, that is commenced, brought conducted or heard by or before any Governmental Authority or arbitrator.

**"Process Documents"** has the meaning set forth in Section 1.8.

**"Products"** means passive twin-tube shocks, passive twin-tube struts and related modules supplied for North American vehicle programs of GM and its Affiliates.

**"Purchase Price"** has the meaning set forth in Section 2.1.

**"Purchase Price Adjustment"** has the meaning set forth in Section 2.2.D.

**"Purchase Price Decrease"** has the meaning set forth in Section 2.2.D.

**"Purchase Price Increase"** has the meaning set forth in Section 2.2.D.

**"Purchaser"** has the meaning set forth in the Preamble.

**"Purchaser Damages"** has the meaning set forth in Section 11.2.

**"Purchaser Employee Benefit Plans"** means all of the following of Purchaser or any of its Affiliates: pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive and deferred compensation, hospitalization, severance, vacation, cafeteria, sick leave, fringe and welfare benefit plans, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals and written policies, practices or understandings, in each case relating to employment as applicable to Transferred Salaried Employees or Transferred Hourly Employees.

**"Purchaser Indemnified Parties"** means Purchaser and each of its Affiliates.

**"Qualified Bid"** has the meaning set forth in Section 9.2.F.

**"Qualified Bidder"** has the meaning set forth in Section 9.2.B.

**"Required Bid Documents"** has the meaning set forth in Section 9.2.E.

**"Retained Liabilities"** has the meaning set forth in Section 1.4.

7

**"Return Date"** has the meaning set forth in <u>Section 9.2.K</u>.

**"Salaried Employees"** has the meaning set forth in <u>Section 3.1.A</u>.

**"Sale"** means the sale, transfer and assignment of the Acquired Assets from Seller to Purchaser in accordance with this Agreement.

**"Sale Approval Order"** means a Governmental Order or Governmental Orders of the Bankruptcy Court issued pursuant to Section 363 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets, free and clear of all Liens, in accordance with the terms and conditions of this Agreement.

**"Sale Hearing"** has the meaning set forth in <u>Section 9.2.I</u>.

**"Sale Motion"** means the motion filed by Seller with the Bankruptcy Court for approval of the Sale Approval Order.

**"SDN List"** has the meaning set forth in <u>Section 5.2.I</u>.

**"Seller"** has the meaning set forth in the Preamble.

**"Seller Employee Benefit Plans"** means all of the following of Seller or any of its Affiliates: pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, severance, vacation, cafeteria, sick leave, fringe or welfare benefit plans, any employment or consulting Contracts, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written policies, practices or understandings relating to employment as applicable to any of the Transferred Employees whether or not collectively bargained.

**"Seller Damages"** has the meaning set forth in <u>Section 11.3</u>.

**"Seller Indemnified Parties"** means Seller and each of its Affiliates.

**"Spare Parts and Crib Items"** means all spare parts for machinery and equipment, perishable Tooling used in the manufacture of the Products (including spare perishable Tooling), disposable dunnage, personal protection equipment (including gloves, safety glasses, safety vests and hearing protection) and all other spare or maintenance items used in the manufacture of the Products, in shipping or in receiving, in each case to the extent on hand at the Kettering Facility on the Closing Date.

**"Subsequent Bid"** has the meaning set forth in <u>Section 9.2.F</u>.

**"Successful Bid(s)"** has the meaning set forth in <u>Section 9.2.H(vi)</u>.

**"Successful Bidder(s)"** has the meaning set forth in <u>Section 9.2.H(vi)</u>.

**"Supplies"** means all maintenance, shop and manufacturing supplies, cleaning supplies, lubricants, packaging and shipping materials, labels, disposable dunnage and other supplies used in the manufacture or shipping and receiving of the Products or Inventory or in the operation of the Kettering Facility, in each case to the extent owned by Seller or its Affiliates.

**"Third Party Assets"** has the meaning set forth in Section 1.2.A.

**"Third Party Claim"** has the meaning set forth in Section 11.5.B.

**"Tooling"** means all tooling, gauges, dies, fixtures, test and assembly fixtures, patterns, casting patterns, cavities, molds, prototype tooling, engineering product testing tooling and fixtures and similar items utilized primarily in connection with the Machinery & Equipment, wherever located, and all such items for past-model production of the Products, which past-model service related Tooling will be transferred to Purchaser following the termination of Seller's supply of past-model service parts pursuant to the Transition Services Agreement.  "Tooling" also includes all tooling, gauges, dies, fixtures, test and assembly fixtures, patterns, casting patterns, cavities, molds, prototype tooling, engineering product testing tooling and fixtures and similar items owned by Seller and used by a supplier primarily for the manufacture of sub-components for the Products, which Tooling is located at the Supplier's facility.

**"Transaction"** has the meaning set forth in Section 9.2.A.

**"Transferred Employees"** means all Transferred Salaried Employees and Transferred Hourly Employees.

**"Transferred Hourly Employees"** has the meaning set forth in Section 3.2.B.

**"Transferred Salaried Employees"** has the meaning set forth in Section 3.1.H.

**"USA Patriot Act"** has the meaning set forth in Section 5.2.I.

**"Warranty and Service Parts"** has the meaning set forth in Section 1.7.

## 1.    CONVEYANCE OF THE ACQUIRED ASSETS.

### 1.1    Acquired Assets Transaction.

Upon the terms and subject to the conditions set forth in this Agreement, at Closing, Seller will sell, transfer, assign, convey and deliver to Purchaser, and Purchaser will purchase, accept and acquire from Seller, the Acquired Assets, free and clear of all Liens.

### 1.2    Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, other than the Acquired Assets, no other assets, rights, interests, privileges or benefits, of whatever kind or nature, whether real, personal, tangible, intangible, choate or inchoate, are being sold by Seller to Purchaser or being purchased by Purchaser from Seller.  All assets, rights, interests, privileges or benefits not comprising the Acquired Assets, including the following assets, rights, interests, privileges or benefits of Seller and its Affiliates, are Excluded Assets:

A.    All Tooling, dunnage or containers owned by GM or any third party, and the other items set forth on Schedule 1.2.A ("**Third Party Assets**"); provided, that to the extent any Tooling, dunnage or containers or other Third Party Assets are owned by a third party and are in the possession of Seller as of the Closing Date, Seller shall transfer possession of such Third Party Assets to Purchaser as of the Closing and Purchaser shall, subject to the rights of the owner thereof, have any right to use such items in the manufacture and shipping of Products that Seller has as of the Closing Date (and such possession and right shall constitute an Acquired Asset).

Execution Copy

B.      All trademarks, copyrights, patents and applications therefor, trade secrets, and all other forms of  intellectual property, registrations and applications therefor.

C.      Insurance coverage and insurance policies of Seller relating to the Acquired Assets, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums.

D.      All claims, defenses, causes of action or claims of any kind relating to either Excluded Assets or Retained Liabilities.

E.      All tax refunds, credits, prepayments or deferred tax assets, and tax returns and work papers relating thereto, for time periods prior to the Closing.

F.      All of the rights and claims of Seller and its Affiliates available to them under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

G.      Information and materials protected by the attorney-client privilege or that Seller considers to be proprietary information; and the lack of which excluded information and materials are not material to the manufacture of the Products or the use of the Acquired Assets.

H.      Common Delphi services, if any, including legal, insurance, accounting, finance, tax and information technology and related support.

I.      (i) Vehicles assigned to any Transferred Employee under Seller's company vehicle program and pooled vehicles; and (ii) any asset set forth on Schedule 1.2.I, entitled Other Excluded Assets.

J.      All work histories, personnel and medical records of employees and former employees of Seller who worked at any time for any reason at the Kettering Facility for whom a record exists at the Kettering Facility at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, Purchaser will be provided the originals of all personnel and medical records of all Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if Seller so elects.  Upon written request of Seller, Purchaser will promptly return or cause to be returned any and all of these records to Seller at which time Seller, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide Purchaser with copies of the personnel and medical records of such employees.  If an employee objects to provision of personnel or medical records to Purchaser, the records will not be provided, except to the extent Seller determines that provision of the records to Purchaser over the objections by the employee is permitted by the applicable local Law without adverse consequences to Seller.

1.3     **Post-Closing Asset Deliveries**.

Subject to Section 1.2 above, should Seller or Purchaser, in its reasonable discretion, determine after the Closing that any Acquired Assets (including books, records or other materials) are still in the possession of Seller, Seller will promptly deliver them to Purchaser at no cost to Purchaser.  Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials not included in the Acquired Assets or

10

otherwise constituting Excluded Assets were delivered to Purchaser, Purchaser will promptly return them to Seller at no cost to Seller.

### 1.4    **No Assumption of Liabilities by Purchaser; Retained Liabilities**.

Except as otherwise specifically provided in this Agreement, neither Purchaser nor any of its Affiliates shall assume or otherwise be liable in respect of, or be deemed to have assumed or otherwise be liable in respect of, any Liability of Seller or any of its Affiliates whatsoever (the "**Retained Liabilities**").

### 1.5    **Additional Assets**.

If, after the Closing, Seller or Purchaser determines, in its reasonable discretion, that any tangible personal property not included in the Acquired Assets and not identified on Schedule 1.2.I (i) was used prior to the Closing by Seller primarily in the production of the Products at the Kettering Facility and (ii) is necessary to enable Purchaser to manufacture the Products using the Machinery & Equipment in accordance with the manner in which and to the level at which Seller manufactured Products at the Kettering Facility during the twelve (12) months prior to the Closing date (the "**Additional Assets**"), Seller will, to the extent available, transfer, sell and assign such Additional Assets to Purchaser at a price to be mutually agreed by the parties.

### 1.6    **Kettering Lease Agreement**.

At the Closing, Seller and Purchaser will enter into the Kettering Lease Agreement in the form attached as Exhibit A.

### 1.7    **Warranty and Service Parts**.

Until the third anniversary of the Closing Date (or such later date as may be agreed to in writing by Purchaser and Seller) Purchaser will provide to Seller, at Purchaser's plant-cost basis plus five percent (5%), in support of its obligations for any Products to be provided to GM for warranty (including recall) and service parts related to Products sold prior to the Closing Date ("**Warranty and Service Parts**"), provided that, at such time, Purchaser has the capability to make such parts without any design, manufacturing or other change from Purchaser's then-existing production at the Kettering Facility.  Subject to price terms of this Section 1.7, the Warranty and Service Parts will be sold pursuant to the commercially reasonable terms and conditions of a separate purchase order to be negotiated by the Parties between signing and Closing.

### 1.8    **Delivery of Certain Documentation**.

As soon as reasonably practicable following execution of this Agreement, but in any event within five (5) Business Days following execution of this Agreement, Seller will deliver to Purchaser, in whatever form they exist, the items listed on Schedule C and such other Process related information as may be reasonably agreed to by the Parties (the "**Process Documents**"). Purchaser shall have the right to use the Process Documents in connection with its operation of the Acquired Assets (and any additions thereto or replacements thereof).  Subject to Section 1.2 above, should Seller, in its reasonable discretion, determine after the Closing that any Process Documents are still in the possession of Seller, Seller will promptly deliver them to Purchaser at no cost to Purchaser.  All Process Documents are provided "AS IS, WHERE IS", without representation or warranty of any kind whatsoever.

1.9    **Non-Compete and Non-Solicitation**.

A.    For a period of five (5) years from the Closing Date, except with the prior written consent of Purchaser, Seller will not and will cause its Affiliates not to, either on its or their own account or in conjunction with or on behalf of any Person, design,  manufacture, assemble or sell (including quoting or offering to design, manufacture, assemble or sell) any passive twin-tube dampers, passive twin-tube struts or related modules solely for GM or its Affiliates in the United States, Canada or Mexico ("**Competitive Activity**").  For certainty, the foregoing:

(i)    will not prohibit Seller or any of its Affiliates from selling finished goods or work in process inventory existing as of the Closing Date or other inventory in connection with winding down in an orderly fashion or sale of operations at the Other Product Facilities, or any related supplier locations as reasonably determined by Seller.

(ii)    will not prohibit in any way:  (v) the acquisition of a controlling interest or merger with any Person, or any division or business unit thereof, which is not primarily engaged in a Competitive Activity, acquired by or merged, directly or indirectly, into Seller or any of its Affiliates after the Closing Date, (w) the acquisition by Seller or any of its Affiliates, directly or indirectly, of a non-controlling ownership interest in any Person, or any division or business unit thereof, or any other entity engaged in a Competitive Activity, if the Competitive Activity accounts for fifteen percent (15%) or less of the sales or fifteen percent (15%) or less of the value of the acquired business at the date of such acquisition (whichever is greater) and the Competitive Activity is not anticipated to become greater than twenty percent (20%) of such acquired business's sales or value; (x) the acquisition by Seller or any of its Affiliates, directly or indirectly, of less than five percent (5%) of the publicly traded stock of any Person engaged in a Competitive Activity; (y) excluding such activities in connection with the Products or next-generation programs related thereto, the provision of consulting services to, the license of any technology that Seller or any of its Affiliates owns or has license to use, or the financing (on its own behalf or on behalf of any other Person) of any person for the purpose of designing or manufacturing on behalf of Seller or any of its Affiliates or selling to Seller or any of its Affiliates components and parts for automotive applications; and (z) consistent with Seller's troubled supplier practices, any direct or indirect activities of Seller or any of its Affiliates to advise, operate, manage or finance a troubled supplier of Seller or any of its Affiliates.

B.    Notwithstanding anything to the contrary contained in the Agreement, this Section 1.9 shall not:

(i)    prohibit Seller or any of its Affiliates from licensing any intellectual property related to the Products to GM;

(ii)    prohibit Seller's plant at Los Pinos Chihuahua, Mexico that currently supplies passive monotubes, controlled suspension products and related modules to North American customers from continuing to supply such passive monotubes, controlled suspension products and related modules to GM and its Affiliates;

(iii)    in any way restrict Seller's effective non-controlling interest in the Gabriel de Mexico operation held through Seller's participation in the Promotora

12

Joint Venture with Grupo Condumex.  Gabriel de Mexico manufactures twin tube dampers for the Mexican domestic market; or

        (iv)     prohibit Seller or any of its Affiliates from supporting or selling Warranty and Service Parts to GM and its Affiliates

C.     While the restrictions contained in this <u>Section 1.9</u> are considered by the Parties to be reasonable in all the circumstances, it is recognized that restrictions of the nature in question may fail for technical reasons and, accordingly, it is hereby agreed and declared that if any of such restrictions will be adjudged to be void as going beyond what is reasonable in all the circumstances for the protection of the interests of Purchaser but would be valid if part of the wording thereof were deleted or the periods thereof reduced or the range of activities or area dealt with thereby reduced in scope the said restriction will apply with such modifications as may be necessary to make it valid and effective.

## 2.    PURCHASE PRICE.

### 2.1    Purchase Price for Acquired Assets.

Subject to the terms and conditions of this Agreement, the aggregate purchase price (the "**Purchase Price**") for the Acquired Assets will be (i) Eighteen Million Eight Hundred Forty-Three Thousand Four Hundred Sixty-Seven Dollars ($18,843,467.00) (the "**Initial Purchase Price**"), plus or minus (ii) the Purchase Price Adjustment as finally determined pursuant to <u>Section 2.2</u>.

### 2.2    Payment of Purchase Price.

A.     The Initial Purchase Price, less the Deposit, will be paid by Purchaser to Seller on the Closing Date in cash by wire transfer to an account designated in writing by Seller.

B.     Within twenty (20) days prior to or within twenty (20) days following the Closing Date, Seller shall conduct a physical count of the Inventory.  Purchaser shall have the right to have a representative present at any physical inventory performed pursuant to this <u>Section 2.2.B</u>.  Within sixty (60) days after the Closing, Seller shall calculate the Inventory Value (the "**Initial Inventory Valuation**") in accordance with the Inventory Valuation Principles and shall deliver to Purchaser a statement of the Initial Inventory Valuation.  Purchaser and its representatives, as well as any Independent Accounting Firm, shall have the right to review all work papers and procedures used to calculate the Initial Inventory Valuation as set forth in such statement and shall have the right to perform any other reasonable procedures necessary to verify the accuracy thereof.  During the thirty (30) days following receipt by Purchaser of the statement of Initial Inventory Valuation, Purchaser and Seller shall work together in good faith to agree upon the Initial Inventory Valuation.

C.     If Purchaser and Seller do not enter into a written agreement setting forth the agreed upon Inventory Value within thirty (30) days following receipt by Purchaser of the statement of Initial Inventory Valuation, any disagreement shall be submitted by the Parties for final determination to the Independent Accounting Firm.  The Independent Accounting Firm shall follow such procedures as it deems appropriate for obtaining the necessary information in considering the positions of Purchaser and Seller; <u>provided</u>, <u>however</u>, the scope of the review of the Independent Accounting Firm shall be limited to (i) a determination of whether the Initial Inventory Valuation was calculated in accordance with the terms of <u>Section 2.2.B</u>, and, based on its determination of clause (i), a final determination of the Inventory Value.  The Independent Accounting Firm shall render its determination on the matter within twenty (20) days of its

submission by Purchaser and Seller, and such determination shall be final, conclusive and binding upon Purchaser and Seller. The fees and expenses of the Independent Accounting Firm shall be paid equally by Purchaser and Seller. The term "**Final Inventory Valuation**" refers to the Inventory Value as agreed by the Parties or the Inventory Value as determined by the Independent Accounting Firm.

D.    The Purchase Price shall be adjusted ("**Purchase Price Adjustment**") as provided in this Section 2.2.D. The Purchase Price shall be increased (the "**Purchase Price Increase**") by the amount, if any, by which the Final Inventory Valuation is greater than Ten Million One Hundred Seventy-Seven Thousand Forty-Five Dollars ($10,177,045.00). The Purchase Price shall be decreased (the "**Purchase Price Decrease**") by the amount, if any, by which the Final Inventory Valuation is less than Ten Million One Hundred Seventy-Seven Thousand Forty-Five Dollars ($10,177,045.00). Within five (5) days following the date upon which the Final Inventory Valuation is mutually agreed upon by Purchaser and Seller or determined pursuant to Section 2.2.C, (i) Purchaser shall pay by wire transfer in U.S. Dollars in immediately available funds to an account designated by Seller any Purchase Price Increase, or (ii) Seller shall pay by wire transfer in U.S. Dollars in immediately available funds to an account designated by Purchaser any Purchase Price Decrease.

2.3    **Deposit Amount**.

A.    On or before 5:00 p.m. (prevailing Eastern time), Monday, March 10, 2008, Purchaser shall deliver to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement in the form attached hereto as Exhibit 2.3 Nine Hundred Forty-Two Thousand Dollars ($942,000.00) in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Deposit**") to be held by the Deposit Escrow Agent in an interest bearing account reasonably acceptable to Purchaser to serve as an earnest money Deposit under this Agreement, and to be released in accordance with the following procedures:

(i)    Deposit Instructions. At Closing, Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to deliver the Deposit, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price). The costs and expenses of the Deposit Escrow Agent will be paid from and borne solely by the Deposit;

(ii)    Termination of Agreement. Upon any failure by Purchaser to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Article 7 hereof (it being understood that Purchaser shall not be required to waive any condition to Closing intended for its benefit), the Deposit Escrow Agent to deliver the Deposit, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement, to be retained by Seller. Any such payment shall constitute Seller's sole recourse against Purchaser in the event Purchaser notifies Seller, prior to the Auction date, of Purchaser's intent to terminate this Agreement. Upon any breach by Purchaser on or after the Auction date, Seller will be entitled to all available remedies in law or equity.

(iii)    Other Reason. Upon termination of this Agreement for any other reason or upon the failure by Seller to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Article 7,

Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to deliver the Deposit, by wire transfer of immediately available funds, to an account designated by Purchaser in the Deposit Escrow Agreement, to be retained by Purchaser.

3.    **EMPLOYEE MATTERS**.

3.1    **Salaried Employees**.

A.    Prior to executing this Agreement, Purchaser has interviewed all salaried employees regularly assigned to work at the Kettering Facility in connection with the manufacturing operations related to the Products and the Acquired Assets as of the date of this Agreement (the "**Salaried Employees**") for the purpose of determining to which Salaried Employees Purchaser wishes to offer employment.

B.    With respect to the Salaried Employees interviewed, Seller has provided Purchaser the following information:

(i)    Name

(ii)    Current job title, dates in position, and position description

(iii)    Prior two job titles and dates in positions

(iv)    Date of hire

(v)    Current salary and two-year salary history

(vi)    Bonus target and three-year bonus payout history

(vii)    Long term (cash and equity) incentive target(s) and three-year history

(viii)    Three most recent performance reviews

(ix)    Documented disciplinary and corrective actions

C.    After completing the interviews referenced in <u>Section 3.1.A</u>, Purchaser will provide Seller with two lists.  One list will identify no fewer than thirty (30) (which number shall be reduced by the number, if any, of Salaried Employees whose employment by Seller and its Affiliates terminates prior to the Closing Date) Salaried Employees to whom Purchaser wishes to extend an offer of employment.  This list may be attached to this Agreement as <u>Schedule 3.1</u>.  The other list will identify Salaried Employees to whom Purchaser does not wish to extend an offer of employment (hereinafter referred to as the "**Excluded Salaried Employees**").  The lists will be provided to Seller as soon as practical but no later than thirty (30) days from the date of this Agreement.

D.    From the date of this Agreement through the Closing Date, except for "for-cause" terminations, Seller will not terminate or redeploy any Salaried Employee (which obligation shall be limited to those Salaried Employees for periods after such Schedule is prepared)  identified on <u>Schedule 3.1</u>.

E.      From the date of this Agreement through the Closing Date, Seller will not make available alternative positions to, or otherwise seek to delay the commencement of employment with Purchaser by, any Salaried Employee (which obligation shall be limited to those Salaried Employees identified on <u>Schedule 3.1</u> for periods after such Schedule is prepared).

F.      For a period of five (5) years after the Closing Date, Seller will not (and will cause its Affiliates not to) offer to employ or employ any employees hired by Purchaser under the provisions of this <u>Section 3</u>.  For a period of five years after the Closing Date, Purchaser will not (and will cause its Affiliates not to), without Seller's prior consent, offer to employ or employ:  1) any of the Salaried Employees identified on <u>Schedule 3.1</u> who receive severance benefits from Seller in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees as the result of Purchaser's failure to meet the "substantially comparable in the aggregate" standard described in <u>Section 3.1.G</u>; or 2) the Excluded Salaried Employees.

G.      With respect to the Salaried Employees identified on <u>Schedule 3.1</u> who remain employed by Seller and its Affiliates until the Closing, prior to Closing, Purchaser will provide Seller with the terms of each individual offer of employment Purchaser wishes to extend.  Within ten Business Days of Seller receiving such terms of each offer, Seller, acting reasonably, will determine whether each offer provides wages and benefits that are substantially comparable in the aggregate to wages and benefits Seller provides the Salaried Employee as of the date of this Agreement and advise Purchaser and the employee of its determination.  In the event that Seller determines that the terms are substantially comparable in the aggregate and an offer of employment is extended and accepted, Purchaser will maintain such level of compensation and benefits for a minimum of twelve (12) months following the Closing Date, excluding those reasonable changes Purchaser and its Affiliates apply to all of their U.S. salaried employees so as the Transferred Salaried Employees' compensation and benefits remain substantially comparable in the aggregate as contemplated hereby.  In the event Seller determines that the terms are not substantially similar in the aggregate, Purchaser may, in its sole discretion, cure any deficiency so as to meet this standard.  However, if after consultation with Purchaser, Seller, acting reasonably, determines that Purchaser has still not met this standard, the affected employee will be so advised and given the option of:  1) receiving severance benefits from Seller in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees (and thus barred from employment by Purchaser for five years in accordance with <u>Section 3.1.F</u>); or 2) accepting Purchaser's offer of employment and waiving eligibility for any severance benefits from Seller.  In no event, however, will Purchaser bear any responsibility or liability relating to any severance benefits Seller provides to: 1) any of the Salaried Employees identified on <u>Schedule 3.1</u> who receive severance benefits from Seller in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees as the result of Purchaser's failure to meet the "substantially comparable in the aggregate" standard; or 2) the Excluded Salaried Employees.

H.      Unless provided otherwise in this Agreement, Purchaser will be solely responsible for and will bear all Liabilities arising out of, resulting from or relating to the employment by Purchaser of the Salaried Employees identified on <u>Schedule 3.1</u> whom Purchaser hires ("**Transferred Salaried Employees**") to the extent arising from acts or events occurring on or after the Closing Date.  Unless provided otherwise in this Agreement, Seller will be solely responsible for and will bear all Liabilities arising out of, resulting from or relating to the employment of any salaried employee by Seller arising from acts or events occurring prior to the Closing Date.

I.      If, at any time between the Closing Date and the second anniversary thereof, Purchaser severs (except for cause) any Transferred Salaried Employee, Purchaser shall pay

Seller within thirty (30) days of such severance an amount equal to the Employee Severance Amount with respect to such severed employee.

3.2    **Transferred Hourly Employees**.

A.    <u>Employee List</u>.    No later than ten (10) days following the execution of this Agreement, Seller will provide Purchaser with a list of all current hourly employees regularly assigned to work at the Kettering Facility in connection with the manufacturing operations related to the Products and Acquired Assets.  The list will identify the employees on active and inactive status as of the day the list is issued.  For all such inactive hourly employees, Seller will identify each employee's specific inactive status and, if other than due to a layoff, the expected return to work date, if any.  The list will also provide for each hourly employee: (a)  Name; (b) Job classification/title; (c)  Date of hire; and (d)  Rate of pay.  Such list may be attached to this Agreement as <u>Schedule 3.2</u> and will be updated as of the Business Day immediately preceding the Closing.

B.    <u>Employment with Buyer</u>.    Effective as of the Closing Date, Purchaser will commence employment of approximately 356 hourly employees listed on <u>Schedule 3.2</u> and who remain on active status as of the Closing Date ("**Transferred Hourly Employees**").  Effective at Closing, all Transferred Hourly Employees will be deemed by Buyer to have resigned from Seller.  Purchaser shall have no obligation to offer employment to any hourly employee (i) who elected "Option 2 and 3 Layoff" under Seller's 2007 special attrition program or (ii) who is on pre-retirement leave under Seller's 2006 or 2007 special attrition programs.

C.    <u>Inactive Employees</u>.  Hourly employees listed as inactive on <u>Schedule 3.2</u> due to leave status shall remain employees of Seller for the duration of such leave.  At such time as these employees are released to return to work under the Collective Bargaining Agreements, they shall become Transferred Hourly Employees, subject solely to the provisions of the August 5, 2007 IUE-CWA-Tenneco CBA and the Effects MOU, as may be applicable.  In no event shall Purchaser have any obligations to a Transferred Hourly Employee before such Transferred Hourly Employee becomes an employee of Purchaser, except to make the offers of employment contemplated by this Agreement.  Any Transferred Hourly Employee who becomes employed by Purchaser pursuant to this <u>Section 3.2.C</u> shall be considered a Transferred Hourly Employee only from and after the date his employment by Purchaser commences in accordance with this <u>Section 3.2.C</u> (the "**Delayed Transfer Date**").  In the event that there are any Seller employees with "seniority" listed as inactive due to lay off, such employees shall be recalled by Purchaser as provided in the Effects MOU.  Such employees shall thereafter be treated as Transferred Hourly Employees from and after the Delayed Transfer Date.

D.    <u>August 5, 2007 IUE-CWA-Tenneco CBA</u>.    Notwithstanding anything to the contrary contained herein, the August 5, 2007 collective bargaining agreement between the IUE-CWA and Purchaser ("**August 5, 2007 IUE-CWA-Tenneco CBA**") provides the terms and conditions of employment applicable to the Transferred Hourly Employees effective as of the Closing Date, as may be modified by the Effects MOU to be negotiated among Seller, Purchaser, the IUE-CWA and GM regarding the effects of the transactions contemplated by this Agreement upon the IUE-CWA Kettering bargaining unit members.  The parties acknowledge that the Effects MOU may modify <u>Section 3.2.A</u> herein by providing that certain active hourly Seller employees listed on <u>Schedule 3.2</u>, i.e. those who are or may become eligible for traditional pension benefits under the Delphi Hourly-Rate Pension Plan (the "**Delphi HRP**"), may continue to be employed by Seller and be leased to Purchaser until such time as benefit accruals under the Delphi HRP are frozen, at which time such employees will commence employment with Purchaser as Transferred Hourly Employees.  During the period of any such

lease arrangement, the leased employees shall, for all purposes other than the Delphi HRP, be managed at the direction of Purchaser and treated in accordance with the August 5, 2007 IUE-CWA-Tenneco CBA, except as may otherwise be provided by the Effects MOU.

