1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.,


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


        U.S. Bankruptcy Court

        One Bowling Green

        New York, New York


        February 29, 2008

        10:07 a.m.


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1    MOTION for Approving Patent License Settlement with Denso

2    Corporation

3

4    CLAIM Objection Hearing Regarding Claim of Furukawa Electric

5    Co. Ltd.

6

7    MOTION of Equal Employment Opportunity Commission for Leave to

8    File Late Proof of Claim

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:   Esther Accardi

25

3

```
 1   A P P E A R A N C E S :

 2   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

 3       Attorneys for Debtors

 4       333 West Wacker Drive

 5       Chicago, Illinois 60606

 6

 7   BY:  JOHN K. LYONS, ESQ.

 8       ADLAI HARDIN, ESQ.

 9

10

11   TOGUT SEGAL & SEGAL, LLP

12       Attorneys for Debtors

13       One Penn Plaza

14       New York, New York 10119

15

16   BY:  ANDREW WINCHELL, ESQ.

17

18

19   UNITED STATES DEPARTMENT OF JUSTICE

20   OFFICE OF THE UNITED STATES TRUSTEE

21       Attorneys for the EEOC

22       86 Chambers Street

23       New York, New York 10007

24

25   BY:  MATTHEW L. SCHWARTZ, ESQ.
```

4

1    BLANK ROME, LLP

2        Attorneys for Denso

3        405 Lexington Avenue

4        New York, New York 10174

5

6    BY:  MELISSA S. VONGTAMA, ESQ.

7

8    MARGARET MALLOY, ESQ., EEOC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    P R O C E E D I N G S

2         THE COURT:  Please be seated.  Okay.  Delphi

3    Corporation.

4         MR. LYONS:  Good morning, Your Honor.  John Lyons on

5    behalf of the debtors.

6         THE COURT:  Good morning.

7         MR. LYONS:  This is our twenty-first claims hearing.

8    And, Your Honor, and we have one contested matter today.  We

9    have two other matters that I'd like to take first, though.

10   They're handled by Togut Segal and they involve some

11   compromises at compromised motions.

12        THE COURT:  Okay.

13        MR. WINCHELL:  Good morning, Your Honor.  Andy

14   Winchell for Togut Segal & Segal, LLP, on behalf of the

15   debtors.  The first item on the agenda this morning is a motion

16   to approve for patents -- license settlement agreement with

17   Denso Corporation.  This arises out of the claims context

18   because Denso filed three claims, claims 12339, 12340, 12341,

19   for alleged patent infringement.  Each claim was in the amount

20   of 697,778 dollars.  One claim against DAS, LLC, one against

21   Delphi Corporation, and one against Delphi Technologies.

22        Your Honor, the settlement was arguably in the

23   ordinary course of business, but we, out of an abundance of

24   caution decided to bring this motion, give all parties an

25   opportunity -- some notice, and a chance to inquire about the

6

1    terms of the settlement.  We did receive one inquiry about the

2    settlement, that was from the creditors' committee, it came a

3    couple of weeks ago.  FTI responded and the creditors'

4    committee is now supportive of the settlement, so they did not

5    end up filing any objection.

6           After the filing of these three claims, there was

7    approximately a year/year and a half worth of arms length

8    negotiations between sophisticated parties, representing by

9    competent counsel, Melissa Vongtama of Blank Rome is here

10    representing Denso.  The result of this, had a license

11    settlement agreement, which we filed under seal, pursuant to

12    your order.

13           There are two remaining provisions of the settlement

14    agreement, one of which is obviously the withdrawal of the

15    three claims, that's not confidential at all.  The rest of the

16    settlement agreement contains highly sensitive pricing

17    information which is confidential and therefore we filed it

18    under seal.

19           THE COURT:  Because it's essentially the patent

20    license.

21           MR. WINCHELL:  Absolutely, Your Honor.  But

22    otherwise, Your Honor, we consider this in the best interest of

23    the estate and request it be approved.

24           THE COURT:  I reviewed the license, and I was going

25    to ask you but you've already told me, the creditors' committee

7

1    considered it also.

2         MR. WINCHELL:  Yes.

3         THE COURT:  So in light of that and there being no

4    objections, I'll approve the settlement.  As you noted also,it

5    includes approval of the license agreement.

6         MR. WINCHELL:  Thank you, Your Honor.

7         THE COURT:  Okay.

8         MR. WINCHELL:  And the second item, Your Honor, is

9    the claims objection hearing regarding the claim of Furukawa

10   Electric.  This is a purely housekeeping matter.  The claim was

11   superseded -- opposing counsel confirmed to us on Wednesday

12   that the claim should be expunged as being superseded.  We have

13   that with an e-mail they transmitted to us.  They're not here.

14   They did not want to go through the effort of having a

15   stipulation, they just intend to have us proceed.

16        THE COURT:  Okay.  So how's that going to be

17   memorialized, do you have an order on that?

18        MR. WINCHELL:  We'll have an order on that, yes.

19        THE COURT:  Okay.  Fine.  Then, I'll sign that when

20   you give it to me, the claim is conceded -- duplicate of --

21   superseded by subsequent proof of claim.

22        MR. WINCHELL:  Very good.  Thank you, Your Honor.

23        THE COURT:  Okay.

24        MR. LYONS:  Your Honor, the third item on the agenda

25   is the contested matter.  And that's the motion of the Equal

8

1    Opportunity Commission for a leave to file a late proof of

2    claim.  I'll yield the podium to the United States.

3         THE COURT:  Okay.

4         MR. SCHWARTZ:  Good morning, Your Honor.  Matthew

De

l

e

5    Schwartz for the United States of America.  We're here for a

6    hearing on the United States' motion for leave to file a late

7    claim, that's the claim of the Equal Employment Opportunity

8    Commission.  At the outset, I would like to ask that this

9    hearing be adjourned to a time next week.  We were served with

10   Delphi's papers yesterday morning.  I have personally been on

11   trial before Judge Stein since the beginning of the month,

12   concluding yesterday, and so was not able to turn to the papers

13   until after that.  I don't think that we've had adequate time

14   to review them.  I would like to put in a response, especially

15   in view of the fact that Delphi's papers implicates serious

16   evidentiary problems, I think that should be briefed.  There

17   are large portions of the response that I feel should be

18   stricken, because they disclose improper settlement material.

19   And so we would ask at the outset that the hearing be adjourned

20   so that we could file reply papers.

21        THE COURT:  Well, let me first hear about the

22   evidentiary record for this matter.  I was provided with an

23   exhibit index which indicated that the last item in the index,

24   a January 8, 2008 e-mail, is in dispute.  I took from that that

25   the other items were not.  I didn't read the e-mail because I

1    knew it was in dispute.  Was that a fair assumption?

2         MR. SCHWARTZ:  It's a fair assumption, of course,

3    that we dispute the admissibility of item 8.  There is one

4    other item, it's an item actually that we've included as

5    Exhibit N to Ms. Malloy's declaration, that is admissible.  But

6    the use that Delphi  has made of that document is not

7    acceptable under the rules of evidence.  In addition, they have

8    disclosed the contests of settlement discussion in their motion

9    papers, their brief.  That is not reflected in any of the

10   documents.  And those portions of the brief should also be

11   stricken.  And there specifically, I'm referring to with

12   respect to Exhibit N, that is the conciliation letter from the

13   EEOC during the investigative process.  We included that

14   basically to give a full picture of the investigation.  And

15   because by the EEOC's regulations, they were required to enter

16   into conciliation efforts.  Under Rule 408, in other words, the

17   use of that settlement material was to rebut an argument of

18   undue delays, specifically, explicitly under the rules of

19   permissible use.  The use that Delphi has made of that document

20   is (1) to look at the actual terms of the conciliation offer,

21   to say this number, the number that's in that letter which may

22   have read, is 200,000 dollars, and that is the actual amount of

23   the claim.  And then they used that to try to impeach the

24   amount of the later settlement offer.  You may not have read

25   the e-mail but you read the number because its all throughout

1    their brief, so if you read the brief you know that.

2        THE COURT:  But you don't want to have either of the

3    settlement offers in for purposes of the amount of the claim?

4        MR. SCHWARTZ:  For purposes of the amount of the

5    claim, that's correct.

6        THE COURT:  I agree with you on that.

7        MR. SCHWARTZ:  And in addition, there is commentary

8    in Delphi's --

9        THE COURT:  I mean, it's admissible for other

10   purposes, but under 408 it can't be admitted to go to show the

11   amount of the claim.

12       MR. SCHWARTZ:  I think that is the only purpose that

13   Exhibit 8 is being offered.  I know in our conversations, Mr.

14   Lyons has said that this goes to the good faith prong of the

15   pioneer analysis.  But that can't be right, this is not good --

16   it doesn't have anything to do with the good faith of the EEOC

17   and filing the claim when it did.  If anything, it has to --

18       THE COURT:  Well, I haven't read it.  So as long as

19   it's not being admitted to show the amount of the claim Mr.

20   Lyons can make the argument and you can say that's what it's

21   doing, and I'll consider it at that point, if he wants to rely

22   on it.

