00000010:1-ALL

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------x

In re :

:Chapter 11

DELPHI CORPORATION, et al.,:Case No. 05-44481(RDD)

Debtors. :Jointly Administered

:

:

---------------------------x

**************************************

This is the deposition of CHRISTOPHER DELL, taken in the above-entitled cause, before NANCY E. LOWREY, CSR, RPR, at the offices of Automodular Corporation, 20 Toronto Street, Suite 420, Toronto, Ontario, Canada, M5C 2B8, on the 12th day of February, 2008.

**************************************

APPEARANCES:

ATTORNEYS FOR DELPHI CORPORATION, et al.,

FRANCIS NEIL MACDONALD
Skadden Arps Slate Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
312-407-0700
fmacdona@skadden.com

ATTORNEYS FOR AUTOMODULAR CORPORATION

EDUARDO J. GLAS
McCarter & English, LLP
245 Park Avenue
New York, New York 10167
212-609-6844
eglas@mccarter.com

TABLE OF CONTENTS

INDEX OF EXAMINATIONS:

CHRISTOPHER DELL: Affirmed............ 6
EXAMINATION BY MR. MACDONALD.......... 6

LIST OF EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Notice of Deposition of Christopher Dell. | 8 |
| 2 | Multi-page document entitled "Notice of Motion of Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc. to Compel Assumption or Rejection of Executory Contracts and Motion to Allow and Direct Payment of Administrative Expense Claim". | 25 |
| 3 | Multi-page document bearing Bates numbers DPH 00096 through 00103. | 80 |
| 4 | Two-page document bearing Bates numbers DPH 00403 through 406. | 90 |
| 5 | Multi-page document bearing Bates numbers AUTO-217, AUTO-218, AUTO-219, and AUTO-280. | 94 |

LIST OF EXHIBITS (cont'd)

| No. | Description | Page |
|---|---|---|
| 6 | Two-page document bearing Bates numbers AUTO-383 through 386. | 136 |
| 7 | Multi-page document bearing Bates numbers DPH 00481 through 00486. | 138 |
| 8 | Two-page document bearing Bates number AUTO-281 and AUTO-282. | 138 |
| 9 | One-page document bearing Bates numbers DPH 00463 and 00464. | 139 |
| 10 | Two-page document bearing Bates numbers AUTO-349 through AUTO-351. | 147 |
| 11 | Two-page document bearing Bates numbers DPH 005 through 7. | 147 |

--- UPON COMMENCING AT 2:00 P.M.
CHRISTOPHER DELL: Affirmed.
EXAMINATION BY MR. MACDONALD:
Q. Mr. Dell, my name is Neil MacDonald. I'm here on behalf of the debtors and we are taking your deposition in connection with a matter that has been brought by Automodular Corporation in connection with a claim it has, it is asserting against the Delphi Corporation. Have you been deposed before?
A. No.
Q. Okay. There are a few rules and they're pretty simple. Your counsel may have gone over them with you, but I'll need to repeat them for the record. The first is that this is an oral record and, therefore, your comments must be clearly audible. No uh, huh or uh, uh, or things that are ambiguous. That's rule number one.
The second one is that no matter whether you know what I'm going to say or not, let me finish it first because it's difficult for the court reporter to transcribe if we're both talking at the same time. And it usually starts out nice and clean, and then sometime in the middle it kind of falls apart. But if you'll try to remember

that, that will be helpful.
Is there, I will ask questions, and if you don't understand the question, or if I'm not clear, please ask me to clarify. There's nothing magic about the questions. I'm just trying to get some information, and if you don't, if it's unclear, it's unhelpful to both of us. Do you understand that?
A. Yes, I do.
Q. And if you will, if I ask you a question and your attorney raises an objection, that is a matter of preserving the record for objection, pardon me, preserving the objection for the record. Unless I'm discussing with you or raising questions that implicate the attorney-client privilege, you will be obligated to, subject to your attorney's instructions, to answer that question. There will be times when we will run a little long. If you need a break, please ask for one. I'll try to be mindful of that. We'll go from there. Am I clear?
A. Yes.
MR. MACDONALD: Okay. I want to have marked first the notice of deposition in this case.

EXHIBIT NO. 1: Notice of Deposition of Christopher Dell.
BY MR. MACDONALD:
Q. Could you take a look at that, Mr. Dell, and let me know when you're done with it. Did you see a copy of this notice of deposition before today?
A. No.
Q. Okay. I will point you to the second paragraph on the second page where it, if you'll take a look at that. I'll let you read it. As you're looking at it, it's calling for the production of certain documents. You did not bring any documents to the deposition here today, did you?
A. No.
Q. As you look at this request for production of documents, do you recognize the documents that are identified by what's called the Bates range AUTO-217, AUTO-218, AUTO-219 and AUTO-280, do you recognize those documents by their numbers?
A. Yes.
Q. Okay. Can you describe for me what those numbers, what the documents so numbered

represent?
A. I'm not clear.
Q. Can you describe the documents that those numbers represent?
A. No.
Q. Okay. Well, we will get back to them later on. Did you discuss with your attorney, without disclosing the advice he gave you, did you disclose with your attorney the possibility of bringing documents with you here today?
A. Today?
Q. Yes.
A. Yes.
Q. Okay. And were these the documents that you discussed?
A. In part and parcel with all the other documents, yes.
Q. Correct. These were contracts that I was calling for the production of, contracts between the, that were implicated in connection with certain Scope Change Forms that GM filed in this matter. Do you recognize the description of those documents?
A. I recognize the Scope Change

Form. I do not know if these exact numbers are exactly those scope change numbers.

Q. Okay. I will, it will probably be more efficient if I bring this up later. I just wanted to see at this point whether you had them and we'll pick it up later. Okay. So, before we get to the meat of the deposition, I would like to get some terminology straight just because this is a new area for me and there are some broad and narrow issues. The first is when I say "Delphi", I'm talking about not only about Delphi Corporation, but Delphi Thermal & Interior Division and DAS LLC. So unless I'm being specific it means all of those groups, is that clear?

A. Yes.

Q. When I mean, when I say Automodular, I'm also talking about Automodular Corporation and all of the individual entities, Tec-Mar, Automodular Assemblies Ohio and all of the individual entities that you referred to in your affidavit in connection with this motion, is that clear?

A. Yes.

Q. Okay. There's a term, for the

court reporter, called a CRFM. Could you explain what that is?

A. That's a condenser rad fan module.

Q. And what is that?

A. It's a module that encompasses those parts to be fully assembled and delivered to the OEM, GM.

Q. Pardon me, it's, in lay terms it's basically the cooling system for an engine?

A. Correct.

Q. Okay. And it's a stand alone module that is assembled by Automodular and then shipped to General Motors for installation in a number of different models of cars, is that correct?

A. That is correct.

Q. Lordstown is a facility, is an Automodular facility where they install, where they assemble these CRFMs, is that correct?

A. That's correct.

Q. And they install them in a project called the GMX001, is that correct?

A. Yes.

Q. And what is the GMX001?

A. It's the program name for the Chevy Cobalt and the Pontiac G4 and G5.

Q. Is that the Pontiac Pursuit?

A. The Pontiac Pursuit in Canada. It's sold in Canada. It's name plate is the Pursuit.

Q. Okay. There are, and those, that work was done under a group of purchase orders known in your affidavit and in the motion as the U.S. contract, is that correct?

A. Correct.

Q. Okay. It is common practice in the auto industry to issue purchase orders for work to be performed, and those purchase orders, as they do here, act as binding contracts on both parties, is that correct?

A. Correct.

Q. There is another facility or pair of facilities in Ontario called Oshawa 1 and Oshawa 2, is that correct?

A. Facilities you're talking about are the GM assembly plants?

Q. Correct.

A. That's correct.

Q. And those are in Ontario,

correct? Two facilities?

A. Yes.

Q. And Automodular assembles CRFMs for Delphi, is that correct, at Oshawa 1 and 2?

A. No.

Q. Okay. Could you explain that, please, then?

A. At our Thorton facility located near Oshawa 1 and 2.

Q. So Oshawa 1 and 2 are GM facilities?

A. Correct.

Q. Okay. In Ontario. The work at Thorton or Thornton?

A. Thorton.

Q. The work at Automodular's Thorton facility is the assembly of the CRFMs for Delphi that are then shipped to the Oshawa facilities for installation in the cars there, is that correct?

A. Correct.

Q. Okay. There are a number of GM cars there. Their technical terms I believe are the GMX 365, which is the Buick Mid Lux

series, is that correct?
A. No.
Q. Okay. How is that incorrect?
A. It's the Buick LaCrosse.
Q. And the GMX367 project is?
A. Pontiac Grand Prix.
Q. GMX 210?
A. And 211.
Q. And 211?
A. Are the Chevy Impala.
Q. Okay. And what's the difference between the two?
A. The 210 and 211?
Q. Yes.
A. Just the program name.
Q. Were they running consecutively or did one supersede the other?
A. Correct.
Q. Which one?
A. The 211 superseded the 210.
Q. And the GMX 230 and 231, what is that?
A. The 230 and 231 are the same as, it's the Chevy Monte Carlo, and the 231 superseded the 230.

Q. And Automodular assembles CRFMs for those cars on behalf of Delphi?
A. Correct.
Q. And it does that work in connection with a contract known as, known in the motion as the Ontario contract, is that correct?
A. Yes.
Q. Okay. There's another phrase called "de-rate", and basically as far as I can tell, it's an abbreviation for a decrease in the rate of production or a drop in the unit output, is that your understanding of the term?
A. De-rate is a decrease in the line rate reduction, jobs per hour.
Q. Okay, jobs per hour. And I believe the last one here is an OEM, which is an original equipment manufacturer, is that correct?
A. Yes.
Q. And that would be, for example, General Motors, Ford, Chrysler, those are examples of OEMs?
A. Yes.
Q. Delphi is not an OEM, is it?
A. No.
Q. Okay. With respect to the

CRFMs that Automodular assembled for Delphi, either at Lordstown or for the Oshawa facilities, did Automodular engage any additional suppliers directly, sub suppliers?
A. For?
Q. For the work it did for Delphi?
A. Sub suppliers to assemble the work?
Q. That would be one example. For instance, Delphi engaged Automodular to do work for General Motors. Did Automodular have that same second relationship with any other suppliers?
A. No.
Q. Okay. So it was, Automodular was the end of the line so to speak in terms of the relationships that, the working relationships that were implicated in the Lordstown contract, pardon me, the U.S. contract and the Ontario contract?
A. Correct.
Q. Okay. Is Automodular a direct service provider to General Motors on any projects?

A. Yes.
Q. Which ones are those? Does -- let me rephrase that. I'm sure there are plenty of them. Is Automodular a direct service provider to General Motors on projects either at Oshawa -- let's start with Oshawa. Is it --
A. Yes.
Q. And what projects does it work on directly with GM at the Oshawa facilities?
A. The programs that you referenced. The 211, 231, 365 and 367 at the Oshawa car facilities.
Q. 211, 231, 365 and 367?
A. Correct.
Q. What work does it do directly with GM on those projects?
A. For the 211 and the 231 we do the cockpit.
Q. Anything else on those two models?
A. For the 211 and the 231 and the 365 we do the headliner.
Q. Anything else?
A. For the, what time reference?
Q. Let's start 2004 forward let's

say.

A. 2004? There was other contracts, but I don't recall the exact commodities, but there was several.

Q. Okay. And what about for the 367 model?

A. Yeah, that's some of the work -- currently today we do not do any work for 367, other than the CRFM.

Q. Pardon me, go ahead.

A. In addition to the other contracts we supply GM, we also supply for the GM Oshawa truck.

Q. So you do work directly with GM for a truck called the Oshawa truck, is that right?

A. Correct.

Q. And that's a Canadian, is that a Canadian truck?

A. Correct. And it's right beside Oshawa 1 and 2.

Q. Okay. And with respect to the work that you just described, Automodular has a direct contractual relationship with General Motors for the work it does that you just

described?

A. That is correct.

Q. So with the work that you just described, for instance, the cockpit work on the 211 and the 231, that was done pursuant to a direct contract between General Motors on the one hand and Automodular on the other?

A. Correct.

Q. It is my understanding in these cases that it is customary to award these kinds of contracts several years in advance of the date when the production actually starts in full swing, is that correct?

MR. GLAS: What kind of contracts?

BY MR. MACDONALD:

Q. Contracts, for instance, for cockpit installation, pardon me, cockpit assembly or CRFM contracts, that those projects are bid out and contracted out several years in advance of the actual full-scale start up of the production itself, is that correct?

A. That is incorrect.

Q. Okay. Tell me how that is incorrect?

A. In some cases that is correct,

but in other cases, in other contracts, there's a shorter period of time.

Q. What does the interval depend on?

A. On the customer.

Q. The need of the customer to start quickly or to have the time to be able to ramp up more slowly, is that the difference?

A. No, the need of the customer to fulfill the requirement.

Q. I see. The customer being, for instance, General Motors, is that what you mean?

A. Or Delphi or other tier ones that we do assembly work.

Q. Does it have to do with the complexity of the project as well?

A. It can.

Q. Okay. With respect to the contracts that, the U.S. contracts, was there a, what was the length of the preliminary period in which the work was bid or requests for quotations were received and information exchanged before the final contract began?

MR. GLAS: You're talking final

contracts for the --

MR. MACDONALD: For the U.S. contracts.

MR. GLAS -- the CFRM.

MR. MACDONALD: The CRFM, correct.

THE DEPONENT: I don't recall the exact timing. I do recall that the start of production was 2004 and there were several documents I think we exchanged that shows there was discussions that go back as far back as 2003 or 2002.

BY MR. MACDONALD:

Q. Who is Jim Gazo?

A. Jim Gazo is the vice-president of operations currently.

Q. During the period prior to 2004, what position did he hold for Automodular?

A. I believe it was director of business development.

Q. And was he involved in negotiating what ultimately became the U.S. contracts?

A. I do not recall if he was the final individual. I do recall Travis Doyle was a part of the final negotiation.

Q. Travis, as I recall, was involved prior to 2004 and was involved maybe as early as 2003, is that correct?
A. I believe so.
Q. In the negotiations -- so Travis Doyle was involved in the negotiations that ultimately led to the U.S. contract, is that correct?
A. Yes.
Q. Were you involved in the negotiation of the transactions that ultimately became the U.S. contract?
A. I was involved on a financial level. Financial analysis.
Q. What was your position at that time during 2003 and 2000, early 2004?
A. Advanced planning manager.
Q. And what was your role in connection with the negotiations again?
A. Financial analysis.
Q. Could you explain what you did?
A. We developed pricing associated with the contracts, worked with the models and worked with Travis Doyle and his team

as far as establishing the contracted price, the quoted price.
Q. Were you also involved in that capacity in the Lordstown -- pardon me, the Ontario contract?
A. Correct. Not in the original contract. The LTA, yes, I was 100 percent involved with the LTA.
Q. And the LTA is what they call the long-term contract that was signed I believe in June 2005, is that correct?
A. Correct.
Q. There was another, there was a preexisting contract that preceded the LTA, LTC?
A. LTA.
Q. LTA, is that correct?
A. Yes.
Q. And the LTA amended it, is that correct?
A. Yes.
Q. With respect to the Ontario contract, did Automodular submit information in response to a request for quotation?
A. I believe so, yes.
Q. And were you involved in that

process?
A. The Ontario, with the LTA, yes.
Q. Yes. And were you involved in gathering information that ultimately was submitted --
A. Yes.
Q. -- in connection with that? Okay. Who had principal responsibility for negotiating the LTA on behalf of Automodular?
A. Principal responsibility?
Q. Principal responsibility?
A. I would say Michael -- Winston Ash at the time, sorry.
Q. Winston Ash, what was his position at the time?
A. Vice-president business development.
Q. Did you work with Mr. Ash?
A. Yes.
Q. And you worked in connection, you provided advice to him in connection with the negotiations that ultimately became the long-term agreement?
A. Yes.

MR. MACDONALD: Let me hand you what we can mark as Exhibit 2.
EXHIBIT NO. 2: Multi-page document entitled "Notice of Motion of Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc. to Compel Assumption Or Rejection of Executory Contracts and Motion to Allow and Direct Payment of Administrative Expense Claim".
BY MR. MACDONALD:
Q. This is the motion, what is known as the Motion to Compel that Automodular filed on November 30th, 2007 at docket entry 11180. The Motion to Compel and the supplement are the subject of the litigation or a frame of litigation that's currently going on in connection between Automodular and Delphi. Your affidavit is attached to this, is that correct? After page nine?
A. Yes.
Q. And you signed that affidavit for and on behalf of Automodular in connection

with that motion?
A. Yes.
Q. And at paragraph two of your affidavit you describe your responsibilities as,

"...responsible for the negotiation, maintenance and ongoing administration of all commercial contracts of Automodular...and its subsidiaries."

Are those your current responsibilities?
A. That's correct.
Q. And do you have responsibility now for the maintenance and the ongoing administration of the U.S. contract?
A. Yes.
Q. And is that also true with respect to the Ontario contract?
A. Yes.
Q. And you describe in paragraph three, and we've just gone over this, that Automodular and Delphi entered the U.S. contract

in about March 2004, is that correct?
A. Yes.
Q. And you've attached to this Exhibit, to this affidavit at Exhibit A the purchase orders that are described in here as the U.S. contract, that's a collection of purchase orders of varying dates, is that correct?
A. Yes.
Q. And you did the, you did the negotiation, you were involved in the negotiations that led to the execution of the U.S. contract, is that correct?
A. No.
Q. Okay. How is that incorrect again?
A. I believe I said that before Travis Doyle, and at the time I believe he is also reporting to Winston Ash.
Q. Okay. Was the U.S. contract subject to any long-term agreement or long-term contract as well as the purchase orders? Or are the purchase orders the contract, for the U.S. contract?
A. The purchase orders and the quotation and the SOR that we quoted against are

considered the contract.
Q. Okay. And let me ask you this. Did you read these contracts, the purchase orders before they, before Automodular entered into the contracts?
A. No.
Q. Did anybody to your knowledge read these contracts?
A. I don't know.
Q. Okay. Now that Automodular is a party to the U.S. contracts, have you read them?
A. Yes.
Q. Okay. And is it, it is my understanding that your position in your affidavit is that the general terms and conditions, Delphi's general terms and conditions are an integrated part of the U.S. contract, is that correct?
A. Yes.
Q. And that's also true with respect to the Ontario contract, is that correct?
A. Correct.
Q. What sort of financial information and advice did you give Automodular in connection with the U.S. contract?
A. At what time?

Q. Describe the range of advice and counsel that you gave if you would, please?
A. During the entire period of the contract?
Q. Sure. If you could start broadly?
A. Basically I did have some financial analysis with the contract itself, and this is the Ohio contract, U.S. contract?
Q. Correct, the U.S. contract?
A. And as of recent, responsibility of managing the contract on a go forward basis.
Q. And in your capacity, with your responsibilities of managing and administrating these, you've had recourse to read the contracts and understand their contents?
A. Yes.
Q. Okay. In March 2004, did Automodular have in-house counsel?
A. I don't recall.
Q. Did they, in connection with their entry into the U.S. contract, did they consult, did Automodular consult with either in-house counsel or outside counsel?

A. Not to my knowledge.
Q. Okay. Were you involved in discussions with Mr. Ash or Mr., I can't remember his name?
A. Doyle?
Q. Doyle, in connection with their decision to enter into the U.S. contract?
A. Yes.
Q. And you supported that --
A. Yes.
Q. -- decision? Did you discuss it, did you discuss the U.S. contracts with Mr. Blair prior to the period, prior to Automodular's decision to enter into the U.S. contracts?
A. I don't recall discussing it with Mr. Blair in that period.
Q. Did you make any presentation to the Board of Directors --
A. No.
Q. -- in connection with the U.S. contract?
A. No.
Q. With respect to the Ontario contract that was executed in June of 2005, did

you have discussions with Mr. Ash in connection with Automodular's decision?
A. Yes.
Q. And did you provide advice and counsel to him in connection with Automodular's decision to enter into the Ontario contract?
A. Yes.
Q. Did you speak with Mr. Blair about the decision to enter or not the Ontario contracts?
A. Not me, no.
Q. Did you make any presentation to the Board of Directors?
A. No.
Q. Okay. You read the long-term agreement before Automodular executed the long-term agreement?
A. Yes.
Q. Okay. And that is also true to your knowledge with respect to Mr. Ash? He read it before Automodular entered into the agreement?
A. I believe so.
Q. If you will turn -- well, let's turn to at Exhibit A, the very first page of

the very first purchase order for the U.S. contract. It says, turn to it, it says "Requirements Contract", do you see that? It's going to be hard to describe without a Bates number, but this is purchase order number 550162897 dated, date issued 03 April 2007, correct?
A. Correct.
Q. And it says "Requirements Contract" above that box, is that correct?
A. Correct.
Q. And lower down it says,

"This Requirement Contract is for 100% unless otherwise specified."

Is that correct?
A. Correct.
Q. In your current capacity as administering and maintaining the relationships and this contract, you understand that this is a requirements contract, is that correct?
A. Please provide further clarification. What do you mean by requirements contract?

Q. Do you agree with the proposition that there is no set volume of goods or services to be provided in this contract? It isn't specified, is that a fair statement?
A. I believe it's specified in the quotation that we provided.
Q. Okay. But it is not specified in this document, correct?
A. Correct.
Q. Okay. And it is also true, let's turn to the, I believe it's Exhibit C of the affidavit, which is the long-term agreement, the long-term contract. And it is "Purchase of Product", paragraph one, it indicates that,

"Automodular ("Seller") agrees to sell and Delphi Automotive Systems LLC agrees to..."

Pardon me. I'll start again.

"Automodular ("Seller") agrees to sell and Delphi Automotive Systems LLC acting through its Delphi Thermal&Interior ("Buyer")

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 34

agrees to purchase approximately one hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a 'Product' and collectively referred to as the 'Products')."

Correct? That's provision one.
A. Correct.
Q. And to be fair, you understood this contract as an integrated document, is that correct? That all of the provisions of the contract are part of it, there is nothing written down here that is not excluded from the contract, is that correct?
MR. GLAS: Object to the form. If you understand the question, you can answer.
THE DEPONENT: Could you provide further clarification, please.
BY MR. MACDONALD:
Q. Sure. This is -- let's backup. It's your understanding that the, Delphi's general terms and conditions are integrated into the long-term contract, is that

Page 35

correct?
A. Yes.
Q. All of the provisions of the general terms and conditions are integrated, there is nothing left out in the long-term contract?
A. I believe this doesn't have all the Delphi provisions in it.
Q. But the general terms and, all of the general terms and conditions provided here later on after Exhibit A of your Exhibit C, all of the Delphi Corporation's general terms and conditions are incorporated expressly by reference into the long-term contract, right?
A. I believe so.
Q. Okay. And that actually is paragraph one of the general terms and conditions, the first sentence makes that clear, doesn't it?
A. Yes.
Q. And as in your responsibility for administering and maintaining for the contract, you understood as well that section three of the general terms and conditions, that is specification design and scope changes are also incorporated by reference into the long-term agreement?

Page 36

A. Yes.
Q. And all the rest of them are, we could tick through this one at a time, and you would agree that all of those provisions are part of the general, the long-term agreement?
A. Yes.
Q. Okay. I want to go back and get some clarification here. When you said that the, when I asked you whether there were contract, pardon me, whether there were volume terms identified in the purchase orders that are the U.S. contract, you indicated to me that the response to the request for quotation is also incorporated by reference into the purchase orders, is that correct?
A. Our response for our price in the terms and conditions of our quotation is in response to the requirement that Delphi set forth.
Q. Is it your position that that is incorporated by reference into the purchase orders, into the U.S. contract?
A. The quotation we provided?
Q. Yes.
A. Yes.
Q. Can you point to someplace in

Page

this, in these purchase orders in the U.S. contract where that is?
A. Yes, the price.
Q. Okay. Can you point to a price -- well, can you explain that, please?
A. Well, acceptance of the price I believe is acceptance of our quotation, which is acceptance of the terms of our quotation.
Q. Okay. And so if I understand your position then, each of the prices here is an unwritten assumption of the quotation that you provided and all of its terms and conditions, is that correct?
MR. GLAS: Object to the form. But you can answer if you understood.
THE DEPONENT: Yeah, please provide clarification.
BY MR. MACDONALD:
Q. I'm trying to understand how your quotation is incorporated into the U.S. contract. And I'm, so let me have you explain rather than me trying to paraphrase your answer.
A. Delphi provides us with Exhibits, statement requirement to quote on a particular piece of business.

10 (Pages 34 to 37)

(416) 865-9339 www.stenographers.com Atchison & Denman Court Reporting 155 University Avenue, Suite 302 (800) 250-9059 Toronto, ON Canada

Page 38

Q. Okay.

A. We provide a quotation with terms and conditions and parameters of our quote. Delphi provides a purchase order with the price associated with that quotation. After reviewing our quotation in several, usually several discussions or correspondence, acceptance of the price is acceptance, I believe is acceptance of our quotation.

Q. Are you speaking on your own behalf now or on behalf of Automodular?

A. On behalf of Automodular.

Q. Okay. Can I point you to paragraph 29 of the general terms and conditions? Does paragraph 29 -- how does the statement that you just read, pardon me, how does the statement that you just provided square with paragraph 29, that is the integration clause in this document?

A. Integration clause for -- can I read this?

Q. Sure. Please take your time. Take a look at it and let me re-ask the question. Paragraph one of the long-term contract indicates that the Automodular, pardon me, indicates that Delphi agrees to buy 100 percent of its product

Page 39

production and service requirements from Automodular of the items identified at Exhibit A of the long-term --

A. Are we --

Q. On the Ontario contract, okay. And I'll ask the same thing with respect to the U.S. contract. We are in paragraph one of the long-term contract.

A. Right.

Q. Paragraph one provides that, in sum or substance that Delphi will agree to purchase 100 percent of its production and service requirements from Automodular for the items, the products identified as, on Exhibit A to the Ontario contract, is that correct?

A. That is correct.

Q. And it's also true with respect to the U.S. contract that they, the U.S. contract specifies that its, that Delphi will, agrees to purchase 100 percent of its requirements of the CRFMs for its GMX 1 project, is that correct?

A. Correct.

Q. But your position is that both the U.S. contract and the Ontario contract

Page 40

incorporate by reference the documents that Automodular submitted prior to the execution of the U.S. contract and prior to the execution of the Ontario contract, is that correct?

A. Correct, along with the Delphi documents that were presented for the requirements.

Q. So the bid documents and the pre-execution exchange of documents also are incorporated by reference into the U.S. contract, is that correct?

A. Correct.

Q. And also to the Ontario contract, is that correct?

A. Correct.

Q. Okay. And where again in the U.S. contract is that incorporation reflected?

A. On the purchase order it references a part number.

Q. Okay. Can you give me a for instance?

A. If we go back to that first purchase order, 550162897, it references 52423591. Nowhere on the purchase order does it say what the requirement is to build that part. The SOR that

Page 41

GM provides along with our quotation outlines how that part is to be assembled and sequenced into the GM assembly plant.

Q. Okay. And --

A. And therefore those documents are part of the purchase order.

Q. Okay. And let's go back to the Ontario contract. Where in the Ontario contract are the bid documents and the pre-execution documents both by Delphi and by Automodular Incorporated?

A. The same with the U.S. contract under Exhibit A it outlines the part numbers and the pricing associated with the part numbers of which the SOR requirements that Delphi provided along with our quotations represents the contract.

MR. GLAS: I think you meant the Ontario contract, but said the U.S. contract.

THE DEPONENT: I'm sorry, the Ontario contract. I'm sorry.

BY MR. MACDONALD:

Q. So is it your understanding that Delphi has agreed not only to purchase 100 percent of its requirements of the products

identified at Exhibit A, but also the volumes specified in the prebid documents, pardon me, the pre-execution documents as well?

A. Can you provide clarity a little bit more on the volume?

Q. As I understand paragraph one it indicates that Delphi agrees to purchase 100 percent of its requirements of the products at Exhibit A?

A. Correct.

Q. Okay. But if I understand what you just said you're saying that there is an additional requirement that Delphi has agreed to take on, is that correct? And that's with respect to the volume and that is the bid volume, the volumes that were, the projected volumes that were provided in connection with the bid materials, is that correct?

A. No.

Q. Okay. Please explain it then.

A. With reference to the part numbers in question there's a process and a design put in place to accomplish the assembly of these part numbers.

Q. And we're now talking about

Exhibit A to the Ontario contract?

A. Yes.

Q. Okay. So please explain.

A. And in order to develop that process, there needs to be a defined jobs per hour and labor resource to fulfill the requirement to assemble and deliver the products to the OEM just in time. That is captured in other documents that support this price and this, these part numbers.

Q. Do you believe that the price, we're still talking about Exhibit A of the Ontario contract, do you believe that the price per piece in, for each of these parts identified at Exhibit A is a fixed price over the life of this?

