1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.,


       Debtor.


- - - - - - - - - - - - - - - - - - - -x


          U.S. Bankruptcy Court

          One Bowling Green

          New York, New York


          March 7, 2008

          10:05 a.m.


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1    ORDER to Show Cause Why Debtors' Expedited Motion for

2    Implementation of Debtors' Confirmed Plan of Reorganization

3    Should Not be Granted

4

5    MOTION for Implementation of Debtors' Confirmed Plan of

6    Reorganization

7

8    JOINDER of the Official Committee of Equity Security Holders to

9    the Debtors' Expedited Motion

10

11   EMERGENCY Motion of A-D Acquisition Holdings, LLC for a

12   Continuance and Order Vacating the Order to Show Cause

13

14   CO-INVESTORS' Memorandum of Law in Opposition to Debtors'

15   Expedited Motion for Implementation of Debtors' Confirmed Plan

16   of Reorganization

17

18

19

20

21

22

23

24   Transcribed By:  Esther Accardi

25

3

```
 1   A P P E A R A N C E S :

 2   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

 3        Attorneys for Debtors

 4        333 West Wacker Drive

 5        Chicago, Illinois 60606

 6

 7   BY:   JOHN WM. BUTLER, JR., ESQ.

 8         ALBERT HOGAN, ESQ.

 9

10   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

11        Attorneys for Debtors

12        Four Times Square

13        New York, New York 10036

14

15   BY:   KAYALYN A. MARAFIOTI, ESQ.

16

17   LATHAM & WATKINS, LLP

18        Attorneys for Unsecured Creditors' Committee

19        885 Third Avenue

20        New York, New York 10022

21

22   BY:   MARK A. BROUDE, ESQ.

23

24

25
```

4

1   LOWENSTEIN SANDLER, PC

2        Attorneys for Plaintiffs

3        1251 Avenue of the Americas

4        New York, New York

5

6   BY:  S. JASON TEELE, ESQ.

7        MICHAEL S. ETKIN, ESQ.

8

9   WEIL GOTSHAL & MANGES, LLP

10       Attorneys for General Motors

11       1300 Eye Street, N.W.

12       Washington, D.C. 20005

13

14  BY:  ADAM P. STROCHAK, ESQ.

15       JEFFREY TANENBAUM, ESQ.

16

17

18  CLEARY GOTTLIEB STEEN & HAMILTON, LLP

19       Attorneys for UBS Securities, LLC

20       One Liberty Plaza

21       New York, New York 10006

22

23  BY:  JAMES A. ROSENTHAL, ESQ.

24       JAMES BROMLEY, ESQ.

25

5

1   KAYE SCHOLER, LLP

2        Attorneys for Harbinger

3        425 Park Avenue

4        New York, New York 10022

5

6   BY:   BENJAMIN MINTZ, ESQ.

7        MYRON KIRSCHBAUM, ESQ.

8

9

10   FRIED FRANK HARRIS SHRIVER & JACOBSON, LLP

11        Attorneys for Equity Committee

12        One New York Plaza

13        New York, New York 10004

14

15   BY:   BONNIE STEINGART, ESQ.

16

17   WHITE & CASE, LLP

18        Attorneys for ADAH

19        1155 Avenue of the Americas

20        New York, New York 10036

21

22   BY:   J. CHRISTOPHER SHORE, ESQ.

23        THOMAS LAURIA, ESQ.

24

25

6

1

2    WILKIE FARR & GALLAGHER, LLP

3          Attorneys for Pardus, DPH Holding LLC

4          787 Seventh Avenue

5          New York, New York 10019

6

7    BY:   MYRON TRIPPER, ESQ.

8          RACHEL STRICKLAND, ESQ. (Telephonically)

9

10   HAIN CAPITAL GROUP, LLC

11   BY:   BRIAN BRAKER (Telephonically)

12

13   KELLER ROHRBACK, PLC

14         Attorneys for Kessler

15   BY:   GARY A. GOTTO, ESQ. (Telephonically)

16

17   JP MORGAN CHASE BANK

18   BY:   JACOB POLLACK (Telephonically)

19

20

21

22

23

24

25

7

1                       P R O C E E D I N G S

2           THE COURT:  Good morning.  Delphi Corporation.

3           MR. BUTLER:  Your Honor, good morning.  Jack Butler,

4    Kayalyn Marafioti and Al Hogan from the Skadden Arps firm, here

5    today on behalf of Delphi Corporation and it's affiliated

6    debtors, for this off omnibus calendar hearing on the debtors'

7    1142(b) motion that was filed at docket number 12978, pursuant

8    to an order to show cause, granted by Your Honor, filed at

9    docket number 12977.

10          Yesterday, Your Honor, the official committee of

11   equity security holders filed a joinder to the motion, which is

12   found at docket number 12985.  There had been, Your Honor,

13   filed several responsive pleadings.  AD Acquisitions Holdings,

14   LLC has served on the relevant parties and unredacted version

15   of its response.  And at some point the redacted version will

16   be docketed, I don't have a docket number for the record yet

17   this morning.  The co-investors memorandum of law and

18   opposition to the 1142(b) motion was filed and docketed at

19   docket number 12991.  And in addition, ADAH Acquisitions

20   Holdings, LLC filed an emergency motion for continuance of the

21   hearing and an order vacating the order to show cause, at

22   docket number 12990.

23          Before turning to that motion, which presumably Your

24   Honor would like to take first, this morning, I just simply

25   want to summarize, in this record, specifically what the

8

1    debtors are seeking in the 1142(b) motion.  And the motion from

2    the debtors' perspective is for the purpose of a non-

3    evidentiary hearing to ask the Court under 1142(b) to assist

4    the debtors with consummation of the plan and moving forward to

5    consummate the plan by determining that the debtors' proposed

6    exit financing is compliant with the plan, inclusive of the

7    EPCA, which is incorporated into the plan and is Exhibit 7.11

8    to the plan.  We're also asking, in addition to that, obviously

9    a determination that the plan investors, and for that matter,

10   Your Honor, Delphi is prepared to be similarly ordered,

11   although I think the reason we're here today, is our

12   obligations under Section 8 of the EPCA, the plan investor's

13   obligations are under Section 6(d) of the EPCA, for both the

14   debtors and the plan investors, as the case may be, to use the

15   reasonable best efforts to take all actions and do all things

16   reasonably and proper advisable on their part under the EPCA to

17   consummate and make affective all transactions contemplated by

18   the EPCA in the plan.  And we think it's important, as we move

19   forward, in seeking to close these transactions for that

20   relief.  And finally, in connection with that, we've asked Your

21   Honor to schedule a series of status conferences, chambers

22   conferences, under Sections 105 and 1142(b) of the Code, for

23   the Court to monitor plan consummation matters over the next

24   several weeks leading up to April 4th, which is the last day on

25   which the debtors can close and consummate the plan without

9

1     giving rise to a termination right under the EPCA to ADAH.

2             Your Honor, that is the relief that we're seeking

3     today.  I'll address other matters later in this hearing in

4     terms of issues that the plan investors are suggesting that

5     we're also seeking today which are not in our motion and not

6     before the Court.  This is a narrow -- in our view, a very

7     narrow matter that's a controversy but I think, as Your Honor

8     has indicated, the first order of business with that background

9     is to deal with the motion to vacate and for an adjournment at

10    docket number 12990.

11            THE COURT:  Okay.

12            MR. SHORE:  Good morning, Your Honor.  Chris Shore

13    from White & Case.

14            THE COURT:  Good morning.

15            MR. SHORE:  For ADAH.  I've actually got three

16    procedural issues.  I'll start with the continuance request.

17    We also need to address the issue of sealing, which I

18    understand that may be resolved at this point.  And then we'd

19    like to, to the extent that Your Honor doesn't grant the

20    continuance, just address the issue of discovery that was

21    presaged with the Court before.  And just putting some

22    agreements on the record with respect to how we're going to

23    proceed if we do.

24            With respect to the continuance, we filed the motion

25    last night.  And let me make clear the relief we're seeking.

10

1    We understand the Court signed the order to show cause allowing

2    a non-evidentiary proceeding to go forward today.  If we must

3    litigate that motion, I think where we are now, we filed a huge

4    amount of material last night, as you know, the other plan

5    investors filed material, we got a reply this morning, it's a

6    lot for the -- to ask the Court to go forward on that record,

7    it's a lot to have asked us to put that record together and

8    have our clients, ADAH respond on twenty-four hours notice to

9    them of having read the pleading.  And I understand that some

10   plan investors may not even have seen the pleading until it was

11   filed at 5 p.m.  So we would ask for a short continuance,

12   unless everybody else is ready to proceed on the non-

13   evidentiary basis.  But more importantly, there's a larger

14   issue here, which is whether or not this proceeding should go

15   forward now at all.  And our request is that this whole matter,

16   evidentiary/non-evidentiary be continued until after the plan

17   is consummated, in which case it will be irrelevant, or after a

18   termination event has occurred.

19        And I think there are three reasons for that.  First,

20   I think it's an evidentiary matter; I don't think there's a

21   sound basis for it, seeing that there's an emergency here to

22   proceed.  The burden is on Delphi to provide that.  Ms.

23   Marafioti's declaration links in some way today's hearing with

24   the need to file an S-1 on Monday, but no explanation has been

25   put forth linking the need to file the S-1 with a decision from

11

1    this Court.  We all know that we make disclosures in S-1s, we

2    make disclosures of pending matters.  And in the absence of any

3    connection between a ruling from this Court on very short

4    notice that won't become final until after the S-1, there

5    doesn't seem to be a basis to say that everybody needs to

6    proceed on this schedule, including the Court, to get a ruling

7    out that can be published in the S-1, because certainly the S-1

8    would need to disclose, whichever way it goes, that the matter

9    is non-final.

10          Second, and I know this isn't a particularly popular

11    point, but Delphi chose when to file this motion.  We have been

12    a huge proponent of trying to settle.  But we have never said

13    that the cost of settlement would be paid by us in having to

14    respond on this notice.  The fact is that Delphi chose not to

15    file and chose when to file.  Again, I think from our

16    perspective, we'd all be served -- or would have been served

17    with additional time, and I believe that the saying is true, if

18    we had had more time we certainly would have given you a

19    shorter letter.

20          But I need to focus in presage for a bit, and I do

21    not want to pre-argue the motion to the extent you hear it

22    today, Your Honor.  Which goes to the issue of why we're having

23    a pre-closing litigation at all.  It seems to us, and we've

24    said before, that there are two ways to proceed.  We can either

25    juggle litigation and try to settle this matter and move

12

1   towards exit, concurrently.  Or we could see if we can reach a

2   deal, and if we can't reach a deal have a litigation.  The only

3   reason you would try to juggle is if there is a good faith

4   belief that litigation is going to resolve anything prior to

5   the consummation of this plan.  That is, that litigation will

6   result in an arm-in-arm proceeding forward.  Or if this Court

7   can order specific performance.  You don't want to argue that

8   point, I know that's a point that'll be taken up by both, Mr.

9   Lauria and Mr. Butler, but our view is, based upon the EPCA,

10  the statements that were made by Delphi before entering into

11  the EPCA, the statements made by Delphi after entering into the

12  EPCA that there is no specific performance.  And if there is no

13  specific performance of that contract, nothing that's done

14  between now and closing is going to affect whether or not the

15  closing occurs.  Instead, what Your Honor is going to be asked

16  to do, is make advisory rulings with respect to what the

17  contract might mean if its breached.  But in the absence of the

18  breach, there's no remedy to be granted.  And even if there

19  were a breach the remedy of specific performance could be

20  granted.  I don't believe anybody would say that an award of

21  damages in this case is going to cause consummation.  So in the

22  end of the day I think that issue, it does tie into the

23  ultimate motion and the opposition to the motion, but it goes

24  to the question of scheduling.  If there is no specific

25  performance, and the debtors did not join issue on that in

13

1   their reply filed this morning, in fact, didn't dispute any of

2   the things that were said in the pleading they filed this

3   morning, then there really isn't, from our perspective a basis

4   to try to do this.  Rather, our view is push it off, we'll all

5   try to close, if we don't close facts will be developed, one

6   party will say breach, not breach.  And if that occurs, we can

7   have a litigation on the normal schedule with an adversary

8   proceeding, a complaint and answer discovery in trial.

9        THE COURT:  Don't both the parties to the EPCA have a

10  current obligation to use their reasonable best efforts to

11  proceed with and conclude the financing?

12       MR. SHORE:  Yes, Your Honor.

13       THE COURT:  And isn't there currently a dispute

14  between the two parties as to whether the debtors' proposed

15  inclusion of GM in the proposed financing violates the debtors'

16  provision on the one-hand or, alternatively, the plan

17  investors' statement that they cannot -- GM cannot participate

18  in the financing on the revised basis or the debtor -- violates

19  the plan investors' reciprocal obligation under 6(d), isn't

20  that something that's right before me at this point?

21       MR. SHORE:  On the first part, we have not made a

22  claim yet that they are breaching best efforts or any other

23  provision in the EPCA and going forward with the GM proposal.

24  Our view is consistent with what I said, that we'll wait to see

25  what happens with that.

1          THE COURT:  But -- I mean, let's be real here.  You

2    said in a pleading that it would be a breach of the EPCA to do

3    that financing with GM.  Leaving aside all the other points,

4    just to include GM, you said it breaches 5(p) and 5(t).  So

5    while you -- you somewhat coyly say, we haven't accused the

6    debtor in going forward in good faith, how could it be good

7    faith for the debtor to proceed with the financing where you

8    take the view that it's a breach of the EPCA?

9          MR. SHORE:  We need to separate out, you know, to

10   some extent, our calling a breach and not calling a breach.  We

11   have not filed a pleading that says they have breached the

12   EPCA.  We filed a pleading that says -- we filed a letter with

13   them, a private communication, which said we don't think you're

14   complying with the EPCA, that this financing complies with the

15   EPCA.  But from our perspective there won't be a breach of the

16   EPCA until -- there'd be closing conditions, until the closing

17   and with respect of the best efforts obligation, we have not

18   called a breach yet.  With respect of our obligations and when

19   it's ripe, again, I don't necessarily want to jump right into

20   the motion.  If Your Honor, is going to deny the continuance

21   then I think we can let those who are going to deal with it,

22   deal with it.  But, our view is with respect to the best

23   efforts violation that they're alleging that there isn't a

24   violation of the best efforts provision.

25          THE COURT:  All right.  But all I'm saying, it seems

15

1   to me that in response to your point that there's no purpose

2   served in litigation on any issue that the debtors' have raised

3   today, I'm having a hard time seeing that.

4        MR. SHORE:  Well, again, it rolls back to the issue

5   of specific performance.  Assume that there is a breach.

6        THE COURT:  No, leave aside specific performance.

7   Because in my mind 250 million dollars is a lot of money, all

8   right.  So whether you've got specific performance or not, I

9   think it's an important issue.  So the only question in my mind

10  is whether you're right and it needs to be decided now or

11  whether we should all wait around and see what happens.

12       MR. SHORE:  Unfortunately it comes to this point.  If

13  there is a breach of the best efforts provision right now, if

14  the debtors are right, we think they're wrong, but if they're

15  right, the question is one of remedy.  Ultimately, it is one of

16  remedy.  If we are breaching a covenant, that is covered by the

17  remedies provision, they can't get around the remedies

18  provision that's saying notwithstanding --

19       THE COURT:  Well, that's a legal issue, and I'll

20  address that at a later point in this hearing.  But I'm really

21  trying to see just now whether those legal issues should even

22  be addressed in the manner that debtors have proposed and I

23  initially concluded was appropriate at this hearing, which is

24  simply based on the documents that are part of the plan

25  confirmation record, frankly, the plan confirmation order, the

16

1   ECPA and the exhibits.

2          MR. SHORE:  Yes, Your Honor.  I'm just -- if they

3   don't have the remedy, whether it's a breach of the closing

4   conditions or a breach of the best efforts provision, our point

5   is they've got to sit around and wait for damages.

6          THE COURT:  Okay.

7          MR. SHORE:  That's all.

8          MR. BUTLER:  Your Honor, we're here today under 1142

9   for one reason and one reason alone, and that is ADAH, as the

10  lead plan investor, at midnight on February 24th delivered what

11  Mr. Shore now calls a private communication to the debtors, in

12  which they asserted that the financing to be launched the next

13  morning on the 25th of February at 11 o'clock in the morning

14  pursuant to a press release they had was noncompliant with the

15  EPCA and did not constitute the financing.  And while Mr. Shore

16  says it's a private communication, the last paragraph of that

17  letter urged the debtors to consider their disclosure

18  obligations to the bank syndicate and to the investing public.

19  There was no way that was intended to be a private

20  communication.

21         And we asked them to withdraw it.  They declined to

22  withdraw it.  We have negotiated 24/7 to try to address those

23  before today.  And the only thing we are trying to do under

24  1142 is deal with that issue so that we can launch the exit

25  financing next week and file the S-1 and conduct a rights

1    offering.  There is nothing in our pleading, not a single

2    sentence, not a single word, that seeks or addresses remedies.

3    We are not here to talk about specific performance.  We are not

4    here to talk about damages under the EPCA.  We're not here to

5    accuse anyone of anything.  In fact, we went to extraordinary

6    lengths in our documents because we're still negotiating with

7    people and trying to get to a closing table to exercise our

8    responsibilities under Article 8 of the EPCA to do everything

9    reasonably necessary to get to a closing.  It's simple math.

10   April 4th is the last day we can do it.  It takes twenty days

11   of actual rights offering time, plus three or four, five days

12   before that.  Plus, it takes two weeks or so in connection with

13   the -- which run concurrently in connection with the financing,

14   to be able to move forward with these matters, which means we

15   have to launch next week.

16        The debtors believe that to launch these two, the

17   rights offering and the exit financing, with the public

18   statements, because Mr. Shore knew and Mr. Lauria knew when he

19   wrote me the letter that the debtors would exercise reasonable

20   judgment in connection with disclosure and would, if they

21   didn't withdraw the letter, make disclosure about their

22   assertions, and we believe that makes the exit financing

23   futile.  The effect of that will be that if we can't get the

24   financing, if we ever get to the litigation apparently that

25   Mr. Shore's so concerned about that we didn't even bring, they

1    would end up saying you didn't meet your conditions, we were at

2    the closing table, you couldn't meet your conditions.

3          We are trying to meet our conditions to close.  There

4    is a reason that I stand before Your Honor today as lead

5    restructuring counsel, as opposed to having special litigation

6    counsel at this podium.  I hope there will never come that day,

7    but there may be a day where we're dealing with remedies and,

8    you know, equitable and at-law remedies.  If that's the day,

9    Your Honor, I won't be standing at this podium.  A special

10   litigation counsel will do it, just like happened in Solutia.

11         Today is a restructuring day.  The simple question is

12   whether or not he can ask Your Honor on the documents, and I'll

13   talk about that in a few minutes if Your Honor is prepared to

14   proceed, whether on the documents Your Honor can give the

15   debtors guidance under 1142(b) in order to be able to proceed

16   with the conditions precedent to even getting to a closing to

17   be able to call the question of the plan investors.  I believe

18   if we're able to move forward and get over this hump and move

19   forward with this and raise the financing, I believe there will

20   be continued negotiations in good faith with the plan investors

21   and I believe that there will be an opportunity to close this

22   transaction.

23         If we cannot proceed beyond today, there will never

24   be an exit financing launched and there will never be a closing

25   and the litigation, then, will be whatever it is.  But I am

19

1    sure that Mr. Shore will stand before you and say and "well,

2    they didn't meet their conditions, Judge; they never showed up

3    with exit financing at the closing."

4           So we're looking for very limited relief.  And we

5    believe -- and I'll talk in a few minutes when we get to the

6    portion of that hearing if Your Honor is prepared to move

7    forward, we believe that Your Honor can -- under 1142(b), can

8    in fact give us the guidance that we're seeking.  And I would

9    just make the point:  if you follow Mr. Shore's view, 1142(b)

10   has no meaning in the Bankruptcy Code because Mr. Shore says

11   don't do anything to aid in confirmation of the plan; wait till

12   it all -- whatever happens happens and then we can pick up the

13   pieces afterwards.  That's not what 1142(b) is about.  That's

14   not what Congress intended, Your Honor.

15           THE COURT:  Okay.

16           MR. SHORE:  Judge, I have the two persona procedural

17   matters --

18           THE COURT:  Right.

19           MR. SHORE:  -- to address up.  I don't know whether

20   you want me to respond.  I can respond in one minute.

21           THE COURT:  That's all right.

22           MR. SHORE:  Okay.

23           THE COURT:  If you want -- if it's a minute, that's

24   okay.

25           MR. SHORE:  I just -- I dispute the characterizations

20

1   of the timing of any of this or the motivation or anything

2   else, so I just wanted that on the record.  With respect to

3   sealing, I understand that the issue may have been resolved.

