FORM B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT ___Southern___ DISTRICT OF ___New York___ | PROOF OF CLAIM |
|---|---|

| Name of Debtor <br> **Delphi Automotive Systems, LLC** | Case Number <br> **05-44640 (RDD)** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Claim #08391
USBC SDNY
Delphi Corporation, et al.
05-44481 (RDD)

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**Motorola, Inc.**

Name and address where notices should be sent:
Peter A. Clark, McDermott Will & Emery LLP
227 W. Monroe Street, Chicago IL 60606

Telephone number: **(312) 984-7504**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☑ Check box if the address differs from the address on the envelope sent to you by the court.

**Received**

**JUN 23 2006**

**Kurtzman Carson**

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:
**See Addendum**

Check here ☐ replaces
if this claim ☐ amends   a previously filed claim, dated:_____

**1. Basis for Claim**
- ☑ Goods sold
- ☑ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☑ Other _____**See Addendum**_____

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of SS #: _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)                  (date)

**2. Date debt was incurred:** **11/01/2002**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ ___8385154___ _____ _____ ___8385154___
(unsecured)      (secured)        (priority)        (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other_____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim** $ **8,385,154**

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim

Amount entitled to priority $_____
Specify the priority of the claim:

- ☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph - 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

CLAIMS PROCESSING CENTER
USBC SDN

| Date <br> June 20, 2006 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): <br> **Thomas J. Augspurger, Atty. for Motorola, Inc.** |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

05446400606220000000000003

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Delphi Corp., | ) | Case No. 05-44481 (RDD) |
| Debtor. | ) | |
| | ) | Jointly Administered |
| | ) | |

## ADDENDUM TO PROOF OF CLAIM OF MOTOROLA, INC.

Motorola, Inc. ("**Motorola**"), by its attorneys, hereby submits this addendum (the "**Addendum**") to its proof of claim (the "**Proof of Claim**") against Delphi Corp. and Delphi Automotive Systems, LLC (collectively, "**Delphi**") and in support thereof states as follows:

### Background

1.      On October 8, 2005, Delphi filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York.

2.      Delphi remains in possession of its property and continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

### Basis for Claim

3.      Motorola's claim arises from Delphi's prepetition breach of a long-term contract for the development, manufacture, sale and purchase of automobile parts for use in the Delphi "2006 GMT-900 Quadrasteer" program.

4.      On or about November 1, 2002, Delphi and Motorola executed the "Additional Purchase Order Provisions Long Term Contract," attached hereto as Exhibit 1 (the "**Agreement**"), by which Delphi agreed to purchase from Motorola 100% of its production and service requirements for the Products (as defined in the Agreement) related to the Quadrasteer program.

5.   The term of the Agreement was "thru calendar year 2011 for OEM production thru calendar year 2027 for 15-year service requirement." Agreement, §2. The Agreement states that "[Motorola] will sell to Buyer all Product necessary to fulfill Buyer's service and replacement part obligations during the applicable OEM Production Purchaser Prior (sic) at the then current production pricing under the contract plus any cost differential for packaging." Agreement, §4. Additionally, "[a]fter the applicable OEM production purchase period ends, Seller will sell Product to Buyer to fulfill Buyer's past model service and replacement requirements for a minimum of 15 years." Agreement, §4. Further, paragraph (4)(c) of the "Conditions of Sale" incorporated and made part of the Agreement provides that "[i]f Motorola terminates this Agreement for default, or if Buyer terminates this Agreement for convenience, Buyer will pay to Motorola a cancellation charge consisting of Motorola's incurred costs, committed costs and a reasonable contract profit."

6.   Motorola performed under the Agreement beginning in 2002 by, among other things, preparing engineering specifications for the Products, manufacture of a sample delivery of the Products, software design, tooling of equipment, and making other significant capital investments required for the manufacture and sale of the Products to Delphi.

7.   Despite repeated requests for performance by, and notice to, Delphi of its obligations under the Agreement, Delphi failed to purchase the Products and otherwise perform as required. Delphi's omissions and failures constitute a default and material breach of the Agreement that has caused damage to Motorola for which Delphi is liable at law and in equity.

8.   Motorola's damages total not less than $8,385,154, comprising (a) engineering costs of $4,152,864, (b) capital costs of $708,088 and (c) lost profits of $3,524,201 (collectively, the "**Claim Amount**"). Based on the foregoing, and without prejudice to its other rights and remedies, Motorola hereby demands allowance and payment of the Claim Amount as an unsecured non-priority claim.

