Hearing Date And Time: April 30, 2008 at 10:00 a.m.
Objection Deadline: April 23, 2008 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :
    In re                             :    Chapter 11
                                     :
DELPHI CORPORATION, et al.,      :    Case No. 05-44481 (RDD)
                                     :
                                     :    (Jointly Administered)
                Debtors.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 1121(d) EXTENDING
DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE
AND SOLICIT ACCEPTANCES OF REORGANIZATION PLAN

("POSTCONFIRMATION § 1121(d) EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this precautionary motion (the "Motion") for an order under 11 U.S.C. § 1121(d) further extending the Debtors' exclusive periods within which to file and solicit acceptances of a plan of reorganization, and respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.  On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In

2

Possession (Docket No. 9264).  Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement").  The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

4. On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi.  The Debtors are prepared to pursue actions with respect to the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

5. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6. The statutory predicate for the relief requested herein is section 1121(d) of the Bankruptcy Code, as amended and in effect on October 8, 2005.

B.    Current Business Operations Of The Debtors

7.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

8.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

9.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective

---

[1]  The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]  On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.     Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

11.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

13. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.   The Debtors' Transformation Plan

13. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.    Plan Confirmation And Postconfirmation Matters

14.    The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order. After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective. The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees. The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement. Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008. The Debtors are prepared to pursue actions against the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

15.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

16. As set forth in the Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan (Docket No. 13175) entered by this Court on March 19, 2008, the Debtors have the exclusive right under section 1121 of the Bankruptcy Code to file one or more reorganization plans through and including May 31, 2008 (the "Plan Proposal Period") and the exclusive right to solicit and obtain acceptances for those plans through and including July 31, 2008 (the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods"). As noted above, the Debtors did, in fact, file a plan, solicit acceptances of that plan, obtain confirmation of it, and, after the Confirmation Order became final, commence a formal closing process that was adjourned on April 4, 2008 pending the Debtors' pursuit of their remedies against the Plan Investors and/or exploration with their stakeholders of possible plan modifications.

17. Because the Court may confirm only one plan of reorganization, see 11 U.S.C. § 1129(c), no other plan of reorganization may be filed or solicited in these cases. Thus, section 1129(c) operates to extend the exclusive periods until the Plan (as modified or otherwise) becomes effective.

18. Accordingly, it is solely out of an abundance of caution and to ensure clarity with the Debtors' stakeholders, including their customers and supplies, that the Debtors move at this time under section 1121(d) of the Bankruptcy Code to extend the Exclusive Periods to prevent any lapse in exclusivity. The Debtors seek entry of an order further extending (a) the Plan Proposal Period until 30 days after substantial consummation of the Plan or any modified plan and (b) the Solicitation Period until 90 days after

substantial consummation of the Plan or any modified plan.  Although the Debtors are requesting a further extension of the Exclusivity Periods, the Debtors nonetheless anticipate emerging from chapter 11 as soon as reasonably practicable.

Basis For Relief

19.    The Exclusive Periods are intended to afford chapter 11 debtors a full and fair opportunity to rehabilitate their businesses and to negotiate, propose, confirm, and consummate a reorganization plan without the deterioration and disruption of their businesses that might be caused by the filing of competing reorganization plans by non-debtor parties.

20.    A further prophylactic extension of the Exclusive Periods is justified here by the significant progress the Debtors have made toward emerging from chapter 11 since they last sought an extension of the Exclusive Periods.  After obtaining confirmation of the Plan, the Debtors secured exit financing and met all other conditions to the effectiveness of the Plan and Investment Agreement and were prepared to emerge from chapter 11.  All of this was the result of diligent work by the Debtors, the Statutory Committees, GM, and other stakeholders over many months.

21.    The Debtors' efforts to emerge from chapter 11 were affected by severe dislocations in the capital markets that began late in the second quarter of 2007 and that have continued through the present.  Although the Debtors eventually obtained the exit financing required by the Plan, this turbulence in the capital markets was a principal cause of the delay in the Debtors' emergence from chapter 11 before the end of 2007.  Finally, the Plan Investors' decision not to honor their commitments in the Investment Agreement prevented the Debtors from emerging on April 4, 2008.

22.   Nevertheless, the Debtors have accomplished numerous other tasks related to many different aspects of the cases (as further detailed below) in an effort to emerge from chapter 11 protection. The unresolved contingencies relating to emergence notwithstanding the Plan Investors' failure to perform, along with the Court's prior recognition of the operation of section 1129(c) of the Bankruptcy Code and the size and complexity of the Debtors' cases, also justify a further extension of the Exclusive Periods.

