**Hearing Date and Time: April 30, 2008 at 10:00 a.m.**
**Objection Deadline: April 28, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner (DB 2301)
Andrew V. Tenzer (AT 2263)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                           :
    In re                    :    Chapter 11
                           :
DELPHI CORPORATION, et al.,   :    Case No. 05-44481 (RDD)
                           :
             Debtors.    :    (Jointly Administered)
                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

EXPEDITED MOTION FOR ORDER (I) SUPPLEMENTING JANUARY 5, 2007 DIP
ORDER (DOCKET NO. 6461) AND NOVEMBER 16, 2007 DIP EXTENSION ORDER
(DOCKET NO. 10854) AND AUTHORIZING DEBTORS TO (A) EXTEND MATURITY DATE OF
DIP FACILITY, (B) ENTER INTO RELATED DOCUMENTS, AND (C) PAY FEES IN CONNECTION
THEREWITH, AND (II) AUTHORIZING DEBTORS TO ENTER INTO AN ARRANGEMENT
WITH GENERAL MOTORS CORPORATION OR AN AFFILIATE

("SECOND DIP EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,
debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),
hereby submit this Expedited Motion (the "Motion") For Order (I) Supplementing January 5,
2007 DIP Order (Docket No. 6461) And November 16, 2007 DIP Extension Order (Docket No.
10854) And Authorizing Debtors To (A) Extend Maturity Date Of DIP Facility, (B) Enter Into
Related Documents, And (C) Pay Fees In Connection Therewith, And (II) Authorizing Debtors
To Enter Into An Arrangement With General Motors Corporation Or An Affiliate, and
respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this
Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.
§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their
businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections
1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,
2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official
committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official
committee of equity holders (together with the official committee of unsecured creditors, the
"Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization
Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.
9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi

2

Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).

Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan (Docket No. 11388) (the "Disclosure Statement").  The Court entered an order

approving the adequacy of the Disclosure Statement and granting the related solicitation

procedures motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court

entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation

Order"), which became a final order on February 4, 2008.

        4.      On April 4, 2008, the Debtors announced that although they had met the

conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit

financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that

was commenced but not completed and refused to fund their Investment Agreement (as defined

in the Plan) with Delphi.  The Debtors are prepared to pursue actions with respect to the Plan

Investors that are in the best interests of the Debtors and their stakeholders and are working with

their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

        5.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

        6.      The statutory predicates for the relief requested herein are sections 105,

361, 362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001, and 6004(g) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3

B.    Current Business Operations Of The Debtors

7.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

8.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

9.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and

---

[1]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.        Events Leading To The Chapter 11 Filing

        10.        In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

        11.        The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

        12.        In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

---

[3]        Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
        valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
        calendar year 2004 was $482 million.

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

13.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable

solution to their current pension situation.

E.    Plan Confirmation And Postconfirmation Matters

14.    The confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases.

The Global Settlement Agreement and the Master Restructuring Agreement provide for a

comprehensive settlement with GM, and both agreements were approved by this Court in the

Confirmation Order.  After the Plan was confirmed, the Debtors focused their efforts on

satisfying the conditions for the Plan to become effective.  The Debtors satisfied those conditions

and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit

lenders, and the Statutory Committees.  The Plan Investors, however, refused to participate in the

closing or fund their obligations under the Investment Agreement.  Instead, the Plan Investors

delivered written notices purporting to terminate the Investment Agreement based on both

alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4,

2008.  The Debtors are prepared to pursue actions against the Plan Investors that are in the best

interests of the Debtors and their stakeholders and are working with their stakeholders to

evaluate their options to move forward with emerging from chapter 11 as soon as reasonably

practicable.

