Execution Copy

**ASSET PURCHASE AGREEMENT**
**BY AND BETWEEN**

**DELPHI AUTOMOTIVE SYSTEMS LLC**

**AND**

**TENNECO AUTOMOTIVE OPERATING COMPANY INC.**

**DATED:  March 7, 2008**

# TABLE OF CONTENTS

**Page**

1.      CONVEYANCE OF THE ACQUIRED ASSETS ................................................................9

    1.1     Acquired Assets Transaction ............................................................9

    1.2     Excluded Assets ...............................................................................9

    1.3     Post-Closing Asset Deliveries .......................................................10

    1.4     No Assumption of Liabilities by Purchaser; Retained Liabilities .........................11

    1.5     Additional Assets ...........................................................................11

    1.6     Kettering Lease Agreement ...........................................................11

    1.7     Warranty and Service Parts ...........................................................11

    1.8     Delivery of Certain Documentation ................................................11

    1.9     Non-Compete and Non-Solicitation ...............................................12

2.      PURCHASE PRICE .................................................................................13

    2.1     Purchase Price for Acquired Assets ...............................................13

    2.2     Payment of Purchase Price ............................................................13

    2.3     Deposit Amount ..............................................................................14

3.      EMPLOYEE MATTERS ..........................................................................15

    3.1     Salaried Employees .......................................................................15

    3.2     Transferred Hourly Employees ......................................................17

    3.3     Other Matters .................................................................................18

    3.4     Due Diligence .................................................................................19

4.      CERTAIN TRANSITION SERVICES ......................................................19

5.      REPRESENTATIONS AND WARRANTIES ............................................20

    5.1     Warranties of Seller .......................................................................20

    5.2     Warranties of Purchaser ................................................................23

    5.3     Fair Disclosure ...............................................................................24

6.      CONDITIONS TO CLOSING ..................................................................25

    6.1     Conditions to Obligations of Seller and Purchaser ...........................25

    6.2     Conditions to Obligations of Purchaser .........................................25

    6.3     Conditions to Obligations of Seller ................................................26

7.      CLOSING ...............................................................................................26

    7.1     Closing Date ...................................................................................26

    7.2     Kettering Lease Agreement ...........................................................26

    7.3     Seller's Deliveries ..........................................................................26

## TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 7.4 | Purchaser's Deliveries | 27 |
| 8. | | CERTAIN ADDITIONAL COVENANTS | 27 |
| | 8.1 | Operations Pending Closing | 27 |
| | 8.2 | Cooperation; Efforts and Actions to Cause Closing | 27 |
| | 8.3 | Jobs Covenant | 28 |
| | 8.4 | Purchaser's Access | 28 |
| 9. | | BANKRUPTCY ACTIONS | 28 |
| | 9.1 | Orders | 28 |
| | 9.2 | Bidding Procedures | 28 |
| | 9.3 | Break-up Fee and Expense Reimbursement | 35 |
| 10. | | TERMINATION | 35 |
| | 10.1 | Termination as to Specific Assets | 35 |
| | 10.2 | General Termination | 35 |
| | 10.3 | Termination By Seller | 36 |
| | 10.4 | Termination By Purchaser | 36 |
| | 10.5 | Effect of Termination | 36 |
| 11. | | INDEMNIFICATION | 37 |
| | 11.1 | Survival | 37 |
| | 11.2 | Seller's Agreement to Indemnify | 37 |
| | 11.3 | Purchaser's Agreement to Indemnify | 37 |
| | 11.4 | Limitations on Agreements to Indemnify | 37 |
| | 11.5 | Claims | 38 |
| | 11.6 | Treatments of Payments | 40 |
| 12. | | MISCELLANEOUS | 40 |
| | 12.1 | Notices | 40 |
| | 12.2 | Bulk Sales Laws | 41 |
| | 12.3 | Assignment | 41 |
| | 12.4 | Entire Agreement | 41 |
| | 12.5 | Waiver | 42 |
| | 12.6 | Severability | 42 |
| | 12.7 | Amendment | 42 |
| | 12.8 | Expenses | 42 |

**TABLE OF CONTENTS**
(continued)

**Page**

12.9    Third Parties ............................................................................................42

12.10   Headings ..............................................................................................42

12.11   Counterparts..........................................................................................43

12.12   Governing Law ......................................................................................43

12.13   Public Announcements...........................................................................43

12.14   Sales or Transfer Taxes ........................................................................43

12.15   Venue and Jurisdiction ..........................................................................43

12.16   Risk of Loss...........................................................................................43

12.17   Enforcement of Agreement ...................................................................43

12.18   Dispute Resolution ................................................................................44

12.19   Further Assurances ...............................................................................44

12.20   No Right of Setoff..................................................................................44

12.21   Dollar Amounts......................................................................................44

12.22   Bankruptcy Court Approval....................................................................44

12.23   Miscellaneous Definitional Provisions ...................................................44

12.24   Jury Trial Waiver ...................................................................................45

Execution Copy

## ASSET PURCHASE AGREEMENT

Delphi Automotive Systems LLC, a Delaware limited liability company ("**Seller**"), and Tenneco Automotive Operating Company Inc., a Delaware corporation ("**Purchaser**"), enter into this Asset Purchase Agreement on March 7, 2008.

## <u>RECITALS</u>:

A.      On October 8, 2005 (the "**Petition Date**"), Seller and certain of its affiliates filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as then amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

B.      Seller, along with certain affiliated companies, continues to operate as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

C.      Seller desires to sell to Purchaser all right, title and interest of Seller in and to the Acquired Assets (as defined below), and Purchaser desires to make such purchase subject to the terms and conditions set forth in this Agreement, and as authorized under Sections 105 and 363 of the Bankruptcy Code.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

## <u>DEFINITIONS</u>

The following terms, as used in this Agreement, have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**Acquired Assets**" means only the following assets:

A.      the Machinery & Equipment set forth on <u>Schedule A</u>;

B.      the Inventory set forth on <u>Schedule B</u> that is held by Seller as of the Closing Date; and

C.      the  Other Personal Property, including the personal property set forth on <u>Schedule C</u>.

"**Additional Assets**" has the meaning set forth in <u>Section 1.5</u>.

"**Affiliate**" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under common control with such specified Person.  For purposes of this definition, control means ownership of at least fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.

"**Agreement**" means this Asset Purchase Agreement, including all Schedules and Exhibits, as the same may be amended from time to time in accordance with its terms.

**"Alternate Bid(s)"** has the meaning set forth in Section 9.2.J.

**"Alternate Bidder(s)"** has the meaning set forth in Section 9.2.J.

**"Alternative Transaction"** has the meaning set forth in Section 9.3.A.

**"Ancillary Agreements"** means the Bill of Sale, Kettering Lease Agreement and each other agreement entered into between Seller (or any of its Affiliates), on the one hand, and Purchaser (or any of its Affiliates), on the other hand, at or in connection with the Closing, but excluding purchase orders, if any, entered into pursuant to either Section 1.7 or Article 4.

**"Auction"** has the meaning set forth in Section 9.2.H.

**"August 5, 2007 IUE-CWA-Tenneco CBA"** has the meaning set forth in Section 3.2.D.

**"Bankruptcy Cases"** has the meaning set forth in the Recitals.

**"Bankruptcy Code"** has the meaning set forth in the Recitals.

**"Bankruptcy Court"** has the meaning set forth in the Recitals.

**"Basket"** has the meaning set forth in Section 11.4.D.

**"Bid Deadline"** has the meaning set forth in Section 9.2.C.

**"Bid Requirements"** has the meaning set forth in Section 9.2.C.

**"Bidding Procedures"** has the meaning set forth in Section 9.2.A.

**"Bidding Procedures Order"** means a Governmental Order or Governmental Orders (as defined below) of the Bankruptcy Court (including all schedules and exhibits thereto), approving the Bidding Procedures, which shall be in form and substance reasonably satisfactory to Purchaser.

**"Bidding Process"** has the meaning set forth in Section 9.2.A.

**"Break-Up Fee"** has the meaning set forth in Section 9.3.A.

**"Business Day"** means any day other than a Saturday, a Sunday or a day on which banks in Detroit, Michigan or Chicago, Illinois are authorized or obligated by Law or executive order to close.

**"Closing"** has the meaning set forth in Section 7.1.

**"Closing Date"** means the date of Closing.

**"Collective Bargaining Agreements"** means all collectively bargained agreements entered into by Seller or its Affiliates with the IUE-CWA International and/or its Local 755 applicable to the Kettering Facility and/or the Seller IUE-CWA represented bargaining unit members at the Kettering Facility (including without limitation local agreements, amendments, supplements, letters, supplemental agreements, benefit plans, and memoranda of understanding of any kind) in effect from time to time.

**"Competitive Activity"** has the meaning set forth in Section 1.9.A.

**"Consent"** means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person.

**"Defending Party"** has the meaning set forth in Section 12.18.

**"Delayed Transfer Date"** has the meaning set forth in Section 3.2.C.

**"Delphi HRP"** has the meaning set forth in Section 3.2.D.

**"Delphi Corporation Separation Allowance Plan for U.S. Salaried Employees"** means the salaried separation allowance plan of Seller and its Affiliates in the form provided to Purchaser prior to the date hereof.

**"Demanding Party"** has the meaning set forth in Section 12.18.

**"Deposit"** has the meaning set forth in Section 2.3.A.

**"Deposit Escrow Agent"** means JP Morgan Chase Bank, National Association.

**"Deposit Escrow Agreement"** means the Deposit Escrow Agreement entered into among Seller, Purchaser and the Deposit Escrow Agent as of the date of this Agreement in the form attached hereto as Exhibit 2.3.

**"Effects MOU"** means any memorandum of understanding or other agreement among Purchaser, GM, Seller and the IUE-CWA and/or its Local 755 regarding the effects of the transactions contemplated hereby upon the IUE-CWA Kettering Facility bargaining unit members.

**"Employee Severance Amount"** means, as to any Transferred Salaried Employee, the amount representing separation pay as set forth next to such employee's name on Schedule 3.1.A.

**"Equityholders' Committee"** has the meaning set forth in Section 9.2.C.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

**"Expense Reimbursement"** has the meaning set forth in Section 9.3.B.

**"Excluded Assets"** means assets not included in the Acquired Assets, as set forth in Section 1.2.

**"Excluded Salaried Employees"** has the meaning set forth in Section 3.1.C.

**"Final Inventory Valuation"** has the meaning set forth in Section 2.2.C.

**"GM"** means General Motors Corporation.

**"GM-Delphi License Agreement"** means that certain License Agreement between Seller and GM dated as of September 6, 2007.

**"GM Supply Agreement"** means an agreement between GM and Purchaser, in form and substance satisfactory to Purchaser in its sole discretion, pursuant to which GM agrees to purchase from Purchaser Products manufactured by Purchaser at the Kettering Facility and pursuant to which GM licenses to Purchaser and Purchaser has been granted access to all intellectual property necessary for Purchaser to manufacture Products at the Kettering Facility in accordance with the requirements of GM and its Affiliates.

**"Good Faith Deposit"** has the meaning set forth in Section 9.2.E(iii).

**"Governmental Authority"** means any United States, foreign, federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision and any supranational organization of sovereign states exercising such functions for such sovereign states.

**"Governmental Order"** means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority affecting such Person or any of its properties.

**"Indemnitee"** means the Person or Persons entitled to, or claiming a right to, indemnification under Article 11.

**"Indemnitor"** means the Person or Persons obligated, or claimed by the Indemnitee to be obligated, to provide indemnification under Article 11.

**"Independent Accounting Firm"** means KPMG LLP or a nationally recognized independent accounting firm mutually agreeable to Seller and Purchaser.

**"Initial Inventory Valuation"** has the meaning set forth in Section 2.2.B.

**"Initial Purchase Price"** has the meaning set forth in Section 2.1.

**"Inventory"** means all of Seller's finished goods, raw materials, work-in-process and purchased component parts inventories related to the Products produced or scheduled to be produced at the Kettering Facility and which are in Seller's possession or control as of the Closing Date, wherever located, including Inventory owned by Seller and in the possession of outside processors as of the Closing Date (together with all rights of Seller or its Affiliates against suppliers of such Inventory).  The Inventory as of the date of this Agreement is set forth on Schedule B to this Agreement.

**"Inventory Value"** means Seller's cost for "useable" and "merchantable" Inventory existing as of the Closing Date and sold to Purchaser pursuant to this Agreement, as determined in accordance with the Inventory Valuation Principles.  (Burden rate to be applied is the actual burden rate at time of the physical Inventory count and further including premiums associated with the twin-tube build ahead.)

**"Inventory Valuation Principles"** are United States generally accepted accounting principles, subject to the following:  (a) except for one-time buys and special build-ups and for agreed service support inventories, in each case set forth on Schedule D (which Schedule D to be provided after signing subject to mutual review and agreement), "useable" means not obsolete and reasonably usable by Purchaser in manufacturing Products in quantities not to exceed GM's outstanding unsatisfied releases as of the Closing Date or forecasted requirements for a period of ninety  (90) days from the Closing Date, including releases related to any protection of

supply initiative, (b) "merchantable" means merchantable as that term is defined in U.C.C. §2-314, in conformance with applicable GM purchase order or supply contract specifications, reasonably applied, and not rusted, damaged or deteriorated such that it cannot reasonably be used in the Ordinary Course of Business without processing or preparation not normally done in the Ordinary Course of Business and (c) for all purposes of such principles, Seller's standard manufacturing cost shall be used.

**"IUE-CWA"** means International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America and its Local Union Number 755.

**"Jobs Covenant"** has the meaning given in Section 8.3.

**"Kettering Facility"** means Seller's facility of approximately 147 acres located at 2000 Forrer Boulevard, Kettering, Ohio, including the land and buildings thereon.

**"Kettering Lease Agreement"** means a lease agreement in the form attached hereto as Exhibit A pursuant to which Seller will lease to Purchaser a portion of the Kettering Facility.

**"Laws"** means any and all laws, ordinances, codes, standards, administrative rulings, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any applicable Governmental Authority, including any Governmental Order.

**"Leased Premises"** means that portion of the Kettering Facility that is to be leased to Purchaser pursuant to the Kettering Lease Agreement.

**"Liability"** means any and all direct or indirect liabilities, indebtedness, obligations, expenses, claims, Losses, damages, deficiencies, guaranties or endorsements of or by any Person, absolute or contingent, accrued or unaccrued, due or to become due, liquidated or unliquidated, known or unknown.

**"Lien"** means any lien (including tax liens and any statutory or common law liens, possessory or otherwise), charge, pledge, security interest, conditional sale agreement or other title retention agreement, lease, license, right of first refusal, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction) and any monetary amounts which are secured by any Lien.

**"Loss"** means all out-of-pocket losses, liabilities, costs, claims, damages, and expenses(including reasonable attorneys' fees and expenses).

**"Machinery & Equipment"** means the machinery and equipment and other personal property set forth on Schedule A.

**"Marked Agreements"** has the meaning set forth in Section 9.2.E(ii).

**"Material Adverse Effect"** means any change or event that has a material adverse effect on the Acquired Assets taken as a whole or a material adverse effect on the Leased Premises taken as whole, except any change or event resulting from, relating to or arising out of: (i) any act or omission of a Seller taken with the prior written consent of the Purchaser; (ii) any action taken by Seller or Purchaser or any of their respective representatives required by the terms of this Agreement; (iii) general business or economic conditions; (iv) conditions affecting the industry and markets in which Purchaser and Seller generally operate; (v) increases in energy,

electricity, natural gas, raw materials or other operating costs; (vi) changes resulting from any action required by the Bankruptcy Court; (vii) national or international political or social conditions, including the engagement by the United States in hostilities whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of any such countries; (viii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (ix) changes in United States generally accepted accounting principles; (x) changes in any Law; (xi) any existing event, occurrence or circumstance listed in any Schedule to this Agreement as of the date hereof; or (xii) any adverse change in or effect on the Acquired Assets that is cured, in its entirety, by Seller, before the earlier of (1) the Closing Date, and (2) the date on which this Agreement is terminated pursuant to <u>Section 10</u> hereof.

**"Nondisclosure Agreement"** means the nondisclosure and confidentiality letter agreement dated August 23, 2006, as amended, executed by Purchaser and Delphi Corporation.

**"Notice"** has the meaning set forth in <u>Section 12.18</u>.

**"OFAC"** has the meaning set forth in <u>Section 5.2.I</u>.

**"Orders"** has the meaning set forth in <u>Section 5.1.B</u>.

**"Ordinary Course of Business"** means, with respect to the use and operation of the Acquired Assets, consistent with custom and practice of Seller prior to the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases.

**"Organizational Documents"** means: (a) the articles of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the articles or certificate of organization and the operating agreement or other document intended to govern the structure and/or internal affairs of a limited liability company; (e) any charter, agreement, indenture, or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to the foregoing.

**"Other Personal Property"** means all of the following owned by Seller which are used or associated with the manufacture or shipment of the Products or the use or operation of the Leased Premises or the other Acquired Assets:  Spare Parts and Crib Items; disposable and non-disposable dunnage (including in-plant racking and containers and all shipping containers and dunnage at the Leased Premises or in the possession of customers or outside processors, to the extent such items are used primarily in the manufacture, processing or shipment of the Products); Supplies; any warranties given by the manufacturers or suppliers of any Acquired Assets (but only to the extent such warranties are assignable under otherwise applicable Law without assumption under, if applicable, Section 365 of the Bankruptcy Code); the assets described on <u>Schedule C</u>; and office furniture and office equipment located at the Leased Premises, in each case, to the extent that they exist on the Closing Date.  For certainty, Other Personal Property does not include any Excluded Assets or any assets that are within the description of any other assets included in categories "A" or "B" of the definition of Acquired Assets.

**"Other Product Facilities"** means any facility owned or operated by Seller or any Affiliate of Seller, other than the Kettering Facility.

**"Party"** means Purchaser or Seller and **"Parties"** means Purchaser and Seller collectively.

**"Person"** means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

**"Petition Date"** has the meaning set forth in the Recitals.

**"Potential Bidder"** has the meaning set forth in Section 9.2.B.

**"Pre-Closing Product Liabilities"** means any Liabilities for death, bodily injury or property damage arising with respect to the Products manufactured by or on behalf of Seller or any of its Affiliates prior to the Closing Date (regardless of when such Product was sold), however arising.

**"Proceeding"** means any action, suit, litigation, arbitration, investigation or similar proceeding (including any civil, criminal, administrative or applicable proceeding) whether at Law or in equity, that is commenced, brought conducted or heard by or before any Governmental Authority or arbitrator.

**"Process Documents"** has the meaning set forth in Section 1.8.

**"Products"** means passive twin-tube shocks, passive twin-tube struts and related modules supplied for North American vehicle programs of GM and its Affiliates.

**"Purchase Price"** has the meaning set forth in Section 2.1.

**"Purchase Price Adjustment"** has the meaning set forth in Section 2.2.D.

**"Purchase Price Decrease"** has the meaning set forth in Section 2.2.D.

**"Purchase Price Increase"** has the meaning set forth in Section 2.2.D.

**"Purchaser"** has the meaning set forth in the Preamble.

**"Purchaser Damages"** has the meaning set forth in Section 11.2.

**"Purchaser Employee Benefit Plans"** means all of the following of Purchaser or any of its Affiliates: pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive and deferred compensation, hospitalization, severance, vacation, cafeteria, sick leave, fringe and welfare benefit plans, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals and written policies, practices or understandings, in each case relating to employment as applicable to Transferred Salaried Employees or Transferred Hourly Employees.

**"Purchaser Indemnified Parties"** means Purchaser and each of its Affiliates.

**"Qualified Bid"** has the meaning set forth in Section 9.2.F.

**"Qualified Bidder"** has the meaning set forth in Section 9.2.B.

**"Required Bid Documents"** has the meaning set forth in Section 9.2.E.

**"Retained Liabilities"** has the meaning set forth in Section 1.4.

**"Return Date"** has the meaning set forth in <u>Section 9.2.K</u>.

**"Salaried Employees"** has the meaning set forth in <u>Section 3.1.A</u>.

**"Sale"** means the sale, transfer and assignment of the Acquired Assets from Seller to Purchaser in accordance with this Agreement.

**"Sale Approval Order"** means a Governmental Order or Governmental Orders of the Bankruptcy Court issued pursuant to Section 363 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets, free and clear of all Liens, in accordance with the terms and conditions of this Agreement.

**"Sale Hearing"** has the meaning set forth in <u>Section 9.2.I</u>.

**"Sale Motion"** means the motion filed by Seller with the Bankruptcy Court for approval of the Sale Approval Order.

**"SDN List"** has the meaning set forth in <u>Section 5.2.I</u>.

**"Seller"** has the meaning set forth in the Preamble.

**"Seller Employee Benefit Plans"** means all of the following of Seller or any of its Affiliates: pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, other equity, executive or deferred compensation, hospitalization, severance, vacation, cafeteria, sick leave, fringe or welfare benefit plans, any employment or consulting Contracts, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written policies, practices or understandings relating to employment as applicable to any of the Transferred Employees whether or not collectively bargained.

**"Seller Damages"** has the meaning set forth in <u>Section 11.3</u>.

**"Seller Indemnified Parties"** means Seller and each of its Affiliates.

**"Spare Parts and Crib Items"** means all spare parts for machinery and equipment, perishable Tooling used in the manufacture of the Products (including spare perishable Tooling), disposable dunnage, personal protection equipment (including gloves, safety glasses, safety vests and hearing protection) and all other spare or maintenance items used in the manufacture of the Products, in shipping or in receiving, in each case to the extent on hand at the Kettering Facility on the Closing Date.

**"Subsequent Bid"** has the meaning set forth in <u>Section 9.2.F</u>.

**"Successful Bid(s)"** has the meaning set forth in <u>Section 9.2.H(vi)</u>.

**"Successful Bidder(s)"** has the meaning set forth in <u>Section 9.2.H(vi)</u>.

**"Supplies"** means all maintenance, shop and manufacturing supplies, cleaning supplies, lubricants, packaging and shipping materials, labels, disposable dunnage and other supplies used in the manufacture or shipping and receiving of the Products or Inventory or in the operation of the Kettering Facility, in each case to the extent owned by Seller or its Affiliates.

**"Third Party Assets"** has the meaning set forth in <u>Section 1.2.A</u>.

**"Third Party Claim"** has the meaning set forth in <u>Section 11.5.B</u>.

**"Tooling"** means all tooling, gauges, dies, fixtures, test and assembly fixtures, patterns, casting patterns, cavities, molds, prototype tooling, engineering product testing tooling and fixtures and similar items utilized primarily in connection with the Machinery & Equipment, wherever located, and all such items for past-model production of the Products, which past-model service related Tooling will be transferred to Purchaser following the termination of Seller's supply of past-model service parts pursuant to the Transition Services Agreement. "Tooling" also includes all tooling, gauges, dies, fixtures, test and assembly fixtures, patterns, casting patterns, cavities, molds, prototype tooling, engineering product testing tooling and fixtures and similar items owned by Seller and used by a supplier primarily for the manufacture of sub-components for the Products, which Tooling is located at the Supplier's facility.

**"Transaction"** has the meaning set forth in <u>Section 9.2.A</u>.

**"Transferred Employees"** means all Transferred Salaried Employees and Transferred Hourly Employees.

**"Transferred Hourly Employees"** has the meaning set forth in <u>Section 3.2.B</u>.

**"Transferred Salaried Employees"** has the meaning set forth in <u>Section 3.1.H</u>.

**"USA Patriot Act"** has the meaning set forth in <u>Section 5.2.I</u>.

**"Warranty and Service Parts"** has the meaning set forth in <u>Section 1.7</u>.

## 1.    <u>CONVEYANCE OF THE ACQUIRED ASSETS</u>.

### 1.1    <u>Acquired Assets Transaction</u>.

Upon the terms and subject to the conditions set forth in this Agreement, at Closing, Seller will sell, transfer, assign, convey and deliver to Purchaser, and Purchaser will purchase, accept and acquire from Seller, the Acquired Assets, free and clear of all Liens.

### 1.2    <u>Excluded Assets</u>.

Notwithstanding anything to the contrary in this Agreement, other than the Acquired Assets, no other assets, rights, interests, privileges or benefits, of whatever kind or nature, whether real, personal, tangible, intangible, choate or inchoate, are being sold by Seller to Purchaser or being purchased by Purchaser from Seller. All assets, rights, interests, privileges or benefits not comprising the Acquired Assets, including the following assets, rights, interests, privileges or benefits of Seller and its Affiliates, are Excluded Assets:

A.    All Tooling, dunnage or containers owned by GM or any third party, and the other items set forth on <u>Schedule 1.2.A</u> ("**Third Party Assets**"); provided, that to the extent any Tooling, dunnage or containers or other Third Party Assets are owned by a third party and are in the possession of Seller as of the Closing Date, Seller shall transfer possession of such Third Party Assets to Purchaser as of the Closing and Purchaser shall, subject to the rights of the owner thereof, have any right to use such items in the manufacture and shipping of Products that Seller has as of the Closing Date (and such possession and right shall constitute an Acquired Asset).

B.      All trademarks, copyrights, patents and applications therefor, trade secrets, and all other forms of  intellectual property, registrations and applications therefor.

C.      Insurance coverage and insurance policies of Seller relating to the Acquired Assets, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums.

D.      All claims, defenses, causes of action or claims of any kind relating to either Excluded Assets or Retained Liabilities.

E.      All tax refunds, credits, prepayments or deferred tax assets, and tax returns and work papers relating thereto, for time periods prior to the Closing.

F.      All of the rights and claims of Seller and its Affiliates available to them under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

G.      Information and materials protected by the attorney-client privilege or that Seller considers to be proprietary information; and the lack of which excluded information and materials are not material to the manufacture of the Products or the use of the Acquired Assets.

H.      Common Delphi services, if any, including legal, insurance, accounting, finance, tax and information technology and related support.

I.      (i) Vehicles assigned to any Transferred Employee under Seller's company vehicle program and pooled vehicles; and (ii) any asset set forth on <u>Schedule 1.2.I</u>, entitled Other Excluded Assets.

J.      All work histories, personnel and medical records of employees and former employees of Seller who worked at any time for any reason at the Kettering Facility for whom a record exists at the Kettering Facility at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, Purchaser will be provided the originals of all personnel and medical records of all Transferred Employees after posted written notice or other appropriate notice to such Transferred Employees if legally required or if Seller so elects.  Upon written request of Seller, Purchaser will promptly return or cause to be returned any and all of these records to Seller at which time Seller, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide Purchaser with copies of the personnel and medical records of such employees.  If an employee objects to provision of personnel or medical records to Purchaser, the records will not be provided, except to the extent Seller determines that provision of the records to Purchaser over the objections by the employee is permitted by the applicable local Law without adverse consequences to Seller.

