**Hearing Date And Time: May 29, 2008 at 10:00 a.m.**
                                    **Response Date And Time: May 22, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
    In re                                :      Chapter 11
                                        :
DELPHI CORPORATION, et al.,       :      Case No. 05-44481 (RDD)
                                        :
                                        :      (Jointly Administered)
        Debtors.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        DEBTORS' MOTION PURSUANT TO 11 U.S.C. § 363 FOR AUTHORIZATION
       TO ENTER INTO LEASE FOR PROPERTY LOCATED IN WARREN, OHIO

                                ("WARREN, OHIO LEASE MOTION ")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion (the "Motion") pursuant to 11 U.S.C. § 363 for authorization to enter into a lease for property located in Warren, Ohio, and respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.  On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

2

respect to the Plan (Docket No. 11388) (the "Disclosure Statement").  The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

     4.  On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi.  The Debtors are prepared to pursue actions with respect to the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

     5.  This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

     6.  The statutory predicates for the relief requested herein are section 363 of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

     7.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately

3

$13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

    8.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

    9.  Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's

---

[1] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

10.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

11.     The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.  The Debtors' Transformation Plan

13.  On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.  Plan Confirmation And Postconfirmation Matters

14.  The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order. After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective. The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit

lenders, and the Statutory Committees.  The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement.  Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008.  The Debtors are prepared to pursue actions against the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

15.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

16.    By this Motion, the Debtors request entry of an order under section 363 of the Bankruptcy Code authorizing Delphi Automotive Systems LLC ("DAS LLC") to enter into leases for a research and development facility and an adjacent parcel located at the premises commonly known as 4551 Research Parkway in Warren, Ohio (the "Premises").  On May 8, 2008, subject to this Court's approval, DAS LLC executed lease agreements for the Premises with Orix Warren, LLC, the lessor of the Premises (the "Lessor").  The lease agreements include a building lease (the "Building Lease") and a ground lease for an adjacent parcel (the "Ground

Lease"). Copies of the Building Lease and the Ground Lease (collectively, the "Lease Agreement") are attached hereto as Exhibit A.

### Basis For Relief

17.     The Debtors have operated a research and development facility at the Premises since their separation from GM in 1999. The Premises consists of approximately 94,000 square feet, of which 70,000 square feet are used for Delphi Packard's North American Product Testing Laboratory and 24,000 square feet are used for Advanced Product and Process Development, and the adjacent parcel of 28 acres. The research and development conducted at the Premises supports the Debtors' core business lines, and the Debtors intend to continue the activities performed at the Premises following their emergence from chapter 11.

18.     At the time of the Debtors' separation from GM, the prior lease for the Premises between GM and the Lessor (the "Prior Lease") was assigned to DAS LLC, and the Debtors have operated at the Premises under the Prior Lease since that time. The Prior Lease expires on December 31, 2008, and the Debtors have accordingly undertaken negotiations with the Lessor for an extension of the term of the Prior Lease. Although the Prior Lease contained an option to extend its term for an additional five years, DAS LLC and the Lessor decided to enter into the Lease Agreement, which includes a longer term than the extension option (seven years instead of five) and lower base rental amounts. Indeed, the base rent will be reduced from $15.68 per square foot (per year) to $7.00 per square foot, with DAS LLC to continue to be

responsible for operating expenses and real property taxes. The significant terms of the Lease Agreement are as follows:[4]

(a) <u>Term</u>. The Lease Agreement would commence on January 1, 2009 and expire on December 31, 2015, provided that DAS LLC would have the right, upon 550 days' advance written notice, to exercise an early termination of the Lease Agreement as of a date that is 65 months after DAS LLC's emergence from chapter 11. Under no circumstance, however, would the term of the Lease Agreement end prior to December 31, 2013.

(b) <u>Rent</u>. The base rent under the Building Lease would be $7.00 per square foot, and DAS LLC would be responsible for all operating expenses, maintenance, and real estate taxes. These costs are estimated to be $3.32 per square foot over the term of the Lease Agreement, for an average rental cost of $10.32 per square foot, or approximately $81,000 per month.[5] The base rent for the Ground Lease would be $1.00 per year.

(c) <u>Renewal Option</u>. DAS LLC would have one five-year renewal option at Fair Market Value (as defined in the Lease Agreement), exercisable upon 550 days' notice prior to the expiration of the term of the Lease Agreement.

(d) <u>Brokerage Fees</u>. Any brokerage fees would be paid by the Lessor. DAS LLC's broker would be entitled to brokerage fees of approximately $100,000, of which approximately $25,000 would be remitted to the Debtors' real estate brokerage entity, DREAL, Inc.

(e) <u>Purchase Option</u>. The adjacent parcel Ground Lease includes a purchase option for DAS LLC's benefit (exercisable immediately), pursuant to which DAS LLC would be entitled to purchase the approximately 28 acres covered by the Ground Lease for $1.00 per acre.

---

[4] In the event of any discrepancy between the Lease Agreement and this summary of the Lease Agreement, the provisions of the Lease Agreement are controlling.

[5] Because the obligations under the Lease Agreement exceed $5 million in the aggregate, the Debtors are bringing this Motion to comply with the Court's Order Under 11 U.S.C. §§ 363, 1107, And 1108 Approving Procedures To Enter Into Or Renew Real Property Leases Without Further Court Approval (Docket No. 1777).

9

(f) <u>Prior Lease Cure Claim</u>. In connection with the Prior Lease, the Lessor filed a cure claim in accordance with the Plan on March 4, 2008 (Docket No. 12956) (the "Cure Claim"). Should the Court approve DAS LLC's entry into the Lease Agreement, the Lessor has agreed that the Cure Claim would be deemed withdrawn, with prejudice, by the order approving entry into the Lease Agreement. Should the Debtors fail to obtain the Court's approval of the Lease Agreement, the Cure Claim would continue in force subject to the parties' rights and defenses with respect thereto.

19. Based on their assessment of the market prior to deciding to enter into the Lease Agreement, the Debtors believe that the rent reserved under each of the Building Lease and the Ground Lease is at or below market rates for similarly situated property. Moreover, the Debtors have invested approximately $4 million in the infrastructure of the Premises to facilitate the research and development conducted there, rendering a relocation from the Premises more costly. Accordingly, the Debtors believe that entry into the Lease Agreement represents the best means for continuing the important work done at the Premises, which supports the Debtors' continued focus on development of cutting edge technology.

<u>Applicable Authority</u>

20. Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it. <u>See</u> <u>Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); <u>see also</u> <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 178-179 (D. Del. 1991).

21.     The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098-99.

22.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

23.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)). As set forth above, the Debtors have a sound business justification for entering into the Lease

11

Agreement. The Debtors require an extension of their occupancy of the Premises so that they can continue the research and development activities performed there, and the Debtors believe that the terms of the Lease Agreement are fair and at or below market rates for similar property.

### Notice Of Motion

24.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

### Memorandum Of Law

25.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to enter into the Lease Agreement in respect of the Premises and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
May 9, 2008

        SKADDEN, ARPS, SLATE, MEAGHER
         & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 9331)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession