**Hearing Date and Time: May 29, 2008 at 10:00 a.m.**
**Objection Deadline: May 22, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner (DB 2301)
Andrew V. Tenzer (AT 2263)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :
    In re                                    :      Chapter 11
                                                :
DELPHI CORPORATION, et al.,       :      Case No. 05-44481 (RDD)
                                                :
                          Debtors.   :      (Jointly Administered)
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER SUPPLEMENTING SECOND DIP EXTENSION ORDER (DOCKET NO.
13489) AUTHORIZING INCREASE IN FINANCING COMMITMENTS IN RESPONSE TO
<u>OVERSUBSCRIPTION OF DEBTORS' SYNDICATION OF SECOND DIP EXTENSION</u>

("SUPPLEMENTAL SECOND DIP EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion (the "Motion") For Order Supplementing Second DIP Extension Order (Docket No. 13489) Authorizing Increase In Financing Commitments In Response To Oversubscription Of Debtors' Syndication Of Second DIP Extension, and respectfully represent as follows:

### Background

A.   The Chapter 11 Filings

1.   On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.   No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.   On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of

2

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

4. On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi. The Debtors are prepared to pursue actions with respect to the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

5. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6. The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001, and 6004(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

7. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately

3

$13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

        8.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

        9.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[1] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

C.     Events Leading To The Chapter 11 Filing

          10.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

          11.     The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

          12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

5

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

13.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.    Plan Confirmation And Postconfirmation Matters

14.    The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order. After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective. The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees. The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement. Instead, the Plan Investors

6

delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008. The Debtors are prepared to pursue actions against the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

15.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.     <u>The DIP Facility</u>

16.     On January 5, 2007, pursuant to the Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt (the "DIP Order") (Docket No. 6461), this Court authorized the Debtors to enter into the current $4.5 billion postpetition financing facility (the "DIP Facility") governed by the Revolving Credit, Term Loan, and Guaranty Agreement (the "DIP Credit Agreement"). The DIP Facility refinanced both the $2.0 billion first amended DIP credit facility and the approximate $2.5 billion outstanding on the Debtors' $2.825 billion prepetition credit facility. JPMorgan

Chase Bank, N.A. ("JPMorgan" or the "Agent") is the administrative agent for the lenders under the DIP Facility (the "DIP Lenders").

        17.     The DIP Facility is secured by (a) a perfected first-priority lien on substantially all of the Debtors' otherwise unencumbered assets (subject to certain exclusions), (b) a perfected junior lien on substantially all of the Debtors' previously encumbered assets (subject to certain exclusions), (c) superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the DIP Facility, and (d) a first priority senior priming lien under section 364(d)(1) of the Bankruptcy Code on substantially all of the Debtors' property.[4] Borrowings under the DIP Facility are prepayable at the Debtors' option without premium or penalty.

        18.     On November 16, 2007, pursuant to the Order Supplementing January 5, 2007 DIP Order (Docket No. 6461) And Authorizing Debtors To (I) Extend Maturity Date Of DIP Facility, (II) Enter Into Related Documents, And (III) Pay Fees In Connection Therewith (the "DIP Extension Order") (Docket No. 10957), this Court authorized the Debtors to enter into the third amendment to the DIP Credit Agreement (the DIP Credit Agreement as so amended, the "First Amended and Restated DIP Credit Agreement") which, among other things, extended the term of the DIP Facility from December 31, 2007 to July 1, 2008.

        19.     On April 30, 2008, this Court entered the Second DIP Extension Order,[5] authorizing the Debtors to enter into an amendment and restatement of the First Amended and

---

[4] A more detailed description of the terms of the DIP Facility is contained in the expedited motion for approval of the DIP Facility dated December 18, 2006 (Docket No. 6180) (the "DIP Motion"), the DIP Order, and the form of DIP Credit Agreement attached thereto.

[5] Order (I) Supplementing January 5, 2007 DIP Order (Docket No. 6461) And Authorizing Debtors To (A) Extend Maturity Date Of DIP Facility, (B) Enter Into Related Documents, And (C) Pay Fees In Connection Therewith And (II) Authorizing Debtors To Enter Into Arrangement With General Motors Corporation Or An Affiliate (Docket No. 13489).

