**Hearing Date And Time: May 29, 2008 at 10:00 a.m.**
**Objection Deadline: May 22, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | x | |
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | x | |

MOTION FOR ORDER UNDER 11 U.S.C. §§ 361 AND 363, FED. R. BANKR. P. 9019, AND CASH MANAGEMENT ORDER AUTHORIZING DASHI TO GRANT ADEQUATE PROTECTION TO PENSION BENEFIT GUARANTY CORPORATION IN CONNECTION WITH CERTAIN INTERCOMPANY TRANSFERS OF REPATRIATED FUNDS

("PBGC ADEQUATE PROTECTION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), including Delphi Automotive Systems (Holding), Inc. ("DASHI"), hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, and the Cash Management Order (as defined below), authorizing DASHI to grant adequate protection to the Pension Benefit Guaranty Corporation (the "PBGC") in connection with certain anticipated intercompany transfers of repatriated funds, and respectfully represent as follows:

## Background

### A. The Chapter 11 Filings

1. On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2. No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3. On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).

Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

4. On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi. The Debtors are prepared to pursue actions with respect to the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

5. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6. The statutory predicates for the relief requested herein are sections 361 and 363 of the Bankruptcy Code and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. Current Business Operations Of The Debtors

7. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

8. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

9. Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-

---

1 The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

2 On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C. Events Leading To The Chapter 11 Filing

10. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

11. The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. The Debtors' Transformation Plan

13. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E. Plan Confirmation And Postconfirmation Matters

14. The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement ("GSA") and the Master Restructuring Agreement ("MRA") provide for a comprehensive settlement with GM, and both agreements were approved by this

Court in the Confirmation Order. After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective. The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees. The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement. Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008. The Debtors are prepared to pursue actions against the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

15. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F. Background To Intercompany Transfer And Proposed Adequate Protection

16. Because the Debtors did not emerge from chapter 11 as anticipated on April 4th, the Debtors commenced negotiations to extend the maturity date of their current debtor-in-possession financing facility (the "DIP Financing Facility"). On April 30, 2008, this Court entered an order (Docket No. 13489) approving, among other things, the extension of the maturity date of the DIP Financing Facility to December 31, 2008 (the "DIP Extension"). When

negotiating the DIP Extension, and in connection with the Debtors' overall business planning, the Debtors contemplated the repatriation of cash from certain of their global affiliates. The DIP Extension, together with cash anticipated from repatriated funds, will enable the Debtors to continue on their path toward emergence from chapter 11. This liquidity is necessary in the United States because to achieve the Debtors' transformation objectives, the Debtors have been, and for the duration of these chapter 11 cases are expected to continue to be, "consumers" of cash in the aggregate. At the same time, the Debtors' non-Debtor global affiliates (the "Global Affiliates") have been and are expected to continue to be "accumulators" of cash in the aggregate. Accordingly, Delphi's five-year consolidated business plan filed as Appendix C to the Disclosure Statement contemplates that the Debtors' non-U.S. affiliates will continue to repatriate funds to the Debtors.[4]

17. The Debtors expect to repatriate funds in a manner consistent with the repatriation recognized by this Court in the Fall of 2007 in the 2007 DASHI Intercompany Transfer Order (as defined below). Specifically, Delphi manages the Company's global cash and liquidity position on a daily basis in the ordinary course of business. Delphi Automotive Systems LLC ("DAS LLC"), a wholly owned subsidiary of Delphi and a Debtor in these chapter 11 cases, is the holder of the treasury account that acts as the "hub" for the Company's integrated cash management system. Over the course of this calendar year, DASHI will accumulate cash balances on account of repatriated funds from the Global Affiliates. The anticipated repatriation of cash to DASHI is governed by the laws of the respective jurisdictions of each of the Global

---

[4] In September 2005, Delphi loaned approximately $400 million to certain non-Debtor global affiliates, which loans were evidenced by various loan agreements and promissory notes. During these chapter 11 cases, the loan obligors have been repaying the principal and interest in the ordinary course of business and these repayments are expected to continue. For the avoidance of doubt, the repayment of these prepetition loans is not the subject of this Motion.

Affiliates. DASHI will then transfer that cash to DAS LLC in accordance with the Order Under 11 U.S.C. §§ 363 And 553 Authorizing (I) Continued Maintenance Of Existing Bank Accounts, (II) Continued Use Of Existing Cash Management System, (III) Continued Use of Business Forms, (IV) Preservation And Exercise Of Intercompany Setoff Rights, And (V) Grant Of Administrative Status For Postpetition Intercompany Transactions (Docket No. 882) (the "Cash Management Order"). The cash will be used to reduce the borrowing under the DIP Financing Facility.[5]

18. As set forth in the Debtors' first day cash management motion (Docket No. 24), the Debtors routinely enter into intercompany financial transactions, such as the intercompany transfers contemplated by this Motion, in the ordinary course of their business. The Cash Management Order specifically provides that the Debtors are authorized to continue to engage in such intercompany transactions. (See Cash Management Order ¶ 10.) As this Court is aware, the Cash Management Order requires that such intercompany transfers take the form of a loan or extension of intercompany credit, with the "Beneficiary Debtor" providing the lending Debtor a lien securing the amount of the transfer and an administrative claim. (See Cash Management Order ¶¶ 12-14.) This is precisely the manner in which DASHI intends to effectuate the intercompany transfers of repatriated funds to DAS LLC, and therefore, the intercompany transfers of funds are authorized under the Cash Management Order.[6]

---

[5] Certain of these transactions may create global tax efficiencies. Any taxable income recognized by the Debtors for United States federal income tax purposes as a result of the transactions is expected to be fully offset by Delphi's tax losses. If such transactions were to occur after the Debtors' emergence from chapter 11, the Debtors' tax losses might not be available to fully offset the amount of taxable income resulting from the transactions. This is because Delphi might undergo an "ownership change," as defined in the Internal Revenue Code of 1986, upon emergence from chapter 11, and, as such, the availability of its tax losses following emergence could be limited. (See Disclosure Statement, Article XII.)

[6] In October 2007, out of an abundance of caution, the Debtors sought this Court's confirmation that the 2007 intercompany transfers were authorized by the Cash Management Order. The order entered by this Court on

19. Although the Debtors are authorized to undertake the intercompany transfers, the Debtors realize that the PBGC asserts an interest in the funds that are expected to be transferred. The Debtors dispute that the PBGC has an interest in those funds, but to avoid litigation, the Debtors seek an order granting adequate protection to the PBGC on a consensual basis in connection with the anticipated intercompany transfers of repatriated funds. Except as to the amount, the adequate protection that the Debtors propose to provide the PBGC is identical to the adequate protection that the Debtors agreed to provide the PBGC in connection with the 2007 DASHI Intercompany Transfer Order. To illustrate the point, attached hereto as Exhibit A is an excerpt of the proposed order granting the relief requested in this Motion marked to show changes in the adequate protection provisions of the 2007 DASHI Intercompany Transfer Order. The relief sought in this Motion does not alter the relief granted in the 2007 DASHI Intercompany Transfer Order and is made in respect of unrelated intercompany transfers as described herein.

Relief Requested

20. By this Motion, the Debtors seek entry of an order under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, and the Cash Management Order, authorizing DASHI to grant adequate protection to the PBGC in connection with certain anticipated intercompany transfers of repatriated funds in an amount not to exceed $750 million.

October 25, 2007 (Docket No. 10725) (the "2007 DASHI Intercompany Transfer Order") confirmed the Debtors' authority under the Cash Management Order to complete the intercompany transactions contemplated. (See 2007 DASHI Intercompany Transfer Order ¶ 2) ("This order confirms DASHI's authority to complete the Intercompany Transaction in accordance with the [Cash Management Order]."). Because the Court already issued an order confirming the authority granted under the Cash Management Order, no additional confirmation or authority is believed necessary at this time.

Basis For Relief

21. The PBGC has indicated that it will contend – as it did with respect to the 2007 intercompany transfers – that the cash to be transferred to DAS LLC is subject to the PBGC's purported liens on assets owned by certain of the Global Affiliates, and therefore, the allegedly encumbered cash would constitute the PBGC's cash collateral.[7] The Debtors dispute the PBGC's position with respect to its asserted security interest in the assets of the Global Affiliates and any claim that any such purported lien, to the extent even valid, would survive following the non-Debtor's transfer of any allegedly encumbered assets. Nonetheless, the Debtors understand that the issue presented is an important policy matter for the PBGC that the agency might choose to litigate. In light of the significant legal issues that are implicated with respect to the PBGC's asserted security interests, the parties took a practical approach and resolved their differences consensually.

22. In this regard, the Debtors and the PBGC have agreed that each time repatriated cash is transferred by DASHI to DAS LLC (up to $750 million in repatriated funds), DASHI will grant the PBGC adequate protection in the form of conditional junior replacement liens (the "Adequate Protection Liens") in DASHI's assets that are already encumbered by the liens of the Debtors' DIP Financing Facility lenders. Such PBGC liens will be valid only to the

[7] Specifically, certain pension plan contributions remain unpaid because the Debtors assert that under the Bankruptcy Code Delphi is not required to make payments for amounts attributable to prepetition services while operating in chapter 11. The PBGC contends that when Delphi did not make the prepetition portion of its pension plan contributions, liens arose against the assets of those Global Affiliates that are members of Delphi's "controlled group," as defined under section 414 of the Internal Revenue Code ("IRC"). The PBGC contends that members of Delphi's controlled group, wherever located, are jointly and severally liable for Delphi's contribution obligations, see 29 U.S.C. § 1082(b)(2); 26 U.S.C. § 412(b)(2). The PBGC further contends that it has perfected the foregoing liens on assets outside of the United States by filing notices in the District of Columbia Office of the Recorder of Deeds. See 26 U.S.C. § 6323(f)(2). As a consequence, the PBGC contends that the cash to be transferred to DASHI would remain subject to liens totaling up to the amount of the underfunding and the encumbered cash would constitute PBGC's cash collateral. The foregoing is only the Debtors' characterization of the PBGC's position. The PBGC's arguments in support of its position, however, may differ. This description is not intended to represent the PBGC's expression of its views on this matter.

extent that the PBGC has valid and perfected liens in the cash abroad before the repatriation of such funds.[8] The grant of the Adequate Protection Liens in exchange for the PBGC's consent with respect to the proposed intercompany transfer avoids potential litigation regarding the validity of the PBGC's purported liens with respect to the proposed transfers, while simultaneously accomplishing the Debtors' liquidity objectives.

23. Moreover, the proposed order granting this Motion makes clear that, if necessary, each party in interest in these cases retains and reserves the right to challenge the PBGC's purported liens on any grounds. Conversely, all of the PBGC's claims, defenses, and arguments with respect to any such challenges are expressly reserved and preserved. Accordingly, the Debtors believe that an order authorizing DASHI to grant adequate protection to the PBGC in connection with certain anticipated intercompany transfers of repatriated funds is in the best interests of the Debtors and their estates.

Applicable Authority

24. Adequate Protection. To avoid unnecessary litigation over the parties' positions with respect to the PBGC's purported liens, the Debtors are prosecuting this Motion for authority to grant adequate protection to the PBGC in a form that preserves the parties' rights. Section 363(c)(2) of the Bankruptcy Code provides that a debtor-in-possession may use cash collateral only with (i) the consent of the creditor with an interest in the collateral or (ii) court authorization, granted after notice and a hearing. 11 U.S.C. § 363(c)(2). A court must grant adequate protection of the creditor's interest in the cash collateral if the creditor so requests. 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code describes three nonexclusive means by

[8] The 2007 DASHI Intercompany Transfer Order authorized the Debtors to grant similar adequate protection to the PBGC. (See 2007 DASHI Intercompany Transfer Order, at 4-5.) A redline showing the similarity of the provisions is attached hereto as Exhibit A.

which adequate protection may be provided: (i) periodic payments, (ii) additional or replacement liens, and (iii) such other relief as will result in the realization of the "indubitable equivalent" of the creditor's interest. See 11 U.S.C. § 361; see also In re WestPoint Stevens, Inc., 333 B.R. 30, 48 (S.D.N.Y. 2005) (adequate protection may be supplied by means replacement liens "and/or 'such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property'").

25. The Adequate Protection Liens are conditional replacement liens, as set forth above, and thus are explicitly authorized under section 361 of the Bankruptcy Code. See LNC Invs., Inc. v. Nat'l Westminster Bank, N.J., 308 F.3d 169, 172 n.3 (2d Cir. 2002) (under section 361, adequate protection may be provided by "an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property"). Importantly, the PBGC has consented to the Adequate Protection Liens in satisfaction of section 363(c)(2)(A) of the Bankruptcy Code. Accordingly, the grant of the Adequate Protection Liens to the PBGC would comply with sections 361 and 363(c)(2) of the Bankruptcy Code, if applicable. In addition, the grant of Adequate Protection Liens, as well as the Debtors' use of the proceeds of the proposed intercompany transfers, would comply with the Debtors' DIP Financing Facility. The Company therefore believes that an order authorizing DASHI to grant adequate protection to the PBGC in connection with the anticipated intercompany transfers of repatriated funds is in the best interests of the Debtors and their estates.

26. Business Judgment. This Court should grant the relief requested because the basis for relief articulated by the Debtors meets the requirements of section 363(b)(1) of the Bankruptcy Code, which requires that "there must be some articulated business justification for

using, selling, or leasing the property outside the ordinary course of business." Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) (citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983)); accord Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); Fulton State Bank v. Schipper (In re Schipper), 109 B.R. 832, 836 (Bankr. N.D. Ill. 1988), aff'd, 112 B.R. 917 (N.D. Ill. 1990), aff'd, 933 F.2d 513 (7th Cir. 1991); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1988).

27. The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Id.

28. As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (quoting In re Logical Software, Inc., 66 B.R. 683, 686 (Bankr. D. Mass. 1986)). For the reasons set forth in this Motion, the Debtors have demonstrated sound business reasons to justify the grant of the Adequate Protection Liens to the PBGC.

29. Approval Under Bankruptcy Rule 9019. As stated above, although the Debtors dispute the PBGC's assertion that it has an interest in the funds to be repatriated, settling

with the PBGC by granting conditional junior replacement liens on the terms set forth in the proposed order is a pragmatic solution to an uncertain legal issue.

30. Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Settlements and compromises are "a normal part of the process of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

31. Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate. See, e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Commc'ns, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained. Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Cent. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979)); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983).

32. The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation,

(b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

33. Courts in this district have further elaborated on these factors to consider: (a) the balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the proportion of the class members who do not object or who affirmatively support the proposed settlement, (d) the competency and experience of counsel who support the settlement, (e) the relative benefits to be received by individuals or groups within the class, (f) the nature and breadth of releases to be obtained by the directors and officers as a result of the settlement, and (g) the extent to which the settlement is truly the product of arm's-length bargaining, and not of fraud or collusion. Adelphia Commc'ns, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

34. The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances. See Adelphia Commc'ns, 327 B.R. at 159-60; Penn Cent., 596 F.2d at 1114. Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'" In re Telesphere Commc'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994). To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the

issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'" Adelphia Commc'ns, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994).

35. The grant of adequate protection to the PBGC should be authorized under Bankruptcy Rule 9019(a) because the settlement terms contained herein are fair and equitable, fall well within the range of reasonableness, and are in the best interests of the Debtors and their estates. The Debtors negotiated with the PBGC at arm's length and in good faith. In addition, the settlement embodied in the proposed order with respect to the Adequate Protection Liens serves the best interests of the Debtors' estates and will maximize value for all stakeholders as described above.

Notice

36. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

37. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing, but not directing, DASHI to grant adequate protection to the PBGC in connection with certain anticipated intercompany transfers of repatriated funds in an amount not to exceed $750 million and (ii) granting the Debtors such other further relief as is just.

Dated: New York, New York
May 9, 2008

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By: /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession