SUSMAN GODFREY LLP

654 Madison Avenue, 5th Floor
New York, New York 10065
Telephone:  (212) 336-8330
Facsimile:  (212) 336-8340
Jacob W. Buchdahl (JB-1902)

1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
Kenneth S. Marks

Attorneys for Delphi Corporation,
 DEBTOR AND DEBTOR-IN-POSSESSION


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
In re:                                                           :
                                                                 :   Chapter 11
DELPHI CORPORATION,                                              :   Case No. 05-44481 (RDD)
                                                                 :   (Jointly Administered)
                                   Debtor.                        :
                                                                 :
                                                                 :
-----------------------------------------------------------------x
DELPHI CORPORATION,                                             :
                                                                 :
                                   Plaintiff,                     :
                                                                 :   Adversary Proceeding
              - against -                                         :   Case No ____-_____
                                                                 :
                                                                 :
UBS SECURITIES LLC,                                            :
                                                                 :
                                   Defendant.                     :
-----------------------------------------------------------------x
```

**COMPLAINT**

Plaintiff Delphi Corporation ("Delphi"), by its undersigned attorneys, for
its Complaint against UBS Securities LLC ("UBS"), alleges upon knowledge as to its
own actions and otherwise upon information and belief, as follows:

**PRELIMINARY STATEMENT**

1.        In this lawsuit, Delphi seeks a decree of specific performance
compelling UBS to provide equity financing to Delphi as it committed to do pursuant to
agreements that are essential building blocks of the confirmed First Amended Joint Plan
of Reorganization (the "Plan") in these jointly-administered Chapter 11 proceedings for
Delphi and forty-one of its subsidiaries (collectively, the "Debtors").  UBS, together with
A-D Acquisition Holdings, LLC ("ADAH"), Harbinger Del-Auto Investment Company,
Ltd. ("Harbinger Del-Auto"), Pardus DPH Holding LLC ("Pardus DPH Holding"),
Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and Goldman Sachs &
Co. ("Goldman") (collectively, the "Other Investors"), committed to fund up to $2.55
billion as necessary for the consummation of the Plan.

2.        If a final judgment of specific performance is not awarded, Delphi
seeks, in the alternative, to recover damages in an amount to be determined at trial for the
wrongful termination of the parties' agreements and other contractual breaches.  Under
the agreements executed by UBS, UBS is jointly and severally liable with the Other
Investors for its wrongful termination and other breaches.

3.        UBS's failure to honor its contractual commitments – at the
eleventh hour, when all parties other than UBS and the Other Investors were ready,
willing and able to close on all financing and other agreements embodied in the Plan –

has derailed Delphi's progress toward emergence from Chapter 11 in April 2008, and has

prevented the consummation of the Plan.  Plaintiff alleges and believes that a judgment of

this Court requiring UBS to comply with its obligations is warranted as a matter of law

and equity, and necessary for the consummation of the confirmed Plan.

    4.  On April 4, 2008, the Debtors were set to emerge from Chapter 11

pursuant to the Plan and the agreements embodied therein, all of which are the product of

years of negotiation, accommodation, conflict, litigation and ultimately resolution among

Delphi, the Debtors' Statutory Committees, the Debtors' principal labor unions, General

Motors, certain claimants in multidistrict ERISA and securities litigation, the Internal

Revenue Service, the Pension Benefit Guaranty Corporation, UBS, and the Other

Investors.

    5.  One crucial piece of the intricate and complex arrangements

necessary for the consummation of the Plan is the Equity Purchase and Commitment

Agreement dated as of August 3, 2007 as amended on December 10, 2007 (the

"Investment Agreement" and sometimes referred to as the "EPCA"), pursuant to which

UBS and the Other Investors (together, the "Equity Investors") commit to invest up to

$2.55 billion of equity financing in the reorganized Delphi.  (UBS's commitment is

$166,866,749.19; the commitments of the Other Investors, which are sued separately,

amount to approximately $2.383 billion.[1])  The Investment Agreement was developed

---

[1] The commitments of ADAH, Harbinger Del-Auto and Pardus DPH Holding are backed by
Commitment Letter Agreements executed on December 10, 2007 by their respective parents, Appaloosa
Management L.P., Harbinger Capital Partners Master Fund I, Ltd., and Pardus Special Opportunities
Master Fund L.P. (the "Commitment Parties").  The Commitment Parties are also named as defendants in a
separate action brought by Delphi.

through a process that involved intense and protracted negotiations among the various parties in these Chapter 11 cases as well as numerous conferences and hearings with the Court over a period of eighteen months.

6.    The stakes at the closing scheduled for April 4, 2008, could not have been higher for the Debtors, their employees, creditors, and other stakeholders. The equity financing promised by the Equity Investors was and is essential to the consummation of the Plan. In light of the complexity and inter-relatedness of all the agreements with lenders, unions, General Motors, government agencies, etc., as well as market conditions, and after having devoted more than a year to reaching agreement with the Equity Investors on all the terms and conditions of their equity investment, there is no possible alternative source of equity financing that could save the Plan. Indeed, because of the vital importance of the equity financing committed by the Equity Investors, the agreements in question do not contain any "outs" for the Equity Investors based on market conditions or like contingencies. Rather, UBS and the Other Investors are required to honor their commitments, just as Delphi has honored its commitments.

7.    Unfortunately, just hours before the scheduled closing, instead of funding and honoring its obligations, ADAH sent Delphi a written notice purporting to terminate the Investment Agreement. ADAH asserted in its notice that Delphi had breached the Investment Agreement, entered into agreements for an "Alternate Transaction" and effectuated a "Change of Recommendation" (as those terms are defined in the Investment Agreement). ADAH claimed that Delphi was obligated to pay an Alternative Transaction Fee of $82,500,000. In fact, ADAH's assertions were false.

3

Delphi had not breached the Investment Agreement, had not entered into agreements for

an "Alternate Transaction" and had not effectuated a "Change in Recommendation."

       8.     Delphi believes that UBS and the Other Investors backed out of the

transaction simply because they decided they did not like the economics of the deal they

had agreed to, and that they never intended to close if the deal was under water.  By its

refusal to close on April 4, 2008, UBS breached its binding commitment upon which the

consummation of the Plan depended.

       9.     Delphi brings this action to enforce UBS's commitment – in other

words, to require UBS to honor its obligation in accordance with the terms of the parties'

written agreements.  In particular, Delphi seeks a decree of specific performance as

against UBS because that equitable remedy is necessary and proper in all of the

circumstances of this case, and any legal remedy would be inadequate; in addition,

Delphi seeks compensation for damages caused by UBS that have been and will be

suffered even if specific performance is awarded.  In the alternative, Delphi seeks redress

for the substantial damages UBS has inflicted on the Debtors, their employees, creditors,

and other stakeholders.

## JURISDICTION AND VENUE

      10.    This Court has subject matter jurisdiction over this adversary

proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28

U.S.C. §§ 1408 and 1409.  This proceeding is a core proceeding under 28 U.S.C.

§ 157(b) arising in a case under title 11 of the United States Code, 11 U.S.C. §§ 101-

1532.

11.     In the Investment Agreement, UBS "irrevocably submit[s] to the jurisdiction of, and venue in, the United States Bankruptcy Court for the Southern District of New York and waive[s] any objection based on <u>forum non conveniens</u>." Investment Agreement ¶ 16.

12.     In the Plan, which was confirmed by Order of this Court dated January 25, 2008, this Court retained jurisdiction, pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, over all matters arising out of, and related to, Debtors' Chapter 11 cases and the Plan, including for purposes of adjudicating all adversary proceedings commenced pursuant to the Plan, issuing any orders in aid of execution, implementation, or consummation of the Plan, enforcing all orders previously entered by the Bankruptcy Court, and hearing and determining all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement.

## <u>THE PARTIES</u>

13.     Plaintiff Delphi is a leading global supplier of mobile electronics and transportation systems.  Headquartered in Troy, Michigan, Delphi and its subsidiaries have approximately 163,500 employees and operate 152 wholly-owned manufacturing sites in 34 countries.  Delphi supplies products to nearly every major global automotive original equipment manufacturer ("OEM"), including General Motors, Ford Motor Company, Chrysler LLC, Volkswagen Group, Hyundai, and Renault/Nissan Motor Company.

14.     Defendant UBS is a Delaware limited liability company with its principal place of business in New York, New York.

5

## FACTUAL ALLEGATIONS

***Delphi's Early Years and Bankruptcy Filing***

15.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors, and separated from GM in or about January 1999.  Delphi has evolved from a North America-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although General Motors remains Delphi's single largest customer, Delphi generates more than half of its revenue from non-GM sources.

16.     In the first two years following Delphi's separation from General Motors, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In 2004, the last full year prior to the filing of these Chapter 11 cases, Delphi reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.

17.     Delphi believes that its financial performance deteriorated because of (a) unsustainable U.S. legacy liabilities and operational restrictions that have prevented the Company from exiting non-profitable, non-core operations, all of which have contributed to relatively high and largely fixed labor costs; (b) a competitive vehicle production environment for domestic OEMs resulting in a reduction of GM's annual U.S. production and related pricing pressures; and (c) increasing commodity prices.

18.     In order to address these issues, on October 8, 2005 (the "Petition Date"), Delphi and 38 of its U.S. subsidiaries filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for reorganization relief under Chapter 11 of the United States Bankruptcy Code.  On

October 14, 2005, three additional U.S. Delphi affiliates filed voluntary petitions. As of the Petition Date, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Since the Petition Date, Delphi and its U.S. subsidiaries have operated its business subject to the restrictions imposed by the Bankruptcy Code. Until UBS and the other Investors refused to fund their commitments on April 4, 2008, Delphi expected that the consummation of the Plan and the emergence from Chapter 11 on that date would hasten Delphi's return to economic viability and health.

***The Plan of Reorganization***

19.    Almost two years before the Plan was confirmed, Delphi outlined the key tenets of a transformation plan that Delphi believed would enable a return to stable, profitable business operations. The Transformation Plan covered five (5) key areas and set goals within those areas:

Labor.  Modify Debtors' labor agreements to create a competitive arena in which to conduct business.

General Motors.  Conclude negotiations with General Motors to finalize General Motors' financial support for certain of the Debtors' legacy and labor costs and to ascertain General Motors' business commitment to the Company.

Product Portfolio and Manufacturing Footprint.  Streamline Debtors' product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus.

Cost Structure.  Transform Delphi's salaried workforce and reduce general

and administrative expenses to ensure that Delphi's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.

Pension.  Devise a workable solution to Delphi's pension funding

situation.

20.    The effort and cooperation required of multiple disparate parties to

make progress toward those goals has been tremendous, and essential to the formulation

of a plan of reorganization.  During the course of these Chapter 11 cases, there has been

significant progress by Debtors toward achieving the objectives of their Transformation

Plan.  First, Delphi negotiated amended collective bargaining agreements with its labor

unions that will enable Debtors to be more competitive in their U.S. operations.  Second,

Delphi entered into comprehensive settlement and restructuring agreements with General

Motors – specifically, on September 6, 2007, a Global Settlement Agreement and a

Master Restructuring Agreement, both of which were later approved by the Bankruptcy

Court as part of the plan confirmation process.  These agreements were intended to

resolve all major pre-petition disputes between Delphi and General Motors, and were

filed as Exhibits 7.20(a) and 7.20(b) to the Plan, respectively.  Third, with respect to its

product portfolio and manufacturing facility realignment, Debtors made substantial

progress in identifying and beginning to divest or wind down those facilities and business

lines that are not within Delphi's future plans.  Fourth, Delphi is implementing important

cost savings in its organizational cost structure and rationalization of its salaried

workforce to competitive levels that will allow it to emerge from Chapter 11 much leaner

and in a better competitive position.  Fifth, Delphi received favorable pension funding

waivers from the IRS which, combined with the transaction under the Internal Revenue Code of 1986 (the "IRC"), Section 414(l) and Section 208 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"), and adequate debt financing and equity infusions, will allow Delphi to fund its pension plans after emergence from Chapter 11.

21.    In the early stages of these Chapter 11 cases, Appaloosa Management L.P. ("Appaloosa") pushed, with the grace and diplomacy of a battering ram, to play a central role in the reorganization of the Debtors.

22.    In the course of these Chapter 11 proceedings, Appaloosa acquired substantial Delphi equity and debt in several places in Delphi's capital structure, and Appaloosa actively campaigned and litigated for the appointment of an Equity Committee, on the basis of its contention that Delphi's equity had significant value.

23.    Although Appaloosa did not obtain a place for itself on the Equity Committee, Appaloosa ultimately succeeded in its quest for a prominent role in Delphi's restructuring.  During 2006, Delphi, and also the Statutory Committees and General Motors, interviewed potential plan investors.  The competition was intense, but Appaloosa, together with Cerberus Capital Management L.P. ("Cerberus"), was the winner.  The first version of the Investment Agreement was signed in December 2006; by mid-2007, however, Cerberus was engaged in the acquisition of what is now Chrysler LLC and the completion of its acquisition of 50% of General Motors Acceptance Corporation and decided not to invest in Delphi.

24.    In August 2007, a second version of the Investment Agreement (sometimes referred to as the July EPCA) was executed, with Appaloosa as the sole lead plan investor.

25.    The Investment Agreement, which rests on the commitments of some of the world's largest and best-known financial institutions, is a crucial and irreplaceable component of the agreements and arrangements embodied in the Plan and is necessary for the successful consummation of the Plan.  The Bankruptcy Court approved Delphi's entry into the final form of Investment Agreement, as amended, in a ruling from the bench on December 7, 2007 and a written order dated December 10, 2007.

26.    The Plan confirmed by the Bankruptcy Court on January 25, 2008 was the culmination of all the settlements that Debtors reached with General Motors, with Debtors' labor unions and with other critical stakeholders in the reorganization cases, as well as all the other agreements Delphi negotiated, including the Investment Agreement, to obtain the necessary financing to fund the Plan and emerge from Chapter 11 as a viable business.

*The Investment Agreement*

27.    The Investment Agreement, which is incorporated in the Plan (*see* Article 1, ¶ F; Exhibit 7.11), sets forth the terms upon which UBS and the Other Investors commit to purchase (i) $175 million of common stock in the reorganized Delphi (the "Direct Subscription Shares"), (ii) $800 million of preferred shares in the reorganized Delphi (the "Preferred Shares") and (iii) any unsubscribed shares of common stock (the "Backstop Commitment") up to $1.575 billion in connection with a certain rights offering (the "Rights Offering").

10

28.     The Rights Offering contemplated by the Investment Agreement provides for Delphi to distribute, at no charge, to each general unsecured claim holder (an "Eligible Holder") certain rights to acquire new common stock in reorganized Delphi. The "rights" would permit the Eligible Holders to purchase their pro rata share of a set number of shares (41,026,309) at a set purchase price ($38.39 per share). To the extent that any of these shares are not purchased by Eligible Holders, UBS and the Other Investors, through the Backstop Commitment, agree to purchase such shares, resulting in a commitment of approximately $1.575 billion in respect of such shares. The Rights Offering raised approximately $20 million as of April 4, 2008, so the Backstop Commitment as of that date was approximately $1.555 billion.

29.     Accordingly, after taking into account the proceeds of the Rights Offering, the total commitment of UBS and the Other Investors, including the Backstop Commitment and the commitments to purchase Direct Subscription Shares and the Preferred Shares, amounts to $2.53 billion as of April 4, 2008.

30.     In consideration of the Investors' commitment, the Investment Agreement obligates Delphi to pay fees to UBS and the Other Investors in the amount of approximately $60 million. Such fees are comprised of a "Preferred Commitment Fee," a fee regarding the Direct Subscription Shares and the Backstop Commitment, and a fee to ADAH for arranging the transactions contemplated by the Investment Agreement. In addition, Delphi agrees to pay certain transaction expenses of the Equity Investors.

31.     At the time Delphi entered into the Investment Agreement, it believed that these fees demanded by the Equity Investors, although considerable, were appropriate given the size and crucial importance of the equity investment to which the

11

Investors were committing.  In fact, Delphi represented to the Bankruptcy Court that these fees represent a small fraction of the investment that the Equity Investors would make to acquire the various securities to be issued by reorganized Delphi.

32.     The Investment Agreement obligates UBS to "use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the GM Settlement, and the Plan."  Investment Agreement ¶ 6(b).

33.     In section 12 of the Investment Agreement, the parties agree that Delphi would have the right to terminate the Investment Agreement if Delphi's Board of Directors determines that their fiduciary duties require them to pursue an alternative transaction.  In that event, the Investment Agreement provides for an agreed-upon fee to be paid by Delphi to the Equity Investors.  The Investment Agreement, however, does not provide a similar termination right to UBS or the Other Investors.

34.     Appaloosa has nonetheless taken the position that the Investment Agreement – for which it received from Delphi the lion's share of commitment fees in excess of $60 million and reimbursement of transaction expenses in the tens of million of dollars – essentially grants it and the Equity Investors an option to fulfill their commitments or not, in their sole discretion, and that Delphi's sole remedy for a wrongful termination is to assert a claim for breach (if the breach is willful) and recover whatever damages are proven up to a cap of $250 million.

35.    In fact, the Investment Agreement does not contain such a limitation on the remedies available to Delphi.  Section 18 of the Investment Agreement explicitly provides that "[t]he rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights and remedies which any party otherwise may have in law or in equity."  Investment Agreement ¶ 18.  Moreover, the Investment Agreement does not contain any limitation on equitable remedies available to Delphi, nor does it purport to limit the power of the Bankruptcy Court to award equitable relief such as specific performance in appropriate circumstances.

36.    As UBS well knows, the Investment Agreement has been recognized by the Court and the parties as forming the foundation for, and being a crucial component of, the Plan (along with the other inter-related agreements, settlements and commitments embodied in the Plan).

**The Bankruptcy Court Confirms the Plan**

37.    On January 25, 2008, the Bankruptcy Court entered an order confirming the Plan.  The Plan is based on a series of global settlements, compromises and agreements that involve nearly every major constituency in the Debtors' reorganization cases.  The Plan provides, *inter alia*, that, on its effective date, the reorganized Debtors would receive the proceeds of the equity financing arrangements as defined in the Plan and the Investment Agreement.

38.    The Plan, including all agreements and documents encompassed therein, was confirmed with the unqualified support of UBS and the Other Investors, among others.  Under the terms of the Investment Agreement, conditions relating to the

13

terms of any and all post-confirmation amendments and supplements have been deemed to be conclusively satisfied.

*Delphi Arranges Its Exit Financing*

39.    On November 16, 2007, the Bankruptcy Court entered an order authorizing Delphi to enter into a "commercially reasonable best efforts" engagement letter and fee letter with JPMorgan Securities Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc. (the "Lead Arrangers").  At the time, Delphi anticipated that its exit financing would consist of: (i) a senior secured first-lien asset-based revolving credit facility in an aggregate principal amount of $1.6 billion (the "ABL Facility"); (ii) a senior secured first-lien term facility in an aggregate amount of $3.7 billion (the "First-Lien Loan"); and (iii) a senior secured second-lien term facility in the amount of $1.5 billion (the "Second-Lien Loan"), of which up to $750 million would be in the form of a note issued to General Motors in connection with the distributions contemplated under the Plan.

40.    On January 9, 2008, Delphi announced the commencement of the syndication of its exit financing package to support the Debtors' planned emergence from Chapter 11.  Primarily as a result of improved operating performance and lower than forecast capital expenditures for the 2007 fiscal year, Delphi reduced its planned exit facilities from the previously announced $6.8 billion to approximately $6.1 billion. Specifically, Delphi reduced the Second-Lien Loan from $1.5 billion to $825 million, of which up to $750 million would be in the form of a note issued to General Motors in connection with the distributions contemplated under the Plan.  At the time of the

14

financing launch in January, Delphi discussed with the Equity Investors this reduction in the amount of the financing to be sought, and the Equity Investors gave their approval.

41.    Pursuant to the Plan, the Debtors were to "receive the proceeds of the Exit Financing Arrangements, in the aggregate amount necessary to implement the Plan within the terms and conditions previously approved by the Bankruptcy Court as described in the exit financing engagement letter and term sheet attached [to the Plan] as Exhibit 7.14, as such term sheet may be amended, modified or supplemented….." (Plan art. 7.14.)

42.    With respect to exit financing, the Investment Agreement requires that the amount of the exit financing be "sufficient" to fund the Plan (Investment Agreement § 9(a)(xix)) and additionally requires that Delphi "demonstrate[], to the reasonable satisfaction of ADAH, that the pro forma interest (cash or noncash) expense for the Company during 2008 on the Company's indebtedness will not exceed $585 million…." (Investment Agreement § 9(a)(xx)).

43.    During the syndication process, it became apparent to Delphi and the Lead Arrangers that the likelihood of consummation of the syndication in its proposed amount, structure, and terms would be improved by GM's participation, pursuant to which General Motors would purchase up to $2 billion of the First-Lien Loan and, if necessary, all of the $825 million Second-Lien Loan without any original issue discount ("OID") and at an interest rate calculated to ensure compliance with the Investment Agreement interest expense limitation.  It was anticipated that the aggregate effect of GM's exit financing participation would result in General Motors holding an up-to-$2 billion first-lien note and an up-to-$825 million second-lien note, and receiving at

15

least $175 million in cash. GM's position in the First-Lien Loan would be junior to that

of other lenders and would be subject to voting restrictions during any time period in

which it holds $1 billion or more in first-lien financing.  Delphi and the Lead Arrangers

reasonably determined that the increased GM's participation would allow the Debtors to

obtain the remaining exit financing required to consummate the Plan.

### ADAH Objects to the Exit Financing Arrangements

44.     On February 6, 2008, Delphi, General Motors, ADAH, and their

respective representatives met to discuss the proposal for GM's enhanced participation in

the Exit Financing Arrangements (the "Proposal") as summarized in a draft term sheet.

Subsequently, in a February 13, 2008 letter, counsel for Appaloosa and ADAH (on behalf

of UBS and all of the Other Investors except Goldman) set forth various concerns with

that Proposal.  The February 13 letter also advised that the UBS and the Other Investors

(other than Goldman) had entered into a common interest agreement.  In fact, the parties

to the common interest agreement are UBS, Merrill, Appaloosa, Harbinger, and Pardus,

i.e., the Commitment Parties acting for their affiliated shell entities who are among the

Other Investors.  The common interest agreement recites that the signatories thereto

(defined as the "Common Interest Parties") have a common interest in "potential

litigation between the Common Interest Parties, on the one hand, and Delphi . . . on the

other hand."

45.     Delphi responded to the February 13 letter on February 20, 2008,

explaining why the concerns of the Equity Investors under the EPCA were unfounded

and requesting that the Equity Investors proceed with their reasonable best efforts to take

all actions, and do all things, reasonably necessary, proper, or advisable to cooperate with

16

the Debtors and to consummate and make effective the transactions contemplated by the

Investment Agreement and the Plan.  In a February 24, 2008 letter, however, counsel for

Appaloosa and ADAH asserted that the Proposal was "non-compliant, and inconsistent,

with the EPCA."

46.    As a result of the Investors' intransigence concerning the proposed

terms of the exit financing, Delphi filed a motion under section 1142 of the Bankruptcy

Code.  Although that motion was not granted, the guidance from the Court – that the

Equity Investors' objection to GM's participation in the exit financing could be addressed

if a GM affiliate were substituted for General Motors – was accepted by Delphi.

***Delphi Performs under the Investment Agreement***

47.    In reliance on the binding commitments made by UBS and the

Other Investors, as set forth in the Investment Agreement, Delphi proceeded to take all

actions necessary to consummate the Plan, with an announced goal of emerging from

bankruptcy during the first quarter of 2008.  For example, in order to ensure that the more

than $6 billion in exit financing would be available on April 4, 2008, Delphi paid all

commitment fees due to the Lead Arrangers ($10 million) plus millions more in

expenses, and proceeded with the Rights Offering and complied with all conditions

necessary to obtain such financing.  As of April 4, 2008, Delphi fulfilled all applicable

conditions and covenants for closing under the Investment Agreement and consummation

of the Plan.

***ADAH's Purported Termination of the Investment Agreement***

48.    On April 4, 2008, all the parties (other than UBS and the Other

Investors) required for a successful closing under the Plan and emergence from Chapter

17

11 – including Delphi's exit financing lenders, GM, and the Creditors Committee and
Equity Committee – were ready, willing and able to move forward. All actions necessary
to consummate the Plan were prepared to be taken – other than the concurrent closing
and funding of the Investment Agreement. Thus, the closing would have been
consummated, and Delphi would have successfully emerged from Chapter 11, but for the
wrongful termination by ADAH and the refusal of UBS and the Other Investors to honor
their commitments.

49.    Just hours before the scheduled closing, Delphi received a letter
from ADAH stating that "this letter constitutes a notice of immediate termination of the
Agreement…." In its letter, ADAH asserted a right to terminate under sections 12(d)(v),
12(d)(vi)(A) and 12(d)(vi)(B) of the Investment Agreement.

50.    In fact, because Delphi had complied with all conditions and
requirements under the Investment Agreement, ADAH had no right to terminate, and
ADAH's April 4 notice constituted a wrongful termination of the Investment Agreement.

51.    There are many deficiencies in the ADAH notice of April 4. For
example, section 12(d)(vi)(B) of the Investment Agreement, cited by ADAH, concerns
termination if Delphi enters into an "Alternate Transaction Agreement." In fact, although
ADAH asserted that it was terminating under 12(d)(vi)(B), and that Delphi was obligated
to pay an Alternate Transaction Fee of $82,500,000, Delphi had not entered into an
Alternate Transaction Agreement. As defined in the Investment Agreement, an Alternate
Transaction Agreement is an agreement that relates to an Alternate Transaction, which
means any plan, proposal, offer or transaction that is inconsistent with the Investment
Agreement, the Preferred Term Sheet, the GM Settlement, or the Plan. Delphi did not

18

enter in any such agreement. On the contrary, Delphi did everything that was required of it in order to consummate the Agreement, the Preferred Term Sheet, the GM Settlement and the Plan.

52.     ADAH also asserted a right of termination under section 12(d)(vi)(A) of the Investment Agreement which provides that ADAH has a right of termination if there has been a "Change of Recommendation," as defined in the Agreement. A Change of Recommendation means that Delphi or its Board of Directors or any committee thereof shall have (i) withheld, withdrawn, qualified or modified (or resolved to do any of those things), in a manner adverse to the Investors, its approval or recommendation of the Agreement, the Preferred Term Sheet, the GM Settlement or the Plan or the Transactions contemplated hereby or thereby, or (ii) approved or recommended, or proposed to approve or recommend, any Alternate Transaction. In fact, Delphi and its Board and the committees thereof have done everything appropriate to consummate the Agreement, the Preferred Term Sheet, the GM Settlement and the Plan, and there has been no Change of Recommendation.

53.     With respect to section 12(d)(v) of the Investment Agreement, which provides that ADAH may terminate if the Company has breached any provision of the Investment Agreement, which breach would cause the failure of any condition set forth in section 9(a)(xvi) or (xvii) to be satisfied, Delphi committed no such breach. Sections 9(a)(xvi) and (xvii) set forth the closing conditions that all the representations and warranties of Delphi contained in the Investment Agreement shall be true and correct and that Delphi shall have performed and complied with all of its covenants. In fact, as

of April 4, all of the representations and warranties of Delphi were true and correct and Delphi had performed and complied with all of its covenants and agreements.

54.     On April 5, 2008, ADAH delivered to Delphi a second letter, described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the Investment Agreement.  The April 5 letter cited Section 12(d)(iii) of the Investment Agreement based on the Plan not having become effective on or before the deadline of April 4, 2008. Having already derailed the closing by its wrongful termination the previous day, however, ADAH could not profit or benefit from its own wrongful refusal to close on April 4, 2008.  The second letter thus had no legal or practical significance.

55.     As things now stand, unless a decree of specific performance is issued by the Court as requested herein, there is no possibility that the confirmed Plan can be consummated, and Delphi, which on April 4 was literally on the brink of emerging from Chapter 11, will have to develop a modified plan with the resultant burdens, costs and delays for all stakeholders that such process entails.  Monetary damages could not adequately compensate Delphi for such harm, and would not protect Delphi's employees and other stakeholders from the consequences of UBS's wrongful conduct.

***Delphi's Exit Financing Complied with the Investment Agreement***

56.     Contrary to ADAH's contentions, as of April 4, 2008, Delphi's exit financing arrangements satisfied all requirements of the Investment Agreement.

57.     The Investment Agreement does not specify the terms of Delphi's exit financing.  Rather, that Agreement provides two principal closing conditions concerning Delphi's exit financing.  First, the Investment Agreement requires that that

20

amount of the exit financing be "sufficient" to fund the Plan.   (Investment Agreement § 9(a)(xix).)  Second, the Investment Agreement requires that Delphi's aggregate interest expense for 2008 not exceed $585 million.  (*Id.* § 9(a) (xx).)

58.    Delphi's exit financing, as available on April 4, satisfied both conditions.

59.    Nonetheless, in its April 4 termination notice, ADAH contended that Delphi's exit financing arrangements breached certain representations, warranties, or covenants contained in the Investment Agreement.  First, ADAH contended that Section 5(p) of the Investment Agreement prohibits GM from participating in Delphi's exit financing because such participation would constitute an "agreement with GM . . . outside the ordinary course of business."  The Bankruptcy Court, however, in the hearing on March 7, 2008, addressed this contention and provided guidance to Delphi that the proposed exit financing would *not* violate Paragraph 5(p) of the Investment Agreement so long as the financing was entered into between Delphi and an affiliate or subsidiary of GM, rather than GM itself.  Informed by that guidance, Delphi arranged its exit financing in a manner that would comply with the Court's direction.

60.    ADAH also contended in its April 4 notice that Delphi's exit financing breached Paragraph 5(t) of the Investment Agreement.  In order to justify their decision not to close, the Equity Investors took the position that the Investment Agreement's definition of "debt financing" required Delphi to obtain financing on the exact financing terms described in the "best efforts" financing letter provided by Delphi's lead arrangers.  However, subject to the specific covenants concerning sufficiency to fund the Plan and cap on first-year interest, the Equity Investors did not retain the right to

21

reject the exit financing if the "best efforts" resulted in terms that were different from those expressly indicated in the financing letter.

61.    Because Delphi satisfied its obligations under Paragraph 5(t), that covenant was satisfied.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract:  the Investment Agreement)

62.    Delphi repeats and re-alleges the allegations contained in paragraphs 1 through 61 above as if fully set forth in this paragraph.

63.    Delphi and UBS are parties to the Investment Agreement, which is a valid and binding contract.

64.    The Investment Agreement sets forth the obligation of UBS to invest up to $166 million in reorganized Delphi.

65.    Delphi substantially performed under the Investment Agreement.

66.    On April 4, 2008, Delphi was ready, willing, and able to fulfill its obligations under the Investment Agreement and had fulfilled all of its covenants and satisfied all of the conditions under the Investment Agreement.  Delphi alleges in the alternative that as to each condition, it was either satisfied by Delphi or waived by UBS and/or UBS by its conduct is estopped from asserting any non-compliance.

67.    UBS breached the Investment Agreement, as well as the implied covenant of good faith and fair dealing inherent in the Investment Agreement, by refusing to comply with its obligations under the Investment Agreement, and by wrongfully and without cause terminating the Investment Agreement.  UBS also breached its contractual

obligation and its duty of good faith by failing to use its reasonable best efforts to consummate the transactions under the Investment Agreement.

68.    Delphi has no adequate remedy at law.

69.    Delphi is entitled to a decree of specific performance ordering UBS to perform its obligations under the terms of the Investment Agreement, including, without limitation, the obligation of UBS to purchase $10.2 million of common stock in the reorganized Delphi; to purchase $65 million of preferred shares in the reorganized Delphi; and to purchase all unsubscribed shares of common stock in connection with the Rights Offering, up to a total investment of $166,866,749.19.  In addition, Delphi is entitled to damages in an amount to be determined at trial to compensate for harm incurred as a result of costs and losses due to the delay in UBS's performance from April 4, 2008 to the date performance occurs pursuant to a judgment of the Court.

70.    In the alternative, Delphi is entitled to damages from UBS in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (11 U.S.C. § 1142)

71.    Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 70 above as if fully set forth in this paragraph.

72.    The Bankruptcy Code empowers the Bankruptcy Court to direct any necessary party to perform any act that is necessary for the consummation of a plan. 11 U.S.C. § 1142(b).

73.    The Plan would have been consummated on April 4, 2008, but for the wrongful conduct of UBS and the Other Investors.

74.     It is necessary for the consummation of the Plan for UBS to comply with its obligations under the Plan and the Investment Agreement.

75.     Absent an order of the Bankruptcy Court compelling its performance, UBS will continue to refuse to fulfill its obligations and to perform the acts necessary to consummate the Plan.

76.     The Bankruptcy Court should exercise its equitable authority under 11 U.S.C. § 1142 to order UBS to comply with its obligations under the Plan and the Investment Agreement.

### THIRD CLAIM FOR RELIEF

### (Equitable Subordination and Disallowance)

77.     Delphi repeats and re-alleges the allegations set forth in paragraphs 1 through 76 above as if fully set forth in this paragraph.

78.     Because UBS was selected as a sponsor of the Plan and undertook both fiduciary and contractual duties in connection with that role, UBS is an insider and/or fiduciary of Delphi and the other Debtors.

79.     UBS has acted inequitably and breached its duties to the Debtors, and caused substantial harm to the Debtors, their employees, creditors and other stakeholders.  Therefore, any claim or interest of UBS in respect of the Debtors' estates should be equitably subordinated and/or disallowed to the fullest extent of the law.

80.     UBS's conduct has been inequitable, egregious, unconscionable and/or outrageous and has harmed the Debtors, their employees, creditors and other stakeholders.  Any claim or interest of UBS in respect of the Debtors' estates should be equitably subordinated and/or disallowed to the fullest extent permitted by law.

24

## PRAYER FOR RELIEF

WHEREFORE, Delphi respectfully requests that this Bankruptcy Court enter judgment in its favor and grant the following relief:

(1)    ordering UBS to fully comply with its obligations under the Investment Agreement and the Plan, including its obligation to invest up to $166,866,749.19 in reorganized Delphi;

(2)    in the alternative, ordering UBS to pay damages in an amount to be determined at trial;

(3)    equitably subordinating and/or disallowing UBS's claims and interests in respect of the Debtors' estates;

.        (4)    awarding Delphi costs and attorneys' fees; and

(5)    awarding any other and further relief the Court deems just.

Dated:   New York, New York
         May 16, 2008

SUSMAN GODFREY LLP


        /s/ Jacob W. Buchdahl
Jacob W. Buchdahl (JB-1902)

654 Madison Avenue, 5th Floor
New York, New York 10065
Telephone:  (212) 336-8330
Facsimile:   (212) 336-8340

Kenneth S. Marks
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
*Attorneys for Plaintiff Delphi Corporation*

25