<pre>
 1                 UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2

 3
        ----------------------------------------X
 4                                              :
        In Re the Matter of:                    :   05-44481
 5                                              :
            DELPHI CORPORATION, et al.,         :   One Bowling Green
 6                                              :   New York, New York
                        Debtors.                :   November 29, 2005
 7      ----------------------------------------X

 8
                        TRANSCRIPT OF MOTIONS
 9             BEFORE THE HONORABLE ROBERT D. DRAIN
                  UNITED STATES BANKRUPTCY JUDGE
10

11      APPEARANCES:

12
        For the Debtors:          JOHN W. BUTLER, ESQ.
13                                 KAYALYN A. MARAFIOTI, ESQ.
                                   Skadden, Arps, Slate, Meagher
14                                  & Flom, LLP
                                   333 West Whacker Drive
15                                 Chicago, Illinois  60606

16      For the Creditors Com:    ROBERT J. ROSENBERG, ESQ.
                                   Latham & Watkins
17                                 885 Third Avenue
                                   New York, New York  10022
18
        For the U.S. Trustee:     ALICA LEONHARD, ESQ.
19                                 Office of the United States Trustee
                                   33 Whitehall Street
20                                 New York, New York  10004

21      For Russell Reynolds:     CHARLES BOULBOL, ESQ.
                                   26 Broadway
22                                 New York, New York  10004

23      For Pillarhouse:          J. TED DONOVAN, ESQ.
                                   Finkel, Goldstein, Rosenbloom, Nash
24                                 26 Broadway
                                   New York, New York  10004
25
        For Bank of America:      PATRICK E. MEARS, ESQ.
                                   Barnes & Thornburg, LLP
                                   300 Ottawa Avenue, N.W.
                                   Grand Rapids, Michigan  49503
</pre>

```
 1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3      APPEARANCES CONTINUED:

 4
        For Selectron:          KENNETH LAW, ESQ.
 5                              Bialson, Bergen & Schwab
                                2600 El Camino Real
 6                              Palo Alto, California  94306

 7
        For Wilmington Trust:   EDWARD M. FOX, ESQ.
 8                              ERIC MOSER, ESQ.
                                Kirkpatrick & Lockhart, Nicholson
 9                               & Graham
                                399 Lexington Avenue
10                              New York, New York  10022

11
        Court Transcriber:      CARLA NUTTER
12                              TypeWrite Word Processing Service
                                356 Eltingville Boulevard
13                              Staten Island, New York 10312

14

15

16

17

18

19

20

21

22

23

24

25

        Proceedings recorded by electronic sound recording,
        transcript produced by transcription service
```

1                           UNITED STATES BANKRUPTCY COURT
                            SOUTHERN DISTRICT OF NEW YORK
2

3
     Randall Eisenberg          104
4

5    A    Exhibit Book                                          102     103

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1            THE COURT:  Please be seated.

2            Delphi Corporation.

3            MR. BUTLER:  Your Honor, Jack Butler from the law

4    firm of Skadden, Arps, Slate, Meagher & Flom with my partners,

5    Kayalyn Marafioti [Ph.], John Lyons [Ph.] and David Springer,

6    here for Delphi's second omnibus hearing, the hearing scheduled

7    for November 2005.

8            Your Honor, before we begin the agenda, just as a

9    procedural matter, we have filed and served the proposed second

10   amended agenda.  The agenda has 32 matters in it.  With the

11   Court's permission, we would follow the agenda in the order

12   that it's presented.

13           THE COURT:  All right.

14           But I understand from my clerk that you wanted to

15   have one matter be heard in the afternoon?

16           MR. BUTLER:  Your Honor, there are many people here

17   on the contested evidentiary matter.  There are 31 matters that

18   need to be dealt with prior to the contested evidentiary matter

19   and there is an additional meet and confer conference that has

20   been scheduled with the Court's permission between the

21   committee indenture trustee and the debtors and so we'd like to

22   have sort of a time early this afternoon and that way people

23   who are here just on that matter don't need to sit through

24   three hours of other things.

25           THE COURT:  Okay.

5

```
 1            The matter you're referring to is the so-called
 2   assumption matter?
 3            MR. BUTLER:  Right.
 4            The supplier agreement assumption procedures matter,
 5   Matter 32, which is the only contested evidentiary hearing on
 6   the agenda today.
 7            THE COURT:  All right.
 8            I think that's fine to have that additional
 9   discussion with the committee.
10            So, those of you who are here on that matter, the
11   supplier contract assumption matter, so-called, are free to
12   leave because your matter won't come on until 2:00.
13            MR. BUTLER:  Your Honor, could I also just on the
14   record indicate that if there are suppliers who are here who
15   would like to talk with representatives of the debtors, my
16   partner, John Lyons, who is right over here will be out in the
17   hallway to talk with suppliers about any individual questions
18   or concerns they might have during the morning call.
19            THE COURT:  Okay.
20            Let's give people a bit of time to move out.
21                    (Pause in proceedings.)
22            THE COURT:  Mr. Butler, since the rest of the agenda
23   doesn't have any evidence you can use that seat if you want.
24   You can bring it down below unless you want to sit there.
25                    (Pause in proceedings.)
```

6

1          THE COURT:  Okay.

2          MR. BUTLER:  Thank you, Your Honor.

3          Your Honor, again, in connection with -- just one

4 announcement we wanted to also make to the Court and we'll be

5 submitting a separate order to chambers, yesterday Delphi

6 issued a press release that announced that it and General

7 Motors had agreed to accelerate discussions in connection with

8 the matters between General Motors and Delphi that are

9 important to the restructuring in this case.  General Motors

10 agreed to provide some interim financial support to Delphi

11 through not going forward with certain price downs that were

12 contractually committed to and the debtors believe that gave

13 them the opportunity to continue if you will on the negotiation

14 track with the principal parties in this case as it relates to

15 labor and human (sic) capital with our principal customer,

16 General Motors, and as a result the company announced that it

17 would seek to have an order entered in this Court that would

18 adjourn the date by which the debtors would file an 1113/1114

19 motion from December 16th to January 20, 2006.  We have a form

20 of proposed order that would then reset the dates.  We've asked

21 the contact at chambers to get dates for the rest of the order

22 and we'll submit that some time before the end of the week for

23 Your Honor's consideration.

24          THE COURT:  Okay.

25          That's fine.

7

1          I think that the one date that's not going to work is

2     the hearing date that you had because I'm going to be gone that

3     week, the week of the 20th of February.

4          So you can pick a date right after that.  You can

5     make it the following Monday.

6                    (Pause in proceedings.)

7          THE COURT:  So the one day that doesn't work is the

8     28th which is a <u>Refco</u> omnibus day but the 27th or the 1st of

9     March would work.

10          MR. BUTLER:  Thank you, Your Honor.

11          We'll confer and consult with chambers and submit the

12     order.

13          THE COURT:  Okay.

14          MR. BUTLER:  Your Honor, now turning to the omnibus

15     agenda and the 31 matters now on for this morning's session.

16          Matter No. 1 is the remaining portion of the interim

17     compensation motion originally filed as docket No. 11.  The

18     Court has previously established interim compensation

19     procedures through an order entered at docket No. 869.  What

20     remains is the presentation of an order establishing a joint

21     fee review committee in this case or a fee review committee.

22     We are in discussions with the U.S. Trustee about the

23     procedures in connection with that.  We want to also consult

24     with the creditors committee and just with the press (sic) of

25     activities, the U.S. Trustee asked if we could present this on

8

 1  January 5th.

 2          THE COURT:  Okay.  That's fine.

 3          MR. BUTLER:  Your Honor, the second matter that is on

 4  the agenda is a motion for an order approving the debtor's key

 5  employee compensation program at docket No. 13.  This was filed

 6  originally on or about October 12th or 13th.  It was scheduled

 7  for a hearing today.  There was an objection deadline as to all

 8  parties for November 22nd.  That was extended briefly for the

 9  United States Trustee.  There were some technology problems.

10  They have since filed their papers and it has been extended to

11  December 12th with respect to the creditors committee and the

12  company and the committee continue to meet in connection with

13  the program and we are asking the Court now to set that over to

14  January 5, 2006.

15          THE COURT:  Okay.

16          MR. BUTLER:  The next matter on the agenda, Your

17  Honor, is matter No. 3 which is the final hearing on the claims

18  trading order.  This was originally filed at docket No. 29 and

19  there was an interim order approved by Your Honor that has been

20  controlling in this case and continues to control.  That is

21  entered at docket No. 126.

22          We're requesting that the matter be adjourned to the

23  January 5, 2006 hearing with respect to the objections filed at

24  docket numbers 76 and 1117 pursuant to an agreement between

25  those parties and the debtors with a full reservation of rights

9

1   as to all parties-in-interest and we are pleased to advise the

2   Court that the matter with respect to the response filed by

3   Appaloosa Management, LP has been resolved.

4               THE COURT:  Okay.

5               Are they being treated like the earlier objectants?

6               MR. BUTLER:  Yes, Your Honor, I believe that they

7   are.

8               THE COURT:  Okay.

9               MR. BUTLER:  There may be some additional matter with

10  regard to Appaloosa but to the extent there is that would also

11  be extended over to January 5th.

12              THE COURT:  Okay.

13              MR. BUTLER:  Your Honor, the next matter on the

14  agenda, matter No. 4, is the utilities motion with respect to

15  any objections that have been presented and I'm pleased to

16  report this matter -- this was originally filed by the way at

17  docket No. 41 and Your Honor entered an interim order at docket

18  No. 234 and a final order at docket No. 760.  We have been

19  working through the objections that were reserved.  As Your

20  Honor may recall, there were a few objectors reserved in that

21  final order.  I'm pleased to report that we have resolved the

22  objections with respect to AT&T Corporation, Entergy [Ph.]

23  Mississippi, Inc., American Electric Power, Dominion East Ohio,

24  New York State Electrical & Gas Corporation, Niagara Mohawk

25  Power Corporation, The Public Services Electric & Gas Company

10

1   and the Rochester Gas & Electric Corporation.

2         That leaves, Your Honor, only, I believe, the

3   objection of SBC Communications, Inc. to the motion as the

4   only, I believe, remaining objection and that matter, which I

5   believe is docketed at docket No. 559, with the Court's

6   permission, that's being adjourned to the January 5, 2006

7   omnibus hearing.

8         THE COURT:  Okay.

9         In the interim the order is governing obviously.

10         MR. BUTLER:  The final order, Your Honor.  This is

11   just -- and they're governed by it.

12         THE COURT:  Okay.

13         MR. BUTLER:  Your Honor, the next matter on the

14   agenda is matter No. 5 which is the Speckmo [Ph.] Enterprises

15   motion for relief from stay at docket No. 284.

16         This is a motion filed to lift the automatic stay.

17   There have been -- this is part of the volume of set off

18   requests, both formal and informal, that have been received.

19   We have not been able to resolve Speckmo's set off request at

20   this particular time but we're working on reconciling it and

21   there's an agreement to adjourn this matter to the January 5,

22   2006 hearing.

23         THE COURT:  Okay.

24         MR. BUTLER:  Your Honor, the next three matters, I

25   will briefly address, although Mr. Berger is handling them and

1    Mr. Berger can report on the status.  I'll just take them

2    together and Mr. Berger can report on the status.  They're the

3    Schmidt [Ph.] Technology, Gmbh., order to show cause at docket

4    No. 477.  The order to show cause was entered at docket No.

5    816.  The Lee Company is an order to show cause at docket No.

6    699 and the order was entered at docket No. 842 and item No. 8

7    on the agenda, Baer [Ph.] Industries, is the order to show

8    cause, docket No. 774 and Your Honor entered an order at docket

9    No. 1119.

10           We're asking these to be adjourned to the January 5th

11   hearing but I think Mr. Berger has an update on these matters.

12           MR. BERGER:  Speckmo Industries, Schmidt Technology

13   and Lee Company are all parties that we are in active review

14   and negotiations with.

15           In Speckmo, we're meeting and trying to reconcile

16   pre-petition obligations and claims.  Schmidt Technology, No.

17   6, Your Honor, asserts status as a foreign vendor.  We are at

18   the tail end of the debtor's investigation to determine whether

19   or not Schmidt fits within that definition under Your Honor's

20   protocol, whether or not specifically it has assets and subject

21   in the United States to this Court's jurisdiction.  If it is,

22   we note counsel for Hirschman (sic) and we think that we'll be

23   able to work through those issues.  The Lee Company for the

24   most part is resolved, Your Honor.  It appears that we'll be

25   able to submit an order to the Court either before or after the

12

1  January 5th adjourn date.

2          THE COURT:  Okay.

3          MR. BUTLER:  Your Honor, the next three motions are

4  all -- one is a motion -- I'll just walk through them -- No. 9

5  is a demand exercise set off by Decketer [Ph.] Plastic

6  Products, Inc. at docket No. 799.  No. 10 is the Tricon [Ph.]

7  Industries, Inc. motion for modification of automatic stay,

8  again, for docket No. 805.  No. 11 is the Meens [Ph.]

9  Industries motion to set off pre-petition payment against pre-

10  petition claims.  Another set off matter at docket No. 818 and

11  then, I think, similarly, although it's a slightly different

12  fact pattern, No. 12 is Eclipse Tool & Die, Inc., motions for

13  relief from the automatic stay.

14          All four of these, Your Honor -- the first three deal

15  with suppliers and customers of the debtor seeking to lift the

16  automatic stay to exercise rights of set off.  The fourth is an

17  allegation from Eclipse that it is a valid lienor to the

18  Michigan Special Tool Lien Act.

19          We're reviewing all of these matters with the

20  particular movants and all have agreed to adjourn their

21  hearings to January 5, 2006.

22          THE COURT:  Okay.

23          MR. BUTLER:  Matter No. 13 on the agenda is also

24  somewhat similar to Mercedes Benz U.S. International, Inc.

25  motion for relief from the automatic stay.  It's filed at

13

1    docket No. 983 and we're working along the same lines with

2    Mercedes Benz.  They've also agreed to move their matter to

3    January 5, 2006.

4           Your Honor, matter No. 14 is a little bit different.

5    This is Niagara Mohawk matter.  This is our motion authorizing

6    the debtors to obtain preferential power rates pursuant to a

7    letter agreement with Niagara Mohawk Power Corporation to

8    assume it at docket No. 997.

9           This particular transaction -- there's a regulatory

10   matter that requires the consent of the New York Power

11   Authority.  They were scheduled to meet on November 22, 2005

12   but the Power Authority has rescheduled their meeting until

13   December.  Accordingly, we ask the Court to move to the January

14   5th hearing so we can get that decision first.

15          THE COURT:  Okay.  That's fine.

16          MR. BUTLER:  Your Honor, matter Nos. 15 and 16 also

17   are motions for set off; one by Entergy and that's for both

18   recoupment and set off.  At docket No. 1024 and item No. 16 on

19   the agenda, DBM Technologies, LLC, is another set off motion at

20   docket No. 1042 and as with the others, they have agreed to

21   adjourn these matters to January 5, 2006.

22          The last item on the adjourn docket, Your Honor, is

23   the lead plaintiff's motion for limited modification of the

24   automatic stay.  This is docket No. 1063.  This is a little bit

25   different, Your Honor.  This is a request by the lead

14

1  plaintiffs in what the debtors believe is subordinated

2  securities claim litigation to lift the automatic stay to

3  require the production of documents and limited discovery and

4  we're in the process of meeting with them to discuss that

5  matter and have meet and confers during the course of December

6  and, therefore, we have asked to move that to the January 5,

7  2006 agenda with a deadline to file our objection on December

8  29, 2005.

9           THE COURT:  All right.  That's fine.

10          MR. BUTLER:  Your Honor, now moving to the

11  uncontested agreed or settled matters, the first one is the

12  Macato [Ph.] USA, Inc. order to show case at docket No. 785.

13  That's been handled by Mr. Berger.

14          MR. BERGER:  Good morning, Judge.

15          Your Honor set in motion in the early days of the

16  case a procedure by which the debtors could obtain orders to

17  show cause to bring vendors before Your Honor; those vendors

18  being those that threaten to disrupt or withhold delivery of

19  goods on account of payment of pre-petition balances.

20          The orders to show cause were designed to bring those

21  vendors before Your Honor to describe why they weren't in

22  violation of the automatic stay and why those funds should not

23  be disgorged.

24          A number of orders to show cause were filed among

25  Your Honor's dockets this morning.  We're working through all

 1   of those orders to show cause toward settlements favorable to

 2   the debtor.  We reached final agreement with Macato.  It's only

 3   on the agenda this morning and we have a proposed order, Your

 4   Honor, that provides in pertinent part that the $966,000.00

 5   that Macato extracted from the debtors was repaid to the

 6   debtors.  Based upon that and the parties' other agreements as

 7   to timing of payments for post-petition goods we've come up

 8   with a form of order that counsel for Macato has reviewed and

 9   approved and I have it here for you, Your Honor.

10           THE COURT:  Okay.

11           And that's the order that was earlier submitted, the

12   proposed order?

13           MR. BERGER:  Correct, Your Honor.

14           THE COURT:  All right.

15           I'll approve that.

16           MR. BERGER:  May I approach?

17           THE COURT:  Yes.

18           MR. BERGER:  Thank you, Judge.

19           MR. BUTLER:  Your Honor, the next matter on the

20   agenda is matter No. 19.  This is the debtor's motion for an

21   order under 11 U.S.C. Section 365(d)(4) to extend the deadline

22   to assume or reject leases of non-residential real property

23   filed at docket No. 995.

24           We're asking Your Honor to extend that period from

25   December 7, 2005 to and including June 7, 2007, a date which is

16

1    eighteen months from the initial deadline within which the

2    debtors were otherwise required to assume or reject the real

3    property leases.

4           The debtors are parties to approximately 90 real

5    property leases, in most instances as lessee, some 85 of those.

6    In a minority of instances, we have a separate interest and in

7    some cases of a lessor.

8           The debtors have asked that this be entered without

9    prejudice to our rights to seek further extensions and without

10   prejudice to a lessor's rights to seek a shortening of those

11   deadlines for cause.

12          I'm pleased to report, Your Honor, that only one

13   objection was filed to this particular motion by Orricksworn,

14   LLC [Ph.] at docket No. 1123.  That matter has been resolved.

15   With respect to the Orricks, they have -- what we did with

16   respect to Orricks is they have agreed that they would be

17   subject to the eighteen month period but that after twelve

18   months they would have the right to file a supplemental

19   objection on or prior to October 1, 2006 and bring the

20   additional six month (inaudible) back to the Court as it

21   relates to them alone.

22          THE COURT:  Okay.

23          MR. BUTLER:  And that's the way they chose to resolve

24   that so they have what I would call a springing objection

25   opportunity -- a window next fall.

17

1              THE COURT:  All right.

2              Although this is without prejudice to anyone's rights

3    if circumstances change to seek a shorter period.

4              MR. BUTLER:  Correct.

5              Anyone can come in.  The order specifically provides

6    for cause shown under the statute.  People can come in earlier.

7              THE COURT:  All right.

8              In light of the notice given to the landlords and the

9    lack of objections or the resolution of the one objection, I'll

10   grant this.

11             MR. BUTLER:  Thank you, Your Honor.

12             Your Honor, we're now moving to matter No. 20, the

13   retention matter.  This is the debtor's application to

14   authorize the employment retention of Jones, Lang, LaSalle

15   Americas, Inc. [Ph.], as real estate administrative and

16   transaction service provider.  It's docketed, docket No. 996,

17   no objections have been filed.

18             Just briefly, Your Honor, JLL provides a large

19   component of professional services to the debtors including

20   maintaining the debtor's real property information database,

21   coordinating all the lease real estate related payables.  They

22   deal with issuance of recommendations regarding notice

23   provisions, expiration dates, other actions and they act if you

24   will as a manager of our portfolio.  They perform initial

25   evaluations and abstract all real property interests.  They

18

1    provide strategic real estate advisory advise.  They perform

2    in-house lease administration.  I sort of view this -- having

3    been on site and seen the facility -- that this is a function

4    that is partly outsourced if you will by the debtors to Jones,

5    Lang, LaSalle.  They also serve as providing real property

6    purchase and sales services and deal with facility planning and

7    strategy.

8          It is an extremely important contractual relationship

9    that the debtors have and the application -- we had if Your

10   Honor wanted to hear more, Mr. Sheehan, our vice president in

11   charge of restructuring is here with us today as is James C.

12   Baker, managing director of Jones, Lang, LaSalle, Inc.

13         But there have been no objections filed, Your Honor,

14   and we'd like to ask Your Honor to consider approval of the

15   retention.

16         THE COURT:  Okay.

17         I don't have any problems with the retention per se

18   as you said it.  It really appears to me to be largely an

19   outsourcing function plus market rates for brokerage services

20   but the order was ambiguous and I've made it clear that the

21   compensation is pursuant to Sections 330 and 331 to be

22   consistent with the motion itself which suggests that.

23         The only other thing I would say is that given the

24   profit element of the firm's compensation, I assume that there

25   is someone, even though this is an outsourced function, who

19

1  will review their activities and if the lease portfolio duties

2  change significantly, we'll tell them to reduce their staff in

3  case they don't do it themselves.

4          MR. BUTLER:  Absolutely, Your Honor.

5          Karen Healey [Ph.] is one of the officers of the

6  company and is responsible for facilities management for Delphi

7  Corporation on a global basis.  This function reports up

8  through people on her staff to her and I have personally spent

9  time with her on this particular issue.

10          I should point out, Your Honor, Jones, Lang, LaSalle,

11  their involvement is relatively new to the company.  They

12  replaced another facility manager that had been providing that

13  and it was precisely the oversight function I think Your Honor

14  was concerned about and that is they're interested in just

15  making sure -- the company thought they could improve the

16  management of that dysfunction and that's how Jones, Lang &

17  LaSalle came to be.

18          THE COURT:  Okay.  That's fine.

19          So with that small change I'll approve the order.

20          MR. BUTLER:  Thank you, Your Honor.

21          Your Honor, matter No. 21 is our motion to authorize

22  the debtors to preserve an option entering into a new power

23  contract for preferential rates with Consumers Energy Company

24  and related power contracts.  It's sort of similar to the

25  earlier motion that I talked briefly about that's been

20

1  adjourned but this is a request for Delphi Automotive Systems,

2  LLC to assume two contracts with Consumers Energy.  First, is a

3  special manufacturing contract dated October 13, 1995, the

4  other is a partial assignment contract dated December 22, 1998.

5  These contracts provide the debtors with the opportunity to

6  receive electrical power for six of their manufacturing sites

7  in Michigan and there are specific terms of conditions set

8  forth in the agreement that the debtors believe are beneficial

9  and by assuming these contracts Delphi Automotive Systems, LLC

10 is entitled to receive preferential rates from Consumers with

11 respect to a new power contracts; power service is to be

12 retained at these facilities and at other potential locations.

13      The debtors believe, Your Honor, that this is another

14 exercise of reasonable business judgment by the debtors.  We

15 think it's a very useful way of being able to make sure that

16 we're obtaining power which is a pretty important commodity of

17 our business to power manufacturing sites at as reasonable a

18 price as we can obtain.

19      We've described all of the specific relief in the

20 motion and no objections have been filed.

21      THE COURT:  Okay.

22      I have a question about this which is as I understand

23 these contracts are expiring at the end of the year?

24      MR. BUTLER:  Some of them are, Your Honor, expiring

25 and then the way this works with Consumers is to be able to

21

1  maintain the preferential rates we have to have authority then

2  to enter into the new power agreement and so, you're right, as

3  I understand the negotiations -- and they're fairly complicated

4  -- but as I understand the way this has worked in order to be

5  eligible to enter in to the new power contract with them and

6  maintain the preferential rates we need to assume these

7  contracts in the Chapter 11 case and enter into a new power

8  contract.

9          THE COURT:  My question is is that just something

10  they're saying or have you all reviewed the agreements to see

11  whether they have the right to cut you off that way?

12          MR. BUTLER:  Your Honor, I haven't personally

13  reviewed the agreement.  The people working on this believe

14  that this was appropriate and in fact we had specifically

15  Donald Poole [Ph.], who is a manager of the utility supply

16  group was the individual who worked on --

17          THE COURT:  I know.  I reads his affidavit and all he

18  says is that, "Consumers Power tells us that they won't do this

19  unless the contract is assumed" but he quoted some language

20  from the Michigan regs. that suggested otherwise.

21          MR. BUTLER:  Your Honor, my colleague, Mr. Meisler

22  [Ph.], simply points out, who has done more work on this,

23  simply said that Consumers Energy has the rights under their

24  rate tariffs to make these determinations as to whether we're

25  eligible to get the preferential rates --

22

1          THE COURT:  So it's not a --

2          MR. BUTLER:  -- and that's a judgment on their part

3     and this is what's being required.

4          THE COURT:  It's not a right under Michigan law to

5     the party receiving the rate?

6          MR. BUTLER:  I believe that's correct, Your Honor.

7          THE COURT:  Well, is this something the committee has

8     reviewed?

9          MR. ROSENBERG:  Your Honor, to be perfectly honest,

10    the committee reviewed it on an economic level via Messerow

11    (sic) and was satisfied on an economic level but we have not

12    reviewed the specific question that Your Honor is raising.

13         THE COURT:  Okay.

14         Well, of course, they're related because if you don't

15    have to pay the $3.5 million of cure costs then the economics

16    are all the better.

17         MR. ROSENBERG:  Your Honor obviously read our papers

18    for this afternoon's motion and I apologize that we did not do

19    this with respect to this motion.  We simply looked at the

20    economics.

21         THE COURT:  All right.

22         Is there an actual option in the contract?

23         MR. BUTLER:  Your Honor, I don't believe that there

24    is.  I believe that this was a product of discussions with

25    Consumers Energy.  From the company's perspective, what hangs

23

1   in the balance here is about $10 million a year in preferential

2   rates.  So, again, as the committee did, this, from an economic

3   perspective is as we understand the ability to qualify for

4   preferential rates in Michigan, this was a pretty

5   straightforward business decision.  It's $10 million a year for

6   two to four years of benefits we give up and a much smaller

7   cure payment.

8           THE COURT:  Well, the issue is whether you need to

9   make the cure payment to get the benefits.  The benefits are

10  great.

11          MR. ROSENBERG:  Your Honor, perhaps we can take a

12  break on this one and --

13          THE COURT:  I think that's worthwhile --

14          MR. ROSENBERG:  -- and look at the legal issues that

15  Your Honor is raising?

16          THE COURT:  It should be fairly evident in the

17  agreement.

18          MR. ROSENBERG:  It should, indeed, be and --

19          THE COURT:  I would think that CEC should be able to

20  point to something that gives them the absolute discretion

21  here.

22          So why don't we adjourn this to 2:00.

23          MR. BUTLER:  Okay, Your Honor.

24          Your Honor, the next matter on the agenda is matter

25  No. 22.  This is the Wilmer, Cutler, Pickering, Hale & Dor

24

1   retention as special regulatory counsel.  It's filed at docket

2   No. 999.  The debtors do in fact rely on Wilmer, Hale -- as

3   they're referred to now -- as their special regulatory counsel

4   on a variety of capacities that are described more clearly and

5   completely in the retention application.

6          There have been no objections filed by any party to

7   the retention.

8          THE COURT:  I'll approve this retention.

9          MR. BUTLER:  Thank you, Your Honor.

10         Matter No. 23 on the agenda is the Latham & Watkins

11  retention filed by the official committee of unsecured

12  creditors, filed at docket No. 1086.  This is proposed to be

13  nunc pro tunc to the date of appointment on October 17, 2005

14  and the debtors support that appointment, Your Honor, nunc pro

15  tunc to October 17th.

16         The committee has given the debtors the opportunity

17  to review the disclosures and the application as to the debtors

18  only through the next hearing on January 5, 2006.  The order

19  would otherwise be final as the other parties did not object as

20  of today's hearing.

21         THE COURT:  Okay.

22         Again, I reviewed this as well as the marked interim

23  order and hearing no objections and recognizing the debtor's

24  continuing right through the 5th, I'll grant it.

25         MR. BUTLER:  Thank you, Your Honor.

25

1          Your Honor, the next matter on the agenda, now moving

2    to what had been contested matters and this one we have listed

3    still as a contested matter for a specific reason.

4          Your Honor, the first matter, matter No. 24, is the

5    Rothschild retention as the debtor's financial advisors and

6    investment bankers at docket No. 52.

7          This had been under discussion with the creditors

8    committee.  We have reached agreement with the committee on the

9    form of proposed retention.  There is a proposed order and an

10   amended restated retention agreement.  That also was resolved -

11   - questions that the agent for the pre-petition lenders had --

12   and we now have a form of agreement acceptable to those

13   parties.

14         We have listed this as contested, however, because

15   there was a letter that was received by us by Robert E. Newton

16   from Lockport, New York in which he wrote that he was compelled

17   as a Delphi retiree to voice his objection to the motion and

18   explained his concerns there.

19         THE COURT:  I've read that letter.

20         MR. BUTLER:  I don't know whether Mr. Newton is

21   present today in the courtroom or not.

22                    (No response.)

23         MR. BUTLER:  Your Honor, having not been present in

24   the courtroom and not withstanding Mr. Newton's letter

25   objection, we'd ask Your Honor to approve the retention as

26

1   amended.

2          THE COURT:  Okay.

3          Let me just ask.  Obviously, this reflects review by

4   the committee.  Is it the committee's view that for a case of

5   this size this is a market-driven or market-based retention?

6          MR. ROSENBERG:  Your Honor, the committee has come to

7   the conclusion that it is, both in terms of the total amount

8   and in terms of a 328 retention.

9          If Your Honor compares what we have submitted to you

10  today with our consent to the original Rothschild request, I

11  think you will see that it has been cut back in several

12  respects quite substantially and to the satisfaction of the

13  committee.

14         There is no question but that the committee would

15  have liked the retention, given the size of it, not to be under

16  Section 328.  We would have liked Rothschild to be a completely

17  independent voice in the boardroom fighting for what's best for

18  the estate and we hope they will still do so even though they

19  have a 328 retention but that's a long-winded way, Your Honor,

20  of saying that notwithstanding our preference as to what the

21  market might be, we have to concede that for investment bankers

22  for the debtor and for the committee in significant, large

23  cases, a 328 retention is appropriate and, again, given the

24  negotiation that occurred right through this morning as to what

25  this retention and the order should look like, Your Honor, we

27

1    are satisfied with it as presented.

2              THE COURT:  Okay.

3              MS. LEONHARD:  Good morning, Your Honor.

4              Alicia Leonhard for the United States Trustee.

5              The United States Trustee would like to say that

6    under the protocol for investment bankers in the Southern

7    District, the United States Trustee reserves the right to

8    review the fees for reasonable --

9              THE COURT:  Right and that's set forth in the

10   proposed order.

11             MS. LEONHARD:  Yes.

12             THE COURT:  Under Section 330.

13             MS. LEONHARD:  Yes.

14             Thank you, Your Honor.

15             THE COURT:  On that score, I don't see anything in

16   here about keeping time records.  Has that been discussed?

17             MS. LEONHARD:  Your Honor, I believe the protocol

18   calls for investment bankers to keep time records in one half

19   hour increments and if that has been changed, it was done

20   without the knowledge of the U.S. Trustee and without our

21   approval.

22             THE COURT:  All right.

23             Mr. Resnick, is there --

24             MR. BUTLER:  Your Honor, I think Mr. Resnick is

25   present in court today and I think Rothschild intends to file

28

1    the U.S. Trustee's protocol in these cases.

2                MR. RESNICK:  Yes, that's correct.

3                THE COURT:  Okay.

4                MR. RESNICK:  I think the order contemplates, as we

5    have in other cases, that we will follow that protocol.

6                THE COURT:  All right.  Very well.

7                I had two specific questions and one observation --

8    well, one question and two observations; the first is the new

9    capital fee described on Page 7 has a proviso which says that

10   "no new capital fees shall become payable in respect of any new

11   capital raised (X) with respect to any debtor-in-possession

12   financing" and then it says, "(Y) from an entity not otherwise

13   participating in or not having expressed an interest in

14   participating in a transaction and I was confused why it said

15   "not."  I would have thought it would have been that you

16   wouldn't get it if an entity was participating in a

17   transaction, for example -- I'm just throwing this out --

18   suppose GM provided capital in connection with the plan, I

19   would have thought that would be excluded from the financing

20   fee because that's picked up in the transaction fee.

21               I don't know if that had been focused on by the

22   parties or now.  In other words, my view of the new capital fee

23   is that it would apply to something separate from the

24   transaction-related services that are being provided by

25   Rothschild as opposed to this language.

29

1          So unless the parties have discussed this already?

2          MR. ROSENBERG:  I believe so, Your Honor, and I

3   certainly don't want to speak for Rothschild on this but I'll

4   tell you what the committee's understanding was when it agreed

5   to this.

6          The new capital fee was certainly the single, most

7   controversial piece of the original Rothschild proposal for any

8   number of reasons, not limited to its potentially duplicative

9   nature.  So what has been resolved here is (1) they only get a

10  new capital fee at all if they are so designated by the debtor

11  to provide that service and the Court on notice to the

12  committee, etc., specifically approves they're providing that

13  service (sic), but again, the issue is the duplicativeness.

14         THE COURT:  Right.

15         MR. ROSENBERG:  On the situation that you describe

16  they'll be getting an M&A fee or a completion fee or something

17  of that sort.

18         THE COURT:  Right.

19         MR. ROSENBERG:  That's why it's written the way it

20  is.

21         MR. BUTLER:  Your Honor, I also think -- I mean this

22  was reviewed and I was just consulting with Mr. Zeiman [Ph.],

23  who reviewed this on behalf of the pre-petition banks.

24         The way this provision operates, I believe, it says,

25  "new capital fees due and payable in cash in closing" and among

30

1  the requirements is that the capital has to come from an entity

2  that's not otherwise participating so I think it's exactly the

3  way you wanted it to read.

4           MR. ROSENBERG:  Yes.

5           THE COURT:  Oh, I see.  I got it.  I got it.  I read

6  it wrong.

7           You're absolutely right.

8           Okay.

9           My other point was -- it's on the same issue which is

10 the approval of the new capital fee.  I think that that's

11 something that should come back to the Court even if the

12 committee is on board with it.  I think it should come back to

13 the Court.

14          This has sort of an either/or mechanism but I think

15 it's -- among other things, it will point to a certain

16 direction in the case and I think it's better to have it aired

17 in connection with that process.

18          The last point I would make is that even though this

19 is under Section 328(a) except for the U.S. Trustee, as in

20 other cases, I would expect that if the case is in wind down

21 mode, that is, for example, a plan has been confirmed and you

22 need an investment banker for some purposes but not at the

23 level that you need here that I would anticipate -- and it

24 would be unusual circumstances not to have it -- for there to

25 be some reduction in the monthly fee at that point.

31

1          MR. BUTLER:  Your Honor, that's our expectation and

2    Rothschild in other transactions has been very cognizant of

3    those --

4          THE COURT:  Right.  They have in other transactions.

5    I just wanted to state that on the record.

6          But with, I guess, that one change then on Page 5

7    about the approval for 4(e) services, I'll approve it.

8          MR. BUTLER:  Thank you, Your Honor.

9          Do you want us to adjust the order to require that

10   the new capital fee come back to the Court?

11         THE COURT:  Yes, that's fine.

12         MR. BUTLER:  Thank you, Your Honor.

13         Your Honor, the next matters on the agenda are

14   matters No. 25 and 26.

15         The first was a motion to vacate or amend the early

16   retiree committee order that had been honored.  The motion was

17   filed -- rather then had been entered -- the motion was filed

18   at docket No. 595 and the order they were referring to was the

19   order Your Honor entered previously appointing a retiree

20   committee for hourly workers.

21         Matter No. 26 on the agenda was the official

22   committee retiree's motion for the appointment of an official

23   committee of retirees dealing with essentially salaried workers

24   and this was filed at docket No. 874.

25         Your Honor, there have been two notices of withdrawal

32

1   of these motions.  Both have been docketed at docket No. 1295

2   and docket No. 1312 where the movants withdrew these motions

3   and they withdrew them based, I believe, on the representations

4   we made and the objections we filed to the motion and I think

5   it's useful to just briefly review that on the record here.

6           First, the debtor stated that neither the retiree

7   committee motion, nor the retiree committee order affected the

8   substantive rights and interests of any non-union retiree

9   including the movants and Your Honor may recall when we filed

10  that motion it was to deal primarily with OPED [Ph.] health

11  care benefits, among other matters, with respect to our hourly

12  workforce which was represented and to go through the process

13  that the statute contemplated on determining whether the unions

14  wanted to actually take that on on behalf of the retirees or

15  whether they wanted a separate committee appointed.

16          We went through that process, as it went to them

17  (sic) and all the unions have taken on that responsibility but

18  we said at the time that with respect to salaried workers that

19  any committee would be premature because the debtors had not

20  proposed any further reductions in health care benefits beyond

21  those very substantial reductions that have already occurred

22  over the last number of years.  The health care benefits for

23  salaried workers are very different than the health care

24  benefits for hourly workers at Delphi.

25          We also stated in the papers that the international

33

1   unions have agreed to serve as the authorized representatives

2   of the retired hourly employees.  We also have stated that we

3   had not determined if and to what extent we would modify

4   retiree medical and life insurance benefits for non-union

5   retirees.

6           Finally, we stated that if and when we sought a

7   bankruptcy court approval to eliminate or modify retiree

8   medical and life insurance benefits of non-union retired

9   employees, the debtors provide the movants notice of those

10  proceedings.  So we'll give special notice to these four

11  individuals but beyond that, Your Honor, if we reach that

12  decision, I think it is more likely than not that we will come

13  to Your Honor and a file a motion for the appointment of a

14  retiree committee to deal with salaried retirees and that's a

15  bridge not yet crossed in terms of reaching a final decision.

16  What we are guided by, as I said, are the very substantial pre-

17  petition reductions in health care benefits that have occurred

18  over the last number of years that have already brought down

19  health care benefits for salaried workers into what may be

20  viewed as a competitive norm but we're addressing those issues

21  as we look at sort of everything that's on the drawing board if

22  you would.

23          THE COURT:  Okay.

24          So they've withdrawn their motions in light of their

25  now understanding the fact that their request was premature.

34

1          MR. BUTLER:  Correct, Your Honor.

2          THE COURT:  Okay.

3          MR. BUTLER:  Your Honor, the next motion is the

4   motion of Pillar [Ph.] House, Inc., USA, seeking an order for

5   fixing a deadline for the debtors to assume or reject an

6   executory contract at docket No. 917.

7          We filed an objection to the motion.  There's been a

8   memorandum of law filed by Pillar House at docket No. 918 and

9   this matter is contested.

10          THE COURT:  Okay.

11          MR. DONOVAN:  Good morning, Your Honor.

12          Ted Donovan of Finkel, Goldstein for Pillar House.

13          Your Honor, we're seeking to compel the debtor to set

14   a deadline for assuming or rejecting a rather small executory

15   contract.

16          My client, pursuant to the contract, delivered to the

17   debtor's Mexican plant two pieces of equipment.  They went

18   there prior to the petition to install the equipment as per the

19   contract.  The debtor was not ready for the equipment to be

20   installed and the debtor now, post-petition, has requested that

21   my client complete the contract for which they will pay the

22   $4,000.00 installation fee as an administrative claim for post-

23   petition work, presumably, although that's not even clear but

24   they've made no attempt to assume the contract and pay my

25   client the roughly $77,000.00 that's due for the equipment and,

35

1    Your Honor, it places my client in a very tenuous position

2    because, obviously, if they install it then the debtor can

3    reject the contract and not have to pay the pre-petition

4    services, all of which in essence turns this into the debtor

5    cherry picking that portion of the contract it wants to have

6    done and allowing it to reject the rest of the contract.

7           It may be, Your Honor, that this is not a

8    particularly important contract as far as the debtor is

9    concerned and the debtor wants to make the decision, that's

10   fine, but, Your Honor, in our conversations with

11   representatives of the debtor and general counsel for the

12   debtor since the filing -- I don't want to say there's been a

13   threat but there's certainly been an implication that if we

14   don't go and install it we'll be liable for whatever damages

15   the company has in being unable to fulfill its contracts

16   because it doesn't have the equipment up and running and,

17   obviously, that could cause my client tremendous financial

18   hardship and risk.

19          So we're just asking that the Court have the debtor

20   look at the contract, make a decision.  It's just not that big

21   an issue and the debtor ought to be able to make a decision

22   fairly quickly or advise everybody that it doesn't need to make

23   a decision quickly and it can put everything off for however

24   long it needs to and in the meantime my client would not have

25   to be responsible for fulfilling its portion of the contract.

36

1          THE COURT:  Okay.

2          MR. BUTLER:  Your Honor, this is an example of where

3   the debtors do not believe at the moment there is any good

4   business reason why the debtors should make a decision about

5   the assumption or rejection of this contract.

6          As counsel has acknowledged, this is an executory

7   contract.  They are obligated to continue to perform under it

8   and we are obligated to pay for their post-petition

9   administrative claims associated with that contract which

10  simply means as it sets out for Pillar House, they have about

11  $4,000.00 worth of additional work to do.  It's work to install

12  the equipment.  They're contractually obligated to do it.  We

13  will pay them the $4,000.00 for those services performed and

14  then we will address whether the executive contract ought to be

15  assumed or not ought to be assumed.

16         They're trying to use this process essentially to

17  have the debtors pay $81,000.00 or $82,000.00 for a $4,000.00

18  installation job because they're trying to bootstrap their pre-

19  petition claim against the post-petition obligation for service

20  and there's really no basis to do that as we certainly

21  understand the application of the statute.  In this particular

22  case this contract is not expiring in the near term, there are

23  not extraordinary circumstances --

24         THE COURT:  Well, does it expire when they've

25  installed the goods?

37

1         MR. BUTLER:  It may be fully performed at that time,

2    Your Honor, that's a different question.

3         But there's no basis under a 365, as certainly the

4    debtors understand it, for someone who has a contractual

5    obligation to install equipment post-petition, which they do,

6    to not perform those services and be paid an administrative

7    claim, be paid for those services rendered.

8         THE COURT:  Are the debtors themselves facing a

9    deadline for when this needs to be installed?

10        MR. BUTLER:  Your Honor, Mr. Sheehan is present and

11   can testify to this.

12        There is, I think, some need to get this equipment

13   installed here at the plant that it was delivered to.  I don't

14   have the exact deadline on what that would be but they have

15   under their contract an obligation to install it now.

16        THE COURT:  Is this something that any talented

17   mechanic can install or do these people have special expertise

18   that only they are necessary to install it?

19        MR. BUTLER:  My understanding when I asked a question

20   similar to that, Your Honor, is that these particular -- that

21   the company that provides this equipment have the

22   qualifications to install the equipment.  I don't know if we

23   couldn't go find another mechanic, maybe we could, but my

24   understanding is they need to do it and it's a pretty simple --

25                    (Pause in proceedings.)

38

1          MR. BUTLER:  As I was saying, Your Honor, I believe

2    that they have the expertise to install the equipment.  I think

3    they're experienced in installing it.  The debtors do not wish

4    to take on the obligation of finding someone else to install

5    that equipment and among other things invalidating the

6    warranties and other contractual agreements we have between us

7    and the supplier.

8          This particular question is do they have an

9    obligation to perform?

10         THE COURT:  Well, if you reject it do you lose the

11   warranties?

12         MR. BUTLER:  We may, Your Honor.  I haven't examined

13   that.  I mean that's the whole point.  This isn't a time --

14   we're sixty days into our case.  This is not the time to assume

15   or reject a contract that we don't believe is affecting if you

16   will the supply chain.  This is an example of where the debtors

17   believe somebody is trying to take advantage of the system to

18   leverage their $4,000.00 installation fee against a $77,000.00

19   recovery of a pre-petition debt and we didn't think that's the

20   way 365 operates.  They should install the equipment and they

21   should get paid their $4,000.00 and we'll deal with the other

22   issues later.

23         THE COURT:  Well, are you prepared to stipulate that

24   if they're necessary to install the equipment that their

25   administrative claim may be significantly greater than

39

1   $4,000.00?

2           MR. BUTLER:  Well, the contract provides for

3   $4,000.00, Your Honor, so I'm not prepared to stipulate to --

4           THE COURT:  All right.

5           I will grant the motion and give the debtors ten days

6   to decide whether to assume or reject for the following reason.

7   As set forth in the <u>Burger Boys</u> (sic) case as well as <u>Adelphia</u>

8   <u>Communications</u>, the Court is to consider on a case-by-case

9   basis in essence the balance of harm to the debtor and the

10  contract party.

11          Normally, that balance tips decidedly in favor of the

12  debtor.  However, in the unique circumstances of this motion

13  where in essence the debtor would be forcing the contract party

14  to work through the completion of the contract so that it is no

15  longer executory, I see no meaning in the provision of the Code

16  that permits a contract party to seek to compel assumption or

17  rejection of an executory contract if in fact I granted the

18  debtor's objection here because in essence the contract would

19  be no longer executory at that point and, clearly, in my mind

20  the debtors would have been leveraging the contract party to

21  complete performance for only $4,000.00.

22          Now, it may well be that in those ten days the debtor

23  can find someone that will do this for $4,000.00 or even

24  slightly more and I think that's the type of flexibility that

25  in these circumstances Congress had in mind as opposed to

40

1    requiring full performance under these circumstances.

2         So the debtors have ten days to decide whether to

3    assume or reject.

4         MR. BUTLER:  Thank you, Your Honor.

5         MR. DONOVAN:  Thank you, Your Honor.

6         I'll submit an order.

7         MR. BUTLER:  Your Honor, the next matter on the

8    agenda is matter No. 28.  Russell Reynolds & Associates, Inc.

9    This is a motion in which we have an alleged executory contract

10   which Russell Reynolds would like to have a deadline fixed in

11   which they must assume or reject an employment recruiting

12   contract between Russell Reynolds and Delphi.  Russell Reynolds

13   is an executive recruiting services firm.  They were retained

14   by the debtors to solicit and vet individuals for employment by

15   the debtors as the particular position they're looking for is

16   something called the director of global architecture and

17   infrastructure.  They are in the process of implementing that

18   search.

19        Pursuant to the agreement, Russell Reynolds was to

20   receive one-third of the total compensation paid to the

21   candidate hired and that was a minimum fee -- rather, against

22   that one-third, sort of a third of the compensation, they got a

23   minimum fee.  The minimum fee is $106,000.00.  It was to be

24   paid in three monthly retainers.  They got one of those three

25   retainers paid pre-petition, the others got not paid and were

41

1   caught up in the pre-petition amount.

2          They have not yet completed the search.  Our view is

3   they should continue to complete the responsibilities under the

4   search and unlike, Your Honor, the last motion the debtor's

5   view here is that if in fact they complete the search and place

6   someone to the satisfaction of the debtors they will earn the

7   fee for the completion of that placement post-petition against

8   which they'll simply be crediting less of a credit then they

9   might have otherwise gotten as a minimum fee.  But if they

10  never complete the search and they never perform post-petition

11  administrative services for the debtors to result in that value

12  to the estate, then they will end up having an unassumed

13  executory contract which we'll deal with at some time but if

14  it's rejected, for example, they'll have whatever claims

15  they'll have but that will be for the minimum fee.  We don't

16  think we should bootstrap the minimum fee into an

17  administrative expense.

18          Our view here is they should go complete the search.

19  We get the quality candidate, that is clearly an administrative

20  expense against which the other matters would be credited.

21          THE COURT:  Okay.

22          MR. BOULBOL:  Good morning, Your Honor.

23          Charles Boulbol for Russell Reynolds Associates.

24          As counsel pointed out, there is an executory

25  contract between Russell Reynolds and the debtor.  The

threshold issue presented to the Court is does the debtor and

Russell Reynolds have the authority of the Court to proceed

under this contract?

The position that is sought to be filled, the salary

level that is being discussed is about $300,000.00, maybe a

little more per year.  There was a candidate interviewed by the

vice chairman of the company yesterday so we are making

significant performances on behalf of the debtor post-petition

and if that person is hired -- and there's also a back-up

candidate, I understand -- there will be complete performance

of the intent of the agreement which is for Russell Reynolds to

deliver someone who will ultimately become the chief

information officer of the company.

Now, when Russell Reynolds goes out to find people to

take these positions, they didn't go out to find a person to

take this position for a bankrupt company.  So the debtor has

completely altered the landscape under which we are proceeding.

Nevertheless, we have continued to perform.  The cases make

very clear that our only alternative is to come to court and

ask for the contract to be assumed or rejected, assuming the

Court agrees that the debtor is able to proceed without prior

Court permission.  The cases make pretty clear that real estate

brokers have to be retained by the Court, investment advisors

and the work that Russell Reynolds does is essentially

indistinguishable from the work that real estate brokers and

43

1  investment advisors do.

2         Under the terms of the contract Russell Reynolds

3  intends to have the position filled in about a three to six

4  month period.  We're in that window now, although, we did agree

5  to continue the search until it was completed.  Of course, now

6  the debtor has altered the landscape but, nevertheless, we seem

7  relatively confident that the job is going to be done but,

8  again, Your Honor, if Russell Reynolds is a professional, its

9  status must be decided now.

10        There are too many cases out there of real estate

11 brokers who made the application after the property was sold

12 for us to have any comfort that we have the right to proceed

13 which we have, nevertheless, done at the insistence of the

14 debtor.

15        The only case I've ever found that even remotely

16 approaches the situation that Russell Reynolds finds itself in

17 is In Re:  Monarch Capital, 163 BR 899.  In that case, an

18 exclusive financial advisor entered into a letter agreement

19 regarding the sale of the debtor's holdings in another company.

20 It was a success fee based fee which is essentially what

21 Russell Reynolds has agreed to here.

22        Now, counsel says Russell Reynolds gets paid only if

23 it's successful.  Well, that's not what our contract says.  Our

24 contract says Russell Reynolds gets paid without regard to the

25 results of the search.  That's the first point.

44

1          The second point is the debtor needs this position

2    filled now.  It is a critical position in the debtor's

3    reorganization.  So for the debtor to take the position that,

4    "Well, we'll decide what to do about Russell Reynolds after

5    Russell Reynolds completely performs under the contract," is

6    completely unreasonable.

7          Now, the Court in <u>Monarch</u> noted that Putnam, the

8    investment advisor, should have been the subject of a retention

9    order and it explained that in great detail but because the

10   debtor forced the investment advisor to continue, the Court

11   ruled that there were post-petition performances by the

12   investment advisor that were entitled to administrative

13   priority and it described how that came about.

14         Russell Reynolds is not here saying, "We want to get

15   paid today, we want to get paid tomorrow."  What we're here

16   today saying is, "We need to know what our status is legally

17   under the Bankruptcy Code because it's unclear."  There has

18   never been a case to decide the issue of whether an executive

19   search firm must be specially retained.

20         I can tell Your Honor that twice in the last year for

21   Russell Reynolds in the District of Delaware we've gotten

22   retention orders and I have gone to fee application hearings

23   with my client in Delaware where we walked out of there saying,

24   "Thank goodness we had a retention order."  Russell Reynolds

25   doesn't keep time sheets.  They don't keep contemporaneous

45

1   records of individual work done.  We vet the universe and we

2   try to find successful candidates and that's what we're doing

3   and that we're successfully, so far, doing for the debtor here

4   but the debtor is taking the position that, "We'll wait and see

5   how we treat Russell Reynolds after they complete performance."

6          THE COURT:  Well, no, I heard Mr. Butler say that if

7   they hire the individual that you will be paid.

8          MR. BOULBOL:  Well, we'll be paid what is the first

9   question?  What are they going to say?  They'll say the pre-

10  petition is different than the post-petition.  The fact of the

11  matter is we have a fee for finding a candidate that was made -

12  - if the search was unsuccessful we're still entitled to our

13  fee so the question for the debtor is assume the contract or

14  reject it.

15         If they reject the contract we just simply stop

16  working and we have a general unsecured claim.  If they want to

17  assume the contract and we completely perform which we're

18  basically on the verge of doing and even if it is unsuccessful

19  and the debtor decides, "Oh, we can't get anybody or we don't

20  want anybody or this position needs the Court approval to be

21  filled," we're still entitled to our fee and right now we're

22  entitled to a fee -- actually, in the Monarch case the Court

23  said that it was unjust to allow Putnam to only recover for its

24  expenses because I think that's what the debtor's position will

25  be here because our contract says we get to bill them post-

46

1  petition -- well, we get to bill them for the expenses we incur

2  in bringing candidates to interview and flying them out to

3  Michigan and that sort of thing.

4         THE COURT:  Frankly, my experience has been that

5  firms like Russell Reynolds don't get retained in bankruptcy

6  cases formally.

7         Does the U.S. Trustee have a position on this?

8         MS. LEONHARD:  Your Honor, I believe to my knowledge,

9  a firm like this has never been retained so I think it's

10 probably not appropriate.

11        THE COURT:  The two cases you mentioned in Delaware,

12 I think, represent a change in the practice that I was familiar

13 with -- now, three or four years ago but -- it sounds to me,

14 though, what you're seeking is really different than compelling

15 assumption or rejection of a contract, it's either to file a

16 retention application or to have assurance that you will have

17 an administrative claim for your client's services.  It's one

18 or the other, I think, as opposed to compelling assumption or

19 rejection of the agreement which doesn't really fit into either

20 approach, it seems to me that could be given here.

21        MR. BOULBOL:  Well, if the Court approves assumption

22 or rejection of the contract then our status is solidified.

23        THE COURT:  Well, I know, but I would never approve

24 the assumption or rejection of, say, Rothschild's pre-petition

25 agreement.  They are clearly -- I'm just using it as an example

47

1  -- a professional that would be retained under 327 as opposed

2  to them moving in front of me to compel assumption or rejection

3  of their contract.  That would be rejected by me automatically.

4         So, I think what you want here is reasonable comfort

5  that you'll be compensated appropriately for -- or your client

6  will be appropriately compensated for its services under 503(b)

7  and you've heard the U.S. Trustee, I don't think you will be

8  barred from that, and you've heard me, too, I don't believe

9  your client will be barred from that because there's been no

10  retention order and as far as the measure of the compensation

11  is concerned, the contract is presumptively the measure of that

12  compensation but if, for example, you're unsuccessful in

13  finding a candidate, I have the flexibility to move off of that

14  but that's the way 503(b) works.

15         So, I'll deny the motion but, I believe, you can give

16  Russell Reynolds the comfort that they will have an allowed

17  503(b) claim for their post-petition services if they're

18  successful.  Presumptively, it's measured by the contract but

19  that's subject to the case law in 503(b) generally.  If they're

20  unsuccessful, I imagine there will be some claim but we'll see

21  what it is.

22         MR. BOULBOL:  Thank you very much.

23         THE COURT:  Okay.

24         MR. BUTLER:  Matter No. 29 is Bank of America's

25  Leasing and Capital, LLC's motion for adequate protection filed

48

1    at docket No. 1022.

2            There were several objections filed; one by Pentastar

3    [Ph.] Aviation at document No. 1251, one by the debtors at

4    docket No. 1269 and Bank of America filed a response at docket

5    No. 1284 and Mr. Berger is handling this matter for the

6    debtors.

7            THE COURT:  Okay.

8            MR. MEARS:  Good morning, Your Honor.

9            THE COURT:  Good morning, Mr. Mears.

10           MR. MEARS:  Thank you very much.

11           Your Honor, my name is Patrick Mears.  I'm an

12   attorney with Barnes & Thornberg, LLP based in Grand Rapids,

13   Michigan.  I am representing Bank of America, N.A., which is

14   the lessor of two corporate aircraft to Delphi Automotive

15   Systems Human Resources, LLC and I'll refer to that company as

16   Delphi HR throughout.

17           This is the preliminary hearing on the Bank of

18   America's motion for adequate protection and relief from the

19   automatic stay.  It was filed on November 11th of this year.

20   The Court has not yet scheduled a final hearing.  Two

21   objections to the motion have been filed as noted in the

22   agenda; one by the debtors and one by Pentastar Aviation, LLC.

23           Bank of America has responded to the two objections

24   separately.  I note that the response to the Pentastar

25   objection is noted in the agenda, the response to the debtor's

49

1   objection is not.

2           THE COURT:  I read both.

3           MR. MEARS:  Okay.  Great.  Thank you very much.

4           Now, just some background facts and if you're

5   familiar with the papers I'll keep this relatively short.

6           Basically, these two aircraft are managed by

7   Pentastar and there is two charter agreements with a Pentastar

8   affiliate named Automotive Air Charters, Inc. and as we

9   understand it Automotive Air Charters, Inc. charters the two

10  aircraft to third parties during the times during which Delphi

11  is not using them.  Automotive Air Charter then pays Delphi HR

12  a fee after, I think, deducting a certain percentage amount

13  which we have been advised by the debtors amounts to

14  approximately $80,000.00 per month which is not an

15  inconsiderable sum.

16          I think the primary facts involved are fairly

17  straightforward.  They don't appear to be disputed, although

18  there may be certainly disputed facts as we go forward, but I

19  would note that neither the DIP lenders nor the creditors

20  committee have filed a separate objection to this motion.

21          Now, really, what we're talking about here is

22  primarily the cash collateral generated by the charter

23  agreements and also any cash collateral that might be generated

24  by the management agreement or any subleases.

25          It's clear that that cash collateral has been carved

50

1  out of the debt.  It's not subject to any liens in favor of

2  anyone else other than Bank of America and what we've gotten

3  down to -- and there have been negotiations as the debtor has

4  stated in its objection, there have been long negotiations

5  about the resolution of this motion and what it's really come

6  down to primarily is a dispute over whether or not Bank of

7  America should be entitled to receive replacement liens under

8  Section 361 of the Bankruptcy Code as adequate protection of

9  its security interests in those revenues, not only the ones in

10 existence now but also to be generated in the future.

11         It is conceivable, based upon the debtor's track

12 record and entering into agreements without Bank of America's

13 knowledge concerning the charter agreements that the debtor

14 could enter into a new charter agreement with someone else

15 without our knowledge or consent and then take the position,

16 conceivably, or someone else can take the position,

17 conceivably, that the revenue generated from those new charter

18 agreements does not constitute property that's subject to our

19 lien.  It's not products or proceeds.

20         It's also possible, although I don't think the debtor

21 has said this yet, that someone might say that a charter

22 entered into between Automotive Air Charters and X on March 31,

23 2006, even though done under the existing charter agreement,

24 could be free and clear from our post-petition efforts.

25         The point is that the dollars are significant enough

51

1   that Bank of America does not wish to face these issues in the

2   future and it really is primarily concerned about getting a

3   replacement lien in future revenues and also in future

4   agreements.

5        It is important also to note that the leases have not

6   yet been assumed or rejected.  The debtor has not yet made any

7   post-petition payments to Bank of America, though, it is using

8   the aircraft and we understand that there are post-petition

9   charters being entered into.

10        THE COURT:  Isn't the debtor offering to make -- this

11   was something I was a little confused about.

12        The debtor seemed to be offering to make post-

13   petition payments but what B of A was asking for didn't seem to

14   include post-petition payments.

15        MR. MEARS:  No, what the debtor offered was in the

16   context of, really, a global settlement.

17        THE COURT:  Right.

18        MR. MEARS:  As I understand the offer, there would

19   have been a pro-ration made as of December 6th which is the end

20   of the sixty day so-called grace period under 365(d)(10), that

21   that amount would have been paid and the debtor would have

22   continued to make future lease payments but the debtor is

23   reluctant, unwilling, to give us a replacement lien in the

24   charter revenue.

25        It is conceivable that the leases could be rejected,

52

 1  that because of the rejection we would then have to liquidate

 2  the aircraft and that we could end up, based on our estimates

 3  done earlier this year that we could have a multi-million

 4  dollar shortfall.  At that point the only way we could cover

 5  that shortfall is by recourse to this cash collateral that has

 6  been building up, presumably, and hopefully been paid over to

 7  Bank of America in reduction of its claims.

 8          But in any event, that's been the nub of the issue.

 9          THE COURT:  Okay.

10          Now, I'm right, though, that there's no concession

11  that these are true leases.  Right?

12          MR. MEARS:  The first we heard of that was the

13  reservation of rights contained in the debtor's objection.

14          THE COURT:  Okay.

15          I don't understand, though, why -- assume that the

16  debtor can adequately protect B of A for the use of the

17  airplane and for its depreciation and value which is, arguably,

18  something approaching the lease payments.  Why is B of A

19  entitled to adequate protection in the form of a replacement

20  lien for its interests in the charter agreement -- it's lien on

21  the charter agreement?  Assuming that the debtor doesn't use

22  the cash collateral that's generated by that charter agreement.

23          MR. MEARS:  Because it's conceivable that the debtor

24  could enter into a new charter agreement and whatever small

25  amount -- that could be done tomorrow or relatively soon.

53

1          THE COURT:  But why does that leave B of A

2     inadequately protected in respect of its lien on the charter

3     agreement?

4          MR. MEARS:  Because if there's a rejection of the

5     leases and a liquidation of the collateral we will have a

6     substantial shortfall based on our estimate of the market right

7     now.

8          THE COURT:  But that doesn't reflect the decline in

9     value during the post-petition period, that's just a reflection

10    of the value of the collateral.

11         Remember, I prefaced my question by saying, "assume

12    that the debtor is paying you for the post-petition use of the

13    planes under the lease."

14         MR. MEARS:  Assuming that all charter revenues are

15    being escrowed and not used by the debtor?

16         THE COURT:  Yes, that's what they're proposing.

17         MR. MEARS:  And that we would then not be prohibited

18    -- if, indeed, the debtor entered into a new charter agreement

19    we would not be prohibited then from asking for additional

20    adequate protection?

21         THE COURT:  Well, I am assuming they would have to

22    give you notice of their entry into a new agreement.

23         MR. MEARS:  I hope so.

24         THE COURT:  Since you have a lien on the plane and

25    the charter assumes the use of the plane.

54

1          I don't know whether you'd be entitled to adequate

2    protection at that point but we'd see at that point.

3          MR. MEARS:  Well, the only other point is if you

4    analogize the charter payments to rents, I mean this is a

5    wasting asset.  If the debtor uses that money in the course of

6    its Chapter 11 case it's gone.

7          THE COURT:  But as I read it they weren't proposing

8    to use it, they're proposing to leave it aside until further

9    determination that you're adequately protected even if they do

10   use it.

11         MR. BERGER:  That's correct, Judge.

12         THE COURT:  So, in a way I thought you won when I

13   read what they were offering.

14         MR. MEARS:  Well, the concern --

15         THE COURT:  I appreciate your notice issue but given

16   that a new charter would be using either a plane you own or

17   that you have a lien on or that you own and they're leasing

18   from you, I can't imagine how they couldn't give you notice.  I

19   mean I would think that the other party of the charter would

20   insist that the potential owner of the plane or the person that

21   has a lien on the plane would get notice of the new charter.

22         MR. MEARS:  Well, with those remarks I guess all I

23   can suggest is that this Court schedule a final hearing and

24   then in the meantime --

25         THE COURT:  You can work out the details of an

55

1   agreement.

2           MR. MEARS:  -- we would attempt to reach a

3   settlement.

4           THE COURT:  And I don't know if Pentastar is here but

5   given the factual issue that you raised in your response, that

6   seems to me to be something that should be addressed at a final

7   hearing, too, which is whether they have any right to assert

8   what they're asserting or not but given that what the debtor is

9   offering is, I assume, something they would agree with, I'm

10  assuming that would get resolved also before the final hearing.

11          So should we put this on for the 5th of January?

12          MR. MEARS:  The 5th of January is fine, Your Honor.

13          Thank you.

14          THE COURT:  Okay.

15          MR. BUTLER:  Your Honor, the next matter on the

16  contested non-evidentiary docket is matter No. 30, Censis

17  Precision Diecasting, Inc. [Ph.].  Their motion directing the

18  debtors to determine within thirty days whether to assume or

19  reject their executory contracts with Censis Precision

20  Diecasting, Inc. at docket No. 1028 and we have filed an

21  objection, Your Honor.  This matter is contested.

22          MR. MOSER:  Good morning, Your Honor.

23          Eric Moser of Kirkpatrick & Lockhart, appearing on

24  behalf of Censis Diecasting.

25          If I can begin with a preliminary matter.

56

1          I was called in to replace lead counsel on this

2    matter approximately ten minutes ago so I have not had a chance

3    to file a pro hac vice motion.  I would request the Court's

4    indulgence.  I'll take care of that as soon as I leave this

5    afternoon.

6          THE COURT:  Okay.

7          MR. MOSER:  In a nutshell, Your Honor, Censis

8    Precision Diecasting has a number of long-term supply contracts

9    with Delphi.  Delphi is far and away Censis' largest customer

10   and as a result, the outstanding arrearages under the contract

11   on a pre-petition basis and also the uncertainty going forward

12   on a post-petition basis caused a significant amount of

13   distress to their allocation determinations regarding the

14   present use of their assets.

15         Accordingly, we have asked the Court to impose a

16   deadline on Delphi, requested thirty days to make a

17   determination as to whether they will be assuming this contract

18   or not.

19         I can run through the factors in that analysis if the

20   Court would like but I believe they're fairly set forth on our

21   papers.

22         There is a small dispute, apparently, regarding the

23   calculation of the post-petition amounts due under the

24   contract.  I understand that the debtor has been making some

25   payments, although, in Censis' view those are inadequate and

57

1    based on an inappropriate modification of certain aluminum

2    commodity costs.

3             Under the circumstances, given the fairly modest

4    amounts at issue, approximately $2 million, I believe, are

5    currently outstanding.  We think that this would impose

6    relatively little burden on Delphi to make a determination to

7    assume this contract and based on the information that I have –

8    –

9             THE COURT:  Isn't it a lot of contracts?  Isn't it

10   like thirty contracts?

11            MR. MOSER:  It is a large number of contracts

12   although the amount due is relatively small.

13            It's of great importance to our client and it's

14   relatively insignificant in the context of the larger case.

15            THE COURT:  Do these contracts have the termination

16   for convenience language that is sort of the customary Delphia

17   terms?

18            MR. MOSER:  I believe that they do, Your Honor.

19            THE COURT:  Okay.

20            MR. MOSER:  As I said, in a nutshell, Your Honor, we

21   believe this would impose relatively little burden on Delphi to

22   make a determination regarding these contracts in a modest

23   period of time.  Thirty days is what we've asked and it imposes

24   a significant burden on our client to endure the uncertainty

25   associated with having their largest customer contracts

58

1   outstanding and unassumed during the interim period.

2           Apart from that, I'll stand on our papers, Your

3   Honor.

4           THE COURT:  Okay.

5           MR. BUTLER:  Your Honor, as Your Honor recognized,

6   this motion involves obligations surrounding two long-term

7   contracts and several blanket purchase orders so there are

8   multiple agreements here.

9           I think the total amount of annual sales between

10  Censis and the debtors is about $25 million and this is an

11  example of a contract that we are prepared to perform in the

12  interim basis post-petition but haven't made a final decision

13  about what's going to happen long-term in dealing with this and

14  this is -- I don't think Your Honor can look at the Censis

15  contracts -- there's another motion following it which is a

16  similar one -- in a vacuum or in a void because behind Censis

17  there are thousands of suppliers who have similar arrangements

18  and we're going to be dealing with that a little bit this

19  afternoon in the contracts that are coming up in the shorter

20  horizon where we risk the loss of supply.

21          Here with Censis, the debtors don't risk any loss of

22  supply.  The debtors are prepared to perform under the contract

23  in terms of paying the amounts for post-petition services that

24  are goods that are delivered to them.

25          I don't believe that an issue of allocation

59

1    determinations, which is the harm that is being suggested here

2    by the movant, comes anywhere close to the legal standards that

3    we'd suggest that they would have to compel some type of early

4    assumption and the debtor's general position with all of these,

5    Your Honor -- I mean Your Honor understands we think the supply

6    chain is extremely important, we think it's probably the major

7    value driver of this Chapter 11 case.  We are completely

8    sensitized to dealing with the supply chain but the debtors do

9    not believe that they should be making assumption or rejection

10   decisions regarding long-term contracts that come up in June or

11   December of next year until the case proceeds down the line and

12   there's more clarity about what we should be doing as it

13   relates to those transactions.  There's no, we don't believe,

14   any real benefit to the estate, in fact we believe the estate

15   is harmed by forcing an early assumption and an early cure of

16   outstanding amounts as far as cure payments go for long-term

17   contracts in which the debtors believe performance is required

18   and as Your Honor noticed from Mr. Berger's presentation of

19   motions, the debtors launch of the Chapter 11 cases has been

20   quite successful with the supply chain in requiring the people

21   under their obligations under the agreements and the so-called

22   -- I guess we agreed not to use the word "rogue" -- non-

23   conforming suppliers.

24        You saw an example today of someone who, based on the

25   procedures Your Honor permitted, are in fact giving back money

60

1  to the estate that they otherwise compelled us to deliver to

2  them to maintain the supply chain.

3          So in sum, Your Honor, the debtors with respect to

4  this motion think it is premature to make a decision about this

5  and to impose a cure obligation payment on the estate.  I would

6  simply point out, Your Honor, that if Your Honor were to grant

7  this particular motion because of the vendors' concern

8  suppliers concern about allocation determinations, I think you

9  will virtually guaranty a thousand similar motions for the next

10 hearing or a hearing shortly thereafter because if that's the

11 standard in which the 2006 and 2007 renewals can be forced and

12 they can get 100 percent cure payments for it, I'm sure people

13 would find that a much more preferable way to proceed in this

14 case then deal with the kind of measured response that we'll be

15 dealing with this in the proposal this afternoon where we have

16 contracts that have a shorter horizon that we want to renew for

17 a series of years and that have implications on the supply

18 chain -- immediate implications.

19         Your Honor, we believe the primary reason that it's

20 premature and that there's no extraordinary harm imposed on

21 this vendor, we would ask Your Honor to deny the motion.

22         THE COURT:  Okay.

23         MR. ROSENBERG:  Your Honor, this one is of sufficient

24 precedential value to us or potential harm, I might add, that I

25 will rise in support of the debtor's position on this one and,

61

1    indeed, without agreeing at all with what the debtor said with

2    respect to the motion this afternoon, payments or cure and

3    assumption of a long-term contract where there are no immediate

4    issues or risks involved is simply unwarranted and would simply

5    open the flood gates for thousands and thousands more which is

6    simply not justified on the facts.

7              THE COURT:  Okay.

8              Do you have anything to say, Mr. Moser?

9              MR. MOSER:  Just briefly, Your Honor.

10             I can't speak to what thousands and thousands of

11   suppliers might do tomorrow and it seems to me that in this

12   case many amounts of money have been set aside for substantial

13   but discrete groups of vendors.

14             I think the case law calls for the Court to balance

15   the harms and in this case Delphi is, proverbially speaking,

16   the 800 pound gorilla who has the vast majority of the leverage

17   in the relationship so we're exposed to a great deal more harm

18   by the uncertainty than another vendor might be if they did not

19   have that largest customer relationship.

20             Beyond that I have nothing to add.

21             THE COURT:  All right.

22             I'm going to deny this motion to compel assumption or

23   rejection.

24             Again, applying the factors laid out in <u>Burger Boys</u>

25   and other cases including <u>Adelphia Communications</u> in balancing

62

1    the harm between the debtor and Censis as well as the status of

2    the case and particular concerns pertaining to that status as

3    it relates to these contracts and other contracts like it, it

4    seems to me that the debtor should have unfettered right at

5    this time to decide whether to assume or reject some or all or

6    none of these agreements.

7           Censis is an important supplier to Delphi and these

8    are not easily analyzed agreements.  I note that the motion had

9    exhibits A through I listing all the contracts and,

10   consequently, I think that the debtor should be given more time

11   to analyze the agreements.  Secondly, while there was a

12   suggestion that Delphi was not performing all of its post-

13   petition obligations when the dispute was actually discussed in

14   detail, it appears to me more likely than not that Delphi is

15   right on the dispute and not Censis, given my review of the

16   actual agreements which seem to contain the pricing provision

17   that Delphi is relying on.  So Delphi does appear to be

18   performing post-petition.

19          Last, as far as any particular harm to Censis caused

20   by being in the assume or reject limbo I note, first, that only

21   in respect of one of the contracts -- the tooling contract --

22   did Censis allege that there was some significant advance

23   capital outlay or planning to be had, although that wasn't

24   really amplified beyond that general statement and, second, I

25   note that as confirmed today, these contracts all have the

63

1   termination for convenience language in them which in essence

2   shifts much of the risk on to the supplier anyway from Delphia

3   and weighing all of those factors it appears to me that the

4   motion should be denied.

5           MR. MOSER:  Thank you, Your Honor.

6           Could I just clarify that the Court was not ruling on

7   the post-petition pricing issue?

8           THE COURT:  No, I'm not ruling I'm just saying as far

9   as ongoing performance that that factor is concerned, it

10  appeared to me that the debtor had the better argument there.

11          MR. MOSER:  I just wanted to preserve our rights if

12  in fact that should turn out to be a more contentious issue.

13          Thank you, Your Honor.

14          THE COURT:  Okay.

15          MR. BUTLER:  Your Honor, the next matter and the last

16  matter on this part of the agenda is the Selectron Manufacturer

17  de Mexico, S.A. motion filed at docket No. 1087.

18          This is a similar motion to fix a time to assume or

19  reject the time for assumption or rejection of the executory

20  contract.

21          Selectron is a provider of electronic manufacturing

22  integrated supplying chain services to Delphi.  The contract at

23  issue is a long-term supply and manufacturing contract whereby

24  Delphi purchases goods, components and products.

25          It's a requirements contract and with installment

64

1  requirements and the matter is contested.

2           MR. LAW:  Good morning, Your Honor.

3           Kenneth Law of Bialson, Bergen & Schwab [Ph.] on

4  behalf of Selectron.

5           I won't belabor the issue.

6           Our contract is very similar in many respects to the

7  last matter that was before the Court.  This is a long-term

8  supply requirements contract and so we're supplying components

9  not only that we make but supplies of products that we put

10 together as subcomponents and supply to the debtor for their

11 supply chain.

12          Timing, obviously, is of the essence here.  Our

13 concern and the risk here is that the risk to my client far

14 exceeds in terms of time the payment and rejection policies

15 under the contract.  So in other words, we're required to

16 perform post-petition but we're also required to buy these

17 advance future parts in order to supply the requirement side of

18 the contract.  It's possible that we may at any given point in

19 time be purchasing or committing to purchase items several

20 million dollars in excess of the actual payment risk that we

21 might have before we know there's a default under this

22 contract.

23          So, therefore, by continuing to perform under this

24 executory contract we're actually extending our risk by several

25 multiple factors.

65

1          Now, I understand the argument that was previously

2   made and it applies equally, frankly, to this case.

3   Nonetheless, I think the debtor could make a decision on this

4   within some period of time.  I'm not asking for thirty days.  I

5   made the offer to the debtor that I would adjourn this hearing

6   if they would make some commitment to make a decision within

7   some time period less than confirmation and they've only been

8   willing to give me a commitment to "some decision will be made

9   before the plan is confirmed."

10          Given the risk imposed on my client, I think

11   something less than that in terms of a deadline is appropriate.

12          THE COURT:  Okay.

13          MR. BUTLER:  Your Honor, I'll not repeat the

14   arguments I made in connection with the last motion but adopt

15   them for purposes of the record for this because it is, I

16   think, similar.

17          I would just amplify one issue and that is that --

18   this, I believe, also has a termination for convenience

19   provisions in it and there are contractual provisions and what

20   happens in those circumstances with future work that had been

21   authorized -- work in progress that had been authorized -- and

22   those provisions and the risk allocations between the supplier

23   and Delphi had been negotiated between the parties.  I don't

24   think that's an assumption or rejection risk particularly

25   because to the extent that they are acquiring post-petition

66

1   inventory or post-petition raw materials for a post-petition

2   basis and they're going to have a claim, whether there's a

3   rejection or not under 503(b) or otherwise, they're going to

4   have administrative claims for what they're doing post-petition

5   and the allocation of risk as between the supplier and the

6   debtors is set forth in those contractual terms which may not

7   be entirely binding but, I think, will provide some guidance to

8   the Court if we ever get there and I just don't think that's a

9   basis to set a time to assume or reject a long-term contract at

10  this point in time in the case.

11          THE COURT:  Okay.

12          I'm going to deny this motion as well, again,

13  applying the Burger Boys and Adelphia Communications factors.

14          It's very early in the case.  The debtors stated

15  since the start of the case that one of the reasons it is in

16  Chapter 11 is to further rationalize manufacturing facilities

17  and the like and those decisions clearly have not been made yet

18  on how to do that and will take some time to work through and

19  it seems to me that this agreement is bound up in that

20  decision.

21          Secondly, the debtor is, I think, without dispute,

22  paying its way post-petition under the contract and, thirdly,

23  as Mr. Butler said, the parties already laid out between

24  themselves the allocation of risk if the contract is terminated

25  for convenience which in essence is what a rejection is and

67

1   while that is not the absolute measure of a post-petition claim

2   it's the clear starting point for one as far as the capital

3   allocation issues go.

4          So I believe that Selectron is reasonably protected

5   weighing the balance of all the considerations that I have to

6   keep in mind here.

7          One point that it made and you made today is the

8   financial hardship of not being paid the pre-petition amount

9   owed but, again, that is being borne by in essence all of the

10  creditors in this case.  If it is so dramatic in Selectron's

11  case that it jeopardizes Selectron's business and the debtor

12  believes that business is necessary ongoing, I've already given

13  the debtor some leeway in connection with the rescue program

14  that I authorized but I don't know whether that's the case here

15  or not but it's an additional protection that Selectron has.

16         MR. LAW:  Thank you, Your Honor.

17         THE COURT:  Okay.

18         So, Mr. Butler, with respect to those motions you

19  should, I guess, submit orders denying the motions and if you

20  could just circulate them to the various counsel that were

21  involved.

22         MR. BUTLER:  We will, Your Honor.

23         Your Honor, that completes the morning agenda and

24  we'll take up matters 21 and 32 at 2:00.

25         THE COURT:  Yes.

68

1              I'd like to meet briefly with the counsel for the

2     committee and for the company just in my conference room back

3     here.

4              Otherwise, we'll resume at 2:00.

5                          (Recess.)

6              THE COURT:  All right.

7              We're back on the record in <u>Delphi</u>.

8              MR. BUTLER:  Your Honor, we're back on the debtor's

9     second omnibus hearing agenda.

10             If I could revisit matter 20, Your Honor?

11             Matter 20 was something the Court took up this

12    morning and this was the debtor's application for the

13    employment of Jones, Lang, LaSalle Americas, Inc.

14             On the record Your Honor noted that we did not

15    implicate in the order of Section 330, the Bankruptcy Code, but

16    instead of Section 328.

17             THE COURT:  Right.

18             MR. BUTLER:  That was done, I was advised -- over the

19    hour we did a little research over the lunch hour just to

20    verify where we were at on that -- that was because there are

21    co-brokers in this particular retention arrangement where there

22    can be a sharing of compensation.  That would be prohibited

23    under 330 and there's a lot of case law on that point and the

24    way I understand it's been handled in the District before is to

25    prove this under 328.  I don't think we're not -- the

69

1   information is not going to be shared.  The retention

2   arrangement will be made available to the U.S. Trustee and the

3   committee but I think because of the nature of that if Your

4   Honor is comfortable with a 328 rather than a 330, I just think

5   there's a technical problem.

6            THE COURT:  Well, what I'm referring to is just the

7   compensation -- the review of their compensation -- of the

8   LaSalle firm's compensation would be under 330.

9            MR. BUTLER:  Is the Court comfortable that we made

10  the disclosure about the co-sharing --

11           THE COURT:  That's fine.  No, that was clear on the

12  application.

13           MR. BUTLER:  Thank you, Your Honor.

14           THE COURT:  And they're not just a broker, they're

15  doing other things which is why I think it's kind of a sui

16  generous application.

17           THE COURT:  If we could just take a moment for the

18  telephone.

19           (Other parties being included by telephone.)

20           THE COURT:  Okay.

21           For those on the phone, we're back on the record in

22  Delphi Corporation.

23           I apologize for the glitch this morning but as I

24  recall, almost all of you were on the phone for the matter that

25  we're going to be addressing this afternoon so I don't think

70

1   you missed a whole lot.

2          Mr. Butler, why don't you continue.

3          MR. BUTLER:  Your Honor, the next matter we had

4   carried forward from the morning agenda was matter No. 21, the

5   Consumers Energy matter and Your Honor had some questions about

6   that.

7          We went back and examined the materials and I can

8   make the following report to the Court.  On October 13, 2005,

9   Consumers Power delivered a certified letter to Delphi in which

10  Consumers took the position that Delphi could not participate

11  in negotiations for favorable 2006 and beyond preferred rate

12  sets until the special manufacturing contract had been assumed.

13         The position that they were taking was in that

14  interpretation from Consumers Energy was that under their

15  general service transitional primary rate -- TPR -- Delphi was

16  not a current customer under the requirements of that rate set

17  under the availability section which states that the preferable

18  rate will be available to a current customer taking primary

19  voltage service under a special contract on December 31, 2005.

20  The position that the utility has taken is that under their

21  interpretation of the rate sets from Michigan Public Service

22  Commission and that Delphia, because the contract was not

23  assumed, would not be viewed as a current customer for purposes

24  of qualifying under that rate set.

25         We have, subsequent to receiving that letter, the

71

1   company through Mr. Poole, who is one of the affiants of the

2   Delphi employees available here today to testify, contacted

3   Consumers Energy and took the position that we believed Delphi,

4   because it was making timely post-petition payments under

5   unassumed contract and was entitled to receive service in the

6   ordinary course of business and in light of Your Honor's entry

7   of the 366 order that had taken place, that we believed that we

8   were eligible to participate in that process and asked them to

9   reconsider their position.  Consumers reconsidered their

10  position and contacted us again on October 31st and indicated

11  that they had made a determination that Delphi would need to

12  assume the special manufacturing contract before it expired on

13  December 31, 2005 to be subject to the rate set that I

14  described, the general service transitional primary rate -- TPR

15  -- and Consumers recognized in their communications with Delphi

16  that it was entirely within Delphi's discretion whether to

17  assume or reject the contract and recognized there were various

18  uncertainties that were -- including the fact that the Michigan

19  Public Service Commission had not approved the TPR rate -- the

20  final terms of that rate for 2006 and beyond.

21        That was the exchange between the parties.  We have

22  not done a regulatory review other than to take the position of

23  the utility because of the economics that both the committee

24  and we had reviewed -- it's adjusted economically, this was a

25  very good deal for us, that was the purpose of the motion -- I

72

1   think if that explanation is not acceptable to Your Honor, I

2   think the only thing that we could think of over the lunch

3   recess would be, Your Honor, to include a provision in the

4   assumption order that would direct Consumers Energy to file a

5   certification with this Court essentially certifying to this

6   Court that which they have directed -- they have told as a

7   public utility to the debtors -- which is that but for the

8   assumption this preferential rate would not be available.  I

9   mean I suppose the other alternative is not to approve the

10  motion in which case we run the risk of losing tens of millions

11  of dollars of benefits.

12          THE COURT:  Well, the utility has some rights that

13  are unique to it and other utilities under 366 but, actually,

14  as you were going through the facts I was thinking of something

15  else you could put in the order which is already somewhat

16  conditional in that the cure money is not there unless there's

17  a satisfactory new contract negotiated.

18          I think you should also put in the order that all

19  issues with respect to violation of the automatic stay are

20  preserved subject to further settlement between the parties.

21          MR. BUTLER:  We'll do that, Your Honor.

22          THE COURT:  Because, certainly, under the case law

23  this might fall under that category.

24          But with that caveat, I'll approve the motion.

25          MR. BUTLER:  Thank you, Your Honor.

73

1          Your Honor, the last and final matter on today's

2   agenda is matter No. 32 which has been referred to as the

3   supplier agreement assumption procedures motion.  It's the

4   debtor's motion for an order under various sections of the

5   Bankruptcy Code and Rules to prove (sic) procedures to assume

6   certain amended and restated sole support source supplier

7   agreements filed at docket No. 1098.

8          Your Honor, there were two, what I would call,

9   substantive objections filed to the motion -- to the relief

10  granted under the motion and those were filed by Wilmington

11  Trust Company as indenture trustee and by the official

12  committee of unsecured creditors.

13         I am pleased to report that we have reached a

14  settlement of those objections with those parties.  The balance

15  of the objections, all of which to the extent we were aware of

16  them on the docket, are listed on the agenda as of some point

17  in time yesterday and Exhibits A and B to the debtor's response

18  filed at 4:00 p.m. yesterday afternoon lists all of the

19  objections that we were aware of as of 11:00 yesterday morning,

20  although there have been additional supplier joinders and

21  objections filed since that time.

22         Your Honor, the debtors filed the assumption

23  procedures motion on Friday, November 18, 2005.  I'd like to

24  note at the outset of this hearing and express appreciation to

25  the support that has been given to the debtor's motion by the

74

1    debtor's two largest labor unions, the International Union of

2    United Automobile Aerospace and Agricultural Implement Workers

3    of America, otherwise known as the UAW, and the International

4    Union of Electronic Electrical Salaried Machine and Furniture

5    Workers and Communication Workers of America, the IUECWA, as

6    well as the administrative agents for the debtor's pre-petition

7    and post-petition lenders as well as the appearance today of

8    General Motors Corporation's counsel in favor of the motion.

9    That indicates widespread support from some of our more

10   significant customers; our major unions and our lenders and

11   with having now received the support of the committee and the

12   indenture trustee on terms that I will read into the record in

13   a few moments, we believe that most of the substantive

14   objections have been addressed.  I think there are a number of

15   issues that suppliers would like to raise with the Court and at

16   a point in this presentation there will be an opportunity for

17   that to occur.

18         Your Honor, I'd like to note also that the debtors

19   filed as I indicated their omnibus reply to the objections

20   yesterday at docket No. 1299 together with three declarations

21   that were filed in support of the motion.  Those include those

22   of John Sheehan, the vice president of corporate restructuring,

23   chief accounting officer and controller for Delphi Corporation;

24   R. David Nelson, the vice president of global supply management

25   for Delphi Corporation and Randall Eisenberg, a senior managing

75

1   director of FTI Consulting, Inc.

2          I'd like to give a little bit of background, Your

3   Honor, and then address the settlement that has been reached

4   with the creditors committee and the indenture trustee.

5          As Your Honor I think is familiar -- and this goes

6   back to the first day of hearings that we had in this case --

7   the preservation of the debtor's supply chain is of paramount

8   importance to preserving business enterprise value in these

9   estates.  We have a number of very significant restructuring

10  issues to address in these cases.  We have to address human

11  capital, we have to address our customers, we have to address

12  our portfolio and product line ends dates as this company is

13  restructured.  But through all of that there is a common theme

14  and that is preservation of the supply chain provides business

15  enterprise value to the company because the supply chain and

16  our ability to operate it efficiently is paramount to be able

17  to keeping our customers happy and having them give us new

18  business awards for years out that are four, five, six or seven

19  years out.  That's what drives value here.

20          Ultimately, if you don't maintain the supply chain as

21  Mr. Miller, our chief executive officer said, "If we disappoint

22  our customers by shutting down their plants then they will be

23  desource away from us both in terms of not giving us new

24  business awards and desourcing as they're entitled to -- or at

25  least they would allege they're entitled to -- desourcing away

76

1   from us some of our current business and that would have a

2   devastating impact on business enterprise value."

3          With the committee's support after it was organized

4   and with the support of many of the other parties in this case,

5   the debtors obtained a significant amount of first day

6   authority from Your Honor to address a series of issues in

7   connection with its supply chain and with its suppliers and

8   we've made several reports to the Court over time regarding the

9   administration of those programs but I can tell the Court today

10  that while only one of the programs was capped and the others

11  were estimated in essence we've used just under half of the

12  authority that people estimated at the time we would need to

13  use and we have provided all the reporting to the committee

14  that Your Honor is aware was to be provided and that process

15  has been, I think and I hope -- Mr. Rosenberg will be able to

16  address this later -- operated to the satisfaction of the

17  committee and the company as we move forward on that.

18         What we faced in connection with the year-end process

19  is that we had some 11,000 supply contracts that were due to

20  expire on December 31, 2005 absent a further extension and we

21  found a number of our suppliers were prepared to honor their

22  supply commitments under their supply agreements through

23  expiration but not beyond that and that there was not a well-

24  organized process.  I mean we believed it was well-organized

25  from our perspective but in terms of the responses we got we

77

1  believed that some suppliers at least were seeking to sort of

2  take advantage of the renewal process in a way that we thought

3  was not in the best interests of the company and not in the

4  best interests of its stakeholders and so the debtors, which

5  depending on the foreign currency exchange rates, either the

6  first or second largest global supplier in this industry and

7  whose got literally tens of thousands of these contracts to

8  deal with over the next couple of years, believed that we

9  should try to establish procedures for an orderly way of

10 amending, extending and assuming these agreements.  We believed

11 that there were substantial benefits to the estate and the

12 declarations that have been filed describe those in greater

13 detail and I'll try and discuss those in summary form in a few

14 minutes.

15        Over the course of the last ten days but, certainly,

16 even in discussions dating back with some our stakeholders to

17 early mid-November, around November 11th, we ended up trying to

18 figure out a set of procedures to address these problems that

19 would meet and balance the various needs of the estates in a

20 way that Your Honor ultimately could authorize and in a manner

21 that would allow the company to move forward.

22        We filed a series of papers with the Court over the

23 last couple of days and those include a black-lined order that

24 was attached as Exhibit C to our responsive brief yesterday and

25 that order as it was described in the responsive brief that we

78

1   filed included a series of changes to the relief that we were

2   proposing and I'll not summarize each of these there but they

3   were intended to address many of the issues that had been

4   raised and the objections that were filed and many of the

5   discussions that we have had with the committee and the

6   indenture trustee and other of our major stakeholders.

7          I'm pleased to report, Your Honor, that that order as

8   is the basis of the settlement that I want to place on the

9   record today with the further modifications that I will now

10  summarize for Your Honor and the indenture trustee that the

11  committee and the company want to -- I'm assuming Your Honor is

12  prepared to approve this order after hearing all the other

13  objections and resolving them -- we would like to be able to

14  review the order overnight and, perhaps, during the day

15  tomorrow and at some point get a revised order to chambers to

16  look at but if Your Honor is willing to go forward in this

17  we're not prepared to submit a draft order today.  We hope to

18  do that in the very near future but we want to make sure we get

19  the words correct.

20         The changes that are contemplated here that resolve

21  the remaining objections of the committee are all centered on

22  two paragraphs of the order, Paragraph 2 of the order and

23  Paragraph 14 of the order.  Paragraph 2 of the order is the

24  paragraph that among other things provides that the debtors

25  will permit the creditors committee to monitor the debtor's

79

1    conduct and performance with respect to the order by providing

2    continuing access during regular business hours to the global

3    supply management group at the company's worldwide headquarters

4    by a designated representative of the financial advisor

5    retained by the creditors committee and that also provides how

6    the information that individual gets would be treated.

7            The committee and the company believe and have agreed

8    to adding language to the paragraph of the order to make it

9    clear that the debtors and the committee are obliged to -- the

10   financial advisors are obliged to work together to establish an

11   information sharing protocol that will be reasonably acceptable

12   to the financial advisor to the creditors committee, that will

13   be subject to the practical limitations of the debtor's global

14   supply management operation and that will provide a relief

15   mechanism that if at any time during the implementation or

16   operation of this order the creditors committee is not

17   satisfied with the information processes or the information

18   that they're receiving, that they can come back to Court,

19   first, through having the debtors and the committee request,

20   Your Honor, to meet with you in a Section 105 chambers status

21   conference as a method of alternative dispute resolution and if

22   that is unsuccessful, then access to the Court for purposes of

23   an emergency hearing to seek modification of the order as

24   appropriate having to do with the issues raised by the

25   committee.

80

1          In connection with the information sharing protocol,

2     the committee and the company have agreed that there should be

3     some threshold for sharing information in terms of the type of

4     information that's shared and as the Court indicated in the

5     November 4th hearing, the threshold that the parties have

6     agreed is a threshold where there would be contracts considered

7     involving a supplier that had $1 million or more of pre-

8     petition liabilities that would be part of a cure arrangement

9     and I don't mean just the contracts that would be examined at

10    that moment but basically we'd draw a line, we know what the

11    pre-petition liabilities are.  We'd draw a line at the $1

12    million level.  Anybody above that who is going to get cure

13    payments against that, those contracts when they're considered

14    would fall into a separate bucket that would be subject to more

15    detailed scrutiny and analysis by the committee.  We estimate

16    that that would involve -- I can't tell you the number of

17    contracts -- we estimate that more or less -- and this is not a

18    perfect number, Your Honor -- but more or less that would

19    involve 250 or so of the debtor's suppliers as opposed to

20    having that level of what I'll call scrutiny to the several

21    thousand suppliers that will be involved in this process.

22         THE COURT:  In terms of number of suppliers, in terms

23    of the pre-petition trade debt, what percentage do you have

24    roughly would that be?  Is it the majority of it?

25         MR. BUTLER:  Your Honor, I haven't looked at the

1   October pre-petition trade debt.  The amount of trade debt that

2   is subject to these contracts is in the range -- we actually

3   have an exhibit on it which I'll get into a little bit later --

4   the gross level is about $1 billion but that number comes way

5   down when you look at what we think would be implicated in this

6   program which is less than, I think, about half of that but

7   we've got an exhibit to introduce into evidence and get some

8   estimates on that number, Your Honor.

9            THE COURT:  But of that $580 million or so, how much

10  -- do you know what these 250 or so suppliers meet?  Would it

11  be half of the $587 million?

12           MR. BUTLER:  Generally, I think, Your Honor, the

13  estimate is about sixty percent.

14           THE COURT:  Okay.

15           MR. BUTLER:  Of the total trade debt would be

16  implicated in the suppliers with more than $1 million of pre-

17  petition exposure.

18           THE COURT:  Okay.

19           MR. BUTLER:  Your Honor, with suppliers that have

20  less than $1 million of aggregate exposure the protocol would

21  still address the less detailed information that they required

22  with respect to that.

23           In addition, Your Honor, we have agreed, there is a

24  part of our procedures in dealing with any of these

25  transactions is there is a global supply management approval

82

1   panel that deals with significant transactions to the company

2   and that panel or review committee -- we've committed to the

3   creditors committee that that panel would review each of the

4   contracts that would be assumed for anyone in the million

5   dollar and above threshold -- they meet above that threshold --

6   and we've also agreed that the senior member of Messerow that

7   is going to e responsible for this process on behalf of the

8   committee could participate -- and I'll say attend because

9   they're not making the decisions and the committee wants to

10  make it clear that they're not making the decisions -- but they

11  could attend and certainly be heard at those review panel

12  meetings so that they would have the actual opportunity and

13  then report back to the committee exactly how the process is

14  working because they'll be sitting in on it on those major

15  contract assumptions.

16          In order to provide that level of access to the

17  committee's financial advisors, the committee has committed to

18  the debtors that there will be a designated senior Messerow

19  executive who will be responsible for this process and at least

20  for the period dealing with the assumption of the December

21  contracts that that individual will devote the necessary time -

22  - and we think it's probably substantially their full-time at

23  the company -- and they will have such other assistance as

24  Messerow needs to have and they've told us they'll need a few

25  other Messerow folks out there to help them but what's

83

1   important to the company is that there be continuity of the

2   Messerow team that's there and that the senior individual

3   responsible be constant to the company so that they can have a

4   meaningful opportunity to be involved with the global supply

5   management team.

6          That's the understanding with respect to Paragraph 2

7   of the order, Your Honor, in terms of the information sharing

8   protocol and how that would operate.

9          THE COURT:  Could I interrupt you just for a second?

10         Is it still the intention that this be professionals

11  eyes only, i.e., Messerow and the counsel for the committee

12  with sort of generic summaries?

13         MR. BUTLER:  Yes, Your Honor.  Absolutely.

14         THE COURT:  Okay.

15         MR. ROSENBERG:  If I may clarify, Your Honor?

16         That is correct with respect to what we are calling

17  the conforming contracts.  That is the conforming settlements.

18         MR. BUTLER:  Yes, I believe with respect to the non-

19  conforming settlements we're not going to let individual

20  committee members gain access to pricing information as it

21  relates to any suppliers.

22         MR. ROSENBERG:  What we are going to have to do there

23  is come up with an appropriate mechanism pursuant to which if

24  Messerow wishes to recommend an objection to the committee and

25  -- Mr. Butler hasn't reached that point in his description yet

84

1  -- that an appropriate level of information can get to the

2  committee without disclosing names or anything else that is

3  identifying or essential but there's got to be an appropriate

4  level of disclosure there so that the committee can react

5  appropriately.

6            THE COURT:  Okay.

7            MR. ROSENBERG:  It would not be unlike, I believe,

8  the information that is presently supplied under the existing

9  programs by Messerow.

10           THE COURT:  Okay.

11           MR. BUTLER:  I have no worries that we can work

12  through that mechanic, Your Honor.

13           THE COURT:  Okay.

14           MR. BUTLER:  The other change, Your Honor, is to

15  Paragraph 14 of the order.  Paragraph 14 of the order provides

16  the ability for the filing of a supplemental objection under

17  two conditions here; first, at any time on or after March 1,

18  2006 -- and the purpose of that particular provision, Your

19  Honor, has been that the debtors believe and I think the

20  committee now concurs that once the company runs this process

21  through the December batch of renewals we'll have a pretty good

22  population to be able to understand how the program is working

23  and it gives the committee the opportunity at any time after

24  March 1, 2006 to file an objection about the future prospective

25  application of the program.  So that's not tied to any use,

85

1   it's just that it's an unlimited opportunity to object on and

2   after that date.

3            There's also an opportunity to object if the amounts

4   of cure contractually committed to be paid by the debtors

5   pursuant to Paragraph 8 of the order exceed a dollar amount.

6   Now, it currently says $150 million.  I'll address that in a

7   moment.

8            Exclusive of cure amounts associated with non-

9   conforming assumptions.  There are two changes to that part of

10  the order.  First, the number amount would move from $150

11  million down to $100 million and, second, the ways in which the

12  exclusion is calculated would be limited to cure amounts

13  associated with non-conforming assumptions to which the

14  committee does not object.  Put another way, Your Honor, if the

15  committee under this mechanism -- if there's a non-conforming

16  assumption that comes to the committee's attention and they

17  don't like it, they object to it, they come to court, Your

18  Honor says, "Hey, debtors, I've decided you win that won, you

19  can assume it," then that dollar amount -- the cure associated

20  with that dollar amount of the Court-approved assumptions

21  counts in against the $100 million to reduce the $100 million

22  and then, remember, that, Your Honor, is simply a threshold.

23  The whole point of that measurement -- and Your Honor has said

24  in other hearings about the importance of having the committee

25  be able to monitor things -- that's the level where the

86

 1  debtor's entirely comfortable with it, we've agreed to it,

 2  that's the level in which the committee's currently comfortable

 3  as we move into this program on the threshold.

 4        Now, all the threshold does is say that either they

 5  or the pre-petition agent can file an objection.  Now, there's

 6  a change to the next sentence and, again, I'm not trying to

 7  give specific words -- just the understanding that we'll draft

 8  the words later -- but in the event the party filing a

 9  supplemental objection seeks an emergency hearing, that

10  sentence is going to change.  First, it will change in the

11  following respects.  In the event the party decides to file a

12  supplemental objection they will be required to give advance

13  notice to the debtors and to enter into a meet and confer

14  process that will take at least two business days so that we

15  have an opportunity to try to work it out and after that, that

16  sort of alternative dispute resolution mechanism occurs.  If it

17  can't be worked out then a supplemental objection can be filed.

18  Under the mechanism I'm now going to describe, Your Honor, once

19  it's filed the Court would schedule that for a hearing as soon

20  as reasonably practicable for the Court.  So we'd get a hearing

21  in front of Your Honor as soon as the Court's calendar would

22  permit and Your Honor would be prepared to hear it as opposed

23  to the mechanism that otherwise was in the order and the other

24  piece of this is from and after the time -- the way this

25  mechanism works, the last sentence of Paragraph 14 says, "The

87

1  debtor shall continue to be authorized to assume supply

2  agreements pursuant to the terms of this order following the

3  filing of the supplemental objection until the Court disposes

4  of the supplemental objection after notice and a hearing.  That

5  would be modified in two respects; (1) we would be authorized

6  to do it but it would pick up the meet and confer period as

7  well as the supplemental objection and it would limit the

8  additional assumptions without Court authority to cures in the

9  aggregate of $25 million.

10       MR. ROSENBERG:  My partner, Mr. Savage [Ph.], just

11  wanted to clarify that the restriction on spending limited to

12  $25 million commences upon the notice to the debtor of our

13  objection and the request to meet and greet.

14       MR. BUTLER:  Correct.

15       MR. ROSENBERG:  Okay.

16       MR. BUTLER:  I think I said -- is that in the meet

17  and confer period?  That's correct.

18       MR. ROSENBERG:  Okay.

19       Excuse me.  Meet and confer.  I'm always happy to

20  greet.

21       MR. BUTLER:  Your Honor, just to also be clear here

22  is in the event there's an emergency hearing, the burden of

23  proof before continuing the program would rest on the debtors.

24       Could I have a moment, Your Honor?

25       THE COURT:  Yes.

88

1              (Pause in proceedings.)

2         MR. BUTLER:  Mr. Rosenberg wasn't part of our

3    discussions this morning but I think we can move (sic) our

4    agreement along.

5              In connection where there's an objection with a non-

6    conforming agreement, the burden of proof to demonstrate to

7    Your Honor why we should be able to assume that is the debtor's

8    as well.

9              Your Honor, I believe that I have captured the

10   changes to Paragraphs 2 and 14 of the order that would cause

11   the committee and the indenture trustee to consider their

12   objections resolved.

13        THE COURT:  Before I hear from them, is the amount of

14   potential preference waivers taken into account in these caps?

15        MR. BUTLER:  No, Your Honor.

16        THE COURT:  Okay.

17        MR. ROSENBERG:  In connection with the contracts in

18   question, otherwise, it's a non-conforming agreement that

19   requires the committee consent.

20        MR. BUTLER:  Correct.

21        THE COURT:  Okay.

22             As to the point about the contracts in question, I

23   had a question about that definition which is in Paragraph 2.

24   It's in 2(b).  It says that "these contracts don't include (b)

25   or any agreements that are not related to the continuation of

89

1  the supply chain" and then it has a parenthetical, "except with

2  respect to agreements related to the debtor's obligations to

3  provide manufactured goods on account of direct and indirect

4  government contracts" and my question is that an exception to -

5  - what is that an exception to?  Is that an exception to the

6  supply chain?  I mean it's something on top of the supply chain

7  or does it say that even with the supply chain these aren't

8  included in there?

9            MR. BUTLER:  Your Honor, what we tried to do here was

10  to limit the scope of the program so we did it in two ways; the

11  first one Your Honor didn't question, it's pretty clear, if

12  someone sold their claim we're not going to assume that

13  contract for this program at least.

14            THE COURT:  Right.

15            MR. BUTLER:  Then the second one is we agreed to say

16  that we're not going to assume agreements that aren't related

17  to the automotive manufacturing facility locations because we

18  have other facilities that don't have quite the same supply

19  chain issues with them or we'll address them in a separate

20  motion but the government contract thing is the exception to

21  the exception because the problem is with government contracts,

22  the way in which the government contracts are written, whether

23  they're direct to us or they're indirect to the supply chain to

24  us is if you don't get the goods in to supply the government,

25  what the government's contracts say is you have to shut down

90

1    the plant and not supply anybody else.

2              THE COURT:  Okay.

3              So it's an exception to the exception?

4              MR. BUTLER:  Correct.

5              THE COURT:  All right.

6              MR. BUTLER:  The reason for it is because the

7    government has this special provision that basically says if

8    you can't service us, you can't service anybody else.

9              THE COURT:  Okay.

10             Then Paragraph 15 was put in, I assume, was put in in

11   response to the objections; the one dealing with the KEYSIP

12   (sic)?

13             MR. BUTLER:  Yes, Your Honor.

14             THE COURT:  But it was a little opaque to me.  What's

15   the intent of this paragraph?  Is it just to say that these

16   payments don't add on to someone's right to a KEYSIP?

17             MR. BUTLER:  No.

18             One of the things that was suggested is that our

19   proposed KEYSIP program is up through January 5th has an annual

20   incentive program.  That annual incentive program has as its

21   proposed target measurement, EBITDAR, which is not the normal

22   EBITDA target, but like most restructurings has an "R" at the

23   end of the EBITDA calculation which means you exclude

24   restructuring charges from the measurement and there was at

25   least the implication in one of the objections that somehow or

1    other we would try to classify as restructuring expenses the

2    otherwise gap expenses that would normally go above the line,

3    in a particular monthly period we put them below the line and,

4    therefore, not subject the incentive compensation measurements

5    to those amounts and our view of that, Your Honor, was that was

6    never the intention and we thought the easiest way -- nobody

7    solicited this language from us, the debtors put this in

8    unilaterally.  We want to make it very clear, you know, we know

9    this is not a KEYSIP here and we'll have another day for that

10   that we want to do it.

11           Now, what we did not do is address in this order are

12   balance sheet issues.  To the extent that you pay down a pre-

13   petition liability, that's a balance sheet adjustment, that's

14   not a -- that EBITDA would never effect that issue.  That's

15   simply a balance sheet issue in terms of obligations subject to

16   compromise and so we made no adjustment for that.

17           But to the suggestion that we would take anything in

18   this program and charge it to "R" for the restructuring and,

19   therefore, exempt it from the capturing within what would be

20   comprehended in the KEYSIP program as a measurement target, we

21   simply wanted the Court to be aware that wasn't the intention

22   and that's what we put it there for.

23           THE COURT:  Okay.

24           So no one's potential bonus or compensation is going

25   to be structured so that they're incentivized to pay down pre-

92

1    petition debt?

2           MR. BUTLER:  Correct.

3           THE COURT:  Okay.

4           Why don't I hear from the committee and Wilmington

5    Trust then on this.

6           MR. ROSENBERG:  Your Honor, the committee basically,

7    when you boil down our objection to the original motion was

8    concerned with two points; one was that the program have

9    appropriate caps attached to it or if you will at least targets

10   which the committee had an input into as to whether or not they

11   went beyond and that the program was properly monitored with

12   respect to a level of information and participation by the

13   creditors committee consistent with the extraordinary relief of

14   paying down a large amount of pre-petition debt.  The committee

15   never for a moment questioned the debtor's legitimate concern

16   that the prospect of all of these expiring contracts at the end

17   of the year could create supply chain issues which were not in

18   anybody's interest whatsoever, the committee did have serious

19   problems with the debtor's initial proposal for how to solve

20   it, principally again, for the two reasons suggested that it

21   didn't seem properly targeted to those with the most clout to

22   actually cause a problem and, instead, created a situation

23   where those with the lease amount of clout to cause a problem

24   were essentially being handed a gift but still left the problem

25   of those with substantial clout and what we have now negotiated

93

1    is an arrangement pursuant to which the committee has

2    sufficient oversight and input into the process to be

3    comfortable that the money is going where it should be going to

4    prevent interruptions to the supply chain and not simply be

5    spent kind of in an off-handed, throw it up in the air and see

6    where it sticks sort of way.

7            Accordingly, the committee is satisfied that we now

8    have an appropriate communal solution to a legitimate problem

9    or at least an appropriate communal approach to a solution to

10   what is clearly a legitimate problem and, accordingly, with the

11   changes that have been read into the record the committee is

12   satisfied that the program as amended should go forward for the

13   period as described.

14           I don't want to say on a trial basis because we're

15   quite convinced that the debtor will exercise its rights and

16   use our money appropriately but it does gives us the

17   appropriate mechanism for coming to Court with the burden

18   remaining on the debtor to justify what it is doing and the

19   continuation of the program and on that basis the oversight of

20   both the committee and the Court is properly placed and we are

21   satisfied with the proposal as it was now described to the

22   Court.

23           THE COURT:  Okay.  Mr. Fox.

24           MR. FOX:  Thank you, Your Honor.

25           Edward Fox from Kirkpatrick & Lockhart, Nickels &

94

1    Grimm, LLP on behalf of Wilmington Trust Company as indenture

2    trustee.

3            Your Honor, before I address the compromise I do have

4    to ask Mr. Butler a question which is the language that was

5    added to Paragraph 12 of the order goes beyond preference

6    waivers if I understand it.  I don't know why that was added or

7    why that is the case?

8            MR. BUTLER:  The language that was adopted in

9    Paragraph 12 -- I think you're talking about the first

10   sentence?

11           MR. FOX:  Yes.

12           MR. BUTLER:  The first sentence that was added was to

13   make it very clear that with respect to an assumed contract and

14   with respect to amounts paid under that assumed contract, there

15   were no avoidance powers of the debtors that would be used in

16   connection with that.  So once you've assumed a contract you

17   wouldn't have a fraudulent transfer of any other kind and uses

18   the avoidance powers of Chapter 5.  That's all.

19           MR. FOX:  Well, except that the motion as I

20   understood it only asked for preference waivers under 547.

21           MR. BUTLER:  It's a different issue.

22           We asked for 547 preference waivers for other

23   contracts the supplier might have as the opportunity to use

24   this on a negotiating basis.  I'm going to tell the score of

25   suppliers' counselors sitting in the courtroom that we don't

95

1    intend to pass those out either on a willy nilly basis -- to

2    use Mr. Rosenberg's words.  But they were intended to say that

3    we recognize when you work with a supplier some suppliers are

4    going to want to negotiate preference waivers as to things not

5    being assumed.

6            We believe the law is generally -- and we put it in

7    for purposes of clarity because suppliers want to understand

8    this -- that as to a contract that's assumed the payments under

9    that contract are in fact protected from Chapter 5, not just

10   preferences -- once you've assumed the contract as a post-

11   petition obligation it's not a fraudulent transfer, the

12   avoidance actions are in fact taken care of which is why we

13   added Chapter 5 as opposed to -- but that Chapter 5, that first

14   sentence, Mr. Fox, is limited only to the payments made to

15   covered supplier with respect to the assumable contracts

16   actually assumed.  It's a much more limited statement but it's

17   intended to be clear to that matter.

18           MR. ROSENBERG:  So if I may, just to make sure we

19   have a clear record here, to the extent that a supplier asks in

20   addition for any kind of Chapter 5 type waiver with respect to

21   anything else other than the contract being assumed, that is a

22   non-conforming agreement that specifically requires the consent

23   of the committee.

24           MR. BUTLER:  That's correct.

25           Or the review and objection process of the committee.

96

1          MR. ROSENBERG:  Yes.

2          MR. FOX:  Subject to seeing the actual form of order,

3    Wilmington Trust is prepared to go along with the compromises

4    being put on the record.

5          THE COURT:  Okay.  Thank you.

6          MR. BUTLER:  Your Honor, we do want to make an

7    evidentiary record here.  We don't expect to present live

8    testimony at this point and we do recognize that there have

9    been a group of very patient counsel representing a lot of

10   suppliers on the phone and in the room today that have

11   presented -- and we've had conversations with most if not all

12   of them to deal with several issues and I should say, Your

13   Honor, under the case management as Your Honor knows there is a

14   meet and confer obligation with respect to contested matters

15   and many if not most of the counsel in this case for this

16   contested matter cooperated and participated in meet and

17   confers.  The committee and Wilmington Trust and the company

18   had many meet and confers.  With respect to the suppliers we

19   had some smaller meet and confers and at least one large

20   organized or two large organized meet and confers and that has

21   led to a change in Paragraph 10 which I want to discuss

22   specifically and then some clarifying language throughout the

23   order that was in the order before, I'm not going to read it

24   through in detail, but it has to do with how a supplier can be

25   found to be under the terms of this order.

97

1          When the debtors filed this motion we were seeking to

2   use the customary arrangements in the automotive industry which

3   provides essentially that people either sign documents or they

4   perform under agreements.  It is not uncommon in the industry

5   for people to receive purchase orders, ship under those

6   purchase orders without giving a written acknowledgment or

7   without signing a contract and then be paid and that's viewed

8   not only in the Uniform Commercial Code, generally, as it's

9   adopted in most states, but by custom, acceptance by

10  performance.  We include that as an option under this order and

11  doing so caused a wrath of objections to be filed by a score of

12  suppliers and, you know, again, we found it in some respects

13  peculiar -- not trying to characterize the objections -- but we

14  believe that this order is a significant benefit for a number

15  of suppliers.  Obviously, there are suppliers who don't want to

16  be covered by this or certainly they don't want to be covered

17  by it by performance and so we have categorically eliminated

18  that as an option.

19          The only way now that any supplier can be impacted by

20  this order in any way as it relates to their contractual

21  relationships with Delphi is in the event the covered supplier

22  actually executes and delivers to the debtors an assumption

23  agreement that comes to the debtors and at one point even in

24  Paragraph 10, Your Honor, and I would say it's an assumption

25  agreement or an agreement authorized under and subject to

98

1  Paragraph 6 of the order taking into account what Paragraph 6

2  permits as well, but it's not a similar document.  We put in a

3  similar document to let people acknowledge in various forms

4  and enough suppliers convinced us that they didn't want that

5  and so we took it out and so it's now assumption agreement or

6  an agreement authorized under and subject to Paragraph 6 of the

7  order.

8         Therefore, there is in the debtor's view, absent the

9  signature and execution of an assumption agreement, there is no

10 opportunity for a supplier to be in any way bound by the terms

11 of this order and, therefore, because of that change we have in

12 Paragraph B of the order asked Your Honor to overrule all of

13 the objections of suppliers filed in opposition to the motion

14 to the extent they're not deemed otherwise settled or

15 withdrawn.

16        I would note, Your Honor, that there are counsel here

17 who will make the argument -- either one or fifty of them --

18 that suppliers request or that the counsel request that notice

19 of any proposed assumption be directed to specific individuals,

20 either outside counsel or to other specific individuals and the

21 debtors are resistant to that and at the appropriate time after

22 the argument is made we'll explain to you why that is.  This is

23 a process done through supply management change throughout the

24 industry and a new individual supplier has got to regulate

25 itself.  They can decide whether they're going to sign an

99

1   agreement under their internal procedures.  We're not going to

2   try to complicate and we'll argue vigorously to Your Honor to

3   ask you not to require us to set up a process which is

4   different than the customary supply process in the industry.

5   If a supplier signs the contract, then they sign the contract

6   but we want to do business with the people who are customarily

7   responsible for this.

8          I also want to bring to the Court's attention as it

9   relates to suppliers an issue that has come up which we are

10  going to try to consult with the committee and seek some

11  resolution of and, perhaps, even with the U.S. Trustee.

12         There are a number of 2019 statements that have been

13  filed and others that are contemplated to be filed for an

14  individual lawyer or firm to represent multiple suppliers in

15  this case and the issues that we're talking about here all

16  relate to pricing and individual economic terms and competitive

17  information, all of which is highly confidential, represents

18  trade secrets of the company and, you know, one of the things

19  you never do in the supply management business is show how one

20  supplier structures their deal to another supplier or invite

21  the suppliers to all congregate together and figure out the

22  best way to place their products to the company.  In fact,

23  there are federal laws starting with the anti-trust statutes,

24  among others, that prohibit that and provide both criminal and

25  civil sanctions.

100

1          In addition, confidentiality is paramount in

2   connection with this and we have met with and conferred with

3   some of the counsel who filed those statements and asked them

4   to work with us promptly to try to sort through that because

5   the debtors are not making any claims on this record but the

6   debtors are very concerned about how somebody can -- a single

7   lawyer can represent fourteen or fifteen or seventeen suppliers

8   with respect to providing advice on how pricing and

9   negotiations ought to be going vis-a-vis Delphi and look at --

10  the same person look at seventeen different suppliers economic

11  packages.  I don't know how one does that without violating --

12  without that supplier violating confidentiality obligations

13  they have at Delphi and without the anti-trust statutes and

14  other laws being implicated.  So it's a real concern for the

15  company.  We raise it on the record only to make note of the

16  concern.  We hope to work it out with people.  If we can't,

17  Your Honor, the debtors will likely file some type of

18  application or motion with the Court to address that and make

19  sure that an appropriate protective order is entered to protect

20  the debtor's interests.

21          Now, Your Honor, what remains in this hearing is the

22  following.  We need to present some matters into evidence and

23  then hear from the suppliers and I want to ask Your Honor how

24  you want to proceed.

25          THE COURT:  Well, I'm happy to take a proffer on the

101

1   evidence.  My main question, which I hope the proffer will

2   address, is why this concern hasn't arisen in the four or five

3   years before Delphi filed bankruptcy and in the years before

4   then when it wasn't Delphi but Delco since I gather at least

5   over the last few years with the move to real time supply

6   suppliers could have this type of leverage even aside of the

7   bankruptcy context where their contracts are not longer than a

8   year or two and they could easily hold up Delphi at the time

9   those contracts expire.

10           MR. BUTLER:  Your Honor --

11           THE COURT:  But other than that I mean that's my main

12   question, but if you're prepared to give a proffer I'll take a

13   proffer.

14           MR. BUTLER:  Let me introduce the evidence with

15   respect that we have with respect to that and then if I can

16   briefly confer -- I may actually call someone to answer that

17   question directly to make sure Your Honor has the answer rather

18   than me try and state the proffer in a way I want to actually

19   call someone in that but let me try to get the evidence on the

20   record.

21           MR. ROSENBERG:  Your Honor, before Mr. Butler begins

22   I just want to state on the record that obviously considering

23   that we have compromised as described on the record we don't

24   have any particular interest in objecting to or cross-examining

25   with respect to the proffer, but as Your Honor heard there will

1  be any number of situations where we'll come back to Court and

2  the burden of proof remains on the debtor notwithstanding that

3  we may initiate the next court appearance and accordingly I'd

4  like it clear that by not objecting to anything proffered today

5  or cross-examining we are not waiving any rights whatsoever

6  with respect to any such future hearings.

7          THE COURT:  As far the Committee and Wilmington Trust

8  are concerned, I'm reviewing this under the TMT lowest bounds

9  of reasonableness standard.

10          MR. ROSENBERG:  Very good, Your Honor.  Thank you.

11          (Exhibit Book, Debtor's Exhibit A, Marked.)

12          MR. BUTLER:  Your Honor, we prepared an exhibit book

13  that I'd like to mark Debtor's Exhibit A which has in it

14  essentially sixteen exhibits.  The first is the declaration of

15  Randall Eisenberg that was filed at Docket Number 1278.  The

16  second is the declaration of David Nelson filed at Docket 1279.

17  The third is the declaration of John Sheehan, Docket Number

18  1280, fourth is Exhibit A to the debtor's omnibus response,

19  fifth is Exhibit B to that response.  Sixth is the Exhibit C.

20  That was the proposed assumptions order as it was filed with

21  the motion.  Seven is the current blacklined order.  Exhibit 8

22  is an analysis the debtor's did of AP contract assumptions.

23  Nine is the expiring contracts divisional data.  Eleven, and

24  there are a series of six demonstrative exhibits.  Eleven is

25  assumption procedures approval process.  Twelve is the minimum

Eisenberg – Direct                     103

1    required provisions.   Thirteen is accumulative cash flow

2    benefit estimated by the debtors through the first quarter of

3    2007.   Fourteen is the expiring direct material contracts.

4    Fifteen is unresolved direct material contracts, and sixteen is

5    the estimated pre-petition exposure for assumable agreements.

6            Exhibit 10 had been some exemplary supply responses

7    which we've eliminated and substituted in their place a

8    supplemental proffer of Mr. Eisenberg.

9            THE COURT:  Okay.

10           MR. BUTLER:  I'd like to move those into evidence,

11   Your Honor, if I may.

12           THE COURT:  Do you have a copy of them?

13           MR. BUTLER:  I do if I may present them.

14           THE COURT:  Yes.  Any objection to their admission

15   for the purposes of this hearing?

16           Hearing none, I'll admit them.

17           (Exhibit Book, Debtor's Exhibit A, Received.)

18           MR. BUTLER:  Thank you, Your Honor.

19           Could I have a moment, Your Honor?

20           THE COURT:  Yes.

21                   [Pause in proceedings.]

22           MR. BUTLER:  Your Honor, with the Court's permission

23   we would just call Mr. Eisenberg to the stand and let him

24   answer any questions Your Honor has on this.  I think that he's

25   prepared to answer the question that you posed on the record

Eisenberg – Direct                                              104

1   and any other questions the Court might have.

2              THE COURT:  Okay.

3              MR. BUTLER:  Mr. Eisenberg.

4              THE COURT:  Mr. Eisenberg, would you raise your right

5   hand, please.

6              (Randall Eisenberg, Debtor's Witness, Sworn.)

7              THE COURT:  Why don't you elicit the information

8   needed for the record as to Mr. Eisenberg's qualifications.

9                        DIRECT EXAMINATION

10  BY MR. BUTLER:

11  Q    Mr. Eisenberg, were you present in court during the course

12  of this hearing on the assumption procedures motion?

13  A    Yes, I have been.

14  Q    The Court asked and wanted evidence in the record

15  regarding why this issue with contracts has come -- the renewal

16  contract renewal issues, why the debtors are experiencing

17  difficulties not that were not experienced last year or three

18  or four years ago or after the spinoff from GM or at some other

19  time?  Do you have a view as to that question?

20  A    Yes, I do.

21  Q    Could you explain to the Court, please?

22  A    Let me address the answer in two components, first from

23  looking at it from an industry perspective and then second

24  looking at it specifically from the debtor's issues.

25       As it relates to the industry one of the significant

1   factors that have changed over the last couple of years is that

2   the industry, the automotive supplier industry is under

3   significant strain, far more than in prior years as a result of

4   a number of other suppliers who have filed for Chapter 11.  The

5   knowledge that the OEMs, the original equipment manufacturers

6   are losing market share, that the OEMs are also putting

7   significant pressures on their suppliers to boost their own

8   financial profitability, and as a result of these and the

9   various Chapter 11 filings that have occurred suppliers are

10  under a greater greater strain right now to manage through

11  these difficult times.

12      I think second, from an industry's perspective the

13  suppliers in general are a lot more sophisticated than -- or

14  are sophisticated relative to suppliers in other industries and

15  therefore have a good understanding themselves and with counsel

16  of where they have specific leverage with their customers.

17      As it specifically relates to the debtors, a couple of

18  observations.  First, the debtors have filed for Chapter 11 and

19  as a result suppliers have an amount of pre-petition

20  obligations that they were not paid which has burdened them

21  even further.  Second, I think it has been publicly reported

22  that the debtors are going through a very significant

23  restructuring.  That restructuring will impact or result in a

24  significant cost reduction and that cost reduction may include

25  the consolidation sale or closure of plants.  This creates a

Eisenberg – Direct                          106

1  significant amount of anxiety among the suppliers.  It causes

2  suppliers to look short term at what their leverage points are

3  and their leverage points tend to be in the areas of first,

4  seeing if there's a way for their pre-petition obligations to

5  be paid during their contract period and we have some motions

6  that enable us in certain situations to do that.

7      Alternatively, when their contracts expire they recognize

8  this as a valuable leverage point for them and many suppliers

9  we use our leverage point to either increase prices, insist on

10 pre-petition amounts cured or put other -- ask for other things

11 that will enable them to get as much as they can from their

12 leverage point.

13     Those are the primary factors I think changed today

14 relative to a couple of years ago and also deals specifically

15 with the debtor's situation.

16     One last point with -- if I could, Your Honor, is

17 that the debtors, unlike many of the other companies that have

18 filed in this industry, it's a $28 billion revenue business

19 globally.  It has a significant impact relative to the other

20 suppliers in the entire automotive industry and with that

21 significant impact and -- it has caused a number of suppliers

22 to suffer greater than as a result of other Chapter 11 filings.

23     THE COURT:  Am I right though that given the nature

24 of the industry the suppliers also don't have that many other

25 customers to go to?

Eisenberg – Direct                    107

1        THE WITNESS:  It really depends upon the supplier,

2    Your Honor.  I think there are two factors to consider in that

3    regard.  One, suppliers -- this debtor may be a large customer

4    and may in fact be a relatively small customer to many of our

5    suppliers.  Number two, many of our suppliers recognize that

6    they cannot continue to operate if they're losing money.  We

7    know we have some suppliers who even said the amount that they

8    lost in their pre-petition claim equates to a significant

9    amount of profitability for the last couple of years.  That's

10   how tight the margins are.

11       So as a result many of the suppliers wonder whether

12   they should remain in this business at all absent being able to

13   create a financially sound platform to do that in.

14       THE COURT:  Okay.  Well, let me ask you first.  Who

15   is going to make the decisions at the debtor or the debtor

16   entities about how to respond to supplier requests for new

17   contracts or offering new contracts to the suppliers?  Who's in

18   charge of that and how does the chain of command go?

19       THE WITNESS:  Yes.  Mr. Butler, I believe we have an

20   exhibit.  If it's all right with you, Your Honor, I'd like to

21   take you through that exhibit. I think it can address your

22   question most effectively.

23       THE COURT:  Okay.

24       MR. BUTLER:  Can I approach the witness, Your Honor?

25       THE COURT:  Yes.

Eisenberg - Direct                          108

1          [Pause in proceedings.]

2          MR. BUTLER:  Your Honor, I believe Mr. Eisenberg is

3    speaking to Exhibit Number 11, Debtor's Exhibit 11.

4          THE WITNESS:  First, the global supply management

5    group which is the supply management group within Delphi will

6    have overall responsibility for managing the process.  What

7    this diagram illustrates is a tiering process which starts at

8    the lowest level which are the buyers themselves and there's --

9    as this exhibit indicates, over 600 buyers, buyers who've been

10   assigned responsibility for different suppliers and they are

11   the ones that are in direct contact with those buyers on a

12   regular basis -- I'm sorry.  Those suppliers rather on a

13   regular basis and understand the debtor's leverage points with

14   those suppliers as well as the suppliers leverage points with

15   the debtors.

16         The global supply management has established a set of

17   criteria by which they will direct the buyers, their

18   negotiating parameters with each of the suppliers.  To the

19   extent these buyers are able to sufficiently or adequately

20   negotiate within the parameters that are established then they

21   will have the authority to enter into those agreements on

22   behalf of the debtors with the suppliers.

23         THE COURT:  Well, I'm sorry now.  When you say within

24   the parameters established, amplify on that.

25         THE WITNESS:  Absolutely.

Eisenberg – Direct                        109

1          THE COURT:  They're not going to automatically offer

2     people 75 percent cure, are they?

3          THE WITNESS:  The structure, Your Honor, that we are

4     contemplating and it's still being finalized, but the structure

5     we're contemplating this to bifurcate the suppliers into two

6     categories, those with pre-petition dollars in excess of $1

7     million and those with pre-petition dollars or exposure less

8     than $1 million.

9          For those that have less than $1 million, the buyers

10    would have the authority to execute into contracts whereby the

11    supplier has agreed on all of the terms that are outlined in

12    the motion and as it relates to the cure amounts to some

13    percentage and the percentage we're contemplating is up to 60

14    percent.  That doesn't mean that the buyer will automatically

15    offer 60 percent.  The thought process here is the buyer

16    understands a leverage point will offer what they believe is an

17    appropriate amount and will have the ability to negotiate real

18    time to attempt to come to an agreement but cannot exceed 60

19    percent.

20         For those suppliers -- let me if I could just finish

21    the other side of that coin, which is those suppliers that are

22    in excess with pre-petition balances in excess of $1 million,

23    all of those situations will need to be approved in a much

24    senior level in the chain and that's specifically at the

25    assumption procedures approval panel that's in this box in the

Eisenberg - Direct                                    110

1   middle of the page.

2           So we've intentionally bifurcated --

3           THE COURT:  That's the panel that Messerow can sit in

4   on?

5           THE WITNESS:  Correct, Your Honor.

6           THE COURT:  Okay.

7           THE WITNESS:  Through this process to the extent

8   there are difficulties in getting a supplier to agree to what

9   specifically the company believes is appropriate regardless of

10  what the percentage but not in excess of 60 percent as I

11  indicated, that will escalate through this pyramid that I have

12  here in this slide all the way up to the panel and ultimately

13  the panel will make authorization for number one, any

14  deviations from the standard terms and conditions that we've

15  outlined in the motion; two, for any cure amounts that either

16  the debtor believes is unreasonable but not to exceed 60

17  percent, and then as it relates to the contracts in excess of

18  $1 million all parameters that are being proposed.

19          THE COURT:  Will the buyers have information

20  available to them showing transfers made to the supplier within

21  ninety days or the filing date that might be preferences so

22  that they could have that as part of their negotiating

23  leverage?  Has that -- would that analysis be available to

24  them?

25          THE WITNESS:  To the extent the analysis is

Eisenberg - Direct                              111

1   available, yes.  The preference --

2               THE COURT:  I'm sorry, to the extent --

3               THE WITNESS:  To the extent the analysis is

4   available, yes.  The preference analysis has not been fully

5   completed obviously because of the timing in this case, but --

6               THE COURT:  But this would just be -- I mean these

7   are suppliers that they ostensibly deal with a lot.  So I would

8   think that they would at least have a list of the payments made

9   to them within ninety days of the filing date.

10              THE WITNESS:  Your Honor, I believe that they will

11  understand which suppliers may have a preference and may have

12  some assessment as to a quantification to it or a financial

13  impact.  I just don't want to mislead the Court to say that it

14  will be fully analyzed unless on a specific vendor basis it's

15  absolutely necessary.

16              THE COURT:  Okay.

17  BY MR. BUTLER:

18  Q   Mr. Eisenberg, I also wonder if you might -- just a couple

19  of questions on leverage issues between the suppliers of this

20  company and the company.

21        In your -- to the best of your knowledge, do we -- does

22  this company obtain simply raw materials or more specialized

23  components from its suppliers?

24  A   A significant portion of the product purchase is highly

25  customized in specialized parts which take a significant amount

112

1   of time to research and obtain -- engineer and research and

2   obtain customer approval to produce.

3   Q    Do you have an opinion as to whether that is the type of

4   product that Delphi obtains from its suppliers has any impact

5   on the leverage of those suppliers negotiating with Delphi?

6   A    I believe it does.

7   Q    What's your opinion?  For the record, I asked if you had

8   an opinion.  You said I believe --

9   A    Excuse me.  I do have an opinion and yes, I do believe

10  they have leverage.  The suppliers have leverage on Delphi.

11          MR. BUTLER:  Your Honor, are there any other areas of

12  examination that the Court would like to hear outside of --

13          THE COURT:  Actually, I have a question for you and

14  Mr. Rosenberg which is the -- I don't know how many there are,

15  but the suppliers who have already entered into extension

16  agreements, are they non conforming or conforming at this

17  point, i.e. if they are offered new agreements along these

18  terms are they -- I'm a little confused about where they fall

19  out in this.

20          MR. BUTLER:  If they fall within -- if they agree to

21  amend their previous agreements to adopt all of these new terms

22  along the lines of the motion they could be conforming.  If

23  they refuse to they could be non conforming.

24          THE COURT:  And it's up to the debtors to decide in

25  the first instance with the Committee oversight whether they

1    want to want to offer that to the -- offer the new terms to the

2    extension agreement parties?

3              MR. BUTLER:   Correct.   Your Honor, if you look at

4    Exhibit 14 you'll see that there is some direct material

5    contracts.   There's a pie shape that describes the total

6    universe of contracts and gives you at least the debtor's

7    preliminary cut on those that need to be assumed through a

8    negotiation and extension and those that don't require an

9    extension.   I mean it is not -- the company doesn't believe

10   that everyone is entitled to this or should get it.   Obviously

11   one of the very peculiar positions of being in the fish bowl of

12   a Delphi Chapter 11 is I get to sit in a federal courtroom with

13   a Federal Judge and explain global supply management strategy

14   with sixty suppliers' counsel sitting in the back taking

15   copious notes about exactly how we're trying to manage this and

16   that puts the debtors at some disadvantage but we understand

17   it's a necessary part of this process but we are trying to keep

18   this at a summary level because we would like to be able to

19   have some strategic leverage with them.

20              But as this particular exhibit illustrates as we've

21   reviewed with the Committee, not every supplier is entitled to

22   or should receive the benefits of this order and this gives you

23   some sense of the preliminary cut of how one might approach it.

24              THE COURT:   Indeed more than half, arguably more than

25   more than half.

1          MR. BUTLER:  These are the total contracts, not just

2    the renewals, Your Honor.  To give you a sense of --

3          THE COURT:  I'm sorry.  But the people who have

4    already entered into extensions, is that the 44?

5          MR. BUTLER:  No, those are the people who refused to.

6    It's the 568.

7          THE COURT:  568 have already --

8          MR. BUTLER:  Exhibit 15 gives you a sense, this gives

9    you a sense of the issues we're dealing with, Your Honor.

10   We've actually sent out requests -- we had a November 15th

11   deadline for all of our suppliers to renew their 2006

12   agreements.  That's a normal rollover process that occurs every

13   year.  Exhibit 16 gives you a sense of how many people actually

14   responded to that request.

15         I'm not trying to publish all these numbers for the

16   Financial Times, but the reality is obviously a small subset

17   have actually -- the Wall Street Journal -- a small subset have

18   actually responded at this point in time, and the debtors

19   believe and Mr. Eisenberg testified that has to do a lot to the

20   uncertainties in these cases which is the part of the unique

21   issues that we're dealing with here.

22         THE COURT:  Okay.  So with respect to those who have

23   already agreed -- whoever is on the phone, please put it on

24   mute.  Whoever has already agreed to an extension they're going

25   to apply the same business logic to whether to grant them

1  better terms that they already agreed to?

2         MR. BUTLER:  Yes, Your Honor.  To the extent they

3  request them and the debtors believe that it would be in their

4  best interest because of the additional benefits that are

5  contemplated in the motion that the debtors will receive as a

6  result of assuming their contract.

7         THE COURT:  That being some more flexibility and some

8  more comfort on the supplier end, those are the two benefits?

9         MR. BUTLER:  I'm sorry.  I couldn't hear you.  Could

10  you repeat that?

11         THE COURT:  There's two benefits being a) more

12  flexibility for the debtor, and b) some additional good will on

13  the supplier side.

14         MR. BUTLER:  In addition to that, requiring two-year

15  terms which was --

16         THE COURT:  That's the flexibility.

17         MR. BUTLER:  Yes, that's correct, Your Honor.

18         THE COURT:  Okay.

19         MR. BUTLER:  Your Honor, with the admission of the

20  declarations and the proffers and with Mr. Eisenberg's direct

21  testimony and the admission of the other exhibits, that would

22  represent the debtor's evidentiary record and I would move Your

23  Honor to close the record.

24         THE COURT:  All right.

25         MR. BUTLER:  Your Honor, I also wanted to mention in

116

1   connection with the order today during one of the court

2   recesses the debtors agreed to make one other change to

3   Paragraph 6.  Again, by way of clarification and just -- I was

4   told that if I read into this record as many as fifteen or

5   sixteen lawyers might not come to the podium.  So I figured it

6   was worth it.  And that is the first part of the sentence would

7   read as follows:  Notwithstanding anything to the contrary

8   contained herein but subject to Paragraph 10 hereof, should a

9   covered supplier and the debtors execute an agreement that

10  deviates from any required minimum provision, and then the

11  paragraph would continue.

12       They again simply wanted to clarify that it requires the

13  execution of an agreement between the debtors and the covered

14  supplier that deviates from the required minimums.  So we've

15  greed to that language.  I think that's what it said before but

16  if it will satisfy people --

17       THE COURT:  In any event, these new terms, whether

18  they're the pre-approved terms or one off terms, have to be

19  agreed to in writing by the supplier.  That's the point?

20       MR. BUTLER:  Yes, Your Honor.  From our perspective,

21  the debtor's perspective, and you've couched it as sort of

22  flexibility and good will, but from the debtor's perspective as

23  you know the required minimum provisions include the extension

24  contract for two years, the termination for convenience and

25  other provisions of our general terms being enforceable, the

1   MNS two payment terms being required as well as getting back to

2   the most favorable trade terms and practices that existed

3   between the debtors and the suppliers in the twelve months

4   prior to the petition date subject to current market terms,

5   supplier waiving the right to seek adequate assurance of future

6   performance, payment of pre-petition cure payments, a

7   limitation of those payments and a treatment of others under

8   the plan and a real definition about what happens in the event

9   of termination or rejection of an assumable agreement or the

10  breach of the agreements and what can occur.

11          Those benefits to the company, the cure payments are

12  benefit to the supplier -- to the company as Mr. Eisenberg

13  testified -- as we go through this period of addressing product

14  and portfolio and plant rationalization and alignment and

15  realignment and deal with human capital matters over the next

16  period in 2006 having these in place is very important to the

17  debtors because, again, it's the overlay, Your Honor.  If you

18  think of this company -- a rationalized stable supply chain

19  that works every day and keeps our customers happy, that's what

20  creates the business enterprise value.  The rest of this is how

21  one allocates it towards everybody else and how we rationalize

22  human capital and our plants and portfolio.  So that's very

23  important.

24          In the declarations that have now been admitted into

25  evidence, Your Honor has an indication of the -- and testimony

1   -- more than an indication, testimony about the kinds of cash

2   flow benefits and liquidity benefits that the estate realizes

3   here.  So there are real EBITDA savings, there are cash flow

4   savings.  There's additional flexibility and most importantly,

5   and I think from the debtor's perspective the single most

6   important thing of all is there is a stabilization of what the

7   debtor believes to be perhaps one of the most important if not

8   the single most important value driving proposition.  A well

9   managed supply chain in this business is what allows us

10  generate business enterprise value for all of our stakeholder

11  and that's the underlying -- this motion.

12          THE COURT:  Okay.  Well, why don't I hear from anyone

13  who wants to speak having heard all the clarifications and

14  changes to the reliefs sought.

15          MR. LEINWAND:  I'm Harris Leinwand representing Baker

16  Hughes Incorporated and Baker Petrolife Corporation.

17          The debtor says that the vendors objections are not

18  substantial because they will not be bound by this order unless

19  they execute and deliver an assumption agreement.  The vendors

20  have asked for something very simple, which is if a vendor

21  should write to Skadden, should write to a particular

22  individual at Skadden which could be designated, that only one

23  person has the authority to sign this assumption agreement.  It

24  isn't complicated then for Delphi.  It doesn't require lawyers

25  on the part of Delphi to send the assumption agreement to that

119

1   person.

2          We're concerned that someone who -- they're trying to

3   put a burden on the vendors to make sure that nobody signs an

4   agreement if the vendor doesn't want to sign it and that's an

5   unnecessary burden.  So we think they're trying to entrap

6   vendors to sign these assumption agreements even if it's

7   clearly against the interest of that vendor.

8          THE COURT:  Okay.

9          MR. BUTLER:  May I respond, Your Honor?

10         Your Honor, we're not trying to entrap anyone but

11  we're also not endorsing and would ask the Court not to order a

12  disruption in the day-to-day business relationships between

13  Delphi and its supply chain.  An individual supplier has a

14  supply management function and they operate with Delphi every

15  day and they're the ones to determine -- and their CEO could

16  give them direction.  They could do whatever they want to when

17  they decide manage their side.  But we're not looking to do and

18  we think it would be highly disruptive is to have an outside

19  lawyer send in a thing saying okay, because we're not --

20  Skadden is not involved in documenting all these things.  This

21  is done on a principle to principle basis within the supply

22  chain all over the world.

23         All of a sudden say and we're to be able to go

24  forward, we want to change the ordinary course of business and

25  we want to impose to a federal court order the only way in

120

1   which something can be signed we think is inappropriate.  If a

2   particular supplier doesn't want to sign something, that's for

3   them to manage themselves.  We are not trying to change the

4   ordinary course work that occurs in an organization.  I don't

5   know how these letters would be generated, who would authorize

6   them to be generated, and that's the concern.  I don't know

7   whether these -- whether the people who are in this courtroom

8   are hired by the finance side of the group as opposed to the

9   supply side or however they're operating, but I don't think,

10  Your Honor, that this court order should regulate how the

11  relationships occur between those ordinary course business

12  relationships occur between the debtor and its suppliers.  That

13  I think is for the suppliers to manage and for them to deal

14  with on their own.

15          THE COURT:  So you're not disagreeing with Mr.

16  Leinwand insofar as this, that if buyer X at Delphi who always

17  deals with his opposite number at Selectron calls up that

18  person and that persons says well, I'm sorry, I'm not

19  authorized to talk to you any more, you have to talk to so and

20  so.  That's -- there's no problem with that, I assume.

21          MR. BUTLER:  Absolutely none, Your Honor.

22          THE COURT:  But at least then it goes through the

23  normal channels?

24          MR. BUTLER:  Absolutely.  But if the normal channels

25  are authorized to participate and they do participate as we've

1    said most of this will occur, we don't want to simply disrupt

2    that through a federal court order.  That's our only point,

3    Your Honor.  Each supplier can manage their own

4    responsibilities.

5            THE COURT:  Okay.

6            MR. FARBER:  Your Honor, good afternoon.  My name is

7    Eugene Farber for DBM Technology.  We would respectfully make

8    three points for Your Honor's consideration.

9            Number one, Your Honor, as a matter for the record we

10   do think that Your Honor ought to allow for cross-examination

11   of some of the witnesses who put in declarations before fully

12   and completely determining that they're in evidence.

13           THE COURT:  I'm sorry.  Everyone has that right.  I

14   assumed no one wanted to cross-examine him.

15           MR. FARBER:  I don't think that, Your Honor, any of

16   us -- the many of us in the back of the room felt that we had

17   the opportunity to assert that.

18           THE COURT:  Well, you can do that I suppose, but let

19   me hear your objection first.

20           MR. FARBER:  Your Honor, there are two points here

21   that appear to us to be very significant.  With hundreds or

22   thousands of employees we think that there's not much of a

23   substantive difference between simply saying no signature and a

24   signature from anyone.  We agree with the prior comment that

25   we'd like to designate who is the one who should sign.

122

1            We also respectfully request, Your Honor, that -- and

2    we don't understand why this is so difficult that those

3    suppliers who've spent the money to retain counsel, to be here

4    today or to interpose objections which have been served before

5    Your Honor that we ought to be served with the assumption

6    agreement.  What's going to happen here, Your Honor, is that an

7    employee, probably a low level employee is going to get a

8    document we're told that -- and the form that's been sent us

9    appears to indicate that it's a document that's going to say

10   something has been approved by the Court and we think it's

11   highly likely that without additional language that indicates

12   to that employee please consult your counsel prior to signing

13   this document that lower level employees are readily going to

14   sign and just send it back and thereby bind us.

15           Your Honor, the final point that I'd like to make

16   which is relevant to that and related is we'd respectfully

17   request that there be an opt out procedure, that we have the

18   right to, as a creditor, to send a notice to all involved,

19   certainly including debtor saying we don't want this procedure.

20   Even if you get someone who will fulfill our obligations

21   contractually certainly as they exist, but we don't want to be

22   forced that if some lower level employees sign something of our

23   many hundreds or thousands of employees that that binds us to

24   an agreement and we'll have a senior official of our company

25   write a letter and say we want out.  It's a settlement

123

1  agreement and we respectfully request that we have the right to

2  say we don't want it.

3  　　　　Your Honor, thank you.

4  　　　　THE COURT:  Frankly on the first point given that

5  that's the nature of the objection I don't -- I mean you're

6  free to cross-examine, but I don't see any purpose to cross-

7  examining, at least as far as my review of the binder and the

8  witness' testimony.

9  　　　　MR. FARBER:  Your Honor, when we met privately with

10  counsel for the debtor we asked why can't you send a copy of

11  this assumption agreement at the same time it goes out to those

12  who are here today.  It's a limited universe.  There are sixty

13  or seventy of us.  The answer was it's too onerous, it's too

14  difficult to track.

15  　　　　We just can't -- we'd like to explore if Your Honor

16  would permit us through the witness and through cross-

17  examination how difficult it would be so that we who represent

18  our clients have the ability to give our clients legal advice

19  in connection with what's a very significant binding

20  essentially settlement document.  That's the reason, Your

21  Honor.

22  　　　　THE COURT:  I think that can be dealt with on oral

23  argument.

24  　　　　MR. BUTLER:  Your Honor, responding to this.  Again,

25  what we're trying to do is permit the ordinary course of

124

1    negotiations to go on between our very sophisticated supply

2    chain and the company and this is not a situation where the

3    bankruptcy lawyers are involved in the process.  I mean Skadden

4    is not out in -- with these 800 buyers advising them on how to

5    negotiating things.  This is done a principle to principle

6    basis, and if a particular supplier they want to have their

7    outside bankruptcy counsel involved they can do that.  This

8    gentleman can make sure that they set those rules up right away

9    internally, but to set up a process with these 11,000 contracts

10   they've got to -- those contracts around the entire world have

11   got to bubble up to some central place in Troy and then be sent

12   to the outside counsel so we can figure out who might have

13   shown up in a bankruptcy court and then send out the bankruptcy

14   court and then goes -- this will never be done by December

15   31st, Your Honor.

16           It seems to me that these sophisticated companies can

17   in these situations, can manage themselves and they can

18   internally set up whatever controls they want to to deal with

19   this issue but that shouldn't be part of a federal court order

20   dealing with the debtor's procedures on how the debtors will

21   assume something.

22           Similarly, Your Honor, for the opt out provision, I

23   think it would be very detrimental to set up a procedure where

24   the bankruptcy lawyer is going to start saying there's an opt

25   out unless you contact me.  That's not what this process is

1  about, Your Honor.

2          MR. ECKSTEIN:  Good afternoon, Your Honor.  Andrew

3  Eckstein, Blank Rome on behalf of Denso International America,

4  Inc.

5          Your Honor, Mr. Butler refers to this as an ordinary

6  course supply chain issue.  Perhaps it is on a commercial order

7  and delivery basis, but this is an extraordinary relief and

8  it's an extraordinary deviation from bankruptcy law.  This is

9  an assumption of an amended contract.  This is a binding waiver

10 of rights and it's all well and good for counterparts, business

11 counterparts in the buying and selling of parts to communicate

12 with one another and communicate purchase orders.  But to hand

13 somebody what is effectively a material waiver of rights and

14 say you've got to sign this to keep doing business with us is

15 something that should not happen or should not be permitted to

16 happen where somebody expresses a concern that --

17         THE COURT:  You're saying this a contract of

18 adhesion?

19         MR. ECKSTEIN:  Your Honor, in some ways it seems that

20 way.

21         THE COURT:  I don't want to hear any more on this

22 issue about notice.  I think everyone has made their points.

23         Are there other issues?

24         MR. BERKOFF:  Good afternoon, Your Honor.  Leslie

25 Berkoff, Morihat, Cameroff & Horowitz [Ph.].  I'm local counsel

1   for S&Z Tool & Die Robbin Industries.

2          I have with me co-counsel Dan DeMarco.  I'm going to

3   make an oral application to admit him pro hoc.  We will follow

4   it up with a formal application.  He's a member in good

5   standing of the Ohio Bar, a partner at the firm in -- I would

6   ask you to allow him to speak today.

7          THE COURT:  Okay.

8          MS. BERKOFF:  Thank you Your Honor.

9          MR. DeMARCO:  Thank you, Your Honor.  I appreciate

10  you extending the courtesy.

11         I think it bears mentioning in connection with this,

12  the point the gentleman who preceded me on behalf of suppliers

13  attempting to make is that I would expect that if we have the

14  opportunity to ask the lawyers from Skadden Arps or the Delphi

15  representatives here today who prepared the documents that's

16  referred to the "procedures" and the documents that are

17  referred to as the "minimum requirements" and the documents

18  that are referred to as the "assumed or assumable agreements"

19  that we would find that it is not the 600 buyers at the bottom

20  of the pyramid that we heard testimony about.

21         I think the suggestion that have been made by

22  preceding counsel is trying to simply and certainly would be

23  open to other ways to simplify.  Your Honor, there was

24  reference made earlier to a meet and confer yesterday at 5:00.

25  It was assembled within a couple of hours that afternoon by the

127

1  lawyers at Skadden Arps who reached by e-mail my co-counsel,

2  Ms. Berkoff, who filed the objection, myself who -- although I

3  didn't sign the objection was on the paper, they were able to

4  identify me and my partner whose name also appeared on the

5  pleadings.  During that call, and I think it's been alluded to

6  here today, thirty some counsel perhaps participated in that

7  call.  So the list already exists to provide notice to the

8  suppliers that their designated counsel can receive notice that

9  they're about to be impacted by these procedures.

10         As a final point, Your Honor, I would like the

11  opportunity to ask, although I think it's rhetorical at this

12  point, the Delphi representatives when was the last time that

13  they sent a normal rollover contract renewal that contained

14  provisions such as the cure under Section 365(b) at a

15  percentage less than a hundred percent which is not back

16  stopped by the protections of Section 503(b).  When was the

17  last time such a rollover document contained a waiver of

18  preference rights, when was the last time it included the

19  waiver of any right to adequate protection for the duration of

20  the agreement.  I think the answer is evident.

21         Thank you, Your Honor.

22         THE COURT:  Am I right, Mr. Butler, though that this

23  is really applying as to contracts that are expiring and that

24  if you can get a good deal in connection with other contracts

25  you'll run it by the Committee?

1          MR. BUTLER:  That's correct.  These are extensions of

2     contracts that are expiring, Your Honor.  Your Honor has in

3     the -- just to give -- to put the point in focus.  Your Honor

4     has attached to the order the Delphi standard terms and

5     conditions and if you look at that they are detailed, they are

6     lengthy.  They deal with, among other things, one of the most

7     important contractual rights -- debtors here which is a

8     termination for convenience provisions.  Those go routinely to

9     these buyers at the other side in the supply chain management

10     and they use their lawyers and their companies to evaluate

11     that.

12          I just think that if we're going to let the global

13     supply management operation move forward it should move forward

14     through ordinary course business channels and if any particular

15     represented entity here that wants to put -- set up internal

16     procedures to refer everything to outside bankruptcy counsel

17     they can do that, but there shouldn't be an order that requires

18     that entered in this court.

19          THE COURT:  Anyone else want to speak?  And you

20     should assume that I read the objections as well as the

21     statements filed in support by the two unions and the agents.

22          MR. ZIMAN:  Your Honor, Ken Ziman, Simpson, Thatcher

23     & Bartlett on behalf of JP Morgan Chase as pre-petition agent.

24          Mr. Butler has alluded to the fact that we also

25     support the relief requested here and especially on the

1   modified basis now negotiated we absolutely do.  Maintaining

2   the supply chain, we view ourselves as being at the top of the

3   supply chain and Mr. Rosenberg made reference to our money.

4   We'd like to think it's our money until we get paid and we're

5   quite concerned about it going out to pay junior creditors and

6   we raised that concern.  But on the other hand, we have a lot

7   of confidence in the global supply team at the debtors.

8   They've distinguished themselves in the way they're operated

9   with respect to the essential supplier and the other relief

10  entered on the first day and we think that this is the kind of

11  discretion they need to have to maintain that supply chain

12  going forward.

13          Thank you, Your Honor.

14          THE COURT:  Thank you.

15          MR. ROSENBERG:  Your Honor, just as an aside.  If Mr.

16  Ziman is correct that it is his client's money being spent

17  today everybody in this room is in very, very deep trouble.

18          THE COURT:  Anyone else?

19          I have in front of me a motion as modified both last

20  night and on the record today that's captioned order under 11

21  U.S.C. Sections 363(b) and 365(a) in Bankruptcy Rule 9019

22  approving procedures to assume certain amended and restated

23  sole source supplier agreements.  We clarified on the record

24  what types of agreements are contemplated by that motion and

25  the different steps involved in connection with the different

130

1   types of agreements that have been identified.

2        This is, as the Committee pointed out, extraordinary

3   relief in that it is not a simple assumption motion.  I say

4   that because the contracts that are addressed here are being

5   addressed because they're literally expiring and normally if

6   ever does one -- abnormally if ever does one assume an expiring

7   contract.  So I view this, and I think it should be viewed

8   generally as primarily a motion under Section 363(b) to approve

9   parameters for negotiating the terms of new contracts and the

10  reason that Section 363(b) is particularly implicated here is

11  that one of the parameters involved is the satisfaction of a

12  portion of the non-debtor party's pre-petition claim.

13       In addition, even though this is not what you would

14  normally view as a garden variety assumption of a contract, the

15  procedures contemplate the release of preference and other

16  Chapter 5 claims with respect to the conforming contracts.  So

17  in that sense again Section 363(b) and Bankruptcy Rule 9019 are

18  implicated.

19       In large measure then I need to evaluate the motion

20  in the light of those cases that have considered motions that

21  involve the payment of pre-petition debt and that's what I've

22  done here.  I've done I think it in light of the standards of

23  those courts that authorized such payment and in fact I myself

24  have applied those standards earlier in the case with respect

25  to some of the first day motions that were subsequently

131

1    reviewed and with some modification signed off on by the

2    Creditors Committee.

3              First and foremost, I take comfort in approving the

4    motion today from the fact that the two objectants who I

5    believe were asking the right questions have now been satisfied

6    with the motion as far as it's been modified on the record,

7    those objectants being the Official Creditors Committee and

8    Wilmington Trust as indenture trustee.

9              Notwithstanding Mr. Zeman, they have the most to lose

10   as part of this motion, at least in the immediate sense,

11   because of the payment of pre-petition debt that the motion

12   contemplates and also are closer to the facts than I am and

13   have had the benefit of more discussions with the debtor than I

14   have.  So I rely in large part on their judgment.

15             In addition, I'm reasonably satisfied by the

16   testimony and the proffers that this is a critical time in

17   Delphi's business with the imminent expiration of numerous

18   contracts that gives those contract parties, or at least some

19   of them, meaningful leverage for renegotiation and I believe

20   that in light of that fact the debtors do require a measure of

21   flexibility including the ability to provide for payment of

22   some pre-petition debt and release of avoidance claims in

23   connection with the renegotiation of contracts.

24             I'm also satisfied generally that the debtors

25   understand that this process is one in which they are supposed

132

1   to balance the harm to the estate and other creditors that

2   derives from paying pre-petition debt against the benefits of

3   new agreements and the risks of the leverage possessed by

4   various suppliers.  I don't view this, and I think it needs to

5   be made clear in particular to the 660 or so buyers that that -

6   - this is not simply a Christmas present that people can hand

7   out to suppliers.  I don't believe that's how the debtors have

8   approached the other critical vendor relief that I gave them

9   and one reason for the Committee's involvement is to make sure

10   that -- again, that doesn't happen here but I don't believe

11   that the debtors view it that way from the start.

12              I think it's important for the heads of the team that

13   overseeing this project, again to make clear that this is not

14   an easy giveaway for the debtor and that in addition to all the

15   other leverage that the debtor has it also has the leverage of

16   the automatic stay and the cases of which there are many which

17   say that it is a violation of the automatic stay to condition a

18   new agreement specifically on payment of pre-petition debt

19   going back to Sport Frame and the cases that follow it.

20              So I trust and I know that the Committee will be

21   looking over the debtor's shoulder on this, that the debtors

22   and in particular the buyers who will be dealing with the more

23   numerous group if smaller in terms of dollar amount group will

24   be informed by their counsel and by their advisors to consider

25   their leverage points very carefully before making offers even

133

1   if there's a general threshold say of 60 percent that they're

2   authorized to go up to.

3          I would also strongly hope that if there is any

4   significant preference exposure that is also an element of the

5   negotiation because again this is not as I see it a simple

6   contract assumption issue but really an issue of a continuation

7   of doing business and forms of consideration that the debtors

8   can offer up to a supplier in the negotiation for a continuing

9   business.

10         The bottom line is although I'm approving the motion

11  the authority granted here should be used conservatively and in

12  full recognition of the debtor's rights under the automatic

13  stay.

14         The objections that I believe remain from the

15  suppliers have gone to the issue of notice and whether the

16  order should provide that the debtors should only deal with or

17  at least should provide a copy of a proposed new contract only

18  to -- either only to or to counsel of record for the non-

19  contract party.

20         If this were a motion to assume contracts I'd fully

21  understand that, but I really don't view it that way.  Again,

22  as I said before, it's really a motion to give the debtor some

23  flexibility in negotiating new contracts.  Therefore, I don't

24  believe it is appropriate to engraft on that relief an extra

25  layer of notice which would change it from what it is to

134

1   something else.  That being said, consistent with applicable

2   non-bankruptcy law, if any of these suppliers wants to notify

3   the appropriate people at the debtor, and I would assume that's

4   the people who are on the side, the buyer's side of dealing

5   with the suppliers.  They're perfectly free to do that.  It's

6   all a matter of the applicable non-bankruptcy law of authority

7   and agency and apparent authority to enter into a contract.

8        So if someone wants to get their bankruptcy lawyer

9   involved in a discussion that person can notify his or her

10   counterpart of the debtor that that's what he or she wants to

11   do.  If they want to get their regular contract lawyer in part

12   of the discussion, that's fine too, or if they think that they

13   understand the deal that's being offered and to negotiate off

14   of that on their own they should certainly feel free to do that

15   and avoid the cost and expense of adding in a layer of

16   additional legal review.

17        I note on that score one of the reasons given by Mr.

18   Eisenberg for the need for this relief is that the suppliers

19   have become more sophisticated unfortunately because of the

20   state of this industry and at this point understand terms like

21   pre-petition debt and preferences and the like.  Consequently,

22   I think it really is up to them to decide whether they want to

23   involve further layers of review on their end and so notify the

24   debtors.  But I don't view this as certainly changing any non

25   bankruptcy law applicable to entering into contracts and if

135

 1   someone signs an agreement that extends the term of an

 2   agreement for two years I'm assuming they know what they're

 3   doing.

 4         Similarly, if someone doesn't sign an agreement

 5   that's sent to them but continues to perform, I don't view this

 6   as changing any sort of non bankruptcy law that would be

 7   applicable that would say that that course of dealing after a

 8   certain time may constitute a new agreement.  It may not be

 9   this agreement but it may be a new agreement.  So this isn't

10   the only agreement that people can be bound by and that's been

11   made clear as requested by all of the supplier objectants.

12   These preferred terms or acceptable terms are only binding if

13   they sign the agreement.

14         So subject to seeing the final terms of the order,

15   and I understand you need to circulate it to the Committee and

16   to Wilmington Trust and I suppose to the banks as well, and the

17   objectants insofar as they have an interest still and I assume

18   they do because there are certain provision that you've laid

19   out you're going to be changing to reflect their concerns, I'll

20   approve the motion.

21         MR McDOWELL:  Quick question as to the form of the

22   order.

23         THE COURT:  I'm sorry.  Who are you, sir?

24         MR. McDOWELL:  Ralph McDowell, Your Honor,

25   representing the suppliers.

136

1        Mr. Butler alluded to some changes that came out of

2   the meet and confer with the suppliers last evening and his

3   partner, Mr. Reese circulated a redlined version.  Are those

4   changes being included?

5        THE COURT:  Well, except as he clarified further

6   changes on the record I assume they are, but he will -- if he

7   has your -- are you an objectant?

8        MR. McDOWELL:  Yes, I am.

9        THE COURT:  I'm assuming that you will circulate the

10  revised order to all of the objectants and again I'm not

11  looking for new objections.  I just wanted -- this is really

12  just to make sure it conforms with what's set forth on the

13  record.

14       MR. BUTLER:  Our process will be we will confer with

15  the bank agent, the Creditors Committee, Wilmington Trust and

16  get the order in the form that we're all comfortable with.

17  Then we'll send it out to the rest of the objector list.

18       THE COURT:  Okay.  Very well.  Thank you.

19       MR. BUTLER:  Your Honor, that completes the matters

20  on the November omnibus agenda.  Thank you very much.

21       THE COURT:  Thank you.

22                    * * * * *

23

24

25

137

1      I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                   _____

6                                        Carla Nutter

7   Dated:   12/1/05

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25