**Hearing Date And Time: June 24, 2008 at 10:00 a.m.**
**Objection Deadline: June 17, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------- - x
                                        :
   In re                                :      Chapter 11
                                        :
DELPHI CORPORATION, et al.,      :      Case No. 05-44481 (RDD)
                                        :
                                        :      (Jointly Administered)
              Debtors.          :
------------------------------- - - x

MOTION UNDER 11 U.S.C. § 365 FOR ORDER AUTHORIZING AND APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS IN
CONNECTION WITH SALE OF DEBTORS' POWER PRODUCTS
<u>BUSINESS TO STRATTEC BUYERS</u>

("POWER PRODUCTS CONTRACT ASSUMPTION AND ASSIGNMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") under 11 U.S.C. § 365 for an order authorizing and approving the assumption and assignment of certain prepetition executory contracts listed on <u>Exhibit A</u> attached hereto (the "Assumed U.S. Contracts") in connection with the Debtors' sale of their power products business (the "Power Products Business") to Strattec Security Corporation ("Strattec"), Witte-Velbert GmbH & Co. Kg, Vehicle Access Systems Technology LLC, and certain of their affiliates (collectively, the "Strattec Buyers").  In support of the Motion, the Debtors respectfully represent as follows:

Background

A.    <u>The Chapter 11 Filings</u>

      1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

      2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

      3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

        4.        On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless continue to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

        5.        This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

3

      6.      The statutory predicate for the relief requested herein is section 365 of the Bankruptcy Code.

B.      <u>Current Business Operations Of The Debtors</u>

      7.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

      8.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

      9.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

---

[1] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

11.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

---

[3]  Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

13. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.     Plan Confirmation And Postconfirmation Matters

14. The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order. After the Plan was confirmed, the Debtors focused their efforts on

satisfying the conditions for the Plan to become effective. The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees. The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement. Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless are working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

15.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

16.    By this Motion, the Debtors, in connection with the sale of the Power Products Business, seek entry of an order authorizing and approving the assumption and assignment of the Assumed U.S. Contracts to the Strattec Buyers.

7

Basis For Relief

17. In connection with the Debtors' continuous evaluation of their product portfolio, the Debtors have determined that the power products business no longer fit within the Company's future product portfolio.

18. Following extensive marketing efforts by the Debtors, on May 27, 2008, certain selling Debtor entities (the "Selling Debtor Entities")[4] and non-Debtor selling affiliates (together with the Selling Debtor Entities, the "Sellers") entered into a master sale and purchase agreement (the "Agreement") with the Strattec Buyers for the sale of certain assets related to the Power Products Business. Under the Agreement, the Strattec Buyers would purchase the Power Products Business from the Sellers for $7.8 million, subject to certain adjustments (the "Purchase Price"). Because the Purchase Price does not exceed $10 million, the Selling Debtor Entities have authority to sell the assets related to the Power Products Business to the Strattec Buyers in accordance with the terms of the Agreement under the Order Under 11 U.S.C. § 363 Approving Procedures To Sell Certain De Minimis Assets Free And Clear of Liens, Claims, And Encumbrances And To Pay Market Rate Broker Commissions In Connection With Such Sales Without Further Court Approval (Docket No. 766) (the "De Minimis Asset Sale Order").

19. Accordingly, on May 27, 2008, pursuant to the De Minimis Asset Sale Order, the Selling Debtor Entities gave notice of their intention to sell certain assets related to the Power Products Business by serving a Notice Of Proposed Sale Of Power Products Business Pursuant To Order Under 11 U.S.C. § 363 Approving Procedures To Sell Certain De Minimis Assets Free And Clear Of Liens, Claims, And Encumbrances (the "De Minimis Notice") on all

---

[4]  Under the Agreement (as defined below), the Selling Debtor Entities are Delphi, Delphi Automotive Systems LLC, and Delphi Technologies, Inc.

8

Interested Parties (as defined in the <u>De Minimis</u> Asset Sale Order). The Debtors served the <u>De Minimis</u> Notice on, among others, those parties known to have expressed an interest in purchasing the Power Products Business. The <u>De Minimis</u> Notice outlined that the sale of the Power Products Business would be consummated with the Strattec Buyers unless written objections, bids, or requests for additional time were received by the Debtors by June 3, 2008.

20. On June 3, 2008, the Debtors received a competing bid for the sale of the Power Products Business. The Debtors are currently in the process of evaluating such bid. If the Debtors, in their sole discretion, determine that this bid, or subsequent bid, constitutes the highest value bid, then Delphi will seek relief from this Court to assume and assign the Assumed U.S Contracts to this competing bidder.

F.    <u>The Assumption And Assignment Of The Assumed U.S. Contracts</u>

21. Under Section 6.3 of the Agreement, as soon as practicable after the Agreement was signed, Delphi was obligated to seek this Court's authority to assume and assign to the Strattec Buyers the Assumed U.S. Contracts. The Assumed U.S. Contracts are important to the operation of the Power Products Business and the Strattec Buyers would not purchase the Power Products Business unless the Assumed U.S. Contracts are transferred to them. Thus, the Selling Debtor Entities' assumption of the Assumed U.S. Contracts and assignment of such contracts to the Strattec Buyers is necessary to enable the Sellers to consummate the sale of the Power Products Business to the Strattec Buyers.

22. As a result, the Selling Debtor Entities seek authority under section 365 of the Bankruptcy Code to assume and assign to the Strattec Buyers the Assumed U.S. Contracts. The approximate cost to cure the Assumed U.S. Contracts related to the Power Products Business is $347,010.73. Pursuant to the Solicitation Procedures Order, each non-Debtor party to the 54 Assumed U.S. Contracts that are material supply agreements already has

received a cure notice (the "Plan Cure Notice"). The Plan Cure Notice stated, with respect to each such Assumed U.S. Contract, the cure amount that the Debtors believe is necessary to assume such contract pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"). The Plan Cure Notice provided parties to these Assumed U.S. Contracts with an opportunity to object to the Cure Amount, and notified each party that such party's contract was to be assumed under the Plan.

23.     Of the 54 parties to the Assumed U.S. Contracts for which the Debtors served a Plan Cure Notice, only four parties objected to the Debtors' proposed Cure Amount. Unless the Selling Debtor Entities and the non-Debtor party to an Assumed U.S. Contract agree otherwise to the Cure Amount or the Cure Amount is otherwise resolved in accordance with Solicitation Procedures Order or other order of this Court, the Cure listed on the Plan Cure Notices control the amounts required to cure all defaults under the Assumed U.S. Contracts that are material supply contracts.[5]

24.     Similar to the procedures established by this Court in connection with the assumption and assignment of contracts to a buyer of non-core assets, the Debtors propose that any objection to the relief requested herein would be required to state, with specificity the legal and factual grounds upon which the objection is based. The Debtors further propose that counterparty's objection should include appropriate documentation in support of its objection.

---

[5]   There are three Assumed U.S. Contracts related to the Power Products Business that are not material supply contracts (the "Other Prepetition Contracts"). Because the Plan did not provide for these parties to receive a Plan Cure Notice, the Debtors, concurrently with serving this Motion, will serve a notice of assumption and a proposed cure amount, substantially in the form attached hereto as <u>Exhibit B</u>, to the contract parties for each of the Other Prepetition Contracts. In the event the non-Debtor party disagrees with the assumption and assignment of an Other Prepetition Contract, the non-Debtor party to each of the Other Prepetition Contracts would be required to file an objection to the notice of assumption and proposed cure amount by 4:00 pm. (prevailing Eastern time) on June 17, 2008.

10

25.  The Assumed U.S. Contracts would be assumed at the earlier of the closing of the sale of the Power Products Business (the "Closing Date") or the Debtors' Emergence Date from these chapter 11 cases.   Nonetheless, prior to the Closing Date or the Emergence Date, the Selling Debtor Entities may revise their decision with respect to the assumption and assignment of any Assumed U.S. Contract and provide notice amending the information provided herein.

26.  The assumption and assignment of the Assumed U.S. Contracts to the Strattec Buyers are in the best interests of the Debtors and their estates, creditors, and stakeholders, and the relief requested herein should be granted.

## Applicable Authority

G.  Authority To Assume And Assign The Assumed U.S Contracts.

27.  Section 8.4 of the Plan contemplates that this Court may enter a post-confirmation order authorizing the assumption and assignment of executory contracts in connection with a divestiture transaction, and that the Debtors would be permitted to assign an assumed contract subsequent to the Emergence Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the divestiture-related order.  Section 365(f)(2) of the Bankruptcy Code provides that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

    28. Under section 365(a) of the Bankruptcy Code a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee –
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

    29.  Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction." <u>EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)</u>, 139 B.R. 585, 592 (S.D.N.Y. 1992), <u>aff'd</u>, 993 F.2d 300 (2d Cir. 1993) (presence of adequate assurance should be "determined under the facts of each particular case"); <u>see also</u> <u>In re Fifth Ave. Originals</u>, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds).  Courts have consistently held that the phrase does not require total assurances.  <u>See</u> <u>In re Natco Indus., Inc.</u>, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); <u>In re Prime Motor Inns Inc.</u>, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (although no single solution will satisfy every case, the required assurance will fall "considerably short of an absolute guaranty of performance").  In fact, adequate assurance has

12

been provided by demonstrating the Strattec Buyers' financial health and experience in managing the type of enterprise or property assigned. See In re Bygraph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

30. Because the Power Products Business no longer fits within the Debtors' product portfolio, the Selling Debtor Entities determined it was in the best interest of their estates to sell the assets related to the Power Products Business, including the transfer of the Assumed U.S. Contracts to the buyer of the Power Products Business. To the extent that any defaults exist under any prepetition executory contract that is to be assumed and assigned in connection with the sale of the Power Products Business, the Selling Debtor Entities would cure any such default. Additionally, it is the Debtors' understanding that Strattec, one of the Strattec Buyers, has participated in the automotive sector for nearly 100 years, has a strong cash position for quarter-ended, March 30, 2008, and 2008 calendar-to-date sales for nine months totaling more than $121 million. Through a formal alliance structure, the Strattec Buyers would work closely together to provide a global footprint for the supply of vehicular access control products to the automotive industry. Thus, the Debtors believe that the Strattec Buyers are well positioned to consummate this transaction. Upon Closing, it is expected that the Strattec Buyers will have the financial resources to perform under the Assumed U.S. Contracts. Moreover, if necessary, the Selling Debtor Entities will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Strattec Buyers their experience in the industry, and their willingness and ability to perform under the contracts to be assumed and assigned to them.

31.     The hearing on any objection, therefore, will provide this Court and other parties-in-interest ample opportunity to evaluate and, if necessary, challenge the ability of the Strattec Buyers to provide adequate assurance of future performance under the applicable Assumed U.S. Contracts.  Therefore, sufficient basis exists to authorize the Selling Debtor Entities to assume and assign the Assumed U.S. Contracts as set forth in the Agreement.

## Notice Of Motion

32.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

33.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) authorizing and approving the assumption and assignment of the Assumed U.S. Contracts to the Strattec Buyers and (b) granting them such other and further relief as is just.

Dated:  New York, New York
        June 4, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession