**Hearing Date and Time:  July 31, 2008 at 10:00 a.m.**
                    **Objection Deadline:  July 24, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

  - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

MOTION UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 2002 AND 6004 FOR ORDER
AUTHORIZING AND APPROVING ENTRY BY DELPHI AUTOMOTIVE SYSTEMS LLC INTO
RESTRUCTURING AND EXCHANGE AGREEMENT WITH ENER1, INC. RELATED TO JOINT
<u>VENTURE ENERDEL, INC.</u>

("JOINT VENTURE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002 and 6004 for an order authorizing and approving, but not directing, the entry by Delphi Automotive Systems LLC ("DAS LLC") into that certain Restructuring and Exchange Agreement (the "Restructuring and Exchange Agreement") with Ener1, Inc. ("Ener1") for the restructuring and exchange of DAS LLC's ownership interests in EnerDel, Inc. ("EnerDel"), an existing joint venture between DAS LLC and Ener1. In support of the Motion, the Debtors respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1.   On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.   No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.   On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi

2

Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

4. On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless continue to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

5. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

    6.  The statutory predicates for the relief requested herein are section 363 of the Bankruptcy Code and rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

    7.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

    8.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

    9.  Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the

---

[1] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.  Events Leading To The Chapter 11 Filing

10. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

11. The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

---

[3]  Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

12.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

13.     On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.    Plan Confirmation And Postconfirmation Matters

14.     The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a

6

comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order. After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective. The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees. The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement. Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless are working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

15. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.  Background To Restructuring And Exchange Agreement

16. In 2004, DAS LLC and Ener1 entered into an agreement[4] (the "Formation Agreement") pursuant to which the parties formed a joint venture, EnerDel, to design and

---

[4] The Formation, Subscription, And Stockholders' Agreement Of EnerDel, Inc., dated as of October 20, 2004 and amended as of December 23, 2004.

7

manufacture lithium-ion battery technologies and products. The goal of the joint venture was to create an alternative energy source and sell and distribute its products globally. EnerDel primarily focuses its lithium-ion batteries business in the automotive, power tool, military, consumer appliance, and personal mobility markets. Ener1 contributed capital and intellectual property to the joint venture and in exchange was granted 80.5% of EnerDel's common stock. DAS LLC contributed proportionally a smaller amount of capital and intellectual property to the joint venture and in exchange was granted 19.5% of EnerDel's common stock (the "Common Stock"). In addition to the Common Stock, DAS LLC was also granted one of six seats on the EnerDel board of directors,[5] 8,000 shares of EnerDel preferred stock (the "Preferred Stock"), and warrants to acquire 750,000 shares of Ener1 common stock with a strike price of $7.00 per share and an expiration date in October 20, 2011 (the "Original Warrants").

17.     The low-cost, high-performance lithium-ion batteries that EnerDel has been developing are designed for plug-in hybrid and extended-range electric vehicles. This niche is becoming increasingly competitive. Nevertheless, EnerDel believes that it has a feasible business plan for the development of the lithium-ion batteries, and the global market for such alternate fuel sources is in the billions of dollars.

## Relief Requested

18.     By this Motion, the Debtors seek entry of an order under section 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 (a) authorizing and approving, but not directing, DAS LLC's entry into and performance under the Restructuring and Exchange

---

[5] The Bylaws of EnerDel generally require an affirmative vote of a majority of the total number of directors to approve matters. Because DAS LLC holds only one of six board seats, its relative voting power on the board is generally not sufficient to alter the decisions made by EnerDel's board.

8

Agreement, a copy of which is attached hereto as Exhibit A,[6] (b) finding that the transactions contemplated by the Restructuring and Exchange Agreement and the related agreements, documents, and instruments contemplated by the Restructuring and Exchange Agreement were negotiated and documented in good faith and from arm's length bargaining positions, (c) finding that the transactions contemplated by the Restructuring and Exchange Agreement and the related agreements, documents, and instruments contemplated by the Restructuring and Exchange Agreement satisfy the requirements of section 363 of the Bankruptcy Code, (d) finding that DAS LLC's execution of and performance under the Restructuring and Exchange Agreement is in the best interests of DAS LLC, its estate, its creditors, and its stakeholders, (e) finding that the terms and conditions of the Restructuring and Exchange Agreement are fair and reasonable and approving the terms and conditions of such agreement, thereby making such terms and conditions valid, binding, and enforceable, (f) finding that the consideration DAS LLC receives pursuant to this transaction is fair and at least reasonably equivalent value for its Common Stock and Preferred Stock in EnerDel, and (g) authorizing DAS LLC to transfer, upon consummation of the Restructuring and Exchange Agreement, its Common Stock and Preferred Stock to Ener1 free and clear of any and all Liens (as defined in the Restructuring and Exchange Agreement)[7] as permitted under section 363 of the Bankruptcy Code (based upon, inter alia, compliance with section 363(f) of the Bankruptcy Code).

---

[6] Copies of the exhibits to the Restructuring and Exchange Agreement are available upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show that they would be affected by the relief requested in this Motion.

[7] The term "Liens" is defined in section 1.10 of the Restructuring and Exchange Agreement as "claims (as defined in the Bankruptcy Code), pledges, options, charges, hypothecations, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, imperfection of title, prior assignment or other encumbrance of any kind or nature whatsoever."

Basis For Relief

19.     DAS LLC has determined in its business judgment that it is in its best interests to restructure its ownership interest in EnerDel to a more liquid asset.  Specifically, the Restructuring and Exchange Agreement provides that DAS LLC would transfer its 19.5% Common Stock interest in EnerDel (valued at approximately $18.0 million) and its EnerDel Preferred Stock (valued at approximately $9.6 million) to its joint venture partner, Ener1, in exchange for Ener1 common stock, warrants in Ener1 with a lower strike price, and cash, all of which DAS LLC values at approximately $27.6 million.[8]  Ener1 shares were recently approved for listing on the American Stock Exchange ("AMEX"), and as of July 10, 2008 had a closing price of $6.53.  Ener1 also owns two other subsidiaries that engage in the development and marketing of other alternative energy sources, such as fuel cells and nanotechnology-related manufacturing processes and materials for batteries.  DAS LLC believes that the proposed transaction to exchange its interest in EnerDel (which is not traded on an open market and is not similarly diversified) for assets that can be sold more readily is in the best interests of its estate.[9]

---

[8]  On June 30, 2008, DAS LLC reviewed a fairness opinion provided by an independent investment bank engaged by EnerDel which supports, among other things, the conclusion that the consideration DAS LLC would receive from Ener1 in exchange for its ownership in EnerDel is fair and reasonable from a financial point of view.

[9]  DAS LLC believes that consummating the Restructuring and Exchange Agreement is in the best interests of its estates, its creditors, and its other stakeholders.  However, to the extent that before the hearing on this Motion a third party bidder submits a more valuable offer (in DAS LLC's reasonable discretion) for DAS LLC's ownership interest in EnerDel, DAS LLC would consider such an offer in the exercise of its fiduciary duty and reserves the right to take appropriate actions under the circumstances to maximize value for its estate, its creditors, and its other stakeholders.

10

G.   Material Terms Of The Restructuring Agreement[10]

20.   Pursuant to the Restructuring and Exchange Agreement, DAS LLC would exchange its Common Stock, its Preferred Stock, and its seat on the Board of Directors of EnerDel (the "Exchange Consideration") for the following:

(a)   2.86 million shares of the common stock in Ener1 valued at approximately $19.5 million;

(b)   $8 million cash; and

(c)   revised warrants to acquire Ener1 common stock at an exercise price of $5.25 per share.[11]

21.   In addition, the Restructuring and Exchange Agreement provides that the Formation Agreement will terminate as part of this transaction. Nonetheless, the non-compete provision and intellectual property licenses contributed under the Formation Agreement will remain in effect as agreed to by the parties pursuant to the Formation Agreement.

22.   Covenant Not To Compete. The non-compete provision in the Formation Agreement, which will remain in effect with respect to EnerDel's current scope of business operations until October 20, 2010, provides DAS LLC and Ener1 limited options to engage in operations that compete with EnerDel. For instance, DAS LLC may acquire a company if the revenues that the company earns from business operations that compete with EnerDel do not exceed 15% of the company's total revenues, or DAS LLC may purchase up to 5% of publicly traded stock of an entity that engages in a business that competes with EnerDel. In addition,

---

[10]   In the event of any discrepancy between the Restructuring and Exchange Agreement and this summary, the provisions of the Restructuring and Exchange Agreement control.

[11]   In valuing the warrants under the Black-Scholes method, lowering the strike price of the warrants from $7.00 to $5.25 increases the aggregate differential value of the revised warrants to DAS LLC by approximately $100,000. Although the original warrants have a strike price higher than Ener1's current stock price, the original warrants still have value, in part, because of the underlying stock's volatility and the duration of the warrants.

11

DAS LLC may continue designing and assembling lithium-based batteries if DAS LLC includes EnerDel in the bidding process to supply the products. Because DAS LLC will continue to benefit from any expansion in EnerDel's business through its holding of common stock and warrants in its parent Ener1, DAS LLC believes that continuation of the existing non-compete provision is acceptable under the circumstances.

23. <u>Licenses And Intellectual Property</u>. As set forth above, DAS LLC contributed certain intellectual property in EnerDel upon the formation of the joint venture. Pursuant to the Formation Agreement, EnerDel licensed the contributed intellectual property back to DAS LLC as a paid-up, royalty-free, perpetual and irrevocable worldwide exclusive license. The Restructuring and Exchange Agreement provides that EnerDel would continue to license intellectual property to DAS LLC for the use, manufacture, and sale of products other than lithium batteries. In addition, the Restructuring and Exchange Agreement provides that DAS LLC will not make any claim for EnerDel's confidential company information or intellectual property related to the patents that DAS LLC did not contribute under the Formation Agreement.

24. <u>Termination</u>. The Restructuring and Exchange Agreement could be terminated prior to closing under the following circumstances: (i) mutual agreement by the parties, (ii) by either party, provided that the terminating party is not in material breach of its obligations under the Restructuring and Exchange Agreement, if the closing does not occur on or before five Business Days following the date an order approving the Motion is no longer subject to a stay or injunction, (iii) by either party, if the other party materially breached its representations and warranties and such breach is not cured within 10 business days of written

notice of such breaches, and (iv) by either party, if this Court has not entered an order approving the Motion on or before September 12, 2008.

25.  DAS LLC has sound business justifications for restructuring DAS LLC's ownership interest in EnerDel as contemplated by the Restructuring and Exchange Agreement. Among other things, consummation of the Restructuring and Exchange Agreement makes DAS LLC's investment more liquid.  First, because Ener1's common stock is listed on AMEX, the Ener1 shares can be sold or transferred more readily than DAS LLC's existing equity interests in EnerDel.  DAS LLC would have the option to retain or sell its interest in Ener1 upon completion of the terms of the Restructuring and Exchange Agreement, subject to compliance with applicable securities laws.[12]  Second, DAS LLC would benefit by receiving the consideration of $8 million in cash.  Third, DAS LLC would have warrants to acquire Ener1 common stock at an exercise price of $5.25 per share rather than $7.00, which strike price is at a discount to the current trading price of the stock.

26.  As set forth above, the aggregate value of the consideration that DAS LLC would receive through the Restructuring and Exchange Agreement is fair and reasonable and is a better investment for DAS LLC.  Because DAS LLC currently has a minority position on EnerDel's board of directors with limited voting rights, DAS LLC believes that exchanging that board seat as partial consideration for cash and an ownership stake in Ener1 is justified. Moreover, through its ownership of Ener1 common stock, DAS LLC would retain an indirect interest in EnerDel, which will provide DAS LLC the opportunity to profit should the EnerDel venture succeed.  Moreover, Ener1's other holdings should diversify the risk of owning equity in

---

[12] The common stock in Ener1 that DAS LLC would receive would be subject to Rule 144A of the Securities Act of 1933 (17 C.F.R. § 230.114A), thereby restricting public sales of the common stock for six months after the transaction closes.

13

EnerDel alone.  Accordingly, in its business judgment, DAS LLC has determined that it is in the best interest of its estate, its creditors, and its other stakeholders to enter into and perform under the Restructuring and Exchange Agreement.

Applicable Authority

H.     Approval Of The Restructuring Agreement

27.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).

28.     The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098-99.

29.     Once a debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed

14

basis, in good faith and in the honest belief that the action was in the best interests of the company."  <u>Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc.</u> (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter,"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  <u>Id.</u>  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." <u>Lionel</u>, 722 F.2d at 1071. As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" <u>In re Aerovox, Inc.</u>, 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting <u>In re Interco, Inc.</u>, 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

        30.     DAS LLC submits that the decision to enter into the Restructuring and Exchange Agreement and to complete this proposed transaction represents a proper exercise of DAS LLC's business judgment.  DAS LLC also submits that the terms and conditions of the Restructuring Agreement are fair and reasonable and that the company negotiated the terms with Ener1 in good faith and at arm's length.  Indeed, DAS LLC believes that the Exchange Consideration constitutes fair and at least reasonably equivalent value for its Common Stock and Preferred Stock.  Moreover, the structure of the transaction will increase the liquidity of DAS LLC's investment.  Because of the contemplated benefits, this Court should approve the relief requested herein.

I.     <u>Transfer Of Common Stock And Preferred Stock Free And Clear Of Liens</u>

        31.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may transfer property free and clear of any lien, claim, or interest in such property if, among other things, at least one of the five factors under section 363(f)(5) is satisfied. <u>See</u>, 11 U.S.C. § 363(f).

15

Section 363(f) enables DAS LLC to transfer the Common Stock and Preferred Stock free and clear of Liens.  DAS LLC believes that it satisfies at least one of the five conditions of 11 U.S.C. § 363(f) for each Lien in the Shares, if any, and DAS LLC submits that any such Lien in the Shares will be adequately protected by attachment to the Exchange Consideration, subject to any claims and defenses DAS LLC may possess with respect thereto.  Accordingly, DAS LLC requests that the Common Stock and Preferred Stock be transferred to Ener1 free and clear of all Liens.

### Notice

32.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487).  In light of the nature of the relief requested, the Debtors submit, and seek a finding from this Court, that no other or further notice is necessary.

### Memorandum Of Law

33.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) authorizing and approving, but not directing, DAS LLC's entry into the Restructuring and Exchange Agreement, (b) finding that the transactions contemplated by the Restructuring and Exchange Agreement and the related agreements, documents, and instruments contemplated by the Restructuring and Exchange Agreement were negotiated and documented in good faith and from arm's length bargaining positions, (c) finding that the transactions contemplated by the Restructuring and Exchange Agreement and the related agreements, documents, and instruments contemplated by the Restructuring and Exchange Agreement satisfy the requirements of section 363 of the Bankruptcy Code, (d) finding that DAS LLC's execution of and performance under the Restructuring and Exchange Agreement is in the best interests of DAS LLC, its estate, its creditors, and its stakeholders, (e) finding that the terms and conditions of the Restructuring and Exchange Agreement are fair and reasonable and approving the terms and conditions of such agreement, thereby making such terms and conditions valid, binding, and enforceable, (f) finding that the consideration DAS LLC receives pursuant to this transaction is fair and at least reasonably equivalent value for its Common Stock and Preferred Stock in EnerDel, and (g) authorizing DAS LLC to transfer, upon consummation of the Restructuring and Exchange Agreement, its Common Stock and Preferred Stock to Ener1 free and clear of any and all Liens (as defined in the Restructuring and Exchange Agreement) as permitted under section 363 of the Bankruptcy Code (based upon, inter alia, compliance with section 363(f) of the Bankruptcy Code), and (h) granting the Debtors such other and further relief as is just.

Dated: New York, New York
      July 11, 2008

                    SKADDEN, ARPS, SLATE, MEAGHER
                        & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

                - and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession