**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Michael J. Riela (MR-7829)
Email: robert.rosenberg@lw.com
        mitchell.seider@lw.com
        mark.broude@lw.com
        michael.riela@lw.com

Counsel for the Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>DELPHI CORPORATION, et al.<br><br>        Debtors. | Chapter 11<br>Case No. 05-44481 (RDD)<br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>        Plaintiff,<br><br> - against -<br><br>DELPHI CORPORATION, ASEC MANUFACTURING GENERAL PARTNERSHIP, DELPHI FURUKAWA WIRING SYSTEMS LLC, ASEC SALES GENERAL PARTNERSHIP, DELPHI INTEGRATED SERVICE SOLUTIONS, INC., ASPIRE, INC, DELPHI INTERNATIONAL HOLDINGS CORP.,  DELCO ELECTRONICS OVERSEAS CORPORATION, DELPHI INTERNATIONAL SERVICES, INC., DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC., DELPHI LIQUIDATION HOLDING COMPANY, DELPHI AUTOMOTIVE SYSTEMS GLOBAL (HOLDING), INC., DELPHI LLC, DELPHI AUTOMOTIVE SYSTEMS HUMAN RESOURCES LLC, DELPHI MECHATRONIC SYSTEMS, INC.,  DELPHI AUTOMOTIVE SYSTEMS INTERNATIONAL, INC., DELPHI MEDICAL SYSTEMS COLORADO CORPORATION, DELPHI AUTOMOTIVE SYSTEMS KOREA, INC., DELPHI MEDICAL SYSTEMS | Adversary Proceeding<br><br>Case No. _____(RDD) |

| | |
|---|---|
| CORPORATION,  DELPHI AUTOMOTIVE SYSTEMS LLC, DELPHI MEDICAL SYSTEMS TEXAS CORPORATION, DELPHI AUTOMOTIVE SYSTEMS OVERSEAS CORPORATION, DELPHI NY HOLDING CORPORATION, DELPHI AUTOMOTIVE SYSTEMS RISK MANAGEMENT CORP., DELPHI RECEIVABLES LLC, DELPHI AUTOMOTIVE SYSTEMS SERVICES LLC, DELPHI SERVICES HOLDING CORPORATION, DELPHI AUTOMOTIVE SYSTEMS TENNESSEE, INC., DELPHI TECHNOLOGIES, INC., DELPHI AUTOMOTIVE SYSTEMS THAILAND, INC., DREAL, INC., DELPHI CHINA LLC, ENVIRONMENTAL CATALYSTS, LLC, DELPHI CONNECTION SYSTEMS, EXHAUST SYSTEMS CORPORATION, MOBILEARIA, INC., DELPHI DIESEL SYSTEMS CORP., PACKARD HUGHES INTERCONNECT COMPANY, DELPHI ELECTRONICS (HOLDING) LLC, SPECIALTY ELECTRONICS INTERNATIONAL LTD., DELPHI FOREIGN SALES CORPORATION,  and SPECIALTY ELECTRONICS, INC. | |
| Defendants. | |

## ADVERSARY COMPLAINT PURSUANT TO 11 U.S.C. § 1144 TO REVOKE ORDER CONFIRMING CHAPTER 11 PLAN BASED UPON PROMISSORY FRAUD OF APPALOOSA MANAGEMENT, L.P., DAVID A. TEPPER, AND A-D ACQUISITION HOLDINGS, LLC

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") in the

chapter 11 cases of Delphi Corporation ("Delphi") et al., by its attorneys, submits this Complaint

against Delphi and its affiliates and subsidiaries as debtors and debtors-in-possession, (the

"Debtors") pursuant to section 1144 of Title 11 of the United States Code (the "Bankruptcy

Code"), and alleges as follows:

### INTRODUCTION

1.      By this Complaint, and pursuant to Section 1144 of the Bankruptcy Code, the

Committee seeks to revoke the Court order entered on January 25, 2008 (the "Confirmation

Order"), which confirmed the First Amended Joint Plan of Reorganization proposed by the

2

Debtors (the "Plan") on the ground that the Confirmation Order was procured by acts of promissory fraud by "vulture investors" Appaloosa Management L.P., its founder David A. Tepper, and its shell entity created for this transaction, A-D Acquisition Holdings, LLC (collectively, "Appaloosa").

2.    Further pursuant to Section 1144, the Committee brings its Complaint before 180 days of the date this Court issued the Confirmation Order.  The Committee is actively negotiating with the Debtors to reach mutually acceptable modifications to the current Plan, which the Committee and its constituents accepted based upon the promissory fraud of Appaloosa.  If current negotiations do not achieve a resolution that is satisfactory to the Committee, the Committee will prosecute this Complaint to pursue the revocation of the Confirmation Order.

3.    The filing of this Complaint will not have, and is not expected to have, any effect whatsoever on the conduct of Delphi's ongoing operations.

4.    Appaloosa has defrauded Delphi, the Committee, all other parties in interest in these chapter 11 cases, and the Court by making numerous promises to remain committed to the Plan and to use its best efforts to consummate the Plan while, at the same time, covertly discussing and then executing a strategy to ensure the Plan's demise.  For doing little more than falsely promising to be an equity investor in the reorganized Debtors, Appaloosa has extracted from the estate and its stakeholders in excess of $60 million in fees and millions more in expense reimbursements, with a claim pending for an another $82.5 million on account of a purported Alternative Transaction Fee.

5.    The motive was greed.  Known as the "king" of "vulture investors," or those who capitalize on distressed assets for financial gain, Appaloosa, and Mr. Tepper in particular, has

3

amassed a fortune by investing in companies in chapter 11 and then realizing a healthy financial gain as result. Although such tactics normally could be hailed as reflecting shrewd business sense, the law stops short of sanctioning them where, as here, they are based upon fraud.

6.      The fraud occurred when Appaloosa made numerous promises that were untrue, and that Appaloosa knew to be untrue, about Appaloosa's commitment to the Plan and to the emergence of the Debtors from bankruptcy.

7.      These false promises were made throughout Appaloosa's involvement in Delphi's bankruptcy proceedings, including but not limited to statements to the press throughout the summer and fall 2007 concerning Appaloosa's purported commitment to the Debtors and their efforts to reorganize; in the disclosure statement accompanying the Plan, which reflected Appaloosa's false promises to use its best efforts to consummate the Equity Purchase and Commitment Agreement (the "EPCA"); in November 2007 testimony from Mr. Tepper, in which he falsely promised to remain committed to the Plan; and at the December 2007 hearing to approve final amendments to the EPCA, when Mr. Tepper falsely promised in open court to remain committed to the Plan so that the Committee, its constituents, and other stakeholders in the Debtors' estate would be persuaded to approve the Plan.

8.      Despite Mr. Tepper's repeated assurances that, "when I gave my word to somebody and shake somebody's hand I have a deal, I have a deal," he had no intention that Appaloosa would actually fulfill its obligations to the Debtors. Appaloosa's true, undisclosed scheme was to extract as much value as possible in the form of fees and expenses from the Debtors' estates and then abandon the Plan without actually having to provide its promised equity investment. Appaloosa had no intention to, and never did, fund the Plan. Its promises to do so were false at the time those promises were made, and Appaloosa knew they were false.

4

9.      In fact, at the same time that Appaloosa was assuring the Court, the Committee, and other Delphi stakeholders of its unwavering commitment to the Plan, Appaloosa was also strategizing to walk away from its obligations and to lay blame for the Plan's collapse on the Debtors themselves.

10.     Everything has gone according to Appaloosa's fraudulent scheme. Through its knowingly false promises, Appaloosa secured Delphi's continued approval and support of the Plan, ensured that the Committee would recommend approval of the Plan to its constituents, and ensured the Court's confirmation of the Plan. When a GM affiliate committed to provide exit financing necessary to consummate the Plan, for which the Court had expressed approval, Appaloosa used that commitment to allege that Delphi had entered into an "alternate transaction," thus entitling Appaloosa not only to walk away from the deal, but to do so with a check from the estate for $82.5 million in purported breakup fees.

11.     Appaloosa's fraudulent scheme has exacted tremendous costs and special damages on the estate and its stakeholders that money simply cannot repay. Delphi's stakeholders have wasted months of time operating under the false pretense that Appaloosa would actually provide its equity investment. Although it lays claim to nearly $150 million in fees, Appaloosa is not going to make the investment, and it never intended to do so.

## PARTIES

12.     Plaintiff is the Official Committee of Unsecured Creditors in the above-captioned bankruptcy cases, having been appointed by the Office of the United States Trustee pursuant to section 1102 of the Bankruptcy Code on October 17, 2005 and as reconstituted from time to time. The Committee represents and is a fiduciary for tens of thousands of creditors of Delphi and its affiliates.

13.     Defendant Delphi Corporation (formerly Delphi Automotive Systems Corporation) is a corporation organized under the laws of the State of Delaware with its primary place of business in Michigan. Delphi has offices at 5725 Delphi Drive, Troy, Michigan 48098.

14.     Defendant ASEC Manufacturing General Partnership is a Delaware general partnership, with its principal place of business located at 1301 Main Parkway, Catoosa, Oklahoma 74015. It is a wholly-owned subsidiary of Delphi.

15.     Defendant ASEC Sales General Partnership is a Delaware general partnership, with its principal place of business located at 1301 Main Parkway, Catoosa, Oklahoma 74015. It is a wholly-owned subsidiary of Delphi.

16.     Defendant Aspire, Inc. is a Michigan corporation, with its principal place of business located at U.S. Route 1, Morrisville, Pennsylvania 19067. It is a wholly-owned subsidiary of Delphi.

17.     Defendant Delco Electronics Overseas Corporation is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

18.     Defendant Delphi Automotive Systems (Holding), Inc. is a Delaware corporation, with its principal place of business located at 5785 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

19.     Defendant Delphi Automotive Systems Global (Holdings), Inc. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

20.     Defendant Delphi Automotive Systems Human Resources LLC is a Delaware limited liability company, with its principal place of business located at 5725 Delphi Drive, Troy,

6

Michigan 48098. It is a wholly-owned subsidiary of Delphi.

21.    Defendant Delphi Automotive Systems International, Inc. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

22.    Defendant Delphi Automotive Systems Korea, Inc. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

23.    Defendant Delphi Automotive Systems LLC is a Delaware limited liability company, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

24.    Defendant Delphi Automotive Systems Overseas Corporation is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

25.    Defendant Delphi Automotive Systems Risk Management Corp. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

26.    Defendant Delphi Automotive Systems Services LLC is a Delaware limited liability company, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

27.    Defendant Delphi Automotive Systems Tennessee, Inc. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

28.    Defendant Delphi Automotive Systems Thailand, Inc. is a Delaware corporation, with

7

its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

29.    Defendant Delphi China LLC is a Delaware limited liability company, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

30.    Defendant Delphi Connection Systems is a California corporation, with its principal place of business located at 17150 Von Karman Ave., Irvine, California 92614. It is a wholly-owned subsidiary of Delphi.

31.    Defendant Delphi Diesel Systems Corp. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

32.    Defendant Delphi Electronics (Holding) LLC is a Delaware limited liability company, with its principal place of business located at One Corporate Center, Kokomo, Indiana 46904. It is a wholly-owned subsidiary of Delphi.

33.    Defendant Delphi Foreign Sales Corporation is a Virgin Islands corporation, with its principal place of business located at Chase Trade, Inc., Post Office Box 309420, 55-11 Conacao Gade, Charlotte Amalie, St. Thomas, Virgin Islands 00803. It is a wholly-owned subsidiary of Delphi.

34.    Defendant Delphi Furukawa Wiring Systems LLC is a Delaware limited liability company, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a joint venture in which Delphi is a member.

35.    Defendant Delphi Integrated Service Solutions, Inc. is a Michigan corporation, with its principal place of business located at 1322 Rankin Street, Troy, Michigan 48083. It is a

8

wholly-owned subsidiary of Delphi.

36.     Defendant Delphi International Holdings Corp. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

37.     Defendant Delphi International Services, Inc. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

38.     Defendant Delphi Liquidation Holding Company is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

39.     Defendant Delphi LLC is a Delaware limited liability company, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

40.     Defendant Delphi Mechatronic Systems, Inc. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

41.     Defendant Delphi Medical Systems Colorado Corporation is a Colorado corporation, with its principal place of business located at 4300 Road 18, Longmont, Colorado 80504. It is a wholly-owned subsidiary of Delphi.

42.     Defendant Delphi Medical Systems Corporation is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

43.     Defendant Delphi Medical Systems Texas Corporation is a Delaware corporation,

with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

44.    Defendant Delphi NY Holding Corporation is a New York corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

45.    Defendant Delphi Receivables LLC is a Delaware limited liability company, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

46.    Defendant Delphi Services Holding Corporation is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

47.    Defendant Delphi Technologies, Inc. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

48.    Defendant DREAL, Inc. is a Delaware corporation, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

49.    Defendant Environmental Catalysts, LLC is a Delaware limited liability company, with its principal place of business located at 5725 Delphi Drive, Troy, Michigan 48098. It is a wholly-owned subsidiary of Delphi.

50.    Defendant Exhaust Systems Corporation is a Delaware corporation, with its principal place of business located at 4800 S. Saginaw Street, Flint, Michigan 48501. It is a wholly-owned subsidiary of Delphi.

51.    Defendant MobileAria, Inc. is a Delaware corporation, with its principal place of business located at 800 West El Camino Real, Suite 240, Mountain View, California 94040. It is a joint venture in which Delphi is a member.

52.    Defendant Packard Hughes Interconnect Company is a Delaware corporation, with its principal place of business located at 17150 Von Karman Ave., Irvine, California 92614. It is a wholly-owned subsidiary of Delphi.

53.    Defendant Specialty Electronics International Ltd. is a Virgin Islands corporation, with its principal place of business located at 69A Kronprindsens Gace, 3rd Floor, P.O. Box 1858, St. Thomas, Virgin Islands. It is a wholly-owned subsidiary of Delphi.

54.    Defendant Specialty Electronics, Inc. is a South Carolina corporation, with its principal place of business located at 19200 Asheville Highway, P.O. Box 519, Landrum, South Carolina 29356. It is a wholly-owned subsidiary of Delphi.

## JURISDICTION AND VENUE

55.    This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b) arising under Title 11 of the United States Code.

56.    In the Plan, which was confirmed by Order of this Court dated January 25, 2008, this Court retained jurisdiction, pursuant to sections 105(a) and 1142 of the Bankruptcy Code, over all matters arising out of and related to the Debtors' chapter 11 cases and the Plan.

## BACKGROUND TO APPALOOSA'S PROMISSORY FRAUD

**Delphi's Bankruptcy**

57.    Delphi is a worldwide leader in the automotive industry, providing components, integrated systems, and related parts to a worldwide customer base. It separated from General

Motors Corporation ("GM") in early 1999.

58.    On October 8, 2005, 39 of the 42 Debtors (including Delphi) filed voluntary petitions

in the United States Bankruptcy Court for the Southern District of New York for reorganization

relief under chapter 11 of the United States Bankruptcy Code.  On October 14, 2005, the three

other Debtors filed voluntary petitions as well.

**Appaloosa Begins Making Knowingly False Promises as It Forces its Way into the Delphi**
**Bankruptcy**

59.    Appaloosa was created by Mr. Tepper in 1993 and has primarily been a "vulture

investor," focusing on investments in distressed debt.  As the President of Appaloosa Partners,

Inc., which is the general partner of Appaloosa, Mr. Tepper has been described as the "king of

the...vulture investors."

60.    As a "vulture investor," Mr. Tepper takes advantage of bankrupt or nearly bankrupt

companies in what he describes as a "probability game."   The practice of acquiring "distressed"

debt and equity is, statistically, a poor proposition – one study found that investors in stock of

bankrupt companies tended to lose $0.70 for each dollar invested.   However, Mr. Tepper has

reaped the benefit of this "game," and by 2008, he had a net worth of over $200,000,000 and was

the 605th richest person in the world.

61.    Soon after the Debtors filed these chapter 11 cases, Appaloosa sought to insert itself

into the Debtors' chapter 11 proceedings in the belief that the Debtors retained significant value

that could be stripped for Appaloosa's benefit.

62.    Following the investment strategies of similar vulture investors, Appaloosa acquired

substantial amounts of Delphi pre-petition debt and equity in the secondary market at a

substantial discount – Delphi stock was selling at approximately $0.32 per share when

Appaloosa acquired it.  Appaloosa then succeeded in procuring an order of this Court mandating

the appointment of the Equity Committee.  However, because of the Court's concerns that

Appaloosa may have acted improperly in releasing confidential information, this Court ordered

the United States Trustee to investigate Appaloosa's conduct should it seek membership on the

Equity Committee.  Ultimately, Appaloosa was not appointed to the Equity Committee.

63.    Unsatisfied with simply seeking profits by holding its investments in Delphi's pre-

petition securities, Appaloosa continued to agitate for a greater role in the Delphi bankruptcy.  It

succeeded in late 2006 when Appaloosa, together with Cerberus Capital Management, L.P.

("Cerberus"), emerged as the lead plan investors.  Appaloosa, Cerberus and other investors

signed the first investment agreement together on December 18, 2006.

64.    Appaloosa also executed a commitment letter agreement, in which it agreed to

provide almost $1.1 billion in funds that could satisfy its obligations under the investment

agreement.  Appaloosa also agreed to guarantee over $1.4 billion of funding from other

investors, thus resulting in a financial commitment in excess of $2.5 billion.

65.    Other investors had also been interested in providing an equity investment in

reorganized Delphi.  Appaloosa campaigned intensely, and used its existing pre-petition equity

and debt positions as well as its promises to use its best efforts to consummate the Plan, to

convince Delphi to choose Appaloosa over its competitors.

66.    As early as January 10, 2007, Appaloosa had convinced Delphi that this proposed

equity investment by Appaloosa and others would, in the words of Delphi's counsel, be the

"rock to stand on" to move the reorganization forward.

67.    That first investment agreement was subsequently terminated in mid-2007 when

Cerberus withdrew its involvement to pursue its acquisition of Chrysler.

68.    Even as rumors of Cerberus's potential exit from the investor agreement spread in

13

early 2007, however, Appaloosa continued to fuel public expectations of its commitment to the

Debtors via statements to the press. On April 19, 2007, in an article discussing Cerberus's

impending departure from the investment agreement, Mr. Tepper was reported to have said, "We

have been in this transaction for a long time and we are committed to the process."

69.    Rumors of Cerberus's impending exit continued to spread until July 9, 2007, when

Delphi officially announced that it was abandoning the investment agreement involving

Cerberus. On the same day, Delphi continued to assure the public concerning the commitment

of the other investors: "[i]t is Delphi's belief that Appaloosa and Harbinger [another signatory to

the investment agreement] remain committed to a transaction with Delphi that will maximize

stakeholder recoveries and permit the company to make an expeditious exit from Chapter 11."

**Appaloosa Continues Its Knowingly False Promises As It Extracts Increasingly
Burdensome Concessions from the Debtors**

70.    On July 18, 2007, Delphi issued a press release announcing a second version of the

EPCA, which would ultimately be approved by the Court on August 2, 2007 (the "August

EPCA"). The August EPCA provided that Appaloosa was to be the sole lead plan investor. The

August EPCA specifically provided for Appaloosa and the other Plan Investors collectively to

purchase $975 million in preferred and common stock of the reorganized Delphi, and to backstop

the sale of approximately $1.6 billion in shares of common stock.

71.    During the drafting and negotiation of the August EPCA, Appaloosa continued to

make various false promises that it would use its best efforts to ensure the Debtors emerged from

chapter 11. The Debtors and the other stakeholders relied on those false promises in agreeing to

the terms of the revised EPCA.

72.    As consideration for the Investors' purchase commitment, Delphi agreed to pay fees

in the amount of approximately $60 million (the "Commitment Fees"), the majority of which

was due to Appaloosa being the largest investor, and approximately $6 million to Appaloosa for arranging the transaction (the "Arrangement Fee"). In other words, just for agreeing to be the lead investor and arranging the transaction, Appaloosa was rewarded with a payout worth tens of millions of dollars.

73.    According to the August EPCA, payment of these fees was due in set installments: the first business day following the day the issuance of the approval order by this Court on August 2, 2007; the first business day following the filing of Delphi's disclosure statement on September 6, 2007; and the remaining balance on the first business day following the date of approval of the disclosure statement, which occurred on December 10, 2007.

74.    Further, Delphi agreed to pay certain related expenses for the Plan Investors.

75.    On July 19, 2007, the day after Delphi announced the August EPCA, The Detroit News quoted Mr. Tepper as saying, "we're happy to get a consensual deal....We look forward to working with management and all the employees of Delphi. It looks like everybody is on board."

76.    Believing that the Plan Investors, with Appaloosa in the lead, would fulfill their obligations, the Committee did not object to the August EPCA.

77.    The August EPCA was approved by this Court by order entered on August 2, 2007. The August EPCA was approved despite the fact that a competing investment firm had made a higher bid. The basis for such approval was, in part, the Court's stated belief that the Appaloosa-led transaction had greater certainty of closing. Upon the Court's approval, Appaloosa and the other Plan Investors received $7,525,000 in Commitment Fees.

78.    Even after the Court's approval of the August EPCA, Appaloosa continued to reaffirm its commitment to the Debtors. Thomas Lauria, counsel for Appaloosa, was quoted by

15

USA Today as saying, "We'll get this company out of Chapter 11 as quickly as possible so it can resume its business in the real world."

79.     Once the Court had approved the August EPCA, the Debtors filed their disclosure statement on September 6, 2007, which reflected Appaloosa's false promises to use its best efforts to consummate the EPCA.

80.     As per the terms of the August EPCA, Appaloosa recouped another $21.2 million in Commitment Fees from the Debtors, for a total of over $35 million in fees even before any capital had been committed.  Appaloosa anticipated receiving the balance of its fees once the disclosure statement was approved.

81.     The stability of the August EPCA was short-lived.  Having reached two milestone payments for its Commitment Fees, Appaloosa had one more multi-million dollar payment that it wanted to realize before completing its fraudulent scheme to abandon the deal.  It viewed the weakening financial markets as an opportunity to undermine the entire arrangement and exit the August EPCA without any liability.

82.     To avoid having to comply with its promised commitments under the August EPCA, Appaloosa stalled by using the financial markets as an excuse to spend the next five months "renegotiating" the August EPCA.  In fact, Appaloosa had no intention of living up to its promises – it was simply using the worsening financial markets as cover for its pre-planned exit. Appaloosa's disingenuity is evidenced by the fact that the financial markets were in poor condition even before the August EPCA was executed.  Worsening market conditions could not have come as a surprise to a savvy investor such as Mr. Tepper, who has made hundreds of millions of dollars paying attention to market trends.  Nonetheless, Appaloosa used the worsening financial markets in the late summer of 2007 as an opportunity to strip a little more

16

value from the estate without actually having to live up to its promises – all while promising to

remain committed to the deal as the lead Plan Investor. "Negotiations" regarding modifications

to the August EPCA continued throughout Fall 2007.

83.    In late October, it appeared that the parties had reached a "compromise" whereby the

Debtors agreed to provide substantial economic concessions to the Plan Investors to the

detriment of the Debtors' other stakeholders. These concessions were made to Appaloosa in

response to its continued false promises and representations that it would not walk away from the

deal – that it would remain committed.

84.    These amendments to the EPCA were approved by Delphi's board of directors, and

the Debtors filed an expedited motion for an order approving the amended EPCA.

85.    At a hearing on November 16, 2007 – almost a full year after the first investment

agreement with Appaloosa and the other Plan Investors was approved – the Court indicated its

displeasure at Appaloosa's perpetual renegotiation of the August EPCA:

> I am very distressed that [the agreements] have changed, sucking out hundreds of
> millions of dollars over these apparent excuses [regarding the financial markets].... what
> I have seen suggests to me that maybe, if the parties don't come to their senses and
> appreciate that as a sponsor of this company they have to stand by the company --
> because otherwise why have a sponsor, why not give the equity to those who are in the
> debt already and in the equity already -- that we're going to change course.

86.    During the November 16, 2007 hearing, the Court further stated its reliance on

Appaloosa's good faith assurances, noting that it approved the August EPCA with the Plan

Investors, despite the higher bid by Highland Capital:

> I ruled in favor of this investor group [*i.e.*, with Appaloosa as lead investor] not just
> because they were the highest bid, because they weren't, but because they were the best
> bid, because they had done their due diligence, because they were presented to me, and I
> believed it, that two of the nation's biggest investment banks . . . and the large hedge
> funds that had also their own reputational interests, ***would stick by this debtor and their***
> ***fundamental economic commitments***, unlike the competitive -- the competitor investor
> who had not done due diligence originally…

17

**REDACTED**

(Emphasis added.)

87.    Based on those representations, the Court approved the Debtors' exit financing

motion at that hearing.  Thus, it appeared to all concerned that Delphi was heading for

emergence from bankruptcy.  Appaloosa, however, had its own plans.

**Appaloosa Offers Sworn Testimony In Support of its Knowingly False, But Oft-Repeated Promises To Remain Committed**

REDACTED

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

93.    Unaware that their trust and reliance were wholly misplaced, the Delphi stakeholders, including the Committee, reasonably viewed Appaloosa's and Mr. Tepper's statements as an affirmation of Appaloosa's continued interest and willingness to invest in Delphi and work towards its emergence from bankruptcy.

94.    But Appaloosa's sworn statements were false at the time they were made, and Appaloosa knew they were false given that it had no present intent to perform any obligations under the EPCA. Its sole motivation was to extract as much as possible in fees from the estate without being made to risk any meaningful amount of capital. To achieve that goal, and as detailed below, Appaloosa intentionally misled and defrauded the Debtors and its stakeholders by undermining the August EPCA at the same time Appaloosa swore to uphold it.

95.    These false statements were made to maintain Appaloosa's status as the lead Plan Investor (where it could continue to extract millions of dollars in fees) by falsely leading others to believe that Appaloosa was serious about its commitment to getting Delphi out of bankruptcy. In fact, Appaloosa was simply locking up as much as it could in fees, and abusing the trust and

19

reliance of the Debtors and their stakeholders in the process.

96.    To ensure that Appaloosa maintained its monopoly over Delphi's investment options (thereby preserving its control over the Plan and the Debtors' ability to exit chapter 11), Appaloosa also made significant efforts to block other sources of investor financing by entering into "lock up" arrangements with numerous potential investors who had not signed the EPCA. As long as the EPCA was still in effect, the "lock up" agreements prohibited these potential investors from making an investment offer to Delphi that competed in any way with Appaloosa's investment offer.

### Appaloosa Secures the Approval of the Amended EPCA and Millions of Dollars in Commitment Fees.

97.    In December 2007, Appaloosa and the Debtors sought Court approval of the Amended EPCA and disclosure statement.  The approval of the disclosure statement would result in a final payout to Appaloosa of approximately $12 million in commitment fees.

98.    At the December 6, 2007 hearing, Mr. Tepper testified regarding the EPCA, the Plan, and the related agreements.  He painted Appaloosa's desire to renegotiate the August EPCA as being motivated by a real desire for Delphi to exit chapter 11, and again falsely promised that Appaloosa remained committed as lead Plan Investor, and that it would use its best efforts to consummate the EPCA.

99.    During the December 6 hearing, Mr. Tepper further testified that he had, "made a deal." Appaloosa remained committed because "[w]e have some relationship with the parties in the case.  We'd like to see this thing come out of bankruptcy . . . and the same thing I said before, you know, you make a handshake you make a handshake, it's what it is."

100.    Mr. Tepper reiterated his position when he emphatically told the Court that "I understand that when I gave my word to somebody and shake somebody's hand I have a deal, I

have a deal." He returned to his theme of unwavering commitment and best efforts by telling the

Court that when "I do a deal with somebody they're my partner in my deal." And he continued

to encourage the Debtors' reliance on Appaloosa, knowing that such reliance would reduce the

likelihood that Delphi would explore alternative financing options.

101.    The Delphi stakeholders, including the Committee, reasonably viewed such

statements as continued affirmation of Appaloosa's interest and willingness to invest in Delphi,

and to work towards its emergence from bankruptcy.

102.    Appaloosa invited and induced such reliance through false and misleading promises

to remain committed to the Plan by using its best efforts to secure consummation of same.

103.    The strategy worked.  At the December 7, 2007 hearing, the Court explicitly

expressed its reliance on Mr. Tepper's testimony and prior statements in its decision to approve

the amended EPCA and the disclosure statement accompanying the Plan:

> There are investors out there who have a reputation which I assume they deserve who go
> into every deal with a strike against them even though they have lots of cash and that's
> because it's perceived that at the end of the day their handshake won't be trusted and that
> they won't deal in good faith as a business person would expect.
>
> Frankly, I believe that Appaloosa's response to this whole set of circumstances doesn't
> put them in that category at all. *I don't believe Mr. Tepper was blowing smoke at me
> yesterday when he said a handshake is a handshake, a deal is a deal.*  Given that and
> given that I believe all of the other plan investors want to continue to fall in the category
> where you don't have a strike against you whenever you come into court and say we want
> to bid for this company or we want to bid against those people that they will deal in good
> faith if in fact the debtors don't have room to manage this condition.

(Emphasis added).

104.    By inducing Delphi, its stakeholders, and the Court to rely on its false promises,

Appaloosa both secured such court approval, and more importantly, clinched a multi-million

dollar payday for itself.

105.    Following Court approval of the EPCA and disclosure statement, Delphi's

stakeholders then had an opportunity to vote on the Plan.  Voting occurred in December 2007

and January 2008.  In reliance on the knowingly false promises perpetuated by Appaloosa,

Delphi's stakeholders, including thousands of unsecured creditors, voted to approve the Plan by

a wide margin, as 81% of all voting creditors aggregated across classes voted to accept the Plan.

106.    During this period, and based upon Appaloosa's knowingly false promises, Delphi

continued to express optimism that it would emerge from bankruptcy in the first quarter of 2008.

107.    On January 17, 18, and 22, 2008, the Court held hearings to confirm the Plan.  The

Plan was confirmed on January 25, 2008.

108.    At the January 22 hearing, Mr. John ("Jack") Butler, counsel for the Debtors, made

numerous statements regarding Appaloosa's "line-by-line, provision-by-provision" review of the

EPCA that was required for its consent.

109.    At that hearing, Mr. Butler explicitly stated that:

> There was a requirement here, fundamental to the investment agreement, that the -- that
> the plan investors have a material say in the go forward program…. This wasn't simply
> an idle review.  This was a line-by-line, provision-by-provision review by the plan
> investors of what needed to be done in order to get their concurrence....

> [T]he plan investors concurred in and gave the approvals necessary to suggest that they
> had fully reviewed this as the new money into the case, those people that are going to put
> in the investment to allow the company to go forward that they had signed off as the
> EPCA required.

110.    Appaloosa's counsel was in attendance at the confirmation hearings and did not

disavow these statements – thus reconfirming in the minds of the Court and the Delphi

stakeholders that Appaloosa was committed to the consummation of the Plan on the eve of its

confirmation.

## THE NATURE OF APPALOOSA'S PROMISSORY FRAUD

### Appaloosa's Representations, Promises, and Stated Commitment Were Made As Appaloosa Actively Sought To Undermine the Plan and Prevent Consummation of the EPCA

111.    Appaloosa's promises to remain committed to the Plan and to the Debtors' successful emergence from bankruptcy were a sham.

112.    Even as it repeatedly made knowingly false promissory statements, Appaloosa was also strategizing to undermine the Plan and prevent the EPCA from being consummated.

113.    As pleaded in the complaint in *Delphi Corp. v. Appaloosa Management L.P. et al.*, 08-01232 (the "Delphi Complaint"), Appaloosa met with numerous investors that had not signed the EPCA, but had committed to fund some of the Plan Investors' obligations thereunder (the "Additional Investors") to coordinate efforts to avoid their obligations under the Plan *in the same timeframe that negotiation, approval, and confirmation of the Plan were taking place.*

114.    The purpose of the meeting was for the Plan Investors and the Additional Investors to determine how they could avoid their obligations under the Plan.

115.    More specifically, Appaloosa and the Additional Investors discussed how to prevent closing under the EPCA, despite Appaloosa's obligation to use, and repeated promises that it *would* use, its best efforts to consummate the Plan.

116.    The meetings took place at the same time that negotiation, approval and confirmation of the Plan were taking place, and while Appaloosa was falsely promising to remain committed as the lead Plan Investor.

117.    As reportedly confirmed to Delphi by a credible source, certain Additional Investors, with the knowledge and complicity of Appaloosa, also communicated directly with Delphi's exit financing lenders.  The purpose of those communications was to persuade exit financing lenders to withdraw their commitments, so that Delphi would be unable to satisfy the exit financing

23

conditions under the EPCA. If that happened, Appaloosa believed that it would not be liable for any damages because the failure to consummate the EPCA would be blamed on the Debtors.

118.    As a backup plan, the Additional Investors agreed amongst themselves to pay Delphi what they believed would be limited, contractual damages, rather than fulfill their obligations under the EPCA. During these covert discussions, the Additional Investors also agreed that Appaloosa would be reimbursed for any amount in damages resulting from their portion of liability should Appaloosa terminate the EPCA.

119.    Moreover, and as further pleaded in the Delphi Complaint, certain Additional Investors also sought to undermine the estate by trading in and short-selling Delphi securities. As stated in a recent public filing, Delphi has reportedly received "information from a stakeholder who alleged direct knowledge…. that one or more Investors may have been trading in or shorting one or more of Delphi's outstanding public securities…. The Debtors have been further advised that one or more of these Investors may have communicated with the Debtors' lead Plan Investor [i.e., Appaloosa] or its representatives concerning scenarios or courses of conduct pursuant to which the EPCA would not be consummated or funded to the detriment of the Debtors and their stakeholders."

120.    Short selling of Delphi's stock was intended to have the domino effect of gravely undercutting the company's market value, rendering exit financing impossible due to Delphi's reduced market capitalization, and thus providing the perfect cover for Appaloosa to avoid its obligations under the Plan. Although Appaloosa never intended to fulfill its obligations under the Plan despite its promises to the contrary, the after-effects of the short selling strategy permitted Appaloosa to blame Delphi for the failure of the amended EPCA.

121.    In numerous statements to the press in the first quarter of 2008, Delphi reiterated its

24

intent to secure exit financing and to emerge from bankruptcy protection by the end of March.

These statements illustrate the Debtors' misplaced faith in Appaloosa and its willingness to hold

up its end of the EPCA and the Plan.

**Appaloosa Purportedly Terminates the EPCA and Abandons the Plan**

122.    By February 2008, having recouped over $30 million in fees and millions more in

costs, and without having put any real capital at risk, Appaloosa determined that it was ready for

the last stage of its scheme to walk away from the EPCA. The only open question was exactly

when and how it would do it.

123.    When Delphi requested GM's participation in the exit financing on terms consistent

with the EPCA, Appaloosa seized on the opportunity to purportedly terminate the EPCA and

walk away from Delphi's reorganization.

124.    Although the Court subsequently stated that the terms of the EPCA would be satisfied

if Delphi obtained financing from an affiliate of GM (rather than from GM itself), Appaloosa

continued to repudiate the EPCA in its entirety, calling Delphi's effort to obtain exit financing

from any GM entity an "alternate transaction" that entitled Appaloosa to over $80 million in

breakup fees and related expenses.

125.    In sum, it is now clear that Appaloosa's conduct was directed at a single aim – to

encourage the Court, the Debtors, the Committee and the other stakeholders in the Debtors'

bankruptcy to trust Appaloosa's false promises of performance so that it could wrongfully

extract tens of millions of dollars in fees (and without committing any significant capital), while

simultaneously taking clandestine steps to avoid fulfilling its obligations under the EPCA.

126.    The Debtors and their stakeholders relied on Appaloosa's false statements in their

perpetuation of a Plan that, in reality and because of Appaloosa's duplicity, had no chance of

25

succeeding.

127.    The Court relied on Appaloosa's false statements when it confirmed the Plan.

128.    The Committee also relied on Appaloosa's false statements, first by declining to object to the Plan (despite numerous opportunities to do so), and, most importantly, by informing unsecured creditors that it supported the Plan as the best transaction reasonably available. The unsecured creditors proceeded to vote for the Plan in overwhelming numbers.

129.    The relevant parties are now bound to a Plan to which Appaloosa knew it was not truly committed. As a result, all of Delphi's stakeholders have suffered considerable and special injury, including but not limited to eighteen months of unnecessary delay; tens of millions of dollars in fees and costs paid to Appaloosa for no purpose; and millions more expended on legal fees and expenses negotiating and documenting the EPCA, and several amendments thereto; and developing a Plan that Appaloosa subverted through its knowingly false promises.

130.    Further, the Debtors have taken the position that, unless they voluntarily withdraw the current inoperable Plan, they are entitled to an indefinite period of exclusivity under the Bankruptcy Code. Therefore, it appears likely that the Debtors will attempt to exploit the current impasse for their own benefit at the expense of the Committee and the other stakeholders.

131.    The Committee is continuing to work with the Debtors towards a plan that can be consummated, and will continue those negotiations to develop a new plan that will permit the Debtors to emerge from bankruptcy. The Committee is hopeful that these efforts will succeed. Should these efforts ultimately not prevail, however, revocation of the current Plan, based on Appaloosa's promissory fraud in procuring the Confirmation Order, will be necessary to bring the parties to a just and equitable result.

## COUNT ONE:  FOR REVOCATION OF THE CONFIRMATION ORDER

132.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs as though set forth fully herein.

133.    Pursuant to 11 U.S.C. § 1144, this Court may revoke an order of confirmation if such order was procured by fraud.

134.    The Conformation Order was procured by promissory fraud perpetuated through knowingly false statements by Appaloosa who repeatedly, publicly, and falsely promised to remain committed to the Plan and to use its best efforts to consummate the Plan (thereby inducing the Debtors, the Court, the Committee and its constituents, and Delphi's other stakeholders to approve the Plan), while simultaneously (and covertly) working to undermine the Plan, avoid its obligations under the EPCA, and create lucrative exit opportunities for itself.

135.    Appaloosa's false promises formed a substantial and material part of the reasons why the Plan was approved by Delphi, the Committee and its constituents, and confirmed by the Court.  Because of their reliance on Appaloosa's false promises, Delphi and its stakeholders are bound to a Plan that cannot be consummated because the lead investor has dropped its committed demeanor and walked away from the deal.

136.    Appaloosa's fraudulent acts have caused substantial and special damages to Delphi and its stakeholders in the form of tens of millions of dollars in unnecessary fees to Appaloosa, over eighteen months of wasted time, and substantial uncertainty brought on by the Debtors' failure to emerge from chapter 11 on the anticipated schedule.

137.    Because of the complexity and interrelatedness of all the agreements with lenders, unions, General Motors, government agencies, deteriorating market conditions, and having devoted more than a year attempting to reach agreement with Plan Investors on the terms and

27

conditions of their equity investment, Delphi has no possible alternative source of equity

financing that could save the Plan. And it is being forced to start over in its search for financing

at a time when the financial markets are at historic and sustained lows.

## PRAYER FOR RELIEF

WHEREFORE the plaintiff Official Committee of Unsecured Creditors respectfully

requests that this Court enter judgment in its favor and grant the following relief:

a) revocation of the Confirmation Order pursuant to section 1144 of the Bankruptcy Code;

b) any other further relief as the Court deems just and proper.

Dated: New York, New York
       July 22, 2008

### LATHAM & WATKINS LLP

By: /s/ Robert J. Rosenberg
    Robert J. Rosenberg (RR-9585)
    Mitchell A. Seider (MS-4321)
    Mark A. Broude (MB-1902)
    Michael J. Riela (MR-7829)

    885 Third Avenue, Suite 1000
    New York, New York 10022
    Telephone: (212) 906-1200

*Counsel for the Official Committee of*
*Unsecured Creditors*