1                 UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF NEW YORK

2

3    ---------------------------------X
                        :  05-44481

4    In re:                  :
                        :  One Bowling Green

5      DELPHI CORPORATION,     :  New York, New York
                        :

6                 Debtor.  :  July 25, 2008
    ---------------------------------X

7                  TRANSCRIPT OF HEARING

8         BEFORE THE HONORABLE ROBERT D. DRAIN
            UNITED STATES BANKRUPTCY JUDGE

9

10   APPEARANCES:

11

12   For Delphi:           WILLIAM P. WEINTRAUB, ESQ.
                      Friedman Kaplan Seiler & Adelman
                      1633 Broadway

13                    New York, New York 10016

14

15   For AMLP & ADAH:      J. CHRISTOPHER SHORE, ESQ.
                      White & Case LLP
                      1155 Avenue of the Americas

16                    New York, New York 10036

17

18   Official Committee:    JENNIFER L. REDBURG, ESQ.
                      Fried Frank Harris Shriver & Jacobson
                      One New York Plaza

19                    New York, New York 10004

20

21   For Creditors Comm.:   JEFFREY R. ERLER, ESQ.
                      Warner Stevens LLP
                      1700 City Center Tower II

22                    301 Commerce Street
                    Fort Worth, Texas 76102

23

24

25                (Appearances continue on next page.)

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1                    UNITED STATES BANKRUPTCY COURT                    2
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3      APPEARANCES (Continued):

 4      Official Cred. Comm.:      MICHAEL RIELA, ESQ.
                                   Latham & Watkins
 5                                 53rd at Third, 885 Third Avenue
                                   New York, New York 10022
 6
        For UBS:                   JEFFREY A. ROSENTHAL, ESQ.
 7                                 Cleary Gottlieb Steen & Hamilton LLP
                                   One Liberty Plaza
 8                                 New York, New York 10006

 9      Counsel for Pardas:        TERENCE K. McLAUGHLIN, ESQ.
                                   Willkie Farr & Gallagher
10                                 787 Seventh Avenue
                                   New York, New York 10019
11

12

13      Court Transcriber:         MARY GRECO
                                   TypeWrite Word Processing Service
14                                 211 N. Milton Road
                                   Saratoga Springs, New York 12866
15

16

17

18

19

20

21

22

23

24

25
```

3

1           THE Court:  Be seated.

2           THE COURT:  All right.  Delphi Corporation.

3           MR. FRIEDMAN:  Good morning, Your Honor.  This is

4    Edward A. Friedman with Friedman, Kaplan, Seiler, and Adelman

5    representing the plaintiff, Delphi Corporation.

6           The defendants are the moving party so I think I

7    should sit down and let the moving parties speak.

8           THE COURT:  Right.  Whoever wants to speak first

9    for the movants should speak.

10          MR. SHORE:  Good morning, Your Honor.  Chris Shore

11   from White and Case for the defendants AMLP and ADAH.

12          I'd like to give you quickly a road map of how the

13   defendants are divided.  I'll be speaking first with respect to

14   issues which I'll describe.  Mr. Falcone will be addressing

15   issues relating to limitations on liability.  Mr. Kirschbaum

16   will be dealing largely with issues related to piercing the

17   corporate veil.  Mr. Rosenthal with respect to whether or not

18   the plaintiff has pleaded itself out of a breach of contract

19   claim, and then Mr. Lacey with respect to specific Goldman

20   issues.

21          Obviously, we're here on a 72 or a 7012 Motion to

22   Dismiss the complaint in its entirety.  I won't address

23   anything with respect to the standards and I won't, and I don't

24   think any of the defendants are going to be challenging the

25   factual allegations point by point.  I think it's fair to say

4

1   though that all the defendants believe the operative

2   allegations of this complaint are deficient and materially

3   untrue, and if we get to discovery I'm sure we'll be able to

4   show that.

5          Obviously, though an important point to the extent

6   that the record on this motion to dismiss contradicts the

7   factual allegations and particularly the conclusory allegations

8   of satisfaction and conditions or reliance, the Court need not

9   credit those.

10          Fundamentally, I'm going to be addressing one

11   point.

12          THE COURT:  Before you get to that --

13          MR. SHORE:  Sure.

14          THE COURT:  -- I want to say just once during the

15   hearing, and I'm saying it here--I don't normally say it during

16   a hearing on a Motion to Dismiss but as I've said a number of

17   times in this case in addition to the legal issues at stake,

18   there may be reputational issues at stake--those in the

19   audience, particularly those who are not lawyers, should

20   understand that when the parties are referring to the facts

21   today they're referring to the facts as set out in the

22   complaint.  They're not referring to facts as adjudicated by me

23   or as found by me.

24          The Court takes the facts as set forth in the

25   complaint, except, as Mr. Shore notes, when those facts are

5

1    flatly contradicted by a document incorporated into or referred

2    to by the complaint or in some other permissible way.

3              MR. SHORE:  We thank you for that qualification,

4    Your Honor, particularly in light of the filings that were

5    recently made in other complaints which we may touch on today.

6              Fundamentally, I'm going to address one point

7    which is whether, even if you accept all the allegations as

8    true, Delphi has pleaded any legal theory on which they can

9    recover more than $250 million in money damages from the plan

10   investors.  That's ultimately what this complaint is about and

11   when you read the opposition, what the opposition is about.

12             If what we're talking about is $250 million in

13   money damages, there's a simple complaint to be pleaded with

14   respect to the EPCA and the commitment letters.  But that's not

15   what this debtor has done.  They've pleaded claims, or

16   attempted to plead claims for fraud, they've attempted to plead

17   specific performance, invoking Section 1142, invoking Section

18   510, seeking to void the limitation in Section 11(b).  All of

19   that is an attempt by the debtor to get something more out of

20   this action than money damages capped at $250.

21             I'm going to start with fraud which is from my

22   perspective the claim which is most directly aimed at avoiding

23   the contract and trying to get damages both in quantum and type

24   of damages that aren't permitted under the contract.

25             Here's the central point with respect to the fraud

6

1   and you can carve all other things away.  An allegation that a

2   contracting party always intended to commit an efficient breach

3   is not a fraud.  You have to find that it is in order to allow

4   this claim as pleaded to proceed.

5            To start with where you have to start with any

6   fraudulent misrepresentation and fraudulent inducement claim,

7   which is the actual allegations of the complaint, and if you

8   look specifically at the allegations as opposed to the

9   generalized allegations of what people were saying, what people

10  were relying on, there are only three operative allegations.

11           The first is the quote of the testimony of Mr.

12  Tepper at the December 7th hearing with respect to a deal is a

13  deal and a handshake is a handshake.

14           The second is a statement in an affidavit which

15  was submitted to the Court in connection with that hearing that

16  AMLP has committed a minimum of $1.1 billion of its own

17  capital.

18           The third is the alleged plot that existed both

19  prior to and after the entry of that agreement to commit an

20  efficient breach even if all the conditions to consummation of

21  that agreement had been fulfilled by Delphi.

22           The first two pleaded frauds, misrepresentations

23  of fact are classically non-actionable.

24           The first statement beyond being incredibly vague

25  about what "a deal is a deal" means has to be taken in the

7

1    context of the entire proceeding there.  It is not, when you

2    take it in context, that hearing, fair to say that what Mr.

3    Tepper was telling either the Court or Delphi was that

4    irrespective of any rights and remedies and conditions and

5    written commitments of the parties in the EPCA, I will close

6    this deal, because that's what Delphi needs to make it mean and

7    we're to proceed to the fraud claim based upon that allegation.

8             It's not a fair reading.  It's not a

9    misrepresentation of fact.  I'll come back when I deal with the

10    third misrepresentation as to that kind of contingent claim

11    that under certain circumstances I will close this deal and

12    under circumstances I won't close this deal.

13            The second allegation that he committed $1.1

14    billion of AMLP's funds has to be read in the context of the

15    entire affidavit which was submitted which makes clear in the

16    next paragraph, which wasn't quoted, that the deal was of

17    course subject to written commitments and conditions.

18            So both of those allegations in the end fairly

19    read just bring you right back to the contract.  If there was a

20    right under the contract to send the termination notice on

21    April 4th, even if Delphi had satisfied all of its conditions,

22    then these can't be actionable frauds.  You can't turn the

23    breach of contract into a fraud that way.

24            Now again, I mean I think if we get to discovery

25    on that I think that there would be actual facts that come out

8

1   with respect to what the parties' intents were at the time are

2   going to be very different than as pleaded.

3            THE COURT:  I don't want to waste time on those

4   types of points.

5            MR. SHORE:  So we come to a point in dealing with

6   those two misrepresentations, a point which the debtors really

7   haven't addressed.  Assume they are true, assume that the

8   statements made were as broadly intended as Delphi says they

9   were.  "A deal is a deal" means notwithstanding that my lawyers

10  have spent months negotiating these agreements, I'll close come

11  hell or high water.  I won't terminate this agreement if it's

12  uneconomic to do so or if it's uneconomic to close it.

13           Under New York law, under Michigan law, whatever

14  matters, when you sign a contract that says my contract

15  contains all of the understandings of the parties and

16  supersedes any prior statements like that, they can't rely on

17  those statements to satisfy the burden even in a pleading stage

18  of showing reasonable reliance.

19           So leave aside the practical notion or the

20  impracticability of their notion that notwithstanding the

21  negotiation of the EPCA, what Mr. Tepper was saying was I'll

22  close the deal come hell or high water, they can't as a matter

23  of law rely upon that in establishing a fraudulent inducement

24  claim.

25           THE COURT:  Well, I'm sorry, you seem to me to be

9

1    shifting gears here for a second.  I thought where you were

2    going was the notion that a fraud claim that overlaps with the

3    contract claim--since contracts may be breached and that's an

4    element of what happens when you enter into a contract--it

5    doesn't set forth a claim for fraud subject to the

6    Bridgestone/Firestone exceptions.  Now you seem to be saying

7    something different.

8            MR. SHORE:  I am saying with respect to these two

9    misrepresentations, the misrepresentations to the effect that

10   I'll close the deal notwithstanding what the documents say,

11   they can't rely upon those.

12           THE COURT:  Well --

13           MR. SHORE:  Leave aside Bridgestone/Firestone --

14           THE COURT:  -- but now you're just basically

15   saying there's no breach; right?  You're just saying that what

16   he said was true because the documents say differently, the

17   documents are consistent with what he said?

18           MR. SHORE:  No.  What he said was the documents

19   are going to be what controls here.  A deal is a deal means

20   whatever the parties have agreed to in the agreement is --

21           THE COURT:  Right.  I understand.  So that's why

22   it seems to me you're shifting gears and saying that they

23   couldn't rely on this because the contract controls and there's

24   no breach of the contract.

25           MR. SHORE:  That's exactly right.

10

1              THE COURT:  But that just goes to a separate point

2    which one of your colleagues is going to address which is that

3    there's no breach.  I want to focus on the issue of whether

4    there's  a fraud claim in light of your contention that it

5    overlaps with, as you refer to it, an "efficient breach."

6              MR. SHORE:  I don't think --

7              THE COURT:  Assume a breach for the moment.  One

8    of your other colleagues is going to try to convince  me that

9    for the motion to dismiss' purposes there's no breach, but I

10   really want to focus in on the point where I thought you were

11   going, which is they're just pleading breach and an intention

12   not to perform and that's, under New York law and Michigan law,

13   you contend, insufficient to establish fraud.

14             MR. SHORE:  Okay.

15             THE COURT:  To plead fraud.

16             MR. SHORE:  I'd like to loop back at some point

17   then, Your Honor, with respect to the issue on breach, because

18   I don't think what I'm saying is there was no breach of

19   contract.  I'm saying if the contract does not provide for a

20   specific performance, then a delivery of a termination notice

21   and intent to deliver a termination notice which is provided in

22   the contract can't be overridden by a pre-contractual statement

23   that I thought that the termination  notice was going to be

24   delivered under different circumstances.  As I said, I can loop

25   back to that.

11

1          But the Bridgestone/Firestone issue comes up

2    really with what is the core of their claim which is this non-

3    disclosed alleged intent on the part of AMLP to commit an

4    efficient breach?  If and when we got to closing it turned out

5    that the deal was under water by more than $250 million, under

6    all circumstances Delphi was going to -- sorry, Appaloosa was

7    going to walk away from the deal.

8          THE COURT:  In essence, it was a $250 million

9    negative option?

10         MR. SHORE:  Yes.

11         First, when dealing with those claims which are

12   really set out in Paragraphs 129 to 133 of the complaint, you

13   have to be careful with respect to the time alleged.  All of

14   those allegations claim the nondisclosure and an obligation to

15   disclose from the period December 1 through April 4th, in

16   dealing with the fraud claim, and really in a fraudulent

17   inducement claim you can only deal with respect to what was

18   said or not said up to the time of the contract.  Anything that

19   wasn't said till later is really a question of what are the

20   obligations under the contract with respect to disclosing an

21   intent to deliver a termination notice.

22         THE COURT:  But they're not saying it's just

23   fraudulent inducement.  They're saying it's fraud in general.

24         MR. SHORE:  Well, but the cases are clear with

25   respect to--let's talk again about the post-closing period.

12

1    The EPCA has been signed and Appaloosa is not disclosing that

2    it intends to deliver a termination notice if the deal is under

3    water on [inaudible].  All they're alleging is a breach of the

4    duty of the contract.  In fact, they keep saying the best

5    efforts obligations are what requires you to disclose that and

6    to make it clear what's going on.  You can't in that instance

7    turn a breach of contract into a fraud by saying that what

8    you're doing is violating a duty established by the contract.

9          THE COURT:  Do you think -- let me posit a

10   different point.  I appreciate that this is only there because

11   of the incorporation of Paragraphs 1 through 112 in the claim,

12   but they have done that.  They allege that Appaloosa

13   surreptitiously met with lower case "investors"--

14         MR. SHORE:  Additional Investors.

15         THE COURT:  -- and either with them developed a

16   strategy which included interfering with the bank financing

17   and/or [unintelligible] they were aware that there would be

18   interference with the bank financing and shorting the stock not

19   only to make a profit off of it but also to lead to the

20   disparagement of the company's stock in the marketplace and

21   again to have the effect on the financing to chill it.

22         It's also the case that under the EPCA those

23   investors were required to be party to the confidentiality

24   agreements and that any dealings between the company and the

25   investors, between the debtors and the investors would have to

13

1   be through Appaloosa.  Now of course since I used the word

2   surreptitious instead of using the word -- or that they allege

3   that this is all kept from Delphi, why isn't that a fraud

4   separate and apart from an intention to breach the contract?

5          MR. SHORE:  Let me deal with each of the three

6   allegations, and two of them get grouped together.

7          With respect to the interfering with bank finance,

8   the allegation is there to establish that the bank finance

9   condition in 5(t) was relieved.

10          THE COURT:  Is that why it's there?

11          MR. SHORE:  I believe that's why it's there.

12          THE COURT:  Do they say that?

13          MR. SHORE:  That is --

14          THE COURT:  Why did they incorporate that into the

15   cause of action?

16          MR. SHORE:  Because if --

17          THE COURT:  That's not relevant to the equitable

18   subordination?

19          MR. SHORE:  It may be relevant to equitable

20   subordination which I can come to.  Whether or not it

21   constitutes --

22          THE COURT:  You should move on to a different

23   point.  That's not a point --

24          MR. SHORE:  Well, let me deal with the --

25          THE COURT:  I'm not required to read into why the

14

1   debtor put something into a complaint when you make an

2   allegation that is that serious and that frankly in my mind

3   would constitute a bankruptcy crime under 18 USC,

4            MR. SHORE:  Again, I know --

5            THE COURT:  Again, this is all in the context of a

6   Motion to Dismiss --

7            MR. SHORE:  Right.

8            THE COURT:  -- where I take the facts as pled and

9   I don't make a finding.  But it's a serious allegation.

10            MR. SHORE:  Yes, it is.  To the extent Appaloosa

11  interfered with the bank finance that would be a violation of

12  the contractual duty and they've not established any other duty

13  beyond the contract with respect to that.

14            THE COURT:  Really?  You think that anyone else

15  could be free to interfere with the bank financing like that,

16  separate and apart from whether they had a contract?

17            MR. SHORE:  Delphi has not pleaded anything with

18  respect to that.  Right?  At best their allegation is

19  surreptitiously and without doing anything because it was too

20  smart to do so, it directed people to not buy bank debt.  That

21  would just go to whether or not Delphi was ever able to satisfy

22  5(t).

23            THE COURT:  No, I told you don't go there.  Don't

24  go to eliminate the purpose for that allegation.

25            MR. SHORE:  With respect to shorting of the stock

15

1    be very careful with respect to the allegations because this is

2    going to come up in the context of the creditors committee

3    complaint.   There is no allegation in this complaint after the

4    debtors conducted their investigation that Appaloosa did

5    anything with respect to shorting.   There's a bare allegation

6    without any facts attached to it that Appaloosa was responsible

7    for it.   In the absence of -- now, that can be I suppose one of

8    two things.   Either it was directed or it's legally

9    responsible.   But I think based upon where that investigation

10   was that "responsible" in that circumstance does not mean that

11   Appaloosa was directing any short sales.   To the extent with

12   respect to both of these issues, something was going on, either

13   interference with bank finance or an allegation or a conspiracy

14   to short, the Court has separate remedies with respect to that

15   other than saying that there was a fraud in connection with the

16   EPCA which allows the parties to avoid the commitments in the

17   EPCA, which is what the fraud claim as pleaded in that section

18   asks for.

19            I know they incorporate by reference the

20   allegations of that.   But the fraud claim as pleaded is you

21   need to avoid the EPCA and the debtor's rights under the EPCA

22   because there was a fraud committed in connection with the

23   EPCA.   That's the fraud claim which I'm arguing right now.   As

24   I said, equitable subordination is a different issue with

25   respect to those limited allegations.   But the fraud claim as

16

1   pleaded is because there was a conspiracy, we're afraid to sue

2   for the inducement, and that's the problem.

3           THE COURT:  You're saying they're entitled to what

4   for the fraud?

5           MR. SHORE:  In the context of the claim I believe

6   the fair reading of the complaint is that what they're trying

7   to do is establish, on the fraud claim, establish that the

8   existence of the post contract and conspiracy forms a basis to

9   allow them to get around the provisions in the EPCA.

10          THE COURT:  Well, which provisions?

11          MR. SHORE:  The punitive damage waiver, the

12  limitation on liability, the ability of the parties to, under

13  12(h) of the contract deliver a termination notice and have no

14  liability except for willful breach.

15          THE COURT:  Are they allowed to do that under

16  Bridgestone/Firestone?

17          MR. SHORE:  Are the debtors allowed to –

18          THE COURT:  Given the Bridgestone/Firestone

19  exception on special damages, is that something that they're

20  entitled to do?

21          MR. SHORE:  So let's go back to special damages

22  then and back to the pre-contract and nondisclosure.

23          THE COURT:  No, I'm focusing on you said they were

24  using this as a way to get around the damage cap.  I'm asking

25  you is that something that not only are they-- well, something

17

1  that they were permitted to do and that in fact is an exception

2  to the "you can't plead fraud to go around an efficient

3  breach"?

4          MR. SHORE:  I don't think that's what

5  Bridgestone/Firestone says.  If we could compartmentalize this

6  to some extent and then leave aside the post-contracting

7  nondisclosures and whether those may be three items you listed

8  would form an independent basis to assert an independent fraud

9  claim against AMLP, and go back to whether or not they can

10  contend that the efficient breach concept, the hidden intent to

11  commit an efficient breach is a basis for pleading a fraud

12  claim, I don't think Bridgestone/Firestone, which is dealing

13  with a fraudulent inducement, is saying that the existence of a

14  damage cap here is a basis for turning every breach of contract

15  claim into an inquiry into the parties' subjective intent as to

16  how they were going to perform the contract, not whether they

17  were going to perform the contract.

18          THE COURT:  What about the VTech case?

19          MR. SHORE:  Well VTech, what VTech does if you

20  look at the limitation on liability there was where they were

21  trying to disclaim willful misconduct, not a willful breach.

22  The point there was if what you're talking about is an

23  independent tort in that instance, the contract is not going to

24  allow you to disclaim liability for willful acts, but willful

25  misconduct, gross negligence, fraud.  We're not contending

18

1    that.  But in connection with the fraudulent inducement issue,

2    which is whether or not we had a duty to disclose an intent to

3    commit an efficient breach at a later date, that's not willful

4    misconduct.  That's in fact what the cases say is an efficient

5    breach, is a willful breach.

6            So I don't think with VTech, VTech doesn't create

7    an exception and say that any time the parties have a

8    limitation on liability in their contract they are exposing

9    themselves to a fraudulent inducement claim.  If you go back to

10   Bridgestone/Firestone and special damages and what special

11   damages means in the context of the New York cases, what

12   they're really talking about are damages which are not ones

13   that foreseeably and proximately flow from the breach of the

14   contract.

15           Those are not damages that are alleged here.  In

16   fact, quite the opposite.  The debtor is saying this was all

17   foreseeable.  This is exactly what was going to happen in the

18   context of an efficient breach.  So I don't think VTech gets

19   you around the -- or gets you into a Bridgestone/Firestone

20   exception.

21           Ultimately where this claim fails is on two very

22   clear issues of law.  The first is you can't have a contingent

23   misrepresentation.  Right?  The allegation of this complaint is

24   that under some circumstances Appaloosa would perform, under

25   certain circumstances Appaloosa wouldn't perform.  If it was in

1  the money it would close, if it was out of the money it

2  wouldn't close.  That's not how you plead the fraud claim.  The

3  fraud claim is this person had no intention of doing any deal

4  ever is exactly --

5          THE COURT:  Where does that come from?  Where do

6  you get that from?

7          MR. SHORE:  That comes from in New York there's

8  the Deal Time case, in Michigan the McMullen case, and the

9  whole line of cases if you go back --

10          THE COURT:  So you think that Michigan case really

11  stands for that proposition?

12          MR. SHORE:  I think McMullen stands for the

13  proposition that if your performance under the contract is

14  based upon a contingency --

15          THE COURT:  A future event that the parties knew

16  about, since that's what's the holding of that case.

17          MR. SHORE:  The parties here had no -

18          THE COURT:  No, not in that case that you cited to

19  me for the proposition that you say it stands for.  I've read

20  it.  It doesn't stand for that proposition at all.

21          MR. SHORE:  McMullen was a question of at the end

22  of the day --

23          THE COURT:  I know what it said and whoever wrote

24  your brief and cited that case better read it again because it

25  doesn't say what you said it said at all.  Now, this is a theme

1    I will come back to several times today.

2             In addition to that, why isn't it a fact that they

3    have alleged that under a certain circumstance Appaloosa

4    certainly knew it was not going to perform.  How is that

5    contingent?  The only contingency was whether the facts

6    changed, not their intention.  So that seems specious to me.

7             I understand your point about VTech and I'm going

8    to ask the debtors about that.  I understand your basic point

9    about overlap on intention not to perform at all.  But the

10   other arguments I think are a waste of trees.

11            MR. SHORE:  We focused on where the debtors -- and

12   we can have long debates over where to draw the line between

13   contract and tort and the difference between the Second Circuit

14   and the New York Court of Appeals and do that.  But ultimately,

15   Delphi is asking you to draw the line between contract and tort

16   where no case has ever done it before.

17            If a party negotiates a contract that says we have

18   a right to send a termination notice as of a drop dead date and

19   has a provision in it that says under those circumstances you

20   have no liability --

21            THE COURT:  You're starting on breach again.  All

22   right?  I'm really -- someone else is going to argue to me that

23   there is no breach here.  I'm just focusing on Appaloosa and

24   the fraud issue right now.

25            MR. SHORE:  I'm focusing on the issue of efficient

21

1  breach because what allows you to make an efficient breach in a

2  case is an understanding of what your damages are.  So in a

3  case in which you've negotiated a cap, a $250 million cap on

4  any liability --

5          THE COURT:  Who's going to argue the point about

6  the cap?

7          MR. SHORE:  I will argue it to some extent.

8          THE COURT:  You just said Mr. Falcone was.

9          MR. SHORE:  I'm going to argue it in the context

10  of specific performance.

11          THE COURT:  All right.  I accept your point.  Are

12  you arguing in terms of specific performance, Mr. Falcone?

13          MR. FALCONE:  I'm going to address certain aspects

14  of it, Your Honor.

15          THE COURT:  Look, there's no fraud about an

16  intention to breach if there's no breach.  I accept that.  So

17  you don't need to make that point to me.

18          MR. SHORE:  It's not the point I'm making, Your

19  Honor.

20          THE COURT:  Okay.

21          MR. SHORE:  The point I'm making is in order to

22  find an actionable fraud here, the Court has to make an inquiry

23  to the subjective intent of the parties as to their intent to

24  rely on a provision in the contract.  If the parties negotiated

25  a provision which said you could walk away and pay $250

22

1   million, what turns that into a fraud in this case as alleged

2   is that when that was negotiated Mr. Tepper intended to use

3   that provision or intended that he might use that provision

4   under certain circumstances but then did not intend, or did not

5   intend to use it if it was economically viable to do so.

6            The only difference between that and any other

7   case would be that the person who didn't intend to use a

8   termination provision under certain circumstances wouldn't be

9   liable for fraud.  That's what I'm saying, that line has never

10  been drawn there to ask the Court to go into the subjective

11  intent of the parties as to whether they intended to use the

12  contract provisions or not because this contract, as I'll get

13  to, provides that on the drop dead date you can send a

14  termination notice and you are liable for $250 million.  That's

15  what it contemplates.  Whether a breach or not, you can send a

16  termination notice on the drop dead date.

17           They're saying that becomes a fraud because Mr.

18  Tepper intended to use that under certain circumstances.  But

19  that turns every case with a termination, a drop dead

20  termination and a limitation on liability into a subjective

21  inquiry by the Court into the intent of the parties when they

22  negotiated.  Did you really mean to use that or were you just

23  putting that in there because your lawyers wanted that in

24  there?

25           THE COURT:  I'm sorry, you're just losing me on

23

1   that.  I'm not following what you're saying.  A fraud case

2   often looks into the intent of the parties, so you must be

3   making some other proposition.

4             MR. SHORE:  The basis of the fraudulent inducement

5   claims and going all the way back to Greenstein is the Court

6   does not want to look into the subjective intent of the parties

7   in entering into the contract because it's irrelevant.  Whether

8   we intended to be bound to the contract or not is irrelevant.

9   If the contract says we're bound, we're bound.

10            A narrow exception came up through the cases in

11  all the states with respect to what if on these future

12  performances there never was an intent to perform?

13            THE COURT:  No, I understand that point.  The

14  argument -- let me just paraphrase what I think you're saying,

15  which is that every contract has within it the possibility of a

16  breach, and just as every contract has within it the

17  possibility that the contracting party may have to pay damages;

18  and, therefore, a fraud claim that says that you intended to

19  breach when you entered into it or you intended to not be able

20  to pay damages is within the contemplation of the parties, and

21  therefore, is not really a fraud.  It's an overlap on the

22  contract claim.

23            MR. SHORE:  That's right.

24            THE COURT:  Okay.

25            MR. SHORE:  Section 12 and Section 11 expressly

24

1  contemplate that the parties would get to the closing date,

2  that either party would have satisfied its conditions, and that

3  the other party was still free to deliver a termination notice

4  on that date.  It's a point that was raised on reply and I

5  think we really need to go into it.  It's what let the debtor

6  have a fiduciary out in this case under this contract.  It's

7  not just an equitable balancing.  The way the contract is

8  structured, the language going to a specific performance is

9  drafted for both parties.  Under their reading of the contract

10  that this was hell or high water, even if they had an offer for

11  $1 billion more for the equity and we got to the closing date,

12  Appaloosa was free to waive all conditions and they would not

13  have had a fiduciary out, an ability to get out of this

14  contract unless you can read it the way we read it.  You can't

15  turn it into a fraud by saying that the parties intended to do

16  that any more than Delphi would be liable for fraud if it has a

17  memo in its files which said if we get to closing and Cerberus

18  comes back and offers us $1 billion more, we intend to go with

19  Cerberus.  That was a right which was contemplated by the

20  parties and built into this contract.

21        THE COURT:  I guess that's the way I go back to

22  the first line of questions that I was at.  They allege, in

23  addition to what you're saying, they allege, which clearly they

24  did too, that Appaloosa wasn't up front like that about its

25  rights under the contract.  Instead, it felt that it had to

1   work behind the scenes to kill the deal secretly instead of

2   simply saying look, we're going to pay $250 million; tough.

3   That starts with of course not Paragraph 78 and 79 but Mr.

4   Tepper's testimony at the December 3rd hearing where there was

5   a discussion of optionality in the agreement, but that

6   discussion was over a financing condition, the $585 million

7   cap, not about a walk right for $250 million.

8          So I think what they're alleging has problems if

9   it's couched as you've couched it, but I don't think that's the

10  only way they've couched it.

11         MR. SHORE:  As I said, leaving aside those three

12  instances of interference with the bank finance, the alleged

13  responsibility for shorting, and you know, the confidentiality

14  --

15         THE COURT:  What about Mr. Tepper's testimony at

16  the December 3rd hearing?  There was a lot of colloquy about

17  optionality and Appaloosa's commitment to the deal, et cetera.

18  Do you think -- how do you respond to the debtor's argument

19  that that testimony alone is sufficient to show that the Court

20  and the parties were misled?

21         MR. SHORE:  I mean I addressed it to some extent.

22  Let me elaborate on it.

23         First of all, the deal is a deal comment came up

24  in the context of something different.  It came up --

25         THE COURT:  No, I'm talking about the testimony in

26

1  its totality.  I can read you sections from it if you want.

2  But the import of it, and I said it, is that one of the reasons

3  I'm ruling on this is I don't believe the parties want to come

4  back here again and deal with litigation over this deal.  That

5  was the context of dealing with a very narrow provision which

6  is the only provision that the creditors committee and debtors

7  were worried about.

8           But anyway, it's not just the "deal is a deal"

9  comment.

10          MR. SHORE:  No, but I think in the totality of

11  that testimony the point was, there is a written contract here

12  and we want to abide by that written contract.  I don't think

13  it can be fairly read as saying that any aspect of that

14  contract would be waived or modified.  Quite to the contrary, I

15  think the colloquy came up with respect to the 585 cap as to

16  whether or not the parties would move and Mr. Tepper said I

17  don't think I can get them to move.  It was going to be a

18  strict following of the contract.  Ultimately what the fraud

19  claim, at least in pre-closing nondisclosure, comes down to is

20  the debtor's subjective belief that when April 4th came a

21  termination notice wouldn't be sent, that it would only --

22          THE COURT:  Well, the debtor's belief that there

23  would not be an "efficient breach if the deal was under water,

24  and I guess the issue I have, and I don't think it's an easy

25  one for the debtors by any means, is whether Mr. Tepper's

27

1   testimony at the hearing was one where the parties, including

2   the Court, would have assumed that he had always intended to

3   reserve the right to commit an "efficient breach."

4           MR. SHORE:  The way to fix that subjective intent,

5   though, is easy.  You put a provision in the contract that says

6   the parties hereby agree there's no adequate remedy at law and

7   agree that specific performance is the remedy to be had in the

8   context of a breach.  In the absence of that, you can't imply

9   into the contract and the termination provision on the drop

10  dead date a right of the debtors which is enforceable under New

11  York law that it would only be sent if the deal above water.

12          Under what circumstances does the termination

13  notice get sent, a termination notice gets sent on the drop

14  dead date except when there is a breach of the contract?

15  Because there's a breach of contract termination provision and

16  one that was sent here, but you've got a [unintelligible]

17  termination on the drop dead date which is not qualified by

18  whether you're in breach or not.  I can come back to that a bit

19  later.

20          But that's it.  That was there.  That provision

21  was there before the Court when it was approved.  Delphi had

22  had that contract in hand.  It can't now come and say --

23          THE COURT:  Even if it was ready, willing, and

24  able to close with all the other conditions met on the day

25  before the drop dead date?

28

1              MR. SHORE:  Yes.

2              THE COURT:  I think all your arguments come down

3    to whether you can walk for $250 million.

4              MR. SHORE:  Well, let's turn there and I can come

5    back.

6              THE COURT:  In that regard, and this is as much a

7    question for the debtors to focus on, Mr. Tepper was asked,

8    "Why did you invest this level of personal time and commitment

9    in working with Delphi?"  The answer, "I just asked my wife

10   that question last night, so I don't know.  I guess at some

11   point, you know, I guess we made a deal.  We're trying to

12   figure out how to get this deal done.  We have some

13   relationship with the parties in the case.  We'd like to see

14   this thing come out of bankruptcy if we can.  We have fiduciary

15   responsibilities to a lot of different people and a lot of

16   investors so we can't ever violate that.  But in the fact that,

17   and the same thing I said before, you know, you make a

18   handshake and you make a handshake to what it is.  That's why.

19   I don't know, I don't know how else to say it."

20             So [unintelligible] and he does refer to the fact

21   that he has his investors that he owes fiduciary duties to on

22   this fund.  He also says he's trying to make this happen, make

23   it work.

24             MR. SHORE:  The premise of this complaint and the

25   reason why the debtors are trying to get above $250 million in

29

1    damages is we're not talking about a scenario in which this was

2    a dollar under water.  The question is under this contract and

3    dealing within specific performance could either party be

4    compelled, going back to the example, if Cerberus came forward

5    with a $1 billion topping bid, could we compel the debtors

6    nonetheless to sell the asset to us?  Conversely, if this asset

7    was worth $1 billion less --

8            THE COURT:  But that was a separate provision that

9    deals with that.

10           MR. SHORE:  No.  It all actually funnels through

11   12(h).  In fact, if we can start at 12(h) I can get a handout

12   or if Your Honor has 12(h) later.  Do you want me to hand --

13           THE COURT:  The separate provision specifically

14   acknowledged that the debtor is going to enter into an

15   "Alternative Transaction."

16           MR. SHORE:  They could but they still had to

17   terminate the agreement.  The alternate transaction allows them

18   to send a termination notice.  That termination notice in and

19   of itself doesn't have effect until you get to 12(h).

20           THE COURT:  They paid for the right to enter into

21   a deal with Cerberus or whoever else in the Alternative

22   Transaction section.  You guys didn't pay for the right to walk

23   separate from the damages cap --

24           MR. SHORE:  All right.  So let's --

25           THE COURT:  -- if that right applies.

30

1          MR. SHORE:  We're in a period -- all those things

2     they're doing an Alternative Transaction.  They have a right to

3     send a termination notice.  If we don't want to close -- if we

4     believe they [unintelligible] warranties can send a termination

5     notice.  All those termination notices in Section 12 funnel

6     into 12(h) which tells you exactly what happens when a

7     termination notice is sent.  When a termination notice is sent,

8     no party has any liability under the contract except for

9     liability for willful breach and the provisions of 10 through

10    18 survive.  That's what 12(h) says.  When they deliver a

11    termination notice because they've got an alternate

12    transaction, first of all, they have to pay $82.5 million.

13    Second, they remain liable for a willful breach.  The debate

14    was going to be in that instance whether or not their

15    exercising a fiduciary out to fulfill their fiduciary duties to

16    creditors was a willful act or a non-willful act.  But it still

17    goes through 12.  12 is what -- 12(h), it cuts off the parties'

18    liability

19          THE COURT:  If the point you're making, which I

20    thought you were making, is that there's parallelism, I don't

21    see it.  It's a separate fee the debtors pay.

22          MR. SHORE:  They pay the fee but the consequence

23    of the release -- and if you look at the actual --

24          THE COURT:  I guess I just -- I mean we're talking

25    about fraud here.  The debtors specifically acknowledged that

31

1   they might do something, i.e. accept a higher and better offer,

2   and they paid for it up front.  That to me seems quite

3   different than saying that because there is a damages provision

4   capping under certain circumstances the damages of the

5   investors that you [unintelligible].

6          MR. SHORE:  All I'm saying is that the fraud

7   claim, that fraudulent inducement claim hinges on the Court

8   finding that the contract allows for a specific performance

9   because if the contract does not allow for specific

10  performance, Delphi is not entitled --

11         THE COURT:  I understand that point.  But I'm

12  pointing at two other things.  One we talked about already and

13  I don't know if there's much more to add to that, although I

14  can quote you some interesting language from Mr. Tepper on that

15  concept, which is the idea of behind-the-scenes secretly

16  interfering with other aspects of the deal.  Mr. Tepper had

17  some very harsh words about one of his partners about that type

18  of behavior at the December 3rd hearing.  I think he would

19  agree that that's separately actionable.  In fact, he had his

20  lawyer send a letter to Goldman Sachs threatening just that.

21         But then the separate point is, did Tepper commit

22  fraud when he said what he said in the context of the hearing

23  on December 3rd?

24         MR. SHORE:  I'm saying that if the contract

25  allowed him to commit an efficient breach there is no duty to

32

1   disclose under any law that you intend to use a contract

2   provision under certain circumstances.  Delphi, as a

3   sophisticated party, is not entitled to rely in any respect on

4   any statement outside the contract that says or they could

5   interpret as saying don't worry about the contract provision.

6   If we get to April 4th and if you have satisfied your

7   conditions, I will close under any circumstances because that's

8   what drives you into having to make a subjective inquiry into

9   subjective intent as to whether or not he intended to use that

10  provision or intended that he might use that provision, or

11  didn't even think about that provision.

12              THE COURT:  Okay.

13              MR. SHORE:  That's why the fraudulent inducement

14  claim has to go, because otherwise no party who puts a

15  provision in the contract which caps liability and allows the

16  termination on the drop dead date can be free of what the New

17  York Courts and the Michigan Courts don't want, which is

18  turning every breach of contract claim into a fraud claim.

19              THE COURT:  Well, I'm going to ask this more

20  plainly.  Sometimes I ask questions just to get, you know, a

21  response, so don't take this too personally, but do you think

22  the New York Courts and the Michigan Courts don't have an

23  interest in witnesses being candid to courts in their

24  testimony?

25              MR. SHORE:  Yes, they do.

1            THE COURT:  So --

2            MR. SHORE:  I do not, and as I said, I do not

3    think that with respect to those allegations that you've laid

4    off to the side with three, that they may have a question --

5            THE COURT:  No, no, I'm focusing on Mr. Tepper's

6    testimony now.  I guess ultimately what I believe might, and

7    I'm saying this "might," I don't want the debtors to address

8    this, might survive your objection -- leaving aside those three

9    -- is the allegation that Mr. Tepper was not candid to the

10   Court and the parties when he testified in favor of the deal on

11   December 3rd, and that in fact he misrepresented as to his

12   intentions.

13           MR. SHORE:  All right.  But that does not make it

14   a fraudulent inducement.  That may raise other issues --

15           THE COURT:  No, I already said that.  They are not

16   pleading, they're just saying fraud and damages for fraud.  So

17   the issue is how do I deal with that point that they've made,

18   which is that he wasn't candid, that he misled the Court and

19   the parties at a time when the approval of going forward with

20   the modified EPCA was at issue and it might not have been

21   approved but for that testimony?

22           MR. SHORE:  I think that the way to handle that is

23   to say that there was no basis for Delphi to reasonably rely on

24   that testimony as modifying the expressed rights of the parties

25   under the contract particularly in the context where Mr. Tepper

34

1   is saying that he does have fiduciary duties, that if one's

2   fiduciary duties say efficiently breach the contract, don't buy

3   an asset that's worth X because you can limit your liability to

4   250, that that will be done.  In fact, the only way they could

5   have had a justifiable reliance--

6                    THE COURT:  Well, even if -- but I guess your

7   point is even if that's not the case, you can always breach the

8   contract notwithstanding anything; right?

9                    MR. SHORE:  Notwithstanding -- except to the

10  extent where the contract with the parties -- and even then it

11  doesn't always work where you have a specific performance

12  provision.  We'll get to why there isn't one in this in a bit.

13  But until you have that, a party is free and has for hundreds

14  of years been free to walk from a contract and suffer damages.

15                   THE COURT:  Okay.

16                   MR. SHORE:  The Court can't move the line on fraud

17  to say that well that's qualified by whether or not you

18  intended at the time you entered into the contract --

19                   THE COURT:  Well, if Mr. Tepper had said the only

20  option [inaudible] are the financial conditions and those are

21  conditions that could be objectively determined, then it seems

22  to me if he intended at that time, notwithstanding that

23  statement, to intentionally breach, notwithstanding the

24  fulfillment of those conditions, if it was a good idea to do so

25  for Appaloosa -- to me that would be a crime.  I'm not sure

35

1   that he said that at the December 3rd hearing.

2           MR. SHORE:  That's why I started with the question

3   as to whether or not what they quoted is an actionable

4   misrepresentation in the context of the law of fraud on what "a

5   deal is a deal" means.

6           THE COURT:  But now I --

7           MR. SHORE:  They must draw the line between a deal

8   is a deal and why are you doing this because I want to get this

9   deal done and saying I want to get this deal done

10  notwithstanding what my contract says because unless you put in

11  that notwithstanding what the contract says, you end up right

12  back to the contract which is under this contract is a party

13  free on April 4th to send a termination notice and suffer money

14  damages of the $250 million?  Because if he is allowed to do

15  that, there's nothing, no misrepresentation in that statement

16  because it is stating a deal is a deal.  If I'm allowed to

17  walk, I can walk, and the same thing goes the other way.  If

18  they -- leave aside Cerberus or anything else, if Delphi got to

19  the end of the day and wanted to do an alternate plan, a stand

20  alone plan and go to a change of recommendation, they're free

21  to do that.  They just subject themselves to liability for

22  willful breach in 12(h) and kick back to 11(b).

23          The reason you can't say that those provisions can

24  be read as permitting specific performance is the definition of

25  liability.

36

1                    [Pause in proceedings.]

2                    MR. SHORE:

3    As I said before, all termination notices delivered under

4    Section 12 funnel through 12(h).   12(h) says that upon the

5    termination all rights and obligations under the agreement

6    shall terminate without liability to any party except that

7    nothing contained herein shall release any party from liability

8    for willful breach and the covenants of confidentiality and

9    whatnot remain.

10                   Our view is that when you did that, when you

11   delivered, all liability is cut off except for willful breach.

12   So if you had a non-willful breach of any sort, there is no

13   liability under this contract.   It's exactly the way it's

14   written, that's exactly the way it should be read.   But you

15   exposed yourself to liability under any legal theory for a

16   willful breach.   That's the provision which would allow the

17   debtors to terminate the EPCA and enter into an alternate

18   transaction.

19                   The provision before which allows them to

20   terminate by sending a notice for an alternate transaction does

21   not cut off liability in any respect.   In fact, it says that it

22   is, even if you pay the alternate transaction fee, does not

23   release you from claims.   12(h) is what releases the parties

24   for claims.

25                   Where Delphi gets into trouble with their

37

1    interpretation, which I think is pretty clear that liability

2    means money damages, is that even if they sent a termination

3    notice for an alternate transaction, their reading would be

4    that the only thing not cut off was our claim for money

5    damages, but left open the possibility for a specific

6    performance.  When you talk about the common law specific

7    performance, this here is going that way, the type of unique

8    asset, which would make it difficult for Delphi to claim that

9    it was free to walk.

10              So if under 12(h) it only means money damages,

11   they've read out all the stuff they said before.

12              THE COURT:  What's the point of this as related to

13   fraud?

14              MR. SHORE:  Well, I think it's moving into

15   specific performance, but if you have a right to do this under

16   the contract to commit an efficient breach, they can't turn

17   that into a fraud because they say we intended to use Section

18   12 this way versus we didn't think about using Section or we

19   never intended to use Section 12.

20              It all funnels back to whether or not ultimately

21   this contract can be -- the closing can be compelled versus the

22   parties suffer money damages because if it can't be compelled,

23   there's nothing fraudulent about his statement a deal is a

24   deal.  The deal was effectuated here by sending a termination

25   notice.

38

1          So 12(h), all right, is the provision that says --

2    essentially sets the table for the complaint here which is the

3    only thing that can survive once the termination notice has

4    been sent is a claim for willful breach.

5          Then you go back to 11(b) and that tells you what

6    the parties' liability is for a willful breach.  When you get

7    to 11(b), the liability for willful breach under the agreement

8    for any reason under any legal theory for any act or omission

9    occurring prior to the subsequent approval date shall not

10   exceed $100 million or $250 million after the disclosure

11   statement.

12         So the only thing that can happen under this

13   agreement, under the agreement, after a termination notice has

14   been sent is a claim by one party for a willful breach not to

15   exceed $250 million.

16         THE COURT:  Okay.  Now, doesn't that get you back

17   to VTech since it refers to damages under the agreement?  VTech

18   says well, the agreement limited damages; therefore, you have

19   special damages, you can sue for fraud.

20         MR. SHORE:  But now we're going back to changing

21   the premise of the argument which there's no misrepresentation

22   if you either by nondisclosure or affirmative disclosure that

23   says that a termination notice would not be sent and we would

24   not claim that this was either not a willful breach --

25         THE COURT:  Oh, I understand, I understand.  If

1   they hadn't alleged a breach claim you guys could walk

2   completely.

3              MR. SHORE:  But it's not just a breach claim.

4   It's a question of the remedy.  If there is no remedy of

5   specific performance under this deal, then there's nothing

6   misrepresentational about not saying I'm not going to commit an

7   efficient breach.  If the contract provides that you can commit

8   an efficient breach and you can't be compelled to close, you

9   can't misrepresent that you're not going to commit an efficient

10  breach because your contract says and contemplates that there's

11  not only going to be an efficient breach, it's going to be one

12  in which the conditions have been met and nonetheless you

13  decide not to close by April 4th.  So it turns out to be not a

14  misrepresentation either by affirmative misstatement or

15  omission.

16             If it's a money damages case, there can't be a

17  misrepresentation here because the money damage case

18  presupposes that an efficient breach is allowed then and they

19  can suffer the damages.  The contract says --

20             THE COURT:  The damages are limited.  You're still

21  going back -- I'm still going back to VTech on that point.

22             MR. SHORE:  Well, I mean I addressed VTech.  I

23  don't think what VTech is saying that if you commit an

24  efficient breach you can --

25             THE COURT:  No, because that wasn't the issue

40

1  before the Court.

2          MR. SHORE:  That's right.

3          THE COURT:  It also didn't say the price of

4  bananas is 20 cents a bunch.  I mean, you know, I think you

5  have to deal with the fact that Judge Koetl thought that

6  because of the cap on damages in the contract they could sue

7  for fraud.  Now, I agree the contract said they can sue for

8  tort, said it.

9          MR. SHORE:  Except for --

10         THE COURT:  Right, it permitted a suit for tort.

11 That goes back to a reading of this contract.  But if I assume

12 -- whoever of your colleagues is going to try to convince me

13 otherwise, if I disagree with them that this provision does not

14 [unintelligible] the debtors and that they could sue for a

15 tort, for example, doesn't prevent them from suing for any

16 tort, then why doesn't VTech be right on point?  Because just

17 as in VTech they would be permitted to sue for a tort because

18 they're not excluded from suing for a tort, the tort of fraud.

19         MR. SHORE:  Again, I sort of compartmentalize the

20 post-contracting fraud --

21         THE COURT:  No, no, this one I'm just talking

22 about fraud right from the get go.

23         MR. SHORE:  Right.  The problem with that is we're

24 not alleging in that instance an independent tort.  We're

25 alleging an intent to commit an efficient breach.  Don't

41

1   forget, this is not a case in which the allegation has been

2   made for some reason other than the parties wanted to save

3   money, this didn't close.  That might raise a different issue,

4   but the issue here about whether or not the parties can commit

5   an efficient breach is and always should be answered by the

6   contract.  If the contract says you can commit an efficient

7   breach, nothing that was said outside the contract should

8   change that.  12(h) and 11(b) read together say that --

9           THE COURT:  Well, all right, all right.  During

10  the hearing on December 3rd, and I guess this may be as

11  relevant as anything on this line of inquiry -- the debtors

12  need to address this also -- at one point Mr. Rosenberg, the

13  creditors committee's counsel, was quite concerned about one

14  provision of the amended EPCA, with the $585 million provision

15  and he starts talking it at Page 268.  He's worried that the

16  debtor will trip over this condition.  He says that, "We've

17  learned [inaudible] the last 11 months or so that this EPCA is

18  neither a commitment nor an agreement.  What it is is a one-way

19  option, a one-way option for Appaloosa and its co-investors to

20  go forward if it decides it wants to."  I say, "All right.

21  That's overstating it."  He says, "Perhaps.  I suggest to Your

22  Honor that it may not be."

23          His focus there, though, is not on the $250

24  million cap as an option, but on this covenant.  He invokes the

25  Court's -- he requests the Court's authority, and this carries

42

1    over to 271, in helping the committee to change that covenant.

2    Much of the rest of the hearing is focused on whether I would

3    do that or not.   The focus is all on that aspect of

4    optionality.

5              Then I say -- I'm sorry.   So then he says, "So

6    there are investors you could do a different transaction with

7    but the price is going to be $82.5 million and waiting to at

8    least March 31st.   So therefore," and then I say, "Well, let's

9    explore that a minute.   I appreciate that everyone focused on

10   what happened over the last couple of months, poured over the

11   legal options under the EPCA agreement and what could happen."

12   Mr. Rosenberg agrees.

13             I said, "And obviously the cap on damages is an

14   extremely relevant legal point that I'm sure everyone

15   considered and it's referred to in the debtor's response.   That

16   being said, I heard the testimony from Mr. Resnick and I tend

17   to agree with that.   While there is some quantifiable effect of

18   a higher interest cost, it's fairly small.   I'm still of the

19   belief that each of the institutions that are signed up to the

20   EPCA is a real institution that wants to engage in business in

21   the future, engage in transactions in the future, and in fact

22   that they can't do deals unless they have the trust of the

23   people across the table from them.   The idea that they would

24   ultimately hold you all up in a way that would be materially

25   greater than the effect of such an interest cost on them would

43

have real consequences to them and I would not hesitate, as you

know from the last three weeks, to explore those events in

great detail.  So there is a consequence in jerking people

around, and frankly, that goes beyond the document, but the

document itself has obligations in it to work to preserve the

transaction.  And I have before me the testimony that this

isn't Mr. Tepper's doing, i.e. the jerking people around part

and that it's all of his investors' doing.  His testimony was

in essence like this is herding a group of cats, and I think

there's probably some truth in that."

So again, the issue I have is, in light of that,

can the debtors allege that simply because Mr. Tepper didn't

stand up then and say "well wait a minute, Judge, you know, we

could always commit an efficient breach, we can always jerk

people around," should I infer a fraud?  This is for purposes

of a motion to dismiss.

MR. SHORE:  I would answer as follows.  I would

answer we're not talking about an incident that was where you

were at $585.2 million and we could not herd the cats and

people were having a problem.  Where we are now in the

fundamental basis of this complaint is a dislocation outside

the damage cap.  We're talking about a dislocation of more than

$250 million, otherwise all of this is irrelevant.  We're

talking about people were jerking someone around over $5

million or $10 million, or $50 million.  It may be a different

44

1  issue.  But the complaint is premised upon a dislocation.  That

2  is it would only be efficient if closing the transaction lost

3  you more than $250 million.  Because if you close the

4  transaction inappropriately, we're coming back to Judge Drain,

5  and everybody recognized that.

6           THE COURT:  Well, I beg to differ with you on

7  that, because the complaint alleges that Appaloosa went out of

8  its way to cause the transaction not to happen without a

9  willful breach on its own -- appearing to be on its own behalf,

10  that it tried to change other events so that they didn't have

11  to even pay the $250 million.

12           MR. SHORE:  Fair enough.  Maybe I spoke outside

13  the record on this.

14           THE COURT:  Okay.

15           MR. SHORE:  But even with respect to those

16  allegations, that goes to whether or not the condition was

17  frustrated and then our ability to raise 5(t) as a defense.

18  But fundamentally we're talking about what did the parties

19  intend if you add a dislocation either way outside 250?  When

20  you speak of fraud from the perspective of this side that the

21  debtors, after having said what they said with respect to this

22  contract and the inability to get specific performance in the

23  context of the disclosure statement, in their statements before

24  the Court, in their testimony before the Court, in their

25  pleading filed in support of the reply in the EPCA about no

45

1   specific performance, the best the parties can do here is a

2   capped quantum of damages.  That speaks volumes to what the

3   parties' intent was at the time with respect to whether there

4   could be an efficient breach.

5            THE COURT:  I'm talking about whether someone

6   should have stood up after I said what I said.  All right?  I

7   was the one that was talking, not Mr. Butler.  I think whether

8   or not I find that there was a fraud here or not based on what

9   was alleged in the complaint or whether I dismiss the complaint

10  or permit leave to re-plead on this point, it's not what the

11  debtor said and what people responded to what the debtor said.

12  It's what people didn't say in response to what I was saying.

13  Maybe that's not actionable.  I don't know.  I'll ask the

14  debtor.  But I think we should move on.

15           MR. SHORE:  Ultimately the question that just --

16           THE COURT:  I appreciate that sharp practice may

17  not rise to the level of fraud.  Maybe the debtors can convince

18  me otherwise.

19           MR. SHORE:  In an environment in which nobody

20  mentioned the possibility ever that this deal could be

21  compelled even it was more than $250 million under water --

22           THE COURT:  I did.  I did.  You know, just move

23  on.  All right?  In fact, I told you all that, at the hearing

24  on the 1142, and I always felt that, and that's why I did not

25  rule on the basis of the cap on December 7th.  If you read my

46

1  ruling even if you're not in my head, you know that.  Whoever

2  is trying to argue judicial estoppel on that point, I suggest

3  you start right there.

4            MR. SHORE:  In the context of the deal, though, on

5  whether or not -- because ultimately the question before the

6  Court on specific performance is what does the contract say?

7  Not what people subjectively intended or anything else and I --

8            THE COURT:  Well, I mean you know, I don't want to

9  be rude to you but, and maybe I misunderstood you when you gave

10 your introduction but are you covering issues other than fraud?

11           MR. SHORE:  Yes.

12           THE COURT:  Okay.

13           MR. SHORE:  Just specific performance with respect

14 to how you can interpret this contract to provide for or

15 prevent an efficient breach.  I can understand that people --

16           THE COURT:  But is someone else going to cover

17 this same area?

18           MR. SHORE:  No.

19           THE COURT:  Okay.  All right.

20           MR. SHORE:  With respect to specific performance,

21 and we've gone through 12(h) and 11(b).  The only way you can

22 find that specific performance of Section 2(a) is available is

23 to read the liability in 12(h) and 11(b) to mean money damages

24 like the debtors say.  We can come to the issue of the

25 commitment letters and the tiering of the structures.  But if

47

1   liability means what the four dictionaries say it means, the

2   New York Court of Appeals, and the Second Circuit, albeit in

3   context other than this contract, liability is a broad term

4   which encompasses legal responsibility in law or in equity.

5

6          So when you get to 11(b) which says that you can't

7   have liability in excess of $250 million, you can't be liable,

8   legally responsible in law or equity for more than $250

9   million.

10          THE COURT:  Well, it says under a legal theory.

11   It doesn't say under law or equity.

12          MR. SHORE:  Liability, the definition of liability

13   in the dictionaries and in the New York Court of Appeals is

14   that it means both an action in law or equity.

15          THE COURT:  No, I'm referring to the phrase later,

16   under any legal theory.

17          MR. SHORE:  Right.  That means you can't seek

18   specific -- you can't seek an equitable claim under a fraud

19   theory and you can't seek a legal claim under a fraud theory if

20   it requires $250 million.  We don't have to -- that's a

21   limitation of liability issue I'm not going to address right

22   now.  But fundamentally, if you read the word "liability" as

23   defined which is a legal responsibility in law or equity, you

24   can't have legal responsibility under law or equity for any

25   reason under any legal theory including --

48

1           THE COURT:  It doesn't say under law or equity.

2    It says the aggregate liability.  You're reading into it the

3    law and equity part.  That's not part of your quote.

4           MR. SHORE:  I'm reading a definition of liability.

5    Liability is an expansive term which means legal responsibility

6    in law or equity.  The New York Court of Appeals just dealt

7    with this when somebody tried to bring an equitable claim even

8    though the statute passed on liability.

9           THE COURT:  But we're dealing with a set of cases

10   that requires a fairly tight level of drafting where the

11   parties are contracting out a specific performance.  In the

12   commitment letters, the financing letters, the backstop

13   letters, the parties seem to know how to draft it right to fit

14   those cases.  I think to me you're reading more into this,

15   given the case law, than is permissible.

16           MR. SHORE:  I'm not saying we have not said in

17   connection with this that Section 11(b) operates as a waiver of

18   all specific performance remedies.  It does not.  That would

19   contradict with our reading of 12(h).  All the parties are

20   exposed to whatever remedy the Court wants to fashion in law or

21   in equity for a willful breach.  But under no circumstances can

22   it cost more than $250 million.  If the Court wanted to

23   specifically enforce the --

24           THE COURT:  So you're basically saying you could

25   have specific performance but it's capped at $250 million and

49

1   that's what this provision says?

2          MR. SHORE:  If you had a confidentiality provision

3   that was being violated, you could order that to be followed,

4   not if it requires the payment of more than $250 million.

5   That's what it says.  I'm not reading anything into it except

6   taking a definition from the dictionaries, the New York Court

7   of Appeals, and the Second Circuit with respect to what

8   liability means and putting it in this context.

9          THE COURT:  All right.  And you're not also then

10  reading the case law like the Deutsche case about what you need

11  to say generally in terms of reading out the remedy like this.

12         MR. SHORE:  It does not -- I have not found any

13  cases that say the sole and exclusive way to waive specific

14  performance is using sole and exclusive language.  It's not.

15  Those cases fundamentally stand for the proposition that the

16  Court's responsibility in connection with a contract

17  interpretation is to read the contract and give it its plain

18  meaning which expresses the intent of the parties whether or

19  not they had a subjective intent or not.  That's what the

20  Court's job is.

21         THE COURT:  Okay.

22         MR. SHORE:  And if we can argue about drafting

23  what should have been and what should have been out, the flip

24  side is true.  We all know how to make it clear that specific

25  performance is an available remedy.  You say there's no

50

1    adequate remedy of law and you say specific performance is the

2    available remedy.

3              THE COURT:  I guess, at least as I read the cases,

4    that you don't have to say that to have specific performance.

5              MR. SHORE:  You don't have to.  I mean it doesn't

6    end the inquiry any more than the absence of sole and exclusive

7    [unintelligible] whether specific performance is available.

8              THE COURT:  Okay.

9              MR. SHORE:  When you look at all the other things

10   beyond the language of the contract, there isn't anything the

11   debtors point to which supports their reading that liability

12   means money damage is the only thing that happened was a --

13   with the sending of the termination notice was money damages

14   for non-willful breaches or above 250.  It's contradicted on

15   the statements they put before.  It's contradicted with the

16   structure of the deal.  We get to --

17             THE COURT:  This is a motion to dismiss, though,

18   so aren't those all points you'd be making at summary judgment

19   or -- I mean your argument has to be plain meaning.

20             MR. SHORE:  Right.  The plain meaning of this --

21   well, you can take into consideration the debtor's post-

22   contract statements with respect to what this provision means

23   outside the context of litigation, absolutely.  They put in the

24   disclosure statement and you find that the disclosure statement

25   means that there's no specific performance provision, and the

51

1   only thing we can do is to get damages up to the cap, that's

2   absolutely in the record on this motion.  I think the

3   explanation for what that meant totally falls apart.

4            THE COURT:  Okay.

5            MR. SHORE:  But if you look at the structure of

6   this deal, this is on this motion to dismiss as well because

7   they don't get specific performance unless they can get

8   specific performance of the commitment letters.  If you're

9   operating under the terms of the documents, if AMLP

10  [unintelligible] aren't funding the full amount, you can't have

11  a closing, you can't have specific performance.

12           THE COURT:  How do I know that?

13           MR. SHORE:  Because there's not enough money.

14           THE COURT:  How do I know that?

15           MR. SHORE:  Based upon the structure of the deal

16  and sole capitalization as admitted by the debtors and as

17  disclosed in the disclosure statement or the commitment

18  letters.

19           THE COURT:  Where is that shown?

20           MR. SHORE:  I'll pull out the disclosure statement

21  discussion.  Maybe I'll bring it up on reply, Your Honor.

22           THE COURT:  Okay.  What about either -- well, I

23  guess one of your colleagues is going to talk about veil

24  piercing, but what about the exception to a waiver under -- if

25  I can find it here -- Kalisch-Jarcho, I mean unless someone

52

1   else is going to talk about that.

2           MR. SHORE:  Someone else is going to talk about

3   that but in the context of deal structure it's just why

4   specific performance is inconsistent with both the pleadings

5   and the contracts that are in front of you.  The debtors aren't

6   alleging that any of the other plan investors were materially

7   misrepresenting to you in the Court that they were going to

8   close this deal.  I don't fairly read that complaint as

9   alleging that the other plan investors did anything which would

10  get around their waivers of, or limitations on liability and

11  waiver of specific performance in their commitment letters.  I

12  mean fundamentally --

13          THE COURT:  But Appaloosa picked up the difference

14  under the contract.

15          MR. SHORE:  Appaloosa picked up the -- no, they

16  picked up the 1.1.  They would not have picked up all of the

17  other parties' commitments.  You would get into a situation

18  where if you said all right, Appaloosa's waiver doesn't apply

19  so Appaloosa, you must fund.  But unless you can get the other

20  two entities to fund, you can't compel specific performance.

21          THE COURT:  But Appaloosa is picking it up for the

22  investors.

23          MR. SHORE:  The additional investors, not the

24  other two funds.

25          THE COURT:  Not the funds but the actual

53

1   investors.  Not their parents, but the actual investors.

2           MR. SHORE:  It does not pick up liability for the

3   plan investors.  It picks up its own liability up to the whole

4   funding amount of Appaloosa.

5           THE COURT:  Now, you make two different points.

6           MR. SHORE:  Okay.

7           THE COURT:  You're saying first that the only one

8   who's alleged that did anything really bad that would fit into

9   the exception of specific performance is Appaloosa; right?

10          MR. SHORE:  Well, I wouldn't even say that

11  [unintelligible], but yes.

12          THE COURT:  Obviously you're not accepting that

13  Appaloosa did anything either but I thought you were saying the

14  premise of your argument is that for there to be specific

15  performance, for it not to be moot, you need Harbinger [Ph.]

16  and Pardus [Ph.], you need their money,

17          MR. SHORE:  I'm actually -- I'm not --

18          THE COURT:  I think you did need their money given

19  the back stop by Appaloosa.

20          MR. SHORE:  That's all right.  It's difficult with

21  this many defendants to divide it up.

22          Now, the point I'm making is when you're looking -

23  - when you're trying to discern the intent of the parties as to

24  whether there could be an efficient breach here, whether the

25  parties always contemplated that specific performance was an

54

1  available remedy consistent with the language that's

2  interpreted, the language put into the agreement with what the

3  debtors were saying, you also have the structure of the deal

4  which was always set up with the funds capitalizing the special

5  purpose entities only to the amount of the cap on damages and

6  that under no circumstances --

7          THE COURT:  Wait.  They represented that they had

8  the full money to pay.

9          MR. SHORE:  They had the full commitment to pay

10 could be consistent with the contract, and the contract itself,

11 the commitment letters say that notwithstanding anything else,

12 notwithstanding any other term or condition of this letter

13 agreement, under no circumstances shall the liability of AMLP,

14 or in that case each of the three funds hereunder, for breach

15 of this letter agreement exceed in the aggregate the cap for

16 any reason, the cap being 250, under no circumstances shall

17 AMLP be liable for punitive damages, and three, the liability

18 of AMLP shall be limited to monetary damages only.  The

19 structure of this deal is set up that the only -- that if

20 there's a breach of the underlying EPCA, if there's a breach

21 which is the predicate to specific performance on that deal,

22 but if there's a breach, the only thing AMLP has to do is fund

23 up to 250.

24          THE COURT:  Okay.

25          MR. SHORE:  And that deal is consistent with the

55

1  concept of allowing efficient breach.  That structure is

2  consistent.  It's completely inconsistent with the notion that

3  the parties always contemplated and intended that specific

4  performance was available here because it was always going to

5  put you in a position where if specific performance came up,

6  you'd never be able to get sufficient funds to close the

7  transaction.

8             THE COURT:  I just pointed out a scenario where

9  you would.

10            MR. SHORE:  Well, that's what I'm saying, this is

11  where we're getting back into fraud.  No.  Under the terms of

12  the contract, what we're doing here is not voiding any

13  provision of the contract.  We're trying to discern the

14  parties' intent in entering into this.  The only thing you can

15  discern from the structure of the deal --

16            THE COURT:  Why didn't they put the same provision

17  in 11(b) then?  Why would you do it in such a roundabout way?

18            MR. SHORE:  Because there are circumstances under

19  which specific performance would be an available remedy.  If

20  someone was violating their best efforts, and Your Honor

21  addressed this to some extent in 1142, as long as the order

22  that the Court's writing is not putting us in a position to

23  spend more than 250, 11(b) isn't handling it.

24            THE COURT:  Okay.

25            MR. SHORE:  So just from the perspective of

56

1    looking at what's in front of the Court, I don't think there's

2    any fair reading of the contract which says that merely by

3    using the term liability in 12(h) and 12 -- or 11(b) that the

4    parties were either contemplating or intending that specific

5    performance would be available even if it meant putting in a

6    lot more into this deal than $250 million.

7                    THE COURT:  Okay.

8                    MR. SHORE:  I don't -- I'm not going to dwell.

9    I'm just closing out specific performance on the common law

10   issues because I think a lot of them are going to be brought up

11   on piercing the corporate veil and being able to put the deal

12   together.

13                   But ultimately, we do have a problem here, a

14   pleading problem and matter of law on the issue of ready,

15   willing, and able.  The debtors made it very clear that they

16   are not going to be ready, willing, and able to close at the

17   time of judgment.  What they intend to do --

18                   THE COURT:  All right.  I have a -- I mentioned

19   this problem before.  I'm going to mention it now too.  I want

20   you to point to me one case -- before I do that, I'm going to

21   distinguish between two different facts.  I accept, and I think

22   the debtors will accept, that if the remedy of specific

23   performance is moot for some reason -- you know it can't be

24   done -- the specific performance claim in the complaint will be

25   dismissed.  Name me one case that holds that absent that type

57

 1   of mootness, the fact that additional conditions will have to

 2   be met for specific performance, i.e. it holds that the debtor

 3   is not today ready, willing, and able albeit that it would be,

 4   you know, tomorrow or the next day --  I'd like one case cited

 5   for that proposition.

 6          MR. SHORE:  Outside the real estate context I do

 7   have one case, I'll get the name of it in a minute, where they

 8   were unable to get the loan and the allegation was that

 9   [unintelligible] liability to get the loan and the Court said

10   sorry, I'm not going to do that.  I will cite that to Your

11   Honor.

12          But then you end up in the position ultimately

13   where we've gone through the specific performance analysis, the

14   Court has ordered specific performance, and we're no further

15   along than we were before if the debtors are saying they're

16   going to try to recreate the financing.

17          THE COURT:  Again, one case that says that.

18          MR. SHORE:  Okay.  Well --

19          THE COURT:  The many cases that you have cited for

20   that proposition, all of you, do not say that.  In fact, in one

21   of the cases you cited you switch the word in brackets in

22   footnote 12 from "was" to "is," a very important change.  I

23   don't want that ever to happen in front of me again.

24          MR. SHORE:  Ultimately --

25          THE COURT:  So have we disposed with the ready,

58

1  willing, and able point now?

2           MR. SHORE:  Yes, Your Honor.

3           THE COURT:  All right.

4           MR. SHORE:  With respect to 1142 and 510, which

5  are my last two issues and I think we can dispose of them

6  pretty quickly, based upon the debtor's opposition, I don't

7  know that they are seeking to apply 1142 in a real way.  We're

8  not disputing that the Court has jurisdiction to do what it's

9  going to do with respect to the EPCA, but we just don't see a

10 scenario under which 1142 applies and that increases in any

11 respect the debtor's available remedies.

12          THE COURT:  Well, I understand the point unless

13 the debtors can persuade me otherwise -- I don't see how they

14 will -- 1142 doesn't authorize the Court to rewrite the

15 contracts or the plan.  But it does seem to me to be a very

16 clear remedy, that would get around any argument about money

17 damages being sufficient or anything like that, where congress

18 specifically provided for a specific performance.  I mean

19 leaving aside whether in fact the contract permits specific

20 performance, whether, you know, the plan that you're trying to

21 enforce specifically says you can't enforce it this way, if

22 you're able to enforce under the agreement, congress seems to

23 say you can enforce it.  It doesn't matter whether -- the Court

24 doesn't even have to get into whether money damages are

25 sufficient or not.

59

1              MR. SHORE:  But it would not undercut the

2    obligation to follow at least at that point common law concepts

3    under what circumstances do you get specific performance.

4              THE COURT:  Why?  Why wouldn't it?  It says

5    "enforce the plan."

6              MR. SHORE:  I think you'd have, among other

7    things, a vagueness issue there.  If 1142 was to be interpreted

8    as saying that notwithstanding the common law and any defenses

9    such as ready, willing, and able or ability to close the

10   transaction, or -- let me say it this way.  With respect to no

11   adequate remedy at law I think it probably does pick up that.

12   But with respect to the other aspects of what it takes to get

13   specific performance, I don't think it creates a right without

14   standards to say okay, the deal is going to be done.  I think

15   the Court still has to import standards for the application of

16   the code provision.

17             THE COURT:  Why?

18             MR. SHORE:  Because --

19             THE COURT:  I mean congress knew how to

20   incorporate applicable non-bankruptcy law if it wanted to.

21             MR. SHORE:  Then it fundamentally raises the issue

22   of under what circumstances, if the contract has not waived

23   specific performance, the Court would order the plan to be --

24             THE COURT:  Right.

25             MR. SHORE:  -- consummated that way.

60

1          THE COURT:  Recognize it's a plan where the

2    parties had voted on and the Court has confirmed an integrated

3    transaction obviously in an environment that's different than

4    your normal two-party contract environment.  Why wouldn't it be

5    reasonable to think that congress didn't want the Court to get

6    into an analysis of whether money damages would be

7    satisfactory, because at that point you'd have to deal with who

8    gets what.  You can't really carry out a plan if it's a stock,

9    you're distributing cash to people where some people were

10   before taking warrants and contingent rights.  I mean it just

11   seems to me that not only does the language say it but it makes

12   evident sense to have specific performance in that context.

13         MR. SHORE:  What I was saying is leaving aside

14   adequacy of damages, the issue would be, for example, in the

15   1142 order is the Court required in ordering specific

16   performance to maintain that the debtors follow and meet all

17   conditions.

18         THE COURT:  Oh yes, no, I understand that.  I mean

19   unless the debtors are able to convince me otherwise, you can't

20   order specific performance of something that isn't the plan or

21   isn't the agreement incorporated in the plan.

22         MR. SHORE:  I wouldn't think it would get rid of

23   issues with respect to feasibility of doing it.  That is, for

24   example, with the common law which says you can't order

25   specific performance if it's going to be impossible.  That

61

1  would also apply in -- that's why I'm saying I know you have to

2  --

3          THE COURT:  I agree.  That's fine.  But you can't

4  -- no Court can -- you don't have to incorporate common law to

5  that.  No Court's going to order someone to do something that's

6  impossible.

7          MR. SHORE:  That was my -- my point is --

8          THE COURT:  All right.

9          MR. SHORE:  -- you have to incorporate the

10  standards under which you would get specific performance under

11  common law otherwise you get yourself caught up in a completely

12  vague statute which --

13          THE COURT:  Well, all right, I'm not agreeing with

14  you on that point but you can go ahead.

15          MR. SHORE:  With respect to any of the other

16  claims, though, the only time 1142 would come in would be that

17  limited instance.  I don't know that that's -- we sort of see

18  in the case where anybody said that but in respect to the other

19  causes of action, this is a damage case.  1142 doesn't change

20  that because there's no plan.

21          THE COURT:  But given that rule, I don't see why

22  you dismiss the claim.  I'm not sure why you dismiss it anyway

23  on the basis it's duplicative, which is what's been alleged.

24  But it seems to me it's not duplicative.  It gives the debtor

25  an additional right that it wouldn't necessarily have under the

62

1    common law.

2              MR. SHORE:  But it can't be applied.  The only

3    instance in which it can be applied in this case would be that

4    limited one.  Again, I'm not saying it can't in your example.

5    But it can't be applied in instances, for example, on money

6    damages or fraud.

7              THE COURT:  Why not?  I don't --why can't it?

8              MR. SHORE:  Because there's no plan.  1142 just

9    says the Court can do whatever is necessary to consummate the

10   plan.  If we're talking about money damages here --

11             THE COURT:  Oh no, yes, but the basis for the

12   motion to dismiss that cause of action and complaint was that

13   it was duplicative of other causes of action.  I don't think it

14   is because it's different than the common law on damages, on

15   whether money damages are adequate.  To me, what congress said

16   is the Court doesn't have to get into that inquiry as to

17   whether money damages are adequate or not.  So there's a reason

18   for them to have pled it.  Granted, if they can't get specific

19   performance generally, then they're not going to win on that

20   complaint either, but that wasn't.  So on that basis, you know,

21   it's not going to give the debtor any additional rights, but I

22   don't think it should be dismissed.

23             MR. SHORE:  Except to the extent, and I don't mean

24   to belabor the point, if for example under the common law they

25   have to show it was feasible and if Mr. Kirschbaum could

63

1  convince you --

2              THE COURT:  I agree.

3              MR. SHORE:  -- that you can't compel it, that 1142

4  won't say it doesn't matter if you don't have the money, I'm

5  going to order you to perform and if you don't perform you're

6  going to be held in contempt.  That's the issue that I think

7  1142, there are going to be some circumstances under which 1142

8  has to go out of this complaint.

9              THE COURT:  When you say you don't have the money,

10  are you referring to the debtors not having the financing?

11             MR. SHORE:  Or if you find that the commitment

12  letters, which are limited to money damages only, put everybody

13  in the position that you can't close the deal and then we're

14  just talking about -- I mean if --

15             THE COURT:  No, I understand what you mean.

16  That's fine.  I agree with that.

17             MR. SHORE:  Equitable subordination are the same

18  issue.  I mean the aspects of equitable subordination which

19  we're seeking to dismiss with respect to the Court is this

20  notion that if the Court finds that there's no breach of

21  contract and if the Court finds that there was no fraud, then

22  you can still have equitable subordination.  That's where I

23  think the case law is pretty clear that equitable subordination

24  is not going to be used to resurrect claims which have been

25  dismissed under valid legal theories.

64

1          The point being is that if ultimately we find out

2   on a motion to dismiss that there's no specific performance

3   claim and that they haven't pleaded fraud, equitable

4   subordination can't be let back in as the opening of the door

5   to, you know, just a general equitable analysis of the parties'

6   behavior.  We didn't act fraudulently, we didn't breach a

7   contract.  You can't sue for equitable subordination.

8          THE COURT:  Don't those cases say that if you

9   acted in -- all they're saying is that if you acted within your

10  rights under your contract you won't be equitably subordinated.

11         MR. SHORE:  Right.

12         THE COURT:  They're not saying if you otherwise

13  engaged in bad behavior, nevertheless you won't be equitably

14  subordinated.

15         MR. SHORE:  As I said, I think that the aspects of

16  this complaint that were obviously troubling Your Honor about

17  the allegations of what we were doing, to the extent that we're

18  permitted to do that under the contract, I'm not even going to

19  argue that, but to the extent that what we're talking about

20  with equitable subordination is that we had some duty to close

21  that was independent of the contract and we didn't fulfill it,

22  you can't equitably subordinate the claim on some notion that -

23  - and it just comes back to what --

24         THE COURT:  No, I understand.  I understand that

25  point.

1              MR. SHORE:  It comes back to what Your Honor said

2    at the 1142 hearing.  Look, we have a right to act under the

3    contract, we have a right to act under the contract.  This

4    isn't going to turn into some general equitable analysis of

5    whether we're nice people or not.

6              THE COURT:  Okay.  I understand.

7              MR. SHORE:  So I mean with that I'll turn over to

8    the others but, you know, with adopting their arguments.

9              THE COURT:  Okay.

10             MR. SHORE:  Thank you.

11             THE COURT:  That's fine.

12             MR. FALCONE:  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MR. FALCONE:  Marc Falcone from Paul, Weiss,

15   Rifkind for defendant Merrill Lynch.

16             Your Honor, I had planned to start my presentation

17   with the case you mentioned, Kalisch-Jarcho [Ph.] but in the

18   last exchange between you and Mr. Shore one point came up that

19   I would just like to address.

20             In thinking about 1142 and its relationship to the

21   common law and the contract, I do think it has to be noted that

22   the contract expressly incorporates in the common law of the

23   State of New York.  What the parties agreed to was in Paragraph

24   16, a contract governed by the internal laws of the State of

25   New York.  In a footnote in their brief Delphi concedes that it

66

1  is not taking the position that 1142 can create any rights that

2  are inconsistent with the rights under the contract.

3            So I would submit for Your Honor's consideration

4  that in order to displace the common law in this case you would

5  have to override Paragraph 16 of the EPCA.

6            Let me talk about Kalisch-Jarcho.  I may actually

7  talk about three cases from the New York Court of Appeals which

8  I believe have to be thought of in succession.  Kalish Jarco

9  was the earliest.  Kalisch-Jarcho was not actually a case that

10  was about the enforceability of a liability limitation.

11  Kalisch-Jarcho was a case that was actually about the

12  interpretation of a liability limitation and what jury

13  instruction the defendant was entitled to based on the

14  appropriate interpretation of that provision in the contract.

15            The Court in Kalisch-Jarcho had given -- the trial

16  Court had given the jury an instruction instructing it that it

17  could find for the plaintiff if it found that the defendant,

18  who was the City of New York, had interfered in the contract.

19  The city on appeal took the position that the provision in the

20  contract entitled the city to an instruction that in fact there

21  could be no finding for the plaintiff absent a showing of bad

22  faith or I believe it was intentional misconduct.

23            The Court reviewed to a limited extent the public

24  policy exception to the enforceability of liability limitations

25  in order to help it interpret the clause but then said

1  something very interesting in its holding.  What the Court

2  concluded is that, and this is a quote, that the city was

3  entitled, quote, "at the very least to the instruction that it

4  was advocating for from the Court."

5          So the only thing at issue before the Court of

6  Appeals in Kalisch-Jarcho was whether the jury instruction that

7  the city was in question was consistent with the public policy

8  exception, meaning below the line, and a proper interpretation

9  of the provision.

10         The next case from the Court of Appeals on this

11  issue is the Sommer case.  In the Sommer case the Court started

12  out with its discussion about the sometimes murky distinction

13  between contract and tort claims.  But the Court didn't give up

14  on that issue.  In fact, in Sommer, the Court proceeded from

15  that observation to identify a number of principles that are

16  applied under New York law to distinguish contract from tort

17  and concluded in that section of the opinion that indeed the

18  plaintiff in that case could state a tort claim for gross

19  negligence.  The defendant in that case had argued that the

20  duty to take care was incorporated in the contract and so a

21  tort claim could not be alleged because of the overlap.

22         The Court rejected that position and said yes, you

23  can state a separate tort claim.  You can state a claim for a

24  breach of a duty other than your duty under the contract, a

25  tort claim for gross negligence.  Only then did the Court

68

1  proceed with its analysis of the public policy exception.

2           The next case is Metropolitan Life, and in

3  Metropolitan Life, as we detailed in our reply brief to the

4  Court, the whole opinion in Metropolitan Life is focused.  We

5  now gravitated from Kalisch=Jarcho, which admittedly has some

6  vague language in it, to Metropolitan Life where the Court

7  starts its analysis distinguishing contract law from tort law,

8  distinguishing the role of intent in contract and tort law.

9           THE COURT:  But again, that's a case in which the

10  Court is interpreting contract language.  It's only discussing

11  the bad conduct exception in the context of helping it construe

12  the contract.

13           MR. FALCONE:  I agree, Your Honor.  However, I do

14  think that the difference between Kalisch-Jarcho is that the

15  analysis of that public policy exception in Metropolitan Life

16  is much more specific and much more complete.  I do think that

17  although I agree with Your Honor that the main issue before the

18  Court was one of contract interpretation, I do think the Court

19  of Appeals was taking pains to draw that distinction and here's

20  why.  The Court in Met Life, as, frankly, the Court in Bank of

21  America which is the First Department decision that Delphi

22  principally relies on, the Courts in both those cases were very

23  aware that an intentional, deliberate, planned breach of

24  contract is just a breach of contract, that even if you sign a

25  contract not intending to perform it with nothing more, that's

69

1    just a breach of contract.

2            So the Court needed to make a distinction that

3    could make sense of the law between well, what do we mean by

4    willful misconduct in a world where we say intentional breach

5    is just a breach?  In order to reconcile, in order to give

6    meaning to willful misconduct that was consistent with the

7    principle that an intentional breach is just a breach, the

8    Court drew the line between contract and tort.  It cited

9    Professor Corbin's treatise.  It noted that the only exceptions

10   recognized by Professor Corbin were contracts of adhesion,

11   which we know that we don't have here because of the

12   allegations of how heavily negotiated the EPCA was, and tort.

13           Then it looked back to its precedence in Kalisch-

14   Jarcho and Sommer and it cited them in a footnote in a piece

15   with quotations from the Restatement and Corbin that talk only

16   about exceptions for tortious conduct.

17           So I think it's important, Your Honor, to

18   understand Bank of America in that context.  Bank of America,

19   as we pointed out in our brief, was a case in which the

20   plaintiff alleged a scheme of extortion.  The plaintiff alleged

21   in that case that the defendant over a long period of time was

22   repeatedly over and over and over failing to perform its

23   obligations under the contract in order to create a situation

24   of economic duress in order to extract a payment from the

25   plaintiff that the Court said it could see absolutely no

1   colorable basis for in the agreement.  In fact, the express

2   provisions of the agreement in the Bank of America case

3   contradicted what the defendant was doing.  The agreement said

4   you get costs and you get this much, and the defendant came

5   back with a demand for a fee based on a percentage of the

6   transaction that not only had no basis in the contract but

7   clearly contradicted the provision.

8           The Court in that case simply said looking at

9   these facts I can infer that this was not just a breach of

10   contract, that this was a scheme to coerce a non-contractual

11   benefit, a non-contractual demand by imposing economic duress.

12           Federal Court in this district I believe has

13   recognized this principle in the DynCorp case, in the -- is it

14   N2D2?  I always forget what that stands for.  They have

15   recognized this principle and that when we think about this

16   public policy exception and that when we think about what the

17   Courts mean by willful, which is a separate issue from what the

18   contracting parties may mean by willful, but when we talk about

19   what the Courts mean by willful, we have to keep in mind that

20   principle, that intentional breaches are just breaches.

21           THE COURT:  Well, I don't agree with you there.

22   "Willful" is a separate issue.  We're talking about the public

23   policy exception to a breach damages limitation.  I don't think

24   that what "willful" means in various contracts has much to do

25   with that.

71

1          MR. FALCONE:  No, I'm sorry, that was exactly the

2    point I was trying to make, Your Honor, that the meaning of the

3    word "willful" in those cases about the public policy exception

4    is a separate issue --

5          THE COURT:  Okay.

6          MR. FALCONE:  -- from what contracting parties may

7    mean.

8          Now, it is possible in theory that parties chose

9    the word willful because they were looking at those cases, but

10   that would be a question of fact and that doesn't really have

11   anything to do with it.

12         So Your Honor, there is no allegation in this

13   contract of any tortious conduct against any defendant other

14   than Appaloosa.  There's no allegation against Merrill.

15         THE COURT:  Well, it's fairly vaguely stated but

16   they do say "with other investors" in a couple of places.

17         MR. FALCONE:  Well, I think, Your Honor, if that

18   is intended to be an allegation against Merrill then we're

19   entitled to know because --

20         THE COURT:  I agree with that.

21         MR. FALCONE:  I actually don't think -- I think

22   the complaint is sneaky in that way and if that's what they

23   want --

24         THE COURT:  Well, I wouldn't characterize it as

25   sneaky, but I think you are entitled to have more information.

72

1              MR. FALCONE:  If that's what they want to plead, I

2      think they should be required to plead it and we'll see if they

3      can.

4              THE COURT:  Okay.

5              MR. FALCONE:  But there is no allegation against

6      any of the other defendants that would trigger the public

7      policy exception to the enforceability of 11(b).  That's the

8      main point I wanted to make.

9              For the same reason, Your Honor, on equitable

10     subordination there is no inequitable conduct alleged against

11     Merrill or any of the investors other than Appaloosa.  There's

12     absolutely no factual basis for that claim in the complaint.

13             MR. FALCONE:  As for adequacy, as for the adequacy

14     of the plaintiff's remedy of money, Your Honor, Delphi has

15     argued that it is a unique asset and it has used that argument

16     to invoke this regime of specific performance which primarily

17     applies, not exclusively, in real estate which is truly a

18     unique asset.

19             But I would submit to Your Honor that the question

20     here is not whether the company is a unique asset.  The

21     question here is whether the money that they were going to get

22     is a unique asset.

23             The cases they cite from the New York Court of

24     Appeals like Butler and Ronnel [Ph.] are cases in which a

25     plaintiff was trying to compel the sale of stock to the

73

1   plaintiff.  The plaintiff wanted the stock and the Court said

2   the stock is a unique asset, and moreover, the Court made very

3   clear in those cases that stock for which there was a market,

4   stock that is going to be publicly traded is not a unique

5   asset.

6          You could only get specific performance of stock -

7   - even if the tables were reversed and the claim here was for

8   specific performance for the sale of stock, this stock probably

9   wouldn't even qualify under New York law as a unique asset.

10  The cases are about stock in closely held corporations for

11  which there is no market and there's no way to put a value on

12  that stock.  But my understanding, Your Honor, is that this is

13  going to be publicly traded stock.

14          THE COURT:  I guess I'm focusing on something a

15  little different, which is that this transaction, and I will

16  focus on the transactions, as opposed to on Delphi, although

17  I'll note Justice Friedman's's [Ph.] opinion cited in the

18  debtor's papers.  But focusing on this transaction, it does

19  seem to me to be unique.

20          First, it wasn't just the payment of money.  It

21  was to be a plan sponsor which included the best efforts

22  obligation in connection with fulfilling the entire plan.  It

23  involved being able to designate the new, not all of them, but

24  new board members.  It was integrated in a minutely negotiated

25  plan that provided for specific distributions to all of

74

1    Delphi's creditors and interest holders that were premised upon

2    this particular investment, including a rights offering.

3            They allege that no one else will step into that

4    gap that the investors were fulfilling.  To me, that seems to

5    be something that would certainly survive a motion to dismiss.

6    It's not just a normal commercial transaction where someone was

7    just paying money.  It's in the context of a plan that

8    distributes out stock and rights, as well as cash, but mostly

9    stock and rights.  To say that you could just satisfy that with

10   a damages claim seems to me to be a real stretch.

11           MR. FALCONE:  Well, Your Honor, the background

12   principle in a contract breach is that a defendant has a duty

13   to cover if possible and to mitigate if possible.  Delphi has

14   alleged that it cannot replicate this particular deal but

15   Delphi has not alleged that it can't emerge from bankruptcy

16   under a modified plan.  On the contrary.  Delphi has indicated

17   that if it doesn't get specific performance in this case its

18   damages will include the costs and --

19           THE COURT:  But how would you ever quantify what

20   the difference was in terms of the rights offered up to the

21   stockholders -- existing stockholders -- and the creditors

22   under this plan from some future plan?  I mean it's much harder

23   to me than quantifying what the damages would be for failure to

24   close on an office building.  Judges value office buildings

25   every day and notwithstanding that the courts say that it's a

1    unique asset.  Well, to value the difference between -- how

2    many classes were in Delphi's -- were in this plan?  Many

3    classes, and each of their recoveries versus what -- however

4    many recoveries are into some future plan seems to me to be

5    very, very difficult doing.  That's why you have distressed

6    investors looking at their trades every day.  They're betting

7    on that and there's such big spreads in it because it's so hard

8    to do, much harder than valuing an office building.

9              MR. FALCONE: Well, I think, Your Honor that under

10   the EPCA the defendant's contractual liability was to Delphi

11   and the question I believe the focus of the damages inquiry

12   would be what was the damage to Delphi, what has it cost Delphi

13   to not have this transaction but to have another transaction.

14             THE COURT: Right.  It doesn't have this plan.

15             MR. FALCONE: But those kinds of issues, Your

16   Honor, are quite common in front of the courts.  Every time

17   there's a claim in a court that somebody acquired a company and

18   over leveraged it and paid too much and breached their

19   fiduciary duties the court has to make a finding as to what the

20   value of the company was and how it compared to what was paid

21   for the company and whether -- and there was a breach of --

22   those kinds of cases are legion to my dismay but they are.

23   I've litigated those cases and I'm sure they've been litigated

24   in this courtroom.  Determining the value of an enterprise,

25   determining the economic harm that an enterprise has suffered

1   as a result of a transfer of cash or not receiving a transfer

2   of cash, that is not an unusual issue for a court to address.

3              So I would submit, Your Honor, that Delphi should

4   not be relieved of its duty to mitigate.  It should not be

5   relieved of its duty to cover.  It has not alleged that it

6   can't cover.  It has alleged expressly in its complaint that if

7   it doesn't get specific performance it will have to emerge

8   under a modified plan and it has specifically identified

9   economic costs associated with doing that and those costs are

10  compensable through a damages remedy and whatever harm has been

11  done to Delphi as a result of not seeing this cash doesn't --

12  it really genuinely seems to me does not present an

13  extraordinary issue for courts in this day.

14             THE COURT: I don't understand the connection on

15  your point about covering.  Even someone who's entitled to a

16  specific performance will try to mitigate damages.  They'll try

17  to cover but that doesn't mean that that specific performance

18  wouldn't lie.

19             MR. FALCONE: The cases on which Delphi relies in

20  which specific performance is awarded are cases in which the

21  court concluded that attempts to cover would be futile.

22             THE COURT: But --

23             MR. FALCONE: The courts expressly address that

24  relationship that the damages --

25             THE COURT: You can always buy another building.

77

1   It's not the same building but you can always buy another

2   building or sell another -- sell your building to someone else.

3   I just --

4           MR. FALCONE: No, Your Honor.  These are cases that

5   are cited where if the defendant is developing a shopping mall

6   doesn't get a loan another lender is going to foreclose.  There

7   are cases in which the plaintiff has pleaded I have negotiated

8   with five separate lenders and nobody will lend her the money

9   and the business is going to go under.  There are cases in

10  which the court is looking at the situation and saying this

11  shopping mall is a financial failure and cannot -- and nobody

12  will lend it money and it's going to fold.  There's been no

13  similar allegation like that by Delphi.  All they've said is we

14  may have to do another deal in lieu of this one and that's just

15  cover.

16          THE COURT: You're saying that it's all or nothing?

17          MR. FALCONE: I'm not sure I understand the

18  question.

19          THE COURT: You're saying that specific performance

20  won't lie unless the plaintiff will disappear?

21          MR. FALCONE: I'm saying specific performance won't

22  lie as long as there is another deal that can be done that will

23  get in this case -- in this case the issue is not buying a

24  house.  In this case the issue is getting the debtor out of

25  bankruptcy.  That's the objective and as long as there is

1  another plan that can be done, another deal that can be done

2  that will get the debtor out of bankruptcy and into full

3  operations then the debtor should be required to pursue that

4  deal and unless the debtor can say there can never be such a

5  deal and we're going to have to liquidate then they should make

6  the deal, they should cover, and then we can talk about a

7  contract measure of damages.

8           THE COURT: I haven't even gotten to Justice

9  Friedman's case.  What do you have to say on that one?

10          MR. FALCONE: I'm sorry.  Which is Justice

11  Friedman's case, Your Honor?

12          THE COURT: Well, it's the Clear Channel case but

13  it's the --

14          MR. FALCONE: Oh, the Clear Channel case.  But

15  there, Your Honor, the plaintiff was trying to buy a unique

16  asset and the plaintiff sought an order.  This is the same in

17  the stock cases and it's actually the same in the real estate

18  cases.  It's the reverse of this case.  In those cases you have

19  a plaintiff who wants to acquire a unique asset and the --

20          THE COURT: How unique is Clear Channel?  I mean

21  there are other companies somewhat like Clear Channel, just as

22  much as somewhat like this plan as some other plan that Delphi

23  would do down the road.  Why couldn't the plaintiff go out and

24  buy some other business that's like Clear Channel?

25          MR. FALCONE: But the premise of the decision in

79

1    Clear Channel, Your Honor, is that the court concluded that

2    Clear Channel was a unique asset just as Delphi is claiming

3    that it is a unique asset.  Delphi has now said in its pleading

4    the reorganized Delphi is a unique asset.  There are other

5    auto-parts companies.

6                THE COURT: Well, but that didn't -- I guess you're

7    just disagreeing with the logic of her opinion then.

8                MR. FALCONE: With the logic of?

9                THE COURT: Of that opinion then.

10               MR. FALCONE: No.  I think given what the court --

11   given the court's conclusion in that opinion that Clear Channel

12   is a unique asset, that the financing that the plaintiff

13   required the financing to acquire that unique asset.  It's

14   actually very similar, Your Honor, to I think it was the

15   Bergmann case where the court enforced the loan because the

16   loan was part of a contract of sale for real estate and the

17   court said this is really a transaction about acquiring a

18   unique asset, about acquiring a piece of real estate.  In my

19   mind, Your Honor, that is of apiece with Clear Channel but the

20   case -- but the order, the specific performance has to be an

21   order compelling somebody to sell that unique asset to you.

22   Money is not a unique asset and that's all that Delphi seeks

23   here.  Delphi is not seeking to acquire its -- Delphi has not

24   alleged that the money was being lent specifically for the

25   purpose of it to go out and buy a piece of property or a race

80

1    horse or a unique company.   There's no connection to any unique

2    asset from Delphi's point of view here.   It's just cash.

3                    THE COURT: Well, I guess what you're saying there

4    is that the difference is that one is a purchase and the other

5    is a sale?

6                    MR. FALCONE: I believe that's one difference, Your

7    Honor, yes.

8                    THE COURT: But --

9                    MR. FALCONE: And the --

10                   THE COURT: Even though you may not be able to

11   purchase -- you may not be able to persuade someone to have you

12   buy -- just to sell you the exact equivalent of Clear Channel.

13   There's always a seller out there somewhere that you can buy

14   something close to Clear Channel; right?

15                   MR. FALCONE: But, Your Honor, I think if the court

16   in Clear Channel had accepted that view it couldn't have ruled

17   the way it did.

18                   THE COURT: Well, but it's --

19                   MR. FALCONE: If we're going to take Clear Channel

20   as authority I think we have to accept the premises of the

21   decision.

22                   THE COURT: But then why isn't it the same

23   allegation as far as a motion to dismiss applicable here?   Why

24   isn't Delphi in the context of the plan that was negotiated

25   with all of its moveable parts aligned on April 4th as unique as

81

1   by analogy Clear Channel is.

2          MR. FALCONE: Delphi may be unique but Delphi isn't

3   seeking --

4          THE COURT: No, no.  I'm saying the plan was as

5   unique if not more so because it required all of the moving

6   parts to get in place, which they detail at length in the

7   complaint.

8          MR. FALCONE: But the cases talk about the subject

9   matter of the contract that somebody is trying to acquire.

10         THE COURT: The contract in theory incorporates the

11  whole magilla.  It has the whole deal in it.

12         MR. FALCONE: Even so, Your Honor, it's still cash.

13  The provision in the contract that entitles any group of the

14  investors to appoint a board director, that's a benefit for the

15  investors because they're buying so much stock in this company.

16         THE COURT: You think so?

17         MR. FALCONE: I --

18         THE COURT: Sponsors don't have any real -- well, I

19  guess we've learned that; right?  Most people when they make a

20  deal, they have a sponsor for their plan and assume that the

21  sponsor is going to do something good for the company.  It's

22  not a one-way street.  We've learned our lesson here.

23         MR. FALCONE: I would submit, Your Honor, that most

24  investors get directors on the boards because they bargain for

25  that.

82

1            THE COURT: And most debtors agree to it because

2    they want to have someone nominated by Merrill Lynch on the

3    board because that looks good to their investors too.

4            MR. FALCONE: I accept that, Your Honor, but --

5            THE COURT: And they bargain to have, as I said

6    repeatedly at the hearings, the biggest investment banks in the

7    country in the deal as a measure of confidence in the deal,

8    particularly when they're covenanting to use their best efforts

9    to make the entire transaction happen, all of the transaction,

10   including, one would have thought, helping to facilitate the

11   financing instead of trash talking it, which is alleged here as

12   far as Appaloosa is concerned.  But maybe that's neither here

13   nor there but I do believe that this on its face, since it

14   gives the investors the right to review every scrap of paper

15   with regard to the plan, the rights offering, you name it, and

16   to provide their input on it, that this is very clearly more

17   than just an acquisition of some stock.  This is an entire

18   transaction premised upon an emergence from bankruptcy.  As Mr.

19   Tepper characterized it in his testimony, they want to get

20   Delphi out of bankruptcy.

21           MR. FALCONE: And Delphi, I think everybody in this

22   room believes, can still get out of bankruptcy and if it has

23   suffered damages as a result of having to do another deal

24   rather than this deal then those damages should be measured,

25   but the complexity of measuring them, Your Honor, I would

83

1   submit frankly is limited by the damages cap.

2           THE COURT: I don't see how that would be any

3   more -- any less complex than measuring the damages of not

4   being able to buy Clear Channel.  Sure, judges can make their

5   best shot at those sorts of things and we do sometimes, but to

6   me that doesn't rule out specific performance.

7           MR. FALCONE: I guess all I'm suggesting, Your

8   Honor, is that given the existence of the damages cap we know

9   what the range is going to be between the top number and the

10  bottom number and that was not the case in Clear Channel and

11  that frankly was not the case in any of the other cases that

12  have been cited here.

13          THE COURT: Well, that was a nice switch of topics.

14          MR. FALCONE: Unless you have any more questions,

15  Your Honor, I'm done.

16          THE COURT: Thank you.

17          MR. FALCONE: Thank you.

18              [Pause in proceedings.]

19          MR. ROSENTHAL: Good afternoon now, Your Honor.

20  Jeff Rosenthal, Cleary Gottlieb on behalf of UBS.

21          The one issue that I'd like to address today is

22  that the record cognizable before this Court already

23  establishes grounds for the breach of contract claim and the

24  specific question that I'm looking to address is did Delphi

25  violate the EPCA [2:14:25] condition through any "Alternate

84

1   Transaction Agreement."  Well, the defined term uses the word

2   "agreement," Your Honor.  The actual definition in the EPCA is

3   much broader and it includes as the Court knows the word

4   "proposal."  The defined term, Your Honor, is in Section

5   9(a)(5) of the EPCA and it says "the company shall not have,"

6   and then it says "taken any action to seek any bankruptcy court

7   approval relating to any Alternate Transaction."  For the

8   purposes of this agreement, an alternate transaction means any

9   plan, proposal, offer or transaction that is inconsistent with

10  this agreement, the preferred term sheet, the GM settlement or

11  the plan other than a Chapter 7.

12          So there are really three elements, Your Honor,

13  that need to be satisfied for the alternate transaction

14  definition, all of which we submit are part of the

15  incontrovertible record.  One is a proposal; two is that it's

16  inconsistent with the EPCA; and three is that it's for which

17  Delphi sought any approval of this Court.  If all three of

18  those elements are satisfied, then by definition there's an

19  Alternate Transaction and then ADAH had a right of termination

20  and this specific performance remedy really becomes a moot

21  issue.  I'd like to spend a moment focusing on these three

22  individual elements.

23          With regard to a proposal, Your Honor, we believe

24  there's no dispute here.  Delphi delivered back in February of

25  2008 to the plan investors a "summary of revised terms to

85

1    provide for enhanced participation by GM in Delphi's existing

2    financing."  That's at Exhibit 9 to the Cohen declaration filed

3    by ADAH.  Then when Delphi, Your Honor, presented it to this

4    Court in its 1142 motion even they defined it as the proposal.

5    That's at Paragraph 26.

6               THE COURT: Have you read the transcript of that

7    hearing?

8               MR. ROSENTHAL: Not only that, Your Honor, I was at

9    that hearing.

10              THE COURT: Okay.  You know what I ruled at that

11   hearing.

12              MR. ROSENTHAL: Yes, Your Honor.  I was going to

13   get to that element in a moment, Your Honor, and just take

14   these elements one by one.  I'm happy to jump ahead to the

15   other two elements.

16              THE COURT: Okay.

17              MR. ROSENTHAL: So as to simply the question of

18   whether there was a "proposal," there was a proposal that was

19   both presented to the plan investors and defined as a proposal

20   in Delphi's 1142 motion.

21              The next question, Your Honor, is was it

22   inconsistent with the outcome.  Section 5(p)(ii) of the EPCA,

23   whether the Court ruled on it back in March or not, it's

24   something that based on incontrovertible facts before this

25   Court it's capable of disposition right now.  In Section

86

1  5(p)(ii) of the EPCA it says, among other things, "the company

2  shall not enter into any other agreement with GM that is

3  outside the ordinary course of business."  As the Court knows

4  and the parties do have a debate as to the degree to which the

5  Court ruled and I'm not going to tell Your Honor what you meant

6  by it, but on Page 127 the Court said "It also appears to me

7  that the incurrence of up to almost $2 billion of additional

8  notes, more than $750 million originally contemplated to GM

9  would be outside the ordinary course of the debtor's business

10  which is precluded by Paragraph 5(p)(ii) of the EPCA.

11          But even had the Court not made any statement at

12  all on that issue, we have before the Court in the record what

13  that proposal was and we have the unambiguous terms of the EPCA

14  and therefore on a motion to dismiss this Court can render a

15  definitive conclusion now without requiring millions of dollars

16  of discovery for the case to go on to decide whether that

17  proposal was consistent or inconsistent with the EPCA.

18          We finally have then, Your Honor, to the extent

19  that there's a proposal that on its face is inconsistent with

20  the EPCA the only other question is did the debtors seek any

21  approval of this Court of that proposal.  Delphi says in its

22  opposition that it just sought guidance from the Court,

23  whatever that may purport to be.  But that guidance involved to

24  use Delphi's own words in the 1142 motion and in oral argument

25  "determining that the debtor's proposed exit financing is

87

1   compliant with the plan inclusive of the EPCA" finding that the

2   terms of the debtor's proposed exit financing comply with the

3   plan in the EPCA.  To the extent that there's any doubt, Your

4   Honor, we could look at the proposed order that was filed by

5   Delphi in connection with the 1142 motion that they asked the

6   Court to sign.  In fact, that very much tracks some of the

7   language in the EPCA.  They asked you to conclude that the

8   terms -- to make a ruling the terms of the debtor's proposed

9   exit -- the proposed exit financing comply with the plan in the

10  EPCA.  That, Your Honor, is as we put in our brief the very

11  definition of approval which includes favorable opinion,

12  confirm, to have or express a favorable opinion of, to confirm

13  authoritatively, and at Page 5 of UBS' reply brief we cite

14  three leading dictionaries which all have those definitions,

15  Oxford, Black's and Webster's, and I would note that to insure

16  that it's broadly construed the parties in the alternate

17  transaction definition of the EPCA used the phrase any

18  approval.

19          So not only did Delphi, Your Honor, seek approval

20  of the proposal that was inconsistent with the EPCA, but they

21  affirmatively -- and this is in the next paragraph, Paragraph 3

22  of the proposed order, they sought to direct the plan

23  investors, for the Court to enter into an order directing the

24  plan investors to use their reasonable best efforts to support

25  the confirmation of that exit financing.

1          Your Honor, the debtors knew what the restrictions

2   of the EPCA were and while there's nothing wrong with them

3   taking simply a proposal or even a proposal that's inconsistent

4   with the EPCA given that there's three elements needed and

5   trying to persuade the plan investors we need to do this, will

6   you consider it, and trying to do it through negotiation and

7   then pursuing an alternate avenue if the plan investors reject

8   that, they knew and they made an informed decision that if they

9   sought that third element which was to seek a favorable opinion

10  of this Court with regard to that proposal, that the risk that

11  they ran was that if that proposal was inconsistent with the

12  EPCA --

13          THE COURT: Even if they reasonably believed, as I

14  believe was the case, the plan investors were in breach?

15          MR. ROSENTHAL:  Yes, Your Honor.  In fact --

16          THE COURT: Yes?  You don't think the plan

17  investors had any obligation, that they had bound them to that

18  obligation?

19          MR. ROSENTHAL: I think even if they reasonably

20  believed that that was compliant, Your Honor, the -- I have

21  really two responses.  One is that's not the language that's

22  used in Section 9(a)(5) but the other thing is you had an

23  interesting colloquy back on March 7th with Mr. Lauria in which

24  Mr. Lauria proposed the question in reverse to you.  He said to

25  the Court "Would we, the plan investors, be in violation" --

89

1   I'm reading from Pages 101 to 102 of the transcript, Your

2   Honor.

3           He said to you "Would we, the plan investors, be

4   in violation if we reasonably believed that this was not

5   compliant and yet we opposed it until we received a ruling from

6   the Court."  The Court instructed Mr. Lauria that essentially

7   well, if the contract is unambiguous, that it was consistent

8   with the EPCA well, then you've answered your own question.  I

9   think the same thing holds true here.  If the contract is

10  unambiguous, the GM proposal, and it is unambiguous, it cannot

11  submit to the Court for approval --

12          THE COURT: I didn't find that.  I said there

13  needed to be evidence on the issue.

14          MR. ROSENTHAL: Your Honor, I'm reading on Page

15  102. I'm looking at Line 5.  "If you're in breach of the clear

16  terms of the document then it seems to me that issue is

17  answered."  If you --

18          THE COURT: Yes, it seems to me but I go on to say

19  it isn't.

20          MR. ROSENTHAL: I agree, Your Honor, but the

21  question there was are you in violation of the reasonable best

22  efforts clause.  So it's possible after a factual inquiry that

23  you would find that the debtors have violated the reasonable

24  best efforts clause.  But is there a violation of 9(a)(5), the

25  alternate transaction clause because of a subjective belief

90

1   that was wrong?   There's no language in 9(a)(5) that creates an

2   exception.

3           THE COURT: This argument, unlike -- despite some

4   of my -- the response to the other arguments -- really turns my

5   head.   Let's leave aside for a second that everyone who

6   practices bankruptcy law knows what "alternative transaction"

7   means and that no bankruptcy judge, this one included, would

8   authorize a breakup fee of $82.5 million unless the debtor was

9   proposing something that involved what we all know to be an

10  alternative transaction.   As I said repeatedly at the hearing,

11  which you attended, that's not what the debtors were doing.

12  What the debtors were doing was seeking a determination that

13  the plan investors are in breach.

14          MR. ROSENTHAL:   But by not supporting the proposal

15  that was inconsistent with the EPCA.

16          THE COURT:   Right.   And, you know what, there was

17  a very good argument that they were in breach.

18          MR. ROSENTHAL:   Your Honor --

19          THE COURT:   And in fact, I told the debtors that

20  if they did a little tweak and the plan investors,

21  nevertheless, continued to take the position they were taking -

22  - and that's even before what's alleged in this complaint --

23  the plan investors would be in breach.   It seemed to me -- and

24  I said this -- the debtors were acting reasonably and properly

25  in seeking that relief rather than playing along with the

91

1   investors' "Got ya" game over holding them to what you're

2   suggesting.  You know, it just doesn't make any sense.

3            MR. ROSENTHAL:  Your Honor, if I could explain the

4   logic behind this --

5            THE COURT:  It's beautifully logical.  Just

6   beautifully logical.  It just doesn't make any sense.

7            MR. ROSENTHAL:  Your Honor, it was important --

8   there was a four month period or three month period in fact

9   from December 2007 until the original termination date of March

10  31, 2008 to get this deal done.  Therefore, it was critical to

11  all the parties to focus their efforts on this deal and get it

12  done for six weeks.

13           THE COURT:  You know what, that was at issue and

14  in fact what the debtors were proposing was the same dollar

15  amount but less cash coming out of the company.  So it would

16  seem to me but for the drafting of their document, which did

17  put in GM, they were acting totally appropriately and the only

18  issue was, consistent with the parties' obligations expressly

19  in the contract to deal with each other with their best efforts

20  and their unwritten obligations to deal with each other in good

21  faith and fair dealing, whether Delphi could win in terms of

22  the papers on that point.  Now, I said, no, there had to be an

23  evidentiary hearing and your colleagues all showed up and said

24  that you can't do this on this basis you need evidence.  So I

25  said fine.  Meanwhile, you all should understand that I won't

92

1   need evidence if in fact it's done by a GM subsidiary.  Period.

2            How you could equate that into a breach and treat

3   it as an $82.5 million termination fee is beyond me and I

4   think, sir, it's beyond you.

5            MR. ROSENTHAL:  Your Honor, it's the words of the

6   contract, it's what the parties agreed to.

7            THE COURT:  Well, the words of the contract also

8   include a "best efforts obligation" and implicit in the

9   contract under New York law is good faith and fair dealing, and

10  what you and your colleagues were trying to do to this debtor

11  over this issue, it's pretty clear to me, was not consistent

12  with those obligations.

13           MR. ROSENTHAL:  Your Honor, we didn't brief the

14  issue but I'm confident there's a lot of New York law that when

15  you abide by the terms of the contract and you insist on strict

16  performance of the contract it's not a breach of good faith or

17  --

18           THE COURT:  You were doing more than that because

19  you were proposing that the debtor was in breach in what they

20  were proposing and you were holding them up even though it was

21  a clear issue as to whether in fact it wasn't the debtor that

22  was in breach but your clients.

23           MR. ROSENTHAL:  I don't have anything more to add

24  on the subject.  Thank you.

25           THE COURT:  I will note that I specifically held

93

1  "it is appropriate for the debtors to have requested such

2  relief which was to seek a ruling as to whether the plan

3  investors are properly honoring their agreement under Paragraph

4  6(d) of the EPCA."  Frankly, although it would require an

5  evidentiary hearing I have very serious doubts whether they

6  were.

7             MR. KIRSHBAUM:  Moving right along, Your Honor.

8  Myron Kirshbaum from Kaye, Scholer representing the two

9  Harbinger defendants; Harbinger Del-Auto and its parent

10  company, Harbinger Capital.

11             Your Honor, the issue I'd like to address briefly

12  -- the Harbinger/Pardus brief goes into it in quite a bit of

13  detail -- but I'd like to address the piercing of the corporate

14  veil and the issue of whether or not, assuming as I believe it

15  has been established that the committal letters themselves are

16  clear and do not permit specific performance by virtue of the

17  very specific limitation to monetary damages only, whether or

18  not Delphi's alternative theory, which is piercing the

19  corporate veil, works, and I'd like to argue basically two

20  points which were in the briefs but which, I believe, are

21  dispositive and under either of them we believe that the

22  piercing theory fails to state a claim here.

23             One is the Brunswick case, which if I'm not

24  mistaken the Delphi brief does not even cite in its response.

25  The Brunswick case in the Second Circuit --

94

1            THE COURT:  Let me cut you short.  I understand

2   your argument on that case and I accept it with one caveat, and

3   one of you -- I think Mr. Shore -- said he would show me

4   something on this -- I don't see in the record anything that I

5   could look to on the motion to dismiss basis to show that in

6   fact the Pardus and Harbinger investors as opposed to the

7   parent companies were actually -- you know, assetless and

8   unable to perform, etc.  I know they say they were "shells."

9   I'm not sure that's sufficient.

10           As I read Brunswick it applies in a situation

11  where the parties seeking to pierce the corporate veil knew

12  that they were dealing with the real party-in-interest as --

13  that in fact the relationship between the parent and sub was

14  clear to them -- and that makes sense to me -- but it's not

15  clear to me that in the record that's before me, which is,

16  again, on a motion to dismiss basis that that's not the case in

17  all cases.  You sometimes get parent funding agreements just as

18  a back-up or to do some of it, not all of it.

19           MR. KIRSHBAUM:  Your Honor, I think Delphi's

20  opposition actually takes care of that issue.  On Page 42 of

21  its opposition papers, Delphi states --

22           THE COURT:  Well, but that's -- okay, go ahead.

23           MR. KIRSHBAUM:  Well, it states that it knew that

24  the assets of ADAH, Harbinger Del-Auto and Pardus DPH Holding

25  were limited to the commitments of their respective parent

95

1  corporations and those commitments in turn are defined in

2  Paragraph Section 40 of the EPCA.  So they knew --

3              THE COURT:  Okay.  So the debtors should address

4  that point?  All right.

5              MR. KIRSHBAUM:  I guess they'll have to.

6              THE COURT:  Okay.

7              MR. KIRSHBAUM:  Your Honor, then if that's the

8  case I'll just move along.  I think the Brunswick point is

9  dispositive and establishes lack of piercing the corporate veil

10 and nothing else really needs to be said with Brunswick

11 applicable.  But in addition, we brief this at some length, New

12 York law now -- whatever it might have been in 1972 or at some

13 other point, New York law is now very clear that piercing the

14 corporate veil requires the satisfaction of two prongs; one is

15 domination by the parent company and the normal piercing kinds

16 of issues and the second thing is the use of the corporate form

17 or misuse of the corporate form to perpetrate a fraud or wrong

18 and with that additional clarity in New York law which has come

19 about, I would say, within the last ten years but it's now very

20 clear both at the federal and state level, it's clear here that

21 just the fact that there was a parent company and a sub and the

22 sub was dominated by the parent and breached the contract that

23 can't add up to what you need for piercing.  What you need for

24 piercing -- Judge Roker deals with it in the Ticket Planet case

25 and other cases -- is showing that the parent syphoned assets

1   out of the sub to make it impossible for the sub to perform,

2   moved money around and in fact engaged in a "shell game" as the

3   cases refer to it to take money from one place to another --

4           THE COURT:  Well, you need a fraud or wrong by the

5   parent --

6           MR. KIRSHBAUM:  Yes, you need a fraud or wrong.

7           THE COURT:  -- in its domination of the sub.

8           MR. KIRSHBAUM:  That's right and the fraud or

9   wrong is not just a breach of contract, Your Honor.

10          THE COURT:  I guess the issue I have there and

11  it's, frankly -- although the debtors can respond to this -- I

12  don't think it's an issue with Harbinger and Pardus as the

13  complaint currently lies but it is an issue, I think, with

14  Appaloosa, is that other aspects of the complaint, to me, do

15  allege that Appaloosa was doing stuff itself in the case on

16  behalf of the investor and, you know, you may be great friends

17  with Mr. Shore; I might ask you to carry his oar though on

18  this, but --

19          MR. KIRSHBAUM:  I would just point out that the

20  way I read these cases -- and the Ticket Planet case being one

21  -- it wouldn't be enough even for Appaloosa to have done the

22  things that are alleged and even if the conclusions of those

23  are frauds or wrongs it still wouldn't be enough because that

24  had nothing to do with the corporate structure here.

25          THE COURT:  Well, except it was the investor that

97

1   was supposed to be under the contract dealing with, for

2   example, the "additional investors" and to allege that

3   Appaloosa was doing that and that that was all under the

4   control of Mr. Tepper and they were all -- you know, they were

5   concerting this strategy, not little, undercapitalized ADAH.

6           MR. KIRSHBAUM:  I would suggest that wouldn't be a

7   piercing theory that would be a tort theory against Appaloosa

8   if it existed but at that time --

9           THE COURT:  Well, it would seem to me that it

10  would be truly inequitable to let Appaloosa off of the hook for

11  something like that -- and, again, this is just in a motion to

12  dismiss context -- on the theory that it had capped its

13  liability under the funding agreement and, of course, ADAH

14  wouldn't have anything to pay under this theory.  So in that

15  sense it would seem to me that you could satisfy the New York

16  requirements for veil piercing but, anyway, most of what you've

17  said is really for the debtors to respond to, I think.

18          MR. KIRSHBAUM:  Okay.  The final thing I'd just

19  like to point out is an equitable subrogation -- equitable

20  subordination -- again --

21          THE COURT:  It's really the same point; right?

22  There's no wrongdoing --

23          MR. KIRSHBAUM:  There's no wrongdoing --

24          THE COURT:  It's what Mr. Shore said.

25          MR. KIRSHBAUM:  That coupled with the fact that

98

1   under the -- the additional wrinkle is that the claims that

2   would be subordinated if there were going to be subordination

3   would be at the parent company level.  The parent company isn't

4   charged with doing a wrong but even if it were there's a

5   limitation of remedies in the letter agreement to monetary

6   damages only.

7              THE COURT:  Well, that's an interesting issue --

8   whether equitable subordination is a monetary damage or not.

9   You certainly don't get paid --

10             MR. KIRSHBAUM:  I would argue it's equitable, Your

11  Honor, and --

12             THE COURT:  Well, is that in the papers?  I didn't

13  see that issue.

14             MR. KIRSHBAUM:  Yes, it is.  It's in the Harbinger

15  part of --

16             THE COURT:  Is there a case that says that

17  equitable subordination doesn't -- no, there couldn't be.

18             MR. KIRSHBAUM:  I don't believe we cited a case

19  but I don't think it would be hard to find a case that says

20  that equitable subordination is an equitable remedy.

21             THE COURT:  Well, but that's different than

22  monetary damages.

23             MR. KIRSHBAUM:  Well, the commitment letter said

24  monetary damages only.

25             THE COURT:  Right.  You don't get money.

99

1          MR. KIRSHBAUM:  That's what I'm saying.

2          THE COURT:  If you're equitably subordinated you

3  wouldn't get money.

4          MR. KIRSHBAUM:  That's not monetary damages

5  though, that's an equitable subordination.

6          THE COURT:  All right.  Okay.

7          MR. KIRSHBAUM:  It is in the brief though, Your

8  Honor.

9          THE COURT:  All right.

10          MR. KIRSHBAUM:  Thank you.

11          THE COURT:  Okay.  The defendants are done subject

12  to rebuttal.  Is that correct?

13          MR. LACEY:  No, Your Honor.  Goldman Sachs would

14  like to say something.

15          THE COURT:  Okay.

16          MR. LACEY:  Your Honor, I don't know if you've

17  ever climbed a mountain or gone for a long hike, but there

18  comes a point when you do that and you can no longer hear the

19  noise from the highway and you've gotten out and it's quiet and

20  we've gotten to this stage of this argument.

21          I'm Rob Lacey from Sullivan & Cromwell.  I'm

22  speaking on behalf of Goldman Sachs which made the decision

23  back before the EPCA amendment was approved to stay out of the

24  fray, and it has been trying to stay out of the fray ever since

25  and Delphi recognizes that it has stayed out of the fray and

100

1  the other investors recognize that it has stayed out of the

2  fray and the result is that apart from the allegation that

3  Goldman Sachs was a party -- was an investor under the EPCA and

4  the allegation that it didn't fund, there are no allegations in

5  the complaint about Goldman Sachs.  Even the allegations that

6  are done on a sort of group basis concerning other investors

7  specifically exclude Goldman Sachs because they all relate to a

8  common interest agreement that Goldman Sachs didn't sign or

9  letters that were written on behalf of the other investors

10 which exclude Goldman Sachs because Goldman Sachs wasn't

11 talking to the other investors.

12        So, Section 12(a)(1) of the EPCA which is the one

13 that creates the obligation to buy shares says that the

14 obligation is assumed severally and not jointly.  This is an

15 agreement that creates a separate obligation by each of the

16 investors to buy shares, not a joint application.  Section

17 9(a)(xvii) says that each party's obligations are conditioned

18 on all the other parties' obligations -- all the other parties'

19 performance of their obligations.  We said in our opening brief

20 that you can tell from the complaint that either Delphi or ADAH

21 had breached their obligations prior to the time when the

22 closing was supposed to occur so Goldman Sachs had no

23 obligation to close and it didn't breach the agreement and

24 Delphi has not disagreed with any part of that analysis.  It is

25 agreed, Delphi does not dispute that Goldman Sachs' obligations

101

1   were conditioned on performance by everybody else, and it does

2   not dispute that as of early on the morning of April 4th

3   somebody else had breached the agreement.  So the opposition to

4   the Goldman Sachs' motion has only got two points in it which

5   raise matters which are not in the complaint, and that's really

6   all I need to talk about.

7           The first is it says, ah, but we assert that

8   Goldman Sachs acted in concert with the other defendants.

9   Well, there are two problems with that argument; the first is

10  that's not in the complaint.  They cite Paragraphs 44 and 45 of

11  the complaint  as their allegations of action in concert.  Your

12  Honor, I presume you have a copy of the complaint up there

13  somewhere?

14          THE COURT:  Yes.

15          MR. LACEY:  Well, if you turn to Paragraphs 44 and

16  45 you will see that these are descriptions of the investment

17  agreement; they don't say anything about Goldman Sachs, they

18  don't say anything about acting in concert.  In fact, all of

19  the allegations concerning behavior of the investors consists

20  of allegations about dealings between Appaloosa and the

21  "additional investors" -- Goldman Sachs is not an additional

22  investor, those additional investors are not parties to this

23  case -- and the back and forth which eventually led to the

24  Section 1142 motion in March.  Goldman Sachs was not part of

25  that and Delphi knows it's part of that because when -- Delphi

102

1   knows Goldman Sachs was not a part of that because when they

2   made the 1142 motion they said the term "investors" that's used

3   in this motion does not include Goldman Sachs when it describes

4   the conduct that made this motion necessary.  We have it

5   established that that conduct did not involve Goldman Sachs.

6   Then the complaint has no allegations of any conduct by anybody

7   between the 1142 hearing and April 4th.  So there is clearly --

8   the other thing they -- the second problem with the "in

9   concert" argument is, even if they did allege that, there is no

10  saying that someone has acted in concert with somebody who

11  breaches a contract doesn't state a claim for which relief can

12  be granted.  There is a theory called tortious interference

13  with contract where you can be held liable on account of

14  somebody else's breach, but for the reasons we've explained in

15  the brief they have not attempted to allege that and they can't

16  allege that because in New York you have to allege that the

17  conduct of the person who committed the tortious interference

18  caused the breach.  The other thing they say is that they've

19  asserted a claim against Goldman Sachs for failing to use

20  reasonable best efforts.  Again, they don't cite anything when

21  they say that, but as I've just described, all of the conduct

22  that is actually described prior to April 4th is conduct of

23  people other than Goldman Sachs, so they quite clearly have not

24  alleged any failure to exercise reasonable efforts by Goldman

25  Sachs, and as I say, when they came to court to compel

103

1   reasonable best efforts they let Goldman Sachs out because

2   Goldman Sachs hadn't done anything.  The other thing, of

3   course, is sort of a vague -- you can't just sort of wave

4   reasonable best efforts as a wand to sort of change the

5   contract.

6           Now, I started out by saying the contract creates

7   several and not joint obligations to invest and I hope I have

8   explained why Goldman Sachs doesn't think that it breached its

9   obligation to invest.  The contract does have another provision

10  in it that says that the investors assume joint and several

11  liability for one another's willful breach, and Goldman Sachs

12  is not trying to run away from that.  If you find that there is

13  a litigable issue concerning whether anybody willfully breached

14  the contract then Goldman Sachs has to stay in pursuant to that

15  commitment, but that commitment is limited to $39 million.

16  That commitment clearly would not support an award of specific

17  performance against Goldman Sachs and Delphi has never

18  suggested that it would.  So at that point we would be

19  continuing in our role of what they used to refer to as a

20  Nantucket sleigh ride where you managed to spear a whale and

21  get towed along and we will continue to be towed along, but the

22  loss at the end is going to be limited to $39 million and will

23  not include specific performance because there's no breach to

24  support a claim for specific performance.

25          I have nothing further to say, Your Honor.

104

1          THE COURT:  Okay.  Thank you.

2          That's 11(b)?

3          MR. LACEY:  It's 11(b), Your Honor.

4          THE COURT:  It's 11(b) and that's separate from

5    the whole $250 million point, that's the specific limitations

6    that are in 11(b) for the named entities?

7          MR. LACEY:  That's correct.  The 39 is a parceling

8    out of the $250 million.

9          THE COURT:  But it's a different provision than

10   the one --

11         MR. LACEY:  That's right.  It's a subsidiary

12   provision.

13         THE COURT:  Right.  Okay.  Anyone else from the

14   movants?

15                    [No response.]

16         THE COURT:  Okay.  I'm going to take a break for

17   lunch and be back here at two.

18                    [Recess.]

19         THE COURT:  Okay.  We're back on the record in

20   Delphi v. Appaloosa, et al. and I guess I'm going to hear now

21   from Delphi.

22         MR. FRIEDMAN:  Good afternoon, Your Honor.  May it

23   please the Court, I am Edward A. Friedman with the firm of

24   Friedman, Kaplan, Seiler & Adelman representing the plaintiff

25   Delphi Corporation.

105

1          Your Honor, I could start responding to various of

2     the things that were said by defendants' counsel this morning

3     that I think need to be responded to.  I also understand that

4     Your Honor has questions that the Court would like me to

5     address so I'm happy to proceed with anything Your Honor wants

6     to ask me at this time or I'm happy just to start in my own

7     order.

8          THE COURT:  Well, not knowing what your order is,

9     let me just reiterate some points that I want you to address at

10    some point.  If they fit into your order, that's fine, if not,

11    I just want to remind you of them, and there may be other ones

12    that you took down and if you did, don't ignore them.

13         The first point is, just in order of sequence,

14    responding to the argument that leaving aside the allegations

15    in Paragraphs 71 through 90 or so about the alleged behind-the-

16    scenes activity by Appaloosa and other unnamed parties, is

17    there any other allegation in the complaint that would

18    independently support a fraud claim against Appaloosa -- and

19    that would include what if anything can be made of the various

20    statements under oath in court or in pleadings filed in court

21    in connection with the transaction?

22         The second issue is responding to Mr. Shore's

23    point that on its face Paragraph 11(b) unambiguously limits the

24    investors or claims against the investors -- the investors'

25    liability -- to $250 million in the aggregate even if it

1  doesn't limit specific performance, i.e., it would limit

2  specific performance to only $250 million.

3          The next point would be a general point, which has

4  been raised by counsel for all the defendants other than

5  Appaloosa, that there's really nothing in the complaint that

6  accuses them, as opposed to Appaloosa, of truly culpable,

7  harmful conduct that would rise to the level of either creating

8  an equitable subordination claim or the type of conduct that as

9  a matter of public policy would override a limitation on

10  liability under Kalisch and the cases that you've cited since

11  then; and there's, I guess, a related point, which is Mr.

12  Kirshbaum's point that because of the limitation on liability

13  in the parent's backstop agreement, i.e., "monetary damages

14  only," you can't go against the parent companies, particularly

15  absent any allegations of truly culpable, harmful conduct, to

16  equitably subordinate their claims.

17          I think that's it, although I may have mentioned

18  other things that you shouldn't ignore if you wrote them down,

19  but those are the ones I was going to ask you.

20          MR. FRIEDMAN:  Well, what I'd like to do, Your

21  Honor, is address these questions in the order in which you've

22  presented them and then there may be other things.

23          THE COURT:  Okay.

24          MR. FRIEDMAN:  So, first, the question is do we

25  have sufficient allegations to support a fraud claim against

107

1    Appaloosa?

2            THE COURT:  Separate and apart from the, going

3    behind the back to disparage the financing --

4            MR. FRIEDMAN:  Exactly.

5            THE COURT:  So my focus in addressing that

6    question would be the allegations in Paragraph 60, 61 and

7    thereabouts in our complaint which is where we have allegations

8    about statements by Appaloosa in court and in papers filed with

9    the Court in both cases.  These are statements under oath.  We

10   believe that these representations and assurances by David

11   Tepper are a sufficient predicate for the fraud claims that we

12   assert.  I would start with the allegations in Paragraph 61 of

13   the complaint, and there, there are two representations and

14   assurances set forth; one is the statement by David Tepper in

15   his affidavit that was submitted to the bankruptcy court in

16   which Mr. Tepper states, Appaloosa "committed a minimum of $1.1

17   billion of its own capital."  The second statement by Mr.

18   Tepper which is quoted in Paragraph 61 of the complaint is Mr.

19   Tepper's testimony at the hearing on December 6, 2007 when Mr.

20   Tepper said, "I understand that when I gave my word to somebody

21   and shake somebody's hand I have a deal.  I have a deal.

22   That's what I understand."

23           THE COURT:  Okay.  But Mr. Shore's point is, when

24   he says, I have a deal, I have a deal, you've got to look to

25   the deal, and if the deal gives you an out then that's what

1  he's referring to.

2           MR. FRIEDMAN:  I have sort of two thoughts and

3  points with respect to that, Your Honor.

4           THE COURT:  Okay.

5           MR. FRIEDMAN:  The first is the premise for Mr.

6  Shore's argument is that the contract -- the EPCA -- gave

7  Appaloosa a right to send a termination notice even if Delphi

8  complied with all of the conditions and that's the argument

9  that Appaloosa makes that they had the right to send a notice

10 on April 4th whether or not Delphi was in breach or in

11 compliance with all of the conditions.  The EPCA does not give

12 Appaloosa or ADAH the right to send a termination notice under

13 those circumstances.  It does not give ADAH the right to

14 decline to honor its funding commitment if Delphi complies with

15 all the conditions applicable to it.  What Mr. Shore is

16 apparently talking about would be jurisprudence that recognizes

17 as a general matter that parties to a contract may have a right

18 to breach the contract and pay damages but the idea that you

19 can plan to breach a contract in that manner when you do not

20 have a contractual right to do that and assert that as a

21 defense for a fraud claim is wrong for two reasons.  First,

22 it's wrong because as a matter of fact we have to look at all

23 the facts and circumstances that were present in November and

24 December of 2007 when Mr. Tepper was making the statements that

25 are identified in the complaint, and, second, we have to look

1   at, as we do in the briefs, the law that applies to pre-

2   contractual statements that are alleged to be fraudulent, and

3   in that regard we believe that the law of Michigan which

4   applies is actually more liberal than the law of New York.

5          So, first, with respect to the context in which

6   Mr. Tepper made his statements, I recognize we're now at the

7   pleading stage of this action and we believe there are issues

8   of fact that will have to be developed, but it's already

9   apparent from the pleadings and from the record in this case

10  what was going on in December 2007 and the months leading up to

11  that.  What was going on was that Appaloosa was campaigning

12  aggressively and had succeeded to become the lead plan investor

13  and it had won the competition, it had pushed aside other

14  parties who were expressing a willingness to provide the

15  funding that Delphi needed, and any fair reading, we believe,

16  of the facts and circumstances in late 2006 would show that

17  Delphi and Delphi stakeholders could not possibly understood

18  that Mr. Tepper was merely referring to the possibility that he

19  would engage in what his attorneys now call an efficient

20  breach.  What was under discussion in December 2007 was a

21  commitment that was vital to what was then the proposed plan of

22  reorganization and what became the confirmed plan of

23  reorganization.

24          If there had been a hint that Appaloosa was

25  viewing this as an option -- and I appreciate that Your Honor

1  referred to optionality this morning, but I do not believe that

2  there was disclosure by Appaloosa that Appaloosa viewed the

3  equity purchase commitment agreement and the accompanying

4  commitment letter agreements as option agreements because the

5  entire --

6          THE COURT:  I mean it's right in the agreement.

7  We didn't have to say it because it was right there.

8          MR. FRIEDMAN:  Well, I think in that regard, Your

9  Honor, the issue of what's in the agreement is related to the

10 fraud claim because if it, the agreement, said under no

11 circumstances can the plan investors be required to fund their

12 commitments, I think we would have a different case.  I believe

13 -- and we've explained this in our briefs -- that under the

14 EPCA the right of specific performance is not excluded, it is

15 not waived and the notion advanced by the defendants that the

16 cap on liability should be read as precluding in any

17 circumstances, enforcement of the commitment.  We think that is

18 an insupportable reading of the EPCA and that relates to why we

19 believe Mr. Tepper's assurance that Appaloosa was funding a

20 minimum of $1.1 billion is misleading and fraudulent under all

21 the circumstances when it was made.  This case is not --

22         THE COURT:  Is that argument separate from the

23 argument that when you contend he's saying a deal is a deal it

24 means a performed deal?  You're not allowed to say the deal

25 itself but a deal is a deal means a performed deal?

111

1                MR. FRIEDMAN:  I would answer that, Your Honor, by

2      saying with respect to the statement, "a deal is a deal," it is

3      necessary to look at that statement in the context in which it

4      was made and when it's made in the context of Mr. Tepper saying

5      expressly Appaloosa is committing a minimum of $1 billion of

6      his own capital and at that time he says a deal is a deal I do

7      not believe that anybody listening to those statements could

8      infer that Mr. Tepper is saying anything other than our deal is

9      our commitment of $1 billion as opposed to the spin that

10     defendant's counsel now tries to put on it that all Mr. Tepper

11     was saying was that we've got a deal and we've got outs and

12     we'll take advantage of whatever outs we can.

13                THE COURT:  What about the notion that the context

14     that you're referring to generally includes statements that the

15     debtor has made that the prior version of the deal which had

16     the same language in it did have a cap?

17                MR. FRIEDMAN:  The statements by the debtor which

18     are pointed to by the defendants in these papers include in

19     particular the statement in the disclosure statement that both

20     refers to the cap and states that there is no specific

21     performance provision in the EPCA.  When we look at the

22     circumstances, Your Honor, in December 2006 we have

23     circumstances that are very different from the circumstances

24     that existed on April 4, 2008, in particular, we have the

25     circumstance that Delphi did not have exit financing in place,

112

1   there was necessarily tremendous uncertainty as to whether

2   Delphi would obtain that financing and, certainly, it was

3   reasonable for Delphi in looking at it's legal options as of

4   December 2006 to recognize as it did in statements that were

5   made on the record that Delphi might be able to bring a claim

6   for anticipatory repudiation based on certain conduct by the

7   plan investors.  That is a very different set of circumstances

8   from the circumstances that ultimately came to exist in April

9   2008 when Delphi had, as we allege, fully complied with all of

10  the conditions applicable to it.

11          THE COURT:  But the fraud you're alleging isn't in

12  April, it's in December 2007; right?

13          MR. FRIEDMAN:  Yes.  I was going into the

14  difference between December and April in response to Your

15  Honor's question about Delphi's statement concerning specific

16  performance and the basic point I'm trying to make is that as a

17  practical matter Delphi could have taken a very dim view of the

18  prospects for specific performance as of December 2007 and I do

19  not believe that Delphi stated under no circumstances even if

20  the EPCA is amended, even if we comply with all the conditions

21  we would be unable to get specific performance.

22          THE COURT:  Because the request would have been

23  moot because it couldn't have complied with the other

24  covenants?

25          MR. FRIEDMAN:  Exactly.  It just didn't come up at

113

1    that time.  Delphi was making a statement about the situation

2    in which it found itself and the issue at that time was whether

3    Delphi should be embarking on litigation under the prior

4    version of the EPCA or moving forward with these plan investors

5    and agreeing to an amendment.

6                THE COURT:  Well, let me turn -- unless you want

7    to make --

8                MR. FRIEDMAN:  No.

9                THE COURT:  Even assuming that you convince me

10   that for purposes of this motion what Mr. Tepper said in his

11   declaration and in court is sufficient to be misleading and a

12   misrepresentation and not a description of the truth, what is

13   your response to the argument that it's on all fours with the

14   contract claim, i.e., all that you're saying he misrepresented

15   was his intention not to perform the contract -- his intention

16   to breach was not revealed, in other words.

17               MR. FRIEDMAN:  Two things, Your Honor.  First,

18   under Michigan law -- and we've cited the cases in our brief --

19   a bad faith promise is actionable as fraud.

20               THE COURT:  But -- I don't want to forget the main

21   point, but the fraud happened here.  I mean if it happened at

22   all this fraud happened literally right in this courtroom.  It

23   would seem to me that no state would have a greater interest in

24   that than New York.  What's your response to that?

25               MR. FRIEDMAN:  The response to that, Your Honor,

114

1   is, under the authorities that we have cited in our brief, in

2   general the law that governs a fraud claim is the law of the

3   place where the injury occurred and I appreciate what Your

4   Honor is saying about the interests of New York but where the

5   victim of the fraud is a substantial Michigan corporation, as

6   Delphi is, the authorities that we have cited, which are not

7   contradicted by anything that the defendants have cited, have

8   said that the principal and foundational element under choice

9   of law principles with respect to fraud claims is the place of

10  injury; and if the place of injury -- and for a corporation the

11  place of injury is where the corporation is located.  The cases

12  that are cited by the defendants in their reply brief on choice

13  of law either do not involve fraud claims or they involve fraud

14  claims where the plaintiffs were seeking the application of New

15  York law.  They have not cited any cases where a plaintiff from

16  another state such as Delphi here was urging the application of

17  its home state law to a fraud claim and the Court ruled some

18  other jurisdiction, be it New York or somewhere else, has a

19  greater interest.

20          THE COURT:  Okay.  Well, just humor me for the

21  moment.  Assume New York law applies -- and I hear what you're

22  saying -- but assuming New York law applies, why wouldn't this

23  be precluded by the basic principle laid out in

24  Bridgestone/Firestone?

25          MR. FRIEDMAN:  Well, as Your Honor was discussing

1  this morning, there are exceptions to the Bridgestone/Firestone

2  rule which as a general matter precludes assertions of fraud

3  claims that are duplicative of contract claims; and one of the

4  circumstances in which New York law recognizes that exception

5  is where there are damages recoverable for the fraud claim that

6  are different from the damages that would be recoverable on the

7  breach of contract claim, and the VTech case that was discussed

8  this morning expressly holds that in a situation where the

9  contract provides for a cap on damages that's a basis for a

10  Court to uphold a fraud claim that would otherwise be viewed as

11  duplicative of the contract claim.

12            THE COURT:  But that contract permitted, you've

13  carved out from that cap the claims for torts and the like

14  which would include fraud claims.  I mean I think that's how

15  the defendants distinguish it or try to distinguish it.

16            MR. FRIEDMAN:  The contract in this case, Your

17  Honor, in particular Section 11(b) which provides for a cap on

18  liability, does say that it's a cap on liability "under this

19  agreement" so I would think that would be read as liability

20  arising under the agreement for breach of the agreement and not

21  liability for torts.

22            THE COURT:  Let me just make sure --

23            MR. FRIEDMAN:  I'm just turning to it now, Your

24  Honor.

25            THE COURT:  Yes.  It does say "under this

116

1    agreement."  Okay.  I see what you mean.

2            MR. FRIEDMAN:  The next point I would address,

3    Your Honor, are the arguments by counsel for Goldman Sachs and

4    for Harbinger that there's nothing in the complaint that --

5            THE COURT:  I'm sorry, before you --

6            MR. FRIEDMAN:  Yes.

7            THE COURT:  Is that the only exception you're

8    pointing me to -- to Bridgestone/Firestone on this point?

9            MR. FRIEDMAN:  Yes.

10           THE COURT:  As opposed from the other hidden

11   conduct?

12           MR. FRIEDMAN:  I believe that's the case, Your

13   Honor.

14           THE COURT:  Okay.

15           MR. FRIEDMAN:  So the argument by counsel for

16   Goldman Sachs and counsel for defendants other than Appaloosa

17   is, we didn't do anything wrong.

18           THE COURT:  Well, it isn't pled that they did

19   anything wrong other than breach.

20           MR. FRIEDMAN:  The complaint pleads a number of

21   things, Your Honor, which we think respond to that point.  The

22   complaint pleads that all of the plan investors undertook an

23   obligation to use reasonable best efforts to cooperate with

24   Delphi and to do all things reasonable and necessary to achieve

25   a consummation in closing under the EPCA.  The argument by

117

1   counsel for Goldman Sachs is essentially an admission that

2   Goldman Sachs did not live up to its best efforts obligation.

3              The case law makes clear that an obligation to use

4   best efforts is an obligation that goes beyond the obligation

5   of good faith and fair dealing that is inherent in every

6   contract.  The exact contours of what is required of a party

7   who undertakes a best efforts obligation is in all cases a

8   question of fact.  What the courts say is that the exact nature

9   of what a party is required to do in order to comply with its

10  best efforts obligation is a function of who that party is,

11  what is that party capable of?  That is a very important

12  consideration in this case, Your Honor.  The reason why Delphi

13  entered into the EPCA with these plan investors was because of

14  who they are, and the reason why the best efforts obligation is

15  particularly significant is because of who these plan investors

16  are.  So when counsel for Goldman Sachs essentially says, we

17  tried to stay outside the fray, I do not understand how that

18  can be reconciled with the obligation that Goldman Sachs

19  undertook to use its reasonable best efforts to do all things

20  necessary to achieve a closing.  We would say, Your Honor, that

21  as the facts are developed the obligation to use reasonable

22  best efforts includes an obligation to communicate with other

23  plan investors, communicate with Delphi, avoid the kinds of

24  problems that came up, and the idea advanced by Goldman Sachs

25  and other defendants that in the absence of specific culpable

1 conduct there's no basis for alleging an actual breach of

2 contract, we think, should be rejected at the pleading stage.

3         THE COURT:  Okay.  That deals with the issue of

4 breach, and I understand the argument; there's an additional

5 point that Mr. Falcone made, which is that under Kalisch and

6 the cases that followed it including Met Life and some district

7 court cases, it's pretty clear that you need not only

8 intentional conduct -- which you need to be liable for breach

9 under the contract -- but also intentionally bad conduct;

10 whether that rises to the level of an intended tort or is just

11 pernicious, truly reckless, etc., you need bad conduct in order

12 to get around a damages limitation, for example.

13         MR. FRIEDMAN:  Yes.

14         THE COURT:  He contends and the others, other than

15 Appaloosa, have contended that that type of bad conduct has not

16 been pled.

17         MR. FRIEDMAN:  Well, the bad conduct that is

18 required under Kalisch-Jarcho or the Bank of America/Solow case

19 includes reckless indifference to the rights of others,

20 reckless indifference to the harm inflicted on others.  So at

21 this stage of the case, Your Honor, I would say it's much too

22 early to say whether Merrill Lynch and Goldman Sachs should or

23 should not ultimately have the benefit of the liability caps

24 that apply to them.

25         THE COURT:  But don't you need to at least allege

119

1   that they knew about what Appaloosa was doing?  I mean you've

2   alleged what Appaloosa is doing.  Don't you need to allege that

3   either they were doing it, too, or that they knew about it and

4   chose not to say anything or to keep it quiet?

5             MR. FRIEDMAN:  Well, Your Honor, in the Bank of

6   America case, as we've discussed, a key part of the intentional

7   wrongdoing that was alleged and that was found sufficient by

8   the Court was the demand by Solow, who is the landlord of Bank

9   of America, for a payment of $6 million.  I would submit that

10  the demand by UBS and Merrill Lynch and Harbinger and Pardus

11  for $82.5 million in the form of an alternate transaction fee

12  is more outrageous and less justifiable than the demand by

13  Solow for a $6 million payment.  Under his contract Solow had a

14  right to be reimbursed for his out-of-pocket expenses in

15  connection with reviewing proposed renovation plans, and the

16  way landlords always do, he was figuring overhead and

17  allocation of costs, and the Court found this to be improper

18  and I'm certainly not defending what Solow did, but in this

19  case when Merrill Lynch and UBS and Harbinger and Pardus took

20  the position that Delphi's efforts to obtain financing on the

21  most favorable possible terms in order to achieve a closing

22  under this EPCA and consummate the confirmed plan -- the

23  argument that that constitutes an "alternative transaction"

24  that exposes Delphi to liability for $82.5 million, I would

25  say, Your Honor, that at the pleading stage there should be no

120

1    doubt that the allegations are sufficient.  When all the

2    evidence is in, the Court will be in a position to determine

3    whether the wrongful conduct rises to the level that's required

4    -- and I would emphasize that in the cases discussed by counsel

5    for Merrill Lynch every one of those cases makes crystal clear

6    that this issue is an issue of fact, and the case principally

7    relied on by the defendants, which is the Noble

8    Lowndes/Metropolitan Life  case, which was decided prior to the

9    Bank of America decision by the Appellate Division, First

10   Department, the Appellate Division in the Bank of America case

11   points out that in the Noble Lowndes case there was a lengthy

12   jury trial and the result of the trial was the conclusion that

13   the defendant did nothing more than refuse to perform its

14   obligations.  In other words, did nothing more than engage in

15   what Appaloosa's counsel would call an efficient breach.

16           THE COURT:  All right.  Let me explore that a

17   little bit.  I mean you still have to comply -- even though

18   this is a motion to dismiss, you have to comply with Bell

19   Atlantic v. Twombley and plead sufficient facts where the

20   context requires to make it plausible.  The context here

21   requires bad things or truly reckless -- I'm not sure there's

22   much of a difference -- behavior and, I guess demanding a

23   break-up fee on a spurious basis -- I guess unlike the Solow

24   case they weren't saying, I'll perform if you give me this

25   break-up fee, they were doing it sort of as a threat that, you

1    know, if you push this further you'll owe us a break-up fee.

2    Do you see any distinction there?

3                    MR. FRIEDMAN:  Well, yes and no, Your Honor.  The

4    reason why in the main I don't think there's a distinction is

5    that I see the demand for the break-up fee here as part of a

6    campaign of pressure to prevent Delphi from exercising its

7    legal rights, and for that reason I'm not sure there's any real

8    distinction between what Solow was doing in making an improper

9    demand and what certain of the plan investor defendants were

10   doing here in making improper demand, especially coupled with

11   the allegation that the investor defendants were not complying

12   with their obligation to use reasonable best efforts to

13   consummate this plan and that on the contrary at a time when

14   Delphi and other stakeholders were committed to doing all

15   things necessary these defendants were seeking to avoid their

16   obligations and --

17                   THE COURT:  I'm not sure there's anything in the

18   complaint about the -- I mean there's a reference to the

19   termination letter, I guess --

20                   MR. FRIEDMAN:  Yes.

21                   THE COURT:  -- and there's a reference to the

22   letters that were sent before then.  I guess that's the only

23   place where the $82 million is referred to; right?

24                   MR. FRIEDMAN:  Yes.

25                   THE COURT:  The threat that if you do this it will

1    trigger the alternative transaction.  All right.

2            MR. FRIEDMAN:  We also would rely on the

3    obligation that in failing to fulfill their best efforts

4    obligation the investors were either in willful breach and in

5    reckless disregard of their obligations or helping Appaloosa --

6            THE COURT:  I'm sorry, could you say that again?

7            MR. FRIEDMAN:  Yes.

8            THE COURT:  I missed that.

9            MR. FRIEDMAN:  Under the circumstances of this

10   case by failing to fulfill their best efforts obligations the

11   investors were acting with reckless indifference to the rights

12   of Delphi.

13           THE COURT:  Then unless you plead something that

14   says that -- I mean Appaloosa was a lead investor and the other

15   investors were not entirely but somewhat restricted in what

16   they could do as far as even talking to other parties, although

17   Mr. Tepper said it would be okay to talk but not to be

18   "mischievous," that was his phrase when he was talking about

19   Goldman, don't you need to plead something that they knew that

20   would have caused them to be acting improperly and badly as

21   opposed to saying that they had an obligation to act properly?

22           MR. FRIEDMAN:  Well, other than Goldman Sachs,

23   what we have pleaded is that the investor defendants entered

24   into a common interest agreement.  We don't know what

25   communications occurred behind that common interest agreement.

1   That will be a subject of discovery.  All the investors who

2   were a party to that common interest agreement were aligned

3   with Appaloosa in fighting with Delphi on the exit financing

4   and, therefore, it can be inferred that the investors other

5   than Appaloosa had knowledge of the positions that Appaloosa

6   was taking and whatever restrictions there might have been on

7   the investors' ability to talk to other people, the investors

8   had -- each one had, including Goldman Sachs, an obligation to

9   cooperate with Delphi.  The investors did not have the

10  contractual right to hide behind the status of Appaloosa as the

11  lead plan investor.

12          THE COURT:  I don't want to spend much longer on

13  this, but it seems to me that it's one thing to say that they

14  were acting under a common interest agreement in connection

15  with litigation against Delphi over the financing -- and

16  perhaps making demands or threats about the "alternate

17  transaction" fits into that -- but it seems to me you'd have to

18  allege more than just a common interest agreement if you're

19  going to link them to efforts that you've pleaded by Appaloosa

20  in respect of chilling the exit financing and the stock price

21  and all of that.  I mean you could certainly -- it's hard for

22  me to infer from a common interest agreement that the other

23  three investors would have known about that.

24          MR. FRIEDMAN:  I would submit, Your Honor, that

25  the Court does not have to reach that question at the pleading

124

1   stage because in the contract here the other plan investor

2   defendants are jointly and severally liable for the willful

3   breaches of Appaloosa.

4          THE COURT:  I believe here "willful" is just

5   willful breach.  It's not willful misconduct, it's just willful

6   breach which I view as intentionally, knowingly breaching.  I

7   don't view that as the equivalent of acting badly for the

8   purposes of Kalisch and those other cases.

9          MR. FRIEDMAN:  The point I'm making is that

10  whatever the nature of the allegations at this stage concerning

11  Kalisch-Jarcho and its applicability to Goldman and Merrill,

12  etc., as Goldman's counsel said, they are defendants in this

13  case, they can't escape --

14         THE COURT:  Well, no, but I know that they have

15  made a motion to dismiss everything other than their liability

16  for someone else's willful breach but it's not an all-or-

17  nothing thing here, I can grant part of their motion and say,

18  well, the specific performance counts are dismissed as to

19  Goldman.

20         MR. FRIEDMAN:  Well, let me say a couple of

21  things, Your Honor -- one with respect to damages and one with

22  respect to specific performance.  First, with respect to

23  damages, for each of the other plan investors there's a

24  provision in the EPCA saying that each individual plan investor

25  is jointly and severally liable for the breaches and each --

125

1              THE COURT:  Up to a certain dollar amount.

2              MR. FRIEDMAN:  Exactly, Your Honor, up to a

3      certain cap.

4              THE COURT:  Except for ADAH.  I don't think

5      there's any cap on ADAH in that provision.

6              MR. FRIEDMAN:  Yes, that's correct.  So with

7      respect to that, the point I am making is it's not an issue to

8      be determined at the pleading stage whether the ultimate

9      financial liability of Goldman Sachs or Merrill Lynch will be

10     in accordance with that contractual cap or in excess of that

11     cap based on evidence that will be presented at trial.  It's

12     simply a question of what will the ultimate measure of damages

13     or remedy be.

14             THE COURT:  Leave aside the damages part, assuming

15     that there's nothing alleged about Goldman other than it stood

16     aside and waited, and, unlike getting into Heaven, you're

17     saying that's not enough for performance of a contract, and I

18     tend to agree with you as far as a motion to dismiss is

19     concerned given the best efforts provision; but you've also

20     alleged specific performance against them and unless I read

21     11(b) to be ambiguous or how you want to interpret it is clear

22     on your side, the only way to get specific performance against

23     Goldman, then, would be to, I think, apply the Kalisch line of

24     cases; right?

25             MR. FRIEDMAN:   I would say it only slightly

1  differently, Your Honor, but I basically agree with what the

2  Court is saying --

3              THE COURT:  Okay.

4              MR. FRIEDMAN:  -- that the way to get specific

5  performance would be either to apply the Kalisch-Jarcho line or

6  to agree with Delphi that specific performance is an available

7  remedy under 11(b) as we think it is.

8              THE COURT:  All right.  But if that's not the case

9  I'm having a hard time seeing how the complaint pleads

10  sufficiently reprehensible behavior on Goldman's part to

11  sustain the specific performance claim against Goldman.

12             MR. FRIEDMAN:  Well, the specific performance

13  claim --

14             THE COURT:  That's separate and apart from the

15  contract reading.  I understand that, but I --

16             MR. FRIEDMAN:  Right.  Well, I was just going to

17  say the specific performance claim is not a separate claim,

18  it's a remedy that we are seeking for breach of contract, and

19  whether that remedy is ultimately determined by the Court to be

20  appropriate should be determined on the basis of the evidence

21  that will be submitted.

22             THE COURT:  Well, so you're saying you don't have

23  to plead it?  I mean why couldn't it be excluded now so that

24  people don't have to take discovery on -- so that Goldman

25  doesn't have to be the subject of discovery under Kalisch?

127

1              MR. FRIEDMAN:  Well, because I think in that --

2              THE COURT:  I mean it is listed --

3              MR. FRIEDMAN:  Yes.

4              THE COURT:  -- I mean you could -- I don't

5    understand why I shouldn't rule on this point now?

6              MR. FRIEDMAN:  Because Goldman Sachs had a best

7    efforts obligation.

8              THE COURT:  No, I understand that.  Leaving that

9    aside.

10             MR. FRIEDMAN:  Okay.  Their breach of that could

11   be sufficient because --

12             THE COURT:  The interpretation of 11(b).

13             MR. FRIEDMAN:  Separate from 11(b), I'm saying.

14   Goldman Sachs' position as articulated in this Court that

15   Goldman Sachs sat on the sidelines while other plan investors,

16   savaged Delphi and Delphi stakeholders, could be a basis for a

17   finding of --

18             THE COURT:  Right.  I could see that if you

19   alleged they knew about it or had reason to know about it, but

20   if you don't say that why would it be a basis?  Did they have

21   an obligation to take discovery of their co-investors and

22   constantly bombard them with questions about whether they're

23   acting properly or not?

24             MR. FRIEDMAN:  Well, if as the record now reflects

25   -- if what they did was absolutely nothing even to find out

128

1   what was going on, then, yes, that could be a basis for finding

2   reckless indifference.  I mean why was Goldman Sachs a plan

3   investor, to sit on the sidelines and wait and see whether

4   other plan investors complied with their obligations?

5               THE COURT:  Okay.

6               MR. FRIEDMAN:  The next point, Your Honor raises

7   which is the next point I wanted to address -- is the issue of

8   piercing the corporate veil, and the argument made there by

9   Harbinger and Pardus is that there's not a sufficient

10  allegation of fraud or other wrong in the complaint.

11              We would submit that the complaint does properly

12  and sufficiently allege that the Harbinger and Pardus parents

13  dominated and controlled the subsidiaries and used their

14  domination and control to cause the subsidiaries to evade their

15  contractual obligations and that under Brunswick and under the

16  cases we cite is sufficient as a pleading matter.

17              THE COURT:  Well, where does it say that they did

18  that?

19              MR. FRIEDMAN:  It's Paragraph 120 of the

20  complaint, Your Honor.

21              THE COURT:  Okay.  "Caused the affiliates to

22  breach."

23              MR. FRIEDMAN:  Right.  And what the Court said in

24  Brunswick which, I think, is important in this case is that --

25              THE COURT:  But Brunswick is -- I mean there have

 1  been some developments since then.

 2          MR. FRIEDMAN:  Well, I'm pointing to Brunswick

 3  because the defendants say Brunswick supports their position

 4  and Delphi failed to respond to Brunswick.

 5          THE COURT:  Right.

 6          MR. FRIEDMAN:  So the point that Brunswick makes

 7  is that -- I mean I actually like what the Court says that the

 8  New York law in this area is hardly as "clear as a mountain

 9  lake in springtime."

10          THE COURT:  Well, that's why I was referring to

11  it.  Since then it became more like Poland Spring.  I mean it's

12  pretty clear now.

13          MR. FRIEDMAN:  Your Honor, what I would say is

14  that the Brunswick court goes on to say that what the formula

15  comes down to, once shorn of verbiage about control,

16  instrumentality, agency and corporate entity, is that liability

17  is imposed to reach an equitable result and what the cases say

18  is that it's very much a fact-driven inquiry.

19          THE COURT:  But here the Second Circuit found it

20  would not be inequitable where the party who was seeking to

21  pierce the veil knew that they were dealing with a shell

22  corporation and a parent.

23          MR. FRIEDMAN:  Your Honor, that's true in a

24  circumstance such as Brunswick where the issue and the claim is

25  simply payment, that is Brunswick was dealing with an entity

1  that it knew to have no assets and it was an entity that was

2  operating a business and was paying Brunswick's bills but when

3  the business went bad the entity had no assets to pay the bills

4  and Brunswick sought to pierce the corporate veil to obtain

5  payment.   There is nothing else going on in that case so the

6  Court's conclusion was Brunswick knew that it was dealing with

7  an entity with limited assets.   That was all that case was

8  about.

9           What this case is about is about a parent using

10  its control of the subsidiary to evade the contractual

11  obligations.   When we look at the cases cited by Delphi or

12  cited by the defendants, all the cases say that the veil will

13  be pierced to avoid a fraud or inequitable result or fraud or

14  wrong and we submit that under the circumstances here the test

15  is met as a pleading matter.

16           THE COURT:   So you're saying that Harbinger Del-

17  Auto Investment Company, if it were a normal company, not under

18  the thumb of Harbinger Capital Partners Master Fund I Limited

19  which is the party to the funding agreement, it would have

20  called on that company to perform under the funding agreement

21  that it had with it.   That was its asset, it refused to do

22  that.   The only reason it refused to do that is that it was

23  under the thumb of the parent and, therefore, it breached.

24           MR. FRIEDMAN:   I would say that and one other

25  thing, Your Honor, which is that all of the activities of

1  Harbinger Del-Auto leading up to the closing including

2  Harbinger Del-Auto's fulfillment or non-fulfillment of its best

3  efforts obligations, we have alleged, were all caused and

4  dominated and controlled by the parent.

5          THE COURT:  Okay.  But that kind of goes back to

6  the earlier point, which is whether I'm satisfied that you've

7  alleged with enough specificity that the investor Pardus and

8  Harbinger entities were acting sufficiently wrongfully under

9  the control of their parent and I guess that goes back to the

10  same point, which is what does a best efforts provision mean,

11  does it require you to do some due diligence and be proactive

12  or is it enough to say, I'm ready, willing and able and I don't

13  care what anyone else is doing, I don't have any reason to know

14  what anyone is doing, call me when it's time for the closing.

15          MR. FRIEDMAN:  I would submit, Your Honor, that

16  the head in the sand, call me when it's time for the closing,

17  is not in compliance with the best efforts obligation

18  especially under the circumstances of this case where the

19  record establishes that there is such heavy reliance on these

20  plan investors and who they were.

21          THE COURT:  Okay.  I think those were the main

22  points but there was the other point about equitable

23  subordination also being precluded by the liability cap in the

24  Pardus and Harbinger commitment letters -- that equitable

25  subordination is not something that you get money damages for.

132

1        MR. FRIEDMAN:  There's a sort of a fundamental

2   issue, Your Honor, about the proper interpretation of both the

3   EPCA and the commitment letter agreements.  The defendants now

4   conceded that specific performance is an available remedy under

5   the EPCA and they argue, however, that it's limited to $250

6   million and they argue that it's not available under the

7   commitment letter agreements.  We think it's necessary and

8   proper under the law to read the EPCA and the commitment

9   letters together.  They're obviously executed at the same time,

10  the EPCA refers to the commitment letter agreements, they need

11  to be interpreted together in a way that is coherent, looking

12  at the two sets of agreements as an integrated whole.  The

13  suggestion that specific performance under the EPCA is limited

14  to $250 million, we would submit is flatly contradicted by

15  Section 18 of the EPCA which expressly provides that the rights

16  and remedies in the EPCA are cumulative and not exclusive.  So

17  the defendants take the position that the rights and remedies

18  set forth in Section 11(b) are exclusive and that a broader

19  right of specific performance that is clearly preserved under

20  Section 18 does not exist.  In fact, the defendants in their

21  papers point to the word "notwithstanding" which appears in

22  Section 11(b) as if that enables 11(b) to trump Section 18 but

23  the word "notwithstanding" in Section 11(b) refers to

24  notwithstanding the foregoing.  It's clearly not --

25        THE COURT:  But humor me for the moment and assume

133

1    that I view the commitment letters as a separate agreement and

2    governed by their own terms, separately.  Do you have any --

3    I'm just dealing with a specific point that equitable

4    subordination is somehow ruled out by the language in the

5    commitment letter.

6            MR. FRIEDMAN:  I don't think equitable

7    subordination or any equitable remedy is ruled out by the

8    language of the commitment letter.  I think at most there is an

9    ambiguity either within the commitment letter or when the

10   commitment letter is read with the EPCA.  I say that because

11   the commitment letter expressly provides in precise detail for

12   the commitments that are being funded by each of the commitment

13   parties.  That funding is an essential component of the EPCA

14   and when the two are read together the idea that specific

15   performance under the EPCA is limited to $250 million and

16   specific performance under the commitment letter is not

17   available at all, we think that's simply a case of the

18   defendants choosing words that they like and not paying

19   attention to contractual words and provisions that they don't

20   like.

21           THE COURT:  Okay.  I mean if you look at the

22   commitment letters, though, they do say "the liability of

23   Pardus shall be limited to monetary damages only," which is not

24   in the EPCA -- that type of language.

25           MR. FRIEDMAN:  Right.  But when you read the

134

1    commitment letters together with the EPCA we believe that the

2    proper interpretation of "liability" as it's used through the

3    EPCA and in the commitment letters is that it's a reference to

4    monetary damages and not an exclusion of specific performance.

5    So, for example, there are other provisions in the commitment

6    letter if we look at the -- which one are you looking at, Your

7    Honor?

8            THE COURT:  The Pardus one which is Exhibit 15 to

9    Ms. Cohen's declaration.

10           MR. FRIEDMAN:  Okay.  I have the --

11           THE COURT:  I mean it's the same language in the

12    other two.

13           MR. FRIEDMAN:  Right.  Right.  Okay, so the

14    language that I'm looking at, in the AMLP letter, is the

15    language that says, "AMLP shall not be liable to fund to the

16    investor any amounts hereunder other than to fund the purchase

17    obligation unless and until any party to the agreement other

18    than the company commits a willful breach of the agreement."

19           THE COURT:  Right.

20           MR. FRIEDMAN:  So that's a suggestion that we

21    would interpret as carving out the purchase obligation from the

22    liability scheme that pervades the EPCA and the commitment

23    letters.

24           THE COURT:  But then unlike the EPCA, here, this

25    operative paragraph does say "notwithstanding any other term or

135

1   condition of this agreement" and then it says, "the liability

2   of AMLP shall be limited to monetary damages only."

3           MR. FRIEDMAN:  Well, at a minimum we think that

4   creates an ambiguity, because when we go back to the beginning

5   of the second paragraph in all of these letters there's an

6   express confirmation of the commitment to provide funds, and

7   that commitment is an essential component of the EPCA which is

8   an essential component of the plan.

9           THE COURT:  Okay.

10           MR. FRIEDMAN:  Unless Your Honor has further

11   questions, I'll sit down for now.

12           THE COURT:  Well, no, you had other points you

13   were going to make too.

14           MR. FRIEDMAN:  No, that covers what we needed to

15   address.

16           THE COURT:  That covers what you needed to

17   discuss?

18           Okay.

19           MR. SHORE:  Could we have a short break, Your

20   Honor, to make sure we don't cover the same ground?

21           THE COURT:  Yes.  Why don't I come back in about

22   ten minutes.  Does that work?

23           MR. SHORE:  Perfect, Your Honor.  Thank you.

24           THE COURT:  So at 3:20 or so.

25                     [Recess.]

136

1              THE COURT:  Mr. Friedman, I have one question for

2    you on the veil piercing claim.

3              If the wrong that the parent supposedly did --

4    let's assume no other wrongs are alleged in the complaint other

5    than that the parents caused the subs to breach, and in

6    particular did they cause them to breach trying to enforce the

7    funding commitment itself.  Wouldn't that get you back to the

8    damages limitation in the funding commitment itself because

9    that's what would cure the wrong, is to enforce the contract,

10   which has that damage limitation in it?

11             MR. FRIEDMAN:  I believe the answer to your

12   question, Your Honor, is yes and we believe that properly

13   interpreted a decree of specific performance aimed at the plan

14   investors --

15             THE COURT:  Is permissible under the language.

16             MR. FRIEDMAN:  -- would be enforceable and that

17   the parent entities would not be able to avoid a decree by

18   saying our liability is limited to monetary damages only,

19   because in the case of a decree of specific performance,

20   assuming the Court decides it's warranted, the two agreements

21   would have to be read together as they are intended to be.

22             THE COURT:  Okay.  Thank you.

23             MR. BAUMSTEIN:  Good afternoon, Your Honor.  We'll

24   change the order and deal with the piercing claim first this

25   time.

137

1             Your Honor, on the Brunswick case I would

2    respectfully submit that Delphi has it kind of turned around.

3    Brunswick lived in a world in which New York law had not yet

4    been settled as to whether or not there was a requirement

5    independently not only of domination and control but also a

6    requirement of fraud.

7             THE COURT:  Well, not just fraud, fraud or wrong.

8             MR. BAUMSTEIN:  Fraud or wrong -- and I don't mean

9    to limit it to fraud -- fraud or wrong.

10            THE COURT:  Okay.

11            MR. BAUMSTEIN:  What the Brunswick Court said was

12   notwithstanding that it's possible that under New York law

13   there is absolutely no requirement for fraud or wrong,

14   nevertheless, when you have a situation which Delphi admits

15   exists here and that is that a company contracts with another

16   company that it knows has no assets, then aside from the issue

17   of -- whether you require fraud or wrong even if you don't

18   require a fraud or wrong, the basic premise of the entire veil

19   piercing theory falls away because there is no inequity or

20   unfairness in having a company deal with the entity that it

21   knew it was dealing with and the whole veil piercing --

22            THE COURT:  These companies had a lot of assets in

23   one respect; they had a contract within their respective cases

24   with Pardus, Harbinger and Appaloosa under which those three

25   entities agreed to put in a lot of money -- over $1 billion.

138

1          MR. BAUMSTEIN:  Veil piercing is only pleaded in

2    this complaint as an alternative to a claim under the

3    commitment letters.  The commitment letters would be the one

4    and only source of the funding obligation Your Honor just

5    referred to.

6          THE COURT:  Right.

7          MR. BAUMSTEIN:  Therefore, you don't get to veil

8    piercing until you've gotten to the point of saying whatever

9    the claim is that you're asserting cannot be sustained based on

10   the commitment letters, which we believe it cannot.  But if

11   there's a claim under the commitment letters for a funding

12   obligation, whether that claim would be asserted by Delphi,

13   whether that claim would be asserted by one of the entities --

14   the shell entities that signed these letters or they were

15   parties to these letters as well -- in that case you don't get

16   to piercing.  The point is that if the letters do not provide

17   for the basis of getting more than X dollars from the parents,

18   piercing doesn't help.

19         THE COURT:  Assume for the moment -- I'm not

20   asking you to agree with this, just assume for the moment that

21   the EPCA does permit piercing and the commitment letters don't

22   as to the respective signatories, so you'd have to deal with

23   that situation.

24         MR. BAUMSTEIN:  Without accepting the premise --

25         THE COURT:  No, I know.

1          MR. BAUMSTEIN:  -- other than for sake of

2    responding to it, Your Honor, I don't believe piercing is an

3    analysis that takes place by contract.  Piercing is an analysis

4    that takes place based on the relationship between the parent

5    and the sub.

6          THE COURT:  I'm sorry.  I completely misphrased my

7    question to you.

8          Assume for the moment that the EPCA permits

9    specific performance -- I meant to say that instead of

10   "piercing" -- and the commitment letters don't -- and this is

11   where I was going somewhat with Mr. Friedman -- it seems to me,

12   perhaps arguable, that if in fact what is the basis for

13   piercing here is not that Pardus and Harbinger caused a shell

14   corporation to enter into the agreements with Delphi because

15   Delphi knew they were shell corporations -- and by the way,

16   I've confirmed your reference that you cited to me earlier on

17   the pleading -- but rather that they caused those corporations

18   not to have any assets by not enforcing the commitment letters.

19   At that point, if you assume that the EPCA permits specific

20   performance, has that bad act in essence gotten the parents out

21   of their funding agreement limitation because they in essence

22   should be viewed as the subs because they used the subs and

23   their domination of the subs wrongfully, not to enforce the

24   funding?

25          MR. BAUMSTEIN:  Your Honor, to the extent these

140

1   subs would have had any kind of right under the commitment

2   letters to force funding, it would have been no different to

3   Delphi's right to force the funding.  So it's a wash, Your

4   Honor, because there would be a claim under the commitment

5   letter for that amount.  So, again, the whole theory as pled

6   but also as exists in the law, the whole reason why you get to

7   piercing is because the contracts as written don't do what in

8   fact should be done.

9             THE COURT:  All right.  Fine.

10            MR. BAUMSTEIN:  In essence, Your Honor, that's --

11            THE COURT:  If you have any revelation on that,

12   Mr. Friedman, before anyone finishes you can tell me, but that

13   seems to be the right answer.

14            MR. BAUMSTEIN:  That's pretty much what I had,

15   Your Honor.

16            THE COURT:  Okay.

17            MR. FALCONE:  Good afternoon, Your Honor.

18            I still haven' heard a single allegation of a

19   single act from any defendant other than Appaloosa that would

20   justify equitable subordination claim or that would justify the

21   public policy exception to the enforcement of liability

22   provisions.  The breach, if there was a breach of the best

23   efforts provision in this contract, is not the kind of conduct

24   that the Courts discuss in Kalisch-Jarcho or in Met Life or in

25   any of the cases on which even the plaintiff has cited in

141

1   support of specific performance.  Even if we intentionally

2   breach the best efforts clause it's just a breach of contract.

3          So I still haven't heard any allegation and I

4   didn't hear Mr. Friedman say one thing about something that he

5   can allege in the complaint that we did, that Harbinger did,

6   that Pardus did, that Goldman did, that UBS did, that would be

7   relevant either in support of the equitable subordination or

8   the specific performance.  Can this be decided on a motion to

9   dismiss?  You bet.  Look at Judge Hellerstein's in Dyncorp.  It

10  wasn't a specific performance case but having found a liability

11  limitation important in that case he didn't hesitate to dismiss

12  the claims for damages that exceeded the cap.  Of course, it's

13  important.  It's important for its discovery, it's important

14  because baseless allegations of liability shouldn't be hanging

15  out there in a complaint if they're unsupported.  That's why we

16  have 12(b)(6), that's why we have pleading rules.  There's no

17  question that you have to plead the facts to show that specific

18  performance is an appropriate remedy.  There's no Court that

19  has said you can seek specific performance without pleading any

20  facts that suggests that either your remedy at law is

21  inadequate or that you are entitled to it, and it's clear from

22  Dyncorp and even in the absence of a precedent it would still

23  be clear that if facts have not been alleged in the complaint

24  the motion to dismiss is the perfectly appropriate stage to

25  take care of this.

142

1              THE COURT:  Well, on that score what Mr. Friedman

2    has said in addition to the reference to the parties other than

3    Goldman having a joint interest agreement and coordinating

4    their responses on litigation, and in addition to the

5    uncertainty as to whether in light of their best efforts

6    obligation they were required to do more than just simply stand

7    and wait for the closing, is the -- both of which I have some

8    skepticism over -- is the suggestion that rather than try to

9    work to make the deal work, the investors other than Goldman

10   together threatened the alternative transaction fee.

11             MR. FALCONE:  First of all, I'm not aware of any

12   threat by Merrill for the alternate transaction fee.  Second,

13   best efforts clauses -- just as the duty of good faith and fair

14   dealing, the best efforts clause does not require you to waive

15   you rights under a contract.  The best efforts clause doesn't

16   create rights that are not in the contract, it doesn't require

17   a party to waive its rights --

18             THE COURT:  Well, this best efforts clause went to

19   more than this contract, it went to the transactions

20   contemplated by the agreement which includes the financing and

21   everything else.

22             MR. FALCONE:  There's no authority for the

23   proposition that the best efforts clause in this contract

24   required any of these defendants to waive any right they had

25   under the contract.

143

1              THE COURT:  But that's a tautology.  Part of the

2    contract is that they use their best efforts not only to

3    perform the contract but the related transaction -- to cause

4    the related transactions to come to pass.

5              MR. FALCONE:  But that can only be understood to

6    mean within their rights of the contract because --

7              THE COURT:  But the contract itself says that.

8              MR. FALCONE:  If it means something more than that

9    then we have an unenumerated set of rights for the plaintiff.

10             THE COURT:  Well, it certainly means you can't

11   chill those things; right?

12             MR. FALCONE:  It may well mean you cannot actively

13   interfere but there's no allegation of active interference

14   against any of these other defendants other than Appaloosa.

15             THE COURT:  The allegation is rather than even let

16   Delphi raise the issue as to whether your clients were in

17   breach, your clients said that Delphi would owe $82.5 million.

18   That's a pretty serious threat when you consider that you would

19   think that parties dealing with each other in good faith to

20   make the transactions including the financing happen would talk

21   together and ultimately look to the arbiter of the issue, the

22   Judge, as to whether there's a solution as opposed to saying,

23   you owe us $82 million, ha, ha, ha.  That does sound like

24   Sheldon Solow to me.

25             MR. FALCONE:  Well, it doesn't to me, Your Honor,

144

1  and let me explain why.

2                THE COURT:  Okay.

3                MR. FALCONE:  The Court in Solow made it clear

4  that there was a cluster of facts that supported an inference

5  that the defendant in that case was trying to exert economic

6  duress.  One of those things was remember that in Solow you're

7  not dealing with a defendant who terminated a contract, you're

8  dealing with a defendant who continually, time after time after

9  time, refused to perform by renewing plans for renewal, not --

10                THE COURT:  All right.  But here what Mr. Friedman

11  is saying -- and I appreciate this is all only through

12  referring to a letter and I haven't gone back and read the

13  letter so I don't know whether it was on behalf of all the

14  investors except Goldman or just Appaloosa or whatever but what

15  Mr. Friedman is saying is that similarly here the investors

16  rather than talk or let the Court decide this issue said,

17  you're going to pay us, and they weren't terminating and

18  neither was Delphi.

19                MR. FALCONE:  Well, again, I don't know what Mr.

20  Friedman is pointing to to say where he says that the investors

21  as a group demanded the fee.  I don't know what he's pointing

22  to.  Secondly, in Solow you didn't have -- Solow didn't

23  terminate the contract and end his rights.  There's a

24  fundamentally different way in which Solow used the contract.

25  The allegation of economic duress was credible because --

145

1              THE COURT:  But I think the letter was also not a

2    termination letter.  The letter was sent as a threat well

3    before the termination.

4              MR. FALCONE:  But then we terminated and if we had

5    been trying to use that threat to coerce something that

6    termination gave up the leverage and that's why the facts of

7    this case are not on all fours with Solow.  Solow never

8    terminated that contract.  He was spinning this scheme on and

9    on and on in time.

10             THE COURT:  But the actual termination occurred

11   after there had been no ability to pursue alternatives.

12             MR. FALCONE:  Once Appaloosa terminated the

13   contract it makes clear --

14             THE COURT:  But that was two hours before the

15   closing.  Yes, it was clear because no one showed up.

16             MR. FALCONE:  But it made it clear that this was

17   not a scheme to extract anything.  If it was a scheme to

18   extract something why would Appaloosa have terminated?

19             THE COURT:  Consistency.  They had already done

20   it, why not do it again?

21             MR. FALCONE:  Well, I think, Your Honor, if we

22   look at the facts in Solow, the continuing nature of the

23   breach, not terminating the contract, the fact that -- I mean

24   here we do have an alternate transaction fee in the contract.

25   We may have a dispute about whether it's due but in Solow the

1 absence of any contractual basis for the demand was -- I mean

2 in this case there is a contractual basis for a demand and I

3 believe the fee is rightly claimed but even if you thought that

4 the fee was not rightly claimed you can't compare this to Solow

5 in the way that what he was demanding was not only absent from

6 the contract but in direct contradiction of its terms.  The

7 facts in this case just don't add up to the inference that the

8 Court said could be drawn from the facts in Solow and the

9 allegation which comes now in Delphi's opposition papers is

10 inconsistent with the allegation in the complaint.  The

11 complaint alleges squarely that the contract was not performed

12 because it was uneconomical, because they didn't like the

13 economics of the deal.  Period.  That's the motivation.

14          THE COURT:  But that doesn't stop the cogency to

15 an allegation that to support that improper position the

16 investors used this unwonted leverage.

17          MR. FALCONE:  How would that effort have supported

18 --

19          THE COURT:  Because rather than work with the

20 debtors to make the transaction happen, to have the financing

21 work, consistent with the best efforts obligation, first,

22 privately and then very publicly and in a very damaging way,

23 the investors said, not only will we not work with you but if

24 you even try to suggest that we're in breach you're going to be

25 liable for $82.5 million.  That's not how a normal contract

 1  party deals with its partner in the deal.

 2           MR. FALCONE:  I don't believe there's any

 3  allegation or a basis for an allegation that any of these

 4  defendants ever said if you say we're in breach we will then

 5  demand the fee.

 6           THE COURT:  Oh, I don't know if you were here

 7  during the 1142 argument, but that was all over the place and

 8  that's what your colleague here has said.

 9           MR. FALCONE:  Well, if that was happening at that

10  point in time and the fee was never paid and the agreement was

11  subsequently terminated because one or more defendants didn't

12  like the economics of the deal why would that supposed threat

13  constitute a ground for specific performance?  It doesn't link

14  up.

15           THE COURT:  Because it's bad stuff.  It basically

16  comes down to that, it's bad action.

17           MR. FALCONE:  But it's not bad stuff that caused

18  any injury.  Because the fee hasn't been paid and now Delphi

19  has alleged --

20           THE COURT:  It's all part of the same scheme.  I'm

21  not saying it's true, but it's all part of the same scheme to

22  do whatever could be done to get out of this deal.

23           MR. FALCONE:  But demanding the fee is not getting

24  out of the deal.

25           THE COURT:  You know, it's part of even getting

148

 1   out of having to pay the 250 if you could cause the debtors to

 2   miss a condition.  For example, by saying you can't even talk

 3   to us or the Court about whether we've breached, you can't

 4   suggest alternatives, for example, by paying out less cash,

 5   which normally an equity investor would be pretty happy about,

 6   then, you know, it's all part of the same theme that these

 7   investors were doing whatever -- leaving aside Goldman -- they

 8   could to get out of any liability.  You know, with whatever

 9   threat, whatever they could do.

10             MR. FALCONE:  Well, with all due respect, Your

11   Honor, I don't think that the best efforts clause required the

12   investors to accept a transaction that was inconsistent with

13   the contract and, Your Honor, I know I'm speaking a little bit

14   beyond the record now but I just want to prepare you, GM's

15   participation as the major first lien lender in this company

16   was anathema to the business plan of Delphi.  Delphi's business

17   plan on which this whole transaction was based was that it

18   could grow its business through other suppliers and bringing GM

19   in in a dominant -- from other carmakers and bringing GM in a

20   dominant way was --

21             THE COURT:  As a lender?

22             MR. FALCONE:   -- was a major change.  It was the

23   major vendor and now it was going to be the major creditor of

24   this company.  The whole reason that GM spun off Delphi was

25   that Delphi could grow its business by getting business from

149

1   other carmakers and now GM wanted to be both the principal

2   customer and the principal creditor but to get --

3                THE COURT:  You know what, that's going to be a

4   hard one to convince me of because I view the role of a lender

5   as being very different than the role of an owner or of a

6   customer.

7                MR. FALCONE:  It can be but when --

8                THE COURT:  And the notion that you wouldn't even

9   be able to talk about that, well, I just -- to me that seemed

10  like a real squeeze.

11               MR. FALCONE:  Your Honor, Mr. Friedman --

12               THE COURT:  And it's certainly not what people in

13  the bankruptcy world view as an alternative transaction when

14  you're bargaining for the right to go out and deal with a third

15  party on a higher and better basis.

16               MR. FALCONE:  Your Honor, Mr. Friedman also made

17  an allusion to joint and several liability saying that in light

18  of that provision he didn't see why it was important to resolve

19  the issue of whether specific performance is available to

20  defendants other than Appaloosa.

21               THE COURT:  I didn't agree with him on that.

22               MR. FALCONE:  Okay.  Thank you.

23               Just one comment, Your Honor, as to Section 18.

24  Section 11(b) is not a provision that creates rights.  Section

25  11(b) is a provision that curtails remedies.  Section 18 cannot

150

1    add back what Section 11(b) takes away.  So understanding that

2    Your Honor has concerns about the interpretation of 11(b),

3    whatever 11(b) takes away is not restored by Section 18.

4    Section 18 says in addition to the rights and remedies provided

5    in this contract.  Section 11(b) is not providing remedies,

6    it's curtailing remedies and that limitation on liability has

7    to be enforced and is not at all intentional and it is not at

8    all contradicted by Section 18.

9              If you have no questions, Your Honor, I'll sit

10   down.

11             THE COURT:  Well, let me explore that a little bit

12   with you.

13             Section 18 says the rights and remedies pursuant

14   to this agreement are cumulative and are not exclusive of any

15   rights or remedies which any party otherwise may have at law or

16   equity.  Your emphasis is on the "otherwise;" right?

17             MR. FALCONE:  Yes, Your Honor.

18             My emphasis is on a couple of things.  It's on the

19   beginning of it that the rights and remedies provided in this

20   agreement are cumulative.  This paragraph is not --

21             THE COURT:  It says pursuant to this --

22             MR. FALCONE:  It's similar, Your Honor.  The

23   concept is similar to the cases that Your Honor previously

24   cited about liquidated damages provisions.  There are cases

25   that say that just because a contract gives the right of

1   liquidated damages doesn't mean we should assume it's excluding

2   everything but there's other things, but those are not cases

3   that address liability limiting provisions, provisions that cut

4   back on rights and 11(b) is so clearly drafted in that way, in

5   fact it begins with a release.  Section 11(b) begins with both

6   sides of the transaction releasing all claims under the

7   contract against each other except for willful breach and then

8   it proceeds for there to cap the amount of liability.  So this

9   provision is not even being addressed in 18, 18 is only

10  addressing provisions that create rights and saying they should

11  not be construed as being exclusive.

12             THE COURT:  Okay.

13             MR. FALCONE:  Thank you, Your Honor.

14             MR. ROSENTHAL:  Good afternoon, Your Honor.

15             THE COURT:  Good afternoon.

16             MR. ROSENTHAL:  I'm not interested in debating any

17  of the legal or factual points but just in response to some of

18  the points you made with Mr. Falcone just now, just directing

19  the Court to the actual allegations in the complaint itself,

20  and I have before me the UBS complaint by the Sussman firm;

21  also the allegations with respect to Merrill, Pardus, Harbinger

22  and Goldman, are as I understand them the same in the other

23  complaint.  But with respect to the alternate transaction

24  agreement and the demand for the $82 million, the only place in

25  the UBS complaint that it's referenced is in Paragraph 51 in

1    the termination notice on April 4th.  There's no reference or

2    allegation at all that anybody said before April 4th that there

3    was a demand for money, that there was a threat of an alternate

4    transaction compensation, nor was there any allegation at all

5    in the complaint that there was an offer that it won't be

6    asserted under certain conditions or provided the debtors do or

7    don't do something.  It's only attacking the termination notice

8    itself so I think when we look to see what's alleged --

9             THE COURT:  I think that's right.  Right, Mr.

10   Friedman?  It really references the termination notice, nothing

11   else?

12            MR. FRIEDMAN:  Right.  But we would submit, Your

13   Honor, that everything in the record on this motion can be

14   considered by the Court and --

15            THE COURT:  Well, where else is it in the record?

16            MR. FRIEDMAN:  Well, no, I'm saying in the record

17   in these bankruptcy cases and we would and we could --

18            THE COURT:  Well, I mean this is a letter that --

19   it may have come in as an exhibit somewhere but I don't have it

20   --well, all right.

21            MR. FRIEDMAN:  Well, I'd just finish the point.

22   We would and could amend the complaint to add the specific

23   reference to the alternate transaction letter that we're

24   discussing today.

25            THE COURT:  All right.

153

1            MR. ROSENTHAL:  In response, I would just say if

2    there was such a letter earlier I think we're entitled to have

3    that as an allegation in the complaint itself.

4            THE COURT:  Okay.

5            MR. SHORE:  Chris Shore from White & Case for

6    Appaloosa.

7            Two points with respect to the fraud.  With

8    respect to what's now been called the behind-the-scenes

9    activity, and I trust that everybody recognizes still that it's

10   an allegation and it's one that Appaloosa or ones that

11   Appaloosa is just as concerned about and if we have to get

12   there, we'll get there.  But allegations of short selling and

13   allegations of talking to lenders are not frauds as pleaded in

14   this complaint.  They're certainly acts which are pled, facts

15   which are pleaded, but we're not here on facts, we're here on

16   have they presented pursuant to Rules 9 and 12 a pleaded legal

17   theory to go forward and if what they're talking about is a

18   fraud and the bad stuff, we need the who, what, when, where,

19   why and how and a legal theory upon which Appaloosa can be held

20   liable which meets Twombley which we can respond to.  This

21   whole bad acts concept --

22           THE COURT:  Wouldn't it, though, be a material

23   failure to disclose, given an obligation to do so?

24           MR. SHORE:  Failure to disclose in what context?

25   If we're talking about short selling we are entitled to a

154

1    pleading that says how the short sale occurred, who was

2    involved, how they tie it to us and then how the debtor was

3    harmed.  We're entitled to that and with respect to the talking

4    to the lenders, what lender was talked to, who was talked to

5    and what's their good faith basis under Rule 11 for saying we

6    secretly pulled the strings on that?  We are entitled to that

7    and that does not form the basis right now of an actionable

8    fraud claim against AMLP.  The fraud claim that is attempted to

9    be pleaded against AMLP is in 60 and 61 which Mr. Friedman

10   referred to, and that one is the, I was led to believe that

11   this was a contract that was going to close no matter what, and

12   I didn't hear any textual analysis that supported a reading of

13   the contract that said it was going to be closed no matter

14   what.  In fact, the contract expressly contemplates that there

15   are two types of termination notices we could send; one is if a

16   party was in breach and another is if April 4th came and in

17   that instance the contract expressly contemplates --

18            THE COURT:  I'm sorry, I thought you were going

19   somewhere else.  I thought you were going to say the other

20   basis would be we could choose to breach and then pay the

21   amount.

22            MR. SHORE:  That's right.  If you get to April 4th

23   you can send a termination notice.  The argument had been made

24   that we said that got us out of liability, it doesn't.  Section

25   12(h) says expressly if we were in breach of that contract,

155

1   even wilfully so on April 4th, we'd suffer liability up to $250

2   million.  So I have not heard any textual analysis of this

3   contract which says that the debtors could have reasonably

4   relied on any of those statements about, I'm really interested

5   in this deal.  Leave aside that they aren't misrepresentations

6   of fact, leaving aside that they don't form the basis of a

7   claim but even if all of that were true, the debtors who are

8   asserting a fraud claim and what they've asserted in this

9   complaint don't have as a matter of law a basis to rely on

10  that.

11             THE COURT:  Do you have anything on the choice of

12  law point beyond what's set forth in your papers?

13             MR. SHORE:  No, I think Your Honor noted there are

14  a whole bunch of reasons including the one that I didn't

15  mention as to why a New York Court would want to apply.  I

16  think we're misstating to some extent to say that the law is

17  it's where the injury occurs unless other things happen.  The

18  law is which state has the greatest interest in it, whether no

19  other factors will default to the law where the injury

20  occurred.  So in the end of the day I think it's New York,

21  we've addressed it as New York.  I think it should be New York

22  but I don't see the material difference between Michigan law

23  and New York law at least now for the purposes of determining

24  the motion to dismiss on the theories we're talking about that

25  will require a different result which leads us, I think, to a

156

1   false conflict.

2            A quick thing and on the last point on fraud with

3   respect to the special damage point, right, so the only

4   exception they've argued for why we entered into the contract,

5   even if it was we can show reasonable reliance is because we've

6   got special damages.  I don't see a special damages allegation

7   in the complaint.  In fact, as I said before and wasn't

8   responded to --

9            THE COURT:  Do they have to do that?

10           MR. SHORE:  Yes, they have to do that particularly

11  under Rule 9.  But in any event, special damages are --

12           THE COURT:  I know they have to show damages but

13  do they actually anticipate the Bridgestone/Firestone objection

14  and allege special damages?

15           MR. SHORE:  If they're going to claim special

16  damages, yes.  Why would they --

17           THE COURT:  No, no, under Rule 9 you have to,

18  among other things, plead damages so now -- under Rule 12 too -

19  - but do you have to plead special damages --

20           MR. SHORE:  Yes.

21           THE COURT:  -- as opposed to show the Court in

22  connection with a motion to dismiss or a motion for summary

23  judgment that there are special damages?

24           MR. SHORE:  But the point being, is the theory of

25  this complaint is that the damages were all, of course,

1   foreseeable from what we were doing.  These are the damages

2   that flow from the breach of contract.

3               THE COURT:  But I guess I'm not sure why this is

4   relevant anyway, given that the complaint clearly references

5   and incorporates the EPCA and the commitment letters and so I

6   can read them to determine whether there's special damages or

7   not.

8               MR. SHORE:  Okay.  My point being is that there

9   are multiple hurdles when we're talking about the Paragraphs

10  60/61 fraud that is being pressed here.

11              THE COURT:  That doesn't seem to be one of them,

12  though.

13              MR. SHORE:  No, the issue would be is there an

14  exception under the New York or the Michigan law which would

15  allow them to proceed with a fraud claim and the only one that

16  was articulated was the special damages and we don't need to

17  dwell on that.

18              Corporate form.  Now, let me address that real

19  quick.  With respect to the behind-the-scenes activity, I mean

20  if they show that's an actionable wrong we're not -- the

21  piercing isn't being sought for those purposes.  Actually,

22  Appaloosa was the party who was sued for the fraud.  It was not

23  AMLP was sued for the fraud and, therefore, they wanted to --

24  ADAH was sued for the fraud and they wanted to seek the whole

25  AMLP liable.  They sued Appaloosa directly.  So the piercing

158

1    isn't being brought in the context of the fraud claim, the

2    piercing is being brought in the context of we're dealing with

3    a contract and can they pierce -- so my point being is that the

4    distinction was being drawn in the piercing context based upon

5    a fraud having occurred.  I think the piercing only comes up in

6    the context where we're passed a fraud and we're only dealing

7    with a breach of contract.

8           THE COURT:  What about wrongdoing?  Wasn't ADAH

9    under the contract supposed to be the entity that dealt with

10   the additional investors?

11          MR. SHORE:  Yes.

12          THE COURT:  And they allege that Appaloosa dealt

13   with them and concerted or concocted this whole approach to get

14   out of the agreement by among other things trashing the

15   financing.  So either they're doing it directly or they're

16   doing it through ADAH wrongfully.

17          MR. SHORE:  I think in working through it I think

18   the only time those allegations come up or when we're dealing

19   in the EPCA setting which you still deal with the Brunswick

20   issue; right?  I mean I don't think you get around the

21   Brunswick issue by talking about bad acts.

22          THE COURT:  When it's a matter of knowing you're

23   dealing with an undercapitalized entity, that's right, but

24   where it's not knowing that you're dealing with an entity that

25   you can't trust, I think that's something different.

1          MR. SHORE:  That may be the basis for asserting a

2    direct fraud claim against AMLP or a direct claim on these bad

3    acts against AMLP.  I just don't see --

4          THE COURT:  Not if they were causing ADAH, which

5    is the party under the contract that's supposed to be dealing

6    with the additional investors, to scheme like this -- it would

7    seem to me.

8          Remember, Delphi was not permitted to talk to

9    those people.  ADAH was supposed to be the interface.  If

10   instead of that or in control of ADAH, Appaloosa caused ADAH to

11   do X, Y and Z, then that doesn't seem to me to be covered by

12   Brunswick because, certainly, Delphi couldn't be said to have

13   expected that ADAH under the control of Appaloosa would have

14   been doing that as opposed to in Brunswick where the Court

15   said, of course, you expect a shell to be a shell because you

16   knew they were a shell.

17         MR. SHORE:  Right.  Okay.  I mean I think if we

18   see a repleaded claim with respect to who was talking to who,

19   when and what was being done, I think that will allow you to

20   pick apart a little closer the allegations which would support

21   or not support a piercing on the contract claim.

22         THE COURT:  That's probably correct.

23         MR. SHORE:  On the termination letter, that's

24   another instance.  That's just not in the complaint.

25         THE COURT:  Well, the termination letter is, but

160

1    the other letters aren't.

2                MR. SHORE:   There are no other letters.

3                THE COURT:   Well, I don't know --

4                MR. SHORE:   Okay.   I'm just saying so --

5                THE COURT:   -- I don't know if there are or there

6    aren't but --

7                MR. SHORE:   -- so that's another instance in which

8    we get a little more clarity.   If they want to make an

9    allegation that some other communication occurred they'll make

10   that subject to whatever obligations they have to make that

11   statement.   But with respect to what's pleaded in the

12   complaint, the termination notice contained a demand that can't

13   fairly be read in the same way as --

14               THE COURT:   I have a feeling, but maybe I'm wrong,

15   that they'll be able to do that.

16               MR. SHORE:   Coming now to just ending with two

17   points on specific performance.   I still haven't heard a

18   definition of liability supported by anything which says that

19   means money damages only, anywhere, anything.   Just, we want

20   you, Your Honor, to redefine the word and the latest

21   explanation as to why you need to redefine the word is because

22   the commitment letters are ambiguous.   It says in the first

23   part that we commit to $1.1 billion.   It says in the second

24   part, notwithstanding the foregoing --

25               THE COURT:   I don't find the commitment letters to

161

1  be ambiguous.

2          MR. SHORE:  It's the same, though, with respect to

3  the EPCAs.

4          THE COURT:  That's where we part company.

5          MR. SHORE:  Okay.  With respect to the EPCAs the

6  only explanation they've given is that liability means money

7  damages.  If they're arguing those two should be read together

8  --

9          THE COURT:  I'm not.

10         MR. SHORE:  Okay.

11         THE COURT:  In fact, I'm arguing just the opposite

12  with you, which is that the parties knew how to draft it right

13  and they didn't.

14         MR. SHORE:  And the only -- I mean I heard Your

15  Honor talking -- we go to 11(b) where we talk about liability.

16  The only thing we've talked about differently than what they've

17  put forward in their papers is that parenthetical "under any

18  legal theory" and I don't think they can create an ambiguity by

19  saying "legal theory" refers to something other than a claim

20  which you could bring at all or a claim in which you can bring

21  any legal proceeding.  A breach of contract is a legal theory

22  so how can you read that paragraph as saying the aggregate

23  liability if it's not money damages but if it includes

24  equitable forms of relief, how can you read that as saying the

25  aggregate liability of all the investors under the agreement

162

1  for any breach of contract including a willful breach shall not

2  exceed 250?  If there's a breach of contract --

3           THE COURT:  If that's the case why in the

4  commitment letter didn't the parties stop at (i) in Paragraph 3

5  but felt they needed to put in (iii) as well?

6           MR. SHORE:  Because the commitment letter was an

7  obligation only for the payment of money.  The only obligation

8  under that commitment letter is the payment of money.  So

9  you're not going to get specific performance of that.  The EPCA

10  contains all sorts of other obligations of the parties that

11  have nothing to do with a monetary obligation.

12           THE COURT:  Okay.

13           MR. SHORE:  Last point on specific performance.

14  This concept has been floated somehow by Mr. Friedman that

15  there could be specific performance of one plan investor and

16  not all plan investors.  That just can't work.  There's no way

17  to have specific performance of this deal without each of the

18  plan investors being there with their full amount of the

19  commitment.

20           THE COURT:  Why not ADAH and Appaloosa alone?

21           MR. SHORE:   Because they are not liable for the

22  full amount of the purchase price.

23           THE COURT:  Why?

24           MR. SHORE:  Because the contract does not commit

25  them to be full amount of the purchase price.

163

1              THE COURT:  Other than the $250 million --

2              MR. SHORE:  No, the actual commitments that we are

3    required to buy in 2(a).

4              THE COURT:  Now, ADAH, you'd better walk me

5    through that, because that's not my understanding.  The

6    individual caps on liability -- on joint and several liability

7    only apply to the other investors.

8              MR. SHORE:  No, but the actual commitment to fund

9    -- what we're talking about here is a specific performance.

10             THE COURT:  But it's joint and several liability

11   for a breach and once that happens unless you're capped ADAH

12   has 100 percent joint and several liability.

13             MR. SHORE:  No, but one of the conditions here is

14   that everybody else is funded.  So you can't force a closing --

15             THE COURT:  No, it's a willful breach.  That's

16   all.  Once there's a willful breach everyone is jointly and

17   severally liable.  Am I missing that?

18             MR. SHORE:  Specific performance requires that all

19   of the terms of the contract are being performed.  You can't

20   perform all the terms of the contract -- the debtors can't just

21   say --

22             THE COURT:  The contract -- you've been arguing to

23   me for six hours now that the contract is every provision --

24   one of the provisions of it says that if anyone wilfully

25   breaches ADAH is jointly and severally liable for the whole

164

1   thing.  That's what they would enforce.

2           MR. SHORE:  But that would be in a damage concept;

3   right?  You can't have a closing of this transaction --

4   specific performance is an order --

5           THE COURT:  Why not?  ADAH agreed to do that.

6           MR. SHORE:  No, ADAH, subject to the caps and

7   subject to its ability to perform has committed to a specific

8   amount of money and --

9           THE COURT:  And if someone else wilfully breaches,

10  their share too.

11          MR. SHORE:  Their share, too, but not in the

12  context of requiring a performance of the agreement.  I mean

13  this is not a --

14          THE COURT:  As far as ADAH is concerned it's their

15  performance.  You say that's not a contractual obligation?

16          MR. SHORE:  No, I do not believe that the contract

17  is fairly read.  It's not an issue of today other than the

18  concept that there can be specific performance of this contract

19  without all the plan investors being there.

20          THE COURT:  Well, then it is an issue for today.

21          MR. SHORE:  It's an issue in the context of is

22  this specific performance remedy available?  The cap on

23  liability here does apply to ADAH, it's 250.  It's 250.  It

24  does not have the sublimit --

25          THE COURT:  We've been over that point.

165

1              MR. SHORE:  But it's not an instance in which the

2       only parties who are allowed to assert the cap with respect to

3       the transaction are the others who have the specified

4       sublimits.  You can't say the others are permitted to use their

5       cap on liability where we're going to add specific performance

6       because then it's avoiding the cap which is being used to let

7       the others out.

8              THE COURT:  Well, what if it's the case that the

9       only bad conduct was Appaloosa's?  Then that seems to be

10      clearly consistent with the contract as written that Appaloosa

11      would have to perform consistent with its role as being the

12      lead investor.

13             MR. SHORE:  Yes, I --

14             THE COURT:  I don't see how Appaloosa can engage

15      in bad conduct that would be sufficient to get it out from

16      under the cap or force it to specifically perform and then

17      plead that because one of its co-investors was not acting badly

18      it can be relieved of that obligation.  That just doesn't seem

19      right to me.

20             MR. SHORE:  No, and as I said I think if what

21      we're talking about is a particularized allegation of the bad

22      acts and responding to the bad acts, that's a different thing

23      and that is not even on the allegations here sufficient to wipe

24      out a cap to permit a $2.5 billion transaction to go forward.

25      That's the issue and I don't think that that's necessarily even

166

1   what they're pleading but --

2            THE COURT:  Why wouldn't it be sufficient on a

3   motion to dismiss basis?

4            MR. SHORE:  But I'm saying I don't think that's

5   what they're pleading.

6            THE COURT:  But it's in the complaint.  Why

7   wouldn't it be sufficient?

8            MR. SHORE:  Why?

9            THE COURT:  Why wouldn't it be sufficiently a bad

10  act to invoke Kalisch and the other cases?

11           MR. SHORE:  Because Kalisch is only going to apply

12  to the act you're talking about; right?  I mean if they want to

13  plead with respect to talking that Appaloosa -- and falsely

14  pleaded so -- shut down the capital markets such that the only

15  reason they couldn't get the debt finances because that was

16  going on; right?

17           THE COURT:  Right.

18           MR. SHORE:  If they showed that, that the only

19  reason they couldn't, we're talking about different damages

20  than they weren't able to get exit finance that didn't close

21  the transaction.

22           THE COURT:  You think there has to be a specific

23  tie-in to the damages?  You don't think it's enough to say that

24  in addition to the normal contractual undertakings the party

25  you were in a contract with was working in improper and

167

1   egregious ways to subvert the contract is enough to take it out

2   of the specific performance?

3            MR. SHORE:  I think it isn't enough to take it out

4   of specific --

5            THE COURT:  You think it is?

6            MR. SHORE:  I'm misphrasing that.

7            THE COURT:  It isn't enough to take it out of

8   specific performance?

9            MR. SHORE:  It isn't enough to override the entire

10  cap with respect to the entire transaction is what I'm saying.

11            THE COURT:  Because?

12            MR. SHORE:  Because I don't think the cases read

13  that way.  I don't think that what ends up is happening is one

14  bad act voids the entire limitation on liability.  I think it

15  applies to the conduct.  So there does have to be a tie.  It's

16  not an issue that was raised by the debtors.  It's kind of hard

17  to brief this on the fly.

18            So if Your Honor has no further questions I think

19  I'm finished.

20            THE COURT:  I'm just thinking this point through.

21                 [Pause in proceedings.]

22            THE COURT:  Okay.

23            MR. SHORE:  Thank you, Your Honor.

24            MR. LACEY:  Your Honor, first, I think we've made

25  some progress as far as Goldman Sachs is concerned.  Right

1  before lunch I pointed out to you that the two paragraphs of

2  the complaint in which Goldman Sachs is supposedly alleged to

3  have acted in concert with the other defendants does not say

4  anything like that, and I assume that Mr. Friedman had a chance

5  to look at the complaint over lunch and did not respond to

6  that.  So I take it that we are now done with concerted action.

7  There's no allegation of concerted action.

8              Mr. Friedman also did not say that there's any

9  allegation in the complaint that Goldman Sachs failed to use

10  reasonable best efforts.  But he did make what I thought was a

11  shocking assertion that I had admitted that Goldman Sachs

12  failed to use reasonable best efforts and I said --

13              THE COURT:  No, he said that your pleading said

14  that you stood aside and waited and he equated that to a breach

15  of -- he didn't say you admitted that, he just said that you

16  acknowledged that Goldman Sachs said, we don't have a dog in

17  this fight, our money is here and you tell us when the closing

18  is.

19              MR. LACEY:  Your Honor, I think the record will

20  reflect that he did not refer to anything in the complaint.  He

21  said that my presentation here amounted to an assertion that

22  Goldman Sachs did nothing.  I did not say that Goldman Sachs

23  did nothing and Mr. Friedman knows that Goldman Sachs did not

24  do nothing.

25              THE COURT:  I don't think he said you did nothing,

169

1   I think he said you did nothing proactive other than being

2   ready to close.

3            MR. LACEY:  As he also knows and as the Court

4   knows, I personally told Mr. Butler that Goldman Sachs would

5   close if everyone else did, that we were not going to raise any

6   objections.

7            THE COURT:  He said --

8            MR. LACEY:  Mr. Butler said it would be immensely

9   helpful if I wrote a letter confirming that.

10           THE COURT:  Right.

11           MR. LACEY:  We did write a letter confirming that.

12  To the best of my knowledge that is the only thing that Delphi

13  asked Goldman Sachs to do to help get this deal done and

14  Goldman Sachs did it.

15           THE COURT:  I appreciate that.  I think that the

16  point he was making, and I tell you I have some skepticism

17  about it, is that, without alleging anything more, the mere

18  fact that there is a reasonable best efforts provision in there

19  required Goldman somehow to be more proactive than that.

20           MR. LACEY:  Well, I'd like to just reinforce that

21  skepticism.  You mentioned this morning that Goldman Sachs was

22  criticized before the EPCA amendment was entered into by trying

23  to talk to somebody else.  It was shut down, we got an angry

24  letter --

25           THE COURT:  But not by the debtors.  The debtors

1   weren't --

2           MR. LACEY:  No, that's correct but we were told

3   not to.

4           THE COURT:  By Appaloosa.

5           MR. LACEY:  All of the conduct of the other

6   investors, that is other than ADAH and Goldman Sachs, which

7   forms the basis of the pleaded claim of failure to use

8   reasonable and best efforts relate to discussions pursuant to

9   the common interest agreement and it is affirmatively alleged

10  that Goldman Sachs did not sign that.  The effective course is

11  that nobody would talk to Goldman Sachs.  It cannot be right

12  that you can hang people out to dry, that you can assert a

13  claim for breach of reasonable best efforts by entering into a

14  common interest agreement and also assert that Goldman Sachs

15  breached a duty of reasonable efforts by not signing it and

16  being excluded from all the discussions.

17          At least, Your Honor, I think this is -- just to

18  be clear -- as a number of people have pointed out, in 11(b),

19  11(b) begins with a release by Delphi of all of the investors

20  of any claim other than a claim for willful breach.  In the

21  absence of any allegation concerning anything that Goldman

22  Sachs should have done that it failed to do, much less any

23  allegation that Goldman Sachs knew or had any reason to know it

24  was supposed to be doing something it didn't do, nobody could

25  say that there has been the claim of willful breach pleaded on

171

1  the basis of the best efforts clause.  There is no claim.

2  There is a failure to state a claim for which relief may be

3  granted for any breach of this agreement by Goldman Sachs and a

4  willful breach.

5          THE COURT:  Well, by Goldman Sachs; right.

6          MR. LACEY:  That's correct.  That's all I'm

7  talking about.

8          THE COURT:  Okay.

9          MR. LACEY:  Now, I just want to mention in passing

10 that --

11         THE COURT:  I mean I take it you mean that simply

12 by interpreting "willful" as "intentional" --

13         MR. LACEY:  That's correct --

14         THE COURT:  -- because there's no statement that

15 there was even an intentional --

16         MR. LACEY:  -- taking at the lowest level that

17 whatever scienter -- it clearly has some scienter requirement.

18         THE COURT:  Right.

19         MR. LACEY:  And since there's no pleading of

20 anything, not even the identification of the thing that Goldman

21 Sachs is supposed to have done and no assertion whatsoever that

22 it knew or should have known or ought to have known or in

23 exercise of reasonable care would have known, there can't be a

24 willful breach.

25         THE COURT:  Right.  Okay.

172

1          MR. LACEY:  Now, the one last thing is I just want

2    to clear the air about this alternative transaction fee.  If

3    you look at Schedule 2 to the EPCA you will see that Goldman

4    Sachs is in the unique position of being the only defendant

5    that is entitled to zero of any alternate transaction fee at

6    this point.  It's not entitled to it, it's never asked for it,

7    it's never even arguably been part of a group that asked for

8    it.  So to the extent that has any relevance, it is not

9    relevant to Goldman Sachs.

10          Thank you, Your Honor.

11          THE COURT:  Okay.  Just really briefly, Mr.

12    Friedman, if you have anything to say.  If you don't then --

13          MR. FRIEDMAN:  Just a couple of things, Your

14    Honor.

15          Delphi, if necessary, could and would amend its

16    pleading to allege that Merrill and Goldman and the other non-

17    Appaloosa defendants knew or were wilfully blind to activities

18    that were going on by Appaloosa to avoid its obligations under

19    the EPCA and the commitment letter agreements.

20          All of these plan investors were reaping the

21    benefits of the millions of dollars in fees being paid by

22    Delphi pursuant to the EPCA and the notion that they did not

23    know what Appaloosa was doing is something that Delphi believes

24    is just ludicrous and if that needs to be alleged expressly in

25    the complaint, Delphi would be prepared to do that.

1          THE COURT:  Okay.  First of all, does anyone have

2   anything else to say?

3                    [No response.]

4          THE COURT:  When you were all before me on

5   Delphi's scheduling motion, I said that I would rule promptly

6   and I will.  I'll rule from the bench, but I'm going to do that

7   Monday morning.  I want to look at a couple of points that were

8   raised by the parties this afternoon and so I will give an oral

9   ruling Monday at ten o'clock.

10          There will be an open 800 line as there was today.

11   I'll vary my normal rule, which is that counsel who are located

12   in New York should be here for a hearing.  This isn't a

13   hearing, it's an oral ruling, so unless you want to be here in

14   person you can dial in and I'll ask the debtors to set up that

15   line.  It's obviously dialed in for listen only, and, again,

16   it's just to give a ruling, I'm not going to hear further

17   arguments and, frankly, if someone wants to ask for a

18   clarification or something like that, they should be here in

19   person.

20          So I will see you all at ten o'clock on Monday.

21                    * * * * *

22

23

24

25

174

1                              * * * * *

2         I certify that the foregoing is a transcript from an

3    electronic sound recording of the proceedings in the above-

4    entitled matter, except where, as indicated, the Court has

5    modified the transcript.

6

7                          _____

8                                  MARY GRECO

9

10   Dated:  July 29, 2008

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25