**Hearing Date And Time: August 26, 2008 at 10:00 a.m.**
**Objection Deadline: August 19, 2008 at 4:00 p.m.**

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | SHEARMAN & STERLING LLP |
| 333 West Wacker Drive, Suite 2100 | 599 Lexington Avenue |
| Chicago, Illinois 60606 | New York, New York 10022 |
| (312) 407-0700 | (212) 848-4000 |
| John Wm. Butler, Jr. | Douglas P. Bartner |
| John K. Lyons | Andrew V. Tenzer |
| Ron E. Meisler | |

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
    In re                            :    Chapter 11
                                    :
DELPHI CORPORATION, et al.,     :    Case No. 05-44481 (RDD)
                                    :
                       Debtors.    :    (Jointly Administered)
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER AUTHORIZING AMENDMENT TO ARRANGEMENT
WITH GENERAL MOTORS CORPORATION APPROVED PURSUANT
<u>TO SECOND DIP EXTENSION ORDER (DOCKET NO. 13489)</u>

("GM ARRANGEMENT AMENDMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion (the "Motion") For Order Authorizing Amendment To Arrangement With General Motors Corporation Approved Pursuant To Second DIP Extension Order (Docket No. 13489), and respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.  On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263), and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

2

Possession (Docket No. 11386) (the "Plan"), and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

4. On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless continue to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

5. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6. The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. Current Business Operations Of The Debtors

7. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately

3

$13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

        8.        The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

        9.        Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, more than half of Delphi's revenue is generated from non-GM sources.

---

[1]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

C.     Events Leading To The Chapter 11 Filing

      10.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] In 2005, Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. In 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs. In 2007, the Debtors incurred a net loss of $3.1 billion. The Debtors believe that the Company's financial performance deteriorated because of (i) unsustainable U.S. legacy liabilities and operational restrictions that prevented the Debtors from exiting non-profitable, non-core operations and created largely fixed labor costs, (ii) a competitive vehicle production environment that resulted in reduced U.S. GM production and related pricing pressures, and (iii) increasing commodity prices. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

      11.     On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.    Plan Confirmation And Postconfirmation Matters

12.    The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order. After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective. The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees. The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement. Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence

from chapter 11.  The Debtors nevertheless are working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.  Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.      <u>The DIP Facility</u>

13.     On January 5, 2007, pursuant to the Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt (the "DIP Order") (Docket No. 6461), this Court authorized the Debtors to enter into the current $4.5 billion postpetition financing facility (the "DIP Facility") governed by the Revolving Credit, Term Loan, and Guaranty Agreement (the "DIP Credit Agreement").  The DIP Facility refinanced both the $2.0 billion first amended DIP credit facility and the approximate $2.5 billion outstanding on the Debtors' $2.825 billion prepetition credit facility, and, at that time, consisted of a $1.75 billion first priority revolving credit facility, a $250 million first priority term loan, and an approximate $2.5 billion second priority term loan.  JPMorgan Chase Bank, N.A. ("JPMorgan" or the "Agent") is the administrative agent for the lenders under the DIP Facility (the "DIP Lenders").

14. The DIP Facility is secured by (a) a perfected first-priority lien on substantially all of the Debtors' otherwise unencumbered assets (subject to certain exclusions), (b) a perfected junior lien on substantially all of the Debtors' previously encumbered assets (subject to certain exclusions), (c) superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the DIP Facility, and (d) a first priority senior priming lien under section 364(d)(1) of the Bankruptcy Code on substantially all of the Debtors' property.[4] Borrowings under the DIP Facility are prepayable at the Debtors' option without premium or penalty.

15. On November 16, 2007, pursuant to the Order Supplementing January 5, 2007 DIP Order (Docket No. 6461) And Authorizing Debtors To (I) Extend Maturity Date Of DIP Facility, (II) Enter Into Related Documents, And (III) Pay Fees In Connection Therewith (the "DIP Extension Order") (Docket No. 10957), this Court authorized the Debtors to enter into the third amendment to the DIP Credit Agreement (the "First Amended and Restated DIP Credit Agreement") to, among other things, extend the term of the DIP Facility from December 31, 2007 to July 1, 2008.

16. On April 30, 2008, this Court entered the Second DIP Extension Order,[5] which authorized the Debtors to enter into an amendment and restatement of the First Amended and Restated DIP Credit Agreement (the "Second Amended and Restated DIP Credit Agreement"). Among other things, the Second Amended and Restated Credit Agreement

---

[4] A more detailed description of the terms of the DIP Facility is contained in the expedited motion for approval of the DIP Facility dated December 18, 2006 (Docket No. 6180) (the "DIP Motion"), the DIP Order, and the form of DIP Credit Agreement attached thereto.

[5] Order (I) Supplementing January 5, 2007 DIP Order (Docket No. 6461) And Authorizing Debtors To (A) Extend Maturity Date Of DIP Facility, (B) Enter Into Related Documents, And (C) Pay Fees In Connection Therewith And (II) Authorizing Debtors To Enter Into Arrangement With General Motors Corporation Or An Affiliate (Docket No. 13489).

8

extended the maturity of the DIP Facility to December 31, 2008 and reconfigured the size of the first priority revolving loan ("Tranche A") and the first priority term loan ("Tranche B").

17. At the time of the April 30, 2008 hearing, the Debtors anticipated that Tranche A of the DIP Facility would consist of a first priority revolving credit facility of up to $1 billion and a first priority term loan of up to $600 million and that the principal amount of the second priority term loan ("Tranche C") of approximately $2.5 billion would remain unchanged. As the syndication effort proceeded, however, investor interest in participating in the Debtors' DIP Facility proved to be significantly stronger than previously expected. Indeed, interest in the Debtors' DIP Facility was so high that it resulted in an oversubscription for the Tranche A, Tranche B, and Tranche C amounts that the Debtors anticipated borrowing. As a result, the Debtors and the DIP Lenders were able to make use of the opportunity afforded by the market support to make several improvements to the structure of the Second DIP Extension.

18. On May 29, 2008, this Court entered the Supplemental Second DIP Extension Order,[6] which authorized several adjustments to the DIP Facility in response to market interest. First, the Debtors increased the amount of availability under the Tranche A revolving credit facility to $1.1 billion and decreased the amount of the Tranche B term loan to $500 million. In addition, as a result of greater market interest, the Debtors were able to increase the principal amount of the Tranche C Loan by approximately $254 million.

G. The GM Arrangement

19. Pursuant to various orders entered by this Court during these chapter 11 cases, and in anticipation of entering into the GSA and the MRA, the Debtors have expended

---

[6] Order Supplementing Second DIP Extension Order (Docket No. 13489) Authorizing Increase In Financing Commitments In Response To Oversubscription Of Debtors' Syndication Of Second DIP Extension (Docket No. 13699).

9

significant sums that would otherwise have been paid or reimbursed by GM following the effectiveness of the GSA and the MRA. In connection with the Debtors' efforts to secure lender support for amendments to the DIP Facility now reflected in the Second Amended and Restated DIP Credit Agreement, the Debtors entered into an agreement with GM, dated as of May 9, 2008 and attached hereto as <u>Exhibit A</u> (the "GM Arrangement") pursuant to which GM agreed to make specified accommodations to enhance the Debtors' liquidity through the second half of 2008.

20. Under the current GM Arrangement, GM agreed to advance the Debtors an aggregate amount of up to $650,000,000 subject to the terms set forth therein. The terms of the GM Arrangement were structured to support the Debtors' objective to maintain a minimum of $500,000,000 of liquidity in Available Funds (as defined in the GM Arrangement), consistent with the terms of the Second Amended DIP Credit Agreement. Amounts advanced accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The interest on the advances will be cancelled if the GSA and MRA become effective on or prior to the expiration of the GM Arrangement, and the advances will be set off against amounts paid by GM or its affiliates to for the benefit of the Debtors under the GSA and the MRA, following the effectiveness of those agreements. The maturity date in the existing GM Arrangement is the earlier of (i) December 31, 2008, (ii) the date on or after the effectiveness of the GSA and the MRA on which GM or its affiliates have paid to or for the benefit of the Debtors an amount equal to or greater than $650,000,000 under those agreements, and (iii) the date on which the Plan becomes effective.

21. Pursuant to the GM Arrangement, Delphi agreed to pay certain fees and expenses and to indemnify certain parties under certain conditions. In addition, the Debtors other than Delphi that are Parties to the GM Arrangement have guaranteed Delphi's obligations

10

thereunder. The GM Arrangement provides that the Debtors' obligations thereunder are entitled to administrative expense priority under section 503(b)(1) of the Bankruptcy Code, subject to the terms of the GM Arrangement and the Second DIP Extension Order. This Court approved the GM Arrangement as part of the Second DIP Extension Order.

22. The Debtors and GM agreed to use good faith commercially reasonable efforts to negotiate and enter into amendments to the GSA and the MRA and to obtain the support of the Statutory Committees for such amendments following approval by this Court of the GM Arrangement. These negotiations are continuing.

Relief Requested

23. By this Motion, the Debtors seek entry of an order authorizing the Debtors to enter into an amendment to the GM Arrangement approved pursuant to the Second DIP Extension Order (Docket No. 13489) (the "GM Arrangement Amendment") attached as <u>Exhibit B</u> hereto, as described below.

Basis For Relief

24. The Debtors have determined that it would be prudent to further enhance their liquidity through the balance of 2008. As explained above, the Debtors and GM entered into the GM Arrangement to provide a means by which GM could advance amounts paid by the Debtors that would have been paid or reimbursed to the Debtors had the GSA and the MRA become effective. Delphi has continued to pay such amounts since this Court approved the GM Arrangement on April 30, 2008. As set forth in further detail below, the GM Arrangement Amendment would increase the aggregate commitment by GM to the Debtors under the GM Arrangement, thereby providing further liquidity enhancement to the Debtors as they continue their efforts to exit chapter 11.

11

H.   The GM Arrangement Amendment

25.   Under the GM Arrangement Amendment, GM has agreed to increase the aggregate principal amount available under the GM Arrangement by a maximum of $300,000,000 to a total aggregate amount of $950,000,000, as necessary for Delphi to maintain a minimum of $300,000,000 in liquidity in Available Funds (as defined in the GM Arrangement Amendment). Under the terms of the GM Arrangement Amendment, interest on advances above the original facility amount of $650,000,000 will be cancelled if a plan of reorganization reasonably satisfactory to GM becomes effective on or prior to the Tranche B Termination Date (as defined in the GM Arrangement Amendment), and upon the satisfaction of certain conditions set forth in the GM Arrangement Amendment.

26.   GM may terminate the GM Arrangement Amendment if the Debtors have not filed amendments to the Plan and Disclosure Statement with this Court that are reasonably satisfactory to GM on or prior to October 31, 2008. The maturity date for the incremental $300,000,000 in advances under the GM Arrangement Amendment is the earlier of (i) December 31, 2008, provided that, in the event the Bankruptcy Court shall have entered a final and non-appealable order approving the extension of the DIP Credit Agreement on substantially the same terms (other than pricing) as the DIP Credit Agreement in effect on the date hereof or on terms otherwise reasonably acceptable to GM, upon request by the Borrower, and if mutually agreed by GM and the Borrower, such date may be extended to the earlier of (x) June 30, 2009 and (y) the Termination Date (as defined in the DIP Credit Agreement and as such term may be amended, replaced or otherwise modified pursuant to such order), (ii) the date on which Delphi or any guarantor of the GM Arrangement files any motion or other pleading seeking to amend the Plan or Disclosure Statement in a manner not reasonably acceptable to GM, (iii) the termination of the DIP Facility, and (iv) the occurrence of the effective date of the Plan.

27. Upon execution of the GM Arrangement Amendment, GM and its relevant Affiliates (as defined in the GM Arrangement, the "GM Affiliates") will have (a) allowed claims with administrative expense priority pursuant to section 503(b)(1) of the Bankruptcy Code against Delphi and the GM Guarantors for all Obligations (as defined in the GM Arrangement, the "GM Arrangement Obligations") owing to GM or any applicable GM Affiliates and (b) all other rights under the GM Arrangement and the GM Arrangement Amendment, including, without limitation, the ability to exercise the right to set off and apply, subject to the terms of the GM Arrangement and the GM Arrangement Amendment, any indebtedness or liabilities owing by GM or the GM Affiliates to or for the credit or the account of Delphi or the GM Guarantors against any and all GM Arrangement Obligations of Delphi or the GM Guarantors without need to seek additional modification of the automatic stay imposed pursuant to section 362 of the Bankruptcy Code and without further order of the Court.

Applicable Authority

I. This Court Should Authorize The GM Arrangement Amendment

    (a) The GM Arrangement Amendment Is Appropriate Under 11 U.S.C. § 364(b)

28. The Debtors propose to enter into the GM Arrangement Amendment, which amends the GM Arrangement by, among other things, increasing the unsecured obligations thereunder by an amount not to exceed $300,000,000 and by granting GM an administrative claim for such amount under section 503(b) of the Bankruptcy Code.

29. Under section 364(b) of the Bankruptcy Code, a debtor may obtain unsecured credit outside the ordinary course of business and provide the lender extending such credit with an administrative priority claim for such amounts under section 503(b)(1) of the Bankruptcy Code. 11 U.S.C. § 364(b). Bankruptcy courts have discretion in determining whether to approve such transactions, although such "discretion is not unbridled." In re Ames

Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).  In making such determinations, "courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits."  Id. (citations omitted).

30.    This Court determined that these standards were met when it approved the GM Arrangement pursuant to the Second DIP Extension Order.  Because the GM Arrangement will remain in place, as supplemented by the GM Arrangement Amendment, this Court's prior findings should apply.

(b)    Application Of The Business Judgment Standard

31.    Based on the foregoing, the Debtors submit that entry of an order authorizing the GM Arrangement Amendment is necessary and appropriate to enable the Debtors to reorganize successfully.  The GM Arrangement Amendment negotiated in good faith, at arm's length, and pursuant to the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering whether a debtor has exercised its business judgment, a court is not free to second-guess particular provisions but rather determines whether the proposed action "as a whole is within reasonable business judgment." In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

32.    The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

14

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993). Once the debtor articulates a valid business justification, a presumption arises that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Comm. Of Equity Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

33. The Debtors have exercised sound business judgment in determining that entering into the GM Arrangement Amendment is appropriate. Indeed, the proposed terms of the GM Arrangement Amendment are fair, reasonable, and necessary and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter into the GM Arrangement Amendment, and receive advances on the basis set forth therein, pursuant to sections 363 and 364 of the Bankruptcy Code.

J.  The GM Arrangement As Amended By The GM Arrangement Amendment Should Be Accorded The Benefits Of Section 364(e)

34. No consideration is being provided to any party to, or guarantor of, obligations arising under the GM Arrangement or the GM Arrangement Amendment other than as disclosed therein. Accordingly, the GM Arrangement, as amended by the GM Arrangement

15

Amendment, should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

K.      Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

      35.      Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-day stay.  This Court previously granted similar relief from Bankruptcy Rule 6004(g) in approving the DIP Order, the DIP Extension Order, the Second DIP Extension Order, and the Supplemental Second DIP Extension Order, and other courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(g)).  With a waiver of the ten-day stay period, the Debtors will be able to consummate the GM Arrangement Amendment promptly upon this Court's approval of the Motion and continue to take the steps necessary to emerge from chapter 11.

Notice Of Motion

      36.      Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Twelfth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered July 23, 2008 (Docket No. 13965).  The Debtors have also provided notice to counsel to the agent for the Debtors' former prepetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

05-44481-rdd    Doc 14031    Filed 08/06/08    Entered 08/06/08 21:52:44    Main Document
Pg 17 of 18

WHEREFORE the Debtors respectfully request that the Court enter an order authorizing the Debtors to enter into the GM Arrangement Amendment and granting the Debtors such other and further relief as is just.

Dated: New York, New York
August 6, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti
Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

- and -

SHEARMAN & STERLING LLP

By:   /s/ Douglas P. Bartner
Douglas P. Bartner
Andrew V. Tenzer
599 Lexington Avenue
New York, New York  10022
(212) 848-4000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession