# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

**Debtors:** Delphi Corporation, et al. [1]
**Case Number:** Jointly Administered 05-44481 (RDD)

**Quarterly Operating Report for the Period Ended:**
June 30, 2008

**Debtors' Address:**
5725 Delphi Drive
Troy, Michigan 48098

**Operating Loss for the Three Months Ended June 30, 2008:** $560 million

**Debtors' Attorneys:**
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Suite 2100
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

And

Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

**Report Preparer:**

The undersigned, having reviewed the attached report and being familiar with the Debtors' financial affairs, verifies under penalty of perjury that the information contained therein is complete, accurate, and truthful to the best of my knowledge. [2]

**Date:** August 8, 2008        /s/: THOMAS S. TIMKO _____
                                Thomas S. Timko
                                Chief Accounting Officer and Controller

(1)   See next page for a listing of Debtors by case number.
(2)   All amounts herein are unaudited and subject to revision. The Debtors reserve all rights to revise this report.

**DELPHI CORPORATION, <u>et al.</u>**
**QUARTERLY OPERATING REPORT**

[1] The Debtors in these jointly administered cases are as follows:

| Debtor Name | Case Number |
|---|---|
| Delphi NY Holdings Corporation | 05-44480 |
| Delphi Corporation | 05-44481 |
| ASEC Manufacturing General Partnership | 05-44482 |
| ASEC Sales General Partnership | 05-44484 |
| Environmental Catalysts, LLC | 05-44503 |
| Delphi Medical Systems Colorado Corporation | 05-44507 |
| Delphi Medical Systems Texas Corporation | 05-44511 |
| Delphi Medical Systems Corporation | 05-44529 |
| Specialty Electronics International Ltd. | 05-44536 |
| Specialty Electronics, Inc. | 05-44539 |
| Delphi Liquidation Holding Company | 05-44542 |
| Delphi Electronics (Holding) LLC | 05-44547 |
| Delphi Technologies, Inc. | 05-44554 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 |
| Delphi Mechatronic Systems, Inc. | 05-44567 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 |
| Exhaust Systems Corporation | 05-44573 |
| Delphi China LLC | 05-44577 |
| Delphi Automotive Systems Korea, Inc. | 05-44580 |
| Delphi International Services, Inc. | 05-44583 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 |
| Delphi Automotive Systems International, Inc. | 05-44589 |
| Delphi International Holdings Corporation | 05-44591 |
| Delphi Automotive Systems Overseas Corporation | 05-44593 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 |
| Delco Electronics Overseas Corporation | 05-44610 |
| Delphi Diesel Systems Corporation | 05-44612 |
| Delphi LLC | 05-44615 |
| Aspire, Inc. | 05-44618 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 |
| Delphi Connection Systems | 05-44624 |
| Packard Hughes Interconnect Company | 05-44626 |
| DREAL, Inc. | 05-44627 |
| Delphi Automotive Systems Services LLC | 05-44632 |
| Delphi Services Holding Corporation | 05-44633 |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 |
| Delphi Foreign Sales Corporation | 05-44638 |
| Delphi Automotive Systems Human Resources LLC | 05-44639 |
| Delphi Automotive Systems LLC | 05-44640 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 |
| Delphi Receivables LLC | 05-47459 |
| MobileAria, Inc. | 05-47474 |

**DELPHI CORPORATION, <u>et al.</u>**
**QUARTERLY OPERATING REPORT**
**INDEX**

| <u>Description</u> | <u>Page</u> |
|---|---|
| Condensed Combined Debtors-in-Possession Statement of Operations for the three and five months ended June 30, 2008 | 4 |
| Condensed Combined Debtors-in-Possession Balance Sheet as of June 30, 2008 | 5 |
| Condensed Combined Debtors-in-Possession Statement of Cash Flows for the three months ended June 30, 2008 | 6 |
| Notes to Quarterly Operating Report | 7 |
| Schedule of Payroll and Payroll Taxes Withheld and Incurred | 21 |
| Schedule of Payroll Taxes Paid | 22 |
| Schedule of Other Taxes Collected, Incurred and Paid | 24 |
| Schedule of Disbursements | 27 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

| | Three Months Ended June 30, 2008 | Five Months Ended June 30, 2008 |
|---|---|---|
| | (in millions) | |
| Net sales: | | |
| General Motors and affiliates | $ 1,003 | $ 1,777 |
| Other customers | 1,010 | 1,724 |
| Non-Debtor affiliates | 113 | 183 |
| Total net sales | 2,126 | 3,684 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 2,238 | 3,881 |
| U.S. employee workforce transition program charges | 18 | 47 |
| Depreciation and amortization | 95 | 171 |
| Long-lived asset impairment charges | 4 | 7 |
| Goodwill impairment charges | 99 | 99 |
| Selling, general and administrative | 232 | 370 |
| Total operating expenses | 2,686 | 4,575 |
| | | |
| Operating loss | (560) | (891) |
| Interest expense (contractual interest expense was $127 million and $200 million, respectively) | (86) | (138) |
| Loss on extinguishment of debt | (49) | (49) |
| Other (expense) income, net | (5) | (3) |
| Reorganization items, net | (13) | (102) |
| Income tax benefit (expense) | 18 | 15 |
| Equity income from non-consolidated affiliates, net of tax | 12 | 13 |
| Loss from continuing operations | (683) | (1,155) |
| Loss from discontinued operations, net of tax | (10) | (70) |
| Equity income from non-Debtor affiliates, net of tax | 142 | 248 |
| | | |
| Net loss | $ (551) | $ (977) |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | June 30, 2008 (in millions) |
|---|---|
| **ASSETS** | |
| Current assets: | |
| Cash and cash equivalents | $ 148 |
| Restricted cash | 58 |
| Accounts receivable, net: | |
| General Motors and affiliates | 768 |
| Other third parties | 654 |
| Non-Debtor affiliates | 313 |
| Notes receivable from non-Debtor affiliates | 41 |
| Inventories, net | 708 |
| Other current assets | 365 |
| Assets held for sale | 450 |
| Total current assets | 3,505 |
| Long-term assets: | |
| Property, net | 1,317 |
| Investments in affiliates | 327 |
| Investments in non-Debtor affiliates | 2,075 |
| Goodwill | 53 |
| Notes receivable from non-Debtor affiliates | 1,429 |
| Other | 456 |
| Total long-term assets | 5,657 |
| Total assets | $ 9,162 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | |
| Current liabilities not subject to compromise: | |
| Short-term debt | $ 3,594 |
| Accounts payable | 821 |
| Accounts payable to non-Debtor affiliates | 654 |
| Accrued liabilities | 1,266 |
| Liabilities held for sale | 190 |
| Total current liabilities not subject to compromise | 6,525 |
| Long-term liabilities not subject to compromise: | |
| Long-term debt | 22 |
| Employee benefit plan obligations and other | 870 |
| Total long-term liabilities not subject to compromise | 892 |
| Liabilities subject to compromise | 16,325 |
| Total liabilities | 23,742 |
| Stockholders' deficit: | |
| Total stockholders' deficit | (14,580) |
| Total liabilities and stockholders' deficit | $ 9,162 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Three Months Ended June 30, 2008 (in millions) |
|---|---:|
| Cash flows from operating activities: | |
| Net cash used in operating activities | (405) |
| | |
| Cash flows from investing activities: | |
| Capital expenditures | (56) |
| Proceeds from sale of property | 21 |
| Proceeds from divestitures | 34 |
| Decrease in restricted cash | 67 |
| Proceeds from notes receivable from non-Debtor affiliates | 165 |
| Other, net | 17 |
| Discontinued operations | (12) |
| Net cash provided by investing activities | 236 |
| | |
| Cash flows from financing activities: | |
| Repayments of borrowings under refinanced debtor-in-possession facility | (3,198) |
| Net borrowings under amended and restated DIP facility | 3,469 |
| Other | (1) |
| Net cash provided by financing activities | 270 |
| | |
| Increase in cash and cash equivalents | 101 |
| Cash and cash equivalents at beginning of period | 47 |
| Cash and cash equivalents at end of period | $ 148 |

The accompanying notes are an integral part of the financial statements.

**1. Background and Organization**

    *General* – Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company") is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.

    *Chapter 11 Reorganization Cases* – On October 8, 2005, Delphi and certain of its United States ("U.S.") subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, will continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code.

    *Equity Purchase and Commitment Agreement* –  Under the terms and subject to the conditions of the Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively, the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

    The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

    On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

    On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination. On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

    Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16,

2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages. No amounts relating to this matter have been recorded in Delphi's financial statements. The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions. A trial on Delphi's complaint is currently scheduled to occur in March 2009, and the parties have agreed to participate in mediation in an attempt to settle the claims that were not dismissed.

During 2007, in exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million. In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA. The Company also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. Delphi had deferred the recognition of these amounts in other current assets as they were to be netted against the proceeds from the EPCA upon issuance of the new shares. However, as a result of the events relating to the termination of the EPCA, Delphi recognized $79 million of expense related to these fees and other expenses during the five months ended June 30, 2008.

***U.S. Labor Agreements*** – On March 31, 2006, the Debtors filed a motion with the Court under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As approved and confirmed by the Court, a series of settlement agreements or memoranda of understanding (each, a memorandum of understanding or "MOU") among Delphi, its unions, and GM settled the 1113/1114 Motion with respect to each of Delphi's unions.

***Plan of Reorganization*** – On September 6, 2007, Delphi filed a proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") with the Court and subsequently filed amendments to both the Plan and Disclosure Statement. The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, including agreements reached with each of Delphi's principal U.S. labor unions and GM. The Court entered an order approving the adequacy of the Disclosure Statement on December 10, 2007. After entry of the order approving the Disclosure Statement, Delphi began solicitation of votes on the Plan. On January 16, 2008, Delphi announced that the voting results had been filed with the Court. A hearing on confirmation of the Plan took place on January 17, 18, and 22, 2008. The Court entered the order confirming the Plan, as amended, on January 25, 2008, and that order became final on February 4, 2008.

As noted above, due to the Investors failure to fund their commitments under the EPCA, Delphi has not yet consummated the Plan and is continuing discussions with its stakeholders regarding potential amendments to the Plan that will enable Delphi to emerge from chapter 11 as soon as practicable. Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization is extended until 30 days after substantial consummation of the Amended Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Amended Plan (as modified) is extended until 90 days after substantial consummation of the Amended Plan (as modified) or any modified plan. On July 23, 2008, Delphi's Official Committee of Unsecured Creditors (the "Creditors' Committee") and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not presently intend to prosecute such complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against Appaloosa Management L.P. and the other investors who were party to the Equity Purchase and Commitment Agreement dated as of August 3, 2007. Notwithstanding the foregoing, pursuant to an order entered by the court on July 31, 2008, the Debtors' exclusive period for filing a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including October 31, 2008 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including December 31, 2008.

***GM Settlement*** – On September 6, 2007, Delphi entered into a Global Settlement Agreement ("GSA") and a Master Restructuring Agreement ("MRA") with GM. On October 29, 2007, Delphi entered into amendments to both the GSA and the MRA. On November 14, 2007 and again on December 3, 2007, Delphi entered into

amendments to both the GSA and the MRA.  Together, these agreements provide for a comprehensive settlement of outstanding issues between Delphi and GM (other than ordinary course matters), including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999; certain post-separation claims and disputes between Delphi and GM; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under Delphi's Plan; and various other legacy matters between the companies.

Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Plan or as soon as reasonably practicable thereafter.  However, as part of Delphi's overall discussions with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi and GM are negotiating modifications to the GSA and MRA, which if finalized and agreed to by both parties and approved by the Court, would provide for the agreements or certain portions of the agreements, including provisions related to the transfer of certain legacy pension and other postretirement benefit obligations, to become effective prior to substantial consummation of a plan of reorganization.  Among other things, early effectiveness of certain provisions of the GSA and MRA would facilitate the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the U.S. Internal Revenue Code (the "Code") to GM in an economically efficient manner prior to September 30, 2008, see Note 2. Basis of Presentation, Pension Funding. Given the ongoing nature of the discussions there can be no assurance that the parties will agree to potential amendments or that the Court will approve such amendments.

The GSA is intended to resolve outstanding issues between Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11 and will be implemented by Delphi and GM in the short term.  The GSA addresses, among other things, commitments by Delphi and GM regarding pensions and other postretirement benefit obligations, and other GM contributions with respect to labor matters, releases, and claims treatment.

By contrast, the MRA addresses matters that will require a significantly longer period that will extend for a number of years after the effective date of the Plan to complete.  The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11.  The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM.

Delphi filed the GSA and the MRA as exhibits to the Plan.  Both agreements were approved through confirmation of the Plan.

## 2.  Basis of Presentation

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects.  In addition, the financial statements and supplemental information contained within this note represent the condensed combined financial statements for the Debtors only.  Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements, and as such, their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared.  However it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.  The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

The unaudited combined financial statements have been derived from the books and records of the Debtors. This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures (such as tests for asset impairment), the Debtors believe that the financial information could be subject to changes, and these changes could be material.  The information furnished in this report includes primarily normal recurring adjustments but does not include all of the adjustments that would typically be made for quarterly financial statements in accordance with

U.S. GAAP.  Included in these financial statements is the impact of Delphi's adoption of Financial Accounting Standards Board ("FASB") Statement No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R),* which resulted in adjustments that increased pension and other postretirement benefit liabilities by $139 million, the beginning accumulated deficit by $129 million and other comprehensive loss by $10 million.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted.  Therefore, this report should be read in conjunction with the Company's consolidated financial statements and notes thereto included in its Annual Report on Form 10-K for the year ended December 31, 2007 and the Company's quarterly periodic reports or the subsequent periods filed with the U.S. Securities and Exchange Commission ("SEC").

The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the consolidated results of operations, financial position, and cash flows of the Debtors in the future.

*Going Concern* – The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) return to profitability; (iv) generate sufficient cash flow from operations; and (v) obtain financing sources to meet the Company's future obligations, including an extension or replacement of their DIP financing agreement, which expires on December 31, 2008.  These matters create substantial uncertainty relating to the Company's ability to continue as a going concern.  The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties.  In addition, the Company filed its proposed plan of reorganization with the Court in September 2007.  The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008, but Delphi was unable to consummate the plan because certain investors under the plan refused to participate in the closing, which was commenced but not completed on April 4, 2008.  Delphi subsequently filed complaints seeking redress for the breach of the investment agreement and damages related to the consequent delay of Delphi's emergence from chapter 11.  Delphi continues to work with its stakeholders, including GM, to further amend the plan.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein.  Intercompany transactions between the Debtors' and non-Debtor affiliates have not been eliminated in the Debtors' financial statements.  As approved by the Court on January 25, 2008, the Debtors sold investments in non-Debtor affiliates in the amount of $1.4 billion to a non-Debtor affiliate and received a note receivable from non-Debtor affiliates.  As of March 31, 2008 approximately $0.2 billion was included in current assets and $1.2 billion was included in long-term assets.  However, during the second quarter of 2008, based on strategic tax planning changes in repatriation plans the timing of payment of the note receivable was re-evaluated and the full note receivable from non-Debtor affiliates balance of $1.4 billion is included in long-term assets as of June 30, 2008.

*General Motors and Affiliates* – Includes activity with GM and its consolidated subsidiaries.  Activity with GM's non-consolidated affiliates (such as GM Shanghai) and activity with other Tier 1 suppliers which sell directly to GM is classified as other (non-GM) customer activity.

*Restricted Cash* – Primarily includes balances restricted for use for the pre-retirement portion of the special attrition program.

*Property* – Includes property, plant, and equipment and is recorded at cost net of accumulated depreciation.

*Goodwill Impairment Charges* – Delphi reviews the recoverability of goodwill annually on May 31 and at any other time when business conditions indicate a potential change in recoverability.  In conjunction with Delphi's annual recoverability tests, the deterioration of Delphi's financial performance, combined with an unfavorable outlook, were indicators for potential impairment.  More specifically, during the second quarter of 2008, Delphi has experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, particularly related to GM, continuing unfavorable pricing pressures and increasing commodity prices.  This caused previously unanticipated projected revenue and operating income declines.  As a result of these changes, long-term projections showed declines in discounted future operating cash flows.  These revised cash flows and declining market conditions caused the implied fair value of Delphi's Electrical/Electronic Architecture segment to be less than its book value.  The fair value was also adversely affected by declining industry market valuation

metrics.  Accordingly, the Debtors recorded $99 million of goodwill impairment charges during the three and five months ended June 30, 2008.

Delphi performed its goodwill impairment test by comparing the carrying value of each of its reporting units to the fair value of the reporting unit.  In determining fair value of reporting units, Delphi utilized a number of methodologies, including discounted cash flow analysis and review of fair value appraisals.  Where the carrying value exceeded the fair value for a particular reporting unit, goodwill impairment charges were recognized.  The goodwill impairment charges recognized were determined by stating all other assets and liabilities of a reporting unit at their fair values with the remaining fair value of the reporting unit attributed to goodwill.  The resulting goodwill impairment charges are the excess of the recorded goodwill balance over the implied fair value of goodwill for the reporting unit.  Delphi's reporting units are the global businesses focused on product families.  The fair value of the reporting units was negatively impacted by the continued deterioration of business conditions, principally in North America, as previously described.

*Discontinued Operations* – In accordance with Statement of FASB Statement No. 144 ("SFAS 144"), Accounting *for the Impairment or Disposal of Long-Lived Assets*, a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component.  The results of discontinued operations are aggregated and presented separately in the condensed combined statement of operations and condensed combined statement of cash flows.  Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the condensed combined balance sheet.  Refer to Note 7. Divestitures for more information.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business").  The sale of the U.S. operation and certain of the non-U.S. operations of the Steering Business will be sales of assets and will include (i) all assets, except for cash, deferred tax assets, and intercompany accounts, and (ii) all liabilities, except for debt, deferred tax liabilities, intercompany accounts, U.S. pension and other postretirement benefit liabilities, accrued payroll, and certain employee benefit accounts.  The sale of certain non-U.S. operations of the Steering Business are stock sales and will include all assets and liabilities for the sites with purchase price adjustments for cash, debt, and certain other accounts.  The sale of the Interiors and Closures Business closed on February 29, 2008.  The majority of the Interiors and Closures Business sale was primarily accomplished through asset sales and the buyer assumed inventory, fixed assets, non-U.S. pension liabilities, and an investment in a joint venture in Korea.

While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to the loss from discontinued operations in the statements of operations.  Delphi expects to retain certain employee pension and other postretirement benefit liabilities for the Steering Business and these liabilities were not allocated to liabilities held for sale in the balance sheets.  Expenses related to the service cost of employee pension and other postretirement benefit plans, however, were allocated to discontinued operations in the statements of operations, because Delphi will not continue to incur such related expense subsequent to the divestiture of these businesses.  Allocations have been made based upon a reasonable allocation method.

*Securities and ERISA Litigation Charges* – Delphi, along with certain of its subsidiaries, current and former directors of the Company, certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005.  Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the securities actions, ERISA actions, and shareholder derivative actions in consolidated proceedings (the "Multidistrict Litigation" or "MDL") reached an agreement with the lead plaintiffs in the Securities Actions (the "Lead Plaintiffs") and named plaintiffs in the amended ERISA Action (the "ERISA Plaintiffs") resulting in a settlement of the Multidistrict Litigation (the "MDL Settlements").  Pursuant to the MDL Settlements, the class claimants will receive cash and allowed claims in the chapter 11 cases that, when valued at the face amount of the allowed claims, is equivalent to approximately $351 million.  On December 4, 2007, the U.S. District Court for the Eastern District of Michigan (the "District Court") held a hearing to consider proposed

modifications to the MDL Settlements (the "Modified MDL Settlements") and tentatively approved the Modified MDL Settlements, after determining that the modifications were at least neutral to the Lead Plaintiffs and potentially provide a net benefit to the Lead Plaintiffs.  The District Court approved the Modified MDL Settlements in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered final orders and judgments dated January 23, 2008 with respect to the securities and ERISA actions.  On January 25, 2008, the Court approved the Modified MDL Settlements.  As provided in the confirmation order, the Modified MDL Settlements are contingent upon the effective date of the Plan occurring, and if, for any reason, Delphi cannot emerge from chapter 11 as contemplated, the Modified MDL Settlements will become null and void.

As a result of the Modified MDL Settlements, as of June 30, 2008, Delphi has a liability of $351 million recorded for this matter.  Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million.  As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage.  In conjunction with the Modified MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

*Warranty Matters* – Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments, and various other considerations.  Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases.  Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from chapter 11.  Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM.  In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in our Amended and Restated DIP Credit Facility, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, and as a result Delphi expects to record the extinguishment of this liability as a reduction of warranty expense in cost of sales, which will have a corresponding  favorable impact on operating income of $112 million in July 2008.

*Contractual Interest Expense and Interest Expense on Unsecured Claims* – Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007.  The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, the confirmation date of the plan of reorganization (as amended), when the Company ceased accruing interest on these claims.  Delphi recorded interest related to prepetition debt and allowed unsecured claims of $14 million through January 25, 2008.  Delphi reduced interest expense by $7 million during the three months ended June 30, 2008 due to changes in estimates of certain prepetition claim amounts.  At June 30, 2008, Delphi had accrued interest of $418 million in accrued liabilities in the accompanying balance sheet for prepetition claims.  This estimate is based on numerous factual and legal assumptions.  Upon consummation of the confirmed plan of reorganization discussed in Note 1. Background and Organization, Chapter 11 Reorganization Cases, the interest accrued for prepetition claims will be discharged at the emergence date; however, as noted above, Delphi has not yet consummated its confirmed Plan and is continuing to work with its stakeholders to further amend the Plan or develop an alternative plan accordingly, and there can be no assurances that these estimates will not change.

*Taxes* – Delphi recognizes current and deferred income tax assets and liabilities based upon all events that have been recognized in the consolidated financial statements as measured by the enacted tax laws.  Due to the Company's history of U.S. losses over the past years, combined with the deterioration in its current U.S. operating

outlook, Delphi has a 100% valuation allowance against all of its U.S. deferred tax assets, and as a result, does not recognize income tax benefits for net operating losses for its U.S. entities.

The Debtors have received Court authorization, but not direction, to pay sales, use, trust fund, and certain other taxes in the normal course. Accordingly, the Debtors have paid the applicable taxes when due. See the schedules of payroll and other taxes paid for additional information regarding taxes paid.

Generally the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as other comprehensive income ("OCI"). However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year.

Accordingly, all items of current year income, including those in OCI, should be considered for purposes of determining the amount of tax benefit that results from a loss in continuing operations and that should be allocated to continuing operations. In such instances, income from other categories must offset the current loss from operations, the tax benefit of such offset being reflected in continuing operations even when a valuation allowance has been established against the deferred tax assets.

For the three- and five-month periods ended June 30, 2008, Delphi had a $117 million pre-tax gain in OCI, primarily related to derivative contracts on copper and the Mexican Peso, thereby reducing the Company's current year valuation allowance and resulting in a benefit of $21 million allocated to the current year loss from continuing operations.

**Other Postretirement Benefit (Payments) Receipts, Net of Reimbursement by GM** – As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly employees represented by the UAW and the IUE-CWA were eligible to retire as employees of Delphi or flow back to GM and retire. During 2006, approximately 10,000 employees elected to flow back to GM and retire. Although GM agreed to assume the postretirement healthcare and life insurance coverages for these retirees, due to the volume of retirements, GM was unable immediately to transition these retirees to GM healthcare and life insurance plans. Delphi agreed to administer health and life insurance coverage for these retirees during the transition period and GM agreed to reimburse Delphi for its actual costs for providing such coverage. As of March 31, 2008, Delphi owed GM approximately $10 million due to overpayments made mostly during 2007. This amount was paid in April 2008. As of June 30, 2008, GM had reimbursed Delphi for all of its costs related to providing postretirement healthcare and life insurance coverage for these retirees.

**Pension Funding** – Delphi's discussions with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM.

On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers"). On May 31, 2007, the Court authorized Delphi to perform under the terms of those funding waivers. The IRS modified the 2006 Waivers by extending the dates by which Delphi is required to file its Plan and emerge from chapter 11. On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver"). The waivers were required, at that time, to facilitate the Debtors' option to effectuate the transfer of certain hourly pension obligations to GM in an economically efficient manner, and to remove uncertainty as to whether excise taxes would be assessed as a result of accumulated funding deficiencies relating to prepetition service. Absent the waivers, the transfer to GM could have triggered an obligation of the Debtors to make cash contributions to the Hourly Plan which would result in a projected overfunding of the Hourly Plan. On October 26, 2007, the Court authorized Delphi to perform under the 2007 Hourly Plan Waiver, which would have expired if Delphi did not emerge from chapter 11 by February 29, 2008. The Court authorized two additional funding waivers which authorized Delphi to defer funding contributions due under the Employee Retirement Income Security Act ("ERISA") and the Code until May 9, 2008. On April 4, 2008, the IRS and the PBGC modified the 2006 Waivers and the 2007 Hourly Plan Waiver by extending the date by which Delphi must emerge from chapter 11 to May 9, 2008.

Delphi did not seek extension of the 2006 Waivers or the 2007 Hourly Plan Waiver past May 9, 2008.  Delphi believes that ERISA and the Code will still, under most circumstances, after June 15, 2008, permit the Company to be able to effect the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the Code to GM in an economically efficient manner prior to September 30, 2008.  However, by permitting the waivers to lapse Delphi is potentially exposed to excise taxes as a result of accumulated funding deficiencies for the plan years ended September 30, 2005 and 2006 of approximately $173 million and $1.22 billion, respectively.  Accordingly, the IRS may assert against Delphi excise taxes in the approximate amounts of $17 million and $122 million for plan years ended September 30, 2005 and 2006, respectively. Because Delphi did not meet its minimum funding requirements on or before June 15, 2008, the accumulated funding deficiency without the effect of the waivers would be approximately $2.44 billion for the plan year ended September 30, 2007, which could lead to the IRS further asserting additional excise taxes of approximately $244 million. If the accumulated funding deficiency is not corrected after Delphi receives the assessments, an excise tax of up to 100% may be assessed at the discretion of the IRS.  Assuming Delphi is assessed an excise tax for all plan years through 2007, the total range of exposure would approximate between $380 million and $3.8 billion.  Delphi expects that the Hourly and Salaried Plans will have accumulated funding deficiencies for the plan year ending September 30, 2008, should Delphi not emerge from chapter 11.  Any transfer of hourly pension obligations to a GM pension plan will mitigate such deficiency for the Delphi Hourly Plan.

 As noted in Note 1. Background and Organization, Delphi and GM are considering potential amendments to the GSA and MRA, which if agreed to by the parties and approved by the Court, would cause the agreements or certain portions of the agreements to become effective prior to substantial consummation of a plan of reorganization, including those relating to the transfer of certain assets and liabilities of Delphi's Hourly Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the U.S. labor union settlement agreements, thereby facilitating completion of such transfer in an economically efficient manner prior to September 30, 2008.  However, there can be no assurances that Delphi and GM will reach final agreement on potential amendments or that the Court will approve the potential amendments such that the proposed transfer can be completed prior to September 30, 2008.  In the event such transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits attributable to prepetition service while in chapter 11 and that it has made all required payments for postpetition service.  Delphi further believes that as a result, it is not liable for any penalty excise taxes that may be assessed by the IRS.  Delphi believes that its ultimate emergence from chapter 11 will result in a consensual resolution of its pension funding obligations, and given the significant uncertainty surrounding the outcome of the excise tax assessment and the potential for Delphi to litigate this matter, if necessary, management has concluded that an unfavorable outcome is not currently probable.  Accordingly, as of June 30, 2008, no amounts have been recorded for any potential excise tax assessment.

Pursuant to the pertinent terms of the waivers, as modified, Delphi provided to the PBGC letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan.  Due to the expiration of the waivers, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on May 16, 2008.  The cash proceeds from the letters of credit have been recognized as Delphi funding contributions to the plans for the plan year ending September 30, 2008.

The Company has represented that it currently intends to meet the minimum funding standard under IRC section 412 upon emergence from chapter 11.  The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the ability to transfer certain assets and unfunded benefit liabilities from the Hourly Plan to a pension plan sponsored by GM, the date and size of such transfer, the funded status of the Hourly Plan and the date of emergence.  As noted above, in the event the anticipated transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

In addition to the funding strategy discussed above, Delphi committed to freeze the Hourly and Salaried Plans effective at the end of the month following emergence from chapter 11.

**3. Debtor-in-Possession ("DIP") Financing**

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consisted of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan (the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan (the "Tranche C Term Loan").

The Refinanced DIP Credit Facility had a maturity date of July 1, 2008. Delphi received Court approval to amend and extend its Refinanced DIP Credit Facility on April 30, 2008. Delphi received the required commitments from its lenders and the amended and restated DIP credit facility (the "Amended and Restated DIP Credit Facility") became effective on May 9, 2008. The Amended and Restated DIP Credit Facility extends the term until December 31, 2008 and modifies the size of the facility by reducing the Revolving Facility to $1.1 billion from $1.75 billion and increasing the size of the Tranche B Term Loan to $500 million from $250 million and leaving the Tranche C Term Loan unchanged at approximately $2.5 billion. On May 30, 2008, the Court entered an order authorizing Delphi to increase the Tranche C Term Loan to $2.75 billion from approximately $2.5 billion with funding in June 2008. The Amended and Restated DIP Credit Facility includes certain covenants and restrictions on Delphi's financial and business operations that mirror those imposed by the Refinanced DIP Credit Facility with the exception of the modifications listed below. The Amended and Restated DIP Credit Facility:

- Increases the interest rate on the facilities at the option of Delphi of either the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent or LIBOR plus a specified percent as follows:

|  | ABR plus | | LIBOR plus | |
|---|---|---|---|---|
|  | Amended and Restated DIP Credit Facility | Refinanced DIP Credit Facility | Amended and Restated DIP Credit Facility | Refinanced DIP Credit Facility |
| Tranche A | 3.00% | 2.50% | 4.00% | 3.50% |
| Tranche B | 3.00% | 2.50% | 4.00% | 3.50% |
| Tranche C | 4.25% | 3.00% | 5.25% | 4.00% |

As LIBOR borrowings are less costly than ABR borrowings, Delphi seeks to maximize the amount of loans outstanding on a LIBOR basis.

- Increases the undrawn revolver fees from 50 basis points to 100 basis points,
- Adds a LIBOR and ABR floor to the Tranche B and Tranche C Term Loans of 3.25% and 4.25%, respectively,
- Sets rolling 12-month cumulative Global EBITDAR covenant levels for the extension period as follows:

| Period Ending | Global EBITDAR (in millions) |
|---|---|
| June 30, 2008 | $600 |
| July 31, 2008 | $575 |
| August 31, 2008 | $550 |
| September 30, 2008 | $625 |
| October 31, 2008 | $600 |
| November 30, 2008 | $675 |

- Modifies the borrowing base definition and limits availability to draw additional amounts under the Revolving Facility, under certain conditions as defined, and modifies the allowable junior liens, and
- Allows Delphi to enter into an agreement with GM as described below.

In connection with the Amended and Restated DIP Credit Facility, Delphi paid a total of approximately $75 million to consenting lenders on the Revolving Facility, the Tranche B facility and the Tranche C facility. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the

Amended and Restated DIP Credit Facility and the bankruptcy exit financing that was commenced but not completed.

In conjunction with the entry into the Amended and Restated DIP Credit Facility, the Refinanced DIP Credit Facility was terminated. Delphi incurred no early termination penalties in connection with the termination of this agreement. However, as a result of significant changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $49 million of unamortized debt issuance costs related to the Amended and Restated DIP Credit Facility and the Refinanced DIP Credit Facility in the second quarter of 2008, which was recognized as loss on extinguishment of debt. As of June 30, 2008, $40 million of debt issuance costs remains deferred in other current assets and is being amortized over the term of the Amended and Restated DIP Credit Facility.

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement"). The original GM Advance Agreement has a maturity date of the earlier of December 31, 2008, when $650 million has been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. GM will receive an administrative claim for its advances. The original GM Advance Agreement provides for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement. The amounts advanced will accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The interest on the advances will be cancelled if the GSA and MRA become effective on or prior to the expiration date of the agreement. Advances will be set off against the GSA and MRA upon effectiveness of those agreements or any remaining administrative claims in Delphi's chapter 11 cases. As of June 30, 2008, no amounts were outstanding pursuant to the GM Advance Agreement. However, during the second quarter of 2008 Delphi received and subsequently repaid amounts up to approximately $190 million under the GM Advance Agreement.

In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding short-term liquidity support until confirmation of the Plan or an alternative plan of reorganization, on August 7, 2008 GM agreed to amend the GM Advance Agreement to provide for an additional $300 million availability above the existing $650 million, as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement. The amendment provides that the outside maturity date with respect to the original $650 million may be extended in connection with an extension of Delphi's existing Amended and Restated DIP Credit Facility, if GM and Delphi agree, to the earlier of June 30, 2009, and the termination of Delphi's Amended and Restated DIP Credit Facility, and that the maturity date with respect to the additional $300 million is the earlier of December 31, 2008 (subject to potential extension through June 30, 2009, on the same terms as apply to the original $650 million), such date as Delphi files any motion seeking to amend the Plan in a manner that is not reasonably acceptable to GM, the termination of Delphi's Amended and Restated DIP Credit Facility and such date as a plan of reorganization becomes effective. The additional $300 million of advances is also conditioned upon Delphi filing modifications to its Plan which are reasonably acceptable to GM by October 31, 2008 (or such later date as GM may agree in its sole discretion), and certain other conditions. Interest on advances above the original facility amount of $650 million will be cancelled if certain conditions are met. The advances will remain administrative claims in Delphi's chapter 11 cases. The proposed amendment to expand the facility under the GM Advance Agreement is subject to Court approval. On August 6, 2008, Delphi filed a motion requesting approval and expects such motion to be considered later this month. The executed agreement is filed as an exhibit to Delphi's Quarterly Report on Form 10-Q for the period ended June 30, 2008.

Borrowings under the Amended and Restated DIP Credit Facility are prepayable at Delphi's option without premium or penalty. As of June 30, 2008, total available liquidity under the Amended and Restated DIP Credit Facility was approximately $613 million. At June 30, 2008, there was $500 million outstanding under the Tranche B Term Loan at LIBOR plus 4.00% (or 7.25%), $2.75 billion outstanding under the Tranche C Term Loan at LIBOR plus 5.25% (or 8.50%), and $311 million outstanding under the Revolving Facility, of which $300 million was at LIBOR plus 4.00% (or 6.625%) and $11 million was at ABR plus 3.00% (or 8.00%). Additionally, the Company had $102 million in letters of credit outstanding under the Revolving Facility as of that date. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Amended and Restated DIP Credit Facility. While the borrowing base computation excluded outstanding borrowings, it was less than the Amended and Restated DIP Credit Facility commitment at June 30, 2008. Under the Amended and Restated DIP Credit Facility, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate regardless of availability levels.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock.  The Company does not expect to pay dividends prior to emergence from chapter 11.  So long as the Facility Availability Amount (as defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except with respect to investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors).

The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility) for Delphi and its direct and indirect subsidiaries, on a consolidated basis, at the levels set forth in the Amended and Restated DIP Credit Facility.  Delphi was in compliance with the Amended and Restated DIP Credit Facility covenants as of June 30, 2008.  However, its margin of compliance with the Global EBITDAR covenant decreased significantly in the months of May and June 2008, primarily as a result of work stoppages at American Axle, a Tier 1 supplier to GM based in Detroit, Michigan, and other reductions in customer production volumes, continuing unfavorable pricing pressures and increasing commodity prices.  In light of these factors, Delphi expects that continued covenant compliance over the balance of 2008 will be subject to challenges.  In view of the increasing pressure on earnings due to the continuing difficult economic and industry conditions during the first part of 2008, Delphi sought additional support from GM to assist Delphi in remaining compliant with its covenants.  Specifically, GM, on July 31, 2008, agreed to forego cash payments of up to $112 million in warranty costs, which amount Delphi had agreed to pay GM upon emergence from chapter 11 pursuant to the previously reported Warranty, Settlement and Release Agreement entered into in September 2007.  Refer to Note 22. Commitments and Contingencies, Ordinary Business Litigation for more information on the Warranty, Settlement and Release Agreement and Note 23. Subsequent Events on Delphi's Quarterly Report on Form 10-Q for the period ended June 30, 2008.  Delphi believes this additional support will assist Delphi to remain compliant with the Global EBITDAR covenant in its Amended and Restated DIP Credit Facility in July as the extinguishment of this liability will be recorded as a reduction to warranty expense in cost of sales in July 2008.  However, there can be no assurance that Delphi will remain in compliance for the balance of 2008, particularly if further deterioration in its earnings or increases in its operating costs occurs, without additional support from GM.  Failure to comply with the Amended and Restated DIP Credit Facility covenants could result in an event of default under the Amended and Restated DIP Credit Facility, which would permit the lender to cause the amounts outstanding to become immediately due and payable.  In addition, failure to comply could result in termination of the commitments under Delphi's revolving credit facility, which would result in Delphi being prohibited from borrowing additional amounts under such facility without the negotiation of an amendment or waiver as further described in Refer to Part II, Item 1A. Risk Factors in Delphi's Quarterly Report on Form 10-Q for the period ended June 30, 2008.

The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type.  Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, and interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.  The foregoing description of the Amended and Restated DIP Credit Facility is a general description only.  For additional detail see the underlying agreements, copies of which were previously filed with the SEC.

**4. Reorganization Items**

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed.  Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors, and unions.  The Debtors' reorganization items consist of the following:

| | Three Months Ended June 30, 2008 | | Five Months Ended June 30, 2008 | |
|---|---|---|---|---|
| | | | (in millions) | |
| Professional fees directly related to reorganization ............ | $ | (15) | $ | (33) |
| Interest income.................................................................. | | 18 | | 27 |
| Write off of previously capitalized fees and expenses related to the EPCA ...................................................... | | — | | (79) |
| Other ................................................................................. | | (16) | | (17) |
| Total Reorganization Items......................................... | $ | (13) | $ | (102) |

Professional fees directly related to the reorganization ("Professional Fees") include fees and reimbursable expenses associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Debtors' debtor-in-possession credit facility and prepetition credit facility (for fees and expenses incurred on or prior to the effective date of the refinancing), and the unions.  Professional Fees also include $4 million during the five months ended June 30, 2008, including $2 million recorded during the three months ended June 30, 2008, for certain legal advisors to GM.  Professional fees for the three and five months ended June 30, 2008 also includes arrangement and other fees paid to various lenders in conjunction with the bankruptcy exit financing that was commenced but not completed in April 2008.  Professional Fees for the three months ended June 30, 2008 were estimated by the Debtors and will be reconciled to actual invoices when received.

**5. Liabilities Subject to Compromise**

The Debtors have received approximately 16,800 proofs of claim, some of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.

Although the Debtors have not completed the process of reconciling these proofs of claim and thus the ultimate amount of such liabilities is not determinable at this time, as of June 30, 2008, the Debtors had objected to approximately 13,500 proofs of claim which asserted approximately $10.1 billion in aggregate liquidated amounts plus additional unliquidated amounts.  The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,700 of those proofs of claim, which reduced the amount of asserted claims by approximately $9.7 billion in aggregate liquidated amounts plus additional unliquidated amounts.  In addition, the Court has entered an order allowing or modifying approximately 3,650 claims, reducing the aggregate amount on those claims by $260 million, which amount is subject to further objection by the Debtors at a later date on any basis.

The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled, and that as a result of such objections, the aggregate amount of claims ultimately allowed by the Court will be further reduced.  The determination of how liabilities will ultimately be settled and treated is set forth in the Plan, which was approved by the Court on January 25, 2008.  Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect

to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.  Liabilities subject to compromise consist of the following:

|  | **June 30, 2008** |
|---|---|
|  | (in millions) |
| Pension obligations | $    3,132 |
| Postretirement obligations other than pensions, including amounts payable to GM | 9,073 |
| Debt and notes payable | 2,374 |
| Accounts payable | 817 |
| Securities and ERISA litigation liability | 351 |
| Other | 578 |
| Total Liabilities Subject to Compromise | $    16,325 |

## 6.  Postpetition Accounts Payable

To the best of the Debtors' knowledge, all undisputed postpetition accounts payable have been and are being paid under agreed-upon payment terms.

## 7.  Divestitures

On September 28, 2007, Delphi closed on the sale of its original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore.  The Catalyst Business revenues for the nine months ended September 30, 2007 were $249 million.  During the five months ended June 30, 2008, Delphi and Umicore agreed on final working capital adjustments and Delphi received a payment of $9 million, of which $6 million offset a receivable recognized during 2007 and $3 million was recorded as a reduction to cost of sales.

On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for Delphi's North American brake components machining and assembly assets ("North American Brake Components") primarily located at its Saginaw, Michigan, Spring Hill, Tennessee, Oshawa, Ontario, Canada and Saltillo, Mexico facilities.  The 2007 annual revenues for North American Brake Components were $568 million.  The sale occurred in the five months ended June 30, 2008 and resulted in a gain of $3 million which was recorded as a reduction to cost of sales.  Additionally, Delphi received proceeds from this sale of approximately $38 million in the five months ended June 30, 2008.

On December 20, 2007, the Court approved the sale of Delphi's cockpits and interior systems business and integrated closures systems business (the "Interiors and Closures Business") to Inteva Products, LLC ("Inteva").  Delphi closed on the sale of the Interiors and Closures Business to Inteva on February 29, 2008.  Delphi received proceeds from the sale of approximately $99 million consisting of $63 million of cash (less $23 million of cash at an overseas entity that was included in the sale) and the remainder in notes at fair value.  As a result of the operating results and sale of the Interiors and Closures Business, Delphi recorded income of $14 million, net of tax, in the five months ended June 30, 2008.

On December 20, 2007, the Court approved bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code to dispose of its global steering and halfshaft business (the "Steering Business").  On February 25, 2008, the Court issued an order authorizing the sale of the Steering Business to Steering Solutions Corporation, a wholly-owned entity of Platinum Equity LLC.    Delphi is working to close the sale as soon as practicable.  Any party in compliance with its obligations under the Purchase Agreement may terminate the Purchase Agreement if the transaction does not close by August 31, 2008, with certain exceptions.  Delphi expects that it will have satisfied all of its conditions by this date.  Delphi recorded losses of $10 million and $84 million, net of tax, respectively, related to the operations and adjustment of assets held for sale to fair value of the Steering Business as of June 30, 2008.

On January 15, 2008, the Debtors filed a motion to sell Delphi's bearings business (the "Bearings Business").  On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code.  On February 21, 2008, the Debtors announced that they had entered into a purchase agreement with Kyklos, Inc., a wholly owned subsidiary of Hephaestus Holdings, Inc. and an affiliate of KPS Special Situations Fund II, L.P. ("Kyklos") which was the successful bidder at the auction held on February 19, and 20, 2008.  The Court entered the order confirming the sale of the Bearings Business to Kyklos on March 19, 2008.  The 2007 annual revenues for the Bearings Business were $280 million.  During the first quarter of 2008, Delphi recognized a charge of $30 million, included in cost of sales, related to the assets held for sale of the

Bearings Business.  The sale occurred on April 30, 2008 and Delphi received net proceeds from this sale of approximately $15 million in the second quarter of 2008 with no net change to the loss on the sale.

On March 7, 2008, the Debtors filed a motion to sell certain assets of Delphi's U.S. suspensions business, including the machinery, equipment and inventory primarily used and located at its suspension manufacturing facility in Kettering, Ohio (the "Kettering Assets") to Tenneco Automotive Operating Company Inc. ("Tenneco") for approximately $19 million and other consideration.  On March 20, 2008, the Court approved the bidding procedures for the Kettering Assets, but no further bids were submitted by the bid deadline.  On April 30, 2008, the Court entered an order approving the sale of the Kettering Assets to Tenneco.  The 2007 annual revenues for the Kettering Assets were $113 million.  The sale occurred on May 30, 2008 and resulted in a gain of $9 million, which was recorded as a reduction to cost of sales.  Additionally, Delphi received proceeds from this sale of approximately $19 million in the second quarter of 2008.

On May 27, 2008 and in accordance with the terms of an order authorizing the sale of certain assets for less than $10 million, Delphi served notice of its intention to sell its power products business (the "Power Products Business") to Strattec Security Corporation, Witte-Velvert GmbH & Co. KG, Vehicle Access Systems Technology LLC, and certain of their affiliates (collectively, the "Strattec Buyers") for approximately $8 million.  On June 4, 2008, the Debtors filed a motion to assume and assign certain prepetition executory contracts related to the Power Products Business to the Strattec Buyers.  On June 24, 2008, the Court entered an order authorizing the Debtors to assume and assign such contracts to the Strattec Buyers.  The 2007 annual revenues for the Power Products Business were $59 million.  Delphi recognized a charge of $3 million during the second quarter of 2008, included in cost of sales, related to the assets held for sale of the Power Products Business.

On June 27, 2008, the Debtors announced their intention to sell Delphi's global exhaust business relating to the design and manufacture of the exhaust system front exhaust module including catalytic converters and exhaust manifolds (the "Exhaust Business").  Although Delphi intends to divest its Exhaust Business, the Company intends to continue to provide full engine management systems, including air and fuel management, and combustion and valve-train technology.

**DELPHI CORPORATION, <u>et al.</u>**
**SCHEDULE OF PAYROLL AND PAYROLL TAXES WITHHELD AND INCURRED**
**THREE MONTHS ENDED JUNE 30, 2008**

| Gross Wages Paid | Employee Payroll Taxes Withheld | Employer Payroll Taxes Owed |
|---|---|---|
| $    433,165,381 | $    117,963,240 | $    36,037,686 |

Note:    As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly employees represented by the UAW and the IUE-CWA received lump sum incentive payments or buyout payments.  These payments were made by Delphi and are wholly or partially reimbursed by GM, and are included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL TAXES PAID**
**THREE MONTHS ENDED JUNE 30, 2008**

| Payee | Payroll Taxes Paid |
|---|---|
| Internal Revenue Service | $ 131,007,003 |
| State of Michigan | 9,506,586 |
| City of Flint, MI | 123,602 |
| City of Saginaw, MI | 82,461 |
| City of Grand Rapids, MI | 10,322 |
| City of Detroit, MI | 7,417 |
| City of Walker, MI | 1,533 |
| City of Lansing, MI | 1,029 |
| City of Pontiac, MI | 968 |
| City of Lapeer, MI | 254 |
| State of Ohio | 5,680,141 |
| City of Dayton, OH | 371,444 |
| City of Kettering, OH | 296,941 |
| City of Vandalia, OH | 204,802 |
| City of Rita, OH | 86,104 |
| Ohio School District | 50,734 |
| City of Warren, OH | 44,548 |
| City of Moraine, OH | 30,878 |
| City of Niles, OH | 18,289 |
| City of Norwalk, OH | 9,442 |
| City of Hubbard, OH | 7,724 |
| City of Huron, OH | 6,243 |
| City of Port Clinton, OH | 4,356 |
| City of Dublin, OH | 4,003 |
| City of Lorain, OH | 3,109 |
| City of Lordstown, OH | 2,731 |
| City of Akron, OH | 2,525 |
| City of Trotwood, OH | 2,117 |
| City of Toledo, OH | 1,757 |
| City of Troy, OH | 1,663 |
| City of Newton Falls, OH | 1,077 |
| City of Parma, OH | 1,017 |
| City of Canton, OH | 960 |
| City of Hamilton, OH | 932 |
| City of Springfield, OH | 887 |
| City of Xenia, OH | 564 |
| City of West Carrollton, OH | 529 |
| City of Cincinnati, OH | 432 |
| City of Ontario, OH | 262 |
| City of Mansfield, OH | 40 |
| City of Elyria, OH | 16 |
| City of Columbus, OH | (59,036) |
| State of Indiana | 4,978,538 |
| State of New York | 3,951,389 |
| State of Alabama | 1,903,256 |
| City of Gadsden, AL | 8,812 |
| State of Wisconsin | 980,077 |
| State of Mississippi | 424,135 |
| State of California | 110,073 |
| State of Colorado | 68,946 |
| City of Denver, CO | 2,156 |
| State of Illinois | 56,129 |
| State of Pennsylvania | 44,088 |
| City of Towamencin, PA | 37 |
| State of Texas | 36,009 |

| Payee | Payroll Taxes Paid |
|---|---|
| State of Georgia | $ 31,196 |
| State of South Carolina | 24,832 |
| State of Kansas | 17,355 |
| State of Oregon | 12,217 |
| State of North Carolina | 9,150 |
| State of Missouri | 8,909 |
| City of Kansas City, MO | 980 |
| State of Virginia | 7,579 |
| State of Arizona | 6,327 |
| State of Kentucky | 6,132 |
| City of Elizabethtown, KY | 552 |
| City of Bowling Green, KY | 426 |
| State of New Mexico | 4,395 |
| State of New Jersey | 3,771 |
| State of Iowa | 3,092 |
| State of Louisiana | 3,028 |
| State of Arkansas | 2,524 |
| State of Utah | 1,741 |
| State of Oklahoma | 1,314 |
| State of Minnesota | 1,195 |
| State of Maryland | 1,036 |
| State of Washington | 1,023 |
| State of Massachusetts | 1,019 |
| State of Delaware | 612 |
| State of Connecticut | 386 |
| State of West Virginia | 292 |
| State of Tennessee | 196 |
| State of Florida | 17 |
| Inland Revenue Service (UK) | 2,301,302 |
| Country of Switzerland | 22,045 |
| Total | $ 162,556,694 |

## DELPHI CORPORATION, et al.
### SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID
### THREE MONTHS ENDED JUNE 30, 2008

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---:|---:|
| State of Ohio | Use | $ 1,266,782 | $ 1,266,782 |
| State of Michigan | Use | 697,519 | 697,519 |
| State of New York | Use | 351,615 | 351,615 |
| State of Indiana | Use | 193,771 | 193,771 |
| State of Mississippi | Use | 165,877 | 165,877 |
| State of Texas | Use | 111,183 | 111,183 |
| Limestone County, Alabama  (Payee: AL Department of Revenue) | Use | 35,201 | 35,201 |
| State of Wisconsin | Use | 33,678 | 33,678 |
| Colorado Dept of Revenue | Use | 9,822 | 9,822 |
| Ohio Treasurer of State | Commercial Activity | 371,188 | 371,188 |
| Texas Comptroller of Public Accounts | Franchise | 125,000 | 125,000 |
| Kentucky Department of Revenue | Franchise | 115,000 | 115,000 |
| Delaware Secretary of State | Franchise | 68,000 | 68,000 |
| Tennessee Department of Revenue | Franchise | 47,000 | 47,000 |
| Pennsylvania Department of Revenue | Franchise | 2,000 | 2,000 |
| Alabama Department of Revenue | Franchise | 300 | 300 |
| Connecticut Commissioner of Revenue Services | Franchise | 250 | 250 |
| Oklahoma Tax Commission | Franchise | 100 | 100 |
| State of Alabama | Franchise | 100 | 100 |
| Franklin County, Ohio | Real Property | 175,470 | 175,470 |
| Oak Creek, Wisconsin | Real Property | 57,893 | 57,893 |
| Johnson County, Kansas | Real Property | 21,201 | 21,201 |
| Orange County, California | Real Property | 9,202 | 9,202 |
| Monroe County, Michigan | Real Property | 225 | 225 |
| Colorado Weld County Assessor Office | Personal Property | 83,571 | 83,571 |
| Weld County, Colorado | Personal Property | 60,406 | 60,406 |
| Nemaha County, Kansas | Personal Property | 2,901 | 2,901 |
| Tipton County, Indiana | Personal Property | 2,354 | 2,354 |
| San Diego County, California | Personal Property | 1,184 | 1,184 |
| Boulder County, Colorado | Personal Property | 945 | 945 |
| St. Joseph County, Indiana | Personal Property | 731 | 731 |
| Kosciusko County, Indiana | Personal Property | 614 | 614 |
| Burlington, Massachusetts | Personal Property | 234 | 234 |
| Goodlettsville, Tennessee | Personal Property | 125 | 125 |
| Vanderburgh County, Indiana | Personal Property | 113 | 113 |
| King County, Washington | Personal Property | 90 | 90 |
| Marion County, Indiana | Personal Property | 56 | 56 |
| Roswell, Georgia | Personal Property | 34 | 34 |
| State of Ohio | Kilowatt Hour | 126,218 | 126,218 |
| State of Alabama | Consumers Use | 101,166 | 101,166 |
| California Franchise Tax Board | Income | 43,570 | 43,570 |
| State of Alabama | Income | 25,000 | 25,000 |
| Wisconsin Department of Revenue | Income | 19,800 | 19,800 |
| State of New Jersey Division of Taxation | Income | 1,000 | 1,000 |
| City of Portland | Income | 220 | 220 |
| Utah State Tax Commission | Income | 200 | 200 |
| Arizona Department of Revenue | Income | 50 | 50 |
| Treasurer City of Bowling Green | Income | 30 | 30 |
| Oregon Department of Revenue | Income | 20 | 20 |
| Louisiana Department of Revenue | Income | 10 | 10 |
| State of Alabama | Seller's Use | 86,190 | 86,190 |
| Internal Revenue Service | Federal Excise | 23,000 | 23,000 |

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---:|---:|
| Internal Revenue Service | Withholding (non-payroll) | $ 10,500 | $ 10,500 |
| Colorado Department of Revenue | Sales | 8,050 | 8,050 |
| State of Washington | Business & Occupation | 6,190 | 6,190 |
| Colorado Department of Revenue | Utility | 640 | 640 |
| South Carolina Department of Revenue | Sales & Use | 172 | 172 |
| State of California Board of Equalization | Sales & Use | 27 | 27 |
| Michigan Department of Treasury | Single Business | 6 | 6 |
| Total | | $ 4,463,794 | $ 4,463,794 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED JUNE 30, 2008**

Note 1:    The amounts listed above for tax due and tax paid include postpetition taxes and only those prepetition taxes for which the Debtors have received Court authorization to pay.  Accordingly, certain prepetition taxes (primarily on real and personal property) that the Debtors do not have authority to pay are not included in the schedule above.  Such prepetition taxes are included in the balance sheet as part of "Liabilities Subject to Compromise."

Note 2:    Certain Debtors also pay transaction taxes such as value added tax ("VAT") to certain foreign countries based upon the purchase or supply of goods or services within the country and the importation of goods into the country from outside the country.  For the purchase of goods or services in certain foreign countries, VAT may either be collected by the supplier from the Debtors or paid directly by the Debtors through self-assessment.  For the supply of goods or services in certain foreign countries, the Debtors may collect VAT from the customers and remit the tax to the foreign governments.  Upon importation in certain countries, VAT may be paid by the Debtors.  In most cases, VAT is recoverable either as an input VAT credit or as a refund.  The process of calculating VAT owed or refundable is a complex process of netting VAT paid, collected, and remitted.  To the best of the Company's knowledge, all VAT has been paid and is being paid when due.  In addition, certain Debtors incur foreign withholding taxes on certain payments from various foreign non-Debtor affiliates.  These foreign withholding taxes generally apply to interest, royalties, dividends, and service payments received from certain foreign non-Debtor affiliates.  The foreign withholding taxes are required to be withheld by the foreign non-Debtor affiliates and paid over to the foreign tax authorities on behalf of the Debtors.  To the best of the Company's knowledge, all foreign withholding taxes have been withheld by the foreign non-Debtor facilitates when required to be withheld and paid over to the appropriate foreign tax authorities when due.  These foreign tax payments have not been included in the schedule above.

### DELPHI CORPORATION, et al.
### SCHEDULE OF DISBURSEMENTS
### THREE MONTHS ENDED JUNE 30, 2008

| Debtor Name | Case Number | Amount [1] |
|---|---|---|
| Delphi NY Holdings Corporation | 05-44480 | $ — |
| Delphi Corporation | 05-44481 | 59,800 |
| ASEC Manufacturing General Partnership | 05-44482 | — |
| ASEC Sales General Partnership | 05-44484 | — |
| Environmental Catalysts, LLC | 05-44503 | — |
| Delphi Medical Systems Colorado Corporation | 05-44507 | 8,757,910 |
| Delphi Medical Systems Texas Corporation | 05-44511 | 19,956 |
| Delphi Medical Systems Corporation | 05-44529 | 3,114,741 |
| Specialty Electronics International Ltd. | 05-44536 | — |
| Specialty Electronics, Inc. | 05-44539 | 1,589,359 |
| Delphi Liquidation Holding Company | 05-44542 | — |
| Delphi Electronics (Holding) LLC | 05-44547 | — |
| Delphi Technologies, Inc. | 05-44554 | 9,357,012 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 | — |
| Delphi Mechatronic Systems, Inc. | 05-44567 | 132,740,141 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 | — |
| Exhaust Systems Corporation | 05-44573 | 619 |
| Delphi China LLC | 05-44577 | — |
| Delphi Automotive Systems Korea, Inc. | 05-44580 | 270,843 |
| Delphi International Services, Inc. | 05-44583 | 24,169,839 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 | — |
| Delphi Automotive Systems International, Inc. | 05-44589 | — |
| Delphi International Holdings Corporation | 05-44591 | — |
| Delphi Automotive Systems Overseas Corporation | 05-44593 | 785 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 | — |
| Delco Electronics Overseas Corporation | 05-44610 | 26,953,544 |
| Delphi Diesel Systems Corporation | 05-44612 | 95,573,038 |
| Delphi LLC | 05-44615 | — |
| Aspire, Inc. | 05-44618 | 228,349 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 | 488,948 |
| Delphi Connection Systems | 05-44624 | 15,612,658 |
| Packard Hughes Interconnect Company | 05-44626 | — |
| DREAL, Inc. | 05-44627 | — |
| Delphi Automotive Systems Services LLC | 05-44632 | 208,920,153 |
| Delphi Services Holding Corporation | 05-44633 | — |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 | — |
| Delphi Foreign Sales Corporation | 05-44638 | — |
| Delphi Automotive Systems Human Resources LLC | 05-44639 | 368,918,595 |
| Delphi Automotive Systems LLC | 05-44640 | 2,914,604,026 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 | 40,720,864 |
| Delphi Receivables LLC | 05-47459 | — |
| MobileAria, Inc. | 05-47474 | 28,273 |

(1) Operating expenses for the three months ended June 30, 2008 were used as a proxy for disbursements.