STUTMAN, TREISTER & GLATT P.C.
Attorneys for CR Intrinsic Investors, LLC, and
Highland Capital Management, L.P.
(and/or certain funds managed thereby)
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
(310) 228-5600
Isaac M. Pachulski
Jeffrey H. Davidson
Eric D. Goldberg
Christine M. Pajak

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------ X
In re:                                                 | Chapter 11
                                                       |
DELPHI CORPORATION, et al.,                            | Case No. 05-44482 (RDD)
                                                       |
                                   Debtors.            | Jointly Administered
                                                       |
------------------------------------------------------ X

**OBJECTION TO DEBTORS' MOTION TO AUTHORIZE AMENDMENT**
**TO ARRANGEMENT WITH GENERAL MOTORS CORP.**
**AND REQUEST FOR THE APPOINTMENT OF AN EXAMINER**

CR Intrinsic Investors, LLC and Highland Capital Management, L.P. (and/or certain funds managed thereby) (collectively, the "Senior Noteholders"), which collectively hold approximately $495 million in principal amount of Delphi Corporation senior notes (the "Senior Notes"), hereby object to the Debtors' "Motion for Order Authorizing Amendment To Arrangement With General Motors Corporation Approved Pursuant To Second DIP Extension Order (Docket No. 13489)" (the "GM Motion") and request the appointment of an examiner.[1]

---

[1] Terms not otherwise defined herein shall have the same meanings ascribed to them in the GM Motion.

477440v1

# I.
# INTRODUCTION

1.     Pursuant to the GM Motion, the Debtors seek to incur an administrative priority debt to GM to cover losses generated during the period after the Plan failed to become effective.  Although these losses are clearly attributable to the North American operations, the Debtors propose to place this burden on all Debtors, thereby harming the creditors of Delphi Corporation, whose profitable, non-debtor foreign subsidiaries are already subsidizing the money-losing North American operations.  By granting GM an administrative priority claim that could be asserted against all Debtors, including Delphi Corporation, the Debtors are effectively proposing to allow the equity value in Delphi Corporation's foreign subsidiaries to be stripped for the benefit of its failing North American subsidiary operations, which may have no equity value at all.  Thus, the GM Motion proposes to effectively shift assets improperly from the corporations (and/or their stakeholders) that conduct Delphi's global operations to those that conduct its North American operations, and effectively shift the North American liabilities to the global operations (and/or their stakeholders).  This shifting of assets and liabilities is nothing more than a creeping *de facto* substantive consolidation of the Debtors' estates, which is taking place outside of a plan of reorganization and without the compelling showing necessary to justify the extraordinary and sparingly-granted remedy of substantive consolidation.  Accordingly, the GM Motion should be denied and an examiner should be appointed to ensure that the disparate interests of the Debtors' many estates are being adequately protected.

## II.
## DISCUSSION

2.    Pursuant to the GM Motion, the Debtors seek authority to incur $300 million of unsecured, administrative priority debt, in the form of an 'advance' to be provided by their largest customer, General Motors ("GM").  These borrowings are to be provided in the form of an incremental $300 million amendment ("GM Amendment") to the existing $650 million facility ("GM Arrangement") by which "GM agreed to make specified accommodations to enhance the Debtors' liquidity through the second half of 2008."  GM Motion, ¶19.  The GM Motion does not, however, answer one critical question:  Why?

3.    To the extent the GM Motion addresses this issue at all, it is quite vague.  For example, the GM Motion states that the Debtors and GM entered into the GM Arrangement in May of 2008 "to provide a means by which GM could advance amounts paid by the Debtors that would have been paid or reimbursed to the Debtors had the GSA and the MRA become effective."  GM Motion, ¶24.  Now, however, despite the additional borrowing, the liquidity goal is lower than it was before.  While "the terms of the [original] GM Arrangement were structured to support the Debtors' objective to maintain a minimum of *$500,000,000* of liquidity . . .", GM Motion at ¶20, the Debtors at this later time now maintain that the incremental $300 million is "necessary for Delphi to maintain a minimum of *$300,000,000* in liquidity . . ."  GM Motion, ¶24.  Put another way, the Debtors now need to borrow $300 million <u>more</u> under the GM Arrangement (for a total of $950 Million), in order to end up with $200 million <u>less</u> in liquidity ($300 million) than they thought they would have back in May ($500 million).

4.    All this begs the question: where did all the money go?  The answer, of course, is losses.  The Debtors' operations continue to lose money at an

477440v1    3

alarming rate; in the 3 months ended June 30, 2008, the Debtors' loss from continuing operations was more than $500 million.  See Delphi Corporation Form 10-Q Quarterly Report for the quarterly period ended June 30, 2008 ("June 30th 10Q") at 3.[2]

        5.      More specifically, while the Debtors' *global* operations (largely conducted through non-Debtor subsidiaries) are profitable, the Debtors' *North American* operations (largely conducted through Debtor subsidiaries) continue to lose staggering sums of money, and drag down the rest of the business.  The Debtors acknowledge that this has been the case historically.  See, e.g., Disclosure Statement at 28-29 ("Although Delphi's global operations remain profitable to this day, as a result of steadily increasing losses in the U.S., Delphi has not had a net profit on a consolidated basis since 2002. … Delphi's losses arose primarily from its U.S. operations.").  The Debtors' more recent financial results show that this pattern persists.  See June 30th 10Q at 3, 20 (for the second quarter ending June 30, 2008, compare adjusted net operating loss of $344 million for the Debtors[3] against adjusted net operating profits of $380 million for Delphi's non-debtor entities[4]).  Not only do the North American operations operate at a loss, but

---

[2]    The June 30th 10Q is attached as Exhibit "1" to the Request for Judicial Notice (the "RJN"), which is being concurrently filed in support of this Objection.

[3]    Based on the Debtors' Statement of Operations on page 20 of the June 30th 10Q, adjusted net operating loss for the Debtors was calculated using the following formula: Operating Loss + U.S. employee workforce transition program charges + Depreciation and amortization + Long-lived asset impairment charges + Goodwill impairment charges.  Based on the preceding formula, the adjusted net operating loss for the Debtors was $344 million.

[4]    First, based on the Debtors' Statement of Operations on page 3 of the June 30th 10Q, the adjusted net operating profit for the consolidated Delphi organization (including Debtors and non-Debtors) was calculated based on the following formula: Operating Loss + U.S. employee workforce transition program charges + Depreciation and amortization + Long-lived asset impairment charges + Goodwill impairment charges.  Based on the preceding formula, the adjusted net operating profit for the consolidated Delphi organization was $36 million.  Subtracting the adjusted net operating loss of the Debtors from the adjusted net operating profit of the consolidated Delphi organization results in the net operating profit of Delphi's non-Debtor operations – i.e., $380 million.

they also burn cash at an alarming rate.  More than $960 million in net cash has been used to fund the Debtors' operating activities in just the first six months of 2008.  <u>See</u> June 30th 10Q at 22.

    6.  The problem with the proposal presented by the GM Motion, <u>i.e.</u>, to amend the GM Arrangement to provide for an additional $300 million in administrative priority borrowings, is that it does not fix anything – it is merely a band-aid (albeit an enormously expensive and porous band-aid).  It is a truism that borrowing to fund losses is a loser's bet; such borrowing does not generate a corresponding asset (like a factory), or a source of repayment (like a receivable).  The borrowing proposed by the GM Motion thus cannot, and will not, benefit the Debtors' estates.

    7.  The real beneficiary of the GM Arrangement, of course, is GM.  With the Plan incapable of being consummated, and the GSA and MRA thus not being implemented, GM continues to reap the benefit of the status quo.  The Debtors have acknowledged that they supply GM with products at unprofitable pricing levels that result in substantial operating losses for North American's business operations.[5]  <u>See, e.g.</u>, Motion For Order Under 11 U.S.C §365 and Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033) ("GM Rejection Motion") at ¶2 ("…performing under the current terms of the GM Loss Contracts generates significant operating losses and is effectively draining the assets of the estates . . . the Debtors have a duty to their creditors and other stakeholders to stop supplying GM at a loss and to renegotiate fair and reasonable terms under which they will produce parts for GM.")  Despite this acknowledged "duty . .

---

[5] Not surprisingly, GM revenue accounts for a substantial majority of the Debtors' non-profitable North American operations but only accounts for just a fraction of Delphi's profitable non-debtor business operations.  <u>See</u> June 30th 10-Q.

477440v1    5

. to stop supplying GM at a loss," the Debtors propose to continue doing just that – to continue performance under contracts that they have already acknowledged as money-losers – and to saddle the stakeholders of the healthy global operations with the resulting loss. This defeats one of the fundamental purposes of Chapter 11, which is to afford debtors an opportunity to exit unprofitable businesses and contracts.

8.  The Debtors' continued willingness to operate a money-losing business that burns cash for the benefit of GM is beyond comprehension. The Debtors are now proposing to incur even greater administrative claims payable to GM in order to sink more cash into this unprofitable business model for GM's benefit. The Debtors should not be layering on increasing amounts of debt to pay for losses. Rather, the Debtors should be exploring other avenues to restructure their North American operations and should be considering all options, including, (i) union negotiations, (ii) exiting unprofitable businesses and rejecting unprofitable contracts, and (iii) negotiating agreements with their customers, including GM, to increase their pricing to rational levels which would allow their North American operations to operate on an economic basis.

9.  Notwithstanding the fact that it is GM, rather than the Debtors or their estates, that benefits most from the GM Arrangement, GM bears little of the risk associated therewith. As discussed above, GM gets immediate benefits in terms of continued pricing levels at which the Debtors are wildly unprofitable. However, under the GM Arrangement, those pricing benefits do not get applied to, or set off against the advances made by GM. Rather, the Debtors only get "credit" against the advances for "amounts paid by GM or its affiliates to or for the benefit of the Debtors under the GSA and the MRA, following the effectiveness of those agreements." GM Motion, ¶20.

Thus, unless the Plan (and the GSA and MRA) actually becomes effective, the Debtors get no credit, or benefit, for continuing to provide GM with supplies that do not cover the Debtors' own costs. Moreover, even if GM were not already getting repaid in the form of pricing benefits, the GM Arrangement further provides for GM to receive the protection of having the Debtors' repayment obligations accorded administrative expense priority under §503(b)(1). Even more, this §503(b)(1) claim is against <u>all</u> Debtors, not just those that arguably benefit from the availability of additional liquidity to fund more losses.

10. Furthermore, GM is entitled to <u>payment</u> of this administrative priority expense claim upon the applicable termination date provided for in the GM Amendment. <u>See</u> GM Amendment, Exhibit "A", §2.07.[6] This may not be noteworthy except for the fact that GM is attempting to grab even more control in the Debtors' bankruptcy cases. <u>First</u>, the additional financing of $300 million, is expressly conditioned on the Debtors filing a "Reorganization Plan" and "Disclosure Statement" that is "reasonably satisfactory to GM." <u>See</u> GM Amendment, Exhibit "A," §4.03(e). <u>Second</u>, in the event that such a plan and disclosure statement is not filed by October 31, 2008, any amounts that may have been advanced under the $300 million Tranche B Commitment (presumably pursuant to a waiver of §4.03(e)), expires and becomes immediately due and payable. <u>See</u> GM Amendment, Exhibit "A" at 4 (definition of "Tranche B Schedule Termination Date"). This effectively gives GM veto rights on any plan of reorganization that the Debtors might file. Once again, GM, a creditor of the Debtors' estates, not the Debtors, themselves, is the beneficiary of the financing

---

[6] As noted above, the GM Amendment provides that any such administrative claim may be set off against amounts that GM owes the Debtors under the GSA and MRA, but this does not change the fact the amounts become immediately due and payable at termination.

provided under the GM Amendment.[7]  Third, should the Debtors be able to jump this hurdle, then the GM Amendment, with respect to all advances (including both the $650 million and $300 million advances), would terminate by no later than December 31, 2008 unless there are further extensions of the DIP Credit Agreement – again, on terms that are acceptable to GM.  The Debtors are on a short-leash – their access to the "liquidity" offered by GM is but for a few short months and is expressly dependent on GM's pre-approval of major steps in these bankruptcy cases.  It remains unclear how any of the Debtors' estates, let alone all of the Debtors' estates, are to benefit from incurring this additional obligation.

11.    The Debtors presumably will argue that there is nothing new here, that everybody knows that the non-debtor, global operations have been subsidizing the Debtor's money-losing North American operations, and that is exactly why the Plan provided for the "Transformation Plan" and the ultimate implementation of the GSA and MRA.  The GM Arrangement, the Debtors will argue, is merely a "bridge" to the effective date.  But what is different now is the failure of the Plan to become effective, and the risk that this is a "bridge" to nowhere.

12.    Had the Plan gone effective, the "transformation" would be in process, North American operating losses would be diminished, and creditors, including the Senior Noteholders, would have received the 100% recovery provided for in the Plan. But that isn't going to happen now.  At this point, while nobody can say when a new plan will be confirmed and become effective, or what recoveries might be provided for in such a plan, it is a virtual certainty that whatever value might otherwise be

---

[7]  See In re Ames Dept. Stores, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) ("a proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate.") (emphasis added).

477440v1                                                8

available for distribution to general unsecured creditors under such a plan is being eroded by effectively saddling the stakeholders of the healthy, foreign entities with the liabilities incurred to cover the losses sustained by the money-losing North American entities.

13.     As this process goes on, and as the Debtors continue to burn cash, the value that otherwise would be available for general unsecured creditors when a new plan finally is confirmed (and becomes effective) disappears at a very fast clip (over $500 million during the past quarter). When it is eventually time to establish the amount of the value to be allocated to the general unsecured creditors, the Debtors and GM will of course seek to use as a benchmark the depressed value resulting from raiding the healthy global operations to prop up the domestic ones (and to prop up GM). Consequently, instead of these domestic losses being shouldered by the beneficiary thereof (GM), as they would under the now-defunct Plan, they are going to be borne by the general unsecured creditors.[8]

14.     What's really happening here is a form of substantive consolidation: assets are being shifted away from the stakeholders of the healthy, foreign non-debtors to the money-losing US debtors, and the healthy foreign non-debtors' stakeholders are being forced to assume liabilities from which they derive no benefit whatsoever, all to the detriment of the creditors of Delphi Corporation, which ultimately owns the equity in

---

[8]   Indeed, it is an express condition precedent to GM providing the $300 million under the GM Amendment that the global operations are able to continue funneling cash to support the money-losing U.S. operations/GM. See, e.g., GM Amendment at 3(g) (establishing as a condition to the effectiveness of the amendment that "The Bankruptcy Court shall not have entered any order that would prohibit or materially impair the ability of the Borrower to repatriate cash from its foreign subsidiaries as contemplated under Schedule I to Exhibit A attached hereto.") On August 13, 2005, counsel to the Senior Noteholders requested that the Debtors' counsel provide a

those healthy non-debtors.  Even worse, as discussed below, this "creeping," de-facto substantive consolidation is taking place outside of a plan, and without satisfying any of the procedural or substantive requirements mandated by the Bankruptcy Code.  Accordingly, the Motion should be denied.

15.     Moreover, the steps that the Debtors are proposing to take in the GM Motion to compromise the interests of one creditor group to benefit other Debtors' estates (and GM) are troubling.  The fact that the Debtors saw fit to even file the GM Motion demonstrates that the disparate interests of each Debtor estate are not being adequately represented and that further oversight is clearly needed.  To this end, the Senior Noteholders request that this Court appoint an examiner for the limited purpose of determining how the GM Arrangement will impact the different Debtor estates and whether it will benefit certain debtor estates to the detriment of others.  These safeguards are needed to ensure that no Debtor estate is unduly prejudiced.

### III.
### APPLICABLE AUTHORITY

**A.    Implementation of the GM Amendment Would Impermissibly
Lead to the Substantive Consolidation of the Debtors' Estates
Outside of a Viable Confirmed Plan of Reorganization.**

16.     While the corporate structure of the Delphi organization is complex, it is simple at its core.  The North American operations, which were not profitable at the Petition Date and continue to lose money to this day, are the primary debtors in these bankruptcy cases.  With one exception[9], the global operations outside of North America generate positive cash flow and are not the subject of any bankruptcy proceedings.  In

---

    copy of that Schedule I, but as of the date this Objection was filed, the Debtors have neither provided that Schedule nor even acknowledged the request.

[9]  One of Delphi's wholly-owned indirect Spanish subsidiaries was the subject of a Spanish insolvency proceeding.

477440v1                                                          10

fact, in their Disclosure Statement, the Debtors highlight the fact that:

> Delphi's foreign entities are separate legal entities under the direction of local management and are distinct from the U.S. operations. Delphi's non-U.S. businesses are generally competitive with those of their peers, have positive cash flow, and are experiencing high growth opportunities. Moreover, the foreign subsidiaries do not materially rely on funding from the U.S. entities.

See Disclosure Statement at 30-31. The economic interests in these foreign entities, however, are ultimately held by the parent of the entire Delphi organization, Delphi Corporation. Thus, while creditors of Delphi Corporation could expect to benefit from Delphi's global operations, creditors of Delphi's North American operations, which are separate and distinct subsidiaries of the parent, could not expect the same.

17. The Debtors and GM, however, seek to effectively "prime" the rights of Delphi Corporation's creditors by granting an administrative priority claim to GM that would be enforceable against all the Debtors, including Delphi Corporation. Such an action would result in the *de facto* substantive consolidation of the Debtors' estates – by allowing the profits generated by the parent's foreign subsidiaries to pay for the losses incurred by the parent's North American subsidiary operations. The Debtors have established no basis for this Court to ignore the separate integrity of each Debtor's estate that would justify the depletion of one estate to benefit another.[10]

---

[10] The Debtors cannot hide behind the shield of "business judgment" to support their actions under the GM Motion. The "business judgment" rule does not sanction creeping substantive consolidation, nor is it a legal basis for the Debtors to disregard the separate integrity of each Debtor's estate.  Cf. In re Owens Corning, 419 F.3d 195, 211 (3rd Cir. 2005) (noting that substantive consolidation is an action of "last resort" and that "[m]ere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues . . .) is hardly a harm calling substantive consolidation into play."); In re Flora Mir Candy Corp., 432 F.2d 1060, 1063 (2d Cir. 1970) (under a Bankruptcy Act case, noting that "the quick consummation of an arrangement under Chapter XI" does not justify "sacrificing" the rights of creditors through substantive consolidation).

18. As the Court of Appeals for the Third Circuit recently emphasized,

> Limiting the cross-creep of liability by respecting entities' separateness is a 'fundamental ground rule [ ].' . . . [citation omitted] . . . As a result, the general expectation of the law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entities' separateness absent compelling circumstances calling equity, and even then only possibly substantive consolidation, into play.

In re Owens Corning, 419 F.3d 195, 211 (3rd Cir. 2005). No such "compelling circumstances" are found here.

19. In the Second Circuit, the leading case on substantive consolidation is In re Augie/Restivo Banking Co., Ltd., 860 F.2d 515 (2nd Cir. 1988). In determining whether substantive consolidation would be appropriate, the Court of Appeals for the Second Circuit considered "two critical factors: (i) whether creditors dealt with the entities as a single economic unit and "did not rely on their separate identity in extending credit," or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." Id. at 518. Explaining the first factor, the court stressed, "creditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan." Id. The expectations of creditors determine how they structure their financings, and creditors should be able to rely on those expectations in bankruptcy. In considering the second factor, the court reasoned that the commingling of the debtors' assets and operations must be so intertwined that it would be prejudicial not to order substantive consolidation. "[S]ubstantive consolidation should be used only after it has been determined that <u>all creditors</u> will benefit because untangling is either impossible or so costly as to consume the assets." Id. at 519 (emphasis added). Neither one of these two critical factors can be found in these cases.

20.     First, not only do creditors treat each Debtor and foreign subsidiary as separate and distinct entities but the Delphi organization, itself, also recognizes the separateness of each entity.  The rights of the Senior Noteholders should not be compromised by depleting the assets of their obligor, Delphi Corporation, to pay for the losses incurred by the Debtors' other estates.  With regard to the second factor, no evidence demonstrates that the Debtors' affairs are so intertwined that it would be too costly to untangle.  There is simply no entanglement at any level.

21.     In fact, as reflected in Delphi's filings with the SEC, the assets and liabilities of the non-Debtor entities can be segregated out from those held by the Debtor entities.  <u>See, e.g.</u>, June 30th 10Q at 3, 20 (highlighting the statement of operations for the Delphi organization as a whole (at 3) and the statement of operations for only the Debtors (at 20)).  As a result, no independent legal basis exists for the Debtors to seek substantive consolidation in these cases.  The Debtors should not be permitted to do an end-run around substantive consolidation by taking actions that would impermissibly pool all the assets of the Debtors as security for the benefit of GM's administrative priority claim, especially when the liquidity offered by GM would be used to offset losses of some Debtors by draining other Debtors' estates.   This is even more critical now when it is unclear whether Delphi Corporation will be able to pay its own creditors, such as the Senior Noteholders, in full.  The assets of Delphi Corporation should not be siphoned off to support its profitless domestic debtor subsidiaries that continue to produce products at a loss for the benefit of GM.

22.     The fact that the Debtors' estates are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015 does not alter this construct: "[T]he Code forces the recognition ***that each debtor is a separate entity with***

***separate assets and separate obligations to creditors . . .*** [J]oint administration does not create a substantive consolidation of these debtors." In re Emdura Corp., 121 B.R. 862, 868 (Bankr. D. Colo. 1990 (emphasis added)).  Moreover, the fact that the GM Motion does not use the phrase "substantive consolidation" is of no moment; a construct that disregards the integrity of the Debtors' separate corporate existence to the prejudice of Senior Noteholders should not be approved. Cf. ACC Bondholder Group v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.), 361 B.R. 337, 361-63 (S.D.N.Y. 2007) (criticizing a plan that does not specify which estate's assets are being used to pay which estate's creditors).

        23.     While the Debtors and their creditors may have contemplated substantive consolidation as an integral part of a carefully crafted plan that contained several settlements and compromises, that plan is no longer viable.  All parties acknowledge that the confirmed plan cannot be consummated.  The Debtors and GM, however, would like the Court to ignore this fact and continue down the path of *de facto* substantive consolidation by granting GM an administrative priority claim against all the Debtors' estates, thereby impermissibly pooling the Debtors' assets and liabilities into one pot.  GM is relying on the good credit of the parent, based on its profit-making foreign subsidiaries, to support the Debtors' North American operations, which are then compelled to provide supplies to GM at a loss.[11]  Nothing in the law supports such an outcome.  Benefits to GM and Delphi's North American operations should not come at the expense of Delphi Corporation's creditors.

---

[11]  This is further reflected in the GM Amendment which premises its effectiveness on there being no Bankruptcy Court order that would prohibit or materially impair the repatriation of cash from the parent's foreign subsidiaries.  See infra, fn. 4.

B. **The Appointment of an Examiner Is Necessary to Protect the Disparate Interests of the Debtors' Different Estates and Their Creditors.**

24.     The Debtors' actions in seeking the GM Amendment call into question the ability of the Debtors' representatives to represent the disparate interests of the Debtors' different estates.  The rights of all creditor parties must be protected and, unfortunately, it appears that the Debtors are all too willing to undertake actions to favor one group of creditors over another.

25.     Given these recent events, the Senior Noteholders, hereby, request that the Court appoint an examiner.  Bankruptcy Code section 1104(c) provides that:

> . . .at any time before confirmation of a plan, on request of a party in interest . . ., and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as appropriate, including an investigation of any allegations of . . .misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current . . . management of the debtor, if –
>
> (1) such appointment is in the best interests of creditors. . .; or
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. §1104.  Here, not only would the appointment of an examiner be in the best interests of the Debtors' estates, but such an appointment is mandatory.

As outlined by the bankruptcy court in the Northern District of Illinois, appointment of an examiner . . . has four requirements:

- first, the debtor must still be in possession of the estate--
a trustee must not have been appointed;

- second, a plan must not have been confirmed;

- third, a party in interest must request the appointment;

477440v1                                     15

> - fourth, one of the conditions set out in the numbered paragraphs of subsection (c) must be satisfied--either (1) appointment of the examiner must be in the interests of the estate, or (2) specified unsecured debts must exceed $ 5 million

In re UAL Corp., 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004).  Once these requirements have been met, appointment of an examiner is mandatory.  See, e.g., Morgenstern v. Revco D.S., Inc.(In re Revco D.S., Inc.), 898 F.2d 498, 500 (6th Cir. Ohio 1990) (holding that because 11 U.S.C. §1104(c) uses the word, "shall", the court lacks discretion not to appoint an examiner if the statutory requirements are met); Loral Stockholders Protective Comm. v. Loral Space & Communs., Ltd. (In re Loral Space & Communs., Ltd.), 2004 U.S. Dist. LEXIS 25681, 15-16 (S.D.N.Y. Dec. 23, 2004) (finding that appointment of an examiner is mandatory under 11 U.C.C. §1104(c) so long as all statutory requirements are met); In re UAL Corp., 307 B.R. 80, 84 (Bankr. N.D. Ill. 2004) (holding that the "appointment of an examiner is mandatory if the four conditions are met").

26. As explained further below, here, except for the confirmation of the Plan that is now clearly incapable of being implemented, all conditions have been met. First, the Debtors are still in the possession of their estates, and no trustee has been appointed.  Second, the Senior Noteholders are a party in interest who are entitled to request the appointment of an examiner.  Third, not only would the appointment of an examiner be in the best interests of the Debtors' estates but Delphi Corporation, the lead Debtor in these bankruptcy cases, has more than $5,000,000 in fixed, liquidated, unsecured debts as represented by the $2 billion in outstanding Senior Notes, alone. See Disclosure Statement at 32.

27.     The Bankruptcy Code does not specifically provide for the appointment of an examiner after a plan has been confirmed but, significantly, it does not prohibit such an appointment either.  The fact that a Plan was confirmed in these cases should have no bearing on the appointment of an examiner, especially, where as here, the Plan has been rendered infeasible such that its confirmation is now meaningless. The current situation is more akin to a "chapter 22" – where Debtors emerge from bankruptcy only to re-file for bankruptcy protection shortly thereafter. Interpreting the Bankruptcy Code to prevent the appointment of an examiner in these cases would produce an absurd result – i.e., the confirmation of a plan that can never be consummated, and that must be modified, prevents the appointment of an examiner. Statutes should not be interpreted to produce an absurd result.[12]  Clearly, Congress contemplated that an examiner should not be appointed after confirmation, because it would be a waste given the imminent consummation of the plan.  Obviously, that rationale is inapposite here.

28.     Here, an examiner is needed to ensure that the interests of all creditor bodies are adequately protected and ensure that the subsidiaries that own the profitable global operations are not raided to prop up the corporations that own the money-losing and cash-guzzling North American operations.  Ample precedent exists in this district for the appointment of an Examiner in complex cases to investigate issues relating to maintaining the integrity of the separate assets of non-substantively

---

[12]  See, e.g., United States v. Ron Pair Enters., 489 U.S. 235, 242 (1989) (holding that, "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' In such cases, the intention of the drafters, rather than the strict language, controls.")(citations omitted); United States v. American Trucking Ass'ns, 310 U.S. 534, 543-544 (1940) (finding that, when the "plain

consolidated debtors and ensuring that assets of one debtor are not diverted improperly for the benefit of another debtor.  See, e.g., In re Enron Corp., et. al., Case No. 01 B 16034, Docket No. [1605] (order appointing an examiner to investigate, among other things, one debtor's involvement in the Debtors' cash management system).  An examiner is necessary in these cases to investigate the facts and circumstances behind the negotiation and documentation of the GM Arrangement and GM Amendment.   Why are the Debtors willing to sacrifice the interests of Delphi Corporation's creditors in order to benefit the unprofitable North American debtor-subsidiaries and their creditors (and GM)?  Why is so much more liquidity needed under the GM Amendment?  Affirmative steps must be taken to safeguard the interests of the Delphi Corporation's creditors.

---

meaning" of a statute would lead to "absurd or futile results," the Court follows the purpose and policy of the legislation as a whole, "rather than the literal words.").

# IV.
# CONCLUSION

WHEREFORE, based on the foregoing, the Senior Noteholders respectfully request that the Court appoint an Examiner to investigate the GM Arrangement and GM Amendment, deny or adjourn the GM Motion pending the conclusion of such investigation, and grant such other relief that the Court deems just and proper.

Dated:   August 20, 2008
         Los Angeles, California

                STUTMAN, TREISTER & GLATT P.C.

        By:   /s/ Isaac M. Pachulski
                Isaac M. Pachulski
                Jeffrey H. Davidson
                Eric D. Goldberg
                Christine M. Pajak
                1901 Avenue of the Stars, 12th Floor
                Los Angeles, California 90067
                Tel:  (310) 228-5600