STUTMAN, TREISTER & GLATT P.C.
Attorneys for CR Intrinsic Investors, LLC, and
Highland Capital Management, L.P.
(and/or certain funds managed thereby)
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
(310) 228-5600
Isaac M. Pachulski,
Jeffrey H. Davidson,
Eric D. Goldberg, and
Christine M. Pajak

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------ X
In re:                                                 |   Chapter 11
                                                       |
DELPHI CORPORATION, et al.,                            |   Case No. 05-44482 (RDD)
                                                       |
                              Debtors.                 |   Jointly Administered
                                                       |
------------------------------------------------------ X
```

**REQUEST FOR JUDICIAL NOTICE RE**
**OBJECTION TO DEBTORS' MOTION TO AUTHORIZE AMENDMENT**
**TO ARRANGEMENT WITH GENERAL MOTORS CORP.  AND**
**REQUEST FOR THE APPOINTMENT OF AN EXAMINER**

In support of their Objection to Debtors' "Motion for Order Authorizing

Amendment To Arrangement With General Motors Corporation Approved Pursuant To

Second DIP Extension Order (Docket No. 13489)" and request for the appointment of

an examiner, which is being filed concurrently herewith, CR Intrinsic Investors, LLC and

Highland Capital Management, L.P. (collectively, the "Senior Noteholders") hereby

respectfully request that the Court take judicial notice, pursuant to Federal Rule of

Evidence 201, of the following publicly filed document:

Delphi Corporation Form 10-Q Quarterly Report for the quarterly period ended June 30, 2008 which was filed with the SEC on August 8, 2008 and is attached hereto as Exhibit "1".

Dated:    August 20, 2008
          Los Angeles, California

                    STUTMAN, TREISTER & GLATT P.C.


          By:          /s/ Isaac M. Pachulski
                       Isaac M. Pachulski
                       Jeffrey H. Davidson
                       Eric D. Goldberg
                       Christine M. Pajak
                       1901 Avenue of the Stars, 12th Floor
                       Los Angeles, California 90067
                       (310) 228-5600

2

# EXHIBIT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

☑     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2008**

**OR**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____.**

**Commission file number: 1-14787**

# DELPHI CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **38-3430473** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **5725 Delphi Drive, Troy, Michigan** | **48098** |
| (Address of principal executive offices) | (Zip Code) |

**(248) 813-2000**
( Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑.        No ☐.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑.    Accelerated filer ☐.    Non-accelerated filer ☐.    Smaller reporting company ☐.

**(Do not check if a smaller reporting company)**

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐.        No ☑.

As of June 30, 2008 there were 564,635,299 outstanding shares of the registrant's $0.01 par value common stock.

### WEBSITE ACCESS TO COMPANY'S REPORTS

Delphi's internet website address is www.delphi.com. Our Annual Reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to section 13(a) or 15(d) of the Exchange Act are available free of charge through our website as soon as reasonably practicable after they are electronically filed with, or furnished to, the Securities and Exchange Commission.

**DELPHI CORPORATION**

**INDEX**

Page

**Part I — Financial Information**

Item 1.   Financial Statements

Consolidated Statements of Operations for the Three and Six Months Ended June 30, 2008 and 2007 (Unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Consolidated Balance Sheets as of June 30, 2008 (Unaudited) and December 31, 2007 . . . . . 4

Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2008 and 2007 (Unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Consolidated Statements of Comprehensive Loss for the Three and Six Months Ended June 30, 2008 and 2007 (Unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Notes to Consolidated Financial Statements (Unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations . . . 50

Executive Summary of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Overview of Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Overview of Net Sales and Net Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Liquidity and Capital Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Liquidity Outlook for 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Litigation Commitments and Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Environmental Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Inflation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Recently Issued Accounting Pronouncements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Significant Accounting Policies and Critical Accounting Estimates . . . . . . . . . . . . . . . . . . . . 82

Forward-Looking Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Item 3.   Quantitative and Qualitative Disclosures About Market Risk . . . . . . . . . . . . . . . . . . . . . . . 83

Item 4.   Controls and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

**Part II — Other Information**

Item 1.    Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Item 1A.  Risk Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Item 2.    Unregistered Sales of Equity Securities and Use of Proceeds . . . . . . . . . . . . . . . . . . . . . . . 86

Item 3.    Defaults Upon Senior Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Item 4.    Submission of Matters to a Vote of Security Holders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Item 5.    Other Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Item 6.    Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Signatures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

# PART I. FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

### DELPHI CORPORATION
### (DEBTOR-IN-POSSESSION)

### CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2008 | 2007 | 2008 | 2007 |
|  | (in millions, except per share amounts) | | | |
| **Net sales:** |  |  |  |  |
| General Motors and affiliates | $1,483 | $2,247 | $ 3,124 | $ 4,410 |
| Other customers | 3,751 | 3,753 | 7,362 | 7,272 |
| Total net sales | 5,234 | 6,000 | 10,486 | 11,682 |
| **Operating expenses:** |  |  |  |  |
| Cost of sales, excluding items listed below | 4,821 | 5,654 | 9,718 | 10,960 |
| U.S. employee workforce transition program charges (credit) | 18 | — | 54 | (6) |
| Depreciation and amortization | 210 | 230 | 429 | 457 |
| Long-lived asset impairment charges | 5 | 34 | 8 | 40 |
| Goodwill impairment charges | 168 | — | 168 | — |
| Selling, general and administrative | 377 | 394 | 741 | 758 |
| Securities & ERISA litigation charge | — | 332 | — | 332 |
| Total operating expenses | 5,599 | 6,644 | 11,118 | 12,541 |
| Operating loss | (365) | (644) | (632) | (859) |
| Interest expense (contractual interest expense for the three and six months ended June 30, 2008 was $150 million and $279 million, respectively, and for the three and six months ended June 30, 2007 was $118 million and $242 million, respectively) | (109) | (84) | (219) | (174) |
| Loss on extinguishment of debt | (49) | — | (49) | (23) |
| Other income, net | 4 | 19 | 23 | 39 |
| Reorganization items | (29) | (42) | (138) | (81) |
| Loss from continuing operations before income taxes, minority interest and equity income | (548) | (751) | (1,015) | (1,098) |
| Income tax expense | (10) | (55) | (73) | (101) |
| Loss from continuing operations before minority interest and equity income | (558) | (806) | (1,088) | (1,199) |
| Minority interest, net of tax | (12) | (12) | (23) | (24) |
| Equity income, net of tax | 11 | 10 | 22 | 24 |
| Loss from continuing operations | (559) | (808) | (1,089) | (1,199) |
| Income (loss) from discontinued operations, net of tax | 8 | (13) | (51) | (155) |
| Net loss | $ (551) | $ (821) | $(1,140) | $(1,354) |
| **Basic and diluted loss per share:** |  |  |  |  |
| Continuing operations | $(0.99) | $(1.44) | $ (1.93) | $ (2.14) |
| Discontinued operations | 0.01 | (0.02) | (0.09) | (0.27) |
| Basic and diluted loss per share | $(0.98) | $(1.46) | $ (2.02) | $ (2.41) |

See notes to consolidated financial statements.

3

# DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)

## CONSOLIDATED BALANCE SHEETS

|  | June 30, 2008 (Unaudited) | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,054 | $ 1,036 |
| Restricted cash | 121 | 173 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,108 | 1,257 |
| Other | 3,024 | 2,637 |
| Inventories, net (Note 11) | 1,737 | 1,808 |
| Other current assets | 677 | 588 |
| Assets held for sale (Note 4) | 711 | 720 |
| Total current assets | 8,432 | 8,219 |
| Long-term assets: | | |
| Property, net | 3,811 | 3,863 |
| Investments in affiliates | 386 | 387 |
| Goodwill | 256 | 397 |
| Other | 784 | 801 |
| Total long-term assets | 5,237 | 5,448 |
| Total assets | $ 13,669 | $ 13,667 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Short-term debt (Note 15) | $ 4,421 | $ 3,495 |
| Accounts payable | 2,951 | 2,904 |
| Accrued liabilities (Note 12) | 2,343 | 2,281 |
| Liabilities held for sale (Note 4) | 451 | 412 |
| Total current liabilities | 10,166 | 9,092 |
| Long-Term liabilities: | | |
| Other long-term debt (Note 15) | 59 | 59 |
| Employee benefit plan obligations (Note 17) | 475 | 443 |
| Other (Note 12) | 1,160 | 1,185 |
| Total long-term liabilities | 1,694 | 1,687 |
| Liabilities subject to compromise (Note 14) | 16,244 | 16,197 |
| Total liabilities | 28,104 | 26,976 |
| Commitments and contingencies (Note 22) | | |
| Minority interest | 145 | 163 |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued in 2008 and 2007 | 6 | 6 |
| Additional paid-in capital | 2,747 | 2,756 |
| Accumulated deficit | (16,241) | (14,976) |
| Accumulated other comprehensive loss: | | |
| Employee benefit plans (Note 17) | (1,702) | (1,679) |
| Other | 616 | 446 |
| Total accumulated other comprehensive loss | (1,086) | (1,233) |
| Treasury stock, at cost (391 thousand and 1.5 million shares in 2008 and 2007, respectively) | (6) | (25) |
| Total stockholders' deficit | (14,580) | (13,472) |
| Total liabilities and stockholders' deficit | $ 13,669 | $ 13,667 |

See notes to consolidated financial statements.

4

# DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)

### CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited)

|  | Six Months Ended June 30, | |
| --- | ---: | ---: |
|  | **2008** | **2007** |
|  | (in millions) | |
| Cash flows from operating activities: | | |
| Net loss | $(1,140) | $(1,354) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 429 | 457 |
| Long-lived asset impairment charges | 8 | 40 |
| Goodwill impairment charges | 168 | — |
| Deferred income taxes | (10) | 19 |
| Pension and other postretirement benefit expenses | 375 | 482 |
| Equity income | (22) | (24) |
| Reorganization items | 138 | 81 |
| U.S. employee workforce transition program charges (credit) | 54 | (6) |
| Loss on extinguishment of debt | 49 | 23 |
| Loss on assets held for sale | 32 | — |
| Securities & ERISA litigation charge | — | 332 |
| Loss on liquidation/deconsolidation of investment | — | 79 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (376) | (922) |
| Inventories, net | 36 | 4 |
| Other assets | 36 | (42) |
| Accounts payable | 151 | 399 |
| Accrued and other long-term liabilities | 53 | 389 |
| Other, net | (42) | (33) |
| U.S. employee workforce transition program payments | (100) | (526) |
| U.S. employee workforce transition program reimbursement by GM | — | 265 |
| Pension contributions | (310) | (156) |
| Other postretirement benefit payments | (131) | (87) |
| Net payments for reorganization items | (55) | (61) |
| Dividends from equity investments | 10 | 12 |
| Discontinued operations (Note 4) | 48 | 193 |
| Net cash used in operating activities | (599) | (436) |
| Cash flows from investing activities: | | |
| Capital expenditures | (414) | (308) |
| Proceeds from sale of property | 47 | 20 |
| Cost of acquisitions | (15) | — |
| Proceeds from sale of non-U.S. trade bank notes | 117 | 95 |
| Proceeds from divestitures, net | 121 | — |
| Decrease (increase) in restricted cash | 52 | (10) |
| Other, net | (6) | (16) |
| Discontinued operations | (99) | (19) |
| Net cash used in investing activities | (197) | (238) |
| Cash flows from financing activities: | | |
| Proceeds from amended and restated debtor-in-possession facility, net of issuance cost of $92 million | 3,158 | — |
| Proceeds from refinanced debtor-in-possession facility, net of issuance cost of $7 million | — | 2,739 |
| Repayments of borrowings from refinanced debtor-in-possession facility | (2,746) | — |
| Repayments of borrowings under debtor-in-possession facility | — | (250) |
| Repayments of borrowings under prepetition term loan facility | — | (988) |
| Repayments of borrowings under prepetition revolving credit facility | — | (1,508) |
| Net borrowings under amended and restated debtor-in-possession facility | 311 | — |
| Net borrowings under refinanced debtor-in-possession facility | — | 410 |
| Net borrowings under other debt agreements | 29 | 83 |
| Dividend payments of consolidated affiliates to minority shareholders | (23) | (30) |
| Discontinued operations | 17 | (3) |
| Net cash provided by financing activities | 746 | 453 |
| Effect of exchange rate fluctuations on cash and cash equivalents | 68 | 38 |
| Increase (decrease) in cash and cash equivalents | 18 | (183) |
| Cash and cash equivalents at beginning of period | 1,036 | 1,608 |
| Cash and cash equivalents at end of period | $ 1,054 | $ 1,425 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS (Unaudited)**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | **2008** | **2007** | **2008** | **2007** |
|  | (in millions) | | | |
| Net loss | $(551) | $(821) | $(1,140) | $(1,354) |
| Other comprehensive income: | | | | |
| Currency translation adjustments, net of tax | 21 | 120 | 90 | 146 |
| Net change in unrecognized gain on derivative instruments, net of tax | (16) | 50 | 80 | 53 |
| Employee benefit plans adjustment, net of tax | 19 | (5) | (11) | (5) |
| Other comprehensive income | 24 | 165 | 159 | 194 |
| Comprehensive loss | $(527) | $(656) | $  (981) | $(1,160) |

See notes to consolidated financial statements.

6

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)**

## 1. BASIS OF PRESENTATION

*General* — Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company"), is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Delphi's largest customer is General Motors Corporation ("GM") and North America and Europe are its largest markets. Delphi is continuing to diversify its customer base and geographic markets. The consolidated financial statements and notes thereto included in this report should be read in conjunction with Delphi's consolidated financial statements and notes thereto included in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007 filed with the United States ("U.S.") Securities and Exchange Commission ("SEC").

*Consolidation* — The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary. Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated. All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included. The results for interim periods are not necessarily indicative of results that may be expected from any other interim period or for the full year and may not necessarily reflect the consolidated results of operations, financial position and cash flows of Delphi in the future.

*Bankruptcy Filing* — On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, will continue their business operations without supervision from the Court and are not subject to the requirements of the Bankruptcy Code.

American Institute of Certified Public Accountants ("AICPA") Statement of Position 90-7 ("SOP 90-7"), *Financial Reporting by Entities in Reorganization under the Bankruptcy Code*, which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. Delphi has segregated those items as outlined above for all reporting periods subsequent to October 8, 2005.

***Going Concern*** — The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) return to profitability; (iv) generate sufficient cash flow from operations; and (v) obtain financing sources to meet the Company's future obligations, including an extension or replacement of their DIP financing agreement, which expires on December 31, 2008. These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007. The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008, but Delphi was unable to consummate the plan because certain investors under the plan refused to participate in the closing, which was commenced but not completed on April 4, 2008. Delphi subsequently filed complaints seeking redress for the breach of the investment agreement and damages related to the consequent delay of Delphi's emergence from chapter 11. Delphi continues to work with its stakeholders, including GM, to further amend the plan. On July 23, 2008, Delphi's Official Committee of Unsecured Creditors (the "Creditors' Committee") and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's plan of reorganization. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not presently intend to prosecute such complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the previously confirmed plan of reorganization, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against Appaloosa Management L.P. and the other investors who were party to the Equity Purchase and Commitment Agreement dated as of August 3, 2007. Pending confirmation and consummation of the plan of reorganization (as amended) or an alternative plan of reorganization, Delphi and certain of its U.S. subsidiaries will continue as "debtors-in-possession" in chapter 11. Because discussions are ongoing, we can not provide any assurances as to when or if Delphi will confirm or consummate a modified plan or the extent or nature of any future amendments. Consummation of a confirmed plan of reorganization often materially changes the amounts reported in a company's consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of consummation of a confirmed plan of reorganization (as amended).

***Contractual Interest Expense and Interest Expense on Unsecured Claims*** — Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt during the six months ended June 30, 2007. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007. The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, the confirmation date of the plan of reorganization (as amended), when the Company ceased accruing interest on these claims. Delphi recorded interest related to prepetition debt and allowed unsecured claims of $14 million through January 25, 2008. Delphi reduced interest expense by $7 million during the three months ended June 30, 2008 due to changes in estimates of certain prepetition claim amounts. At June 30, 2008, Delphi had accrued interest of $418 million in accrued liabilities in the accompanying balance sheet for prepetition claims. This estimate is based on numerous factual and legal assumptions. Upon consummation of the confirmed plan of reorganization discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, the interest accrued for prepetition claims will be discharged at the emergence date; however, as noted above, Delphi has not yet consummated its confirmed plan and is

continuing to work with its stakeholders to further amend the plan or develop an alternative plan accordingly, and there can be no assurances that these estimates will not change.

*Use of Estimates* — Preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein. During the second quarter of 2008, there were no material changes in the methods or policies used to establish accounting estimates. Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, workers' compensation accruals and healthcare accruals. Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

*Valuation of Long-Lived Assets*— Delphi periodically evaluates the carrying value of long-lived assets held for use, including intangible assets, when events or circumstances warrant such a review. The carrying value of a long-lived asset held for use is considered impaired when the anticipated separately identifiable undiscounted cash flows from the asset are less than the carrying value of the asset. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. Fair value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved or Delphi's review of appraisals. Impairment losses on long-lived assets held for sale are determined in a similar manner, except that fair values are reduced for the cost to dispose of the assets. Refer to Note 4. Discontinued Operations and Note 7. Long-Lived Asset Impairment for more information.

*Discontinued Operations* — In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ("SFAS 144"), a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component. The results of discontinued operations are aggregated and presented separately in the consolidated statements of operations and consolidated statements of cash flows. Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the consolidated balance sheet. SFAS 144 requires the reclassification of amounts presented for prior years to effect their classification as discontinued operations.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business"). The sale of the U.S. operation and certain of the non-U.S. operations of the Steering Business will be sales of assets and will include (i) all assets, except for cash, deferred tax assets, and intercompany accounts, and (ii) all liabilities, except for debt, deferred tax liabilities, intercompany accounts, U.S. pension and other postretirement benefit liabilities, accrued payroll, and certain employee benefit accounts. The sale of certain non-U.S. operations of the Steering Business are stock sales and will include all assets and liabilities for the sites with purchase price adjustments for cash, debt, and certain other accounts. The sale of the Interiors and Closures Business closed on February 29, 2008. The majority of the Interiors and Closures Business sale was primarily accomplished through asset sales and the buyer assumed inventory, fixed assets, non-U.S. pension liabilities and an investment in a joint venture in Korea.

While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to the loss from discontinued operations in the statements of operations. Delphi expects to retain certain employee pension and other postretirement benefit liabilities for the Steering Business and these liabilities were not allocated to liabilities held for sale in the balance sheets. Expenses related to the service cost of employee pension and other postretirement benefit plans, however,

9

were allocated to discontinued operations in the statements of operations, because Delphi will not continue to incur such related expense subsequent to the divestiture of these businesses. Allocations have been made based upon a reasonable allocation method. Refer to Note 4. Discontinued Operations.

*Recently Issued Accounting Pronouncements* — In September 2006, the Financial Accounting Standards Board (the "FASB") issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *Fair Value Measurements*. SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value. SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. The Company utilized the fair value measures of SFAS 157 in accounting for its marketable securities and derivative net assets. The adoption of the new definition of fair value pursuant to SFAS 157 did not have a significant impact on Delphi's financial statements. Refer to Note 19. Fair Value Measurements for the disclosures required by SFAS 157.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R)*. SFAS 158 requires, among other things, an employer to measure the funded status of its defined benefit pension and other postretirement benefits plans as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Historically, Delphi has measured the funded status of its U.S. retiree health care benefit plans and certain international pension plans as of September 30 of each year. Delphi adopted the measurement date provisions of SFAS 158 as of January 1, 2008, which resulted in adjustments that increased pension and other postretirement benefit liabilities by $139 million, the accumulated deficit by $129 million and accumulated other comprehensive loss by $10 million.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 ("SFAS 159"), *The Fair Value Option for Financial Assets and Financial Liabilities — Including an amendment of FASB Statement No. 115*. SFAS 159 permits entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently measured at fair value. Unrealized gains and losses on items for which the fair value option has been elected would be reported in earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements in order to facilitate comparisons between entities choosing different measurement attributes for similar types of assets and liabilities. SFAS 159 does not affect existing accounting requirements for certain assets and liabilities to be carried at fair value. SFAS 159 is effective as of the beginning of a reporting entity's first fiscal year that begins after November 15, 2007. Delphi adopted SFAS 159 as of January 1, 2008 and did not elect the fair value option for any financial instruments upon adoption of SFAS 159.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (Revised 2007) ("SFAS 141R"), *Business Combinations*. SFAS 141R requires an acquiring entity to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. SFAS 141R applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. Earlier adoption is prohibited. Accordingly, Delphi is required to record and disclose business combinations following existing U.S. GAAP until January 1, 2009. Delphi is currently evaluating the requirements of SFAS 141R, and has not yet determined the impact on its financial statements.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160 ("SFAS 160"), *Noncontrolling Interests in Consolidated Financial Statements — An Amendment of ARB No. 51*. SFAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. SFAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Earlier adoption is prohibited.

Delphi is currently evaluating the requirements of SFAS 160, and has not yet determined the impact on its financial statements.

In March 2008, the FASB issued Statement of Financial Accounting Standards No. 161 ("SFAS 161"), *Disclosures about Derivative Instruments and Hedging Activities — an Amendment of FASB Statement 133*. SFAS 161 enhances required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (a) an entity uses derivative instruments; (b) derivative instruments and related hedged items are accounted for under FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities;* and (c) derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS 161 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after November 15, 2008. Earlier adoption is encouraged. Delphi is currently evaluating the requirements of SFAS 161, and has not yet determined the impact on its financial statements.

In April 2008, the FASB issued FASB Staff Position SOP 90-7-1 ("FSP SOP 90-7-1"), *An Amendment of AICPA Statement of Position 90-7*. FSP SOP 90-7-1 resolves the conflict between the guidance requiring early adoption of new accounting standards for entities required to follow fresh-start reporting under SOP 90-7, and other authoritative accounting standards that expressly prohibit early adoption. Specifically, FSP SOP 90-7-1 will require an entity emerging from bankruptcy that applies fresh-start reporting to follow only the accounting standards in effect at the date fresh-start reporting is adopted, which include those standards eligible for early adoption if an election is made to adopt early.

## 2.  TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

### Plan of Reorganization and Transformation Plan

Elements of Transformation Plan

On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") became final, but Delphi was unable to consummate the Plan because certain investors under the Plan refused to participate in the closing, which was commenced but not completed on April 4, 2008. The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, as detailed below, including agreements reached with each of Delphi's principal U.S. labor unions and GM. The Plan incorporates, approves, and is consistent with the terms of each agreement.

Labor — Modify Delphi's labor agreements to create a more competitive arena in which to conduct business.

During the second quarter of 2007, Delphi signed an agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007. Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject their U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues. Portions of these agreements have already become effective, and the remaining portions will not become effective until the effectiveness of the Global Settlement Agreement, as amended (the "GSA"), and the Master Restructuring Agreement, as amended (the "MRA"), with GM and upon substantial consummation of the Plan as confirmed by the Court. However, as part of Delphi's overall discussions with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi and GM are negotiating modifications to the GSA and MRA, which if finalized and agreed to by both parties and approved by the Court, would provide for the agreements or certain portions of the agreements,

including provisions related to the transfer of certain legacy pension and other postretirement benefit obligations, to become effective prior to substantial consummation of a plan of reorganization. Among other things, early effectiveness of certain provisions of the GSA and MRA would facilitate the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the U.S. Internal Revenue Code (the "Code") to GM in an economically efficient manner prior to September 30, 2008, see Pensions below.

Among other things, these agreements generally provided certain members of the union labor workforce options to either retire, accept a voluntary severance package or accept lump sum payments in return for lower hourly wages. Refer to Note 16. U.S. Employee Workforce Transition Programs for more information.

On September 4, 2007, the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, subject to the Court's prior settlement approval orders pertaining to each of Delphi's U.S. labor unions, as it relates to all parties and the intervening respondents, by entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g).

GM — Conclude negotiations with GM to finalize financial support for certain of Delphi's legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

Delphi and GM have entered into comprehensive settlement agreements consisting of the GSA and the MRA. The GSA and the MRA comprised part of the Plan and were approved in the order confirming the Plan on January 25, 2008. The GSA and MRA currently provide that such agreements are not effective until and unless Delphi emerges from chapter 11. However, as noted above, Delphi and GM are considering potential amendments which would make the agreements or certain portions of the agreements effective prior to emergence. Given the ongoing nature of the discussions there can be no assurance that the parties will agree to potential amendments or that the Court will approve such amendments. Accordingly, the accompanying consolidated financial statements do not include any adjustments related to the GSA or the MRA and the following discussion does not consider the potential impact of any amendments. These agreements will result in a material reduction in Delphi's liabilities related to the workforce transition programs. Delphi will account for the impact of the GSA or the MRA when the conditions of the agreements are satisfied and Court approval, if required, has been obtained.

- Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Plan or as soon as reasonably possible thereafter. By contrast, the MRA addresses matters that will require a significantly longer period that will extend for a number of years after consummation of the Plan to complete.

- GM's obligations under the GSA and MRA are conditioned upon, among other things, Delphi's consummation of the Plan, including payment of amounts to settle GM claims as outlined below.

The GSA is intended to resolve outstanding issues between Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11, and will be implemented by Delphi and GM in the short term. During 2007, Delphi entered into amendments to both the GSA and the MRA. These agreements, as amended, provide for a comprehensive settlement of outstanding issues between Delphi and GM (other than ordinary course matters), including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999; certain post-separation claims and disputes between Delphi and GM; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under Delphi's Plan; and various other legacy issues.

In addition to establishing claims treatment, including specifying which claims survive and the consideration to be paid by Delphi to GM in satisfaction of certain claims, the GSA addresses, among other things, commitments by Delphi and GM regarding other postretirement benefit and pension obligations, and other GM contributions with respect to labor matters and releases.

- GM will assume approximately $7 billion of certain postretirement benefits for certain of the Company's active and retired hourly employees, including health care and life insurance;

12

- Delphi will freeze its Delphi Hourly-Rate Employees Pension Plan as soon as practicable following the effective date of the Plan, as provided in the union settlement agreements, and GM's Hourly-Rate Employees Pension Plan will become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi will transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the U.S. labor union settlement agreements;

- Shortly after the effectiveness of the Plan, GM will receive an interest bearing note from Delphi in the amount of $1.5 billion which is expected to be paid promptly following effectiveness;

- GM will make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the U.S. labor union settlement agreements; and

- GM and certain related parties and Delphi and certain related parties will exchange broad, global releases (which will not apply to certain surviving claims as set forth in the GSA).

The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11. The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM. Through the MRA, Delphi and GM have agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- GM will make significant, ongoing contributions to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and other postretirement benefit contributions provided under the Supplemental Wage Agreement, at specified UAW manufacturing facilities retained by Delphi;

- GM and Delphi have agreed to certain terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- GM and Delphi have agreed to certain additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by certain future dates (as defined in the MRA); and

- GM and Delphi have agreed to the treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

The GSA and MRA may be terminated by the Company or GM because the effective date of the Plan did not occur by March 31, 2008 and the EPCA (as defined below) was terminated. As of the date hereof, neither Delphi nor GM has terminated the GSA or the MRA.

<u>Portfolio</u> — Streamline Delphi's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with Delphi's new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, and wheel bearings. In connection with the Company's continuous evaluation of its product portfolio, effective November 1, 2006 Delphi decided that the power products business no longer fit within the Company's future product portfolio and that business line was moved to Delphi's Automotive Holdings Group and during the second quarter of 2008 Delphi decided that the global exhaust business no longer fit within the Company's future product portfolio. With the exception of the catalyst product line and the global exhaust business (included in the Powertrain Systems segment), and the steering and halfshaft product lines and interiors and closures product lines (included in

13

discontinued operations), the Company's non-core product lines are included in the Automotive Holdings Group segment, refer to Note 21. Segment Reporting.

Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites. The sale and wind-down process is being conducted in consultation with the Company's customers, labor unions and other stakeholders to carefully manage the transition of affected product lines and manufacturing sites. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

During the first six months of 2008, Delphi obtained Court approval of bidding procedures and sales agreements for the steering and halfshaft product line and closed on the sales of the interiors and closures product line, the North American brake components machining and assembly assets, the global bearings business and the U.S. suspensions business. Additionally, under an order providing Delphi with authority to sell certain assets that do not exceed $10 million without further Court approval, Delphi entered into an agreement to sell its power products business. Refer to Note 4. Discontinued Operations and Note 5. Acquisitions and Divestitures for more information.

Costs recorded in the three and six months ended June 30, 2008 and 2007 related to the transformation plan for non-core product lines include impairments of long-lived assets, employee termination benefits and other exit costs and U.S. employee workforce transition program charges as further described in Note 4. Discontinued Operations, Note 7. Long-Lived Asset Impairment, Note 9. Employee Termination Benefits and Other Exit Costs and Note 9. U.S. Employee Workforce Transition Programs.

Cost Structure — Transform the salaried workforce and reduce general and administrative expenses to ensure that its organizational and cost structure is competitive and aligned with Delphi's product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services, information technology and certain sales administration outsourcing activities, reduction of its global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of certain salaried benefit programs to bring them in line with more competitive industry levels. Given the investment required to implement these initiatives, Delphi does not expect to fully realize substantial savings until 2009 and beyond.

Pensions — Devise a workable solution to the current pension funding situation, whether by extending contributions to the pension trusts or otherwise.

Delphi's discussions with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of emergence contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM.

On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers"). On May 31, 2007, the Court authorized Delphi to perform under the terms of those funding waivers. The IRS modified the 2006 Waivers by extending the dates by which Delphi is required to file its Plan and emerge from chapter 11. On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver"). The waivers were required, at that time, to facilitate the Debtors' option to effectuate the transfer of certain hourly pension obligations to GM in an economically efficient manner, and to remove uncertainty as to whether excise taxes would be assessed as a result of accumulated funding deficiencies relating to prepetition service. Absent the waivers, the transfer to GM could have triggered an obligation of the Debtors to make cash contributions to the Hourly Plan which would result in a projected

overfunding of the Hourly Plan. On October 26, 2007, the Court authorized Delphi to perform under the 2007 Hourly Plan Waiver, which would have expired if Delphi did not emerge from chapter 11 by February 29, 2008. The Court authorized two additional funding waivers which authorized Delphi to defer funding contributions due under the Employee Retirement Income Security Act ("ERISA") and the Code until May 9, 2008. On April 4, 2008, the IRS and the PBGC modified the 2006 Waivers and the 2007 Hourly Plan Waiver by extending the date by which Delphi must emerge from chapter 11 to May 9, 2008.

Delphi did not seek extension of the 2006 Waivers or the 2007 Hourly Plan Waiver past May 9, 2008. Delphi believes that ERISA and the Code will still, under most circumstances, after June 15, 2008, permit the Company to be able to effect the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the Code to GM in an economically efficient manner prior to September 30, 2008. However, by permitting the waivers to lapse Delphi is potentially exposed to excise taxes as a result of accumulated funding deficiencies for the plan years ended September 30, 2005 and 2006 of approximately $173 million and $1.22 billion, respectively. Accordingly, the IRS may assert against Delphi excise taxes in the approximate amounts of $17 million and $122 million for plan years ended September 30, 2005 and 2006, respectively. Because Delphi did not meet its minimum funding requirements on or before June 15, 2008, the accumulated funding deficiency without the effect of the waivers would be approximately $2.44 billion for the plan year ended September 30, 2007, which could lead to the IRS further asserting additional excise taxes of approximately $244 million. If the accumulated funding deficiency is not corrected after Delphi receives the assessments, an excise tax of up to 100% may be assessed at the discretion of the IRS. Assuming Delphi is assessed an excise tax for all plan years through 2007, the total range of exposure would approximate between $380 million and $3.8 billion. Delphi expects that the Hourly and Salaried Plans will have accumulated funding deficiencies for the plan year ending September 30, 2008, should Delphi not emerge from chapter 11. Any transfer of hourly pension obligations to a GM pension plan will mitigate such deficiency for the Delphi Hourly Plan.

As noted above, Delphi and GM are considering potential amendments to the GSA and MRA, which if agreed to by the parties and approved by the Court, would cause the agreements or certain portions of the agreements to become effective prior to substantial consummation of a plan of reorganization, including those relating to the transfer of certain assets and liabilities of Delphi's Hourly Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the U.S. labor union settlement agreements, thereby facilitating completion of such transfer in an economically efficient manner prior to September 30, 2008. However, there can be no assurances that Delphi and GM will reach final agreement on potential amendments or that the Court will approve the potential amendments such that the proposed transfer can be completed prior to September 30, 2008. In the event such transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits attributable to prepetition service while in chapter 11 and that it has made all required payments for postpetition service. Delphi further believes that as a result, it is not liable for any penalty excise taxes that may be assessed by the IRS. Delphi believes that its ultimate emergence from chapter 11 will result in a consensual resolution of its pension funding obligations, and given the significant uncertainty surrounding the outcome of the excise tax assessment and the potential for Delphi to litigate this matter, if necessary, management has concluded that an unfavorable outcome is not currently probable. Accordingly, as of June 30, 2008, no amounts have been recorded for any potential excise tax assessment.

Pursuant to the pertinent terms of the waivers, as modified, Delphi provided to the PBGC letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan. Due to the expiration of the waivers, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on May 16, 2008. The cash proceeds from the letters of credit have been recognized as Delphi funding contributions to the plans for the plan year ending September 30, 2008.

15

The Company has represented that it currently intends to meet the minimum funding standard under IRC section 412 upon emergence from chapter 11. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the ability to transfer certain assets and unfunded benefit liabilities from the Hourly Plan to a pension plan sponsored by GM, the date and size of such transfer, the funded status of the Hourly Plan and the date of emergence. As noted above, in the event the anticipated transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the Labor section, Delphi committed to freeze the Hourly and Salaried Plans effective at the end of the month following emergence from chapter 11. Refer to Note 17. Pension and Other Postretirement Benefits for more information.

Equity Purchase and Commitment Agreement

Under the terms and subject to the conditions of Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination. On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by

Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16, 2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages. No amounts related to this matter have been recorded in Delphi's financial statements. The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions. A trial on Delphi's complaint is currently scheduled to occur in March 2009, and the parties have agreed to participate in mediation in an attempt to settle the claims that were not dismissed.

During 2007, in exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million. In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA. The Company also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. Delphi had deferred the recognition of these amounts in other current assets as they were to be netted against the proceeds from the EPCA upon issuance of the new shares. However, as a result of the events relating to the termination of the EPCA as described above, Delphi recognized $79 million of expense related to these fees and other expenses during the six months ended June 30, 2008.

<u>The Plan of Reorganization</u>

As noted above, due to the Investors failure to fund their commitments under the EPCA, Delphi has not yet consummated the Plan and is continuing discussions with its stakeholders regarding potential amendments to the Plan that will enable Delphi to emerge from chapter 11 as soon as practicable. Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization is extended until 30 days after substantial consummation of the Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Plan (as modified) is extended until 90 days after substantial consummation of the Plan (as modified) or any modified plan. On July 23, 2008, Delphi's Creditors' Committee and WTC, as Indenture Trustee and a member of the UCC, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not presently intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against Appaloosa and the other Investors. Notwithstanding the foregoing, pursuant to an order entered by the court on July 31, 2008, the Debtors' exclusive period for filing a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including October 31, 2008 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including December 31, 2008.

The cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Plan (as modified), as the terms of any future confirmed plan of reorganization, as the U.S. labor agreements, and as the GSA, and the MRA become effective. In the event the Debtors are unable to consummate the Plan (as modified), the cost will be recognized as the aforementioned agreements become effective as elements of any future confirmed plan of reorganization. The Plan and agreements will significantly impact Delphi's accounting for its pension plans, postretirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

17

There are a number of risks and uncertainties inherent in the chapter 11 process, including those detailed in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007, Part I, Item 1A. Risk Factors, Part II, Item 1A. Risk Factors in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008 and Part II, Item 1A. Risk Factors in this Quarterly Report on Form 10-Q. In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder Delphi's ongoing business activities and its ability to operate, fund and execute Delphi's business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers.

The financial statements of the Debtors are presented as follows:

### Basis of Presentation

***Condensed Combined Debtors-in-Possession Financial Statements —*** The financial statements contained within this note represent the condensed combined financial statements for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet. The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

***Intercompany Transactions —*** Intercompany transactions between Debtors have been eliminated in the financial statements contained herein. Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements. Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors' Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors' Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements. As approved by the Court on January 25, 2008, the Debtors sold investments in non-Debtor affiliates in the amount of $1.4 billion to a non-Debtor affiliate and received a note receivable from non-Debtor affiliates. As of March 31, 2008 approximately $0.2 billion was included in current assets and $1.2 billion was included in long-term assets. However, during the second quarter of 2008, based on strategic tax planning changes in repatriation plans the timing of payment of the note receivable was re-evaluated and the full note receivable from non-Debtor affiliates balance of $1.4 billion is included in long-term assets as of June 30, 2008. During the three and six months ended June 30, 2008, the Debtors received approximately $167 million of dividends from non-Debtor affiliates and during the three and six months ended June 30, 2007, the Debtors received approximately $26 million and $29 million, respectively, of dividends from non-Debtor affiliates. Dividends from non-Debtor affiliates are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore were recorded in equity income from non-Debtor affiliates, net of tax.

***Contractual Interest Expense and Interest Expense on Unsecured Claims —*** Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt during the six months ended June 30, 2007. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007. The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, the confirmation date of the plan of reorganization, when the Company ceased accruing interest on these claims. Delphi recorded interest related to prepetition debt and allowed unsecured claims of $14 million through January 25, 2008. Delphi reduced interest expense by $7 million during the three months ended June 30, 2008 due to changes in estimates of certain prepetition claim amounts. At June 30, 2008, Delphi had accrued interest of $418 million in accrued liabilities in the accompanying balance sheet for prepetition claims. This estimate is based on numerous factual and legal assumptions.

18

***U.S. Employee Workforce Transition Programs*** — The workforce transition programs offer buy-down payments for eligible traditional employees who do not elect the attrition or flowback options and continue to work for Delphi. The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability in 2007. In the first six months of 2008, the wage asset and liability were increased by $3 million to reflect the final terms of certain divestitures. At June 30, 2008, $82 million was recorded in other current assets and $181 million was recorded in other long-term assets in the accompanying balance sheet, net of $20 million and $41 million of amortization expense recorded in the three and six months ended June 30, 2008, respectively, of which $2 million and $3 million, respectively, was recorded in loss from discontinued operations. In addition, $16 million was recorded during the first quarter of 2008 in U.S. employee workforce transition program charges to reflect costs under the workforce transition programs in excess of amounts previously estimated. Refer to Note 16. U.S. Employee Workforce Transition Programs for more information.

***Goodwill Impairment Charges*** — During the second quarter of 2008, Delphi experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, particularly related to GM, continuing unfavorable pricing pressures and increasing commodity prices. This caused previously unanticipated projected revenue and operating income declines. As a result of these changes, long-term projections showed declines in discounted future operating cash flows. These revised cash flows and declining market conditions caused the implied fair value of Delphi's Electrical/Electronic Architecture segment to be less than its book value. The fair value was also adversely affected by declining industry market valuation metrics. Accordingly, the Debtors recorded $99 million of goodwill impairment charges in the Debtor financial statements during the three and six months ended June 30, 2008 related to the Electrical/Electronic Architecture segment. Refer to Note 8. Goodwill Impairment for more information.

***Income Tax Benefit*** — Generally the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as other comprehensive income ("OCI"). However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year.

Accordingly, all items of current year income, including those in OCI, should be considered for purposes of determining the amount of tax benefit that results from a loss in continuing operations and that should be allocated to continuing operations. In such instances, income from other categories must offset the current loss from operations, the tax benefit of such offset being reflected in continuing operations even when a valuation allowance has been established against the deferred tax assets.

For the three- and six-month periods ended June 30, 2008, Delphi had a $117 million pre-tax gain in OCI, primarily related to derivative contracts on copper and the Mexican Peso, thereby reducing the Company's current year valuation allowance and resulting in a benefit of $21 million allocated to the current year loss from continuing operations.

***Assets Held for Sale*** — The assets held for sale by the Debtors include the net assets held for sale of the non-Debtor affiliates of $356 million which was reclassified from investments in non-Debtor affiliates.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENTS OF OPERATIONS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| | (in millions) | | | |
| Net Sales | $2,126 | $ 3,251 | $ 4,454 | $ 6,538 |
| Operating expenses: | | | | |
| Cost of sales, excluding items listed below | 2,238 | 3,428 | 4,691 | 6,750 |
| U.S. employee workforce transition program charges (credit) | 18 | — | 54 | (6) |
| Depreciation and amortization | 95 | 128 | 207 | 261 |
| Long-lived asset impairment charges | 4 | 33 | 7 | 37 |
| Goodwill impairment charges | 99 | — | 99 | — |
| Selling, general and administrative | 232 | 248 | 457 | 484 |
| Securities & ERISA litigation charge | — | 332 | — | 332 |
| Total operating expenses | 2,686 | 4,169 | 5,515 | 7,858 |
| Operating loss | (560) | (918) | (1,061) | (1,320) |
| Interest expense (contractual interest expense for the three and six months ended June 30, 2008 was $127 million and $241 million, respectively, and for the three and six months ended June 30, 2007 was $106 million and $219 million, respectively) | (86) | (73) | (181) | (152) |
| Loss on extinguishment of debt | (49) | — | (49) | (23) |
| Other (expense) income, net | (5) | (7) | (5) | 5 |
| Reorganization items | (13) | (35) | (113) | (66) |
| Loss from continuing operations before income taxes, minority interest and equity income | (713) | (1,033) | (1,409) | (1,556) |
| Income tax benefit (expense) | 18 | (20) | 15 | (24) |
| Loss from continuing operations before minority interest and equity income | (695) | (1,053) | (1,394) | (1,580) |
| Equity income from non-consolidated affiliates, net of tax | 12 | 8 | 19 | 22 |
| Loss from continuing operations | (683) | (1,045) | (1,375) | (1,558) |
| (Loss) income from discontinued operations, net of tax | (10) | 47 | (92) | (76) |
| Equity income from non-Debtor affiliates, net of tax | 142 | 177 | 327 | 280 |
| Net loss | $ (551) | $ (821) | $(1,140) | $(1,354) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | June 30, 2008 (Unaudited) | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 148 | $ 113 |
| Restricted cash | 58 | 125 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 768 | 972 |
| Other third parties | 654 | 623 |
| Non-Debtor affiliates | 313 | 250 |
| Notes receivable from non-Debtor affiliates | 41 | 278 |
| Inventories, net | 708 | 823 |
| Other current assets | 365 | 385 |
| Assets held for sale | 450 | 475 |
| Total current assets | 3,505 | 4,044 |
| Long-term assets: | | |
| Property, net | 1,317 | 1,446 |
| Investments in affiliates | 327 | 331 |
| Investments in non-Debtor affiliates | 2,075 | 3,267 |
| Goodwill | 53 | 152 |
| Notes receivable from non-Debtor affiliates | 1,429 | — |
| Other | 456 | 512 |
| Total long-term assets | 5,657 | 5,708 |
| Total assets | $ 9,162 | $ 9,752 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Short-term debt | $ 3,594 | $ 2,782 |
| Accounts payable | 821 | 1,007 |
| Accounts payable to non-Debtor affiliates | 654 | 689 |
| Accrued liabilities | 1,266 | 1,328 |
| Liabilities held for sale | 190 | 167 |
| Total current liabilities | 6,525 | 5,973 |
| Long-term liabilities not subject to compromise: | | |
| Debtor-in-possession financing | 22 | 24 |
| Employee benefit plan obligations and other | 870 | 951 |
| Total long-term liabilities | 892 | 975 |
| Liabilities subject to compromise | 16,325 | 16,276 |
| Total liabilities | 23,742 | 23,224 |
| Stockholders' deficit: | | |
| Total stockholders' deficit | (14,580) | (13,472) |
| Total liabilities and stockholders' deficit | $ 9,162 | $ 9,752 |

21

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2008 | 2007 |
| | (in millions) | |
| Cash flows from operating activities: | | |
| Net cash used in operating activities | $ (960) | $ (648) |
| Cash flows from investing activities: | | |
| Capital expenditures | (161) | (104) |
| Proceeds from sale of property | 32 | 10 |
| Proceeds from divestitures | 119 | — |
| Decrease in restricted cash | 67 | — |
| Proceeds from notes receivable from non-Debtor affiliates | 265 | — |
| Other, net | 5 | 2 |
| Discontinued operations | (50) | (6) |
| Net cash provided by (used in) investing activities | 277 | (98) |
| Cash flows from financing activities: | | |
| Net borrowings under amended and restated debtor-in-possession facility | 3,469 | — |
| (Repayments of borrowings) net proceeds from refinanced debtor-in-possession facility | (2,746) | 3,149 |
| Repayments of borrowings from debtor-in-possession facility | — | (250) |
| Repayments of borrowings under prepetition term loan facility | — | (988) |
| Repayments of borrowings from prepetition revolving credit facility | — | (1,508) |
| Repayments of borrowings under other debt agreements | (5) | (7) |
| Net cash provided by financing activities | 718 | 396 |
| Increase (decrease) in cash and cash equivalents | 35 | (350) |
| Cash and cash equivalents at beginning of period | 113 | 376 |
| Cash and cash equivalents at end of period | $ 148 | $ 26 |

## 3. REORGANIZATION ITEMS

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed. Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors and unions. The Debtors' reorganization items consist of the following:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| | (in millions) | | | |
| Professional fees directly related to reorganization | $30 | $44 | $ 59 | $87 |
| Interest income | (2) | (2) | (4) | (6) |
| Write off of previously capitalized fees and expenses related to the EPCA | — | — | 79 | — |
| Other | 1 | — | 4 | — |
| Total Reorganization Items | $29 | $42 | $138 | $81 |

For the six months ended June 30, 2008 and 2007, reorganization items resulted in $3 million and $6 million, respectively, of cash received entirely related to interest income. Cash paid for professional fees was approximately $58 million and $67 million, respectively, for the six months ended June 30, 2008 and 2007. Professional fees for the three and six months ended June 30, 2008 also includes arrangement and other fees paid to various lenders in conjunction with the bankruptcy exit financing that was commenced but not completed in April 2008.

## 4.  DISCONTINUED OPERATIONS

The Court approval of Delphi's plan to dispose of the Interiors and Closures Business and the Steering Business triggered held for sale accounting under SFAS 144 in 2007.

### Steering and Halfshaft Business

In the fourth quarter of 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement"). Delphi expects proceeds from the sale and related Transaction Agreement to approximate $250 million. In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business. Delphi is working to close the sale as soon as practicable. Any party in compliance with its obligations under the Purchase Agreement may terminate the Purchase Agreement if the transaction does not close by August 31, 2008, with certain exceptions. Delphi expects that it will have satisfied all of its conditions by this date. During the three and six months ended June 30, 2008, Delphi recorded income of $8 million and losses of $69 million, net of tax, respectively, due to the results of operations for the six months ended June 30, 2008, and adjustment of assets held for sale to fair value of the Steering Business as of June 30, 2008.

Prior to the assets of the Steering Business being classified as held for sale, Delphi recorded asset impairment charges related to the valuation of long-lived assets held-for-use for its Steering Business of $152 million during the first quarter of 2007.

### Interiors and Closures Business

Delphi and certain of its affiliates closed on the sale of the Interiors and Closures Business to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group, on February 29, 2008. Delphi received proceeds from the sale of approximately $98 million consisting of $63 million of cash (less $23 million of cash at an overseas entity that was included in the sale) and the remainder in notes at fair value. During the first quarter of 2008, as a result of the operating results and sale of the Interiors and Closures Business, Delphi recorded income of $18 million, net of tax.

The Interiors and Closures Business, through the date of the sale, and the Steering Business are reported as discontinued operations in the consolidated statement of operations and statement of cash flows for the three and six months ended June 30, 2008 and 2007. The assets and liabilities of the Steering Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of June 30, 2008 and December 31, 2007. The assets and liabilities of the Interiors and Closures Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of December 31, 2007.

23

The results of the discontinued operations are summarized as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| | | (in millions) | | |
| Sales: | | | | |
| Steering Business . . . . . . . . . . . . . . . . . . . . . . . . . . . | $570 | $ 699 | $1,139 | $1,380 |
| Interiors and Closures Business . . . . . . . . . . . . . . . . | — | 322 | 241 | 634 |
| Total sales . . . . . . . . . . . . . . . . . . . . . . . . . . . | $570 | $1,021 | $1,380 | $2,014 |
| | | | | |
| Income (loss) before income taxes (including minority interest and equity income, net of tax) . . . . . . . . . . . | $ 13 | $ (11) | $ (42) | $ (150) |
| Provision for income taxes . . . . . . . . . . . . . . . . . . . . . | (5) | (2) | (9) | (5) |
| Income (loss) from discontinued operations . . . . . . . . . | $ 8 | $ (13) | $ (51) | $ (155) |
| *Steering Business* . . . . . . . . . . . . . . . . . . . . . . . . . . . | *8* | *(23)* | *(69)* | *(177)* |
| *Interiors and Closures Business* . . . . . . . . . . . . . . . . . | *—* | *10* | *18* | *22* |

Assets and liabilities of the discontinued operations are summarized as follows:

| | June 30, 2008 | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| Current assets: | | |
| Cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 79 | $ 49 |
| Accounts receivable . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 425 | 411 |
| Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 188 | 188 |
| Other current assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 | 8 |
| Long-term assets: | | |
| Property, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 48 |
| Other long-term assets . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 | 16 |
| Assets held for sale . . . . . . . . . . . . . . . . . . . . . . . . . . | $711 | $720 |
| *Steering Business* (a) . . . . . . . . . . . . . . . . . . . . . . . . . . | *711* | *594* |
| *Interiors and Closures Business* . . . . . . . . . . . . . . . . . . | *—* | *126* |
| Current liabilities: | | |
| Accounts payable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $268 | $271 |
| Accrued liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74 | 53 |
| Short-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 66 | 49 |
| Other long-term liabilities . . . . . . . . . . . . . . . . . . . . . . . | 23 | 14 |
| Minority interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 | 25 |
| Liabilities held for sale . . . . . . . . . . . . . . . . . . . . . . . | $451 | $412 |
| *Steering Business* (b) . . . . . . . . . . . . . . . . . . . . . . . . . . | *451* | *392* |
| *Interiors and Closures Business* . . . . . . . . . . . . . . . . . . | *—* | *20* |

(a) The increase in the Steering Business assets held for sale as of June 30, 2008 is due to increased cash at certain non-U.S. operations of the Steering Business that will be stock sales, as well as increased accounts receivable due to operational seasonality.

(b) The increase in the Steering Business liabilities held for sale as of June 30, 2008 is due to increased borrowings at certain non-U.S. operations of the Steering Business that will be stock sales, as well as an increase in employee termination benefit and other exit cost accruals related to the closure of a plant in accordance with the U.S. labor settlement agreements.

Cash flows from operating activities for discontinued operations are summarized as follows:

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2008 | 2007 |
|  | (in millions) | |
| Charge related to assets held for sale | $ 7 | $ — |
| Long-lived asset impairment charges | — | 159 |
| Pension and other postretirement benefit expenses | 20 | 38 |
| U.S. employee workforce transition program charges | 3 | — |
| Changes in net operating assets | 18 | (4) |
| Total | $48 | $193 |
| *Steering Business* | *18* | *170* |
| *Interiors and Closures Business* | *30* | *23* |

## 5. ACQUISITIONS AND DIVESTITURES

The results of operations, including the gain or loss on divestitures described below, were not significant to the consolidated financial statements in any period presented.

### North American Brake Product Asset Sale (Automotive Holdings Group Segment)

On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for Delphi's North American brake components machining and assembly assets ("North American Brake Components") primarily located at its Saginaw, Michigan; Spring Hill, Tennessee; Oshawa, Ontario, Canada; and Saltillo, Mexico facilities. The 2007 annual revenues for North American Brake Components were $568 million. The sale occurred in the first quarter of 2008 and resulted in a gain of $3 million which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $38 million in the first quarter of 2008.

### Bearings Business Product Sale (Automotive Holdings Group Segment)

On January 15, 2008, the Debtors filed a motion to sell Delphi's bearings business (the "Bearings Business"). On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code. On February 21, 2008, the Debtors announced that they had entered into a purchase agreement with Kyklos, Inc., a wholly owned subsidiary of Hephaestus Holdings, Inc. and an affiliate of KPS Special Situations Fund II, L.P. ("Kyklos"), which was the successful bidder at the auction held on February 19, and 20, 2008. The Court entered the order confirming the sale of the Bearings Business to Kyklos on March 19, 2008. The 2007 annual revenues for the Bearings Business were $280 million. During the first quarter of 2008, Delphi recognized a charge of $30 million, included in cost of sales, related to the assets held for sale of the Bearings Business. The sale occurred on April 30, 2008, and Delphi received net proceeds from this sale of approximately $15 million in the second quarter of 2008 with no net change to the loss on the sale.

### U.S. Suspensions Asset Sale (Automotive Holdings Group Segment)

On March 7, 2008, the Debtors filed a motion to sell certain assets of Delphi's U.S. suspensions business including the machinery, equipment and inventory primarily used and located at its suspension manufacturing facility in Kettering, Ohio (the "Kettering Assets"), to Tenneco Automotive Operating Company Inc. ("Tenneco") for approximately $19 million and other consideration. On March 20, 2008, the Court approved the bidding procedures for the Kettering Assets, but no further bids were submitted by the bid deadline. On April 30, 2008, the Court entered an order approving the sale of the Kettering Assets to Tenneco. The 2007 annual revenues for the Kettering Assets were $113 million. The sale occurred on May 30, 2008 and resulted

25

in a gain of $9 million, which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $19 million in the second quarter of 2008.

### Catalyst Product Line Sale (Powertrain Systems Segment)

On September 28, 2007, Delphi closed on the sale of its original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore. The Catalyst Business revenues for the nine months ended September 30, 2007 were $249 million. During the first quarter of 2008, Delphi and Umicore agreed on final working capital adjustments and Delphi received a payment of $9 million, of which $6 million offset a receivable recognized during 2007 and $3 million was recorded as a reduction to cost of sales.

### Power Products Business Sale (Automotive Holdings Group Segment)

On May 27, 2008 and in accordance with the terms of an order authorizing the sale of certain assets for less than $10 million, Delphi served notice of its intention to sell its power products business (the "Power Products Business") to Strattec Security Corporation, Witte-Velvert GmbH & Co. KG, Vehicle Access Systems Technology LLC, and certain of their affiliates (collectively, the "Strattec Buyers") for approximately $8 million. On June 4, 2008, the Debtors filed a motion to assume and assign certain prepetition executory contracts related to the Power Products Business to the Strattec Buyers. On June 24, 2008, the Court entered an order authorizing the Debtors to assume and assign such contracts to the Strattec Buyers. The 2007 annual revenues for the Power Products Business were $59 million. Delphi recognized a charge of $3 million during the second quarter of 2008, included in cost of sales, related to the assets held for sale of the Power Products Business.

### Global Exhaust Business Sale (Powertrain Systems Segment)

On June 27, 2008, the Debtors announced their intention to sell Delphi's global exhaust business relating to the design and manufacture of the exhaust system front exhaust module including catalytic converters and exhaust manifolds (the "Exhaust Business"). Although Delphi intends to divest its Exhaust Business, the Company intends to continue to provide full engine management systems, including air and fuel management, and combustion and valve-train technology.

### Acquisition of Joint Venture (Electronics & Safety Segment)

In the second quarter of 2008, Delphi made an additional investment in a consolidated South American majority-owned subsidiary for approximately $35 million in cash and short term notes. As a result, the ownership interest is now 100 percent.

## 6. INCOME TAXES

Generally the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as OCI. However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year.

Accordingly, all items of current year income, including those in OCI, should be considered for purposes of determining the amount of tax benefit that results from a loss in continuing operations and that should be allocated to continuing operations. In such instances, income from other categories must offset the current loss from operations, the tax benefit of such offset being reflected in continuing operations even when a valuation allowance has been established against the deferred tax assets.

For the three- and six-month periods ended June 30, 2008, Delphi had a $117 million pre-tax gain in OCI, primarily related to derivative contracts on copper and the Mexican Peso, thereby reducing the Company's current year valuation allowance and resulting in a benefit of $21 million allocated to the current year loss from continuing operations.

### 7.  LONG-LIVED ASSET IMPAIRMENT

Delphi evaluates the recoverability of long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets. Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets. The fair value of the assets was determined based on the "held for use" classification.

The following table summarizes the long-lived asset impairment charges recorded for the three and six months ended June 30, 2008 and 2007 by operating segment:

| Segment | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| | (in millions) | | | |
| Electronics & Safety | $ 4 | $— | $ 5 | $   1 |
| Powertrain Systems | — | 8 | — | 9 |
| Electrical/Electronic Architecture | 1 | — | 1 | 1 |
| Automotive Holdings Group | — | 26 | 2 | 29 |
| Continuing Operations | 5 | 34 | 8 | 40 |
| Discontinued Operations | — | 5 | — | 159 |
| Total | $ 5 | $39 | $ 8 | $199 |

Refer to Note 4. Discontinued Operations for more information on the long-lived asset impairment charges recorded in loss from discontinued operations.

Delphi's Bearings Business was a non-core product line that Delphi sold in the second quarter of 2008. In June 2007, Delphi had reassessed its estimated net proceeds from disposition and determined that the carrying value of the Bearings Business exceeded the undiscounted estimated future cash flows and consequently recognized an impairment charge of $26 million related to the valuation of long-lived assets held-for-use in the second quarter of 2007.

### 8.  GOODWILL IMPAIRMENT

At June 30, 2008 and December 31, 2007, Delphi's goodwill balance was approximately $256 million and $397 million, respectively. The change in carrying amount of goodwill for the first six months of 2008 is as follows:

| | 2008 |
|---|---|
| | (in millions) |
| Balance at January 1, | $ 397 (a) |
| Acquisitions | 19 |
| Impairment | (168) |
| Currency translation | 8 |
| Balance at June 30, | $ 256 (b) |

(a)  $165 million in Electrical/Electronic Architecture, $155 million in Electronics & Safety and $77 million in Corporate and Other.

(b)  $177 million in Electronics & Safety and $79 million in Corporate and Other.

Delphi reviews the recoverability of goodwill annually on May 31 and at any other time when business conditions indicate a potential change in recoverability. In conjunction with Delphi's annual recoverability tests, the deterioration of Delphi's financial performance, combined with an unfavorable outlook, were indicators for potential impairment. More specifically, during the second quarter of 2008, Delphi has experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, particularly related to GM, continuing unfavorable pricing pressures and increasing commodity prices. This caused previously unanticipated projected revenue and operating income declines. As a result of these changes, long-term projections showed declines in discounted future operating cash flows. These revised cash flows and declining market conditions caused the implied fair value of Delphi's Electrical/Electronic Architecture segment to be less than its book value. The fair value was also adversely affected by declining industry market valuation metrics. Accordingly, the Company recorded $168 million of goodwill impairment charges during the three and six months ended June 30, 2008 related to the Electrical/Electronic Architecture segment.

Delphi performed its goodwill impairment test by comparing the carrying value of each of its reporting units to the fair value of the reporting unit. In determining fair value of reporting units, Delphi utilized a number of methodologies, including discounted cash flow analysis and review of fair value appraisals. Where the carrying value exceeded the fair value for a particular reporting unit, goodwill impairment charges were recognized. The goodwill impairment charges recognized were determined by stating all other assets and liabilities of a reporting unit at their fair values with the remaining fair value of the reporting unit attributed to goodwill. The resulting goodwill impairment charges are the excess of the recorded goodwill balance over the implied fair value of goodwill for the reporting unit. Delphi's reporting units are the global businesses focused on product families. The fair value of the reporting units was negatively impacted by the continued deterioration of business conditions, principally in North America, as previously described.

## 9.  EMPLOYEE TERMINATION BENEFITS AND OTHER EXIT COSTS

Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company. This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business. These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements. Voluntary termination benefits are accrued when an employee accepts the related offer. Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan. Contract termination costs are recorded when contracts are terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract. All other exit costs are accrued when incurred.

Delphi's employee termination benefit and other exit costs are undertaken as necessary to execute management's strategy, streamline operations, take advantage of available capacity and resources, and ultimately achieve net cost reductions. These activities generally fall into one of two categories:

(1) Realignment of existing manufacturing capacity and closure of facilities and other exit or disposal activities, as it relates to executing the Company's strategy in the normal course of business.

(2) Transformation plan activities, which support the Company's overall transformation initiatives announced in 2006, including selling or winding down non-core product lines, transforming its salaried workforce to reduce general and administrative expenses, and modifying labor agreements with its principal unions in the U.S.

The following table summarizes the employee termination benefit and other exit cost charges recorded for the three and six months ended June 30, 2008 and 2007 by operating segment:

| Segment | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| | (in millions) | | | |
| Electronics & Safety | $11 | $  1 | $ 39 | $  3 |
| Powertrain Systems | 6 | 18 | 10 | 19 |
| Electrical/Electronic Architecture | 19 | 34 | 32 | 65 |
| Thermal Systems | 6 | 7 | 9 | 10 |
| Automotive Holdings Group | 15 | 145 | 58 | 189 |
| Corporate and Other | 1 | 18 | 1 | 22 |
| Continuing Operations | 58 | 223 | 149 | 308 |
| Discontinued Operations | 9 | 78 | 44 | 112 |
| Total | $67 | $301 | $193 | $420 |
| *Cost of sales* | *53* | *202* | *139* | *284* |
| *Selling, general and administrative expenses* | *5* | *21* | *10* | *24* |
| *Loss from discontinued operations* | *9* | *78* | *44* | *112* |

Delphi has initiated several programs to streamline operations and lower costs. The following are details of significant charges during the three and six months ended June 30, 2008.

- *Realignment of existing manufacturing capacity and closure of facilities.*   As part of Delphi's ongoing efforts to lower costs and operate efficiently, Delphi's Electronics & Safety and Automotive Holdings Group segments plan to transfer core products manufactured at a shared location in Portugal to a lower cost market and exit non-core products from that facility and recognized employee termination benefits of $44 million during the six months ended June 30, 2008. Additionally, Electronics & Safety, Electrical / Electronic Architecture ("E/EA"), Thermal Systems and the Automotive Holdings Group segments executed initiatives to realign manufacturing operations within North America to lower cost markets, and incurred approximately $18 million and $41 million of employee termination benefits and other related exit costs during the three and six months ended June 30, 2008, respectively.

- *Transformation plan activities.*   As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $6 million and $37 million related to the closure of a manufacturing facility in Athens, Alabama during the three and six months ended June 30, 2008, respectively, which related to the Steering Business and was recorded in loss from discontinued operations. As part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees in North America during the three and six months ended June 30, 2008 for involuntary separation and incurred $24 million and $42 million, respectively, in related employee termination benefits in the Electronics & Safety, Powertrain Systems, E/EA and Automotive Holdings Group segments.

The following are details of significant charges during the three and six months ended June 30, 2007.

- *Realignment of existing manufacturing capacity and closure of facilities.*   As part of Delphi's ongoing efforts to lower costs and operate efficiently, the E/EA segment transferred manufacturing operations in Germany and Portugal to lower cost markets in Eastern Europe and Asia Pacific. As a result, E/EA significantly reduced the number of employees at these locations, and announced involuntary employee separation packages for approximately $26 million during the three and six months ended June 30, 2007. Additionally, E/EA announced an involuntary employee separation package due to a planned closure of a manufacturing facility in France for approximately $11 million during the six months ended June 30, 2007.

29

- *Transformation plan activities.* As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $207 million and $268 million related to the closure of a manufacturing facility in Cadiz, Spain during the three and six months ended June 30, 2007, respectively, of which $130 million and $161 million, respectively, related to the Automotive Holdings Group segment and $77 million and $107 million, respectively, related to the Steering Business, which is recorded in loss from discontinued operations. As a part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees, primarily in North America, during the three and six months ended June 30, 2007 for involuntary separation, and incurred $19 million and $42 million, respectively, in related employee termination benefits in the Powertrain Systems, E/EA, and Automotive Holdings Group segments. During the three and six months ended June 30, 2007, Delphi incurred $19 million related to the financial services and information technology outsourcing activities related to the transformation of our salaried workforce to reduce general and administrative expenses in the Corporate and Other segment.

## 10.  WEIGHTED AVERAGE SHARES

Basic and diluted loss per share amounts were computed using weighted average shares outstanding for each respective period. As Delphi incurred losses in the three and six months ended June 30, 2008 and 2007, the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted loss per share were:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2008 | 2007 | 2008 | 2007 |
|  | (in thousands) | | | |
| Weighted average shares outstanding | 564,519 | 561,782 | 564,083 | 561,782 |
| Effect of dilutive securities | — | — | — | — |
| Diluted shares outstanding | 564,519 | 561,782 | 564,083 | 561,782 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

|  | Three and Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2008 | 2007 |
|  | (in thousands) | |
| Anti-dilutive securities | 60,922 | 78,652 |

## 11.  INVENTORIES, NET

Inventories are stated at the lower of cost, determined on a first-in, first-out basis ("FIFO"), or market, including direct material costs and direct and indirect manufacturing costs. A summary of inventories, net is shown below:

|  | June 30, 2008 | December 31, 2007 |
| --- | --- | --- |
|  | (in millions) | |
| Productive material | $ 916 | $ 926 |
| Work-in-process and supplies | 331 | 386 |
| Finished goods | 490 | 496 |
| Total | $1,737 | $1,808 |

## 12.  LIABILITIES

Accrued liabilities consisted of the following:

| | June 30, 2008 | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| Payroll-related obligations | $  303 | $  238 |
| Employee benefits, including current pension obligations | 156 | 185 |
| Accrued income taxes | 132 | 54 |
| Taxes other than income | 245 | 195 |
| Warranty obligations (Note 13) | 242 | 244 |
| U.S. employee workforce transition program (Note 16) | 167 | 234 |
| Manufacturing plant rationalization | 207 | 259 |
| Interest on prepetition claims | 418 | 411 |
| Other | 473 | 461 |
| Total | $2,343 | $2,281 |

Other long-term liabilities consisted of the following:

| | June 30, 2008 | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| Workers compensation | $  325 | $  328 |
| Environmental | 87 | 112 |
| U.S. employee workforce transition program (Note 16) | 122 | 148 |
| Extended disability benefits | 74 | 72 |
| Warranty obligations (Note 13) | 302 | 315 |
| Other | 250 | 210 |
| Total | $1,160 | $1,185 |

## 13.  WARRANTY OBLIGATIONS

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the six months ended June 30, 2008:

| | June 30, 2008 |
|---|---|
| | (in millions) |
| Accrual balance at beginning of year | $559 |
| Provision for estimated warranties issued during the period | 31 |
| Provision for changes in estimate for preexisting warranties | 19 |
| Settlements made during the period (in cash or in kind) | (79) |
| Foreign currency translation and other | 14 |
| Accrual balance at end of period | $544 |

Approximately $242 million and $244 million of the warranty accrual balance as of June 30, 2008 and December 31, 2007, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $302 million and $315 million of the warranty accrual balance as of June 30, 2008 and December 31, 2007, respectively, is included in other long-term liabilities.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases. Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from chapter 11. Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM. In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in our Amended and Restated DIP Credit Facility, GM agreed, on July 31, 2008 to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, and as a result Delphi expects to record the extinguishment of this liability as a reduction of warranty expense in cost of sales, which will have a corresponding favorable impact on operating income of $112 million in July 2008. As of June 30, 2007, Delphi expected to settle obligations with GM for approximately $199 million and recorded $91 million of additional warranty expense in costs of sales in the second quarter of 2007, primarily related to the Automotive Holdings Group and Powertrain Systems segments. Refer to Note 22. Commitments and Contingencies, Ordinary Business Litigation for additional disclosure regarding warranty matters and Note 23. Subsequent Events.

## 14.   LIABILITIES SUBJECT TO COMPROMISE

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' plan of reorganization. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy. Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals. The following data regarding the number and amount of claims and proof of claims is unaudited.

The Debtors have been paying and intend to continue to pay undisputed postpetition obligations in the ordinary course of business. In addition, pursuant to the Plan, the Debtors assumed most of their executory contracts and unexpired leases with respect to the Debtors' operations, and rejected certain of them, with the approval of the Court. Damages resulting from rejection of executory contracts and unexpired leases are treated as general unsecured claims and will be classified as liabilities subject to compromise. The Court entered an order establishing July 31, 2006 as the bar date by which claims against the Debtors arising prior to the Debtors' Chapter 11 Filings were required to be filed if the claimants were to receive any distribution in the chapter 11 cases. As of June 30, 2008, the Debtors' have received approximately 16,800 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. Many of these claims have been found to be duplicative, based on contingencies that have not occurred, or are otherwise overstated, and therefore have been determined to be invalid. As a result, the aggregate amount of claims filed with the Court exceeds the amount that has been to date allowed by the

Court. As of June 30, 2008, the Debtors have filed thirty omnibus claims objections that objected to claims on procedural or substantive grounds. Pursuant to these claims objections, the Debtors have objected to approximately 13,500 proofs of claim which asserted approximately $10.1 billion in aggregate liquidated amounts plus additional unliquidated amounts. As of June 30, 2008, the Court has entered orders disallowing and/or claimants have withdrawn approximately 9,700 of those claims, which orders reduced the amount of asserted claims by approximately $9.7 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order allowing or modifying approximately 3,650 claims reducing the aggregate amount on those claims by $260 million, which amounts are subject to further objection by the Debtors at a later date on any basis. The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled. The determination of how these liabilities are to be settled and treated is set forth in the Plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court. As of January 25, 2008, the total general unsecured claims, other than funded debt claims, against the Company had been reduced to an amount less than the $1.45 billion cap specified in the Plan. Delphi was unable to consummate the Plan because certain Investors under the Plan refused to participate in the closing, which was commenced but not completed on April 4, 2008. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.

Liabilities subject to compromise consist of the following:

| | June 30, 2008 | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| Pension obligations | $ 3,132 | $ 3,329 |
| Postretirement obligations other than pensions, including amounts payable to GM | 9,073 | 8,786 |
| Debt and notes payable | 1,984 | 1,984 |
| Accounts payable | 737 | 744 |
| Junior subordinated notes due 2033 | 391 | 391 |
| GM claim for U.S. employee workforce transition programs | 312 | 312 |
| Securities & ERISA litigation liability (Note 22) | 351 | 351 |
| Other | 264 | 300 |
| Total Liabilities Subject to Compromise | $16,244 | $16,197 |

## 15.  DEBT

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consisted of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan (the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan (the "Tranche C Term Loan").

The Refinanced DIP Credit Facility had a maturity date of July 1, 2008. On May 9, 2008, Delphi entered into an amended and restated DIP credit facility (the "Amended and Restated DIP Credit Facility"). The Amended and Restated DIP Credit Facility extends the term until December 31, 2008 and modifies the size of the facility by reducing the Revolving Facility to $1.1 billion from $1.75 billion and increasing the size of the Tranche B Term Loan to $500 million from $250 million and leaving the Tranche C Term Loan unchanged at approximately $2.5 billion. On May 30, 2008, the Court entered an order authorizing Delphi to increase the Tranche C Term Loan to $2.75 billion from approximately $2.5 billion with funding in June 2008. The Amended and Restated DIP Credit Facility includes certain covenants and restrictions on Delphi's financial and business operations that mirror those imposed by the Refinanced DIP Credit Facility, with the exception of the modifications listed below. The Amended and Restated DIP Credit Facility:

- Increases the interest rate on the facilities at the option of Delphi of either the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent or LIBOR plus a specified percent as follows:

|  | ABR plus | | LIBOR plus | |
| --- | --- | --- | --- | --- |
|  | Amended and Restated DIP Credit Facility | Refinanced DIP Credit Facility | Amended and Restated DIP Credit Facility | Refinanced DIP Credit Facility |
| Tranche A . . . . . . . . . . . . . . . . . . . . . . | 3.00% | 2.50% | 4.00% | 3.50% |
| Tranche B . . . . . . . . . . . . . . . . . . . . . . | 3.00% | 2.50% | 4.00% | 3.50% |
| Tranche C . . . . . . . . . . . . . . . . . . . . . . | 4.25% | 3.00% | 5.25% | 4.00% |

As LIBOR borrowings are less costly than ABR borrowings, Delphi seeks to maximize the amount of loans outstanding on a LIBOR basis.

- Increases the undrawn revolver fees from 50 basis points to 100 basis points,

- Adds a LIBOR and ABR floor to the Tranche B and Tranche C Term Loans of 3.25% and 4.25%, respectively,

- Sets rolling 12-month cumulative Global EBITDAR covenant levels for the extension period as follows:

| Period Ending | Global EBITDAR |
| --- | --- |
|  | (in millions) |
| June 30, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $600 |
| July 31, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $575 |
| August 31, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $550 |
| September 30, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $625 |
| October 31, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $600 |
| November 30, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $675 |

- Modifies the borrowing base definition and limits availability to draw additional amounts under the Revolving Facility, under certain conditions as defined, and modifies the allowable junior liens, and

- Allows Delphi to enter into an agreement with GM as described below.

In connection with the Amended and Restated DIP Credit Facility, Delphi paid a total of approximately $75 million to consenting lenders on the Revolving Facility, the Tranche B facility and the Tranche C facility. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Amended and Restated DIP Credit Facility and the bankruptcy exit financing that was commenced but not completed.

In conjunction with the entry into the Amended and Restated DIP Credit Facility, the Refinanced DIP Credit Facility was terminated. Delphi incurred no early termination penalties in connection with the termination of this agreement. However, as a result of significant changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $49 million of unamortized debt issuance costs related to the Amended and Restated DIP Credit Facility and the Refinanced DIP Credit Facility in the second quarter of 2008, which was recognized as loss on extinguishment of debt. As of June 30, 2008,

$40 million of debt issuance costs remains deferred in other current assets and is being amortized over the term of the Amended and Restated DIP Credit Facility.

In 2007, concurrently with the entry into the Refinanced DIP Credit Facility, Delphi expensed $25 million of unamortized debt issuance costs related to the Revolving Credit, Term Loan and Guaranty Agreement Delphi entered into on October 14, 2005, as amended through November 13, 2006, and the Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt, as these fees relate to the refinancing of the term loans, and $2 million was recognized as interest expense, as these fees relate to the refinancing of the revolving credit facility.

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement"). The original GM Advance Agreement has a maturity date of the earlier of December 31, 2008, when $650 million has been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. GM will receive an administrative claim for its advances. The original GM Advance Agreement provides for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement. The amounts advanced will accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The interest on the advances will be cancelled if the GSA and MRA become effective on or prior to the expiration date of the agreement. Advances will be set off against the GSA and MRA upon effectiveness of those agreements or any remaining administrative claims in Delphi's chapter 11 cases. As of June 30, 2008, no amounts were outstanding pursuant to the GM Advance Agreement. However, during the second quarter of 2008 Delphi received and subsequently repaid amounts up to approximately $190 million under the GM Advance Agreement. GM has agreed, subject to Court approval, to expand the availability under the GM Advance Agreement, see Note 23. Subsequent Events.

Borrowings under the Amended and Restated DIP Credit Facility are prepayable at Delphi's option without premium or penalty. As of June 30, 2008, total available liquidity under the Amended and Restated DIP Credit Facility was approximately $613 million. At June 30, 2008, there was $500 million outstanding under the Tranche B Term Loan at LIBOR plus 4.00% (or 7.25%), $2.75 billion outstanding under the Tranche C Term Loan at LIBOR plus 5.25% (or 8.50%), and $311 million outstanding under the Revolving Facility, of which $300 million was at LIBOR plus 4.00% (or 6.625%) and $11 million was at ABR plus 3.00% (or 8.00%). Additionally, the Company had $102 million in letters of credit outstanding under the Revolving Facility as of that date. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Amended and Restated DIP Credit Facility. While the borrowing base computation excluded outstanding borrowings, it was less than the Amended and Restated DIP Credit Facility commitment at June 30, 2008. Under the Amended and Restated DIP Credit Facility, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate regardless of availability levels.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. The Company does not expect to pay dividends prior to emergence from chapter 11. So long as the Facility Availability Amount (as defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors). The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility) for Delphi and its direct and indirect subsidiaries, on a consolidated basis, at the levels set forth in the Amended and Restated DIP Credit Facility. The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2%

above the then applicable rate. Delphi was in compliance with the Amended and Restated DIP Credit Facility covenants as of June 30, 2008.

## 16.   U.S. EMPLOYEE WORKFORCE TRANSITION PROGRAMS

As previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2007, Delphi, GM, and Delphi's principal labor unions in the U.S. signed settlement agreements during 2007 which included workforce transition programs for eligible union employees (the "Workforce Transition Programs"). During the second half of 2007, Delphi recorded charges for the attrition programs included in the Workforce Transition Programs of approximately $52 million. During the six months ended June 30, 2008, Delphi recorded additional charges of $16 million to reflect costs under the Workforce Transition Programs in excess of amounts previously estimated. The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability during 2007. In accordance with EITF 88-23, *"Lump-Sum Payments under Union Contracts,"* the wage asset is being amortized over the life of the respective union agreements. The corresponding wage liability will be reduced as buy-down payments are made. Based on the GSA with GM, Delphi expects reimbursement for certain costs related to the workforce transition programs, but given that the GSA is not effective until Delphi's emergence from chapter 11, reimbursement of these costs has not been recorded as of June 30, 2008. GM's reimbursement for costs associated with incentivized retirements are included in the U.S. labor agreements, which as previously discussed have been approved by the Court and ratified by the respective unions. Therefore, as of June 30, 2008, Delphi has recorded a receivable from GM in the amount of $7 million included in GM and affiliates accounts receivable in the accompanying consolidated balance sheet.

The following table represents the activity in the U.S. employee workforce transition program liability for the six months ended June 30, 2008:

| U.S. Employee Workforce Transition Program Liability | (in millions) |
|---|---|
| Balance at December 31, 2007 | $ 382 |
| U.S. employee workforce transition program charges | 16 |
| Buy-down wage liability adjustment | 3 |
| Payments | (100) |
| Pension and other postretirement benefits (Note 17) | (17) |
| Accretion and other | 5 |
| Balance at June 30, 2008 | $ 289 |

At June 30, 2008 and December 31, 2007, $167 million and $234 million, respectively, of the U.S. employee workforce transition program liability is included in accrued liabilities, and $122 million and $148 million, respectively, is included in other long-term liabilities in the consolidated balance sheet.

The following table represents the activity in the U.S. employee workforce transition program buydown wage asset for the six months ended June 30, 2008:

| U.S. Employee Workforce Transition Program Buydown Wage Asset | (in millions) |
|---|---|
| Balance at December 31, 2007 | $301 |
| Buy-down wage asset adjustment | 3 |
| Amortization expense | (41) |
| Balance at June 30, 2008 | $263 |

As of June 30, 2008 and December 31, 2007, $82 million and $80 million, respectively, of the U.S. employee workforce transition program buydown wage asset is included in other current assets and $181 million and $221 million, respectively, is included in other long-term assets in the consolidated balance sheet.

## 17.   PENSION AND OTHER POSTRETIREMENT BENEFITS

The Debtors sponsor pension plans covering unionized employees in the U.S., which generally provide benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. The Debtors also sponsor defined benefit plans covering U.S. salaried employees, with benefits generally based on years of service and salary history. Certain Delphi employees also participate in nonqualified pension plans covering executives, which are based on targeted wage replacement percentages and are unfunded. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code. Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, and the United Kingdom ("UK"). The UK and certain Mexican plans are funded. In addition, Delphi has defined benefit plans in Korea, Turkey and Italy for which amounts are payable to employees immediately upon separation. The obligations for these plans are recorded based on the vested benefit obligation.

Delphi also maintains other postretirement benefit plans, which provide covered U.S. hourly and salaried employees with retiree medical and life insurance benefits. Certain of Delphi's non-U.S. subsidiaries have other postretirement benefit plans; although most participants are covered by government sponsored or administered programs. The annual cost of such non-U.S. other postretirement benefit plans was not significant to Delphi.

The amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three- and six-month periods ended June 30, 2008 and 2007 for U.S. and non-U.S. salaried and hourly employees excluding the plans in Korea, Turkey and Italy discussed above. The settlements recorded in the six months ended June 30, 2007 were primarily due to renegotiated labor contracts in Mexico. Benefit costs presented below were determined based on actuarial methods and included the following components for U.S. and non-U.S. salaried and hourly employees:

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | Three Months Ended June 30, | | | | | |
|  | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
|  | | | (in millions) | | | |
| Service cost (a) | $ 41 | $ 47 | $ 11 | $ 11 | $ 8 | $ 21 |
| Interest cost | 214 | 213 | 24 | 20 | 137 | 136 |
| Expected return on plan assets | (218) | (216) | (23) | (20) | — | — |
| Settlements | — | — | 13 | 3 | — | — |
| Curtailment loss | — | — | — | 5 | — | — |
| Amortization of prior service costs | 4 | 14 | 3 | 1 | (26) | (25) |
| Amortization of actuarial losses | 6 | 26 | 2 | 9 | 11 | 19 |
| Net periodic benefit cost | $ 47 | $ 84 | $ 30 | $ 29 | $130 | $151 |

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | Six Months Ended June 30, | | | | | |
|  | 2008 | 2007 | 2008 | 2007 | 2008 | 2007 |
|  | | | (in millions) | | | |
| Service cost (a) | $ 82 | $ 95 | $ 22 | $ 23 | $ 15 | $ 42 |
| Interest cost | 427 | 425 | 47 | 40 | 274 | 271 |
| Expected return on plan assets | (436) | (432) | (46) | (40) | — | — |
| Settlements | — | — | 24 | 33 | — | — |
| Curtailment loss | — | — | — | 5 | — | — |
| Amortization of prior service costs | 11 | 28 | 4 | 2 | (53) | (50) |
| Amortization of actuarial losses | 11 | 51 | 8 | 17 | 22 | 38 |
| Net periodic benefit cost | $ 95 | $ 167 | $ 59 | $ 80 | $258 | $301 |

(a) Includes $8 million and $17 million for the three and six months ended June 30, 2008, respectively, and $13 million and $28 million for the three and six months ended June 30, 2007, respectively, of costs previously accrued related to the U.S. employee workforce transition programs.

Net periodic benefit cost above reflects $9 million and $20 million for the three and six months ended June 30, 2008, respectively, and $19 million and $38 million for the three and six months ended June 30, 2007, respectively, that were included in loss from discontinued operations.

In September 2006, the FASB issued SFAS 158, which requires, among other things, an employer to measure the funded status of its defined benefit pension and other postretirement benefit plans as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Historically, Delphi has measured the funded status of its U.S. retiree health care benefit plans and certain international pension plans as of September 30 of each year. Delphi adopted the measurement date provisions of SFAS 158 as of January 1, 2008, and utilized the second transition approach provided under SFAS 158. Under this approach, net periodic benefit cost related to these plans for the period between the most recent measurement date of September 30, 2007 and December 31, 2008, was allocated proportionately between an adjustment of accumulated deficit as of January 1, 2008 and amounts to be recognized as net periodic benefit cost during 2008. The following table summarizes the impact of the adoption of the measurement date provisions of SFAS 158:

|  | U.S. Retiree Medical Plans | Non-U.S. Pension Plans | Total |
|  | Increase/(Decrease) | | |
|  | (in millions) | | |
| Pension and other postretirement benefit liabilities | $132 | $ 7 | $139 |
| Accumulated deficit as of January 1, 2008 | $117 | $12 | $129 |
| Accumulated other comprehensive loss as of January 1, 2008 | $ 15 | $(5) | $ 10 |

As permitted under chapter 11 of the Bankruptcy Code, Delphi contributed only the portion of the contribution attributable to service after the Chapter 11 Filings. During the six months ended June 30, 2008, Delphi contributed approximately $264 million to its U.S. pension plans, of which $45 million and $46 million related to services rendered during the fourth quarter of 2007 and first quarter of 2008, respectively, and the remaining $172.5 million related to the PBGC draw against the letters of credit in favor of the Hourly and Salaried Plans discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy. On July 14 and 15, 2008, Delphi contributed approximately $435 thousand to its U.S. subsidiary pension plans related to services rendered during the second quarter of 2008. Approximately $46 million of the proceeds from the letters of credit were applied to the July 15, 2008 quarterly contribution to the Hourly and Salaried plans related to services rendered during the second quarter of 2008. Under ERISA and the Code, minimum

38

funding payments to the U.S. pension plans of $739 million were due during the first six months of 2008 and a minimum funding payment of approximately $333 million to the U.S. pension plans was due in July 2008.

Delphi did not meet the minimum funding standards of ERISA and the Code for its primary U.S. pension plans for the plan year ended September 30, 2005. The under-contributed amount of approximately $173 million was due on June 15, 2006. The Company did not pay this amount and a related penalty was assessed by the IRS in the amount of approximately $17 million. The penalty was recorded in liabilities subject to compromise in 2006. Given the receipt of the pension waivers described in Note 2. Plan of Reorganization and Transformation Plan, Delphi determined it was no longer probable that it would ultimately pay this penalty and Delphi reversed the liability of $19 million (including $2 million of accrued interest) during the second quarter of 2007.

## 18.    DERIVATIVES AND HEDGING ACTIVITIES

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks. To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies. Designation is performed on a transaction basis to support hedge accounting. The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged. Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy. Delphi's policy prohibits holding or issuing derivative financial instruments for trading purposes.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of June 30, 2008 and December 31, 2007 are as follows:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| Current assets | $113 | $ 40 |
| Non-current assets | 17 | 13 |
| Total assets | $130 | $ 53 |
| Current liabilities | $ 12 | $ 24 |
| Non-current liabilities | 1 | — |
| Total liabilities | $ 13 | $ 24 |

The fair value of financial instruments recorded as assets increased from December 31, 2007 to June 30, 2008 primarily due to the increase in copper prices and related increase in copper forward rates. The fair value of financial instruments recorded as liabilities decreased from December 31, 2007 to June 30, 2008, primarily due to certain favorable foreign currency contracts involving the Mexican Peso with the U.S. Dollar, which offset unfavorable contracts involving the Euro with the U.S. Dollar, Turkish New Lira, and South African Rand.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in OCI, to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period. Net gains included in accumulated OCI as of June 30, 2008, were $176 million pre-tax. Of this pre-tax total, a gain of approximately $140 million is expected to be included in cost of sales within the next 12 months and a gain of approximately $37 million is expected to be included in cost of sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Cash flow hedges are discontinued when it is no longer probable that the originally forecasted transactions will occur. The amount included in cost of sales related to hedge ineffectiveness was a $3 million gain for the six months ended June 30, 2008 and a less than $1 million loss for the six months ended June 30, 2007. The amount included in cost of sales related to the time value of

options was not significant in the six months ended June 30, 2008 and 2007. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was not significant for the six months ended June 30, 2008 and was $1 million for the six months ended June 30, 2007.

## 19.  FAIR VALUE MEASUREMENTS

In September 2006, the FASB issued SFAS 157, which defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value.

In February 2008, the FASB issued FASB Staff Position No. 157-2 ("FSP 157-2"), *Effective Date of FASB Statement No. 157,* which partially defers the effective date of SFAS No. 157 for one year for nonfinancial assets and nonfinancial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis. The FSP does not defer recognition and disclosure requirements for financial assets and liabilities or for nonfinancial assets and nonfinancial liabilities that are remeasured at least annually. Delphi adopted SFAS No. 157 as of January 1, 2008 for assets and liabilities not subject to the deferral and expects to adopt the provisions of SFAS No. 157 as of January 1, 2009 for nonfinancial assets and liabilities that are subject to the deferral.

SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS No. 157 also establishes a fair value hierarchy to prioritize inputs used in measuring fair value as follows:

- *Level 1:*   Observable inputs such as quoted prices in active markets;

- *Level 2:*   Inputs, other than quoted prices in active markets, that are observable either directly or indirectly; and

- *Level 3:*   Unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

Assets and liabilities measured at fair value are based on one or more of the following three valuation techniques noted in SFAS 157:

a. *Market approach:* Prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities.

b. *Cost approach:* Amount that would be required to replace the service capacity of an asset (replacement cost).

c. *Income approach:* Techniques to convert future amounts to a single present amount based upon market expectations (including present value techniques, option-pricing and excess earnings models).

As of June 30, 2008, Delphi had the following assets measured at fair value on a recurring basis:

| | Fair Value Measurements Using: | | | |
| | Total as of June 30, 2008 | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
|---|---|---|---|---|
| | (in millions) | | | |
| Available-for-sale securities . . . . . . . . . . . . . . . | $  2 | $ 2 | $ — | $— |
| Commodity derivatives . . . . . . . . . . . . . . . . . . . | 80 | — | 80 | — |
| Foreign currency derivatives . . . . . . . . . . . . . . . | 50 | — | 50 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $132 | $ 2 | $130 | $— |

As of June 30, 2008, Delphi had the following liabilities measured at fair value on a recurring basis:

| | Total as of June 30, 2008 | Fair Value Measurements Using: | | |
| --- | --- | --- | --- | --- |
| | | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
| | | (in millions) | | |
| Commodity derivatives . . . . . . . . . . . . . . . . . . . | $ 3 | $— | $ 3 | $— |
| Foreign currency derivatives . . . . . . . . . . . . . . . | 10 | — | 10 | — |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $13 | $— | $13 | $— |

All derivative instruments are required to be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria. The fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates. Delphi values its derivative contracts using an income approach based on valuation techniques to convert future amounts to a single, discounted amount. Delphi also considers the risk of non-performance in its determination of fair value of derivative instruments.

## 20.  OTHER INCOME (EXPENSE), NET

Other income (expense), net included:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2008 | 2007 | 2008 | 2007 |
| | (in millions) | | | |
| Interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 8 | $16 | $21 | $31 |
| Other, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (4) | 3 | 2 | 8 |
| Other income, net . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 4 | $19 | $23 | $39 |

## 21.  SEGMENT REPORTING

Delphi's operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as the Automotive Holdings Group, consisting of business operations to be sold or wound down. An overview of Delphi's five reporting segments, which are grouped on the basis of similar product, market and operating factors follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, displays, mechatronics and power electronics, as well as advanced development of software and silicon.

- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronic controls, exhaust handling, and test and validation capabilities.

- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.

- Thermal Systems, which includes Heating, Ventilating and Air Conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.

- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.

41

Delphi also has non-core steering and halfshaft product lines and interiors and closures product lines that are reported in discontinued operations. Previously, the steering and halfshaft product line was a separate operating segment and the interiors and closures product line was part of Delphi's Automotive Holdings Group segment. Refer to Note 4. Discontinued Operations for more information.

The Corporate and Other category includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to the U.S. employee workforce transition programs. Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

The accounting policies of the segments are the same as those described in Note 1. Basis of Presentation, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions. Generally, Delphi evaluates performance based on stand-alone segment operating income and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

As of December 31, 2007, Delphi transferred responsibility for certain product lines that are no longer considered non-core from the Company's Automotive Holdings Group segment to the Powertrain Systems, Thermal Systems and Electronics and Safety segments to more directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions. The reporting segment results shown below have been reclassified to conform to current presentation for comparability with no effect on previously reported consolidated results of Delphi.

Included below are sales and operating data for Delphi's segments for the three and six months ended June 30, 2008 and 2007.

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| | | | (in millions) | | | | |
| **For the Three Months Ended:** | | | | | | | |
| June 30, 2008 | | | | | | | |
| Net sales to GM and affiliates . . . . . . . . | $ 296 | $ 298 | $ 365 | $287 | $ 156 | $ 81 | $1,483 |
| Net sales to other customers . . . . . . . . . | 812 | 923 | 1,216 | 291 | 232 | 277 | 3,751 |
| Inter-segment net sales . . . . . . . . . . . . . | 37 | 117 | 38 | 20 | 34 | (246) | — |
| Total net sales . . . . . . . . . . . . . . . . . | $1,145 | $1,338 | $1,619 | $598 | $ 422 | $ 112 | $5,234 |
| Depreciation and amortization . . . . . . . . | $ 64 | $ 63 | $ 46 | $ 19 | $ 5 | $ 13 | $ 210 |
| Long-lived asset impairment charges . . . | $ 4 | $ — | $ 1 | $ — | $ — | $ — | $ 5 |
| Goodwill impairment charges . . . . . . . . | $ — | $ — | $ 168 | $ — | $ — | $ — | $ 168 |
| Operating (loss) income . . . . . . . . . . . . | $ (75) | $ 7 | $ (183) | $(11) | $ (27) | $ (76) | $ (365) |
| Equity income . . . . . . . . . . . . . . . . . . . | $ — | $ 2 | $ 6 | $ 3 | $ (1) | $ 1 | $ 11 |
| Minority interest. . . . . . . . . . . . . . . . . . | $ — | $ (6) | $ (5) | $ (1) | $ — | $ — | $ (12) |
| June 30, 2007 | | | | | | | |
| Net sales to GM and affiliates . . . . . . . . | $ 435 | $ 441 | $ 461 | $362 | $ 434 | $ 114 | $2,247 |
| Net sales to other customers . . . . . . . . . | 857 | 1,021 | 1,032 | 245 | 325 | 273 | 3,753 |
| Inter-segment net sales . . . . . . . . . . . . . | 60 | 132 | 53 | 30 | 58 | (333) | — |
| Total net sales . . . . . . . . . . . . . . . . . | $1,352 | $1,594 | $1,546 | $637 | $ 817 | $ 54 | $6,000 |
| Depreciation and amortization . . . . . . . . | $ 67 | $ 65 | $ 42 | $ 17 | $ 17 | $ 22 | $ 230 |
| Long-lived asset impairment charges . . . | $ — | $ 8 | $ — | $ — | $ 26 | $ — | $ 34 |
| Operating income (loss) . . . . . . . . . . . . | $ 9 | $ (16) | $ 44 | $ 16 | $(177) | $(520) | $ (644) |
| Equity income . . . . . . . . . . . . . . . . . . . | $ — | $ 4 | $ 3 | $ 2 | $ — | $ 1 | $ 10 |
| Minority interest. . . . . . . . . . . . . . . . . . | $ (1) | $ (7) | $ (6) | $ (3) | $ — | $ 5 | $ (12) |

43

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| **For the Six Months Ended**: | | | | | | | |
| June 30, 2008 | | | | | | | |
| Net sales to GM and affiliates . . . . . . . | $ 645 | $ 606 | $ 768 | $ 583 | $ 351 | $ 171 | $ 3,124 |
| Net sales to other customers. . . . . . . . . | 1,630 | 1,789 | 2,353 | 542 | 512 | 536 | 7,362 |
| Inter-segment net sales . . . . . . . . . . . . | 85 | 226 | 82 | 47 | 76 | (516) | — |
| Total net sales. . . . . . . . . . . . . . . . . | $2,360 | $2,621 | $3,203 | $1,172 | $ 939 | $ 191 | $10,486 |
| Depreciation and amortization . . . . . . . | $ 127 | $ 131 | $ 91 | $ 34 | $ 17 | $ 29 | $ 429 |
| Long-lived asset impairment charges. . . | $ 5 | $ — | $ 1 | $ — | $ 2 | $ — | $ 8 |
| Goodwill impairment charges. . . . . . . . | $ — | $ — | $ 168 | $ — | $ — | $ — | $ 168 |
| Operating (loss) income. . . . . . . . . . . | $ (155) | $ (6) | $ (189) | $ 15 | $ (97) | $(200) | $ (632) |
| Equity income . . . . . . . . . . . . . . . . . . | $ — | $ 6 | $ 9 | $ 5 | $ (2) | $ 4 | $ 22 |
| Minority interest. . . . . . . . . . . . . . . . . | $ — | $ (12) | $ (9) | $ (2) | $ — | $ — | $ (23) |
| June 30, 2007 | | | | | | | |
| Net sales to GM and affiliates . . . . . . . | $ 842 | $ 855 | $ 903 | $ 731 | $ 857 | $ 222 | $ 4,410 |
| Net sales to other customers. . . . . . . . . | 1,682 | 1,926 | 2,001 | 472 | 670 | 521 | 7,272 |
| Inter-segment net sales . . . . . . . . . . . . | 127 | 259 | 98 | 66 | 109 | (659) | — |
| Total net sales. . . . . . . . . . . . . . . . . | $2,651 | $3,040 | $3,002 | $1,269 | $1,636 | $ 84 | $11,682 |
| Depreciation and amortization . . . . . . . | $ 136 | $ 136 | $ 86 | $ 30 | $ 27 | $ 42 | $ 457 |
| Long-lived asset impairment charges. . . | $ 1 | $ 9 | $ 1 | $ — | $ 29 | $ — | $ 40 |
| Operating income (loss). . . . . . . . . . . | $ 56 | $ (50) | $ 39 | $ 17 | $ (240) | $(681) | $ (859) |
| Equity income . . . . . . . . . . . . . . . . . . | $ — | $ 8 | $ 7 | $ 3 | $ 2 | $ 4 | $ 24 |
| Minority interest. . . . . . . . . . . . . . . . . | $ (1) | $ (16) | $ (13) | $ (1) | $ — | $ 7 | $ (24) |

## 22.   COMMITMENTS AND CONTINGENCIES

### Shareholder Lawsuits

As previously disclosed, the Company, along with certain of its subsidiaries, current and former directors of the Company, and certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005. These lawsuits (the "Multidistrict Litigation") were coordinated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and assigned to Hon. Gerald E. Rosen in the United States District Court for the Eastern District of Michigan (the "District Court"). Set forth below is a description of the Multidistrict Litigation and a summary of a settlement concerning the Multidistrict Litigation.

The Multidistrict Litigation is comprised of lawsuits in three categories. One group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under ERISA. On October 21, 2005, the District Court appointed interim lead plaintiffs for the putative class. On March 3, 2006, these plaintiffs filed a consolidated class action complaint (the "ERISA Action") with a class period of May 28, 1999 to November 1, 2005. Plaintiffs in the ERISA Action allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA. The Company, which was initially named as a defendant in these lawsuits, was not named as a defendant in the ERISA Action due to its chapter 11 filing, but the plaintiffs stated that they intended to proceed with claims against the Company in the ongoing bankruptcy cases, and would seek to name the Company as a defendant in the ERISA Action if the bankruptcy stay were modified or lifted to permit such action. On May 31, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to plaintiffs' counsel and other parties in the case.

44

A second group of class action lawsuits alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws. On September 30, 2005, the court-appointed Lead Plaintiffs filed a consolidated class action complaint (the "Securities Action") on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly-traded securities of the Company, including securities issued by Delphi Trust I and Delphi Trust II, during a class period of March 7, 2000 through March 3, 2005. The Securities Action names several additional defendants, including Delphi Trust I and Delphi Trust II, certain former directors, and underwriters and other third parties, and includes securities claims regarding additional offerings of Delphi securities. The Securities Action, which had been consolidated in the United States District Court for Southern District of New York, was subsequently transferred to the District Court as part of the Multidistrict Litigation (as was a related securities action filed in the United States District Court for the Southern District of Florida concerning Delphi Trust I, which was subsequently consolidated into the Securities Action). The Securities Action was stayed against the Company pursuant to the Bankruptcy Code, but continued against the other defendants. On February 15, 2007, the District Court partially granted the Lead Plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act of 1995, thereby allowing the Lead Plaintiffs to obtain certain discovery from the defendants. On April 16, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to the Lead Plaintiffs and other parties in the case.

The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions"). A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court. These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results. The federal cases were coordinated with the securities and ERISA class actions in the Multidistrict Litigation. Following the filing on October 8, 2005 of the Debtors' petitions for reorganization relief under chapter 11 of the Bankruptcy Code, all the Shareholder Derivative Actions were administratively closed.

Following mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi named as defendants, and certain other defendants involved in the Multidistrict Litigation reached agreements with the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action to settle the claims asserted against them in those actions (the "MDL Settlements").

On September 5, 2007 the District Court entered an order preliminarily certifying a class in the Securities Action and the ERISA Action, preliminarily approving the MDL Settlements, and scheduling a fairness hearing on November 13, 2007. On November 13, 2007, the District Court conducted the fairness hearing and took the matter under advisement. Separately, on October 29, 2007, the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's plan of reorganization and the Court's consideration of certain objections that may be filed as to the MDL Settlements. On October 29, 2007, the Court lifted the automatic stay as to the discovery provided to the Lead Plaintiffs. On December 4, 2007, the District Court held another hearing to consider proposed modifications to the proposed settlement of the Securities Action (as modified, the "Securities Settlement"), and tentatively approved the Securities Settlement, after determining that the modifications were at least neutral to the class and may potentially provide a net benefit to the class.

The District Court approved the MDL Settlements (including the Securities Settlement) in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered an Order and Final Judgment dated January 23, 2008 in both the Securities Action and ERISA Action. One security holder appealed certain aspects of the District Court's opinion and order, as amended, approving the MDL Settlements. That appeal is pending before the United States Court of Appeals for the Sixth Circuit.

On January 25, 2008, the Court approved the MDL Settlements. As provided in the confirmation order, the MDL Settlements are contingent upon the effective date of the Plan occurring, and if, for any reason,

Delphi cannot emerge as contemplated, the MDL Settlements will become null and void. A copy of an addendum setting forth the modification is attached as Exhibit 99(f) to the Company's Current Report on Form 8-K filed with the SEC on January 30, 2008.

Under the terms of the MDL Settlements, the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action will receive claims that will be satisfied through Delphi's Plan as confirmed by the Court pursuant to the confirmation order. Under the Securities Settlement, the Lead Plaintiffs will be granted an allowed claim in the face amount of $179 million, which will be satisfied by Delphi providing $179 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Plan. Additionally, the class in the Securities Action will receive $15 million to be provided by a third party. Delphi has also agreed to provide the Lead Plaintiffs, on behalf of the class members, the ability to exercise their rights in the discount rights offering in connection with the Plan through a notice mechanism and a pledge of cash collateral. If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the amount received by the class in the Securities Action. Delphi will object to any claims filed by opt-out plaintiffs in the Court, and will seek to have such claims expunged.

The settlement of the ERISA Action is structured similarly to the settlement reached with the Lead Plaintiffs. The claim of the named plaintiffs in the ERISA Action will be allowed in the amount of approximately $25 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under the Plan. Unlike the settlement of the Securities Action, no member of the class in the ERISA Action can "opt out" of the settlement.

In addition to the amounts to be provided by Delphi from the above described claims in its chapter 11 cases, the class in the Securities Action will also receive a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer and director named defendants in defense of any future civil actions arising from the allegations raised in the securities cases. The class in the ERISA Action will also receive a distribution of insurance proceeds in the amount of approximately $22 million. Settlement amounts from insurers and underwriters were paid and placed in escrow by September 25, 2007, pending the effective date of the MDL Settlements.

The MDL Settlements also provide for the dismissal with prejudice of the ERISA Action and Securities Action and a release of certain claims against certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants. If the MDL Settlements are terminated according to their terms, the parties will proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or of their fiduciary duties. The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand. As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

As a result of the MDL Settlements, as of June 30, 2008 and December 31, 2007, Delphi has a liability of $351 million recorded for this matter. Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million. As part

of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage. In conjunction with the MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

As of June 30, 2007, Delphi's best estimate of the liability for these matters was $340 million. Delphi had earlier recorded an initial reserve in the amount of its $10 million insurance deductible, and net of related payments, had an $8 million liability recorded as of March 31, 2007 as at such date no other amount was deemed probable and estimable. Accordingly, Delphi recognized Securities and ERISA litigation charges of $332 million in the second quarter of 2007.

**Ordinary Business Litigation**

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases.

With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements. However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates. Additionally, in connection with the Separation, Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility. Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof.

During the six months ended June 30, 2008, Delphi recovered $28 million from an affiliated supplier and recorded it as a reduction of warranty expense. Delphi began experiencing quality issues regarding parts purchased by Delphi's Thermal Systems segment during the third quarter of 2006 and established warranty reserves of approximately $60 million to cover the cost of various repairs that may be implemented. The reserve has subsequently been adjusted for payments, settlements and the impact of foreign currency exchange rate fluctuations. As of June 30, 2008 and December 31, 2007, the related reserve was $43 million and $41 million, respectively.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases. Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from chapter 11. Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM. In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in our Amended and Restated DIP Credit Facility, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, and as a result Delphi expects to record the extinguishment of this liability as a reduction of warranty expense in cost of sales, which will have a corresponding favorable impact on operating income, of $112 million in July 2008. As of June 30, 2007, Delphi expected to settle obligations with GM for approximately $199 million and recorded $91 million of additional warranty expense in costs of sales in the second quarter of 2007, primarily related to the Automotive Holdings Group and Powertrain Systems segments.

**Environmental Matters**

Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating air emissions, water discharge and waste management. Delphi has an environmental management structure designed to facilitate and support its compliance with these requirements globally. Although it is Delphi's intent to comply with all such requirements and regulations, it cannot provide assurance that it is at all times in compliance. Delphi has made and will continue to make capital and other expenditures to comply with environmental requirements. Environmental requirements are complex, change frequently and have tended to become more stringent over time. Accordingly, Delphi cannot assure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not be material.

Delphi establishes reserves for environmental cleanup liabilities when a loss is probable and can be reasonably estimated. Such liabilities generally are not subject to insurance coverage. The cost of each environmental cleanup is estimated by engineering, financial, and legal specialists within Delphi based on current law and considers the estimated cost of investigation and remediation required and the likelihood that, where applicable, other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable. The process of estimating environmental cleanup liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remediation and technology will be required, and the outcome of discussions with regulatory agencies and other PRPs at multi-party sites. In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remediation methodology to be used could significantly change Delphi's estimates.

As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a PRP in proceedings at various sites, including the Tremont City Landfill Site (the "Site") located in Tremont, Ohio, which is alleged to involve ground water contamination. In September 2002, Delphi and other PRPs entered into a Consent Order with the U.S. Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the Site. The Remedial Investigation and Alternatives Array Document were finalized in 2007. A Feasibility Study and Record of Decision are expected to be completed in late 2008 or 2009. Although Delphi believes that capping and future monitoring is a reasonably possible outcome, a different cleanup approach ultimately may be required for the Site. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves. As of June 30, 2008, Delphi has recorded its best estimate of its share of the remediation based on the remedy described above. However, if that remedy is not accepted, Delphi's expenditures for remediation could increase by $20 million in excess of its existing reserves. Delphi will continue to reassess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

Delphi received a Notice of Intent to File Civil Administrative Complaint ("Notice") from the EPA on May 30, 2008 regarding a June 2007 chlorine gas cylinder leak that occurred at the Saginaw, Michigan Delphi Steering facility. The Notice alleges that Delphi failed to properly notify agency officials about the leak or the presence of chlorine gas at the site, and describes EPA's intent to seek approximately $130 thousand in civil penalties relating to the incident. Delphi has sent a preliminary response to the Notice, and has commenced discussions with EPA concerning the matter. No formal complaint has been filed by EPA to date.

Delphi is in various stages of investigation and cleanup at its manufacturing facilities where contamination has been discovered. As previously disclosed, Delphi completed a number of environmental investigations during 2006 in conjunction with its transformation plan, which contemplates significant restructuring activity, including the sale, closure or demolition of numerous facilities. These assessments identified previously unknown conditions and resulted in Delphi recording an adjustment to its environmental reserves. As Delphi continues the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be

identified. Delphi cannot assure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not exceed the amount of its current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

As of June 30, 2008 and December 31, 2007, Delphi's reserve for environmental investigation and remediation was approximately $105 million and $112 million, respectively. Approximately $18 million of the environmental reserve balance as of June 30, 2008 is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $87 million and $112 million of the environmental reserve balance as of June 30, 2008 and December 31, 2007, respectively, is included in other long-term liabilities.

### Other

As mentioned above, Delphi continues to pursue its transformation plan and continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity. These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future.

## 23.  SUBSEQUENT EVENTS

Certain events have occurred subsequent to June 30, 2008 that do not impact the reported balances or results of operations as of that date, but are material to the Company's ongoing operations. These events are listed below.

On July 31, 2008, GM agreed to forgive certain of the cash amounts due under the Warranty Settlement Agreement entered into on September 27, 2007, including any applicable interest, and as a result Delphi expects to record the extinguishment of this liability as a reduction of warranty expense in cost of sales, which will have a corresponding favorable impact on operating income, of $112 million in July 2008. Refer to Note 13. Warranty Obligations and Note 22. Commitments and Contingencies for more information.

In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding short-term liquidity support until confirmation of the Plan or an alternative plan of reorganization, on August 7, 2008 GM agreed to amend the GM Advance Agreement to provide for an additional $300 million availability above the existing $650 million, as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement. The amendment provides that the outside maturity date with respect to the original $650 million may be extended in connection with an extension of Delphi's existing Amended and Restated DIP Credit Facility, if GM and Delphi agree, to the earlier of June 30, 2009, and the termination of Delphi's Amended and Restated DIP Credit Facility, and that the maturity date with respect to the additional $300 million is the earlier of December 31, 2008 (subject to potential extension through June 30, 2009, on the same terms as apply to the original $650 million), such date as Delphi files any motion seeking to amend the Plan in a manner that is not reasonably acceptable to GM, the termination of Delphi's Amended and Restated DIP Credit Facility and such date as a plan of reorganization becomes effective. The additional $300 million of advances is also conditioned upon Delphi filing modifications to its Plan which are reasonably acceptable to GM by October 31, 2008 (or such later date as GM may agree in its sole discretion), and certain other conditions. Interest on advances above the original facility amount of $650 million will be cancelled if certain conditions are met. The advances will remain administrative claims in Delphi's chapter 11 cases. The proposed amendment to expand the facility under the GM Advance Agreement is subject to Court approval. On August 6, 2008, Delphi filed a motion requesting approval and expects such motion to be considered later this month. The executed agreement is filed as an exhibit to this quarterly report.

49

**ITEM 2.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

The following management's discussion and analysis of financial condition and results of operations ("MD&A") is intended to help you understand the business operations and financial condition of Delphi Corporation (referred to as "Delphi," the "Company," "we," or "our"). The MD&A should be read in conjunction with our financial statements and the accompanying notes as well as the MD&A included in our Annual Report on Form 10-K for the year ended December 31, 2007.

**Executive Summary of Business**

Delphi Corporation is a global supplier of vehicle electronics, transportation components, integrated systems and modules and other electronic technology. In addition, our technologies are present in communication, computer, consumer electronic, energy and medical applications. We operate in extremely competitive markets. Our customers select us based upon numerous factors, including technology, quality, delivery and price. Our efforts to generate new business do not immediately affect our financial results, because supplier selection in the auto industry is generally finalized several years prior to the start of production of the vehicle. As a result, business that we win in 2008 will generally not impact our financial results until 2010 or beyond.

In light of our continued deterioration in performance in recent years, we determined that it was necessary to address and resolve our United States ("U.S.") legacy liabilities, product portfolio, operational issues and profitability requirements. As a result, we intensified our efforts during 2005 to engage our labor unions, as well as General Motors Corporation ("GM"), in discussions seeking consensual modifications that would permit us to align our U.S. operations to our strategic portfolio and be competitive with our U.S. peers, and to obtain financial support from GM to implement our restructuring plan. Despite significant efforts to reach a resolution, we determined that these discussions were not likely to lead to the implementation of a plan sufficient to address our issues on a timely basis and that we needed to pursue other alternatives to preserve value for our stakeholders.

Accordingly, to transform and preserve the value of the Company, which requires resolution of existing legacy liabilities and the resulting high cost of U.S. operations, on October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively, the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings") in the Court. The Court is jointly administering these cases as "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." We continue to operate our business as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, continue their business operations without supervision from the Court and are not subject to the requirements of the Bankruptcy Code.

On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's amended plan of reorganization (the "Plan") and related amended disclosure statement (the "Disclosure Statement") became final, but Delphi was unable to consummate the Plan because certain investors under the Plan refused to participate in the closing, which was commenced but not completed on April 4, 2008. The Disclosure Statement and Plan are based upon a series of global settlements and compromises that involved every major constituency of Delphi and its affiliated Debtors' reorganization cases, including Delphi's principal U.S. labor unions, GM, the official committee of unsecured creditors (the "Creditors' Committee") and the official committee of equity security holders (the "Equity Committee") appointed in Delphi's chapter 11 cases, and the lead plaintiffs in certain securities and ERISA Multidistrict Litigation (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA), and include detailed information regarding the treatment of claims and interests and an outline of the EPCA (as defined below) and rights offering.

On April 4, 2008, Delphi announced that although the Debtors had met the conditions required to substantially consummate the Plan (as modified), including obtaining $6.1 billion of exit financing, the Investors

refused to participate in a closing that was commenced but not completed and refused to fund the EPCA (as defined below). The Debtors filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA (as defined below) as well as compensatory and punitive damages, and are working with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable. On July 23, 2008, Delphi's Creditors' Committee and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's plan of reorganization. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not presently intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the previously confirmed plan of reorganization, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against Appaloosa Management L.P. and the other investors in the Equity Purchase and Commitment Agreement dated as of August 3, 2007.

Delphi's ability to develop a revised recapitalization plan and continue implementing its transformation plan such that it can consummate the Plan (as modified) or obtain a confirmation order and successfully consummate an alternative plan of reorganization is affected by the substantial uncertainty and a significant decline in capacity in the credit markets and operational challenges due to the overall climate in the U.S. automotive industry. Refer to Part II, Item 1A. Risk Factors in this Quarterly Report on Form 10-Q and in the Quarterly Report on Form 10-Q for the period ended March 31, 2008, the rest of this Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations and the other risk factors set forth in our Annual Report on Form 10-K for the year ended December 31, 2007. Until Delphi is able to successfully consummate a confirmed plan of reorganization, Delphi and certain of its U.S. subsidiaries will continue as "debtors-in-possession" in chapter 11, until one of the following occurs: the order confirming the Plan is modified, a further amended plan of reorganization is confirmed or other dispositive action is taken. In addition, in the event the Plan is not consummated, approvals obtained in connection with the confirmation of the Plan, as described more fully below, may become null and void, including Court approval of the GM settlement and restructuring agreements and the Court's entry of orders authorizing the assumption and rejection of unexpired leases and executory contracts by Delphi as contemplated by Article 8.1 of the Plan.

Furthermore, if the MDL Settlements (as defined in Note 22. Commitments and Contingencies to the consolidated financial statements) are terminated according to their terms, the parties may proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

Delphi is working with its stakeholders to review and consider modifications to the Plan to reflect the change in circumstances. There can be no assurances that Delphi would be successful in these alternative actions or any other actions necessary if the Plan is not consummated.

In addition, Delphi entered into an amended and restated DIP credit facility (the "Amended and Restated DIP Credit Facility") on May 9, 2008. Additionally, Delphi entered into an agreement with GM whereby GM agreed to advance payments to be made by GM to Delphi following effectiveness of the GM settlement and restructuring agreements (the "GM Advance Agreement") and is further seeking Court approval to an amendment to increase availability under the GM Advance Agreement. Refer to Note 15. Debt and Note 23. Subsequent Events for additional information. The Amended and Restated DIP Credit Facility and the original GM Advance Agreement both expire on December 31, 2008. If we are not able to emerge from chapter 11 prior to December 31, 2008, we would seek to further extend the term of our Amended and Restated DIP Credit Facility and seek alternative sources of financing. Delphi can make no assurances that it will emerge from bankruptcy before the Amended and Restated DIP Credit Facility and GM Advance Agreement expire. The failure to secure such extension or alternative sources of financing would materially adversely impact our business, financial condition and operating results by severely restricting our liquidity, may further delay or prevent our consummation of a consensual plan of reorganization, and may require us to dispose of or wind-down one or more core product lines. See Part II, Item 1A. Risk Factors in this Quarterly Report on Form 10-Q, the Quarterly Report on Form 10-Q for the period ended March 31, 2008 and also our Annual

Report on Form 10-K for the year ended December 31, 2007, Item 1A. Risk Factors, Risk Factors Specifically Related to our Current Reorganization Cases Under Chapter 11 of the U.S. Bankruptcy Code, and Debt.

In addition, with respect to implementing the transfer of certain of Delphi's unfunded pension obligations to a pension plan sponsored by GM, the Internal Revenue Service ("IRS") and Pension Benefit Guaranty Corporation ("PBGC") agreed to certain waivers that, at the time, were required for the transfers to proceed in an economically efficient manner. The waivers were conditioned upon Delphi emerging from chapter 11 by a specified date, which has been modified from time to time. On April 4, 2008, the IRS and the PBGC modified the 2006 Hourly and Salaried Plan Waivers (as defined below) and the 2007 Hourly Plan Waiver (as defined below) by extending the date by which Delphi must emerge from chapter 11 until May 9, 2008. Delphi did not seek extension of the 2006 Waivers or the 2007 Hourly Plan Waiver past May 9, 2008. Delphi believes that ERISA and the Bankruptcy Code will still, under most circumstances, after June 15, 2008, permit the Company to be able to effect the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the U.S. Internal Revenue Code (the "Code") to GM in an economically efficient manner prior to September 30, 2008. However, by permitting the waivers to lapse Delphi is potentially exposed to excise taxes as a result of accumulated funding deficiencies. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for further information on Delphi's discussions with the IRS and the PBGC.

Delphi and GM are considering potential amendments to the global settlement and restructuring agreements, which if agreed to by the parties and approved by the Court, would cause the agreements or certain portions of the agreements to become effective prior to substantial consummation of a plan of reorganization, including those relating to the transfer of certain assets and liabilities of Delphi's Hourly-Rate Employees Pension Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the U.S. labor union settlement agreements, thereby facilitating completion of such transfer in an economically efficient manner prior to September 30, 2008. However, there can be no assurances that Delphi and GM will reach final agreement on potential amendments or that the Court will approve the potential amendments such that the proposed transfer can be completed prior to September 30, 2008. In the event such transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

There can be no assurance that Delphi will be able to negotiate a revised funding plan with the IRS and PBGC, that GM will agree that any revised funding plan satisfies the conditions to consummation of the other transactions called for by the global settlement and restructuring agreements, or that any plan agreed to will not result in the need for substantially greater cash contributions or that Delphi will be able to satisfy such increased obligations. If the Plan, including the settlement agreements reached with GM, does not become effective and the transactions contemplated thereby are not consummated such that Delphi does not emerge from chapter 11, the PBGC could initiate an involuntary plan termination, missed contributions would become due and the IRS could assess penalties on the accumulated funding deficiencies. Although Delphi would likely contest such assessment, the PBGC could consider our failure to immediately fund our plans a basis to call for an involuntary termination of the plans.

### Plan of Reorganization and Transformation Plan

#### Elements of Transformation Plan

The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, as detailed below, including agreements reached with each of Delphi's principal U.S. labor unions and GM. The Plan incorporates, approves, and is consistent with the terms of each agreement.

Labor — Modify our labor agreements to create a more competitive arena in which to conduct business.

During the second quarter of 2007, Delphi signed an agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007. Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and 1114 of

the Bankruptcy Code seeking authority to reject their U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues. Portions of these agreements have already become effective, and the remaining portions will not become effective until the effectiveness of the Global Settlement Agreement, as amended (the "GSA"), and the Master Restructuring Agreement, as amended (the "MRA"), with GM and upon substantial consummation of the Plan as confirmed by the Court. However, as part of Delphi's overall discussions with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi and GM are negotiating modifications to the GSA and MRA, which if finalized and agreed to by both parties and approved by the Court, would provide for the agreements or certain portions of the agreements, including provisions related to the transfer of certain legacy pension and other postretirement benefit obligations, to become effective prior to substantial consummation of a plan of reorganization. Among other things, early effectiveness of certain provisions of the GSA and MRA would facilitate the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the Code to GM in an economically efficient manner prior to September 30, 2008, see Pensions below.

Among other things, these agreements generally provided certain members of the union labor workforce options to either retire, accept a voluntary severance package or accept lump sum payments in return for lower hourly wages. Refer to Note 16. U.S. Employee Workforce Transition Programs to the consolidated financial statements for more information.

On September 4, 2007, the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, subject to the Court's prior settlement approval orders pertaining to each of Delphi's U.S. labor unions, as it relates to all parties and the intervening respondents, by entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g).

GM — Conclude negotiations with GM to finalize financial support for certain of our legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

Delphi and GM have entered into comprehensive settlement agreements consisting of the GSA and the MRA. The GSA and the MRA comprised part of the Plan and were approved in the order confirming the Plan on January 25, 2008. The GSA and MRA currently provide that such agreements are not effective until and unless Delphi emerges from chapter 11. However, as noted above, Delphi and GM are considering potential amendments which would make the agreements or certain portions of the agreements effective prior to emergence. Given the ongoing nature of the discussions there can be no assurance that the parties will agree to potential amendments or that the Court will approve such amendments. Accordingly, the accompanying consolidated financial statements do not include any adjustments related to the GSA or the MRA and the following discussion does not consider the potential impact of any amendments. These agreements will result in a material reduction in Delphi's liabilities related to the workforce transition programs. Delphi will account for the impact of the GSA or the MRA when the conditions of the agreements are satisfied and Court approval, if required, has been obtained.

- Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Plan or as soon as reasonably possible thereafter. By contrast, the MRA addresses matters that will require a significantly longer period that will extend for a number of years after consummation of the Plan to complete.

- GM's obligations under the GSA and MRA are conditioned upon, among other things, Delphi's consummation of the Plan, including payment of amounts to settle GM claims as outlined below.

The GSA is intended to resolve outstanding issues between Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11, and will be implemented by Delphi and GM in the short term. During 2007, Delphi and GM entered into amendments to both the GSA and the MRA. These agreements, as amended, provide for a comprehensive settlement of outstanding issues (other than ordinary course matters)

53

between Delphi and GM, including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999; certain post-separation claims and disputes between Delphi and GM; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under Delphi's Plan; and various other legacy issues.

In addition to establishing claims treatment, including specifying which claims survive and the consideration to be paid by Delphi to GM in satisfaction of certain claims, the GSA addresses, among other things, commitments by Delphi and GM regarding other postretirement benefit and pension obligations, and other GM contributions with respect to labor matters and releases.

- GM will assume approximately $7 billion of certain postretirement benefits for certain of the Company's active and retired hourly employees, including health care and life insurance;

- Delphi will freeze its Delphi Hourly-Rate Employees Pension Plan as soon as practicable following the effective date of the Plan, as provided in the union settlement agreements, and GM's Hourly-Rate Employees Pension Plan will become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi will transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the U.S. labor union settlement agreements;

- Shortly after the effectiveness of the Plan, GM will receive an interest bearing note from Delphi in the amount of $1.5 billion which is expected to be paid promptly following effectiveness;

- GM will make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the U.S. labor union settlement agreements; and

- GM and certain related parties and Delphi and certain related parties will exchange broad, global releases (which will not apply to certain surviving claims as set forth in the GSA).

The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11. The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM. Through the MRA, Delphi and GM have agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- GM will make significant, ongoing contributions to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and other postretirement benefit contributions provided under the Supplemental Wage Agreement, at specified UAW manufacturing facilities retained by Delphi;

- GM and Delphi have agreed to certain terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- GM and Delphi have agreed to certain additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by certain future dates (as defined in the MRA); and

- GM and Delphi have agreed to the treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

The GSA and MRA may be terminated by the Company or GM because the effective date of the Plan did not occur by March 31, 2008 and the EPCA (as defined below) was terminated. As of the date hereof, neither Delphi nor GM has terminated the GSA or the MRA.

54

Portfolio — Streamline Delphi's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, and wheel bearings. In connection with the Company's continuous evaluation of its product portfolio, effective November 1, 2006 Delphi decided that the power products business no longer fit within the Company's future product portfolio and that business line was moved to Delphi's Automotive Holdings Group and during the second quarter of 2008 Delphi decided that the global exhaust business no longer fit within the Company's future product portfolio. With the exception of the catalyst product line and the global exhaust business (included in the Powertrain Systems segment), the steering and halfshaft product lines and interiors and closures product lines (included in discontinued operations), the Company's non-core product lines are included in the Automotive Holdings Group segment, refer to Note 21. Segment Reporting to the consolidated financial statements.

Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites. The sale and wind-down process is being conducted in consultation with the Company's customers, labor unions and other stakeholders to carefully manage the transition of affected product lines and manufacturing sites. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

During the first six months of 2008, Delphi obtained Court approval of bidding procedures and sales agreements for the steering and halfshaft product line and closed on the sales of the interiors and closures product line, the North American brake components machining and assembly assets, the global bearings business and the U.S. suspensions business. Additionally, under an order providing Delphi authority to sell certain assets that do not exceed $10 million without further Court approval, Delphi entered into an agreement to sell its power products business. Refer to Note 4. Discontinued Operations and Note 5. Acquisitions and Divestitures to the consolidated financial statements for more information.

Costs recorded in the three and six months ended June 30, 2008 and 2007 related to the transformation plan for non-core product lines include impairments of long-lived, employee termination benefits and other exit costs and U.S. employee workforce transition program charges. Refer to Note 7. Long-Lived Asset Impairment, Note 8. Employee Termination Benefits and Other Exit Costs, and Note 16. U.S. Employee Workforce Transition Programs to the consolidated financial statements for more information.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| | (in millions) | | | |
| Long-lived asset impairment charges . . . . . . . . . . . . . . . . . . . . | $ 5 | $ 39 | $ 8 | $199 |
| Employee termination benefits and other exit costs . . . . . . . . . | 67 | 301 | 193 | 420 |
| U.S. employee workforce transition program charges . . . . . . . | 20 | — | 57 | (6) |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $92 | $340 | $258 | $613 |
| *Core product lines* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 66 | 79 | 151 | 117 |
| *Non-core product lines* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 15 | 178 | 60 | 225 |
| *Discontinued operations* . . . . . . . . . . . . . . . . . . . . . . . . . . . | 11 | 83 | 47 | 271 |

Cost Structure — Transform our salaried workforce and reduce general and administrative expenses to ensure that our organizational and cost structure is competitive and aligned with our product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses necessary to support its realigned

portfolio. These initiatives include financial services, information technology and certain sales administration outsourcing activities, reduction of our global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of certain salaried benefit programs to bring them in line with more competitive industry levels. Given the investment required to implement these initiatives, we do not expect to fully realize substantial savings until 2009 and beyond.

Pensions — Devise a workable solution to our current pension funding situation, whether by extending contributions to the pension trusts or otherwise.

Delphi's discussions with the IRS and the PBGC regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of emergence contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM.

On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers"). On May 31, 2007, the Court authorized Delphi to perform under the terms of those funding waivers. The IRS modified the 2006 Waivers by extending the dates by which Delphi is required to file its Plan and emerge from chapter 11. On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver"). The waivers were required, at that time, to facilitate the Debtors' option to effectuate the transfer of certain hourly pension obligations to GM in an economically efficient manner, and to remove uncertainty as to whether excise taxes would be assessed as a result of accumulated funding deficiencies relating to prepetition service. Absent the waivers, the transfer to GM could have triggered an obligation of the Debtors to make cash contributions to the Hourly Plan which would result in a projected overfunding of the Hourly Plan. On October 26, 2007, the Court authorized Delphi to perform under the 2007 Hourly Plan Waiver, which would have expired if Delphi did not emerge from chapter 11 by February 29, 2008. The Court authorized two additional funding waivers which authorized Delphi to defer funding contributions due under the Employee Retirement Income Security Act ("ERISA") and the Code until May 9, 2008. On April 4, 2008, the IRS and the PBGC modified the 2006 Waivers and the 2007 Hourly Plan Waiver by extending the date by which Delphi must emerge from chapter 11 to May 9, 2008.

Delphi did not seek extension past May 9, 2008 of the 2006 Waivers or the 2007 Hourly Plan Waiver. Delphi believes that ERISA and the Code will still, under most circumstances, after June 15, 2008, permit the Company to be able to effect the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the Code to GM in an economically efficient manner prior to September 30, 2008. However, by permitting the waivers to lapse Delphi is potentially exposed to excise taxes as a result of accumulated funding deficiencies for the plan years ended September 30, 2005 and 2006 of approximately $173 million and $1.22 billion, respectively. Accordingly, the IRS may assert against Delphi excise taxes in the approximate amounts of $17 million and $122 million for plan years ended September 30, 2005 and 2006, respectively. Because Delphi did not meet its minimum funding requirements on or before June 15, 2008, the accumulated funding deficiency without the effect of the waivers would be approximately $2.44 billion for the plan year ended September 30, 2007, which could lead to the IRS further asserting additional excise taxes of approximately $244 million. If the accumulated funding deficiency is not corrected after Delphi receives the assessments, an excise tax of up to 100% may be assessed at the discretion of the IRS. Assuming Delphi is assessed an excise tax for all plan years through 2007, the total range of exposure would approximate between $380 million and $3.8 billion. Delphi expects that the Hourly and Salaried Plans will have accumulated funding deficiencies for the plan year ending September 30, 2008, should Delphi not emerge from chapter 11. Any transfer of hourly pension obligations to a GM pension plan will mitigate such deficiency for the Delphi Hourly Plan.

As noted above, Delphi and GM are considering potential amendments to the GSA and MRA, which if agreed to by the parties and approved by the Court, would cause the agreements or certain portions of the agreements to become effective prior to substantial consummation of a plan of reorganization, including those relating to the transfer of certain assets and liabilities of Delphi's Hourly Plan to the GM Hourly-Rate Employees Pension Plan, as set forth

56

in the U.S. labor union settlement agreements, thereby facilitating completion of such transfer in an economically efficient manner prior to September 30, 2008. However, there can be no assurances that Delphi and GM will reach final agreement on potential amendments or that the Court will approve the potential amendments such that the proposed transfer can be completed prior to September 30, 2008. In the event such transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits attributable to prepetition service while in chapter 11 and that it has made all required payments for postpetition service. Delphi further believes that as a result, it is not liable for any penalty excise taxes that may be assessed by the IRS. Delphi believes that its ultimate emergence from chapter 11 will result in a consensual resolution of its pension funding obligations, and given the significant uncertainty surrounding the outcome of the excise tax assessment and the potential for Delphi to litigate this matter, if necessary, management has concluded that an unfavorable outcome is not currently probable. Accordingly, as of June 30, 2008, no amounts have been recorded for any potential excise tax assessment.

Pursuant to the pertinent terms of the waivers, as modified, Delphi provided to the PBGC letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan. Due to the expiration of the waivers, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on May 16, 2008. The cash proceeds from the letters of credit have been recognized as Delphi funding contributions to the plans for the plan year ending September 30, 2008.

The Company has represented that it currently intends to meet the minimum funding standard under IRC section 412 upon emergence from chapter 11. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the ability to transfer certain assets and unfunded benefit liabilities from the Hourly Plan to a pension plan sponsored by GM, the date and size of such transfer, the funded status of the Hourly Plan and the date of emergence. As noted above, in the event the anticipated transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the Labor section, Delphi committed to freeze the Hourly and Salaried Plans effective at the end of the month following emergence from chapter 11. Refer to Note 17. Pension and Other Postretirement Benefits to the consolidated financial statements for more information.

<u>Equity Purchase and Commitment Agreement</u>

Under the terms and subject to the conditions of the Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

The foregoing description of the EPCA is a general description only. For additional detail see the July EPCA, which was filed as an exhibit to the Quarterly Report on Form 10-Q for the quarter ended June 30, 2007, and the EPCA Amendment filed as an exhibit to the Company's Current Report on Form 8-K/A dated December 12, 2007.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination. On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16, 2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages. No amounts related to this matter have been recorded in Delphi's financial statements. The Investors filed motions to dismiss Delphi's complaints, and July 28, 2008, the Court denied in part and granted in part the Investors' motions. A trial on Delphi's complaint is currently scheduled to occur in March 2009, and the parties have agreed to participate in mediation in an attempt to settle the claims that were not dismissed.

During 2007, in exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million. In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA. The Company also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. Delphi had deferred the recognition of these amounts in other current assets as they were to be netted against the proceeds from the EPCA upon issuance of the new shares. However, as a result of the events relating to the termination of the EPCA described above, Delphi recognized $79 million of expense related to these fees and other expenses during the six months ended June 30, 2008.

<u>The Plan of Reorganization</u>

As noted above, due to the Investors failure to fund their commitments under the EPCA, Delphi has not yet consummated the Plan and is continuing discussions with its stakeholders regarding potential amendments to the Plan that will enable Delphi to emerge from chapter 11 as soon as practicable. Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization is extended until 30 days after substantial consummation of the Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Plan (as modified) is extended until 90 days after substantial consummation of the Plan (as modified) or any modified plan. On

58

July 23, 2008, Delphi's Creditors' Committee and WTC, as Indenture Trustee and a member of the UCC, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not presently intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against Appaloosa and the other Investors. Notwithstanding the foregoing, pursuant to an order entered by the Court on July 31, 2008, the Debtors' exclusive period for filing a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including October 31, 2008 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including December 31, 2008.

The cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Plan (as modified), as the terms of any future confirmed plan of reorganization, as the U.S. labor agreements, the GSA, and the MRA become effective. In the event the Debtors are unable to consummate the Plan (as modified), the cost will be recognized as the aforementioned agreements become effective as elements of any future confirmed plan of reorganization. The Plan and agreements will significantly impact Delphi's accounting for its pension plans, postretirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

There are a number of risks and uncertainties inherent in the chapter 11 process, including those detailed in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007, Part I, Item 1A. Risk Factors, Part II, Item 1A. Risk Factors in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008 and Part II, Item 1A. Risk Factors in this Quarterly Report on Form 10-Q. In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder Delphi's ongoing business activities and our ability to operate, fund and execute Delphi's business plan by impairing relations with existing and potential customers; negatively impacting our ability to attract, retain and compensate key executives and to retain employees generally; limiting our ability to obtain trade credit; and impairing present and future relationships with vendors and service providers.

**Overview of Performance During the Second Quarter of 2008**

Delphi believes that several significant issues have largely contributed to our financial performance, including (a) a competitive U.S. vehicle production environment for domestic original equipment manufacturers resulting in the reduced number of motor vehicles that GM, our largest customer, produces annually in the U.S. and pricing pressures; (b) increasing commodity prices; (c) U.S. labor legacy liabilities and noncompetitive wage and benefit levels; and (d) restrictive collectively bargained labor agreement provisions which have historically inhibited Delphi's responsiveness to market conditions, including exiting non-strategic, non-profitable operations or flexing the size of our unionized workforce when volume decreases. Although the 2006 UAW and IUE-CWA U.S. employee workforce transition programs and the U.S. labor settlement agreements entered into in 2007 will allow us to reduce our legacy labor liabilities, transition our workforce to more competitive wage and benefit levels and allow us to exit non-core product lines, such changes will occur over several years, and are partially dependent on GM being able to provide significant financial support. We are beginning to see the benefits of decreased labor costs as a result of the attrition plans included in the workforce transition programs. However, we still have future costs to incur to complete our transformation plan, divest of non-core operations and realign our cost structure to match our more streamlined product portfolio.

In light of the current economic climate in the U.S. automotive industry, Delphi is facing considerable challenges due to revenue decreases in the U.S. and related pricing pressures stemming from a substantial reduction in GM's North American vehicle production in recent years. Our sales to GM have declined since our separation from GM, principally due to declining GM North America ("GMNA") production, the impact of customer-driven price reductions, and GM's diversification of its supply base and ongoing changes in our content per vehicle and the product mix purchased. During the six months ended June 30, 2008, production in GM North America decreased due to work stoppages at American Axle, a Tier 1 supplier to GM based in Detroit, Michigan (the "work stoppages"). On February 25, 2008 certain UAW-represented hourly employees of American Axle ceased production at certain of its manufacturing plants in North America. The work stoppages forced GM to slow down production at certain of their manufacturing plants, which has also slowed production of other Tier 1 suppliers, including Delphi. On May 22, 2008, UAW-represented employees finalized a vote in favor of a contract which ended the work stoppages. In the second quarter of 2008, GM North America produced 0.8 million vehicles, excluding CAMI Automotive Inc., New United Motor Manufacturing, Inc. and HUMMER H2 brand vehicle production, a decrease of 28% from the second quarter of 2007 production levels. We do not expect that production levels will increase to fully recover volumes lost as a result of the work stoppages and we expect a continued trend toward passenger cars and away from light duty pick-up trucks and sport utility vehicles. This may result in unfavorable revenue mix for Delphi as our content per vehicle is lower on cars than trucks. During the second quarter of 2008, these challenges intensified as a result of the continued downturn in general economic conditions, including reduced consumer spending and confidence, high oil prices and tight credit markets, all of which have resulted in domestic vehicle manufacturers reducing production forecasts and taking other restructuring actions (which hereinafter we refer to as recent consumer trends and market conditions).

During the second quarter of 2008 we continued to be challenged by commodity cost increases, most notably copper, aluminum, petroleum-based resin products, steel and steel scrap, and fuel surcharges. We are continually seeking to manage these and other material related cost pressures using a combination of strategies, including working with our suppliers to mitigate costs, seeking alternative product designs and material specifications, combining our purchase requirements with our customers and/or suppliers, changing suppliers, hedging of certain commodities and other means. In the case of copper, which primarily affects the Electrical/Electronic Architecture segment, contract escalation clauses have enabled us to pass on some of the price increases to our customers and thereby partially offset the impact of increased commodity costs on operating income for the related products. However, despite our efforts, surcharges and other cost increases, particularly when necessary to ensure the continued financial viability of a key supplier, had the effect of reducing our earnings during the second quarter of 2008. We will continue and increase our efforts to pass market-driven commodity cost increases to our customers in an effort to mitigate all or some of the adverse earnings impacts incurred on quoted customer programs. Except as noted below in Results of Operations, our overall success in passing commodity cost increases on to our customers has been limited. As contracts with our customers expire, we will seek to renegotiate terms in order to recover the actual commodity costs we are incurring.

**Overview of Net Sales and Net Loss During the Three and Six Months Ended June 30, 2008 and 2007**

| | Three Months Ended June 30, | | | | | Six Months Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | | 2007 | | Favorable/ (Unfavorable) | 2008 | | 2007 | | Favorable/ (Unfavorable) |
| | | | | | (dollars in millions) | | | | | |
| Net sales: | | | | | | | | | | |
| General Motors and affiliates . . . . . . . . | $1,483 | 28% | $2,247 | 37% | $(764) | $ 3,124 | 30% | $ 4,410 | 38% | $(1,286) |
| Other customers . . . . . | 3,751 | 72% | 3,753 | 63% | (2) | 7,362 | 70% | 7,272 | 62% | 90 |
| Total net sales . . . . . | $5,234 | | $6,000 | | $(766) | $10,486 | | $11,682 | | $(1,196) |
| Loss from continuing operations . . . . . . . . | $ (559) | | $ (808) | | $ 249 | $(1,089) | | $(1,199) | | $ 110 |
| Income (loss) from discontinued operations, net of tax . . . . . . . . . . . . . | 8 | | (13) | | 21 | (51) | | (155) | | 104 |
| Net loss . . . . . . . . . . . | $ (551) | | $ (821) | | $ 270 | $(1,140) | | $(1,354) | | $ 214 |

Including the impact of migration during the period of certain product programs from direct sales to GM to sales to customers which ultimately sell our products to GM as a sub-assembly of their final part ("Tier I") as well as the wind down and closure of certain plants and divestitures in our Automotive Holdings Group ("AHG") segment which were predominately GM related, our non-GM sales from continuing operations in the second quarter and first six months of 2008 remained relatively constant. GMNA sales decreased due to a 28% and 23% reduction in production by GMNA for the second quarter and first six months of 2008, respectively, which includes the impact of the work stoppages and the consumer trend toward more fuel-efficient vehicles which is anticipated to reduce customer production to levels preventing recovery of volumes lost as a result of the work stoppages. GMNA sales represented approximately 19% of total net sales for the three months ended June 30, 2008, as compared to approximately 31% of total net sales for the three months ended June 30, 2007. As GM sales decreased due to reduced GMNA volumes, non-GM sales increased as a percentage of total net sales from continuing operations to 72% and 70% for the second quarter and first six months of 2008. However, excluding the impact of favorable foreign currency exchange rates, non-GM sales decreased 7% and 6% for the second quarter and first six months of 2008, respectively, primarily due to the sale of Delphi's original equipment and aftermarket catalyst business (the "Catalyst Business") in the third quarter of 2007 and the migration of our converter business to a non-consolidated venture during 2007. In the second quarter and first six months of 2008, GM sales from continuing operations decreased 34% and 29% from the second quarter and first six months of 2007, respectively, and represented 28% and 30% of total net sales from continuing operations for the second quarter and first six months of 2008. The net loss reflects the continuing negative impacts of volume reductions and commodity cost increases for the three and six months ended June 30, 2008 and decreased compared to the three and six months ended June 30, 2007 due to $332 million of Securities and ERISA litigation charges recorded during the three months ended June 30, 2007, as well as lower employee termination benefits and other exit costs of $234 million and $227 million, respectively, primarily related to the exit of the manufacturing facility in Cadiz, Spain during the six months ended June 30, 2007. Net loss for the six months ended June 30, 2008 was also favorably impacted by decreased long-lived asset impairment charges of $191 million, primarily included within loss from discontinued operations. Offsetting these improvements were goodwill impairment charges of $168 million, related to our Electrical/Electronic Architecture segment, recorded during the three months ended June 30, 2008. Net loss for the six months ended June 30, 2008 was also unfavorably impacted by increased reorganization charges of $57 million, primarily due to $79 million of previously capitalized fees paid to the potential Investors and their affiliates recorded as expense during the first quarter of 2008 as a result of the termination of the EPCA.

## Consolidated Results of Operations

### *Three and Six Months Ended June 30, 2008 versus Three and Six Months Ended June 30, 2007*

The Company's sales and operating results for the three and six months ended June 30, 2008 and 2007 were as follows:

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2008 | 2007 | Favorable/ (Unfavorable) | 2008 | 2007 | Favorable/ (Unfavorable) |
| | (dollars in millions) | | | (dollars in millions) | | |
| Net sales: | | | | | | |
| General Motors and affiliates . . . . | $1,483  28% | $2,247  37% | $(764) | $ 3,124  30% | $ 4,410  38% | $(1,286) |
| Other customers . . . . . . . . . . . . | 3,751  72% | 3,753  63% | (2) | 7,362  70% | 7,272  62% | 90 |
| Total net sales . . . . . . . . . . . . | $5,234 | $6,000 | $(766) | $10,486 | $11,682 | $(1,196) |
| Cost of sales . . . . . . . . . . . . . . . . | 4,821 | 5,654 | 833 | 9,718 | 10,960 | 1,242 |
| Gross margin(a) . . . . . . . . . . . . . . | $ 413  7.9% | $ 346  5.8% | $ 67 | $ 768  7.3% | $ 722  6.2% | $ 46 |
| U.S. employee workforce transition program charges (credit) . . . . . . . | 18 | — | (18) | 54 | (6) | (60) |
| Depreciation and amortization . . . . . | 210 | 230 | 20 | 429 | 457 | 28 |
| Long-lived asset impairment charges . . . . . . . . . . . . . . . . . . . | 5 | 34 | 29 | 8 | 40 | 32 |
| Goodwill impairment charges. . . . . . | 168 | — | (168) | 168 | — | (168) |
| Selling, general and administrative . . | 377 | 394 | 17 | 741 | 758 | 17 |
| Securities & ERISA litigation charge . . | — | 332 | 332 | — | 332 | 332 |
| Operating loss. . . . . . . . . . . . . . . | $ (365) | $ (644) | $ 279 | $ (632) | $ (859) | $ 227 |
| Interest expense . . . . . . . . . . . . . | (109) | (84) | (25) | (219) | (174) | (45) |
| Loss on extinguishment of debt . . | (49) | — | (49) | (49) | (23) | (26) |
| Other income, net . . . . . . . . . . . . | 4 | 19 | (15) | 23 | 39 | (16) |
| Reorganization items . . . . . . . . . . | (29) | (42) | 13 | (138) | (81) | (57) |
| Loss from continuing operations before income taxes, minority interest and equity income . . . . . . | $ (548) | $ (751) | $ 203 | $(1,015) | $(1,098) | $ 83 |
| Income tax expense . . . . . . . . . . . | (10) | (55) | 45 | (73) | (101) | 28 |
| Loss from continuing operations before minority interest and equity income. . . . . . . . . . . . . . . . . . . | $ (558) | $ (806) | $ 248 | $(1,088) | $(1,199) | $ 111 |
| Minority interest, net of tax . . . . . | (12) | (12) | — | (23) | (24) | 1 |
| Equity income, net of tax . . . . . . . | 11 | 10 | 1 | 22 | 24 | (2) |
| Loss from continuing operations. . . . | $ (559) | $ (808) | $ 249 | $(1,089) | $(1,199) | $ 110 |
| Income (loss) from discontinued operations, net of tax . . . . . . . . | 8 | (13) | 21 | (51) | (155) | 104 |
| Net loss. . . . . . . . . . . . . . . . . . . . | $ (551) | $ (821) | $ 270 | $(1,140) | $(1,354) | $ 214 |

(a) Gross margin is defined as net sales less cost of sales (excluding U.S. employee workforce transition program charges (credit), Depreciation and amortization, Long-lived asset impairment charges and Goodwill impairment charges).

Delphi typically experiences fluctuations in sales due to customer production schedules, sales mix and the net of new and lost business (which we refer to collectively as volume), increased prices attributable to escalation clauses in our supply contracts for recovery of increased commodity costs (which we refer to as commodity pass-through), fluctuations in foreign currency exchange rates (which we refer to as FX),

contractual reductions of the sales price to the customer (which we refer to as contractual price reductions) and design changes. Occasionally, business transactions or non-recurring events may impact sales as well.

Delphi typically experiences fluctuations in operating income due to volume, contractual price reductions, cost savings due to materials or manufacturing efficiencies (which we refer to collectively as operational performance), and employee termination benefits and other exit costs.

Net Sales

*Net Sales for the Three Months Ended June 30, 2008 versus June 30, 2007.*   Below is a summary of Delphi's sales for the three months ended June 30, 2008 versus June 30, 2007.

| | Three Months Ended June 30, | | | | | Variance Due To: | | | |
| | 2008 | | 2007 | | Favorable/ (Unfavorable) | Price Reductions and Volume | FX | Other | Total |
| | | | (dollars in millions) | | | | (dollars in millions) | | |
| Net sales: | | | | | | | | | |
| General Motors and affiliates .............. | $1,483 | 28% | $2,247 | 37% | $(764) | $  (844) | $ 63 | $17 | $(764) |
| Other customers .......... | 3,751 | 72% | 3,753 | 63% | (2) | (282) | 253 | 27 | (2) |
| Total net sales .......... | $5,234 | | $6,000 | | $(766) | $(1,126) | $316 | $44 | $(766) |

Total sales for the three months ended June 30, 2008 decreased $766 million. GM sales for the three months ended June 30, 2008 decreased $764 million to 28% of total sales, primarily due to decreases in GMNA volume of 28% and contractual price reductions. Approximately $428 million of the GMNA sales decrease is due to the work stoppages. Additionally, primarily as a result of portfolio transformation related to non-core businesses and recent consumer trends and market conditions, during the three months ended June 30, 2008, our GMNA content per vehicle was $1,184, 27% lower than the $1,620 content per vehicle for the three months ended June 30, 2007, and GM sales were also decreased by the impact of certain plant closures and divestitures in our AHG segment. The decrease to GM sales was offset slightly due to favorable fluctuations in foreign currency exchange rates, primarily driven by the Euro, Brazilian Real, Polish Zloty, Hungarian Forint and Chinese Renminbi as well as increases in volume of GM sales in international locations.

Other customer sales for the three months ended June 30, 2008 were flat compared to 2007 but increased to 72% of total sales, primarily due to the decrease in GM sales. Excluding the impact of foreign currency exchange, other customer sales decreased by $255 million, or 7%, due to decreased volume, of which $150 million was related to the migration of our converter business to a non-consolidated venture during 2007, $51 million was related to the sale of the Catalyst Business in the third quarter of 2007 and additional decreases were a result of certain plant closures and divestitures in our AHG segment, as well as contractual price reductions.

*Net Sales for the Six Months Ended June 30, 2008 versus June 30, 2007.*   Below is a summary of Delphi's sales for the six months ended June 30, 2008 versus June 30, 2007.

| | Six Months Ended June 30, | | | | | Variance Due To: | | | |
| | 2008 | | 2007 | | Favorable/ (Unfavorable) | Price Reductions and Volume | FX | Other | Total |
| | | | (dollars in millions) | | | | (dollars in millions) | | |
| Net sales: | | | | | | | | | |
| General Motors and affiliates ............ | $ 3,124 | 30% | $ 4,410 | 38% | $(1,286) | $(1,412) | $116 | $10 | $(1,286) |
| Other customers ....... | 7,362 | 70% | 7,272 | 62% | 90 | (439) | 501 | 28 | 90 |
| Total net sales ...... | $10,486 | | $11,682 | | $(1,196) | $(1,851) | $617 | $38 | $(1,196) |

Total sales for the six months ended June 30, 2008 decreased $1,196 million. GM sales for the six months ended June 30, 2008 decreased $1,286 million to 30% of total sales, primarily due to decreases in

GMNA volume of 23% and contractual price reductions. Approximately $636 million of the GMNA sales decrease is due to the work stoppages. Primarily as a result of portfolio transformation related to non-core businesses and recent consumer trends and market conditions, during the six months ended June 30, 2008, our GMNA content per vehicle was $1,259, 23% lower than the $1,637 content per vehicle for the six months ended June 30, 2007, and GMNA sales were decreased by the impact of certain plant closures and divestitures in our AHG segment. The decrease to GMNA sales was offset slightly due to favorable fluctuations in foreign currency exchange rates; primarily driven by the Euro, Brazilian Real, Polish Zloty, Hungarian Forint and Chinese Renminbi; as well as increases in volume of GM sales in international locations.

Other customer sales for the six months ended June 30, 2008 increased by $90 million to 70% of total sales, primarily due to favorable foreign currency exchange impacts. Excluding the impact of foreign currency exchange, other customer sales decreased by $411 million, or 6%, due to decreased volume, of which $258 million was related to the migration of our converter business to a non-consolidated venture during 2007, and $89 million was related to the sale of the Catalyst Business in the third quarter of 2007. Additional decreases were a result of certain plant closures and divestitures in our AHG segment, as well as contractual price reductions.

<u>Operating Results</u>
Below is a summary of the variances in Delphi's operating results for the three and six months ended June 30, 2008 versus June 30, 2007.

*Gross Margin for the Three Months Ended June 30, 2008 versus June 30, 2007.*   Gross margin increased $67 million to $413 million, or 7.9%, as a percentage of sales, for the three months ended June 30, 2008. Below is a summary of Delphi's gross margin for this period.

| | Three Months Ended June 30, | | | Variance Due To: | | | |
|---|---|---|---|---|---|---|---|
| | **2008** | **2007** | **Favorable/ (Unfavorable)** | **Price Reductions and Volume** | **Operational Performance** | **Other** | **Total** |
| | (dollars in millions) | | | (dollars in millions) | | | |
| Gross Margin . . . . . . . . . . . . . | $413 | $346 | $67 | $(445) | $226 | $286 | $67 |
| Percentage of Sales . . . . . . . | 7.9% | 5.8% | | | | | |

The gross margin increase was attributable to improvements in operational performance as noted in the table above, as well as the following items:

- $149 million decrease in costs in employee termination benefits and other exit costs, primarily due to costs recorded during 2007 related to the exit of a manufacturing facility in Cadiz, Spain;

- $101 million decrease in warranty costs, primarily due to a $91 million increase to warranty reserves recorded in the six months ended June 30, 2007 in the Powertrain Systems and Electronics and Safety segments related to the warranty settlement agreement with GM; and

- $25 million decrease in costs related to incentive compensation plans for executives and U.S. salaried employees.

Offsetting these increases was an approximate 28% reduction in GMNA vehicle production, as noted in the table above, including the negative impact of the work stoppages, the impact of certain plant closures and divestitures in our AHG segment and recent consumer trends and market conditions.

*Gross Margin the Six Months Ended June 30, 2008 versus June 30, 2007.*    Gross margin increased $46 million to $768 million, or 7.3%, as a percentage of sales, for the six months ended June 30, 2008. Below is a summary of Delphi's gross margin for this period.

| | Six Months Ended June 30, | | | Variance Due To: | | | |
| | 2008 | 2007 | Favorable/ (Unfavorable) | Price Reductions and Volume | Operational Performance | Other | Total |
| | (dollars in millions) | | | (dollars in millions) | | | |
|---|---|---|---|---|---|---|---|
| Gross Margin . . . . . . . . . . . . . . | $768 | $722 | $46 | $(761) | $474 | $333 | $46 |
| Percentage of Sales. . . . . . . . | 7.3% | 6.2% | | | | | |

The gross margin increase was due to improvements in operational performance as noted in the table above, as well as the following items:

- $129 million decrease in warranty costs, primarily due to a $91 million increase to warranty reserves recorded in the six months ended June 30, 2007 in the Powertrain Systems and Electronics and Safety segments related to the warranty settlement agreement with GM, and a $28 million recovery from an affiliated supplier related to previously established warranty reserves in the Thermal Systems segment during the six months ended June 30, 2008;

- $145 million decrease in costs in employee termination benefits and other exit costs, primarily due to costs recorded during 2007 related to the exit of a manufacturing facility in Cadiz, Spain;

- $46 million decrease in incentive compensation plans for executives and U.S. salaried employees;

- $32 million of employee benefit plan settlements in Mexico which occurred in the six months ended June 30, 2007 in the Electronics & Safety segment; and

- $30 million due to the impact of foreign currency exchange rate fluctuations.

Offsetting these decreases was an approximate 23% reduction in GMNA vehicle production, as noted in the table above, including the negative impact of the work stoppages and the impact of certain plant closures and divestitures in our AHG segment and the consumer trend toward more fuel-efficient vehicles which is anticipated to reduce customer production to levels preventing recovery of volumes lost as a result of the work stoppages. In addition to the decreased volume the following items negatively impacted gross margin in the six months ended June 30, 2008:

- $30 million charge related to the loss on sale of Delphi's global bearings business in the AHG segment recorded during the first quarter of 2008; and

- $24 million loss on foreign currency exchange contracts related to purchase transactions primarily within the Powertrain Systems segment.

*U.S. Employee Workforce Transition Program Charges (Credit) for the Three and Six Months Ended June 30, 2008 versus June 30, 2007.*    Delphi recorded workforce transition program charges of approximately $18 million and $54 million during the three and six months ended June 30, 2008, respectively, for UAW-, IUE-CWA-, and USW-represented employees. These charges included $18 million and $38 million, respectively, of amortization expense related to buy-down payments for eligible traditional employees who did not elect an attrition or flowback option and continue to work for Delphi and $16 million for the six months ended June 30, 2008 to reflect costs under the workforce transition programs in excess of amounts previously estimated. Refer to Note 16. U.S. Employee Workforce Transition Programs to the consolidated financial statements for more information.

*Depreciation and Amortization for the Three Months Ended June 30, 2008 versus June 30, 2007.* Depreciation and amortization was $210 million for the three months ended June 30, 2008 compared to $230 million for the three months ended June 30, 2007. The decrease of $20 million primarily reflects the impact of certain assets that were impaired in 2006 and 2007, resulting in reduced depreciation and amortization expense, lower capital spending at previously impaired sites and the effect of accelerated

depreciation on assets nearing the end of their program life. Partially offsetting these decreases is an increase in overall capital spending of $29 million or approximately 22% versus the three months ended June 30, 2007.

*Depreciation and Amortization for the Six Months Ended June 30, 2008 versus June 30, 2007.*
Depreciation and amortization was $429 million for the six months ended June 30, 2008 compared to $457 million for the six months ended June 30, 2007. The decrease of $28 million primarily reflects the impact of certain assets that were impaired in 2006 and 2007, resulting in reduced depreciation and amortization expense, lower capital spending at previously impaired sites and the effect of accelerated depreciation on assets nearing the end of their program life. Partially offsetting these decreases is an increase in overall capital spending of $106 million or approximately 34% versus the six months ended June 30, 2007.

*Long-Lived Asset Impairment Charges for the Three Months Ended June 30, 2008 versus June 30, 2007.*
Long-lived asset impairment charges related to the valuation of long-lived assets held for use were recorded in the amount of $5 million during the three months ended June 30, 2008 compared to $34 million during the three months ended June 30, 2007. Pursuant to Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ("SFAS 144"), Delphi evaluates the recoverability of certain long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. The charges for the three months ended June 30, 2008 primarily related to our Electronics and Safety segment and the charges for the three months ended June 30, 2007 primarily related to our Automotive Holdings Group segment. Refer to Note 7. Long-Lived Asset Impairment to the consolidated financial statements.

*Long-Lived Asset Impairment Charges for the Six Months Ended June 30, 2008 versus June 30, 2007.*
Long-lived asset impairment charges related to the valuation of long-lived assets held for use were recorded in the amount of $8 million during the six months ended June 30, 2008 compared to $40 million during the six months ended June 30, 2007. Delphi evaluates the recoverability of certain long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. The charges for the six months ended June 30, 2008 primarily related to our Electronics and Safety and Automotive Holdings Group segment and the charges for the six months ended June 30, 2007 primarily related to our Automotive Holdings Group segment. Refer to Note 7. Long-Lived Asset Impairment to the consolidated financial statements.

*Goodwill Impairment Charges for the Three and Six Months Ended June 30, 2008 versus June 30, 2007.*
Goodwill impairment charges of approximately $168 million were recorded in the three and six months ended June 30, 2008 related to our Electrical/Electronic Architecture segment. Delphi evaluates the recoverability of goodwill at least annually and any time business conditions indicate a potential change in recoverability. There were no goodwill charges for the three and six months ended June 30, 2007.

The Electronics & Safety segment and Corporate and Other segment goodwill was not impaired. The excess of fair value over the carrying value of these segments was approximately $175 million and $489 million, respectively. In order to evaluate the sensitivity of the fair value calculations on the goodwill impairment test, we applied a hypothetical 10 percent decrease to the fair values of the Electronics & Safety and Corporate and Other segments, resulting in excess fair value over carrying value of approximately $2 million and $420 million, respectively. Refer to Note 8. Goodwill Impairment to the consolidated financial statements.

*Selling, General and Administrative Expenses for the Three Months Ended June 30, 2008 versus June 30, 2007.*   Selling general and administrative ("SG&A") expenses were $377 million for the three months ended June 30, 2008, or 7.2% of total net sales, compared to $394 million for the three months ended June 30, 2007, or 6.6% of total net sales. SG&A expenses in the three months ended June 30, 2008 were unfavorably impacted by foreign currency exchange impacts of $18 million, offset by increased performance, primarily related to information technology systems.

*Selling, General and Administrative Expenses for the Six Months Ended June 30, 2008 versus June 30, 2007.*   SG&A expenses were $741 million for the six months ended June 30, 2008, or 7.1% of total net sales, compared to $758 million for the six months ended June 30, 2007, or 6.5% of total net sales. SG&A

66

expenses in the six months ended June 30, 2008 were unfavorably impacted by foreign currency exchange impacts of $34 million, offset by increased performance, primarily related to information technology systems.

*Securities & ERISA Litigation Charge for the Three and Six Months Ended June 30, 2008 versus June 30, 2007.*   As previously disclosed, Delphi, along with certain of its subsidiaries and certain current and former officers and employees of the Company or its subsidiaries, and others were named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements. Delphi's estimate of liability for these matters as of June 30, 2007 was $340 million. Delphi had an $8 million liability recorded as of March 31, 2007; therefore a net charge of $332 million was recorded in the second quarter of 2007. Refer to Note 22. Commitments and Contingencies, Shareholder Lawsuits to the consolidated financial statements.

*Interest Expense for the Three Months Ended June 30, 2008 versus June 30, 2007.*   Interest expense for the three months ended June 30, 2008 was $109 million compared to $84 million for the three months ended June 30, 2007. This increase primarily resulted from higher overall debt outstanding for the three months ended June 30, 2008 as compared to the three months ended June 30, 2007 partially offset by a reversal of $7 million of interest expense related to prepetition debt and allowed unsecured claims during the three months ended June 30, 2008 due to changes in estimates of prepetition claim amounts. Approximately $33 million of contractual interest expense related to outstanding debt, including debt subject to compromise, was not recognized in accordance with the provisions of American Institute of Certified Public Accountants Statement of Position 90-7 ("SOP 90-7"), *Financial Reporting by Entities in Reorganization under the Bankruptcy Code*, for both the three months ended June 30, 2008 and 2007.

*Interest Expense for the Six Months Ended June 30, 2008 versus June 30, 2007.*   Interest expense for the six months ended June 30, 2008 was $219 million compared to $174 million for the six months ended June 30, 2007. This increase primarily resulted from higher overall debt outstanding for the six months ended June 30, 2008 as compared to the six months ended June 30, 2007. Additionally, Delphi recorded interest related to prepetition expense during the first quarter of 2008 related to prepetition debt and allowed unsecured claims of $14 million through January 25, 2008, the confirmation date of the plan of reorganization, and reversed $7 million of interest expense during the second quarter of 2008 due to changes in estimates of prepetition claim amounts. Approximately $57 million and $66 million, of contractual interest expense related to outstanding debt, including debt subject to compromise, was not recognized in accordance with the provisions of SOP 90-7 in the six months ended June 30, 2008 and 2007, respectively.

*Loss on Extinguishment of Debt for the Three and Six Months Ended June 30, 2008 versus June 30, 2007.*   Loss on extinguishment of debt for the three and six months ended June 30, 2008 was $49 million. Concurrent with the execution of the Amended and Restated DIP Credit Facility, the Refinanced DIP Credit Facility was terminated. As a result of the changes in the debt structure and corresponding cash flows related to the refinancing, Delphi recognized $49 million of loss on extinguishments of debt related to unamortized debt issuance costs related to the Amended and Restated DIP Credit Facility and the Refinanced DIP Credit Facility in the three and six months ended June 30, 2008. Loss on extinguishment of debt for the six months ended June 30, 2007 was $23 million. Concurrent with the execution of the Refinanced DIP Credit Facility in January 2007, the Amended DIP Credit Facility and the Prepetition Facility were terminated. As a result of the changes in the debt structure and corresponding cash flows related to the refinancing, Delphi recognized $23 million of loss on extinguishments of debt related to unamortized debt issuance costs related to the Amended DIP Credit Facility and Prepetition Facility in the six months ended June 30, 2007.

*Other Income and Expense for the Three Months Ended June 30, 2008 versus June 30, 2007.*   Other income for the three months ended June 30, 2008 was $4 million as compared to other income of $19 million for the three months ended June 30, 2007. The decrease was due to decreased non-Debtor interest income associated with cash and cash equivalents on hand.

*Other Income and Expense for the Six and Months Ended June 30, 2008 versus June 30, 2007.*   Other income for the six months ended June 30, 2008 was $23 million as compared to other income of $39 million for the six months ended June 30, 2007. The decrease was due to decreased non-Debtor interest income associated with cash and cash equivalents on hand.

*Reorganization Items for the Three Months Ended June 30, 2008 versus June 30, 2007.* Bankruptcy-related reorganization expenses were $29 million and $42 million for the three months ended June 30, 2008 and 2007, respectively. Delphi incurred professional fees, primarily legal, directly related to the reorganization of $30 million and $44 million during the three months ended June 30, 2008 and 2007, respectively. Professional fees in the three months ended June 30, 2008 and 2007 also includes arrangement and other fees paid to various lenders in connection with the bankruptcy exit financing that was commenced but not completed in April 2008. These costs were partially offset by interest income of $2 million and $2 million from accumulated cash from the reorganization during the three months ended June 30, 2008 and 2007, respectively.

*Reorganization Items for the Six Months Ended June 30, 2008 versus June 30, 2007.* Bankruptcy-related reorganization expenses were $138 million and $81 million for the six months ended June 30, 2008 and 2007, respectively. Delphi incurred professional fees, primarily legal, directly related to the reorganization of $59 million and $87 million during the six months ended June 30, 2008 and 2007, respectively. Additionally, as a result of the events surrounding the termination of the EPCA, Delphi recorded expense of $79 million related to previously capitalized fees paid to the Investors and their affiliates during the six months ended June 30, 2008. Professional fees in the six months ended June 30, 2008 and 2007 also includes arrangement and other fees paid to various lenders in connection with the bankruptcy exit financing that was commenced but not completed in April of 2008. These costs were partially offset by interest income of $4 million and $6 million from accumulated cash from the reorganization during the six months ended June 30, 2008 and 2007, respectively.

*Income Taxes for the Three and Six Months Ended June 30, 2008 versus June 30, 2007.* Income tax expense was $10 million and $55 million for the three months ended June 30, 2008 and 2007, respectively, and $73 million and $101 million for the six months ended June 30, 2008 and 2007, respectively. During the second quarter of 2008 and 2007, taxes were recorded at amounts approximating the projected annual effective tax rate applied to earnings of certain non-U.S. operations. The change in annual effective rate in the three and six months ended June 30, 2008 was related to the $117 million in U.S. pre-tax other comprehensive income related to derivative contracts on copper and the Mexican Peso, reducing the Company's current year valuation allowance and resulting in a benefit of $21 million. During the second quarter of 2007, Delphi determined that certain unremitted foreign earnings, for which taxes had not been previously provided, would be repatriated to the U.S. and Delphi recorded $12 million of withholding tax. Income tax benefits are not recognized on losses in U.S. and certain non-U.S. operations because, due to a history of operating losses, it is more likely than not that these tax benefits will not be realized.

*Minority Interest, net of tax, for the Three and Six Months Ended June 30, 2008 versus June 30, 2007.* Minority interest was $12 million for both the three months ended June 30, 2008 and 2007, and was $23 million and $24 million for the six months ended June 30, 2008 and 2007, respectively. Minority interest reflects the results of ongoing operations within Delphi's consolidated investments.

*Equity Income, net of tax, for the Three and Six Months Ended June 30, 2008 versus June 30, 2007.* Equity income was $11 million and $10 million for the three months ended June 30, 2008 and 2007, respectively, and was $22 million and $24 million for the six months ended June 30, 2008 and 2007, respectively. Equity income reflects the results of ongoing operations within Delphi's equity-method investments.

*Income (loss) from Discontinued Operations for the Three Months Ended June 30, 2008 versus June 30, 2007.* Income from discontinued operations was $8 million for the three months ended June 30, 2008 and the loss from discontinued operations was $13 million for the three months ended June 30, 2007. The income from discontinued operations for the three months ended June 30, 2008 was the result of operations and assets held for sale of the Steering Business, including $9 million of employee termination benefits and other exit costs. Included in the results of operations and assets held for sale of the Steering Business and Interiors and Closures Business were long-lived asset impairment charges of $5 million and employee termination benefits and other exit costs of $78 million, primarily due to the exit of the Puerto

Real site in Cadiz, Spain. Refer to Note 4. Discontinued Operations, and Note 9. Employee Termination Benefits and Other Exit Costs to the consolidated financial statements.

*Loss from Discontinued Operations for the Six Months Ended June 30, 2008 versus June 30, 2007.*   Loss from discontinued operations was $51 million and $155 million for the six months ended June 30, 2008 and 2007, respectively. Included in loss from discontinued operations for the six months ended June 30, 2008 were additional losses of $69 million related to the operations and assets held for sale of the Steering Business. Additionally, during six months ended June 30, 2008, Delphi recorded a favorable adjustment of $18 million to the overall loss on the sale of the Interiors and Closures Business due to the results of operations and changes in working capital through the sale closing date of February 29, 2008. Included in the results of operations for the Steering Business and Interiors and Closures Business for the six months ended June 30, 2008 were $44 million of employee termination benefits and other exit costs. Included in the results of operations for the Steering Business and Interiors and Closures Business for the six months ended June 30, 2007 were long-lived asset impairment charges of $159 million and employee termination benefits and other exit costs of $112 million, primarily due to the exit of the Puerto Real site in Cadiz, Spain. Refer to Note 4. Discontinued Operations, and Note 9. Employee Termination Benefits and Other Exit Costs to the consolidated financial statements.

## Results of Operations by Segment

### Three and Six Months Ended June 30, 2008 versus Three and Six Months Ended June 30, 2007

<u>Electronics and Safety</u>
The Electronics and Safety segment, which includes audio, entertainment and communications, safety systems, body controls and security systems, displays, mechatronics and power electronics, as well as advanced development of software and silicon, had sales and operating results for the three and six months ended June 30, 2008 and 2007 as follows:

| | Three Months Ended June 30, | | | | | Six Months Ended June 30, | | | | |
| | 2008 | | 2007 | | Favorable/ (Unfavorable) | 2008 | | 2007 | | Favorable/ (Unfavorable) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | (dollars in millions) | | | | | |
| Net sales: | | | | | | | | | | |
| General Motors and affiliates . . . . . . . | $ 296 | 26% | $ 435 | 32% | $(139) | $ 645 | 27% | $ 842 | 32% | $(197) |
| Other customers. . . . | 812 | 71% | 857 | 64% | (45) | 1,630 | 69% | 1,682 | 63% | (52) |
| Inter-segment. . . . . . | 37 | 3% | 60 | 4% | (23) | 85 | 4% | 127 | 5% | (42) |
| Total other and inter-segment . . . . | 849 | 74% | 917 | 68% | (68) | 1,715 | 73% | 1,809 | 68% | (94) |
| Total net sales . . . | $1,145 | | $1,352 | | $(207) | $2,360 | | $2,651 | | $(291) |
| Operating (loss) income . . . . . . . . . . | $ (75) | | $ 9 | | $ (84) | $ (155) | | $ 56 | | $(211) |
| Gross margin . . . . . . . | $ 75 | | $ 152 | | $ (77) | $ 142 | | $ 340 | | $(198) |
| Gross margin % . . . . . | 6.6% | | 11.2% | | | 6.0% | | 12.8% | | |

*Net Sales*   Total sales for the three and six months ended June 30, 2008 decreased $207 million and $291 million, respectively. The GM sales decrease for the three and six months ended June 30, 2008 was due primarily to a decline in volume of $141 million and $200 million, respectively, of which $108 million and $162 million, respectively, was due to the work stoppages. Additionally, the volume was impacted by recent consumer trends and market conditions. GM sales were also negatively impacted by contractual price reductions. These decreases were slightly offset by favorable fluctuations in foreign currency exchange rates of $12 million and $24 million, respectively, primarily related to the Euro.

The other customers and inter-segment sales decreased for the three and six months ended June 30, 2008 primarily due to decreased volume of $93 million and $150 million, respectively, as well as contractual price

reductions. Other customer and inter-segment sales were favorably impacted by foreign currency exchange rates of $49 million and $98 million, respectively, primarily related to the Euro.

*Operating Income/Loss*   Operating income for the three and six months ended June 30, 2008 decreased due to a reduction in volume of $131 million and $205 million, respectively, including the negative impact of the work stoppages. Additionally, operating income was unfavorably impacted by contractual price reductions of $35 million and $64 million, respectively, increased expense for employee termination benefits and other exit costs of $10 million and $36 million, respectively, primarily related to operations in Portugal and as a result of initiatives to realign manufacturing operations within North America to lower cost markets, and increased SG&A expenses of $7 million and $19 million. Offsetting these decreases for the three and six months ended June 30, 2008 was $40 million and $16 million, respectively, of operational performance improvements, primarily related to material, manufacturing and engineering, and $81 million and $77 million, respectively, primarily due to increased warranty reserves for the instrument cluster product line recorded in the three months ended June 30, 2007. (The instrument cluster product line was transferred to the Electronics and Safety segment effective December 2007.) Additionally, operating income in the six months ended June 30, 2007 was negatively impacted by employee benefit plan settlements in Mexico of $32 million, which did not occur in the six months ended June 30, 2008.

Powertrain Systems

The Powertrain Systems segment, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronics controls, exhaust handling, and test and validation capabilities, had sales and operating results for the three and six months ended June 30, 2008 and 2007 as follows:

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2008 | 2007 | Favorable/ (Unfavorable) | 2008 | 2007 | Favorable/ (Unfavorable) |
| | | | (dollars in millions) | | | |
| Net sales: | | | | | | |
| General Motors and affiliates . . . . . . . . . | $  298   22% | $ 441   28% | $(143) | $  606   23% | $ 855   28% | $(249) |
| Other customers . . . . . . | 923   69% | 1,021   64% | (98) | 1,789   68% | 1,926   63% | (137) |
| Inter-segment . . . . . . . . | 117   9% | 132   8% | (15) | 226   9% | 259   9% | (33) |
| Total other and inter-segment . . . . . . . . . . | 1,040   78% | 1,153   72% | (113) | 2,015   77% | 2,185   72% | (170) |
| Total net sales . . . . . | $1,338 | $1,594 | $(256) | $2,621 | $3,040 | $(419) |
| Operating income (loss) . . | $    7 | $   (16) | $   23 | $   (6) | $  (50) | $   44 |
| Gross margin . . . . . . . . . | $  144 | $  142 | $    2 | $  273 | $  262 | $   11 |
| Gross margin % . . . . . . . | 10.8% | 8.9% | | 10.4% | 8.6% | |

*Net Sales*   Total sales for the three and six months ended June 30, 2008 decreased by $256 million and $419 million, respectively. The GM sales decrease for the three and six months ended June 30, 2008 was primarily due to a decline in GM volume of $155 million and $265 million, respectively, of which $61 million and $95 million, respectively, was due to the work stoppages. The volume declines were also impacted by recent consumer trends and market conditions. GM sales were also negatively impacted by contractual price reductions. Offsetting these sales decreases was the favorable impact from currency exchange rates of $12 million and $19 million, respectively, related to the Euro, Brazilian Real, and Chinese Renminbi, as well as commodity pass-through.

Excluding the effects of portfolio divestitures and transformations, the other customers and inter-segment sales for the three and six months ended June 30, 2008 increased due to volume, primarily in Europe related to diesel products, and favorable impacts of $59 million and $117 million, respectively, from foreign currency exchange rates related to the Euro, Brazilian Real, and Chinese Renminbi. However, these increases were more than offset by decreased volumes of $167 million and $287 million, respectively, due to the migration of

our converter business to a non-consolidated venture during 2007 and $54 million and $95 million, respectively, due to the sale of the Catalyst Business in the third quarter of 2007. Other customer and inter-segment sales were also negatively impacted by contractual price reductions.

*Operating Income/Loss*    The improved operating income for the three and six months ended June 30, 2008 was attributable to improvements related to operating performance of $73 million and $157 million, respectively, reductions in SG&A costs of $10 million and $19 million, respectively, and reductions in employee termination benefits and other exit costs of $12 million and $9 million. Additionally, reductions in warranty expense had a favorable impact of $12 million and $7 million during the three and six months ended June 30, 2008, including the impact of an increase to warranty reserves related to the estimate of the GM settlement as of June 30, 2007. Long-lived asset impairment charges were favorable by $8 million and $9 million due to charges recorded during the three months ended June 30, 2007 primarily related to the catalyst product line. Offsetting these improvements were reductions in volume of $66 million and $98 million, respectively, including the negative impact of the work stoppages, contractual price reductions of $32 million and $56 million, respectively, and $21 million due to the loss on foreign currency exchange contracts related to purchase transactions during the six months ended June 30, 2008.

Electrical/Electronic Architecture

The Electrical/Electronic Architecture segment, which includes complete electrical architecture and component products, had sales and operating results for the three and six months ended June 30, 2008 and 2007 as follows:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008 | | 2007 | | Favorable/ (Unfavorable) | 2008 | | 2007 | | Favorable/ (Unfavorable) |
| | | | | | (dollars in millions) | | | | |
| Net sales: | | | | | | | | | |
| General Motors and affiliates . . . . . . . . . . | $ 365 | 23% | $ 461 | 30% | $ (96) | $ 768 | 24% | $ 903 | 30% | $(135) |
| Other customers . . . . . . | 1,216 | 75% | 1,032 | 67% | 184 | 2,353 | 73% | 2,001 | 67% | 352 |
| Inter-segment . . . . . . . . | 38 | 2% | 53 | 3% | (15) | 82 | 3% | 98 | 3% | (16) |
| Total other and inter-segment. . . . . . . . . . . | 1,254 | 77% | 1,085 | 70% | 169 | 2,435 | 76% | 2,099 | 70% | 336 |
| Total net sales. . . . . . . . | $1,619 | | $1,546 | | $ 73 | $3,203 | | $3,002 | | $ 201 |
| Operating (loss) income. . . | $ (183) | | $ 44 | | $(227) | $ (189) | | $ 39 | | $(228) |
| Gross margin . . . . . . . . . | $ 142 | | $ 193 | | $ (51) | $ 283 | | $ 336 | | $ (53) |
| Gross margin % . . . . . . . . | 8.8% | | 12.5% | | | 8.8% | | 11.2% | | |

*Net Sales*    Total sales increased $73 million and $201 million for the three and six months ended June 30, 2008. GM sales decreased for three and six months ended June 30, 2008 due to a decline in volume in North America of $132 million and $178 million, respectively, of which $87 million and $133 million, respectively, was related to the work stoppages. The volume declines were also impacted by recent consumer trends and market conditions. GM sales were also negatively impacted by contractual price reductions. Offsetting the decreased North America volume was increased GM volume in Europe, Asia Pacific and South America of $21 million and $35 million, respectively, and $19 million and $35 million, respectively, due to favorable foreign currency exchange rate fluctuations, primarily related to the Euro and Brazilian Real. Sales for three and six months ended June 30, 2008 and 2007 have also been favorably impacted by contract escalation clauses which have enabled some of the commodity price increases to be passed on to our customers.

The other customers and inter-segment sales increased for the three and six months ended June 30, 2008 due to volume increases outside of North America of $88 million and $187 million, respectively, the impact of

favorable foreign currency exchange rates of $96 million and $196 million, respectively, primarily related to the Euro and Brazilian Real and commodity cost pass-through of $24 million and $26 million, respectively. Offsetting these increases was a reduction in North America volume of $35 million and $67 million, respectively, and contractual price reductions.

*Operating Income/Loss*   Operating loss for the three and six months ended June 30, 2008 increased due to $168 million of goodwill impairment charges recorded during the three months ended June 30, 2008. More specifically, during the second quarter of 2008, Delphi has experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, continuing unfavorable pricing pressures, increasing commodity prices, along with a decline in market valuation metrics which resulted in the goodwill impairment charge. Additionally, operating loss was unfavorably impacted by $37 million and $53 million, respectively, due to a decrease in volume, primarily GMNA, including the negative impact of the work stoppages, and contractual price reductions of $23 million and $59 million, respectively, and the negative impact of foreign currency exchange of $5 million and $6 million, respectively. Operating loss was positively impacted by operational performance improvements, partially offset by negative material economics related to copper and oil-based resins, of $7 million and $55 million, respectively, and decreased expenses related to employee termination benefits and other exit costs of $15 million and $33 million, respectively.

Thermal Systems
The Thermal Systems segment, which includes heating, ventilating and air conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, commercial/industry applications, and powertrain cooling and related technologies, had sales and operating results for the three and six months ended June 30, 2008 and 2007 as follows:

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2008 | | 2007 | | Favorable/ (Unfavorable) | 2008 | | 2007 | | Favorable/ (Unfavorable) |
| | | | | | (dollars in millions) | | | | |
| Net sales: | | | | | | | | | |
| General Motors and affiliates . . . . . . . . . . . . . | $287 | 48% | $ 362 | 57% | $(75) | $ 583 | 50% | $ 731 | 58% | $(148) |
| Other customers . . . . . . . . . | 291 | 49% | 245 | 38% | 46 | 542 | 46% | 472 | 37% | 70 |
| Inter-segment . . . . . . . . . . . . | 20 | 3% | 30 | 5% | (10) | 47 | 4% | 66 | 5% | (19) |
| Total other and inter-segment . . . . . . . . . . . . | 311 | 52% | 275 | 43% | 36 | 589 | 50% | 538 | 42% | 51 |
| Total net sales . . . . . . . . . | $598 | | $ 637 | | $(39) | $1,172 | | $1,269 | | $ (97) |
| Operating (loss) income . . . . . . | $(11) | | $ 16 | | $(27) | $ 15 | | $ 17 | | $ (2) |
| Gross margin . . . . . . . . . . . . . . | $ 41 | | $ 66 | | $(25) | $ 118 | | $ 116 | | $ 2 |
| Gross margin % . . . . . . . . . . . | 6.9% | | 10.4% | | | 10.1% | | 9.1% | | |

*Net Sales*   Total sales for the three and six months ended June 30, 2008 decreased by $39 million and $97 million, respectively. The GM sales decrease for the three and six months ended June 30, 2008 was driven by a decline in volume of $88 million and $159 million, respectively, of which $60 million and $82 million, respectively, was due to the work stoppages. The volume declines were also impacted by recent consumer trends and market conditions. Additionally, GM sales were unfavorably impacted by contractual price reductions. Offsetting these decreases was the favorable impact of foreign currency exchange rates of $14 million and $27 million, respectively, related to the Euro, Polish Zloty, Hungarian Forint, and Brazilian Real.

The other customer and inter-segment sales increase for the three and six months ended June 30, 2008 was favorably impacted by foreign currency exchange rates of $28 million and $50 million, respectively, related to the Euro, Polish Zloty, Hungarian Forint and Brazilian Real as well as increases in volume of $11 million and $10 million, respectively. Offsetting these increases were contractual price reductions.

*Operating Income/Loss*   The decrease in operating income for the three and six months ended June 30, 2008 was primarily due to a reduction in volume of $28 million and $57 million, respectively, including the negative impact of the work stoppages. Additionally, operating income decreased due to contractual price reductions. Offsetting these decreases was favorable operational performance of $28 million and $56 million in the three and six months ended June 30, 2008, respectively, and the recovery of $28 million from an affiliated supplier during the six months ended June 30, 2008 related to previously incurred warranty costs.

Automotive Holdings Group

The Automotive Holdings Group segment, which includes non-core product lines and plant sites that do not fit Delphi's future strategic framework, had sales and operating results for the three and six months ended June 30, 2008 and 2007 as follows:

| | Three Months Ended June 30, | | | | | Six Months Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | | 2007 | | Favorable/ (Unfavorable) | 2008 | | 2007 | | Favorable/ (Unfavorable) |
| | | | | | (dollars in millions) | | | | | |
| Net sales: | | | | | | | | | | |
| General Motors and affiliates . . . . . . . . . . . | $156 | 37% | $ 434 | 53% | $(278) | $351 | 37% | $ 857 | 52% | $(506) |
| Other customers. . . . . . . . | 232 | 55% | 325 | 40% | (93) | 512 | 55% | 670 | 41% | (158) |
| Inter-segment. . . . . . . . . . | 34 | 8% | 58 | 7% | (24) | 76 | 8% | 109 | 7% | (33) |
| Total other and inter-segment. . . . . . . . . . . . . | 266 | 63% | 383 | 47% | (117) | 588 | 63% | 779 | 48% | (191) |
| Total net sales . . . . . . . . | $422 | | $ 817 | | $(395) | $939 | | $1,636 | | $(697) |
| Operating (loss). . . . . . . . . . | $(27) | | $ (177) | | $ 150 | $ (97) | | $ (240) | | $ 143 |
| Gross margin . . . . . . . . . . . | $  3 | | $  (87) | | $  90 | $ (28) | | $  (89) | | $  61 |
| Gross margin % . . . . . . . . . | 0.7% | | (10.6)% | | | (3.0)% | | (5.4)% | | |

*Net Sales*   Total sales for the three and six months ended June 30, 2008 decreased $395 million and $697 million, respectively. GM sales decreased for the three and six months ended June 30, 2008 primarily due to the impact of certain plant closures and divestitures and lower volumes of $283 million and $515 million, respectively, including a slight impact of the work stoppages and the impact of recent consumer trends and market conditions. The sales decrease was partially offset by favorable foreign currency exchange rates, primarily due to the Brazilian Real.

The other customer and inter-segment sales decrease for the three and six months ended June 30, 2008 was primarily due to decreases in volume of $126 million and $210 million, respectively, and contractual price reductions. The sales decrease was slightly offset by the impact of favorable foreign currency exchange rates of $17 million and $32 million, respectively, primarily due to the Polish Zloty, Chinese Renminbi, and the Euro.

*Operating Income/Loss*   The decreased operating loss for the three and six months ended June 30, 2008 was primarily due to favorable operational performance improvements of $39 million and $104 million, respectively, and reduced long-lived asset impairment charges and lower depreciation and amortization expenses of $34 million and $32 million, respectively. Additionally, operating loss decreased due to employee termination benefits and other exit costs of $130 million and $161 million, respectively, related to the closure of the Puerto Real site in Cadiz, Spain during the three and six months ended June 30, 2007 and $35 million and $69 million due to decreased corporate expenses allocated to AHG due to the impact of divestitures and plant closures. Offsetting these improvements, were reductions in volume of $79 million and $146 million for the three and six months ended June 30, 2008. Operating income for the six months ended June 30, 2008 was unfavorably impacted by increased employee termination benefits and other exit costs of $30 million, additional costs related to certain plant closures and divestitures of $20 million, and a $30 million charge related to the sale of Delphi's global bearings business recorded during the six months ended June 30, 2008.

Corporate and Other

The Corporate and Other segment includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to U.S. workforce transition programs (Refer to Note 16. U.S. Employee Workforce Transition Programs to the consolidated financial statements). Additionally, the Corporate and Other segment includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems. The Corporate and Other segment had sales and operating results for the three and six months ended June 30, 2008 and 2007 as follows:

| | Three Months Ended June 30, | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2008** | **2007** | **Favorable/ (Unfavorable)** | **2008** | **2007** | **Favorable/ (Unfavorable)** |
| | | | (dollars in millions) | | | |
| Net sales | $112 | $ 54 | $ 58 | $ 191 | $ 84 | $107 |
| Operating (loss) | $ (76) | $(520) | $444 | $(200) | $(681) | $481 |

*Net Sales*   Corporate and Other sales for the three and six months ended June 30, 2008 increased $58 million and $107 million, respectively, compared to the three and six months ended June 30, 2007, primarily as a result of decreased eliminations of inter-segment transactions resulting from decreased volume and lower inter-segment sales at Delphi's other reporting segments. Offsetting the increases were lower sales in our GM service parts organization.

*Operating Income/Loss*   Operating loss for the three and six months ended June 30, 2008 was favorably impacted by $332 million of securities and ERISA litigation charges recorded during the three months ended June 30, 2007 as well as decreased expenses related to incentive compensation plans for executives and U.S. salaried employees of $56 million and $98 million, respectively, decreases in pension and other postretirement and postemployment benefit and workers' compensation costs of $22 million and $54 million, respectively, and lower costs necessary to sustain information technology systems which support finance, manufacturing and product development of $15 million and $27 million, respectively. Offsetting these favorable variances were increased workforce transition charges of $18 million and $60 million, respectively, and increased corporate expenses retained at Corporate and Other due to the impact of divestitures and plant closures. Additionally, $19 million of pension excise taxes were reversed during the three months ended June 30, 2007.

## Liquidity and Capital Resources

### Overview of Capital Structure

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consisted of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan (the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan (the "Tranche C Term Loan").

The Refinanced DIP Credit Facility had a maturity date of July 1, 2008. Delphi received Court approval to amend and extend its Refinanced DIP Credit Facility on April 30, 2008. Delphi received the required commitments from its lenders and the amended and restated DIP credit facility (the "Amended and Restated DIP Credit Facility") became effective on May 9, 2008. The Amended and Restated DIP Credit Facility extends the term until December 31, 2008 and modifies the size of the facility by reducing the Revolving Facility to $1.1 billion from $1.75 billion and increasing the size of the Tranche B Term Loan to $500 million from $250 million and leaving the Tranche C Term Loan unchanged at approximately $2.5 billion. On May 30, 2008, the Court entered an order authorizing Delphi to increase the Tranche C Term Loan to $2.75 billion from approximately $2.5 billion with funding in June 2008. The Amended and Restated DIP Credit Facility includes certain covenants and restrictions on Delphi's financial and business operations that

mirror those imposed by the Refinanced DIP Credit Facility with the exception of the modifications listed below. The Amended and Restated DIP Credit Facility:

• Increases the interest rate on the facilities at the option of Delphi of either the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent or LIBOR plus a specified percent as follows:

|  | ABR plus | | LIBOR plus | |
| --- | --- | --- | --- | --- |
|  | Amended and Restated DIP Credit Facility | Refinanced DIP Credit Facility | Amended and Restated DIP Credit Facility | Refinanced DIP Credit Facility |
| Tranche A . . . . . . . . . . . . . . . . . . . . . | 3.00% | 2.50% | 4.00% | 3.50% |
| Tranche B . . . . . . . . . . . . . . . . . . . . . | 3.00% | 2.50% | 4.00% | 3.50% |
| Tranche C . . . . . . . . . . . . . . . . . . . . . | 4.25% | 3.00% | 5.25% | 4.00% |

As LIBOR borrowings are less costly than ABR borrowings, Delphi seeks to maximize the amount of loans outstanding on a LIBOR basis.

• Increases the undrawn revolver fees from 50 basis points to 100 basis points,

• Adds a LIBOR and ABR floor to the Tranche B and Tranche C Term Loans of 3.25% and 4.25%, respectively,

• Sets rolling 12-month cumulative Global EBITDAR covenant levels for the extension period as follows:

| Period Ending | Global EBITDAR |
| --- | --- |
|  | (in millions) |
| June 30, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $600 |
| July 31, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $575 |
| August 31, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $550 |
| September 30, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $625 |
| October 31, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $600 |
| November 30, 2008. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $675 |

• Modifies the borrowing base definition and limits availability to draw additional amounts under the Revolving Facility, under certain conditions as defined, and modifies the allowable junior liens, and

• Allows Delphi to enter into an agreement with GM as described below.

In connection with the Amended and Restated DIP Credit Facility, Delphi paid a total of approximately $75 million to consenting lenders on the Revolving Facility, the Tranche B facility and the Tranche C facility. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Amended and Restated DIP Credit Facility and the bankruptcy exit financing that was commenced but not completed.

In conjunction with the entry into the Amended and Restated DIP Credit Facility, the Refinanced DIP Credit Facility was terminated. Delphi incurred no early termination penalties in connection with the termination of this agreement. However, as a result of significant changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $49 million of unamortized debt issuance costs related to the Amended and Restated DIP Credit Facility and the Refinanced DIP Credit Facility in the second quarter of 2008, which was recognized as loss on extinguishment of debt. As of June 30, 2008, $40 million of debt issuance costs remains deferred in other current assets and is being amortized over the term of the Amended and Restated DIP Credit Facility.

In 2007, concurrently with the entry into the Refinanced DIP Credit Facility, Delphi expensed $25 million of unamortized debt issuance costs related to the Revolving Credit, Term Loan and Guaranty Agreement Delphi entered into on October 14, 2005, as amended through November 13, 2006, and the Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt, as these fees relate to the refinancing of

the term loans, and $2 million was recognized as interest expense, as these fees relate to the refinancing of the revolving credit facility.

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into the GM Advance Agreement whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA. The original GM Advance Agreement has a maturity date of the earlier of December 31, 2008, when $650 million has been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. GM will receive an administrative claim for its advances. The original GM Advance Agreement provides for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement. The amounts advanced will accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The interest on the advances will be cancelled if the GSA and MRA become effective on or prior to the expiration date of the agreement. Advances will be set off against the GSA and MRA upon effectiveness of those agreements or any remaining administrative claims in Delphi's chapter 11 cases. As of June 30, 2008, no amounts were outstanding pursuant to the GM Advance Agreement. However, during the second quarter of 2008 Delphi received and subsequently repaid amounts up to approximately $190 million under the GM Advance Agreement.

In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding short-term liquidity support until confirmation of the Plan or an alternative plan of reorganization, on August 7, 2008 GM agreed to amend the GM Advance Agreement to provide for an additional $300 million availability above the existing $650 million, as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement. The amendment provides that the outside maturity date with respect to the original $650 million may be extended in connection with an extension of Delphi's existing Amended and Restated DIP Credit Facility, if GM and Delphi agree, to the earlier of June 30, 2009, and the termination of Delphi's Amended and Restated DIP Credit Facility, and that the maturity date with respect to the additional $300 million is the earlier of December 31, 2008 (subject to potential extension through June 30, 2009, on the same terms as apply to the original $650 million), such date as Delphi files any motion seeking to amend the Plan in a manner that is not reasonably acceptable to GM, the termination of Delphi's Amended and Restated DIP Credit Facility and such date as a plan of reorganization becomes effective. The additional $300 million of advances is also conditioned upon Delphi filing modifications to its Plan which are reasonably acceptable to GM by October 31, 2008 (or such later date as GM may agree in its sole discretion), and certain other conditions. Interest on advances above the original facility amount of $650 million will be cancelled if certain conditions are met. The advances will remain administrative claims in Delphi's chapter 11 cases. The proposed amendment to expand the facility under the GM Advance Agreement is subject to Court approval. On August 6, 2008, Delphi filed a motion requesting approval and expects such motion to be considered later this month. The executed agreement is filed as an exhibit to this quarterly report.

Borrowings under the Amended and Restated DIP Credit Facility are prepayable at Delphi's option without premium or penalty. As of June 30, 2008, total available liquidity under the Amended and Restated DIP Credit Facility was approximately $613 million. At June 30, 2008, there was $500 million outstanding under the Tranche B Term Loan at LIBOR plus 4.00% (or 7.25%), $2.75 billion outstanding under the Tranche C Term Loan at LIBOR plus 5.25% (or 8.50%), and $311 million outstanding under the Revolving Facility, of which $300 million was at LIBOR plus 4.00% (or 6.625%) and $11 million was at ABR plus 3.00% (or 8.00%). Additionally, the Company had $102 million in letters of credit outstanding under the Revolving Facility as of that date. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Amended and Restated DIP Credit Facility. While the borrowing base computation excluded outstanding borrowings, it was less than the Amended and Restated DIP Credit Facility commitment at June 30, 2008. Under the Amended and Restated DIP Credit Facility, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate regardless of availability levels.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. The

76

Company does not expect to pay dividends prior to emergence from chapter 11. So long as the Facility Availability Amount (as defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except with respect to investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors).

The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility) for Delphi and its direct and indirect subsidiaries, on a consolidated basis, at the levels set forth in the Amended and Restated DIP Credit Facility. Delphi was in compliance with the Amended and Restated DIP Credit Facility covenants as of June 30, 2008. However, our margin of compliance with the Global EBITDAR covenant decreased significantly in the months of May and June 2008, primarily as a result of the work stoppages and other reductions in customer production volumes, continuing unfavorable pricing pressures and increasing commodity prices. In light of these factors, we expect that continued covenant compliance over the balance of 2008 will be subject to challenges. In view of the increasing pressure on earnings due to the continuing difficult economic and industry conditions during the first part of 2008, we sought additional support from GM to assist us in remaining compliant with our covenants. Specifically, GM, on July 31, 2008, agreed to forego cash payments of up to $112 million in warranty costs, which amount Delphi had agreed to pay GM upon emergence from chapter 11 pursuant to the previously reported Warranty, Settlement and Release Agreement entered into in September 2007. Refer to Note 22. Commitments and Contingencies, Ordinary Business Litigation to the consolidated financial statements for more information on the Warranty, Settlement and Release Agreement and Note 23. Subsequent Events. We believe this additional support will assist us in remaining compliant with the Global EBITDAR covenant in our Amended and Restated DIP Credit Facility as the extinguishment of this liability will be recorded as a reduction to warranty expense in cost of sales in July 2008. However, there can be no assurance that we will remain in compliance for the balance of 2008, particularly if further deterioration in our earnings or increases in our operating costs occurs, without additional support from GM. Failure to comply with the Amended and Restated DIP Credit Facility covenants could result in an event of default under the Amended and Restated DIP Credit Facility, which would permit the lender to cause the amounts outstanding to become immediately due and payable. In addition, failure to comply could result in termination of the commitments under our Revolving Facility, which would result in Delphi being prohibited from borrowing additional amounts under such facility without the negotiation of an amendment or waiver as further described in Part II, Item 1A. Risk Factors in this Quarterly Report on Form 10-Q.

The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, and interest on all outstanding amounts is payable on demand at 2% above the then applicable rate. The foregoing description of the Amended and Restated DIP Credit Facility is a general description only. For additional detail see the underlying agreements, copies of which were previously filed with the SEC.

As of June 30, 2008, substantially all of our unsecured prepetition long-term debt was in default and is subject to compromise. For additional information on our unsecured prepetition long-term debt, please refer to our Annual Report on Form 10-K for the year ended December 31, 2007. Pursuant to the terms of our

confirmed Plan, the following table details our unsecured prepetition long-term debt subject to compromise, and our short-term and other debt not subject to compromise:

| | June 30, 2008 | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| Long-term debt subject to compromise: | | |
| Senior unsecured debt with maturities ranging from 2006 to 2029 . . . . . . | $1,984 | $1,984 |
| Junior subordinated notes due 2033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 391 | 391 |
| Total long-term debt subject to compromise . . . . . . . . . . . . . . . . . . . . . | 2,375 | 2,375 |
| Short-term, other, and long-term debt not subject to compromise: | | |
| Amended and Restated DIP term loans . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,250 | — |
| Amended and Restated DIP revolving credit facility . . . . . . . . . . . . . . . . | 311 | — |
| Refinanced DIP term loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 2,746 |
| Accounts receivable factoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 442 | 384 |
| European securitization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 232 | 205 |
| Other debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 186 | 160 |
| Total short-term and other debt not subject to compromise . . . . . . . . . . | 4,421 | 3,495 |
| Other long-term debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59 | 59 |
| Total debt not subject to compromise . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,480 | 3,554 |
| Total outstanding debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,855 | $5,929 |

### Other Financing

We also maintain various accounts receivable factoring facilities in Europe that are accounted for as short-term debt. These uncommitted factoring facilities are available through various financial institutions. As of June 30, 2008, we had $442 million outstanding under these accounts receivable factoring facilities.

In addition, Delphi continues to use its European accounts receivable securitization program, which has an availability of €178 million ($279 million with June 30, 2008 foreign currency exchange rates) and £12 million ($24 million with June 30, 2008 foreign currency exchange rates). Accounts receivable transferred under this program are also accounted for as short-term debt. As of June 30, 2008, outstanding borrowings under this program were approximately $232 million.

As of June 30, 2008, we had $245 million of other debt, primarily consisting of overseas bank facilities, and less than $1 million of other debt classified as Liabilities Subject to Compromise.

### Credit Ratings, Stock Listing

Delphi was rated by Standard & Poor's, Moody's, and Fitch Ratings, however, as a result of the Chapter 11 Filings, Standard & Poor's, Moody's, and Fitch Ratings had withdrawn their ratings of Delphi's senior unsecured debt, preferred stock, and senior secured debt. There are no ratings on the Amended and Restated DIP Credit Facility.

As of the date of filing this Quarterly Report on Form 10-Q, Delphi's common stock (OTC: DPHIQ) is traded on the Pink Sheets, LLC (the "Pink Sheets"), a quotation service for over the counter ("OTC") securities. Delphi's preferred shares (OTC: DPHAQ) ceased trading on the Pink Sheets November 14, 2006 due to the fact that the same day the property trustee of each Trust liquidated each Trust's assets in accordance with the terms of the applicable trust declarations. Pink Sheets is a centralized quotation service that collects and publishes market maker quotes for OTC securities in real-time. Delphi's listing status on the Pink Sheets is dependent on market makers' willingness to provide the service of accepting trades to buyers and sellers of the stock. Unlike securities traded on a stock exchange, such as the New York Stock Exchange, issuers of securities traded on the Pink Sheets do not have to meet any specific quantitative and qualitative

listing and maintenance standards. As of the date of filing this Quarterly Report on Form 10-Q, Delphi's 6½% Notes due May 1, 2009 (DPHIQ.GB) and 7⅛% debentures due May 1, 2029 (DPHIQ.GC) are also trading over the counter via the Trade Reporting and Compliance Engine (TRACE), a NASD-developed reporting vehicle for OTC secondary market transactions in eligible fixed income securities that provides debt transaction prices.

### Cash Flows

*Operating Activities.*    Net cash used in operating activities totaled $599 million and $436 million for the six months ended June 30, 2008 and 2007, respectively. Cash flow from operating activities continues to be negatively impacted by operating challenges due to lower North American production volumes, related pricing pressures stemming from increasingly competitive markets, and continued commodity price increases, and we expect that our operating activities will continue to use, not generate, cash. Additionally, cash flow from operating activities was reduced for the six months ended June 30, 2008 by increased contributions to our pension plans of $154 million and increased other postretirement benefit payments of $44 million, offset by decreased net cash paid to employees in conjunction with the U.S. employee workforce transition programs of $161 million.

Although Delphi's 2008 minimum funding requirement is approximately $2.5 billion under current legislation and plan design, as permitted under chapter 11 of the Bankruptcy Code, Delphi's 2008 contributions will be limited to approximately $0.2 billion, representing only the portion of the contribution attributable to service after the Chapter 11 Filings. During 2007, Delphi contributed $0.2 billion to its U.S. pension plans. Upon emergence from chapter 11, we would be required to meet our past due funding obligations. Delphi held discussions with the IRS and the PBGC regarding the funding of Delphi's pension plans upon emergence from chapter 11. These discussions were meant to achieve a consensual funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM. The Company has represented that it currently intends to meet the minimum funding standard under IRC section 412 upon emergence from chapter 11. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the ability to transfer certain assets and unfunded benefit liabilities from the Hourly Plan to a pension plan sponsored by GM, the date and size of such transfer, the funded status of the Hourly Plan and the date of emergence. As noted above, in the event the anticipated transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

In 2006 and 2007, the IRS issued conditional funding waivers for the Hourly Plan and Salaried Plan which were intended to facilitate the Debtors' option to effectuate the transfer of certain hourly pension obligations to GM in an economically efficient manner, and to remove uncertainty as to whether excise taxes would be assessed as a result of accumulated funding deficiencies relating to prepetition service. The waivers were conditioned on Delphi emerging from chapter 11 and contributing funds to its pension plans on or before May 9, 2008. Delphi did not seek extension of the waivers past May 9, 2008 and as a result, Delphi may be exposed to an excise tax penalty. Refer to Item 2, Management's Discussion and Analysis of Financial Condition and Results of Operations, Transformation Plan for more information.

*Investing Activities.*    Cash flows used in investing activities totaled $197 million and $238 million for the six months ended June 30, 2008 and 2007, respectively. The decreased use of cash in the first six months of 2008 primarily reflects proceeds from divestitures of $121 million, related to the Interiors and Closures Business sale on February 29, 2008, the sale of Delphi's North American brake components machining and assembly assets in January 2008, the sale of the U.S. suspensions business, the sale of the bearings business and an additional payment related to the sale of the Catalyst Business, and increased proceeds of $49 million from the sale of property and non-U.S. trade bank notes representing short term notes receivable received from customers with original maturities of 90 days or more. Offsetting these improvements were increased capital expenditures related to ongoing operations of $106 million.

*Financing Activities.*   The increased net cash provided by financing activities of $746 million for the six months ended June 30, 2008 as compared to $453 million for the six months ended June 30, 2007 primarily reflects increased borrowings under the Amended and Restated DIP Credit Facility rather than borrowings under the Refinanced DIP Credit facility. As of June 30, 2008, total available liquidity under the Amended and Restated DIP Credit Facility decreased $0.4 billion from total available liquidity under the Refinanced DIP Credit Facility at June 30, 2007 to $613 million.

*Dividends.*   The Company's debtor-in-possession credit facilities include negative covenants, which prohibit the payment of dividends by the Company. The Company does not expect to pay dividends in the near future. Refer to Note 15. Debt, to the consolidated financial statements for more information.

## Liquidity Outlook for 2008

In light of the current economic climate in the global automotive industry, we anticipate continued operating challenges due to lower North American production volumes, related pricing pressures stemming from increasingly competitive markets, and continued commodity price increases. In addition, constraints in the credit markets continue to impede our ability to obtain financing at reasonable rates and furthers the delay in our emergence from chapter 11, making us particularly vulnerable to changes in the overall economic climate.

As a result of the foregoing, we believe 2008 revenue will be significantly lower as compared to 2007, reflecting lower GM revenues, primarily as a result of lower forecast production volumes in North America as well as continued divestitures by Delphi of non-core operations, and flat to moderate growth in sales to other customers.

We continue to make progress in our overall transformation plan, including transformation of our labor force, streamlining our product portfolio and making the manufacturing and cost structure improvements to address these changes in the global automotive industry. Until such time as we are able to successfully reorganize our capital structure and operations, fully implement our transformation plan and emerge from chapter 11, we expect that our operations will continue to use cash. Throughout 2008 we expect that a substantial use of cash will be related to our restructuring efforts and capital projects and that despite the current economic climate, we will be able to continue funding our restructuring and capital projects by supplementing cash generated from operations with available borrowings. With the Amended and Restated DIP Credit Facility, advances from GM of amounts anticipated to be paid upon the effectiveness of the GM settlement and restructuring agreements, GM's agreement to forego certain warranty payments, and if approved by the Court, additional advances from GM for a total of up to $950 million, we believe we will continue to have adequate access to liquidity to continue implementing our transformation plan. In addition, we expect that the continued divestiture of non-core and discontinued operations will be a source of liquidity. We have the flexibility to delay some of these actions should revenues and cash flow from operations decrease significantly below our expectations as a result of a further deterioration in the economic climate or global automotive industry or should such divestitures not be completed when expected to continue to have access to sufficient liquidity. If we are not able to emerge from chapter 11 prior to December 31, 2008, we would seek to further extend the term of our Amended and Restated DIP Credit Facility and seek alternative sources of financing. Delphi can make no assurances that it will emerge from bankruptcy before the Amended and Restated DIP Credit Facility and GM Advance Agreement expire. The failure to secure such extension or alternative sources of financing would materially adversely impact our business, financial condition and operating results by severely restricting our liquidity, may further delay or prevent our consummation of a consensual plan of reorganization, and may require us to dispose of or wind-down one or more core product lines. For more information regarding our sources and uses of liquidity and the Amended and Restated DIP Credit Facility and arrangements with GM, see Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources.

In addition, upon successful emergence from chapter 11, we will be required to fund our pension plans. As permitted under chapter 11 of the Bankruptcy Code, Delphi contributed only the portion of the contribution attributable to service after the Chapter 11 Filings. The Company has represented that it currently intends to meet the minimum funding standard under IRC section 412 upon emergence from chapter 11. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including,

among other things, the ability to transfer certain assets and unfunded benefit liabilities from the Hourly Plan to a pension plan sponsored by GM, the date and size of such transfer, the funded status of the Hourly Plan and the date of emergence. As noted above, in the event the anticipated transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy to the consolidated financial statements for further information.

**Litigation Commitments and Contingencies**

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters and employment-related matters. We do not believe that any of the routine litigation incidental to the conduct of our business to which we are currently a party will have a material adverse effect on our business or financial condition. For a description of significant litigation that is not routine in nature and which if adversely determined against us could have a significant impact on our business, see Note 2. Transformation Plan and Chapter 11 Bankruptcy and Note 22. Commitments and Contingencies, Shareholder Lawsuits, to the consolidated financial statements.

**Environmental Matters**

Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations. For a discussion of matters relating to compliance with laws for the protection of the environment, refer to Item 1. Business — Environmental Compliance in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007. Additionally, refer to Note 22. Commitments and Contingencies to the consolidated financial statements for information on sites where Delphi has been named a potentially responsible party.

As of June 30, 2008 and December 31, 2007, our reserve for environmental investigation and remediation was approximately $105 million and $112 million, respectively. The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the separation from GM in 1999 (the "Separation").

**Other**

As mentioned above, Delphi continues to pursue its transformation plan and continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity. These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future.

**Inflation**

Inflation generally affects Delphi by increasing the cost of labor, equipment and raw materials. We believe that, because rates of inflation in countries where we have significant operations have been moderate during the periods presented, inflation has not had a significant impact on our results of operations, other than increased commodity costs as disclosed in Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations — Executive Summary.

**Recently Issued Accounting Pronouncements**

Refer to Note 1. Basis of Presentation, Recently Issued Accounting Pronouncements, to the unaudited consolidated financial statements for a complete description of recent accounting standards which we have not yet been required to implement and may be applicable to our operation, as well as those significant accounting standards that have been adopted during 2008.

**Significant Accounting Policies and Critical Accounting Estimates**

Certain of our accounting policies require the application of significant judgment by management in selecting the appropriate assumptions for calculating financial estimates. By their nature, these judgments are subject to an inherent degree of uncertainty. These judgments are based on our historical experience, terms of existing contracts, our evaluation of trends in the industry, information provided by our customers and information available from other outside sources, as appropriate. For a discussion of our significant accounting policies and critical accounting estimates, see Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations — Significant Accounting Policies and Critical Accounting Estimates, and Note 1. Significant Accounting Policies, to the consolidated financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2007.

**Forward-Looking Statements**

This Quarterly Report on Form 10-Q, including the exhibits being filed as part of this report, as well as other statements made by Delphi may contain forward-looking statements that reflect, when made, the Company's current views with respect to current events and financial performance. Such forward-looking statements are and will be, as the case may be, subject to many risks, uncertainties and factors relating to the Company's operations and business environment which may cause the actual results of the Company to be materially different from any future results, express or implied, by such forward-looking statements. In some cases, you can identify these statements by forward-looking words such as "may," "might," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "potential" or "continue," the negative of these terms and other comparable terminology. Factors that could cause actual results to differ materially from these forward-looking statements include, but are not limited to, the following: the ability of the Company to continue as a going concern; the ability of the Company to operate pursuant to the terms of the debtor-in-possession financing facility and its advance agreement with GM, to obtain an extension of term or other amendments as necessary to maintain access to such facility and advance agreement; the Company's ability to obtain Court approval with respect to motions in the chapter 11 cases prosecuted by it from time to time; the ability of the Company to consummate its Plan which was confirmed by the Court on January 25, 2008 or any other subsequently confirmed plan of reorganization; risks associated with third parties seeking and obtaining Court approval to terminate or shorten the exclusivity period for the Company to propose and confirm one or more plans of reorganization, for the appointment of a chapter 11 trustee or to convert the cases to chapter 7 cases; the ability of the Company to obtain and maintain normal terms with vendors and service providers; the Company's ability to maintain contracts that are critical to its operations; the potential adverse impact of the chapter 11 cases on the Company's liquidity or results of operations; the ability of the Company to fund and execute its business plan (including the transformation plan described in Note 2. Transformation Plan and Chapter 11 Bankruptcy, to the consolidated financial statements) and to do so in a timely manner; the ability of the Company to attract, motivate and/or retain key executives and associates; the ability of the Company to avoid or continue to operate during a strike, or partial work stoppage or slow down by any of its unionized employees or those of its principal customers and the ability of the Company to attract and retain customers. Additional factors that could affect future results are identified in the Annual Report on Form 10-K for the year ended December 31, 2007 filed with the SEC, including the risk factors in Part I. Item 1A. Risk Factors, contained therein and the Company's quarterly periodic reports for the subsequent periods, including the risk factors in Part II. Item 1A. Risk Factors, contained therein, filed with the SEC. Delphi disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events and/or otherwise. Similarly, these and other factors, including the terms of any reorganization plan ultimately confirmed, can affect the value of the Company's various prepetition liabilities, common stock and/or other equity securities.

**ITEM 3.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

There have been no material changes to our exposures to market risk since December 31, 2007.

**ITEM 4.    CONTROLS AND PROCEDURES**

**Disclosure Controls and Procedures**

Under the supervision and with the participation of our management, including our Chief Executive Officer (the "CEO") and Chief Financial Officer (the "CFO"), we have evaluated the effectiveness of design and operation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this report. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were not effective as of June 30, 2008. The basis for this determination was that, as reported in our annual report on Form 10-K for the period ended December 31, 2007, we have identified a material weakness in our internal control over financial reporting, which we view as an integral part of our disclosure controls and procedures. For a more detailed understanding of the material weakness, the impact of such on disclosure controls and procedures, and remedial actions taken and planned which we expect will materially affect such controls, see Item 9A. Controls and Procedures of our annual report on Form 10-K for the year ended December 31, 2007, which was filed on February 19, 2008, and which is incorporated by reference into this Item 4.

The certifications of the Company's CEO and CFO are attached as Exhibits 31(a) and 31(b) to this Quarterly Report on Form 10-Q include, in paragraph 4 of such certifications, information concerning the Company's disclosure controls and procedures and internal control over financial reporting. Such certifications should be read in conjunction with the information contained in this Item 4, including the information incorporated by reference to our filing on Form 10-K for the year ended December 31, 2007, for a more complete understanding of the matters covered by such certifications.

**Changes in internal control over financial reporting**

While we are continuing to develop and implement remediation plans with respect to the identified material weakness, there have been no changes in our internal control over financial reporting other than those discussed below that have materially affected, or that are reasonably likely to materially affect, our internal control over financial reporting beyond those identified in our Form 10-K for the year ended December 31, 2007.

Deployment of the Company's enterprise software solution, including the implementation of a perpetual inventory system at our Electrical/Electronics Architecture segment's operations will continue through mid-2009. The timely and successful implementation of this system is an integral element to the remediation of our material weakness regarding Inventory Accounting Adjustments as disclosed in Item 9A. Controls and Procedures of our annual report on Form 10-K for the year ended December 31, 2007. Through June 30, 2008, approximately 65% of Electrical/Electronics Architecture's inventory is now on a perpetual inventory system.

During the six months ended June 30, 2008, the Company made progress in outsourcing the transaction processing and administration for its contract administration, travel and expense reporting, accounts payable and receivables processing functions for its North American and European operations to a third party. The Company expects outsourcing of these functions will streamline and enhance the control environment of these accounting and reporting activities. The failure to successfully transition these processes and to implement proper controls and procedures both in the transition as well as after the transition is complete may adversely impact our internal control environment. We anticipate the global transition of these activities will continue throughout 2008 and 2009.

As noted in Item 1A. Risk Factors in our annual report on Form 10-K for the year ended December 31, 2007, failure to achieve and maintain effective internal controls in accordance with Section 404 of the Sarbanes-Oxley Act of 2002 could have a material effect on our business and our failure to maintain sustained improvements in our controls or successfully implement compensating controls and procedures as part of our disclosure controls and procedures may further adversely impact our existing internal control structure.

# PART II. OTHER INFORMATION

## ITEM 1.   LEGAL PROCEEDINGS

Except as discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, and Note 22. Commitments and Contingencies, to the consolidated financial statements of this quarterly report there have been no other material developments in legal proceedings involving Delphi or its subsidiaries since those reported in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007.

We are involved in routine litigation incidental to the conduct of our business. We do not believe that any of the routine litigation to which we are currently a party will have a material adverse effect on our business or financial condition.

## ITEM 1A.   RISK FACTORS

In addition to the other information set forth in this report, you should carefully consider the factors discussed in Item 1A. Risk Factors, in our Annual Report on Form 10-K for the year ended December 31, 2007, as updated in Item 1A. Risk Factors in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2008 and as set forth below, which could materially affect our business, financial condition or future results. The risks described in our Annual Report on Form 10-K and our Quarterly Reports on Form 10-Q are not the only risks facing our Company. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may adversely affect our business, financial condition and/or operating results. You should also refer to the Statement Regarding Forward-Looking Statements in this quarterly report.

***Our Delayed Emergence from Chapter 11 Coupled With Continued Difficult Economic and Industry Conditions May Further Increase Operating Losses, Which May Result in Non-Compliance with Certain Covenants and Financial Tests contained in our Refinanced DIP Credit Facility.***

The covenants in the Amended and Restated DIP Credit Facility generally require Delphi to, among other things, maintain a rolling 12-month cumulative global earnings before interest, taxes, depreciation, amortization, reorganization and restructuring costs ("Global EBITDAR"), as defined, for Delphi and its direct and indirect subsidiaries, on a consolidated basis, at specified levels. The Amended and Restated DIP Credit Facility contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.

Failure to comply with this covenant could result in an event of default under the Amended and Restated DIP Credit Facility, which would permit the lender to cause the amounts outstanding to become immediately due and payable. In addition, failure to comply could result in termination of the commitments under our Revolving Facility, which would result in Delphi being prohibited from borrowing additional amounts under such facility without the negotiation of an amendment or waiver. As noted in Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations, Liquidity and Capital Resources at June 30, 2008 we were in compliance with this and the other covenants in the facility. However, our margin of compliance with the Global EBITDAR covenant decreased significantly in the months of May and June 2008, primarily as a result of the work stoppages at American Axle, a Tier 1 supplier to General Motors Corporation ("GM") based in Detroit, Michigan, and other reductions in customer production volumes, continuing unfavorable pricing pressures and increasing commodity prices. In light of these factors, we expect that continued covenant compliance over the balance of 2008 will be subject to challenges. In view of the increasing pressure on earnings due to the continuing difficult economic and industry conditions during the first part of 2008, we sought additional support from GM to assist us in remaining compliant with our covenants. Specifically, GM, on July 31, 2008, agreed to forego cash payments of up to $112 million in warranty costs, which amount Delphi had agreed to pay GM upon emergence from chapter 11 pursuant to the previously reported Warranty, Settlement and Release Agreement entered into in September 2007. Refer to Note 22. Commitments and Contingencies, Ordinary Business Litigation to the consolidated financial

statements for more information on the Warranty, Settlement and Release Agreement and Note 23. Subsequent Events to the consolidated financial statements. We believe this additional support will assist us in remaining compliant with the Global EBITDAR covenant in our Amended and Restated DIP Credit Facility as the extinguishment of this liability will be recorded as a reduction to warranty expense in cost of sales in July 2008. However, there can be no assurance that we will remain in compliance for the balance of 2008, particularly if further deterioration in our earnings or increases in our operating costs occurs, without additional support from GM. For more detail regarding risk factors facing the company see Item 1A. Risk Factors, in our Annual Report on Form 10-K for the year ended December 31, 2007.

Our Amended and Restated DIP Credit Facility has a current maturity date of December 31, 2008. We cannot assure that we will emerge from chapter 11 prior to such date or be successful in obtaining an extension of such facility beyond its current maturity date. Failure to continue to operate pursuant to the terms of the Amended and Restated DIP Credit Facility or procure alternative financing would have a material adverse impact on our business, financial condition and operating results by severely restricting our liquidity and force us, among other things to delay completion of our transformation plan.

*We Anticipate the Need to Supplement Borrowings Under Our Amended And Restated DIP Credit Facility With Advances Under The GM Advance Facility To Maintain Adequate Liquidity Until We Are Able To Emerge From Chapter 11. Should The Court Not Approve The Amendment To Increase Availability Under The GM Advance Facility, Should GM Be Unwilling Or Unable To Continue To Provide Such Liquidity Support Or Should Such Liquidity Otherwise Become Unavailable To Us, Then Absent Procurement of Alternative Financing, Our Liquidity Would Be Severely Restricted Resulting In A Material Adverse Impact On Our Business, Financial Condition and Operating Results, Which May, Among Other Things, Delay Completion Of Our Transformation Plan.*

In light of the current economic climate in the global automotive industry, we anticipate continued operating challenges due to lower North American production volumes, related pricing pressures stemming from increasingly competitive markets, and continued commodity price increases. In addition, tight credit markets continue to delay our emergence from chapter 11, making us particularly vulnerable to changes in the overall economic climate. As a result of the foregoing, we believe 2008 revenue will be significantly lower as compared to 2007, reflecting lower GM revenues, primarily as a result of lower forecast production volumes in North America as well as continued divestitures by Delphi of non-core operations, and flat to moderate growth in sales to other customers.

Until such time as we are able to successfully reorganize our capital structure and operations, fully implement our transformation plan and emerge from chapter 11, we expect that our operations will continue to use cash. In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding short-term liquidity support until confirmation of the Plan or an alternative plan of reorganization, on August 7, 2008 GM agreed to amend the GM Advance Agreement to provide for an additional $300 million availability above the existing $650 million, as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement. The amendment provides that the outside maturity date with respect to the original $650 million may be extended in connection with an extension of Delphi's existing Amended and Restated DIP Credit Facility, if GM and Delphi agree, to the earlier of June 30, 2009, and the termination of Delphi's Amended and Restated DIP Credit Facility, and that the maturity date with respect to the additional $300 million is the earlier of December 31, 2008 (subject to potential extension through June 30, 2009, on the same terms as apply to the original $650 million), such date as Delphi files any motion seeking to amend the Plan in a manner that is not reasonably acceptable to GM, the termination of Delphi's Amended and Restated DIP Credit Facility and such date as a plan of reorganization becomes effective. The additional $300 million of advances is also conditioned upon Delphi filing modifications to its Plan which are reasonably acceptable to GM by October 31, 2008 (or such later date as GM may agree in its sole discretion), and certain other conditions. Interest on advances above the original facility amount of $650 million will be cancelled if certain conditions are met. The advances will remain administrative claims in Delphi's chapter 11 cases. The proposed amendment to expand the facility under the GM Advance Agreement is subject to Court approval. On August 6, 2008 Delphi filed a motion requesting approval and expects such motion to be

considered later this month. There can be no assurances that the Court will grant such approval. In addition, GM has announced a number of challenges it is facing due to the current economic climate and is considering a number of restructuring actions to support its own liquidity needs. GM's unwillingness or inability to continue providing Delphi with additional liquidity support until completion of our transformation plan may result in us needing to consider disposing or winding-down one or more core product lines, terminating the previously agreed to restructuring and settlement agreements, and re-instituting previously filed motions to reject or re-price product supply agreements with GM under Section 363 of the Bankruptcy Code.

## ITEM 2.   UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

### *Purchase of Equity Securities by the Issuer and Affiliated Purchasers*

No shares were purchased by the Company or on its behalf by any affiliated purchaser in the first quarter of 2008.

## ITEM 3.   DEFAULTS UPON SENIOR SECURITIES

The Chapter 11 Filings triggered defaults on substantially all debt obligations of the Debtors. For additional information, refer to Note 14. Debt, to the consolidated financial statements within our Annual Report on Form 10-K for the year ended December 31, 2007.

## ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

During the second quarter of 2008, no matters were submitted to a vote of security holders.

## ITEM 5.   OTHER INFORMATION

None.

## ITEM 6.   EXHIBITS

| Exhibit Number | Exhibit Name |
|---|---|
| 2(a) | Confirmed Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession, incorporated by reference to Exhibit 99(e) to Delphi's Report on Form 8-K filed January 30, 2008. |
| 3(a) | Amended and Restated Certificate of Incorporation of Delphi Automotive Systems Corporation, incorporated by reference to Exhibit 3(a) to Delphi's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002. |
| 3(b) | Certificate of Ownership and Merger, dated March 13, 2002, Merging Delphi Corporation into Delphi Automotive Systems Corporation, incorporated by reference to Exhibit 3(b) to Delphi's Quarterly Report on Form 10-Q for the quarter ended June 30, 2002. |
| 3(c) | Amended and Restated Bylaws of Delphi Corporation, incorporated by reference to Exhibit 99(c) to Delphi's Report on Form 8-K filed October 14, 2005. |
| 31(a) | Certification Pursuant to Exchange Act Rules 13a-14(a)/15d-14(a), adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31(b) | Certification Pursuant to Exchange Act Rules 13a-14(a)/15d-14(a), adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32(a) | Certification Pursuant to 18 U.S.C. Section 1350, adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32(b) | Certification Pursuant to 18 U.S.C. Section 1350, adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99(a) | Agreement between Delphi Corporation and General Motors Corporation dated as of August 7, 2008. |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

DELPHI CORPORATION
_____
(Registrant)

August 8, 2008                                   /s/ THOMAS S. TIMKO
_____
Thomas S. Timko
Chief Accounting Officer and Controller

87