**Hearing Date And Time:  September 23, 2008 at 10:00 a.m.**
**Objection Deadline: September 19, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |  |
|---|---|---|
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. § 363 FOR
AUTHORITY TO MODIFY BENEFITS UNDER HOURLY AND SALARIED
PENSION PROGRAMS AND MODIFY APPLICABLE UNION
AGREEMENTS IN CONNECTION THEREWITH

("HOURLY AND SALARIED PENSION PROGRAM MODIFICATION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for an order pursuant to 11 U.S.C. § 363 authorizing but not directing the Debtors (I) to modify benefits under certain of the Debtors' hourly and salaried retirement programs by implementing (i) a freeze of Delphi's hourly employee pension plan, in whole or in part, following union consent, (ii) a freeze of certain salaried employee pension plans, including the Delphi salaried employee pension plan and three subsidiary Debtors' salaried employee pension plans, (iii) a freeze of Delphi's existing salaried supplemental executive retirement plan, (iv) a replacement plan through Delphi contributions under Delphi's existing defined contribution plan for salaried employees, (v) a replacement supplemental executive retirement plan and salaried retirement and equalization savings program, and (II) subject to union consent, to make modifications to the Debtors' agreements with their U.S. labor unions, as may be necessary to implement the freeze of Delphi's hourly employee pension plan and related matters as soon as practicable and as contemplated herein, and respectfully represent as follows:

<u>Preliminary Statement</u>

1.       On January 25, 2008, this Court entered an order confirming the Debtors' Chapter 11 Plan (as hereinafter defined), which provided in part for the implementation of the Debtors' workable solution to their pension situation, one of the five key tenets of Delphi's Transformation Plan.  The Plan Investors' breach of the Investment Agreement on April 4, 2008 and thereafter prevented the Chapter 11 Plan, including key aspects of the Debtors' pension solution, from becoming effective.  Nevertheless, Delphi continued to address its transformation goals after the events of April 4, and is now at a crucial point in respect of the pension tenet of its

2

Transformation Plan.  Despite an economic downturn in the automotive industry and

extraordinarily turbulent capital markets, Delphi's salaried and hourly employees have effected a

remarkable transformation of the Company.  Now there remain only a few key pieces of Delphi's

transformation to be structured and implemented to allow Delphi to achieve its pension-related

transformation goals.  Rather than wait for emergence from chapter 11, the Debtors intend to

materially implement the pension tenet of the Transformation Plan by bringing forward aspects

of the pension modifications previously approved by this Court as part of the Chapter 11 Plan.

These modifications will protect and solidify pension benefits already earned by Delphi's current

and former hourly and salaried employees, while helping the Debtors achieve cost savings now

instead of later.  The retirement program modifications described below will help position Delphi

to emerge from chapter 11 as soon as practicable while simultaneously protecting the welfare of

the Debtors' employees.

Background

B.     The Chapter 11 Filings

        2.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

        3.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

3

committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

4.      On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Chapter 11 Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

5.      On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless continue to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

4

6.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

7.      The statutory predicates for the relief requested herein are section 363 of the Bankruptcy Code and rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.      Current Business Operations Of The Debtors

8.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

9.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

---

[1]  The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]  On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding was consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

5

10.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today substantially more than half of Delphi's revenue is generated from non-GM sources.

D.     Events Leading To The Chapter 11 Filing

11.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

12.     The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

_____

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

6

had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

13.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

E.    The Debtors' Transformation Plan

14.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

7

15.     Upon the conclusion of the reorganization process, the Debtors expect to emerge with a stronger, more financially sound business with U.S. operations that are globally integrated and well-positioned to advance enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.      The Debtors' Retirement Plans

16.     As stated above, one of the primary areas of focus related to the Debtors' transformation plan has been to devise a workable solution to their current pension situation. Delphi maintains two principal qualified, defined benefit pension plans under the Internal Revenue Code (the "IRC") for its employees: the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan" or "HRP") and the Delphi Retirement Program for Salaried Employees (the "Delphi Salaried Plan" or "SRP").  The Debtors also currently maintain four additional subsidiary defined benefit pension plans that are also qualified plans under the IRC:  the Delphi Mechatronic Systems Retirement Program (the "Mechatronic Plan"), the ASEC Manufacturing Retirement Program (the "ASEC Plan"), the Packard-Hughes Interconnect Bargaining Retirement Plan (the "PHI Bargaining Plan"),[4] and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan (the "PHI Non-Bargaining Plan") (the SRP, Mechatronic Plan, ASEC Plan, and PHI Non-Bargaining Plan are hereinafter collectively referred to as the "Salaried Plans," and the Salaried Plans and the Hourly Plan are referred to collectively as the "Pension Plans").  In addition, the Debtors maintain a defined contribution pension plan — the Delphi Savings-Stock Purchase Program for salaried employees (the "Defined Contribution

---

[4]     The PHI Bargaining Plan is not subject to this Motion and is not being affected at this time.

8

Plan") — which provides a defined contribution benefit (a "401(k) Benefit") for salaried employees.[5]

        17.    <u>Treatment Of the Pension Plans Under The Confirmed Plan</u>.  The Debtors' funding obligations under the Pension Plans are governed by the IRC and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"). Outside chapter 11, the IRC and ERISA generally require a plan sponsor and related companies—in this case the Debtors—to meet certain minimum funding requirements for their qualified, defined benefit pension plans.  In accordance with the Bankruptcy Code, since the Debtors sought reorganization relief they have been making "normal cost" contributions to the Pension Plans, or contributions that reflect the amounts related to service provided by plan participants post-filing.[6]  Under the Chapter 11 Plan, the Debtors were to assume and maintain the Hourly Plan and the Salaried Plans on a frozen basis as of the effective date of the Chapter 11 Plan.  In addition, the Chapter 11 Plan contemplated the implementation of a funded defined contribution plan to replace pre-existing supplemental retirement programs.  Following the suspension of the April 4, 2008 closing of the Chapter 11 Plan, the Debtors have decided to freeze the Salaried Plans as of September 30, 2008, and the Hourly Plan as soon as reasonably practicable following applicable union consents, rather than wait any longer to freeze the Pension Plans.  Doing so on this time frame would halt the accrual of normal cost payments going forward, which would preserve liquidity.  Finally, the Debtors believe that the relief requested in this Motion, if authorized and implemented, should cause the Pension Benefit Guaranty

---

[5]    As part of the implementation of Delphi's pension transformation, but subject to the entry of an order approving this Motion, the Delphi Savings-Stock Purchase Program would be renamed the Delphi Salaried Retirement Savings Program to better reflect the program's purpose as a vehicle to facilitate saving for retirement.

[6]    <u>See</u> Treas. Reg. 1.404(a)-6 for further discussion of the definition of "normal cost." 26 C.F.R. § 1.404(a)-6 (2007).

Corporation (the "PBGC") to forebear from taking unilateral action to terminate the Debtors'

Pension Plans and asserting related termination claims in the Chapter 11 Cases.

G.     The Debtors' Settlements With Their U.S. Labor Unions

18.     To achieve the results related to the Hourly Plan, the Debtors will need to

bargain with their unions to obtain their consent to freeze the Hourly Plan as soon as practicable

and hopefully by November 2008.  The Debtors have already secured the unions' consent to

implement a pension freeze upon emergence (originally contemplated to occur several months

ago) in connection with the Debtors' modification of collective bargaining agreements with the

unions representing certain of their U.S. employees and retirees, including the United

Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-

Communication Workers of America (the "IUE-CWA"), the United Steelworkers of America

(the "USW"), the International Association of Machinists and Aerospace Workers (the "IAM"),

the International Brotherhood of Electrical Workers (the "IBEW"), the International Union of

Operating Engineers (the "IUOE"), and their applicable local unions and other affiliated entities

(collectively, the "Unions").

19.     During the summer of 2007, the Debtors successfully negotiated and

obtained Court approval of agreements with all of the Unions, as follows:

- On June 22, 2007, the UAW, Delphi, and GM entered into the UAW-Delphi-GM Memorandum of Understanding, which was approved by this Court on July 19, 2007 (Docket No. 8693) (the "UAW MOU Approval Order") and ratified by the UAW membership as of June 28, 2007.  The UAW MOU Approval Order is Exhibit 7.21(a) to the Chapter 11 Plan.

- On August 5, 2007, the IUE-CWA, Delphi, and GM entered into the IUE-CWA-Delphi-GM Memorandum of Understanding, which was approved by this Court on August 16, 2007 (Docket No. 9106)

        (the "IUE-CWA MOU Approval Order") and ratified by the IUE-CWA membership as of August 20, 2007.  The IUE-CWA MOU Approval Order is Exhibit 7.21(b) to the Chapter 11 Plan.

- On August 16, 2007, the USW, Delphi, and GM entered into two memoranda of understanding, collectively the USW-Delphi-GM Memoranda of Understanding, which was approved by this Court on August 29, 2007 (Docket No. 9169) (the "USW MOU Approval Order") and ratified by the USW membership as of August 30 and August 31, 2007.  The USW MOU Approval Order is Exhibit 7.21(c) to the Chapter 11 Plan.

- On July 31, 2007 and August 1, 2007, Delphi signed six memoranda of understanding with GM and the IAM, IBEW, and IUOE, collectively the IAM, IBEW, and IUOE Memoranda of Understanding, which were approved by the Bankruptcy Court on August 16, 2007 (Docket No. 9107) (the "IUOE, IBEW, And IAM MOU Approval Order") and ratified by IAM and IBEW membership as of August 4, 20907 and by IUOE membership as of August 9 and 10, 2007.  IUOE, IBEW, And IAM MOU Approval Order is Exhibit 7.21(d) to the Chapter 11 Plan.

The UAW-Delphi-GM Memorandum of Understanding, IUE-CWA-Delphi-GM Memorandum of Understanding, USW-Delphi-GM Memoranda of Understanding, and the IAM, IBEW, and IUOE Memoranda of Understanding are collectively referred to herein as the "Union Settlement Agreements."[7]  The Union Settlement Agreements were designed to enable Delphi's continued transformation to more competitive wage and benefit levels and to address divestiture, work rules, and staffing level issues in its workforce.

---

[7]   Copies of the UAW MOU Approval Order, IUE-CWA MOU Approval Order, USW MOU Approval Order, and IUOE, IBEW, And IAM MOU Approval Order, including the Union Settlement Agreements that are appended to these orders, are of record in these chapter 11 cases and are not attached to this Motion.  For convenience, however, these documents and certain other documents that are referenced in this Motion are included in a separate notice to be filed shortly after this Motion is filed (the "Exhibit Notice"), including materials describing, for each of the relevant Unions, the treatment of hourly employee pension obligations following the freeze of the HRP.  The documents appended to the Exhibit Notice are voluminous and will thus not be served with the Motion, but the Exhibit Notice is or will be publicly available, along with the docket and other case information, at www.delphidocket.com.

H.      Supplemental Retirement Programs

20.      Since the separation from GM, Delphi has also maintained a Supplemental

Executive Retirement Program (the "SERP") for certain senior level salaried employees to

provide retirement benefits that are comparable to those provided to their industry peers.  The

SERP is a non-qualified defined benefit plan under the IRC that is separate from, but is

integrated with, the Delphi Salaried Plan.  The Chapter 11 Plan provides that the Debtors would

(i) no longer honor their obligations under the SERP because the Debtors would reject or

otherwise terminate the current SERP as of their emergence from chapter 11 and (ii) implement a

replacement Supplemental Executive Retirement Program with respect to current eligible

employees (subject to the execution of a waiver of claims) which, in effect, freezes the benefits

under the SERP and modifies eligibility to the age of 55 years with ten years of service.  A

summary of the replacement SERP plan was filed as part of Exhibit 7.8 to the Chapter 11 Plan,

and Delphi filed the formal SERP plan contemplated by and approved in connection with the

Chapter 11 Plan in final form with the SEC on February 20, 2008 (the "Approved SERP").[8]

21.      Under the Chapter 11 Plan, those eligible for the replacement SERP are

also eligible for the Salaried Retirement Equalization Savings Program (the "SRESP") as a

replacement for pension benefits lost due to the freeze of the Salaried Plans.  The purpose of this

program is to supplement Delphi's tax-qualified defined contribution savings plan and allow

employee contributions, Delphi non-elective contributions, and Delphi matching contributions to

be made under a non-qualified defined contribution savings plan in situations where legal

limitations under the tax-qualified defined contribution savings plan have been reached.  A

summary of the SRESP was filed as part of Exhibit 7.8 to the Chapter 11 Plan, and Delphi filed

---

[8]     Exhibit 7.8 to the Chapter 11 Plan and the Approved SERP will be attached to the Exhibit Notice.

the SRESP contemplated by and approved in connection with the Chapter 11 Plan in final form

with the SEC on January 31, 2008 (the "Approved SRESP").[9]

Relief Requested

22.    By this Motion, the Debtors seek entry of an order under section 363 of

the Bankruptcy Code authorizing, but not directing, the Debtors (I) to implement (i) a freeze of

the Hourly Plan, in whole or in part, effective as soon as practicable following Union consent,

(ii) a freeze of the Salaried Plans effective as of September 30, 2008, (iii) a freeze of the SERP,

also effective as of September 30, 2008, (iv) the institution of Delphi contributions under the

Defined Contribution Plan for salaried employees, effective as of October 1, 2008, (v) the

amended SERP (the "Amended SERP"), effective as of October 1, 2008 but not vesting or first

becoming payable until emergence, and the amended SRESP (the "Amended SRESP"), effective

and vesting upon emergence, and (II) subject to Union consent, to make modifications to the

Debtors' agreements with their U.S. labor Unions, as may be necessary to implement the freeze

of the Hourly Plan, in whole or in part, as soon as practicable and as contemplated herein and

related matters.

Basis For Relief

23.    The relief requested in this Motion would help facilitate the Debtors'

emergence from chapter 11 and is consistent with the relief approved by this Court in connection

with the Chapter 11 Plan.  Due to the suspension of the April 4, 2008 closing resulting from the

Plan Investors' breach of their obligations to fund the Chapter 11 Plan, Delphi is proactively

seeking to implement necessary cost-saving measures, including instituting aspects of the

pension transformation immediately instead of waiting to do so upon emergence.  The Salaried

---

[9]    A copy of the Approved SRESP will be attached to the Exhibit Notice.

13

Plans and the SERP would thus be frozen on September 30, 2008 instead of at emergence, and

the HRP would be frozen, with limited exceptions, as soon as practicable following Union

consent.  These pension plan freezes were originally contemplated to have occurred several

months ago, at the time of Delphi's scheduled emergence from chapter 11 in early April 2008.

Importantly, the relief sought in this Motion should have no impact on the Debtors' retirees who

already have ceased accruing benefits and should not lead to additional claims against the

Debtors' estates.  Any benefits to salaried employees as a result of the implementation of the

Amended SERP or Amended SRESP would not vest or first become payable unless and until the

Debtors emerge from chapter 11.

I.       <u>Freeze Of The Pension Plans And SERP</u>

             24.       As set forth above, to implement important aspects of their pension

transformation before emergence from chapter 11, the Debtors propose to freeze the Hourly

Plan, except with regard to the Individual Retirement Plan (i.e., cash balance) provisions of the

HRP for which certain UAW and splinter Union-represented employees would be eligible,

effective as soon as practicable following Union consent.  Following Union consent, as well as

compliance with statutory notice requirements, the Debtors would hope to freeze the Hourly Plan

effective November 2008.  The contemplated freeze of the Hourly Plan in and of itself would

reduce the Debtors' normal cost contributions by approximately $4 million per quarter based on

current assumptions.

25.     The Debtors also propose to freeze the Salaried Plans and the SERP effective September 30, 2008.[10]  With respect to the Salaried Plans, this freeze would save the Debtors normal cost contributions of approximately $26 million per quarter.

26.     The Debtors' proposed freeze would also limit interest rate risk and asset performance risk which could impact normal cost accruals and it would thus preserve the benefits already accrued by the participants in the plans.  To be clear, the participants in the Pension Plans would retain benefits accrued as of the applicable freeze dates, and the Debtors remain committed to maintaining their Pension Plans on a frozen basis upon emergence from chapter 11.  But by freezing the Pension Plans, the Debtors believe that their employees' pensions would be better protected going forward because liabilities under the Pension Plans would not increase as a result of additional accruals.  In addition, as stated above, the Debtors also believe that the relief requested in this Motion, if authorized and implemented, should cause the PBGC to forebear from taking unilateral action to terminate the Debtors' Pension Plans and asserting related termination claims in the Chapter 11 Cases.

27.     The Hourly Plan.  The Unions must consent to the new timetable for a freeze of the Hourly Plan because the Union Settlement Agreements provide for the freeze to occur at emergence (originally contemplated to occur several months ago) and the collective bargaining agreements with the Unions, and thus the Bankruptcy Code, do not permit the Debtors to alter the Hourly Plan unilaterally.  Nonetheless, the Debtors are seeking the approval of the Unions and working to provide statutory notices to the affected employees in compliance with section 204(h) of ERISA, and the Hourly Plan would be frozen effective not less than 45

---

[10]   The Debtors previously sent notices of the pension plan freezes contemplated in this Motion to affected salaried employees in compliance with section 204(h) of ERISA.  These notices are not attached to this Motion, but are available upon reasonable request.

15

days following issuance of such notices. With respect to the Hourly Plan, this Motion thus seeks

the Court's authorization for Delphi to execute modifications to the Union Settlement

Agreements which would move up the freeze date.  Once the HRP is frozen as contemplated

herein, certain participants in the HRP would be eligible, in accordance with the Union

Settlement Agreements and depending upon Union affiliation, for enhanced contributions to the

existing defined contribution pension plan and the Individual Retirement Plan (i.e., cash balance)

provisions of the HRP,[11] neither of which would be frozen.  This will give the affected

participants more control over saving and investing their pension assets in the future.

28.    The Debtors accordingly request prospective relief, subject to Union

consent, to make such modifications to the Union Settlement Agreements as may be necessary to

effect the aspects of their pension transformation related to the HRP freeze and related matters.

While the Debtors do not believe that the proposed modifications with Union consent require

court approval, the Debtors are nonetheless seeking this Court's approval of these modifications

out of an abundance of caution.  See  In re The Leslie Fay Cos., 168 B.R. 294, 303 (Bankr.

S.D.N.Y. 1994) (debtors can enter into agreement modifying existing collective bargaining

agreements postpetition without notice or hearing).

29.    The Salaried Plans And The SERP.  The terms of each of the Salaried

Plans and the SERP permit the Debtors to modify or terminate the plans at the Debtors'

discretion.  With respect to the Salaried Plans, the freeze would cause credited service to cease to

accrue for the purpose of benefit calculations.  Active employee participants would continue to

have credited service calculated for each month worked after the freeze date solely for the

---

[11]    The Individual Retirement Plan (i.e., cash balance) provisions of the HRP provide a defined pension benefit
based on company contributions equal to 5.4% of the eligible employee's wages and an annual interest credit on
such contributions based on the 30-year U.S. Treasury Bond rate.

16

purpose of determining retirement eligibility, and employees would thus be able to continue to "grow in" to retirement eligibility under the Salaried Plans.[12]  As set forth more fully below, to keep their compensation programs for salaried employees competitive, the Debtors intend to implement (a) Delphi contributions under the Defined Contribution Plan effective October 1, 2008, (b) the Amended SERP, effective as of October 1, 2008 but not first payable or vested until the Debtors' emergence from chapter 11, and (c) the Amended SRESP, effective and vesting upon emergence.

J.      Delphi Contributions Under Defined Contribution Plan

30.      The Defined Contribution Plan currently provides a 401(k) Benefit to the Debtors' salaried employees.  To ensure that the Debtors' compensation of their salaried employees remains competitive notwithstanding the freeze of the Salaried Plans, the Debtors intend to replace future defined benefit accruals under the SRP with Delphi contributions to the Defined Contribution Plan.  This replacement would be effective as of October 1, 2008.  The first aspect of this defined contribution program would be a non-elective direct contribution by Delphi to each eligible employee's account equal to 4% of the employee's total compensation, including base salary, incentive compensation, sales incentive, and merit-based recognition award.

31.      The second component of the defined contribution program would be a Delphi matching contribution.  Delphi would contribute a capped amount equal to $.50 for every dollar an employee contributes to the Defined Contribution Plan.  The amount of the employee

---

[12]     Continued service time would not have an impact on the amount of an eligible employee's accrued benefit, but an employee who needed to accrue additional service to become eligible for certain early retirement benefits could continue to accrue the necessary time through continued service.  Although this continued accrual of service time for retirement eligibility purposes could cause additional liability under the Salaried Plans, the Debtors estimate such exposure to be less than $3 million per year.

17

contribution eligible for the Delphi matching contribution would be capped at 7% of an

employee's total compensation (9% for 60 months beginning October 1, 2008 if the employee's

length of credited service is 25 years or more).  The participant employee would be entitled to

direct the investment of contributions into one or a number of options available under the

Defined Contribution Plan.

        32.     Even counting the contributions by Delphi under the Defined Contribution

Plan, Delphi expects the freeze of continuing accrued benefits under the SRP and the substitution

of the Defined Contribution Plan benefits to result in net cash savings to Delphi of approximately

$5 million per quarter based on 2008 data.  These savings and future savings will preserve

liquidity and allow the Debtors greater flexibility in planning their exit from chapter 11.

K.      Implementation Of The Amended SERP And Amended SRESP

        33.     Due to the Debtors' decision to freeze the Salaried Plans and the SERP as

described above, the Debtors are also now seeking approval of the Amended SERP and the

Amended SRESP.  The purpose of the Amended SERP and the Amended SRESP is to assure

that eligible retiring salaried executive employees of the Company would be eligible to receive

an overall level of retirement benefits that are generally competitive with Delphi's peer group of

companies.  The Debtors do not intend to pay benefits under either program until emergence

(when the current SERP would be rejected or otherwise terminated), but seek approval of the

terms of the two programs at this time to provide clarity to active salaried executive employees

eligible to participate in the programs.  In addition, the approval of the terms of these programs is

important to reassure Delphi's affected salaried employees regarding retirement, which should

help maintain focus on the Debtors' turnaround and emergence from chapter 11.

18

34.    The Amended SERP, like the Approved SERP, would be an unfunded, non-qualified defined benefit plan that Delphi would administer separately and distinctly from the Salaried Plans and would not first become payable or vest until the Debtors' emergence from chapter 11.  The Amended SERP would be closed to new employees as of September 30, 2008 and benefits under the Amended SERP would be calculated based solely on service accrued as of September 30, 2008 and no new benefits would be accrued under the Amended SERP on account of service after that date.  Aside from the timing of the proposed pension freeze, the terms of the Amended SERP differ from the Approved SERP primarily in relation to the eligibility of certain employees who, with the Company's consent, voluntarily separate from Delphi between the day after the SERP is frozen (i.e., October 1, 2008) and the date the benefits under the Amended SERP first become payable or vested (i.e., Delphi's emergence from chapter 11).  Specifically, Delphi has amended the Approved SERP to make prospective retirees eligible, at Delphi's discretion, for Amended SERP benefits, although no payments under the Amended SERP would vest or be made until emergence from chapter 11.  Additionally, any such prospective retirees, due to the voluntary nature of their separation, are not eligible for severance benefits and can only become eligible for Amended SERP benefits by waiving his or her claim to benefits under the current SERP effective upon Delphi's emergence from chapter 11.  At or around emergence, the Amended SERP benefit would be calculated so as to reduce such retiree's benefit by the amount of any SERP payments received after retirement and prior to termination of the SERP.[13]

35.    The Amended SRESP differs from the Approved SRESP because, at emergence, Delphi would calculate and credit into the Approved SRESP the Delphi nonelective

---

[13]    The Amended SERP and Amended SRESP are attached to the Exhibit Notice.  In addition, for ease of reference, a version of the Amended SERP marked to show changes from the Approved SERP is attached to the Exhibit Notice along with a version of the Amended SRESP marked to show changes from the Approved SRESP.

and matching contributions for each individual to take into account the period between the freeze

of the Salaried Plans (i.e., September 30, 2008) and Delphi's emergence from chapter 11.  Delphi

would undertake these matching contributions provided the eligible employee contributes his or

her elected contribution percentage on an after-tax basis.  Employees who are separated prior to

emergence would not be entitled to Amended SRESP contributions.  The implementation of the

Amended SERP and Amended SRESP is reasonable and appropriate at this time because it will

provide consistent application and treatment to all salaried employees and will provide clarity as

to the program design and implementation to facilitate retirement planning while ensuring that

affected salaried employees are neither advantaged nor disadvantaged with respect to the

retirement freeze and applicable replacement plans.

Applicable Authority

L.      The Retirement Program Modifications Are
        Appropriate Under Section 363 Of The Bankruptcy Code

              (a)      The Modifications Satisfy The Business Judgment Test

              36.      Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession

to use property of the estate "other than in the ordinary course of business" after notice and a

hearing.  11 U.S.C. § 363(b)(1).  The Court should grant the relief requested in this Motion

because the basis for relief articulated by the Debtors is clearly compliant with section 363(b)(1)

of the Bankruptcy Code, which requires that "there must be some articulated business

justification for using, selling, or leasing the property outside the ordinary course of business."

Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re

Continental Airlines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) (citing In re Lionel Corp., 722

F.2d 1063, 1071 (2d Cir. 1983)); accord Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390

(6th Cir. 1986); Fulton State Bank v. Schipper (In re Schipper), 109 B.R. 832, 836 (Bankr. N.D.

20

Ill. 1989), aff'd, 112 B.R. 917 (N.D. Ill. 1990), aff'd, 933 F.2d 513 (7th Cir. 1991); In re

Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1988).


       37.     The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate." Orion Picture Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),

4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b)

motion is a summary proceeding, intended merely as a means to "efficiently review the . . .

debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is

not the time or place for prolonged discovery or a lengthy trial with disputed issues." Id.

       38.     As a rule, the debtor's business judgment "should be approved by the court

unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

80 (Bankr. D.Mass. 2001) (quoting In re Logical Software, Inc., 66 B.R. 683, 686 (Bankr. D.

Mass. 1986)).  As more fully discussed above, the Debtors have sound business reasons for the

freeze of the Pension Plans and the SERP, as well as the implementation of the Delphi

contributions under the Defined Contribution Plan and the approval of the terms of the Amended

SERP and the Amended SRESP.  Granting the relief requested herein will put in place an

important piece of the workable solution to the Debtors' current pension situation while

achieving cost savings that will inure to the benefit of the Debtors' estates and stake holders.

Freezing the pensions will protect the retirement benefits already accrued by employees and

retirees, while the modifications to the Defined Contribution Plan and approval of the Amended

SERP and Amended SRESP will help the Debtors' salaried compensation programs remain competitive.

M.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

39.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-day stay.  This Court previously granted similar relief from Bankruptcy Rule 6004(g) in approving the DIP Order, the DIP Extension Order, the Second DIP Extension Order, and the Supplemental Second DIP Extension Order, and other courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(g)).  With a waiver of the ten-day stay period, the Debtors will be able to consummate the pension freezes contemplated herein promptly upon this Court's approval of the Motion.

Notice

40.      Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Twelfth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered July 23, 2008 (Docket No. 13965).  In addition, the

Debtors have complied with the Supplemental Case Management Order with respect to the filing

of this Motion and the need for expedited relief.[14]  In light of the nature of the relief requested,

the Debtors submit that no other or further notice is necessary.

---

[14]   The Debtors have noticed this Motion for the omnibus hearing on September 23, 2008.  In compliance with the
terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors'
Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been
informed that the Creditors' Committee has consented to this Motion being heard on September 23, 2008.
Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until September
19, 2008 to file an objection to the Motion.

23

WHEREFORE the Debtors respectfully request that the Court enter an order

(a) authorizing, but not directing, the Debtors (I) to implement (i) a freeze of the Hourly Plan in

whole or in part effective as soon as practicable following Union consent, (ii) a freeze of the

Salaried Plans effective as of September 30, 2008, (iii) a freeze of the SERP, effective as of

September 30, 2008, (iv) the institution of Delphi contributions under the Defined Contribution

Plan for salaried employees, effective as of October 1, 2008, (v) the Amended SERP, effective as

of October 1, 2008 but not vesting or first becoming payable until emergence and the Amended

SRESP, effective and vesting upon emergence, and (II) subject to Union consent, to make

modifications to the Debtors' agreements with their U.S. labor Unions, as may be necessary to

implement the freeze of Delphi's hourly employee pension plan in whole or in part as soon as

practicable and as contemplated herein and related matters, and (b) granting the Debtors such

other further relief as is just.

Dated:          New York, New York
                September 12, 2008

                        SKADDEN, ARPS, SLATE, MEAGHER
                        & FLOM LLP
                        By:    /s/ John Wm. Butler, Jr.
                                John Wm. Butler, Jr.
                                John K. Lyons
                                Ron E. Meisler
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois 60606
                        (312) 407-0700

                                        - and –

                        By:    /s/ Kayalyn A. Marafioti
                                Kayalyn A. Marafioti
                                Thomas J. Matz
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                        Attorneys for Delphi Corporation, et al.,
                          Debtors and Debtors-in-Possession

24