**Proposed Hearing Date And Time: September 23, 2008 at 10:00 a.m.**
**Proposed Objection Deadline: September 19, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER AUTHORIZING DEBTORS TO IMPLEMENT
AMENDED AND RESTATED GLOBAL SETTLEMENT AGREEMENT AND MASTER
<u>RESTRUCTURING AGREEMENT WITH GENERAL MOTORS CORPORATION</u>

("GSA AND MRA AMENDMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Expedited Motion (the "Motion") For Order Authorizing Debtors To Implement Amended And Restated Global Settlement Agreement And Master Restructuring Agreement With General Motors Corporation ("GM"), and respectfully represent as follows:

<u>Preliminary Statement</u>

1.      On March 31, 2006, Delphi outlined the key tenets of a transformation plan (the "Transformation Plan") that it believed would enable it to return to stable, profitable business operations.  At that time, the Debtors stated that to successfully reorganize pursuant to a sustainable business model, during the course of their chapter 11 cases they needed to (i) modify their labor agreements to create a competitive arena in which to conduct business, (ii) conclude their negotiations with GM to finalize GM's financial support for Delphi's legacy and labor costs and ascertain GM's business commitment to the Company, (iii) streamline their product portfolio to capitalize on their technology and market strengths, and align their manufacturing capabilities with this new focus, (iv) transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint, and (v) devise a workable solution to their pension situation.

2.      By the end of 2007, as discussed in Delphi's Disclosure Statement (as defined below), which was approved by this Court on December 10, 2007, the Debtors had made considerable progress in addressing their Transformation Plan objectives.  The Debtors' ability to complete certain aspects of the Transformation Plan, however, was contingent on the consummation of their settlement agreement with GM.

3.      By including the resolution of issues with GM as one of the tenets of its Transformation Plan, Delphi signaled the paramount importance of addressing these matters to

2

the achievement of a successful restructuring of the Company.  In fact, aspects of the Debtors'

settlement with GM impact the Company's ability to fully complete certain Transformation Plan

objectives.  Specifically, the Debtors' global resolution of business and legacy issues with GM is

central to the Company's employee-related objectives (including those related to pensions and

other retirement benefits, labor agreements, and attrition programs), the restructuring of its

manufacturing base, and its ability to complete its restructuring.

4.       On January 25, 2008, this Court entered the Confirmation Order (as

defined below) confirming the Debtors' Plan (as defined below), which included several

settlements.  One of the settlements included in the Plan was the agreement between the Debtors

and GM that is memorialized in the Global Settlement Agreement and Master Restructuring

Agreement (respectively, the "Approved GSA" and the "Approved MRA").  The Plan, which

provided par plus accrued recoveries at a negotiated enterprise value for certain stakeholders and

a material distribution to equity holders, was approved by an overwhelming majority of creditors

and interest holders entitled to vote on the Plan.  The Debtors anticipate that certain stakeholders

may object to the relief requested in this Motion because of their concern that recoveries under

any modified Plan will be materially less than under the Plan.  For the reasons set forth in this

Motion, however, the Debtors believe that implementing their amended settlement with GM now

is a necessary step to providing meaningful recoveries to stakeholders under any viable strategic

alternative.

5.       On April 4, 2008, the Debtors announced that although they had met the

conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit

financing, Delphi's Plan Investors (as defined in the Plan) refused to fund their Investment

Agreement (as defined in the Plan) with Delphi.  Because the Debtors' Plan has not become

3

effective, the Approved GSA and the Approved MRA have not been consummated. However, the Approved GSA and the Approved MRA have not been terminated by the Debtors or GM. In fact, Delphi and GM have been engaged in continuous discussions since the events of April 4 regarding potential economic support to facilitate the Debtors' emergence from chapter 11 and for Delphi's reaffirmed emergence business plan, which discussions led to the development of the amendments to the Global Settlement Agreement (the "Amended GSA") and the Master Restructuring Agreement (the "Amended MRA").[1] The Amended GSA and Amended MRA are critical components of Delphi's reaffirmed emergence business plan, which is summarized below and attached hereto in summary form as Exhibit C.

6.        After the events of April 4, Delphi continued to address its other transformation goals as well. Delphi's Transformation Plan accomplishments that were made during these chapter 11 cases, despite the harsh economic climate that developed in 2007, are discussed in greater detail in this Motion. Indeed, in the face of what may be the most difficult credit crisis in perhaps fifty years combined with an acute economic downturn in the automotive industry, Delphi's salaried and hourly employees have made phenomenal progress in the transformation of the Company. The consummation of the Amended GSA and the Amended MRA will enable the Debtors to take the next step in the Company's transformation.

7.        The Debtors believe that it is their fiduciary responsibility and in the best interests of their estates to seek approval to implement the amendments to the Approved GSA and the Approved MRA now, independent of and in advance of the effectiveness of the Plan, whether or not that Plan is subsequently modified and even in light of uncertainty regarding

---

[1]        A copy of the Amended GSA is attached hereto as Exhibit A-1 and a marked copy of the agreement showing changes against the Approved GSA is attached hereto as Exhibit A-2. A copy of the Amended MRA is attached hereto as Exhibit B-1 and a marked copy of the agreement showing changes against the Approved MRA is attached hereto as Exhibit B-2. The Debtors are making the exhibits to the Amended GSA and the Amended MRA available under separate docket entry due to their voluminous nature.

ultimate stakeholder recovery.  It is the Debtors' business judgment that no strategic alternative

outside of a consensual settlement with GM would produce a meaningful stakeholder recovery.

The Debtors believe that a settlement with GM is the necessary predicate to establishing a viable,

stand-alone business plan, which is in turn a necessary predicate to entering the capital markets.

The Debtors believe that it is in the best interests of their estates to avoid a scenario that could

lead to potentially massive claims being asserted by the Pension Benefit Guaranty Corporation

(the "PBGC"), the Internal Revenue Service (the "IRS"), and GM, and/or the requirement of

making cash contributions to its pension plans upon emergence.  The Debtors recognize that

certain stakeholders may oppose the settlement with GM embodied in the Amended GSA and

Amended MRA because their potential recoveries under the Plan (as it may be modified) are

uncertain.  The Debtors believe, however, that the approval of their settlement with GM and the

implementation of the Amended GSA and the Amended MRA, the transfer of pension liabilities,

and the ability to enter the extraordinarily turbulent capital markets with a reaffirmed emergence

business plan are necessary predicates to <u>any</u> meaningful recovery to stakeholders.

8.    The Amended GSA and the Amended MRA described in this Motion are

consistent with, and essential to, Delphi's transformation and reorganization plans and reflect

GM's continuing and immediate support for Delphi's reorganization efforts.  Through the

Amended GSA and the Amended MRA, GM will make net contributions to Delphi's

transformation that the Debtors estimate have a value of approximately $10.6 billion.  Without

GM's support embodied in the Amended GSA and Amended MRA, the Debtors believe that a

viable stand-alone business plan may not be possible.  Consequently, implementation of the

Amended GSA and Amended MRA at this time is necessary to preserve the tremendous progress

the Company has made and to position Delphi to emerge from chapter 11 as soon as reasonably

practicable. The Debtors do not believe that any other strategic alternative that is reasonably available to them would yield potential recoveries equal to or greater than the potential recoveries available from implementing the Amended GSA and the Amended MRA.

9.    The timing of the transactions contemplated by the Amended GSA and Amended MRA is vital to the successful implementation of the Transformation Plan. Under the Amended GSA, GM has committed to assume financial responsibility for all of Delphi's hourly post-retirement health care benefits and post-retirement life insurance liabilities (collectively, "OPEB") and approximately $3.4 billion, as estimated by the Debtors, in net pension liability for Delphi's hourly pension plan (which has increased from $1.5 billion under the Approved GSA). Consummation of the transfer of certain of the Debtors' pension assets and liabilities to GM's pension plan, as contemplated by the Amended GSA, must take place before September 30, 2008 to avoid Delphi's accumulated funding deficiency arising on such date of $2.1 billion to $2.4 billion for its hourly pension plan because on October 1, 2008, Delphi's pension plans, including Delphi's hourly pension plan, will be subject to new regulations that may eliminate many of the efficiencies of the proposed pension transfer to GM, making such a transfer difficult if not entirely impractical.

10.    Unlike the Approved GSA and Approved MRA, in which GM required that its performance under those agreements be tied to the Debtors' emergence from chapter 11, the Amended GSA and Amended MRA accelerate substantially all of GM's obligations in support of the Debtors under the Approved GSA and Approved MRA, which will be implemented immediately upon the effectiveness of the Amended GSA and Amended MRA. In addition, a substantial portion of GM's incremental net contributions of $4.6 billion, as estimated by the Debtors, under the Amended GSA and the Amended MRA will become immediately and

unconditionally effective.  In exchange for GM's willingness to undertake its obligations,

including substantial obligations which will commence immediately, under the Amended GSA

and the Amended MRA, the Debtors have agreed to release GM from certain claims and causes

of action upon the effectiveness of the Amended GSA and the Amended MRA.

11.    In addition to accelerating its obligations under the Amended GSA and

Amended MRA, GM has also agreed to a dramatically altered compensation scheme for its

contributions.  GM is contributing approximately $4.6 billion more to the Debtors than it was

obligated to do under the Approved GSA and Approved MRA, including agreeing to effectively

reduce its net recovery by $1.9 billion, as estimated by the Debtors.  Under the Amended GSA,

GM would receive a $2.055 billion administrative claim for its contributions under the Amended

GSA and Amended MRA, including its assumption of $3.4 billion of Delphi's unfunded pension

liabilities (rather than a $1.5 billion note, payable in cash in 10 days, for the assumption of $1.5

billion in unfunded pension liabilities, as originally provided by the Approved GSA), as further

described below.  In addition, notwithstanding GM's contributions in addition to the assumption

of Delphi's pension and OPEB liabilities, which amount to several billion dollars, GM has agreed

to fix its unsecured claim against the estates at $2.5 billion and subordinate any recovery on this

claim until other general unsecured creditors (other than holders of claims arising from Delphi's

trust preferred securities) receive a distribution under the Plan amounting to at least twenty

percent of their claims.

12.    The Debtors believe that by their terms, the Approved GSA, the Approved

MRA, and the Confirmation Order allow the Debtors and GM to modify the Approved GSA and

Approved MRA upon the consent of both Delphi and GM.  Nevertheless, the Debtors believe

that this Court's review and consideration of this Motion is required because the Debtors are

7

seeking to (a) use estate assets pursuant to the terms of the Amended GSA and Amended MRA prior to the effective date of the Plan when estate assets revest in the reorganized Company and (b) implement the Debtors' settlement with GM in advance of the effectiveness of the Debtors' Plan, whether or not it is modified.  In addition, the Debtors are also seeking, to the extent necessary, authority to modify applicable union memoranda of understanding.  In connection with entering into their respective memoranda of understanding, Delphi's unions consented to certain transactions contemplated by the Approved GSA and Approved MRA.  To implement certain transactions under the Amended GSA and Amended MRA, union consent is necessary.

13.    Assuming that this Court approves this Motion and the companion Hourly And Salaried Pension Program Modification Motion,[2] the Debtors expect to enter the capital markets later this year with their reaffirmed emergence business plan and anticipate filing a motion pursuant to section 1127 of the Bankruptcy Code seeking approval of modifications to the Plan as soon as practicable.

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

14.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

---

[2]    Contemporaneously herewith, the Debtors are filing the Motion For Order Under 11 U.S.C. § 363 For Authority To Modify Benefits Under Hourly And Salaried Pension Programs And Modify Applicable Union Agreements In Connection Therewith (the "Hourly And Salaried Pension Program Modification Motion"), which seeks, among other things, authority to freeze the Debtors' hourly and salaried pension plans.

15.     No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders (together with the official committee of unsecured creditors, the

"Statutory Committees").

16.     On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9263), and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi

Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).

Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession (Docket No. 11386), and the First Amended Disclosure Statement with respect to the

Plan (Docket No. 11388) (the "Disclosure Statement").  The Court entered an order approving

the adequacy of the Disclosure Statement and granting the related solicitation procedures motion

on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court entered an order

(the "Confirmation Order") confirming the plan filed on December 10, 2007 (as modified) (the

"Plan") (Docket No. 12359), which became a final order on February 4, 2008.

17.     On April 4, 2008, the Debtors announced that although they had met the

conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit

financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that

was commenced but not completed and refused to fund their Investment Agreement (as defined

in the Plan) with Delphi.  On May 16, 2008, Delphi filed complaints for damages and specific

performance against the Plan Investors and related parties who refused to honor their equity

9

financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11.  The Debtors nevertheless continue to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

18.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334 and pursuant to the Confirmation Order and Article XIII of the Plan.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

19.    The statutory predicates for the relief requested herein are sections 363, 365, and 503(b) of the Bankruptcy Code and rules 2002, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

20.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[4]

21.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the

---

[3]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[4]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

22.     Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of GM.  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, more than half of Delphi's revenue is generated from non-GM sources.

C.     Events Leading To The Chapter 11 Filing

23.     In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[5]  In 2005, Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  In 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.  In 2007, the Debtors incurred a net loss of $3.1 billion.

---

[5]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

11

24.    The Debtors believe that the Company's financial performance deteriorated because of (i) unsustainable U.S. legacy liabilities and operational restrictions that prevented the Debtors from exiting non-profitable, non-core operations and created largely fixed labor costs, (ii) a competitive vehicle production environment that resulted in reduced U.S. GM production and related pricing pressures, and (iii) increasing commodity prices.

25.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its Transformation Plan and preserve value for its stakeholders.

D.    <u>Transformation Plan</u>

26.    On March 31, 2006, Delphi announced its five-point Transformation Plan:

- Labor:  Modify the Company's labor agreements to create a competitive arena in which to conduct business

- GM:  Conclude negotiations with GM to finalize GM's financial support for certain of the Debtors' legacy and labor costs and ascertain GM's business commitment to the Company

- Product Portfolio and Manufacturing Footprint:  Streamline the Company's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus

- Cost Structure:  Transform the Company's salaried workforce and reduce general and administrative expenses to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint

- Pension:  Devise a workable solution to the Company's pension funding situation

27.    Since that announcement, Delphi has achieved considerable progress in implementing its key transformation goals.  Delphi's transformation activities during its chapter 11 cases have produced an enterprise with a focused product portfolio that has far more

12

flexibility and a greater capability to respond and adapt to changing markets because Delphi now

has reduced U.S. employment costs, the ability to adjust U.S. manufacturing with volume, a

significant reduction in high cost production capacity, increasingly shared business process and

IT platforms between operating units, a simplified organizational structure, greater business

diversification by customer, and greater business diversification by region.

28.    The differences between the business operation of Delphi from the time of

its chapter 11 filing in 2005, its present state of transformation in mid-2008, and its expected

2009 state, on a post-emergence basis, are striking:

| | Pre-Transformation | Current Progress | Post-Transformation |
|---|---|---|---|
| Year | 2005 | June YTD 2008 | 2009 RPOR 8/08 |
| Product Line Businesses | 27 | 21 | 16 |
| U.S. Plants | 37 | 14 | 8 |
| U.S. Hourly Cost / Hour | $73 / hour | > $40 / hour | ~ $27 / hour |
| Manufacturing % of Revenue | 30% | 25% | 19% |
| U.S. Hourly Employment | 32,869 | 10,665 | < 5,000 |
| U.S. Salaried Employment | 14,542 | 10,243 | < 7,700 |
| SG&A Expense | $1.64 B | $0.70 B | $1.07 B |
| Number of Suppliers | > 5,000 | ~ 3,200 | ~ 2,700 |
| Capital Investment | $1.1 B | $0.5 B | $0.7 B |
| GMNA % of Revenue | 40% | 22% | 18% |
| Non-GM % of Revenue | 52% | 67% | 74% |
| Non-N.A. % of Revenue | 32% | 56% | 63% |

2005 and June YTD 2008 metrics include total Delphi operations including those units classified as
"Discontinued" for external financial reporting
SG&A metrics exclude one-time transformation related charges

29.    With respect to the modification of its labor agreements, Delphi has been

able to significantly lower its hourly labor costs by entering into modified agreements with each

of its major U.S. unions in 2007.  Portions of these agreements have already become effective,

and certain portions will become effective upon the consummation of the Amended GSA and

Amended MRA (subject to applicable union consent), and the consummation of the Plan.

30.     As shown by the illustration below, Delphi has also been successful in streamlining its product portfolio, aligning its manufacturing capabilities to focus on its market strengths, and developing "Safe, Green, & Connected" products.

### *"Safe, Green & Connected"*



31.     The Debtors have sold or wound down non-core product lines and manufacturing sites identified in March 2006 and are continuing their efforts to sell certain non-core product lines.  For example, during the first six months of 2008 alone, Delphi obtained Court approval of bidding procedures and sales agreements for the steering and halfshaft product line and closed on the sales of the interiors and closures product line, the North American brake components machining and assembly assets, and the global bearings business. Additionally, under an order providing Delphi with authority to sell certain assets that do not exceed $10 million without further Court approval, Delphi entered into an agreement to sell its power products business.

32.     Delphi is also continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and

14

administrative expenses to support its realigned portfolio. These initiatives include financial services, information technology and certain sales administration outsourcing activities, reduction of its global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of certain salaried benefit programs to bring them in line with more competitive industry levels. Given the investment required to implement these initiatives, Delphi does not expect to fully realize substantial savings until 2009 and beyond.

33.     Upon the conclusion of the reorganization process, the Debtors expect to emerge with a stronger, more financially sound business with U.S. operations that are globally integrated and well-positioned to advance enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

E.     Approved GSA And Approved MRA

34.     As noted above, the Debtors' March 2006 Transformation Plan reiterated the Company's goal of concluding negotiations with GM to finalize GM's financial support for certain of the Debtors' legacy and labor costs and ascertain GM's business commitment to the Company.  The resolution of Delphi's pension issues, another key Transformation Plan tenet, is a necessary concordant to the GM settlement.

35.     The discussions between the Debtors and GM that ultimately led to the terms set forth in the Approved GSA and the Approved MRA began in the summer of 2005 prior to the Debtors' chapter 11 filing.  In March 2006, the Debtors filed a motion to reject certain GM contracts.  As part of a joint effort to avoid litigation related to the contract rejection motion, during the spring and summer of 2006, the Debtors and GM developed the framework for GM's contributions to the Debtors in support of the Transformation Plan and the guiding tenets for

15

strengthening the parties' business relationship to achieve mutually beneficial commercial and strategic objectives.

36.     The Debtors' discussions with GM continued through April 2007.  By May 2007, the parties had agreed on the broad outlines of the Approved GSA and the Approved MRA.  Throughout the summer of 2007, working groups of specialists in various subject matter areas together with senior management from the Debtors and GM developed comprehensive approaches for addressing a wide range of matters, including the resolution of issues related to the Debtors' pension and retiree benefit plans, the disposition of various legacy agreements between the Debtors and GM, the restructuring of the Debtors' U.S. manufacturing base, and the adoption of guidelines for certain ongoing commercial agreements.  Both the Approved GSA and the Approved MRA were substantially complete by the end of August 2007.

37.     Delphi and GM first entered into the Approved GSA and the Approved MRA on September 6, 2007.  At GM's insistence, most obligations set forth in the Approved GSA were to be performed upon the occurrence of the effective date of the Plan or as soon as reasonably possible thereafter.  Under the Approved GSA:

- GM was to assume certain postretirement benefits for certain of the Delphi's active and retired hourly employees, including health care and life insurance;

- Delphi was to freeze its Delphi Hourly-Rate Employees Pension Plan as soon as practicable following the effective date of the Plan, as provided in the union settlement agreements, and GM's Hourly-Rate Employees Pension Plan was to become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi was to transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the U.S. labor union settlement agreements;

- GM was to receive an interest bearing note from Delphi in the amount of $1.5 billion which was expected to be paid promptly in cash following effectiveness of the Plan;

16

- GM was to make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the U.S. labor union settlement agreements; and

- GM and certain related parties and Delphi and certain related parties were to exchange broad, global releases (which would not apply to certain surviving claims as set forth in the Approved GSA).

38.    By contrast, the Approved MRA addressed matters that would require a number of years after consummation of the Plan to complete.  Through the Approved MRA, Delphi and GM had agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- Significant, ongoing contributions by GM to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and other postretirement benefit contributions provided under the Supplemental Wage Agreement, at specified UAW manufacturing facilities retained by Delphi;

- Certain terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- Certain additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by certain future dates (as defined in the Approved MRA); and

- The treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

39.    The agreements and settlements in the Approved GSA and Approved MRA were approved by this Court as part of the Confirmation Order.  The terms of the Approved GSA and Approved MRA provided that the Debtors and GM could amend the agreements.  The Approved GSA and Approved MRA also provided that such agreements would not become effective until and unless Delphi emerges from chapter 11.  Consequently, GM's obligations under the Approved GSA and Approved MRA were conditioned upon, among other things, Delphi's consummation of the Plan, including payment of certain amounts to settle GM's

17

claims.  Ultimately, the effectiveness of the Approved GSA and the Approved MRA were to

deliver, among other things, a material reduction in Delphi's liabilities related to the workforce

transition programs, revenue support from GM, and certain labor subsidies, which would have

provided significant amounts of liquidity to Delphi.

40.     The events of April 4 prevented the Debtors from consummating the

Approved GSA, Approved MRA, and associated pension transactions.  Nonetheless, since that

time, Delphi has continued to negotiate with GM regarding amendments to the Approved GSA

and Approved MRA that would allow Delphi to pursue a reaffirmed emergence business plan

and propose modifications to the Plan that would allow the Debtors to emerge from chapter 11 as

soon as reasonably practicable.

F.     Delphi's Reaffirmed Emergence Business Plan

41.     As described in the Disclosure Statement, Delphi's business planning

process is an annual process undertaken by the Company to provide revenue and cost projections

which assist the Company in managing its portfolio, planning its working capital needs,

developing its capital structure, and planning for the supporting capital expenditures. Annually,

Delphi undergoes a lengthy and detailed process to develop its business plan. The business plan

originally filed in September 2007, as amended in October 2007 to account for certain changes in

the capital structure of Reorganized Delphi as well as an updated forecast for GMNA volumes in

2008, was the business plan attached as Appendix C to the Disclosure Statement for the First

Amended Joint Plan of Reorganization that was confirmed by the Bankruptcy Court on January

25, 2008 (referred to hereafter as the "POR Business Plan").

42.     As part of the Company's annual business plan process, and in preparation

for Delphi's planned emergence from chapter 11 reorganization in early 2008, Delphi undertook

and completed its annual business plan process and updated the POR Business Plan.  The

updated business plan, referred to internally at Delphi and hereafter in this summary as the 2008-2011 Budget Business Plan (or "BBP"), was prepared at a divisional level and was used by the Company in connection with the POR confirmation process to confirm the overall company performance set forth in the POR Business Plan.  While updates were made for changes to volume and commodity assumptions at that time along with specific operating performance updates, overall the BBP process confirmed Delphi's commitment to the aggregate EBITDAR projections in the POR Business Plan based on macroeconomic and automotive sector conditions at that time.

43.    When the closing on Delphi's POR was suspended on April 4, 2008, as part of Delphi's consideration of potential modifications to its POR in order to emerge from chapter 11 as soon as practicable, Delphi undertook a reaffirmation process with respect to the POR Business Plan.  That reaffirmation process involved review and reaffirmation of the BBP (which had been prepared as part of Delphi's annual business planning process and which had confirmed Delphi's prior commitment to the aggregate EBITDAR projections in the POR Business Plan).  The preliminary reaffirmed POR business plan, which is attached in summary form as Exhibit C, is referred to internally at Delphi and in this Motion as the August 2008 Reaffirmed POR Business Plan, or the "RPOR."  Among other changes, the RPOR includes revised actual and expected volumes for the North American automotive market, significant increases in commodities costs that are used as raw materials in certain of Delphi's products and changes in the underfunded status of its pension plans as a result of negative plan asset returns. Certain of these changes are discussed in more detail below.

44.    The RPOR has been revised to account for changes in key commodity costs.  Delphi's products and the sub-components used in its manufacturing processes consume a

variety of commodities.  Recently, prices for all commodities, including steel, copper, aluminum,

oil, and oil-based resins that constitute the primary commodities used by Delphi, have increased

significantly.  Although there has been some retrenchment in commodity costs in recent months,

virtually all of the commodities used by Delphi have increased in price since the Debtors

formulated the POR Business Plan.  The RPOR has also been revised to account for changes in

OEM product mix.  The increase in oil prices and the corresponding increase in gas prices have

resulted in a significant shift in the mix of vehicles being manufactured and sold by OEM's (due

to consumers shifting their vehicle purchases away from Sport Utility Vehicles and other light

trucks that generally have larger and less fuel-efficient engines).  Finally, the RPOR has been

revised to account for reduced sales volume.  The weakening of the United States economy has

resulted in consumers' deferring or avoiding altogether the purchase of new vehicles.  As a result,

2008 United States light vehicle sales are currently projected to be the lowest since 1994.

45.    The macroeconomic changes and automotive industry conditions outlined

above have impacted virtually every OEM, including GM.  Although approximately 70% of

Delphi's revenue is not GM-related and non-North American revenue now constitutes

approximately 44% of Delphi's revenue, shifts in GM's North America ("GMNA") volume

impact Delphi.  Over the course of 2008, Global Insight/DRI (a third-party econometric

forecasting firm) has lowered GMNA volumes for every year of the RPOR.  In addition, GM has

lowered its expectations for its North American production.  The following diagram

demonstrates the changes in projected GMNA production volumes over the 2008-2011 periods.



46.    Delphi's RPOR has addressed the changes in the automotive industry described above and has incorporated the elements of GM support embodied in the Amended GSA and Amended MRA.  Overall, the 2008-2011 BBP Process affirmed that Delphi would meet the EBITDAR levels provided in the POR Business Plan.  The RPOR has been updated since the events of April 4 and reflects revised actual and expected volumes for the North American automotive market, significant increases in commodities costs that are used as raw materials in certain of Delphi's products, and changes in the underfunded status of its pension plans as a result of depressed asset performance.  The RPOR also reflects a change in the assumed emergence date to on or around December 31, 2008, actual financial results for the first half of 2008, updated foreign exchange rates over the RPOR period, and other specific operational adjustments with respect to particular customer program volumes and timing, including the modifications embodied in the Amended GSA and Amended MRA.

47.    As described in greater detail in <u>Exhibit C</u>, and described in only summary form here, the RPOR projects 2008 EBITDARP at approximately $0.63 billion improving to $1.74 billion in 2009.  The main contributors of this improvement are: (a) the reduction of hourly OPEB expense (which is generally being assumed by GM), (b) incremental GM labor subsidy and keep site facilitation support, (c) restructuring-related structural cost improvements in the areas of manufacturing and SG&A, and (d) increased profit related to new business wins outside of GM North America.  Material cost improvements are also anticipated in the RPOR, offset by year over year pricedowns with contractual customer price reductions.

48.    In addition, under the projections in the RPOR, cash flow from operating activities is projected to increase from a use of cash of $0.05 billion in 2007 to a source of cash of $1.3 billion in 2011. Significant sources and uses of cash from operations include:

- EBITDARPO (operating income before depreciation, amortization, restructuring, pension and OPEB expense) improves from $1.5 billion in 2007 to $2.2 billion in 2011;

- Global restructuring cash outflows of approximately $1.5 billion, $0.3 billion, and $0.5 billion in 2007, 2008, and 2009, respectively;

- Projected net working capital monetization proceeds associated with the exit from certain Non-Continuing Businesses; and,

- Net payments from GM of $1.7 billion, as estimated by the Debtors, in 2008 resulting from the settlement with GM.

49.    Improved operating cash flows are generally the result of the implementation of the Debtors' Transformation Plan, including product portfolio rationalization and migration, SG&A cost reduction initiatives, reduction in personnel costs as a result of negotiations with labor groups, the freezing of U.S. legacy defined benefit pension plans and agreement with GM regarding future business commitments and financial support for legacy costs, including hourly OPEB, as well as revenue growth in the continuing businesses.

G.    The Amended GSA And Amended MRA

50.    As more fully described below, the Approved GSA and Approved MRA must be amended and implemented now to effectuate the Debtors' GM and pension-related transformation goals and to allow the Debtors to pursue a viable reaffirmed emergence business plan.  Through the Amended GSA and Amended MRA, GM will make an estimated net contribution of approximately $10.6 billion to Delphi's transformation.  As discussed in more detail below, GM's contributions to Delphi's transformation have been greatly enhanced since Delphi and GM originally entered into the Approved GSA and Approved MRA.  In addition, GM has agreed to adjust its potential recoveries for its unsecured claim and alter the consideration it is to receive in exchange for its contributions.  In the aggregate, through the Amended GSA and Amended MRA, GM is increasing its estimated net contribution to Delphi's transformation by approximately $4.6 billion, from approximately $6.0 billion to $10.6 billion.

Relief Requested

51.    By this Motion, the Debtors seek entry of an order authorizing the Debtors to implement the Amended GSA and the Amended MRA, and to modify applicable union memoranda of understanding, as necessary, to effectuate the Amended GSA and the Amended MRA.  Implementation of the Amended GSA and the Amended MRA will allow the Debtors to consummate their comprehensive settlement with GM and the necessary transactions related to the transfer of certain pension obligations to the GM Hourly-Rate Employees Pension Plan on or before September 29, 2008.  Through implementation of the Amended GSA and Amended MRA, substantially all obligations under the Approved GSA and Approved MRA will become immediately and unconditionally effective, rather than upon the Debtors' emergence, and the majority of GM's enhanced obligations under the Amended GSA and Amended MRA will become immediately effective.  The relief requested in this Motion will allow the Debtors to

23

carry out their transformation goals of (i) concluding negotiations with GM to finalize financial

support for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi

going forward and (ii) devising a workable solution to Delphi's pension funding situation.

Implementation of the Amended GSA and Amended MRA will also allow the Debtors to move

forward on the basis of their reaffirmed emergence business plan to enter the capital markets and

to be in a position to negotiate with their stakeholders regarding funding of, and modifications to,

the Plan.

<u>Basis For Relief</u>

52.    The Debtors believe that the terms of the Approved GSA, the Approved

MRA, and the Confirmation Order clearly allow the Debtors and GM to modify these

agreements.  Nevertheless, the Debtors believe they need authority to use assets of their estates

outside the ordinary course of business prior to revesting or to implement their settlement with

GM in advance of the effectiveness of the Debtors' Plan, whether or not it is modified.

Consequently, the Debtors are now seeking authority to implement the transactions contemplated

by the Amended GSA and the Amended MRA.[6]

53.    Through a confluence of market-based and legislative events, the prompt

consummation of the Amended GSA and Amended MRA is critical to the transformation of

Delphi.  Implementing the Amended GSA now is of primary importance to the Debtors so that

the Debtors can transfer certain pension assets and liabilities to GM's pension plan.

Consummation of this pension transfer on or before September 29, 2008 will avoid Delphi's

having an accumulated funding deficiency of $2.1 billion to $2.4 billion for its hourly pension

---

[6]    The discussion of the Amended GSA and the Amended MRA contained herein is a summary only.  The
Amended GSA and the Amended MRA are complex and lengthy documents, and many of the provisions of the
agreements are not highlighted in this summary.  In the event of any inconsistency between this summary and
the Amended GSA or the Amended MRA, the terms of the agreements control.

plan as of September 30, 2008, and therefore will substantially reduce the Debtors' required
emergence contribution to their pension plans.  On October 1, 2008, Delphi's pension plans,
including Delphi's hourly pension plan, will be subject to new regulations that may eliminate
many of the efficiencies of the proposed pension transfer to GM.  Under the Amended GSA, GM
has committed to assume approximately $3.4 billion of Delphi's hourly pension plan net
liabilities (subject to the occurrence of the second transfer of pension liability as described in the
Amended GSA) and relieve Delphi of contribution obligations in respect thereto.

54.     Implementing the Amended MRA is equally important to Delphi's
transformation.  As described above, the expectation for North American vehicle production
volume has changed dramatically, for GM and nearly all other manufacturers, since September
2007.  Consequently, the Debtors believe that many of the arrangements contemplated by the
Amended MRA will support a viable reaffirmed emergence business plan that will be the
cornerstone of seeking debt and equity financing of the Plan (whether or not modified).
Consequently, it is critical for Delphi's transformation that the Company act on a reaffirmed
emergence business plan that takes into account today's market conditions and GM's revised
contributions to Delphi embodied in the Amended MRA.

55.     The enhancement of GM's support for Delphi through the Amended GSA
and Amended MRA is significant.[7]  As outlined in the chart below, through the Amended GSA
and Amended MRA, GM's net contributions to Delphi's transformation would increase by
approximately $4.6 billion.

---

[7]     In addition to GM's contributions to the Debtors' restructuring through amendments to the GSA and MRA,
under separate agreements GM has agreed to arrangements to advance the Debtors up to $950 million and
forego a payment of more than $100 million for warranty claims.

| $ in Billions | April 4th | Today |
|---|---|---|
| Cash Already Paid by GM | 0.7 | 0.7 |
| Cash Paid Through Effective Date | 1.3 | 1.7 |
| Future Obligations [1] | 7.9 | 10.4 |
| Sub Total | 10.0 | 12.7 |
| 414(L) Consideration | (1.5) | (2.1) |
| Chapter 11 Recovery [2] | (2.5) | - |
| Net GM Contributions To Delphi | 6.0 | 10.6 |

[1]  OPEB is Delphi's estimate based on economic value not accounting value
[2]  Today estimate assumes creditor recovery of $0.20 (or less)

H.    The Amended And Restated GSA

56.    Like the Approved GSA, the Amended GSA focuses on near-term Delphi-GM issues.  The Amended GSA has been revised, however, to accelerate the effectiveness of Delphi's comprehensive settlement with GM and eliminate significant elements of conditionality to the performance of GM's obligations under the agreement.  In addition, GM has agreed to consent to, and to waive its right to object to, any Delphi reorganization plan that provides for the GM releases, consideration, and interpretation provisions set forth in the Amended GSA.  GM has also agreed to use its reasonable best efforts to satisfy the conditions precedent to the effectiveness of the Amended GSA.

57.    As described in more detail below, GM will assume financial responsibility for certain pension and post-retirement obligations of Delphi.  However, GM's assumption of such responsibility, and the effectiveness of the Amended GSA, is conditioned on GM and Delphi receiving consents from enough unions to, among other things, complete the first step of the section 414(l) pension transfer (described below).  For the union consents to be considered, each union must consent that upon the effectiveness of the Amended GSA and the

Amended MRA, the pension freeze, the transfer of pension-related assets and liabilities, the

OPEB cessation, and the releases provided for in the Amended GSA and the unions' benefit

guarantee term sheets (all as the unions agreed to in connection with the Approved GSA and the

Approved MRA) will all become immediately effective.

58.     The Approved GSA and the Amended GSA govern the same aspects of

Delphi's settlement with GM.  The Amended GSA has been revised to, among other things:

- Modify the mechanics and expand the amount of Delphi's net pension liability transfer to GM pursuant to section 414(l) of the Internal Revenue Code from $1.5 billion to approximately $3.4 billion (subject to the occurrence of the second transfer of pension liability as described in the Amended GSA);

- Increase GM's support for Delphi's hourly OPEB obligations such that GM becomes financially responsible for all hourly OPEB retroactive to January 1, 2007;

- Reduce GM's consideration for the pension transfer and GM's rights to distributions on its unsecured claim pursuant to a plan of reorganization; and

- Accelerate the effectiveness of certain releases granted to GM.

Each of these modifications is described in greater detail below.

(a)     Amended GSA:  Modification Of Pension Transfer

59.     Delphi currently maintains the Delphi Hourly-Rate Employees Pension

Plan (the "HRP") for tens of thousands of its hourly employees and retirees.[8]  Delphi's funding

obligations under the HRP are governed by the Internal Revenue Code (the "IRC") and the

Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461

("ERISA").  Under the IRC and ERISA, Delphi is required to meet certain minimum funding

requirements for the HRP.

---

[8]     The Debtors currently administer additional pension plans which are not the subject of this Motion: the Delphi Retirement Program for Salaried Employees, the Delphi Mechatronic Systems Retirement Program, the ASEC Manufacturing Retirement Program, the Packard-Hughes Interconnect Bargaining Retirement Plan, and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan.

60.    Pursuant to the confirmed Plan and the Approved GSA, the Debtors were to transfer approximately $1.5 billion of net unfunded liabilities from the HRP to the General Motors Hourly-Rate Employees Pension Plan (the "GM Plan") pursuant to section 414(l) of the IRC, which would have reduced Delphi's minimum funding obligation to the HRP.  On the Effective Date of the confirmed Plan, GM was to receive a note for $1.5 billion, which was to be repaid in cash within 10 days.  In addition, Delphi would have been required to make certain contributions to its pension plans after emergence.

61.    Since the Debtors filed the Plan, asset values in the HRP have declined in part due to adverse market conditions, which have contributed to a projected accumulated funding deficiency at September 30, 2008 of $2.1 billion to $2.4 billion.  To alleviate the HRP underfunding and resolve future contribution needs, the Debtors therefore seek to transfer the majority of the HRP to the GM Plan in two transfers totaling approximately $3.4 billion in net unfunded liabilities (the "414(l) Transfer").

62.    Based on current actuarial determinations of the minimum cost of maintaining the HRP, the 414(l) Transfer is likely necessary to allow the Debtors to emerge from chapter 11 without substantial contribution obligations to their pension plans.  The Debtors and GM have therefore agreed, subject to this Court's approval (and union consent as necessary), to implement the 414(l) Transfer in connection with the consummation of the Amended GSA and in compliance with IRC section 414(l) and the private letter ruling issued by the IRS to Delphi on May 29, 2007 (the "Private Letter Ruling").[9]  Even in the hypothetical scenario in which the

---

[9]    Consistent with the Private Letter Ruling, the 414(l) Transfer will involve a spin-off of a portion of the HRP to temporarily create a spin-off plan, which would then immediately be merged with the GM Plan.  Also consistent with the Private Letter Ruling, no individual participant would have his or her benefits split between the HRP and the GM Plan.  The 414(l) Transfer would utilize the funding methods discussed in the Private Letter Ruling, which the IRS found to be reasonable approaches, consistent with sections 412 and 414(l) of the IRC.

Debtors do not emerge from chapter 11 on a stand alone basis, the Debtors believe that implementing the Amended GSA and the Amended MRA now, including effectuating the first Transferred Liability (as described below) under the 414(l) Transfer and providing GM with an allowed administrative claim and certain releases, would be preferable to exposing the estates to potentially massive additional claims by the PBGC, IRS, and GM.

(i)    Structure Of The 414(l) Transfer

63.    Pursuant to the Amended GSA, the Debtors would transfer to the GM Plan all allocable pension benefit obligations (the "Allocable PBOs") and an allocable portion of the HRP assets (the "Assets")[10] for those employees who were employed by Delphi at the time of Delphi's spin-off and had prior GM service, with the unfunded portion of such Allocable PBOs representing the transferred liability (the "Transferred Liability").

64.    The 414(l) Transfer would take place in two separate transfers.  Assuming the Motion is approved, the first transfer would occur no later than September 29, 2008 (the "First Transfer Date").  On the First Transfer Date, the Debtors would move Transferred Liability sufficient to avoid an accumulated funding deficiency for the plan year ending September 30, 2008, which is estimated to be approximately $2.1 to $2.4 billion as of September 30, 2008.[11]  The Debtors would also transfer approximately 90% of the Assets corresponding to the liability transferred on the First Transfer Date, which would be valued at approximately $600

---

[10]    As required under IRC section 414(l), the Assets would be allocated in accordance with plan termination priority categories under section 4044 of ERISA and in accordance with Treas. Reg. 1.414(l)-1(n)(1)(ii), such that each participant remaining in the HRP and each participant transferred to the GM Plan would receive a benefit, if both plans were terminated immediately after the 414(l) Transfer, which is equal to or greater than the benefit that such participant would have received if the HRP had terminated immediately before the 414(l) Transfer.

[11]    The accumulated funding deficiency measures the accumulated pension underfunding for the HRP as of September 30, 2008.  Avoiding the accumulated funding deficiency provides several benefits to the Debtors. First, the Debtors would not need additional pension funding waivers for the HRP for the 2008 plan year. Second, although the Debtors do not believe excise taxes would be enforceable or valid, eliminating the HRP underfunding would remove the risk of excise taxes being assessed due to HRP underfunding.

29

million to $1 billion.  The remaining 10% of the Assets would be transferred to the GM Plan

after an approximate six-month true-up period.  During this-six month true-up period, the HRP

would continue to deliver pension payments associated with the Transferred Liabilities to ensure

continuity of administration.

   65. The second transfer would be completed upon Delphi's emergence from

chapter 11 (the "Second Transfer Date"), provided that the Plan (i) provides for the treatment of

GM's claims and releases as set forth in the Amended GSA and (ii) contains provisions clarifying

that if there is any inconsistency with respect to the subject matter of the Amended GSA and the

Amended MRA between the terms of the Plan and the terms of the Amended GSA and Amended

MRA, the terms of the Amended GSA and Amended MRA will govern.  On the Second Transfer

Date, the Debtors would convey the remainder of the Transferred Liability representing the

remaining net-unfunded liability related to Allocable PBOs, which Delphi estimates to be

approximately $1 billion (but may increase or decrease depending on, among other things, the

performance of the assets in the pension plans).

(ii) <u>Benefits Of 414(l) Transfer</u>

   66. On October 1, 2008, the HRP will be subject to the Pension Protection Act

of 2006 (the "PPA").  Under proposed Treasury Regulations implementing the PPA, any

accumulated funding deficiency under the HRP that exists as of September 30, 2008 could be

corrected only by actual contributions to the HRP for the full amount of the deficiency – the

deficiency could no longer be cured by transfers of unfunded liabilities to the GM Plan.  As a

result, absent either an additional pension funding waiver from the IRS or a change in the

applicable proposed Treasury Regulations, if the first 414(l) Transfer were to occur after

September 29, 2008, the Debtors would be required to make a significant contribution to the

30

HRP, estimated to be several billion dollars, upon emergence from chapter 11. Moreover, while

not without material uncertainty, a 414(l) Transfer of the HRP to GM's fully-funded plan

occurring after September 29, 2008 would not be efficient to eliminate or moderate the

contribution obligation. Finally, the Private Letter Ruling reflects IRS approval for Delphi's

intended structure of the 414(l) Transfer only under current law, which will be replaced by the

PPA on October 1, 2008. The PBGC has been emphatic regarding the upcoming deadline. On

August 15, 2008 and September 9, 2008, PBGC Director Charles E.F. Millard sent the Debtors

letters strongly urging that they consummate a 414(l) transfer before the end of the current plan

year on September 30, 2008.

　　　　　　　　67.　　　　Completing the 414(l) Transfer (together with freezing its pension plans as

contemplated in the Hourly And Salaried Pension Program Modification Motion filed

contemporaneously herewith) would allow Delphi to accomplish its goal of devising a workable

solution to its pension funding situation and would avoid billions of dollars of cash contributions

that would otherwise be required to be funded upon emergence from chapter 11. Under current

IRC and ERISA funding standards, the 414(l) Transfer implemented during the current plan year

should significantly reduce Delphi's funding obligations to the HRP by avoiding any

accumulated funding deficiency as of September 30, 2008. Upon the completion of both steps of

the 414(l) Transfer, Delphi would be left with unfunded liabilities for the retained portion of the

HRP of only approximately $100 million. Because the 414(l) Transfer would reduce the

Debtors' emergence contribution required in connection with the HRP, the Debtors' exit

financing requirements could be significantly reduced. In light of the extraordinarily turbulent

capital markets, reducing the amount of exit financing required substantially improves the

Debtors' prospects for emergence.

68.    Consummating the 414(l) Transfer prior to September 30, 2008 would also prevent the potential assessment of significant excise tax penalties with respect to the HRP underfunding that the IRS might impose if the Debtors did not effectuate the 414(l) Transfer. Section 4971(a) of the IRC imposes a 10% excise tax penalty on the amount of any funding deficiency.  Under section 4971(b) of the IRC, an additional excise tax penalty of 100% may be assessed by the IRS if the funding deficiency is not timely corrected.  Although the Debtors believe such penalties are unenforceable under applicable bankruptcy law, consummating the 414(l) Transfer before September 30, 2008 would avoid a dispute with the IRS over the issue as well as any questions about how a potential significant excise tax assessment would be reflected in the Debtors' financial statements.

69.    Consummation of the 414(l) Transfer prior to September 30, 2008, therefore, provides substantial economic benefits to the Debtors and their estates.  In addition, the 414(l) Transfer would reduce the Debtors' contribution to the HRP that would otherwise be required upon emergence from chapter 11, which in turn would reduce the amount of necessary exit financing.  In light of the extraordinarily turbulent capital markets, reducing the amount of financing required to successfully emerge from chapter 11 is crucial to the Debtors and their stakeholders.

(b)    Amended GSA:  Modification Of GM's
       Assumption Of Delphi OPEB Obligations

70.    Under the Approved GSA, and in connection with the effectiveness of the memoranda of understanding between Delphi and its labor unions, Delphi was to cease providing certain post-employment benefits such as health care benefits and employer-paid post-retirement basic life insurance benefits, and GM was to assume the provision of OPEB to certain Delphi employees and retirees.  Under the Approved GSA, GM was to reimburse Delphi for OPEB

32

costs from January 1, 2007 through the date after the effective date of the confirmed Plan when

Delphi actually terminated OPEB for its hourly retirees and employees.  In addition, GM was to

reimburse Delphi for OPEB provided by Delphi since January 1, 2007 only after the effective

date of the confirmed Plan.

71.     The Amended GSA retains GM's assumption of those post-retirement

benefits, but accelerates the effectiveness of GM's assumption of financial responsibility for the

OPEB liabilities.  Under the Amended GSA, GM would assume financial responsibility for all

Delphi hourly OPEB liability from and after January 1, 2007, which would be implemented and

satisfied by GM reimbursing Delphi for any OPEB expenses from January 1, 2007 through the

date when Delphi actually terminates OPEB for its hourly retirees and employees and GM

assumes the OPEB obligations for the hourly retirees and employees.  The Debtors anticipate the

immediate cash reimbursement for the period from January 1, 2007 through June 30, 2008 to be

approximately $290 million.  This amount will be paid on the later of the effective date of the

Amended GSA and the date which is two business days after Delphi has provided written notice

to GM of the effective date of the Amended GSA.  GM will also reimburse Delphi for hourly

OPEB paid from July 1, 2008 going forward until Delphi actually terminates OPEB for its hourly

retirees and employees.  In addition to assuming financial responsibility for all of Delphi's OPEB

retroactive to January 1, 2007 on the effective date of the Amended GSA, GM will assume direct

responsibility for the OPEB obligations upon the earliest date agreed upon with each respective

union.  GM will use its best efforts to begin administering OPEB on or before the 90th day

following the date Delphi ceases providing OPEB (subject to the applicable labor agreements),

or as soon as practicable thereafter.  The Debtors believe the net present value of the OPEB

obligations is approximately $5.5 billion.

72.     GM's assumption of financial responsibility for hourly OPEB obligations, combined with the cessation of Delphi's OPEB obligations, provides a substantial benefit to the Debtors and their estates.  First, upon the effectiveness of the Amended GSA, GM would reimburse Delphi for $290 million of OPEB expenses incurred since January 1, 2007.  Second, upon receipt of the applicable union consents, the Debtors would no longer be obligated for future OPEB obligations, which would relieve the estates of approximately $5.5 billion of liabilities (and in the interim, GM would assume responsibility for the OPEB as if the date Delphi ceased providing OPEB, subject to the applicable labor agreements, had occurred).  This would have a significant impact on Delphi's reaffirmed emergence business plan by reducing cash payments in later years of the RPOR and increasing cash, through the GM reimbursement, for 2008.

(c)     Amended GSA:  GM's Claims

73.     Under the confirmed Plan, GM was to receive a general unsecured claim that would have been satisfied through the issuance of $1.073 billion in face amount of non-voting convertible preferred stock in Reorganized Delphi, $1.5 billion in a combination of cash and notes, and global releases from Delphi and certain third parties.  In addition, as consideration for the section 414(l) transfer of $1.5 billion that was contemplated under the Approved GSA, GM would have received a note for $1.5 billion that was to be payable in cash within 10 days of the effective date of the Plan.

74.     To facilitate a viable capital structure for the Debtors, GM has now agreed to fix its general unsecured claim amount at $2.5 billion and subordinate its recovery on such claim until other general unsecured creditors have achieved a recovery of 20% of the allowed amount of their claims (other than holders of claims arising from Delphi's trust preferred

securities).[12]  Once Delphi's other general unsecured creditors have received a distribution of

20% of the allowed amount of their claims, if there is any remaining value to be distributed, GM

would receive a distribution on its general unsecured claim until it has received a 20%

distribution on such claim amount.  Once GM has received a 20% distribution on its general

unsecured claim, and if there is any remaining value to be distributed, any additional

distributions would be shared ratably between GM and Delphi's other general unsecured

creditors.

        75.     In consideration of its contributions under the Amended GSA and

Amended MRA, GM would receive an allowed administrative claim.  Based on GM's

contributions under the Amended GSA and Amended MRA, GM would receive an allowed

administrative expense claim in the amount of $2.055 billion.  As a basis for calculating the

amount of GM's administrative claim, GM and the Debtors agreed to fix the administrative claim

(at a reduced amount) to the liabilities transferred to GM through the 414(l) Transfer.  The

administrative claim would be allowed in two steps.  On the First Transfer Date of the 414(l)

Transfer, GM would receive a claim equivalent to 77.5% of the net liabilities transferred on the

First Transfer Date.[13]  On the Second Transfer Date of the 414(l) Transfer, GM would receive

the balance of the $2.055 billion claim.  In a chapter 11 reorganization in which Delphi emerges

with its principal core businesses, the plan of reorganization may satisfy GM's administrative

claim through the issuance of non-voting convertible preferred stock (provided that (i) Delphi's

exit funding does not exceed $3.0 billion, (ii) no equity securities are issued that are senior to or

---

[12]    GM's claim consideration described in the Confirmed Plan was reduced from a $2.7 billion cash distribution as
described in the Debtors' plan and disclosure statement filed on September 6, 2007.

[13]    GM remains responsible under its benefit guarantee with the unions in the event of a termination of the HRP for
amounts above those provided by the PBGC.  The net Transferred Liability transferred in connection with the
First Transfer Date represents, in the Debtors' estimate, approximately $1.6 billion in Transferred Liability that
GM would not otherwise be liable for under GM's benefit guarantee.

pari passu with GM's preferred stock, (iii) the Plan provides for the GM releases as described in

the Amended GSA, (iv) the Plan contains provisions clarifying that if there is any inconsistency

with respect to the subject matter of the Amended GSA and the Amended MRA between the

terms of the Plan and the terms of the Amended GSA and Amended MRA, the terms of the

Amended GSA and Amended MRA will govern, and (v) pursuant to which the Debtors emerge

with substantially all of their core businesses).

(d)    <u>Amended GSA:  Modification Of Releases</u>

76.    Under the Approved GSA, Delphi and GM were to exchange global

releases, and GM was to receive third-party releases, that would have become effective upon the

effectiveness of the Approved GSA and Approved MRA (which was to be the effective date of

the confirmed Plan).  Under the Amended GSA, the Debtors would release GM upon the

effectiveness of the Amended GSA and the Amended MRA.  Because the releases are an integral

part of the consideration GM is receiving in exchange for the benefits its is providing to the

Debtors' estates under the Amended GSA and the Amended MRA, GM is unwilling to

implement the Amended GSA and the Amended MRA and to provide the benefits thereunder

unless the releases by the Debtors are granted contemporaneously with the effectiveness of the

Amended GSA and the Amended MRA.  The Debtors believe, in their business judgment, that it

is necessary and appropriate to provide GM a release in exchange for its immediate and

irrevocable performance under the Amended GSA and the Amended MRA.  The Debtors

conducted a thorough evaluation of the alternatives to releasing GM from certain potential

claims and, on balance, determined that a consensual resolution with GM is fair and equitable

and in the best interests of the Debtors' estates.

77.    As described in the Disclosure Statement, in January 2006, the Debtors scheduled unliquidated claims against GM and reserved their rights to assert claims against GM in their Schedules of Assets and Liabilities and Statements of Financial Affairs.  Similarly, from the outset of the Chapter 11 Cases, the Debtors have been aware of certain defenses to claims that might be asserted by GM against the Debtors' Estates (collectively with the claims against GM, the "GM Claims and Defenses").  In addition, on July 31, 2006, GM and its affiliates filed a proof of claim against the Debtors' Estates, which stated a liquidated claim in the aggregate amount of $6 billion and also identified further purported significant unliquidated claims.  In its third quarter 2007 Form 10-Q filed on November 8, 2007, GM stated that the exact amount of its claims could not be established (due in part to the contingent nature of many of its claims), but estimated that the amount of its claims could be as much as $13 billion.

78.    The Debtors explained in the Disclosure Statement that, based on the factual information discovered through their ongoing investigations, the Debtors' professionals analyzed the legal strengths and weaknesses of the GM Claims and Defenses.  Although the Debtors concluded that some of the GM Claims and Defenses are colorable, inasmuch as the known facts may support certain legal causes of action, the Debtors also concluded that other purported claims and causes of action may not be supported by the facts.  Moreover, the Debtors further concluded that for the potential causes of action that may be supported by the facts, GM may have available to it certain substantial complete or partial legal defenses to those claims or causes of action, including, among others, defenses based on applicable statutes of limitations.  Furthermore, as part of the Debtors' overall assessment of the GM Claims and Defenses, the Debtors, through their professionals, also estimated the economic damages that might be recoverable through the GM Claims and Defenses.  Here again, the Debtors determined that,

although certain causes of action may give rise to economic damages, GM may also have substantial factual defenses to the recovery of such economic damages.

79.    Nevertheless, out of an abundance of caution, and because of GM's unique role in these Chapter 11 Cases, the Debtors filed a sealed complaint (the "GM Complaint") on October 5, 2007 governed by the Avoidance Procedures Order entered by the this Court on August 16, 2007.  The Debtors and GM have also filed a stipulation that contains tolling provisions, consistent with the Avoidance Procedures Order, and other agreements of the parties with respect to the GM Complaint, which stipulation has been deemed "so ordered" and has been sealed in accordance with the terms of the Avoidance Procedures Order.

80.    In sum, although the potential economic recovery to the Debtors from the GM Claims and Defenses may be significant in absolute terms, the Debtors have concluded that any such recovery carries with it a risk of significant uncertainty in light of the potential factual and legal defenses available to GM, as well as the inherent risk of uncertainty that would accompany such a substantial litigation matter.  Moreover, the pursuit of the GM Claims and Defenses in a manner adversarial to GM is, without question, mutually exclusive of GM's substantial consensual support of the Debtors' reorganization and transformation efforts as currently contemplated, including GM's support for the resolution of Delphi's legacy labor union obligations, as well as GM's support of the Debtors' business through ongoing commercial relationships.

81.    Similarly, the pursuit of the GM Claims and Defenses in a manner adversarial to GM would likely result in litigation that would take years to resolve, during which time the Debtors' ability to exit successfully from their chapter 11 reorganization and operate as a competitive enterprise would be much more uncertain.  Based on all of the Debtors' own

investigation and analysis, it is the Debtors' judgment that the consensual resolution of the GM

Claims and Defenses is in the best interests of the Debtors' estates and is clearly superior to any

alternative under which the Debtors would seek to pursue the GM Claims and Defenses through

proceedings adversarial to GM.

82.    In addition to providing a release to GM, the Debtors would withdraw

with prejudice the GM Complaint upon the effectiveness of the Amended GSA.  The Debtors

have agreed that any modified Plan would contain third party releases for GM.  As with the

releases from the Debtors, GM was unwilling to implement the Amended GSA and the Amended

MRA without the requirement that any modified Plan contain the third party releases.  The

effectiveness of third party releases for GM, however, would not begin until the date of

substantial consummation of a modified Plan.

83.    The Debtors believe that the release provisions of the Amended GSA are

appropriate under the circumstances.  The release provisions in the Amended GSA were

negotiated over an extended period of time at arms' length and are a material, integral, and

essential portion of the consideration that GM is receiving under the Amended GSA and the

Amended MRA.  Accordingly, the Debtors' release of GM is a necessary predicate to the

effectiveness of the Amended GSA and Amended MRA which give rise to GM's commitment of

billions of dollars to Delphi's restructuring.  Moreover, the amount of GM's contribution under

the Amended GSA and Amended MRA has increased dramatically since GM and Delphi entered

into the Approved GSA and Approved MRA.

84.    On December 7, 2007, the date GM and Delphi entered into the Approved

GSA and Approved MRA, based on the Debtors' estimate GM was to contribute approximately

$10 billion and receive approximately $4 billion in a combination of consideration for the 414(l)

39

Transfer and recoveries on its unsecured claim, and the negotiated total enterprise value of reorganized Delphi was approximately $12.8 billion.  Since December 2007, many events have occurred that have impacted the necessary amount of GM's contribution, GM's consideration and recoveries, and the enterprise value of the reorganized Debtors.  For example, commodity costs have greatly increased while North American production volumes have decreased.  As a result, Delphi requires greater support from GM under the MRA.  In addition, because of the sharp decrease in market values and the factors affecting the auto sector, the potential total enterprise value of Delphi has likely significantly decreased.  Thus, GM's net contributions to Delphi's restructuring have increased by approximately $4.6 billion and GM's consideration for the 414(l) Transfer has been reduced to a $2.055 billion administrative claim payable in convertible preferred stock rather than a $1.5 billion note, payable in cash in ten days.

85.    For the foregoing reasons, the Debtors believe that under the circumstances, the releases in the Amended GSA are appropriate.  The Debtors recognize the releases approved in connection with the confirmation of the Plan were approved in the context of overwhelming support for the Plan that included a settlement with GM that required a $6.0 billion contribution from GM, a par plus accrued recovery (at an agreed upon enterprise value) for the unsecured creditors, and a recovery for equity holders.  The Debtors understand that in an environment of uncertain recoveries, certain stakeholders may object to the Debtors' settlement with GM that is embodied in the Amended GSA and the Amended MRA, even though GM is increasing its estimated net contribution to the Debtors' to approximately $10.6 billion.  The Debtors believe that despite the potential for uncertain recoveries to stakeholders, the implementation of their settlement with GM is well within the standards established by Bankruptcy Rule 9019, is fair and equitable, and in the best interests of the Debtors' estates.

I.    <u>The Amended And Restated MRA</u>

86.    The Approved MRA and Amended MRA govern the same aspects of the commercial relationship between Delphi and GM.   The Amended MRA, like the Approved MRA, addresses matters that would require a significantly longer period of time to complete, most likely a number of years after consummation of a plan of reorganization.   The Amended MRA also addresses the treatment of certain legacy agreements and other contracts between Delphi and GM.   The effectiveness of the Amended MRA would be concurrent with the effectiveness of the Amended GSA and GM's obligations under the MRA would not be subject to termination until 2015 (provided that certain obligations of GM with respect to legacy UAW employees would survive any such termination).

87.    GM's enhanced obligations under the Amended MRA are considerable.   First, GM would provide Delphi with a $110 million "Keep Site Facilitation Fee" payment in 2009 and 2010, which would allow Delphi to address downward pressures from the current economic environment and labor and commodity costs that arise from U.S. sites producing parts for GM.   GM's obligation for the Keep Site Facilitation Fee is not contingent on the Debtors' emergence from chapter 11.   The Amended MRA also maintains GM's support, in the form of a cash contribution, for Delphi's efforts to sell certain businesses and U.S. facilities.

88.    The Amended MRA also has been revised to eliminate GM's ability to receive price-downs, as was originally contemplated in the Approved MRA.   The Amended MRA restricts GM's ability to re-source products manufactured at core U.S. operations through at least 2011 and Mexican operations through 2010.   The Amended MRA also has been revised

to accelerate GM's payment terms through 2011 upon the effectiveness of the access agreement[14]

and the consummation of a revised Plan that (i) provides GM the consideration and releases

under the Amended GSA, (ii) contains provisions clarifying that if there is any inconsistency

with respect to the subject matter of the Amended GSA and the Amended MRA between the

terms of the Plan and the terms of the Amended GSA and Amended MRA, the terms of the

Amended GSA and Amended MRA will govern, and (iii) pursuant to which the Debtors emerge

with substantially all of their core businesses.

   89.  Pursuant to the Amended MRA, on the effective date, GM would assume

financial responsibility to Delphi for all current and future workers compensation, disability,

supplemental unemployment benefits, and severance obligations incurred by Delphi after

January 1, 2009 in relation to all current and former UAW-represented hourly active, inactive,

and retired employees.  This enhancement was not part of the Approved MRA, and the Debtors

believe that the net present value of this liability is approximately $184 million.

   90.  GM's enhanced contributions to Delphi's ongoing business operations

under the terms of the Amended MRA are substantial, and are necessary to allow Delphi to

pursue a viable reaffirmed emergence business plan.  In the aggregate, the Debtors estimate that

the net present value of GM's obligations under the Amended MRA exceeds $1 billion.

Consequently, the Debtors believe that implementing the Amended MRA is critical to the

Debtors' reorganization and in the best interests of the Debtors and their estates.

---

[14] Also as part of the Amended MRA and as a condition to the acceleration of payment terms, GM has required
that upon the Debtors' emergence from chapter 11 the Debtors grant limited access rights to GM for four U.S
plants in the unlikely event that the reorganized Company experiences extreme financial distress at some point
in the future.

Applicable Authority

J.    The Agreements Can Be Modified

91.    By their terms, the Approved GSA and the Approved MRA allow the

Debtors to enter into amendments to the agreements.  Moreover, the Confirmation Order allows

the exhibits to the Plan (the Approved GSA is Exhibit 7.20(a) and the Approved MRA is Exhibit

7.20(b) to the Plan) to be modified according to their terms.  See Confirmation Order ¶ 1.

Consequently, the Debtors believe that they have authority to amend the Approved GSA and the

Approved MRA.

92.    The Debtors do not believe, however, that they have authority to

effectuate the Amended GSA and Amended MRA at this time without authority from this Court,

and are consequently bringing this Motion.  The Amended GSA and the Amended MRA

contemplate the use of estate property prior to its revesting in Reorganized Delphi outside the

ordinary course of business.  In addition, the Debtors are seeking to effectuate their settlement

with GM now, rather than upon the effective date of the Plan.  Paragraph 50 of the Confirmation

Order provides that any settlement embodied in the Plan, including the GM Settlement, will be

considered null and void if the Plan is not consummated.  Accordingly, the Debtors are seeking

approval of the GM settlement embodied in the Amended GSA and Amended MRA pursuant to

Rule 9019.  As discussed in more detail below, the Debtors believe, in their business judgment

and pursuant to their fiduciary duty, that the settlement with GM embodied in the Amended GSA

and Amended MRA is necessary and appropriate.

93.    This Court retains jurisdiction to approve the implementation of the

Amended GSA and the Amended MRA.  Paragraph 51 of the Confirmation Order provides that

this Court retains "exclusive jurisdiction as provided in the Plan over all matters arising out of,

and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law,

43

including, among other items and matters, jurisdiction over those items and matters set forth in

Article XIII of the Plan."  Article XIII of the Plan states that the Court will have exclusive

jurisdiction to hear and determine disputes arising in connection with the interpretation and

implementation of the Approved GSA and Approved MRA.  Accordingly, the Debtors are

seeking this Court's authorization to implement the Amended GSA and Amended MRA.

K.    This Court Should Authorize Implementation Of The Amended And Restated GSA And
       MRA

94.    Based on the description of the Amended GSA and Amended MRA in this

Motion, the Debtors submit that entry of an order authorizing the implementation Amended GSA

and Amended MRA is necessary and appropriate and in the best interests of the Debtors' estates.

The Amended GSA and Amended MRA were negotiated in good faith, at arms' length, and in

the exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's

business judgment on most business decisions.  Bankruptcy Code section 363(b)(1) permits a

debtor-in-possession to use property of the estate "other than in the ordinary course of business"

after notice and a hearing.  11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary

course of business may be authorized if the debtor demonstrates a sound business justification

for it. See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063,

1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to

grant debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124

B.R. 169, 178-79 (D. Del. 1991).

95.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b)

motion is a summary proceeding, intended merely as a means to "efficiently review the . . .

debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not

the time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098- 99.

        96.     Once a debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company."  Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re

Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter,"[p]arties opposing

the proposed exercise of a debtor's business judgment have the burden of rebutting the

presumption of validity." Id.  To satisfy its burden, it is not enough for an objector simply to

raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections."  Lionel, 722 F.2d at 1071. As a rule, the debtor's business judgment

"should be approved by the court unless it is shown to be 'so manifestly unreasonable that it

could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'"

In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R.

229, 234 (Bankr. E.D. Mo. 1991)).

        97.     The Debtors have exercised sound business judgment in determining that

implementing the Amended GSA and Amended MRA is appropriate.  These agreements

comprise a crucial aspect of Delphi's business transformation and are necessary for the Debtors

to pursue a viable reaffirmed emergence business plan.  The proposed terms of the Amended

GSA and Amended MRA are fair, reasonable, and necessary and are in the best interests of the

Debtors' estates.  Accordingly, the Debtors should be granted authority to implement the

Amended GSA and Amended MRA, and conduct the transactions set forth therein pursuant to sections 363 and 365 of the Bankruptcy Code.

L.      An Administrative Claim In Consideration Of GM's Contributions Is Appropriate

98.      GM should receive an allowed administrative claim in exchange for its contributions under the Amended GSA and the Amended MRA, including its assumption of Delphi's pension liabilities through the 414(l) Transfer.  Under Bankruptcy Code section 503(b)(1), claims are accorded administrative expense priority where such claims are for the actual, necessary costs and expenses of preserving the bankruptcy estate.  See 11 U.S.C. § 503(b)(1)(A).  To be awarded an administrative expense claim, a claimant must demonstrate that it conducted a transaction with a debtor-in-possession which, in turn, provided a benefit to such debtor's estate.  As the Second Circuit has stated, "an expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and 'only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.'"  Trustees of Amalgamated Ins. Fund v. McFarlin's, 789 F.2d 98, 101 (2d Cir. 1986) (citations omitted).

99.      GM's contributions under the Amended GSA and Amended MRA provide substantial consideration to the Debtors' estates.  As discussed in detail in this Motion, the Debtors would likely be required to make multi-billion dollar pension funding payments and may be subject to certain excise taxes upon their emergence if the 414(l) Transfer were not to take place.  GM will assume certain of the Debtors' underfunded pension obligations, thereby allowing Delphi to avoid the emergence pension payments related to the underfunded pension obligations.  GM will also make contributions to the Debtors' estates by assuming financial responsibility for all hourly OPEB obligations and will make substantial contributions to the

46

Company's revenue plan.  The bottom line is that the Debtors and their estates are receiving real

value through the implementation of the Amended GSA and the Amended MRA, which GM is

providing.  Under the circumstances, an administrative claim in exchange for GM's contributions

is appropriate.

M.    This Court Should Approve The Amended Settlement Embodied In The Amended GSA
      And Amended MRA

100.    The Approved GSA and Approved MRA were approved as part of the

confirmed Plan.  Due to the changes in circumstances discussed throughout this Motion, the

Debtors are seeking to consummate their settlement with GM now.  Bankruptcy Rule 9019

provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the

court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Settlements and

compromises are "a normal part of the process of reorganization."  Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v.

L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Commc'ns Corp.,

327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of

bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).[15]

101.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate

when the compromise is fair and equitable and is in the best interests of a debtor's estate.  See,

e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Comm'ns, 327 B.R. at 159 ("The settlement

need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within

---

[15]    The Court considered applicable 9019 factors in considering the approval of the Approved GSA and Approved
MRA in connection with the Plan.  In the Second Circuit, the standard for approving a settlement pursuant to a
Plan under 1123(b)(3)(A) is the same as the standard under Rule 9019.  See Resolution Trust Corp. v. Best
Prods. Co. (In re Best Prods. Co.), 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) (standards for approval of settlement
under section 1123(b)(3)(A) are same as those for approval of settlement pursuant to separate motion under
Rule 9019), aff'd, 68 F.3d 26, 33 (2d Cir. 1995) (citing In re Drexel Burnham Lambert Group Inc., 138 B.R.
723, 758 (Bankr. S.D.N.Y. 1992)).

47

the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr.

Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y

1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best

interest of an estate before approving it.").  In general, compromises in the bankruptcy context

should be approved unless they "'fall below the lowest point in the range of reasonableness.'"

Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

102.    The Supreme Court in TMT Trailer Ferry set forth the following factors

that courts should consider in determining whether a proposed settlement or compromise is in the

best interests of a debtor's estate: (a) the probability of the debtor's success in the litigation, (b)

the difficulties associated with collection, (c) the complexity of the litigation, and the attendant

expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors.

TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v.

Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

103.    Courts in this district have further elaborated on the factors to consider,

including:  (a) the balance between the likelihood of plaintiffs' or defendants' success should the

case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement

without the expense and delay of trial and subsequent appellate procedures, (b) the prospect of

complex and protracted litigation if the settlement is not approved, (c) the competency and

experience of counsel who support the settlement, and (d) the extent to which the settlement is

truly the product of arms-length bargaining, and not of fraud or collusion.  Adelphia Commc'ns,

327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 802 (Bankr. S.D.N.Y. 1988).

104.    The Bankruptcy Court need not determine that all of the foregoing criteria

favor approval of a compromise, and the proposed compromise need not be the best agreement

that the debtor could have achieved under the circumstances.  See Adelphia Commc'ns, 327 B.R.

at 159-60; see also Penn Centr., 596 F.2d at 1114.  Instead, the court's proper "role is to

determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co.,

120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation

possibilities'."  In re Telesphere Commc'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994)

(citation omitted).  To that end, courts should not substitute their own judgment for that of the

debtor, but rather should "'canvas the issues'" to affirm that the proposed settlement falls above

"'the lowest point in the range of reasonableness.'"  Adelphia Comc'ns, 327 B.R. at 159 (quoting

W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust

Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack

v. Am. Nat'l Bank & Trust Co., 17 F.3D 600 (2d Cir. 1994).

      105.    The Debtors submit that the terms of the settlement embodied in the

Amended GSA and Amended MRA overwhelmingly satisfy the standards for a settlement under

Rule 9019.  Indeed, the majority of GM's contributions to Delphi's transformation and

reorganization under the Amended GSA and Amended MRA will be immediate and non-

contingent and are the product of an extended, arm's-length negotiation between the Debtors and

GM.  In addition, as described throughout this Motion, the contributions to Delphi that would be

made by GM through the implementation of the Amended GSA and Amended MRA greatly

exceed the contributions GM had originally agreed to make under the Approved GSA and the

Approved MRA.  The Debtors estimate that GM's net contributions to the Debtors' restructuring

and transformation would increase from approximately $6.0 billion to $10.6 billion.  As a result,

the Debtors still believe, in their business judgment, that notwithstanding the uncertainty

regarding potential stakeholder recoveries that has arisen since the Debtors entered into the

Approved GSA and the Approved MRA, the terms of the settlement embodied in the Amended

GSA and Amended MRA are fair, equitable, and the best available under the circumstances.

106.    The Debtors also believe that any litigation with GM with respect to the

GM Claims and Defenses would be prolonged and would not result in a better result for the

Debtors or their estates than that obtained in the Amended GSA and the Amended MRA.

Moreover, it is the Debtors' belief that the likelihood of a successful Delphi reorganization would

be significantly diminished without the comprehensive GM settlement embodied in the

Amended GSA and Amended MRA.  The substantial contributions from GM, provided for in the

Amended GSA and Amended MRA are critical to the Debtors' reorganization.  Approval of the

Debtors' settlement with GM, which will allow the Debtors to implement the 414(l) Transfer and

enter the capital markets with a reaffirmed emergence business plan that is inclusive of GM's

support, is a necessary predicate to any meaningful recovery for stakeholders.

107.    For all the reasons stated above, the Debtors believe the settlement

embodied in the Amended GSA and Amended MRA should be approved.

N.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

108.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-

day stay.  This Court previously granted similar relief from Bankruptcy Rule 6004(g) in

approving the DIP Order, the DIP Extension Order, the Second DIP Extension Order, and the

Supplemental Second DIP Extension Order, and other courts in this district have waived this ten-

day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143,

175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been

shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P.

50

6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(g)).

109.    The Debtors' business reasons for consummating the Amended GSA and Amended MRA before September 30, 2008 are discussed at length in this Motion.  For the 414(l) Transfer to economically efficient, it must take place on or before September 29, 2008.  With a waiver of the ten-day stay period, the Debtors will be able to consummate the Amended GSA and Amended MRA (including the 414(l) Transfer) promptly upon this Court's approval of the Motion and continue to take the steps necessary to emerge from chapter 11.  The Debtors believe that the waiver of the ten-day stay is necessary and appropriate under the circumstances.

<u>Notice Of Motion</u>

110.    Notice of this Motion has been provided in accordance with the Order To Show Cause submitted on September 12, 2008.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to implement the Amended GSA and the Amended MRA, (b) authorizing the Debtors to take the necessary related actions to implement the Amended GSA and Amended MRA, and (c) granting the Debtors such other and further relief as is just.

Dated:      New York, New York
            September 12, 2008

                               SKADDEN, ARPS, SLATE, MEAGHER
                                            & FLOM LLP

                                  By:    /s/ John Wm. Butler, Jr.
                                          John Wm. Butler, Jr.
                                          John K. Lyons
                                          Ron E. Meisler
                                  333 West Wacker Drive, Suite 2100
                                  Chicago, Illinois 60606
                                  (312) 407-0700

                                              - and -

                                  By:    /s/ Kayalyn A. Marafioti
                                          Kayalyn A. Marafioti
                                          Thomas J. Matz
                                  Four Times Square
                                  New York, New York 10036
                                  (212) 735-3000

                                  Attorneys for Delphi Corporation, et al.,
                                      Debtors and Debtors-in-Possession