## Exhibit 5.01(a)(i)
**Environmental Matters Agreement between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM, dated as of "October 1998"**

Exhibit C-1

# ENVIRONMENTAL MATTERS AGREEMENT

This Environmental Matters Agreement ("Agreement"), dated as of October, 1998, is made among General Motors Corporation, a Delaware corporation ("GM"), with its principal place of business in Detroit, Michigan, and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi"), with its principal place of business in Troy, Michigan. GM and Delphi are sometimes referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, GM and Delphi are Parties to a Master Separation Agreement entered into in connection with the separation of the business heretofore carried on by the Delphi Automotive Systems Division as a part of GM into a business owned and operated by Delphi and completely separate and independent from GM; and

WHEREAS, the Parties desire to enter into this Agreement regarding environmental matters.

NOW, THEREFORE, in consideration of the mutual covenants and provisions hereunder contained, the Parties agree as follows:

## ARTICLE 1

### Definitions

**1.1.  Defined Terms.** As used in this Agreement, the following terms (in singular and plural forms) shall have the meanings below.  Capitalized terms used, but not defined, herein shall have the meaning set forth in the Master Separation Agreement or elsewhere in this Agreement.

"Contribution Date" has the same meaning assigned to this term in the Master Separation Agreement.

"Corporate Successor" means any successor in interest of a Party by reason of a merger, reorganization or sale of all or substantially all of the assets of such Party.

"Delphi Assets" means the equipment, machinery and other personal property acquired by purchase, lease or otherwise by Delphi from GM as of the Contribution Date in accordance with the terms of the Master Separation Agreement whether or not associated with a Delphi Facility.

"Delphi Facility" means each parcel of real property, including all facilities and improvements thereon, acquired by purchase, lease or otherwise by Delphi as of the Contribution Date in accordance with the terms of the Master Separation Agreement as the same may

1

hereafter be revised as a result of the "true-up" process provided for in the Real Estate Matters Agreement between the Parties.

"Environmental Claim" shall mean any third-party (i.e., non-Party) accusation, allegation, notice of violation, action, claim, lien, demand, abatement or other order or directive (conditional or otherwise) for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination of or other adverse effect on the environment or human health, or for fines, penalties, or restrictions, resulting from or based upon: (i) the existence, or the continuation of the existence of, a Release (including without limitation a sudden or non-sudden accidental or non-accidental Release), or, exposure to, any Hazardous Material, in, into or onto the indoor or outdoor environment, including, but not limited to, the air, soil, surface water or groundwater, at, on, by, from or related to any Facility; (ii) the use, management, handling, transportation, storage, treatment or disposal of Hazardous Material in connection with any Facility; or (iii) the violation or alleged violation of any Environmental Law relating to the ownership, use, operation, or remediation of any Facility or to the use, management, handling, transportation, Release, storage, treatment or disposal of Hazardous Materials thereon or therefrom.

"Environmental Costs and Liabilities" shall mean any and all losses, liabilities, obligations, damages, fines, penalties, judgments, actions, claims, reasonable costs and reasonable expenses (including without limitation attorneys' fees, disbursements and expenses of legal counsel, experts, engineers, and consultants and the costs of Remedial Action) arising from or under or related to any Environmental Law.

"Environmental Damages" shall refer to any and all Environmental Costs and Liabilities and Environmental Claims, including, but not limited to, costs, expenses and attorneys' or other experts' or consultants' fees in connection with any Remedial Action or enforcing any right of indemnification hereunder against any Indemnitor; provided, however, that Environmental Damages do not include consequential, special or incidental damages, including, but not limited to, loss of profits, loss of business opportunity, loss of use, diminution in value, stigma damages, or any attorneys' or consultant's fees or other expenses as to any matter as to which an Indemnitor has accepted its defense and indemnity obligations.

"Environmental Law" means, collectively, all applicable foreign, domestic, federal, state or local laws, statutes, ordinances, rules, regulations, codes, common law doctrines, or other legally binding requirements, including, but not limited to, orders, judgments, settlement agreements, consent orders, consent decrees, consent judgments or Environmental Permits, relating to regulation and protection of human health, the environment, or natural resources, including, but not limited to, all laws regulating Releases or threatened Releases of Hazardous Materials, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Toxic Substances Control Act, 15 U.S.C. § 52601 *et seq.*, as any of the foregoing may have been, or may in the future be, amended.

2

"Environmental Permits" means permits, licenses, registrations, and other authorizations issued under any Environmental Law.

"Environmental Records" means any and all books, records, notes, reports, letters, memoranda, assessments, testing data, maps, Environmental Permits, certificates, applications, approvals, surveys or other written, printed, or electronically or magnetically recorded materials, communications or data relating to: (i) the use, management, handling, transportation, Release, storage, treatment or disposal of any Hazardous Material in, about or under any Delphi Facility; (ii) the environmental condition of the Delphi Facilities; and (iii) compliance with Environmental Laws at the Delphi Facilities. By way of example, Environmental Records includes the following as they directly or indirectly relate to Delphi Facilities: environmental bulletins, environmental performance criteria, NAO reference letters, EPCRA and TSCA manuals, environmental performance audit reports (IPSR & EPR), Phase I property transfer evaluations, release reports, GM SARA database, ISO 14001 certification guidance, Title V materials, (e.g., compliance assessments, compliance reports, outside counsel memoranda re issues, GM emission factors, and rule interpretations).

"Facility" means, as the context may require, either a GM Retained Facility or a Delphi Facility, or both.

"GM Retained Facility" means any and all real property and facilities which are not Delphi Facilities and which were owned, operated, occupied or possessed by GM or its direct or indirect wholly-owned subsidiaries prior to the Contribution Date.

"Hazardous Material" shall mean, collectively, any: (i) chemical, material or substance: (a) which is now or hereafter becomes defined as or included in the definition of "hazardous substance," "extremely hazardous substance," "hazardous waste," "hazardous material," "restricted hazardous waste," "contaminant," "pollutant," "toxic substance," or words of similar import under any Environmental Law; or (b) the emission, discharge, release, storage, transport, disposal, management, handling or use of which is regulated under or subject to any Environmental Law; and (ii) petroleum or petroleum products, or derivatives or fractions thereof, flammable materials, explosives, radioactive materials (including radon gas other than that which is naturally occurring), urea formaldehyde foam insulation ("UFI"), asbestos-containing materials ("ACM") and polychlorinated biphenyls ("PCBs").

"Identified Waste Disposal Sites" means those Off-Site Waste Disposal Sites known to the Parties as of the Contribution Date, where liability is known or alleged, which are identified on Exhibit A to this Agreement.

"Indemnifying Party" or "Indemnitor" means a person that is obligated to provide indemnification under Article 3 of this Agreement.

"Indemnitee" means a person that is entitled to seek indemnification under Article 3 of this Agreement.

3

"Newly Identified Waste Disposal Site" means an Off-Site Waste Disposal Site other than an Identified Waste Disposal Site where liability becomes known or is alleged after the Contribution Date.

"Off-Site Waste Disposal Site" means any site, other than a Facility, which is or becomes subject to an obligation for Remedial Action under an Environmental Law.

"Release" means any release, spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leaking, pumping, pouring, emptying, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration of any Hazardous Material on or into the indoor or outdoor environment or into or out of any property.

"Remedial Action" means all investigations and/or actions to:  (i) clean up, remove, remediate, treat, or in any other way address any Hazardous Material under or pursuant to any Environmental Law; (ii) prevent the Release or threatened Release, or minimize the further Release of, any Hazardous Material so that it does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; (iv) perform corrective actions or obtain timely closure or closure certification related to any underground or aboveground tank, container storage area, treatment, storage or disposal facility or operation, solid waste management unit or other location of Hazardous Material use, management, handling, transportation, treatment, storage, or disposal; or (v) bring any matter, activity, practice or conduct into compliance with any Environmental Law.

## ARTICLE 2

### Allocation of Environmental Liabilities

### 2.1.  Responsibility for GM Retained Facilities.

As of and after the Contribution Date, GM shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all GM Retained Facilities, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that Delphi shall be responsible for all Environmental Damages at the GM Retained Facilities to the extent caused by Delphi's acts or omissions first occurring or continuing after the Contribution Date.  Where necessary for GM to fulfill its obligations under this Agreement, Delphi will use its best efforts to assign its rights with respect to GM Retained Facilities.

### 2.2.  Responsibility for Delphi Facilities.

(a)    Subject to Section 2.2(b), as of and after the Contribution Date, Delphi shall be solely responsible for all Environmental Damages arising from, relating to or in connection with all Delphi Facilities and Delphi Assets, whether or not the circumstances or claims giving rise to such Environmental Damages occurred or were asserted before or after the Contribution Date; provided, however, that GM shall be responsible for all Environmental Damages at the Delphi

4

Facilities to the extent caused by GM's acts or omissions first occurring or continuing after the Contribution Date.

(b)      Notwithstanding Section 2.2(a), GM shall be solely responsible for all payments relating to any contract for Remedial Action and other environmental-related service or goods procurement contracts, or any stipulated penalties, fines or other sanctions under orders, decrees, judgments or settlements with respect to any environmental matter at a Delphi Facility, actually incurred but not paid by GM prior to the Contribution Date for services performed or acts or omissions occurring before the Contribution Date. Before the Contribution Date, Delphi shall procure environmental-related goods and services only on commercially reasonable terms and conditions, and in no event shall GM be responsible for any materials purchased by Delphi before the Contribution Date and not utilized by Delphi within ninety (90) days after the Contribution Date. Except as otherwise specifically provided in this Section 2.2(b), Delphi shall be solely responsible for all payments under any contracts for Remedial Action, other environmental-related service or goods procurement contracts, and any stipulated penalties, fines or other sanctions under orders, decrees, judgments, or settlements with respect to any environmental matter at a Delphi Facility.

(c)      Between the date of the execution of this Agreement and the Contribution Date, the Parties shall pursue, with reasonable diligence and in good faith, with respect to the Delphi Facilities: (i) compliance with Environmental Laws; (ii) the avoidance of any liability under any Environmental Law; and (iii) the resolution or continued performance of any activities necessary to resolve any Environmental Claim or satisfy or discharge any Environmental Damages before the Contribution Date.

### 2.3.  Responsibility for Waste Disposal Sites.

(a)      Identified Waste Disposal Sites.

As of and after the Contribution Date, GM shall be solely responsible for Environmental Damages and any other liabilities, to the extent due to contributions by GM before or after the Contribution Date, arising from, relating to or in connection with all Identified Waste Disposal Sites.

(b)      Newly Identified Waste Disposal Sites.

Within twenty (20) days after receiving notice or other information as to the existence of a Newly Identified Waste Disposal Site as to which the other Party may have liability under an Environmental Law, the Party receiving such notice or information shall notify the other Party and provide copies of all relevant correspondence and other documents relating thereto.

(c)      Allocation.

(i)      The Parties' respective liability with respect to:  (1) Newly Identified Waste Disposal Sites; and (2) contributions to Identified Waste Disposal Sites after the

5

Contribution Date, shall be allocated based on each Party's respective contributions thereto, as follows:

> (a)    GM's liability shall be based on contributions attributable to the GM Retained Facilities and any other facility owned or operated by GM before, on or after the Contribution Date except the Delphi Facilities.

> (b)    Delphi's liability shall be based on contributions attributable to the Delphi Facilities and any other facility owned or operated by Delphi on or after the Contribution Date, whether or not such contributions were made before or after the Contribution Date.  Delphi shall not be responsible for contributions to Identified Waste Disposal Sites occurring before the Contribution Date.

(ii)    The Parties shall use their reasonable best efforts to amicably resolve all liability and allocation issues using traditional factors, such as the volume, type and toxicity of the contributions to such Newly Identified Waste Disposal Site or Identified Waste Disposal Site by each Party.

### 2.4.    Duty to Comply With Environmental Laws.

(a)    GM.    As of and after the Contribution Date, GM shall comply with Environmental Laws at the GM Retained Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to GM's use of, operations at or occupancy of the GM Retained Facilities shall be that of GM.

(b)    Delphi.    As of and after the Contribution Date, Delphi shall comply with Environmental Laws at the Delphi Facilities and the sole legal and financial responsibility for compliance with Environmental Laws applicable to Delphi's use of, operations at or occupancy of the Delphi Facilities shall be that of Delphi.

(c)    The sole remedy of the Parties for breach of this Section 2.4 shall be under the indemnification provisions of Article 3 of this Agreement.

### 2.5.    No Representations or Warranties.    Except as otherwise expressly set forth in this Agreement, the Delphi Facilities and Delphi Assets are being conveyed in their "as is, where is" condition and with all faults and without any representation or warranty of any nature whatsoever, express or implied, oral or written, and in particular without any implied warranty of merchantability or fitness for a particular purpose.

6

NOV-24-1998  14:12    HFSC ENVIRON.    313 256 7944    P.08/16

## ARTICLE 3

### Indemnification

3.1. <u>Indemnification by GM</u>. GM shall indemnify, defend and hold harmless Delphi from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a)    The GM Retained Facilities, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that GM shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to, or arising in connection with Delphi's acts or omissions first occurring or continuing after the Contribution Date.

(b)    Any act or omission by GM after the Contribution Date.

(c)    Contributions before the Contribution Date to all Identified Waste Disposal Sites attributable to a Delphi Facility as well as contributions attributable to a GM Retained Facility.

(d)    GM contributions to Newly Identified Waste Disposal Sites attributable to a GM Retained Facility.

(e)    Any breach of this Agreement.

(f)    Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding GM Retained Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

3.2. <u>Indemnification by Delphi</u>. Delphi shall indemnify, defend and hold harmless GM from and against all Environmental Damages which are caused by, relate to or arise in connection with:

(a)    The Delphi Facilities and all Delphi Assets, including, but not limited to, Environmental Damages caused by, relating to or arising in connection with circumstances occurring or claims asserted either on, before or after the Contribution Date; provided, however, that Delphi shall have no indemnity or defense obligations hereunder with respect to Environmental Damages to the extent caused by, relating to or arising in connection with GM's acts or omissions first occurring or continuing after the Contribution Date.

(b)    Any act or omission by Delphi after the Contribution Date.

(c)    Any breach of this Agreement.

7

(d)    Delphi contributions on or after the Contribution Date to Identified Waste Disposal Sites.

(e)    Delphi contributions to Newly Identified Waste Disposal Sites attributable to a Delphi Facility.

(f)    Any imposition or acceleration of Environmental Costs and Liabilities or Environmental Claims regarding Delphi Facilities under Section 9.2(b) under any applicable Environmental Transfer Law, as defined hereafter, as a result of the transactions contemplated by the Master Separation Agreement.

### 3.3.  Indemnification Procedures.

(a)    If any Indemnitee receives notice of any Environmental Claim or becomes aware of any Environmental Costs and Liabilities or other matter with respect to which an Indemnifying Party is or may be obligated under this Agreement to provide indemnification to such Indemnitee, the Indemnitee shall give the Indemnifying Party prompt written notice thereof (together with any information concerning the matter). Whenever practicable, such notice shall be provided at least ten (10) business days before the Indemnitee incurs any Environmental Damages in respect of such matter. If such advance notice is not practicable, then notice shall be provided as soon as practicable. Failure or delay of any Indemnitee to give notice as provided in this Section 3.3 shall not relieve any Indemnifying Party of its obligations except to the extent that such Indemnifying Party is actually prejudiced.

(b)    An Indemnifying Party may elect to defend any Environmental Claim at its own expense and through its counsel (which counsel shall be reasonably acceptable to the Indemnitee). If an Indemnifying Party elects to defend an Environmental Claim, it shall notify the Indemnitee of its intent to do so within ten (10) business days after receiving notice of such Environmental Claim (or sooner, if the nature of such Environmental Claim so requires). The Indemnitee shall cooperate in the defense of such Environmental Claim. The Indemnifying Party shall keep the Indemnitee reasonably informed as to the status of the defense of such Environmental Claim. The Indemnifying Party shall also pay such Indemnitee's reasonable out-of-pocket expenses incurred in connection with such cooperation, but shall not be responsible for any legal or other expenses subsequently incurred by such Indemnitee in connection with the defense of such Environmental Claim. The Indemnifying Party shall not, without the prior written consent of the Indemnitee: (i) settle or compromise any Environmental Claim or consent to the entry of any judgment which does not include a written release from all liability to the Indemnitee; or (ii) settle or compromise any Environmental Claim in any manner that would be reasonably likely to have a material adverse effect on the Indemnitee. If an Indemnifying Party elects not to defend against a Environmental Claim, or fails to properly notify an Indemnitee of its election, the Indemnitee may defend, compromise, and settle such Environmental Claim and shall be entitled to indemnification to the extent permitted hereunder; provided, however, that the Indemnitee may not compromise or settle any such Environmental Claim without the prior written consent of the Indemnifying Party, which shall not be unreasonably withheld or delayed.

8

3.4    **Mitigation.** No Party shall have any obligation to indemnify the other Party with respect to any Environmental Damages to the extent such Environmental Damages could have reasonably been avoided or mitigated.

3.5.    **Exclusive Remedy.** The Parties acknowledge that, except with respect to matters covered under Sections 9.3 and 9.4 of this Agreement: (a) the rights and obligations provided in this Agreement shall be the exclusive rights and obligations of the Parties with respect to environmental matters; and (b) the remedies in Articles 3 and 6 of this Agreement shall be the exclusive remedies of the Parties with respect to environmental matters and shall be in lieu of, and not in addition to, all other remedies which may exist in law, equity or under any other contract.

3.6    **No Initiation of Third Party Claims.** The Parties shall not initiate any action with any third party, including any governmental agency, which could reasonably be expected to lead to an Environmental Claim; provided, however, that nothing herein shall prevent either Party from performing its obligations or exercising its rights under this Agreement.

3.7    **Cooperation On Third Party Claims.** If either Party, in addressing a matter or in defending or resolving any Environmental Claim as to which it has defense or indemnification responsibility under this Agreement (for purposes of this Section 3.7, the "Indemnifying Party"), remediates or incurs costs or damages with respect to a matter for which a third party may be responsible or liable, the other party agrees to cooperate with the Indemnifying Party in pursuing any claim against such third party and the Parties shall assist each other so as to enable the Indemnifying Party to legally assert such claim against such third party and to recover its costs and damages from such third party, including acting as the real party in interest and assigning any rights or causes of action against any such third party relating to such claim or the proceeds thereof to the Indemnifying Party.

# ARTICLE 4

## Environmental Reserves

4.1.    As of the Contribution Date, each Party shall be responsible for establishing its own reserves for environmental liabilities in accordance with generally accepted accounting principles. At the time of Contribution, the environmental reserves established for the Delphi Facilities are shown on Exhibit B. These reserves were established in accordance with the same principles used to establish reserves for GM Retained Facilities.

# ARTICLE 5

## Environmental Permits

5.1.    Set forth on Exhibit C are all of the Environmental Permits identified and not yet expired with respect to the Delphi Facilities and the Delphi Assets. Exhibit C also identifies, with respect to each such Environmental Permit, whether each such Environmental Permit: (i)

9

relates to the Delphi Facilities and operations by GM on GM Retained Facilities, but shall not be transferred to Delphi by GM and shall remain with GM and shall remain with GM as permittee; (ii) may be transferred to Delphi under applicable Environmental Law; or (iii) may not be transferred to Delphi under applicable Environmental Law. The Parties shall use best efforts to: (i) effectuate the transfer of those Environmental Permits under clause (ii), above, that may be transferred to Delphi under applicable Environmental Law; (ii) obtain issuance to Delphi of new or replacement Environmental Permits for Delphi's operations now covered by the Environmental Permits described in clauses (i) or (iii), above; and (iii) mitigate problems that may arise during the transfer process. As of and after the Contribution Date, Delphi shall be solely responsible to obtain and comply with all Environmental Permits with respect to the Delphi Facilities and the Delphi Assets, whether or not GM was required under any Environmental Law to, but did not, obtain any such Environmental Permits. Prior to the Contribution Date, Delphi shall have obtained and GM shall also assist Delphi in obtaining new RCRA generator identification numbers which are or may be required under current or future Environmental Laws for hazardous waste, as defined under current or future Environmental Laws. If same cannot be obtained prior to the Contribution Date, Delphi will expeditiously obtain such identification number after the Contribution Date and, to the extent legally required, will use such number or obtain a substitute number for Delphi's use after the Contribution Date. Without the prior written consent of GM, Delphi will not use for any purpose any such numbers issued before the Contribution Date to GM with respect to the Delphi Facilities.

## ARTICLE 6

### Dispute Resolution

6.1. The Parties shall use good faith, best efforts and sound and accepted engineering judgment in making all determinations under this Agreement. In the event of a dispute or disagreement under this Agreement, the Parties shall consult in good faith with each other and shall use best efforts to resolve the matter. It is the express intent of the Parties that any such disputes or disagreements shall be resolved through negotiation between the Parties or, if mutually agreeable as to a specific matter in each Party's discretion, a form of alternative dispute resolution, including binding or non-binding arbitration. It is further understood and agreed, however, that alternative dispute resolution and litigation under this Agreement shall be viewed as a last resort and that the results of any non-litigation dispute resolution procedure under this Article 6 shall not be admissible for any purposes in any litigation in which the Parties are involved and relating to this Agreement unless the Parties otherwise agree as part of such resolution or are utilized to enforce the terms thereof. Either Party shall have the right, after making a reasonable and good faith effort to resolve such dispute through other means, to seek judicial relief in connection with any dispute arising under this Agreement, and in the event that either Party resorts to litigation in order to resolve a dispute (including any breach of this Agreement) under this Agreement, the Party prevailing in connection with such dispute shall be entitled to recover its reasonable and actual attorneys' fees and costs incurred in connection with such litigation. In the event that the matter in litigation relates to a dispute involving a Party's failure to comply with its defense and indemnification obligations under this Agreement and the Party in favor of whom such obligations run has, as a result of the successful assertion of an Environmental Claim, spent money to resolve or otherwise dispose of any resulting

Environmental Damages, the Indemnifying Party shall pay the Indemnitee's interest at the "prime rate" then in effect from the date due until fully paid, on and to the extent of any expenditures by the other Party in respect of such Environmental Damages.. Except with respect to matters covered by Section 2.4 (Duty to Comply with Environmental Laws), the procedures under this Article 6 shall apply to all disputes arising under this Agreement.

## ARTICLE 7

### Transfer Obligations and Non-Assignability

7.1.    **Duties Upon Transfer.**    Each Party, in connection with the execution and delivery of any lease, sublease, assignment, agreement of sale or other transfer, assignment or conveyance agreement relating to the Delphi Facilities, Delphi Assets or GM Retained Facilities ("Conveyance Document") in which any interest in or portion of any Delphi Facility, Delphi Asset or GM Retained Facility, respectively, is conveyed, sold, contributed, assigned, transferred, leased or subleased, shall use its reasonable best efforts to provide in such Conveyance Document that the non-transferring Party shall have no liability or responsibility for, and shall be fully released and exculpated from, all Environmental Costs and Liabilities and Environmental Claims with respect to the specific Delphi Facility, Delphi Asset or GM Retained Facility subject to such Conveyance Document, and to impose the obligations under this Section 7.1 on any subsequent user, occupant or transferee.

7.2.    **Non-Assignability.**    The Parties' respective rights, obligations, duties and liabilities under this Agreement, including, but not limited to, the indemnification provisions of Article 3, are personal to each of them and may not be assigned to, or assumed by, any successor, assignee, or any other person without the prior written consent of the other Party, which consent may be granted or withheld in the sole discretion of such other Party; provided, however, that either Party may assign their respective rights under this Agreement to a Corporate Successor without the consent of the other Party, but only if such Corporate Successor also agrees to assume such Party's duties, obligations and liabilities under this Agreement. No such assignment or assumption shall relieve either Party of its obligations under this Agreement unless so agreed in writing by the other Party.

## ARTICLE 8

### Mutual Releases and Covenants Not to Sue

8.1.    **Release.**    Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby fully and forever releases and discharges the other Party and its officers, directors, employees, shareholders, direct and indirect wholly-owned subsidiaries, representatives and agents from all manner of action and causes of action, suits, proceedings, arbitrations, choses in action, contracts, covenants, claims, bonds, bills, debts, dues, sums of money, damages, demands and rights whatsoever, in law or in equity, now existing or which may hereafter accrue by reason of any known or unknown facts existing either before or after the Contribution Date and which relate to matters under Environmental Laws, whether or not specifically addressed in this Agreement, including, but not limited to, the environmental

11

condition and compliance status of the Delphi Facilities, the Delphi Assets, the GM Retained Facilities, the Identified Waste Disposal Sites, and the Newly Identified Waste Disposal Sites, and all Environmental Damages, Environmental Costs and Liabilities, and Environmental Claims relating thereto.

8.2.    **Covenant Not to Sue.**  Except as otherwise expressly set forth in Articles 3 and 6 of this Agreement, each Party hereby covenants that it shall not commence any action, arbitration, proceeding or suit, or participate or assist in any manner in the commencement or prosecution of any action, arbitration, proceeding or suit, in law or in equity, in any judicial, administrative, or other forum, based upon or arising out of any matter subject to a release by such Party under Section 8.1 of this Agreement.

## ARTICLE 9

## Miscellaneous

### 9.1. Environmental Records.

(a)    As of the Contribution Date, GM shall transfer to Delphi either the originals or true and complete copies of all Environmental Records.

(b)    Subject to Section 9.1(c), for a period of seven (7) years from and after the date hereof, each Party covenants and agrees to keep and maintain at reasonably accessible locations all of the Environmental Records in its possession or control as of the date hereof or otherwise coming into the possession or control of such Party after the date hereof.  Following reasonable advance written notice, each Party shall make available for review and photocopying by the other Party each and all of its Environmental Records.

(c)    With respect to matters in dispute between the Parties or subject to an Environmental Claim at the end of the seven (7) year record retention period, such retention period shall be extended and shall continue with respect to all Environmental Records that may be relevant to the matter until the matter is finally and fully resolved.

### 9.2. Environmental/Real Property Transfer Laws.

(a)    The Parties shall reasonably cooperate in good faith with respect to compliance with any applicable Environmental Laws or other laws that require disclosures or other notifications regarding environmental matters to be made by or to either Party or any unit of government in connection with the transactions contemplated by the Master Separation Agreement (collectively, "Environmental Transfer Laws").  To the extent that any obligation exists under any Environmental Transfer Laws to report any information or make any report or notice, such obligation shall be jointly undertaken by the Parties.  Each Party hereby waives any requirements under any such Environmental Transfer Law that disclosures or other reports or notifications be made before the Contribution Date and agree that such disclosures and other notifications may be made on the Contribution Date.

12

(b)    The Parties shall each use their reasonable best efforts to avoid the imposition of or accelerating any Environmental Costs and Liabilities or Environmental Claims under any applicable Environmental Transfer Law as a result of the transactions contemplated by the Master Separation Agreement. Such avoidance strategies could include GM leasing assets to Delphi. Subject to the preceding sentence, neither Party shall be liable or responsible for any Environmental Costs and Liabilities or Environmental Claims regarding the other Party's facilities under any Environmental Transfer Law resulting from the transactions contemplated by the Master Separation Agreement, and each Party shall indemnify and defend the other with respect thereto in accordance with the terms of Article 3.

9.3.   **Wastewaters, Stormwater and other Services Agreements**. The Parties may enter into a Wastewaters and Stormwater Services Agreement, or other agreements, under which one Party shall provide certain services for the other Party.

9.4.   **Leases and Sub-leases Regarding Certain Facilities.** The Parties have entered or will enter into leases and sub-leases with respect to certain facilities. The terms and conditions with respect to environmental matters at such facilities shall be governed by the respective leases and sub-leases for those facilities.

9.5.   **Entire Agreement.** Except for the Master Separation Agreement, the service agreements and the leases and sub-leases referenced in this Agreement, this Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect to the subject matter hereof. In the event of a conflict between this Agreement and the Master Separation Agreement, the terms of this Agreement shall supersede those of the Master Separation Agreement. This Agreement is not intended to confer upon any other person any benefit, right or remedy.

9.6.   **No Arrangement for Disposal.** The Parties each acknowledge that the transactions contemplated by this Agreement constitute a transfer of assets in the ordinary course of business and are not intended in any way, nor will they be deemed to be, an arrangement for treatment, storage or disposal of any of the Delphi Facilities or Delphi Assets or any substances or materials contained therein. Delphi agrees that GM will not have any liability under any Environmental Law by virtue of such transfer alone and Delphi will not assert any claim or cause of action against GM based solely thereon.

9.7.   **Further Assurances.** The Parties hereto, at any time before or after the Contribution Date, shall, at their own expense, execute, acknowledge and deliver any further assurances, documents and instruments reasonably requested by one another and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by one another for the purpose of consummating the transactions contemplated by or fulfilling the intent of this Agreement.

9.8.   **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware regardless of the laws that otherwise govern under applicable principles of conflicts of laws.

13

**9.9. Descriptive Headings.** The descriptive headings herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**9.10. Notices.** All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person, by express or overnight mail or messenger delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested), to a Party as follows:

If to GM:    Michelle T. Fisher, Esq.

If to Delphi:    Mark A. Hester, Esq.

**9.11. Amendment.** No change or amendment shall be made to this Agreement except by an instrument in writing signed on behalf of each Party hereto.

**9.12. Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**9.13. Severability.** If any provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the subject matter hereof is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner so the intent hereof is fulfilled to the fullest extent possible.

**9.14. Failure or Indulgence Not Waived.** Subject to the express provisions of this Agreement, no failure or delay on the part of any Party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of this Agreement, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.

**9.15. Confidentiality.** The terms of this Agreement shall remain confidential and each Party shall not disclose the same without the prior written consent of the other Party except: (a) to such Party's directors, officers, partners, employees, legal counsel, accountants, engineers,

14

NOV-24-1998  14:16        HMS&C ENVIRON.                          313 256 7944      P.16/16

contractors, financial advisors and similar professionals and consultants to the extent such Party deems it necessary or appropriate and such Party shall inform each of the foregoing persons of such Party's obligations under this paragraph and shall secure the agreement of such persons to be bound by the terms hereof; (b) pursuant to contractual obligations existing as of the date hereof; or (c) as otherwise required by law or regulation.

9.16.  No rights are created in any third party by this Agreement.

9.17.  Each Party will cause its direct and indirect wholly-owned subsidiaries to take such actions as may be reasonably necessary to assist such Party to perform its obligations under this Agreement.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its authorized officers.

GENERAL MOTORS CORPORATION

By: _____

Name: _____

Title: _____

DELPHI    AUTOMOTIVE    SYSTEMS CORPORATION

By: _____

Name: _____

Title: _____

DET_B\118240.4

15

TOTAL P.16

## Exhibit 5.01(a)(iv)

**Amended and Restated Agreement for the Allocation of United States Federal, State and Local Income Taxes, dated as of December 16, 1998, between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM**

Exhibit L-3

## AMENDED AND RESTATED AGREEMENT FOR THE ALLOCATION OF

## UNITED STATES FEDERAL, STATE AND LOCAL INCOME TAXES

This Agreement is by and between General Motors Corporation, a Delaware corporation ("GM"), and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi").

### RECITALS

1. GM is the common parent of the GM Group, which includes Delphi.

2. On June 19, 1998, GM formed Delphi Automotive Systems (Holding), Inc. ("DASHI"), as a Delaware corporation wholly owned by GM. On or about January 1, 1999, GM will contribute to DASHI GM's ownership interest in all of the foreign branches, subsidiaries, joint ventures and other foreign assets related to the business of Delphi.

3. On September 9, 1998, GM formed Delphi Technologies, Inc., a Delaware corporation ("Delphi Technologies"), and will, on or about January 1, 1999, contribute to it certain intellectual property (e.g., patents, trademarks and trade names) related to the Delphi business. Delphi Technologies will then be contributed to Delco Electronics Corporation, a Delaware corporation. Delphi Technologies will grant a license to other Delphi entities for use of the intellectual property in exchange for an appropriate royalty.

4. On September 16, 1998 GM formed Delphi Automotive Systems LLC ("DAS") as a single-member Delaware limited liability company. Pursuant to Treas. Reg. § 301.7701-1(a)(4), following its formation DAS will be treated as a division of GM for Federal Income Tax purposes. On or about January 1, 1999, GM will contribute to DAS all of Delphi's U.S. assets, including the stock of Delco.

5. On September 16, 1998 GM formed Delphi and will, on or about January 1, 1999, contribute to it all of GM's ownership interest in DASHI and DAS.

6. Pursuant to Treas. Reg. § 301.7701-1(a)(4), following the contribution of DAS to Delphi, DAS will be treated as a division of Delphi for Federal Income Tax purposes.

7. It is anticipated that during the second quarter of 1999 GM will distribute all of its Delphi capital stock to holders of GM's $1-2/3 Par Value Common Stock.

8. The effective date of this Agreement is intended to be the day following the Spin-Off Date.

1

9. Except as otherwise provided, GM and Delphi agree and acknowledge that the Spin-Off has no effect on the relationship between them for any Consolidated Tax Period, and GM and Delphi intend to amend and restate the Agreement for the Allocation of United States Federal, State and Local Income Taxes (the "First Agreement") to provide for, among other things, (i) the allocation between GM and Delphi of Carryforward Tax Attributes available to be carried forward to Separate Return Tax Periods, (ii) the rights, duties and responsibilities of the parties in connection with audits, protests, appeals, litigation and other proceedings with respect to the Consolidated Tax Periods, (iii) the treatment of any carryback item from a Separate Return Tax Period to a Consolidated Tax Period, and (iv) the relationship of the parties as it relates to income tax matters from the effective date of this Agreement until the date of the Final Determination of the last of the income tax liabilities to be so finally determined.

10. This Agreement supersedes and replaces the First Agreement.

11. This Agreement has been entered into by the parties based on the assumption that the GM Tax Staff will, pursuant to the Tax Compliance and Planning Services Agreement, be providing Delphi with tax compliance services related to Income Tax reporting with respect to taxable years ending on or before December 31, 1999.

AGREEMENT

## Article I. Definitions

"Accountants" means an internationally recognized firm of Certified Public Accountants mutually agreed to by the parties.

"Business Day" means any day other than a Saturday, a Sunday, or a day on which banking institutions located in the State of Michigan are authorized or obligated by law or executive order to close.

"Carryforward Tax Attribute" means a deductible or creditable consolidated Federal tax attribute, including, but not limited to, (i) a consolidated net operating loss, a consolidated net capital loss, a consolidated unused investment credit, a consolidated unused foreign tax credit, or a consolidated excess charitable contribution (see §1.1502-79 of the Regulations), and (ii) the consolidated minimum tax credit, or other consolidated general business credits, that can be carried forward from one tax period to subsequent tax periods.

"Code" means the Internal Revenue Code of 1986, as amended.

2

"Consolidated Tax Period" means any tax period (except a Prior Tax Year) of the GM Group ending before, with, or which includes the Spin-Off Date during which any member of the Delphi Group was a member of the GM Group.

"Contribution Date" means that date that GM completes the formation of Delphi by contributing to it all of GM's ownership interest in DASHI and DAS, anticipated to be January 1, 1999.

"Delco" means Delco Electronics Corporation, a Delaware corporation.

"Delco Closing Date Balance Sheet" is defined in the Hughes Transactions Agreement.

"Delco Group" means Delco and all corporations which from time to time would join with Delco in filing a consolidated Federal Income Tax Return with Delco as the common parent of that group if Delco were not a member of the GM Group.

"Delphi" means Delphi Automotive Systems Corporation, a Delaware corporation.

"Delphi Group" means Delphi and all corporations which from time to time would join with Delphi in filing a consolidated Federal Income Tax Return with Delphi as the common parent of that group if Delphi were not a member of the GM Group.

"Delphi Group Tax Liability" means the Delphi Group consolidated Federal income tax liability, determined as of the end of the applicable tax period in accordance with Section 1.1502-1, et seq. of the Regulations as if (i) the highest rate of tax specified in subsection (b) of Section 11 of the Code were the only rate set forth in that subsection, and (ii) the Delphi Group were a separate affiliated group of corporations filing a consolidated Federal income tax return, including any elections which have been made by Delphi pursuant to the Code or the Regulations.

"Election" means the treatment of an item or items in an Income Tax Return, including (i) affirmative elections such as inventory methods, depreciation methods, the use of a foreign sales corporation, or tax year-end, (ii) accounting method elections, including timing of the recognition of items of income or deduction on the taxpayer's Income Tax Return, and (iii) Income Tax Return filing positions with respect to certain characterization issues, including whether a particular item is deductible, whether a particular gain or loss is ordinary or capital, or whether an item is business or non-business income.

"Final Determination" means (i) an adjustment mutually agreed by either GM or Delphi, as appropriate, and the tax authority, (ii) the definition of "determination" set forth in Section 1313(a) of the Code, or (iii) the expiration of the applicable statute of limitations.

"GM" means General Motors Corporation, a Delaware corporation.

3

"GM Group" means GM and all corporations which from time to time join with GM in filing a consolidated Federal Income Tax Return with GM as the common parent of that group.

"GM Group Tax Liability" means the consolidated Federal income tax liability of the GM Group, determined as of the end of the applicable tax period, in accordance with Section 1.1502-1, et seq. of the Regulations.

"Hughes Transactions Agreement" means that certain agreement dated as of December 17, 1997 by and between GM and Hughes Electronics Corporation, a Delaware corporation, formerly known as Hughes Network Systems, Inc. ("Hughes").

"Income Tax" means any United States Federal, state or local (but not foreign) tax, charge, fee, levy or other assessment which is determined with reference to (i) net income or profits (including, but not limited to, the Michigan Single Business Tax and capital gains, gross receipts, value added or minimum tax, but not including sales or use tax), or (ii) multiple bases, including but not limited to, corporate franchise, gross receipts, net worth, privilege, doing business or occupation taxes, if one of the bases is listed in clause (i).

"Income Tax Return" means any return, report, filing, statement, declaration or other document required to be filed with a taxing authority in respect of Income Taxes.

"Master Separation Agreement" means that certain Master Separation Agreement entered into by and among GM, Delphi, and certain members of the Delphi Group in December 1998.

"Prior Tax Year" means 1998 and all previous tax periods.

"Proceeding" means any audit or other examination, protest, appeals or other administrative or judicial proceeding relating to liability for or refunds or adjustments with respect to Income Taxes for any tax period.

"Regulations" means the regulations promulgated under the Code, in effect from time to time.

"Separate Return Tax Period" means any tax period of Delphi or any member of the Delphi Group not included in a Consolidated Tax Period, or any tax period of the GM Group subsequent to the final Consolidated Tax Period.

"Spin-Off" means the distribution by GM of the Delphi common stock to GM's common stockholders in a tax-free transaction under Section 355 of the Code, and related transactions.

4

"Spin-Off Date" means the last date that Delphi is included in the GM Group's consolidated Federal Income Tax Return.

"Tax Change" means for any tax period the difference between (i) the relevant income tax liability calculated taking into account any Timing Difference, and (ii) the relevant income tax liability calculated as if such Timing Difference had not occurred, but taking all other facts into account.  The amount of any Tax Change will be determined by multiplying the relevant adjustment to taxable income for the relevant tax period by the highest rate of tax specified in Section 11(b) of the Code.

"Timing Difference" means an adjustment to the taxable income or credits of the GM Group which results in (i) an increase or decrease in the income, gain, recapture, deduction, loss or credit of either the GM Group or the Delphi Group for a particular tax year, and (ii) an offsetting increase or decrease in deduction, loss, credit, income, gain or recapture of the other party for other tax years.  Timing Difference also means an adjustment to the taxable income of the Delphi Group and an offsetting adjustment to the taxable income of the GM Group for the same tax year.

Article II.  General Provisions; Effective Date and Other Agreements

2.1.  Effective Period.  This Agreement shall be effective on the day following the Spin-Off Date; provided, however, that if this Agreement has not become effective on or prior to January 1, 2000, it shall not become effective thereafter in the absence of the written consent of both parties to extend the effective date.  This Agreement will remain in full force and effect until the Final Determination of the GM Group Tax Liability has been made for all tax periods in which Delphi or any member of the Delphi Group is included in the GM Group.

2.2.  Recitals Incorporated.  The above recitals are hereby incorporated into this Agreement by reference.

2.3.  Application of the Code.  Unless otherwise indicated, the words and concepts used in this Agreement shall be given the same definitions and meanings ascribed to them by the Code and the Regulations, unless that meaning is clearly inconsistent with this Agreement.  Any alteration, modification, addition, deletion, or other change in the applicable provisions of the Code or the Regulations will automatically be applicable to this Agreement.  Unless otherwise indicated, all references herein to a particular Section of the Code or the Regulations will include any successor provision designated by a different or additional Section reference.

2.4.  Hughes Transactions Agreement.  In connection with the post-closing payment made by Hughes to GM pursuant to Section 1 of the Hughes Transactions Agreement dated December 17, 1997, GM, Hughes Electronics Corporation, and Delco entered into an agreement dated June 26, 1998 that provides for indemnification by Hughes with respect to certain issues.  The parties hereby acknowledge that any

5

indemnity payment that may be due from Hughes pursuant to the June 26, 1998 agreement relates to the payment made by Hughes to GM pursuant to the Hughes Transactions Agreement and would be payable to GM.

2.5. State and Local Income Taxes  If any state or local Income Tax is determined by combining or consolidating all or part of the income, losses, properties, payrolls, sales or other attributes of any member of the GM Group with those of any member of the Delphi Group, the parties will apply all of the provisions of this Agreement and the relevant provisions of state and local laws to such state and local Income Taxes, including estimated and final tax payments, Elections, Proceedings, and Final Determinations.

Article III.  Tax Payments; Consolidated Returns

3.1. Agreement to File.  As long as Delphi is a member of the GM Group, GM and Delphi (and all members of the Delphi Group) hereby agree to file consolidated Federal Income Tax Returns in the United States, and will execute such documents and take such actions as are necessary or appropriate in connection with filing those returns.

3.2. Elections.

For 1998 and each Consolidated Tax Period:

(a) General.

(i) Consolidated Elections.  GM will make all Elections that the Code or the Regulations require to be made by the parent corporation of a consolidated group, or Elections that must be followed by all members of the GM Group.

(ii) General Delphi Elections.  Except for Elections described in (i) above and subject to Section 3.2(b) below, all Elections that are available to Delphi under the Code and the Regulations relating to the filing of consolidated Federal Income Tax Returns, including Elections with respect to a Delphi taxable period beginning before the Contribution Date, will be determined by Delphi in its sole discretion and made by GM on behalf of Delphi.  All Elections made on Delphi's behalf by GM are deemed to have been made by Delphi.

(b) GM Consent.  Delphi shall not make any Election that might have an adverse impact on GM (whether because the Election is not consistent with Elections made by GM or otherwise) without the prior written consent of GM.  Whether an Election might have an adverse impact on GM will be determined by GM acting reasonably.

(c) Delphi Specific Elections.  GM may, in connection with providing the Income Tax reporting compliance services to Delphi referred to in Recital 11, provide

6

Delphi with a written description of certain specific Elections for which GM may require that Delphi make an affirmative determination of the Delphi Election. The written description will include all of the facts known to GM that are reasonably necessary for Delphi to make the determination, and the date by which the determination must be made in order to permit GM sufficient time to prepare the Income Tax Returns. Delphi will provide GM with its written determination of Election by the specified date. If Delphi fails to provide GM with its written determination of Election by the specified date, Delphi shall be deemed to have determined the Election made on its behalf by GM.

(d) <u>Delphi Pension Plan Contribution Deduction.</u>  Notwithstanding anything in this Section 3.2 to the contrary, if permitted to do so by the Code and Regulations, Delphi may make an Election to treat an amount of its pension plan contribution (including any contribution that Delphi makes to GM's pension plan in respect of Delphi employees) as deductible in its Consolidated Tax Period that includes the Contribution Date, and subsequent Consolidated Tax Periods (including the Consolidated Tax Period that includes the Spin-Off Date) but such deduction shall not exceed an amount that reduces the Delphi Group domestic source taxable income for the applicable Consolidated Tax Period below zero.

<u>3.3  Preparation of Income Tax Returns.</u>

(a)  <u>Consolidated or Combined Income Tax Returns.</u>  This Section 3.3(a) applies with respect to the preparation and filing of the GM Group's consolidated Federal Income Tax Returns and its consolidated or combined state or local Income Tax Returns for the Consolidated Tax Period that includes the Contribution Date, and subsequent Consolidated Tax Periods (including the Consolidated Tax Period that includes the Spin-Off Date).

(i)  <u>Delphi Consolidated Returns.</u>  For each Consolidated Tax Period, Delphi shall provide GM with a draft Federal Income Tax Return and draft state and local Income Tax Returns for each jurisdiction in which Delphi is included in a consolidated or combined state or local Income Tax Return with any member of the GM Group, on or before a date established by GM (which shall be consistent with the dates established for other members of the GM Group). Each draft Income Tax Return provided to GM shall be signed by an officer of Delphi in the space provided for the taxpayer's signature on the appropriate Income Tax Return form. Items of income, gain, deduction, loss and credit to be included in the draft Income Tax Returns for the Consolidated Tax Period that includes the Spin-Off Date shall be determined by the method described in Section 3.3(a)(ii).

(ii)  <u>Delphi Final Consolidated Tax Period.</u>  Notwithstanding anything in this Agreement to the contrary, the Delphi Group Tax Liability for the Consolidated Tax Period that Delphi ceases to be a member of the GM Group shall be determined pursuant to Reg. § 1.1502-76 by including only that portion of the taxable year ending on the Spin-Off Date, based on a closing of the books for income tax purposes and,

7

immediately before the Spin-Off, items of income, gain, loss, deduction, and credit will be taken into account (to the extent not previously taken into account in the computation of the Delphi Group Tax Liability) as required by the applicable intercompany transaction Regulations.

(b) Delphi Separate Returns.

(i) Separate State and Local Returns. Delphi shall prepare and file Income Tax Returns, and pay its separate Income Tax Liabilities or estimated separate Income Tax liabilities for any tax jurisdiction in which Delphi (or any member of the Delphi Group) is required to file (or does file) a separate state or local Income Tax Return directly with the taxing authority and not as a part of a GM return for a period that includes a Consolidated Tax Period.

(ii) Separate Return Tax Periods. GM and Delphi shall each prepare and file Income Tax Returns, and pay their own Income Tax liabilities directly with the taxing authorities for all Separate Return Tax Periods.

(iii) Separate Tax Return Adjustments. If there are any adjustments to the Delphi Group Income Tax liabilities for Separate Return Tax Periods or for separate state or local Income Tax Returns for a Consolidated Tax Period, Delphi will control the conduct of Proceedings related thereto, and will pay the Income Tax liability, if any, directly to the relevant taxing authority.

3.4  Payment of Tax to Internal Revenue Service.  For each Consolidated Tax Period GM will pay to the Internal Revenue Service, or to any other payee that may be required by the Code, the GM Group Tax Liability as shown on the consolidated Federal Income Tax Return filed with the Internal Revenue Service.

3.5  Tax Payments.

For Each Consolidated Tax Period:

(a) Calculation.  Not less that ten (10) Business Days prior to the date on which GM is required to make payments of estimated tax (as defined in Section 6655 of the Code) on behalf of the GM Group, for any quarter in which the Delphi Group is includable in the GM Group consolidated Federal Income Tax Return, Delphi shall submit to GM a calculation of the separate Delphi Group estimated tax, determined on the basis of the estimated Delphi Group Tax Liability.

(b) Estimated Payment.  On or before the due date of GM's payment of estimated tax, Delphi will pay to GM the amount, if any, shown in the calculation of Delphi Group estimated tax.  If, at the due date of any payment of estimated tax, or after the close of the tax year, Delphi's calculations show that its previous payments to GM are in excess of the Delphi Group Tax Liability for estimated tax due on a

cumulative basis, GM shall promptly refund such excess to Delphi. No refund shall be required prior to the filing of the Income Tax Return related to such taxes unless GM can obtain cash benefit of such Delphi excess payment whether by refund from the taxing authorities or by reduction of other taxes for which GM is liable.

(c) Underpayment Penalty. If an additional tax would have been imposed on the Delphi Group under Section 6655 because of an underpayment of estimated tax had that Group paid the calculated Delphi Group estimated tax and incurred the Delphi Group Tax Liability, Delphi will pay to GM the amount of the additional tax on the date the additional tax would have been due, but not in excess of the amount that the GM Group Tax Liability is increased under Section 6655 of the Code.

(d) Federal Income Tax Return Payment. On or before September 30 of the year following each tax year to which this Agreement applies, Delphi will pay to GM or GM will pay to Delphi, as appropriate, the difference between the Delphi Group Federal Income Tax liability for that tax year and the estimated tax payments paid by Delphi for that tax year.

(e) State or Local Income Tax Return Payment. On or before January 15 of the second year following each tax year to which this Agreement applies, Delphi will pay to GM or GM will pay to Delphi, as appropriate, the difference between the aggregate Delphi Group state and local Income Tax liability for such tax year and the estimated tax payments paid by Delphi for that tax year. This Section 3.5(e) does not apply to Delphi Income Tax Returns described in Section 3.3(b).

3.6 Method of Payment.

(a) General. Unless otherwise mutually agreed, all payments required by this Agreement will be made by wire transfer of same day funds to the appropriate bank account as may from time to time be designated for that purpose, and notice of the transfer will be given to the payee of the payment in accordance with Section 8.5 of this Agreement.

(b) Setoff. Notwithstanding anything to the contrary in any agreement between Delphi and GM, but subject to the following sentence, each party has the right to collect payments under this Agreement that are more than sixty (60) calendar days past due by setoff against payments due to the other party under this Agreement or any other agreement between them, unless such other agreement is in respect of any form of taxes, in which case no right of setoff shall apply. Notwithstanding the preceding sentence, in the event and to the extent that any payment to be made under this Agreement is in dispute between the parties and the disputed matter is subject to the dispute resolution procedure set forth in Section 7.2 of this Agreement, the setoff provision of this Section 3.6(b) shall not apply to the extent of the disputed amount. No amounts due under this Agreement may be used to satisfy claims by either party under any other agreement between them.

9

3.7 Interest. If any payment required by this Agreement is not timely paid, interest shall accrue during any calendar quarter on the unpaid amount at a rate per annum equal to the highest Prime Lending Rate published on the first Business Day of such calendar quarter by the Wall Street Journal, but in no event to exceed the maximum rate of interest allowed by applicable law. For this purpose, a payment will be timely paid only if actually received by the payee on or before the due date of the payment.

## Article IV. Recomputations and Adjustments

### 4.1. Adjustments of GM Group Tax Liability.

(a)   Adjusting Payments Generally.   For Prior Tax Years and any Consolidated Tax Period, if any item of income, gain, loss, deduction, or credit of the GM Group is adjusted as part of a Final Determination, GM will pay Delphi or Delphi will pay GM an amount, including interest and penalties imposed on the GM Group, (A) as may be necessary to adjust the payments between Delphi and GM to reflect payments that would have been made under Section 3.5 of this Agreement had the Final Determination of the adjustment been taken into account in determining the amount of those payments, or (B) as described in other Sections of this Agreement. However, any payment otherwise required by (A) or (B) will be required to be made only if the payment results from an adjustment that:

(i) constitutes a Timing Difference, as described in Section 4.2,

(ii) relates to Delphi Technologies, Inc.,

(iii) results from the failure of GM or Delphi to retain records as required by Section 6.2,

(iv) results from the failure of GM or Delphi to cooperate in tax administration matters as required by Section 6.3,

(v) relates to other recomputations described in Section 4.3 below,

(vi) relates to Delco for Prior Tax Years, as described in Section 4.4 below,

(vii) relates to Elections determined by Delphi, but not consented to by GM in writing pursuant to Section 3.2(b),

(viii) relates to Elections determined by Delphi pursuant to Section 3.2(c), or

(ix) relates to foreign tax refunds, as described in Section 4.5.

10

(b) Time of Payment. A payment required under this Section 4.1 will be due ten (10) calendar days following the date that one party gives notice to the other party that a payment is due.

(c) Required Notice. Notice will include a copy of the notice of deficiency or other written communication from an authority describing the Final Determination and, if necessary, detailed calculations supporting the amount due.

4.2. Timing Differences. If any item of income, gain, recapture, loss, deduction, or credit of the GM Group is adjusted as part of a Final Determination for any tax year (whether or not this Agreement applies to that tax year), and the adjustment results in a Timing Difference, GM or Delphi, as appropriate, will pay to the party incurring the tax detriment an amount equal to the Tax Change. The party obtaining the Tax Change benefit will pay to the party incurring the Tax Change detriment the amount of the benefit, without interest, on the earlier of (i) the due date of the Income Tax Return on which the benefit is claimed (unless that return was filed before the Timing Difference arose), (ii) the date that a refund of the tax benefit is received, or (iii) the date that a taxing authority applies the tax benefit to an amount owed by the party receiving the tax benefit. The party incurring the Tax Change detriment shall have the right to review the tax benefit utilization by the other party. GM and Delphi may negotiate a single payment to be made in lieu of the payments contemplated in this Section 4.2. The parties may consider, among other factors, the time value of the future tax benefits, anticipated future tax rates, and the likelihood that the tax benefits will be utilized.

4.3. Other Recomputations. If there is any change of or adjustment to any item relating to the computation of payment under this Agreement that is not otherwise provided for (such as correction of a previous erroneous calculation), GM and Delphi will make payments to each other as may be appropriate to reflect the intent of this Agreement, as described in Section 7.1. No payment shall be required with respect to a Prior Tax Year pursuant to this Section 4.3.

4.4. Delco Prior Tax Year Adjustments. If any item of Delco's income, gain, loss, deduction, or credit is adjusted as part of a Final Determination made with respect to any Prior Tax Year and the adjustment increases the Delco Income Tax liability, Delphi will pay GM an amount equal to such increase, reduced by the amount of any indemnification payment due to GM from Hughes described in Section 2.4(a) of this Agreement. If the Delco adjustment decreases the Delco Income Tax liability (net of any such indemnification payment), GM will pay Delphi the amount of the decrease.

4.5. Foreign Tax Refunds. If Delphi receives, after the Spin-Off Date, a refund of foreign taxes related to a tax year ending on or before the Spin-Off Date and the IRS requires an adjustment pursuant to Regulation §1.905-3T to the GM Group's foreign tax credit for a Consolidated Tax Period or a Prior Tax Year, Delphi will pay GM an amount equal to the adjustment to the GM Group's foreign tax credit generated through the last

11

Consolidated Tax Period. If any portion of the foreign tax credit repaid by Delphi to GM would have expired unused, GM will pay an amount equal to such portion to Delphi, together with interest on such portion from the date Delphi paid GM to the date GM pays Delphi, computed at the Federal short-term rate described in Section 6621(b) of the Code, plus two percentage points. Delphi shall have the right to review such foreign tax utilization.

4.6. Character of Adjusting Payments. If any payment required by this Article IV is taxable to the recipient, the amount of the payment shall be adjusted to place the recipient in the same after-tax position it would have enjoyed if the payment were not taxable to the recipient.

Article V. Carryforward Tax Attributes.

5.1. Delco Carryforward Tax Attributes. The Carryforward Tax Attributes available to the Delphi Group for the tax period that includes the Contribution Date will be determined by apportioning the Carryforward Tax Attributes of the GM Group among the GM Group and the Delco Group, as described below:

(a)   Federal Tax Attributes. If the final or temporary Regulations would require an allocation of a portion of the GM Group's Carryforward Tax Attributes to the Delco Group had the Delco Group left the GM Group as of the Contribution Date, then, GM will allocate to the Delco Group only that portion, if any, of the particular Carryforward Tax Attribute items that would have been expressly required to be allocated to the Delco Group if the Delco Group left the GM Group as of the Contribution Date. The Delphi Group may take only these Carryforward Tax Attributes into account in determining the Delphi Group Tax Liability for the Consolidated Tax Period that includes the Contribution Date. The determination of the amount of unused foreign tax credit allocable to the Delco Group shall be determined separately with respect to each of the items of income listed in Section 904(d) of the Code.

5.2. Separate Return Tax Period Carryforward Tax Attributes. The Carryforward Tax Attributes available to the Delphi Group for Separate Return Tax Periods will be determined by allocating the Carryforward Tax Attributes of the GM Group available to carry forward to tax periods beginning after the end of the final Consolidated Tax Period among the GM Group and the Delphi Group, as described below:

(a)   Federal Tax Attributes. Unless the final or temporary Regulations expressly require an allocation of particular items of the GM Group's Carryforward Tax Attributes from the final Consolidated Tax Period to the Delphi Group's Separate Return Tax Periods, no Carryforward Tax Attributes will be allocated to Delphi. GM will allocate to the Delphi Group only that portion, if any, of particular Carryforward Tax Attribute items as the final or temporary Regulations expressly require to be so allocated. The portion, if any, of any GM Group consolidated unused foreign tax credit

12

which is allocable to Delphi shall be determined separately with respect to each of the items of income listed in Section 904(d) of the Code.

(b) State or Local Income Tax Attributes.  No tax attributes arising from state or local Income Tax Returns shall be allocated to Delphi or any member of the Delphi Group (including Delco), unless under the provisions of applicable state law or state regulations such tax attributes are expressly required to be allocated to Delphi.

(c) R&E Credit Base Period.  As provided by Section 41(f)(3) of the Code, GM will allocate to Delphi the required portion of GM's Code Section 41(c) base amount.

(d) Earnings and Profits.  As provided by §312(h) of the Code, earnings and profits shall be allocated between GM and Delphi.

5.3.  Calculation of Carryforward Tax Attributes.  Calculation of the portion of any Carryforward Tax Attribute, state or local tax attributes, R & E Credit base period amount, and earnings and profits available to Delphi or to any member of the Delphi Group shall be made by GM in accordance with this Article V.  Such calculation will be provided to Delphi as soon as practicable but in any case estimates shall be provided to Delphi not later than a date that permits Delphi sufficient time to prepare and to timely file its Income Tax Returns for Delphi's first Separate Return Tax Period, taking all extensions of time to file Income Tax Returns into consideration.  GM shall also advise Delphi of any adjustments to such calculations as a result of a tax audit, a Final Determination, or otherwise.  Delphi shall have a right to review GM's calculations made pursuant to this Section 5.3.

5.4.  Tax Attributes to be Claimed for Separate Return Tax Periods.  Delphi shall prepare and file all of its Income Tax Returns for all Separate Return Tax Periods taking into account the amount of the Carryforward Tax Attributes provided to Delphi by GM pursuant to this Article V, or such tax attributes as finally determined.

5.5.  Carryback Items from Separate Return Tax Periods. With respect to carrybacks by Delphi of net operating losses, net capital losses, unused tax credits and other deductible or creditable tax attributes to a Consolidated Tax Period from a Separate Return Tax Period which would be permitted under the Code and the Regulations (or state law or state regulations), taking into consideration the separate return limitation year rules, whenever permitted to do so by the Code, the Regulations, state law or state regulations, Delphi shall elect to relinquish any carryback period which would include any Consolidated Tax Period.  In cases where Delphi cannot relinquish the carryback period, or if the parties otherwise agree, GM shall cooperate with Delphi in seeking tax refunds from the appropriate taxing authority, at Delphi's expense, and Delphi shall be entitled to such refund, including interest paid by the taxing authority in connection with such refund; provided, however, that Delphi shall indemnify and hold GM harmless from and against any and all collateral tax

13

consequences resulting from or caused by the carryback of deductible or creditable tax attributes by Delphi from a Separate Return Tax Period to a Consolidated Tax Period, including, but not limited to, tax attributes of GM that expire unused (including tax attributes that expire during a tax period subsequent to the tax period during which the Delphi tax attribute carried back was generated) and which would have been used but for Delphi's carryback. The amount of such indemnity shall be limited to the actual tax benefit to which the GM Group would have been entitled in the absence of the carryback of the deductible or creditable tax attribute of Delphi. GM shall only be entitled to indemnification under this Section 5.5 if GM has used its reasonable best efforts to avoid the collateral tax consequence being indemnified. Delphi shall have the right to review the collateral tax consequence being indemnified. The amount of the refund due to Delphi from GM shall be reduced by the amount of the indemnification, if any.

In the event that (i) Delphi or a member of the Delphi Group has filed a refund claim with a taxing authority for a Consolidated Tax Period as contemplated by this Section 5.5, (ii) the refund claim has been allowed, and (iii) the taxing authority has applied the refund to an amount owed by GM, then GM shall pay Delphi the amount of the refund, including the amount of interest that would otherwise have been paid by the taxing authority to Delphi or such member of the Delphi Group.

The refund payment shall be due to Delphi ten Business Days after the earlier of (i) the date that GM receives the refund from the taxing authority, or (ii) the date that a taxing authority applies the refund to an amount owed by GM.

Article VI.    Tax Matters Administration, Indemnification, Record Retention, and Cooperation

6.1. Audits, Protests, Appeals and Litigation.

(a) Notification. GM will notify Delphi in writing of any pending or threatened Proceeding in connection with any Income Tax liability for which any member of the Delphi Group may be liable, promptly upon receipt of notice of such Proceeding by any member of the GM Group. Delphi will notify GM in writing of any pending or threatened Proceeding in connection with any Income Tax Liability for which any member of the GM Group may be liable, promptly upon receipt of notice of such Proceeding by any member of the Delphi Group. Notification must include a complete copy of any written communication, and a complete written summary of any oral communication. The failure of GM or Delphi to timely forward such notification shall not relieve the other party of its obligation to pay such Income Tax, except to the extent that the failure to timely forward notification prejudices the ability of the other party to contest the Income Tax Liability.

(b) Representation. GM has the sole right to represent the interests of the GM Group, including all members of the Delphi Group, in any Proceeding in connection

14

with any Income Tax Liability for a Consolidated Tax Period for which a member of the GM Group may be liable.  GM shall not resolve or settle such Proceeding if the resolution or settlement would result in (i) an Income Tax liability for Delphi pursuant to Section 4.1 of this Agreement (and provisions of this Agreement referred to therein), or (ii) a change in an accounting method of any member of the Delphi Group, without the concurrence of Delphi, which shall not be unreasonably withheld.

6.2.  Record Retention.  GM and Delphi agree to maintain books and records in accordance with the record retention procedures described in the Master Separation Agreement.

6.3.  Cooperation.

(a)  Exchange of Information.  GM (and each member of the GM Group) and Delphi (and each member of the Delphi Group) will provide each other with the cooperation and information reasonably requested by the other party in connection with tax planning, the preparation or filing of any Income Tax Return (or claim for refund), the determination and payment of estimated Income Tax, or the conduct of any Proceeding; provided, however, that neither party is required to disclose privileged and confidential information.  Such cooperation and information includes:

(i) promptly forwarding copies of appropriate notices and other communications (including, information document requests, revenue agent's reports and similar reports, notices of proposed adjustments and notices of deficiency) received from or sent to any taxing authority,

(ii) providing copies of all relevant Income Tax Returns (including workpapers and schedules), and documents relating to rulings or other determinations by taxing authorities,

(iii) providing copies of records concerning the ownership and tax basis of property,

(iv) providing other relevant information which either party may possess, including explanations of documents and information provided under this Agreement, as well as access to appropriate personnel,

(v) the execution of any document that may be necessary or reasonably helpful in connection with the filing of an Income Tax Return (or claim for refund) or in connection with any Proceeding, including waivers, consents or powers of attorney, and

(vi) the use of the parties' reasonable efforts to obtain any documentation from a governmental authority or a third party that may be necessary or reasonable helpful in connection with any of the foregoing.

15

(b) Information Confidential.    GM and Delphi shall hold and cause its consultants and advisors to hold in strict confidence, unless compelled to disclose by judicial or administrative process or, in the opinion of its counsel, by other requirements of law, all information (other than any such information relating solely to the business or affairs of such party) concerning the other party furnished to it by the other party or its representatives pursuant to this Agreement (except to the extent that such information was (i) in the public domain through no fault of the party to which it was furnished, or (ii) lawfully acquired from other sources by such party), and shall not release or disclose such information to any other person, except its auditors, attorneys, financial advisors, bankers and other consultants and advisors who shall be advised of the provisions of this Section 6.3(b). Any disclosure of information by either party to Accountants for review purposes pursuant to sections of the Agreement providing for review rights shall not constitute a breach of confidentiality under this Agreement.

(c) R & E Credit Audit.  In particular, Delphi shall fully cooperate with GM in connection with any Proceeding that involves:

(i) the credit for increasing research activities under Section 41 of the Code (the "R & E Credit") claimed on the GM Group's Federal Income Tax Return for the tax years 1995 through 1998, and

(ii) the R & E Credit claimed on the GM Group's Federal Income Tax Return for any Consolidated Tax Period to the extent that the qualified research expenses (as defined by Section 41(b) of the Code) ("QRE") of Delphi or any member of the Delphi Group were included in the determination of the GM Group's R & E Credit.

(iii) Target Range.  Delphi will be responsible for sustaining in a Final Determination QRE within a QRE Target Range established by GM for each of the tax years 1995 through the tax year during which the Spin-Off occurs.  The QRE Target Range will be based on the methodology that resulted from the 1991-1994 audit agreed Delphi QRE (Delphi's sustained QRE) in GM's overall R & E Credit resolution for tax years 1991 through 1994. Such methodology will be applied to tax years 1995 through the tax year during which the Spin-Off occurs, and a QRE Target Amount will be determined.  The upper end of the QRE Target Range will be the QRE Target Amount plus 5% of the QRE Target Amount.  The lower end of the QRE Target Range will be the QRE Target Amount less 5% of the QRE Target Amount. (For example, if the QRE Target Amount is $100, then the upper end of the QRE Target Range will be $105, and the lower end of the QRE Target Range will be $95.)  The QRE Target Range for each of the tax years 1995 through the tax year during which the Spin-Off occurs will be provided to Delphi by GM at the commencement of the audit for the respective tax years.

(iv) Incentive.  If Delphi sustains QRE in excess of the specified target range for a particular tax year, then GM will pay Delphi 6-1/2 cents for each one dollar of sustained QRE in excess of the highest amount of the target range for that tax year.

16

If Delphi fails to sustain QRE within the specified target range for a particular tax year, then Delphi will pay GM 6-1/2 cents for each one dollar that the lowest amount of the target range exceeds the amount QRE sustained by Delphi that tax year. This Section 6.3(c) is intended to quantify the amount that Delphi may be required to pay GM for failure to maintain records under Section 6.2, or for failure to cooperate under Section 6.3, as those Sections relate to QRE. Any amount that Delphi is required to pay GM under this Section 6.3(c) will be in addition to any amount that Delphi would be required to pay GM in respect of issues other than QRE in connection with tax liabilities resulting from Delphi's failure to retain records or to cooperate. With respect to those tax years for which the R & E Credit was in effect for only part of the tax year (i.e., 1995 and 1996), the amount of the incentive payment will be reduced proportionately to reflect that portion of the tax year for which the R & E Credit was in effect.

6.4. Indemnification.

(a) GM Group Taxes. Subject to Section 6.4(e) below, GM will indemnify Delphi for all Income Taxes that GM is required to pay (including Income Tax that a taxing authority may attempt to collect from Delphi pursuant to Section 1.1502-6 of the Regulations or similar provisions of state or local law or regulations), except those Delphi is required to pay to GM pursuant to this Agreement.

(b) Delphi Separate Taxes. Delphi will indemnify GM for all Income Taxes that Delphi is required to pay to any taxing authority, including those related to state or local Income Tax Returns for Consolidated Tax Periods that are not combined or consolidated returns with a member of the GM Group other than members of the Delphi Group.

(c) Gain Recognition Agreements. If GM is required to enter into a Gain Recognition Agreement, as that term is defined in Section 1.367(a)-8 of the Regulations (which would result in an Income Tax liability to GM in the event that Delphi disposes of certain foreign entities or assets within the time period described in the Regulations), Delphi will indemnify GM from any Income Tax liability, including interest and penalties thereon, resulting from the disposition by Delphi of assets that are the subject of a Gain Recognition Agreement entered into by GM in respect of any Delphi foreign entities or assets. GM will notify Delphi of all such Gain Recognition Agreements by the later of (i) the Contribution Date, or (ii) within 10 Business Days after the Gain Recognition Agreement is entered into.

(d) Coordination With Services Agreements. Nothing in this Agreement will limit the indemnification or hold harmless provisions of the Tax Compliance and Planning Services Agreement or the Customs Consulting Agreement.

(e) Coordination With Other Agreements. Nothing in this Agreement will limit the covenants, representations or warranties, or indemnification obligations of the

17

parties with respect to Income Tax related matters in the Master Separation Agreement
or the Initial Pubic Offering and Distribution Agreement.

Article VII.  Dispute Resolution

7.1.  Intent of the Parties.  Except as otherwise provided in this Agreement, it is the
intent of the parties that the Delphi Group Federal, state and local Income Tax liability
for all taxable periods, beginning with the tax period that includes the Contribution Date,
will be determined as if the Delphi Group were a separate affiliated group of
corporations filing a consolidated Federal Income Tax Return, and that Delphi shall pay
such liability.  This Agreement shall at all times be interpreted consistently with such
intent.

7.2.  Dispute Resolution.  Disputes arising in connection with this Agreement shall
be resolved in accordance with the procedures set forth in the Master Separation
Agreement, with the proviso that each arbitrator shall be a tax attorney or tax
accountant who is generally recognized in the tax community as a qualified and
competent tax practitioner with experience in the tax area involved in the issue or
issues to be resolved.

Article VIII.  Miscellaneous Provisions.

8.1.  Additional Members.  The parties recognize that from time to time other
corporations may become members of the GM Group or the Delphi Group during the
term of this Agreement, and GM and Delphi agree to use their best efforts to cause
such corporations to be bound by all of the terms and conditions of this Agreement.

8.2.  Successors and Assigns.  This Agreement shall inure to the benefit of, and
be binding upon the parties and their respective successors, predecessors and assigns,
but no assignment of this Agreement shall relieve any party of its obligations without the
written consent of the other party.

8.3.  Entire Understanding.  This Agreement contains the entire understanding of
the parties with respect to:

(a) the allocation of Federal, state and local Income Tax liabilities for tax
periods beginning on or after the Contribution Date, and

(b) transitional tax matters, including those related to the contribution of Delco
by GM to Delphi.

This Agreement may not be amended except by a written agreement executed by each
of the parties.  The parties recognize and acknowledge their intention to enter into
additional agreements from time to time with respect to the allocation of taxes not
covered by this Agreement.  This Agreement is separate from, and will not affect or be

18

affected by, the rights and obligations of the parties under the Master Separation Agreement, the Initial Public Offering Agreement and Distribution Agreement, the Tax Compliance and Planning Services Agreement or the Customs Consulting Agreement.

8.4.    Conflict of Law.    The validity, interpretation and performance of this Agreement will be controlled and construed under the laws of the State of Michigan, without giving effect to laws and principles relating to conflicts of law.

8.5.    Notices.    Every notice, request, statement, or bill or other communication provided for in this Agreement (a "Notice") must be in writing and may be personally served, provided a receipt is obtained, or may be sent by certified mail, return receipt requested, postage prepaid, or may be sent by facsimile, with acknowledgment of receipt requested, to the parties at the following addresses (or such other address as one party may specify by Notice to the other parties):

If to GM:

> Chief Tax Officer
> GENERAL MOTORS CORPORATION
> Mail Code 482-114-262
> 3044 West Grand Boulevard
> Detroit, Michigan  48202

with a copy (which shall not constitute effective notice) to:

> Assistant General Tax Counsel
> GENERAL MOTORS CORPORATION
> Mail Code 482-114-262
> 3044 West Grand Boulevard
> Detroit, Michigan  48202

If to Delphi:

> Chief Tax Officer
> DELPHI AUTOMOTIVE SYSTEMS CORPORATION
> Mail Code 483.400.626
> 5725 Delphi Drive
> Troy, Michigan  48098

19

with a copy (which shall not constitute effective notice) to:

General Counsel
DELPHI AUTOMOTIVE SYSTEMS CORPORATION
Mail Code 483.400.603
5725 Delphi Drive
Troy, Michigan  48098

A Notice which is delivered personally is given as of the date specified in the written receipt.  A Notice sent by certified mail is given on the third Business Day following the date of mailing.  A Notice by facsimile is given on the date it is transmitted, provided that acknowledgment of receipt is received by sender.

8.6.  Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be an original, but all of which together will constitute one and the same instrument.

8.7.  Change in Law.  If, due to any change in applicable law or regulation or the interpretation thereof by any court of law or other governing body having jurisdiction, subsequent to the date of the Agreement, performance of any provision of or any transaction contemplated by this Agreement shall become impracticable or impossible, the parties will use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by this Agreement.

8.8.  Review Rights.  Whenever either party has a right of review pursuant to any provision of this Agreement, either (i) the party exercising its review right may engage Accountants to perform (or assist in performing) the review, or (ii) the other party may elect to engage Accountants to perform the review, and in that event the party exercising its review right shall not perform the review.  The party engaging the Accountants shall pay all costs and fees associated with the Accountants' review.  Both parties will cooperate fully in such review.

20

The parties have duly executed this Amended and Restated Agreement for the Allocation of United States Federal, State and Local Income Taxes on the date indicated.

GENERAL MOTORS CORPORATION

By: *Roger D. Wheeler*    Date: *12/15/98*
Roger D. Wheeler
Chief Tax Officer

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: *James P. Whitson*    Date: *12/16/98*
James P. Whitson
Chief Tax Officer

taa_2jw2.doc

21

<u>ADDENDUM TO THE
AMENDED AND RESTATED AGREEMENT FOR THE ALLOCATION OF
UNITED STATES FEDERAL, STATE AND LOCAL INCOME TAXES
RELATING TO MICHIGAN SINGLE BUSINESS TAX</u>

This Addendum is by and between General Motors Corporation, a Delaware corporation ("GM"), and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi").

## RECITALS

1. GM and Delphi entered into that certain Amended and Restated Agreement for the Allocation of United States Federal, State and Local Income Taxes on December 16, 1998 (the "Tax Allocation Agreement").

2. Pursuant to the Tax Allocation Agreement, for Delphi's tax year ended May 28, 1999, Delphi will pay its Michigan Single Business Tax ("SBT") to GM.

3. Delphi has lobbied for a new provision in the Michigan SBT law that would permit a corporation such as Delphi to elect to determine its SBT by excluding sales to members of its former affiliated group (the "Proposed Legislation"), but only if such corporation commits to make a certain amount of capital investment in the state of Michigan within a certain time (the "Required Investment"). In Delphi's case, the Proposed Legislation would permit Delphi to elect to exclude sales to GM in its determination of its SBT liability for a five year period.

4. Delphi intends to make the election described in Recital 3 above, first effective for its tax year beginning January 1, 1999. Delphi's election under the enacted Proposed Legislation described in Recital 3 above for its tax year beginning January 1, 1999 and ending May 28, 1999 is referred to herein as the "Election".

5. GM believes that, if enacted, the Proposed Legislation would have no effect on the amount of SBT that Delphi is required to pay GM under the Tax Allocation Agreement for the five months ended May 28, 1999.

6. Delphi believes that, if enacted, the Proposed Legislation will substantially reduce the amount of SBT that Delphi is required to pay GM under the Tax Allocation Agreement for the five months ended May 28, 1999.

1

7. GM and Delphi desire to resolve their difference of opinion described in Recitals 5 and 6 by entering into this Addendum.

8. Delphi made an estimated SBT payment to GM of approximately $10.8 million on May 28, 1999, for the first quarter 1999.

## AGREEMENT

1. <u>Recitals Incorporated</u>. The above recitals are hereby incorporated into this Agreement by reference.

2. <u>Pending Enactment</u>. Until the Proposed Legislation is enacted, Delphi shall pay to GM the amount of Delphi's SBT for its tax year ending May 28, 1999, including estimated and final tax payments, as and when due under the Tax Allocation Agreement, without regard to the Proposed Legislation.

3. <u>After Enactment</u>. If the Proposed Legislation is enacted and is effective on January 1, 1999, either by its terms or pursuant to Delphi's Election, then:

    (a) Delphi shall notify GM of the enactment of the Proposed Legislation and of its intention to make the Election. Promptly after Delphi makes its Election, Delphi shall provide GM with a copy of such Election, together with the appropriate State of Michigan Election approvals.

    (b) GM and Delphi hereby agree that, in consideration for GM not taking action contrary to Delphi's legislative efforts, if Delphi makes the Election, then Delphi's SBT liability for that tax year shall be determined under the Tax Allocation Agreement to be equal to:

        (i) the amount determined as if the Proposed Legislation had not been enacted (i.e., by including Delphi's sales to GM) but including all other SBT law provisions that are effective for tax years beginning January 1, 1999,

        (ii) reduced by one-half of the difference between the amount determined in clause (i) and the amount determined by excluding Delphi's sales to GM that would be excluded under the Proposed Legislation and the Election (the "Excess SBT Payment").

2

(c) If the Proposed Legislation is enacted before July 31, 1999 and Delphi has provided GM notice of its intention to make the Election before that date, then

(i) pursuant to Section 3.5(a) of the Tax Allocation Agreement, Delphi will provide to GM the calculation of its estimated SBT payment for the second quarter 1999 by the formula set forth in (b) above, based on the then most recent tax forecast, and

(ii) Delphi's estimated SBT due to GM on July 31 shall be the difference between the amount for Delphi's tax year ending May 28, 1999 as determined under (b) above, reduced by the amount of the estimated SBT paid to GM for Delphi's first quarter 1999.

(d) If the Proposed Legislation is enacted after July 31, 1999 and Delphi has provided to GM notice of its intention to make the Election after that date then, at Delphi's option, Delphi may (i) apply the Excess SBT Payment to tax liabilities due to GM for other tax jurisdictions, or (ii) pursuant to Section 3.5(b) of the Tax Allocation Agreement, require GM to promptly refund the Excess SBT Payment, which refund shall not be subject to the last sentence of Section 3.5(b).

4. Recapture. If it is determined at any time that Delphi would not be entitled to the benefits of the Proposed Legislation for its tax year ending May 28, 1999 for any reason, including failure to make the Required Investment in accordance with Section 208.54(1)(C)(iii) of the Michigan Tax Code, failure to make or ineffectiveness of the Election, repeal or invalidation of the Proposed Legislation, or otherwise, Delphi shall immediately repay to GM the amount of the Excess SBT Payment, together with interest at the rate described in Section 3.7 of the Tax Allocation Agreement from the later of July 31, 1999 or the date GM applies or refunds the Excess SBT Payment to Delphi. Ineffectiveness of the Election shall be determined for this purpose as follows: If Delphi actually makes the Election, and the election described in Recital 3 for Delphi's next succeeding tax year is determined to be ineffective or invalid by the relevant agency of the State of Michigan, then the Election shall be deemed to be ineffective.

5. Notices. Any notice given under this Addendum shall comply with the provisions of Section 8.5 of the Tax Allocation Agreement.

3

The parties have duly executed this Addendum to the Amended and Restated Agreement for the Allocation of United States Federal, State and Local Income Taxes on the date indicated.

GENERAL MOTORS CORPORATION

By: _____   Date: _____

Roger D. Wheeler
Chief Tax Officer

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _____   Date: _____

James P. Whitson
Chief Tax Officer

4

## Exhibit 5.01(a)(v)
**Agreement for Indemnification of United States Federal, State and Local Non-Income Taxes, dated as of December 16, 1998, between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM**

**Exhibit L-2**

## AGREEMENT FOR THE INDEMNIFICATION OF

## UNITED STATES FEDERAL, STATE AND LOCAL NON-INCOME TAXES

This Agreement is by and between General Motors Corporation, a Delaware corporation ("GM"), and Delphi Automotive Systems Corporation, a Delaware corporation ("Delphi").

## RECITALS

1.      GM is the common parent of the GM Group, which includes Delphi.

2.      On June 19, 1998, GM formed Delphi Automotive Systems (Holding), Inc. ("DASHI"), as a Delaware corporation wholly owned by GM.    On or about January 1, 1999, GM will contribute to DASHI GM's ownership interest in all of the foreign branches, subsidiaries, joint ventures and other foreign assets related to the business of Delphi.

3.      On September 9, 1998, GM formed Delphi Technologies, Inc., a Delaware corporation ("Delphi Technologies"), and will, on or about January 1, 1999, contribute to it certain intellectual property (e.g. patents, trademarks and tradenames) related to the Delphi business. Delphi Technologies will then be contributed to Delco Electronics Corporation, a Delaware corporation ("Delco").    Delphi Technologies will grant a license to other Delphi entities for use of the intellectual property in exchange for an appropriate royalty.

4.      On September 16, 1998, GM formed Delphi Automotive Systems LLC ("DAS") as a single-member Delaware limited liability company.    Pursuant to Treas. Reg. §301.7701-1(a)(4), following its formation DAS will be treated as a division of GM for Federal income tax purposes.    On or about January 1, 1999, GM will contribute to DAS all of Delphi's U.S. assets, including the stock of Delco.

5.      On September 16, 1998, GM formed Delphi and will, on or about January 1, 1999, contribute to it all of GM's ownership interest in DASHI and DAS.

6.      Pursuant to Treas. Reg. § 301.7701-1(a)(4), following the contribution of DAS to Delphi, DAS will be treated as a division of Delphi for Federal income tax purposes.

7.      It is anticipated that during the second quarter of 1999 GM will distribute all of its Delphi capital stock to holders of GM's $1-2/3 Par Value Common Stock.

8.    Prior to the Contribution Date, GM's business practice with respect to Non-Income Tax liabilities and adjustments thereto was to bill the Delphi Business Sector for those liabilities or adjustments that were attributable to the Delphi Business Sector or its operations.

## AGREEMENT

Article I.  Definitions

"Business Day" means any day other than a Saturday, a Sunday, or a day on which banking institutions located in the State of Michigan are authorized or obligated by law or executive order to close.

"Contribution Date" means that date that GM completes the formation of Delphi by contributing to it all of GM's ownership interest in DASHI and DAS, anticipated to be January 1, 1999.

"Customs Duty" means a tax or fee imposed by the U.S. Federal government (e.g., under Title 19 of the U.S. Code) on goods imported into the customs territory of the United States.  This includes a charge, fixed by U.S. statute or regulation, for services provided by U.S. government officials or officers, or for the use of a privilege granted by or under the control of the U.S. government, including, but not limited to the Merchandise Processing Fee and the Harbor Maintenance Fee.

"Delco" means Delco Electronics Corporation, a Delaware corporation.

"Delphi" means Delphi Automotive Systems Corporation, a Delaware corporation.

"Delphi Group" means Delphi and majority-owned subsidiary companies, including Delco.

"Delphi Business Sector" means those assets and divisions of GM, including the stock of Delco, representing the automotive component manufacturing operations of GM prior to the Contribution Date and which are included as part of Delphi and subsidiaries in the Form S-1 filed by Delphi with the Securities and Exchange Commission on November 16, 1998.

"Determination" means the point in time where liability for Non-Income Taxes is either: (1) adjusted to the mutual agreement of GM or Delphi and the Federal or state or local government, (2) adjusted by a court of law, or (3) no longer subject to adjustment due to the lapse of the applicable statute of limitations.  A Determination will generally occur at earliest of the following points in time:  (1) the conclusion of an audit, examination, or investigation, where the Non-Income Tax adjustment is agreed to by GM or Delphi and

the Federal or state or local government, (2) the conclusion of an administrative appeal, where the Non-Income Tax adjustment is the subject of a settlement between GM or Delphi and the Federal or state or local government, (3) a final non-appealable court decision, or (4) the lapse of the applicable statute of limitations.

"Employment Tax" means any of the following taxes imposed or collectible based on wages as defined in Subtitle C of the Tax Code and related state or local law provisions:  (1) Federal, state or local employee withholding taxes, (2) Federal Unemployment Tax Act taxes, or related state or local unemployment taxes, and (3) Federal Insurance Contribution Act taxes.

"Federal Excise Tax" means taxes imposed under Subtitles D or E of the Tax Code.

"Federal Regulations" means the regulations promulgated under the U.S. Code, in effect from time to time.

"GM" means General Motors Corporation, a Delaware corporation.

"GM Group" means GM and majority-owned subsidiary companies, including Delphi and the Delphi Group where applicable.

"Master Separation Agreement" means that certain Master Separation Agreement entered into by and among GM, Delphi, and certain members of the Delphi Group in December 1998.

"Non-Income Taxes" means any or all of the following:  Customs Duties, Sales or Use Taxes, Property Taxes, Employment Taxes, or Federal Excise Taxes.

"Sales or Use Tax" means any U.S. state or local tax on the purchase, sale or use of tangible personal property or statutorily enumerated services by the taxpayer.

"Property Tax" means any U.S. state or local tax based on the value of real or personal property owned by the taxpayer.

"Prior Tax Year" means 1998 and all previous tax periods.

"Proceeding" means any audit, inquiry, or other examination, protest, appeals or other administrative or judicial proceeding relating to liability for, refunds of, or other adjustments with respect to Non-Income Taxes for any tax period.

"Spin-Off" means the distribution by GM of the Delphi common stock to GM's common stockholders in a tax-free transaction under Section 355 of the Tax Code, and related transactions.

"Spin-Off Date" means the last date that Delphi is included in the consolidated Federal income tax return of GM and affiliated companies.

"Tax Code" means the Internal Revenue Code of 1986, Title 26 of the U.S. Code, as amended.

"U.S. Code" means the United States Code, as amended.

Article II.  General Provisions and Effective Date

2.1.  Effective Period.  This Agreement is effective on January 1, 1999, and applies with respect to Prior Tax Years and all tax periods during which Delphi or any member of the Delphi Group is included in the GM Group.  This Agreement will remain in full force and effect until a Determination of the GM Group Liability for all Non-Income Taxes has been made for all Prior Tax Years and all periods in which Delphi or any member of the Delphi Group is a member of the GM Group.  This Agreement will be re-negotiated if the Spin-Off Date does not occur on or before December 31, 1999.

2.2.  Recitals Incorporated.  The above recitals are hereby incorporated into this Agreement by reference.

2.3.  Application of Law.  Unless otherwise indicated, the words and concepts used in this Agreement shall be given the same definitions and meanings ascribed to them by applicable Federal, state or local law.  Any alteration, modification, addition, deletion, or other change in the applicable law will automatically be applicable to this Agreement. Unless otherwise indicated, all references herein to a particular Section of the U.S. Code, the Tax Code, or the Federal Regulations will include any successor provision designated by a different or additional Section reference.

Article III.  Payments of and Adjustments to Non-Income Taxes

3.1  Payments of and Adjustments to GM Group or Delphi Group Non-Income Tax. Delphi will be liable for, and will indemnify, defend and hold harmless GM from and against any and all Non-Income Taxes, together with interest and penalties thereon, attributable to the Delphi Business Sector, Delphi, a member of the Delphi Group, or the operations of any of them.  GM will remit to Delphi any and all Non-Income Taxes, together with interest and penalties thereon, refunded to GM and attributable to the Delphi Business Sector, Delphi, a member of the Delphi Group, or the operations of any of them.  GM will be liable for, and will indemnify, defend and hold harmless Delphi from and against any and all Non-Income Taxes, together with interest and penalties thereon, not attributable to the Delphi Business Sector, Delphi, a member of the Delphi Group, or the operations of any of them.  Delphi will remit to GM any and all Non-Income Taxes, together with interest and penalties thereon, refunded to Delphi

-4-

and not attributable to the Delphi Business Sector, Delphi, a member of the Delphi Group, or the operations of any of them.

3.2  Time of Payment.  A payment required under this Section will be due ten (10) calendar days after the date that one party gives notice to the other party that a payment is due following a Determination.

3.3  Required Notice.  Notice will include a copy of the notice or other written communication from an authority describing the Determination and, if necessary, detailed calculations supporting the amount due.

3.4  Method of Payment.

(a)  General.  Unless otherwise mutually agreed, all payments required by this Agreement will be made by wire transfer of same day funds to the appropriate bank account as may from time to time be designated for that purpose, and notice of the transfer will be given to the payee of the payment in accordance with Section 6.5 of this Agreement.

(b)  Setoff.  Notwithstanding anything to the contrary in any agreement between Delphi and GM, but subject to the following sentence, each party has the right to collect payments under this Agreement that are more than sixty (60) calendar days past due by setoff against payments due to the other party under this Agreement or any other agreement between them, unless such other agreement is in respect of any form of taxes, in which case no right of setoff shall apply. Notwithstanding the preceding sentence, in the event and to the extent that any payment to be made under this Agreement is in dispute between the parties and the disputed matter is subject to the dispute resolution procedure set forth in Section 5.1 of this Agreement, the setoff provision of this Section 3.4(b) shall not apply to the extent of the disputed amount.

3.5  Interest.  If any payment required by this Agreement is not timely paid, interest shall accrue during any calendar quarter on the unpaid amount at a rate per annum equal to the highest Prime Lending Rate published on the first Business Day of such calendar quarter by the Wall Street Journal, but in no event to exceed the maximum rate of interest allowed by applicable law.  For this purpose, a payment will be timely paid only if actually received by the payee on or before the due date of the payment.

3.6  Other Recomputations.  If there is any change of or adjustment to any item relating to the computation of a payment under this Agreement that is not otherwise provided for, GM and Delphi will make payments to each other as may be appropriate to reflect the intent of this Agreement, as described in Section 5.2 of this Agreement.

Article IV.  Tax Matters Administration, Record Retention, and Cooperation

4.1  Audits, Protests, Appeals and Litigation.

>    (a)  Notification.  Delphi will notify GM in writing of any pending or threatened Proceeding in connection with any Non-Income Tax Liability for a Prior Tax Year, promptly upon receipt of notice of such Proceeding by any member of the Delphi Group.  GM will notify Delphi in writing of any pending or threatened Proceeding in connection with any Delphi Non-Income Tax Liability for a Prior Tax Year, promptly upon receipt of notice of such Proceeding by any member of the GM Group.  Notification must include a complete copy of any written communication, and a complete written summary of any oral communication.

>    (b)  Representation.  GM has the sole right to represent the interests of the GM Group, including the Delphi Business Sector and all members of the Delphi Group, in any Proceeding in connection with any Non-Income Tax Liability for a Prior Tax Year or for any period during which Delphi or any member of the Delphi Group is included within the GM Group.  GM shall not resolve or settle such Proceeding without the concurrence of Delphi, which shall not be unreasonably withheld, if the resolution or settlement would result in (i) a Non-Income Tax liability for Delphi pursuant to Section 3.1 of this Agreement or (ii) a change in (or establishment of) an accounting method of any member of the Delphi Group.

4.2   Record Retention.   GM and Delphi agree to maintain books and records in accordance with the record retention procedures described in the Master Separation Agreement.

4.3  Cooperation.  Delphi will cooperate, and will cause members of the Delphi Group to cooperate, with GM in connection with all matters covered by this Agreement in a manner consistent with prior practice as adjusted for evolving requirements.   Such cooperation will include making resources, including human resources, information, and documents available to GM upon request.

Article V.  Dispute Resolution

5.1.  Dispute Resolution.  Disputes arising in connection with this Agreement shall be resolved in accordance with the procedures set forth in the Master Separation Agreement with the proviso that each arbitrator shall be a tax attorney or tax accountant who is generally recognized in the tax community as a qualified and competent tax practitioner with experience in the tax area involved in the issue or issues to be resolved.

5.2  Intent of Agreement.  It is the intent of GM and Delphi that Delphi will be liable for Non-Income Taxes that are attributable to Delphi, its operations, or any member of the Delphi Group, for all pre-Spin-Off periods.  It is further the intent of GM and Delphi that: (1) Delphi will bear the burden of any unfavorable adjustments paid by GM for Non-Income Taxes that are attributable to Delphi, its operations, or any member of the Delphi Group, (2) Delphi will receive the benefit of any favorable adjustments refunded to GM for Non-Income Taxes that are attributable to Delphi, its operations, or any member of the Delphi Group, for all pre-Spin-Off periods and (3) GM will be liable for, or receive the benefit of refunds of,  all other Non-Income Taxes.

Article VI.  Miscellaneous Provisions.

6.1   Additional Members.   The parties recognize that from time to time other corporations may become members of the GM Group or the Delphi Group during the term of this Agreement, and GM and Delphi agree to use their best efforts to cause such corporations to be bound by all of the terms and conditions of this Agreement.

6.2  Successors and Assigns.  This Agreement shall inure to the benefit of, and be binding upon the parties and their respective successors, predecessors and assigns, but no assignment of this Agreement shall relieve any party of its obligations without the written consent of the other party.

6.3  Entire Understanding.  This Agreement contains the entire understanding of the parties with respect to the allocation of Non-Income Taxes between GM and Delphi for Prior Tax Years and all periods in which Delphi or any member of the Delphi Group is a member of the GM Group.  This Agreement shall not override any other agreement (including a country separation agreement) between GM and Delphi which specifically addresses any Non-Income Taxes.

This Agreement may not be amended except by a written agreement executed by each of the parties.  The parties recognize and acknowledge their intention to enter into additional agreements from time to time with respect to the allocation of taxes not covered by this Agreement.  This Agreement is separate from, and will not affect or be affected by, the rights and obligations of the parties under the Master Separation Agreement, the Initial Public Offering and Distribution Agreement, the Tax Compliance and Planning Services Agreement or the Customs Consulting Agreement.

6.4  Conflict of Law.  The validity, interpretation and performance of this Agreement will be controlled and construed under the laws of the State of Michigan, without giving effect to laws and principles relating to conflicts of law.

6.5  Notices.  Every notice, request, statement, or bill or other communication  provided for in this Agreement (a "Notice) must be in writing and may be personally served, provided a receipt is obtained, or may be sent by certified mail, return receipt

-7-

requested, postage prepaid, or may be sent by facsimile, with acknowledgment of receipt requested, to the parties at the following addresses (or such other address as one party may specify by Notice to the other parties):

If to GM:

> Chief Tax Officer
> GENERAL MOTORS CORPORATION
> Mail Code 482-114-262
> 3044 West Grand Boulevard
> Detroit, Michigan  48202

with a copy (which shall not constitute effective notice) to:

> Assistant General Tax Counsel
> GENERAL MOTORS CORPORATION
> Mail Code 482-114-262
> 3044 West Grand Boulevard
> Detroit, Michigan  48202

If to Delphi:

> Chief Tax Officer
> DELPHI AUTOMOTIVE SYSTEMS CORPORATION
> Mail Code 483.400.626
> 5725 Delphi Drive
> Troy, Michigan  48098

with a copy (which shall not constitute effective notice) to:

> General Counsel
> DELPHI AUTOMOTIVE SYSTEMS CORPORATION
> Mail Code 483.400.603
> 5725 Delphi Drive
> Troy, Michigan  48098

A Notice which is delivered personally is given as of the date specified in the written receipt.  A Notice sent by certified mail is given on the third Business Day following the date of mailing.  A Notice by facsimile is given on the date it is transmitted, provided acknowledgment of receipt is received by sender

6.6 Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be an original, but all of which together will constitute one and the same instrument.

-8-

6.7  Change in Law.   If, due to any change in applicable law or regulation or the
interpretation thereof by any court of law or other governing body having jurisdiction,
subsequent to the date of the Agreement, performance of any provision of or any
transaction contemplated by this Agreement shall become impracticable or impossible,
the parties will use their best efforts to find and employ an alternative means to achieve
the same or substantially the same result as is consistent with the intent of the parties,
as described in Section 5.2 of this Agreement.

6.8  Non-U.S. Customs Duties.   The provisions of this Agreement shall apply to
Customs Duties imposed by governments of countries other that the United States in
the same manner as such provisions apply to Customs Duties imposed by the U.S.
Federal government.


The parties have duly executed this Agreement for the Indemnification of United
States Federal, State and Local Non-Income Taxes on the date indicated.


GENERAL MOTORS CORPORATION


By: _Roger D. Wheeler_          Date: _12/15/98_
Roger D. Wheeler
Chief Tax Officer


DELPHI AUTOMOTIVE SYSTEMS CORPORATION


By: _____          Date: _12/16/98_
James P. Whitson
Chief Tax Officer