**<u>Exhibit 5.01(a)(vii)(ii)</u>**

**Oshawa Labour & Management Agreement between Delphi Canada, Inc. and General Motors Canada Limited, dated as of May 1, 2000**

## OSHAWA LABOUR AND MANAGEMENT SERVICES AGREEMENT

Entered into as of May 1, 2000

B E T W E E N :

### GENERAL MOTORS OF CANADA LIMITED

(hereinafter referred to as "GMCL")

OF THE FIRST PART

- and -

### DELPHI CANADA INC.

(hereinafter referred to as "Delphi")

OF THE SECOND PART

RECITALS:

A.      Delphi Canada Inc. ("Delphi") and General Motors of Canada Limited ("GMCL") have entered into an Asset Purchase Agreement dated as of the 31st day of December, 1998 amended and restated as of April 30, 2000 (the "Asset Purchase Agreement") for the sale of each of the Businesses ;

B.      Pursuant to the Asset Purchase Agreement, the employees of the Businesses will remain employees of GMCL;

C.      GMCL has agreed to provide to Delphi the services of certain GMCL hourly rate employees for the Businesses;

D.      GMCL has also agreed to provide certain management and supervisory services as well as certain indirect services of GMCL non-unionized employees currently engaged, on a substantially full-time basis, in the operation of the Businesses;

E.      GMCL and Delphi are entering into this Agreement to set forth the terms and conditions governing the Services to be provided hereunder;

TOR_H2O:302679.7 200004180852
1004511

**THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GMCL and Delphi agree as follows:

## 1. **DEFINITIONS**

In this Agreement (including the recitals to this Agreement) the definitions found in the Asset Purchase Agreement, to the extent not defined in this Agreement will apply. In addition, the following words will have the following meaning:

1.1    **"Agreement"** means this Labour and Management Services Agreement.

1.2    **"Annual Operating Parameters"** has the meaning ascribed thereto in Section 2.2.

1.3    **"Appeal Committee"** has the meaning ascribed thereto in Section 5.5.

1.4    **"Assigned Employee"** or **"Assigned Employees"** means an employee or employees of GMCL providing services to a Business, those persons providing services to a Business by virtue of rights to employment at one of the Businesses under the Collective Agreement, those GMCL employees, if any, who replace Assigned Employees who depart from a Business for any reason and such other GMCL employees whose services are provided by GMCL to Delphi pursuant to this Agreement;

1.5    **"Assigned Hourly Employee"** means an Assigned Employee who is represented by the CAW and to whom the Collective Agreement, when in effect, applies and includes a person deemed to be assigned to the Business by virtue of rights to employment at one of the Businesses under the Collective Agreement.

1.6    **"Assigned Salaried Employee"** means an Assigned Employee who is not an Assigned Hourly Employee, and may include a non-unionized GMCL employee who is not remunerated on a Salaried basis.

1.7    **"Businesses"** means, together, the business and operations on the Closing Date as conducted by GMCL of: (a) the manufacture of Battery Products at the Oshawa Battery Plant; and (b) the manufacture of Chassis Products at the Oshawa Tri-Link Plant ("TRI-LINK"); and either of which may be referred individually, a "Business".

- 3 -

1.8     **"CAW"** means the National Automobile, Aerospace, Transportation and General
Workers Union of Canada (CAW/Canada) and includes Locals 222 and any
successors thereof.

1.9     **"Collective Agreement"** means the Master Agreement between GMCL and the
CAW dated October 19, 1999 and all associated or related documents, letters and
further agreements between GMCL and the CAW, including, without limitation,
the local agreements between GMCL and Local 222, CAW Oshawa as amended,
and includes statutory or negotiated extensions thereof, and any successor
agreements thereto, and any written communications with the CAW which impose
obligations on GMCL or set out the understanding of GMCL and the CAW with
respect to the meaning of any provision of such Master Agreement and local
agreements.

1.10     **"Collective Agreement Issue"** means an issue, including but not limited to a
difference or dispute, regarding the administration of the Collective Agreement,
and includes but is not limited to all grievances under the Collective Agreement
and any issue concerning the interpretation, application, operation or alleged
violation of the Collective Agreement, or concerning discipline or dismissal,
affecting a Assigned Hourly Employee or a union.

1.11     **"Composite Fringe Amount"** has the meaning ascribed thereto in Section 3.3.

1.12     **"Delphi US"** means Delphi Automotive Systems Corp., the ultimate parent
corporation of Delphi, and its successors or assigns.

1.13     **"Employment Costs"** has the meaning ascribed thereto in Section 3.1(b);

1.14     **"Employment Laws"** means all Laws relating in whole or in part to the Assigned
Employees, including without limitation, Laws with respect to occupational health
and safety, human rights, employment standards, workplace safety and insurance,
labour relations, pay equity as well as Laws regarding wages, and the withholding
and remittance of taxes on the wages and salaries of Employees, including those
amounts owed pursuant to the *Income Tax Act, Canada Pension Plan, Employer
Health Tax Act,* and the *Employment Insurance Act.*

1.15     **"GMCL Policy"** means employment procedures, programs, standards and
policies with respect to or are applicable to GMCL employees who are not
unionized.

1.16     **"GMCL Service"** means employment with GMCL.

1.17    **"Hourly Employees"** means employees of GMCL who are represented by the CAW and to whom the Collective Agreement, when in effect, applies.

1.18    **"Laws"** means all applicable laws, by-laws, rules, regulations, orders, ordinances, protocols, codes, guidelines, policies, notices, directions and judgements or other requirements of any Governmental Authority.

1.19    **"Lay-off Cost Amount"** has the meaning ascribed thereto in Section 3.4.

1.20    **"Loss"** means any claim, demand, action, cause of action, damage, costs, liability or expense, including reasonable professional fees and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

1.21    **"OHSA"** means the Occupational Health and Safety Act (Ontario), as amended.

1.22    **"OPEB Expense"** means in relation to any calendar year, the amount determined in accordance with Section 3.3;

1.23    **"Particular Employment Cost Matters"** has the meaning ascribed in Section 3.2.

1.24    **Pension Expense"** means in relation to any calendar year, the amount determined in accordance with Section 3.3;

1.25    **"Services"** means the services of the Assigned Employees provided by GMCL to Delphi pursuant to this Agreement.

## 2.   PROVISION OF SERVICES

### 2.1   GMCL Employment Services

In accordance with and subject to the terms and conditions hereof, GMCL agrees to employ and provide to Delphi the Services of Assigned Salaried Employees to operate the Businesses. On May 1, 2000 the number of such Assigned Salaried Employees shall be fifty-two (52) and as of that date, the persons who are Assigned Salaried Employees will be the persons employed by GMCL on that date in the operation of the Businesses. The number and identity of Assigned Salaried Employees after May 1, 2000 will vary in accordance with this Agreement. GMCL is not obliged to replace Assigned Salaried Employees who depart the Businesses.

In accordance with and subject to the terms and conditions hereof, GMCL also agrees to employ and provide to Delphi the Services of Hourly Employees necessary to manufacture the products of the Business at their current locations as of the date of this Agreement. On May 1, 2000, such persons will be the persons who are the Hourly Employees who are engaged in the operation of the Businesses on that date but the Parties acknowledge the number and identity of such persons will vary in accordance with this Agreement and the provisions of the Collective Agreement. In the event Delphi wishes to use the Services of Hourly Employees in excess of the number of Assigned Hourly Employees then provided by GMCL, it shall give GMCL written notice of the number of such Hourly Employees required and the duration for which such Hourly Employees are required. For greater certainty any Hourly Employees so provided become Assigned Hourly Employees. GMCL will use commercially reasonable efforts to provide the services of such additional Hourly Employees as soon as practicable but not in any case less than within 60 days of receipt of such notice.

Schedule 2.1 sets forth the number of GMCL employees who are actively at work at the Businesses as of May 1, 2000 and those GMCL employees who have employment rights related to the Businesses, catagorized as hourly and salaried, direct and indirect.

### 2.2   Annual Operating Parameters

(a)   Delphi Canada will provide strategic and operational direction to Assigned Salaried Employees consistent with the Laws, the Collective Agreement, GMCL Policy and the Annual Operating Parameters.

(b)   Delphi and GMCL will evaluate the skills of the Assigned Salaried Employees and will use commercially reasonable efforts to (i) jointly determine what initiatives are required to improve operations which if agreed may include changes to identity of Assigned Salaried Employees and (ii) to agree on an action plan to achieve such improvements.

(c)     Recognizing that GMCL will retain exclusive control to direct the day-to-day
work of Assigned Employees (including discipline) and that Delphi will provide
operational direction to Assigned Salaried Employees, Delphi and GMCL will
agree on Annual Operating Parameters. The Annual Operating Parameters will
govern costs, productivity, quality and delivery performances of the Businesses.
They will be formulated based on productivity, quality, and other traditional
measurement metrics excerpted from Delphi's business plans for the Businesses
consistent with the provisions of Laws, the Collective Agreement and GMCL
Policy. The 2000 budget and business plan metrics will be the Annual Operating
Parameters for the balance of 2000 and will serve as the basis for subsequent
Annual Operating Parameters. Absent agreement regarding matters specifically
referenced in the Annual Operating Parameters, which agreement will not be
unreasonably withheld, GMCL will supply Services in a manner consistent with the
conduct of the Businesses as carried on prior to the failure to agree to any
applicable provisions within the Annual Operating Parameters.

(d)     Delphi will advise GMCL in writing of the manufacturing processes and
procedures to be followed by the Assigned Employees, provided that such
manufacturing processes and procedures must be consistent with Laws, the
Collective Agreement, GMCL Policy and the Annual Operating Parameters.
GMCL will direct its Assigned Employees to follow Delphi manufacturing
processes and procedures provided to it in writing by Delphi in accordance with
Section 2.2(a), except where in the opinion of GMCL, acting reasonably, such
processes and procedures violate Laws, the Collective Agreement, GMCL Policy
or this Agreement.

(e)     GMCL will compensate Delphi for documented additional costs incurred by Delphi
if Delphi is prevented or precluded from implementing a, detailed cost reduction
initiative presented in writing to GMCL because of GMCL unreasonably refusing
to implement such initiative. A refusal to implement such an initiative is not an
unreasonable refusal by GMCL if such initiative (i) is not consistent with the
Collective Agreement (as interpreted by GMCL acting reasonably and in good
faith), (ii) would violate Law, or (iii) would have a material adverse effect, as
reasonably documented by GMCL, on the operations of GMCLL.

(f)     Any disputes, including failures to agree, between GMCL and Delphi concerning
matters covered in this Section 2.2 must be submitted to the Appeal Committee for
resolution in accordance with this Agreement.

**2.3     Administration of the Collective Agreement**

(a)     Delphi acknowledges that GMCL and Assigned Salaried Employees in providing
the Services, and otherwise performing its obligations under this Agreement, are

- 7 -

required to comply with all of GMCL's obligations under the Collective Agreement. Delphi will not prevent, impair or impede such compliance. Delphi also agrees that the terms of the Collective Agreement shall govern if there is a conflict between the terms of the Collective Agreement and this Agreement.

(b)   GMCL shall have exclusive control over hiring, discipline, termination and directing the day to day work of Assigned Hourly Employees, as well as over administration of the Collective Agreement and management of Collective Agreement Issues.

(c)   Loss incurred by GMCL in the administration of the Collective Agreement, including but not limited to costs or expenses incurred in assisting and advising Delphi, for grievance procedures, the arbitration process or legal services pertaining to a Collective Agreement Issue, in relation to Services provided to a Business by the Assigned Hourly Employees shall be the responsibility of Delphi and to the extent not otherwise reimbursed under this Agreement GMCL shall be reimbursed by Delphi for all such costs in accordance with Section 3.5, except where the Loss relates to a Collective Agreement Issue caused by a GMCL employee who is not an Assigned Employee. Delphi may refer any dispute regarding its obligations under this provision to the Appeal Committee in accordance with this Agreement.

(d)   Delphi shall co-operate with GMCL in all respects to assist GMCL in fulfilling its responsibilities related to the administration of the Collective Agreement as it affects the Assigned Hourly Employees and the Businesses under this Agreement.

**2.4    Absent Assigned Employees**

(a)   GMCL hourly and salaried employees identified on Schedule 2.1 who (i) are absent from the Businesses at Closing, due to illness or injury and, who subsequently go on a compensable or sick leave of absence for the same condition or, (ii) who at Closing are on statutory, compensable or sick leave of absence will, upon their return to active employment, subject to the requirements of the Collective Agreement, GMCL Policy and applicable Law be returned to the job at the Businesses which was held immediately prior to their absence.   Such employees will then become Assigned Employees.

(b)   GMCL hourly and salaried employees identified in Schedule "2.1", who are, as at Closing, on layoff or leave from the Businesses, including disability leave (whether or not any applicable waiting period relating to such disability leave is then satisfied), shall, upon their return to active employment, be returned subject to the

requirements of the Collective Agreement, GMCL Policy and applicable Laws to the job at the Business which was held immediately prior to their absence.

(c)     Notwithstanding any other provisions in this Agreement, to the extent that any Assigned Employees are terminated or laid off as a result of the implementation of this Section 2.4, GMCL will pay the costs attributable to any terminations or lay-offs caused by the return to work of the persons referred to in this Section 2.4 and Delphi will not be required to reimburse such costs as defined in Article 3.

**2.5     No Employment Relationship and the Relationship of the Parties**

(a)     It is acknowledged and agreed by the Parties that the Assigned Employees shall remain employees of GMCL and that nothing contained in this Agreement shall be construed to imply that they are the employees of Delphi.

(b)     GMCL shall provide the Services to Delphi as an independent contractor and the relationship between GMCL and Delphi shall be that of independent parties and neither Party shall be considered an agent of the other, except as expressly and specifically agreed to in respect of compensation, payroll and benefit administration services provided by GMCL on behalf of Delphi.

(c)     GMCL shall not have the power or authority to bind Delphi or to assume or create any obligations or responsibilities, express or implied, on Delphi's behalf or in its name, nor shall GMCL represent to anyone that GMCL has such power or authority except as expressly provided in this Agreement or as may be expressly agreed to in writing by the Parties. Delphi shall not have the power or authority to bind GMCL or to assume or create any obligations or responsibilities express or implied, on GMCL's behalf or in its name nor shall Delphi represent to anyone that Delphi has such power or authority except as expressly provided in this Agreement or as may be expressly agreed to in writing by the Parties.

(d)     Assigned Employees performing the Services under this Agreement shall at all times be under GMCL's direction and control and both GMCL and Delphi shall instruct their personnel accordingly. GMCL shall retain the sole and exclusive right to assign, direct, discipline, promote, hire and terminate the Assigned Employees, except as otherwise expressly provided in this Agreement.

**2.6     GMCL Supervision**

(a)     GMCL has the exclusive right to discipline Assigned Employees, subject to the applicable terms and conditions of employment. If GMCL determines that it is appropriate to suspend or terminate an Assigned Employee, then GMCL shall so

notify Delphi in writing and at GMCL's option, either terminate or suspend the employment of the Assigned Employee, or terminate the assignment in respect of that Assigned Employee and accept that Assigned Employee into another position outside of the Businesses.  If GMCL chooses to terminate the assignment and transfer the Assigned Employee to a GMCL position, then:

(i)         GMCL and Delphi shall, acting reasonably having regard to all of the surrounding circumstances, mutually agree upon the effective date of such transfer; and

(ii)        Delphi shall be responsible for all Employment Costs relating to such employee until a suitable alternative placement can be arranged for the Assigned Employee.

(b)     If a dispute arises between GMCL and the CAW regarding the termination of the assignment of an Assigned Hourly Employee and a transfer of the Assigned Hourly Employee out of either Business, the dispute shall be deemed to be a Collective Agreement Issue which shall be managed in accordance with the requirements of Section 2.3 of this Agreement.  The Collective Agreement Issue will be permitted to proceed to arbitration if GMCL and the CAW are unable to agree on any other resolution.  GMCL and Delphi agree to be bound by the outcome of any such arbitration, including (but not limited to) an award that the Assigned Hourly Employee is to be reinstated to the grieved position in the Businesses.

## 2.7    Compensation, Payroll and Benefit Administration

Subject to GMCL entitlement to be reimbursed by Delphi in accordance with Article 3 of this Agreement:

(a)     GMCL shall continue to maintain, administer and pay the payroll and benefits of the Assigned Hourly Employees in accordance with the Collective Agreement and applicable Law.

(b)     GMCL shall continue to maintain, administer and pay the payroll and benefits of Assigned Salaried Employees in accordance with GMCL Policy.  GMCL will advise Delphi in writing of any material changes to GMCL Policy as soon as practicable in advance of the implementation of such changes

(c)     GMCL will remain solely responsible for the maintenance, administration and payment of Workplace Safety and Insurance, Employment Insurance, Canada Pension Plan, Employer Health Tax and all other coverage and payments or assessments to governments or government agencies that accrue or arise after the

commencement of this Agreement in connection with the Assigned Employees. Without limiting the foregoing, GMCL shall remain responsible for and make payments necessary to satisfy the requirements of the *Income Tax Act* (Canada) and any provincial taxes in connection with the Assigned Employees.

**2.8    Delphi Directly Hiring Employees**

Delphi agrees that it will not hire any persons to perform work required to be performed by members of the CAW bargaining unit at the Businesses. All such persons shall be provided by GMCL in accordance with this Agreement. Delphi may directly hire personnel as Delphi employees or Delphi contract employees ("Delphi Employees"), provided that they will not perform work required to be performed by members in the bargaining unit governed by the Collective Agreement.

Delphi will directly pay all costs associated with Delphi Employees. Delphi Employees will have no entitlement under GMCL r Policies, including, without limitation to GMCL self nomination process and GMCL benefit programs and will have no access or recall rights to any GMCL position. Delphi shall be directly responsible for establishing and maintaining appropriate payroll, and benefit practices and benefit plans for Delphi Employees. Delphi will be solely responsible for the maintenance, administration and payment Workplace Safety and Insurance, Employment Insurance, Canada Pension Plan, Employer Health Tax and all other coverage and payments for assessments to governments or governmental agencies that arise or accrue in connection with Delphi Employees. Delphi shall be responsible for making payments necessary to satisfy the requirements of the Income Tax Act (Canada) and any provincial taxes in connection with the Delphi Employees. Delphi will be solely responsible for directing and supervising Delphi Employees unless otherwise agreed between the Parties.

**2.9    Termination of Assignment**

(a)    If an Assigned Employee departs a Business for any reason other than layoff or termination at the request of Delphi, including, without limitation, transfer, resignation, election to transfer to another location at GMCL, GMCL shall inform Delphi of the employee's departure as soon as practicable upon GMCL becoming aware of the departure. If Delphi is advised by an Assigned Employee that he or she is terminating or resigning, Delphi shall inform GMCL but shall have no authority to accept such termination or resignation.

(b)    Subject to Section 2.10 and 2.2(b), GMCL will not be responsible for replacing Assigned Salaried Employees. GMCL shall be responsible only for staffing any vacancy that results from an Assigned Hourly Employee departing from the Business other than layoff or termination at the request of Delphi, and then only if

Delphi requests replacement of such persons. Any GMCL employee filling such vacancy shall be deemed to be an Assigned Employee.

(c)     Where an Assigned Hourly Employee elects to transfer out of the Business in accordance with the Collective Agreement, GMCL and Delphi shall, acting reasonably having regard to all of the surrounding circumstances, and subject to the requirements of the Collective Agreement, mutually agree upon the effective date of such transfer.

(d)     It is agreed GMCL will not replace or increase the number of Customer Service Engineers ("CSEs") employed in respect of the Businesses. Notwithstanding the provisions on any purchase order governing the services provided by CSEs to the Businesses, all Employment Costs, and support costs related to CSEs (including all of GMCL's costs relating to vehicles provided to such CSE's, such as insurance, marketing losses, theft, repair, replacement, gas, etc.) will be the responsibility of the appropriate Delphi division and will be reimbursed to GMCL by that Delphi division.

**2.10    Self Nomination by Assigned Salaried Employee**

Assigned Salaried Employees may continue to self-nominate for other positions within GMCL in accordance with the GMCL self-nomination process and policies (subject to reasonable restrictions on movement where such move is determined by Delphi to be adverse to a Business). GMCL will not reassign Assigned Salaried Employees away from the Business without first consulting Delphi and obtaining Delphi's consent which consent shall not be unreasonably withheld. Positions to replace Assigned Salaried Employees will be posted by GMCL in accordance with GMCL policies upon Delphi's request when openings arise as a result of an Assigned Salaried Employee self-nominating for other positions within GMCL. Appropriate replacement personnel satisfactory to Delphi include other qualified GMCL salaried employees as identified in accordance with GMCL Policies who volunteer to transfer to either Business or Delphi Employees.

GMCL alone will be required to review and approve internal postings for and promotions to "Level 8" positions involving Assigned Salaried Employees.

Neither Party or their affiliates may approach the other's employees about employment opportunities without prior written consent of the other Party.

**2.11    Delphi Offers of Employment**

Once Delphi has provided notice in writing to GMCL of its *bona fide* long-term plan for the Businesses, Delphi will be permitted to offer *bona fide* employment to the Assigned

Salaried Employees upon terms and conditions to be agreed between GMCL and Delphi, but in any case substantially similar in value in the aggregate to that then offered by GMCL. Once all the terms of employment have been agreed upon between GMCL and Delphi and the offers made, such Assigned Salaried Employees will have thirty (30) days to consider the offer of employment. During that period, GMCL and Delphi will work together to encourage Assigned Salaried Employees to accept employment with Delphi. The effective date of the transfer to employment with Delphi will be a mutually agreeable date, no later than 18 months thereafter and GMCL and Delphi will work together to transition any Assigned Salaried Employees who elect not to transfer to Delphi into suitable GMCL jobs. To the extent that such employees elect not to transition to Delphi and are not placed within GMCL, GMCL and Delphi will share equally the costs of the resulting layoff or severance, if any.

Except as provided in this Section 2.11, Delphi will not employ or offer to employ a GMCL employee or, for a period of fifteen months after retirement, a GMCL employee who has taken incentive separation from GMCL, without the prior consent of GMCL, such consent which will not be unreasonably withheld.

### 2.12    Complaints to Outside Agencies

GMCL is the party responsible for defending against all claims, complaints, suits and actions against it relating to or involved with the employment or cessation of employment of Assigned Employees, including, without limitation, claims under contract, tort, equity, or pursuant to any Employment Laws, and Delphi agrees to reimburse GMCL for the portion of any settlement or judgment that constitutes (a) Employment Costs or (b) that were caused by the actions (i) of Delphi or (ii) GMCL, where GMCL was complying with Delphi's processes or procedures or Annual Operating Parameters provided that GMCL has advised Delphi of the claim, complaint or action, and Delphi has consented to any settlement (such consent not to be unreasonably withheld). Further Delphi agrees to reimburse GMCL for all reasonable legal and administrative costs resulting from such claims, complaints suits or actions in proportion that it is obligated to reimburse GMCL on the substantive portion of the claim.

GMCL reserves the right to transfer, reassign, rehire, terminate or otherwise deal with a Assigned Employee to ensure compliance with Laws and to ensure compliance with an order or ruling from a government organization, agency or body. Delphi agrees to assist GMCL to comply with all Laws relating to the provision of Services under this Agreement.

### 2.13    Performance Evaluation

GMCL shall apply its policy of carrying out annual performance reviews to the Assigned Salaried Employees and shall conduct all such reviews in accordance with the applicable GMCL Policy. Delphi may provide input to GMCL concerning the performance of Assigned Salaried Employees. Delphi concerns about performance issues relating to Assigned Employees

may be referred to the Appeal Committee if, in Delphi's view, Delphi's concerns have not otherwise been adequately addressed..

### 2.14    Approval of Communications

(a)    Where Delphi contemplates formal communications outside of those communications required to operate the Businesses to GMCL's employees, the public or governmental representatives relating to Delphi's plans, intentions or obligations with respect to the Businesses or the Assigned Employees; such communications shall be reviewed and agreed to by both GMCL and Delphi acting reasonably. If GMCL objects to the proposed communication the dispute shall be referred to the Appeals Committee for resolution prior to its release.

(b)    GMCL shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit Delphi to obligations, hiring arrangements, benefits or other terms or conditions of employment or to any other matter, nor shall any such communication by GMCL expand the specific and limited obligations of Delphi set forth herein.

(c)    Where communications are desired by Delphi to Assigned Employees, such communications shall be made by GMCL. Delphi shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit GMCL to obligations, hiring arrangements, benefits or other terms or conditions or employment or to any other matter governed by this Agreement, nor shall any such communication by Delphi expand the specific and limited obligations of GMCL set forth herein.

## 3.    PAYMENT FOR SERVICES

### 3.1    Delphi Reimbursement of Employment Costs

(a)    Delphi shall be obligated to reimburse GMCL for all Employment Costs defined in subsection (b), relating to the Businesses incurred on or after May 1, 2000, which will include: (i) weekly and semi-monthly payment for payroll, payroll related taxes, and related costs for Assigned Hourly and Assigned Salaried Employees, respectively; (ii) reimbursement for Particular Employment Cost Matters as defined in Section 3.2; and (ii) a Composite Fringe Amount defined in Section 3.3 that is inclusive of the Layoff Cost Amount defined in Section 3.4. GMCL shall maintain responsibility for Employment Costs incurred prior to May 1, 2000, including but not limited to 2000, including but not limited to 2000 calendar year

- 14 -

vacation pay, special paid allowance, statutory holidays, Christmas bonus, and paid absence allowance.

(b)     Employment Costs means all direct costs paid to or on behalf of the Assigned Employees by GMCL relating to Services provided to the Businesses for: (i) salaries, wages, holiday pay, vacation pay, bonuses, costs of living allowances, shift premiums, overtime costs; (ii) third party provider costs GMCL incurs for GMCL benefit plans; (ii) legally required costs referred to in Section 2.7(c). These Employment Costs are as set forth in Schedule 3.1(b) and must be incurred as a result of the Collective Agreement, GMCL Policies, or Employment Laws.

**3.2     Arrangements and Reimbursement for Particular Employment Cost Matters**

(a)     **Ideas For Excellence**

All GMCL employees shall remain eligible to submit suggestions under the GMCL Ideas for Excellence Program for improvements to either GMCL or Delphi operations.    GMCL and Delphi will appoint representatives to determine the disposition of suggestions that affect the Businesses.    If Delphi agrees that the suggestion made on or after May 1, 2000 is to be implemented in respect of a Business, then Delphi and GMCL shall determine jointly the award to be made to the GMCL employee in respect of the suggestion.    GMCL will make the payment agreed in accordance with the GMCL Ideas for Excellence Program and Delphi will reimburse GMCL in an amount representing Delphi's proportionate share of the financial benefit.

(b)     **Tuition Allowance**

GMCL has the right to approve the taking of courses by Assigned Employees. Delphi shall reimburse GMCL for all costs associated with the tuition allowance program for Assigned Salaried Employees regarding short-term training courses where Delphi agrees to the Assigned Salaried Employee taking such course. Delphi will have no reimbursement obligations for long-term training and education (that is, degree programs) allowances provided to Assigned Salaried Employees.

Delphi shall reimburse GMCL for all costs associated with the tuition assistance program and tuition assistance for dependent children plan contemplated by the Collective Agreement and GMCL Policy.

(c)  **Company Cars**

GMCL will continue to provide eligible Assigned Salaried Employees with
company supplied automobiles in accordance with GMCL's policies governing
company supplied automobiles. Delphi shall reimburse GMCL for all of GMCL's
costs associated with providing such automobiles to Assigned Salaried Employees
(including, without limitation marketing losses, insurance, theft, repair,
replacement, gas, etc.).

However, if Delphi U.S. establishes a uniform stipend approach in lieu of
supplying automobiles to its employees in its operations in the United States, the
total amount which Delphi reimburses to GMCL pursuant to this paragraph shall
not exceed the product of:

U.S. pre-tax stipend amount (converted to Canadian dollars) multiplied by the
number of company supplied cars used by Assigned Salaried Employees.

(d)  **Compensation Fund for Assigned Salaried Employees**

Delphi will have input regarding administration of the GMCL compensation fund
at GMCL levels as applied to the Businesses. To the extent that the GMCL
compensation fund percentage of compensation is greater than the percentage of
compensation provided under similar Delphi U.S. programs, Delphi will only be
required to reimburse GMCL for the costs that would have been incurred if
GMCL applied the Delphi U.S. percentage of compensation to the Assigned
Salaried Employees. Subject to the foregoing sentence, Delphi will reimburse
GMCL for the total amount of the enhanced variable compensation award paid by
GMCL to Assigned Employees(which in respect of any options will be based on
the Black-Scholes value at the time of the grant by GMCL) assigned by GMCL to
any stock options granted by GMCL. For greater certainty, GMCL will be
responsible and Delphi will not be obliged to reimburse GMCL for the cost of
exercise of any stock options granted by GMCL.

(e)  **General Training**

(i)  GMCL will be responsible for providing any training that is
required under the Collective Agreement and Delphi will
reimburse GMCL for all costs relating to such training.

(ii)  Other than in respect of the training referred to in subparagraph
(i) above, GMCL and Delphi will use commercially reasonable
efforts to develop a joint process to determine the appropriate

training to be provided to the Assigned Employees. Subject to Section 3.2(e)(i), Delphi will have primary responsibility for operations and organizational-related training such as lean manufacturing training. GMCL will have primary responsibility for personnel and country-related training, including but not limited to, health and safety, human rights, environmental and diversity training.

(iii)     Delphi will only be obligated to reimburse GMCL for its out-of-pocket costs for training, such as consultants, training materials and development costs, food and rentals of third party space. Delphi will not be responsible for costs related to GMCL employees providing the training or GMCL facilities used for the training.

(iv)     Delphi will be responsible for paying for all operations and organizational training except to the extent that bumping caused by an event caused by GMCL or GMCL employees other than Assigned Employees exceeds 10% of a specific employee classification affected by the bumping. Such training is set forth in Section 3.2(f). In such case, either

(1)     GMCL will either (a) provide Assigned Employees with the applicable training, or (b) will pay (and will not be reimbursed by Delphi) for the out-of-pocket costs for the standard operations and organizational training provided by Delphi, including Employment Costs, for those new Assigned Employees, above such percentage who bump in the Businesses, or

(2)     GMCL will only transfer such persons after completing the necessary training itself.

(v)     Any dispute concerning whether training should be provided, the cost of training or the allocation of the costs therefor will be referred to the Appeal Committee.

(f)     **Skilled Trades Training**

The Parties agree that certain training is required for particular trades:

Tool & Die:

Hands-on machine familiarization – (overlap with the resident trades person) – 80 hrs.

<u>Electrician:</u>

IMT Gas Certification – 120 hrs.

Robot Training – 80 hrs.

Hands-on Equipment Familiarization – 80 hrs. (overlap)

Miller Weld Controls – 16 hrs. (TRI-LINK only)

AFS Fastening – 24 hrs. (TRI-LINK only)

Vision Systems – 8 hrs. (TRI-LINK only)

Mig Welding – 8 hrs. (TRI-LINK only)

<u>Industrial Mechanic - Millwright</u>

IMT Gas Certification – 120 hrs. (Delphi should only train the 16 people and beyond that all additional would be GMCL's responsibility)

Hands-on Equipment Familiarization – 80 hrs. (overlap)

Mig Welding (Robots) – 8 hrs. (TRI-LINK only).

GMCL and Delphi will agree upon the allocation of the costs in advance of such training.

(g)    **Travel**

If it is necessary for Assigned Employees to travel in the course of their work assignment, the travel guidelines of the GM Travel Policy, as amended from time to time, will apply to Assigned Salaried Employees and the Collective Agreement will apply to Assigned Hourly Employees. The Assigned Employees will be reimbursed by GMCL and Delphi will reimburse GMCL for such costs of travel that Delphi approves in advance.

(h)    **Lay-offs and Terminations**

    (i)    <u>Lay-offs Under Thirteen Weeks</u>

        The costs of any layoffs anticipated to be of thirteen (13) weeks or less will be paid by GMCL and reimbursed by Delphi as incurred regardless of the initiating cause. Such layoffs of a temporary nature and hence the required funding will be supported by a special report to be generated by GMCL to Delphi. When a layoff is deemed to be short term GMCL will continue to be reimbursed in the same fashion until such time that the layoff ends.

    (ii)    <u>Lay-offs Greater than Thirteen Weeks</u>

        (A)    Delphi shall give GMCL at least six months' notice of any changes to the Businesses that may lead to the layoff of Assigned Employees anticipated to be greater than thirteen (13) weeks, (but at least one year in the event of a plant closure). Delphi acknowledges that GMCL has obligations that could be breached if Delphi fails to give GM notice of layoffs anticipated to be greater than 13 weeks. Upon receipt of such notice, GMCL shall provide sufficient working notice to the CAW and any affected Assigned Hourly Employees in compliance with the applicable statutory and Collective Agreement notice requirements. GMCL shall pay the costs relating to layoffs of this nature and will be reimbursed by Delphi in respect of the Layoff Cost Amount in accordance with Sections 3.3 and 3.4.

(i)    **Vehicle Purchase Program**

    GMCL will bear the costs of the GMCL Vehicle Purchase Program if used by Assigned Employees. Delphi will not be required to reimburse such costs.

3.3    **Composite Fringe Amount**

(a)    The Composite Fringe Amount in any year will be based initially upon the costs determined in accordance with this Agreement for costs of the type set out in Schedule 3.3. Such amount will include an amount for layoffs of a type referred to in Section 3.2(h)(ii) and early retirement costs determined in accordance with section 3.4 ("Lay-off Cost Amount"). The Composite Fringe Amount will be reviewed and adjusted annually to reflect the variance in the prior year's forecast. The Parties recognise that costs of the type set out in Schedule 3.3 are not

definitive of all types of costs that should be considered as part of the Composite Fringe Amount in future years. The Composite Fringe Amount may vary from year to year reflecting required legislative or market changes to fringe benefits paid by GMCL to its employees. As well, the types of costs incurred may vary depending on the particular sub-population of employees under study.

(b)     In relation to the OPEB Expense and the Pension Expense, which forms part of the Composite Fringe Amount, the annual adjustment will reflect (i) the difference between the forecast number of Assigned Employees and the actual number of such Assigned Employees and (ii) the difference between the forecast OPEB Expense and Pension Expense upon which the monthly invoices to Delphi are based, and the actual OPEB Expense and Pension Expense, based upon the relevant FASB report referred to in this Section.

(c)     For each calendar year Delphi and GMCL will agree on a Composite Fringe Amount for Assigned Employees that includes: (i) selected forecast fringe benefit costs for the calendar year; and (ii) any amount carried forward from the previous calendar year that represents the difference between the amount accrued by GMCL in accordance with this Agreement and the amount paid by Delphi Canada. The reconciliation of the Composite Fringe Amounts contemplated in Article 3 will be at calculated at a minimum, on an annual basis, but no later than January of the following year. Delphi and GMCL will reconcile the Actual "Composite Fringe Benefit" categories to the amount which Delphi reimbursed on a 1/12th budget basis and the aggregate variance will be settled no later than March 31 of the following year.

(d)     The Composite Fringe Amounts for Assigned Employees will include an amount for Pension Expense reflecting active service cost only (i.e., exclude any amount for interest expense, retiree expense or prior period actuarial gains or losses) where GMCL's liability for the Business employees is valued on an economic basis. For pension liability valuation purposes, all actuarial assumptions will be consistent with GMCL's prior year-end valuation as reported in GMCL's FASB-87 report, except for: (i) the discount rate, which will be the plan's actuarially assumed asset return rate in the previous year; and (ii) the pension benefit will be assumed to increase at the average rate over the past rolling 10 years. These exceptions will adjust the valuation to be an economic valuation. By valuing these expenses on an economic basis, any future pension benefit enhancements approved by GMCL will not be incorporated in any future allocations to Delphi (i.e., the benefit plan design will remain fixed).

(e)     The Composite Fringe Amounts for Assigned Hourly Employees will also include an amount for OPEB Expense reflecting active service cost only (i.e., exclude any amount for interest expense, retiree expense or prior period actuarial gains or

losses) where GMCL's liability for the Business employees is valued on an economic basis. For OPEB liability valuation purposes, all actuarial assumptions will be consistent with GMCL's prior year-end valuation as reported in GMCL's FASB-106 report, except for: (i) the discount rate, which will be the Pension Plan's actuarially assumed asset return rate in the previous year; and (ii) the health care trend rate will be assumed to be 100 basis points higher. These exceptions will adjust the valuation to be an economic valuation. By valuing these expenses on an economic basis, any future OPEB enhancements approved by GMCL will not be incorporated in any future allocations to Delphi (i.e., the benefit plan design will remain fixed).

(f)    The hourly and salaried Composite Fringe Amounts will include amounts for other fringe benefits that reflect GMCL's prior experience adjusted in a way consistent with GMCL's budgeting process used to determine the expense at GMCL's other operations.

## 3.4    Lay-off Cost Amount

(a)    Delphi and GMCL will agree on Lay-off Cost Amounts for Assigned Employees in accordance with the following process:

(i)    In May of each year, prior to the commencement of the applicable calendar year budget process, the Parties will agree on the next year's forecast Lay-off Cost Amount using a weighted amount of lay-off costs and the cost of early retirement. The weighting will be determined, and mutually agreed upon based on past experience for the number of retirement elections.

(ii)    The layoff costs will include SUB, IMP, VTEP payment, Health care, group insurance and any Pension Expense and OPEB Expense as calculated in the Composite Fringe Amount. The early retirement allowance will include the allowance and pension plan experience loss. (See Schedule 3.4 for examples)

(b)    The Lay-Off Cost Amount will be reviewed and adjusted annually to reflect the difference between forecast lay-off events (i.e., timing, number and mix of layoffs and early retirements) and actual layoff events (i.e., timing, number and mix). The variance between forecast and actual lay-off events and resulting actual and forecast Lay-off Cost Amounts will be subject to an annual reconciliation of the assumed timing, number and mix of long term layoff and early retirement as part of the reconciliation of the Composite Fringe Amount.

(c)    The base head count for assessing the Layoff Cost Amount for 2000 calendar year
will be 449 Assigned Hourly Employees and 52 Assigned Salaried Employees.
The base head count will be reduced by 1% annually for normal attrition (such as
normal retirement without incentive payments, quit, or deaths). Such reduction will
be recognised only as of January (starting in 2001) of each year, rounded down to
the next whole number. The base head count will also be reduced for actual long-
term layoffs that have occurred and for which Delphi has agreed to pay the costs
pursuant to this Section 3.4. Base head count will be increased for additional
permanently assigned heads added to Delphi.

(d)    Notwithstanding anything else in this Agreement, Delphi shall only be responsible
for reimbursing layoff costs amount relating to long-term layoffs for Assigned
Employees when such layoff reduces the Assigned Employee headcount within the
Businesses below the then applicable base headcount for assessing actual layoff
costs set out in the paragraph above.

**[Delphi will be given credit against future Layoff Cost Amounts for reducing GMCL
layoff costs during periods that the Businesses Assigned Employees who are
permanent active GMCL employees are is in excess of the base head count.]**
However, in such case, notwithstanding the definition of Employment Costs and Lay-off
Cost Amount, Delphi will be responsible for reimbursing GMCL for any actual layoff
costs incurred by GMCL subsequent to the commencement of this Agreement in relation
to Assigned Employees for whom it has received such credit, but only if such excess
employees are actually laid off directly from Delphi.

### 3.5    Invoices

GMCL shall invoice Delphi, and be paid, for the Services and other amounts
required to be paid by Delphi to GMCL under this Agreement in accordance with the Schedule
3.5 attached hereto. GMCL's invoice for the Services will be submitted t on or before the times
specified in Schedule 3.5. Delphi shall pay by electronic fund transfer on or before the times
specified on Schedule 3.5. Any amounts payable under this Agreement in respect of which goods
and services tax or harmonized sales tax is payable shall have such tax added thereto, and Delphi
shall in addition to the amount payable pay an amount equal to the tax exigible thereon to the
bank account(s) specified by GMCL from time to time.

In the event that GMCL determines that an invoice previously issued contains an
error or omission, a correction will be made to a subsequent invoice as soon as is practicably
possible. The subsequent invoice will show the correction as a separate line item with a
description of the nature of the error and the period to which it relates.

- 22 -

GMCL shall be solely responsible for any penalties or interest as a result of errors or omissions arising from the assessment, calculation, collection, payment, or remittance of any goods and services tax or any other applicable tax related to GMCL's invoices for Services.

## 4.    TERM AND TERMINATION

### 4.1    Termination

This Agreement shall commence May 1, 2000 and shall continue indefinitely unless terminated under, and only under, the following alternative conditions.

1.    Delphi gives written termination notice to GMCL on or before September 1, 2001 with termination effective December 31, 2002 or such other date to which both Parties agrees.

2.    Delphi gives written termination notice to GMCL on or before September 1, 2004 with termination effective December 31, 2005 or such other date to which Parties agrees.

3.    Delphi gives written termination notice to GMCL on or after December 31, 2005 with termination effective at least one year after notice has been given or such other date to which GMCL agrees.

4.    GMCL gives written termination notice to Delphi with termination effective at least to one year after notice has been given.

The Party requesting termination shall be liable for costs associated with termination of this Agreement including, but not limited to, associated severance and layoff costs.

### 4.2    Insolvency Default

A Party (not then subject to the events enumerated in this Section) may terminate this Agreement on sixty (60) days' notice if:

(a)    if the other Party does not generally pay its debts when such debts become due or admits in writing its inability to pay its debts generally or becomes insolvent or makes a general assignment for the benefit of creditors or conveys or transfers any of its material property with a view to delaying, defeating or hindering creditors or any proceedings are instituted by or against the other Party seeking to adjudicate it a bankrupt or insolvent or seeking liquidation or winding up, reorganization or relief of debtors or other similar law or seeking the entry of an order for relief or

the appointment of a receiver, trustee, custodian or other similar official for it or
for any substantial part of its property (excluding proceedings being contested by
the other Party in good faith so long as any enforcement proceedings are stayed),
or if a receiver, trustee, custodian or other similar official for it or for any
substantial part of its property is appointed, or any of them shall take any
corporate action to authorize any of the actions set forth above in this clause;

(b)    if an order shall be made or an effective resolution passed for the winding-up,
liquidation or dissolution of the other Party; or

(c)    if an encumbrancer shall take possession of all or a substantial part of the property
of the other Party (whether by appointment of a receiver, receiver and manager or
otherwise) or if a distress or execution or any similar process be levied or enforced
there against and remain unsatisfied for such period as would permit such property
or such substantial part thereof to be sold thereunder.

The Party whose condition under either paragraphs (a), (b), or (c) triggered the termination shall
bear the costs of any such termination of this Agreement, including layoff and severance costs.

### 4.3    Force Majeure

Delays in or the failure of any Party to perform its obligations under this
Agreement shall not constitute a default hereunder or give rise to any claim for Loss if and to the
extent caused by a general lock-out of the GMCL complex or occurrences beyond the control of
the Party so affected, including, but not limited to, decrees of Government (whether federal,
provincial or municipal), acts of God, inability to procure materials or labour, strikes (legal or
illegal), slowdowns, refusal to work or other activity to restrict output by Assigned Employees,
fires, floods, explosions, riots, war, rebellion, sabotage and atomic or nuclear incidents; but lack
of finances shall in no event be deemed to be a cause beyond a Party's control. A Party, who
wishes to rely on this Section, shall advise the other Parties of such state of force majeure as soon
as possible.

## 5.    INDEMNITY

### 5.1    Indemnity by GMCL

GMCL shall defend, hold harmless and indemnify Delphi against any Loss as a
result of, in connection with or related to:

(a)    product liability claims in respect of products manufactured by GMCL Assigned
Employees for Delphi pursuant to this Agreement, but only to the extent of any
Loss attributable to the gross negligence or wilful misconduct of GMCL or its

employees in failing to comply with Delphi's manufacturing processes and procedures as required under this Agreement. For greater certainty Delphi is responsible and liable for all aspects of the design and engineering of such products manufactured after the date of the Agreement;

(b)     all employment related claims by Assigned Employees, or by the CAW on behalf of Assigned Employees, except (i) that such indemnity shall not preclude GMCL from claiming reimbursement from Delphi for any portion of such Losses that are otherwise amounts reimbursable by Delphi to GMCL under this Agreement and (ii) this indemnity does not extend to Losses to the extent, such Losses, are attributable to (A) GMCL properly implementing Delphi Annual Operating Parameters or (B) to the gross negligence of Delphi or wilful misconduct of Delphi Employees, (including without limitation, breach of Laws, or actions constituting sexual harassment or constructive dismissal);

(c)     claims by the CAW in relation to this Agreement and GMCL's performance of the terms of this Agreement, except to the extent that the claim relates to the actions of GMCL taken at the direction of Delphi or in accordance with the proper implementation of the Annual Operating Parameters.

(d)     claims, including prosecutions and other regulatory proceedings, commenced against Delphi Canada as a result of the alleged failure of GMCL to comply with the duties and responsibilities under applicable Laws in relation to GMCL's provision of Services under this Agreement.

## 5.2    Indemnity by Delphi

Delphi shall defend, hold harmless and indemnify GMCL against any Loss as a result of, in connection with or related to:

(a)     product liability claims relating to products manufactured after the date of this Agreement, except claims that are specified as a GMCL liability in s. 5.1(i); or

(b)     any employment related claims by Delphi Employees, except to the extent that such claims relates to the gross negligence of GMCL or wilful misconduct of GMCL employees (other than Assigned Employees) including breach of Laws, actions constituting sexual harassment or constructive dismissal.

## 5.3    Certain Limitations

Unless otherwise specifically provided, the obligations of indemnification in Sections 5.1 and 5.2 shall be subject to the requirements that the Party seeking to be indemnified

provides the indemnifying Party, in respect of any claim made by a third party, prompt notice in writing of such claim and an opportunity at the indemnifying Party's sole expense to resist, defend and negotiate a settlement regarding the same, including the final disposition of any appeal therefrom. The other Party shall have the right at its sole expense and option to be represented by counsel of its own choice in defence of any such claim and to be consulted in respect of all negotiations for settlement in connection with any such claim.

### 5.4    Sole Remedy

The Parties agree that any dispute between GMCL and Delphi with respect to the obligations of the parties to this Agreement or the interpretation, application, or alleged violation of this Agreement or the failure by the Parties to agree on a matter which, under the terms herein, requires the agreement of the Parties (collectively "Disputes") shall be subject to the provisions set out in Section 5.5.

### 5.5    Dispute Resolution

The Parties shall use all commercially reasonable efforts to settle all Disputes without resorting to mediation, arbitration or otherwise. Senior employees with expertise concerning the dispute shall first attempt to settle the Dispute within thirty (30) days of the issue being raised in writing by a Party. In the event that the Dispute is unresolved at the end of such period, it may be referred by either party to an appeal committee consisting of the GMCL Vice President, Personnel, Vice President Finance and Vice President Operations and Delphi E&C Director of Canadian Operations and Personnel Director, Delphi's Oshawa site manager and Delphi Canada's CFO (the "Appeal Committee"). The Appeal Committee will meet within thirty (30) days of having a Dispute referred to it and use commercially reasonable efforts to resolve the Dispute within sixty (60) days of the date of the referral of the Dispute. Regarding labour issues, the Appeal Committee will resolve Disputes in an effort to achieve a result that reflects as reasonably practicable the result that would have occurred had Delphi executed its own collective agreement with the CAW in the context of being the major supplier to GMCL. If any Dispute remains unsettled by the Appeal Committee within thirty (30) days of a Dispute being referred to it, either Party may require that the Dispute be subject to the Dispute resolution mechanism agreed between General Motors Corporation and Delphi U.S. If the Dispute is not resolved within the time frame set out in such agreement a Party may commence proceedings hereunder by delivering a written notice from a Senior Vice President or comparable executive officer of such Party (the "Demand") to the other Party providing reasonable description of the Dispute to the other and expressly requesting mediation hereunder.

The Parties hereby agree to submit all Disputes to non-binding mediation before a mediator reasonably acceptable to both Parties. If, after such mediation, the Parties subject to such mediation disagree regarding the mediator's recommendation, such Dispute shall be submitted to arbitration under the terms hereof, which arbitration shall be final, conclusive and binding upon the Parties, their successors and assigns. The arbitration shall be conducted in

Oshawa, Ontario by three arbitrators acting by majority vote (the "Panel") selected by agreement of the parties not later than ten (10) days after the delivery of the recommendation provided by the mediator as described above or, failing such agreement, appointed pursuant to the commercial arbitration rules of the American Arbitration Association, as amended from time to time (the "AAA Rules"). If an arbitrator so selected becomes unable to serve, his or her successors shall be similarly selected or appointed. The arbitration shall be conducted pursuant to the 1 Arbitration Act (Ontario) and such procedures as the Parties subject to such arbitration may agree, or, in the absence of or failing such agreement, pursuant to the AAA Rules. Notwithstanding the foregoing: (i) each Party shall have the right to audit the books and records of the other Party that are reasonably related to the Dispute; (ii) each Party shall provide to the other, reasonably in advance of any hearing, copies of all documents which a Party intends to present in such hearing; and (iii) each Party shall be allowed to conduct reasonable discovery through written requests for information, document requests, requests for stipulation of fact and depositions, the nature and extent of which discovery shall be determined by the Parties; provided that if the Parties cannot agree on the terms of such discovery, the nature and extent thereof shall be determined by the Panel which shall take into account the needs of the Parties and the desirability of making discovery expeditious and cost effective. The award shall be in writing and shall specify the factual and legal basis for the award. The Panel shall apportion all costs and expenses of arbitration, including the Panel's fees and expenses and fees and expenses of experts, between the prevailing and non-prevailing Party as the Panel deems fair and reasonable. The Parties hereto agree that monetary damages may be inadequate and that either Party by whom this Agreement is enforceable shall be entitled to seek specific performance of the arbitrators' decision from a court of competent jurisdiction, in addition to any other appropriate relief or remedy. Notwithstanding the foregoing, in no event may the Panel award consequential, special, exemplary or punitive damages. Any arbitration award shall be binding and enforceable against the parties hereto and judgment may be entered thereon in any court of competent jurisdiction.

## 6.    INSPECTION OF RECORDS

### 6.1    Records

All Employment Cost and time records shall be maintained by GMCL and GMCL shall maintain detailed, complete and accurate accounting records of Employment Costs and of the hours of direct labour performed under this Agreement. The hours of such labour billed by GMCL shall be supported by work schedules showing hours worked and by evidence of actual payment either through payroll records or cancelled cheques. All records pertaining to this Agreement shall be preserved for at least seven (7) years following the expiration or termination of this Agreement or any purchase order under it.

GMCL agrees that its books and records, or such part thereof, relating to the performance of its obligations under this Agreement, shall at all reasonable times during business hours and on reasonable prior notice be subject to inspection by any authorized representative of Delphi and/or any government authorities having jurisdiction.

## 7.    COMPLIANCE WITH LAW

### 7.1    Compliance with Law

GMCL and Delphi, as the case may be,  shall use commercially reasonable efforts to cause their respective employees, agents, and representatives to, comply with and observe all applicable Laws,.

### 7.2    Permits and Approvals

GMCL is responsible for obtaining (and maintaining) any necessary governmental permits for approvals that are required by law in order for GMCL to provide the Services to Delphi under this Agreement.

### 7.3    Governing Law

This Agreement shall be governed by, and construed and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.  Subject to Section 5.5, the Parties hereby irrevocably attorn to the exclusive jurisdiction of the Courts of the Province of Ontario in respect of the subject matter hereof.

## 8.    CONFIDENTIALITY

### 8.1    GMCL's Name

Delphi shall not, directly or indirectly, in any manner use or register or attempt to register (i) any name containing General Motors of Canada Limited, GMCL, General Motors Corporation, General Motors or GM, or (ii) any other mark, name or design owned by GMCL or its subsidiaries or affiliates or any confusingly similar marks, names or designs.  Without limiting the generality of the foregoing, Delphi shall not use GMCL's name in any advertising, promotional materials, publicity releases or other written material distributed to prospective clients relating to the Services to be performed by GMCL hereunder or the results thereof, without the prior written consent of GMCL.

### 8.2    Delphi Confidentiality Obligations

All GMCL Confidential Information disclosed or otherwise made available to Delphi by GMCL shall be considered confidential by Delphi. "GMCL Confidential Information" means confidential information known or used by GMCL in connection with its business including without limitation employee information (both personal and costs), financial information, marketing information, business opportunities and research and development which information

may be modified, amended or improved from time to time, together with all data, compilations of information, forecasts, studies and other documentation, whether in oral, written, graphic, machine readable or physical form.

Delphi shall not be subject to the obligations of this Section 8.2 with respect to:

(a)    information which is in the public domain or public information at the time of Delphi's receipt thereof from GMCL;

(b)    information which, after Delphi's receipt thereof from GMCL, becomes part of the public domain or public information through no act or fault of Delphi;

(c)    information which Delphi can show was lawfully in Delphi's possession prior to the receipt thereof from GMCL;

(d)    information which at the time it was received in good faith by Delphi from an independent third party was lawfully in possession of such third party and under no obligation of secrecy; and

(e)    information which is released from the provisions of this Agreement by the written authorization of GMCL.

Delphi shall, and shall cause its officers, directors, employees and agents, to keep confidential all Confidential Information and not use such information except as contemplated by this Agreement. The standard of care imposed on Delphi for protecting such information shall be the reasonable and prudent care necessary to prevent improper disclosure or use of such information, to the same degree employed by Delphi to protect its own information of such nature, Delphi shall not be liable to GMCL, nor it will not be a default under this Confidentiality provision unless Delphi is grossly negligent in breaching this standard. During and after the term of this Agreement, Delphi agrees to not for any reason, without the prior written authorization of GMCL, directly or indirectly provide any other person, firm or corporation with access to the GMCL Confidential Information or make use of the GMCL Confidential Information for its personal benefit or for the benefit of any person, firm or corporation other than GMCL or assist others in doing so.

Delphi acknowledges that the GMCL Confidential Information is confidential and a valuable asset of GMCL and is and at all times shall remain the exclusive property of GMCL and the confidentiality of the same shall be protected by Delphi. All applicable intellectual property rights residing in the GMCL Confidential Information, including, without limitation, patents, copyrights, industrial designs, trade-marks and trade secrets are and will remain the exclusive property of GMCL.

Upon written request from GMCL upon the termination of this Agreement, Delphi shall promptly return to GMCL all GMCL Confidential Information in Delphi's possession or subject to its control.

Delphi agrees to request that Delphi salaried employees execute a confidentiality acknowledgment in favour of GMCL substantially in the form of Schedule 8.2.

In the event that Delphi or anyone to whom Delphi provides or otherwise makes available the GMCL Confidential Information pursuant to this Agreement becomes legally compelled to disclose any of the GMCL Confidential Information to any government entity or other third party, Delphi will provide GMCL with prompt notice, together with copies of all GMCL Confidential Information which Delphi intends to disclose so that GMCL may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. Such notice and GMCL Confidential Information shall be provided to GMCL in writing at least five (5) Business Days prior to disclosure of same to any governmental entity or other third party. In the event that such protective order or other remedy is not obtained, or that GMCL waives compliance with the provisions of this Agreement, Delphi will furnish only that portion of the GMCL Confidential Information which Delphi is advised, by written opinion of counsel, addressed to Delphi, is legally required and will exercise reasonable commercial efforts to obtain reliable assurance that confidential treatment will be accorded the GMCL Confidential Information.

**8.3    GMCL Confidentiality Obligations**

All Delphi Confidential Information disclosed or otherwise made available to GMCL by Delphi shall be considered confidential by GMCL. "Delphi Confidential Information" means confidential information known or used by Delphi in connection with its business including without limitation employee information (both personal and costs), financial information, marketing information, business opportunities and research and development which information may be modified, amended or improved from time to time, together with all data, compilations of information, forecasts, studies and other documentation, whether in oral, written, graphic, machine readable or physical form.

GMCL shall not be subject to the obligations of this Section 8.3 with respect to:

(a)    information which is in the public domain or public information at the time of GMCL's receipt thereof from Delphi;

(b)    information which, after GMCL's receipt thereof from Delphi, becomes part of the public domain or public information through no act or fault of GMCL;

(c)    information which GMCL can show was lawfully in GMCL's possession prior to the receipt thereof from Delphi;

(d)    information which at the time it was received in good faith by GMCL from an independent third party was lawfully in possession of such third party and under no obligation of secrecy; and

(e)    information which is released from the provisions of this Agreement by the written authorization of Delphi.

GMCL shall, and shall cause its officers, directors, employees and agents, to keep confidential all Delphi Confidential Information and not use such information except as contemplated by this Agreement. The standard of care imposed on GMCL for protecting such information shall be the reasonable and prudent care necessary to prevent improper disclosure or use of such information, to the same degree employed by GMCL to protect its own information of such nature, GMCL shall not be liable to Delphi, nor it will not be a default under this Confidentiality provision unless GMCL is grossly negligent in breaching this standard. During and after the term of this Agreement, GMCL agrees to not for any reason, without the prior written authorization of Delphi, directly or indirectly provide any other person, firm or corporation with access to the Delphi Confidential Information or make use of the Delphi Confidential Information for its personal benefit or for the benefit of any person, firm or corporation other than Delphi or assist others in doing so.

GMCL acknowledges that the Delphi Confidential Information is confidential and a valuable asset of Delphi and is and at all times shall remain the exclusive property of Delphi and the confidentiality of the same shall be protected by GMCL. All applicable intellectual property rights residing in the Delphi Confidential Information, including, without limitation, patents, copyrights, industrial designs, trade-marks and trade secrets are and will remain the exclusive property of Delphi.

Upon written request from Delphi upon termination of this Agreement, GMCL shall promptly return to Delphi all Delphi Confidential Information in GMCL's possession or subject to its control.

GMCL agrees to request that GMCL Assigned Salaried Employees execute a confidentiality acknowledgment in favour of Delphi substantially in the form of Schedule 8.3.

In the event that GMCL or anyone to whom GMCL provides or otherwise makes available the Delphi Confidential Information pursuant to this Agreement becomes legally compelled to disclose any of the Delphi Confidential Information to any government entity or other third party, GMCL will provide Delphi with prompt notice, together with copies of all Delphi Confidential Information which GMCL intends to disclose so that Delphi may seek a

protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. Such notice and Delphi Confidential Information shall be provided to Delphi in writing at least five (5) Business Days prior to disclosure of same to any governmental entity or other third party. In the event that such protective order or other remedy is not obtained, or that Delphi waives compliance with the provisions of this Agreement, GMCL will furnish only that portion of the Delphi Confidential Information which GMCL is advised, by written opinion of counsel, addressed to GMCL, is legally required and will exercise reasonable commercial efforts to obtain reliable assurance that confidential treatment will be accorded the Delphi Confidential Information.

### 8.4   Public Disclosures

The terms of this Agreement shall be kept confidential by the Parties except that the CAW may be informed by GMCL of its terms. GMCL and Delphi Canada will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by applicable law and then only after such prior consultation.

## 9.   NOTICE

### 9.1   Notice

Any notice or other communication required or permitted to be given by this Agreement shall be in writing and shall be effectively given if (i) delivered personally; or (ii) sent by prepaid courier service; or (iii) sent by facsimile and confirmed by mailing the original document so sent by prepaid mail on the same or following day,

    If to GMCL:

    General Motors of Canada Limited
    1908 Colonel Sam Drive
    Oshawa, Ontario  L1H 8P7
    Attention:      Treasurer
    Fax No:         (905) 644-6273

with a copy to:  General Motors of Canada Limited

1908 Colonel Sam Drive
Oshawa, Ontario  L1H 8P7
Attention:      General Counsel
Fax No:        (905) 644-7772

If to Delphi Canada:

Delphi Canada Inc.
c/o Delphi Energy & Chassis Systems
4800 S. Saginaw Street
M/C 485-301-14C

Flint, Michigan 48501

Attention:      President
Fax No:        (810) 257-6957

with a copy to:  Delphi Automotive Systems Corporation

5725 Delphi Drive
Troy, MI 48098-2815
Attention:      Assistant General Counsel, Commercial Practices
Fax No.        (248) 813-2491

or at such address as the Party to whom such notice or other communication is to be given shall have advised the Party giving same in the manner provided in this Section.  Any notice or other communication delivered personally or by prepaid courier service shall be deemed to have been given and received on the day of actual receipt at such address, provided that if such day is not a Business Day (as defined below), such notice or other communication shall be deemed to have been given and received on the next Business Day.  Any notice or other communication transmitted by facsimile shall be deemed given and received on the day of its transmission provided that the sending Party contacts the receiving Party to confirm receipt thereof and that such day is a Business Day and such transmission is completed before 5:00 p.m. on such day, failing which such notice or other communication shall be deemed given and received on the first Business Day after its transmission.  Regardless of the foregoing, if there is a mail stoppage or labour dispute or threatened labour dispute which has affected or could affect normal mail delivery by Canada Post, then a Party who sends a notice or other communication by telecopier shall be relieved from the obligation to mail the original document in accordance with this Section.

10.    <u>**GENERAL**</u>

### 10.1    Cooperation

Delphi and GMCL agree to work together in good faith and cooperate in performing under this Agreement.  In this regard, other than with respect to claims by GMCL or any GMCL affiliate against Delphi, GMCL shall, at the reasonable request of Delphi, provide Delphi with technical assistance, documentation, and other information, through Assigned Employees and, to the extent possible, former Assigned Employees. Delphi shall reimburse GMCL for GMCL's reasonable out-of-pocket costs incurred in connection with such assistance as agreed upon by the Parties.

### 10.2    Survival

Sections 5, regarding indemnification, 6, regarding inspection of records, 8, regarding confidentiality, and 10.1, regarding cooperation, shall survive the termination of this Agreement for a period of seven (7) years.  If any portion of this Agreement is deemed invalid by a court of competent jurisdiction, the other provisions of this Agreement will apply with full force and effect.

### 10.3    No Assignment

This Agreement shall be binding upon the parties hereto and shall not be assignable or transferable by either party to any third party without the prior written consent of the other party, which consent may be withheld to the other party in its sole discretion.

### 10.4    Time

Time is of the essence in the performance of the Parties' respective obligations under this Agreement.

### 10.5    Singular, etc.

In this Agreement, the use of words in the singular or plural, or with a particular gender, shall not limit the scope or exclude the application of any provision of this Agreement to such person or persons or circumstances as the context otherwise requires.

- 34 -

### 10.6    Headings

The division of this Agreement and the insertion of headings is for convenience of reference only and shall not affect the construction or interpretation of this Agreement or any part thereof.

### 10.7    Currency

Unless otherwise indicated, all dollar amounts referred to in this Agreement are in lawful Canadian funds.   All amounts to be paid pursuant to this Agreement are to be paid in lawful Canadian funds.

### 10.8    Entire Agreement

This Agreement, including all schedules attached hereto and including any purchase orders and/or releases issued by GMCL from time to time shall constitute the entire agreement between the Parties with respect to the furnishing of the Services.

### 10.9    Waiver and Modification

No provision of this Agreement shall be deemed waived, amended or modified by any Party unless such waiver, amendment or modification is in writing, and signed by an authorized representative of each Party.

### 10.10   Business Day

For the purposes of this Agreement, "Business Day" shall mean any day that is not a Saturday, Sunday, a statutory or public holiday or a day on which GMCL is closed for business.

### 10.11   Counterparts

This Agreement may be executed by the Parties in separate counterparts or by facsimile, each of which when so executed and delivered shall be an original, but all such counterparts or facsimile copies shall together constitute one and the same instrument. All signatures of the Parties to and pursuant to this Agreement may be transmitted by facsimile, and such facsimile will for all purposes be deemed to be the original signature of the person whose signature it reproduces and will be binding upon that person and on the Party on whose behalf that person signed.

- 35 -

## 10.12  Third Parties

Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labour organization, or trust other than the Parties and their respective successors and permitted assigns, any claims, rights, or remedies under or by reason of this Agreement.

**IN WITNESS WHEREOF**, the Parties hereby have caused this Agreement to be

executed by their duly authorized representatives as of the date first above written.


**GENERAL MOTORS OF CANADA LIMITED**

By: _____
    Title:

By: _____
    Title:

**DELPHI CANADA INC.**

By: _____
    Title:

By: _____
    Title:

| APPROVED | |
|---|---|
| FINANCIAL | LEGAL |
| BPM 4/28/00 | C |
| DATE | DATE April 28, 2 |

## SCHEDULE "2.1"

## TOTAL EMPLOYEES

| LOCATION | HOURLY EMPLOYEES | SALARIED EMPLOYEES |
|---|---|---|
| OSHAWA BATTERY | 244 | 25 |
| TRI-LINK | 205 | 27 |
| TOTAL | 449 | 52 |

Hourly Employees on leave, etc.

### Oshawa Battery

| Leave | 4 |
|---|---|
| Layoff | 8 |
| Total | 12 |

### Oshawa Tri-Link

| Leave | 3 |
|---|---|
| Layoff | 3 |
| Total | 6 |

Salaried Employees on leave, etc.

Nil

## Schedule 3.1(b) – Payroll Related Actuals

| Description | Group | |
|---|---|---|
| 1 Straight Time | Hourly | Salary |
| 2 Shift Premiums | Hourly | Salary |
| 3 Overtime | Hourly | Salary |
| 4 COLA | Hourly | |
| 5 Vacation Pay (PAA, SPA) | Hourly | |
| 6 Special Payment (Holiday Bonus) | Hourly | Salary |
| 7 Holiday Pay | Hourly | |
| 8 Short Work Week Benefits | Hourly | |
| 9 Bereavement, Election & Jury Duty | Hourly | |
| 10 Disability Leave of Absence | Hourly | Salary |
| 11 Military leave of Absence | Hourly | |
| 12 Enhanced Variable Pay | | Salary |
| 13 Health Care Tax | Hourly | Salary |
| 14 Employment Insurance | Hourly | Salary |
| 15 Employment Insurance Rebate | | Salary |
| 16 Canada Pension Plan | Hourly | Salary |
| 17 Stock Savings Plan | | Salary |
| 18 Tuition and Tool Allowance | Hourly | |
| 19 Tuition Refund | Hourly | Salary |
| 20 Worker's Compensation | Hourly | Salary |
| 21 Short-term Layoff Costs | Hourly | Salary |
| 22 Short-term Leave | Hourly | Salary |

## Schedule 3.3 – Composite Fringe Items

| Description | Group | |
|---|---|---|
| 23 Wages Training Program | Hourly | |
| 24 Group Life Insurance | Hourly | Salary |
| 25 Health Care Benefits | Hourly | Salary |
| 26 Substance Abuse | | Salary |
| 27 Legal Services Plan | Hourly | |
| 28 Retiree Health Group / OPEB | Hourly | Salary |
| 29 Pension Plan | Hourly | Salary |
| 30 Stock Savings Plan | Hourly | |
| 31 National Training Fund | Hourly | |
| 32 Paid Educational Leave | Hourly | |
| 33 Training Fund - National Overtime Penalty | Hourly | |
| 34 Long-term Layoff Costs | Hourly | Salary |
| 35 Special Canadian Contingency Plan | Hourly | |
| 36 Other Benefits As Agreed To By GMCL And Delphi From Time to Time | Hourly | Salary |

## Schedule 3.4 – Layoff Cost Example (Salary)

| Salary Layoffs | 2000 CY | 2001 CY | 2002 CY |
|---|---|---|---|
| **Year 1** | | | |
| Sub payments per head | | | |
| (6 mths * 6140/mth * 75%) + (6 mths * 6140/mth * 60%), less EI portion | 33,627 | 35,308 | 37,074 |
| Health care per head (1 mth * 307.07 + 11 mths * 222.79) | 2,758 | 2,903 | 3,055 |
| Group Ins per head ( 1 mth @ 222.96 + 11 mths @ 98.09) | 1,302 | 1,367 | 1,435 |
| Pension Cost | 5,800 | 6,090 | 6,395 |
| OPEB Cost | 1,400 | 1,474 | 1,551 |
| Total Costs - year 1 | 44,887 | 47,141 | 49,509 |
| **Year 2** | | | |
| Sub payments per head (12 mths @ $6140/mth * .60%) | 44,208 | 46,418 | 48,739 |
| Health care per head (12 mths @ 222.79) | 2,673 | 2,814 | 2,982 |
| Group Ins per head (12 mths @ 98.09) | 1,177 | 1,236 | 1,298 |
| Pension Cost | 5,800 | 6,090 | 6,395 |
| OPEB Cost | 1,400 | 1,474 | 1,551 |
| Total Costs - year 2 | 55,259 | 58,032 | 60,944 |
| **Year 3** | | | |
| ICP payments per head (12 mths @ $6140/mth * 60%) | 44,208 | 46,418 | 48,739 |
| Total Costs - year 3 | 44,208 | 46,418 | 48,739 |
| **Total Layoff Costs Per Employee** | 144,353 | 151,592 | 159,193 |

## Schedule 3.4 -- Layoff Cost Example (Hourly)

| | 2000 CY 90% | 2001 CY 90% | 2002 CY 90% |
|---|---|---|---|
| **Early Retirements** | | | |
| Document 12 Early Retirement Incentive | 50,000 | 50,000 | 50,000 |
| Pension Plan Experience Loss | 98,650 | 98,650 | 98,650 |
| **Total Early Retirement Costs Per Employee** | 148,650 | 148,650 | 148,650 |
| **Layoffs** | 10% | 10% | 10% |
| **Year 1** | | | |
| Sub payments per head (52 weeks * $698/week), less EI portion | | | |
| = (52*698)-(39*413) | 20,189 | 21,198 | 22,258 |
| Health care per head (1 mth * 264.31 + 11 mths * 188.42) | 2,337 | 2,460 | 2,589 |
| Group ins per head ( 1 mth @ 204.08 + 11 mths @ 46.43) | 715 | 751 | 788 |
| Pension Cost | 5,000 | 5,250 | 5,513 |
| OPEB Cost | 1,100 | 1,158 | 1,219 |
| **Total Costs - year 1** | 29,341 | 30,816 | 32,366 |
| **Year 2** | | | |
| Sub payments per head (52 weeks @ $698/week) | 36,296 | 38,111 | 40,016 |
| Health care per head (12 mths @ 188.42) | 2,261 | 2,380 | 2,505 |
| Group ins per head (12 mths @ 46.43) | 557 | 585 | 614 |
| Pension Cost | 5,000 | 5,250 | 5,513 |
| OPEB Cost | 1,100 | 1,158 | 1,219 |
| **Total Costs - year 2** | 45,214 | 47,483 | 49,866 |
| **Year 3** | | | |
| IMP payments per head (52 weeks @ $844/week) | 33,488 | 35,162 | 36,921 |
| Health care per head (12 mths @ 188.42) | 2,261 | 2,380 | 2,505 |
| Group ins per head (12 mths @ 46.43) | 557 | 585 | 614 |
| **Total Costs - year 3** | 36,306 | 38,127 | 40,039 |
| **Year 4** | | | |
| Sub payments per head (52 weeks @ $698/week) | 36,296 | 38,111 | 40,016 |
| Health care per head (12 mths @ 188.42) | 2,261 | 2,380 | 2,505 |
| Group ins per head (12 mths @ 46.43) | 557 | 585 | 614 |
| **Total Costs - year 4** | 39,114 | 41,076 | 43,135 |
| **Year 5** | | | |
| Sub payments per head (26 weeks @ $698/week) | 18,148 | 19,055 | 20,008 |
| Health care per head (6 mths @ 188.42) | 1,131 | 1,190 | 1,252 |
| Group ins per head (6 mths @ 46.43) | 279 | 293 | 307 |
| **Total Costs - year 5** | 19,557 | 20,538 | 21,568 |
| **Total Layoff Costs Per Employee** | 169,532 | 178,040 | 186,975 |

## SCHEDULE "3.5"

(a)    Except as specified in paragraph (c) Delphi will reimburse GMCL on a weekly basis for Assigned Hourly Employee payroll and related payroll taxes and payments on or before the dates on Schedule 3.5.A.

(b)    Except as specified in paragraph (c) Delphi will reimburse GMCL semi-monthly for Assigned Salaried Employee payroll and related payroll taxes and payments on or before the dates on Schedule 3.5.A, except for reimbursement of the cost of the options granted as part of variable compensation which will be reimbursed at the end of the month in which the optins are paid.

(c)    Delphi will reimburse GMCL on a monthly (5th Working Day of following month) for Hourly and Salary actual incurred Health Care Tax and Worker's Compensation Tax.

(d)    Composite Fringe Amounts will be recovered on a prorated monthly basis based on the agreed Composite Fringe Amount for the year in question and paid on or before the dates set out in Schedule 3.5.A.

(e)    All other reimbursements due under this Agreement between the Parties shall be paid within fourteen days of the presentment of invoices for such payment, invoices for ordinary course reimbursement may be presented at the end of each month in which the expense was incurred and invoices for extraordinary items and all reimbursement in excess of $500,000 may be presented upon the expense being incurred.  In either case, payment will be due 14 days after presentment of the invoice.

(f)    Any other Employee related costs which may arise during the course of this agreement must be reviewed and agreed upon by Delphi prior to invoicing and will be reimbursed to GMCL on the appropriate basis depending on the type of cost, i.e., weekly, semi-monthly.

## Schedule 3.5 – Invoice Delphi Funding Schedule – Calendar Year 2000

| Month | Hourly Pay<br><br>Funding<br>Code "A" | Short-term<br>Layoff /<br>Leave<br><br>Funding<br>Code "A*" | Salaried<br>Pay<br><br>Funding<br>Code "B" |
|---|---|---|---|
| May | 10th<br>17th<br>25th<br>31st | 11th<br>18th<br>26th<br>1st | 12th<br>30th |
| June | 7th<br>14th<br>21st<br>28th | 8th<br>15th<br>22nd<br>29th | 14th<br>28th |
| July | 5th<br>12th<br>19th<br>26th | 6th<br>13th<br>20th<br>27th | 12th<br>28th |
| August | 2nd<br>10th<br>16th<br>23rd<br>30th | 3rd<br>11th<br>17th<br>24th<br>31st | 14th<br>30th |
| September | 7th<br>13th<br>20th<br>27th | 8th<br>14th<br>21st<br>28th | 13th<br>27th |
| October | 4th<br>12th<br>18th<br>25th | 5th<br>13th<br>19th<br>26th | 11th<br>30th |
| November | 1st<br>8th<br>15th<br>22nd<br>29th | 2nd<br>9th<br>16th<br>23rd<br>30th | 14th<br>29th |
| December | 6th<br>13th<br>20th<br>28th | 7th<br>14th<br>21st<br>29th | 13th<br>20th |

## Schedule 3.5 – Invoice Payroll & Composite Fringe Funding Legend

| Funding Code | | |
|---|---|---|
| "A" | Delphi To Reimburse "Weekly" | |
| "A*" | Delphi To Reimburse "Weekly" | |
| "B" | Delphi To Reimburse "Semi-Monthly" | |
| "C" | Delphi To Reimburse "Monthly" | |

| | Description | Employee Group | Funding Code | Employee Group | Funding Code |
|---|---|---|---|---|---|
| 1 | Straight Time | Hourly | A | Salary | B |
| 2 | Shift Premiums | Hourly | A | Salary | B |
| 3 | Overtime | Hourly | A | Salary | B |
| 4 | COLA | Hourly | A | | |
| 5 | Vacation Pay (PAA, SPA) | Hourly | A | | |
| 6 | Special Payment (Holiday Bonus) | Hourly | A | Salary | B |
| 7 | Holiday Pay | Hourly | A | | |
| 8 | Short Work Week Benefits | Hourly | A | | |
| 9 | Bereavement, Election & Jury Duty | Hourly | A | | |
| 10 | Disability Leave of Absence | Hourly | A | Salary | B |
| 11 | Military leave of Absence | Hourly | A | | |
| 12 | Enhanced Variable Pay | | | Salary | B |
| 13 | Health Care Tax | Hourly | C | Salary | C |
| 14 | Employment Insurance | Hourly | A | Salary | B |
| 15 | Employment Insurance Rebate | | | Salary | B |
| 16 | Canada Pension Plan | Hourly | A | Salary | B |
| 17 | Stock Savings Plan | | | Salary | B |
| 18 | Tuition and Tool Allowance | Hourly | A | | |
| 19 | Tuition Refund | Hourly | A | Salary | B |
| 20 | Worker's Compensation | Hourly | C | Salary | C |
| 21 | Short-term Layoff Costs | Hourly | A* | Salary | B |
| 22 | Short-term Leave | Hourly | A* | Salary | B |

| | Description | Employee Group | Funding Code |
|---|---|---|---|
| 23 | Wages Training Program | Hourly | C |
| 24 | Group Life Insurance | Hrly/Salary | C |
| 25 | Health Care Benefits | Hrly/Salary | C |
| 26 | Substance Abuse | Salary | C |
| 27 | Legal Services Plan | Hourly | C |
| 28 | Retiree Health Group / OPEB | Hrly/Salary | C |
| 29 | Pension Plan | Hrly/Salary | C |
| 30 | Stock Savings Plan | Hourly | C |
| 31 | National Training Fund | Hourly | C |
| 32 | Paid Educational Leave | Hourly | C |
| 33 | Training Fund - National O/T Penalty | Hourly | C |
| 34 | Long-term Layoff Costs | Hrly/Salary | C |
| 35 | Special Canadian Contingency Plan | Hourly | C |
| | Other Benefits As Agreed To By | | |
| 36 | GMCL/ Delphi From Time to Time | Hrly/Salary | C |

### SCHEDULE 8.2

### DELPHI SALARIED EMPLOYEES
### CONFIDENTIALITY ACKNOWLEDGMENT

TO:    GENERAL MOTORS OF CANADA LIMITED ("GMCL")

Dear Sirs/Mesdames:

I acknowledge that as an employee of Delphi Canada Inc. ("Delphi Canada") who may from time to time receive non-public, confidential or proprietary information pertaining to GMCL and its affiliates, including, without limitation, information concerning GMCL costs, technology, financing, financial statements, pricing and business plans ("Information"). "Information" does not include information that is or becomes generally available to the public other than as a result of disclosure by me or other Delphi Canada employees or that is received by me from an independent third party that obtained it lawfully and was under no duty of confidentiality.

I will keep the Information confidential and will not, without your prior written consent, disclose such Information to any person other than (i) as required by law; (ii) to employees of GMCL and their affiliates; or (iii) to Delphi Canada or Delphi Canada employees as required to permit Delphi to provide services to GMCL. I will not use such Information for any purpose other than to provide the services to GMCL. Any copies of the Information in my possession will be returned to you promptly upon your request (and, in any event, within five (5) business days after such request).

I acknowledge that disclosure of the Information may cause serious irreparable damage and harm to GMCL and that remedies at law would be inadequate to protect against breach of this agreement, and therefore I agree in advance to the granting of injunctive relief in your favour for any breach of the provisions of this acknowledgment and to the specific enforcement of the terms of this acknowledgment, without proof of actual damages, in addition to any other remedy to which you would be entitled.

Yours very truly,

By:_____          _____
        [Name of Employee]                                       Witness Signature


Date:_____          _____
                                                                          Name of Witness (Printed)

**SCHEDULE 8.3**
**GMCL ASSIGNED SALARIED EMPLOYEES**
**CONFIDENTIALITY ACKNOWLEDGMENT**


TO:    DELPHI CANADA INC. ("Delphi Canada")

Dear Sirs/Mesdames:

I acknowledge that as an employee of General Motors of Canada Limited ("GMCL") who may provide services to Delphi Canada from time to time I may receive non-public, confidential or proprietary information pertaining to Delphi Canada and its affiliates, including, without limitation, information concerning Delphi Canada costs, technology, financing, financial statements, pricing and business plans ("Information"). "Information" does not include information that is or becomes generally available to the public other than as a result of disclosure by me or other GMCL employees or that is received by me from an independent third party that obtained it lawfully and was under no duty of confidentiality.

I will keep the Information confidential and will not, without your prior written consent, disclose such Information to any person other than (i) as required by law; (ii) as required in order to properly perform services for Delphi; (iii) to employees of Delphi Canada and their affiliates; or (iv) to GMCL or GMCL employees as required to permit GMCL to provide services to Delphi Canada. I will not use such Information for any purpose other than to provide the services to Delphi. Any copies of the Information in my possession will be returned to you promptly upon your request (and, in any event, within five (5) business days after such request).

I acknowledge that disclosure of the Information may cause serious irreparable damage and harm to Delphi Canada and that remedies at law would be inadequate to protect against breach of this agreement, and therefore I agree in advance to the granting of injunctive relief in your favour for any breach of the provisions of this acknowledgment and to the specific enforcement of the terms of this acknowledgment, without proof of actual damages, in addition to any other remedy to which you would be entitled.


Yours very truly,



By:_____            _____
     [Name of Employee]                              Witness Signature



Date:_____            _____
                                                            Name of Witness (Printed)