## Exhibit 5.01(a)(vii)(iii)

**Administrative Services Agreement between Delphi Canada, Inc. and General Motors Canada Limited, dated as of May 1, 2000**

## ADMINISTRATIVE SERVICES AGREEMENT

**THIS ADMINISTRATIVE SERVICES AGREEMENT** ("Agreement") is made and entered into as of May 1, 2000 by GENERAL MOTORS OF CANADA LIMITED, a Canadian Corporation ("GMCL"), and DELPHI CANADA INC., an Ontario corporation, ("Delphi Canada"), based upon the following:

**WHEREAS**, GMCL and Delphi Canada are parties to an Asset Purchase Agreement dated as of December 31, 1998 as amended and restated May 1, 2000 (the "Asset Purchase Agreement"), under which Delphi Canada is purchasing certain assets from GMCL in connection with GMCL's Battery Products business at the Oshawa Battery Plant and the Chassis Products business at the Oshawa Tri-Link Plant, which constitute the Businesses that are the subject of the Asset Purchase Agreement; and

**WHEREAS**, in accordance with the Asset Purchase Agreement, GMCL and Delphi Canada will enter the Oshawa Labour and Management Services Agreement with respect to the provision of the services of GMCL employees directly engaged in the operation of the Businesses; and

**WHEREAS**, in accordance with the Asset Purchase Agreement, GMCL and Delphi Canada will enter Leases with respect to the Oshawa Battery Plant and Oshawa Tri-Link Plant; and

**WHEREAS**, in connection with the Asset Purchase Agreement and Leases, GMCL has agreed to provide to Delphi Canada, directly or through one or more of its affiliates or third party suppliers, commencing on the date of closing as set forth in the Asset Purchase Agreement, certain administrative services, under the terms and conditions set forth in this Agreement; and

**WHEREAS**, GMCL and Delphi Canada are entering into this Agreement to set forth terms and conditions governing GMCL's provision of services to Delphi Canada and the rights and obligations of the parties with respect thereto; and

**WHEREAS**, capitalized terms in this Agreement shall have the meaning ascribed thereto in the Asset Purchase Agreement unless defined otherwise in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GMCL and Delphi Canada agree as follows:

1.    <u>Provision of Services</u>

       1.1    During the Term of this Agreement as defined in Section 4 below ("Term"), GMCL will provide or ensure the provision to Delphi Canada of any services provided by GMCL or its Affiliates to the Businesses (as defined in the Asset Purchase Agreement) in the year period ending April 30, 2000 (the "Prior Year") which Delphi Canada reasonably identifies and requests in writing that GMCL provide to it, in accordance with the times, specifications and other provisions contained in Delphi Canada purchase orders issued from time to time and in accordance with this Agreement (the "Services"). The Services shall be provided in the manner and at a relative level of service consistent in all material

- 2 -

respects with that provided by GMCL or its Affiliates to the Businesses in the Prior Year.

1.2    GMCL represents that Exhibit 1.1 (listing "Administrative Services") includes only those services which GMCL and Delphi Canada have agreed are to be provided. The parties agree to review and amend, if required, the Exhibit on an annual basis to more fully list the Services and to carry out the intent of Section 1.1. The terms of this Agreement will apply except to the extent conflicting with the terms of an Exhibit as to a particular Service, in which case the terms of such Exhibit will control.

1.3    GMCL shall continue to manage all Health and Safety and Industrial Hygiene issues associated with the properties subject to the Leases (the "Delphi Facilities") in the same manner in all respects as before the Closing Date. All costs associated with such management shall be borne by Delphi Canada upon presentation of account. The Parties contemplate that in managing Health and Safety and Industrial Hygiene issues at the Delphi Facilities, GMCL will include the Delphi Facilities in all generally applicable Health and Safety and Industrial Hygiene programmes in effect at GMCL Oshawa Autoplex, including without limiting the generality of the foregoing, all programmes directed to auditing, due diligence, monitoring, testing, Health and Safety and Industrial Hygiene reporting, compliance with applicable laws, permits, any and all orders or directives issued by a competent authority. Where changes to existing programmes are required in order to effect enhanced auditing, due diligence, monitoring, testing, Health and Safety and Industrial Hygiene reporting, compliance with applicable laws, permits, or any and all orders or directives, such changes shall be implemented by GMCL. It is also contemplated by the Parties that the Delphi Facilities will participate in all applicable spill prevention, response, and remediation activities in the same manner and degree following the Closing Date as was the case prior to the Closing Date, and that the same method and approach to costs allocation will be used following the Closing Date. Delphi Canada will take no steps which compromise the compliance status of the Delphi Canada Facilities, and will ensure that all proposed changes to product, product components, or manufacturing processes which may have Health and Safety and Industrial Hygiene implications, or implications for compliance with relevant permits, orders or directives will be revealed to GMCL Health and Safety and Industrial Hygiene personnel prior to implementation, and sufficiently in advance of implementation to permit the impact of the proposed changes to be fully assessed. GMCL shall be responsible for all losses attributable to Health and Safety and Industrial Hygiene management services GMCL provides under this Agreement except to the extent such Losses are attributable to the gross negligence of Delphi.

1.4    If, after the execution of this Agreement, Delphi Canada requests GMCL to provide a Service available from GMCL and omitted from the Exhibit, such Service shall be provided to Delphi Canada subject to GMCL's consent, which consent shall not be unreasonably withheld or delayed, and GMCL and Delphi Canada shall negotiate in good faith to agree on the terms and conditions

05-44481-rdd    Doc 14165-7    Filed 09/12/08    Entered 09/12/08 18:07:50    Exhibit A-5
- 5.01(a)(vii)(iii) - 5.01(a)(viii)    Pg 4 of 50

- 3 -

upon which such Service would be added to this Agreement, it being agreed that, subject to Article 2, the charges for such Services should be determined on a basis consistent with the methodology for determining the charges provided for in this Agreement (i.e., sufficient to cover GMCL's actual costs, without any profit margin).

1.5    Services will be performed by GMCL in the same manner as GMCL performs or requires performance of the same services for its own organization and customers.  Subject to the foregoing, GMCL has the right to change the manner of rendering Services from time to time, but in no event will any such change cause a material adverse effect on the quality of the Services rendered, except only if (a) such change relates to a Service provided by a U.S. Affiliate of GMCL and is made necessary by a change mandated by such U.S. Affiliate and (b) such change is generally applicable to GMCL and its U.S. and Canadian vehicle producing Affiliates.  In any case, all changes will be implemented to the extent practicable so as to minimize any disruption to Delphi Canada's operations and ability of Delphi Canada to use such Services.  Delphi Canada shall have the option of paying for changes in its systems and operations to minimize any such disruption, and GMCL will cooperate in a commercially reasonable fashion in implementing its changes in coordination with any changes made by Delphi Canada so as to minimize such disruption.

1.6    Services and the form of reports and other data as historically rendered will be adapted at no charge for Delphi Canada's use in a reasonable manner, in order to reflect the separation of Delphi Canada from GMCL.  Additional adaptation requested by Delphi Canada will be provided by GMCL at Delphi Canada's expense.  Reports and other data will be given to Delphi Canada in a form separate from reports and other data applicable to GMCL and its Affiliates, and access thereto will be restricted except to the extent necessary to perform the Services.

1.7    Subject to Section 1.8, this Agreement shall not be exclusive and Delphi Canada may order other services from other parties.  GMCL may provide these Services to other parties at any time.

1.8    The Services of GMCL referenced in Section 4.2, must however be exclusively used by Delphi Canada during the Term of the Oshawa Labour and Management Services Agreement of GMCL that are environmental services in respect of a premises that are subject to a Lease must be exclusively used by Delphi Canada during the term of the relevant Lease.

2.    Pricing

2.1    In the first year that Services are provided, the pricing charged to Delphi Canada for each Service will be an amount equal to the cost allocated, consistent with past practice, to the Businesses in the Prior Year for such Service as set out in Exhibit 1.1, adjusted to reflect any changes in the nature, cost or level of the Services provided; *provided that*, if no cost has historically been allocated to the Businesses for any Service, then Delphi Canada shall pay to GMCL that

- 4 -

portion of the total cost borne by GMCL which GMCL would have allocated to Delphi Canada under its internal allocation formula.

2.2     The pricing for Services shall be subject to revision by GMCL annually on January 1 based on GMCL's costs for the Service in the year then ended and shall be allocated, consistent with the manner in which such costs have been allocated to the Businesses in the prior year.  GMCL shall notify Delphi Canada as soon as practical after establishing the revised costs of Services of such costs.

2.3     To the extent that GMCL undertakes projects in order to improve its cost structure, and such projects are beneficial to Delphi Canada and are approved in advance by Delphi Canada, costs or investments associated with the execution of such approved projects including, but not limited to, systems investments, property purchase or lease and furniture, fixtures and equipment will be shared between GMCL and Delphi Canada pro rata based on the annual volume of transactions performed.  If a project is not approved by Delphi Canada, Delphi Canada will not be entitled to receive any cost benefit resulting from such project and, if such project requires modifications in Delphi Canada interfaces, Delphi Canada will bear the reasonable cost for such modifications.

3.    <u>Payment</u>

As indicated on the Exhibit, Delphi Canada will pay GMCL on a prox 15 term agreement.  All payments will be made in immediately available funds by wire transfer.

4.    <u>Term</u>

4.1     The initial Term for each Service shall be coincident with the initial term of the Lease for the Business with respect to which the Service is provided, subject to renewal by the Parties by mutual agreement in writing.  In the event of valid termination of one Lease but not the other, the Services shall continue only in respect of the location for which a Lease continues to be in effect.

4.2     Notwithstanding Section 4.1, Services consisting of health and safety, payroll and other human resources services in respect of GMCL's employees who are supplied to Delphi under the Oshawa Labour and Management Services Agreement shall continue until the termination of the Oshawa Labour and Management Services Agreement.

4.3     Delphi Canada may, upon sixty (60) days' prior notice, request an extension beyond the Term contemplated for a Service in Section 4.1.  In such event, GMCL and Delphi Canada shall negotiate in good faith to agree to the terms and conditions upon which such Service may be extended taking into consideration whether GMCL has sufficient available personnel, time and resources to provide such Service.

- 5 -

4.4    If either party cancels any Service, other than a Service referred in Section 1.8, before the end of the Term of such Service without giving the required notice under this Agreement, the other party will invoice or re-bill the cancelling party for all cancellation costs, if any, without provision for profit to the other party. GMCL and Delphi Canada will work together to minimize any cancellation costs.

4.5    Upon termination of any Service and for a reasonable time thereafter, GMCL shall cooperate with Delphi Canada in assuring a smooth transition for provision of such Service.

## 5.    Independent Contractor Relationship

GMCL shall for all purposes be an independent contractor of Delphi Canada with respect to the Services being provided under this Agreement. GMCL shall be solely responsible for (i) the supply, maintenance, repair and replacement of all equipment, machinery, parts, materials and other products used in connection with the provision of the Services, (ii) the fulfillment of all obligations to GMCL's contractors, employees and subcontractors and (iii) the compliance with all laws, regulations, orders and other governmental requirements applicable to GMCL's performance of the Services. The foregoing sentence shall not limit any obligation of Delphi Canada to pay for certain items as specifically set forth in the Leases.

## 6.    Limitation of Liability

Neither GMCL nor Delphi Canada will be responsible to the other for any damages, including, without limitation, incidental, consequential, punitive, or special damages, arising out of either's performance or failure to perform under this Agreement, except where the party has committed gross negligence or willful misconduct. With respect to any liability resulting from an act or omission of any third party vendor providing a Service under this Agreement, GMCL shall have no liability to Delphi Canada for any amount in excess of the amount that is recovered from the vendor. GMCL will assign any rights or causes of action it may have against the vendor to Delphi Canada to the extent permitted and will cooperate with Delphi Canada in pursuing legal action against the vendor.

## 7.    Indemnification

Subject to Section 1.3 of this Agreement and the indemnification provisions of the Leases, Delphi Canada shall indemnify, defend and hold harmless GMCL, its directors, officers, employees and agents from and against any losses, claims, damages, costs, expenses, liabilities or actions (including reasonable attorneys' fees) arising out of the performance or failure to perform Services on behalf of Delphi Canada except if GMCL has committed gross negligence or willful misconduct.

## 8.    Audit Rights

The cost of Services provided under this Agreement shall be subject to audit by Delphi Canada or by certified public accountants retained by Delphi Canada at any time during GMCL's normal business hours and upon reasonable notice to GMCL. GMCL shall maintain all relevant records (including all relevant ledgers, books, vouchers, time sheets, billing rates, billing

- 6 -

calculation worksheets, invoices and backup information related thereto from suppliers) in a manner to facilitate such audit throughout the term of each Service, the cost of which is being audited and for one (1) year after the payment due date of the invoice for any such Service even if all or any part of such one (1) year period occurs after the term of such Service, only to the extent consistent with past practices. The provisions of this Paragraph shall continue in full force and effect notwithstanding expiration or termination of this Agreement for any reason. In the event it is discovered, whether through an audit or otherwise, that Delphi Canada has overpaid GMCL, such overpayment shall be refunded to Delphi Canada with interest. Such refund shall be without prejudice to any other remedies Delphi Canada shall have under this Agreement or at law.

9.    Proprietary Information

        In the performance of this Agreement, certain proprietary commercial and financial information of a party (the disclosing party) may be made available to the other party (the receiving party). The receiving party agrees to: (i) exercise reasonable discretion so as to maintain the confidential nature of such proprietary information consistent with the receiving party's procedures for handling similar information of its own, (ii) use such information only in connection with its provision or receipt of Services hereunder, and (iii) not use, disclose, or otherwise divulge such information to others without the prior written authorization of the disclosing party. The receiving party has no obligation with respect to any information which is or becomes publicly known or available to the public through no wrongful act of the receiving party; which is already known to the receiving party at the time of receipt; or which is approved for release by written authorization of the disclosing party.

10.    Force Majeure

        In the event that either party is rendered wholly or partially unable to carry out its obligations under this Agreement because of a lockout or because of causes beyond its reasonable control, including but not limited to, war (whether or not declared), sabotage, insurrection, rebellion, riot or other act of civil disobedience, labour disputes (including strikes), act of a public enemy, act of any government or any agency or subdivision thereof, fire, accident, explosion, epidemic, quarantine, restrictions, storm, flood, earthquake or other act of God, or new laws or regulations forbidding or limiting the execution of this Agreement, then the performance of either party or both parties, as they are affected by such cause, is excused during the continuance of any such inability.

11.    Notices

        All notices, requests, consents, or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when

- 7 -

personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first
business day after sent by reputable overnight carrier.

        If to GMCL:

        General Motors of Canada Limited
        1908 Colonel Sam Drive
        Oshawa, Ontario   L1H 8P7
        Attn: Treasurer
        Fax No.: (905) 644-6273

        With a copy to:

        General Motors of Canada Limited
        1908 Colonel Sam Drive
        Oshawa, Ontario   L1H 8P7
        Attn: General Counsel
        Fax No.: (905) 644-7772

        If to Delphi Canada:

        Delphi Canada Inc.
        c/o Delphi Energy & Chassis Systems
        4800 S. Saginaw Street
        M/C 485-301-140
        Flint, MI 48501
        Attn: President - Pat Straney

        Fax No.:  (810) 257-6957

        With a copy to:

        Delphi Automotive Systems LLC
        5725 Delphi Drive
        Troy, MI  48098-2815
        Attn: Assistant General Counsel, Commercial Practices
        Fax No.:  (248) 813-2491

12.    Entire Agreement

        This Agreement constitutes the entire agreement between the parties with respect
to the subject matter hereof.  All Exhibits attached to this Agreement are incorporated herein and
made a part hereof by this reference.

13.    Waiver

        Any waiver by GMCL or Delphi Canada of any breach or of a failure to comply
with any provision of this Agreement (i) shall be valid only if set forth in a written instrument
signed by the party to be bound, and (ii) shall not constitute, or be construed as, a continuing

- 8 -

waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.

14.    Severability

Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by law.

15.    Specific Performance

Delphi Canada acknowledges that the provision of the Services referenced in Section 1.8 are an integral part of the transaction contemplated by the Asset Purchase Agreement and Oshawa Labour and Management Services Agreement under which Delphi Canada has received a significant benefit. Delphi Canada acknowledges and agrees that a breach of Section 1.8 or termination of those Services prior to the end of their respective term would cause GMCL irreparable harm not compensable in damages. Delphi Canada further acknowledges and agrees that it is essential to the effective enforcement of this Agreement that GMCL be entitled to the remedy of an injunction or specific performance without being required to show irreparable harm.

16.    Amendment

This Agreement may only be amended in writing by duly authorized representatives or officers of the parties.

17.    Counterparts

This Agreement may be executed in counterparts, each of which shall constitute an original although not fully executed, but all of which when taken together, shall constitute an original although not fully executed, but all of which when taken together, shall constitute but one agreement. Delivery by facsimile of this Agreement or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof.

- 9 -

18.    <u>Headings</u>

The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

19.    <u>Governing Law</u>

This Agreement shall be construed and enforced in accordance with the laws of the Province of Ontario, without giving effect to rules governing the conflict of laws.

20.    <u>Defined Terms</u>

All capitalized terms shall have the meaning ascribed thereto in the Asset Purchase Agreement unless otherwise defined in this Agreement.

21.    <u>Disputes</u>

The parties agree that any disputes concerning this Agreement or the subject matter hereof, including the interpretation or application of this Agreement will be settled in accordance with the dispute resolution provisions in the Oshawa Labour and Management Services Agreement as the exclusive remedy of the parties.

22.    <u>Benefit of Agreement</u>

This Agreement shall bind and inure to the benefit of the parties and their successors and permitted assigns, but may not be assigned, subcontracted or delegated by GMCL

- 10 -

or Delphi Canada without the consent of the other Party in its sole discretion.  There shall be no third party beneficiaries of this Agreement or any of its provisions.

**IN WITNESS WHEREOF,** this Agreement has been duly executed by the parties hereto as of the day and year first above written.

**GENERAL MOTORS OF CANADA LIMITED**

By: _____

    Name: L.D. WORRALL

    Title:            Vice-President

By: _____ C.S.

    Name: D.S. ZUR SCHMEDE

    Title:         Vice-President

**DELPHI CANADA INC.**

By: _____

    Name: RICHARD J. WILKINS

    Title: CHIEF FINANCIAL OFFICER

I have authority to bind the Corporation

| APPROVED | |
|---|---|
| FINANCIAL | LEGAL |
| 4/28/00 | 9 29/2000 |
| DATE | DATE Ap |

Administrative Services Agreement (ASA)                 Exhibit 1.1

## Delphi Canada Inc. & General Motors of Canada Ltd.

| Service | Battery Monthly | Annual Cost Battery | Trillut Monthly | Annual Cost Trillut | Annualized Cost Both Plants | Dept Number | Comments/Issues |
|---|---|---|---|---|---|---|---|
| Environmental (incl. Wastewater Treatment) | $5,833 | $69,996 | $4,500 | $54,000 | $123,996 | 19905 | Source: Work effort study 2000 budget |
| Medical Services Regional Personnel | $7,043 | $84,516 | $7,043 | $84,516 | $169,032 | 19955 | ONA negotiationed contract increases |
| Security Services Regional Personnel | $31,161 | $373,932 | $31,161 | $373,932 | $747,864 | 19959 | Security here includes Fire Protection which is a mostly Pinkerton expense and maintence to fire equipment. |
| Security Services Divisional Personnel | $569 | $6,828 | $568 | $6,816 | $13,644 | 19305 | |
| Industrial Hygiene Divisional Personnel | $2,417 | $29,004 | $2,000 | $24,000 | $53,004 | 19105 | This is a natural split out of the allocation to account 19105, was previously only Industrial Hygiene. |
| Health & Safety Divisional Personnel | $2,500 | $30,000 | $2,000 | $24,000 | $54,000 | 19105 | This is a natural split out of the allocation to account 19105, was previously only Industrial Hygiene. |
| Industrial Relations Divisional Personnel | $6,354 | $76,248 | $6,353 | $76,236 | $152,484 | 19205 | 2000 includes CAW National Co-ordination(new) as well as post negotiations benefit book, joint annual meeting, other union (powerhouse) negotiations |
| Div Admin / Employment Equity Divisional Personnel | $4,013 | $48,156 | $4,012 | $48,144 | $96,300 | 19405 | |
| Organization & Employee Dev. Divisional Personnel | $826 | $9,912 | $825 | $9,900 | $19,812 | 19705 | |
| Sal. Personnel/Comp.Ben.Policy Divisional Personnel | $2,000 | $24,000 | $2,000 | $24,000 | $48,000 | 19805 | Salaried Personnel /Compensation Benefit Policy |
| Personnel Admin Regional Personnel | $401 | $4,812 | $400 | $4,800 | $9,612 | 19958 | Wages/Fringe, training travel, Floral Tribute, Call center services. |
| Labour Relations Regional Personnel | $1,311 | $15,732 | $1,310 | $15,720 | $31,452 | 19960 | Labour relations and CAW reps. Interface |
| Cross docking Expense Stores Car Plant | $1,335 | $16,020 | $765 | $9,180 | $25,200 | 19866 | This expense is from the Car plant. |
| Handling Fee Expense Stores Car Plant | $1,890 | $22,680 | $1,890 | $22,680 | $45,360 | 19766/19866 | This expense is from the Car plant. |
| Indirect Material Buyer GMCL Indirect Material Purchasing | $1,583 | $18,996 | $1,583 | $18,996 | $37,992 | 19937 | Source: Assessment Worksheet - Allocation of .75 heads and related costs for indirect purchasing |
| MOA Tracking of Expense | $250 | $3,000 | $250 | $3,000 | $6,000 | | This is the cost that MOA incurs in tracking and billing for expense reports and other ASA billing. |

Delphi Canada Inc. & General Motors of Canada Ltd.

| Service | Battery Monthly | Annual Cost Battery | Trillek Monthly | Annual Cost Trillek | Annualized Cost Both Plants | Dept Number | Comment/Issues |
|---|---|---|---|---|---|---|---|
| Hourly Employment | $417 | $5,004 | $417 | $5,004 | $10,008 | 19961 | |
| Payroll | $28,167 | $338,004 | $21,167 | $254,004 | $592,008 | 36520 | Includes department work effort plus carrier admin costs |
| Timekeeper | $1,750 | $21,000 | $1,750 | $21,000 | $42,000 | | The portion of the timekeeper needed for Delphi personnel. |
| Maintaining Almenu | | $0 | | $0 | $0 | | Special Requests Only (Pay as you Go) |
| Logistics | $0 | $0 | $0 | $0 | $0 | . | There is no fee for this service. Direct freight charges will be handled through Corpay. |
| Supplier Quality Laboratory Salt Spray testing | | $0 | | $0 | $0 | | Assume Delphi has their own salt spray equipment. |
| Totals | $99,820 | $1,197,840 | $89,994 | $1,079,928 | $2,277,768 | | |

Monthly Battery  Annual Battery  Monthly Trillek  Annual Trillek  Total Annual ASX Cost

## Exhibit 5.01(a)(viii)
## Trademark and Trade Name Agreement, dated as of January 1, 1999, between Delphi Automotive Systems Corporation (n/k/a Delphi), DAS, and GM

## TRADEMARK AND TRADE NAME AGREEMENT

This TRADEMARK and TRADE NAME AGREEMENT is made and entered into as of the Effective Date, by and among Delphi Automotive Systems Corporation, a company organized under the laws of the State of Delaware ("DAS"), Delco Electronics Corporation, a wholly-owned subsidiary company of DAS organized under the laws of the State of Delaware ("DE"), Delphi Technologies, Inc., a wholly-owned subsidiary company of DE organized under the laws of the State of Delaware ("DT"), and General Motors Corporation, a corporation organized under the laws of the State of Delaware ("GM").

# WITNESSETH

WHEREAS, GM has created DAS to acquire certain assets and assume certain liabilities of GM's automotive components business.

WHEREAS, DT desires to acquire and GM is willing to assign all of its rights, title and interest to certain trademarks and trade names.

WHEREAS, DT desires to acquire, and GM is willing to grant, a license to use certain trademarks and Trade names worldwide.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, for themselves and their successors and assigns, agree as follows:

1.    DEFINITIONS.    The following terms have the meaning ascribed to them herein:

ACDelco Trademark.    The term "ACDelco Trademark" shall mean the trademarks AC, DELCO, ACDelco and all formatives and derivatives thereof.

Business Sector.    The term "Business Sector" shall mean the Delphi Automotive Systems Group, including its affiliated companies.

GMSPO.    The term "GMSPO" shall mean General Motors Service Parts Operations, a division of GM.

Business Relationship Agreement.    The term "Business Relationship Agreement" shall mean the Delphi/SPO Business Relationship Agreement between DAS and GM included among the Ancillary Agreements to the Master Separation Agreement.

Assigned Trademarks.    The term "Assigned Trademarks" shall mean the "DELPHI" trademark, the other trademarks set forth in Exhibit A, any other trademarks used exclusively in the Business Sector, and all common law rights as well as the applications for and registrations thereof worldwide.

Assigned Trade Names.    The term "Trade Names" shall mean the subsidiary and joint venture company names set forth on Exhibit C, and divisional, departmental and business unit names of the Business Sector immediately prior to the Effective Date.

Legacy Trademarks.  The term "Legacy Trademarks" shall mean the HARRISON, PACKARD, PACKARD ELECTRIC [add PACKARD ELECTRIC to Exhibit A?], SAGINAW, ROCHESTER, NDH trademarks and associated logos which are included in the Assigned Trademarks.

Licensed Trademarks.  The term "Licensed Trademarks" shall mean the ACDelco Trademarks (Exhibit B) and Licensed Delco Electronics Trademarks.

Licensed Trade Name.  The term "Licensed Trade Name" shall mean the Trade name "Delco Electronics" when used in relation to the business of Delco Electronics Corporation and its subsidiaries and affiliated companies (Exhibit D).

Licensed Delco Electronics Trademarks.  The term "Licensed Delco Electronics Trademarks" shall mean the trademarks "DELCO" and "DELCO ELECTRONICS" in block letters or logotype format (Exhibit E) when used in relation to the current business of Delco Electronics Corporation and its subsidiaries and affiliated companies.

Effective Date.  The term "Effective Date" shall mean 1 January 1999.

Products.  The term "Products" shall mean those automotive components manufactured, assembled, designed, processed, marketed, offered for sale, sold, imported, installed or serviced by or in the conduct of the Business Sector immediately prior to the Effective Date.

Quality Standards.  The term "Quality Standards" shall have the meaning described in Paragraph 11 (a) herein.

Territory.  The term "Territory" shall mean worldwide.

Third Party Licensees.  The term "Third Party Licensees" shall mean contract manufacturers/assemblers, licensees, joint ventures and subsidiary companies set forth on Exhibit F.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Master Separation Agreement.

2.    ASSIGNMENT

GM hereby assigns its right, title and interest in and to the Assigned Trademarks, the Assigned Trade Names, the goodwill associated therewith, and all trademark and Trade name license agreements relating thereto worldwide (Exhibit C) to DT and DT shall assume responsibility for all trademark and Trade name applications, registrations, prosecutions, oppositions, cancellations and litigation related thereto.    DT will be responsible for recording such assignments to the extent required by local law; the costs of recording will be considered a Project Oracle expense.

(a)    With respect to the Legacy Trademarks:

2

(i)    DAS agrees that for the duration of the Business Relationship Agreement (through 31 December 2000), and except as provided in Subparagraphs (b) and (c) of this Section, the Legacy Trademarks will be used only in relation to OEM business and will always be used in association with the DELPHI trademark and Trade name.

(ii)    If DAS elects to cancel the Business Relationship Agreement or allow it to terminate, DAS agrees not to use or permit others to use the Legacy Trademarks in relation to aftermarket sales until after 31 December 2001.   However, if GM elects to cancel the Business Relationship Agreement, then DT may use and permit others to use the Legacy Trademarks in relation to aftermarket sales after 31 December 2000.

(iii)    DAS agrees that it will not use the Legacy Trademarks in Europe and South America in relation to aftermarket sales so long as it is using the ACDelco Trademark.

(b)    DT may permit DAS and its subsidiary and affiliated companies and third party licensees to continue to use Legacy Trademarks alone in existing tooling and on current Products; however, when tooling is replaced or refurbished the DELPHI trademark will be substituted for or added to the Legacy Trademark if it is commercially practical to do so.

(c)    DT grants to GM a perpetual, nonexclusive, royalty free license, with the right to sublicense, the Assigned Trademarks or Licensed Delco Electronics Trademarks for use in relation to restoration parts (including all related prints, drawings, specifications and tools) for GM vehicles to the extent such parts are no longer manufactured by DAS or DAS no longer desires to manufacture or have those parts manufactured. GM agrees that all such restoration parts shall comply with provisions corresponding to the Goodwill provisions set forth in Paragraph 8 below, the Protection of Rights provisions provided in Paragraph 9 below and the Quality Control provisions set forth in Paragraph 11 below.   GM also agrees to indemnify DT and its affiliated companies and hold them harmless from any and all liability with regard to such restoration parts. DAS and GM will each appoint a representative to be responsible for restoration parts matters.

(d)    DAS agrees that with regard to the FREEDOM trademark:

3

(i)    In North America, for the duration of the Business Relationship Agreement, it will not use or permit others to use the FREEDOM trademark in the aftermarket either alone or in relation to another trademark and that the FREEDOM trademark will only be used on batteries supplied to and as requested by GMSPO

(ii)    In Europe and South America, with the exception of Brazil and other MERCOSUR countries (Argentina, Paraguay, Uruguay), it will not use, or permit others to' use, the FREEDOM trademark, alone or in relation to DELPHI or any other trademark in the aftermarket until it has ceased use of the ACDelco trademark.  DAS undertakes that it and its distributors and licensees (Exhibit F) cease use of the ACDelco trademark within 12 months of the Effective Date as provided in Paragraph 5(a)(ii).

(e)    GM shall retain ownership of the VOYAGER trademark for marine batteries.  However, GM agrees that it will only use the VOYAGER trademark on marine batteries it purchases from DAS.

(f)    DAS undertakes that it will not adopt and use the part numbers and/or merchandising numbers used by GM for parts sold other than to GM or any other such numbering scheme that would be confusingly similar to that used by GM.  However, this shall not preclude DAS from referring to GM part numbers for cross-referencing purposes.

3.    TRADE NAME/COMPANY NAME CHANGE

DAS undertakes to promptly amend or change the names of the companies listed on Exhibit G so as to eliminate the use of the ACDelco or other GM trademark or Trade name.

4.    GRANT OF TRADE NAME AND TRADEMARK LICENSE FOR DELCO ELECTRONICS

(a)    Trade Name Grant.  GM grants DT the right to grant DE and DE's subsidiaries and affiliates, joint ventures, and sublicensees in existence immediately prior to the Effective Date (Exhibit D) a exclusive, royalty free license to use the Licensed Trade Name.  DE shall display the Licensed Trade Name in the logo type shown in Exhibit E and such other logotypes containing the Licensed Trade Name as DE may adopt (any such logotype being subject to GM's written consent not to be unreasonably delayed or withheld), but DE

4

will not display the Licensed Trade Name in any other logo without prior written approval of GM.

(b)  Trademark Grant.  Subject to the terms and conditions of this Agreement, GM hereby grants DT the right to grant to DE and DE's subsidiaries and affiliates, joint ventures, and sublicensees in existence immediately prior to the Effective Date a royalty free license to use the Licensed Delco Electronics Trademarks on current Products and future automotive audio products.

(i)  The grant shall include all typical uses such as letterhead, business cards, signage as well as the advertising, promotion, distribution, service and sale of products in the Territory except as provided herein, and shall include use as a corporate name as well as a Trade name.

(c)  Sole Use.  DE agrees that its use of the Licensed Trade Name and the Licensed Delco Electronics Trademarks is with the permission of GM.

(d)  Scope of Use.  DE undertakes to wind down the use of the Licensed Delco Electronics Trademarks on products other than automotive audio equipment over a two-year period or as tooling is replaced or refurbished.

(e)  Term.  The term of the license granted in this Section 4 shall be perpetual, fully paid, royalty-free and commence on the Effective Date, and shall continue unless terminated as provided herein or until such time as DE has ceased use of the Licensed Trade Name and Licensed Delco Electronics Trademarks for two years or has notified GM that it has ceased their use.

(f)  Non-Assignment.  It is agreed that nothing contained in this Agreement shall be construed as an assignment or grant to DE, DT or DAS of any other right, title or interest in or to the Licensed Trade Name, it being understood that all rights relating thereto are reserved by GM, except for the license of the right to use and utilize the Licensed Trade Name only as specifically and expressly provided in this Agreement.

(g)  Standard of Conduct.  GM acknowledges that the overall manner in which business is being conducted by DE meets its high standards. So as not to impair the substantial goodwill that GM has built up and

now possesses in the Licensed Trade Name it is an essential condition of this Agreement, and DE hereby covenants and agrees: (i) that the overall manner in which the business will be conducted under this Agreement, and any use of the Licensed Trade Name in connection therewith, shall meet or exceed the standard of DE as of the Effective Date; (ii) that business will be conducted in all material respects in accordance with all applicable and material federal, state and local laws and regulations; and (ii) that the activities of DE hereunder shall not reflect adversely in any material respect upon the good name and reputation of GM.

5.  **GRANT OF TRADEMARK LICENSE TO WIND DOWN USE OF ACDELCO TRADEMARK**

   (a)  **Authorization for Use of ACDelco Trademark on Existing Products and Products Supplied to GM and Third Parties Worldwide and Specific Undertakings in Europe and South America During a Wind Down Period.**

   GM grants to DT the right to grant to DAS and its subsidiaries and affiliates, joint ventures, and sublicensees in existence immediately prior to the Effective Date a royalty free license to use (1) the ACDelco Trademark on and in connection with existing Products and other finished goods inventory as of the Effective Date, (2) the ACDelco Trademark, or such other GM owned trademark specified by GM in a Purchase Order, on and in connection with products made by or for supply to GM and its subsidiaries; (3) the ACDelco Trademark on and in connection with Products made by or for DAS and its subsidiaries and affiliates, joint ventures, and sublicensees in existence immediately prior to the Effective Date not supplied to GM.

   (i)  The grant shall include the manufacture (including the right to have made), packaging, advertising, promotion, distribution, service and sale of such Products in Europe and South America only by or for DAS and its subsidiaries and affiliates, joint ventures, and sublicensees in existence immediately prior to the Effective Date.

   (ii)  DAS undertakes to wind down all use of the ACDelco Trademark and cause all of the distributors and dealers of DAS to remove all ACDelco signs and cease use of letterhead and business cards bearing the ACDelco Trademark within twelve (12) months of the Effective Date.

6

(b)    <u>Special Undertakings with Respect to Brazil/MERCOSUR</u>

GM grants to DT a royalty free license to use and authorize others to use DELCO in conjunction with FREEDOM for batteries in the MERCOSUR region (Brazil, Argentina, Paraguay, Uruguay) during a wind down period from 1/1/99 (Effective Date) until 12/31/99, with no extensions permitted thereafter. The license extends to "battery specialists" in Brazil who use DELCO FREEDOM on signs, trucks and buildings as well.

(i)    DT is unrestricted as to its use of FREEDOM as a brand.

(ii)    GM may begin selling ACDelco batteries in Brazil on or after 1 January 2000.

(iii)    GM is unrestricted from using the ACDelco Trademark on other parts in Brazil.

(iv)    GM may continue using ACDelco on batteries it sells in MERCOSUR countries other than Brazil.

(c)    <u>Provision for the Use of the ACDelco Trademarks by Third Parties During Wind Down Period</u>

It is agreed that DAS and GM will use their best efforts to identify all situations where DAS will be assigned the business relationship with a joint venture or other third party and such entity has a pre-existing trademark license with GM to use the ACDelco Trademark (Exhibit F) and address them in the following manner within 12 months of the Effective Date:

1.    Assign a priority to each of the joint ventures and third party relationships that have been identified.

2.    For each such joint venture or third party relationship, identify the appropriate operating units of DAS and GM and the appropriate personnel including attorneys for DAS and GM as necessary and develop a resolution that is satisfactory to all parties and implement it in agreements accordingly.

7

Desired resolutions include:

(a)    Recognizing GM ownership of the ACDelco Trademark;

(b)    GMSPO controlling the distribution of all products sold under the ACDelco Trademark;

(c)    Aligning the time periods for trademark license and distribution agreements (Middle East Battery);

(d)    ACDelco product manufactured by third parties being sold to GM (Zhuzhou);

(e)    Joint ventures or third parties ceasing use of ACDelco Trademark on products sold to third parties.

3.    If it is not possible to amend such pre-existing trademark license agreements in a manner satisfactory to all parties and DAS is deriving financial benefit from the joint venture or third party, then DAS agrees to pay GM a royalty or fee on an annual basis for products sold by the entity under the ACDelco Trademark, calculated as follows:

(a)    50% of dividends received by DAS from that entity; plus

(b)    1/3 of any royalty received by DAS on technology or know-how licensed to such entity; plus

(c)    3% of DAS' source plant revenue on sales to that entity;

but not to exceed 3% of the ex-works price of all products sold by the entity under the ACDelco Trademark.

4.    If there are any agreements under which a royalty is received by DAS based solely on granting permission to use and distribute under the ACDelco Trademark such agreements and royalty stream shall be assigned to GM.

(d)    Payment, Records and Reports.

DAS agrees to provide an annual statement summarizing the royalties, revenue and/or dividends received from each of the Third Party Licensees listed on Exhibit F as long as those companies continue to use the ACDelco Trademark. Such statement as well as the royalty payment shall be made and provided within sixty days after the anniversary date of the Effective Date. Further, DAS shall keep accurate books of account and records covering all transactions relating to

8

Paragraph 5(c)(3 and 4) of this Agreement and GM or its
nominee shall have the right at all reasonable business hours to
examine said books of account and records and all other
documents and material in the possession or under the control of
DAS and shall have free and full access thereto for said
purposes and for the purpose of making extracts therefrom.
DAS must segregate its records in such a manner as to facilitate
a complete audit and agrees that such audit may be used as a
basis of settlement of charges in accordance with this
Agreement. Examinations under this paragraph shall be
conducted during normal business hours with notice of such
examination provided to DAS at least one week prior to such
examination, and no more often than once each calendar year.
DAS agrees to maintain such records for at least two years.

6.    LIMITATIONS TO DAS' RIGHTS.

DAS shall not use the Licensed Trademarks directly or indirectly on or in
connection with, or in relation to, any product except as provided herein.
DAS shall not make trademark use of - the Licensed Trademarks or any
confusingly similar forms of, variation on, or alternative spelling of the terms
"AC", "DELCO", "ACDelco", "GM" or "GENERAL MOTORS", or other
Licensed Trademark except as provided in this Agreement. No other right or
license is granted hereby by implication or otherwise under any other mark,
trademark, service mark or Trade name of GM.

7.    LIMITATIONS TO GM'S RIGHTS.

Except with respect to issuing license agreements to third parties for parts
and components used in the restoration of GM vehicles as provided in
Paragraph 2(c), GM shall not use, and will not directly or indirectly authorize
or permit any third party to use the Assigned Trademarks or the Assigned
Trade Names (or any confusingly similar form of variation on, or alternative
spelling thereof), directly or indirectly on or in connection with or in relation
to any products or services.

8.    GOODWILL

DAS recognizes the value of the goodwill associated with the Licensed Trade
Name and the Licensed Trademarks and acknowledges that the Licensed
Trade Name and Licensed Trademarks, and all rights therein and the goodwill
pertaining thereto, belong exclusively to GM and that the Licensed Trade
Name and Licensed Trademarks have acquired secondary meaning in the
mind of the public in association with GM. Notwithstanding anything to the

9

contrary expressed in this Agreement, DAS shall not acquire, be deemed to have acquired and shall not claim any rights to the Licensed Trade Name and Licensed Trademarks other than the rights granted by GM under this Agreement.

9.    PROTECTION OF RIGHTS

(a)    Conduct of DAS.  DAS agrees that it will not knowingly do or suffer to be done during the term of this Agreement any act or thing that will materially impair the rights of GM in and to the Licensed Trademarks or Licensed Trade Name then licensed hereunder.  GM hereby agrees to indemnify and defend DAS and its subsidiaries and affiliates and authorized licensees and undertakes to hold them harmless against any claims or suits to the extent that such claim or suit arises out of the use by DAS or its subsidiaries or affiliates or authorized licensees of the Licensed Trademarks and Licensed Trade Name as authorized in this Agreement, provided that the claim or suit arises in the Territory and prompt notice is given to GM of any such claim or suit and provided further that GM shall have the option to undertake and conduct, at GM's expense, the defense of any suit brought and that no settlement of any such claim or suit is made without prior written consent of GM (which consent shall not be unreasonably delayed or withheld).  DAS or its subsidiary shall participate in such defense, at its own expense, to protect its interests.   GM shall keep DAS informed on all material developments throughout the progress of any such defense, and GM shall not, without DAS' prior approval, which approval shall not be unreasonably withheld, enter into any consent, settlement, or other agreement which materially diminishes or restricts any rights under this Agreement or places any material restrictions or conditions upon use of the Licensed Trademarks or Licensed Trade Name as provided in this Agreement.

(b)    Assistance.  DAS agrees to assist GM to the extent necessary in the procurement of any protection or to protect any of GM's rights in and to the Licensed Trademarks or Licensed Trade Name.  To this end, GM may commence or prosecute, at GM's expense, any claim or suits in its own name, in the name of DAS or may join DAS as a party thereto. Each party shall promptly notify the other in writing of any material infringement of the Licensed Trade Name or imitation by others of the Licensed Trademarks on goods the same as or similar to the products covered by this Agreement which may come to such party's attention. The parties shall promptly consult with each other and use their best efforts to agree upon a course of action to be taken with respect to such infringement, including conducting an analysis as to whether the goods are counterfeit, provided, however, that GM shall have the sole right to determine whether or not it takes any action on account of any

10

such infringement or imitation.  If GM decides not to take action, DAS
or a DAS subsidiary may then take action in its own name and at its
expense and discretion and may join GM as a party to the extent
necessary, provided that DAS indemnifies and defends and holds GM
harmless from any claims, suits, or counterclaims resulting therefrom.

(c)   No Registration.  Except as otherwise provided in this Agreement, DAS
shall not attempt to register the Licensed Trademarks, or any formative
thereof, alone or as part of its own trademark, nor shall DAS use or
attempt to register any marks which are likely to be confusingly similar
to or constitute a colorable imitation of the Licensed Trademarks.  This
undertaking shall survive the termination of this Agreement.

(d)   Registration and Registered User.  GM has in GM's name registrations
of the Licensed Trademarks in the Territory.  In the event that DAS or a
DAS subsidiary or affiliate desires to market products bearing the
DELCO or DELCO ELECTRONICS trademark in any country where they
are not adequately registered, DE or DT shall first promptly notify GM
so appropriate trademark applications can be filed by GM and where
necessary registrations issued before any manufacturing or marketing of
such products shall commence; provided that GM shall instruct the
filing of any application within sixty (60) days after receipt of the notice
to GM.  DAS agrees to cooperate with GM in having DAS, DT and/or
DE recorded as a registered user where GM in its sole discretion deems
that such recordal is necessary.

(e)   Maintenance.  DAS agrees to reimburse GM for its out-of-pocket costs
associated with filing new applications, renewing, filing affidavits and/or
evidence of use, or other taxes, expenses or fees associated with
maintaining the Licensed Delco Electronics Trademark registrations in
the Territory, recording as a registered user DAS, DT and/or DE or
others with which DT has a trademark/technology agreement and costs,
attorneys, investigators and other fees associated with taking
reasonable action against infringers or counterfeiters of the Licensed
Delco Electronics Trademarks in the Territory.  GM shall endeavor to
give DAS three (3) months' prior notice of the deadlines for such
maintenance and renewal and in countries where there is no actual or
contemplated use the option of declining to maintain or renew such
registrations or recordals.  Each party shall furnish the other with all
reasonable requested information and documentation (including the
execution and delivery of any appropriate and accurate affidavits,
declaration, oaths and other documentation) to assist the other in
obtaining or maintaining trademark registrations or other forms of
intellectual property protection and registrations and in any litigation or
administrative proceeding related thereto.

11

(f)   <u>No Assignment</u>.  It is agreed that nothing contained in this Agreement shall be construed as an assignment or grant to DAS of any right, title or interest in or to the Licensed Trademarks, it being understood that all rights relating thereto are reserved by GM, except for the license of the right to use and utilize the Licensed Trademarks only as specifically and expressly provided in this Agreement.

10.   <u>INDEMNIFICATION</u>

Except for claims of trademark or Trade name infringement, DAS agrees to indemnify GM and hold it harmless from all claims arising out of its use and/or use by third parties authorized by it of the Licensed Trademarks and Licensed Trade Names.

11.   <u>QUALITY CONTROL</u>

(a)   <u>Quality Standards</u>.  GM acknowledges that the Products currently manufactured by its Business Sector meets its high standards for quality.  DAS acknowledges that if the Products it manufactures after the Effective Date were to be of inferior quality in design, material or workmanship, the substantial goodwill that GM has built up and now possesses in the Licensed Trademarks would be impaired.  Accordingly, it is an essential condition of this Agreement, and DAS hereby covenants and agrees:  (i) that the overall quality of the Products covered by this Agreement, and any use or depiction of the Licensed Trademarks in connection therewith, shall continue to meet or exceed the overall standard and quality of the Products manufactured by or for the Business Sector as of the Effective Date; and (ii) that products bearing the Licensed Trademarks will be of merchantable quality as defined in the Uniform Commercial Code and will be manufactured, imported, promoted, sold, distributed and exploited in all material respects in accordance with all applicable and material federal, state and local laws and regulation; however, this clause does not apply as a warranty with respect to goods supplied to GM or others.  In addition, if any Product sold by DAS to GM under the Business Relationship Agreement is resourced by GM because of DAS' breach of the quality requirements of such agreement, then DAS will not thereafter without GM's written authorization use the Licensed Trademarks to promote that particular Product for sale in the same application as original equipment or new service parts.

(b)   <u>Reporting and Inspection</u>.  In order to verify that DE is continuing to maintain the Quality Standards as required under this Agreement, at GM's reasonable request DE shall deliver to GM or its designee sample

12

Products bearing the Licensed Delco Electronics Trademarks together with information relating to the design, specification, manufacture and reliability of products including but not limited to those supplied to GM pursuant to the Business Relationship Agreement.    This requirement shall survive the termination of such Business Relationship Agreement.

(c)    Advertising.   DE shall provide GM, at GM's request, a representative sampling of all current or proposed tags, labels, identification plates, packaging, advertising copy, brochures, catalogs, marketing and promotional materials, bearing the Licensed Delco Electronics Trademarks or Licensed Trade Name not previously provided pursuant to this provision (individually or collectively, the "Material") for GM's review of (i) the manner in which the Licensed Delco Electronics Trademarks and Licensed Trade Name are used and depicted and (ii) conformity to the Quality Standards.   GM shall use its best efforts to respond with any reasonable objections thereto in writing within fourteen (14) days, and the parties will use their best efforts to resolve in good faith such objections. If GM shall fail, however, to object in writing within thirty (30) days after receipt of the Material, it shall be deemed to have consented to DE's use of the Material.   Such consent by GM shall not constitute a waiver of DAS' other duties under this Agreement.

12.    TERMINATION

(a)    Bankruptcy.   If any party (i) files a voluntary petition for an order of relief in bankruptcy; (ii) is adjudicated a bankrupt; (iii) has an involuntary petition in bankruptcy filed against it which remains unstayed or undismissed for sixty (60) days following the filing thereof; (iv) makes an assignment for the benefit of its creditors or pursuant to any bankruptcy law; or (v) has a liquidating receiver appointed for it or for its business, the license hereby granted to that party shall automatically terminate without any notice being necessary.

(b)    Material Breach.   If any party commits a material breach of any of its obligations under this Agreement, any other party shall have the right to terminate the license granted to that party upon ninety (90) days prior written notice ("Notice Of Termination"), and such Notice Of Termination shall become effective unless the breaching party shall have substantially remedied the breach within the ninety (90) days and the breaching party is working in good faith to fully remedy such breach.

13

13.    DISPOSAL OF STOCK UPON TERMINATION

DAS and its subsidiaries and affiliates and authorized licensees may dispose
of products bearing Licensed Trademarks which were manufactured prior to
the time of termination.   DAS shall in no event manufacture, promote,
assemble, sell, exploit or dispose of any Product bearing Licensed
Trademarks after termination of   its license, where such termination was
based on the material departure by DAS from the Quality Standards required
by Paragraph 11 of this Agreement.

14.    EFFECT OF TERMINATION

Upon and after the termination of a license, such license shall forthwith
revert to the grantor, and the licensee shall execute any instruments
reasonably requested to accomplish or confirm the foregoing, provided,
however, that such termination shall not in any way diminish, limit, revoke,
or cause any reversion of, DT's rights to the Assigned Trademarks and
Assigned Trade Names transferred and assigned pursuant to Paragraph 2 of
this Agreement.

15.    REMEDIES

(a)    No Waiver.  The resort by any party to any remedies referred to herein
shall not be construed as a waiver of any other rights or remedies to
which such party is entitled under this Agreement or otherwise.

(b)    Remedies Cumulative.   All rights and remedies of a party hereto
whether evidenced hereby or arising as a result of any other contract,
agreement, instrument or law shall be cumulative and may be exercised
singularly or concurrently.

16.    NOTICES

All communications, notices and exchanges of information contemplated
herein, or required or permitted to be given under this Agreement, must be in
writing and will be deemed effective when delivered in person or on the third
business day after the day on which such notice is mailed by the highest
class of regular mail to the following addresses:

14

If to GM:

General Motors Service Parts Operations

6200 Grand Pointe Drive

P.O. Box 6020

Grand Blanc, MI  48439

Attention:  General Manager

With a copy to:

General Motors Corporation

Office of General Counsel

3031 W. Grand Boulevard

P.O. Box 33114

Detroit, Michigan  48232-5122

Attention:  Trademark Counsel

If to DAS, DE or DT:

Delphi Technologies, Inc.

Legal Staff

Delphi Drive

Troy, Michigan

17.    RELATIONSHIP BETWEEN THE PARTIES

Nothing in this Agreement shall be construed to place the parties in a relationship whereby either shall be considered to be the agent of the other for any purpose whatsoever.  Neither party is authorized to bind the other party or to enter into any contract or assume any obligation for the other. Any such unauthorized act will be null and void as to the party for which such obligations were assumed.    Nothing in this Agreement shall be construed to establish a relationship of partners or joint ventures between GM and DAS.    Each party is individually responsible only for its own obligations, duties and promises as set out in this Agreement.

18.    ASSIGNMENT OR SUBLICENSE

The licenses granted in this Agreement and each part hereof and all rights
and duties hereunder are personal to the parties and except as provided
herein and shall not be assigned, mortgaged, sublicensed or otherwise
encumbered. Notwithstanding the foregoing, GM may assign this Agreement
to any wholly owned subsidiary company of GM, and DAS, DE and DT may
assign their rights under this Agreement as part of an internal reorganization
or to the successor of all or substantially all of their business.

19.    PRESS RELEASES OR PUBLIC STATEMENTS

DAS agrees to submit to GM for its prior review and approval any and all
press releases or other public statements or communications relating to its
ongoing ability to use the ACDelco trademarks as provided in this
Agreement.

20.    NO WAIVER, ENTIRE AGREEMENT

None of the terms of this Agreement can be waived or modified except by an
express agreement in writing signed by all of the parties.    There are no
representations, promises, warranties, covenants or undertakings other than
those contained in this Agreement and Exhibits hereto, and the Master
Separation Agreement and its Ancillary Agreements, which represent the
entire understanding of the parties hereto relating to the subject matter
thereof.    The failure of either party hereto to enforce, or the delay by either
party in enforcing, any of its rights under this Agreement shall not be deemed
a continuing waiver or a modification thereof, and either party may, within
the time provided by applicable law, commence appropriate legal proceedings
to enforce any or all of such rights.    No person, firm, group or corporation
other than GM and DT (and DAS and DE to the extent provided in
agreements with DT) shall be deemed to have acquired any rights by reason
of anything contained in this Agreement.

21.    MISCELLANEOUS

(a)    Controlling Law.    This Agreement shall be considered as having been
entered into in the State of Michigan, without giving effect to the
principles of conflict of laws, and shall be construed and interpreted in
accordance with the laws of that State.

16

(b) <u>Service of Process</u>.    Service of process shall be effective if mailed pursuant to Paragraph 16 hereof.

(c) <u>Singular Shall Include Plural</u>.    Whenever required by the context, the singular shall include the plural and the plural the singular, and the masculine shall include the feminine and neuter.

(d) <u>Severability</u>. The provisions of this Agreement shall be severable, and if any provision of this Agreement shall be held or declared to be illegal, invalid or unenforceable in any jurisdiction, such illegality, invalidity or unenforceability shall not affect any other provision hereof or the interpretation and effect of this Agreement as to any other jurisdiction, and the remainder of this Agreement, disregarding such illegal, invalid or unenforceable provision shall continue in full force and effect as though such illegal, invalid or unenforceable provision had not been contained herein.

(e) <u>Heading</u>.    Headings or titles to Paragraphs or subparagraphs in this Agreement are for the convenience of reference only and shall not affect the meaning or interpretation of this Agreement or any part hereof.

(f) <u>No Modifications</u>.    This Agreement may not be released, discharged, abandoned, changed or modified in any manner except in an instrument signed by each of the parties hereto.

(g) <u>No Strict Construction</u>.    The language used in this Agreement shall be deemed to be language chosen by all parties hereto to express their mutual intent, and no rule of strict construction against either party shall apply to any term or condition of this Agreement.

(h) <u>Signature Representation</u>.    Each person who signs this Agreement on behalf of a party hereto represents and warrants that he has the proper authority to execute this Agreement on such party's behalf.

17

IN WITNESS WHEREOF, GM, DAS, DE and DT have caused this Agreement to be executed by their duly authorized representatives on the day and year first written above.

GENERAL MOTORS CORPORATION
SERVICE PARTS OPERATIONS

BY _____

TITLE   V.P. & GENERAL MANAGER

DELCO ELECTRONICS CORPORATION

BY _____

TITLE _____

DELPHI AUTOMOTIVE
SYSTEMS CORPORATION

BY _____

TITLE _____

DELPHI TECHNOLOGIES, INC.

BY _____

TITLE _____

18

IN WITNESS WHEREOF, GM, DAS, DE and DT have caused this Agreement to be
executed by their duly authorized representatives on the day and year first written
above.

GENERAL MOTORS CORPORATION          DELPHI AUTOMOTIVE

                                    SYSTEMS CORPORATION


BY_____           BY _____
                                         Alan S. Dawes

TITLE_____           TITLE____Vice President_____


DELCO ELECTRONICS CORPORATION       DELPHI TECHNOLOGIES, INC.


BY_____           BY_____
     David B. Wohleen                    Andrew Brown, Jr.

TITLE____President_____           TITLE_____President_____

18



IN WITNESS WHEREOF, GM, DAS, DE and DT have caused this Agreement to be executed by their duly authorized representatives on the day and year first written above.

GENERAL MOTORS CORPORATION     DELPHI AUTOMOTIVE

SYSTEMS CORPORATION

BY _____     BY _____
                                             Alan S. Dawes

TITLE _____    TITLE    Vice President

DELCO ELECTRONICS CORPORATION   DELPHI TECHNOLOGIES, INC.

BY _____     BY _____
     David B. Wohleen           Andrew Brown, Jr.

TITLE   President        TITLE   President

18

## EXHIBIT A

### ASSIGNED TRADEMARKS

ACTIVE AUDIO

AIRSTAR

AUDYSSEY

AUTRA

CASM

CHIPSTACK

COMMUNIPORT

DE & DESIGN



DELPHI

DECISE

DELIGHT

DRB



DYNAVOLT

E-LOC

E-TUNE

E-Z-PACK

ENERGEN

ETR

EYECUE

FORESIGHT

1

## EXHIBIT A

FOREWARN

FREEDOM

GALILEO

GOLD DOT

GT CONNECTION SYSTEM

GUIDESTAR

HARRISON

HARRISON
& DESIGN



HYATT

INLAND



INLITE

INTELLEK

INTELLI-GUARD

IONITE

IZON

KLAXON

LITECAST

LITEFLEX

MAGNARIDE

MAGNASTEER

MICRO-MAX

MINI-WEDGE

2

## EXHIBIT A

MONSOON

MULTEC

MUSIC IMMERSION

NDH

P.E.D.

PACK-CON

PACKARD

PACKARD LOGO



PASSKEY

PLEASURIZER

PLIACELL

RAT

ROCHESTER

RP



RP



SAGINAW

SAGINAW LOGO



SEALRATER

SENTRI-SEAL

3

## EXHIBIT A

SKYHOOK

SUPERLIFT

TELEPATH

THE SMARTS WITHIN

THEFTLOCK



TBI

TILT WHEEL
LOGO



UNI-SET

4

# EXHIBIT A

## COMMON LAW TRADEMARKS

ACTRA
ADAPTIVE PROTECTIONS SYSTEM
ADAPTIVE RESTRAINT TECHNOLOGY
ADCAT
AGILON
COM-PACK
CONDELP
CRUISESTEER
DBC7
DEL-PACK
DHT-3
DOCK AND LOCK
E-STEER
E-H-STEER
EASYSPLICE
EXA-LIGHT
EZDEK
EZDOOR
EZGLASS
EZHATCH
FLEXA-LIGHT
FLEXISPLICE
FLEXWIRE
GASCAT
HID
HV3
IMAGI-KNIT
INFI-KNIT
INFINITILT
INNOVENT
INTELLIGENT PROTECTION SYSTEM
INTELLSTART
INVISAMOD
LINEAX
LIGHTPACK
LIGHTSAVER
LITE PACK
LOGISTIX
LUXURYTILT
MAESTRO
MAGICDOOR
MAGNA RIDE
METRI-PACK
MICRO
MICRO-PACK
OES
OPEN COCKPIT
OPTI-LIGHT
OPTI-NET
QUADRASTEER
POWERMASTER

5

# EXHIBIT A

### COMMON LAW TRADEMARKS

POWEREADY
POWERTRAXX
PROFILER
PROJECT RIDE PROFICIENT
REACTRA
SENSORSTEER
SMARTSPEED
SNOISE
SPLICE SAVER
STAR-LIGHT
STEERLITE
SUPERPLUG
TACTIX
TORSO-LOCK
TUNING FORK
TRAXXAR
UNI-SOURCE
UTJII
VARISPLICE
VIRTUOSO
VERSA-LIGHT
WIRE TO BUMP
XDELP
ZNOISE
064
3D-KNIT

## EXHIBIT B

## LICENSED TRADEMARKS

AC in Bullseye



AC in Circle



AC

**AC**

AC-DELCO

ACDELCO



ACDELCO



## <u>EXHIBIT B</u>

ACDELCO
Tri-shield



SPLIT CIRCLE



2

## EXHIBIT C

ASSIGNED TRADEMARK/TRADENAME AGREEMENTS

Aegis Technologies
Alambrados Y Circuitos Electronicos
Ambrake
American Axle
Arco
Arabian Battery Holding Company
Arneses Electricos Automotrices SA de CV
Auto Cable Industries Ltd.
Autoensambles Y Logistica SA de CV
Beijing Delphi Automotive Systems Co., Ltd.
Blaimer 2
Calsonic Harrison Co., Ltd.
Carquest
Cei, Co., Ltd.
Centro Tecnico Herramental SA de CV
Cofomat
Compagnie Des Faiscaux Tunisiens International SA
Componentes Delfa, CA
Cordoflex do Brasil
Delnosa
Delphi Alambrados Automotrices
Delphi Alambrados and Circuitos Electricos SA de CV
Delphi Automotive Systems Australia, Ltd.
Delphi Automotive Systems China Inc.
Delphi Automotive Systems do Brasil
Delphi Automotive Systems Deutschland GMBH
Delphi Automotive Systems Espana SA
Delphi Automotive Systems France SA
Delphi Automotive Systems (M) SDN BHD
Delphi Automotive Systems Private Ltd. (Pte)
Delphi Automotive Systems International Inc.
Delphi Automotive Systems International Inc. - Beijing
Delphi Automotive Systems International Inc. - Changchun
Delphi Automotive Systems International Inc. - Shanghai
Delphi Automotive Systems Luxembourg
Delphi Automotive Systems Overseas Corporation
Delphi Automotive Systems Poland
Delphi Automotive Systems Pvt Ltd. – Chassis
Delphi Automotive Systems Pvt Ltd. – E & E
Delphi Automotive Systems Pvt Ltd. – Packard
Delphi Automotive Systems Pvt Ltd. - Saginaw
Delphi Automotive Systems SA de CV
Delphi Automotive Systems Sweden
Delphi Automotive Systems Thailand, Inc.
Delphi Automotive Systems (Thailand) Ltd.
Delphi Automotive Systems Uk Ltd.
Delphi Automotive Systems Vienna GMBH
Delphi Cableados

1

## EXHIBIT C

Delphi Calsonic Compressors SAS
Delphi Cetesa, SL
Delphi Chassis Systems Krosno SA
Delphi Cisa SA
Delphi Colvegasa, SA
Delphi Components Mecanicos de Matamoros
Delphi Components SA
Delphi Energy and Engine Management Systems (Malaysia) SDN BHD
Delphi Energy and Engine Management Systems – UK Overseas Corporation
Delphi Ensamble de Cables Y Componentes
Delphi Ensamble de Cubiertas Automotrices
Delphi Gliwice SP
Delphi Harrison Calsonic
Delphi Inlan – Industria de Componentes Mecanicos, SA
Delphi Interior & Lighting Systems South Africa
Delphi Italia Automotive Systems SRL
Delphi Italia Service Center SRL
Delphi L'em Argentina SA
Delphi Merit, SA
Delphi Overseas Corporation
Delphi Packard Austria
Delphi Packard Deutschland GMBH
Delphi Packard Electric (Guangzhou) Co., Ltd.
Delphi Packard Electric Sielin Argentina, SA
Delphi Packard Electric Systems Malaysia SDN BHD
Delphi Packard Electric Systems Philippines Inc
Delphi Packard Electric Systems Venezuela
Delphi Packard Elektrik Sistemleri Ltd., Sti.
Delphi Packard Hungary Kft
Delphi Packard Romania SRL
Delphi Packard Systems Electricos, SA
Delphi Polska Automotive Systems SP.Z.O.O.
Delphi Rimir
Delphi Saginaw Lingyun Driveshaft Co., Ltd.
Delphi Saginaw Nsk Company Ltd.
Delphi Saginaw Steering Systems Ltd.
Delphi Shanghai Steering And Chassis Systems
Delphi Sistemas de Energia E Controlo de Motors, LDA
Delphi Steering (Malaysia) SDN BHD
Delphi Sistemas de Energia
Delphi Unicables, SA
Deltronics de Mataboros
DHB Componentes Automotivos, SA
Diavia Aire SA
Diavia SRL
DRB SA
El Teriak
Epec
Exhaust Systems Corporation
Flip Chip Technologies LLC
General Bearing Corp
HE Microwave LLD
Hezhong Automotive Component Co.
Hubei Delphi Automotive Generator Co., Ltd.

## EXHIBIT C

ITT Automotive Mabu
Kabelindo Munri PT
KDS Company, Ltd.
Kyungshin Delphi Packard
MB Cable Confections SDN BHD (M)
Merit Verwaltungs GMBH
Noteco Comercio E Particpacoes Ltda
Packard Cta Pty Ltd.
Packard Electric Baicheng Co., Ltd.
Packard Electric Baicheng Ltd., Chanchun Service Center
Packard Electric Czech Republic
Packard Electric Hebi Co., Ltd.
Packard Electric Ireland, Ltd.
Packard Electric Shanghai Co., Ltd.
Packard Electric Systems Samara Cable Company
Packard Electric VAS KF
Pietong Engine Co.
Promotora – Arcomex I
Promotora – Arcomex II
Promotora – Arela I
Promotora – Arela II
Promotora – Arela III
Promotora – Arela V
Promotora – Arela VI
Promotora – Arela VII
Promotora – Arela VIII
Promotora – Cordaflex I
Promotora – Cordaflex II
Promotora – Macopel SA de CV
Promotora de Partes Electricas
Promotora de Partes Electricas Automotrices
PT Packard Kabelindo Murni Indonesia
Reinshagen GMBH
Reinshagen Italia SRL
Reinshagen Tournai SA
Reinshagen UK Branch
Rio Bravo Electricos
Saginaw Delhi Automotive Latch
Saginaw Deutschland GMBH
Saginaw Norinco Lingyun Driveshaft Ltd.
Saginaw Zhejiang Xiaoshan Steering Gear Co., Ltd.
Samaro Cable Co
Sanyco
Sengton Transportation Implement Company
Shanghai Delphi Automotive Air Conditioning Systems Co. Ltd.
Shanghai Saginaw Dongfeng Steering Gear Co., Ltd.
Shinsung Packard Company Ltd.
Sistemas Electricos y Conmutadores
Sistemas Para Automotores de Mexico
Society Francaise Des Amortisseurs De Carbon
Sodex
Sonigistix
Sung San Co., Ltd.
Tianjin Delphi Suspension Systems Co., Ltd.

3

## EXHIBIT C

Torrington
Typro SA de CV
Voltas
Zhejiang Delphi Asia Pacific Brake Co., Ltd.

4

# EXHIBIT D

## LICENSED DELCO ELECTRONICS TRADENAMES

Delco Electronics Asia Pacific Pte., Ltd.

Delco Electronics Corporaiton

Delco Electronics Europe GMBH

Delco Electronics International Inc. (DEII)

Delco Electronics Overseas Corporation U.K. Branch

Delco Electronics Singapore Pte., Ltd.

Delco Electronics International Inc.

Shanghai Delco Electronics & Instrumentation Co., Ltd.

1

## EXHIBIT E

### LICENSED DELCO ELECTRONICS TRADEMARKS

DELCO

**Delco**

DELCO
ELECTRONICS

DELCO ELECTRONICS
LOGO



DELCO-LOC II

DELCO-LOC II

DELCO SOUND

## EXHIBIT F

### THIRD PARTY USE OF ACDELCO TRADEMARK

AC Battery Co.

Arlamex

ASEC (Allied Signal Catalyseurs Pour L'Environment SA)

Asermex

Bakony

Bujias De Colombia

Bujias Mexicanas

Delco Chassis Nsk

Empreses ca le de Tlaxcala

Katcon Sa de Cv

Middle East Battery Company

Sistemas de Frenos

Zhuzhou Spark Plug Plant

1

## EXHIBIT G

### TRADENAME CHANGE

AC Battery Co.

AC Delco Systems Australia

AC Rochester Malaysia

AC Rochester Overseas Corporation

Controlodora General Motors

Delco Chassis NSK Do Brasil LTDA.

GM Holding (Portugal) SGBS LTD.

Productos Delco De Chihuahua (Maquiladora Operations)

Shanghai Delco International Battery Co., LTD.

1