## Exhibit 5.01(b)(i)

**UAW – GM – Delphi Memorandum of Understanding
Regarding Benefit Plan Treatment between UAW, GM, and Delphi Automotive Systems
Corporation (n/k/a Delphi), dated September 30, 1999**

## UAW-GM-DELPHI MEMORANDUM OF UNDERSTANDING
### BENEFIT PLAN TREATMENT

It is recognized that the separation of GM and Delphi has raised issues which are of concern to employees. In order to address these issues it is agreed that the following will apply.

1. DIVESTED UNITS

    a.    Benefit treatment of employees at divested units (see Attachment A) will be as set forth in the applicable memorandum of understanding negotiated with the UAW to address the particular divestiture. Where service at a divested unit is referenced in this Understanding, such service applies only pursuant to the terms of an applicable memorandum of understanding for a divested unit listed in Attachment A.

    b.    Nothing contained in this Understanding increases or decreases the benefit entitlement of any employee impacted by a prior divestiture. For example, employment at Delphi will be treated the same as employment at GM for purposes of suspension of pension payments upon re-employment.

2.    SUB/GIS AND JOBS PROGRAM

    a.    Delphi Employees are not entitled to any benefits under the GM-UAW SUB Plan, GIS Program, or JOBS Program. Any such benefits payable will be paid consistent with Plan provisions under the Delphi-UAW National Agreement.

    b.    Assets in the GM-UAW Layoff Benefit trust as of May 28, 1999 will be allocated based on the proportion that the number of Delphi-UAW eligible employees bears to the sum of all GM-UAW eligible employees plus Delphi-UAW eligible employees as of May 28, 1999.

3.    PENSIONS

a.1.    Delphi established a defined benefit pension plan (hereinafter referred to as the Delphi Pension Plan), effective as of May 28, 1999, covering all Delphi Employees which contains terms identical to the GM Pension Plan except for those provisions required to be changed as a result of a new plan sponsor and the provisions addressed in this Understanding. The intent of the parties is to provide Delphi Employees with benefits from the Delphi Pension Plan which, apart from any difference that may result from future bargaining, in aggregate, will equal the benefits that would have been provided had the separation of Delphi not occurred.

## DELPHI PENSION PLAN INCLUDING MOVEMENT TO GM AFTER MAY 28, 1999

The Delphi Pension Plan will also provide as set forth in 3.a.2. through 3.a.9., the following:

a.2.    The Delphi Pension Plan will recognize the credited service accrued under the GM Pension Plan as of May 28, 1999 for vesting and for accrual purposes for Delphi Employees. The GM Pension Plan will reassume responsibility for those Delphi Employees who retire on or before January 1, 2000. In such cases, the GM Pension Plan will provide benefits in accordance with the applicable provisions of Section 3.b.2.

a.3.    All Delphi Employees with unbroken seniority at GM immediately prior to May 28, 1999, who retire from Delphi on a normal or early voluntary or total and permanent disability (approved by Delphi) basis after January 1, 2000, shall be entitled to payment from the Delphi Pension Plan. The Delphi Pension Plan payment will be equal to the total benefit that would be payable under the Delphi Pension Plan determined by including for eligibility for payment and for the determination of the amount of payment, the credited service accrued under the GM Pension Plan as of May 28, 1999 and the credited service accrued under the Delphi Pension Plan thereafter and for eligibility for payment (but not for determination of the amount of payment) the credited service accrued under the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes) if applicable. The payment will include a basic benefit (reduced for age where appropriate) for each year of accrued credited service recognized under the Delphi Pension Plan and any applicable supplement or temporary benefit.

a.4.    Pro-rata share in this Section 3.a. shall equal a percentage of the number of years of accrued credited service (including fractional years) under the Delphi Pension Plan divided by the sum of the total years of credited service accrued under the GM Pension Plan after May 28, 1999, if any, the credited service accrued under the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes) if applicable, and the number of years of accrued credited service under the Delphi Pension Plan as of the date of retirement from Delphi or GM.

a.5.    Except as provided in 3.a.6. below, all Delphi Employees with unbroken seniority at GM immediately prior to May 28, 1999, who move to GM pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and are not retired on or before January 1, 2000, shall be entitled to payment from the Delphi Pension Plan, upon retirement from GM. The Delphi Pension Plan benefit will be determined as if the Delphi Employee were then retiring from Delphi on a voluntary basis and by taking into account solely for eligibility for payment (but not for determination of the amount of payment) the accrued credited service under the GM Pension Plan as a result of re-employment by GM after May 28, 1999 and the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes) if applicable. The payment will include a basic benefit (reduced for age where appropriate) for each year of credited service accrued under the Delphi Pension Plan, and any applicable supplement in an amount equal to the difference between the pro-rata share of the total benefit that would be payable under the Delphi Pension Plan if all the credited service described above were accrued in the Delphi Pension Plan and the basic benefit (reduced for age where appropriate) for each year of credited service accrued under the Delphi Pension Plan. All other Delphi Pension Plan terms shall apply, including but not limited to the discontinuation of benefit payments upon death, an award of Social Security Disability Insurance benefits, or cessation of pension benefits for other reasons.

a.6.    Unless Delphi agrees to a "Mutual Retirement" (as defined in the GM Pension Plan), or approves a disability retirement , any Delphi Employee who moves to GM after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and who retires from GM but is not otherwise eligible to retire under the Delphi Pension Plan, shall be

eligible under the Delphi Pension Plan only for unreduced benefits at age sixty-two (62) and one (1) month. The amount of such benefits will be calculated by using the benefit levels in effect under the Delphi Pension Plan as of the date of retirement from GM increased to reflect post-retirement increases, as appropriate, until age 62 and one month, as if the Delphi Pension Plan benefits had commenced as of the date the employee retired from GM. Provided however, if such employee grows into eligibility for an 85 point retirement, Delphi Pension Plan responsibility will commence the first of the month following attainment of age 60 subject to any applicable age reductions and the GM Pension Plan supplement will be reduced accordingly.

a.7.    Except as provided in 3.a.9 below, the surviving spouse, of a Delphi Employee who is vested under the Delphi Pension Plan and who dies while employed by Delphi, shall be eligible for payment from the Delphi Pension Plan of a death benefit based on Delphi Pension Plan credited service and the Delphi Pension Plan benefit levels in effect at the time of death. All other Delphi Pension Plan terms shall apply, including but not limited to, those regarding eligibility and duration of surviving spouse benefits.

a.8.    Except as provided in 3.a.9 below, the surviving spouse, of a Delphi Employee who has unbroken seniority at GM immediately prior to May 28, 1999 and is vested under the Delphi Pension Plan and who moves to GM after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and dies while employed by GM, shall be eligible for payment from the Delphi Pension Plan of a pro-rata death benefit based on Delphi Pension Plan credited service and the Delphi Pension Plan benefit levels in effect at the time of death. All other Delphi Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of surviving spouse benefits.

a.9.    The surviving spouse, of a Delphi Employee who is vested under the Delphi Pension Plan and who dies on or before January 1, 2000 while employed by Delphi or GM, shall not be eligible for any death benefit from the Delphi Pension Plan and shall be eligible for payment from the GM Pension Plan of a death benefit based on GM and Delphi credited service. All other GM Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of surviving spouse benefits.

**GM PENSION PLAN INCLUDING MOVEMENT FROM DELPHI AFTER MAY 28, 1999**

b.1.    The GM Pension Plan will be amended to provide as set forth in 3.b.2. through 3.b.8, the following:

b.2.    The GM Pension Plan shall recognize, for vesting and accrual purposes, credited service accrued under the Delphi Pension Plan for any Delphi Employee who retires on a normal or early voluntary or total and permanent disability (approved by GM) basis under the GM Pension Plan on or before January 1, 2000. Further, the GM Pension Plan shall only recognize Delphi credited service in an amount equal to the credited service actually accrued under the Delphi Pension Plan prior to January 1, 2000 and no credited service shall be recognized for any period for which the GM Pension Plan has already provided credited service.

b.3.    Pro-rata share in this Section 3.b. shall equal a percentage of the number of years of credited service accrued (including fractional years) under the GM Pension Plan after May 28, 1999, if any, divided by the sum of the total years of credited service accrued under the GM Pension Plan after May 28, 1999, if any, the credited service accrued under the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes) if applicable, and the number of years of accrued credited service recognized under the Delphi Pension Plan as of the date of retirement from Delphi or GM.

b.4.    Except as provided in 3.d. below, Delphi Employees who retire from Delphi after January 1, 2000, shall not be entitled to any payment from the GM Pension Plan.

b.5.    Except as provided in 3.b.6. below, all Delphi Employees with unbroken seniority at GM immediately prior to May 28, 1999, who move to GM after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and are not retired on or before January 1, 2000, shall be entitled to payment from the GM Pension Plan upon retirement from GM. The GM Pension Plan benefit will be determined by taking into account solely for eligibility for payment (but not for the determination of the amount of payment) the accrued

credited service under the Delphi Pension Plan, and if applicable, the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes). The payment will include a basic benefit (reduced for age where appropriate) for each year of credited service accrued under the GM Pension Plan after May 28, 1999, and any applicable supplement in an amount equal to the difference between the pro-rata share of the total benefit that would be payable under the GM Pension Plan if all the credited service described above were accrued in the GM Pension Plan and the basic benefit (reduced for age where appropriate) for each of credited service accrued under the GM Pension Plan. All other GM Pension Plan terms shall apply, including but not limited to the discontinuation of benefit payments upon death, an award of Social Security Disability Insurance benefits, or cessation of pension benefits for other reasons.

b.6.    Unless Delphi agrees to a "Mutual Retirement" (as defined in the GM Pension Plan), or approves a disability retirement , any Delphi Employee, who moves to GM after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and who retires from GM but is not otherwise eligible to retire under the Delphi Pension Plan, shall be entitled to a monthly benefit, until age sixty-two (62) and one (1) month, from the GM Pension Plan equal to the total benefit that would be payable under the GM Pension Plan, determined as if the employee were then retiring from GM with combined GM, Delphi, and any applicable plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes), benefit accrual credited service. After the employee attains or would have attained age sixty-two (62) and one (1) month, the GM Pension Plan shall pay monthly benefits based only on GM credited service accrued after May 28, 1999, however, if such employee grows into eligibility for an 85 point retirement, Delphi Pension Plan responsibility will commence the first of the month following attainment of age 60 subject to any applicable age reductions and the GM Pension Plan supplement will be reduced accordingly.

b.7.    Except as provided in 3.a.9 above, the surviving spouse, of a Delphi Employee who dies while employed by Delphi, shall not be eligible for payment from the GM Pension Plan.

b.8.    Except as provided in 3.a.9 above, the surviving spouse, of a Delphi Employee who has unbroken seniority at GM immediately prior to May 28, 1999 and is vested under the Delphi Pension Plan and who moves to GM after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and dies while employed by GM, shall be eligible for payment from the GM Pension Plan of a pro-rata death benefit based on GM Pension Plan credited service and the GM Pension Plan benefit levels in effect at the time of death. All other GM Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of surviving spouse benefits.

## DELPHI PENSION PLAN-MOVEMENT TO DELPHI AFTER MAY 28, 1999

c.1.    The Delphi Pension Plan will also provide, as set forth in 3.c.2 through 3.c.5, the following for UAW represented employees who move to Delphi after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement.

c.2.    Pro-rata share in this Section 3.c. shall equal a percentage of the number of years of accrued credited service (including fractional years) under the Delphi Pension Plan divided by the sum of the total years of credited service accrued under the GM Pension Plan, the credited service accrued under the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes) if applicable, and credited service accrued under the Delphi Pension Plan as of the date of retirement from Delphi or GM.

c.3.    Except as provided in 3.c.4. below, all GM UAW represented employees with unbroken seniority at GM, who move to Delphi after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and are not retired on or before January 1, 2000, shall be entitled to payment from the Delphi Pension Plan upon retirement from Delphi. The Delphi Pension Plan benefit will be determined by taking into account solely for eligibility for payment (but not for determination of the amount of payment) the accrued credited service under the GM Pension Plan and, if applicable, the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding

-7-

provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes), for service prior to employment at Delphi. The payment will include a basic benefit (reduced for age where appropriate) for each year of credited service accrued under the Delphi Pension Plan, and any applicable supplement in an amount equal to the difference between the pro-rata share of the total benefit that would be payable under the Delphi Pension Plan if all the credited service described above were accrued in the Delphi Pension Plan and the basic benefit (reduced for age where appropriate) for each year of credited service accrued under the Delphi Pension Plan. All other Delphi Pension Plan terms shall apply, including but not limited to the discontinuation of benefit payments upon death, an award of Social Security Disability Insurance benefits, or cessation of pension benefits for other reasons.

c.4.    Unless GM agrees to a "Mutual Retirement" (as defined in the GM Pension Plan), or approves a disability retirement , any GM employee, who moves to Delphi pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and who retires from Delphi but is not otherwise eligible to retire under the GM Pension Plan, shall be entitled to a monthly benefit, until age sixty-two (62) and one (1) month, from the Delphi Pension Plan equal to the total benefit that would be payable under the Delphi Pension Plan, determined as if the employee were then retiring from Delphi with combined GM, Delphi, and any applicable pension plan of a divested unit, benefit accrual credited service. After the employee attains or would have attained age sixty-two (62) and one (1) month, the Delphi Plan shall pay monthly benefits based only on Delphi credited service, however, if such employee grows into eligibility for an 85 point retirement, GM's responsibility will commence the first of the month following attainment of age 60 subject to any applicable age reductions and the Delphi Pension Plan supplement will be reduced accordingly.

c.5.    Except as provided in 3.a.9 above, the surviving spouse, of a GM UAW represented employee who has unbroken seniority at GM on May 28, 1999 and who is vested under the GM Pension Plan as of such date and who moves to Delphi after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and dies while employed by Delphi, shall be eligible for payment from the Delphi Pension Plan of a pro-rata death benefit based on Delphi Pension Plan credited service and the Delphi Pension Plan benefit levels in effect at the time of death. All other Delphi Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of Social Security benefits.

## GM PENSION PLAN-MOVEMENT TO DELPHI AFTER MAY 28, 1999

d.1.    The GM Pension Plan will also provide, as set forth in 3.d.2 through 3.d.5, the following for UAW represented employees who move to Delphi after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement.

d.2.    Pro-rata share in this Section 3.d. shall equal a percentage of the number of years of accrued credited service (including fractional years) under the GM Pension Plan divided by the sum of the total years of credited service accrued under the GM Pension Plan, the credited service accrued under the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes) if applicable, and credited service accrued under the Delphi Pension Plan as of the date of retirement from Delphi or GM.

d.3.    Except as provided in d.4. below, all GM UAW represented employees with unbroken seniority at GM as of May 28, 1999, who move to Delphi after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and are not retired on or before January 1, 2000, shall be entitled to payment from the GM Pension Plan, upon retirement from GM or Delphi. The GM Pension Plan benefit will be determined by taking into account solely for eligibility for payment (but not for determination of the amount of payment) the accrued credited service under the Delphi Pension Plan and, if applicable, the pension plan of a divested unit (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes). The payment will include a basic benefit (reduced for age where appropriate) for each year of credited service accrued under the GM Pension Plan, and any applicable supplement in an amount equal to the difference between the pro-rata share of the total benefit that would be payable under the GM Pension Plan if all the credited service described above were accrued in the GM Pension Plan and the basic benefit (reduced for age where appropriate) for each year of credited service accrued under the GM Pension Plan. All other GM Pension Plan terms shall apply, including but not limited to the discontinuation of

benefit payments upon death, an award of Social Security Disability Insurance benefits, or cessation of pension benefits for other reasons.

d.4.    Unless GM agrees to a "Mutual Retirement" (as defined in the GM Pension Plan), or approves a disability retirement , any GM employee, who moves to Delphi after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and who retires from Delphi but is not otherwise eligible to retire under the GM Pension Plan, shall be eligible under the GM Pension Plan only for unreduced benefits at age sixty-two (62) and one (1) month at the benefit levels in effect under the GM Pension Plan as of the date of retirement from Delphi increased to reflect post-retirement increases as appropriate until age 62 and one (1) month as if the GM Pension Plan benefits had commenced as of the date the employee retired from Delphi. Provided however, if such employee grows into eligibility for an 85 point retirement, GM Pension Plan responsibility will commence the first of the month following attainment of age 60 subject to any applicable age reductions and the GM Pension Plan supplement will be reduced accordingly.

d.5.    Except as provided in 3.a.9 above, the surviving spouse, of a GM employee who has unbroken seniority at GM on May 28, 1999 and who is vested under the GM Pension Plan as of such date and moves to Delphi after May 28, 1999 pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement and dies while employed by Delphi, shall be eligible for payment from the GM Pension Plan of a pro-rata death benefit based on GM Pension Plan credited service and the GM Pension Plan benefit levels in effect at the time of death. All other GM Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of Social Security benefits.

e.    If any GM Employee or Delphi Employee retires under the provisions of this Section 3 and is subsequently re-employed by GM or Delphi on a regular, contract or other basis, then consistent with treatment for all GM and Delphi retirees, payments being made to such employee by the GM Pension Plan or the Delphi Pension Plan shall be suspended until such employment ceases. Upon cessation of employment the suspended benefit will recommence.

f.     GM and Delphi will enter into an agreement with a designated paying agent to combine Delphi and GM pension plan payments in order to issue, on a monthly basis, one check for the combined benefit amount for individuals who retire on or prior to November 1, 2007.

4.    CREDITED SERVICE

a.     Delphi Employees will accumulate credited service under the Delphi Pension Plan in accordance with its terms.

b.     Credited service will not accrue simultaneously at Delphi, GM, or a divested unit for the same period of time.  For purposes of Section 3, the term "credited service" shall have the meaning set forth in the applicable  pension plan or plans.

c.     The GM Pension Plan shall not recognize any additional grants of credited service by Delphi or a divested unit, for example, extra credited service offered as an inducement for employees to retire early.  Similarly, The Delphi Pension Plan shall not recognize any additional grants of credited service by GM or a divested unit.

5.    HEALTH CARE AND LIFE AND DISABILITY BENEFIT PROGRAMS

a.     As of May 28, 1999, Delphi established Delphi Health Care and Life and Disability Benefits Programs that duplicate the terms and conditions provided for under the GM Health Care and Life and Disability Benefits Programs, except for the provisions required to be changed as a result of a new plan sponsor.

b.     Upon retirement from GM and, where applicable, Delphi, GM shall provide  post-retirement health care and Basic Life Insurance coverage for the following Delphi Employees as if retiring from GM to:

i)  All Delphi Employees who retire on a normal or early voluntary basis or a total and permanent disability basis (approved by GM) on or before January 1, 2000 and who are then, based on combined credited service, otherwise eligible for post-retirement health care and Basic Life Insurance coverage under the terms of the applicable GM-UAW Agreement, and

- 11 -

ii) All Delphi Employees who are re-employed by GM under the provisions of the UAW-GM-Delphi Flowback Agreement and retire with eligibility for such benefits.

The provision of post-retirement health care and Basic Life Insurance coverage by GM is subject to all applicable benefit plan terms then in effect.

c.      GM will reinstate Basic Life (BLI), Optional Life (OLI), Dependent Life (DLI) and Personal Accident Insurance (PAI) coverage under the GM Life and Disability Benefits Program for Hourly Employees (the Program) for Delphi Employees who are eligible for such coverage in retirement (other than Deferred Vested) under the provisions of paragraph 5.b.(i) and 5.b.(ii) immediately above.

c.1.    In determining amounts of BLI, the base hourly rate, in effect on the date immediately prior to retirement from GM and, where applicable, Delphi, will be used.

c.2.    In determining amounts of Continuing Life Insurance in retirement, the combined credited service accumulated under the GM and Delphi pension plans and, where applicable, pension plans of divested units (or other unit divested by GM which is not included in Attachment A, where a Memorandum of Understanding provides for recognition by the GM Pension Plan of credited service at the divested unit for eligibility purposes) will be used. If Delphi's coverage amounts differ from those available under the Program, the amount(s) reinstated will be the next higher amount(s) available under the GM Program.

c.3.    An otherwise eligible Delphi Employee will be eligible in retirement for OLI, DLI and PAI from GM, provided such Delphi Employee has BLI coverage reinstated by GM and had such employee paid coverage in effect under Delphi's plans immediately prior to retirement.

c.4.    An otherwise eligible Delphi Employee shall contribute the full cost of any OLI, DLI and PAI. Contributions shall be payable monthly in advance and where possible from benefits payable under any GM benefit plan or program. At an employee's election, this amount may be deducted from the pension check.

c.5.    Eligibility for coverage, amounts of coverage, contribution rates and all other Program provisions will be those of the GM Life and Disability Benefits Program then in effect except as otherwise provided above.

d.    Post-retirement health care and Basic Life Insurance coverage for all other Delphi Employees, and UAW represented employees who move to Delphi pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement after May 28, 1999, other than those in 5.b.(i) and 5.b.(ii), shall be pursuant to the terms of the Delphi-UAW Agreement and Delphi Health Care and Life and Disability Benefits Programs.

6.    SAVINGS PLAN

a.    Delphi established a Delphi Personal Savings Plan (Delphi PSP) as of May 28, 1999 that duplicates the terms and conditions provided for under the GM Personal Savings Plan, except the provisions required to be changed as a result of a new plan sponsor. All existing account balances of Delphi Employees may be voluntarily transferred to the Delphi PSP under procedures established by GM.  A Delphi stock investment option will be added to the Delphi PSP.

b.    Delphi PSP participants who retire on or before January 1, 2000 will be eligible for a one-time transfer of their account balances (including loans) from the Delphi PSP to the GM PSP under procedures established by GM.

c.    Delphi PSP participants who had unbroken seniority at GM immediately prior to May 28, 1999, who move to GM pursuant to the provisions of the UAW-GM-Delphi Flowback Agreement will be eligible for a one-time transfer of their account balances (including loans) from the Delphi PSP to the GM PSP under procedures established by GM.

7.    PROFIT SHARING

Otherwise eligible Delphi employees shall be treated under the Delphi Profit Sharing Plan as if they were covered under the terms and conditions of the 1996 UAW-GM Supplemental Agreement on The General Motors Profit Sharing Plan for Hourly-Rate Employees in the United States for Plan Year 1999.  Thereafter, Delphi employees shall be covered under the terms and conditions of the 1999 UAW-Delphi Supplemental Agreement on the Delphi Profit Sharing Plan for Hourly-Rate Employees in the United States.

For Plan Year 2000 and thereafter, Delphi and GM employees who are Eligible Participants in the Delphi and GM Profit Sharing Plans for separate periods of a given Plan Year as a result of flow-back arrangements between the two companies, shall have his/her

Compensated Hours for the Plan Year under the respective Plans not exceed a combined total of 1,850 hours. Furthermore, such an employee's combined total Compensated Hours for the Plan Year shall accumulate and be applicable under each Plan in the order in which the hours are compensated under the respective Plans, up to a combined total not to exceed 1,850 hours. For purposes of determining the Allocation of the Total Profit Share, such an employee shall be considered a Participant in each Plan for the given Plan Year.

If issues arise regarding the application of these provisions, the parties will meet to discuss and resolve them.

8.    OVERPAYMENTS

a.    Any overpayments recoverable to GM or GM-UAW benefit plans from employees transferring to Delphi, will be recoverable from future wages and benefit payments payable to Delphi employees.

9.    OTHER

a.    Eligibility for any GM or Delphi employee benefit plan/program shall be determined solely by the written provisions of such respective plan/program.

b.    Retirement from either GM or Delphi will terminate all seniority at all plants of both GM and Delphi.

The parties agree that if unusual circumstances occur that were not contemplated at the time this Understanding was negotiated and agreed upon, said parties may discuss and resolve such circumstances.

Executed by the duly authorized representatives of the parties this 30th day of September, 1999.

INTERNATIONAL UNION, UAW          GENERAL MOTORS CORPORATION

DELPHI AUTOMOTIVE SYSTEMS

## DELPHI DIVESTED UNITS

- **American Axle**
  - Delphi Steering-Buffalo
  - Delphi Steering-Detroit Forge
  - Delphi Steering-Detroit Gear & Axle
  - Delphi Steering-Tonawanda Forge
  - Delphi Steering-Three Rivers

- **Delco Remy America**
  - Delphi Energy & Engine-Anderson
  - Delphi Energy & Engine-Meridian

- **Magnaquench**
  - Delphi Energy & Engine-Anderson

- **Peregrine**
  - Delphi Interior-Coldwater Road
  - Delphi Interior-Livonia

- **Guide Lighting**
  - Delphi Interior-Monroe
  - Delphi Interior-Anderson

- **Lear Seating**
  - Delphi Interior-Monroe
  - Delphi Interior-Anderson

- **Chasco Systems**
  - Delphi Chassis Systems-Livonia (Coil Springs)

## Amendment to UAW-GM-Delphi Memorandum
## of Understanding Benefit Plan Treatment

Whereas, the UAW, GM and Delphi entered into a Memorandum of Understanding, Benefit Plan Treatment ("MOU") concerning benefit treatment for UAW represented employees regarding the separation of GM and Delphi.

Whereas, the MOU set forth certain provisions regarding benefit treatment in the event of a flowback to GM or Delphi under the provisions of the UAW-GM-Delphi Flowback Agreement.

Whereas, flowback treatment was limited to GM and Delphi employees who acquired seniority on or before the expiration of their respective 1996 GM-UAW or Delphi-UAW National Agreements.

Whereas, as part of the negotiations with the UAW regarding the 2003 GM-UAW National Agreement and the 2003 Delphi-UAW National Agreement, the parties agreed to extend flowback rights to all UAW represented employees hired by GM or Delphi before the expiration of their respective 1996 GM-UAW or Delphi-UAW National Agreement but who were not covered under the UAW-GM-Delphi Flowback Agreement (the "Covered Employees").

Now, therefore the parties agree to amend the MOU for Covered Employees as follows:

1. Flowback treatment under the MOU shall apply to Covered Employees.

2. The requirement that an employee have unbroken seniority at GM immediately prior to May 28, 1999 shall not apply to Covered Employees.

3. In the event GM or Delphi agree to make lump-sum payments to retirees and Covered Employees are included in the group of retirees eligible for such lump sums, the lump sum payable by each company will be pro-rated based on the credited service at the paying company divided by total credited service at both GM and Delphi in accordance with the terms of the MOU.

Executed by the duly authorized representatives of the parties this 18TH day of SEPTEMBER, 2003.


INTERNATIONAL UNION, UAW         GENERAL MOTORS CORPORATION

*[signature]*                     *[signature]*

DELPHI CORPORATION

*[signature]*

## Exhibit 5.01(b)(ii)
**Letter agreement dated March 4, 1999 between Delphi and GM
concerning certain asbestos liability, as supplemented by letter agreement
dated May 10, 1999 between Delphi and GM**

MAR 04 1999 14:19 FR DELPHI LEGAL STAFF    248813X451 TO 913133140012

# DELPHI
### Automotive Systems

## memo

Privileged and Confidential
Attorney Work Product

Date:    March 4, 1999

To:    Louis H. Lindeman, Jr.

From    Joseph E. Papelian

Subject    Asbestos Brake Pads

c    Warren G. Andersen
John G. Blahnik
Graham M. Rickard
Logan G. Robinson

This letter is a follow-up to our telephone conversation yesterday and memorializes the agreement reached last year during Project Oracle regarding existing and future asbestos brake claims.

The GM/Delphi Master Separation Agreement provides that Delphi will indemnify GM for all claims involving components and systems we provide to parties other than GM, and that Delphi will indemnify GM for all components and systems provided to GM that were manufactured after January 1, 1999. Although Delphi has not manufactured asbestos brake pads for several years, and has no plans to do so, there are pending brake asbestos claims against GM that the GM Legal Staff is defending. I understand Glenn Jackson of your section is the principal GM attorney supervising these cases.

While many of the asbestos brake pads were manufactured and installed on GM vehicles, others were sold to non-GM entities. Last year we agreed that GM would retain responsibility for all existing and future claims for asbestos brake pads manufactured by Delphi before January 1, 1999, including those sold to non-GM entities.

I believe this letter accurately summarizes our agreement. If you agree, please sign in the space below and return a signed copy to me.

Accepted and agreed to this 4ᵗʰ day of March 1999.

_____
Louis H. Lindeman

C:\DELPHI\DELPHI-A\ORACLE\Lindeman-01-lv.Doc

MAR 04 1999 14:54

MAY-12-99 WED 08:06                                                                P. 02/04



**DELPHI**
Automotive Systems

**memo**

Privileged and Confidential
Attorney Work Product

Date:    May 10, 1999

To       Louis H. Lindeman, Jr.

From:    Joseph E. Papelian

Subject: Asbestos Brakes

c        Warren G. Andersen
         John G. Blahnik
         Graham M. Rickard
         Logan G. Robinson

This letter supplements our March 4th agreement regarding existing and future asbestos brake claims.

My March 4th memo memorialized our agreement that GM would retain responsibility for all existing and future claims for asbestos brake pads manufactured by Delphi before January 1, 1999, including those sold to non-GM entities. Subsequent to that agreement, I learned that Delphi still manufactures asbestos rear brake drum **linings** for sale to Chrysler and GM. Chrysler uses these linings on one line of pick-up trucks (RAM 1500) and GM uses asbestos linings on the "J" car.

Chrysler plans to discontinue use of asbestos linings at the end of the 1999 Model Year. However, GM plans to use asbestos linings on the "J" car for several more model years. In addition, Delphi manufactures asbestos brake linings for service parts but sells them only to Chrysler and GM. The asbestos brake linings service parts sold to GM are for several models, but those sold to Chrysler are limited to the RAM 1500 truck. The attached schedule provides information about the part numbers and vehicle lines on which the asbestos linings are used. There are markings on the linings that reflect the date of manufacture and material used. Delphi has no plans to enter the after-market sale of asbestos brake linings or pads beyond that noted above.

Since Delphi currently sells asbestos linings only to Chrysler and GM for the applications noted on the attached, we propose amending our March 4 agreement as follows.

• GM would retain responsibility for all existing and future claims for asbestos brake pads manufactured by Delphi before January 1, 1999, including those sold to non-GM entities;

MAY 12 1999 08:37                                               05/11/99 2E 12

Louis H. Lindeman, Jr.
May 10, 1999

- GM would retain responsibility for all existing and future claims for asbestos pads and linings manufactured by Delphi and sold to GM, regardless of when they were manufactured; and

- Delphi would accept responsibility for asbestos pads and linings manufactured after December 31, 1998 and sold to customers other than GM.

If you agree to the proposed amendment, please sign in the space below and return a signed copy to me.

att.

Accepted and agreed to this 11th day of May 1999.

Louis H. Lindeman, Jr.

DELPHI-A·ORACLE·Lindeman-02-Lit.Doc

MAY 12 1999  09:37                                                PAGE.03

· DELPHI CHASSIS DRUM BRAKE LININGS

| APPLICATION | BRAKE TYPE | BLANK PART NO. | DRILLED PART | CHART | POSITIO | COMPOUND | EDGE CODE | WIDTH +0.6/-1.0 | NOMINAL THICKNESS +/_1.0 | ARC LENGTH |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SEMI - METALLIC | | | | | |
| 225 x 45 mm | UT | 18016450 | | 14012561 | UT | CM 9103 | 245 FE | 44.2 | 7.27 - 6.27 | 176 |
| 225 X 45 mm | UT | 18023572 | | 14013621 | UT | CM 9104 | 246 FE | 43.2 - 44.6 | 5.44 - 5.44 | 115 |
| 230 x 40 mm | UT | 18019453 | | 18019459 | UT | CM 9103 | 245 FE | 28.7 - 30.3 | 4.45 - 4.95 | 110 |
| 241 x 51 mm | D/S | 13011381 | | 13003905 | PRI | IN 4064 | 241 FF | 50.2 | 5.84 - 6.40 | 92 |
| 241 x 51 mm | | 18001584 | | 13003905 | SEC | IN 4064 | 241 FF | 50.2 | 7.37 - 8.13 | 119.5 |
| 241 x 51 mm | D/S | 18023658 | | 18009905 | PRI | CM 9100 | 243 EE | 50.2 | 5.64 - 6.40 | 92 |
| 241 x 51 mm | | 18023863 | | 18009905 | SEC | CM 9130 | 243 EE | 50.2 | 7.37 - 8.13 | 119 |
| 254 x 57 mm | UT | 18017923 | | 18012561 | UT | IN 4094 | 241 FF | 55.2 | 8.00 - 9.76 | 110 |
| 279 x 51 mm | D/S | 18018184 | | 18009905 | PRI | CM 9100 | 243 GE | 50.2 | 6.22 - 6.88 | 95 |
| 279 x 51 mm | | 18015617 | | 18009905 | SEC | CM 9100 | 243 EE | 50.2 | 7.24 - 8.00 | 137.5 |
| 279 x 51 mm | D/S | 17563377 | 17563566 | 17747776 | SEC | IN 4064 | 241 FF | 50.2 | 7.24 - 8.00 | 122 |
| 279 x 70 mm | D/S | 52005181 | | 52005181 | PRI | CM 9103 | 243 EE | 86.90 - 67.29 | 5.16 - 5.94 | 87 |
| 279 x 70 mm | | 52005183 | | 62006183 | SEC | CM 9103 | 243 EE | 67.59 - 61.29 | 6.30 - 7.14 | 124.67 |
| 283 x 70 mm | D/S | 17588281 | 18015205 | 17947776 | PRI | IN 4064 | 241 FF | 59.1 - 70.1 | 5.69 - 6.65 | 102.51 |
| 283 x 70 mm | | 17506254 | 18018236 | 17747776 | SEC | IN 4064 | 241 FF | 59.1 - 70.1 | 5.19 - 5.94 | 124.49 |
| 330 x 58 mm | D/S | 18013727 | 18019729 | 17841778 | PRI | CM 9100 | 243 EE | 53.5 | 8.78 - 7.94 | 111.9 |
| 330 x 58 mm | | 18013726 | 18019728 | 17787776 | SEC | CM 9100 | 243 EE | 53.5 | 9.98 - 10.72 | 121.5 |
| 330 x 89 mm | D/S | 17583378 | 18016316 | 17841778 | PRI | CM 9100 | 243 EE | 90 | 5.79 - 7.64 | 111.9 |
| 330 x 89 mm | | 17583375 | 18016317 | 17787776 | SEC | CM 9100 | 243 EE | 90 | 9.90 - 10.72 | 121.5 |
| | | | | | ASBESTOS | | | | | |
| "L" car 200 x 45 mm | UT | 13012960 | | 18012561 | UT | IN 4202 | 242 FE | 44.2 | 7.27 - 8.03 | 172.5 |
| J/N/J car 200 x 45 mm | D/S | 18033953 | 14003252 | 14009905 | SEC | IN 4080 | 235 FE | 44.2 | 7.22 - 7.96 | 117 |
| 200 x 45 mm | | 18036371 | 13008372 | 14009905 | PRI | IN 4080 | 235 FE | 44.2 | 5.63 - 7.38 | 39 6+/- |
| "A" car 225 x 45 mm | D/S | 18003440 | | 18003905 | PRI | IN 4050 | 236 FE | 44.2 | 6.99 - 6.30 | 97.5 |
| 225 x 45 mm | | 18006446 | | 18003905 | SEC | IN 4050 | 235 FE | 44.2 | 7.22 - 7.96 | 115 |
| "C/H" car 225 x 45 mm | UT | 18012579 | | 18012561 | UT | IN 4202 | 242 FE | 44.2 | 7.27 - 9.23 | 115 |
| S/T Truck 241 x 51 mm | D/S | 4474974 | | 18009784 | PRI | IN 4035 | 224 FF | 50.2 | 5.64 - 8.40 | 92 |
| 241 x 51 mm | | 18001777 | | 18009784 | SEC | IN 4050 | 235 FE | 50.2 | 7.37 - 8.13 | 119.5 |
| "B" Heavy 279 x 51 mm | D/S | 14026647 | 18019312 | 14025567 | PRI | IN 4035 | 224 FF | 50.2 | 9.22 - 6.88 | 93 |
| 279 x 51 mm | | 14025846 | 18019313 | 14026848 | SEC | IN 4050 | 235 FG | 50.2 | 7.54 - 8.00 | 122 |
| Chrysler RAMI500 279 x 51 mm | D/S | 18040763 | | 18008905 | PRI | IN 4035 | 224 FF | 50.2 | 6.22 - 6.95 | 94.75 |
| 279 x 51 mm | | 18040784 | | 18008905 | SEC | IN 4050 | 236 FE | 50.2 | 7.24 - 9.08 | 122 |
| 279 x 51 mm | D/S | 5471566 | | 18009784 | PRI | IN 4035 | 224 FF | 50.2 | 5.22 - 5.54 | 93 |
| 279 x 51 mm | | 18001735 | | 18009784 | SEC | IN 4050 | 235 FE | 50.2 | 7.24 - 8.00 | 119+122 |
| C/K Trucks 283 x 70 mm | D/S | 14009537 | 18016316 | 14005567 | PRI | IN 4053 | 263 FE | 59.1 - 70.1 | 5.89 - 9.93 | 102.51 |
| 283 x 70 mm | | 14005586 | 18015317 | 14005586 | SEC | IN 4053 | 236 FE | 59.1 - 70.1 | 6.18 - 3.94 | 124.49 |
| UPS VAN service 330 x 89 mm | D/S | 333216 | SAME | | PRI | IN 4035 | 224 FF | 56.90 - 89.39 | 9.76 - 7.52 | 111.5 |

## **Exhibit 5.01(b)(iii)**

**Investment Tax Credit Transfer Agreement, dated December 8, 2000, between Delphi Automotive Systems Corporation (n/k/a Delphi) and GM**

## INVESTMENT TAX CREDIT TRANSFER AGREEMENT

This INVESTMENT TAX CREDIT TRANSFER AGREEMENT ("Agreement") is made and entered into as of December 8, 2000, by and between General Motors Corporation ("GM"), a Delaware corporation, and Delphi Automotive Systems Corporation ("Delphi"), a Delaware corporation.

## RECITALS

WHEREAS, pursuant to Subdivision 12 of Section 210 of Chapter 60 of the New York Laws (hereinafter "Tax Law"), where property with respect to which investment tax credit has been allowed is disposed of by transfer to a taxpayer in a qualified transaction that otherwise qualifies under the Tax Law, the taxpayer and the transferor may jointly elect to permit such credit to be treated as the credit of the taxpayer and carried forward by the taxpayer (hereinafter referred to as "unused credit");

WHEREAS, GM and Delphi agree that property was transferred to Delphi from GM by means of a qualified transaction that otherwise qualifies under the Tax Law;

WHEREAS, GM and Delphi desire to jointly elect pursuant to the Tax Law to permit such credit to be treated as the credit of Delphi;

WHEREAS, the joint election is to be made by filing a document indicating the joint election with the GM and Delphi New York franchise tax returns for tax year 1999, due on or about December 15, 2000;

WHEREAS, GM and Delphi agree that the amount of unused credit with respect to the property transferred tentatively is $43,817,192, calculated in the manner and for the years as indicated in Attachment 1, that schedule being incorporated by reference and made a part of this Agreement;

WHEREAS, it is the intention of the parties to cooperate fully to maximize the amount of the investment tax credit that is the subject of this joint election;

NOW, THEREFORE, in consideration of the agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, and intending to be legally bound thereby, GM and Delphi agree as follows:

Section 1. The above recitals are hereby incorporated into this Agreement by reference.

Section 2. GM and Delphi will execute this Agreement, all parties signing thereto being authorized to execute said Agreement;

Section 3. GM and Delphi will execute the document included as Attachment 2, such document constituting the aforementioned joint election;

Section 4.  GM and Delphi will file said executed document described as Attachment 2 with
their respective 1999 New York franchise tax returns on or before the extended due date of
December 15, 2000;

Section 5.  In consideration of the execution of this agreement and the election Delphi will
make payments to GM as follows:

    a.  Where a credit is allowed to Delphi pursuant to Section 210 (12)(g)(11) of the Tax
       Law, Delphi shall pay to GM forty percent (40%) of the amount of such credit
       applied by Delphi in accordance with the provisions of Section 210 (12)(g)(11)(H) of
       the Tax Law;

    b.  Delphi shall pay to GM forty percent (40%) of the amount of unused credit used to
       offset, reduce or eliminate any New York tax, expense, fee, or any other amount due
       by Delphi, except as discussed in subsection a above.

    c.  Delphi shall make available to GM all records necessary to permit a review of the
       compliance with the provisions of this Section 5.

Section 6.  In the event that the State of New York audits or otherwise attempts to adjust the
amount or availability of the unused credit, such audit shall be the responsibility of Delphi,
with the complete cooperation of GM with respect to records or any other relevant
information that may be in the control of GM.

    a.  Delphi shall conduct such audits of the unused credits in good faith, and any audits,
       assessments, agreements, settlements and related documents that affect the amount of
       the payment to be paid to GM thereto are subject to review by GM prior to their
       acceptance by Delphi.

    b.  In the event that outside legal or other professional expenses are incurred by Delphi to
       defend the amount or availability of the unused credit, GM shall reimburse Delphi for
       forty percent (40%) of such expenses.  Delphi shall be reimbursed by GM after
       Delphi presents to GM a demand for such reimbursement supported by copies of such
       invoices setting forth the detail of the expense.

    c.  In the event that any audits, assessments, agreements or settlements result in a
       reduction of the unused credit that has become final, and to the extent that any related
       amount has been previously paid to GM, GM shall reimburse Delphi for forty percent
       (40%) of such reduction paid to the State of New York after being presented with a
       demand for such reimbursement, such demand attaching copies and setting forth the
       detail of the reduction.

Section 7.  Disputes arising in connection with this Agreement shall be resolved in
accordance with the procedures set forth in the Master Separation Agreement, with the
proviso that each arbitrator shall be a tax attorney or tax accountant who is generally

12/08/00

recognized in the tax community as a qualified and competent tax practitioner with experience in the tax area involved in the issue or issues to be resolved.

Section 8.

a.  All payments required by this Agreement shall be made by (i) wire transfer to the appropriate bank account as may from time to time be designated by the parties for such purpose; provided, that on the date of such wire transfer notice of the transfer is given to the recipient thereof in accordance with Section 9 hereof, or (ii) any other method agreed to by the parties. All payments due under this Agreement shall be deemed to be paid when available funds are actually received by the payee.

b.  Delphi shall make the payments provided for in Section 5 not later than 30 days following:

    I.    the application of the credit as provided in Section 5(a) of this Agreement and if such application is a refund then Delphi will pay GM when it receives the refund from the State of New York, or

    II.    the filing of a return or report which utilizes the unused credit to offset, reduce or eliminate any New York tax, expense or fee, as provided in Section 5(b) of this Agreement.

c.  Payments due shall not be reduced or subjected to setoff by Delphi for any reason whatsoever.

Section 9.

a.  Notices, requests, permissions, waivers, and other communications hereunder shall be in writing and shall be deemed to have been duly given upon (a) a transmitter's confirmation of a receipt of a facsimile transmission (but only if followed by confirmed delivery of a standard overnight courier the following Business Day or if delivered by hand the following Business Day), or (b) confirmed delivery of a standard overnight courier if delivered by hand, to the parties at the following addresses (or at such other addresses for a party as shall be specified by like notice):

    If to GM, to:

        General Motors Corporation
        300 Renaissance Center
        MC 482-C15-C66
        Detroit, Michigan 48265-3000
        Attention: Harry Brinsden
        Telecopy No.: (313) 665-4123

12/08/00

If to Delphi, to:

        Delphi Automotive Systems
        P.O. Box 5086
        MC 480-414-410
        Troy, Michigan  48007-5086
        Attention:  Denise C. Olbrecht
        Telecopy No.: (248) 267-5771

Such names and addresses may be changed by notice given in accordance with this Section 9.

Section 10.  GM and Delphi may assign any of their rights or obligations under this Agreement to any subsidiary or affiliate that they shall designate.

Section 11.  This Agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein, and supersedes and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

Section 12.  This Agreement may be amended, modified or supplemented only by a written agreement signed by all of the parties hereto.

Section 13.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Michigan, without reference to choice of law principles, including matter of construction, validity and performance.

Section 14.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

Section 15.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner.

Section 16.  Franchise tax shall mean that tax imposed pursuant to Article 9-A of Chapter 60 of the New York Laws.

12/08/00

IN WITNESS WHEREOF, each of the parties has caused this Investment Tax Credit Transfer Agreement to be executed on its behalf by its officers or designates thereunto duly authorized, all as of the day and year first written above.

GENERAL MOTORS CORPORATION

By: _Roger D. Wheeler_

Title: CHIEF TAX OFFICER

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _[signature]_

Title: CHIEF TAX OFFICER

5                                    12/08/00

Attachment 1

New York State
Investment Credit Carryforward

Total GM & Subs Carryforward

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carryforward From Prior Years | 292,035 | 23,303,542 | 36,371,996 | 33,289,132 | 37,313,392 | 45,280,701 | 50,098,617 | 52,468,246 | 56,099,566 | 58,416,336 | 61,969,482 | 64,913,219 | 66,605,281 | 105,251,354 |
| Current Year ITC | 29,068,818 | 15,966,165 | 5,664,672 | 4,896,148 | 8,518,576 | 5,430,166 | 2,872,970 | 4,362,485 | 4,212,606 | 3,891,991 | 3,394,330 | 3,763,992 | 13,116,625 | |
| Current Year Recapture Of ITC | (759,413) | (651,638) | (416,067) | (245,689) | (54,187) | (37,633) | (65,207) | (527,203) | (1,253,494) | (14,259) | (197,185) | (55,139) | (124,129) | (4,586,431) |
| Total Carryforward Plus Current Year | 28,610,440 | 38,618,069 | 41,572,601 | 37,839,591 | 45,777,781 | 50,666,054 | 53,024,980 | 56,253,528 | 58,858,678 | 62,274,071 | 65,166,627 | 68,622,072 | 81,600,768 | |
| ITC Used In Current Year | (5,306,898) | (446,073) | (10,283,469) | (526,199) | (497,080) | (569,437) | (556,734) | (153,982) | (442,342) | (304,589) | (253,608) | (15,791) | (16,873) | (19,373,055) |
| Carryforward To Future Years | 23,303,542 | 38,371,996 | 33,289,132 | 37,313,392 | 45,280,701 | 50,098,617 | 52,468,246 | 56,099,566 | 58,416,336 | 61,969,482 | 64,913,219 | 68,606,281 | 81,583,913 | |

Delphi Portion

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carryforward From Prior Years | 0 | 6,401,664 | 19,360,722 | 19,506,575 | 21,633,265 | 24,306,274 | 27,972,136 | 30,504,024 | 33,604,276 | 35,902,755 | 37,991,606 | 39,814,750 | 41,829,516 | |
| Current Year ITC | 8,624,491 | 13,706,106 | 3,626,240 | 2,562,504 | 2,944,132 | 3,959,122 | 2,860,645 | 3,625,104 | 3,707,645 | 2,197,940 | 2,014,848 | 2,049,426 | 2,011,664 | 54,230,367 |
| Current Year Recapture Of ITC | (222,642) | (390,253) | (313,457) | (183,112) | (18,728) | (23,983) | (44,178) | (479,640) | (1,279,283) | (19,343) | (117,029) | (30,022) | (10,033) | (3,141,205) |
| Total Carryforward Plus Current Year | 8,401,849 | 19,607,537 | 22,873,505 | 21,916,967 | 24,558,699 | 28,241,413 | 30,808,003 | 33,649,488 | 36,032,255 | 38,081,353 | 39,889,225 | 41,834,153 | 43,822,147 | |
| ITC Used In Current Year | (1,558,444) | (130,995) | (3,019,882) | (154,526) | (145,974) | (145,413) | (163,493) | (45,213) | (129,900) | (89,747) | (74,475) | (4,637) | (4,955) | (5,689,164) |
| Adjusted Amount | 6,843,405 | 19,676,542 | 19,653,623 | 21,762,441 | 24,412,725 | 28,074,190 | 30,644,510 | 33,604,276 | 35,902,755 | 37,991,606 | 39,814,750 | 41,829,516 | 43,817,192 | |
| % Disallowed Per NY Audit | 5.1217% | 2.2682% | 9.0102% | 4.9788% | 3.9157% | 2.5717% | 4.8749% | | | | | | | |
| Amount Disallowed | (441,721) | (315,620) | (347,048) | (126,146) | (106,451) | (102,054) | (140,486) | | | | | | | (1,582,726) |
| Carryforward To Future Years | 6,401,664 | 19,360,722 | 19,506,575 | 21,633,265 | 24,306,274 | 27,972,136 | 30,504,024 | 33,604,276 | 35,902,755 | 37,991,606 | 39,814,750 | 41,829,516 | 43,817,192 | 43,817,192 |

December 8, 2000

State of New York Department of Taxation and Finance
W.A. Harriman Campus
Albany, NY  12227

Joint Election Under Tax Law Section 210.12(g)(11)(B)

For General Motors Corporation:

I certify that I am an authorized person with respect to the transferor, General Motors
Corporation.  On behalf of General Motors Corporation, I elect to utilize the investment
tax credit provisions set forth in Tax Law section 210.12(g)(11)(B).

On behalf of General Motors Corporation

ROGER D. WHEELER
CHIEF TAX OFFICER                    12/8/2000
Name & Title                         Date


For Delphi Automotive Systems Corporation:

I certify that I am an authorized person with respect to the taxpayer, Delphi Automotive
Systems Corporation.  On behalf of Delphi Automotive Systems Corporation, I elect to
utilize the investment tax credit provisions set forth in Tax Law section 210.12(g)(11)(B).

On behalf of Delphi Automotive Systems Corporation

James P. Whitson
Chief Tax Officer                    12/11/2000
Name & Title                         Date

## CONFIDENTIALITY AGREEMENT

     This CONFIDENTIALITY AGREEMENT ("Agreement") is made and entered into as of February 27, 2001, by and between General Motors Corporation ("GM"), a Delaware corporation, and Delphi Automotive Systems Corporation ("Delphi"), a Delaware corporation. The Agreement reduces to writing the oral agreement and understanding reached between the parties on December 11, 2000.

## RECITALS

WHEREAS, GM and Delphi have entered into an INVESTMENT TAX CREDIT TRANSFER AGREEMENT (incorporated by reference and made a part of this Agreement) which relates to a claim for refund of unused Investment Tax Credit with the State of New York;

WHEREAS, GM and Delphi filed tax returns on or about December 15, 2000 making the required elections and claiming the refund;

NOW, THEREFORE, GM and Delphi agree as follows:

Section 1. The purpose of this Agreement is to protect and prevent unauthorized disclosure of confidential information to any third party.

Section 2. GM and Delphi agree that the terms of the INVESTMENT TAX CREDIT TRANSFER AGREEMENT are confidential and will not be discussed with, or disclosed to, any third party unless required by law.

     IN WITNESS WHEREOF, each of the parties has caused this Confidentiality Agreement to be executed on its behalf by its officers or designates thereunto duly authorized, all as of the day and year first written above.

GENERAL MOTORS CORPORATION

By: _Michael Mack_

Title: General Director - State and Local Taxes and Global Customs Activities

DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _Richard J. Zillah_

Title: Director of Tax Administration

Delphi Corporation (f/k/a Delphi Automotive Systems Corporation)
Tax Year: 01/01/02 - 12/31/02

Form CT-46 - Claim for Investment Tax Credit

Investment Tax Credit Carryforward

The taxpayer, Delphi Automotive Systems Corporation (DASC) was spun-off from General Motors Corporation (GMC) on May 28, 1999. Pursuant to Tax Law Section 210.12(j)(1)(B), on December 8, 2000, DASC and GMC entered into an election whereby the amount of any unused Investment Tax Credits relating to DASC New York State investments prior to the spin-off date are to be treated as a credit of DASC which will be carried forward by the taxpayer. The joint election that was entered into by DASC and GMC (copy attached), was filed with each party's respective New York State franchise tax return for the tax year ended December 31, 1999, as required by Tax Law Section 210.12(j)(1)(B). The following Tax Law Section specifies the manner in which the unused credits are to be treated in years subsequent to the spin-off of the taxpayer from GMC.

Tax Law section 210.12(j)(1)(b) specifies that:

Where a credit is allowed to a taxpayer pursuant to this subparagraph, the taxpayer may treat the amount of such credit as an overpayment of tax to be credited or refunded in accordance with the provisions of section ten hundred eighty-six of this chapter, provided, however, the provisions of subsection (c) of section ten hundred eighty-eight of this article notwithstanding, no interest shall be paid thereon. Such credit shall be allowed against the tax imposed by this article with respect to the second succeeding taxable year next following the transaction year, provided that not more than one-fourth of the amount of such credit may be applied by the taxpayer, whether to reduce tax otherwise due or to be treated as an overpayment to be credited or refunded, with respect to such second succeeding taxable year and each of the next three taxable years following such second succeeding taxable year.

The unused Investment Tax Credit transferred from General Motors Corporation to DASC on May 28, 1999, DASC's first taxable year after the transaction year was May 29, 1999 through December 31, 1999. Therefore, the second succeeding taxable year following the transaction year is the tax year January 1, 2000 through December 31, 2000. The total unused credits as of May 28, 1999 were $43,817,192. The following schedule outlines the availability of one-fourth of the amount of total credits to be applied in the second succeeding taxable year and each of the next three taxable years following the second succeeding taxable year. The taxpayer will claim a refund of the allowable amount of credits on Form CT-46 (Claim for Investment Tax Credit).

Amount of Unused Investment Tax Credit Available for Tax Years 2000-2003:

| Tax Year | Allowable Refund | Total Future Amounts Available for Credit or Refund |
|---|---|---|
| 2000 | 10,954,298 | |
| 2001 | 10,954,298 | |
| 2002 | 10,954,298 | |
| 2003 | 10,954,298 | 10,954,298 |
| | 43,817,192 | 10,954,298 |

Detail of Available Unused Investment Tax Credit:

| | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|---|---|---|---|
| Carryforward From Prior Years | 0 | 6,401,684 | 19,360,722 | 19,606,575 | 21,633,296 | 24,306,274 | 27,972,136 | 30,564,024 | 33,604,276 |
| Current Year ITC | 8,624,491 | 13,798,106 | 3,826,240 | 2,593,504 | 2,944,132 | 3,959,132 | 2,890,845 | 3,625,104 | 3,707,645 |
| Current Year Recapture Of ITC | (222,642) | (396,283) | (315,457) | (163,112) | (18,728) | (23,983) | (64,718) | (479,640) | (1,279,255) |
| Total Carryforward Plus Current Year | 8,401,849 | 19,802,507 | 22,871,505 | 22,036,967 | 24,558,700 | 28,241,413 | 30,800,003 | 33,649,488 | 36,032,666 |
| ITC Used In Current Year | (1,558,444) | (130,989) | (3,019,892) | (154,526) | (145,974) | (167,223) | (163,493) | (45,213) | (129,900) |
| Adjusted Amount | 6,843,405 | 19,676,542 | 19,853,623 | 21,782,441 | 24,412,725 | 28,074,190 | 30,646,510 | 33,604,276 | 35,902,755 |
| Tax Credit Used For NY Audit | 5,121,176 | 2,292,676 | 9,870,576 | 4,979,876 | 3,515,734 | 2,577,776 | 4,808,875 | | |
| Amount Disallowed | (443,732) | (531,030) | (247,048) | (176,416) | (103,451) | (102,054) | (146,460) | | |
| Carryforward To Future Years | 6,401,684 | 19,360,722 | 19,606,575 | 21,633,296 | 24,306,274 | 27,972,136 | 30,564,024 | 33,604,276 | 35,902,755 |

| | 1995 | 1996 | 1997 | 1998 | Totals |
|---|---|---|---|---|---|
| Carryforward From Prior Years | 35,902,755 | 37,991,606 | 39,814,750 | 41,829,516 | |
| Current Year ITC | 2,197,640 | 2,014,848 | 2,049,438 | 2,011,664 | 54,230,367 |
| Current Year Recapture Of ITC | (19,349) | (117,029) | (30,022) | (10,033) | (3,412,265) |
| Total Carryforward Plus Current Year | 38,081,053 | 39,889,225 | 41,834,153 | 43,822,147 | |
| ITC Used In Current Year | (89,447) | (74,475) | (4,637) | (4,955) | (5,999,164) |
| Adjusted Amount | 37,991,606 | 39,814,750 | 41,829,516 | 43,817,192 | 43,817,192 |
| Tax Credit Used For NY Audit | | | | | |
| Amount Disallowed | | | | | (1,562,726) |
| Carryforward To Future Years | 37,991,606 | 39,814,750 | 41,829,516 | 43,817,192 | 43,817,192 |

Statement 10

**<u>Exhibit 5.01(b)(iv)</u>**
**Management Services Agreement, dated September 19, 2002, as amended, among Delphi Corporation and General Motors Management Corporation, Delphi Mechatronic Systems, Inc., Packard-Hughes Interconnect Company and ASEC Manufacturing**

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement, including Exhibits A, B, C and D and Addenda 1 through 3 (the "Agreement"), dated September 17, 2002, is entered into by and between Delphi Corporation, a Delaware corporation (formerly known as Delphi Automotive Systems Corporation) ("Delphi") and General Motors Investment Management Corporation, a Delaware corporation ("GMIMCo").

### RECITALS

1.    Delphi and certain of its wholly-owned subsidiaries (each a "Delphi Subsidiary" and collectively the "Delphi Subsidiaries") sponsor "employee pension benefit plans," as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 3(2)(A). These employee pension benefit plans (each a "U.S. Plan" and collectively the "U.S. Plans") are subject to the provisions of ERISA.

2.    Delphi, acting through its Board of Directors, appointed the Executive Committee of the Board of Directors as "named fiduciary" (as defined in ERISA § 402(a)(2)) with respect to the U.S. Plans sponsored by Delphi.

3.    Additionally, Delphi, acting through its Board of Directors, designated GMIMCo as "named fiduciary" (as defined in ERISA § 402(a)(2)) for purposes of investment of the U.S. Plans sponsored by Delphi.

4.    Further, pursuant to two separate Investment Management Agreements between GMIMCo and Delphi (together, the "Investment Management Agreements"), each dated January 1, 1999 and each subsequently amended through the date of this Agreement, Delphi, acting through one of its designated officers, appointed GMIMCo "investment manager" (as defined in ERISA § 3(38)(A)) with respect to the U.S. Plans Delphi sponsors.

5.    Moreover, Delphi, acting through its Board of Directors, directed the establishment of the Investment Policy Committee of Delphi ("IPC") and authorized the IPC to: (a) make annual recommendations to the Executive Committee regarding investment policy guidelines for the assets of the U.S. Plans sponsored by Delphi; (b) interact with and oversee the performance of the named fiduciary for investment purposes of the U.S. Plans sponsored by Delphi; (c) acting as employer on behalf of Delphi and in accordance with a procedure described in ERISA § 402(a)(2), remove and replace the named fiduciary for investment purposes of the U.S. Plans sponsored by Delphi with itself or another appointee; and (d) perform such fiduciary and other responsibilities as may be delegated to it or as have been authorized by the Executive Committee.

6.    In anticipation of and for the purpose of executing this Agreement, and in accordance with a procedure described in ERISA § 402(a)(2), the IPC removed and immediately re-appointed GMIMCo as named fiduciary for investment purposes and re-appointed GMIMCo as investment manager of the U.S. Plans sponsored by Delphi to undertake the duties, responsibilities and authority set forth in this Agreement, reserving to itself the authority to: (a) remove a portion of the assets of any of the U.S. Plans from the investment control and authority

L:\DM\DELPHI  FPO\DELPHI DRAFTS\MSA FINAL.DOC

of GMIMCo (any assets so removed by the IPC or by any other person or entity duly appointed
and empowered by Delphi or a Delphi Subsidiary are referred to as the "Removed Assets"); (b)
direct how the Removed Assets are to be invested; and (c) appoint "investment manager(s)" (as
defined in ERISA § 3(38)(A)) to manage the Removed Assets (investment managers other than
GMIMCo that are appointed by the IPC or by any other entity duly appointed and empowered
by Delphi or a Delphi Subsidiary are referred to in this Agreement as "Delphi Investment
Managers") as it deems appropriate in its sole discretion.

    7.    Each Delphi Subsidiary, acting through its respective Board of Directors, general
partner, or other duly designated "named fiduciary," as applicable, has designated GMIMCo as
"named fiduciary" (as defined in ERISA § 402(a)(2)) for purposes of investment of the U.S.
Plans it sponsors.

    8.    Delphi, GMIMCo, and each Delphi Subsidiary, simultaneous with the execution
of this Agreement, are entering into a separate Addendum to this Agreement pursuant to which
each Delphi Subsidiary, acting through a designated officer, will authorize Delphi, the IPC, and
GMIMCo to act in accordance with the terms of this Agreement, including the right of the IPC to
remove assets from the control and management of GMIMCo and to appoint one or more Delphi
Investment Managers to manage the Removed Assets, and the Addendum for each Delphi
Subsidiary will be ratified and approved by the governing body of such Delphi Subsidiary or the
designated named fiduciary for the U.S Plans sponsored by such subsidiary.

    9.    GMIMCo, in its capacity as a named fiduciary for purposes of investment of the
U.S. Plans, has and may again in the future enter into one or more trust agreements (such
agreement(s) together with any amendments or restatements collectively referred to as the "Trust
Agreements") with one or more trustees or custodians (such trustees or custodians serving as
such from time to time with respect to the trust funds next referred to being sometimes
collectively referred to as the "Trustee") and other parties establishing trust funds to hold the
assets of the U.S. Plans (collectively, the "Trust Funds").

    10.    The Trust Agreements provide for the assets of the U.S. Plans to be invested by
the Trustee as directed by a named fiduciary or investment manager and permit the assets of the
Trust Funds to be held in one or more group trusts which are incorporated into the Trust
Agreements.

    11.    General Motors Trust Company, a New Hampshire trust company and an affiliate
of GMIMCo (such company together with any successor being referred to as "GMTC"), has
established and may again in the future establish various collective investment funds in which
assets of the U.S. Plans may be invested (the "Collective Funds").

2

## TERMS

In consideration of the foregoing Recitals and the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the parties agree as follows:

**Section 1.    Plans Covered.**

The U.S. Plans to which this Agreement relates are listed in Exhibit A, as it may be amended from time to time by written agreement of the parties. No other plans are covered by this Agreement.

**Section 2.    Retention.**

Delphi retains GMIMCo to perform investment management services for the U.S. Plans subject to the terms and conditions of this Agreement. In addition, Delphi retains GMIMCo to perform such other related services with respect to the U.S. Plans as are specified in this Agreement.

**Section 3.    GMIMCo Duties Regarding the U.S. Plans.**

(a)    In accordance with its appointment as named fiduciary for purposes of investment of the U.S. Plans, GMIMCo will have and perform the investment management authority listed in items (i) through (viii) below with respect to the U.S. Plans, it being understood that GMIMCo will have full and independent authority to act in connection with those listed items; provided, however, that the extent of such authority is subject to Section 4 (regarding Delphi Investment Managers) below. In addition, but subject to Section 4, GMIMCo will perform the duties with respect to the U.S. Plans as provided in items (ix) through (xxxii) below. GMIMCo acknowledges that, with respect to its independent authority and duties as investment manager under this Section 3 referred to in ERISA § 3(38)(A) to the extent applicable to GMIMCo, it is a fiduciary with respect to the U.S. Plans as contemplated by ERISA § 3(38)(C).

    (i)    Selection, hiring, monitoring, evaluation and termination of investment managers. In this regard, GMIMCo has the power to appoint investment managers (as defined in ERISA §3(38)) and is authorized to establish investment guidelines for the investment managers appointed by it, and to negotiate and enter into investment management agreements with respect to the assets of the U.S. Plans with such investment managers.

    (ii)    Allocation of assets among investment managers and strategies.

    (iii)    Management of portfolio transitions, with full authority regarding in-kind contributions, asset liquidations, and the use of transition accounts.

    (iv)    Selection, hiring, monitoring, evaluation and termination of the Trustee, and management of the Trustee relationship (it being understood that GMIMCo will ensure that the Trustee maintains custody of the assets of the U.S. Plans in accordance with ERISA § 403(a) and the regulations thereunder).

3

(v)     Projections of cash flows of the investment accounts within the U.S. Plans taking into account plan liquidity sources and needs as and to the extent identified to GMIMCo by Delphi.

(vi)    Performance of asset mix management, including tactical asset allocation and rebalancing assets within Strategic Investment Policy Guidelines (as defined in subparagraph (x) below).

(vii)   Management of short-term cash.

(viii)  Establishment and management of equitization, currency overlay and similar derivative-based strategies with respect to the U.S. Plan assets.

(ix)    Conduct comprehensive studies of the U.S. Plans' pension liabilities, investment objectives, and risk tolerance (with input from Delphi and its actuaries) as and when such asset/liability studies are requested by Delphi.

(x)     Periodic (and on at least an annual basis) review and recommendations concerning the appropriateness and efficacy of existing investment policy guidelines for the Hourly and Salaried Plans (as defined in Exhibit A) setting forth target allocations and ranges for broad investment categories (e.g., equity, fixed income, real estate), which guidelines, as of the date of this Agreement, are set forth in Exhibit B, and any additional policy guidelines for other U.S. Plans (as such guidelines may be amended by the IPC, the "Strategic Investment Policy Guidelines") based on, among other things, pension liabilities, investment objectives and risk tolerance, in light of Delphi's objectives with respect to the U.S. Plans as communicated by it to GMIMCo.

(xi)    Research with respect to new asset classes or strategies for consideration by Delphi for the U.S. Plans.

(xii)   Recommendations regarding the addition or deletion of investment options that are offered to participants under the participant-directed defined contribution U.S. Plans (defined contribution U.S. Plans being referred to in this Agreement as "DC U.S. Plans").

(xiii)  Advice regarding plan design issues as requested by Delphi.

(xiv)   Advice regarding plan liability analysis and funding decisions as requested by Delphi.

(xv)    Administration of U.S. Plan expense accruals and fee payments based on data provided by or on behalf of Delphi or the Trustee.

(xvi)   Monitoring of trade execution costs and brokerage commissions based on data provided by or on behalf of the Trustee or third-party investment managers.

4

(xvii)  Monitoring of securities lending activities.

(xviii)  Management of any brokerage commission recapture program of the U.S. Plans.

(xix)  Monitoring of soft dollar utilization by the U.S. Plans based on data provided by or on behalf of the Trustee or third-party investment managers.

(xx)  Oversight of proxy voting policies and procedures.  In this regard, GMIMCo will maintain procedures for voting proxies with respect to securities held in GMIMCo managed investments and for overseeing proxy voting by investment managers retained by GMIMCo.

(xxi)  Assistance to Delphi in connection with its (A) obtaining the financial data required for annual actuarial valuations, (B) preparing Department of Labor filings, Internal Revenue Service filings, summary annual reports and summary plan descriptions, (C) preparing corporate financial statement footnote disclosures, (D)  periodic corporate, plan and regulatory audits and (E) preparing benefit plan cost analyses, in connection with each of the foregoing clauses (A) through (E) as required by Delphi in administering the U.S. Plans (it being understood and agreed that such assistance will be limited to matters pertaining to the services provided by GMIMCo under the Agreement).

(xxii)  Oversight of U.S. Plan investment data provided by the Trustee to any recordkeeper ("Recordkeeper") with respect to a U.S. Plan.

(xxiii)  Assistance to Delphi treasury, legal, and human resource departments and the applicable Delphi benefits center(s) in addressing questions regarding pension, benefits, and Trust issues (it being understood and agreed that such assistance will be limited to matters pertaining to the services provided by GMIMCo under this Agreement).

(xxiv)  Monitoring of third-party investment funds made available by Delphi to U.S. Plan participants under the DC U.S. Plans.

(xxv)  Monitoring of the Recordkeeper relationship with respect to investment-related issues.

(xxvi)  Monitoring of Delphi's relationship with any online investment advice provider designated by Delphi ("DC Adviser") with respect to a DC U.S. Plan.

(xxvii)  Coordinating the development and production of Delphi-approved DC U.S. Plan participant communications and educational materials, consisting of Pathways Magazine, Promark Fund fact sheets, the

5

Investment Performance Summary, and any successor publications for the DC U.S. Plans.

(xxviii) Assistance with coordination of content for the website of the DC U.S. Plans.

(xxix) Assistance with the preparation of the investment-related sections of annual prospectuses for participants in the DC U.S. Plans.

(xxx) Performing the following functions with respect to the assets of the U.S. Plans managed by it (and without taking into account any other assets of such U.S. Plans):

    (A)    monitor U.S. Plan-level investment risk exposures;

    (B)    monitor asset class-level risk exposures;

    (C)    monitor investment manager investment guideline compliance;

    (D)    assess risks of investment manager internal investment controls;

    (E)    monitor counter-party exposures; and

    (F)    provide procedures for disaster recovery and business continuity of GMIMCo.

(xxxi) Providing reports to such personnel as Delphi may designate, in accordance with Exhibit C.

(xxxii) Participating in (A) quarterly meetings with the IPC to report on fund returns and analysis of fund performance and to discuss significant activities affecting U.S. Plan investments, (B) annual benefits meetings with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers and Communication Workers of America ("IUE-CAW"), and (C) such other meetings as Delphi reasonably requests.

(b)    In furtherance of its authority as set forth above, but subject to Section 4 of this Agreement, GMIMCo has the following specific powers with respect to the discretionary investment management of the assets of the U.S. Plans:

(i)    to establish, form, invest in, dissolve, liquidate or take any other actions with respect to any corporation, limited liability company, partnership, trust or other person, including, without limitation, any title holding corporation under Internal Revenue Code ("Code") §§ 501(c)(2) or 501(c)(25);

6

(ii)    to abandon, acquire, convert, dispose of, exchange, exercise, grant, hold, issue, lease, mortgage, permit to expire, permit to be held in escrow, pledge, redeem, sell, subscribe for, surrender, vote, write, or take any and all other actions with respect to Securities or Other Property[1], and to exercise or decline to exercise any rights or obligations appurtenant or otherwise relating thereto, including (A) engaging in any transactions involving any combination of and taking any actions necessary or appropriate to settle transactions in puts, calls or other forms of options (covered or uncovered), futures contracts, swaps or other Securities or Other Property and (B) entering into stand-by agreements for future investment (either with or without a stand-by fee), short-selling programs, foreign exchange or foreign exchange contracts, swaps, guaranteed investment contracts, synthetic guaranteed investment contracts, bank or insurance company investment contracts (including guarantees with respect to investments), contracts for the immediate or future delivery of or otherwise pertaining to Securities or Other Property, and similar instruments and other derivative investments;

(iii)    to initiate, settle, compromise or submit to arbitration any claims, debts or damages due or owing to or from the investment accounts of the U.S. Plans or to commence, join in or defend, or represent any such investment account in, any suits or proceedings in any court of law or before any other body or tribunal, including, without limitation, any claims with respect to taxes; _provided, however_, that Delphi will retain the right, in its sole discretion, to commence, join in, or oppose any such settlements, compromises, arbitrations, suits, or proceedings where it may be adversely affected by the outcome, or where it believes that such action is required by ERISA or other applicable law;

(iv)    to commence, join in, consent to or oppose the reorganization, recapitalization, consolidation, sale, merger, foreclosure, liquidation or readjustment of the finances of any person or the Securities or Other Property thereof, and to deposit any Securities or Other Property with any protective, reorganization or similar committee, and to pay or agree to pay

---

[1] The term "Securities or Other Property" means property of any kind or nature, whether real or personal, tangible or intangible, whole or part interest therein, wherever situated, without being limited to the classes of property in which trustees are authorized to invest trust funds by any law or any rule of court of any jurisdiction, including without limitation: currency, evidences of obligations or indebtedness of any person, trust or participation certificates, general or limited interests in partnerships, membership interests in any organization or other person, insurance or annuity contracts, guaranteed investment contracts, synthetic guaranteed investment contracts, bank investment contracts, leaseholds, fee titles, mortgages or other interests in realty, preferred or common stocks, American depositary receipts, certificates of deposit, evidences of ownership in joint ventures, swap contracts, futures and/or option contracts, short-selling programs, foreign exchange contracts, contracts for future or immediate receipt or delivery of securities or relating to the lending of securities or property and other derivative investments.

7

the expenses and compensation of any such committee and any assessments levied with respect to Securities or Other Property so deposited;

(v)    to borrow money, to guarantee indebtedness or other obligations of other persons, to pledge any Securities or Other Property for the payment of any such loan or guarantee, or for any other purpose (whether or not in connection with the borrowing of money), and to enter into contracts ancillary or relating to such loans, guarantees or pledges;

(vi)    to manage, administer, operate, lease for any number of years (regardless of any restrictions on leases made by fiduciaries), develop, improve, repair, alter, demolish, mortgage, pledge, grant options with respect to, or otherwise deal with any property or interest therein at any time held by it, and to renew, extend or participate in the renewal or extension of any mortgage upon such terms as may be deemed advisable;

(vii)    to agree to a reduction in the rate of interest on or other modification in the terms of any mortgage, loan or guarantee, to waive or enforce any default whether in the performance of any covenant or condition of any mortgage, loan or guarantee in such manner and to such extent as may be deemed advisable, to exercise and enforce any and all rights of foreclosure, to bid on property in foreclosure, to take a deed in lieu of foreclosure with or without paying consideration therefor and in connection therewith to release the obligation on the bond secured by such mortgage, and to exercise and enforce in any action, suit or proceedings at law or in equity any rights or remedies in respect of any such mortgage, loan or guarantee;

(viii)    to convert monies received with respect to assets in the investment accounts of the U.S. Plans into or out of U.S. dollars or other currencies;

(ix)    to collect dividends, interest, rents, royalties and other forms of income on or distributions in respect of Securities or Other Property;

(x)    to exercise any right appurtenant to any Securities or Other Property, including without limitation, by general or limited power of attorney, or by serving or otherwise acting as a general or limited partner of a partnership, a managing or other member of a limited liability company, a member of an association, committee or other organization or in any similar capacity with respect to any person;

(xi)    to invest at any bank (A) in any type of interest bearing investments (including, but not limited to, savings accounts, money market accounts, certificates of deposit and repurchase agreements) and (B) in non-interest bearing accounts (including, but not limited to, checking accounts);

(xii)    to invest in the Collective Funds as well as in other collective investment funds (which in each case may provide for payment by the U.S. Plans of

8

fund-level management and other fees and costs, for purchase and redemption related transaction costs or fees in lieu thereof to be borne by the investor purchasing or redeeming and for limitations on the size and/or frequency of and required advance notice with respect to such transactions); and

(xiii) to invest in open-end and closed-end investment companies, regardless of the purposes of which such funds were created, including those managed, serviced, advised and/or distributed by GMIMCo or its affiliates, and any partnership, limited or unlimited, joint venture and other forms of joint enterprise created for any lawful purpose.

(c)    GMIMCo's responsibilities and obligations with respect to the U.S. Plans are limited to those responsibilities and obligations specifically set forth in this Agreement.

Section 4.    Delphi Investment Managers.

(a) During the term of this Agreement and subject to the terms of this Section 4, Delphi (acting through the IPC or other duly appointed person or entity) may withdraw from GMIMCo's management assets of the U.S. Plans and arrange for those Removed Assets to be managed by one or more Delphi Investment Managers; provided, however, that the Trustee and Recordkeeper with respect to all of the other assets of the U.S. Plans continue to be the Trustee and Recordkeeper, respectively, of any assets so withdrawn.  GMIMCo will have no duties or responsibilities in connection with the selection, hiring, monitoring, evaluation and termination of Delphi Investment Managers.

(b) In the event that Delphi intends to withdraw assets from GMIMCo's management, Delphi will provide GMIMCo with prompt written notice of such intent.  The notice will specify (i) the amount of assets that are being withdrawn, (ii) the U.S. Plan(s) with respect to which such assets relate, (iii) the name, address and contact information for the Delphi Investment Manager(s) who will manage the assets, (iv) the asset class and sub-asset class mandate from which the assets will be withdrawn and in which they will be invested by the applicable Delphi Investment Manager(s) and (v) the proposed date(s) upon which the withdrawal of assets and the appointment of the Delphi Investment Manager(s) are to become effective.  After such notice is delivered, the parties agree to cooperate to effect the transfer of the Removed Assets to the specified Delphi Investment Manager(s) in a commercially reasonable time frame and manner.

(c) Delphi acknowledges that transaction costs and out-of-pocket third party expenses directly related to a transition may be incurred as a result of the appointment and termination of, and movement of assets to and from, a Delphi Investment Manager, and agrees that all such costs, regardless of by whom incurred, will be borne by Delphi or the applicable U.S. Plan(s).

(d) In the event that and for so long as a Delphi Investment Manager is appointed to manage Removed Assets:

(i) if requested by GMIMCo, Delphi will either provide to GMIMCo or arrange for GMIMCo to receive (A) within the time frame set by the Trustee to meet GMIMCo's reporting requirements, the month-end values

9

of the Removed Assets and (B) in a commercially reasonable time frame, such other information with respect to the Removed Assets in such manner and form as GMIMCo may reasonably request in connection with its performance of services under this Agreement;

(ii)  except as otherwise provided in Section 3(a)(iv) (regarding the Trustee), but regardless of whether the appointment of a Delphi Investment Manager is effective under ERISA § 405(c) to relieve Delphi of any responsibility for investment or management of the Removed Assets, GMIMCo will have none of the authority, power, control, advisement, responsibilities, delegations, duties, or designations referred to in ERISA § 3(21), nor will it have any of the designations, delegations, authority, duties, responsibilities or powers specified in Sections 2 or 3 of this Agreement with respect to the Removed Assets, and, accordingly, will, to that extent, not be deemed a fiduciary with respect to such Removed Assets except as otherwise expressly provided in Sections 4(d)(iii) and (iv) below, and will have no obligations to take any of the Removed Assets into account in carrying out any of its authority, powers and duties with respect to the assets of the U.S. Plans except as otherwise expressly provided in Sections 4(d)(iii) and (iv) below;

(iii)  GMIMCo will consult with and make recommendations to Delphi regarding the allocation of inflows and outflows of U.S. Plan assets as between GMIMCo, on the one hand, and each Delphi Investment Manager, on the other hand, it being understood that (A) in the absence of a decision by Delphi to the contrary pursuant to the parenthetical in Section 4(d)(iv)(B) (regarding asset management mix and re-balancing), GMIMCo's allocable portion thereof will be equal to the result obtained by multiplying the amount of a particular inflow or outflow by a fraction the numerator of which is the most recent preceding calendar month-end value of the assets under GMIMCo's management of the U.S. Plan experiencing the cash flow and the denominator of which is the value of all of the assets of such U.S. Plan, (B) Delphi will cause and have sole responsibility for the Delphi Investment Managers to contribute out of the Removed Assets their allocable portion of any such outflow, and (C) Delphi will timely provide to each of GMIMCo, the Delphi Investment Manager(s) and the Trustee all appropriate directions and instructions to effect such allocations;

(iv)  GMIMCo's sole duties with respect to the Removed Assets will be to:

(A)  take into account cash flow data with respect to the Removed Assets timely provided to GMIMCo by or on behalf of Delphi (along with U.S. Plan liquidity needs as and to the extent identified to GMIMCo by Delphi) in GMIMCo's projections of cash flows of the investment accounts within the U.S. Plans;

10

(B)    take into account relevant data with respect to the Removed Assets timely provided to GMIMCo by or on behalf of Delphi in the making by GMIMCo of recommendations to Delphi regarding asset mix management, including rebalancing assets within the Strategic Investment Policy Guidelines, of the U.S. Plans' assets (it being understood and agreed that Delphi will be solely responsible for evaluating such recommendations, deciding whether and to what extent they will be implemented and then directing GMIMCo and the Delphi Investment Manager(s) as to the manner of implementation of Delphi's decisions, all as and to the extent that Delphi deems appropriate);

(C)    take into account relevant data with respect to the Removed Assets and other matters timely provided to GMIMCo by or on behalf of Delphi and its actuaries in GMIMCo's performance of asset/liability studies with respect to the U.S. Plans as and when such studies are requested by Delphi;

(D)    take into account relevant data with respect to the Removed Assets timely provided to GMIMCo by or on behalf of Delphi in GMIMCo's monitoring of the Recordkeeper relationship with respect to investment-related issues;

(E)    take into account relevant data with respect to the Removed Assets timely provided to GMIMCo by or on behalf of Delphi in the provision by GMIMCo of assistance to Delphi in connection with Delphi's (A) obtaining the financial data required for annual actuarial valuations, (B) preparing Department of Labor filings, Internal Revenue Service filings, summary annual reports and summary plan descriptions, (C) preparing corporate financial statement footnote disclosures and (D) preparing benefit plan cost analyses, in connection with each of the foregoing clauses (A) through (D) as required by Delphi in administering the U.S. Plans (it being understood and agreed that such assistance will be limited to matters pertaining to the other services provided by GMIMCo under this Agreement);

(F)    exercise its authority under Section 3(a)(iv) (regarding the Trustee); and

(G)    take into account, to the extent necessary, relevant data with respect to the Removed Assets for the purpose of fulfilling GMIMCo's reporting obligations under Section 3(a)(xxxi).

11

**Section 5.    Compensation and Expenses.**

Delphi, acting for itself and on behalf of the U.S. Plans, agrees that GMIMCo will receive compensation and reimbursement of expenses, effective as of January 1, 2002 in accordance with Exhibit D.

**Section 6.    Records and Audit Rights.**

GMIMCo will preserve its records relating to services it performs under this Agreement (to the extent that it maintains records with respect to such service) for a period of seven (7) years from the date of such performance, unless a shorter period is approved by Delphi in writing; *provided, however,* that if a longer period of retention is required by law for a particular type of record, GMIMCo will preserve such records for the legally required period. Delphi may, at its expense, examine and audit these records during normal business hours, upon reasonable advance written notice to GMIMCo. Delphi may perform the audits itself, or use an outside, independent auditor. GMIMCo will fully cooperate with Delphi's reasonable requests during such audits. Delphi will not engage direct or indirect competitors of GMIMCo to perform audit services.

**Section 7.    Representations, Warranties and Covenants of GMIMCo.**

GMIMCo represents and warrants to and covenants with Delphi that:

(a)    it has been duly incorporated and is validly existing as a corporation under the laws of the State of Delaware and the statements with respect to it contained in the Recitals to this Agreement are true and correct; ·

(b)    it is registered with the Securities and Exchange Commission as an investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and will use its best efforts to remain so registered during the term of this Agreement;

(c)    this Agreement has been duly and validly authorized, executed and delivered on behalf of GMIMCo and is a valid and binding agreement of GMIMCo enforceable against GMIMCo in accordance with its terms;

(d)    the execution and delivery of this Agreement by GMIMCo will not violate, or constitute a breach of or default under, the certificate of incorporation or by-laws of GMIMCo, any agreement or instrument by which GMIMCo is bound or, to the best of GMIMCo's knowledge, any order, rule, law or regulation applicable to GMIMCo of any court, governmental body, administrative agency or self-regulatory authority having jurisdiction over GMIMCo; and

(e)    it will cooperate with Delphi as it may reasonably so request, and promptly inform Delphi of any significant developments, in order to facilitate Delphi's compliance with applicable requirements under this Agreement.

**Section 8.    Representations, Warranties and Covenants of Delphi.**

Delphi represents and warrants to and covenants with GMIMCo that:

12

(a)    it has been duly incorporated and is validly existing as a corporation under the laws of the State of Delaware and the statements with respect to it contained in the Recitals to this Agreement are true and correct;

(b)    each Delphi Subsidiary has been duly formed and is validly existing as a corporation or partnership under the laws of its state of organization and the statements with respect to the Delphi Subsidiary and the Delphi Subsidiary's board of directors or general partner, as applicable, contained in the Recitals to this Agreement and to the applicable Addendum are true and correct;

(c)    Delphi and the appropriately designated committee or officer of Delphi and each Delphi Subsidiary and the appropriately designated entity or officer of each Delphi Subsidiary have all necessary corporate power and other authority and have taken all necessary action to take the steps ascribed to them in the Recitals to this Agreement and any applicable Addendum;

(d)    this Agreement and each Addendum has been duly and validly authorized, executed and delivered on behalf of Delphi and/or a Delphi Subsidiary, as applicable, and is a valid and binding agreement of each such party enforceable against such party in accordance with its terms;

(e)    the execution and delivery of this Agreement by Delphi and each Addendum by Delphi and a Delphi Subsidiary will not violate, or constitute a breach of or default under, their constituent documents, any plan document of a U.S. Plan or any other agreement or instrument by which any such party or any U.S. Plan is bound or, to the best of Delphi's knowledge, any order, rule, law or regulation applicable to Delphi or a Delphi Subsidiary or any U.S. Plan or any court, governmental body, administrative agency or self-regulatory authority having jurisdiction over Delphi or a Delphi Subsidiary or any U.S. Plan;

(f)    it has delivered to GMIMCo true and correct copies of the U.S. Plans listed in Exhibit A including all amendments thereto through and including the date of this Agreement, and will provide GMIMCo all subsequent material amendments to or restatements of any such documents during the term of this Agreement;

(g)    each of the U.S. Plans is qualified under Code §401(a);

(h)    the review of and decision to enter into this Agreement and for Delphi and each Delphi Subsidiary to enter into the applicable Addendum, including the decision to authorize the investment of assets of the U.S. Plans in the Collective Funds, has been made solely and independently by a fiduciary or fiduciaries (other than GMIMCo or any of its affiliates) with investment discretion for the U.S. Plans;

(i)    Delphi has authorized each Recordkeeper to provide GMIMCo with such data and other information in the possession or under the control of or otherwise available to such Recordkeeper (including, without limitation, access to relevant web sites) as may from time to time be requested by GMIMCo; and

13

(j)    it will cooperate with GMIMCo as it may reasonably so request, and promptly inform GMIMCo of any developments, in order to facilitate the performance of GMIMCo's duties and compliance with applicable requirements under this Agreement.

Section 9.    Confidentiality.

(a)    GMIMCo agrees to keep confidential and not to disclose any information or matter relating to the investments of the U.S. Plans (other than to GMIMCo's or Delphi's employees, agents, advisors, or representatives responsible for matters relating to the investments of the U.S. Plans, each such person being hereinafter referred to as an "Authorized Representative"); provided, however, that GMIMCo and its Authorized Representatives may make such disclosure to the extent that (i) the information being disclosed is publicly known at the time of the proposed disclosure by GMIMCo or such Authorized Representative, (ii) such disclosure, in the opinion of legal counsel (which may be inside counsel), is required by law or regulation, (iii) such disclosure is requested or demanded by any regulatory agency which has regulatory authority over GMIMCo and/or any of its Authorized Representatives, or (iv) Delphi otherwise consents.

(b)    Delphi agrees to keep confidential and not disclose (and to cause each Delphi Subsidiary to keep confidential and not disclose): (i) this Agreement or (ii) any information or other matter relating hereto including GMIMCo's actual or proposed costs or fees for the services provided under this Agreement or under the Investment Management Agreements (other than to Delphi's or a Delphi Subsidiary's officers, directors and employees responsible for matters relating to the U.S. Plans); provided, however, that Delphi or a Delphi Subsidiary may disclose such information to the extent that (X) the item being disclosed is publicly known at the time of the proposed disclosure by Delphi or a Delphi Subsidiary or one of its officers, directors, or employees, (Y) such disclosure by Delphi or a Delphi Subsidiary or one of its officers, directors, or employees, in the opinion of legal counsel (which may be inside counsel), is required by law or regulation or (Z) such disclosure is requested or demanded by any regulatory agency which has regulatory authority over Delphi or a Delphi Subsidiary or any of its officers, directors or employees; and provided further, that Delphi may disclose asset class information for the U.S. Plans and, upon the execution (immediately prior to the disclosure referred to below) of a confidentiality agreement between GMIMCo and a consultant retained by Delphi, disclose to such consultant information regarding GMIMCo's actual or proposed costs or fees for the services provided under this Agreement.

(c)    GMIMCo agrees to inform its officers, directors, and employees, and Delphi agrees (and agrees to cause each Delphi Subsidiary) to inform its officers, directors and employees, of the confidential nature of such information and will instruct such persons not to disclose such confidential information to any other person.

Section 10.    GMIMCo Standard of Care; Liability.

GMIMCo will perform its duties and obligations under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ("the GMIMCo Standard of Care"). GMIMCo will be deemed

14

to have discharged its duties and obligations under this Agreement so long as it complies with the GMIMCo Standard of Care. Subject to ERISA, no affiliate of GMIMCo, other than GMTC, and no officer, director or employee of GMIMCo or any of its affiliates, will have any liability to Delphi, any Delphi Subsidiary, any U.S. Plan or any Trust Fund for action taken, or for failure to act, under or in connection with this Agreement.

Section 11.    Indemnification; Litigation; Dispute Resolution.

(a)    To the fullest extent permitted by applicable law, neither GMIMCo nor any of its affiliates will be liable for any loss sustained by the U.S. Plans or the Trust Funds by reason of the acquisition, holding, management or disposition of any asset of the U.S. Plans or the Trust Funds in good faith and in accordance with the provisions of this Agreement. Subject to such limitations as may be imposed by ERISA or other applicable law, GMIMCo will indemnify and hold harmless the U.S. Plans, Delphi and Delphi's affiliates (other than in any of such affiliate's capacity as a participant in or beneficiary of a U.S. Plan) from and against any and all losses, claims, damages, liabilities and any reasonable and necessary expenses incurred by the U.S. Plans, Delphi or any such affiliate in connection therewith (including reasonable attorneys' fees) to which any such person may become subject arising as a result of any failure by GMIMCo to perform its duties under this Agreement in accordance with the GMIMCo Standard of Care.

(b)    Subject to such limitations as may be imposed by ERISA or other applicable law, Delphi will indemnify and hold harmless GMIMCo and its affiliates from and against any and all losses, claims, damages, liabilities and any reasonable and necessary expenses incurred by GMIMCo or any such affiliate in connection therewith (including reasonable attorneys' fees) to which any such person may become subject (i) arising as a result of any action which they take or refrain from taking in accordance with the direction of Delphi, any Delphi Investment Manager(s), or other person authorized by Delphi to direct GMIMCo in connection with this Agreement; and (ii) in instances where GMIMCo has performed its duties under this Agreement in accordance with the GMIMCo Standard of Care. GMIMCo will have no duty to make any investigation or inquiry as to the genuineness of the signature of any person or as to any statement contained in such directions, and it may accept the same as conclusive evidence of the truth and accuracy of the statement. Subject to ERISA, no affiliate of Delphi and no officer, director or employee of Delphi or any of its affiliates, will have any liability to GMIMCo or any affiliate of GMIMCo for action taken, or for failure to act, under or in connection with this Agreement.

(c)    Upon the assertion of any claim or the commencement of any action, suit or proceeding involving an indemnified party under this Section 11 that may give rise to liability of an indemnifying party hereunder, the party knowledgeable about the claim will promptly notify the other party of the existence of such claim, action, suit or proceeding. To the extent one party is obligated to defend an indemnified party in accordance with this Section 11, the indemnifying party will have the right to defend or settle such claim, action, suit, or proceeding at its own expense and with counsel of its own selection; provided, however, that the indemnified party will at all times have the right to fully participate in any settlement decision that it reasonably believes would have an adverse effect on its business. The indemnified party will make available to the indemnifying party all requested books and records relating to such claim, action, suit or proceeding, and the parties agree to render to each other such requested assistance as is

15

reasonably necessary to ensure a proper and adequate defense, all at the respective indemnifying party's sole expense. Neither party will settle a claim, action, suit or proceeding that might give rise to liability of the other party without the prior written consent of such other party.

Section 12.    **Bonding.**

To the extent bonding is required by any applicable law with regard to the services GMIMCo is providing, GMIMCo will obtain such bond.

Section 13.    **Term; Curing of Defaults; Termination.**

(a)    This Agreement is effective as of the date first above written and, unless earlier terminated as provided in paragraphs (b) through (d) below, will remain in effect until terminated by Delphi or by GMIMCo with 90 days prior written notice to the other; provided, however, that nothing in this Agreement may be construed to limit the power of Delphi to terminate GMIMCo's appointment as a named fiduciary for investment purposes of the U.S. Plans.

(b)    In the event of a material breach of this Agreement, the party alleging the breach must give written notice of the breach to the other party. If the breach is not cured within 30 days of such notice, the non-breaching party may terminate this Agreement upon written notice to the other party (which termination will be effective immediately or on such later date as may be specified in such notice).

(c)    Each of GMIMCo and Delphi may immediately terminate this Agreement upon written notice to the other party (which termination will be effective immediately or on such later date as may be specified in such notice), without prejudice to any other right or remedy, in the event that (i) in the case of Delphi, GMIMCo or (ii) in the case of GMIMCo, Delphi or any of the U.S. Plans or Trust Funds:

(A)    makes an assignment for the benefit of creditors,

(B)    files a voluntary petition in bankruptcy,

(C)    is adjudged bankrupt or insolvent or there is entered against it an order for relief in any bankruptcy or insolvency proceeding,

(D)    files a petition or answer seeking for it any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation,

(E)    seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator for it or of all or any substantial part of its properties,

(F)    files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding described in clauses (A) through (E), or

16

(G)    90 days expires following commencement of any proceeding against it seeking a bankruptcy or insolvency determination, reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation if the proceeding has not been dismissed within such period, or 90 days expires following the appointment of a trustee, receiver or liquidator for it or all or any substantial part of its properties without its agreement or acquiescence, which appointment is not vacated or stayed within such period, or if the appointment is so stayed, 90 days expires following the expiration of the stay, unless during such period the appointment is vacated.

(d)    This Agreement may be terminated by either party upon written notice to the other party (which termination will be effective immediately or on such later date as may be specified in such notice) with respect to services to be performed for any U.S. Plan in the event that a notice of intent to terminate such U.S. Plan is filed, a notice is issued by the Pension Benefit Guaranty Corporation to terminate involuntarily such U.S. Plan, such U.S. Plan fails to meet the minimum funding standards under the Code or ERISA, or such U.S. Plan is unable to pay benefits thereunder when due, or the Internal Revenue Service advises that a Trust Fund may not be qualified or exempt from federal income tax under the Code as described in Section 8(h) of this Agreement.

(e)    Upon the termination of this Agreement pursuant to this Section 13, any fees or costs that are accrued (in accordance with Exhibit D) as of the date of termination but are at such date unpaid will be due and payable within 30 days of either (i) the date of termination or (ii) if required pursuant to Exhibit D for certain fees and costs, the date of any invoice sent to Delphi in connection therewith.

**Section 14.    Force Majeure.**

Neither GMIMCo nor Delphi will be deemed to have breached this Agreement or be held liable for any failure or delay in the performance of all or any portion of its obligations under this Agreement if it is prevented from doing so by a cause or causes beyond its reasonable control. Without limiting the generality of the foregoing, such causes include acts of God, fires, floods, storms, earthquakes, riots, boycotts, strikes, lock-outs, wars and war operations, restraints of government, power or communication line failure or other circumstance beyond such party's reasonable control, or by reason of the judgment, ruling or order of any court or agency of competent jurisdiction or change of law or regulation subsequent to the execution of this Agreement.

**Section 15.    Services to Other Clients.**

The parties agree that GMIMCo and its affiliates may engage in any other business or act as investment adviser or investment manager to any other person or entity, whether or not having investment objectives similar to those of Delphi, the U.S. Plans or the Trust Funds, and that GMIMCo and its affiliates may give advice and take action with respect to any of their other clients which may differ from advice given or from the timing and nature of actions taken with respect to the U.S. Plans or the Trust Funds.

17

**Section 16.    Status of the Parties.**

GMIMCo and Delphi are independent contractors.  Nothing in this Agreement creates or may be construed to constitute GMIMCo, its affiliates, Delphi, the Delphi Subsidiaries, the U.S. Plans or the Trust Funds as members of any partnership, joint venture, association, unincorporated business or other joint entity.

**Section 17.    No Third Party Rights.**

Except to the extent ERISA, Sections 10 (regarding standard of care), 11 (regarding indemnification), or 15 (regarding services to other clients) of this Agreement or this Section 17 otherwise expressly so provides, this Agreement does not confer any rights or remedies upon any person other than Delphi and GMIMCo and their respective successors and permitted assigns.

**Section 18.    Assignment.**

Except as contemplated herein, a party may not assign this Agreement (including but not limited to within the meaning of "assignment" as defined in the Advisers Act) without the prior written consent of the other party, and any attempted assignment without such consent will be null and void.

**Section 19.    Amendment.**

This Agreement may not be modified or amended in any respect except in writing signed by the parties hereto.

**Section 20.    Notices.**

(a)    Any notice, approval, consent or similar communication required by this Agreement to be in writing will be deemed duly given if sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Delphi: | Delphi Corporation |
| | Attention:  Treasurer |
| | 5725 Delphi Drive |
| | Troy, Michigan 48098 |
| | |
| If to GMIMCo: | General Motors Investment Management Corporation |
| | Attention:  Vice President & General Counsel |
| | 767 Fifth Avenue |
| | New York, New York 10153. |

(b)    Any party may send any notice to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, facsimile or electronic mail), but no such notice will be deemed to have been duly given unless and until it is actually received by the intended recipient.  Any party may change its address for notices by giving the other party written notice of such change.

**Section 21.**    **Governing Law.**

Subject to the provisions of ERISA, the Code, and the Advisers Act, this Agreement will be construed, administered and enforced according to the internal law (and not the law of conflicts) of the State of New York.

**Section 22.**    **Severability.**

If any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will continue in full force and effect so long as they preserve the basic terms of this Agreement.

**Section 23.**    **Waiver.**

No delay or omission by either party to exercise any right or power under this Agreement will impair such right or power or be construed to be a waiver thereof. A waiver by either of the parties of any of the covenants to be performed by the other or any breach of this Agreement will not be construed to be a waiver of any succeeding breach or of any other covenant contained in this Agreement. Except as otherwise expressly provided in this Agreement, all remedies provided for in this Agreement will be cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity or otherwise.

**Section 24.**    **Survival.**

Sections 6 (regarding records and audit rights), 9 (regarding confidentiality), and 11 (regarding indemnification) will survive the termination or expiration of this Agreement.

**Section 25.**    **Counterparts.**

This Agreement may be executed in one or more counterparts, which will together constitute one and the same document.

**Section 26.**    **GMIMCo ADV.**

Delphi, on behalf of itself and each U.S. Plan, acknowledges that it has been provided with of a copy of Part II of GMIMCo's Form ADV under the Advisers Act. Notwithstanding the provisions of Section 13, Delphi may terminate this Agreement without penalty within five business days after the date that this Agreement is executed, pursuant to Advisers Act Rule 204-3(b).

**Section 27.**    **Compliance with Laws.**

It will be a duty and obligation of GMIMCo under this Agreement to perform its services hereunder in accordance with all laws, rules and regulations applicable to it.

19

Section 28.    **Entire Agreement**.

This Agreement embodies the entire understanding of the parties and supersedes any prior agreements or understandings with respect to the subject matter of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement on the date first above written.

DELPHI CORPORATION

By:    _____

Name:    John Blahnik
Title:    Treasurer


GENERAL MOTORS INVESTMENT
MANAGEMENT CORPORATION

By:    _____

Name:    W. Allen Reed
Title:    President and Chief Executive
Officer

20

**Addendum 1 to Management Services Agreement Dated September 17, 2002**

**Delphi Mechatronic Systems, Inc.**

## RECITALS

    1.    Delphi Corporation ("Delphi") and General Motors Investment Management Corporation ("GMIMCo") have entered into a Management Services Agreement dated September 17, 2002 ("MSA") pursuant to which GMIMCo will perform certain services in its role as "named fiduciary" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 402(a)(2)) for investment purposes and "investment manager" (as defined in ERISA § 3(38)(A)) of the U.S. Plans, and provide certain other services for the U.S. Plans.

    2.    Delphi Mechatronic Systems, Inc., a Delaware corporation ("D-MS"), is a wholly-owned subsidiary of Delphi and is thus part of the same "controlled group of corporations" (as defined in Internal Revenue Code ("Code") § 1563(a)) as Delphi.

    3.    D-MS sponsors certain U.S. Plans listed in Exhibit A to the MSA.

    4.    The D-MS Board of Directors is the "named fiduciary" (as defined in ERISA § 402(a)(2)) of the D-MS-sponsored U.S. Plans and is authorized to appoint a named fiduciary for investment purposes and one or more investment managers for such U.S. Plans.

    5.    D-MS, acting through its Board of Directors, designated GMIMCo as named fiduciary for purposes of investment of the assets of the U.S. Plans sponsored by D-MS and investment manager for the U.S. Plans D-MS sponsors.

    6.    D-MS has authorized Delphi (whether acting through the IPC or other person or entity appointed by Delphi) to act in accordance with the MSA with respect to the U.S. Plans sponsored by D-MS to the same extent that Delphi acts with respect to the U.S. Plans sponsored by Delphi.

    7.    Capitalized terms used in this Addendum without definition have the meanings given to them in the MSA.

## TERMS

Section 1.    **Appointment and Retention.**

    D-MS appoints GMIMCo as investment manager and retains GMIMCo to perform for the D-MS-sponsored U.S. Plans the services to be provided by GMIMCo for the Delphi-sponsored U.S. Plans under the MSA and in accordance with all of the terms and conditions of the MSA. GMIMCo accepts such appointment.

**Section 2.**    **GMIMCo Responsibilities.**

GMIMCo will provide the services for the D-MS-sponsored U.S. Plans that it provides to the Delphi-sponsored U.S. Plans in accordance with all terms and conditions of the MSA.

**Section 3.**    **Delphi Authorization.**

D-MS authorizes Delphi, and any persons or entities authorized to act on behalf of Delphi under the MSA, to act in accordance with the terms of the MSA with regard to the U.S. Plans sponsored by D-MS, including, without limitation, the payment of GMIMCo's compensation and expenses pursuant to Section 5 and Exhibit D of the MSA as such compensation and expenses relate to the D-MS-sponsored U.S. Plans, and the removal of Removed Assets and allocation of such assets to Delphi Investment Manager(s) pursuant to Section 4 of the MSA, and Delphi agrees to so act.

**Section 4.**    **Notices.**

(a)    Any notice, approval, consent, or similar communication required by this Addendum to be in writing to be sent to D-MS will be deemed duly given if sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to D-MS: | Delphi Mechatronic Systems, Inc.<br>Attention: Employee Benefit Plan Administrator<br>3110 Wood Creek Drive<br>Downers Grove, Illinois 60515 |
| If to Delphi: | Delphi Corporation<br>Attention:  Treasurer<br>5725 Delphi Drive<br>Troy, Michigan 48098 |
| If to GMIMCo: | General Motors Investment Management Corporation<br>Attention:  Vice President & General Counsel<br>767 Fifth Avenue<br>New York, New York 10153. |

(b)    Any party may send any notice to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, facsimile, or electronic mail), but no such notice will be deemed to have been duly given unless and until it is actually received by the intended recipient.  Any party may change its address by giving the other party notice.

2

**Section 5.    Relationship to MSA.**

Unless otherwise specified in this Addendum, the terms and conditions of the MSA govern this Addendum and, in the event of a conflict between the MSA and this Addendum, the MSA governs.

**DELPHI CORPORATION**

By: _____
   Name:  John Blahnik
   Title:   Treasurer

7

8

**GENERAL MOTORS INVESTMENT
MANAGEMENT CORPORATION**

By: _____
   Name:  W. Allen Reed
   Title:   President and Chief Executive
           Officer

**DELPHI MECHATRONIC SYSTEMS, INC.**

By: _____
   Name:  Lothar Veeser
   Title:   President

3

**Addendum 2 to Management Services Agreement Dated September 17, 2002**

**Packard-Hughes Interconnect Company**

## RECITALS

1.    Delphi Corporation ("Delphi") and General Motors Investment Management Corporation ("GMIMCo") have entered into a Management Services Agreement dated September 17, 2002 ("MSA") pursuant to which GMIMCo will perform certain services in its role as "named fiduciary" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 402(a)(2)) for investment purposes and "investment manager" (as defined in ERISA § 3(38)(A)) of the U.S. Plans, and provide certain other services for the U.S. Plans.

2.    Packard-Hughes Interconnect Company, a Delaware corporation ("PHI"), is a wholly-owned subsidiary of Delphi and is thus part of the same "controlled group of corporations" (as defined in Internal Revenue Code ("Code") § 1563(a)) as Delphi.

3.    PHI sponsors certain U.S. Plans listed in Exhibit A to the MSA.

4.    The PHI Board of Directors is the "named fiduciary" (as defined in ERISA § 402(a)(2)) of the PHI-sponsored U.S. Plans and is authorized to appoint a named fiduciary for investment purposes and one or more investment managers for such U.S. Plans.

5.    PHI, acting through its Board of Directors, designated GMIMCo as named fiduciary for purposes of investment of the assets of the U.S. Plans sponsored by PHI and investment manager for the U.S. Plans PHI sponsors.

6.    PHI has authorized Delphi (whether acting through the IPC or other person or entity appointed by Delphi) to act in accordance with the MSA with respect to the U.S. Plans sponsored by PHI to the same extent that Delphi acts with respect to the U.S. Plans sponsored by Delphi.

7.    Capitalized terms used in this Addendum without definition have the meanings given to them in the MSA.

## TERMS

**Section 1.    Appointment and Retention.**

PHI appoints GMIMCo as investment manager and retains GMIMCo to perform for the PHI-sponsored U.S. Plans the services to be provided by GMIMCo for the Delphi-sponsored U.S. Plans under the MSA and in accordance with all of the terms and conditions of the MSA. GMIMCo accepts such appointment.

L:\DM\DELPHI  FPO\DELPHI DRAFTS\MSA ADDENDUM 2 (PHI) FINAL.DOC

Section 2.    **GMIMCo Responsibilities.**

GMIMCo will provide the services for the PHI-sponsored U.S. Plans that it provides to the Delphi-sponsored U.S. Plans in accordance with all terms and conditions of the MSA.

Section 3.    **Delphi Authorization.**

PHI authorizes Delphi, and any persons or entities authorized to act on behalf of Delphi under the MSA, to act in accordance with the terms of the MSA with regard to the U.S. Plans sponsored by PHI, including, without limitation, the payment of GMIMCo's compensation and expenses pursuant to Section 5 and Exhibit D of the MSA as such compensation and expenses relate to the PHI-sponsored U.S. Plans, and the removal of Removed Assets and allocation of such assets to Delphi Investment Manager(s) pursuant to Section 4 of the MSA, and Delphi agrees to so act.

Section 4.    **Notices.**

(a)    Any notice, approval, consent, or similar communication required by this Addendum to be in writing to be sent to PHI will be deemed duly given if sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to PHI: | Packard-Hughes Interconnect Company |
| | Attention: Employee Benefit Plan Administrator |
| | 17159 Von Karman Avenue |
| | Irvine, California 92614-0901 |
| | |
| If to Delphi: | Delphi Corporation |
| | Attention: Treasurer |
| | 5725 Delphi Drive |
| | Troy, Michigan 48098 |
| | |
| If to GMIMCo: | General Motors Investment Management Corporation |
| | Attention: Vice President & General Counsel |
| | 767 Fifth Avenue |
| | New York, New York 10153. |

(b)    Any party may send any notice to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, facsimile, or electronic mail), but no such notice will be deemed to have been duly given unless and until it is actually received by the intended recipient. Any party may change its address by giving the other party notice.

2

**Section 5.**     <u>Relationship to MSA</u>.

Unless otherwise specified in this Addendum, the terms and conditions of the MSA govern this Addendum and, in the event of a conflict between the MSA and this Addendum, the MSA governs.

**DELPHI CORPORATION**

By:     _____
Name:     John Blahnik
Title:     Treasurer


**GENERAL MOTORS INVESTMENT
MANAGEMENT CORPORATION**

By:     _____
Name:     W. Allen Reed
Title:     President and Chief Executive
        Officer


**PACKARD-HUGHES INTERCONNECT
COMPANY**

By:     _____
Name:     CHARU MANOCHA
Title:     DIRECTOR OF HUMAN RESOURCES

3

Addendum 3 to Management Services Agreement Dated September 17, 2002

**ASEC Manufacturing**

## RECITALS

1.      Delphi Corporation ("Delphi") and General Motors Investment Management Corporation ("GMIMCo") have entered into a Management Services Agreement dated September 17, 2002 ("MSA") pursuant to which GMIMCo will perform certain services in its role as "named fiduciary" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") § 402(a)(2)) for investment purposes and "investment manager" (as defined in ERISA § 3(38)(A)) of the U.S. Plans, and provide certain other services for the U.S. Plans.

2.      ASEC Manufacturing, a Delaware general partnership a/k/a Delphi Catalyst Systems ("ASEC"), is a wholly-owned subsidiary of Delphi and is thus part of the same "controlled group of corporations" (as defined in Internal Revenue Code ("Code") § 1563(a)) as Delphi.

3.      ASEC sponsors certain U.S. Plans listed in Exhibit A to the MSA.

4.      The ASEC Benefits Committee is the "named fiduciary" (as defined in ERISA § 402(a)(2)) of the ASEC -sponsored U.S. Plans and is authorized to appoint a named fiduciary for investment purposes and one or more investment managers for such U.S. Plans.

5.      ASEC, acting through its Benefits Committee, designated GMIMCo as named fiduciary for purposes of investment of the assets of the U.S. Plans sponsored by ASEC and investment manager for the U.S. Plans ASEC sponsors.

6.      ASEC has authorized Delphi (whether acting through the IPC or other person or entity appointed by Delphi) to act in accordance with the MSA with respect to the U.S. Plans sponsored by ASEC to the same extent that Delphi acts with respect to the U.S. Plans sponsored by Delphi.

7.      Capitalized terms used in this Addendum without definition have the meanings given to them in the MSA.

## TERMS

**Section 1.    Appointment and Retention.**

ASEC appoints GMIMCo as investment manager and retains GMIMCo to perform for the ASEC-sponsored U.S. Plans the services to be provided by GMIMCo for the Delphi-sponsored U.S. Plans under the MSA and in accordance with all of the terms and conditions of the MSA. GMIMCo accepts such appointment.

L:\DM\DELPHI FPD\DELPHI DRAFTS\MSA ADDENDUM 3 (ASEC) FINAL.DOC

**Section 2.**    **GMIMCo Responsibilities.**

GMIMCo will provide the services for the ASEC-sponsored U.S. Plans that it provides to the Delphi-sponsored U.S. Plans in accordance with all terms and conditions of the MSA.

**Section 3.**    **Delphi Authorization.**

ASEC authorizes Delphi, and any persons or entities authorized to act on behalf of Delphi under the MSA, to act in accordance with the terms of the MSA with regard to the U.S. Plans sponsored by ASEC, including, without limitation, the payment of GMIMCo's compensation and expenses pursuant to Section 5 and Exhibit D of the MSA as such compensation and expenses relate to the ASEC-sponsored U.S. Plans, and the removal of Removed Assets and allocation of such assets to Delphi Investment Manager(s) pursuant to Section 4 of the MSA, and Delphi agrees to so act.

**Section 4.**    **Notices.**

(a)    Any notice, approval, consent, or similar communication required by this Addendum to be in writing to be sent to ASEC will be deemed duly given if sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to ASEC: | ASEC Manufacturing |
| | Attention: Employee Benefit Plan Administrator |
| | 1301 Main Parkway |
| | Catoosa, Oklahoma 74015 |
| | |
| If to Delphi: | Delphi Corporation |
| | Attention: Treasurer |
| | 5725 Delphi Drive |
| | Troy, Michigan 48098 |
| | |
| If to GMIMCo: | General Motors Investment Management Corporation |
| | Attention: Vice President & General Counsel |
| | 767 Fifth Avenue |
| | New York, New York 10153. |

(b)    Any party may send any notice to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, ordinary mail, facsimile, or electronic mail), but no such notice will be deemed to have been duly given unless and until it is actually received by the intended recipient. Any party may change its address by giving the other party notice.

2

**Section 5.**    Relationship to MSA.

Unless otherwise specified in this Addendum, the terms and conditions of the MSA govern this Addendum and, in the event of a conflict between the MSA and this Addendum, the MSA governs.

**DELPHI CORPORATION**

By:    _____

Name:    John Blahnik

Title:    Treasurer

**GENERAL MOTORS INVESTMENT
MANAGEMENT CORPORATION**

By:    _____

Name:    W. Allen Reed

Title:    President and Chief Executive
Officer

**ASEC MANUFACTURING**

By:    _____

Name:    F. Thomas Sprunger

Title:    Manager, Human Resources

3

**EXHIBIT A**

**TO MANAGEMENT SERVICES AGREEMENT**

**LIST OF U.S. PLANS**

1. Delphi Retirement Program for Salaried Employees (the "Salaried Plan");

2. Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan" and together with the Salaried Plan, the "Hourly and Salaried Plans");

3. ASEC Manufacturing Retirement Program;

4. ASEC Manufacturing Savings Plan;

5. Packard Hughes Interconnect Non-Bargaining Retirement Plan;

6. Packard Hughes Interconnect Bargaining Retirement Plan;

7. Packard Hughes Interconnect Foley, Alabama Facility Retirement Plan;

8. Delphi Mechatronic Systems Retirement Program;

9. Delphi Mechatronic Systems Savings-Stock Purchase Program;

10. Delphi Income Security Plan for Hourly-Rate Employees;

11. Delphi Savings-Stock Purchase Program for Salaried Employees in the United States; and

12. Delphi Personal Savings Plan for Hourly-Rate Employees in the United States.

L:\DM\DELPHI FPO\DELPHI DRAFTS\MSA EXHIBIT A FINAL.DOC

**EXHIBIT B**

**TO MANAGEMENT SERVICES AGREEMENT**

**STRATEGIC INVESTMENT POLICY GUIDELINES**

**FOR THE HOURLY AND SALARIED PLANS (AS DEFINED IN EXHIBIT A)**

| Asset Class | Strategic Investment Policy Guideline Range[1] |
|---|---|
| **Equity** | |
| - US Publicly Traded | 24-36 |
| - Private Market | 5-9 |
| - Developed International Markets | 20-26 |
| - Emerging Markets | 0-4 |
| | |
| **Fixed Income** | |
| - Global Bonds | 17-27 |
| - High Yield | 7-11 |
| | |
| **Absolute Return Strategy** | 0-2 |
| **Real Estate** | 5-9 |

---

[1] Within the policy guideline ranges, specific target allocations have been and will be recommended by GMIMCo and approved by the IPC.

L:\DM\DELPHI  FPO\DELPHI DRAFTS\MSA EXHIBIT B FINAL.DOC

**EXHIBIT C**

**TO MANAGEMENT SERVICES AGREEMENT**

**REPORTING**

1.  Quarterly reports will be delivered after the end of each calendar quarter. Reports for quarters prior to the quarter ended June 30, 2003 will be delivered within forty-five days after quarter-end. Reports for the quarter ended June 30, 2003 and subsequent quarters will be delivered within thirty days after quarter-end. GMIMCo will use reasonable best efforts to deliver reports at least five business days prior to the relevant quarterly IPC meeting if that occurs earlier than the agreed upon due date of a quarterly report, and to improve the timing of report delivery for the quarters ending after June 2003. These reports will include:

    (a)  Asset values of each U.S. Plan;

    (b)  Asset allocation versus strategic policy for the defined benefit U.S. Plans (hereinafter "DB U.S. Plans");

    (c)  Explanation of changes in market values for the Hourly and Salaried Plans (as defined in Exhibit A);

    (d)  Investment results compared to relevant benchmarks at the total plan and asset class levels, including discussion thereof for major asset classes managed by GMIMCo, for the DB U.S. Plans;

    (e)  Significant investment activities, including manager changes for major asset classes managed by GMIMCo;

    (f)  Fund allocations by asset class for the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States;

    (g)  Summary performance versus benchmark by asset class for the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States; and

    (h)  Allocation of major asset classes at the sub-asset-class level for the Hourly and Salaried Plans.

2.  Beginning with the quarterly report pertaining to the calendar period ending December 31, 2002, the quarterly reports will also include:

    (a)  Plan level performance attribution by asset class for the Hourly and Salaried Plans;

    (b)  Balanced Fund performance attribution by asset class;

L:\DM\DELPHI  FPO\DELPHI DRAFTS\MSA EXHIBIT C FINAL.DOC

EXHIBIT C

(c)  Rolling excess return, tracking error versus benchmarks and information ratio for major asset classes managed by GMIMCo for the Hourly and Salaried Plans; and

(d)  Fact sheets for each major asset class managed by GMIMCo for the Hourly and Salaried Plans, including (but not limited to) investment managers in the asset class and overall allocations by major characteristics appropriate to each asset class (e.g. economic sectors, major holdings, geography, and/or credit quality).

3.  An estimate of calendar year-to-date investment returns for the Hourly and Salaried Plans will be delivered bi-weekly within five business days following the end of each bi-weekly period.

4.  An estimate of the market values of the Hourly and Salaried Plans will be delivered annually within three business days following the end of the calendar year.

2

## EXHIBIT D

### TO MANAGEMENT SERVICES AGREEMENT

### COMPENSATION AND EXPENSE REIMBURSEMENT

1. **Management Fee**

   Delphi, on behalf of itself and the U.S. Plans, will pay or cause to be paid to GMIMCo a fee ("Management Fee") consisting of a "Base Assets Fee" and an "Alternative Assets Fee". The Management Fee will be calculated monthly and payable quarterly in arrears, as described in this Exhibit D. The Base Assets Fee is calculated at the per annum percentage rates of Average Base Assets (as defined below) determined in accordance with the following schedule:

   | Average Base Assets | Per Annum Rate |
   |---------------------|----------------|
   | first $3.5 billion | .035% |
   | over $3.5 billion | .025%; |

   and the Alternative Assets Fee is calculated at the per annum rate of .40% of Average Alternative Assets (as defined below).

   For purposes of calculating and paying the Management Fee:

   (a)    "Average Base Assets" means, with respect to each calendar month, the sum of the Value (as defined below) of the Base Assets (as defined below) on the last day of such month and the Value of the Base Assets on the last day of the immediately preceding calendar month, divided by two (it being understood that in the case of the month of January, 2002, for the purpose of determining the Value of the Base Assets on the last day of the immediately preceding calendar month, the Value of the corresponding assets on December 31, 2001 will be used);

   (b)    "Average Alternative Assets" means, with respect to each calendar month, the sum of the Alternative Assets (as defined below) on the last day of such month and the Alternative Assets on the last day of the immediately preceding calendar month, divided by two (it being understood that in the case of the month of January, 2002, for the purpose of determining the Alternative Assets on the last day of the immediately preceding calendar month, the corresponding assets on December 31, 2001 will be used);

   (c)    "Base Assets" means, on any date, all of the assets of the U.S. Plans that on such date are managed by GMIMCo under the Agreement, minus the Alternative Assets on such date;

EXHIBIT D

(d)     "Alternative Assets" means, on any date, the result obtained by multiplying (i) the
Value on such date of the aggregate gross assets of the U.S. Plans by (ii) the percentage
which represents the policy allocation to Alternative Investments[1] for the Hourly and
Salaried Plans (as defined in Exhibit A) as approved from time to time by the IPC
(disregarding, for purposes of calculating the Base Assets Fee and the Alternative
Assets Fee, any ranges around such policy allocation as may be so approved), it being
understood that such policy allocation to Alternative Investments as of the date of the
Agreement is 13%;

(e)     "Value" means the value in U.S. dollars as communicated to GMIMCo by the Trustee
of the assets in question;

(f)     At the end of each quarter, following the receipt of an invoice from GMIMCo
providing detailed supporting information for the Management Fee for such quarter, the
invoice will be paid within 30 days from one or more Funds (as defined in section 2(b)
below) or the U.S. Plans' interests in such Funds as determined by GMIMCo or its
affiliates and upon the direction to the Trustee, which payment will be reported in the
next following summary provided by GMIMCo to Delphi pursuant to paragraph 4
below;

(g)     GMIMCo will allocate the Management Fee among the various U.S. Plans in
proportion to the market value of each of the U.S. Plans. Accordingly, following the
end of each quarter GMIMCo will provide written instructions to the Trustee regarding
the allocation of the Management Fee with respect to such quarter among the various
U.S. Plans. Delphi may from time to time amend the standing allocation instructions
for the Management Fee by providing GMIMCo with new written instructions; and

(h)     It is understood by the parties to the Agreement that there is no minimum Management
Fee.

---

[1] For the purposes of this Exhibit D to the Agreement, Alternative Investments include private market investments, real
estate investments including investments in real estate investment trusts, investments in absolute return strategies and
investments in other alternative strategies as may be identified and agreed by the parties to the Agreement after the date of
Agreement.

2

EXHIBIT D

2. <u>Direct Fund Costs</u>

Delphi, on behalf of itself and the U.S. Plans, will pay or cause to be paid, and will cause the U.S. Plans to bear, the Delphi Portion of Direct Fund Costs (each as defined below).

For purposes of calculating and paying Direct Fund Costs:

(a)    "Fund" means any trust, account, fund, company or other vehicle holding or otherwise established or existing with respect to assets attributable to any U.S. Plan and which vehicle is managed by (and/or by third parties retained by or on behalf of) GMIMCo or its affiliates;

(b)    "Direct Fund Costs" means those expenses incurred by or with respect to any Fund. Such expenses include but are not limited to (i) expenses incurred by GMIMCo or its affiliates in connection with management of any Fund (whether such management is by GMIMCo, such affiliates or third parties), including Allocated Expenses (as defined below), (ii) investment management fees and related expenses payable to or incurred by persons other than GMIMCo and its affiliates, (iii) brokerage commissions and other trading expenses, (iv) interest, (v) taxes, if any, (vi) trustee and custodial fees and expenses and (vii) legal, accounting and other professional fees and expenses;

(c)    "Allocated Expenses" means that portion of the compensation and benefits, facility and occupancy, information technology and other expenses incurred by GMIMCo or its affiliates and allocated by GMIMCo or its affiliates to a Fund pursuant to the activity-based costing model or other cost allocation system employed from time to time by GMIMCo or its affiliates;

(d)    "Delphi Portion" means (i) the percentage determined by dividing the Value (as defined in Section 1(e) of this Exhibit D) of a Fund's net assets attributable to the U.S. Plans by the Value of such Fund's total net assets or (ii) in the case of one or more particular Direct Fund Costs such other percentage as may from time to time be agreed to between GMIMCo and Delphi;

(e)    in furtherance of but without limiting the obligations of Delphi with respect to the Delphi Portion of Direct Fund Costs, such Costs will be paid by a Fund to a third party or GMIMCo or its affiliates when and as directed by GMIMCo or its affiliates; and

(f)    GMIMCo will allocate the Delphi Portion of Direct Fund Costs among the various U.S. Plans in proportion to the market value of each of the U.S. Plans.  Accordingly, GMIMCo will provide written instructions to the Trustee regarding such allocation of the Delphi Portion of Direct Fund Costs among the various U.S. Plans.  Delphi may from time to time amend the allocation instructions for Direct Fund costs by providing GMIMCo with new written instructions.

3. <u>Out-of-Pocket Expenses</u>.

3

EXHIBIT D

(a)    Delphi, itself and on behalf of the U.S. Plans, will be responsible for the payment of, and will cause either one or more U.S. Plans or Delphi to bear, all Out-of-Pocket Expenses "Out-of-Pocket Expenses" means those amounts (other than Direct Fund Costs) related to a U.S. Plan that are paid or payable to a third party or have been paid by GMIMCo to a third party on behalf of Delphi or a U.S. Plan.  Such Expenses include (but are not limited to) fees and expenses with respect to:

(i)    U.S. Plan or trust record keeping;

(ii)    communications with Plan participants (e.g., contract writers, printing, publication and mailing costs);

(iii)    trustees and custodians;

(iv)    third party DC U.S. Plan advisers, if any;

(v)    U.S. Plan or trust accounting;

(vi)    U.S. Plan, trust, or other audits;

(vii)    preparation, publication and distribution of U.S. Plan, trust, or other financial statements;

(viii)    regulatory filings (e.g., Form 5500), examinations, and other proceedings;

(ix)    actuarial, legal, or tax matters;

(x)    Pension Benefit Guaranty Corporation premiums; and

(xi)    beneficiary payment processing expenses.

"Out-of-Pocket Expenses" will also be deemed to include fees and expenses with respect to (i) the provision of special services by GMIMCo or its affiliates (e.g., services arising out of an acquisition or divestiture by Delphi) and (ii) the incurrence of regulatory or other expenses occasioned by and directly as a result of compliance with the requirements of the Agreement.

(b)    In furtherance of, but without limiting the payment obligations of Delphi with respect to, Out-of-Pocket Expenses, such Expenses will be paid by the U.S. Plans or Delphi (as applicable) (i) in the case of Delphi, within thirty days of invoice by GMIMCo supporting such expense and (ii) in the case of the U.S. Plans, when and as directed by GMIMCo or its affiliates.

4

EXHIBIT D

(c)    With respect to a particular Out-of-Pocket Expense, unless Delphi directs otherwise, GMIMCo will direct the Trustee to allocate Out-of-Pocket Expenses among the applicable U.S. Plans or Funds in proportion to the market value of the applicable U.S. Plans or Funds.

Reporting

In addition to the reporting obligations outlined in Exhibit C, GMIMCo will provide to Delphi on a quarterly basis detailed information supporting the calculation of the Management Fee (including all relevant Values), the Delphi Portion of Direct Fund Costs, and Out-of-Pocket Expenses (listed according to the items specified in this Exhibit D) for the most recent calendar quarter.

Re-Negotiation of Management Fee

In the event that, at any time during the term of the Agreement, either:

(a)    the percentage policy allocation referred to in Section 1(d)(ii) of this Exhibit D is either reduced to below 11% or increased to greater than 15% of the aggregate value of the gross assets of such U.S. Plans; or

(b)    the total of Removed Assets, plus all other U.S. Plan assets which for any reason (other than payment of benefits, fees or expenses in the ordinary course of business, and investment losses) cease to be managed by GMIMCo under the Agreement, exceeds $2 billion;

then the parties will, if either party chooses to initiate discussions regarding the Management Fee (by providing written notice to the other), attempt in good faith to re-negotiate the Management Fee. In the event that the parties are unable, after good faith negotiations, to agree upon a new Management Fee, then either party may terminate the Agreement upon 30 days' written notice to the other, notwithstanding any provision in Section 13 of the Agreement to the contrary.