Master Restructuring Agreement

**Exhibit 5.01(b)(v)**
**Battery Facilitation Agreement – Transaction Summary**
**dated as of March 21, 2005 between Delphi and GM**

## GM/Delphi Battery Facilitation Agreement – Transaction Summary

This Transaction Summary, dated as of March 21, 2005 ("**Facilitation Agreement**") will confirm the understanding between Delphi Corporation ("**Delphi**") and General Motors Corporation ("**GM**") regarding certain arrangements between the parties intended to facilitate the transfer of Delphi's global battery business to JCI (the "**JCI Transaction**"), and the transition from Delphi as the Tier I supplier to GM of certain automotive batteries to GM to JCI.

### A.    Delphi's U.S. Plant Consolidation.

1.    Delphi shall transform its U.S. plant operations to be more efficient and competitive, including but not limited to:

(i)    Transfer battery production at Anaheim and Olathe facilities to other Delphi battery facilities;

(ii)    Transformation of Fitzgerald to other products ; and

(iii)    Transformation of New Brunswick operations to competitive wage structure.

2.    GM and Delphi agree that the relocation cost associated with the flow back of Fitzgerald employees to a GM U.S. facility will be shared equally (50/50) by GM and Delphi up to a total $67,000 relocation cost ($33,500 each).    These costs shall include relocation allowances, relocation services and other related expenses provided for in the National Agreement or any other applicable collective bargaining agreement.    Regarding New Brunswick employees, GM intends to work with Delphi to make transfer and new hire opportunities available at GM or Delphi sites for New Brunswick employees.

3.    **Delphi's Olathe Battery Plant**. GM and Delphi will undertake the following actions commencing upon the Closing Date,    and for a four year period thereafter, (except where specified otherwise), contingent upon UAW cooperation and contractual considerations, as applicable.

(i)    Delphi will offer as soon as possible after the date of this Facilitation Agreement and for a limited period, a one-time incentive attrition/redeployment opportunities to current Olathe employees, similar to opportunities and incentives offered in Flint West.

(ii)    Relative to the consolidation of the Olathe Battery Plant and the employee redundancies associated with such consolidation, it is agreed between GM and Delphi that immediately after receiving concurrence from the UAW, Delphi will begin executing the Olathe Redeployment Plan. As a part of this redeployment plan GM will offer, as soon as possible, as openings occur, flow back opportunities to the GM Fairfax facility, for the Olathe employees pursuant to the provisions of the 2003 Delphi/GM/UAW National Agreements. In addition, if Delphi is successful in achieving the concurrence of the UAW, flow back opportunities will be extended to include employees hired after October 18, 1999, as well as any employees who are ineligible as a result of turning down a previous Fairfax job offer. GM also agrees to support any closed plant employee placement treatment for the Olathe employees, which Delphi negotiates with the UAW, provided a waiver of any GM new hire obligations created as a result of these placements is included in the Delphi /UAW settlement. Employees, as described above,

Page 1

who volunteer for the Fairfax flow back option, will be placed on active status at the GM Fairfax Plant or into GM protected status on or before June 6, 2005.

Delphi will be responsible for all cost associated with managing the employees in protected status. Beginning January 1, 2006, GM will be responsible for all JOBS costs associated with the production employees. Delphi will remain responsible for all facility, management and administrative costs associated with those employees in protected status until June 5, 2006, or, until the total number of protected employees falls below twenty (20), whichever is earlier. No later than April 4, 2006, GM will assume the JOBS costs of the remaining skilled trades employees unless the parties mutually agree to extend such timing. The parties commit to make every effort to eliminate the JOBS costs as soon as possible. Such efforts may include items such as allowing Fairfax employees to accept extended area hire placement and backfilling with Olathe employees, retraining skilled trades employees for other classifications.

   (iii) GM will reimburse Delphi for 50% of all contractually related incremental costs (up to an annual reimbursement of $500,000.00) for hourly represented employees incurred at the North Kansas City Cockpit plant ("KCC Plant"), as a result of Delphi hiring employees at the KCC Plant cockpit operation under the Delphi Supplement and National Agreement, as applicable. Amount to be paid quarterly beginning the date of closure of the Battery Transaction for the prior three months' of expense.

   (iv) In addition to GM's obligation under clause (iii) above, GM will reimburse Delphi for current Olathe employees who accept redeployment opportunities at the KCC Plant, at a rate of $39,322.50 annually per employee. To be paid quarterly beginning the date of closure of the battery transaction for the prior three months' of expense.

  4. In addition to the payments described in Sections 2 and 3 above, GM would provide up to $30 million in funding to assist Delphi in restructuring operations for closure or transformation to a competitive wage workforce contingent upon the following milestones:

   (i) $7.5 million at closing of the JCI Transaction;
   (ii) $3.6 million payable upon price reduction implemented on July 1, 2005;
   (iii) $3.6 million payable upon price reduction implemented on July 1, 2006;
   (iv) $3.3 million payable upon price reduction implemented on July 1, 2007;
   (v) $6.0 million upon sale of New Brunswick to JCI or upon resourcing manufacturing of all New Brunswick battery volume after December 1, 2007, recognizing that GM is not obligated to provide any backfill work for New Brunswick; and
   (vi) $6.0 million upon re-sourcing manufacturing of all Fitzgerald battery volume to JCI.

No further consideration will be offered for any other U.S. battery sites. In the event the specific contingent milestones listed above do not occur, GM shall have no liability for the specific payment associated with such milestone.

  5. For the period from closure of the JCI Transaction until the subsequent sale of the New Brunswick Plant to JCI (the "New Brunswick Sale") and re-sourcing of Fitzgerald battery volume to JCI (but in no event beyond December 1, 2007), GM will purchase batteries

manufactured at Delphi's Fitzgerald and New Brunswick operations through JCI, who will in turn have a contractual relationship with Delphi.

6.    In consideration of GM's cost sharing in Delphi's U.S. restructuring, JCI will receive price reductions for all North American batteries (OE, service, and aftermarket) manufactured at Fitzgerald or New Brunswick, per the following schedule and implemented by Delphi:

      (i)    1.5% on July 1, 2005;
      (ii)   2.0% on July 1, 2006; and
      (iii)  3.0% on July 1, 2007.

These price reductions are in addition to any pre-existing contractual price reductions.

7.    GM through JCI will purchase GM's annual battery volume requirements from these sites for the product programs specified in **Exhibit A**, including all successor or derivative programs (excluding the GMT-900), through the earlier of December 1, 2007 or until battery operations at the New Brunswick and Fitzgerald facilities either cease production or are transferred to JCI;  provided, however, that such volume requirements shall not include; (i) programs exited at Delphi's request, (ii) batteries purchased by Delphi, and (iii)  batteries manufactured outside of the United States.   Should GM or JCI re-source a program from Exhibit A, for any programs that begin production prior to December 1, 2007 (or such other date as may apply under clauses A.8 or  A.9 below) other than for a reason permitted under Section A.10 below, Delphi would have a right to withhold price reductions.

8.    GM and Delphi will jointly develop a transition plan that will facilitate the re-sourcing of battery production from Fitzgerald to JCI based on the timing of the product backfill for 2007 by quarter.  Delphi intends to place backfill work for seventy-five (75) employees by June 30, 2007.  The parties intend to achieve 100% of the Fitzgerald battery re-sourcing by October 1, 2007 but will be predicated on GM's timed backfill plan for 175 hourly employees.

9.    In the event Delphi is delayed in achieving its commitments regarding the New Brunswick facility by the December 1, 2007 date referenced above, as the result of the inability to finalize the 2007 National IUE agreement for reasons beyond Delphi's reasonable control, the parties would agree upon a reasonable extension of that time period taking into consideration all appropriate facts and circumstances.  Delphi will make finalization of the New Brunswick Sale a priority in 2007 IUE-Delphi national negotiations.

10.    The above provisions notwithstanding, GM reserves the right to resource such products, but only in the event Delphi cannot satisfy GM's volume and quality requirements for Delphi produced batteries, based on technology in place at closing of JCI Transaction.

11.    <u>Fitzgerald Battery Replacement Work</u>.  As a result of the loss of the GMT201 battery business out of Fitzgerald, GM and Delphi agree that Delphi will move equivalent battery volume (GMX-365 program and certain SPO batteries) from Oshawa to Fitzgerald as soon as commercially practical:

      (i)    Contracts will be at US pricing levels at the time of move; and
      (ii)   FOB Delphi.

12.  <u>GMT900 and Fitzgerald Wind-Down</u>.  During the transition of batteries from Delphi to JCI, transition will be accomplished in a manner that assures all batteries for the GMT900 program will be sourced to JCI.  All pricing for these batteries will be handled between GM and JCI.  Loss of the GMT900 program will be backfilled in part by transferring remaining Oshawa battery volume to Fitzgerald in accordance with the jointly developed battery transition plan.  Contracts will be at US pricing levels at time of move and FOB Delphi

13.  <u>Non-Battery Fitzgerald Product Backfill</u>.  GM will provide support for Delphi's plan to identify and place non-battery backfill product in the Fitzgerald, GA area upon the cessation of battery production as described in the August 10, 2004 side letter signed by GM and Delphi (the "Fitzgerald Letter").  The following changes will be made to the Fitzgerald Letter:

(i)  In lieu of all price increases, labor premiums or other labor related payments contemplated for the 150 jobs described in the Fitzgerald Letter, GM will pay Delphi $4.4 million per year for four years as a competitive adjustment.  Such competitive adjustment will be payable quarterly in increments of $1.1 million beginning with the last day of the calendar quarter in which the first such non-battery product begins SOP in Fitzgerald, GA (payments estimated to begin on June 30, 2007) and continue on the last day of each quarter thereafter until 16 such payments have been made.  GM's obligation to make such annual payments is expressly contingent upon Delphi being market competitive in terms of price, quality and service during the 4 year period specified above.

(ii)  Incremental GM steering hose business that is sourced to Delphi Fitzgerald will be on a "Lifetime Contract" basis pursuant to GM's standard terms and conditions, except that Delphi may terminate any such contracts after expiration of the four year competitive adjustment upon one year's advance notice to GM.  In the event of such termination, Delphi will reimburse GM for the cost of re-tooling the business to a new supplier if GM paid for the cost of the original tooling.  All reasonable efforts will be made to transfer production tooling to new supplier and avoid any such incremental retooling costs.

(iii)  GM intends to source the Lambda, Monte Carlo/Impala, and Buick La Crosse LY7 programs to Delphi for a total of 63 jobs; GM needs to provide product program details for the remaining 12 employee shortfall.

(iv)  GM will also provide viable incremental business opportunities to support 100 additional jobs for Fitzgerald tier 2 employees:

• Initial list of possible product program opportunities has been provided by GM, and GM is expected to provide Delphi with sufficient detail for each program for analysis and development of a business case

• Delphi must be competitive on the basis of quality, performance, technology and price for this new business.

• Programs that are sourced to Delphi Fitzgerald will be on a "Lifetime Contract" basis pursuant to GM's standard purchasing terms and conditions

B.  <u>Delphi's Oshawa Battery Wind-down</u>.

1.  Battery production is expected to wind down by May 31, 2005 as production relocates to other Delphi US Battery plants.  GMCL will provide necessary contractual and

Employment Standards Act notices of job loss to employees at Oshawa, including Delphi's Oshawa battery operation, and the parties will work together to develop an efficient wind-down plan. Each party will use its reasonable best efforts to assure that such plan will avoid disruption to vehicle programs / aftermarket. Such plan will include the handling and removal of Delphi's production assets. Except as expressly set forth below, all of the current GM, GMCL and Delphi agreements will remain in full force and effect in accordance with their respective terms.

2.    The current number of assigned employees at the Oshawa Battery operations is 265 assigned employees, consisting of: 254 assigned hourly employees and 11 assigned salaried employees. Lay-off cost amounts with respect to the wind-down of the Battery operations will be handled as follows:

(i)    In lieu of paying lay-off cost amounts for 65 assigned hourly employees of the Battery operations, Delphi will add 65 assigned hourly employees to Delphi's Chassis operations to supply the GMX210/230 (211/231) front and rear brake corners and GMT-800 (900) front brake corners at carryover pricing. Inasmuch as there is a shortfall of transferred employees to the aforementioned 65 employees, Delphi will be required to pay GMCL CDN $150,000 per employee for such shortfall.

(ii)    With regard to the remaining 200 assigned employees remaining in the Battery operations (189 hourly and 11 salaried employees), (a) at completion of wind-down of the production at the Battery operations, Delphi will pay GMCL a lay-off cost amount of CDN $150,000 per employee for 67.5 assigned employees (in addition to the aforementioned shortfall if required), and (b) GMCL will absorb (i.e., assign no liability to Delphi) the lay-off cost amounts otherwise allocable to Delphi under the Oshawa Labour and Management Services Agreement between the parties (as amended, "LMSA") for the remaining 132.5 assigned employees.

(iii)    The assigned employee headcount will be reduced by 200 employees (increased to reflect any shortfall payments made by Delphi) for the purposes of computing future employees as to which Delphi is subject to lay-off provisions under the LMSA.

(iv)    No lay-off cost amounts will be owed by Delphi to GMCL under the LMSA for the actual number of transferred employees up to a total of 65, to the extent that such reductions will not cause GMCL to incur actual layoff or severance costs to its employees (e.g., GMCL is able to place such assigned hourly employee(s) elsewhere within GMCL without incurring layoff, severance or retirement incentive costs). Such reductions are in addition to the 1% attritions, natural attritions and other attritions permitted under the LMSA.

(v)    GMCL will use its reasonable best efforts to notify Delphi of available openings for assigned hourly employees in order to reduce the assigned hourly employees headcount without incurring lay-off cost amounts.

3.    GMCL's assistance is subject to the following:

(i)    Delphi's agreeing to remain responsible for, and to pay GMCL the respective lay-off cost amounts for reductions in assigned employees supporting the Chassis operations, after taking into consideration permitted attritions and the above described headcount reductions and opportunity for Delphi to re-assign up to 65 assigned hourly employees; and

(ii)    Closure of the contemplated JCI Transaction. If the JCI Transaction does not close, the parties will re-negotiate GMCL's obligations under clause B.2(ii) above. In any case, the headcount reduction referred to in clause B.2(iii) above would be deemed to refer to 67.5 employees (or the actual number for which Delphi has paid layoff costs to GMCL) rather than 200 employees.

4.    Delphi Battery-related fees under the Administrative Services Agreement will cease to be assessed at the end of the month of the cessation of Battery production. All payments owed by Delphi under the Battery lease will terminate at the end of the month in which Delphi completes its obligations as stated in section 8 (b) of the lease agreement.

## C.    <u>Transition Plan</u>.

In support of the matters described in Sections A and B above, GM, Delphi, and JCI will develop a detailed battery transition plan that defines battery and non battery (Fitzgerald backfill) product movement between the various facilities for the 2005-2007 period.

## D.    <u>Miscellaneous</u>.

1.    It is understood that the Parties' agreements set forth herein, including Delphi's price reductions and GM's assistance in restructuring operations, providing replacement work and other financial support, are expressly contingent upon: (i) the transfer of the global Delphi battery business (OE, service, and aftermarket) to JCI on terms and conditions reasonably acceptable to GM (including, but not limited to, an economic subsidy from Delphi to JCI for New Brunswick employees not converted to competitive wage by the Closing of the New Brunswick Sale); (ii) the execution by GM and JCI of a long term battery supply agreement on terms and conditions acceptable to GM; (iii) execution by Delphi and JCI of a long term contract manufacturing agreement on terms and conditions acceptable to Delphi; (iv) Delphi's obtaining acceptable agreements with the UAW and support from the IUE for its restructuring of the New Brunswick facility; and (v) GMCL obtaining CAW support for accomplishment of the quality, service, technology and price improvements noted above.

2.    It is intended that the terms and conditions pertaining to JCI in this Facilitation Agreement be consistent with the GM/JCI Long Term Supply Agreement.

3.    The parties understand and agree that this Facilitation Agreement constitutes only a statement of mutual intentions with respect to the matters referred to herein, does not constitute a binding obligation on any party and does not contain all terms upon which agreement must be reached with respect to such matters. A binding commitment with respect to the matters referred to in this Facilitation Agreement will result only from the execution of definitive agreements, subject to the conditions expressed therein.

MAR 21 '05 16:27 FR DELPHI          248 813 2599 TO 915985753404      P.08/09

4.    This Facilitation Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, without regard to the conflict of laws principles thereof. This Facilitation Agreement may not be amended or otherwise modified except by a written instrument signed by both parties.

DELPHI CORPORATION                    GENERAL MOTORS CORPORATION

By: _____        By: _____
       John Blahnik                          Susan Tuohy

Title:  Director, Mergers,           Title:  Executive Director, Finance
        Acquisitions & Planning               General Motors WWP

Date: 3/21/05                        Date:  3-21-05

Page 7

MAR 21 '05 17:16                                      586 575 1519    PAGE.08

**Exhibit A**

## Fitzgerald & New Brunswick Product Programs for 2005-2007

| Platform | Delphi Mfg. Plant | Platform | Delphi Mfg. Plant |
|---|---|---|---|
| GM SPO Canada – currently mfd. In US or Canada | | GMT-265 | New Brunswick |
| GM SPO US - currently mfd. In US | | GMT-305 | New Brunswick |
| H1 | | GMT-325 | New Brunswick |
| J-2902 | | GMT-330 | New Brunswick |
| GMX-211 | | GMT-360 | New Brunswick |
| GMX-231 | | GMT-368 | New Brunswick |
| GMX-283 | | GMT-370 | New Brunswick |
| GMT-800 | All | GMX-001 | New Brunswick |
| GMT-800E | All | GMX-002 | New Brunswick |
| GMT-820 | All | GMX-130 | New Brunswick |
| GMT-830 | All | GMX-295 | New Brunswick |
| GMT-880 | All | GMX-320 | New Brunswick |
| GMX-365 | Anaheim * | GMX-380 | New Brunswick |
| | Anaheim * | GMX-381 | New Brunswick |
| 97PA | Fitzgerald | GMX-384 | New Brunswick |
| GMT-315 | Fitzgerald | GMX-386 | New Brunswick |
| GMT-610 | Fitzgerald | J | New Brunswick |
| GMX-220 | Fitzgerald | M/L | New Brunswick |
| GMX-222 | Fitzgerald | P-90 | New Brunswick |
| GMX-270 | Fitzgerald | GMT-319 | Undefined |
| GMX-272 | Fitzgerald | GMT-361 | Undefined |
| GMX-310 | Fitzgerald | GMT-371 | Undefined |
| GMX-357 | Fitzgerald | GMT-440 | Undefined |
| H2 | Fitzgerald | GMX-282 | Undefined |
| S5S | Fitzgerald | GMX-322 | Undefined |

* Pending transition plan to be proposed by Delphi and approved by GM

Page 8

# DELPHI

June 30, 2005

Bo Andersson
Vice President
General Motors Corporation
30009 Van Dyke Avenue M/C 480-206-114
Warren, Michigan 48090-9025

Dear Bo:

   In connection with the sale by Delphi Corporation ("Delphi") of its global Starting, Lighting and Ignition lead-acid ("SLI") battery business to Johnson Controls, Inc. ("Buyer") (the "JCI Transaction"), General Motors Corporation ("GM") and Delphi have previously executed: (i) a non-binding letter agreement dated August 10, 2004 relating to non-battery backfill products for Delphi's Fitzgerald, Georgia SLI facility (the "Fitzgerald Letter"); and (ii) a non-binding GM/Delphi Battery Facilitation Agreement – Transaction Summary dated March 21, 2005 relating to cost sharing between the parties to facilitate transformation of Delphi's US SLI plants (the "Facilitation Agreement"). With regard to the aforementioned agreements, GM and Delphi agree as follows:

1.  GM is executing a supply agreement with Buyer relating to SLI batteries made in the US, and consents to the transfer of existing SLI agreements to Buyer.

2.  Notwithstanding language to the contrary therein, the terms and conditions of the Fitzgerald Letter, as modified by the Facilitation Agreement shall be binding on both GM and Delphi effective as of the closing of the JCI Transaction; provided, however, that the parties acknowledge and agree that any then remaining GM commitments and/or obligations therein shall immediately become null and void in the event Delphi sells, conveys, assigns, leases or otherwise transfers majority ownership, control and/or operation of the Fitzgerald Steering Hose operations (as referenced in the Fitzgerald Letter) to a third party.

3.  Notwithstanding language to the contrary therein, the terms and conditions of the Facilitation Agreement shall be binding on both GM and Delphi effective as of the closing of the JCI Transaction; provided, however, that the parties acknowledge and agree that: (i) any then remaining GM commitments and/or obligations pursuant to Section A.13 of the Facilitation Agreement shall immediately become null and void in the event Delphi sells, conveys, assigns, leases or otherwise transfers majority ownership, control and/or operation of the Fitzgerald Steering Hose operations to a third party; and (ii) any then remaining GM commitments and/or obligations pursuant to Section A.3 of the Facilitation Agreement shall immediately become null and void in the event Delphi sells, conveys, assigns, leases or otherwise transfers majority ownership, control and/or

Delphi Corporation, 5725 Delphi Drive, Troy, MI 48098

Bo Andersson
June 30, 2005
Page 2

operation of the North Kansas City Cockpit Plant (as referenced in the Facilitation
Agreement) to a third party.

4.    In the event that the JCI Transaction does not close on June 30, 2005, the "July
1, 2005" date referred to in clauses A.4(ii) (payment of $3.6 million GM to Delphi) and
A.6(i) (1.5% price reduction) of the Facilitation Agreement shall be deemed to refer to
"the first day of the month immediately following the closing of the JCI Transaction".

5.    Exhibit A to this letter (Fitzgerald & New Brunswick Product programs for 2005-
2007) replaces and supercedes the Exhibit A attached to the Facilitation Agreement.

6.    This letter, the Fitzgerald Letter, and Facilitation Agreement shall be governed
by, and construed and enforced in accordance with the laws of the State of Michigan,
without regard to the conflict of laws principles thereof. The terms of this letter may not
be amended or otherwise modified except by a written instrument signed by both
parties.

If you are in agreement with the foregoing, please so indicate by signing and returning
the enclosed copy of this letter to the undersigned.

Very truly yours,

Stephen H. Olsen
Director, Mergers and Acquisitions


ACCEPTED AND AGREED FOR GM:

By: _____
    Bo Andersson,
    Vice President
Date: _06/30/05_____

### EXHIBIT "A"

### Fitzgerald & New Brunswick Product Programs for 2005-2007

| Platform | Delphi Mfg. Plant | Platform | Delphi Mfg. Plant |
|---|---|---|---|
| GM SPO Canada – currently mfd. in US | | GMX-357 | Fitzgerald |
| GM SPO US - currently mfd. in US | | H2 | Fitzgerald |
| GM SPO I – currently mfd. in US | | S5S | Fitzgerald |
| H1 | Fitzgerald | GMT-265 | Fitzgerald |
| GMX-211 | Fitzgerald | GMT-325 | New Brunswick |
| GMX-231 | Fitzgerald | GMT-330 | New Brunswick |
| GMX-283 | | GMT-360 | Both |
| GMT-800 | Both | GMT-368 | Both |
| GMT-800E | Both | GMT-370 | Both |
| GMT-820 | Both | GMX-001 | New Brunswick |
| GMT-830 | Both | GMX-130 | New Brunswick |
| GMT-880 | Both | GMX-295 | Fitzgerald |
| GMX-365 (L26 & L27 engines) | Fitzgerald | GMX-320 | Fitzgerald |
| 97PA | Fitzgerald | GMX-380 | Both |
| GMT-315 | Both | GMX-381 | Both |
| GMT-610 | Both | GMX-384 | Both |
| GMX-220 | Fitzgerald | J | New Brunswick |
| GMX-222 | Fitzgerald | M/L | Both |
| GMX-270 | Fitzgerald | P-90 | New Brunswick |
| GMX-272 | Fitzgerald | W4 | Both |
| GMX-310 | Fitzgerald | | |

**Note:** Successor programs are not listed but are considered as extended production of the Programs identified above.

Execution Copy

*Letter Agreement*

The purpose of this letter agreement ("Agreement") is to formalize the understanding that has been reached between General Motors Corporation ("GM") and Delphi Corporation ("Delphi") regarding the future use of the "Freedom" trade name and associated trademarks.  In this regard the parties mutually agree as follows:

1.    The parties acknowledge and agree that as part of the sale of Delphi's global battery business to Johnson Controls, Inc.("JCI"), Delphi has granted JCI a perpetual, non-revocable, exclusive, global license to JCI for use of the "Freedom" trade name and associated trademarks with SLI lead acid batteries. Such license being non-transferable except in connection with sale of JCI's SLI lead acid battery business.

2.    The parties further acknowledge and agree that prior to entering into any transaction that would sell, assign, or otherwise transfer Delphi's ownership of the "Freedom" trade name and associated trademarks, Delphi will offer GM a right of last refusal on the same terms and conditions.

This Agreement shall be governed by the laws of the State of Michigan without regard to the principles of conflicts of law, shall be binding and inure to the benefit of Delphi and GM and their respective successors and assigns, and may only be modified or amended by a written document duly executed by both parties.

**Delphi Corporation**                    **General Motors Corporation**

By: _Stph H. Oler_                    By: _____

Date: _Jun 30, 2005_                  Date: _06/30/05_

# DELPHI

August 10, 2004

Mary Boland
GMNA Vice President and CFO
General Motors Corporation
300 Renaissance Drive M/C 482-C35-D24
Detroit, Michigan 48265-3000

Dear Mary:

This letter will confirm our recent discussions relating to potential changes in Delphi's battery operations associated with the possible sale of certain of Delphi's assets relating to its global Starting, Lighting and Ignition lead-acid ("SLI") battery business to Johnson Controls, Inc. ("Buyer") (the "Transaction"), recognizing that GM's consent is required for transfer of existing agreements to Buyer.

The Transaction contemplates technological and other improvements ("Improvements") to Delphi's SLI battery business that would be beneficial to both GM and Delphi. It is anticipated that the parties will develop a timing and transition plan, taking into account such factors as wind down of the battery business to coincide with timing of SOP for new business and avoidance of supplier cancellation charges. As part of the Improvements, the parties' intent is to transform the entire Fitzgerald hourly workforce such that all employees will be "Tier 2 Employees" under the terms of the two tier wage and benefit structure recently agreed upon between Delphi and the UAW. The parties recognize that the transformation and the headcount parameters set forth below are subject to Delphi's ability to negotiate a satisfactory Delphi-UAW agreement which includes capping employment at 150. Cost sharing between the parties to facilitate such transformation will be addressed in a separate agreement. GM and Delphi are willing to cooperate with each other in order to facilitate the improvements, including:

1.  **Incremental GM Steering Hose Business for Delphi:**

    •   For placement in connection with the Delphi Fitzgerald, GA operation, GM would source incremental steering hose (both pressure and return hose) business for 50% of the headcount level agreed with the UAW, but in no case more than 75 hourly (direct and indirect) employees based on a standard 40 hour work week at the Tier 2 employee wage and benefit structure recently agreed upon between Delphi and the UAW. The parties agree that the headcount set forth below are based on a standard 40 hour work week. Beginning in 2007, business that may be sourced includes:

Mary Boland
August 10, 2004
Page 2

| Vehicle Program | Vehicle Model | Employees |
|---|---|---|
| GMT962/966/967/968 | Lambda | 13 |
| GMT945 | Hummer III | 5 |
| GMX211/231 | Monte Carlo / Impala | 14 |
| GMX365 LY7 | Buick La Crosse | 9 |
| GMX367 P | Grand Prix | 2 |
| GMX215 | Cadillac XLR | 1 |
| Holden VE | Various | 9 |

- Delphi recognizes GM's memo of June 4, 2004 (attached as Exhibit "A") outlining potential requirements for certain programs noted above and will be prepared to respond accordingly once Delphi has adequately reviewed specific target pricing and product requirements, including math models and vehicle program timing.

- Delphi must be competitive in terms of quality, service, technology and price (initial agreed price and price reductions will be deemed competitive through September 2011) with similar products otherwise available to GM. If GM notifies Delphi of a supplier more competitive in quality, service, or technology, Delphi will have a reasonable opportunity to meet such alternative quality, service, or technology, failing which GM may at its sole discretion move the business to such other supplier. In the event GM moves the business as a result of non-competitiveness, Delphi shall immediately become responsible for any and all hourly employees and related costs impacted by such transfer of business.

- For above referenced programs where an integrated supplier has system responsibility, GM will exercise commercially reasonable efforts to encourage the supplier to re-source the business to Delphi and this business will be considered incremental revenue for Delphi.

- Requirement is for the incremental business to provide supply from September 2007 through September 2011 enabling a minimum duration of four (4) years. From the closing date of the Transaction until September 2011, Delphi will be provided with: (i) if otherwise competitive on quality, service and technology, a right to match the competitive price (if necessary) for next generation business having SOP between September 2007 and September 2011; and (ii) an opportunity to quote on next generation business having SOP after September 2011

- Both Delphi and GM are flexible to consider creative, mutually beneficial solutions to support GM's efforts to achieve re-sourcing of certain programs noted above.

2. **Delphi Transferred Steering Hose Work:**

- For placement in connection with the Delphi Fitzgerald, GA operation, Delphi would transfer steering hose business for 50% of the headcount level agreed with the UAW, but in no case more than 75 hourly (direct and indirect) employees. Notwithstanding the foregoing, GM's maximum obligation, under this item2, will be strictly limited to labor subsidies for transferred programs supporting up to a cumulative total of 75 hourly employees, as specified below. Beginning in 2007, business that may be sourced includes:

Mary Boland
August 10, 2004
Page 3

| Vehicle Program | Vehicle Model | Employes |
|---|---|---|
| GMT380/370 | Various models | 10 |
| GMT800/900 | Various models | 18 |
| GMT201 | Various models | 0 |
| GMT610 | Savanna / Express | 8 |
| GMX365 | Buick Regal | 6 |
| GMX380SS/381 | Malibu SS/G6 | 2 |

- Requirement is for the incremental business to provide supply from September 2007 through September 2011 enabling a minimum duration of four (4) years. From the closing date of the Transaction until September 2011, Delphi will be provided with: (i) if otherwise competitive on quality, service and technology, a right to match the competitive price (if necessary) for next generation business having SCP between September 2007 and September 2011; and (ii) an opportunity to quote on next generation business having SOP after September 2011.

- GM will provide Delphi with a corresponding price increase (if any) as a direct result of mutually agreed differences in labor rates between the current manufacturing source and Delphi. The labor cost differential will be added to the price on contract at the time of the product on transfer. Outstanding price issues would be handled by the parties in the ordinary course of business.

- Both Delphi and GM are flexible to consider creative, mutually beneficial solutions to support Delphi's efforts to achieve transfer of programs noted above.

The above-referenced product programs under consideration may be adjusted due to the overall expectation to place work for up to 75 employees in each of Items 1 and 2 as described above.

Delphi and GM understand that this letter represents a non-binding statement of their mutual intentions regarding the Transaction and may not address all the issues on which agreement must be reached before the Transaction can be consummated through the execution of final contracts. Neither party shall make any public announcements or other public disclosures with respect to the Transaction or this Letter Agreement without the consent of the other party, except as required by applicable laws and regulations. Each party agrees to bear all of its own fees and expenses incurred in connection with this letter and the Transaction contemplated.

08/12/2004  18:59    565-575-1519              GM WWP                                PAGE  05/06

Mary Boland
August 10, 2004
Page 4

If you are in agreement with the foregoing, please so indicate by signing
and returning the enclosed copy of this letter to the undersigned. We very much look
forward to working with you as set forth above in connection with the proposed
Transaction.

Very truly yours,

John Blahnik,
Vice President Treasury, Mergers,
Acquisitions & New Markets

**ACCEPTED AND AGREED FOR GM:**

By: _____
        Mary Boland,
        GMNA Vice President and CFO

Date: _8/12/04_____

Mary Boland
August 10, 2004
Page 5

## EXHIBIT "A"

- Delphi must meet or exceed GM's and/or System Supplier's metrics for Quality, Service, Delivery, Technology and Price – including Warranty

  - Delphi must agree to thorough quality audits and supply chain reviews as defined by GM and/or integrated suppliers
  - Program timing will not be compromised and all key gates must be met
    - Delphi must provide a documented and achievable timeline with plan to achieve to GM and/or integrated supplier
  - In the case of an integrated system supplier, said supplier will have option of moving any business if Delphi's performance does not meet specific targets
  - Delphi must identify and provide dedicated support through launch of program and key program gates, as defined by GM or integrated supplier
    - Delphi must also provide necessary on-going support for all FDT's
  - Delphi must meet GM's or integrated suppliers design and specification
    - System supplier will not modify system design to work around Delphi's design
  - Delphi will be responsible to fund any required tooling and/or engineering development costs for any program already funded and paid for
    - Delphi will also be responsible for on-going tuning "costs" and support associated with each program
  - System suppliers' current cost and annual performance and cost reduction targets will be met

**Execution Copy**

*Letter Agreement*

The purpose of this letter agreement ("Agreement") is to formalize the understanding that has been reached between General Motors Corporation ("GM") and Delphi Corporation ("Delphi") regarding certain subsidy payments that Delphi has agreed to make to Johnson Controls, Inc ("JCI") in connection with JCI's acquisition of Delphi's global battery business and certain agreements by and between Delphi and GM intended to facilitate that transaction. In this regard the parties mutually agree as follows:

> To the extent that all IUE hourly employees at Delphi's New Brunswick, New Jersey battery plant, have not converted to competitive wage by the time of Closing of the New Brunswick sale from Delphi to JCI ("New Brunswick Sale"), Delphi has agreed to provide JCI with an appropriate subsidy for New Brunswick employees, a description of which subsidy has been provided to GM (the "Subsidy"), a copy of which is attached to this Agreement as Exhibit A. In this regard, Delphi agrees not to amend the terms of the Subsidy without GM's prior consent, which may not be unreasonably withheld or delayed. Delphi will use reasonable best efforts to close the New Brunswick Sale as soon as practicable following finalization of the 2007 National IUE negotiations.

This Agreement shall be governed by the laws of the State of Michigan without regard to the principles of conflicts of law, shall be binding and inure to the benefit of Delphi and GM and their respective successors and assigns, and may only be modified or amended by a written document duly executed by both parties.

**Delphi Corporation**          **General Motors Corporation**

By: _Steph H. Oba_          By: _____

Date: _June 30, 2005_          Date: _06/30/05_

## EXHIBIT A

## SUBSIDY

**Excerpts for New Brunswick Put and call Agreement dated June 30, 2005
("Agreement") between JOHNSON CONTROLS, INC., a Wisconsin corporation
("Buyer") and DELPHI AUTOMOTIVE SYSTEMS LLC ("Seller")**

**Section 9.1**

. . . . to the extent that: (i) Seller has delivered a Put Exercise Notice; and (ii) one
hundred percent (100%) of the U.S. Hourly Employees have not been converted to a
Competitive Package (as defined in Exhibit 4.1) by the Completion Date, Seller will
subsidize Buyer in the amount of the Labor Differential (as defined in Exhibit 4.1) for
the Traditional Wage Employees (as defined in Exhibit 4.1) who transfer or whom
Seller, in its sole discretion, leases to Buyer on and after the Completion Date. In the
event Seller chooses to lease such Traditional Wage Employees to Buyer, Seller will
use commercially reasonable efforts to give notice of its intent to do so ninety (90)
days prior to Completion Date.

**Exhibit 4.1, Section 3.A(ii)**

(ii)  Effective on the Completion Date, Buyer will offer employment to all U.S.
Hourly Employees identified on Schedule 3.A(i) to Exhibit 4.1. U.S. Hourly
Employees who accept Buyer's offer of employment (by reporting to work or
otherwise acknowledging acceptance) will be referred to as Transferred U.S. Hourly
Employees:

    a.  U.S. Hourly Employees who are not active as of the Completion Date due
to disability, layoff, family medical leave or other approved leave of
absence will remain Seller's responsibility until any such U.S. Hourly
Employee is ready to return to active employment in accordance with
Seller's leave policies.

    b.  Upon such U.S. Hourly Employee's return to active status, Buyer will offer
employment in accordance with Section 3.A(ii) above, and, provided such
individual accepts Buyer's offer of employment, will be considered a
Transferred U.S. Hourly Employee as of such date. In the event that a
U.S. Hourly Employee is seeking to return to active employment from a
medical-based leave, such individual's fitness for active employment must
be approved by both Seller and Buyer provided such does not violate any
applicable collective bargaining agreement.

    c.  If Seller and Buyer do not agree as to such individual's fitness for active
employment, the issue will be submitted to an independent medical
evaluator, whose determination will be final and binding on the parties.
The cost of such independent medical evaluation will be shared equally
by the parties.

1

**Exhibit 4.1, Section 3.C(ii)**

(ii)    To the extent there remain Traditional Wage Employees as of the Completion Date, Seller will subsidize Buyer for the difference between the wages and benefits Buyer provides the Traditional Wage Employees and the wages and benefits Buyer provides Transferred U.S. Hourly Employees under the Competitive Package (the "Labor Differential"):

a.    Upon the earlier of Seller's delivery of a Put Exercise Notice to Buyer or Buyer's delivery of a Call Exercise Notice to Seller, the parties will confirm whether there remain any Traditional Wage Employees.  If the parties determine that there are, the parties will, in good faith,  negotiate:

(1)    The benefit treatment of such Traditional Wage Employees, which will be intended to allocate responsibility to Seller for the years of credited service each Traditional Wage Employee earned at Seller and to allocate responsibility to Buyer for the years of credited service each Traditional Wage Employee earns at Buyer;

(2)    An appropriate methodology for calculating the Labor Differential, which, notwithstanding Buyer's responsibilities under Section 3.A(iii), will:

(a)    Limit Buyer's liability for the Employment Rights of the Traditional Wage Employees as if they were eligible only for the Competitive Package; and

(b)    Not require Seller to make payments to Buyer in advance of Buyer's payment of actual benefit obligations to the Traditional Wage Employees;

(3)    The timing and method of payment or, if Seller opts to lease Traditional Wage Employees to Buyer, credit of such Labor Differential; and

(4)    Any other pertinent terms and conditions associated with the allocation of Employment Rights consistent with this Agreement for the Traditional Wage Employees.

The benefit treatment, methodology, timing and any other pertinent terms and conditions will be documented in writing and become a part of this Agreement.

**Definitions:**

**"Call Exercise Notice"** means a written notice substantially in the form of <u>Exhibit 1.5</u> to this Agreement delivered by Buyer to Seller.

2

"**Competitive Package**" means the wages and benefits payable to new hire U.S. Hourly Employees at the New Brunswick Facility under the Delphi-IUE-CWA Local Agreement.

"**Completion**" means completion of the purchase of the [New Brunswick assets] by Buyer resulting from, and within thirty (30) days after, the exercise of the Put Option or Call Option contained in this Agreement.

"**Completion Date**" means the date of Completion, as specified in the Put Exercise or Call Exercise Notice.

"**Delphi-IUE-CWA National Agreement**" means the nationally negotiated collective bargaining agreements, including any letter agreements, MOUs, supplemental agreements and all applicable employee benefit plans in effect between Seller and the IUE-CWA.

"**Employment Rights**" means all obligations arising out of, or relating to, the employment relationship between the relevant company and the relevant employees, including, without limitation, payment of wages and salaries, employee benefits, taxes, vacation pay, sick leave and severance pay and any claims under any Laws dealing with employment.

"**IUE-CWA**" means the IUE-CWA, the Industrial Division of the Communication Workers of America, AFL-CIO and CLC.

"**Put Exercise Notice**" means a written notice substantially in the form of Exhibit 1.23 to this Agreement delivered by Seller to Buyer.

"**Traditional Wage Employees**" means the Transferred U.S. Hourly Employees who are eligible to receive wages and benefits in accordance with the Delphi-IUE-CWA National Agreement (i.e., in excess of the Competitive Package).

"**Transferred U.S. Hourly Employees**" means those hourly employees of Seller hired by Buyer pursuant to Section 3.A(ii) [of this Exhibit 4.1].

"**U.S. Hourly Employees**" means the hourly employees represented by the IUE-CWA who are employed by Seller at the New Brunswick, New Jersey plant immediately prior to the Completion Date and identified on Schedule 3.A(i) to this Exhibit 4.1 to be provided to Buyer by Seller concurrently with the Put Exercise Notice or within ten (10) days after Seller's receipt of a Call Exercise Notice, as applicable.

3

**Execution Copy**

*Letter Agreement*

The purpose of this letter agreement ("Agreement") is to formalize the understanding that
has been reached between General Motors Corporation ("GM") and Delphi Corporation
("Delphi") regarding the future use of the "Freedom" trade name and associated
trademarks.  In this regard the parties mutually agree as follows:

1.      The parties acknowledge and agree that as part of the sale of Delphi's global
        battery business to Johnson Controls, Inc.("JCI"), Delphi has granted JCI a
        perpetual, non-revocable, exclusive, global license to JCI for use of the
        "Freedom" trade name and associated trademarks with SLI lead acid batteries.
        Such license being non-transferable except in connection with sale of JCI's SLI
        lead acid battery business.

2.      The parties further acknowledge and agree that prior to entering into any
        transaction that would sell, assign, or otherwise transfer Delphi's ownership of
        the "Freedom" trade name and associated trademarks, Delphi will offer GM a
        right of last refusal on the same terms and conditions.

This Agreement shall be governed by the laws of the State of Michigan without regard to
the principles of conflicts of law, shall be binding and inure to the benefit of Delphi and
GM and their respective successors and assigns, and may only be modified or amended
by a written document duly executed by both parties.


**Delphi Corporation**                          **General Motors Corporation**


By: _Steph H. Ale_____                          By: _____

Date: _June 30, 2005___                         Date: _06/30/05_____

## Exhibit 5.01(b)(vi)
**Agreement, dated as of June 3, 2005, between Delphi and GM
concerning certain matters related to Collins & Aikman Corporation**

## Agreement

1.    GM guarantees that Delphi will receive payment of $8.3 million by wire transfer upon the satisfaction of the terms of this agreement("Agreement") by Delphi.

2.    Delphi will assign to GM 50% of the first proceeds received on its $16.6 million pre-petition claim against C&A (the "Delphi Claim"). The maximum amount that GM may recover from the proceeds of the Delphi Claim will equal the difference between $8.3 million and the amount that GM is otherwise able to setoff against C&A. Delphi agrees to pursue all of its rights against C&A under the Delphi Claim and consult with GM in that regard and will provide GM with the right of first refusal to purchase the Delphi Claim.

3.    Delphi will only reduce the Delphi Claim to the extent that GM offsets the amounts that it pays to Delphi under this Agreement.

4.    In consideration of the payments made by GM to Delphi under this Agreement. Delphi agrees to continue to supply to C&A through the term of C&A's bankruptcy to ensure the continuity of supply of parts to GM and will work in good faith to enter into an agreement with C&A for the continued supply of these parts through the term of the bankruptcy.

5.    GM shall not have any responsibility to Delphi for any premium freight charges relating to C&A including those incurred by Delphi during the period from and after May 12, 2005 through and including May 19, 2005.

6.    GM will guaranty the payment for goods shipped and delivered by Delphi to C&A after May 19, 2005 until the earlier of (a) the termination of the purchase orders between C&A and Delphi which is consented to by GM or (b) C&A's emergence from bankruptcy, limited to the amount of goods shipped in accordance with trade terms provided by similarly situated suppliers to C&A.

7.    The terms of this Agreement shall be held in strict confidence by the parties. To the extent that Delphi breaches this confidentiality agreement, all consideration received by Delphi under this Agreement will be returned to GM.

8.    This document contains the entire agreement of the parties in connection with the subject matter of this Agreement and cannot be changed or terminated orally. All prior agreements, understandings, representations, warranties and negotiations regarding the subject matter hereof, if any, are merged into this Agreement. The parties executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation or entity that they represent and that their signatures bind said corporations or entities to the terms of this Agreement. This Agreement may be executed in any number of duplicate originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and taken together shall constitute but one and the same instrument. The parties agree that their respective

signatures may be delivered by facsimile with original signatures to follow, and that facsimile signatures shall be treated as originals for all purposes. This Agreement is made in the State of Michigan and shall be governed by, and construed and enforced in accordance with the laws of the State of Michigan, without regards to conflicts of law principles.

Agreed,

Date: June 3, 2005                    Delphi Corporation

                                      By: _D. UOHLEEN_

                                      Its: _____

Date: June 3, 2005                    General Motors Corporation

                                      By: _____

                                      Its: _ASSISTANT TREASURER_

DETROIT:1816621.3

2

**Exhibit 5.11(c)**
**Certain Employment Related Claims**

EXHIBIT 5.11(c)

| File Name | Court |
|---|---|
| James Burdette v. GM and UAW | USDC, Southern District of OH, Western Division |
| Julie Brittingham and David Brittingham v. Delphi and GM, et al. | US Ct of Appeals Sixth Circuit OH |
| Lynn Rowell v. General Motors Corp. Life & Disability Benefits Program and Metropolitan Life Insurance Company | USDC Southern District NY |
| Michael D. Straney v. General Motors Corporation | USDC Eastern District Southern Division MI |
| Thomas Alfred Sylvester v. General Motors Corporation | Saginaw County Circuit Court MI |

09/04/2007

Master Restructuring Agreement


**<u>Exhibit 6.01</u>**
**Access Agreement Term Sheet**

**Exhibit 6.01**
**Access Agreement Term Sheet**

**FILED UNDER SEAL**