Hearing Date and Time:  September 23, 2008 at 10:00 a.m.
Objection Deadline:  September 19, 2008 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Albert L. Hogan, III
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                         :
     In re                               :    Chapter 11
                                         :
DELPHI CORPORATION, et al.,              :    Case No. 05-44481 (RDD)
                                         :
                    Debtors.             :    (Jointly Administered)
                                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED FIFTH SUPPLEMENT TO KECP MOTION (DOCKET NO. 213)
SEEKING AUTHORITY TO CONTINUE SHORT-TERM AT-RISK
PERFORMANCE PAYMENT PROGRAM ("AIP") FOR SECOND HALF OF 2008

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited fifth supplement to their Motion For Order Under §§ 105 And 363 Authorizing The Debtors To Implement A Key Employee Compensation Program (Docket No. 213), dated October 13, 2005 (the "Fifth Supplement").[1]  The relief sought in this Fifth Supplement is limited to a continuation of the Debtors' short-term at-risk performance payment program (the "AIP") for the six-month period starting July 1, 2008 and ending December 31, 2008, including approval of the Debtors' financial targets and payout curves for that period.

        1.       The design of the AIP for the second half of 2008 is the same in all material respects as that approved by this Court in February 2006 (for the first half of 2006), July 2006 (second half of 2006), March 2007 (first half of 2007), October 2007 (second half of 2007), and March 2008 (first half of 2008), and is similar to that underlying the Short-Term Incentive Plan (the "STIP") included in the Debtors' post-emergence Management Compensation Plan (the "MCP") that was approved by this Court in January 2008.  The AIP is a market-competitive program that provides at-risk incentive-compensation opportunities linked to corporate- and division-level financial targets derived from the Debtors' current Budget Business Plan as of August 2008 (the "August 2008 BBP")[2] and to each eligible employee's individual performance.

---

[1]    In accordance with paragraph 11 of this Court's Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures (Docket No. 2883), dated March 17, 2006, the Debtors have consulted with counsel to the official committee of unsecured creditors (the "Creditors' Committee") regarding the relief sought in the Fifth Supplement as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to the Fifth Supplement being heard on September 23, 2008.

[2]    The August 2008 BBP is an updated version of the Budget Business Plan (the "BBP") that was used in setting the AIP targets for the first half of 2008 and was derived from the business plan attached to the Debtors' First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, as Appendix C.  (See Docket No. 11388 App. C.)  It includes adjustments to the BBP based on (a) actual

*(cont'd)*

2

As in prior periods, the terms and conditions of the AIP were approved by the independent, disinterested members of the Compensation and Executive Development Committee of Delphi's Board of Directors (the "Compensation Committee").

    2.    The principal terms and conditions of the AIP for the second half of 2008 are as follows:

    (a)    <u>Covered Employees</u>.  The AIP applies to all of the Debtors' employees holding executive positions in the United States during the second half of 2008 (collectively, the "Covered Employees").  As of August 1, 2008, there were approximately 416 Covered Employees, including 21 members of the Delphi Strategy Board (the "DSB"), Delphi's top policymaking group.

    (b)    <u>Financial Targets</u>.  The AIP will not generate incentive-compensation opportunities unless the Debtors meet or exceed established corporate- or division-level financial targets that were derived from the August 2008 BBP and were reviewed and approved by the Compensation Committee. Delphi's corporate-level target is measured in earnings before interest, taxes, depreciation, amortization, and restructuring items ("EBITDAR"), and is set at $156.5 million.  The targets at the division level, which are measured in operating income (which excludes interest and taxes) before depreciation, amortization, and restructuring items ("OIBDAR"), are as follows:  (i) Powertrain, $102.0 million, (ii) Steering, negative $15.2 million, (iii) Thermal, $21.7 million, (iv) Electronics and Safety, $50.0 million, (v) Electrical and Electronic Architecture, $100.4 million, (vi) Product and Service Solutions, $10.2 million, and (vii) Automotive Holdings Group, negative $17.7 million.

    (c)    <u>Target Mix</u>.  If a Covered Employee's responsibilities are limited to the corporate level, 100% of his or her incentive-compensation opportunity will be determined based on Delphi's corporate-level EBITDAR performance.  For all other Covered Employees, 50% of the opportunity will be determined based on Delphi's corporate-level EBITDAR performance and 50% will be determined based on the relevant division's OIBDAR performance.

    (d)    <u>Incentive-Compensation Opportunities</u>.  A Covered Employee's target incentive-compensation opportunity – i.e., the opportunity associated with financial performance equal to 100% of the applicable target or targets – is based on the Covered Employee's level of responsibility.  Opportunities increase as the

---

*(cont'd from previous page)*
    monthly results through June 2008, (b) the addition of earnings forecasted for the Steering division that were not included in the BBP because the BBP assumed that the Debtors' steering business would be sold before June 1, 2008, (c) modified assumptions regarding the timing of the Debtors' emergence from chapter 11, (d) updated volume estimates, (e) increases in commodity prices, and (f) other specific changes.

3

Debtors' financial performance increases until they reach a cap of 150% of the target opportunity for DSB members and 200% of the target opportunity for all other Covered Employees. The aggregate target opportunities under the AIP for the second half of 2008 are approximately $19.5 million and the aggregate maximum opportunities are approximately $36.1 million.

(e)    Payout Curves. The payout curves for the second half of 2008 are attached to this Fifth Supplement as Exhibit B. Under those curves, the maximum incentive-compensation opportunities are associated with corporate-level EBITDAR performance of at least $577.5 million and the following division-level OIBDAR performance: (i) Powertrain, at least $198.4 million, (ii) Steering, at least $29.5 million, (iii) Thermal, at least $63.8 million, (iv) Electronics and Safety, at least $130.5 million, (v) Electrical and Electronic Architecture, at least $218.1 million, (vi) Product and Service Solutions, at least $36.8 million, and (vii) Automotive Holdings Group, at least $4.2 million.

(f)    Adjustment Protocol. The August 2008 BBP and the AIP financial targets incorporate assumptions concerning the financial impact of several items, including, for example, the Debtors' agreements with their labor unions and General Motors Corporation ("GM"). To ensure that incentive compensation is not affected in a positive or negative manner based on those agreements, the Debtors will make adjustments on a dollar-for-dollar basis to the extent the actual financial impact of the agreements differs from the assumptions. Thus, consistent with prior periods, the Covered Employees will not receive incentive compensation based on cost savings achieved through those agreements. The adjustment methodologies are set forth in the adjustment protocol attached to this Fifth Supplement as Exhibit C (the "Adjustment Protocol").[3] The Adjustment Protocol will also govern any adjustments arising from (i) the Debtors' divestiture of substantially all of the assets comprising their steering and halfshaft business (the "Steering Business") or (ii) the Debtors' emergence from chapter 11 earlier than the December 31, 2008 emergence date assumed in the August 2008 BBP.[4] If the Debtors do not emerge from chapter 11 on or before February 13, 2009, the Creditors' Committee may review and raise reasonable objections to the Debtors' adjustments to their EBITDAR performance. If the Debtors and the Creditors' Committee cannot resolve such objections, the Creditors' Committee can adjust by up to $150 million the Debtors' EBITDAR performance for purposes of the AIP, but in no event can the adjustment be used to decrease EBITDAR

---

[3]    As indicated in the Adjustment Protocol, the categories of potential adjustments related to the Debtors' divestiture of their interiors business and competitive operating agreements that were present in the protocol for the first half of 2008 have been removed from the protocol for the second half of 2008.

[4]    This Court approved the Debtors' sale of the Steering Business, which accounts for substantially all of the Steering division, in February 2008. (See Docket No. 12868.) The Adjustment Protocol contemplates adjustments related to the Steering Business that will provide prorated incentive-compensation opportunities according to when the divestiture is completed.

4

performance below the EBITDAR target, and any adjustment must be based on an unresolved objection. In addition to the adjustments described above, the post-emergence Compensation Committee will have the authority to make other adjustments if it determines that such adjustments are in Delphi's best interest so as to preserve the incentive features of the plan.[5]

(g)    Individual Performance. The actual amount of incentive compensation paid to a Covered Employee will depend on his or her individual performance during the second half of 2008. The performance of DSB members will be reviewed by Robert S. "Steve" Miller, the Executive Chairman of Delphi's Board of Directors (the "Board"), or Rodney O'Neal, Delphi's Chief Executive Officer, as well as the Compensation Committee. With respect to all other Covered Employees, the reviews will be conducted by the Covered Employee's supervisor. Any Covered Employee who is designated a poor performer or otherwise does not meet expectations will not receive any incentive compensation. In other cases, a Covered Employee's incentive compensation can be adjusted downward to a minimum of zero or upward to a maximum of the applicable cap of 150% or 200% of the Covered Employee's target opportunity. The net impact of the adjustments cannot result in aggregate payments that exceed the aggregate earned opportunities, and an adjustment to a DSB member's incentive compensation cannot be funded by or fund an adjustment to the incentive compensation of a Covered Employee who is not a DSB member.

(h)    Prophylactic Measures. The AIP includes a prophylactic measure that prevents Covered Employees who engage in misconduct from benefiting under the AIP, including Covered Employees who fail to act in good faith and in a manner consistent with the Debtors' best interests. The prophylactic measure is set out in full in paragraph 10 of this Court's Order Under 11 U.S.C. §§ 105 And 363 Authorizing The Debtors To Implement A Short-Term Annual Incentive Program (Docket No. 2441), dated February 17, 2006.

3.    On five occasions, this Court has authorized the Debtors to implement the AIP under terms and conditions that are the same in all material respects as those outlined above. Each time, this Court found that the Debtors had exercised reasonable business judgment in seeking to implement the AIP and that the Debtors had proposed the AIP in good faith. (See Docket No. 2441 ¶¶ B-C; Docket No. 4660 ¶¶ A-B; Docket No. 7474 ¶¶ A-B; Docket No. 10428

---

[5]    If the Debtors do not emerge from chapter 11 on or before February 13, 2009, the Debtors will review any such adjustments with the Creditors' Committee. If the Creditors' Committee does not object, the Debtors will implement the adjustments without further order of this Court. If the Creditors' Committee does object, however, such adjustments will not become effective unless they are approved by this Court.

¶¶ A-B; Docket No. 13179 ¶¶ A-B.)  This Court also found each time that the AIP was in all respects fair and reasonable, that it was in the best interests of the Debtors and their estates, creditors, stakeholders, and other parties-in-interest, and that it was necessary to the Debtors' reorganization efforts.  (See Docket No. 2441 ¶¶ C, E; Docket No. 4660 ¶¶ B-C; Docket No. 7474 ¶¶ B-C; Docket No. 10428 ¶¶ B-C; Docket No. 13179 ¶¶ B-C.)

        4.       The MCP, which sets forth the Debtors' post-emergence compensation structure, also includes at-risk short-term incentive-compensation opportunities.  The STIP portion of the MCP is similar to the AIP in that it will provide eligible employees, including executives, with opportunities that are tied to annual financial goals established by the Compensation Committee.  (See Docket No. 11386 Ex. 7.8.)  In addition, like the AIP, the STIP provides that the amount of any incentive compensation paid to an eligible employee will depend on the employee's individual performance as evaluated by the Compensation Committee, Delphi's Chief Executive Officer, and/or the employee's direct supervisor.  (See id.)  The Compensation Committee ratified the MCP on December 28, 2007, and the MCP was attached to the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "Amended Plan"), as Exhibit 7.8.[6]

        5.       At-risk short-term incentive-compensation opportunities – along with salary, benefits, and at-risk long-term incentive-compensation opportunities – were an essential element of the Covered Employees' total compensation from the time of Delphi's separation from GM in 1999 until the Debtors filed their voluntary petitions for reorganization relief in October 2005.  During these cases, at-risk short-term incentive-compensation opportunities – but not at-

---

[6] The Debtors filed the MCP with the Amended Plan on December 10, 2007 (see Docket No. 11386), a supplement to the MCP on December 28, 2007 (see Docket No. 11608), and modifications to the MCP on January 16, 2008 (see Docket No. 12165), and they further modified the MCP based on this Court's comments at the confirmation hearing regarding the Amended Plan (see Docket No. 12359).

6

risk long-term incentive-compensation opportunities – have continued as an essential element of total compensation through the AIP from January 1, 2006 through June 30, 2008.  And under the MCP, at-risk short-term incentive-compensation opportunities will remain an essential element of total compensation following the Debtors' emergence from chapter 11 through the STIP.  In this Fifth Supplement, the Debtors seek to preserve these opportunities during the six-month period from July 1, 2008 through December 31, 2008.  Without this relief, the total compensation of the Covered Employees will include only salary and benefits, with no at-risk incentive-compensation elements whatsoever.  As this Court has found in connection with earlier performance periods, and as no party has seriously disputed at any point in these cases, this would place the compensation structure of the Covered Employees well below market-competitive levels.

        6.        The Debtors seek the authority to continue the AIP for the second half of 2008 under 11 U.S.C. § 363(b)(1), which allows a debtor-in-possession to use estate property other than in the ordinary course of business after notice and a hearing if any party objects.  See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384 (2d Cir. 1997); Cedar Tide Corp. v. Chandler's Cove Inn, Ltd. (In re Cedar Tide Corp.), 859 F.2d 1127, 1133 (2d Cir. 1988).  In prior hearings, this Court has applied a two-part standard in reviewing the AIP under section 363(b)(1).  (See Docket No. 3414 at 241:15-242:18; Docket No. 4996 at 97:19-97:22; Docket No. 7557 at 83:22-84:22; Docket No. 11057 at 115:15-115:22, 116:20-116:23.)  The first part asks "whether th[e] program is in any way tainted by self-dealing or is, instead, the product of the advice of independent advisors and . . . ultimate decision-making by an independent board," as well as "whether it has been appropriately vetted with the other constituents in the

7

case." (Docket No. 3414 at 241:16-242:1.) The second part involves an examination of the program "in the light of whether it makes good business sense." (Id. at 242:3-242:8.)

   7.  In making these determinations, this Court has looked to the business-judgment factors set forth in In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006). (See Docket No. 7557 at 84:24-85:14.) Those factors are:

- Is there a reasonable relationship between the program and the results to be obtained – i.e, in the case of a performance incentive, is the program calculated to achieve the desired performance? Dana, 358 B.R. at 576.

- Is the cost of the program reasonable in the context of the debtor's assets, liabilities, and earning potential? Id.

- Is the scope of the program fair and reasonable? Does it apply to all employees? Does it discriminate unfairly? Id. at 577.

- Is the program consistent with industry standards? Id.

- What were the due-diligence efforts of the debtor in investigating the need for a program, analyzing which employees need to be incentivized, what is available, and what is generally applicable in a particular industry? Id.

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation? Id.

   8.  The Debtors' request to continue the AIP for the six-month period starting July 1, 2008 and ending December 31, 2008 easily satisfies the requirements of section 363(b)(1). With respect to the first part of the standard set out above, the AIP is the result of a process that involves independent review that is sufficient to defeat any suggestion of bad faith or improper self-dealing. As part of that process, the AIP was submitted to and reviewed by the Compensation Committee, which is responsible for discharging the Board's responsibilities relating to all aspects of director and officer and other executive compensation. The Compensation Committee is composed of three independent, disinterested members of the Board – Craig G. Naylor (chairman), John D. Englar, and Raymond J. Milchovich – who are not

8

covered by the AIP. The Compensation Committee voted in favor of continuing the AIP for the second half of 2008 and approved the terms and conditions of the AIP, including the financial targets and payout curves, at its meeting on August 19, 2008.

9. As for the second part of the standard – whether the Debtors' proposal makes good business sense – the Debtors have made the reasonable business judgment that continuing the AIP for the second half of 2008 is a critical step toward achieving the Debtors' objective of providing market-competitive compensation to their entire workforce, including the Covered Employees. Delphi's most recent comprehensive statement of its goals with respect to executive compensation was set forth in the philosophy and strategy adopted by the Compensation Committee in December 2007 and included in the Amended Plan as part of the MCP. (See Docket No. 11386 Ex. 7.8.) As set forth in that statement, Delphi's compensation goals take into account the competitive marketplace, including by seeking to provide total direct compensation – the sum of salary, short-term incentive opportunities, and long-term incentive opportunities – that is at the market median at planned levels of performance and above the market median when performance exceeds planned levels. (See id.) They also include linking compensation opportunities to performance-based incentives such as the achievement of financial goals, and providing flexibility to recognize, differentiate, and reward individual performance. (See id.)

10. The AIP is tailored to these purposes and is within the range of competitive practice. The executive-compensation structure offered by the Debtors' competitors in the automotive industry and other peers generally includes salary, benefits, short-term incentive opportunities, and long-term incentive opportunities. The Debtors' historical and future structures involve those same four elements, and there is no dispute that the design of the AIP is

9

in line with market practice. Without the at-risk short-term incentive-compensation opportunities provided under the AIP, the Covered Employees' compensation during the second half of 2008 will be limited to salary and benefits. As the Debtors have demonstrated in connection with earlier performance periods, a compensation structure without at-risk short- or long-term incentive-compensation opportunities is not competitive with the compensation structures offered by Delphi's peer companies in the marketplace, and would place the Debtors' compensation structure in the bottom quartile as compared with its peers. In short, the AIP is calculated to achieve the Debtors' reasonable compensation objectives of providing market-competitive compensation and at-risk compensation opportunities that are tied directly to the Debtors' financial targets and each executive's individual performance in a manner that is consistent with the Debtors' compensation philosophy and strategy.

11. In terms of the scope of coverage of the AIP, it is fair and reasonable that all of the Debtors' executives are eligible in the first instance because that is the population that will experience a significant competitive shortfall if compensation is limited to salary and benefits. Within the executive population, the AIP draws appropriate distinctions based on each Covered Employee's level of responsibility and contributions to the Debtors' success through its apportionment of opportunities, reviews of individual performance and accompanying adjustments in compensation, and, in more serious cases, the escrow and "clawback" features of the prophylactic measure.

12. The financial targets for the second half of 2008 are reasonable and appropriate as well. Consistent with prior periods, Delphi's corporate-level EBITDAR target was not developed specifically for compensation purposes, but rather was drawn from Delphi's most recent business plan, the August 2008 BBP. At the division level, the Debtors' OIBDAR

10

targets were derived from the divisions' operating income under the August 2008 BBP for the second half of 2008.  As with the corporate-level EBITDAR target, the OIBDAR targets were not the result of a special process related to the AIP, but rather are drawn from the same August 2008 BBP used by the Debtors in managing the day-to-day operations of their businesses.

13.     The overall cost of the AIP is reasonable in the context of the Debtors' assets, liabilities, and earning potential.  Again, the aggregate target opportunities available under the AIP are approximately $19.5 million.  This represents approximately 0.21% of the Debtors' total assets of $9.162 billion as of June 30, 2008 and approximately 0.08% of the Debtors' total liabilities of $23.742 billion as of that date.[7]  With respect to potential earnings, the difference between the corporate-level EBITDAR target of $156.5 million and the EBITDAR maximum of $577.5 million is approximately $421.0 million.  When viewed from an incremental perspective, moving from target to maximum EBITDAR increases the available AIP opportunities by approximately $16.6 million, or approximately 3.94% of the additional EBITDAR.[8]  All of the major constituents in these cases will benefit if the Debtors meet or exceed their financial targets for the second half of 2008, particularly if the Debtors' performance places them at or near the top of the AIP payout curves.  The opportunities provided under the AIP are reasonable in relation to the Debtors' financial condition and the magnitude of their financial targets, and they provide the Covered Employees with an incentive to achieve performance that is in the best interests of the Debtors and their estates, creditors, and other stakeholders.

---

[7]   The Debtors' total assets and liabilities are as reflected in the unaudited condensed combined debtors-in-possession balance sheet in Delphi's quarterly report for the fiscal quarter ended June 30, 2008 as filed by Delphi with the United States Securities and Exchange Commission on Form 10-Q on August 8, 2008.

[8]   This illustration assumes that achieving the maximum EBITDAR target will result in the aggregate maximum opportunity, which is not necessarily the case.  Most Covered Employees' opportunities are based on a mix of corporate- and division-level performance.  Thus, if Delphi reaches its maximum EBITDAR target and at least one division does not achieve its maximum OIBDAR target, the aggregate earned opportunity will be less than the aggregate maximum opportunity.

WHEREFORE, the Debtors respectfully request that this Court enter an order in substantially the same form as the form of Fifth Supplemental Order Under 11 U.S.C. §§ 105 And 363 Authorizing Debtors To Continue Short-Term At-Risk Performance Payment Program For Second Half Of 2008 attached to this Fifth Supplement as Exhibit A, and grant the Debtors such other and further relief as is just.

Dated:  New York, New York
       September 12, 2008

            SKADDEN, ARPS, SLATE, MEAGHER
             & FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr.
    John K. Lyons
    Albert L. Hogan, III
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti
    Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

12