**Hearing Date: September 23, 2008**
**Hearing Time: 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Albert L. Hogan III
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :
     In re                        :     Chapter 11
                               :
DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                               :
                               :     (Jointly Administered)
              Debtors.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OBJECTION TO MOTION OF CR INTRINSIC INVESTORS, LLC AND
HIGHLAND CAPITAL MANAGEMENT, L.P. FOR APPOINTMENT OF EXAMINER

("OBJECTION TO MOTION FOR EXAMINER")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby submit this objection (the "Objection") to the Motion Requesting The Appointment Of An Examiner, dated August 29, 2008 (Docket No. 14109) (the "Motion"), filed by CR Intrinsic Investors, LLC ("CR Intrinsic") and Highland Capital Management, L.P. ("Highland," and together with CR Intrinsic, the "Noteholders"), and respectfully represent as follows:

Preliminary Statement

1.  The Noteholders seek the appointment of an examiner to investigate postpetition agreements between the Debtors and General Motors Corporation ("GM") (Motion Ex. 1 at 19.). These agreements provide up to $950 million in liquidity to the Debtors while granting administrative claims to GM that are subordinated to the Debtors' current debtor-in-possession financing facility ("DIP Financing Facility"). The first agreement has already been approved by the Court. That agreement (the "GM Arrangement"), which was approved when the Court granted the Debtors' motion to authorize an extension of the DIP Financing Facility, provides that GM will advance up to $650 million to the Debtors. The second agreement (the "Amendment") – which will be considered by this Court at a contested September 23, 2008 omnibus hearing and is the subject of a separate Noteholders' objection – would expand the available advances from GM by up to $300 million.

2.  The Noteholders' request for an examiner is apparently based on their assertion that at least one of the Debtors, Delphi Automotive Systems (Holdings), Inc. ("DASHI"), should not share the repayment obligations arising from either the previously approved GM Arrangement or the Amendment. The Noteholders' motion should be denied because it is not authorized by the Bankruptcy Code; alternatively, the Motion should be denied

2

because it was brought in bad faith and because the Noteholders have waived their right to seek the appointment of an examiner based on their prior conduct in these chapter 11 cases.

        3.      As a threshold matter, the Noteholders' examiner request fails to satisfy the plain language of the Bankruptcy Code and is nothing more than a guerilla tactic that should not be tolerated. As stated clearly in the statute, a request for an examiner can be made only before a plan has been confirmed. The Noteholders' request for an examiner has been filed seven months after the Court confirmed the Debtors' First Amended Joint Plan Of Reorganization (as modified) (the "Plan"), and for that reason alone, the Motion must be denied.

        4.      Alternatively, the request for an examiner should be denied because it has been made in bad faith. At least one of the movants indirectly holds a significant portion of the loans and commitments under the DIP Financing Facility and relies on the identical group of Debtors (including DASHI) for repayment of the DIP Financing Facility that GM does in respect of the GM Arrangement. Moreover, the very effectiveness of the DIP Financing Facility was conditioned on this Court's entering an order approving the terms and conditions of the GM Arrangement. It is inexplicable that one or both of the movants can benefit on the one hand from this financing structure (i.e., repayment scheme based on claims against all of the Debtors and implementation of a subordinated GM liquidity facility) and on the other hand would demand an examiner to investigate the same structure on the basis that it is gravely flawed and prejudicial to stakeholders. The absurdity of this approach is underscored by the irony that, if the Noteholders were to succeed in somehow challenging the GM Arrangement so that the availability of advances from GM under the GM Arrangement were reduced, that action could result in an event

3

of default under the DIP Financing Facility to the detriment of the Debtors and the possible benefit of the lenders under the DIP Financing Facility ("DIP Lenders").[1]

5. Finally, putting aside the statutory preclusion and good faith issues, the Noteholders' request for an examiner should be denied because their prior conduct constitutes a waiver of these parties' ability to seek an examiner with respect to the subject matter identified by them. The Noteholders want an examiner to investigate whether imposing financing obligations on DASHI is prejudicial to the creditors of Delphi. This is not a new issue that the Noteholders recently stumbled upon which they were unable to raise before plan confirmation. This issue has been raised numerous times since the inception of these cases, yet the Noteholders have never joined as objectors in those contested hearings (or have previously withdrawn or settled any such objections) and have never before sought an examiner to investigate it.

6. The Noteholders' prior conduct in these cases has not been incidental to its administration. To the contrary, Highland first became very active in these cases almost two years ago, in December 2006, when it submitted an unsolicited proposal to invest more than $4 billion in the Debtors and litigated against court approval of the competing investment agreement. CR Intrinsic was a member of the ad hoc bondholder committee that was critical of, and objected to, material aspects of the Debtors' restructuring efforts, including participating as an active litigant during the plan confirmation process in December 2007 and January 2008. Moreover, neither movant objected to approval of the DIP Financing Facility and the GM Arrangement earlier this year and at least one of the movants is fundamentally a DIP Lender

---

[1] See Amended & Restated Revolving Credit, Term Loan & Guaranty Agreement § 7.01(r)-(s) (redline attached to Supplemental Second DIP Extension Order, dated May 30, 2008 (Docket No. 13699)).

4

itself. The Noteholders' newest litigation strategy (which is being pursued by at least the third law firm to represent one or both of the movants in these chapter 11 cases) is inconsistent with their prior conduct and suggests that the request for an examiner is nothing more than a litigation tactic designed to fund a fishing expedition at the expense of the estates. The Motion should therefore be denied.

Argument

A.    <u>An Examiner Cannot Be Requested In These Cases At This Time</u>

   7.  Section 1104(c) of the Bankruptcy Code provides in relevant part: "If the court does not order the appointment of a trustee under this section, then at any time <u>before</u> the confirmation of a plan . . . the court shall order the appointment of an examiner . . . ." 11 U.S.C. § 1104(c) (emphasis added). On January 25, 2008, this Court entered an order confirming the Debtors' First Amended Joint Plan Of Reorganization (as modified) (Docket No. 12359) (the "Confirmation Order"). The Confirmation Order became final on February 4, 2008. Accordingly, as a matter of law, the Motion must fail. <u>See</u> <u>In re eToys, Inc.</u>, 331 B.R. 176, 186 (Bankr. D. Del. 2005) (denying request for appointment of examiner because debtors' plan had been confirmed).

   8.  The Noteholders concede that the plain meaning of the Bankruptcy Code precludes appointment of an examiner (Motion Ex. 1 ¶ 16), and that the plain meaning should ordinarily be "conclusive." Indeed, in the principal case on statutory construction cited by the Noteholders, the Supreme Court instructed that "where . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" <u>United States v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 241 (1989) (quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917)). Because the Confirmation Order is a final, non-appealable order, the result required

5

by 11 U.S.C. § 1104(c) is plain and simple: an examiner cannot be requested in these cases at this time.[2]

9.  Section 1104(a) of the Bankruptcy Code, the companion to section 1104(c), similarly provides that a trustee may not be appointed after confirmation of a plan.[3] 11 U.S.C. § 1104(a). Several courts have found that the plain meaning of section 1104(a) must be followed and have held that a trustee may only be appointed before confirmation. See Tracar, S.A. v. Silverman (In re Am. Preferred Prescriptions, Inc.), 250 B.R. 11, 18 (E.D.N.Y. 2000), rev'd on other grounds, 255 F.3d 87 (2d Cir. 2001); In re Schultz, 69 B.R. 629, 631 (D.S.D. 1987) (holding that trustee could not be appointed contemporaneously with confirmation of liquidating plan), appeal dismissed, 837 F.2d 481 (8th Cir. 1987); In re Modern Steel Treating Co., 130 B.R. 60, 66 (Bankr. N.D. Ill. 1991), aff'd, No. 91 C 5747, 1992 WL 82966 (N.D. Ill.

---

[2] Although two parties-in-interest (the Official Committee of Unsecured Creditors and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors. In contrast, the Noteholders did not seek to revoke the Confirmation Order within the 180-day deadline set by 11 U.S.C. § 1144. In addition to the pending section 1144 complaints, the Debtors also acknowledge the Court's prior consideration of whether to impose a deadline or sunset date for consummation of the Plan as discussed by the Court both during the confirmation hearings and again recently when extending the Debtors' section 1121(d) exclusive periods vis-à-vis the official committees of creditors and equity security holders. (Hr'g Tr., 45, 67-68, Jan. 17, 2008; Hr'g Tr., 12, July 31, 2008.) This Objection does not address whether the Court has inherent or reserved authority to address revocation of the Confirmation Order or the appointment of an examiner at the discretion of the Court; instead, this Objection solely addresses the Noteholders' ability to request the appointment of an examiner after confirmation of the Plan. Cf. In re Record and Tape Place, Inc., No. 81-1665-L, 1981 Bankr. LEXIS 6461 (Bankr. D. Mass. Apr. 7, 1983) (holding that trustee may not be appointed after confirmation, but ultimately appointing "supervisor" under § 105 whose "duties were a hybrid of a trustee and an examiner" with consent of debtor and creditors' committee).

[3] "At any time after the commencement of the case but before confirmation of a plan, . . . the court shall order the appointment of a trustee . . . ." 11 U.S.C. § 1104(a).

6

Apr. 1, 1992). A request for appointment of an examiner should be afforded no different treatment in the circumstances.[4]

10. Nevertheless, the Noteholders urge the Court to reject the "literal application" of the statute based on the Supreme Court's recognition that there will be "'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" Ron Pair Enterprises, 489 U.S. at 242 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, (1982)). This is not that rare case. First, "'[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.'" Ron Pair Enterprises, 289 U.S. at 242 (quoting United States v. Am. Trucking Assns., Inc., 310 U.S. 534, 543 (1940)). Second, the Noteholders offer no evidence other than conjecture that the language of the statute is "demonstrably at odds" with the legislative intent.

11. The Noteholders argue that "[i]nterpreting the Bankruptcy Code to prevent the appointment of an examiner in these cases would produce an absurd result – i.e., the confirmation of a plan that can never be consummated, and that must be modified, prevents the appointment of an examiner." The Noteholders would substitute the bright line rule of

---

[4] There is a presumption in the Bankruptcy Code that "equivalent words have equivalent meaning when repeated in the same statute." Cohen v. De La Cruz, 523 U.S. 213, 220 (1998) (citing Ratzlaf v. United States, 510 U.S. 135, 143 (1994) (noting that presumption had particular resonance "[b]ecause each use of 'debt for' in § 523(a) [of the Bankruptcy Code] serves the identical function of introducing a category of nondischargeable debt")); Bear, Stearns Sec. Corp. v. Gredd, 275 B.R. 190, 194 (S.D.N.Y. 2002) (phrase "interest of the debtor in property" has same meaning in section 548 as it does in section 547); Carrieri v. Jobs.com Inc., 393 F.3d 508, 520 n.11 (5th Cir. 2004) (applying presumption to determine that "warrant" as used in section 101(16)(C) of Bankruptcy Code has same meaning as "warrant" used in section 101(49)(A)(xv)); In re Federal Mogul-Global, Inc., 348 F.3d 390, 407 (3d Cir. 2003) ("reasonable" compensation under section 328(a) has same meaning as in section 330(a)(1)); see also Katz v. Comm'r of Internal Revenue, 335 F.3d 1121, 1128 (10th Cir. 2003) (interpreting word "partner" in Treasury Regulations to refer to debtor in bankruptcy because "identical words in different parts of the same act are intended to have the same meaning.").

7

"confirmation" with an inherently subjective and litigation-generating rule of "incapable of consummation." Thus, the Noteholders urge a rule that, as a practical matter, would permit requests for an examiner at any time before substantial consummation of a plan (or at least permit litigation over the likelihood of consummation). It is this interpretation that would create an absurdity, because it is "demonstrably at odds" with the legislative intent reflected by the statute's reference to "confirmation," not "consummation." Congress well knows the difference between the two, permitting modifications to a plan "at any time after confirmation of such plan and before substantial consummation of such plan." See 11 U.S.C. § 1127(b). Section 1104(c) is crystal clear that the timeliness of a request for the appointment of an examiner is measured only by reference to plan confirmation, not consummation.

        12.      Moreover, the Plan, which was confirmed after overwhelming support from creditors and equity security holders, is still capable of implementation, which the Debtors continue to seek on two tracks. First, the Debtors have filed, and continue to prosecute, adversary proceedings seeking specific performance relief against at least some of the plan investors, whose refusal to perform prevented substantial consummation of the Plan. Second, the Debtors are developing potential modifications of the Plan to implement the Plan with modifications, as permitted under section 1127(b) of the Bankruptcy Code and contemplated by the Plan, as soon as practicable. Based on the express terms of the Plan and the Confirmation Order, unless the Plan is withdrawn by the Debtors in accordance with the discretion granted to them by creditors who voted in favor of the Plan, including § 14.7(a) thereof, only modifications to the Plan proposed and prosecuted by the Debtors may be considered by the Court. The

8

confirmation of the Plan, therefore, is far from "meaningless" and does not warrant dispensing with the plain meaning of 11 U.S.C. § 1104(c).[5]

B.     <u>The Noteholders Have Waived Their Right To Seek Appointment Of An Examiner, And The Request Is An Unacceptable Litigation Tactic To Shift Costs To The Debtors' Estates</u>

        (i)     <u>The Right To Request The Appointment Of An Examiner Can Be Waived</u>

13.     The Motion should also be denied because the Noteholders have waived their right to request the appointment of an examiner, which request is an obvious litigation tactic that attempts improperly to shift litigation costs to the Debtors' estates. Several courts have held that even when appointment of an examiner is otherwise warranted under 11 U.S.C. § 1104(c)(2), a party-in-interest's conduct can waive the right to request an examiner. <u>See</u> <u>Six West Retail Acquisition, Inc. v. Loews Cineplex Entertainment Corp.</u> (In re Loews Cineplex Entertainment Corp.), 286 B.R. 239, 249 (S.D.N.Y. 2002) (affirming bankruptcy court's denial of request for examiner that was filed shortly before confirmation hearing based on "implicit waiver"); <u>In re Bradlees Stores, Inc.</u>, 209 B.R. 36, 39 (Bankr. S.D.N.Y. 1997); <u>In re Schepps Food Stores, Inc.</u>, 148 B.R. 27, 30-31 (Bankr. S.D. Tex. 1992); <u>In re Altheimer & Gray</u>, Case

---

[5]     The Noteholders also rely on an order appointing an examiner in the <u>Enron</u> cases as illustrative that "[a]mple precedent exists in this district for appointment of an examiner in complex cases . . . ." (Motion Ex. 1 ¶ 28). As a threshold matter, the <u>Enron</u> order appointing the examiner was entered within three months after the petition date and, more importantly, approximately 2-½ years <u>before</u> entry of the confirmation order. Because the request for an examiner in the <u>Enron</u> cases was made before a plan had been confirmed, the request was timely under section 1104(c) and the decision is inapposite.

Moreover, the Noteholders' reliance on the complexity of the case is nothing more than a red herring. In fact, the complexity of the <u>Enron</u> cases was not the primary reason why an examiner was appointed. Instead, an examiner was appointed in <u>Enron</u> because the Debtor had more than $5 million in unsecured debt and the examiner request was made before confirmation of a plan. (Motion Ex. 1 ¶¶ 25-26); <u>see also</u> <u>Loral Stockholders Protective Committee v. Loral Space & Commc'ns, Ltd.</u> (In re Loral Space & Commc'ns, Ltd.), No. 04-8645, 2004 WL 2979785, at *4 (S.D.N.Y. Dec. 23, 2004).

9

No. 03 B 43547 (Bankr. N.D. Ill. Feb. 10, 2005) (denying request for examiner because movant waived right by waiting until disclosure statement hearing to bring motion).

14. In <u>Bradlees Stores</u>, a group of claims traders requested appointment of an examiner to investigate potential claims or causes of action relating to the parent debtor's pre-bankruptcy purchase of other subsidiaries of the parent debtor. Almost two years earlier, the court had conducted a chambers conference and the parties had agreed that the debtors' professionals would investigate those transactions. The debtors' professionals conducted the investigation and issued a report concluding that the estate did not have any viable claims or causes of action relating to the transactions in question. The claims traders had received a copy of the report eight months earlier, and waited until nineteen days before the expiration of the two-year statute of limitations under 11 U.S.C § 546(a) to seek an examiner. The court denied the request, holding that the claims traders "waived the right to seek such relief at this juncture. . . . The movants have had over nineteen months to seek this relief. They are barred by their own inaction from seeking it at this late date." <u>Bradlees Stores</u>, 209 B.R. at 39.

15. Similarly, in <u>Schepps Food Stores</u>, the movant sought an examiner on the "eve of confirmation." As the court explained, "[w]hile the statute states that the court may appoint an examiner any time before the plan is confirmed, a creditor cannot use the provision to disrupt the proceedings." <u>Schepps Food Stores</u>, 148 B.R. at 30. The court concluded that "[b]y its late action, [movant] has waived its right to an examiner." <u>Id.</u> at 31. Here, by waiting since they entered the case until now to request an examiner, the Noteholders have waived their right to do so.

10

        (ii)      <u>The Noteholders Waived The Right To Request An Examiner By Failing To Make Such A Request When Other Parties-In-Interest Previously Raised Similar Issues</u>

16.    The Noteholders could have filed a request for an examiner at any time before the Confirmation Order was entered, but never did so, even when other parties-in-interest had publicly raised the same issue. The issue raised by the Noteholders, and which they want an examiner to investigate – whether DASHI should stand behind the obligations of its affiliated Debtors' North American operations – has been at issue since the beginning of these cases. The Noteholders have never bothered to raise it at any time in the past.

        (a)      <u>Preconfirmation Proceedings</u>

17.    Less than three weeks after commencing these cases, on October 28, 2005, this Court entered a final order approving the Debtors' initial debtor-in-possession financing facility. Although Delphi was the primary borrower under this facility, all other Debtors were guarantors and the DIP Lenders received a lien on all of the Debtors' assets, not merely those of Delphi. The Debtors' initial financing arrangement and, as described below, subsequent financing arrangements were structured in this manner because Delphi is a global, integrated enterprise that operates along different business segments or divisions.

18.    Although the North American operations are currently benefiting from excess liquidity generated by the profitable global operations, the value of Delphi is premised on this cohesive enterprise. Without the assets and business operations of the Debtors' U.S. operations, as presently structured, the global affiliates would not be capable of existing as stand-alone entities, since many of the non-U.S. subsidiaries rely in substantial part on intellectual property and technology, as well as administrative, engineering, and other support services provided by Delphi's North American subsidiaries. Nevertheless, because Delphi's worldwide headquarters are located in the United States, events that take place in the U.S., including the

perceived strength of Delphi's U.S. subsidiaries, have a substantial impact on decisions made and what takes place outside of the United States.  Strong U.S. Delphi operations imbue confidence in Delphi customers worldwide, influence global purchasing decisions, and thereby increase value and growth opportunities for all of Delphi's subsidiaries.

19.     This same issue has been raised many times in the following matters:

- The Debtors' October 8, 2005 motion for approval to maintain its cash management system.  (Docket No. 25.)  The Official Committee of Unsecured Creditors and the Pension Benefit Guaranty Corporation filed responsive pleadings noting that one Debtor should not bear the costs of another Debtor.[6]

- The Debtors' June 19, 2006 motion for approval to enter into various attrition plans with certain unions.  (Docket No. 4269.)  Wilmington Trust Company ("WTC"), as indenture trustee for holders of the same notes held by the Noteholders, objected on the ground that that Debtor entities other than Delphi were benefiting from the underlying transactions at the expense of Delphi's creditors.[7]

---

[6] See Statement Of The Official Committee Of Unsecured Creditors In Response To Debtors' Motion For Order Under 11 U.S.C. §§ 363 And 553 Authorizing (I) Continued Maintenance Of Existing Bank Accounts, (II) Continued Use Of Existing Cash Management System, (III) Continued Use Of Existing Business Forms, (IV) Preservation And Exercise Of Intercompany Setoff Rights, And (V) Grant Of Administrative Status For Postpetition Intercompany Transactions, dated October 25, 2005 (Docket No. 639) ¶¶ 6-7 (noting agreement with position that individual Debtor affiliates should not bear the risk and cost of other Debtor entities); Limited Omnibus Objection Of Pension Benefit Guaranty Corporation To (A) Interim Cash Management Order And (B) Debtor In Possession Financing Motion, dated October 20, 2005 (Docket No. 437) (arguing that Debtors should not be allowed to jeopardize creditors' recoveries by allowing one Debtor entity to prop up estate of another).

[7] See Limited Objection Of Wilmington Trust Company, As Indenture Trustee, To Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Approving (I) Supplement To UAW Special Attrition Program, And (II) IUE-CWA Special Attrition Program, dated June 27, 2006 (Docket No. 4379) ¶ 4 (noting that Debtors are separate legal entities and that each entity has fiduciary duty to act in best interests of its creditors and shareholders); Amended Objection To Motion Amended Objection Of Wilmington Trust Company, As Indenture Trustee, To Motion For Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 2002 And 6004 Approving Debtors' Entry Into Transfer Agreement With Johnson Controls, Inc. Providing For (A) Sale Of Acquired Assets Free And Clear Of Liens, Claims, And Encumbrances, (B) Continuation And Transition Of Supply To Johnson Controls, Inc. Of Battery Products Out Of Fitzgerald Facility, And (C) Implementation Of Attrition Plan With Respect To New Brunswick Facility In Accordance With IUE-CWA Memorandum, dated June 16, 2006 (Docket No. 4250) ¶ 25 (stating that each Debtor entity is distinct and has fiduciary duty to protect interests of its own creditors and equity holders).

- The Debtors' March 31, 2006 motion for approval to reject their collective bargaining agreements. (Docket No. 3035.) WTC asserted that Debtor entities other than Delphi were benefiting from the underlying transactions at the expense of Delphi's creditors.[8]

- The Debtors' December 18, 2006 motion to refinance their original debtor-in-possession financing facility by entering into their current $4.5 billion DIP Financing Facility. (Docket No. 6180.) As with the original DIP financing facility, Delphi is the borrower under the DIP Financing Facility, all other Debtors are guarantors, and the DIP Lenders again have liens on all of the Debtors' assets.

- The Debtors' October 5, 2007 motion for approval of certain intercompany transactions. (Docket No. 10484.) WTC objected with renewed concerns that the creditors of Delphi would be harmed by the transfer of excess cash value that had accumulated at DASHI to the Debtors' U.S. operations.[9]

- The Debtors' November 1, 2007 motion to extend the maturity date of the DIP Financing Facility, under which Delphi continued to be the borrower and the DIP Lenders retained their liens on all of the Debtors' assets. (Docket No. 10787.)

- The Debtors' September 6, 2007 motion to approve the disclosure statement, which as subsequently amended, discussed all of the above. (Docket No. 9264.)

20. Highland was on notice of the concerns raised above no later than December 2006[10] and CR Intrinsic was on notice no later than October 2007,[11] although it is

---

[8] See Objection Of Wilmington Trust Company, As Indenture Trustee, To Motion Of UAW To Limit Participation In The Hearing On Debtors' Section 1113/1114 Motion And Sur Reply To Debtors' Omnibus Reply Memorandum In Support Of 1113/1114 Motion, dated May 5, 2006 (Docket No. 3644) ¶ 33 (arguing that Delphi would bear cost of rejecting collective bargaining agreements although it did not employ any union members, which would benefit Delphi's U.S. Debtor subsidiaries); Limited Objection of Wilmington Trust Company, As Indenture Trustee, To Motion for Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits, dated April 21, 2006 (Docket No. 3353) ¶ 23 (nothing that each Debtor entity is distinct and has duty to protect its own creditors.).

[9] See Preliminary Objection Of Wilmington Trust Company, As Indenture Trustee, To Motion for Order Under 11 U.S.C. 363(c), 1107 And 1108, And Cash Management Order, And Alternatively, Under 11 U.S.C. §§ 363(b)(1) And 364(c) Confirming Authority Of Delphi Automotive Systems (Holding), Inc. To Complete Intercompany Transfer Of Funds, dated October 12, 2007 (Docket No. 10564) ¶ 2 (questioning Debtors' business judgment for entering into transactions).

[10] See Notice of Appearance filed by Judith Elkin on behalf of Highland Capital Management L.P., dated December 21, 2006 (Docket No. 6257).

13

currently unknown just when the Noteholders first began to actively monitor these cases. In any event, the Noteholders were active litigants from their first appearance through confirmation of the Plan.

21.     In December 2006, Highland submitted an unsolicited proposal to Delphi's Board of Directors offering to invest more than $4 billion to fund the Debtors' plan of reorganization.[12] The Debtors ultimately rejected Highland's offer, but Highland continued to actively participate in the Debtors' reorganization efforts by objecting to the proposed agreement with the competing plan investors and subsequently to the Debtors' request for an exclusivity extension. In May and June 2007, the Debtors and Highland entered into a non-disclosure agreement and Highland's attorneys conducted extensive due diligence at Delphi's corporate headquarters, including the review of material, non-public information. After these extensive due diligence efforts, Highland made a second proposal to Delphi's Board of Directors to invest billions of dollars in the Debtors' plan of reorganization.[13]

22.     From October 2007 through January 2008, CR Intrinsic (as part of an ad hoc bondholder committee) filed objections to the Debtors' motions to approve a settlement of multi-district litigation and an amended agreement with plan investors, disclosure statement, motion to estimate claims for voting purposes, and plan of reorganization. Highland also

---

*(cont'd from previous page)*

[11]   See Objection By Castlerigg Master Investments Ltd.; CR Intrinsic Investors, LLC; Davidson Kempner Capital Management LLC; Elliot Associates, L.P.; And SPCP Group, LLC To Motion By The Debtors For Order Approving Multidistrict Litigation And Insurance Settlements, dated October 19, 2007 (Docket No. 10687).

[12]   See Form SC 13D, filed by Highland Capital Management L.P., December 22, 2006.

[13]   See Form SC 13D/A, filed by Highland Capital Management L.P., July 19, 2007.

objected to the Debtors' disclosure statement and a proposed amendment to the investment agreement with the plan investors.

(b)     <u>Postconfirmation Proceedings</u>

23.     When the Debtors did not emerge from chapter 11 protection as anticipated on April 4, 2008, the Debtors obtained Court approval for a number of financing-related agreements. As before, each of the following matters raised the same issue that the Noteholders wish to have an examiner investigate:

- The Debtors' April 16, 2008 motion to approve a second extension of the DIP Financing Facility's maturity date, until December 31, 2008, and the GM Arrangement. (Docket No. 13409.) As noted above, one of the Noteholders has a significant beneficial interest in the DIP Financing Facility. All Debtors, including DASHI, have repayment obligations with respect to both the DIP Financing Facility and the GM Arrangement.

- The Debtors' May 9, 2008 motion for approval to supplement the second extension of the DIP Financing Facility. (Docket No. 13584.)

- The Debtors' May 9, 2008 motion to approve adequate protection with respect to additional intercompany transfers of cash from DASHI. (Docket No. 13585.) WTC once again raised the concern that using excess cash from DASHI to assist the U.S. operations was detrimental to Delphi's creditors.[14]

24.     On August 10, 2008, new attorneys for the Noteholders filed a Notice of Appearance And Request For Service Of Papers (Docket No. 14051), a copy of which is attached hereto as <u>Exhibit A</u>. Soon after the Debtors filed their August 16, 2008 motion seeking approval of the Amendment, the Noteholders—for the first time—alleged that an examiner should be appointed. The Noteholders have had ample notice of the issues underlying their

---

[14]    <u>See</u> Supplemental Objection Of Wilmington Trust Company, As Indenture Trustee, To Motion For Order Under 11 U.S.C. §§ 361 And 363, Fed. R. Bankr. P. 9019, And Cash Management Order, Authorizing DASHI To Grant Adequate Protection To Pension Benefit Guaranty Corporation In Connection With Certain Intercompany Transfers Of Repatriated Funds, dated May 22, 2008 (Docket No. 13652) ¶ 5.

15

examiner request and ample opportunity to request an examiner to investigate their concerns. By failing to make such a request until now, the Noteholders have waived their right to do so.

25.   After remaining silent about these issues throughout these cases, the Noteholders suddenly determined to object to the Debtors' plan to obtain $300 million in incremental subordinated, unsecured advances from GM, just five months after the Court approved the first $650 million of this arrangement with GM without objection from the movants and just five months after the Court approved an extension of the secured DIP Financing Facility in which at least one of the movants has invested. This change in position suggests that the Noteholders are using the request for an examiner as a method for shifting to the Debtors' estates the litigation costs of investigating or challenging the underlying transactions with GM. Using a request for an examiner as a litigation tactic or negotiating leverage should not be tolerated. <u>See Schepps Food Stores</u>, 148 B.R. at 31 ("There is ample support in the record to conclude that [movant's] interest in the appointment of an examiner is a tactic to prevent confirmation, rather than to investigate bad faith allegations.").

WHEREFORE, the Debtors respectfully request that the court enter an order (i) denying the Motion and (ii) granting the Debtors such other and further relief as is just.

Dated:     New York, New York
           September 16, 2008

>                               SKADDEN, ARPS, SLATE, MEAGHER
>                                & FLOM LLP
>
>                               By:    */s/ John Wm. Butler, Jr.*
>                                      John Wm. Butler, Jr.
>                                      John K. Lyons
>                                      Albert L. Hogan III
>                                      Ron E. Meisler
>                               333 West Wacker Drive, Suite 2100
>                               Chicago, Illinois 60606
>                               (312) 407-0700
>
>                                           - and –
>
>                               By:    */s/ Kayalyn A. Marafioti*
>                                      Kayalyn A. Marafioti
>                                      Thomas J. Matz
>                               Four Times Square
>                               New York, New York 10036
>                               (212) 735-3000
>
>                               Attorneys for Delphi Corporation, et al.,
>                                 Debtors and Debtors-in-Possession