Hearing Date: September 23, 2008, at 10:00 a.m.

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Michael J. Riela (MR-7829)
Email: robert.rosenberg@lw.com
       mitchell.seider@lw.com
       mark.broude@lw.com
       michael.riela@lw.com

Counsel for The Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, et al., | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | |
| | ) | Jointly Administered |
| | ) | |

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO FIFTH SUPPLEMENT TO DEBTORS' KECP
MOTION SEEKING AUTHORITY TO CONTINUE SHORT-TERM AT-RISK
PERFORMANCE PAYMENT PROGRAM ("AIP") FOR SECOND HALF OF 2008**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Delphi Corporation, *et al.* (the "Debtors"), by and through its undersigned counsel, hereby objects (this "Objection") to the Debtors' fifth supplement to their Motion (the "Motion") for an Order under §§ 105 and 363 Authorizing the Debtors to Implement a Key Employee Compensation Program (the "Fifth Supplement") during the six-month period from July 1, 2008 through December 31, 2008, to the extent it includes the 21 members of the Delphi

NY\1450440.3

Strategy Board (the "<u>DSB</u>")[1] in the group of executives covered by the AIP. In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.   The Committee objects to the Motion to the extent that it awards short-term bonuses to members of the DSB. Throughout these cases, the Committee has worked with the Debtors to craft a reasonable short-term incentive program, and the Committee continues to support the proposition that compensation properly geared to incentivize performance is appropriate. In that spirit, the Committee is not objecting to the Motion as it pertains to the non-DSB employees. However, in light of recent developments in these cases and the Debtors' inability to establish a workable timetable for their emergence from chapter 11 without capitulating to the latest demands from General Motors Corporation ("<u>GM</u>"), the members of the DSB (who, after all, are in charge of creating the Debtors' strategy to emerge from chapter 11) should not continue to participate in a short-term incentive plan while the Debtors remain in bankruptcy.

2.   By denying the portion of the Fifth Supplement that relates to the members of the DSB, this Court will place the economic incentives for the DSB executives where they belong: on emergence from chapter 11 protection as soon as reasonably practicable, while preserving the value of the estates for the benefit of the Debtors' unsecured creditors.

## BACKGROUND

3.   On October 8, 2005 (the "<u>Petition Date</u>"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On October 14, 2005, the three remaining Debtors also filed voluntary petitions.

---

[1] The DSB is Delphi's top policymaking group of executives.

4. The Committee was appointed nine days after the Petition Date, on October 17, 2005.[2] Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its investment banker. On September 3, 2008, the Committee filed an application to retain Moelis & Company LLC as its co-investment banker, along with Jefferies & Company, Inc.

5. On January 25, 2008, the Debtors' First Amended Joint Plan of Reorganization (the "Old Chapter 11 Plan") was confirmed. On April 4, 2008, the plan investors chosen by the Debtors to fund the Old Chapter 11 Plan purported to terminate the equity purchase and commitment agreement that formed the backbone of the Old Chapter 11 Plan. As of this time, the Old Chapter 11 Plan has not been consummated.

6. In the five months since the Old Chapter 11 Plan failed to close on April 4, the Debtors have not yet proposed a revised chapter 11 plan. This is the case even though the Debtors' current post-petition debtor-in-possession financing facility (the "DIP Facility") matures on December 31, 2008, and the Debtors will be unable to transfer their pension assets and liabilities to GM's pension plans under section 414(l) of the Internal Revenue Code on the most economically efficient basis after September 30, 2008.

7. By failing to use their negotiating levers effectively and by waiting until the last minute to reach a deal with GM, the Debtors currently are on the verge of giving away all of their value to General Motors Corporation ("GM"). The Debtors recently have negotiated proposed amendments to the Global Settlement Agreement and the Master Restructuring Agreement with GM. These negotiations led to the announcement of an agreement in which the

---

[2] The current members of the Committee are: (a) Capital Research and Management Company; (b) Freescale Semiconductor, Inc.; (c) IUE-CWA; (d) Wilmington Trust Company, as Indenture Trustee and (e) Tyco Electronics Corporation. The Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio* members of the Committee.

3

Debtors would grant GM a $2.055 billion administrative expense claim and an immediate full release of all claims held by the Debtors' estates against GM (even though a revised plan of reorganization is not yet on the table). The proposed amendments to the Global Settlement Agreement and the Master Restructuring Agreement are the subject of a separate objection that will be filed by the Committee. The Committee believes that the Debtors' management and board of directors have breached their fiduciary duties to the Debtors' estates and unsecured creditors by their failure to take concrete action against GM in the months after the Old Chapter 11 Plan failed, and by their acquiescence to GM's outrageous demands in connection with the negotiation of the amendments to the Global Settlement Agreement and the Master Restructuring Agreement.

8.   Against this backdrop, the Debtors filed the Motion seeking approval of the Fifth Supplement on September 12, 2008. The Fifth Supplement would apply to all of the Debtors' employees holding executive positions in the United States during the second half of 2008 (collectively, the "Covered Employees"). As of August 1, 2008, there were approximately 416 Covered Employees, including 21 members of the DSB.

**OBJECTION**

9.   The Committee objects to the Fifth Supplement as it relates to the members of the DSB because it unreasonably continues an incentive program for those executives and does nothing to expedite the Debtors' emergence from chapter 11 protection. To be blunt, the last four iterations of the AIP for the members of the DSB did not result in the Debtors' successful emergence from chapter 11, and nothing in the Motion gives anyone cause to believe that this time will be any different. The Debtors have been in chapter 11 for nearly three years now, and time is now running out on the Debtors' hopes for a successful reorganization. The Debtors are

4

facing a massive liquidity crisis for 2008 and beyond, which will likely threaten the continued viability of the Debtors' U.S. operations.  In addition, the DIP Facility will mature at the end of this year, and still there is no revised plan of reorganization in sight.

10. Nevertheless, the Debtors proposed an AIP program that would continue to award the members of the DSB—the Delphi executives with the greatest influence over the Debtors' emergence—additional compensation based on the performance of the Debtors *while they remain in bankruptcy*.  Rather than perpetuating a situation in which the members of the DSB are rewarded for performance in bankruptcy, the proposed AIP should remove the DSB members from bonus eligibility until they attain what should be their principal goal: emergence from chapter 11 as soon as reasonably practicable, while preserving the value of the estates for the Debtors' unsecured creditors.

11. To be clear, the Committee does not assert that the AIP is tainted by self-dealing or is anything other than the product of independent advice.  In fact, the Committee and its compensation experts have worked with the Debtors in the past to propose "payout curves" for the AIP, and the Committee continues to support implementation of the proposed AIP for non-DSB executives.  It is the non-DSB executives whose work in trying to maximize performance of each of the Debtors' divisions deserves to be rewarded.  However, as the name "Delphi Strategy Board" suggests, the role of the DSB is broader than simply enhancing the performance of individual divisions; rather, the DSB should be charting Delphi's broader strategic course and, in particular, its exit from chapter 11.  Given the DSB's performance (or lack thereof) in the last few months and the challenges the Debtors' presently face, the Committee has concluded that an incentive program that rewards the executives charged with getting the Debtors *out* of

5

bankruptcy for performance achieved while the Debtors *remain* in bankruptcy no longer "makes good business sense." *See* Motion, at 8.

12. In considering employee retention and compensation programs under section 363 of the Bankruptcy Code, Bankruptcy Courts ordinarily apply the business judgment standard, and examine the plan for a sound business reason. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (stating that, "[t]he rule we adopt requires that a judge determining a § 363 application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"). "[T]he debtor carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will assist the debtor's reorganization." *Id.*; *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 155 (D. Del. 1999) (applying the standard in *Lionel* to an application for approval of an employee retention plan); *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (stating that "[b]ankruptcy courts will approve key employee retention plans if the Debtor has used proper business judgment in formulating the program and the court finds the program to be 'fair and reasonable'").

13. Notably, courts have said that, when evaluating whether a sound business reason exists for granting an application under section 363 of the Bankruptcy Code, a bankruptcy judge should consider "all salient factors pertaining to the proceeding." *Id.*; *see In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (finding that the bankruptcy court was within its discretion to approve a sale of assets "based on its consideration of all the factors"); *see also In re Georgetown Steel Co., LLC*, 306 B.R. 549, 555 (Bankr. D.S.C. 2004) (stating that "retention plans are reviewed on a case-by-case basis, depending on each debtor's particular facts and circumstances.").

6

14.     The facts and circumstances of these cases simply do not support the continued inclusion of the DSB members in the AIP.  The members of the DSB have failed to propose a new plan of reorganization in the nearly six months that have elapsed since the Old Chapter 11 Plan failed, and there is presently not even a timetable for the Debtors' emergence from chapter 11.  Indeed, the Debtors' best idea of exiting bankruptcy is to acquiesce to GM's demands, to the detriment of unsecured creditors.  Now is not the time to implement an incentive program that will award these senior executives based upon the work of others while the Debtors languish in chapter 11.

15.     It may be true that eliminating the DSB from the AIP will cause compensation for members of the DSB to fall "below market-competitive levels."  *See* Motion at 7.  There can be no real dispute, however, that these are cases in which the DSB has failed to achieve its principal goal of emergence.  As such, what may have been reasonable in earlier performance periods, as the Debtors were progressing towards confirmation of the Old Chapter 11 Plan and emergence from bankruptcy, must be adapted to reflect the changing circumstances of these cases.  In that context, the Debtors' statement that approval of the AIP is "a critical step toward achieving the Debtors' objective of providing market-competitive compensation to their entire workforce" misses the mark.  At a less crucial stage, such an objective would have made sense and garnered the Committee's support (as, indeed, the Debtors' prior requests for approval of an AIP did); given the current state of the cases, all objectives must take a back seat to the overarching objective of emerging from chapter 11.[3]

---

[3] Furthermore, as set forth in the Motion, the Debtors have arranged for a post-emergence Management Compensation Plan (the "MCP") that will pay market-competitive compensation to eligible executives, including those on the DSB, once the Debtors have emerged from chapter 11 protection.  Thus, if the members of the DSB wish to be paid in line with the market, they need only bring these cases to a long-overdue end.

16. In short, with the collapse of the Old Chapter 11 Plan, the world has changed since the Fourth Supplement was approved in March, and it is only reasonable that the Debtors' AIP must change with it. As the name suggests, an incentive plan is intended to incentivize performance and to motivate employees to improve corporate performance above the *status quo*. The *status quo* in these cases is an utterly stagnant reorganization process. The AIP, as proposed in the Motion, does nothing to change that, particularly with respect to the one group of Delphi employees most responsible for overcoming the inertia that has set in—the DSB members. To the extent that the AIP gives the members of the DSB the opportunity for bonus payments before the Debtors have emerged from chapter 11 protection, it should be rejected.

**WHEREFORE,** the Committee respectfully requests that this Court (a) deny the Motion to the extent that it contemplates any bonus payments to the 21 members of the DSB, and (b) grant the Committee such other relief as is just and proper.

Dated:  September 19, 2008
         New York, New York

                                      **LATHAM & WATKINS LLP**

                                      By: /s/ Robert J. Rosenberg
                                           Robert J. Rosenberg (RR-9585)
                                           Mitchell A. Seider (MS-4321)
                                           Mark A. Broude (MB-1902)
                                           Michael J. Riela (MR-7829)
                                           885 Third Avenue, Suite 1000
                                           New York, New York 10022
                                           Telephone:  (212) 906-1200

                                      Counsel for the Official Committee
                                      of Unsecured Creditors