**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Michael J. Riela (MR-7829)
Email: robert.rosenberg@lw.com
       mitchell.seider@lw.com
       mark.broude@lw.com
       michael.riela@lw.com

Counsel for The Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, et al., | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTIONS FOR ORDERS
(I) AUTHORIZING AMENDMENT TO ARRANGEMENT WITH GENERAL
MOTORS CORPORATION APPROVED PURSUANT TO SECOND DIP
EXTENSION ORDER, AND (II) GRANTING AUTHORITY TO MODIFY BENEFITS
UNDER HOURLY AND SALARIED PENSION PROGRAMS AND MODIFY
<u>APPLICABLE UNION AGREEMENTS IN CONNECTION THEREWITH</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the

chapter 11 cases of Delphi Corporation, *et al.* (collectively, the "<u>Debtors</u>"), by and through its

counsel, hereby files this Objection to the Debtors' motions for orders (a) authorizing an

amendment to a liquidity arrangement with General Motors Corporation ("<u>GM</u>") approved

pursuant to the second DIP extension order and (b) authorizing the modification of benefits

under hourly and salaried pension programs and modification of applicable union agreements in

connection therewith (together, the "Motions").  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Debtors' motion for authority to enter into an amendment to the liquidity arrangement with GM should be denied.  So many strings are attached new loans the Debtors would receive under the amended liquidity arrangement with GM, that it would be fair to say that the Debtors' access to these funds is illusory.  In exchange for this, the Debtors would give away control over the chapter 11 plan process to GM.  In addition, GM would not be obligated to advance any new loans if this Court stops the Debtors from repatriating funds to support the Debtors' North American operations that are being run primarily for GM's benefit.

2. It also makes no sense for the Debtors to establish replacement retirement plans for executives while the Debtors have no revised plan of reorganization to present to creditors.  In light of the drastically reduced recoveries to unsecured creditors under any revised chapter 11 plan, the Debtors' remaining assets should not be used for the benefit of the Debtors' executives.  In addition, modifications to the pension plans for hourly employees cannot take place without union consent, and it is certainly possible that one or more of the unions may condition its consent on the receipt of additional consideration or other modifications to the transaction.  As a result, the hearing to consider the pension freeze related to union pension plans should be held only after union consent is obtained.  Delaying the hearing with respect to that portion of the relief sought until that time will permit this Court to consider the requested freezes in light of the deal that is reached between the Debtors and the unions.

3. A number of the objections that the Committee will raise with respect to the motion (the "GSA/MRA Motion") to approve the amendments to the Global Settlement

2

Agreement and the Master Restructuring Agreement with GM apply to the Motions. Indeed, the relief sought in the GSA/MRA Motion is very much intertwined with the relief sought in the Motions, so the legal and factual arguments that the Committee will raise in its objection to the GSA/MRA Motion should be considered in evaluating the merits of the Motions. However, the Committee's deadline to object to the GSA/MRA Motion is Monday, September 22, and the deadline to object to the Pension Freeze Motion (as defined below) is September 19, making it necessary for the Committee to file this Objection at this time. The Committee reserves its right to supplement its objections to the Motions herein with the objections that will be raised in the Committee's objection to the GSA/MRA Motion.

4. The relief being sought under the Motions, particularly when viewed in light of the transactions contemplated by the GSA/MRA Motion, is part and parcel of the Debtors' abdication of control over these cases to GM. In particular, the relief sought in the Liquidity Agreement Motion (as defined below) conditions the Debtors' access to the purported liquidity on filing a plan of reorganization that is acceptable to GM and on the Debtors' continued repatriation of cash from their foreign operations. Those provisions have the effect of solidifying the control that GM has been exercising over the Debtors, to the detriment of all other consituencies in these cases.

5. Furthermore, the relief sought in the Motions will lock the Debtors into many of the most important terms of a plan of reorganization. This is so even though no plan of reorganization has been filed or, as far as the Committee knows, even drafted. As will be further demonstrated in the Committee's objection to the GSA/MRA Motion, these aspects of the Motions constitute a *sub rosa* plan that cannot be approved.

3

NY\1453221.3

6.      GM, through its control over the Debtors' access to allegedly critical liquidity, will be able to dictate the terms of a plan of reorganization without regard to the outcome for unsecured creditors.  At the same time, the Debtors are seeking to protect their own by implementing new retirement plans designed to go into effect once a plan is consummated, again even though no plan has been drafted.  Yet the Debtors have failed to provide even the most basic information about some of these new retirement plans, making it impossible for the Committee or this Court to evaluate the costs of what the Debtors are seeking to have this Court approve.

## BACKGROUND

7.      On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, the three remaining Debtors also filed voluntary petitions.

8.      The Committee was appointed nine days after the Petition Date, on October 17, 2005.[1]  Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its investment banker.  On September 3, 2008, the Committee filed an application to retain Moelis & Company LLC as its co-investment banker, along with Jefferies & Company, Inc.

9.      On December 10, 2007, the Debtors filed their proposed chapter 11 plan that ultimately was confirmed by this Court on January 25, 2008 (the "Old Chapter 11 Plan").  On April 4, 2008, the plan investors purported to terminate that certain Equity Purchase and Commitment Agreement, and the Old Chapter 11 Plan has not become effective.  Because the

---

[1] The current members of the Committee are: (a) Capital Research and Management Company; (b) Freescale Semiconductor, Inc.; (c) IUE-CWA; (d) Wilmington Trust Company, as Indenture Trustee and (e) Tyco Electronics Corporation.  The Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio* members of the Committee.

4

Old Chapter 11 Plan has not become effective, neither has the current GSA and MRA between the Debtors and GM.

10. On April 30, 2008, this Court entered an order authorizing the Debtors to enter into an amendment and restatement of their debtor-in-possession credit agreement, and authorizing the Debtors to receive advances of up to $650,000,000 from GM pursuant to the terms of a liquidity support agreement between Delphi and GM (the "Original Delphi/GM Agreement"). The Original Delphi/GM Agreement was structured to provide a means by which GM would advance funds to the Debtors representing the amounts by which GM had underpaid for parts from the Debtors. GM would already have paid those amounts to the Debtors had the Old Chapter 11 Plan, and thus the GSA and MRA become effective.

11. On August 6, 2008, the Debtors filed a motion (the "Liquidity Agreement Motion") requesting the approval of an amendment to the Original Delphi/GM Agreement (the "Amended Delphi/GM Agreement"). Under the Amended Delphi/GM Agreement, GM would increase the aggregate principal amount available (via the "Tranche B Loans" described therein) by a maximum of $300 million. Unlike the Original Delphi/GM Agreement, the Amended Delphi/GM Agreement contains stringent conditions precedent to the Debtors' ability to receive any of the additional Tranche B Loans, and it is possible that these additional loans may never become available to the Debtors.

12. On September 12, 2008, the Debtors filed a motion (the "Pension Freeze Motion") requesting (a) permission to freeze the Delphi Hourly-Rate Employees Pension Plan as soon as possible following union consent; (b) permission to unilaterally freeze the Delphi Retirement Program for Salaried Employees and three subsidiary Debtors' salaried employee pension plans, and the existing Supplemental Executive Retirement Program as of September 30,

5

2008; (c) permission to institute Delphi contributions under an existing 401(k) benefit plan for salaried employees as of October 1, 2008; and (d) permission to implement an amended Supplemental Executive Retirement Program (the "Amended SERP") or an amended Salaried Retirement Equalization Savings Program (the "Amended SRESP") for the Debtors' executives.

13. On September 12, 2008, the Committee filed its preliminary objection to the GSA/MRA Motion, the Liquidity Agreement Motion and the Pension Freeze Motion, as well as the Debtors' motion to establish second half 2008 AIP targets and continue the Debtors' AIP program.

**OBJECTION**

**I.    The Liquidity Agreement Motion**

14. It is well-established that the use or disposition of estate assets under section 363(b) of the Bankruptcy Code to benefit insiders is subject to heightened scrutiny. *See, e.g.*, *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005). When the debtor is a corporation, and insider includes a "person in control of the debtor," such as GM. 11 U.S.C. § 101(31)(B)(iii). The list set forth in section 101(31)(B) of "insiders" where the debtor is a corporation is not exclusive. *See* 11 U.S.C. § 101(31) (stating that "the term 'insider' *includes* …") (emphasis added).

15. In applying the term "insider," courts generally rely on the legislative history of the "insider" definition, which makes clear that the term covers "one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499-500 (S.D.N.Y. 1994), citing S. Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810, 6269; *see also DeRosa v. Buildex Inc. (In re F & S Central Mfg.*

6

*Corp.)*, 53 B.R. 842, 848 (Bankr. E.D.N.Y. 1985) (stating that insiders include those with "special influence over the debtor"). For example, courts have held that a creditor who has a special relationship with the debtor through which it can compel payment of its debt has sufficient control over the debtor to be deemed an insider. *See, e.g.*, *In re F & S Central Mfg. Corp.*, 53 B.R. at 848; *In re Missionary Baptist Foundation of America Inc.*, 712 F.2d 206, 210 (5th Cir. 1983); *In re Montanino*, 15 B.R. 307, 310 (D. N.J. 1981). In determining whether a creditor is an "insider" of a debtor, courts have considered a wide variety of factors, including whether the creditor: (a) received information from the debtor that was not available to other creditors, shareholders and the general public; (b) attempted to influence decisions made by the debtor; (c) selected new management for the debtor; (d) had special access to the debtor's premises and personnel; (e) was the debtor's sole source of financial support; and (f) generally acted as a joint venturer or prospective partner with the debtor rather than an arms length creditor. *See Pan Am Corp.*, 175 B.R. at 500, citing *In re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990).

16. GM is a person in control of these Debtors, and therefore is an insider. Almost every one of the factors listed above is present in this case: since Delphi's spin-off from GM, GM (a) has received information from the Debtors that was not available to other creditors, shareholders and the general public; (b) has had substantial influence over decisions made by the Debtors; (c) had special access to the Debtors' premises and personnel; and (d) was either the sole source or one of few sources of financial support for the Debtors (particularly recently). The manifestations of this control are clear. GM used its overwhelming leverage against the Debtors to force them to depress the prices they charged to GM, to such a degree that the Debtors have been losing billions of dollars per year on their sales to GM in North America. In

7

addition, GM has caused Delphi to enter into contracts that gave GM both continuing access to the Debtors' business information and continuing control over important business decisions. The complaint that the Committee has prepared and filed under seal with this Court in connection with its STN motion contains numerous other supported allegations of GM's control over the Debtors. If the GSA/MRA Motion and the Liquidity Agreement Motion are granted, GM will have complete control over the Debtors' plan process, and can dictate what the terms of the plan would be.

17.     Transactions with insiders are not *per se* prohibited under section 363 of the Bankruptcy Code, but "they are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse." *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997); *In re Wingspread Corp.*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988); *see also Gross v. Russo (In re Russo)*, 762 F.2d 239, 243 (2d Cir. 1985) (stating that "[t]he Bankruptcy Court should be afforded the opportunity to determine whether there is a meaningful possibility that [the insider] would be taking unfair advantage of confidential information" in consummating transaction).

18.     So many strings are attached to the Tranche B Loans in the Amended Delphi/GM Agreement, that it would be fair to say that the Debtors' access to these funds is illusory. In exchange for this illusory right to borrow the Tranche B Loans, the Debtors would give away even more control over the chapter 11 plan process to GM. Specifically, the availability of the Tranche B Loans terminates if the Debtors fail to file a chapter 11 plan and disclosure statement in form and substance reasonably satisfactory to GM by October 31, 2008. This condition is more stringent than the terms of the proposed amended GSA (which sets forth plan requirements,

8

but does not require the Debtors to file a plan in form and substance reasonably satisfactory to GM and also does not set forth a deadline of October 31).

19. The Debtors must create and implement a strategy that leads to viable operations in North America, and not simply continue running those operations at significant losses to benefit GM. To preserve its ability to monitor the Debtors and take action if necessary, the Committee has retained the right to object to future repatriations of funds by the Debtors. However, if the Committee prevails in such an objection, GM would be able to stop making additional Tranche B Loans under the Amended Delphi/GM Agreement. This is but another example of GM taking control from the Debtors and the Committee.

20. In exchange for the mere possibility of obtaining the Tranche B Loans, however, the Debtors have agreed to new obligations in favor of GM. Specifically, the Amended Delphi/GM Agreement provides that if the DIP Facility is amended, modified or replaced such that the interest rate of the highest-priced DIP loan tranche is higher than the interest rate applicable to the existing Tranche A Loans and the Tranche B Loans,[2] then the interest rate on all GM advances (including the existing Tranche A Loans) would automatically increase to the rate in effect for the highest-priced DIP tranche. This provision is new; it was not in the Original Delphi/GM Agreement. While the interest on the GM advances will be cancelled if certain events occur, there can be no guarantee that those events actually will occur. Indeed, if the GSA/MRA Motion is granted those events, such as confirmation of an amended plan, may never occur and Delphi will be obligated to repay GM advances in cash, with interest as an administrative expense claim. In addition, the Debtors have agreed to pay GM's and its

---

[2] The interest rate applicable to the GM advances is Libor plus 5.25%, with a 3.25% Libor floor.

9

NY\1453221.3

counsel's fees and expenses in connection with the preparation and delivery of the Amended Delphi/GM Agreement. For these reasons, the Liquidity Agreement Motion should be denied.

### III.     The Amended SERP and the Amended SRESP in the Pension Freeze Motion

21.     In concept, the Committee supports the Debtors' decision to freeze their hourly and salaried pension plans and to establish replacement hourly and non-executive salaried retirement programs. However, given the urgent need to conserve the Debtors' remaining assets for the benefit of unsecured creditors, the Committee does not support the use of valuable estate assets for the creation of an amended Supplemental Executive Retirement Program (the "Amended SERP") or an amended Salaried Retirement Equalization Savings Program (the "Amended SRESP"). While the terms of the Amended SERP and the Amended SRESP are the same or very similar to the programs that this Court approved for executives in connection with the confirmation of the Old Chapter 11 Plan, it simply makes no sense for the Debtors to establish replacement retirement plans for executives while the Debtors have no revised plan of reorganization to present to creditors. In addition, in light of the drastically reduced recoveries to unsecured creditors under any revised chapter 11 plan, the Debtors' remaining assets should be reserved to the greatest extent possible for the unsecured creditors.

22.     What is more, the Debtors have not provided the Committee and this Court with a current estimate for the annual cost of the Amended SERP and the Amended SRESP once the Debtors emerge from chapter 11. Here, the Debtors are asking this Court to approve replacement retirement plans for executives, yet the Committee and this Court have no idea how much those plans would cost the Debtors upon their emergence from chapter 11. For these reasons, the Debtors' request to authorize the Amended SERP and the Amended SRESP should be denied.

NY\1453221.3

23. The Debtors' request to authorize the Amended SERP and the Amended SRESP must also be denied because it (along with the proposed amendments to the GSA and the MRA) impermissibly sets the terms of the executives' pension arrangements outside the context of the plan confirmation process. As of now, the Debtors have not proposed a plan of reorganization, and have not begun to develop the building blocks that such a plan will require, such as exit financing. Yet, while the Debtors appropriately sought this Court's approval of the Amended SERP and the Amended SRESP as part of a complete plan of reorganization in January 2008, they now seek to establish the terms of these programs separately now. These plans should be approved (if at all) in connection with the plan confirmation process.

24. In addition, modifications to the pension plans for hourly employees cannot take place without union consent, and it is certainly possible that one or more of the unions may condition its consent on the receipt of additional consideration or other modifications to the transaction. As a result, the hearing to consider the pension freeze related to union pension plans should be held only after union consent is obtained. Delaying the hearing with respect to that portion of the relief sought until that time will permit this Court to consider the requested freezes in light of the deal that is reached between the Debtors and the unions.

25. As noted above, the Committee reserves its right to supplement its objections to the Motions herein with the objections that will be raised in the Committee's objection to the GSA/MRA Motion.

**WHEREFORE,** the Committee respectfully requests that this Court (a) deny the Liquidity Agreement Motion in its entirety, and deny the Debtors' request to establish the Amended SERP and the Amended SRESP and (b) grant the Committee such relief that it deems just and proper.

Dated:  September 19, 2008
         New York, New York

**LATHAM & WATKINS LLP**

By: /s/ Robert J. Rosenberg
   Robert J. Rosenberg (RR-9585)
   Mitchell A. Seider (MS-4321)
   Mark A. Broude (MB-1902)
   Michael J. Riela (MR-7829)
   885 Third Avenue, Suite 1000
   New York, New York 10022
   Telephone:  (212) 906-1200

Counsel for the Official Committee
of Unsecured Creditors