STUTMAN, TREISTER & GLATT P.C.
Attorneys for CR Intrinsic Investors, LLC, and
Highland Capital Management, L.P.
(and/or certain funds managed thereby)
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
(310) 228-5600
Isaac M. Pachulski
Jeffrey H. Davidson
Eric D. Goldberg
Christine M. Pajak

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- X
In re:                              |    Chapter 11
                                    |
DELPHI CORPORATION, et al.,         |    Case No. 05-44481 (RDD)
                                    |
                    Debtors.        |    Jointly Administered
                                    |
-------------------------------------------------- X
```

**OBJECTION TO MOTION FOR ORDER AUTHORIZING DEBTORS TO IMPLEMENT
AMENDED AND RESTATED GLOBAL SETTLEMENT AGREEMENT AND MASTER
RESTRUCTURING AGREEMENT WITH GENERAL MOTORS CORPORATION**

CR Intrinsic Investors, LLC and Highland Capital Management, L.P.

(and/or certain funds managed thereby) (collectively, the "Senior Noteholders"), which

collectively hold approximately $495 million in principal amount of Delphi Corporation

senior notes (the "Senior Notes"), hereby object to the Debtors' "Expedited Motion for

Order Authorizing Debtors To Implement Amended And Restated Global Settlement

Agreement And Master Restructuring Agreement With General Motors Corporation"

(Docket No. 14164) (the "GSA and MRA Amendment Motion").[1]

---

[1]    Terms not otherwise defined herein shall have the same meanings ascribed to them in the
GSA and MRA Amendment Motion.

# I.
# INTRODUCTION

1.      Pursuant to the GSA and MRA Amendment Motion, the Debtors seek approval of the most important and far-reaching settlement in this case and the fixing of central elements of a plan of reorganization, on just ten days' notice, without providing the most basic information necessary for this Court to evaluate the claims to be settled, and without any pretense of adhering to the fundamental protections to which creditors are entitled in connection with a plan of reorganization.  The Debtors seek such expansive relief without the support of any major creditor constituency in this case (other than the two creditors who receive direct benefits from this deal – i.e., GM, which obtains releases and the allowance of billions of dollars in claims and the PBGC, which is relieved of any obligation to back-stop certain of the Debtors' pension obligations).  GM has simply pushed the Debtors too far; the Debtors' Motion should be denied.

2.      If the GSA and MRA Amendment Motion is granted, the Debtors will enter into sweeping and far-reaching agreements with GM that would irrevocably impact the outcome of these cases and effectively dictate the terms of any plan of reorganization.  Unlike the Approved GSA and Approved MRA that (i) were integrated into a plan of reorganization, (ii) not only included a series of carefully crafted compromises but were also subject to full disclosure under (a) the strictures of section 1125 of the Bankruptcy Code, (b) **_two_** amply-noticed hearings (one on the Disclosure Statement and one on confirmation), and (c) a vote by the Debtors' entire creditor body, and (iii) were approved in the context of a plan that appeared to provide for full recoveries by unsecured creditors, the Amended GSA and Amended MRA – one of the

most important matters this Court will likely consider in this case – are being presented in a virtual vacuum for expedited Court approval in just 10 days' time.

3.      Not a single creditor of the Debtors (other than GM and the PBGC who have unmistakable vested interests in these transactions) has joined in support of the GSA and MRA Amendment Motion.  In addition to the Senior Noteholders who, together, hold almost $500 million in Senior Notes, the Creditors' Committee – the fiduciary representative of <u>all</u> unsecured creditors – vehemently opposes the GSA and MRA Amendment Motion.[2]  Meanwhile, the Debtors seek Court approval to release multi-billion dollar claims against GM (and, apparently, abandon the ability to equitably subordinate GM's claims) without providing anything resembling the kind of evidentiary record that the Supreme Court has insisted be established in order to enable this Court to make a reasoned decision on the proposed settlement with GM.  Despite the volume of paperwork submitted by the Debtors, there is nothing that would enable the Court to evaluate the merits or the magnitude of the claims being released.

## II.
## DISCUSSION

4.      The GSA and MRA Amendment Motion seeks approval of what amounts to a *sub rosa* plan of reorganization, without providing the kind of disclosure and procedural and substantive protection to which creditors are entitled in connection with the confirmation of a plan, and without any creditor vote.  A sampling of just some of the provisions of the Amended GSA highlights how pervasively these agreements will dictate the terms of any plan and the ultimate outcome of these cases.

---

[2]      <u>See</u> Preliminary Objection of the Official Committee of Unsecured Creditors to the Debtors' Motions (I) to Approve an Agreement with General Motors Corporation to Amend the Master Restructuring Agreement and the Global Settlement Agreement, Etc." ("Committee Objection") [Docket No. 14172].

5.    <u>First</u>, the Amended GSA includes comprehensive provisions for the allowance and treatment of GM's claims under any plan of reorganization.  Under the Amended GSA, GM agrees to assume certain pension liability which is primarily rooted in *prepetition* services of employees who worked for GM at the time of the Delphi spin-off in exchange for *an administrative claim*.[3]  It is not at all clear, however, whether these unfunded pension claims would be entitled to any priority distribution in the context of a plan of reorganization.  The Debtors, themselves, have asserted that, in the event they terminate their pension funding and service obligations, the PBGC, as the primary guarantor for the Debtors' unfunded pension liability, would only be entitled to a general unsecured claim.[4]  While the PBGC has asserted liens against assets of the non-debtor foreign subsidiaries, these liens remain the subject of dispute.[5]  In fact, the

---

[3]    <u>See</u> GSA and MRA Amendment Motion, ¶ 63 (noting that the Transferred Liability relates to "all allocable pension obligations . . . and an allocable portion of the HRP assets . . . for those employees who were employed by Delphi at the time of Delphi's spin-off and had prior GM service . . . .").  <u>See</u> also Disclosure Statement, DS-107 (Debtors explaining that, "since the Petition Dates, the Debtors have been making only 'normal cost' contributions to the pension plans, or *contributions that reflect the amounts related to service provided by plan participants post-filing.*  These 'normal cost' contributions are less than the minimum funding requirements. . . .")(emphasis added).  Thus, any funding deficiencies must relate to the funding requirements represented by pre-petition obligations.

[4]    <u>See</u> <u>Disclosure Statement</u>, Appendix E (Liquidation Analysis), 9. [Docket No. 11388].  Nowhere in the liquidation analysis do the Debtors even consider that the PBGC could be entitled to anything but a general unsecured claim.

[5]    <u>See</u> Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, and Cash Management Order Authorizing DASHI to Grant Adequate Protection to Pension Benefit Guaranty Corporation in Connection with Certain Intercompany Transfer of Repatriated Funds ("PBGC Adequate Protection Order") (as amended) [Docket Nos. 13694, 13733, 14005], ¶4 (holding that "that the Adequate Protection Obligations and the resulting Replacement Liens granted hereunder to the PBGC shall be valid only to the extent that the PBGC's asserted liens on the cash to be accumulated by DASHI from the Global Affiliates are valid, perfected, enforceable and non-avoidable against such assets; provided further that *all parties in interest in these cases shall retain and reserve the right to challenge the PBGC's purported liens on any grounds*, including without limitation the enforceability, validity, perfection, and non-avoidability of such purported liens, and that all of PBGC's claims, defenses and arguments with respect to any such challenges are expressly reserved and preserved.") (emphasis added).

Debtors have argued that "under the Bankruptcy Code Delphi is not required to make payments for amounts attributable to prepetition services while operating in chapter 11" and, therefore, the PBGC has no right to assert any lien against the assets of the non-debtor foreign subsidiaries.[6] Yet, the Debtors, without addressing these critical points in any meaningful fashion at all, let alone at the level required by Supreme Court precedent, have asked this Court for authority to compensate GM for taking on certain of the Debtors' pension liability by granting GM something even more than the Debtors allege that the PBGC has the right to assert – an administrative claim which is entitled to payment before any distribution is made to the Debtors' pre-petition creditors. Not only does an administrative claim entitle GM to priority payment but it also handcuffs the Debtors in treating this claim under a plan of reorganization. Without question, the Debtors have more flexibility providing for the payment of unsecured claims, as opposed to administrative claims, under a plan of reorganization.

6.      More remarkably, the terms of the settlement ignore the fact that GM is able to take on this Transferred Liability (as defined below) at essentially no cost to itself because it has massive overfunding in its own pension plan.[7] Not only do the Debtors fail to disclose this fact but they also do not reveal that GM has no ability to otherwise use its excess pension funding.[8] In other words, the overfunding of the GM

---

[6]    See Motion for Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, and Cash Management Order Authorizing DASHI to Grant Adequate Protection to Pension Benefit Guaranty Corporation in Connection with Certain Intercompany Transfers of Repatriated Funds  (the "PBGC Adequate Protection Motion") [Docket No. 13585], fn. 7.

[7]    See Creditors' Committee's Notice of Renewed Motion for an Order Authorizing the Official Committee of Unsecured Creditors to Prosecute the Debtors' Claims and Defenses Against General Motors Corporation (the "Committee GM Prosecution Motion") [Docket No. 14137], ¶ 4 (noting that "GM simply would be using some of the massive overfunding in its own pension plans, which is an asset that GM cannot use for any other purpose").

[8]    See id.

pension plan is an illiquid asset, which GM is only able to monetize by the Debtors granting it an administrative claim, which comes at no real cost to GM.

7.    According to the Amended GSA and MRA Motion, the Debtors currently face a $2.1 billion to $2.4 billion funding deficiency under one of their pension plans.  The Debtors seek to alleviate this underfunding and future funding needs by transferring certain unfunded allocable pension benefit obligations (the "Transferred Liability") to GM in a two-step transaction.  In simplified terms, on the first transfer date, which is expected to take place before September 30, 2008 and before any disclosure statement can be approved and circulated or any new plan of reorganization can be confirmed, the Debtors would transfer a minimum of $2.1 billion to a maximum of $2.4 billion in Transferred Liability to the GM Plan.  In exchange, GM would be entitled to an administrative priority claim, valued at 77.5% of the Transferred Liability (i.e., a minimum of $1.6275 billion to a maximum of $1.86 billion).  On the second transfer date, which would only occur when the Debtors emerge from chapter 11 pursuant to the terms and conditions set forth in and agreed upon by GM in the Amended GSA, the Debtors would convey the remainder of the Transferred Liability to the GM Plan, which the Debtors estimate to be approximately $1 billion.  After all Transferred Liability has been conveyed to the GM Plan, GM then would be entitled to a single aggregate administrative claim in the amount of $2.055 billion (the "GM Admin Claim").

8.    In addition to the GM Admin Claim, the Amended GSA also contemplates that GM would be entitled to an unsecured claim in the amount of $2.5 billion (the "GM Unsecured Claim" and, together with the GM Admin Claim, the "GM Claims").  While GM would not be entitled to any recovery on the GM Unsecured Claim until other unsecured creditors receive at least a 20% recovery, both the GM Unsecured

Claim and GM Admin Claim would be entitled to specified, and special, treatment under any plan of reorganization pursuant to the Amended GSA.  Distributions on account of the GM Claims are to be made by issuing preferred stock to GM (the "GM Preferred Stock")[9] which is not made available to any other constituent body of the Debtors.  <u>See</u> Amended GSA, Exhibit F (term sheet for the GM Preferred Stock).

9.    Moreover, the value of the GM Preferred Stock remains unknown. The term sheet for the GM Preferred Stock provides that its aggregate initial value (the "Stated Value") is to be determined in accordance with Section 4.04(c) of the Amended GSA.  This provision of the Amended GSA, however, offers little guidance as to the Stated Value of the GM Preferred Stock and only makes a circular reference to the GM Preferred Stock term sheet which is contained in Exhibit F, as set forth below:

---

[9]    Section 4.04(b) of the Amended GSA defines GM Unsecured Claim as follows:

> Upon the occurrence of the Effective Date, ***GM shall receive an allowed general unsecured claim in the amount of $2.5 billion (the "GM Unsecured Claim")***

Amended GSA, §4.04(b) (emphasis added).  Section 4.04(c) of the Amended GSA specifically provides that the GM Unsecured Claim shall be paid in GM Preferred Stock, stating that:

> If the GSA Consummation Date occurs and substantially all of the Debtors' core businesses are revested in the reorganized Debtors, ***any distributions to GM as set forth in subsection (a) or (b) of this section 4.04 shall be in convertible preferred stock*** in reorganized Delphi, the material terms of which are set forth in Exhibit F; provided, however, that ***it is a condition to GM receiving such preferred stock in lieu of payment of the administrative expense claim referred to in subsection (a) of this section 4.04 and the GM Unsecured Claim*** that exit financing for such plan of reorganization not exceed $3 billion (plus a revolving credit facility) and that there be no equity securities issued pursuant to any Plan that are senior to or pari passu with the preferred stock issued to GM as provided hereunder.

Amended GSA, §4.04(c) (emphasis added).

> If the GSA Consummation Date occurs and substantially all of the Debtors' core businesses are revested in the reorganized Debtors, any distributions to GM as set forth in subsection (a) or (b) of this section 4.04 shall be in convertible preferred stock in reorganized Delphi, the material terms of which are set forth in **Exhibit F**; provided, however, that it is a condition to GM receiving such preferred stock in lieu of payment of the administrative expense claim referred to in subsection (a) of this section 4.04 and the GM Unsecured Claim that exit financing for such plan of reorganization not exceed $3 billion (plus a revolving credit facility) and that there be no equity securities issued pursuant to any Plan that are senior to or *pari passu* with the preferred stock issued to GM as provided hereunder.

Amended GSA, §4.04(c). In their rush to seek approval of the Amended GSA, the Debtors fail to consider a critical piece of their compromise with GM – the value of the consideration that the Debtors offered to GM; or maybe they are just keeping it a secret. Either way, this approach violates their duty of disclosure to creditors, and further illustrates the need for a Court-approved disclosure statement. In short, the Debtors seek to give GM some undetermined value on account of the GM Claims that cannot be measured or market-tested.

10. <u>Second</u>, the Amended GSA contemplates that the Debtors and their affiliates *immediately* release substantially all of their claims against GM and its affiliates on the Effective Date of the Amended GSA and reaffirm this release as of the date that the Debtors emerge from chapter 11 (the "Emergence Date"). The Amended GSA also requires that any future plan of reorganization provide that certain third parties, including the Creditors' Committee, the Equity Committee, the DIP Agent, and the DIP Lenders, among others (the "Additional Releasing Parties"), release GM and its affiliates of substantially all of their claims against GM and its affiliates as of the Emergence Date. Specifically, this section provides as follows:

Any Delphi Plan shall provide (and no modification or supplement thereto shall abrogate such provision) that effective as of the Emergence Date, the GM-Related Parties shall be forever released by the Additional Releasing Parties from any and all claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, which the Additional Releasing Parties ever had, now have, or hereafter may have, whether known or unknown, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, or otherwise, that are directly or indirectly related to any of the Delphi-Related Parties, including without limitation claims based in whole or in part upon any act or omission, transaction, agreement, event, action, or other occurrence taking place or failing to take place on or before the Effective Date related to (i) the Separation, (ii) any collective bargaining agreements to which any Delphi-Related Party is now or has been a party, (iii) any agreement or obligation related to any employees or former employees of the Delphi-Related Parties, (iv) the Chapter 11 Cases, or (v) the formulation, preparation, negotiation, dissemination, confirmation, or consummation (but not performance) of the Plan, the Disclosure Statement, this Agreement, the Labor MOUs, the Non-Represented Employees Term Sheet, the UAW SAP, the IUE-CWA SAP, the IP License, the Warranty Settlement Agreement, or any contract, instrument, or other agreement or document created, modified, amended, or entered into in connection with any of the foregoing. The releases provided for in this section 4.01(c) shall include any and all claims that any of the Additional Releasing Parties have or would have been legally entitled to assert in its own right (whether individually or collectively) and shall be effective against any person or entity that would have been legally entitled to assert such claim derivatively or otherwise on behalf of any of the Additional Releasing Parties.

Amended GSA, §4.01 (c). This amounts to nothing more than a non-consensual third-party release, which raises serious questions, and, impermissibly seeks to cement this term in any plan of reorganization in advance. Without knowing what consideration, if any, these constituencies are to receive under a plan of reorganization, how can these entities be forced to release GM? Moreover, even if such a release under a plan can be

forced upon them, how can such a plan provision be fixed in advance, without complying with the requirements applicable to confirmation of a plan?

11.    In exchange for these broad releases, GM and its affiliates agree to release substantially all of their claims against the Debtors and their affiliates *only* as of the Effective Date.  Thus, there is a lack of full mutuality in this proposed release of claims – not only does GM not give a release to the Additional Releasing Parties but GM has no obligation to "down date" the release as of the Emergence Date.

12.    More fundamentally, the Amended GSA and MRA Motion provides this Court and creditors with no basis to make an informed evaluation of the proposed settlement, no analysis of the factors which Supreme Court precedent requires this Court to consider before granting such a sweeping release, and no basis to make the informed and detailed findings required before it can approve this settlement.  The transparency that a Disclosure Statement would provide with respect to these critical points is absent.  Meanwhile, assured of its stake in the Debtors' reorganization with the GM Claims, which are to be paid in GM Preferred Stock, and comforted by a release of substantially all claims by the Debtors' constituencies through the Emergence Date, GM has no incentive to negotiate – as opposed to dictating terms – in connection with any plan of reorganization.

13.    Third, the Amended GSA and Amended MRA leave little doubt that these agreements are to control and dictate the terms of any future plan of reorganization.  By their very terms, these agreements are drafted to control any plan of reorganization.  Specifically, the Amended GSA requires that any Delphi Plan contain provisions "clarifying that to the extent of any inconsistency between the terms of the Delphi Plan and [the Amended GSA] (solely as to the subject matters addressed in [the

Amended GSA]), the terms of [the Amended GSA] will govern." See Amended GSA, §1.57.

14.      Taken altogether, the Amended GSA and Amended MRA cement the future reorganization of the Debtors while circumventing the requirements that govern confirmation of a plan. The purported justification for this end-run around the requirements of the Bankruptcy Code is the Debtor-and-GM created crisis du jour – the looming deadline to correct certain deficiencies in the funding of the Debtors' pension plans, which came as no surprise to either of them.  Expediency, however, is no justification for short-circuiting the protections of the plan process to the detriment of the Debtors' creditor body.  This is especially true when the Debtors and GM have long known about this impending deadline and now seek to fix the terms of a plan that they have not negotiated with creditors through an eleventh-hour settlement.  The statutory rights of creditors to participate in an open and informed plan process should not be curtailed just because the Debtors and GM have manufactured this emergency.

15.      Moreover, the proposed settlement seeks the broad release of claims against GM, without providing the information necessary to make the informed and independent judgment that the Supreme Court demands.  This shortcoming is particularly egregious here, where the Creditors' Committee and the major holders of the Senior Notes oppose the settlement, and no other creditor constituency other than the beneficiaries of the settlement – GM and the PBGC – endorse it.  On this record, the settlement cannot be approved.

## III.
## APPLICABLE AUTHORITY

**A.    The GSA and MRA Amendment Motion Fails to Meet the Basic Standard for Approval of a Settlement under Bankruptcy Rule 9019.**

16.    Although the GSA and MRA Amendment Motion correctly identifies the general principles and case law governing the approval of compromises in bankruptcy, it immediately proceeds to ignore them. The guiding principles are set forth in Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) and Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452 (2nd Cir. 2007).

17.    As the Supreme Court stated in TMT Trailer Ferry, "[t]here can be no informed and independent judgment as to whether a compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." 390 U.S. at 424. Finding an insufficient record on which the trial court could base its approval of the settlements that were contained in the trustee's amended plan of reorganization, the Supreme Court emphasized that, "[t]he record before us leaves us completely uninformed as to whether the trial court ever evaluated the merits of the causes of actions held by the debtor, the prospects and problems of litigating those claims, or the fairness of the terms of compromise. More than this, the record is devoid of facts which would have permitted a reasoned judgment that the claims of actions should be settled in this fashion." Id. at 390 U.S. 440-41. Here, the Debtors face the same deficiencies in their attempt to seek approval of the Amended GSA and Amended MRA.

18.    As explained by the Second Circuit, the purpose behind requiring Court approval of settlements is "to prevent the making of . . . agreements which are unknown and unevaluated by the court." In re Iridium, 478 F.3d at 461 (citations

omitted).  Following the analysis set forth in <u>TMT Trailer Ferry</u>, courts have developed a

framework to evaluate the reasonableness of proposed settlements.  The determination

of whether a settlement is "fair and equitable" requires the analysis of several

interrelated factors as set forth by the Second Circuit, including:

> (1) the balance between the litigation's possibility of success
> and the settlement's future benefits;
>
> (2) the likelihood of complex and protracted litigation, "with
> its attendant expense, inconvenience, and delay," including
> the difficulty in collecting on the judgment;
>
> (3) "the paramount interests of the creditors," including each
> affected class's [sic] relative benefits "and the degree to
> which creditors either do not object to or affirmatively support
> the proposed settlement";
>
> (4) whether other parties in interest support the settlement;
>
> (5) the "competency and experience of counsel" supporting,
> and "[t]he experience and knowledge of the bankruptcy court
> judge" reviewing, the settlement;
>
> (6) "the nature and breadth of releases to be obtained by
> officers and directors"; and
>
> (7) "the extent to which the settlement is the product of arm's
> length bargaining".

<u>In re Iridium</u>, 478 F.3d at 462 (citing <u>In re WorldCom, Inc.</u>, 347 B.R. 11 123, 137 (Bankr.

S.D.N.Y. 2006); <u>see</u> <u>also</u> <u>TMT Trailer Ferry</u>, 390 U.S. at 424-25; <u>In re A&C Properties</u>,

784 F.2d 1377, 1381 (9th Cir. 1986), <u>cert. denied</u>, 479 U.S. 854, 107 S. Ct. 189 (1986).

      19.    In assessing the factors listed above, this Court must not give

"boilerplate approval."  <u>In re Boston & Providence R.R. Corp.</u>, 673 F.2d 11, 12 (1st Cir.

1982); <u>In re West Pointe Props. L.P.</u>, 249 B.R. 273, 281 (Bankr. E.D. Tenn. 2000) ("'The

court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that

the compromise is reasonable.'" (quoting <u>Reynolds v. Commissioner of Internal</u>

<u>Revenue</u>, 861 F.2d 469, 473 (6th Cir. 1988)).  The Court should not approve the

Amended GSA and Amended MRA unless and until this Court has apprised itself of all
necessary facts to form an informed and independent judgment that the settlements
contained therein are fair and reasonable.  See In re AWECO, Inc., 725 F.2d 293, 299
(5th Cir.), cert. denied, 469 U.S., 880 (1984) ("An approval of a compromise, absent a
sufficient factual foundation, inherently constitutes an abuse of discretion.").

          20.     Case law in this District and elsewhere highlights the point that the
Debtors have the burden of presenting competent, meaningful facts, evidence, analysis
and figures to demonstrate the reasonableness of the settlements .  For example, in In
re Lion Capital Group, 49 B.R. 163 (Bankr. S.D.N.Y. 1985), the court refused to approve
the settlement of an adversary proceeding among the chapter 11 trustee, Bradford Trust
Company (""Bradford"), and various entities.  The adversary proceeding involved
competing claims of priority to approximately $45 million in securities on deposit in
accounts held by the debtor.  Paying heed to the Second Circuit's admonition to
canvass the proposed settlement to determine whether it fell below the lowest point of
reasonableness, the Lion Capital court concluded that the chapter 11 trustee had failed
to present sufficient evidence to demonstrate that the settlement was in the best
interests of the estate.  See id. at 183-84 ("[W]e would note that our ability to canvass
the issues and to form an opinion as to reasonableness is hampered by the lack of
factual information and the presence of other issues no one has seen fit to address"); id.
at 185 ("there is no evidence relating to those transfers to new value or indicating if they
were made in payment of a debt incurred within the 45 day period.  We are thus
disabled from meaningfully reviewing the preference claim relating to these transfers.");
id. ("We are similarly precluded by the lack of evidence on the record from estimating
the Trustee's probability of success in his claim that Bradford transferred government
securities having a par value of $69,610,000 from the Segregation Account in fraud of
creditors.").

21.    Similarly, in <u>AWECO</u>, 725 F.2d 293, the Fifth Circuit Court of Appeals reversed an order approving a settlement of litigation with an unsecured creditor that called for a transfer of cash and property from the debtor to the unsecured creditor.  In so doing, the Fifth Circuit noted that there were "gaping holes in the background of information regarding the … settlement."  <u>Id</u>. at 299.  While recognizing that bankruptcy cases sometimes require quick approvals of settlements, "[p]roof of value must find expression in definite numbers, not figures merely opined, mentioned or guessed.  The bankruptcy judge should not reach for his stamp marked 'approved' unless some party supplies concrete facts."  <u>Id</u>. at 300; <u>see</u> <u>also</u> <u>Reiss v. Hagmann</u>, 881 F.2d 890, 892 (10th Cir. 1989) (following <u>AWECO</u>); <u>In re MCorp Fin., Inc</u>., 160 B.R. 941, 950 (S.D. Tex. 1993) ("In reviewing the settlement, the court cannot accept the propriety of the settlement on the mere assertion of its value by the proponents.").

22.    As reflected above, applicable case law requires that the court must have sufficient information to make a finding, or at least some intelligent estimate, of the value of the claims being settled by the estate.  These include, not only claims that might produce an affirmative dollar recovery for other creditors against GM, but also claims that might result in the equitable subordination of any claims of GM – including any claims for indemnification arising for payments that it is required to make to the PBGC on account of pension liabilities relating to Delphi employees who were the employees of GM at the time of the ill-fated spin-off of Delphi.  Without this information about the claims being released, the Court cannot balance what is being offered by the Debtors' estates against the consideration being given in exchange or satisfy the requirements of <u>TMT Trailer Ferry</u>.

23.    In violation of <u>TMT Trailer Ferry</u> and the other authorities cited above, the GSA and MRA Amendment Motion lacks any evaluation of the rights and claims that the Debtors are giving up.  <u>First</u>, as discussed above, the Debtors, on behalf of themselves and other third parties, are releasing substantially all claims and causes of action against GM (the "Delphi Released Claims").  Despite the fact that the Debtors have filed a complaint against GM (the "GM Complaint"), and presumably concluded that there was a basis to do so, the very nature of the Delphi Released Claims, let alone their value, remain unknown to creditors due to the fact that the GM Complaint was filed under seal.  Moreover, while the Court may have access to the GM Complaint, that is hardly enough to evaluate a settlement of the claims asserted in that complaint, and the GSA and MRA Amendment Motion gives the Court (and creditors) nothing else to go on.  The Court and others can only guess as to the potential value of the Delphi Released Claims.[10]  Without an analysis of the strengths and weakness of the GM Complaint, the range of potential outcomes, and GM's potential liability – both from the standpoint of affirmative recovery, and from that of the equitable subordination of any claim that GM might assert – no Court or other interested party can even begin to comprehend the value of the Delphi Released Claims.  <u>See</u> <u>In re Iridium</u>, 478 F.3d at 462 (emphasizing the importance of an evidentiary record that demonstrates "the balance between the litigation's possibility of success and the settlement's future benefits" ).  Just for starters, why is GM given billions of dollars in allowed claims when all of its claims might be equitably subordinated?  Allowing the Debtors and GM to settle

---

[10]    The fact that the Creditors' Committee has recently sought Court authority to prosecute the complaint is a clear indicator that the Delphi Released Claims hold significant value, and that the fiduciary for creditors has no confidence in the Debtors' ability or willingness to realize that value.  <u>See</u> Committee GM Prosecution Motion.

a sealed complaint is fundamentally at odds with the principles of transparency and disclosure that underlie chapter 11.  The GM Complaint, which raises major claims that the Debtors propose to settle, should not be treated as a state secret and cannot, without far more, serve as a foundation for this Court to approve the proposed settlements contained in the Amended GSA.

24.    Second, in exchange for the Transferred Liability, the Debtors have agreed to the allowance of the GM Admin Claim in the amount of $2.055 billion.  The Transferred Liability, however, is most likely not an administrative obligation of the Debtors' estates.  As described above, the unfunded pension liability relates to the Debtors' funding obligations with respect to the *pre-petition services* of the Debtors' employees.  The Debtors, themselves, have taken the position that any claim asserted by the PBGC for unfunded pension liability would be treated as a general unsecured claim.[11]  In fact, the Debtors dispute the assertion of any lien by the PBGC against its non-debtor foreign assets, arguing that because the Debtors are not obligated to make "payments for amounts attributable to prepetition services while operating in chapter 11," the PBGC has no basis on which to assert a lien against the non-debtor foreign assets.  See PBGC Adequate Protection Motion, fn. 7 and PBGC Adequate Protection Order, ¶4.  Yet, the Debtors have decided to give GM even more than they allege the PBGC is entitled to assert on account of these very same claims, without an analysis of the strengths and weaknesses of the PBGC's lien claims or a basis in the record to evaluate those claims.  Instead of a general unsecured claim, which can then be restructured under the terms of a chapter 11 plan, the Debtors would now grant GM an administrative claim that has priority over all other pre-petition claims.  This is even

---

[11]    See Disclosure Statement, Appendix E (Liquidation Analysis), 9. [Docket No. 11388].

more egregious in light of the fact that GM is not actually going out of pocket to pay for

the Transferred Liability.  Opportunistically, GM is taking advantage of the Debtors'

situation to monetize its otherwise illiquid asset – its over-funded pension plan.[12]  GM is

unable to spend or borrow against its over-funded pension plan but has used its

leverage with the Debtors to ensure payment, in full, of the $2.055 billion pension

obligation that it is assuming.  Giving GM more than any other party would be able to

assert on account of its assumption of the Transferred Liability, the Debtors are clearly

not acting in the "paramount interests of the [Debtors'] creditors."  See In re Iridium, 478

F.3d at 462 (taking into account the paramount interests of creditors in deciding whether

to approve a settlement).

        25.     In addition, the Debtors have also agreed to the GM Unsecured

Claim in the amount of $2.5 billion. Both claims are being allowed on a substantially

non-subordinated basis, effectively waiving any claim for equitable subordination.

Unfortunately, the Court can only speculate on the extent to which GM's claims might be

equitably subordinated, because the Motion is devoid of any information that would

allow the court to evaluate that possibility rationally.  Without understanding this

potential outcome, it is impossible to determine whether abandoning the right to seek

equitable subordination makes sense.  See TMT Trailer Ferry, 390 U.S. 440-41

(Supreme Court finding an inadequate record to approve settlements contained in the

trustee's amended plan of reorganization).

        26.     Meanwhile, although the dollar amounts of the GM Claims may be

known under the terms of the Amended GSA, the value of the GM Preferred Stock that

GM is to receive on account of these claims is unknown.  Instead of receiving cash

---

[12]   See Committee GM Prosecution Motion, ¶ 4.

distributions on its new administrative claim and the same (or an inferior) type of security that other unsecured creditors can only hope to receive on account of their unsecured claims, GM, on account of its GM Unsecured Claim, will be treated materially better: it will be issued GM Preferred Stock.  See Amended GSA, §4.04(c) and Exhibit F.  Tellingly, only GM is entitled to receive the GM Preferred Stock and, yet, the Debtors have failed to (i) delineate the "Stated Value" of the Preferred Stock, (ii) provide evidence of the same or (iii) show proof as to whether the "Stated Value" and the real economic value are the same.[13]  Moreover, without market-testing the GM Preferred Stock, the Court cannot determine if the Debtors are making fair payment on account of the GM Claims.  If other parties are willing to pay more than par value for the Preferred Stock (whatever that may be), the Debtors may very well overpay for their obligations to GM.  Finally, by requiring the Debtors to issue GM Preferred Stock on account of the GM Claims, GM assures itself that it will be the ultimate beneficiary of any concessions that it makes to the Debtors under the Amended GSA or Amended MRA.  In other words, the alleged "settlements" are at least somewhat illusory, because GM, by virtue of its exclusive entitlement to the GM Preferred Stock, has guaranteed that it will continue to profit from the compromises it has made with the Debtors, since any bottom-line benefits of the Amended GSA and Amended MRA will flow first to GM's Preferred Stock before any benefits inure to common equity.

27.    Third, as a practical matter, the Debtors have effectively ceded to GM control over the plan process.  Armed with the GM Claims and the release of the Delphi Released Claims that extends through the Emergence Date, GM has little incentive to be constructive in the Debtors' ongoing plan process.  If the GSA and MRA

---

[13]    See supra, ¶ 9.

Amendment Motion is granted, GM's treatment under a plan – down to the kind of

securities it will receive and its right to releases from both Committees – will be set in

concrete.[14]  Meanwhile, general unsecured creditors, unlike GM, have no certainty

whatsoever regarding what a future plan will provide for them (other than knowing that

under no circumstances will they ever be permitted to pursue estate claims against

GM).

          28.    <u>Fourth</u>, and of itself dispositive, no creditor – other than GM and the

PBGC which have a vested interest in the underlying agreements –  supports the

Amended GSA or Amended MRA, and the Creditors' Committee and major creditors

oppose it.  On this basis alone, the GSA and MRA Amendment Motion should be

denied.  As several courts have noted, there is "no precedent for a compromise . . .

actively opposed by the major creditors and affirmatively approved by none." <u>Reiss v.</u>

<u>Hagmann</u>, 881 F.2d at 892-893 (citing <u>In re Lloyd, Carr & Co.</u>, 617 F.2d 882, 889 (1st

Cir. 1980)).  <u>See</u> <u>also</u> <u>Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re</u>

<u>Foster Mortgage Corp.)</u>, 68 F.3d 914, 918 (5th Cir. 1995) (vacating the settlement

agreement on the basis that the bankruptcy court abused its discretion "by not showing

proper deference to the views of the creditors" who opposed the settlement); <u>In re</u>

<u>Lloyd, Carr & Co.</u>, 617 F.2d 882, 889 (1st Cir. 1980) (finding "no precedent for a

compromise of this nature actively opposed by the major creditors and affirmatively

approved by none.").  The Debtors simply cannot be acting in the best interests of the

Debtors' estates if not a single creditor constituency supports the underlying settlement

other than those who are expected to receive direct benefits therefrom.

---

[14]    Although admittedly, the Court cannot ascertain from the opaque documents submitted by
the Debtors the actual Stated Value of the GM Preferred Stock that GM will receive for its
administrative and unsecured claims.

29.    Simply put, the Debtors have not and cannot demonstrate that their proposed compromises are fair and equitable.  Without understanding the value what the Debtors are giving up, there is no way to evaluate what GM is offering in exchange, especially since GM is to receive GM Preferred Stock on account of the GM Claims.  Any value given to the Debtors by GM is merely recycled back to GM via its GM Preferred Stock holdings.  ***Importantly, there is insufficient information to determine whether creditors other than GM and the PBGC are better off or worse off under this settlement than without it.***  With no understanding of either side of the equation for balancing the pros and cons ***to creditors*** of the Debtors' settlements with GM, no basis exists to approve the compromises contained in the Amended GSA and Amended MRA, ***especially since no other creditor constituency, other than GM and the PBGC (who receive the benefits of the compromises), supports the GSA and MRA Amendment Motion***.  Although a properly vetted Disclosure Statement, might provide the answer, the Debtors (on 10 days' notice) seek to short-circuit that process and the transparency that it would provide.

**B.    The Amended GSA and Amended MRA Constitute An Illegitimate *Sub Rosa* Plan.**

30.    The Amended GSA and MRA Motion seeks approval of a complex series of undertakings by the Debtors that will, in large measure, dictate the terms of any plan.  If approved, the Amended GSA and Amended MRA will effect substantial readjustments of the rights of creditors, the debtors, and other interests – the type of readjustments that are supposed to occur only on confirmation of a plan, after interested parties have had the benefit of disclosure and assurance, after evidence submitted to the Court, and after the protective plan-related requirements of chapter 11 have been met.

31.     Here, without a court-approved disclosure statement, a vote by affected creditors, or any of the other protections afforded by the plan confirmation process, many of the essential features of any eventual plan will be set in stone.  The changes are so significant, and their control over the terms of an eventual plan so pervasive, that the "compromises" contained in the Amended GSA and Amended MRA, in every meaningful sense, *are* the plan.

32.     This procedure runs afoul of the vast body of case law prohibiting the effectuation of *sub rosa* plans of reorganization without complying with the disclosure and confirmation requirements applicable to plans of reorganization. While most such cases arise in the context of asset sales rather than the compromise of a dispute, the principle is the same: the parties to a chapter 11 case should not be permitted to make an end-run around the elaborate structure of protective features Congress has imposed upon the confirmation process by the device of a substantive transaction that locks in the terms of any eventual plan.

33.     For example, under the Amended GSA, GM is entitled to receive GM Preferred Stock on account of its GM Claims.  Thus, the nature of the consideration that GM will receive under a plan is fixed, and the GM Preferred Stock is being offered exclusively to GM.  Moreover, there is no market test to determine the value of the GM Preferred Stock.  If a third party would pay more than par for the GM Preferred Stock, then GM is being overpaid on account of its GM Claims.  Moreover, insofar as the Amended GSA seems to contemplate that GM will receive preferred stock on account of its unsecured claims, rather than being paid in the same currency as other unsecured creditors, this is clearly a critical plan term regarding claim treatment which, if the GSA and MRA Amendment Motion is granted, would be fixed outside of a plan, and without any evidence to justify this special treatment of the GM Unsecured Claim.  Without more information that would normally be provided in a disclosure statement, it is not clear if claims that would otherwise fall into the same class as the GM Unsecured Claim are being unfairly discriminated against because they are not entitled to GM Preferred Stock

distributions.  See 11 U.S.C. §1123(a)(4) (a plan shall "provide the same treatment for each claim or interest of a particular class"); § 11 U.S.C. § 1129(b) (prohibition against unfair discrimination).

34.    At least two other features of this "compromise" render it an improper *sub rosa* plan. The first of these is that the Amended GSA, in no uncertain terms, controls any future plan of reorganization.  The Amended GSA specifically requires that any Delphi Plan provide that the terms of the Amended GSA will control in the event of a conflict between the Amended GSA and any Delphi Plan.  See Amended GSA, §1.57.  The second is that the compromise purports to bind third parties to release GM.  As is clear from the case law, these provisions take this transaction out of the land of simple settlements and on to the forbidden territory of *sub rosa* plans.

35.    A long line of circuit-level cases prohibits the use of sale motions under 11 U.S.C. § 363 to effectuate a *sub rosa* plan. See, e.g., In re Lionel Corp., 722 F.2d 1063, 1069, 1071 (2nd Cir. 1983); In re Braniff Airways, Inc., 700 F.2d 935, 940 (5th Cir. 1983).

36.    While these seminal cases arose in the context of a sale of assets rather than a compromise, their logic is not limited to the sale context, and other cases make clear that the same principle applies in the settlement context – the protective provisions governing plan confirmation are not to be circumvented.  As the Braniff court put it: "In any future attempts to specify the terms whereby a reorganization plan is to be adopted, the parties and the district court must scale the hurdles erected in Chapter 11. *See*, *e.g.*, 11 U.S.C. § 1125 (disclosure requirements); *id.* § 1126 (voting); *id.* § 1129(a)(7) (best interests of creditors test); *id.* § 1129(b)(2)(B) (absolute priority rule)." Braniff 700 F.2d at 940.  See also, In re Continental Air Lines, Inc., 780 F.2d 1223, 1228 (5th Cir. 1986) (holding that the court cannot approve a transaction under section 363 of the Bankruptcy Code when other parties in interest are denied identified plan protections).

37.    Several cases analyzing proposed compromises under the <u>Braniff</u> rule make clear that the principle applies here with equal force. For example, the court in <u>In re Victoria Alloys, Inc.</u>, 261 B.R. 918 (Bankr. N.D. Ohio 2001), approved a compromise on the specific ground that, unlike the sale in <u>Braniff</u>, the compromise at issue did not mandate either the terms of or votes on a future plan, and did not contain a release of claims.  The Amended GSA at issue today, of course, fixes plan terms and releases claims, on shortened notice, without any of the protections of the plan process. Moreover, while the Amended GSA does not require the affirmative vote of GM to support an Delphi Plan, it does prohibit GM from opposing any plan that would otherwise meet the requirements set forth therein.  <u>See</u> Amended GSA, §4.04(d).

38.    Similarly, the court in <u>In re Condere Corp.</u>, 228 B.R. 615 (Bankr. S.D. Miss. 1998), approved a compromise, only after finding that the compromise shared none of the three principal infirmities of the <u>Braniff</u> transaction.  Namely the <u>Condere</u> settlement did not dictate the terms of a future plan, did not restructure the rights of creditors, and did not require parties to release claims against the debtor and others. The Amended GSA and Amended MRA before the Court today does all three.

39.    The GSA and MRA Amendment Motion now before the Court flouts the principles enunciated by the cases arising under both asset sales and settlements. And needlessly so: there is absolutely no reason that this compromise could not be incorporated into a plan.  Indeed, the Bankruptcy Code expressly contemplates that major settlements may be effectuated in a plan.  <u>See</u> 11 U.S.C. § 1123(b)(3)(A) ("a plan may . . . provide for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate").  The Court could then be sure that the full panoply of protections of disclosure, voting, best interests, and fair and equitable treatment were met. The GSA and MRA Amendment Motion, therefore, should be denied on the grounds that it should be accomplished, if at all, through a plan.

40.    The fact that GM waited until the eleventh hour to reach these "compromises" before regulation changes and pension funding requirements reach a crucial point on September 30, 2008, does not change the analysis.  As the Second Circuit Court of Appeals admonished in <u>Lionel</u>, "[t]he need for expedition . . . is not a justification for abandoning proper standards." <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2nd Cir. 1983) (citing <u>TMT Trailer Ferry</u>, 390 U.S. at 450).  After being aware of this problem for months, GM should not be permitted to leverage the Debtors into railroading through these broad-ranging "compromises" with GM that go well beyond addressing the immediate problem with the PBGC, and would dictate the terms of any plan of reorganization, all with just ten days' notice, without affording the Debtors' creditors an opportunity to exercise their rights under a full and comprehensive plan process.

41.    Importantly, this compromise goes far beyond what is necessary to address the self-made "crisis."  As the Senior Noteholders understand matters, the pension liabilities being "transferred" to GM under this "settlement" relate solely to employees who were employees of GM at the time of the spin-off of Delphi, and that as between itself and the PBGC, GM may in any event be liable for a substantial portion of that amount.  Thus, GM would appear to have an economic incentive of its own to solve this problem.  The Debtors should be required to provide adequate evidence and disclosure on this point.  In any event, this issue could have been addressed without releasing GM; without fixing the kinds and terms of securities that GM will receive on its administrative and general unsecured claims; and without allowing GM a $2.5 billion unsecured claim all outside of a plan of reorganization and without the procedural and substantive protections of the plan process.

## IV.
## CONCLUSION

WHEREFORE, based on the foregoing, the Senior Noteholders

respectfully request that the Court deny the GSA and MRA Amendment Motion, and

grant such other relief that the Court deems just and proper.


Dated:     September 22, 2008
           Los Angeles, California


                           STUTMAN, TREISTER & GLATT P.C.


                           By:        /s/ Isaac M. Pachulski
                                  Isaac M. Pachulski
                                  Jeffrey H. Davidson
                                  Eric D. Goldberg
                                  Christine M. Pajak
                                  1901 Avenue of the Stars, 12th Floor
                                  Los Angeles, California 90067
                                  Tel:  (310) 228-5600