Hearing Date and Time: September 23, 2008 at 10:00 a.m.
Objection Deadline: September 22, 2008 at 12:00 p.m.

| | |
|---|---|
| PENSION BENEFIT GUARANTY CORPORATION | KELLEY DRYE & WARREN LLP |
| Israel Goldowitz, Chief Counsel | Merrill B. Stone |
| Karen Morris, Deputy Chief Counsel | Craig A. Wolfe |
| John A. Menke, Assistant Chief Counsel | 101 Park Avenue |
| Ralph Landy, Attorney | New York, NY 10178 |
| Craig Fessenden, Attorney | Tel: (212) 808-7800 |
| C. Wayne Owen, Attorney | Fax: (212) 808-7897 |
| 1200 K Street, N.W. | |
| Washington, D.C. 20005 | KELLEY DRYE & WARREN LLP |
| Tel: (202) 326-4020 | Joseph A. Boyle |
| Fax: (202) 326-4112 | 200 Kimball Drive |
| | Parsippany, NJ 07054 |
| Attorneys for Pension Benefit Guaranty Corporation | Tel: (973) 503-5920 |
| | Fax: (973) 503-5930 |
| | |
| | Attorneys for Pension Benefit Guaranty Corporation |

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                    )
In re:                              )    Chapter 11
                                    )
DELPHI CORPORATION, *et al.*,       )    Case No. 05-44481 (RDD)
                                    )
                    Debtors.        )    (Jointly Administered)
_____)


**STATEMENT OF PENSION BENEFIT GUARANTY CORPORATION
REGARDING DEBTORS' EXPEDITED MOTION FOR AN ORDER
AUTHORIZING DEBTOR TO IMPLEMENT THE AMENDED AND
RESTATED GLOBAL SETTLEMENT AGREEMENT AND MASTER
RESTRUCTURING AGREEMENT WITH GENERAL MOTORS
CORPORATION (THE "GSA AND MRA AMENDMENT MOTION")**


Pension Benefit Guaranty Corporation ("PBGC") hereby submits its Statement supporting the Court's approval of the GSA and MRA Amendment Motion. In support of the Statement, PBGC respectfully represents as follows:

**PRELIMINARY STATEMENT**

The relief sought in the GSA and MRA Amendment Motion constitutes an overwhelmingly positive solution to some of the Debtors' major pension obligations and eliminates what might well be insurmountable obstacles to a successful reorganization. If the 414(l) Transfer, as described in the GSA and MRA Amendment Motion, occurs by September 29, 2008, major benefits flow to Debtors, certain non-Debtor affiliates and the unsecured creditors. The Debtors will be relieved of billions of dollars of current liability for contributions that would otherwise be due to its Hourly Plan (as defined below) and that would have to be satisfied, probably in a cash lump sum, before the Debtors could emerge. Because Delphi's existing liability for contributions to the Hourly Plan will be erased by the 414(l) Transfer, as soon as possible after the First Transfer Date (as defined below), PBGC will relinquish more than $1.2 billion in liens filed against Delphi's foreign non-Debtor affiliates. The 414(l) Transfer, as a practical matter, provides the only realistic possibility for the Debtors to emerge from bankruptcy without termination of its pension plans, thereby allowing a recovery for Delphi's unsecured creditors. And perhaps most important, more than 64,000 of Delphi's retirees and employees can rest comfortably knowing that they will receive their full pension benefits and will not have to endure the consequences of pension plan termination.

On the other hand, the series of events that would ensue if the 414(l) Transfer does not occur by September 29, 2008 would be a financial nightmare. The overhanging pension obligations would make it virtually impossible for the Debtors to emerge from bankruptcy. The increased likelihood that Delphi's pension plans would terminate means that Delphi's unsecured creditors would be severely impacted by the failure to effect the 414(l) Transfer in a timely manner. Resolution of PBGC's secured claims would impose significant costs upon Delphi. The amount of PBGC's termination claims could swamp all others. Further, PBGC's joint and

several claims are structurally superior to those of the unsecured creditors. The likely need for PBGC to resort to these remedies would almost certainly place unsecured creditors in a far worse position than if the 414(l) Transfer occurs.

## BACKGROUND

**A.      General Background**

1. On October 8 and 14, 2005 (the "Petition Dates"), Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code") and commenced the above-captioned chapter 11 cases.

2. Delphi is the plan sponsor of the Delphi Hourly-Rate Employees Pension Plan (the "HRP" or "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan" and, collectively with the HRP, the "Plans"). Each of the Plans is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461 (2000 & Supp. IV 2004). Neither of the Plans has been terminated. Delphi and certain other Debtors are plan sponsors of certain other defined benefit pension plans covered by Title IV of ERISA that are not the subject of the GSA and MRA Amendment Motion.

**B.   Background of Pension Liability**

3.   PBGC is a wholly owned United States government corporation that administers and enforces the nation's defined benefit pension plan termination insurance program under ERISA.  The termination insurance program protects nearly 44 million workers participating in over 30,000 private sector pension plans.  *See* PBGC 2007 Annual Report at (i);[1] *see generally PBGC v. LTV Corp.,* 496 U.S. 633 (1990).

**1.   Minimum Funding Requirements**

4.   An employer's decision to establish a defined benefit pension plan is entirely voluntary.  Once established, however, federal law requires the employer to fund the plan in accordance with the minimum funding standards prescribed by the Internal Revenue Code ("IRC") and ERISA.  26 U.S.C. § 412; 29 U.S.C. § 1082.

5.   A pension plan must be funded until it is terminated in accordance with ERISA.  Rev. Rul. No.79 237, 1979 2 C.B. 190.  If an employer is unable to satisfy the minimum funding standards for a plan year without experiencing a "temporary substantial business hardship," the employer may apply to the Internal Revenue Service for a waiver of some or all of the required contribution for the plan year.  IRC § 412(d)(1).

**2.   PBGC's Proofs of Claim**

6.   PBGC has timely filed three claims regarding each of the Plans against each of the Debtors for:  (1) unpaid minimum funding contributions required under 26 U.S.C. § 412 and 29 U.S.C. §§ 1082 and 1362(c); (2) unpaid premiums owed to PBGC under 29 U.S.C. § 1307; and (3) contingent termination liability to PBGC under 29 U.S.C. § 1362(a)

---

[1]   This Annual Report is available on PBGC's website at:  http://www.pbgc/gov/doc/2007_annual_report.pdf.

- 4 -

and (b). Each of the claims filed by PBGC, on behalf of itself and on behalf of the Plans, is asserted against each of the Debtors for joint and several liability.[2]

       7.     Delphi, as the contributing sponsor of the Plans, and each member of its controlled group is jointly and severally liable to the Plans for the contributions necessary to satisfy the minimum funding standard under the IRC and ERISA, 26 U.S.C. § 412(c)(11), 29 U.S.C. § 1082(b), and, if the Plans are terminated, for the unfunded benefit liabilities discussed below. A "controlled group" essentially consists of corporations having at least 80 percent common ownership. 26 U.S.C. § 1563(a). A "controlled group" may include affiliates such as a parent corporation, subsidiary, or brother-sister company. *See* 26 U.S.C. § 414(b), (c); 29 U.S.C. § 1301(a)(14).

**3.    PBGC Liens**

       8.     IRC § 412(n) imposes a statutory lien in favor of a pension plan. The statutory lien arises by operation of law immediately on the day following the date on which unpaid contributions first exceed $1 million and is for the aggregate unpaid balance of the funding contributions (plus interest). IRC § 412(n)(3), (4), and (5). PBGC has exclusive authority governing enforcement of the lien and collection of amounts due under the IRC § 412(n) provisions. I.R.C. § 412(n)(5) ("Any lien created under [§ 412(n)(1)] may be perfected and enforced only by the Pension Benefit Guaranty Corporation . . ."). The statutory lien attaches to all property of the employer and each member of its controlled group. IRC § 412(n)(1).

---

[2]    On June 27, 2006, this Court approved a stipulation between PBGC and the Debtors allowing PBGC to file consolidated claims against the Debtors. Pursuant to the stipulation, the filing of a claim by PBGC in these proceedings is deemed to constitute the filing of such claim in all of the cases jointly administered under the above case caption. Therefore, each claim PBGC filed represents a separate claim asserted against each of the Debtors.

9. Delphi and other Debtor and non-Debtor entities affiliated with Delphi are contributing sponsors or are members of the contributing sponsors' controlled group with respect to the Plans under 29 U.S.C. § 1301(a)(13)-(14).  The contributing sponsors of the Plans and each member of their controlled group, including the non-Debtor foreign affiliates of the Debtors, are jointly and severally liable to the Plans for the contributions necessary to satisfy the minimum funding requirements for the Plans under the IRC and ERISA, 26 U.S.C. § 412(c)(11), 29 U.S.C. § 1082(b), and for unfunded benefit liabilities if the Plans were to be terminated.  29 U.S.C. § 1362.

10. PBGC has recorded Notices of Federal Lien with the Recorder of Deeds for the District of Columbia (the "Notices") with respect to the liens under IRC § 412(n) of each Plan against all property and rights to property of certain non-Debtor foreign affiliates of the Debtors.  The Notices relate to liens arising in favor of the HRP in excess of $1.2 billion and liens arising in favor of the Salaried Plan in excess of $450 million.  The failure to make future funding contributions would increase the amounts of these liens.  Indeed, if the 414(l) Transfer does not take place as set forth in the GSA and MRA Amendment Motion, PBGC will promptly file additional lien amounts aggregating more than $1 billion in favor of the HRP and Salaried Plans.

**C.    The GSA and MRA Amendment Motion Is an
       <u>Extremely Positive Development in This Case</u>**

11. Among other things, the GSA and MRA Amendment Motion seeks to effect the 414(l) Transfer to the GM Plan of assets and liabilities of the HRP.  If the Court approves the GSA and MRA Amendment Motion, the 414(1) Transfer would take place in two separate transfers.  No later than September 29, 2008 (the "First Transfer Date"), Delphi will transfer to the GM Plan net HRP liabilities in an amount sufficient to avoid an accumulated

- 6 -

funding deficiency for the plan year ending September 30, 2008, which amount the Debtors estimate to be approximately $2.1 to $2.4 billion. When Delphi emerges from bankruptcy, the bulk of the remaining net liabilities in the HRP, approximately $1 billion, will be transferred to the GM Plan, leaving behind at Delphi only a relatively small segment of the current HRP.

12. The pension relief sought in the GSA and MRA Amendment Motion will greatly improve the Debtors' ability to emerge from bankruptcy and will significantly enhance value available to unsecured creditors. Under the GSA and MRA Amendment Motion, the transfer of the approximately $3.4 billion of net liabilities of the HRP to the GM Plan is a major step forward for the Debtors and their creditors.

13. If the 414(l) Transfer is completed by September 29, 2008, the Debtors will avoid a $2.1 to $2.4 billion funding deficiency for the HRP year ending September 30, 2008. If this liability were to remain with the Debtors, it will be an obligation that will have to be paid in cash, either in a lump sum upon emergence from bankruptcy or, in the event the IRS granted a waiver, over a five-year period. Even if a waiver were obtained, this would be an obligation requiring a cash outlay in excess of $500 million (including interest) per year for five years. And it would not be easy for the Debtors to obtain a waiver in any event, as collateral is generally required to receive such a waiver and the Debtors would not be in a position to offer sufficient collateral to justify the waiver as a practical matter.

14. If the GSA and MRA Amendment Motion is not approved, the Debtors' plan of reorganization must provide for payment of the HRP funding obligations then due. With such a funding obligation looming, sufficient and rational exit financing would be extremely difficult, if not altogether impossible, to obtain, even if the IRS granted a waiver enabling the Debtors to spread out the minimum funding deficiency payments. This problem is

only further exacerbated by the current turmoil in the credit markets.  As a result, it is highly unlikely that Debtors can propose a feasible plan of reorganization that includes payment of the accrued HRP funding obligations.

15. Because Debtors cannot reasonably propose a feasible plan of reorganization that would satisfy the HRP funding requirements that will arise if the 414(l) Transfer is not effected on or before September 29, 2008, this necessarily increases dramatically the chances that the HRP and the Salaried Plan will need to be terminated. Termination would result in approximately $8 billion of PBGC claims for unfunded benefit liabilities from the two Plans alone.  Because each member of the Debtors' controlled group is jointly and severally liable for these claims, PBGC can assert the full amount of its claim against each non-Debtor affiliate, in addition to each Debtor.  These claims would overshadow the entire case and would practically ensure that any recovery to other unsecured creditors would be de minimis.  By contrast, if the Debtors successfully reorganize and the Plans are not terminated, these unfunded benefit liability claims, and their negative impact on the recovery to unsecured creditors, would be avoided entirely.

16. In addition to easing the Debtors' future obligations for the HRP, the first part of the 414(l) Transfer, if implemented by September 29, 2008, will eliminate the Debtors' accrued funding debt for the HRP.  PBGC currently holds $1.2 billion in liens under IRC § 412(n) attributable to missed HRP contributions.  Because the 414(l) Transfer has the effect of wiping out the obligation secured by those liens, PBGC will, as soon as practicable after the first part of the 414(l) Transfer is completed, file notices to withdraw the full amount of those liens.  Though not as a direct result of these Motions, but to simplify Delphi's path to reorganization, PBGC will also will file statements to reduce its outstanding IRC § 412(n) liens

with respect to the Salaried Plan from the current amount of about $450 million to $250 million.  Thus, the 414(l) Transfer will effectively wipe out more that 80% of the liens that PBGC currently holds against the Debtors' foreign, non-debtor affiliates.  PBGC and Delphi are in continuing discussions regarding possible forbearance by PBGC from enforcing the remaining liens or filing additional liens.

    17. Finally, PBGC urges the Court not to overlook the benefits that the 414(l) Transfer will bring to the more than 64,000 active workers, retirees, and surviving beneficiaries in the Hourly Plan.  They will continue to receive the full amount of pension benefits due them, free from the loss and disruption that would occur if termination of the HRP becomes necessary.  Therefore, the 414(l) Transfer will serve not only the interest of the Debtors and their unsecured creditors, but the public interest as well.

    WHEREFORE, PBGC requests that this Court grant the GSA and MRA Amendment Motion.

Dated: Washington, D.C.  
   September 22, 2008

PENSION BENEFIT GUARANTY CORPORATION

By: */s/ John A. Menke*_____  
  Israel Goldowitz, Chief Counsel  
  Karen Morris, Deputy Chief Counsel  
  John A. Menke, Assistant Chief Counsel  
  Ralph Landy, Attorney  
  Craig Fessenden, Attorney  
  C. Wayne Owen, Attorney  
1200 K Street, N.W.  
Washington, D.C. 20005  
Tel:  (202) 326-4020  
Fax: (202) 326-4112

-and-

Dated: New York, New York
September 22, 2008

KELLEY DRYE & WARREN LLP

By: */s/ Craig A. Wolfe*
    Merrill B. Stone
    Craig A. Wolfe
101 Park Avenue
New York, NY 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

KELLEY DRYE & WARREN LLP
Joseph A. Boyle
200 Kimball Drive
Parsippany, NJ 07054
Tel: (973) 503-5920
Fax: (973) 503-5930

Attorneys for Pension Benefit Guaranty Corporation

# **CERTIFICATE OF SERVICE**

        I, Marie Vicinanza, certify that on the 22nd day of September, 2008, I caused to be served to the parties listed below, a true and correct copy of the foregoing *Statement of Pension Benefit Guaranty Corporation Regarding Debtors' Expedited Motion for an Order Authorizing Debtor to Implement the Amended and Restated Global Settlement Agreement and Master Restructuring Agreement with General Motors Corporation (the "GSA and MRA Amendment Motion"),* via hand delivery and/or electronic mail as indicated.

| | |
|---|---|
| Skadden, Arps, Slate, Meagher & Flom LLP,<br>John Wm. Butler, Jr.<br>333 West Wacker Drive<br>Suite 2100<br>Chicago, Illinois 60606<br>**Electronic Mail**<br>jack.butler@skadden.com | Kayalyn A. Marafioti<br>Thomas J. Matz<br>Skadden, Arps, Slate, Meagher & Flom LLP,<br>Four Times Square<br>New York, New York 10036<br>**Via Hand Delivery and Electronic Mail**<br>kayalyn.marafioti@skadden.com<br>thomas.j.matz@skadden.com |
| Office of the United States Trustee<br>Brian Masumoto, Esq.<br>33 Whitehall Street<br>New York, New York 10004<br>**Via Hand Delivery** | Honorable Robert D. Drain<br>United States Bankruptcy Court<br>Southern District of New York<br>One Bowling Green<br>New York, NY 10004<br>**Via Hand Delivery** |

Dated:  September 22, 2008        */s/ Marie Vicinanza*
       New York, New York        Marie Vicinanza