K&L GATES LLP                                          **Hearing Date: September 23, 2008**
Edward M. Fox, Esq.                                                       **10:00 a.m.**
Eric T. Moser, Esq.
599 Lexington Avenue
New York, New York 10022
Telephone (212) 536-3900

Attorneys for Wilmington Trust Company,
as Indenture Trustee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:                                      :           Chapter 11
                                            :           Case No. 05-44481 (RDD)
DELPHI CORPORATION, *et al.*,               :           (Jointly Administered)
                                            :
        Debtors.                            :
--------------------------------------------------------X

**OBJECTION OF WILMINGTON TRUST COMPANY, AS INDENTURE TRUSTEE, TO
EXPEDITED MOTION FOR ORDER AUTHORIZING DEBTORS TO IMPLEMENT
AMENDED AND RESTATED GLOBAL SETTLEMENT AGREEMENT AND MASTER
RESTRUCTURING AGREEMENT WITH GENERAL MOTORS CORPORATION**

> Wilmington Trust Company ("WTC"), as indenture trustee for the senior notes

and debentures (the "Senior Debt") in the aggregate principal amount of $2 billion issued by

Delphi Corporation ("Delphi"), by and through its attorneys, K&L Gates LLP, hereby objects to

the Expedited Motion for Order Authorizing Debtors to Implement Amended and Restated

Global Settlement Agreement and Master Restructuring Agreement with General Motors

Corporation (the "Motion") filed by Delphi and its debtor affiliates and subsidiaries (collectively,

the "Debtors"), stating as follows:

## PRELIMINARY STATEMENT

> 11.     Nearly six months after the failed closing under the confirmed First

Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and

NY-637192 v1

Debtors and Debtors-in-Possession (the "Plan"),[1] the Debtors have yet to propose an amended

plan that would provide a meaningful recovery to creditors and could be consummated in a

timely fashion.

12.    All the while, the Debtors continue to suffer enormous – and much larger

than projected -- operating losses that are further diminishing the value of the Debtors' estates on

a daily basis, largely as the result of their continued refusal to use the tools available to them

under the Bankruptcy Code to stop selling products at a loss to Delphi's former corporate parent,

General Motors Corporation ("GM").

13.    To make matters even worse, the Debtors' debtor-in-possession loan

facility is set to mature in a few short months on December 31, 2008, and it will likely be

difficult for the Debtors to refinance given the continuing turmoil, and worsening condition, of

the credit markets.

14.    Confronted with these dire circumstances in large part of the Debtors' own

making -- and faced with an impending deadline from the Pension Benefit Guaranty Corporation

("PBGC") to address the underfunding in the Debtors pension plan – the Debtors now propose to

give away their last bit of negotiating leverage against GM by granting GM a general release of

claims prior to consummation of a plan of reorganization, without any assurance that the Debtors

will be able to secure from any other source the exit financing they will need to emerge from

bankruptcy.

---

[1] WTC requests that the Court take judicial notice of the Plan, including all exhibits thereto, and the
Confirmation Order (as hereinafter defined), as well as the record of the hearing on Confirmation of the
Plan.

15.     While the Debtors claim that they have no choice but to agree to GM's demand for an immediate release, the fact is that the Debtors have painted themselves into a corner by stubbornly refusing for the past three years to exert their leverage against GM and by failing to address their pension problems with greater urgency six months ago when the Debtors' confirmed Plan could not be consummated.

16.     Notwithstanding the sense of urgency with which the Debtors now seek approval of the proposed amendments to the Delphi-General Motors Global Settlement Agreement (the "GSA") and the Delphi-General Motors Master Restructuring Agreement (the "MRA"), the Debtors' Motion must be rejected because it seeks to unlawfully modify the Plan post confirmation and is manifestly not in the best interests of the Debtors' creditors, at least not prior to consummation of an amended plan that provides for a meaningful recovery to unsecured creditors.

17.     As explained more fully below, the GSA and MRA are integral parts of the Plan that was confirmed by this Court.  As a result, they cannot be amended or modified except in accordance with the provisions of section 1127 of the Bankruptcy Code, with which the Debtors have not complied.

18.     Even if the proposed amendments were legally permissible, however, the Debtors' proposal to grant a general release to GM at this time is contrary to the best interests of creditors, particularly since the Debtors' may well need additional assistance and support from GM in order to consummate a plan of reorganization and emerge from bankruptcy.

19.     The Motion should therefore be denied in its entirety.

## FACTUAL BACKGROUND

20.     On October 8, 2005 (the "Petition Date"), Delphi Corporation and certain

of its affiliates and subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief

under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the

"Bankruptcy Code").  Since the Petition Date, the Debtors have continued to operate their

businesses and remained in possession of their assets as debtors in possession pursuant to

sections 1107 and 1108 of the Bankruptcy Code.

### A.    Corporate Structure and Organization

11.     Delphi is a holding company that directly owns one hundred percent of the

equity of Delphi Automotive Systems, LLC ("DAS"), its principal U.S. operating subsidiary, and

is also the direct or indirect parent of all of the other Debtors.[2]

12.     Delphi does not own or operate any of the Debtors' manufacturing

facilities in the United States.  Instead, all, or substantially all, of the Debtors manufacturing

facilities are owned and operated directly by DAS.[3]

---

[2]  A corporate organization chart reflecting the relationships between the various Debtors is annexed
hereto as Exhibit A.

[3]  See Transcript of May 24, 2006 Hearing, at 188, wherein John D. Sheehan testified as follows:

    Q.    Okay.  Now the U.S. operations though are not run directly by Delphi Corporation,
        correct?

    A.    The – Delphi is the parent company and there are – most of the oper – U.S.
        operations are included in a subsidiary that's owned by Delphi Corporation.

    Q.    But Delphi Corporation, itself, does not directly own or operate the U.S.
        manufacturing operations, correct?

    A.    Not directly.

    Q.    Okay.  In fact, they're owned and operated by Delphi Automotive Systems LLC,
        correct?

    A.    Largely, that's correct, yeah.

**B.      Foreign Operations**

11.      Delphi also owns 87% of the equity of Delphi Automotive Systems (Holding), Inc. ("DASHI"), which in turn owns 100% of the equity interests in the Debtors' highly profitable foreign affiliates.

12.      These foreign affiliates "generally are separate legal entities under the direction of local management" and "are generally competitive with their peers, generating an estimated operating income of $800 million in 2003, $1.1 billion in 2004, and $700 million in 2005."[4]

13.      Delphi's foreign affiliates have continued to generate positive operating income for periods after 2005, and remain profitable today.[5]

**C.      Financial Performance**

14.      Notwithstanding the financial success of Delphi's foreign subsidiaries, "as a result of steadily increasing losses in the U.S., Delphi has not had a net profit on a consolidated basis since 2002."[6]

15.      From 2005 to 2007, the Debtors suffered losses totaling more than $10 billion on a consolidated basis: (i) $3.065 billion in 2007; (ii) $5,464 billion in 2006; and (iii)

---

[4]  Affidavit of John D. Sheehan in Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements Under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits Under 11 U.S.C. § 1114(g), ¶ 25.

[5]  Disclosure Statement, p. 28 ("Although Delphi's global operations remain profitable to this day, as a result of steadily increasing losses in the U.S., Delphi has not had a net profit on a consolidated basis since 2002.").

[6]  Disclosure Statement, p. 28; see also Delphi's Amended and Restated Schedules of Assets and Liabilities which reflect that Delphi Corporation holds a $3.637 billion intercompany claim against DAS.

$2.357 billion in 2005 (including a net loss of approximately $743 million for the three-month,

postpetition portion of 2005).[7]

16.    The Debtors financial situation has continued to deteriorate in 2008.

17.    During the first half of 2008, the Debtors incurred losses totalling $1.140

billion[8] -- almost as much as the Debtors expected to lose for all of 2008 based on the financial

projections set forth in their Disclosure Statement.[9]

18.    Delphi has also acknowledged that it expects these losses to continue, and

that the Debtors' North American operations will continue to generate negative cash flows

during the second half of 2008.[10]

**D.    Repatriation of Funds and Supplemental Borrowings**

19.    In order to cover these staggering and continuing losses, Delphi has

recently made arrangements to borrow more than $950 million from GM,[11] and to repatriate

more than $1.4 billion in cash from its foreign subsidiaries,[12] to continue financing DAS's

---

[7]  See Delphi 10-K dated February 19, 2008 ("2007 Annual Report"), p. 100.

[8]  See Delphi 10-Q dated August 8, 2008, p. 61.

[9]  Disclosure Statement, Apx. C, p. 11.

[10]  See Delphi 10-Q dated August 8, 2008, p. 77 ("Cash flow from operating activities continues to be negatively impacted by operating challenges due to lower North American production volumes, related price pressures stemming from increasingly competitive markets, and continued commodity price increases, and we expect that our operating activities will continue to use, not generate, cash.") (emphasis added).

[11]  See Motion for Order Authorizing Amendment to Arrangement with General Motors Corporation Approved Pursuant to Second DIP Extension Order (Docket No. 14031) (the "GM Motion"), ¶ 25 ("Under the GM Arrangement Amendment, GM has agreed to increase the aggregate principal amount available under the GM Arrangement by a maximum of $300,000,000 to a total aggregate amount of $950,000,000.").

[12]  See Order Under 11 U.S.C. §§ 363(c), 1107, and 1108, and Cash Management Order, and Alternatively, Under 11 U.S.C. §§ 363(b)(1) and 364(c), Confirming Authority of Delphi Automotive Systems (Holding), Inc. to Complete Intercompany Transfer of Funds (Docket No. 10725) (authorizing Delphi to repatriate and loan up to $650 million to DAS); Supplemental Order Under 11 U.S.C. §§ 361

- 6 -

operations, despite the fact that DAS has no ability to repay those loans at any point in the foreseeable future.

20.     WTC has repeatedly noted its concerns about Delphi's willingness to repatriate funds from its foreign affiliates – funds that would otherwise be available for the benefit of Delphi's own creditors – to fund the failing operations of its North American subsidiaries,[13] and has reserved its right to object to any future repatriations.[14]

21.     WTC has not pursued those objections to date based on Delphi's assurances that it was making reasonable progress towards the proposal and consummation of a plan of reorganization that would provide a reasonable return to the holders of Senior Debt.

**E.     The Plan**

22.     On December 10, 2007, the Debtors filed their Plan.

---

AND 363, Fed. R. Bankr. P. 9019, and Cash Management Order Authorizing DASHI to Grant Adequate Protection to Pension Benefit Guaranty Corporation in Connection with Certain Intercompany Transfers of Repatriated Funds (Docket No. 13733) (authorizing Delphi to repatriate and loan up to an additional $750 million to DAS, subject to the continuing right of the Creditors Committee and WTC to object on a prospective basis).

[13] See, e.g., Preliminary Objection of Wilmington Trust Company, as Indenture Trustee, to Motion for Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, and Cash Management Order, Authorizing DASHI to Grant Adequate Protection to Pension Benefit Guaranty Corporation in Connection with Certain Intercompany Transfers of Repatriated Funds (Docket No. 13623); Supplemental Objection of Wilmington Trust Company, as Indenture Trustee, to Motion for Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019, and Cash Management Order, Authorizing DASHI to Grant Adequate Protection to Pension Benefit Guaranty Corporation in Connection with Certain Intercompany Transfers Repatriated Funds (Docket No. 13652); Preliminary Objection of Wilmington Trust Company, as Indenture Trustee, to Motion for Order Under 11 U.S.C. § 363(c), 1107 and 1108, and Cash Management Order, and Alternatively, Under 11 U.S.C. §§ 363(b)(1) and 364(c), Confirming Authority of Delphi Automotive Systems (Holding), Inc. to Complete Intercompany Transfer of Funds (Docket No. 10564).

[14] Second Supplemental Order Under 11 U.S.C. §§ 361 and 363, Fed. R. Bankr. P. 9019 and Cash Management Order Authorizing DASHI to Grant Adequate Protection to Pension Benefit Guaranty Corporation in Connection with Certain Intercompany Transfers of Repatriated Funds (Docket No. 14005), ¶ 2 (reserving the right of WTC and the Creditors Committee to object to prospective repatriations).

23.    On January 25, 2008, the Court issued its Findings of Fact, Conclusions of

Law, and Order Under 11 U.S.C. §§ 1129(a) and (b) and Fed. R. Bankr. P. 3020 Confirming

First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates,

Debtors and Debtors in Possession, as Modified (the "Confirmation Order").

24.    The first decretal paragraph of the Confirmation Order provides:

> 1.    Confirmation.  The Plan, which consists of the Amended
> Plan (and all exhibits and supplements thereto and the modification
> set forth in Exhibit A hereto, which are hereby incorporated into
> and constitute a part of the Plan, is hereby approved and confirmed
> under section 1129 of the Bankruptcy Code.  The exhibits to the
> Plan (as may be modified pursuant to the terms of the Plan and/or
> such exhibit, as applicable) are incorporated by reference into and
> comprise an integral part of the Plan and this Confirmation Order.

Plan ¶ 1.

25.    Further, decretal paragraph 58 of the Confirmation Order, provides, in

pertinent part:

> 58.    GM Settlement.  The GM Settlement is hereby authorized
> and approved pursuant to section 1123(b)(3) of the Bankruptcy
> code, including (a) the Delphi-GM Global Settlement Agreement
> **[the GSA]**, attached to the Plan as Exhibit 7.20(a), which resolves,
> inter alia, the GM Claim, and (b) the Delphi-GM Master
> Restructuring Agreement **[the MRA]** attached to the Plan as
> Exhibit 7.20(b), which sets forth the continuing obligations of GM
> and Delphi.  The terms of the Delphi-GM Global Settlement
> Agreement and the Delphi-GM Master Restructuring Agreement,
> and the exhibits thereto, are incorporated by reference into and
> comprise an integral part of the Plan and this Confirmation Order.

Plan ¶ 58.

26.    The Confirmation Order which, immediately upon entry, is binding on the

Debtors,[15] Confirmation Order ¶ 5, further provides that "Reorganized Delphi shall be

_____

[15] The Court may take judicial notice of the Debtors' Objection to Motion of CR Intrinsic Investors, LLC
and Highland Capital Management, L.P. for Appointment of Examiner dated September 16, 2008 (the

authorized, empowered, and directed to make, **<u>no earlier than the Effective Date</u>**, but no later

than five days after the Effective Date, the IRC Section 414(l) Transfer as set forth in section

2.03 of the [GSA] and to issue and pay the 414(l) Note as set forth in section 2.03(c)(iii)(3)

thereof."  (¶ 58) (emphasis added).

27.    Following entry of the Confirmation Order, the Debtors sought to obtain

exit financing in the capital markets.

28.    The Debtors were initially unable to obtain adequate financing on

satisfactory terms in the capital markets.  Ultimately, however, the Debtors were able to obtain a

commitment from GM to participate in the Debtors' exit financing arrangements on "below-

market terms"[16] that permitted the Debtors to obtain the necessary financing and satisfy their

interest rate covenants with their plan investors.

29.    Notwithstanding GM's exit-financing assistance, however, on April 4,

2008, Delphi announced that "although it ha[d] met the conditions required to substantially

consummate its [Plan] . . . Delphi's plan investors refused to participate in a closing . . . and

refused to fund their investment agreement with the Company."[17]

---

"Examiner Objection") , in which the Debtors object to the motion for the appointment of an examiner
because a plan has already been confirmed in these cases and the confirmation order is final and non-
appealable. Id. ¶¶ 3, 7, 9 and 12.  Indeed, the Debtors insist in this objection that the Plan is still capable
of implementation. Id. at ¶ 12.

[16] See Expedited Motion under 11 U.S.C. § 1142(b) and Fed. R. Bankr. P. 3020(d) for Implementation of
Debtors' Confirmed Plan of Reorganization (Docket No. 12978), ¶ 5; see Memorandum of Law of
Plaintiff Delphi Corporation in Opposition to Defendants' Motions to Dismiss the Complaint in Delphi
Corporation v. Appaloosa Management L.P., Adv. Pro. 08-01232, at 8.  ("Defendants' hope that Delphi
would fail to fulfill its obligations with respect to exit financing were dashed when General Motors agreed
to participate in the loan syndicate.  Indeed, in late February 2008, one of the Additional Investors
expressed the gloomy (to defendants) prognosis:  'If General Motors takes down the financing, we will
not have a choice but to fund.'")

[17]  Delphi Press Release dated April 4, 2008, p. 1.

30.    Delphi has since acknowledged that "[u]nless a decree of specific

performance is issued by the Court, there is no possibility that the Plan can be consummated."[18]

**F.    Proposed Amendments to the MRA and GSA**

31.    On September 12, 2008, the Debtors filed the Motion, and thereby sought

Court approval to amend the GSA and MRA to provide for, among other things: (i) the

immediate transfer of certain of the Debtors' pension obligations to GM (the "414(l) Transfer")

in consideration of a $2.055 billion administrative claim and a $2.5 billion general unsecured

claim; and (ii) the immediate release of substantially all claims that the Debtors or their estates

may have against GM.

32.    The relief requested by the Motion would  accelerate certain aspects of the

Plan for GM's benefit, most notably the timing of the 414(l) Transfer and the timing of the

release of the Debtors' claims against GM.

## THE MOTION MUST BE DENIED IN ITS ENTIRETY

**I.    The Motion Seeks Approval for an Unauthorized Modification of the Debtors'
Confirmed Plan of Reorganization**

33.    Section 1127 of the Bankruptcy Code provides, in pertinent part, that:

> (b)  The proponent of a plan or the reorganized debtor may
> modify such plan at any time after confirmation of such
> plan and before substantial consummation of such plan . . .
> Such plan as modified under this subsection becomes the
> plan only if the circumstances warrant such modification
> and the court, after notice and a hearing, confirms such plan
> as modified, under section 1129 of this title.

---

[18]  See Memorandum of Law of Plaintiff Delphi Corporation in Opposition to Defendants' Motion to
Dismiss the Complaint in Adversary No. 08-1232 (RDD), p. 9, although Delphi, more recently, has taken
a different position in the Examiner Objection.  See note 15, above.

(c) The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

(d) Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

11 U.S.C. § 1127.

34.     Section 1127 not only applies to proposed modifications of actual plan language, but also to proposed modifications of plan-related documents, particularly where the documents "[were] an integral part of the reorganization plan and confirmation order." Doral Center, Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.), 208 B.R. 812, 816 (S.D.N.Y. 1997); In re Joint Eastern and Southern District Asbestos Litigation (In re Johns-Manville Corp.), 982 F.2d 721, 748 (2d Cir. 1992) ("The question remains whether a change that would contravene section 1127(b) if made in the provisions of a plan can be accomplished by modifying the provisions of a plan-related document. The answer must be no."); In re Rickle & Assoc., Inc., 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001) ("A debtor cannot circumvent § 1127(b) and change the plan simply by calling its request a motion to modify the confirmation order . . . or a plan-related document . . . or another application that nonetheless affects rights under the plan.") (internal citations omitted).

35.     The requirements of section 1127 apply even where, as the Debtors assert is the case here, the plan documents in question expressly contemplate the possibility of amendments. In re Ionosphere Clubs, Inc., 208 B.R. at 816 ("The fact that the lease in this case . . . contemplated consensual modifications by the parties is of no consequence, as the surrender of the right of first refusal was an integral part of the reorganization plan and confirmation order.").

36.    Indeed, the necessity of seeking approval under section 1127(b) in this

case is further confirmed by Article 14.3 of the Plan itself, which is entitled "Modifications and

Amendments," and provides that "[a]fter the Confirmation Date and prior to substantial

consummation of this Plan . . . any Debtor may, under section 1127(b) of the Bankruptcy Code,

institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any

inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such

matters as may be necessary to carry out the purposes and effects of this Plan."

37.    Because the Confirmation Order expressly provides that "[t]he terms of

the [GSA] and the [MRA] . . . are incorporated by reference into and comprise an integral part of

the Plan and the Confirmation Order," Plan ¶ 58, the GSA and MRA are indisputably part of the

Debtors' confirmed Plan.  As a result, they cannot be amended except in accordance with the

provisions of section 1127 of the Bankruptcy Code, which would require, among other things,

that the Debtors (i) provide all of their creditors with "adequate information" regarding their

proposed amendments to the Plan 11 U.S.C. § 1127(c), and (ii) permit the creditors who voted on

the original Plan the opportunity to change their vote.  11 U.S.C. § 1127(d).

38.    Likewise, because paragraph 58 of the Confirmation Order expressly

provides that the Debtors are not authorized to consummate the 414(l) Transfer prior to the

Effective Date of the Plan (¶58), granting the relief requested by the Motion would also require a

modification of the Confirmation Order, and the Debtors have neither requested, nor offered any

legal basis by which they could obtain, such modification.

39.    The Debtors have not even attempted to satisfy the standards of section

1127 of the Bankruptcy Code, which incorporates the plan confirmation requirements of 11

U.S.C. § 1129, nor have they requested, or offered any justification for seeking, relief from the

Confirmation Order under Fed. R. Bankr. P. 9024 or 11 U.S.C. § 1144.

      40.     This Court thus lacks the authority to modify the terms of the Plan

(including the GSA and MRA) confirmed, even if the Court were to determine that it would be

beneficial to do so.

      41.     As the Second Circuit observed in <u>In re Joint Eastern and Southern</u>

<u>District Asbestos Litigation</u>, the statutory requirements imposed by the Bankruptcy Code

> may not be cast aside no matter how beneficial the outcome
> may seem to the majority of those affected by the class action
> settlement.  A reorganization is assuredly governed by equitable
> considerations, but that guiding principle is not a license to
> courts to invent remedies that overstep statutory limitations nor
> to approve arrangements that some parties to a reorganization
> proceeding find preferable to the arrangements incorporated in a
> confirmed and consummated plan.

982 F.2d at 751.

      42.     The Motion must therefore be denied in its entirety as a matter of law.

## II.    The GSA and MRA May Not Be Amended Without the Approval of the Creditors Committee

      43.     Section 12.2 of the Plan sets forth "conditions precedent to the occurrence

of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3

of the Plan."  Plan § 12.2.

      44.     Section 12.2(e) of the Plan provides that:

> (e) Each Exhibit,[19] document, or agreement to be executed
> in connection with this Plan shall be in form and substance
> reasonably acceptable to the Debtors.

---

[19] Pursuant to Section 1.79 of the Plan, "'Exhibit' means an exhibit annexed either to this Plan or as an appendix to the Disclosure Statement."  Plan § 1.79.

Consequently, the GSA and the MRA are required to be reasonably acceptable to the Debtors.

This does not give the Debtors *carte blanche* to agree to amendments to these documents,

however, as Section 12.3 of the Plan specifically provides that

> in connection with the satisfaction or waiver of the
> condition set forth in Article 12.2(e) of this Plan, no
> material modification of the Investment Agreement, the
> Delphi-GM Definitive Documents, and the exhibits to each
> such agreements (sic) (except exhibits B and C to the
> Investment Agreement) that have a material adverse effect
> on the recoveries of unsecured creditors or existing equity
> holders may be made without the consent of the Creditors'
> Committee or the Equity Committee, as the case may be,
> and the respective non-Debtor counterparty to the
> agreement.

Plan § 2.3.  Accordingly, the Debtors are not free to amend the GSA and the MRA absent the

approval of the Creditors' Committee.

### III.    The Proposed Settlement With GM Is Not in the Best Interests of the Debtors' Estates Prior to Consummation of a Plan of Reorganization

45.    In an attempt to ignore the requirements of 11 U.S.C. § 1127(b), the

Debtors seek approval of their Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy

Procedure.  Assuming the rule is applicable here, it provides that "[o]n motion by the trustee and

after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr.

P. 9019.

46.    While the rule itself does not itself contain a clear legal standard for

approval, the Supreme Court long ago established that a settlement should only be approved if it

is "fair and equitable."  Protective Committee for Independent Stockholders of TMT Trailer

- 14 -

Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1967); accord In re Iridium Operating LLC, 478

F.3d 452, 462 (2d Cir. 2007).

47.    In considering whether a settlement meets the TMT standard, the Second

Circuit has directed bankruptcy courts to consider a number of factors, including:

> (1) the balance between the litigation's possibility of
> success and the settlement's future benefits; (2) the
> likelihood of complex and protected litigation . . . (3) the
> paramount interest of creditors, including each affected
> classes relative benefits and the degree to which creditors
> either do not object or affirmatively support the proposed
> settlement; (4) whether other parties in interest support the
> settlement; (5) the competency and experience of counsel
> supporting and the experience and knowledge of the
> bankruptcy judge' reviewing, the settlement; (6) the nature
> and breadth of releases to be obtained by officers and
> directors; and (7) the extent to which the settlement is the
> product of arm's length bargaining.

In re Iridium Operating LLC, 478 F.3d at 462 (citations and internal quotation marks omitted).

48.    Before making any determination regarding a proposed settlement,

however, a court must first "apprise [itself] of all facts necessary for an intelligent and objective

opinion of the probabilities of ultimate success should the claim be litigated." TMT, 390 U.S. at

424.

49.    The court need not hold a mini-trial on the merits of the proposed

settlement.  Nevertheless, the decision to approve a proposed settlement must be based on an

independent evaluation of the facts underlying the compromise, and cannot rest on mere

conclusory allegations by the debtor. Id. at 437 ("To make an informed and independent

judgment, however, the court needs facts, not allegations."); In re Texaco Inc., 84 B.R. 893, 902

(Bankr. S.D.N.Y. 1988) ("Decisions as central to bankruptcy proceedings as approval of

- 15 -

settlements cannot be visceral.  They must issue from reason and rest upon factual

undergirdings.").[20]

50.     In this case, the Debtors' motion lacks any meaningful information

regarding the nature of the Debtors' claims against GM, and makes it virtually impossible for the

Court to reach the "informed and independent" judgment required by TMT, or to apply the

factors enumerated by the Second Circuit in Iridium.

51.     Moreover, to the extent the Iridium factors can be evaluated, they

manifestly do not support approval of the proposed settlement.

52.     First, the Debtors admit that "the potential economic recovery to the

Debtors from the GM Claims and Defenses may be significant in absolute terms." (Motion,

¶ 80).[21]

53.     Second, while litigation with GM would presumably be "complex and

protracted" if it were to ensue, there is no reason to believe that litigation would necessarily

result from a denial of the Motion.  More likely, denial of the Motion would lead to vigorous

negotiations between the Debtor and GM (and the Creditors Committee if the Court grants the

---

[20]   See also TMT, 390 U.S. at 440-41 (1968) (reversing and remanding where "the record [was] devoid of facts which would have permitted a reasoned judgment that the claims of actions should be settled in this fashion."); LaSalle Nat. Bank v. Holland (In re Am. Reserve Corp.), 841 F.2d 159, 163 (7th Cir. 1987) ("Because the bankruptcy judge made inadequate findings to support the settlement, we reverse and remand . . . ."); United States v AWECO (Matter of AWECO), 725 F.2d 293, 299 (5th Cir. 1984) ("An approval of a compromise, absent a sufficient factual foundation, inherently constitutes an abuse of discretion."); Matter of Boston & Providence R.R. Corp., 673 F.2d 11, 13 (1st Cir. 1982) (remanding for further Opinion where the trial court's "findings and order do not demonstrate an independent evaluation of [the] information" presented regarding the claims being compromised).

[21] Indeed, in paragraph 12 of the Objection of the Official Committee of Equity Security Holders to the Renewed Motion for an Order Authorizing the Official Committee of Unsecured Creditors to prosecute the Debtors' Claims and Defenses Against General Motors Corporation, the Equity Committee states that "The value of the Debtors' claims, causes of action and defenses against GM is **massive** . . . ." (Emphasis added.)

Committee's <u>STN</u> motion) regarding the terms of a revised plan of reorganization that would

include, among other things, a release of claims against GM and a meaningful recovery to the

Debtors' unsecured creditors.

54.     Third, the "paramount interest of creditors" would be ill served by

approval of the Debtors' proposed settlement with GM.  If GM is able to secure a release of

claims prior to consummation of a plan, GM will have no incentive to provide any additional

support for the Debtors' efforts to confirm and consummate a plan that provides a meaningful

recovery to creditors, or to confirm any Plan at all.

55.     Fourth, while the Debtors have the benefit of competent and experienced

counsel, the Debtors have offered no evidence regarding their counsel's evaluation of the merits

of the claims being released or of the overall advisability of the settlement proposed by the

Motion.

56.     Fifth, the amended GSA provides for the release, by GM, of a wide variety

of claims against Delphi's officers and directors.[22]

57.     Finally in light of the Debtors' profound dependence on GM for financial

support and demonstrated unwillingness to act in a manner adverse to GM's interests, it cannot

fairly be said that the Amended GSA and Amended MRA are the product of "arms-length"

bargaining.  GM has exercised effective control over the Debtors throughout the entire chapter

11 process, as reflected most vividly by the Debtors' willingness, for nearly three years while in

---

[22]  Amended GSA, § 4.02 (granting releases to, among others, "Delphi-Related Parties"); Amended GSA,
§ 1.29 (defining "Delphi-Related Parties" to include the Debtors' "current and former principals, officers,
directors, agents, employees, advisors, and representatives (including any attorneys, financial advisors,
investment bankers, and other professionals retained by such persons or entities) in their respective
capacities.").

bankruptcy, to continue selling products to GM at a price lower than the Debtors' cost of
production.

58.     Thus, there is simply no evidence to support the view that the Amended
GSA and Amended MRA are the products of a genuinely fair and arms-length bargaining
process.

59.     Accordingly, because the Debtors' proposed settlement with GM is not
fair and equitable, the Motion should be denied.

**IV.    There Is No Good Business Reason for the Proposed Amendments to the GSA and
MRA**

60.     Section 363(b) of the Bankruptcy Code provides that the Debtors "after
notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,
property of the estate."  11 U.S.C. § 363(b).

61.     Under section 363(b), the Debtors bear the burden of demonstrating that
there is "a good business reason" for implementing the Amended GSA and Amended MRA
described by the Motion.  In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).

62.     In considering whether the Debtors have met that burden, the Court may
not blindly defer to the Debtors' collective business judgment, but must, instead, "consider all
salient factors pertaining to the proceeding, and . . . act to further the diverse interests of the
debtor, creditors and equity holders, alike."  Id.

63.     The Debtors have reached a critical juncture in their bankruptcy cases, and
decisive action is needed to maximize the value of the Debtors' estates and preserve the
possibility of a meaningful recovery for the Debtors' creditors.

64.    Unfortunately, rather than insisting that GM agree to provide the support

necessary to ensure that the Debtors' creditors receive a meaningful recovery in these cases as a

condition to the release of any claims against it, the Debtors have instead elected to grant GM the

immediate release of claims it so earnestly desires – and thereby relinquish their last bit of

bargaining leverage with GM -- while leaving their creditors to wonder whether the Debtor will

be able to finance a plan that will ensure them even a modest recovery.

65.    In light of the adverse conditions in the capital markets which the Debtors

candidly acknowledge, it is questionable whether Delphi will be able to secure adequate exit

financing to permit confirmation and consummation of a plan that provides a meaningful

recovery to creditors, or even to secure an extension of their current debtor-in-possession facility

to enable the Debtors to continue operating into 2009.  Indeed, since the Motion was filed,

conditions in the capital markets have only gotten worse.  Merrill Lynch agreed to sell itself to

Bank of America, Lehman Brothers collapsed into bankruptcy and is being sold off in pieces at

fire sale prices and AIG, the insurance giant, has effectively been taken over by the federal

government.

66.    At the confirmation hearing in January, the Debtors' Chief Restructuring

Officer assured the court that, in this opinion, based on his conversations with the Debtors'

lender, JPMorgan Chase, the Debtors would be able to tap the credit markets for the exit

financing they needed to emerge from bankruptcy.[23]  In fact, the Debtors were not able to obtain

all of the necessary financing in the capital markets, so they turned to GM, which had an

---

[23] Declaration of John P. Sheehan in support of Confirmation of First Amended Joint Plan of
Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession executed
January 13, 2008, ¶¶ 165-167.

incentive, then, to extend the necessary financing to enable the Plan to become effective, at which time GM would obtain it releases.

67.     If the Debtors release their claims against GM now, however, and then face similar difficulties in obtaining financing for an amended version of the Plan, as they surely will, GM would have no incentive to extend the same financial accommodations again.  Instead, GM would simply arrange for a sale of the plants which produce the products it needs and leave the Debtor to liquidate.

68.     Accordingly, the Motion must be denied because granting an immediate release of claims to GM would have disastrous consequences for the Debtors' ability to propose and consummate an amended plan of reorganization that provides a meaningful recovery to their creditors.

WHEREFORE, WTC respectfully requests that the Court enter an order denying the Motion, and granting such other and further relief as this Court deems just and proper.


Dated: New York, New York
        September 22, 2008

                                K&L GATES LLP


                                By:    /s/ Edward M. Fox
                                    Edward M. Fox
                                    A Member of the Firm
                                Attorneys for Wilmington Trust Company,
                                as Indenture Trustee
                                599 Lexington Avenue
                                New York, NY 10022
                                (212) 536-3900


- 20 -