**Hearing Date: September 23, 2008, at 10:00 a.m.**

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022-4802
Telephone: (212) 906-1200
Robert J. Rosenberg (RR-9585)
Mitchell A. Seider (MS-4321)
Mark A. Broude (MB-1902)
Michael J. Riela (MR-7829)
Email: robert.rosenberg@lw.com
           mitchell.seider@lw.com
           mark.broude@lw.com
           michael.riela@lw.com

Counsel for The Official Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELPHI CORPORATION, et al., | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO THE DEBTORS' MOTION FOR AN ORDER**
**AUTHORIZING THEM TO IMPLEMENT THE AMENDED**
**GLOBAL SETTLEMENT AGREEMENT AND MASTER**
**RESTRUCTURING AGREEMENT WITH GENERAL MOTORS CORPORATION**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of Delphi Corporation, *et al.* (collectively, the "Debtors"), by and through its

counsel, hereby objects to the Debtors' motion (the "GSA/MRA Motion") for an order

authorizing them to implement an agreement with General Motors Corporation ("GM") to amend

the Master Restructuring Agreement (the "MRA") and the Global Settlement Agreement (the

"GSA"). In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.        The Debtors assert that under the amended GSA and MRA, GM will be providing

"net contributions" to the Debtors' estates of approximately $10.6 billion, and trumpet that "net"

contribution as necessary to "preserve the tremendous progress" that the Debtors have made

towards their emergence.  However, what the Debtors cast as $10.6 billion in "net" value being

provided by GM is in fact no more than GM accepting liability it already has, which it will pay

for in large part with liquidity in its pension plans it could not otherwise access, and which only

partly makes up for the massive losses generated by years of GM forcing the Debtors to sell parts

below cost.  Those costs, in turn, were generated by the onerous, OEM-type labor contracts with

which GM saddled Delphi from Delphi's inception.  Yet the Debtors would have this Court

believe that these amounts nonetheless entitle GM to massive allowed administrative expense

and unsecured claims and a release, which collectively give GM total control over the outcome

of these cases.

2.        The simple fact is that the Debtors have once again knuckled under GM's

demands, completely failing to avail themselves of any of the leverage at their disposal.  The

amendments to the GSA and MRA provide GM with extraordinary consideration in exchange for

GM entering into transactions that are tremendously beneficial to GM on their own.  These

agreements represent no less than the complete abdication by the Debtors of all control over their

destiny, without regard to the consequences to their unsecured creditors.  This court should not

countenance such a wholesale surrender.

3.        If the proposed amendments to the GSA and the MRA are approved, GM will

incredibly have achieved the result it could only have hoped for when it spun off Delphi – it will

have caused the losses of its parts-making operation to be borne by outside creditors, and will

NY\1452198.8

have received a full release of all claims those creditors and other parties could assert on behalf

of the Debtors.  In addition, to add insult to injury, GM will receive billions of dollars of allowed

claims against the Debtors.  The Debtors' unsecured creditors would be left holding the bag,

facing potentially a paltry recovery or no recovery at all.  This Court should not countenance this

injustice.

4.      The GSA/MRA Motion must be denied because the grant of the immediate

release and the size of the allowed administrative expense claim to GM violate section 1127 of

the Bankruptcy Code.  The original GSA and MRA were exhibits to the Debtors' confirmed

chapter 11 plan (the "<u>Old Chapter 11 Plan</u>").  Pursuant this Court's January 25, 2008 order (the

"<u>Confirmation Order</u>") confirming the Old Chapter 11 Plan (an order which the Debtors

themselves have repeatedly said remains in force and effect), the original GSA and MRA were

approved, were incorporated into, and comprised an "integral part of", both the Old Chapter 11

Plan and the Confirmation Order.  As such, the granting of the immediate release would be a

modification (not a mere "clarification") of the Old Chapter 11 Plan.  Pursuant to section 1127(b)

of the Bankruptcy Code, the Old Chapter 11 Plan can be modified only if circumstances warrant

such modification and this Court, after notice and a hearing, confirms such plan as modified.

Moreover, section 1127(c) of the Bankruptcy Code requires the Debtors to comply with the

disclosure requirements of section 1125 with respect to the modified plan.  The Debtors are not

seeking confirmation of a revised plan of reorganization during the September 23 hearing, nor

have they filed and disseminated a disclosure statement and received votes by creditors in favor

of modification.  Thus, at least so long as the Confirmation Order remains in effect, and so long

as the amended GSA and MRA grant GM the immediate release, the GSA/MRA Motion cannot

be granted.

NY\1452198.8

5.      In addition, the purported "settlement" embodied in amendments to the GSA and MRA abdicates the Debtors' legal duties and flagrantly disregards the unsecured creditors' legal rights. In capitulating to GM's demands, the Debtors have simply given up too much - so much that the amendments to the GSA and MRA violate the legal standards and principles applicable under *Iridium*, *TMT Trailer Ferry*, and section 363(b) of the Bankruptcy Code.  To protect the unsecured creditors' interests - as the Debtors were duty-bound to do - the proposed settlement should have been rejected in the first instance.  Moreover, the manner in which the Debtors agreed to the amendments – waiting until the eleventh hour, allowing GM to coerce the Debtors into accepting these terms, and failing to involve or even inform the Committee about the critical terms until the last possible moment – only underscores the Debtors' disregard for their fiduciary duties.  Because the Debtors failed to satisfy these duties, we rely on the Court to do so now.

6.      Any analysis of the GSA/MRA Motion must begin with an understanding of what GM is purporting to provide to the Debtors under the proposed amendments to the GSA and MRA, how GM is "paying" for much of what it is providing, and what the Debtors would give to GM in return.  The Debtors assert that GM is making approximately $10.6 billion in net contributions to the Debtors' transformation.  However, the vast majority of the heralded "contribution" is in fact simply GM paying amounts for which it is already liable, and indeed paying less than what it is liable for.

7.      Of the $10.6 billion of "net contributions" the Debtors say that GM is providing under the amended GSA and MRA, approximately $9 billion relates to GM's assumption of hourly pension and OPEB liabilities, *all or substantially all of which GM is already obligated to pay*.  In particular, GM has separate pre-petition benefit guarantees with three major labor unions representing the Debtors' employees – the UAW, the IUE-CWA and the USW, and is obligated

4

to provide pension and OPEB benefits to certain hourly employees represented by those unions if

the Debtors do not do so.  Moreover, GM may already be liable under statute and regulation for

the remainder of the Debtors' pension underfunding liabilities.  The source of that liability

includes, but is not limited to, 29 U.S.C. § 1369, which subjects a person and the members of its

controlled group to liability if a principal purpose of a transaction  was to evade or avoid liability

under ERISA.[1]  GM's spin-off of Delphi and its pensions may well be such a liability-creating

transaction.

8.      Furthermore, GM is not really paying for the assumption of any of the pension

liabilities.  The currency that GM is using to pay for its assumption of the Debtors' hourly

pension obligations under section 414(l) of the Internal Revenue Code (the "Section 414(l)

Transfer") is not cash from its coffers.  Rather, GM is using the multi-billion overfunding in its

own pension plans to cover the pension liabilities that are being transferred by the Debtors.  GM

cannot use its pension overfunding for any purpose other than covering pension and related

attrition liabilities.  For example, GM cannot withdraw any amount of overfunding and use it to

cover its own liabilities, or for its operations in any way.  However, were GM to incur liabilities

under its benefit guarantees, or by virtue of statutory or regulatory claims, GM would be required

to pay those liabilities from its own pocket.  Thus, not only is GM simply taking care of

obligations for which it is already liable, it is using the Debtors' assistance to satisfy its liabilities

---

[1]  29 U.S.C. § 1369(a) provides as follows:

"[t]reatment of transactions to evade liability. If a principal purpose of any person in entering into any transaction is
to evade liability to which such person would be subject under this subtitle and the transaction becomes effective
within five years before the termination date of the termination on which such liability would be based, then such
person and the members of such person's controlled group (determined as of the termination date) shall be subject to
liability under this subtitle in connection with such termination as if such person were a contributing sponsor of the
terminated plan as of the termination date. This subsection shall not cause any person to be liable under this subtitle
in connection with such plan termination for any increases or improvements in the benefits provided under the plan
which are adopted after the date on which the transaction referred to in the preceding sentence becomes effective."

NY\1452198.8

to the Debtors without spending any of its own money.  If anything, rather than receiving an allowed administrative expense claim, GM should pay the Debtors for the tremendous value that they are enabling GM to unlock.  Even GM acknowledges that the Section 414(l) Transfer is a benefit to it, because it should ultimately provide GM with cash for its operations that it otherwise would not be able to use, and GM may be able to avoid incurring billions more in liabilities as a result of the benefit guarantees and its potential statutory and regulatory liability.

9.       The remaining amounts being paid by GM are likewise simply repayments (and inadequate ones at that) of losses borne by the Debtors.  Most conspicuously, GM is paying over $1 billion to compensate the Debtors for the fact that GM has been forcing the Debtors to sell parts to GM below cost and to partially offset the labor obligations GM had foisted upon the Debtors.  This payment – indeed the entire $10.6 billion – must be compared against the losses that Delphi has incurred from the moment that GM spun it off.  Since these chapter 11 cases were filed, the Debtors have suffered net losses in excess of $12.3 billion, at least a substantial majority of which relates to their relationship with GM.  Moreover, between 1999 and 2005, the Delphi enterprise's net losses were another over $4 billion, again primarily derived from the parts being sold to GM.  Viewed in that light, the entire $10.6 billion represents simply a partial payment of the damages that GM has inflicted on the Debtors through its ruinous control which permitted it to compel Delphi to sell parts to GM at a loss.

10.      GM realizes other benefits from the amended GSA and MRA.  GM continues to need Delphi to produce its automotive parts.  Without Delphi, GM cannot manufacture automobiles, so transactions that prolong Delphi's life thus benefit GM.  In light of this, the amended GSA and MRA are an incredibly good deal for GM, even without the allowed administrative expense and unsecured claims or the immediate release.

NY\1452198.8

11.     Yet GM was not content simply to take advantage of the Debtors to allow it to escape from massive liability for a fraction of its exposure.  It went one (very large) step further and compelled the Debtors to pay GM for the privilege of helping GM out.  The Debtors have agreed to provide GM with not one claim but two, most extraordinarily a $2.055 billion administrative expense claim, and then topped that off with an immediate general release.  Astoundingly, while the Debtors' own documents demonstrate that they recognized that accelerating the effectiveness of the release was neither obvious nor a foregone conclusion, nor even a reasonable business decision.  Nonetheless, it was the Debtors who first offered to do so, and then withheld that information from the Committee.[2]  The Debtors could have fought to preserve that crucial piece of leverage, but instead handed it to GM before GM even asked.  It appears that the Debtors simply gave GM what it wanted.  This either is a sign of GM's control over the Debtors, or the Debtors' inability to bargain effectively.

12.     The amount of GM's allowed administrative expense claim was purportedly calculated solely based on the amount of the liabilities transferred to GM through the 414(l) Transfer in excess of those covered by the benefits guarantees that GM provided to the unions.  *See* GSA/MRA Motion at ¶ 75.  Thus, the Debtors admit that GM is not receiving the administrative expense claim on account of any other consideration to be provided by it under the amended GSA and the amended MRA.  In light of the facts that (a) GM already is obligated to assume most (if not all) of the Debtors' pension obligations, (b) the Section 414(l) Transfer will unlock the value of GM's pension overfunding, (c) GM is not using any of its cash in

---

[2]  Some of the Debtors' witnesses have either stated or implied that the acceleration of the release was so obvious that the Committee should have understood that it would be part of the deal whether or not the Debtors explicitly said as much.  However, while the existence of a release was certainly obvious, it is by no means obvious or necessary that any new deal would involve an acceleration of the timing of the release.  Indeed, other of the Debtors' witnesses understood that changing the timing of the release was not at all obvious.

NY\1452198.8

connection with the Section 414(l) Transfer, (d) GM will be able to avoid certain litigation if the

Section 414(l) Transfer is completed, and (e) GM's actions since the spin-off have been a

primary cause for the pension underfunding liabilities and OPEB obligations that the Debtors

need to shed, there is no basis for GM to have a $2.055 billion administrative expense claim or a

$2.5 billion allowed general unsecured claim against the Debtors, let alone a release.

13.     By granting GM an allowed administrative expense claim and an immediate

release, the Debtors have abdicated control of their reorganization to GM without even having

prepared and filed a revised plan of reorganization.  To exit from chapter 11, the Debtors will

need to (among other things) obtain exit financing, run a successful rights offering in which

creditors invest more money in the Debtors, and extend or refinance its DIP Facility.  While the

Debtors may believe that they are getting all the support they need from GM under the proposed

amendments to the GSA and the MRA, there is absolutely no basis for the Debtors to assume

that they can confirm a plan without additional GM support, particularly given the state of

today's credit markets.  The Debtors simply cannot know whether a plan can be consummated in

the current market, and GM has concerns – even under the proposed amendments to the GSA

and the MRA – that the Debtors may emerge from bankruptcy.  Because of the allowed

administrative expense claim and the immediate general release, however, the Debtors would

have ceded any leverage they have against GM to obtain additional support later.

14.     If any events happen in the future that reduce the Debtors' value, 100% of that

reduction will be borne by the unsecured creditors, until their recoveries reach zero.  As just two

examples, the Debtors may be unable to obtain exit financing, or the costs to the Debtors of

producing goods to GM might significantly increase.  The ultimate effect of the amendments to

the GSA and the MRA very likely could be the elimination of any potential recovery by

NY\1452198.8

unsecured creditors in connection with the Debtors' restructuring. Wiping out recoveries to

unsecured creditors is not consistent with the Debtors' fiduciary duties.

15.    The amendments to the GSA and MRA are an improper *sub rosa* plan, as they set

many of the crucial terms of any plan of reorganization. The Debtors are seeking to freeze

critical elements of a plan into place and to give GM extraordinary control over the plan process.

The amendments to the GSA and the MRA are a *sub rosa* plan because they (a) state exactly

what GM will receive under a plan of reorganization and (b) provide that if there is any

inconsistency with respect to the subject matters set forth in the amended GSA and the amended

MRA (*i.e.*, the entire relationship between GM and the Debtors) between a chapter 11 plan and

the amended GSA and amended MRA, the amended GSA and amended MRA would trump the

plan. Thus, no plan can be consummated unless it complies with the requirements for such plan

described in the amended GSA and amended MRA.

16.    The Debtors try to rationalize their deal by pleading that they must enter into a

deal – any deal – with GM as soon as possible to produce a meaningful stakeholder recovery.

The Debtors, by waiting until the last possible moment to reach a deal with GM, have presented

to their unsecured creditors and this Court a Hobson's choice; grant the GSA/MRA Motion or

the Debtors' reorganization prospects would be irreparably harmed. It did not (and does not)

have to be this way. More than five months ago, the Old Chapter 11 Plan failed to become

effective because the so-called "plan investors" who were supposed to fund the Debtors' exit

from chapter 11 walked away from their obligations. During those five months, two important

deadlines loomed ever closer: (a) the September 30, 2008 deadline to document a Section 414(l)

Transfer on an economically efficient basis, and (b) the maturity of its post-petition debtor-in-

possession credit facility (the "<u>DIP Facility</u>"). The Debtors have always been aware of these

NY\1452198.8

deadlines, yet allowed that time to pass without sufficient progress in negotiations with GM, and without availing themselves of the leverage against GM at their disposal.

17.     GM undoubtedly was aware of the Debtors' urgent need to alter the terms of their supply relationship with GM, to address the bloated legacy pensions and OPEB obligations with which GM saddled the Debtors and to emerge from chapter 11 expeditiously.  However, GM had an incentive to stall because it benefited from the below-cost pricing at which it was purchasing parts from the Debtors, pricing that largely caused the billions of dollars in losses the Debtors were suffering in their North American operations.  As the days passed, and the last days for the most efficient Section 414(l) Transfer approached, GM's bargaining power became ever stronger.  GM used this to its full advantage, refusing for weeks on end to even sit at the negotiating table.  When it did decide to negotiate, it made harsh demands in exchange for the alleged "new value" it would provide under an amended GSA and MRA.  In the context of a negotiation between two typical parties with relatively equal bargaining power, one might call GM's behavior "good, old-fashioned hard bargaining."  But in light of the history and current state of GM's dominance over Delphi, GM's behavior is nothing less than outrageous.

18.     This is not to say that Delphi's management and board were powerless against GM, or that they did not know how to use leverage against GM when they wanted to use it – as the Debtors' March 2006 motion to reject certain executory contracts with GM indicates.  In fact, the Debtors had ample tools at their disposal to assert appropriate negotiating leverage over GM.  These included, but were not limited to, (a) repricing under expired and expiring supply contracts between the Debtors and GM, (b) prosecuting an amended motion to reject unprofitable executory contracts with GM, (c) requiring accelerated payment terms from GM and (d) asserting the Debtors' estates' causes of action against GM.  In light of the importance to the

10

Debtors of documenting a Section 414(l) Transfer by September 30 and exiting chapter 11 by December 31, and in light of GM's refusal to negotiate in good faith, one would have expected a management and board that had their fiduciary duties to unsecured creditors in mind to have used some or all of these levers.  The Debtors did not do so.  Despite the Committee's persistent urging, the Debtors simply failed to take any concrete action to increase their negotiating leverage against GM in the months leading up to the present day.

19.    Making matters worse, the Debtors kept the Committee in the dark about some of the most important elements of the deal being negotiated with GM, depriving the Committee of any opportunity to have its voice heard.  Most importantly, the Debtors failed to inform the Committee about the immediate general release (not contingent upon the effective date of a chapter 11 plan) until less than two weeks before they filed the GSA/MRA Motion, and then only informing the Committee about the release after the deal was done.  During an August 25, 2008 meeting among the Committee's counsel, the Debtors and their counsel to discuss the status of the negotiations between the Debtors and GM, the Debtors informed the Committee's counsel that GM likely would receive an allowed administrative expense claim under the GSA and MRA amendments.  The Committee's counsel objected to the granting of any allowed administrative expense claim to GM.  Never did the Debtors bother to mention the issue of an immediate general release in favor of GM, even though the Debtors have acknowledged in depositions and documents that the issue of an immediate release had been discussed between the Debtors and GM long before that time, and indeed that it was the Debtors themselves that had offered it up.  The Debtors did not inform the Committee that the issue of an immediate release was under discussion until about a week later.  The first time the Committee's counsel received drafts of the amendments to the GSA and the MRA was just days before the GSA/MRA

11

Motion was filed, and they were presented to the Committee's counsel simply for informational purposes. The Committee's comments were not sought or welcomed. In light of the Debtors' fiduciary duties to unsecured creditors, the Debtors' actions are inexcusable.

20.     The Debtors purport to cloak the entire transaction under the mantle of a Rule 9019 settlement of claims between them and GM. Yet they provide this Court with only a cursory review of the clams that the estates have, and certainly insufficient information to allow this Court to evaluate whether a release of those claims in exchange for the purported consideration begin provided is reasonable. Given the illusory nature of that consideration, the reason for the lack of detail is clear – this transaction would not survive such scrutiny. The Debtors cannot avoid the facts, however. They cannot avoid the facts that they have capitulated to GM's demands (or, in the context of the acceleration of the timing of the release, gratuitously made the offer), and have agreed to pay GM for the privilege of helping GM avoid massive liability. This Court should not allow the Debtors to abdicate their duties and responsibilities in that fashion.

## **BACKGROUND**

21.     On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On October 14, 2005, the three remaining Debtors also filed voluntary petitions.

22.     The Committee was appointed nine days after the Petition Date, on October 17, 2005.[3] Shortly thereafter, the Committee selected Latham & Watkins LLP as its counsel, Mesirow Financial Consulting LLC as its financial advisor and Jefferies & Company, Inc. as its

---

[3] The current members of the Committee are: (a) Capital Research and Management Company; (b) Freescale Semiconductor, Inc.; (c) IUE-CWA; (d) Wilmington Trust Company, as Indenture Trustee and (e) Tyco Electronics Corporation. The Pension Benefit Guaranty Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America are *ex officio* members of the Committee.

NY\1452198.8

investment banker.  On September 3, 2008, the Committee filed an application to retain Moelis & Company LLC as its co-investment banker, along with Jefferies & Company, Inc.

23.        On December 10, 2007, the Debtors filed the Old Chapter 11 Plan and an accompanying disclosure statement.  This Court entered an order approving the adequacy of the disclosure statement and granting the related solicitation procedures motion on December 10, 2007.  On January 25, 2008, this Court entered an order confirming the Old Chapter 11 Plan (as modified), which became a final order on February 4, 2008.

24.        On April 4, 2008, the plan investors purported to terminate that certain Equity Purchase and Commitment Agreement, and the Old Chapter 11 Plan has not become effective. Because the Old Chapter 11 Plan has not become effective, neither has the current GSA and MRA between the Debtors and GM.

25.        On September 12, 2008, the Debtors filed the GSA/MRA Motion, in which the Debtors seek to enter into amendments to the GSA and the MRA pursuant to sections 363 and 503(b)(1) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Under the proposed amendments, among other things, GM would assume financial responsibility for Delphi's hourly OPEB and approximately $3.4 billion of net pension liability for Delphi's hourly pension plan under a Section 414(l) Transfer.  In exchange, the Debtors have agreed to grant GM, among other things, an allowed $2.5 billion allowed unsecured claim, an allowed $2.055 billion allowed administrative expense claim, and an immediate release of all of the Debtors' estates' claims and causes of action against GM.

NY\1452198.8

## LEGAL STANDARDS

### I.    Modification of a Confirmed Chapter 11 Plan

26.    Section 1127 of the Bankruptcy Code is the sole basis for modifying a chapter 11 plan that already has been confirmed but has not been substantially consummated. *See, e.g.*, *In re Doral Center, Inc. v. Ionosphere Clubs (In re Ionosphere Clubs)*, 208 B.R. 812, 816 (S.D.N.Y. 1997); *Rickel & Assoc., Inc.*, 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001). Courts may not modify a plan (or, as discussed below, plan-related documents) under section 105 of the Bankruptcy Code, because that would produce a result at odds with the specific provisions of section 1127 of the Bankruptcy Code. *See Rickel*, 260 B.R. at 678.

27.    Section 1127 of the Bankruptcy Code states, in relevant part:

> (b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.
>
> (c) The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

11 U.S.C. § 1127. Modification of a confirmed plan is permitted if: (a) it is done by a "proponent of a plan or the reorganized debtor," (b) it occurs before "substantial consummation" of the plan; (c) the plan as modified meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; (d) the proponent complies with section 1125; (e) circumstances warrant such modification; and (f) the court, after notice and a hearing, confirms the modified plan under section 1129 of the Bankruptcy Code.

28.    The requirements of section 1127 of the Bankruptcy Code apply not only to amendments to a plan itself, but also to amendments to plan-related documents. *See, e.g.*,

*Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.)*, 982 F.2d 721, 748 (2d Cir. 1992)

(stating that statutory limitations on modifying a substantially consummated plan cannot be

circumvented by modifying a plan-related document); *Ionosphere Clubs*, 208 B.R. at 816; *Rickel

& Assoc.*, 260 B.R. at 677.  Thus, because the original GSA and MRA are exhibits to the Old

Chapter 11 Plan, and indeed are explicitly "integral" to the Old Plan, they can only be modified

in accordance with section 1127 of the Bankruptcy Code.

29.    "Modification" is not defined in section 1127 of the Bankruptcy Code.  *See, e.g.*,

*State Government Creditors' Committee For Property Damage Claims v. McKay (In re Johns-

Manville Corp.)*, 920 F.2d 121, 128 (2d Cir. 1990); *Cohen v. Tic Fin. Sys. (In re Ampace Corp.)*,

279 B.R. 145 (Bankr. D. Del. 2002).  In the absence of a definition, courts have focused on the

distinction between a "modification" and a "clarification" of a plan.  If the change is simply a

clarification, then the requirements of section 1127 of the Bankruptcy Code do not apply.  If the

change is a modification, however, then the requirements of section 1127 must be met.

30.    The Second Circuit has held that a "modification" occurs when a payment right is

altered.  *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d at 748.  Another court in this district

held that a modification occurs when the legal relationships among the debtor and its creditors

and other parties in interest are altered.  *See Ionosphere Clubs*, 208 B.R. at 816.   Another court

stated that a modification occurs if a material term of the plan is altered.  *See, e.g.*, *Enterprise

Financial Group, Inc. v. Curtis Mathes Corp.*, 197 B.R. 40 (E.D. Tex. 1996).

## II.    **Bankruptcy Rule 9019**

31.    Bankruptcy Rule 9019 requires that a debtor in possession obtain approval of the

bankruptcy court before entering into a compromise or settlement agreement.  See Fed. R. Bankr.

NY\1452198.8

P. 9019(a) (providing that "[o]n motion by the [debtor in possession] and after notice and a

hearing, the court may approve a compromise or settlement.").

32.    Courts have developed standards to evaluate if a settlement is fair and equitable,

and, to that end, courts in the Second Circuit have set forth factors for approval of settlements

based on the original framework announced in *Protective Comm. for Indep. Stockholders of TMT

Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968).  Those

factors are: (a) the balance between the litigation's possibility of success and the settlement's

future benefits; (b) the likelihood of complex and protracted litigation, including the difficulty in

collecting on the judgment; (c) the paramount interests of the creditors, including each affected

class's relative benefits and the degree to which creditors either do not object to or affirmatively

support the proposed settlement; (d) whether other parties in interest support the settlement; (e)

the competency and experience of counsel supporting, and the experience and knowledge of the

bankruptcy court judge reviewing, the settlement; (f) the nature and breadth of releases to be

obtained by officers and directors; and (g) the extent to which the settlement is the product of

arm's length bargaining.  *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re

Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).

33.    The proponent of a settlement bears the burden of establishing that the proposed

settlement is "in the range of reasonableness and in the best interest of the estate and creditors."

*In re Remsen Partners, Ltd.*, 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003) (Drain, J.); *see also In re

Matco Elecs. Group, Inc.*, 287 B.R. 68, 76 (Bankr. N.D.N.Y. 2002).  As one court stated, the

proponent must set forth the facts in "sufficient detail that a reviewing court could distinguish it

from 'mere boilerplate approval' of the trustee's suggestions."  *In re Lion Capital Group*, 49

B.R. 163, 176 (Bankr. S.D.N.Y. 1985), citing *Matter of Boston & Providence Railroad Corp.*,

673 F.2d 11, 12 (1st Cir. 1982).  The decision whether to approve or reject a settlement lies

within the sound discretion of the bankruptcy court.  *See In re Remsen Partners*, 294 B.R. at 565;

*see also Matco Elecs. Group, Inc.*, 287 B.R. at 75.  A court is not obligated to approve a

settlement at the lowest level of reasonableness.  *See, e.g.*, *In re Lion Capital Group*, 49 B.R. at

176.

34.    While compromises are favored in bankruptcy, courts have made clear that "it is

essential that every important determination in reorganization proceedings receive the informed

independent judgment of the bankruptcy court."  *See In re Remsen Partners*, 294 B.R. at 564

(citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390

U.S. 414, 424 (1968)).  To reach an informed and independent judgment as to whether a

proposed compromise is fair and equitable, the court must apprise itself of all facts necessary for

an intelligent and objective opinion of the probabilities of ultimate success if the claim is

litigated.  *See id.*  The court may not simply rubber stamp the recommendation of the debtor, but

instead must make an independent, full and fair assessment of the wisdom of the proposed

compromise.  *See In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 362 (Bankr.

S.D.N.Y. 2002); *Nellis v. Shugrue*, 165 B.R. 115, 121 (S.D.N.Y. 1994).

### A.    Compliance With the Absolute Priority
### Rule is the Dispositive Factor in the Second Circuit

35.    Courts should only approve settlements that are "fair and equitable and in the best

interest in the estate."  *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster

Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *see also Nellis*, 165 B.R. at 121.  Courts

have noted that a basic notion of fairness is contravened if the court looks only to the fairness of

the settlement as between the debtor and the settling claimant, and ignores the rights of third

parties that are not a party to the settlement. *See, e.g.*, *Cullen v. Riley (In re Masters Mates &*

*Pilots Pension Plan*), 957 F.2d 1020, 1026, 1031 (2d Cir. 1992) (holding that "where the rights

of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling

parties is not enough to earn the judicial stamp of approval," and requiring a determination that

"no one has been set apart for unfair treatment."); *Feld v. Zale Corp.*, *(In re Zale Corp.)*, 62 F.3d

746, 754 (5th Cir. 1995); *In re Quality Beverage Co. Inc.*, 181 B.R. 887, 894 (Bankr. S.D. Tex.

1995).

36.     Compliance with the Bankruptcy Code's priority scheme is the most important

factor for the bankruptcy court to consider when determining whether a settlement is "fair and

equitable" under Rule 9019.  The court must be certain that parties to a settlement have not

employed a settlement as a means to avoid the priority strictures of the Bankruptcy Code.  *See*

*Iridium Operating LLC*, 478 F.2d at 464.  In fact, in the chapter 11 context, whether a

settlement's distribution plan complies with the Bankruptcy Code's priority scheme will often be

the dispositive factor.  The bankruptcy court may endorse a settlement that does not comply in

some minor respects with the absolute priority rule, but only if the parties to the settlement

justify, and the court clearly articulates the reasons for approving, a settlement that deviates from

the absolute priority rule.  *See id.* at 464-65.

37.     In *Iridium*, the bankruptcy court approved a settlement agreement between the

creditors' committee and the debtors' secured lenders, in which $37.5 million of the estate's cash

would be distributed to a litigation vehicle created for the committee to sue Motorola, Inc., the

debtor's former parent.  Any cash remaining in the vehicle at the end of the litigation would be

distributed to unsecured creditors.  Motorola (a significant administrative expense claimant)

opposed the settlement, arguing that it circumvented the absolute priority rule by providing a

distribution of the excess cash in the litigation vehicle to unsecured creditors before senior

creditors (*i.e.*, holders of administrative expense claims) were paid in full.

38.     Even though the Second Circuit noted that nearly all the *TMT Trailer Ferry*

factors weighed in favor of the settlement's approval and that almost all the parties supported the

settlement, it vacated the bankruptcy court's order approving the settlement, stating that the

bankruptcy court failed to assess the settlement proponents' justification for distributing any

leftover funds in the litigation vehicle to the junior creditors at the completion of the Motorola

litigation. *See id.* at 466.  As discussed *infra*, the amendments to the GSA and the MRA violate

the absolute priority rule, and the Debtors do not justify the departure of the terms of those

agreements from the absolute priority rule.  Thus, the GSA/MRA Motion cannot be granted.

### B.     *TMT Trailer Ferry* Standards

39.     Assuming that a proposed settlement passes muster under *Iridium*, it must survive

scrutiny under the remaining factors in the *TMT Trailer Ferry* test.  One of the most important of

those factors is the paramount interests of creditors.  Though creditors' views on a settlement are

not binding, courts give particularly great weight to the paramount interest of creditors in

considering whether a settlement meets the standards of Bankruptcy Rule 9019.  *See, e.g.*, *In re*

*Remsen Partners*, 294 B.R. at 566 (stating that, "other than an assessment of the merits," the

interests of creditors are "the most important consideration"); *In re Matco Elecs. Group*, 287

B.R. at 77 (describing the creditors' committee's objection to a settlement agreement as a "major

consideration for the Court" in finding that proponents failed to establish that settlement was in

best interests of estate).  A bankruptcy court should carefully consider the reasonable views put

forth in creditors' objections to the settlement.  *See, e.g.*, *Knowles v. Putterbaugh (In re Hallet)*,

33 B.R. 564, 566 (Bankr. D. Me. 1983).  Thus, when deciding whether to approve a settlement,

NY\1452198.8

bankruptcy courts should consider the amount of creditor support for that settlement as a factor

bearing on the wisdom of the compromise. *See In re Foster Mortgage Corp.*, 68 F.3d at 917

(holding that the bankruptcy court abused its discretion "by failing to show adequate deference to

the interests of the overwhelming majority of creditors"); *In re Lloyd, Carr & Co.*, 617 F.2d 882,

891 (1st Cir. 1980) (stating that the court was "concerned by the absence of creditors' support –

and by the strength of creditor opposition.").

40.    In reviewing a settlement agreement, the bankruptcy court must also assess the

balance between the litigation's possibility of success and the settlement's future benefits. *See

Remsen Partners*, 294 B.R. at 567-68; *In re Carla Leather,* 44 B.R. 457, 466 (Bankr. S.D.N.Y.

1984). Accordingly, the proponent of the settlement must provide a reasonably detailed

explanation of its reasons for agreeing to such a compromise, particularly where (as here)

creditors probably will receive little or no benefit from the proposed settlement. *See Remsen

Partners*, 294 B.R. at 567.

41.    In determining whether to approve a proposed settlement, courts also consider

whether it was negotiated with an insider of the debtor. If a proposed settlement was negotiated

with an insider, courts will subject it to much closer scrutiny because of the potential for fraud or

collusion. *See, e.g.*, *In re Foster Mortgage Corp.*, 68 F.3d at 918; *In re Drexel Burnham

Lambert Group Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991); *In re The Present Co., Inc.*, 141

B.R. 18, 23 (Bankr. W.D.N.Y. 1992). As discussed below, GM is an insider of the Debtors.

## III.    Section 363 of the Bankruptcy Code

### A.    There Can Be No Valid Business Justification for a Transaction Where the Debtor had Breached its Fiduciary Duties

42.    In justifying the proposed amendments to the GSA and MRA, the Debtors seek to

hide behind the relatively lenient standards of the business judgment rule. However, given the

NY\1452198.8

failure by the Debtors to use any of the leverage available to them, and their unreasoned

capitulation to the demands of GM, they are not entitled to the benefits of that rule.

43.     The officers and directors of a debtor in possession owe the same fiduciary duties

as a trustee in bankruptcy.  *See* 11 U.S.C. 1107(a); *see also Commodity Futures Trading*

*Comm'n v. Weintraub*, 471 U.S. 343, 105 S. Ct. 1986, 85 L. Ed. 2d 372 (1985).  A trustee in

bankruptcy owes a duty of care and a duty of loyalty to the corporation and its shareholders,

similar to a director's fiduciary duties, but also owes those same duties to the creditors of the

bankrupt corporation.  *See, e.g.*, *Schepps Food Stores*, 160 B.R. at 797-98.  Stated differently, a

paramount duty of a debtor in possession in a bankruptcy case is to act on behalf of the

bankruptcy estate, that is for the benefit of the creditors.  *See, e.g.*, *Official Committee of*

*Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

44.     When a debtor has violated its fiduciary duties, as a matter of law, any business

justification that the debtor might provide for a proposed use, sale or lease of property under

section 363(b) of the Bankruptcy Code cannot be a sound business justification.  *See, e.g., Mims*

*v. Kennedy Capital Management, Inc. (In re Performance Nutrition Inc.)*, 239 B.R. 93, 112

(Bankr. N.D. Tex. 1999).

> **B.      Even if The Debtors Did Not Breach Their Fiduciary**
> **Duties, Transactions With Insiders are Subject to Heightened Scrutiny**

45.     It is well-established that the use or disposition of estate assets under section

363(b) of the Bankruptcy Code to benefit insiders is subject to heightened scrutiny.  *See, e.g.*,

*Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335

B.R. 22, 28 (S.D.N.Y. 2005).  When the debtor is a corporation, an insider includes a "person in

control of the debtor," such as GM.  11 U.S.C. § 101(31)(B)(iii).  The list set forth in section

21

101(31)(B) of "insiders" where the debtor is a corporation is not exclusive.  *See* 11 U.S.C. §

101(31) (stating that "the term 'insider' includes …") (emphasis added).

46.    In applying the term "insider," courts generally rely on the legislative history of

the "insider" definition, which makes clear that the term covers "one who has a sufficiently close

relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing

at arms length with the debtor." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499-

500 (S.D.N.Y. 1994), citing S. Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), reprinted in 1978

U.S.C.C.A.N. 5787, 5810, 6269; *see also DeRosa v. Buildex Inc. (In re F & S Central Mfg.

Corp.)*, 53 B.R. 842, 848 (Bankr. E.D.N.Y. 1985) (stating that insiders include those with

"special influence over the debtor").  For example, courts have held that a creditor who has a

special relationship with the debtor through which it can compel payment of its debt has

sufficient control over the debtor to be deemed an insider.  *See, e.g.*, *In re F & S Central Mfg.

Corp.*, 53 B.R. at 848; *In re Missionary Baptist Foundation of America Inc.*, 712 F.2d 206, 210

(5th Cir. 1983); *In re Montanino*, 15 B.R. 307, 310 (D. N.J. 1981).  In determining whether a

creditor is an "insider" of a debtor, courts have considered a wide variety of factors, including

whether the creditor: (a) received information from the debtor that was not available to other

creditors, shareholders and the general public; (b) attempted to influence decisions made by the

debtor; (c) selected new management for the debtor; (d) had special access to the debtor's

premises and personnel; (e) was the debtor's sole source of financial support; and (f) generally

acted as a joint venturer or prospective partner with the debtor rather than an arms length

creditor.  *See Pan Am Corp.*, 175 B.R. at 500, citing *In re Allegheny Int'l, Inc.*, 118 B.R.

282 (Bankr. W.D. Pa. 1990).

NY\1452198.8

47.    Here GM was clearly an insider of the Delphi.  Almost every one of the factors cited by *Pan Am Corp.*, and *In re Allegheny Int'l, Inc.* in determining insider status is present in this case.  Since Delphi's spin-off from GM, GM (a) has received information from the Debtors that was not available to other creditors, shareholders and the general public; (b) has had substantial influence over decisions made by the Debtors; (c) had special access to the Debtors' premises and personnel; and (d) was either the sole source or one of few sources of financial support for the Debtors (particularly recently).  The manifestations of this control are clear. Historically and presently, GM used its overwhelming leverage against the Debtors to force them to depress the prices they charged to GM, to assume GM's liabilities, and to continue paying OEM-level wages, to such a degree that the Debtors have been losing billions of dollars per year on their sales to GM in North America.  In addition, GM has caused Delphi to enter into contracts that gave GM both continuing access to the Debtors' business information and continuing control over important business decisions.  The complaint that the Committee has prepared and filed under seal with this Court in connection with its STN motion contains numerous other supported allegations of GM's control over the Debtors.

48.    Transactions with insiders are not per se prohibited under section 363 of the Bankruptcy Code, but "they are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse." *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997); *In re Wingspread Corp.*, 92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988); *see also Gross v. Russo (In re Russo)*, 762 F.2d 239, 243 (2d Cir. 1985) (stating that "[t]he Bankruptcy Court should be afforded the opportunity to determine whether there is a meaningful possibility that [the insider] would be taking unfair advantage of confidential information" in consummating transaction).

## OBJECTION

### I.  The GSA and the MRA Cannot be Amended by Motion

49.    The requirements of section 1127 apply even where, as the Debtors assert is the case here, the plan documents in question expressly contemplate the possibility of amendments. *Ionosphere Clubs, Inc.*, 208 B.R. at 816 ("The fact that the lease in this case … contemplated consensual modifications by the parties is of no consequence, as the surrender of the right of first refusal was an integral part of the reorganization plan and confirmation order."). The original GSA and MRA were Exhibits 7.20(a) and 7.20(b) of the Old Chapter 11 Plan. Pursuant to the Confirmation Order, the original GSA and MRA were approved, were incorporated into, and comprised an "integral part of", both the Old Chapter 11 Plan and the Confirmation Order. *See* Confirmation Order ¶¶ 1, 58.

50.    The proposed immediate release to GM clearly is a material and substantial modification of the amended GSA and MRA, because it alters the legal relationships among the Debtors, unsecured creditors, and GM. Because of this feature, the amended GSA and MRA is a modification to the Plan, and not simply a clarification. *See, e.g.*, *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d at 748; *Ionosphere Clubs*, 208 B.R. at 816. The Debtors do not even contend that the have complied with the requirements of section 1127 of the Bankruptcy Code. As a result of the proposed immediate release, the GSA/MRA Motion violates section 1127 of the Bankruptcy Code and should be denied.

### II.  The GSA/MRA Motion Cannot Be Approved Under Bankruptcy Rule 9019

51.    Though a comprehensive settlement with GM with respect to the issues facing the Debtors certainly is desirable in principle, it does not follow that any settlement with GM should be approved regardless of its terms. The amendments to the GSA and the MRA clearly fail to

24

meet the standards of Bankruptcy Rule 9019. Indeed, as discussed below, the factors that courts

regularly consider in analyzing a proposed settlement under Bankruptcy Rule 9019 weigh

heavily against approval of the amended GSA and MRA.

>    **A.    The Terms of the Amended GSA and MRA Violate the Absolute
>    Priority Rule, and the Debtors Have Not Justified That Violation**

52.    The Bankruptcy Code grants priority to certain administrative expenses, such as

the actual, necessary costs and expenses of preserving the estate. *See* 11 U.S.C. §§ 503(b)(1)(A);

507(a)(2). A debt is not entitled to administrative expense treatment merely because the right to

payment arises after the debtor-in-possession has begun managing the debtor's affairs. *See*

*Matter of Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984); *Amalgamated Ins. Fund v. McFarlin's,*

*Inc.,* 789 F.2d 98, 101 (2d Cir. 1986). Instead, for a claim to be given administrative expense

status, two elements must be satisfied. First, the claim must arise "out of a transaction between

the creditor and the bankrupt's trustee or debtor-in-possession." *McFarlin's,* 789 F.2d at 101.

Second, the claim's consideration must be "both supplied to and beneficial to the debtor in

possession in the operation of the business." *Id.* at 101; *see also Pension Benefit Guar. Corp. v.*

*Sunarhauserman, Inc. (In re Sunarhouserman, Inc.)*, 126 F.3d 811, 816 (6th Cir. 1997). It is

axiomatic that the party seeking administrative expense status bears the burden of establishing its

entitlement to that status. *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 482,

489 (Bankr. S.D.N.Y. 1991).

53.    Here, GM is *already* liable for the vast majority of the claims that it is assuming

or paying under the amended GSA and MRA, and which constitute the alleged "new value" that

it is providing under the amended GSA and MRA. GM has pre-petition contractual obligations

to assume a substantial part of the Debtors' hourly pension and OPEB liabilities. In addition,

GM faces possible statutory and regulatory obligations to assume the rest of the Debtors' pension

25

underfunding liabilities.  The source of that liability includes, but is not limited to, 29 U.S.C. §

1369, which subjects a person and the members of its controlled group to liability if a principal

purpose of a transaction  was to evade or avoid liability under ERISA.

54.     Moreover, much (if not all) of the remaining amounts being provided by GM

represent nothing more than a partial repayment of losses that GM has inflicted on the Debtors

through forcing the Debtors to sell it parts below cost.    Simply paying amounts already owed is

not and cannot be a "benefit" to the estates that justifies any administrative expense claim, much

less an administrative expense claim of this magnitude.

55.     Yet Delphi has nonetheless agreed to provide GM with an administrative expense

claim to which GM is not entitled.  That claim would allow GM to receive distributions of value

in an absolutely staggering amount, likely sufficient to ensure that no value remains for

unsecured creditors.  In essence, the proposed transaction would allow GM to receive over $2

billion in value ahead of unsecured creditors when at best any claim that GM might have is on

par with those creditors.  By allowing GM to bootstrap itself in that fashion, the amendments to

the GSA and MRA would violate the absolute priority rule.

56.     This violation is further compounded by the distinct possibility that any valid

claims that GM does have are subject to equitable subordination.  Based upon the facts and

claims that the Debtors have included in their own complaint, the Committee has already made

that very assertion.  Yet the Debtors completely ignore that possibility in the GSA/MRA Motion.

This Court must be given sufficient information to evaluate this issue, for if the Committee's

assertion is correct, the amended GSA and MRA would constitute an even more disturbing

violation of absolute priority – paying a subordinated claim before senior claims have received a

penny.

26

57.      Because the amendments to the GSA and the MRA violate the absolute priority rule, the Debtors must come before this Court with specific and credible grounds to justify the deviation of the terms of the settlement from the absolute priority rule, so that the court can carefully articulate its reasons for approving the agreement. *See Iridium Operating LLC*, 478 F.3d at 466.  The Debtors have failed to provide justification for the violation of the absolute priority rule in the GSA/MRA Motion.  While they do describe the importance of effectuating a Section 414(l) Transfer by September 30, they do not take into account GM's pre-existing obligations with respect to the Debtors' pension underfunding liabilities, nor do they state why a $2.055 billion administrative expense claim on account of the Section 414(l) Transfer is necessary and appropriate.  Accordingly, in accordance with *Iridium*, the GSA/MRA Motion must be denied.

**B.      The Amended GSA and Amended MRA Do Not Take
Into Account the Paramount Interests of the Debtors' Creditors**

58.      Courts rely heavily on creditor support for a compromise as a key consideration when deciding whether or not to approve a settlement.  *See, e.g.*, *Reiss v. Hagmann*, 881 F.2d 890, 892-93 (10th Cir. 1989); *Nellis*, 165 B.R. at 122.  Courts have refused to approve settlements that were supported only by the debtor and insiders and actively opposed by the creditors' committee, where the creditors' committee was not involved in the negotiation of that settlement.  *See, e.g.*, *In re Foster Mortgage Corp.*, 68 F.3d at 918 (vacating lower court's order approving a settlement that was negotiated between a debtor subsidiary corporation and its parent, and that was negotiated without participation by creditors); *In re The Present Co., Inc.*, 141 B.R. at 23 (refusing to approve a proposed settlement in which the only parties supporting it were the debtors and insiders, and in which the creditors' committee was not involved in the negotiation of the settlement).

NY\1452198.8

59.    In this case, the Committee's representatives were not involved in the negotiation of the amended GSA and MRA.  This much is clear in the results of the deal: the Debtors have agreed to put GM in control of the outcome of these cases, with the almost certain result that creditor recoveries will be substantially diminished, if not effectively eliminated.  There is no conceivable way that entering into an agreement that puts creditor recoveries at the mercy of GM serves the paramount interests of those creditors.

**C.    The Debtors Have Not Provided This Court With Enough Information to Evaluate the Estates' Claims Against GM**

60.    Because the amendments to the GSA and the MRA contain an immediate general release of GM, in connection with a Rule 9019 motion seeking authorization of such settlement, this Court must evaluate the claims that the Debtors have against GM, and how valuable those claims could be.  The Debtors have the burden of providing enough information to justify its proposed settlement of their claims against GM.  *See, e.g.*, *In re Lion Capital Group*, 49 B.R. at 190.  They have utterly failed to meet that burden.  In the GSA/MRA Motion, the Debtors provide only a very cursory mention of the estates' significant causes of action and defenses against GM (collectively, the "Claims and Defenses").  Indeed, the GSA/MRA Motion contains only two paragraphs that even mention the Claims and Defenses, simply to mention that it is uncertain whether the Debtors would prevail and that litigating the Claims and Defenses would take time (as though these facts would be unique to this litigation).  The Debtors do not even bother to describe the very complaint that they filed against GM.  That hardly is enough to permit this Court to even begin to evaluate the Claims and Defenses under the Rule 9019 standards, and much more analysis of the Claims and Defenses is necessary for this Court to evaluate whether the settlement is reasonable in light of the strengths and weaknesses of the

NY\1452198.8

Claims and Defenses. The Debtors cannot be permitted to simply say "trust me" and provide this court with absolutely no information to back up their position.

61.    The Committee strongly believes that GM's conduct both before and after the spin-off of Delphi gives rise to significant claims based on, among other things, constructive fraud, breach of fiduciary duty, conspiracy, unjust enrichment, alter ego and equitable subordination that should be asserted against GM by or on behalf of the Debtors.[4] The Claims and Defenses against GM, as set forth in the complaint prepared by the Committee are more than colorable. Indeed the Debtors, in filing their own complaint under seal against GM, already have acknowledged that fact. However, in the GSA/MRA Motion, the Debtors do not even make a cursory attempt to describe these claims so that this Court can evaluate whether the proposed settlement is reasonable. The Debtors have wholly failed to meet their burden of proof under rule 9019 (and, frankly, they do not even try), and as a result cannot satisfy any of the standards under that rule.

## II.    The Amended GSA and the Amended MRA Constitute an Improper *Sub Rosa* Plan

62.    This Court should not approve the GSA/MRA Motion for the separate and independent reason that the amended GSA and the amended MRA constitute an impermissible *sub rosa* plan of reorganization. A debtor may not "short circuit the requirements of a reorganization plan by establishing the terms of the plan *sub rosa*" in connection with a proposed sale or use of assets. *See, e.g.*, *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re*

---

[4]  In light of GM's refusal to negotiate in good faith since the demise of the Old Chapter 11 Plan, the Debtors' failure to prosecute the Claims and Defenses is unjustified because each claim against GM that the Committee has identified are viable claims which, if successful, could recapture billions of dollars for the Debtors' estates and creditors. Also, the equitable subordination of GM's claims against the Debtors would prevent the dilution of the claims of the Debtors' innocent unsecured creditors and of their recoveries on such claims. Despite the benefits of successful litigation against GM, the Debtors instead decided not to pursue their claims against GM. Rather, the Debtors simply decided to negotiate an agreement that provides GM an immediate general release.

NY\1452198.8

*Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) (refusing to permit a sale of

substantially all of the debtors' assets where the terms of that sale "had the practical effect of

dictating some of the terms of any future reorganization plan"); *see also Institutional Creditors*

*of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223,

1227 (5th Cir. 1986) (stating that section 363 of the Bankruptcy Code does not authorize a debtor

and the bankruptcy court to short-circuit the requirements of a reorganization plan by

establishing a *sub rosa* plan); *In re WestPoint Stevens, Inc.*, 333 B.R. 30, 52 (S.D.N.Y. 2005)

(stating that "section 363(b) is not to be utilized as a means of avoiding Chapter 11's plan

confirmation procedures. Where it is clear that the terms of a section 363(b) sale would preempt

or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b)

and should not be approved under that section").

63.    Proposed transactions that have a significant impact on a debtor's reorganization

prospects must be subject to a higher level of scrutiny.  For example, courts must determine

whether the proposed transaction would "improperly and indirectly lock the estate into any

particular plan mode prematurely and without the protection afforded by the procedures

surrounding a disclosure statement and confirmation hearing, in a plan of reorganization."  *In re*

*Public Serv. Co. of New Hampshire*, 90 B.R. 575, 582 (Bankr. D. N.H. 1988) (denying debtor's

proposal to enter into transactions out of ordinary course of business pursuant to which debtor

would transfer management and operational control of nuclear plant to separate corporation).  In

that case, the bankruptcy court noted that:

> "the degree of scrutiny necessarily must be elastic – becoming
> more strict and searching the nearer the transaction gets to the
> heart of the reorganization plan process in terms of channeling that
> process toward any particular plan option."

*Id.*

NY\1452198.8

64.    The prohibition against *sub rosa* plans applies equally to proposed settlements under Bankruptcy Rule 9019. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997) (a debtor in possession cannot enter a settlement "if the result amounts to a *sub rosa* plan of reorganization"); *see also Securities & Exchange Comm'n. v. Drexel Burnham Lambert Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 130 B.R. 910, 926 (S.D.N.Y. 1991); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 884 (Bankr. S.D.N.Y. 1990). The court in *Crowthers*, in determining whether to approve proposed merger transactions, noted that "major pre-confirmation transactions," such as settlements, "raise the concern that the scheme of Chapter 11 will be distorted." *See id.* at 885. Thus, a court must consider not only whether the proponent of the settlement has satisfied the standards of Bankruptcy Rule 9019, but also whether the proposed transaction is a *de facto* plan. *See id.* The court stated that a proposed transaction will not be approved if it constitutes:

> A "creeping" or *de facto* plan if timely objection is made that the transaction, either in fact or in effect, encroaches on a right afforded creditors or equity holders in the Chapter 11 plan process, particularized by the objector. A transaction which would effect a lock-up of the terms of a plan will not be permitted.

*Id.*

65.    At this time, the Debtors have not proposed a plan of reorganization. Yet the amendments to the GSA and MRA lock Delphi into many of the terms of a plan of reorganization. This is not a simple "motion in aid of confirmation" – there is not even a plan to confirm yet. The amendments to the GSA and the MRA lock down exactly what GM will receive under a plan of reorganization (including detailed terms of the preferred stock that GM would receive under a plan), and provide that if there is any inconsistency with respect to the

31

subject matters set forth in the amended GSA and the amended MRA (*i.e.*, the entire relationship between GM and the Debtors) between a chapter 11 plan and the amended GSA and amended MRA, the amended GSA and amended MRA would trump the plan.  No plan can be consummated unless it complies with the requirements for such plan described in the amended GSA and amended MRA.  Thus, the provisions of the amended GSA and amended MRA set many of the crucial terms of any plan of reorganization at this time (a plan that does not exist).

66.    Those facts, combined with the allowed general unsecured claim and the massive administrative expense claim that must somehow be paid in full unless the Debtors propose a plan that strictly complies with the requirements of the amended GSA, mean that it is GM, not Delphi, that will be able to determine exactly what the rest of the plan of reorganization will provide.  All of this is being done on 10 days' notice, with no disclosure statement, and no voting by creditors.

### III.    The GSA/MRA Motion Cannot be Approved Under Section 363(b) of the Bankruptcy Code

67.    The Debtors have breached their fiduciary duties to the estates and unsecured creditors by, among other things, (a) failing to take the concrete steps that were necessary to assert the leverage the estates had against GM after the Old Chapter 11 Plan failed in April, and (b) acquiescing to GM's demands for a multi-billion dollar allowed administrative expense claim and gratuitously offering to accelerate the timing of GM's general release from the estates even though GM was only providing to the Debtors amounts for which it was already obligated

68.    Because there is no plan of reorganization, it is at least possible that the Debtors will need future consideration from GM.  Indeed, in light of the volatility in today's markets, one has to assume that further support will be required from GM to allow the Debtors to emerge from bankruptcy.  With the release already in its hand, GM would have no incentive to agree to

NY\1452198.8

provide such consideration.  In addition, if any events happen in the future that reduces the

Debtors' value, 100% of that reduction will be borne by the unsecured creditors.  Examples of

such potential events include difficulty in getting exit financing, the failure of any rights offering

as part of a plan of reorganization, and changes in the prices for the Debtors' raw materials.

These are all events beyond the Debtors' control.  In breach of their fiduciary duties, the Debtors

have created a situation where their unsecured creditors would bear all of the downside risk of

these and many other possible events.  As a result, their business judgment in entering into the

amendments to the GSA and the MRA is not entitled to any deference at all under section 363(b)

of the Bankruptcy Code.  *See, e.g., In re Performance Nutrition Inc.*, 239 B.R. at 112.

69.    There is another reason that this Court cannot apply the standard section 363(b)

scrutiny to the amended GSA and amended MRA: the agreements are with GM, an insider, and

thus these transactions must be subject to a heightened scrutiny, and the Court cannot simply rely

upon the Debtors' alleged business judgment.  Under such scrutiny, the proposed transaction

simply falls apart.

70.    If the GSA/MRA Motion is granted, GM will have complete control over the

Debtors' plan process, and can dictate what the terms of the plan would be.  GM has exercised its

control over the Debtors to extract a multi-billion dollar allowed administrative expense claim,

coupled with an accelerated release that the Debtors offered up on their own.  GM greatly

benefits from the Section 414(l) Transfer for a host of reasons (*e.g.*, the ability to use its own

pension overfunding to effectuate the transfer; its ability to avoid litigation with the unions, the

Pension Benefit Guaranty Corporation and others relating to Delphi's pension underfunding

liabilities; and the continuation of the Debtors' existence).  Accordingly, there really was no need

for the Debtors to grant GM an allowed administrative expense claim and a general release to get

NY\1452198.8

GM to agree.  It appears that the Debtors gave GM what it wanted, just because GM demanded it – or, in the case of the release, even before GM demanded it.  This either is a sign of GM's control over the Debtors, or the Debtors' inability to bargain effectively with GM.  Either way, the amended GSA and the amended MRA must be subject to greater scrutiny than a typical transaction under section 363(b) of the Bankruptcy Code.

71.     Even if this Court were to determine that the amendments to the GSA and the MRA are subject to the standard scrutiny under section 363(b) of the Bankruptcy Code, for the reasons discussed above, the amendments to the GSA and the MRA are not in the best interests of the Debtors' estates and creditors, and thus cannot survive even that lowered level of scrutiny. *See, e.g.*, *Command Performance Operators, Inc. v. First Int'l Servs. Corp. (In re First Int'l Servs. Corp.)*, 25 B.R. 66, 69 (Bankr. D. Conn. 1982) (refusing to approve an agreement for sale and purchase of shares that "not only subject the debtors' estates to the claims of the defendants, but such approval might deprive the debtors of the right to assert claims against certain defendants …").

72.     The Debtors are at a critical crossroads in their cases.  They have presented the Court with a deal that, if approved, will dramatically reduce, if not eliminate, the possibility of unsecured creditors receiving a meaningful recovery.  By capitulating to GM's demands, the Debtors are abdicating their control over these cases, and putting GM in charge.  GM will, as it has from the beginning, run these cases for its own benefit, without regard to anyone else.  This Court should not countenance such a heavy-handed exercise of brute power.

NY\1452198.8

**WHEREFORE,** the Committee respectfully requests that this Court (a) deny the

GSA/MRA Motion in its entirety, and (b) grant the Committee such relief that it deems just and

proper.

Dated:  September 22, 2008
          New York, New York

LATHAM & WATKINS LLP

By: /s/ Robert J. Rosenberg
     Robert J. Rosenberg (RR-9585)
     Mitchell A. Seider (MS-4321)
     Mark A. Broude (MB-1902)
     Michael J. Riela (MR-7829)
     885 Third Avenue, Suite 1000
     New York, New York 10022
     Telephone:  (212) 906-1200

Counsel for the Official Committee
of Unsecured Creditors

NY\1452198.8