Hearing Date & Time:  September 23, 2008 at 10:00 a.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

<u>DEBTORS' REPLY IN SUPPORT OF FIFTH AIP SUPPLEMENT</u>

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this reply to the limited objection by the official committee of unsecured creditors (the "Creditors' Committee") to the Expedited Fifth Supplement To KECP Motion (Docket No. 213) Seeking Authority To Continue Short-Term At-Risk Performance Payment Program ("AIP") For Second Half Of 2008 (Docket No. 14170), dated September 12, 2008 (the "Fifth Supplement").[1]  Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Fifth Supplement.

1. In its Limited Objection (the sole objection to the Fifth Supplement), the Creditors' Committee does not challenge any aspect of the proposed AIP for the second half of 2008 – except that the Creditors' Committee would have this Court exclude Delphi's 21 most senior executives who are members of the Delphi Strategy Board (the "DSB").  Indeed, the Creditors' Committee specifically acknowledged in its Limited Objection that it "does not assert that the AIP is tainted by self-dealing or is anything other than the product of independent advice."  (Limited Objection ¶ 11.)

2. The Creditors' Committee's rationale for asking this Court to exclude Delphi's senior leadership from the AIP is its belief that:

> the Debtors' management and board of directors have breached their fiduciary duties to the Debtors' estates and unsecured creditors by their failure to take concrete action against GM in the months after the Old Chapter 11 Plan failed, and by their acquiescence to GM's outrageous demands in connection with the negotiation of the amendments to the Global Settlement Agreement and the Master Restructuring Agreement.

---

[1] See Limited Objection Of The Official Committee Of Unsecured Creditors To Fifth Supplement To Debtors' KECP Motion Seeking Authority To Continue Short-Term At-Risk Performance Payment Program ("AIP") For Second Half Of 2008 (Docket No. 14201), September 12, 2008 (the "Limited Objection").

2

(Limited Objection ¶ 7.)  While the Creditors' Committee should reasonably have been expected to introduce compelling evidence to justify such serious allegations, the simple truth is that it did not offer a single declarant in support of the Limited Objection and has not pointed to a scintilla of documentary evidence supporting these baseless claims.

3.      Moreover, when the chairperson of the Creditors' Committee was deposed as part of the consolidated discovery record in connection with the five contested matters between the Debtors and the Creditors' Committee that are scheduled for hearing on September 23, 2008, he acknowledged that the Debtors needed to negotiate amendments to the Global Settlement Agreement (the "GSA") and the Master Restructuring Agreement (the "MRA") in which GM made incremental contributions to Delphi's reorganization which were required because of a deterioration in Delphi's operating results, in the automotive industry, in GM's volumes, and in commodity costs that led to "a prospect of an inability to emerge unless the MRA and GSA were amended."  (Joint Hearing Exhibit 27 at 8:15-8:22, 9:22-10:11.)  He also acknowledged that emerging from chapter 11 as quickly as possible was "the best course of action," and that he did not believe that the Debtors should pursue other strategic alternatives that had been identified, such as shutting down the Debtors' North American operations or selling one or more of the Debtors' core businesses.  (Id. at 18:11-18:17, 21:14-26:18.)

4.      The only reasonable inference to be drawn with respect to the Limited Objection is that the Creditors' Committee wants to punish the 21 executives who are members of Delphi's top policymaking group because Delphi has decided to seek acceleration of the GSA and MRA (and to implement an upsized 414(l) transaction with GM) in advance of entering the capital markets to explore exit financing of Delphi's reaffirmed POR Business Plan for 2008-2011 (the "RPOR") and filing proposed modifications to the POR that was confirmed on January

3

25, 2008.[2] That the Creditors' Committee understands the punitive nature of the relief it is seeking is undeniable: the Creditors' Committee even concedes in the Limited Objection that "[i]t may be true that eliminating the DSB from the AIP will cause compensation for members of the DSB to fall 'below market-competitive levels.' " (Limited Objection ¶ 15). This Court should grant the relief sought in the Fifth Supplement and overrule the Limited Objection because it is mean-spirited, devoid of any factual foundation to support the Creditors' Committee's disparaging and baseless claims of misconduct, and contrary to the factual record of these chapter 11 reorganization cases.

5.  Indeed, when the plan investors under the POR (the "Plan Investors") began to waiver on honoring their obligations under their agreement to provide an equity investment, the Debtors began to formulate a contingency plan and presented a summary of that plan to the Creditors' Committee at its March 12, 2008 meeting in advance of the scheduled April 4, 2008 closing on the POR. (Joint Hearing Exhibit 28 at 56-58.) When the Plan Investors failed to participate in the April 4, 2008 closing, the Debtors met with the Creditors' Committee just two business days later, on April 8, 2008, and shared with it the alternative paths to emergence from chapter 11 that Delphi was considering – which included bifurcating the Debtors' transformation plan and plan of reorganization framework and assuming the GSA and MRA in advance of the POR effective date. (Joint Hearing Exhibit 29 at 43.)

6.  For nearly three months thereafter, the Debtors pursued a modified plan of reorganization framework involving a standalone plan to be funded internally through adjustments to the recoveries of GM, general unsecured creditors, and other stakeholders. The Creditors' Committee was supportive of this approach, and it was a principal participant in

---

[2] In the Fifth Supplement, the RPOR was referred to as the August 2008 BBP.

4

Delphi's discussions with GM regarding a potential standalone arrangement. Those discussions concluded on June 25, 2008, when GM informed Delphi that it was not willing to provide the extraordinary level of incremental financial support necessary to make a standalone plan of reorganization framework possible under the RPOR as it existed at that time.

7. Immediately after learning of GM's decision, Delphi began a process of identifying and assessing a range of specific strategic alternatives that included POR modifications providing for debt financing and equity financing through a rights offering backstopped by creditors or other potential investors that was reviewed with the Creditors' Committee at a meeting on July 16, 2008. (Joint Hearing Exhibit 30 at 63.) During this same period, Delphi was also engaged in the reaffirmation process with respect to the POR Business Plan, which was completed in August 2008 when Delphi finalized the RPOR. (Joint Hearing Exhibit 31 at 41-51.) In addition, in mid-July 2008, Delphi and GM re-engaged in constructive discussions that addressed, among other things, the incremental financial support needed to make the RPOR a realistic business plan that could attract interest in the capital markets. These efforts have resulted in a number of significant developments since April 2008, all of them accomplished against the backdrop of deteriorating macroeconomic and automotive industry conditions and turbulence in the capital markets.

8. These accomplishments include:

- obtaining GM's agreement to increase its financial support for Delphi's liquidity requirements for at least the balance of 2008 from $650 million to $950 million;

- reaching agreement with GM on amendments to the GSA and the MRA under which Delphi will receive support for its transformation from GM that Delphi estimates to be valued at approximately $10.6 billion (increased from approximately $6.0 billion under the original GSA and MRA), including an expansion of the amount of Delphi's pension liability transfer to GM pursuant to section 414(l) of the Internal Revenue Code

5

    from $1.5 billion to approximately $3.4 billion, with the bulk of that support to become effective independent of and in advance of the effective date of the POR;

- taking additional action to preserve and fund Delphi's hourly and salaried pension plans through modifications that would freeze the Delphi hourly pension plan following union consent and its U.S. salaried pension plan;

- completing the POR Business Plan reaffirmation process and finalizing the RPOR for 2008-2011;

- making material additional progress with respect to Delphi's transformation plan that was announced in March 2006 such that Delphi is on track to complete its transformation plan by the end of the year; and

- preparing and publicly disclosing its intent to enter the capital markets with the RPOR, and to file with this Court proposed modifications to the POR.

  9. Throughout this process, Delphi's senior leadership acted with diligence and in accordance with its fiduciary duty to maximize the business enterprise value of Delphi and its affiliates and thereby maximize the opportunities for recoveries by the Debtors' stakeholders. In doing so, Delphi considered the Creditors' Committee's demand that the Debtors play a high-stakes game of "chicken" with GM up through the 414(l) transfer deadline of September 29, 2008 in the hopes that GM would eventually agree to what the Creditors' Committee was really seeking – a form of guaranteed recovery for general unsecured creditors from GM. Delphi ultimately rejected that approach because it believed that obtaining the GM's commitment to take on an upsized 414(l) transfer, assume immediate financial responsibility for other post-employment benefits, and provide what the Debtors concluded was the additional required support of the RPOR was, on balance, more beneficial to the Debtors and their stakeholders than holding out for more at the risk of losing everything. While the Creditors' Committee may not agree with the Debtors' business judgment, there is no basis for its claim that

6

the DSB members have breached their fiduciary duties and should be disqualified from the incentive-compensation opportunities offered under the AIP.

        10.    It is also particularly ironic that the Creditors' Committee wants the DSB members to be penalized for the Debtors' continued operation in chapter 11 when it is the Creditors' Committee that is seeking to derail a series of transactions that Delphi believes will place the Debtors in the best possible position for emerging as soon as practicable. Furthermore, the Creditors' Committee does not believe that there is any other strategic alternative identified by the Debtors that should be pursued at this time and has not come forward with any alternative that would enable the Debtors to emerge by December 31, 2008, when the AIP performance period ends. Thus, at the same time it is leveling criticisms and accusations against Delphi's senior leadership because the Debtors are still in chapter 11, the Creditors' Committee is also impeding the Debtors' efforts to take the very steps that they believe are necessary to complete the successful restructuring of their U.S. operations, the global transformation of Delphi, and the Debtors' emergence from chapter 11 as soon as practicable.

        11.    The AIP for the second half of 2008 is designed to provide the Covered Employees, including the 21 members of the DSB, with incentives to meet or exceed the Debtors' financial targets under the RPOR and to maintain an appropriate level of individual performance during the performance period. Fundamental to the compensation philosophy supporting the AIP is that the Debtors' executives should receive performance incentives for performance achieved. While the Creditors' Committee is apparently seeking to transform the periodic AIP program into an emergence incentive program, Delphi is focused on the AIP providing performance compensation for achievement of the RPOR and Delphi's continued transformation. This objective is especially important now, as Delphi intends to enter the capital

7

markets with the RPOR to raise the debt and equity financing that the Debtors are currently contemplating in connection with potential POR modifications.  If Delphi achieves the financial targets, it will lend additional credibility to the RPOR and facilitate Delphi's ability to obtain this financing.  The Debtors' emergence from chapter 11 is, of course, also an important goal, and the DSB members are focused on doing all they can to enable the Debtors to emerge as soon as practicable.  The Debtors' executive-compensation program already takes this objective into account, however, through the separate emergence incentive program that was approved by this Court in connection with its confirmation of the POR.  Under that program, covered employees are eligible to receive a cash incentive payment upon the Debtors' emergence from chapter 11.

          12.     The Creditors' Committee's proposal to exclude the DSB members from the AIP lacks merit for the additional reason that it would widen the competitive gap between the DSB members' executive-compensation structure and a market-competitive structure.  As explained in the Fifth Supplement, providing market-competitive compensation is one of the tenets of the compensation philosophy adopted by the independent members of the Compensation Committee.  A market-competitive structure includes four elements – (i) salary, (ii) benefits, (iii) short-term incentive-compensation opportunities, and (iv) long-term incentive-compensation opportunities.  The relative size of each element depends on the executive's position and the nature of his or her responsibilities.  For higher-ranking executives such as the DSB members at issue here, the mix of elements is more heavily weighted toward short- and long-term incentive-compensation opportunities.  As the charts attached to this reply as <u>Exhibit A</u> illustrate, these opportunities account for approximately 76% of the market-competitive structure for the DSB members, with the split between short- and long-term opportunities at approximately 22% and 54%, respectively.  Without the short-term incentives provided under the

8

AIP, the DSB members' compensation would be limited to salary and benefits through December 31, 2008, creating a massive competitive shortfall. The Creditors' Committee's naked allegations of mismanagement are insufficient to overturn the Debtors' reasonable business judgment to move DSB members' compensation toward market-competitive levels through the AIP.

        13.    In evaluating the Limited Objection, it is essential to consider that the Creditors' Committee does not challenge any of the terms and conditions of the AIP, which are the same in all material respects as the terms and conditions that have been supported by the Creditors' Committee and approved by this Court on several occasions throughout these cases. It does not contend that the AIP financial targets drawn from the RPOR are unreasonable, or that there is any flaw in the corporate- and division-level payout curves.[3] It does not dispute the existence of a significant competitive shortfall affecting the Debtors' current executive-compensation structure. It does not assert that the safeguards included in the program design – which include individual-performance reviews and adjustments to earned incentive compensation, a prophylactic measure that prevents wrongdoers from receiving benefits under the AIP, and the Creditors' Committee's own authority to adjust Delphi's EBITDAR performance by up to $150 million – are inadequate in any respect. Given that the Creditors' Committee has not taken issue with any of these fundamental points, it has fallen far short of presenting any legitimate grounds for overriding the Debtors' business judgment that it would be unreasonable to segregate DSB members from the rest of the Covered Employees and eliminate their participation in the AIP.

---

[3] Under those payout curves, the maximum incentive-compensation opportunities available to DSB members are capped at 150% of their target opportunities, whereas the cap for all other Covered Employees is 200%.

9

WHEREFORE, the Debtors respectfully request that this Court overrule the Creditors' Committee's Limited Objection, enter an order in substantially the same form as the form of Fifth Supplemental Order Under 11 U.S.C. §§ 105 And 363 Authorizing Debtors To Continue Short-Term At-Risk Performance Payment Program For Second Half Of 2008 that is attached hereto as <u>Exhibit B</u>, and grant the Debtors such other and further relief as is just.

Dated: New York, New York
    September 22, 2008

                              SKADDEN, ARPS, SLATE, MEAGHER
                                 & FLOM LLP

                              By:  /s/ John Wm. Butler, Jr.
                                  John Wm. Butler, Jr.
                                  Albert L. Hogan III
                                  John K. Lyons
                                  Ron E. Meisler
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                     - and -

                              By:  /s/ Kayalyn A. Marafioti
                                  Kayalyn A. Marafioti
                                  Thomas J. Matz
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, <u>et</u> <u>al.</u>,
                                Debtors and Debtors-in-Possession