Hearing Date: September 23, 2008, at 10:00 a.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
    In re                                   :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                                            :    (Jointly Administered)
                                            :
              Debtors.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO MOTION
FOR ORDER AUTHORIZING AMENDMENT TO ARRANGEMENT
WITH GENERAL MOTORS CORPORATION APPROVED
PURSUANT TO SECOND DIP EXTENSION ORDER (DOCKET NO. 13489)

("REPLY IN SUPPORT OF GM ARRANGEMENT AMENDMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this response (the "Reply") to the objection of CR Intrinsic Investors, LLC and Highland Capital Management, L.P. (the "Noteholders") (Docket No. 14082) and the preliminary (Docket No. 14168) and subsequent (Docket No. 14205)[1] objections of the official committee of unsecured creditors (the "Creditors' Committee") to the motion for order authorizing amendment to arrangement with General Motors Corporation ("GM") approved pursuant to Second DIP Extension Order, dated April 30, 2008, (Docket No. 13489) (the "Motion"), and respectfully represent as follows:

Preliminary Statement

1.       The Debtors have exercised reasonable business judgment by entering into an amendment (the "GM Arrangement Amendment") to supplement availability under their current debtor-in-possession financing facility (the "DIP Financing Facility") and enhance their liquidity position by an additional $300 million of postpetition financing subject to the terms of the amendment. The amendment also provides for the continuation of the original $650 million commitment under the original arrangement (the "GM Arrangement"). As with the DIP Financing Facility and the GM Arrangement previously approved by this Court, all of the Debtors would be financially responsible for the incremental $300 million facility provided by GM pursuant to the GM Arrangement Amendment. This is consistent with all of the Debtors' prior postpetition financing arrangements, which were structured in this manner because Delphi is a global, integrated enterprise that operates along different business segments and divisions.

---

[1] This untimely objection was filed three days after September 16, 2008, the objection deadline for the Creditors' Committee agreed to by the Debtors.

2

At least one of the objectors has provided postpetition financing to the Debtors in accordance with this same structure, and none of the objectors has challenged any of the prior postpetition financings on this ground. The additional liquidity provided by the GM Arrangement Amendment on these favorable terms is in the best interests of the estates and thus the Debtors' entry into the amendment should be approved.

2. The GM Arrangement Amendment was negotiated on a basis that was very favorable to the Debtors; for example, the Debtors' repayment obligations would be unsecured and interest on the advances would be cancelled assuming the Debtors meet certain specified conditions. Nevertheless, the objectors ask this Court to deny the Motion on the basis that GM's promise to lend is illusory, the amendment somehow permits GM to control these chapter 11 cases, the amendment constitutes a de facto substantive consolidation and somehow constitutes a sub rosa plan of reorganization.

3. The purported illusory "promises," however, are nothing more than conditions to GM's performance under the amendment that the Debtors have the ability to satisfy. The mere possibility that the Debtors might not satisfy certain conditions does not make the GM Arrangement Amendment illusory. Nor is there any reasonable interpretation of the GM Arrangement or the GM Arrangement Amendment that would constitute either a de facto substantive consolidations of the chapter 11 cases or a sub rosa plan of reorganization. Certainly, the fact that all debtors are responsible for post-petition financing advances, which is generally customary and has been the basis upon which the Court has approved the prior financing arrangements in these cases, is not an indicia of substantive consolidation or a sub rosa plan. Neither is there any cognizable evidence that GM is in control of these chapter 11 cases; to the contrary, based on aggressive, arms-length, complex, good-faith and protracted negotiations,

3

GM has agreed to amend the original Global Settlement Agreement (the "GSA") and the original Master Restructuring Agreement (the "MRA") to pull forward all of its original commitments to Delphi and to increase its overall financial responsibility from $6.0 billion to $10.6 billion of net financial contributions. The fierce independence from GM control that the Debtors have exhibited from the inception of these cases to the present is a stark rebuttal to the objectors' unsupported claims of Delphi management's abdication to the company's largest customer and represents overwhelming repudiation of the objectors' gratuitous claim that GM is an insider of the Debtors.

4.  To assist the Court in evaluating the objections, the Debtors have attached as Exhibit 1 hereto a chart listing the identity of each objecting party, the general nature of each objection, and the Debtors' response to the objection. Attached as Exhibit 2 hereto is a chart that summarizes all of the objections by category of issue raised. Exhibit 1 and Exhibit 2 provide detailed responses to the Objections. This Reply, therefore, does not repeat everything contained in those exhibits. In addition, attached as Exhibit 3 hereto is a revised proposed order marked to show the changes against the proposed order that was submitted with the Motion.

## Argument

A.  Debtors Have Exercised Sound Business Judgment In Deciding To Enter Into The GM Arrangement Amendment

5.  The Debtors have properly presented a valid business reason for entering into the GM Arrangement Amendment. The amendment is necessary and appropriate to help the Debtors maintain appropriate levels of liquidity to operate their business and to continue to retain the confidence and support of their non-GM customers and global supply base. The cornerstone of the Debtors' reorganization cases has been their ability to effect their business transformation while maintaining appropriate levels of liquidity. (Joint Hearing Exhibit 56, at 27-28.) As set

4

forth in the Motion, bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. And although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming the "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

6. Once the debtor articulates a valid business justification, a presumption arises that the directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. Opposing parties bear the burden of rebutting this presumption by producing some evidence in support of their objections. Comm. Of Equity Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). Here, no relevant evidence has been submitted to support the objections. The Debtors' business judgment should therefore not be overturned.

7. The Creditors' Committee skirts this standard of review by asserting, without the submission of submission of a single declaration or pointing to any documentary evidence, that GM is a nonstatutory insider of the Debtors and that thus the proposed transaction is subject to a heightened level of scrutiny. This is not the first time that this claim has been brought before this Court – and the Court should reject the notion this time as it did before: GM is simply not an insider of the Debtors.[2] As the Court is aware, among the factors used when evaluating such a contention are whether the party (a) received information that was not available to other parties in interest or the general public, (b) attempted to influence the debtor's

---

[2] Hr'g Tr., 216-17, April 7, 2006 (hearing on motion to approve human capital hourly attrition programs, in which Court declined to find that GM was insider and accordingly declined to apply strict scrutiny).

decisions, (c) selected new management for the debtor, (d) had special access to the debtor's premises and personnel, (e) was the debtor's sole source of financial support, and (f) generally acted as a joint venturer or prospective partner with the debtor rather than an arm's-length creditor.  Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 500 (S.D.N.Y. 1994).

8. During these cases, however, GM has not influenced the Debtors' decisions except through contentious arm's-length negotiations leading to agreements that were approved by this Court, has not selected the Debtors' management, has not had access to Delphi that is any different than any of the Debtors' other customers under customary customer contracts, and has provided postpetition financing to the Debtors along with the many DIP Lenders.[3]  GM's access to information has been appropriate to the nature and magnitude of the transactions and proposed transactions between the Debtors and GM.  Accordingly, the Court should apply the customary level of review to the proposed transaction.

    (i)  The Liquidity To Be Provided Under The GM Arrangement Amendment Is Necessary

9. The primary reason for entering into the amendment to the GM Arrangement is to provide the Debtors with additional liquidity to continue to operate their business, substantially complete their business transformation, and continue on their path toward emergence from chapter 11 as soon as practicable.  When the Debtors did not emerge from chapter 11 as anticipated on April 4, 2008, the Debtors successfully negotiated with their lenders (the "DIP Lenders") an extension, until December 31, 2008, of the maturity date of their then-current DIP Financing Facility.  In connection with this extension, the Debtors had identified the three steps that they would take to provide themselves with the desirable level of liquidity to

---

[3] The Creditors' Committee does not allege that GM has acted as a joint venturer or prospective partner with the Debtors.

6

operate their businesses as they continue to work toward emergence from chapter 11: (a) the extension of the DIP Financing Facility, (b) additional intercompany transfers of cash originating from global affiliates, and (c) advancements under the GM Arrangement.

10.    With respect to the latter, the Debtors, as a condition precedent to extending the DIP Financing Facility, entered into the GM Arrangement whereby GM agreed to advance Delphi up to $650 million, subject to certain terms in connection with various payments for which GM ultimately would be reimbursing Delphi under the amended Global Settlement Agreement ("GSA") and the amended Master Restructuring Agreement ("MRA").  Consistent with all of the Debtors' other financing arrangements in these cases, the Debtors other than Delphi that are parties to the GM Arrangement have guaranteed Delphi's obligations under the GM Arrangement.  The GM Arrangement also provides GM with an administrative expense priority claim under section 503(b)(1) of the Bankruptcy Code, subject to the terms of the GM Arrangement and the Second DIP Extension Order.  Thus, since April 4, 2008, the opportunity to receive advances under the GM Arrangement has been an important component of the Debtors' program to meet their liquidity objectives.

11.    The Debtors believe that in the aggregate, and in conjunction with the DIP Financing Facility and the Debtors' ongoing intercompany asset repatriations, the GM Arrangement and the GM Arrangement Amendment will be sufficient to permit Delphi to operate its global businesses, including all of the Debtors' operations, in accordance with the Company's reaffirmed business plan while preserving and maximizing the value of the Debtors' estates for the benefit of their stakeholders as the Debtors work towards emergence from chapter 11 as soon as practicable.

        (ii)        The GM Arrangement Amendment Is The Best Alternative To Meet Liquidity Objectives

12.    In reaching their decision to amend the GM Arrangement, the Debtors considered a number of factors and concluded that it would be prudent from a business standpoint, and would provide substantial benefits for the Debtors' estates and their various stakeholders, to proceed with the proposed GM Arrangement Amendment. Among other benefits, the proposed GM Arrangement Amendment simply extends the financing arrangements previously reviewed and approved by this Court in connection with the DIP Financing Facility and the GM Arrangement. Those agreements were arrived at through extended, good-faith, arm's-length negotiations among the Debtors, the DIP Lenders, and GM, and they provide the Debtors, their estates, and their various stakeholders with a thoroughly vetted financial platform from which to continue the Debtors' efforts to emerge from chapter 11. The GM Arrangement Amendment is intended in this regard to function as an adjunct to the DIP Financing Facility, effectively providing Delphi with an additional $300 million in unsecured, subordinated advancements from GM.

13.    The GM Arrangement Amendment also provides the Debtors with a definite source of liquidity during an extended period of uncertainty in the capital markets generally and the automotive industry in particular, without the inherent transaction costs – including, among other things, borrowing fees and closing costs – incurred in obtaining funds from alternative sources in the open market.[4] The GM Arrangement Amendment provides that

---

[4]    The Noteholders appear puzzled by the relationship between the $650 million in liquidity provided by the GM Arrangement and the additional $300 million in liquidity provided by the GM Arrangement Amendment. When the Debtors negotiated the GM Arrangement in connection with the DIP Extension, the DIP Lenders required that the Debtors and GM enter into an arrangement whereby GM would advance funds to the Debtors to ensure that the Debtors would generally maintain $500 million of availability under the DIP Financing Facility. (Exhibit 38, § 4.01). In connection with the GM Arrangement Amendment, GM believed that because it already had committed to provide the Debtors with $650 million of additional liquidity under the GM

*(cont'd)*

8

interest on advances above the $650 million provided under the original GM Arrangement will be cancelled under certain conditions.[5]  Moreover, because the advancements are unsecured, they ultimately may be less costly than borrowing from alternative sources, even if such sources were otherwise available.  The GM Arrangement Amendment thus allows the Debtors to reduce their external borrowings and funded interest expense, saving the Debtors tens of millions of dollars of interest under their DIP Financing Facility.

          (iii)      <u>The Terms Of The GM Arrangement Amendment Are Appropriate</u>

14.    The GM Arrangement Amendment has a number of unremarkable provisions creating conditions to performance and relating to the progress of the chapter 11 cases.  The objectors assert that the latter render the agreement illusory and that the former divest the Debtors of their control of the chapter 11 process.  Neither is true.

15.    As with many contracts, the GM Arrangement Amendment contains a number of conditions.  For example, advances would be available after October 31, 2008 only if by that date the Debtors have filed a plan of reorganization reasonably satisfactory to GM.[6]  GM has indicated what it believes is a reasonable acceptable plan in the amended GSA, which provides that Delphi's plan must (a) provide for the consideration to be received by GM as set

---

*(cont'd from previous page)*
Arrangement, the Debtors would generally be required to draw down another $200 million on the DIP Financing Facility before any additional advancements under the GM Arrangement Amendment would be available to the Debtors.  Once the Debtors draw an additional $200 million on the DIP Financing Facility, resulting in less than $300 million availability on the DIP Financing Facility, the Debtors can then draw on the $300 million available under the GM Arrangement Amendment.  Thus, the $300 million liquidity threshold was required by GM when negotiating the GM Arrangement Amendment.

[5]    The GM Arrangement has a similar cancellation of interest provision with respect to the $650 million commitment, which is carried forward into the GM Arrangement Amendment.

[6]    A condition to GM's obligation to make advances under the $650 million commitment is that no pleading has been filed to confirm a plan which materially impacts the benefits GM reasonably expected to receive under the confirmed Plan, the GSA, and the MRA (<u>see</u> GM Arrangement Amendment § 4.02(d)), although the parties committed to continue considering amendments to the GSA and MRA.  (<u>See</u> GM Arrangement Amendment § 5.03.)

9

forth in the GSA, (b) include the release provisions set forth therein, and (c) provide that any inconsistency between the Debtors' plan and the agreement will be governed by the GSA. (GSA § 5.04.) Any advances under the Amendment would be available only so long as the Debtors' ability to repatriate cash remains unrestricted by this Court. Similarly, cancellation of interest depends on timely emergence from chapter 11. That a condition <u>might</u> not be satisfied, however, does not make a contract's promises illusory, especially when the party has some measure of control over meeting the condition. Moreover, the Debtors have the ability to satisfy these conditions, as they have done in the past.

    16.  As noted above, some of these conditions relate to the filing of a plan of reorganization. The Noteholders contend that these conditions give too much leverage to GM, and the Creditors' Committee goes so far as to say that the amendment constitutes a sub rosa plan. The GM Arrangement Amendment, however, does not dispose of all third-party claims against the Debtors or interfere with any of the disclosure and voting rights to which creditors are entitled. <u>See</u> <u>Motorola, Inc. v. Official Comm. Of Unsecured Creditors</u> (In re Iridium Operating LLC), Case No. 01 Civ. 5429 (GBD), 2005 WL 756900, at *8 (S.D.N.Y. Apr. 4, 2005). The Noteholders also argue that the possibility that the Debtors' obligation to repay the advances might become due (without setoff against the amended GSA or MRA) before emergence gives GM a de facto veto right over the Debtors' ability to file a plan of reorganization.[7] But nothing in the amendment prevents the Debtors from taking any action to address such a possibility, including entering into alternative financing arrangements.

---

[7] As noted above, GM has indicated in the amended GSA the content of an acceptable plan.

10

     (iv) <u>The Repayment Structure Of The GM Arrangement Amendment Is Consistent With Other DIP Financing Arrangements In These Cases And The Debtors' Integrated Enterprise</u>

   17. In their objection, the Noteholders assert that at least one of the Debtors, Delphi Automotive Systems (Holdings), Inc. ("DASHI"), should not share the repayment obligations arising from the GM Arrangement Amendment (or the previously approved GM Arrangement).  At least one of the Noteholders indirectly holds a significant portion of the loans and commitments under the DIP Financing Facility and relies on the identical group of Debtors (including DASHI) for repayment of the DIP Financing Facility that GM does in respect of the GM Arrangement.  Moreover, the very effectiveness of the DIP Financing Facility was conditioned on this Court's entering an order approving this same repayment structure found in the GM Arrangement.  It is inexplicable that one or both of the Noteholders can benefit on the one hand from this financing structure (i.e., a repayment scheme based on claims against all of the Debtors and implementation of a subordinated GM liquidity facility) while on the other hand contending that the same structure is gravely flawed and prejudicial to stakeholders.

   18. Nevertheless, the Noteholders' assertion that having all of the Debtors as obligors under the GM Arrangement Amendment prejudices Delphi's creditors is premised on a misunderstanding about the way Delphi conducts its global business.  Less than three weeks after commencing these cases, this Court entered a final order on October 28, 2005 approving the Debtors' initial debtor-in-possession financing facility.  Although Delphi was the primary borrower under this facility, all of the other Debtors, including DASHI, were guarantors and the DIP Lenders received a lien on all of the Debtors' assets, including DASHI, and not merely those

of Delphi. The Debtors' initial financing arrangement and subsequent financing arrangements[8] were structured in this manner because Delphi is a global, integrated enterprise that operates along different business segments or divisions. It is customary for all debtors to be jointly and severally liable for postpetition financing, as done here in the DIP Financing Facility and the GM Arrangement.

19.    As a preliminary matter, the Company brands itself as "Delphi" without regard to legal entity.[9] Delphi and its subsidiaries, both foreign and domestic, operate on a global basis, with common products grouped together in divisions. Business decisions likewise are made by divisional management teams at the divisional level. Although the North American operations currently are benefiting from excess liquidity generated by the profitable global operations, the value of Delphi is premised on this cohesive enterprise. Without the assets and business operations of the Debtors' U.S. operations, as presently structured, the global affiliates would not be capable of existing as stand-alone entities, since many of the non-U.S. subsidiaries rely in substantial part on intellectual property and technology, as well as administrative, engineering, and other support services provided by Delphi's North American subsidiaries.

---

[8] On Debtors' December 18, 2006, the Debtors filed a motion to refinance their original debtor-in-possession financing facility by entering into their current $4.5 billion DIP Financing Facility. (Docket No. 6180.) On November 1, 2007, the Debtors moved to extend the maturity date of the DIP Financing Facility, under which Delphi continued to be the borrower and the DIP Lenders retained their liens on all of the Debtors' assets. (Docket No. 10787.) The Debtors sought this Court's approval on April 16, 2008 to approve a second extension of the DIP Financing Facility's maturity date, until December 31, 2008, and the GM Arrangement. (Docket No. 13409.) On May 9, 2008, the Debtors filed a motion for approval to supplement the second extension of the DIP Financing Facility. (Docket No. 13584.) As noted above, one of the Noteholders has a significant beneficial interest in the DIP Financing Facility. All Debtors, including DASHI, have repayment obligations with respect to all iterations of the DIP Financing Facility as well as the GM Arrangement.

[9] Only Delphi consolidated financial statements are regularly prepared and distributed to third parties. Publicly filed Forms 10-K and 10-Q do not refer to Delphi Corporation's various subsidiaries in any significant detail. Instead, they refer principally to divisions, regions, or product lines of the global corporation. (See, e.g., Delphi Corp. Form 10-K Annual Report, dated June 30, 2005, at 3; id. Ex. 21; Delphi Corp. SEC Rule 424(b)(5) 6.5% Notes Prospectus Supplement, dated July 22, 2003, at S-5 to S-7.)

Delphi's subsidiaries, both foreign and domestic, thus are integrated components of the Company's worldwide operations.

20.    Revenue opportunities for the Company's Debtor and non-Debtor subsidiaries are strengthened by Delphi's ability to meet its customers' cross-regional needs, and Delphi's considerable purchasing power and global reach allow for large-scale negotiations on a global basis.[10] This includes sales by Delphi offshore affiliates to North American OEMs, including Ford and Chrysler, as well as GM. Nevertheless, because Delphi's worldwide headquarters are located in the United States, events that take place in the U.S., including the perceived strength of Delphi's U.S. subsidiaries, have a substantial impact on decisions made and what takes place outside of the United States. Strong U.S. Delphi operations imbue confidence in Delphi customers worldwide, influence global purchasing decisions, and thereby increase value and growth opportunities for all of Delphi's subsidiaries, both foreign and domestic.

21.    Contrary to the Noteholders' objection, there is no basis to believe that unwinding Delphi's integrated global business structure to reconfigure the Debtors' non-U.S. subsidiaries as self-sustaining, stand-alone entities could be achieved in any reasonable time frame, and without a commitment of resources that simply are unavailable to the Debtors and their estates under current circumstances. Successfully reorganizing Delphi without its North American operations not only raises legitimate concerns about retaining key employees during

---

[10]   DASHI and Delphi Automotive Systems LLC ("DAS LLC"), respectively, are holding and operating companies established to facilitate the operations and efficiencies of the entire Delphi enterprise. DASHI is the entity that holds most of the equity interests in Delphi's non-U.S. entities, while DAS LLC is the entity that holds Delphi's principal U.S. operations. A number of key Delphi customers do business with both DAS LLC- and DASHI-owned subsidiaries. It should be noted specifically in this regard that the future of Delphi as a stand-alone company depends on its ability to increase its non-GM business. Any plan by Delphi to abandon or wind down its North American operations likely would raise legitimate concerns with Delphi's global clients about Delphi's continued ability to efficiently provide goods on a global basis, including goods delivered to non-GM manufacturing sites located in the United States, the world's largest market for new automobiles.

the wind-down process, but also would likely require the active support of GM and the Debtors' Unions, because current UAW and IUE-CWA agreements through 2011 include "no sale/no close" provisions relating to Delphi's "core" businesses. Absent a waiver of these provisions, Delphi would need to identify such sell- or wind-down sites, commence another round of complex, extended, and potentially contentious negotiations with affected parties-in-interest to effectuate such sales or closures, and might need to initiate, and therefore to prevail in connection with, another section 1113/1114 motion. Based on their experiences to date in these chapter 11 cases, the Debtors have no reason to believe that such hypothetical scenarios could be completed without considerable delay, disruption, aggravation, and cost to virtually all of the Debtors' stakeholders. Moreover, the chairman of the Creditors' Committee has testified that he does not believe that the Debtors should pursue other strategic alternatives, including shutting down the Debtors' North American operations or selling one or more of the Debtors' core businesses. (GSA Motion Joint Hearing Exhibit 27 at 18:11-18:17, 21:14-26:18.) Accordingly, the Noteholders' objection should be overruled.

## Conclusion

22.     For the reasons discussed herein, the objections of the Creditors' Committee and the Noteholders should be overruled.

Pg 15 of 15

WHEREFORE the Debtors respectfully request that the Court enter an order (i) granting the Motion and (ii) granting the Debtors such other further relief as is just.

Dated:     New York, New York
           September 22, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    */s/ John Wm. Butler, Jr.*
       John Wm. Butler, Jr.
       Albert L. Hogan III
       John K. Lyons
       Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700


By:    */s/ Kayalyn A. Marafioti*
       Kayalyn A. Marafioti
       Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession