**Hearing Date And Time: September 23, 2008 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
John K. Lyons
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                               :
    In re                                       :        Chapter 11
                                                 :
DELPHI CORPORATION, et al.,     :        Case No. 05-44481 (RDD)
                                                 :
                       Debtors.   :        (Jointly Administered)
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF EXPEDITED MOTION FOR
ORDER UNDER 11 U.S.C. § 363 FOR AUTHORITY TO MODIFY BENEFITS
UNDER HOURLY AND SALARIED PENSION PROGRAMS AND MODIFY
<u>APPLICABLE UNION AGREEMENTS IN CONNECTION THEREWITH</u>**

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Reply In Support Of The Debtors' Expedited Motion For Order Under 11 U.S.C. § 363 For Authority To Modify Benefits Under Hourly And Salaried Pension Programs And Modify Applicable Union Agreements In Connection Therewith,[1] dated September 12, 2008 (Docket No. 14162) (the "Motion"), and respectfully represent as follows:

        1.      Although the Debtors were required to serve the Motion on more than 12,000 parties in order to comply with the Case Management Order, as supplemented, the Debtors have received only four objections: a purportedly substantive objection from the official committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors' Committee" or "Committee"), limited objections from the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (the "IUE-CWA") and the United Steelworkers of America (the "USW") (both of which are continuing to collectively bargain implementation agreements with Delphi which would include their consent to the proposed Freeze Date for the HRP sought to be authorized by this Motion), and an individual objection from a salaried employee. The objections and the Debtors' responses thereto are summarized in the chart attached hereto as <u>Exhibit 1</u>. None of the objections has presented a legally cognizable reason to deny the relief requested in the Motion. Instead, the Committee asserts that its frustration with respect to the GSA and MRA Amendment Motion is reason to deny the relief requested here. This contention is

---

[1]     Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

2

without basis, however, because the relief requested here as part of the Hourly and Salaried Pension Program Modification Motion is completely distinct and separate from the relief sought in the GSA and MRA Amendment Motion.

2.  Indeed, the Creditors' Committee filed an objection to this and every other Delphi motion scheduled to be heard on September 23. Despite the objection and its tone, the Creditors' Committee actually concedes its support for the freezing of the Debtors' pension plans and most aspects of the follow-on plans. The Creditors' Committee also concedes that the relief requested in the Motion will save the estates money. In fact, the Debtors' proposed freeze and replacement package will save millions of dollars per quarter, even taking into account the implementation of replacement pension plans for all affected employees. The Debtors' hourly and salaried workforce has achieved remarkable success in the face of one of the most difficult financial and automotive markets in recent memory. The Debtors do not believe that it would be reasonable to propose to accelerate the freeze of employee pension plans and not provide for the phased implementation of replacement pension plans – such a measure would be counterproductive to the Debtors' objective of maintaining a workforce focused on achieving operational effectiveness and increasing enterprise value for the benefit of stakeholders. Despite the Creditors' Committee's complaints, the Debtors' proposed program has been carefully considered, maintains estate value by saving money, and is in the best interests of the Debtors' estates. Accordingly, this Court should overrule the Creditors' Committee's objection and grant the relief requested in the Motion.

3.  The IUE-CWA filed a limited objection geared towards obtaining discovery, but has not raised a substantive issue with the relief requested. Because the

IUE-CWA has raised no substantive issue and the Debtors fulfilled the IUE-CWA's discovery request, the Debtors will not address the IUE-CWA objection in this response and request that this Court strike the IUE-CWA objection to the extent it is not withdrawn prior to the hearing.  Likewise, the USW filed a limited objection based on the USW's perceived need to have completed implementation agreements with respect to the section 414(l) transfer described in the GSA and MRA Amendment Motion.  The USW objection was filed on September 22, 2008, three days later than the September 19 deadline imposed by the Supplemental Case Management Order.  The Debtors believe that the Court should therefore strike the USW objection on procedural grounds.  In addition, the union objections should be overruled because, as the Debtors acknowledged in the Motion, the Debtors do not intend to, and indeed cannot, affect any rights of the IUE-CWA or the USW or their membership without applicable union consent.  The Debtors are hopeful that they will obtain that consent and intend to continue to work constructively with their unions in this regard.  But the fact remains that the Motion will have no impact on the IUE-CWA or the USW that is not collectively bargained.  The IUE-CWA and USW objections should therefore be denied in their entirety.

    4.  The sole remaining objection was asserted by a salaried worker and served on the required parties and the Court on September 22, 2008 and is accordingly untimely.  Despite the Debtors' belief that the Court should strike or otherwise overrule the objection, the Debtors would like to clarify the record with respect to the objector's concern that service costs exceeded $4 million; in fact, service costs were approximately $400,000.  The Debtors acknowledge that this was a substantial expense but it was necessary to provide due process and for the Debtors to comply with

4

the requirements of the Case Management Order. Moreover, the cost is justified by the millions of dollars in savings that would be achieved if the Court approved the relief requested in the Motion.

A. <u>The Pension Modifications Are Appropriate And Necessary</u>

      5.     Faced with continued challenges in completing its reorganization, Delphi seeks to implement significant aspects of its pension transformation now instead of at emergence from chapter 11. In the exercise of its business judgment, Delphi determined that the modified retirement package described in the Motion, the terms of which were previously approved by this Court, would maintain retirement benefits for the Debtors' workforce while protecting existing retirement benefits and preserving estate assets. Further, the pension modifications would protect the Pension Plans by preventing further accruals and thus reducing the likelihood that the PBGC would take unilateral action to terminate the Pension Plans.

B. <u>The Creditors' Committee's Request To Hold the Hearing
On The Pension Freeze Only Following Union Consent Is Unreasonable</u>

      6.     As the Motion makes clear, freezing the Hourly Plan requires Union consent, i.e., consensual modifications to the applicable collective bargaining agreements and memoranda of understanding. Pursuant to the Motion, the Debtors seek limited relief with respect to the Hourly Plan: the authority to modify the collective bargaining agreements with their Unions to implement the freeze of the Hourly Plan. The Creditors' Committee alleges that "it is possible that one or more of the unions may condition its consent on the receipt of additional consideration or other modifications to the transaction." Creditors' Committee Objection, ¶2. The Creditors' Committee apparently believes that this is reason enough to delay the hearing on this Motion. Because this is a

5

hypothetical objection, it deserves no weight and in any event is premature. Every month in which the Debtors are prevented from freezing the Hourly Plan would cost the Debtors approximately $1 million in normal cost contributions. Moreover, on other occasions in these cases the Court has authorized relief, due to exigent circumstances, subject to subsequent Union consent. The Debtors also believe that they are permitted under the Bankruptcy Code and applicable to continue to collectively bargain with their unions in the ordinary course of business. While the implementation agreements that are or will be the subject of discussions between Delphi and the affected unions fall within such parameters, the Debtors seek to provide comfort to all of their North American unions that entry into such implementation agreements will be effective as against the Debtors.

C.  The Creditors' Committee's Attempt To Link
    Replacement Retirement Programs To Plan Modifications Is Baseless

7.  The Committee claims that instituting replacement plans, specifically the Amended SERP and Amended SRESP, is inappropriate because the Debtors are not concurrently proposing a plan of reorganization. Yet, the Committee acknowledges its support for the freezing of the Debtors' pension plans and implementation of replacement hourly and non-executive salaried plans. The Creditors' Committee also concedes that the relief requested in the Motion will save the estates money. But because of the GSA/MRA amendments currently proposed by the Debtors — a matter that is being pursued independently of this Motion — the Creditors' Committee appears determined to indiscriminately object to all relief sought by the Debtors, even relief that the Committee acknowledges is beneficial to the estate. In other words, the Creditors' Committee wants to deprive at least some salaried employees from the customary benefit of a follow-on pension plan, while simultaneously demanding that

6

the same group of employees work harder to develop plan modifications that would facilitate Delphi's emergence from chapter 11 as soon as practicable.

8. The Creditors' Committee's implicit suggestion that the Salaried Plan should be frozen and the SERP and SRESP should be ignored reflects a fundamental misunderstanding of the Debtors' benefit programs. For the reasons set forth above, the Debtors do not believe that it would be a reasonable business judgment in the current circumstances to freeze the SERP without also implementing a replacement plan. And were the Salaried Plan to be frozen but the SERP left intact, the operation of the pension plan documents would result in SERP benefits that would expand to cover the loss of the benefits provided by the Salaried Plan. Consequently, the amount of unsecured claims would increase on account of current employees that are eligible and vested.

9. Similarly, the Committee's claim that it does not support the "use of valuable estate assets" for the "creation" of the Amended SERP or Amended SRESP is misguided and apparently stems from a misreading of the Motion. First, the Amended SERP and Amended SRESP are not being "created" now: as the Committee acknowledges, the terms of these programs "are the same or very similar to the programs this Court approved for executives" in the Debtors' approved plan of reorganization. Second, as the Motion makes plain, no estate assets will currently be used to fund these plans, and no benefits would vest or be payable until emergence from chapter 11. In fact, the Creditors' Committee's assertion that emergence is the brass ring that Delphi's management should seek underscores the importance of giving management the incentives that the Amended SERP and Amended SRESP create.

7

10. Moreover, the Debtors have maintained retirement programs for their employees throughout these chapter 11 cases, and only seek the modifications described in the Motion to implement a replacement program that saves money and thus preserves liquidity. There is simply no basis for the Committee to claim that it is inappropriate for the Debtors to adopt a replacement retirement program, as part of an overall cost-saving package, simply because the Debtors are not concurrently presenting a modified Chapter 11 Plan.

D. The Debtors Have Provided Sufficient Information
   Regarding the Amended SERP And Amended SRESP

11. The assertion by the Committee that the Debtors did not provide sufficient information with respect to the Amended SERP and Amended SRESP is disingenuous because the Debtors and their professionals worked with the Creditors' Committee and its professionals to provide an open exchange of information even before the Debtors filed the Motion. In fact, not only were these two follow-on plans filed with the Court, but on September 10, 2008 the Debtors and their professionals conducted a conference call in which the Debtors' professionals were led to believe that all of the Creditors' Committee's questions were answered. Among other data provided, the Creditors' Committee were told that the annual cost estimate for the salaried replacement plans (exclusive of the Amended SERP) was approximately $87 million and that the Amended SRESP was a small part of that aggregate number.

12. While the Debtors acknowledge that there was a delay in responding to an isolated follow-up information request, that information has been provided to the Creditors' Committee and is summarized below. Specifically, of the estimated $87 million dollars, the total estimated annual cost for the Amended SRESP ranges from

8

approximately $0.8 million to $2.8 million, depending upon that year's level of at risk incentive. Assuming the Debtors emerge from chapter 11 in 2008 or 2009, the total estimated annual cash cost of the Amended SERP for 2009, 2010, and 2011 is $5 million, $8 million, and $11 million, respectively. Both the Amended SERP and Amended SRESP cover the approximately 460 Delphi executives. Each of these plans was approved pursuant to the Chapter 11 Plan, and the Creditors' Committee concedes that the terms of these programs "are the same or very similar to the programs this Court approved for executives." Nevertheless, because the Debtors are seeking to freeze the existing plans, they must provide replacement plans now so that affected employees are appropriately focused and motivated to continue to achieve Delphi's business transformation and to emerge from chapter 11 as soon as practicable. (As the Motion indicates, neither the Amended SERP nor the Amended SRESP that are of apparent concern to the Creditors' Committee would be payable until the Debtors emerge from chapter 11.)

E.     Conclusion

13.    The pension modifications requested in the Motion create real value for the Debtors' stakeholders by preserving assets of the Debtors' estates while protecting the pension benefits already earned by Delphi employees and retirees. Pension Plan participants would retain all benefits accrued as of the applicable freeze dates, and the Debtors remain committed to maintaining their Pension Plans, albeit on a frozen basis, upon emergence from chapter 11. The Debtors likewise believe that freezing the Pension Plans now, rather than delaying such action until emergence, would substantially reduce the likelihood that the PBGC would take unilateral action to terminate the Debtors' Pension Plans and assert related termination claims in these chapter 11 cases. The relief

9

requested in the Motion represents the sound exercise of the Debtors' business judgment and should be approved.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) granting the Motion and (b) granting them such other and further relief as is just.

Dated: New York, New York
       September 22, 2008

> SKADDEN, ARPS, SLATE, MEAGHER
>   & FLOM LLP
>
> By: */s/* John Wm. Butler, Jr.
>     John Wm. Butler, Jr.
>     Albert L. Hogan III
>     John K. Lyons
>     Ron E. Meisler
> 333 West Wacker Drive, Suite 2100
> Chicago, Illinois 60606
> (312) 407-0700
>
>     - and -
>
> By  /s/ Kayalyn A. Marafioti
>     Kayalyn A. Marafioti (KM 9632)
>     Thomas J. Matz (TM 5986)
> Four Times Square
> New York, New York 10036
> (212) 735-3000
>
> Attorneys for Delphi Corporation, et al.,
>     Debtors and Debtors-in-Possession