Hearing Date & Time: September 23, 2008 at 10:00 a.m. (prevailing Eastern time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan III
John K. Lyons
Ron E. Meisler

  - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
    In re                               :   Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :   Case No. 05-44481 (RDD)
                                        :
            Debtors.                    :   (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS REPLY IN SUPPORT OF
GSA AND MRA AMENDMENT MOTION

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby submit this omnibus reply (the "Reply") in support of the Debtors' Expedited Motion For Order Authorizing Debtors To Implement Amended And Restated Global Settlement Agreement And Master Restructuring Agreement With General Motors Corporation, dated September 12, 2008 (the "GSA and MRA Amendment Motion" or "Motion").

Preliminary Statement

1.      Although certain parties allege that the Debtors are requesting relief that is not in the best interests of the estates and in breach of their fiduciary duties, only five objections to the Motion have been filed and remain unresolved:  limited objections from the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America (the "IUE-CWA") and the United Steelworkers of America (the "USW") (both of which are continuing to collectively bargain implementation agreements with Delphi which would include their consent to the proposed relief sought to be authorized by this Motion) and substantive objections from the official committee of unsecured creditors (the "Creditors' Committee"), Wilmington Trust Company ("WTC") (who is a member of the Creditors' Committee), and CR Intrinsic Investors, LLC and Highland Capital Management, L.P. (the "Senior Noteholders") (whose interests are represented by both the Creditors' Committee and WTC).  The objections and the Debtors' responses thereto are summarized in the charts attached hereto as Exhibit 1 and Exhibit 2.

2.      Importantly, the Debtors' largest union, the United Auto Workers, is not opposing the relief requested.  In addition, statements supporting the relief requested or indicating

2

no objection to the relief requested were filed by the Equity Committee, Fiduciary Counselors, the PBGC, and three unions (the IUOE, IBEW, and the IAM).

        3.      The Debtors have carried their burden of demonstrating that the Amended GSA and the Amended MRA satisfy the best interest tests under Bankruptcy Rule 9019 and the business judgment test under section 363 of the Bankruptcy Code.  Nevertheless, the objectors argue that the Motion must be denied because (a) the Debtors have acceded to GM's demands and have failed to exercise business judgment by entering into the Amended GSA and the Amended MRA, (b) the Amended GSA and Amended MRA constitute a <u>sub rosa</u> plan, and (c) this Court can not approve the Motion because it somehow represents an impermissible modification of the Plan. In addition, the Creditors' Committee incorrectly asserts that GM is an insider of the Debtors, which would subject the examination of the Amended GSA and Amended MRA to higher scrutiny.  The objectors have failed to produce any documentary evidence or testimony that supports their assertions that the Debtors have breached their fiduciary duty to the estates or abdicated control of this case to GM.

        4.      Contrary to the assertions of the Creditors' Committee, the Amended GSA and the Amended MRA are the product of months of intense, arms'-length bargaining between the Debtors and GM during which the Debtors clearly considered various alternatives and options to the Amended GSA and the Amended MRA.  When the Plan Investors failed to participate in the April 4, 2008 closing, Delphi's Board of Directors (the "Board") convened the first of nine meetings that would be held between that date and the Board's ultimate approval of the Amended GSA and the Amended MRA on September 12, 2008. (See Joint Hearing Exhibit 85 at 8.)  The Debtors met with the Creditors' Committee on April 8, 2008, just two business days after the scheduled April 4 closing, and shared with it the alternative paths to emergence from chapter 11 that Delphi

3

was considering. One of these paths involved bifurcating the Debtors' transformation plan from the plan of reorganization framework and assuming the GSA and MRA in advance of the POR effective date. (Id. at 12.)

5. For nearly three months thereafter, the Debtors pursued a modified plan of reorganization framework involving a stand-alone plan to be funded internally through adjustments to the recoveries of GM, general unsecured creditors, and other stakeholders. The Creditors' Committee was supportive of this approach, and it was a principal participant in Delphi's discussions with GM regarding a potential standalone arrangement. Those discussions concluded on June 25, 2008, when GM informed Delphi that it was not willing to provide the level of incremental financial support that would have been necessary to make a standalone plan of reorganization framework possible under the RPOR as it existed at that time.

6. Immediately after learning of GM's decision, Delphi began a process of identifying and assessing a range of specific strategic alternatives that included POR modifications providing for debt financing and equity financing through a rights offering backstopped by creditors or other potential investors. This range of strategic alternatives was reviewed with the Creditors' Committee at a meeting on July 16, 2008. (Id. at 15.) During this same period, Delphi was also engaged in the reaffirmation process with respect to the POR Business Plan, which was completed in August 2008. The reaffirmed POR Business Plan is known internally as the "RPOR." In addition, in mid-July 2008, Delphi and GM re-engaged in constructive discussions that addressed, among other things, the incremental financial support needed to make the RPOR a realistic business plan that should attract interest in the capital markets. These efforts have resulted in a number of significant developments since April 2008, all of them accomplished against

4

the backdrop of deteriorating macroeconomic and automotive industry conditions and turbulence in the capital markets.

7. Throughout this process, Delphi's senior leadership acted with diligence and in accordance with its fiduciary duty to maximize the business enterprise value of Delphi and its affiliates and thereby maximize the opportunities for recoveries by the Debtors' stakeholders. In doing so, Delphi considered the Creditors' Committee's demand that the Debtors play a high-stakes game of "chicken" with GM up through the 414(l) Transfer deadline of September 29, 2008 in the hopes that GM would eventually agree to what the Creditors' Committee was really seeking – a form of guaranteed recovery for general unsecured creditors from GM. Delphi ultimately rejected that approach because it believed that obtaining GM's commitment to take on an upsized 414(l) Transfer, assume immediate financial responsibility for other post-employment benefits, and provide what the Debtors concluded was the additional required support for the RPOR was, on balance, more beneficial to the Debtors and their stakeholders than holding out for more at the risk of losing everything. Although the Creditors' Committee may not agree with the Debtors' decisions for failing to initiate litigation or use other "tools" against GM, the decisions made by the Debtors since April 4 are sound.

8. Both the timeline of events and the breadth of support GM is providing through the Amended GSA and the Amended MRA demonstrate that the Debtors did not "surrender" or abdicate control of these cases to GM. The Debtors firmly believe that the Amended GSA and the Amended MRA are in the best interests of the estates, and that entry into the agreements is fundamentally necessary for any meaningful recovery to stakeholders.

9. The chairperson of the Creditors' Committee does not dispute that certain of the transactions contemplated by the Amended GSA and Amended MRA are necessary for a

5

successful restructuring of the Debtors, in particular the execution of the 414(l) Transfer. (Joint Hearing Exhibit 27 at 50: 4-15.) Nor does the chairperson of the Creditors' Committee dispute that the RPOR, which incorporates GM's support from the Amended GSA and Amended MRA, is a business plan that should give the Debtors a chance for a successful emergence from chapter 11. (Id. at 35: 21-25.) Instead, the Creditors' Committee alleges a breach of fiduciary duties for not asserting sufficient "leverage" against GM after April 4, agreeing to an administrative claim in exchange for the 414(l) Transfer, and accelerating both GM's obligations and the Debtors' concomitant release under the Amended GSA and the Amended MRA.

        10.       The Debtors and the Delphi's Board of Directors carefully evaluated both the Amended GSA and Amended MRA and the other potential strategic alternatives in the context of maximizing recoveries for all stakeholders, including unsecured creditors. Further, the Debtors and the Board of Directors dedicated time to listen to the Creditors' Committee directly to consider their grievances, although no viable alternative was proposed. The Debtors' fundamental conclusion that the Amended GSA and Amended MRA would provide the best outcome among the strategic alternatives they reviewed should not now be challenged by the Creditors' Committee when it has proposed no potential alternative, other than exerting leverage over GM by way of an unrealistic litigation strategy. The Creditors' Committee clearly has not considered the ramifications on Delphi's business of exerting this so-called leverage (see id. at 48:2-14), but Delphi's board and management have.

Argument

I.      <u>The Debtors' Settlement With GM Is Fair, Equitable, And In The Best Interests Of The Estates</u>

        11.       The Amended GSA and the Amended MRA are fair, equitable, and in the best interests of the Debtors' estates. The Debtors are receiving significant contributions from GM

6

through the Amended GSA and Amended MRA, which will be immediate and unconditional. The Debtors have also concluded that the Amended GSA and the Amended MRA are essential pre-requisites to maximizing the Company's business enterprise value and therefore maximizing the opportunities for recoveries by stakeholders. The Debtors have concluded that the balance of the consideration to and from the Debtors was reasonable and appropriate under the circumstances. The objectors have failed to produce any documentary evidence or testimony that supports their claims that GM's contributions to the Debtors are inadequate. Moreover, no realistic alternative to the Amended GSA and Amended MRA has been proposed by the Creditors' Committee, WTC, or the Senior Noteholders.

12. "In general, a bankruptcy court has broad authority to approve or disapprove compromises and settlements affecting the bankruptcy estate." Wolinsky v. Maynard (In re Maynard), 269 B.R. 535, 539 (S.D.N.Y. 2001). In evaluating a settlement, a bankruptcy court must determine whether it is supported by adequate consideration and whether it is fair, equitable, and in the best interests of the debtor's estate. Id. (bankruptcy court must "make an informed, independent judgment as to whether a settlement is 'fair and equitable' and 'in the best interests of the estate'") (quoting Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968), reh. denied, 391 U.S. 909 (1989)). See also Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.") (citations omitted); Air Line Pilots Ass'n Int'l v. American Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993) (same), aff'd, 17 F. 3d 600 (2d Cir. 1994).

13. The settlement embodied in the Amended GSA and Amended MRA is supported by adequate consideration, is fair and equitable, and is in the best interests of the

7

Debtors' estates.  The Debtors have demonstrated that GM's contributions under the agreements represent more than $10 billion of net contributions to the estates.  In return, as part of this broad settlement, the Debtors agreed to provide to GM an administrative claim in exchange for the 414(l) Transfer, a subordinated unsecured claim, and a release from the Debtors.  It is appropriate to grant an administrative claim under the circumstances presented here because GM is providing real value that will preserve the Debtors' estates.  The objectors' attempt to obviate this point by arguing that, because GM is already obligated to assume some portion of the pension obligations that would be included in the 414(l) Transfer, the value of the transaction to the Debtors should be ignored.  But, the simple fact is, through the Amended GSA the Debtors will be relieved of billions of dollars of liabilities through these transactions, and will avoid billions more by doing so on or before September 29, 2008.  These circumstances clearly warrant the provision of an administrative claim, as the Debtors have no other reasonable source or mechanism to avoid these liabilities.

    14. In addition, the Debtors have adequately evaluated the GM Claims and Defenses and have made such evaluation available.  The Debtors' explanation for granting the release is contained in the Motion, but is covered in even greater detail in the Debtors' Disclosure Statement (See Disclosure Statement 54-61.)  Moreover, the Debtors' witnesses will provide unrebutted testimony concerning their assessment of the merits of the Debtors' claims against GM.  In reviewing a settlement, the "responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised . . . but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"  Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972).  See also In re Ashford Hotels, Ltd., 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998).  Proposed settlements that fall within the range of reasonableness should be approved.  See In re

8

Mrs. Weinberg's Kosher Foods, Inc., 278 B.R. 358, 361-62 (Bankr. S.D.N.Y. 2002) ("A proposed settlement will pass muster provided it does not fall below the lowest point in the range of reasonableness.") (citations and internal quotation marks omitted).  Indeed, a court may approve a settlement even if it believes that the claim being settled by the debtor would ultimately prove successful.  Official Committee of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc. (Int'l Distrib. Ctrs., Inc.), 103 B.R. 420, 423 (S.D.N.Y. 1989) (citation omitted).  This Court has great familiarity with the GM Claims and Defenses and can adequately evaluate the terms of the settlement on the information that has been presented.

    15. In evaluating the GM Claims and Defenses, the Debtors considered, among other things, the uncertainty of the outcome of any potential litigation with GM, the complexity of the litigation and the attendant expense, inconvenience, and delay, and the interests of their creditors and other stakeholders.  When viewed in the context of these factors, it is clear that the settlement falls within the range of reasonableness.[1]  See, e.g., S.E.C. v. Drexel Burnham Lambert Inc. (In re Drexel Burnham Lambert), 130 B.R. 910, 927 (S.D.N.Y. 1991) (citations omitted); Nellis, 165 B.R. at 122 (citations omitted);  In re Levy, 89 B.R. 389, 392 (Bankr. S.D.N.Y. 1988).

---

[1] This list is not exhaustive.  A bankruptcy court may review any factor that is relevant to a determination about the reasonableness of a proposed settlement.  In re Enron, 2003 WL 230838, at *2 (S.D.N.Y. Jan. 31, 2003) (citations omitted)  Several courts in this Circuit have employed a seven-factor test "[i]n determining whether a settlement is 'fair and equitable,' i.e., within the range of reasonableness." Drexel, 134 B.R. at 497.  These factors are as follows:

1. the probability of success in litigation in comparison to the present and future benefits offered by the settlement;
2. the prospect of complex and protracted litigation if the settlement is not approved;
3. the degree to which the settlement is supported by parties in interest;
4. the competency and experience of counsel who support the settlement;
5. the relative benefits to be received by members of any affected class;
6. the nature and breadth of releases to be obtained by officers and directors; and
7. the extent to which settlement is the product of arms'-length bargaining.

Drexel, 134 B.R. at 497 (citing In re Texaco, Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988), appeal dismissed, 92 B.R. 38 (S.D.N.Y. 1988)).

16. The Debtors have also thoroughly evaluated the GM Claims and Defenses and found, on balance, that the proposed settlement under the Amended GSA and Amended MRA would be more likely to maximize the value of the estates. Moreover, the attendant delay of the transfer of liabilities to GM has a direct impact on Delphi's business plan and the Debtors' ability to reorganize. It is in the paramount interests of all stakeholders, including the unsecured creditors, that the Debtors be authorized to implement the Amended GSA and the Amended MRA.

A. <u>The Debtors Have Appropriately Exercised Their Fiduciary Duties</u>

17. Contrary to the baseless assertions in the objections, Delphi's board of directors appropriately exercised their fiduciary duties when approving the Amended GSA and Amended MRA. The Creditors' Committee's argument that the Company and the Board acceded to unreasonable demands of GM in reaching these agreements is simply untrue. In the months following the failed closing of the Plan, the Board was involved in evaluating the progress of the Debtors' potential Plan modifications with the Creditors' Committee and GM. When it was clear that a modified Plan framework involving an internally funded modified Plan could not be consummated, the Board, with the assistance of management and the Company's advisors, evaluated the range of strategic alternatives available to the Company. This analysis continued through August 2008, as GM and the Debtors discussed a modified Plan framework with a GM-Delphi Rights Offering structure. As previously stated, the Board determined that the best way to maximize value for stakeholders was to accelerate the effectiveness of the Approved GSA and Approved MRA.

18. In addressing the fiduciary duties of directors of a bankruptcy company, courts in this Circuit have recognized that "[i]n the non-bankruptcy takeover cases, management's fiduciary duties run primarily to the corporation's shareholders. In contrast, the management of a bankrupt company must 'further the diverse interests of the debtor, creditors and equity holders,

10

alike.' The bankruptcy court must resolve the tension which results from the sometimes conflicting objectives of these constituencies." In re Integrated Resources, Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992) (Mukasey, D. J.). Similarly, Judge Gerber, in discussing the approval of a settlement that was opposed by unsecured creditors, noted that

> [T]he approval of a settlement cannot be regarded as a counting exercise. Rather, it must be considered in light of the reasons for any opposition, and the more fundamental factors — such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk — described above. That is particularly so in cases like this one where a debtor's board is the fiduciary for all parties in interest, who naturally have competing interests with respect to limited assets that are insufficient to satisfy everyone's needs and concerns. In such cases, where the settlement proponent is trying to maximize value for all, or to minimize risk for all, concerns of that character plainly trump the head count in support.

In re Adelphia Communications, 327 B.R. at 165.

        19.      Delphi's Board is the fiduciary for the Company's unsecured creditors, including bondholders, and owes fiduciary duties to shareholders and other parties-in-interest. Because of this duty, the Board must consider how to maximize the value of Delphi's assets. In the face of tightening credit markets and a current dearth of viable strategic alternatives, the Board approved entry into the Amended GSA and Amended MRA to maximize value and to support Delphi's business plan going forward for the benefit of all constituencies. The Debtors believe that, with this business plan, they have maximized their opportunity to emerge from chapter 11 in a way that provides value for their stakeholders.

        20.      Given what has been achieved through these agreements, the release granted to GM is not a breach of any fiduciary duties. The Debtors and the Board considered the acceleration of substantially all of GM's obligations under the Amended GSA and Amended MRA as mandatory symmetry for the acceleration of the release. The Debtors did not accede to GM's demand for a release, but instead required GM to provide adequate consideration for the acceleration of the release.

11

    B.    <u>The Court Should Affirm The Debtors' Business Judgment</u>

    21.    A debtor may use the property of the estate outside the ordinary course of business pursuant to Bankruptcy Code section 363(b), so long as the debtor exercised proper business judgment. <u>See</u> <u>Comm. Of Equity Sec. Holders v. Lionel Corp.</u> (In re Lionel Corp.) 722 F.2d 1063, 1071 (2d Cir. 1983); <u>Orion Pictures Corp. v. Showtime Network, Inc.</u> (In re Orion Pictures Corp.) 4 F.3d 1095, 1098-99 (2d Cir. 1993).  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" <u>In re Global Crossing Ltd.</u> 295 B.R. 726, 743 (Bankr. S.D.N.Y., 2003) (<u>quoting</u> <u>Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc.</u> (In re Integrated Resources, Inc.)  147 B.R. 650, 656 (S.D.N.Y. 1992)).  Parties opposing the Debtors' use of business judgment have the burden of rebutting a presumption of validity.  <u>Integrated Resources, Inc.</u>,  147 B.R. at 656.

    22.    The Debtors and the Board have satisfied the standards applicable under section 363(b).  Following the attempted closing on the Plan on April 4, 2008, the Debtors' management and Board carefully identified and examined a full range of strategic alternatives that were available to them.  The Debtors consulted with the Creditors' Committee regarding potential strategic alternatives and sought input with respect to preferred paths to emergence.  The Board also held separate meetings with the Creditors' Committee and Equity Committee to elicit their views on the Amended GSA and the Amended MRA.  The Board and the Debtors have carefully considered every step since the events of April 4 and have acted in their informed business judgment throughout the process that led to the amended agreements with GM.  The objectors have provided no evidence that the Board has failed to act in good faith, or that the Board's action authorizing the Debtors to enter into the Amended GSA and Amended MRA is not in the best

12

interests of the Debtors' estates. Consequently, the Court should affirm the Debtors' business judgment.

II.     The Amended GSA And Amended MRA Do Not Constitute A Sub Rosa Plan

23.     The Approved GSA and the Approved MRA contained many provisions that were centered around the POR process. For example, GM had consent rights with respect to the Plan and any Plan modifications, all exhibits to the Plan, and the confirmation order. (See Joint Hearing Exhibit 85 at 7.) The Amended GSA eliminates many of GM's consent rights, and further eliminates GM's ability to object to a Delphi Plan if certain limited plan provisions are included. The Amended GSA also contains a covenant pursuant to which, to the extent the Court approves the Amended GSA, the Debtors will propose a plan containing certain elements regarding GM's claim, release provisions, and interpretation provisions. These elements of the Amended GSA and the Amended MRA, which affect a single party in interest, do not constitute a sub rosa plan.

24.     A transaction within chapter 11 may be a sub rosa plan of reorganization if it disposes of all the debtor's assets, restricts creditor's rights to vote on a plan of reorganization, or dictates the terms of a plan of reorganization. In re Tower Automotive, Inc., 342 B.R. 158, 163-64 (Bankr. S.D.N.Y.), aff'd, 241 F.R.D. 162 (S.D.N.Y. 2006). The concern is that the debtor will enter a transaction "that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.'" In re Iridium Operating LLC, 478 F.3d 452 (2nd Cir. 2007) (alterations in original) (citing In re Braniff Airways, Inc. 700 F.2d 935, 940 (5th Cir. 1983)).

25.     Granting an administrative claim to GM does not constitute a *sub rosa* plan. Neither do the proposed amendments to the Approved GSA and the Approved MRA restrict any party's right to vote on any future plan or modification to the current Plan. Nor do the Amended GSA and Amended MRA dictate the terms of any plan. The Debtors have agreed to include certain elements in a plan or modifications to the Plan, but the ultimate terms, particularly with

13

respect to parties other than GM, have not been decided by the Amended GSA and Amended MRA. While it is true that some aspects of the Amended GSA and the Amended MRA are contingent upon consummation of a Delphi plan, a failure to confirm such a plan does not render the Amended GSA and the Amended MRA unenforceable. Finally, the provisions the Debtors have agreed to include in a plan or modifications to the Plan remain subject to the votes of creditors through the safeguards prescribed by sections 1125 and 1127 of the Bankruptcy Code.

III.    The Agreements Can Be Modified

26.    Both the Creditors' Committee and WTC argue that section 1127 of the Bankruptcy Code prohibits modifications of the Approved GSA and the Approved MRA. But, this ignores the structure under which these agreements were included in the Plan. The Confirmation Order provides explicit authority to the Debtors and GM to modify the Approved GSA and the Approved MRA. The Confirmation Order provides that the exhibits to the Plan can be modified by their terms. In short, the Debtors are doing precisely what the Plan allows.

27.    WTC and the Creditors' Committee cite the Ionosphere case for the certain proposition that the Approved GSA and Approved MRA cannot be modified outside of section 1127, notwithstanding the clear language of the Confirmation Order, the Plan, and the Approved GSA and MRA. The Ionosphere case cited by WTC and the Creditors' Committee is distinguishable in a very important respect, however. The modification right contained in the agreement in Ionosphere was pre-existing in a prepetition contract that was adopted as part of a plan and modified in other respects; the parties did not have authority pursuant to the confirmation order to modify the agreements. Indeed, the modifications under the plan in Ionosphere were the direct subject of and contradictory to the post-effective date modifications proposed by the parties to the agreements. Here, the authority to make modifications to the Approved GSA and Approved MRA was included in the agreements themselves that were approved for the first time at confirmation.

14

The Court's approval of these agreements, with the right to modify explicit not only in the agreements but in the Confirmation Order itself, renders the present case completely distinguishable from Ionosphere.

28.  Finally, even if the Court were persuaded by the Creditors' Committee's and WTC's argument that this Court is barred by the Confirmation Order or case law from considering the relief requested in the Motion, these arguments could be mitigated by the Court either exercising its reserved power to revoke the confirmation order or conditioning the approval of the Motion upon the Debtors' withdrawal of the Plan.[2]  The Debtors do not believe that either action, standing alone, would be in the best interests of the Debtors and their estates, and apparently neither do the Creditors' Committee or WTC, as each has suspended indefinitely their adversary proceedings under section 1144 to revoke the Confirmation Order.  Indeed, the revocation or withdrawal of the confirmation order may have unintended adverse consequences, for example, with respect to the Plan Investor litigation and the recently withdrawn examiner request.  But, the importance of the Amended GSA and the Amended MRA to the Debtors' prospects for a successful emergence changes this calculus entirely.

IV.   Other Objections

  A.   GM Is Not An Insider

29.  The Creditors' Committee asserts, without any factual support, that GM is an insider of the Debtors because GM is a "person in control" of the Debtors.  As this Court has previously determined, GM is not an insider.[3]  Among the factors used when evaluating such a contention are whether the party (a) received information that was not available to other parties in

---

[2]  The Debtors' Board has not considered, and would have to approve such an action.

[3]  Hr'g Tr., 216-17, April 7, 2006 (hearing on motion to approve human capital hourly attrition programs, in which Court declined to find that GM was insider and accordingly declined to apply strict scrutiny).

interest or the general public, (b) attempted to influence the debtor's decisions, (c) selected new management for the debtor, (d) had special access to the debtor's premises and personnel, (e) was the debtor's sole source of financial support, and (f) generally acted as a joint venturer or prospective partner with the debtor rather than an arms'-length creditor.  Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 500 (S.D.N.Y. 1994).

30. During these cases, however, GM has not influenced the Debtors' decisions except through contentious arms'-length negotiations leading to agreements that were approved by this Court, has not selected the Debtors' management, has not had access to Delphi that is any different than any of the Debtors' other customers under customary customer contracts, and has provided postpetition financing to the Debtors along with the many DIP Lenders.[4]  GM's access to information has been appropriate to the nature and magnitude of the transactions and proposed transactions between the Debtors and GM.  Accordingly, the Court should apply the customary level of review to the proposed transaction.

B. The IUE-CWA

31. The IUE-CWA alleges that under the Amended GSA and Amended MRA, the Debtors will receive a $26 million cash payments from GM in satisfaction of a portion of the IUE-CWA claim relating to an IUE-CWA VEBA that is to be created under the IUE-CWA MOU. The IUE-CWA agreed as part of its settlement with the Debtors that it would accept a general unsecured claim (a portion of which is attributable to the IUE-CWA VEBA).  Nonetheless, the IUE-CWA now alleges that the Debtors are now violating the principle of the agreement with the IUE-CWA and that Delphi is not properly addressing its OPEB responsibilities in violation of section 1114 of the Bankruptcy Code.

---

[4] The Creditors' Committee does not allege that GM has acted as a joint venturer or prospective partner with the Debtors.

16

32.     The IUE-CWA was well-represented during the negotiations in 2007 when it agreed to take general unsecured claim currency to fund the VEBA in question. That the IUE-CWA is now unhappy with the deal it struck then is not relevant and the IUE-CWA should not now be permitted to renegotiate its deal to the detriment of the Debtors' other stakeholders.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) overruling the objections, (b) granting the GSA and MRA Amendment Motion, and (c) granting them such other and further relief as is just.

Dated:  New York, New York
        September 23, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr.
      Albert L. Hogan, III
      John K. Lyons
      Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti
      Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession