**Exhibit 2**

***OBJECTIONS TO AND STATEMENTS IN SUPPORT OF THE GSA AND MRA AMENDMENT MOTION
ORGANIZED BY OBJECTOR[1]***

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| 1. | 14168 | Official Committee of Unsecured Creditors | The Creditors' Committee's Preliminary Objection asserts: | |
| | | | Entry into the Amended GSA and MRA does not reflect the sound exercise of the Debtors' business judgment. | Throughout its negotiations with GM, Delphi's senior leadership acted with diligence and in accordance with its fiduciary duty to maximize the business enterprise value of Delphi and its affiliates and thereby maximize the opportunities for recoveries by the Debtors' stakeholders.  In doing so, Delphi considered the Creditors' Committee's demand that the Debtors play a high-stakes game of "chicken" with GM up through the 414(l) Transfer deadline of September 29, 2008 in the hopes that GM would eventually agree to what the Creditors' Committee was really seeking – a form of guaranteed recovery for general unsecured creditors from GM.  Delphi ultimately rejected that approach because it believed that obtaining GM's commitment to take on an upsized 414(l) Transfer, assume immediate financial responsibility for other post-employment benefits, and provide what the Debtors concluded was the additional required support for the RPOR was, on balance, more beneficial to the Debtors and their stakeholders than holding out for more at the risk of losing everything.  While the Creditors' Committee may not agree with the Debtors' decisions for failing to initiate litigation or use other "tools" against GM, the decisions made by the Debtors since April 4 are sound. |

---

[1] This chart reflects all objections received as of September 22, 2008.

| DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|
| | | Entry into the Amended GSA and MRA reflects an abdication of the Debtors' fiduciary duties. | The Debtors' fiduciary duties extend to all parties in interest and require a focus on maximizing the value of the corporation as an entity, rather than for the benefit of particular constituencies. See In re Adelphia Communications, 327 B.R. 143, 165 (Bankr. S.D.N.Y. 2005) (finding that in reaching settlement, board of directors acted not only appropriately, but preferably, by considering "the good of the entire enterprise" rather than one constituency). In the face of uncertain credit markets, potentially massive claims to be asserted by the PBGC, and a dearth of other viable strategic alternatives at this time, the Board approved entry into the Amended GSA and Amended MRA to maximize the value and accelerate the benefits to be obtained from GM and to support the Debtors' business plan going forward to the benefit of all constituencies. Case law supports approval of a settlement over the objections of particular groups where a settlement proponent is seeking to maximize value and minimize risk for the benefit of all parties in interest. |
| | | The amendments to the GSA and MRA represent a *sub rosa* plan. | A transaction within Chapter 11 may be a *sub rosa* or *de facto* plan of reorganization only when it disposes of all the debtor's assets, restricts creditor's rights to vote on a plan of reorganization, or dictates the terms of a plan of reorganization. In re Tower Automotive, Inc., 342 B.R. 158, 163-64 (Bankr. S.D.N.Y.), aff'd 241 F.R.D. 162 (S.D.N.Y. 2006). The proposed GSA and MRA amendments do not seek to dispose of all or substantially all the Debtors' assets; nor do they restrict any party's right to vote on any future plan or modification of the current Plan. The amendments also do not dictate the terms of any plan or Plan modification. Although it is true that some aspects of the amendments are contingent upon consummation of a revised plan, a failure to confirm such a plan does not render the amendments unenforceable; it would merely fail to trigger certain of the amendments' provisions. If there were a new plan or an amended Plan, no party would be restricted by the amendments from voting for or against it as they desire. |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | Granting GM a release without regard to the Debtors' successful reorganization or creditor recoveries is inappropriate. | GM is contributing more than $10 billion to the estates. In light of the contributions made by GM through the Amended GSA and the Amended MRA, the Debtors believe it is in the best interests of the estates to grant such a release. Moreover, the grant of such a release is reasonable and market in the context of a settlement of this magnitude. |
| | | | The GM administrative claim is inappropriate. | GM is providing new value to the estates during the postpetition period by assuming postpetition and future Debtor obligations and the payments to GM therefore constitute an actual, necessary cost to preserve the estates. GM's administrative claim will be subject to all of the procedures and protections of chapter 11. Moreover, no payments to GM will be made until the first distribution date, which applies to all other claimants. |
| 2. | 14176 | IUE-CWA | Limited objection aimed at discovering materials related to the 414(l) transfer. | The IUE-CWA has consent rights to any relief that might affect the IUE-CWA or its members. There is accordingly no basis to object.. |
| 3. | 14202 | United States of America | The Court lacks jurisdiction to rule on matters related to or grant releases applicable to the Government for tax and environmental liabilities of non-debtors under applicable federal laws including CERCLA, the Anti-Injunction Act, and the Declaratory Judgment Act. | Resolved. The Debtors will include additional language in the proposed order in resolution of this objection. |
| 4. | 14211 | CR Intrinsic Investors, LLC and Highland Capital Management, L.P. (the "Senior Noteholders") | The Senior Noteholders object on the following grounds: | |

3

| DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|
| | | The GSA and MRA constitute a *sub rosa* plan without providing the disclosure and procedural and substantive protections that are provided to creditors in conjunction with a plan, including the right to vote. | A transaction within Chapter 11 may be a *sub rosa* or *de facto* plan of reorganization only when it disposes of all the debtor's assets, restricts creditor's rights to vote on a plan of reorganization, or dictates the terms of a plan of reorganization. In re Tower Automotive, Inc., 342 B.R. 158, 163-64 (Bankr. S.D.N.Y.), aff'd 241 F.R.D. 162 (S.D.N.Y. 2006). The proposed GSA and MRA amendments do not seek to dispose of all or substantially all the Debtors' assets; nor do they restrict any party's right to vote on any future plan or modification of the current Plan. The amendments also do not dictate the terms of any plan or Plan modification. Although it is true that some aspects of the amendments are contingent upon consummation of a revised plan, a failure to confirm such a plan does not render the amendments unenforceable; it would merely fail to trigger certain of the amendments' provisions. If there were a new plan or an amended Plan, no party would be restricted by the amendments from voting for or against it as they desire. |
| | | The Amended GSA and Amended MRA include provisions for the allowance and treatment of GM's claims under any plan by (1) affording GM an administrative claim for obligations that are rooted in prepetition liabilities while ignoring that GM is overfunded in its pension plan and could not use the funds in that pension plan for any other purpose and (2) granting GM preferred stock in a reorganization plan. | The Senior Noteholders allege that the Amended GSA and Amended MRA are a *sub rosa* plan because GM is entitled to receive preferred stock under the amended agreements, a different currency than that which is to be afforded to unsecured creditors. First, the preferred stock granted to GM under the Amended GSA is granted for both its administrative claim and its unsecured claim, but only under certain conditions. This mechanism has been used to allow Delphi to pay the administrative claim in currency other than cash to preserve liquidity and lower the required exit financing under a modified plan. In addition, the preferred stock provides limited voting rights to the holder of the preferred stock and does not provide dividends for three years. As the Amended GSA and Amended MRA do not proscribe the recoveries for all stakeholders, it properly does not address the claims of other constituencies, nor does it bind the Debtor as to what type of recovery to provide to other parties. |

4

| DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|
| | | The Amended GSA contemplates that the Debtors and their affiliates immediately release substantially all of their claims against GM and its affiliates on the Effective Date of the Amended GSA, reaffirm the release as of the Emergence Date, and include releases by third parties in the plan of reorganization. | Although the Amended GSA does provide that the Debtors and their affiliates immediately release substantially all of their claims against GM and its affiliates on the Effective Date of the Amended GSA, it does not bind third parties. Moreover, the appropriate standard is not whether the agreement includes releases but whether the Debtors appropriately exercised their business judgment in reaching the agreements and whether the settlement is in the best interests of the estates, which standard the Debtors have met. |
| | | The GSA/MRA Amendment Motion cannot be approved under Bankruptcy Rule 9019 because there is insufficient information in the record. | The Debtors' analysis and assessment of the GM claims and defenses was provided in great detail in the Debtors' disclosure statement. In addition, the record amply demonstrates that the Debtors carefully considered strategic alternatives, including actions against GM. |
| | | The GSA/MRA Amendment Motion cannot be approved under Bankruptcy Rule 9019 because no creditor other than GM and the PBGC support the Amended GSA or Amended MRA. | As Judge Gerber, in discussing the approval of a settlement that was opposed by unsecured creditors, noted, "[T]he approval of a settlement cannot be regarded as a counting exercise. Rather, it must be considered in light of the reasons for any opposition, and the more fundamental factors – such as benefits of settlement, likely rewards of litigation, costs of litigation and downside risk-described above. That is particularly so in cases like this one where a Debtors' board is the fiduciary for all parties in interest, who naturally have competing interests with respect to limited assets that are insufficient to satisfy everyone's needs and concerns. In such cases, where the settlement proponent is trying to maximize value for all, or to minimize risk for all, concerns of that character plainly trump the head count in support." In re Adelphia Communications, 327 B.R. at 165. |

5

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| 5. | 14214 | Wilmington Trust Company | Wilmington Trust alleges the following: | |
| | | | The GSA/MRA Amendment Motion seeks approval of an unauthorized modification of the Debtors' confirmed plan of reorganization by not complying with section 1127 of the Bankruptcy Code and section 12.3 of the Plan. | Both the Creditors' Committee and WTC argue that section 1127 of the Bankruptcy Code prohibits modifications of the Approved GSA and the Approved MRA. But, this ignores the structure under which these agreements were included in the Plan. The Confirmation Order provides explicit authority to the Debtors and GM to modify the Approved GSA and the Approved MRA. The Confirmation Order provides that the exhibits to the Plan can be modified by their terms. In short, the Debtors are doing precisely what the Plan allows. WTC and the Creditors' Committee cite the Ionosphere case for the certain proposition that the Approved GSA and Approved MRA cannot be modified outside of section 1127, notwithstanding the clear language of the Confirmation Order, the Plan, and the Approved GSA and MRA. Doral Center Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.), 208 B.R. 812 (S.D.N.Y. 1997). The Ionosphere case cited by WTC and the Creditors' Committee is distinguishable in a very important respect, however. The modification right contained in the agreement in Ionosphere was pre-existing in a prepetition contract that was adopted as part of a plan and modified in other respects; the parties did not have authority pursuant to the confirmation order to modify the agreements. Indeed, the modifications under the plan in Ionosphere were the direct subject of and contradictory to the post-effective date modifications proposed by the parties to the agreements. Here, the authority to make modifications to the Approved GSA and Approved MRA was included in the agreements themselves that were approved for the first time at confirmation. The Court's approval of these agreements, with the right to modify explicit not only in the agreements but in the Confirmation Order itself, renders the present case completely distinguishable from Ionosphere.<br><br>Section 12.3 of the Plan describes the waiver of conditions to effectiveness. The Debtors are not seeking to take action under this section or Section 12.2. |

6

| DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|
| | | The proposed settlement with GM is not in the best interests of the Debtors' estates because the settlement was not the product of "arms-length" bargaining. | This objection is without merit. The Debtors have clearly shown that the bargaining with GM was intense, prolonged, and accordingly, without question, at arms'-length. |
| | | The Debtors release of their claims against GM is inappropriate because the Debtors will not be able to exert leverage over GM at a later time and the release is not incorporated into a plan of reorganization. | The Debtors, after careful and thorough consideration have determined in their business judgment that the benefit of potential future leverage against GM is outweighed by the present, concrete benefit of having a supportable business plan with which the approach the credit markets. Although the Amended GSA does provide that the Debtors and their affiliates immediately release substantially all of their claims against GM and its affiliates on the Effective Date of the Amended GSA, it does not bind third parties. Moreover, the appropriate standard is not whether the agreement includes releases but whether the Debtors appropriately exercised their business judgment in reaching the agreements and whether the settlement is in the best interests of the estates, which standard the Debtors have met. Finally, GM is contributing more than $10 billion to the estates. In light of the contributions made by GM through the Amended GSA and the Amended MRA, the Debtors believe it is in the best interests of the estates to grant such a release. Moreover, the grant of such release is reasonable in the context of a settlement of this magnitude. |
| | | The confirmed plan specifies that the 414(l) transaction will occur no earlier than the Effective Date of the Plan. | The First Net Liability Transfer as defined in the Amended GSA will take place on the effective date of the Amended GSA. The remainder of the liability transfer will take place upon the GSA Consummation Date and the effective date of the Delphi' Plan as defined in the Amended GSA. |

|    | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|----|------------|----------|----------------------|-----------------------------------|
| 6. | 14215 | Official Committee of Unsecured Creditors (the "Creditors' Committee") | Objection asserts: | |
|    |       |          | The GSA/MRA Amendment Motion seeks approval of an unauthorized modification of the Debtors' confirmed plan of reorganization by not complying with section 1127 of the Bankruptcy Code. | Both the Creditors' Committee and WTC argue that section 1127 of the Bankruptcy Code prohibits modifications of the Approved GSA and the Approved MRA. But, this ignores the structure under which these agreements were included in the Plan. The Confirmation Order provides explicit authority to the Debtors and GM to modify the Approved GSA and the Approved MRA. The Confirmation Order provides that the exhibits to the Plan can be modified by their terms. In short, the Debtors are doing precisely what the Plan allows. WTC and the Creditors' Committee cite the Ionosphere case for the certain proposition that the Approved GSA and Approved MRA cannot be modified outside of section 1127, notwithstanding the clear language of the Confirmation Order, the Plan, and the Approved GSA and MRA. Doral Center Inc. v. Ionosphere Clubs, Inc. (In re Ionosphere Clubs, Inc.), 208 B.R. 812 (S.D.N.Y. 1997). The Ionosphere case cited by WTC and the Creditors' Committee is distinguishable in a very important respect, however. The modification right contained in the agreement in Ionosphere was pre-existing in a prepetition contract that was adopted as part of a plan and modified in other respects; the parties did not have authority pursuant to the confirmation order to modify the agreements. Indeed, the modifications under the plan in Ionosphere were the direct subject of and contradictory to the post-effective date modifications proposed by the parties to the agreements. Here, the authority to make modifications to the Approved GSA and Approved MRA was included in the agreements themselves that were approved for the first time at confirmation. The Court's approval of these agreements, with the right to modify explicit not only in the agreements but in the Confirmation Order itself, renders the present case completely distinguishable from Ionosphere. |

| DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|
| | | The GSA/MRA Amendment Motion cannot be approved under Bankruptcy Rule 9019 because it violates the absolute priority rule by granting a priority claim to GM for obligations that would have been on par with or subordinated to unsecured creditors' claims. | The administrative claim granted to GM stems from liabilities assumed by GM that constitute a necessary, actual expense to preserve the estates. Moreover, as the Equity Committee correctly notes in its Statement, "disputes over allocation and applicability of the absolute priority rule are not before the Court at this time" because the Debtors are not proposing a distribution scheme in connection with the Motion. |
| | | The GSA/MRA Amendment Motion cannot be approved under Bankruptcy Rule 9019 because the Amended GSA and Amended MRA do not take into account the paramount interests of the Debtors' creditors because the Creditors' Committee was not involved in the negotiations and allegedly GM would be put in control of the outcome of the cases, resulting in substantially diminished creditor recoveries. | First, a settlement need not be in the "paramount" interest of unsecured creditors to be approved. Further, even if this were the standard, active participation by the Creditors' Committee in all aspects of negotiation would not be required nor would such participation conclusively establish that this transaction is appropriate. Moreover, the Debtors would still have their contractual rights and rights under the Bankruptcy Code with respect to GM. Any leverage preserved by failing to provide a release now is far outweighed, in the Debtors' business judgment (after a thorough analysis by management, the Board, and Delphi's advisors) by the benefits provided to the Debtors from the immediate effectiveness of the Amended GSA and Amended MRA. |
| | | The GSA/MRA Amendment Motion cannot be approved under Bankruptcy Rule 9019 because there is insufficient information in the record. | The Debtors' analysis and assessment of the GM claims and defenses was provided in great detail in the Debtors' disclosure statement. In addition, the record amply demonstrates that the Debtors carefully considered strategic alternatives, including actions against GM. |

9

| Docket No. | Objector | Summary of Objection | Resolution, Response, or Proposal |
|---|---|---|---|
| | | The amendments to the GSA and MRA represent a *sub rosa* plan because the Amended GSA and Amended MRA provide for the treatment of GM's claim (in some instances through the issuance of preferred stock) and the Debtors' obligation to include certain provisions in a plan. | A transaction within Chapter 11 may be a *sub rosa* or *de facto* plan of reorganization only when it disposes of all the debtor's assets, restricts creditor's rights to vote on a plan of reorganization, or dictates the terms of a plan of reorganization. In re Tower Automotive, Inc., 342 B.R. 158, 163-64 (Bankr. S.D.N.Y.), aff'd 241 F.R.D. 162 (S.D.N.Y. 2006). The proposed GSA and MRA amendments do not seek to dispose of all or substantially all the Debtors' assets; nor do they restrict any party's right to vote on any future plan or modification of the current Plan. The amendments also do not dictate the terms of any plan or Plan modification. Although it is true that some aspects of the amendments are contingent upon consummation of a revised plan, a failure to confirm such a plan does not render the amendments unenforceable; it would merely fail to trigger certain of the amendments' provisions. If there were a new plan or an amended Plan, no party would be restricted by the amendments from voting for or against it as they desire. |
| | | The Debtors breached their fiduciary duties to the estates and unsecured creditors by (1) failing to take concrete steps to assert leverage the estates had against GM after the April 4 failed closing and (2) acquiescing to GM's demands for a multi-billion dollar allowed administrative expense claim and gratuitously offering to accelerate the timing of GM's release from the estates even though GM was allegedly only providing to the Debtors amounts for which it was already obligated. | This objection is without merit. The record amply demonstrates that the Debtors carefully considered strategic alternatives, including actions against GM. Moreover, the Debtors have clearly shown that the bargaining with GM was intense, prolonged, and accordingly without question at arms'-length. |
| | | The agreements with GM are agreements with an insider and are thus subject to heightened scrutiny under 363(b), which the Debtors cannot meet. | GM is not an insider, as previously ruled by the Court in the hearing on motion to approve human capital hourly attrition programs. See Hr'g Tr., 216-17, April 7, 2006 (Court declined to find that GM was insider and accordingly declined to apply strict scrutiny). |
| | | GM would have control over the chapter 11 cases if the releases are granted. | To the contrary, the Debtors would still have their contractual rights and rights under the Bankruptcy Code with respect to GM. Any leverage preserved by failing to provide a release now is far outweighed, in the Debtors' business judgment (after a thorough analysis by management, the Board, and Delphi's advisors) by the benefits provided to the Debtors from the immediate effectiveness of the Amended GSA and Amended MRA. |

| | DOCKET NO. | OBJECTOR | SUMMARY OF OBJECTION | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| 7. | 14216 | United Steelworkers of America | The USW submits a limited objection to the motion solely because it has not yet been able to reach an agreement on the terms of the Implementation Agreement with Delphi and GM however it is committed to continued good faith negotiations. | The USW has consent rights with respect to its rights and the rights of its members and accordingly the USW has no basis to object to the motion. |
| 8. | 14220 | IUE-CWA [Filed under seal as to certain information not disclosed herein] | The Debtors will receive a $26 million cash payment from GM in satisfaction of a portion of the IUE-CWA claim relating to an IUE-CWA VEBA that is to be created under the IUE-CWA MOU. Although the IUE-CWA agreed that the VEBA would be funded by the proceeds from an unsecured claim, because the modified plan will likely not be paid at par plus accrued values, the IUE-CWA believes the Debtors will be violating the principle of the agreement with the IUE-CWA and will not be properly addressing its OPEB responsibilities in violation of section 1114. | The IUE-CWA was well-represented during the negotiations in 2007 when it agreed to take general unsecured claim currency to fund the VEBA in question. That the IUE-CWA is now unhappy with the deal it struck then is not relevant and the IUE-CWA should not now be permitted to renegotiate its deal to the detriment of the Debtors' other stakeholders. |

| | DOCKET NO. | RESPONDENT | SUMMARY OF STATEMENT | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| | | | **STATEMENTS FILED WITH RESPECT TO THE GSA/MRA AMENDMENT MOTION** | |
| 9. | 14210 | Fiduciary Counselors Inc. | Fiduciary Counselors filed a statement in support of the relief requested in the GSA/MRA Amendment Motion as effectuating the 414(l) transfer in the manner described will substantially satisfy the HRP's claim and will avoid application of the provisions of the Pension Protection Act to the unfunded HRP obligations, both of which will make the Debtors' emergence from chapter 11 more viable. | |
| 10. | 14212 | Pension Benefit Guaranty Corporation ("PBGC") | In its statement of support, the PBGC states that the relief sought in the GSA and MRA Amendment Motion constitutes an overwhelmingly positive solution to some of the Debtors' major pension obligations and eliminates what might well be insurmountable obstacles to a successful reorganization because the 414(l) transfer will relieve the Debtors of billions of dollars of current liability for contributions owing to its Hourly Plan that otherwise (a) would have to be satisfied, probably in a cash lump sum, before the Debtors could emerge, or (b) would likely cause the PBGC to resort to remedies that would almost certainly place unsecured creditors in a far worse position.<br><br>Furthermore, PBGC has filed notices asserting in the aggregate approximately $1.65 billion in liens arising under IRC § 412(n) attributable to missed Hourly Plan (approximately $1.2 billion) and Salaried Plan (approximately $450 million) contributions. The 414(l) transfer has the effect of eliminating the obligation secured by those liens. Accordingly, the PBGC will, as soon as practicable after the first part of the 414(l) transfer is completed, file notices to withdraw the full amount of the Hourly Plan liens. In addition, though not as a direct result of the GSA and MRA Amendment Motion, but to simplify Delphi's path to reorganization, PBGC will also file statements to reduce its asserted and outstanding IRC § 412(n) liens with respect to the Salaried Plan from the current amount of approximately $450 million to $250 million. | While the Debtors do not agree with all the assertions set forth in the PBGC pleading, the Debtors agree with the general points described in the juxtaposed summary and appreciate the PBGC's continuing support. |

|  | DOCKET NO. | RESPONDENT | SUMMARY OF STATEMENT | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|---|
| 11. | 14217 | Official Committee Of Equity Security Holders | In its statement, the Equity Committee does not object to the relief requested in the GSA/MRA Amendment Motion. Equity Committee Statement ¶ 7. Instead, the Equity Committee reserves its rights to object to confirmation of any chapter 11 plan on any ground relating to confirmation requirements, including that the third party releases do not meet the requirements for the grant of such releases and do not provide "appropriate value" to existing equity in exchange for the releases granted in favor of GM.  The Equity Committee acknowledges that the Amended GSA and Amended MRA are the "lifeblood of the Debtors' chapter 11 cases"  but importantly note that the determination of distribution that will be made to stakeholders are not fixed, but will be made during a confirmation hearing at which time a determination of whether the third party releases in the favor of GM may be granted will also be made.  Moreover, the Equity Committee states that while absolute priority is an issue that will need to be addressed regarding certain of the value provided by GM, "[d]isputes over allocation and the applicability of the absolute priority rule are not before the Court at this time." Equity Committee Statement ¶ 17. |  |
| 12. | 14222, 14225 | IUOE, IBEW, IAM | In its statement, the IUE, IBEW and IAM state that they have not yet reached agreement on the Implementation Agreement but do not object to the conceptual framework underlying the motion. |  |