1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481-rdd

Adversary Case No. 08-01232

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


       Debtor.


- - - - - - - - - - - - - - - - - - - -x


         United States Bankruptcy Court

         One Bowling Green

         New York, New York


         September 23, 2008

         10:21 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1    HEARING re Notice of Hearing on Application to Employ Moelis &

2    Company LLC as Co-Investment Banker to the Official Committee

3    of Unsecured Creditors Nunc Pro Tunc to July 1, 2008.

4

5    HEARING re Motion for Order Authorizing Amendment to

6    Arrangement with General Motors Corporation.

7

8    HEARING re Expedited Motion for Order Under 11 U.S.C. Section

9    363 for Authority to Modify Benefits Under Hourly and Salaried

10   Programs and Modify Applicable Union Agreements.

11

12   HEARING re Expedited Motion for Order Authorizing Debtors to

13   Implement Amended and Restated Global Settlement Agreement and

14   Master Restructuring Agreement with General Motors Corporation.

15

16   HEARING re Supplement to KECP Motion (Docket No. 213).

17

18   HEARING re Notice of Renewed Motion For An Order Authorizing

19   The official Committee of Unsecured Creditors To Prosecute The

20   Debtors' Claims And Defenses Against General Motors Corporation

21

22   HEARING re Thirty-fifth Omnibus Hearing Agenda.

23

24   HEARING re Notice of Motion of AMLP and ADAH to Reargue and

25   Strike.

3

1

2    A P P E A R A N C E S :

3    SKADDEN ARPS SLATE MEAGHER & FLOM LLP

4           Attorneys for Debtor

5           333 West Wacker Drive

6           Chicago, IL 60606

7

8    BY:   JOHN WM. BUTLER, JR., ESQ.

9           ALBERT L. HOGAN, III, ESQ.

10

11   SKADDEN ARPS SLATE MEAGHER & FLOM LLP

12          Attorneys for Debtor

13          Four Times Square

14          New York, NY 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17

18   K&L GATES LLP

19          Attorneys for Wilmington Trust Company

20          599 Lexington Avenue

21          New York, NY 10022

22

23   BY:   EDWARD M. FOX, ESQ.

24

25

4

```
 1
 2    LOWENSTEIN SANDLER PC
 3         Attorneys for Securities, Lead Plaintiffs
 4         1251 Avenue of the Americas
 5         New York, NY 10020
 6
 7    BY:  S. JASON TEELE, ESQ.
 8         MICHAEL S. ETKIN, ESQ.
 9
10    LATHAM & WATKINS LLP
11         Attorneys for Creditors' Committee
12         885 Third Avenue
13         New York, NY 10022
14
15    BY:  MICHAEL RIELA, ESQ.
16         ROBERT J. ROSENBERG, ESQ.
17         MARK A. BROUDE, ESQ.
18         BLAIR CONNELLY, ESQ.
19
20    KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
21         Attorneys for Ad Hoc Trade Committee
22         1633 Broadway
23         New York, NY 10019
24
25    BY:  ADAM L. SHIFF, ESQ.
```

5

1

2    STUTMAN TREISTER & GLATT

3         Attorneys for Senior Noteholders

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   ERIC D. GOLDBERG, ESQ.

9

10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

11        One New York Plaza

12        New York, NY 10004

13

14   BY:   RICHARD J. SLIVINSKI, ESQ.

15        BONNIE STEINGART, ESQ.

16

17   UNITED STATES DEPARTMENT OF JUSTICE

18        Office of the United States Trustee

19        33 Whitehall Street

20        Suite 2100

21        New York, NY 10004

22

23   BY:   TRACY HOPE DAVIS, ESQ.

24        BRIAN MASUMOTO, ESQ.

25

6

1

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for General Motors

4         767 Fifth Avenue

5         New York, NY 10153

6

7    BY:   JEFFREY L. TANENBAUM, ESQ.

8          PENNY P. REID, ESQ.

9          ROBERT J. LEMONS, ESQ.

10

11   KENNEDY, JENNIK AND MURRAY P.C.

12         Attorneys for IUE-CWA

13         113 University Place

14         New York, NY 10003

15

16   BY:   THOMAS M. KENNEDY, ESQ.

17

18   UNITED STATED DEPARTMENT OF JUSTICE

19         United States Attorney's Office

20         86 Chambers Street

21         New York, NY 10007

22

23   BY:   JOSEPH CORDERO, ESQ.

24

25

7

1                    P R O C E E D I N G S

2           THE COURT:  Please be seated.  Okay.  Good morning,

3   Delphi Corporation.

4           MR. BUTLER:  Good morning, Your Honor.  Jack Butler,

5   Kayalyn Marafioti and Al Hogan here on behalf of the debtors

6   for their thirty-fifth omnibus hearing agenda which has been

7   filed with the Court.

8           Your Honor, we have an agreed order for the contested

9   matters which we will review for you in the first few minutes,

10  but there are two items to deal with prior to that.  First is

11  item one, an uncontested matter, dealing with the unsecured

12  creditors' committee application involving their investment

13  bankers.  That was filed at docket number 14126 and Mr. Riela

14  from the creditors' committee, from Latham, is going to present

15  that application.

16          THE COURT:  Okay.

17          MR. RIELA:  Good morning, Your Honor.  Michael Riela

18  from Latham & Watkins on behalf of the creditors' committee.

19  The committee filed the application on September 3rd to retain

20  Moelis & Company as the coinvestment banker.  There have been

21  no objections.

22          Prior to filing the motion, I was in contact with the

23  office of the United States Trustee.  The proposed order

24  contains some revisions that the U.S. Trustee had requested.

25  And also, per the U.S. Trustee's request, provide for an

8

1    interim final order dichotomy whereby an interim order would be

2    entered now and a final order entered later, after notice to

3    all creditors.  And perhaps I'd like to get some guidance from

4    the Court as to whether you have, given the situation in which

5    we are now, whether you were doing no soft credit at this

6    point.  It would be feasible, but, obviously, if we decide to

7    go that route that would be fine with us.

8              THE COURT:  All right.  And the revisions are to

9    include the standard language on indemnification and attorneys'

10   fees related to the indemnification?

11             MR. RIELA:  The indemnification language is exactly

12   the same or very similar to what was approved by this Court

13   with the Jeffries application.  The language that the U.S.

14   Trustee had asked for was there is a provision in the

15   engagement letter that provides that Moelis has the opportunity

16   to seek an increase in the transaction fee cap.  And we had

17   agreed that if Moelis were to seek that modification that this

18   Court would apply the standards applicable to professional

19   compensation, a fee enhancement.  We had agreed to that, that

20   was the U.S. Trustee's request.

21             THE COURT:  I.e., it's not at 328(a) it's a 330?

22             MR. RIELA:  For that fee enhancement request,

23   correct.

24             THE COURT:  All right.  Any position by the debtor?

25             MR. BUTLER:  Your Honor, the debtors have no

9

1    objection to the application.  Our understanding is that

2    there's no additional economic burden being placed on the

3    estates.  This is an agreement between the two investment banks

4    as to how to --

5              THE COURT:  It's really kind of a replacement.

6              MR. BUTLER:  Correct, Your Honor.

7              THE COURT:  Because people moved firms.

8              THE COURT:  You're right, Your Honor.  And for that

9    reason the debtors would ask, and hopefully it would be

10   acceptable to the U.S. Trustee and it's acceptable to the

11   Court, that the estate not be burdened with the cost -- because

12   we'll be the ones paying for it -- the cost of noticing out all

13   creditors seeing as this arrangement's already been, if you

14   will, approved once.

15             THE COURT:  Well, I think the structure of having it

16   be interim and final is a good one.  It can be on the docket,

17   though, if anyone is interested they'll see it on the ECF

18   docket and they'll have that extra time to react to it.  I

19   don't think you need to give notice, under these circumstances,

20   to the whole universe but simply the filing of the order, which

21   provides for a second chance, if you will, to object on ECF

22   will be sufficient.

23             MR. RIELA:  Thank you, Your Honor.  And would the

24   hearing on the final order be during the November omnibus or

25   the October, given there's usually a forty-five day window?

10

1          THE COURT:  Well, the October is when?

2          MR. BUTLER:  October 23rd, Your Honor.

3          THE COURT:  Yes, let's make it the November one.

4          MR. RIELA:  Okay.  I have a proposed order on disk,

5     let me hand it up.

6          THE COURT:  Why don't you hand that up?

7          MR. RIELA:  Thank you, Your Honor.

8          THE COURT:  For those of you who are standing, there

9     is an overflow courtroom, although I imagine you've heard of

10    that already.

11         (Pause)

12         MR. BUTLER:  Your Honor, the other housekeeping

13    matter that I would mention is that with respect to item number

14    7 on the agenda, which is the motion of AMLP and ADH, the

15    Appaloosa entities, to reargue and strike the Court's earlier

16    ruling in the plan investor litigation; that's in adversary

17    proceeding number 08-01232 at docket number 95.  That matter

18    has been set by the Court and the parties to be heard in a non

19    omnibus hearing on October 8, 2008.

20         THE COURT:  Right.  And that's subject to my

21    reviewing the responses or objection to the motion.  I may,

22    after reviewing them, inform the parties I don't need a

23    hearing, but that's a holding date in case I do need a hearing.

24         MR. BUTLER:  Thank you, Your Honor.  So, Your Honor,

25    that leaves us, then, with the contested matters on the docket.

11

1   There are five contested matters.

2           During an earlier meet and confer, the parties agreed

3   that we would take them in the following order, they're in

4   the -- on the agenda in the docket order but the order in which

5   we would propose to present them, with Your Honor's agreement,

6   would be number 3, the pension modification motion, then moving

7   to number 4, the GSA and MRA amendment motion, then back to

8   number 2, the GM arrangement, amendment approval motion on the

9   liquidity support arrangements.  Then number 6, the fifth

10  supplement of the IAP, which are the four debtor motions, and

11  then finally number 5, the STN motion brought by the creditors'

12  committee.  So that would be the order we propose to proceed

13  with.

14          THE COURT:  Okay.

15      (Pause)

16          MR. BUTLER:  Your Honor, the first matter we're going

17  to deal with, then, is matter number 3 on the agenda.  It's the

18  hourly and salaried pension program modification motion filed

19  at docket number 14162.

20          There have been objections filed, two objections

21  filed, by the creditors' committee at dockets number 14168 and

22  14205.  There were limited objections filed by the IUE-CWA at

23  docket number 14176 and by the United Steel Workers at docket

24  number 14216.  And there was an undocketed objection of an

25  individual salaried employee that was also received by the

12

1    debtors and which we've addressed in the reply.

2          My understanding is that at this hearing that neither

3    of the unions are going to be prosecuting their objections to

4    this motion.  I just want to confirm that.

5          MR. ROSENBERG:  The IUE is very supportive of this

6    motion.  We are not objecting to it.

7          THE COURT:  Okay.

8          UNIDENTIFIED ATTORNEY:  On behalf of the steel

9    workers our objections are stated but we anticipate working it

10   out.

11         THE COURT:  Right.  But the objection is more, as I

12   read it, a reservation because you're in the middle of

13   bargaining on terms?

14         UNIDENTIFIED ATTORNEY:  That's exactly right, Your

15   Honor.

16         THE COURT:  Okay.

17         MR. BUTLER:  And, Your Honor, it's the debtors' view,

18   as we've stated both in our original motion and in the reply,

19   that we would not be able to pull forward the pension freeze

20   date as it relates, for example, to the United Steel Workers

21   without an implementation agreement signed by them that has to

22   be collectively bargained.  And, so we understand that and

23   we've advised counsel of that and I'll state it here again on

24   the record.

25         THE COURT:  Okay.

13

1          MR. BUTLER:  So, Your Honor, that leaves us dealing,

2     essentially, with the -- in terms of the substantive

3     objections, with the objections of the creditors' committee.

4          Turning for a moment to the evidentiary record, there

5     are -- and I'll indicate, Your Honor, that we have conducted a

6     series of meet and confers over the last ten days involving the

7     parties; involved all the parties that chose to participate,

8     other than entities that filed objections for the first time

9     yesterday.  There were no meet and confers after yesterday's

10    noon filing but as to the others there were, so there certainly

11    was as to this motion.  And we have worked on joint exhibit

12    indices.  I believe there are no objections from any party as

13    to the exhibits that are coming in.  When we get to the GSA

14    hearing, there are some designations for depositions and there

15    are some additional exhibits that Wilmington Trust provided us

16    this morning, which I'll talk about when we get to the GSA and

17    MRA hearing, which the debtors have no objection to coming in.

18         But in terms of this motion, because while we -- I

19    should say, Your Honor, we conducted discovery over the last

20    ten days or so on a consolidated basis but the hearings are

21    proceeding, obviously, on a motion by motion basis -- separate

22    contested hearings.  And so we'll indicate to the Court the

23    record that's appropriate and agreed to as to each of those

24    motions.

25         For purposes of this motion, the hourly and salaried

14

1    pension program modification motion, there is a joint index

2    indicating sixty exhibits although there are a series of them

3    in the index, when you go through, that are actually reserved.

4    The first three are the declarations of the party witnesses.

5    The next, 4, 5 and 6, are materials presented to the debtors'

6    board of directors and compensation committee.  Exhibit 7 deals

7    with a presentation made to the Delphi statutory committees.

8            Then there are some excerpted sections from board of

9    directors, comp committee and statutory committee presentations

10   that run from Exhibits 8 through 15.  And then there are some

11   union documents that run from 16 to 30, although I'll note that

12   numbers 25 through 30 are reserved and we will not be using

13   them at today's hearing.

14           There are some salary or pension related documents

15   that are from number 31 to 41.  And then the court documents

16   are from 42 to 51.  Exhibit 52 is reserved, it's not going to

17   be used today.  The demonstratives are Exhibit 53.

18           A word on the deposition transcripts:  54, 55, 56 are

19   all highly confidential; 56 should have been the transcript of

20   Craig Naylor, not Rodney O'Neal.  Mr. Naylor's deposition was

21   taken in connection with this motion.

22           And then there were additional materials designated

23   by the IUE-CWA at items 57 through 60 which are agreed to in

24   terms of admission.

25           So, Your Honor, with that in mind as it relates to

15

1   this motion, I would move the admission of documents 1 through

2   60.

3          THE COURT:  Any objection to their admission?

4          MR. ROSENBERG:  Your Honor, we're having a bit of a

5   problem here.  In terms of the people who are in the courtroom

6   sitting next to me, the only agreements that we are aware of,

7   the only agreements we were ever asked to make, were with

8   respect to the exhibits for the GSA motion.  To the extent

9   these are the same, I guess we have no problem.  To the extent

10  that they are different, I can't say we've agreed, unless

11  someone on my team corrects me, but no one has.  And

12  furthermore, part of our objection was that we had no financial

13  information to back up the proposed SERP and SRESP proposal for

14  the follow-up plan.

15         A whole bunch of material in that regard came in in a

16  reply that was filed 7 or 8 o'clock last night.  To the extent

17  that any of that is in the exhibit, we certainly have not

18  agreed to it, nor have we even analyzed it yet.  So, again, I'm

19  sort of speaking in the blind here because all of this is news

20  to me.  We certainly have an agreement on the GSA exhibits.

21         MR. BUTLER:  Your Honor, my understanding is we met

22  and conferred on all the exhibits for all of the contested

23  hearings today, not just isolated to one of the five hearings,

24  and there were indices prepared for all of them and reviewed

25  for all of them and we received no objections.  And my

16

1    understanding -- and I can certainly talk for my team, my

2    understanding is that there was an understanding as to all

3    these matters as to what would come in and would not come in.

4         Mr. Rosenberg's statement just now about information

5    appearing for the first time in a reply is incorrect.  The

6    reply had information that summarized an e-mail sent to

7    Mr. Rosenberg's firm a number of days ago.  And a bunch of

8    information --

9         THE COURT:  But that's not really an admissibility --

10   the issue before me is whether these documents should be

11   admitted or not.

12        MR. BUTLER:  Your Honor, I move their admission

13   unless someone has -- I thought we had an agreement.  And if we

14   don't, then I guess we should hear what objections people have.

15        MR. ROSENBERG:  We'd like to see them first, Your

16   Honor.

17        THE COURT:  That's --

18        MR. BUTLER:  They've been provided.  All the exhibits

19   were provided to the creditors' committee.

20        THE COURT:  You should take a look, at least, at the

21   index.  I'm assuming they're right in front of you.

22        MR. ROSENBERG:  We can do that, Your Honor.  May we

23   have five minutes to do that?

24        THE COURT:  Yes.  And while you're doing that, I had

25   a question that's separate from the exhibits that Mr. Butler,

17

1    you can address.

2         The confirmation order says in paragraph 18, headed

3    Freezing of Pension Plan, "notwithstanding anything in the

4    plan, the pension plan shall be frozen by March 1, 2008 or as

5    soon as practical thereafter".  Upon it's face, that suggests

6    this should already have been done in March.

7         MR. BUTLER:  Right.  Your Honor, except that there

8    is -- that's true, that's what the confirmation order says but

9    there are collectively bargained agreements which each of the

10   unions that provides that the freeze date cannot occur until, I

11   believe, the emergence date in each of the CVAs.  And those are

12   in the labor MOUs.  And given the interplay of Section 1113 and

13   1114 and the CVAs, we believe that we had the responsibility of

14   collectively bargaining the acceleration of the freeze date.

15        THE COURT:  I understand that but you still have that

16   responsibility, right?  I mean, you've committed to the unions

17   to finish the bargaining.

18        MR. BUTLER:  Correct.

19        THE COURT:  So my question is as far as the Court's

20   authority is concerned, what additional authority do you need

21   on this aspect of the motion, the freezing aspect?

22        MR. BUTLER:  Your Honor, our belief was because we

23   intended to bring, and we've said this in a number of cases,

24   because there are aspects of the confirmation order that we

25   think we could rely on, the fact that we were deciding for what

18

1    we think good business reason to bring forward -- to bifurcate

2    and bring forward a number of these items in order to preserve

3    and protect the estates.  We believed it was appropriate to

4    come before the Court.

5              THE COURT:  No, I understand that, but this one

6    doesn't seem to me to be a bring forward.  It seems to me I

7    already granted authority, under the confirmation order, for

8    this.  Not necessarily for the aspects dealing with the

9    salaried plans because I think those were contingent upon

10   confirmation.

11             MR. BUTLER:  I think all the follow-on plans, Your

12   Honor --

13             THE COURT:  The follow-on plans.  But the freezing --

14             MR. BUTLER:  The SHRP, the SRP the CIRP, all of them,

15   all follow-on plans

16             THE COURT:  But as far as the freezing is concerned,

17   it seems to me I've already approved that.  Is there some other

18   issue there?

19             MR. BUTLER:  Your Honor, not if Your Honor chooses on

20   that point to confirm your authority.  The problem with the

21   reports is that the debtors would not freeze these things

22   without the follow-on plans becoming available.

23             If you remember, the March 1 date -- since Friday was

24   tied to a January confirmation order and attempt to emerge in

25   the first quarter of this year and there are notices that had

19

1    to be given and there was a whole reason for the sequencing of

2    that and a connection with that order.  But you're right, Your

3    Honor, you have already approved the freeze of the plans.  We

4    believed it to be in the context of the confirmation and the

5    effectiveness of the plan and we were being very conservative

6    on how we addressed this.  This is obviously a very sensitive

7    issue to a lot of our stakeholders, as Your Honor can tell.

8            THE COURT:  Actually, that raises the other issue I

9    had on this, which is that the order says they shall be frozen.

10   It doesn't seem to contain any other conditions to that.  The

11   follow-on plans deal with the assets of the frozen plans.  And

12   I understand that that's a use of estate property and that

13   requires authority, I believe, but it does seem to me that as a

14   legal matter, as opposed to a business matter, the follow-on is

15   not a requirement of freezing.  As a business matter you argue

16   it makes sense.

17           MR. BUTLER:  Yes.  Well, it certainly is, Your Honor,

18   to the HRP.  It's clear to me that the unions would not agree

19   to the amendment of the collective bargaining agreements and to

20   pull forward the freeze date outside of the plan package, which

21   included the follow-on plan without the follow-on plan being

22   part and parcel to that.  And for the very same reason, the

23   confirmation report has the same view.

24           THE COURT:  As a matter of this hearing, I think it's

25   probably an academic issue because no one, as far as I can see,

20

1    is opposing freezing; they're just focusing -- the committee is

2    just focusing on some aspects of some of the follow-on plans.

3             MR. BUTLER:  Right.  I think the only aspects they're

4    focused on are the plans that don't pay anything until we

5    emerge, and those are the two executive plans.

6             THE COURT:  It does seem to me, as far as the relief

7    that you're seeking, I don't think you need an order for the

8    freezing part of it, maybe just defining that it's -- that you

9    already had that authorization.

10            Have you had a chance to look at the exhibit index?

11            MR. ROSENBERG:  We have, Your Honor, and we would

12   object only to 54, 55 and 56, which are three deposition

13   transcripts.  The committee, in connection with this motion,

14   has not designated anything in those depositions for this Court

15   and they were depositions taken by the objectors.  So we will

16   discuss this again when we get to the GSA, but for purposes of

17   this motion, we object to that being part of the record.

18            THE COURT:  And the basis?

19            MR. ROSENBERG:  The basis is that they were our

20   depositions and we have not designated any portion of it to be

21   part of the record.

22            THE COURT:  Okay.  And there was no agreement at the

23   beginning that either --

24            MR. ROSENBERG:  They are Delphi party witnesses,

25   Your Honor.

21

1          MR. BUTLER:  Your Honor, could I have one moment?

2          THE COURT:  Okay.

3       (Pause)

4          THE COURT:  These are depositions of the people who

5    submitted declarations?

6          MR. BUTLER:  They are, Your Honor.

7          THE COURT:  All right.  So we have the declarations

8    and we have the cross examination if we want.

9          MR. BUTLER:  That's correct, Your Honor.  I'm not --

10   if the creditors' committee wants to persist in their

11   objection, that's their right.

12         THE COURT:  All right.

13         MR. ROSENBERG:  We do, Your Honor.

14         THE COURT:  I'll admit the exhibits with the

15   exception of the three declarants' depositions.

16   (Joint Exhibits 1-53 and 57-60 were hereby admitted into

17   evidence, as of this date.)

18         MR. BUTLER:  Right.  So that would be, just for the

19   record, Your Honor, 1 through 60 excluding 54 through 56.

20         THE COURT:  Correct.

21         MR. BUTLER:  Your Honor, as we customarily do in

22   these hearings, we will not present any argument until after

23   the evidentiary record comes in.  The first declarant for the

24   debtors, the first witness, is John D. Sheehan, our chief

25   restructuring officer, and his declaration is Exhibit 1, which

22

1    has been admitted subject to cross examination.

2         THE COURT:  Okay.  Does anyone want to cross examine

3    Mr. Sheehan?  Okay.  I've reviewed Mr. Sheehan's declaration

4    and I don't have any questions of him, so we should move on.

5         MR. BUTLER:  Your Honor, the next declaration, the

6    next witness, is Robert (Steve) Miller, Jr., our chairman of

7    the company, executive chairman of Delphi Corporation.  His

8    declaration is Exhibit 2 to this hearing.  It's been moved and

9    admitted subject to cross examination.

10        THE COURT:  Does anyone want to cross examine

11    Mr. Miller?  No?  Okay.

12     (Pause)

13        THE COURT:  Again, I've reviewed Mr. Miller's

14    declaration, and I don't have any questions of him either.

15        MR. BUTLER:  Thank you, Your Honor.  Finally, Your

16    Honor, the third witness for the debtors is Craig G. Naylor,

17    our acting lead independent director and chairman of the

18    compensation committee.  His declaration has been admitted at

19    Exhibit 3, subject to cross examination.

20        THE COURT:  Does anyone wish to cross examine

21    Mr. Naylor?

22        MR. ROSENBERG:  No, Your Honor.

23        THE COURT:  All right.

24     (Pause)

25        THE COURT:  My questions of Mr. Naylor, I think, are

23

1    questions that also can go to you, Mr. Butler.  So unless

2    you're not able to answer them, that's your option, then we can

3    put him on the stand if necessary.  I don't think I have

4    questions that can't be answered by the attorneys.  So I don't

5    need to have him testify live.

6            MR. BUTLER:  All right.  Your Honor, I believe that

7    is the evidentiary record in connection with this matter.

8            THE COURT:  Okay.  All right.  So maybe I should hear

9    from you, Mr. Rosenberg, on the objection.

10           MR. ROSENBERG:  I will be very brief, Your Honor.  As

11   Your Honor correctly noted, we are not objecting to the

12   freezes, nor are we objecting to the carry-on plans for the

13   hourly workers or the salaried workers except to note that we

14   may not have the full final terms of the hourly carry-on plan

15   because it needs to be negotiated and signed off on by the

16   unions.  So it could change considerably.  And I would think

17   that the parties-in-interest and this Court should know what a

18   final deal looks like before a final sign-off.

19           But our real problem and concern is with the SERP and

20   SRESP.  Again, not the freeze, but rather building in now an

21   improved carry-on plan which becomes effective upon the

22   confirmation of a plan.  Now the debtor blithely says that it's

23   the same carryover plan that was provided for under the

24   confirmed but unconsummated plan, so why do we have a problem?

25           Well, Your Honor, we have a problem because the

24

1    universe has changed and changed rather dramatically.  What was

2    appropriate then, pursuant to consummation of that plan, is not

3    necessarily appropriate now pursuant to consummation of a plan

4    that doesn't even exist yet.  That is a plan term to be looked

5    at and negotiated in connection with a plan, not locked in now

6    so that again we will be looking at a sub rosa plan, a plan

7    that will have to contain these terms, regardless of the

8    economic costs, regardless of the relative costs vis-a-vis

9    benefits to other parties, regardless of the cost to the

10   reorganized entity as it comes out and whether or not it can

11   afford it, whether or not it is properly sized, whether or not

12   the company looks anything like what it looks like today.  It

13   is simply, one more time, an improper lock in of a plan term,

14   unnecessarily, potentially prejudicially not only to the

15   creditors but potentially to the reorganized entity.  It should

16   not be confidenced; it should come later.

17          THE COURT:  Let's deal with the first point

18   Mr. Rosenberg made, which is the final terms of the replacement

19   plan, or carry-on plan, for the unions haven't been negotiated

20   yet.

21          MR. BUTLER:  Actually, Your Honor, my understanding,

22   and I've got Kevin Butler in the courtroom and you can confirm

23   with him, but my understanding is that the follow-on plan for

24   the HRP was bargained in 2004.  That plan has been up and

25   running and has already been collectively bargained.

25

1          What we're collectively bargaining now are

2     implementation agreements for the freeze and for the 414(l)

3     pull forward and for the releases and for the cessation date of

4     OPEB.  I don't believe that and Mr. Butler, without disclosing

5     any of the negotiation, I think can probably confirm.  I don't

6     think that we're negotiating amendments to the 2004 follow-up.

7          MR. K. BUTLER:  That's absolutely correct.  The 2004

8     and 2007 confirmed those terms.

9          MR. BUTLER:  Those already exist, Your Honor.

10         THE COURT:  I guess my concern is that you're asking

11    me for authority subject to a condition subsequent still,

12    right?  There are still things to be done that you're asking

13    me, I think, to approve now without knowing what those things

14    are?

15         MR. BUTLER:  Your Honor, this is no different -- I

16    don't think that's exactly the way I would think about this.

17    This is no different, I think, than, for example, a number of

18    the asset sales Your Honor approved where the transactions were

19    subject to the negotiation of agreements between the company

20    and the successor/purchaser and the unions, where there were

21    consents required.

22         There were a number of times with the IUE, for

23    example, where transactions approved in this court were

24    approved subject to those continued negotiations and those were

25    heard.  We never brought those back to the Court.  There's

26

1    also, I think, a principle here.  I think the Bankruptcy Code,

2    and we indicated this in our papers, the Bankruptcy Code

3    authorizes the debtors to negotiate with their unions and

4    basically to collectively bargain things without, I think, the

5    expressed approval of the Bankruptcy Court.

6         THE COURT:  That's fair.  I guess my concern, and I'm

7    pretty sure it's a hypothetical concern, is if those

8    negotiations go off on a track that you and I and everyone

9    else, if you looked at it objectively, would say this is not

10   anticipated.  If, for example, the debtors were so eager to get

11   this done that they gave away something that would really

12   appear to be out of the ordinary course and not really properly

13   the subject of collective bargaining it would seem to me if

14   that were the case then I should revisit this if that type of

15   thing happens.

16        MR. BUTLER:  Your Honor, you're right.  There are

17   hypotheticals throughout today's hearing that can be

18   postulated.  The requirements of what the unions need to do,

19   between now and the end of this month, to participate in the

20   first transfer under 414(l), if that motion is approved by

21   Your Honor, are quite explicit.  And the company, perhaps to

22   the chagrin of the unions -- I think Mr. Kennedy, among others,

23   would confirm to the Court that the company has been quite

24   focused on limiting the negotiations to those subject matters.

25   And that's part of what we're going to be doing about the next

27

1    motion because at least one union is unhappy about that.

2            THE COURT:  Well, that was one of the things that was

3    prompting my comment.

4            MR. BUTLER:  Right.

5            THE COURT:  I think I know what you're alluding to.

6            MR. BUTLER:  And, Your Honor, from our perspective I

7    do think, as it relates to the pension freeze, that Your Honor

8    can approve this.  I don't think it's necessary to have the

9    implementation agreements.  By their nature, the implementation

10   agreements are designed as being matters that can be approved.

11   And I'm not a labor lawyer, so I'll probably use the wrong

12   nomenclature.  But the implementation agreements are intended

13   to be agreements that are not so material that they would

14   require, for example, ratification by the membership.  They are

15   intended to implement the labor MOUs that have been previously

16   approved by this Court.

17           THE COURT:  All right.

18           MR. BUTLER:  And therefore I don't think they arrive

19   to the level of anything either the code requires or Your

20   Honor, in his discretion, should require separate

21   consideration.

22           THE COURT:  All right.  Well, given the company's

23   authority under the code, in fact the code's preference for the

24   company to bargain on its own without Court supervision, I

25   believe that I can approve the motion insofar as it deals with

28

1   the plans covering the union employees although the motion

2   contemplates additional bargaining that still has to occur.

3        However, I would be very quick to issue an order

4   under Rule 59 or Rule 60 if I was presented with facts that

5   showed that that bargaining went beyond what I believe is

6   contemplated by this motion.

7        So let's then turn to the add-on or replacement plan

8   issue for the SERP and the -- I don't know do you pronounce it

9   by the letters or by trying to pronounce the whole thing,

10  SERSP.  I'm not -- and Mr. Rosenberg you can respond to this,

11  I'm not particularly bothered by the notion that the

12  replacement, or add-on, kicks in on the effective date of a

13  plan because, as we've just seen, I certainly have authority to

14  approve it now to kick in.  In other words, I don't really see

15  this as determining the structure of a plan as opposed to

16  affecting or reflecting a proposal that should be looked at on

17  its merits.  But I am, I guess, concerned about the notion that

18  it is necessary.

19       As I understand it, unlike the plans that involve

20  union employees, but you tell me, is there a requirement that

21  there be a replacement or is this really a business

22  determination only?

23       MR. BUTLER:  This is a business judgment, Your Honor.

24  I mean, with respect to -- there are three sets of plans here.

25  There is the HRP, which is collectively bargained.  There is

29

1    the SRP, which affects all salaried employees and which I

2    understand Mr. Rosenberg to say they're not objecting to.  And

3    then there is the replacement plans for the SERP which we are,

4    in our -- the company's business judgment we want to freeze now

5    because if you freeze the SRP and don't freeze the SERP,

6    because the SERP's a wraparound plan, the amounts of claims

7    under that will simply grow fairly exponentially.

8            THE COURT:  They just move.

9            MR. BUTLER:  They just move; it doesn't freeze

10   anything as it relates to those people.  That's not what we're

11   trying to do as the debtors.  We're trying to freeze that now.

12           We think -- and this is a business judgment test,

13   this is a 363 question.  The company's board of directors, the

14   company's compensation committee, Mr. Naylor's here as their

15   representative, believes that it would be patently unreasonable

16   to freeze all the plans of all the employees at Delphi and

17   provide replacement plans for everybody but the 460 executives.

18           What the compensation committee decided to do was to

19   make the follow-on plans, with respect to the executives, not

20   pay anything until we emerge.  So if we don't emerge and

21   there's not an effective date then they won't get paid under

22   those plans.  But if there is an effective date they will.  It

23   is the judgment of the company that that is very important here

24   as a matter of parity, a matter of fairness, a matter of trying

25   to do the right thing here because we are taking benefits away

30

1    from people.

2           The reality here is that the SERP -- in the

3    automotive industry the SERP benefit is one of the most

4    significant benefits that people have, whether you and I might

5    think that's the right thing or the wrong thing.  The reality

6    is in the compensation scheme in the automotive industry, SERP

7    is a big, big issue.  The concept of freezing the SERP -- and

8    as Mr. Rosenberg would have you say -- by the way, we won't

9    tell you now in uncertain times and uncertain future as to

10   whether or not if we get done at the end of the day you'll have

11   anything, even though we're providing for everybody else at the

12   company.  The debtors think it's patently unreasonable.  And I

13   would indicate, Your Honor, that I think 363 and the business

14   judgment rule allows the debtors to make that judgment.  It is

15   a reasonable judgment.  This plan is not -- while it was

16   included in the original plan at that point in time, there's

17   nothing in the Bankruptcy Code that requires these plans that

18   Your Honor pointed out to be dealt with in a plan of

19   reorganization.

20          This is a use of assets of the estate.  We concede --

21   some would argue that it's not outside of the ordinary course

22   of business; I wasn't prepared to take that on.  I think we

23   need to come before the Court and we have.  But it is the

24   debtors' business judgment, and I think, frankly, uncontested

25   on this record, other than Mr. Rosenberg's argument, there's no

31

1    testimony to the contrary here.  The record's uncontroverted.

2    They didn't even designate their own depositions and put those

3    into the record -- of the party witnesses.

4           What Your Honor has are the declarations of

5    Mr. Miller and Mr. Sheehan and Mr. Naylor as to the exercise of

6    that business judgment.

7           MR. ROSENBERG:  Your Honor, the record may indeed be

8    uncontested, but it is woefully inadequate.  For the first time

9    in the responsive pleading, late last night, financial

10   information respecting this proposed plan and its cost was

11   provided.  Obviously, between 8 o'clock last night and right

12   now our consultant has not reviewed -- they've been asked to

13   but they have not reviewed this material for reasonableness and

14   reasonable exercise of business judgment even if that were the

15   standard.  All of that information could have been supplied

16   many, many weeks ago.  And I would point out that unlike the

17   GSA motion, this one was noticed, brought on under the regular

18   rules of engagement in this case.  There was plenty of time,

19   plenty of notice, and the first time any financial information

20   was received was late last night.

21          MR. BUTLER:  Your Honor, I think Mr. Rosenberg needs

22   to consult with his team and see whether he wants to correct

23   the record.  If necessary, I will introduce into evidence

24   e-mails to Mr. Rosenberg and his colleagues and I will put on

25   testimony of the financial due diligence done with the

32

1    creditors' committee over the last ten days on this subject.

2    For him to tell this Court today the first financial analysis

3    they had on this motion was yesterday night is not accurate.

4    And I'll be happy to put on the record, I'll be happy to get

5    the e-mails, I'll be happy to introduce it and call it to

6    question.  But that's not the way we should be conducting these

7    hearings.

8              MR. ROSENBERG:  Your Honor, there was indeed a call

9    at which some information was given; a large amount of

10   additional information was requested.  It was provided last

11   night notwithstanding that it was asked for some time ago.

12             THE COURT:  Well, let me -- before we get into this

13   further, the -- I think the record is clear that there is a

14   substantial cost, a monthly cost, to the debtors of not

15   freezing the plans.  And I would like to know what the -- a

16   portion of that is, which is if you don't freeze the salary

17   plan does -- what portion of that monthly cost kicks in, for

18   example, if it is not frozen until October 3rd, when the Court

19   has another hearing date, to enable the committee to look at

20   the material that it claims it wants to look at.

21             MR. BUTLER:  Your Honor, I'll get that information.

22   I can't tell you off the top of my head.  We have a summary

23   here which I'll go through with you.

24             But, Your Honor, I have an e-mail where Mesirow

25   Financial has confirmed with the company on September 20th that

33

1    they have all the financial information that they need to

2    analyze this motion, all right?  I don't want the Court to be

3    misled here.

4         First Mr. Rosenberg got up and said they didn't have

5    any information until last night.  When I called the question

6    he corrected himself and he said oh, no, there was a call in

7    which we got information and then we didn't get a large amount

8    of information until last night.  There were two discrete

9    questions, the e-mail that was sent on the 20th was one page

10   long and that information was summarized in the pleading.

11        This is not a case -- and I will on this one, Your

12   Honor, I will put on witnesses and I will impeach

13   Mr. Rosenberg's statements; they are not accurate.  So he could

14   either correct them or we will go and put the e-mails on and

15   call Mesirow, they're here, and ask his financial advisor

16   whether or not they can --

17        THE COURT:  Well, that's fair.  We should probably

18   hear from Mesirow.

19        (Pause)

20        THE COURT:  No, you should come up because it's what

21   gets picked up by the microphone.

22        (Pause)

23        MR. ROSENBERG:  Your Honor, if I may, I'm sorry to

24   give this to you piecemeal.  The information that was received

25   last night was the information that our pension consultants

34

1    both requested, not the Mesirow information.

2              THE COURT:  Well, Mr. Rosenberg, what is it that you

3    believe you need to close the loop here?

4              MR. ROSENBERG:  Well, we got the information last

5    night, right?

6              THE COURT:  No, but what is it?

7              MR. ROSENBERG:  A Buck analysis, Your Honor, of the

8    information received last night.

9              THE COURT:  You have to be a little more specific

10   then that for me.  What is it that is going to close the gap

11   for them?

12             MR. ROSENBERG:  It is the information that was

13   contained in their reply papers that was filed last night.

14   That information needs to be analyzed.

15             MR. BUTLER:  Your Honor --

16             THE COURT:  You mean the cost of this program?

17             MR. RIELA:  Your Honor, there is a cost of the

18   salary -- the information that was provided to us during the

19   course of the due diligence was a single number relating to the

20   cost of the follow-on salary and the executive -- the SPR, PDR,

21   SRPS.  It was all bunched together.  But it asked for a

22   breakout of that information.  The information that we hadn't

23   gotten up until yesterday.

24             THE COURT:  Breaking out the salary from the

25   executive?

35

1          MR. RIELA:  The relative cost of the plan as broken

2     out.

3          THE COURT:  And your focus is really only on the

4     executive one?

5          MR. RIELA:  That is correct, Your Honor.

6          MR. BUTLER:  And, Your Honor, I'd like to examine

7     Mesirow because that's just not a truthful statement.  The

8     information was circulated on September 20th.  I have an e-mail

9     from Mesirow confirming it.  I'm happy to go through it.  There

10    was nothing provided to Buck last night, that I'm aware of,

11    because our process is always to exchange financial

12    information.  The creditors' committee asks, no matter which

13    advisor it is, through Mesirow.  So there's a conduit.  So we

14    know that the creditors' committee has the information.

15    Mesirow is the gatekeeper of information, they always have

16    been.  We've gone back and forth and I have the e-mail right

17    here.

18          MR. ROSENBERG:  Your Honor, the person --

19          MR. BUTLER:  I can't print it out, not in my

20    BlackBerry.

21          MR. ROSENBERG:  A secret plan to get out of Vietnam,

22    Judge.

23          THE COURT:  No, no, he has his BlackBerry.  He

24    can't --

25          MR. ROSENBERG:  Your Honor, the personnel who was

36

1   involved in this from Mesirow is not, in fact, in the

2   courtroom.  It's hardly fair to put someone different up.

3          THE COURT:  Let me just ask your colleague, was the

4   information that was previously provided, did it have a

5   breakout of the two different follow-on plans' costs separately

6   broken out?

7          MR. RIELA:  The information that was first provided

8   was a single number.  The information that was provided in the

9   reply did break out the --

10         THE COURT:  And you haven't had anything other than a

11  single number until yesterday?

12         MR. RIELA:  That is my understanding.

13         MR. BUTLER:  That is not accurate, Your Honor.  I can

14  prove it.

15         MR. ROSENBERG:  Well, Your Honor --

16         MR. BUTLER:  I mean, they're responsible for their

17  financial advisors.  And if we need to get Mr. Pickering to

18  show up --

19         MR. ROSENBERG:  Well, Your Honor, Mr. Pickering was

20  not subpoenaed and they had this argument --

21         THE COURT:  I know, but --

22         MR. ROSENBERG:  If we could over the lunch break, or

23  whatever, we can resolve whether Mr. Butler is correct.

24         THE COURT:  Well, I guess you ought to show me

25  whether you provided this information.

                                                                        37

1          MR. BUTLER:  Sure, Your Honor.

2          THE COURT:  And, actually, I'd like to see it.  I'd

3    like to know what the --

4          MR. BUTLER:  It was the same information that was in

5    here.  There was a simple information request.

6       (Pause)

7          THE COURT:  The large amount of information that

8    Mr. Rosenberg said was needed was this information on one page,

9    Your Honor.  And it was provided on September 20th and

10   Mr. Pickering sent a notice back to our financial advisors,

11   FTI, acknowledging they received it and thanking us for it.

12   And I'm happy to mark this, Your Honor, if you'd like, as

13   Exhibit 61 and provide it to the Court.  And you'll find it has

14   the same information in it that we summarized in our brief.

15         THE COURT:  Okay.  Why don't I see that?

16         MR. ROSENBERG:  I have never seen it, Jack.  How

17   about showing it to the guys who got it?

18      (Pause)

19         MR. BUTLER:  And I think, Your Honor, we indicate in

20   paragraph 12 of our reply --

21         THE COURT:  Right.  No, I have that.

22         MR. BUTLER:  -- that there was a delay in following

23   up to an isolated request and that we resolved that on the

24   20th, three days before the hearing.

25      (Pause)

38

1          THE COURT:  Okay.  Well, the e-mail does, almost word

2     for word, follow or track paragraph 12 of the response, both

3     with regard to the portion of the eighty-seven million of the

4     defined contribution plan proposal, that it would be

5     attributable to the DC as rep and the projected annual costs

6     attributable for active vet SERP participants.

7          MR. BUTLER:  And, Your Honor, just if I may so, the

8     record's clear here with respect to this motion.  On September

9     3rd, Mr. Rosenberg and I reached an agreement about this motion

10     being filed on September 12th as next vetted motion with the

11     procedural consent, not substantive consent, of the creditors'

12     committee on the understanding that I would provide him, on

13     September 3rd, with a draft of the motion and the follow-on

14     plans so that they could begin to look at them, which I did.

15     Mr. Rosenberg acknowledges that.

16          There was, subsequent to September 3rd, a financial

17     due diligence call that included business people at Delphi with

18     representatives of the committee at which this entire motion

19     was vetted.  There was then an isolated follow-up request, it

20     was an e-mail sent from one of the financial advisors of the

21     creditors' committee sent to a business person at Delphi, which

22     we didn't get, didn't follow up, didn't understand it to be

23     there.

24          When they filed their objection on Friday which said

25     we didn't give them some information, we immediately followed

39

1    up to find out what it was.  We found out that there was this

2    isolated piece of information which Your Honor has.  We

3    provided that immediately to them and we got FTI's -- excuse

4    me, Mesirow's information that they had received that

5    information on Saturday afternoon, the 20th.  That's the record

6    of how that information was provided.  And all it was was the

7    confirmation of these breakdown numbers, that's all.  The rest

8    of the diligence in this motion had been completed by the

9    creditors' committee prior to that time.

10            MR. ROSENBERG:  Your Honor, needless to say, I will

11   look at this and if Mr. Butler is correct, that this was a

12   delay between professionals on our side of the fence, I will

13   apologize profusely to the Court and act accordingly.  This is

14   news to me.

15            THE COURT:  Okay.  Well, there are really two

16   different bases for the objection.  One is the contention that

17   there's not sufficient information with regard to the cost of

18   the aspect of the motion that the committee is objecting to.

19   The other is that, simply, this aspect of the motion shouldn't

20   be approved now.  And, frankly, it seems to me that that

21   objection would be made whether or not there was sufficient

22   information.

23            The cost, as set forth here in the pleading and in

24   the information, I don't have any basis to refute it and no one

25   has sought to refute it.  So I'm going to focus on the other

40

1     aspect of the objection, which is that it's premature to do

2     this.  On that score it is clear that, particularly when you

3     get up to senior level people, quite often their compensation

4     arrangements, particularly those aspects of the compensation

5     that are contingent, are left for the plan stage and sometimes

6     even left for the new board to deal with.

7              My question here, Mr. Rosenberg, is how does this

8     really fit into that category?  This strikes me as not the type

9     of arrangement that you'd enter into with a CEO or chief

10    financial officer or division head regarding his or her

11    compensation package, generally.  This is a retirement program

12    that seems to be, I guess, I mean, from what I can tell there's

13    no objection on this basis to the contrary that is consistent

14    with, in fact, less than what was previously in place.  I have

15    Mr. Naylor's declaration and Mr. Sheehan's declaration that

16    this is, as best as they can tell, customary in the industry.

17    And if the debtor were to reorganize -- it would seem to me

18    that this is not the type of aspect of an executive's

19    compensation package that a committee or a new board would want

20    to negotiate.  Am I wrong about that?

21             MR. ROSENBERG:  Well, Your Honor, I fully appreciate

22    and understand what you're saying and wouldn't disagree with

23    it.  I guess the real response is simply of all the times to

24    lock in a new program, given what's going on in the auto

25    industry and the capital markets, with no knowledge of what

41

1   reality is going to look like tomorrow, let alone in a year,

2   the timing is just not appropriate from the point of view of

3   the estate.

4        THE COURT:  But is it really a new program?  I mean,

5   it's only new in a sense that the old one is being terminated

6   to save the debtor money.

7        MR. ROSENBERG:  That's true.  That's true but, you

8   know, it may well be that the appropriate replacement is a lot

9   less than this.  I'm not saying it is but I am saying that

10   we're making a judgment at a time of incredible flux and

11   uncertainty.  And I would think that the more appropriate time

12   to make it is in the context of a plan, a TEV, some recognition

13   of where the industry and where the company is going.

14        THE COURT:  Okay.  All right.  Well, I'm going to

15   grant this motion.  I believe that the objection would be a

16   valid objection to certain types of executive compensation but

17   is not, given the nature of this replacement plan in the record

18   as to its cost and the fact that it is a replacement plan for

19   one that's being terminated for a substantial cash savings to

20   the debtor, one that would lead me to deny this aspect of the

21   motion.

22        The record before me shows that this replacement plan

23   is consistent with the industry.  Certainly no replacement

24   plan, to my mind, would be inconsistent with the industry since

25   the industry does have these types of plans.  And, finally, I

42

1   believe the debtors have appropriately taken into account the

2   effectiveness of this program being tied to emergence from

3   Chapter 11.  As a legal matter I don't believe, as I said

4   before, that that somehow disables the relief sought as a sub

5   rosa plan.  They could have, as they have with the other

6   replacement plans, had it kick in tomorrow.  The deferral is to

7   the benefit of the debtors.  I don't believe that determines a

8   plan, but it does protect the debtors against a situation

9   where, for example, certain debtors, albeit a hypothetical

10  situation, might not emerge in a Chapter 11 plan.  And that's a

11  legitimate protection that the debtors have foreseen.

12         So I conclude, as a business matter, that providing

13  some form of replacement plan for the executives in the amended

14  SERP and amended SRESP, to the extent objected to by the

15  committee, is a valid exercise of business judgment and a

16  more -- more in the nature of the traditional aspects of

17  compensation in this industry that should not await either

18  further developments in the industry or further development of

19  a Chapter 11 plan.

20         MR. BUTLER:  Thank you, Your Honor.

21      (Pause)

22         MR. BUTLER:  Your Honor, by agreement, the next

23  matter we're taking up is matter number 4 on the docket.  On

24  the agenda it is the GSA and MRA amendment motion, docket

25  number 14164.

43

1      (Pause)

2            MR. BUTLER:  Your Honor, in this case there have

3      been -- with respect to this matter there have been eight

4      objections filed by six parties and that would be not including

5      a series of objections -- excuse me -- eight objections filed

6      by six parties.  And then there have been five parties -- I

7      should say four parties that have filed five statements of

8      support or no objections to the document.

9            The principle -- and of the parties that have

10     objected, one of those parties, the United States of America,

11     at docket number 14202, has been settled by the placement of

12     appropriate language in the revised order.

13           THE COURT:  Is that similar to or the same as the

14     language that was in the confirmation order?

15           MR. BUTLER:  Yes, Your Honor.  It is.

16           THE COURT:  Okay.

17           MR. BUTLER:  And that had always been intended.  And

18     it was under discussion with --

19           THE COURT:  And the United States is withdrawing its

20     objection on that basis?

21           MR. CUDARO:  Yes, Your Honor.  Joseph Cordero (ph.)

22     for the U.S. -- for the U.S. -- United States Attorney's

23     office.  On that basis the United States withdraws the

24     objection.

25           THE COURT:  Okay.  Thank you.

44

1          MR. BUTLER:  Your Honor, as I understand it the IUE-

2     CWA and the steel workers have filed objections relating to the

3     implementation agreement negotiations as a placeholder.  In

4     addition, I believe -- I think that's the same as the prior

5     motion.  In addition, the IUE has a separate basis for

6     objection on this motion which they're going to present.

7          MR. BROUDE:  That's correct.

8          THE COURT:  Okay.

9          MR. BUTLER:  That leaves us with, I think -- and the

10    creditors' committee filed two objections.  Their preliminary

11    at 14168 and their final at 14215.  That leaves, I think, the

12    principal litigants here, other than the isolated issue that

13    Mr. Kennedy will discuss, the creditors' committee -- a member

14    of the creditors' committee, Wilmington Trust, the indentured

15    trustee, and two of the noteholders under those indentures, CR

16    Intrinsic Investors LLC and Highland Capital Management LP.

17         Conversely, Your Honor, statements of support or no

18    objection have been filed by Fiduciary Counselors Inc. at

19    docket number 14210, the PBGC at docket number 14212, the

20    Official Committee of Equity Security Holders at docket number

21    14222 and three of the debtors North American unions:  the

22    IUOE, the IBEW and the IAM at dockets number 14222 and 14225.

23    And they're, I think, very much in the position that those

24    three unions, as the steel workers and the IUE is, except for

25    its isolated issue, in that they are involved in collectively

45

1    bargaining implementation agreements.  And they have reported

2    on their view of the status of that to the Court in the

3    statements that they filed.

4            In terms of the record for this motion, Your Honor,

5    we again have worked with the parties and we have a joint

6    exhibit index which is Exhibits 1 through 143.  I'll add 144 in

7    just a moment.  And those exhibits are as follows:  The

8    debtor's declarations are Exhibits 1 through 5.  The creditors'

9    committee's declarations is Exhibit 6.  There are board

10   presentations that are Exhibits 7 through 13, statutory

11   committee presentation Exhibit 14 through 21.   There are

12   excerpts from those on specific business plan module, a plan of

13   reorganization, GSA modules, pension plan investor matters,

14   strategic alternatives, transformation plan updates and other

15   matters which begin at Exhibit 22 and go all the way through

16   Exhibit 50.

17           There are some documents regarding negotiations

18   between the debtors and General Motors which are at Exhibits 51

19   through 53.  The PBGC's documents are 54 through 57.  There are

20   various communications between the statutory committees and the

21   company, Exhibit 58 through 60.  Some plan related documents,

22   61 and 62, the plan and the confirmation order.  And then

23   there's documents relating to this matter that begin at

24   Exhibit 63.  These are court documents running all the way to

25   82.

46

1          I would, Your Honor, note that document -- item 77

2     through 80 we'll reserve.  We have used one of those numbers,

3     and I think Your Honor's book has been updated for this

4     purpose, which is Exhibit 77, is the IUE supplemental

5     objection.  That was filed under seal, marked highly

6     confidential simply because it refers to some nonpublic

7     information.  But that's at docket number 14220 and that's now

8     Exhibit 77.

9          Exhibit 83 and 84 are other supporting documents; 84

10    is reserved, not being used today.  The demonstratives that

11    we'll be using during the course of the hearing and that have

12    been testified to by the party witnesses for Delphi are in a

13    group at Exhibit 85.

14          I'd like, now, to talk about the depositions.  This

15    is Exhibits 86 through 94.  First, with respect to certain of

16    the either parties or nonparties other than the debtor's

17    declarants, this would be Exhibits 92 through 94,

18    Mr. Celentano's deposition, Mr. Henderson's deposition and

19    Mr. Daigle's deposition; those are all coming in.

20          With respect to the debtor's declarants, Exhibits 86

21    through 91, the creditors' committee intends to file -- we have

22    agreed on an agreement.  We've agreed that those will come in

23    for convenience but subject to a stipulation I'm going to read

24    because the creditor's committee is going to file a composite

25    exhibit, 144, which will be their designations of those

47

1    depositions because they don't want the whole deposition to

2    come in.  Officially they want to designate the parts of the

3    depositions to come in for you.  And so --

4            THE COURT:  Is that in the binder?

5            MR. BUTLER:  Excuse me?

6            THE COURT:  Is the composite in the binder?

7            MR. BUTLER:  That composite exhibit, I think, is

8    going to be in by lunchtime, I hope.

9            MR. CONNELLY:  Yes, Blair Connelly, Your Honor.  We

10    will prepare it and insert it in the binder.

11            THE COURT:  Okay.

12            MR. BUTLER:  And the agreement I've been asked to

13    read in the record says that the debtors and the creditors'

14    committee have reached an agreement regarding admissibility of

15    deposition transcripts.  I'm speaking now of the declarant

16    transcripts, 86 through 91.  The transcripts are admitted into

17    the record in their entirety, for convenience, with the

18    understanding the Court will only consider as admissible

19    evidence those portions of the transcripts that have been

20    designated by the creditors' committee or the Court finds

21    related to the creditors' committee deposition designations

22    under Federal Rule of Evidence 106.

23            The creditors' committee reserves all rights and

24    objections as to whether any particular excerpt is admissible

25    under Rule 106.  And that's the basis of that agreement.

48

1          In addition, Your Honor, we have asked the creditors'

2     committee, and I presume they'll inform us before the record

3     closes today, as to whether they would permit Mr. O'Neal's

4     deposition to come in in its entirety, without designations.

5     Mr. O'Neal is our chief executive officer.  He was not a

6     witness here.  They had requested he be deposed.  We agreed to

7     produce him for that purpose.  And we've asked them to consider

8     allowing the Court to read the entire deposition, and they're

9     going to take that under consideration and advise us.  If

10    they're unwilling to do so then the same agreement, with the

11    same rules I've just described, would be applicable.

12          MR. BROUDE:  Yes, Your Honor.  The purpose of the

13    agreement that Mr. Butler has described was to relieve the

14    debtors, and really their lawyers, from the burden of having to

15    do counterdesignations under this expedited proceeding.  We had

16    a bit of a miscommunication, I think, regarding Mr. O'Neal, but

17    we are considering that discussing it with them.

18          THE COURT:  Okay.  All right.

19          MR. BROUDE:  And if I may add one point, Your Honor,

20    and I apologize to Mr. Butler who did vet this issue with me

21    beforehand, but I've received an e-mail since we spoke that I

22    want to address.

23          I understand there was a bit of a snarl-up with the

24    exhibit list and that there were some exhibits that came off of

25    the iteration that we thought was going in that we would like

49

1    back in.  I candidly don't know if the exhibit list, as before

2    Your Honor, has those or not.  I just found out about it.  I

3    don't believe there is any objection to those exhibits.  They

4    were actually originally put on by the debtors and we had no

5    objection to them.  They subsequently took them off, but we

6    wanted them to stay on.  That's the only comment I would say on

7    the exhibit list.

8              THE COURT:  Okay.

9              MR. BUTLER:  I'm not quite done yet.  I only got

10   through the depositions; I've got two more to go.

11             MR. KENNEDY:  We did have some markings on the

12   deposition.

13             MR. BUTLER:  I'm sorry, Mr. Kennedy, you have other

14   designations you wanted to submit as well?

15             MR. KENNEDY:  We had earlier submitted them when it

16   turned out that the entire deposition --

17             THE COURT:  You'd better come to the microphone

18   because it's not being picked up.

19             MR. KENNEDY:  We had earlier communicated with your

20   office some deposition designations that we did not insist upon

21   when it appeared that the entire depositions were in the

22   office.  We'll simply include, what we're suggesting, is part

23   of what the committee designates.

24             THE COURT:  Okay.

25             MR. KENNEDY:  For purposes of convenience.

50

1          THE COURT:  All right.  That's fine, Mr. Kennedy.

2          MR. BUTLER:  So Exhibit 144, then, will be the

3    composite UCC/IUE designations.

4          THE COURT:  Just highlight yours in a different

5    color.

6          MR. BUTLER:  With respect to Exhibits 95 to 124 are

7    materials designated by the creditors' committee which we have

8    no objection.  Items 125 through 128 are materials designated

9    by the IUE-CWA to which we have no objection.  Exhibit 129 was

10   the complaint that's been filed under seal in these cases and

11   was designated by the senior noteholders; we have no objections

12   to that.

13          There were then additional materials designated by

14   the creditors' committee over the weekend and last evening

15   which are listed at items 130 through 143 and we have no

16   objections to that.  Certainly, and we can sort this out in the

17   lunch break, if there are any additional exhibits the committee

18   wants in we'll take a look at them and read those designations

19   after lunch.  There was something that was taken off that was

20   ours, we didn't want to proceed with, they want it in and I

21   don't have a problem with that.  So we'll sort out those.

22          So, Your Honor, I think with that understanding on

23   the depositions, I don't think there's a dispute about the

24   exhibits and I would move, therefore, the admissions of

25   Exhibits 1 through 144, subject to the stipulation I've read

51

1 into the record.

2    THE COURT:  All right.  Well, it's clear to me that

3 there's agreement as to the admissibility of the exhibits.  We

4 don't actually have, necessarily, all the exhibits yet so the

5 agreement's reflected on the record.  The exhibit books that

6 will contain the exhibits, I guess, are going to be submitted

7 to me around lunchtime?

8    MR. BUTLER:  Well, you have them already, Your Honor.

9    THE COURT:  No, I thought you said that there are

10 some other ones that might come in.

11    MR. BROUDE:  Once we confirm, I mean, for all I

12 know --

13    MR. BUTLER:  I think they have to confirm it.

14    THE COURT:  All right.  The ones that are presently

15 in the book are --

16    MR. BUTLER:  1 through 143 --

17    THE COURT:  -- admitted.  And subject to your

18 actually providing me with any of the additional ones you

19 referred to, those will be admitted also.**

20 (Joint Exhibits 1-143, were hereby admitted into evidence, as

21 of this date.)

22    MR. BUTLER:  Thank you, Your Honor.

23    MR. FOX:  Your Honor, if I might?  Before the hearing

24 started I --

25    MR. BUTLER:  I have more.  I want to go to yours

52

1    next.

2              MR. FOX:  I've got the hearsay point.

3              MR. BUTLER:  I'm sorry.  Okay.  Do you also want me

4    to put yours in?

5              MR. FOX:  Before you do that, yes.

6              MR. BUTLER:  Okay.

7              MR. FOX:  The point Mr. Hogan and I discussed,

8    throughout the hearings we've agreed that to the extent the

9    exhibits come in, if they're out of court declarations and not

10   admitted for the truth of the matters asserted -- and we have

11   agreed that that would continue with these exhibits as well.

12             MR. BUTLER:  Not the declarations.

13             MR. FOX:  No, no, not the declarations.  All of the

14   other -- you know, you've got the board brought some committee

15   presentations and all sorts of documents that --

16             THE COURT:  Unsworn declarations --

17             MR. FOX:  Yes.

18             THE COURT:  -- would be subject to hearsay objection.

19             MR. FOX:  Correct.  Thank you.

20             THE COURT:  Is that a fair summary, Mr. Fox?

21             MR. FOX:  That's correct.

22             THE COURT:  Okay.

23             MR. BUTLER:  Your Honor, we also had --

24             THE COURT:  Before we go further, I thought people

25   had informed the ECRO operator who they were but I think

53

1    it's -- particularly given the fact that people are in another

2    courtroom listening to this.  When you stand up, if you could

3    just identify yourself for the record the first time you speak

4    and then we can go on from that.

5            MR. BUTLER:  In addition to those 144 exhibits that

6    have come in, Your Honor, Wilmington Trust provided, either

7    last night or this morning, a separate exhibit book.  They were

8    not part of the meet and confer process because they didn't

9    file an objection until yesterday at noon.  And they have

10   designated twenty-four exhibits separately.  I think many of

11   these exhibits have already come in in another way.  But for

12   the purposes of just, I think, efficiency, we would agree to

13   mark these as, instead of joint Exhibit 1 through 144,

14   Wilmington Exhibits 1 through 24.  I believe Mr. Fox has given

15   the Court one of these exhibit books.  If not, I can provide

16   it.

17           THE COURT:  I don't have one up here.

18           MR. BUTLER:  I'll pass mine up right now and get

19   another one from Mr. Fox, Your Honor.

20           THE COURT:  Okay.

21           MR. BUTLER:  The debtors have no objection to the

22   admission of these either.

23           THE COURT:  All right.  That's fine.  So those will

24   be admitted also, in that way.

25   (Wilmington Trust Exhibits 1-24 were hereby admitted into

54

1    evidence, as of this date.)

2        (Pause)

3            MR. BUTLER:  Your Honor, I think that now takes us to

4    the cross examination, if there's going to be any, with respect

5    to the declarants.  And we would start with the debtor's case,

6    and the first witness we would proffer is John D. Sheehan.

7    Mr. Sheehan, our chief restructuring officer whose declaration

8    is set forth at Exhibit 1 of this record.

9            THE COURT:  Well, that is my normal practice with an

10   evidentiary matter.  But I think there's a threshold issue here

11   that I'd like the parties to address, the lawyers to address,

12   which is the issue as to whether this agreement constitutes a

13   modification of the plan, under Section 1127, in light of the

14   plan, the confirmation order and the terms of the amendment.  I

15   don't know if that threw you all off.  I can take a break for

16   five or ten minutes if you want to focus on that.

17           MR. ROSENBERG:  Yes, please, Your Honor.

18           THE COURT:  Okay.  So I'll come back at quarter of.

19           MR. BUTLER:  Thank you, Judge.

20           THE COURT:  I'm also prepared to discuss that issue

21   with people in chambers also; I'll leave that up to you.

22       (Recess from 11:35 a.m. till 12:15 p.m.)

23           THE COURT:  Please be seated.  We're back on the

24   record in Delphi Corporation, having had a chambers conference

25   with the debtors, the objectors, GM and other parties-in-

55

1    interest, including the equity committee.  And in light of that

2    conference, it appeared to me and to the parties that the

3    hearings that remain that were scheduled for today should be

4    adjourned to Thursday morning.  And I will adjourn them to 9

5    o'clock on Thursday morning.

6            I'm very mindful of the time pressures that the

7    debtors and all of their constituents are under.  Not only the

8    time pressure facing the debtor as of the end of this month but

9    also the debtors' very strong desire and the creditors' very

10   strong desire for the debtors to emerge by the end of this

11   year.

12           It's my view that adjourning this hearing until

13   Thursday morning will not jeopardize those time frames.  And,

14   in fact, given the issues that the parties have ably briefed

15   and teed up for trial, that the time can be better spent given

16   their -- at this point, the parties' level of knowledge in

17   meeting today and tomorrow, which is the purpose of the

18   adjournment.

19           So I will adjourn the remaining matters, again, until

20   9 a.m. on Thursday.  And I'm prepared to hear them Thursday and

21   Friday.  And I will rule from the bench if the matters are not

22   resolved at the close of the hearing on either Thursday or

23   Friday.  Any questions?

24           MR. BUTLER:  Thank you, Your Honor.

25           THE COURT:  Okay.  I do have a trial for tomorrow but

56

1    I imagine you could store -- I know you can store your

2    materials, if you wish, in the conference room that I share

3    with Judge Peck, who's out until later this week.  So if that's

4    more convenient to you then hauling them back to your offices,

5    you can do that.

6         MR. BUTLER:  Thanks, Judge.

7         MR. ROSENBERG:  Thank you, Your Honor.

8       (Proceedings Concluded at 12:15 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

57

1

2                          E X H I B I T S

3                     DESCRIPTION          PAGE

4    1-57 and          Joint Exhibits      21

5    57-60

6    1-143             Joint Exhibits      51

7    1-24              Wilmington Trust     54

8

9                          RULINGS

10                                  Page        Line

11   Motion Granted                 41         13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

1

2                           C E R T I F I C A T I O N

3

4       I, Pnina Eilberg, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       Pnina Eilberg

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:      September 25, 2008

16

17

18

19

20

21

22

23

24

25