1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 25, 2008

            9:17 AM


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Motion for Order Authorizing Amendment to

3   Arrangement with General Motors Corporation

4

5   HEARING re Expedited Motion for Order Authorizing Debtors to

6   Implement Amended and Restated Global Settlement Agreement and

7   Master Restructuring Agreement with General Motors Corporation

8

9   HEARING re Expedited Fifth Supplement to KECP Motion Seeking

10  Authority to Continue Short Term At Risk Performance Payment

11  Program for Second Half of 2008

12

13  HEARING re Renewed Motion for an Order Authorizing the Official

14  Committee of Unsecured Creditors to Prosecute the Debtors'

15  Claim and Defenses Against General Motors Corporation

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4         Attorneys for Debtors

5         333 West Wacker Drive

6         Chicago, IL 60606

7

8    BY:   JOHN WM. BUTLER, JR.

9         ALBERT L. HOGAN III

10

11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

12        Attorneys for Debtors

13        Four Times Square

14        New York, NY 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17

18   LATHAM & WATKINS LLP

19        Attorneys for Official Committee of Unsecured Creditors

20        53rd at Third

21        885 Third Avenue

22        New York, NY 10022

23

24   BY:   ROBERT J. ROSENBERG, ESQ.

25

4

1

2    FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

3          Attorneys for Equity Committee

4          One New York Plaza

5          New York, NY 10004

6

7    BY:   RICHARD J. SLIVINSKI, ESQ.

8          BONNIE STEINGART, ESQ.

9          JENNIFER L. RODBURG, ESQ.

10

11   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

12         Attorneys for Ad Hoc Trade Committee

13         1633 Broadway

14         New York, NY 10019

15

16   BY:   ADAM L. SHIFF, ESQ.

17

18   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

19         1285 Avenue of the Americas

20         New York, NY 10019

21

22   BY:   MICHAEL BALASCIO, ESQ.

23

24

25

5

1

2   K&L GATES LLP

3        Attorneys for Wilmington Trust Company, as Indenture

4         Trustee

5        599 Lexington Avenue

6        New York, NY 10022

7

8   BY:   EDWARD M. FOX, ESQ.

9

10  LOWENSTEIN SANDLER PC

11        Attorneys for Securities Lead Plaintiffs

12        1251 Avenue of the Americas

13        New York, NY 10020

14

15  BY:   S. JASON TEELE, ESQ.

16

17  WEIL, GOTSHAL & MANGES LLP

18        Attorneys for General Motors Corporation

19        767 Fifth Avenue

20        New York, NY 10153

21

22  BY:   JEFFREY L. TANENBAUM, ESQ.

23        ROBERT J. LEMONS, ESQ.

24

25

6

1

2    STUTMAN TREISTER & GLATT, PC

3          Attorneys for the Senior Noteholders

4          1901 Avenue of the Stars

5          Twelfth Floor

6          Los Angeles, CA 90067

7

8    BY:   ERIC D. GOLDBERG, ESQ.

9

10   KENNEDY, JENNIK & MURRAY, P.C.

11         Attorneys for IUE-CWA

12         113 University Place

13         New York, NY 10003

14

15   BY:   THOMAS M. KENNEDY, ESQ.

16

17   U.S. DEPARTMENT OF JUSTICE

18         Office of the United States Trustee

19         33 Whitehall Street

20         21st Floor

21         New York, NY 10004

22

23   BY:   TRACY HOPE DAVIS, ESQ.

24         BRIAN MASUMOTO, ESQ.

25

7

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.  Okay.  Delphi

3    Corporation.

4          MR. BUTLER:  Your Honor, good morning.  Jack Butler,

5    Kayalyn Marafioti and Al Hogan on behalf of the debtors in

6    connection with the continuation of their thirty-fifth omnibus

7    hearing.  Your Honor, we were, when we adjourned on Tuesday, at

8    matter number 4 on the agenda, the GSA and MRA amendment motion

9    at docket number 14164.  And we had been discussing some of the

10   evidentiary matters and were preparing to enter into the

11   declarations and the cross-examination.  We had a chambers

12   conference after which the Court announced that there would be

13   an adjournment to today.  And the statutory committee of

14   General Motors and Delphi, the debtors, would engage in good

15   faith negotiations regarding possible resolutions of some of

16   the objections that had been filed.  Those discussions, Your

17   Honor, began at about 1:30 on Tuesday and continued until after

18   midnight last night.  And I'm pleased to report that there has

19   been an agreement reached between the debtors, the creditors'

20   committee and General Motors.  I'm going to describe the basic

21   economic terms.  I'm not going to discuss the language; it's

22   being drafted right now.  I'm going to ask Your Honor for the

23   Court's consideration that after I describe this, I'm going to

24   ask the Court to adjourn until 11:00 this morning so that we

25   can complete some work on this and also provide objectors, who

8

1    have filed objections who are not restricted from a

2    confidentiality perspective and therefore aren't aware of what

3    I'm about to say, the opportunity to consider these comments to

4    consult with their clients to discuss with us whether they wish

5    to continue pressing their objections to the motion.  And I

6    need some time for those lawyers to have an opportunity to

7    consult with their clients.  I've spoken to the lawyers

8    involved.  They understand that I was going to ask for this

9    procedure today.  And I think it will give us an opportunity to

10   have a more orderly hearing as to whatever's going to be

11   litigated beginning at 11:00, if that's acceptable to Your

12   Honor.

13            THE COURT:  That's fine.

14            MR. BUTLER:  Your Honor, what is being negotiated --

15   and I should also indicate on the record that subject to the

16   documentation being satisfactory to their respective counsel,

17   Delphi's board of directors has approved this first amendment.

18   And the creditors' committee has approved the first amendment

19   subject to counsel being satisfied with the language.  In

20   addition, we expect to get approval from a special committee of

21   GM's board of directors during the course of the day today.

22   That is in process as well.

23            What we are proposing to do at the appropriate time

24   today is to mark as an exhibit, and it will be marked as

25   Debtors' -- or Joint Exhibit 160 when it's completed, is the

9

1    first amendment to the amended and restated global settlement

2    agreement.  This amended and restated agreement will have

3    attached to it a revised -- among other things, a revised

4    Series D preferred stock term sheet that has a few changes in

5    connection with that that are part of the business transaction.

6            In addition to the general economic terms that I'm

7    going to describe in a moment relating to the creditors'

8    committee, Delphi and General Motors, I also want to point out,

9    for the benefit of the union representatives here, that that

10   amendment will also include clarifying language in Sections

11   401(e) through (j) of the amended and restated global

12   settlement agreement, that the releases that the union

13   releasing parties are being asked to provide in connection with

14   the 414(L) transaction are the releases under the applicable

15   benefit guarantied term sheets.  The releases under the labor

16   MOUs would continue to be effective on the effective date of

17   the plan.  There are two sets of releases.  I know there was

18   some question as to which releases were being pulled forward.

19   The releases being pulled forward are under the benefit

20   guaranty term sheet that was approved as part of that labor

21   MOUs, but the broader releases and the labor MOUs would be

22   effective on the effective date of the plan.  And this

23   amendment will clarify that language as we continue the

24   collective bargaining discussions with our unions.

25           In terms of the transaction that is being documented

10

1    now, the transaction, from the debtors' perspective,

2    essentially amends Article 4.04 of the GSA.  And this is an

3    amendment to the GSA not to the MRA.  And it deals with the

4    manner in which General Motors receives consideration and how

5    that consideration is ultimately -- elements of that

6    consideration are shared with general unsecured creditors

7    exclusive, for all purposes, holders of Toppers claims, as that

8    term is defined in the 2007 plan, the plan that's been

9    confirmed.  And there are two scenarios here.  The first

10   scenario is what occurs if there is an -- if the conditions

11   occur that would obligate GM under the GSA to accept preferred

12   stock in connection with a reorganization, there's one

13   treatment.  And there's a second treatment if it turns out that

14   General Motors is not obligated to accept preferred stock and

15   there would be some other transaction here other than that type

16   of emergence, either not -- what I'll call a non-emergent

17   scenario but it could be if some other transaction doesn't meet

18   those conditions.

19        In the event that -- and let me deal with the latter

20   first.  And that is, in the event that there is a circumstance

21   in which, under the GSA, GM would not be obligated to accept

22   the preferred stock in satisfaction of the administrative

23   claims proposed to be granted to them in those circumstances.

24   There would be a sharing of the proceeds of the realization of

25   that administrative claim on a fifty/fifty basis between

11

1    general unsecured creditors and General Motors.  Up until there

2    had been a aggregate distribution on account of the allowed

3    general unsecured claims equal in value to 300 million.  That's

4    to say, essentially, the first 600 million dollars of the

5    administrative claim would be shared.  The proceeds would be

6    shared, not the claim itself.  The proceeds would be shared so

7    that that would be the way in which we would deal with that

8    circumstance.

9            In connection with a reorganization as being

10    contemplated by the debtors and General Motors accepts the

11    preferred stock, there is an understanding -- and again, I have

12    committed to Mr. Rosenberg and to Mr. Tanenbaum that I'm

13    describing the general economic principle here.  I'm not

14    describing the particular words.  The words are being worked on

15    and they will be dealt with and need to be acceptable to

16    counsel to both General Motors and the creditors' committee as

17    well as to Delphi.  But the essential understanding is that to

18    the extent that we have a reorganization and there's preferred

19    stock out there, there is going to be another sharing.  And

20    that sharing would be a sharing that would result in -- and I'm

21    not going to go through the entire sharing mechanism here, but

22    that sharing would result in a sharing that would allow the

23    unsecured creditors to receive distributions exclusive of any

24    value received as a result of participation and any rights

25    offering or similar undertaking equal to twenty percent of

12

1    their allowed general unsecured claims.  That is not a cap.

2    That is simply saying as to the extent that the circumstance in

3    these cases would require General Motors to share part of its

4    recovery under the preferred tranche, it would share it in a

5    way that would provide that the general unsecured creditors

6    would receive an amount equal to twenty percent of their

7    allowed general unsecured claims.  The form of security that

8    would be distributed to unsecured creditors is common stock.

9    The form of security that would be shared with -- distributed

10   to General Motors would be preferred.  So there would be the

11   sharing mechanism but if General Motors had to, essentially,

12   reallocate part of its preferred stock, that would be converted

13   to common and that would be what would be distributed to

14   unsecured creditors.

15          There's also an understanding, and this is similar to

16   as it was before, which is that unless GM consents, they would

17   not be required to accept this transaction if after taking into

18   account the kinds of reductions or sharing mechanisms I've just

19   described, GM did not receive stated value of less than 2.055

20   billion without their consent.  So how ever this transaction

21   would work out, they would need to receive a stated value.  And

22   that's important to the parties in terms of how we go forward

23   and conduct our exit financing and other transactions.

24          Last but not least, these are two other important

25   provisions.  GM has agreed to eliminate some of the preferred

13

1    dividend terms that were in the what was called the "pick

2    dividend" in the Series D term sheet.  And they have also

3    agreed that for a period of six months after the effective date

4    of the plan, the company, Delphi, the reorganized company, will

5    have the right to redeem up to one-half of the Series D

6    preferred stock at a price per share that's equal to eighty-

7    five percent of the stated value per share.  We'll have that

8    option of redemption to be able to do that for a six month

9    period from the effective date.

10       Those are the essential economic terms.  There's

11   obviously a fair amount of language that's been drafted that's

12   being reviewed and finalized that implements the terms of that.

13   It is -- from the debtors' perspective, represents at the end

14   of the day a contractual modification to Article 4.04 of the

15   GSA that I think, if the terms are acceptable, the creditors'

16   committee will advise the Court that they're withdrawing their

17   objection to the GSA.

18       What we would like to do, Your Honor, is to be able

19   to take a recess to finalize the language so we'll have Joint

20   Exhibit 160 for the Court to consider.  We'd like an

21   opportunity to consult with other counsel representing other

22   objectors, give them an opportunity to consult with their

23   clients as to how we proceed and sort out how we would propose

24   to proceed at 11:00 this morning if that's acceptable to the

25   Court.

14

1    THE COURT:  Okay.  Anyone else want to say anything

2    about that limited procedural step?  Okay.  I'll adjourn the

3    hearing until 11, then, to enable you to do that.  I have a

4    brief hearing at 10 that'll last about, I think, ten or fifteen

5    minutes.  But you can leave your materials here.  I don't think

6    it's going to get in anyone's way.  And I'll plan on coming

7    back at 11 unless I hear otherwise.

8    MR. BUTLER:  Thank you, Your Honor.

9    (Recess from 9:30 a.m. until 12:38 p.m.)

10    THE COURT:  Please be seated.  Okay.  We're back on

11    the record in Delphi Corporation.

12    MR. BUTLER:  Your Honor, again, the debtors

13    appreciate the Court's accommodations this morning.  During the

14    interim recess, it's been very productive and I would like to

15    describe, if I may, where we are to the Court.

16    THE COURT:  Okay.

17    MR. BUTLER:  Your Honor, with respect to the matter

18    that's before the Court, the GSA and MRA amendment motion at

19    docket number 14164, there's now an agreed form of Exhibit 160,

20    which is the first amendment to the amended and restated global

21    settlement agreement.  What I'd like to be able to do at the

22    break is to make a copy of this and provide it to the Court

23    during the lunch recess so the Court has an opportunity to

24    review it before we continue with the hearing.

25    THE COURT:  Okay.

15

1          MR. BUTLER:  In connection with the hearing, it is my

2    understanding that the objections of the unsecured creditors'

3    committee, at docket number 14168 and at docket number 14215,

4    the objections of CR Intrinsic Investors, LLC and Highland

5    Capital Management, L.P., at docket number 14211, and the

6    objection of Wilmington Trust Company, at docket number 14214,

7    based on this agreement, have been settled.  And I'd ask

8    counsel to confirm that, please.

9          MR. GOLDBERG:  Your Honor, Eric Goldberg for the

10   senior noteholders.  I'll confirm that.

11         THE COURT:  Okay.

12         MR. FOX:  Edward Fox, Your Honor, on behalf of

13   Wilmington Trust Company, as indenture trustee.  We confirm

14   that, too, and it's subject to an understanding with the

15   debtors which I've put in writing with Mr. Butler.

16         THE COURT:  Okay.

17         MR. GOLDBERG:  That's true with us as well, Your

18   Honor.

19         THE COURT:  All right.  And the committee's also

20   withdrawing its objection on this basis?

21         MR. ROSENBERG:  Yes, Your Honor.

22         THE COURT:  Okay.

23         MR. BUTLER:  Your Honor, we will be proceeding

24   with -- and I don't believe -- is counsel for the United Steel

25   Workers of America here in the courtroom?  I don't think

16

1    they're proceeding with their objection at docket number 14216.

2         That leaves the IUE-CWA objections at docket number

3    14176 and at docket 14220.  I think Mr. Kennedy would confirm

4    that they intend to proceed on a discreet but important issue

5    to them involving the twenty-six million dollar dispute.  But

6    that they're not otherwise opposed to the motion and they have

7    no plans to cross-examine the witnesses.

8         MR. KENNEDY:  Tom Kennedy, IUE, Your Honor.  That is

9    correct.

10        THE COURT:  Okay.

11        MR. BUTLER:  All right.  So, Your Honor, what I would

12   propose to do as -- and let me just briefly then also describe

13   because we do have witnesses here that have been brought in

14   from -- taken away from other meetings to be here.  That

15   indicates that there is no party here objecting to the GSA/MRA

16   who has either withdrawn their objection or if they haven't

17   withdrawn their objection wishes to examine any of the

18   witnesses for this motion.

19        With respect to -- we have several other motions up

20   today and I'd like, if I may, Your Honor, just to be able to

21   address those because I'm going to ask Your Honor to excuse the

22   witnesses if Your Honor has no questions if that's okay.

23        With respect to the next matter that we'd be dealing

24   with and we indicated that it would be matter number 2 on the

25   agenda, the GM arrangement amendment approval motion at docket

17

1    number 14031.  Mr. Sheehan is going to remain here in the

2    courtroom with respect to that particular matter.  My

3    understanding is that -- let me just grab my notes here.  Let

4    me get the right piece of paper.  With respect to that, Your

5    Honor, the objection of CR Intrinsic Investors, LLC and

6    Highland Capital Management, L.P., at docket number 14082, is

7    similarly settled.

8              THE COURT:  Okay.

9              MR. GOLDBERG:  That's correct, Your Honor.

10             MR. BUTLER:  Your Honor, we're going to, during the

11   lunch break, continue to discuss the objections filed by the

12   creditors' committee at docket numbers 14168 and at docket

13   number 14205.  The only witness they've indicated they would be

14   interested in examining is Mr. Sheehan who is remaining in the

15   courtroom.

16             MR. ROSENBERG:  Could you just identify those by

17   name, Jack?

18             MR. BUTLER:  Those are your two objections filed to

19   the GM arrangement.  You've not yet with --

20             MR. ROSENBERG:  Oh, both.  Okay.

21             MR. BUTLER:  You've not yet withdrawn those.

22             MR. ROSENBERG:  Yes, I'm sorry, correct.

23             MR. BUTLER:  We're going to discuss them during the

24   lunch period.  Mr. Sheehan will remain available in the

25   courtroom --

18

1          THE COURT:  All right.

2          MR. BUTLER:  -- if he needs to be called --

3          MR. ROSENBERG:  That there were two confused me.

4          THE COURT:  And he would be the only witness that the

5     committee might want to cross-examine --

6          MR. BUTLER:  Correct.

7          THE COURT:  -- on that motion?

8          MR. ROSENBERG:  Yes, sir.

9          THE COURT:  Okay.

10          MR. BUTLER:  And, Your Honor, the other matter that

11     is before the Court, which is the fifth supplement of the KECP,

12     at docket number 14170, similarly, I don't believe that, at

13     this point -- the only -- bear with me one second.  The only

14     objection filed, I believe, in connection with that was the

15     creditors' committee objection.  And they have, at this point,

16     not yet withdrawn that objection but do not plan to examine

17     anyone in connection with it, I believe.

18          MR. ROSENBERG:  That's correct.  Just for your

19     understanding, Your Honor, we will withdraw our objection.  I

20     would, however, like to put a statement on the record about it.

21          THE COURT:  All right.  Okay.

22          MR. ROSENBERG:  Okay?

23          MR. BUTLER:  And, Your Honor, I also believe that in

24     dealing with the item on the agenda, matter number 5, which is

25     the STN motion, at docket number 14167, my understanding is

19

1    that that is not being prosecuted today assuming the GSA-MRA is

2    approved.

3              MR. ROSENBERG:  Upon approval -- if approved, Your

4    Honor, that presumably is moot.

5              THE COURT:  All right.

6              MR. ROSENBERG:  Okay?

7              THE COURT:  It's not being denied.  It's just not

8    being pursued at this time?

9              MR. ROSENBERG:  Correct.  If for some reason, Your

10   Honor does not approve the GSA/MRA, we will have to talk about

11   it.

12             THE COURT:  Okay.  All right.  Well, with regard to

13   your other witnesses, I have reviewed the declarations in

14   connection with the three motions and also the objections that

15   are still out there although they may be resolved.  And in

16   light of that review, I don't believe I will have questions for

17   the declarants other than perhaps of Mr. Sheehan if he's going

18   to be cross-examined.

19             MR. BUTLER:  Thank you, Your Honor.  So I would ask

20   Your Honor, with Your Honor's permission, if the remaining

21   declarants who are appearing here in support of the debtors'

22   motions be excused at the lunch break.

23             THE COURT:  That's fine.

24             MR. BUTLER:  Thank you, Your Honor.

25             THE COURT:  So, Your Honor, what I would propose we

20

1    do, if it's acceptable to the Court, is take the lunch break at

2    this point.  We'll get Exhibit 160 to you to look at over the

3    course of the lunch break.  We have a few matters that we want

4    to prepare for in connection with Mr. Kennedy for the IUE

5    argument after we present the balance of our case.  And then we

6    will also try to resolve the issue -- narrow the issues on the

7    two remaining motions over the course of the lunch break and

8    hopefully be ready to run a more efficient hearing this

9    afternoon.

10           THE COURT:  All right.  It sounds like you have a

11   fair amount to do in addition to maybe grabbing some lunch.  So

12   2:30?  Quarter to 3?

13           MR. BUTLER:  2:30, I think, is a good target.

14           THE COURT:  Okay.  2:30 then.

15           MR. KENNEDY:  Very well.

16           MR. BUTLER:  Thank you.

17           MR. KENNEDY:  Thank you.

18           THE COURT:  And again, you can leave your materials

19   here.

20           MR. BUTLER:  Thank you.

21      (Recess from 12:46 p.m. until 2:46 p.m.)

22           THE COURT:  Please be seated.  All right.  We're back

23   on the record in Delphi Corporation.

24           MR. BUTLER:  Thank you, Your Honor, and good

25   afternoon again.  Jack Butler for the debtors resuming our

21

1    omnibus hearing.  And we're back on the record in connection

2    with the GSA and MRA amendment motion at docket number 14164.

3    Since Your Honor -- during the lunch recess, the parties have

4    completed the finalization of the first amendment to the

5    amended and restated global settlement agreement.  That has

6    been marked as Joint Exhibit 160.  It's also been filed

7    publicly on the docket at docket number 14275.

8              THE COURT:  Okay.  And I've had a chance to review it

9    as well.

10             MR. BUTLER:  Thank you, Your Honor.  Your Honor, just

11   to complete the evidentiary record so that we have -- we were,

12   I think, through Exhibits 1 through 143 as we'd otherwise

13   described them on the record at the prior hearing.  There have

14   been deposition designations that were submitted as Joint

15   Exhibit 144.  The creditors' committee submitted additional

16   exhibits, 145 through 152.  Those were the exhibits Mr.

17   Rosenberg made reference to at the earlier part of the hearing

18   back on Tuesday.  We had identified some exhibits, Exhibits 153

19   through 159.  We've agreed, given the settlement posture of

20   this case vis-a-vis the committee, to not seek the admission of

21   those.  So we'll ask everything through 152 to come in.  153

22   through 159 would not come in.  Exhibit 160 would come in, the

23   first amendment.  And there has been an agreement that Mr.

24   O'Neil's deposition would be admitted in full, that's Exhibit

25   number 91, in support of the motion.

22

1          THE COURT:  Okay.  So hearing no objection to the

2     admission of those documents that the debtors now are seeking

3     to have admitted, I'll admit them into the record.

4     (Debtors' Exhibits 1-152, 160 were hereby received into

5     evidence as of this date.)

6          MR. BUTLER:  Thank you, Your Honor.  Your Honor, I

7     think we have also, as I indicated before the lunch recess, I

8     think we have disposed of all of the objections other than the

9     objections of the IUE-CWA at docket number 14176 and docket

10    number 14220.  That was filed under seal because of some

11    personnel information that was indicated in it but it's been

12    available -- made available to the Court and the principal

13    parties here.  Again, I'll ask if anyone from the United Steel

14    Workers is here with respect to objection 14216.  So I don't

15    believe they're intending to prosecute.  That was more for a

16    reservation of rights.

17         THE COURT:  Well, that was their protective

18    reservation while they were in the middle of bargaining with

19    you.

20         MR. BUTLER:  Right.  Right.

21         THE COURT:  Okay.

22         MR. BUTLER:  So, Your Honor, I think the only

23    objector that we have left to deal with today, and it's on a

24    more limited objection, is Mr. Kennedy and the IUE-CWA

25    objections.

23

1          THE COURT:  Okay.  I reviewed that objection and the

2     debtors' response but I'm happy to hear counsel as well.

3          MR. KENNEDY:  Good afternoon, Your Honor.  Tom

4     Kennedy --

5          THE COURT:  Good afternoon.

6          MR. KENNEDY:  -- counsel for IUE-CWA.  As you know,

7     we have objected to the amended GSA motion.  We've made an

8     application that that motion, if it's approved, be approved on

9     the basis that there be a modification of Section 303(c) of the

10    GSA and the amended GSA that would provide that monies now

11    being paid under the agreement by General Motors directly to

12    the general funds of Delphi be instead directed to an IUE-CWA

13    OPEB VEBA which was created in connection with the 2007

14    negotiations between Delphi, GM and IUE.

15          We realize that this is a difficult motion.  In the

16    context of tough economic times, the company is struggling to

17    exit bankruptcy with compromises by many.  The easiest position

18    to take is that a deal is a deal; the IUE made a choice and

19    it's stuck with it.  In fact, that's the position Delphi has

20    articulated in the final two paragraphs of its supplemental

21    response to the GSA objections.  But this is not an effort on

22    the part of the IUE-CWA to obtain a better position vis-a-vis

23    its institutional entity or, in fact, its membership as a

24    whole.  Exhibit 125 identifies 576 individuals whom the parties

25    intended specifically to be covered by the IUE-CWA OPEB VEBA at

24

1   the time of the 2007 negotiations.  They range from Lashawn

2   Aaron (ph.) from the Clinton, Mississippi plant to a Gary

3   Zuraski (ph.) who is employed at the Warren, Ohio facility.

4   Those 576 individuals are looking to this IUE OPEB VEBA to

5   provide the substantive OPEB benefits that they were promised

6   by both General Motors and Delphi.  The legal basis for this

7   motion is not just a cri de coeur or a request that fairness

8   dictates that result that we think that's true.  But in the

9   context of a 9019 motion, it's longstanding duration that a

10  Court should grant such motion only under circumstances that

11  are just and fair.

12          But that is not the main basis on which we make this

13  application today.  Bankruptcy Code 1114(g) has an expressed

14  provision dealing with the rights of retirees, solely and

15  uniquely retirees, because of the concern Congress had for

16  their welfare at the time of the adoption of 1114 -- could

17  approach this Court during a proceeding notwithstanding an

18  agreement that had previously been made and make an application

19  to, in effect, increase the funding for their benefits.

20          The August 16th, 2007 order that this Court entered

21  had approved the memorandum of understanding between General

22  Motors, Delphi and the IUE that appears as Exhibit 127 in your

23  book, Your Honor.  At paragraph 5, it's clear and specific that

24  that order is being entered as a final and binding amendment to

25  existing retiree health and welfare benefits under Section

1   1114.  The funding of the IUE-CWA OPEB VEBA was one of the

2   elements, an important, a cardinal element, in that 2007

3   settlement.  And since the original order was entered under

4   1114, the IUE-CWA rights under 1114(g) are triggered.

5        The first proviso of Section (g) states that "any

6   time after an agreement modifying such benefits", referring to

7   OPEB type benefits, "is made between the trustee", in this

8   case, that would be Delphi, of course, "and the authorized

9   representative of the recipients", that's the IUE-CWA, "the

10  IUE-CWA may apply to the Court for an order increasing those

11  benefits which order shall be granted if the increase sought is

12  consistent with the standard articulated above in subsection

13  (3) of 1114(g)".  That standard is "all the affected parties

14  are treated fairly and equitably and it is clearly favored by

15  the balance of the equities".  In our view, as the facts we

16  will demonstrate briefly before Your Honor, we think compel.

17  The conclusion is that 2(b) fair and equitable to meet the

18  balance of the equities test, these 576 individuals cannot be

19  deprived of the OPEB benefit which they were promised and which

20  they had bargained for.

21        Delphi appropriately talks in its motions about the

22  achievement it has made in this proceeding, in fact, today, to

23  convince General Motors finally to accept 5.5 billion dollars

24  in OPEB obligations.  There are thousands and thousands of

25  employees who are being covered whose OPEB is being assured

26

1    through this process.  The only individuals who Delphi has

2    acknowledged were entitled to OPEB that are not being provided,

3    in effect, OPEB, and I'll tell you what I mean by that in a

4    second, are these 576 individuals.  When they bargained for and

5    received a claim for twenty-six million dollars that would

6    support their OPEB, the anticipation was that that claim would

7    pay off at a hundred percent dollars.

8            That rule just changed.  That plan's not out there.

9    If the current understanding were to take place, just to pick a

10   ballpark number, assuming that the equity trades at the level

11   that it's likely to be granted under the revised plan of

12   reorganization and there's a twenty percent recovery, there

13   would be five million dollars in the OPEB VEBA.  The arithmetic

14   in this case is that Delphi and GM and the IUE agreed upon an

15   average funding of 45,000 dollars per person.  Times 576

16   people, that's twenty-six million dollars.  The actual cost of

17   providing OPEB are multiples of that.  In fact, in the

18   evidence -- rather, in the record, I think, at 125, is an

19   analysis, an internal analysis, that mentions 132,000 dollars

20   as the present value of supplying OPEB to a retiree which is

21   consistent with my understanding as a labor lawyer about the

22   likely cost.  We are not, assuming we get the 45,000 dollars

23   average, able to supply a OPEB-like benefit.  But it's enough

24   money to provide some form of retiree health care.  At twenty

25   percent of that number, at 8,000 dollars, 8,000 dollars cannot

27

1    supply a single year's coverage let alone the retirement for

2    life, health and life insurance benefits that are encompassed

3    within the term OPEB.

4        Now, this is a situation that, as I said, if it were

5    an institutional interest of the IUE, I could understand the

6    idea that claims having been made, claims having been accepted,

7    you live with whatever the claim comes in.  But that's not what

8    this is about.  This is about the specific insurance for these

9    individuals.

10       In Delphi's approach in this case after the agreement

11   was reached in August 2007, in our view was consistent with the

12   application we're making today.  We've included in the record

13   letters that were sent to all 576 of these individuals.  They

14   were sent by Delphi's personnel department.  There's a

15   stipulation in evidence in Exhibit 128 that confirms that these

16   letters were sent to each one of these individuals.  They were

17   advised that year coverage for post-retirement health and life

18   insurance will be under the Voluntary Employees' Benefit

19   Association, VEBA, to be established by the IUE-CWA.  That was

20   repeated in correspondence which was directed to union

21   officials and, more importantly, correspondence delivered

22   particularly to these employees.  In fact, the deal was that

23   people who did not get OPEB were entitled to a one percent

24   additional contribution to their 401K plan.  Not that one

25   percent to a 401K plan is going to buy much.  But at least it

28

1   was some gesture, some understanding that there had been groups

2   of people that were covered by OPEB, groups that weren't.  The

3   people that weren't would be getting this benefit or this

4   amount of money in lieu of OPEB.  That one percent additional

5   401K contribution doesn't apply to the individuals that are

6   covered by the IUE-CWA OPEB VEBA.  So not only do they lose the

7   health and life insurance coverage but they lose the

8   contributions that would otherwise have been payable to them.

9   Given these letters, it's simply impossible to look at this

10  record and not understand that what was arrived at in the

11  summer of 2007 was an agreement that OPEB benefits themselves

12  would be paid.  Not would be paid depending on the amount of

13  the claims, because the notices from Delphi do not reference a

14  claims experience screen that one would have to go through in

15  order to actually obtain the benefits.  The obligation to

16  provide the benefits is on the VEBA.  Delphi made that clear to

17  its employees.  And without the application we're making today,

18  the VEBA will not have sufficient funds to make that promise

19  come true.

20       Mr. Miller, in his deposition, acknowledged that

21  there was a mismatch between what the intent of the parties had

22  been at the time the IUE OPEB VEBA was negotiated in August

23  2007 and where we are today because of what's likely to happen

24  with the claims experience.  We're in a unique situation in our

25  view.  We are looking not to capture money which is currently

1    in the estate.  We're looking to correct a current provision in

2    the GSA in which twenty-six million dollars of GM money is to

3    be paid upon the effective date of the plan, by the way, to

4    Delphi general funds.  In our view, it should have been to the

5    IUE OPEB VEBA.  The concept that this money was paid in what

6    I'll call response to the claim that was given, the overall

7    claim, the 126 million dollar claim, in our view doesn't

8    withstand analysis.  The twenty-six million dollars, if we

9    assume we had gotten the claim at a hundred percent value,

10   would have represented a recovery of less than twenty percent

11   of what the claim dollars might have paid out if you view the

12   twenty-six million from General Motors as some compensation for

13   the claim as a whole.  If the claim is only paying off at

14   twenty percent and the twenty-six million dollars in dollars is

15   still --

16           THE COURT:  I'm sorry.  You have to walk me -- I'm

17   losing you on this point.

18           MR. KENNEDY:  All right.  I'm sorry.  It's a little

19   complicated.  I'm trying to illustrate something, perhaps

20   poorly, and I apologize.  I'm responding to an argument that

21   was raised in various discussions I've had with the company

22   that that twenty-six million dollars was not specifically

23   related to the VEBA.  It was just generally part of the

24   restructuring monies that were being paid to General Motors.

25           THE COURT:  Paid by General Motors.

30

1          MR. KENNEDY:  Being paid by General Motors to Delphi.

2    And there's really two responses to that.  The first is that

3    the text of the agreement, the 303(c) text is exactly the same

4    as the text that were used for the UAW and later used for the

5    USW in which monies were paid directly to those unions for

6    VEBAs.  So I think the text of the agreement doesn't support

7    that but --

8          THE COURT:  Well, let's stop there.

9          MR. KENNEDY:  Sure.

10          THE COURT:  Do you take the view that the original

11    GSA provided that those funds would be earmarked for the VEBA?

12          MR. KENNEDY:  No.

13          THE COURT:  Okay.

14          MR. KENNEDY:  The language of 303(c) has not changed

15    from the initial document to the amended document.

16          THE COURT:  Okay.  So, I'm still trying to understand

17    this point.

18          MR. KENNEDY:  Well, what's changed, of course, is

19    that at the time of the original GSA, what was expected to be

20    the claim dollars, in other words, the match or mismatch

21    between outcomes, was not as it is today.  As it is today, it's

22    an intolerable outcome.

23          THE COURT:  No.  I understand that point.

24          MR. KENNEDY:  All right.

25          THE COURT:  Okay.

31

1      MR. KENNEDY:  And had the debtor, in all candor, not

2   been seeking to amend the GSA, we would perhaps be bringing

3   this notion on by a different route.  But since they are, in

4   our view, we have the ability to come before the Court and make

5   the application to condition that approval upon a correction of

6   what we think represents an unjust result and an inappropriate

7   one given what the parties' intentions were at the time the

8   negotiations were had in 2007.  And what I was --

9      THE COURT:  Okay.  Well, but when you say the

10  parties' intentions, though, you're not going so far as to say

11  that the original GSA should be subject to reformation, right?

12     MR. KENNEDY:  No.  I think the grounds for

13  reformation would require a mutual mistake and, in all candor,

14  I don't believe we could demonstrate a basis for alleging

15  mutual mistake.  We certainly can allege a mismatch between

16  what the parties' intentions and expectations were at the time

17  of the agreement and where they are now.

18     THE COURT:  Okay.  All right.

19     MR. KENNEDY:  The percentage argument I was trying to

20  use as an illustration is that if someone were viewing the

21  twenty-six million dollars from GM as an offset or a payment or

22  compensation for the 126 million dollar claim the IUE has,

23  obviously, the comparison --

24     THE COURT:  No, I understand, because you have a much

25  bigger claim pool that you're falling into --

32

1        MR. KENNEDY:  Yes.

2        THE COURT:  -- to share in that twenty-six million.

3    I understand your argument now.  I was --

4        MR. KENNEDY:  Okay, great.  Great.  So we're really,

5    in our view, in a special circumstance.  The GSA amendment

6    motion states at paragraph 9 that under the amended GSA that GM

7    is committed to assume financial responsibility for all of

8    Delphi's hourly post-retirement health care benefits and post-

9    retirement life insurance liabilities, collectively, OPEB.  The

10   only way that will, in fact, be true, the only actual support

11   for that statement would be if the application we are making

12   now under 1114(g) is granted.  And given two things, the first

13   that the statute permits and contemplates that in this kind of

14   situation where later in a case the equities would be such that

15   the retirees could come before you and ask for a modification

16   of orders previously entered and the fact that money

17   provides -- would not be taken from the estate but would be

18   coming from General Motors.  And I'll note, Your Honor,

19   something I think is important.  Obviously, this would have, in

20   some generalized sense, an impact on the estate.  It's not a

21   meaningless number.  It's not a number which is as large as

22   many of the other ones we talk about in this case pretty

23   frequently.  But in this case, General Motors has authorized

24   the IUE to state in its discussions with the debtor that it did

25   not object to a change in 303(c) which would allow the payment

33

1   to be made directly to the IUE OPEB VEBA.  And they are the

2   largest creditor of this estate.  And I'll note that the UCC

3   has not filed an objection to our application either.  So that

4   the only party contesting the application that we've made is

5   the debtor.  And given the debtor's promises to these

6   individuals that they would have OPEB coverage from the IUE

7   OPEB VEBA, in our view, the balancing of the equities as such

8   requires the application we've made.

9          THE COURT:  Okay.  To be honest, I did not view the

10  filing in the context of 1114(g).  I viewed it more as an

11  objection to the settlement with a suggestion on how to fix it.

12         MR. KENNEDY:  We will accept it if that's the way you

13  want to provide it, Your Honor.

14         THE COURT:  Well, no.  I'm going somewhere else --

15         MR. KENNEDY:  Oh.

16         THE COURT:  -- which is that as far as the Court's

17  consideration of settlements is concerned, what I'm supposed to

18  focus on is the settlement from the perspective of the debtor

19  and the debtor's estate, generally.  Obviously, one of the

20  things I would consider is how it affects issues in the case

21  including your client's issue.  But ultimately, when I look at

22  a settlement, I'm supposed to look at the merits of the

23  settlement vis-a-vis the debtor, an issue the Second Circuit

24  addressed most recently in the Refco case where parties said

25  well, it's a bad deal for us and affects our rights in a way

34

1    that was sort of tangential to the overall picture of the

2    settlement.

3            I also generally don't believe that affirmative

4    relief, particularly under a unique section of the Code, 1114,

5    is really appropriate to be heard on this type of request.  It

6    seems to me, therefore, particularly given the unique nature of

7    1114, that this is properly viewed as a request as opposed to

8    an objection to the settlement.  The settlement provides for a

9    pot of money to the estate.  Your clients want some of that

10   money to be allocated in a specific way.  It seems to me that

11   given that they may well have rights under 1114(g), it'd be

12   better to tee it up so that the standards of 1114(g) can be

13   focused on, as opposed to in the context of, in essence, trying

14   to reform a settlement.

15           MR. KENNEDY:  All right.  We will do that, Your

16   Honor.

17           THE COURT:  And I would say that, in particular, for

18   a couple of other reasons.  One is I don't believe this is

19   properly viewed as a case of mutual mistake that when the

20   original GSA and the deal with your clients was struck.  I also

21   don't believe there was a guarantee of any recovery,

22   specifically.  I mean, I think everyone went in to the plan

23   knowing that the stated plan value was just that, a compromise

24   value.  I mean, we spent hours on that topic at the

25   confirmation hearing.  And, frankly, even the letters, which I

35

1    reviewed, the model letter, can certainly be read as saying

2    well, from now on, the VEBA's picking up your coverage,

3    whatever that is.  Look to the VEBA for it.  As opposed to

4    whatever you are owed today will be paid by the VEBA.  That

5    being said, I think you're right that 1114 does uniquely have

6    this concept of looking again under -- however, circumstances

7    that are pretty prescribed in the statute.  And I think it

8    would be better for the parties to actually couch it in those

9    terms than dealing with it in this record.

10             MR. KENNEDY:  All right.  Thank you, Your Honor.

11             THE COURT:  Okay.  And, Mr. Butler, you're free to

12   say whatever you want to say but that was my general reaction

13   to this.

14             Let me summarize it again.  I don't view the argument

15   raised by the IUE as one that would be sufficient to defeat the

16   settlement.  And, in fact, I think that, although it's couched

17   as an objection to the settlement, perhaps even the IUE

18   wouldn't want the settlement defeated.  The settlement stands

19   on its own.  It provides for certain consideration to the

20   debtor as a whole.  I don't see a basis for reformation or for

21   forcing the parties to the settlement to redo it.  But I don't

22   believe, on this record, I should properly rule on the request,

23   particularly since I think it is, if it's going to be formally

24   sought, one that would be under 1114 without having a proper

25   record under 1114, including a motion under 1114.

1          MR. BUTLER:  Your Honor, I don't think, on behalf of

2     the debtors, we really have anything to say.  We have a

3     different perspective, with all due respect, to the IUE-CWA and

4     their views.  I think it's appropriate for us to respond to the

5     1114(g) record if and when it's brought and to develop our

6     views in connection with that record.  And we will do so if and

7     when the estate's called upon to do so.

8          I think the IUE-CWA and Mr. Kennedy are aware of

9     Delphi's views which are not directed in any pejorative way to

10    the IUE-CWA.  The fact of the matter is that we did negotiate a

11    transaction with them.  We collectively bargained it.  We

12    believe we're living up to our end of it.  And if they believe

13    that they're entitled to benefits under 1114(g) and can

14    establish that to the Court, we'll be here in connection with

15    that record.  We don't believe that they can but I don't think

16    it makes sense for me to argue -- present 1114(g) argument --

17          THE COURT:  It's not in front of me.

18          MR. BUTLER:  -- when it's not before you.  So I think

19    I should just stop there.

20          THE COURT:  Okay.  All right.  And, of course, you

21    have an ongoing relationship with the -- you -- the company has

22    an ongoing relationship with the IUE.

23          MR. BUTLER:  Right.

24          THE COURT:  And maybe --

25          MR. BUTLER:  We do, Your Honor --

37

1          THE COURT:  -- these issues may be dealt with as part

2     of that ongoing relationship in some way, shape or form, too.

3          MR. BUTLER:  We do, Your Honor.  It's an important

4     relationship.  And I should tell the Court, just to say it here

5     because we've worked very closely with the IUE-CWA.  They have

6     worked in a lot of ways to be cooperative with the company and

7     we've tried to do the same with them.  I will point out they

8     are the first of the unions to have executed their

9     implementation agreements -- or to agree to them.  I don't if

10    they're actually signed yet but the IUE-CWA has agreed to the

11    terms of the implementation and will be the first population to

12    be included in the -- as people do the bucketing, to be

13    considered to be in the bucket in the net liability transfer if

14    Your Honor approves this.  So they already have spent a lot of

15    time and effort on behalf of their negotiating leadership to do

16    that in order to represent the interest of their members.

17         So we respect their issues and their views.  We

18    regret that we have this difference of view.  But we have one

19    and we'll deal with it in the 1113(g) (sic) context or

20    otherwise in our discussions with them.

21         THE COURT:  Okay.  1114.

22         MR. BUTLER:  1114, excuse me.

23         THE COURT:  Okay.  Thank you.

24         MR. BUTLER:  Your Honor, I think Your Honor had

25    indicated this matter had been fully briefed.  I'm not going to

38

1    make a closing argument in the context of where we are.  I

2    don't know that we need to in terms of the record.  I will --

3    some of the, I think, benefits of this agreement are spelled

4    out in the papers.  They're also spelled out in Joint Exhibit

5    85 which is the group of demonstrative exhibits that go through

6    and demonstrate the amount of additional contributions and how

7    the amended GSA and amended MRA work.

8         Your Honor had expressed concerns about 1127.  I

9    recognize that both 1127 objectors have withdrawn their

10    objections in that regard.  We did file a supplemental brief on

11    that subject --

12         THE COURT:  I read that.

13         MR. BUTLER:  -- so that the record was fully

14    developed, from our perspective, on that issue as well.  So,

15    unless Your Honor has specific questions of us, I would --

16         THE COURT:  One of your colleagues has something.

17         MR. BUTLER:  Oh.  Yeah, I had to get to -- before a

18    bunch of people stand up, there are a litany of things I'm

19    supposed to say on behalf of various people.  So let me read

20    those statements --

21         THE COURT:  Okay.

22         MR. BUTLER:  -- into the record, if I may.  Just one

23    moment here.  I do have them.  They're even appropriately

24    marked for me.

25         Your Honor, one of the first things that I did want

39

1    to address was what was accomplished in the first amendment

2    that's now been published was an agreement, as I've described

3    it earlier, in terms of a contractual allocation of prospective

4    GM contributions -- or compensation, rather, to general

5    unsubordinated unsecured creditors as it has been outlined in

6    the first amendment under the circumstances and subject to the

7    terms and conditions of that amendment.  What we did not do,

8    and it was by design and after discussion, is we did not

9    attempt in the context of a GSA MRA to come to the Court with a

10   full plan framework.  We intend, if Your Honor approves this,

11   and we're able to implement the 414(L) next week and pull

12   forward the effectiveness of the GM contributions to the

13   estate, our intention is to move forward rapidly in examining

14   what our options are in what are, obviously, extraordinarily

15   complex capital markets and in negotiations and discussions

16   with stakeholders who have expressed interest in providing

17   financial support to the company in connection with emergence.

18   Once they had confidence in that the new plan actually -- I'm

19   talking now the financial plan that was publicly released back

20   earlier this month, that that plan was, in fact, the plan the

21   company was going to go forward with.  And so we need to get

22   about that business as part of those discussions.  We intend to

23   continue the plan framework discussions or the POR modification

24   discussions with our joint statutory committees, both the

25   creditors' committee and the equity committee.  And I think

40

1    it's clear to say, but I'll just sort of say it, there's

2    nothing in this settlement today other than the agreement on

3    how we're addressing Article 4.04 of the GSA that has any

4    implication whatsoever in connection with the ultimate plan

5    modifications the debtors will put forward.  That is to say, we

6    have agreed on how we're going to be treating General Motors'

7    claims.  There has been an agreement with the creditors'

8    committee in 4.04 as to the mechanisms that have been adopted

9    in the first amendment.  But that is -- while everyone reserves

10   their rights and everyone has a point of view and there are

11   going to be some spirited discussions among the parties as to

12   how we should shape the rest of the plan framework, that is

13   work ahead of us.  And I just wanted to -- and work that we

14   have already started and we'll be moving forward very rapidly.

15   It is our intention to file modifications under Section 1127 to

16   the plan, as soon as we reasonably can, in order to accomplish

17   an emergence from Chapter 11 as soon as practicable.  And that

18   is our goal, we're working very hard at it.  But I did want to

19   make it clear today as to what the scope of this hearing is.

20            THE COURT:  Okay.

21            MR. BUTLER:  Second, Your Honor, in connection with

22   the GSA MRA amendments, we did receive inquiry from the MDL

23   ERISA plaintiffs' class counsel concerning the scope of the

24   release to the GM related parties.  As Your Honor will recall,

25   in the MDL ERISA action, in addition to claims against the

1    debtors, the plaintiffs asserted claims against a GM related

2    party entitled -- by the name of G-M I-M-C-O, GM IMCO.  As part

3    of the settlement of the MDL ERISA action approved by the Court

4    and by the district court in Michigan, the MDL ERISA plaintiffs

5    will grant release to GM when that settlement becomes

6    effective.  The point of this statement on the record here is

7    to clarify that it is not the debtors' intent, the releases

8    under Section 401(a) or (b) of the amended GSA, the ones to be

9    effective prior to the effective date of a plan, extended the

10   claims asserted in the MDL ERISA action.  And that is an

11   accurate statement.  We agreed to say it.  We are obliged --

12           THE COURT:  And GM understands that, too?

13           MR. BUTLER:  I believe they do.

14           THE COURT:  Okay.

15           MR. BUTLER:  And they're here.  We have assumed

16   obligations about third party releases in connection with the

17   plan.  We understand them and we are committed to them.

18           THE COURT:  Okay.

19           MR. BUTLER:  All right.  Let me look around for a

20   moment and see if anyone is -- excuse me one second.  Mr.

21   Tanenbaum just wanted me to make clear that the releases I'm

22   describing under the plan are third party releases.  I think we

23   understood that.

24           THE COURT:  Right.

25           MR. BUTLER:  I thought I said it but I'll say it

42

1   again to make sure the record's clear.  Anyone else?

2        All right.  I think, Your Honor, I have made the

3   statements that we committed to make in connection with

4   consideration of this motion.  And subject to questions Your

5   Honor may have, the debtors would rest on the evidentiary

6   record and the pleadings that have been filed in this case.

7        THE COURT:  Okay.  As I said, I did get a chance to

8   review the first amendment to the GSA.  I just had one

9   question.  I think it's probably worth clarifying this on the

10  record.  Paragraph 8, the phrase at the end there, "equal in

11  value of up to 300 million", do you see that?

12       MR. BUTLER:  Um-hmm.

13       THE COURT:  That refers to the amount of the

14  distribution, right, not to the amount of the unsecured claims?

15       MR. BUTLER:  Correct.

16       THE COURT:  So --

17       MR. BUTLER:  Yes.

18       THE COURT:  -- you could read a comma in there to --

19       MR. BUTLER:  Yes, Your Honor.

20       THE COURT:  Okay.

21       MR. BUTLER:  That is correct.

22       THE COURT:  All right.  Okay.  Does anyone else have

23  anything to say on this matter?  All right.  The debtors sought

24  approval of an amendment to the two agreements with GM,

25  referred to in this case as the GSA and the MRA.  There were a

43

1    handful of objections to that motion all of which, based on my

2    reading of them, went to features of the GSA as opposed to the

3    MRA.   The MRA, I guess, in some ways deals more with the

4    ongoing relationship as a business matter between GM and the

5    debtors.   And the GSA deals more with the treatment of GM in

6    the bankruptcy case as far as its claims are concerned as well

7    as the resolution of the relationship between the debtors and

8    GM and the debtors' pension liabilities.

9         The parties have since negotiated, in light of the

10   objections, which is stated on the record, with the exception

11   of the IUE-CWA's limited objection which has already been dealt

12   with, have since been withdrawn in light of the first amendment

13   to the amended and restated GSA.   Based on my review of that

14   amendment as well as, of course, the withdrawal of the

15   objections, and my review of the declarations and other

16   exhibits submitted in support of the motion and the GSA itself,

17   I find that the GSA is a valid and proper settlement of the

18   respective claims and rights of the debtors and GM.

19        The objections raised two fundamental issues that I

20   should address briefly that go not to the merits of the

21   settlement as a function of the rights between the parties but

22   rather to bankruptcy process issues, guided first and foremost

23   by Iridium Operating LLC, 478 F.3rd 452 (2nd Cir. 2007).   I

24   believe that as originally drafted, and certainly as amended as

25   well, the settlement does not run afoul of the concerns raised

44

1    by the Second Circuit in Iridium regarding the impact of a

2    settlement on the absolute priority rule.  The amendment does

3    talk about allocation of -- or a redistribution by GM of its

4    recoveries under certain scenarios to other creditors.  But

5    given the way that the settlement is structured, that

6    reallocation, to my mind, doesn't violate the absolute -- or

7    wouldn't violate the absolute priority rule and therefore

8    doesn't implicate the special considerations and require the

9    special findings that Iridium required.

10        The objections dealt also with the suggestion that

11   the amendment to the GSA that the debtors first sought approval

12   of constituted a sub rosa plan and therefore should not be

13   approved in the context of a motion under 9019 and 363(b).  It

14   seemed to me that but for one issue, those objections were not

15   well taken and that, again, consistent with Iridium, and also

16   the evolution of the case law under -- on the sub rosa issue,

17   including in the Fifth Circuit where the issue, I think, first

18   originated, as most recently articulated in the Cajun case

19   which Judge Gropper and Judge Romero cited in the Tower

20   Automotive case.  It seems to me that, again, with this one

21   issue, the original amendment would not have run afoul of the

22   sub rosa plan concern.  I believe that with the agreement of

23   the objectors and, first and foremost, of the unsecured

24   creditors' committee, that one issue that I had has been

25   resolved.  That concern, in my mind, was that the true benefits

45

1    of the settlement could potentially be viewed if the evidence

2    ultimately showed this, and, of course we never got to the

3    evidence because of the consensus, as being so contingent upon

4    approval of a modified plan that it would have forced the

5    parties into a particular straightjacket in their plan

6    negotiations.  I don't know whether that argument would have

7    won out based on the evidence.  But I do know now that the

8    committee and the other objectors are satisfied enough with the

9    modifications to the plan that they don't feel they're in that

10   straightjacket anymore.  And, of course, everyone's rights are

11   reserved with regard to an ultimate modification of the plan or

12   any other reorganization scenario.

13          Finally, it was argued by two of the objectors that

14   the motion would have affected an impermissible modification of

15   the confirmed plan under Section 1127(b).  Again, this, to me,

16   as even acknowledged by the debtors' supplemental brief, is

17   somewhat unchartered territory but one provision of the plan,

18   notwithstanding all of the provisions of the confirmation order

19   and the plan that ranks the priority of various agreements

20   putting the GSA as the governing agreement.  It troubled me in

21   that regard and that was the provision in Section 12 regarding

22   amendments and the committee's rights over amendments that

23   materially affected their constituents.  Again, the party -- or

24   the objecting party with that right is no longer objecting.

25   And, in my mind, given that fact and given the modification

46

1    rights in the GSA as incorporated in the plan and the

2    confirmation order, the motion at this point seems to be, to

3    me, more in keeping with the circumstances in the first Johns

4    Manville amendment as well as the Mirant case and the Reserve

5    Capital case where there was authority to amend and, therefore,

6    the Court said 1127 didn't apply.  We may leave for another day

7    the issue of what Article 12 means.  But at this point, I view

8    the withdrawal of the objections as resolving that issue for

9    today.

10            So, separate and apart from those considerations,

11   given the consensual nature of the relief before me and the

12   case the debtors have made as to why it makes a good business

13   decision to structure a settlement with GM now in this way,

14   I'll approve the motion.

15            I've reviewed the order and I see that it includes

16   the language that the United States wanted --

17            MR. BUTLER:  Your Honor, we're still --

18            THE COURT:  -- in return for their withdrawal of

19   their objection.

20            MR. BUTLER:  Right.

21            THE COURT:  Are you still working on other aspects of

22   the order?

23            MR. BUTLER:  Yeah.  We're still working on some of

24   the language, Judge.

25            THE COURT:  All right.

47

1          MR. BUTLER:  We'll submit that order either later

2     today or tomorrow.

3          THE COURT:  Okay.

4          MR. BUTLER:  But I want to make sure that,

5     particularly as to the committees, General Motors and we that

6     we're on the same wavelength on the --

7          THE COURT:  All right.  As far as the findings were

8     concerned, I was comfortable with the findings.

9          MR. BUTLER:  Thanks, Judge.

10         THE COURT:  I'll look for that order to come in.

11         MR. BUTLER:  Thank you very much, Judge.

12         THE COURT:  Okay.  So I believe that leaves the --

13         MR. BUTLER:  Let me just try and get rid of the STN

14    motion at this point in time.  Mr. Rosenberg, do we have

15    agreement that the STN motion is withdrawn without prejudice?

16         MR. ROSENBERG:  Without prejudice, correct, we have

17    such an agreement.

18         THE COURT:  Okay.  So I'll treat that as withdrawn

19    without prejudice.

20         MR. BUTLER:  Thank you, Your Honor.  Your Honor, I

21    would next move then -- just give me just a moment here.

22         (Pause)

23         MR. BUTLER:  Your Honor, I'd next move to item 2 on

24    the agenda.  And item 2 is our motion for an order authorizing

25    an amendment to an arrangement with General Motors Corporation

48

1    approved pursuant to the second DIP extension order found at

2    docket number 14031.  And, Your Honor, there were three

3    objections filed to this order.  As we talked about before the

4    lunch recess, the objection from Highland Capital and CR

5    Intrinsic at docket number 14082 has been withdrawn.  There was

6    also two objections filed by the creditors' committee, a

7    preliminary and final objection at docket number 14168 and

8    docket 14205.  I'd like to address those right now in just a

9    moment.

10             THE COURT:  Okay.

11             MR. BUTLER:  Your Honor, my understanding in

12   discussing this with Mr. Rosenberg before the hearing is that

13   the creditors' committee is willing to withdraw their

14   objections to this motion provided there is a clarification on

15   the record that General Motors would concur with, that would

16   just make it very clear that the approval powers or approval

17   rights under the second tranche of this GM arrangement, the

18   tranche we're asking Your Honor to approve today, which, among

19   other things, has a requirement in it that says this wouldn't

20   become available unless by October 31st we file plan

21   modifications that were acceptable to General Motors.  And the

22   words are actually in the amendment; I'm not quoting them

23   precisely.

24             The creditors' committee wanted, I think, a

25   straightforward and sensible clarification that the exercise of

49

1   those rights by General Motors cannot be in any way materially

2   inconsistent with the rights and obligations of General Motors

3   that they have just assumed now in this GSA and MRA that the

4   Court's approved.  I think General Motors agrees with that

5   clarification.

6           THE COURT:  Yeah.  I see its counsel nodding.  Okay.

7   All right.

8           MR. BUTLER:  Mr. Tanenbaum agrees with that; that's

9   the corroboration Mr. Rosenberg was seeking on the record.  And

10   I believe, with that, the creditors' committee is prepared to

11   withdraw their objections to the LSA.

12           MR. ROSENBERG:  Yes, Your Honor.  I just think that

13   it's sufficiently important to us and I'd like it to go beyond

14   the record into the order or whatever.

15           THE COURT:  I'm sorry.  I missed that last -- I

16   couldn't hear that last --

17           MR. ROSENBERG:  I said, Your Honor, that I would like

18   this proviso, which is absolutely crucial in terms of the

19   creditors' committee's willingness to go along with this, to

20   appear either in an amended document, the order, somewhere

21   beyond the statement on the record.

22           THE COURT:  Seems to me it could be in the order.

23           MR. BUTLER:  We'll be happy to -- we're happy to put

24   it in the order.  I'm sure we can work on a sentence that will

25   be acceptable --

50

1          MR. ROSENBERG:  Very good.  Thank you.

2          THE COURT:  I think it would have been unreasonable

3     to have taken a contrary position if that ever came to pass.

4     But now it's laid out so that no one has to argue what's

5     reasonable or unreasonable.

6          MR. ROSENBERG:  That was not a fight we wanted to

7     have, Your Honor.

8          THE COURT:  Right.  Okay.

9          MR. BUTLER:  So, Your Honor, with that understanding,

10    which we'll put into an amended order we'll submit to Your

11    Honor, this matter's uncontested.  There are some exhibits.

12    There are fifty-nine exhibits that have been presented for

13    this.  They are the declaration of Mr. Sheehan at Debtors'

14    Exhibit 1, four presentations to the board, Exhibits 2 through

15    5, Exhibit 6, a presentation to the statutory committees.  And

16    there are excerpts of a series of those presentations which are

17    Exhibits 7 through 10.  Court documents from 11 to 22.  23 was

18    reserved.  Some additional court documents about the prior GM

19    arrangement from 24 through 27.  And then the applicable

20    financing motion starting at Exhibit 28 all the way through --

21    all the way through, actually, 51.  And then, finally, Your

22    Honor, there are some relevant documents that have been

23    identified, some other excerpts and some things the objectors

24    had identified which are all the way through 59 which is Mr.

25    Degel's (ph.) deposition.  So, Your Honor, we'd move the

51

1   admissions of Exhibits 1 through 59.

2            THE COURT:  And there were no objections to --

3            MR. BUTLER:  No.

4            THE COURT:  -- their admissibility?

5            MR. BUTLER:  We had a meet and confer on this.  There

6   are no objections to these.

7            THE COURT:  Okay.  I'll admit them.  As I said

8   before, I reviewed Mr. Sheehan's declaration --

9   (Debtors' Exhibits 1-59 in support of GM arrangement motion

10  were hereby received into evidence as of this date.)

11           MR. BUTLER:  Your Honor, given the --

12           THE COURT:  -- and I have no questions of him.  It's

13  clear to me from that declaration and from the agreement itself

14  and from your remarks that the debtors and their key

15  constituents are going to be very busy over the next few weeks.

16  But I trust they'll use that time well.  So, this loan will, I

17  believe under these circumstances, assist them and

18  consequently, I'll approve the motion.

19           MR. BUTLER:  Thank you, Your Honor.  We appreciate

20  that.  We'll submit an amended order, that has the language in

21  it we've discussed, to chambers.

22           THE COURT:  Okay.

23           MR. BUTLER:  Your Honor, the last matter on this

24  agenda is matter number 6 on the agenda.  It is the debtors'

25  fifth supplement to the KECP motion, the original motion filed

52

1    at docket number 213.  This deals with the second half AIP

2    program for the second half of 2008 at docket number 14170.

3    The only objection was an objection to -- a limited objection

4    filed by the creditors' committee to a specific part of the

5    program which we'll address in just a moment.  I would

6    indicate, Your Honor, that in terms of the evidentiary record,

7    there are thirty-one exhibits that have been agreed to in

8    connection with the meet and confer.  They would include the

9    declarations of Mr. Sheehan and Mr. Naler at Exhibits 1 and 2;

10   AIP documents dealing with the financial performance targets

11   and PALE curves and the adjustment protocol at Exhibits 3 and

12   4.  Materials presented to the statutory committees at Exhibit

13   5.  Court documents concerning the fifth supplement, Exhibits 6

14   through 13.  Some other relevant court documents then filed at

15   Exhibits 14 through 25.  Our demonstrative package which we use

16   at these hearings at Exhibit 26.  And then some additional

17   exhibits that were designated Exhibits 27 through 31.  These

18   have been agreed to during our meet and confer and there is no

19   objection that I'm aware.

20          THE COURT:  Okay.  Well, go ahead, Mr. Rosenberg.  No

21   objections?

22          MR. ROSENBERG:  Is this the time, Your Honor?

23          THE COURT:  Well, this is just on the exhibits.

24          MR. ROSENBERG:  Oh, I'm sorry.

25          THE COURT:  So they'll be deemed --

53

1          MR. ROSENBERG:  Nothing on the exhibits.

2          THE COURT:  They'll be admitted.  They're admitted.

3     (Debtors' Exhibits 1-33 in support of fifth supplement to the

4     KECP motion seeking authority to continue AIP program for

5     second half of 2008, were hereby received into evidence as of

6     this date.)

7          MR. BUTLER:  And I think Mr. Rosenberg indicated he

8     wanted to make a statement about the creditors' committee

9     objection.

10          MR. ROSENBERG:  Is this the time?

11          THE COURT:  Yes.

12          MR. ROSENBERG:  Thank you, Jack.  Thank you, Your

13     Honor.  I guess I just would like to have the record reflect

14     our perspective on this issue.  We do withdraw the objection at

15     this time.  But based on the totality of papers that we put

16     before Your Honor in connection with the various motions that

17     were on this week, I think it should be obvious to Your Honor

18     that the committee was enormously frustrated by what it

19     perceived as the absence of progress and, in particular,

20     frustrated by the process pursuant to which we were brought to

21     court this week in connection with the approval of the GSA.

22     All's well that ends well.  We are pleased with the result

23     today.  We are pleased that the 414(L) transaction can now

24     occur.  It was important to everybody.  But it had to occur on

25     reasonable terms and we believe that now it has.  And

54

1    accordingly, coming full circle, that obviously is progress

2    that somewhat ameliorates the committee's frustration and

3    hopeful -- and therefore withdrawal of the AIP objection to the

4    extent that it was aimed solely at the members of the Delphi

5    strategy board who, in our judgment, are the people to move

6    this process forward.

7            But I guess the point of the statement is to say that

8    we hope that we do not have a repeat of the kinds of

9    frustrations that brought us to have to file the motion in the

10   first place.  And I hope we have a more cooperative and

11   deliberative process going forward toward the end of the year

12   as we hopefully march toward an exit from this case.

13           THE COURT:  Okay.

14           MR. BUTLER:  Your Honor, I don't think it pays good

15   dividends in the context of what is being completed as a

16   consensual hearing to have a lengthy rebuttal to Mr.

17   Rosenberg's comments but I will tell you that we understand

18   that reasonable people can have differences of view about how a

19   particular subject ought to be treated or about demands of a

20   particular stakeholder or constituency.  The debtors don't have

21   the luxury of looking just to one individual creditor, one

22   individual stakeholder.  We have to exercise our fiduciary

23   responsibilities, as our directors and officers understand them

24   under Delaware law and under applicable bankruptcy law, to all

25   of our stakeholders, obviously in accordance with the

55

1    Bankruptcy Code and other applicable law.

2         I think that we have a profound sense of

3    disappointment that when a particular stakeholder, be it the

4    creditors' committee or anyone else, doesn't get precisely what

5    they want that they file papers that claim breach of fiduciary

6    duty or that they file papers that are intended to be, from the

7    debtors' perspective, some type of retribution against

8    particular people at Delphi.  I think it's unfortunate.  I

9    obviously acknowledge Mr. Rosenberg's statement that it

10   reflects frustration on behalf of people.  I don't think that

11   frustration is something owned only by one group of people

12   here.  This has been an extraordinarily complex process.  I

13   have been doing this for somewhat up -- almost thirty years.  I

14   can't imagine a time or remember a time in my professional

15   career that we have had to deal with the headwinds that a large

16   complex restructuring is dealing with today.  And I think that

17   the company is doing all that it can do to fulfill its

18   fiduciary responsibilities.  I think people are working twenty-

19   four/seven and trying to make the right decisions.  I am

20   pleased that the debtors were able, at the end of the day, to

21   participate in an environment that allowed people to come

22   together and resolve their differences.  This will not be the

23   first nor the last case that is decided at the courthouse steps

24   on some issues.  That seems to be the way the process goes, no

25   matter what the design might be.

56

1        But I would simply say to Your Honor that, from the

2    debtors' perspective, the debtors firmly believe that their

3    officers and directors have and will continue to exercise their

4    fiduciary responsibilities.  And I hope in the future if there

5    are differences of views, we can focus on the differences of

6    views rather than a broad assassination of character as we go

7    forward.  Thank you.

8        THE COURT:  Okay.  Well, one thing is very clear to

9    me which is that the debtors and their two committees and GM,

10   for that matter, I think all appreciate the same goal which is

11   to have a reasonable rational exit from Chapter 11 in the

12   next -- before year-end.  And as I think is evidenced by the

13   fact that you all worked around the clock over the last few

14   days, I trust that level of creativity and analysis will

15   continue.

16       As far as the motion itself is concerned, it's

17   unopposed at this point.  It was opposed not on the nature

18   of -- or on the basis of specific targets or the business plan

19   upon which it was based or the process by which the targets of

20   the business plan were developed, which are laid out in the

21   declarations, but more in a sense of view that the top people

22   should have been doing different things in the bankruptcy case.

23   That objection's been withdrawn and as far as the motion itself

24   is concerned, it appears to me consistent with prior motions

25   for these six months short term incentives to be appropriate

57

1    and therefore I will approve it.

2            MR. BUTLER:  Judge, thank you very much.  That

3    concludes the matters that are on the omnibus agenda for this

4    month.

5            THE COURT:  Okay.

6            MR. BUTLER:  Thank you very much for the Court's

7    accommodations.

8            THE COURT:  Since you're going over the order, let me

9    just give you the couple of --

10           MR. BUTLER:  Okay.

11           THE COURT:  -- changes I had on it so you can have

12   that.

13           MR. BUTLER:  Thanks, Judge.

14           THE COURT:  Okay.

15       (Whereupon these proceedings were concluded at 3:49 p.m.)

16

17

18

19

20

21

22

23

24

25

```
                                                              58

 1

 2                          I N D E X

 3

 4                      E X H I B I T S

 5      PARTY    NO.    DESCRIPTION                ID.    EVID.

 6      Amended and Restated GSA/MRA Motion:

 7      Debtors' 1-143   Previously identified exhibits    22,4

 8                       in support of amended GSA

 9                       motion

10      Joint    144    Deposition designations            22,4

11      Debtors' 145-152 Exhibits submitted by creditors'  22,4

12                       committee

13      Debtors' 160    First amendment to the GSA/MRA     22,4

14                       agreement

15

16      GM Arrangement Motion:

17      Debtors' 1      Declaration of Mr. Sheehan         51,9

18      Debtors' 2-5    Presentations to the board         51,9

19      Debtors' 6      Presentations to statutory         51,9

20                       committees

21      Debtors' 7-10   Excerpts from series of            51,9

22                       presentations to statutory

23                       committees

24      Debtors' 11-22  Various court documents            51,9

25
```

59

I N D E X, cont'd

E X H I B I T S

| PARTY | NO. | DESCRIPTION | ID. | EVID. |
|---|---|---|---|---|
| GM Arrangement Motion, cont'd: | | | | |
| Debtors' | 24-27 | Additional court documents re | | 51,9 |
| | | prior GM arrangement | | |
| Debtors' | 28-51 | Applicable financing motion | | 51,9 |
| | | documents | | |
| Debtors' | 52-59 | Various relevant documents | | 51,9 |
| Fifth Supplement to KECP Motion: | | | | |
| Debtors' | 1 | Declaration of Mr. Sheehan | | 53,1 |
| Debtors' | 2 | Declaration of Mr. Naler | | 53,1 |
| Debtors' | 3,4 | AIP documents dealing with | | 53,1 |
| | | financial performance targets and | | |
| | | PALE curves and adjustment protocol | | |
| Debtors' | 5 | Materials presented to statutory | | 53,1 |
| | | committees | | |
| Debtors' | 6-13 | Court documents in support of fifth | | 53,1 |
| | | supplement to KECP motion | | |
| Debtors' | 14-25 | Other relevant documents | | 53,1 |
| Debtors' | 26 | Demonstrative package debtors use at | | 53,1 |
| | | hearings | | |

60

1

2                          I N D E X, cont'd

3

4                          E X H I B I T S

5   PARTY    NO.     DESCRIPTION                      ID.        EVID.

6   Fifth Supplement to KECP Motion, cont'd:

7

8   Debtors' 27-31   Various relevant exhibits                  53,1

9

10                         R U L I N G S

11  DESCRIPTION                                   PAGE       LINE

12  Debtors' motion for order authorizing          46          14

13  implementation of amended and restated

14  GSA and MRA approved

15  Debtors' motion for order authorizing          51,         18

16  amendment to arrangement with GM approved

17  Debtors' expedited fifth supplement to KECP    57           1

18  motion seeking authority to continue AIP

19  programs for second half of 2008 approved

20

21

22

23

24

25

61

1

2                      C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  September 29, 2008

16

17

18

19

20

21

22

23

24

25