E.    <u>Liabilities</u>.  Unless provided otherwise in this Agreement, Purchaser will be solely responsible for and will bear all Liabilities arising out of, resulting from or relating to the employment of the Transferred Hourly Employees by Purchaser to the extent arising from acts or events occurring on or after the Closing Date, or the Delayed Transfer Date if applicable, including without limitation grievances filed under the August 5, 2007 IUE-CWA Tenneco CBA, as may be modified by the Effects MOU.  Unless provided otherwise in this Agreement, Seller will be solely responsible for and will bear all Liabilities arising out of, resulting from or relating to the employment of the Transferred Hourly Employees by Seller arising from acts or events occurring prior to the Closing Date, or the Delayed Transfer Date if applicable, including without limitation grievances filed under the Collective Bargaining Agreements.

3.3    **<u>Other Matters</u>**.

A.    Transferred Salaried Employees and Transferred Hourly Employees and their dependents' and beneficiaries' participation in and eligibility for benefits under the Seller Benefit Plans shall cease as of the Closing  (or, in the case of a Transferred Hourly Employee who becomes a Transferred Hourly Employee after the Closing in accordance with <u>Section 3.2.C</u>, the Delayed Transfer Date).    Transferred Salaried Employees and their dependents' and beneficiaries' participation in and eligibility for benefits under the Purchaser Employee Benefit Plans shall commence as of the Closing.  Transferred Hourly Employees and their dependents' and beneficiaries' participation in and eligibility for benefits under the Purchaser Employee Benefit Plans shall commence as provided under the August 5, 2007 IUE-CWA-Tenneco CBA (as the same may be amended by the Effects MOU).  Notwithstanding the preceding sentences, Seller and the Seller Employee Benefit Plans shall retain Liability for all claims incurred by the Transferred Employees and their dependents and beneficiaries prior to the Closing (or Delayed Transfer Date, if applicable), including claims which were not submitted until after the Closing (or Delayed Transfer Date, if applicable).  A claim would be deemed incurred, as applicable:

(i)    On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

(ii)    On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

(iii)    On the date following a Transferred Salaried Employee's or Transferred Hourly Employee's last day worked, in the case of any such employee for whom a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

B.    Regardless of the vesting date, Seller shall pay to each Transferred Employee the amount of all accrued and unused vacation pay and any incentive compensation which such employee may be eligible to earn for 2008 on a pro-rata basis using the number of days worked for Seller during 2008 by such employee.

C.    Seller shall retain responsibility for all Liabilities for workers' compensation benefits related to injuries or illnesses incurred by Transferred Employees prior to the Closing. Purchaser shall be responsible for all Liabilities for workers' compensation benefits related to

injuries or illnesses incurred by Transferred Employees after the Closing.  With respect to claims for cumulative trauma (such as carpal tunnel syndrome) that are filed after the Closing, began prior to the Closing and continue after the Closing, Purchaser and Seller shall be liable for a pro-rata share of the Liabilities based on the claimant's respective length of service with each party.

D.      To the extent allowed under applicable Law, Transferred Employees who become eligible for a distribution of their account balances in either the Seller Personal Savings Plan or the Seller Savings-Stock Purchase Plan will be permitted, at their discretion, to transfer such account balances to Purchaser's defined contribution plan, if any.  The manner of such transfer will be a rollover.

E.      Except as otherwise expressly provided in this Agreement, Seller shall retain and be responsible for all Liabilities arising out of, resulting from or relating to for claims for hourly severance, termination (actual or constructive), Worker Adjustment and Retraining Notification Act or other payments or benefits due to any employee as a result of the transactions contemplated by this Agreement.

F.      Purchaser and Seller shall, and shall cause each of their respective subsidiaries and/or third party administrators and consultants (to the extent reasonably practicable), to provide to the other all such information as the other may reasonably request to enable the requesting party to comply with (as applicable) the provisions of this Article 3, the Collective Bargaining Agreements, the Effects MOU and the August 5, 2007 IUE-CWA-Tenneco CBA. Such information shall, to the extent reasonably practicable, be provided in the format and at the times and places requested, but in no event shall the party providing such information be obligated to incur any out-of-pocket expense not reimbursed by the party making such request, nor to make such information available outside its normal business hours and premises.  Any information shared or exchanged pursuant to this Section 3.3.F shall at all times be kept confidential, except as otherwise required by Law.

3.4    **Due Diligence**

A.      No later than ten Business Days following the execution of this Agreement (or, in the case of employees listed on Schedule 3.1, as soon as practicable after such Schedule is prepared), Seller shall provide Purchaser:

(i)      A description of all pending grievances involving the hourly employees listed on Schedule 3.2.

(ii)      A description of all pending employment-related litigation by or against employees identified on Schedule 3.1 or Schedule 3.2.

(iii)      A description of all pending administrative agency complaints, charges, unfair labor practice charges, or investigations by or against employees listed on Schedule 3.1 or Schedule 3.2.

(iv)      A description of any consent orders or orders by any court or administrative agency applicable to employees listed on Schedule 3.1 or Schedule 3.2.

(v)      All documents constituting the Collective Bargaining Agreements between Seller and the IUE-CWA applicable to the hourly employees listed on Schedule 3.2, including but not limited to any side letters, memoranda of understanding or agreement and grievance or arbitration settlements.

19

4.    **CERTAIN TRANSITION SERVICES**.

A.    <u>ASSISTANCE OF CERTAIN SELLER SALARIED EMPLOYEES</u>.  For a period of no more than 90 days after the Closing, at Purchaser's request, Seller shall cause the Seller salaried employees identified on <u>Schedule 4A</u> to provide such services to Purchaser as Purchaser may reasonably request.  Such services shall be provided at the hourly rate set forth on <u>Schedule 4A</u>.  In no event shall any such employee be required to provide to Purchaser more than 40 hours of service in any calendar week.  Subject to the price terms of <u>Schedule 4A</u>, the services will be sold pursuant to the commercially reasonable terms and conditions of a separate purchase order to be negotiated by the Parties between signing and Closing.

B.    <u>TOP MOUNT SUPPLY</u>.  Until December 31, 2008, Seller shall sell the component(s) identified on <u>Schedule 4B</u> to Purchaser.  Such components shall be sold at the prices set forth on <u>Schedule 4B</u>.  Subject to the price terms of <u>Schedule 4B</u>, the components will be sold pursuant to the commercially reasonable terms and conditions of a separate purchase order to be negotiated by the Parties between signing and Closing.  Supply of the component(s) may be extended beyond December 31, 2008, only by mutual written agreement of the Seller and Purchaser entered into after the Closing Date.  Seller agrees to support the validation testing required by GM to allow for uninterrupted supply.

5.    **REPRESENTATIONS AND WARRANTIES**.

5.1    **Warranties of Seller**.

Seller represents and warrants, as of the date hereof and as of the Closing Date as if such representations and warranties were remade as of the Closing Date, to Purchaser as follows:

A.    <u>Organization and Good Standing</u>.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate or other organizational power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate its properties and assets, and is in good standing in all jurisdictions where it owns or leases real property, except where the failure to so qualify would not have a Material Adverse Effect.

B.    <u>Corporate Authority</u>.  Subject to the entry and effectiveness of the Bidding Procedures Order and Sale Approval Order (collectively, the ""), Seller has the requisite power and authority to execute and perform in accordance with this Agreement and the Kettering Lease Agreement, and, upon full satisfaction of the terms and conditions of the Orders, this Agreement and the Kettering Lease Agreement shall each constitute a valid and binding obligation of Seller (provided that <u>Section 9.3</u> will be enforceable upon entry of the Bidding Procedures Order).

C.    <u>No Conflict</u>.  The execution and performance by Seller of this Agreement and the Kettering Lease Agreement does not violate, conflict with or result in a breach by Seller of its Organizational Documents or of any other agreement to which Seller is a party or by which it is bound, except for those violations that are excused by or are unenforceable as a result of the Bankruptcy Code.

D.    <u>Consents and Approvals</u>.  No Consent of any non-governmental third party and no Consent with or of any Governmental Authority is required to be made or obtained by Seller in connection with the execution, delivery or performance of this Agreement and the Kettering

Lease Agreement and the consummation of the transactions contemplated hereby and thereby except for Consent of the Bankruptcy Court.

      E.    <u>Employee Matters</u>.

      (i)    <u>Schedule 5.1.E(i)</u> sets forth a list of all employees regularly assigned to work at the Kettering Facility in connection with the manufacturing operations related to the Products and Acquired Assets ("**Employees**"), including for each such employee:  (i) such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's employment status (i.e., actively employed, on lay off, or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (iv) each such person's current annual base rate of compensation and bonus target; (v) each person's date of hire, and, for hourly employees, the "Delphi Kettering Plant Hire" date; and (vi) each Seller Employee Benefit Plan in which such person participates.  Due to the sensitive nature of the information on such Schedule, Seller has delivered it separately and Purchaser acknowledges such delivery.

      (ii)    With respect to the Employees, Seller and its Affiliates are and have been in compliance with all applicable Laws, including all health and safety laws and immigration laws, relating to employment and employment practices, terms and conditions of employment and wages and hours, and, are not and have not been engaged in any unfair labor practice or unlawful employment practice.

      (iii)    Except as set forth on <u>Schedule 5.1.E(iii)</u>, with regard to the Employees, neither Seller nor any of its Affiliates has received notice of any unfair labor practice complaint since January 1, 2005 before the National Labor Relations Board relating to Seller or any of its Affiliates and neither Seller nor any of its Affiliates has received notice of any threatened unfair labor practice complaint before the National Labor Relations Board relating to Seller or any of its Affiliates during the same time period.

      (iv)    Except as set forth on <u>Schedule 5.1.E(iv)</u>, with regard to the Employees, neither Seller nor any of its Affiliates has received notice of any charge or complaint since January 1, 2005 before the Equal Employment Opportunity Commission or the Department of Labor or any state or local agency of similar jurisdiction relating to Seller or its Affiliates, and neither Seller nor any of its Affiliates has received any notice of any material threatened charge or complaint against Seller or any of its Affiliates before the Equal Employment Opportunity Commission or the Department of Labor or any state or local agency of similar jurisdiction relating to Seller or any of its Affiliates.

      (v)    Except as disclosed on <u>Schedule 5.1.E(v)</u>, with respect to the Employees:  (a) there is no labor strike, dispute, slowdown or stoppage actually pending or, to Seller's knowledge, threatened against or involving Seller or any of its Affiliates; (b) neither Seller nor any of its Affiliates has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity relating to any of its employees; (c) no labor grievance relating to any employee of Seller or any of its Affiliates is pending as of the date of this Agreement; and (d) neither Seller nor any of its Affiliates has any labor

negotiations in process with any labor union or other labor organization. Except as set forth on Schedule 5.1.E(v) there are no pending or threatened Proceedings (judicial, administrative, grievances or otherwise) or claims against Seller or any of its Affiliates whether under applicable Laws, any Collective Bargaining Agreement, employment agreements or otherwise asserted by any present employee or former employee (or their representative) as relates to the Kettering Facility, including claims on account of or for: (a) overtime pay, other than overtime pay for work done during the current payroll period; (b) wages or salary for any period other than the current payroll period; (c) any amount of vacation pay or pay in lieu of vacation or time off; or (d) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours at work.

F.    Title to Acquired Assets.  Seller warrants that, as of the Closing Date, Seller will have good and marketable title to the Acquired Assets, and at the Closing the Acquired Assets will be sold to Purchaser, free and clear of any Lien, as permitted under Section 363(f) of the Bankruptcy Code and subject to the entry into and the effectiveness of the Sale Approval Order.

G.    Brokers.  Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Purchaser would be liable.

H.    Certain Tangible Property.

(i)    Inventory.  Except to the extent identified in Schedule 5.1.H(i), the Inventory will, as of the Closing, be located at the Kettering Facility.

(ii)    Condition of Personal Property.  With respect to all Acquired Assets, Seller has performed maintenance consistent with Seller's applicable maintenance policies and procedures and will continue to perform such maintenance in the Ordinary Course of Business until the Closing Date.

(iii)    Maintenance of Spare Parts and Crib Items.  Until the Closing Date, Seller will manage its on-hand supply of Spare Parts and Crib Items in the Ordinary Course of Business and will not unreasonably deplete such supply.

(iv)    Absence of Representations or Warranties Regarding Acquired Assets.  (a) THE ACQUIRED ASSETS HAVE BEEN INSPECTED BY PURCHASER AND PURCHASER IS SATISFIED WITH THE CONDITION THEREOF.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ALL ACQUIRED ASSETS ARE BEING SOLD TO PURCHASER ON AN "AS IS, WHERE IS" BASIS.  EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 5.1.H, SELLER MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WHATSOEVER CONCERNING THE ACQUIRED ASSETS, OR THE CONDITION, ACCURACY, QUALITY, UTILITY OR COMPLETENESS THEREOF, AND HEREBY EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND, EXCEPT AS PROVIDED IN SECTION 5, ANY WARRANTY OF NON-INFRINGEMENT OF THE PROPRIETARY RIGHTS OF THIRD PARTIES.

(b) WITHOUT LIMITING THE GENERALITY OF SECTION 5.1.H(iv)(a) ABOVE, PURCHASER AGREES THAT, EXCEPT AS OTHERWISE

EXPRESSLY SET FORTH IN THIS AGREEMENT: (i) SELLER SHALL HAVE NO LIABILITY OR RESPONSIBILITY FOR THE CONDITION AND/OR OPERATION OF SUCH ACQUIRED ASSETS AFTER THE CLOSING DATE; AND (ii) PURCHASER IS PURCHASING SUCH ACQUIRED ASSETS BASED SOLELY UPON ITS OWN INSPECTION, EVALUATION, REVIEW AND ANALYSIS, AND PURCHASER ASSUMES THE ENTIRE RISK ASSOCIATED WITH SUCH INSPECTION, EVALUATION, REVIEW AND ANALYSIS BEING INCOMPLETE OR INACCURATE.

I.    <u>Intellectual Property</u>.  Since the GM-Delphi License Agreement's Effective Date (as that term is defined therein), no unresolved written claim that could have a Material Adverse Effect upon Purchaser's production of Products at the Kettering Facility has been asserted against Seller alleging the Products as commercialized by Seller prior to the Closing Date, or methods used by Seller prior to the Closing Date for manufacturing such commercialized Products, infringe the intellectual property rights of any third party.

J.    <u>No Other Representations and Warranties</u>.  Except for the warranties expressly set forth in this Agreement and the Ancillary Agreements, Seller makes no representations or warranties, express or implied, with respect to the Acquired Assets.  For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement or the Ancillary Agreements, all which were produced only for information purposes.

5.2    **Warranties of Purchaser**.

Purchaser warrants and represents, as of the date hereof and as of the Closing Date (as if such representations and warranties were remade as of the Closing Date), to Seller as follows:

A.    <u>Organization and Good Standing</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Delaware.  Purchaser has all requisite corporate power and authority to own, lease and operate its properties and assets, and is in good standing in all jurisdictions where it owns or leases real property, except where the failure to be so qualified or to be so licensed would not have a Material Adverse Effect.

B.    <u>Corporate Authority</u>.  Purchaser has the requisite power and authority to execute and perform in accordance with this Agreement and the Kettering Lease Agreement.  Each of this Agreement and the Kettering Lease Agreement constitutes, or will upon execution and delivery by Purchaser constitute, a valid and binding obligation of Purchaser.

C.    <u>No Conflict</u>.  The execution and performance by Purchaser of this Agreement and each Ancillary Agreement does not violate, conflict with, or result in a breach of Purchaser's Organizational Documents,  or of any other agreement to which Purchaser is a party or by which it is bound.

D.    <u>Consents and Approvals</u>.  No Consent of any non-governmental third party and no Consent with or of any Governmental Authority is required to be made or obtained by Purchaser in connection with the execution, delivery or performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby.

E.    <u>Brokers</u>.  Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Seller would be liable.

F.    <u>No Inducement or Reliance; Independent Assessment</u>.  With respect to the Acquired Assets or any other rights or obligations to be transferred hereunder, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller, any of its Affiliates, or any agent, employee, attorney or other representative of Seller representing or purporting to represent Seller that are not expressly set forth herein (including the Schedules and Exhibits hereto), whether or not any such representations, warranties or statements were made in writing or orally, and none of Seller, any Affiliate of Seller, or any agent, employee, attorney, other representative of Seller or other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents or material made available to Purchaser in expectation of the transactions contemplated by this Agreement.  Nothing in this <u>Section 5.2.F</u> shall be deemed to limit, offset, serve as a defense to or give Seller a claim or counterclaim in connection with Seller's Liability for fraud, willful misconduct or gross negligence.

G.    <u>No Projections</u>.  Purchaser acknowledges that it has made its own assessment of the present condition and the future prospects of the Acquired Assets and is sufficiently experienced to make an informed judgment with respect thereto.  Purchaser acknowledges that neither Seller nor any of its Affiliates has made any warranty, express or implied, as to the prospects of the performance of the Acquired Assets, financial or otherwise, or their profitability for Purchaser, or with respect to any financial forecasts, projections or business plans prepared by or on behalf of Seller and delivered to Purchaser in connection with Purchaser's review of the Acquired Assets and the negotiation and the execution of this Agreement.

H.    <u>Availability of Funds</u>.  Purchaser has or will have available, at or prior to Closing, sufficient cash in immediately available funds to pay the Purchase Price and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

I.    <u>Anti-Money Laundering</u>.  To Purchaser's knowledge, Purchaser is in material compliance with:  (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA Patriot Act**"), as amended, and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, Effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which Purchaser operates or does business.  To Purchaser's Knowledge, neither Purchaser nor any of its directors, officers or Affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and Purchaser is not affiliated in any way with, or providing financial or material support to, any such persons or entities.  Purchaser agrees that should it be named, or if Purchaser receives written notice that any of its directors, officers or Affiliates are named, on the SDN List or any other similar list maintained by the U.S. Government in each case prior to Closing, Purchaser shall promptly inform Seller in writing.

5.3    **Fair Disclosure**.  Any matter fairly disclosed in any Schedule to this Agreement will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations or warranties contain a reference to such

Schedule to the extent it is reasonably apparent on the face of such disclosure that it applies to another representation or warranty.

6.    **CONDITIONS TO CLOSING**.

6.1    **Conditions to Obligations of Seller and Purchaser**.    The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by each Party at or prior to the Closing Date of the following conditions precedent:

A.    Sale Approval Order.    The Sale Approval Order, in form and substance reasonably satisfactory to Purchaser, shall have been entered by the Bankruptcy Court and will not be subject to an appeal, stay or injunction.

B.    No Law, Judgments, Etc.    No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or any decree, judgment, injunction or other Governmental Order (whether temporary, preliminary or permanent) which is in effect and which restricts, prevents, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement.

C.    Other Governmental Consents.    All filings with or Consents of any Governmental Authority legally required for the consummation of the transactions contemplated by this Agreement shall have been made or obtained and be in full force and effect, except where failure to make or obtain the same could not reasonably be expected to have a Material Adverse Effect.

6.2    **Conditions to Obligations of Purchaser**.

The obligation of Purchaser to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser in its sole discretion):

A.    Accuracy of Warranties.    After giving effect to the Sale Approval Order (if entered), the representations and warranties of Seller contained in this Agreement and the Kettering Lease Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) will be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of any such representation and warranty to be true and correct has not had and could not reasonably be expected to have a Material Adverse Effect.

B.    Performance of Covenants.    Each of the Ancillary Agreements to which Seller is a party will have been executed and delivered by Seller to Purchaser, and all other covenants and agreements contemplated hereby or in any Ancillary Agreement to be performed by Seller on or before the Closing will have been performed in all material respects.

C.    GM Supply Agreement.    The GM Supply Agreement shall have been validly executed and delivered and be in full force and effect.

D.    Effects MOU.    Purchaser shall have entered into the Effects MOU, and such Effects MOU shall be effective as of the Closing Date and in form and substance satisfactory to Purchaser in its sole discretion.

Execution Copy

E.    <u>Material Adverse Effect</u>.  Since the date of this Agreement there shall have been no Material Adverse Effect.

F.    <u>Environmental Insurance</u>.  Purchaser shall have secured insurance satisfactory to Purchaser in its reasonable discretion in amount, duration and nature of coverage with respect to Pre-Commencement Date Contamination (as defined in the Kettering Lease Agreement attached hereto).

6.3    **Conditions to Obligations of Seller**.

Except as otherwise permitted by this Agreement, the obligation of Seller to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

A.    <u>Accuracy of Warranties</u>.  The representations and warranties of Purchaser contained in this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) will be true and correct as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of any such representation and warranty to be true and correct has not had and could not reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

B.    <u>Performance of Covenants</u>.  Each Ancillary Agreement to which Purchaser is a party will have been executed and delivered by Purchaser to Seller, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Purchaser on or before the Closing will have been performed in all material respects.

C.    <u>Delivery of Purchase Price</u>.  Purchaser shall have delivered to Seller the Initial Purchase Price, less the Deposit.

D.    <u>Seller's Labor Union Matters</u>.  Seller and IUE-CWA shall have executed a written agreement providing that Seller has satisfied all Seller obligations relating to all applicable IUE-CWA-Delphi collectively bargained "Sale of the Business" and successor provisions.

**7.    <u>CLOSING.</u>**

7.1    **Closing Date**.  Subject to the satisfaction or, if applicable, waiver of the conditions set forth in this Agreement, the closing (the "**Closing**") of the transactions contemplated hereby will take place at the offices of Seller on June 1, 2008 or, if later, on the second Business Day after the conditions set forth in <u>Article 6</u> will have been satisfied or, if applicable, waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree.

7.2    **Kettering Lease Agreement**.

At the Closing, the Parties will execute and deliver or, where appropriate, cause their respective Affiliates to execute and deliver the Kettering Lease Agreement.

7.3    **Seller's Deliveries**.  At the Closing, Seller will deliver to Purchaser the following: A duly executed Bill of Sale for all Acquired Assets to be transferred at Closing.

26

A.      Copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order, if applicable.

7.4    **Purchaser's Deliveries**.   At the Closing, Purchaser will deliver to Seller the following:

A.      The Initial Purchase Price less the Deposit.

## 8.    CERTAIN ADDITIONAL COVENANTS.

8.1    **Operations Pending Closing**.

A.      From the date hereof until the Closing, except as required by or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court, Seller will continue to use and operate the Acquired Assets in the Ordinary Course of Business.

B.      Without limiting the generality of <u>Section 8.1.A</u>, except as set forth on <u>Schedule 8.1.B</u>, entitled Operations Pending Closing, prior to the Closing, Seller shall not (and shall cause its Affiliates not to):

(i)      sell, lease, transfer or assign any of the Acquired Assets, except for the sale of Inventory in the Ordinary Course of Business;

(ii)     In connection with the Applicable Employees, (A) grant any increase in compensation or benefits, except for increases (1) required by applicable Law or the terms of any Collective Bargaining Agreement and (2) in salary for non-management employees in the Ordinary Course of Business, (B) grant any increase in severance or termination pay, (C) enter into or materially amend any employment, consulting, indemnification, severance or termination agreement, (D) establish, adopt, enter into or materially amend any Benefit Plan, except as required by applicable Law or the terms of any Collective Bargaining Agreement, or (E) take any action to accelerate any payments, rights or benefits, or make any material determinations not in the Ordinary Course of Business, under any Collective Bargaining Agreement or Benefit Plan; and

(iii)    Agree, whether in writing or otherwise, or announce an intention or negotiate to do any of the foregoing.

C.      From the date hereof until the Closing, Seller shall cause the Machinery & Equipment to be maintained and repaired or replaced in the Ordinary Course of Business.

8.2    **Cooperation; Efforts and Actions to Cause Closing**.   From the date hereof until the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall cooperate in good faith and use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable (subject to applicable Laws) to satisfy the conditions to Closing, as applicable, set forth in <u>Article 6</u> and to consummate the Closing and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable.  Notwithstanding the foregoing, Purchaser shall not be deemed to be in breach of this <u>Section 8.2</u> if it fails to reach agreement on the GM Supply Agreement, or any ancillary agreements related thereto or the Effects MOU, and nothing in this <u>Section 8.2</u> shall be deemed to require Purchaser to agree to any such agreement.

8.3   **Jobs Covenant**.

From the Closing Date until 11:59 p.m. on October 12, 2011, Purchaser covenants to Seller and its Affiliates, that Purchaser will maintain no fewer than two hundred (200) hourly bargaining unit jobs at the Kettering Facility ("**Jobs Covenant**").   Notwithstanding anything to the contrary herein and in addition to any other Purchaser indemnification obligations herein, Purchaser shall indemnify, defend and hold harmless Seller, its Affiliates, and each of its and their officers, directors and employees from and against all severance costs, out-of-pocket liabilities, claims, losses, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys and other professional fees and expenses, and the cost of SUB payments, if the employee elects SUB payments in lieu of severance upon release from Purchaser employment) incurred by Seller as a result of or arising out of Purchaser's breach of the Jobs Covenant.

8.4   **Purchaser's Access**.   From the date hereof until the Closing, and upon reasonable advance notice received from Purchaser and at Purchaser's sole cost and expense, Seller will afford Purchaser and its authorized representative reasonable access, during regular business hours on Business Days, to inspect the physical condition of the Kettering Facility and Acquired Assets and afford Purchaser and its authorized representatives reasonable access to information, offices and other facilities as well as management and other employees in each case to the extent related to the Acquired Assets, the operation of the Machinery & Equipment or the production of the Products, such right of access to be exercised in a manner that does not unreasonably interfere with the operations of Seller.

9.   **BANKRUPTCY ACTIONS**.

9.1   **Orders**.

Provided that Seller is then subject to a Proceeding under the Bankruptcy Code:  (i) as soon as reasonably practicable after the execution of this Agreement, Seller will file a motion with the Bankruptcy Court seeking approval of the Bidding Procedures Order (and related notices) and the Sale Approval Order: and (ii) Seller shall use commercially reasonable efforts to comply (or, to the extent not already obtained, obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets under this Agreement, and the other transactions contemplated by this Agreement and the Ancillary Agreements, including serving on all required persons in the Bankruptcy Cases, notice of the Sale Motion, the Sale Hearing and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

9.2   **Bidding Procedures**.

A.   Seller Initial Bankruptcy Actions.   Subject to the continued pendency of the Bankruptcy Case, this Section 9.2 sets forth the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the Agreement and the Sale of the Acquired Assets and the other transactions contemplated by this Agreement and the Ancillary Agreements (collectively, the "**Transaction**").   Except as otherwise contemplated by this Agreement, the Transaction is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Bidding Procedures Order and Sale Approval Order.  The following overbid provisions and related bid protections are designed to compensate Purchaser for its efforts and agreements to date and to facilitate a full and fair process (the "**Bidding Process**")

designed to maximize the value of the Acquired Assets for the benefit of Seller's creditors, shareholders and bankruptcy estate.

B.    <u>Qualified Bidder</u>.    Unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Seller in its sole discretion, in order to participate in the Bidding Process, each person (a "Potential Bidder"), other than Purchaser, must deliver (unless previously delivered) to Seller:

(i)    an executed confidentiality agreement in form and substance reasonably satisfactory to Seller;

(ii)    current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Seller and its financial advisors;

(iii)    a preliminary (non-binding) written proposal regarding: (a) the purchase price range; (b) any assets expected to be excluded; (c) the financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (d) any anticipated regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (e) any conditions to Closing that it may wish to impose in addition to those set forth in this Agreement; and (f) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed; and

(iv)    the Good Faith Deposit.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Transaction, if selected as a successful bidder, and that Seller determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction within the time frame provided by this Agreement shall be deemed a "**Qualified Bidder**." As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Seller shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that Seller notifies the Potential Bidder that it is a Qualified Bidder, Seller shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets as provided in <u>Section 9.2.D</u> below. Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

C.    <u>Bid Deadline</u>.    A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to:

| Delphi Automotive Systems LLC: | Delphi Automotive Systems LLC<br>5725 Delphi Drive<br>Troy, MI  48098<br>Attn:   Fred Bellar III |
|---|---|
| With copies to, Seller's outside counsel: | Skadden, Arps, Slate Meagher & Flom LLP<br>333 West Wacker Drive |

Execution Copy

|  | Chicago, IL  60606-1285 |
|  | Attn:   John K. Lyons and Brian M. Fern |
| Seller's Legal Staff: | Delphi Legal Staff |
|  | MC 480-410-268 |
|  | 5825 Delphi Drive |
|  | Troy, MI  48098 |
|  | Attn:   Mark Densmore |
| Counsel to the Official Committee of unsecured creditors appointed in the Bankruptcy Cases (the "Creditors' Committee"): | Latham & Watkins LLP |
|  | 885 Third Avenue |
|  | New York, NY  10022 |
|  | Attn:   Mark A. Broude |
| The Creditors' Committee's financial advisor: | Mesirow Financial Consulting LLC |
|  | 21st Floor |
|  | 666 Third Avenue |
|  | New York, NY  10017 |
|  | Attn:   Ben Pickering |
| Counsel to the debtors' secured lenders: | Davis, Polk & Wardwell |
|  | 450 Lexington Avenue |
|  | New York, NY  10017 |
|  | Attn:   Donald Bernstein and Brian Resnick |
| Purchaser: | TENNECO AUTOMOTIVE OPERATING COMPANY INC. |
|  | c/o Tenneco Inc. |
|  | 500 North Field Drive |
|  | Lake Forest, Illinois 60045 |
|  | Attn:   General Counsel |
|  | Fax No.: 847-482-5040 |
| With copies to Purchaser's outside counsel: | Mayer Brown LLP |
|  | 71 South Wacker Drive |
|  | Chicago, Illinois 60606 |
|  | Attn: Jodi Simala |

so as to be received not later than 11:00 A.M. (prevailing Eastern time), on April 10, 2008 (the "**Bid Deadline**").  Seller may extend the Bid Deadline once or successively, but is not obligated to do so.  If Seller extends the Bid Deadline, it will promptly notify all Qualified Bidders of such extension.   As soon as reasonably practicable following receipt and qualification of each Qualified Bid, Seller shall deliver complete copies of all items and information enumerated in the section below entitled "**Bid Requirements**" to counsel for the official committee of equity security holders (the "**Equityholders' Committee**").

        D.    Due Diligence.  Seller shall afford each Qualified Bidder due diligence access to the Acquired Assets   Due diligence access may include access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Seller, in its sole discretion, may agree to.   Seller shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.   Any additional due diligence shall not continue after the Bid Deadline.  Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified

Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at site inspections.  Seller (or any of its representatives) shall not be obligated to furnish any information relating to Acquired Assets to any person other than to Qualified Bidders who make an acceptable preliminary proposal.

E.      Bid Requirements.  All bids must include the following documents (the "**Required Bid Documents**"):

(i)      A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the Closing of the Transaction.

(ii)      An executed copy of the Agreement together with all Ancillary Agreements as well as the Exhibits and Schedules to the Agreement marked (the "Marked Agreements") to show those amendments and modifications to such agreements that the Qualified Bidder proposes, including the Purchase Price (as defined in the Agreement).

(iii)      A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine) in an amount equal to 5% of the Initial Purchase Price.

(iv)      Written evidence of a commitment for financing or other evidence of ability to consummate the Transaction satisfactory to Seller and its advisors.

(v)      Written evidence of a collective bargaining agreement with the IUE-CBA or commitment to assume Seller's Collective Bargaining Agreement with the IUE-CBA.

F.      Qualified Bids.  A bid will be considered only if the bid:

(i)      Is on terms and conditions (other than the amount of the consideration) that are substantially similar to, and are not, in Seller's sole discretion, materially more burdensome or conditional to Seller than, those contained in the Agreement.

(ii)      Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

(iii)      Proposes a transaction on terms that Seller determines, in its sole discretion, has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee plus: (i) in the case of the initial Qualified Bid, Five Hundred Thousand Dollars ($500,000.00); and (ii) Two Hundred Fifty Thousand Dollars ($250,000.00) in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

(iv)      Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

(v)      Includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the

31

Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreements.

(vi)    Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required governmental approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase and license, subject to the receipt of any governmental approvals which must be obtained within 10 days after entry of such order.

(vii)    Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Seller shall have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified in Section 9.2 and deem such bids to be Qualified Bids.  Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction and the Transaction.  A Qualified Bid may be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such Transaction.  Each Qualified Bid other than that of Purchaser is referred to as a "**Subsequent Bid**".  If Seller does not receive any Qualified Bids other than the Agreement received from Purchaser, Seller will report the same to the Bankruptcy Court and will proceed with the Transaction pursuant to the terms of the Agreement.

G.    Bid Protection.    Recognizing Purchaser's expenditure of time, energy and resources, Seller has agreed to provide certain bidding protections to Purchaser.  Specifically, Seller has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed.  As a result, Seller has agreed that if Purchaser is not the Successful Bidder, Seller shall, in certain circumstances, pay to Purchaser the Break-Up Fee or the Expense Reimbursement, but not both.  The payment of the Break-Up Fee or the Expense Reimbursement shall be governed by the provisions of the Agreement and the Bidding Procedures Order.

H.    Auction, Bidding Increments and Bids Remaining Open.    If Seller receives at least one (1) Qualified Bid in addition to the Agreement, Seller will conduct an auction (the "**Auction**") of the Acquired Assets upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. (prevailing Eastern time) on April 14, 2008 , at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606-1285 or Four Times Square, New York, New York 10036 (at Seller's election) or such later time or other place as Seller shall notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

(i)    Only Seller, Purchaser, any representative of the Creditors' Committee and the Equityholders' Committee, any representative of Seller's

secured lender (and the legal and financial advisers to each of the foregoing), any representative of GM, and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only Purchaser and the other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

(ii)     At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Seller whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Seller shall provide copies of the Qualified Bid or combination of Qualified Bids which Seller believes is the highest or otherwise best offer going into the Auction (the "Lead Bid") to all Qualified Bidders who have informed Seller of their intent to participate in the Auction.    Notwithstanding this determination of the Lead Bid, Seller reserves the right, in its sole discretion, to determine which bid, or subsequent bid, is the Successful Bid (as defined below), following the conclusion of the Auction based upon a number of factors and other considerations.

(iii)    All Qualified Bidders who have submitted a Qualified Bid shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

(iv)    Seller may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

(v)     Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least Two Hundred Fifty Thousand Dollars ($250,000.00) higher than the previous bid or bids.  The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Purchaser), Seller may give effect to the Break-Up Fee that may be payable to Purchaser under the Agreement as well as any assets to be retained by Seller.

(vi)    At the conclusion of the Auction, or as soon thereafter as practicable, Seller, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Transaction; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets received at the Auction (the "**Successful Bid(s)**" the bidder(s) making such bid, the "**Successful Bidder(s)**").

I.    <u>Acceptance of Qualified Bids</u>.    Seller shall sell the Acquired Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**").    If, after an Auction in which Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less the Break-Up Fee.    Seller's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Seller's acceptance of the bid.    Seller will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

J.    <u>Sale Hearing</u>.    The Sale Hearing will be held before the Honorable Judge Robert Drain on April 30, 2008 at 10:00 A.M. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.    If Seller does not receive any Qualified Bids (other than the Qualified Bid of Purchaser), Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to Purchaser following entry of the Sale Order.    If Seller does receive additional Qualified Bids, then, at the Sale Hearing, Seller shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").    Seller's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Seller's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.    Following approval by the Bankruptcy Court of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Seller or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Seller shall be permitted to effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

K.    <u>Return of Good Faith Deposit</u>.    The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Qualified Bids by one or more Qualified Bidders), until two (2) Business Days following the Closing of the Transaction (the "**Return Date**").    Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).    If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Seller will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Seller.    On the Return Date, Seller shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

L.    <u>Reservation of Rights</u>.    Seller, after consultation with the agents for its secured lenders and the Creditors' Committee: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time any bid (other than Purchaser's initial bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Transaction; or (c) contrary to the best interests of Seller, its estate and creditors as determined by Seller in its sole discretion.

9.3    **Break-up Fee and Expense Reimbursement**.

A.    In the event that Seller terminates the Agreement under Section 10.2.B and, within twelve (12) months of entry into this Agreement, sells, transfers, or otherwise disposes of, all or substantially all or a material portion of the Acquired Assets in a transaction or a series of related transactions with one or more Persons other than Purchaser in accordance with the Bidding Procedures (such event being an "**Alternative Transaction**").  Seller shall, within five (5) Business Days after consummation of the Alternative Transaction, pay to Purchaser by wire transfer in immediately available funds an amount equal to Five Hundred Sixty-Five Thousand Three Hundred Four Dollars ($565,304.00) (the "Break-Up Fee").    Notwithstanding the foregoing, Purchaser shall not be entitled to a Break-Up Fee if Purchaser is in material breach of this Agreement or the Bidding Procedures.

B.    In the event that either party terminates the Agreement under Section 10.2.C or 10.2.D or Purchaser terminates the Agreement under Section 10.4, Seller shall reimburse Purchaser, by wire transfer in immediately available funds, for Purchaser's reasonable, actual, documented out-of-pocket expenses incurred in connection with the transaction contemplated by the Agreement up to an amount equal to Seven Hundred Fifty Thousand Dollars ($750,000.00) (the "Expense Reimbursement").  Any Expense Reimbursement payable upon termination of this Agreement will be immediately earned upon such termination and payable by Seller to Purchaser promptly upon the delivery of an invoice related to such Expense Reimbursement to Seller by Purchaser to be delivered to Seller within ten (10) Business Days of termination of this Agreement; provided, however, that if Seller believes, in good faith, that the amount of the Expense Reimbursement sought by buyer is not reasonable, then Seller will have the right to seek Bankruptcy Court review thereof prior to paying the disputed portion of the Expense Reimbursement.  Notwithstanding the foregoing, Purchaser shall not be entitled to the Expense Reimbursement if Purchaser is in material breach of this Agreement or the Bidding Procedures or the termination is under Section 10.2.D and, at the time of termination, the condition set forth in Section 6.2.C or Section 6.2.D is not satisfied.

C.    Any claim or claims of Purchaser, to payment of either of the Break-Up Fee and Expense Reimbursement shall constitute an allowed administrative expense claim arising in the Bankruptcy Cases of Seller under sections 503(b) and 507(a)(1) of the Bankruptcy Code.

D.    Purchaser acknowledges and agrees that if Purchaser becomes entitled to receive any Break-Up Fee or Expense Reimbursement, then such Break-Up Fee and/or Expense Reimbursement will be the sole and exclusive remedy of the Buyer, whether at law or in equity, for any breach by Seller or any of its Affiliate of the terms and conditions of this Agreement.

10.    **TERMINATION**.

10.1    **Termination as to Specific Assets**.  If, after the date of this Agreement and prior to the passage of title and risk of loss to any Acquired Asset, (x) any Acquired Asset is lost, damaged or destroyed by any cause whatsoever (excluding ordinary wear and tear and damage caused by the acts or omissions of Purchaser or its agents or employees), and (y) such loss, damage or destruction does not constitute a Material Adverse Effect, this Agreement shall terminate with respect to the affected Acquired Asset, and an appropriate adjustment will be made to the Purchase Price by the Parties.

10.2    **General Termination**.  This Agreement may be terminated at any time prior to the Closing:

A.    by mutual written consent;

B.    by either Party, if Seller consummates an Alternative Transaction according to the terms of this Agreement;

C.    by either Party, provided that the terminating Party is not then in breach of its obligations under this Agreement, if the Bankruptcy Court has not entered the Sale Approval Order, on or before May 23, 2008; and such Sale Approval Order, as of May 23, 2008, is not subject to stay or injunction;

D.    by either Party, provided that the terminating Party is not then in default of its obligations under this Agreement, if the Closing shall not have occurred for any reason within sixty (60) days after entry of the Sale Approval Order that is not subject to a stay or injunction; or

E.    by either Party, if a Material Adverse Effect occurs, but only by a Party that is not then in breach of this Agreement.

10.3    **Termination By Seller**.  This Agreement may be terminated by Seller at any time prior to the Closing if Purchaser materially fails to perform any of its covenants or obligations under this Agreement or materially breaches any representation or warranty under this Agreement, in each case which breach has not been cured within thirty (30) days following receipt by Purchaser from Seller notice of such breach.

10.4    **Termination By Purchaser**.  This Agreement may be terminated by Purchaser at any time prior to the Closing if Seller materially fails to perform any of its covenants or obligations under this Agreement or materially breaches any representation or warranty under this Agreement, in each case which breach has not been cured within thirty (30) days following receipt by Seller from Purchaser of notice of such breach.

10.5    **Effect of Termination**.  If this Agreement is terminated in accordance with Section 10.2, 10.3 or 10.4, this Agreement shall become void and of no further force and effect (subject to the provisions of this Article 10) and the transactions contemplated by this Agreement shall be abandoned, without further action by any party.  If this Agreement is terminated and the transactions contemplated by this Agreement are abandoned as provided herein:

A.    Purchaser will (i) return and deliver to Seller all Process Documents and (ii) destroy (and certify to the destruction of) all other documents, work papers and other material of Seller relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; provided, however, that Purchaser shall not be required to return or destroy any material stored electronically that is not capable of return or destruction without commercially unreasonable efforts;

B.    The provisions of the Nondisclosure Agreement will continue in full force and effect; and

C.    The following sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: (i) Article 10 (Termination); and (ii) Sections 2.3 (Deposit Amount), 9.3 (Breakup Fee; Expense Reimbursement), 12.1 (Notices), 12.4 (Entire Agreement), 12.5 (Waiver), 12.8 (Expenses), 12.12 (Governing Law), 12.13 (Public Announcements), 12.15 (Venue and Jurisdiction) and 12.24 (Jury Trial Waiver); and (iii) all related definitional provisions.

D.    No party to this Agreement will have any Liability under this Agreement to any other except:  (i) that nothing herein will relieve any party from any Liability (other than for special, incidental, punitive, exemplary or consequential damages and lost profits) for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination; and (ii) as contemplated by Section 10.5.C above.

## 11.    **INDEMNIFICATION**.

11.1    **Survival**.  The representations and warranties of the Seller in this Agreement shall survive the Closing for a period of ninety (90) days, except that the representation in Section 5.1.B shall survive the Closing for a period of one (1) year.  The representations and warranties of the Purchaser in this Agreement shall survive the Closing for a period of ninety (90) days, except that the representation in Section 5.2.B shall survive the Closing for a period of one (1) year and the representation in Section 5.2.F shall survive indefinitely.  Purchaser's covenant in Section 8.3 shall survive until 11:59 p.m. October 12, 2011.  If written notice asserting any bona fide claim for indemnification under this Article 11 shall have been given within the applicable survival period, the representations and warranties that are the subject of such claim shall survive until such claim is fully and finally resolved.  The covenants and agreements of the Parties in this Agreement and each Ancillary Agreement, and to the right to assert a claim under this Article 11 with respect to any such covenants or agreements, shall survive the Closing in accordance with the terms of such covenants and agreements.

11.2    **Seller's Agreement to Indemnify**.  If the Closing occurs and Purchaser makes a written claim for indemnification against Seller in accordance with the procedures set forth in this Article 11, then, from and after the Closing, Seller agrees to indemnify and hold harmless the Purchaser Indemnified Parties from and against all Losses (collectively, the "**Purchaser Damages**") suffered or incurred by the Purchaser Indemnified Parties arising out of, resulting from or relating to:  (i) the Retained Liabilities; (ii) the Excluded Assets; (iii) a breach of any representation or warranty of Seller contained in this Agreement; (iv) a material breach of any covenant to be performed by Seller under this Agreement; or (v) without limiting clause (i), the Pre-Closing Product Liabilities.

11.3    **Purchaser's Agreement to Indemnify**.  If the Closing occurs and Seller makes a written claim for indemnification against Purchaser in accordance with the procedures set forth in this Article 11, then, from and after the Closing, Purchaser shall indemnify and hold harmless the Seller Indemnified Parties from and against all Losses (collectively, the "**Seller Damages**") incurred by the Seller Indemnified Parties arising out of, resulting from or relating to:  (i) a breach of any representation or warranty of Purchaser contained in this Agreement; (ii) a material breach of any covenant (other than Purchaser's covenant under Section 8.3 of this Agreement) to be performed by Purchaser under this Agreement; (iii) a breach of Purchaser's covenant under Section 8.3 of this Agreement; or (iv) Purchaser's use or operation of any of the Acquired Assets after the Closing, unless such matters are of a nature also subject to indemnification pursuant to Section 11.2 above.

11.4    **Limitations on Agreements to Indemnify**.  The obligations of each Party to provide indemnification pursuant to this Article 11 are subject to the following limitations:

A.    Each Party agrees that, from and after the Closing, the indemnification provided in this Article 11 is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement; provided, however, that nothing in this Agreement shall limit the right of a Party to seek specific performance of this Agreement

or otherwise seek any equitable remedy or any remedy for fraud, willful misconduct or gross negligence.

B.      In calculating amounts payable to an Indemnitee, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty, covenant or agreement included herein.

C.      Notwithstanding any other provision of this Agreement, in no event shall an Indemnitee be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the case may be, were attributable to the Indemnitee 's own intentional wrongdoing, gross negligence, or willful misconduct.

D.      Seller shall not have any liability pursuant to Section 11.2(iii) unless and until the aggregate amount of Losses incurred or suffered by the Purchaser Indemnified Parties for which they are entitled to indemnification pursuant to Section 11.2(iii) exceeds Three Hundred Thousand Dollars ($300,000) (the "**Basket**"), but in the event such Losses exceed the Basket, Seller shall be liable and responsible to the Purchaser Indemnified Parties for the full amount of such Losses, without reduction for the Basket.  Purchaser shall not have any liability pursuant to Section 11.3(i) unless and until the aggregate amount of all Losses incurred or suffered by the Seller Indemnified Parties for which they are entitled to indemnification pursuant to Section 11.3(i) exceeds the Basket, but in the event such Losses exceed the Basket, Purchaser shall be liable and responsible to the Seller Indemnified Parties for the full amount of such Losses, without reduction for the Basket.

E.      In no event shall Seller's aggregate liability pursuant to Section 11.2(iii) for Losses incurred or suffered by the Purchaser Indemnified Parties (other than with respect to any breach of or inaccuracy in any of the made by Seller) exceed the sum of One Million Two Hundred Thousand Dollars ($1,200,000).  In no event shall Purchaser's' aggregate liability pursuant to Section 11.3(i) for Losses incurred or suffered by the Seller Indemnified Parties exceed the sum of One Million Two Hundred Thousand Dollars ($1,200,000).

F.      Notwithstanding anything to the contrary contained in this Agreement or in any Ancillary Agreement, nothing shall be deemed to limit any Party's rights to recover any or all Losses incurred or suffered by it relating to or arising out of or in connection with fraud, willful misconduct, gross negligence or intentional misrepresentation.

G.      For purposes of this Article 11, the representations and warranties described in this Agreement, any Ancillary Agreement or any certificate or other instrument delivered by any Party pursuant to this Agreement shall be deemed to have been made without any qualifications as to materiality and, accordingly, for such purposes, all references therein to "material", "in all material respects", "Material Adverse Effect" and similar qualifications as to materiality shall be deemed to be deleted therefrom (except where any such provision requires disclosure of lists of items of a material nature or above a specified threshold).

11.5    **Claims**.

A.      Claims.  As soon as is reasonably practicable after becoming aware of a claim for indemnification under this Agreement not involving a claim (or the commencement of any Proceeding) of the type described in Section 11.5.B, the Indemnitee shall give notice to the Indemnitor of such claim; provided, that the failure of the Indemnitee to give such notice shall not relieve the Indemnitor of its obligations under this Article 11 except to the extent (if any) that the Indemnitor shall have been prejudiced thereby.  Any written notice delivered by an

Indemnitee to an Indemnitee seeking indemnification pursuant to this Agreement shall set forth, with as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such Indemnitee.  If the Indemnitor does not object in writing to such indemnification claim within thirty (30) days of receiving notice thereof, the Indemnitee shall be entitled to recover promptly from the Indemnitor and the Indemnitor shall promptly pay to the Indemnitee the full amount of such claim (but such recovery shall not limit the amount of any additional indemnification to which the Indemnitee may be entitled pursuant to this Article 11), and no later objection by the Indemnitor shall be permitted with respect thereto.  If within such thirty (30) day period the Indemnitor agrees that it has an indemnification obligation but objects that it is obligated to pay only a lesser amount, the Indemnitee shall nevertheless be entitled to recover from the Indemnitor and the Indemnitor shall promptly pay to the Indemnitee the lesser amount, without prejudice to the Indemnitee's claim for the difference.

B.    Third Party Indemnification.  The obligations of any Indemnitor to indemnify any Indemnitee under Article 11 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of Liability by an unaffiliated third party (including a Governmental Authority) (a "**Third Party Claim**"), shall be subject to the following terms and conditions:

(i)    The Indemnitee shall give notice as promptly as is reasonably practicable to the Indemnitor of the assertion of a Third Party Claim in respect of which indemnity may be sought under this Agreement; provided, that the failure of the Indemnitee to give notice shall not relieve the Indemnitor of its obligations under this Article 11 except to the extent (if any) that the Indemnitor shall have been prejudiced thereby.  The notice shall be in the form contemplated by Section 11.5.A.

(ii)    The Indemnitor may, at its own expense, (a) participate in the defense of any such Third Party Claim and (b) upon notice to the Indemnitee and the Indemnitor's delivering to the Indemnitee a written agreement that the Indemnitee is entitled to indemnification pursuant to Article 11 for all Losses arising out of such Third Party Claim and that the Indemnitor shall be liable for the entire amount of such Losses, at any time during the course of any such Third Party Claim assume the defense thereof; provided, that (x) the Indemnitor shall provide written evidence reasonably satisfactory to the Indemnitee demonstrating that the Indemnitor has a sufficient amount of assets for purposes of such assumption of defense, (y) the Indemnitor's counsel is reasonably satisfactory to the Indemnitee and (z) the Indemnitor shall thereafter consult with the Indemnitee upon the Indemnitee's reasonable request for such consultation from time to time with respect to such Third Party Claim.  If the Indemnitor assumes such defense, the Indemnitee shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own cost and expense, separate from the counsel employed by the Indemnitor.

(iii)    Notwithstanding anything to the contrary contained herein, the Indemnitor shall not be entitled to assume the defense of, defend, compromise and settle any Third Party Claim in the name of the Indemnitee (and the reasonable fees and expenses of the Indemnitee's separate counsel shall be borne by the Indemnitor) if (a) the Indemnitee shall have determined in good faith

that an actual or potential conflict of interest makes representation of the Indemnitee and Indemnitor by the same counsel or the counsel selected by the Indemnitor inappropriate, (b) the Third Party Claim is a criminal Proceeding, (c) in the case of a Purchaser Indemnified Party, the Indemnitee reasonably believes an adverse determination (or adverse actions to be taken by or on behalf of the Indemnitee) with respect to the Third Party Claim would be detrimental to or injure the reputation of the Business such that the Business would lose a significant amount of future revenues, (d) the Third Party Claim seeks an injunction or other equitable or non-monetary relief, (e) the Indemnitor failed or is failing to vigorously defend the Third Party Claim (or prosecute any related counterclaim), or (f) the Indemnitor shall have authorized the Indemnitee to employ separate counsel at the Indemnitor's expense.

(iv)    If the Indemnitor is not defending any Third Party Claim of which it has received notice as contemplated hereby, the Indemnitee shall have the right, in addition to any other right or remedy it may have hereunder, at the Indemnitor's expense, to defend such Third Party Claim; provided, however, that: (a) the Indemnitee shall not have any obligation to participate in the defense of, or defend, any such claim; and (b) the Indemnitee's defense of or participation in the defense of any such claim shall not in any way diminish or lessen the obligations of the Indemnitor under this Article 11.

(v)    Whether or not the Indemnitor chooses to defend or contest any Third Party Claim, upon the request of the Indemnitee, the Indemnitor shall provide reasonable cooperation to the Indemnitee with respect thereto. Anything in this Article 11 to the contrary notwithstanding, with respect to any Third Party Claim: (a) the Indemnitee shall not settle or compromise any Proceeding, or consent to the entry of any judgment, without the prior written consent of the Indemnitor, which consent shall not be unreasonably withheld, conditioned or delayed; and (b) the Indemnitor shall not settle or compromise any Proceeding, or consent to the entry of any judgment, without the prior written consent of the Indemnitee, unless the relief (x) consists solely of money damages (all of which the Indemnitor shall pay), (y) includes a provision whereby the plaintiff or claimant in the matter releases the Indemnitee from all Liability with respect thereto and (z) includes a provision whereby the plaintiff or claimant in the matter is prohibited from disclosing publicly any information regarding the Third Party Claim or such relief without the Indemnitee's prior written consent.

11.6    **Treatments of Payments**.    Any amounts payable under Article 11 shall be treated by Purchaser and Seller as an adjustment to the Purchase Price.

## 12.    **MISCELLANEOUS**.

12.1    **Notices**.

All notices, requests, consents or other communications permitted or required under this Agreement will be in writing and will be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first Business Day after sent by reputable overnight carrier, or on the third Business Day after sent by registered or certified first class mail (with receipt confirmed), to the following:

Execution Copy

| If to Seller: | DELPHI AUTOMOTIVE SYSTEMS LLC<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:<br>Fax No.: |
| --- | --- |
| With a copy to: | DELPHI AUTOMOTIVE SYSTEMS LLC<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:   Deputy General Counsel - Transactional and Restructuring<br>Fax No.: 248-813-2491 |
| If to Purchaser: | TENNECO AUTOMOTIVE OPERATING COMPANY INC.<br>c/o Tenneco Inc.<br>500 North Field Drive<br>Lake Forest, Illinois 60045<br>Attn:   General Counsel<br>Fax No.:  847-482-5040 |
| With a copy to: | MAYER BROWN LLP<br>71 S. Wacker Drive<br>Chicago, Illinois 60606<br>Attn:   Jodi A. Simala<br>Fax No.: 312-701-7711 |

provided, however, if a Party will have designated a different addressee by notice, then to the last addressee so designated.

12.2   **Bulk Sales Laws**.

Seller and Purchaser hereby waive compliance by Seller with the provisions of the bulk sales Law of any state or foreign jurisdiction.

12.3   **Assignment**.

This Agreement will be binding on and inure to the benefit of the successors and assigns of each of the Parties, but no rights, obligations, duties or liabilities of any Party may be assigned by that Party without the prior written consent of the other, which consent will not be unreasonably withheld; provided, however, Purchaser may assign this Agreement to any Affiliate of Purchaser or to any Person who is acquiring all or substantially all of the Acquired Assets, but such assignment will not relieve Purchaser of any of its obligations under this Agreement or the Transition Services Agreement.

12.4   **Entire Agreement**.

This Agreement, together with the Ancillary Agreements and any environmental access agreement between the Parties or their Affiliates, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein.  This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

41

12.5    **Waiver**.

Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement:  (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, either of the Parties may:  (a) extend the time for the performance of any of the obligations or other acts of the other Party hereto; (b) waive any breaches of or inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto; and (c) waive compliance by the other Party with any of the agreements or conditions contained herein.  Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.  The failure of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

12.6    **Severability**.

The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions herein.  Should any provision, or any portion thereof, of this Agreement, or the application thereof to any Person or any circumstance, for any reason be held invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (ii) such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to Persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

12.7    **Amendment**.

This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties

12.8    **Expenses**.

Except as provided in <u>Section 9.3</u>, each Party will be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

12.9    **Third Parties**.

Nothing contained in this Agreement, express or implied, is intended to or will be construed to confer upon or give to any Person (other than the Parties and their Affiliates, and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

12.10    **Headings**.

The headings contained in this Agreement are inserted for convenience only and will not be deemed to constitute a part of this Agreement.

12.11  **Counterparts**.

More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart will be deemed an original.

12.12  **Governing Law**.

This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without giving effect to the principles of conflicts of law thereof and, to the extent applicable, the Bankruptcy Code.

12.13  **Public Announcements**.

Seller may inform its employees, customers, suppliers and/or any of the constituents in the Bankruptcy Cases (including the IUE-CWE, the unsecured creditors committee, the equity committee, ad hoc committees and the plan investors and other stakeholders and GM) of the substance of this Agreement.  Seller and Purchase will consult with each other before issuing any press releases or other public statements with respect to this Agreement or the transactions contemplated hereby, and will not issue any press release or other public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

12.14  **Sales or Transfer Taxes**.

All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets will be paid by Purchaser.

12.15  **Venue and Jurisdiction**.

A.      Purchaser and Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement, any Ancillary Agreement, and the transactions contemplated hereby or thereby, and agree not to commence any litigation relating thereto except in the Bankruptcy Court.

12.16  **Risk of Loss**.

Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets will be borne exclusively by Seller.

12.17  **Enforcement of Agreement**.

The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that each of the Parties will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement by the other Party (without the requirement to post bond or other security or demonstrate injury) and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at Law or in equity.

12.18  **Dispute Resolution**.

Except with respect to matters covered by <u>Section 2.2</u> Seller and Purchaser will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Ancillary Agreement by good faith negotiations by senior management of each Party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute.  Within fifteen (15) Business Days after receipt of the Notice, the receiving Party (the "**Defending Party**") will submit to the other a written response.  The Notice and the response will include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the Parties.  Within fifteen (15) Business Days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly.  All negotiations pursuant to this <u>Section 12.18</u> are confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.  In any case, except as otherwise provided above, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to <u>Section 12.15</u> above.

12.19  **Further Assurances**.

If at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as the other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

12.20  **No Right of Setoff**.

Neither Party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Party to the other Party hereto or any of such other Party's Affiliates.

12.21  **Dollar Amounts**.

All amounts referenced in this Agreement are in US dollars.

12.22  **Bankruptcy Court Approval**.

Notwithstanding anything to the contrary herein, Seller's obligations under <u>Section 9.3</u> are expressly subject to the entry of the Bidding Procedures Order.  All other obligations of Seller hereunder are subject to the entry of the Sale Approval Order.

12.23  **Miscellaneous Definitional Provisions**.

A.    For purposes of this Agreement, whenever the context requires:  the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine

and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include masculine and feminine genders.

B.    The Parties hereby agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

C.    As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

D.    Terms, other than those defined or referenced in the Section hereof entitled Definitions, may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have the specified meaning throughout this Agreement.

E.    The words "hereof", "herein", "hereby", and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

F.    References to an article or section, or an exhibit or schedule, are (unless otherwise stated) references to an article or section of, or any exhibit or schedule to, this Agreement.

G.    Except as otherwise expressly provided herein, reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

H.    All accounting terms not specifically defined herein shall be construed in accordance with United States generally accepted accounting principles.

12.24   **Jury Trial Waiver**.

**THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED.  THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS.  NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED.**

**[the remainder of this page is intentionally left blank]**

**IN WITNESS WHEREOF**, the Parties have caused this Asset Purchase Agreement to be executed by their duly authorized officers.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By: _____ /s/ _____

Print Name: _____

Its: _____


**TENNECO AUTOMOTIVE OPERATING COMPANY INC.**

By: _____ /s/ _____

Print Name: _____

Its: _____

Execution Copy

## List of Schedules and Exhibits

| Designation | Description |
| --- | --- |
| Schedule A | Machinery & Equipment |
| Schedule B | Inventory |
| Schedule C | Other Personal Property |
| Schedule D | One Time Buys and Special Build Ups |
| Schedule 1.2.A | Third Party Assets |
| Schedule 1.2.I | Other Excluded Assets |
| Schedule 1.8 | Process Documents |
| Schedule 3.1 | Salaried Employees and Severance Costs |
| Schedule 3.1.A | Employee Severance Amounts |
| Schedule 3.2 | Transferred Hourly Employee Data |
| Schedule 4A | Certain Seller Salaried Employees |
| Schedule 4B | Top Mount Supply Components |
| Schedule 5.1.H(i) | Inventory in Other Locations |
| Schedule 5.1.E(i) | Employees |
| Schedule 5.1.E(iii) | Labor Matters |
| Schedule 5.1.E(iv) | EEOC, etc. Complaints |
| Schedule 5.1.E(v) | Work Stoppages |
| Schedule 8.1.B | Operations Pending Closing |
| Exhibit A | Form of Kettering Lease Agreement |
| Exhibit 2.3 | Form of Deposit Escrow Agreement |

**Exhibit A**

**Form Of Kettering Lease Agreement**

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made and entered into to be effective as of the [_____] day of [_____], 2008, by and between DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, whose address is 5725 Delphi Drive, Troy, Michigan 48098 ("Landlord"), and TENNECO AUTOMOTIVE OPERATING COMPANY INC., a Delaware corporation, whose address is 500 North Field Drive, Lake Forest, Illinois 60045 ("Tenant").

W I T N E S S E T H:

ARTICLE 1

GRANT AND TERM

Section 1.01.  The Leased Premises.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord those certain premises consisting of approximately nine hundred thirty thousand nine hundred thirty-two (930,932) square feet as depicted on Exhibit A, attached hereto and made a part hereof (the "Leased Premises").  The Leased Premises are located in a certain building consisting of approximately two million two hundred twenty-three thousand ninety-four (2,223,094) square feet located at 2000 Forrer Boulevard, Kettering, Ohio (the "Building"), which Building has been constructed on certain land (the "Land"; the Building, other buildings and improvements on the Land, and Land are collectively referred to as the "Property").  A site plan of the Property is attached hereto as Exhibit A.  Notwithstanding anything herein contained to the contrary, Buildings 9 and 10 and Plant 16, as shown on Exhibit A shall not constitute a portion of the Leased Premises or the Building for any purpose of this Lease, and, subject to Article 14, Landlord, at its option, may elect to demolish Buildings 9 and 10 and Plant 16.

Section 1.02.  Initial Term.  The initial term of this Lease (the "Initial Term") shall commence on [_____], 2008 (the "Commencement Date") and continuing for a period of eighty-four (84) months, shall expire on [_____], 2015, unless sooner extended or terminated as herein provided.  The Initial Term and the Option Term(s), as hereinafter defined, are hereinafter sometimes referred to as the "Term" and/or "Lease Term".

Section 1.03.  Option Terms.

1.03.A.    Provided Tenant is not in default hereunder at the time of its exercise or at the time of commencement of the applicable option term, after notice and the expiration of any applicable cure period provided for herein, Tenant shall have the right to extend the Initial Term of this Lease upon the same terms, covenants and conditions as are set forth herein, except as to the amount of Base Rent, for four (4) additional periods of five (5) Lease Years each (each being an "Option Term").  Tenant shall exercise its right to extend the term of this Lease by giving Landlord written notice at least six (6) months prior to the expiration of the Initial Term or the applicable Option Term, as the case may be.  In the event Tenant fails to properly exercise any option to extend the term hereof, then all remaining options shall cease and terminate and be of no further force and effect.  The Base Rent which Tenant shall pay during each Option Term shall be adjusted to the then prevailing fair market rental for similar

1

properties, such fair market rental to be determined in accordance with Section 1.03.B hereof; provided, however, that in no event shall the Base Rent during each Option Term be less than the Base Rent applicable upon the expiration of the previous Term of this Lease.

1.03.B.    In the event Tenant shall exercise its right to so extend the term of this Lease in accordance with Section 1.03A hereof, the Base Rent for each such Option Term shall be the prevailing market rent for comparable premises in the Kettering area, determined in accordance with this Section 1.03B.

i.    Within twenty (20) business days after the exercise by Tenant of such right to extend the Term for such Option Term, Landlord shall submit to Tenant Landlord's determination of the Base Rent for the Leased Premises for such Option Term. If Tenant does not notify Landlord of its acceptance of such Base Rent as so determined by Landlord within ten (10) business days after receipt thereof, then the parties shall proceed as provided in Paragraph (ii) below.

ii.    Within five (5) business days after said ten (10) business day period, Landlord and Tenant shall each simultaneously submit to the other in a sealed envelope its suggested annual Base Rent for such Option Term, which rental shall be Landlord's and Tenant's respective good faith opinions as to the amount of the prevailing market Base Rent for the Leased Premises. If the higher of such suggested rentals is not more than one hundred five percent (105%) of the lower of such suggested rentals for each year of such Option Term, then the average of the two suggested rentals shall be the Base Rent for such Option Term; provided, however, in no event shall the Base Rent during the Option Term be less than the Base Rent applicable upon the expiration of the previous Term of the Lease. Otherwise, Landlord and Tenant shall negotiate in good faith to agree upon the Base Rent for such Option Term, and if Landlord and Tenant are unable to agree within five (5) business days, the determination of the Base Rent shall be made in accordance with Paragraph (iii) below.

iii.    Within ten (10) business days after the expiration of the ten (10) business day period referred to in Paragraph (ii) above, Landlord and Tenant shall mutually select an MAI appraiser with experience in real estate activities, including at least five (5) years of current experience in appraising comparable facilities in the Kettering area. If the parties cannot agree on such an appraiser, then within five (5) business days thereafter, each shall select an independent MAI appraiser meeting the aforementioned criteria and within five (5) business days thereafter the two appointed appraisers shall select a third neutral appraiser meeting the aforementioned criteria and the third appraiser shall determine the Base Rent for such Option Term in accordance with Paragraph (iv) below. If either Landlord or Tenant shall fail to make such appointment within said ten (10) business day period, the other shall make such appointment on its behalf.

iv.    Once the appraiser or third appraiser has been selected as provided in Paragraph (iii) above, each of Landlord and Tenant shall submit to such appraiser its suggested Base Rent as submitted to the other party pursuant to Paragraph (ii) above. As soon thereafter as practical, but in no event more than thirty (30) days after such selection, the appraiser shall select one of the two suggested Base Rents submitted by Landlord and Tenant that is closer to the one determined by such appraiser. The Base Rent so selected by the appraiser shall be binding on Landlord and Tenant. Landlord and Tenant shall equally share the cost of such appraisal.

2

Section 1.04.    Complete Separation of Leased Premises; Separation of Utilities.

1.04.A.    Subject to Section 19.01, no later than September 30, 2009, Tenant, at its sole cost and expense, shall completely separate the portion of the Building shown on Exhibit A (the "Remaining Premises"), including the separation of utilities serving the Leased Premises (the "Complete Separation") from all or portions of Plants 11, 17, and 18 (such portions of Plants 11, 17 and 18 hereinafter referred to as the "Separated Premises") by construction of a new permanent exterior wall.  The new exterior wall must be of at least as high a quality and of consistent design and color with the existing wall on Plants 12 and 14.  All work contemplated by this Section 1.04.A shall be done by Tenant (i) in compliance with all Laws (as defined below in Section 3.01), (ii) in accordance with plans and specifications to be reasonably approved by Landlord, and (iii) in a good and workmanlike manner.  Tenant shall provide to Landlord plans and specifications for the Complete Separation within sixty (60) days of the Commencement Date. After the Complete Separation, the Separated Premises shall no longer be deemed to be a part of the "Building" or the "Property" for purposes of this Lease.  Tenant shall have no responsibility for the repair, maintenance, replacement and/or security of the Separated Premises or to insure the Separated Premises, other than any damages caused by the negligence or intentional conduct of Tenant or Tenant's agents, employees or invitees. Landlord at its option will sever the utilities to Buildings 9 and 10 and Plant 16.

1.04.B.    Intentionally omitted.

1.04.C.    Landlord and Tenant acknowledge that, as of the Commencement Date, the utilities serving the Leased Premises will also serve Buildings 9 and 10 and Plant 16, and Landlord, at its option and sole cost and expense, may separate all utilities serving Buildings 9 and 10 and Plant 16 from those serving the Leased Premises at any time during the Term.   In the event Landlord determines to separate such utilities, Landlord may (within a reasonable time thereafter) perform the separation of such utilities provided that such performance is (i) in compliance with all Laws, and (ii) in a good and workmanlike manner. Landlord will use reasonable efforts, in light of the then-existing circumstances, so that such separation of utilities shall not unreasonably interfere with or disrupt Tenant's operations at the Leased Premises.

1.04.D.    Landlord acknowledges that Tenant intends after the 2007-2008 heating season, to discontinue and disconnect the steam heating system currently serving the Building and also acknowledges that this heat is the sole source of heat for the Separated Premises, Buildings 9 and 10 and Plant 16.  Notwithstanding anything to the contrary contained herein, Tenant shall have no obligation to provide steam heat to the Buildings 9 and 10 or Plant 16 after the 2007-2008 heating season.  Tenant must provide sufficient heat to the Separated Premises to keep it in "warm shutdown" until Completed Separation of the Separated Premises from the Remaining Premises is completed.

Section 1.05.    Non-Exclusive Right to Use Parking Areas and Drives.    Subject to Tenant's exclusive right to utilize the facilities in the "Tenneco Lease Area" shown on Exhibit A hereto, Tenant is to have the nonexclusive right and easement to use the employee car parking area, yard and driveway areas, and all other common areas, if any, which may from time to time be furnished by Landlord in common with Landlord and any other tenants or occupants, their agents, employees, customers, guests, invitees, licensees, assignees, subtenants and legal representatives of the Property.

Section 1.06.  <u>Landlord Use of Buildings 9 and 10 and Plant 16</u>.  During the period that Landlord occupies Buildings 9 and 10 and Plant 16, Tenant acknowledges that Landlord shall use the areas of the Property described on <u>Exhibit C</u>.

Section 1.07.  <u>Removal and Installation of Machinery and Equipment</u>.

1.07.A. In accordance with the timeline set forth on <u>Exhibit D</u> attached hereto, Landlord, at its sole cost and expense, shall decommission and remove from the Leased Premises the machinery, equipment and other items of personal property described on <u>Exhibit D</u> (the "<u>Delphi Equipment</u>").  Landlord shall decommission and remove the Delphi Equipment (i) in compliance with all Laws, (ii) with due care, and (iii) in a good and workmanlike manner.  Landlord will use reasonable efforts, in light of the then-existing circumstances, so that such removal of the Delphi Equipment shall not unreasonably interfere with or disrupt Tenant's operations at the Leased Premises.  Landlord shall be responsible for any injury or damage that arises as a result of its decommissioning or removal of such equipment.  Except for any Landlord breach or failure which causes an emergency, health or safety situation, Landlord shall in no event be charged with default in the performance of any of its obligations set forth in this <u>Section 1.07A</u> unless and until Landlord shall have failed to perform such obligations within thirty (30) days after notice has been given by Tenant to Landlord specifying wherein Landlord has failed to perform any such obligation; provided, so long as Landlord has commenced the cure within such thirty (30) day period and diligently pursues the same, the cure period shall be extended for such period as may reasonably be required to cure the default, up to but not exceeding, sixty (60) days following Tenant's original notice of default (a "<u>Landlord Event of Default</u>").  In the event of a Landlord Event of Default or breach or failure which causes an emergency, health or safety situation, Tenant, at its option, without further notice or demand, shall have the right, in addition to any other rights and remedies provided at law or in equity or elsewhere herein, to remedy such default or breach and deduct the costs thereof from the installments of Rent next falling due.  Nothing herein contained shall relieve Landlord from its obligations hereunder, be construed to waive any claim by Tenant for damages or other relief, or obligate Tenant to perform Landlord's obligations.

1.07.B. Pursuant to that certain Asset Purchase Agreement by and between Landlord and Tenant dated March 7, 2008 (the "<u>Purchase Agreement</u>"), Tenant has agreed to purchase certain machinery, equipment and other items of personal property from Landlord, certain items of which are described on <u>Exhibit E</u> attached hereto (the "<u>Tenneco Equipment</u>") and are located in the Separated Premises.  By July 15, 2008, Tenant, at its sole cost and expense, shall cause the Tenneco Equipment to be decommissioned and removed from the Separated Premises.  Tenant shall decommission and remove the Tenneco Equipment (i) in compliance with all Laws, (ii) with due care, and (iii) in a good and workmanlike manner.  Tenant shall be responsible for any injury or damage that arises as a result of its decommissioning or removal of such equipment.

Section 1.08.  <u>Demolition</u>.  Landlord plans to demolish and remove the Separated Premises (except for the slab) after the Complete Separation and Buildings 9 and 10 and Plant 16 (except for the slab) after Landlord ends its occupation of such buildings (the "<u>Demolition</u>").  Prior to the Demolition, Landlord shall provide plans for the Demolition (the "<u>Demolition Plans</u>") to Tenant.  Landlord and Tenant shall reasonably cooperate with each other in connection with Landlord's demolition of the Separated Premises and Tenant's obligations to complete the Complete Separation, in each case in order to provide for Tenant to maintain its occupancy permits for the Leased Premises.  Landlord shall perform Demolition (i) in compliance with all Laws, (ii) with due care, (iii) in a good and workmanlike manner, (iv) , and (v) without damage to

4

the Tenneco Equipment or the Leased Premises.  Landlord will use reasonable efforts, in light of the then-existing circumstances, so that the Demolition shall not unreasonably interfere with or disrupt Tenant's operations at the Leased Premises.

Section 1.09.  "As Is" Condition of the Leased Premises.  Tenant acknowledges that on the Commencement Date it shall have had the opportunity to make such investigations and inspections of the Leased Premises which it deems necessary to determine whether the Leased Premises are in satisfactory condition and suitable for its intended use.  Subject to Section 1.07, Section 1.08, Section 16.04, and Article 17 hereof, Tenant acknowledges that Landlord has made no warranties or representations of any kind with regard to the condition of the Leased Premises, including all heating, ventilating and air conditioning systems (the "HVAC Systems"), water, sanitary sewer, storm sewer, plumbing, electrical and gas systems, any utilities, the roof, the building structure, windows, doors, partitions, driveways, parking areas, loading docks and facilities, landscaping or any other non-environmental conditions affecting the Property or the Leased Premises.  Tenant further acknowledges that, subject to Section 1.06, Section 1.07 and Article 17, it is leasing the Leased Premises in its "As Is" condition, and that the Leased Premises are in the condition required under this Lease.

Section 1.10.  Separation of Property.   At any time during the Term, at Landlord's option, Landlord may segregate the portion of the Property north of Plant 12 from the remainder of the Property as set forth on the attached Exhibit B effective as of any day chosen by Landlord during the Term hereof; provided (i) Landlord gives Tenant prior written notice of the segregation and (ii) Landlord builds a demising fence separating the Property.  After completion of the fence pursuant to this Section, the portion of the property north of the fence (the "**North Property**") shall no longer be part of the Property, Tenant shall have no access right to the North Property and Tenant shall have no responsibility for the repair, maintenance, replacement and/or security or to insure the North Property, other than damages caused by the negligence or intentional misconduct of Tenant or Tenant's agents, employees or invitees.

ARTICLE 2

RENT

Section 2.01.  Base Rent.  The fixed annual base rent ("Base Rent") to be paid by Tenant during the Initial Term shall be as follows:

| Lease Year | Period | Cost per Ft$^2$ | Ft$^2$ Req'd | Annual Base Rent | Monthly Installments of Base Rent |
|---|---|---|---|---|---|
| 1 | 5-1-08 TO 4-30-09 | $0.00 | 930,932 | $0.00 | $0.00 |
| 2 | 5-1-09 TO 4-30-10 | $0.25 | 930,932 | $232,733.00 | $19,394.42 |
| 3 | 5-1-10 TO 4-30-11 | $0.50 | 930,932 | $465,466.00 | $38,788.83 |
| 4 | 5-1-11 TO 4-30-12 | $0.75 | 930,932 | $698,199.00 | $58,183.25 |
| 5 | 5-1-12 TO 4-30-13 | $1.00 | 930,932 | $930,932.00 | $77,577.67 |
| 6 | 5-1-13 TO 4-30-14 | $1.25 | 930,932 | $1,163,665.00 | $96,972.08 |
| 7 | 5-1-14 TO 4-30-15 | $1.50 | 930,932 | $1,396,398.00 | $116,366.50 |

5

| 7 & Beyond | 5-Year Extensions | Market | TBD | TBD | TBD |
|---|---|---|---|---|---|

Landlord and Tenant acknowledge and agree that for the purposes of calculating Base Rent for the Initial Term, the total square footage of the Leased Premises shall be equal to 930,932 square feet.    Base Rent during the Option Terms shall be the amounts provided in Section 1.03.B of this Lease.    Base Rent shall be payable in advance in equal consecutive monthly installments on the first (1st) day of each month following the month in which the Commencement Date shall occur.    Monthly installments of Base Rent shall be payable by Tenant at the office of Landlord or at such other place as Landlord may designate from time to time in writing, without any prior demand therefor and without any deductions or setoffs whatsoever, except as provided in Sections 2.04, 11.01, 11.02.B and 12.02.    If the Lease Term shall commence on a day other than the first (1st) day of a calendar month, or shall end on a day other than the last day of a calendar month, then any monthly Installment of Base Rent due for such a partial month shall be prorated.

Section 2.02.    Lease Year.    The term "Lease Year" as used herein shall mean the twelve (12) consecutive month period commencing on the Commencement Date and on each anniversary date thereof during the term of this Lease except that the last Lease Year shall end on the date this Lease expires or sooner terminates.

Section 2.03.    Additional Rent.    All amounts due from Tenant and payable to Landlord other than Base Rent, including, if applicable, taxes and assessments pursuant to Article 7 hereof and insurance premiums pursuant to Article 5 hereof, shall be deemed to be "Additional Rent".    Upon Tenant's failure to pay any such Additional Rent, Landlord, in addition to any other remedies, shall have the same remedies provided for Tenant's failure to pay the Base Rent. (The Base Rent and the Additional Rent, are herein collectively referred to as "Rent").    Tenant shall pay any and all sums of money or charges required to be paid by Tenant under this Lease promptly when the same are due, without any deduction, abatement or setoff whatsoever, except as herein provided.    All such amounts shall be deemed to be rent and Tenant's failure to pay any such amounts or charges when due shall carry with it the same consequences as Tenant's failure to pay Base Rent.

Section 2.04.    Abatement In Rent.    Notwithstanding anything herein contained to the contrary, in the event Tenant is unable to reasonably conduct its operations in the Leased Premises as a result of Landlord's demolition of improvements or Landlord's entry or other activities on or adjacent to the Property, all Rent shall abate for the period Tenant is unable to so reasonably conduct such operations, and if such interference effects only a portion of the Leased Premises, such abatement shall be on a prorata basis relating to the portion of the Leased Premises so affected.

ARTICLE 3

CONDUCT OF BUSINESS BY TENANT

Section 3.01.    Use of the Leased Premises.    Tenant covenants and agrees to use the Leased Premises only for general manufacturing, assembly, engineering and design, warehouse and distribution operations and for such other purposes as shall be incidental thereto.    Tenant shall obtain all necessary permits for the operation of its business within the

6

Leased Premises and shall also obtain a certificate of occupancy and all permits necessary in connection with any alterations or remodeling performed by Tenant.  Tenant will not use the Leased Premises for any purpose in violation of any Law.  Tenant shall not do or permit anything to be done in or about the Leased Premises, or bring anything therein, which will in any way conflict with any law, ordinance, statute, order, decree, rule, regulation, judgment or requirement enacted, promulgated, entered into, agreed or imposed by any governmental authority ("Law") affecting the occupancy or use of the Leased Premises or the Building which is or may hereafter be enacted or promulgated by any governmental authorities or use the Leased Premises for purposes other than the permitted uses set forth above.

Section 3.02.  Care of the Leased Premises.  Tenant shall not perform any acts or carry on any practices which may overload or otherwise materially and adversely affect the floors or structure of, or any machinery or equipment comprising the Building systems located in, the Building, damage or injure any portion of the Leased Premises, the Building or the Property, or constitute a nuisance or waste.  Subject to Landlord's obligations in Section 4.02, Tenant shall at all times keep the Leased Premises in an orderly, neat, lawful and safe condition comparable to the condition thereof on the Commencement Date.   Subject to Article 17 hereof and Landlord's obligations in Section 4.02 and except for matters relating to the Demolition, Tenant shall also promptly comply with all Laws of any governmental authority or insurer of the Leased Premises applicable to the Leased Premises and ensure the cleanliness, safety, and lawful occupancy and use of the Leased Premises, including any requirements under the Occupational Safety and Health Act, regardless of whether such Laws shall require any structural or non-structural alterations to the Leased Premises or shall be foreseen or unforeseen; provided, however, that if such compliance was necessitated by or the result solely of the actions of Landlord (or its agents, invitees or tenants (other than Tenant)) after the Commencement Date, Landlord shall promptly reimburse Tenant for Tenant's cost and expenses in connection with such compliance.  Tenant shall, at Tenant's expense, install and maintain such fire protection systems and fire extinguishers in the Building as may be required at any time by any agency having jurisdiction over the Leased Premises and the insurance underwriters insuring the Building.

ARTICLE 4

MAINTENANCE AND SIGNS

Section 4.01.  Tenant's Obligations for Maintenance.

4.01.A.        (i)        Except as set forth in Section 4.02 below as a Landlord obligation, Tenant at its own expense shall keep the Leased Premises in as good condition and repair as the same existed on the Commencement Date, reasonable wear and tear excluded, including, without limiting the generality of the foregoing, all plumbing, heating, air conditioning, ventilating, electrical, lighting facilities and equipment within the Leased Premises, and fixtures, interior walls, ceilings, roof, floors, subfloors, floor coverings, windows, doors, loading areas, load levelers, plate glass and skylights located within the Leased Premises, or used by Tenant in connection with Tenant's occupancy of the Leased Premises.  All replacements and major and material structural repairs by Tenant shall be made by contractors approved in writing by Landlord, which approval shall not be unreasonably withheld.

4.01.B.    (ii)  No later than September 30, 2009, Tenant shall construct a demising fence at Tenant's sole cost and expense to separate the Leased Premises from the

7

remainder of the Building.  Such fence shall be constructed in a good and workmanlike manner and in compliance with all Laws.  Subject to Article 17 hereof, Landlord and Tenant intend that Tenant shall be responsible for maintaining, repairing and, to the extent deemed necessary by Tenant, replacing all areas of the Property exterior to the Leased Premises (other than Buildings 9 and 10 and Plant 16 and during the period Landlord occupies Buildings 9 and 10 and Plant 16, the Delphi Parking Areas marked on <u>Exhibit C</u> ("**Delphi Parking Areas**") in order to keep the same in as good condition and repair as of the Commencement Date subject to normal wear and tear, including the Leased Premises, the remainder of the Building, sewers, utility lines, the parking areas, the driveways, fencing, landscaping, and making all structural repairs to the Building so that the entire Property is kept in a good, clean and safe condition, in accordance with all applicable Laws including security for the entire Property (herein referred to as the "Common Areas").  In the event Tenant does not perform any maintenance, repair or replacement work with respect to the Property as herein required, then Landlord shall have the right, but not the obligation, after notice to Tenant and Tenant's failure to cure as provided in <u>Section 13.04</u> hereof, to perform such work and Tenant shall reimburse Landlord for all reasonable costs and expenses of performing such work within thirty (30) days following Landlord's invoice therefor, which obligations shall survive the termination or expiration of this Lease.  Tenant has the nonexclusive right to enter upon the remainder of the Building to perform Tenant's obligations under this Section.

Section 4.02.  <u>Landlord's Obligations for Maintenance</u>.    Other than due to the negligence or intentional misconduct of Landlord or Landlord's agents, employees, or invitees, Tenant acknowledges that Landlord shall not be required to maintain, repair, rebuild, or replace all or any part of the Leased Premises, the Building, or the Property (other than Buildings 9 and 10 and Plant 16 and during the period Landlord occupies Buildings 9 and 10 and Plant 16, the Delphi Parking Areas).  Tenant expressly waives the benefit of any statute or regulation which would afford Tenant the right to make repairs at Landlord's expense because of Landlord's failure to keep the Leased Premises, the Building or the Property in good order, condition and repair.  Landlord shall not be liable to Tenant for injury or damage that may result from any defect in the construction or condition of the Leased Premises the Building or the Property, except if caused by the negligence or intentional misconduct of Landlord or Landlord's agents, employees, or invitees.  Notwithstanding anything contained herein to the contrary, after Complete Separation, but prior to the Demolition, Landlord shall maintain the Separated Premises in such a manner as to not unreasonably interfere with or disrupt Tenant's operations of the Leased Premises.

Section 4.03.  <u>Signs</u>.  Any sign placed or erected by Tenant on the grounds of the Property shall contain only Tenant's name, and shall not contain any advertising matter.  No such sign shall be erected until Tenant has obtained (i) any necessary governmental permits and approvals and (ii) Landlord's written approval of the location, material, size, design and content thereof and any necessary permit therefor, which approval shall not be unreasonably withheld.  Prior to termination of this Lease, Tenant shall remove any such sign and shall repair any damage to the Property caused by such removal.

Section 4.04.  <u>Compliance with Laws</u>.

4.04.A.    Excluding environmental matters, which are addressed exclusively in <u>Article 17</u> hereof, during the Term:  (i) Tenant shall comply with all Laws applicable to the Leased Premises and make any repairs, additions, modifications, or alterations to the Leased Premises and Common Areas, regardless of the nature thereof, which are required by any Law or reasonably required by any insurance carrier to maintain the insurance required under this

8

Lease.  Notwithstanding anything contained herein to the contrary, Tenant shall not be required to make any repairs, additions, modifications, or alterations to the Common Areas if such repairs, additions, modifications, or alterations to the Common Areas are necessitated by or the result of the negligence or intentional misconduct of Landlord (or its agents, invitees or tenants (other than Tenant)).

4.04.B.    With Landlord's prior written consent, which consent shall not be unreasonably withheld, Tenant shall have the right, but not the obligation, to contest by appropriate legal proceedings diligently conducted in good faith, in the name of Tenant, or Landlord (if legally required), or both (if legally required), without cost or expense to Landlord, the validity or application of any Laws of the nature, to be complied with by Tenant under the terms of this Lease, and, if by the terms of any such Law compliance therewith may legally be delayed pending the prosecution of any such proceeding, Tenant may delay such compliance therewith until the final determination of such proceeding.

4.04.C.    Within thirty (30) days after receipt of the same from Tenant, Landlord agrees to execute and deliver any appropriate papers or other instruments which may be necessary or proper to permit Tenant to contest the validity or application of any such Law and to reasonably cooperate with Tenant in such contest.

ARTICLE 5

INSURANCE AND INDEMNIFICATION

Section 5.01.  Tenant Insurance.  Tenant shall obtain and maintain consistent with the provisions of this Lease, at its sole expense, the following types of insurance coverage, to remain in force during the term of this Lease, with minimum limits as set forth below:

5.01.A.    "All risk" or "special form" insurance coverage protecting against physical damage to the extent of 100% of the replacement cost of Tenant's property and improvements.

5.01.B.    Commercial General Liability covering liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and blanket contractual liability – US $5,000,000 each occurrence.

5.01.C.    Business Automobile Liability covering all owned, hired, and non-owned vehicles - US$1,000,000 each occurrence, including all applicable statutory coverages.

5.01.D.    Workers Compensation - statutory limits for all states of operation.

5.01.E.    Employers Liability - US$1,000,000 each employee for bodily injury by accident and - US$1,000,000 each employee for bodily injury by disease.

5.01.F.    Property insurance, covering the Building and all contents of the Building (except for the Delphi Equipment) against all risks of direct physical loss or damage, including flood insurance; boiler and machinery insurance, and builder's risk insurance.  Such insurance shall be sufficient to cover the full replacement cost of the Building and all contents of the Building and shall remain in force during the Lease Term.

9

All policies of insurance procured by Tenant herein shall be written as primary policies; not contributing with or in excess of coverage that Landlord may carry. If Tenant's liability policies do not contain the standard separation of insureds provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage. Tenant shall agree to waive their insurer's right of subrogation under its policies. Landlord shall be an additional insured under Tenant's insurance policies, and at Landlord's request, Tenant shall provide Landlord with a certificate of insurance evidencing compliance with the limits, insurance requirements and waiver of subrogation set forth above. Such certificate shall be in a form reasonably acceptable to, and underwritten by an insurance company reasonably satisfactory to Landlord and with an A.M. Best Company rating of A- or above. By requiring insurance herein, Landlord does not represent that coverage and limits will necessarily be adequate to protect Tenant. The purchase of appropriate insurance coverage by Tenant or the furnishing of certificate of insurance shall not release Tenant from its respective obligations or liabilities under this Agreement.

Section 5.02.  Tenant Self-Insurance.  Notwithstanding anything herein contained to the contrary, Tenant may self-insure against any of the property risks covered by such insurance, provided Tenant or an affiliate maintains a prudent plan of self-insurance which includes Tenant and the Leased Premises.

Section 5.03.  Landlord Insurance.  Landlord shall obtain and maintain consistent with the provisions of this Lease, at its sole expense, property insurance, covering Buildings 9 and 10 and Plant 16.  Such insurance shall be sufficient to cover the full replacement cost of Buildings 9 and 10 and Plant 16, and remain in force so long as Buildings 9 and 10 and Plant 16 are standing during the Term ("Landlord Insurance").  Notwithstanding anything herein contained to the contrary, Landlord may self-insure against any of the property risks covered by such insurance, provided Landlord or an affiliate maintains a prudent plan of self-insurance which includes Landlord and Buildings 9 and 10 and Plant 16.

All policies of insurance procured by Landlord herein shall be written as primary policies; not contributing with or in excess of coverage that Tenant may carry. Landlord shall agree to waive their insurer's right of subrogation under its policies.  Landlord shall provide Tenant with evidence of insurance evidencing compliance with the limits, insurance requirements and waiver of subrogation set forth above. Such evidence shall be in a form reasonably acceptable to, and underwritten by an insurance company reasonably satisfactory to, Tenant and with an A.M. Best Company rating of A- or above. By requiring insurance herein, Tenant does not represent that coverage and limits will necessarily be adequate to protect Landlord. The purchase of appropriate insurance coverage by Landlord or the furnishing of evidence of insurance shall not release Landlord from its respective obligations or liabilities under this Agreement.

Section 5.04.  Indemnification of Landlord.  Excluding matters under Environmental Law which are addressed exclusively in Article 17 hereof, Tenant shall defend, indemnify and hold harmless Landlord and Landlord's officers, directors, employees and agents, from and against any and all claims, suits, liabilities, damages, losses, costs or expenses, including reasonable legal, accounting, consulting, engineering and other expenses which may be imposed upon, incurred by, or asserted against Landlord or Landlord's officers, directors, employees or agents, for personal injuries, death or property damage, ("Landlord's Damages") (i) occurring or originating on or about the Property and arising from Tenant's (or any of its affiliate's, agent's or invitee's) use of the Property, (ii) arising as a result of Tenant's failure to comply with any provision of this Lease during the Lease Term or (iii) arising from the negligence or wrongful acts of Tenant or any of its affiliates, agents or invitees and (iv) the breach or default of any provision of this Lease hereunder by Tenant.  The indemnities provided herein shall include

10

reasonable attorneys' fees incurred by Landlord or Landlord's officers, directors, employees and agents in connection with such Landlord's Damages or to enforce the indemnity given hereunder.

Section 5.05.    <u>Indemnification of Tenant</u>.  Excluding environmental matters which are addressed exclusively in <u>Article 17</u> hereof, Landlord shall defend, indemnify and hold harmless Tenant and Tenant's  officers, directors, employees and agents, from and against any and all claims, suits, liabilities, damages, losses, costs or expenses, including reasonable legal, accounting, consulting, engineering and other expenses which may be imposed upon, incurred by, or asserted against Tenant or Tenant's officers, directors, employees or agents, for personal injuries, death or property damage ("<u>Tenant's Damages</u>") (i) occurring or originating on or about the Property from Landlord's (or any of its affiliate's, agent's or invitee's) use of the Property, (ii) arising as a result of Landlord's failure to comply with any provision of this Lease during the Lease Term, (iii) arising from the negligence or wrongful acts of Landlord or any of its affiliates, agents, invitees or tenants (other than Tenant), (iv) arising from or relating to the performance of Landlord's obligations hereunder, including the obligations set forth in <u>Section 1.04.C</u>, <u>1.07.A</u> and <u>1.08</u>, and (v) the breach or default of any provision of this Lease hereunder by Landlord, including the breach of any of the representations and warranties contained in <u>Section 16.04</u>. The indemnities provided herein shall include reasonable attorneys' fees incurred by Tenant or Tenant's officers, directors, employees and agents in connection with such Tenant's Damages or to enforce the indemnity given hereunder.

Section 5.06.    <u>Limitation on Liability</u>.  Notwithstanding anything to the contrary contained herein, no party hereto shall be liable under this Lease for special, incidental, punitive, exemplary or consequential damages or lost profits or revenues.

Section 5.07.    <u>Survival</u>.  The provisions of <u>Section 5.04</u> and <u>Section 5.05</u> shall survive the termination of the Lease Term without limitation as to time.

ARTICLE 6

<u>UTILITIES</u>

Section 6.01.    <u>Utilities</u>.  Subject to Section 1.04.C and Section 6.02, Tenant agrees to pay all charges against the Property for gas, heat, water, air conditioning, electricity, sanitary and storm sewage disposition, telephone and all other utilities during the Lease Term as the same shall become due.  Landlord shall not be liable for damages or otherwise for the quality or quantity of any such utilities or for any interruption in the supply of any such utilities, unless due to the negligence or wrongful acts of Landlord or Landlord's agents, employees, or invitees.

Section 6.02.    <u>Reimbursements</u>.    Landlord shall pay to Tenant Landlord's Utility Proportionate Share of the utility charges described in Section 6.01.    The definition of "<u>Landlord's Utility Proportionate Share</u>" is set forth on <u>Schedule 6.02</u> attached hereto.  Landlord shall pay to Tenant Landlord's Utility Proportionate Share within thirty (30) days after receipt of an invoice therefor.

11

ARTICLE 7

TAXES AND ASSESSMENTS

Section 7.01.  Obligation.  Tenant agrees to pay to Landlord as Additional Rent Tenant's Proportionate Share of all Taxes, as defined in Section 7.03, on the Leased Premises during the Lease Term.

Section 7.02.  Definition of Tenant's Proportionate Share.  As used herein, "Tenant's Proportionate Share" is equal to the percent which equals the ratio of (a) the total number of square feet of area in the Leased Premises (930,932 square feet) to (b) the total number of square feet of improvements located on the Property.  If any new improvements are constructed on the Property or any improvements are demolished on the Property, Tenant's Proportionate Share will be adjusted accordingly.  Tenant's Proportionate Share is set forth on Schedule 7.02.

Section 7.03.  Definition of Taxes.  "Taxes" shall be defined as: (a) all taxes (either real or personal), assessments (general or specific), all water and sewer charges, and all other governmental impositions, which may be levied during the Lease Term upon the land, the Building or other improvements located on the Property or any portion thereof; (b) a tax or surcharge of any kind or nature upon, against or with respect to the parking areas or the number of parking spaces on the Property; (c) any tax imposed on this Lease or based on a reassessment of the Property due to a change in ownership or a transfer of all or part of Landlord's interest in the Property; (d) any tax levied upon Landlord in full or partial substitution for, or as a supplement to, any taxes previously included within the definition of "Taxes"; and (d) all reasonable costs and expenses incurred by Landlord during negotiations for or contests of the amount of such taxes and assessments, without regard to the result, including actual reasonable attorneys' fees.  All installments of assessments for local improvements payable during the Term shall be paid by Tenant as they shall become due and payable during the Term, provided that Landlord shall be deemed to have elected to pay any such special assessments in installments over the longest period permitted by the taxing authority.  Nothing herein or in this Lease otherwise contained shall require or be construed to require Tenant to pay any inheritance, estate, succession, transfer, gift, franchise, income or profit taxes that are or may be imposed upon Landlord, its successors or assigns.

Section 7.04.  Payments.  Tenant's Proportionate Share of Taxes levied or assessed for or during the Lease Term shall be paid to Landlord within ten (10) days after Landlord delivers to Tenant a statement for such Taxes, but not prior to the thirtieth (30th) day before such taxes are subject to interest or penalties.  The Taxes for the years in which this Lease commences and terminates shall be prorated on a due date basis.  On the Commencement Date, Tenant shall reimburse Landlord for Tenant's Proportionate Share of the Taxes paid by Landlord for the calendar year in which the Commencement Date occurs and allocated to the calendar months occurring after the Commencement Date.  Upon conclusion of this Lease, Landlord shall reimburse Tenant for Tenant's Proportionate Share of Taxes paid by Tenant for the calendar year in which the Lease terminates and allocated to the calendar months occurring after the Termination Date.  In the event a refund of Taxes previously paid by Tenant is obtained, Landlord shall credit the portion which relates to the Leased Premises to the next payment due under this Lease or promptly refund the same if the Term has expired.  A copy of a tax bill or assessment bill submitted by Landlord to Tenant shall at all times be sufficient evidence of the amount of Taxes assessed or levied against the property to which such bill or return relates.  In the event the Property is subdivided such that the Leased Premises becomes a separate tax parcel, Tenant's obligation to pay Tenant's Proportionate Share shall terminate

12

and Tenant shall only be required to pay Taxes for the Leased Premises in accordance with the separate tax parcel bill.

Section 7.05.    Tax Contests.    If Landlord shall elect to contest any change in the tax assessment of the Property, Landlord shall notify Tenant of such contest. If Landlord elects not to so contest such assessment, with Landlord's prior written consent, which consent shall not be unreasonably withheld, Tenant may contest such assessment at its cost, provided that its reasonable expenses thereof shall be reimbursed out of any reductions obtained. If either of the parties shall contest such assessment, it shall keep the other reasonably informed of its progress.

Section 7.06.    Tenant's Taxes.    Tenant shall pay all real and personal property taxes levied or assessed against Tenant's property and improvements upon or affixed to the Leased Premises, including taxes attributable to all alterations, additions, or improvements made by Tenant.

ARTICLE 8

TENANT'S ALTERATIONS

Section 8.01.    Alterations.    Tenant may, without Landlord's consent, make (i) the alterations, additions, modifications or improvements set forth on Exhibit F attached hereto and (ii) any other lawful, nonstructural alterations, additions, modifications or improvements to the Leased Premises which do not modify the exterior of the Building, do not adversely affect the architectural design or systems as described in Section 4.01 hereof, and do not involve any demolition work. Landlord's prior written consent shall be required for all other alterations, additions, modifications or improvements (herein referred to as "Structural Alterations"), which consent shall not be unreasonably withheld. Except for those items set forth on Exhibit F, Tenant shall notify Landlord in writing and obtain prior written consent of Landlord, which consent shall not be unreasonably withheld, for any alterations which involve asbestos-based fire retardants, ceiling tiles, pipes or other asbestos-containing materials. All alterations made by Tenant to the Leased Premises shall become the property of Landlord and shall remain upon and be surrendered with the Leased Premises at the termination of this Lease, without molestation or injury unless Landlord consents in writing to Tenant's removal of such alterations and Tenant repairs any damage or injury caused thereby in a good and workmanlike manner; provided, however, that Landlord shall have no right to any of Tenant's trade fixtures or equipment, and Tenant may remove such trade fixtures and equipment upon the expiration or early termination of this Lease. In the event Tenant removes such trade fixtures and equipment upon the expiration or early termination of this Lease, Tenant shall cause the floor of the Leased Premises to be returned to Landlord in as good a condition and repair as existed on the Commencement Date, subject to normal wear and tear. Landlord, at its option, may at the expiration of the Lease Term require Tenant, at Tenant's sole cost and expense, to remove any structural or exterior alterations made by Tenant during the Lease Term, which were so designated by Landlord at the time its consent thereto was given, and to promptly repair any damage or injury caused thereby in a good and workmanlike manner. All alterations made by Tenant or the removal thereof shall be made free of all liens and encumbrances and in compliance with all applicable Laws. Tenant shall indemnify, defend and hold Landlord harmless from and against any such liens, encumbrances and violations of Laws or claims relating thereto. The repair and indemnification obligations of Tenant hereunder shall survive

13

the termination or expiration of this Lease. The provisions of this Section 8.01 are subject to the provisions of Section 17.01.M.

Section 8.02.    Construction Liens.

8.02.A.    In accordance with the applicable provisions of the [Ohio Construction Lien Law], Tenant has no authority to, and shall not, create any liens for labor or material on or against Landlord's interest in the Property or any portion thereof.  Tenant agrees to notify any materialmen, supplier, contractor, mechanic, or laborer involved with work on the Property that such party must look only to Tenant or Tenant's property interests.  All materialmen, suppliers, contractors, mechanics and laborers may be put on notice of this Section 8.02 by the recordation, at Landlord's option, of a notice of this exculpatory provision of this Lease in the Montgomery County Public Records, and Tenant shall promptly execute and acknowledge such a notice if requested to do so by Landlord.  Tenant shall require from any and all materialmen, suppliers, contractors, mechanics, laborers and subcontractors duly executed waivers of lien with respect to Landlord's interest prior to the commencement of any work at the Property.

8.02.B.    If notwithstanding Tenant's obligations under Section 8.02.A. above Tenant shall suffer or permit any construction liens to be filed against the Property or any part thereof by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Leased Premises or any part thereof through or under Tenant, Tenant shall cause the same to be discharged of record within thirty (30) days after the date of filing the same.  If Tenant shall fail to discharge such construction lien within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit in court or by giving security or in such other manner as is, or may be, prescribed by Law.  Any amount paid by Landlord for any of the aforesaid purposes, and all reasonable legal and other expenses of Landlord, including reasonable counsel fees, incurred in connection with the discharge of any such lien, together with all necessary disbursements in connection therewith, and together with interest thereon at the rate of twelve percent (12%) per annum, but in no event higher than the legal limit (hereinafter referred to as the "Interest Rate"), from the date of payment, shall be repaid by Tenant to Landlord on demand, and if unpaid may be treated as Additional Rent.  Nothing herein contained shall imply any consent or agreement on the part of Landlord to subject Landlord's estate to liability under any construction lien law.

ARTICLE 9

ASSIGNMENT AND SUBLETTING

Section 9.01.    Prohibition of Assignment and Subletting.  Subject to the terms below, Tenant shall not assign (by operation of Law or otherwise), mortgage or encumber this Lease or any interest in this Lease, nor sublet or permit the Leased Premises or any part thereof to be used by others, without the prior written consent of Landlord.  Notwithstanding anything contained herein to the contrary, Landlord and Tenant acknowledge and agree that Tenant shall have the right during the Lease Term to sublet all or any portion of the Leased Premises to Alken-Ziegler, Inc. without the consent of Landlord, provided the sublease commences during the Initial Term, Tenant shall provide Landlord with a copy of any sublease agreement with Alken-Ziegler, Inc. prior to the start of the sublease term and fifty percent (50%) of the "rent"

14

which is explicitly described in the sublease agreement that Tenant receives as a result of such subletting, which exceeds the total amount Tenant is obligated to pay Landlord under this Lease for such period (prorated to reflect obligations allocable to that portion of Leased Premises subject to such Sublease) shall be paid by Tenant to Landlord as Additional Rent under this Lease without effecting or reducing other obligations of Tenant hereunder.  If this Lease is assigned, or if the Leased Premises or any part thereof is sublet, or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, subtenant, or occupant and apply the net amount collected to the rent herein reserved.  No such assignment, subletting, occupancy, or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, subtenant, or occupant as tenant, or a release of Tenant from the further performance by Tenant of the covenants in this Lease.  The consent by Landlord to an assignment or subletting shall not be construed to relieve Tenant from obtaining the consent in writing of Landlord to any further assignment or subletting.  Notwithstanding anything herein contained to the contrary, Tenant shall have the right, without Landlord's consent, to assign this Lease and/or sublet all or any part of the Leased Premises to any entity which Tenant controls, controls Tenant or is under common control with Tenant or any entity to which the business being conducted on the Leased Premises is sold; provided that any such assignment or sublet will not relieve Tenant of any liability under this Lease.


ARTICLE 10

ESTOPPEL CERTIFICATES, ATTORNMENT AND SUBORDINATION

Section 10.01.  Estoppel Certificates.  Within twenty (20) days after request by Landlord, Tenant shall execute, in recordable form, and deliver to Landlord or such other party as Landlord may direct, a statement certifying (i) that this Lease is in full force and effect, (ii) the date of commencement of the term of this Lease, (iii) that rent is paid currently without any offset or defense thereto, (iv) the amount of rent, if any, paid in advance, (v) that there are no uncured defaults by Landlord (or stating those claimed by Tenant) and (vi) that none of the terms or provisions of this Lease have been modified or amended (or stating how they have been modified or amended).  Any such statement by Tenant may be given by Landlord to and conclusively relied upon as true and correct by any prospective transferee or mortgagee of the Leased Premises.  Within twenty (20) days after request by Tenant, Landlord shall execute, in recordable form, and deliver to Tenant or such other party as Tenant may direct, a statement certifying (i) that this Lease is in full force and effect, (ii) the date of commencement of the term of this Lease, (iii) that rent is paid currently without any offset or defense thereto, (iv) the amount of rent, if any, paid in advance, (v) that there are no uncured defaults by Tenant (or stating those claimed by Landlord) and (vi) that none of the terms or provisions of this Lease have been modified or amended (or stating how they have been modified or amended).  Any such statement by Landlord may be given by Tenant to and conclusively relied upon as true and correct by any prospective transferee or mortgagee of the Leased Premises.

Section 10.02.  Attornment.  In the event of any sale or the assignment as security of Landlord's interest in the Leased Premises, or in the event any proceedings are brought for the foreclosure of such interest or in the event of the exercise of the power of sale under any mortgage made by Landlord covering the Leased Premises, or for the eviction of Landlord under any underlying lease, this Lease shall remain in full force and effect and Tenant shall attorn to the purchaser or lessor and, if such purchaser or lessor shall so request, Tenant shall recognize such purchaser or lessor as Landlord under this Lease.  Such attornment shall be

15

self-operative upon demand without the execution or delivery of any further instrument by Tenant; provided however, that Tenant shall execute an instrument in writing evidencing such attornment upon the new owner's request, which instrument shall be subject to Tenant's reasonable approval. No such attornment shall cause such subsequent Landlord to be liable for any act or omission of any prior landlord or subject to any offsets or defenses against any prior landlord or bind it for any rent or additional rent which Tenant may have paid in advance to Landlord.

Section 10.03.  <u>Subordination</u>.  Tenant hereby agrees that this Lease is and shall be subject and subordinate at all times to any and all present and future ground or underlying leases, leasehold mortgages, mortgages and building loan mortgages affecting Landlord's interest in the Leased Premises, the Building and/or the Property or upon any building or other improvements hereafter placed upon the Property; provided, however, that as a condition precedent to such subordination, Tenant shall receive a nondisturbance agreement from any such lessor or mortgagee in form and substance reasonably satisfactory to Tenant.  Tenant also covenants and agrees that any mortgagee, underlying or ground lessor may elect to have this Lease prior to its interest in the Leased Premises, and in the event of notification to Tenant of such election, this Lease shall thereupon be deemed to be prior to such mortgage or ground lease, whether this Lease is dated prior or subsequent to the date of such other interest.

Section 10.04.  <u>Acknowledgments by Tenant</u>.  Tenant covenants and agrees to execute and deliver within fourteen (14) days after a demand has been made such further instruments as may be reasonably required to carry out the purposes of this <u>Article 10</u>, provided the same are in form and substance reasonably satisfactory to Tenant.

ARTICLE 11

<u>DESTRUCTION OF THE LEASED PREMISES</u>

Section 11.01.  <u>Destruction Due to Insured Risk</u>.  Subject to <u>Section 11.02</u> hereof, if the Leased Premises shall be damaged or destroyed, in whole or in part, by a casualty covered by the insurance carried by Tenant under <u>Article 5</u>, then the Leased Premises shall be repaired by Tenant.  The obligation of Tenant hereunder shall be limited to restoring the Leased Premises to a condition which is similar to that which existed as of the Commencement Date (but specifically excluding all of Tenant's alterations, additions, improvements, fixtures and any other property of Tenant which Tenant elects not to restore).  The Rent herein provided shall be abated with respect to any portion of the Leased Premises which is untenantable for the period from the date of such damage or destruction until the same is restored; provided that Tenant is not entitled to any abatement of Rent if the damage was caused by Tenant's negligence or misconduct, except to the extent Landlord receives proceeds of rent interruption insurance maintained by Tenant, if any.

Section 11.02.  <u>Election to Terminate</u>.

11.02.A.  If, at any time during the Term (i) more than twenty percent (20%) of the floor area of the Building shall be damaged or destroyed, in whole or in part, by fire or any other casualty or occurrence, or (ii) the Leased Premises are damaged in whole or in part during the last year of the Lease Term, or (iii) all or any part of the Leased Premises are destroyed by a casualty which is not insured under the insurance carried by Tenant under this Lease, then

16

notwithstanding the provisions of Section 11.01 hereof, Tenant shall have the right to terminate this Lease by giving notice to Landlord not more than sixty (60) days after such casualty or occurrence.  If Tenant elects to terminate this Lease pursuant to this Section 11.02, this Lease shall terminate as of the date such notice is given, and Rent shall be prorated as of the date of such termination.  In such event, Tenant shall not be responsible for any restoration or the razing of any damaged improvements and Landlord shall receive any insurance proceeds relating to such improvements.

11.02.B.  In the event a portion of the Leased Premises shall be so damaged or destroyed, Tenant may elect that this Lease shall be terminated only with respect to such portion of the Leased Premises designated by written notice to Landlord within sixty (60) days after such damage or destruction.  In such event, Tenant shall use insurance proceeds to raze such damaged improvements and make such area safe and secure, the Rent specifically provided for in this Lease shall be reduced in proportion to the amount the Leased Premises is reduced and Tenant's Proportionate Share shall be reduced accordingly.

11.02.C.  In the event this Lease is terminated pursuant to this Section 11.02, all of the insurance proceeds relating to the Building and/or the portion thereof with respect to which this Lease is terminated pursuant to Section 11.02.B hereof (less the cost of razing and making the same safe), exclusive of Tenant's trade fixtures, machinery, equipment, leasehold improvements, contents, inventory or other aspects, shall belong to and be paid over to Landlord and Tenant shall also pay to Landlord any deductible on the insurance carried or any self-insured amount.  In no event shall Landlord be entitled to the insurance proceeds relating to Tenant's trade fixtures, machinery, equipment, leasehold improvements, contents, inventory or other aspects and/or Tenant's insurance proceeds associated with business interruption.

Section 11.03.  Tenant's Obligations.  Tenant shall give prompt notice to Landlord in case of any fire or material damage to the Leased Premises or the Building.

ARTICLE 12

EMINENT DOMAIN

Section 12.01.  Total Condemnation.  In the event that the entire Leased Premises shall be taken by any public authority under the power of eminent domain or sold to public authority under threat or in lieu of such taking, then the term of this Lease shall automatically cease and terminate as of the date possession is taken by such public authority or its designees and all rentals shall be paid up to that date and Tenant shall have no claim against Landlord nor the condemning authority for the value of any unexpired term of this Lease.

Section 12.02.  Partial Condemnation.

12.02.A.  In the event that any portion of the Property shall be taken by any public authority under the power of eminent domain or sold to public authority under threat or in lieu of such taking, and as a result thereof, Tenant cannot reasonably operate in the balance of the Leased Premises, or Tenant is deprived of parking which is necessary to comply with applicable Law, then Tenant shall have the option of terminating this Lease as of the date possession is taken by such public authority or its designee by notifying Landlord in writing, and upon such notice being given, the condemnation shall be treated as a total condemnation pursuant to Section 12.01 hereof.

17

12.02.B.  In the event that any portion of the Property shall be taken by any public authority under the power of eminent domain or sold to public authority under threat or in lieu of such taking, if the value of the restored Building which includes the Leased Premises (taking into account the rents to be paid therefor hereunder) and any excess condemnation proceeds received by Landlord are $200,000 less than the value of the Building immediately prior to such condemnation, Landlord shall have the option of terminating this Lease as of the date possession is taken by such public authority or its designee by notifying Tenant in writing, and upon such notice being given, the condemnation shall be treated as a total condemnation pursuant to Section 12.01 hereof; provided, however, that Tenant may agree to pay such deficiency to Landlord within thirty (30) days after receipt of Landlord's notice, in which event this Lease shall continue in full force and effect.  If the parties are unable to agree upon the value of the Building prior or subsequent to such condemnation, such matter shall be determined by binding arbitration in Detroit, Michigan, in accordance with the commercial arbitration rules then appertaining of The American Arbitration Association.  Each party shall pay one-half (1/2) of the cost of such arbitration, and any order rendered therein may be enforced by any court of competent jurisdiction.

12.02.C.  In the event that only a portion of the floor area of the Leased Premises shall be taken as hereinabove described and this Lease is not terminated pursuant to the provisions of this Section 12.02, then Landlord shall, at its sole cost and expense, restore the remaining portion of the Leased Premises to the extent necessary to render it suitable for the purposes for which it was leased; provided, however, that in no event shall Landlord be obligated to expend any amount for such restoration in excess of the proceeds of any condemnation award received by Landlord.  If this Lease shall not be terminated as herein provided, this Lease shall continue for the balance of its term as to the part of the Leased Premises remaining, with an abatement of rent based upon the square foot area of the Leased Premises so taken on a proportionate basis and a corresponding reduction in Tenant's Proportionate Share and without an effect upon the term hereof or the liability of Tenant to pay any amount due under this Lease.

Section 12.03. Distribution of Award.    All compensation awarded or paid by any governmental authority upon a total or partial taking of the Leased Premises shall belong to and be the property of Landlord whether such damages shall be awarded as compensation for diminution in value to the leasehold or to the fee of the Leased Premises; provided, however, that Landlord shall not be entitled to any award made to Tenant for depreciation to, and cost of removal of, merchandise and trade fixtures or any other award to which Tenant is entitled which does not reduce Landlord's award.


ARTICLE 13

DEFAULT

Section 13.01. Default.  The occurrence of any of the following shall constitute an Event of Default:

13.01.A.  delinquency in the payment of rent or any other amount payable by Tenant under this Lease, or any part thereof for a period in excess of ten (10) days after receipt of notice thereof; provided, however, Landlord shall only be required to give such notice once per calendar year;

18

13.01.B.  failure by Tenant to perform or comply with any of the terms, covenants or agreements to be performed by Tenant under this Lease, other than those described in the Section 13.01.A. hereof, for a period of thirty (30) days after written notice of such default has been given to Tenant; provided, however, that if the cure of such matter reasonably requires in excess of thirty (30) days, no Event of Default shall be deemed to have occurred if Tenant commences such cure within thirty (30) days after receipt of such notice and thereafter diligently prosecutes such cure to completion; provided that such cure period shall not extend past  one hundred eighty (180) days; and

13.01.C.  the filing by or against Tenant in any court pursuant to any state statute of a petition in bankruptcy or insolvency, or for reorganization or rearrangement, or for the appointment of a receiver or trustee of all of a portion of Tenant's property (except when any such proceeding is filed against Tenant, Tenant shall have sixty (60) days after commencement to have such proceeding dismissed), or any assignment of the property of Tenant for the benefit of creditors; and

13.01.D.  abandonment, vacation or desertion of the Leased Premises.

Section 13.02. Landlord's Remedies.   Should an Event of Default occur under this Lease, Landlord may pursue any or all of the following:

13.02.A.  Landlord, in addition to any other rights or remedies it may have, shall have the right, by written notice to Tenant, to declare this Lease terminated and the term ended, in which event this Lease and the term hereof shall expire, cease and terminate with the same force and effect as though the date set forth in the notice of termination were the date originally set forth herein and fixed for the expiration of the term, and Tenant shall vacate and surrender the Leased Premises.

13.02.B.  Landlord shall have the right to bring a summary proceeding to recover possession from Tenant holding over and/or Landlord may, in any such events, without notice to the extent permitted by law, reenter the Leased Premises and dispossess, by summary proceedings, Tenant and the legal representatives of Tenant or other occupant(s) of the Leased Premises and remove their effects and Tenant shall have no further claim or right hereunder. To the extent permitted by law, Tenant waives further notice of reentry or institution of legal proceedings to that end and any right of redemption, reentry or repossession.  No reentry or commencement of any action for reentry shall be construed as an election to terminate this Lease nor shall any such action absolve or release Tenant from any of its obligations for the remainder of the Initial Term or the then current Option Term (and any Option Term with respect to which Tenant shall have exercised its option to extend the term of this Lease).  In the event of reentry, Landlord may remove all persons and property from the Leased Premises and such property may be removed and stored in a public warehouse or elsewhere at the expense and risk of Tenant, without notice or resort to legal process and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby. Tenant hereby waives all rights to trial by jury and any right to impose any non-compulsory counterclaim in any claim, action or demand asserted against Landlord by reason of this Lease.

Section 13.03. Right to Relet.  Should Landlord reenter the Leased Premises or take possession by summary proceedings or otherwise, it may from time to time, without terminating this Lease, make such reasonable alterations and repairs as may be necessary to relet, and relet the Leased Premises or any part thereof for such reasonable term or terms (which may be

19

for a term extending beyond the term of this Lease) and at such reasonable rental or rentals and upon such other reasonable terms and conditions as Landlord in its reasonable discretion may deem advisable.    Upon each such reletting, all rentals and other sums received by Landlord shall be applied in the following order of priority:  (i) to the payment of any indebtedness other than rent due from Tenant to Landlord; (ii) to the payment of any costs and expenses of reletting, including reasonable brokerage and attorneys' fees, and costs and repairs; and (iii) to the payment of rent and other charges due and unpaid hereunder.    Tenant shall have no right with respect to any excess.    If such rentals and other sums received from reletting are less than that to be paid by Tenant, Tenant shall immediately pay such deficiency to Landlord.    Such deficiency shall be calculated and paid monthly.    To enforce payment thereof, Landlord may institute as many separate or additional proceedings as Landlord shall determine to be necessary or desirable, whether in a separate lawsuit or lawsuits or as supplementary proceedings or other legal proceedings instituted to recover possession.    Notwithstanding any reentry and/or reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for any previous breach.    Should Landlord terminate this Lease for any breach, in addition to other remedies, it may recover all damages incurred by reason of such breach, including, in the event Tenant shall at any time be in arrears in the payments required to be paid monthly pursuant to this Section 18.02 for in excess of sixty (60) days, the worth at such time of the excess, if any, of the amount of rents reserved in this Lease for the remainder of the stated term over the then reasonable rental value of the Leased Premises for the remainder of the stated term, all of which amounts shall be immediately due and payable from Tenant to Landlord, such amounts so due upon such acceleration shall be discounted to present value at the "prime rate" then published in The Wall Street Journal.

Section 13.04. Curing of Tenant's Default.  Notwithstanding anything herein contained to the contrary, if Tenant shall be in default in the performance under any of the provisions of this Lease after notice and the expiration of all applicable cure periods, in addition to Landlord's other rights and remedies hereunder, Landlord may, but shall not be obligated to, cure such default at the reasonable cost and expense of Tenant (and, if necessary, enter upon the Leased Premises in order to effect such cure) and the reasonable sums so expended by Landlord shall be deemed to be additional rent and shall be immediately due and payable.

Section 13.05. Tenant's Interest in Bankruptcy.   Neither this Lease nor any interest therein nor any estate thereby created shall pass to any trustee or receiver or assignee for the benefit of creditors or any other person or entity under or by operation of any state law.

Section 13.06. Mitigation of Damages.   Landlord shall take all reasonable actions to mitigate its damages resulting from Tenant's default hereunder.


ARTICLE 14

ACCESS

Section 14.01. Right of Entry.  Landlord and Landlord's agents and employees shall have the right to enter the Leased Premises upon one (1) business day's notice (except in the event of an emergency, in which event notice shall not be required) for the purposes of (a) examining the same, (b) showing the Leased Premises to prospective lenders, purchasers, investors or lessees; provided, however, that if Tenant notifies Landlord in writing that a potential lessee is a competitor of Tenant, then Tenant may restrict access by that potential lessee from certain

portions of the Leased Premises that Tenant states that Tenant is using for proprietary activities and Tenant may accompany Landlord during such entry by potential lessees, (c) making any alterations or repairs to the Leased Premises or the Building that Landlord may be required to perform, or (d) or for any other purpose Landlord reasonably deems necessary.  During the seven (7) months prior to the expiration of the term of this Lease, Landlord may place upon the Property and the Leased Premises "For Lease" notices provided at any time during the term Landlord may place upon the Property "For Sale" notices.  Such "For Lease" and "For Sale" notices shall be commercially reasonable in size, color and placement and shall not unreasonably interfere with Tenant's business operations within the Lease Premises.  Nothing contained in this Lease, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility, or liability for the care, supervision, or repair of the Leased Premises other than as expressly herein provided.  Landlord agrees to use reasonable efforts, in light of the then existing circumstances, so that any entry by Landlord shall not unreasonably interfere with Tenant's business operations within the Leased Premises.

Section 14.02. <u>Reservation of Landlord</u>.  Landlord reserves the right to place, maintain, repair and replace such utility lines, pipes, tunneling, and the like in, under, over and upon the Leased Premises as may be reasonably necessary or advisable for the servicing of the Leased Premises or of other portions of the Building or the Property, provided the foregoing (i) shall not interfere with Tenant's operations in the Leased Premises and (ii) shall be subject to the prior approval of Tenant not to be unreasonably withheld.  Landlord and Tenant acknowledge and agree that in no event shall Tenant be liable in connection with the placement of the such utility lines, pipes, tunneling, and the like in, under, over and upon the Leased Premises.

Section 14.03. <u>Demolition</u>.

14.03.A.  Landlord reserves the right for Landlord and Landlord's agents and employees to enter upon the Property for the demolition of any portion of the Building or Property other then the Leased Premises pursuant to Section 1.04.B; provided that any such entry shall be subject to the provisions of Section 14.01.

14.03.B.  <u>DP&L Easement</u>.  Landlord reserves the right to grant an easement in the Leased Premises to Dayton Power and Light in the location noted on **<u>Exhibit A</u>**.

ARTICLE 15

<u>SURRENDER OF THE LEASED PREMISES, HOLDING OVER, SUCCESSORS</u>

Section 15.01.  <u>Surrender of the Leased Premises</u>.    On the expiration or earlier termination of this Lease, Tenant shall surrender to Landlord the Leased Premises, in as good a condition and repair as existed on the Commencement Date, subject to normal wear and tear and the provisions of <u>Articles 11</u> and <u>12</u> hereof.  Tenant shall also remove all its trade fixtures, machinery and equipment and other removable personal property, trash and debris and any other property of Tenant which Tenant is obligated to remove pursuant to the terms of this Lease and perform all restoration and repair work made necessary by the removal of any such alterations, additions, improvements, fixtures or other property upon the expiration or earlier termination of this Lease.  All such property which is not so removed upon the expiration or earlier termination of this Lease shall be deemed to have been abandoned by Tenant and may be retained by Landlord as its property or removed and disposed of in such manner as Landlord

may see fit.  Tenant shall be liable to Landlord for any and all costs and expenses incurred in connection with any such removal and disposal, including court costs, attorneys' fees and storage charges for such property.  If Tenant fails to surrender the Leased Premises to Landlord within sixty (60) days after the expiration or earlier termination of this Lease, Tenant shall hold Landlord harmless from all damages resulting from Tenant's failure to surrender the Leased Premises, including claims made by a succeeding tenant resulting therefrom.

Section 15.02.  <u>Holding Over</u>.  Any holding over after the expiration of the Term shall be construed to be a tenancy from month to month subject to all of the terms and conditions of this Lease applicable to a tenancy from month to month, except that the monthly installment of Base Rent shall be equal to one hundred fifty (150%) percent of the monthly installments of Base Rent due in the last full month of the Lease Term.  Should Tenant or any party claiming under Tenant remain in possession of the Leased Premises, or any part thereof, after expiration or any termination of this Lease, Landlord shall have the right of reentry as set forth in <u>Section 13.02</u> hereof.

Section 15.03.  <u>Successors</u>.  Except as otherwise set forth herein, all rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind their respective heirs, executors, administrators, successors and assigns.  No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as provided in <u>Section 7.01</u> hereof or Landlord's approval thereof is not required.


ARTICLE 16

QUIET ENJOYMENT, LANDLORD'S LIABILITY

Section 16.01.  <u>Quiet Enjoyment</u>.  Upon payment by Tenant of the rents herein provided, and upon the observance and performance of all the covenants, terms and conditions of this Lease on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Leased Premises for the Term hereby demised without hindrance or interruption by Landlord or any other person acting through or under Landlord; subject, however, to the terms and conditions of this Lease and any mortgage, or ground or underlying lease or other encumbrance to which this Lease is subordinate.

Section 16.02.  <u>Exculpation of Landlord from Liability</u>.  Unless the same results from the negligence or wrongful act of Landlord, its agents, contractors or employees, neither Landlord nor any entity or entities under common control with Landlord (nor their respective officers, shareholders, partners, members, employees and agents) shall be liable for any damage done or occasioned by or from the electrical systems, the heating or air conditioning system, or the plumbing in, upon or about the Leased Premises or the Building, nor for damages occasioned by water, snow or ice being upon or coming through the roof, trapdoor, walls, windows, doors or otherwise, nor for any damage arising from acts of negligence of co-tenants or other occupants of the Building or the acts of any owners or occupants of adjoining or contiguous property.

Section 16.03.  <u>Liability of Landlord</u>.  Neither Landlord, any entity or entities under common control with Landlord, Landlord's and/or such entity or entities' beneficiaries, any persons or entities comprising Landlord and/or such entity or entities, any agents, employees, shareholders, partners or members of any such entities, nor any successor in interest to

22

Landlord (or to such persons or entity or entities) shall have any personal liability for any failure by Landlord to perform any of the terms, covenants or conditions of this Lease.  Except for any liability arising pursuant to Article 17 hereof, if Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and if as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Leased Premises, and neither Landlord nor its agents, employees, shareholders, partners, or members, or any other persons holding interests under, through or in Landlord, shall be liable for any deficiency.  Landlord shall be fully responsible for its obligations pursuant to Article 17 hereof.

       Section 16.04. Landlord's Representations.    Landlord represents and warrants as follows: (i) Landlord is the legal and beneficial owner of the Property and has full right and authority to enter into this Lease and to perform Landlord's obligations under this Lease for the Term, in the manner, and upon the conditions and provisions herein contained, and no additional signatories or consents are required to make the Lease binding and fully enforceable, (ii) from the date of the Purchase Agreement until the Commencement Date, Landlord has (a) used and operated the Leased Premises and (b) maintained and repaired the Leased Premises, in each case in the ordinary course of business, consistent with past practice of Landlord, and (iii) Landlord has not granted to any other party a possessory interest in the Leased Premises, other than the DPL Easement pursuant to Section 14.03.B.


ARTICLE 17

ENVIRONMENTAL MATTERS

       Section 17.01.   Notwithstanding any other provision in this Lease:

       17.01.A.    (i) Hazardous Substances.  Except for those reasonable quantities of materials, chemicals, products, or Hazardous Substances that are lawfully and customarily used in or result from manufacturing and related operations at the Leased Premises allowed under Article 3, above, Tenant shall not cause or permit the Leased Premises to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or Release any "hazardous substances" as defined in Section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §9601(14), "hazardous wastes" as defined in Section 1004(5) of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6903(5) or "extremely hazardous substances" as defined in the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. §11001 et seq. or any other substance, chemical, compound, product, waste, by-product, pollutant, contaminant or material that is classified or regulated under other federal, state or local Environmental Laws (hereinafter collectively referred to as "Hazardous Substances").  Hazardous Substances shall also include any petroleum or asbestos containing materials.  (ii) "Environmental Laws" mean any applicable federal, state, county or local statutes, laws, regulations, rules, ordinances, orders, judgments, injunctions, or decrees relating to environmental matters, (including ambient air, surface, water, groundwater, land surface or sub surface strata) including by way of illustration and not by way of limitation, the Clean Air Act, the Federal Water Pollution Control Act of 1972, the Resource, Conservation and Recovery Act of 1976, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, the Federal Hazardous Materials Transportation Act, the Toxic

Substance Control Act, and any amendments or extensions thereof, and any rules, regulations or orders issued pursuant to any of the aforesaid. Environmental Laws does not include laws or regulations pertaining to worker safety such as the Occupational Safety and Health Act.  (iii) "<u>Release</u>" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposal, including the abandonment or discarding of barrels, containers, or other closed receptacles containing Hazardous Substances or other wastes, materials, substances, pollutants or contaminants into the environment.  For purposes of this Lease:  (1) the  Release or exacerbation of Hazardous Substances on, in or about the Leased Premises or Property is referred to as "contamination;" (2) contamination existing before the Commencement Date is referred to as "<u>Pre-Commencement Date Contamination</u>;" (3) contamination occurring or exacerbated after the Commencement Date and during the Term of this Lease as a result of an act or omission of Tenant (or any of its affiliates, agents, invitees or subtenants) is referred to as "<u>Tenant Post-Commencement Date Contamination</u>;" and (4) contamination occurring or exacerbated after the Commencement Date and during the Term of this Lease as a result of an act or omission of Landlord (or any of its affiliates, agents, invitees, or tenants (other than Tenant)) is referred to as "<u>Landlord Post-Commencement Date Contamination</u>."

17.01.B.    <u>Waste Reports.</u>  Tenant shall simultaneously submit to Landlord copies of all reports Tenant submits to any government entity regarding the generation, manufacturing, refining, storage, treatment, transportation, handling, production, processing, transferring or disposal of waste materials, including Hazardous Substances, associated with Tenant's operations at the Leased Premises.

17.01.C.    <u>Environmental Assessment at End of Lease Term.</u>

(a)    Tenant and Landlord agree to jointly retain a mutually agreeable environmental consultant (the "<u>Environmental Consultant</u>"), to conduct a reasonable and cost-effective environmental assessment (i.e., not to exceed $<u>200,000</u>) of the Leased Premises within sixty (60) days of the end of the Lease Term, or any extensions thereto, for the purpose of advising Tenant and Landlord whether, in the Environmental Consultant's reasonable, professional opinion, there is any Tenant Post-Commencement Date Contamination on, under, in or migrating from the Leased Premises (the "<u>Assessment</u>").  The Assessment shall include sufficient data and analysis to support the Environmental Consultant's conclusion that the contamination identified in the Assessment is Tenant Post-Commencement Date Contamination.  Tenant and Landlord agree to cooperate in good faith to define the scope of such Assessment.  If Tenant and Landlord cannot agree on the scope of such Assessment, then the Environmental Consultant shall define the scope of such Assessment applying the Environmental Consultant's best professional judgment.

(b)    Where the Environmental Consultant concludes in its reasonable professional opinion that Tenant Post-Commencement Date Contamination has commingled with Pre-Commencement Date Contamination or Landlord Post-Commencement Date Contamination, such Assessment shall include the Environmental Consultant's reasonable professional opinion regarding the relative contribution of Pre-Commencement Date Contamination, Tenant Post-Commencement Date Contamination and Landlord Post-Commencement Date Contamination to any contamination of the Leased Premises.

(c)    The Environmental Consultant shall prepare a written report documenting such Assessment of the Leased Premises.  Tenant and Landlord agree to share equally in the costs of such Assessment.

24

(d)    If both Tenant and Landlord agree with such Assessment, both parties shall implement their responsibilities consistent with such Assessment and this <u>Article 17</u>.  If either Tenant or Landlord objects to such Assessment as inconsistent with this <u>Article 17</u>, the objecting party shall, within thirty (30) days of receipt of such Assessment, provide to the other party and the Environmental Consultant a brief written explanation of any such objections.  Tenant and Landlord shall meet with the Environmental Consultant no later than forty-five (45) days after receipt of such Assessment to discuss, in good faith, any such objections, with the goal of reaching a mutually acceptable agreement regarding each party's rights and responsibilities for Pre-Commencement Date Contamination, Tenant Post-Commencement Date Contamination and Landlord Post-Commencement Contamination under this <u>Article 17</u>.

(e)    This <u>Section 17.01.C</u> shall survive the termination of this Lease.

17.01.D.    <u>Permits.</u>  Tenant has sole responsibility for obtaining, maintaining, and complying with any permits or transfers of permits required for Tenant's lawful use of and operations on the Leased Premises during the Lease Term.  Landlord will reasonably cooperate with Tenant regarding such permit responsibility.  At the conclusion of the Lease, Landlord has sole responsibility for obtaining any permits or transfers of permits needed for future use of and operations on the Leased Premises.  Tenant's obligations in this Section 17.01.D shall survive the termination of this Lease.

17.01.E.    <u>No Assumption of Liabilities by Tenant.</u>  Neither Tenant nor any of its Affiliates shall assume or otherwise be liable for or be deemed to have assumed or otherwise be liable for any environmental liabilities arising out of or relating from Pre-Commencement Date Contamination or Landlord's Post-Commencement Date Contamination.  Tenant agrees to assume liability for any permits transferred or assigned to Tenant by Landlord to the extent such liabilities arise from acts or omissions by Tenneco (or any of its affiliates or agents) during the period that Tenneco is the permitted entity or operates the Leased Premises .

17.01.F.    <u>Compliance with Use Restrictions.</u>  Tenant acknowledges that the Leased Premises are subject to certain activity and use restrictions that prohibit any groundwater use and limit the use of the Leased Premises to industrial purposes, and prohibit digging or excavation in those areas identified on <u>Exhibit G</u>.  Tenant covenants and agrees to abide by these activity and use restrictions and will not dig, excavate, or otherwise disturb the soils in the area outlined in <u>Exhibit G</u> attached hereto.  Tenant further agrees to use its best efforts to ensure that its employees, agents, contractors and other third parties who have been given access to the Leased Premises do not violate these activity and use restrictions.

17.01.G.    <u>RCRA Generator Closure</u>.  Tenant acknowledges its intention to continue to use the less than ninety (90) day sludge accumulation area (the "Sludge Accumulation Area") associated with the onsite wastewater treatment plant shown on <u>Exhibit A (as "C.T.P.")</u> during the Term of Lease (and Landlord agrees to such use) and, Tenant agrees to retain responsibility for the RCRA generator closure of the Sludge Accumulation Area, and any other hazardous waste accumulation or storage areas created, used or maintained by Tenant on the Leased Premises.  Tenant agrees to begin generator closure of the Sludge Accumulation Area and any other such areas prior to termination of the Lease, in accordance with Ohio Revised Code Chapter 3734 and the rules adopted thereunder, as maybe amended from time to time, including Ohio Administrative Code Chapter 3745-52, and to provide reasonably satisfactory documentation to Landlord of the Tenant's closure of such hazardous waste accumulation area within sixty (60) days of the discontinuation of its use of such hazardous

25

waste accumulation or storage areas. However, if Tenant is unable to complete closure activities within such sixty (60) day period, Tenant agrees to exercise its best efforts to complete such closure as soon as is possible. To the extent closure of the Sludge Accumulation Area requires the investigation or remediation of Pre-Commencement Date Contamination and Tenant Post-Commencement Date Contamination present in the subsurface, the costs to investigate and remediate such contamination shall be allocated between the Landlord and Tenant proportionate to the extent of their respective liability for such contamination. Landlord agrees to reimburse Tenant for such investigation and remediation costs associated with the Sludge Accumulation Area proportionate to its liability for any such contamination. Tenant agrees to provide the work plan for such closure activities for Landlord's review and approval, which approval shall not be unreasonably withheld. Tenant agrees to provide copies of any environmental reports concerning any investigation or remediation of the Leased Premises to Landlord within sixty (60) days of their preparation by Tenant. Tenant's and Landlord's obligations in this <u>Section 17.01.G</u> shall survive the termination of this Lease.

      17.01.H.    <u>Landlord's Indemnification Obligation.</u> Except as otherwise set forth in this <u>Article 17</u>, Landlord will retain responsibility for, and will release, indemnify, defend, and hold harmless Tenant from and against, any liability, cost, obligation, expense or responsibility ("<u>Liability</u>"), related to or arising from:   (1) Pre-Commencement Date Contamination; (2) retirement, closure, decommissioning, demolition and/or disposal of any real or personal property, other than Tenant's responsibility for: (i) the Acquired Assets, as that term is defined in the Asset Purchase Agreement, dated March 7, 2008, 2008 between Landlord and the Tenant; (ii) any features of the Leased Premises for which Tenant has retirement, closure, decommissioning, or restoration responsibilities at the conclusion of the Lease, provided, however, that (A) Tenant's responsibility under this <u>Section 17.01.H(2)(ii)</u> shall extend only to the draining, removing and disposing of Hazardous Substances generated, treated, stored, used or disposed of by Tenneco during the Lease Term, (B)Tenneco shall have no retirement, closure or decommissioning responsibility for any asbestos or asbestos containing materials not contained within the Acquired Assets and (C) to the extent Tenneco's activities under <u>Section 17.01.H(2)(ii)</u> require the investigation or remediation of Pre-Commencement Date Contamination, Tenant agrees to conduct such activities subject to the provisions of <u>Section 17.01.O</u> and Landlord agrees to reimburse Tenant for all such investigation and remediation costs proportionate to Landlord's share of responsibility for such contamination; and (iii) any materials or Hazardous Substances of any kind brought onto, generated at, or released on, in, at or about the Leased Premises during the Lease Term, and any extensions thereto, by (A) Tenant, (B) its employees, agents, contractors, invitees, licensees, subtenants, successors, or assigns, (C) utility workers undertaking actions benefiting Tenant, or (D) trespassers; (3) the Pre-Commencement Date generation, manufacturing, refining, storage, treatment, transportation, handling, production, processing, transferring or disposal of Hazardous Substances, wastes of any kind, or other materials or products at or from the Leased Premises; and (4) any acts or omission of Landlord (or any of its affiliates, agents, invitees, or tenants (other than Tenant)) after the Commencement Date, including any act or omission by Landlord regarding the investigation or remediation of any Pre-Commencement Contamination.) Landlord's obligations in this <u>Section 17.01.H</u> shall survive the termination of this Lease.

      17.01.I.    <u>Tenant's Indemnification Obligation.</u> Tenant will be responsible for, and will release, indemnify, defend, and hold harmless the Landlord from and against, any Liabilities related to or arising from:  (1) Tenant Post-Commencement Date Contamination at, from, or otherwise associated with the Leased Premises, including any Post-Commencement Date Releases of Hazardous Substances, but excluding passive migration of Pre-Commencement Date Contamination at or from the Leased Premises; (2) exacerbation of Pre-

Commencement Date Contamination by (A) Tenant, (B) its affiliates, agents, employees, contractors, invitees, licensees, subtenants, successors or assignees, (C) utility workers undertaking action benefiting Tenant, or (D) trespassers; (3) removal of the Acquired Assets, as well as all materials or Hazardous Substances brought onto, generated at or Released at the Leased Premises during the Lease Term, and any extensions thereto, by Tenant, or its Affiliates and their agents or invitees (or utility workers undertaking actions benefiting Tenant), or trespassers; (4) the Post-Commencement Date generation, manufacturing, refining, storage, treatment, transportation, handling, production, processing, transferring or disposal of Hazardous Substances, wastes of any kind or other materials or products at or from the Leased Premises by Tenant (or any of its affiliates, agents, or invitees) and (5) any decommissioning, cessation of regulated operations, closure or other regulatory or permit obligations relating to the Acquired Assets.  Landlord and Tenant agree that the mere discovery of contamination is not exacerbation.  Tenant's obligations in this Section 17.01.I shall survive the termination of the Lease.

17.01.J.    Landlord's Representations.  Except as set forth in Environmental Schedule 17 of this Lease, and subject to the last sentence of this Section 17.01.J, Landlord represents and warrants that, as of the Commencement Date:  (1) the Leased Premises are in material compliance with Environmental Laws and environmental permits; (2) Landlord has not received any threatened or actual claims under Environmental Laws, or notices regarding environmental permits, relating to the Leased Premises that are unresolved as of the Commencement Date; and (3) Landlord has provided Tenant with true and complete copies of all material reports and data concerning the Pre-Commencement Date Contamination and the environmental compliance status of the Leased Premises.  Subject to the last sentence of this Section 17.01.J, Landlord will indemnify Tenant for any Liabilities incurred by Tenant related to or arising from Landlord's breach of these representations and warranties, but such indemnification excludes any consequential damages.  Landlord's representations, warranties and indemnification obligations under this Section 17.01.J shall terminate at noon Eastern time on the second (2nd) anniversary of the Commencement Date or upon the termination of the Lease, which ever date is sooner, except as to claims made prior to such date by the Tenant with respect to the representations and warranties contained in this Section 17.01.J.

17.01.K.    Landlord's Compliance Obligation.  Landlord is responsible for ensuring that the Leased Premises are in material compliance with Environmental Laws on the Commencement Date.

17.01.L.    Tenant's Compliance Obligation.  Except for any material noncompliance with Environmental Laws on the part of Landlord that exists before or on the Commencement Date, Tenant is responsible for compliance with Environmental Laws at the Leased Premises during the Lease Term and any extensions thereto.  Landlord shall have reasonable access to the Leased Premises to monitor Tenant's compliance with Environmental Laws.  With respect to the Acquired Assets, upon expiration or termination of the Lease, or upon cessation of manufacturing operations at the Leased Premises, Tenant agrees to comply with any retirement, closure, decommissioning or restoration responsibilities, including but not limited to Ohio's Cessation of Regulated Operations requirements, as set forth in Ohio Revised Code Chapter 3752 and the rules adopted thereunder, as they may be amended from time to time.  The obligations in this Section 17.01.L shall survive the termination of this Lease.

17.01.M.    Tenant's Modification Of The Leased Premises.  Except as provided in Exhibit F, Tenant is prohibited from making structural modifications to the building(s) and property within the Leased Premises without first obtaining approval from Landlord, which

27

approval will not be unreasonably withheld or delayed by Landlord.  In determining whether to grant such approval, Landlord may consider factors such as whether the requested modifications would occur in areas where Hazardous Substances are present in the soil, surface water or subsurface of the Leased Premises.  Except for those modifications included in Section 1.04, with respect to any modification of the building(s) or property within the Leased Premises undertaken by Tenant, Tenant will be responsible for, and will release, indemnify, defend, and hold harmless Landlord from and against:    (1) any costs associated with implementing Tenant's modification to the building(s) and property within the Leased Premises, including without limitation any actions concerning Hazardous Substances or compliance with Environmental Laws required to implement such a modification (including, but not limited to, asbestos abatement and removal/disposal of soil with Pre-Commencement Date Contamination); and (2) any higher costs to remediate Hazardous Substances in the soil, surface water or subsurface of the Leased Premises caused by such modification.  With respect to those modifications included in Section 1.04, Tenant shall be responsible for (1) any costs associated with implementing Tenant's modification to the building(s) and property as described in Section 1.04 and (2) any exacerbation of Pre-Commencement Date Contamination resulting from such modifications; provided, however, that any increased disposal costs resulting from the disposal of soil with Pre-Commencement Date Contamination, shall be paid by Landlord,  The obligations in this Section 17.01.M shall survive the termination of the Lease.

17.01.N.    Landlord's Remedial Action Work.  Landlord shall perform and fund investigation and remedial actions, operations and maintenance activities, and monitoring as required by applicable law for those matters for which Landlord is responsible pursuant to Article 17.  Landlord has the sole right to select remedial actions and cleanup criteria in compliance with applicable law for any contamination for which it is responsible under this Lease, including any Pre-Commencement Date Contamination and Landlord Post-Commencement Date Contamination at or from the Leased Premises, and to perform such actions.  Except for emergency actions required by applicable law, Landlord shall provide Tenant with notice of its intention to conduct remedial action work at the Leased Premises at least fourteen (14) days before the date on which Landlord intends to begin such work, which notice shall include a description of the remedial actions to be performed, the location(s) where they are to be performed, the schedule for their performance, the contractor who will perform those actions, and a copy of any health and safety plan for such actions.  Tenant shall notify Landlord within ten (10) days of Tenant's receipt of such notice from Landlord if Tenant believes such remedial actions to be undertaken by Landlord would not comply with Environmental Laws or would unreasonably interfere with Tenant's use of the Leased Premises.  Tenant's failure to so notify Landlord shall constitute a full waiver and release of any claim Tenant might have that Landlord's remedial action work, as described in Landlord's notice to Tenant, unreasonably interferes with Tenant's use of the Leased Premises.  Provided that Tenant satisfies its notice obligation in this Section 17.01.N, Landlord shall use commercially reasonable efforts to conduct such remedial action work in a manner that does not unreasonably interfere with Tenant's use of the Leased Premises.  Landlord shall have reasonable access to the Leased Premises to conduct any such remedial actions.    Additionally, Landlord shall keep Tenant reasonably informed of data generated by Landlord during any such remedial action work.

17.01.O.    Tenant's Remedial Action Work.  Tenant has the sole responsibility to perform and fund investigation and remedial actions, operations and maintenance activities, and monitoring in compliance with applicable law for those matters for which Tenant is responsible pursuant to Article 17.  Except for emergency actions required by applicable law, Tenant shall not perform any remedial actions regarding any contamination at or from the Leased Premises without the approval of Landlord, which approval shall not be

28

unreasonably withheld or delayed by Landlord.    Promptly upon discovering Post-Commencement Date Contamination at, on, in or migrating from the Leased Premises, Tenant shall promptly notify Landlord and promptly investigate such Post-Commencement Date Contamination.    If remedial action is required by Environmental Laws regarding such Post-Commencement Date Contamination, Tenant shall promptly prepare a work plan(s) for any such remedial action(s), and provide copies of a draft of any such work plan(s) to Landlord. Tenant shall not make any submissions to a government entity regarding Post-Commencement Date Contamination at or from the Leased Premises without Landlord's advance approval of drafts of such submissions, which approval shall not be unreasonably withheld or delayed by Landlord. Additionally, Landlord shall have the opportunity to participate in any meeting or call with any government entity at which matters involving contamination at or from the Leased Premises are to be discussed.    Tenant shall select cleanup criteria for remedial actions regarding those matters for which Tenant is responsible pursuant to <u>Article 17</u> that comply with Environmental Laws, that are consistent with the zoning of the Leased Premises as of the Commencement Date, and that do not unreasonably interfere with the future use or sale of the Leased Premises as an industrial property following the conclusion of the Lease.  Following the conclusion of the Lease, Tenant shall retain sole responsibility for any ongoing compliance or remedial action requirements regarding those matters for which Tenant is responsible pursuant to <u>Article 17</u>.   If applicable under Environmental Laws for the selection of cleanup criteria, Landlord agrees to record   a restrictive covenant regarding the Leased Premises which prohibits the use of groundwater at the Leased Premises and which limits the use of the Leased Premises to industrial uses.  Upon receiving Landlord's approval, Tenant shall promptly perform the approved remedial action work.   Tenant shall simultaneously provide to Landlord copies of all reports, information and data that Tenant or any contractor of Tenant submits to a government entity regarding contamination at or from the Leased Premises.  Upon Landlord's request, Tenant shall promptly provide to Landlord copies of all other reports, information and data that Tenant or any contractor of Tenant produces or collects regarding contamination at or from the Leased Premises.  Tenant shall have reasonable access to the Leased Premises and the Property to perform the obligations set forth in this <u>Section 17.01.O.</u>  This <u>Section 17.01.O</u> shall survive the termination of this Lease.

17.01.P.    <u>Waste Water Treatment Plant</u>.    Tenant and its successors, assigns, and subtenants, agree to allow Landlord to dispose of any captured or evacuated chromium contaminated groundwater at the waste water treatment plant located on the Property at no additional cost to Landlord until Landlord's obligation for the Pre-Commencement Date Contamination is satisfied or terminated, provided that the quantity and quality of the chromium contaminated groundwater disposed of by Landlord shall remain consistent with the quantity and quality of such groundwater disposed of by Landlord during the twelve (12) months prior to the Commencement Date.

17.01.Q.    <u>Tenant's Notice Obligation.</u>  Tenant shall promptly notify Landlord in the event Tenant obtains knowledge of Tenant Post-Commencement Date Contamination at or from the Leased Premises which has not been previously disclosed to Landlord.

17.01.R.    <u>Landlord's Notice Obligation.</u>    Landlord shall promptly notify Tenant in the event Landlord obtains knowledge of Pre-Commencement Date Contamination and Landlord Post-Commencement Date Contamination at or from the Leased Premises which has not been previously disclosed to Tenant.

17.01.S.        Delays In Performance.

(1)        Any delay in a party's performance under Article 17 attributable to a "Force Majeure" shall not be deemed a violation of that party's obligations under this Agreement, if that party meets the requirements of this Section 17.01.S.

(2)        For the purpose of Article 17, "Force Majeure" means an occurrence arising from causes beyond the control of and without the fault of a party claiming "Force Majeure," including but not limited to: an Act of God; untimely review of permit applications or submissions to any government authority; a court order that forces a delay in the performance of an obligation under this Lease.

(3)        When circumstances occur that a party believes constitute a "Force Majeure," that party will notice the other party by telephone or fax within five (5) business days of discovering that the occurrence will or may cause a delay in that party's compliance with any provision of Article 17.   Verbal notice shall be followed by written notice within ten (10) business days and shall describe in detail the anticipated length of the delay; the precise causes of the delay; the measures taken or to be taken by the party to avoid, minimize or overcome the delay; and the timetable by which those measures shall be implemented.

(4)        If a party's delay is or was caused by "Force Majeure" and timely notice as required in this Section 17.01.S is given, then that party's delay, to the extent that party is unable to avoid, minimize or overcome the delay, shall be excused and that party will be provided with such additional time equal to the number of days delay caused by the "Force Majeure" event.

(5)        This Section 17.01.S shall survive the termination of this Lease.

17.01.T.        All notices and other communications under this Article 17 will be in writing and will be deemed given when delivered personally or mailed (via electronic and/or land mail) to each party's senior environmental attorney (or to such other addressee as a party may have specified by notice given to the other party pursuant to this Agreement):

| | |
|---|---|
| In the case of Tenant: | Tenneco Automotive Operating Company, Inc.<br>c/o Tenneco, Inc.<br>500 North Field Drive<br>Lake Forest, IL  60045<br>Attn: General Counsel |
| In the case of Landlord: | Delphi Corporation<br>5825 Delphi Drive<br>M/C 480-410-166<br>Troy, MI 48098<br>Attn: Assistant General Counsel,<br>Environmental and Energy |

30

ARTICLE 18

MISCELLANEOUS

Section 18.01.  <u>Delays</u>.  In the event either Landlord or Tenant is delayed or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive Laws, riots, insurrection, war or other reason of a like nature, then the performance of such act shall be excused for the period of the delay, and the period for the performance of such act shall be extended for a period equivalent to the delay.  The provisions of this <u>Section 18.01</u> shall not operate to excuse Tenant from prompt payment of rent or any other payments required by the terms of this Lease.

Section 18.02.  <u>Transfer of Landlord's Interest in the Leased Premises</u>.  In the event of any transfer or transfers of Landlord's interest in the Leased Premises, including any so-called "sale-leaseback" transaction, the transferor shall be automatically released from the further performance of covenants on the part of Landlord herein contained, and from any and all further liability, obligations, costs and expenses, demands, causes of action, claims or judgments arising from or growing out of, or connected with this Lease after the effective date of the transfer.  If requested, Tenant shall execute a form of release and such other documentation as may be required to further effect the provisions of this <u>Section 18.02</u>.  Notwithstanding anything herein contained to the contrary, no such transfer shall affect the liability of the Landlord named herein pursuant to <u>Section 5.05</u> for matters which arose prior to the effective date of the transfer or <u>Article 17</u> hereof and such Landlord shall remain responsible under <u>Section 5.05</u> for matters which arose prior to the effective date of the transfer or <u>Article 17</u> notwithstanding any sale or transfer of the Property.

Section 18.03.  <u>Recording</u>.  Tenant shall not record this Lease or any memorandum thereof without the written consent of Landlord, provided, that, at Tenant's request, Landlord shall execute a memorandum of this Lease, which Tenant may record.  If such a memorandum is recorded, Tenant shall execute and deliver to Landlord a termination thereof upon the expiration or earlier termination of this Lease.

Section 18.04.  <u>Late Charges and Interest on Late Payments</u>.  Tenant acknowledges that late payment by Tenant to Landlord of the Base Rent and other amounts due hereunder will cause Landlord to incur costs not contemplated by this Lease and that the exact amount of such costs is extremely difficult and impractical to fix.  Such costs include processing and accounting charges and late charges and additional interest imposed on Landlord by the terms of any mortgage note or other financing.  Therefore, if any amount due from Tenant is not received by Landlord within ten (10) business days of the due date, Tenant shall pay to Landlord an additional sum equal to five percent (5%) of such overdue amount as a late charge and not as interest or a penalty.  In addition, any such amount which is not received by Landlord when due shall bear interest at twelve percent (12%) per annum (or such lesser rate equal to the maximum interest rate then permitted by Law) from the date due until received.  The parties agree that these charges represent a fair and reasonable estimate of the costs that Landlord will incur by reason of Tenant's late payment.  Payment of any such late charge or interest shall not excuse or cure any default nor prevent Landlord from exercising any of its other available rights and remedies.  Notwithstanding the foregoing, if Tenant cures any late payment within ten (10) days of notice from Landlord, then Tenant does not have to pay the late fee charge or such interest, provided that Landlord is only required to give such notice twice per calendar year.

31

Section 18.05.  <u>Consent Right</u>.  Landlord shall not, without the prior written consent of Tenant (which consent shall not be unreasonably withheld, conditioned or delayed), lease any other portion of the Property or grant any license, concession, or other right of occupancy of any other portion of the Property.    In the event Landlord desires Tenant's consent to the above listed item, Landlord shall, at least thirty (30) days prior to the date of the proposed action, provide Tenant with (i) a written description of all terms and conditions of the proposed action, (ii) copies of the proposed pertinent documentation, and (iii) the following information about the proposed transferee: name and address, reasonably satisfactory information about its business and business history, and its proposed use of the applicable portion of the Property.

Section 18.06.  <u>Accord and Satisfaction</u>.  No payment by Tenant or receipt by Landlord of a lesser amount than the Base Rent or any other amounts due hereunder shall be deemed to be other than on account of the earliest rent and/or other amounts due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment under this Lease be deemed an accord and satisfaction.  Landlord may accept such check or payment without prejudice to its right to recover the balance of the amount due hereunder or pursue any other remedy.

Section 18.07.  <u>Waiver</u>.  No default in the payment of rent or any other amount set forth herein, nor the failure to enforce the provisions of this Lease upon any default shall be construed as creating a custom of deferring payment or as modifying in any way the terms of this Lease or as a waiver of the right to terminate or cancel or otherwise to enforce the provisions hereof.  No express waiver of any provision, condition, or term shall affect any other provision, condition or term other than that specified in the waiving party's express waiver, and that only as specifically stated, and shall not be deemed to imply or constitute a subsequent waiver of such provision, condition or term.  No breach of a covenant or condition of this Lease shall be deemed to have been waived unless in writing by the waiving party.  It is expressly agreed that time shall be of the essence under this Lease.

Section 18.08.  <u>Tenant's Release of General Motors Corporation</u>.    So long as the Environmental Matters Agreement between Landlord and General Motors Corporation ("<u>GM</u>")  is in effect, Tenant on behalf of itself, and its successors and assigns, agrees to waive, hold harmless, and release, any and all claims, it may now have or have in the future against GM, and its successors and assignees, for any environmentally related claims, actions, losses, penalties, fines, liabilities, obligations, damages, judgments, costs, and expenses, including without limitations attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants, and the costs of remedial actions arising under any Environmental Laws (including but not limited to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended thereafter and the rules promulgated and amended thereafter, and Ohio Revised Code Chapter 3746 and the rules promulgated thereunder and amended thereafter) associated with GM's prior ownership, use or operation of the Acquired Assets, Leased Premises, Building, Land, and Property, and Landlord's ownership, use or operation of the Leased Premises, Building, Land, and Property.

Section 18.09.  <u>Legal Expenses</u>.  In the event any legal proceedings are instituted by Landlord or Tenant to enforce the terms of this Lease, the non-prevailing party shall pay to the prevailing party all reasonable costs incurred in connection with such legal proceedings, including reasonable attorneys' fees.  Each of the parties shall also indemnify the other against and hold it harmless from all costs, expenses, demands, claims and liabilities which may arise in the event the indemnified party becomes or is made a party to any claim or action (a) instituted by the other, or by any third party against the other, or by or against any person

32

holding any interest under or using the Leased Premises by license of or agreement with the other; (b) for foreclosure of any lien for labor or material furnished to or for the other or such other person; (c) otherwise arising out of or resulting from any act or transaction of the other or such other person; or (d) necessary to protect such party's interest under this Lease in a bankruptcy proceeding, or other proceeding under the Bankruptcy Code.

Section 18.10.  <u>Real Estate Brokers</u>.  Each party hereto represents that it has had no dealings with any real estate broker, finder or other person with respect to this Lease in any manner.  Each party hereto shall indemnify and hold the other party harmless from all damages resulting from any claims which may be asserted against the other party by any broker, finder or other person with whom the other party has or purportedly has dealt.

Section 18.11.  <u>Governing Law</u>.  This Lease shall be governed by and construed in accordance with the internal laws of the State of Ohio.  The unenforceability, invalidity or illegality of any term or provision of this Lease shall not render any other term or provision unenforceable, invalid or illegal.  In the event of litigation regarding this Lease, suit shall be brought in _____ County, Ohio.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT HEREBY WAIVE ANY AND ALL RIGHT TO A TRIAL BY JURY ON ANY ISSUE TO ENFORCE ANY TERM OR CONDITION OF THIS LEASE, OR WITH RESPECT TO LANDLORD'S RIGHT TO TERMINATE THIS LEASE OR TERMINATE TENANT'S RIGHT OF POSSESSION.

Section 18.12.  <u>Entire Agreement</u>.  This Lease and the Exhibits attached hereto set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant and there are no covenants, promises, agreements or understandings between Landlord and Tenant, either oral or written, other than are set forth herein.  No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by both parties hereto.

Section 18.13.  <u>No Partnership</u>.  Nothing contained herein shall be deemed or construed to create the relationship of principal and agent or of partnership or joint venture between the parties hereto.

Section 18.14.  <u>Interpretation and Use of Pronouns</u>.  The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.  Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include any other genders, when required by the context of this Lease.  If any language is deleted from this Lease, such language shall be deemed never to have appeared herein, and no implication shall be drawn therefrom.

Section 18.15.  <u>Notices</u>.  Any notice, demand, request, consent or other instrument which may be or is required to be given under this Lease shall be in writing and will be deemed to have been given when personally delivered or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by United States registered or certified mail, return receipt requested, postage prepaid, and addressed to the other party at the address set forth below or at such other place as either party may designate by written notice to the other.  Any written notice sent by mail shall be deemed to have been served as of the date of receipt or refusal to accept receipt.

33

| | |
|---|---|
| If to Landlord: | Delphi Corporation<br>5825 Delphi Drive<br>M/C 480-410-172<br>Troy, MI 48098<br>Attn: Executive Director, Operations Support<br>Group |
| with a copy to: | Delphi Corporation<br>5725 Delphi Drive<br>M/C 483-400-603<br>Troy, MI  48098<br>Attn: Deputy General Counsel,<br>Transactional & Restructuring |
| If to Tenant: | Tenneco Automotive Operating Company,<br>Inc.<br>c/o Tenneco, Inc.<br>500 North Field Drive<br>Lake Forest, IL  60045<br>Attn: General Counsel |
| with a copy to: | Mayer Brown LLP<br>71 S. Wacker Drive<br>Chicago, IL 60606<br>Attn: Jodi A. Simala |
| | and to: |
| | Mayer Brown LLP<br>214 N. Tryon Street, Suite 3800<br>Charlotte, NC 28202<br>Attn: Frank E. Arado |

Section 18.16.  <u>Execution of Lease</u>.  The individual(s) executing this Lease on behalf of Landlord and Tenant warrant and represent that it is each validly organized and existing and authorized to do business under the laws of the State of Ohio, that it has full power and lawful authority to enter into this Lease in the manner and form herein set forth, and that the execution of this Lease by such individual(s) is proper and sufficient to legally bind such party in accordance with the terms and conditions hereof.

Section 18.17.  <u>Further Assurances</u>.  Tenant shall, from time to time, execute and deliver to Landlord such statements, certifications, and other documents and agreements as Landlord may reasonably determine to be reasonably necessary or desirable to evidence Tenant's compliance with the terms of this Lease.

Section 18.18.  <u>Captions and Section Numbers</u>.  The table of contents, captions, Article numbers, and numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such articles.

34

Section 18.19.  <u>No Relocation</u>.  Landlord shall not have the right to relocate the Leased Premises at any time during the Lease Term.

Section 18.20.  <u>Counterpart Execution</u>.  This Lease may be executed in several counterparts, each of which shall be deemed an original, and all of which shall constitute but one and the same instrument.

Section 18.21.  <u>No Third Party Beneficiaries</u>.  Nothing contained in this Agreement, express or implied, is intended to or will be construed to confer upon or give to any Person (other than the Parties and their Affiliates, and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

WITNESSES:

"**Landlord**"
Delphi Automotive Systems LLC,
a Delaware limited liability company

By:_____

Print Name:_____

By:_____

Print Name:_____

By:_____

Print Name:_____

Its:_____

"**Tenant**"
TENNECO AUTOMOTIVE OPERATING COMPANY INC.,
a Delaware corporation

By:_____

Print Name:_____

By:_____

Print Name:_____

By:_____

Print Name:_____

Its:_____

35

<u>LANDLORD'S ACKNOWLEDGMENT</u>

STATE OF MICHIGAN            )
                             ) ss.
COUNTY OF  OAKLAND           )

     The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____, the _____ of Delphi Automotive Systems LLC, a limited liability company, on behalf of said company.

                                   _____

                                   Print Name:_____
                                   Notary Public, State of Michigan

                                   _____ County

                                   My commission expires:_____


<u>TENANT'S ACKNOWLEDGMENT</u>

STATE OF _____)
                         ) ss.
COUNTY OF _____)

     The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____, the _____ of Tenneco Automotive Operating Company Inc., a Delaware corporation, on behalf of said company.

                                     _____

                                     Print Name:_____
                                   Notary Public, State of Michigan

                                   _____ County

                                   My commission expires:_____

36

## LIST OF EXHIBITS AND SCHEDULES

**EXHIBITS**               **TOPIC**

A............................    Site Plan
B............................    North Property Fence line Location
C ............................   Landlord Access for Buildings 9 and 10 and Plant 16
D ............................   Delphi Equipment Removal
E............................    Tenneco Equipment Removal
F............................    Tenant Alterations
G ............................   Use Restrictions


**SCHEDULES**              **TOPIC**

6.02........................    Landlord's Utility Proportionate Share
7.02........................    Tenant's Proportionate Share of Taxes
17 ...........................   Environmental Matters

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
      In re                            :        Chapter 11
                                    :
DELPHI CORPORATION, et al.,        :        Case No. 05-44481 (RDD)
                                    :
                Debtors.      :        (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 363 AND 1146 AND FED. R. BANKR. P. 2002, 6004, AND
9014 AUTHORIZING AND APPROVING (I) SALE BY DELPHI AUTOMOTIVE SYSTEMS
LLC OF CERTAIN MACHINERY, EQUIPMENT, AND INVENTORY USED AT
DEBTOR'S KETTERING FACILITY FREE AND CLEAR OF LIENS AND (II) ENTRY INTO
<u>LEASE AGREEMENT IN CONNECTION THEREWITH</u>

("KETTERING SALE APPROVAL ORDER")

                Upon the expedited motion, dated March 7, 2008 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-

possession in the above-captioned cases (collectively, the "Debtors"), for orders pursuant to 11

U.S.C. §§ 363 and 1146 and Fed. R. Bankr. P. 2002, 6004, and 9014 (i) approving bidding

procedures, (ii) granting certain bid protections, (iii) approving the form and manner of sale

notices, (iv) setting a sale hearing date (the "Sale Hearing") in connection with the sale  (the

"Sale") of certain assets of Delphi Automotive Systems LLC ("DAS LLC" or the "Seller")

comprising certain assets used in the U.S. damper business (the "Acquired Assets"), including,

without limitation, the machinery, equipment, and inventory primarily used and located at DAS

LLC's damper manufacturing facility in Kettering, Ohio for approximately $18.8 million and

other consideration, as such purchase price may be adjusted based on Inventory Value (as

defined below) at closing pursuant to the Asset Purchase Agreement, dated March 7, 2008 (the

"Agreement," a copy of which is attached hereto as <u>Exhibit A</u>), by and between the Seller and

Tenneco Automotive Operating Company Inc. (the "Purchaser")[1] or to the party submitting the

highest or otherwise best bid (the "Successful Bidder"), and (v) approving and authorizing the

Seller to enter into the lease agreement attached to the Agreement as Exhibit A (the "Lease");[2]

and the Court having entered an order on ___, 2008 (the "Bidding Procedures Order") (Docket

No.____) (a) approving bidding procedures, (b) granting certain bid protections, (c) approving

the form and manner of sale notices, and (d) setting the Sale Hearing; and the Sale Hearing

having been held on April 30, 2008, at which time all interested parties were offered an

opportunity to be heard with respect to the Motion; and the Court having reviewed and

considered the Motion and the arguments of counsel made, and the evidence proffered or

adduced, at the Sale Hearing; and it appearing that the relief requested in the Motion is in the

best interests of the Debtors, their estates, their stakeholders, and all other parties-in-interest; and

after due deliberation thereon, and sufficient cause appearing therefor,

　　　IT IS HEREBY FOUND AND DETERMINED THAT:[3]

　　　A.　　The Court has jurisdiction over the Motion and the transactions

contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Motion

in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

[1]　　Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

[2]　　Further references throughout this order to the Agreement shall include the Lease and the terms thereof.

[3]　　Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  <u>See</u> Fed. R. Bankr. P. 7052.

2

B.       The statutory predicates for the relief sought in the Motion are sections

363 and 1146 of 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the

"Bankruptcy Code"), and Fed. R. Bankr. P. 2002, 6004, and 9014.

C.       As evidenced by the affidavits of service previously filed with the Court,

and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate, and

sufficient notice of the Motion, the Sale Hearing, and the Sale has been provided in accordance

with 11 U.S.C. §§ 102(l) and 363 and Fed. R. Bankr. P. 2002, 6004, and 9014, (ii) such notice

was good, sufficient, and appropriate under the circumstances, and (iii) no other or further notice

of the Motion, the Sale Hearing, or the Sale is necessary.

D.       As demonstrated by (i) the testimony and other evidence proffered or

adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale

Hearing, the Seller has marketed the Acquired Assets and conducted the sale process in

compliance with the Bidding Procedures Order.

E.       The Seller has full power and authority to execute the Agreement and all

other applicable documents contemplated thereby.  The transfer and conveyance of the Acquired

Assets by the Seller have been duly and validly authorized by all necessary action of the Seller.

The Seller has all of the power and authority necessary to consummate the transactions

contemplated by the Agreement and has taken all action necessary to authorize and approve the

Agreement and to consummate the transactions contemplated thereby.  No consents or approvals,

other than those expressly provided for in the Agreement, are required for the Seller to

consummate such transactions.

F.       The Seller has demonstrated (i) good, sufficient, and sound business

purpose and justification for the Sale because, among other things, the Seller and its advisors

3

diligently and in good faith analyzed all other available options in connection with the

disposition of the Acquired Assets and determined that (a) the terms and conditions set forth in

the Agreement, (b) the transfer to the Purchaser of the Acquired Assets pursuant thereto, and (c)

the Purchase Price agreed to as reflected in the Agreement are all fair and reasonable and

together constitute the highest or otherwise best value obtainable for the Acquired Assets.

G.    A reasonable opportunity to object or be heard with respect to the Motion

and the relief requested therein has been afforded to all interested persons and entities, including

without limitation: (i) the Office of the United States Trustee for the Southern District of New

York, (ii) counsel for the Purchaser, (iii) counsel for the official committee of unsecured

creditors appointed in these chapter 11 cases (the "Creditors' Committee"), (iv) counsel for the

official committee of equity security holders appointed in these chapter 11 cases, (v) all entities

known to have expressed an interest in a transaction with respect to the Acquired Assets during

the past six months, (vi) all entities known to have asserted any Liens (as defined below) in or

upon the Acquired Assets, (vii) all federal, state, and local regulatory or taxing authorities or

recording offices which have a reasonably known interest in the relief requested by the Motion,

(viii) the United States Attorney's office, (ix) the United States Department of Justice, (x) the

Securities and Exchange Commission, (xi) the Internal Revenue Service, (xii) all entities on the

Master Service List (as defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105

And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates

And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883) (the

"Supplemental Case Management Order")), and (xiii) such other entities as are required to be

served with notices under the Supplemental Case Management Order.

4

H.    The Purchaser is not an "insider" of any of the Debtors as that term is

defined in 11 U.S.C. § 101(31).

I.    The Agreement was negotiated, proposed, and entered into by the Seller

and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.

Neither the Seller nor the Purchaser has engaged in any conduct that would cause or permit the

Sale to be avoidable under 11 U.S.C. § 363(n).

J.    The Purchaser is a good faith purchaser under 11 U.S.C. § 363(m) and, as

such, is entitled to all of the protections afforded thereby.  The Purchaser will be acting in good

faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the

Agreement at all times after the entry of this Sale Approval Order.

K.    The consideration provided by the Purchaser for the Acquired Assets

pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for

the Acquired Assets, (iii) will provide a greater recovery for the Seller's stakeholders than would

be provided by any other practical available alternative, and (iv) constitutes reasonably

equivalent value and fair consideration under the Bankruptcy Code and under the laws of the

United States, any state, territory, or possession thereof, or the District of Columbia.

L.    The Sale must be approved and consummated promptly to preserve the

viability of the Kettering damper business as a going concern. The Sale is consistent with the

terms of the First Amended Joint Plan of Reorganization Of Delphi Corporation And Certain

Affiliates, Debtors And Debtors-In-Possession, As Modified (as amended, the "Plan") confirmed

by order of the Court on January 25, 2008 (the "Confirmation Order") (Docket No. 12359), and,

accordingly, constitutes a transfer to which section 1146(c) of the Bankruptcy Code applies.

5

M.    The transfer of the Acquired Assets to the Purchaser is a legal, valid, and effective transfer of the Acquired Assets, and shall vest the Purchaser with all right, title, and interest of the Seller to the Acquired Assets free and clear of any and all liens of any type whatsoever (including tax liens and any statutory or common law liens, possessory or otherwise), charges, pledges, security interests, conditional sale agreements or other title retention agreements, leases, mortgages, security interests, options, or other encumbrances (including the filing of, or agreement to give, any financing statements under the Uniform Commercial Code of any jurisdiction) and any monetary amounts which are secured by any lien, including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Seller or the Purchaser's interest in the Acquired Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Kettering damper business prior to the transfer of the Acquired Assets to the Purchaser except as expressly provided in the Agreement (collectively, the "Liens").

N.    If the Sale of the Acquired Assets by the Seller were not free and clear of any Liens as set forth in the Agreement and this Sale Approval Order, or if the Purchaser would, or in the future could, be liable for any of the Liens as set forth in the Agreement and this Sale Approval Order, the Purchaser would not have entered into the Agreement and would not consummate the Sale or the transactions contemplated by the Agreement, thus adversely affecting the Seller, its estate, and its stakeholders.

O.    The Seller may sell its interest in the Acquired Assets free and clear of all Liens because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. All holders of Liens who did not object or withdrew their objections to the

6

Sale are deemed to have consented to the Sale pursuant to 11 U.S.C. § 363(f)(2).  Those holders

of Liens who did object fall within one or more of the other subsections of 11 U.S.C. § 363(f),

and all holders of Liens are adequately protected by having their Liens, if any, attach to the cash

proceeds of the Sale ultimately attributable to the property against or in which they claim an

interest with the same priority, validity, force, and effect as they attached to such property

immediately before the closing of the Sale.

P.      The transfer of the Acquired Assets to the Purchaser will not subject the

Purchaser to any liability whatsoever with respect to the operation of the Kettering damper

business prior to the Closing of the Sale or by reason of such transfer under the laws of the

United States, any state, territory, or possession thereof, or the District of Columbia based, in

whole or in part, directly or indirectly, on any theory of law or equity, including, without

limitation, any theory of equitable law, including, without limitation, any theory of antitrust or

successor or transferee liability.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND

DECREED THAT:

### General Provisions

1.      The Motion is GRANTED.

### Approval Of The Agreement

2.      Pursuant to 11 U.S.C. § 363(b), the Agreement and all of the terms and

conditions thereof are hereby approved.

7

3.        Pursuant to 11 U.S.C. § 363(b), the Seller is authorized, but not directed, to perform its obligations under the Agreement and comply with the terms thereof and consummate the Sale in accordance with and subject to the terms and conditions of the Agreement.

4.        Each of the signatories to the Agreement is authorized, but not directed, to take all actions necessary or appropriate to effectuate the terms of this Sale Approval Order.

5.        The Seller is authorized, but not directed, to execute and deliver, and empowered to perform under, consummate, and implement, the Agreement, together with all additional instruments and documents as may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Agreement.

6.        This Sale Approval Order and the Agreement shall be binding in all respects upon all stakeholders (whether known or unknown) of the Seller, the Purchaser, all successors and assigns of the Purchaser and the Seller, all affiliates and subsidiaries of the Purchaser and the Seller, and any subsequent trustees appointed in the Seller's chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code, and shall not be subject to rejection. To the extent that any provision of this Sale Approval Order is inconsistent with the terms of the Agreement, this Sale Approval Order shall govern.

7.        The Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto without further

8

order of the Court; <u>provided</u> that any such modification, amendment, or supplement is disclosed

to the Creditors' Committee and does not have a material adverse effect on the Seller's estate, in

the good faith business judgment of the Seller.

<u>Sale And Transfer Of The Acquired Assets</u>

8.      Pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the consummation of the

Agreement, the Seller's right, title, and interest in the Acquired Assets shall be transferred to the

Purchaser free and clear of all Liens, with all such Liens to attach to the cash proceeds of the

Sale in the order of their priority, with the same validity, force, and effect which they had as

against the Acquired Assets immediately before such transfer, subject to any claims and defenses

the Seller may possess with respect thereto.

9.      The transfer of the Acquired Assets to the Purchaser pursuant to the

Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest

the Purchaser with all right, title, and interest of the Seller in and to the Acquired Assets free and

clear of all Liens of any kind or nature whatsoever.

10.     If any person or entity which has filed financing statements, mortgages,

mechanic's liens, <u>lis pendens,</u> or other documents or agreements evidencing Liens against or in

the Acquired Assets shall not have delivered to the Seller prior to the Closing of the Sale, in

proper form for filing and executed by the appropriate parties, termination statements,

instruments of satisfaction, releases of all Liens that the person or entity has with respect to the

Acquired Assets, or otherwise, then (a) the Seller is hereby authorized to execute and file such

statements, instruments, releases, and other documents on behalf of the person or entity with

respect to the Acquired Assets and (b) the Purchaser is hereby authorized to file, register, or

9

otherwise record a certified copy of this Sale Approval Order, which, once filed, registered, or

otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the

Acquired Assets of any kind or nature whatsoever.

11.    This Sale Approval Order (a) shall be effective as a determination that,

upon the Closing of the Sale, all Liens of any kind or nature whatsoever existing as to the Seller

or the Acquired Assets being sold by the Seller prior to the Closing of the Sale have been

unconditionally released, discharged, and terminated (other than any surviving obligations), and

that the conveyances described herein have been effected and (b) shall be binding upon and shall

govern the acts of all entities including, without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state, and local

officials, and all other persons and entities who may be required by operation of law, the duties

of their office, or contract, to accept, file, register, or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of

the Acquired Assets.

12.    All persons and entities, including, but not limited to, all debt security

holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade

stakeholders, and other stakeholders, holding Liens of any kind or nature whatsoever against or

in the Seller or the Acquired Assets (whether legal or equitable, secured or unsecured, matured

or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in

connection with, or in any way relating to, the Kettering facility, the Acquired Assets, the

operation of the Kettering facility prior to the Closing of the Sale, or the transfer of the Acquired

Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from

10

asserting against the Purchaser, its successors or assigns, its property, or the Acquired Assets,

such persons' or entities' Liens.  Nothing in this Sale Approval Order or the Agreement releases

or nullifies any Liability to a governmental agency under any environmental laws and

regulations that any entity would be subject to as owner or operator of any Acquired Assets after

the date of entry of this Sale Approval Order.  Nothing in this Sale Approval Order or the

Agreement bars, estops, or enjoins any governmental agency from asserting or enforcing, outside

the Court, any Liability described in the preceding sentence.  Notwithstanding the above, nothing

herein shall be construed to permit a governmental agency to obtain penalties from the Purchaser

for days of violation of environmental laws and regulations prior to Closing.

<u>Additional Provisions</u>

13.    The transactions contemplated by the Agreement, and the execution,

delivery, and/or recordation of any and all documents or instruments necessary or desirable to

consummate the transactions contemplated by the Agreement shall be, and hereby are, exempt

from the imposition and payment of all stamp taxes or any other similar taxes pursuant to section

1146(c) of the Bankruptcy Code.

14.    The consideration provided by the Purchaser for the Acquired Assets

under the Agreement is hereby deemed to constitute reasonably equivalent value and fair

consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform

Fraudulent Transfer Act, and under the laws of the United States, and any state, territory, or

possession thereof, or the District of Columbia.

15.    Upon the Closing of the Sale, this Sale Approval Order shall be construed

as and shall constitute for any and all purposes a full and complete general assignment,

11

conveyance, and transfer of all of the Acquired Assets or a bill of sale transferring good and

marketable title in the Acquired Assets to the Purchaser pursuant to the terms of the Agreement.

16.     Upon the Closing of the Sale, each of the Seller's creditors is authorized

and directed to execute such documents and take all other such actions as may be necessary to

release its respective Liens against the Acquired Assets, if any, as such Liens may have been

recorded or may otherwise exist.

17.     Each and every federal, state, and governmental agency or department,

and any other person or entity, is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the

Agreement.

18.     All entities which are currently, or as of the Closing of the Sale may be, in

possession of some or all of the Acquired Assets to be sold, transferred, or conveyed pursuant to

the Agreement are hereby directed to surrender possession of the Acquired Assets to the

Purchaser upon the Closing of the Sale.

19.     The transactions contemplated by the Agreement are undertaken by the

Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and

accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the sale of the Acquired Assets shall not affect the validity of the Sale to the

Purchaser, unless such authorization is duly stayed pending such appeal.  The Purchaser is a

purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded

by section 363(m) of the Bankruptcy Code.

12

20.    The consideration provided by the Purchaser for the Acquired Assets under the Agreement is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

21.    The Seller, including, but not limited to, its officers, employees, and agents, is hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Agreement and this Sale Approval Order.  The Seller shall be, and it hereby is, authorized to take all such actions as may be necessary to effectuate the terms of this Sale Approval Order.

22.    The terms and provisions of the Agreement and this Sale Approval Order shall be binding in all respects upon, and shall inure to the benefit of, the Seller, its estate, and its stakeholders, the Purchaser, and its affiliates, successors, and assigns, and any affected third parties, including, but not limited to, all persons asserting a Lien in the Acquired Assets to be sold to the Purchaser pursuant to the Agreement, notwithstanding any subsequent appointment of any trustee or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee or other fiduciary such terms and provisions likewise shall be binding.

23.    Notwithstanding anything contained herein to the contrary, the term "Acquired Assets" as defined herein does not include property that is not property of the Seller's estate, such as funds that are trust funds under any applicable state lien laws.

24.    The failure specifically to include or to reference any particular provision of the Agreement in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

13

25.    This Court retains exclusive jurisdiction to interpret, construe, enforce, and implement the terms and provisions of this Sale Approval Order, the Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed to the Seller pursuant to the Agreement, (c) resolve any disputes arising under or related to the Agreement, (d) interpret, implement, and enforce the provisions of this Sale Approval Order, and (e) protect the Purchaser against any Lien against the Selling Debtor Entities or the Acquired Assets, of any kind or nature whatsoever, which Liens, valid and timely perfected, shall attach to the proceeds of the Sale.

26.    The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
          ____, 2008

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT F

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com slivini@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 1540 Broadway | 24th Fl | New York | NY | 10036 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Richard Duker | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | richard.duker@jpmorgan.com | Prepetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Susan Atkins, Gianni Russello | 277 Park Ave 8th Fl | | New York | NY | 10172 | 212-270-0426 | 212-270-0430 | susan.atkins@jpmorgan.com | Postpetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 2335 Alaska Ave | | El Segundo | CA | 90245 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 212735860 3 | 917522310 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | william.dornbos@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2.023E+09 | 2.023E+09 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-3500 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2.123E+09 | 2.123E+09 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

3/21/2008 10:28 AM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Harvey R. Miller | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8500 | 212-310-8077 | harvey.miller@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

3/21/2008 10:28 AM
Master Service List Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Adalberto Cañadas Castillo | | Avda Ramon de Carranza | 10-1° | Cadiz | | 11006 | Spain | 34 956 226 311 | adalberto@canadas.com | Representative to DASE |
| Adler Pollock & Sheehan PC | Joseph Avanzato | One Citizens Plz 8th Fl | | Providence | RI | 02903 | | 401-274-7200 | javanzato@apslaw.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Akin Gump Strauss Hauer & Feld, LLP | David M Dunn | 1333 New Hampshire Ave NW | | Washington | DC | 20036 | | 202-887-4000 | ddunn@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Ira S Dizengoff | 590 Madison Ave | | New York | NY | 10022-2524 | | 212-872-1000 | idizengoff@akingump.com | Counsel to TAI Unsecured Creditors Liquidating Trust |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC, PD George Co, Furukawa Electric Companay, LLC., and Furukawa Electric North America APD, Inc. |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | mblacker@andrewskurth.com | Counsel to  ITW Mortgage Investments IV, Inc. |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Anthony Ostlund & Baer PA | John B Orenstein | 3600 Wells Fargo Ctr | 90 S 7th St | Minneapolis | MN | 55402 | | 612-349-6969 | jorenstein@aoblaw.com | Attorneys for Whitebox Hedged High Yield Partners, LP |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | cgalloway@atsautomation.com | Company |
| Balch & Bingham LLP | Eric T. Ray | PO Box 306 | | Birmingham | AL | 35201 | | 205-251-8100 | eray@balch.com | Attorney for Alabama Power Company |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | Kimberly J. Robinson | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | kim.robinson@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum & Nagelberg LLP | William J. Barrett | 200 W Madison St Ste 3900 | | Chicago | IL | 60606 | | 312-984-3100 | william.barrett@bfkn.com | Counsel to Motion Industries, Inc., EIS, Inc. and Johnson Industries, Inc. |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | alan.mills@btlaw.com | Counsel to Mays Chemical Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | john.gregg@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | mark.owens@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | michael.mccrory@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | pmears@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | wendy.brewer@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | ffm@bostonbusinesslaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | tom@beemanlawoffice.com | Counsel to Madison County (Indiana) Treasurer |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | hannah@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | tgaa@bbslaw.com | Counsel to Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | jtaylor@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Industries |
| Blank Rome LLP | Marc E. Richards | The Chrysler Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bose McKinney & Evans LLP | Michael A Trentadue Carina M de la Torre | 2700 First Indiana Plz | 135 N Pennsylvania St | Indianapolis | IN | 46204 | | 317-684-5000 | mtrentadue@boselaw.com cdelatorre@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605-529 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc |
| Cadwalader Wickersham & Taft LLP | Jeannine D'Amico | 1201 F St NW Ste 1100 | | Washington | DC | 20004 | | 202-862-2452 | jeannine.damico@cwt.com | Attorneys for the Audit Committee of Delphi Corporation |
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | jonathan.greenberg@BASF.COM | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | jrobertson@calfee.com | Counsel to Brush Engineered materials |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | japplebaum@clarkhill.com | Counsel to 1st Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany; Attorneys for Columbia Industrial |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Coompany |
| Covington & Burling | Susan Power Johnston Aaron R. Marcu | 620 Eighth Ave | | New York | NY | 10018 | | 212-841-1005 | sjohnston@cov.com | Special Counsel to the Debtor |
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Curtin & Heefner, LLP | Robert Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| David P. Martin | | 519 Energy Center Blvd | Ste 1104 | Northport | AL | 35401 | | 205-343-1771 | davidpmartin@erisacase.com davidpmartin@bellsouth.net | Co-Counsel for David Gargis, Jimmy Mueller, and D. Keith Livingston |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |
| Day Pitney LLP | Ronald S. Beacher Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | rbeacher@daypitney.com cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Dreier LLP | Maura I. Russell Wendy G. Marcari | 499 Park Ave | 14th Fl | New York | NY | 10022 | | 212-328-6100 | jguerrier@dreierllp.com | Counsel to SPCP Group LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Drinker Biddle & Reath LLP | Janice B. Grubin | 140 Broadway 39th Fl | | New York | NY | 10005-1116 | | 212-248-3140 | janice.grubin@dbr.com | Counsel to Vanguard Distributors, Inc. |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; and Hosiden America Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | ayala.hassell@eds.com | Representattive for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 639 Loyola Ave 26th Fl | | New Orleans | LA | 70113 | | | akatz@entergy.com | Assistant General Counsel to Entergy Services, Inc |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 5 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | David G Dragich | 500 Woodward Ave Suite 2700 | | Detroit | MI | 48226-3489 | | 313-234-7100 | ddragich@foley.com | Counsel to Intermet Corporation |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute Attorney for Solvay Fluorides, LLC |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Garvey Schubert Barer | Roberto Carrillo | 100 Wall St 20th Fl | | New York | NY | 10005 | | 212-965-4511 | rcarrillo@gsblaw.com | Attorney's for Tecnomec S.r.L. |
| Gibbons P.C. | David N. Crapo | One Gateway Center | | Newark | NJ | 07102-5310 | | 973-596-4523 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg Segalla LLP | Attn Bruce W Hoover | 665 Main St Ste 400 | | Buffalo | NY | 14203 | | 716-566-5400 | bhoover@goldbergsegalla.com | Counsel to Wells Manufacturing Co.; Inc.; Attorneys for MasTec Inc. |
| Goodwin Procter LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | abrilliant@goodwinprocter.com | Counsel to UGS Corp. |
| Goodwin Procter LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | cdruehl@goodwinprocter.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | MetLife Bldg | 200 Park Avenue | New York | NY | 10166 | | 212-801-9200 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation; Co-Counsel for Yazaki North America, Inc. |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 60 E 42nd St 37th Fl | | New York | NY | 10165-0150 | | 212-661-3535 | sgross@hodgsonruss.com | Co-Counsel for Yazaki North America, Inc. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Honigman, Miller, Schwartz and Cohn, LLP | Lawrence J. Murphy | 2290 First National Building | 660 Woodward Ave | Detroit | MI | 48226 | | 313-465-7488 | lmurphy@honigman.com | Attorneys for Guide Corporation and Lightsource Parent Corporation |
| Honigman, Miller, Schwartz and Cohn, LLP | Seth A Drucker | 2290 First National Building | 660 Woodward Avenue Ste 2290 | Detroit | MI | 48226 | | 313-465-7626 | sdrucker@honigman.com | Counsel for Valeo Climate Control, Corp. |
| Howard & Howard Attorneys PC | Lisa S Gretchko | 39400 Woodward Ave | Ste 101 | Bloomfield Hills | MI | 48304-5151 | | 248-723-0396 | lgretchko@howardandhoward.com | Intellectual Property Counsel for Delphi Corporation, et al. |
| Howick, Westfall, McBryan & Kaplan, LLP | Louis G. McBryan | 3101 Tower Creek Parkway | Ste 600 One Tower Creek | Atlanta | GA | 30339 | | 678-384-7000 | lmcbryan@bwmklaw.com | Counsel to Vanguard Distributors, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | heather@inplaytechnologies.com | Creditor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | rgriffin@iuoe.org | Counsel to International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC, Tenneco Inc. and Contech LLC |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rily | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | H. Slayton Dabney, Jr.; Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | sdabney@kslaw.com | Counsel to KPMG LLP |
| Kirkland & Ellis LLP | Jim Stempel | 200 East Randolph Drive | | Chicago | IL | 60601 | | 312-861-2000 | jstempel@kirkland.com | Counsel to Lunt Mannufacturing Company |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | sosimmerman@kwgd.com | Counsel for Millwood, Inc. |
| Kutak Rock LLP | Jay Selanders | 1010 Grand Blvd Ste 500 | | Kansas City | MO | 64106 | | 816-502-4617 | jay.selanders@kutakrock.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrylser Canada, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | Two Center Plaza | Suite 620 | Boston | MA | 02108-1906 | | 617-542-3000 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etikin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| Maddin, Hauser, Wartell, Roth & Heller PC | Alexander Stotland Esq | 28400 Northwestern Hwy | Third Floor | Southfield | MI | 48034 | | 248-354-4030 | axs@maddinhauser.com | Attorney for Danice Manufacturing Co. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC and Hosiden America Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | Gary O. Ravert | 340 Madison Avenue | | New York | NY | 10017-1922 | | 212-547-5477 | gravert@mwe.com | Counsel for Temic Automotive of North America, Inc. |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDermott Will & Emery LLP | Steven P. Handler Monica M. Quinn | 227 W Monroe St | | Chicago | IL | 60606 | | 312-372-2000 | shandler@mwe.com mquinn@mwe.com | Counsel for Temic Automotive of North America, Inc. |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuireWoods LLP | Aaron G McCollough Esq | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1000 | amccollough@mcguirewoods.com | Counsel to Siemens Energy & Automation, Inc. |
| McGuireWoods LLP | John H Maddock IIII, Daniel F Blanks | One James Center | 901 East Cary Street | Richmond | VA | 23219 | | 804-775-1000 | jmaddock@mcguirewoods.com dblanks@mcguirewoods.com | Counsel for CSX Transportation, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers Law Group, P.C. | Merle C. Meyers | 44 Montgomery Street | Suite 1010 | San Francisco | CA | 94104 | | 415-362-7500 | mmeyers@mlg-pc.com | Counsel to Alps Automotive, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Heritage Bank | Janice M. Donahue | 28300 Orchard Lake Rd | Ste 200 | Farmington Hills | MI | 48334 | | 248-538-2529 | jdonahue@miheritage.com | Counsel to Michigan Heritage Bank; MHB Leasing, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 | sarbt@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller Johnson | Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1726 | wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | piricotta@mintz.com  pricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiares Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| National Renewable Energy Laboratory | Marty Noland Principal Attorney | 1617 Golden Blvd | Legal Office, Mail Stop 1734 | Golden | CO | 80401 | | 303-384-7550 | marty_noland@nrel.gov | Counsel for National Renewable Energy Laboratory |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| New Jersey Attorney General's Office Division of Law | Tracy E Richardson Deputy Attorney General | R.J. Hughes Justice Complex | 25 Market St P.O. Box 106 | Trenton | NJ | 08628-0106 | | 609-292-1537 | tracy.richardson@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey Division of Taxation |
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississipi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississipi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississipi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-------|------------------|
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Ohio Environmental Protection Agency | c/o Michelle T. Sutter | Principal Assistant Attorney General Environmental Enforcement Section | 30 E Broad St 25th Fl | Columbus | OH | 43215 | | 614-466-2766 | msutter@ag.state.oh.us | Attorney for State of Ohio, Environmental Protection Agency |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | Columbia Center | 1152 15th St NW | Washington | DC | 20005-1706 | | 202-339-8400 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | Columbia Center | 1152 15th St NW | Washington | DC | 20005-1706 | | 202-339-8400 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | mseidl@pszjlaw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl & Jones LLP | Robert J. Feinstein Ilan D. Scharf | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | Rfeinstein@pszjlaw.com lscharf@pszjlaw.com | Counsel for Essex Group, Inc. |
| Patterson Belknap Webb & Tyler LLP | David W. Dykhouse Phyllis S. Wallitt | 1133 Avenue of the Americas | | New York | NY | 10036-6710 | | 212-336-2000 | dwdykhouse@pbwt.com | Attorneys for Fry's Metals Inc. and Specialty Coatings Systems Eft |
| Paul H. Spaeth Co. LPA | Paul H. Spaeth | 130 W Second St Ste 450 | | Dayton | OH | 45402 | | 937-223-1655 | spaethlaw@phslaw.com | Attorneys for F&G Multi-Slide Inc and F&G Tool & Die Co. Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p.A. |
| Pietragallo Bosick & Gordon LLP | Richard J. Parks | 54 Buhl Blvd | | Sharon | PA | 16146 | | 724-981-1397 | rjp@pbandg.com | Counsel to Ideal Tool Company, Inc. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | Ste 550 | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | jh@previant.com mgr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| PriceWaterHouseCoopers | Enrique Bujidos | Almagro | 40 | Madrid | | 28010 | Spain | 34 915 684 356 | enrique.bujidos@es.pwc.com | Representative to DASE |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | andrew.herenstein@quadranglegroup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | patrick.bartels@quadranglegroup.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Roy Prange | 33 E Main St Ste 900 | | Madison | WI | 53703-3095 | | 608-283-2485 | rlp@quarles.com | Counsel for Flambeau Inc. |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | tslome@rsmllp.com | Counsel to JAE Electronics, Inc. Counsel for Pamela Gellar |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Eugene J. Geekie, Jr. | 7500 Sears Tower | | Chicago | IL | 60606 | | 312-258-5635 | egeekie@schiffhardin.com | Counsel to  Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | james.bentley@srz.com | Counsel to Panasonic Automomtive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk | 620 Eighth Ave | | New York | NY | 10018-1405 | | 212-218-5500 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | whanlon@seyfarth.com | Counsel to le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 18 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Valerie A Hamilton Simon Kimmelman | 650 College Rd E | | Princeton | NJ | 08540 | | 609-227-4600 | vhamilton@sillscummis.com skimmelman@sillscummis.com | Counsel to Doosan Infracore America Corp. |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Simon, Stella & Zingas, PC | Stephen P. Stella | 422 W Congress Ste 400 | | Detroit | MI | 48226 | | 313-962-6400 X225 | attorneystella@sszpc.com | Counsel to Motor City Electric |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. and United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Monika J. Machen | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | mmachen@sonnenschein.com | Counsel to United Plastics Group |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Squire Sanders & Dempsey | G Christopher Meyer | 4900 Key Tower | 127 Public Sq | Cleveland | OH | 44114-1304 | | 216-479-8500 | cmeyer@ssd.com | Counsel for the City of Dayton, Ohio |
| Squire, Sanders & Dempsey L.L.P. | G. Christopher Meyer | 4900 Key Tower | 127 Public Sq | Cleveland | OH | 44114 | | 216-479-8692 | cmeyer@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta Michael A Spero Simon Kimmelman Valerie A Hamilton | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-392-2100 | jposta@sternslaw.com jspecf@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | madison.cashman@stites.com | Counsel to Setech, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 19 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 502-587-3400 | wbeard@stites.com loucourtsum@stites.com | Counsel to WAKO Electronics (USA), Inc.,Ambrake Corporation, and Akebona Corporation (North America) |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| Thaler & Gertler LLP | Andrew M. Thaler Esq | 90 Merrick Ave Ste 400 | | East Meadow | NY | 11554 | | 516-228-3533 | thaler@tglawfirm.com | Co-Counsel for David Gargis, Jimmy Mueller, and D. Keith Livingston |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timken Corporation BIC -08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | robert.morris@timken.com | Representative for Timken Corporation |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thompson Coburn LLP d/b/a Thompson Coburn Fagel Haber | Dennis E. Quaid Esq | 55 E Monroe 40th Fl | | Chicago | IL | 60603 | | 312-580-2226 | dquaid@tcfhlaw.com efiledocketgroup@fagelhaber.com | Counsel for Penn Aluminum International Inc |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| TI Group Automotive Systms LLC | Timothy M. Guerriero | 12345 E Nine Mile Rd | | Warren | MI | 48089 | | 586-755-8066 | tguerriero@us.tiauto.com | General Counsel and Company Secretary to TI Group Automotive Systems LLC |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 20 of 21

3/21/2008 10:27 AM
Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Varnum, Riddering, Schmidt & Howlett LLP | Michael S. McElwee | Bridgewater Place | P.O. Box 352 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | msmcelwee@varnumlaw.com | Co-Counsel to Tower Automotive, Inc. |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | robert.welhoelter@wallerlaw.c om | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation; Counsel to Daewoo International Corp and Daewoo International (America) Corp |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.co m | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Wickens Herzer Panza Cook & Batista Co | James W Moennich Esq | 35765 Chester Rd | | Avon | OH | 44011-1262 | | 440-930-8000 | jmoennich@wickenslaw.com | Counsel for Delphi Sandusky ESOP |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | mwinthrop@winthropcouchot.c om | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | sokeefe@winthropcouchot.co m | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 21 of 21

3/21/2008 10:27 AM
Email