23       MR. SCHWARTZ:  Okay.  And there are also statements

24   throughout the brief about the content of settlement

25   discussions.  And in particular, there is a suggestion in the

11

1    papers that I threatened them that if they were to litigate
2    this -- that if they were to litigate this claim, I would have
3    moved to withdraw the reference in this case.  That is, first
4    of all, not at all what I said.  What I said was, if they were
5    going to litigate the merits of the claim, it might make sense
6    to agree to withdraw the reference so it can be consolidated
7    with the enforcement action in Buffalo, so as not to duplicate
8    effort.  But in any case, that also came in the context that
9    settlement is not in any way admissible in this proceeding.
10        THE COURT:  Well, why is that?  Everything you say in
11    the context of a settlement is not shielded.
12        MR. SCHWARTZ:  I think that under Rule 408 that's not
13    the case.  I think that discussions in the context of a
14    settlement are shielded.
15        THE COURT:  No, that's not right.  Not every
16    discussion.  If it goes to an issue of good faith, it isn't.
17    Now, you -- it's not that big a point, frankly.  I take with a
18    grain of salt the whole -- the whole issue.  But --
19        MR. SCHWARTZ:  That also goes to an issue on the
20    merits because these are not the relevant good faith arguments.
21    Again --
22        THE COURT:  But again, I'm just talking about the
23    evidentiary issues to see whether they really are something

De
l
e

24    that needs to be briefed.  So far I don't think they do.  You

De
l
e

25    won on one and I think legitimately you lost on the other and I

12

1   don't think any briefing would have changed that, particularly
2   since -- I'm telling you both right now, I think it's a very
3   peripheral point to begin with.
4        MR. SCHWARTZ:  Fair enough.  And just generally, I
5   would like an opportunity to be able to review the papers, to
6   read the cases cited in the papers, and to put in a reply.
7        THE COURT:  Well, I -- you know, I prepared for
8   this --
9        MR. SCHWARTZ:  Let me ask in the alternative then,
10  can I ask for the opportunity to put in post-hearing papers?
11       THE COURT:  Well, we see.  The law in this area is
12  quite clear.  There -- there's a leading Second Circuit case on
13  it, you've cited Pioneer, you cited Trap Rock, although not --
14  well, no, you cited both Trap Rocks.  And, you know, I don't
15  think there's any particular mystery here on the standard under
16  Pioneer.  If we go off on some other point, including the

De
l
e

17  capacity in which the EEOC seeks damages that I think needs
18  additional briefing, I'll ask for it.  But, I just -- you know,

De
l
e

19  this is -- I know this was adjourned once because – I recollect     De
l
e
t

20  your letters, and it was something I prepared on already and
21  the parties are here on it, I just don't think I --
22       MR. SCHWARTZ:  I appreciate that, Judge.  I just --
23       THE COURT:  -- should adjourn it further.
24       MR. SCHWARTZ:  I just do want to note that prejudice
25  here is that Delphi's had our arguments for months.  We put in

13

1  a reply to their untimeliness objection that had the merits of

2  our arguments.  We've had their arguments functionally since 5

3  p.m. yesterday.

4       THE COURT:  Well, but -- you know, they haven't

5  violated any rule.  And again, this is -- the arguments are

6  pretty evident -- should be pretty evident to the movant and

7  everyone else.  I mean, it's a -- I just don't feel you're

8  particularly disadvantaged.

9       MR. SCHWARTZ:  Okay.  Well --

10      THE COURT:  So, as far as the record is concerned

11  then, is it -- it's fair to say that items 1 through 7 in the

12  exhibit index are agreed to as to admissibility?

13      MR. SCHWARTZ:  That's correct.

14      THE COURT:  And as number 8 is concerned, well, I

15  haven't looked at it.

16      MR. LYONS:  If I may, Your Honor.  I mean, again,

17  we're not introducing it to prove the amount of the claim.

18      THE COURT:  Okay.

19      MR. LYONS:  Rather, again, I think it's almost to

20  rebut the rebuttal of the contention of undue delay.

21      THE COURT:  All right.  Well, why don't we --

22      MR. SCHWARTZ:  Let me say one more thing on that

23  Exhibit 8, before we look at it.  A characterization in the

24  index that its an e-mail regarding expanding discovery is

25  grossly wrong.  Is an e-mail from me that begins and ends in

14

1    boldfaced letters with the phrase "for settlement purposes

2    only."  It was not something that should have been disclosed.

3         THE COURT:  Well, again, I don't accept the fact that

4    someone can write a settlement memo and keep it all out.  But,

5    let me take a look at it.

6         (Pause in proceedings.

7         THE COURT:  Okay.  I guess, as long as its not being

8    introduced to show the -- some sort of admission or evidence as

9    to the amount of the claim, then I believe it's marginally

10   relevant.  And I think it could serve as part of the record.

11   You can tell me why I shouldn't give it much attention, and I

12   may well agree with you, but I just -- I don't see why it

13   should be excluded.

14        MR. SCHWARTZ:  Thank you, Your Honor.  I suppose then

15   we'll move to the merits of the motion.

16        THE COURT:  Okay.

17        MR. LYONS:  As a threshold, though, the parties have

18   agreed that we are not going to introduce live testimony, we'd

19   rely on the papers and also the depositions which Your Honor

20   has in exhibit binder.

21        THE COURT:  Except for the depositions, there's not

22   going to be any cross examination of any witnesses or the like.

23        MR. LYONS:  That's correct.

24        THE COURT:  Okay.  All right.

25        MR. SCHWARTZ:  And so as Your Honor said, about the

15

1   standard of excusable neglect, is well established by the
2   Pioneer case and by the Second Circuit in a line of cases.  And
3   there are four factors to consider.  And so let me just discuss
4   those factors and how they apply to this case.  But let me
5   stress at the outset, that this case presents a exceedingly
6   narrow question, whether when a law enforcement agency receives

7   a complaint by a single individual of unlawful conduct and

8   after a diligent investigation determines that there was
9   unlawful conduct against a class of employees, whether all of
10  that information is received after the bar date, whether the

11  agency acts with excusable neglect if they wait until they
12  complete their investigation to file a proof of claim in
13  bankruptcy.  And I think the answer to that case -- to that
14  question, that narrow question on the facts of this case,
15  should be yes.  And let me look to the four Pioneer facts.
16         The first, of course, is the reason for the delay.
17  And as Mr. Lyons points out in his opposition, this is the most

18  important factor in the Circuit.  The reason for this -- for
19  the delay is clear.  First of all, there is, I don't think, any
20  contest that the EEOC could not have filed its proof of claim
21  before the bar date.  They did not learn about the charge of

22  discrimination from Mr. Straughter until after the bar date.

23  In fact, the conduct giving rise to Mr. Straughter's claim of

24  discrimination did not occur until a month after the bar date.
25  So they -- the EEOC received the information after the bar

16

1   date, and then they went through their process.  And the
2   process is receive a charge of discrimination, investigate that
3   claim, including disclose it to the target of the investigation
4   and allow them to make a response, make a determination, enter
    Dele

5   into conciliation efforts, if those conciliation efforts fail,   Dele
    t

6   refer the case to the legal unit, the legal unit makes a   De
    let

7   determination to -- whether or not to recommend further action
8   to the commissioners.  The commissioners of the EEOC in
    Dele

9   Washington, decide in cases like this, whether an enforcement
10  action is appropriate.  If they decided that it is, an
11  enforcement action is filed.  And then and only then, could the
12  EEOC file a proof of claim.
13          THE COURT:  Wasn't that contradicted by your witness'
    Dele

14  deposition?
15          MR. SCHWARTZ:  Absolutely not.  And that was one of
16  the misstatements of facts that I would have like to have
17  corrected in briefing.
18          THE COURT:  Let me just read the deposition.
19          MR. SCHWARTZ:  Absolutely.  What page are we at?
20          THE COURT:  Well, there are two different pages on
21  the deposition.  If you look at the bottom --
22          MR. SCHWARTZ:  This is the version in the binder?
23          THE COURT:  Yes.  And it's Ms. Malloy's deposition,
24  it starts on page 29.
25          MR. SCHWARTZ:  That's the page at the bottom.

1    THE COURT:  Right.  Line 6 on page 34 of the original
2  transcript, I guess.

De
l
e
t

3  "Q. Are you aware of the steps -- are you aware of any steps
4  that the EEOC must take to file a proof of claim in a
5  bankruptcy case?"
6  "A. I'm aware of some of the steps, yes."
7  "Q. What are those steps?"
8  "A. I can only testify as to this case."
9  "Q. This case is your only source of knowledge as to the
10  steps?"
11  "A. Yes."

De
l
e
t

12    She earlier testified about the Attorney Manuel with    De
l
e
t

13  regard to enforcement actions.
14    MR. SCHWARTZ:  Judge, I think we can stop right
15  there.  She could only testify about this case.  In this case,
16  the EEOC commissioners had already authorized the District
17  Court litigation.  And so to say that they did not have to go
18  back to those commissioners to get further authorization to
19  file the proof of claim is not nearly the same thing as saying
20  they could have filed the proof of claim at the outset.  And
21  let me --
22    THE COURT:  That's your reading of her argument, her
23  question, "What authorizations do you need to file a proof of
24  claim in a bankruptcy case on behalf of the EEOC?"
25    MR. SCHWARTZ:  Everything is qualified by lines 11

1    and 12, "I can only testify as to this case."  If there's
2    ambiguity on that, as long as --
3         THE COURT:  And what is your evidence to show that
4    there are those limitations on filing a proof of claim?
5         MR. SCHWARTZ:  It's the confidentiality rules of the
6    EEOC.  The EEOC is not permitted to make public a charge of
7    discrimination until there is litigation.  Either until they
8    file litigation or until the claimant files litigation.  I'm
9    reading here from that enforcement manual, laws enforced by the
                                                              De
                                                               l
                                                               e

10   EEOC quoting 42 U.S.C. 2000e-5.  "Charges shall be in writing,
11   under oath or affirmation, and shall contain such information
12   and be in such form as the Commission requires.  Charges shall
13   not be made public by the Commission.  If the Commission
14   determines after such investigation that there's not reasonable
15   cause," it says "that you issue a right to sue letter."  And
                                                              De
                                                               l
                                                               e

16   then it says, that or they'll sue if they determine that it is
                                                              De
                                                               l
                                                               e

17   founded.  But the critical language, "charges shall not be made
18   public by the Commission."  Simply on the basis of a charge of
19   discrimination, the Commission could not have filed a proof of
20   claim, that is critical.  And that's sound public policy.  You
                                                              De
                                                               l
                                                               e

21   don't want the EEOC filing, in its own name, charges of
22   discrimination, until it determines that those charges have
23   merit.  It also, incidentally, would be an enormous waste of
24   public resources to require the EEOC to file proof of claims in
25   association with every unfounded charge of discrimination.

1  Earlier this week in the Holowicki case, the Supreme Court
2  observed that the EEOC receives approximately 175,000
3  complaints of ADA discrimination alone every year.  To require
4  the EEOC, an agency which receives no compensation as a result
5  of prosecuting these claims, to file a proof of claim in every
6  bankruptcy, every single time someone simply makes a complaint
7  of discrimination, it doesn't make sense and it's not permitted
8  under the EEOC's rules.  They were required to wait until

                                        De
                                         l
                                         e

9  either Mr. Straughter had filed a District Court lawsuit, or,

                                        De
                                         l
                                         e

10  because in this case they determined that his claims had merit,
11  they filed a District Court lawsuit to file the proof of claim.
12  And that is why there was good reason for the delay in this
13  case, because they had to substantiate the charge of
14  investigation because they were not permitted to publicize it.
15  That's the first Pioneer factor.
16       Second Pioneer factor, the prejudice to the debtor.
17  You seem like you saw questions.
18       THE COURT:  This really sounds totally bizarre to me
19  and totally contradictory to the definition of claim in the

                                        De
                                         l
                                         e

20  Bankruptcy Code.                     De
                                          l
                                          e
                                          t

21       MR. SCHWARTZ:  I think that is fair, Judge.  And the
22  point that I'm trying to make is that the claim of --
23       THE COURT:  Why wasn't this argued at all in the
24  motion?  Why wasn't it argued at all at deposition?
25       MR. SCHWARTZ:  Because it came to my attention

20

1    earlier today --

                                                              De
                                                               l
                                                               e
                                                               t

2          THE COURT:  Weren't you defending the deposition?
3          MR. SCHWARTZ:  I was, Judge.  I didn't know about
4    this --
5          THE COURT:  So this isn't like a -- a, you know,
                                                              De
                                                               l
                                                               e

6    creative use of what is the meaning of the word is?  You were
7    truly mistaken by that question and her answer, that you refer
                                                              De
                                                               l
                                                               e

8    to a bankruptcy case?
9          MR. SCHWARTZ:  No.  Everything -- everything has to
10   be taken in the context of the conversation.  She said that she
11   could only testify to this case.  She doesn't --
12         THE COURT:  She's the witness on excusable neglect.
13         MR. SCHWARTZ:  No.  She is a fact witness.
14         THE COURT:  I know.  And it's a fact issue.
15         MR. SCHWARTZ:  No, no.  That's fair but --
16         THE COURT:  And she was asked -- never mind.  You
17   know, I'll take it for what its worth.
18         MR. LYONS:  Your Honor, if I could make just one
19   point.  The bar date order says all attached documentation is
20   confidential.  So if there's some confidentiality concern,
21   paragraph 4 of the bar date order makes it clear that all
22   supporting documentation to a proof of claim --
23         THE COURT:  What is the --
24         MR. LYONS:  -- are confidential.
25         THE COURT:  -- citation of the document you're

21

1   reading from?  Is it a CFR or is that confidential --

2        MR. SCHWARTZ:  This is the statute itself.  It's 42

3   U.S.C. Section 2000E-5.  And that, Judge --

4        THE COURT:  I'm sorry, 2000?

5        MR. SCHWARTZ:  It's 2000E, not in parens, just 2000E-

6   5.

7        THE COURT:  Okay.

8        MR. SCHWARTZ:  And that's -- that's actually a

9   sentence -- a provision under Title 7, that is incorporated

10  into the ADA by Section 107 of the ADA.

11       THE COURT:  Okay.  So you're reading the statute

12  itself.

13       MR. SCHWARTZ:  I was reading the statute itself.  You

14  asked why we didn't mention this earlier.  Frankly, the reason

15  that we didn't mention this earlier is because we've been

16  forced to litigate this in an extremely rushed way and, you

17  know, it just came to my attention.  And I apologize for that.

18  And that's why I would have liked the opportunity to put in

                                                           De

                                                           l

                                                           e

19  additional briefing.  However, the fact remains that the EEOC

20  was not permitted to disclose the claim until litigation was

21  filed.  And that absolutely justifies the delay.

22       The next two factors, the prejudice to the debtor and

23  prejudice --

24       THE COURT:  Well, I have a question.  You're saying

25  this witness doesn't know anything about the EEOC's policy in

22

1   bankruptcy cases -- the, right?  Just this case?
2          MR. SCHWARTZ:  That's correct.
3          THE COURT:  Do you have any evidence that the EEOC
4   does or does not file proofs of claim in other bankruptcy
5   cases?
6          MR. SCHWARTZ:  Does or does not file proofs of claim?
7          THE COURT:  Right.
8          MR. SCHWARTZ:  I don't have any evidence one way or
9   the other.
10         THE COURT:  So you don't have any evidence as to

                                              De
                                              l
                                              e

11  whether they file claims before litigation ever, or only after
12  litigation is commenced?
13         MR. SCHWARTZ:  Not as I stand here today.
14         THE COURT:  Okay.
15         MR. SCHWARTZ:  Okay.  And moving on to the
16  prejudice --
17         THE COURT:  So the argument about the policy point is
18  not backed up by any specific facts as to the EEOC's actual
19  practices on whether, notwithstanding the policy argument you
20  made, it does or does not file proofs of claims in bankruptcy

                                              De
                                              l
                                              e

21  cases?
22         MR. SCHWARTZ:  That is not a policy argument, that is
23  a statutory argument.
24         THE COURT:  No.  You said think of the policy, Judge,
25  if we had to do this.

23

```
 1        MR. SCHWARTZ:  No.  I do not know the evidence
 2   underlying the policy, that's correct.  The policy, though,
 3   certainly makes sense.  I believe, again, the reference to the
 4   number of ADA claims, as I said, comes from the Supreme Court's
 5   case earlier this week in the Holowicki decision.
 6        You know, the reason for the a delay, and excusable
 7   neglect, is, according to the Supreme Court from Pioneer,
 8   supposed to be a flexible inquiry.  And when you say it's a
 9   flexible inquiry, that means you have to look at the entire
10   context and what is excusable for the EEOC, where a law
11   enforcement agency may not be excusable for the Acme
12   Corporation.  But that's why I began by saying that this is a
13   case that presents an extraordinarily narrow issue.  And then
14   that is the segue to the prejudiced point.  Because the
15   prejudice really that arises out of allowing this claim, is
                                                          De
                                                           l
                                                           e

16   that it opens the floodgates.  I asked last night, Mr. Unrue,
17   what are the prejudices that flow to Delphi if this claim is
18   allowed.  He said if the claims are allowed that it endangers
19   the bankruptcy.  And I said what if only this one were allowed?
20   He said that might be different.  And I said well, what if this
21   one were allowed in some small amount?  He said well, that
22   might be different.
23        This case -- this claim is sui generis, it is the
                                                          De
                                                           l
                                                           e

24   claim of a law enforcement agency asserting law enforcement
25   charges on behalf of grieved Delphi employees who were the
```

24

1    victims of a facially unlawful policy.  And the EEOC didn't
2    know that it was facially unlawful until they were able to
3    investigate it.  And even now, they don't know the full extent
4    of the unlawfulness because --
5         THE COURT:  Let me ask you about that.  Because if
6    its facially unlawful, in the response of Delphi to the first
7    inquiry, which is attached to Ms. Malloy's declaration and is
8    also quoted at paragraph 11.  That response was on November 6,
9    2006.
10        MR. SCHWARTZ:  Which exhibit is this, Judge.
11        THE COURT:  Well, it's attached as Exhibit H, but she
12   also quotes at paragraph 11 of her declaration.
13        MR. SCHWARTZ:  Okay.
14        THE COURT:  And the response said, "it has been
15   Delphi's policy to require this of all employees."  So as far
16   as investigating whether this is a pre or post-petition

                                              De
                                               l
                                               e

17   claim,on  November 6th they said it -- everyone.
18        MR. SCHWARTZ:  That's not what they're saying now,
19   Judge.
20        THE COURT:  No, I know.  But that's what they said

                                              De
                                               l
                                               e

21   then.  What more was there to investigate?                De
                                                               l
                                                               e
                                                               t

22        MR. SCHWARTZ:  Because, first of all, they have to
23   determine whether that's true.  And they have to determine what
24   it means.  Does that mean of all employees forever.  Does that
25   mean for all employees at all locations.  Does that mean for

25

1    all employees at the Rochester plant on August 16, 2006  They    De
l
e
t

2    don't know what that means.  They have an obligation to
3    investigate it.  That is why the EEOC exists.  And now, Delphi
4    has taken a very different position, which is that they never    De
l
e

5    really had such problems and that that policy doesn't exist    De
l
e
t

6    every place, they won't tell us where the policy exists.
7    That's' why we're in discovery in the Western District of New
8    York, because we don't even know what the policy is.  We still
9    don't understand the contours of this claim, and that's --
10   that's why we are litigating.
11        THE COURT:  But as far as having the basis for
12   asserting a claim, I just really -- again, leaving aside your
13   point about some hoops need to be gone through before a proof
14   of claim is filed, several hoops, what more investigation
15   really needed to be done to at least have been able to say, at
16   that date, that it appeared reasonable to the EEOC based on    De
l
e

17   Delphi's own statement that there was a pre-petition claim?
18        MR. SCHWARTZ:  The investigation that occurred
19   between November 6, 2006 and May 27, 2007, when the letter of
20   determination was made.  This response by Delphi was the first
21   response to the charge of discrimination made by Mr.    De
l
e

22   Straughter.  It incidentally only responded to his individual    De
l
e
t

23   charge and not because there were not at that point any class
24   charges.  They did not, in this response, also respond to the
25   requests for information that the EEOC had propounded, they

26

1   didn't do that until a little bit later.  So all we had was a
2   position statement by Delphi that their practices were entirely
3   lawful.  A position statement by Delphi that their practices

Dele

4   were entirely lawful was not, apparently, enough for the EECO
5   to feel comfortable issuing a letter of determination.  And
6   with respect, I think it is not for us to second guess the way
7   that the EEOC investigates claims of discrimination, that is
8   why they exist.  And this investigation, I think by all
9   objective measures, have been extraordinarily quickly, there
10  are not delays in here.  And the delays that do exist are while
11  they were waiting for information from the Delphi Corporation.
12        THE COURT:  So the determination was made May 22nd?
13        MR. SCHWARTZ:  That is when the determination was
14  made.  At that point, they were required to enter into

Dele

15  conciliation efforts.  This is all by reg.  The conciliation
16  efforts failed a month later and they were required to notify
17  Delphi that they failed.  They did that, I believe, on June 19,
18  2007.  At that point, again, by regulation, the case was
19  referred to the legal unit.  The legal unit did its assessment
20  of the case and made its recommendation to the commissioners in
21  Washington.  The commissioners of the EEOC are the only people
22  who have the authority to authorize an enforcement action in
23  Federal District Court in cases like this one.  They did and
24  that complaint was filed on September 28, 2007.  At that point,
25  when the District Court complaint was filed, the charge of

27

1   discrimination and the EEOC's findings were effectively

2   unsealed.  And so, as well, they filed their proof of claim in

3   this bankruptcy.  This is not a case, Judge, like Trap Rock,

4   where the agency -- the county in that case, who is prosecuting

De

l

e

5   a circa claim was essentially trying to game the system, where

6   they filed an enforcement action instead of filing a proof of

7   claim.  The EEOC acted entirely appropriately here when they

8   were ready to unveil to the world that they had determined that

9   Delphi had an unlawful policy of requiring its employees to

10  execute releases to all their medical records, whenever they

11  called in sick.  When they were ready to release that to the

12  world, they both filed a complaint in Federal District Court

13  and filed a proof of claim to protect the monetary component of

14  their damages in this Court.  That's what you want a

15  responsible law enforcement agency to do.  That act, again,

16  causes no prejudice to the debtors because it has no floodgate

17  effect.  It is entirely reasonable, and it certainly was all

18  done absolutely in good faith.  This is the model of an

19  investigation by a law enforcement agency.  They received a

20  claim, they investigated it quickly, they made a determination,

21  they filed a lawsuit, and simultaneously they filed a proof of

22  claim.  They were not permitted to file a proof of claim

23  earlier, it would not have been responsible to file a proof of

24  claim earlier.  It would not have been reasonable.  And again,

25  excusable neglect standard, has to take into account the

28

1   position of the creditor.  And for the EEOC, an agency that
2   gets none of the money if this claim's allowed -- gets none of
3   the money back, even to offset its litigation costs to require
                                                        De
                                                        l
                                                        e

4   them to file protective proofs of claims which both disclose      De
                                                                      l
                                                                      e
                                                                      t

5   the charge of discrimination in violation of their
6   confidentiality rules, disclose the charge of discrimination,
7   you know, in a way that embarrasses potentially the debtors,
8   disclose the charge of discrimination in a way certainly that
9   can embarrasses the claimant, who in many cases, may be current
10  employees of the corporation.  And to file a charge of dis --
11  to file a proof of claim --
                                                        De
                                                        l
                                                        e

12         THE COURT:  I'm sorry, how does it embarrass the
13  claimant?
14         MR. SCHWARTZ:  The claimant can still be working for
15  the corporation.  And so to, you know, disclose to the world
16  that you have accused your boss, your current boss, of
17  discrimination --
                                                        De
                                                        l
                                                        e
                                                        t

18         THE COURT:  But he -- Mr. Straughter's done that.
                                                        De
                                                        l
                                                        e

19         MR. SCHWARTZ:  Mr. Straughter had been fired.
20         THE COURT:  Right.
21         MR. SCHWARTZ:  It was pretty obvious.
22         THE COURT:  Right.
23         MR. SCHWARTZ:  He was no longer employed in this
24  particular case.  But, well --
25         THE COURT:  Oh, I see, you're arguing the policy

29

1  again without --
2          MR. SCHWARTZ:  I'm arguing that policy.
3          THE COURT:  All right.  Fine.  I got it.
4          MR. SCHWARTZ:  That's correct.  It doesn't make sense
5  to require the EEOC, particularly on the facts of this case, to

                                                        De
                                                         l
                                                         e

6  have filed a proof of claim in the moment that Mr. Straughter
7  filed his charge of discrimination.
8          And, in particular, in this case, all of this
9  happened after the bar date.  There's no conceivable way for
10 the EEOC to file a timely claim.  So really, we're only
11 quibbling about the delay now, whether they should have filed
12 the proof of claim a month after the bar date or a year after
13 the bar date.  And I submit to you, on the facts of this case,
14 it was entirely reasonable and certainly excusable for the EEOC
15 to do a quick and responsible investigation consistent with its
16 regulations and statutes before filing the proof of claim.  And
17 for that reason, the proof of claim --
18         THE COURT:  Are you telling me, as an officer of the
19 Court, that you do not know, and have not made an inquiry, of
20 the EEOC as to its policy in filing proofs of claims in

                                                        De
                                                         l
                                                         e

21 bankruptcy cases?
22         MR. SCHWARTZ:  Yes.
23         THE COURT:  You just -- you literary don't know.
24         MR. SCHWARTZ:  I literary don't know, Judge.
25         THE COURT:  Okay.  All right.  That's all I want to

1   know.  That's all I want to know.  Okay.

2         MR. SCHWARTZ:  Unless, there are questions, I'll

3   submit.

4         THE COURT:  It's not referred to in any regs or

5   anything like that?

6         MR. SCHWARTZ:  I would have been happy to have put in

7   briefing with all the regulations.

8         THE COURT:  Okay.  How does the statute define

9   enforcement action?

10        MR. SCHWARTZ:  I don't know the answer to that.

11        THE COURT:  Okay.  I take it there's no cap on the

12   claim at this point, right?

13        MR. SCHWARTZ:  There is not.  As you now know, we

14   have begun to enter into settlement discussions, we have never

15   received a counteroffer from the debtors.

                                                    De
                                                     l
                                                     e

16        THE COURT:  Okay.  Mr. Lyons?

17        MR. LYONS:  I do Your Honor.  I'm sorry, Your Honor.

18   Your Honor, I'll be very brief.  I mean, we're going to rely on

19   our papers.  You know, again, the burden of proof is on the

20   United States to prove that they've met the Pioneer factors of

                                                    De
                                                     l
                                                     e

21   excusable neglect.  Your Honor, the length of the delay -- I

22   mean putting the proof of claim in is to give a placeholder to

23   know that there may be a claim.  There's nothing horribly

24   embarrassing or sensitive about that.  The bar date order,

25   frankly, encompasses any attachments are confidential.  So I

31

1   think it's kind of an after the fact excuse, after Ms. Malloy
2   testified, and I asked her pretty squarely are there any
3   authorizations, she didn't believe they were, and now we're
4   hearing this today.  You know, again, they decided to submit
5   whatever proof that they had in support of their motion.  I'm
6   frankly surprised they didn't have the investigator here.  The
7   primary investigatory, Ms. Carlo, who was involved in this back
8   in September of '06, who -- it's not like this is some charge

9   that Mr. Straughter came up with: she drafted the charge.  She

10   drafted it for him, he reviewed it --
11        THE COURT:  All the argument they're making is that
12   they're precluded by statute from filing a proof of claim.
13   That's the only argument that has any possible merit here.
14        MR. LYONS:  And on that, Your Honor, is -- you know
15   steps could have been taken to make it even more confidential
16   if that were, in fact, the case.  Again, you know, Chapter 11
17   in this case, we need to know what claims there are.  We have
18   investors who are depending upon the answer as to what our
19   claims pool is.  We have an EPCA target that we have to meet.
20   You know, we can't wait until, you know, three years after we
21   emerge to all of a sudden find out they've completed their

22   investigation; we need to know if there's a claim.  And also
23   another point, Your Honor, we served all of our employees with
24   the bar date order.  Not a single claimant filed a proof of
25   claim by the bar date.  So certainly those claimants would know

32

1  if they had a violation, and none of them have filed a proof of
2  claim.  The EEOC is just seeking damages on behalf of these

De
l
e

3  employees.  So there's another grounds, apart from the whole
4  excusable neglect, Your Honor, why the other employees would be
5  -- would be bound by the bar date order.  They all got the bar
6  date order, none of them filed a claim, and we briefed that in
7  our papers.
8      So, Your Honor, I really don't have much more, we'll
9  rely on the papers.  We don't believe that they've met the
10 burden under Pioneer.  There's no explanation as to the length
11 of delay.  It was within their reasonable control.  There's
12 tremendous prejudice to the debtors.  It will unduly lengthen
13 proceedings.  And that's where the -- and he may disagree with
14 what was said on the -- withdrawing the reference to estimate
15 the claim, but that would no question add delay to be able to
16 estimate this claim if we had to, you know, go out to Buffalo
17 to estimate this claim within the time period that we have to
18 estimate this claim, which is one month before emergence, Your
19 Honor.  And frankly, good faith, we've laid out the facts,
20 that's just up to Your Honor how Your Honor wants to view that,
21 we've just laid it out.  With having a 200,000 dollar offer and
22 then come in with a fifteen million dollar cap, certainly that

De
l
e

23 goes to the issue of we're negating a negative contention of
24 undue delay for under Federal Rule 408.  Unless Your Honor has
25 any questions, I'm prepared to rest on our response.

33

1          THE COURT:  Okay.  Do you have a response to the
Dele

2    argument that the -- the actual employees got notice of the bar
Dele

3    date, and obviously knew about the policies?  They may or may
4    not have known that it was subject to attack, but they had
5    notice?
6          MR. SCHWARTZ:  Two responses.  One, there's no
Dele

7    evidence that Mr. Straughter was served and there's -- you
Dele

8    know, artful drafting over there, but Mr. Straughter was not
9    working for Delphi at the time that the bar date order was
10   served on the employees.  So there's no reason to believe that
11   he got it, and he was the charging party in this case, first
12   point.
13         Second point, the fact that the employees may have
14   been aware of the policy is very, very different from saying
15   that they were aware that they had a claim.  This is not an
16   obvious form of discrimination that we're talking about in this
17   case.  This is not "we are firing you because of your race or
18   gender."  This is a policy that required employees to, you
Dele

19   know, execute releases for their medical records when they
20   called in sick.  It is an unlawful policy and a discriminatory
21   policy under the law, but not at all obvious to the common
22   person that it is either unlawful and certainly not unlawful in
23   a discriminatory way.  As evidence of that fact, I point to the
24   incredible paucity of cases that discuss this particular point
25   of discrimination.  Really, I'm aware of two, the Conway case

34

1    from the Second Circuit and Judge Scheindlin's decision in the
2    Transport Worker's Union case.  So to say that they were aware
3    of the policy is not to say that they were aware that they had
4    a claim.
5          I don't think in any case, that Mr. Lyons is making
6    an estoppel --
7          THE COURT:  You know -- look, let me make two -- let
8    ask you two questions related to that.  First of all, as far as
9    the intricacies of the law are concerned, I understand your
10   point.  I doubt any employee would have read the case law.  On
11   the other hand, if you had a policy that said you can be fired
12   unless you provided all your medical records, human nature
13   being what it is, someone might be offended by that.

De
l
e

14         MR. SCHWARTZ:  Mr. Straughter was.  And he was the
15   first person to bring it to the attention of the EEOC.  And
16   bear in mind, this was not, at least to my knowledge --
17         THE COURT:  No, but what I'm saying -- but in that
18   sense it doesn't seem esoteric to me, you know.  It seems

De
l
e

19   analogous to situations where people don't necessarily know the

De
l
e

20   ins and out of securities laws but nevertheless feel sometimes   De
l
e
t

21   that they were defrauded by debtor.
22         MR. SCHWARTZ:  That's right.
23         THE COURT:  In those cases the courts have said if
24   someone is looking to certify a class, now I understand your
25   class is being -- your action, on behalf of the class, is being

35

1    brought by a government agency as opposed to an individual lead
2    plaintiff.  But the courts have said, Judge Rakoff, Chief Judge
3    Bernstein, and other courts have said, Judge Garrity from this
4    district, that there's a big distinction when someone seeks to

5    certify a class in a bankruptcy case after the bar date,

6    because the members of the class got notice and they haven't

7    filed a proof of claim.  Class certifi -- you know, certifying

8    them undermines the bar date.  So what's your response to that?
9           MR. SCHWARTZ:  A few responses.  The first one is I
10   think that it was not nearly as clear to Delphi employees that
11   this was the policy.  And, in fact, the policy of firing
12   employees was limited to a small class of probationary

13   employees that Mr. Straughter fell in.  So that day-to-day
14   employees of Delphi may have been denied sick pay for those
15   days when they were not -- when they didn't execute releases,
16   but they wouldn't have been fired.  And so prior to where
17   someone would go to a lawyer over a day or two's loss of sick
18   leave pay, that's one point.  The second point, I think --
19          THE COURT:  I'd get pretty mad if someone asked me to

20   turn over all my medical records.  That's the type of thing
21   that people get mad about.  But so -- go ahead.
22          MR. SCHWARTZ:  And there were a few other people who
23   complained and we are starting to learn this in discovery.  As
24   we are getting names of people from Delphi, there were people

25   who complained.  Delphi tells us that no one else was ever

36

1    fired, I don't know if that's the case.  And it may be that
2    people felt aggrieved.  You know, I don't know what the case
3    is.

De
l
e
t

4        The second, and I think more important point, is that
5    that is essentially an estoppel argument.  And the estoppel
6    argument can go to the merits of our claim, say that we should
7    be estoped from recovering on the claim.  I don't think it
8    goes to any of the Pioneer factors, whether it goes to whether
9    the claim should be permitted to be filed in the first place,
10   it goes to whether or not it should be allowed.
11       Finally, I would point out to you, this argument was
12   an argument first raised in the papers that I received last
13   night at 5 p.m. and we have not had an opportunity to respond
14   to it.
15           THE COURT:  Okay.  Anything else?
16           MR. LYONS:  Just very quickly.  You know, if Mr.

De
l
e

17   Straughter was just involved, Your Honor, we wouldn't be here.

De
l
e

18   I mean, I think if there's liability to Mr. Straughter it would
19   be an administrative --
20           THE COURT:  Well, it's admit -- it's post-petition.
21           MR. LYONS:  It's post-petition, exactly.  So we're
22   really here because of the other unnamed, you know, claimants
23   that, you know, that the EEOC asserts are out there, and that's
24   really why we're here.
25       And as to the argument on the bar date and the other

1   employees, again, I think any kind of discovery accrual
2   analysis, Your Honor, it's always the facts.  Did you -- were
3   you aware of the facts?  Whether you understood what claim
4   arises out of those facts does not go to what point in time the
5   particular plaintiff had awareness of the facts giving rise to
6   this cause of action.
7        MR. SCHWARTZ:  Just one factual note, Judge.  They

                                              De
                                              l
                                              e

8   have objected on timeliness grounds to Mr. Straughter's
9   personal proof of claim, that's part of the twenty-sixth
10  omnibus objection.
11       MR. LYONS:  If we did, Your Honor, it's inadvertent.

                                              De
                                              l
                                              e

12  I mean, again, the timeliness of Mr. Straughter's claim is
13  governed by the administrative bar date, which is established
14  under the plan.
15       THE COURT:  Okay.  All right.  Well, I'll take a
16  break and read the statute that was cited to me.  And so I'll
17  be back probably at 11:30.
18    (Recess from 10:55 a.m. to 11:44 a.m.)
19       THE COURT:  Please be seated.  Okay.  Before I
20  proceed, is Ms. Malloy present?
21       MR. SCHWARTZ:  Yes, Judge, she is.
22       THE COURT:  Ms. Malloy, if you can come up, please.
23  I understand the parties have waived any sort of direct
24  testimony, but I have a question of you as the declarant and as
25  the person who was deposed.  I'm not going to put you under

38

1   oath because you are an officer of the Court.  But my question

2   is, are you aware of any policies or practices of the EEOC with

3   respect to filing proofs of claim in a bankruptcy case, other

4   than that particular proof of claim that you filed?

5        MS. MALLOY:  No, Your Honor, I don't know the

6   policies or practices or --

7        THE COURT:  Okay.

8        MS. MALLOY:  -- whether there are any.

9        THE COURT:  Okay.  Very well, thank you.  You can sit

10  down, as can you, unless you have something to say.

11       MR. SCHWARTZ:  No, sir.

12       THE COURT:  Okay.  All right.  I have before me a

13  motion by the United States on behalf of the Equal Employment

14  Opportunity Commission, or the EEOC, to deem a proof of pre-

15  petition claim filed in these Chapter 11 cases, claim number

16  16727, timely filed.  That motion is necessary because the bar

17  date in these Chapter 11 cases was July 31, 2006 and the EEOC

18  proof of claim was filed on October 16, 2007.  The U.S.'s

19  motion is made pursuant to Bankruptcy Rule 9006(b)(1) and the

20  case law interpreting that rule, first and foremost, Pioneer

21  Investment Services Co. v. Brunswick Associates Ltd.

22  Partnership, 507 U.S. 380 (1993).  The general standard for

23  determining such a motion was set forth in the Pioneer

24  Investment Services case, but the Court is also guided by the

25  Second Circuit's interpretation and application of that

1    standard in Midland Cogeneration Venture Ltd. Partnership v.

2    Enron, (In re Enron) 419 F.3d 115 (2d Cir. 2005).  The standard

3    is generally well settled.  Bankruptcy Rule 9006(b)(1) permits

4    a claimant to file a late proof of claim if the failure to

5    submit a timely proof of claim was due to "excusable neglect."

6    The burden of proving excusable neglect is on the claimant

7    seeking to extend the bar date.  In re R.H. Macy & Co., 161

8    B.R. 355, 360 (Bankr. S.D.N.Y. 1993).  The Supreme Court in

9    Pioneer developed a two-step test to determine whether the

10   cause for a late filing was due to excusable neglect.  First,

11   the movant must show that its failure to file a timely claim

12   constituted neglect, as opposed to willfulness.  Neglect

13   generally being attributed to a movant's inadvertent mistake

14   for carelessness, 507 U.S. at 387-88.  After establishing

15   neglect, as opposed to willfulness or a knowledge of the bar

16   date and the failure to show any basis for neglecting it, the

17   movant must show by a preponderance of the evidence that the

18   neglect was excusable.  That analysis is to be undertaken on a

19   case-by-case basis, under the particular facts of the case.

20   Although the Court is to be guided by and make the

21   determination pursuant to a balancing of the following factors:

22   the danger of prejudice to the debtor, the length of the delay

23   and whether or not it would impact the case, the reason for the

24   delay, in particular whether the delay was within the control

25   of the movant, and finally, whether the movant acted in good

1   faith, Id. at 395.

2        In the Midland Cogeneration case the Second Circuit,

3   in upholding the lower court's determination that a late filed

4   proof of claim would not be deemed timely filed stated, "we

5   have taken a hard line" in applying the Pioneer test.

6   Silivanch v. Celebrity Cruises Inc., 333 F.3d 355, 368 (2d Cir.

7   2003) in a "typical" case, "three of the Pioneer factors," the

8   length of the delay, the danger of prejudice and the movant's

9   good faith "usually weigh in favor of the parties seeking the

10  extension," Id. at 366.  We noted though that "we and other

11  circuits have focused on the third factor, "the reason for the

12  delay, including whether it was within the reasonable control

13  of the movant," Id.  And we cautioned "that the equities will

14  rarely, if ever, favor a party who fails to follow the clear

15  dictates of a court rule" and "that where the rule is entirely

16  clear, we continue to expect that a party claiming excusable

17  neglect will, in the ordinary course, lose under the Pioneer

18  test," Id. at 366-67.  And that quotation appears in the

19  Midland Cogeneration case at 419 F.3d at 122-123.  See also In

20  re Musicland Holding Corporation, 356 B.R. 603 (Bankr.

21  S.D.N.Y.) in which Chief Bankruptcy Judge Bernstein stated that

22  the Second Circuit focuses on the reason for the delay in

23  determining excusable neglect under Pioneer and that the other

24  factors are relevant only in close cases.

25        Strict enforcement of a bar date is no mere and

41

1    unimportant procedural matter in a Chapter 11 case.  And the

2    bar date and a consequent filing of claims before the bar date

3    allows a debtor-in-possession, such as these debtors, to

4    evaluate the claims against the estate and formulate and

5    negotiate a plan that relates to the claims as filed, In re

6    Drexel Burnham Lambert Group, Inc. 148 B.R. 1002, 1008-10

7    (Bankr. S.D.N.Y. 1993).  Allowing late filed claims, especially

8    after their plan is confirmed, subjected debtor to prejudice

9    because it would have to renegotiate a myriad of settlements.

10   In this case, at least that form generally speaking, the basis

11   for a Chapter 11 plan, which are negotiated and set forth for

12   the Court to consider in contemplation of the known claims

13   asserted against the estate.  Again, See Drexel Burnham at 148

14   B.R. 1008-10, see also Midland Cogeneration 419 F.3d at 129.

15        Furthermore, allowing a late claim that materially

16   alters the distribution to creditors would prejudice the

17   creditors who relied on the disclosed distribution when voting

18   to accept or reject the plan, Id.  In light of the importance

19   of collecting on all of the allowable claims against the estate

20   in one forum and to permit the parties to proceed to consider a

21   Chapter 11 plan in light of those claim, Congress interpreted

22   the term claim in the Bankruptcy Code extremely broadly.  As

23   set forth in Section 1015 of the Bankruptcy Code, the term

24   claim means a right to payment, whether or not such right is

25   reduced to judgment, liquidated, unliquidated fixed,

42

1   contingent, matured, unmatured, disputed, undisputed, legal,

2   equitable, secured or unsecured, or a right to an equitable

3   remedy for breach of performance, if such breach gives rise to

4   a right to payment.  Whether or not such right to an equitable

5   remedy is reduced to judgment, fixed contingent, matured,

6   unmatured, disputed, undisputed, secured, or unsecured.

7        In this Chapter 11 case the reasonable allowed amount

8   of unsecured claims against the debtors' estate took on even

9   more significance than in most Chapter 11 cases.  That is,

10  because over a year ago it became clear that the debtor, to

11  achieve all the various goals that it wanted to achieve in the

12  case, including the preservation on a frozen basis of its

13  pension plan, needed outside investors to agree to invest

14  considerable amount of money in the debtors pursuant to a plan

15  of reorganization.  Part of that investment decision, as

16  negotiated with the plan investors and the creditor and

17  shareholder committees and other interested parties, was a cap

18  on the allowed amount or allowable amount of unsecured claims

19  as of the effective date of the plan.  As ultimately negotiated

20  in the so-called EPCA agreement, that cap was 1.45 billion

21  dollars, as specified in the agreement.  The Court, at the

22  confirmation hearing in this case, that began on January 7th of

23  this year, took testimony as to the debtors' ability to satisfy

24  that cap.  At the time of the confirmation hearing in that

25  testimony, pursuant to the debtors' analysis and the Court's

1    determination of timely filed claims, that would meet the

2    definition of the claim in the EPCA cap, the debtors had

3    satisfied the cap by approximately two million dollars.

4    Subsequently, the Court has continued to deal with the debtors'

5    expedited process for dealing with claims to which they object

6    and there have been further rulings on claims as well as

7    further settlements, and as set forth in the deposition of Mr.

8    Unrou, who has primarily responsibility, as an officer of the

9    debtors, for the claim liquidation process.  Taking into

10   account timely filed claims, the debtors are now approximately

11   twenty-four million dollars under the EPCA cap.  And again,

12   under the EPCA, debtors will not be able to obtain the

13   investment.  And consequently under their Chapter 11 plan,

14   which I confirmed by final -- now final order in January of

15   this year, will not be able to emerge from Chapter 11 unless

16   they remain under that cap.  But, of course, the cap is only an

17   added example of the importance of timely compliance with the

18   bar date in these particular cases.  In addition to it, the

19   parties-in-interest assessment of properly allowable claims. as

20   in most Chapter 11 cases, as recognized by Drexel in the Second

21   Circuit in Midlantic, form the critical backdrop for the plan

22   as proposed, negotiated and ultimately confirmed by the Court,

23   in the collective process of these cases.

24        The material facts surrounding or underlying the

25   present motion under 9006(b) are not, as I see it, contested.

44

1   And the EEOC, through Ms. Malloy's declaration, primarily

2   alleges that on or about August 28th a former employee of one

3   of the debtors, Stanley Strauder, contacted the EEOC regarding

4   a potential claim for discrimination against Delphi.  He was a

5   temporary Delphi employee hired post-petition and terminated

6   post-petition, allegedly he believed in violation of the ADA.

7   He believed that he was terminated improperly based upon

8   Delphi's sick leave policy, which apparently required employees

9   who called in sick to execute a release that would allow

10  Delphi, or at least the entity employing Mr. Strauder, to

11  obtain medical records relating, not just to the employee's

12  reason for taking sick days, but the employees entire medical

13  history.

14       Ms. Malloy's declaration, which is Exhibit 1 in the

15  record, then states that an investigator for the EEOC, Ms.

16  Carlo, after sending Mr. Strauder a questionnaire to complete,

17  and receiving the questionnaire, drafted a charge of

18  discrimination for Mr. Strauder's signature, which she sent to

19  him on or about September 13, 2006.  She subsequently discussed

20  that charge with him and a revised charge to him on September

21  18, 2006.  I take it that the charge referred to in Ms.

22  Malloy's declaration is the charge also referred to -- or the

23  type of charge referred to in 42 U.S.C. Section 2000E-5.

24       On September 22, 2006, Mr. Strauder formally filed

25  his complaint of discrimination with the EECO, Index Discharge

45

1    Number 525-2006-001314.  And on October 2, 2006, the EEOC

2    forwarded the charge to Delphi for a response.  Before

3    continuing, I should note, although I think by references of

4    the dates makes this obvious, that all of these dates, and most

5    importantly the date upon which the EEOC learned of Mr.

6    Strauder's concerns about discrimination, were after the bar

7    date.  Again, that date being July 31, 2006.

8         On November 6, 2006 Delphi responded to the charge.

9    According to Ms. Malloy's declaration at paragraph 11, the

10   response "essentially admitted the factual allegations of

11   Strauder's complaint, but contended that he could not

12   demonstrate a prima facie case of retaliation of violation of

13   the ADA."  Relying on EEOC guidance that an employer may ask an

14   employee to justify his/her use of sick leave by providing a

15   doctor's note or other explanation, as long it has a policy or

16   practice of requiring all employees to do so, Delphi argued

17   that it was permitted to require its employees to execute a

18   release so that the company could obtain medical records and to

19   speak with personal physicians.  The specific responses

20   attached as Exhibit H to Ms. Malloy's affidavit, in which on

21   page 2, Delphi says "because Delphi requires this of all

22   employees it was within the EEOC's guidelines."  U.S. has

23   stated that Delphi's policy is, on its face, relative of the

24   ADA.  It appears to me, notwithstanding the fact that Mr.

25   Strauder was a post-petition employee, Delphi's November 2,

46

1    2006 response were one to assume, as of course the EEOC does,

2    the truth of the position that the policy was violative on its

3    face, that there was sufficient information to reasonably infer

4    that Delphi's policy extended also to those who were employed

5    during the pre-petition period since the response referred to

6    practice required of all employees.

7         In any event, as noted in Ms. Malloy's declaration,

8    the EEOC continued to seek further information from Delphi to

9    investigate a claim of discrimination as set forth in

10   paragraphs 12-14, and in particular, the first sentence of

11   paragraph 14 of her declaration.  Eventually, having received

12   sufficient information to satisfy its internal deliberative

13   process, according to Ms. Malloy on or about May 22, 2007, the

14   EEOC issued its letter of determination which, in relevant

15   part, took the position that Delphi subjected Strauder and a

16   class of employees nationwide to an unlawful policy of making

17   disability-related inquiries that are not job related and

18   consistent with business necessity in violation of the ADA.

19   The next day, May 23, the EEOC contacted Delphi to begin

20   conciliation efforts as contemplated by 42 U.S.C. Section

21   2000(e)(5), which were not fruitful since there is a

22   fundamental disagreement between Delphi and the EEOC as to the

23   underlying premise that Delphi had breached the ADA.

24   Confirming that those efforts had failed on June 19, 2007, the

25   EEOC forwarded the case to the New York District Office for

47

1    determination of whether an enforcement action should be filed

2    in the U.S. District Court.

3         Ms. Malloy's declaration as well as her deposition

4    testimony, referred to the EEOC's Regional Attorneys Manual,

5    which outlines the steps that the EEOC must take before filing

6    a Federal District Court action, as contemplated by 482 U.S.C.

7    2000(e)(5), to enforce its rights and remedies under the ADA.

8    And her declaration states that after going through the steps

9    in the manual, the EEOC filed a complaint on behalf of a class

10   of Delphi employees in the U.S. District Court for the Western

11   District of New York on or about September 28, 2007, just over

12   three months after conciliation efforts had failed.  The EEOC

13   takes the position here that that was a timely and rapid

14   process under its statute and the Regional Attorney's Manual.

15   And as far as this matter is concerned, which deals with relief

16   from the bar date, Delphi appears to me not to have disputed

17   that.  Roughly, three weeks later, on October 16, 2007, the

18   EEOC filed the claim at issue here in the bankruptcy case.

19   Which again, is roughly fourteen months since the date that it

20   learned of Mr. Strauder's concern and thirteen -- roughly

21   thirteen months since the date that Delphi responded to the

22   charge.

23        In addition, the record before me reflects that no

24   employee of Delphi asserted a claim for which one could

25   arguably contend any element included a breach of the ADA or a

48

1   violation of the ADA on this type of basis.  Notwithstanding

2   the notice of the bar date, to known present and former

3   employees, as well as the publication notice, that was

4   provided, and of course, the fact that this being a very

5   prominent Chapter 11 case involving prominent labor issues, the

6   Court can reasonably infer that present and former employees,

7   who did not receive actual notice, would have been aware of the

8   case and found publication notice meaningful.

9         As I said at oral argument, I also believe that the

10  basis -- the underlying factual basis for this type of claim,

11  is not counter-intuitive or esoteric.  The litigation of the

12  basis of the claim might be, but the fundamental facts

13  underlying the claim are ones where one would assume an

14  employee with a grievance would assert such a grievance.  That

15  is, that Delphi required access to all of an employee's medical

16  records in connection with sick leave.  Obviously a very

17  sensitive subject to individual employees.  Nevertheless, as I

18  said, the record, I believe, is undisputed that there are no

19  such claims on file by employees on a pre-petition basis filed

20  before the bar date.

21        The monetary relief in the proof of claim of the EEOC

22  appears to assert the claim, on behalf of the employees

23  themselves.  And the debtors have cited case law that stands

24  without proposition, including in a bankruptcy context where

25  the EEOC is seeking monetary relief as opposed to perspective

49

1   injunctive relief.  See EEOC v. Jefferson Dental Clinics, PA

2   478 F.3d 690, 696-99 (5th Cir. 2007) as well as O'Loughlin v.

3   County of Orange, 229 F.3d 871 (9th Cir. 2007), in which the

4   monetary claim was deemed discharged in Orange County's

5   bankruptcy case.

6        The argument made by the EEOC in its motion and in

7   the exhibits offered up by the EEOC, including Ms. Malloy's

8   declaration, for why Rule 9006(b)(1) should apply here, is two-

9   fold.  First, the EEOC contends that since it is conceded that

10  it learned of the claim after the bar date past, it should be

11  excused from complying to the bar date.  Secondly, it contends

12  that its own reasonable deliberative practices and procedures

13  for determining whether it had a properly assertible claim

14  precluded it from filing the proof of claim until the date that

15  it did, or until a short time after the date that it would have

16  been so precluded.  The first argument, given the facts that

17  I've recited not clearly as inadequate.  Under the two-step

18  analysis set forth in Pioneer, the failure to file a proof of

19  claim until well over a year past after learning of the claim,

20  would need to be justified.  First, as an act of neglect as

21  opposed to a conscious decision, or a decision that was made

22  knowing of the existence of the bar date.  And second, assuming

23  that that hurdle were surmounted that would satisfy in favor of

24  the EEOC, the balancing test for which the EEOC bears the

25  burden set forth in Pioneer and Midland.

1         Except as set forth in oral argument today, the EEOC

2    has not carried its burden to show neglect in the first place.

3    Ms. Malloy's declaration and more significantly her deposition

4    transcript, reflect that she did not know when or would not say

5    when she began her involvement in this matter.  Although,

6    ultimately, with a considerable amount of prying, her

7    involvement went back from -- went back to sometime before May

8    22, 2007, but after December of 2006.

9         In any event, neither from her personal knowledge or

10   from her familiarity with the file and what others have told

11   her, she has not offered up a reason for delay in filing a

12   proof of claim.  Such as, for example, any sort of excuses set

13   forth by the Supreme Court or provided by example by the

14   Supreme Court in Brunswick or Pioneer or the absence of notice

15   of the bar date.  In any event, the declaration and deposition

16   of Mr. Gershbein show that the debtors' provided sufficient

17   notice of the bar date to the government.  As well as, of

18   course, to the bar date order referred to in the bar date

19   notice.  And that there was no return of that notice under the

20   case law that establishes a strong presumption of the receipt

21   of notice, which very clearly has not been rebutted here.  See

22   In re Dana Corporation, 2007, W.L. 1577763 at page 4 (Bankr.

23   S.D.N.Y. 2007) and In re R.H. Macy & Co., Inc., 161 B.R. 355,

24   359 (Bankr. S.D.N.Y. 1993), indeed, and I will come back to

25   this.  In her deposition, Ms. Malloy was asked two questions

51

1   first.

2   "Q. Did you need to get advance authorization from the

3   commissioner or at EEOC headquarters in Washington prior to

4   filing your proofs of claim, that is the proofs of claim in

5   this case?"

6   "A. No."

7       Next question.

8   "Q. What authorizations do you need to file a proof of claim

9   in a bankruptcy case on behalf of the EEOC?"

10  "A. I'm not aware of any particular authorizations that we

11  require."

12      She was also asked, as a witness testifying in

13  support of excusable neglect --

14  "Q. Are there any other basis of excusable neglect, other than

15  in your memorandum, that the EEOC filed, of which you are

16  aware?"

17  "A. I think the memorandum covers it."

18      Including the fact that Mr. Strauder did not even

19  come to the EEOC, I believe it was after the bar date already

20  at that time.  And his claim, in any event, is not a pre-

21  petition claim.

22      Moreover, even if the EEOC could be said to have

23  proven that its delay stemmed from "neglect" as opposed to a

24  knowing act or choice, it has not shown that such length the

25  neglect.  And again, I point out, that to my mind for purposes

52

1   of the Bankruptcy's Code's definition of a claim under 1015,

2   the EEOC would have believed that there was a basis for

3   asserting a claim at least as early as November 2006 and

4   determined that there was a claim through its own processes on

5   May 22, 2006.  But that delay, if it does rise to the level of

6   neglect, would be excusable.  The case law dealing with

7   analogous situations, is to the contrary, in support of the

8   debtors' position.  See for example, In re Calpine Corporation,

9   2007 W.L. 4326738, at pages 6-7 (S.D.N.Y 2007), holding that

10  six-month delay between the date when one could be said to have

11  had to file a proof of claim and the date that it was actually

12  filed, was not excusable neglect.  And noting that the

13  claimants "had the ability to file supplemental proofs of claim

14  at any time" have not offered any explanation as to why no such

15  supplements were filed until such a late date.  In re Northwest

16  Airlines Corporation, 2007 W.L. 498, 295 at page 3 (Bankr.

17  S.D.N.Y. 2007), which the Court stated "movant cannot properly

18  ground it's excusable neglect argument on the fact that it

19  conducted an investigation and tried to resolve the issues in

20  good faith negotiations."  All of this could be done after a

21  filing is first made and rights are preserved.  A similar point

22  was made in In re Enron Corporation, 2007 W.L. 294, 114 (Bankr.

23  S.D.N.Y. 2007), in which the movant sought leave to file a late

24  proof of claim approximately twenty months after the bar date,

25  stating that it was not sure that it had a pre-petition

1   guarantee claim against the debtor because it did not have an

2   executed copy of the guarantee.  Notwithstanding a diligent

3   search therefore in its file, bankruptcy judge Gonzalez

4   disagreed.  Noting again, that the most important factor in the

5   Pioneer analysis is the reason for the delay, the court found

6   that the creditor had failed to carry its burden.  In addition,

7   to noting that the creditor had a means to obtain information

8   in the bankruptcy case itself by getting the intervention of

9   the court under Bankruptcy Rule 2004, the court found that it

10   also could have filed a proof of claim without a copy of the

11   executed guarantee, without committing perjury.  And that, in

12   fact, the bar date order permitted it to file a protected claim

13   and explain why a copy of the guarantee was not available.  See

14   also New York Trap Rock Corporation, 153 B.R. 648 (Bankr.

15   S.D.N.Y. 1993), in which bankruptcy judge Schwartzberg denied a

16   Rule 9006(b) motion on the basis of prejudice to the debtor, as

17   well as untimeliness in pursing non-bankruptcy remedies in the

18   face of a bar date.

19       As far as the reason for the delay argument, as well

20   as the issue of prejudice, I conclude that the facts here or at

21   least, if not more, compelling.  The debtors here were clearly

22   reorganizing, unlike in Enron.  Moreover, I've noted the

23   particular nature of prejudice here over and beyond the

24   prejudice recognized in the Enron case that I've just discussed

25   as well as New York Trap Rock whenever new claims are asserted

54

1    after a plan has been filed and negotiated and confirmed, that

2    prejudice being of course the cap on claims for purposes of the

3    EPCA and emergence from Chapter 11, which is premises on the

4    EPCA closing.  Moreover, at least from the record, the EEOC has

5    not explained why it could not file a protective proof of

6    claim, particularly given the fact that it had formed the

7    belief that there was a claim at least by May 22, 2006, and

8    arguably -- or more than arguably, would have been able to do

9    so in November of 2006.  This is particularly so, given the

10    fact that the bar date order itself recognizes in paragraph 4

11    limitations on who may review the supporting documentation in

12    any proof of claim, which is over and above any rights that a

13    claimant, such as the EEOC, would have generally under Section

14    107 of the Bankruptcy Code, to obtain additional

15    confidentiality protection, which this Court has repeatedly

16    granted generally in this case, not only to the debtor but to

17    third parties, whenever they made a reasonable case that

18    information covered by 107 would be implicated in a public

19    filing.

20         It was argued by counsel at oral argument, and I

21    believe contrary to the reasonable inference one can draw from

22    the deposition testimony of Ms. Malloy, which I believe is

23    defended by the same counsel, that the EEOC's statute governing

24    how it needs to process charges in bringing enforcement actions

25    in the District Court, nevertheless precluded the EEOC from

55

1    filing a proof of claim in the bankruptcy case.  Again See 42

2    U.S.C. Section 2000E-5, which sets forth a process for the EEOC

3    to review charges by persons aggrieved under the statute.  As

4    well as a process for proceeding with a civil action.  In

5    particular, it's contended in oral argument that under 42

6    U.S.C. Section 2000E-5(b), which provides that charges shall

7    not be made public by the Commission, that the Commission was

8    precluded from filing a proof of claim in the bankruptcy case.

9    And that the process set forth in Section F(1) of the statute

10   including the process for going through conciliation before the

11   Commission may bring a civil action also precluded the

12   Commission from filing a proof of claim.

13        Neither counsel nor Ms. Malloy, who's also obviously

14   an attorney for the EEOC, has been able to tell me whether

15   indeed, the EEOC follows its practice generally in bankruptcy

16   cases of not filing proofs of claim, even as a protective

17   matter, until it has made a determination and commenced civil

18   action.  They state that they know nothing about how the EEOC

19   deals with proofs of claim in Chapter 11 cases, except in

20   respect of Ms. Malloy's own personal knowledge of this case.

21   Which, of course, as a factual matter, begs the question since

22   the claim here was filed only after the filing of the complaint

23   in the Western District.

24        I've reviewed the statute, as well as the

25   regulations, 29 C.F.R. 1600 et seq., and I believe based upon

56

1    that review, including the regulation specification of what

2    must be set forth in a charge, that this requirement as set

3    forth in -- or these requirements as set forth in 42 U.S.C.

4    Section 2000E-5, does not preclude -- it would not reasonably

5    be read to preclude the EEOC from filing a proof of claim in

6    this case before the commencement of the District Court

7    litigation.  The EEOC has made no effort in the case to seek

8    direction from the Court on this issue, but merely waited until

9    after the litigation was filed to file the proof of claim.

10   Given the definition of claim in the Bankruptcy Code and the

11   importance of that definition, I believe that what Congress had

12   in mind there was far broader than either the definition of

13   charge or a civil action in 42 U.S.C. Section 2000E-5.  And

14   that to the extent it even constituted neglect, which I have

15   serious doubts over, as opposed to a conscious decision, the

16   neglect of the EEOC to file a proof of claim, until the date

17   that it did, is not excusable.  First, because of the asserted

18   reason for the delay, being a unilateral legal interpretation,

19   that frankly to me appears to have been come up with following

20   Ms. Malloy's deposition this morning at oral argument, and to

21   be contrary to her deposition.  Secondly, because unlike the

22   normal case, there would indeed be prejudice here.  This is an

23   unliquidated claim, it would be difficult to liquidate it.  And

24   it is contended, and even if it were not contended, the Court

25   would take into account the fact that the liquidation of that

57

1   claim might involved, even on an estimation basis, a request

2   for withdrawal of the reference, which would further delay the

3   liquidation of the claim.

4        This Court has dealt with several requests to extend

5   the bar date in these cases, and consistent with Midlantic, has

6   generally taken a hard line with those requests and denied

7   them.  In addition to the affect of this claim itself on the

8   EPCA cap and the premises by which the parties negotiated and

9   voted on and the Court confirmed the Chapter 11 plan, therefore

10  it appears to me that other claims late filed could come out of

11  the woodwork as well at this point if the Court were to, under

12  the present facts, grant the motion here.  So the prejudice is

13  two-fold.  First, directly because it's not clear to me that

14  this claim on its own would be liquidated in time to preclude

15  an assertion of a default under the EPCA.  And secondly, that

16  such liquidation would necessarily result in an amount under

17  the cap based on Mr. Unrou's declaration and deposition, in

18  which he said that there were a handful, at least, of other

19  unliquidated and partial liquidated claims, that were filed on

20  a timely basis.  And then secondly, the prejudice generally

21  which is harder to quantify but is believed still exists, that

22  opening the door by granting a motion on this shaky foundation,

23  would encourage other late claimants to seek relief under 9006,

24  or to seek reconsideration of the Court's prior orders denying

25  them relief under Rule 9006.

58

1          Finally, I note here as an independent concern, the

2     point I made some time ago, which is no individual, employee or

3     former employee, all of whom I believe had adequate notice of

4     the bar date, filed a claim that could be construed to assert

5     this type of claim which the EEOC is asserting on behalf of

6     such a class.  By analogy, although I believe it's a very close

7     analogy, therefore, I believe that the reluctance of courts in

8     this district to certify classes for purposes of class proofs

9     of claim under Bankruptcy Rule 7023 and Federal Rule 23, are

10    instructive.  As Chief Judge Bernstein has noted where the

11    request for class certification comes after a bar date has been

12    established and past, bankruptcy law considerations argue

13    strongly against granting the motion for certification.  See In

14    re Musicland Holding Corporation, 362 B.R. 644, 654-6 (Bankr.

15    S.D.N.Y. 2007) citing In re Jamesway Corporation, 1997 Bankr.

16    Lexus 825 at page 10 (Bankr. S.D.N.Y. June 11, 1997) and In re

17    Sacred Heart Hospital of Norristown, 177 B.R. 1624 (Bankr. E.D.

18    P.A. 1995).  See also Judge Rakoff's decision In re Ephedra

19    Products Liability litigation, 329 B.R. 1 (S.D.N.Y 2005), in

20    which Judge Rakoff examined the timing of the request for class

21    certification and found that the late date of the request, in

22    essence, arriving in connection with the impending hearing on

23    confirmation of the debtors' plan, precluded the granting of

24    the motion.  I believe it would similarly undermine the bar

25    date order to let in a claim on behalf of people who did not

59

1  file pre-petition claims for the very same claim before the bar

2  date, under these particular circumstances at least.

3          So for those reasons, I'll deny the motion.  Mr.

4  Lyons, you can submit an order to that effect.  You don't need

5  to settle it but you should provide counsel for the EEOC with a

6  copy when you give it to the Court.  As I often do when I give

7  a long bench ruling, I'll go over the transcript of this

8  matter, not only for typos and mis-citations or incorrect

9  spellings of names and case names, but also for my grammar and

10  additional points that I may or may not want to make.  But the

11  gist of my ruling and the reasons for it won't change.

12          MR. LYONS:  Thank you, Your Honor.  I did clarify

13  that proof of claim 16727 is actually the claim that was filed

14  on behalf of the other pre-petition claimants.  Claim number

15  16728 was actually the administrative expense request filed by

16  Mr. Strauder.

17          THE COURT:  And that's not objected to on the basis

18  of timeliness.

19          MR. LYONS:  Correct.  So that one would clearly

20  remain -- survive Your Honor's ruling.  It's 16727 that would

21  be disallowed and expunged.

22          THE COURT:  Right.  The pre-petition claim.

23          MR. LYONS:  Correct.

24          THE COURT:  Okay.  All right.

25          MR. LYONS:  Thank you, Your Honor.

60

1        (Proceedings concluded at 12:57 p.m.)

2

3                    I N D E X

4

5                    RULINGS

6                              Page Line

7    Settlement Between Denso and Delphi Approved     7    4

8    Claim of Furukawa Expunged

                              7    9

9    Motion of the EEOC Denied              59   2

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

1

2

3                        C E R T I F I C A T I O N

4

5    I, Esther Accardi, court approved transcriber(s), certify that

6    the foregoing is a correct transcript from the official

7    electronic sound recording of the proceedings in the above-

8    entitled matter, except where, as indicated, the Court has

9    modified its bench ruling.

10

11    _____ March 3, 2008

12    Signature of Transcriber              Date

13

14    ESTHER ACCARDI

15    typed or printed name

16

17

18

19

20

21

22

23

24

25