A. No.

Q. You do not?

A. No.

Q. Do you believe that the volumes identify, the projected volumes in Exhibit A are fixed volumes?

A. No.

Q. Okay. Is there, what is the flex element in terms of price with respect to the prices per piece identified here in Exhibit A?

A. What do you mean by flex

items?

Q. You say that they're not fixed if I understood you correctly that, for instance, in year one, the price here per piece of, I believe it's Redacted is not a fixed price for the product for that year, is that correct?

A. You referenced the volume.

Q. First the price, and then the volume. But it is at a fixed price for that year for that product?

A. If no other scope changes are incurred, yes.

Q. And are you considering a volume change, a volume reduction a change in scope?

A. A change in net jobs per hour is a change in scope.

Q. And that would also be -- okay, a change in net volumes would be a change in scope. And that is with the Ontario contract?

A. That is for the Ontario contract as well as the U.S. contract.

Q. Okay. And where in the Ontario contract is that provision to be found?

A. In the documents that were

supportive of the part numbers for the process defined in the pricing established.

Q. When the, when the document was executed in June 28th, 2005, correct?

A. Correct.

Q. Okay. And where in the general terms and conditions is the provision incorporating those bid documents?

A. I believe you said section three, which is the scope change.

Q. Okay. Scope change. And to be more specific -- well, let's leave it at that. If I understand you, let's take a look at the Lordstown contract then. If there's a reduction in net jobs per hour, that is a scope change, is that correct?

A. If there is reduction or an increase it is a scope change.

Q. Okay. So any scope, any reduction in volume or is there a materiality element, it has to be a substantial reduction or a substantial increase?

A. It revolves around the process to build the CRFMs, and the demand of the OEM to supply them just in time within usually a one to

FEBRUARY 12, 2008                    IN RE: DELPHI CORPORATION ET AL                    CHRISTOPHER DELL

Page 46

two hour window.
 Q. Well, would a one percent drop
in the net jobs per hour constitute a change in
scope?
 A. Any change, any increase or
decrease will constitute a change in scope within
net jobs per hour.
 Q. Any change in net jobs per
hour?
 A. Correct.
 Q. Is that true also with respect
to the U.S. contract?
 A. Correct.
 Q. So, of course, is it as
sensitive to a downward reduction or downward
departure in volume as it would be to an increase
in net jobs per hour, they both affect the scope
of the job and therefore permit repricing?
 A. An increase or a decrease
affects the process and would affect therefore the
pricing.
 Q. Does that right run to the
buyer as well, for instance, if the volume
increases five percent, that's a change in scope
under your view, is that correct?

Page 47

 MR. GLAS: Objection to form.
That's not exactly what he said. If you
understand, you can answer.
 THE DEPONENT: An increase and
decrease in jobs per hour, one percent, two
percent, three percent, four percent, five, 10,
100 is considered a scope change.
 BY MR. MACDONALD:
 Q. Okay. And that's in
Automodular's view that is Automodular's position?
 A. That is Automodular's
position.
 Q. Let's take a five percent
increase in net jobs per hour. Does the buyer of
the product or service, in this case Delphi, have
a right to seek a reduction in the price piece
charged by Automodular for increases in volume?
 A. Yes.
 Q. Okay. So it does run both
ways?
 A. Yes.
 Q. Okay. I may have asked you
this, but I want to make sure one more time. That
the U.S. contract, the long-term, the long-term
contract that's known as the Ontario contract, and

Page 48

Delphi's general terms and conditions, along with
the purchase orders that were issued in connection
with the Ontario contract, those are the universe
of contracts -- that's incorrect. I see your
point. Let me phrase it this way.
 Is this a fair statement of your
position with respect to the rights you are
asserting in connection with this action? The
universe of relevant documents that provide you
the right to seek a change in scope are the
following: Number one, the U.S. contracts; number
two, the Ontario contract; number three, the
purchase orders issued in connection with the
Ontario contract; number four, the general,
Delphi's general terms and conditions that are an
integrated part of the U.S. contract and the
Ontario contract; and number five, the bid
documents submitted by Delphi and by Automodular
in connection with the decision to ultimately
execute all of those contracts, is that correct?
 A. That is correct. I believe
you're missing the Ontario contracts purchase
orders.
 Q. I thought I said that, but if
I didn't.

Page 49

 A. Okay. I didn't know if I
heard that.
 Q. Sure. So that is the universe
of documents that you are relying on to bring this
action for relief in the Motion to Compel, is that
correct?
 A. Those documents and the
correspondence that goes with those documents.
 Q. Okay. And what correspondence
would that be?
 A. The correspondence would be
the submission of the documents, reviewing of the
documents between both parties, and replies, any
correspondence associated with those documents.
 Q. In connection -- let me try
that again. So we'll add to that any
communications back and forth between the parties
in connection with the negotiation of the
transaction that ultimately led to the execution
of the U.S. contract and the Ontario contract?
 A. Correct.
 MR. GLAS: Just a clarification,
was there actually an execution of the U.S.
contract, is there a signed contract by both
sides?

13 (Pages 46 to 49)

(416) 865-9339
www.stenographers.com

Atchison & Denman Court Reporting
155 University Avenue, Suite 302

(800) 250-9059
Toronto, ON Canada

MR. MACDONALD: I think you're correct. I'm not aware of any. But acceptance of the U.S. contract. Acceptance by deed I suppose.
BY MR. MACDONALD:
Q. Is it Automodular's position, let's go back to Exhibit A again here. Start again. One of the parts of one of the products identified in Exhibit A is the GMX 231, is that correct, the Monte Carlo?
A. That is correct.
Q. Okay. And it is also the case that the General Motors wound up production of the Monte Carlo in 2007 and ceased producing that vehicle, is that correct?
A. And ceased producing it in June 2007.
Q. Okay. And it is Automodular's position that notwithstanding General Motors cessation of production of that model, Delphi is obligated for the remainder of the term of the contract to pay for the costs incurred by Automodular in connection with the contract itself?
A. Correct. 231.
Q. Correct, 231.

MR. GLAS: Can we go off the record for a second?
MR. MACDONALD: Yes.
--- OFF THE RECORD DISCUSSION.
BY MR. MACDONALD:
Q. With respect to the Ontario contract, and again Exhibit A, if I understood you correctly, you said that the per piece price is not necessarily fixed for the products in Exhibit A, is that correct? As it sits there on the page?
A. It's fixed for the requirement of those parts at that time. If there's any additional scope changes after that, they're subject to change.
Q. But any change in the volume required by the buyer subjects those prices to a change in scope adjustment under your view of this contract, is that correct?
A. On the jobs per hour.
Q. On the jobs per hour?
A. Volume is estimated on an annual demand basis but jobs per hour is basically how the process is developed in order to assemble the CRFMs and meet the delivery requirements.
Q. And any variation in volume on

an annual basis is sufficient to trigger a change in scope review by the seller, is that correct?
A. With the Ontario contract.
Q. With the Ontario contract?
A. The change in annual volume?
Q. Correct.
A. Is not subject to a price change.
Q. What about monthly volumes?
A. No.
Q. What about a situation where production fell during the summer months and then picked back up in the autumn, would that, would that monthly variation in the jobs per hour implicate a per piece rate change under a change of scope analysis?
MR. GLAS: I'll object to the form, but you can answer if you understood it.
THE DEPONENT: No.
BY MR. MACDONALD:
Q. Let me play out this scenario. As in January 2006, for instance, production starts at an annual, pardon me, at a daily rate of 2630 jobs, units produced per day. During the course of the next month there are large swings in

the number of units per day produced. Do the daily, do each of the daily swings permit the seller, Automodular in this case, to try to claim a scope change with respect to the pricing of those units?
A. Any change in the net jobs per hour is a scope change. Any daily volume shortfalls due to downtime or whatever from the OEM is just a volume loss and would not require a scope change.
Q. Let me make sure I understand what you just said. If there are fluctuations caused by the OEM, the original equipment manufacturer, those would not be scope changes, is that what you said?
A. No, daily shortfalls.
Q. Can you explain what you mean by that?
A. Shortfall, for example, would be starting up on a Monday and you're not meeting, like they get the jobs per hour, but they have a slow start.
Q. So at the end of the day if they want to put, 2630 jobs at the end of the day, kind of intra day fluctuations would not affect

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 54

it. But at the close of every day the buyer's price per unit is subject to evaluation on a rate change for a change in scope if they're off the number at the end of the day?

A. That's the jobs per hour.

Q. Okay. Let me point you to paragraph 2.7 of the general terms and conditions. And let me have you take a look at it.

A. Okay.

Q. Okay. It's my understanding then that based on the universe of documents that you are claiming provide you with the right, provide Automodular with the right to seek a change of scope rate adjustment include estimates that were provided either by Automodular or by Delphi in connection with the bidding process that became the U.S. contract, is that correct? The estimates themselves are evidence that should be taken into account in deciding whether there is a need for a rate adjustment or change of scope, is that correct?

A. The volume forecasts?

Q. Correct.

A. No.

Q. They should not be taken into

Page 55

account, the volume projections?

A. The volume projections are forecast, forecasts only.

Q. So the projections, what about the projections in the bid documents?

A. With regards to the Lordstown contract, there was a provision put in for a 10 percent variation.

Q. Okay. What about the Ontario contracts?

A. The Ontario contracts, there was no provision put in for volume, but a change in jobs per hour is considered a scope change.

Q. So at Ontario, let's go back to Exhibit A. If I can make out this document, and it's pretty difficult, the estimated demand here in the third column down is, is that on a yearly basis or a monthly basis, estimated demand?

MR. GLAS: Are you reading the notes?

MR. MACDONALD: No, I'm trying to read here under Exhibit A if you work your way over the first row says, there's some handwritten interlineation that says "old" and then there's something that I can't read, and right next to

Page 56

that it says "estimated demand".

MR. GLAS: Oh.

BY MR. MACDONALD:

Q. Do you understand that to be a binding commitment as to the number of jobs per time unit in this Ontario contract?

A. It's an estimated demand of volume.

Q. Okay. Suppose then we have fluctuations from that number, and I can't read it clearly enough, suppose we have a five percent fluctuation at the end of the interval, does that trigger a scope change?

A. If the jobs her hour have not been changed, then yes, it would not. I should say no, it would not.

Q. Let me ask the question again here. We're now looking at this estimated demand, and as far as I can tell it looks like it says 143, pardon me 143936. Would that be jobs per month?

A. I believe that's jobs per year for that particular part number.

Q. Okay. And then there are -- so how do you arrive, do you arrive at a simple

Page 57

arithmetic process to arrive at the jobs per hour given that estimate for the number of jobs per year, do you measure it once a year to determine --

A. The jobs per hour is established at the start of the contract and changes throughout the contract and are treated as scope changes in pricing and adjusted accordingly.

Q. Is there any limitation on the frequency that a seller can reprice its units, for instance, in this case the assembly of the CRFMs?

A. Frequency in what particular?

Q. Per month, per quarter?

A. If the jobs per hour change per day it could, or per month or per quarter it could result in a price change.

Q. Okay. Are you -- let's go to the U.S. contract. You're not asserting in your affidavit anywhere that Delphi is going some other place to some other provider to get CRFMs for its GMX 1 project, are you?

MR. GLAS: I'm sorry, can you repeat that?

BY MR. MACDONALD:

Q. Sure. In your affidavit, you

15 (Pages 54 to 57)

(416) 865-9339 www.stenographers.com Atchison & Denman Court Reporting 155 University Avenue, Suite 302 (800) 250-9059 Toronto, ON Canada

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 58

are not asserting that Delphi is going to some other assembler to acquire the CRFMs that it's using on its GMX 1 project, are you? That's not your claim, is it? That Delphi is going some other place to buy the CRFMs from somebody else other than Automodular?
A. No.
Q. And it's not your position either in your affidavit that Delphi is going to some other assembler to buy the CRFMs that it's inserting in the Oshawa, the cars being assembled at the Oshawa facilities, is that correct?
A. That is correct.
Q. Delphi is not going someplace else to buy these things that they should rightfully be buying from Automodular, that's not the position that you're taking, is it? They're not going someplace else for their requirements?
A. I guess I need more clarity on that. Based on the contracts that --
Q. I'm trying to make sure what isn't your claim. You're not claiming --
MR. GLAS: That they bought somewhere else.

Page 59

BY MR. MACDONALD:
Q. Right, from the John Smith company, that they're going, for instance, to the John Smith company to buy CRFMs that they're using to install in the GMX 1 project or the GMX367 project? You're not claiming that, are you?
A. No.
Q. Okay. Would you agree that Delphi is purchasing 100 percent of its requirements for the CRFMs from Automodular for the GMX project?
A. GMX?
Q. 001, correct.
A. Yes.
Q. Would you agree that Delphi is buying 100 percent of its requirements for the CRFMs on -- let me start it again. Would you agree that Delphi is purchasing from Automodular 100 percent of the, of its requirements for the CRFMs that its using, that its installing in the Oshawa 1 and 2 plants for General Motors?
A. Yes.
--- BRIEF ADJOURNMENT.
BY MR. MACDONALD:
Q. Mr. Dell, I want to ask you a

Page 60

follow-up question to something I asked before. Is, if I understood you correctly, it is Automodular's position that Delphi is on the hook for the early termination costs incurred by Automodular in connection with the, GMs termination of production on this, the GMX 231, is that correct?
A. Correct.
Q. And Automodular is attempting to recover the early termination costs it has incurred in connection with tooling up for that contract, including rental of facilities and all of the other incidental costs that it had incurred in connection with entering into that contract, is that correct?
A. Correct.
Q. Is Automodular attempting to recover early termination costs against General Motors?
A. Yes.
Q. Okay. Is, has Automodular in the past -- well, can you explain to me Automodular currently is attempting to recover early termination fees, early termination costs against General Motors in connection with the wrap

Page 61

up of the GMX 231?
A. Yes.
Q. Okay. What is it doing, what is Automodular doing to attempt to recover those costs from General Motors?
A. We are pursuing General Motors to recover those costs.
Q. Meaning has it come to litigation yet?
A. No.
Q. Okay. So it is requesting by letter -- there has been a demand placed on General Motors to attempt to recover some of these costs, is that correct?
A. That's correct.
Q. Okay. Has Automodular attempted to recover termination, early termination costs against any party other than Delphi or General Motors in connection with the early wind up of the GMX 231?
A. No.
Q. Has Automodular ever been in a situation before where the work it was doing for an OEM or another supplier wound up prior to the projected termination date of the contract?

16 (Pages 58 to 61)

(416) 865-9339 www.stenographers.com Atchison & Denman Court Reporting 155 University Avenue, Suite 302 (800) 250-9059 Toronto, ON Canada

A. Can you explain that again?
Q. For instance, has Automodular ever been in a situation where the contract ended early for some reason or another and Automodular then sought to get early termination costs or fees?
A. Yes.
Q. Okay. Can you identify those situations, those transactions where that has come to pass?
A. I don't recall all of them, but one I do recall is in connection with the GM Delaware facility.
Q. When was that?
A. That was, I don't recall the close-out date.
Q. Was it recently?
A. I believe it was 2004 or 2005.
Q. Did that ever come to litigation?
A. No.
Q. Did Automodular place a demand to GM to attempt to recover early termination costs?
A. Yes.

Q. Can you explain to me what the GM Delaware, what happened to the GM Delaware facility that --
A. There was something negotiated between the two parties. To exit the contract, GM and Automodular agreed on a resolution.
Q. To terminate the contract early?
A. To terminate the contract and pay for whatever price that we agreed on between the two parties.
Q. So there was actually demand placed and settlement reached between Automodular and GM in connection with this early termination of the GM Delaware facility?
A. Correct.
Q. Any other examples besides the GM Delaware facilities?
A. No, not that I recall.
Q. So the only two times that Automodular has attempted to recover early termination costs incurred where a contract ended before it was projected to end would have been the GM Delaware facility and the GMX 231 program, is that correct?

MR. GLAS: I'll object to the form. You can answer.
THE DEPONENT: That I am aware of.
BY MR. MACDONALD:
Q. That you are aware of?
A. That I am aware.
Q. That's fair.
A. Yes.
Q. Has any supplier ever attempted to recover from Automodular early termination costs in connection with a contract that ended prior to the projected termination date?
A. Of the GMX 231?
Q. At any time, any project?
A. Not to my knowledge.
Q. Okay. Are you aware of any instances, other than these two, the GMX 231 and the Delaware GM facility, where a supplier -- let me withdraw that question. Do you as the person responsible for negotiating, maintaining and administering Automodular's commercial contracts have an opinion about what a requirements contract is?
A. No.

Q. You have no idea?
A. I don't understand the requirements. Can you provide further clarification?
Q. You are aware that there is a body of contract law that deals with requirement, call it requirements contract? I'll go piece by piece. There is a body of case law concerning a type of contract called a requirement contract. You've heard the term?
A. Yes.
Q. Okay. And in a requirements contract, it is often the case that a buyer will agree to purchase 100 percent of its requirements over a certain period of time, requirements for products or services, you're aware of that?
A. Yes.
Q. Okay. Would it be fair to say that within the automotive industry, between OEMs and their suppliers, that the majority of the contracts entered into to provide goods and services to the OEMs are entered on a requirements contract basis?
A. I don't know.
Q. Okay. In your experience as

Automodular's lead negotiator and administrator for the contracts it enters, are the majority of the contracts that it enters either with OEMs or other suppliers requirements contracts?
MR. GLAS: I'll object to the form. You can answer.
THE DEPONENT: The, I think requirements is as set out in what fashion?
BY MR. MACDONALD:
Q. Where the contract will state either, state on its face that it is a requirements contract or that the seller, pardon me, that the buyer agrees to purchase 100 percent of its requirements from Automodular in this case?
A. Okay, yes.
Q. The majority of the contracts are of that sort?
A. Yes.
Q. Okay. And would that be a fair statement with respect to, in your experience in the automotive industry in general, between OEMs and their principal suppliers?
A. I believe so.
Q. Okay. Would it be fair to say then that the requirements contract is the

industry standard with respect to providing major components or services in the auto industry for the construction of automobiles?
A. Yes.
Q. I think we would agree that it has been a tough time in the auto industry for the last couple years, in the U.S. auto industry, you would agree with that?
A. Yes.
Q. Sales are down?
A. Sales are down?
Q. New car sales are down for the last couple of years?
A. No, I believe not. In total, yes, but certain OEMs have sales increases.
Q. Some are having a better time than others?
A. Correct.
Q. The U.S. auto industry, and in particular General Motors seems to be having a fairly tough time of things lately with respect to its sales of new cars, is that correct?
A. I don't, I don't think so, no. Not with GM.
Q. What about Ford?

A. Ford I believe, yes.
Q. Okay. Do you have any, do you have, does Automodular have any long-term agreements with Ford to provide it goods or services in connection with the construction of Ford automobiles?
A. Yes.
Q. Okay. Are these requirements contracts?
A. Yes.
Q. And are these requirements contracts for an extended period of time?
A. Yes.
Q. Have volumes of goods or services provided by Automodular fluctuated over time in connection with the goods or services that Ford buys from Automodular?
A. Yes.
Q. Has Automodular attempted to obtain repricing relief based on changes of scope based on a change in net jobs per hour?
A. Yes.
Q. Okay. And is that, is that a customary practice with Automodular in its relationships with OEMs?

A. Yes.
Q. And it customarily takes the position, not with just, not with just General Motors or Delphi, but with OEMs, with its contract partners in particular, in general -- let me start it again. It is Automodular's position as a matter of custom that it will enforce its right to a scope change and a price adjustment for any variation in net jobs per hour over the course of the requirements contract that it has with that contracting partner?
MR. GLAS: I will object to as a matter of custom. You can answer.
BY MR. MACDONALD:
Q. As a matter of business practice?
A. Yes, as directed by the OEM.
Q. What do you mean by as directed?
A. Receiving the scope change notice as well.
Q. They will issue a scope change notice and Automodular will respond with, accordingly with the information?
A. Correct.

Q. Okay. Is that true with respect to OEMs other than General Motors?
A. Yes.
Q. Is that true with respect to service providers other than, pardon me, with suppliers other than OEMs? That Automodular has a business relationship with?
A. I believe so.
Q. How many contracts are you responsible for negotiating on a yearly basis in connection or on behalf of Automodular?
A. I don't recall.
Q. More than one dozen?
A. Yes.
Q. More than 100?
A. No.
Q. More than 50? I'm just trying to get a general sense.
A. Depends on what you consider a contract. If it's by module I'd say closer to, north of 50.
Q. And a module meaning, for instance, a cockpit?
A. CRFM cockpit or an IP.
Q. Or a power pack?

A. Power pack.
Q. Okay. Or a rear suspension?
A. Correct.
Q. An assembly unit that would be sold to a car manufacturer to install as a unit into its vehicle?
A. Correct.
Q. Okay. And the majority of those contracts are requirements contracts, is that correct? Is that what you said?
A. Yes.
Q. It is Automodular's business practice to seek a change in scope price adjustment whenever there is a fluctuation in the net jobs per hour over the course of the contracts it enters with its various contracting parties?
A. Yes.
Q. Is that a, to your knowledge, is that a standard practice in the auto industry?
A. Yes.
Q. It is?
A. Yes. To my knowledge.
Q. Can you give me an example of another assembler or subassembly provider in the industry that follows that practice?

A. Ford.
Q. Ford? Is that what you said, Ford?
A. You said sub assembler.
Q. Assembler?
A. Our competitors?
Q. Yes, exactly.
A. I wouldn't know if they followed that practice. I believe they would because it is issued on one of the scope changes that we did receive from GM, which was the third shift removal of the Ohio contract or the U.S. contract, there was a notification of Comprehensive Logistics, who was one of our competitors, that they received the Scope Change Form as well. So I believe yes, in that case another supplier would, assembler would seek recourse.
Q. Okay.
MR. GLAS: What was the name of the other assembler?
THE DEPONENT: Comprehensive Logistics.
MR. MACDONALD: Lordstown.

BY MR. MACDONALD:
Q. I want to direct your attention here to paragraph five of your affidavit. If you'll take a look at that. Would you take a look and let me know when you're done?
A. Yes.
Q. Okay. In particular I want to direct your attention to the sentence that begins,

"Effective July 17, 2006, the following changes were made by Delphi under the scope of production."

Let me take that phrase. You're referring there to changes that are made pursuant to paragraph three of the general terms and conditions, that is the scope change provision of the general terms and conditions, is that correct?
A. Correct.
Q. Okay. So the next part is,

"Shifts were reduced from 3 shifts to 2 shifts; and (2) there was an increase line rate from 54 net

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 74

jobs per hour to 63 net jobs per hour."

Okay. Is that statement, is it your position that Delphi made those changes or that Automodular made those changes?
A. GM made those changes.
Q. Okay. So explain that to me?
A. The OEM set, decided to reduce one shift and increase the net jobs per hour from 54 to 63.
Q. So that was a decision that was driven by General Motors, is that correct?
A. Correct.
Q. Okay. General Motors issued a notice to whom?
A. To Automodular.
Q. So General Motors directly issued to Automodular a request that the shifts be reduced from three to two and increase the line rate from 54 to 63 jobs per hour, is that correct?
A. That's correct.
Q. There is a phrase, and for the life of me I forget it all the time, sequence delivery. Are you familiar with that phrase?

Page 75

A. Yes.
Q. What is sequence delivery?
A. Sequence delivery is we receive a trigger from our OEM to produce, I'll use CRFM module as an example. CRFM module based on certain parameters of one of the part numbers of the CRFM modules, and have it assembled and shipped over to a sequence, assembled and put in sequence in order that the OEM has requested it.
Q. Okay.
A. And then that is shipped over just in time to the facility which usually is installed in a vehicle within two hours.
Q. So the change that's referenced there in paragraph five we just spoke about, that was a change that was initiated by General Motors?
A. Correct.
Q. And that was a direct communication between General Motors and Automodular, is that correct?
A. Correct.
Q. Delphi did not direct that that change be made, is that correct?
A. I, I don't recall. I believe

Page 76

Delphi would have to be involved with the change because it is, I do not know if GM directed Delphi to make the change, but I believe they would have in order for us to service GM properly.
Q. But at any rate GM contacted Automodular directly and instructed Automodular to make that change?
A. To service two shifts at 63 jobs an hour, and not in particular the CRFM.
Q. Okay. Can you explain that then?
A. In particular to do with the program, like the contracts that we have. We have other contracts with GM.
Q. Okay. So it was not just the CRFM that was affected but it was --
A. It was the entire facility we service, all the products.
Q. And that was the Oshawa facility, is that correct?
A. That would be, no this one here is in Lordstown.
Q. Pardon me, that's correct. So General Motors instructed Automodular to make the shift in the increase in the corresponding net

Page

jobs per hour. Did Automodular discuss that directly with Delphi before those changes were made?
A. I believe so.
Q. Who at Delphi did they discuss?
A. I don't know.
Q. Who at Automodular was involved in those discussions?
A. I don't know. I would believe the operating folks would be in discussion with possibly Greg Connolly and Bill Vandemeer from the Delphi organization about these changes and the new demand in shifts.
Q. The operations folks on the Automodular side?
A. Correct.
Q. Automodular operations people would have been in contact with Greg Connolly or others at Delphi, is that your statement?
A. I believe, yes, we would be in contact, whether we initiate the contact or Delphi would initiate it to us, I do not know how that, how that communication came across. But it is quite possible that Delphi contacted us on these

20 (Pages 74 to 77)

(416) 865-9339 www.stenographers.com Atchison & Denman Court Reporting 155 University Avenue, Suite 302 (800) 250-9059 Toronto, ON Canada

changes as well.
Q. But you don't have personal knowledge?
A. No, I don't have personal knowledge.
Q. Okay. Do you know what is a design record change notice?
A. I believe a design record change notice is a change in the design of a CRFM.
Q. And there is a form, is there not, that Delphi issues called a design record change notice?
A. I believe so, yes.
Q. Okay. Do you know, to your knowledge, has Delphi ever issued a design record change notice for a reduction in shifts from three to two, for instance?
A. I believe the design record change notice is only for the design of the CRFM, not for the shifts or the jobs per hour.
Q. Okay. And is that, the same would be true with respect to the jobs per hour, is that what you said?
A. Yes.
Q. So the DRCN only covers design

changes in the parts themselves?
A. I believe, yeah, the parts that are required to produce the final assembly of the CRFM.
Q. Why were the shifts reduced from three to two, do you know?
A. No.
Q. But it was at Delphi's, pardon me, it was at General Motors' direction that the shifts were changed?
A. Correct.
Q. When Automodular went from three shifts to two at Lordstown and increased the line, the net jobs per hour on the line, it notified Delphi that it considered this change a change in scope, is that correct?
A. Yes, we sent Delphi a price associated with the change of scope for the three shift to two shift, or the one shift reduction to two shift and the net jobs per hour change.
Q. You actually drafted that notice?
A. Yes, that's correct.
MR. MACDONALD: And let me deal with that now. This will be Exhibit 3.

EXHIBIT NO. 3: Multi-page document bearing Bates numbers DPH 00096 through 00103.
BY MR. MACDONALD:
Q. You can look through it but I believe your letter starts on the second or third page. For the record the Bates range is DPH 00096 through 00103. And beginning at 00098 is a letter from you, Chris Dell, to Doug McLean. Who is Doug McLean?
A. Doug McLean is the buyer for Delphi. At the time.
Q. This was the letter that you sent to Delphi in connection with General Motors' direction to Automodular to reduce the line from three to two and increase the net jobs per hour?
A. Correct.
Q. Okay. To your knowledge, was this the first that Delphi had heard of this change directed by General Motors?
A. To my knowledge, yes.
Q. How did you find out that these changes were to be made at General Motors' direction?
A. From GM.

Q. Who at GM gave you the instruction?
A. I believe that Tony Monaco was the individual on the Scope Change Form.
Q. Who is, what facility does Tony Monaco work at?
A. Tony Monaco works at the GM Lordstown assembly plant.
Q. Okay. And did he contact you by phone or in person?
A. I believe that was sent to us via email.
Q. Okay. Did Doug McLean request this quotation in connection with the transition from three to two shifts?
A. Not to my knowledge.
Q. Okay. So this was a document that you initiated on behalf of Automodular?
A. Correct. Based on the scope changes.
Q. Based on the scope changes. But this was not a document or request that Doug McLean had requested?
A. That is correct.
Q. What are variable costs in the

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 82

"Quotation Terms and Conditions"? The first item there, what does it mean that the variable costs will be paid on the units produced?
A. It's a variable contract, which is a piece price.
Q. Is a what price?
A. Piece price.
Q. Explain that if you would, please?
A. Our contract's based on per piece.
Q. Okay.
A. And it's a variable contract relative to the number of units produced.
Q. I'm not sure I understand the terminology. A variable contract meaning that the number of units produced over a certain period of time may vary?
A. Yes.
Q. So there is no set quantity that Automodular is obligated to produce, is that correct?
A. No set quantity.
Q. No set quantity?
A. There is an estimated demand.

Page 83

Q. Okay. There is an estimated demand, and does that estimated demand fluctuate over time in the variable contract that you're proposing here?
A. I believe no. Unless, it could, it could. That's the answer, it could.
Q. So this is a variable contract, a variable cost contract that you're proposing here?
A. Correct.
Q. Okay. That is not the contract -- well, let me ask you this. This contract, this variable cost contract in your letter will become effective July 1st, 2006, that's the proposition to Delphi, is that correct?
A. Correct.
Q. Okay. This was not the U.S. contract, this was a proposal to amend or supersede the U.S. contract?
A. Yeah, this is a U.S. contract, or this is a price for the U.S. contract for the scope changes in question.
Q. This is an addition to the U.S. contract, is that -- you're quoting a requirement. Let me backup here. This is a

Page 84

variable cost contract that you're proposing here?
A. We have a purchase order in place and this is the pricing associated with the changes that have occurred.
Q. So do you believe that the terms and conditions that are proposed here are consistent with those in the U.S. contract?
A. The terms and conditions?
Q. Right. For instance --
A. Are in addition. These are changes. Some of these are the same, but these are changes to the existing contract that was in place.
Q. Okay. So that Automodular has proposed these changes?
A. For the changes that the scope change has identified with the shift reduction in the jobs per hour change.
Q. And at page 00099 Automodular has requested that Delphi confirm acceptance of this new pricing in quotation that are proposed in the July 19th letter?
A. Yes.
Q. What was Delphi's response to receiving this letter?

Page

A. I believe they didn't respond.
Q. At all?
A. No, I would say that initially they did not respond. But I do believe there was some type of response as we went through some of the correspondence that we were presented. I don't know the exact response.
Q. How does the variable cost contract differ from the requirements contract that is stated on the U.S. contract? Is there a difference at all in your mind?
A. The difference is the change in the scope of work.
Q. Okay. The only difference between the U.S. contract and the contract you're proposing here is an adjustment based on the change in scope?
A. Pricing?
Q. Pricing change, pricing adjustment based on the change in scope?
A. Correct.
Q. Did Delphi ever agree to the terms and conditions proposed here?
A. No.
Q. Okay. And this, the terms and

22 (Pages 82 to 85)

(416) 865-9339 www.stenographers.com Atchison & Denman Court Reporting 155 University Avenue, Suite 302 (800) 250-9059 Toronto, ON Canada

conditions reflected here in connection with the Lordstown facility are a matter of active dispute between Automodular and Delphi at this time?
A. Correct.
Q. Okay. Is this an amendment in Automodular's view to the U.S. contract?
A. Can you clarify amendment?
Q. In the, Automodular and Delphi entered the U.S. contract in March 2004, is that correct?
A. That's correct.
Q. Approximately?
A. I believe so, yes.
Q. And in effective July, sometime in July 2006, Delphi, pardon me, General Motors initiated a change in the line requirements and the per job requirement, per hour net jobs requirement for those lines, is that correct?
A. And the shifts, correct.
Q. And the shifts. Automodular submits a letter to Delphi requesting that costs be amended in connection with a change in scope of the work produced on those lines, correct?
MR. GLAS: Object to the form.

Not the costs, not amendments to the costs.
BY MR. MACDONALD:
Q. Amendments, there is an amendment, a proposed -- let me start over. This is a modification of the per piece price charged by Automodular for the CRFM's producing or assembling at its Lordstown facility under the U.S. contract, is that correct?
A. Yes, for the scope changes in question.
Q. But prior to receiving this letter, Delphi was unaware that there would be a request for a scope change from Automodular, is that correct, to your knowledge?
MR. GLAS: Okay. Object to the form. You can answer.
THE DEPONENT: To my knowledge?
BY MR. MACDONALD:
Q. To your knowledge?
A. The Delphi --
Q. This was the first Delphi had heard --
A. To my knowledge, yes I believe so, yes.
Q. And there were no, there were

no letters between you and anybody at Delphi that indicated that they were requesting a quotation for a change in per piece price under the U.S. contract based on a scope change, correct?
A. Correct.
Q. Let me ask you this. On the second page here, this was, the first bullet point. One of the terms and conditions of this proposed change to the pricing scheme under the U.S. contract was that,

"[Automodular] reserves the right of setoff or recoupment against any amounts owed to Delphi and its affiliates or subsidiaries."

Is that correct?
A. That's correct.
Q. And Automodular was of the view that that was an important provision to include in this proposal, is that correct?
A. Correct.
Q. And is that, it remains Automodular's position to this date that that is an important provision in this proposal agreement?

A. Correct.
Q. Let me refer you to paragraph 11 again of your declaration, pardon me, your affidavit. Let me know when you're done with paragraph 11.
A. Okay.
Q. And what I want is the first sentence,

"Beginning in 2006 and continuing through November 2006, Delphi issued notices of change in scope."

What notices of change in scope did Delphi issue during that period?
A. I believe that should be corrected. It was GM issued the change in scope.
Q. So GM issues the change in scope -- okay. That statement is incorrect as written?
A. That's correct.
Q. So there were no statements by, no DRCNs issued by Delphi in connection with parts changes -- no, there were actually. Let me

rephrase that. Delphi itself never issued a notice of change in scope during that period, is that correct?
A. Delphi did not issue a notice of change in scope for jobs per hour and shift reduction.
Q. There were during that period, and let me get this document.
EXHIBIT NO. 4: Two-page document bearing Bates numbers DPH 00403 through 406.
BY MR. MACDONALD:
Q. I will direct your attention to the back page.
MR. GLAS: 406?
MR. MACDONALD: That's correct. DPH 00406, and for the record, the Bates range on this is DPH 00403 through 406.
BY MR. MACDONALD:
Q. These are references to the notices of changes in scope that GM issued, is that correct, that you refer to here in paragraph 11?
A. This is appendix A we're looking at?

Q. Appendix A, that is correct?
A. The notification --
Q. These reflect, these are the transactions or incidents that are reflected in your statement in paragraph 11?
A. Relating to de-rate, correct.
Q. Relating to de-rate. It's not your position that a currency exchange, for instance, adjustment is a change in scope?
A. The currency exchange adjustment is a part of, not a change in scope, sorry, it's not, it's a clause of our agreement.
Q. It's a clause in the agreement but it's not a change?
A. Correct.
Q. A change in scope?
A. Labeling and clip addition would be a change in scope from Delphi.
Q. Okay. But --
A. And foam pad installed would also be one.
Q. But let me refer you to, for instance, I'll point you to Exhibit, pardon me, section G down there and then M, there was a label and clip addition and it was removed M. So it

seems like there was a debit and credit made, is that it?
MR. GLAS: I don't follow that.
BY MR. MACDONALD:
Q. There was a charge made and then removed, is that how you read that?
A. I believe so.
Q. Okay. Is a grease application a change in scope of work?
A. A grease application was already included in the contract.
Q. Okay. Was there, and the rebate payment itself for an overcharge for the application is not a change in scope under the --
A. No.
Q. Okay. With respect to the de-rate adjustments reflected here, those are dated January 23rd, 2006, and that was at Oshawa 2, May 8, 2006 at Oshawa 2, February 26, 2007 that was Oshawa 2 again, and then July 16th, 2007 at Oshawa 1, correct, those are all de-rates charges or adjustments reflected?
A. Yes, I believe there is one, two, three, four, five, six.
Q. Okay.

A. One, two, three, four, five, there should be five. I don't know if you called out five different changes.
Q. Okay. But these, but these, Delphi did not issue notices of changes in scope with respect to those de-rates?
A. That's correct.
Q. That was with respect to the GM notice we were just talking about?
A. That's correct.
Q. Okay. If we look again at appendix A, we can walk our way horizontally across the page and identify per part or assembly all of the adjustments that were made to the pricing over the course of that period. Is that how this diagram or spread sheet works?
A. For the time.
Q. For the time represented in each?
A. Correct.
Q. And this is for the Oshawa facility?
A. Correct.
Q. And all the changes in scope reflected in appendix A are predicated on

paragraph three of the general terms and conditions, that's the change in scope provision of that, the general terms and conditions, correct? That's where the authority for these proposed changes is coming from?

A. With the exception of exchange.

Q. Correct.

A. And the rebate for grease.

Q. Right. I want to direct your attention now to documents we talked about earlier today. And that is the GM Scope Change Forms we talked about earlier today. Take a look at those. This is a group Exhibit that I've assembled.

EXHIBIT NO. 5: Multi-page document bearing Bates numbers AUTO-217, AUTO-218, AUTO-219, and AUTO-280.

BY MR. MACDONALD:

Q. And the Bates range on this group Exhibit is AUTO-217, AUTO-218, AUTO-219, and AUTO-280. These are GM forms, is that correct?

A. Correct.

Q. These were issued by General Motors to Automodular, correct?

A. Correct.

Q. If I understood your earlier comment correctly, the contract for which the work, under which the work was done in AUTO-217 is a contract between Automodular and Delphi, is that correct?

A. Can you clarify?

Q. Sure. This, there's work described here in the box in the center of the form on 217, and this description indicates there will be a volume adjustment in plant number two. And it goes on to describe a decrease in the volume of units produced over the period of the daily, reduction of the daily number of units produced on this line at this facility, correct?

A. Right.

Q. Who is the contract between with respect to the work described here in the center of the page? Is that a contract between Automodular and General Motors or is that a contract between Automodular and Delphi for the work being done here, that's described here?

A. This would affect all work.

Q. But who is the actual contract with? Does this Scope Change Form refer to work

done by Automodular under a contract directly with General Motors?

A. No, it's just a form identifying service to GM Lordstown with these changes.

Q. Okay.

A. Service to, regardless of what contracts I think are in place.

Q. Okay. So who was the contract with that this work was being done for here in the center of the page?

A. We have contracts with the OEMs and the tier ones to service this location with these changes.

Q. Was, is the work done here and the scope change here, was that work done under contract directly between Automodular and General Motors?

A. Yes.

Q. Okay. Then with respect to this Exhibit No. 1, I had called for the production of the contract under which this, the work in these four Scope Change Forms was conducted. If I understood you correctly, Automodular had a contract directly with GM to do

the work described here in the center of this AUTO-217, is that correct?

A. Automodular has worked with contracts that service this assembly plant, correct.

Q. And that contract is with General Motors?

A. Yes.

Q. Then that was the contract I was calling for the production of. If I can get that, I would be very appreciative. Is that also true, let me just turn to -- the 218.

MR. GLAS: I think there is a misunderstanding. I think that there is a location where GM is assembling cars and GM is informing all its suppliers that the cars assembled at that location will undergo a certain change, and this affects all suppliers. And I think that what Chris is saying is that Automodular was a supplier, if you will, wearing two hats, one as a direct supplier, and a second hat as an indirect supplier through Delphi.

So the description of the scope change affects both as a direct supplier and as an indirect supplier through Delphi. Is that how you

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 98

read this?
THE DEPONENT: Yes.
BY MR. MACDONALD:
Q. Okay. So who was the contract with, pardon me --
MR. GLAS: There is more than one.
BY MR. MACDONALD:
Q. No, but the work that Automodular is doing here for General Motors, is that being done subject to a contract between Automodular and General Motors, or Automodular and Delphi?
MR. GLAS: I object to the form.
BY MR. MACDONALD:
Q. I understand. Let me -- go ahead.
A. The Delphi contract that we have in place, the SOR requirements of the contract --
Q. Can you explain what SOR?
A. Statement of requirements, before we quoted and execute the contract specifically outline that you need to work with the OEM assembly plants at the OEM assembly plant rates.

Page 99

Q. Okay. Go ahead.
A. And subject to changes to the OEM demand requirements.
Q. Then let me see if this is right. Are you saying that the work that is being described here, this reduction, is work that, and it's work that Automodular is performing, that work is being performed under the Ontario contract, is that your statement? Or is there a separate contract here that's, that this work is being done under?
A. This work affects both the GM contract and the Delphi contract.
Q. But there are two contracts here, one of them is with GM, and one of them is with Automodular for the work that's being described here?
A. Correct.
Q. Okay. Now, let me try it this way. GM and Automodular have a direct contractual relationship for the work that's described in this Scope Change Form, is that correct?
MR. GLAS: Again --
MR. MACDONALD: For the Ontario.
MR. GLAS: I object to the form.

Page 100

For the work that's described in the form in part, if you like, because all the work affects one car. And if there is change in the production of that car, it affects all the contracts that relate to that car, both Delphi, Automodular's and any other supplier.
BY MR. MACDONALD:
Q. Okay. Let me ask this. Was Automodular providing CRFM's for the cars that were being assembled in this facility on, in connection with this change in scope description?
A. Yes.
Q. Was it providing any other modules or pieces or parts or assemblies to those cars?
A. Yes.
Q. Okay. Which assemblies was it providing?
A. Specifically the -- actually, this is for Oshawa 2. Just give me a minute, please.
Q. Sure.
A. No, we did not provide any GM work for Oshawa car plant 2.
Q. Okay. So this --

Page 1'

A. At that time I believe.
Q. So the work described in this change of scope, this description of the change of scope only involves the CRFMs that Automodular was providing to Delphi for inclusion in the cars that it was producing, that GM was producing at Oshawa, is that correct?
A. For Oshawa car plant 2, correct.
Q. Okay. Let me ask this. There is a -- who was, who was paying Automodular for the work being performed here prior to this change in scope, was that Delphi paying Automodular for that work?
A. Delphi was paying for us to assemble CRFMs for this particular plant at that time.
Q. There were no other assemblies other than the CRFMs that were being assembled and used in these cars, in this Buick and Pontiac reflected here on AUTO-217, is that correct?
A. Actually, I have to correct myself here. 2005 we did have the rear strut contract, so there was a rear strut contract that GM, that we did with GM at this particular time.

26 (Pages 98 to 101)

(416) 865-9339 Atchison & Denman Court Reporting (800) 250-9059
www.stenographers.com 155 University Avenue, Suite 302 Toronto, ON Canada

Q. Okay. So --
A. And that one expired in 2006. That's why the timing, I'm just --
Q. So Automodular had a contract with General Motors for the assembly of the rear strut assembly?
A. At that time.
Q. Okay, at that time. That's the contract --
A. Sorry, servicing the plant, that plant.
Q. So that's the contract I was calling for. It's not just the CRFMs. The CRFM contract was with Delphi, correct?
A. Correct.
Q. It's the rear strut assembly contract with General Motors that I was calling for the production of. So if I could get that, I would appreciate it.
MR. GLAS: We'll take it under advisement.
MR. MACDONALD: I understand.
BY MR. MACDONALD:
Q. Let me ask you this --
MR. GLAS: S-T-R-U-T?

THE DEPONENT: Yes.
MR. MACDONALD: It's a brace basically.
BY MR. MACDONALD:
Q. Let me ask you that same question then on AUTO-218. Is this only CRFM work in this, being affected here in the description of scope change?
A. I do believe we, the, I would have to check my records, but I believe the rear strut contract expired June 2006. So this, it would have been a short period of time it would have been affected I believe.
Q. I'm calling for the production of that as well.
MR. GLAS: Just to clarify, that would be the same contract?
THE DEPONENT: Same.
MR. GLAS: Okay.
BY MR. MACDONALD:
Q. And 219, AUTO-219, I believe you indicated that you had, that Automodular had cockpit or cockpit module contract with respect directly with General Motors for the Chevy Impala and the Monte Carlo, is that correct?

A. That's correct.
Q. And it also had interior lining contracts?
A. Headliner.
Q. Headliner?
A. The headliner contract was with two parties, one with GM and one with Grupo Antolin.
Q. Okay. There is a pathway, let's go back to 217, and this description will be common to all of these. At the bottom of the page it says,

"All Scope Changes should follow the appropriate course before being applied."

And then there is a pathway below that.
MR. GLAS: I'm sorry, where are you?
MR. MACDONALD: At the bottom of the page.
MR. GLAS: 217?

BY MR. MACDONALD:
Q. 217, do you see that, and that's the assembly plant. What is WWP?
A. World Wide Purchasing.
Q. Is that a GM division or department?
A. Yes.
Q. Okay. Walk me through this appropriate course that's being described at the bottom of the page?
A. This is how all scope changes are processed.
Q. Explain that to me?
A. The assembly issues the change to World Wide Purchasing who issues the changes change to the supplier.
Q. Every supplier affected by the proposed change?
A. Correct.
Q. Yes?
A. In turn supplier issues back to the World Wide Purchasing, and then World Wide Purchasing back to the assembly plant, and the assembly plant issues a purchase requisition.
Q. What does World Wide

Purchasing provide to the supplier at this stage in this path here? What information does World Wide Purchasing provide to the supplier, this form, is that what they provide?
A. Correct.
Q. Okay. There is a space at the top called "WWP Log #" and a purchase order. Do you know why those are blank?
A. No.
Q. Do you know why the supplier section -- let me ask you this. The supplier section refers to in this case Automodular, doesn't it, the information to be provided by Automodular?
A. Correct.
Q. Why is that blank?
A. This was the original form received. So for each of our other contracts we issued a response associated with changes that affected that contract.
Q. So --
A. So, for instance, the rear strut contract, we would have issued a response to this based on these changes for 217 and 218. And then for 219 we would also have issued a response

to the headliner and the cockpit.
Q. So this was the incoming document, if I understand you correctly, is that correct?
A. Correct, from GM.
Q. And having received these information, this document, you would then gather responsive information and fill out this document, correct?
A. Correct.
Q. And then you would submit that filled out document back up to World Wide Purchasing, correct?
A. Correct.
Q. What happens then at World Wide Purchasing?
A. I believe they review the numbers with management as well as possibly the assembly plant.
Q. Okay. And then the World Wide processing group sends the completed information and, the completed form and their recommendation to the assembly plant?
A. Yes, I believe so.
Q. And then the assembly plant

either issues a change in scope order or denies it? Tell me what happens when it gets -- it issues a purchase requisition?
A. Purchase requisition for the costs both parties have agreed to.
Q. Now this one here indicates, if I understand it correctly, in the middle of page 217 that there will be a 5.4 percent decrease in volume, is that correct?
A. I believe that's what it says.
Q. Okay. And there is a request to Automodular to have a plan in place and sent out to the buyers, and that third party manager at World Wide processing, is that correct? That's who the buyer and third party manager are at World Wide processing, is that correct?
A. The buyer is World Wide Purchasing, third party manager is the assembly plant.
Q. Okay. And that plan should be sent out by July 9, 2006. Did Automodular do that, send out a plan?
A. I do believe so, but I don't recall, if it happened on that exact date.
Q. On or about that date did

Automodular send out a plan --
A. Yes.
Q. -- in response to that?
A. Yes.
Q. And the plan must address the volume adjustment with piece price decreases, is that correct?
A. That was their request was to look at reducing the price, but in fact it increased the price.
Q. Did Automodular submit a plan with a piece price increase?
A. That is correct.
Q. And what was the result of that submission?
A. With this particular?
Q. With this particular change?
A. With the rear strut we were successful in getting the change adjusted.
Q. What about with respect to the CRFM?
A. The CRFM I believe we're dealing with this now.
Q. That's a current dispute, is that correct?

A. That's correct.
Q. Unresolved?
A. Unresolved.
Q. Unresolved would be a better. So if I understand this document correctly, there were two contracts at issue in AUTO-217, correct?
A. Correct.
Q. There was an Automodular to General Motors direct contract for a rear strut assembly?
A. Yes.
Q. And then there was an Automodular to Delphi contract for the CRFMs, is that correct?
A. Yes, correct.
Q. And then because there was a change in line jobs per hour or rate speed, it would have affected all the components in the car that were being assembled into the car, is that correct?
A. In the case of what we supplied, yes.
Q. So you are currently, Automodular is currently in disagreement, it's an open question about whether Automodular will get

its proposed rate increase from General Motors, is that correct?
A. It is negotiated.
MR. GLAS: Up to the court.
BY MR. MACDONALD:
Q. Is the dispute with General Motors, between General Motors and Delphi in the courts right now?
A. Is the dispute between General Motors and Delphi, I don't know.
Q. Pardon me, I think I started to lose track here. Let me rephrase it. General Motors -- strike that. Automodular has requested that General Motors increase its per piece price rate for the strut, correct?
A. Automodular has requested.
Q. Okay. Has its strut price increase been granted by General Motors?
A. Yes.
Q. Okay. And the CRFM is currently in dispute with Delphi, is that correct?
A. CRFM is currently in dispute.
Q. Okay. But Automodular submitted a request to Delphi to increase the price of the CRFM?

A. Automodular did submit an increased price for the scope change in question.
Q. Okay. But it's an open question about whether that will be authorized by General Motors or not, is that correct?
MR. GLAS: I object to the form.
BY MR. MACDONALD:
Q. It is not yet decided, General Motors has not yet decided whether that rate increase will be granted, is that correct?
A. The rear strut they did decide.
Q. No, I'm talking about the CRFM?
A. General Motors, I don't --
Q. Okay.
A. Submitted the change to Delphi.
Q. Got it, got it. I see. Let me recap. The rear strut contract, Automodular was successful in getting its rate per piece price increase?
A. We were successful in getting an increase in price.
Q. CRFM is being actively

disputed between Automodular on the one hand and Delphi on the other, correct?
A. Correct.
Q. That dispute is -- who will make that decision, that will be -- if Delphi can convince General Motors to grant the per piece price increase that will be granted and Automodular will get its increase, is that correct?
MR. GLAS: Object to the form.
MR. MACDONALD: Hold on, let me --
BY MR. MACDONALD:
Q. Has anybody at Delphi asked Automodular for supporting documentation that it can take to General Motors to support Automodular's request for a per piece price increase?
A. They have asked for documentation. I don't know if they specifically wanted to use for GM. But they have asked for documentation to explain our increases.
Q. Is Automodular obliged to provide that information to Delphi to support that proposed rate increase?
A. Are we obliged to provide

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 114

that, yes.
Q. Under the Ontario contract, is that correct?
A. Under the Ontario contract, we're obliged to have supporting information.
Q. And has Automodular provided that information to Delphi?
A. To the best of our knowledge, yes.
Q. Do you have the completed submitted information to General Motors that's, that is reflected here in AUTO-217?
A. For the rear strut, yes.
Q. No, for the CRFM?
A. No, there would not be one submitted for the CRFM. That was submitted to Delphi.
Q. Okay. Got it. I see the process now. Let me go on to the next one. This is AUTO-218. And the description of the scope change here is also reflected in the Exhibit No. 4 I believe, this is the scope change at Oshawa number 2 on May 8, and that would be column C I believe on Delphi 00406, is that correct?
A. That is correct.

Page 115

Q. And this GM form was issued in connection with the CRFM assembly, that work that was being done by Automodular for Delphi on this line, is that correct?
A. This was issued for all work being supplied to this plant.
Q. But there was also one, there was also --
A. A request.
Q. There was a request for information in connection with the, you were doing rear strut work here, is that correct? On this line as well?
A. Correct.
Q. Okay. Has Automodular submitted a request for an increase in per piece price to General Motors for its strut work under this contract?
A. Yes.
Q. What is the current status of that request?
A. The contract expired in 2006.
Q. So what about the interim period -- oh, it expired, so there was a brief period of time when the increase would have been

Page 116

effective before the contract expired?
A. Correct.
Q. Okay. What is the current status of that, the discussion about the rate increase for that interim period?
A. We did have a negotiated price for rear struts.
Q. You and GM were --
A. Based on 218 and 217 there was a negotiated price for rear struts. For those changes.
Q. When did the contract for the rear strut end on AUTO-217? Is that an ongoing contract? 217?
A. It was an ongoing contract that I believe expired June 30th, 2006.
Q. So if I understand you correctly then Automodular and General Motors reached a negotiated settlement with respect to Automodular's request for an increase notwithstanding a de-rate that triggered this request for information?
A. Correct.
Q. Okay. And with respect to, if I understand this correctly, with respect to the

Page 1

CRFM work that is the subject of AUTO-218, that dispute is ongoing between Automodular and Delphi?
A. Correct.
Q. Did -- strike that. Let me take a break at this point.
--- BRIEF ADJOURNMENT.
BY MR. MACDONALD:
Q. Let me ask you to pickup on something that you said with respect to 218, and that is if I understand it again there's a current and ongoing dispute about whether Automodular is entitled to a de-rate price increase with respect to the work being described in AUTO-218, is that correct?
A. Dispute with Delphi?
Q. Dispute with Delphi?
A. That's correct.
Q. This form is a GM form though, is that correct, that we're looking at, AUTO-218?
A. That is correct.
Q. So based on the submission of this form to the supplier, that is Automodular, Automodular is obligated to provide World Wide Purchasing with information to support its claim for an increase, is that right?

30 (Pages 114 to 117)

(416) 865-9339 www.stenographers.com Atchison & Denman Court Reporting 155 University Avenue, Suite 302 (800) 250-9059 Toronto, ON Canada

A. That's right.
Q. Has Automodular provided World Wide Purchasing with that information?
A. With respect to which contract?
Q. With respect to the CRFM?
A. No. We provided that information to Delphi.
Q. So you provided the information to Delphi with the expectation that Delphi would provide it to World Wide Purchasing, is that correct?
A. Correct.
Q. Okay. Why has Automodular submitted it to Delphi rather than to General Motors in that instance?
A. Because we're contracted with Delphi.
Q. So the contractual obligation, the contract obligates Automodular to provide the information to Delphi, not to General Motors?
A. Correct.
Q. Okay. Now, let me point you to paragraph, pardon me, to provision five, paragraph five of the long-term contract?

MR. GLAS: Page number?
BY MR. MACDONALD:
Q. No, it's in your affidavit. I can give you the, paragraph five called "Savings Initiative". It says in terms of cost, this is the last paragraph on that page.

"In terms of Cost Management, Seller agrees to provide detailed Cost Breakdown Information as requested by Buyer."

Has buyer, that is Delphi, requested detailed cost information from Automodular in connection with this proposed de-rate price increase reflected here in 218?
A. They have requested and we have provided.
Q. Is it Automodular's position that they have provided all the information that they are required to do under the long-term contract?
A. We have provided every piece of information that they've asked for.
Q. But are you limiting your

response to what has been asked for by Delphi or is there some gap here between what you believe that you need to support the request for the price hike?
A. Delphi has requested for information and we responded accordingly.
Q. Have you provided all information that Delphi has requested?
A. That is correct.
Q. Okay. Anything that Delphi wanted in connection with supporting this information has been provided to Delphi in connection with this dispute reflected in the de-rate price hike requested in connection with AUTO-218?
A. I believe so.
Q. Okay. Are you the person responsible for providing that information to Delphi on behalf of Automodular?
A. Myself and people that report to me, correct.
Q. Who would those people be?
A. Jessica Anthony, depending on the timing as well. The timing of this particular contract, actually Winston Ash was vice-president

of business development. So I was working for him. So I was providing information along with other people in the department. But to name a few that work today for our organization, Jessica Anthony, Mark Pierce, Rob Luke are ones that are working in our purchasing department.
Q. Let's turn to AUTO-219. This is work done on the Chevy Impala and the Monte Carlo. With me?
A. Yes.
Q. Automodular had direct contracts with General Motors to provide modules in those two vehicles, is that correct?
A. We had contracts with both GM and Delphi and Grupo.
Q. Okay. With respect to the contract that Automodular had with General Motors for the Chevy Impala and the Monte Carlo, has Delphi, pardon me, has Automodular submitted to General Motors a request for a de-rate price increase?
A. For this one, yes.
Q. And what has General Motors response been to date?
A. It's still being negotiated.

Q. Who on behalf of General Motors is negotiating with Automodular?
A. Who on behalf?
Q. Of General Motors?
A. At the time I believe Dave Storms was the buyer and the buyer today is Terry Lee.
Q. And those negotiations are ongoing at this time, is that correct, about whether Automodular --
A. The last response is GM is not accepting the increase.
Q. They are not accepting the increase?
A. Yes.
Q. And is it you on behalf of Automodular who is negotiating with General Motors on this matter?
A. Yes.
Q. And this has been ongoing since July 17, 2006?
A. Correct.
Q. Has GM given any indication that it will flex?
A. There has been periods through

the negotiation process through those two years that there was flexible, and then the final, the final response from GM was that they weren't accepting the price increase.
Q. When did you get this final response?
A. I don't recall the time.
Q. Was it within the last six months?
A. Yes, I believe so. I believe so.
Q. And did they provide that response in writing?
A. Yes.
Q. Did they follow it up with a phone call or an email?
A. I believe an email.
Q. This response rejecting your request for a de-rate price increase, I would definitely call for the production of that and I think it's responsive to our document requests. So I'm going to ask for that. Without addressing in this deposition whether we're going to get it or not, is that rejection of Automodular's request available in the building?

A. No. I believe not.
Q. But it is accessible by computer, is that correct?
A. I believe it is accessible by computer.
Q. And you have access to that document?
A. No.
Q. But you could cause it to be?
A. I could get a copy of the document within a relative period of time.
Q. Okay. What did GM say with respect to, in connection with its denial of Automodular's request for a de-rate price increase?
A. I don't recall, other than the denial.
Q. I was asking for an explanation of it since I don't have the document, right.
A. I don't recall.
Q. Okay. And again, tell me the name of the person who you were --
A. I believe at the time was Dave Storms was the buy and Terry Lee is the buyer now.

Dave Storms has moved on to.
Q. Was this decision by General Motors handed down before Mr. Storms passed along or?
A. I believe Terry Lee -- I don't recall actually.
Q. Gave the final no?
A. I think Terry Lee gave the final no, correct. I believe.
Q. Okay. Let me turn now to AUTO-280, and this is work at Lordstown. Is this work at Lordstown the CRFM work that Automodular does for Delphi?
A. Correct.
Q. Are there any other contracts or work reflected in this scope change request?
A. Yes.
Q. Okay. Which ones, can you describe them for me?
A. GM contracts that the front horizontal, the body shop T bar, and I believe the, there's another one. There's three modules that we provide.
Q. And these are contracts that Automodular has directly with General Motors, is

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 126

that correct?
A. That is correct.
Q. And what is the current stat -- strike that. Did Automodular submit to General Motors a request for a de-rate price increase in connection with these proposed changes?
A. This particular change was not a de-rate.
Q. Okay.
A. This was a change in the shift reduction and an increase in line speed.
Q. Do you consider that a scope change?
A. Yes.
Q. Okay. Did you submit a request for a per piece price increase based on the scope change reflected here in item number one?
A. Yes.
Q. Okay. And that was under a contract that Automodular had directly with GM?
A. Correct.
Q. Okay. What is the current status of those discussions between Automodular

Page 127

and GM with respect to item number one?
A. It's still being negotiated.
Q. Okay. Who on behalf of Automodular is negotiating?
A. Myself.
Q. Who on behalf of General Motors is negotiating?
A. Andrea Bradocks.
Q. Andrea Bradocks, she is where?
A. Andrea Bradocks is purchasing. I believe her office is in Michigan.
Q. Have they requested additional supporting information?
A. Yes.
Q. Have you provided that information?
A. Yes.
Q. When was the most recent transmission of information from Automodular to General Motors about item number one?
A. Tuesday.
Q. How much additional information have you provided to General Motors with respect to the change in scope that you believe you're entitled to in item number one?

Page 128

MR. GLAS: The question?
BY MR. MACDONALD:
Q. How many transmissions back and forth?
A. Several.
Q. Several, okay. Can you describe to me the kinds of information that they're seeking from Automodular in connection with this request?
A. Breakdowns of cost, validation of resources, there is several audits that occurred with their supplier business development teams where they visit our location and reviewed and confirmed our process and our resources, as well as documents supporting leases for lease cost rates and facility costs and labor costs as well as any other overheads.
Q. Has substantially the same information with respect to the CRFM costs been provided to Delphi in connection with Automodular's request for a change in scope increase with the CRFM work it does at Lordstown?
A. We provided the information that they requested.
Q. Are there any requests for

Page 129

information from Delphi to Automodular that have not been responded to?
A. To my knowledge, no.
Q. Have there been any requests by Delphi to Automodular for information that Automodular has declined to provide that information?
A. No. Not to my knowledge as it stands today.
Q. Okay. What about item number two here? Has Automodular provided to GM a request for a de-rate price increase in connection with item number two?
A. That's an increase. Line increase.
Q. Yes.
A. Yes.
Q. And it's scope change?
A. Scope change.
Q. And has Automodular provided GM with the request for a scope change price increase?
A. Yes.
Q. And has that been granted?
A. We're negotiating.

33 (Pages 126 to 129)

(416) 865-9339 Atchison & Denman Court Reporting (800) 250-9059
www.stenographers.com 155 University Avenue, Suite 302 Toronto, ON Canada

Page 130

Q. That's been negotiated?
A. There was further changes from this that have occurred.
Q. Since that time?
A. Yes.
Q. Okay. What about item number three, has Automodular submitted information for a change of scope price increase?
A. Yes.
Q. In connection with item number three?
A. Yes.
Q. Is this under current consideration right now by General Motors?
A. Yes.
Q. Okay. How long, have they provided any indication about whether they are going to grant it or not?
A. No, but they've requested information and they have not denied it.
Q. Who are you dealing with at General Motors?
A. Andrea Bradocks.
Q. And is that Andrea Bradocks you're dealing with for item number four?

Page 131

A. One, two, three, four.
Q. All four of them?
A. Yes.
Q. And the discussions with General Motors are ongoing at this point?
A. Correct.
Q. Who is Robin Williams?
A. Robin Williams at the time was the buyer. Andrea Bradocks has replaced her position.
Q. Who is Comprehensive Logistics Lordstown?
A. They're our competitor.
Q. They are a competitor and not a corporate?
A. No.
Q. Corporate related?
MR. GLAS: Are they mentioned here?
MR. MACDONALD: Yes. Supplier name.
MR. GLAS: I see.
BY MR. MACDONALD:
Q. What is four phases, final phase mean up there in the effective date? Four phases final phase 1/2-2007?

Page 132

A. I believe it refers to the four steps below.
Q. Okay. What's the final phase part?
A. I do not, I believe it's four. I believe four is the final, the period of months July, September, November and in January of the following year, those are the adjustments and that's where it ends for this particular scope.
Q. Tony Monaco is the person at General Motors who has notified you of these scope changes?
A. That is correct.
Q. Okay. So this is back up at World Wide Purchasing right now, is that correct? That's the stage in this multi-step process?
A. I believe it's with World Wide Purchasing and the assembly plant.
Q. What is the assembly plant's position, to the extent that you know with respect to your proposed request?
A. There is no position that has been communicated.
Q. Okay. Has Comprehensive

Page 1

Logistics requested a per piece price increase based on these scope changes?
A. I don't know.
Q. And if I recall correctly, with respect to again 219, this is the contract termination on the Monte Carlo GMX 231 Automodular and General Motors are in active discussion about whether Automodular is entitled to early termination costs, is that correct?
A. Yeah, we are, we have issued our claim and it has not been resolved.
Q. It's not in litigation though?
A. No.
Q. Okay. And who are you dealing with at General Motors on that?
A. That would be Terry Lee as well.
Q. Okay. When was the claim issued?
A. I believe when it was, when it was terminated.
Q. When?
A. June of 2007.
Q. Okay. Are you the contact person on behalf of Automodular who is involved in

these negotiations?
A. Yes.
Q. Can you point to me in the long-term agreement or the general terms and conditions provision in those two documents that permits Automodular to attempt to seek early termination costs and fees?
A. No, I can't.
Q. Okay.
A. I don't recall it.
Q. Could you take a look at it?
A. I can't answer that question.
Q. Okay. Let me, okay.
A. I believe Michael Blair can answer that question because he was the one addressed.
Q. Okay. That's fine. I'll ask. Who negotiated the contract on behalf of Automodular with respect to the Chevy Monte Carlo cockpits?
A. Chevy Monte Carlo cockpits?
Q. 219, we're back to the early termination?
A. Who negotiated?
Q. Yes.

A. I do not recall.
Q. That was before your time?
A. Yes.
Q. Do you know when that contract was negotiated or entered into?
A. I believe, I believe 2004 or 5.
Q. Okay. But it wasn't you?
A. I was a part of that process but I did not negotiate. At the time.
Q. And Automodular has in the past attempted to recover early termination costs against other OEMs or suppliers in the case where a program terminated early?
A. With GM.
Q. With GM. Any other?
A. Delphi.
Q. Any other OEMs?
A. No. Not at this time.
Q. This is going to be a short one, this next point here. Let me ask you, one of the open issues with respect to Delphi's dispute or Automodular's current claims against Delphi involves paying for a screw fastener or series of screw fasteners that were used I believe at the

CRFM contract in Lordstown, and I'm going to give you another Exhibit.

EXHIBIT NO. 6: Two-page document bearing Bates numbers AUTO-383 through 386.

BY MR. MACDONALD:
Q. And the Bates range on this is AUTO-383 through 386. Prior to this claim on November 30, 2007 when Automodular filed its request or Motion to Compel, was this request for an increase ever raised again beyond this letter with, to your knowledge?
A. Not to my knowledge.
Q. Okay. So this request for the increase in materials cost just kind of fell off of everybody's radar as far as you know, is that correct? Fell off of Automodular's radar until it came up recently? Was this request ever renewed after December 20th, 2004?
A. I believe no.
Q. Do you know whether it was submitted as part of Automodular's proof of claim that it filed with the court?
A. Not that I recall. Yes, it was submitted.

Q. It was? No, the proof of claim, not the Motion to Compel with us, but there was a proof of claim for pre-petition monies owed, was that ever filed?
A. I can't tell you.
Q. I want to turn your attention to, let's see, your declaration, pardon me, your affidavit, paragraph 12. And this concerns, I'll direct your attention to a statement "furthermore", halfway through the paragraph. And I'll read the sentence in the record.

"Furthermore, while Delphi chose to ignore changes in scope that would result in a price increase, it unilaterally backcharged Automodular $183,931 where the change in scope would result in a price decrease."

This, can you describe for me the underlying issue that is reflected in that 183 thousand dollar amount that's referred to in this paragraph? If I understand it correctly, it represents a dispute about materials costs that

were, in connection with certain CRFM work that was done by Automodular. Does that strike a chord? Let me refer you to another group of documents here. This is going to be three documents.
MR. GLAS: Are you going to mark them?
MR. MACDONALD: Yes, I will cause them to be marked, let's put it that way.
EXHIBIT NO. 7: Multi-page document bearing Bates numbers DPH 00481 through 00486.
MR. GLAS: And this is 7, 8 and 9 or?
MR. MACDONALD: No, this is 7. And this will be 8.
EXHIBIT NO. 8: Two-page document bearing Bates number AUTO-281 and AUTO-282.
MR. GLAS: This is 8?
MR. MACDONALD: No, this is 9.
MR. GLAS: I didn't get 8.
MR. MACDONALD: 8 will be the debit memo.
MR. GLAS: No.

MR. MACDONALD: There you go.
MR. GLAS: Thank you.
EXHIBIT NO. 9: One-page document bearing Bates numbers DPH 00463 and 00464.
BY MR. MACDONALD:
Q. Mr. Dell, have you had a chance to look at those?
A. Yes.
Q. All right. Let me then direct your attention to Exhibit No. 7 and that is DPH 000481 through 486. Okay. Does this refresh your recollection of the subject matter of the dispute here at issue in paragraph 12 of your declaration?
A. Correct.
Q. These three documents. And if I understand these documents correctly, they are, they, there was a difference of opinion about whether certain charges were warranted with respect to materials costs, is that correct?
A. No.
Q. Okay.
A. I believe this was part of the resolution of the contract as a whole with all outstanding adjustments that were on the table,

inclusive of exchange, de-rate, material costs.
Q. But some of the, there were a number of individual pieces to this overall discussion and attempt to resolve the problems, is that?
A. Correct.
Q. That would be correct? One of the pieces was the, was an overcharge for a screw or series of screws that had been used in the CRFMs, that was one piece of the puzzle to be resolved, is that correct?
A. It was not considered an overcharge, but it was considered, the cost estimated to provide that material was less than what actually incurred.
Q. There was a dispute about how much should be charged for that screw, would that be correct?
A. For the screw?
Q. That was one piece of it? For instance, I'm looking here now at page DPH 00483. And well, let me ask you this. These spread sheets that are attached to this email and this letter, you did the calculations on those spread sheets, is that correct?

A. I assisted in the calculation.
Q. But you reviewed them?
A. Yes.
Q. And you reviewed them for accuracy?
A. Yes.
Q. You don't have any doubt about their accuracy?
A. No.
Q. And at the, during the course of the discussions about these outstanding matters, Doug McLean wrote to you and added up at least some of the numbers on the spread sheet here that's been attached as Exhibit 7, is that -- I'm directing your attention now to Exhibit No. 9. And if you could look at the bottom of the page here. If you look at, Exhibit 9 is Delphi 00463 and 64.
A. Yes.
Q. Okay. And the email reference here at the bottom of 463 is this document number 7, Exhibit No. 7, is that correct?
A. I believe so.
Q. If you look at the date and time of transmittal?

A. Yes.
Q. So based on the information provided here in Exhibit No. 7, Doug McLean informed you that he will be correcting the purchase orders today to accommodate the currency fluctuation. That was one of the pieces that was being disputed between Automodular and Delphi, is that correct?
A. That's correct.
Q. And he also indicated they would be adding the cost of the label and clip effective that day, pardon me, effective October 1, 2006. That was also going to be a part of his proposed resolution of this outstanding matter, right?
A. That's what he was reducing from our account.
Q. So he used your numbers and claimed a total overcharge of 186,046 dollars and deducted from that charges for label and clip and wound up with a total debit of 183,931 dollars, is that correct?
A. I believe that's what he has here.
Q. And those were overcharges

that he had, that Delphi had claimed for services, materials and services that it provided prior to October 10th, pardon me, October 1, 2006, right?
A. Right.
Q. And he took, he on behalf of Delphi issued a debit memo, and that's Exhibit 8 here, right?
A. Yes.
Q. And he on behalf of Delphi debited monies outstanding and due Automodular in the sum of 183,931?
A. Yes.
Q. And again, turning to the paragraph 21 of the general terms and conditions provides Delphi with the right to recover, recoup or setoff such amounts due and outstanding and owed to Delphi by its sellers, is that correct?
A. Not -- I'm trying to find it.
Q. Paragraph 21, page 9 of the general terms and conditions.
A. What was your question again?
Q. Okay. So my question is that paragraph 21 of the general terms and conditions provides Delphi with the right of recoupment and setoff, does it not, against monies owed it?

A. No.
Q. It does not?
A. Not for this particular adjustment.
Q. So, but the provision itself does provide a right of recoupment and setoff for monies due and owed, does it not?
A. I believe it says sellers failure to timely deliver goods and services. I believe we met our delivery requirements.
Q. Okay. Do you dispute that the calculation of the 183,931 dollars is accurate, is an accurate calculation?
A. I cannot equate to that calculation, but I believe it was pulled from segments of the materials that I provided.
Q. Okay. Is it your position that -- explain to me why you believe that Delphi does not have the right to claim that money?
MR. GLAS: 183?
BY MR. MACDONALD:
Q. Yes, the 183,931 dollars?
A. Explain to you?
Q. Why you believe that Delphi didn't have the right to issue that debit memo and

recover that money?
A. Because we did not agree to it.
Q. By that do you mean it was Delphi and Automodular did not reach a global settlement of all outstanding issues?
A. On the items outlined in the October 5th, 2006 letter, it was in our position to give up those changes for all outstanding issues at that time in conjunction with the decrease in reduction as well as the exchange, the de-rates, and I believe there was other price adjustments associated with some other purchase parts.
Q. So let me make sure I understand. You're not questioning the accuracy of the dollar amount, let's start with that, is that correct?
A. I believe the dollar amount is relatively accurate, yes.
Q. Okay. And you're not contesting that there were other open issues that were not resolved by the transactions represented here, there remained open issues, is that correct?
A. There was open issues.

Page 146

Q. And you don't, you do dispute that section 21 of the general terms and conditions permits Automodular to issue that debit memo for those funds, is that correct? You do dispute that?

A. I dispute that Delphi is not entitled to those funds.

Q. Why is that, what's the basis for that statement?

A. Based on our understanding was they were entitled to those funds if they accepted the other terms of our negotiations that we were addressing.

Q. So the only, so because Delphi did not resolve, reach a global resolution of the outstanding issues reflected in this letter, Delphi 00482 which is Exhibit 7, because there was no global resolution of those issues, Delphi had no right to issue the debit memo for the subset of problems that it had quantified and could recover the assets for?

A. Automodular was in the position to accept those prices based off the conditions outlined in the letter.

Q. Okay. Let me go and produce a

Page 147

couple more documents here, two documents.

EXHIBIT NO. 10: Two-page document bearing Bates numbers AUTO-349 through AUTO-351.

EXHIBIT NO. 11: Two-page document bearing Bates numbers DPH 005 through 7.

MR. MACDONALD: 11 would be Delphi 005 through 7.

BY MR. MACDONALD:

Q. These are requests and schedules of de-rate scope change and exchange currency exchange adjustment amounts asserted by Automodular against Delphi in this matter, is that correct?

A. That's correct.

Q. And both of these Exhibits, 10 and 11, were sent by Automodular to Delphi in connection with this, with the work that was being done under the Ontario contract?

A. That is correct.

Q. Okay. And I want to look here at Exhibit 10, AUTO-349 and 50. There is a Calculation (A) here and I want to make sure I understand it. This is a calculation, and I've

Page 148

kind of referred to it colloquially as the de-rate multiplier. And if I understand it correctly, we have, this refers to the new price for the Oshawa 2 de-rate 63.25 net jobs per hour on January 23rd, 2006. And as I understand it we take the old price --

MR. GLAS: The 2630 are jobs per day.

MR. MACDONALD: It is. I didn't say that.

MR. GLAS: I thought you said jobs per hour, I'm sorry.

MR. MACDONALD: Let's try it again.

BY MR. MACDONALD:

Q. The Calculation (A) refers to in column, there's a column here for new price Oshawa number 2 de-rate 63.25 net jobs per hour on January 23rd, correct?

A. Correct.

Q. So if I understand the way this calculation works, we have the starting price of the assembly as of January 1st, 2006, and that was Redacted and you subtract the cost of the materials. Tell me why you subtract the cost of

Page 1

the materials?

A. Because we purchase the materials in U.S. dollars, so it's not subject to the currency exchange clause.

Q. Automodular purchased those materials, is that correct?

A. Yes.

Q. Okay. So they're subtracted from the cost of the assembly, and then they're multiplied by what I've called the de-rate multiplier which is in this case for calculation A is 2630 and that would be jobs per day, divided by the de-rate number, which is 2574. That's the reduction that took place in the jobs per day as of January 23rd, correct?

A. 2006.

Q. 2006. And so, and as we go through that again and we get to calculations D and E, you can see that the numerator in one calculation becomes the denominator in the next one as the de-rate falls again, and that denominator becomes the numerator, and the progression goes on that's, how it works, isn't it, correct?

A. Yes, with the exception when

there is removal of costs of labor, for instance, in calculation E, there was two associates removed from our costs so we reduced that price accordingly.
Q. Correct.
A. If we were able to remove costs, it was removed.
Q. Sure. But I just want to understand what again I've called the de-rate multiplier. If, and again if the scope change, if there were a decline, for instance, let's go back to calculation A on page 349. If on January 23rd, 2006 there had been a decline in the jobs per day from 2630 to 263, the de-rate multiplier would reflect that multiple, correct? I mean, that's just, it's just a straightforward mechanical application of the rate as it existed on January 1st to whatever it fell to on that day?
A. Correct.
Q. Okay. I just wanted to make sure I understood the operation. And that's true for all the de-rate calculations with respect to the de-rate number as it fell during the course of the period at issue here?
A. With respect to the Ontario

contracts, correct.
Q. Correct, that's correct. And again, let me make sure I understand the source. In Automodular's view the source of the authority to seek that de-rate adjustment is section three of the general terms and conditions, change of scope provision, is that correct? It's called specification design and scope change on page two of the general terms and conditions?
A. Correct.
Q. Let me ask you this. With respect to, with respect to the work done by Automodular for Delphi that is not in dispute, that is not the subject of this Motion to Compel, Delphi is continuing to pay those sums timely and in full, isn't it?
A. I believe so.
Q. Okay. You have no reason to believe as we sit here today that they are not doing that?
A. Yeah.
Q. It's only the disputed sums that are being held back and under dispute?
A. Yes.
Q. Okay. Let me hand up another

document here. Let's take a break here.
--- BRIEF ADJOURNMENT.
BY MR. MACDONALD:
Q. Let's go back to Exhibit No. 3 which is, it's a document number DPH 00096 through 103 I guess. And I want to direct your attention to pages 100 and 101. What are these documents?
A. These are the Delphi Global Purchasing Piece Price Breakdown Worksheet.
Q. Are these Delphi documents?
A. They're templates they provide to us and we fill in our price.
Q. So in connection with a proposal for work to be performed, these, they provide its suppliers with a template that should be filled out and information provided so that they can assess the backup for the costs that are being requested, is that right?
A. Yeah, the details of each cost, raw material and purchase components, labor and burden, and the areas that they've identified in the sheet itself when you breakdown the costs.
Q. What is burden, and I'll direct you to the lower, direct you to the lower right hand quadrant of page 100. What is, in this

instance, total manufacturing costs would be material and labor, plus burden. What would burden represent there?
A. Burden I believe is in two segments, one identified as VAR costs, which I believe means variable costs, and that would entail I believe the salaried staff and other burden costs that would be encompassing with the assembly of the CRFM. The fixed costs I believe are facility related and equipment related, I believe.
Q. So the variable would be you said salaried employees?
A. I would say salaried employees would be one of the segments captured in there.
Q. And that would be support staff, secretarial, administrative people?
A. Plant manager, supervisors.
Q. As opposed to the people who are actually involved in the assembly of the module that's at issue here?
A. People involved in the assembly are considered hourly folks and they would be involved in the labor detail.
Q. Okay. And fixed costs would

Page 154

be equipment, and facilities you said?
A. Yes, I believe so. There could be other costs in there, but those would be the majority of the costs.
Q. In connection with the disputes that are at issue in AUTO-217, 218, 219 and 280, that is the Scope Change Forms, the General Motors Scope Change Forms, did Automodular provide this type of piece price breakdown in support of their claim for either the scope change rate increase or the de-rate rate increases that it was seeking?
A. I believe this actual form is part and parcel of the actual Lordstown adjustment to scope change for third shift removal.
Q. Okay. And if we go back to 101, the page on the back here, and that would be information provided in connection with the Oshawa work, is that?
A. Yes.
Q. Was backup material to these work sheets ever provided?
A. Whatever Delphi requested for support we provided.
Q. If Delphi had asked for the

Page 155

backup for this information, would that have been provided?
A. Yes.
Q. To the extent then that the, that they don't have it, it's because they didn't ask for it, they being Delphi?
A. They did ask for individual requests, mostly around the resources I believe. They really didn't get into too much on the cost side at the time I believe with Ontario contracts.
Q. Okay. There was a request to obtain pricing information for the installation of foam pad?
A. Correct.
Q. In December 2005, is that correct?
A. Correct.
Q. Automodular was approached by Delphi and asked to provide a cost estimate with respect to the application of a foam pad in connection with the CRFMs it was building, assembling?
A. Correct.
Q. And that project was delayed through administrative issues and problems at

Page 156

General Motors, is that correct?
A. I believe the work was being done through another source at some particular time, and then they wanted Automodular to install it into our regular process.
Q. And isn't it the case that when the proposed bid came back in, pardon me, in October of 2006, that is 10 months later, it was
Redacted
A. Correct.
Q. Okay. What is the basis for the increase in cost between December 2005 and October 2006?
A. I believe there was changes in the exact application of the foam pad versus what it was estimated to be like prior in November.
Q. Is it your position that the December 2005 submission was only an estimate and --
A. Yes.
Q. Let me ask it again just to make sure. So is it your position that the December 05 submission was only an estimate for the work to be done?

Page 1[illegible]

A. Yes.
Q. And that the October 2006 was the final submission based on more complete information?
A. Correct.
Q. Okay. What change, what's the difference in the information between December 2005 and October 2006? What information did you have access to that was not considered previously?
A. I don't know.
Q. Who would that person be with knowledge?
A. That would basically be our operating folks evaluating, and our engineering department evaluating the impact of the change to the operation at that particular time.
Q. You don't have knowledge of that, of the particulars of that?
A. That is correct.
Q. Do you know whether it was the case that it required no additional labor to apply the foam pad between December and October?
A. It required additional time to install and obviously risk to taking on the additional work for possible quality failures.

And through our process and through our negotiations we were willing at one point to take it on at no charge.

Q. Isn't it also the case that there was less content, that certain, that a clip had been removed from the total CRFM that would result in a reduction in the amount of labor necessary to complete the assembly?

A. I'm not aware of that.

Q. Let me ask you this. What is the difference between a fixed variable contract and a variable contract?

A. A fixed variable contract --

Q. Let's take them one at a time so we don't get out in front of ourselves here. So go ahead.

A. We are compensated for our fixed costs on a monthly basis regardless of production.

Q. Give me an example of fixed costs. Stop right there.

A. Fixed cost is negotiated between both parties and can range anywhere, majority would include the facility, the equipment, salaried staff, other overhead burdens

regardless of production that would be incurred regardless if you produce or not.

Q. And the variable, what's the variable cost in the fixed variable contract?

A. The variable cost in the fixed variable contract would entail the labor, direct labor associated with assembling the product, as well as items such as utilities to run the facility and supplies and quality control such items to enable the product to be built that would normally not be incurred if the, if the workers worked assembling the product.

Q. How is the fixed cost determined initially? Does the seller amortize the projected cost of the, the fixed cost over the length of the contract term, is that how it generally plays out?

A. Generally it is applied over the period of the contract. For example, if it was five years, 60 months.

Q. So the fixed cost would be amortized over the 60 month period?

A. 60 month.

Q. 60 month. So what is the alternative to a fixed variable contract, what's a

variable contract?

A. A variable contract you are strictly paid on a per piece basis on the units you produce.

Q. And the price per unit is fixed at the time the contract is entered, is that?

A. The price per unit is based off the requirements at the time it's entered, correct.

Q. And there is no adjustment for volume, is that correct, in the per piece price?

A. There would not be an adjustment for volume other than the changes in the jobs per hour.

Q. And the jobs per hour would require a change in scope?

A. Right.

Q. But the unit price would not vary -- the unit price would vary because the change in scope would effect the unit price?

A. Correct.

Q. It is, it is the case, is it not, that the Ontario contract is not a fixed variable contract?

A. For Delphi?

Q. For Delphi?

A. Correct.

Q. It is also the case that the U.S. contract for Delphi is not a fixed variable contract?

A. Correct.

Q. Does Automodular have fixed variable contracts with other, with other contracting entities in the automotive industry?

A. Yes.

Q. Which ones?

A. GM.

Q. For instance, give me which contracts, how many fixed variable contracts does Automodular have with GM?

A. Our history I believe we had four, three to four assembly locations fixed contracts. Currently we have one with Lordstown, GM Lordstown.

Q. That's a fixed variable contract?

A. That's a fixed variable contract. We have one with Oshawa truck. We do not have one with Oshawa car, GM. I believe we

did have one with Lansing and Pontiac as well. Those were prior locations or variation of such. And with Wilmington we had a fixed variable contract. That was our first fixed variable contract.

Q. So apart from those, does Automodular have any additional fixed variable contracts with other OEMs or suppliers in the automotive industry?

A. No.

Q. Over, what is the oldest contract currently in existence that is a fixed variable contract with?

A. Oshawa truck.

Q. And when was that entered?

A. We started work with Oshawa truck back in 1989. I don't believe it was a fixed variable contract at that time and it did transfer into a fixed variable format and I don't recall the exact date. I can get that information.

Q. Is the strut contract that you had with General Motors that was the subject of, that was the subject of AUTO-217 a fixed variable contract?

A. Yes.

Q. Was the strut contract that you had with General Motors that was the subject of 218 the same contract as 217, that is a fixed variable contract?

A. Yes.

Q. What about the other two contracts with Chevy, the Impala, was the contract between Automodular, and Automodular and General Motors for AUTO-219 a fixed variable contract?

A. No.

Q. Okay. What about --

A. Actually, sorry, yes, the cockpit that serviced that facility as well as the headliner that serviced that facility were both variable contracts.

Q. Fixed variable contracts?

A. No, sorry, I have to correct myself on that. The cockpit was a variable contract and I believe the actual, the headliner was actually a fixed variable contract. I believe. I believe at this time. I can get confirmation.

Q. Okay.

MR. GLAS: Can you repeat that?

MR. MACDONALD: I'll ask the question to make sure we're nice and clean.

BY MR. MACDONALD:

Q. Let's start again with AUTO-217. There was a strut contract between Automodular and Delphi, correct?

A. Strut contract between GM and Automodular.

Q. I got concentrated on the wrong part. Strike that and start again. In AUTO-217 there was a contract to provide a strut assembly between Automodular and General Motors, correct, and that contract was a fixed variable contract?

A. Correct.

Q. Okay.

A. Correct.

Q. Okay. Let's go to -- but the contract between Automodular and Delphi for the CRFM reflected here in AUTO-217 was not a fixed variable contract?

A. Correct.

Q. Now going on to 218, there was a strut contract between Automodular and on the

one hand and General Motors on the other, is that correct?

A. Correct.

Q. That also was a fixed variable contract?

A. Correct.

Q. The CRFM contract between Automodular and Delphi was not a fixed variable contract?

A. Correct.

Q. Okay. On to 219, Automodular had several contracts with General Motors with respect to the Chevy Impala, correct?

A. Correct.

Q. And it also had several contracts with General Motors with respect to the Monte Carlo?

A. Correct.

Q. Were both of those fixed variable contracts?

A. I believe the cockpit, I know the cockpit contract is variable.

Q. Okay.

A. The headliner contract I believe at that time was fixed variable.

Q. Okay. Any other fixed variable contracts?
A. The rear exit that was June 2006, so no. I believe no.
Q. Okay.
A. Oh, sorry, there is one more. Grupo Antolin though the headliner contract for that is variable.
MR. MACDONALD: Can we take five minutes.
--- OFF THE RECORD DISCUSSION.
BY MR. MACDONALD:
Q. I want to make sure that I understood this. Once a price is fixed under the Ontario contract, it is your position that once the bid is in, the contract is executed and now we're performing under that contract, under the Ontario contract that any price, any variation in volume will subject it to a de-rate adjustment, a downward adjustment for de-rate and an upward adjustment for volume increases?
A. Yeah, basically any, the price is fixed for execution and any changes to the scope of work which is inclusive of the jobs per hour, increase or decrease, will result in an

increase or decrease in price.
Q. And if I understood you correctly, that right also runs to the buyer to seek an adjustment in price based on volume changes, is that also correct?
A. Correct.
Q. Okay. And it's, is there a materiality threshold, this is, or is this an absolute position, any change --
A. On jobs per hour.
Q. On jobs per hour. What about shift consolidation from three to two, for instance, without an adjustment in the line rate speed?
A. Shift reduction is considered a scope change as well.
Q. Under the Ontario contract?
A. Under the Ontario contract.
Q. Is that, and are you looking to section three of the general terms and conditions for that authority, that's the authority for that position in your view?
A. I believe so.
Q. I want you to take a look at it to give me the answer here.

A. Yes.
THE REPORTER:
"What about shift consolidation from three to two, for instance, without an adjustment in the line rate speed?"
BY MR. MACDONALD:
Q. Let me re-ask that question. What about shift consolidation from three shifts to two shifts without an adjustment in the line rate speed, would that be a change in scope?
A. When you say consolidation, can you clarify that?
Q. Where one, where there are, where work is done on three shifts. One shift is eliminated and now we're reduced to two shifts?
A. That is a price adjustment, correct.
Q. And that is a price adjustment because it's a change in scope?
A. Correct.
Q. And that's a change in scope under paragraph three of the general terms and conditions?
A. I believe that's how Delphi,

the general terms and conditions would treat that.
Q. Okay. And there is no materiality standard, there is, it's just a subject to a rate adjustment at a one percent fluctuation as it is for a three percent fluctuation or a five percent or a 10 percent fluctuation?
A. To the jobs per hour.
Q. To the jobs per hour?
A. Any change.
Q. And it works both for upward and downward adjustments?
A. Correct.
Q. Okay. That's the same is true with respect to the U.S. contracts?
A. Correct, with the exception that the U.S. contract I believe had a volume clause already established at the start of the contract which led to a 10 percent reduction in volume would have to be negotiated as well. Jobs per hour is still a scope change, but the volume is still captured under that clause. So they are two separate things.
Q. And the 10 percent volume cap let's say was contained in the bid documents that

were submitted by Automodular in connection with securing the U.S. contract?
A. Correct.
Q. Okay. And to wrap this up on that point, it is Automodular's position that the universe of documents that control the claims it is asserting here for de-rate claims and change in scope claims are the following: Number one, the purchase orders that constitute the U.S. contract, yes?
A. Yes.
Q. The purchase orders that were issued in connection with the Ontario long-term agreement, that is the Ontario contract?
A. Yes.
Q. The purchase order issued in connection with the Ontario contract?
A. Yes.
Q. The general terms and conditions, Delphi's general terms and conditions?
A. Yes.
Q. And the bid documents that were submitted back and forth by the parties in connection with their negotiation of the transaction that became the U.S. contract?

A. Yes.
Q. And the bid documents that were submitted by either party in connection with the transaction that became the Ontario contract?
A. Yes.
Q. And any communications between the parties in connection with either one of those contracts?
A. Yes.
Q. Those, that's the universe of documents that control the, Automodular's right to seek scope change adjustments or de-rate adjustments?
A. Yes.
MR. MACDONALD: Okay. No further questions.
--- WHEREUPON PROCEEDINGS ADJOURNED AT 6:30 P.M.

CERTIFICATE OF REPORTER

CANADA )
PROVINCE OF ONTARIO )

I, Nancy E. Lowrey, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand, using Computer Aided Realtime, to the best of my ability and thereafter reduced to written format under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which the deposition was taken, and further that I am not related or any employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

________________________
Nancy E. Lowrey, CSR, RPR
Commissioner for taking oaths in the Province of Ontario

INSTRUCTIONS TO WITNESS

Read your deposition over carefully. It is your right to read your deposition and make changes in form or substance. You should assign a reason in the appropriate column on the erratum sheet for any change made.

After making any changes in form or substance, and which have been noted on the following erratum sheet, along with the reason for any change, sign your name on the erratum sheet and date it.

Then sign your deposition at the end of your testimony in the space provided. You are signing it subject to the changes you have made in the erratum sheet, which will be attached to the deposition before filing. You must sign it in front of a witness. The witness need not be a notary public. Any competent adult may witness your signature.

Return the original erratum sheet promptly. Court rules require filing within 30 days after you receive the deposition.

FEBRUARY 12, 2008 IN RE: DELPHI CORPORATION ET AL CHRISTOPHER DELL

Page 174

I have read my deposition and wish to make the following changes:

Number Reason Page

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

____________ ________________

Dated: CHRISTOPHER DELL

45 (Page 174)

(416) 865-9339
www.stenographers.com

Atchison & Denman Court Reporting
155 University Avenue, Suite 302

(800) 250-9059
Toronto, ON Canada

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

– and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| Debtors. | Jointly Administered |

**NOTICE OF DEPOSITION OF CHRISTOPHER DELL**
**AND LIMITED REQUEST FOR PRODUCTION OF DOCUMENTS**

DEPOSITION
EXHIBIT
1

To: All Counsel on the Attached Service List

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, made applicable to these chapter 11 cases by the Federal Rules of Bankruptcy Procedure, counsel for Delphi Corporation and certain of its domestic subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), will take the deposition upon oral examination of Christopher Dell, of Automodular Corp, on **Tuesday, February 12, 2008**, commencing at **2:00 p.m.** prevailing local time, at the offices of Automodular Corporation, 20 Toronto Street, Suite 420, Toronto, ON M5C2B8.

Pursuant to Federal Rule of Civil Procedure 34, made applicable to these chapter 11 cases by the Federal Rules of Bankruptcy Procedure, the deponent is directed to produce for examination during the deposition those contracts under which Automodular Corporation performed the work described in the Scope Change Forms produced as AUTO 217 through AUTO 219, and AUTO 280, to the extent that these contracts have not already been produced by Automodular in connection with the current litigation.

DATED: Chicago, Illinois
February 11, 2008

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: _s/ Albert L. Hogan III_
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan III (AH
John K. Lyons (JL 4591)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

– and –

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

**CERTIFICATE OF SERVICE**

I, Sarah J. Platt, an attorney, hereby certify that, on February 11, 2008, I caused a true and correct copy of the foregoing NOTICE OF DEPOSITION OF CHRISTOPHER DELL, to be sent electronically to:

Katharine L. Mayer
McCarter & English
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801

Eduardo Glas
McCarter & English
245 Park Avenue
27th Floor
New York, New York 10167

Karen Craft
c/o Delphi Corporation
5725 Delphi Dr.
Troy, MI 48098

*/s/ Sarah J. Platt*
Sarah J. Platt, Esq.

**MacDonald, Neil (CHI)**

---

**From:** Platt, Sarah J (CHI)

**Sent:** Monday, February 11, 2008 10:23 AM

**To:** 'Mayer, Katharine'; Glas, Eduardo J.

**Cc:** MacDonald, Neil (CHI)

**Subject:** Deposition Notices

**Attachments:** Blair Deposition Notice.pdf; Dell Deposition Notice.pdf

Attached please find notices of the depositions of Michael Blair and Chris Dell.

*Sarah J. Platt*
Associate
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive | Chicago | Illinois | 60606-1285
T: 312.407.0777 | F: 312.827.9317
splatt@skadden.com

Hearing Date: December 20, 2007 @ 10:00 a.m.
Objection Deadline: December 13, 2007 @ 4:00 p.m.

McCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York 10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile
Eduardo J. Glas (EG-7027)
Attorneys for Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>DELPHI CORPORATION INC., et al.<br><br>Debtors. | Chapter 11<br><br>Case Nos. 05-44481 (RDD)<br>(Jointly Administered) |

**NOTICE OF MOTION OF AUTOMODULAR ASSEMBLIES INC., TEC-MAR DISTRIBUTION SERVICES, INC., AND AUTOMODULAR ASSEMBLIES (OHIO) INC. TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND MOTION TO ALLOW AND DIRECT PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

PLEASE TAKE NOTICE THAT a hearing (the "Hearing") to consider the motion (the "Motion") of Automodular Assemblies Inc. and its wholly-owned subsidiaries Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc. (collectively, "Automodular" or "Movant") to compel assumption or rejection of executory contracts and to allow and direct payment of administrative expense claim shall be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, in Room 610 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, on December 20, 2007, at 10 a.m. (New York time), or as soon thereafter as counsel may be heard.

DEPOSITION EXHIBIT 2

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (I) Omnibus Hearing Dates, (II) Certain Notice, Case Management, and Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental Case Management Order") and the Ninth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 19, 2007 (Docket No. 10661) (together with the Supplemental Case Management Order, the "Case Management Orders"), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (iv) counsel for the official committee of unsecured creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), (v) counsel for the official committee of equity security holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One

New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart), (vi) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n: Alicia M. Leonhard) and (vii) Eduardo J. Glas, Esq., McCarter & English, LLP, 245 Park Avenue, 27th floor, New York, NY 10167, in each case so as to be **received** no later than **4:00 p.m. (prevailing Eastern time)** on **December 13, 2007** (the "Objection Deadline").

Dated: November 30, 2007
New York, New York

Respectfully submitted,

**MCCARTER & ENGLISH, LLP**

By: /s/ Eduardo J. Glas
245 Park Avenue, 27th Floor
New York, New York 10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile

Attorneys for Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc.

**Hearing Date: December 20, 2007 @ 10:00 a.m.**
**Objection Deadline: December 13, 2007 @ 4:00 p.m.**

McCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York 10167
Eduardo J. Glas (EG-7027)
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile
Attorneys for Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>DELPHI CORPORATION INC., et al.<br><br>Debtors. | Chapter 11<br><br>Case Nos. 05-44481 (RDD)<br>(Jointly Administered) |

**MOTION OF AUTOMODULAR ASSEMBLIES INC., TEC-MAR DISTRIBUTION SERVICES, INC., AND AUTOMODULAR ASSEMBLIES (OHIO) INC. TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND MOTION TO ALLOW AND DIRECT PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

Automodular Assemblies Inc. and its wholly-owned subsidiaries Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc. (collectively, "Automodular" or "Movant") hereby move (the "Motion") to compel assumption or rejection of executory contracts and in support thereof assert as follows:

**BACKGROUND**

1. On October 8, 2005, Delphi and certain of its subsidiaries and affiliates filed for bankruptcy protection pursuant to Chapter 11 of Title 11 of the Bankruptcy Code.

**A. The U.S. Contract**

2. In or about March 2004, Automodular Assemblies (Ohio) Inc. and Delphi Automotive Systems LLC ("Delphi" or "Debtor") entered into a contract (hereinafter the "U.S. Contract") whereby Automodular agreed to provide services to Delphi as specified amongst other items, in purchase orders and work orders. A copy of the U.S. Contract is attached as Exhibit A to the Affidavit in Support.[1]

3. As of the Petition Date, no less than $147,306.27 was owed by the Debtors under the U.S. Contract. Automodular timely filed a Proof of Claim (the "Claim") and the Debtors objected to the Claim. The objection remains unresolved to date.

4. Pursuant to the U.S. Contract, Delphi was to pay Automodular for work performed at the Lordstown assembly plant, which produces the GMX001 Chevrolet Cobalt and GMX001 Pontiac Pursuit/G4/G5. Per the U.S. Contract, Delphi could order certain changes in the amount or extent of the work provided. Effective July 17, 2006, the following changes were made by Delphi under the scope of production: (1) shifts were reduced from 3 shifts to 2 shifts; and (2) there was an increase line rate from 54 net jobs per hour to 63 net jobs per hour. On July 19, 2006, Automodular provided Delphi with documentation of the changes. Pursuant to the U.S. Contract, Automodular also provided the per unit cost of production to sub-assemble and sequence compressor radiator fan modules for Delphi for installation on the vehicles and requested an equitable price adjustment. Despite numerous efforts by Automodular to meet and confer over the price adjustments as required by the U.S. Contract, Delphi has refused to

[1] Tec-Mar Distribution Services, Inc. also had a contract with Delphi for the provision of services (the "Tec-Mar Contract"). The Tec-Mar Contract has been terminated. However, as of the petition date, a total of $79,722.35 was owed under the Tec-Mar Contract.

negotiate price adjustments necessitated by Delphi's changes in the scope of production. This was a breach of Delphi's obligations under the U.S. Contract.

5. As a result, of the change in scope, among other things, required by the Debtor, additional amounts have accrued that remain unpaid. As of September 30, 2007, no less than $625,132.73 was due and owing from the Debtor for post-petition goods and services provided by Automodular under the U.S. Contract. The price adjustments made by Automodular reflect the fair market value for the services and goods provided and are representative of the parties' business relationship for similar work. Additional costs for goods and services continue to accrue on a daily basis. An Affidavit in support is attached hereto.

**B. The Ontario Contract**

6. In addition to the U.S. Contract, Automodular Assemblies Inc. contracted with Delphi under a Long Term Contract, as recently amended in June 2005 (the "Ontario Contract" and collectively with the U.S. Contract, the "Contracts"). A copy of the Ontario Contract is attached as Exhibit C to the Affidavit in Support. Pursuant to the Ontario Contract, Delphi would contract with General Motors of Canada ("GM") for the supply and installation of various car parts. In turn, Delphi contracted with Automodular for Automodular's sub-assembly and sequencing services of condensers, radiators and fan modules, which were ultimately installed in GM vehicles.

7. The Ontario Contract provided a schedule setting out estimated yearly volumes required by Delphi for installations and related prices. Automodular agreed to these prices only with respect to the volumes set out in the schedule attached to the contract.

8. Delphi has failed to perform under the Ontario Contract in several ways, including without limitation, failing to comply with (a) a foreign exchange adjustment clause; (b) to negotiate in good faith for price adjustments contemplated in the contract to changes in the scope of work; and (c) requirements for payment of termination costs for discontinued programs. By way of example, pursuant to the general terms and conditions incorporated into the Ontario Contract, Delphi could require Automodular to implement changes to the specifications of the goods or the scope of any work covered by the Contract, i.e., order a "change in scope." Delphi was obligated to equitably determine any adjustment in price or delivery schedules relating from such changes. If a disagreement arose, Delphi and Automodular were obligated to work to resolve the disagreement in good faith.

9. Beginning in January 2006 and continuing through November of 2006, Delphi issued notices of change in scope. Automodular provided Delphi with documentation of the changes in per unit cost of production and requested an equitable price adjustment to account for the change in volume based on the new per unit cost.

10. Despite its contractual obligation to equitably address price changes as a result of the change in scope of work and to work in good faith to resolve the pricing disagreement, Delphi unilaterally refused to comply with any price adjustment. Automodular has continued to perform the work in accordance with its obligations.

11. As of the Petition Date, no less than $322,249.11 was owed by the Debtors under the Ontario Contract. Automodular timely filed a Proof of Claim (the "Ontario Claim") to which the Debtors have objected. To date, the objection remains unresolved.

ME1 6879403v.1
ME1 6938054v.1
ME1 6952306v.1

12. As a result of the ongoing dispute, additional amounts have accrued that remain unpaid. As of September 30, 2007, no less than $1,042,756.83 is due and owing from the Debtor for post-petition goods and services provided by Automodular under the Ontario Contract. The price adjustments made by Automodular reflect the fair market value for the services and goods provided and are representative of the parties' business relationship for similar work. Additional costs for goods and services continue to accrue on a daily basis.

## ARGUMENT

### A. The Contracts Must be Immediately Assumed or Rejected

13. A debtor-in-possession may generally elect to assume or reject an executory agreement "at any time before the confirmation of a plan[.]" 11 U.S.C. §365(d)(2). A non-debtor party to an executory contract, however, may request an order fixing a specified period of time within which the trustee or debtor-in-possession must elect whether to assume or reject the Contracts. See 11 U.S.C. §365(d)(2).

14. A debtor has only a reasonable amount of time under the facts and circumstances of the case in which to make the decision either to assume or reject a contract. In the Matter of Holly's, Inc., 140 B.R. 643, 682 (Bankr. W.D. Mich. 1992). What is a reasonable time period in a given case is left to the discretion of the bankruptcy court. In the matter of Dunes Casino Hotel, 63 B.R. 939, 949 (D.N.J. 1986) (citing, Theatre Holding Corp. v. Mauro, 681 F.2d 102, 105 (2d Cir. 1982)). In determining what is a "reasonable time," the Court should consider the following four factors: "[t]he nature of the interests at stake, the balance of the harm to the litigants, the good to be achieved, the safeguards afforded those litigants, and whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary."

Id. (quoting, In re GHR Energy Corp., 41 B.R. 668, 676 (Bankr. D. Mass. 1984)). (citations omitted).

15. With regard to the above referenced factors, Movants respectfully submit that the balance weighs in favor of compelling Debtors to immediately assume or reject the Contracts. Debtors incurred substantial pre and post-petition expenses for services provided pursuant to the Contracts. As a result, Automodular has sustained large economic losses due to Debtors' failure to pay for the services provided. Congress did not intend for debtors, such as Delphi, to continue to incur debts at a substantial rate without compensation to the creditor for its loss. As such, the Debtors should be compelled to immediately assume or reject the Automodular Contracts.

**B. Even if the Contracts are Rejected, the Debtors are Required to Make Payment to Automodular**

16. Until the Debtors have elected to assume or reject the contracts, the debtor-in-possession must continue perform its post-petition obligations under the contract. *See*, e.g., Philadelphia Co. v. Dipple, 312 U.S. 168, 174, 61 S.Ct. 538, 85 L. Ed.2d 651 (1941). Automodular continues to provide ongoing services to Debtors in accordance with the Contracts. As of the petition date, Debtors owed Automodular approximately $549,277.73 for pre-petition services rendered. Debtors continue to accrue monthly charges for services rendered post-petition and as of the date of this Motion, an additional $1,667,889.56 is owed for post-petition services. As Delphi receives the benefit of those services, it is required to promptly pay for the services which are continuously being provided to Debtors on an ongoing basis.

17. The post-petition amounts owed should be paid in full and in cash. Section 503(b) of Title 11 of the Bankruptcy Code provides that "[a]fter notice and a hearing, there shall

be allowed administrative expenses, ... including -- the actual, necessary costs and expenses of preserving the estate...." 11 U.S.C. §503(b)(1)(A). While the Bankruptcy Code does not itself elaborate on what constitutes an actual, necessary cost or expense of preserving a debtor 's estate, "[i]f the debtor in possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor in possession is obligated to pay for the reasonable value of those services which, depending on the circumstances of a particular contract, may be what is specified in the contract." NLRB v. Bildisco and Bildisco, 465 U.S. 513, 531 (1984) (internal citations omitted).

18. The fair market value for the services and goods provided as also represented by the parties' business relationship for similar work is the presumed reasonable value of the services to the debtor in possession. In the absence of evidence to the contrary, Automodular is entitled to the usage amount as the reasonable benefit to the Debtors of the use of the services. The Debtors should not be permitted to reap the benefit of the use of these services without compensating Automodular for such use. Thus, Automodular is entitled to immediate payment of an administrative expense claim for the full value of the services rendered and which continue to accrue post-petition, under the Contracts. In addition, administrative expenses which arise under 11 U.S.C. §503(b) are entitled to first priority pursuant to 11 U.S.C. §507(a)(1). The Court has the discretion to order the Debtors to immediately pay an allowed administrative expense claim. See In re Continental Airlines, Inc., 146 B.R. 520, 531 (Bankr. D. Del. 1992). As such, Movants request that the Court enter an Order compelling the Debtors to make immediate payment to Automodular in the amount of any accrued post-petition payments as an administrative expense claim as and when they become due.

**NOTICE OF MOTION**

19. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), the Ninth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 19, 2007 (Docket No. 10661). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

**WAIVER OF MEMORANDUM OF LAW**

20. Because this Motion presents no novel issues of law, Movant respectfully requests that the Court waive the requirement for the filing of a separate memorandum of law in support of this Motion pursuant to L.B.R. 9013-1(b).

WHEREFORE, Automodular respectfully request that this Court grant the relief requested in the above motion by (1) compelling the Debtors to immediately assume or reject the Contracts; (2) compelling Debtors to cure all defaults under the assumed Contracts; and (3) granting such other and further relief as deemed just and proper.

Dated: November 30, 2007
New York, New York

Respectfully submitted,

**MCCARTER & ENGLISH, LLP**

By: /s/ Eduardo J. Glas
245 Park Avenue, 27th Floor
New York, New York 10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile

Attorneys for Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc.

McCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York 10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile
Attorneys for Automodular Assemblies Inc., Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>DELPHI CORPORATION INC., et al.<br><br>Debtors. | Chapter 11<br><br>Case Nos. 05-44481 (RDD)<br>(Jointly Administered) |

**AFFIDAVIT IN SUPPORT OF MOTION OF AUTOMODULAR ASSEMBLIES INC., TEC-MAR DISTRIBUTION SERVICES, INC., AND AUTOMODULAR ASSEMBLIES (OHIO) INC. TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND MOTION TO ALLOW AND DIRECT PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

**AFFIDAVIT OF CHRISTOPHER DELL**

PROVINCE OF ONTARIO )
) ss:
TOWN OF WHITBY )

The undersigned, Christopher Dell, by and on behalf of Automodular Assemblies Inc. and its wholly-owned subsidiaries Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc. (collectively, "Automodular" or "Movant"), does hereby state under oath the following:

1. I am employed by Automodular as the Vice President, Business Development and am competent to testify about matters described below upon personal knowledge.

2. As part of my duties at Automodular, I am responsible for the negotiation, maintenance and ongoing administration of all commercial contracts of Automodular Corporation and its subsidiaries.

3. In or about March 2004, Automodular Assemblies (Ohio) Inc. and Delphi Automotive Systems LLC ("Delphi" or Debtor") entered into a contract (hereinafter the "U.S. Contract") whereby Automodular agreed to provide services to Delphi as specified amongst other items, in purchase orders and work orders. A copy of the U.S. Contract is attached as Exhibit A.[1]

4. As of the Petition Date, no less than $147,306.27 was owed by the Debtors under the U.S. Contract.

5. Pursuant to the U.S. Contract, Delphi was to pay Automodular for work performed at the Lordstown assembly plant, which produces the GMX001 Chevrolet Cobalt and GMX001 Pontiac Pursuit/G4/G5. Per the U.S. Contract, Delphi could order certain changes in the amount or extent of the work provided. Effective July 17, 2006, the following changes were made by Delphi under the scope of production: (1) shifts were reduced from 3 shifts to 2 shifts; and (2) there was an increase line rate from 54 net jobs per hour to 63 net jobs per hour. On July 19, 2006, Automodular provided Delphi with documentation of the changes. Automodular also provided the per unit cost of production under its contract to sub-assemble and sequence compressor radiator fan modules for Delphi for installation on the vehicles and requested an equitable price adjustment. Pursuant to the U.S. Contract, Delphi was required to negotiate in good faith for a price adjustment as necessitated by the change in scope. However, despite

---

[1] Tec-Mar Distribution Services, Inc. also had a contract with Delphi for the provision of services (the "Tec-Mar Contract"). The Tec-Mar Contract has been terminated. However, as of the petition date, a total of $79,722.35was owed under the Tec-Mar Contract.

numerous efforts by Automodular to meet and confer over the price adjustments, Delphi has refused to comply with its obligations under the U.S. Contract.

6. As a result of the ongoing dispute, additional amounts have accrued that remain unpaid. As of September 30, 2007, no less than $625,132.73 was due and owing from the Debtor for post-petition goods and services provided by Automodular under the U.S. Contract. Additional costs for goods and services continue to accrue on a daily basis.

7. A spreadsheet showing the amounts owed is attached hereto as Exhibit B.

8. In addition to the U.S. Contract, Automodular Assemblies Inc. contracted with Delphi under a Long Term Contract, as recently amended in June 2005 (the "Ontario Contract" and collectively with the U.S. Contract, the "Contracts"). A copy of the Ontario Contract is attached hereto as Exhibit C. Pursuant to the Ontario Contract, Delphi would contract with General Motors of Canada ("GM") for the supply and installation of various car parts. In turn, Delphi contracted with Automodular for Automodular's sub-assembly and sequencing services of condensers, radiators and fan modules, which were ultimately installed in GM vehicles.

9. The Ontario Contract provided a schedule setting out estimated yearly volumes required by Delphi for installations and related prices. Automodular agreed to these prices only with respect to the volumes set out in the schedule attached to the contract.

10. Delphi has failed to perform under the Ontario Contract in several ways, including without limitation, failing to comply with (a) a foreign exchange adjustment clause; (b) scope change items; and (c) requirements for payment of termination costs for discontinued programs. By way of example, pursuant to the general terms and conditions incorporated into the Ontario Contract, Delphi could require Automodular to implement changes to the specifications of the goods or the scope of any work covered by the Contract, i.e., order a

"change in scope." Delphi was obligated to equitably determine any adjustment in price or delivery schedules relating from such changes. If a disagreement arose, Delphi and Automodular were obligated to work to resolve the disagreement in good faith.

11. Beginning in January 2006 and continuing through November of 2006, Delphi issued notices of change in scope. Automodular provided Delphi with documentation of the changes in per unit cost of production and requested an equitable price adjustment to account for the change in volume.

12. Despite its contractual obligation to equitably address price changes as a result of the change in scope of work and to work in good faith to resolve the pricing disagreement, Delphi unilaterally refused to comply with any price adjustment. Furthermore, while Delphi chose to ignore changes in scope that would result in a price increase, it unilaterally backcharged Automodular $183,931 where the change in scope would result in a price decrease. Automodular has continued to perform the work in accordance with its obligations.

13. As of the Petition Date, no less than $322,249.11 was owed by the Debtors under the Ontario Contract.

14. As a result of the ongoing dispute, additional amounts have accrued that remain unpaid. As of September 30, 2007, no less than $1,042,756.83 is due and owing from the Debtor for post-petition goods and services provided by Automodular under the Ontario Contract. Additional costs for goods and services continue to accrue on a daily basis. The price adjustments made by Automodular reflect the fair market value for the services and goods provided and are representative of the parties' business relationship for similar work.

15. A spreadsheet showing the amounts owed is attached hereto as Exhibit D.

I AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF, FURTHER AFFIANT SAYETH NAUGHT.

Chris Dell
Christopher Dell
for and on behalf of Automodular Assemblies Inc. and its wholly-owned subsidiaries Tec-Mar Distribution Services, Inc., and Automodular Assemblies (Ohio) Inc.

Sworn to before me and subscribed in my presence by the above named Christopher Dell this 28 day of November, 2007

Notary Public.
My Commission
Expires:________________

MEI 6941704v.1
MEI 6945738v.1

# EXHIBIT A

DELPHI Delphi Thermal and Interior

**Buyer:**
DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

PO Number
550162897
Version
01-Jun-2007 13:20:54

Date Issued
03-Apr-2007

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

Vendor No: 1014930
DUNS No: 147163542

**Payment Terms:** ZMN2 **Currency:** USD
Payment settled on 2nd, 2nd Month

**Incoterms:** FOB-FREIGHT COLLECT

| Item No. | Material No. / Description | Plant |
|---|---|---|
| 00010 | 52423591 | J201 DELPHI T & I LOCKPORT |
| | CRTM-ATM-07 I.A. | |

PART NUMBER CHANGE ONLY FOR EXISTING PART DUE TO ENGINEERING CHANGE. CUSTOMER REQUESTED NEW PART NUMBERS. PRICING REMAINS THE SAME. 52423591 REPLACES 52417044. CUSTOMER PART NUMBER 25784002

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 04-Apr-2007 | 01-Jan-2008 | USD | Redacted | | PC |

This Requirement Contract is for 100% unless otherwise specified.

Purchasing Contact: McLean, D. L.
Phone: 716-439-2480
Fax: 716-439-2216

Contact Address:

Date and Time Printed: 01-Jun-2007 13:20:54

Jun 1 2007 01:14pm P004/009 DELPHI HARRISON PURCH Fax 716-439-2216

DELPHI Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

PO Number 550162897
Version 01-Jun-2007 13:20:54
Date Issued 03-Apr-2007

| Item No. | Material No. Description | Plant |
|---|---|---|

Notes:

**********************************************

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

**********************************************

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

**********************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

**********************************************

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

**********************************************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

**********************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and

**DELPHI** Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

PO Number
550162897
Version
01-Jun-2007 13:20:54

Date Issued
03-Apr-2007

| Item No. | Material No. Description | Plant |
|---|---|---|

Notes Continued:
Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
**************************************************
All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

**************************************************

**********************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
**********************

Delphi Consignment / Subcontracting:
1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

MOVING PART FROM 550125774 - NEED ONE PART PER SA - AS REQUIRED BY PAUL HENNESSY

DELPHI Replaces Part# 52402677 Harrison Thermal Systems

**Buyer:**
DELPHI
THERMAL & INTERIOR SYSTEMS
200 UPPER MOUNTAIN RD
LOCKPORT NY 14094

**Requirements Contract**
PO Number 550073758
Date Issued 04/22/2005
Version 04/22/2005 14:44:20

**Deliver to:**
*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

Vendor No: 1014930
DUNS No: 147163542

**Payment Terms:** 2MN2 **Currency:** USD
Payment settled on 2nd, 2nd Month

**Incoterms:** FOB-FREIGHT COLLECT

| Item No. | Material No. / Description | Plant |
|---|---|---|
| 00010 | 52415045<br>CRFM-ASH-06 | J201 DELPHI T & I LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 05/01/2005 | 12/31/2007 | USD | Redacted | | PC |

This Requirement Contract is for 100% unless otherwise specified.

CA 08/22/05

**Notes:**

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and

Purchasing Contact: Williams, E. A.
Phone: 716-439-2406
Fax: 716-439-3818

Contact Address:

DELPHI Harrison Thermal Systems

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550073758 | 04/22/2005 |
| Version | |
| 04/22/2005 14:44:20 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

**Notes Continued:**

the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

******************************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

******************************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

******************************************************************

1. Consignee agrees to maintain perpetual inventory records and retain records for at least 1 year. 2. Consignee agrees to submit by fax on a mutually agreed upon date, a monthly physical inventory indicating the month end balances by P/N or raw material code to the assigned material control consignment analyst. 3. Consignee agrees to verify that the seal is intact on those sealed truckload where the seal number is indicated on the Delphi Harrison Thermal Systems Bill of Lading. 4. Consignee agrees to verify the accuracy of the material identification and counts received from the Delphi Thermal Plant. Each Bill of Lading must be checked completely at time of receipt and Delphi Thermal Production Control notified immediately of any discrepancy. Consignee will correct information on Bill of Lading, sign, and date and fax copy to production control. 5. Consignee agrees to segregate Delphi Thermal material & provide adequate protection and insurance for Delphi Thermal inventory from loss or damage. 6. Consignee agrees to return all defective or damaged parts and scrap to Delphi Thermal unless alternate arrangements have been made with Delphi Thermal Purchasing. Those consignees who ship directly to Delphi Thermal customers on behalf of Delphi Thermal must send an "Advance Shipping Notice" via Electronic Data Interchange to Delphi Thermal. 7. If consignee is determined to be at fault for scrap, Delphi purchasing will charge back consignee. 8. Consignee will fax to Delphi material control consignment analyst copies of shipping paperwork when



DELPHI Harrison Thermal Systems

Page 3 of 3

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

PO Number
550073758
Version
04/22/2005 14:44:20

Date Issued
04/22/2005

| Item No. | Material No. / Description | Plant |
|---|---|---|

**Notes Continued:**

shipping or receiving parts from other consignee locations. 9. Consignee agrees to allow Delphi scheduling and finance reps. the right to audit inventories as requested. 10. Consignee agrees to provide an annual certified (notarized) letter of physical inventory when Delphi Thermal conducts its annual physical inventory. 11. Tools provided for performance of an operation by consignee remain the property of Delphi Thermal unless otherwise noted. 12. Consignee agrees to ship material directly to Delphi Thermal customers if the physical flow warrants.
This replaces P/N 52402677. New CRFM for GMX-001 program. (Customer 22699885)(5604) DGSS Action Plan: 72473

**DELPHI** jessica has copy Harrison Thermal Systems

**Buyer:**
DELPHI
HARRISON THERMAL SYSTEMS
200 UPPER MOUNTAIN RD
LOCKPORT NY 14094

**Requirements Contract**

PO Number
550056014
Version
09/20/2004 11:32:42

Date Issued
06/01/2004

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

Vendor No: 1014930
DUNS No: 147163542

Payment Terms: ZMN2 Currency: USD
Payment settled on 2nd, 2nd Month

Incoterms: COL- Collect-FOB Ship Point

Adjustment for purchased TOC clip. TD 9/21/04.

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00010 | 52402677 CRFM-CFA-05 | J201 DELPHI THERMAL LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 06/01/2004 | 12/31/2004 | USD | Redacted | | PC |
| 01/01/2005 | 12/31/2005 | USD | | | PC |
| 01/01/2006 | 12/31/2006 | USD | | | PC |
| 01/01/2007 | 12/31/2007 | USD | | | PC |

This Requirement Contract is for 100% unless otherwise specified.
*** Condition record changed

**Notes:**
GMX-001, GM Lordstown Assembly

********************
Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information

Purchasing Contact: Williams, E. A.
Contact Address:
Phone: 716-439-2406
Fax: 716-439-3818

Date and Time Printed: 09/20/2004 11:32:42

Sep 20 2004 13:03 P.02 DELPHI PURCHASING FAX:716-439-3818

DELPHI Harrison Thermal Systems

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

PO Number: 550056014
Version: 09/20/2004 11:32:42
Date Issued: 06/01/2004

| Item No. | Material No. / Description | Plant |
|---|---|---|

Notes Continued:

through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com. (by clicking on the "Suppliers" in the header).

DELPHI

Delphi Thermal and Interior

Page 1 of 3

**Buyer:**
DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

PO Number
550162898

Date Issued
03-Apr-2007

Version
01-Jun-2007 13:22:08

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

Vendor No: 1014930
DUNS No: 147163542

**Payment Terms:** ZMN2 **Currency:** USD

Payment settled on 2nd, 2nd Month

**Incoterms:** FOB-FREIGHT COLLECT

| Item No. | Material No. / Description | Plant |
|---|---|---|
| 00010 | 52423592<br>CRFN-AXN-07 T.A.<br>PART NUMBER CHANGE ONLY FOR EXISTING PART DUE TO ENGINEERING CHANGE. CUSTOMER REQUESTED NEW PART NUMBERS. PRICING REMAINS THE SAME. 52423592 REPLACES 52417045. CUSTOMER PART NUMBER 25784003 | J201 DELPHI T & I LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 04-Apr-2007 | 01-Jan-2008 | USD | Redacted | | PC |

This Requirement Contract is for 100% unless otherwise specified.

Purchasing Contact: McLean, D. L.
Phone: 716-439-2480
Fax: 716-439-2216

Contact Address:

Date and Time Printed: 01-Jun-2007 13:22:08

DELPHI HARRISON PURCH Fax 716-439-2216 Jun 1 2007 01:15pm P004/009

DELPHI — Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

PO Number
550162898

Date Issued
03-Apr-2007

Version
01-Jun-2007 13:22:08

| Item No. | Material No. / Description | Plant |
|---|---|---|

**Notes:**

****************************************************************

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com. (by clicking on the "Suppliers" in the header).

****************************************************************

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

****************************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

****************************************************************

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

****************************************************************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website; www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

****************************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and

**DELPHI** Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1781 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

PO Number: 550162898
Date Issued: 03-Apr-2007
Version: 01-Jun-2007 13:22:08

| Item No. | Material No. / Description | Plant |
|---|---|---|

**Notes Continued:**

Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

************************************

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

************************************

********************

Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.

********************

Delphi Consignment / Subcontracting:

1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories when Delphi conducts its Annual Physical Inventory.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory from loss or damage.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supercedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

MOVING PART FROM 550125774 - NEED ONE PART PER SA - AS REQUIRED BY PAUL HENNESSY

DELPHI Delphi Thermal and Interior

**Buyer:**
DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

PO Number
550162899
Version
01-Jun-2007 13:22:50

Date Issued
03-Apr-2007

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

Vendor No: 1014930
DUNS No: 147163542

Payment Terms: Z2N2 Currency: USD
Payment settled on 2nd, 2nd Month
Incoterms: FOB-FREIGHT COLLECT

| Item No. | Material No. / Description | Plant |
|---|---|---|
| 00010 | 52423593<br>RYN-AYP-07 | 0201 DELPHI T & I LOCKPORT |

PART NUMBER CHANGE ONLY FOR EXISTING PART DUE TO ENGINEERING CHANGE. CUSTOMER REQUESTED NEW PART NUMBERS. PRICING REMAINS THE SAME. 52423593 REPLACES 52417049. CUSTOMER PART NUMBER 25784017

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 04-Apr-2007 | 01-Jan-2008 | USD | Redacted | | PC |

This Requirement Contract is for 100% unless otherwise specified.

Purchasing Contact: McLean, D. L.
Phone: 716-439-2480
Fax: 716-439-2216

Contact Address:

Date and Time Printed: 01-Jun-2007 13:22:50

**DELPHI** Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550162899 | 03-Apr-2007 |
| Version | |
| 01-Jun-2007 13:22:50 | |

| Item No. | Material No. / Description | Plant |
|---|---|---|

Notes:

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website; www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and

DELPHI

Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

PO Number
550162899
Version
01-Jun-2007 13:22:50

Date Issued
03-Apr-2007

| Item No. | Material No. Description | Plant |
|---|---|---|

**Notes Continued:**

Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
**********************************************************

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.
**********************************************************

**********************************************************

******************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
******************

Delphi Consignment / Subcontracting:
1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

MOVING PART FROM 550125774 - NEED ONE PART PER SA - AS REQUIRED BY PAUL HENNESSY

DELPHI HARRISON PURCH Fax 716-439-2216 Jun 1 2007 01:44pm P001/003

DELPHI

Delphi Thermal and Interior

Page 1 of 3

**Buyer:**
DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

PO Number: 550162900
Version: 01-Jun-2007 13:23:34
Date Issued: 03-Apr-2007

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

Vendor No: 1014930
DUNS No: 147163542

Payment Terms: ZMN2 Currency: USD
Payment settled on 2nd, 2nd Month

Incoterms: FOB FREIGHT COLLECT

| Item No. | Material No. / Description | Plant |
|---|---|---|
| 00010 | 52423594<br>RFM-AYR-07 | J201 DELPHI T & I LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 04-Apr-2007 | 01-Jan-2008 | USD | Redacted | | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

Purchasing Contact: McLean, D. L.
Phone: 716-439-2480
Fax: 716-439-2216

Contact Address:

Date and Time Printed: 01-Jun-2007 13:23:34

DELPHI HARRISON PURCH Fax 716-439-2216 Jun 1 2007 01:44pm P002/003

DELPHI

Delphi Thermal and Interior

Page 2 of 3

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

PO Number 550162900

Date Issued 03-Apr-2007

Version 01-Jun-2007 13:23:34

| Item No. | Material No. Description | Plant |
| --- | --- | --- |

**Notes Continued:**

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

****************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

****************************************************

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

****************************************************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

****************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

****************************************************

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

DELPHI

Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HENN PARKWAY
LORDSTOWN OH 48090

**Requirements Contract**

PO Number: 550162900
Date Issued: 03-Apr-2007
Version: 01-Jun-2007 13:23:34

| Item No. | Material No. / Description | Plant |
| --- | --- | --- |

**Notes Continued:**

*********************************************************************************************

********************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
********************

Delphi Consignment / Subcontracting:

1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

MOVING PART FROM 550125774 - NEED ONE PART PER SA - AS REQUIRED BY PAUL HENNESSY

DELPHI Replaces # 52402680

Delphi Thermal and Interior

Page 1 of 4

**Buyer:**
DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

PO Number: 550073730
Date Issued: 25-Apr-2005
Version: 12-Dec-2006 16:41:15

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

Vendor No: 1014930
DUNS No: 147163542

Payment Terms: Z002 Currency: USD

Payment settled on 2nd, 2nd Month

Incoterms: FOB FREIGHT COLLECT

)

| Item No. | Material No. Description | Plant |
|---|---|---|
| 00010 | 52415050 RFM-ASY-06 I.A. | J201 DELPHI T & I LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-May-2005 | 31-Dec-2006 | USD | Redacted | | PC |
| 01-Jan-2007 | 31-Dec-2007 | USD | | | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**
062706 Change Buyer Code
May 24, 2006: Buyer changed from Fred Clark to Doug McLean
****************************************************************************************
****************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the

Purchasing Contact: McLean, D. L.
Phone: 716-439-2480
Fax: 716-439-2216

Contact Address:

)

Date and Time Printed: 12-Dec-2006 16:41:15

DELPHI

Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550073730 | 25-Apr-2005 |
| Version | |
| 12-Dec-2006 16:41:15 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

**Notes Continued:**

Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

******************************************************************

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

******************************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

******************************************************************

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

******************************************************************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

******************************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

DELPHI

Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550073730 | 25-Apr-2005 |
| Version | |
| 12-Dec-2006 16:41:15 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

**Notes Continued:**

*****************************************************************

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

*****************************************************************

Delphi Consignment / Subcontracting:

1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

*****************************************************************

Notwithstanding anything to the contrary contained in the Contract, the execution and/or delivery of this purchase order amendment is for the sole purpose of extending the term/expiration date of this purchase order and shall not be deemed to be an assumption or adoption of any agreement or a new post-petition contract.

The extended Contract shall be subject to assumption or rejection under Section 365 of the Bankruptcy Code and, in the event of rejection, any rejection claim shall be entitle to general unsecured non-priority pre-petition status.

*****************************************************************

This replaces P/N 52402680. (Cust 22699890)(57362)
New RFM for GMX-001 Program.

DELPHI Replaces 52402681

Delphi Thermal and Interior

**Buyer:**
DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI THERMAL & INTERIOR DIV
1401 CROOKS ROAD
TROY MI 48084

**Requirements Contract**

PO Number: 550073762
Date Issued: 22-Apr-2005
Version: 12-Dec-2006 16:52:23

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

Vendor No: 1014930
DUNS No: 147163542

Payment Terms: 2MN2 Currency: USD
Payment settled on 2nd, 2nd Month
Incoterms: FOB FREIGHT COLLECT

| Item No. | Material No. / Description | Plant |
|---|---|---|
| 00010 | 52415047<br>CRFM-ASU-06 I.A. | J201 DELPHI T & I LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 01-May-2005 | 31-Dec-2006 | USD | Redacted | | PC |
| 01-Jan-2007 | 31-Dec-2007 | USD | | | PC |

This Requirement Contract is for 100% unless otherwise specified.

**Notes:**
062706 Change Buyer Code
May 24, 2006: Buyer changed from Fred Clark to Doug McLean
**********************************************************************************
**********************************************************************************
Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the

Purchasing Contact: McLean, D. L.
Phone: 716-439-2480
Fax: 716-439-2216

Contact Address:

Date and Time Printed: 12-Dec-2006 16:52:23

DELPHI

Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550073762 | 22-Apr-2005 |
| Version | |
| 12-Dec-2006 16:52:23 | |

| Item No. Material No. Description | Plant |
|---|---|

**Notes Continued:**

Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

*******************************************************************

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

*******************************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

*******************************************************************

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

*******************************************************************

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

*******************************************************************

Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

DELPHI

Delphi Thermal and Interior

AUTOMODULAR ASSEMBLIES (OH) INC.
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550073762 | 22-Apr-2005 |
| Version | |
| 12-Dec-2006 16:52:23 | |

| Item No. | Material No. / Description | Plant |
|---|---|---|

**Notes Continued:**

**************************************************************

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.

**************************************************************

Delphi Consignment / Subcontracting:

1. Consignee agrees to maintain perpetual inventory records, and assist in any inventory reconciliation or re-count, and retain records for at least 2 years.
2. Consignee agrees to submit and reconcile by fax or e-mail, on a mutually agreed upon date, a monthly physical inventory indicating month end balances by part number or raw material code to the Delphi consignment analyst.
3. Consignee agrees to allow Delphi PC&L and Finance Representatives the right and access to audit inventories as requested.
4. Consignee agrees to provide an annual certified (notarized)letter of physical inventory when Delphi conducts its Annual Physical Inventory.
5. Consignee agrees to segregate Delphi material and provide adequate protection and insurance for Delphi inventory from loss or damage.
6. Consignee agrees to verify the accuracy of the material identification and quantity of shipments from Delphi. Consignee must notify the Delphi consignment analyst immediately of any discrepancy.
7. Consignee agrees to verify the accuracy of the material identification and quantity of Delphi material shipped from other suppliers. Consignee must notify the Delphi consignment analyst immediately of any discrepancy. Upon receipt and verification, Consignee will complete a receiving report (foreign or off-site). Copies of Packing Slips and Bills of Lading and receiving report must be faxed to the Delphi consignment analyst. All original Packing Slips and Bills of Ladings, attached to receiving report, must be mailed to Delphi consignment analyst to assure complete and accurate input into Delphi SAP inventory system. Consignee will maintain a copy of the Bills of Lading, Packing Slip and receiving report for 2 years.
8. Consignee agrees to return to Delphi all defective, damaged or scrapped parts unless alternative arrangements have been made with Delphi.
9. If consignee has caused the damage, scrap or loss of parts, Delphi will charge back the consignee.
10. Consignee agrees to ship material directly to Delphi customers if the physical flow warrants.
11. Those consignees who ship to Delphi, another Delphi Consignee or directly to Delphi customers MUST send an "Advanced Shipping Notice" via Electronic Data Interchange to Delphi at time of shipping.
12. Tools and equipment provided for performance of an operation by consignee remain the property of Delphi unless otherwise noted.
13. These terms constitute the consignment agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. These terms may only be modified by a written contract amendment issued by Buyer.

**************************************************************

Notwithstanding anything to the contrary contained in the Contract, the execution and/or delivery of this purchase order amendment is for the sole purpose of extending the term/expiration date of this purchase order and shall not be deemed to be an assumption or adoption of any agreement or a new post-petition contract.
The extended Contract shall be subject to assumption or rejection under Section 365 of the Bankruptcy Code and, in the event of rejection, any rejection claim shall be entitle to general unsecured non-priority pre-petition status.

**************************************************************

This P/N replaces 52402681. (Customer 22699887) (57363). New CRFM for GMX-001 Program. DGSS Action Plan: 72473

********************

DELPHI Harrison Thermal Systems

**Buyer:**
DELPHI
THERMAL & INTERIOR SYSTEMS
200 UPPER MOUNTAIN RD
LOCKPORT NY 14094

**Requirements Contract**

PO Number 550064260
Version 06/09/2005 11:37:50
Date Issued 12/08/2004

**Deliver to:**

*Please deliver to:*
*See Delivery Schedule*

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

Vendor No: 1014930
DUNS No: 147163542

**Payment Terms:** ZMN2 **Currency:** USD
Payment settled on 2nd, 2nd Month

**Incoterms:** FOB-FREIGHT COLLECT

| Item No. | Material No. / Description | Plant |
|---|---|---|
| 00010 | 52413078 / ECFRM-APY-05 | J201 DELPHI T & I LOCKPORT |

| Valid From | Valid To | Currency | Price | Price Unit | UOM |
|---|---|---|---|---|---|
| 12/08/2004 | 12/31/2010 | USD | Redacted | | PC |

This Requirement Contract is for 100% unless otherwise specified.

Co 08/29/05

Notes:
The customer part number is 15237362
Tuner Coupe CRFM
Ship to GM Lordstown Assembly
********************

Purchasing Contact: Williams, E. A.
Phone: 716-439-2406
Fax: 716-439-3818

Contact Address:

DELPHI Harrison Thermal Systems

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

| PO Number | Date Issued |
|---|---|
| 550064260 | 12/08/2004 |
| Version | |
| 06/09/2005 11:37:50 | |

| Item No. | Material No. Description | Plant |
|---|---|---|

Notes Continued:

Suppliers are required to meet all requirements detailed in the Delphi Global Purchasing Supplier Guidelines and reference documents that are available on the Delphi website, www.delphi.com, (by clicking on the "Suppliers" in the header).

Suppliers are required to meet the requirements of Delphi's Production Part Approval Process as described in the Supplier Performance Development Process (SPDP) and in the Production Part Approval Process (PPAP) Manual. The Production Part Approval Process Manual is available from AIAG (810-358-3003) and the SPDP documents can be provided by the appropriate Supplier Quality Representative. Suppliers must have part manufacturing site approval prior to shipping production quantities. Contact the appropriate Delphi Supplier Quality Representative regarding questions on the approval process or approval status.

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions"). Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

Failure Analysis/Corrective Action: Suppliers are expected to perform failure analysis on defective material returned by any Delphi Division. Irreversible corrective action plans for these failures must be developed and implemented. The plans with effective dates are to be reported back to the Delphi Division who requested the analysis.

Delphi requires suppliers of productive material be capable of communicating material forecasts, material schedules, shipping notices and associated information through Electronic Data Interchange (EDI). To insure that EDI communications are accurate and effective, each productive material supplier will be required to become EDI Certified by exhibiting their ability to send and/or receive the appropriate EDI messages in accordance with applicable standards prior to providing productive material. EDI Certification will be conducted and coordinated by the EDI Competency organization.

An Internet electronic form alternative solution is intended to provide relief in situations where establishing an in-house EDI capability is a hardship for a supplier providing limited material.

Please refer to Delphi's website: www.delphi.com then Suppliers/Supplier Community Portal / Supplier Standards, for additional information.

Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

1. Consignee agrees to maintain perpetual inventory records and retain records for at least 1 year. 2. Consignee agrees to submit by fax on a mutually agreed upon date, a monthly physical inventory indicating the month end balances by P/N or raw material code to the assigned material control consignment analyst. 3.

DELPHI Harrison Thermal Systems

AUTOMODULAR ASSEMBLIES (OH) INC
1701 HEN PKY
LORDSTOWN OH 44481

**Requirements Contract**

PO Number
550064260

Version
06/09/2005 11:37:50

Date Issued
12/08/2004

| Item No. | Material No. Description | Plant |
|---|---|---|

**Notes Continued:**

Consignee agrees to verify that the seal is intact on those sealed truckload where the seal number is indicated on the Delphi Harrison Thermal Systems Bill of Lading. 4. Consignee agrees to verify the accuracy of the material identification and counts received from the Delphi Thermal Plant. Each Bill of Lading must be checked completely at time of receipt and Delphi Thermal Production Control notified immediately of any discrepancy. Consignee will correct information on Bill of Lading, sign, and date and fax copy to production control. 5. Consignee agrees to segregate Delphi Thermal material & provide adequate protection and insurance for Delphi Thermal inventory from loss or damage. 6. Consignee agrees to return all defective or damaged parts and scrap to Delphi Thermal unless alternate arrangements have been made with Delphi Thermal Purchasing. Those consignees who ship directly to Delphi Thermal customers on behalf of Delphi Thermal must send an "Advance Shipping Notice" via Electronic Data Interchange to Delphi Thermal. 7. If consignee is determined to be at fault for scrap, Delphi purchasing will charge back consignee. 8. Consignee will fax to Delphi material control consignment analyst copies of shipping paperwork when shipping or receiving parts from other consignee locations. 9. Consignee agrees to allow Delphi scheduling and finance reps. the right to audit inventories as requested. 10. Consignee agrees to provide an annual certified (notarized) letter of physical inventory when Delphi Thermal conducts its annual physical inventory. 11. Tools provided for performance of an operation by consignee remain the property of Delphi Thermal unless otherwise noted. 12. Consignee agrees to ship material directly to Delphi Thermal customers if the physical flow warrants.

6/9/05 changed inco terms

# EXHIBIT B

[illegible]
Price Adjustments
[illegible]
[illegible]

Redacted

# EXHIBIT C

06/27/05 MON 14:40 FAX 1 517 327 0428 THC MAR

001

DELPHI AUTOMOTIVE SYSTEMS

LONG TERM CONTRACT

1. Purchase of Product

Automodular ("Seller") agrees to sell, and Delphi Automotive Systems LLC acting through its Delphi Thermal&Interior ("Buyer") agrees to purchase, approximately one hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Annual Tool Capacity |
|---|---|---|
| SEE EXHIBIT | A ATTACHED | 83 JOBS/HR |

2. Term

With respect to each Product, the current model production term of this Contract is from CY 2005 beginning 01JUL05 through CY2010 ending 30JUN10.

3. Prices

Subject to adjustment on account of savings initiatives implemented in accordance with Section 5 below, the per unit price of each Product is set forth below. All pricing is F.O.B. OSHAWA, ONTARIO,CANADA - TTOP.

| Year | Beginning | Price | UOM |
|---|---|---|---|
| SEE EXHIBIT A ATTACHED | | | |

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

Price is based on an exchange rate of 1.25. Effective first day of each quarter pricing will be adjusted to reflect the exchange rate as of that date. Bank of Nova

Fax:716-439-3818 Jun 28 2005 9:27 P.02

Scotia USD exchange rate will be used as the basis for this adjustment. Automodular reserves the right of setoff or recoupment against any amounts owing to Delphi and its affiliates or subsidiaries.

4. **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following CY 01JUL06, Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If (i) Seller does not, within ninety (90) days, present a plan to supply any Product with comparable technology, design, quality, or, if applicable, price which is reasonably determined by Delphi to be feasible or (ii) Seller fails to timely implement and execute any such plan, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5. **Savings Initiatives**

Buyer and Seller will work together to implement cost savings and productivity improvements as outlined in the Creative Improvement Plan (TO BE DEVELOPED) in order to reduce Seller's costs of supplying each Product. Seller agrees to reduce the per unit price of each Product on account of any savings in accordance with the Creative Improvement Plan.

In addition to the activities and initiatives set forth in the Creative Improvement Plan, Seller agrees to work cooperatively with Buyer on Supplier Development and Cost Management.

In terms of Supplier Development, Seller agrees to allow Buyer's Supplier Development personnel to visit Seller's manufacturing operations to complete lean manufacturing workshops and identify opportunities to improve the value stream of Buyer's products. Seller will work cooperatively with Buyer's Supplier Development personnel in documenting cost savings opportunities and possible timing for implementation of these savings initiatives through the Creative Improvement Plan or Buyer's Supplier Suggestion Program.

In terms of Cost Management, Seller agrees to provide detailed Cost Breakdown Information as requested by Buyer. In addition, Seller agrees to allow Buyer's Cost Management personnel to visit Seller's manufacturing operations to fully develop a robust cost standard (i.e., an ideal cost structure)

for the Products. Seller will provide the necessary resources (Finance, Engineering, Manufacturing, Management, Purchasing, etc.) and data to support Buyer's Cost Management Initiatives. Seller and Buyer will work cooperatively to identify areas of cost reduction and Product and process improvements in order to close cost gaps and implement Product and process improvements so as to achieve actual costs that are in line with the applicable cost standard.

6. Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end date of 01JUL06. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of 24JUN05.

Buyer:

Delphi Automotive Systems LLC
acting through its Delphi Thermal&Interior

By: E A Williams 6/28/05
Name: Elizabeth A. Williams
Title: Buyer

Seller:

AUTOMODULAR

By: Winston R Ash
Name: WINSTON R. ASH
Title: VICE PRESIDENT
6/27/05



# EXHIBIT A

| | OLD | NEW ESTIMATED DEMAND | YEAR 1 7/2005 - 6/2006 | YEAR 2 7/2006 - 6/2007 | YEAR 3 7/2007 - 6/2008 | YEAR 4 7/2008 - 6/2009 | YEAR 5 7/2009 - 6/2010 |
|---|---|---|---|---|---|---|---|
| AUTOMODULAR CRFMs | | | | | | | |
| SERVICE -> | | | | | | | |

Redacted

$ 13,305,842

NOTES:
TOTAL ESTIMATED DEMAND - 2450/DA
SERVICE ASSEMBLIES INCLUDE COST OF SERVICE PACK (~$30)
ALL PRICES ABOVE SUBJECT TO COST MODEL RESULTS AND SUBSEQUENT ADJUSTMENT
ALL PRICES ABOVE SUBJECT TO ADJUSTMENT FOR CURRENCY EXCHANGE (see LTA for details)

| | |
|---|---|
| 2450 | PC/DA |
| 235 | DA/YR |
| 575750 | PCs/YR |
| 4 | PNs |
| 143938 | PCs/PN |

LTA for Automodular assemblies
GMX 211,231
6/27/2005

Effective March 2004

**DELPHI CORPORATION**

**GENERAL TERMS AND CONDITIONS**

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form, by electronic data interchange or other tangible format, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that an authorized employee of Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Taxes. Unless otherwise stated in this Contract, the price includes all applicable federal, state, provincial, and local taxes other than sales, value added, or similar turnover taxes or charges. Seller will separately invoice Buyer for any sales, value added, or similar turnover taxes or charges that Seller is required by law to collect from Buyer. Seller will provide Buyer with whatever information and documentation that is required under local law in order to enable Buyer to recover any sales, value added, or similar turnover taxes or charges. Invoices shall also be in the appropriate form as required by local law to permit deduction of payments for income tax purposes by the Buyer.

2.4 Withholding of Taxes by Buyer. If Buyer is required by law to make any deduction or withholding from any sum otherwise payable to Seller under this Contract, Buyer shall be entitled to deduct or withhold such amount and effect payment thereof to the applicable tax authority. Buyer will, upon request from Seller, provide Seller official tax receipts or other evidence issued by the applicable tax authorities sufficient to establish that any taxes which are withheld have been paid.

2.5 Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation.

2.6 Premium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

2.7 Volume Forecasts. Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirements for goods. Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all engineering release and validation requirements and procedures, including Buyer's production part approval processes, which Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to enter Seller's facilities at reasonable times to inspect such facilities and any goods, inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges and other items and processes related to Seller's performance of this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for only so long as such event or occurrence continues, provided, however, that the affected party gives written notice of each such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to the then current release/revision level (based on date Buyer's release is issued to Seller) of Buyer's applicable specifications and drawings, (b) conform to all samples, descriptions, brochures and manuals furnished by Seller or Buyer, (c) be merchantable, (d) be of good material and workmanship, (e) be free from defect, and (f) be fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 Warranty Period. In the case of goods supplied for use as, or incorporation into, parts, components or systems for automotive vehicles or other finished products, the period for each of the foregoing warranties will commence upon delivery of the goods to Buyer and, except as provided in Section 7.4 or as otherwise

expressly agreed in writing by an authorized employee of Buyer, and forty-eight (48) months following the date the vehicle or other finished product on which such parts, components or systems are installed is first sold and delivered or otherwise utilized for consumer or commercial purposes, provided, however, that if Buyer offers and provides a longer warranty to its customers with respect to any such parts, components or systems, then such longer warranty period will apply to the goods. In the case of goods supplied for other uses, the period for each of the foregoing warranties will be that provided by applicable law unless otherwise expressly agreed in writing by an authorized employee of Buyer.

7.3 Remedies and Damages. If any goods are reasonably determined (including by use of statistical analysis or other sampling methodology) to fail to conform to the warranties set forth in this Contract, Seller shall reimburse Buyer for all reasonable losses, costs and damages caused by such nonconforming goods. Such costs and damages may include, without limitation, costs, expenses and losses of Buyer and/or its customers arising from (i) inspection, sorting, repair or replacement of any nonconforming goods or any system or component that incorporates such nonconforming goods, (ii) production interruptions or slowdowns, (iii) offlining of vehicles or component systems, and (iv) field service campaigns and other corrective service actions, including, without limitation, the amounts paid to distributors and/or dealers for materials and replacement parts (including reasonable markup to recover administrative costs or other capital expenses) and the labor costs to perform such work.

7.4 Recalls. Notwithstanding the expiration of the warranty period set forth in Section 7.2, if Buyer and/or the manufacturer of the vehicles (or other finished product) on which the goods, or any parts, components or systems incorporating the goods, are installed, voluntarily or pursuant to a government mandate, makes an offer to owners of such vehicles to provide remedial action to address a defect that relates to motor vehicle safety or the failure of the vehicle to comply with any applicable law, safety standard or guideline (a so-called "recall"), Seller will nonetheless be liable for costs and damages associated with the conduct of such recall to the extent that such recall is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the goods fail to conform to the warranties set forth in this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

In any of the following or any similar events Buyer may immediately terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11 if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1 Information Disclosed by Seller. Seller will create, maintain, update, and provide to Buyer, in compliance with Buyer's drafting and math data standards, all technical information about the goods and their manufacture which is reasonably necessary or requested by Buyer in connection with its use of the goods, including, without limitation, the engineering validation and qualification of the goods for automotive production and other applications and compliance with any legal or regulatory requirements. Such technical information will not be subject to any use or disclosure restrictions, except as provided in Section 12.2 below.

12.2 Waiver of Claims. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed, or may hereafter disclose, in connection with the goods or services covered by this Contract.

12.3 Repair and Rebuild. Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4 Software and Written Works. Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods. In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing

this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship. If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.

12.5 Development, Engineering And Consulting Services. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 13. INDEMNIFICATION

13.1 Infringement. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services. Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2 Activities on Buyer's Premises. Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3 Product Liability. Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or any other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval, performance and/or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract. Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of goods covered by this Contract (collectively, "Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract, in which event Buyer will, within 45 days following delivery of such Seller's Equipment to Buyer, pay to Seller of the lower of (i) the net book value of such Seller's Equipment (i.e., actual cost less amortization) or (ii) then current fair market value of such Seller's Equipment, in each case less any amounts that Buyer has previously paid to Seller on account of such Seller's Equipment. The foregoing option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller and are then being sold by Seller to other customers. Buyer's right to exercise the foregoing option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY AND INFORMATION

17.1 Acquisition of Tooling and Materials. To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively, "Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to such Tooling and Materials. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials. Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.

17.2 Bailment of Buyer's Property. All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.

17.3 Seller's Duties with Respect to Buyer's Property. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's

Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.

17.4 Return of Buyer's Property. Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.5 Disclaimer of Warranties. Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages and/or personal injury or death.

17.6 Use of Buyer's Information. Seller will (i) keep all Buyer's Information (as defined below) confidential and disclose it only to its employees who need to know such Buyer's Information in order for Seller to supply goods and services to Buyer under this Contract and (ii) use the Buyer's Information solely for the purpose of supplying goods and services to Buyer. Goods manufactured based on Buyer's Information may not be used for Seller's own use or sold by Seller to third parties without prior express written consent from an authorized employee of Buyer. "Buyer's Information" means all information provided to Seller by Buyer or its representatives or subcontractors in connection with the business, programs, goods and services covered by this Contract, including, without limitation, pricing and other terms of this Contract, specifications, data, formulas, compositions, designs, sketches, photographs, samples, prototypes, test vehicles, manufacturing, packaging or shipping methods and processes and computer software and programs (including object code and source code). Buyer's Information also includes any materials or information that contain, or are based on, any Buyer's Information, whether prepared by Buyer, Seller or any other person.

18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the initial five (5) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES AND INJUNCTIVE RELIEF

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity. To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

## 20. CUSTOMS AND EXPORT CONTROLS

20.1 Credits and Refunds. Transferable credits or benefits associated with or arising from goods purchased under this Contract, including trade credits, export credits or rights to the refund of duties, taxes or fees, belong to Buyer. Seller will, at its expense, provide all information necessary (including written documentation and electronic transaction records in Buyer-approved formats) to permit Buyer to receive these benefits, credits, or rights. Seller will furthermore, at its expense, provide Buyer with all information, documentation, and electronic transaction records relating to the goods necessary for Buyer to fulfill any customs -related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Buyer to claim preferential duty treatment for goods eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import. Seller will, at its expense, provide Buyer or Buyer's nominated service provider with export documentation to enable the goods to be exported, and obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).

20.2 Customs-Trade Partnership Against Terrorism. To the extent any good covered by this Contract are to be imported into the United States of America, Seller shall comply with all applicable recommendations or requirements of the Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") Initiative. Upon request, Seller shall certify in writing its compliance with the C-TPAT Initiative.

## 21. BUYER'S RECOVERY RIGHT

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, including, without limitation, direct and indirect losses, costs and damages resulting from Seller's failure to timely delivery goods or services, the failure of any goods or service to conform to applicable warranties or other breach by Seller of this Contract, Buyer may at any time, as applicable, recover, recoup or setoff such amounts by

deducting such amounts from any sums that are, or will become, owing, due or payable to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's goods, advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No failure or delay in exercising any right or remedy will operate as a waiver thereof nor will any single or partial exercise thereof preclude other or further exercise thereof. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT AND CHANGE IN CONTROL

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without prior written consent from an authorized employee of Buyer. In addition, Buyer may terminate this Contract upon giving at least 60 days notice to Seller, without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11, if Seller (i) sells, or offers to sell, a material portion of its assets or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock or other equity interests that effects a change in the control of Seller or (iii) executes, or otherwise becomes subject to, a voting or other agreement or trust that effects a change in the control of Seller.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

26.1 <u>U.S. Contracts</u>. If either (i) this Contract is issued by Buyer from a location within the United States of America or its territories (as shown by the issuing address of Buyer), (ii) this Contract is issued, in whole or part, for goods to be shipped to a Buyer location within the United States of America or its territories (as shown by the ship to or receiving address of Buyer) or (iii) Seller's applicable shipping location is within the United States of America or its territories (as shown by the shipping address of Seller), then: (a) this Contract is to be construed according to the laws of the United States of America and the State of Michigan, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law, and (b) each party hereby agrees that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Contract will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue.

26.2 <u>Non-U.S. Contracts</u>. In all cases not covered by Section 26.1 above, (a) this Contract is to be construed according to the laws of the country (and state or province, if applicable) where Buyer's receiving location is located (as shown by the ship to or receiving address of Buyer), excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law; (b) any legal or equitable action or proceedings by Buyer against Seller arising out

of, or in connection with, this Contract may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in any court(s) having jurisdiction over Buyer's receiving location, in which event Seller consents to such jurisdiction and venue, including service of process in accordance with applicable procedures; and (c) any legal or equitable actions or proceedings by Seller against Buyer arising out of, or in connection with, this Contract may be brought by Seller only in the court(s) having jurisdiction over the Buyer's receiving location.

**27. SEVERABILITY**

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

**28. RIGHT TO AUDIT AND INSPECT**

Buyer, at its expense, has the right to audit and review all relevant books, records, income statements, balance sheets, cash flow statements, payroll data, receipts and other related supporting data, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to (i) substantiate any charges and other matters under this Contract and (ii) assess Seller's ongoing ability to perform its obligations under the Production Purchase Order. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits by Buyer.

**29. ENTIRE AGREEMENT**

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

**30. TRANSLATIONS**

Buyer may provide various translated versions of these General Terms and Conditions for informational purposes only. However, the original English language version of these General Terms and Conditions will apply in the event of any disagreement over the meaning or construction of any provisions of these General Terms and Conditions.

# EXHIBIT D

**Delphi - CRFM (GMX211/231/355/367) Oshawa Ontario**
**Price Adjustments - Stated in USD$**
**January 01, 2006 to 09/30/2007**
prepared by: Jessica Archer 08-21-07

Redacted

 **AUTOMODULAR ASSEMBLIES INC.**

July 19, 2007

**Doug McLean**
Senior Buyer
Delphi Global Supply Management
716-439-2480
doulgas.l.mclean@delphi.com

**RE: Early Program Termination – GMX 231 CRFM**

Doug,

As of June 19th, 2007 Delphi no longer requires sequencing and subassembly of the GMX231 CRFM, contrary to our contract ending June 30th, 2010. Automodular claims **$322,307.54** in inescapable costs calculated as follows:

| | |
|---|---|
| Annual Direct Labor Cost Include Burden: | |
| Annual Indirect Labor Cost Include Burden: | |
| Annual Manufact-uring Expense: | |
| Annual Freight Cost: | |
| Profit(removed): | |
| 231/ 211/ 365/ 367Total variable: | |
| 231(4.4%) Variable Total: | |
| | |
| 231/ 211/365/ 367 Total Fixed: | Redacted |
| 231(4.4%)Annual Fixed Total: | |
| | |
| Contract Termination Date | |
| Contract End Date | |
| Lost Production days | |
| Number of Months | |
| Calculated Variable recovery: | |
| Calculated Fixed recovery: | |
| Calculated Total Recovery: | |

I appreciate your assistance in having this processed in due course. Please feel free to contact me with any questions you may have.

Sincerely,

Jessica Anthony
Contracts Administrator
Automodular Corporation

cc. Christopher Dell, Chris Nutt, Jim Gazo, Micheal Blair

*200 MONTECORTE ST. WHITBY ON L1N9V8*
*PHONE: 905 665 0060 FAX: 905 665 4961*
*WWW.AUTOMODULAR.COM*

REDACTED

---

**From:** Chris Dell [mailto:C.Dell@automodular.net]
**Sent:** Tuesday, September 12, 2006 9:08 AM
**To:** Vandermeer, William C
**Cc:** j.gazo@automodular.com; Chris Nutt; m.blair@automodular.com; McLean, Douglas L.; Marshall McMaster; Matt Futkos
**Subject:** CRFM Contracts

Bill,

As per our conversation yesterday, the attached files are in support of the exchange and derate adjustments for Oshawa CRFM contract and third shift removal for Lordstown CRFM contract.

As previously mentioned, we need to resolve these adjustments prior to accepting any further changes to our contracts. It should be noted that GM has recognized derate and third shift removal as scope changes.

Shortfalls in daily volumes and down weeks have already been consumed by our operation. Derate and third shift removal is considered a change to the scope of work and we require our contracts to be adjusted accordingly. These adjustments are required to sustain an economically viable operation. Our management will not operate a contract at a loss.

Another consideration is to transfer the variable contract into a fixed/variable contract. We have several of these contracts with GM and it would be advantageous for both parties to entertain this. I understand that Delphi's payment system could pose a problem in implementing such a contract.

I appreciate your help in resolving these issues. Let me know what further assistance you need from me.

Sincerely,

Christopher Dell
Business Development Manager
Automodular Corporation
(905) 665-0060 (x102)
(905) 391-0077 (Cell)
(905) 665-8560 (Fax)

DEPOSITION
EXHIBIT
3

DPH 00096
CONFIDENTIAL

********************************************************************************

Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribu

or copying of this communication is strictly prohibited. If you have received this communication in erroi please notify us immediately by replying to the message and deleting it from your computer. Thank you.

****************************************************************************************

 AUTOMODULAR CORPORATION

July 19, 2006

Doug McLean
Senior Buyer
Delphi Global Supply Management
716-439-2480
doulgas.l.mclean@delphi.com

**RE: GMX001 Delphi CRFM Two-Shift Contract**

Dear Doug,

We appreciate the opportunity to quote your requirement for a two-shift operation for service into GM Lordstown assembly plant. The pricing is outlined in the attached cost breakdown by part number. (File name: 2006-07-17 GMX001 Delphi Two-Shift Cost Breakdown – Automodular.xls)

**Quotation Terms & Conditions:**

- Variable costs will be paid on units produced.
- Pricing is in US$.
- Contract is effective July 1, 2006 to December 31, 2007.
- Payment terms of 2nd day 2nd month.
- Pricing based on a two-shift, eight hour per shift operation.
- Pricing based on 63 net jobs per hour.
- Changes to number of shifts, hours per shift and net jobs per hour will be treated as a scope change and pricing will be adjusted accordingly.
- Pricing based on straight time volume of 1,008 vehicles per day and 236,880 vehicles per year.
- Transportation cost from our facility to GM is not included.
- All scope changes will be done at the rates provided in the attached cost breakdown. If any capital investment is required, it will be handled as a scope change and either paid for by Delphi upfront or the contract pricing will be adjusted accordingly.

20 TORONTO STREET SUITE 420 TORONTO ONTARIO M5C 2P8
PHONE: 416 861 0662 FAX: 416 861 0063
WWW.AUTOMODULAR.COM

- We reserve the right of setoff or recoupment against any amounts owing to Delphi and its affiliates or subsidiaries.
- Special services such as repair, rework, containment, etc will be billed accordingly. These rates are established at the start of each calendar year.

We would request that you confirm acceptance of this pricing and quotation terms & conditions no later than July 31, 2006.

Regards,

Christopher Dell
Business Development Manager
905-665-0060 x102
905-391-0077 Cell
905-665-8560 Fax

CC: Michael Blair, Christopher Nutt, JP Kelly

DELPHI AUTOM[illegible]E SYSTEMS
DELPHI GLOBAL PURCHASING
PIECE PRICE BREAKDOWN WORKSHEET

Redacted

DPH 00100
CONFIDENTIAL

DELPHI GLOBAL PURCHASING

**PIECE PRICE BREAKDOWN WORKSHEET**

Redacted

DPH 00101
CONFIDENTIAL

 AUTOMODULAR CORPORATION

August 16, 2006

**Doug McLean**
Senior Buyer
Delphi Global Supply Management
716-439-2480
doulgas.l.mclean@delphi.com

RE: GMX211/231/365/367 CRFM De-Rate Scope Change & Exchange Adjustment

Dear Doug:

Please find below the updated table outlining the purchase orders and part numbers along with the required pricing at the specific dates for each of the adjustments noted in our letter dated June 12th, 2006, and the July 1st currency adjustment.

| Purchase Order # | Part # |
|---|---|
| 550059352 | 52406053 |
| 550060368 | 52406299 |
| 550072058 | 52445908 |
| 550074793 | 52410855 |
| 550078476 | 52415724 |
| 550078478 | 52415725 |
| 550078479 | 52415727 |
| 550078480 | 52445588 |
| 550078481 | 52445589 |

Redacted

The calculation of the price adjustments above are as follows:

Redacted

*20 TORONTO STREET SUITE 420 TORONTO ONTARIO M5C 2P8*
*PHONE: 416 861 0662 FAX: 416 861 0063*
*WWW.AUTOMODULAR.COM*

Redacted

Give me a call if you have any questions. Please fax a copy of the adjusted purchase orders to 905-665-8560 and/or e-mail a copy to j.anthony@automodular.net

Regards,

Jessica Anthony
Business Development – Contract Administrator
905-665-0060 x155
905-213-9718 Cell

CC: Michael Blair, Jim Gazo, Christopher Nutt, Marshall McMaster

Redacted

**From:** Jessica Anthony [mailto:J.Anthony@automodular.net]
**Sent:** Wednesday, January 09, 2008 11:58 AM
**To:** McLean, Douglas L.
**Cc:** Chris Dell; Chris Nutt; Marshall McMaster; Michael Blair; Jim Gazo
**Subject:** 2008-01-01 Exchange adjustment

Doug,

Please see the attached price adjustment effective January 1, 2008.

Jessica Anthony
Contract Administrator - Business Development
Automodular Corporation
Tel: (905) 665-0060 x. 155
Cell: (905)213-9718
Fax: (905)665-8560

"As a world class Assembly and Sequencing operation, we will meet or exceed our customer's expectations and be competitive through continuous improvement. Our goal is zero defects."

This e-mail and any files transmitted with it may contain confidential information and is intended for the use of the individual to whom they are addressed. If you have received this e-mail in error, please contact the sender and delete all copies. Any review, disclosure, copying, distribution or use of this transmission or its contents by unintended recipients is expressly prohibited.

Please consider the environment before printing this e-mail message.

*****************************************************************************

Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribu or copying of this communication is strictly prohibited. If you have received this communication in erroı please notify us immediately by replying to the message and deleting it from your computer. Thank you.

*****************************************************************************

DEPOSITION
EXHIBIT
4

## Daily closing foreign exchange rates

Nominal quotations based on official parities or market rates, in terms of US dollars converted into Canadian dollars. Updated at about 4:30 p.m. EST the same business day.

| | 27 December 2007 | 28 December 2007 | 31 December 2007 | 01 January 2008 | 02 January 2008 | |
|---|---|---|---|---|---|---|
| **U.S. dollar** | 0.9826 | 0.9805 | 0.9913 | NA | 0.9928 | Graph |
| **Australian dollar** | 0.8617 | 0.8581 | 0.8691 | NA | 0.8774 | Graph |
| **Danish krone** | 0.1925 | 0.1935 | 0.1939 | NA | 0.1962 | Graph |
| **European Monetary Union euro** | 1.4355 | 1.4428 | 1.4457 | NA | 1.4623 | Graph |
| **Hong Kong dollar** | 0.125922 | 0.12563 | 0.127098 | NA | 0.127089 | Graph |
| **Japanese yen** | 0.008643 | 0.008704 | 0.008868 | NA | 0.009067 | Graph |
| **Mexican peso** | 0.0903 | 0.08995 | 0.09079 | NA | 0.09096 | Graph |
| **New Zealand dollar** | 0.7566 | 0.7592 | 0.7591 | NA | 0.7699 | Graph |
| **Norwegian krone** | 0.1799 | 0.1812 | 0.1822 | NA | 0.1839 | Graph |
| **Swedish krona** | 0.1516 | 0.1531 | 0.1532 | NA | 0.1553 | Graph |
| **Swiss franc** | 0.8616 | 0.87 | 0.8726 | NA | 0.888 | Graph |
| **UK pound sterling** | 1.9598 | 1.9542 | 1.9653 | NA | 1.9666 | Graph |

**Bank of Canada**

 **AUTOMODULAR CORPORATION**

January 3rd, 2008

**Doug McLean**
Senior Buyer
Delphi Global Supply Management
716-439-2480
doulgas.l.mclean@delphi.com

**RE: GMX211CRFM Exchange Adjustment**

Dear Doug:

Please find attached (Appendix A) the updated table outlining the part numbers along with the required pricing at the specific dates for each of the adjustments (updated to include the exchange adjustment for January 1, 2008).

Please make the required adjustments to our current purchase orders at the specific effective dates and forward to my attention.

Give me a call if you have any questions. Please fax a copy of the adjusted purchase orders to 905-665-8560 and/or e-mail a copy to j.anthony@automodular.net

Regards,

Jessica Anthony
Business Development – Contract Administrator
905-665-0060 x155
905-213-9718 Cell

CC: Chris Dell, Michael Blair, Jim Gazo, Christopher Nutt, Marshall McMaster

Appendix A

| | Adjustment Effective Date |
|---|---|
| Exchange | 1.103 |
| vehicles produced per day | 2630 |
| Misc. scope change | |
| Part # | Jan-06 |
| 52415724 | 4.9424 |
| 52415725 | 4.9424 |
| 52415727 | 4.9424 |
| 52445588 | 4.9424 |
| 52417036 | 5.0319 |
| 52445589 | 40.5968 |

A) Oshawa Car Plant #2 derate 63.25 jph
B) Exchange adjustment April 2006
C) Oshawa Car Plant #2 derate 55 jph
D) Exchange adjustment July 2006
E) Oshawa Car Plant #1 derate 61.5 jph
F) Exchange adjustment October 2006
G) Label and Clip Addition-remove "M"
H) Rebate for Grease application
I) Foam pad install - Car plant #2
J) Foam pad install - Car plant #1
K) Exchange adjustment January 2007
L) Oshawa Car Plant #2 derate 46.4 jph
M) Correction adjustment per (G)
N) Exchange adjustment April 2007
O) Exchange adjustment July 2007
P) Oshawa Car Plant #1 derate 59.5 jph
Q) Exchange adjustment October 2007
R) Exchange adjustment January 2008

Redacted

DPH 00406
CONFIDENTIAL



# Scope Change Form

**WWP Log #:** ____________
**Purchase Order #:** ____________

☐ Add ☑ Change ☐ Delete

## GM Assembly Plant Section

Requester Name: Jeffery Buller
Requester Telephone: 905-644-1003

Request Date: May 11, 2006
Effective Date: July 17, 2006

GM Assembly Plant: Oshawa Car Assembly

Supplier Name: Automodular Inc.

Vehicle Lines Effected by change: Chevy

PAD or Drawing Document included: Yes ____ No x

Description of Scope Change (if possible, include digital picture): Effective July 17, 2006 – the Chevy Impala and Monte Carlo will have a volume adjustmet – Build requirements will go to 1478 over 3 shifts. Days and Afternoons will equal 506 per shift and Midnights will equal 466. Please have your adjustments to purchasing no later than June 9, 2006.

Account Code (ex. Materials)
GM Internal – *Do not input until Purchasing requests:* ____________

Jeffery Buller May 11, 2006
GM Assembly Plant 3rd Coordinator Date

## Supplier Section

Price Impact for Change: ____________
Zero Cost Impact: ____________

Lead Time to Implement Change: ____________

Tooling/Other Costs for Change: ____________

____________ ____________
Supplier Date

____________ ____________
WWP Buyer Date

ALL Scope Changes should follow the appropriate course before being applied.

Assy. Plant → WWP → Supplier → WWP → Assy. Plant → Assy. Plant Issues Purchase Requisition

Confidential
AUTO-219

GM

# Scope Change Form

**Purchase Order #:**

☐ Add ☑ Change ☐ Delete

## GM Assembly Plant Section

Requester Name: Tony Monaco

Requester Telephone: 30-824-5049

Request Date: 9-27-2006

Effective Date: Four phase's final phase 1/2/2007

GM Assembly Plant: Lordstown

Supplier Name: Automodular Lordstown & Comprehensive Logistics Lordstown

Vehicle Lines Effected by change: Cobalt

PAD or Drawing Document Included: Yes ____ No x

Description of Scope Change (if possible, include digital picture): Submit costing for the following changes:

1. **July:** Reduction of one eight hour shift. (Three to two) final build rate changes from 1296 per day to 1008 per day.
2. **September:** Change in shift requirements from eight hours per shift to nine hours per shift. Change build rate from 1008 per day to 1100 per day.
3. **November:** Change in daily build requirements from 1100 per day to 1136 per day due to line speed increase.
4. **January (2007):** Change in daily build requirements from 1136 per day to 1154 per day due to line speed increase.

Submit all costing to WWP buyer Robin Williams using requested purchasing documentation and format.

Account Code (ex. Materials)
GM Internal -- *Do not input until Purchasing requests*:

Tony Monaco 9/26/2006
GM Assembly Plant 3rd Party Mgr. Date

## Supplier Section

Price Impact for Change:

Zero Cost Impact:

Confidential
AUTO-280

AUTOMODULAR ASSEMBLIES INC.

Liz Williams
Buyer
Delphi Harrison Thermal Systems
Building 7 South
Lockport, NY 14094

12/20/04

Liz:

As you are aware, when Automodular began the CRFM contract in Lordstown with Delphi, we were directed by Delphi to purchase screw part number 52497812 from ITW Medalist. The source and price for the screw were directed by Delphi and Automodular passed the cost through on our piece price plus associated markup for freight, scrap and admin.

As per the attached ITW letter, we regret to inform you that due to a price increase from ITW on our purchased part screw, we must pass the increase through to Delphi.

Please review summary below

| Item | Current Screw Price | New Screw Price Effective Immediately | Increase |
|---|---|---|---|
| Price per screw | | | |
| Allowance for freight, scrap and Admin @ 15% | | | |
| **AAI price to Delphi per Purchased Screw** | | Redacted | |
| Number of Screws per CRFM | | | |
| **Sub-Total per CRFM** | | | |
| Screws per Tuner Coupe | | | |
| **Sub-Total per Tuner Coupe** | | | |

**Price increase to all RFMs in Lordstown =** Redacted **effective January 1, 2005.**
**Price increase to all CRFMs in Lordstown =** Redacted **effective January 1, 2005.**
**Price increase to Tuner Coupe in Lordstown =** Redacted **effective January 1, 2005.** ✓

**Please note that this situation is urgent and we need confirmation of Delphi's acceptance of this increase ASAP in order to ensure we place our next order in time to maintain supply.**

If you have any questions, or concerns, do not hesitate to call me.

Regards,

Travis Doyle
Advance Planning
Automodular Assemblies

CC: W. Ash, C. Dell, R. Baranowski, J. Gazo

DEPOSITION EXHIBIT 6

Confidential
AUTO-383

Gregory Conley
VSE Manager
Delphi Harrison Thermal Systems
Building 7 South
Lockport, NY 14094

1/16/04

Greg:

As per your request, Automodular has tabulated an estimate for cancellation charges should Delphi decide to cancel their sequencing and subassembly agreement with Automodular for the GMX 001.

APQP Meetings

Layout Preparation and Planning

Time / Travel to Lordstown for Facility Investigations

Time / Travel for PPAP run at New Tech.

Preparation of PPAP documentation

Process Flow Diagram

FMEA

Control Plan

Redacted

TOTAL

If you have any questions, or concerns, do not hesitate to call me.

Regards,

Travis Doyle
Advance Planning
Automodular Assemblies

CC: W. Ash, C. Dell, R. Baranowski

| Customer Name | Customer Part# | Current | Revised |
|---|---|---|---|
| | | Price per M | Price Per M |
| AUTOMODULAR ASSEMBLIES | 52497812 | Redacted | |
| AUTOMODULAR ASSEMBLIES | 52495663 | | |

ITW Medalist
An Illinois Tool Works Company
2700 York Road
Elk Grove Village, Illinois 60007
Telephone 847.766.9000
Fax 847.766.3645

ITW Medalist

December 1, 2004

Colleen Stoch
AUTOMODULAR ASSEMBLIES
200 Montecorte Street
Whitby, Ontario L1N 9V8
CANADA

Dear Colleen Stoch,

The global shortage of steel in 2004 has resulted in supply shortages and higher prices. Due to the actions of the steel industry and having absorbed these increases in 2004, we have no alternative but to revise our prices effective January 1, 2005.

We understand that this comes at a time when we are all trying to help the North American automobile manufacturers produce great products at world class competitive prices. Our manufacturing productivity gains and cost reduction programs are no longer able to contain the cost drivers presented to us by the steel industry.

To assure sufficient materials from our steel sources for your product, ITW must commit to the higher steel price levels. ITW Medalist is unable to make these commitments unless you accept our new prices by signing this letter below and issuing amendments to our existing contracts. We must receive your acceptance by December 15th, to protect deliveries. Non-acceptance may result in a supply interruption. Please forward your acceptance via fax at 847-766-3645.

We regret that the forces that impact worldwide steel economics have compelled us to take this action. Attached you will find a worksheet with the new prices. Please advise if you require any additional information.

Yours truly,

KIM VOINOVICH,
Account Service Manager
ITW MEDALIST

Accepted by: Name: (Printed) ____________________

Signature: ____________________

Date: ____________________

attachment

**McLean, Douglas L.**

**From:** Chris Dell [C.Dell@automodular.net]
**Sent:** Thursday, October 05, 2006 6:45 PM
**To:** McLean, Douglas L.
**Cc:** Conley, Greg R.; Vandermeer, William C; m.blair@automodular.com; Chris Nutt; j.gazo@automodular.com; Marshall McMaster
**Subject:** GMX211/231/365/367 CRFM Contract
**Attachments:** 2006-10-05 GMX211+231+365+367 CRFM Contract.doc; GMX211+231+365+367 CRFM Price Adjustment Table (10-03-06).xls; GMX211+231+365+367 CRFM Purchased Parts (10-03-06).xls; 2006-10-01 GMX211+231+365+367 CRFM Cost Breakdown.xls

Doug,

Please see the attached files based on the outcome of the contract review discussions with Greg and Bill. I appreciate if you could respond accordingly.

Thanks

Chris

DPH 00481
CONFIDENTIAL

DEPOSITION
EXHIBIT
7

DELPHI HARRISON PURCH Fax 716-439-2216 Jan 30 2008 04:12pm P002/005

AUTOMODULAR CORPORATION

October 5, 2006

**Doug McLean**
Senior Buyer
Delphi Global Supply Management
716-439-2480
douglas.l.mclean@delphi.com

**RE: GMX211/231/365/367 CRFM Contract**

Dear Doug:

Based on the outcome of the contract review with Greg and Bill, please accept the following:

1. $81,364 is owed to Delphi from Automodular relating to the agreed upon adjustments from July 1, 2005 to September 30, 2006 as outlined in the attached excel file labeled "GMX211+231+365+367 CRFM Price Adjustment Table (10-03-06)". I would recommend this amount be charged against our account for the next payment period.
2. As of October 1, 2006 the pricing has been defined in the cost breakdown for each part as outlined in the attached excel file labeled "2006-10-01 GMX211+231+365+367 CRFM Cost Breakdown". Incorporated in the pricing are the adjustments as outlined in 1 and the exchange rate adjustment for October 1, 2006.
3. Pricing as of October 1, 2006 is based on an exchange rate of 1.0965
4. Pricing is based on 61.5 net JPH for Oshawa Car #1 and 55 net JPH for Oshawa Car #2. Daily volumes equate to 2,356 units per day. Any future change to net JPH will be considered a change in the scope of work and pricing will be adjusted accordingly.
5. Pricing is based on the purchased parts as defined in the attached excel file labeled "GMX211+231+365+367 CRFM Purchased Parts (10-03-06)". Any addition to, removal of or change to the cost of the purchased parts will result in revised pricing and will be adjusted accordingly.
6. Upon Delphi acceptance of the above and receipt of the purchase orders with the pricing defined in 2, Automodular will absorb the addition of the foam pad in our process at no additional cost provided that GP12 containment is not required, Delphi will provide the foam pads in a roll with a dispenser at Delphi's cost and Delphi will error proof the process at Delphi's cost.

Please confirm your acceptance and forward the revised purchase orders.

Regards,

Christopher Dell
Business Development Manager
Automodular Corporation
905-665-0060 x102
905-665-8560 Fax
905-391-0077 Cell

CC: Greg Conley, Bill Vandermeer, Michael Blair, Jim Gazo, Christopher Nutt, Marshall McMaster

*20 TORONTO STREET SUITE 420 TORONTO ONTARIO M5C 2P8*
*PHONE: 416 861 0662 FAX: 416 861 0063*
*WWW.AUTOMODULAR.COM*

DPH 00482
CONFIDENTIAL

GMX211+231+365+367 CRFM Price Adjustment Table (10-03-06).xls
2005 Adjustments

| | | GM OSHAWA CAR PRODUCTION | | | | | |
|---|---|---|---|---|---|---|---|
| | | Plant #1 | | Plant #2 | | TOTAL | |
| START | END | TOTAL | CUM | TOTAL | CUM | TOTAL | CUM |
| 1-Jul-05 | 9-Jul-05 | - | - | - | - | - | - |
| 10-Jul-05 | 16-Jul-05 | - | - | - | - | - | - |
| 17-Jul-05 | 23-Jul-05 | 3,445 | 3,445 | 5,003 | 5,003 | 8,448 | 8,448 |
| 24-Jul-05 | 30-Jul-05 | 4,490 | 7,935 | 5,319 | 10,322 | 9,809 | 18,257 |
| 31-Jul-05 | 6-Aug-05 | 5,511 | 13,446 | 5,033 | 15,355 | 10,544 | 28,801 |
| 7-Aug-05 | 13-Aug-05 | 5,888 | 19,334 | 5,276 | 20,631 | 11,164 | 39,965 |
| 14-Aug-05 | 20-Aug-05 | 6,062 | 25,396 | 5,422 | 26,053 | 11,484 | 51,449 |
| 21-Aug-05 | 27-Aug-05 | 7,619 | 33,015 | 5,926 | 31,979 | 13,545 | 64,994 |
| 28-Aug-05 | 3-Sep-05 | 5,246 | 38,261 | 3,395 | 35,374 | 8,641 | 73,635 |
| 4-Sep-05 | 10-Sep-05 | 5,328 | 43,589 | 4,206 | 39,580 | 9,534 | 83,169 |
| 11-Sep-05 | 17-Sep-05 | 7,777 | 51,366 | 5,945 | 45,525 | 13,722 | 96,891 |
| 18-Sep-05 | 24-Sep-05 | 7,551 | 58,917 | 5,861 | 51,386 | 13,412 | 110,303 |
| 25-Sep-05 | 1-Oct-05 | 7,399 | 66,316 | 6,179 | 57,565 | 13,578 | 123,881 |
| 2-Oct-05 | 8-Oct-05 | 5,910 | 72,226 | 4,237 | 61,802 | 10,147 | 134,028 |
| 9-Oct-05 | 15-Oct-05 | 6,978 | 79,204 | 4,153 | 65,955 | 11,131 | 145,159 |
| 16-Oct-05 | 22-Oct-05 | 7,532 | 86,736 | 6,432 | 72,387 | 13,964 | 159,123 |
| 23-Oct-05 | 29-Oct-05 | 8,602 | 95,338 | 5,905 | 78,292 | 14,507 | 173,630 |
| 30-Oct-05 | 5-Nov-05 | 8,248 | 103,586 | 5,922 | 84,214 | 14,170 | 187,800 |
| 6-Nov-05 | 12-Nov-05 | 8,270 | 111,856 | 5,827 | 90,041 | 14,097 | 201,897 |
| 13-Nov-05 | 19-Nov-05 | 9,450 | 121,306 | 6,273 | 96,314 | 15,723 | 217,620 |
| 20-Nov-05 | 26-Nov-05 | 7,730 | 129,036 | 5,862 | 102,176 | 13,592 | 231,212 |
| 27-Nov-05 | 3-Dec-05 | 9,301 | 138,337 | 5,166 | 107,342 | 14,467 | 245,679 |
| 4-Dec-05 | 10-Dec-05 | 8,189 | 146,526 | 5,352 | 112,694 | 13,541 | 259,220 |
| 11-Dec-05 | 17-Dec-05 | 8,310 | 154,836 | 5,274 | 117,968 | 13,584 | 272,804 |
| 18-Dec-05 | 24-Dec-05 | 7,720 | 162,556 | 5,374 | 123,342 | 13,094 | 285,898 |
| 25-Dec-05 | 31-Dec-05 | - | 162,556 | - | 123,342 | - | 285,898 |
| | TOTAL | 162,556 | | 123,342 | | 285,898 | |

Redacted

DPH 00483
CONFIDENTIAL

GMX211+231+365+367 CRFM Price Adjustment Table (10-03-06).xls

GM OSHAWA CAR PRODUCTION

| | | Plant #1 | | Plant #2 | | TOTAL | |
|---|---|---|---|---|---|---|---|
| START | END | TOTAL | CUM | TOTAL | CUM | TOTAL | CUM |
| 1-Jan-06 | 7-Jan-06 | 6,209 | 6,209 | 4,289 | 4,269 | 10,498 | 10,498 |
| 8-Jan-06 | 14-Jan-06 | 7,804 | 14,013 | 5,420 | 9,709 | 13,224 | 23,722 |
| 15-Jan-06 | 21-Jan-06 | 7,808 | 21,821 | 5,402 | 15,111 | 13,210 | 36,932 |
| 22-Jan-06 | 28-Jan-06 | 7,833 | 29,654 | 5,112 | 20,223 | 12,945 | 49,877 |
| 29-Jan-06 | 4-Feb-06 | 7,562 | 37,216 | - | 20,223 | 7,562 | 57,439 |
| 5-Feb-06 | 11-Feb-06 | 7,766 | 44,982 | 5,127 | 25,350 | 12,893 | 70,332 |
| 12-Feb-06 | 18-Feb-06 | 7,681 | 52,663 | 5,087 | 30,437 | 12,768 | 83,100 |
| 19-Feb-06 | 25-Feb-06 | 7,702 | 60,365 | 5,040 | 35,477 | 12,742 | 95,842 |
| 26-Feb-06 | 4-Mar-06 | 7,677 | 68,042 | - | 35,477 | 7,677 | 103,519 |
| 5-Mar-06 | 11-Mar-06 | 7,754 | 75,796 | 4,906 | 40,383 | 12,660 | 116,179 |
| 12-Mar-06 | 18-Mar-06 | 7,186 | 82,982 | - | 40,383 | 7,186 | 123,365 |
| 19-Mar-06 | 25-Mar-06 | 8,939 | 91,921 | - | 40,383 | 8,939 | 132,304 |
| 26-Mar-06 | 1-Apr-06 | 7,723 | 99,644 | 5,170 | 45,553 | 12,893 | 145,197 |
| 2-Apr-06 | 8-Apr-06 | 7,606 | 107,250 | 5,086 | 50,639 | 12,692 | 157,889 |
| 9-Apr-06 | 15-Apr-06 | 6,040 | 113,290 | 4,191 | 54,830 | 10,231 | 168,120 |
| 16-Apr-06 | 22-Apr-06 | 6,025 | 119,315 | 4,008 | 58,838 | 10,033 | 178,153 |
| 23-Apr-06 | 29-Apr-06 | 7,553 | 126,868 | 5,231 | 64,069 | 12,784 | 190,937 |
| 30-Apr-06 | 6-May-06 | - | 126,868 | - | 64,069 | - | 190,937 |
| 7-May-06 | 13-May-06 | 7,500 | 134,368 | 3,889 | 67,958 | 11,389 | 202,326 |
| 14-May-06 | 20-May-06 | 6,173 | 140,541 | 3,000 | 70,958 | 9,173 | 211,499 |
| 21-May-06 | 27-May-06 | 6,197 | 146,738 | 3,163 | 74,121 | 9,360 | 220,859 |
| 28-May-06 | 3-Jun-06 | 7,390 | 154,128 | 4,037 | 78,158 | 11,427 | 232,286 |
| 4-Jun-06 | 10-Jun-06 | 7,402 | 161,530 | 4,416 | 82,574 | 11,818 | 244,104 |
| 11-Jun-06 | 17-Jun-06 | 7,400 | 168,930 | 4,497 | 87,071 | 11,897 | 256,001 |
| 18-Jun-06 | 24-Jun-06 | 7,136 | 176,066 | 3,823 | 90,894 | 10,959 | 266,960 |
| 25-Jun-06 | 1-Jul-06 | 5,540 | 181,606 | 3,489 | 94,383 | 9,029 | 275,989 |
| 2-Jul-06 | 8-Jul-06 | - | 181,606 | - | 94,383 | - | 275,989 |
| 9-Jul-06 | 15-Jul-06 | - | 181,606 | - | 94,383 | - | 275,989 |
| 16-Jul-06 | 22-Jul-06 | 6,691 | 188,297 | 4,463 | 98,846 | 11,154 | 287,143 |
| 23-Jul-06 | 29-Jul-06 | 7,373 | 195,670 | 4,416 | 103,262 | 11,789 | 298,932 |
| 30-Jul-06 | 5-Aug-06 | 7,061 | 202,731 | 4,200 | 107,462 | 11,261 | 310,193 |
| 6-Aug-06 | 12-Aug-06 | 8,267 | 210,998 | 4,400 | 111,862 | 12,667 | 322,860 |
| 13-Aug-06 | 19-Aug-06 | 7,825 | 218,823 | 4.400 | 116,262 | 12,225 | 335,085 |
| 20-Aug-06 | 26-Aug-06 | 8,342 | 227,165 | 4,400 | 120,662 | 12,742 | 347,827 |
| 27-Aug-06 | 2-Sep-06 | 5,829 | 232,994 | 3,520 | 124,182 | 9,349 | 357,176 |
| 3-Sep-06 | 9-Sep-06 | 6,762 | 239,756 | 3,600 | 127,782 | 10,362 | 367,538 |
| 10-Sep-06 | 16-Sep-06 | 7,523 | 247,279 | 4,440 | 132,222 | 11,963 | 379,501 |
| 17-Sep-06 | 23-Sep-06 | 8,611 | 255,790 | 4,440 | 136,662 | 12,951 | 392,452 |
| 24-Sep-06 | 30-Sep-06 | 7,919 | 263,709 | 4,490 | 141,152 | 12,409 | 404,861 |
| 1-Oct-06 | 7-Oct-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 8-Oct-06 | 14-Oct-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 15-Oct-06 | 21-Oct-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 22-Oct-06 | 28-Oct-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 29-Oct-06 | 4-Nov-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 5-Nov-06 | 11-Nov-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 12-Nov-06 | 18-Nov-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 19-Nov-06 | 25-Nov-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 26-Nov-06 | 2-Dec-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 3-Dec-06 | 9-Dec-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 10-Dec-06 | 16-Dec-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 17-Dec-06 | 23-Dec-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| 24-Dec-06 | 30-Dec-06 | - | 263,709 | - | 141,152 | - | 404,861 |
| | TOTAL | 263,709 | | 141,152 | | 404,861 | |

Redacted

Confidential

DPH 00484
CONFIDENTIAL

GMX211+231+365+367 CRFM Purchased Parts (10-03-06).xls

## CRFM Purchased Parts

| Item | Part Number | Description | P.O Date | Price (USD) | Quantity | Unit Price (USD) | With 20% Markup (Freight, Scrap, Management) | Notes |
|---|---|---|---|---|---|---|---|---|
| 1 | 52495663 | M8.0 x 20 Bolt/Screw | 22-May-06 | Redacted | | | | |
| 2 | 52498650 | Clips for CRFM | 16-Jun-06 | | | | | |
| 3 | 760G | NYOGEL | 16-Jun-06 | | | | | 2 gms of NYOGEL applied |
| 4 | 52467149 | CRFM Labels | 21-Jun-06 | | | | | |
| 5 | FGA053PV | Printer Ribbons | 21-Jun-06 | | | | | 3 days of use |
| 6 | 03710 | Expendable Container | | | | | | Service Part Only (Ship to Tillsonburg) |

| CRFM - ATK | | | Redacted | CRFM - ATF | | | Redacted |
|---|---|---|---|---|---|---|---|
| Delphi Part Number | Number of Bolt/Screw | 4 | | Delphi Part Number | Number of Bolt/Screw | 4 | |
| 52415724 | Number of Clips | 1 | | 52415726 | Number of Clips | 0 | |
| | NYOGEL | 2 Grams | | | NYOGEL | 2 Grams | |
| GM Part Number | CRFM Label | 1 | | GM Part Number | CRFM Label | 1 | |
| 15298831 | Printer Ribbons | N/A | | 15805146 | Printer Ribbons | N/A | |
| | Expendable Container | 0 | | | Expendable Container | 0 | |
| | Purchased Parts Price (USD) | | | | Purchased Parts Price (USD) | | |
| CRFM - ATJ | | | | CRFM - AUD (Cop Car) | | | |
| Delphi Part Number | Number of Bolt/Screw | 4 | | Delphi Part Number | Number of Bolt/Screw | 4 | |
| 52415727 | Number of Clips | 0 | | 52417036 | Number of Clips | 1 | |
| | NYOGEL | 2 Grams | | | NYOGEL | 2 Grams | |
| GM Part Number | CRFM Label | 1 | | GM Part Number | CRFM Label | 1 | |
| 15802026 | Printer Ribbons | N/A | | 15806867 | Printer Ribbons | N/A | |
| | Expendable Container | 0 | | | Expendable Container | 0 | |
| | Purchased Parts Price (USD) | | | | Purchased Parts Price (USD) | | |
| CRFM - ATH | | | | CRFM - Service Part | | | |
| Delphi Part Number | Number of Bolt/Screw | 4 | | Delphi Part Number | Number of Bolt/Screw | 4 | |
| 52416726 | Number of Clips | 0 | | 52445889 | Number of Clips | 0 | |
| | NYOGEL | 2 Grams | | | NYOGEL | 2 Grams | |
| GM Part Number | CRFM Label | 1 | | GM Part Number | CRFM Label | 1 | |
| 15805147 | Printer Ribbons | N/A | | | Printer Ribbons | N/A | |
| | Expendable Container | 0 | | | Expendable Container | 1 | |
| | Purchased Parts Price (USD) | | | | Purchased Parts Price (USD) | | |

DPH 00485
CONFIDENTIAL

P005/005

DELPHI AUTOMOTIVE SYSTEMS
DELPHI GLOBAL PURCHASING
PIECE PRICE BREAKDOWN WORKSHEET

Redacted

DPH 00486
CONFIDENTIAL

11/30/2006 07:11 FAX 602 787 6516 005

# Type: Debit

Disbursement Services

321 Entry Type

| | | |
|---|---|---|
| Remit DUNS # | RD | 248464273 |
| Supplier Name | | AUTOMODULAR ASSEMBLIES INC |
| Plant Code | | J2 |
| Document # | | ADM 11200618393100 |
| Doc Date | | 11/20/2006 |
| Doc Total | | $183,931.00 |
| Doc Prevg Due Date | | |
| Currency | | USD |
| BOL | | 1120061839310 |
| Ship Date | | |
| Terms | | A |
| Desc | | TO DEBIT DUE TO OVERCHARGING FOR GREASE BASED ON DOCUMENTATION ATTACHED AND NEGOTIATIONS |

Multi PO Y Multi Plt Y

PO# MEMO:

| Chrg type | Account Number | Work Order | Total $ |
|---|---|---|---|
| ADJ | J28451000010000000009960000 | | $183,931.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |

| Part # | Qty | UOM | Unit Price | Contract (PO) | Part Total $ |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

☐ See attached for parts contract information

Cancle Reference Information

| DUNS No | Plt Code | Doc Type | Document No |
|---|---|---|---|
| | | | |
| | | | |

Other Required Information

Dup Check Completed ☑ Date 11/29/2006

Submitted By BRADSTOCKSM Phone See Attached for Approval

Approvals (for 321):

Supervisor: __________

Manager or 7th Level: __________

DEPOSITION EXHIBIT 8

063349090002_000501625652

Confidential
AUTO-281

11/30/2006 07:11 FAX 602 787 6510 006

DELPHI PURCHASING LOCK Fax 716-439-3018 Nov 28 2006 12:12pm P006/025

2006 NOV 24 PM 1:28

0633490990002-0005016256652

DELPHI

**FOR INVOICES ALREADY PAID AND MISC. ADJUSTMENTS**

CHECK ONE: MDM: MANUAL DEBIT MEMO [X] MCM: MANUAL CREDIT MEMO [ ]

REQUESTED BY: Douglas McLean
VENDOR NUMBER: RD248464273
PURCHASE ORDER:

VENDOR: Automodular
DOC. TYPE: 04MDM
DOC. DATE: 11/20/2006

DESCRIPTION: (TWO LINES TOTAL OF 74 CHARACTERS)

1 To debit Automodular due to overcharging for grease based on documentation attached and negotiations with Automodular.

2 Ref. Part No. 52415724

FOR ATTACHMENT PLEASE PUT (SEE ATTACHED) IN THE DESCRIPTION

QTY. READS:
QTY. S/READ:
PRICE READS:
PRICE/READ:
PART DESCRIPTION:
(25 POSITIONS FOR DOC. PART ENTRY, ONLY 15 FOR CHARGE TYPE)

| ACCOUNT DISTRIBUTION: | W.O.# | AMOUNT |
|---|---|---|
| J2 - 8451 - 00001 - 00000 - 000 - 998 - 0000 ✓ | | $183,931.00 |

APPROVAL VERIFICATION [signature] SIGNATURE 11-22-06

*If over $50,000 or 50,000 items must have approval from Director of Purchasing and Comptroller.

TOTAL ADJUSTING DOCUMENT AMOUNT: $183,931.00

PROCESSING INSTRUCTIONS

ADJUSTING DOCUMENT NUMBER
DOCUMENTS TO CROSS REFERENCE:

TUSCALOOSA REF#
VENDOR # REF#

[signature] 11/20/06
AUTHORIZED SIGNATURE
[signature] 11/20/06
PURCHASING
[signature] 11-22-06
*Director of Purchasing (Over $50,000)

*Comptroller (Over $50,000)

MAIL TO:
Automodular Assemblies Inc.
940 Thorton Road S
Oshawa, Ontario, Canada L1J 7E2
Chris Dell
CC: Ron Burrell, D. Askey, B. Patterson, file

PUR505-2 - 02/05/03

Confidential
AUTO-282



**From:** Chris Dell [C.Dell@automodular.net]
**Sent:** Monday, October 30, 2006 12:56 PM
**To:** McLean, Douglas L.
**Cc:** m.blair@automodular.com
**Subject:** RE: GMX211/231/365/367 CRFM Contract

**Attachments:** Delphi GMX211+231+365+367 CRFM Pricing Dispute (November 1, 2006).doc

Dear Doug,

Automodular agrees with the changes regarding foreign exchange. Automodular disagrees with any other changes proposed by Delphi without a comprehensive adjustment for the scope change arising from the de-rate, and particularly any adjustment for purchased components. Delphi cannot make unilateral changes to the contract with Automodular and should Delphi purport to do so, Automodular will take appropriate action. Automodular remainswilling to negotiate in good faith with Delphi to reach an equitable adjustment. In this context, I am attaching a letter from our Chief Executive Officer. A copy will be mailed today.

Sincerely,

Christopher Dell
Business Development Manager
Automodular Corporation
905-665-0060 x102
905-665-8560 Fax

---

**From:** McLean, Douglas L. [mailto:Douglas.L.McLean@delphi.com]
**Sent:** Mon 10/30/2006 11:52 AM
**To:** McLean, Douglas L.; Chris Dell
**Cc:** Conley, Greg R.; Vandermeer, William C; m.bilair@automodular.com; Chris Nutt; j.gazo@automodular.com; Marshall McMaster; Carrie Hyde
**Subject:** RE: GMX211/231/365/367 CRFM Contract

I forgot to add that the 10/1/06 pricing will be reduced by Redacte This reflect the overcharge for grease that is still in the base price.

---

**From:** McLean, Douglas L.
**Sent:** Monday, October 30, 2006 11:09 AM
**To:** 'Chris Dell'
**Cc:** Conley, Greg R.; Vandermeer, William C; m.bilair@automodular.com; Chris Nutt; j.gazo@automodular.com; Marshall McMaster; 'Carrie Hyde'
**Subject:** RE: GMX211/231/365/367 CRFM Contract

I will be correcting the purchase orders today to accommodate the currency fluctuation. I will also be adding the cost of the label and clip effective 10/1/06 the earlier cost will be subtracted from the amount that was overcharged for the grease. I will issue a debit memo for the overcharge of the grease based on the file that you sent me.

Total overcharge 186,046

Redacted

As far as the cost to install the foam pad we are still analyzing. You are requesting Redac per assemble and we have quotes from you that state as follows:
10/3/05
12/8/05 Redacted

**From:** Chris Dell [mailto:C.Dell@automodular.net]
**Sent:** Thursday, October 05, 2006 6:45 PM
**To:** McLean, Douglas L.
**Cc:** Conley, Greg R.; Vandermeer, William C; m.bilair@automodular.com; Chris Nutt; j.gazo@automodular.com; Marshall McMaster
**Subject:** GMX211/231/365/367 CRFM Contract

DEPOSITION EXHIBIT 9



**AUTOMODULAR CORPORATION**

August 16, 2006

**Doug McLean**
Senior Buyer
Delphi Global Supply Management
716-439-2480
doulgas.l.mclean@delphi.com

RE: GMX211/231/365/367 CRFM De-Rate Scope Change & Exchange Adjustment

Dear Doug:

Please find below the updated table outlining the purchase orders and part numbers along with the required pricing at the specific dates for each of the adjustments noted in our letter dated June 12th, 2006, and the July 1st currency adjustment.

| Purchase Order # | Part # |
|---|---|
| 550059352 | 52406053 |
| 550060368 | 52406299 |
| 550072058 | 52445908 |
| 550074793 | 52410855 |
| 550078476 | 52415724 |
| 550078478 | 52415725 |
| 550078479 | 52415727 |
| 550078480 | 52445588 |
| 550078481 | 52445589 |

Redacted

The calculation of the price adjustments above are as follows:

Redacted

DEPOSITION
EXHIBIT
10

*20 TORONTO STREET SUITE 420 TORONTO ONTARIO M5C 2P8*
*PHONE: 416 861 0662 FAX: 416 861 0063*
*WWW.AUTOMODULAR.COM*

Redacted

Give me a call if you have any questions. Please fax a copy of the adjusted purchase orders to 905-665-8560 and/or e-mail a copy to j.anthony@automodular.net

Regards,

Jessica Anthony
Business Development – Contract Administrator
905-665-0060 x155
905-213-9718 Cell

CC: Michael Blair, Jim Gazo, Christopher Nutt, Marshall McMaster

**From:** Carrie Hyde [mailto:C.Hyde@automodular.net]
**Sent:** Tuesday, May 22, 2007 2:22 PM
**To:** McLean, Douglas L.
**Cc:** Michael Blair; Chris Nutt; Jim Gazo; Marshall McMaster; c.dell@automodular.com; Jessica Anthony
**Subject:** Delphi CRFM Exchange Adjustment - April 1, 2007

Dear Doug,

Please find attached the file outlining all CRFM Oshawa exchange adjustments from January to April 1, 2007. Feel free to contact me should you have any questions.

Thank you,

**Carrie Hyde**
Contract Administrator - Business Development
Automodular Corporation
Tel: 905.665.0060 ext. 155
Fax: 905.665.8560
Cell: 905.213.9718

DEPOSITION
EXHIBIT
11

 AUTOMODULAR CORPORATION

May 22, 2007

**Doug McLean**
Senior Buyer
Delphi Global Supply Management
716-439-2480
doulgas.l.mclean@delphi.com

**RE: GMX211/231/365/367 CRFM - 2007 Exchange Adjustments & De-Rate Scope Change**

Dear Doug:

Please find below the updated table outlining the purchase orders and part numbers along with the required pricing as of January, 2007 onward. Along with the 2007 exchange adjustments, please find below the de-rate scope change adjustment dated February 26, 2007. A change to the net jobs per hour is considered a scope change to our contract and pricing is to be adjusted accordingly.

| Purchase Order # | Part # |
|---|---|
| 550059352 | 52406053 |
| 550060368 | 52406299 |
| 550072058 | 52445908 |
| 550074793 | 52410855 |
| 550078476 | 52415724 |
| 550078478 | 52415725 |
| 550078479 | 52415727 |
| 550078480 | 52445588 |
| 550072058 | 52445908 |
| 550078481 | 52445589 |
| 550080925 Police Car | 52417036 |

Redacted

The calculation of the price adjustments are as follows:

Redacted

*20 TORONTO STREET SUITE 420 TORONTO ONTARIO M5C 2P8*
*PHONE: 416 861 0662 FAX: 416 861 0063*
*WWW.AUTOMODULAR.COM*

Redacted

Please fax a copy of the adjusted purchase orders to 905-665-8560 and/or e-mail a copy to
c.hyde@automodular.net.

Do not hesitate to call should you have any questions.

Sincerely,

Carrie Hyde
Contract Administrator – Business Development
Automodular Corporation
905-665-0060 x155
905-213-9718 Cell

CC: Michael Blair, Christopher Nutt, Chris Dell, Jim Gazo, Marshall McMaster

20 TORONTO STREET SUITE 420 TORONTO ONTARIO M5C 2P8
PHONE: 416 861 0662 FAX: 416 861 0063
WWW.AUTOMODULAR.COM

DPH 00007
CONFIDENTIAL