4   We're in the process of getting --

5           THE COURT:  It has been resolved.  Yesterday, we

6   discovered on the docket that the plan investors had filed a

7   motion to seal their entire objection, which I believed was not

8   appropriate under 107.  The plan investors then went back and

9   redacted the portions of their motion that, now having reviewed

10  them, I believe are properly protected or protectable under

11  107(b) of the Code.  And therefore I will, when one's presented

12  to me -- and maybe it's sitting back in my chambers, enter an

13  order authorizing you to file publicly the redacted version.

14          I understand that you and the debtors have been

15  sparring about the general effect of the pleading that's filed

16  and the litigation positions that you've taken, not you

17  personally but your clients, and my order really doesn't go to

18  that.  It just goes to the criteria for being permitted to file

19  something under seal.

20          MR. SHORE:  Thank you, Your Honor.  Should I address

21  the issue of discovery now and how we're going to proceed on an

22  evidentiary basis on the hearing, or --

23          THE COURT:  Well, I -- is that -- I mean, if it's

24  part of the argument about prejudice as far as the motion to

25  revoke the order to show cause, you should; otherwise -- I

1    should rule on that first.  But I guess I'd -- even though

2    you're shaking your head and saying it's not part of the

3    prejudice, I -- I'm a little confused.  It's very clear, and

4    this was set forth in the chambers conference we had a few days

5    ago, that this hearing is not an evidentiary hearing.  The

6    documents, as I understand them, are all part of the docket.

7    They've all been filed on the docket, and I don't mean the

8    exhibits that were -- you know, the affidavits that were filed,

9    but the debtors have accepted, and I've made it clear, that if

10   I need evidence either to interpret those documents because

11   they're ambiguous, if I conclude they're ambiguous, or I need

12   evidence to determine whether the plain terms of those

13   documents are breached, then the debtors lose today.  They have

14   a right to come back later and submit evidence and there will

15   be an appropriate discovery period, but for purposes of today's

16   hearing we're not going to get into either of those two issues.

17            So, as far as today's hearing is concerned, I don't

18   know why we need to talk about discovery yet.  We may at the

19   end of the hearing, but I don't see why we need to today --

20            MR. SHORE:  Well --

21            THE COURT:  -- at the start.

22            MR. SHORE:  I think it is, to some extent, to

23   preserve objections we've made, again, in off-the-record

24   conferences that need to be put on the record now.  First, we

25   disagree with the notion that the debtors can either commence a

22

1   contested matter in an adversary proceeding and then avoid

2   discovery by saying I want to file a motion that's

3   nonevidentiary.  Second, from our perspective, the discovery is

4   not a question of timing per se, the fact that they wouldn't

5   give us timing before the hearing and therefore we need more

6   time for the hearing because the debtors have told us that even

7   if we had thirty days to do this nonevidentiary motion they

8   wouldn't be producing discovery.

9          So, really, the only thing that needs to be done for

10  purposes of the motion, not to continue but the motion for the

11  hearing, is to -- the 1142 hearing, is to get on the record

12  that the document requests were made, the deposition notices

13  were made, that the debtors have refused to provide that on the

14  basis that this is proceeding on a nonevidentiary basis.  And

15  then we did have some discussions about the manner in which the

16  Court could accept certain things in, because there is, in

17  fact, evidence at this hearing.  There is the EPCA, the plan,

18  the confirmation order.  There were attachments to the motion

19  that were made, and the debtors have reserved the right to ask

20  the Court to take judicial notice.  We've just reached some

21  stipulations on that, which we can deal with, but again, that

22  presages the --

23          THE COURT:  Okay.  Well, that we can deal with after

24  I rule on the request for, as you phrased it today, a

25  continuance, although it's really a motion to vacate the order

1    to show cause.  And I guess I'm glad I asked you to discuss

2    this because I think, to be fair, the first part of your

3    remarks really did go to the issue of prejudice.  Okay.

4    Anything else?

5            MR. SHORE:  Nothing right now, Your Honor.

6            THE COURT:  All right.  The plan investors, through

7    Appaloosa, or more appropriately, A-D Acquisition Holdings,

8    LLC, have sought an order vacating the order to show cause that

9    I entered to schedule this hearing and a continuance of the

10   hearing to permit, among other things, discovery and, I gather,

11   additional briefing.  The motion is grounded on a few

12   different, although related, propositions.  The first is that

13   this matter is not one that warrants expedited treatment on

14   this basis.  The second is that the expedited treatment that is

15   specified in the order to show cause is unduly prejudicial to

16   ADAH and the other plan investors.  And then, ultimately, the

17   plan investors, or at least ADAH, contend that the hearing

18   today will serve no purpose, that at least would be viewed a

19   beneficial purpose outweighing the alleged prejudice.

20           As I said, all of these bases are related, and I will

21   address them together.  First, under paragraph 11(c) of the

22   Court's supplemental case management order entered March 17,

23   2006, the debtors had the right, as does any party seeking

24   expedited treatment, to seek the entry of this type of order to

25   show cause if there was not consent by the opposing party on

24

1    the proposed timetable for litigation, provided that the relief

2    sought was done in compliance with the local rules, in this

3    case, Local Rule 9077-1.  Based upon the averments in the

4    affidavit in support of the order to show cause, as well as the

5    documents that are part of the record of this case, including

6    the EPCA -- that is, the investment agreement between ADAH and

7    the other five plan investors -- and the exit financing

8    arrangements referred to therein as set forth in the November

9    3, 2007 engagement letter between the debtors and JP Morgan

10   Securities, Inc., JP Morgan Chase Bank, N.A. and Citigroup, as

11   defined therein, I conclude that the relief sought by the

12   debtors is truly the type of relief that reflects the need for

13   expedited treatment.

14          The EPCA, as well as other documents that tie into

15   the EPCA, including the financing letter, all contemplate a

16   hard deadline, which was, during the last week, extended to

17   April 4th, 2008, for the closing of the various transactions

18   contemplated therein, including the financing.  The financing

19   letter itself provides that the lead arrangers shall have been

20   afforded a period of at least thirty days after the completion

21   of the confidential information memoranda to syndicate the

22   credit facilities.  And it is contended by the debtors that

23   they will be asked to syndicate the facilities on the basis of

24   a participation by GM in those facilities in an amount greater

25   than reasonably -- or previously specifically contemplated.

25

1          Further, I accept Ms. Marafioti's representation with

2    regard to the timing of the preparation of the registration

3    statement to enable it to receive the approvals necessary to

4    enable the registration rights to be issued to comply with, on

5    April 4th, a closing deadline.  So all of those deadlines

6    require, if there is to be relief that is at all meaningful,

7    relief to be -- or the request to be -- raised now.

8          It is argued that, as a fallback, I guess, by ADAH,

9    that even if there is sufficient evidence that the company is

10   in exigent circumstances as far as the timing is concerned now,

11   that the effect of relief granted now would not provide

12   sufficient guidance either to the parties or to the lead

13   arrangers or those to whom they were going out to seek

14   financing, including GM, because of the inevitably of appeals

15   and ultimate issues as to whether the financing would conclude.

16         I believe, however, that given the respective

17   obligations of the debtors, on the one hand, and the plan

18   investors, on the other, under Sections 5(t) and 6(d) of the

19   EPCA, that they use their reasonable best efforts in respect

20   of, among other things, the exit financing, as well as the

21   fundamental issue that is before me today, which is whether

22   GM's participation in the exit financing in an amount in excess

23   of 750 million dollars is, in and of itself, a breach of the

24   EPCA, that guidance from this Court in a ruling interpreting

25   the plan and the EPCA and related exhibits is indeed

26

1   meaningful.  I, frankly, don't accept the parsing of the

2   difference between a "breach" and "noncompliance."  I believe

3   the guidance is meaningful under either scenario.

4       That leaves the issue of whether the plan investors

5   are unduly prejudiced by the timing of this hearing.  On that,

6   I have a number of observations going to the nature of this

7   hearing.  As the plan investors understood when they made this

8   motion (and it has been again clarified on the record), they

9   will win this hearing if I conclude that I need to receive

10  evidence as to the meaning of the underlying documents, that

11  is, the EPCA, the plan, the confirmation order and the

12  exhibitsor that a determination as to whether one side or

13  another is in compliance with those documents requires

14  evidence.  Consequently, this is a hearing based solely upon an

15  analysis of the plain meaning of the documents, in the first

16  instance, including, whether, in applying that plain meaning

17  based on the controversy at issue, I need to hear evidence.

18  And that is all that this hearing is.

19      Second, in light of that fact, it seems to me that

20  while I understand that it is incumbent upon the plan investors

21  to point out that they do not concede any of the facts as far

22  as the explanation of any potentially ambiguous terms in the

23  EPCA, or the facts that may be applied to terms in the EPCA

24  that require a factual analysis, and, therefore, I cannot

25  proceed on the basis of any conceded facts, at the same time, I

27

1    don't see why they would need discovery today given the nature

2    of today's hearing, which would make such discovery

3    unnecessary.  In addition, the backdrop of today's hearing is

4    one in which the parties, as I said, have ongoing contractual

5    obligations to each other.  In particular, under paragraphs

6    5(t) and 6(d) of the EPCA.  In light of those ongoing

7    obligations, there's a clear understanding on my part that the

8    parties have been considering the meaning of the relevant

9    provisions of the EPCA, as the pertain to the issue that the

10   debtor has teed up today, for approximately a month.  They

11   would not be taking the actions they have taken unless they had

12   considered the very serious consequences of those actions.  And

13   it is clear to me, in particular from the submissions by ADAH

14   and the plan investors, that they have thoroughly considered

15   the implications of their positions.  This obviously stands to

16   reason -- this issue didn't come up at 5 p.m. two days ago.  I

17   can't even accept Mr. Shore's quote from Mark Twain, because

18   although ADAH's response is long and may have merited some

19   trimming if there had been additional time, the plan investors'

20   response is just the opposite; it's brief and reflects a

21   considerable degree of thought.  That's not at all to belittle

22   ADAH's response, since it's not a matter of anything more than

23   editing, as opposed to making the key arguments that I've noted

24   in its response.

25        So, I don't see prejudice under this record, and I do

28

1   see a valid basis for going forward.  As far as whether there

2   should be discovery during the period between now and April 4th

3   I think will depend on the outcome of today's hearing, and, of

4   course, the parties' decision as to what sort of litigation

5   they want to pursue.  But as far as today's hearing is

6   concerned, I believe that the debtors have appropriately sought

7   the order to show cause that I've granted, and that to take an

8   alternative approach and to preclude any prompt consideration

9   of this matter on the basis that the debtors have sought it to

10  be determined, would, in essence, grant the plan investors the

11  relief that I believe they say they're entitled to, which is

12  the debtors' not seeking or obtaining the financing involving

13  GM, or GM's increased participation, that they seek; and that,

14  I believe, would be inequitable and improper given the nature

15  of this hearing and the lack of prejudice because of the nature

16  of this hearing.  So I'll proceed to the motion itself.  And I

17  think the first thing you should discuss -- when I say you,

18  it's both Mr. Shore and Mr. Butler -- is, I gather, you had had

19  some discussion about the documents to be placed before me

20  today.

21         MR. BUTLER:  Yes, Your Honor.  As Your Honor

22  indicated a few minutes ago in its ruling, the debtors have

23  limited their view of what ought to be before the Court to

24  those items in the record of these bankruptcy cases, of which

25  the Court can take judicial notice, together with the exhibits

29

1    that we attached to the motion, which have previously been

2    reviewed with counsel.  And therefore, let me just summarize

3    what I believe those are.  And I'm going to -- for the purposes

4    of reference in this hearing, with Your Honor's permission,

5    simply designate exhibit numbers if there's some reference, for

6    purposes of being able to conduct the hearing.

7            First would be the confirmation order, which is at

8    docket number 12359.  Number 2 would be the plan.  The plan is

9    docketed at 11386 and is separately Exhibit B to the

10   confirmation order, which I already indicated was docketed at

11   docket number 12359.  The plan by the way includes Exhibits --

12   among other exhibits, Exhibit 7.11, which is the investment

13   agreement, Exhibit 7.14, which is the exist financing

14   engagement letter and term sheet, Exhibit 7.20A and 7.20B,

15   which are the Delphi GM global settlement agreements and master

16   restructuring agreement respectively.

17           THE COURT:  When you say the investment agreement,

18   that's the EPCA?

19           MR. BUTLER:  Yes, Your Honor.  That's the --

20           THE COURT:  So those terms are used interchangeably,

21   okay.

22           MR. BUTLER:  -- that's our version of the EPCA.  It's

23   interchangeable, I'll refer to it.  And pursuant to 1(f) of the

24   plan, Article 1(f) of the plan, all exhibits are incorporated

25   into and are part of the plan as is set forth fully within the

30

1    plan.  So when I refer to the plan I include as incorporated,

2    as fully set forth therein, Exhibit 7.11, 7.14, 7.20A and

3    7.20B, among others.

4         Item number 3 -- designated as number 3, would be the

5    financing approval order with respect to the financing letter,

6    entered at docket number 10960.  Item number 4 are EPCA

7    approval order, and that -- there were two orders entered in

8    this case with respect to the current EPCA investment

9    agreement.  The first entered on or about August 7th at docket

10   number 8856.  The second, dated December 10th, entered at

11   docket number 11382.  Although, I would note that the

12   confirmation order, which has been designated as Exhibit 1,

13   does incorporate both of those orders into the confirmation

14   order pursuant to paragraph PP of the confirmation order.

15        Exhibit number 5 would be the Exhibits A through H of

16   the 1142(b) motion, which was docketed at 12978.  So 5(a) --

17   and I do want to make a comment here on this point -- 5(a)

18   would be the letter from Sullivan & Cromwell on the 27th of

19   February regarding Goldman Sachs.  And I do, for this record,

20   Your Honor, we indicated in our motion and our response -- I do

21   for this record want to indicate that when we're discussing the

22   plan investors here, so that we're not loose in our language,

23   we are not intending to make any reference to Goldman Sachs,

24   who has delivered a letter to the debtors indicating that under

25   the present circumstances they are prepared to close and fund

31

1    if all the other plan investors close and fund.  So for

2    purposes of this hearing, I would just make sure that the

3    record's clear that when the debtors use the phrase "plan

4    investors," we're not referring to Goldman Sachs.

5           5(b) is the letter from Mr. Lauria to myself, dated

6    February 13, 2008.  5(c) is the letter that I wrote to Mr.

7    Lauria, dated February 20, 2008, which has appended to it as

8    Exhibit A the exit financing term sheet evidencing General

9    Motors' proposal to increase its participation with the lead

10   arrangers in the financing.

11          5(d) is the draft of the syndication materials for

12   the bank financing group.  Version 3, which was provided over

13   the weekend of the 23rd to ADAH, and that's only important

14   because of the reference made in 5(e), which is the letter from

15   Mr. Lauria to me, that was dated February 24, 2008, that makes

16   reference to those materials, which have been marked 5(d).  And

17   5(e), as I've indicated in my earlier argument, Your Honor, is

18   the precise reason that we're here today and is the issue at

19   bar, the statements and assertions made by ADAH on behalf of

20   the plan investors at that -- in that letter.

21          5(f) is the response -- my response to Mr. Lauria, on

22   behalf of the debtors, dated February 25, 2008.  There was a

23   further e-mail exchange where Mr. Lauria sought to clarify his

24   February 24th letter on February 25th.  That e-mail exchange is

25   5(g).

32

1          And finally, appended as 5(h) is the financing

2     letter, dated November 3, 2007, which was also appended to the

3     financing approval order, already marked Exhibit 3.

4          Those, Your Honor, we believe to be the sum and

5     substance of the documents that would be relevant for Your

6     Honor in this hearing.  And the debtors have no intention to

7     introduce any other evidence.

8          THE COURT:  Okay.

9          MR. SHORE:  If you don't mind me standing here, Your

10    Honor?

11         THE COURT:  That's fine.

12         MR. SHORE:  Based on prior conversations I had with

13    Mr. Hogan, we're fine with Exhibits 1 through 4 going into the

14    record, for the truth of the matter asserted.  I thought an

15    agreement was reached with respect 5(a) through (h), that the

16    attachments were not being offered for the truth of the matter

17    asserted, but rather only to establish notice and to describe

18    how the dispute has been framed over time.  With respect to the

19    request for judicial notice that started that, I think also

20    with respect to both parties that the way we wanted to proceed

21    was, if any party's going to seek or the Court would seek to

22    take judicial notice, that parties would be provided notice of

23    that with an opportunity to object, although that if there's

24    other grounds for getting it in, like an exception to the

25    hearsay rule, we don't have a problem with that.  We just don't

33

1   want to open this all up for every pleading that's been filed

2   as to the truth of the matter asserted.

3            THE COURT:  Okay.

4            MR. BUTLER:  I think I've identified, Your Honor,

5   what I asked the Court to take judicial notice of, so I'm not

6   looking to do that.  And as to Mr. Shore's comments about 5(a)

7   through (h), I'm fine with those comments.

8            THE COURT:  Okay.  I agree with that.  All right.

9   So, I'll consider them on that basis.

10           MR. SHORE:  Thank you, Your Honor.

11           THE COURT:  Okay.

12           MR. BUTLER:  Just so I think -- so the record is

13   complete on this, Mr. Shore will actually -- White & Case

14   served some declarations on the debtors in connection with

15   their responsive pleadings.  When the declaration of Mr. Bollin

16   who is one of the principals in Appaloosa, and the other the

17   declaration of Mr. Pryor, who is one of the partners at White &

18   Case principally involved in these transactions.  I don't know

19   if I need to address those if Mr. Shore is not intending to

20   deal with those in this hearing, and if he's not then I'm

21   perfectly willing to not address them.  But I don't want there

22   to be anything untidy in the record, given the fact those were

23   served.

24           MR. SHORE:  Yeah.  Just with respect to that.  I

25   mean, we're in an odd procedural setting, which I think we

34

1   discussed before, where is it summary judgment is it something

2   else.  What we're doing with the declarations is making the

3   same as a proffer under Rule 56(f) if there were a proceeding,

4   that there are material issues of fact in dispute, and that

5   there are areas of inquiry that need to be made.  So we

6   proffered them for that purpose and not seek to introduce them

7   into evidence now for the truth of the matter asserted.

8           THE COURT:  All right.  I'll accept them for that.

9   Again, as I've said, you are not conceding any facts, including

10  the facts that there -- or the factual allegations that those

11  two declarations are arguably responding to.  And you're

12  offering them to show that there may well be factual issues

13  here.

14          MR. SHORE:  One clarification that with respect to

15  proceeding today, I think that there will be reference not

16  to -- certainly not to anything that has been placed under

17  seal.  There will be reference to prior pleadings in the case,

18  and statements made by the debtors in the case, which from

19  perspective, would kind of fit that rule that we discussed,

20  that we've noticed that we're going to seek that -- have the

21  Court take judicial notice of those in the prior pleadings and

22  then offer them for the truth of the matter asserted as

23  judicial admissions or other admissions of the debtors.  And

24  specifically that gets to the issue of specific performance.

25  So just as we go forward with any discussion on that, I think

35

1    there will be reference to that and that those statements would

2    be sought to be entered into evidence.  But I think we can

3    clean that up at the end of the hearing to the extent we get to

4    those.

5             THE COURT:  Okay.

6             MR. BUTLER:  And, Your Honor, debtors will reserve to

7    that.  We don't believe specific performance or any remedy is

8    at issue in this hearing.  It's not been sought in the motion.

9    I know the plan investors have been very anxious to bring it up

10   and to somehow introduce it into the hearing and get rulings on

11   it, but the debtors took great care in their motion to ask for

12   guidance in 1142(b) on a single issue, which is the issue Your

13   Honor has framed here regarding the exit financing.  We're not

14   interested at this point in time, and reserved our rights with

15   respect to any other matter, including any remedies, that may

16   or may not be necessary to pursue at a later date.

17            I would also, Your Honor, indicate that with -- we've

18   also reserved our rights with respect to the two declarations

19   that were proffered by ADAH.  In particular, with respect to

20   Mr. Bollin's declaration.  Much of what is in that declaration

21   refers to matters that were involved in settlement discussions,

22   and were specifically provide -- protected under the Federal

23   Rules of Evidence and under agreements between the parties.  So

24   if and when we need to get to that, we can address that.  But

25   they were very specifically protected and we have e-mail

36

1    confirmation of that.  And ADAH has, in other instances, been

2    quite prickly about their view that other parties in this case,

3    be it the committees or the debtors, are trying to get evidence

4    of settlement negotiations before the Court.  And we view Mr.

5    Bollin's declaration as nothing more than a blatant attempt to

6    do that.  So we reserve our rights with that at the point in

7    time.  So I would say that Mr. Bollin's declaration should be

8    disregarded by the Court in its entirety for any purpose, given

9    what it purports to testify to.  But I don't know that we have

10   to get a ruling from Your Honor today.

11          THE COURT:  I don't think you do.  Because, again,

12   it's only raised to support the statements in the objection

13   that the -- well, that ADAH contends it has a good faith belief

14   that there are factual issues.  And understand that in addition

15   to the points you made, I'm sure there's no concession by the

16   debtors on that point either, but it's just on the point of the

17   extent and nature of the factual issues.  So again, but that's

18   not really before me today.

19          MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

20   one item I just wanted to ask guidance from Your Honor because

21   I want to understand whether it was included within the motion

22   to adjourn or we should argue it first here, and that is -- Mr.

23   Shore I think made reference to it, at least indirectly, and I

24   want to make sure we deal with it now, which is the assertion

25   by the plan investors and co-investors, that the debtors can't

37

1      proceed under Section 1142.

2            THE COURT:  I think you should deal with it now.  I

3      don't think it was specifically dealt within the continuance

4      motion.  It was dealt with in the objection to your motion.

5            MR. BUTLER:  So let me then, if I may, Your Honor,

6      deal with that procedural item first.

7            THE COURT:  Okay.

8            MR. BUTLER:  Both -- the debtors have filed the

9      1142(b) motion because they believed under 1142 that Congress

10     created a conduit for -- during the post-confirmation

11     proceedings of a Chapter 11 case, that permitted, from 1142,

12     "the Court may direct any other necessary party to perform any

13     other act that is necessary for consummation of the plan," and

14     I obviously omitted certain words which are not relevant to

15     that, but I cited the entire paragraph in our brief.  And we

16     believe that the case law under that provides broad authority

17     to have the Court involve itself and assist the debtors, or

18     frankly any other party in interest, in moving a confirmed plan

19     towards confirmation -- excuse me, strike that, towards

20     consummation.  And we've indicated the cases on which we rely

21     in our papers, and I'll not run through those in any great

22     extent.  Similarly, we have cited in our papers the right to be

23     able to proceed by motion in -- under 1142 and to have the

24     Court to consider matters on an expedited basis in the context

25     of a contested hearing.

38

1          The plan investors have asserted, in their papers

2     essentially, that the Court lacks the power under 1142(b) to

3     grant the relief we sought in the motion.  We believe that in

4     the Second Circuit bankruptcy courts undisputedly have the

5     power to interpret and resolve disputes over the terms of the

6     confirmed plan.  We also point out, Your Honor, that

7     notwithstanding the responses received from the plan investors,

8     the specific dispute before the Court, which you have framed,

9     which is whether GM's increased participation in the proposed

10    financing, as it is syndicated out to -- by the lead arrangers,

11    as indicated, in fact, in a substantial part now to General

12    Motors, whether that syndication is not permitted under the

13    EPCA such that that public statement would essentially scuttle

14    the ability to move forward with the exit financing.  That's

15    the issue we think that is before the Court.  We have asked for

16    some corollary relief, which is for chambers conferences to

17    monitor the parties under Section 16(a) to the plan; we're

18    certainly, as I indicated earlier, prepared to be ordered in

19    the same way we asked you and the plan investors, to use all

20    their reasonable efforts to confirm the plan as contemplated by

21    the investment agreement.

22         The -- we also believe that the case law permits the

23    Court to consider this, as I indicated, by motion.  And we

24    think that the plan investors attempted to rely on a Utah -- a

25    1988 Utah case, In re Terecore, 86 Bankr. Rep. 671 at 675, that

39

1   somehow would impose a balancing test to determine whether the

2   debtor should proceed by motion or adversary proceeding, is not

3   applicable in this district or circuit.  There is nothing in

4   the Second Circuit that we've been able to find that would

5   suggest that the Terecore decision ought to be followed or has

6   been followed.  And I would simply make the point, Your Honor,

7   even if you determined that you needed to balance, do a

8   balancing test with respect to these matters as Terecore would

9   somehow suggest, we believe that the circumstances here, as you

10  have outlined in your order to show cause, warrant proceeding

11  by motion.  The motion seeks, and Your Honor has granted,

12  judicial review limited to a review of the documents that have

13  now been identified Exhibits 1 through 5.  And you've indicated

14  quite clearly that if you determined, for any number of

15  reasons, that evidence is required that this hearing would not

16  be resolved today in the debtors' favor and will be continued

17  to some other point in the future after a discovery record is

18  made.

19         We also believe that the plan investors' ability to

20  respond effectively as they had to this dispute makes it very

21  clear that this is an appropriate use of the motion procedure

22  in the Court and that there is no basis to assert within the

23  Second Circuit case law that an adversary proceeding is wanted.

24  And even if you were to choose to be guided by Terecore, under

25  those balancing tests, there would no basis upon which for Your

40

1    Honor to conclude that we should not be able to proceed by

2    motion.

3            THE COURT:  Okay.  Do you want to respond to that or

4    just rely on the papers?

5            MR. SHORE:  Your Honor, I think we'll just address

6    all of our argument together at one time.

7            THE COURT:  Okay.  So why don't you go ahead, Mr.

8    Butler, with the rest of your presentation.

9            MR. BUTLER:  Your Honor, our presentation is actually

10   pretty brief and it's pretty simple.  We believe that in order

11   to successfully consummate the financing, that the lead

12   arrangers will need to syndicate a substantial portion of that

13   financing to General Motors, who has indicated, as we have

14   publicly announced, a willingness to participate in that

15   increased syndication.  We do not believe -- and we've also

16   indicated in our papers, that GM's willingness to increase its

17   participation in the financing being arranged by the lead

18   arrangers under the financing letter does not require in either

19   the debtors' view or in General Motor's view any amendment to

20   any existing agreement between the parties.  In fact, what we

21   indicated in our papers just to make the point illustratively,

22   that at the end of the day this is really nothing more from a -

23   - when one examines it rationally or logically, this is nothing

24   more than an advanced order for the syndication book.  It's a

25   very important one, it's one that we think may be the lynch pin

41

1    to actually getting the financing in place, and it's an order

2    for the syndication book that we believe will give confidence

3    to the lead arrangers and to the syndicate to go forward and

4    consummate the financing.  We do not believe that you can --

5    reading the plain meaning of the documents, that Your Honor

6    ought to or that you can reasonably read -- that is, anyone

7    could reasonably read, interpret Section 5(p), which deals with

8    the GM settlement as prohibiting GM from deciding to increase

9    its participation in the syndication.  We don't believe there's

10   any basis for that.  We -- in doing that.  We think, as we've

11   indicated in our papers, that GM's willingness to increase its

12   participation in the syndication is wholly outside of 5(p).

13   And, therefore, the arguments that you need to determine from

14   an evidentiary perspective, whether or not that's outside the

15   ordinary course of agreement with the debtors, or determine on

16   an evidentiary basis, whether the terms of that agreement,

17   which relates back if you read the paragraph to the GM

18   settlement agreements and the amendments to those agreements,

19   whether that would have a material impact on the investors'

20   proposed investment in the company, are in fact evidentiary red

21   herrings that never need to be pursued.

22          THE COURT:  Okay.  Let me break that down, though.

23   The first point you made was that this can be -- this is --

24   this would just be GM being solicited as part of a syndication.

25   But it -- the transaction would still be with GM, wouldn't it?

42

1    Ultimately, wouldn't GM be an actual lender under the loan

2    agreement?

3            MR. BUTLER:  Yes, Your Honor.

4            THE COURT:  It wouldn't be a participation, for

5    example?

6            MR. BUTLER:  No.  When I say they're participating in

7    the syndication, what I mean is they will end up -- they will

8    certainly end up being a lender, yes.  But what I'm saying to

9    Your Honor is, we have a book to fill that in the aggregate, I

10   think at the current time, has been approximately 6.1 billion

11   and it is -- you know -- Your Honor's familiar with commercial

12   transactions and lending transactions, when you're trying to

13   fill a book there's a number of things you can do.  Sometimes

14   you try to get lead arrangers and others to step up and make

15   their own commitments, that's not been the case here, as Your

16   Honor's aware from the financing hearing on November 16th.  You

17   otherwise try to sort out who will participate in the book.

18   What we have concluded, and I think GM independently concluded,

19   and I believe, others believe is that in order to maximize the

20   opportunity to move forward on a successful basis and raise all

21   the funding necessary to fund the plan, that GM needs to

22   indicate and has publicly indicated to the debtors and to the

23   lead arrangers and others, including the plan investors, that

24   GM is prepared to subscribe to that book.  There's no --

25   there's no commitment.  You know, I don't have a commitment or

43

1    agreement.

2         THE COURT:  No, I understand that.  But all I'm

3    saying is -- I'm just dealing with one -- the first point you

4    made, which I think came up for the first time in reply, which

5    is the suggestion it's not really a transaction directly with

6    GM.  I mean, this provision 5(p) says "other than the GM and

7    (indiscernible) the company shall not enter into any other

8    agreement with GM."  And at least as phrased in the terms

9    sheet, the agreement, GM would be signing on to the loan as a

10   loan party.

11        MR. BUTLER:  Right.

12        THE COURT:  So in that sense there would be an

13   agreement with GM.

14        MR. BUTLER:  Right.  As an arrangement -- yeah, I

15   mean, as -- Your Honor, it would be, I suppose, an agreement as

16   it is -- as they're a signatory to the loan documents.

17        THE COURT:  Right.  I'm not addressing yet your point

18   that this isn't really aimed at financing or, you know, non-

19   trade arrangements.  Just dealing with whether this is exempted

20   because it wouldn't even be "an agreement with."  It seems to

21   me there would be an agreement with GM, as phrased at least in

22   the term sheet.  The term sheet also says GM, it doesn't say GM

23   SPV-1 or, you know, an affiliate of GM or someone, you know,

24   funded by GM to make the loan; it's GM.

25        MR. BUTLER:  That's correct, Your Honor.

44

1          THE COURT:  Okay.

2          MR. BUTLER:  And my only point in this is, is that I

3   don't believe that -- that you can -- again, under New York law

4   you read the entire contract as a whole.  And when you read it

5   as a whole and interpret 5(p) and what 5(p) is intended to do

6   as you interpret the contract as a whole, I don't believe that

7   you can read 5(p) to suggest that it is intended to grab and

8   encompass GM's decision to increase its involvement in the

9   loan.

10          THE COURT:  I'll get to that.  I just want to pursue

11  this point for a minute.  I mean, the definition of GM in the

12  EPCA is just GM, it doesn't say "GM and it's affiliates" or

13  anything like that, it's just "General Motors Corporation."

14          MR. BUTLER:  That's correct, Your Honor.

15          THE COURT:  But -- what you have in front of me is a

16  loan by GM, as opposed to, again, GM SPV-1 or whatever.

17          MR. BUTLER:  I have no idea, Your Honor -- I have no

18  idea how GM will ultimately fund its participation.

19          THE COURT:  Okay.

20          MR. BUTLER:  Or its involvement in the syndication

21  with the investors.  When I say the investors today I'm talking

22  now with the lead arrangers.  That documentation hasn't been

23  drafted yet.

24          THE COURT:  Okay.  Well, except there's a term sheet.

25  I mean, that's all I'm going on.  So let's go then to the next

45

1    point.  Which is, if you look at the entire EPCA, the plan

2    investors' interpretation of 5(p) is inconsistent with the

3    entire EPCA.  What specifically are you pointing to there

4    besides the heading "GM settlement"?

5         MR. BUTLER:  Your Honor, I don't think I can point

6    specifically to the heading "GM settlement", because there's a

7    "no headings" provision in the document.

8         THE COURT:  I know, that's a kind of a trick

9    question.

10        MR. BUTLER:  I'm not -- so, I'm not relying

11   specifically on that for the argument, Your Honor.  I don't

12   think I have to rely on those first two words, because I think

13   I can rely on the next sentence which then talks about the GM

14   settlement.

15        THE COURT:  All right.

16        MR. BUTLER:  I think those words can be used by Your

17   Honor in trying to discern and read, in your own view,

18   interpret the EPCA in terms of its plain meaning.  And when I

19   say how one I think needs to look at this, it seems to me

20   interpreting both the issues 5(p), 5(t), any of the other

21   issues that the plan investors want to raise on this point, it

22   seems to me that Your Honor needs to interpret and consider the

23   EPCA as it is incorporated in the plan and as to the, what I

24   consider the sort of interlocking groups of agreements, that

25   make up the entire agreement arrangements between the plan

46

1    investors and the debtors.  Because one looks at the entire

2    EPCA, it looks the EPCA incorporates as an exhibit and the plan

3    has an exhibit, the financing letter, and I'll get to the 5(t)

4    arguments in a minute.  You have the obligations of the

5    investors to use their best -- their commercial reasonable

6    efforts, best efforts to close the transactions, including the

7    financing.  And I think when one looks at this provision, taken

8    as a whole, as oppose to what the plan investors would like you

9    to do, which is to say, look, just look at romanette (ii) and

10   don't -- and put blinders on as to the rest of the paragraph

11   and as to the rest of the agreement, it seems to me that the --

12   that the -- that Your Honor can reasonably conclude, based on

13   the plain language of the EPCA, that this was intended -- these

14   provisions romanette (ii) and (iii), are intended to address

15   the GM settlement into the comprehensive settlement.  I'm not

16   going to try to argue all the meanings behind that because I

17   don't think you have to go behind the document.

18           THE COURT:  But it seems to me that one could argue,

19   though, that if that were the case then you wouldn't need (ii),

20   romanette (ii), you just rely -- there'd just be (i), because

21   (i) says "is materially inconsistent with this agreement and

22   the plan," and that includes everything.  So, you know, if it

23   was meant just to cover the settlement with GM, that's part of

24   the plan, and, therefore, why would you also specify (ii),

25   which is, you know, "out of the ordinary course of business"?

1          MR. BUTLER:  Because, Your Honor, I think (ii) is

2     intended to expound upon (i).

3          THE COURT:  You're saying as long as it's

4     inconsistent with the plan, but is in the ordinary course of

5     business, you can do it?  In essence, you're saying that (ii)

6     and (iii) are really there for the benefit of the company as

7     opposed to the benefit of the investors?

8          MR. BUTLER:  No, Your Honor, I'm not.  I'm actually

9     saying that (i), has a materially inconsistent phrase to it.

10    And there's always -- and that's a subjective standard.  And

11    that as you're looking at changes that we might make to the GM

12    amendments, and the changes we may try to make here, that

13    the -- I believe, that under the plain language that those

14    changes that were outside the ordinary course of business were

15    culled out separately.  So I would conceded, Your Honor -- I

16    think I would have to concede, that if Your Honor believes that

17    GM's willingness to participate in the lead arrangers' exit

18    financing, is, in fact, captured by 5(p), is intended under its

19    plain language to be included within the 5(p), then Your Honor

20    would go and do the analysis under romanettes (i), (ii) and

21    (iii), to determine whether or not it meets those obligations.

22    I don't frankly believe, the company certainly doesn't believe,

23    that the plain reading of this, which is intended to deal with

24    commercial arrangements between Delphi and GM, that one can

25    read its, GM's willingness to participate in the syndication as

48

1    falling within -- under a plain reading, falling within the

2    scope of this document.  This paragraph particularly when read

3    together with the entire EPCA.

4            THE COURT:  Okay.  But, again, maybe you've already

5    answered this.  What else in the EPCA is contradictory to this?

6            MR. BUTLER:  I don't think anything is

7    contradictory --

8            THE COURT:  I'm sorry, what else in the EPCA is

9    contradictory to the plan investors' interpretation of this?

10   That's what I mean to say.

11           MR. BUTLER:  Well, the plan investors' interpretation

12   of this is that you ignore -- I think you ignore the fact that

13   this was supposed to relate to the commercial agreement

14   involving the GM settlement.  As I hear their argument, they're

15   basically saying don't read -- don't read sort of the first

16   part and the last part of this agreement, read the middle of

17   the sentence --

18           THE COURT:  Okay.

19           MR. BUTLER:  -- and suggest that anything we do, of

20   any kind with GM, that even if it's not a direct agreement with

21   us, that that -- that is somehow specifically subject to their

22   specific consent.

23           THE COURT:  Okay.  But that's within this very

24   paragraph.  Are there any other provisions of the EPCA that

25   also would, in your view, contradict the plan investors'

1   position?

2           MR. BUTLER:  No, Your Honor, I don't think there are.

3           THE COURT:  Okay.

4           MR. BUTLER:  I think it's really the construction of

5   this paragraph taken within the framework of the entire EPCA.

6           THE COURT:  Okay.  Am I right that the amount of the

7   proposed GM commitment would go, as far as the uses-of-cash

8   analysis, to pay the amount that GM is getting in cash under

9   the plan?

10          MR. BUTLER:  That's exactly right, Your Honor.

11          THE COURT:  Is it a one-for-one correspondence?

12          MR. BUTLER:  Well, it's -- they're not -- I think

13  it's essentially that, Your Honor.  What they basically --

14  and --

15          THE COURT:  I mean, assuming that they have to invest

16  the whole amount -- I mean, lend the whole amount.

17          MR. BUTLER:  And, Your Honor, there's actually, and I

18  didn't -- we're not going to introduce evidence today, there's

19  no reason to debate this, but I mean, I can talk

20  hypothetically.  But the fact that I -- we can imagine, in

21  fact, not only have imagined but have constructed the flow of

22  funds at a closing, where you could actually provide on the

23  same day that GM both funds and then takes the note.  I mean,

24  GM gets their cash contribution and then takes a note in lieu

25  of it, that it's immediately -- occurs in a series of

50

1   transactions all during the course of the effective date.  It's

2   essentially a swap by GM.

3        THE COURT:  The plan provides the cash amount that's

4   supposed to go to GM?

5        MR. BUTLER:  Correct.

6        THE COURT:  And this -- this commitment amount

7   corresponds to that cash amount, is that right?

8        MR. BUTLER:  Essentially, Your Honor.  In other

9   words, I have to look at the exact math.  I don't want to get

10  the math wrong.  But it is -- the implication of this would be

11  that the day after the closing, forget all the transactions

12  what one might do on the closing date to effectuate the plan,

13  but when the dust settled after closing, GM would have more

14  notes and less cash.  It does not affect the sources and uses

15  of cash for any other party under the plan of reorganization.

16  Nobody else is impacted at all by this transaction.  And the

17  debtors believe that this transaction actually, when

18  effectuated, through a series of transactions on the closing

19  date, are entirely compliant with the plan and all the

20  agreements within it, and in fact, can be effectuated without

21  any amendments.  And that's -- that's where I go back, Your

22  Honor, to 5(p) again.  You know, the phrase "GM amendments" in

23  this is referring to the GM settlement agreements as entered,

24  you know, as set forth in Exhibits 7.20A and 7.20B of the plan.

25  And I think it's appropriate to read that when you say other

51

1   than the GM amendments being other than 7.20A and 7.20B, the

2   company is not supposed to enter into any of those other

3   agreements.  I believe those are commercial agreements and that

4   relates to those agreements.  I mean, I think the plan

5   investors want Your Honor to read out of this the first

6   sentence and the introduction to the second sentence, and

7   simply read each of the three romanettes provisions as

8   disjunctive conditions that would make GM's ability to

9   participate in the exit financing without the express consent

10  of each of the plan investors to be not permitted by the EPCA.

11  And I just think that when    you -- while it's not expressly -

12  - whether or not -- while I think Your Honor in evaluating this

13  can, among other things, evaluate Sections 3(qq) and 5(t) and

14  the financing letter, attached as Exhibit E to the EPCA, in

15  evaluating the overall purpose of trying to consummate exit

16  financing here, and I just -- I think it's a real stretch to

17  suggest that 5(p) could be used to implicate exit financing.

18          THE COURT:  Okay.

19          MR. BUTLER:  Your Honor, with respect to 5(t), which

20  is the other major argument that they make, is if you read the

21  plan investors' views, their basic position is that, I believe

22  it's proper to characterize their position is that,

23  notwithstanding the terms of the financing letter, which is

24  5(h) to this record, not a single indicative term of that

25  letter, which by their nature are -- as you'll read it, are

52

1   indicative terms, not a single indicative term of that letter

2   can be altered without the specific approval and consent of the

3   plan investors.  Now, if that were true, Your Honor, I have no

4   clue as to why we had the controversy and the fight at the

5   December EPCA hearing that led up to the December 10th entry of

6   the EPCA approval or if the amendments at docket number 11382,

7   on interest cap at 585 million dollars, which, I think Your

8   Honor can take judicial notice of that record and of Your

9   Honor's approval of that, and of the controversy because that

10  was the joint issue, the creditors' committee objected to that

11  and we had a highly litigated fight on that issue and testimony

12  from Mr. Tepper and others on that issue, that the plan

13  investors clearly looked at 585 to be the relevant protection

14  for them.  In fact, Mr. Tepper had the right, under the

15  agreements to actually unilaterally raise that to 595.

16          THE COURT:  Are you taking about 9(a)(xx).

17          MR. BUTLER:  Correct.

18          THE COURT:  The interest expense cap.

19          MR. BUTLER:  Correct.  And there was a side letter

20  with the -- among the plan investors that allowed Mr. Tepper to

21  actually raise that by an addition of ten million dollars on

22  his own without their involvement.

23          And when you look at that provision, which was the

24  center part of the amendment, and when you take into account

25  that the December 10th amendment and all that led into that

53

1   hearing was intended to provide and did provide additional

2   consideration of the plan investors and had all the amendments

3   to the documents that they believed to be appropriate, given

4   that they said we're going to proceed on -- based on all the

5   circumstances (indiscernible) both, macro and Delphi-centric,

6   on December 10, I think it's completely implausible to

7   construct a scenario on which their argument is that the

8   November 3rd financing letter that had to be executed or had to

9   be consummated precisely in accordance with the indicative

10  terms and nothing could change: the interest rate couldn't

11  change, even though the November 3rd letter refers to OID

12  couldn't be included.  The arguments just, frankly, make no

13  sense.  This is also true because when Your Honor confirmed the

14  plan there were modifications made under Article 7.14 of the

15  plan in which the plan investors participated, which made it

16  very clear that the exit financing arrangements, the order said

17  -- the confirmation order deals with this topic, that the

18  proceeds in the exit financing arrangements, as may be amended,

19  modified or supplemented have to be the amount necessary to

20  implement the plan, and clearly within the terms and conditions

21  previously approved by the Court and also in terms to satisfy

22  the EPCA.  The plan investors somehow want to read 3(qq) as

23  suggesting that, because it refers in 3(qq) to "the terms

24  indicated thereon," they're asking Your Honor to think of that

25  as being each individual indicative term, and for Your Honor to

54

1    dismiss, as the case law does not require Your Honor to do, to

2    dismiss the commercial understanding that when lead arrangers

3    do commercially reasonable best efforts syndication letters and

4    give indicative terms and indicate they may be modified and

5    provide provisions in the financing letter that reference OID

6    and other kinds of economic provisions, that somehow their

7    statement in 3(qq) that "on the terms indicated" means that

8    they have a veto right on each individual term -- I just don't

9    think there's any construction, Your Honor, of the, of 3(qq) or

10   of 5(t) that can plausibly be used to do what the plan

11   investors want, which is essentially give them veto over every

12   item of the syndication.  Our job, we believe under the EPCA as

13   the debtors, is to go and execute a financing that provides the

14   appropriate financing in order to be able to fund the plan and

15   consummate the plan, on the one hand.  And two, meet the

16   interest rate provision in the condition of the EPCA in Article

17   9, 9(a)(xx), romanette (xx).

18         So from your -- and, Your Honor, I really don't want

19   to do address -- there's lots of colloquy in the exchanges

20   between Mr. Lauria and myself about how one might amortize OID

21   or not amortize OID.  I think that's irrelevant to this

22   particular -- to this particular issue.  I think the issue

23   here, plainly, is given 7.14 of the plan, given the fact that

24   under Article 9 of the EPCA the plan investors had until

25   February 4th, it was I believe, to indicate whether they

55

1   disapproved of the provisions of the confirmation order, the

2   plan and all the plan documents, or any amendments that have

3   been made, any modifications that have been made to the plan,

4   that earlier approved the plan as of a certain date.  To

5   suggest, however, that under the construct of these package of

6   documents, that not a single item will change from November

7   3rd, I think is just not a construction that Your Honor ought

8   to give any credence to.

9           THE COURT:  Well, on the OID point, the term sheet

10   attached to the financing letter does have in it the notion of

11   a "backstop amount," so that the next number -- the net amount

12   of cash that the company gets doesn't change, right?

13           MR. BUTLER:  I'm sorry, we're talking about --

14           THE COURT:  Under the financing, the company's

15   supposed to get a specific amount of cash as a result of the

16   financing and that was amended as part of the amendment to

17   7.14?

18           MR. BUTLER:  Correct.  Which was to the proceeds

19   sufficient to fund the plan.

20           THE COURT:  but if you have so much OID that you

21   don't get that cash, doesn't the financing term sheet

22   contemplate, it's called a "backstop amount," that builds up so

23   you get the cash?

24           MR. BUTLER:  You're talking about in terms of -- it

25   requires -- GM would under -- the way in which they structure

56

1    the economics of --

2              THE COURT:  No, I'm not talking about the GM terms

3    right now; I'm talking about the financing term sheet attached

4    to the November letter.  Or is that something that's -- is that

5    at your discretion.

6              MR. BUTLER:  I think it was our discretion, Your

7    Honor, that's why I'm trying -- I think it was at our

8    discretion, that's why I was a little --

9              THE COURT:  Because I think I recall the lenders --

10   I'm sorry, the investors, the plan investors saying that the

11   OID issue is a little more complicated then you describe: yes,

12   OID was contemplated, but there still had to be enough cash as

13   per the term sheet.

14             MR. BUTLER:  But that's why 7.14, among other things,

15   was amended to make it very clear that the financing is to be

16   sufficient to fund the plan, and the arguments -- I mean, it's

17   there so you can see it in the exhibits that are before the

18   Court, the argument between Mr. Lauria and myself has to do in

19   how one amortizes OID.  The agreement in the EPCA says

20   according to GAAP, which would be over the life of the loan,

21   which is seven years.  And the plan investors wanted it to be

22   something other than seven years, that's what that debate is

23   about, I don't think it's perfectly relevant to this hearing.

24             THE COURT:  All right.  You're --

25             MR. BUTLER:  The main about is them wanting to

57

1    interpret OID in a way different, that's inconsistent with the

2    EPCA, but that's not before the Court today.

3                    THE COURT:  Right.  Okay.  Well, let me just make

4    sure I understand -- I think I understand what you're saying,

5    but let me go through it.  The term sheet under the -- or

6    attached to the financing letter contemplates an aggregate of

7    6.8 billion of borrowings.

8                    MR. BUTLER:  Right.

9                    THE COURT:  You can ask for the underwriters to add

10   up to that -- you know the "backstop amount," but that's in the

11   company's discretion --

12                   MR. BUTLER:  Yes, Your Honor.

13                   THE COURT:  -- on OID.  Then under 7.14 as amended,

14   you're saying that that amount was reduced to 6.125 million.

15                   MR. BUTLER:  Yes, Your Honor.

16                   THE COURT:  Right.

17                   MR. BUTLER:  Yes, Your Honor.

18                   THE COURT:  Because there was a reduction of the

19   second lien amount of a billion-five to 825 million.

20                   MR. BUTLER:  Right.  And, Your Honor can take

21   judicial notice of the confirmation record, hearing record, of

22   all the reasons for that.

23                   THE COURT:  Okay.

24                   MR. BUTLER:  The company had a little bit more cash

25   and resources.

58

1          THE COURT:  And you're saying that as long as the

2    company has enough cash to fund the plan the -- and meet the

3    interest rate cap, and I guess that's both covered by the

4    confirmation order recognizing the amendment to 7.14 as well as

5    paragraphs 9(a)(xix) and 9(a)(xx) of the EPCA?

6          MR. BUTLER:  Right.

7          THE COURT:  There are no other conditions that apply

8    to the financing as far as the company is concerned?

9          MR. BUTLER:  That's correct, Your Honor.  We do not

10   believe that they have -- we have obligations to consult with

11   them, obligations to provide information to them, we think

12   we've done that throughout.

13         THE COURT:  And you're saying that since the uses of

14   cash under the plan have not changed -- indeed, the only thing

15   that's happening is the borrowing from GM is going to pay GM --

16   you've complied with the obligation to have enough cash to fund

17   the plan.

18         MR. BUTLER:  That's correct, Your Honor.

19         THE COURT:  You're saying there's no obligation

20   anywhere under the transaction documents, the EPCA in

21   particular, that any sort of reserve cash be maintained or

22   capital ratios be maintained or anything like that?

23         MR. BUTLER:  There are -- I don't think there are --

24   I don't think there are any obligations under the plan, Your

25   Honor, the plan investors may have pointed any where this

59

1    transaction would violate those provisions.  I can't stand here

2    and think about every single provision under the EPCA, but I'm

3    not aware of any provision that would prohibit -- you know,

4    that require a broader syndication, that require --

5         THE COURT:  Well, I'm asking this because the plan

6    investors say that the -- leaving aside GM's role it in, they

7    suggest that the -- I'm sorry, leaving aside GM's role and

8    leaving aside whether or not the cap under 9(a)(xx) is exceeded

9    -- so assume for the moment, that GM's role is fine and the cap

10   is not exceeded -- I read -- I think -- I mean, I'll ask Mr.

11   Lauria this, but I read the plan investors' arguments as saying

12   that in addition the terms of the financing as proposed violate

13   the EPCA because it's not enough, it's not enough money.

14        MR. BUTLER:  I'll leave to Mr. Lauria to explain why

15   he thinks that and I'm happy to respond to it, Your Honor.

16        THE COURT:  Okay.

17        MR. BUTLER:  I don't believe that there is anything

18   in the EPCA that allows the plan investors to dictate a higher

19   amount to be raised.

20        THE COURT:  But you do concede that if, in fact, the

21   response to the lead arrangers' attempt to syndicate the

22   financing, including with GM, is such that there's so much OID

23   or so much interest rate burden that the company cannot comply

24   with its obligations under the plan, then you would have

25   tripped up under the EPCA.

60

1          MR. BUTLER:  Yes, Your Honor.

2          THE COURT:  And you're not asking me to determine

3   that today?

4          MR. BUTLER:  No.  If we can't fund the plan and we

5   can't meet 9(a)(xx), which is the -- we can't demonstrate that

6   we complied with that --

7          THE COURT:  Right.

8          MR. BUTLER:  -- limitation, then I presume that the

9   plan investors -- we'll have to work that out with the plan

10  investors.

11         THE COURT:  And you're not asking me for a ruling

12  today that the term sheet, that has some bracketed interest

13  rate information in it, as implemented, that that term sheet

14  does or does not trip over the obligations that you say the

15  company does have?

16         MR. BUTLER:  No, Your Honor.  I'm not asking --

17         THE COURT:  That's not before me today.

18         MR. BUTLER:  No, it's not.  Because we're not going

19  to know -- this is -- my whole argument is that all of us

20  sitting in this room plainly understand, and I think the Court

21  plainly understands, that the Court -- that we're not going to

22  know what the results of the syndication are until we complete

23  it.  The comfort that we have is that we have a variable -- we

24  have an understanding that General Motors will -- will, in

25  working out their participation in the financing with the lead

61

1    arrangers, that they will accept, essentially, a variable

2    interest rate that will accommodate the 585 cap.  We believe

3    that to be the case.

4           Ultimately, we -- you know, that -- you know, we have

5    to demonstrate at the closing table that we have no more than

6    585 of pro forma interest for -- for 2008.  We understand that.

7    That's our obligation.

8           THE COURT:  Okay.

9           MR. BUTLER:  I'm not asking Your Honor to determine

10   whether we can do that yet when the financing hasn't been

11   syndicated.

12          THE COURT:  Okay.

13          MR. BUTLER:  Your Honor, from the company's

14   perspective, our argument isn't much more complicated than

15   that.  We're simply asking Your Honor for guidance today that

16   would give comfort to the debtors, our other stakeholders,

17   guidance to the plan investors, frankly, as we continue our

18   negotiations with them, and guidance to the markets that our

19   launching of exit financing next week won't be futile because

20   GM's agreement to participate in the syndication does not, as

21   the plan investors have suggested, render it non-compliant with

22   the EPCA, such that there could never be a closing.

23          THE COURT:  Okay.  What -- what do you - the, 5(t)

24   provides that the company shall not permit any amendment or

25   modification to be made to, or your waiver or any provision or

62

1   remedy under -- but I think the key phrase is "any amendment or

2   modification to be made to," to the extent adverse to the

3   company or the investors, the financing letter.

4          MR. BUTLER:  Right.

5          THE COURT:  I mean, the investors say "well, in

6   essence you're amending it because you're amending the terms

7   attached to it."

8          MR. BUTLER:  You could only reach that arguments if

9   you dismiss in its entirety the fact that this is a best

10  efforts arrangement letter from lead arrangers who are going to

11  syndicate.  There is no -- as I can understand it Your Honor,

12  there is no way in which anyone can reasonably interpret that

13  when lead arrangers go out into the market they give you

14  indicative terms to an issuer.  They go out in the market to

15  syndicate, all right.  They go forward and they end up

16  syndicating on the terms that will clear the market, all right?

17  And our view is, and we think the plan investors knew that.  We

18  certainly knew that.  That's what lead arrangers do.  This was

19  not a commitment letter.  We had a -- that's why I think you

20  can -- Your Honor can take judicial notice of the record at the

21  November 16th hearing.  There was no showing in this case that

22  we were going to have an underwritten commitment at a specific

23  set of terms that weren't going to change.  That was -- we did

24  the exact opposite.  For all the reasons in the turbulent

25  capital markets that caused us in August and September of 2007

63

1    to take the path towards emergence that we took and enter into

2    amendments to the EPCA with the plan investors on December

3    10th.  All of those were designed to allow us to move forward

4    with a best efforts syndication.  And I think Your Honor,

5    again, any reasonable reading of the four corners of the

6    financing letter as it is interpreted by the plan and the EPCA

7    by 7.14 and by the EPCA in Exhibit E, you can only, I think

8    Your Honor, come to one conclusion which is those terms were

9    not static.  Those terms were subject to change within the --

10   the life of the agreement.  It's not an amendment to the

11   agreements.  It's not a modification of the agreement.  The

12   agreement itself, by its nature, contemplated that the lead

13   arrangers would syndicate on market clearing terms.  Otherwise

14   why have the reference to OID in the -- in the best efforts

15   letter.

16          THE COURT:  Well, what about the hypothetical where

17   they syndicate on such terms that the company has one dollar of

18   cash after a -- after emergence.

19          MR. BUTLER:  We couldn't, then, fund all of

20   obligations under the plan.

21          THE COURT:  No, no, no, after funding all the

22   obligations under the plan, you have no other cash left except

23   one dollar.  I mean, is there some limit to this?

24          MR. BUTLER:  Is there some limit to whether or not --

25   I think there -- I mean, aside from our fiduciary obligations

1   and trying to understand whether we've -- I suspect, if we had

2   no cash in our -- I haven't read all of the provisions of the

3   EPCA but I believe there are any number of provisions that if

4   we had no cash to run our business and we were -- you know,

5   that that would -- the plan investors would point to other

6   provisions, Your Honor.  I was talking -- I'm talking more

7   about the terms more than I am the amounts.  I mean, remember

8   this proposal is not intending to modify the amounts that we're

9   raising in any material way.  This is -- this is talking about

10  what the terms of the financing are and who the lenders are.

11  There's no --

12       THE COURT:  Well the investors say that the -- this

13  provision was really to protect them from, or, better yet, to

14  sort of give -- give them a -- a measure protection or a second

15  look based on the perception of the financial markets, by the

16  financial markets of the company.  What is your response to

17  that?

18       MR. BUTLER:  I don't think it does that at all.  I

19  think -- I think it was intended, if you read 5(t) -- what 5(t)

20  tell us is if we're not able to obtain the debt financing as

21  contemplated in the financing letter, we're supposed to notify

22  them of the unavailability of that.  And we're supposed to --

23  you know, and the things that we're supposed to do so that they

24  can consult with us about what the next steps are.  I don't --

25  I think the -- the issue here, Your Honor, is -- begin where

65

1    the capital markets are.  We've concluded that without GM being

2    willing to work with the lead arrangers to increase its

3    participation, we don't believe that we would get to a market

4    clearing transaction that would meet the terms of the EPCA.  We

5    told -- I mean, that was told to the plan investors.  What the

6    plan investors have -- have, I think, is somewhat turned the --

7    whether intentionally or unintentionally, I think they have,

8    sort of, come back to us and said well gee, that may -- you may

9    think that may clear the market and you may think that it will

10   provide the funding to be under the plan, you may think it

11   will -- it will stay below that all important interest rate cap

12   that we fought so much for, but your only solution to this,

13   which is to have GM step up with your lead arrangers to do

14   this, we don't like GM doing.  I mean, it is to put a roadblock

15   to essentially our only -- the only path we can find, that

16   we're aware of, that allows us to raise the financing and on

17   the terms required by the EPCA.

18        So, I mean I -- you know, I don't accept that 5(t) as

19   it's written and I don't think it says it anywhere because

20   people can say things it doesn't say, that they have veto

21   rights over the financing.  It doesn't say that.  That's not

22   what 5(t) says.

23        I mean, you know, it could have conditioned the

24   entire financing -- the entire EPCA on a specific transaction,

25   and it didn't.  And we never would have agreed to that because,

66

1    how could we, Your Honor when we all recognized, and the EPCA

2    itself is formulated on the fact that it is subject to a best

3    efforts syndication letter by the investors -- by the lead

4    arrangers.

5            THE COURT:  What -- what would be an amendment to the

6    EPCA that would be materially adverse to the -- or not even --

7    which would be adverse to the investors?

8            MR. BUTLER:  I would think, Your Honor, one example

9    of that -- let me just go through it.  I would think one

10   example of that, Your Honor -- and by the way this is, as you

11   say, an amendment or modification of the -- of the debt

12   financing --

13           THE COURT:  Right.

14           MR. BUTLER:  -- that would be materially adverse.  I

15   would think that if there was a --

16           THE COURT:  I'm sorry, I misspoke, I said the EPCA; I

17   meant the financing letter.

18           MR. BUTLER:  Yeah.

19           THE COURT:  Yeah.

20           MR. BUTLER:  But it's also -- I would think, for

21   example, that -- I was looking at the debt financing as opposed

22   to the letter itself.  I think one example of the debt

23   financing would be that if we were to come back and say the

24   term of the financing is one year, for example.  That would be,

25   I think, a hypothetical moment to say well, I'm not going to

67

1    put in a couple of billion dollars in a company where the debt

2    financing matures in a year when it was supposed to be a seven

3    year loan.  I mean, I think that's the -- the kind of thing

4    that would be contemplated by that.

5              THE COURT:  Okay.

6              MR. BUTLER:  I don't think it's -- it's the -- it

7    seems to me that the only reasonable interpretation of the EPCA

8    is the economic costs of -- associated with at least the

9    interest rate, things that would go into pro forma interest for

10   2008.  Because it's a 2008 test, limited for one year.  The

11   economics of this deal, the plan investors chose in the

12   amendment, December 10th amendment, to take those -- that --

13   those economics and test them through the interest rate cap.

14   It was hard fought, it was contentious.  The creditors'

15   committee fought -- objected to it.  They didn't agree that it

16   was -- that, you know, we've had chambers conferences on it.

17   The fact of the matter is, that was the test.  And what we've

18   done here, we believe, is construct a path where we can arrange

19   the financing and we can do so in a way that is compliant.

20   What they're basically saying is no, the roadblock is that GM

21   is going to play that role -- is going to help play that role

22   with you.  And we don't see anywhere in the -- certainly our --

23   our interpretation of 5(p), and the rest of the EPCA does not

24   and cannot prohibit GM from providing that third party

25   financing through the lead arrangers.

68

1          THE COURT:  Okay.  Let me just look at one other

2     thing.

3          THE COURT:  Is it -- is it the company's view that

4     under 9(a)(xxviii) the reduced amount, down to 6.125, it's now

5     been approved, right?

6          MR. BUTLER:  Yes.

7          THE COURT:  Because they have the -- they have the

8     confirmation order and the plan and they knew what the amount

9     was going to be, which was 6.125?

10         MR. BUTLER:  Yes, Your Honor.  In fact, I mean, we

11    don't need to -- they're wise and I don't -- it's not for this

12    hearing.  I didn't want -- I'm not going to go into it but the

13    reality is they approved a whole financing that went out in

14    January, but that doesn't need to get before the Court today.

15    You know, I mean, including OID and everything else.  We'll --

16    if we ever have to get there we'll get there on what the

17    conduct was in the first week of January.  But I do believe

18    that the amount of the financing, which was part of the

19    confirmation record and part of the confirmation order and part

20    of the finding of feasibility to which they have agreed, is

21    binding.

22         THE COURT:  Okay.  And -- and you -- you believe they

23    don't have a right to a second look at the time of the closing,

24    as far as the -- the 6.125 being the right number.

25         MR. BUTLER:  I don't.

69

1           THE COURT:  Okay.

2           MR. BUTLER:  Because I think that suggests that they

3   have the right -- I don't think at closing they can say, after

4   you've raised -- you've done all the -- all the acts under the

5   EPCA that you can show up at closing and all of a sudden have

6   them say -- because they've already approved the business plan,

7   remember Your Honor, the business plan was one of the documents

8   that they approved under the terms of the EPCA.  I don't think

9   that they -- having approved the EPCA -- having approved the

10  plan and all of the exhibits to the plan -- I don't think they,

11  at closing, can show up and say we're just walking away and not

12  closing because, you know what, we've decided that, you know,

13  your pro forma cash should be 1.8 billion instead of some other

14  number or 1.5 billion or some other number, we want an extra

15  700 million or a 1.5 billion of cash in your -- because that

16  would make us feel better as investors.  I do not think they

17  have that right under the EPCA.  It's not provided for and I do

18  not think that that would be any kind of a good faith

19  interpretation of the EPCA.

20          THE COURT:  Okay.

21          MR. BUTLER:  Thank you, Your Honor.

22          THE COURT:  Mr. Lauria.

23          MR. LAURIA:  Your Honor, could we take just a short

24  break just to arrange my thoughts here?

25          THE COURT:  Sure.

70

1          MR. LAURIA:  Could we take five minutes?

2          THE COURT:  Yeah, that's fine.  I guess that'll lead

3    to some musical chairs too, for the people who have been

4    standing.  By the way, there is an overflow courtroom if you

5    want to listen.  And then you can look at your blackberries

6    too, more efficiently.  So I'll -- I'll take a break till 12.

7          MR. LAURIA:  Thank you.

8      (Recess from 11:54 AM till 12:08 PM)

9          THE COURT:  Okay.  We're back on the record in

10   Delphi.

11         MR. BUTLER:  Your Honor, during the break as Mr.

12   Lauria asked to arrange his thoughts, I had the opportunity to

13   think through one of the questions you asked me, and Mr. Lauria

14   is kind enough to let me make those remarks in closing our

15   argument.

16         You had asked, Your Honor, about what specific

17   protections did the plan investors have or how could the

18   debtors have tripped or perhaps tripped issues relating to, you

19   know, there only being a dollar of cash left in the company or

20   a debt being far more then it ought to be.  And during the

21   course of my remarks I said I did not believe that this

22   transaction had violated the provisions that exist in the EPCA.

23   In handling the hundreds of pages we have I couldn't remember

24   the exact cites to put on the record and so I simply want to

25   point Your Honor to two areas of the EPCA.

71

1        One is 9(a)(xxvii) which deals with capitalization

2    and which provides at (i) that the company's "net amount" shall

3    not exceed, by more that 250 million, the "net amount" set

4    forth in the business plan.  And then that amount's defined in

5    that same paragraph as the sum of indebtedness, pension plan

6    contributions, certain accrued liabilities, less cash on hand.

7    There's a formula there.  So that's one protection that the

8    plan investors negotiated.  This transaction would not trip

9    that, in the debtors' view.  And that's -- that's one.

10        The other is, Exhibit E to the EPCA, which is -- has

11    a provision determining the -- the one -- the GM note that the

12    -- or a portion of the GM note that the plan investors

13    expressly approved.  In the fourth bullet it makes a reference

14    to "liquidity amount."  And there's actually a governor in the

15    -- in the calculation there of -- of how -- of what GM gets

16    paid in cash and what needs to be taken in the note.  And

17    there's a definition of liquidity amount that is set -- fixed

18    at

19    3.189 billion dollars.  And so there's a -- there's a formula

20    there as well.

21        So in terms of specifically negotiated projections

22    that the plan investors have, they have both the capitalization

23    covenant at 9(a)(xxvii) and they have the -- and the governor

24    set forth in the liquidity definitions in Exhibit E of the plan

25    -- Exhibit E to the EPCA rather.  I just wanted to --

72

1          THE COURT:  Okay.

2          MR. BUTLER:  -- more fully respond to Your Honor's

3     questions.

4          THE COURT:  Okay.

5          MR. BUTLER:  Thank you very much.

6          THE COURT:  Mr. Lauria?

7          MR. LAURIA:  Before I go, I just wanted to find out

8     is there anybody else who's speaking in favor of the motion?  I

9     guess everybody who's for the motion ought to go and then

10    I'll --

11         THE COURT:  That's fair.  Does anyone want to -- want

12    to address the motion on --

13         MR. BROUDE:  Your Honor, if it's okay I'll speak from

14    here since I'm going to be extremely brief.  Your Honor, Mark

15    Broude, Latham & Watkins on behalf of the official committee of

16    unsecured creditors.  Unlike the equity committee, we did not

17    file a formal piece of paper supporting the motion.  However, I

18    don't think it'll be surprising to anyone to know that we do,

19    in fact, fully support the motion.  We support the limited

20    relief that the debtors are seeking here.  We do not believe,

21    as Jack has stated, that there's any need or even any context

22    today to address issues of specific performance or damages.  We

23    just -- those issues are for another day, a day which we hope

24    never comes.  Today the issue is relatively simple and we

25    believe easily decided one.  And that's simply the manner in

1    which the underwriters can syndicate the exit facility.  I

2    think it's important that the debtors have the appropriate

3    guidance that they need so that they can go out and have that

4    facility syndicated within the time frames that are

5    contemplated.  We're operating under exigent circumstances that

6    are set forth in the document and it's important for all of us

7    to be able to move forward and hopefully be very productive in

8    the weeks that are available to us.

9            THE COURT:  Okay.

10           MS. STEINGART:  Your Honor, Bonnie Steingart on

11   behalf of the equity committee.  I would like to make two

12   points.  The first is that the relief requested today by the

13   debtors is precisely what 1142 was -- was put in the Code to

14   enable the Court to do.  Indeed the period between confirmation

15   and consummation with respect to a plan such as the one before

16   the Court is a particularly sensitive time.  When the efforts

17   and sacrifices of so many groups over such a long period can be

18   thrown into a state of disarray when one of the participants,

19   when one of the necessary participants, is behaving in a way

20   that is disruptive to that purpose.  So we believe that the

21   Court certainly has the authority to grant the relief that the

22   debtor has asked for today.  And that that's supported by 1142

23   and all other provisions of the Code.  Thank you, Your Honor.

24           THE COURT:  Okay.  All right.  You can go ahead,

25   Mr. Lauria.

74

1          MR. LAURIA:   Thank you, Your Honor.   Notwithstanding

2     Mr. Butler's protestations to the contrary, the new GM plan

3     financing proposal as set forth in the motion violates the

4     EPCA, strips the company of needed liquidity in an increasingly

5     difficult and uncertain market.   And results in GM, again,

6     having undue influence over the debtors' affairs.

7          In filing the 1142 motion the debtor seeks specific

8     performance with respect to a contract that it has acknowledged

9     publicly and to this Court both before and after the contract's

10    execution and approval does not provide for specific

11    performance.   They also seek to make the investors support

12    changes to the deal that they, in good faith, don't agree to.

13    And they seek an advisory ruling, from this Court, which has

14    been made obvious by the colloquy between debtors' counsel and

15    the Court, that financing the debtor doesn't have and may

16    never, in fact, get would satisfy a condition to closing under

17    the EPCA that may or may not ever occur.

18          It's either, Your Honor, a desperate gambit on the

19    part of the debtors to try to force the investors to play along

20    long enough for the debtor to exhaust all possibilities that it

21    can get its financing or it's a set up for a damages claim

22    arising from the investors' purported breach of a deal the

23    debtor otherwise could never have closed.   Or maybe it's both.

24          In the end it's truly unfortunate that the debtor has

25    resorted to litigation.   Not only has the threat of this

75

1   litigation, outstanding now for over a month, truly chilled the

2   ongoing dialogue between the parties regarding the underlying

3   deal, it has grown from being a mere distraction --

4         THE COURT:  Well, let me -- let me ask you, why does

5   there -- why does there need to be a -- if -- if the debtor is

6   not -- if the debtor is in compliance with the EPCA in regard

7   to the proposal to have GM provide the portion of the financing

8   that it's now proposing, if it's in compliance, why does there

9   need to be dialogue?

10         MR. LAURIA:  Your Honor, the agreement contemplates

11   dialogue.  And indeed Section 5(t) which was discussed --

12         THE COURT:  But again, if there's compliance, why

13   does there need -- I mean -- I mean it's nice of you all to

14   plan, you know, the closing party, but what other dialogue do

15   you need if the debtor's in compliance?

16         MR. LAURIA:  Your Honor, if we agreed that the

17   financing was in compliance, I suppose we wouldn't be here.

18         THE COURT:  Well, I know.  That's the issue.

19         MR. LAURIA:  Well the issue, among others, is whether

20   or not there is a route to this hearing that's proper.

21         THE COURT:  Okay.  And I'm posing that question to

22   you.  It seems to me that if there's a legitimate dispute about

23   compliance and the parties have undertaken respective,

24   reasonable best efforts to comply and you're facing a deadline,

25   both of you, it seems to me that's a pretty live dispute.

76

1          MR. LAURIA:  Well, Your Honor, the -- among the

2    problems we have is we don't, at this moment I think, know

3    fully and finally what it is we're fighting over.

4          THE COURT:  I understand that.  But isn't there a

5    fundamental issue that you definitely are fighting over, which

6    is whether GM can provide more than a 750 million dollar note?

7          MR. LAURIA:  That's one of the issues, Your Honor.

8          THE COURT:  Okay.

9          MR. LAURIA:  But certainly --

10         THE COURT:  Let's focus on --

11         MR. LAURIA:  -- I wouldn't even make that --

12         THE COURT:  -- let's focus on that one first.

13         MR. LAURIA:  All right.

14         THE COURT:  Okay.  What is -- what is the plan

15   investors' response to Mr. Butler's argument that the proposal

16   to involve GM, in addition to the 750 million dollars second

17   lien note, violates the EPCA?

18         MR. LAURIA:  Well Your Honor, let's start with the

19   provision of the EPCA that I think the Court started with,

20   which is 5(p).  Given that the debtor has chosen to proceed in

21   a non-evidentiary fashion, I think we start with the plain

22   language of Section 5(p) which, Your Honor, to read what we

23   think is the controlling language here into the record, "Other

24   than the GM amendments, the company shall not enter into any

25   other agreement with GM that (i) is materially inconsistent

1   with this agreement and the plan; (ii) is outside the ordinary

2   course of business or (iii) the terms of which would have a

3   material impact on the investors' proposed investment in the

4   company."

5           Now, we think that that language is pretty clear and

6   pretty plain.  And in listening to Mr. Butler's responses to

7   the Court, I think the debtor has failed to direct the Court to

8   any language in any document that would cause that language not

9   to mean what it plainly means on its face, which is an

10  agreement with GM outside their ordinary course of business

11  cannot be entered into.  We -- we negotiated for that

12  protection.  And let's not forget the context of that

13  protection.

14          This is a company whose fundamental transition,

15  transformation, as characterized by the debtors, was to

16  separate itself from its former parent once and for all as much

17  as possible.

18          THE COURT:  But I don't -- I don't -- do I need to

19  get to that?

20          MR. LAURIA:  I don't think so, Your Honor.  I think

21  the language is plain on its face.  And I think that the

22  debtors have failed to point the Court to anything that would

23  cause the Court to deviate from giving that language its plain

24  meaning, quite frankly.  And the effort that counsel made to

25  talk about the plan and the incorporation of the EPCA into the

78

1    plan, etcetera, is futile because Article I, Section F of the

2    plan specifically says that to the extent there's any conflict

3    between a provision in the plan and the EPCA, the provision of

4    the EPCA prevails.  So we don't need to look to the plan.

5           Now Mr. Butler, I don't think, pointed us to any

6    provision in the plan that conflicts with the plain meaning of

7    this language, but even if he were to do so, Section --

8    Article I, Section F says the EPCA prevails.

9           I think, just as relevant to this point, to the

10   extent that there was some notion that something about the

11   confirmation order changed the provisions of the EPCA, that too

12   must fall.  Paragraph 32 on page 54 of the confirmation order

13   specifically provides -- and I guess I should just, rather than

14   paraphrasing, read the language into the record.

15   "Notwithstanding any provision in this confirmation order, the

16   investment agreement is valid, binding, in full force and

17   effect in accordance with its terms and constitutes an

18   obligation of the parties thereto, fully enforceable on its

19   terms and is not amended or modified in any way hereby."

20          So as a starting point, Your Honor, we would point

21   the Court to Section 5(p) and say that the deal proposed with

22   GM, and by the way in all of the debtors' papers and all the

23   correspondence on this topic until this morning, it was

24   characterized as an agreement with GM, as indeed it has to be

25   because as the Court pointed out, there has to be some

1    understanding about how this money is flowing.

2              THE COURT:  I don't understand that.

3              MR. LAURIA:  Well, Your Honor, if GM is providing

4    financing it's got to match up to an obligation owed to GM.

5              THE COURT:  Well, let's just parse through that.  Are

6    you saying that if GM didn't participate as the debtors are

7    proposing and only did the 750 million dollar note, if the

8    debtors got the money from whatever bank is left these days and

9    that the -- the closing memo said that two billion of this

10   money is going to go to this account of GM, that wouldn't be an

11   agreement with GM, would it?

12             MR. LAURIA:  That would -- that would not be.

13             THE COURT:  Okay.

14             MR. LAURIA:  That would not be.  What's -- what's --

15   what I think is before the Court is a term sheet that has been

16   heavily negotiated between the debtor and GM.  And in fact, in

17   all of the meetings that we participated in, the syndicators

18   were not present.  This -- these negotiations were between GM

19   and the debtor with the plan investors' participation.  And

20   indeed specifically contemplate direct agreements between --

21             THE COURT:  Yeah, I know.  I understand that.

22             MR. LAURIA:  -- the debtor and GM.  So -- so I think

23   it's simply sophistry to suggest that this is not a deal

24   between the debtor and GM.

25             So, Your Honor, I think that would be the starting

80

1   point and maybe the ending point on the problem with GM's

2   proposed participation.  I am, however, happy to the Court --

3   to the extent needs to hear it, to understand that we're not

4   just making a technical objection.  I think it's -- you know,

5   it's very important from the plan investors' perspective that

6   the Court understand we -- we have -- we take this all very

7   seriously.  We have put at stake billions of dollars.

8        THE COURT:  No, I -- I want to be clear.  And I am

9   approaching this issue, particularly based on how it's been

10  teed up before me, differently then I approached what I

11  perceived to be, sort of, a unilateral act by one or more of

12  the investors a few months ago, where I really was pretty

13  incensed.

14       It seems to me that while it may not necessarily make

15  them the most popular institutions in the automotive world, or

16  anywhere else, if the investors have a contractual right

17  they're entitled to rely on it.  That's -- that's fundamental,

18  you know.  Whether they -- they want to bargain for some

19  amendment for that, you know, whether they -- they want to

20  bargain for some amendment for that, you know, again, that may

21  or may not be a good thing as perceived by others, or not.

22       So it seems to me the focus here is on whether they

23  have the rights or not.

24       MR. LAURIA:  Your Honor, I will tell you that my

25  clients will be very pleased to hear the Court's comments on

81

1    that issue because they've been very concerned by the way we've

2    got to this point that perhaps there is some view that our

3    contract is not a contract; it gets construed in a classical

4    fashion.

5              THE COURT:  Well, it -- it seems to me that, you

6    know, since you mentioned negotiations, there's always a

7    negotiation backdrop.  And as Mr. Butler said, if this

8    transaction doesn't occur, the context of what's going to be

9    brought before me and elsewhere will be totally different.

10   That's -- that's where, you know, things get ugly, or

11   potentially ugly.

12             MR. LAURIA:  Right.

13             THE COURT:  Depending on what discovery brings out.

14             MR. LAURIA:  Right.

15             THE COURT:  But I think the focus is on what parties'

16   rights are under the contracts.

17             MR. LAURIA:  Your Honor, having addressed the GM

18   component of this, perhaps it would make sense to talk a bit --

19             THE COURT:  Well, is --

20             MR. LAURIA:  Sorry.

21             THE COURT:  -- let me just -- before you move on on

22   GM, is -- just focusing on the GM component, is 5(t) implicated

23   by that or is that something else?

24             MR. LAURIA:  I think, Your Honor, 5(t) is implicated.

25   It is a different protection, one that, for most of Mr.

82

1    Butler's argument, apparently means nothing, which I think is

2    the problem with the debtors' argument.  According to the

3    debtor, they are free to change the financing however they see

4    fit.  And as long as it satisfied the 2008 pro forma interest

5    requirement and leaves them with 1.4 billion dollars of

6    availability under the ABL, 5(t) separately means nothing.

7          THE COURT:  I'm -- I'm just focusing on GM now.  Does

8    5(t) have any -- does it implicate GM?

9          MR. LAURIA:  Yes.

10          THE COURT:  Okay.

11          MR. LAURIA:  Because 5(t) gets you through 3(qq)

12    which defines the term "debt financing" which has two

13    components to it, the "bank financing" and the "GM financing."

14          THE COURT:  Uh-huh.

15          MR. LAURIA:  It says that the financing cannot be

16    changed in a way that is adverse to the company or the

17    investors.  And were we to make an evidentiary presentation we

18    believe that we would be able to present evidence that

19    inserting GM into the financing as proposed would be adverse to

20    both the company and the investors.

21          THE COURT:  Okay.

22          MR. LAURIA:  One -- one --

23          THE COURT:  The --

24          MR. LAURIA:  I'm sorry.

25          THE COURT:  -- the term sheets that are referenced in

83

1    the financing letter define the "lenders," have you looked at

2    that provision?

3        MR. LAURIA:  Your Honor, I would like to -- to grab a

4    copy of the financing letter if I may?

5        THE COURT:  Okay.

6    (Pause)

7        MR. LAURIA:  Sorry, your Honor.

8        THE COURT:  Okay.  So if you go to the definition of

9    "lenders," which is on the second page, it says "The syndicate

10   of banks, financial institutions and other entities arranged by

11   the arrangers."  And I assume GM's an entity, and it doesn't

12   say "and not GM," so how would this -- how would it be a

13   change, under your argument, to add GM?

14       MR. LAURIA:  Well, Your Honor, the contemplation was

15   that this was going to be a widely syndicated loan --

16       THE COURT:  I understand.  But you've just tried to

17   hang Mr. Butler on the plain language of an agreement.

18       MR. LAURIA:  Your Honor, I guess if the -- if the

19   Court's question is could the lenders go out and purport to

20   syndicate the loan to GM, is that prohibited by the financing?

21   I suppose it's not.

22       THE COURT:  Okay.

23       MR. LAURIA:  It certainly wasn't within the

24   contemplation of the parties that that was going to happen

25   when -- when this agreement was signed up.

84

1          THE COURT:  Okay.  So then let's turn to the other

2    5(t) arguments that you were making, which I think go to

3    whether what the debtor is proposing is a -- is something that

4    the investors have the right, if it adversely affects them

5    under 5(t) --

6          MR. LAURIA:  Right.

7          THE COURT:  -- to decline to agree to.

8          MR. LAURIA:  Well Your Honor, as we have tried to

9    point out in our papers, and I do apologize for the length --

10         THE COURT:  No, that's all right.  I -- never mind

11   about that.  It actually was helpful to me to have one long one

12   and one short one.

13         MR. LAURIA:  There are a number of ways in which we

14   believe the financing currently being proposed to be marketed,

15   in combination with the GM term sheet, deviates from what is

16   contemplated by the term sheet attached to the financing

17   letter.

18         Most fundamentally, the amount has been reduced from

19   6.8 billion to 6.125 billion.

20         THE COURT:  The -- what is the response then to

21   Mr. Butler's point that the amount was already dealt with under

22   9(a)(xxviii)?

23         MR. LAURIA:  Well Your Honor, there's no -- I am

24   aware of no evidence in this record reflecting an amendment

25   where the investors agreed to a reduction of the amount of

85

1    financing required by the EPCA and the attachments thereto.

2    The debtor has made unsupported statements about an agreement

3    and what the nature and terms of that agreement were.  All of

4    those things are outside the record and would certainly be the

5    subject of the development of a factual record for the Court to

6    determine what agreement was reached and what that agreement

7    meant.

8            THE COURT:  But there's a -- I'm not necessarily

9    disagreeing with you.  I just want to explore this some more.

10   9(a)(xxviii) has this mechanism for a 88(h) delivering within

11   the "relevant date," ten days after delivery by the company, of

12   the various documents.  And Mr. Butler contends that the change

13   to Section 7.14 of the plan, which took out the specific

14   6.8 billion financing initiated that process and that there was

15   no -- no objection.

16           MR. LAURIA:  Your Honor, there was no objection for a

17   number of reasons.  Number one, the amendment to paragraph 7.14

18   of the plan specifically says that any amendment to the

19   financing still has to, and the language is underlined in the

20   copy I have, it's four lines from the bottom of the paragraph,

21   "satisfy the conditions of the investment agreement."  And so

22   it was our view that we were not giving up any ground with the

23   entry of the confirmation order and the amendments to the plan

24   made in connection therewith, particularly taking into account,

25   in addition to paragraph 32 of the of the order which says this

1     isn't modifying the EPCA in any way.

2          THE COURT:  Well when, under 9(a)(xxviii) is there

3     supposed to be -- I mean the "relevant date's" passed.  So when

4     do you make that determination?

5          MR. LAURIA:  Well, when we got the new financing

6     package on February 23rd, on February 24th we sent the debtor a

7     letter saying we don't approve this.  I think that is in the

8     record.

9          THE COURT:  But as far as the dollar amounts of the

10    loans, which is all I'm talking about now I'm not talking about

11    GM at this point, the dollar amounts of the lending, weren't

12    those dollar amounts already in front of the investors at the

13    confirmation hearing?

14         MR. LAURIA:  Your Honor, there were no documents that

15    would constitute material investment documents that changed

16    those amounts.  I mean, if you want to go outside the record --

17         THE COURT:  No, no, that --

18         MR. LAURIA:  -- I can talk about it a little bit.

19         THE COURT:  -- there's nothing -- you're saying

20    there's nothing in the record, at least, and that's all I'm

21    focusing on.  I'm quoting the record to show what was before

22    you as a -- as a material investment document as of the

23    confirmation hearing.

24         MR. LAURIA:  Right.

25         THE COURT:  You weren't aware of the change from 6.8

1    to 6.125?

2            MR. LAURIA:  Well there's -- there's a story, Your

3    Honor, which I --

4            THE COURT:  All right.

5            MR. LAURIA:  -- as a lawyer, I'm happy to talk about.

6            THE COURT:  No, that's -- that's fine.

7            MR. LAURIA:  But I don't -- we don't have a record to

8    deal with here, Your Honor.

9            THE COURT:  Okay.

10            MR. LAURIA:  But fundamentally, that is a very

11    important change to the financing.  And as we have included in

12    the proffered materials that we've submitted and that we've

13    agreed we're not going to discuss openly on the record here,

14    there -- there -- we believe that we did not waive our right to

15    require the full 6.8.  And that we believe that under the

16    circumstances as they have continued to develop in the markets,

17    in the industry and otherwise, again as set forth in the

18    confidential materials that we've filed with the Court, there

19    is no basis for the debtor, at this point, taking the position

20    that it's entitled to go out with 6.125 billion of financing as

21    opposed to 6.8.

22            THE COURT:  Well, the -- I guess the point, as to

23    developments, is concerned there's no -- there's no MAC, right,

24    in this EPCA?

25            MR. LAURIA:  We're not -- well, there is a -- there

88

1   is a MAC but it eliminates market outs.

2          THE COURT:  And are you also saying that the business

3   plan has not already passed through the 9(a)(xxviii) mechanism?

4          MR. LAURIA:  We're not arguing about the business

5   plan today, Your Honor.

6          THE COURT:  But you're nevertheless suggesting that

7   you can still rely on changes to the company's business and --

8   and financial markets?

9          MR. LAURIA:  Well the company came to us, Your Honor,

10  with certain supplemental information.  Again, this is now

11  outside the record.

12         THE COURT:  No, I -- I'm just focusing on the -- the

13  change in the dollar amount of the -- of the financing from 6.8

14  to 6.125.

15         MR. LAURIA:  Your Honor, we're -- our position, as a

16  technical matter, is that there's no evidence in this record

17  that the debtor has directed to you that supports a

18  determination that we have agreed to that reduction.  And if we

19  do have an evidentiary hearing, we'll be able to demonstrate

20  exactly the nature of the exchange between the parties on this

21  topic.

22         THE COURT:  Okay.

23         MR. LAURIA:  So -- so we would point to the change in

24  the amount as being an adverse change to the company and to the

25  investors.  We would point to the change in pricing, which

89

1    again I will not describe on the record here but as we've

2    pointed out in our papers, is material. And I would also point

3    out to the Court that the financing letter does not include

4    flex terms as you would perhaps typically see in a financing

5    letter. And so indeed, as we had proffered to the Court, we

6    think we can demonstrate that the interest rates that are set

7    forth in the term sheet in fact were the interest rates that we

8    were requiring the debtors to get in their financing.

9         THE COURT: Now, Mr. Butler says that if that were

10    the case you wouldn't need a whole series of independent

11    provisions dealing with a cap on interest rates, a cap on the

12    net amount as far as capitalization is concerned and -- and the

13    like. Or -- well, I'll just leave it at that.

14         MR. LAURIA: Your Honor, the interest rate cap in

15    9(a)(xix) is a one year, pro forma interest rate test for 2008.

16    But we are making a long term investment and it is our

17    understanding that contrary to the comment about -- well,

18    putting aside the comment about one year financing, that the

19    financing is going to be long term as well. It is going to be

20    LIBOR based. And so we were concerned that there could be

21    movements in the out years or provisions that -- that would not

22    be captured by the 2008 test that we still wanted to be

23    protected from. And that's why we went from a contract that

24    the Court is saying that is in the record that said the

25    financing was to be on prevailing market terms to one that

90

1    specifically refers to a financing letter and the term sheets

2    attached.

3          We -- the prior version of the EPCA said the

4    financing was to be on prevailing market terms.

5          THE COURT:  No, I understand that point.

6          MR. LAURIA:  Yeah.

7          THE COURT:  I'm still --

8          MR. LAURIA:  And we went to a term sheet not to get

9    looser but to get tighter in terms of what the financing was

10   supposed to be.

11         THE COURT:  Well, why would you have had these other

12   provisions then?

13         MR. LAURIA:  We were -- you know, you can say belt

14   and suspenders but remember the 585 captures all interest

15   related expense of the company, not just the new financing.

16   There are a whole series of things that are moving around that

17   will go into the calculation of that 585.  And that's -- that's

18   a specific test for the first year out.  The same thing with

19   the ABL availability on day one, the undrawn ABL availability

20   of 1.4.

21         THE COURT:  Okay.

22         MR. LAURIA:  Your Honor, I -- you know, a comment was

23   made by counsel about the fact that this letter is a best

24   efforts letter and therefore none of the terms mean anything.

25   That's not the usage that this agreement was to have in

91

1    incorporating it into the EPCA.  And I would submit again that

2    if best efforts mean none of the terms mean anything then the

3    provisions 3(qq) which define the "debt financing" and 5(t)

4    which say it can't be changed in a way that's adverse to the

5    company or us would be rendered meaningless.

6            According to Mr. Butler, except for one year, they

7    can change anything as long as they otherwise satisfy the

8    provisions of the plan.  5(t) provides us with no protection

9    whatsoever.  And I don't think that that is within any

10   reasonable rule of interpretation of the contract, to simply

11   read the provision out of the contract.

12   (Pause)

13           MR. LAURIA:  As a further response to Mr. Butler's

14   comment about changing the financing to one year, I certainly

15   can't see anything in the contract that would suggest that

16   reducing the term of the financing should be treated any

17   differently than reducing the amount or the pricing.

18           So either it's all subject to some protection or none

19   of it's subject to protection.  I don't think there's any -- I

20   don't think Mr. Butler pointed us to anything, and I certainly

21   don't know of any language here, that says the term you're

22   protected on but the amount and pricing you're not.

23           THE COURT:  Okay.

24           MR. LAURIA:  By the way, Your Honor, one -- one

25   related point I want to mention here on this particular topic

92

1    is that there is the capitalization condition, 9(a)(xxvii).

2    And the record is devoid of any evidence as to whether the

3    financing package the debtor is currently proposing would

4    result in satisfaction of the capitalization condition.

5        THE COURT:  But I don't think the debtors are looking

6    for any sort of ruling on that point.

7        MR. LAURIA:  Well, I don't -- I don't know what -- I

8    mean, you know, there comes a point when you have to ask the

9    question of what the debtors really are asking for a ruling on.

10       Your Honor, we've -- we've had some discussion to

11   this point about the issue of specific performance and its

12   relevance to the relief that is being sought under 1142.  And

13   just to -- to try to explain our concerns on this particular

14   topic I'd like to run through a couple of points.

15       Number one, the motion asks that the Court issue an

16   order directing the investors to comply with their reasonable

17   best effort obligation under 6(d) of the EPCA to "take all the

18   actions and do all things reasonably necessary, proper or

19   advisable under the agreement and applicable laws to cooperate

20   with the company and to consummate and make effective the

21   transactions contemplated by the this agreement, the preferred

22   term sheet, the GM settlement and the plan."

23       Now, I don't know how this can be viewed as anything

24   other than a request that the Court direct specific performance

25   of a provision of the plan.  And as such, we believe, it should

1    be denied for a number of reasons.

2         Number one, the EPCA itself does not permit specific

3    performance.  Section 11(b) of the EPCA, by the plain meaning

4    of its words, limits the liability investors to up to a hundred

5    million dollars prior to the approval of the disclosure

6    statement and up 250 million dollars afterwards.  We believe

7    that the language is clear and unambiguous limiting liability,

8    not damages but liability, to a dollar amount forecloses the

9    imposition of specific performance obligations, which, under

10   this contract, at the end of the day could be a liability of up

11   to 2.55 billion.

12        Now what's important is that our interpretation of

13   the agreement is exactly how the debtor interpreted the

14   contract in statements on the record to this Court, to the plan

15   investors, both before and after the EPCA was approved and

16   signed by the parties.

17        In the debtors' omnibus reply --

18        THE COURT:  No, I -- I've read that.

19        MR. LAURIA:  We think this amounts to -- to a

20   judicial admission, Your Honor, on the point.

21        THE COURT:  What does that mean, "judicial

22   admission"?

23        MR. LAURIA:  Well, they can't change their position

24   later.  We -- we were in Court.  We were a party in interest --

25        THE COURT:  No, what is -- there's a doctrine of

94

1    judicial estoppel.

2         MR. LAURIA:  Judicial estoppel, that's really what

3    I'm driving at.  I'm sorry, Your Honor.  The concept is

4    judicial estoppel that they have -- they took a position in

5    connection with a litigation --

6         THE COURT:  But how did they win on that, to your

7    detriment, because you need that to show judicial estoppel?

8         MR. LAURIA:  Well, Your Honor, I wouldn't say -- I

9    guess I wouldn't say it was to our detriment.  It was

10   confirmatory of the deal.

11        THE COURT:  So I think the more appropriate issue is

12   whether this should be raised now and whether it is, in fact,

13   and now I'm talking about paragraph 11, a bar to an equitable

14   remedy.  And I'm going to just leave you with a few cases on

15   that point, because, frankly, I don't think it's that clear.

16   And of course there's a factual issue, ultimately, so that's

17   why I'm only leaving you the cases.  Because ultimately,

18   whether specific performance is owed or not, leaving aside the

19   parties' documents, is a factual issue: can a monetary remedy

20   be granted?  But let me read you the cites, Rubenstein v.

21   Rubenstein, 23 N.Y.2d. 293 (1968), Traveler's Insurance Company

22   v. 633 Third Associates, 973 F2d. 82 (2nd Cir. 1992), Coizza,

23   C-O-I-Z-Z-A, v. Cross Bay Realty Corporation, 831 N.Y.F2d 433

24   (2nd Dept. 2007); Granite Broadway Development LLC v. 1711 LLC,

25   845 N.Y.S2d 10 (1st Dept. 2007); and Sutton Madison Inc. v. 27

95

1   East 65th Street Owners Corporation, 779 N.Y.S2d. 461.

2           But I agree with you, ultimately, that on this record

3   I don't think I can determine specific performance because I

4   need to show or to find that a legal remedy is inadequate.  On

5   the other hand, I do think there's an interesting question

6   raised, which is whether Congress created a separate procedural

7   mechanism -- not a separate procedural ability to change the

8   parties' -- documents but a separate procedural mechanism under

9   1142(b).

10          MR. LAURIA:  Well, Your Honor, we have come to

11  understand 1142 as strictly an enabling provision and not one

12  that would change the parties' rights.  And so if you have a

13  contract that, although associated with the plan, controls, to

14  the extent of any inconsistency with the plan, and is not

15  modified with the confirmation order, we don't think -- we

16  don't see how you get to use 1142 to change our rights under

17  the contract.  If we can't be compelled to perform specifically

18  without 1142, we don't see how 1142 can change that.  It can

19  enforce the rights under the contract, which we maintain would

20  be to seek damages for a breach, up to a capped amount.

21          I also want to take another shot at the question that

22  you asked about how -- and are to our detriment the statements

23  the debtor made.  Had the debtor -- if the debtor in fact

24  believed at the time that the statements were made that it was

25  not entitled to specific performance, that it may have been

96

1    entitled to specific performance, and had so stated, either in

2    its omnibus reply or in statements made to the Court, Your

3    Honor, I can assure you that I would have popped up like a

4    jack-in-the-box and said that's not our deal, and if we don't

5    fix this we don't have a deal.  And so I have waived my

6    opportunity to make that point at that time before the contract

7    has been signed.  So, Your Honor, I do believe that the course

8    of conduct of the debtor in connection with that litigation did

9    work to our detriment.

10            THE COURT:  Okay.

11            MR. LAURIA:  It's processing a little slow here, but

12   I think we -- I think we have a serious problem with the debtor

13   having made those statements before our document was signed and

14   now saying, you know, maybe yes, maybe no.  Because the

15   statements the debtor made, including after we signed in the

16   disclosure statement at page 121, are unequivocal statements

17   that there is no specific performance and that their only

18   remedy is to sue of damages up to a capped amount.  And I just

19   don't know how equitably or otherwise the debtor can now be

20   relieved from those statements.

21            THE COURT:  Okay.

22            MR. LAURIA:  And so, Your Honor, if there is no

23   specific performance, there is no specific performance.

24   There's not just a little bit of specific performance, they're

25   either -- it's either available or it's not.

97

1          THE COURT:  Well, let's explore that.  Because I

2     think the context of that, again, is whether the debtor can

3     seek the relief it's seeking.  I don't hear you saying anything

4     more than the debtor can only cause or enforce a contract up to

5     250 million dollars, right?

6          MR. LAURIA:  Well, I think what they can do is call a

7     breach, terminate and sue for damages from the breach.

8          THE COURT:  Well, but 1142 doesn't say that.  It says

9     that you can direct a party to perform, all right?  And isn't

10    it performance, even under your version of the law and the

11    contract and estoppel, that you would have to not breach and

12    ultimately have to pay 250 million dollars?  And right now,

13    what the debtor's saying is they're in breach.

14         MR. LAURIA:  I think we're allowed to breach.  I

15    mean, I mean I'm going to get to the point -- I think parties

16    can breach contracts and contracts -- and law provide with the

17    remedies for the breach on it.  This contract contemplates

18    breach and says here's what happens if a party breaches.  And I

19    don't think it's appropriate to construe 1142 to change the

20    deal the parties made on what -- regarding what happens --

21         THE COURT:  But I guess -- I guess --

22         MR. LAURIA:  -- on a breach.

23         THE COURT:  -- what I'm saying is that 1142(b), at a

24    minimum, says that the Court can direct the necessary party to

25    perform any other act contemplated.  And so one of the acts, I

98

1   would think, would be either to stop breaching or pay the 250

2   million dollars.

3        MR. LAURIA:  Well, you have to go back and look at

4   11(b), because 11(b) doesn't say liquidated damages pay 250.

5   11(b) says liability up to 250, so, I mean, there would have to

6   be a trial to establish damages.

7        THE COURT:  Right.  But you don't think the debtor's

8   entitled, under 1142(b) to seek a determination that the

9   parties should be doing something under the plan?

10        MR. LAURIA:  Well, I think, to parse a little

11   thinner, or a little finer, I think that the cases have

12   generally said that up to a mere ministerial type of act, we

13   can proceed with a motion like this.  But if we're going to try

14   to get to what is in effect a mandatory injunction, you have to

15   utilize appropriate procedural mechanisms to get that relief.

16        THE COURT:  Well --

17        MR. LAURIA:  And importantly, Your Honor --

18        THE COURT:  -- does the phrase mere ministerial act

19   appear anywhere -- aren't these cases cases where the court

20   determines that a party is in breach of its obligations, and

21   they're just being driven by the nature of the evidence?

22        MR. LAURIA:  Well, you know, Your Honor, certainly

23   some of the cases that we read don't even ever get to the word

24   or concept of breach.

25        THE COURT:  Because they accept it.  Because they

**VERITETEXT/NEW YORK REPORTING COMPANY**

1    know it's a breach.

2         MR. LAURIA:  Well, the court didn't premise the

3    exercise of power under 1142 on the concept of breach in some

4    cases.  What we're concerned about -- I mean, as this all kind

5    of comes together, is 1142 certainly can't create new Federal

6    Court jurisdiction.  Federal Court jurisdiction is created

7    elsewhere, and 1142 cannot be interpreted of an expansion of

8    that jurisdiction.  One of the limits on jurisdiction is do you

9    have a judiciable issue?

10        THE COURT:  Well, you're skipping to another point.

11        MR. LAURIA:  Yeah.  Yeah, I'm --

12        THE COURT:  Have we gotten off this point, though?

13        MR. LAURIA:  Your Honor, we just -- we don't see any

14   support for the notion that 1142 creates rights that the

15   contract doesn't provide.

16        THE COURT:  Well, I guess that's -- that's kind of --

17   you know, that's kind of like motherhood and apple pie.  I

18   would think one of the rights with 1142 as a backdrop, since

19   the Bankruptcy Code is written into every contract, is that a

20   debtor can say "stop breaching" and enforce -- and perform the

21   contract.  Now, I understand your point about, well,

22   performance of the contract here may be limited to money

23   damages, but I don't see why 1142 can't be used to direct

24   someone to stop breaching.

25        MR. LAURIA:  Well --

100

1          THE COURT:  If there's a breach.  We're just talking

2     now about power as opposed to whether there is one.

3          MR. LAURIA:  Your Honor, I think that you could use

4     1142 to order damages for a breach in this situation.  I think

5     that's correct.  I --

6          THE COURT:  I say -- maybe I'm being too subtle here.

7     It seems to me that you could at least declare that there's a

8     breach and the contract itself says what happens at that point.

9          MR. LAURIA:  Right.

10         THE COURT:  And frankly, since the issue of specific

11    performance really isn't before me, because I think you need

12    evidence to determine whether something is specific -- the

13    remedy is available, we need to decide all the other points,

14    then what's really being sought here is simply a determination

15    whether, in fact, the assertion by the lenders ex-Goldman, that

16    Delphi's financing proposal is not in compliance, is a breach.

17         MR. LAURIA:  Well, and that, I think, does kind of

18    transition to what I think is a logical next issue here --

19         THE COURT:  Okay.

20         MR. LAURIA:  -- which is what does the remedy the

21    debtor -- what really is the remedy the debtor seeks.  Because

22    the contract clearly contemplates that the debtor is to update

23    us on its progress with its financing.  We believe says that

24    changes can't be made that are adverse to us and presumably,

25    because of that (gestures).

101

1        THE COURT:  That's not going to show up very well on

2   the transcript.

3        MR. LAURIA:  We've got to be able to say we think

4   that the debtors' made a change that's adverse to us, which is

5   all we've done.

6        THE COURT:  And the debtors have said, in this

7   instance, you're wrong.

8        MR. LAURIA:  Right.  And to resolve that dispute,

9   Your Honor, I think you need a lot more evidence than the

10  document.  We are --we have tried to proffer to you, very

11  quickly, evidence that we would put into the record to

12  demonstrate --

13        THE COURT:  But that --

14        MR. LAURIA:  -- that we're right.

15        THE COURT:  -- but that's fine.  But that's not --

16  I've already dealt with that issue.

17        MR. LAURIA:  But, Your Honor, my question to you is,

18  so I can understand where the Court is going here, is, are we

19  only allowed to be right?  And if we're wrong, is it a breach?

20  If we're -- in good faith, if we believe that the financing

21  does not satisfy the requirements of the contract, is there

22  something in our best -- reasonable best efforts obligation

23  that we're breaching?

24        THE COURT:  Perhaps, if the documents are clear on

25  their face.  I think that's right.

102

1          MR. LAURIA:  Well, but, you know, we are getting into

2     concepts of what reasonable best efforts means and what we have

3     to do and what we've done to satisfy reasonable best efforts.

4     And I don't know how this Court decides that without getting

5     outside the document.

6          THE COURT:  If you're in breach of the clear terms of

7     a document, then it seems to me that issue's answered.  If

8     you're not, if it requires parties to look at the facts,

9     ultimately a court to look at the facts, then that's another

10    issue.

11         MR. LAURIA:  Well, that's --

12         THE COURT:  There may or may not be.

13         MR. LAURIA:  -- that's where I'm trying to get is,

14    again, we're talking about a purported breach of a reasonable

15    best efforts obligation.  And there's very little evidence in

16    the record about what's been done and what the implications of

17    what's been done are, other than that the debtor has

18    proposed -- I guess feel you always have to put quotes around

19    the word proposed, because what we have is an incomplete term

20    sheet with brackets and --

21         THE COURT:  It seems to me that anyone of moderate

22    intelligence, leaving aside the specific terms of the

23    documents, which people are generally stuck with unless they're

24    facially absurd, will say to themselves, GM is just paying

25    itself and taking on the debt itself.  To me that means you

103

1    turn to the documents as to the point -- at least as regards to

2    GM.  Did the parties actually bargain to prevent GM from doing

3    that?  And I think that can be seen very quickly in the

4    documents, in how they define "GM" and what they permit GM to

5    do.  The other points you're making, you know, may or may not

6    require more of an analysis.  But as parties are proceeding in

7    their reasonable good faith, it seems to me that they shouldn't

8    be making arguments that are facially, and I'm using this for

9    both the debtor and the investors, that are facially wrong.

10        MR. LAURIA:  Well, we certainly don't think we're

11   doing that.  And if we are, I presume the Court will tell us.

12        THE COURT:  Okay.  I think you presumed correctly.

13        MR. LAURIA:  Part of the problem we have is that

14   things are still so fluid and uncertain.  I think what Mr.

15   Butler has said is that the terms of the financing may still

16   continue to change even after today.  And part of our concern

17   about this invocation of the Court's powers and involvement in

18   the Court in this process, is where does it end?  I mean, it

19   seems like the debtor is looking for a comfort order and may

20   come back in three days and say you know what, the markets have

21   responded and they've said the financing changes like this,

22   would you give us another comfort order?  And they might come

23   back in another week and say, you know, things have changed

24   again and we need another comfort order.  Where does it end,

25   Your Honor?  This -- what is the debtor going to tell the

104

1   market about the Court's ruling?  And is the debtor

2   impermissibly bringing the Court into what, at the end of the

3   day, is either a business negotiation or a litigation.  But it

4   can't be both at the same time.  It seems to use that --

5           THE COURT:  I understand that.

6           MR. LAURIA:  -- well, you're being asked to issue

7   comfort issues, to put it bluntly.

8           THE COURT:  I go back to my original question to you.

9   To my mind, people don't bother to negotiate when the contract

10  is clear.  They're just being pains in the neck at that point,

11  or worse.  They negotiate when there's an uncertainty, a

12  legitimate uncertainty.  So it seems to me, if either of you is

13  right, one of you is being a pain in the neck.  And given the

14  timing here and your mutual obligations, I should direct

15  whoever's being a pain in the neck to cut it out.

16          MR. LAURIA:  Fair enough, Your Honor.  I guess, you

17  know, we would say, we don't know how you figure that out

18  without more.

19          THE COURT:  Okay.

20          MR. LAURIA:  We also don't understand how the relief

21  that the debtors requested can be fashioned.  It seems to us to

22  be unduly vague and untenable.  What does it mean to be ordered

23  to fulfill our reasonable best efforts with respect to the

24  transaction?  Must we say that we agree to something even

25  though we don't?  Must we tell the market that this financing

105

1    is okay even though we believe it isn't?  Can we be required to

2    specifically perform even though we believe we have a contract

3    that says we can't?

4         THE COURT:  What does that provision mean?  It must

5    mean some obligation, right?  I mean, it would seem to me that

6    one of the reasons -- and I said this when I approved the deal,

7    that the debtor signed up to have plan investors named Merrill

8    Lynch, UBS and Harbinger, is that these investors mean

9    something to the marketplace.  They were supposed to get

10   something out of that provision.  Now, I understand, if you

11   have a contract right, you're not acting improperly.  I

12   understand that.  But if you don't have a contract right, it

13   seems to me, then the debtor can enforce that provision.  It's

14   an ongoing provision.

15        MR. LAURIA:  I can't argue with that, Your Honor.

16   All I can say is that enforcement should never be construed to

17   stop us from exercising our rights under the contract.

18        THE COURT:  Well, I wouldn't be enforcing it unless

19   you were wrong about the contract.

20        MR. LAURIA:  There are a lot of pieces here that

21   touch on each other.

22        THE COURT:  Okay.

23        MR. LAURIA:  Your Honor, I think those are the

24   principal points that I had to make here.  Without going

25   outside the record --

1          THE COURT:  Okay.

2          MR. LAURIA:  I think that's it.

3          THE COURT:  Okay.

4          MR. LAURIA:  Thanks.

5          THE COURT:  Oh, you're speaking for the other plan

6    investors?

7          MR. LAURIA:  We're speaking also against the motion,

8    Your Honor.

9          THE COURT:  Okay.

10         MR. LAURIA:  I apologize.

11         (Pause in proceedings)

12         MR. ROSENTHAL:  Good afternoon, Your Honor.  Jeff

13   Rosenthal of Cleary Gottieb on behalf of one of the co-

14   investors, UBS.

15         THE COURT:  Well, are all of you -- all of you

16   counsel going to speak?  I mean there is one joint objection.

17   Is this?

18         MR. ROSENBERG:  Andrew Rosenberg (indiscernible) for

19   Merrill Lynch.  We are not going to speak.

20         THE COURT:  All right -- well, unless counsel says

21   something that you really want to throttle him over.

22         MR. TREPPER:  Your Honor, Myron Trepper of Willkie

23   Farr on behalf of Pardus.  I little reserved but --

24         THE COURT:  Okay.  Okay.

25         MR. KIRSCHBAUM:  Your Honor, Myron Kirschbaum of Kaye

107

1    Scholer, for Harbinger,  we're the same --

2              THE COURT:  Okay.

3              MR. KIRSCHBAUM:  (Indiscernible).

4              THE COURT:  Right.  Which probably won't happen.  All

5    right.

6              MR. ROSENTHAL:  I hope not, Your Honor.

7              THE COURT:  All right.

8              MR. ROSENTHAL:  Your Honor, I just want to focus on

9    two specific issues that came up primarily during the exchanges

10   that you had with Mr. Butler on behalf on the debtors.  And the

11   first one of those goes to the question of Section 5(p).  And,

12   Your Honor, we have proffered in our papers, and I'm not going

13   to repeat them here, obviously, what is in our view, and we

14   think objectively, is the plain meaning of Section 5(p).  And

15   Your Honor asked Mr. Butler, is there anything in the EPCA

16   inconsistent with our interpretation?  And he said no.  He said

17   you have to read it as a whole.  But Your Honor asked him, tell

18   me where it's inconsistent?  And the debtors could not point

19   the Court to any place inconsistent.

20             THE COURT:  Well, he pointed to the paragraph itself.

21             MR. ROSENTHAL:  Yeah, it's not inconsistent, Your

22   Honor.  But what he said, and if you compare the debtors'

23   motion that was filed on Wednesday with the argument made

24   today, they're very different.  Because on Wednesday the

25   debtors argued we can satisfy 5(p).  Today I heard him say

108

1  actually if 5(p) applies, they have problems.  And he said 5(p)

2  doesn't apply, but he couldn't direct the Court to anyplace out

3  of 5(p) that says that.

4       THE COURT:  Well, that's because this isn't an

5  evidentiary hearing.  You would -- if 5(p) did apply, you would

6  need to satisfy -- you potentially could still satisfy it.

7       MR. ROSENTHAL:  Well, I would say, Your Honor, that

8  there's been no allegation even that this is in the ordinary

9  course of business.  And therefore on this record --

10      THE COURT:  Well, you'd need to -- that's an

11  evidentiary question, I would think.  Right?

12      MR. ROSENTHAL:  Well, I guess, Your Honor, the

13  question only is, is there a next adversary proceeding or does

14  it end here?  But as far as the pending motion is concerned, it

15  can't be granted.  And if we look at 5(p) itself, which is what

16  we think the Court should focus on, it doesn't talk about this

17  only applies to commercial agreements.

18      THE COURT:  I don't think you need to go through

19  this.

20      MR. ROSENTHAL:  Okay.  The only other point I wanted

21  to make, Your Honor -- so I wanted to talk a little bit about

22  the proposed order that the debtors have submitted, because I

23  think it's very different from a lot of what happened in

24  today's argument.  I've got a copy if the Court would like --

25      THE COURT:  I don't think you need to go with that

1    either.  I agree with you.

2            MR. ROSENTHAL:  Okay.  If I may, Your Honor, an

3    entire paragraph --

4            THE COURT:  I just said I agree with you.

5            MR. ROSENTHAL:  Then I'll sit down, Your Honor.

6            THE COURT:  Okay.

7            MR. ROSENTHAL:  Thank you.

8            THE COURT:  Okay.

9            MR. BUTLER:  Your Honor, just a few responses to the

10   arguments that were made.  First, with respect to Mr. Lauria's

11   argument regarding 5(t) and asserting for the first time I have

12   ever heard it that the plan investors had not agreed to the

13   reduction in overall financing from 6.8 billion to 6.125

14   billion, and arguing that that would be a change in the

15   financing letter under 5(t) that was not approved by them,

16   there is nothing in the record that addressed that.  I concede,

17   Your Honor, I am at a loss.  The confirmation proceeding that

18   we went through and in which the plan investors participated,

19   and the documents that were delivered to them as material

20   investment documents, they did not object to under 9(a)(xxviii)

21   relating to confirmation, was based on the record which I've

22   asked you to give judicial notice to, which included among

23   other things --

24           THE COURT:  What are you saying?  Is it that those

25   documents, the material investments documents in that process

110

1   isn't performing.  I think that's what he's saying

2          MR. BUTLER:  I hear -- no, but, Your Honor, I think

3   it is before you that they did not -- they never did anything

4   under 9(a)(xxviii), right?  So now you can read 9(a)(xxviii)

5   what it says, in the four corners of the document.  The -- they

6   participated in the confirmation hearing which was bounded by,

7   in your confirmation order, and the confirmation order, which

8   was a material document that they approved under the term --

9   under 9(a)(xxviii), which made findings regarding feasibility

10  based on an evidentiary record that had financing of 6.1

11  billion dollars. That was one of the principal presentations in

12  the record at the confirmation hearing to support the changes

13  in Section 7.14 and the findings that Your Honor made in

14  connection with confirmation, which they approved.

15         It was laid out in all of the -- remember the big

16  charts at confirmation and all the -- what the net debt was

17  going to be and the total -- the borrowing was; the explanation

18  of the testimony and Mr. Sheehan's affidavits, declarations

19  admitted into evidence, which in part we're asking you take

20  judicial notice of that whole record; the fact of the matter is

21  that the financing was reduced from 6.8 to 6.1 billion dollars.

22  And for them to now suggest that they didn't agree to that and

23  that they were in fact lying in wait, and at the appropriate

24  time what they would have done -- I mean, the logical extension

25  of Mr. Lauria's argument is that having gone out with the 6.1

111

1    billion dollars, which is the only thing we've been intending

2    to do since the confirmation -- since prior to the confirmation

3    hearing, not the confirmation hearing, and having closed it

4    without any involvement from GM, that Mr. Lauria's clients

5    could have shown up at the closing table and not closed,

6    because they would have said, oh no, it was supposed to have

7    been 6.8, don't you remember that, you know, that was what you

8    had agreed to back on November 3rd?

9            There's nothing in the document, and there's a reason

10    that New York case law requires that the document be read as a

11    whole, there's nothing in the document that would have

12    prohibited those actions by the debtors.  And, in fact, Mr.

13    Lauria's argument would have you ignore not just the net

14    debt -- the calculation and net debt provision in 9(a)(xxvii),

15    and the liquidity amount, which was the minimum liquidity

16    provisions that they -- the protection that they had in Exhibit

17    E of the EPCA, or the interest rate cap;  because now Mr.

18    Lauria's argument is under 9(a)(xx), that oh, the interest rate

19    cap, you know, we were real concerned about 2008, so we have

20    that special cap, but we actually were concerned about every

21    other year, and so we could reject the entire financing under

22    5(t), completely obviates why we had the fight in the -- at the

23    EPCA approval hearing in December, with respect to the interest

24    rate cap.

25            Similarly with the minimal availability provision.

112

1    At 1.4 million minimal provision.  All of those things were

2    addressed as a whole, asking Your Honor to review the document

3    as a whole along with 5(t) and the other provisions to address

4    what the company could or could not do in connection with

5    preparing to come to closing.  And they're -- Mr. Lauria's

6    interpretation would essentially gut all of those provisions.

7         The second item I wanted to comment on, Your Honor,

8    was the view that we really believe that Your Honor can, under

9    1142(b) do exactly what was suggested by Your Honor in

10   argument, which is, we think Your Honor can require parties to

11   act in good faith and to take actions necessary as contemplated

12   by 1142 to consummate the plan.  And we don't -- I know that

13   Mr. Lauria and his client would like to use that as a hook to

14   draw the debtors into a debate on specific performance under

15   the document, but we quite intentionally did not raise issues

16   relating to remedies at law or remedies in equity in terms of

17   specific performance or cash breach or any of those other kinds

18   of things now, because as we've indicated in our documents and

19   in our letters which are now all public --

20        THE COURT:  Well, am I right, then, that the second

21   provision of the proposed order, that is, is simply to direct

22   the plan investors to perform the EPCA and not breach it.

23        MR. BUTLER:  Your Honor, yeah, it's intended by us --

24        THE COURT:  What that performance is, other than

25   saying that if you perform it in this way, you're breaching it,

113

1      is to be decided later?

2              MR. BUTLER:  Absolutely.

3              THE COURT:  Okay.

4              MR. BUTLER:  I mean, the point, Your Honor, is we

5      believe, you know -- we are still, and we said it in our

6      papers, and I think you have heard it -- Your Honor has seen me

7      many times at this podium and how I presented arguments.  I

8      have tried today, and we have tried in our papers on behalf of

9      the debtors to be very measured in what we say and how we say

10     it.  We are here because of the exigencies Your Honor found in

11     granting the relief here.  We need to go forward with our exit

12     financing.  We need to find a way to negotiate with our plan

13     investors to a consensual resolution at the closing table, if

14     we can get there.  And we have chosen, as I think a debtor

15     ought to choose, to put off for another day, everything other

16     than what's essential for today, and to not make -- and we have

17     not in our documents made, any aspersions against anybody.  And

18     we intentionally have not done that.  We have -- believe that

19     we need guidance under 1142 on specific precise points.  I'm

20     not asking Your Honor to determine whether we -- when this deal

21     comes to closing, whether we've met the liquidity amount, or

22     the net debt provisions, or the interest rate cap provisions,

23     or make judgments about ABL availability or all of the rest.

24     I'm asking for a simple thing.  Mr. Lauria intentionally

25     delivered a letter to me on midnight on the 24th, beginning of

1    the morning of the 25th, eleven hours before our financing was

2    going to be launched in which they said GM's participation in

3    the financing with the lead arrangers would violate the EPCA.

4    And he told me to be very careful in thinking about how I

5    disclose that to the bank syndicate and to the investing

6    public.  Very hard to misinterpret that letter and the

7    intention of that letter.  And that letter, which we asked Mr.

8    Lauria to withdraw, and which he refused to withdraw is why

9    we're here, on that narrow point.

10           And so, I think, Your Honor, when you look at 5(t)

11   and look at the financing letter and look at what's

12   contemplated in the package, I don't think there's any basis

13   that you can come to the conclusion this is violative of 5(t).

14           With respect to 5(p), and just to say it, paragraph

15   40 and 41 but particularly paragraph 40 and 41 of our motion,

16   doesn't suggest that 5(p) applies.

17           THE COURT:  I'm sorry, that what?

18           MR. BUTLER:  Does not suggest that 5(p) applies.  The

19   position that we have taken consistently in our motion and

20   today is, and I quote at the end of paragraph 40, "Neither GM's

21   participation in the exit financing nor its acceptance of the

22   notes in lieu of cash requires any amendment to the GSA, MRA or

23   plan or, for that matter, any other kind of agreement that will

24   be comprehended within the scope of Section 5(p)."  It has

25   consistently been the debtors' view that this is not within

115

1    5(p), and we've tried, in our responses, to give illustrative

2    hypotheticals.  Your Honor gave another one from the bench

3    today, which we certainly could have included as well, which is

4    that, if the ultimate financing with the lead arrangers has any

5    subsidiary of General Motors providing this, it's by definition

6    outside the scope of 5(p).  And if they were really trying to

7    prevent that kind of thing, why didn't they condition the

8    financing letter, 5(t) or even 5(p) to prevent that

9    arrangement?

10           The reason that 5(p) is limited to the GM settlement

11    agreements under the agreements with General Motors is -- the

12    definition was GM, of who GM was covered, and it was intended

13    to cover those agreements.  And it's, I think, clear to

14    everyone, probably, in this courtroom that the lead arrangers

15    can structure a syndication and, on its face, does not in any

16    way violate the financing letter or even violate the

17    definitional terms of 5(p).  But our view is, Your Honor, that

18    5(p) never, even on the plain meaning of it, would have hatched

19    to, as Your Honor called out, this arrangement which prejudices

20    no one and affects no one other than the form of consideration

21    GM ultimately ends up when --

22           THE COURT:  Well, I don't remember saying whether it

23    prejudiced anyone or not.

24           MR. BUTLER:  That was my argument, Your Honor.

25           THE COURT:  Okay.

1          MR. BUTLER:  I apologize.  It's my --

2          THE COURT:  All right.

3          MR. BUTLER:  -- my argument.

4          THE COURT:  Okay.

5          MR. BUTLER:  I mean, that's the -- so, Your Honor, I

6     think the -- you know, our view at the end of the day here is

7     that Mr. Lauria asked gee, what relief are you asking for.

8     We're asking for narrow relief.  We're not asking to -- many of

9     the things that the plan investors raised as concerns in their

10    papers are not for today.  We didn't seek it, we don't want it

11    today, we're not waiving any rights with respect to any of

12    those things but we fervently hope we'll never get to any of

13    those issues.  The question before Your Honor today that we

14    need guidance for under 1142 is whether we can launch this exit

15    financing with a press release.  I'm not sure with the people

16    in this audience that I need a press release anymore, but

17    whether or not we can launch the financing with GM or its

18    affiliate or whomever, with GM agreeing to participate with the

19    lead arrangers in the syndication in a manner that is designed

20    to meet the interest rate requirements of 9(a)(xx) and to

21    provide the funding necessary to close the plan so we can get

22    on with it.

23         We're not asking Your Honor to determine we've met

24    everything else we have to do in closing and a lot of things we

25    have to do to get ready for closing.  But that's the guidance

1    we needed because the conclusion of the company, Mr. Lauria may

2    choose to ignore this, may believe that, you know, we -- you

3    know, that we're interpreting it wrong.  But we took

4    Mr. Lauria's letter as essentially requiring us to disclose a

5    flat conclusion by the plan investors that would have doomed

6    the exit financing.  We believed it's facially wrong, on the

7    face of the agreements, and we need Your Honor to provide that

8    guidance.  Thank you very much.

9            THE COURT:  All right.  Does anyone have anything

10   further to say?  Okay.  I have before me a motion, brought on

11   at the request that it have expedited treatment, under 11

12   U.S.C. Section 1142(b) and Bankruptcy Rule 3020(d) in respect

13   of the implementation of certain aspects of the debtors'

14   confirmed Chapter 11 plan.  In particular, as made, I believe,

15   clear at today's hearing, the debtor seeks the determination

16   that the plan investors, under the EPCA, are in breach of their

17   obligations under the EPCA and, in particular, Section 6(d) of

18   the EPCA, if they continue to take the position that the

19   proposed increased participation by GM Corporation in the

20   debtors' exit financing would not be in compliance, or would be

21   in breach of, the financing and, therefore, the EPCA, as

22   contemplated in connection with the investors' entry into the

23   EPCA and their performance thereunder as part of the closing of

24   the various transactions contemplated under the Chapter 11

25   plan.

118

1           This particular issue hasn't been, I believe,

2    specifically raised by the parties, but I do want to say, for

3    the record, I have concluded that I clearly have jurisdiction

4    over this matter, notwithstanding that it's after confirmation

5    of the debtors' Chapter 11 plan, because this is a core matter

6    but, more importantly, because it involves both the

7    interpretation of the plan and my confirmation order.  And by

8    "the plan", I include all of the various agreements and, in

9    particular, the EPCA, the exhibits thereto, including the

10   financing letter and its term sheets, and the GM settlement

11   agreement and MOU, and also seeks in part to implement and

12   cause the performance of those agreements and the Chapter 11

13   plan.  See, generally, In re: General Media, Inc., 335 B.R. 66,

14   73 through 74, (Bankr. S.D.N.Y. 2005).

15          It's also been argued by the lead plan investor,

16   ADAH, that the relief sought by the debtor does not constitute

17   a case or a controversy under the Constitution and is not

18   sufficiently ripe for purposes of this Court's subject matter

19   jurisdiction.  I conclude, to the contrary, that the limited

20   relief sought by the debtors, particularly as clarified on the

21   record today, does constitute an actual case or controversy

22   between parties with adverse legal interests and with

23   sufficient immediacy and reality to warrant the issuance of a

24   ruling.

25          It's also ripe in that it is immediate and will

119

1    govern the parties as they perform their obligations under the

2    EPCA agreement.  As I've said repeatedly during this hearing,

3    those obligations include reciprocal reasonable best efforts

4    obligations to take all actions and do all things reasonably

5    necessary, proper or advisable to cooperate with each other and

6    to consummate and make effective the transactions contemplated

7    by the EPCA, including the financing.

8            Notwithstanding those reciprocal obligations, which

9    appear at sections 6(d) and 5(t) of the EPCA, the parties are

10   in direct disagreement over whether the debtors' going out to

11   seek financing pursuant to a proposal that involves the

12   participation of GM Corporation in the amount not of 750

13   million dollars, which was what was originally contemplated in

14   the term sheets attached to the financing letter which, in

15   turn, was attached to the EPCA, but rather in an amount up to

16   two billion seventy-five million dollars, violate the EPCA.

17           It's clear, I believe, and undisputed that the

18   purpose of the additional financing from GM would be to pay GM

19   a cash amount or a portion of the cash amount, depending on

20   what other parties subscribe to the financing, that GM is

21   entitled to under the plan in respect of its claims under the

22   GM settlement agreement.  The debtor contends that seeking the

23   financing from GM is permissible under the EPCA.  The plan

24   investors contend, to the contrary, that to do so would be in

25   contravention of the EPCA or not in compliance with the EPCA.

120

1          Given their best efforts obligations and given the

2    timing that I have already addressed, which is, again, that the

3    transactions contemplated by the EPCA must close by April 4th

4    of this year and the financing and the preparation for those

5    other transactions realistically well encompass that under

6    thirty-day period, I believe that resolution of that

7    controversy is immediate, is -- does immediately need to be

8    addressed.

9          In addition, although, frankly, this is to me

10    somewhat murky, the debtor and the plan investors apparently

11    take opposing positions on the following two issues:  first,

12    whether the EPCA permits other modifications to the financing

13    letter and the term sheets attached to it, as referenced in

14    paragraphs 3(qq) and 5(t) of the EPCA, without having to obtain

15    the approval of the plan investors if those modifications do

16    not result in a breach of specific provisions of the EPCA, such

17    as paragraph 9(a)(xx), which requires a specific cap on first-

18    year interest rate expense and, more broadly, section 7.14 of

19    the plan, as modified, such modification being attached to the

20    confirmation order, and paragraph 9(a)(xix) of the EPCA, which

21    contemplate sufficient financings to fund fully the

22    transactions contemplated by the EPCA, the GM settlement, the

23    plan and the other exhibits to the plan.  The plan investors

24    contend, to the contrary, that every provision of the financing

25    letter and the term sheets attached to it, including, for

1    example, interest rate provisions and principal amount of

2    borrowed debt provisions, must be adhered to for the proposed

3    financing to be compliant.

4        Secondly, the parties appear to disagree over

5    whether, specifically, the amount provided for in the financing

6    letter and the term sheets attached thereto of the aggregate

7    debt financing, which is 6.8 billion, must be the amount of the

8    debt financing, notwithstanding the record of the confirmation

9    hearing, which made it clear the debtor was going to seek 6.125

10   billion of financing, the same amount that it is continuing to

11   seek today.

12       The plan investors contend that paragraph 5(t) of the

13   EPCA requires the agreement of the plan investors to any

14   amendment or modification of the financing letter and the term

15   sheets attached thereto to the extent adverse to the company or

16   the investors.  As previously determined by me, this hearing is

17   intended only to determine whether, pursuant to the plain

18   meaning, the foregoing adverse positions of the parties to the

19   EPCA may be decided; that is, if the plain meaning of the

20   relevant provisions of the plan, confirmation order and the

21   EPCA and the attachments thereto is ambiguous or the

22   implementation of those provisions requires evidence, such as,

23   for example, whether a particular change is adverse to the

24   company or the plan investors, that issue is not for the Court

25   to decide today.

122

1          I concluded, on that basis, that I can properly hear

2    this matter under Section 1142(b), notwithstanding that this is

3    (a), not an evidentiary hearing and (b), not brought on by an

4    adversary proceeding.  I believe that the circumstances so

5    warrant, given the limited issues before me and the parties'

6    immediate ongoing obligations that require resolution of those

7    issues.  While not uniform, the case law in the Second Circuit,

8    as well as the, to my mind, best reasoned case outside of the

9    Circuit determining the issue supports that conclusion.  That

10   case law is referenced in footnote 5 to the debtors' motion.

11   And, of course, the out-of-circuit case I'm referring to is In

12   re: Attalla Golf and Country Club, Inc., 181 B.R. 611

13   (Bankruptcy N.D. Ala. 1995).

14          I have considered the unreported opinion, In re:

15   Integrated Health Services, Inc. (2006) W.L. 54376, District

16   Court of Delaware, March 6, 2006, in which Judge Sleet held

17   that the debtor would have to proceed by an adversary

18   proceeding.  However, I believe that the facts of that opinion

19   are distinguishable.  First and foremost, the lower court's

20   ruling, which Judge Sleet reversed, was premised upon facts

21   accepted as true by the lower court, not the plain meaning of

22   documents that are the underpinning of the Chapter 11 plan

23   confirmed by the Court.  Those facts, as is clear from the

24   recitation of them in Judge Sleet's opinion, dealt with the

25   calculation of taxes -- I'm sorry, dealt with the transfer of

1    property in a way that required an analysis of such facts.    I

2    do not believe that Judge Sleet's opinion can be read as

3    providing that all matters brought under 1142 would require an

4    adversary proceeding or lengthy discovery.    This would seem to

5    me to be contrary to the purpose of Section 1142 and the fact

6    that, as is the case here, frequently it is the case that

7    timing is essential in the implementation of a Chapter 11 plan,

8    particularly one that contemplates multiple transactions,

9    including, as here, a substantial investment by third parties

10    and a rights offering.    I do not believe Congress would want

11    the bankruptcy courts to handcuff themselves and effectively

12    preclude granting effective relief under 1142(b) in the guise

13    of a potentially unnecessary discovery festival.

14          I also believe that, as again clarified on the record

15    at oral argument, that the debtors are not here today seeking

16    to compel the plan investors to close.    Rather, they are

17    seeking a ruling from this Court as to whether the plan

18    investors are properly honoring their agreement under paragraph

19    6(d) of the EPCA and a direction that the investors so honor

20    it.    The plan investors have pointed out a cap on claims or

21    liability -- both words are used in the section -- which is

22    11(b) of the EPCA, for a breach.    However, I believe that the

23    relief that the debtor is seeking, particularly as clarified on

24    the record, at this point, seeks nothing more than a direction

25    that the debtor -- I'm sorry, that the plan investors not

124

1    breach the EPCA in respect of the three interpretations of it

2    that I have outlined that are at issue.

3         Whether they choose to breach or not or take any

4    other action will be governed by the terms of the EPCA and

5    ultimately whether those terms are subject to specific

6    enforcement or not under 1142 and applicable nonbankruptcy law,

7    but I do not believe that the relief that -- or the very act of

8    seeking relief that the debtors have undertaken here would seek

9    to modify the EPCA or the plan in that respect.  And therefore

10   I believe that it's appropriate for the debtors to have

11   requested such relief.

12        That still leaves the question, however, of whether

13   the debtors' interpretation of the EPCA and the related

14   documents on each of the three issues is correct or, to the

15   contrary, whether the debtors, in seeking to commence the

16   financing process, as they propose to do, would themselves be

17   not in compliance with the EPCA and, therefore, apparently in

18   violation of their obligations under 5(p),(t).  The law of New

19   York, which applies to the disputes here as to the proper

20   interpretation of the EPCA, is clear with regard to the basic

21   principles of contract interpretation.  Under New York law, a

22   written contract is to be interpreted so as to give effect to

23   the intention of the parties as expressed in the unequivocal

24   language they have employed.  [I]f a contract is unambiguous on

25   its face, its proper construction is a question of law.  A

125

1  Court should not look beyond the confines of the contract to

2  extrinsic evidence if its relevant provisions are plain and

3  unambiguous.  Cruden v. Bank of New York, 957 F.2d 961, 976 (2d

4  Cir. 1992); Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,

5  906 F.2d 884, 889 (2d. Cir. 1990); W.W.W. Assoc., Inc. v.

6  Giancontieri, 76 N.Y. 2d 157, 162 (1990).

7         As I have previously noted, this is particularly

8  appropriate if the contract was negotiated between

9  sophisticated, counseled business people negotiating at arm's

10  length.  In such circumstances, courts should be extremely

11  reluctant to interpret an agreement as impliedly stating

12  something which the parties have neglected to specifically

13  include.  Hence, courts may not by construction add or excise

14  terms, nor distort the meaning of those used and thereby make a

15  new contract for the parties under the guise of interpreting

16  the writing.  In re: Allegiance Telecom, Inc., 356 B.R. 93, 98

17  (Bankr. S.D.N.Y. 2006), citing the foregoing authorities, as

18  well as Wallace v. 600 Partners Co., 86 N.Y.2d 543, 548 (1995).

19         It's also clear that "[g]iving the terms of a

20  contract their plain meaning, a court should find contractual

21  provisions ambiguous only if they are reasonably susceptible to

22  more than one interpretation by reference to the contract

23  alone."  Krumme v. Westpoint Stevens Inc., 238 F. 3d 133, 139

24  (2d Cir. 2000).  Contract language is unambiguous if it has a

25  definite and precise meaning, unattended by danger of

126

1   misconception in the purport of the contract itself, and

2   concerning which there is no reasonable basis for a difference

3   of opinion.  Language whose meaning is otherwise plain is not

4   ambiguous merely because the parties urge different

5   interpretations in the litigation."  Again, see Allegiance

6   Telecom, 356 B.R. at 98

7           Finally, further in support for the proposition that

8   the EPCA must be read as written and the Court should be

9   extremely reluctant to interpret implied provisions the parties

10  have neglected to specifically include, it's also well

11  acknowledged that "[i]f the parties to a contract adopt a

12  provision which contravenes no principle of public policy and

13  is not ambiguous, the courts have no right to relieve one of

14  them from disadvantageous terms by a process of

15  interpretation."  Ackman v. Toren, Inc., 6 A.D. 2d 427, 179

16  N.Y.S.2d 128, 129-30 (1st Dep't. 1958), aff'd 6 N.Y.2d 720

17  (1959).

18          Here, as to the first issue, which, to my mind, is

19  the primary issue before the parties, since GM's agreement, in

20  essence, to take new notes instead of cash is the fundamental

21  change that the debtors have raised and, frankly, to a

22  layperson may seem like an obvious benefit to the company, I

23  note, however, that the EPCA specifically provides in paragraph

24  5(p) that, in addition to entering into any other agreement

25  than the agreements referenced in the first sentence of

1    paragraph 5(p) that is materially inconsistent with the EPCA

2    and the plan, the parties agreed that they, the debtors, or the

3    company, as defined in the EPCA, shall not enter into any other

4    agreement with GM that is outside the ordinary course of

5    business or the terms of which would have a material impact on

6    the investors' proposed investment in the company.

7          As far as the rule -- the Court's ruling as to the

8    nature of this hearing, I believe that the last clause that I

9    have quoted, paragraph (iii) -- I'm sorry, 5(p)(iii) would

10   require evidence to determine whether, in fact, the addition of

11   GM's proposed acceptance of up to 2.075 billion of new notes

12   would materially impact the investors' proposed investment in

13   the company.  And, therefore, in that narrow respect I could

14   not grant the relief that the debtors are seeking.

15         It also appears to me that the incurrence of up to

16   almost two billion dollars of additional notes more than the

17   750 million originally contemplated, to GM, would be outside

18   the ordinary course of the debtors' business, which is

19   precluded by paragraph 5(p)(ii) of the EPCA.

20         On the other hand, I note, as I did at oral argument,

21   that the EPCA defines "GM" simply as "General Motors

22   Corporation," and it is that defined term that is referred to

23   in paragraph 5(p) as to the counterparty to an agreement with

24   the debtors that would be outside the ordinary course or the

25   terms of which would have a material impact on the investors'

1   proposed investment in the company.

2       Just as the plain meaning of the contract should be

3   enforced on the debtors, I then conclude that the plain meaning

4   would also be enforced on the investors, who certainly knew how

5   to define GM more broadly and, in fact, I believe in other

6   cases have done so.

7       So it appears to me that, for example, a financing

8   that would be by an affiliate or a subsidiary of GM or a

9   participation by GM, which would not be in agreement with the

10  company, would appear to comply with paragraph 5(p).

11      Given the definition of the "lenders" in the term

12  sheet attached to the financing letter, the November 3

13  financing letter, which describes the "lenders" as a syndicate

14  of "banks, financial institutions and other entities arranged

15  by the arrangers and reasonably acceptable to the U.S.

16  borrower," I conclude that the debtors would not run afoul of

17  even the investors' own interpretation of paragraph 5(t) of the

18  EPCA were GM or an affiliate of GM to provide the financing

19  that is proposed here.

20      That leaves the other two disputes between the

21  parties.  The first dispute requires analysis of paragraph 5(t)

22  of the EPCA as well and, in particular, the following two

23  sentences:  "The company shall keep ADAH informed on a

24  reasonably current basis in reasonable detail of the status of

25  its efforts to arrange the debt financing, and shall not permit

1    any amendment or modification to be made to or any waiver of

2    any provision or remedy under, in each case, to the extent

3    adverse to the company or the investors, the financing letter

4    or the terms set forth in Exhibit E."  The plan investors argue

5    that under paragraph 3(qq) of the EPCA, which defines the term

6    "debt financing", which appears in the first clause that I just

7    read, that paragraph 5(t) requires the company to comply with

8    all of the terms of the financing letter and the term sheet for

9    the exit financing attached thereto.  As set forth in paragraph

10   3(qq), the term "bank financing" is, together with the GM debt,

11   which is defined later in the agreement, defined as the "debt

12   financing," which is the term used in the first clause that I

13   previously quoted.

14           In turn, paragraph 3(qq) defines "bank financing" as

15   that which is quote, "on the term indicated," referencing back

16   to the financing letter, the November 3 financing letter.

17   Consequently, the plan investors contend that the two -- I'm

18   sorry, that the provisions of paragraph 5(t) that I quoted

19   require the debtors to comply with the "terms indicated" in the

20   financing letter, which would include the term sheet attached

21   thereto.

22           The debtors contend, to the contrary, that more

23   specific provisions of the EPCA limit the debtors' obligations

24   in respect of the financing, the exit financing, namely,

25   paragraphs 9(a)(xix) and 9(a)(xx).  They also point to Section

130

1    7.14 of the plan as amended.  Those three provisions, they

2    argue, require the debtor only to comply with a year 1 interest

3    expense cap and have sufficient financing to make the payments

4    contemplated under the plan.  They contend, and I believe that

5    I can take judicial notice of this, given that I have the plan

6    before me as well as the disclosure statement, the payments

7    contemplated under the plan have not changed as far as cash

8    payments.

9         The debtors also contend that the financing letter is

10   not a financing commitment but rather simply an engagement

11   letter pursuant to which the lead arrangers agreed to seek

12   financing on such terms.  In response thereto, the plan

13   investors point out that those terms are not described as being

14   indicative or merely goals.

15        In response, it also should be pointed out, however,

16   that when paragraph 5(t) states that the company shall do

17   something in respect to the "debt financing," which is defined

18   as in reference to "terms of" the financing letter, those

19   obligations are referenced in terms of, in the language I

20   quoted, keeping ADAH informed and using reasonable best efforts

21   to complete the bank financing.

22        The prohibition on adverse amendments refers to

23   simply an adverse amendment of the financing letter.  To my

24   mind, that strongly indicates, particularly in light of the

25   other specific provisions of the agreement, which the company

131

1   is not seeking today any sort of ruling as to whether the

2   company's complied with, that the company's interpretation is

3   correct.

4          However, given the fact that this ruling is dicta, I

5   won't go further. I say that, in particular, because even if I

6   were incorrect and the plan investors' interpretation is

7   correct, the company still would have a further issue as to

8   whether the proposed change of adding GM as a secured lender

9   would be adverse to the company or the investors. And,

10  frankly, that is an issue, given the nature of the term sheet

11  and my first ruling in this matter, I believe is one that would

12  benefit from a more complete record.

13         I have a similar reaction to the third point, which

14  is that, even if paragraph 5(t) may be read as the plan

15  investors apparently read it, they are precluded at this point,

16  given their express consent rights under paragraph

17  9(a)(xxviii), from objecting to the amount of the debtors'

18  proposed exit financing, which is not changed from the amount

19  that was put into evidence at the confirmation hearing.

20         I have reviewed paragraph 7.14 of the plan, as well

21  as, obviously, recall the presentation made to me at the

22  confirmation hearing, and I believe that, particularly given

23  what I just said about the general issue of the ability to

24  modify the financing letter under paragraph 5(t), that an

25  actual ruling on whether the proposed unchanged 6.125 billion

132

1    dollar amount of the exit financing would nevertheless require

2    the plan investors' consent is better left to factual

3    development, if necessary, given my belief that there is a

4    possibility that the issue may become moot, given the

5    development of the prior issue and, secondly, that particular

6    communications in respect of that financing number, which are

7    not in the record, may well be particularly relevant as to

8    whether the debtors can rely upon paragraph 9(a)(xxviii).

9            As I said before at oral argument, I do not know the

10   reasons, and I don't believe it's relevant to this hearing, why

11   the plan investors have taken the positions they have in

12   respect of the foregoing three issues.  As I said, if in fact

13   they are entitled to take those positions, it's their choice

14   whether they want to take them or not and, in making that

15   choice, they'll factor in, I presume, since they're well

16   represented and intelligent people themselves, all of the

17   considerations that would flow from making once choice or

18   another, even if they were incorrect.  Those choices could

19   range from -- or those goals could range from simply wanting to

20   terminate the agreement to wanting something more in return for

21   performing the agreement.  Again, that's up to them.  What's

22   before me today is whether, in making those interpretations, I

23   believe does the court of first instance -- whether they were

24   correct or not under the plain language of their documents or,

25   as they have contended, whether the debtor was incorrect in its

133

1    interpretation.  And, as I have stated, I believe my ruling

2    will in fact enable the parties to perform their obligations

3    under the EPCA, including under paragraphs 5(t) and 6(d).

4            As a simple practical matter, based on what's before

5    me today, I have either declined to rule or, in respect of the

6    first issue, I have denied the debtors' motion.  However, very

7    clearly, all of those rulings are without prejudice to

8    positions the debtor may take under different facts and

9    circumstances.  And it seems to me that they are, consequently,

10   if they take heed to my ruling, given sufficient guidance to

11   seek exit financing on terms that are potentially achievable.

12   And the plan investors have also received sufficient guidance,

13   I believe, to factor into their other calculations with regard

14   to the positions they want to take.

15           I do not believe, finally, as to the last element of

16   the relief that the debtors are seeking, that there need to be

17   periodic status conferences involving the debtors, the Court,

18   the committees and GM and other interested parties.  The

19   financing process will be somewhat fluid, and it appears to me

20   that any relief that's to be sought, either in the form of a

21   status conference or a contested matter, which I presume, at

22   this point, if we're focusing on the issues that I have

23   identified, would require potentially a further factual record,

24   would be on an evidentiary basis with at least the adversary

25   proceeding rules adopted, albeit with the potential for

134

1    expedited treatment, that until there's a specific need for any

2    involvement by the Court, the parties will deal with each other

3    and act according to their interests.

4          Let me say on that last point, when a document like

5    this uses a phrase "does not adversely affect or does not

6    materially adversely affect the investors", it does seem to me

7    that the interests that are affected have to be looked at in

8    the context of the document as a whole and what the parties

9    have agreed to in the specific provisions of those documents.

10   So, to the extent that the parties do wish to (a), dispute and

11   (b), litigate over whether something is in their interest or

12   not, they should take that into account in planning their

13   discovery.

14         So, Mr. Lauria, you should submit an order consistent

15   with my ruling.  You don't need to settle it on Mr. Butler and

16   the two committees but obviously you should send it to them

17   when you send it to me.  And I suggest that you do more than

18   that and talk it about it before you send it to me.

19         MR. LAURIA:  We will, Your Honor.

20         THE COURT:  Okay.  Thank you.

21     (Proceedings concluded at 2:24 p.m.)

22

23

24

25

135

1

2                                  I N D E X

3

4                                  RULINGS

5                                                      Page Line

6   Motion for a Continuance Denied                     24    7

7   Debtors' Motion Denied Without Prejudice           133    3

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

136

1                    C E R T I F I C A T I O N

2

3     I, Esther Accardi, court approved transcriber, certify that the

4     foregoing is a correct transcript from the official electronic

5     sound recording of the proceedings in the above-entitled

6     matter, except where, as indicated, the Court has modified its

7     bench ruling.

8

9     _____ March 8, 2008

10    Signature of Transcriber            Date

11

12    Esther Accardi

13    typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25