- 2 -

CHI99 4597909-2 034764.0216

## Reservation of Other Claims and Rights

9.      Motorola reserves the right to amend and supplement the Proof of Claim and this Addendum and to file additional claims against Delphi for any reason.  Additionally, Motorola reserves all other rights, remedies, interests, priorities, protections, claims, counterclaims, defenses, setoffs, and recoupments, including, without limitation, claims against Delphi under sections 503, 507, 510, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code.  Motorola further reserves any and all rights against all entities other than Delphi based on the foregoing facts and circumstances.

10.     The filing of this Proof of Claim is not and should not be construed as (i) an election of remedy, (ii) a waiver of jury trial rights or (iii) a waiver or limitation of any right, interest, or cause of action held by Motorola, all of which are expressly reserved.

Dated: June 20, 2006
        Chicago, Illinois

                          Respectfully submitted,

                          McDERMOTT WILL & EMERY LLP

                          *Attorneys for Motorola, Inc.*

                          Peter A. Clark
                          Thomas J. Augspurger
                          227 West Monroe Street
                          Chicago, Illinois 60606-5096
                          Telephone:  312.372.2000
                          Facsimile:  312.984.7700
                          Email:  pclark@mwe.com
                                  taugspurger@mwe.com

- 3 -

EXHIBIT 1

# DELPHI

## ADDITIONAL PURCHASE ORDER PROVISIONS

## LONG TERM CONTRACT

### 1.    Purchase of Product

Motorola Inc. ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Delphi Saginaw Steering Systems ("Buyer") agrees to purchase, approximately 100 percent (%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

- See Appendix A for complete listing of products/specifications
- Product development shall includes the development of an Open Loop and Closed Loop system

### 2.    Term

The term of this Contract is thru calendar year 2011 for OEM production thru calendar year 2027 for 15-year service requirement.

- See Appendix B for Product Specific Timing

### 3.    Prices

The sample and production per unit price, shipping terms and annual reductions is included in Appendix C.  The Price includes MNS-2 payment terms with payment trigger of receipt of parts at Buyer's Plant (TTOP).  Pricing is based on supplier provided expendable dunnage.

Seller agrees to reduce the price according to Appendix C upon the award of additional volume.   Additional volumes include new programs or additional volume for previously awarded Product.

- See Appendix C for pricing, volumes, and logistic terms

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount

# DELPHI

equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

## 4.    Service Pricing

Seller will sell to Buyer all Product necessary to fulfill Buyer's service and replacement part obligations during the applicable OEM Production Purchase Prior at the then current production pricing under the contract plus any actual cost differential for packaging.

After the applicable OEM production purchase period ends, Seller will sell Product to Buyer to fulfill Buyer's past model service and replacement requirements for a minimum of 15 years. The price of the Product shall be the last year OEM production price plus any cost differential for packaging.

When requested by Buyer, Seller shall make service literature and other materials available to support Buyer's service part sales activities.

## 5.    Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

## 6.    Supplier Quality

2002 11 01 QuadraSteer LTA.doc
11/01/02

-2-

# DELPHI

Seller agrees to participate in Buyer's supplier quality and development program(s). In addition, Seller shall comply with all quality requirements and procedures specified by Buyer, as the same may be revised from time to time, including those applicable to Seller as set forth in *Quality System Requirements QS-9000 and Delphi Automotive Advanced Planning and Quality Process (APQP)*.

Seller agrees to take necessary steps through quality improvement and production containment at Seller's plant to insure that there will be:

1) No incoming inspection of components at Buyer's location
2) No on-line testing of components at Buyer's location
3) No extended containment at Buyer's location
4) If Buyer has to implement any of the above items to ensure component quality, Seller shall reimburse Buyer for any and all expense/cost.

## 7.    Lean Manufacturing

Seller shall support typical automotive industry "lean" manufacturing principals in support of Buyer's manufacturing plant.

## 8.    Resident Support

Seller shall provide resident program management, engineering, and software support (i.e., rapid prototyping) as required, on-site, at Buyer's facility in order to effectively manage, develop, implement, and support the Product. Resident support shall include at least (2) two resident engineers to support this program. One System engineer shall be on-site 100% of the time or as needed. One Software engineer shall be on-site at least 50% of the time or as needed. On-site support will be provided though PPAP.

## 9.    Resource Plan

Seller understands and accepts the need to allocate additional resources to facilitate a successful launch of these Product(s) as well as previously awarded Product. Seller shall provide a resource plan 30 days after signing as well as regular updates as needed.

Seller agrees to provide adequate resources to develop an Open and Closed Loop system controller.

## 10.    Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Condition that have been agreed upon by both parties, and a copy of which is attached, are hereby incorporated into this

# DELPHI

Contract by reference. Any amandment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that both parties execute the revised General Terms and Conditions. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

**EXECUTED** by Buyer and Seller as of November 1, 2002

Motorola objects to Delphi's Terms and Conditions and will supply product on the terms and conditions set forth in Motorola's enclosed Terms of Sale. It is expressly made conditional on assent to those terms and conditions, whether assent is in writing or by conduct. Acceptance of this Response or payment for products shall constitute such assent.

*Delphi does not agree to Motorola's terms + conditions*

**Buyer:**                                        **Seller:**

**Delphi Corporation LLC**                        **Motorola, Inc.**
**acting through its Delphi Saginaw**
**Steering Systems**

By: *Nancy Wisniewski*                            By: _____
Name: *Nancy Wisniewski*                          Name: *Randolph E. Scott*
Title: *Buyer*                                     Title: *Director - Motorola ECTD*

By: _____                               By: _____
Name: *Salvatore D. Orsini*                        Name: *Mike Adams*
Title: *Purchasing Manager*                         Title: *VP and Director of Sales*



Quadrasteer Long Term Agreement

Appendix A - Product and Product Specific Specifications

1. **2006 GMT-900**

| Part Number | Description | Date | Revision |
|---|---|---|---|
| P/N SX077051 | QS Controller, Module | 06AU02 | 000 |
| P/N PE086357 | Connector 8M 150, 800 | 13SE00 | 003 |
| P/N 26100182 | Spec, Control Module | 15JL02 | 01A |
| P/N 26105315 | Spec, EMI / EMC | 21JL02 | 01A |
| P/N SX074326 | Spec, Quadrasteer Software Requirements | 30JA02 | 01A |
| P/N 26077687 | Spec, Control Module Software | 11OC00 | 01A |
| P/N 26082248 | Spec, Controller Diagnostics | 10OC00 | 01A |
| N/a | Closed Loop Pin-outs | 13AU02 | 000 |

- **Assumptions:  (Pricing in Appendix C is based on the following)**

   1. A $2 material cost was assumed for each connector. The controller price will be adjusted accordingly when pricing of intended connectors is made available.
   2. Short circuit resistors for motor protection are not included. Implementation would require an estimated unit price increase of $1.56.
   3. CAN chokes are not included. Should these components be required after vehicle EMC testing, the controller unit price will increase by $1.74.
   4. Flight Recorder is not included. Implementation would require an estimated unit price increase of $0.75.



Quadrasteer Long Term Agreement

Appendix B

Program Specific Key Dates:

1. 2006 GMT-900 Quadrasteer

| | |
|---|---|
| • Motorola First Sample Delivery | 12/13/02 |
| • Delphi Final Software Specification | 03/18/04 |
| • Delphi Calibration Freeze date | 06/16/04 |
| • Final SW Sample Delivery | 06/29/04 |
| • PV | 11/02/04 |
| • PPAP   (Closed Loop) | 03/22/05 |
| • Run at Rate | 10/01/05 |
| • Supplier start of Production | 01/01/06 |
| • Customer Start of Production | 04/03/06 |
| • Alternate* Run at Rate | 04/01/05 |
| • Alternate* Supplier Start of Production | 07/01/05 |
| • Alternate* Customer Start of Production | 09/01/05 |

* Alternate dates:  The alternate dates are required to enable Delphi to seek additional opportunities. Delivery on alternative dates shall only be required when Motorola is awarded additional business with such expectations.  Stated here, they are only to indicate the timing commitment required for Delphi to obtain such business.  Motorola shall provide adequate resources to meet such dates.

**DELPHI STEERING – MOTOROLA**
**ATTACHMENT A – LONG TERM AGREEMENT**

PRODUCTION PRICING

| Part Number | Description | Estimated Annual Volume | Total Capacity (based on 100 hrs/wk) | Duration | Currency | Logistics Term | Duration | Tooling & Software Cost | 2004 PRICE (RED) | % RED | 1/1/2005 PRICE | % RED | 1/1/2006 PRICE | % RED | 1/1/2007 PRICE | % RED | 1/1/2008 PRICE | % RED | 1/1/2009 PRICE | % RED | 1/1/2010 PRICE | % RED | 1/1/2011 PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8J407T001 | QS Controller, Module | 160,000 | 180,000 | Expendable | USD | FOB Elma, NY | | 20.99 | $95.51 | 0 | $95.51 | 0 | $95.51 | 0 | $95.61 | 3 | $97.74 | 4 | $98.09 | 4 | $98.47 | 4 | $98.86 | 4 | $70.77 |

**Annual percent reductions:**

Effective 1/1/2007 annual reduction will be increased to 4% if by 1/1/2007 180,000 component units have shipped.

Effective 1/1/2007 annual reduction will increase to 5% if supplier is awarded combined business of 500,000 units or ...

| Volume Based Pricing | Price |
|---|---|
| Total Volume 160,000 | $90.50 |
| Total Volume 400,000 | $81.94 |
| Total Volume 1,000,000 | $71.66 |

Volume based pricing will be applied for all awarded business upon the award of additional volume.

| Additional Options: | Price Impact: |
|---|---|
| Returnable Dunnage | -$0.10 |

Optional, if selected shall be subtracted from the piece price.

PROTOTYPE AND SAMPLE PRICING

| Part Number | Description | Currency | Tooling Cost | Sample Definition | Price |
|---|---|---|---|---|---|
| 8J407T001 | QS Controller, Module | USD | $0.00 | Mule | $1,250.00 |
| | | | | Alpha | $350.00 |
| | | | | Beta | $150.00 |
| | | | | Prototype | Production Price |
| | | | | Pilot/TPAP | Production Price |

2002 11 01 QSteer LTA Appendix C.xls

## MOTOROLA INTEGRATED ELECTRONICS SYSTEMS SECTOR
## AUTOMOTIVE COMMUNICATIONS AND ELECTRONIC SYSTEMS GROUP

## CONDITIONS OF SALE

(1)    CONDITIONS OF SALE.

a.    The following are the conditions of sale for all Products sold by the Automotive Communication and Electronic Systems Group of the Integrated Electronics Systems Sector of Motorola, Inc. (hereinafter "Motorola"). Any Motorola quotation or order acknowledgment is an offer subject to and expressly conditioned upon these Conditions of Sale, except to the extent otherwise stated or agreed by Motorola in writing. Any provisions, conditions, or terms contained in Buyer's purchase order that are in addition to or not consistent with Motorola's offer and these Conditions of Sale, are null and void and not binding on Motorola.

b.    Unless Buyer is an authorized distributor of Motorola, Buyer agrees to limit its distribution of the Products purchased under this Agreement to the incorporation of said Products into a value added product which Buyer shall market under Buyer's name for sale, lease or rent to third parties in the regular course of Buyer's business.  Buyer is responsible for the selection of each Product(s), its ability to achieve the results intended with other products, software and/or peripherals of Buyer's design, assembly, manufacture or purchase, and for the system performance of Buyer's value added product. Buyer also acknowledges that any technical support for Buyer's value added product shall be entirely Buyer's responsibility.

(2)    PRICES, FORECASTS, INVOICES AND PAYMENT.

a.    The price for each Product shall be in the form of a volume price schedule, attached as Attachment A. Unit prices invoiced to Buyer shall be based on Buyer's good faith estimate of its anticipated purchase volume for that year of production.  If Buyer purchases for the year a quantity corresponding to a unit price different than the unit price at which it was invoiced, Buyer's contract unit price shall be retroactively adjusted accordingly and Buyer or Motorola, as the case may be, shall pay to the other party the difference between the amount invoiced and the amount due for the number of units actually shipped.  This retroactive adjustment shall apply if the purchase quantity is reduced for any reason, including expiration or termination of this Agreement prior to the end of the contract term.

b.    During the term of this Agreement, Buyer shall provide to Motorola a rolling twelve (12) month usage forecast at the beginning of each month.  This forecast will include the number of units to be shipped and the "in-house" dates required by Buyer.  Buyer shall provide an update to this forecast every month.

The quantities forecasted for the first thirty (30) days are fixed, and should be covered by an outstanding purchase order. Buyer will be financially responsible to Motorola for the entire purchase price for the fixed quantity.  The forecasted quantities for the next three months cannot vary by more than ten percent (10%), and unless approved by Motorola, negative variance will be considered a cancelled order according to the terms of Paragraph 4 c.

Buyer's failure to provide such information on a timely basis may be considered cause by Motorola for excusable delivery delay.

c.    Prices quoted are for the Product only, and do not include any amount for freight, insurance, fees, custom duties or Federal, State or Local excise, sales, use, service, occupation, gross income, property or similar taxes, all of which are the responsibility of Buyer.  Shipping and handling charges shall be paid by Motorola and invoiced separately to Buyer. Motorola shall have the right to include taxes which may be applicable to the prices set forth herein in the event that Buyer does not supply to Motorola, prior to sale, appropriate sales, use and Federal excise exemption certificates.

d.    Motorola reserves the right to change quoted prices and warranty if the quoted business assumptions change.

e.    Invoices shall be due and payable thirty (30) days from the date of the invoice, without regard to other deliveries.

f.    Motorola's offer is subject to Motorola's current credit policies and practices.  Motorola reserves the right, in its sole discretion, to approve, disapprove, or change Buyer's credit limit or to impose credit terms, including without limitation the requirement that Buyer make full or partial advance payment. In the event of a complete or partial failure to pay, Motorola may, at its option, revoke any credit extended to Buyer, suspend all subsequent shipments under open purchase orders until Buyer's account is current, or offset such amount against any payments due or that become due from Motorola or its affiliates to Buyer including without limitation payment due Buyer.

g.    Buyer grants to Motorola a security interest and right of possession in the Products until Buyer makes full payment. Buyer will cooperate in whatever manner necessary to assist Motorola in perfecting and recording such security interest.

(3)    DELIVERY.

a.    All shipments are made Ex-works, Incoterms 2000, Motorola's manufacturing location, freight collect.  Title and risk of loss or damage to Products shall pass to Buyer at the place of delivery.

b.    Delivery dates are best estimates only.  Motorola reserves the right to make deliveries in installments and the contract shall be severable as to such installments. Delivery delay or default of any installment shall not relieve Buyer of its obligation to accept and pay for remaining deliveries.

The obligations of Motorola and Buyer under this Agreement shall be temporarily suspended in the event of external delays beyond the obligated party's reasonable control, and any failure to perform by that party as a result of any such interference or interruption shall not be deemed default. Performance may be suspended for the period of any such delay.  The party whose performance is suspended shall notify in writing the other party within fifteen (15) days of such suspension.

In the event Motorola is unable to wholly or partially perform because of any cause beyond its control, Motorola may terminate any order without any liability to Buyer.

(4)    TERMINATION.

a.    Either party may terminate this Agreement if the other party fails to cure a breach of this Agreement within thirty

(30) days after written notification to the breaching party of such breach.

b.    Either party may terminate this Agreement for convenience upon sixty (60) days prior written notice to the other party.

c.    If Motorola terminates this Agreement for default, or if Buyer terminates this Agreement for convenience, Buyer will pay to Motorola a cancellation charge consisting of Motorola's incurred costs, committed costs and a reasonable contract profit. Buyer may cancel an individual order by giving Motorola notice of such cancellation, which notice must be received by Motorola at least sixty (60) or more days prior to the scheduled shipping date of such order, otherwise Buyer will be responsible for a cancellation charge.

d.    Nothing contained in this Agreement shall be deemed to create any express or implied obligation on either party to renew or extend this Agreement or to create any right to continue this Agreement on the same terms and conditions contained in it.

e.    The terms and warranties contained in this Agreement that by their sense and context are intended to survive the performance thereof by either or both parties shall so survive the completion of performances and termination or expiration of this Agreement, including the making of any and all payments due under this Agreement.

(5)    WARRANTY.

a.    Development Products: Prototypes and other development Products are sold "AS IS" and without any warranty, express or implied.

b.    Production Products: Production Products sold hereunder are warranted by Motorola to be free from defects in material and workmanship under normal use and operation and to conform to Motorola's specifications applicable at the time of shipment or, if appropriate, to Buyer's specifications previously accepted by Motorola in writing. This warranty is extended for a period of one (1) year from date of shipment to Buyer. Motorola's sole and exclusive obligation is to repair or replace, at its option, any Product sold hereunder with any defect warranted against, provided that Motorola receives written notice of the defect during the period of warranty and the defective Product is returned to Motorola at a location designated by Motorola. If Motorola determines that the Product conforms to this warranty, the Product will be returned at Buyer's expense. Motorola disclaims any and all liability for equipment not furnished by Motorola, which is attached to, or used in conjunction with, the Product and Motorola, disclaims all liability for operation of the system of which such Product is a part. Motorola extends this warranty to Buyer only, and it is the complete warranty for Products manufactured by Motorola. EXCEPT AS SPECIFICALLY SET FORTH HEREIN, ALL WARRANTIES EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXCLUDED. IN NO EVENT SHALL MOTOROLA BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES FOR BREACH OF WARRANTY. This warranty shall not be enlarged and no obligation or liability shall arise out of Motorola's rendering of technical advice and/or assistance.

(6)    LIMITATION OF LIABILITY.

a.    No action shall be brought for any breach of this Agreement more than one (1) year after the accrual of such cause of action.

b.    Motorola's total liability arising out of or related to this Agreement whether for breach of contract, warranty, Motorola's negligence, strict liability in tort or otherwise, is limited to the price of the particular Product sold hereunder with respect to which losses or damages are claimed. NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES whatsoever arising out of, caused by or related in any way to the breach of any of its obligations under this Agreement, even if the party has been advised of the possibility of such damages. The parties expressly agree that the above limitation on damages is an allocation of risk constituting in part the consideration for this Agreement.

(7)    PATENT AND COPYRIGHT INDEMNITY. Motorola agrees to defend, at its expense, any suit against Buyer based upon a claim that any Product or software furnished by Motorola to Buyer hereunder directly infringes any United States patent or copyright, and to pay costs and damages finally awarded in any such suit, provided that Motorola is notified promptly in writing of the suit and, at Motorola's request and its expense, is given control of the suit and all requested reasonable assistance for the defense of same. If the use or sale of the Product or software furnished hereunder is enjoined as a result of such suit, Motorola, at its option and at no expense to Buyer, shall obtain for Buyer the right to use and sell them, or shall substitute an equivalent product acceptable to Buyer and extend this indemnity thereto, or shall accept their return from Buyer's inventory and reimburse Buyer the purchase price therefore less a reasonable charge for any wear and tear. This indemnity does not extend to any suit based upon alleged infringement of any patent or copyright by the combination of any Product or software furnished by Motorola with other elements added thereto by Buyer or third parties, nor does it extend to any alleged infringement arising out of compliance with Buyer-furnished specifications, designs, or instructions or use of Buyer-furnished components.

Buyer agrees that it will, upon request of Motorola, defend at Buyer's expense any infringement suit against Motorola arising out of either compliance with Buyer-furnished specifications, designs, or instructions, or use of Buyer-furnished components, and Buyer agrees to pay costs and damages finally awarded in any such suit, provided that Buyer is notified promptly of the suit and, at Buyer's request, is given control of such suit and all requested reasonable assistance for the defense of the same.

IN NO EVENT SHALL BUYER OR MOTOROLA BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES FROM INFRINGEMENT OF PATENTS OR COPYRIGHTS.

(8)    LICENSES.

a.    The sale of the Products or software furnished hereunder does not convey any license by implication, estoppel or otherwise under any proprietary or patent rights of Motorola covering combinations of these Products or software with other elements. Unless otherwise agreed to in writing, Motorola retains title and all rights to inventions relating to the Product(s) covered by this Agreement. Except as specifically provided herein, this Agreement conveys no license to Buyer under any intellectual property rights of Motorola.

b.    The Products Buyer purchases from Motorola may contain software in the form of firmware programs built into their circuitry. Buyer's purchase of that Product includes a non-exclusive license to use and sub-license the software only as part of the Product and only under the following conditions: (a) Motorola (or its supplier) retains all title and ownership to the software; (b) Buyer will only transfer possession of the

Rev. 3/02

software in conjunction with a transfer of Product; and (c) Buyer shall not remove any copyright notice or proprietary legend from the software, or use the software with any hardware except with the Motorola hardware product for which it is designed.

c.      Buyer acknowledges Motorola's claim that Motorola software, if any, and Products furnished hereunder contain valuable trade secrets of Motorola and, therefore, agrees that it will not translate, reverse engineer, de-compile or disassemble or make any other unauthorized use of such Motorola software and Products. Since unauthorized use of such Motorola software and Products will greatly diminish the value of such trade secrets and cause irreparable harm to Motorola, Buyer agrees that Motorola, in addition to any other remedies it may have, shall be entitled to equitable relief to protect such trade secrets, including without limitation temporary and permanent injunctive relief without the proving of damage by Motorola.

d.      Buyer is not permitted to use the trademark Motorola or any other trademark or trade name owned by Motorola, except that Buyer may indicate that the Products sold to Buyer per this Agreement are "manufactured by Motorola, Inc.". Any other use of a Motorola owned trademark or the name Motorola is not permitted, except with Motorola's prior written approval.

e.      If Buyer is any unit or agency of the U.S. Government or a contractor which will or may supply the software to a unit or agency of the U.S. Government, Buyer agrees that Motorola software represents "commercial Computer Software", that the Government's use of the software shall be subject to "Restricted Rights", and that (if Buyer is such a contractor) before the software is transferred, it shall be marked with the required restricted rights legend(s) as provided in the relevant governmental regulations.

(9)      CONFIDENTIAL INFORMATION.  To the extent that protection of information or materials to be transferred pursuant to this Agreement is covered by an existing confidentiality agreement, the existing agreement shall apply. Otherwise, the following terms shall apply:  Motorola may furnish to Buyer information and materials (Materials) identified as confidential or proprietary. Buyer may not disclose such Materials except to its employees who may require use of the Materials in the performance of their duties, and Buyer may use such Materials only as authorized by Motorola. Buyer's obligations with respect to such Materials shall continue for five (5) years after receipt of the Materials.

(10)      IMPORTATION AND EXPORTATION.  Buyer shall comply with all applicable export control laws and shall not, directly or indirectly export, reexport, resell, ship, or divert any Product, Material, service, technical data, or software furnished hereunder to any person, entity, project, use, or country in violation of the laws or licensing requirements of the United States or any other appropriate national authority.

Buyer shall indemnify and hold Motorola harmless for any and all claims, demands, cost, fines, penalties, fees, expenses, or losses arising from Buyer's failure, intentional or unintentional, to comply with the foregoing paragraph.

(11)      COMPLIANCE.  In the event that Buyer elects to sell Motorola's Products or services to the U.S. Government or any state, local or non-U.S. Government entity, or to a prime contractor or other subcontractor selling to such entities, Buyer does so solely at its own option and risk.  Except as indicated in the paragraph below, Buyer remains exclusively responsible for compliance with all laws governing such sales and agrees not to obligate Motorola as a subcontractor or otherwise to such entities.  Further, Motorola makes no representations,

certifications or warranties whatsoever with respect to the ability of its goods, services, or prices to satisfy any such statutes or regulations.

Motorola agrees to comply with the following U.S. Governmental Federal Acquisition Regulations:  FAR 52.203-6, FAR 52.203-9, FAR 52.200-10, FAR 252.203-7000, FAR 252.203-7001, FAR 52.222-21, FAR 52.222-22, FAR 52.222-24, FAR 52.222-26, FAR 52.222-26, FAR 52.222-35, FAR 52.222-37, FAR 52.222-36, FAR 52.223-2.

(12)      GENERAL.

a.      Buyer agrees that these Conditions of Sale are the exclusive statement of the terms and conditions of the agreement between the parties and that they supersede all proposals and other communications between the parties, oral or written, relating to the subject matter hereof.

b.      No modifications hereto shall be effective unless they are agreed upon in writing by both parties.

c.      The failure of either party to insist in any one or more instances upon the performance of any of the terms, covenants, or conditions in this Agreement or to exercise any right under this Agreement, shall not be construed as a waiver or relinquishment of the future performance of any such term, covenant, or condition or the future exercise of any such right.

d.      No right, interest or obligation in this Agreement may be assigned or delegated by either party without the written permission of the other party.  This Agreement is binding upon and shall inure to the benefit of the parties and their respective successors.

e.      If any provision of this Agreement is contrary to, prohibited by or held invalid by any law, rule, order or regulation of any government or by the final determination of any State or Federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

f.      Section and paragraph headings used in this Agreement are for convenience only and are not to be deemed or construed to be part of this Agreement.

g.      This Agreement shall be governed and interpreted in accordance with the laws of the State of Illinois, without reference to principles of choice and conflicts of laws.

h.      The parties agree that any claim or dispute arising from this transaction will be submitted to non-binding mediation prior to initiation of any formal legal process.

Rev. 5/02