<u>Applicable Authority</u>

23.   Under the Bankruptcy Code, the Court may confirm only one plan of reorganization. <u>See</u> 11 U.S.C. § 1129(c). Because the Plan was confirmed on January 25, 2008 pursuant to the Confirmation Order that became final on February 4, 2008, and because that order cannot be revoked unless "procured by fraud," <u>see</u> 11 U.S.C. § 1144, no other plan of reorganization may now be filed or solicited in these cases. Thus, in effect, the Debtors' exclusivity period will extend until they consummate the Plan or any modified plan.

24.   Even if that were not the case, however, section 1121(d) of the Bankruptcy Code permits the court to extend a debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

11 U.S.C. § 1121(d). The court in <u>In re McLean Industries, Inc.</u>, 87 B.R. 830 (Bankr. S.D.N.Y. 1987), identified the following factors as relevant to the determination of "cause" to extend a debtor's Exclusive Periods:

10

  (a) the existence of good-faith progress toward reorganization;

  (b) existence of an unresolved contingency;

  (c) the size and complexity of the debtor's case;

  (d) a finding that the debtor is not seeking to extend exclusivity to pressure creditors "to accede to [the Debtor's] reorganization demands"; and

  (e) the fact that the debtor is paying its bills as they come due.

Id. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) (stating that not all factors "are relevant in every case" and court has discretion to "decide which factors are relevant and give the appropriate weight to each"). At least one court has noted that "cause may be measured by a more lenient standard in the determination to grant an enlargement of time in which to gain acceptances to a filed plan." Gaines v. Perkins (In re Perkins), 71 B.R. 294, 299 (W.D. Tenn. 1987) (emphasis added); see also In re Express One International, Inc., 194 B.R. 98 (Bankr. E.D. Tex. 1996) (denying motion to terminate and granting motion to extend exclusivity based in part on debtors' filing of plan and disclosure statement and imminent hearing on disclosure statement). A similar standard should apply when a debtor has negotiated the agreements necessary to support a plan (and satisfied the conditions to a confirmed plan), but merely needs to use that foundation to complete its emergence from chapter 11.

  25. In other cases of similar size and complexity to the Debtors' cases, courts have extended the debtors' exclusive rights to propose a plan of reorganization for periods similar to those requested by the Debtors. See, e.g., In re W.R. Grace & Co., et al., Case No. 01-01139 (Bankr. D. Del. Oct. 3, 2006) (extending exclusive periods for more than six years); In re Kaiser Aluminum Corp., Case No. 02-10429 (Bankr. D. Del. Nov. 2,

11

2005) (extending periods for approximately 43 months); In re Solutia Inc., et al., Case No. 03-17949 (Bankr. S.D.N.Y. May 1, 2007) (extending periods for more than 43 months). In this case, based upon the preceding factors and in line with other cases of similar size and complexity, sufficient cause exists for a prophylactic extension of the Exclusive Periods.

F.     The Debtors Have Made Good-Faith Progress Toward Reorganization

26. An extension of a debtor's exclusive periods is justified by a debtor's progress in resolving issues facing its creditors and estates. McLean Indus., 87 B.R. at 834; In re AMKO Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). The Debtors' progress in these cases thus far is significant and compels a further extension of the Exclusive Periods, should it be necessary.

    (i)     Plan Confirmation And Preparedness For Emergence

27. The Debtors' good-faith progress towards reorganization is most convincingly demonstrated by entry of the Confirmation Order on January 25, 2008 and the Debtors' satisfaction of the conditions to closing in the Plan and Investment Agreement. The Debtors met the conditions to consummate their reorganization Plan as of April 4, 2008. All of these accomplishments represent the Debtors' continuing efforts to emerge from chapter 11 protection as quickly as possible. The Debtors are proceeding rapidly to evaluate the options available to them and to implement a new path to emergence and to maximize value for all their stakeholders.

    (ii)     Claims Reconciliation

28. Although creditors have filed more than 16,800 proofs of claim asserting approximately $34.0 billion in liquidated amounts plus certain unliquidated amounts, the Debtors have made significant strides in the claims reconciliation process.

As of April 1, 2008, the Debtors have objected to approximately 13,800 claims asserting nearly $10.7 billion (plus additional unliquidated amounts) and this Court has granted relief with respect to approximately $10.3 billion in asserted liquidated claims (plus additional unliquidated claims). Thus, the Debtors have successfully reduced the aggregate amount of Trade and Other Unsecured Claims below the $1.45 billion amount set by the Plan.

   (iii)  Other Key Accomplishments

  29.  In addition to the foregoing, since the Debtors last sought a extension of the Exclusivity Periods, the Debtors have also, among other things:

   (a)  obtained court approval of the sale of the bearings business;

   (b)  obtained court approval of the bidding procedures for sale of certain assets used in the Debtors' U.S. damper business in Kettering, Ohio;

   (c)  terminated four joint ventures and settled certain warranty claims with Calsonic Kansei Corporation of Japan;

   (d)  completed the sale of its Interiors and Closures business to Inteva Products, LLC;

   (e)  obtained court authority to extend the deadline to serve process for avoidance actions filed in connection with the Preservation Of Estate Claims Procedures Order;

   (f)  filed two omnibus claims objections;

   (g)  amended the form S-1, obtained the SEC's declaration of its effectiveness, and commenced the Rights Offering which closed March 31, 2008;

   (h)  obtained court approval to perform under modified pension funding waivers;

   (i)  obtained court approval to extend an indemnity agreement with GM with respect to UAW benefit guarantee; and

        (j)      met the conditions necessary to substantially consummate the Plan and commenced a Plan closing that would have been completed but for the actions of the Plan Investors.

30.      In summary, the Debtors have continued to make significant, good-faith progress in their chapter 11 cases.

G.      Unresolved Contingencies Still Exist

31.      Courts have also cited the need to resolve an important contingency as justification for extending a debtor's exclusive periods. Although the Court has confirmed the Debtors' Plan, the Debtors may have to modify the Plan in light of the Plan Investors' failure to meet their funding obligations under the Plan. The tasks of evaluating the Debtors' options and developing a modified path to emergence remain significant for both their magnitude and complexity and amply satisfy the contingency component described in the McLean test.

H.      These Cases Are Large And Complex

32.      The size and complexity of the Debtors' chapter 11 cases alone constitute sufficient cause to extend the Exclusive Periods. See, e.g., In re Texaco Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987); In re United Press Int'l, Inc., 60 B.R. 265, 270 (Bankr. D.D.C. 1986) (granting $40 million company extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan."). These and other authorities show that in large, complex chapter 11 cases, courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, formulate a long-term business plan, and timely obtain confirmation of a plan of reorganization.

33.    The Debtors' cases are indisputably large and the multi-lateral and the multi-dimensional scope of actions that must be taken to address Delphi's restructuring requirements are exceedingly complex. A review of certain basic statistics noted above makes the foregoing conclusion self-evident. At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods under the authorities cited above. Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous significant issues that are unique to the distressed automobile industry and some that affect most large businesses that rely on the capital markets. The extension of the exclusive periods is necessary to continue progress in addressing these complexities.

I.    The Debtors Are Using Exclusivity For A Proper Purpose

34.    Courts have denied extensions of exclusive periods when plan negotiations among parties-in-interest have broken down and the continuation of exclusivity would merely give the debtor unfair bargaining leverage over the other parties-in-interest. See Teachers Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in the Woods), 10 B.R. 338, 345 (E.D. Mich. 1981). Here, the Debtors' precautionary request for an extension of the Exclusive Periods is not a negotiation tactic. The Debtors have negotiated with their stakeholders and obtained their acceptance of the Plan. The Debtors are working with their stakeholders to revise the path to emergence to continue to maximize value for all stakeholders.

J.      <u>The Debtors Are Paying Their Bills As They Come Due</u>

35.      Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency.  <u>See</u> <u>In re Ravenna Indus., Inc.</u>, 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982).  The Debtors are paying their bills as they come due, including the statutory fees paid quarterly to the United States Trustee.  The Debtors have extended the maturity date of their $4.5 billion debtor-in-possession financing facility to July 1, 2008, and anticipate negotiating financing through December 31, 2008, to provide additional comfort to creditors and other stakeholders that the Debtors will continue to meet their obligations as they come due.

K.      <u>The Debtors Have Shown Cause To Further Extend The Exclusive Periods</u>

36.      As shown above, the Debtors have made significant and productive strides in these chapter 11 cases.  Based on this progress and all the other applicable factors, sufficient cause exists to extend the Exclusive Periods.[4]  Accordingly, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

Notice

37.      Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883),

---

[4] Even if the Court denied a further extension under section 1121(d), the operation of section 1129(c) would prevent the filing and solicitation of any competing plan of reorganization so long as the Plan has not been withdrawn and the Confirmation Order has not been revoked.

and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

38.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (1) extending the Debtors' exclusive periods (a) to file a plan of reorganization until 30 days after substantial consummation of the Plan or any modified plan and (b) to solicit acceptance of a plan of reorganization until 90 days after substantial consummation of the Plan or any modified plan and (2) granting the Debtors such other further relief as is just.

Dated:    New York, New York
          April 10, 2008

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                        & FLOM LLP

                                        By:    /s/ John Wm. Butler, Jr.
                                               John Wm. Butler, Jr. (JB 4711)
                                               George N. Panagakis (GP 0770)
                                               Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                                    - and –

                                        By:    /s/ Kayalyn A. Marafioti
                                               Kayalyn A. Marafioti (KM 9632)
                                               Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                          Debtors and Debtors-in-Possession