        15.     Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

F.      The DIP Facility

        16.     On January 5, 2007, pursuant to the Order Under 11 U.S.C. §§ 105, 361,

362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002,

4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II)

Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured

Debt (the "DIP Order") (Docket No. 6461), this Court authorized the Debtors to enter into the

current $4.5 billion postpetition financing facility (the "DIP Facility") governed by the

Revolving Credit, Term Loan, and Guaranty Agreement (the "DIP Credit Agreement").  The DIP

Facility refinanced both the $2.0 billion first amended DIP credit facility and the approximate

$2.5 billion outstanding on the Debtors' $2.825 billion prepetition credit facility.  The DIP

Facility consists of a $1.75 billion first priority revolving credit facility, a $250 million first

priority term loan, and an approximate $2.5 billion second priority term loan.  JPMorgan Chase

Bank, N.A. ("JPMorgan" or the "Agent") is the administrative agent for the lenders under the

DIP Facility (the "DIP Lenders").

       17.    The DIP Facility is secured by (a) a perfected first-priority lien on

substantially all of the Debtors' otherwise unencumbered assets (subject to certain exclusions),

(b) a perfected junior lien on substantially all of the Debtors' previously encumbered assets

(subject to certain exclusions), (c) superpriority administrative expense claims under section

364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the DIP Facility,

and (d) a first priority senior priming lien under section 364(d)(1) of the Bankruptcy Code on

substantially all of the Debtors' property.[4]  Borrowings under the DIP Facility are prepayable at

the Debtors' option without premium or penalty.

       18.    On November 16, 2007, pursuant to the Order Supplementing January 5,

2007 DIP Order (Docket No. 6461) And Authorizing Debtors To (I) Extend Maturity Date Of

DIP Facility, (II) Enter Into Related Documents, And (III) Pay Fees In Connection Therewith

(the "DIP Extension Order") (Docket No. 10957), this Court authorized the Debtors to enter into

the third amendment to the DIP Credit Agreement (the "First Amended and Restated DIP Credit

Agreement") to, among other things, extend the term of the DIP Facility from December 31,

2007 to July 1, 2008.

---

[4]    A more detailed description of the terms of the DIP Facility is contained in the expedited motion for approval of
the DIP Facility dated December 18, 2006 (Docket No. 6180) (the "DIP Motion"), the DIP Order, and the form
of DIP Credit Agreement attached thereto.

Relief Requested

19.    By this Motion, the Debtors seek entry of an order (i) supplementing the

DIP Order and DIP Extension Order and authorizing the Debtors to (a) extend the maturity date

of the DIP Facility, (b) enter into related documents, and (c) pay fees in connection therewith and

(ii) authorizing the Debtors to enter into an arrangement with GM and/or a GM affiliate.

Basis For Relief

20.    As stated above, the DIP Facility currently matures on July 1, 2008.  The

Debtors accordingly seek approval to enter into a fourth amendment (the "Fourth Amendment")

to the First Amended and Restated DIP Credit Agreement (the "Second Amended and Restated

DIP Credit Agreement") to, among other things, extend the term of the DIP Facility to December

31, 2008.  Entering into the Second Amended and Restated DIP Credit Agreement will provide

the Debtors with access to their DIP Facility through the second half of 2008.  This extension is

necessary to enable the Debtors to continue forward on a path to emergence from chapter 11.

The Debtors also seek approval to enter into an arrangement with GM and/or a GM affiliate

regarding the terms and conditions under which GM would reimburse certain amounts that the

Debtors paid during these chapter 11 cases pursuant to orders previously entered by this Court

and in anticipation of entering into the GSA and the MRA on April 4, which sums would have

been reimbursed by GM following the effectiveness of the GSA and the MRA.  The DIP

Extension, together with the Debtors' agreement with GM and/or a GM affiliate and the Debtors'

future repatriation of funds consistent with prior practice in these chapter 11 cases, will allow the

Debtors to enhance their liquidity in the second half of 2008.

G.    The Second Amended and Restated DIP Credit Agreement

21.    The Debtors and the DIP Lenders are currently negotiating the terms of

the Second Amended and Restated DIP Credit Agreement.  The Debtors intend to launch the DIP

extension on April 17, 2008, and syndication is expected to continue through the week of April 21, 2008. The Debtors anticipate receiving commitments from JPMorgan and the other participating lenders by the end of the week of April 28, with closing and funding occurring during the week of May 5, 2008.

22.    The Debtors anticipate that, except as noted herein, the terms of the Second Amended and Restated DIP Credit Agreement will be substantially identical to those of the First Amended and Restated DIP Credit Agreement, albeit more costly due to the current status of the capital markets. In addition, the configuration of the first priority revolving loan and the first priority term loan may change: the refinanced DIP Facility will consist of a $1 billion first priority revolving credit facility ("Tranche A"), an up to $600 million first priority term loan ("Tranche B"), and an approximate $2.5 billion second priority term loan ("Tranche C"). In addition: the maturity date will be extended from July 1, 2008 to December 31, 2008; the amount of unpaid professional fees under the Carve-Out following the delivery of a borrowing base certificate but prior to an Event of Default under the refinanced DIP Facility will be reduced from $10 million to $5 million; and other modifications will be made, including::[5]

---

[5]    The chart below is intended only as an illustrative summary. To the extent the description contained in this chart is inconsistent with the Fourth Amendment, the First Amended And Restated DIP Credit Agreement, or the Second Amended and Restated DIP Credit Agreement, the applicable document controls.

|  | First Amended And Restated DIP Credit Agreement | Second Amended And Restated DIP Credit Agreement |
|---|---|---|
| Maturity Date | July 1, 2008 | December 31, 2008 |
| Undrawn Pricing | 50 bps | [Redacted][6] |
| Drawn Pricing | Tranche A Borrowings: L+350<br>Tranche B Borrowings: L+350<br>Tranche C Borrowings: L+400 | [Redacted] |
| LIBOR Floor | Tranche A Borrowings: None<br>Tranche B Borrowings: None<br>Tranche C Borrowings: None | [Redacted] |

23.     The Second Amended and Restated DIP Credit Agreement will contain fee provisions, including, among other things, certain commitment fees and letter of credit fees. Other fee provisions will be contained in a separate fee letter, which the parties have agreed will be kept confidential.[7]

24.     The Debtors also propose that they be authorized, but not directed, to perform, and take all actions necessary to make, execute, and deliver the Fourth Amendment together with all other documentation executed in connection therewith (the "Fourth Amendment Documents") and to pay the related fees. Upon execution and delivery of each of the Fourth Amendment Documents and such other instruments and documents as may be necessary to effectuate the Fourth Amendment, the Debtors propose that such instruments and documents constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their respective terms.

---

[6]     This chart is being filed in redacted format to protect commercial information. An unredacted chart will be submitted to counsel for the Statutory Committees and the U.S. Trustee. In addition, the Debtors will submit an unredacted chart promptly following the bank meeting at which the DIP extension is launched.

[7]     The fee letter (which may include fees and expenses to JPMorgan and other lenders on account of their efforts in respect of the Debtors' previously-committed exit financing) will be provided, upon request, to counsel to the Statutory Committees (on a professionals' eyes only basis) and the U.S. Trustee and will be made available to this Court for review.

25.    The Debtors propose that the DIP Order and the DIP Extension Order be deemed supplemented by the order approving this Motion, and that the DIP Order and the DIP Extension Order would continue in full force and effect as supplemented.  The DIP Order and the DIP Extension Order, as supplemented by the proposed order approving this Motion, would not treat secured creditors any differently than such secured creditors are treated under the DIP Order or the DIP Extension Order.  In connection with all obligations and indebtedness arising under the Second Amended and Restated DIP Credit Agreement, the Agent and the DIP Lenders would be granted each and every right and remedy granted to the Agent and the DIP Lenders under the DIP Order and the DIP Extension Order.

26.    In addition, with respect to any liens granted to the PBGC, paragraph 6 of the DIP Extension Order will be amended to provide that the consent granted by the DIP Lenders thereunder shall expressly include consensual liens, and such liens shall only be granted on Collateral (as defined in the DIP Order), and only be granted to the extent required and agreed to by the Debtors.

27.    Furthermore, the definition of "Carve-Out" will be amended to exclude Transaction Expenses under and as defined in the Investment Agreement.

H.    Arrangement With GM And/Or A GM Affiliate

28.    Pursuant to various orders entered by this Court during these chapter 11 cases, and in anticipation of entering into the GSA and the MRA, the Debtors have expended significant sums that would have otherwise been reimbursed by GM following the effectiveness of the GSA and the MRA.  In connection with the extension of the maturity date of the DIP Facility, GM and/or a GM affiliate are expected to enter to an arrangement (the "GM Arrangement") under which GM and/or an affiliate of GM under certain circumstances

12

acceptable to Delphi will reimburse Delphi on a net basis for amounts already paid by Delphi in anticipation of the effectiveness of the GSA and the MRA.[8]

Applicable Authority

I.    This Court Should Authorize The Proposed Second Amended and Restated DIP Credit Agreement

    (a)    The Amended and Restated DIP Credit Agreement Is Appropriate Under Section 364(c) Of The Bankruptcy Code

29.    The Debtors propose to enter into the Fourth Amendment, which amends the First Amended and Restated DIP Credit Agreement by continuing to provide security interests and liens as set forth in the Second Amended and Restated DIP Credit Agreement pursuant to sections 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c). This Court has already made this finding in the DIP Order, which approved the Debtors' DIP Facility. Because the DIP Facility will remain in place, subject to certain terms under the Second Amended and Restated DIP Credit Agreement, the Debtors should be permitted to continue to grant the liens in accordance with section 364(c) of the Bankruptcy Code.

30.    Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

---

[8]    The terms of the GM Arrangement remain subject to negotiation among the Debtors and GM. The Agent and the DIP Lenders shall not be deemed to have agreed to any potential terms of an arrangement with GM and/or a GM affiliate by virtue of the Debtors' having filed this Motion and the proposed order granting the relief requested herein (or the Agent's authorization of the Debtors to file this Motion and the proposed order).

13

(b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987),

(secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

      31.    Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether

    (a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

    (b)    the credit transaction is necessary to preserve the assets of the estate; and

    (c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met

when it entered the DIP Order.  Because the DIP Facility will remain in place, as supplemented

by the Fourth Amendment, this Court's prior findings should continue to apply.

    (b)    The Financing Facility Is Appropriate Under
              Section 364(d) Of The Bankruptcy Code

      32.    Section 364(d)(1) provides that the court may, after notice and a hearing,

authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on

property of the estate that is subject to a lien only if–

    (a)    the trustee is unable to obtain credit otherwise; and

    (b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be

decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its

application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process.'" Id.

(quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  In this case, the

Debtors have already established that they are unable to get credit without priming liens.  The

priming lien structure under the DIP Facility, as amended, including the adequate protection

provided to parties whose liens are primed, will continue essentially unchanged from the First

Amended and Restated DIP Credit Agreement.

(c)    Compliance With General Order No. M-274

33.    The Debtors believe that the relief requested in this Motion and the notice

to be provided are in compliance with the Guidelines for Financing Requests (the "Guidelines"),

adopted under General Order No. M-274 of the Board of Judges for the Southern District of New

York.  The Debtors do not believe that entering into the Fourth Amendment, which amends the

First Amended and Restated DIP Credit Agreement creates any incremental right that would

trigger the application of the Extraordinary Provision (as defined in the Guidelines) requirements

beyond that which was already satisfied in the DIP Motion and approved by this Court pursuant

to the DIP Order.  Accordingly, the Debtors submit that they have satisfied the Guidelines.

(d)    Application Of The Business Judgment Standard

34.    Based on the foregoing, the Debtors submit that entry of an order

approving the proposed Second Amended and Restated DIP Credit Agreement is necessary and

appropriate to enable the Debtors to reorganize successfully.  The proposed Second Amended

and Restated DIP Credit Agreement is being negotiated in good faith, at arm's length and

pursuant to the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's

business judgment on most business decisions, including the decision to borrow money.  See

Group of Institutional Investors v. Chicago,  Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523,

550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering

whether a debtor has exercised its business judgment, a court is not free to second-guess

particular provisions but rather determines whether the proposed action "as a whole is within

reasonable business judgment."  In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr.

S.D.N.Y. 1990).

        35.     The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a

presumption arises that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated

Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation

omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment

have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not

enough for an objector simply to raise and argue an objection. Rather, an objector "is required to

produce some evidence respecting its objections."  Comm. Of Equity Holders v. Lionel Corp. (In

re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

        36.     The Debtors have exercised sound business judgment in determining that

supplementing the DIP Order and DIP Extension Order, among other things, to extend the

maturity date under the terms set forth in the Second Amended and Restated DIP Credit

16

Agreement is appropriate.  Indeed, the proposed terms of the Second Amended and Restated DIP

Credit Agreement are fair, reasonable, and necessary and are in the best interests of the Debtors'

estates.  Accordingly, the Debtors should be granted authority to enter into the Fourth

Amendment, which effects the Second Amended and Restated DIP Credit Agreement, and

borrow funds on the secured, administrative super-priority and priming basis as more fully

described in the DIP Motion, pursuant to sections 363 and 364 of the Bankruptcy Code, and take

the other actions contemplated by the Second Amended and Restated DIP Credit Agreement and

as requested herein.

J.    The Amended DIP Financing Facility Should
      Be Accorded The Benefits Of Section 364(e)

37.    No consideration is being provided to any party to, or guarantor of,

obligations arising under the amended DIP Facility, other than as disclosed in the Second

Amended and Restated DIP Credit Agreement.  Accordingly, the amended DIP Facility should

be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth

herein.

K.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

38.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-

day stay.  This Court previously granted similar relief from Bankruptcy Rule 6004(g) in

approving the DIP Order and the DIP Extension Order, and other courts in this district have

waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp.,

327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a

waiver has been shown, the order may provide for a waiver of the 10-day waiting period under

17

Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001)

(requiring demonstration of "a business exigency" for a waiver of the ten-day stay under

Bankruptcy Rule 6004(g)).  By waiving the ten-day stay period, the Debtors will be able to

consummate the Fourth Amendment and the GM Arrangement, thereby allowing the Debtors to

continue to take the steps necessary to emerge from chapter 11.

<u>Notice Of Motion</u>

39.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental

Case Management Order"), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And

105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates

And Certain Notice, Case Management, And Administrative Procedures, entered February 4,

2008 (Docket No. 12487) as well as Bankruptcy Rule 4001.  In addition, the Debtors have

served, among other parties, the setoff claimants and objectors to the Debtors' motion to enter

into its original $2 billion postpetition credit facility and the DIP Motion and the DIP Extension

Motion.  The Debtors have also provided notice to counsel to the agent for the Debtors' former

prepetition credit facility.  Furthermore, the Debtors have complied with the Supplemental Case

Management Order with respect to the filing of this Motion and the need for expedited relief.[9]  In

---

[9]    The Debtors have noticed this Motion for the omnibus hearing on April 30, 2008. In compliance with the terms
of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors'
Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Creditors'
Committee has consented to this Motion's being heard on April 30, 2008.  Because this Motion is being filed on
fewer than 20 days' notice, parties-in-interest will have until April 28, 2008 to file an objection to this Motion.

light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

40.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a)  authorizing the Debtors to (i) extend the maturity date of the DIP Facility, (ii) enter into related documents, and (iii) pay fees in connection therewith; (b) authorizing the Debtors to enter into the GM Arrangement; and (c) granting the Debtors such other and further relief as is just.

Dated:          New York, New York
                April 15, 2008

                                SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM LLP

                                By:    /s/ John Wm. Butler
                                       John Wm. Butler, Jr. (JB 4711)
                                       John K. Lyons (JL 4951)
                                       Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois 60606
                                (312) 407-0700

                                          - and -

                                By:    /s/ Kayalyn A. Marafioti
                                       Kayalyn A. Marafioti (KM 9632)
                                       Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York 10036
                                (212) 735-3000

                                          - and -

                                SHEARMAN & STERLING LLP


                                By:    /s/ Douglas P. Bartner
                                       Douglas P. Bartner (DB 2301)
                                       Andrew V. Tenzer (AT 2263)
                                599 Lexington Avenue
                                New York, New York  10022
                                (212) 848-4000

                                Attorneys for Delphi Corporation, et al.,
                                       Debtors and Debtors-in-Possession