1.3     **Post-Closing Asset Deliveries**.

Subject to <u>Section 1.2</u> above, should Seller or Purchaser, in its reasonable discretion, determine after the Closing that any Acquired Assets (including books, records or other materials) are still in the possession of Seller, Seller will promptly deliver them to Purchaser at no cost to Purchaser.  Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials not included in the Acquired Assets or

otherwise constituting Excluded Assets were delivered to Purchaser, Purchaser will promptly return them to Seller at no cost to Seller.

### 1.4    **No Assumption of Liabilities by Purchaser; Retained Liabilities**.

Except as otherwise specifically provided in this Agreement, neither Purchaser nor any of its Affiliates shall assume or otherwise be liable in respect of, or be deemed to have assumed or otherwise be liable in respect of, any Liability of Seller or any of its Affiliates whatsoever (the "**Retained Liabilities**").

### 1.5    **Additional Assets**.

If, after the Closing, Seller or Purchaser determines, in its reasonable discretion, that any tangible personal property not included in the Acquired Assets and not identified on Schedule 1.2.l (i) was used prior to the Closing by Seller primarily in the production of the Products at the Kettering Facility and (ii) is necessary to enable Purchaser to manufacture the Products using the Machinery & Equipment in accordance with the manner in which and to the level at which Seller manufactured Products at the Kettering Facility during the twelve (12) months prior to the Closing date (the "**Additional Assets**"), Seller will, to the extent available, transfer, sell and assign such Additional Assets to Purchaser at a price to be mutually agreed by the parties.

### 1.6    **Kettering Lease Agreement**.

At the Closing, Seller and Purchaser will enter into the Kettering Lease Agreement in the form attached as Exhibit A.

### 1.7    **Warranty and Service Parts**.

Until the third anniversary of the Closing Date (or such later date as may be agreed to in writing by Purchaser and Seller) Purchaser will provide to Seller, at Purchaser's plant-cost basis plus five percent (5%), in support of its obligations for any Products to be provided to GM for warranty (including recall) and service parts related to Products sold prior to the Closing Date ("**Warranty and Service Parts**"), provided that, at such time, Purchaser has the capability to make such parts without any design, manufacturing or other change from Purchaser's then-existing production at the Kettering Facility.   Subject to price terms of this Section 1.7, the Warranty and Service Parts will be sold pursuant to the commercially reasonable terms and conditions of a separate purchase order to be negotiated by the Parties between signing and Closing.

### 1.8    **Delivery of Certain Documentation**.

As soon as reasonably practicable following execution of this Agreement, but in any event within five (5) Business Days following execution of this Agreement, Seller will deliver to Purchaser, in whatever form they exist, the items listed on Schedule C and such other Process related information as may be reasonably agreed to by the Parties (the "**Process Documents**"). Purchaser shall have the right to use the Process Documents in connection with its operation of the Acquired Assets (and any additions thereto or replacements thereof).   Subject to Section 1.2 above, should Seller, in its reasonable discretion, determine after the Closing that any Process Documents are still in the possession of Seller, Seller will promptly deliver them to Purchaser at no cost to Purchaser.   All Process Documents are provided "AS IS, WHERE IS", without representation or warranty of any kind whatsoever.

1.9    **Non-Compete and Non-Solicitation**.

A.    For a period of five (5) years from the Closing Date, except with the prior written consent of Purchaser, Seller will not and will cause its Affiliates not to, either on its or their own account or in conjunction with or on behalf of any Person, design, manufacture, assemble or sell (including quoting or offering to design, manufacture, assemble or sell) any passive twin-tube dampers, passive twin-tube struts or related modules solely for GM or its Affiliates in the United States, Canada or Mexico ("**Competitive Activity**").  For certainty, the foregoing:

(i)    will not prohibit Seller or any of its Affiliates from selling finished goods or work in process inventory existing as of the Closing Date or other inventory in connection with winding down in an orderly fashion or sale of operations at the Other Product Facilities, or any related supplier locations as reasonably determined by Seller.

(ii)    will not prohibit in any way:  (v) the acquisition of a controlling interest or merger with any Person, or any division or business unit thereof, which is not primarily engaged in a Competitive Activity, acquired by or merged, directly or indirectly, into Seller or any of its Affiliates after the Closing Date, (w) the acquisition by Seller or any of its Affiliates, directly or indirectly, of a non-controlling ownership interest in any Person, or any division or business unit thereof, or any other entity engaged in a Competitive Activity, if the Competitive Activity accounts for fifteen percent (15%) or less of the sales or fifteen percent (15%) or less of the value of the acquired business at the date of such acquisition (whichever is greater) and the Competitive Activity is not anticipated to become greater than twenty percent (20%) of such acquired business's sales or value; (x) the acquisition by Seller or any of its Affiliates, directly or indirectly, of less than five percent (5%) of the publicly traded stock of any Person engaged in a Competitive Activity; (y) excluding such activities in connection with the Products or next-generation programs related thereto, the provision of consulting services to, the license of any technology that Seller or any of its Affiliates owns or has license to use, or the financing (on its own behalf or on behalf of any other Person) of any person for the purpose of designing or manufacturing on behalf of Seller or any of its Affiliates or selling to Seller or any of its Affiliates components and parts for automotive applications; and (z) consistent with Seller's troubled supplier practices, any direct or indirect activities of Seller or any of its Affiliates to advise, operate, manage or finance a troubled supplier of Seller or any of its Affiliates.

B.    Notwithstanding anything to the contrary contained in the Agreement, this Section 1.9 shall not:

(i)    prohibit Seller or any of its Affiliates from licensing any intellectual property related to the Products to GM;

(ii)    prohibit Seller's plant at Los Pinos Chihuahua, Mexico that currently supplies passive monotubes, controlled suspension products and related modules to North American customers from continuing to supply such passive monotubes, controlled suspension products and related modules to GM and its Affiliates;

(iii)    in any way restrict Seller's effective non-controlling interest in the Gabriel de Mexico operation held through Seller's participation in the Promotora

Joint Venture with Grupo Condumex. Gabriel de Mexico manufactures twin tube dampers for the Mexican domestic market; or

       (iv)     prohibit Seller or any of its Affiliates from supporting or selling Warranty and Service Parts to GM and its Affiliates

C.    While the restrictions contained in this <u>Section 1.9</u> are considered by the Parties to be reasonable in all the circumstances, it is recognized that restrictions of the nature in question may fail for technical reasons and, accordingly, it is hereby agreed and declared that if any of such restrictions will be adjudged to be void as going beyond what is reasonable in all the circumstances for the protection of the interests of Purchaser but would be valid if part of the wording thereof were deleted or the periods thereof reduced or the range of activities or area dealt with thereby reduced in scope the said restriction will apply with such modifications as may be necessary to make it valid and effective.

**2.**    **PURCHASE PRICE**.

2.1    **Purchase Price for Acquired Assets**.

Subject to the terms and conditions of this Agreement, the aggregate purchase price (the "**Purchase Price**") for the Acquired Assets will be (i) Eighteen Million Eight Hundred Forty-Three Thousand Four Hundred Sixty-Seven Dollars ($18,843,467.00) (the "**Initial Purchase Price**"), plus or minus (ii) the Purchase Price Adjustment as finally determined pursuant to <u>Section 2.2</u>.

2.2    **Payment of Purchase Price**.

A.    The Initial Purchase Price, less the Deposit, will be paid by Purchaser to Seller on the Closing Date in cash by wire transfer to an account designated in writing by Seller.

B.    Within twenty (20) days prior to or within twenty (20) days following the Closing Date, Seller shall conduct a physical count of the Inventory. Purchaser shall have the right to have a representative present at any physical inventory performed pursuant to this <u>Section 2.2.B</u>. Within sixty (60) days after the Closing, Seller shall calculate the Inventory Value (the "**Initial Inventory Valuation**") in accordance with the Inventory Valuation Principles and shall deliver to Purchaser a statement of the Initial Inventory Valuation. Purchaser and its representatives, as well as any Independent Accounting Firm, shall have the right to review all work papers and procedures used to calculate the Initial Inventory Valuation as set forth in such statement and shall have the right to perform any other reasonable procedures necessary to verify the accuracy thereof. During the thirty (30) days following receipt by Purchaser of the statement of Initial Inventory Valuation, Purchaser and Seller shall work together in good faith to agree upon the Initial Inventory Valuation.

C.    If Purchaser and Seller do not enter into a written agreement setting forth the agreed upon Inventory Value within thirty (30) days following receipt by Purchaser of the statement of Initial Inventory Valuation, any disagreement shall be submitted by the Parties for final determination to the Independent Accounting Firm. The Independent Accounting Firm shall follow such procedures as it deems appropriate for obtaining the necessary information in considering the positions of Purchaser and Seller; <u>provided</u>, <u>however</u>, the scope of the review of the Independent Accounting Firm shall be limited to (i) a determination of whether the Initial Inventory Valuation was calculated in accordance with the terms of <u>Section 2.2.B</u>, and, based on its determination of clause (i), a final determination of the Inventory Value. The Independent Accounting Firm shall render its determination on the matter within twenty (20) days of its

submission by Purchaser and Seller, and such determination shall be final, conclusive and binding upon Purchaser and Seller. The fees and expenses of the Independent Accounting Firm shall be paid equally by Purchaser and Seller. The term "**Final Inventory Valuation**" refers to the Inventory Value as agreed by the Parties or the Inventory Value as determined by the Independent Accounting Firm.

D.    The Purchase Price shall be adjusted ("**Purchase Price Adjustment**") as provided in this Section 2.2.D. The Purchase Price shall be increased (the "**Purchase Price Increase**") by the amount, if any, by which the Final Inventory Valuation is greater than Ten Million One Hundred Seventy-Seven Thousand Forty-Five Dollars ($10,177,045.00). The Purchase Price shall be decreased (the "**Purchase Price Decrease**") by the amount, if any, by which the Final Inventory Valuation is less than Ten Million One Hundred Seventy-Seven Thousand Forty-Five Dollars ($10,177,045.00). Within five (5) days following the date upon which the Final Inventory Valuation is mutually agreed upon by Purchaser and Seller or determined pursuant to Section 2.2.C, (i) Purchaser shall pay by wire transfer in U.S. Dollars in immediately available funds to an account designated by Seller any Purchase Price Increase, or (ii) Seller shall pay by wire transfer in U.S. Dollars in immediately available funds to an account designated by Purchaser any Purchase Price Decrease.

2.3    **Deposit Amount**.

A.    On or before 5:00 p.m. (prevailing Eastern time), Monday, March 10, 2008, Purchaser shall deliver to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement in the form attached hereto as Exhibit 2.3 Nine Hundred Forty-Two Thousand Dollars ($942,000.00) in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing, the "**Deposit**") to be held by the Deposit Escrow Agent in an interest bearing account reasonably acceptable to Purchaser to serve as an earnest money Deposit under this Agreement, and to be released in accordance with the following procedures:

(i)    Deposit Instructions. At Closing, Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to deliver the Deposit, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price). The costs and expenses of the Deposit Escrow Agent will be paid from and borne solely by the Deposit;

(ii)    Termination of Agreement. Upon any failure by Purchaser to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Article 7 hereof (it being understood that Purchaser shall not be required to waive any condition to Closing intended for its benefit), the Deposit Escrow Agent to deliver the Deposit, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement, to be retained by Seller. Any such payment shall constitute Seller's sole recourse against Purchaser in the event Purchaser notifies Seller, prior to the Auction date, of Purchaser's intent to terminate this Agreement. Upon any breach by Purchaser on or after the Auction date, Seller will be entitled to all available remedies in law or equity.

(iii)    Other Reason. Upon termination of this Agreement for any other reason or upon the failure by Seller to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Article 7,

Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to deliver the Deposit, by wire transfer of immediately available funds, to an account designated by Purchaser in the Deposit Escrow Agreement, to be retained by Purchaser.

**3.**     **EMPLOYEE MATTERS**.

3.1     **Salaried Employees**.

A.     Prior to executing this Agreement, Purchaser has interviewed all salaried employees regularly assigned to work at the Kettering Facility in connection with the manufacturing operations related to the Products and the Acquired Assets as of the date of this Agreement (the "**Salaried Employees**") for the purpose of determining to which Salaried Employees Purchaser wishes to offer employment.

B.     With respect to the Salaried Employees interviewed, Seller has provided Purchaser the following information:

(i)     Name

(ii)     Current job title, dates in position, and position description

(iii)     Prior two job titles and dates in positions

(iv)     Date of hire

(v)     Current salary and two-year salary history

(vi)     Bonus target and three-year bonus payout history

(vii)     Long term (cash and equity) incentive target(s) and three-year history

(viii)     Three most recent performance reviews

(ix)     Documented disciplinary and corrective actions

C.     After completing the interviews referenced in Section 3.1.A, Purchaser will provide Seller with two lists.  One list will identify no fewer than thirty (30) (which number shall be reduced by the number, if any, of Salaried Employees whose employment by Seller and its Affiliates terminates prior to the Closing Date) Salaried Employees to whom Purchaser wishes to extend an offer of employment.  This list may be attached to this Agreement as Schedule 3.1. The other list will identify Salaried Employees to whom Purchaser does not wish to extend an offer of employment (hereinafter referred to as the "**Excluded Salaried Employees**").  The lists will be provided to Seller as soon as practical but no later than thirty (30) days from the date of this Agreement.

D.     From the date of this Agreement through the Closing Date, except for "for-cause" terminations, Seller will not terminate or redeploy any Salaried Employee (which obligation shall be limited to those Salaried Employees for periods after such Schedule is prepared)  identified on Schedule 3.1.

Execution Copy

E.      From the date of this Agreement through the Closing Date, Seller will not make available alternative positions to, or otherwise seek to delay the commencement of employment with Purchaser by, any Salaried Employee (which obligation shall be limited to those Salaried Employees identified on <u>Schedule 3.1</u> for periods after such Schedule is prepared).

F.      For a period of five (5) years after the Closing Date, Seller will not (and will cause its Affiliates not to) offer to employ or employ any employees hired by Purchaser under the provisions of this <u>Section 3</u>. For a period of five years after the Closing Date, Purchaser will not (and will cause its Affiliates not to), without Seller's prior consent, offer to employ or employ: 1) any of the Salaried Employees identified on <u>Schedule 3.1</u> who receive severance benefits from Seller in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees as the result of Purchaser's failure to meet the "substantially comparable in the aggregate" standard described in <u>Section 3.1.G</u>; or 2) the Excluded Salaried Employees.

G.      With respect to the Salaried Employees identified on <u>Schedule 3.1</u> who remain employed by Seller and its Affiliates until the Closing, prior to Closing, Purchaser will provide Seller with the terms of each individual offer of employment Purchaser wishes to extend.  Within ten Business Days of Seller receiving such terms of each offer, Seller, acting reasonably, will determine whether each offer provides wages and benefits that are substantially comparable in the aggregate to wages and benefits Seller provides the Salaried Employee as of the date of this Agreement and advise Purchaser and the employee of its determination.  In the event that Seller determines that the terms are substantially comparable in the aggregate and an offer of employment is extended and accepted, Purchaser will maintain such level of compensation and benefits for a minimum of twelve (12) months following the Closing Date, excluding those reasonable changes Purchaser and its Affiliates apply to all of their U.S. salaried employees so as the Transferred Salaried Employees' compensation and benefits remain substantially comparable in the aggregate as contemplated hereby.  In the event Seller determines that the terms are not substantially similar in the aggregate, Purchaser may, in its sole discretion, cure any deficiency so as to meet this standard.  However, if after consultation with Purchaser, Seller, acting reasonably, determines that Purchaser has still not met this standard, the affected employee will be so advised and given the option of:  1) receiving severance benefits from Seller in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees (and thus barred from employment by Purchaser for five years in accordance with <u>Section 3.1.F</u>); or 2) accepting Purchaser's offer of employment and waiving eligibility for any severance benefits from Seller.  In no event, however, will Purchaser bear any responsibility or liability relating to any severance benefits Seller provides to: 1) any of the Salaried Employees identified on <u>Schedule 3.1</u> who receive severance benefits from Seller in accordance with the Delphi Corporation Separation Allowance Plan for U.S. Employees as the result of Purchaser's failure to meet the "substantially comparable in the aggregate" standard; or 2) the Excluded Salaried Employees.

H.      Unless provided otherwise in this Agreement, Purchaser will be solely responsible for and will bear all Liabilities arising out of, resulting from or relating to the employment by Purchaser of the Salaried Employees identified on <u>Schedule 3.1</u> whom Purchaser hires ("**Transferred Salaried Employees**") to the extent arising from acts or events occurring on or after the Closing Date.  Unless provided otherwise in this Agreement, Seller will be solely responsible for and will bear all Liabilities arising out of, resulting from or relating to the employment of any salaried employee by Seller arising from acts or events occurring prior to the Closing Date.

I.      If, at any time between the Closing Date and the second anniversary thereof, Purchaser severs (except for cause) any Transferred Salaried Employee, Purchaser shall pay

Seller within thirty (30) days of such severance an amount equal to the Employee Severance Amount with respect to such severed employee.

3.2    **Transferred Hourly Employees**.

A.    Employee List.  No later than ten (10) days following the execution of this Agreement, Seller will provide Purchaser with a list of all current hourly employees regularly assigned to work at the Kettering Facility in connection with the manufacturing operations related to the Products and Acquired Assets.  The list will identify the employees on active and inactive status as of the day the list is issued.  For all such inactive hourly employees, Seller will identify each employee's specific inactive status and, if other than due to a layoff, the expected return to work date, if any.  The list will also provide for each hourly employee: (a)  Name; (b) Job classification/title; (c)  Date of hire; and (d)  Rate of pay.  Such list may be attached to this Agreement as Schedule 3.2 and will be updated as of the Business Day immediately preceding the Closing.

B.    Employment with Buyer.  Effective as of the Closing Date, Purchaser will commence employment of approximately 356 hourly employees listed on Schedule 3.2 and who remain on active status as of the Closing Date ("**Transferred Hourly Employees**").  Effective at Closing, all Transferred Hourly Employees will be deemed by Buyer to have resigned from Seller.  Purchaser shall have no obligation to offer employment to any hourly employee (i) who elected "Option 2 and 3 Layoff" under Seller's 2007 special attrition program or (ii) who is on pre-retirement leave under Seller's 2006 or 2007 special attrition programs.

C.    Inactive Employees.  Hourly employees listed as inactive on Schedule 3.2 due to leave status shall remain employees of Seller for the duration of such leave.  At such time as these employees are released to return to work under the Collective Bargaining Agreements, they shall become Transferred Hourly Employees, subject solely to the provisions of the August 5, 2007 IUE-CWA-Tenneco CBA and the Effects MOU, as may be applicable.  In no event shall Purchaser have any obligations to a Transferred Hourly Employee before such Transferred Hourly Employee becomes an employee of Purchaser, except to make the offers of employment contemplated by this Agreement.  Any Transferred Hourly Employee who becomes employed by Purchaser pursuant to this Section 3.2.C shall be considered a Transferred Hourly Employee only from and after the date his employment by Purchaser commences in accordance with this Section 3.2.C (the "**Delayed Transfer Date**").  In the event that there are any Seller employees with "seniority" listed as inactive due to lay off, such employees shall be recalled by Purchaser as provided in the Effects MOU.  Such employees shall thereafter be treated as Transferred Hourly Employees from and after the Delayed Transfer Date.

D.    August 5, 2007 IUE-CWA-Tenneco CBA.  Notwithstanding anything to the contrary contained herein, the August 5, 2007 collective bargaining agreement between the IUE-CWA and Purchaser ("**August 5, 2007 IUE-CWA-Tenneco CBA**") provides the terms and conditions of employment applicable to the Transferred Hourly Employees effective as of the Closing Date, as may be modified by the Effects MOU to be negotiated among Seller, Purchaser, the IUE-CWA and GM regarding the effects of the transactions contemplated by this Agreement upon the IUE-CWA Kettering bargaining unit members.  The parties acknowledge that the Effects MOU may modify Section 3.2.A herein by providing that certain active hourly Seller employees listed on Schedule 3.2, i.e. those who are or may become eligible for traditional pension benefits under the Delphi Hourly-Rate Pension Plan (the "**Delphi HRP**"), may continue to be employed by Seller and be leased to Purchaser until such time as benefit accruals under the Delphi HRP are frozen, at which time such employees will commence employment with Purchaser as Transferred Hourly Employees.  During the period of any such

lease arrangement, the leased employees shall, for all purposes other than the Delphi HRP, be managed at the direction of Purchaser and treated in accordance with the August 5, 2007 IUE-CWA-Tenneco CBA, except as may otherwise be provided by the Effects MOU.

E.    Liabilities.  Unless provided otherwise in this Agreement, Purchaser will be solely responsible for and will bear all Liabilities arising out of, resulting from or relating to the employment of the Transferred Hourly Employees by Purchaser to the extent arising from acts or events occurring on or after the Closing Date, or the Delayed Transfer Date if applicable, including without limitation grievances filed under the August 5, 2007 IUE-CWA Tenneco CBA, as may be modified by the Effects MOU.  Unless provided otherwise in this Agreement, Seller will be solely responsible for and will bear all Liabilities arising out of, resulting from or relating to the employment of the Transferred Hourly Employees by Seller arising from acts or events occurring prior to the Closing Date, or the Delayed Transfer Date if applicable, including without limitation grievances filed under the Collective Bargaining Agreements.

3.3    **Other Matters**.

A.    Transferred Salaried Employees and Transferred Hourly Employees and their dependents' and beneficiaries' participation in and eligibility for benefits under the Seller Benefit Plans shall cease as of the Closing  (or, in the case of a Transferred Hourly Employee who becomes a Transferred Hourly Employee after the Closing in accordance with Section 3.2.C, the Delayed Transfer Date).   Transferred Salaried Employees and their dependents' and beneficiaries' participation in and eligibility for benefits under the Purchaser Employee Benefit Plans shall commence as of the Closing.  Transferred Hourly Employees and their dependents' and beneficiaries' participation in and eligibility for benefits under the Purchaser Employee Benefit Plans shall commence as provided under the August 5, 2007 IUE-CWA-Tenneco CBA (as the same may be amended by the Effects MOU).  Notwithstanding the preceding sentences, Seller and the Seller Employee Benefit Plans shall retain Liability for all claims incurred by the Transferred Employees and their dependents and beneficiaries prior to the Closing (or Delayed Transfer Date, if applicable), including claims which were not submitted until after the Closing (or Delayed Transfer Date, if applicable).  A claim would be deemed incurred, as applicable:

(i)    On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

(ii)    On the date on which the service or treatment is provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

(iii)    On the date following a Transferred Salaried Employee's or Transferred Hourly Employee's last day worked, in the case of any such employee for whom a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

B.    Regardless of the vesting date, Seller shall pay to each Transferred Employee the amount of all accrued and unused vacation pay and any incentive compensation which such employee may be eligible to earn for 2008 on a pro-rata basis using the number of days worked for Seller during 2008 by such employee.

C.    Seller shall retain responsibility for all Liabilities for workers' compensation benefits related to injuries or illnesses incurred by Transferred Employees prior to the Closing.  Purchaser shall be responsible for all Liabilities for workers' compensation benefits related to

injuries or illnesses incurred by Transferred Employees after the Closing.  With respect to claims for cumulative trauma (such as carpal tunnel syndrome) that are filed after the Closing, began prior to the Closing and continue after the Closing, Purchaser and Seller shall be liable for a pro-rata share of the Liabilities based on the claimant's respective length of service with each party.

D.    To the extent allowed under applicable Law, Transferred Employees who become eligible for a distribution of their account balances in either the Seller Personal Savings Plan or the Seller Savings-Stock Purchase Plan will be permitted, at their discretion, to transfer such account balances to Purchaser's defined contribution plan, if any.  The manner of such transfer will be a rollover.

E.    Except as otherwise expressly provided in this Agreement, Seller shall retain and be responsible for all Liabilities arising out of, resulting from or relating to for claims for hourly severance, termination (actual or constructive), Worker Adjustment and Retraining Notification Act or other payments or benefits due to any employee as a result of the transactions contemplated by this Agreement.

F.    Purchaser and Seller shall, and shall cause each of their respective subsidiaries and/or third party administrators and consultants (to the extent reasonably practicable), to provide to the other all such information as the other may reasonably request to enable the requesting party to comply with (as applicable) the provisions of this Article 3, the Collective Bargaining Agreements, the Effects MOU and the August 5, 2007 IUE-CWA-Tenneco CBA. Such information shall, to the extent reasonably practicable, be provided in the format and at the times and places requested, but in no event shall the party providing such information be obligated to incur any out-of-pocket expense not reimbursed by the party making such request, nor to make such information available outside its normal business hours and premises.  Any information shared or exchanged pursuant to this Section 3.3.F shall at all times be kept confidential, except as otherwise required by Law.

3.4    **Due Diligence**

A.    No later than ten Business Days following the execution of this Agreement (or, in the case of employees listed on Schedule 3.1, as soon as practicable after such Schedule is prepared), Seller shall provide Purchaser:

(i)    A description of all pending grievances involving the hourly employees listed on Schedule 3.2.

(ii)    A description of all pending employment-related litigation by or against employees identified on Schedule 3.1 or Schedule 3.2.

(iii)    A description of all pending administrative agency complaints, charges, unfair labor practice charges, or investigations by or against employees listed on Schedule 3.1 or Schedule 3.2.

(iv)    A description of any consent orders or orders by any court or administrative agency applicable to employees listed on Schedule 3.1 or Schedule 3.2.

(v)    All documents constituting the Collective Bargaining Agreements between Seller and the IUE-CWA applicable to the hourly employees listed on Schedule 3.2, including but not limited to any side letters, memoranda of understanding or agreement and grievance or arbitration settlements.

4.    **CERTAIN TRANSITION SERVICES**.

A.    ASSISTANCE OF CERTAIN SELLER SALARIED EMPLOYEES.  For a period of no more than 90 days after the Closing, at Purchaser's request, Seller shall cause the Seller salaried employees identified on Schedule 4A to provide such services to Purchaser as Purchaser may reasonably request.  Such services shall be provided at the hourly rate set forth on Schedule 4A.  In no event shall any such employee be required to provide to Purchaser more than 40 hours of service in any calendar week.  Subject to the price terms of Schedule 4A, the services will be sold pursuant to the commercially reasonable terms and conditions of a separate purchase order to be negotiated by the Parties between signing and Closing.

B.    TOP MOUNT SUPPLY.   Until December 31, 2008, Seller shall sell the component(s) identified on Schedule 4B to Purchaser.  Such components shall be sold at the prices set forth on Schedule 4B.  Subject to the price terms of Schedule 4B, the components will be sold pursuant to the commercially reasonable terms and conditions of a separate purchase order to be negotiated by the Parties between signing and Closing.  Supply of the component(s) may be extended beyond December 31, 2008, only by mutual written agreement of the Seller and Purchaser entered into after the Closing Date.   Seller agrees to support the validation testing required by GM to allow for uninterrupted supply.

5.    **REPRESENTATIONS AND WARRANTIES**.

5.1    **Warranties of Seller**.

Seller represents and warrants, as of the date hereof and as of the Closing Date as if such representations and warranties were remade as of the Closing Date, to Purchaser as follows:

A.    Organization and Good Standing.   Seller is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate or other organizational power and, subject to any required Bankruptcy Court approval, authority to own, lease and operate its properties and assets, and is in good standing in all jurisdictions where it owns or leases real property, except where the failure to so qualify would not have a Material Adverse Effect.

B.    Corporate Authority.   Subject to the entry and effectiveness of the Bidding Procedures Order and Sale Approval Order (collectively, the ""), Seller has the requisite power and authority to execute and perform in accordance with this Agreement and the Kettering Lease Agreement, and, upon full satisfaction of the terms and conditions of the Orders, this Agreement and the Kettering Lease Agreement shall each constitute a valid and binding obligation of Seller (provided that Section 9.3 will be enforceable upon entry of the Bidding Procedures Order).

C.    No Conflict.  The execution and performance by Seller of this Agreement and the Kettering Lease Agreement does not violate, conflict with or result in a breach by Seller of its Organizational Documents or of any other agreement to which Seller is a party or by which it is bound, except for those violations that are excused by or are unenforceable as a result of the Bankruptcy Code.

D.    Consents and Approvals.  No Consent of any non-governmental third party and no Consent with or of any Governmental Authority is required to be made or obtained by Seller in connection with the execution, delivery or performance of this Agreement and the Kettering

Lease Agreement and the consummation of the transactions contemplated hereby and thereby except for Consent of the Bankruptcy Court.

       E.    <u>Employee Matters</u>.

       (i)    Schedule 5.1.E(i) sets forth a list of all employees regularly assigned to work at the Kettering Facility in connection with the manufacturing operations related to the Products and Acquired Assets ("**Employees**"), including for each such employee: (i) such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's employment status (i.e., actively employed, on lay off, or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (iv) each such person's current annual base rate of compensation and bonus target; (v) each person's date of hire, and, for hourly employees, the "Delphi Kettering Plant Hire" date; and (vi) each Seller Employee Benefit Plan in which such person participates. Due to the sensitive nature of the information on such Schedule, Seller has delivered it separately and Purchaser acknowledges such delivery.

       (ii)    With respect to the Employees, Seller and its Affiliates are and have been in compliance with all applicable Laws, including all health and safety laws and immigration laws, relating to employment and employment practices, terms and conditions of employment and wages and hours, and, are not and have not been engaged in any unfair labor practice or unlawful employment practice.

       (iii)    Except as set forth on <u>Schedule 5.1.E(iii)</u>, with regard to the Employees, neither Seller nor any of its Affiliates has received notice of any unfair labor practice complaint since January 1, 2005 before the National Labor Relations Board relating to Seller or any of its Affiliates and neither Seller nor any of its Affiliates has received notice of any threatened unfair labor practice complaint before the National Labor Relations Board relating to Seller or any of its Affiliates during the same time period.

       (iv)    Except as set forth on <u>Schedule 5.1.E(iv)</u>, with regard to the Employees, neither Seller nor any of its Affiliates has received notice of any charge or complaint since January 1, 2005 before the Equal Employment Opportunity Commission or the Department of Labor or any state or local agency of similar jurisdiction relating to Seller or its Affiliates, and neither Seller nor any of its Affiliates has received any notice of any material threatened charge or complaint against Seller or any of its Affiliates before the Equal Employment Opportunity Commission or the Department of Labor or any state or local agency of similar jurisdiction relating to Seller or any of its Affiliates.

       (v)    Except as disclosed on <u>Schedule 5.1.E(v)</u>, with respect to the Employees: (a) there is no labor strike, dispute, slowdown or stoppage actually pending or, to Seller's knowledge, threatened against or involving Seller or any of its Affiliates; (b) neither Seller nor any of its Affiliates has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity relating to any of its employees; (c) no labor grievance relating to any employee of Seller or any of its Affiliates is pending as of the date of this Agreement; and (d) neither Seller nor any of its Affiliates has any labor

negotiations in process with any labor union or other labor organization.  Except as set forth on Schedule 5.1.E(v) there are no pending or threatened Proceedings (judicial, administrative, grievances or otherwise) or claims against Seller or any of its Affiliates whether under applicable Laws, any Collective Bargaining Agreement, employment agreements or otherwise asserted by any present employee or former employee (or their representative) as relates to the Kettering Facility, including claims on account of or for: (a) overtime pay, other than overtime pay for work done during the current payroll period; (b) wages or salary for any period other than the current payroll period; (c) any amount of vacation pay or pay in lieu of vacation or time off; or (d) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours at work.

F.    Title to Acquired Assets.  Seller warrants that, as of the Closing Date, Seller will have good and marketable title to the Acquired Assets, and at the Closing the Acquired Assets will be sold to Purchaser, free and clear of any Lien, as permitted under Section 363(f) of the Bankruptcy Code and subject to the entry into and the effectiveness of the Sale Approval Order.

G.    Brokers.  Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Purchaser would be liable.

H.    Certain Tangible Property.

(i)    Inventory.  Except to the extent identified in Schedule 5.1.H(i), the Inventory will, as of the Closing, be located at the Kettering Facility.

(ii)    Condition of Personal Property.  With respect to all Acquired Assets, Seller has performed maintenance consistent with Seller's applicable maintenance policies and procedures and will continue to perform such maintenance in the Ordinary Course of Business until the Closing Date.

(iii)    Maintenance of Spare Parts and Crib Items.  Until the Closing Date, Seller will manage its on-hand supply of Spare Parts and Crib Items in the Ordinary Course of Business and will not unreasonably deplete such supply.

(iv)    Absence of Representations or Warranties Regarding Acquired Assets.  (a) THE ACQUIRED ASSETS HAVE BEEN INSPECTED BY PURCHASER AND PURCHASER IS SATISFIED WITH THE CONDITION THEREOF.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ALL ACQUIRED ASSETS ARE BEING SOLD TO PURCHASER ON AN "AS IS, WHERE IS" BASIS.  EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 5.1.H, SELLER MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WHATSOEVER CONCERNING THE ACQUIRED ASSETS, OR THE CONDITION, ACCURACY, QUALITY, UTILITY OR COMPLETENESS THEREOF, AND HEREBY EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND, EXCEPT AS PROVIDED IN SECTION 5, ANY WARRANTY OF NON-INFRINGEMENT OF THE PROPRIETARY RIGHTS OF THIRD PARTIES.

(b) WITHOUT LIMITING THE GENERALITY OF SECTION 5.1.H(iv)(a) ABOVE, PURCHASER AGREES THAT, EXCEPT AS OTHERWISE

EXPRESSLY SET FORTH IN THIS AGREEMENT:  (i) SELLER SHALL HAVE NO LIABILITY OR RESPONSIBILITY FOR THE CONDITION AND/OR OPERATION OF SUCH ACQUIRED ASSETS AFTER THE CLOSING DATE; AND (ii) PURCHASER IS PURCHASING SUCH ACQUIRED ASSETS BASED SOLELY UPON ITS OWN INSPECTION, EVALUATION, REVIEW AND ANALYSIS, AND PURCHASER ASSUMES THE ENTIRE RISK ASSOCIATED WITH SUCH INSPECTION, EVALUATION, REVIEW AND ANALYSIS BEING INCOMPLETE OR INACCURATE.

I.    <u>Intellectual Property</u>.  Since the GM-Delphi License Agreement's Effective Date (as that term is defined therein), no unresolved written claim that could have a Material Adverse Effect upon Purchaser's production of Products at the Kettering Facility has been asserted against Seller alleging the Products as commercialized by Seller prior to the Closing Date, or methods used by Seller prior to the Closing Date for manufacturing such commercialized Products, infringe the intellectual property rights of any third party.

J.    <u>No Other Representations and Warranties</u>.  Except for the warranties expressly set forth in this Agreement and the Ancillary Agreements, Seller makes no representations or warranties, express or implied, with respect to the Acquired Assets.  For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or other information not contained in this Agreement or the Ancillary Agreements, all which were produced only for information purposes.

5.2   **Warranties of Purchaser**.

Purchaser warrants and represents, as of the date hereof and as of the Closing Date (as if such representations and warranties were remade as of the Closing Date), to Seller as follows:

A.    <u>Organization and Good Standing</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Delaware.  Purchaser has all requisite corporate power and authority to own, lease and operate its properties and assets, and is in good standing in all jurisdictions where it owns or leases real property, except where the failure to be so qualified or to be so licensed would not have a Material Adverse Effect.

B.    <u>Corporate Authority</u>.  Purchaser has the requisite power and authority to execute and perform in accordance with this Agreement and the Kettering Lease Agreement.  Each of this Agreement and the Kettering Lease Agreement constitutes, or will upon execution and delivery by Purchaser constitute, a valid and binding obligation of Purchaser.

C.    <u>No Conflict</u>.  The execution and performance by Purchaser of this Agreement and each Ancillary Agreement does not violate, conflict with, or result in a breach of Purchaser's Organizational Documents,  or of any other agreement to which Purchaser is a party or by which it is bound.

D.    <u>Consents and Approvals</u>.  No Consent of any non-governmental third party and no Consent with or of any Governmental Authority is required to be made or obtained by Purchaser in connection with the execution, delivery or performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby.

E.    <u>Brokers</u>.  Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Seller would be liable.

F.   <u>No Inducement or Reliance; Independent Assessment</u>.   With respect to the Acquired Assets or any other rights or obligations to be transferred hereunder, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller, any of its Affiliates, or any agent, employee, attorney or other representative of Seller representing or purporting to represent Seller that are not expressly set forth herein (including the Schedules and Exhibits hereto), whether or not any such representations, warranties or statements were made in writing or orally, and none of Seller, any Affiliate of Seller, or any agent, employee, attorney, other representative of Seller or other Person will have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents or material made available to Purchaser in expectation of the transactions contemplated by this Agreement.   Nothing in this <u>Section 5.2.F</u> shall be deemed to limit, offset, serve as a defense to or give Seller a claim or counterclaim in connection with Seller's Liability for fraud, willful misconduct or gross negligence.

G.   <u>No Projections</u>.   Purchaser acknowledges that it has made its own assessment of the present condition and the future prospects of the Acquired Assets and is sufficiently experienced to make an informed judgment with respect thereto.   Purchaser acknowledges that neither Seller nor any of its Affiliates has made any warranty, express or implied, as to the prospects of the performance of the Acquired Assets, financial or otherwise, or their profitability for Purchaser, or with respect to any financial forecasts, projections or business plans prepared by or on behalf of Seller and delivered to Purchaser in connection with Purchaser's review of the Acquired Assets and the negotiation and the execution of this Agreement.

H.   <u>Availability of Funds</u>.   Purchaser has or will have available, at or prior to Closing, sufficient cash in immediately available funds to pay the Purchase Price and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

I.   <u>Anti-Money Laundering</u>.   To Purchaser's knowledge, Purchaser is in material compliance with:   (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA Patriot Act**"), as amended, and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, Effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which Purchaser operates or does business.   To Purchaser's Knowledge, neither Purchaser nor any of its directors, officers or Affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and Purchaser is not affiliated in any way with, or providing financial or material support to, any such persons or entities.   Purchaser agrees that should it be named, or if Purchaser receives written notice that any of its directors, officers or Affiliates are named, on the SDN List or any other similar list maintained by the U.S. Government in each case prior to Closing, Purchaser shall promptly inform Seller in writing.

5.3   **Fair Disclosure**.   Any matter fairly disclosed in any Schedule to this Agreement will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations or warranties contain a reference to such

Schedule to the extent it is reasonably apparent on the face of such disclosure that it applies to another representation or warranty.

## 6.    **CONDITIONS TO CLOSING**.

6.1    **Conditions to Obligations of Seller and Purchaser**.    The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by each Party at or prior to the Closing Date of the following conditions precedent:

A.    Sale Approval Order.    The Sale Approval Order, in form and substance reasonably satisfactory to Purchaser, shall have been entered by the Bankruptcy Court and will not be subject to an appeal, stay or injunction.

B.    No Law, Judgments, Etc.    No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or any decree, judgment, injunction or other Governmental Order (whether temporary, preliminary or permanent) which is in effect and which restricts, prevents, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement.

C.    Other Governmental Consents.    All filings with or Consents of any Governmental Authority legally required for the consummation of the transactions contemplated by this Agreement shall have been made or obtained and be in full force and effect, except where failure to make or obtain the same could not reasonably be expected to have a Material Adverse Effect.

6.2    **Conditions to Obligations of Purchaser**.

The obligation of Purchaser to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser in its sole discretion):

A.    Accuracy of Warranties.    After giving effect to the Sale Approval Order (if entered), the representations and warranties of Seller contained in this Agreement and the Kettering Lease Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) will be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of any such representation and warranty to be true and correct has not had and could not reasonably be expected to have a Material Adverse Effect.

B.    Performance of Covenants.    Each of the Ancillary Agreements to which Seller is a party will have been executed and delivered by Seller to Purchaser, and all other covenants and agreements contemplated hereby or in any Ancillary Agreement to be performed by Seller on or before the Closing will have been performed in all material respects.

C.    GM Supply Agreement.    The GM Supply Agreement shall have been validly executed and delivered and be in full force and effect.

D.    Effects MOU.    Purchaser shall have entered into the Effects MOU, and such Effects MOU shall be effective as of the Closing Date and in form and substance satisfactory to Purchaser in its sole discretion.

E.    <u>Material Adverse Effect</u>.  Since the date of this Agreement there shall have been no Material Adverse Effect.

F.    <u>Environmental Insurance</u>.  Purchaser shall have secured insurance satisfactory to Purchaser in its reasonable discretion in amount, duration and nature of coverage with respect to Pre-Commencement Date Contamination (as defined in the Kettering Lease Agreement attached hereto).

6.3    **Conditions to Obligations of Seller**.

Except as otherwise permitted by this Agreement, the obligation of Seller to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller):

A.    <u>Accuracy of Warranties</u>.  The representations and warranties of Purchaser contained in this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) will be true and correct as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of any such representation and warranty to be true and correct has not had and could not reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement.

B.    <u>Performance of Covenants</u>.  Each Ancillary Agreement to which Purchaser is a party will have been executed and delivered by Purchaser to Seller, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Purchaser on or before the Closing will have been performed in all material respects.

C.    <u>Delivery of Purchase Price</u>.  Purchaser shall have delivered to Seller the Initial Purchase Price, less the Deposit.

D.    <u>Seller's Labor Union Matters</u>.  Seller and IUE-CWA shall have executed a written agreement providing that Seller has satisfied all Seller obligations relating to all applicable IUE-CWA-Delphi collectively bargained "Sale of the Business" and successor provisions.

**7.    CLOSING.**

7.1    **Closing Date**.  Subject to the satisfaction or, if applicable, waiver of the conditions set forth in this Agreement, the closing (the "**Closing**") of the transactions contemplated hereby will take place at the offices of Seller on June 1, 2008 or, if later, on the second Business Day after the conditions set forth in <u>Article 6</u> will have been satisfied or, if applicable, waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree.

7.2    **Kettering Lease Agreement**.

At the Closing, the Parties will execute and deliver or, where appropriate, cause their respective Affiliates to execute and deliver the Kettering Lease Agreement.

7.3    **Seller's Deliveries**.  At the Closing, Seller will deliver to Purchaser the following: A duly executed Bill of Sale for all Acquired Assets to be transferred at Closing.

A.       Copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order, if applicable.

7.4    **Purchaser's Deliveries**.   At the Closing, Purchaser will deliver to Seller the following:

A.       The Initial Purchase Price less the Deposit.

## 8.    **CERTAIN ADDITIONAL COVENANTS**.

8.1    **Operations Pending Closing**.

A.       From the date hereof until the Closing, except as required by or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court, Seller will continue to use and operate the Acquired Assets in the Ordinary Course of Business.

B.       Without limiting the generality of <u>Section 8.1.A</u>, except as set forth on <u>Schedule 8.1.B</u>, entitled Operations Pending Closing, prior to the Closing, Seller shall not (and shall cause its Affiliates not to):

(i)       sell, lease, transfer or assign any of the Acquired Assets, except for the sale of Inventory in the Ordinary Course of Business;

(ii)      In connection with the Applicable Employees, (A) grant any increase in compensation or benefits, except for increases (1) required by applicable Law or the terms of any Collective Bargaining Agreement and (2) in salary for non-management employees in the Ordinary Course of Business, (B) grant any increase in severance or termination pay, (C) enter into or materially amend any employment, consulting, indemnification, severance or termination agreement, (D) establish, adopt, enter into or materially amend any Benefit Plan, except as required by applicable Law or the terms of any Collective Bargaining Agreement, or (E) take any action to accelerate any payments, rights or benefits, or make any material determinations not in the Ordinary Course of Business, under any Collective Bargaining Agreement or Benefit Plan; and

(iii)     Agree, whether in writing or otherwise, or announce an intention or negotiate to do any of the foregoing.

C.       From the date hereof until the Closing, Seller shall cause the Machinery & Equipment to be maintained and repaired or replaced in the Ordinary Course of Business.

8.2    **Cooperation; Efforts and Actions to Cause Closing**.   From the date hereof until the Closing, upon the terms and subject to the conditions of this Agreement, each of the Parties shall cooperate in good faith and use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and cooperate with each other in order to do, all things necessary, proper or advisable (subject to applicable Laws) to satisfy the conditions to Closing, as applicable, set forth in <u>Article 6</u> and to consummate the Closing and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable.   Notwithstanding the foregoing, Purchaser shall not be deemed to be in breach of this <u>Section 8.2</u> if it fails to reach agreement on the GM Supply Agreement, or any ancillary agreements related thereto or the Effects MOU, and nothing in this <u>Section 8.2</u> shall be deemed to require Purchaser to agree to any such agreement.

8.3   **Jobs Covenant**.

From the Closing Date until 11:59 p.m. on October 12, 2011, Purchaser covenants to Seller and its Affiliates, that Purchaser will maintain no fewer than two hundred (200) hourly bargaining unit jobs at the Kettering Facility ("**Jobs Covenant**").   Notwithstanding anything to the contrary herein and in addition to any other Purchaser indemnification obligations herein, Purchaser shall indemnify, defend and hold harmless Seller, its Affiliates, and each of its and their officers, directors and employees from and against all severance costs, out-of-pocket liabilities, claims, losses, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys and other professional fees and expenses, and the cost of SUB payments, if the employee elects SUB payments in lieu of severance upon release from Purchaser employment) incurred by Seller as a result of or arising out of Purchaser's breach of the Jobs Covenant.

8.4   **Purchaser's Access**.   From the date hereof until the Closing, and upon reasonable advance notice received from Purchaser and at Purchaser's sole cost and expense, Seller will afford Purchaser and its authorized representative reasonable access, during regular business hours on Business Days, to inspect the physical condition of the Kettering Facility and Acquired Assets and afford Purchaser and its authorized representatives reasonable access to information, offices and other facilities as well as management and other employees in each case to the extent related to the Acquired Assets, the operation of the Machinery & Equipment or the production of the Products, such right of access to be exercised in a manner that does not unreasonably interfere with the operations of Seller.

## 9.   **BANKRUPTCY ACTIONS**.

9.1   **Orders**.

Provided that Seller is then subject to a Proceeding under the Bankruptcy Code:  (i) as soon as reasonably practicable after the execution of this Agreement, Seller will file a motion with the Bankruptcy Court seeking approval of the Bidding Procedures Order (and related notices) and the Sale Approval Order: and (ii) Seller shall use commercially reasonable efforts to comply (or, to the extent not already obtained, obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets under this Agreement, and the other transactions contemplated by this Agreement and the Ancillary Agreements, including serving on all required persons in the Bankruptcy Cases, notice of the Sale Motion, the Sale Hearing and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

9.2   **Bidding Procedures**.

A.   Seller Initial Bankruptcy Actions.   Subject to the continued pendency of the Bankruptcy Case, this Section 9.2 sets forth the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the Agreement and the Sale of the Acquired Assets and the other transactions contemplated by this Agreement and the Ancillary Agreements (collectively, the "**Transaction**").   Except as otherwise contemplated by this Agreement, the Transaction is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Bidding Procedures Order and Sale Approval Order.  The following overbid provisions and related bid protections are designed to compensate Purchaser for its efforts and agreements to date and to facilitate a full and fair process (the "**Bidding Process**")

Execution Copy

designed to maximize the value of the Acquired Assets for the benefit of Seller's creditors, shareholders and bankruptcy estate.

B.    Qualified Bidder.    Unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Seller in its sole discretion, in order to participate in the Bidding Process, each person (a "Potential Bidder"), other than Purchaser, must deliver (unless previously delivered) to Seller:

(i)    an executed confidentiality agreement in form and substance reasonably satisfactory to Seller;

(ii)    current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Seller and its financial advisors;

(iii)    a preliminary (non-binding) written proposal regarding: (a) the purchase price range; (b) any assets expected to be excluded; (c) the financing of the Transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (d) any anticipated regulatory approvals required to close the Transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (e) any conditions to Closing that it may wish to impose in addition to those set forth in this Agreement; and (f) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed; and

(iv)    the Good Faith Deposit.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Transaction, if selected as a successful bidder, and that Seller determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Transaction within the time frame provided by this Agreement shall be deemed a "**Qualified Bidder**." As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Seller shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that Seller notifies the Potential Bidder that it is a Qualified Bidder, Seller shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets as provided in Section 9.2.D below. Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process.

C.    Bid Deadline.    A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to:

| Delphi Automotive Systems LLC: | Delphi Automotive Systems LLC 5725 Delphi Drive Troy, MI 48098 Attn:   Fred Bellar III |
| With copies to, Seller's outside counsel: | Skadden, Arps, Slate Meagher & Flom LLP 333 West Wacker Drive |

Execution Copy

|  | Chicago, IL  60606-1285 |
|  | Attn:    John K. Lyons and Brian M. Fern |

| Seller's Legal Staff: | Delphi Legal Staff |
|  | MC 480-410-268 |
|  | 5825 Delphi Drive |
|  | Troy, MI  48098 |
|  | Attn:    Mark Densmore |

| Counsel to the Official Committee of unsecured creditors appointed in the Bankruptcy Cases (the "Creditors' Committee"): | Latham & Watkins LLP |
|  | 885 Third Avenue |
|  | New York, NY  10022 |
|  | Attn:    Mark A. Broude |

| The Creditors' Committee's financial advisor: | Mesirow Financial Consulting LLC |
|  | 21st Floor |
|  | 666 Third Avenue |
|  | New York, NY  10017 |
|  | Attn:    Ben Pickering |

| Counsel to the debtors' secured lenders: | Davis, Polk & Wardwell |
|  | 450 Lexington Avenue |
|  | New York, NY  10017 |
|  | Attn:    Donald Bernstein and Brian Resnick |

| Purchaser: | TENNECO AUTOMOTIVE OPERATING COMPANY INC. |
|  | c/o Tenneco Inc. |
|  | 500 North Field Drive |
|  | Lake Forest, Illinois 60045 |
|  | Attn:    General Counsel |
|  | Fax No.: 847-482-5040 |

| With copies to Purchaser's outside counsel: | Mayer Brown LLP |
|  | 71 South Wacker Drive |
|  | Chicago, Illinois 60606 |
|  | Attn: Jodi Simala |

so as to be received not later than 11:00 A.M. (prevailing Eastern time), on April 10, 2008 (the "**Bid Deadline**").  Seller may extend the Bid Deadline once or successively, but is not obligated to do so.  If Seller extends the Bid Deadline, it will promptly notify all Qualified Bidders of such extension.   As soon as reasonably practicable following receipt and qualification of each Qualified Bid, Seller shall deliver complete copies of all items and information enumerated in the section below entitled "**Bid Requirements**" to counsel for the official committee of equity security holders (the "**Equityholders' Committee**").

D.    Due Diligence.  Seller shall afford each Qualified Bidder due diligence access to the Acquired Assets   Due diligence access may include access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Seller, in its sole discretion, may agree to.   Seller shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.   Any additional due diligence shall not continue after the Bid Deadline.  Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified

30

Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at site inspections. Seller (or any of its representatives) shall not be obligated to furnish any information relating to Acquired Assets to any person other than to Qualified Bidders who make an acceptable preliminary proposal.

E.    Bid Requirements.  All bids must include the following documents (the "**Required Bid Documents**"):

(i)    A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the Closing of the Transaction.

(ii)    An executed copy of the Agreement together with all Ancillary Agreements as well as the Exhibits and Schedules to the Agreement marked (the "Marked Agreements") to show those amendments and modifications to such agreements that the Qualified Bidder proposes, including the Purchase Price (as defined in the Agreement).

(iii)    A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine) in an amount equal to 5% of the Initial Purchase Price.

(iv)    Written evidence of a commitment for financing or other evidence of ability to consummate the Transaction satisfactory to Seller and its advisors.

(v)    Written evidence of a collective bargaining agreement with the IUE-CBA or commitment to assume Seller's Collective Bargaining Agreement with the IUE-CBA.

F.    Qualified Bids.  A bid will be considered only if the bid:

(i)    Is on terms and conditions (other than the amount of the consideration) that are substantially similar to, and are not, in Seller's sole discretion, materially more burdensome or conditional to Seller than, those contained in the Agreement.

(ii)    Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

(iii)    Proposes a transaction on terms that Seller determines, in its sole discretion, has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee plus: (i) in the case of the initial Qualified Bid, Five Hundred Thousand Dollars ($500,000.00); and (ii) Two Hundred Fifty Thousand Dollars ($250,000.00) in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

(iv)    Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

(v)    Includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the

Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreements.

(vi)    Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required governmental approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase and license, subject to the receipt of any governmental approvals which must be obtained within 10 days after entry of such order.

(vii)    Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Seller shall have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified in Section 9.2 and deem such bids to be Qualified Bids.  Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction and the Transaction.  A Qualified Bid may be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such Transaction.  Each Qualified Bid other than that of Purchaser is referred to as a "**Subsequent Bid**".  If Seller does not receive any Qualified Bids other than the Agreement received from Purchaser, Seller will report the same to the Bankruptcy Court and will proceed with the Transaction pursuant to the terms of the Agreement.

G.    Bid Protection.    Recognizing Purchaser's expenditure of time, energy and resources, Seller has agreed to provide certain bidding protections to Purchaser.  Specifically, Seller has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed.  As a result, Seller has agreed that if Purchaser is not the Successful Bidder, Seller shall, in certain circumstances, pay to Purchaser the Break-Up Fee or the Expense Reimbursement, but not both.  The payment of the Break-Up Fee or the Expense Reimbursement shall be governed by the provisions of the Agreement and the Bidding Procedures Order.

H.    Auction, Bidding Increments and Bids Remaining Open.    If Seller receives at least one (1) Qualified Bid in addition to the Agreement, Seller will conduct an auction (the "**Auction**") of the Acquired Assets upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. (prevailing Eastern time) on April 14, 2008 , at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606-1285 or Four Times Square, New York, New York 10036 (at Seller's election) or such later time or other place as Seller shall notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

(i)    Only Seller, Purchaser, any representative of the Creditors' Committee and the Equityholders' Committee, any representative of Seller's

Execution Copy

secured lender (and the legal and financial advisers to each of the foregoing), any representative of GM, and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only Purchaser and the other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

(ii)    At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Seller whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Seller shall provide copies of the Qualified Bid or combination of Qualified Bids which Seller believes is the highest or otherwise best offer going into the Auction (the "Lead Bid") to all Qualified Bidders who have informed Seller of their intent to participate in the Auction.    Notwithstanding this determination of the Lead Bid, Seller reserves the right, in its sole discretion, to determine which bid, or subsequent bid, is the Successful Bid (as defined below), following the conclusion of the Auction based upon a number of factors and other considerations.

(iii)    All Qualified Bidders who have submitted a Qualified Bid shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

(iv)    Seller may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

(v)    Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least Two Hundred Fifty Thousand Dollars ($250,000.00) higher than the previous bid or bids.  The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Purchaser), Seller may give effect to the Break-Up Fee that may be payable to Purchaser under the Agreement as well as any assets to be retained by Seller.

(vi)    At the conclusion of the Auction, or as soon thereafter as practicable, Seller, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Transaction; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets received at the Auction (the "**Successful Bid(s)**" the bidder(s) making such bid, the "**Successful Bidder(s)**").

       I.    <u>Acceptance of Qualified Bids</u>.  Seller shall sell the Acquired Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**").   If, after an Auction in which Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less the Break-Up Fee.  Seller's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Seller's acceptance of the bid.  Seller will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

       J.    <u>Sale Hearing</u>.  The Sale Hearing will be held before the Honorable Judge Robert Drain on April 30, 2008 at 10:00 A.M. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.  If Seller does not receive any Qualified Bids (other than the Qualified Bid of Purchaser), Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to Purchaser following entry of the Sale Order.  If Seller does receive additional Qualified Bids, then, at the Sale Hearing, Seller shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").  Seller's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Seller's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.  Following approval by the Bankruptcy Court of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Seller or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Seller shall be permitted to effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

       K.    <u>Return of Good Faith Deposit</u>.  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Qualified Bids by one or more Qualified Bidders), until two (2) Business Days following the Closing of the Transaction (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Seller will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Seller.  On the Return Date, Seller shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

       L.    <u>Reservation of Rights</u>.  Seller, after consultation with the agents for its secured lenders and the Creditors' Committee: (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time any bid (other than Purchaser's initial bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Transaction; or (c) contrary to the best interests of Seller, its estate and creditors as determined by Seller in its sole discretion.

9.3    **Break-up Fee and Expense Reimbursement**.

A.    In the event that Seller terminates the Agreement under Section 10.2.B and, within twelve (12) months of entry into this Agreement, sells, transfers, or otherwise disposes of, all or substantially all or a material portion of the Acquired Assets in a transaction or a series of related transactions with one or more Persons other than Purchaser in accordance with the Bidding Procedures (such event being an "**Alternative Transaction**").  Seller shall, within five (5) Business Days after consummation of the Alternative Transaction, pay to Purchaser by wire transfer in immediately available funds an amount equal to Five Hundred Sixty-Five Thousand Three Hundred Four Dollars ($565,304.00) (the "Break-Up Fee").    Notwithstanding the foregoing, Purchaser shall not be entitled to a Break-Up Fee if Purchaser is in material breach of this Agreement or the Bidding Procedures.

B.    In the event that either party terminates the Agreement under Section 10.2.C or 10.2.D or Purchaser terminates the Agreement under Section 10.4, Seller shall reimburse Purchaser, by wire transfer in immediately available funds, for Purchaser's reasonable, actual, documented out-of-pocket expenses incurred in connection with the transaction contemplated by the Agreement up to an amount equal to Seven Hundred Fifty Thousand Dollars ($750,000.00) (the "Expense Reimbursement").  Any Expense Reimbursement payable upon termination of this Agreement will be immediately earned upon such termination and payable by Seller to Purchaser promptly upon the delivery of an invoice related to such Expense Reimbursement to Seller by Purchaser to be delivered to Seller within ten (10) Business Days of termination of this Agreement; provided, however, that if Seller believes, in good faith, that the amount of the Expense Reimbursement sought by buyer is not reasonable, then Seller will have the right to seek Bankruptcy Court review thereof prior to paying the disputed portion of the Expense Reimbursement.  Notwithstanding the foregoing, Purchaser shall not be entitled to the Expense Reimbursement if Purchaser is in material breach of this Agreement or the Bidding Procedures or the termination is under Section 10.2.D and, at the time of termination, the condition set forth in Section 6.2.C or Section 6.2.D is not satisfied.

C.    Any claim or claims of Purchaser, to payment of either of the Break-Up Fee and Expense Reimbursement shall constitute an allowed administrative expense claim arising in the Bankruptcy Cases of Seller under sections 503(b) and 507(a)(1) of the Bankruptcy Code.

D.    Purchaser acknowledges and agrees that if Purchaser becomes entitled to receive any Break-Up Fee or Expense Reimbursement, then such Break-Up Fee and/or Expense Reimbursement will be the sole and exclusive remedy of the Buyer, whether at law or in equity, for any breach by Seller or any of its Affiliate of the terms and conditions of this Agreement.

## 10.    TERMINATION.

10.1    **Termination as to Specific Assets**.  If, after the date of this Agreement and prior to the passage of title and risk of loss to any Acquired Asset, (x) any Acquired Asset is lost, damaged or destroyed by any cause whatsoever (excluding ordinary wear and tear and damage caused by the acts or omissions of Purchaser or its agents or employees), and (y) such loss, damage or destruction does not constitute a Material Adverse Effect, this Agreement shall terminate with respect to the affected Acquired Asset, and an appropriate adjustment will be made to the Purchase Price by the Parties.

10.2    **General Termination**.  This Agreement may be terminated at any time prior to the Closing:

A.      by mutual written consent;

B.      by either Party, if Seller consummates an Alternative Transaction according to the terms of this Agreement;

C.      by either Party, provided that the terminating Party is not then in breach of its obligations under this Agreement, if the Bankruptcy Court has not entered the Sale Approval Order, on or before May 23, 2008; and such Sale Approval Order, as of May 23, 2008, is not subject to stay or injunction;

D.      by either Party, provided that the terminating Party is not then in default of its obligations under this Agreement, if the Closing shall not have occurred for any reason within sixty (60) days after entry of the Sale Approval Order that is not subject to a stay or injunction; or

E.      by either Party, if a Material Adverse Effect occurs, but only by a Party that is not then in breach of this Agreement.

10.3    **Termination By Seller**.  This Agreement may be terminated by Seller at any time prior to the Closing if Purchaser materially fails to perform any of its covenants or obligations under this Agreement or materially breaches any representation or warranty under this Agreement, in each case which breach has not been cured within thirty (30) days following receipt by Purchaser from Seller notice of such breach.

10.4    **Termination By Purchaser**.  This Agreement may be terminated by Purchaser at any time prior to the Closing if Seller materially fails to perform any of its covenants or obligations under this Agreement or materially breaches any representation or warranty under this Agreement, in each case which breach has not been cured within thirty (30) days following receipt by Seller from Purchaser of notice of such breach.

10.5    **Effect of Termination**.  If this Agreement is terminated in accordance with Section 10.2, 10.3 or 10.4, this Agreement shall become void and of no further force and effect (subject to the provisions of this Article 10) and the transactions contemplated by this Agreement shall be abandoned, without further action by any party.  If this Agreement is terminated and the transactions contemplated by this Agreement are abandoned as provided herein:

A.      Purchaser will (i) return and deliver to Seller all Process Documents and (ii) destroy (and certify to the destruction of) all other documents, work papers and other material of Seller relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof; provided, however, that Purchaser shall not be required to return or destroy any material stored electronically that is not capable of return or destruction without commercially unreasonable efforts;

B.      The provisions of the Nondisclosure Agreement will continue in full force and effect; and

C.      The following sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: (i) Article 10 (Termination); and (ii) Sections 2.3 (Deposit Amount), 9.3 (Breakup Fee; Expense Reimbursement), 12.1 (Notices), 12.4 (Entire Agreement), 12.5 (Waiver), 12.8 (Expenses), 12.12 (Governing Law), 12.13 (Public Announcements), 12.15 (Venue and Jurisdiction) and 12.24 (Jury Trial Waiver); and (iii) all related definitional provisions.

D.    No party to this Agreement will have any Liability under this Agreement to any other except:  (i) that nothing herein will relieve any party from any Liability (other than for special, incidental, punitive, exemplary or consequential damages and lost profits) for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination; and (ii) as contemplated by Section 10.5.C above.

## 11.    __INDEMNIFICATION__.

11.1    __Survival__.  The representations and warranties of the Seller in this Agreement shall survive the Closing for a period of ninety (90) days, except that the representation in Section 5.1.B shall survive the Closing for a period of one (1) year.  The representations and warranties of the Purchaser in this Agreement shall survive the Closing for a period of ninety (90) days, except that the representation in Section 5.2.B shall survive the Closing for a period of one (1) year and the representation in Section 5.2.F shall survive indefinitely.  Purchaser's covenant in Section 8.3 shall survive until 11:59 p.m. October 12, 2011.  If written notice asserting any bona fide claim for indemnification under this Article 11 shall have been given within the applicable survival period, the representations and warranties that are the subject of such claim shall survive until such claim is fully and finally resolved.  The covenants and agreements of the Parties in this Agreement and each Ancillary Agreement, and to the right to assert a claim under this Article 11 with respect to any such covenants or agreements, shall survive the Closing in accordance with the terms of such covenants and agreements.

11.2    __Seller's Agreement to Indemnify__.  If the Closing occurs and Purchaser makes a written claim for indemnification against Seller in accordance with the procedures set forth in this Article 11, then, from and after the Closing, Seller agrees to indemnify and hold harmless the Purchaser Indemnified Parties from and against all Losses (collectively, the "__Purchaser Damages__") suffered or incurred by the Purchaser Indemnified Parties arising out of, resulting from or relating to:  (i) the Retained Liabilities; (ii) the Excluded Assets; (iii) a breach of any representation or warranty of Seller contained in this Agreement; (iv) a material breach of any covenant to be performed by Seller under this Agreement; or (v) without limiting clause (i), the Pre-Closing Product Liabilities.

11.3    __Purchaser's Agreement to Indemnify__.  If the Closing occurs and Seller makes a written claim for indemnification against Purchaser in accordance with the procedures set forth in this Article 11, then, from and after the Closing, Purchaser shall indemnify and hold harmless the Seller Indemnified Parties from and against all Losses (collectively, the "__Seller Damages__") incurred by the Seller Indemnified Parties arising out of, resulting from or relating to:  (i) a breach of any representation or warranty of Purchaser contained in this Agreement; (ii) a material breach of any covenant (other than Purchaser's covenant under Section 8.3 of this Agreement) to be performed by Purchaser under this Agreement; (iii) a breach of Purchaser's covenant under Section 8.3 of this Agreement; or (iv) Purchaser's use or operation of any of the Acquired Assets after the Closing, unless such matters are of a nature also subject to indemnification pursuant to Section 11.2 above.

11.4    __Limitations on Agreements to Indemnify__.  The obligations of each Party to provide indemnification pursuant to this Article 11 are subject to the following limitations:

A.    Each Party agrees that, from and after the Closing, the indemnification provided in this Article 11 is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement; provided, however, that nothing in this Agreement shall limit the right of a Party to seek specific performance of this Agreement

or otherwise seek any equitable remedy or any remedy for fraud, willful misconduct or gross negligence.

B.      In calculating amounts payable to an Indemnitee, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty, covenant or agreement included herein.

C.      Notwithstanding any other provision of this Agreement, in no event shall an Indemnitee be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the case may be, were attributable to the Indemnitee 's own intentional wrongdoing, gross negligence, or willful misconduct.

D.      Seller shall not have any liability pursuant to Section 11.2(iii) unless and until the aggregate amount of Losses incurred or suffered by the Purchaser Indemnified Parties for which they are entitled to indemnification pursuant to Section 11.2(iii) exceeds Three Hundred Thousand Dollars ($300,000) (the "**Basket**"), but in the event such Losses exceed the Basket, Seller shall be liable and responsible to the Purchaser Indemnified Parties for the full amount of such Losses, without reduction for the Basket.  Purchaser shall not have any liability pursuant to Section 11.3(i) unless and until the aggregate amount of all Losses incurred or suffered by the Seller Indemnified Parties for which they are entitled to indemnification pursuant to Section 11.3(i) exceeds the Basket, but in the event such Losses exceed the Basket, Purchaser shall be liable and responsible to the Seller Indemnified Parties for the full amount of such Losses, without reduction for the Basket.

E.      In no event shall Seller's aggregate liability pursuant to Section 11.2(iii) for Losses incurred or suffered by the Purchaser Indemnified Parties (other than with respect to any breach of or inaccuracy in any of the made by Seller) exceed the sum of One Million Two Hundred Thousand Dollars ($1,200,000).   In no event shall Purchaser's' aggregate liability pursuant to Section 11.3(i) for Losses incurred or suffered by the Seller Indemnified Parties exceed the sum of One Million Two Hundred Thousand Dollars ($1,200,000).

F.      Notwithstanding anything to the contrary contained in this Agreement or in any Ancillary Agreement, nothing shall be deemed to limit any Party's rights to recover any or all Losses incurred or suffered by it relating to or arising out of or in connection with fraud, willful misconduct, gross negligence or intentional misrepresentation.

G.      For purposes of this Article 11, the representations and warranties described in this Agreement, any Ancillary Agreement or any certificate or other instrument delivered by any Party pursuant to this Agreement shall be deemed to have been made without any qualifications as to materiality and, accordingly, for such purposes, all references therein to "material", "in all material respects", "Material Adverse Effect" and similar qualifications as to materiality shall be deemed to be deleted therefrom (except where any such provision requires disclosure of lists of items of a material nature or above a specified threshold).

11.5    **Claims**.

A.      Claims.  As soon as is reasonably practicable after becoming aware of a claim for indemnification under this Agreement not involving a claim (or the commencement of any Proceeding) of the type described in Section 11.5.B, the Indemnitee shall give notice to the Indemnitor of such claim; provided, that the failure of the Indemnitee to give such notice shall not relieve the Indemnitor of its obligations under this Article 11 except to the extent (if any) that the Indemnitor shall have been prejudiced thereby.   Any written notice delivered by an

Indemnitee to an Indemnitee seeking indemnification pursuant to this Agreement shall set forth, with as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such Indemnitee. If the Indemnitor does not object in writing to such indemnification claim within thirty (30) days of receiving notice thereof, the Indemnitee shall be entitled to recover promptly from the Indemnitor and the Indemnitor shall promptly pay to the Indemnitee the full amount of such claim (but such recovery shall not limit the amount of any additional indemnification to which the Indemnitee may be entitled pursuant to this Article 11), and no later objection by the Indemnitor shall be permitted with respect thereto. If within such thirty (30) day period the Indemnitor agrees that it has an indemnification obligation but objects that it is obligated to pay only a lesser amount, the Indemnitee shall nevertheless be entitled to recover from the Indemnitor and the Indemnitor shall promptly pay to the Indemnitee the lesser amount, without prejudice to the Indemnitee's claim for the difference.

B.     Third Party Indemnification.  The obligations of any Indemnitor to indemnify any Indemnitee under Article 11 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of Liability by an unaffiliated third party (including a Governmental Authority) (a "**Third Party Claim**"), shall be subject to the following terms and conditions:

(i)     The Indemnitee shall give notice as promptly as is reasonably practicable to the Indemnitor of the assertion of a Third Party Claim in respect of which indemnity may be sought under this Agreement; provided, that the failure of the Indemnitee to give notice shall not relieve the Indemnitor of its obligations under this Article 11 except to the extent (if any) that the Indemnitor shall have been prejudiced thereby. The notice shall be in the form contemplated by Section 11.5.A.

(ii)     The Indemnitor may, at its own expense, (a) participate in the defense of any such Third Party Claim and (b) upon notice to the Indemnitee and the Indemnitor's delivering to the Indemnitee a written agreement that the Indemnitee is entitled to indemnification pursuant to Article 11 for all Losses arising out of such Third Party Claim and that the Indemnitor shall be liable for the entire amount of such Losses, at any time during the course of any such Third Party Claim assume the defense thereof; provided, that (x) the Indemnitor shall provide written evidence reasonably satisfactory to the Indemnitee demonstrating that the Indemnitor has a sufficient amount of assets for purposes of such assumption of defense, (y) the Indemnitor's counsel is reasonably satisfactory to the Indemnitee and (z) the Indemnitor shall thereafter consult with the Indemnitee upon the Indemnitee's reasonable request for such consultation from time to time with respect to such Third Party Claim. If the Indemnitor assumes such defense, the Indemnitee shall have the right (but not the duty) to participate in the defense thereof and to employ counsel, at its own cost and expense, separate from the counsel employed by the Indemnitor.

(iii)     Notwithstanding anything to the contrary contained herein, the Indemnitor shall not be entitled to assume the defense of, defend, compromise and settle any Third Party Claim in the name of the Indemnitee (and the reasonable fees and expenses of the Indemnitee's separate counsel shall be borne by the Indemnitor) if (a) the Indemnitee shall have determined in good faith

that an actual or potential conflict of interest makes representation of the Indemnitee and Indemnitor by the same counsel or the counsel selected by the Indemnitor inappropriate, (b) the Third Party Claim is a criminal Proceeding, (c) in the case of a Purchaser Indemnified Party, the Indemnitee reasonably believes an adverse determination (or adverse actions to be taken by or on behalf of the Indemnitee) with respect to the Third Party Claim would be detrimental to or injure the reputation of the Business such that the Business would lose a significant amount of future revenues, (d) the Third Party Claim seeks an injunction or other equitable or non-monetary relief, (e) the Indemnitor failed or is failing to vigorously defend the Third Party Claim (or prosecute any related counterclaim), or (f) the Indemnitor shall have authorized the Indemnitee to employ separate counsel at the Indemnitor's expense.

(iv)    If the Indemnitor is not defending any Third Party Claim of which it has received notice as contemplated hereby, the Indemnitee shall have the right, in addition to any other right or remedy it may have hereunder, at the Indemnitor's expense, to defend such Third Party Claim; provided, however, that: (a) the Indemnitee shall not have any obligation to participate in the defense of, or defend, any such claim; and (b) the Indemnitee's defense of or participation in the defense of any such claim shall not in any way diminish or lessen the obligations of the Indemnitor under this Article 11.

(v)    Whether or not the Indemnitor chooses to defend or contest any Third Party Claim, upon the request of the Indemnitee, the Indemnitor shall provide reasonable cooperation to the Indemnitee with respect thereto. Anything in this Article 11 to the contrary notwithstanding, with respect to any Third Party Claim:  (a) the Indemnitee shall not settle or compromise any Proceeding, or consent to the entry of any judgment, without the prior written consent of the Indemnitor, which consent shall not be unreasonably withheld, conditioned or delayed; and (b) the Indemnitor shall not settle or compromise any Proceeding, or consent to the entry of any judgment, without the prior written consent of the Indemnitee, unless the relief (x) consists solely of money damages (all of which the Indemnitor shall pay), (y) includes a provision whereby the plaintiff or claimant in the matter releases the Indemnitee from all Liability with respect thereto and (z) includes a provision whereby the plaintiff or claimant in the matter is prohibited from disclosing publicly any information regarding the Third Party Claim or such relief without the Indemnitee's prior written consent.

11.6    **Treatments of Payments**.    Any amounts payable under Article 11 shall be treated by Purchaser and Seller as an adjustment to the Purchase Price.

## 12.    **MISCELLANEOUS**.

12.1    **Notices**.

All notices, requests, consents or other communications permitted or required under this Agreement will be in writing and will be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first Business Day after sent by reputable overnight carrier, or on the third Business Day after sent by registered or certified first class mail (with receipt confirmed), to the following:

|                  |                                                                                    |
|------------------|------------------------------------------------------------------------------------|
| If to Seller:    | DELPHI AUTOMOTIVE SYSTEMS LLC<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:<br>Fax No.: |
| With a copy to:  | DELPHI AUTOMOTIVE SYSTEMS LLC<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:   Deputy General Counsel - Transactional and Restructuring<br>Fax No.: 248-813-2491 |
| If to Purchaser: | TENNECO AUTOMOTIVE OPERATING COMPANY INC.<br>c/o Tenneco Inc.<br>500 North Field Drive<br>Lake Forest, Illinois 60045<br>Attn:   General Counsel<br>Fax No.:  847-482-5040 |
| With a copy to:  | MAYER BROWN LLP<br>71 S. Wacker Drive<br>Chicago, Illinois 60606<br>Attn:   Jodi A. Simala<br>Fax No.: 312-701-7711 |

provided, however, if a Party will have designated a different addressee by notice, then to the last addressee so designated.

12.2   **Bulk Sales Laws**.

Seller and Purchaser hereby waive compliance by Seller with the provisions of the bulk sales Law of any state or foreign jurisdiction.

12.3   **Assignment**.

This Agreement will be binding on and inure to the benefit of the successors and assigns of each of the Parties, but no rights, obligations, duties or liabilities of any Party may be assigned by that Party without the prior written consent of the other, which consent will not be unreasonably withheld; provided, however, Purchaser may assign this Agreement to any Affiliate of Purchaser or to any Person who is acquiring all or substantially all of the Acquired Assets, but such assignment will not relieve Purchaser of any of its obligations under this Agreement or the Transition Services Agreement.

12.4   **Entire Agreement**.

This Agreement, together with the Ancillary Agreements and any environmental access agreement between the Parties or their Affiliates, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein.  This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

12.5    **Waiver**.

Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement:  (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, either of the Parties may:  (a) extend the time for the performance of any of the obligations or other acts of the other Party hereto; (b) waive any breaches of or inaccuracies in the representations and warranties of the other Party contained herein or in any document delivered pursuant hereto; and (c) waive compliance by the other Party with any of the agreements or conditions contained herein.  Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.  The failure of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

12.6    **Severability**.

The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions herein.  Should any provision, or any portion thereof, of this Agreement, or the application thereof to any Person or any circumstance, for any reason be held invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (ii) such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to Persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

12.7    **Amendment**.

This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties

12.8    **Expenses**.

Except as provided in Section 9.3, each Party will be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

12.9    **Third Parties**.

Nothing contained in this Agreement, express or implied, is intended to or will be construed to confer upon or give to any Person (other than the Parties and their Affiliates, and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

12.10    **Headings**.

The headings contained in this Agreement are inserted for convenience only and will not be deemed to constitute a part of this Agreement.

12.11  **Counterparts**.

More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart will be deemed an original.

12.12  **Governing Law**.

This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without giving effect to the principles of conflicts of law thereof and, to the extent applicable, the Bankruptcy Code.

12.13  **Public Announcements**.

Seller may inform its employees, customers, suppliers and/or any of the constituents in the Bankruptcy Cases (including the IUE-CWE, the unsecured creditors committee, the equity committee, ad hoc committees and the plan investors and other stakeholders and GM) of the substance of this Agreement.  Seller and Purchase will consult with each other before issuing any press releases or other public statements with respect to this Agreement or the transactions contemplated hereby, and will not issue any press release or other public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

12.14  **Sales or Transfer Taxes**.

All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets will be paid by Purchaser.

12.15  **Venue and Jurisdiction**.

A.    Purchaser and Seller irrevocably and unconditionally consent to submit to the jurisdiction of the Bankruptcy Court for any litigation arising out of or relating to this Agreement, any Ancillary Agreement, and the transactions contemplated hereby or thereby, and agree not to commence any litigation relating thereto except in the Bankruptcy Court.

12.16  **Risk of Loss**.

Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets will be borne exclusively by Seller.

12.17  **Enforcement of Agreement**.

The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached.  It is accordingly agreed that each of the Parties will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement by the other Party (without the requirement to post bond or other security or demonstrate injury) and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at Law or in equity.

12.18   **Dispute Resolution**.

Except with respect to matters covered by <u>Section 2.2</u> Seller and Purchaser will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Ancillary Agreement by good faith negotiations by senior management of each Party.   If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either Party to the other, either Party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute.   Within fifteen (15) Business Days after receipt of the Notice, the receiving Party (the "**Defending Party**") will submit to the other a written response.   The Notice and the response will include: (i) a statement of the respective Party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that Party and of any other person who will accompany the executive to meetings of the Parties.   Within fifteen (15) Business Days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.   All reasonable requests for information made by one party to the other will be honored promptly.   All negotiations pursuant to this <u>Section 12.18</u> are confidential and will be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.   In any case, except as otherwise provided above, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to <u>Section 12.15</u> above.

12.19   **Further Assurances**.

If at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as the other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

12.20   **No Right of Setoff**.

Neither Party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Party to the other Party hereto or any of such other Party's Affiliates.

12.21   **Dollar Amounts**.

All amounts referenced in this Agreement are in US dollars.

12.22   **Bankruptcy Court Approval**.

Notwithstanding anything to the contrary herein, Seller's obligations under <u>Section 9.3</u> are expressly subject to the entry of the Bidding Procedures Order.   All other obligations of Seller hereunder are subject to the entry of the Sale Approval Order.

12.23   **Miscellaneous Definitional Provisions**.

A.      For purposes of this Agreement, whenever the context requires:   the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine

Execution Copy

and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include masculine and feminine genders.

B.     The Parties hereby agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

C.     As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

D.     Terms, other than those defined or referenced in the Section hereof entitled Definitions, may be defined elsewhere in the text of this Agreement and, unless otherwise indicated, shall have the specified meaning throughout this Agreement.

E.     The words "hereof", "herein", "hereby", and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

F.     References to an article or section, or an exhibit or schedule, are (unless otherwise stated) references to an article or section of, or any exhibit or schedule to, this Agreement.

G.     Except as otherwise expressly provided herein, reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

H.     All accounting terms not specifically defined herein shall be construed in accordance with United States generally accepted accounting principles.

12.24   **Jury Trial Waiver**.

**THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED.  THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS.  NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED.**

**[the remainder of this page is intentionally left blank]**

**IN WITNESS WHEREOF**, the Parties have caused this Asset Purchase Agreement to be executed by their duly authorized officers.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By: _____ /s/ _____

Print Name: _____

Its: _____


**TENNECO AUTOMOTIVE OPERATING COMPANY INC.**

By: _____ /s/ _____

Print Name: _____

Its: _____

Execution Copy

## List of Schedules and Exhibits

| Designation | Description |
| --- | --- |
| Schedule A | Machinery & Equipment |
| Schedule B | Inventory |
| Schedule C | Other Personal Property |
| Schedule D | One Time Buys and Special Build Ups |
| Schedule 1.2.A | Third Party Assets |
| Schedule 1.2.I | Other Excluded Assets |
| Schedule 1.8 | Process Documents |
| Schedule 3.1 | Salaried Employees and Severance Costs |
| Schedule 3.1.A | Employee Severance Amounts |
| Schedule 3.2 | Transferred Hourly Employee Data |
| Schedule 4A | Certain Seller Salaried Employees |
| Schedule 4B | Top Mount Supply Components |
| Schedule 5.1.H(i) | Inventory in Other Locations |
| Schedule 5.1.E(i) | Employees |
| Schedule 5.1.E(iii) | Labor Matters |
| Schedule 5.1.E(iv) | EEOC, etc. Complaints |
| Schedule 5.1.E(v) | Work Stoppages |
| Schedule 8.1.B | Operations Pending Closing |
| Exhibit A | Form of Kettering Lease Agreement |
| Exhibit 2.3 | Form of Deposit Escrow Agreement |

## Exhibit A

**Form Of Kettering Lease Agreement**

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made and entered into to be effective as of the [____] day of [_____], 2008, by and between DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, whose address is 5725 Delphi Drive, Troy, Michigan 48098 ("Landlord"), and TENNECO AUTOMOTIVE OPERATING COMPANY INC., a Delaware corporation, whose address is 500 North Field Drive, Lake Forest, Illinois 60045 ("Tenant").

W I T N E S S E T H:

ARTICLE 1

GRANT AND TERM

Section 1.01.  The Leased Premises.  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord those certain premises consisting of approximately nine hundred thirty thousand nine hundred thirty-two (930,932) square feet as depicted on Exhibit A, attached hereto and made a part hereof (the "Leased Premises").  The Leased Premises are located in a certain building consisting of approximately two million two hundred twenty-three thousand ninety-four (2,223,094) square feet located at 2000 Forrer Boulevard, Kettering, Ohio (the "Building"), which Building has been constructed on certain land (the "Land"; the Building, other buildings and improvements on the Land, and Land are collectively referred to as the "Property").  A site plan of the Property is attached hereto as Exhibit A.  Notwithstanding anything herein contained to the contrary, Buildings 9 and 10 and Plant 16, as shown on Exhibit A shall not constitute a portion of the Leased Premises or the Building for any purpose of this Lease, and, subject to Article 14, Landlord, at its option, may elect to demolish Buildings 9 and 10 and Plant 16.

Section 1.02.  Initial Term.  The initial term of this Lease (the "Initial Term") shall commence on [_____], 2008 (the "Commencement Date") and continuing for a period of eighty-four (84) months, shall expire on [_____], 2015, unless sooner extended or terminated as herein provided.  The Initial Term and the Option Term(s), as hereinafter defined, are hereinafter sometimes referred to as the "Term" and/or "Lease Term".

Section 1.03.  Option Terms.

1.03.A.    Provided Tenant is not in default hereunder at the time of its exercise or at the time of commencement of the applicable option term, after notice and the expiration of any applicable cure period provided for herein, Tenant shall have the right to extend the Initial Term of this Lease upon the same terms, covenants and conditions as are set forth herein, except as to the amount of Base Rent, for four (4) additional periods of five (5) Lease Years each (each being an "Option Term").  Tenant shall exercise its right to extend the term of this Lease by giving Landlord written notice at least six (6) months prior to the expiration of the Initial Term or the applicable Option Term, as the case may be.  In the event Tenant fails to properly exercise any option to extend the term hereof, then all remaining options shall cease and terminate and be of no further force and effect.  The Base Rent which Tenant shall pay during each Option Term shall be adjusted to the then prevailing fair market rental for similar

1

properties, such fair market rental to be determined in accordance with Section 1.03.B hereof; provided, however, that in no event shall the Base Rent during each Option Term be less than the Base Rent applicable upon the expiration of the previous Term of this Lease.

1.03.B.    In the event Tenant shall exercise its right to so extend the term of this Lease in accordance with Section 1.03A hereof, the Base Rent for each such Option Term shall be the prevailing market rent for comparable premises in the Kettering area, determined in accordance with this Section 1.03B.

i.    Within twenty (20) business days after the exercise by Tenant of such right to extend the Term for such Option Term, Landlord shall submit to Tenant Landlord's determination of the Base Rent for the Leased Premises for such Option Term.  If Tenant does not notify Landlord of its acceptance of such Base Rent as so determined by Landlord within ten (10) business days after receipt thereof, then the parties shall proceed as provided in Paragraph (ii) below.

ii.    Within five (5) business days after said ten (10) business day period, Landlord and Tenant shall each simultaneously submit to the other in a sealed envelope its suggested annual Base Rent for such Option Term, which rental shall be Landlord's and Tenant's respective good faith opinions as to the amount of the prevailing market Base Rent for the Leased Premises.  If the higher of such suggested rentals is not more than one hundred five percent (105%) of the lower of such suggested rentals for each year of such Option Term, then the average of the two suggested rentals shall be the Base Rent for such Option Term; provided, however, in no event shall the Base Rent during the Option Term be less than the Base Rent applicable upon the expiration of the previous Term of the Lease.  Otherwise, Landlord and Tenant shall negotiate in good faith to agree upon the Base Rent for such Option Term, and if Landlord and Tenant are unable to agree within five (5) business days, the determination of the Base Rent shall be made in accordance with Paragraph (iii) below.

iii.    Within ten (10) business days after the expiration of the ten (10) business day period referred to in Paragraph (ii) above, Landlord and Tenant shall mutually select an MAI appraiser with experience in real estate activities, including at least five (5) years of current experience in appraising comparable facilities in the Kettering area.  If the parties cannot agree on such an appraiser, then within five (5) business days thereafter, each shall select an independent MAI appraiser meeting the aforementioned criteria and within five (5) business days thereafter the two appointed appraisers shall select a third neutral appraiser meeting the aforementioned criteria and the third appraiser shall determine the Base Rent for such Option Term in accordance with Paragraph (iv) below.  If either Landlord or Tenant shall fail to make such appointment within said ten (10) business day period, the other shall make such appointment on its behalf.

iv.    Once the appraiser or third appraiser has been selected as provided in Paragraph (iii) above, each of Landlord and Tenant shall submit to such appraiser its suggested Base Rent as submitted to the other party pursuant to Paragraph (ii) above.  As soon thereafter as practical, but in no event more than thirty (30) days after such selection, the appraiser shall select one of the two suggested Base Rents submitted by Landlord and Tenant that is closer to the one determined by such appraiser.  The Base Rent so selected by the appraiser shall be binding on Landlord and Tenant.  Landlord and Tenant shall equally share the cost of such appraisal.

2

Section 1.04.   <u>Complete Separation of Leased Premises; Separation of Utilities</u>.

1.04.A.    Subject to <u>Section 19.01</u>, no later than September 30, 2009, Tenant, at its sole cost and expense, shall completely separate the portion of the Building shown on <u>Exhibit A</u> (the "Remaining Premises"), including the separation of utilities serving the Leased Premises (the "<u>Complete Separation</u>") from all or portions of Plants 11, 17, and 18 (such portions of Plants 11, 17 and 18 hereinafter referred to as the "<u>Separated Premises</u>") by construction of a new permanent exterior wall.  The new exterior wall must be of at least as high a quality and of consistent design and color with the existing wall on Plants 12 and 14.  All work contemplated by this <u>Section 1.04.A</u> shall be done by Tenant (i) in compliance with all Laws (as defined below in <u>Section 3.01</u>), (ii) in accordance with plans and specifications to be reasonably approved by Landlord, and (iii) in a good and workmanlike manner.  Tenant shall provide to Landlord plans and specifications for the Complete Separation within sixty (60) days of the Commencement Date. After the Complete Separation, the Separated Premises shall no longer be deemed to be a part of the "Building" or the "Property" for purposes of this Lease.  Tenant shall have no responsibility for the repair, maintenance, replacement and/or security of the Separated Premises or to insure the Separated Premises, other than any damages caused by the negligence or intentional conduct of Tenant or Tenant's agents, employees or invitees.  Landlord at its option will sever the utilities to Buildings 9 and 10 and Plant 16.

1.04.B.    Intentionally omitted.

1.04.C.    Landlord and Tenant acknowledge that, as of the Commencement Date, the utilities serving the Leased Premises will also serve Buildings 9 and 10 and Plant 16, and Landlord, at its option and sole cost and expense, may separate all utilities serving Buildings 9 and 10 and Plant 16 from those serving the Leased Premises at any time during the Term.  In the event Landlord determines to separate such utilities, Landlord may (within a reasonable time thereafter) perform the separation of such utilities provided that such performance is (i) in compliance with all Laws, and (ii) in a good and workmanlike manner.  Landlord will use reasonable efforts, in light of the then-existing circumstances, so that such separation of utilities shall not unreasonably interfere with or disrupt Tenant's operations at the Leased Premises.

1.04.D.    Landlord acknowledges that Tenant intends after the 2007-2008 heating season, to discontinue and disconnect the steam heating system currently serving the Building and also acknowledges that this heat is the sole source of heat for the Separated Premises, Buildings 9 and 10 and Plant 16.  Notwithstanding anything to the contrary contained herein, Tenant shall have no obligation to provide steam heat to the Buildings 9 and 10 or Plant 16 after the 2007-2008 heating season.  Tenant must provide sufficient heat to the Separated Premises to keep it in "warm shutdown" until Completed Separation of the Separated Premises from the Remaining Premises is completed.

Section 1.05.   <u>Non-Exclusive Right to Use Parking Areas and Drives</u>.   Subject to Tenant's exclusive right to utilize the facilities in the "Tenneco Lease Area" shown on <u>Exhibit A</u> hereto, Tenant is to have the nonexclusive right and easement to use the employee car parking area, yard and driveway areas, and all other common areas, if any, which may from time to time be furnished by Landlord in common with Landlord and any other tenants or occupants, their agents, employees, customers, guests, invitees, licensees, assignees, subtenants and legal representatives of the Property.

3

Section 1.06.  <u>Landlord Use of Buildings 9 and 10 and Plant 16</u>.  During the period that Landlord occupies Buildings 9 and 10 and Plant 16, Tenant acknowledges that Landlord shall use the areas of the Property described on <u>Exhibit C</u>.

Section 1.07.  <u>Removal and Installation of Machinery and Equipment</u>.

1.07.A. In accordance with the timeline set forth on <u>Exhibit D</u> attached hereto, Landlord, at its sole cost and expense, shall decommission and remove from the Leased Premises the machinery, equipment and other items of personal property described on <u>Exhibit D</u> (the "<u>Delphi Equipment</u>").  Landlord shall decommission and remove the Delphi Equipment (i) in compliance with all Laws, (ii) with due care, and (iii) in a good and workmanlike manner.  Landlord will use reasonable efforts, in light of the then-existing circumstances, so that such removal of the Delphi Equipment shall not unreasonably interfere with or disrupt Tenant's operations at the Leased Premises.  Landlord shall be responsible for any injury or damage that arises as a result of its decommissioning or removal of such equipment.  Except for any Landlord breach or failure which causes an emergency, health or safety situation, Landlord shall in no event be charged with default in the performance of any of its obligations set forth in this <u>Section 1.07A</u> unless and until Landlord shall have failed to perform such obligations within thirty (30) days after notice has been given by Tenant to Landlord specifying wherein Landlord has failed to perform any such obligation; provided, so long as Landlord has commenced the cure within such thirty (30) day period and diligently pursues the same, the cure period shall be extended for such period as may reasonably be required to cure the default, up to but not exceeding, sixty (60) days following Tenant's original notice of default (a "<u>Landlord Event of Default</u>").  In the event of a Landlord Event of Default or breach or failure which causes an emergency, health or safety situation, Tenant, at its option, without further notice or demand, shall have the right, in addition to any other rights and remedies provided at law or in equity or elsewhere herein, to remedy such default or breach and deduct the costs thereof from the installments of Rent next falling due.  Nothing herein contained shall relieve Landlord from its obligations hereunder, be construed to waive any claim by Tenant for damages or other relief, or obligate Tenant to perform Landlord's obligations.

1.07.B. Pursuant to that certain Asset Purchase Agreement by and between Landlord and Tenant dated March 7, 2008 (the "<u>Purchase Agreement</u>"), Tenant has agreed to purchase certain machinery, equipment and other items of personal property from Landlord, certain items of which are described on <u>Exhibit E</u> attached hereto (the "<u>Tenneco Equipment</u>") and are located in the Separated Premises.  By July 15, 2008, Tenant, at its sole cost and expense, shall cause the Tenneco Equipment to be decommissioned and removed from the Separated Premises.  Tenant shall decommission and remove the Tenneco Equipment (i) in compliance with all Laws, (ii) with due care, and (iii) in a good and workmanlike manner.  Tenant shall be responsible for any injury or damage that arises as a result of its decommissioning or removal of such equipment.

Section 1.08.  <u>Demolition</u>.    Landlord plans to demolish and remove the Separated Premises (except for the slab) after the Complete Separation and Buildings 9 and 10 and Plant 16 (except for the slab) after Landlord ends its occupation of such buildings (the "<u>Demolition</u>").  Prior to the Demolition, Landlord shall provide plans for the Demolition (the "<u>Demolition Plans</u>") to Tenant.  Landlord and Tenant shall reasonably cooperate with each other in connection with Landlord's demolition of the Separated Premises and Tenant's obligations to complete the Complete Separation, in each case in order to provide for Tenant to maintain its occupancy permits for the Leased Premises.  Landlord shall perform Demolition (i) in compliance with all Laws, (ii) with due care, (iii) in a good and workmanlike manner, (iv) , and (v) without damage to

4

the Tenneco Equipment or the Leased Premises. Landlord will use reasonable efforts, in light of the then-existing circumstances, so that the Demolition shall not unreasonably interfere with or disrupt Tenant's operations at the Leased Premises.

Section 1.09. "As Is" Condition of the Leased Premises. Tenant acknowledges that on the Commencement Date it shall have had the opportunity to make such investigations and inspections of the Leased Premises which it deems necessary to determine whether the Leased Premises are in satisfactory condition and suitable for its intended use. Subject to Section 1.07, Section 1.08, Section 16.04, and Article 17 hereof, Tenant acknowledges that Landlord has made no warranties or representations of any kind with regard to the condition of the Leased Premises, including all heating, ventilating and air conditioning systems (the "HVAC Systems"), water, sanitary sewer, storm sewer, plumbing, electrical and gas systems, any utilities, the roof, the building structure, windows, doors, partitions, driveways, parking areas, loading docks and facilities, landscaping or any other non-environmental conditions affecting the Property or the Leased Premises. Tenant further acknowledges that, subject to Section 1.06, Section 1.07 and Article 17, it is leasing the Leased Premises in its "As Is" condition, and that the Leased Premises are in the condition required under this Lease.

Section 1.10. Separation of Property. At any time during the Term, at Landlord's option, Landlord may segregate the portion of the Property north of Plant 12 from the remainder of the Property as set forth on the attached Exhibit B effective as of any day chosen by Landlord during the Term hereof; provided (i) Landlord gives Tenant prior written notice of the segregation and (ii) Landlord builds a demising fence separating the Property. After completion of the fence pursuant to this Section, the portion of the property north of the fence (the "**North Property**") shall no longer be part of the Property, Tenant shall have no access right to the North Property and Tenant shall have no responsibility for the repair, maintenance, replacement and/or security or to insure the North Property, other than damages caused by the negligence or intentional misconduct of Tenant or Tenant's agents, employees or invitees.

ARTICLE 2

RENT

Section 2.01. Base Rent. The fixed annual base rent ("Base Rent") to be paid by Tenant during the Initial Term shall be as follows:

| Lease Year | Period | Cost per Ft$^2$ | Ft$^2$ Req'd | Annual Base Rent | Monthly Installments of Base Rent |
|---|---|---|---|---|---|
| 1 | 5-1-08 TO 4-30-09 | $0.00 | 930,932 | $0.00 | $0.00 |
| 2 | 5-1-09 TO 4-30-10 | $0.25 | 930,932 | $232,733.00 | $19,394.42 |
| 3 | 5-1-10 TO 4-30-11 | $0.50 | 930,932 | $465,466.00 | $38,788.83 |
| 4 | 5-1-11 TO 4-30-12 | $0.75 | 930,932 | $698,199.00 | $58,183.25 |
| 5 | 5-1-12 TO 4-30-13 | $1.00 | 930,932 | $930,932.00 | $77,577.67 |
| 6 | 5-1-13 TO 4-30-14 | $1.25 | 930,932 | $1,163,665.00 | $96,972.08 |
| 7 | 5-1-14 TO 4-30-15 | $1.50 | 930,932 | $1,396,398.00 | $116,366.50 |

| 7 & Beyond | 5-Year Extensions | Market | TBD | TBD | TBD |
|---|---|---|---|---|---|

Landlord and Tenant acknowledge and agree that for the purposes of calculating Base Rent for the Initial Term, the total square footage of the Leased Premises shall be equal to 930,932 square feet.    Base Rent during the Option Terms shall be the amounts provided in Section 1.03.B of this Lease.    Base Rent shall be payable in advance in equal consecutive monthly installments on the first (1st) day of each month following the month in which the Commencement Date shall occur.    Monthly installments of Base Rent shall be payable by Tenant at the office of Landlord or at such other place as Landlord may designate from time to time in writing, without any prior demand therefor and without any deductions or setoffs whatsoever, except as provided in Sections 2.04, 11.01, 11.02.B and 12.02.    If the Lease Term shall commence on a day other than the first (1st) day of a calendar month, or shall end on a day other than the last day of a calendar month, then any monthly Installment of Base Rent due for such a partial month shall be prorated.

Section 2.02.    Lease Year.    The term "Lease Year" as used herein shall mean the twelve (12) consecutive month period commencing on the Commencement Date and on each anniversary date thereof during the term of this Lease except that the last Lease Year shall end on the date this Lease expires or sooner terminates.

Section 2.03.    Additional Rent.    All amounts due from Tenant and payable to Landlord other than Base Rent, including, if applicable, taxes and assessments pursuant to Article 7 hereof and insurance premiums pursuant to Article 5 hereof, shall be deemed to be "Additional Rent".    Upon Tenant's failure to pay any such Additional Rent, Landlord, in addition to any other remedies, shall have the same remedies provided for Tenant's failure to pay the Base Rent.    (The Base Rent and the Additional Rent, are herein collectively referred to as "Rent").    Tenant shall pay any and all sums of money or charges required to be paid by Tenant under this Lease promptly when the same are due, without any deduction, abatement or setoff whatsoever, except as herein provided.    All such amounts shall be deemed to be rent and Tenant's failure to pay any such amounts or charges when due shall carry with it the same consequences as Tenant's failure to pay Base Rent.

Section 2.04.    Abatement In Rent.    Notwithstanding anything herein contained to the contrary, in the event Tenant is unable to reasonably conduct its operations in the Leased Premises as a result of Landlord's demolition of improvements or Landlord's entry or other activities on or adjacent to the Property, all Rent shall abate for the period Tenant is unable to so reasonably conduct such operations, and if such interference effects only a portion of the Leased Premises, such abatement shall be on a prorata basis relating to the portion of the Leased Premises so affected.

ARTICLE 3

CONDUCT OF BUSINESS BY TENANT

Section 3.01.    Use of the Leased Premises.    Tenant covenants and agrees to use the Leased Premises only for general manufacturing, assembly, engineering and design, warehouse and distribution operations and for such other purposes as shall be incidental thereto.    Tenant shall obtain all necessary permits for the operation of its business within the

Leased Premises and shall also obtain a certificate of occupancy and all permits necessary in connection with any alterations or remodeling performed by Tenant.  Tenant will not use the Leased Premises for any purpose in violation of any Law.  Tenant shall not do or permit anything to be done in or about the Leased Premises, or bring anything therein, which will in any way conflict with any law, ordinance, statute, order, decree, rule, regulation, judgment or requirement enacted, promulgated, entered into, agreed or imposed by any governmental authority ("Law") affecting the occupancy or use of the Leased Premises or the Building which is or may hereafter be enacted or promulgated by any governmental authorities or use the Leased Premises for purposes other than the permitted uses set forth above.

Section 3.02.  Care of the Leased Premises.  Tenant shall not perform any acts or carry on any practices which may overload or otherwise materially and adversely affect the floors or structure of, or any machinery or equipment comprising the Building systems located in, the Building, damage or injure any portion of the Leased Premises, the Building or the Property, or constitute a nuisance or waste.  Subject to Landlord's obligations in Section 4.02, Tenant shall at all times keep the Leased Premises in an orderly, neat, lawful and safe condition comparable to the condition thereof on the Commencement Date.   Subject to Article 17 hereof and Landlord's obligations in Section 4.02 and except for matters relating to the Demolition, Tenant shall also promptly comply with all Laws of any governmental authority or insurer of the Leased Premises applicable to the Leased Premises and ensure the cleanliness, safety, and lawful occupancy and use of the Leased Premises, including any requirements under the Occupational Safety and Health Act, regardless of whether such Laws shall require any structural or non-structural alterations to the Leased Premises or shall be foreseen or unforeseen; provided, however, that if such compliance was necessitated by or the result solely of the actions of Landlord (or its agents, invitees or tenants (other than Tenant)) after the Commencement Date, Landlord shall promptly reimburse Tenant for Tenant's cost and expenses in connection with such compliance.  Tenant shall, at Tenant's expense, install and maintain such fire protection systems and fire extinguishers in the Building as may be required at any time by any agency having jurisdiction over the Leased Premises and the insurance underwriters insuring the Building.

ARTICLE 4

MAINTENANCE AND SIGNS

Section 4.01.  Tenant's Obligations for Maintenance.

4.01.A.        (i)        Except as set forth in Section 4.02 below as a Landlord obligation, Tenant at its own expense shall keep the Leased Premises in as good condition and repair as the same existed on the Commencement Date, reasonable wear and tear excluded, including, without limiting the generality of the foregoing, all plumbing, heating, air conditioning, ventilating, electrical, lighting facilities and equipment within the Leased Premises, and fixtures, interior walls, ceilings, roof, floors, subfloors, floor coverings, windows, doors, loading areas, load levelers, plate glass and skylights located within the Leased Premises, or used by Tenant in connection with Tenant's occupancy of the Leased Premises.  All replacements and major and material structural repairs by Tenant shall be made by contractors approved in writing by Landlord, which approval shall not be unreasonably withheld.

4.01.B.     (ii)  No later than September 30, 2009, Tenant shall construct a demising fence at Tenant's sole cost and expense to separate the Leased Premises from the

7

remainder of the Building.  Such fence shall be constructed in a good and workmanlike manner and in compliance with all Laws.  Subject to Article 17 hereof, Landlord and Tenant intend that Tenant shall be responsible for maintaining, repairing and, to the extent deemed necessary by Tenant, replacing all areas of the Property exterior to the Leased Premises (other than Buildings 9 and 10 and Plant 16 and during the period Landlord occupies Buildings 9 and 10 and Plant 16, the Delphi Parking Areas marked on <u>Exhibit C</u> ("**Delphi Parking Areas**") in order to keep the same in as good condition and repair as of the Commencement Date subject to normal wear and tear, including the Leased Premises, the remainder of the Building, sewers, utility lines, the parking areas, the driveways, fencing, landscaping, and making all structural repairs to the Building so that the entire Property is kept in a good, clean and safe condition, in accordance with all applicable Laws including security for the entire Property (herein referred to as the "Common Areas").  In the event Tenant does not perform any maintenance, repair or replacement work with respect to the Property as herein required, then Landlord shall have the right, but not the obligation, after notice to Tenant and Tenant's failure to cure as provided in <u>Section 13.04</u> hereof, to perform such work and Tenant shall reimburse Landlord for all reasonable costs and expenses of performing such work within thirty (30) days following Landlord's invoice therefor, which obligations shall survive the termination or expiration of this Lease.  Tenant has the nonexclusive right to enter upon the remainder of the Building to perform Tenant's obligations under this Section.

Section 4.02.  <u>Landlord's Obligations for Maintenance</u>.    Other than due to the negligence or intentional misconduct of Landlord or Landlord's agents, employees, or invitees, Tenant acknowledges that Landlord shall not be required to maintain, repair, rebuild, or replace all or any part of the Leased Premises, the Building, or the Property (other than Buildings 9 and 10 and Plant 16 and during the period Landlord occupies Buildings 9 and 10 and Plant 16, the Delphi Parking Areas).  Tenant expressly waives the benefit of any statute or regulation which would afford Tenant the right to make repairs at Landlord's expense because of Landlord's failure to keep the Leased Premises, the Building or the Property in good order, condition and repair.  Landlord shall not be liable to Tenant for injury or damage that may result from any defect in the construction or condition of the Leased Premises the Building or the Property, except if caused by the negligence or intentional misconduct of Landlord or Landlord's agents, employees, or invitees.  Notwithstanding anything contained herein to the contrary, after Complete Separation, but prior to the Demolition, Landlord shall maintain the Separated Premises in such a manner as to not unreasonably interfere with or disrupt Tenant's operations of the Leased Premises.

Section 4.03.  <u>Signs</u>.   Any sign placed or erected by Tenant on the grounds of the Property shall contain only Tenant's name, and shall not contain any advertising matter.  No such sign shall be erected until Tenant has obtained (i) any necessary governmental permits and approvals and (ii) Landlord's written approval of the location, material, size, design and content thereof and any necessary permit therefor, which approval shall not be unreasonably withheld.  Prior to termination of this Lease, Tenant shall remove any such sign and shall repair any damage to the Property caused by such removal.

Section 4.04.  <u>Compliance with Laws</u>.

4.04.A.    Excluding environmental matters, which are addressed exclusively in <u>Article 17</u> hereof, during the Term:  (i) Tenant shall comply with all Laws applicable to the Leased Premises and make any repairs, additions, modifications, or alterations to the Leased Premises and Common Areas, regardless of the nature thereof, which are required by any Law or reasonably required by any insurance carrier to maintain the insurance required under this

8

Lease.  Notwithstanding anything contained herein to the contrary, Tenant shall not be required to make any repairs, additions, modifications, or alterations to the Common Areas if such repairs, additions, modifications, or alterations to the Common Areas are necessitated by or the result of the negligence or intentional misconduct of Landlord (or its agents, invitees or tenants (other than Tenant)).

4.04.B.    With Landlord's prior written consent, which consent shall not be unreasonably withheld, Tenant shall have the right, but not the obligation, to contest by appropriate legal proceedings diligently conducted in good faith, in the name of Tenant, or Landlord (if legally required), or both (if legally required), without cost or expense to Landlord, the validity or application of any Laws of the nature, to be complied with by Tenant under the terms of this Lease, and, if by the terms of any such Law compliance therewith may legally be delayed pending the prosecution of any such proceeding, Tenant may delay such compliance therewith until the final determination of such proceeding.

4.04.C.    Within thirty (30) days after receipt of the same from Tenant, Landlord agrees to execute and deliver any appropriate papers or other instruments which may be necessary or proper to permit Tenant to contest the validity or application of any such Law and to reasonably cooperate with Tenant in such contest.

## ARTICLE 5

### INSURANCE AND INDEMNIFICATION

Section 5.01.  Tenant Insurance.  Tenant shall obtain and maintain consistent with the provisions of this Lease, at its sole expense, the following types of insurance coverage, to remain in force during the term of this Lease, with minimum limits as set forth below:

5.01.A.    "All risk" or "special form" insurance coverage protecting against physical damage to the extent of 100% of the replacement cost of Tenant's property and improvements.

5.01.B.    Commercial General Liability covering liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and blanket contractual liability – US $5,000,000 each occurrence.

5.01.C.    Business Automobile Liability covering all owned, hired, and non-owned vehicles - US$1,000,000 each occurrence, including all applicable statutory coverages.

5.01.D.    Workers Compensation - statutory limits for all states of operation.

5.01.E.    Employers Liability - US$1,000,000 each employee for bodily injury by accident and - US$1,000,000 each employee for bodily injury by disease.

5.01.F.    Property insurance, covering the Building and all contents of the Building (except for the Delphi Equipment) against all risks of direct physical loss or damage, including flood insurance; boiler and machinery insurance, and builder's risk insurance.  Such insurance shall be sufficient to cover the full replacement cost of the Building and all contents of the Building and shall remain in force during the Lease Term.

All policies of insurance procured by Tenant herein shall be written as primary policies; not contributing with or in excess of coverage that Landlord may carry. If Tenant's liability policies do not contain the standard separation of insureds provision, or a substantially similar clause, they shall be endorsed to provide cross-liability coverage. Tenant shall agree to waive their insurer's right of subrogation under its policies. Landlord shall be an additional insured under Tenant's insurance policies, and at Landlord's request, Tenant shall provide Landlord with a certificate of insurance evidencing compliance with the limits, insurance requirements and waiver of subrogation set forth above. Such certificate shall be in a form reasonably acceptable to, and underwritten by an insurance company reasonably satisfactory to Landlord and with an A.M. Best Company rating of A- or above. By requiring insurance herein, Landlord does not represent that coverage and limits will necessarily be adequate to protect Tenant. The purchase of appropriate insurance coverage by Tenant or the furnishing of certificate of insurance shall not release Tenant from its respective obligations or liabilities under this Agreement.

Section 5.02.   Tenant Self-Insurance.  Notwithstanding anything herein contained to the contrary, Tenant may self-insure against any of the property risks covered by such insurance, provided Tenant or an affiliate maintains a prudent plan of self-insurance which includes Tenant and the Leased Premises.

Section 5.03.   Landlord Insurance.   Landlord shall obtain and maintain consistent with the provisions of this Lease, at its sole expense, property insurance, covering Buildings 9 and 10 and Plant 16.   Such insurance shall be sufficient to cover the full replacement cost of Buildings 9 and 10 and Plant 16, and remain in force so long as Buildings 9 and 10 and Plant 16 are standing during the Term ("Landlord Insurance").   Notwithstanding anything herein contained to the contrary, Landlord may self-insure against any of the property risks covered by such insurance, provided Landlord or an affiliate maintains a prudent plan of self-insurance which includes Landlord and Buildings 9 and 10 and Plant 16.

All policies of insurance procured by Landlord herein shall be written as primary policies; not contributing with or in excess of coverage that Tenant may carry. Landlord shall agree to waive their insurer's right of subrogation under its policies.   Landlord shall provide Tenant with evidence of insurance evidencing compliance with the limits, insurance requirements and waiver of subrogation set forth above. Such evidence shall be in a form reasonably acceptable to, and underwritten by an insurance company reasonably satisfactory to, Tenant and with an A.M. Best Company rating of A- or above. By requiring insurance herein, Tenant does not represent that coverage and limits will necessarily be adequate to protect Landlord. The purchase of appropriate insurance coverage by Landlord or the furnishing of evidence of insurance shall not release Landlord from its respective obligations or liabilities under this Agreement.

Section 5.04.   Indemnification of Landlord.  Excluding matters under Environmental Law which are addressed exclusively in Article 17 hereof, Tenant shall defend, indemnify and hold harmless Landlord and Landlord's officers, directors, employees and agents, from and against any and all claims, suits, liabilities, damages, losses, costs or expenses, including reasonable legal, accounting, consulting, engineering and other expenses which may be imposed upon, incurred by, or asserted against Landlord or Landlord's officers, directors, employees or agents, for personal injuries, death or property damage, ("Landlord's Damages") (i) occurring or originating on or about the Property and arising from Tenant's (or any of its affiliate's, agent's or invitee's) use of the Property, (ii) arising as a result of Tenant's failure to comply with any provision of this Lease during the Lease Term or (iii) arising from the negligence or wrongful acts of Tenant or any of its affiliates, agents or invitees and (iv) the breach or default of any provision of this Lease hereunder by Tenant.   The indemnities provided herein shall include

10

reasonable attorneys' fees incurred by Landlord or Landlord's officers, directors, employees and agents in connection with such Landlord's Damages or to enforce the indemnity given hereunder.

Section 5.05.    <u>Indemnification of Tenant</u>.  Excluding environmental matters which are addressed exclusively in <u>Article 17</u> hereof, Landlord shall defend, indemnify and hold harmless Tenant and Tenant's  officers, directors, employees and agents, from and against any and all claims, suits, liabilities, damages, losses, costs or expenses, including reasonable legal, accounting, consulting, engineering and other expenses which may be imposed upon, incurred by, or asserted against Tenant or Tenant's officers, directors, employees or agents, for personal injuries, death or property damage ("<u>Tenant's Damages</u>") (i) occurring or originating on or about the Property from Landlord's (or any of its affiliate's, agent's or invitee's) use of the Property, (ii) arising as a result of Landlord's failure to comply with any provision of this Lease during the Lease Term, (iii) arising from the negligence or wrongful acts of Landlord or any of its affiliates, agents, invitees or tenants (other than Tenant), (iv) arising from or relating to the performance of Landlord's obligations hereunder, including the obligations set forth in <u>Section 1.04.C</u>, <u>1.07.A</u> and <u>1.08</u>, and (v) the breach or default of any provision of this Lease hereunder by Landlord, including the breach of any of the representations and warranties contained in <u>Section 16.04</u>. The indemnities provided herein shall include reasonable attorneys' fees incurred by Tenant or Tenant's officers, directors, employees and agents in connection with such Tenant's Damages or to enforce the indemnity given hereunder.

Section 5.06.    <u>Limitation on Liability</u>.  Notwithstanding anything to the contrary contained herein, no party hereto shall be liable under this Lease for special, incidental, punitive, exemplary or consequential damages or lost profits or revenues.

Section 5.07.    <u>Survival</u>.  The provisions of <u>Section 5.04</u> and <u>Section 5.05</u> shall survive the termination of the Lease Term without limitation as to time.


ARTICLE 6

UTILITIES

Section 6.01.    <u>Utilities</u>.  Subject to Section 1.04.C and Section 6.02, Tenant agrees to pay all charges against the Property for gas, heat, water, air conditioning, electricity, sanitary and storm sewage disposition, telephone and all other utilities during the Lease Term as the same shall become due.  Landlord shall not be liable for damages or otherwise for the quality or quantity of any such utilities or for any interruption in the supply of any such utilities, unless due to the negligence or wrongful acts of Landlord or Landlord's agents, employees, or invitees.

Section 6.02.    <u>Reimbursements</u>.    Landlord shall pay to Tenant Landlord's Utility Proportionate Share of the utility charges described in Section 6.01.    The definition of "<u>Landlord's Utility Proportionate Share</u>" is set forth on <u>Schedule 6.02</u> attached hereto.  Landlord shall pay to Tenant Landlord's Utility Proportionate Share within thirty (30) days after receipt of an invoice therefor.

11

ARTICLE 7

TAXES AND ASSESSMENTS

Section 7.01.  Obligation.  Tenant agrees to pay to Landlord as Additional Rent Tenant's Proportionate Share of all Taxes, as defined in Section 7.03, on the Leased Premises during the Lease Term.

Section 7.02.  Definition of Tenant's Proportionate Share.  As used herein, "Tenant's Proportionate Share" is equal to the percent which equals the ratio of (a) the total number of square feet of area in the Leased Premises (930,932 square feet) to (b) the total number of square feet of improvements located on the Property.  If any new improvements are constructed on the Property or any improvements are demolished on the Property, Tenant's Proportionate Share will be adjusted accordingly.  Tenant's Proportionate Share is set forth on Schedule 7.02.

Section 7.03.  Definition of Taxes.  "Taxes" shall be defined as: (a) all taxes (either real or personal), assessments (general or specific), all water and sewer charges, and all other governmental impositions, which may be levied during the Lease Term upon the land, the Building or other improvements located on the Property or any portion thereof; (b) a tax or surcharge of any kind or nature upon, against or with respect to the parking areas or the number of parking spaces on the Property; (c) any tax imposed on this Lease or based on a reassessment of the Property due to a change in ownership or a transfer of all or part of Landlord's interest in the Property; (d) any tax levied upon Landlord in full or partial substitution for, or as a supplement to, any taxes previously included within the definition of "Taxes"; and (d) all reasonable costs and expenses incurred by Landlord during negotiations for or contests of the amount of such taxes and assessments, without regard to the result, including actual reasonable attorneys' fees.  All installments of assessments for local improvements payable during the Term shall be paid by Tenant as they shall become due and payable during the Term, provided that Landlord shall be deemed to have elected to pay any such special assessments in installments over the longest period permitted by the taxing authority.  Nothing herein or in this Lease otherwise contained shall require or be construed to require Tenant to pay any inheritance, estate, succession, transfer, gift, franchise, income or profit taxes that are or may be imposed upon Landlord, its successors or assigns.

Section 7.04.  Payments.  Tenant's Proportionate Share of Taxes levied or assessed for or during the Lease Term shall be paid to Landlord within ten (10) days after Landlord delivers to Tenant a statement for such Taxes, but not prior to the thirtieth (30th) day before such taxes are subject to interest or penalties.  The Taxes for the years in which this Lease commences and terminates shall be prorated on a due date basis.  On the Commencement Date, Tenant shall reimburse Landlord for Tenant's Proportionate Share of the Taxes paid by Landlord for the calendar year in which the Commencement Date occurs and allocated to the calendar months occurring after the Commencement Date.  Upon conclusion of this Lease, Landlord shall reimburse Tenant for Tenant's Proportionate Share of Taxes paid by Tenant for the calendar year in which the Lease terminates and allocated to the calendar months occurring after the Termination Date.  In the event a refund of Taxes previously paid by Tenant is obtained, Landlord shall credit the portion which relates to the Leased Premises to the next payment due under this Lease or promptly refund the same if the Term has expired.  A copy of a tax bill or assessment bill submitted by Landlord to Tenant shall at all times be sufficient evidence of the amount of Taxes assessed or levied against the property to which such bill or return relates.  In the event the Property is subdivided such that the Leased Premises becomes a separate tax parcel, Tenant's obligation to pay Tenant's Proportionate Share shall terminate

and Tenant shall only be required to pay Taxes for the Leased Premises in accordance with the separate tax parcel bill.

Section 7.05.    <u>Tax Contests</u>.    If Landlord shall elect to contest any change in the tax assessment of the Property, Landlord shall notify Tenant of such contest.    If Landlord elects not to so contest such assessment, with Landlord's prior written consent, which consent shall not be unreasonably withheld, Tenant may contest such assessment at its cost, provided that its reasonable expenses thereof shall be reimbursed out of any reductions obtained.    If either of the parties shall contest such assessment, it shall keep the other reasonably informed of its progress.

Section 7.06.    <u>Tenant's Taxes</u>.    Tenant shall pay all real and personal property taxes levied or assessed against Tenant's property and improvements upon or affixed to the Leased Premises, including taxes attributable to all alterations, additions, or improvements made by Tenant.

ARTICLE 8

<u>TENANT'S ALTERATIONS</u>

Section 8.01.    <u>Alterations</u>.    Tenant may, without Landlord's consent, make (i) the alterations, additions, modifications or improvements set forth on <u>Exhibit F</u> attached hereto and (ii) any other lawful, nonstructural alterations, additions, modifications or improvements to the Leased Premises which do not modify the exterior of the Building, do not adversely affect the architectural design or systems as described in <u>Section 4.01</u> hereof, and do not involve any demolition work.    Landlord's prior written consent shall be required for all other alterations, additions, modifications or improvements (herein referred to as "<u>Structural Alterations</u>"), which consent shall not be unreasonably withheld.    Except for those items set forth on <u>Exhibit F</u>, Tenant shall notify Landlord in writing and obtain prior written consent of Landlord, which consent shall not be unreasonably withheld, for any alterations which involve asbestos-based fire retardants, ceiling tiles, pipes or other asbestos-containing materials.    All alterations made by Tenant to the Leased Premises shall become the property of Landlord and shall remain upon and be surrendered with the Leased Premises at the termination of this Lease, without molestation or injury unless Landlord consents in writing to Tenant's removal of such alterations and Tenant repairs any damage or injury caused thereby in a good and workmanlike manner; provided, however, that Landlord shall have no right to any of Tenant's trade fixtures or equipment, and Tenant may remove such trade fixtures and equipment upon the expiration or early termination of this Lease.    In the event Tenant removes such trade fixtures and equipment upon the expiration or early termination of this Lease, Tenant shall cause the floor of the Leased Premises to be returned to Landlord in as good a condition and repair as existed on the Commencement Date, subject to normal wear and tear.    Landlord, at its option, may at the expiration of the Lease Term require Tenant, at Tenant's sole cost and expense, to remove any structural or exterior alterations made by Tenant during the Lease Term, which were so designated by Landlord at the time its consent thereto was given, and to promptly repair any damage or injury caused thereby in a good and workmanlike manner.    All alterations made by Tenant or the removal thereof shall be made free of all liens and encumbrances and in compliance with all applicable Laws.    Tenant shall indemnify, defend and hold Landlord harmless from and against any such liens, encumbrances and violations of Laws or claims relating thereto.    The repair and indemnification obligations of Tenant hereunder shall survive

the termination or expiration of this Lease. The provisions of this Section 8.01 are subject to the provisions of Section 17.01.M.

Section 8.02.    Construction Liens.

8.02.A.    In accordance with the applicable provisions of the [Ohio Construction Lien Law], Tenant has no authority to, and shall not, create any liens for labor or material on or against Landlord's interest in the Property or any portion thereof.  Tenant agrees to notify any materialmen, supplier, contractor, mechanic, or laborer involved with work on the Property that such party must look only to Tenant or Tenant's property interests.  All materialmen, suppliers, contractors, mechanics and laborers may be put on notice of this Section 8.02 by the recordation, at Landlord's option, of a notice of this exculpatory provision of this Lease in the Montgomery County Public Records, and Tenant shall promptly execute and acknowledge such a notice if requested to do so by Landlord.  Tenant shall require from any and all materialmen, suppliers, contractors, mechanics, laborers and subcontractors duly executed waivers of lien with respect to Landlord's interest prior to the commencement of any work at the Property.

8.02.B.    If notwithstanding Tenant's obligations under Section 8.02.A. above Tenant shall suffer or permit any construction liens to be filed against the Property or any part thereof by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Leased Premises or any part thereof through or under Tenant, Tenant shall cause the same to be discharged of record within thirty (30) days after the date of filing the same.  If Tenant shall fail to discharge such construction lien within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit in court or by giving security or in such other manner as is, or may be, prescribed by Law.  Any amount paid by Landlord for any of the aforesaid purposes, and all reasonable legal and other expenses of Landlord, including reasonable counsel fees, incurred in connection with the discharge of any such lien, together with all necessary disbursements in connection therewith, and together with interest thereon at the rate of twelve percent (12%) per annum, but in no event higher than the legal limit (hereinafter referred to as the "Interest Rate"), from the date of payment, shall be repaid by Tenant to Landlord on demand, and if unpaid may be treated as Additional Rent.  Nothing herein contained shall imply any consent or agreement on the part of Landlord to subject Landlord's estate to liability under any construction lien law.

ARTICLE 9

ASSIGNMENT AND SUBLETTING

Section 9.01.    Prohibition of Assignment and Subletting.  Subject to the terms below, Tenant shall not assign (by operation of Law or otherwise), mortgage or encumber this Lease or any interest in this Lease, nor sublet or permit the Leased Premises or any part thereof to be used by others, without the prior written consent of Landlord.  Notwithstanding anything contained herein to the contrary, Landlord and Tenant acknowledge and agree that Tenant shall have the right during the Lease Term to sublet all or any portion of the Leased Premises to Alken-Ziegler, Inc. without the consent of Landlord, provided the sublease commences during the Initial Term, Tenant shall provide Landlord with a copy of any sublease agreement with Alken-Ziegler, Inc. prior to the start of the sublease term and fifty percent (50%) of the "rent"

14

which is explicitly described in the sublease agreement that Tenant receives as a result of such subletting, which exceeds the total amount Tenant is obligated to pay Landlord under this Lease for such period (prorated to reflect obligations allocable to that portion of Leased Premises subject to such Sublease) shall be paid by Tenant to Landlord as Additional Rent under this Lease without effecting or reducing other obligations of Tenant hereunder.  If this Lease is assigned, or if the Leased Premises or any part thereof is sublet, or occupied by anybody other than Tenant, Landlord may, after default by Tenant, collect rent from the assignee, subtenant, or occupant and apply the net amount collected to the rent herein reserved.  No such assignment, subletting, occupancy, or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, subtenant, or occupant as tenant, or a release of Tenant from the further performance by Tenant of the covenants in this Lease.  The consent by Landlord to an assignment or subletting shall not be construed to relieve Tenant from obtaining the consent in writing of Landlord to any further assignment or subletting.  Notwithstanding anything herein contained to the contrary, Tenant shall have the right, without Landlord's consent, to assign this Lease and/or sublet all or any part of the Leased Premises to any entity which Tenant controls, controls Tenant or is under common control with Tenant or any entity to which the business being conducted on the Leased Premises is sold; provided that any such assignment or sublet will not relieve Tenant of any liability under this Lease.

ARTICLE 10

ESTOPPEL CERTIFICATES, ATTORNMENT AND SUBORDINATION

Section 10.01.  <u>Estoppel Certificates</u>.  Within twenty (20) days after request by Landlord, Tenant shall execute, in recordable form, and deliver to Landlord or such other party as Landlord may direct, a statement certifying (i) that this Lease is in full force and effect, (ii) the date of commencement of the term of this Lease, (iii) that rent is paid currently without any offset or defense thereto, (iv) the amount of rent, if any, paid in advance, (v) that there are no uncured defaults by Landlord (or stating those claimed by Tenant) and (vi) that none of the terms or provisions of this Lease have been modified or amended (or stating how they have been modified or amended).  Any such statement by Tenant may be given by Landlord to and conclusively relied upon as true and correct by any prospective transferee or mortgagee of the Leased Premises.  Within twenty (20) days after request by Tenant, Landlord shall execute, in recordable form, and deliver to Tenant or such other party as Tenant may direct, a statement certifying (i) that this Lease is in full force and effect, (ii) the date of commencement of the term of this Lease, (iii) that rent is paid currently without any offset or defense thereto, (iv) the amount of rent, if any, paid in advance, (v) that there are no uncured defaults by Tenant (or stating those claimed by Landlord) and (vi) that none of the terms or provisions of this Lease have been modified or amended (or stating how they have been modified or amended).  Any such statement by Landlord may be given by Tenant to and conclusively relied upon as true and correct by any prospective transferee or mortgagee of the Leased Premises.

Section 10.02.  <u>Attornment</u>.  In the event of any sale or the assignment as security of Landlord's interest in the Leased Premises, or in the event any proceedings are brought for the foreclosure of such interest or in the event of the exercise of the power of sale under any mortgage made by Landlord covering the Leased Premises, or for the eviction of Landlord under any underlying lease, this Lease shall remain in full force and effect and Tenant shall attorn to the purchaser or lessor and, if such purchaser or lessor shall so request, Tenant shall recognize such purchaser or lessor as Landlord under this Lease.  Such attornment shall be

self-operative upon demand without the execution or delivery of any further instrument by Tenant; provided however, that Tenant shall execute an instrument in writing evidencing such attornment upon the new owner's request, which instrument shall be subject to Tenant's reasonable approval. No such attornment shall cause such subsequent Landlord to be liable for any act or omission of any prior landlord or subject to any offsets or defenses against any prior landlord or bind it for any rent or additional rent which Tenant may have paid in advance to Landlord.

Section 10.03. <u>Subordination</u>. Tenant hereby agrees that this Lease is and shall be subject and subordinate at all times to any and all present and future ground or underlying leases, leasehold mortgages, mortgages and building loan mortgages affecting Landlord's interest in the Leased Premises, the Building and/or the Property or upon any building or other improvements hereafter placed upon the Property; provided, however, that as a condition precedent to such subordination, Tenant shall receive a nondisturbance agreement from any such lessor or mortgagee in form and substance reasonably satisfactory to Tenant. Tenant also covenants and agrees that any mortgagee, underlying or ground lessor may elect to have this Lease prior to its interest in the Leased Premises, and in the event of notification to Tenant of such election, this Lease shall thereupon be deemed to be prior to such mortgage or ground lease, whether this Lease is dated prior or subsequent to the date of such other interest.

Section 10.04. <u>Acknowledgments by Tenant</u>. Tenant covenants and agrees to execute and deliver within fourteen (14) days after a demand has been made such further instruments as may be reasonably required to carry out the purposes of this <u>Article 10</u>, provided the same are in form and substance reasonably satisfactory to Tenant.

ARTICLE 11

<u>DESTRUCTION OF THE LEASED PREMISES</u>

Section 11.01. <u>Destruction Due to Insured Risk</u>. Subject to <u>Section 11.02</u> hereof, if the Leased Premises shall be damaged or destroyed, in whole or in part, by a casualty covered by the insurance carried by Tenant under <u>Article 5</u>, then the Leased Premises shall be repaired by Tenant. The obligation of Tenant hereunder shall be limited to restoring the Leased Premises to a condition which is similar to that which existed as of the Commencement Date (but specifically excluding all of Tenant's alterations, additions, improvements, fixtures and any other property of Tenant which Tenant elects not to restore). The Rent herein provided shall be abated with respect to any portion of the Leased Premises which is untenantable for the period from the date of such damage or destruction until the same is restored; provided that Tenant is not entitled to any abatement of Rent if the damage was caused by Tenant's negligence or misconduct, except to the extent Landlord receives proceeds of rent interruption insurance maintained by Tenant, if any.

Section 11.02. <u>Election to Terminate</u>.

11.02.A. If, at any time during the Term (i) more than twenty percent (20%) of the floor area of the Building shall be damaged or destroyed, in whole or in part, by fire or any other casualty or occurrence, or (ii) the Leased Premises are damaged in whole or in part during the last year of the Lease Term, or (iii) all or any part of the Leased Premises are destroyed by a casualty which is not insured under the insurance carried by Tenant under this Lease, then

notwithstanding the provisions of <u>Section 11.01</u> hereof, Tenant shall have the right to terminate this Lease by giving notice to Landlord not more than sixty (60) days after such casualty or occurrence.  If Tenant elects to terminate this Lease pursuant to this <u>Section 11.02</u>, this Lease shall terminate as of the date such notice is given, and Rent shall be prorated as of the date of such termination.  In such event, Tenant shall not be responsible for any restoration or the razing of any damaged improvements and Landlord shall receive any insurance proceeds relating to such improvements.

      11.02.B.  In the event a portion of the Leased Premises shall be so damaged or destroyed, Tenant may elect that this Lease shall be terminated only with respect to such portion of the Leased Premises designated by written notice to Landlord within sixty (60) days after such damage or destruction.  In such event, Tenant shall use insurance proceeds to raze such damaged improvements and make such area safe and secure, the Rent specifically provided for in this Lease shall be reduced in proportion to the amount the Leased Premises is reduced and Tenant's Proportionate Share shall be reduced accordingly.

      11.02.C.  In the event this Lease is terminated pursuant to this <u>Section 11.02</u>, all of the insurance proceeds relating to the Building and/or the portion thereof with respect to which this Lease is terminated pursuant to <u>Section 11.02.B</u> hereof (less the cost of razing and making the same safe), exclusive of Tenant's trade fixtures, machinery, equipment, leasehold improvements, contents, inventory or other aspects, shall belong to and be paid over to Landlord and Tenant shall also pay to Landlord any deductible on the insurance carried or any self-insured amount.  In no event shall Landlord be entitled to the insurance proceeds relating to Tenant's trade fixtures, machinery, equipment, leasehold improvements, contents, inventory or other aspects and/or Tenant's insurance proceeds associated with business interruption.

    Section 11.03.  <u>Tenant's Obligations</u>.  Tenant shall give prompt notice to Landlord in case of any fire or material damage to the Leased Premises or the Building.

ARTICLE 12

EMINENT DOMAIN

    Section 12.01.  <u>Total Condemnation</u>.  In the event that the entire Leased Premises shall be taken by any public authority under the power of eminent domain or sold to public authority under threat or in lieu of such taking, then the term of this Lease shall automatically cease and terminate as of the date possession is taken by such public authority or its designees and all rentals shall be paid up to that date and Tenant shall have no claim against Landlord nor the condemning authority for the value of any unexpired term of this Lease.

    Section 12.02.  <u>Partial Condemnation</u>.

      12.02.A.  In the event that any portion of the Property shall be taken by any public authority under the power of eminent domain or sold to public authority under threat or in lieu of such taking, and as a result thereof, Tenant cannot reasonably operate in the balance of the Leased Premises, or Tenant is deprived of parking which is necessary to comply with applicable Law, then Tenant shall have the option of terminating this Lease as of the date possession is taken by such public authority or its designee by notifying Landlord in writing, and upon such notice being given, the condemnation shall be treated as a total condemnation pursuant to <u>Section 12.01</u> hereof.

17

12.02.B.   In the event that any portion of the Property shall be taken by any public authority under the power of eminent domain or sold to public authority under threat or in lieu of such taking, if the value of the restored Building which includes the Leased Premises (taking into account the rents to be paid therefor hereunder) and any excess condemnation proceeds received by Landlord are $200,000 less than the value of the Building immediately prior to such condemnation, Landlord shall have the option of terminating this Lease as of the date possession is taken by such public authority or its designee by notifying Tenant in writing, and upon such notice being given, the condemnation shall be treated as a total condemnation pursuant to <u>Section 12.01</u> hereof; <u>provided</u>, <u>however</u>, that Tenant may agree to pay such deficiency to Landlord within thirty (30) days after receipt of Landlord's notice, in which event this Lease shall continue in full force and effect.   If the parties are unable to agree upon the value of the Building prior or subsequent to such condemnation, such matter shall be determined by binding arbitration in Detroit, Michigan, in accordance with the commercial arbitration rules then appertaining of The American Arbitration Association.   Each party shall pay one-half (1/2) of the cost of such arbitration, and any order rendered therein may be enforced by any court of competent jurisdiction.

12.02.C.   In the event that only a portion of the floor area of the Leased Premises shall be taken as hereinabove described and this Lease is not terminated pursuant to the provisions of this <u>Section 12.02</u>, then Landlord shall, at its sole cost and expense, restore the remaining portion of the Leased Premises to the extent necessary to render it suitable for the purposes for which it was leased; provided, however, that in no event shall Landlord be obligated to expend any amount for such restoration in excess of the proceeds of any condemnation award received by Landlord.   If this Lease shall not be terminated as herein provided, this Lease shall continue for the balance of its term as to the part of the Leased Premises remaining, with an abatement of rent based upon the square foot area of the Leased Premises so taken on a proportionate basis and a corresponding reduction in Tenant's Proportionate Share and without an effect upon the term hereof or the liability of Tenant to pay any amount due under this Lease.

Section 12.03. <u>Distribution of Award</u>.   All compensation awarded or paid by any governmental authority upon a total or partial taking of the Leased Premises shall belong to and be the property of Landlord whether such damages shall be awarded as compensation for diminution in value to the leasehold or to the fee of the Leased Premises; <u>provided</u>, <u>however</u>, that Landlord shall not be entitled to any award made to Tenant for depreciation to, and cost of removal of, merchandise and trade fixtures or any other award to which Tenant is entitled which does not reduce Landlord's award.

ARTICLE 13

<u>DEFAULT</u>

Section 13.01. <u>Default</u>.   The occurrence of any of the following shall constitute an Event of Default:

13.01.A.   delinquency in the payment of rent or any other amount payable by Tenant under this Lease, or any part thereof for a period in excess of ten (10) days after receipt of notice thereof; provided, however, Landlord shall only be required to give such notice once per calendar year;

18

13.01.B. failure by Tenant to perform or comply with any of the terms, covenants or agreements to be performed by Tenant under this Lease, other than those described in the Section 13.01.A. hereof, for a period of thirty (30) days after written notice of such default has been given to Tenant; provided, however, that if the cure of such matter reasonably requires in excess of thirty (30) days, no Event of Default shall be deemed to have occurred if Tenant commences such cure within thirty (30) days after receipt of such notice and thereafter diligently prosecutes such cure to completion; provided that such cure period shall not extend past one hundred eighty (180) days; and

13.01.C. the filing by or against Tenant in any court pursuant to any state statute of a petition in bankruptcy or insolvency, or for reorganization or rearrangement, or for the appointment of a receiver or trustee of all of a portion of Tenant's property (except when any such proceeding is filed against Tenant, Tenant shall have sixty (60) days after commencement to have such proceeding dismissed), or any assignment of the property of Tenant for the benefit of creditors; and

13.01.D. abandonment, vacation or desertion of the Leased Premises.

Section 13.02. Landlord's Remedies. Should an Event of Default occur under this Lease, Landlord may pursue any or all of the following:

13.02.A. Landlord, in addition to any other rights or remedies it may have, shall have the right, by written notice to Tenant, to declare this Lease terminated and the term ended, in which event this Lease and the term hereof shall expire, cease and terminate with the same force and effect as though the date set forth in the notice of termination were the date originally set forth herein and fixed for the expiration of the term, and Tenant shall vacate and surrender the Leased Premises.

13.02.B. Landlord shall have the right to bring a summary proceeding to recover possession from Tenant holding over and/or Landlord may, in any such events, without notice to the extent permitted by law, reenter the Leased Premises and dispossess, by summary proceedings, Tenant and the legal representatives of Tenant or other occupant(s) of the Leased Premises and remove their effects and Tenant shall have no further claim or right hereunder. To the extent permitted by law, Tenant waives further notice of reentry or institution of legal proceedings to that end and any right of redemption, reentry or repossession. No reentry or commencement of any action for reentry shall be construed as an election to terminate this Lease nor shall any such action absolve or release Tenant from any of its obligations for the remainder of the Initial Term or the then current Option Term (and any Option Term with respect to which Tenant shall have exercised its option to extend the term of this Lease). In the event of reentry, Landlord may remove all persons and property from the Leased Premises and such property may be removed and stored in a public warehouse or elsewhere at the expense and risk of Tenant, without notice or resort to legal process and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby. Tenant hereby waives all rights to trial by jury and any right to impose any non-compulsory counterclaim in any claim, action or demand asserted against Landlord by reason of this Lease.

Section 13.03. Right to Relet. Should Landlord reenter the Leased Premises or take possession by summary proceedings or otherwise, it may from time to time, without terminating this Lease, make such reasonable alterations and repairs as may be necessary to relet, and relet the Leased Premises or any part thereof for such reasonable term or terms (which may be

19

for a term extending beyond the term of this Lease) and at such reasonable rental or rentals and upon such other reasonable terms and conditions as Landlord in its reasonable discretion may deem advisable.  Upon each such reletting, all rentals and other sums received by Landlord shall be applied in the following order of priority:  (i) to the payment of any indebtedness other than rent due from Tenant to Landlord; (ii) to the payment of any costs and expenses of reletting, including reasonable brokerage and attorneys' fees, and costs and repairs; and (iii) to the payment of rent and other charges due and unpaid hereunder.  Tenant shall have no right with respect to any excess.  If such rentals and other sums received from reletting are less than that to be paid by Tenant, Tenant shall immediately pay such deficiency to Landlord.  Such deficiency shall be calculated and paid monthly.  To enforce payment thereof, Landlord may institute as many separate or additional proceedings as Landlord shall determine to be necessary or desirable, whether in a separate lawsuit or lawsuits or as supplementary proceedings or other legal proceedings instituted to recover possession.  Notwithstanding any reentry and/or reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for any previous breach.  Should Landlord terminate this Lease for any breach, in addition to other remedies, it may recover all damages incurred by reason of such breach, including, in the event Tenant shall at any time be in arrears in the payments required to be paid monthly pursuant to this Section 18.02 for in excess of sixty (60) days, the worth at such time of the excess, if any, of the amount of rents reserved in this Lease for the remainder of the stated term over the then reasonable rental value of the Leased Premises for the remainder of the stated term, all of which amounts shall be immediately due and payable from Tenant to Landlord, such amounts so due upon such acceleration shall be discounted to present value at the "prime rate" then published in The Wall Street Journal.

Section 13.04. <u>Curing of Tenant's Default</u>.  Notwithstanding anything herein contained to the contrary, if Tenant shall be in default in the performance under any of the provisions of this Lease after notice and the expiration of all applicable cure periods, in addition to Landlord's other rights and remedies hereunder, Landlord may, but shall not be obligated to, cure such default at the reasonable cost and expense of Tenant (and, if necessary, enter upon the Leased Premises in order to effect such cure) and the reasonable sums so expended by Landlord shall be deemed to be additional rent and shall be immediately due and payable.

Section 13.05. <u>Tenant's Interest in Bankruptcy</u>.  Neither this Lease nor any interest therein nor any estate thereby created shall pass to any trustee or receiver or assignee for the benefit of creditors or any other person or entity under or by operation of any state law.

Section 13.06. <u>Mitigation of Damages</u>.  Landlord shall take all reasonable actions to mitigate its damages resulting from Tenant's default hereunder.


ARTICLE 14

<u>ACCESS</u>

Section 14.01. <u>Right of Entry</u>.  Landlord and Landlord's agents and employees shall have the right to enter the Leased Premises upon one (1) business day's notice (except in the event of an emergency, in which event notice shall not be required) for the purposes of (a) examining the same, (b) showing the Leased Premises to prospective lenders, purchasers, investors or lessees; provided, however, that if Tenant notifies Landlord in writing that a potential lessee is a competitor of Tenant, then Tenant may restrict access by that potential lessee from certain

portions of the Leased Premises that Tenant states that Tenant is using for proprietary activities and Tenant may accompany Landlord during such entry by potential lessees, (c) making any alterations or repairs to the Leased Premises or the Building that Landlord may be required to perform, or (d) or for any other purpose Landlord reasonably deems necessary.  During the seven (7) months prior to the expiration of the term of this Lease, Landlord may place upon the Property and the Leased Premises "For Lease" notices provided at any time during the term Landlord may place upon the Property "For Sale" notices.  Such "For Lease" and "For Sale" notices shall be commercially reasonable in size, color and placement and shall not unreasonably interfere with Tenant's business operations within the Lease Premises.  Nothing contained in this Lease, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility, or liability for the care, supervision, or repair of the Leased Premises other than as expressly herein provided.  Landlord agrees to use reasonable efforts, in light of the then existing circumstances, so that any entry by Landlord shall not unreasonably interfere with Tenant's business operations within the Leased Premises.

Section 14.02. <u>Reservation of Landlord</u>.  Landlord reserves the right to place, maintain, repair and replace such utility lines, pipes, tunneling, and the like in, under, over and upon the Leased Premises as may be reasonably necessary or advisable for the servicing of the Leased Premises or of other portions of the Building or the Property, provided the foregoing (i) shall not interfere with Tenant's operations in the Leased Premises and (ii) shall be subject to the prior approval of Tenant not to be unreasonably withheld.  Landlord and Tenant acknowledge and agree that in no event shall Tenant be liable in connection with the placement of the such utility lines, pipes, tunneling, and the like in, under, over and upon the Leased Premises.

Section 14.03. <u>Demolition</u>.

14.03.A.  Landlord reserves the right for Landlord and Landlord's agents and employees to enter upon the Property for the demolition of any portion of the Building or Property other then the Leased Premises pursuant to Section 1.04.B; provided that any such entry shall be subject to the provisions of Section 14.01.

14.03.B.  <u>DP&L Easement</u>.  Landlord reserves the right to grant an easement in the Leased Premises to Dayton Power and Light in the location noted on **<u>Exhibit A</u>**.

ARTICLE 15

<u>SURRENDER OF THE LEASED PREMISES, HOLDING OVER, SUCCESSORS</u>

Section 15.01.  <u>Surrender of the Leased Premises</u>.  On the expiration or earlier termination of this Lease, Tenant shall surrender to Landlord the Leased Premises, in as good a condition and repair as existed on the Commencement Date, subject to normal wear and tear and the provisions of <u>Articles 11</u> and <u>12</u> hereof.  Tenant shall also remove all its trade fixtures, machinery and equipment and other removable personal property, trash and debris and any other property of Tenant which Tenant is obligated to remove pursuant to the terms of this Lease and perform all restoration and repair work made necessary by the removal of any such alterations, additions, improvements, fixtures or other property upon the expiration or earlier termination of this Lease.  All such property which is not so removed upon the expiration or earlier termination of this Lease shall be deemed to have been abandoned by Tenant and may be retained by Landlord as its property or removed and disposed of in such manner as Landlord

may see fit.  Tenant shall be liable to Landlord for any and all costs and expenses incurred in connection with any such removal and disposal, including court costs, attorneys' fees and storage charges for such property.  If Tenant fails to surrender the Leased Premises to Landlord within sixty (60) days after the expiration or earlier termination of this Lease, Tenant shall hold Landlord harmless from all damages resulting from Tenant's failure to surrender the Leased Premises, including claims made by a succeeding tenant resulting therefrom.

Section 15.02.  <u>Holding Over</u>.  Any holding over after the expiration of the Term shall be construed to be a tenancy from month to month subject to all of the terms and conditions of this Lease applicable to a tenancy from month to month, except that the monthly installment of Base Rent shall be equal to one hundred fifty (150%) percent of the monthly installments of Base Rent due in the last full month of the Lease Term.  Should Tenant or any party claiming under Tenant remain in possession of the Leased Premises, or any part thereof, after expiration or any termination of this Lease, Landlord shall have the right of reentry as set forth in <u>Section 13.02</u> hereof.

Section 15.03.  <u>Successors</u>.   Except as otherwise set forth herein, all rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind their respective heirs, executors, administrators, successors and assigns.  No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as provided in <u>Section 7.01</u> hereof or Landlord's approval thereof is not required.


ARTICLE 16

<u>QUIET ENJOYMENT, LANDLORD'S LIABILITY</u>

Section 16.01.  <u>Quiet Enjoyment</u>.   Upon payment by Tenant of the rents herein provided, and upon the observance and performance of all the covenants, terms and conditions of this Lease on Tenant's part to be observed and performed, Tenant shall peaceably and quietly hold and enjoy the Leased Premises for the Term hereby demised without hindrance or interruption by Landlord or any other person acting through or under Landlord; subject, however, to the terms and conditions of this Lease and any mortgage, or ground or underlying lease or other encumbrance to which this Lease is subordinate.

Section 16.02.  <u>Exculpation of Landlord from Liability</u>.  Unless the same results from the negligence or wrongful act of Landlord, its agents, contractors or employees, neither Landlord nor any entity or entities under common control with Landlord (nor their respective officers, shareholders, partners, members, employees and agents) shall be liable for any damage done or occasioned by or from the electrical systems, the heating or air conditioning system, or the plumbing in, upon or about the Leased Premises or the Building, nor for damages occasioned by water, snow or ice being upon or coming through the roof, trapdoor, walls, windows, doors or otherwise, nor for any damage arising from acts of negligence of co-tenants or other occupants of the Building or the acts of any owners or occupants of adjoining or contiguous property.

Section 16.03.  <u>Liability of Landlord</u>.   Neither Landlord, any entity or entities under common control with Landlord, Landlord's and/or such entity or entities' beneficiaries, any persons or entities comprising Landlord and/or such entity or entities, any agents, employees, shareholders, partners or members of any such entities, nor any successor in interest to

22

Landlord (or to such persons or entity or entities) shall have any personal liability for any failure by Landlord to perform any of the terms, covenants or conditions of this Lease.  Except for any liability arising pursuant to Article 17 hereof, if Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and if as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title and interest of Landlord in the Leased Premises, and neither Landlord nor its agents, employees, shareholders, partners, or members, or any other persons holding interests under, through or in Landlord, shall be liable for any deficiency.  Landlord shall be fully responsible for its obligations pursuant to Article 17 hereof.

Section 16.04. Landlord's Representations.    Landlord represents and warrants as follows: (i) Landlord is the legal and beneficial owner of the Property and has full right and authority to enter into this Lease and to perform Landlord's obligations under this Lease for the Term, in the manner, and upon the conditions and provisions herein contained, and no additional signatories or consents are required to make the Lease binding and fully enforceable, (ii) from the date of the Purchase Agreement until the Commencement Date, Landlord has (a) used and operated the Leased Premises and (b) maintained and repaired the Leased Premises, in each case in the ordinary course of business, consistent with past practice of Landlord, and (iii) Landlord has not granted to any other party a possessory interest in the Leased Premises, other than the DPL Easement pursuant to Section 14.03.B.


ARTICLE 17

ENVIRONMENTAL MATTERS

Section 17.01.   Notwithstanding any other provision in this Lease:

17.01.A.    (i) Hazardous Substances.  Except for those reasonable quantities of materials, chemicals, products, or Hazardous Substances that are lawfully and customarily used in or result from manufacturing and related operations at the Leased Premises allowed under Article 3, above, Tenant shall not cause or permit the Leased Premises to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or Release any "hazardous substances" as defined in Section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §9601(14), "hazardous wastes" as defined in Section 1004(5) of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6903(5) or "extremely hazardous substances" as defined in the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. §11001 et seq. or any other substance, chemical, compound, product, waste, by-product, pollutant, contaminant or material that is classified or regulated under other federal, state or local Environmental Laws (hereinafter collectively referred to as "Hazardous Substances").  Hazardous Substances shall also include any petroleum or asbestos containing materials.  (ii) "Environmental Laws" mean any applicable federal, state, county or local statutes, laws, regulations, rules, ordinances, orders, judgments, injunctions, or decrees relating to environmental matters, (including ambient air, surface, water, groundwater, land surface or sub surface strata) including by way of illustration and not by way of limitation, the Clean Air Act, the Federal Water Pollution Control Act of 1972, the Resource, Conservation and Recovery Act of 1976, the Comprehensive Environmental, Response, Compensation, and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, the Federal Hazardous Materials Transportation Act, the Toxic

23

Substance Control Act, and any amendments or extensions thereof, and any rules, regulations or orders issued pursuant to any of the aforesaid. Environmental Laws does not include laws or regulations pertaining to worker safety such as the Occupational Safety and Health Act.  (iii) "<u>Release</u>" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposal, including the abandonment or discarding of barrels, containers, or other closed receptacles containing Hazardous Substances or other wastes, materials, substances, pollutants or contaminants into the environment.  For purposes of this Lease:  (1) the  Release or exacerbation of Hazardous Substances on, in or about the Leased Premises or Property is referred to as "contamination;" (2) contamination existing before the Commencement Date is referred to as "<u>Pre-Commencement Date Contamination;</u>" (3) contamination occurring or exacerbated after the Commencement Date and during the Term of this Lease as a result of an act or omission of Tenant (or any of its affiliates, agents, invitees or subtenants) is referred to as "<u>Tenant Post-Commencement Date Contamination;</u>" and (4) contamination occurring or exacerbated after the Commencement Date and during the Term of this Lease as a result of an act or omission of Landlord (or any of its affiliates, agents, invitees, or tenants (other than Tenant)) is referred to as "<u>Landlord Post-Commencement Date Contamination</u>."

17.01.B.    <u>Waste Reports.</u>  Tenant shall simultaneously submit to Landlord copies of all reports Tenant submits to any government entity regarding the generation, manufacturing, refining, storage, treatment, transportation, handling, production, processing, transferring or disposal of waste materials, including Hazardous Substances, associated with Tenant's operations at the Leased Premises.

17.01.C.    <u>Environmental Assessment at End of Lease Term.</u>

(a)   Tenant and Landlord agree to jointly retain a mutually agreeable environmental consultant (the "<u>Environmental Consultant</u>"), to conduct a reasonable and cost-effective environmental assessment (i.e., not to exceed $200,000) of the Leased Premises within sixty (60) days of the end of the Lease Term, or any extensions thereto, for the purpose of advising Tenant and Landlord whether, in the Environmental Consultant's reasonable, professional opinion, there is any Tenant Post-Commencement Date Contamination on, under, in or migrating from the Leased Premises (the "<u>Assessment</u>").  The Assessment shall include sufficient data and analysis to support the Environmental Consultant's conclusion that the contamination identified in the Assessment is Tenant Post-Commencement Date Contamination.  Tenant and Landlord agree to cooperate in good faith to define the scope of such Assessment.  If Tenant and Landlord cannot agree on the scope of such Assessment, then the Environmental Consultant shall define the scope of such Assessment applying the Environmental Consultant's best professional judgment.

(b)   Where the Environmental Consultant concludes in its reasonable professional opinion that Tenant Post-Commencement Date Contamination has commingled with Pre-Commencement Date Contamination or Landlord Post-Commencement Date Contamination, such Assessment shall include the Environmental Consultant's reasonable professional opinion regarding the relative contribution of Pre-Commencement Date Contamination, Tenant Post-Commencement Date Contamination and Landlord Post-Commencement Date Contamination to any contamination of the Leased Premises.

(c)   The Environmental Consultant shall prepare a written report documenting such Assessment of the Leased Premises.  Tenant and Landlord agree to share equally in the costs of such Assessment.

(d)    If both Tenant and Landlord agree with such Assessment, both parties shall implement their responsibilities consistent with such Assessment and this <u>Article 17</u>.  If either Tenant or Landlord objects to such Assessment as inconsistent with this <u>Article 17</u>, the objecting party shall, within thirty (30) days of receipt of such Assessment, provide to the other party and the Environmental Consultant a brief written explanation of any such objections. Tenant and Landlord shall meet with the Environmental Consultant no later than forty-five (45) days after receipt of such Assessment to discuss, in good faith, any such objections, with the goal of reaching a mutually acceptable agreement regarding each party's rights and responsibilities for Pre-Commencement Date Contamination, Tenant Post-Commencement Date Contamination and Landlord Post-Commencement Contamination under this <u>Article 17</u>.

(e)    This <u>Section 17.01.C</u> shall survive the termination of this Lease.

17.01.D.    <u>Permits.</u>  Tenant has sole responsibility for obtaining, maintaining, and complying with any permits or transfers of permits required for Tenant's lawful use of and operations on the Leased Premises during the Lease Term.  Landlord will reasonably cooperate with Tenant regarding such permit responsibility.  At the conclusion of the Lease, Landlord has sole responsibility for obtaining any permits or transfers of permits needed for future use of and operations on the Leased Premises.  Tenant's obligations in this Section 17.01.D shall survive the termination of this Lease.

17.01.E.    <u>No Assumption of Liabilities by Tenant.</u>  Neither Tenant nor any of its Affiliates shall assume or otherwise be liable for or be deemed to have assumed or otherwise be liable for any environmental liabilities arising out of or relating from Pre-Commencement Date Contamination or Landlord's Post-Commencement Date Contamination.  Tenant agrees to assume liability for any permits transferred or assigned to Tenant by Landlord to the extent such liabilities arise from acts or omissions by Tenneco (or any of its affiliates or agents) during the period that Tenneco is the permitted entity or operates the Leased Premises .

17.01.F.    <u>Compliance with Use Restrictions.</u>  Tenant acknowledges that the Leased Premises are subject to certain activity and use restrictions that prohibit any groundwater use and limit the use of the Leased Premises to industrial purposes, and prohibit digging or excavation in those areas identified on <u>Exhibit G</u>.  Tenant covenants and agrees to abide by these activity and use restrictions and will not dig, excavate, or otherwise disturb the soils in the area outlined in <u>Exhibit G</u> attached hereto.  Tenant further agrees to use its best efforts to ensure that its employees, agents, contractors and other third parties who have been given access to the Leased Premises do not violate these activity and use restrictions.

17.01.G.    <u>RCRA Generator Closure</u>.  Tenant acknowledges its intention to continue to use the less than ninety (90) day sludge accumulation area (the "Sludge Accumulation Area") associated with the onsite wastewater treatment plant shown on <u>Exhibit A (as "C.T.P.")</u> during the Term of Lease (and Landlord agrees to such use) and, Tenant agrees to retain responsibility for the RCRA generator closure of the Sludge Accumulation Area, and any other hazardous waste accumulation or storage areas created, used or maintained by Tenant on the Leased Premises. Tenant agrees to begin generator closure of the Sludge Accumulation Area and any other such areas prior to termination of the Lease, in accordance with Ohio Revised Code Chapter 3734 and the rules adopted thereunder, as maybe amended from time to time, including Ohio Administrative Code Chapter 3745-52, and to provide reasonably satisfactory documentation to Landlord of the Tenant's closure of such hazardous waste accumulation area within sixty (60) days of the discontinuation of its use of such hazardous

waste accumulation or storage areas. However, if Tenant is unable to complete closure activities within such sixty (60) day period, Tenant agrees to exercise its best efforts to complete such closure as soon as is possible. To the extent closure of the Sludge Accumulation Area requires the investigation or remediation of Pre-Commencement Date Contamination and Tenant Post-Commencement Date Contamination present in the subsurface, the costs to investigate and remediate such contamination shall be allocated between the Landlord and Tenant proportionate to the extent of their respective liability for such contamination. Landlord agrees to reimburse Tenant for such investigation and remediation costs associated with the Sludge Accumulation Area proportionate to its liability for any such contamination. Tenant agrees to provide the work plan for such closure activities for Landlord's review and approval, which approval shall not be unreasonably withheld. Tenant agrees to provide copies of any environmental reports concerning any investigation or remediation of the Leased Premises to Landlord within sixty (60) days of their preparation by Tenant. Tenant's and Landlord's obligations in this Section 17.01.G shall survive the termination of this Lease.

      17.01.H.     Landlord's Indemnification Obligation.  Except as otherwise set forth in this Article 17, Landlord will retain responsibility for, and will release, indemnify, defend, and hold harmless Tenant from and against, any liability, cost, obligation, expense or responsibility ("Liability"), related to or arising from: (1) Pre-Commencement Date Contamination; (2) retirement, closure, decommissioning, demolition and/or disposal of any real or personal property, other than Tenant's responsibility for: (i) the Acquired Assets, as that term is defined in the Asset Purchase Agreement, dated March 7, 2008, 2008 between Landlord and the Tenant; (ii) any features of the Leased Premises for which Tenant has retirement, closure, decommissioning, or restoration responsibilities at the conclusion of the Lease, provided, however, that (A) Tenant's responsibility under this Section 17.01.H(2)(ii) shall extend only to the draining, removing and disposing of Hazardous Substances generated, treated, stored, used or disposed of by Tenneco during the Lease Term, (B)Tenneco shall have no retirement, closure or decommissioning responsibility for any asbestos or asbestos containing materials not contained within the Acquired Assets and (C) to the extent Tenneco's activities under Section 17.01.H(2)(ii) require the investigation or remediation of Pre-Commencement Date Contamination, Tenant agrees to conduct such activities subject to the provisions of Section 17.01.O and Landlord agrees to reimburse Tenant for all such investigation and remediation costs proportionate to Landlord's share of responsibility for such contamination; and (iii) any materials or Hazardous Substances of any kind brought onto, generated at, or released on, in, at or about the Leased Premises during the Lease Term, and any extensions thereto, by (A) Tenant, (B) its employees, agents, contractors, invitees, licensees, subtenants, successors, or assigns, (C) utility workers undertaking actions benefiting Tenant, or (D) trespassers; (3) the Pre-Commencement Date generation, manufacturing, refining, storage, treatment, transportation, handling, production, processing, transferring or disposal of Hazardous Substances, wastes of any kind, or other materials or products at or from the Leased Premises; and (4) any acts or omission of Landlord (or any of its affiliates, agents, invitees, or tenants (other than Tenant)) after the Commencement Date, including any act or omission by Landlord regarding the investigation or remediation of any Pre-Commencement Contamination.) Landlord's obligations in this Section 17.01.H shall survive the termination of this Lease.

      17.01.I.     Tenant's Indemnification Obligation.  Tenant will be responsible for, and will release, indemnify, defend, and hold harmless the Landlord from and against, any Liabilities related to or arising from: (1) Tenant Post-Commencement Date Contamination at, from, or otherwise associated with the Leased Premises, including any Post-Commencement Date Releases of Hazardous Substances, but excluding passive migration of Pre-Commencement Date Contamination at or from the Leased Premises; (2) exacerbation of Pre-

Commencement Date Contamination by (A) Tenant, (B) its affiliates, agents, employees, contractors, invitees, licensees, subtenants, successors or assignees, (C) utility workers undertaking action benefiting Tenant, or (D) trespassers; (3) removal of the Acquired Assets, as well as all materials or Hazardous Substances brought onto, generated at or Released at the Leased Premises during the Lease Term, and any extensions thereto, by Tenant, or its Affiliates and their agents or invitees (or utility workers undertaking actions benefiting Tenant), or trespassers; (4) the Post-Commencement Date generation, manufacturing, refining, storage, treatment, transportation, handling, production, processing, transferring or disposal of Hazardous Substances, wastes of any kind or other materials or products at or from the Leased Premises by Tenant (or any of its affiliates, agents, or invitees) and (5) any decommissioning, cessation of regulated operations, closure or other regulatory or permit obligations relating to the Acquired Assets.  Landlord and Tenant agree that the mere discovery of contamination is not exacerbation.  Tenant's obligations in this Section 17.01.I shall survive the termination of the Lease.

17.01.J.      Landlord's Representations.  Except as set forth in Environmental Schedule 17 of this Lease, and subject to the last sentence of this Section 17.01.J, Landlord represents and warrants that, as of the Commencement Date:  (1) the Leased Premises are in material compliance with Environmental Laws and environmental permits; (2) Landlord has not received any threatened or actual claims under Environmental Laws, or notices regarding environmental permits, relating to the Leased Premises that are unresolved as of the Commencement Date; and (3) Landlord has provided Tenant with true and complete copies of all material reports and data concerning the Pre-Commencement Date Contamination and the environmental compliance status of the Leased Premises.  Subject to the last sentence of this Section 17.01.J, Landlord will indemnify Tenant for any Liabilities incurred by Tenant related to or arising from Landlord's breach of these representations and warranties, but such indemnification excludes any consequential damages.  Landlord's representations, warranties and indemnification obligations under this Section 17.01.J shall terminate at noon Eastern time on the second (2nd) anniversary of the Commencement Date or upon the termination of the Lease, which ever date is sooner, except as to claims made prior to such date by the Tenant with respect to the representations and warranties contained in this Section 17.01.J.

17.01.K.      Landlord's Compliance Obligation.  Landlord is responsible for ensuring that the Leased Premises are in material compliance with Environmental Laws on the Commencement Date.

17.01.L.      Tenant's Compliance Obligation.  Except for any material noncompliance with Environmental Laws on the part of Landlord that exists before or on the Commencement Date, Tenant is responsible for compliance with Environmental Laws at the Leased Premises during the Lease Term and any extensions thereto.  Landlord shall have reasonable access to the Leased Premises to monitor Tenant's compliance with Environmental Laws.  With respect to the Acquired Assets, upon expiration or termination of the Lease, or upon cessation of manufacturing operations at the Leased Premises, Tenant agrees to comply with any retirement, closure, decommissioning or restoration responsibilities, including but not limited to Ohio's Cessation of Regulated Operations requirements, as set forth in Ohio Revised Code Chapter 3752 and the rules adopted thereunder, as they may be amended from time to time.  The obligations in this Section 17.01.L shall survive the termination of this Lease.

17.01.M.      Tenant's Modification Of The Leased Premises.  Except as provided in Exhibit F, Tenant is prohibited from making structural modifications to the building(s) and property within the Leased Premises without first obtaining approval from Landlord, which

approval will not be unreasonably withheld or delayed by Landlord.  In determining whether to grant such approval, Landlord may consider factors such as whether the requested modifications would occur in areas where Hazardous Substances are present in the soil, surface water or subsurface of the Leased Premises.  Except for those modifications included in Section 1.04, with respect to any modification of the building(s) or property within the Leased Premises undertaken by Tenant, Tenant will be responsible for, and will release, indemnify, defend, and hold harmless Landlord from and against:  (1) any costs associated with implementing Tenant's modification to the building(s) and property within the Leased Premises, including without limitation any actions concerning Hazardous Substances or compliance with Environmental Laws required to implement such a modification (including, but not limited to, asbestos abatement and removal/disposal of soil with Pre-Commencement Date Contamination); and (2) any higher costs to remediate Hazardous Substances in the soil, surface water or subsurface of the Leased Premises caused by such modification.  With respect to those modifications included in Section 1.04, Tenant shall be responsible for (1) any costs associated with implementing Tenant's modification to the building(s) and property as described in Section 1.04 and (2) any exacerbation of Pre-Commencement Date Contamination resulting from such modifications; provided, however, that any increased disposal costs resulting from the disposal of soil with Pre-Commencement Date Contamination, shall be paid by Landlord,  The obligations in this Section 17.01.M shall survive the termination of the Lease.

17.01.N.        Landlord's Remedial Action Work.  Landlord shall perform and fund investigation and remedial actions, operations and maintenance activities, and monitoring as required by applicable law for those matters for which Landlord is responsible pursuant to Article 17.  Landlord has the sole right to select remedial actions and cleanup criteria in compliance with applicable law for any contamination for which it is responsible under this Lease, including any Pre-Commencement Date Contamination and Landlord Post-Commencement Date Contamination at or from the Leased Premises, and to perform such actions.  Except for emergency actions required by applicable law, Landlord shall provide Tenant with notice of its intention to conduct remedial action work at the Leased Premises at least fourteen (14) days before the date on which Landlord intends to begin such work, which notice shall include a description of the remedial actions to be performed, the location(s) where they are to be performed, the schedule for their performance, the contractor who will perform those actions, and a copy of any health and safety plan for such actions.  Tenant shall notify Landlord within ten (10) days of Tenant's receipt of such notice from Landlord if Tenant believes such remedial actions to be undertaken by Landlord would not comply with Environmental Laws or would unreasonably interfere with Tenant's use of the Leased Premises.  Tenant's failure to so notify Landlord shall constitute a full waiver and release of any claim Tenant might have that Landlord's remedial action work, as described in Landlord's notice to Tenant, unreasonably interferes with Tenant's use of the Leased Premises.  Provided that Tenant satisfies its notice obligation in this Section 17.01.N, Landlord shall use commercially reasonable efforts to conduct such remedial action work in a manner that does not unreasonably interfere with Tenant's use of the Leased Premises.  Landlord shall have reasonable access to the Leased Premises to conduct any such remedial actions.  Additionally, Landlord shall keep Tenant reasonably informed of data generated by Landlord during any such remedial action work.

17.01.O.        Tenant's Remedial Action Work.  Tenant has the sole responsibility to perform and fund investigation and remedial actions, operations and maintenance activities, and monitoring in compliance with applicable law for those matters for which Tenant is responsible pursuant to Article 17.  Except for emergency actions required by applicable law, Tenant shall not perform any remedial actions regarding any contamination at or from the Leased Premises without the approval of Landlord, which approval shall not be

28

unreasonably withheld or delayed by Landlord. Promptly upon discovering Post-Commencement Date Contamination at, on, in or migrating from the Leased Premises, Tenant shall promptly notify Landlord and promptly investigate such Post-Commencement Date Contamination. If remedial action is required by Environmental Laws regarding such Post-Commencement Date Contamination, Tenant shall promptly prepare a work plan(s) for any such remedial action(s), and provide copies of a draft of any such work plan(s) to Landlord. Tenant shall not make any submissions to a government entity regarding Post-Commencement Date Contamination at or from the Leased Premises without Landlord's advance approval of drafts of such submissions, which approval shall not be unreasonably withheld or delayed by Landlord. Additionally, Landlord shall have the opportunity to participate in any meeting or call with any government entity at which matters involving contamination at or from the Leased Premises are to be discussed. Tenant shall select cleanup criteria for remedial actions regarding those matters for which Tenant is responsible pursuant to Article 17 that comply with Environmental Laws, that are consistent with the zoning of the Leased Premises as of the Commencement Date, and that do not unreasonably interfere with the future use or sale of the Leased Premises as an industrial property following the conclusion of the Lease. Following the conclusion of the Lease, Tenant shall retain sole responsibility for any ongoing compliance or remedial action requirements regarding those matters for which Tenant is responsible pursuant to Article 17. If applicable under Environmental Laws for the selection of cleanup criteria, Landlord agrees to record a restrictive covenant regarding the Leased Premises which prohibits the use of groundwater at the Leased Premises and which limits the use of the Leased Premises to industrial uses. Upon receiving Landlord's approval, Tenant shall promptly perform the approved remedial action work. Tenant shall simultaneously provide to Landlord copies of all reports, information and data that Tenant or any contractor of Tenant submits to a government entity regarding contamination at or from the Leased Premises. Upon Landlord's request, Tenant shall promptly provide to Landlord copies of all other reports, information and data that Tenant or any contractor of Tenant produces or collects regarding contamination at or from the Leased Premises. Tenant shall have reasonable access to the Leased Premises and the Property to perform the obligations set forth in this Section 17.01.O. This Section 17.01.O shall survive the termination of this Lease.

17.01.P.    Waste Water Treatment Plant. Tenant and its successors, assigns, and subtenants, agree to allow Landlord to dispose of any captured or evacuated chromium contaminated groundwater at the waste water treatment plant located on the Property at no additional cost to Landlord until Landlord's obligation for the Pre-Commencement Date Contamination is satisfied or terminated, provided that the quantity and quality of the chromium contaminated groundwater disposed of by Landlord shall remain consistent with the quantity and quality of such groundwater disposed of by Landlord during the twelve (12) months prior to the Commencement Date.

17.01.Q.    Tenant's Notice Obligation. Tenant shall promptly notify Landlord in the event Tenant obtains knowledge of Tenant Post-Commencement Date Contamination at or from the Leased Premises which has not been previously disclosed to Landlord.

17.01.R.    Landlord's Notice Obligation. Landlord shall promptly notify Tenant in the event Landlord obtains knowledge of Pre-Commencement Date Contamination and Landlord Post-Commencement Date Contamination at or from the Leased Premises which has not been previously disclosed to Tenant.

17.01.S.    Delays In Performance.

(1)    Any delay in a party's performance under Article 17 attributable to a "Force Majeure" shall not be deemed a violation of that party's obligations under this Agreement, if that party meets the requirements of this Section 17.01.S.

(2)    For the purpose of Article 17, "Force Majeure" means an occurrence arising from causes beyond the control of and without the fault of a party claiming "Force Majeure," including but not limited to: an Act of God; untimely review of permit applications or submissions to any government authority; a court order that forces a delay in the performance of an obligation under this Lease.

(3)    When circumstances occur that a party believes constitute a "Force Majeure," that party will notice the other party by telephone or fax within five (5) business days of discovering that the occurrence will or may cause a delay in that party's compliance with any provision of Article 17.   Verbal notice shall be followed by written notice within ten (10) business days and shall describe in detail the anticipated length of the delay; the precise causes of the delay; the measures taken or to be taken by the party to avoid, minimize or overcome the delay; and the timetable by which those measures shall be implemented.

(4)    If a party's delay is or was caused by "Force Majeure" and timely notice as required in this Section 17.01.S is given, then that party's delay, to the extent that party is unable to avoid, minimize or overcome the delay, shall be excused and that party will be provided with such additional time equal to the number of days delay caused by the "Force Majeure" event.

(5)    This Section 17.01.S shall survive the termination of this Lease.

17.01.T.    All notices and other communications under this Article 17 will be in writing and will be deemed given when delivered personally or mailed (via electronic and/or land mail) to each party's senior environmental attorney (or to such other addressee as a party may have specified by notice given to the other party pursuant to this Agreement):

|  |  |
|---|---|
| In the case of Tenant: | Tenneco Automotive Operating Company, Inc.<br>c/o Tenneco, Inc.<br>500 North Field Drive<br>Lake Forest, IL  60045<br>Attn: General Counsel |
| In the case of Landlord: | Delphi Corporation<br>5825 Delphi Drive<br>M/C 480-410-166<br>Troy, MI 48098<br>Attn: Assistant General Counsel,<br>    Environmental and Energy |

ARTICLE 18

<u>MISCELLANEOUS</u>

Section 18.01.  <u>Delays</u>.  In the event either Landlord or Tenant is delayed or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive Laws, riots, insurrection, war or other reason of a like nature, then the performance of such act shall be excused for the period of the delay, and the period for the performance of such act shall be extended for a period equivalent to the delay.  The provisions of this <u>Section 18.01</u> shall not operate to excuse Tenant from prompt payment of rent or any other payments required by the terms of this Lease.

Section 18.02.  <u>Transfer of Landlord's Interest in the Leased Premises</u>.  In the event of any transfer or transfers of Landlord's interest in the Leased Premises, including any so-called "sale-leaseback" transaction, the transferor shall be automatically released from the further performance of covenants on the part of Landlord herein contained, and from any and all further liability, obligations, costs and expenses, demands, causes of action, claims or judgments arising from or growing out of, or connected with this Lease after the effective date of the transfer.  If requested, Tenant shall execute a form of release and such other documentation as may be required to further effect the provisions of this <u>Section 18.02</u>.  Notwithstanding anything herein contained to the contrary, no such transfer shall affect the liability of the Landlord named herein pursuant to <u>Section 5.05</u> for matters which arose prior to the effective date of the transfer or <u>Article 17</u> hereof and such Landlord shall remain responsible under <u>Section 5.05</u> for matters which arose prior to the effective date of the transfer or <u>Article 17</u> notwithstanding any sale or transfer of the Property.

Section 18.03.  <u>Recording</u>.  Tenant shall not record this Lease or any memorandum thereof without the written consent of Landlord, provided, that, at Tenant's request, Landlord shall execute a memorandum of this Lease, which Tenant may record.  If such a memorandum is recorded, Tenant shall execute and deliver to Landlord a termination thereof upon the expiration or earlier termination of this Lease.

Section 18.04.  <u>Late Charges and Interest on Late Payments</u>.  Tenant acknowledges that late payment by Tenant to Landlord of the Base Rent and other amounts due hereunder will cause Landlord to incur costs not contemplated by this Lease and that the exact amount of such costs is extremely difficult and impractical to fix.  Such costs include processing and accounting charges and late charges and additional interest imposed on Landlord by the terms of any mortgage note or other financing.  Therefore, if any amount due from Tenant is not received by Landlord within ten (10) business days of the due date, Tenant shall pay to Landlord an additional sum equal to five percent (5%) of such overdue amount as a late charge and not as interest or a penalty.  In addition, any such amount which is not received by Landlord when due shall bear interest at twelve percent (12%) per annum (or such lesser rate equal to the maximum interest rate then permitted by Law) from the date due until received.  The parties agree that these charges represent a fair and reasonable estimate of the costs that Landlord will incur by reason of Tenant's late payment.  Payment of any such late charge or interest shall not excuse or cure any default nor prevent Landlord from exercising any of its other available rights and remedies.  Notwithstanding the foregoing, if Tenant cures any late payment within ten (10) days of notice from Landlord, then Tenant does not have to pay the late fee charge or such interest, provided that Landlord is only required to give such notice twice per calendar year.

31

Section 18.05.  <u>Consent Right</u>.  Landlord shall not, without the prior written consent of Tenant (which consent shall not be unreasonably withheld, conditioned or delayed), lease any other portion of the Property or grant any license, concession, or other right of occupancy of any other portion of the Property.    In the event Landlord desires Tenant's consent to the above listed item, Landlord shall, at least thirty (30) days prior to the date of the proposed action, provide Tenant with (i) a written description of all terms and conditions of the proposed action, (ii) copies of the proposed pertinent documentation, and (iii) the following information about the proposed transferee: name and address, reasonably satisfactory information about its business and business history, and its proposed use of the applicable portion of the Property.

Section 18.06.  <u>Accord and Satisfaction</u>.  No payment by Tenant or receipt by Landlord of a lesser amount than the Base Rent or any other amounts due hereunder shall be deemed to be other than on account of the earliest rent and/or other amounts due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment under this Lease be deemed an accord and satisfaction.  Landlord may accept such check or payment without prejudice to its right to recover the balance of the amount due hereunder or pursue any other remedy.

Section 18.07.  <u>Waiver</u>.  No default in the payment of rent or any other amount set forth herein, nor the failure to enforce the provisions of this Lease upon any default shall be construed as creating a custom of deferring payment or as modifying in any way the terms of this Lease or as a waiver of the right to terminate or cancel or otherwise to enforce the provisions hereof.  No express waiver of any provision, condition, or term shall affect any other provision, condition or term other than that specified in the waiving party's express waiver, and that only as specifically stated, and shall not be deemed to imply or constitute a subsequent waiver of such provision, condition or term.  No breach of a covenant or condition of this Lease shall be deemed to have been waived unless in writing by the waiving party.  It is expressly agreed that time shall be of the essence under this Lease.

Section 18.08.  <u>Tenant's Release of General Motors Corporation</u>.  So long as the Environmental Matters Agreement between Landlord and General Motors Corporation ("<u>GM</u>")  is in effect, Tenant on behalf of itself, and its successors and assigns, agrees to waive, hold harmless, and release, any and all claims, it may now have or have in the future against GM, and its successors and assignees, for any environmentally related claims, actions, losses, penalties, fines, liabilities, obligations, damages, judgments, costs, and expenses, including without limitations attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants, and the costs of remedial actions arising under any Environmental Laws (including but not limited to the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended thereafter and the rules promulgated and amended thereafter, and Ohio Revised Code Chapter 3746 and the rules promulgated thereunder and amended thereafter) associated with GM's prior ownership, use or operation of the Acquired Assets, Leased Premises, Building, Land, and Property, and Landlord's ownership, use or operation of the Leased Premises, Building, Land, and Property.

Section 18.09.  <u>Legal Expenses</u>.  In the event any legal proceedings are instituted by Landlord or Tenant to enforce the terms of this Lease, the non-prevailing party shall pay to the prevailing party all reasonable costs incurred in connection with such legal proceedings, including reasonable attorneys' fees.  Each of the parties shall also indemnify the other against and hold it harmless from all costs, expenses, demands, claims and liabilities which may arise in the event the indemnified party becomes or is made a party to any claim or action (a) instituted by the other, or by any third party against the other, or by or against any person

32

holding any interest under or using the Leased Premises by license of or agreement with the other; (b) for foreclosure of any lien for labor or material furnished to or for the other or such other person; (c) otherwise arising out of or resulting from any act or transaction of the other or such other person; or (d) necessary to protect such party's interest under this Lease in a bankruptcy proceeding, or other proceeding under the Bankruptcy Code.

Section 18.10.  <u>Real Estate Brokers</u>.  Each party hereto represents that it has had no dealings with any real estate broker, finder or other person with respect to this Lease in any manner.  Each party hereto shall indemnify and hold the other party harmless from all damages resulting from any claims which may be asserted against the other party by any broker, finder or other person with whom the other party has or purportedly has dealt.

Section 18.11.  <u>Governing Law</u>.  This Lease shall be governed by and construed in accordance with the internal laws of the State of Ohio.  The unenforceability, invalidity or illegality of any term or provision of this Lease shall not render any other term or provision unenforceable, invalid or illegal.  In the event of litigation regarding this Lease, suit shall be brought in _____ County, Ohio.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT HEREBY WAIVE ANY AND ALL RIGHT TO A TRIAL BY JURY ON ANY ISSUE TO ENFORCE ANY TERM OR CONDITION OF THIS LEASE, OR WITH RESPECT TO LANDLORD'S RIGHT TO TERMINATE THIS LEASE OR TERMINATE TENANT'S RIGHT OF POSSESSION.

Section 18.12.  <u>Entire Agreement</u>.  This Lease and the Exhibits attached hereto set forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant and there are no covenants, promises, agreements or understandings between Landlord and Tenant, either oral or written, other than are set forth herein.  No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by both parties hereto.

Section 18.13.  <u>No Partnership</u>.  Nothing contained herein shall be deemed or construed to create the relationship of principal and agent or of partnership or joint venture between the parties hereto.

Section 18.14.  <u>Interpretation and Use of Pronouns</u>.  The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.  Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include any other genders, when required by the context of this Lease.  If any language is deleted from this Lease, such language shall be deemed never to have appeared herein, and no implication shall be drawn therefrom.

Section 18.15.  <u>Notices</u>.  Any notice, demand, request, consent or other instrument which may be or is required to be given under this Lease shall be in writing and will be deemed to have been given when personally delivered or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by United States registered or certified mail, return receipt requested, postage prepaid, and addressed to the other party at the address set forth below or at such other place as either party may designate by written notice to the other.  Any written notice sent by mail shall be deemed to have been served as of the date of receipt or refusal to accept receipt.

| If to Landlord: | Delphi Corporation |
| --- | --- |
| | 5825 Delphi Drive |
| | M/C 480-410-172 |
| | Troy, MI 48098 |
| | Attn: Executive Director, Operations Support Group |
| with a copy to: | Delphi Corporation |
| | 5725 Delphi Drive |
| | M/C 483-400-603 |
| | Troy, MI  48098 |
| | Attn: Deputy General Counsel, Transactional & Restructuring |
| If to Tenant: | Tenneco Automotive Operating Company, Inc. |
| | c/o Tenneco, Inc. |
| | 500 North Field Drive |
| | Lake Forest, IL  60045 |
| | Attn: General Counsel |
| with a copy to: | Mayer Brown LLP |
| | 71 S. Wacker Drive |
| | Chicago, IL 60606 |
| | Attn: Jodi A. Simala |
| | and to: |
| | Mayer Brown LLP |
| | 214 N. Tryon Street, Suite 3800 |
| | Charlotte, NC 28202 |
| | Attn: Frank E. Arado |

Section 18.16.  <u>Execution of Lease</u>.  The individual(s) executing this Lease on behalf of Landlord and Tenant warrant and represent that it is each validly organized and existing and authorized to do business under the laws of the State of Ohio, that it has full power and lawful authority to enter into this Lease in the manner and form herein set forth, and that the execution of this Lease by such individual(s) is proper and sufficient to legally bind such party in accordance with the terms and conditions hereof.

Section 18.17.  <u>Further Assurances</u>.  Tenant shall, from time to time, execute and deliver to Landlord such statements, certifications, and other documents and agreements as Landlord may reasonably determine to be reasonably necessary or desirable to evidence Tenant's compliance with the terms of this Lease.

Section 18.18.  <u>Captions and Section Numbers</u>.  The table of contents, captions, Article numbers, and numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such articles.

Section 18.19.  <u>No Relocation</u>.  Landlord shall not have the right to relocate the Leased Premises at any time during the Lease Term.

Section 18.20.  <u>Counterpart Execution</u>.   This Lease may be executed in several counterparts, each of which shall be deemed an original, and all of which shall constitute but one and the same instrument.

Section 18.21.  <u>No Third Party Beneficiaries</u>.   Nothing contained in this Agreement, express or implied, is intended to or will be construed to confer upon or give to any Person (other than the Parties and their Affiliates, and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

WITNESSES:

"**Landlord**"
Delphi Automotive Systems LLC,
a Delaware limited liability company

By:_____

Print Name:_____

By:_____

Print Name:_____

By:_____

Print Name:_____

Its:_____

"**Tenant**"
TENNECO AUTOMOTIVE OPERATING COMPANY INC.,
a Delaware corporation

By:_____

Print Name:_____

By:_____

Print Name:_____

By:_____

Print Name:_____

Its:_____

35

## LANDLORD'S ACKNOWLEDGMENT

STATE OF MICHIGAN     )
                           ) ss.
COUNTY OF  OAKLAND    )

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____, the _____ of Delphi Automotive Systems LLC, a limited liability company, on behalf of said company.

_____

Print Name:_____
Notary Public, State of Michigan

_____ County

My commission expires:_____

## TENANT'S ACKNOWLEDGMENT

STATE OF _____)
                           ) ss.
COUNTY OF _____)

The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____, the _____ of Tenneco Automotive Operating Company Inc., a Delaware corporation, on behalf of said company.

_____

Print Name:_____
Notary Public, State of Michigan

_____ County

My commission expires:_____

36

## LIST OF EXHIBITS AND SCHEDULES

**EXHIBITS**

| | |
|---|---|
| **TOPIC** | |
| A............................ | Site Plan |
| B............................ | North Property Fence line Location |
| C ........................... | Landlord Access for Buildings 9 and 10 and Plant 16 |
| D ........................... | Delphi Equipment Removal |
| E............................ | Tenneco Equipment Removal |
| F............................ | Tenant Alterations |
| G ........................... | Use Restrictions |

**SCHEDULES**        **TOPIC**

| | |
|---|---|
| 6.02 ....................... | Landlord's Utility Proportionate Share |
| 7.02 ....................... | Tenant's Proportionate Share of Taxes |
| 17 .......................... | Environmental Matters |