Restated DIP Credit Agreement (the "Second Amended and Restated DIP Credit Agreement").[6] Among other things, the Second Amended and Restated Credit Agreement extended the maturity of the DIP Facility to December 31, 2008 and reconfigured the size of the first priority revolving loan ("Tranche A") and the first priority term loan ("Tranche B"). At the time of the April 30, 2008 hearing, the Debtors anticipated that the Tranche A of the DIP Facility would consist of a first priority revolving credit facility of up to $1 billion and a first priority term loan of up to $600 million and that the principal amount of the second priority term loan ("Tranche C") of approximately $2.5 billion would remain unchanged.

20. As the syndication effort proceeded, investor interest in participating in the Debtors' DIP Facility proved to be significantly stronger than previously expected. Indeed, interest in the Debtors' DIP Facility was so high that it resulted in an oversubscription for the Tranche A, Tranche B, and Tranche C amounts that the Debtors anticipated borrowing. As a result, the Debtors and the DIP Lenders were able to make use of the opportunity afforded by the market support to make several improvements to the structure of the Second DIP Extension.

21. First, the Debtors increased the amount of availability under the Tranche A revolving credit facility to $1.1 billion and decreased the amount of the Tranche B term loan to $500 million. The Debtors anticipate that the shift between the Tranche A and Tranche B borrowings will save several hundred thousand dollars in interest expense per month. The Debtors believe that the amendments to Tranche A and Tranche B are substantially consistent with the terms of the form of Second Amended and Restated DIP Credit Agreement attached to the Second Dip Extension Order.

---

[6] Prior to the hearing on the Second Amended and Restated Credit Agreement, the Debtors launched the second DIP extension at a telephonic lenders meeting on April 24, 2008.

22. In addition, as a result of greater market interest, the Debtors were able to increase the principal amount of the Tranche C Loan by approximately $254 million.

23. The Second Amended and Restated Credit Agreement, including the revisions to Tranche A and Tranche B as well as the existing Tranche C, became effective on May 9, 2008. The increase in the principal amount of the Tranche C Term Loan of approximately $254 million remains subject to this Court's approval and therefore has not yet become effective.

## Relief Requested

24. By this Motion, the Debtors seek entry of an order authorizing the Debtors to (a) increase the size of the Tranche C term loan by approximately $254 million, (b) complete any necessary related documentation and transactions, and (c) pay fees in connection therewith.

## Basis For Relief

25. Upsizing the Tranche C term loan will supply additional liquidity for the Debtors without negatively affecting the pricing terms or other benefits of the financing for which the Debtors sought approval from this Court in April 2008. Although the upsizing will result in incrementally higher interest expense (related solely to the contemplated additional principal amount under the Tranche C term loan), the Debtors believe that during this period of unprecedented financial market volatility and uncertainty in the economy and the automotive industry, the additional liquidity resulting from the relief requested herein is of substantial value to the Debtors.

26. As of the date hereof, the Debtors have borrowed $2.496 billion under the Tranche C term loan. Pending this Court's approval of the Motion, the Debtors anticipate borrowing an additional amount equal to approximately $254 million under the Tranche C term loan on June 9, 2008.

27.     The Debtors will be obligated to pay certain fees with respect to the increase of the Tranche C loan.  Specifically, the Debtors will be required to pay the lenders an upfront fee of 2% of the additional $254 million.  In addition, the $254 million will also accrue a "ticking fee" equal to 262.5 basis points from the May 9, 2008 effective date of the DIP Facility through the funding date, on a daily basis.

## Applicable Authority

G.   This Court Should Authorize The Proposed Increase Of Tranche C

    (a)   The Proposed Upsize Is Appropriate Under
           Section 364(c) Of The Bankruptcy Code

28.     The Debtors propose to increase the amount borrowed under the second priority Tranche C term loan in accordance with the terms set forth in the previously approved Second Amended and Restated Credit Agreement.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  This Court has already made this finding in the DIP Order, which approved the Debtors' DIP Facility.  Because the DIP Facility will remain in place, subject to certain terms under the Second Amended and Restated DIP Credit Agreement, the Debtors should be permitted to secure the additional $254 million of borrowing with the liens described in the Second DIP Extension Motion and approved by this Court pursuant to the Second DIP Extension Order in accordance with section 364(c) of the Bankruptcy Code.

    (b)   The Financing Facility Is Appropriate Under
           Section 364(d) Of The Bankruptcy Code

29.     Section 364(d)(1) provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

11

  (a) the trustee is unable to obtain credit otherwise; and

  (b) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'"  Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  In this case, the Debtors have already established that they are unable to get credit without priming liens.  If Tranche C is increased, the priming lien structure under the DIP Facility, as amended, including the adequate protection provided to parties whose liens are primed, will continue essentially unchanged from the Second Amended and Restated DIP Credit Agreement.

  (c) <u>Compliance With General Order No. M-274</u>

  30. The Debtors believe that the relief requested in this Motion and the notice to be provided comply with the Guidelines for Financing Requests (the "Guidelines"), adopted under General Order No. M-274 of the Board of Judges for the Southern District of New York.  The Debtors do not believe that increasing the size of the amount borrowed under Tranche C by approximately $245 million would trigger the application of the Extraordinary Provision (as defined in the Guidelines) requirements beyond that which was already satisfied in the DIP Motion and approved by this Court pursuant to the DIP Order.  Accordingly, the Debtors submit that they have satisfied the Guidelines.

  (d) <u>Application Of The Business Judgment Standard</u>

  31. Based on the foregoing, the Debtors submit that entry of an order approving the upsized Tranche C is appropriate.  The terms for the increased Tranche C

borrowings were negotiated at arms'-length and in good faith. The Debtors believe that increasing the Tranche C borrowings in the amount proposed will provide them with additional strategic and operational flexibility and will further improve their overall financial position. In light of the dramatic events that have transpired in the capital markets in recent months, the Debtors believe that achieving these objectives serves the best interests of all of their stakeholders.

32. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985). In considering whether a debtor has exercised its business judgment properly, a court is not free to second-guess particular provisions but rather determines whether the proposed action "as a whole is within reasonable business judgment." In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

33. The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming an "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993). Once the debtor articulates a valid business justification, a presumption arises that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y.

1992) (citation omitted). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." <u>Id.</u> To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." <u>Comm. Of Equity Holders v. Lionel Corp.</u> (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

34. The Debtors have exercised sound business judgment in determining that increasing the amount of the Tranche C borrowings by approximately $254 million is appropriate. The proposed terms of the Tranche C borrowings are fair, reasonable, and necessary and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to increase the amounts borrowed under Tranche C by approximately $254 million and take the other actions contemplated by the Second Amended and Restated DIP Credit Agreement and as requested herein.

H.   The Amended DIP Financing Facility Should
     Be Accorded The Benefits Of Section 364(e)

35. No consideration is being provided to any party to, or guarantor of, obligations arising under the amended DIP Facility, other than as disclosed in the Second Amended and Restated DIP Credit Agreement. Accordingly, the amended DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

I.   Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

36. Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that this Court waive this ten-day stay in connection with the relief sought herein. This Court previously granted similar relief

from Bankruptcy Rule 6004(g) in approving the DIP Order, the DIP Extension Order, and the Second DIP Extension Order, and other courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(g)).  By waiving the ten-day stay period, the Debtors will be able to consummate the upsizing of the Tranche C borrowings by approximately $254 million promptly, thereby allowing the Debtors to cease paying a ticking fee for amounts that are not borrowed and thus save funds for the benefit of their estates.

### Notice Of Motion

37.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental Case Management Order"), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487), as well as Bankruptcy Rule 4001.  In addition, the Debtors have served, among other parties, the setoff claimants and objectors to the Debtors' motion to enter into its original $2 billion postpetition credit facility and the DIP Motion and the DIP Extension Motion.  The Debtors have also provided notice to counsel to the agent for the Debtors' former

15

prepetition credit facility. In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

38. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to (i) increase the Tranche C term loan, (ii) complete any necessary related documentation and transactions, and (iii) pay fees in connection therewith and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
May 9, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By: /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

- and -

SHEARMAN & STERLING LLP

By: /s/ Douglas P. Bartner
Douglas P. Bartner (DB 2301)
Andrew V. Tenzer (AT 2263)
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession