# Exhibit 2-A



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                  :
      In re                              :     Chapter 11
                                                  :
DELPHI CORPORATION, et al.,                       :     Case No. 05-44481 (RDD)
                                                  :
                                                  :     (Jointly Administered)
          Debtors.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT PLAN**
**OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND**
**DEBTORS-IN-POSSESSION**
**(AS MODIFIED)**


SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
George N. Panagakis
Ron E. Meisler
Nathan L. Stuart

|  |  |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER | Of Counsel |
|   & FLOM LLP | DELPHI CORPORATION |
| Four Times Square | 5725 Delphi Drive |
| New York, New York 10036 | Troy, Michigan 48098 |
| Kayalyn A. Marafioti | David M. Sherbin |
| Thomas J. Matz | Sean P. Corcoran |
|  | Karen J. Craft |

Attorneys for Debtors and Debtors-in-Possession

Dated:  New York, New York
       October 3, 2008

**DISCLAIMER**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF ANY MODIFICATIONS
TO THE PLAN CONFIRMED BY THE BANKRUPTCY COURT ON JANUARY 25, 2008.  THE
BANKRUPTCY COURT WILL DETERMINE UNDER 11 U.S.C § 1127 WHETHER ACCEPTANCES
OR REJECTIONS OF THE MODIFICATIONS WILL BE SOLICITED, AND ANY ACCEPTANCES
OR REJECTIONS OF THE MODIFICATIONS MAY NOT BE SOLICITED UNTIL THE
BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT (AS MODIFIED).
THIS DISCLOSURE STATEMENT (AS MODIFIED) IS BEING SUBMITTED FOR APPROVAL BUT
HAS NOT YET BEEN APPROVED BY THE COURT.**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (AS MODIFIED) (HEREAFTER, THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED) (THE "MODIFIED PLAN"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE MODIFIED PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE MODIFICATIONS TO THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE MODIFIED PLAN.

ALL CLAIM AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE MODIFIED PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE MODIFIED PLAN. SUMMARIES AND STATEMENTS REGARDING THE MODIFIED PLAN MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE MODIFIED PLAN AND THE EXHIBITS ANNEXED TO THE MODIFIED PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE MODIFIED PLAN, THE TERMS OF THE MODIFIED PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE MODIFIED PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE MODIFIED PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, DEBTORS AND DEBTORS-IN- POSSESSION IN THESE CASES.

## EXECUTIVE SUMMARY

This section provides an executive summary of:

- The background of Delphi's restructuring cases

- Material modifications to Delphi's confirmed plan of reorganization

- The organization of the Disclosure Statement (as modified) and the Modified Plan

- Delphi's businesses, transformation plan, business plan, emergence capital funding, and events affecting Delphi's reorganization

- The valuation of reorganized Delphi

- Distributions to be made under the Modified Plan

On October 8 and 14, 2005, Delphi Corporation ("Delphi" or the "Company") and 41 of its direct and indirect United States subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession (collectively, the "Debtors"), filed petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. Chapter 11 of the Bankruptcy Code allows a debtor to propose a plan of reorganization that proposes how to treat claims against, and shareholder interests in, such a debtor company. A plan of reorganization must be voted on by holders of claims and interests and then must meet various standards to be approved (or confirmed) by the Bankruptcy Court. Consummation of a confirmed plan of reorganization is necessary for a debtor to emerge from chapter 11.

On September 6, 2007, the Debtors filed their Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "September 2007 Plan"), together with a proposed Disclosure Statement with respect to the September 2007 Plan (the "September 2007 Disclosure Statement"). After a series of hearings in the Bankruptcy Court that concluded on December 7, 2007, on December 10, 2007, the Debtors filed the First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "December 2007 Disclosure Statement") and the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (the "December 2007 Plan").

On December 10, 2007, the Bankruptcy Court entered an order approving the December 2007 Disclosure Statement, and the Debtors commenced solicitation of acceptance or rejection of the December 2007 Plan. On January 16, 2008, Delphi announced that the voting results with respect to the December 2007 Plan had been filed with the Bankruptcy Court. Voting by classes of creditors and holders of equity security interests (including shareholders) entitled to vote on the December 2007 Plan illustrated broad-based support for the December 2007 Plan. Eighty-one percent of all voting general unsecured creditors voted to accept the December 2007 Plan

(excluding ballots cast by GM, plaintiffs in the certain multi-district securities class action litigation (the "MDL"), and holders of equity security interests). Of the total amount voted by all general unsecured creditors classes, 78 percent voted to accept the December 2007 Plan. One hundred percent of the ballots cast in the GM and MDL classes voted to accept the December 2007 Plan. Seventy-eight percent of voting shareholders voted to accept the December 2007 Plan.

On January 17, 2008, the Bankruptcy Court commenced the confirmation hearing (the "Confirmation Hearing") for the December 2007 Plan.  The December 2007 Plan was confirmed, with certain modifications, by the Bankruptcy Court on January 25, 2008 (the "Confirmed Plan"), and the confirmation order became final on February 4, 2008.

A  key  component  of  the  exit  financing  of  the  Confirmed  Plan  was  the  investment agreement  (the  "Investment  Agreement")  that  the  Debtors  entered  into  with  A-D  Acquisition Holdings,  LLC  ("ADAH"),  an  affiliate  of  Appaloosa  Management  L.P.  ("Appaloosa"), Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, UBS Securities LLC, Goldman, Sachs & Co., and Pardus DPH Holding LLC (collectively, the "Plan Investors").  On the terms and  subject  to  the  conditions  of  the  Investment  Agreement,  as  amended,  the  Plan  Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in Reorganized Delphi.  In addition, the Investment Agreement, as amended,  provided  for  a  $1.575  billion  discount  rights  offering  that  was  made  available  to Delphi's unsecured creditors and holders of Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate the Confirmed Plan, including obtaining $6.1 billion of exit financing and  conducting  the  discount  rights  offering,  the  Plan  Investors  refused  to  participate  in  the closing  that  was  commenced  on  that  date  but  not  completed.  Several  hours  prior  to  this scheduled closing, Appaloosa delivered to Delphi a letter stating that such letter constituted "a notice  of  immediate  termination"  of  the  Investment  Agreement.  Appaloosa's  April  4  letter alleged  that  Delphi  had  breached  certain  provisions  of  the  Investment  Agreement,  that Appaloosa was entitled to terminate the Investment Agreement, and that the Plan Investors were entitled  to  be  paid  a  fee  of  $83  million  plus  certain  expenses  and  other  amounts.  At  the  time Appaloosa  delivered  its  letter,  other  than  the  Plan  Investors,  all  the  required  parties  for  a successful  closing  and  emergence  from  chapter  11,  including  representatives  of  Delphi's  exit financing lenders, GM, and the Creditors' and Equity Committees in Delphi's chapter 11 cases, were  present  and  prepared  to  move  forward.    All  actions  necessary  to  consummate  the Confirmed  Plan  were  taken  other  than  the  concurrent  closing  and  funding  of  the  Investment Agreement.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for  termination"  of  the  Investment  Agreement.  The  April  5  letter  stated  that  because  the Investment Agreement had not become effective on or before April 4, 2008, the Plan Investors had additional grounds for the Investment Agreement's termination.

On May 16, 2008, Delphi filed complaints against the Plan Investors and related parties seeking redress of the unjustified breach of the Investment Agreement as well as damages related

to the consequent delay of the Debtors' emergence from chapter 11.  Although the Debtors are vigorously pursuing and will continue to pursue all appropriate actions against the Plan Investors, during the time since the Plan Investors' breach the Debtors have worked diligently with the Creditors' Committee and GM to develop modifications to the Confirmed Plan that would allow the Debtors to emerge from chapter 11 without waiting for the full resolution of the Debtors' claims against the Plan Investors.

In fact, on September 12, 2008, Delphi filed a motion in the Bankruptcy Court seeking to implement the Amended and Restated Global Settlement Agreement (the "Amended GSA") and Amended and Restated Master Restructuring Agreement (the "Amended MRA") with GM. Through the Amended GSA and Amended MRA, GM is expected to make net contributions to the Debtors' restructuring and transformation plan having a value of approximately $10.6 billion, representing an approximate $4 billion increased contribution.  The Bankruptcy Court approved the Amended GSA and the Amended MRA on September 25, 2008.  The Amended GSA and Amended MRA became effective on September 29, 2008.

The Debtors have now formulated certain modifications to the Confirmed Plan, as summarized more fully below.  The Debtors are seeking to modify the Confirmed Plan pursuant to section 1127 of the Bankruptcy Code.  The Confirmed Plan, with the modifications described herein, will be referred to herein as the "Modified Plan."  The purpose of this Disclosure Statement is to provide to the holders of Claims against, and Interests in, the Debtors adequate information to make an informed judgment about the Modified Plan, which is annexed to this document as Appendix A.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Modified Plan, which is being submitted by the Debtors.  Certain of Delphi's U.S. affiliates are not debtors in these chapter 11 cases (the "Chapter 11 Cases") and, with the exception of one of Delphi's wholly-owned indirect Spanish subsidiaries, none of the Delphi affiliates located outside the U.S. has commenced chapter 11 cases or similar proceedings in any other jurisdictions.  These non-Debtor affiliates are not necessarily affected by the Modified Plan to the same extent as are Delphi and the Affiliate Debtors.  Certain provisions of the Modified Plan, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon, and may be modified.  Such modifications, however, will not have a material adverse effect on the distributions contemplated by the Modified Plan.

**A.    Summary Of Material Modifications To The Confirmed Plan**

As set forth above, the Plan Investors' failure to meet their obligations under the Investment Agreement has delayed the Debtors' emergence from chapter 11.  The loss of this investment, and the resultant exposure to the continued uncertainty of the global capital markets, the current economic climate in the U.S. and the macroeconomic trends affecting the automotive industry, have led to certain modifications to the Confirmed Plan as reflected in the Modified Plan attached hereto as Appendix A.  The chart below briefly summarizes some of the material modifications, but the Modified Plan and the remainder of this Disclosure Statement should be reviewed in their entirety.

| | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| Plan Investor | Plan Investors commitment to invest up to $2.55 billion | No plan investor |
| Rights Offering | $1.75 billion discount rights offering | $1.0 billion discount rights offering |
| Net Funded Debt | $4.7 billion | $2.75 billion |
| Revolver | $1.4 billion | Up to $1.2 billion |
| Total Enterprise Value | Agreed plan value of $12.8 billion | $7.2 billion |
| Section 414(l) Transfer | $1.5 billion | The 414(l) Transfer was approved as part of the Amended GSA, which became effective on September 29, 2008 and is no longer part of the Modified Plan.  Transfer of approximately $2.2 billion in net unfunded liabilities was effective on September 29, 2008; the transfer of approximately $1.0 billion of additional net unfunded liabilities is to occur upon consummation of the Modified Plan |
| GM | $4.073 billion consisting of:<br><br>- $1.073 billion (in liquidation amount) in junior preferred securities<br><br>- $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms<br><br>- $1.5 billion in connection with the effectuation of the IRC Section 414(l) assumption | Approximately $2.095 billion consisting of:<br><br>- An allowed administrative claim of $2.055 billion, which will be satisfied with New Preferred Stock (subject to certain provisions under which value may be allocated to unsubordinated general unsecured creditors)<br><br>- An allowed general unsecured claim in the amount of $2.5 billion, which will be subordinated to the claims of other unsecured creditors until such creditors achieve a 20% recovery |

| | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| Unsecured Creditors | Par plus accrued recovery at plan value of $12.8 billion consisting of:<br><br>-78.6% in New Common Stock at plan equity value<br><br>-21.4% through pro rata participation in discount rights offering at a 35.6% discount from plan equity value<br><br>-TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims | Approximately 38.8% recovery for allowed general unsecured claimholders (excluding TOPrS Claims) consisting of:<br><br>- Approximate 20% recovery in the form of New Common Stock at plan equity value<br><br>- 18.8% through pro rata participation in Discount Rights Offering at a 40% discount from plan equity value<br><br>- TOPrS Claims are included in General Unsecured class with Senior Notes, trade claims, and SERP claims, however, distributions on account of TOPrS Claims will be reallocated and redistributed due to the contractual subordination provision of the indenture governing the TOPrS Claims |
| Postpetition Interest | Postpetition Interest to be paid on certain General Unsecured Claims | No postpetition interest |
| Equity | Direct grant of New Common Stock of $28 million and Warrants valued at $321 million in the aggregate, plus the opportunity to participate in a Par Value Rights Offering | Opportunity to participate in Post-emergence Rights Offering through which New Common Stock will be offered at a discount (valued at approximately $108 million), the proceeds of which will be used to redeem up to 25% of the New Preferred Stock issued to GM |

**B.    Description Of Organization Of This Disclosure Statement And The Modified Plan**

The Disclosure Statement is divided into this executive summary and an additional 17 sections, each of which is sub-divided further under descriptive headings to aid in the understanding of the information contained herein.  The beginning of each section of the Disclosure Statement contains a summary of the information in the section and highlights certain modifications made since the December 2007 Disclosure Statement.  The paragraphs that follow provide a brief overview of the contents of the Disclosure Statement.

The introduction and executive summary contain a general overview of the Debtors, their transformation plan, business plan, emergence capital funding, and proposed plan of reorganization.  The executive summary is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and Appendices to the Disclosure Statement, including the Modified Plan.  The Modified Plan is attached to the Disclosure Statement as Appendix A.  All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to them in the Modified Plan, unless otherwise noted.

Sections I and II of this Disclosure Statement explain the chapter 11 process and provide an overview of voting procedures to accept or reject the Modified Plan.  Section III describes the Debtors' businesses, relationships with customers and suppliers, and current management. Section IV provides information about Delphi's historical operations, the events leading to Delphi's chapter 11 filing, and Delphi's capital structure before it sought chapter 11 relief.  To provide additional information about Delphi's financial performance, historical financial results of the Company are attached to this Disclosure Statement as Appendix B.

Section V of this Disclosure Statement explains Delphi's transformation plan and the actions taken and settlements achieved by Delphi during its reorganization while under chapter 11 protection, including, among other things, an explanation of Delphi's labor settlement agreements and the terms of Delphi's global settlement with GM.  Section V also contains information about adjustments to the Debtors' product portfolio, cost structure, including its salaried employee compensation program, and pension funding situation.

Section VI of this Disclosure Statement describes Delphi's business plan, including the development of the business plan for 2007-2011 and a summary of the Company's outlook from the business plan.  The full financial projections for the reorganized company for the fiscal years 2008 through 2011 are attached to this Disclosure Statement as Appendix C.

Section VII of this Disclosure Statement contains information regarding the emergence capital funding arrangements.  Section VIII provides an overview of major events that have occurred during the Chapter 11 Cases, including a description of various orders entered by the Bankruptcy Court, the appointment of statutory committees, the debtor-in-possession financing obtained and used, the sales of assets, and the litigation between the Debtors and the Plan Investors.  This section also describes the claims process and the Debtors' progress in reconciling claims.

Section IX of this Disclosure Statement contains a summary of the Modified Plan, including, among other things, an explanation of the potential substantive consolidation of certain Debtors, the treatment of claims and interests under the Modified Plan, and the releases and exculpations provided by the Modified Plan to the Debtors and certain third parties.  Section X describes general considerations and risk factors to be evaluated in conjunction with the description of the Debtors' businesses, business plan, and proposed plan of reorganization. Sections XI and XII provide information on securities law matters and federal income tax consequences of distributions to be made under the Modified Plan.

Section XIII of this Disclosure Statement discusses certain bankruptcy law principles that the Debtors must meet for the Modified Plan to be confirmed by the Bankruptcy Court, including that the Modified Plan is feasible and meets the "best interests" test set forth in the Bankruptcy Code.  This section also addresses the valuation of the Reorganized Debtors and an analysis of the hypothetical liquidation of the Debtors performed in conjunction with the formation of the Modified Plan.  An analysis of the total enterprise value of Reorganized Delphi is attached to this Disclosure Statement as Appendix D.  Liquidation analyses showing likely recoveries to creditors under a hypothetical case under chapter 7 of the Bankruptcy Code are attached as Appendix E.

Finally, Sections XIV-XVII of this Disclosure Statement explain, among other things, the process by which confirmation of the Modified Plan may occur, conditions to confirmation and consummation of the Modified Plan and the Effective Date, voting requirements, and details about the hearing on the Modified Plan.

Creditors and shareholders may vote to accept or reject the Modified Plan.  In addition, the modifications must be approved by the Bankruptcy Court before Delphi can consummate the Modified Plan.  The Modified Plan is the document that effectuates, among other things, distributions to creditors and shareholders and the releases of certain parties.

## B.    Business Overview

Delphi is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  Delphi is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  Technology developed and products manufactured by Delphi are changing the way drivers interact with their vehicles.  Delphi is a leader in the breadth and depth of technology to help make cars and trucks smarter, safer, and better.  The Company supplies products to nearly every major global automotive original equipment manufacturer, and in 2007, sales to several of the major global original equipment manufacturers ("OEMs"), including GM, Ford Motor Company, DaimlerChrysler Corporation, Volkswagen Group, Hyundai, and Renault/Nissan Motor Company each exceeded $750 million.  The revenue share for 2007 for customers other than GM – Delphi's former parent and largest customer – was 63%, including discontinued operations.

The Company's core strategy is centered around capitalizing on three megatrends driving growth in the automotive supply industry: creating safe, green and connected products.  Due to government legislation and regulation and consumer preferences, the global markets demands safer, more fuel efficient, and more connected vehicles.  Focusing on technologies that capitalize on these trends allows Delphi to capture more content per vehicle and positions the Company for growth even in a declining volume and increasing commodity cost environment.

Since its separation from GM in 1999, Delphi has sought to diversify its customer base by taking advantage of its technological and manufacturing core competencies.  Delphi has entered and continues to pursue additional opportunities in adjacent markets such as communications (including telematics), computer components, automotive aftermarket, energy,

and the medical devices industry, though sales from such adjacent markets do not materially impact Delphi's revenues or operating income.

Delphi has extensive technical expertise in a broad range of product lines and strong systems integration skills. This expertise enables the Company to provide comprehensive, systems-based solutions to OEMs. Delphi has established an expansive global presence with a network of manufacturing sites, technical centers, sales offices, and joint ventures located in major regions of the world.

Delphi operates its business along six reporting segments that are generally grouped on the basis of similar product, market, and operating factors. Delphi has also identified the product lines that will be the "core" of the transformed Company and "non-core" businesses that will be sold or wound-down. The following is a brief description of the operating reporting segments.

## Continuing Operations



**Electrical/Electronic Architecture**, which includes complete electrical architecture and component products. Electrical/Electronic Architecture had total net sales of $5.97 billion in 2007.



**Powertrain Systems**, which includes extensive systems integration expertise in gasoline, diesel and fuel handling, and full end-to-end systems (including fuel injection, combustion, electronics controls, and test and validation capabilities). Powertrain Systems had total net sales of $5.66 billion in 2007.



**Electronics and Safety**, which includes audio, entertainment and communications, safety systems, body controls and security systems, and power electronics, as well as advanced development of software and silicon. Electronics and Safety had total net sales of $5.04 billion in 2007.



**Thermal Systems**, which includes Heating, Ventilating, and Air Conditioning systems, components for multiple transportation and other adjacent markets, alternative cooling solutions, and powertrain cooling and related technologies. Thermal Systems had total net sales of $2.41 billion in 2007.



**Delphi Product and Service Solutions**, which includes independent aftermarket, diesel aftermarket, original equipment service, and medical systems. Results from this business segment are included with Corporate results for reporting purposes. In addition to the results of DPSS, Corporate consists of the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, and the elimination of inter-segment transactions. Corporate and DPSS total net sales were $259 million in 2007.

 **Automotive Holdings Group**, which includes select plant sites and other non-core product lines that Delphi will seek to sell or wind-down. Automotive Holdings Group had total net sales of $2.95 billion in 2007.

Steering, which includes steering, halfshaft, and column technology, was previously a separate operating segment. Delphi identified the steering and halfshaft product line as a non-core business and entered into agreements to sell the Steering business. On February 25, 2008, the Bankruptcy Court issued an order authorizing Delphi to sell its Steering business. Although the date on which a non-defaulting party can terminate the purchase and sale agreement because a transaction has not yet been consummated has passed, Delphi and the prospective purchaser remain in discussions with each other and GM. Because of the implementation of the Amended GSA and Amended MRA, as defined below, no material adverse impact on the Debtors' operations or business plan is expected, regardless of whether the transaction is consummated. Steering is now reported in discontinued operations for accounting purposes.

## C. Commencement Of Chapter 11 Cases

Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company. Delphi's separation from GM was completed in May 1999. Precipitating Delphi's entry into chapter 11 was a series of significant net losses for the Company. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income, but every year after that (with the exception of 2002), the Company suffered substantial losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales. The reported net loss in calendar year 2004 reflects a $4.1 billion income tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million. In 2005, the year Delphi commenced these Chapter 11 Cases, the Company incurred a net loss of approximately $2.4 billion on net sales of $26.9 billion.

Delphi believes that the Company's financial performance deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for U.S. OEMs resulting in the reduced number of motor vehicles that such OEMs, including GM, produce annually in the United States and related pricing pressures, and (c) increasing commodity prices.

In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these Chapter 11 Cases for its U.S. businesses and preserve value for its stakeholders. On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in the Bankruptcy Court for reorganization relief under chapter 11 of the Bankruptcy Code.

**D.      Overview Of Delphi's Transformation**

On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations (the "Transformation Plan").   Since Delphi's announcement of its Transformation Plan and including the period following April 4, 2008, Delphi has achieved considerable progress in implementing its key transformation goals, despite the harsh economic climate that developed in 2007.   Delphi's transformation activities during its chapter 11 cases have produced an enterprise with more flexibility and a greater capability to respond to changing markets because Delphi now has a focused product portfolio, reduced U.S. employment costs, the ability to adjust U.S. manufacturing with volume, a significant reduction in high cost production capacity, increasingly shared business processes and IT platforms between operating units, a simplified organizational structure, greater business diversification by customer, and greater business diversification by region. The Company's stated goals for transforming five key areas of their business and their progress in realizing those goals is summarized below.

**Labor**

Modify the Company's labor agreements to create a competitive arena in which to conduct business

Agreements with all principal U.S. labor unions that:
- modify, extend, or terminate provisions of the Company's U.S. existing collective bargaining agreements with its unions;
- provide that GM will undertake certain financial obligations to Delphi's union-represented retirees; and
- modify retiree welfare benefits for union-represented retirees

Negotiated attrition programs with certain of Delphi's unions, implemented with the assistance of GM

**GM**

Conclude negotiations with GM to finalize GM's financial support for certain of the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company

A comprehensive settlement agreement with GM
- The Global Settlement Agreement provides a comprehensive resolution of the claims between Delphi and GM (other than ordinary course claims) in consideration for the 414(l) transaction, GM's assumption of financial responsibility for traditional U.S. hourly OPEB and GM's commitments to Delphi
- The Master Restructuring Agreement addresses GM's forward business commitments to Delphi and the parties' continuing obligations to each other

**Product Portfolio And Manufacturing Footprint**

Streamline the Company's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus

- Effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has competitive and technological advantages
- The Company's revised operating structure consists of the following core business segments:
  - Electrical/Electronic Architecture
  - Powertrain Systems
  - Electronics and Safety
  - Thermal Systems
  - Delphi Product and Service Solutions
- The Company has also identified non-core product lines and plants which are held by Automotive Holdings Group
- During 2006-2008, the Company has worked to maximize the value of non-core assets for all stakeholders, has commenced and/or completed the sale of certain bearings, brakes, chassis, catalyst, interiors and closures, power products, and steering businesses
- The Company has identified eight core global automotive facilities in the United States and streamlined its global manufacturing footprint

**Cost Structure**

Transform the Company's salaried workforce and reduce general and administrative expenses to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint

- The Company is making significant progress in ensuring that its organizational and cost structure is competitive by entering into IT and finance transactional process outsourcing agreements
- The Company has outsourced certain of its accounts receivable, accounts payable, and contract administration processes. Additionally, the Company has plans to expand the outsourced scope to include fixed asset and general accounting.  This outsourcing initiative is significantly reducing the Company's SG&A expenses
- The Company developed a competitive benchmark executive and non-executive compensation program

**Pension**

Devise a workable solution to the Company's pension funding situation

- The Company froze all but one of its salaried defined benefit programs as of September 30, 2008, but will provide alternative defined contribution programs and will meet the funding requirements for the frozen programs
- On September 29, 2008, the Company effectuated the first transfer under Section 414(l) of the Internal Revenue Code of certain pension liabilities to GM with a subsequent transfer scheduled to occur upon the effective date of the Modified Plan.  These transfers, combined with contributions upon emergence, will allow the Company to meet its required pension plan funding

As a result of its progress in achieving the goals of its Transformation Plan, Delphi has been able to formulate a business plan going forward that should allow it to return to profitability.

The differences between the business operation of Delphi from the time of its chapter 11 filing in 2005, its present state of transformation in mid-2008, and its expected 2009 state, on a post-emergence basis, are striking:

| | Pre-Transformation | Current Progress | Post-Transformation |
|---|---|---|---|
| Year | 2005[1] | June YTD 2008[1] | 2009 RPOR 8/08 |
| Product Line Businesses | 27 | 21 | 16 |
| U.S. Plants | 37[2] | 14 | 8 |
| U.S. Hourly Cost / Hour | $73 / hour | > $40 / hour | ~ $27 / hour |
| Manufacturing % of Revenue | 30% | 25% | 19% |
| U.S. Hourly Employment | 32,869 | 10,665[3] | < 5,000 |
| U.S. Salaried Employment | 14,542 | 10,243 | < 7,700 |
| SG&A Expense[4] | $1.64 B | $0.70 B | $1.07 B |
| Number of Suppliers | > 5,000 | ~ 3,200 | ~ 2,700 |
| Capital Investment | $1.1 B | $0.5 B | $0.7 B |
| GMNA % of Revenue | 40% | 22% | 18% |
| Non-GM % of Revenue | 52% | 67% | 74% |
| Non-N.A. % of Revenue | 32% | 56% | 61% |

[1] 2005 and June YTD 2008 metrics include total Delphi operations including those units classified as "Discontinued" for external financial reporting
[2] Excluding idled sites
[3] Excluding active pre-retirement program participants
[4] SG&A metrics exclude one-time transformation related charges

Upon the conclusion of the reorganization process, the Debtors expect to emerge with a stronger, more financially sound business with U.S. operations that are globally integrated and well-positioned to advance enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company plans to preserve and continue the strategic growth of its non-U.S. operations and will seek to maintain its prominence as one of the world's premier auto suppliers.

E.    **Business Plan**

When the closing on the Confirmed Plan was suspended on April 4, 2008, as part of Delphi's consideration of potential modifications to its Confirmed Plan in order to emerge from chapter 11 as soon as practicable, Delphi undertook a reaffirmation process with respect to the business plan attached as Appendix C to the December 2007 Disclosure Statement (the "POR Business Plan"). That reaffirmation process involved review and reaffirmation of the budget business plan (the "BBP") (which had been prepared as part of Delphi's annual business planning process and which had confirmed Delphi's prior commitment to the aggregate EBITDAR projections in the POR Business Plan). The reaffirmed POR business plan, is attached hereto as Appendix C and is referred to as the "RPOR." Among other changes, the RPOR includes revised actual and expected volumes for the North American automotive market, significant increases in commodities costs that are used as raw materials in certain of Delphi's products and changes in

the underfunded status of its pension plans as a result of negative plan asset returns.  The RPOR also reflects actual financial results for the first half of 2008, updated foreign exchange rates over the RPOR period, and other specific operational adjustments with respect to particular customer program volumes and timing, including the modifications embodied in the Amended GSA and Amended MRA.

As described in greater detail in Appendix C, and described in summary form here, the RPOR projects 2008 EBITDARP at approximately $0.58 billion improving to $1.74 billion in 2009.  The main contributors of this improvement are: (a) the reduction of traditional hourly U.S. OPEB expense (substantially all of which has been assumed by GM), (b) GM labor subsidy and keep site facilitation support, (c) structural cost improvements in the areas of manufacturing, engineering and SG&A, and (d) increased profit related to new business wins outside of GM North America.  Material cost improvements are also anticipated in the RPOR, partially offset by anticipated year-over-year customer price reductions.

Cash flow from operating activities is projected to increase from an inflow of $0.5 billion in 2008 to an inflow of $1.3 billion in 2011.  Significant sources and uses of cash from operations include:

- EBITDARPO improves from $1.0 billion in 2008 to $2.2 billion in 2011;
- Global restructuring cash outflows of approximately $0.3 billion, $0.5 billion, $0.2 billion and $0.2 billion in 2008, 2009, 2010, and 2011 respectively (the $0.3 billion included in 2008 is net of a $1.0 billion payment from GM);
- Projected net working capital monetization proceeds associated with the exit from certain Non-Continuing Businesses; and,
- Net Payments from GM of $1.7 billion in 2008 resulting from the implementation of the Amended MRA and Amended GSA (including $1.0 billion referred to above in global restructuring cash).

Improved operating cash flows are generally the result of the implementation of the Debtors' Transformation Plan, including product portfolio rationalization and migration, SG&A cost reduction initiatives, the freezing of U.S. legacy defined benefit pension plans and agreement with GM regarding future business commitments and financial support for certain legacy costs, including traditional hourly OPEB, as well as maintaining revenue in the continuing businesses.

**F.    Emergence Capital Funding**

Delphi anticipates raising approximately $3.75 billion of funded emergence capital through a combination of term bank debt and rights to purchase equity in Reorganized Delphi. Delphi anticipates raising at least $2.75 billion in funded first and second lien debt plus an unfunded asset-backed revolving credit facility of up to $1.2 billion.  Delphi anticipates raising the remaining funded emergence capital through a combination of a Discount Rights Offering with a backstop and a direct subscription for New Common Stock in Reorganized Delphi.  The Debtors expect the principal sources of emergence capital to be their existing creditors and stakeholders. The Debtors anticipate supplementing their Emergence Capital Funding disclosures on or prior to the preliminary hearing on modifications to the Confirmed Plan.  For GM to

achieve the $2.055 billion recovery required under the Amended GSA, as defined below, and for the holders of unsubordinated General Unsecured Claims to receive at least 20% in direct recoveries in the form of New Common Stock, Delphi will be required to achieve its projected $3.75 billion in funded emergence capital.  The Discount Rights Offering exercise price will be at a discount not to exceed 40% on a fully diluted basis of Plan Equity Value.  In the event that these metrics are not achieved, the Debtors would be required to procure GM's consent pursuant to the Amended GSA with respect to any modified recovery and the minimum recovery to holders of unsubordinated General Unsecured Claims would be proportionally reduced.

The Second Amended and Restated Credit Agreement, as defined herein (which consists of a $1.1 billion Tranche A DIP Revolver, a $500 million Tranche B DIP Term Loan and a $2.754 billion Tranche C DIP Term Loan) currently matures on December 31, 2008.  The Debtors anticipate seeking an extension of the December 31, 2008 maturity date.

## G.   Events Impacting Reorganization

The Debtors believe the recoveries afforded to all stakeholders under the Modified Plan are the best recoveries available at this time.  Although the currency received by certain stakeholders has changed since the confirmation of the Confirmed Plan in light of the delay in emergence caused by the Plan Investors' breach of the Investment Agreement, the Modified Plan continues to provide for recoveries for unsecured creditors and existing equity holders at a time when the credit markets and the U.S. vehicle market remain uncertain.  Delphi believes any further delay in emerging from chapter 11 may lead to degradation of its total enterprise value and a corresponding reduction in stakeholder recoveries through, for example, the diminution of customer and supplier support, increased financing costs due to continued costs of operating under chapter 11 protection, and the inability of the Company to fully complete its Transformation Plan.

## H.   Summary Of The Modified Plan

### 1.   Distributions Under The Plan

Each of Delphi and its 41 Affiliate Debtors is a proponent of the Modified Plan within the meaning of section 1129 of the Bankruptcy Code.  The Modified Plan provides for the substantive consolidation of certain of the Debtors' Estates for voting and distribution purposes only.  The Modified Plan contains separate classes and proposes recoveries for holders of Claims against and Interests in the Debtors.  After careful review of the Debtors' current business operations, estimated recoveries in a liquidation scenario, and the future prospects of maintaining an ongoing business, the Debtors have concluded that the recovery to the Debtors' creditors and equity holders will be maximized by the reorganization of the Debtors as contemplated by the Modified Plan.

The Modified Plan is the culmination of Delphi's Transformation Plan within the chapter 11 context.  Delphi has determined that it has achieved those aspects of its Transformation Plan for which the chapter 11 reorganization process was necessary and that it is now time to emerge from chapter 11.  The Modified Plan incorporates many of the settlements that Delphi reached with critical stakeholders in these reorganization cases.  The Debtors, all of the Debtors' principal

U.S. labor unions, GM, and the lead plaintiffs in certain securities actions (on behalf of holders of various claims based on alleged violations of federal securities law and ERISA) are all parties to settlements with the Debtors which allow for various recoveries under the Modified Plan.

The Modified Plan provides distributions to all of Delphi's stakeholders.  Specifically, holders of General Unsecured Claims (other than TOPrS Claims), including of claims based on the Debtors' debt securities and trade claims, will receive their pro rata share of a distribution of New Common Stock of Reorganized Delphi which will amount to an approximate 20% recovery.  Holders of General Unsecured Claims will also receive the opportunity to participate in a Discount Rights Offering to purchase New Common Stock in Reorganized Delphi.  Distributions on account of TOPrS Claims will be reallocated and redistributed due to the contractual subordination provision of the indenture governing the TOPrS Claims

Under the terms of the GM settlement approved by Bankruptcy Court on September 25, 2008, GM will receive an allowed administrative claim of up to $2.055 billion and an allowed general unsecured claim in the amount of $2.5 billion, each of which claims will be satisfied with New Preferred Stock if certain conditions are met.  GM has agreed to subordinate recoveries on its general unsecured claim until other holders of Allowed General Unsecured Claims have received a distribution equal to 20% of their Allowed General Unsecured Claims.  GM has also agreed, subject to its right to consent to any distribution on account of its administrative claim of preferred stock with a stated value of less than $2.055 billion, that if there is insufficient value for holders of unsubordinated General Unsecured Claims to receive a distribution equal to 20% of their Allowed General Unsecured Claims in the form of New Common Stock at Plan Equity Value, GM's recovery on its allowed administrative claim and recoveries by holders of Allowed General Unsecured Claims may be reduced proportionally.  In connection with the Modified Plan, GM will also receive releases from various parties, including holders of claims against the Debtors and holders of existing Delphi common stock.

Your vote will help to determine whether the Court confirms and approves the Modified Plan and the distributions it provides, including the distributions to the holders of claims arising from multi-district securities litigation and the distributions to equity holders.

Under the terms of the Modified Plan, certain lead plaintiffs in the MDL litigation will receive, on behalf of themselves and the class they represent, shares of New Common Stock of Reorganized Delphi and discount rights in the same proportion as Modified Plan distributions to holders of General Unsecured Claims.  The resolution of this litigation is critical to the Debtors' reorganization to eliminate the significant risks and costs associated with litigating complex actions under federal securities laws and ERISA and related derivative actions in which plaintiffs have alleged damages in excess of $1 billion.

Finally, holders of existing Delphi common stock will receive the opportunity following the Debtors' emergence from chapter 11 to participate in a Post-emergence Rights Offering to purchase shares of New Common Stock of Reorganized Delphi at a 15% discount to Plan Equity Value. The net proceeds from the Post-emergence Rights Offering will be used to redeem a portion of GM's New Preferred Stock.

### 2. *Valuation Of The Reorganized Debtors And Distributions Under The Plan*

The distributions discussed above are the product of extensive negotiations among the Debtors, GM, and the Creditors' Committee. Because the proposed distributions under the Modified Plan are in the form of equity in the reorganized company, the value of the recovery is based on the enterprise value of Reorganized Delphi. At the time of the confirmation of the Confirmed Plan, the Debtors' investment banker and financial advisor, Rothschild, performed a valuation of the Reorganized Debtors as a going concern and of the New Common Stock based on information and financial projections provided by the Debtors. Rothschild estimated the total enterprise value of Reorganized Delphi to range between $11.2 billion and $14.1 billion, with a midpoint of approximately $12.7 billion, as of December 31, 2007.

Since the confirmation of the Confirmed Plan and the Debtors' delayed emergence from chapter 11 due to the Plan Investors' breach of the Investment Agreement, Rothschild has undertaken a new valuation of the Reorganized Debtors as a going concern. Based on many factors, including the RPOR projections and macroeconomic factors affecting the auto industry as a whole such as the current capital market conditions, weakened automotive outlook, and declining public trading multiples, the estimated total enterprise value of Reorganized Delphi ranges from $6.3 billion to $8.0 billion, with a midpoint of approximately $7.2 billion. The amount of equity available for equity distributions under the Modified Plan is determined by taking the Debtors' estimated total enterprise value and subtracting the estimated amount net debt held by the Reorganized Debtors at emergence ($2.8 billion). This calculation results in a distributable equity value of $4.4 billion. Based on the distributable equity value and assuming the total number of shares issued and outstanding as of the Effective Date is 219,980,753 shares, the per share equity value under the Modified Plan is $20.00 per share assuming conversion of GM Preferred Stock ("Plan Equity Value").

|  | Confirmed Plan | | | Modified Plan | | |
|---|---|---|---|---|---|---|
|  | **Low End** | **Implied Plan Value** | **High End** | **Low End** | **Mid Point** | **High End** |
| **TEV** | 11.2 billion | **12.8 billion** | 14.1 billion | 6.3 billion | **7.2 billion** | 8.0 billion |
| **Less Estimated Pro Forma Net Debt** | (4.6 billion) | (4.6 billion) | (4.6 billion) | (2.8 billion) | (2.8 billion) | (2.8 billion) |
| **Less Seven- And Ten-Year Warrants** | (0.2 billion) | **(0.3 billion)** | (0.3 billion) | n/a | **n/a** | n/a |
| **Reorganized Equity Value** | 6.5 billion | **8.0 billion** | 9.2 billion | 3.2 billion | **4.4 billion** | 5.3 billion |
| **Shares Outstanding (assuming conversion of New Preferred Stock)** | 134,345,642 | 134,345,642 | 134,345,642 | 219,980,753 | 219,980,753 | 219,980,753 |
| **Plan Equity Value** | $48.21 | **$59.61** | $68.72 | $16.00 | **$20.00** | $24.00 |

There can be no guaranty that the trading value of the New Common Stock will fully or immediately reflect the intrinsic value or agreed upon value of the Reorganized Debtors. The valuation of the Reorganized Debtors and the New Common Stock conducted by Rothschild was based on certain assumptions including, among other things, an assumption that the financial

results projected for the Reorganized Debtors will be achieved in all material respects. No assurance can be given, however, that the projected results will be achieved. To the extent that the valuation assumptions are dependent upon the achievement of the results projected by the Debtors, the valuation assumptions must be considered speculative. The valuation assumptions also consider, among other matters, (i) market valuation information concerning certain publicly-traded securities of certain other companies that are considered relevant, (ii) certain general economic and industry information considered relevant to the business of the Reorganized Debtors, and (iii) such other investigations and analyses as Rothschild deemed necessary or appropriate. The Debtors and Rothschild believe that these valuation assumptions are reasonable.

Holders of Claims and Interests voting on the Modified Plan should carefully consider the potential range of value of the Reorganized Debtors when voting on the Modified Plan.

**The foregoing valuation assumptions are not a prediction or reflection of post-confirmation trading prices of the New Common Stock or any other securities. Such securities may trade at substantially higher or lower prices because of a number of factors, including those discussed in <u>Section X – General Considerations And Risk Factors To Be Considered</u>. The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.**

### *3.      Confirmation And Consummation Of The Confirmed Plan*

After a hearing on December 7, 2007 on the adequacy of the proposed disclosure statement (including modifications proposed after September 6, 2007), on December 10, 2007, Delphi filed the December 2007 Plan and the December 2007 Disclosure Statement. The Court entered an order approving the adequacy of the December 2007 Disclosure Statement that same day. Thereafter, Delphi began solicitation of votes on the December 2007 Plan.

At the December 2007 hearing on the adequacy of the disclosure statement, certain parties alleged that the December 2007 Plan and December 2007 Disclosure Statement were deficient because, among other things:

- Certain creditors claimed that the December 2007 Plan treated TOPrS claims differently from other general unsecured claims, which could render the Plan unconfirmable.

- Certain creditors claimed that the inclusion of the TOPrS claims within Class C (General Unsecured Claims) was impermissible.

- Certain stakeholders claimed that the December 2007 Plan did not satisfy the "fair and equitable" or absolute priority requirements of the Bankruptcy Code because certain junior creditors and interest holders are to receive distributions.

- Certain stakeholders claimed that the third-party releases provided by the December 2007 Plan were overbroad and violate applicable law.

- Certain stakeholders claimed that substantive consolidation to be effected by the December 2007 Plan might be unsupportable by applicable law or the facts of these Chapter 11 Cases.

- Certain creditors claimed that the distributions to creditors were less than the Debtors described because the valuation underlying these distributions was allegedly incorrect.

- Although there is absolutely no evidence of bad faith, certain creditors also questioned whether the Debtors could meet the good faith requirement at the Confirmation Hearing.

The Bankruptcy Court noted the potential objections at the December 2007 hearing on the disclosure statement and instructed the Debtors to include language in the December 2007 Disclosure Statement stating that the merit of such objections to the December 2007 Plan's confirmation might depend on the vote of the December 2007 Plan.

On January 16, 2008, Delphi announced that the voting results had been filed with the Court. Voting by classes of creditors and holders of interest (including shareholders) entitled to vote on the December 2007 Plan illustrated broad-based support for the December 2007 Plan. Eighty-one percent of all voting general unsecured creditors voted to accept the December 2007 Plan (excluding ballots cast by GM, plaintiffs in the MDL, and holders of interests). Of the total amount voted by all general unsecured creditors classes, 78 percent voted to accept the December 2007 Plan. One hundred percent of the ballots cast in the GM and MDL classes voted to accept the December 2007 Plan. Seventy-eight percent of voting shareholders voted to accept the December 2007 Plan.

A hearing on confirmation of the December 2007 Plan began on January 17, 2008 and continued on January 18 and 22, 2008. The Bankruptcy Court entered the order confirming the December 2007 Plan (with certain modifications) on January 25, 2008 (the "Confirmation Order").

The Modified Plan contains many of the same elements as the Confirmed Plan, and thus the merits of similar objections to the Modified Plan's confirmation may depend on the vote on the Modified Plan.  For example, as described in more detail below, a senior class may vote under the Bankruptcy Code to permit a distribution to a junior class or group of creditors even if the senior class is not paid in full.  A senior class may do this, for example, because it believes that such a compromise is preferable to a litigation alternative or further delay, or to preserve a settlement.  **Thus, your vote on the Modified Plan is important.**  The Bankruptcy Court will be apprised of the vote of the unsecured creditors senior to the TOPrS.

Although the Debtors need only establish under section 1129(a)(7) of the Bankruptcy Code that their stakeholders will receive at least as much under the Modified Plan as in a liquidation under chapter 7 of the Bankruptcy Code, the Debtors believe that the recoveries provided by the Modified Plan will be not less than those realized through a liquidation. Specifically, the Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  Based on the valuation analysis prepared by the Debtors' investment banker and financial advisor, Rothschild,

and the liquidation analysis prepared by the Company with the assistance of the Debtors' restructuring and financial advisor, FTI Consulting, Inc., the Debtors believe that the value of the Estates of the Debtors is significantly greater in the proposed reorganization than in a liquidation.

The effectiveness of the Modified Plan, and thus the consummation of the Modified Plan, is subject to a number of conditions precedent.  There can be no assurances that these conditions will be satisfied.  In addition, the Debtors have reserved the right to amend or modify the Modified Plan as it applies to any of the Debtors.

**I.      Summary Of Treatment Of Claims And Interests Under The Modified Plan**

The Modified Plan contains separate classes for holders of Claims against and Interests in the Debtors.  As required by the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified.  The table below summarizes the treatment of certain administrative and priority claims and sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each category.

**DIP Claims, Administrative Claims, And Priority Tax Claims**

| Description | Treatment Under Plan |
|---|---|
| **DIP Claims** | DIP Claims consist of the DIP Facility Revolver Claim in the approximate amount of $465 million, the DIP Facility First Priority Term Claim in the approximate amount of $500 million, and the DIP Facility Second Priority Term Claim in the approximate amount of $2.750 billion.  Under the Plan the DIP Claim will be paid on the Effective Date in full in Cash unless otherwise agreed by a DIP Lender. <br><br> **Estimated Amount Of Claims:**      **$3.714 billion** <br> **Percentage Recovery:**               **100%** |

| Description | Treatment Under Plan |
|---|---|
| **Administrative Claims (other than GM Claims)** | An administrative claim is a claim for payment of an expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Cases, Professional Claims, and certain other Claims.  For illustrative purposes, the estimated amounts of Administrative Claims include Cure Claims.   Under the Plan and the procedures provided therein, Administrative Claims will be paid in full in Cash in the ordinary course or as otherwise agreed.<br><br>**Estimated Amount Of Claims:**<br>**$355 million to $395 million plus other Administrative Claims in the ordinary course of business**<br><br>**Percentage Recovery:                    100%** |
| **Priority Tax Claims** | A priority tax claim is a claim for payment of taxes by governmental units as specified in section 507(a)(8) of the Bankruptcy Code.  Under the Plan, Priority Tax Claims will be (1) paid equal cash payments over a period not to exceed six years after the assessment of the tax totaling the aggregate amount of the claim, (2) afforded other treatment that is agreed upon between the Debtors and the holder of the priority tax claim, or (3) paid in full in Cash.<br><br>**Estimated Amount Of Claims:           $17 million to $18 million**<br>**Percentage Recovery:                    100%** |

The table below summarizes the classification and treatment of the principal prepetition Claims and Interests under the Plan.   The classification and treatment for all Classes are described in more detail in <u>Section IX—Summary Of The Reorganization Plan</u>.   The table below also sets forth the Debtors' estimates of the amount of Claims that will ultimately be Allowed in each Class based upon the Debtors' review of all proofs of claim and schedules not superseded by proofs of claim, and consideration of the provisions of the Modified Plan that affect the allowance of certain Claims.   No representation can be or is being made with respect to whether the estimated percentage recoveries shown in the table below will actually be realized by the holders of Allowed Claims in any particular Class.   This summary is qualified in its entirety by reference to the provisions of the Modified Plan, a copy of which is attached hereto as Appendix A.

**Classified Claims**

| Class Description | Treatment Under Plan |
|---|---|
| **Secured Claims** | Secured Claims are claims, other than DIP Lender Claims (which are treated as Administrative Claims), that are secured by liens on property in which the Debtors have an interest.  Under the Plan, the legal, equitable, and contractual rights of each holder of a Secured Claim will be, at the option of the Debtor, paid in full or be unimpaired and reinstated (which means that the claim holder's rights will be unaltered by the Plan and that Delphi will cure outstanding payment defaults, if any).<br><br>**Estimated Amount Of Claims:**      **$7.5 million to $8.5 million**<br>**Estimated Percentage Recovery:**    **100%** |
| **Flow-Through Claims** | A Flow-Through Claim is a claim arising from (1) an Ordinary Course Customer Obligation, (2) an Environmental Obligation (excluding those environmental obligations that were settled or capped during the Chapter 11 Cases (to the extent exceeding the capped amount)), (3) an Employee-Related Obligation (including workers compensation and unemployment compensation claims) asserted by an hourly employee that is not otherwise waived pursuant to the Union Settlement Agreements, (4) any Employee-Related Obligation asserted by a salaried, non-executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement, (5) any Employee-Related Obligation asserted by a salaried executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement and has entered into a new employment agreement as described in Article 7.8 of the Modified Plan, and (6) litigation exposures and other liabilities arising from litigation that are covered by insurance, but only in the event that the party asserting the litigation ultimately agrees to limit its recovery to available insurance proceeds, except that all Estate Causes of Action and defenses to any Flow-Through Claim will be fully preserved.  Flow-Through Claims will be unimpaired by the Modified Plan and will be satisfied in the ordinary course of Delphi's business (subject to the preservation and flow-through of all Estate rights, claims, and defenses with respect to the Flow-Through Claims).<br><br>**Estimated Percentage Recovery:    Unimpaired** |

| Class Description | Treatment Under Plan |
|---|---|
| **General Unsecured Claims** | General Unsecured Claims (other than GM's unsecured claim, which are treated below) include claims arising as a result of trade claims, claims arising from Delphi's Senior Notes, TOPrS Claims, and other general unsecured claims that might result from, for example, the rejection of executory contracts or unexpired leases.  Delphi cannot predict with certainty the total amount of General Unsecured Claims that ultimately may be allowed.  Under the Modified Plan, holders of Allowed General Unsecured Claims (other than TOPrS Claims) will receive their pro rata share of a distribution of New Common Stock and Discount Rights to purchase shares of New Common Stock of Reorganized Delphi.  Holders of TOPrS Claims will not receive a distribution due to the operation of the subordination provision of the indenture governing their Claims.  The distribution of New Common Stock will be subject to certain rounding provisions.<br><br>**Estimated Amount Of Allowed Claims : $3.40 billion to $3.45 billion, including TOPrS Claims of approximately $421 million**<br><br>**Estimated Percentage Recovery: Approximately 38.8% recovery for allowed general unsecured claimholders (excluding TOPrS Claims) consisting of:**<br><br>**Approximate 20% recovery in the form of New Common Stock at plan equity value and**<br><br>**18.8% through pro rata participation in Discount Rights Offering at a 40% discount from plan equity value.**<br><br>**TOPrS Claims are included in General Unsecured class with Senior Notes, trade claims, and SERP claims, however, distributions on account of TOPrS Claims will be reallocated and redistributed due to the contractual subordination provision of the indenture governing the TOPrS Claims.** |

| Class Description | Treatment Under Plan |
|---|---|
| **GM Claims** | Delphi and GM are party to two agreements that resolve issues arising from Delphi's Separation from GM and address matters in Delphi and GM's ongoing relationship.  The amended and restated agreements were approved by the Bankruptcy Court on September 25, 2008.  Pursuant to the agreements, GM received an allowed administrative claim of $2.055 billion and an allowed unsecured claim of $2.5 billion.  If the Modified Plan is approved and the conditions required by the GM settlement documents are met, GM's claims will be satisfied with New Preferred Stock.  GM has agreed to subordinate any recovery on its unsecured claim until other holders of General Unsecured Claims (excluding holders of TOPrS Claims) have received a distribution equal to 20% of their allowed claims.  GM has also agreed, subject to its right to consent to any distribution on account of its administrative claim of preferred stock with a stated value of less than $2.055 billion, that if there is insufficient value for holders of unsubordinated General Unsecured Claims to receive a distribution equal to 20% of their Allowed General Unsecured Claims in the form of New Common Stock at Plan Equity Value, GM's recovery on its allowed administrative claim and recoveries by holders of Allowed General Unsecured Claims may be reduced proportionally.<br><br>**Amount Of Allowed Claim:**          **Agreed Compromise**<br>**Estimated Percentage Recovery:**   **Agreed Compromise** |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Note Claims** | Section 510(b) Note Claims arise from the securities actions consolidated in the multi-district litigation pending in the United States District Court for the Eastern District of Michigan and include claims asserted by current or former holders of the Senior Notes and TOPrS for damages or rescission in connection with the purchase or sale of those securities. Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $179 million.  The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund that portion of the Securities Settlement reflecting the $179 million Allowed Claim, which will be divided between the Section 510(b) Note Claims and the Section 510(b) Equity Claims according to the Securities Settlement approved by the MDL Court.  If any holder of a Section 510(b) Note Claim opts out of the Securities Settlement, and that holder has filed a claim that is ultimately allowed in the Chapter 11 Cases, then the holder of the Allowed Section 510(b) Opt Out Note Claim will receive a distribution, from the Securities Settlement, of New Common Stock and Discount Rights equal to the amount of the Allowed Section 510(b) Opt Out Note Claim in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims.<br><br>**Estimated Recovery:   Allocated share of $179 million Allowed Claim**<br><br>**Estimated Percentage Recovery:    Agreed compromise** |

| Class Description | Treatment Under Plan |
|---|---|
| **Intercompany Claims** | An Intercompany Claim is a claim by Delphi or one or more of its affiliates against other Delphi affiliates on account of various matters incurred in the ordinary course of business.  Under the Modified Plan, at the option of Delphi with certain exceptions, Intercompany Claims will either be reinstated and treated in the ordinary course of business or eliminated.  The ultimate disposition of Intercompany Claims will be based upon business planning reasons of Reorganized Delphi and will not affect distributions to other creditors under the Modified Plan.<br><br>**Estimated Amount Of Claims:**       **N/A**<br>**Estimated Percentage Recovery:**   **N/A** |
| **Existing Common Stock** | Delphi's Existing Common Stock will be canceled on the Effective Date. Each Holder of an allowed interest with respect to Existing Common Stock will receive transferable rights to purchase up to 26,187,745 shares of the New Common Stock of Reorganized Delphi at a 15% discount to Plan Equity Value following the Effective Date of the Modified Plan.<br><br>**Estimated Recovery:**                  **Approximately $108 million** |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) Equity Claims** | Section 510(b) Equity Claims arise from the securities actions consolidated in the MDL and include claims by current or former holders of Delphi's existing common stock for damages or rescission in connection with the purchase or sale of the common stock. Pursuant to the terms of the Securities Settlement (which resolves the claims and causes of action asserted by holders of Section 510(b) Note Claims and Section 510(b) Equity Claims), holders of Section 510(b) Note Claims and Section 510(b) Equity Claims will receive an Allowed Claim valued at $179 million. The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund that portion of the Securities Settlement reflecting the $179 million Allowed Claim, which will be divided between the Section 510(b) Note Claims and the Section 510(b) Equity Claims according to the Securities Settlement approved by the MDL Court. If any holder of a Section 510(b) Equity Claim opts out of the Securities Settlement, and that holder has filed a claim that is ultimately allowed in the Chapter 11 Cases, then the holder of the Allowed Section 510(b) Opt Out Equity Claim will receive a distribution, from the Securities Settlement, of New Common Stock and Discount Rights equal to the amount of the Allowed Section 510(b) Opt Out Equity Claim in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims.<br><br>**Estimated Recovery:    Allocated share of $179 million Allowed Claim**<br><br>**Estimated Percentage Recovery:    Agreed compromise** |

| Class Description | Treatment Under Plan |
|---|---|
| **Section 510(b) ERISA Claims** | Section 510(b) ERISA claims arise from the alleged failure of certain defendants to exercise their fiduciary duties in administering certain retirement plans' investments in Delphi common stock.  The ERISA based claims have been consolidated in the MDL.  Pursuant to the terms of the ERISA Settlement, holders of Section 510(b) ERISA Claims will receive a claim valued at $24.5 million.  The Debtors will make a distribution of New Common Stock and Discount Rights, in the same proportion as the distribution of New Common Stock and Discount Rights made to holders of General Unsecured Claims, to fund a portion of the ERISA Settlement, which will be distributed in accordance with the ERISA Settlement approved by the MDL Court.<br><br>**Estimated Recovery:  $24.5 million Allowed Claim**<br><br>**Estimated Percentage Recovery:    Agreed compromise** |
| **Other Interests** | Other Interests consist of all options, warrants, call rights, puts, awards, or other agreements to acquire existing Delphi common stock.  Under the Modified Plan, all Other Interests will be cancelled and holders of Other Interests will not receive a distribution under the Modified Plan on account of such Other Interests.<br><br>**Percentage Recovery:        0%** |
| **Interests In Affiliate Debtors** | Interests in affiliate debtors consist of any other stock, equity security, or ownership interest in any affiliate Debtor.  Under the Modified Plan, interests in affiliate Debtors will not be impaired or cancelled by the Modified Plan.<br><br>**Estimated Amount Of Interests:    N/A**<br>**Estimated Percentage Recovery:    N/A** |

**THE DEBTORS BELIEVE THAT THE MODIFIED PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AS APPLICABLE.  EACH OF THE DEBTORS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE MODIFIED PLAN.**

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1
II.    BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES ...................2
       A.    Definitions ..............................................................................................2
       B.    Notice To Holders Of Claims And Interests ..............................................2
       C.    Solicitation Package .................................................................................3
       D.    General Voting Procedures, Ballots, And Voting Deadline .........................3
       E.    Questions About Voting Procedures ..........................................................4
             Hearing And Deadline For Objections To ..................................................5
       F.    Modifications Of Confirmed Plan .............................................................5
III.   DESCRIPTION OF DELPHI'S BUSINESSES ...........................................................7
       A.    Overview Of Current Business Operations .................................................7
       B.    Delphi Customer And Supplier Relationships ...........................................11
             1.    Delphi's Relationship With Its Customers ....................................11
             2.    Delphi's Relationships With Its Suppliers .....................................13
       C.    Current Corporate Structure Of The Debtors ...........................................14
             1.    Board Of Directors Of Delphi Corporation ...................................15
             2.    Executive Management Of Delphi .................................................17
IV.    HISTORICAL OVERVIEW OF DELPHI .................................................................20
       A.    Heritage .................................................................................................21
       B.    The Separation From GM ........................................................................21
       C.    OEM Pattern Labor Agreements .............................................................22
       D.    Delphi's Historical Business Operations ..................................................23
       E.    Events Leading To Commencement Of The Chapter 11 Cases And
             Historical Financial Results ....................................................................26
             1.    U.S. Legacy Liabilities And Operational Restrictions ....................26
             2.    Competitive U.S. Vehicle Production Environment For U.S. OEMs ........27
             3.    Increasing Commodity Prices ......................................................27
       F.    Decision To Seek Relief Under The Bankruptcy Code ..............................28
       G.    Prepetition Capital Structure Of The Debtors ..........................................28
             1.    Prepetition Credit Facilities ........................................................28
             2.    Senior Unsecured Debt ...............................................................29
             3.    Junior Subordinated Notes And Trust Preferred Securities .............29
             4.    Other Material Debt Obligations ..................................................30
             5.    Equity .......................................................................................30
       H.    Prepetition Corporate Structure Of Delphi's U.S. Entities .........................31
V.     DELPHI'S TRANSFORMATION PLAN ..................................................................31
       A.    The Transformation Plan .........................................................................32
       B.    The Paths To Delphi's Transformation .....................................................35
       C.    The Framework Discussions .....................................................................37
       D.    Framework Agreements ...........................................................................38
       E.    Labor Transformation ..............................................................................39
             1.    The 1113/1114 Motion ...............................................................39
             2.    The Attrition Programs ...............................................................39

|         |    | 3.   | Labor Settlement Agreements........................................................41 |
|         |    | 4.   | Union Implementation Agreements................................................54 |
|         | F. | GM Transformation ..........................................................................55 |
|         |    | 1.   | Investigation Into GM Claims And Causes Of Action ............................55 |
|         |    | 2.   | Global Settlement Agreement And Master Restructuring Agreement With GM ..................................................................62 |
|         | G. | Product Portfolio Transformation ...................................................72 |
|         | H. | Cost Structure Transformation ........................................................76 |
|         |    | 1.   | SG&A Realignment ..............................................................76 |
|         |    | 2.   | Salaried Employee Compensation Program .................................78 |
|         | I. | Pension Transformation ...................................................................95 |
| VI.     | DELPHI'S BUSINESS PLAN ...................................................................97 |
|         | A. | Developing The Business Plan ........................................................97 |
|         |    | 1.   | Creation Of The POR Business Plan ..........................................98 |
|         |    | 2.   | Development Of The Revenue Plan ............................................99 |
|         | B. | Key POR Business Plan Assumptions ..........................................100 |
|         | C. | Pre-Confirmation Amendments To POR Business Plan ....................101 |
|         | D. | Reaffirmation Of POR Business Plan............................................102 |
|         | E. | Outlook From Reaffirmed Business Plan ......................................104 |
| VII.    | EMERGENCE CAPITAL FUNDING .........................................................105 |
|         | A. | Emergence Capital .........................................................................105 |
|         | B. | Rights Offerings............................................................................106 |
|         |    | 1.   | Eligibility For Participation In Rights Offerings .......................106 |
|         |    | 2.   | Issuance Of Rights ...............................................................107 |
|         |    | 3.   | Rights Offering Period..........................................................107 |
|         |    | 4.   | Exercise Of Rights ...............................................................107 |
|         |    | 5.   | Alternatives To Exercising The Rights....................................107 |
|         |    | 6.   | Use Of Rights Offering Proceeds ...........................................107 |
|         |    | 7.   | Distribution Of Rights Offering Shares ..................................108 |
| VIII.   | THE CHAPTER 11 CASES ...................................................................108 |
|         | A. | Continuation Of Business; Stay Of Litigation ...............................109 |
|         | B. | Chapter 11 Stakeholders ...............................................................109 |
|         | C. | Summary Of Certain Relief Obtained At The Outset Of The Chapter 11 Cases ...........................................................................................110 |
|         |    | 1.   | First Day Orders...................................................................110 |
|         |    | 2.   | Appointment Of Statutory Committees. ..................................112 |
|         |    | 3.   | Postpetition Financing ..........................................................113 |
|         | D. | Other Significant Events During The Chapter 11 Cases ....................116 |
|         |    | 1.   | GM Matters..........................................................................116 |
|         |    | 2.   | Labor Unions And Collective Bargaining Agreements...........116 |
|         |    | 3.   | Investigations, MDL Proceedings, And Settlements ...............116 |
|         |    | 4.   | Maintaining Relationships With Suppliers .............................124 |
|         |    | 5.   | Disposition Of Assets ...........................................................125 |
|         |    | 6.   | Real Property And Related Matters ........................................128 |
|         |    | 7.   | Global Events.......................................................................129 |
|         |    | 8.   | The Joint Interest Agreements ...............................................129 |

|  |  | 9. | Exclusivity ............................................................................130 |
|  |  | 10. | Preserving Estate Causes Of Action ...................................130 |
|  |  | 11. | Investment Agreement And Plan Investor Litigation .............135 |
|  |  | 12. | Complaints Seeking Revocation Of Confirmation Order .......138 |
|  | E. | Summary Of Claims Process ....................................................139 |
|  |  | 1. | Schedules Of Assets And Liabilities And Statements Of Financial Affairs ..................................................................139 |
|  |  | 2. | Claims Bar Date ..................................................................139 |
|  |  | 3. | Proofs Of Claim And Other Claims.....................................141 |
|  |  | 4. | Claims Reconciliation Progress ..........................................141 |
|  |  | 5. | Claims Objection Procedures And Estimation Procedures Motion.........142 |
|  |  | 6. | Key Classes Of Claims .......................................................142 |
|  | F. | Professional Fees .....................................................................146 |
| IX. | | | SUMMARY OF THE MODIFIED PLAN .........................................147 |
|  | A. | Introduction ..............................................................................148 |
|  | B. | Overall Structure Of The Modified Plan ..................................149 |
|  |  | | Settlements During The  ......................................................149 |
|  |  | 1. | Chapter 11 Cases.................................................................149 |
|  | C. | Substantive Consolidation Of Certain Debtors .........................150 |
|  | D. | Classification Of Claims And Interests.....................................155 |
|  |  | 1. | The Debtors..........................................................................155 |
|  |  | 2. | Classification Of Claims Against And Equity Interests In The Debtors ..........................................................................156 |
|  | E. | Treatment Of Claims And Interests Under The Modified Plan ...........157 |
|  |  | 1. | Treatment Of Unclassified Claims.......................................157 |
|  |  | 2. | Treatment Of Classified Claims And Interests .....................159 |
|  | F. | Means For Implementation Of The Modified Plan.....................165 |
|  |  | 1. | Continued Corporate Existence ...........................................165 |
|  |  | 2. | Restructuring Transactions ..................................................166 |
|  |  | 3. | Certificate Of Incorporation And Bylaws.............................167 |
|  |  | 4. | Directors Of Reorganized Delphi .........................................168 |
|  |  | 5. | Officers Of Reorganized Delphi ...........................................168 |
|  |  | 6. | Directors And Officers Of Affiliate Debtors ........................168 |
|  |  | 7. | Employment, Retirement, Indemnification, And Other Agreements And Incentive Compensation Programs .................169 |
|  |  | 8. | Procedures For Asserting SERP Claims ...............................169 |
|  |  | 9. | Cancellation Of Existing Securities And Agreements............170 |
|  |  | 10. | Reserved...............................................................................170 |
|  |  | 11. | Sources Of Cash For Modified Plan Distributions .................170 |
|  |  | 12. | Establishment Of Cash Reserve............................................171 |
|  |  | 13. | Emergence Capital Funding..................................................171 |
|  |  | 14. | Rights Offerings....................................................................171 |
|  |  | 15. | Issuance Of Stock In Reorganized Delphi .............................173 |
|  |  | 16. | Issuance Of New Preferred Stock .........................................173 |
|  |  | 17. | Reserved...............................................................................174 |
|  |  | 18. | MDL Settlements..................................................................174 |

|      | 19.  | GM Settlement ..................................................................174 |
|      | 20.  | Collective Bargaining Agreements ....................................175 |
|      | 21.  | Pension ..............................................................................176 |
|      | 22.  | Reserved.............................................................................177 |
|      | 23.  | Preservation Of Causes Of Action ....................................177 |
|      | 24.  | Reservation Of Rights........................................................178 |
|      | 25.  | Exclusivity Period .............................................................178 |
|      | 26.  | Corporate Action................................................................178 |
|      | 27.  | Effectuating Documents; Further Transactions ..................178 |
|      | 28.  | Consummation Of Divestiture Transaction ........................178 |
|      | 29.  | Exemption From Certain Transfer Taxes And Recording Fees..............179 |
| G.   |      | Unexpired Leases And Executory Contracts ................................179 |
|      | 1.   | Assumed And Rejected Leases And Contracts.....................179 |
|      | 2.   | Payments Related To Assumption Of Executory Contracts And Unexpired Leases................................................................180 |
|      | 3.   | Rejection Damages Bar Date ..............................................184 |
|      | 4.   | Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases........................................184 |
| H.   |      | Provisions Governing Distributions............................................184 |
|      | 1.   | Time Of Distributions ........................................................184 |
|      | 2.   | No Interest On Disputed Claims.........................................184 |
|      | 3.   | Disbursing Agent ...............................................................185 |
|      | 4.   | Surrender Of Securities Or Instruments.............................185 |
|      | 5.   | Services Of Indenture Trustees, Agents, And Servicers.....185 |
|      | 6.   | Claims Administration Responsibility................................186 |
|      | 7.   | Delivery Of Distributions ..................................................187 |
|      | 8.   | Procedures For Treating And Resolving Disputed And Contingent Claims And Interests........................................................187 |
|      | 9.   | Section 510(b) Opt Out Claims..........................................190 |
|      | 10.  | Fractional Securities...........................................................190 |
|      | 11.  | GM Administrative Claim Reserve ....................................190 |
|      | 12.  | Allocation Of Plan Distributions Between Principal And Interest..........191 |
| I.   |      | Allowance And Payment Of Certain Administrative Claims............191 |
|      | 1.   | DIP Facility Claims............................................................191 |
|      | 2.   | Reserved.............................................................................192 |
|      | 3.   | Professional Claims ............................................................192 |
|      | 4.   | Substantial Contribution Compensation And Expenses Bar Date...........193 |
|      | 5.   | Other Administrative Claims ..............................................193 |
| J.   |      | Effect Of The Modified Plan On Claims And Interests..................194 |
|      | 1.   | Revesting Of Assets............................................................194 |
|      | 2.   | Discharge Of Debtors .........................................................194 |
|      | 3.   | Compromises And Settlements............................................195 |
|      | 4.   | Release By Debtors Of Certain Parties...............................195 |
|      | 5.   | Release By Holders Of Claims And Interests......................196 |
|      | 6.   | Release By Unions..............................................................197 |
|      | 7.   | Release Of GM By Debtors And Third Parties ...................197 |

|    | 8.  | Reserved............................................................................................197 |
|    | 9.  | Setoffs.............................................................................................197 |
|    | 10. | Subordination Rights .....................................................................197 |
|    | 11. | Exculpation And Limitation Of Liability ........................................198 |
|    | 12. | Indemnification Obligations ...........................................................199 |
|    | 13. | Exclusions And Limitations On Exculpation, Indemnification, And Releases..........................................................................................200 |
|    | 14. | Injunction .......................................................................................200 |
| X. |     | GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED......201 |
| A. |     | General Considerations....................................................................201 |
| B. |     | Certain Bankruptcy Considerations .................................................201 |
| C. |     | Business Factors And Competitive Conditions .................................202 |
|    | 1.  | The Cyclical Nature Of Automotive Sales And Production Can Adversely Affect Delphi's Business ......................................................202 |
|    | 2.  | The Subprime Mortgage Crisis, Decline In Residential Real Estate Values, Any Changes In Consumer Credit Availability, Or Cost Of Borrowing Could Adversely Affect Delphi's Business ...........................202 |
|    | 3.  | Drop In The Market Share And Changes In Product Mix Offered By Delphi's Customers Can Impact Delphi's Revenues ...........................202 |
|    | 4.  | Delphi Depends On General Motors Corporation As A Customer, And Delphi May Not Be Successful At Attracting New Customers.......203 |
|    | 5.  | Delphi Operates In The Highly Competitive Automotive Supply Industry ...........................................................................................203 |
|    | 6.  | Delphi May Not Be Able To Respond Quickly Enough To Changes In Technology And Technological Risks, And To Develop Its Intellectual Property Into Commercially Viable Products..........................................................................................204 |
|    | 7.  | Continued Pricing Pressures, OEM Cost Reduction Initiatives, And Ability Of OEMs To Resource Or Cancel Vehicle Programs May Result In Lower Than Anticipated Margins, Or Losses, Which May Have A Significant Negative Impact On Delphi's Business ...........204 |
|    | 8.  | Certain Disruptions In Supply Of And Changes In The Competitive Environment For Raw Materials Integral To Delphi's Products May Adversely Affect Delphi's Profitability ...........................205 |
|    | 9.  | Delphi May Not Succeed In Its Attempts To Improve Its Cost Structure and Absent Significant Improvement, if the Modified Plan is not Consummated Delphi May Be Unable To Generate Sufficient Excess Cash Flow To Meet Increased U.S. Pension And OPEB Funding Obligations Upon Emergence. .......................................206 |
|    | 10. | Delphi May Suffer Future Asset Impairment And Other Restructuring Charges, Including Write Downs Of Goodwill Or Intangible Assets......................................................................................207 |

11.    The Company Anticipates The Need For Significant Borrowings Even After Emergence from Chapter 11 as it Completes its Transformation Plan.  The Significant Contraction of Credit Availability as a Result of the Current Difficult and Turbulent Capital Markets May Adversely Impact the Company's Ability to Obtain Exit Financing as Contempleted by the Modified Plan.  In addition, Delphi's Amended and Restated DIP Credit Facility Expires, Absent an Extension, on December 31, 2008.  The Company Is Negotiating an Extension to the Facility, However Further Disruption In The Capital Markets May Adversely Affect Delphi's Ability To Obtain A Timely Extension or  Secure Alternative Finacing.  Should the Facility Become Unavailable To The Debtors, Then Absent Procurement Of Alternative Financing, The Company's Liquidity Would Be Severely Restricted Resulting In A Material Adverse Impact On The Company's Business, Financial Condition And Operating Results Which May, Among Other Things, Delay Completion Of The Company's Transformation Plan .................................................................207

12.    Employee Strikes And Labor Related Disruptions May Adversely Affect Delphi's Operations........................................................................208

13.    Delphi May Lose Or Fail To Attract And Retain Key Salaried Employees And Management Personnel .................................................209

14.    Delphi May Incur Material Losses And Costs As A Result Of Warranty Claims And Product Liability And Intellectual Property Infringement Actions That May Be Brought Against It .........................209

15.    Delphi May Identify The Need For Additional Environmental Remediation Relating To Transformation Activities...............................210

16.    Failure To Achieve And Maintain Effective Internal Controls In Accordance With Section 404 Of The Sarbanes-Oxley Act Of 2002 Could Have A Material Effect On Delphi's Business....................210

17.    Delphi Faces Risks Associated With Growing And Conducting Business In Non-U.S. Jurisdictions .......................................................211

18.    Delphi's Substantial Global Operations Means The Company Is Exposed To Foreign Currency Fluctuations Which May Affect The Company's Financial Results ..................................................................212

19.    Risks Related To Potential Restructuring Transactions: .........................212

D.    Inherent Uncertainty Of Financial Projections ....................................................212
E.    Sources And Uses Of Cash For Plan Distributions .............................................214
F.    Access To Financing And Trade Terms .................................................................214
G.    Value Of, And Market For, New Common Stock .................................................215
      Potential Dilution Caused By ................................................................................215
H.    Future Issuances Of Common Stock......................................................................215
I.    Potential Ownership Change...................................................................................216
J.    Tax Planning ...........................................................................................................216
K.    Dividends ................................................................................................................216

XI.     SECURITIES LAW MATTERS .................................................................216
        A.      Issuance Of New Securities .....................................................216
        B.      Subsequent Transfers Of New Common Stock .................................217
XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
        OF THE MODIFIED PLAN..................................................................218
        A.      United States Federal Income Tax Consequences To The Debtors....................219
                1.      Cancellation Of Indebtedness Income ....................................219
                2.      Net Operating Losses-Section 382........................................220
        B.      United States Federal Income Tax Consequences To Holders Of Claims
                Against And Interests In The Debtors ...........................................221
                1.      Holders Of General Unsecured Claims Other Than TOPrS Claims........221
                2.      Holders of TOPrS Claims ...........................................223
                        Holders of TOPrS Claims will receive no distribution on account of such Claims   223
                3.      Existing Common Stockholders ...........................................224
                4.      Holders Of Section 510(b) Note Claims And Section 510(b) Equity
                        Claims ...........................................................224
                5.      Holders Of Section 510(b) ERISA Claims .............................225
                6.      Ownership And Disposition Of New Common Stock, Additional
                        New Common Stock and Rights..........................................225
                7.      Information Reporting And Backup Withholding .................................227
        C.      Importance Of Obtaining Professional Tax Assistance ......................227
XIII.   FEASIBILITY OF THE MODIFIED PLAN AND THE BEST INTERESTS
        TEST .....................................................................................227
        A.      Feasibility Of The Modified Plan .............................................227
        B.      Acceptance Of The Modified Plan ...............................................228
        C.      Best Interests Test ...............................................................229
        D.      Estimated Valuation Of The Reorganized Debtors .............................229
        E.      Application Of The Best Interests Test To The Liquidation Analysis And
                The Valuation Of The Reorganized Debtors ...................................230
                1.      Overview..........................................................230
                2.      Comparison Of Liquidation Analysis And Valuation Analysis .............232
XIV.    CONFIRMATION..................................................................................233
        A.      Confirmation Without Acceptance Of All Impaired Classes:  The
                "Cramdown" Alternative .....................................................233
        B.      Conditions To Confirmation And Consummation Of The Modified Plan .........234
                1.      Confirmation......................................................234
                2.      Conditions To The Effective Date ......................................234
        C.      Waiver Of Conditions Precedent .............................................235
        D.      Retention Of Jurisdiction ...................................................235
XV.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
        MODIFIED PLAN..................................................................................237
        A.      Continuation Of The Bankruptcy Case...........................................238
        B.      Alternative Plans Of Reorganization .........................................238
        C.      Liquidation Under Chapter 7 Or Chapter 11 ...................................238
XVI.    VOTING REQUIREMENTS .......................................................................239
        A.      Parties-In-Interest Entitled To Vote..........................................240

     B.     Classes Impaired Under The Modified Plan.......................................................241
          1.     Voting Impaired Classes Of Claims ......................................................241
          2.     Unimpaired Classes Of Claims..............................................................241
          3.     Impaired Classes Of Claims And Interests Deemed To Reject The
               Modified Plan.........................................................................................242
          4.     Presumed Acceptance By Certain Classes Of Interests...........................242
XVII.  CONCLUSION.............................................................................................................242
     A.     Hearing On And Objections To Confirmation....................................................242
          1.     Final Modification Hearing....................................................................242
          2.     Date Set For Filing Objections To Confirmation Of The Modified
               Plan .......................................................................................................242
     B.     Recommendation ................................................................................................242

## APPENDICES
### Updated as of October 3, 2008

Appendix A      —      First Amended Joint Plan Of Reorganization Of
Delphi Corporation And Certain Affiliates,
Debtors And Debtors-In-Possession, As Modified

Appendix B      —      Historical Financial Results (2008 3rd Quarter Form 10-Q
to be included when available)

Appendix C      —      Reaffirmed Financial Projections 2008-2011

Appendix D      —      Updated Valuation Analysis

Appendix E      —      Updated Liquidation Analysis

# I.    INTRODUCTION

Delphi and the Affiliate Debtors submit this disclosure statement, as modified (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code"), for use in the solicitation of votes on the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-in-Possession, As Modified (the "Modified Plan"), submitted by the Debtors and filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  A copy of the Modified Plan is annexed hereto as Appendix A.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, and the anticipated organization and operations of the Reorganized Debtors.  This Disclosure Statement also describes terms and provisions of the Modified Plan, including certain alternatives to the Modified Plan, certain effects of confirmation of the Modified Plan, certain risk factors associated with securities to be issued under the Modified Plan, and the manner in which distributions will be made under the Modified Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Interests in Impaired Classes must follow for their votes to be counted.

FOR A DESCRIPTION OF THE MODIFIED PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE MODIFIED PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, SEE SECTION IX – SUMMARY OF THE MODIFIED PLAN AND SECTION X – GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE MODIFIED PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE MODIFIED PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## II.    BANKRUPTCY PLAN VOTING INSTRUCTIONS AND PROCEDURES

This section provides information regarding:

- The procedures and deadlines for casting a vote to accept or reject the Modified Plan

- Contact information for questions about voting procedures

- The date and time of the confirmation hearing and the requirements for filing objections to the Modified Plan

The key modifications to this section are as follows:

- The voting deadline for the Modified Plan is December 12, 2008

- Objections to the Modified Plan are due on December 12, 2008

- The Final Modification Hearing on the Modified Plan is December 17, 2008

### A.    Definitions

Except as otherwise provided herein, capitalized terms used and not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Modified Plan.  In addition, all references in this Disclosure Statement to monetary figures refer to United States of America currency unless otherwise expressly provided.

### B.    Notice To Holders Of Claims And Interests

This Disclosure Statement is being transmitted to certain holders of Claims and Interests for the purpose of soliciting votes on the Modified Plan and to others for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the holder of a Claim against, or Interest in, the Debtors to make a reasonably informed decision with respect to the Plan prior to exercising the right to vote to accept or reject the Modified Plan.

The Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable holders of Claims and Interests who are entitled to vote on the Modified Plan to make an informed judgment with respect to acceptance or rejection of the Modified Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE MODIFIED PLAN BY THE BANKRUPTCY COURT.

ALL HOLDERS OF CLAIMS AND INTERESTS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE MODIFIED PLAN.  This Disclosure Statement

contains important information about the Modified Plan, considerations pertinent to acceptance or rejection of the Modified Plan, and developments concerning the Chapter 11 Cases.

THIS DISCLOSURE STATEMENT AND THE OTHER MATERIALS INCLUDED IN THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE MODIFIED PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Modified Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except with respect to the projections set forth in Appendix C attached hereto (the "Projections"), and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof whether or not such events have a material impact on the information contained in this Disclosure Statement.  Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes of soliciting votes on the Modified Plan; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.  Further, the Debtors do not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement does not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

### C.    Solicitation Package

Accompanying this Disclosure Statement are, among other things, copies of (1) the Modified Plan (Appendix A hereto), (2) the notice of, among other things, (i) the hearings set to consider approval of the Modified Plan, (ii) the deadline and procedures for filing objections to approval of the Modified Plan, (iii) the deadline and procedures for temporary allowance of certain claims for voting purposes, (iv) the treatment of certain unliquidated, contingent, or disputed claims for notice, voting, and distribution purposes, (v) the record date, (vi) the voting deadline for receipt of ballots, and (vii) information relating to releases and injunctions contemplated by the Modified Plan (the "Final Modification Hearing Notice"), and (3) for those entitled to vote, one or more Ballots (and return envelopes) to be used in voting to accept or to reject the Plan.

### D.    General Voting Procedures, Ballots, And Voting Deadline

After carefully reviewing the Modified Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your

acceptance or rejection of the Modified Plan by checking the appropriate box on the enclosed Ballot.  Please complete and sign your original Ballot (copies will not be accepted), and return it in the envelope provided.  You must provide all of the information requested by the appropriate Ballot.  Failure to do so may result in the disqualification of your vote on such Ballot.  Each Ballot has been coded to reflect the Class of Claims or Interests it represents.  Accordingly, in voting to accept or reject the Modified Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

TO ENSURE THAT YOUR VOTE IS COUNTED, YOU MUST PROPERLY COMPLETE YOUR BALLOT AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RETURN IT SO THAT IT IS **ACTUALLY RECEIVED** NO LATER THAN **DECEMBER 12, 2008 AT 7:00 P.M. (PREVAILING EASTERN TIME)** (THE "VOTING DEADLINE") BY THE VOTING AGENT RESPONSIBLE FOR COLLECTING BALLOTS PERTAINING TO YOUR CLAIM OR INTEREST.  **KURTZMAN CARSON CONSULTANTS LLC IS THE VOTING AGENT FOR ALL CREDITORS EXCEPT NOTEHOLDERS.  FINANCIAL BALLOTING GROUP LLC IS THE VOTING AGENT FOR NOTEHOLDERS AND EQUITY INTEREST HOLDERS (HOLDERS OF DELPHI COMMON STOCK)**.  YOUR BALLOT CONTAINS THE CONTACT INFORMATION FOR THE VOTING AGENT RESPONSIBLE FOR COLLECTING BALLOTS PERTAINING TO YOUR CLAIM.  THE CONTACT INFORMATION FOR BOTH VOTING AGENTS IS ALSO LISTED BELOW.

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.  BALLOTS SHOULD NOT BE DELIVERED DIRECTLY TO THE DEBTORS, THE COURT, THE STATUTORY COMMITTEES, COUNSEL TO THE DEBTORS, OR COUNSEL TO THE STATUTORY COMMITTEES.**

E.    **Questions About Voting Procedures**

If (1) you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim holdings or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

| All Creditors except Noteholders: | Noteholders and Equity Interest Holders (Holders of Delphi Common Stock): |
|---|---|
| Kurtzman Carson Consultants LLC | Financial Balloting Group LLC |
| 2335 Alaska Avenue | 757 Third Avenue, 3rd Floor |
| El Segundo, California 90245 | New York, New York 10017 |
| Att'n: Delphi Corporation | Att'n: Delphi Corporation Ballot |
| Telephone: (888) 249-2691 | Tabulation |
| Fax: (310) 751-1856 | Telephone: (866) 486-1727 |
| www.delphidocket.com | www.fbgllc.com |

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE SECTION XVI– VOTING REQUIREMENTS.

**F.      Hearing And Deadline For Objections To Modifications Of Confirmed Plan**

Pursuant to section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled the hearing on objections to modifications of the Confirmed Plan (the "Final Modification Hearing") to begin on **December 17**, 2008, at 10:00 a.m. (prevailing Eastern time) before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004.  The Final Modification Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Final Modification Hearing or at any subsequent adjourned Final Modification Hearing.  The Bankruptcy Court has directed that objections, if any, to the Modified Plan be filed with the Clerk of the Bankruptcy Court and served so that they are ACTUALLY RECEIVED on or before December 12, 2008, at 4:00 p.m. (prevailing Eastern time) by:

*Counsel for the Debtors*

>       Skadden, Arps, Slate, Meagher & Flom LLP
>       333 West Wacker Drive
>       Suite 2100
>       Chicago, Illinois 60606-1285
>       Att'n:    John Wm. Butler, Jr.
>                 George N. Panagakis
>                 Ron E. Meisler
>                 Nathan L. Stuart
>
>       Skadden, Arps, Slate, Meagher & Flom LLP
>       Four Times Square
>       New York, New York 10036
>       Att'n:    Kayalyn A. Marafioti
>                 Thomas J. Matz

*United States Trustee*

>       The Office of the United States Trustee
>       33 Whitehall Street
>       21st Floor
>       New York, New York 10004
>       Att'n:    Brian Masumoto

*Counsel for the Creditors' Committee*

> Latham & Watkins LLP
> 885 Third Avenue
> New York, New York 10022
> Att'n:   Robert J. Rosenberg
>             Mitchell A. Seider
>             Mark A. Broude

*Counsel for the Equity Committee*

> Fried, Frank, Harris, Shriver & Jacobson LLP
> One New York Plaza
> New York, New York 10004
> Att'n:   Brad E. Scheler
>             Bonnie K. Steingart

*Counsel for the Postpetition Lenders*

> Davis Polk & Wardwell
> 450 Lexington Avenue
> New York, New York 10022
> Att'n:   Donald S. Bernstein
>             Brian M. Resnick

### III.    DESCRIPTION OF DELPHI'S BUSINESSES

This section provides information regarding:

- Delphi's current business operations

- Delphi's relationship with its customers and suppliers

- The current corporate structure of the Debtors

The key modifications to this section are as follows:

- Updates reflecting changes to Delphi's financial reporting by business segment and the inclusion of 2007 financial data

- Suppliers and other holders of cure claims may no longer choose the treatment of their cure claims by electing to have their cure claims paid in Plan currency.  All cure claims will now be paid in cash under the Modified Plan.

- Modifications to the corporate structure of the Debtors to account for changes in Delphi's leadership

### A.    Overview Of Current Business Operations

Delphi is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines.  The Company is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  Technology developed and products manufactured by Delphi are changing the way drivers interact with their vehicles.  Delphi is a leader in the breadth and depth of technology to help make cars and trucks smarter, safer, and better.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

Delphi's current product offerings are organized in the following business segments: Electrical/Electronic Architecture, Powertrain Systems, Electronics and Safety, Thermal Systems, and Automotive Holdings Group.  Delphi's product segment offerings and principal competitors as of December 31, 2007 are described below.  In addition to the segment product reporting, Delphi has product sales in the automotive aftermarket, commercial vehicles, computer/peripherals, medical device, and military/aerospace industries.

*Electrical/Electronic Architecture.*  The Electrical/Electronic Architecture segment accounted for $5,968 million, $5,365 million, $5,310 million, and $5,520 million of Delphi's 2007, 2006, 2005, and 2004 sales, respectively.  This segment offers complete electrical/electronic architectures for Delphi's customer-specific needs that help reduce production cost, weight, and mass, and improve reliability and ease of assembly.  Delphi's high quality connectors are engineered primarily for use in the automotive and related markets, but also have applications in the aerospace, military, and telematics sectors.  Delphi's electrical centers provide centralized electrical power and signal distribution and all of the associated circuit protection and switching

devices, thereby optimizing the overall vehicle electrical system. Delphi's distribution systems are integrated into one optimized vehicle electrical system utilizing smaller cable and gauge sizes and ultra-thin wall insulation. Delphi's principal competitors in the Electrical/Electronic Architecture segment include Lear Corporation, Molex Inc., Sumitomo, Tyco International, and Yazaki Corporation.



*Powertrain Systems*. The Powertrain Systems segment accounted for $5,663 million, $5,218 million, $5,310 million, and $6,139 million of Delphi's 2007, 2006, 2005, and 2004 sales, respectively. This segment offers high quality products for complete engine management systems ("EMS") to help optimize performance, emissions, and fuel economy. The products include gasoline and diesel EMS, fuel handling systems, and evaporative emissions systems. Delphi's gasoline EMS portfolio features fuel injection and air/fuel control, valve train, ignition, sensors and actuators, transmission control products, exhaust systems, and powertrain electronic control modules with software, algorithms, and calibration. Delphi's diesel EMS product line offers high quality common rail system technologies which are selected by many of the world's top automakers. Delphi supplies integrated fuel handling systems for gasoline, diesel, flexfuel, and biofuel configurations. Delphi has innovative evaporative emissions systems that are recognized as industry-leading technologies by Delphi's customers in North America and Europe. Delphi's principal competitors in the Powertrain Systems segment include Bosch Group, Continental AG, Denso Corporation, and Magneti Marelli Powertrain USA, Inc.



*Electronics and Safety*. The Electronics and Safety segment accounted for $5,035 million, $4,899 million, $5,120 million, and $5,322 million of Delphi's 2007, 2006, 2005, and 2004 sales, respectively. This business segment offers a wide range of electronic and safety equipment in the areas of controls, security, entertainment, communications, and safety systems. Delphi's controls and security products primarily consist of body computers, security systems, and mechatronics (interior switches, integrated center panels, and gear shift sensors). Delphi's entertainment and communications business primarily consists of advanced reception systems, digital receivers, satellite audio receivers, navigation systems, rear-seat entertainment, and wireless connectivity. Delphi's safety systems primarily consist of airbags, occupant detection systems, collision warning systems, advanced cruise control technologies, safety electronics, seat belts, and steering wheels. Delphi's principal competitors in the Electronics and Safety segment include Autoliv Inc., Bosch Group, Continental AG, Denso Corporation, TRW Automotive, and Valeo Inc.



*Thermal Systems*. The Thermal Systems segment accounted for $2,412 million, $2,387 million, $2,341 million, and $2,352 million of Delphi's 2007, 2006, 2005, and 2004 sales, respectively. This segment offers energy efficient thermal system and component solutions for the automotive market and continues to develop applications for the non-automotive market. Delphi's Automotive Thermal Products are designed to meet customers' needs for powertrain thermal management and cabin thermal comfort (climate control). Main powertrain cooling products include condenser, radiator, and fan module assemblies and components, which include radiators, condensers, and charge air cooling heat exchangers. The climate control portfolio includes

HVAC modules with evaporator and heater core components, compressors, and controls. Delphi's principal competitors in the thermal automotive segment include Behr GmbH & Co. KG, Denso Corporation, Valeo Inc., and Visteon Corporation.



*Automotive Holdings Group*.   The Automotive Holdings Group ("AHG") accounted for $2,946 million, $3,638 million, and $3,777 million of Delphi's 2007, 2006, and 2005 sales, respectively.  AHG is comprised of select plant sites and non-core product lines that Delphi will seek to sell or wind down. Examples of AHG manufactured products include suspension components and brake components.  AHG's sales are predominantly to GM or Tier 1 suppliers that ultimately sell Delphi's products to GM.

*Discontinued Operations.*  Delphi also has non-core steering and halfshaft product lines and interiors and closures product lines that are now reported in discontinued operations for accounting purposes.  Previously, the steering and halfshaft product line was a separate operating segment and interiors and closures product line was part of the AHG segment.

Delphi's world headquarters is in Troy, Michigan.  Delphi also maintains regional headquarters in Shanghai, China; Bascharage, Luxembourg; and Sao Paulo, Brazil.  Excluding Delphi's joint ventures and other investments, as of December 31, 2007, Delphi maintained 290 sites in 34 countries throughout the world, including manufacturing facilities, technical centers, customer centers and sales offices.  Delphi's business segments share many of the manufacturing facilities throughout the world.  Delphi has owned its headquarters since June 2005.  Of the remaining 289 sites, 26 were owned and 40 were leased in the U.S. and Canada, 32 were owned and 21 were leased in Mexico, 33 were owned and 80 were leased in Europe/Middle East/Africa, 10 were owned and 8 were leased in South America, and 10 were owned and 29 were leased in Asia/Pacific.

As of December 31, 2007, Delphi employed approximately 169,500 people, of whom approximately 36,100 were salaried employees and approximately 133,400 were hourly employees.  On a comparable basis, as of December 31, 2006, Delphi employed approximately 171,400 people, of whom approximately 36,700 were salaried employees and approximately 134,700 were hourly employees and as of December 31, 2005, Delphi employed approximately 184,200 people, of whom approximately 37,200 were salaried employees and approximately 147,000 were hourly employees.

When the Chapter 11 Cases commenced, nearly all of the Debtors' approximately 34,750 hourly employees in the United States were represented by three principal unions.  The United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") represented approximately 70% of the Debtors' hourly workforce, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA") represented approximately 25% of the hourly workforce, and the United Steelworkers of America, Local 87 (the "USW") represented nearly 3% of the hourly workforce. The Debtors had master collective bargaining agreements with each of these three unions, as well as "local agreements" with affiliated local unions covering primarily local issues that are worksite or business-specific.  The Debtors also had collective bargaining agreements with four other unions representing a smaller segment of the U.S. hourly workforce – the International

Association of Machinists and Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), the International Union of Operating Engineers (the "IUOE"), and the Electronic and Space Technicians (the "EAST") (six of the foregoing seven unions (the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE) being referred to herein collectively as the "Unions").

Within the United States, as of December 31, 2007, Delphi had approximately 28,400 employees.  Approximately 16,700 of these are production and skilled employees represented primarily by the UAW, IUE-CWA, and USW at Delphi's manufacturing sites.  The remainder are primarily salaried and management employees, including engineers, management employees, and employees who perform Delphi's sales, general, and administration ("SG&A") functions.

Since the commencement of these Chapter 11 Cases, the Debtors have continued to operate their businesses.  Despite a challenging environment, the Company has not only maintained its important and vital relationships with its customers, which have been a component of its positive financial performance during these Chapter 11 Cases, but also has continued to book new business critical to its future.  During 2007, Delphi's new business bookings consistently increased during the year and were above Delphi's 2007 business plan target.

The Company attributes its ability to meet and exceed its financial projections, in part, to its adherence to a disciplined budgeting/forecasting process whereby the corporation's product business unit leaders, divisional heads, and corporate staff heads are asked to "own" the commitments they make in the budget business plan, coupled with the dependence of executive incentive compensation on meeting those commitments.  In addition, the Company's revenue plans incorporated within its financial plans are developed with input from third party econometric forecasts to help ensure the validity of certain assumptions, particularly vehicle sales volumes inherent in Delphi's business plans. These bottom-up budget and forecast plans are also used to establish the targets against which the Debtors measure performance under the short-term at risk performance incentive programs that were approved by the Bankruptcy Court.   The compensation plans generally provide performance rewards only if the short-term financial performance targets are met or exceeded.  The Debtors' recent historical financial results are attached to this Disclosure Statement as Appendix B.  There can be no assurance that Delphi's performance to date during these Chapter 11 Cases is indicative of future performance.

The financial projections attached to this Disclosure Statement as Appendix C were prepared using the same process by which the Company prepared its short-term budget/forecast plans during the Chapter 11 Cases.

Upon the conclusion of the reorganization process, the Company expects to emerge as a stronger, more financially sound business and maintain its prominence as one of the world's premier auto suppliers.  In addition, Delphi anticipates that through its unwavering commitment to its customers, it will continue to win new business and achieve or exceed the financial projections and targets it has established.  However, there can be no assurances that this will be the case given the risks and uncertainties inherent in Delphi's business, see Section X—General Considerations And Risk Factors To Be Considered.

**B.      Delphi Customer And Supplier Relationships**

*1.      Delphi's Relationship With Its Customers*

Delphi has a strong commitment to its customers and seeks to provide its customers with leading-edge technology and product development, superior engineering, outstanding quality, and world-class customer support.  Although GM remains Delphi's largest single customer, 63% of Delphi's sales in 2007 were to customers other than GM.  That percentage has consistently risen since Delphi's separation from GM in 1999 (the "Separation"), and Delphi's revenue from non-GM business grew from $6.9 billion in 1999 to $14.8 billion in 2006.  By 2011, Delphi projects in its business plan that global sales to GM will be 21% of Delphi's sales and non-GM sales will comprise 79% of sales.  In the U.S., in 2009 it is projected that Delphi's sales to GM North America ("GMNA") will only constitute 18% of Delphi's 2009 revenue.  In addition, it is projected that Delphi's total North American business with GMNA, Ford's U.S. business unit, and Chrysler, LLC will comprise only 24% of Delphi's revenue in 2009.

Delphi expects its non-GM business to continue to increase, but GM will likely remain its largest customer for a period of time due to Delphi's long-standing relationship with GM and because of commitments to supply parts to GM in the future.  Delphi currently supplies parts to each regional sector of GM's automotive operations, including its automotive operations in Asia Pacific, Europe, South America, and North America, including the U.S., Canada, and Mexico. In addition, Delphi sells its products to the worldwide aftermarket, both through GM and through independent distributors and retailers.

(a)      Automotive Customers

Delphi supplies products to nearly every major global automotive original equipment manufacturer.  Delphi is continually working to win new business from its customers. Automotive OEMs typically award business to suppliers several years before a model is scheduled to go into production so that the supplier has sufficient time to prepare for production of the component parts.  This preparation may include, among other things, final design and development of the product, cooperation with the customer for final integration of the product into the vehicle, design and development of machinery and tooling with which the part can be manufactured (under certain contracts, tooling is provided by the customer), and quality control testing.

Delphi's customer contracts typically range from one year to the life of the vehicle model into which the part will be incorporated and usually do not require the customer to purchase a minimum quantity, although customer contracts are typically 100% requirements contracts. Once a customer chooses Delphi as a supplier for one of its components, that customer typically issues a requirements purchase order for the specific product supplied for a particular vehicle, but does not contract to purchase a specific quantity of the product.  Due to the nature of the automobile industry, it is difficult to forecast the volume of a particular component or product that will be needed.  Even when forecasts are provided, they often change due to changes in consumer demands.  The automotive market is cyclical and dependent on general economic conditions, consumer spending, and buying preferences. The rate at which Delphi's customers build vehicles – and therefore, the volume of the customers' requirements for Delphi products –

depends on their market performance as well as company-specific inventory and incentive strategies. Nonetheless, under the Amended MRA defined and described in Section V.F. – GM Transformation, GM has made commitments to Delphi that GM will provide Delphi with certain business awards and opportunities.

Delphi's customers often include termination provisions in their contracts. For example, Delphi's largest customer, GM, pursuant to its standard terms and conditions, reserves a right to terminate for convenience certain of its supply contracts, including certain long-term supply contracts, generally after an agreed upon period. Termination for convenience means that GM can terminate the contract at any time for any reason and "re-source" the business to another supplier with limited compensation to Delphi. GM's current standard lifetime contract provides that GM will not exercise its right to terminate for convenience except in the case of cancellation or modification of the related vehicle program, provided that GM may "re-source" for non-competitive pricing, technology, design, or quality at any time during the contract period, subject to the requirement of notice and an opportunity for Delphi to meet the terms of a competitive offer. Although the termination provisions described above remain in many customer contracts, under the Amended MRA described in Section V.F. – GM Transformation, GM's ability to resource certain business away from Delphi and/or terminate for convenience has been restricted.

Customers historically have had significant leverage over their outside suppliers, like Delphi, because suppliers are dependent on only a limited number of customers to purchase their products. Examples of this leverage include customers' power over pricing and ability to direct suppliers to purchase certain materials from lower-tier suppliers. The cost-cutting initiatives adopted by Delphi's customers to remain competitive in the consumer marketplace generally result in increased downward pressure on pricing. Typically, customers require that Delphi reduce its price on its product each successive year of a production cycle. If Delphi is not able to meet this demand, the risk of Delphi's losing the business awarded under those purchase orders to other suppliers increases. In addition, customers may create directed-buy situations in which Delphi is required to purchase certain of its component parts from a particular supplier.

Delphi's vision is to be recognized by its customers as their best supplier. Accordingly, Delphi has sought to ensure that the reorganization process does not interrupt the flow and quality of supply to or otherwise inconvenience or negatively influence Delphi's customers. Particularly because a failure of Delphi to timely supply parts to its customers could cause the shut down of customers' manufacturing facilities in fewer than three days (due to the "just-in-time" delivery system that is used in the automotive industry), resulting in significant economic harm which could damage Delphi's relationship with customers, and because supplier selection and awards of new business in the automotive industry are generally finalized several years prior to vehicle production, it has been critical for Delphi to maintain the strength of its relationship with its customers throughout the Chapter 11 Cases. Without strong customer relationships and the preservation of business awards for future periods, a successful restructuring would not be possible. To maintain these customer relationships and to alleviate any concerns of the customer base from Delphi's chapter 11 filing, as part of Delphi's "first day" relief, Delphi sought and received Court authority to perform certain of its prepetition obligations related to customer programs such as warranty programs, customer adjustments, and customer rebates and allowances, and to continue, renew, replace, implement new, and/or terminate those customer programs as they saw fit, in the ordinary course of business. In addition, the Modified Plan will

allow many ordinary course customer obligations to flow through, and the Debtors' restructuring will not impact these obligations.

(b)    Non-Automotive Customers

Since the Separation from GM, Delphi has diversified its customer base by taking advantage of its technological and manufacturing core competencies. Delphi has entered into adjacent markets and continues to pursue additional opportunities, such as in automotive aftermarket, commercial vehicles, communications (including telematics), electronics cooling, energy, and the medical devices industry. In the medical device market, Delphi manufactures products focused on the Infusion, Respiratory Care, Vital Signs Monitoring, and Power Mobility submarkets, utilizing its vast technology base, product development expertise, and manufacturing excellence. Delphi also supplies the commercial vehicle original equipment market, using its automotive-based technologies to compete in this adjacent market.

2.    *Delphi's Relationships With Its Suppliers*

Delphi and its suppliers have a complex relationship based on the highly integrated nature of the automotive industry supply chain, Delphi's central role in the supply chain, and Delphi's customers' stringent quality requirements that limit the availability of alternate sources of supplies. Most of Delphi's products are not sold to end-users, but rather to OEMs who use Delphi's products in their consumer goods. For example, Delphi produces heating ventilation and air-conditioning systems (HVAC) purchased by automobile manufacturers for use in the production of their vehicles. Delphi produces thousands of separate products, the production of which requires the timely receipt of components and raw materials from thousands of dedicated suppliers. Delphi obtains the components and raw materials that it needs to produce its products pursuant to tens of thousands of separate agreements with its suppliers, many of which have a yearly term. Adding to the complexity of Delphi's relationship with its suppliers is the industry's use of "just-in-time" inventory management systems and "sole-source" supply methods.

(a)    Just-In-Time Supply Method

The just-in-time supply method is customary in the automotive industry. Use of the just-in-time supply method means that Delphi does not maintain a significant inventory of the components supplied by many of its suppliers (in many cases, keeping less than a 24-hour supply on hand). Accordingly, Delphi relies upon frequent and, in many cases, daily, shipments of components from its suppliers to keep its manufacturing facilities operating. Under the just-in-time system, if a suppliers fails to ship goods, Delphi manufacturing facilities utilizing those parts could in many instances be forced to shut down fewer than 24 hours after the missed shipment. Within days after a shutdown of one of Delphi's facilities, Delphi's customers could be forced to halt production of their products on one or more of their assembly lines.

(b)    Sole-Source Supply Method

Pursuant to the sole-source supply method, Delphi frequently purchases all of its requirements for a particular part from one supplier. In Delphi's business, it typically does not buy commodities that are easily interchangeable. Many of the materials and parts that Delphi buys from its suppliers are sophisticated customized components, each of which requires

extensive and time-consuming testing, including approvals required from Delphi's customers. Delphi uses the sole source supply method to reduce production start-up, capital investment, and validation costs necessary to make each part, to maintain a consistent quality of parts, and to achieve a better price by purchasing a larger quantity from a sole supplier.  Because of the stringent customer requirements for parts, with very few exceptions, locating an alternate supplier for the goods quickly or for a short period of time is very difficult and typically impractical.  Consequently, under the sole source supply method, the failure to receive even a very inexpensive part on time can quickly interrupt Delphi's assembly lines.

(c)    Supplier Contracts And Terms

The many of Delphi's contracts with its suppliers are one-year annual contracts, and a smaller portion of Delphi's supplier contracts are long-term contracts lasting one to three years or even the life of a particular vehicle model.

Many of Delphi's suppliers provide favorable trade terms to Delphi.  The Debtors' standard terms and conditions require that they pay their suppliers on MNS-2 payment terms, a common method of payment in the automobile industry.  Under these terms, Delphi must pay for goods, on average, by the second day of the second month following the receipt of the goods. For example, under these terms, payment for goods received by Delphi during the month of August 2008 was due October 2, 2008.  Thus, at any time, depending on when the supplier shipped the goods, payment could be outstanding for more than 60 days and still be timely received.  Prior to the commencement of these Chapter 11 Cases, Delphi's average outstanding payables for North America third party direct material suppliers was approximately 45 days. While in chapter 11, the average outstanding payables for Delphi has grown from 27 days to 34 days.  Delphi believes that its emergence from chapter 11 should allow it to return to more favorable terms with its supply base.  These expected favorable credit terms are an important component of the Company's business plan following emergence from chapter 11.

(d)    Financially-Troubled Suppliers

Certain of Delphi's suppliers are, or from time to time become, financially troubled. Because of the just-in-time and sole-source supply methods that Delphi utilizes, Delphi must pay close attention to the financial health of its suppliers.  As described above, the closure of one of Delphi's suppliers could have a near immediate impact on Delphi's ability to do business with its customers.  With that in mind, dating back prior to Delphi's chapter 11 filing, Delphi has maintained a vendor rescue program under which it provides assistance to its financially troubled suppliers.  This assistance takes many forms, but includes helping the supplier to (a) obtain sufficient financing to ensure the steady flow of raw materials necessary to manufacture the components ordered by Delphi, (b) honor its payroll obligations and other business expenses, and/or (c) restructure its operations so as to allow its businesses to continue to operate.  By assisting these financially troubled suppliers, Delphi ensures that the flow of goods continues.

**C.    Current Corporate Structure Of The Debtors**

Delphi is incorporated in Delaware.  It is the parent corporation of the 41 Affiliate Debtors in these jointly administered Chapter 11 Cases, as well as additional non-debtor

affiliates.  With the exception of one of Delphi's wholly-owned, indirect Spanish subsidiaries, none of Delphi's affiliates located outside the United States sought reorganization relief either in the United States or in its domicile.

### 1.    *Board Of Directors Of Delphi Corporation*

Delphi's Board of Directors (the "Board of Directors" or the "Board") is comprised of 9 individuals, two of whom are also part of Delphi's management and the remaining seven of whom are independent directors.  Five of the seven independent directors have joined Delphi's Board during the last three years. The Board of Directors of Delphi Corporation is comprised of the following persons:

| Name | Position | Term |
|------|----------|------|
| Robert S. Miller | Executive Chairman | Since 2005 |
| Rodney O'Neal | President & CEO | Since 2005 |
| Craig G. Naylor | Lead Independent Director | Since 2005 |
| Oscar de Paula Bernardes Neto | Director | Since 1999 |
| John D. Englar | Director | Since 2006 |
| David N. Farr | Director | Since 2002 |
| Raymond J. Milchovich | Director | Since 2005 |
| John H. Walker | Director | Since 2005 |
| Martin E. Welch | Director | Since 2006 |

*Mr. Miller* was named executive chairman of Delphi Corporation effective January 2007 after serving as chairman and chief executive officer of Delphi Corporation since July 2005. Prior to joining Delphi, Mr. Miller had been non-executive chairman of Federal-Mogul Corporation, a global automotive component supplier, from January 2004 until June 2005. Mr. Miller served in various positions with Federal-Mogul since 1993, including a previous term as non-executive chairman from January to October 2001, and three times in a transitional role as chief executive officer in 1996, again in 2000, and again from July 2004 until February 2005. From September 2001 until December 2003, Mr. Miller was the chairman and chief executive officer of Bethlehem Steel Corporation, a steel manufacturing company.  Mr. Miller is also a director of United Airlines Corporation, Reynolds American, Inc., Symantec Corporation, and Waste Management, Inc.

*Mr. O'Neal* was named president and chief executive officer of Delphi Corporation effective January 2007.  He was president and chief operating officer of Delphi Corporation from January 2005.  Prior to that position, Mr. O'Neal served as president of Delphi's former Dynamics, Propulsion, and Thermal sector from January 2003 and as executive vice president and president of Delphi's former Safety, Thermal, and Electrical Architecture sector from January 2000.  Mr. O'Neal is also a director of Goodyear Tire & Rubber Company and Sprint Nextel Corporation.

*Mr. Naylor* retired in December 2006 from E.I. du Pont de Nemours and Company, a science company offering a wide range of innovative products and services for markets including agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation, and apparel, where he served in various capacities since joining that company in

1970.  He most recently served as group vice president, DuPont Electronic & Communication Technologies, having served in such capacity since March 2004.  Prior to that position, Mr. Naylor served as group vice president, Asia Pacific from January 2004, as group vice president DuPont Performance Materials from 2002 to 2004, and as group vice president and general manager, Engineering Polymers, Fluoroproducts and Packaging & Industrial Polymers from 2000 to 2002.  Mr. Naylor is Chairman of the Compensation and Executive Development Committee of Delphi's Board of Directors, Chairman of the Executive Committee of Delphi's Board of Directors, and became lead independent director as of October 1, 2008.

*Mr. Bernardes* is the senior partner and chairman of LID Group and of Integra Associados Assessoria e Consultoria.  He was chief executive officer of Bunge International from 1996 to 1999.  Before joining Bunge, Mr. Bernardes was a senior partner with Booz Allen & Hamilton ("Booz Allen"), an international consulting firm.  He also has more than 15 years of consulting experience, including several projects related to the automotive industry in South America. Mr. Bernardes is currently a member of the Corporate Governance and Public Issues Committee of Delphi's Board of Directors, and throughout 2005 served as a member of the Audit Committee of Delphi's Board of Directors.  He is also a member of the Advisory Board of Bunge Brasil S.A., Booz Allen & Hamilton do Brasil, Alcoa Brasil, and Veirano Associados.  Mr. Bernardes is also a director of Gerdau S.A., Johnson Electric Holdings Ltd., Companhia Suzano de Papel e Celulose, and Sao Paulo Alpargatas S/A.

*Mr. Englar* was appointed Distinguished Practioner in Residence at the Elon University School of Law in Greensboro, North Carolina in December 2007. Previously, he was an executive in residence for Duke University, Fuqua School of Business, in Durham, North Carolina from January 2004 until December 2007, and The Bryan School of Business of the University of North Carolina, Greensboro, North Carolina since January 2006.  Until November 2003, Mr. Englar was senior vice president, Corporate Development and Law with Burlington Industries, Inc. and also served as a director of Burlington from 1990 to 2003 and chaired its Investment Committee. In his 25-year career with Burlington, he held several critical executive leadership positions including chief financial officer, chief investment officer and general counsel. From 1972 to 1978, he was an attorney with Davis Polk & Wardwell in Paris and New York. Mr. Englar is a member of the Compensation and Executive Development Committee of Delphi's Board of Directors and a member of the Audit Committee of Delphi's Board of Directors.

*Mr. Farr* is the chairman, chief executive officer, and president of Emerson Electric Co., a diversified global technology company that provides products and services for a wide range of industries, commercial markets, and end-users, including consumers, having been named chief executive officer and president in October 2000 and elected to the additional position of chairman of the board in September 2004.  He joined Emerson in 1981.  Mr. Farr is a member of the Business Council and the Civic Progress Group of St. Louis, Missouri.  He is also a member of the Webster University Board of Trustees and the Municipal Theatre Association of St. Louis. Mr. Farr is Chairman of the Corporate Governance and Public Issues Committee of Delphi's Board of Directors and is a member of the Executive Committee of Delphi's Board of Directors. Mr. Farr is also a director of Emerson Electric Co.

*Mr. Milchovich* is the president, chairman and chief executive officer of Foster Wheeler Ltd., a global engineering and construction company serving energy-related markets and served as president, chairman, and chief executive officer until January 2007. Mr. Milchovich joined Foster Wheeler Ltd. in 2001. Previously he had been the president and chief executive officer of Kaiser Aluminum Corp. from 1997 and became chairman of the board in 2000. Mr. Milchovich held various management positions with Kaiser Aluminum Corp. after joining the company in 1980. Mr. Milchovich is a member of the Compensation and Executive Development Committee of Delphi's Board of Directors. Mr. Milchovich is also a director of Foster Wheeler Ltd. and Nucor Corporation.

*Mr. Walker* was named chief executive officer of Global Brass and Copper, Inc. ("GBC") in November 2007. GBC recently acquired the worldwide metals business of Olin Corporation. Previously, he served as president and chief executive officer of The Boler Company, which operates under the name Hendrickson International and is one of the largest private companies in the country, from August 2003 until September 2006. Hendrickson International is a global independent provider of truck and trailer suspensions. From March 2000 to August 2003, he was chief operating officer, president, and chief executive officer for Weirton Steel Corp. Mr. Walker was also associated with the consulting firm McKinsey & Company in the mid-1980s. Mr. Walker is currently a member of the Audit Committee of Delphi's Board of Directors. Mr. Walker is also a director of United Airlines Corporation.

*Mr. Welch* is the executive vice president and chief financial officer of United Rentals, Inc., the largest equipment rental company in the world, having previously served as its interim chief financial officer from September 2005 until March 2006. Previously, Mr. Welch served as senior vice president and chief financial officer of Oxford Automotive, Inc., an automotive supply company, from May 2003 to January 2004. Mr. Welch served as director and business advisor to the private equity firm York Management Services from 2002 to 2005. Mr. Welch joined Kmart Corporation as chief financial officer in 1995 and served in that capacity until 2001. Mr. Welch is currently Chairman of the Audit Committee of Delphi's Board of Directors and a member of the Executive Committee of Delphi's Board of Directors. Mr. Welch is a member of the Board of Trustees of the University of Detroit Mercy.

### 2. *Executive Management Of Delphi*

The following persons comprise the executive management of Delphi.

#### (a) Corporate Officers

*Robert S. Miller, 66, Executive Chairman.* Mr. Miller was named executive chairman of Delphi Corporation effective January 2007. Mr. Miller served as chairman and chief executive officer of Delphi Corporation effective July 2005. Additional information about Mr. Miller's background may be found in the Board of Directors section above.

*Rodney O'Neal, 55, President and Chief Executive Officer.* Mr. O'Neal was named president and chief executive officer of Delphi Corporation effective January 2007. He was president and chief operating officer of Delphi Corporation from January 2005. Additional

information about Mr. O'Neal's background may be found in the Board of Directors section above.

*Mark R. Weber, 60, Executive Vice President, Global Business Services.* Mr. Weber was named executive vice president of Global Business Services effective July 2006. Previously, Mr. Weber served as executive vice president, Operations, Human Resource Management and Corporate Affairs for Delphi since January 2000. He is the executive champion for Delphi's Harley-Davidson Customer Team.

*John D. Sheehan, 48, Vice President* and *Chief Financial Officer.* Mr. Sheehan was named vice president and chief financial officer for Delphi Corporation effective October 3, 2008. Previously, he held the position of vice president and chief restructuring officer for Delphi Corporation beginning in October 2005. Mr. Sheehan served as acting chief financial officer from March 2005 to October 2005. Mr. Sheehan also served as chief accounting officer and controller from July 2002 through July 2006. Previously, he was a partner at KPMG LLP from 1995. His experience at KPMG LLP included 20 years in a number of assignments in the United States, England, and Germany.

*David M. Sherbin, 49, Vice President, General Counsel and Chief Compliance Officer.* Mr. Sherbin was named vice president and general counsel for Delphi Corporation effective October 2005. He was appointed chief compliance officer in January 2006. Prior to his position at Delphi, Mr. Sherbin was vice president, general counsel, and secretary for Pulte Homes, Inc, a national homebuilder, from January 2005 through September 2005. Prior to joining Pulte Homes, Inc., he was senior vice president, general counsel, and secretary for Federal-Mogul Corporation, a global automotive component supplier, from April 2003 through December 2004 and vice president, deputy general counsel, and secretary from March 2001 through March 2003. Mr. Sherbin serves on the Board of Directors of the Michigan Center for Civic Education.

(b)    Division Presidents

*James A. Bertrand, 51, Vice President, President, Delphi Automotive Holdings Group, and President, Delphi Thermal Systems.* Mr. Bertrand was named president of Delphi Automotive Holdings Group division, effective January 2004 and president of Delphi Thermal Systems, effective May 2008. Prior to these positions, Mr. Bertrand served as president of Delphi's Automotive Holdings Group division from January 2003 and president of Delphi's former Safety & Interior Systems division from January 2000. He has been a vice president of Delphi since 1998.

*Francisco A. Ordonez, 58, Vice President and President, Delphi Product & Service Solutions.* Mr. Ordonez was named vice president of Delphi Corporation and president of Delphi Product and Service Solutions division effective March 2002. Prior to holding that position, he had been general manager of Product & Service Solutions division since October 1999. Mr. Ordonez serves on the Board of Directors of the Motor Equipment Manufacturers Association (MEMA).

*Jeffrey J. Owens, 53, Vice President and President, Delphi Electronics & Safety and President, Delphi Asia Pacific.* Mr. Owens was named vice president of Delphi Corporation and

president of Delphi Electronics and Safety division effective September 2001. He also serves as president for Delphi Asia Pacific, effective July 2006. Previously, Mr. Owens served as general director of Business Line Management effective October 2000. Mr. Owens serves on the Engineering Advisory Board of Directors of Purdue University and the Central Indiana Corporate Partnership Board.

*Ronald M. Pirtle,* _54_, *Vice President and President, Delphi* _Powertrain_ *Systems* _and President, Delphi Europe, Middle East & Africa_. Mr. Pirtle was named president of Delphi Powertrain Systems and Delphi Europe, Middle East & Africa in May 2008. Previously, Mr. Pirtle served as president of Delphi Thermal Systems division effective July 2006 and president of the former Delphi Thermal & Interior division effective January 2004. Prior to that, he had been president of the former Delphi Harrison Thermal Systems division from November 1998. He has been a vice president of Delphi since 1998. Mr. Pirtle serves on the Advisory Board of Focus Hope of Detroit.

*Robert J. Remenar, 52, Vice President and President, Delphi Steering.* Mr. Remenar was named vice president of Delphi Corporation and president of Delphi Steering division effective April 2002. Prior to holding that position, he had been the executive director of business lines for Delphi's former Energy & Chassis division since January 2000.

*James A. Spencer*, _55,_ *Vice President and President, Delphi Packard Electrical/Electronic Architecture and President, Delphi South America and Mexico.* Mr. Spencer was named vice president of Delphi Corporation and president of Delphi Packard Electric/Electronic Architecture division, formerly Packard Electric Systems division, effective November 2000. He also serves as president for Delphi South America and Mexico effective July 2006.

(c)    Other Delphi Strategy Board Members

*John P. Arle,* _60,_ *Vice President and Treasurer.* Mr. Arle was named vice president of Delphi Corporation and treasurer in 2005. Previously he served as vice president in charge of corporate audit services from March 2002, and as vice president in charge of mergers, acquisitions, and planning since November 1998.

*Kevin M. Butler,* _53,_ *Vice President, Human Resource Management.* Mr. Butler was named vice president of Delphi Corporation, Human Resource Management in January 2000. Previously, he was the general director of human resources for Delphi Delco Electronics Systems. Additionally, Mr. Butler serves as the executive champion for Delphi's Personnel Task Team.

*Choon T. Chon,* _61,_ *Vice President and President, Delphi Asia Pacific.* Mr. Chon was named vice president of Delphi Corporation and president of Delphi Asia Pacific effective November 1, 2000. He previously served as the general director of Delphi Interior Systems, with responsibility for operations in Asia-Pacific, and in 1999 became president of Delphi Korea. In addition, Mr. Chon serves as the strategic customer champion for Delphi's Toyota, Honda, Isuzu, and Nissan customer teams. Mr. Chon will be leaving Delphi at the end of 2008.

*Karen L. Healy,* _54,_ *Vice President, Corporate Affairs, Marketing and Operations Support Group.* Ms. Healy was named vice president of Delphi Corporation, corporate affairs,

marketing and operations support group effective January 1, 2000.  She previously served as executive director of communications for Delphi from June 1997, and vice president in charge of corporate affairs from November 1998.  Additionally, Ms. Healy serves as the executive champion for Delphi's Corporate Affairs Task Team and is the chairman of the Delphi Foundation.

*Sidney Johnson, 46, Vice President, Global Supply Management.*  Mr. Johnson was named vice president of Global Supply Management for Delphi Corporation effective February 17, 2006.  He previously served as Director, North America Purchasing for Delphi Packard Electric Systems from March 2002, and Director, Global Supply Management for Delphi Packard Electric Systems from September 2003.  Additionally, Mr. Johnson serves as the executive champion for DGSM Task Team.

*Mark C. Lorenz, 57, Vice President, Global Transformation Program.*  Mr. Lorenz is vice president, Global Transformation Program of Delphi Corporation.  In November 1998, Mr. Lorenz was elected as a vice president in charge of PC&L for Delphi.  Effective January 1, 2000, Mr. Lorenz was named vice president of Operations and Logistics for Delphi.

*F. Timothy Richards, 54, Vice President, Electronics Group.*  Mr. Richards is vice president, Electronics Group.  He previously served as Delphi Harrison Thermal Systems' European managing director.  He was named executive director of business lines for Delphi Energy & Chassis Systems in May 2002 and vice president, sales and marketing effective January 1, 2004.

*Brian D. Thelen, 44, Vice President, Corporate Audit Services.*  Mr. Thelen is the vice president, Corporate Audit Services for Delphi Corporation.  Mr. Thelen joined Delphi in February 2006, having previously worked for Waste Management, Inc. as its vice president of internal audit services.

*Bette M. Walker, 65, Vice President and Chief Information Officer.*  Ms. Walker is vice president and chief information officer for Delphi Corporation.  Ms. Walker has been with Delphi since 1997, when she joined the organization as the global chief information officer for the company's largest division, Delphi Energy & Chassis Systems.

## IV.    HISTORICAL OVERVIEW OF DELPHI

This section provides information regarding:

- Delphi's history, including its heritage, separation from GM, formation of its labor agreements, and historical business operations

- The events that led to the deterioration of the Company's financial performance from 1999 to the commencement of its Chapter 11 Cases in October 2005

- The capital structure and corporate structure of the Debtors

## A.    Heritage



## B.    The Separation From GM

For most of its history, GM itself manufactured a large proportion of the parts used in its vehicles.  In 1991, GM combined its parts manufacturing facilities into a single parts division, which was originally known as the Automotive Components Group and eventually renamed Delphi Automotive Systems.  This division produced parts primarily for GM and, to a lesser extent, other automakers.  Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  On January 1, 1999, GM transferred the assets, liabilities, manufacturing sites, and most of the employees assigned to Delphi Automotive Systems to the newly-created Delphi Automotive Systems Corporation, a wholly-owned subsidiary of GM, pursuant to a Master Separation Agreement dated December 22, 1998 (and certain ancillary agreements), making Delphi an independent business.  As contemplated by GM and Delphi and as part of the Separation, in February 1999, shortly after Delphi's incorporation, while GM held a majority of seats on Delphi's Board of Directors, an initial public offering was conducted pursuant to which 17.7% of Delphi's stock was offered for sale to a combination of new investors and GM shareholders, and Delphi became a publicly-traded corporation.  On May 28, 1999, GM distributed Delphi's remaining stock to GM's shareholders.

The Form S-1 Registration Statement filed with the SEC on February 2, 1999 in connection with the separation from GM and Delphi's initial public offering identified several reasons supporting the Separation decision.  First, GM believed that the internal competition by its OEM and component businesses for GM's capital resources was not sustainable.  Accordingly, GM determined that its capital was best devoted to investing in the automobile manufacturing business rather than the component business in which Delphi was engaged.  Second, the S-1 stated that Delphi would increase its competitiveness over time by improving Delphi's labor contracts and relations and by establishing more favorable and flexible local work rules and practices.  This was very important to the continuation of Delphi's business because Delphi's workforce was heavily unionized.  Finally, GM believed that the Separation would maximize the value of Delphi to GM's shareholders because Delphi would be in a better position to win business from other OEMs if it were independent from GM.  Although Delphi began pursuing such independent business in the mid-1990s as a division of GM, it was essentially a captive supplier to GM's assembly plants worldwide.  GM and Delphi believed that many potential customers were reluctant to do business with another OEM, which limited Delphi's growth.  One of the assumptions upon which the Separation was based was that Delphi could eventually more than double its non-GM business if it were independent from GM.

As a result of the Separation, Delphi began operating as a company separate from GM's corporate structure, though GM continued to be Delphi's single largest customer.  At the time of the Separation, Delphi's non-GM customer revenue share was approximately 22%.  Subsequently, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Accordingly, as a percentage of sales from continuing operations, Delphi's total net sales to customers other than GM were 63% in 2007.

C.      OEM Pattern Labor Agreements

At the time of the Separation, Delphi was required to assume the labor agreements in effect between GM and each of its unions, including the UAW, IUE-CWA, and USW.  It was apparent at the time of the Separation that the GM labor agreements might be too costly for an independent parts supplier and limited the flexibility that Delphi needed to improve its operational performance.   The UAW agreements were subject to expiration beginning in September 1999, and the IUE-CWA agreements were subject to expiration in November 1999. The USW agreements in effect at the time of the Separation did not expire until September 2002. GM and Delphi anticipated that following the Separation, Delphi would be able to negotiate independently of GM, and that over time, Delphi would be able to negotiate local work rules and practices and other terms more typical of those generally prevailing in the automotive parts industry.

Prior to the Separation, there was no distinction between UAW-represented GM and Delphi employees – Delphi employees were GM employees.  The UAW publicly opposed the Separation, and after the Separation was announced, pledged to work aggressively to protect the rights and interest of its members.  According to its public statements, the reasons for the opposition included the UAW's concern that the Separation would put the retirement of Delphi employees at risk, result in lower wages or benefits for the new Delphi employees than for those received by their counterparts at GM, or result in the closure of unprofitable Delphi facilities.

Prior to the distribution of Delphi's stock to GM shareholders in May 1999, while Delphi was still majority-owned and controlled by GM, Delphi and GM representatives informed the UAW that, in an effort to help resolve the UAW's concerns over the Separation, Delphi would honor the "pattern" agreements negotiated between GM and the UAW in September 1999. In the course of finalizing the 1999-2003 agreement, however, the UAW sought Delphi's further commitment that Delphi would also "mirror," or duplicate, the next agreement between GM and the UAW, scheduled to be negotiated in 2003, asserting that without such commitment there was a risk that the 1999-2003 agreement would not be ratified. The UAW committed to consider mutually agreeable exceptions to the 2003 Delphi-UAW agreement to assure the continued success of Delphi as an ongoing business. Based on these mutual commitments, Delphi agreed to "mirror" the terms of the 2003 GM-UAW labor agreement (the "Mirror Agreement"). Due to unfavorable macroeconomic conditions which occurred, Delphi did not foresee the full impact of the Mirror Agreements on Delphi's future profitability and viability.

To further resolve the UAW's opposition to the Separation, GM executed with the UAW (and subsequently with the IUE-CWA and USW) a benefit guarantee agreement designed to provide protection of certain benefits for a period of time for certain former GM employees who became employees of Delphi (collectively, the "GM Benefit Guarantee").

### D.    Delphi's Historical Business Operations

As of October 8, 2005, the Debtors had approximately 50,600 employees. Those employees worked at over 40 manufacturing sites across 15 states, 13 technical centers, and at its world headquarters in Troy, Michigan. Approximately 34,750 of these employees were hourly employees, including production and skilled workers represented by the UAW, IUE-CWA, and USW at Delphi's manufacturing sites. The remaining approximately 15,850 employees were primarily salaried and management employees, including engineers engaged in designing and manufacturing Delphi's products, management employees at Delphi's U.S. manufacturing sites, and employees who perform Delphi's SG&A functions.

As of the Petition Date, Delphi was organized into three sectors:

- Electrical, Electronics, and Safety,

- Dynamics Propulsion, Thermal, and Interior, and

- Automotive Holdings Group.

Each sector had one or more operating divisions, and within each operating division Delphi had one or more "business lines" which in turn had different product lines.

***Electrical, Electronics, And Safety*** ("EE&S"). The EE&S sector consisted of Delphi's most profitable and fastest growing businesses and products and was the only sector that had been consistently profitable. EE&S's success was primarily due to the fact that electrical, electronic, audio, and communications components were becoming an increasingly large proportion of overall vehicle content. EE&S also expanded more than any other sector into consumer products, such as satellite radios and mobile video technology. Products developed,

produced, and sold in the EE&S sector included wiring systems and electrical architectures, automotive audio and communication systems, automotive powertrain electronics, and automotive safety systems.  EE&S had three divisions – Delphi Electronics and Safety, Delphi Packard Electric Systems, and Delphi Product and Service Solutions.

*Dynamics, Propulsion, Thermal, And Interior* ("DPT&I").  The DPT&I sector of Delphi's operations designed, manufactured, and sold engine management systems, chassis products, driveline products, steering products, thermal management systems, and interior systems.  DPT&I had three divisions – Delphi Energy and Chassis, Delphi Steering, and Delphi Thermal & Interior.

*Automotive Holdings Group.*  The AHG sector was formed to hold a collection of U.S. manufacturing sites that produced a variety of products, including spark plugs, air filters, fuel modules, air meters, instrument clusters, generators, ignition, brakes, and shock absorbers.  AHG also produced steering gears, halfshafts, and power steering hoses.  AHG historically underperformed financially.  The products within AHG were grouped to allow for targeted management focus on Delphi's long-standing goals of "fixing, selling, or exiting" unprofitable operations.

As of June 30, 2006, 29 of Delphi's U.S. manufacturing sites were staffed by employees covered by Delphi's collective bargaining agreements.  The manufacturing sites, their respective sectors, and the primary products manufactured at each site are listed below.

| Manufacturing Site | Sector | Primary Products |
|---|---|---|
| Adrian, Michigan | DPT&I | Instrument panels, HVAC assemblies |
| Anderson, Indiana | AHG | Remanufactured service generators, Ignition products |
| Athens, Alabama | AHG | Steering products |
| Brookhaven, Mississippi | EE&S | Wiring systems, Connection systems |
| Clinton, Mississippi | EE&S | Wiring systems, Connection systems |
| Columbus, Ohio | DPT&I | Power products, Latches |
| Coopersville, Michigan | DPT&I | Fuel injectors |
| Cottondale, Alabama | DPT&I | Cockpit assemblies |
| Fitzgerald, Georgia | AHG | Batteries |
| Flint, Michigan | AHG | Air filters, Fuel modules, Air meters, Air induction systems, Instrument clusters |
| Gadsden, Alabama | DPT&I | Instrument panels, Consoles |
| Grand Rapids, Michigan | DPT&I | Valve train products |
| Home Avenue—Dayton, Ohio | AHG | Engine mounts, Brake products |
| Kettering, Ohio | AHG | Suspension products, Fan clutches |
| Kokomo, Indiana | EE&S | Powertrain controllers, Airmeter electronics, Ignition electronics, Audio circuit boards, Audio peripherals, HVAC controllers, Sensors, Power modules, Integrated circuits, Crash sensing controllers |
| Laurel, Mississippi | AHG | Subassemblies for batteries, Actuators, Ignition Products |
| Lockport, New York | DPT&I | HVAC climate control systems, Powertrain cooling systems |
| Milwaukee, Wisconsin | DPT&I | Catalytic converters |
| Milwaukee, Wisconsin | EE&S | Powertrain controllers, Body and security products, Throttle control mechanisms |
| Moraine, Ohio | AHG | Air conditioning compressors |
| New Brunswick, New Jersey | AHG | Batteries |
| Needmore—Dayton, Ohio | AHG | Brake products |

| Manufacturing Site | Sector | Primary Products |
|---|---|---|
| Rochester, New York | DPT&I | Engine management systems |
| Saginaw, Michigan | DPT&I | Brake and chassis corner modules |
| Saginaw, Michigan | DPT&I | Steering products |
| Sandusky, Ohio | DPT&I | Wheel bearings, Roller clutch bearings |
| Vandalia, Ohio | DPT&I | Power products, Door modules, Instrument panels, Airbags, Steering Wheels, HVAC climate control assemblies |
| Warren, Ohio | EE&S | Wiring systems, Connection systems, Mechatronics |
| Wichita Falls, Texas | DPT&I | Conical oxygen sensors |

In connection with the Transformation Plan announced on March 31, 2006, as discussed in <u>Section V – Delphi's Transformation Plan</u>, effective July 1, 2006, Delphi realigned its business operations to focus its product portfolio on core technologies for which Delphi believed it had significant competitive and technological advantages.  As part of this realignment, seven sites were transferred to AHG, two sites were transferred from AHG to Steering, and two other sites were targeted for consolidation.











**Shared Services**
Leader: Mark Weber
- Corporate Affairs
- Facilities
- Financial Transaction Services
- Human Resources Administration
- Information Systems
- Marketing Communications
- Operations
- Sales Administration





Steering, which includes steering, halfshaft, and column technology, was previously a separate operating segment.  Delphi identified the steering and halfshaft product line as a non-core business and entered into agreements to sell the Steering business.  On February 25, 2008, the Bankruptcy Court entered an order authorizing Delphi to sell its Steering business.  Steering is now reported in discontinued operations for accounting purposes.

E.      **Events Leading To Commencement Of The Chapter 11 Cases And Historical Financial Results**

In 1999 and 2000, Delphi generated more than $2 billion in net income.  Every year thereafter, however, with the exception of 2002, Delphi suffered losses.

Delphi's customer base has changed substantially since the Separation.  At the time of the Separation, approximately 78% of Delphi's sales were to GM, primarily to GM's North American operations.  By the end of 2005, Delphi's total revenue from GM had declined from $22.3 billion in 1999 to approximately $12.8 billion, while Delphi's non-GM revenue had increased from $6.9 billion in 1999 to approximately $14.1 billion.

Diversification of Delphi's customer base, however, did not curb Delphi's financial losses.  In the first two years following the Separation, Delphi earned net income of approximately $1.0 billion in 1999 and $817 million in 2000.  In 2001, however, as the entire industry suffered the after-effects of the terrorist attacks of September 11, Delphi's financial performance began to deteriorate steadily.  Although Delphi's global operations remain profitable to this day, as a result of steadily increasing losses in the U.S., Delphi has not had a net profit on a consolidated basis since 2002.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales (with a net operating loss of $482 million).  The net losses reflect a $4.1 billion income tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004 and a $456 million charge primarily related to employee and product line charges.  Reflective of a continued downturn in the marketplace, in 2005, Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Delphi's losses arose primarily from its U.S. operations.  Delphi's U.S. manufacturing sites, collectively, had operating losses of $700 million in 2003, $1.6 billion in 2004, and $2.2 billion in 2005.

Delphi identified three significant issues that largely contributed to the deterioration of the Company's financial performance: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively-bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which had the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for U.S. OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.  The effects of each of these issues is discussed in more detail below.

1.      *U.S. Legacy Liabilities And Operational Restrictions*

At the time of Delphi's chapter 11 reorganization filing, the majority of the Debtors' U.S. collective bargaining agreements provided for wages and benefits, including pension plans, retiree health care, and other benefits, that were well above market, and also contained certain operating restrictions that limited Delphi's ability to compete effectively with its U.S. peers.  As discussed above, in connection with the Separation, Delphi was required to assume the terms and conditions of the collective bargaining agreements negotiated by its unions and GM.  Delphi was the only U.S. auto supplier with an OEM assembly pattern labor agreement, which resulted in unsustainable, inflexible, and uncompetitive costs and liabilities.  Consequently, during the time

of Delphi's chapter 11 reorganization filing in 2005, the Debtors compensated their hourly workers an average of approximately $75 per hour, including benefits and legacy liabilities – over three times the hourly labor rates of its U.S. peer companies.

The Debtors estimate that the unfunded liabilities at the end of calendar year 2004 for Delphi's U.S. hourly pension and other post-employment benefits, including without limitation retiree health care and life insurance (collectively, "OPEB"), were approximately $10.4 billion, of which approximately $2.6 billion was on account of the Debtors' unfunded hourly pension obligations and $7.8 billion was on account of the Debtors' OPEB obligations to their hourly workers.  Prior to the chapter 11 filings, the Company projected that cash outflows for hourly pension contributions and OPEB payments through 2007 would be approximately $1.7 billion and would increase geometrically thereafter as a result of the projected retirement of Delphi's U.S. workforce in the years to come.

In addition, under the terms of Delphi's collective bargaining agreements with its U.S. Unions, Delphi was generally not permitted to permanently lay off idled workers.  Coupled with restrictions on Delphi's ability to exit non-strategic, non-profitable operations, the magnitude of the cost of carrying idled, non-productive workers in the event of plant closings or winddowns effectively prevented Delphi from addressing poor product portfolio businesses and non-profitable manufacturing operations.  Historically, under the terms of the Separation from GM, this problem was somewhat mitigated because Delphi's UAW employees were permitted to return to GM's employ (known as "flowback") under certain conditions.  As a result of GM's lower production volumes, however, the opportunities for Delphi's employees to flow back to GM were limited.

## 2.    *Competitive U.S. Vehicle Production Environment For U.S. OEMs*

In light of the economic climate in the U.S. automotive industry, Delphi faced considerable challenges due to revenue decreases and related pricing pressures stemming from a substantial slowdown in GM's North American vehicle production.  Although Delphi showed steady growth of its non-GM business for the first six months of 2005 and non-GM sales exceeded sales to GM for the first time, these gains were outpaced by the decrease of Delphi's GM sales.  As of October 8, 2005, GM still comprised approximately 49% of Delphi's sales, and GM sales for the first six months of 2005 were down by approximately $1.6 billion, an 18.9% year-over-year decline, thereby adversely affecting the Company's financial performance.

## 3.    *Increasing Commodity Prices*

During the first six months of 2005, Delphi faced substantial commodity cost increases, most notably for steel and petroleum-based resin products.  Delphi continued to work proactively with suppliers and customers to manage these cost pressures, including seeking alternative product designs and material specifications, combining the Company's purchase requirements with customers and suppliers, and changing suppliers.  Despite these efforts, however, raw material supply continued to be constrained and commodity cost pressures continued to intensify as Delphi's supply contracts were set to expire during 2005.  To the extent Delphi experienced cost increases, the Company attempted to pass those cost increases on to customers.  In the months leading up to the Petition Date, due to previously established contractual terms, Delphi

had limited success in passing commodity cost increases on to customers.  In the future, if Delphi is unable to continue to pass some of these cost increases on to customers, Delphi's income will be adversely affected.

### F.    Decision To Seek Relief Under The Bankruptcy Code

In light of the factors described above, Delphi determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward looking revenue requirements.  Delphi was aware that to settle these issues, it would be imperative to reach agreements with its Unions and GM.  Accordingly, in the six-month period prior to the Petition Date, Delphi intensified its efforts to engage its Unions and GM in discussions seeking consensual modifications to the collective bargaining agreements that would permit Delphi to align its U.S. operations to its strategic portfolio and be competitive with its U.S. peers.  In addition, Delphi sought to obtain financial support from GM to implement Delphi's restructuring plan.  Despite significant efforts during 2005 to reach a resolution with these parties, Delphi determined that the discussions with the Unions and GM were not leading to the implementation of a plan sufficient to address these critical issues on a reasonable timetable.  Thus, to preserve value for all stakeholders, Delphi decided to commence these Chapter 11 Cases for its U.S. businesses.

None of Delphi's foreign subsidiaries is a debtor in these Chapter 11 Cases, and, with the exception of one of Delphi's wholly-owned indirect Spanish subsidiaries, none of Delphi's foreign subsidiaries commenced any reorganization, bankruptcy, or insolvency cases.  Delphi's foreign entities are separate legal entities under the direction of local management and are distinct from the U.S. operations.  Generally, Delphi's non-U.S. businesses are competitive with those of their peers, have positive cash flow, and are experiencing high growth opportunities. Moreover, the foreign subsidiaries do not materially rely on funding from the U.S. entities.

### G.    Prepetition Capital Structure Of The Debtors

The Debtors' chapter 11 petitions listed consolidated global assets and liabilities, as of August 31, 2005, of approximately $17.1 billion and $22.2 billion, respectively.   Delphi had $3.9 billion in outstanding debt as of June 30, 2005, of which $3.4 billion was long-term debt. The Debtors' prepetition obligations consisted primarily of the following:

#### 1.    Prepetition Credit Facilities

##### (a)    Revolving Credit Facility

Throughout 2004, Delphi had two financing arrangements with a syndicate of lenders providing for an aggregate of $3.0 billion in available revolving credit facilities.  These revolving credit facilities were comprised of a five-year revolving credit line in the amount of $1.5 billion, expiring in June 2009, and a 364-day revolving credit line in the amount of $1.5 billion.  On June 14, 2005, Delphi reached an agreement with its lending syndicate to refinance its $3.0 billion in available revolving credit facilities with an amended and restated $1.825 billion secured revolving credit facility and a new $1.0 billion secured six-year term loan.  To accomplish this refinancing, Delphi terminated its 364-day revolving credit line and amended the terms of its existing $1.5 billion five-year revolving credit facility (the "Revolving Credit Facility") to

increase, among other things, the available credit under that credit facility to $1.825 billion. The Revolving Credit Facility carried a variable interest rate of 500 basis points above the London Interbank Borrowing Rate ("LIBOR") on outstanding borrowings, subject to adjustment based upon Delphi's credit ratings. On August 3, 2005, Delphi drew down $1.5 billion under the Revolving Credit Facility. Additionally, as of September 30, 2005, Delphi also had approximately $91 million in letters of credit outstanding against the Revolving Credit Facility, which remained outstanding as of the Petition Date.

(b)   <u>Term Loan</u>

In connection with its amendment of the Revolving Credit Facility, Delphi also added a $1.0 billion secured six-year term loan (the "Term Loan") that required interest payments during the term at a variable interest rate of 650 basis points above LIBOR and had a 1% per annum amortization for the first five years and nine months with the then-outstanding principal and any accrued and unpaid interest due in full at the end of the term, on June 14, 2011. The Term Loan was fully drawn as of June 30, 2005 and the proceeds of the Term Loan were used for funding pension contributions, paying down short-term debt, and other general corporate purposes. Delphi prepaid approximately $9.2 million of its Term Loan in early September 2005, and on October 7, 2005, Delphi paid down about an additional $1.8 million. All such repayments represented proceeds from the sale of certain assets of the Company. In addition, Delphi made a regularly scheduled quarterly amortization payment of approximately $2.5 million on September 30, 2005.

<b>2.     Senior Unsecured Debt</b>

Delphi also had $2.0 billion in senior unsecured securities (the "Senior Notes"), plus unpaid interest, outstanding as of the Petition Date. The Senior Notes were issued under the indenture, dated as of April 28, 1999, between Delphi Automotive Systems Corporation (Delphi's predecessor in interest) and The First National Bank of Chicago. As of the Petition Date, four series of the Senior Notes were issued and outstanding: (i) $500 million of the 6.55% notes due June 15, 2006, (ii) $500 million of the 6.50% notes due May 1, 2009, (iii) $500 million of the 6.50% notes due August 15, 2013, and (iv) $500 million of the 7.125% notes due May 1, 2029.

<b>3.     Junior Subordinated Notes And Trust Preferred Securities</b>

Delphi's wholly-owned non-debtor subsidiaries, Delphi Trust I ("Trust I") and Delphi Trust II ("Trust II"), issued trust preferred securities in 2003. Trust I issued ten million shares of 8.25% Cumulative Trust Preferred Securities (the "Cumulative Trust Preferred Securities") with a liquidation amount of $25 per Trust Preferred Security and an aggregate liquidation preference amount of $250 million. The sole assets of Trust I were $257 million of aggregate principal amount of Delphi junior subordinated notes due 2033. Trust II issued 150,000 shares of Adjustable Rate Trust Preferred Securities (the "Adjustable Rate Trust Preferred Securities" and, collectively with the Cumulative Trust Preferred Securities, the "Trust Preferred Securities" or "TOPrS") with a five-year initial rate of 6.197%, a liquidation amount of $1,000 per Trust Preferred Security, and an aggregate liquidation preference amount of $150 million. The sole assets of Trust II were $155 million of aggregate principal amount of Delphi junior subordinated

notes due 2033.  Neither Trust I nor Trust II sought chapter 11 protection.  Pursuant to the Amended and Restated Declarations of Trust for Trust I and Trust II, Delphi's filing of a chapter 11 petition was an "Early Termination Event."  On November 14, 2006 the property trustee of each Trust liquidated each Trust's assets and distributed to each holder of the Trust Preferred Securities a pro rata share of each Trust's respective junior subordinated notes issued by Delphi.

### 4.        Other Material Debt Obligations

Prior to the Petition Date, Delphi also maintained a revolving accounts receivable securitization program in the U.S. (the "U.S. Facility Program").  Under the U.S. Facility Program, certain receivables, related securities, and collections (collectively, the "Receivables") generated by Delphi, Delphi Automotive Systems LLC ("DAS LLC"), and Delco Electronics LLC (which was subsequently merged into DAS LLC) were sold and assigned to Delphi Receivables LLC, which in turn sold and assigned the Receivables to the parties to a Receivables Purchase Agreement.  In March 2005, the U.S. Facility Program, which would have expired on March 22, 2006, was amended to allow Delphi to maintain effective control over the Receivables. In June 2005, the U.S. Facility Program was further amended to add a new co-purchaser to the program, to adjust the borrowing limit to $730 million, and to conform the leverage ratio financial covenant to be consistent with the amended facilities covenant.  On October 6, 2005, the Debtors gave notice of their election to terminate the U.S. Facility Program pursuant to the terms of the relevant agreements upon the earlier of October 11, 2005 and the occurrence of an amortization event.   The commencement of these Chapter 11 Cases constituted such an amortization event.   And the U.S. Facility Program was thereby terminated.   As of the Petition Date, there were no outstanding amounts under the U.S. Facility Program.

### 5.        Equity

As of June 30, 2008, there were 564,635,299 shares of common stock of Delphi outstanding.  Prior to October 11, 2005, Delphi's common stock was listed on the New York Stock Exchange (the "NYSE").  On October 11, 2005, the NYSE announced the suspension of trading of Delphi's common stock trading under the symbol "DPH".  This action followed the NYSE's announcement on October 10, 2005 that it was reviewing Delphi's continued listing status in light of Delphi's announcements involving the filing of voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code.  The NYSE subsequently determined to suspend trading based on the trading price for the common stock, which closed at $0.33 on October 10, 2005, and completed delisting proceedings on November 11, 2005. Delphi's common stock is being traded on the Pink Sheets under the symbol "DPHIQ" and is no longer subject to the regulations and controls imposed by the NYSE.  Pink Sheets is a centralized quotation service that collects and publishes market maker quotes for over the counter ("OTC") securities in real time.  Delphi's listing status on the Pink Sheets is dependent on market makers' willingness to provide the service of accepting trades to buyers and sellers of the stock.  Unlike securities traded on a stock exchange, such as the NYSE, issuers of securities traded on the Pink Sheets do not have to meet any specific quantitative and qualitative listing and maintenance standards.

### H.    Prepetition Corporate Structure Of Delphi's U.S. Entities

At the time of the Debtors' filing for chapter 11 reorganization, Delphi's U.S. entities had the following corporate structure.



## V.    DELPHI'S TRANSFORMATION PLAN

This section provides a summary of the five key elements of Delphi's Transformation Plan announced on March 31, 2006.  The progress on each element of the Transformation Plan is also discussed below.

The material modifications to the discussion of the Transformation Plan since the December 2007 Disclosure Statement are:

- Adjustments to the size and timing of the IRC Section 414(l) Transfer that is incorporated in the labor, GM, and pension elements of the Transformation Plan

- Modifications to the Settlement and Restructuring Agreements with GM to accommodate adjustments to the distributions made to GM under the Modified Plan, the 414(l) Transfer, commercial arrangements, and effectiveness of the agreements

- Adjustments to the Salaried Employee Compensation Program based on the Bankruptcy Court's ruling in connection with the Confirmed Plan

- Modifications to Delphi's pension funding strategy through the implementation of the transfer of pension liabilities to GM and a freeze of various of the pension plans

## A.    The Transformation Plan

Since the commencement of these Chapter 11 Cases, the Debtors have been focused on identifying and resolving certain key issues so that they can successfully emerge from chapter 11 and return to profitability.    On March 31, 2006, Delphi outlined the key tenets of its Transformation Plan that the Company believed would enable it to return to stable, profitable business operations.  Much of the effort throughout these Chapter 11 Cases has been focused on meeting the goals outlined in the Transformation Plan.

Following the events of April 4, 2008, the Debtors continued to achieve aspects of the Transformation Plan that the Debtors previously contemplated would not be effective until emergence from chapter 11, and to enhance previously achieved aspects of the Transformation Plan to make the Debtors' restructuring even more comprehensive.  The Debtors believe that these accomplishments were necessary to bring them to successful emergence and to enable their profitable operation post-emergence.

To complete its Transformation Plan, Delphi identified five key areas for change as illustrated below.



Delphi has made significant progress in achieving the objectives of its Transformation Plan and is now poised to emerge from chapter 11.  First, with respect to the modification of its labor agreements, Delphi has been able to significantly lower its hourly labor costs by entering into modified collective bargaining agreements with each of its Unions in 2007.  Portions of these agreements have already become effective both prior to and as a result of the consummation of the Amended GSA and Amended MRA, as defined below, and certain portions will become effective upon the consummation of the Modified Plan.

Second, Delphi has entered into comprehensive settlement and restructuring agreements with GM and most of the provisions of these agreements became effective on September 29, 2008. These agreements will support Delphi's business plan going forward and provide for GM to make an estimated net contribution having a value of approximately $10.6 billion to Delphi's restructuring.

Third, with respect to its product portfolio and manufacturing facility realignment, as shown by the illustration below, Delphi has also been successful in streamlining its product portfolio, aligning its manufacturing capabilities to focus on its market strengths, and developing "Safe, Green, & Connected" products.



The Debtors have sold or wound down non-core product lines and manufacturing sites identified in March 2006 and are continuing their efforts to sell certain non-core product lines. For example, during the first six months of 2008 alone, Delphi obtained Court approval of bidding procedures and sales agreements for the steering and halfshaft product line and closed on the sales of the interiors and closures product line, the North American brake components machining and assembly assets, and the global bearings business. Additionally, under an order providing Delphi with authority to sell certain assets that do not exceed $10 million without further Court approval, Delphi entered into an agreement to sell its power products business.

Fourth, Delphi has implemented and is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services, information technology and certain sales administration outsourcing activities, reduction of its global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of certain salaried benefit programs to bring them in line with more competitive industry levels. Although there is an investment required to implement these initiatives, Delphi expects to realize substantial savings in 2009 and beyond.

Fifth, Delphi has substantially achieved its pension funding strategy objectives for hourly employees through the transaction under the Internal Revenue Code of 1986 (the "IRC"), Section 414(l), and Section 208 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA").  With respect to its salaried employees, Delphi froze the salaried pension plan and implemented replacement plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

As a result of its progress in achieving the goals of its Transformation Plan, Delphi has been able to formulate a business plan going forward that should allow it to return to profitability.

The differences between the business operation of Delphi from the time of its chapter 11 filing in 2005, its present state of transformation in mid-2008, and its expected 2009 state, on a post-emergence basis, are striking:

| | Pre-Transformation | Current Progress | Post-Transformation |
|---|---|---|---|
| Year | 2005[1] | June YTD 2008[1] | 2009 RPOR 8/08 |
| Product Line Businesses | 27 | 21 | 16 |
| U.S. Plants | 37[2] | 14 | 8 |
| U.S. Hourly Cost / Hour | $73 / hour | > $40 / hour | ~ $27 / hour |
| Manufacturing % of Revenue | 30% | 25% | 19% |
| U.S. Hourly Employment | 32,869 | 10,665[3] | < 5,000 |
| U.S. Salaried Employment | 14,542 | 10,243 | < 7,700 |
| SG&A Expense[4] | $1.64 B | $0.70 B | $1.07 B |
| Number of Suppliers | > 5,000 | ~ 3,200 | ~ 2,700 |
| Capital Investment | $1.1 B | $0.5 B | $0.7 B |
| GMNA % of Revenue | 40% | 22% | 18% |
| Non-GM % of Revenue | 52% | 67% | 74% |
| Non-N.A. % of Revenue | 32% | 56% | 61% |

[1] 2005 and June YTD 2008 metrics include total Delphi operations including those units classified as "Discontinued" for external financial reporting
[2] Excluding idled sites
[3] Excluding active pre-retirement program participants
[4] SG&A metrics exclude one-time transformation related charges

Upon the conclusion of the reorganization process, the Debtors expect to emerge with a stronger, more financially sound business with U.S. operations that are globally integrated and well-positioned to advance enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company plans to preserve and continue the strategic growth of its non-U.S. operations and will seek to maintain its prominence as the world's premier auto supplier.

### B.    The Paths To Delphi's Transformation

On March 31, 2006, the same day that Delphi announced the Transformation Plan, the Debtors also announced that they were pursuing a dual track process for achieving key aspects of the Transformation Plan by commencing proceedings under sections 1113 and 1114 of the Bankruptcy Code for authority to reject their U.S. labor agreements and to modify retiree benefits, and simultaneously filing a motion to reject unprofitable supply contracts with GM. See Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (Docket No. 3035) (the "1113/1114 Motion") and Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033) (the "GM Contract Rejection Motion"). Although the Debtors determined that it was necessary to file these two motions, Delphi continued to work diligently to obtain consensual agreements with its Unions and GM. In fact, the hearings on the 1113/1114 Motion and the GM Contract Rejection Motion were scheduled to

commence five weeks after the filing of the motions so that the parties could continue to work on consensual agreements before the hearings.

On May 9, 2006, the hearing on the Debtors' 1113/1114 Motion commenced. The initial phase of the hearing on the 1113/1114 Motion spanned nearly a month, with eight trial days during which the Debtors presented the testimony of 12 witnesses. On June 5, 2006, following the close of the Debtors' direct case, the contested hearing on the 1113/1114 Motion was adjourned, along with the scheduled hearing on the GM Contract Rejection Motion, initially for a 60-day period. The adjournment period permitted the Debtors and their professionals to focus their attention on negotiations with key stakeholders.

In August 2006, the Debtors convened a series of meetings with the statutory and certain ad hoc committees to update them on Delphi's Transformation Plan, the Company's discussions with GM, and potential strategies for further litigation of the 1113/1114 Motion and the GM Contract Rejection Motion. At the meetings, the Debtors presented the committees with six approaches to execute the Transformation Plan. Paths one, two, and three contemplated reaching near-term resolutions with the Unions and GM. Paths four, five, and six were based on the assumption that a resolution with the Unions and GM could not be achieved quickly.



The Debtors, the Creditors' Committee, and the Equity Committee agreed that reaching a near-term resolution with the Unions and GM would be the preferred path, but had different views on which of the first three paths to take in reaching the near-term resolution. The Debtors recommended pursuing "Path 1." Path 1 would require an agreement with the Unions and a "bifurcated" GM agreement, which would outline GM's contribution to the Debtors' restructuring and grant GM a release while saving for a later date the issue of GM's claims against the Debtors' Estates. The next steps on Path 1 would be the suspension of the 1113/1114 Motion and the GM Contract Rejection Motion and the negotiation of the GM claims and Delphi's plan of reorganization.

Neither the Statutory Committees nor GM favored the Path 1 approach and instead preferred the course of action outlined in "Path 3." Delphi received clear and unequivocal input

from GM that it would not explore a consensual path that did not include the determination of GM's net exposure to the Debtors (including any recovery by GM on its claims against the Debtors' Estates). Similarly, the Statutory Committees indicated clearly that they would not consider a settlement with GM (and compromise of the Debtors' claims against GM) prior to a determination of anticipated recoveries for creditors and equity interests. Path 3 involved comprehensive agreements with both GM and the Unions, which would allow for the dismissal of the 1113/1114 Motion and the GM Contract Rejection Motion, followed by the completion of a reorganization plan that would be consensual or contested depending on overall stakeholder support.

Following the meetings of August 2006, in communications from the principals of the Creditors' Committee, Delphi was encouraged to take a leadership role in fostering discussions to explore the comprehensive Path 3 resolution. Accordingly, the Company set a course to resolve the GM and labor issues through the commencement of "framework" discussions. Because of the need to determine GM's net exposure as well as the Statutory Committees' expected recovery in any comprehensive resolution, the framework discussions on those issues ran in parallel with (and ultimately ahead of) discussions on a labor resolution.

## C.    The Framework Discussions

Very early in the framework discussions, GM and the Creditors' Committee agreed on creditor recoveries of "par plus accrued at Plan value," that is, payment of claims in full (with interest) with cash and common stock in the reorganized entity ("Reorganized Delphi") valued at a negotiated total enterprise value. This principle guided the Debtors' reorganization efforts up until the Plan Investors' breach of the Investment Agreement on April 4, 2008. Although GM and the Creditors' Committee were able to reach agreement in a relatively short period of time regarding the level of potential recoveries for creditors, GM and the Creditors' Committee spent a significant amount of time discussing what a "par plus accrued at Plan value" recovery would mean in practice and how such a recovery could be accomplished. Nevertheless, by August 17, 2006, the Debtors viewed the progress made in the Framework Discussions as significant and informed the Bankruptcy Court that the parties to the 1113/1114 Motion had agreed to adjourn the motion to September 20, 2006.

In September 2006, the Equity Committee and Appaloosa, as a significant holder of Delphi equity, were able to generate support among the various stakeholders for recoveries on behalf of equity security holders which would be realized, at least partially, through a rights offering. To realize these potential recoveries, however, the framework discussions still needed to address the labor issues, the GM issues, and the business plan for the Company that would support these desired recoveries. The Debtors and other stakeholders realized that the settlement of the Transformation Plan issues, and the GM claims in particular, would be necessary for any value to be distributed to junior stakeholders. The Debtors, as well as the other participants in the framework discussions, also agreed that an outside plan investor in some form would be necessary to achieve the expected results.

D.    **Negotiation Of The Original Framework Agreements**

By late November 2006, the Debtors and the Original Investors (defined below) began working on documenting their agreements.  Prior to that time period, various groups had circulated and commented on draft "term sheets" outlining potential agreements for the framework for a plan of reorganization (the "Framework Agreements") and discussion points related to the Framework Agreements.  Both the Equity Committee and the Creditors' Committee actively reviewed and commented on the "term sheets" and many of their discussion points were incorporated in the Framework Agreements.  After late November and early December 2006, the Creditors' Committee declined to comment further on the Framework Agreements, despite several invitations from the Debtors to do so.  The Equity Committee did continue to comment on the Framework Agreements, and the Debtors continued to carefully evaluate each of its comments.

On December 11, 2006, Delphi's management presented to the Board for approval an investment agreement and plan support agreement.  These agreements were fully negotiated and were the most favorable agreements that management at that time believed it could reasonably achieve under the circumstances through arms-length bargaining.  After a full discussion with the management team and its advisors, the Board approved and authorized the Company to enter into these agreements.  Taking into account the transaction as a whole, including the fact that it could facilitate an emergence from chapter 11 in an orderly fashion and in an acceptable timeframe (of critical importance in preserving the value of the estate), as well as the importance of having GM publicly committed to certain plan framework support agreements, the Debtors concluded that the benefits to the Debtors' Estates of entering into the agreements outweighed the burdens imposed under the agreements.

On December 18, 2006, Delphi announced that it had entered into a Plan Framework Support Agreement (the "PSA") with the original plan investors (which was comprised of the Plan Investors, excluding Goldman Sachs & Co. ("Goldman Sachs"), but including Cerberus Capital Management, L.P. (the "Original Investors")) and GM, which outlined a framework plan of reorganization, including an outline of the proposed financial recovery of the Company's stakeholders and the treatment of certain claims asserted by GM, the resolution of certain pension funding issues, and the corporate governance of Reorganized Delphi. The PSA, as well as the economics and structure of the plan framework itself, was expressly conditioned on reaching consensual agreements with the Unions and GM.

On the same date, the Debtors filed a motion (the "Framework Motion") with the Bankruptcy Court seeking approval of the PSA and an Equity Purchase and Commitment Agreement (the "Original EPCA") among the Company and the Original Investors under the terms and subject to the conditions of which the Original Investors would invest up to $3.4 billion in reorganized Delphi.

The Framework Motion drew immediate objections from, among others, the Creditors' Committee and the Equity Committee, as well as the ad hoc trade committee.  In addition, on December 21, 2006, the Debtors received an unsolicited investment proposal from Highland Capital Management L.P. ("Highland").  Due to the objections and the unsolicited proposal, the Debtors agreed to postpone the hearing on the Framework Motion from January 5 to January 11,

2007.  Through a series of negotiations spanning the Christmas and New Year holidays, the Debtors were able to clarify certain ambiguities in and make certain changes to the PSA and the Original EPCA.  As a result, the Creditors' Committee and the ad hoc trade committee withdrew their objections.  Ultimately, however, the hearing on the Framework Motion was contested by the Equity Committee and Highland and featured testimony from, among others, Delphi's Chairman and Chief Restructuring Officer.  On January 12, 2007, the Bankruptcy Court authorized the Debtors to enter into the Original EPCA and approved the PSA.  The Debtors entered into the Original EPCA on January 18, 2007.

The Debtors' entry into the Original EPCA and PSA marked a significant milestone in these Chapter 11 Cases.  In addition to providing a key equity component of the Debtors' exit financing, the entry into the Original EPCA and PSA allowed the Debtors to suspend the 1113/1114 Motion and the GM Contract Rejection Motion, which allowed the Debtors, the Unions, GM, and the Original Investors to focus on more productive discussions with the Unions and GM.  These discussions ultimately led to the consensual resolutions with the Unions and GM that laid the groundwork for the Debtors' emergence from chapter 11.

### E.    Labor Transformation

#### 1.    The 1113/1114 Motion

When it filed the 1113/1114 Motion, Delphi had approximately 47,400 employees in the United States, of whom approximately 33,100 were production and skilled employees, a majority of which were represented by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE at Delphi's manufacturing sites.  Of these employees, approximately 23,317 were represented by the UAW, approximately 8,514 were represented by the IUE-CWA, approximately 889 were represented by the USW, and approximately 124 were represented by the IAM, IBEW, and IUOE.

As outlined in more detail above in Section IV– Historical Overview Of Delphi, the costs associated with Delphi's collective bargaining agreements led Delphi to conclude that it must deal with the legacy labor costs as part of its restructuring.  After attempts to reach consensual agreements with its Unions were unsuccessful, the Debtors filed the 1113/1114 Motion.

#### 2.    The Attrition Programs

Notwithstanding the 1113/1114 Motion, throughout these cases, Delphi consistently communicated a clear message to its hourly workforce that it was committed to finding a consensual labor resolution.  An example of that commitment was Delphi's consensual reduction of the size of its hourly workforce through negotiated attrition programs, implemented with the assistance of GM.  On March 22, 2006, Delphi, GM, and the UAW entered into a three-party agreement establishing a special attrition program (the "UAW Special Attrition Program"), under which certain eligible Delphi U.S. hourly employees represented by the UAW were offered normal and early voluntary retirements with a $35,000 lump sum incentive payment paid by Delphi and reimbursed by GM. The program also provided a pre-retirement program for employees with at least 27 and fewer than 30 years of credited service. In addition, employees who elected to participate were eligible to retire as employees of Delphi or to flow back to GM and retire.  On May 8 and 12, 2006, the Bankruptcy Court entered orders approving the UAW

Special Attrition Program.  During late spring and early summer, Delphi and the UAW negotiated a supplemental agreement to the foregoing attrition program.  The UAW supplemental agreement expanded the UAW Special Attrition Program to include a pre-retirement program for employees with 26 years of credited service and provided buyouts for UAW-represented hourly employees.  The buyout payments, depending on the amount of seniority or credited service, ranged from $40,000 to $140,000. GM agreed to reimburse Delphi for one-half of these buyout payments and in exchange received an allowed prepetition general unsecured claim.

On June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition program (the "IUE-CWA Special Attrition Program") that substantially mirrored the UAW Special Attrition Program, as later supplemented.  The cash cost of the lump sum incentive payments of $35,000 per eligible IUE-CWA-represented employee and one-half of the $40,000 to $140,000 buyout payments would be paid by Delphi and reimbursed by GM.  GM received an allowed prepetition general unsecured claim equal to the amount it reimbursed Delphi for the buyout payments.  On July 7, 2006, the Bankruptcy Court entered an order approving the IUE-CWA Special Attrition Program and the supplement to the UAW Special Attrition Program.

Approximately 21,800 U.S. hourly employees represented by the UAW were eligible for buyout payments, with approximately 14,700 of those employees eligible to participate in the retirement and pre-retirement programs.  As of September 26, 2006, approximately 12,400 of Delphi's UAW-represented employees, representing approximately 84% of the retirement-eligible UAW workforce, opted to retire by January 1, 2007.  During 2007, approximately 1,300 employees eligible to participate in the attrition programs elected to leave Delphi.

Approximately 7,500 U.S. hourly employees represented by the IUE-CWA were eligible for buyout payments, with approximately 3,200 of those employees eligible to participate in the retirement and pre-retirement programs.  As of August 18, 2006, approximately 6,200 IUE-CWA-represented Delphi employees, representing approximately 82% of the eligible IUE-CWA-represented workforce, opted to participate in the attrition program.  Although these special hourly attrition programs provided nearly two-thirds of Delphi's existing UAW and IUE-CWA-represented long-term hourly employees (as of September 26, 2006 and August 18, 2006, respectively) with "soft landings" through a combination of retirement programs, attrition programs, and GM flowbacks, the attrition programs did not resolve the issues related to Delphi's uncompetitive labor agreements.

As a result, following the adjournment of the 1113/1114 Motion and throughout the subsequent months, Delphi, the Unions, and GM continued to negotiate in an attempt to modify the Unions' collective bargaining agreements.  In June, July, and August 2007, Delphi reached major milestones with the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE by entering into memoranda of understanding with these unions and GM as described more fully below.  As a result of these settlement agreements, on September 4, 2007, the Bankruptcy Court entered an order withdrawing the 1113/1114 Motion without prejudice, subject to the Bankruptcy Court's prior settlement agreement approval orders.

### 3. *Labor Settlement Agreements*

The labor settlements with Delphi's Unions provided certainty with respect to future labor costs and allowed Delphi to formulate this important aspect of its post-emergence business plan. The benefits of the various labor settlements are summarized briefly in the chart below, and more detailed terms of each settlement follow. As set forth after these summaries, certain terms of the settlement agreements have been modified by implementation agreements among Delphi, the Unions, and GM. In all cases, the summary of the settlement agreements and implementation agreements set forth below is qualified entirely by and is subject to the actual terms and conditions of the respective settlement agreement or implementation agreement. Capitalized terms used and not otherwise defined in those summaries set forth below have the meanings ascribed to them in the respective settlement agreements and implementation agreements.

| Union | Non-Competitive Terms | Transformed Terms |
|---|---|---|
| **UAW** | ▪ Delphi prohibited from disposing of many operations necessary for portfolio transformation<br>▪ Job security provisions that required retention of redundant employees<br>▪ Yearly percentage wage and COLA increases<br>▪ Unsustainable pension and OPEB obligations<br>▪ Numerous non-competitive programs and joint activities | ▪ Delphi will retain ownership and operations in four UAW facilities, seven facilities have been or will be sold or transferred to a third party, and ten facilities have been or will be closed<br>▪ Job security provisions requiring retention of redundant employees eliminated<br>▪ Workforce transformation programs to eliminate high cost legacy wage, job and income security, and benefit levels and to balance manpower with ongoing manufacturing requirement<br>▪ Mandatory buy down to Tier II wage & benefit levels for any remaining legacy employees<br>▪ Yearly wage increases based on industry index; COLA eliminated<br>▪ Agreement to freeze pension plan and transfer OPEB obligations to GM<br>▪ Participation in UAW-GM CHR and mandatory funding of joint programs discontinued<br>▪ 414(l) transfer of certain pension assets and liabilities to GM |

| Union | Non-Competitive Terms | Transformed Terms |
|---|---|---|
| **IUE-CWA** | ▪ Delphi prohibited from disposing of many operations necessary for portfolio transformation<br>▪ Job security provisions required retention of redundant employees<br>▪ Employees hired before 2003 grew into higher wages<br>▪ Unsustainable pension and OPEB obligations<br>▪ Numerous non-competitive programs and joint activities | ▪ Delphi will retain three plants. Two others have been or will be sold and two have been or will be closed<br>▪ Job security provisions requiring retention of redundant employees eliminated<br>▪ Workforce transformation program to eliminate high cost legacy wage, job and income security, and benefit levels and to balance manpower with ongoing manufacturing requirement<br>▪ Modified wages and benefits; mandatory buy down to Tier II wage & benefit levels for any remaining legacy employees—new regular employees at more competitive wage and benefits<br>▪ Agreement to freeze pension plan and transfer OPEB obligations to GM<br>▪ Participation in Joint Activities Center and mandatory funding of joint programs discontinued<br>▪ 414(l) transfer of certain pension assets and liabilities to GM |
| **USW** | ▪ No sale/no closure provisions prevented closure of Home Avenue plant<br>▪ Job security provisions required retention of redundant employees<br>▪ Unsustainable pension and OPEB obligations<br>▪ Numerous non-competitive programs and joint activities | ▪ Agreement to sell businesses and close Home Avenue plant<br>▪ Job security provisions requiring retention of redundant employees eliminated<br>▪ Workforce transformation program to eliminate high cost legacy wage, job and income security, and benefit levels and to balance manpower with ongoing manufacturing requirements<br>▪ Competitive wage, benefit, and work practice agreements for Vandalia plant<br>▪ Agreement to freeze pension plan and transfer OPEB obligations to GM<br>▪ Mandatory funding of joint programs discontinued<br>▪ 414(l) transfer of certain pension assets and liabilities to GM |
| **IAM** | ▪ Yearly percentage wage and COLA increases<br>▪ No sale/no closure provisions<br>▪ Unsustainable pension and OPEB obligations | ▪ COLA eliminated<br>▪ Plant closure restrictions eliminated<br>▪ Workforce transformation program to eliminate redundant employees as operations conclude<br>▪ Agreement to freeze pension plan and transfer OPEB obligations to GM<br>▪ 414(l) transfer of certain pension assets and liabilities to GM |
| **IBEW** | ▪ Yearly percentage wage and COLA increases<br>▪ Job security provisions required retention of redundant employees<br>▪ No sale/no closure provisions<br>▪ Unsustainable pension and OPEB obligations | ▪ COLA eliminated<br>▪ Agreements related to job security and guaranteed levels of employment eliminated<br>▪ Plant closure restrictions eliminated<br>▪ Workforce transformation program to eliminate redundant employees as operations conclude<br>▪ Agreement to freeze pension plan and transfer OPEB obligations to GM<br>▪ 414(l) transfer of certain pension assets and liabilities to GM |

| Union | Non-Competitive Terms | Transformed Terms |
|-------|----------------------|-------------------|
| **IUOE** | ▪ Yearly percentage wage and COLA increases<br>▪ Job security provisions required retention of redundant employees<br>▪ No sale/no closure provisions<br>▪ Unsustainable pension and OPEB obligations | ▪ COLA eliminated<br>▪ Agreements related to job security and guaranteed levels of employment eliminated<br>▪ Plant closure restrictions eliminated<br>▪ Workforce transformation program to balance workforce with ongoing requirements<br>▪ Agreement to freeze pension plan and transfer OPEB obligations to GM<br>▪ 414(l) transfer of certain pension assets and liabilities to GM |

(a)    UAW

On June 22, 2007, the UAW, Delphi, and GM entered into a memorandum of understanding (the "UAW Settlement Agreement" or the "UAW Memorandum of Understanding") to enable continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules, and staffing level issues, and to better position Delphi to retain existing business and attract new business.  The UAW, Delphi, and GM also agreed to the "Term Sheet—Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee," which facilitated the freeze of Delphi's pension plan and the assumption of billions of dollars of OPEB liabilities by GM, thereby dramatically reducing Delphi's ongoing benefit costs.  The UAW Memorandum of Understanding was ratified by the UAW membership on June 28, 2007 and approved by the Bankruptcy Court on July 19, 2007.

Pursuant to the UAW Settlement Agreement, among other subject matters:

- The terms of the UAW CBAs are extended until September 14, 2011;

- A site plan is implemented with respect to each of 21 UAW-Delphi plants which includes specific revenue, production, and job commitments from Delphi and/or GM and pursuant to which Delphi, with support from GM through subsidies, will retain ownership and operations in four facilities, seven facilities have been or will be sold or transferred to a third party so that Delphi will have no further operational or employment responsibilities after certain specified sunset dates, and ten facilities have been or will be closed;

- A workforce transition program has been implemented for traditional UAW-represented employees that provided eligible employees with transformation plan options including (i) attrition options similar to the previously-approved UAW attrition programs, (ii) flowback rights to eligible Delphi employees as of the Petition Date who did not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when plants cease production, (iii) provision of lump sum "buy-down" payments totaling $105,000 for traditional production employees who did not elect the attrition option or flowback and continue to work for Delphi under the terms of the 2004 UAW-Delphi Supplemental Agreement applicable to employees hired after 2004, transferring those employees to Supplemental Employee Status as of October 1, 2007, (iv) conversion of temporary employees in

UAW-Delphi plants to permanent employee status, and (v) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of the 2004 UAW-Delphi Supplemental Agreement with respect to wages, individual retirement and savings plans, and post-retirement health care accounts are modified;

- Certain terms of the UAW CBAs are modified with respect to provisions covering hiring requirements, existing CHR/Legal Services, holiday schedule, workers' compensation letter, temporary employees, Appendix L, GIS, AOL, and other matters described in Attachment E to the UAW Memorandum of Understanding;

- Local negotiations subject to mutual agreement regarding work rules and other local agreement issues have been or will be conducted on an expedited basis;

- Delphi's commitment in the 2004 UAW-Delphi Supplemental Agreement to the principle of "equivalence of sacrifice" when establishing compensation and benefit levels for salaried employees and management is reaffirmed;

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and pending ordinary course grievances of employees remaining in the workforce); and

- The UAW will receive an allowed prepetition claim in the amount of $140 million on account of the CHR and Legal Services claims as of April 1, 2007 (to be adjusted by the difference between accruals through October 1, 2007 and expenditures until the effective date of a plan of reorganization (the "Effective Date")) of which $30 million will be paid to the UAW-GM Center for Human Resources and the balance will be paid directly to the DC VEBA ("Defined Contribution Voluntary Employee Beneficiary Association") established pursuant to a settlement agreement approved by the court in the case of International Union, UAW, et al. v. General Motors Corp., Civil Action No. 05-73991.

In connection with the UAW Memorandum of Understanding, Delphi paid approximately $993,000 in cash severance and vacation payments to former UAW-represented hourly employees of Manufacturers Products Co. ("MPC"), a former distressed supplier to the Debtors. The payments related to an unfunded budget line for severance and vacation payments in connection with an Accommodation Agreement dated January 24, 2006 among Delphi, MPC, and certain third parties pursuant to which parts (including an inventory bank) were produced in February and March 2006. Delphi had previously disputed any contractual or other basis for these claims. Based on Delphi's participation in the Accommodation Agreement, its pro-rata apportionment of the claims would have been approximately $233,355. When MPC wound down and distributed the proceeds of its liquidation, Delphi received approximately $209,000 in reimbursement of payments made under the Accommodation Agreement; however, none of the severance or vacation payments to UAW-represented employees contemplated under the

Accommodation Agreement were previously paid.  These MPC-related payments were in full satisfaction of all claims against the Debtors arising or related to MPC and the Accommodation Agreement and the Debtors received full releases therefor, including from each payment recipient.  In addition, all related claims filed in Delphi's Chapter 11 Cases were expunged and released, including claim number 13270.

Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its Chapter 11 Cases and confirmed by the Bankruptcy Court which incorporates, approves, and is consistent with all of the terms of the UAW Settlement Agreement and the Delphi-GM settlement, the UAW Settlement Agreement, among other subject matters, provides that:

- The amount of $450 million is funded by GM, which the UAW has directed to be paid directly to the DC VEBA established pursuant to a settlement agreement approved by the court in the case of International Union, UAW, et al. v. General Motors Corp., Civil Action No. 05-73991;

- The UAW Memorandum of Understanding (including the UAW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The UAW released parties are exculpated and released in connection with the UAW Memorandum of Understanding and Delphi's Chapter 11 Cases; and

- Delphi and GM receive releases from the UAW, all employees and former employees of Delphi represented or formerly represented by the UAW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the UAW Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the UAW Memorandum of Understanding).

As described below, on September 26, 2008, Delphi and GM entered into an implementation agreement with the UAW which modified certain terms of the UAW Settlement Agreement necessary to effectuate the revised terms of the Amended GSA and Amended MRA. In accordance with the UAW Settlement Agreement and the UAW implementation agreement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain UAW-represented employees covered as provided in the Benefit Guarantee Term Sheet;

- A transfer of certain pension assets and liabilities from Delphi's hourly pension plan to GM's hourly pension plan has been effectuated pursuant to IRC Section 414(l); and

- Delphi's existing pension plan is frozen in certain respects and GM is obligated to pay certain benefits for certain UAW-represented employees covered as provided in the Benefit Guarantee Term Sheet.

(b)     IUE-CWA

On August 5, 2007, the IUE-CWA, Delphi, and GM entered into a memorandum of understanding (the "IUE-CWA Memorandum of Understanding" or the "IUE-CWA Settlement Agreement") covering site plans, workforce transition, and other comprehensive transformational issues.   The IUE-CWA Memorandum of Understanding modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the IUE-CWA, and its various locals, and provides that GM and Delphi will undertake certain financial obligations to Delphi's IUE-CWA-represented employees and retirees to facilitate these modifications.   The IUE-CWA, Delphi, and GM have also agreed to the "Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee," which facilitates the freeze of Delphi's pension plan and the assumption of significant OPEB liabilities by GM, thereby reducing Delphi's ongoing benefit costs and liabilities.   The IUE-CWA Memorandum of Understanding was approved by the Bankruptcy Court on August 16, 2007 and was ratified by the IUE-CWA membership as of August 20, 2007.

Pursuant to the IUE-CWA Settlement Agreement, among other subject matters:

- The terms of the IUE-CWA CBAs are extended until October 12, 2011;

- A site plan is implemented with respect to each of seven IUE-CWA-Delphi plants which includes, at certain sites, certain revenue program and production commitments from Delphi and/or GM and pursuant to which Delphi, with support from GM through subsidies, will retain ownership and operations in three facilities; two facilities have been or will be sold or transferred to a third party; and two facilities have been or will be closed;

- A workforce transition program has been implemented for traditional IUE-CWA-represented employees that provided eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved IUE-CWA attrition program, (ii) special employee placement opportunities for eligible Delphi employees who did not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when specific plants cease production, (iii) provision of lump sum "buy-down" payments totaling up to $105,000 for eligible employees who did not elect the attrition option or become employed by GM and continue to work for Delphi under the terms of the IUE-CWA Settlement Agreement, and (iv) severance payments of up to $40,000 to eligible employees who are permanently laid off prior to October 12, 2011;

- Certain terms of the IUE-CWA CBAs are modified with respect to wages and benefits for certain employees, including vacation entitlement, life insurance, extended disability benefits, supplemental unemployment benefits, paid holidays, and healthcare;

- Certain terms of the IUE-CWA CBAs are modified with respect to provisions covering hiring requirements, existing Delphi Joint Activities Center (the

"JAC")/Legal Services, temporary employees, Appendix F, GIS, AOL, LJISA, and other matters described in Attachment E to the IUE-CWA Memorandum of Understanding;

- Local negotiations for all Keep and Footprint sites conducted concurrently with the negotiations resulting in the IUE-CWA Settlement Agreement are final and binding upon ratification of the IUE-CWA Settlement Agreement;

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and pending ordinary course grievances of employees remaining in the workforce); and

- The IUE-GM National Joint Skill Development and Training Committee will quitclaim any rights to the JAC Building to the IUE-CWA International or to an agreed upon not-for-profit entity.

Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its Chapter 11 Cases and confirmed by the Bankruptcy Court which incorporates, approves, and is consistent with all of the terms of the IUE-CWA Settlement Agreement and Delphi-GM settlement, the IUE-CWA Settlement Agreement, among other subject matters, provides that:

- The IUE-CWA will receive an allowed general unsecured prepetition claim against Delphi in the amount of $126 million in complete settlement of all asserted and unasserted IUE-CWA claims, including, but not limited, to IUE-CWA/JAC asserted and unasserted claims (the "IUE-CWA Allowed Claim"). The proceeds realized by the IUE-CWA from a $26 million dollar portion of the IUE-CWA Allowed Claim, will be paid directly to the voluntary employee beneficiary association ("VEBA") trust to be established and sponsored by the IUE-CWA to provide supplemental retiree health insurance to certain eligible Delphi employees and their dependents; the proceeds realized by the IUE-CWA and/or the VEBA trust, from a $90 million dollar portion of the IUE-CWA Allowed Claim, will be paid directly to a VEBA trust to be established and sponsored by the IUE-CWA for the purpose of funding employee benefits for active and retired employees and their dependents; and the proceeds realized by the IUE-CWA and/or a VEBA trust, from a $10 million dollar portion of the IUE-CWA Allowed Claim, will be paid directly to the successor to the JAC entity which will be established and administered by the IUE-CWA;

- The IUE-CWA Memorandum of Understanding (including the IUE-CWA CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The IUE-CWA released parties are exculpated and released in connection with the IUE-CWA Memorandum of Understanding and Delphi's Chapter 11 Cases; and

- Delphi and GM receive releases from the IUE-CWA, all employees and former employees of Delphi represented or formerly represented by the IUE-CWA, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IUE-CWA Memorandum of Understanding (except for claims for benefits provided for or explicitly not waived under the IUE-CWA Memorandum of Understanding, including, but not limited to, workers' compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

As described below, on September 25, 2008, Delphi and GM entered into an implementation agreement with the IUE-CWA which modified certain terms of the IUE-CWA Settlement Agreement necessary to effectuate the revised terms of the Amended GSA and Amended MRA. In accordance with the IUE-CWA Settlement Agreement and the IUE-CWA implementation agreement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IUE-CWA-represented employees covered as provided in the Benefit Guarantee Term Sheet;

- A transfer of certain pension assets and liabilities from Delphi's hourly pension plan to GM's hourly pension plan has been effectuated pursuant to IRC Section 414(l); and

- Delphi's existing pension plan is frozen in certain respects and GM is obligated to pay certain benefits for certain IUE-CWA-represented employees covered as provided in the Benefit Guarantee Term Sheet.

    (c)    USW

On August 16, 2007, the USW, Delphi, and GM entered into two memoranda of understanding, the first with the USW relating to the Debtors' operations at Home Avenue (the "USW Home Avenue Settlement Agreement" or the "USW Home Avenue Memorandum of Understanding") and the second with the USW relating to the Debtors' operations at Vandalia (the "USW Vandalia Settlement Agreement" or the "USW Vandalia Memorandum of Understanding") covering comprehensive transformational issues. The USW Home Avenue Settlement Agreement and the USW Vandalia Settlement Agreement modify, extend, or terminate provisions of the existing collective bargaining agreements among Delphi and the USW (the "USW CBAs") and provide that GM and Delphi will undertake certain financial obligations to Delphi's USW-represented employees and retirees to facilitate these modifications. These settlement agreements were approved by the Bankruptcy Court on August 29, 2007 and were ratified by the USW membership as of August 30, 2007 for the USW Home Avenue Settlement Agreement and August 31, 2007 for the USW Vandalia Settlement Agreement.

Pursuant to the USW Home Avenue Settlement Agreement, among other subject matters:

- The terms of the USW CBAs applicable at Home Avenue are extended until September 14, 2011;

- Delphi and the USW agree that the businesses at the Home Avenue Operations will be sold or closed;

- A workforce transition program has been implemented for eligible USW-represented employees that provided eligible employees with transformation plan options, including attrition options similar to the previously-approved UAW and IUE-CWA attrition programs (see USW Home Avenue Settlement Agreement Attachment C, USW-Delphi-GM Special Attrition Program-Transformation);

- Certain terms of the USW CBAs are modified with respect to provisions covering Plant Closing and Sale Moratorium, Sourcing, Job Security (Job Opportunity Bank (JOBS) Program), AOL, COLA, Independence Week Pay, Vacation Entitlement, Joint Activities funding, tuition assistance, Guaranteed Income Stream, benefits, temporary employees, and holidays; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for rights, if any, to vested pension benefits, workers' compensation benefits, unemployment compensation benefits, future claims arising out of the modified USW CBAs and pending ordinary course grievances of employees remaining in the workforce).

Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its Chapter 11 Cases and confirmed by the Bankruptcy Court which incorporates, approves, and is consistent with all of the terms of the USW Home Avenue Settlement Agreement and Delphi-GM settlement, the USW Home Avenue Settlement Agreement, among other subject matters, provides that:

- The USW will receive an allowed general unsecured prepetition claim in the amount of $3 million against Delphi in complete settlement of all asserted and unasserted USW claims, including without limitation asserted and unasserted claims of current and former Vandalia Operations bargaining unit members.  The proceeds realized by the USW will be contributed directly to a VEBA trust to provide certain retiree welfare benefits to certain eligible employees and retirees, including certain current or future participants in the Delphi Hourly-Rate Employee Pension Plan ("Delphi HRP" or "Delphi Hourly Plan") or the GM Hourly-Rate Employee Pension Plan ("GM HRP" or "GM Hourly Plan"), and their dependents;

- The amount of $9 million will be paid by GM to a VEBA in resolution of certain claims asserted by the USW, including in connection with the modification of retiree benefit programs, and without any acknowledgment by either GM or Delphi of those claims;

- The USW Home Avenue Memorandum of Understanding (including the USW CBAs) is assumed pursuant to 11 U.S.C. § 365;

- The USW released parties are exculpated and released in connection with the USW Home Avenue Memorandum of Understanding and Delphi's Chapter 11 Cases; and

- Delphi and GM receive releases from the USW, all employees and former employees of Delphi represented or formerly represented by the USW, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements between Delphi and the USW and between GM and the USW (except for claims for benefits provided for or explicitly not waived under the USW Home Avenue Memorandum of Understanding, including, but not limited to, workers' compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

As described below, on September 25-26, 2008, Delphi and GM entered into an implementation agreement with the USW which modified certain terms of the USW Home Avenue Settlement Agreement necessary to effectuate the revised terms of the Amended GSA and Amended MRA.  In accordance with the USW Home Avenue Settlement Agreement and the USW implementation agreement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain USW-represented employees covered as provided in the Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee;

- A transfer of certain pension assets and liabilities from Delphi's hourly pension plan to GM's hourly pension plan has been effectuated pursuant to IRC Section 414(l); and

- Delphi's existing pension plan is frozen in certain respects and GM is obligated to pay certain benefits for certain USW-represented employees covered as provided in Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee.

Pursuant to the USW Vandalia Settlement Agreement, among other subject matters:

- The terms of the USW CBAs applicable at Vandalia are extended until September 14, 2011;

- A site plan is implemented with respect to the Vandalia Thermal Operation for which it is necessary to achieve an all-in blended labor wage and benefit rate of $19.57 per hour as soon as possible and maintain that rate for the life of the Vandalia local agreement; otherwise failure to accomplish and maintain this all-in blended wage and benefit rate will result in the Vandalia Thermal Operations being closed during the term of the Vandalia local agreements;

- A workforce transition program has been implemented for eligible USW-represented employees that provided eligible employees with transformation plan options, including attrition options similar to the previously-approved UAW and IUE-CWA

attrition programs (see USW Vandalia Settlement Agreement, Section C, Special
Attrition Program);

- Certain terms of the USW CBAs are modified with respect to provisions covering
  Guaranteed Income Stream, benefits, vacation accrual, holidays, Income Security
  Plan, Joint Activities funding, Independence Week Pay, COLA, Shift Premium, AOL,
  and overtime; and

- All employee, retiree, and union asserted and unasserted claims are settled (except for
  rights, if any, to vested pension benefits, workers' compensation benefits,
  unemployment compensation benefits, future claims arising out of the modified USW
  CBAs, and pending ordinary course grievances of employees remaining in the
  workforce).

Effective upon the execution by Delphi and GM of a comprehensive settlement
agreement resolving certain financial, commercial, and other matters between Delphi and GM
and substantial consummation of a plan of reorganization proposed by Delphi in its Chapter 11
Cases and confirmed by the Bankruptcy Court which incorporates, approves, and is consistent
with all of the terms of the USW Vandalia Settlement Agreement and Delphi-GM settlement, the
USW Vandalia Settlement Agreement, among other subject matters, provides that:

- The USW asserted and unasserted claims are resolved pursuant to Section F.2 and F.3
  of the USW Home Avenue Settlement Agreement;

- The USW Vandalia Memorandum of Understanding (including the USW CBAs) is
  assumed pursuant to 11 U.S.C. § 365;

- The USW released parties are exculpated and released in connection with the USW
  Vandalia Memorandum of Understanding and Delphi's Chapter 11 Cases; and

- Delphi and GM receive releases from the USW, all employees and former employees
  of Delphi represented or formerly represented by the USW, and all persons or entities
  with claims derived from or related to any relationship with such employees of
  Delphi arising directly or indirectly from or in any way related to any obligations
  under the collective bargaining agreements between Delphi and the USW and
  between GM and the USW (except for claims for benefits provided for or explicitly
  not waived under the USW Vandalia Memorandum of Understanding).

As described below, on September 25-26, 2008, Delphi and GM entered into an
implementation agreement with the USW which modified certain terms of the USW Vandalia
Settlement Agreement necessary to effectuate the revised terms of the Amended GSA and
Amended MRA.  In accordance with the USW Vandalia Settlement Agreement and the USW
implementation agreement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is
  obligated to provide certain retiree welfare benefits for certain USW-represented

employees covered as provided in the Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee;

- A transfer of certain pension assets and liabilities from Delphi's hourly pension plan to GM's hourly pension plan has been effectuated pursuant to IRC Section 414(l); and

- Delphi's existing pension plan is frozen in certain respects and GM is obligated to pay certain benefits for certain USW-represented employees covered as provided in Term Sheet – Delphi Pension Freeze and Cessation of OPEB, and GM Consensual Triggering of Benefit Guarantee.

(d)     IAM, IBEW, and IUOE

On July 31, 2007 and August 1, 2007, Delphi signed six memoranda of understanding with GM and the IAM, IBEW, and IUOE covering site plans, workforce, and transition as well as other comprehensive transformational issues (the "IAM, IBEW, and IUOE Settlement Agreements").  The IAM, IBEW, and IUOE Settlement Agreements are comprehensive agreements that modify, extend, or terminate provisions of the existing collective bargaining agreements among Delphi, the IAM, IBEW, IUOE, and their various locals and provide that GM and Delphi will undertake certain financial obligations to Delphi's IAM, IBEW, and IUOE-represented employees and retirees to facilitate these modifications.  The IAM, IBEW, and IUOE Settlement Agreements are comprised of one IAM agreement, ratified as of August 4, 2007, two IBEW agreements (relating to Electronics & Safety and Powertrain operations), ratified as of August 4, 2007, two IUOE agreements (relating to each of Local 832S and Local 18S), ratified as of August 9, 2007 and August 10, 2007, and one IUOE agreement (relating to Local 101S) that did not require ratification because there were no active bargaining unit members at the Olathe IUOE Local 101S site.   The IAM, IBEW, and IUOE Settlement Agreements were approved by the Bankruptcy Court on August 16, 2007.

Pursuant to the IAM, IBEW, and IUOE Settlement Agreements, among other subject matters:

- Certain collective bargaining agreements are extended until September 14, 2011, subject to their termination provisions, certain operations are scheduled to be or have been closed, and certain operations are acknowledged as closed;

- A workforce transition program has been implemented (except for IUOE Local 101S) for eligible employees that provided eligible employees with transformation plan options, including (i) attrition options similar to the previously-approved UAW and IUE-CWA attrition program for eligible employees who are participants in the Delphi Hourly-Rate Employees Pension Plan, (ii) provision of a lump sum "buy-down" payment totaling $10,000 for eligible employees, and (iii) severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011;

- Certain terms of certain collective bargaining agreements are modified (the settlement agreement relating to IUOE Local 101S terminates and supersedes the 2003 IUOE Local 101S – Delphi Agreements and all related agreements and understandings); and

- All employee, retiree, and union asserted and unasserted claims are settled (except for waiver of rights to vested pension benefits, workers compensation benefits, unemployment compensation benefits, and the right to pursue pending ordinary course grievance except for employees who have signed individual releases of claims).

Effective upon the execution by Delphi and GM of a comprehensive settlement agreement resolving certain financial, commercial, and other matters between Delphi and GM and substantial consummation of a plan of reorganization proposed by Delphi in its Chapter 11 Cases and confirmed by the Bankruptcy Court which incorporates, approves, and is consistent with all of the terms of the IAM, IBEW, and IUOE Settlement Agreements and Delphi-GM settlement, the IAM, IBEW, and IUOE Settlement Agreements, among other subject matters, provide that:

- The IAM, IBEW, and IUOE Memoranda of Understanding (including certain collective bargaining agreements) are assumed pursuant to 11 U.S.C. § 365;

- Certain released parties are exculpated and released in connection with the IAM, IBEW, and IUOE Memoranda of Understanding and Delphi's Chapter 11 Cases; and

- Delphi and GM receive releases from the IAM, IBEW, and IUOE, all employees and former employees of Delphi represented or formerly represented by the IAM, IBEW, and IUOE, and all persons or entities with claims derived from or related to any relationship with such employees of Delphi arising directly or indirectly from or in any way related to any obligations under the collective bargaining agreements or the IAM, IBEW, and IUOE Memoranda of Understanding (except for claims for benefits provided for or explicitly not waived under the IAM, IBEW, and IUOE Memoranda of Understanding, including, but not limited to, workers' compensation benefits and unemployment compensation benefits against Delphi, its subsidiaries, or affiliates that are otherwise assertable under applicable law).

As described below, on September 25, 2008, Delphi and GM entered into an implementation agreement with the IAM, IBEW, and IUOE which modified certain terms of the IAM, IBEW, and IUOE Settlement Agreements necessary to effectuate the revised terms of the Amended GSA and Amended MRA.  In accordance with the IAM, IBEW, and IUOE Settlement Agreements and the IAM, IBEW, and IUOE implementation agreement:

- Delphi's obligation to provide certain retiree welfare benefits is eliminated and GM is obligated to provide certain retiree welfare benefits for certain IAM, IBEW, and IUOE-represented retirees and eligible employees covered as provided in the Term Sheet – Delphi Cessation and GM Provision of OPEB;

- A transfer of certain pension assets and liabilities from Delphi's hourly pension plan to GM's hourly pension plan has been effectuated pursuant to IRC Section 414(l); and

- Delphi's existing pension plan is frozen in certain respects for certain IAM, IBEW, and IUOE-represented employees as provided in Section D.1 of the settlement agreement relating to IUOE Local 101S and Section D.2 of the other IAM, IBEW, and IUOE settlement agreements.

    *4.    Union Implementation Agreements*

On September 25 and 26, 2008, Delphi and GM entered into four implementation agreements, one with each of the (i) UAW; (ii) the IUE-CWA; (iii) the USW; and (iv) the IAM, IBEW, and IUOE.  Among other things, each implementation agreement addresses and modifies certain terms of the Union settlement agreements necessary to effectuate the revised terms of the Amended GSA and Amended MRA.

Each implementation agreement accelerates the timing for certain settlement agreement provisions to become effective, including those relating to (i) the freeze of the Delphi HRP; (ii) Delphi's cessation of OPEB for its Union represented employees and retirees; (iii) transfers pursuant to the IRS Code §414(l) of certain pension assets and liabilities from the Delphi HRP to the GM HRP; (iv) the effectiveness of the waivers of claims and the releases provided for in paragraph 21 of the UAW Benefit Guarantee Term Sheet, paragraph 21 of the IUE-CWA Benefit Guarantee Term Sheet, paragraph 20 of the USW Benefit Guarantee Term Sheet, and paragraph 10 of the IAM, IBEW, and IUOE "Term Sheet-Delphi Cessation and GM Provision of OPEB;" and (v) the triggering of Attachment B to each Union settlement agreement.  Further, each implementation agreement functions to implement Attachment B to each Union settlement agreement and any required corresponding adjustment to each such Attachment B and each Union settlement agreement.

Pursuant to the UAW, IUE-CWA, and USW implementation agreements, the provisions of the UAW, IUE-CWA, and USW settlement agreements relating to the IRS Code §414(l) transfer will modified to be consistent with the Amended GSA, as more fully described below. For the IAM, IBEW, and IUOE implementation agreements, provisions relating to the IRS Code §414(l) transfer were added to be consistent with the Amended GSA because the IAM, IBEW, and IUOE settlement agreements did not previously contain provisions addressing the §414(l) transfer.

Each implementation agreement accelerates the timing conditions previously provided for in the Union settlement agreements related to the ability of Delphi to freeze the Delphi HRP and cease providing OPEB, which had previously required, among other things, substantial consummation of Delphi's plan of reorganization.  Under the implementation agreements, as soon as reasonably practicable after the effective date of the Amended GSA, Delphi shall, as provided for in each of the settlement agreements, (i) amend the Delphi HRP to freeze benefit accruals for future credited service; and (ii) amend the Delphi Hourly Health Care Program and the Delphi Life and Disability Benefits Program so as to cease to provide or offer OPEB. Further, pursuant to the implementation agreements and court order, the waivers of claims and the releases provided for in paragraph 21 of the UAW Benefit Guarantee Term Sheet, paragraph

21 of the IUE-CWA Benefit Guarantee Term Sheet, paragraph 20 of the USW Benefit Guarantee Term Sheet, and paragraph 10 of the IAM, IBEW, and IUOE "Term Sheet-Delphi Cessation and GM Provision of OPEB" became effective as of September 29, 2008, the effective date of the Amended GSA and Amended MRA.

To effectuate these modifications, the implementation agreements provide that Attachment B to each Union settlement agreement shall become triggered, as contemplated by the implementation agreements and the Union settlement agreements, including their attachments, shall be correspondingly adjusted.

## F.    GM Transformation

As set forth above, on March 31, 2006 the Debtors filed the GM Contract Rejection Motion with the Bankruptcy Court seeking authority to reject certain customer contracts with GM under section 365 of the Bankruptcy Code.  GM filed an objection to the GM Contract Rejection Motion and vowed to vigorously contest it.  The GM Contract Rejection Motion covered approximately half of the North American annual purchase volume revenue from GM. The hearing on the motion was scheduled to commence on September 28, 2006, but was adjourned on several occasions with periodic chambers conferences being conducted in the interim to provide the Bankruptcy Court with updates regarding the status of negotiations to consensually resolve the motion.  On January 7, 2008, the Court entered an order (Docket No. 11755) approving a stipulation between the Debtors and GM whereby the Debtors withdrew the GM Contract Rejection Motion without prejudice in connection with the Settlement Agreement and Restructuring Agreement (as defined below).

Also on March 31, 2006, Delphi delivered a letter to GM initiating a process to reset the terms and conditions of more than 400 commercial agreements that expired between October 1, 2005 and March 31, 2006.  The Company did not unilaterally revise the terms and conditions on which it has been supplying parts to GM under expired contracts or file additional contract rejection motions.  As with the Unions, throughout these Chapter 11 Cases the Debtors remained committed to reaching consensual resolution with GM on this and several issues pertaining to the Transformation Plan.

### 1.    Investigation Into GM Claims And Causes Of Action

In January 2006, the Debtors scheduled unliquidated claims against GM and reserved their rights to assert claims against GM in their Schedules of Assets and Liabilities and Statements of Financial Affairs.  Similarly, from the outset of the Chapter 11 Cases, the Debtors have been aware of certain defenses to claims that might be asserted by GM against the Debtors' Estates (collectively with the claims against GM, the "GM Claims and Defenses").  In addition, on July 31, 2006, GM and its affiliates filed a proof of claim (with additional attachments) against the Debtors' Estates, which stated a liquidated claim in the aggregate amount of $6 billion and also identified further purported significant unliquidated claims.  In its third quarter 2007 Form 10-Q filed on November 8, 2007, GM stated that its exact amount of claims could not be established (due in part to the contingent nature of many of its claims), but estimated the amount of its claims could be as much as $13 billion.

As part of the Amended GSA, defined below, the Debtors and GM reached a consensual resolution of the GM Claims and Defenses. As more fully described below, as an integral part of GM's participation and support of the Debtors' reorganization efforts, and as part of a broad global release of claims or potential claims held by the Debtors against GM, the Debtors have resolved and released the GM Claims and Defenses. In addition, in recognition of the contributions made by GM, upon consummation of the Modified Plan (and as an integral part thereof), GM will be released from third-party claims relating to the Debtors. Without such resolution and releases, GM would not have provided its substantial support for the Debtors' reorganization efforts and will not provide the additional support upon Delphi's emergence as provided in the Amended GSA and the Amended MRA, defined below.

GM's continued support as a customer is critical to Delphi's business plan, and initiating heavily contested litigation with GM could put future revenue at risk. In determining to pursue the consensual resolution outlined below, the Debtors analyzed the GM Claims and Defenses with substantial input from their Statutory Committees, and weighed the relative strengths and weaknesses of the GM Claims and Defenses along with the risks of proceeding in a fashion adversarial to GM, against the substantial benefits contemplated by GM's participation in the Debtors' reorganization and transformation and the preservation of the Debtors' relationship with their largest customer. The process by which the Debtors analyzed the GM Claims and Defenses is as described below.

As more fully described in Section IV.B. – Separation From GM, GM is the Debtors' former parent company. In 1998 GM created Delphi Corporation, and in 1999 caused Delphi to separate and spin off from GM as a new publicly-traded corporation. As part of the Separation, GM caused Delphi to assume all of its initial liabilities and assets and also caused Delphi to enter into various agreements that governed the Separation as well as certain material aspects of Delphi's relationship with GM following the Separation. After the Separation, GM continued to be Delphi's single largest customer, accounting for approximately 70% of Delphi's gross revenue in the first year following the Separation and currently accounting for more than 40% of Delphi's gross revenue. Moreover, Delphi and GM continued to have relationships with the same major labor unions in the United States, and thus, GM continued to have an interest in Delphi's dealings with those unions. The GM Claims and Defenses arise, in general terms, based on certain alleged actions taken by GM in connection with the Separation, and also following the Separation in connection with Delphi's ongoing operations and its relationships with its major labor unions. The Debtors have analyzed these alleged actions and, with input from the Statutory Committees, have considered how the alleged actions by GM might be cognizable as legal claims or defenses.

Moreover, the Debtors have provided extensive information to the Statutory Committees so that they could form a view as to potential claims and defenses against GM. On March 24, 2006, the Creditors' Committee filed a motion under Rule 2004 of the Bankruptcy Code seeking to compel GM to produce documents so that the Creditors' Committee could analyze the viability of certain claims against GM as well as potential claims that GM might assert against the Debtors. The Debtors agreed not to oppose the motion, subject only to the Debtors' right to receive copies of the documents produced in connection with the Rule 2004 examination. The Bankruptcy Court entered a stipulation between the Creditors' Committee and GM allowing the Rule 2004 examination on April 11, 2006. Further, on April 18, 2006, the Bankruptcy Court

approved a joint interest agreement sought by the Debtors that enabled the Debtors to share certain confidential investigatory information with the Creditors' Committee without losing any privilege or protection concerning those materials. Under the joint interest agreement, the Debtors produced voluminous investigatory documents to the Creditors' Committee that the Debtors had previously developed in connection with the Debtors' own investigation of certain alleged actions by GM concerning Delphi, among other topics.

On May 11, 2006, the Creditors' Committee delivered a letter (the "May 11 Letter") to Delphi's Board of Directors informing the Board of the Creditors' Committee's view that the Debtors did have potentially significant affirmative causes of action against GM, and requesting that the Debtors refrain from negotiating with GM with respect to the allowance of any claims by GM, or the release by the Debtors of any claims against GM, without the active, direct, and significant involvement of the Creditors' Committee. On May 17, 2006, the Creditors' Committee delivered a 19-count draft complaint to the Board (the "Creditors' Committee Complaint"). The Creditors' Committee acknowledged that substantially all of the non-public information contained in the Creditors' Committee Complaint came from the Debtors, largely pursuant to the joint interest agreement. Through this process, the Creditors' Committee raised with the Debtors certain allegations and resulting potential Claims and Defenses.

The Creditors' Committee believed that there may exist facts demonstrating that in effecting the Separation, GM allegedly overstated Delphi's assets, understated Delphi's liabilities, and based Delphi's financial statements on overly aggressive projections. Additionally, it was alleged that during the period when GM controlled Delphi as a wholly owned subsidiary, GM caused Delphi to execute contracts ensuring that GM would continue to control Delphi's important business decisions even after the Separation. Further, the Creditors' Committee alleged that during and immediately after the Separation, GM forced Delphi to enter into unprofitable agreements with its major U.S. labor unions so that GM could maintain its own relationship with those same unions. The Creditors' Committee also alleged that after the Separation, GM forced Delphi to accept unreasonable price reductions on goods sold by Delphi to GM, and to supply parts to GM at unprofitable pricing levels. The Creditors' Committee also alleged that after the Separation, GM asserted excessive warranty claims against Delphi for pre-Separation products, and in amounts far in excess of the warranty claim estimate that GM itself had established for Delphi as part of the Separation. As set forth in more detail below, allegedly, GM eventually used the excessive warranty claim to force Delphi into a scheme, whereby Delphi made improper warranty payments and both GM and Delphi accounted for those payments in violation of GAAP. Subsequently, GM and Delphi both restated their financial statements for the periods involved.

The Creditors' Committee identified a number of potential causes of action against GM based on the alleged conduct. First, the Creditors' Committee asserted that the Separation of Delphi from GM might constitute a constructively fraudulent transfer because the liabilities GM transferred to Delphi exceeded the value of the assets transferred. Under such a cause of action, the Creditors' Committee maintained that Delphi could seek to avoid its obligations under various Separation agreements. The Creditors' Committee also raised the possibility that Delphi's collectively bargained agreements with its major U.S. labor unions for 1999 through 2003, and for 2003 to 2007, were avoidable as constructively fraudulent obligations because GM coerced Delphi into "mirroring" GM's own collective bargaining agreements for GM's benefit.

Similarly, the Creditors' Committee asserted that Delphi's agreement to indemnify GM for losses resulting from GM's agreement to guarantee Delphi's obligations under certain labor agreements could be avoidable because GM coerced Delphi to enter into the indemnity agreement for no consideration and solely for GM's benefit.    Under these potential claims, the Creditors' Committee believed that Delphi might be able to recover from GM, among other things, Delphi's wage and benefit payments in excess of "market" rates;  the value of price-downs and other commercial concessions to GM that exceeded industry norms;  all costs and expenses incurred by Delphi as a result of restrictions imposed by GM on Delphi's ability to close unprofitable plants and product lines without GM's permission;  and the value of Delphi's warranty payments to GM that exceeded the warranty liability scheduled by Delphi at the time of the Separation.

The Creditors' Committee also raised the possibility that facts could show that GM so dominated and controlled Delphi that Delphi was precluded from having any legal or independent significance of its own, and was a mere instrumentality for GM's own affairs.  As such, the Creditors' Committee identified that GM could be considered the "alter ego" of Delphi and held responsible for all of Delphi's liabilities.  The Creditors' Committee also raised the possibility that GM's retention of benefits from the Separation and subsequent events could be voided under the theory of unjust enrichment as violating fundamental principles of equity.  The Creditors' Committee also raised the possibility that all of GM's claims against the Debtors' Estates could be equitably subordinated below general unsecured claims and/or disallowed based on GM's alleged conduct.

Finally, the Creditors' Committee identified a number of potential claims against GM relating exclusively to warranty issues, including aiding and abetting breach of fiduciary duty, conspiracy, and fraud.   Based on the information provided by the Debtors, the Creditors' Committee noted that facts existed indicating that GM demanded that Delphi pay $237 million to GM, ostensibly in respect of pre-Separation warranty claims, to improve GM's reported financial performance at Delphi's expense, and that GM and certain former officers and directors of Delphi improperly accounted for the payment.

In addition to having previously identified a number of the same facts and potential claims, the Debtors carefully evaluated the information and matters raised by the Creditors' Committee, and sought further information from the Creditors' Committee in support of their views.   The Debtors and the Creditors' Committee, through their professionals, studied the factual basis for the Claims and Defenses and discussed the various Claims and Defenses.  At the same time, however, the Company continued to work with all parties to reach a consensual resolution of its major transformation issues.

On June 27, 2006, in connection with its objection to the second of the major attrition programs, the Creditors' Committee first sought limited authority to control the GM Claims and Defenses.   Subsequently, the Creditors' Committee proposed to the Debtors a stipulation whereby the Debtors would transfer prosecution of the GM Claims and Defenses from the Debtors to the Creditors' Committee.   Around the same time, on July 19, 2006, the Equity Committee delivered a letter to the Debtors stating its position that the Debtors had potentially significant claims and defenses against GM, and advising its view that the ongoing negotiations with GM concerning the Debtors' transformation matters should not be conducted without the involvement of the Equity Committee.

On July 25, 2006, the Board met to consider the May 11 Letter, the Creditors' Committee Complaint, the proposed transfer of authority concerning the GM Claims and Defenses to the Creditors' Committee, and the July 19, 2006 Equity Committee letter. After due deliberation, the Board decided, without dissent, that in its business judgment it would not be in the best interests of the Debtors' Estates to enter into the joint stipulation, to authorize the Creditors' Committee to pursue the GM Claims and Defenses on the Debtors' behalf, or to independently pursue any of the GM Claims and Defenses at that time.

On July 28, 2006, the Creditors' Committee filed a motion seeking authority to pursue the GM Claims and Defenses on behalf of the Debtors, based on the line of cases led by <u>Unsecured Creditors Committee of Debtor STN Enterprises v. Noyes</u> (In re STN Enterprises), 779 F.2d 901 (2d Cir. 1985) (the "STN Motion").  Importantly, in the STN Motion the Creditors' Committee acknowledged that it did not intend to pursue the Claims and Defenses at that time, but rather that it wished to participate in the negotiations with GM concerning a consensual resolution of the Debtors' transformation issues, including the Claims and Defenses.  On August 4, 2006, the Debtors filed their preliminary objection to the STN Motion, pointing out that the Debtors and the Creditors' Committee were in substantial agreement that pursuing the GM Claims and Defenses, at that time, was not in the Debtors' best interests.  On August 8, 2006, the Debtors and the Creditors' Committee agreed to adjourn the STN Motion and, instead, to pursue the ongoing negotiations with GM, reserving their respective rights to seek to control and assert the GM Claims and Defenses if and when such a path would be in the Debtors' best interests.

During the same time period, in response to the Equity Committee's letter of July 19, 2006, the Debtors entered into a joint interest agreement with the Equity Committee similar to the agreement with the Creditors' Committee to allow sharing of confidential information regarding potential GM Claims and Defenses.  Pursuant to the agreement, the Debtors shared voluminous amounts of documents with the Equity Committee and solicited the Equity Committee's views on Delphi's potential GM Claims and Defenses. Subsequently, in response to the Debtors' request for the Equity Committee's views, on August 24, 2006, the Equity Committee delivered a 26-page, single-spaced letter to the Debtors' professionals outlining the Equity Committee's views as to the potential GM Claims and Defenses (the "August 24 Letter").

The August 24 Letter recited essentially the same factual allegations as those previously raised by the Creditors' Committee, but included additional potential theories of recovery from GM.  Significantly, the Equity Committee built on the Creditors' Committee's allegations regarding GM's control and domination of Delphi and raised the theory that facts could show that GM operated Delphi as a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  In connection with its allegations concerning civil RICO violations, the Equity Committee alleged that GM's post-spin-off commercial conduct toward Delphi could constitute civil extortion.  The Equity Committee also raised theories of fraud, conspiracy, and aiding and abetting breach of fiduciary duty in connection with GM's conduct toward Delphi, both before and after the Separation.

The Equity Committee also raised the possibility that GM could be liable to Delphi for obligations incurred by Delphi in various post-Separation agreements under the theory of tortious interference with economic advantage, because GM allegedly caused Delphi to enter into labor agreements on unfavorable terms, to provide GM with well-below-market pricing, and to take

other actions that were economically unfeasible and would not have been taken by an independent company. The Equity Committee also believed that these agreements could be deemed unconscionable, contracts of adhesion, and/or made under duress as a result of economic coercion applied by GM.

Finally, the Equity Committee theorized that the Debtors could seek to recharacterize GM's indemnity claims against Delphi as equity interests based on allegations that GM intentionally undercapitalized Delphi at the time of spin-off, and that GM's benefit guarantees and Delphi's related indemnity agreement were mechanisms for GM to provide future capital infusions to Delphi. The Equity Committee surmised that under such a theory, the Debtors could potentially equitably subordinate these recharacterized interests to all other equity interests pursuant to section 510(c) of the Bankruptcy Code.

The Equity Committee asserted that its analysis indicated that the claims against GM could have a value as high as approximately $26 billion – not including prejudgment interest, trebling of damages provided for in certain claims, or potential punitive damages. On September 5, 2006, the Equity Committee filed its own objection to the Creditors' Committees' STN Motion, incorporating the August 24 Letter. The Equity Committee's objection asserted that the Creditors' Committee Complaint was not sufficiently extensive, and served to artificially cap the value of the claims against GM to the detriment of Delphi's shareholders. Instead, the Equity Committee argued, authority to pursue the GM Claims and Defenses should remain with the Debtors, or to the extent the Debtors failed to satisfy their duty to all stakeholders, the authority should be transferred to the Equity Committee.

On September 14, 2006, the Creditors' Committee delivered a letter to the Debtors' professionals expressing doubt as to the strength of the additional Equity Committee claims. The Creditors' Committee asserted that it had considered and then rejected each of the additional claims raised by the Equity Committee and stated their belief that many of the additional claims and defenses in the August 24 Letter had weak legal and/or factual support. Ultimately, the Equity Committee also agreed to adjourn its objection to the STN Motion and, instead, chose to support the Debtors' decision to pursue negotiations with GM concerning a consensual resolution of the GM Claims and Defenses in the context of the Debtors' overall restructuring and transformation objectives.

Nonetheless, in furtherance of the Debtors' own investigation, and considering the views expressed by the Statutory Committees, the Debtors continued to analyze the legal and factual basis for the GM Claims and Defenses as well as the relative strengths and weaknesses of these potential claims. On September 19, 2006, the Debtors, with assistance from their professionals, began additional witness interviews and document reviews in a supplemental factual inquiry concerning the GM Claims and Defenses. The Debtors and their professionals considered a wide range of information concerning the Debtors' relationship with GM. In total, the Debtors' professionals interviewed 23 current or former employees and nine current and former Board members concerning various aspects of the Debtors' prior relationship with GM. The Debtors' professionals also worked closely with Delphi's in-house counsel to target and identify relevant documents and information, including but not limited to: documents from 1998 regarding the planning, negotiation, and approval of the Separation and spin-off, presentations to investors, underwriters, and rating agencies from 1998-1999, documents regarding Delphi's post-

Separation commercial relationship with GM, SEC filings and analysts' reports, and certain documents produced by GM to the Creditors' Committee pursuant to the Creditors' Committee's prior Rule 2004 motion in the Bankruptcy Court.  The Debtors did not otherwise have access to documents solely within GM's custody and control.

Based on the factual information discovered through their ongoing investigations, the Debtors' professionals analyzed the legal strengths and weaknesses of the GM Claims and Defenses.  Although the Debtors concluded that some of the GM Claims and Defenses are colorable, inasmuch as the known facts may support certain legal causes of action, the Debtors also concluded that other purported claims and causes of action may not be supported by the facts.  Moreover, the Debtors further concluded that for the potential causes of action that may be supported by the facts, GM may have available to it certain substantial complete or partial legal defenses to those claims or causes of action, including, among others, defenses based on applicable statutes of limitations.  Furthermore, as part of the Debtors' overall assessment of the GM Claims and Defenses, the Debtors, through their professionals, also estimated the economic damages that might be recoverable through the GM Claims and Defenses.  Here again, the Debtors determined that, although certain causes of action may give rise to economic damages, GM may also have substantial factual defenses to the recovery of such economic damages.  Although the Creditors' Committee supported the settlement on September 6, 2007, the Statutory Committees disagreed with the Debtors' assertions in this paragraph,.

In sum, although the potential economic recovery to the Debtors from the GM Claims and Defenses may be significant in absolute terms, the Debtors concluded that any such recovery carried with it a risk of significant uncertainty in light of the potential factual and legal defenses available to GM, as well as the inherent risk of uncertainty that would accompany such a substantial litigation matter.  Moreover, the pursuit of the GM Claims and Defenses in a manner adversarial to GM is, without question, mutually exclusive of GM's substantial consensual support of the Debtors' reorganization and transformation efforts as currently contemplated in the Modified Plan, including GM's support for the resolution of Delphi's legacy union labor obligations, as well as GM's support of the Debtors' business through ongoing commercial relationships.  Similarly, the pursuit of the GM Claims and Defenses in a manner adversarial to GM would likely result in litigation that would take years to resolve, during which time the Debtors' ability to exit successfully from their chapter 11 reorganization and operate as a competitive enterprise would be much more uncertain.  Thus, based on all of the Debtors' own investigation and analysis, as well as the input provided by the Debtors' Statutory Committees, the Debtors reached a consensual resolution of the GM Claims and Defenses as described in the summary of the Amended GSA described below.  Although the Creditors' Committee renewed the STN Motion in September 2008 following the Debtors' motion to amend the Settlement Agreement and Restructuring Agreement, the STN Motion was subsequently withdrawn with prejudice.  As described further below, upon the effectiveness of the Amended GSA, GM received a release from the Debtors of the GM Claims and Defenses.  Because the Amended GSA and Amended MRA, each as defined below, became effective on September 29, 2008, the relief requested under the STN Motion is moot.

2. *Global Settlement Agreement And Master Restructuring Agreement With GM*

As discussed above, the Debtors and GM have an extensive commercial relationship and an intertwined corporate and organizational history which has given rise to certain alleged claims and causes of action by each of Delphi and GM against the other.  Pursuant to the Debtors' Confirmed Plan, and subject to the requirements of Bankruptcy Rule 9019, the Debtors and GM determined to settle various disputes and compromise certain claims as provided by two principal agreements: (i) a Global Settlement Agreement, as amended in December 2007 (the "Settlement Agreement" or "Original GSA") and (ii) a Master Restructuring Agreement, as amended in December 2007 (the "Restructiring Agreement").   Given the scope of their continuing commercial relationship, performance of the obligations set forth in the Settlement Agreement and the Restructuring Agreement was critical to the successful implementation of the Debtors' Transformation Plan and is also vitally important to GM.

The discussions between the Debtors and GM that ultimately led to the terms set forth in the Settlement Agreement and the Restructuring Agreement began shortly after the Debtors filed the GM Contract Rejection Motion.  As part of a joint effort to avoid litigation related to the GM Contract Rejection Motion, during the spring and summer of 2006, the Debtors and GM developed the framework for GM's contributions to the Debtors in support of the Transformation Plan and the guiding tenets for strengthening the parties' business relationship to achieve mutually beneficial commercial and strategic objectives, as reflected in the Settlement Agreement and the Restructuring Agreement.

The Debtors' discussions with GM continued intermittently through April 2007.  By May 2007, the parties had agreed on the broad outlines of the Settlement Agreement and the Restructuring Agreement.  Throughout the summer of 2007, working groups of specialists in various subject matter areas together with senior management from the Debtors and GM developed comprehensive approaches for addressing a wide range of matters, including the resolution of issues related to the Debtors' pension and retiree benefit plans, the disposition of various legacy agreements between the Debtors and GM, the restructuring of the Debtors' U.S. manufacturing base, and the adoption of guidelines for certain ongoing commercial agreements. The parties exchanged initial drafts of various sections of the Settlement Agreement and the Restructuring Agreement in July 2007 and negotiated specific terms and conditions over the succeeding six weeks.  Both the Settlement Agreement and the Restructuring Agreement were substantially complete by the end of August 2007.

Delphi and GM first entered into the Settlement Agreement and the Restructuring Agreement on September 6, 2007.  At GM's insistence, most obligations set forth in the Settlement Agreement were to be performed upon the occurrence of the effective date of the Confirmed Plan or as soon as reasonably possible thereafter.  Under the Settlement Agreement as amended on December 7, 2007:

- GM was to assume certain postretirement benefits for certain of Delphi's active and retired hourly employees, including health care and life insurance;

- Delphi was to freeze its Delphi Hourly-Rate Employees Pension Plan as soon as practicable following the effective date of the Confirmed Plan, as provided in the Union Settlement Agreements, and GM's Hourly-Rate Employees Pension Plan was to become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi was to transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the Union Settlement Agreements;

- GM was to receive an interest bearing note from Delphi in the amount of $1.5 billion which was expected to be paid promptly in cash following effectiveness of the Plan;

- GM was to make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the Union Settlement Agreements; and

- GM and certain related parties and Delphi and certain related parties were to exchange broad, global releases (which would not apply to certain surviving claims as set forth in the Settlement Agreement).

By contrast, the Restructuring Agreement addressed matters that would require a significantly longer period of time to complete, most likely a number of years after consummation of the Plan.  Through the Restructuring Agreement, as amended on December 7, 2007, Delphi and GM had agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- Significant, ongoing contributions by GM to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and other postretirement benefit contributions provided under the Supplemental Wage Agreement, at specified UAW manufacturing facilities retained by Delphi;

- Terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- Additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by specified future dates (as defined in the Restructuring Agreement); and

- The treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

The agreements and settlements in the Settlement Agreement and Restructuring Agreement were approved by the Bankruptcy Court as part of the Confirmation Order. The terms of the Settlement Agreement and Restructuring Agreement provided that the Debtors and GM could amend the agreements. The Settlement Agreement and Restructuring Agreement also provided that such agreements would not become effective until and unless Delphi emerges from chapter 11. Consequently, GM's obligations under the Settlement Agreement and Restructuring Agreement were conditioned upon, among other things, Delphi's consummation of the Confirmed Plan, including payment of certain amounts to settle GM's claims. Ultimately, the effectiveness of the Settlement Agreement and Restructuring Agreement were to deliver, among other things, a material reduction in Delphi's liabilities related to the workforce transition programs, revenue support from GM, and certain labor subsidies, which would have provided significant amounts of liquidity to Delphi.

The events of April 4 prevented the Debtors from consummating the Settlement Agreement and Restructuring Agreement, and associated pension transactions. Nonetheless, Delphi continued to negotiate with GM regarding amendments to the Settlement Agreement and Restructuring Agreement that would allow Delphi to pursue a reaffirmed emergence business plan and propose modifications to the Confirmed Plan that would allow the Debtors to emerge from chapter 11 as soon as reasonably practicable.

On September 12, 2008, the Debtors filed a motion seeking entry of an order authorizing the Debtors to implement certain amendments to the Settlement Agreement (as subsequently amended on September 25, 2008 upon the agreement of the Debtors and GM, the "Amended GSA") and the Restructuring Agreement (the "Amended MRA"), and to modify applicable Union Settlement Agreements, as necessary, to effectuate the Amended GSA and the Amended MRA. On September 26, 2008, the Bankruptcy Court entered an order approving the Amended GSA and the Amended MRA. The Amended GSA and Amended MRA became effective on September 29, 2008.

Under the Amended GSA and Amended MRA, GM agreed to contribute additional value to the Debtors with much less conditionality. The net value of the contributions provided to the Debtors from GM under the Amended GSA and Amended MRA increased from approximately $6.0 billion under the Settlement Agreement and Restructuring Agreement to approximately $10.6 billion under the Amended GSA and Amended MRA as demonstrated in the graph below. This graph assumes that general unsecured creditors receive a recovery of 20% of their claims without contributions from GM.





In addition to the increased net contribution by GM, the Amended GSA and Amended MRA have fewer conditionality provisions than the previous versions of the agreements as demonstrated in the charts below.  In addition, all termination provisions other than the provisions allowing for termination by mutual consent or expiration have been deleted or are otherwise no longer effective.

**Comparative GSA/MRA Provisions – Conditions To Effectiveness**

| Conditionality Provisions In Original GSA/MRA | Conditionality Provisions In Amended GSA/MRA* |
|---|---|
| Unions shall have approved the Labor MOUs (GSA § 6.01(a)) | Sufficient consents received from the Unions to complete the First Net Liability Transfer under the 414(l) Transfer (GSA § 6.01(b)) |
| The Bankruptcy Court shall have entered an order approving the GSA in connection with the confirmation of the Plan and the order shall have become a final order (GSA § 6.01(b)(ii)) | The Bankruptcy Court shall have entered an order approving the Amended GSA by September 29 (GSA § 6.01(a)) |
| GM consent rights over Delphi's Plan and any modifications thereto (GSA § 6.01(c)(1)) | **Deleted** |
| GM consent rights over all exhibits or other attachments to the Plan and documents incorporated by reference in the Plan (GSA § 6.01(c)(2)) | **Deleted** |
| GM consent rights over Confirmation Order (GSA § 6.01(c)(3)) | **Deleted** |
| The plan of reorganization effective date shall have occurred (GSA § 6.01(d)) | **Deleted** |
| GM shall have received the consideration described in the Approved GSA on the effective date of the Plan and the GSA (GSA § 6.01(d)) | **Deleted** |

\*   A limited number of GM contributions to Delphi (e.g., payment term changes and the Second Net Liability Transfer under the 414(l) Transfer) are conditioned on the occurrence of the GSA/MRA Consummation Date, as defined in the Amended GSA/MRA.

**Comparative GSA/MRA Termination Provisions**

| Termination Provisions In Original GSA/MRA | Termination Provisions In Amended GSA/MRA |
|---|---|
| By GM if Delphi presents amendments, supplements, or other modifications to the Plan to the Bankruptcy Court without GM's prior written consent *(GSA § 7.03(b)(i))* | Deleted |
| By GM if Delphi presents exhibits or other attachments to the Plan, or any amendments, supplements, or other modifications thereto to the Bankruptcy Court without GM's prior written consent *(GSA § 7.03(b)(ii))* | Deleted |
| By GM if Delphi presents the proposed Confirmation Order or any amendments, supplements, or other modifications thereto to the Bankruptcy Court without GM's prior written consent *(GSA § 7.03(b)(iii))* | Deleted |
| By GM if (i) any of the Chapter 11 Cases is converted into a case under chapter 7 of the Bankruptcy Code or (ii) a trustee is appointed pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases *(GSA § 7.03(c))* | Deleted |
| By GM if it shall not have received the Consideration by March 31, 2008 or, if the EPCA has not been terminated by such date, the first to occur of the termination of the EPCA or April 30, 2008 *(GSA § 7.03(e))* | Deleted |
| **By mutual written consent *(GSA § 7.03(a))*** | **By mutual written consent (GSA § 7.03(a), MRA § 8.02(a))** |
| **Mutual Right if the Effective Date has not occurred by March 31, 2008 or, if the EPCA has not been terminated by such date, the first to occur of the termination of the EPCA or April 30, 2008 *(GSA § 7.03(d))*** | **Mutual Right if Effective Date has not occurred by September 29, 2008 (GSA § 7.03(b), MRA § 8.02(b))** |
| **Automatically on December 31, 2015 *(MRA § 7.01(c))*** | **Automatically on December 31, 2015 (other than section 4.01(a)(4) and 4.01(b) but solely with respect to Additional Labor Reimbursement, which survive such automatic termination) (MRA § 8.02(c))** |

(a)    Amended GSA

The Amended GSA is intended to resolve outstanding issues among the Debtors and GM that have arisen or may arise before the Effective Date. It addresses, among other things, commitments by the Debtors and GM regarding OPEB and pension obligations and other GM contributions with respect to labor matters, releases, and claims treatment. The Amended GSA has been revised, however, to accelerate the effectiveness of Delphi's settlement with GM and eliminate significant elements of conditionality to the performance of GM's obligations under the agreement. In addition, GM has agreed to consent to, and to waive its right to object to, any Delphi reorganization plan that provides for the GM releases, consideration, and interpretation provisions set forth in the Amended GSA. GM has also agreed to use its reasonable best efforts to satisfy the conditions precedent to the effectiveness of the Amended GSA. Finally, GM has agreed (i) subject to its right to consent to any distribution on account of its administrative claim of preferred stock with a stated value of less than $2.055 billion, that if conditions are met for GM to receive preferred stock, but there is insufficient value for holders of unsubordinated General Unsecured Claims to receive a distribution equal to 20% of their Allowed General Unsecured Claims in the form of New Common Stock at Plan Equity Value, GM's recovery on its allowed administrative claim and recoveries by holders of Allowed General Unsecured Claims may be reduced proportionally and (ii) that if any condition is not met for GM to receive preferred stock, 50% of distributions that would otherwise be made to GM on account of its administrative expense claims, up to a value of $300 million, will be conveyed to unsubordinated general unsecured creditors.

The Original GSA and the Amended GSA govern the same aspects of Delphi's settlement with GM. The Amended GSA has been revised to, among other things:

- Modify the mechanics and expand the amount of Delphi's net pension liability transfer to GM pursuant to section 414(l) of the Internal Revenue Code from $1.5

billion to approximately $3.4 billion (subject to the occurrence of the second transfer of pension liability as described in the Amended GSA);

- Increase GM's support for Delphi's traditional hourly OPEB obligations such that GM becomes financially responsible for all traditional hourly OPEB retroactive to January 1, 2007;

- Reduce GM's consideration for the pension transfer and GM's rights to distributions on its unsecured claim pursuant to a plan of reorganization; and

- Accelerate the effectiveness of certain releases granted to GM and Delphi.

Each of these modifications is described in greater detail below.

    (i)    Modification Of Pension Transfer

Delphi currently maintains the Delphi Hourly-Rate Employees Pension Plan (the "HRP") for tens of thousands of its hourly employees and retirees.  Delphi's funding obligations under the HRP are governed by the IRC and ERISA.  Under the IRC and ERISA, Delphi is required to meet certain minimum funding requirements for the HRP.  Pursuant to the Confirmed Plan and the Settlement Agreement, the Debtors were to transfer approximately $1.5 billion of net unfunded liabilities from the HRP to the General Motors Hourly-Rate Employees Pension Plan (the "GM Plan") pursuant to section 414(l) of the IRC, which would have reduced Delphi's minimum funding obligation to the HRP.  On the Effective Date of the Confirmed Plan, GM was to receive a note for $1.5 billion, which was to be repaid in cash within 10 days.  In addition, Delphi would have been required to make certain contributions to its pension plans after emergence.

Since the Debtors filed the Confirmed Plan, asset values in the HRP have declined in part due to adverse market conditions, which have contributed to a projected accumulated funding deficiency at September 30, 2008 of $2.1 billion to $2.4 billion.  To alleviate the HRP underfunding and resolve future contribution needs, the Debtors therefore sought to transfer the majority of the HRP to the GM Plan in two transfers totaling approximately $3.4 billion in net unfunded liabilities (the "414(l) Transfer").

Based on current actuarial determinations of the minimum cost of maintaining the HRP, the 414(l) Transfer was likely necessary to allow the Debtors to emerge from chapter 11 without substantial contribution obligations to their pension plans.  The Debtors and GM therefore agreed, subject to Bankruptcy Court approval, to implement the 414(l) Transfer in connection with the consummation of the Amended GSA and in compliance with IRC section 414(l) and the private letter ruling issued by the IRS to Delphi on May 29, 2007 (the "Private Letter Ruling").

Pursuant to the Amended GSA, the Debtors will transfer to the GM Plan all allocable pension benefit obligations (the "Allocable PBOs") and an allocable portion of the HRP assets (the "Assets") for those employees who were transferred or intended to be transferred to Delphi at the time of Delphi's spin-off from GM, with the unfunded portion of such Allocable PBOs representing the transferred liability (the "Transferred Liability").

The 414(l) Transfer is taking place in two separate transfers.  The first transfer was effective on September 29, 2008 (the "First Transfer Date").  On the First Transfer Date, the Debtors moved Transferred Liability sufficient to avoid an accumulated funding deficiency for the plan year ended September 30, 2008, which is estimated to be approximately $2.1 to $2.4 billion.  The Debtors also transferred approximately 90% of the Assets corresponding to the liability transferred on the First Transfer Date, which was valued at approximately $500 million to $1 billion.  The remaining 10% of the Assets will be transferred to the GM Plan after an approximate six-month true-up period.  During this six-month true-up period, the HRP would continue to deliver pension payments associated with the Transferred Liabilities to ensure continuity of administration.

The second transfer will be completed upon Delphi's emergence from chapter 11 (the "Second Transfer Date"), provided that the Modified Plan (i) provides for the treatment of GM's claims and releases as set forth in the Amended GSA and (ii) contains provisions clarifying that if there is any inconsistency with respect to the subject matter of the Amended GSA and the Amended MRA between the terms of the Modified Plan and the terms of the Amended GSA and Amended MRA, the terms of the Amended GSA and Amended MRA will govern.  On the Second Transfer Date, the Debtors will convey the remainder of the Transferred Liability representing the remaining net-unfunded liability related to Allocable PBOs, which Delphi estimates to be approximately $1 billion (but may increase or decrease depending on, among other things, the performance of the assets in the pension plan).

Reaching agreement with GM on the 414(l) Transfer (together with freezing its pension plans) has allowed Delphi to accomplish its goal of devising a workable solution to its pension funding situation and to avoid billions of dollars of cash contributions that would otherwise have been required to be funded upon emergence from chapter 11 due to certain changes in pension laws.  Under current IRC and ERISA funding standards, the 414(l) Transfer implemented during the current plan year should significantly reduce Delphi's funding obligations to the HRP by avoiding any accumulated funding deficiency as of September 30, 2008.  Upon the completion of both steps of the 414(l) Transfer, Delphi will be left with unfunded liabilities for the retained portion of the HRP of only approximately $100 million. Because the 414(l) Transfer will reduce the Debtors' emergence contribution required in connection with the HRP, the Debtors' emergence capital funding requirements have been significantly reduced.

Consummating the 414(l) Transfer prior to September 30, 2008 also prevented the potential assessment of significant excise tax penalties with respect to the HRP underfunding that the IRS could have imposed if the Debtors had not effectuated the 414(l) Transfer.  Section 4971(a) of the IRC imposes a 10% excise tax penalty on the amount of any funding deficiency. Under section 4971(b) of the IRC, an additional excise tax penalty of 100% may be assessed by the IRS if the funding deficiency is not timely corrected.  Although the Debtors believe such penalties would have been unenforceable under applicable bankruptcy law, consummating the 414(l) Transfer before September 30, 2008 avoided a dispute with the IRS over the issue as well as any questions about how a potential significant excise tax assessment would be reflected in the Debtors' financial statements.

The 414(l) Transfer also eliminated more than $1.2 billion in alleged liens that were filed by the PBGC against Delphi's non-debtor foreign affiliates. The PBGC has publicly stated that as

a result of the transfer of pension liability, the PBGC will begin withdrawing its related lien filings.

    (ii)    Modification Of GM's Assumption Of Delphi OPEB Obligations

Under the Settlement Agreement, and in connection with the effectiveness of the Union Settlement Agreements, Delphi was to cease providing certain post-employment benefits such as health care benefits and employer-paid post-retirement basic life insurance benefits and GM was to assume the provision of OPEB to certain Delphi employees and retirees. Under the Settlement Agreement, GM was to reimburse Delphi for OPEB costs from January 1, 2007 through the date after the effective date of the confirmed Plan when Delphi actually terminated OPEB for its hourly retirees and employees. In addition, GM was to reimburse Delphi for OPEB provided by Delphi since January 1, 2007 only after the effective date of the confirmed Plan.

The Amended GSA retains GM's assumption of those post-retirement benefits, but accelerates the effectiveness of GM's assumption of financial responsibility for the OPEB liabilities to September 29, 2008. Under the Amended GSA, GM assumed financial responsibility for all Delphi traditional hourly OPEB liability from and after January 1, 2007, which was implemented and satisfied by GM reimbursing Delphi for OPEB expenses from January 1, 2007 through the date when Delphi actually terminates OPEB for its hourly retirees and employees and GM assumes the OPEB obligations for the hourly retirees and employees. The cash reimbursement for the period from January 1, 2007 through June 30, 2008 was approximately $350 million. GM will also reimburse Delphi for traditional hourly OPEB paid from July 1, 2008 going forward until Delphi actually transitions the administration of the OPEB for its hourly retirees and employees. In addition to assuming financial responsibility for all of Delphi's traditional hourly OPEB retroactive to January 1, 2007 on the effective date of the Amended GSA, GM will assume direct responsibility for the OPEB obligations in accordance with the implementation agreements discussed above. GM has committed to use its best efforts to begin administering OPEB on or before the 90th day following the date Delphi ceases providing OPEB, which, in accordance with the implementations agreements, is anticipated to be January 1, 2009 or as soon as practicable thereafter. During the 90-day period, Delphi will receive from GM amounts in advance of facilitating OPEB payments to hourly employees on behalf of GM for approximately 90% of the estimated OPEB payments with the remaining 10% settled for actual payments made in the preceding month. The Debtors believe the net present value of the OPEB obligations is approximately $5.5 billion.

    (iii)    GM's Claims

Under the Confirmed Plan, GM was to receive a general unsecured claim that would have been satisfied through the issuance of $1.073 billion in face amount of non-voting convertible preferred stock in Reorganized Delphi, $1.5 billion in a combination of cash and notes, and global releases from Delphi and certain third parties. In addition, as consideration for the section 414(l) transfer of $1.5 billion that was contemplated under the Settlement Agreement, GM was to receive a note for $1.5 billion that was to be payable in cash within 10 days of the effective date of the Plan.

To facilitate a viable capital structure for the Debtors, GM has now agreed to fix its general unsecured claim amount at $2.5 billion and subordinate its recovery on such claim until other general unsecured creditors have achieved a recovery of 20% of the allowed amount of their claims (other than holders of claims arising from Delphi's trust preferred securities).  Once Delphi's other general unsecured creditors have received a distribution of 20% of the allowed amount of their claims, if there is any remaining value to be distributed, GM will receive a distribution on its general unsecured claim until it has received a 20% distribution on such claim amount.  Once GM has received a 20% distribution on its general unsecured claim, and if there is any remaining value to be distributed, any additional distributions will be shared ratably between GM and Delphi's other general unsecured creditors.

Based on GM's contributions under the Amended GSA and Amended MRA for completing the Section 414(l) Transfer, GM will receive an allowed administrative expense claim in the amount of no more than $2.055 billion.  As a basis for calculating the amount of GM's administrative claim, GM and the Debtors agreed to fix the administrative claim (at a reduced amount) to the amount of unfunded liabilities transferred to GM through the 414(l) Transfer.  The administrative claim will be allowed in two steps.  On the First Transfer Date of the 414(l) Transfer, GM received a claim equivalent to 77.5% of the net unfunded liabilities transferred on the First Transfer Date.   On the Second Transfer Date of the 414(l) Transfer, GM will receive the balance of the $2.055 billion claim.  In a chapter 11 reorganization in which Delphi emerges with its principal core businesses, the plan of reorganization may satisfy GM's administrative claim through the issuance of non-voting convertible preferred stock (provided that (i) Delphi's term funding (plus a revolving credit facility) does not exceed $3.0 billion, (ii) no equity securities are issued that are senior to or pari passu with GM's preferred stock, (iii) the Modified Plan provides for the GM releases as described in the Amended GSA, and (iv) the Modified Plan contains provisions clarifying that if there is any inconsistency with respect to the subject matter of the Amended GSA and the Amended MRA between the terms of the Modified Plan and the terms of the Amended GSA and Amended MRA, the terms of the Amended GSA and Amended MRA will govern).  Pursuant to the First Amendment to the Amended GSA, which was approved by the Bankruptcy Court on September 25, 2008, GM has agreed (i) subject to its right to consent to any distribution on account of its administrative claim of preferred stock with a stated value of less than $2.055 billion, that if conditions are met for GM to receive preferred stock, but there is insufficient value for holders of unsubordinated General Unsecured Claims to receive a distribution equal to 20% of their Allowed General Unsecured Claims in the form of New Common Stock at Plan Equity Value, GM's recovery on its allowed administrative claim and recoveries by holders of Allowed General Unsecured Claims may be reduced proportionally and (ii) that if any condition is not met for GM to receive preferred stock, 50% of distributions that would otherwise be made to GM on account of its administrative expense claims, up to a value of $300 million, will be conveyed to unsubordinated general unsecured creditors.

(iv)    Modification Of Releases

Under the Settlement Agreement, Delphi and GM were to exchange global releases, and GM was to receive third-party releases, that would have become effective upon the effectiveness of the Settlement Agreement and Restructuring Agreement (which was to be the effective date of the Confirmed Plan).  Under the Amended GSA, the Debtors released GM upon the effectiveness

of the Amended GSA and the Amended MRA.  Because the releases are an integral part of the consideration GM is receiving in exchange for the benefits its is providing to the Debtors' estates under the Amended GSA and the Amended MRA, GM was unwilling to implement the Amended GSA and the Amended MRA and to provide the benefits thereunder unless the releases by the Debtors were granted contemporaneously with the effectiveness of the Amended GSA and the Amended MRA.  In addition to providing a release to GM, the Debtors agreed to withdraw, with prejudice, the GM Complaint.  The Debtors have agreed that the Modified Plan would contain third party releases for GM.  As with the releases from the Debtors, GM was unwilling to implement the Amended GSA and the Amended MRA without the requirement that any modified Plan proposed by Delphi include the third party releases.  The effectiveness of third party releases for GM, however, would not begin until the date of substantial consummation of a modified Plan.  Failure of the Modified Plan to include such third party releases for GM would have the following consequences:  (1) GM would not be required to accept preferred stock in satisfaction of its administrative expense claim; (2) GM would not be required to complete the second tranche of the 414(l) Transfer on the Effective Date; and (3) there would be no temporary acceleration (as described below) of GM's payment terms pursuant to the Amended MRA.

(b)    Amended MRA

The Amended MRA is intended to govern certain aspects of Delphi and GM's commercial relationship.  The Amended MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM.  The effectiveness of the Amended MRA is concurrent with the effectiveness of the Amended GSA and GM's obligations under the MRA are not subject to termination until December 31, 2015 (provided that certain obligations of GM with respect to legacy UAW employees would survive any such termination).  Through the Amended MRA, Delphi and GM have agreed to certain terms and conditions governing, among other things, the scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards.

GM's enhanced obligations under the Amended MRA are considerable.  First,  the Amended MRA has been revised to eliminate GM's ability to receive the price-downs originally contemplated in the Restructuring Agreement.  Second, GM will provide Delphi with $110 million annual keep site facilitation payments in 2009 and 2010 (payable in quarterly installments), which will allow Delphi to address downward pressures resulting from the current economic environment and commodity costs impacting U.S. sites producing parts for GM specifically for the 2009 and 2010 time periods.  GM's obligation for the keep site facilitation payments is not contingent on the Debtors' emergence from chapter 11.  The Amended MRA also maintains GM's support, in the form of a cash contribution, for Delphi's efforts to sell certain businesses and U.S. facilities.  Third, the Amended MRA restricts GM's ability to re-source products manufactured at core U.S. operations through at least 2011 and Mexican operations through 2010.  Fourth, the Amended MRA also has been revised to temporarily accelerate GM's payment terms through 2011 upon the effectiveness of an access agreement and the consummation of a revised Plan that (i) provides GM the consideration and releases under

the Amended GSA, (ii) contains provisions clarifying that if there is any inconsistency with respect to the subject matter of the Amended GSA and the Amended MRA between the terms of the Plan and the terms of the Amended GSA and Amended MRA, the terms of the Amended GSA and Amended MRA will govern, and (iii) pursuant to which the Debtors emerge with substantially all of their core businesses.

Pursuant to the Amended MRA, on the effective date, GM will begin reimbursing Delphi for its actual cost of all current and future workers compensation, disability, supplemental unemployment benefits, and severance obligations incurred by Delphi after January 1, 2009 in relation to all current and former UAW-represented hourly active, inactive, and retired employees.

(c)     GM Advance Agreement

Pursuant to various orders entered by the Bankruptcy Court during these Chapter 11 Cases, and in anticipation of entering into the Settlement Agreement and the Restructuring Agreement, the Debtors expended significant sums that would have otherwise been reimbursed by GM following the effectiveness of the Settlement Agreement and the Restructuring Agreement.  In connection with the extension of the maturity date of the DIP Facility, on April 30, 2008, the Bankruptcy Court authorized the Debtors and GM and/or a GM affiliate to enter into an arrangement under which GM agreed to advance to Delphi up to $650 million in anticipation of the effectiveness of the Settlement Agreement and the Restructuring Agreement (the "GM Advance Agreement").  In return, GM would receive an administrative claim for such advances.

On August 7, 2008, GM agreed to amend the GM Advance Agreement to provide for an additional $300 million availability above the existing $650 million to be provided under the original agreement.  Interest on advances above the original facility amount of $650 million may be cancelled if certain conditions are met. The advances will remain administrative claims in Delphi's Chapter 11 Cases.  On August 6, 2008, Delphi filed a motion requesting approval of the amended agreement.  On August 20, 2008, CR Intrinsic Investors, LLC and Highland Capital Management, L.P. filed an objection to the Debtors' motion and requested the appointment of an examiner, which request was subsequently withdrawn.  On September 25, 2008, the Bankruptcy Court approved the amendment to expand the facility under the GM Advance Agreement.  When the Amended GSA and Amended MRA became effective on September 29, 2008, the original $650 million commitment terminated but the additional $300 million commitment remains outstanding.

## G.    Product Portfolio Transformation

To implement the third element of Delphi's Transformation Plan, the Company announced plans to focus its product portfolio on those core technologies for which the Company has significant competitive and technological advantages and expects the greatest opportunities for increased growth.  To that end, the Company is focusing the organization around the following core strategic product lines:

- Controls & Security (Body Controllers & Security Systems, Mechatronics and Displays);

- Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems and Electrical Centers);

- Entertainment & Communications (Audio, Navigation, and Telematics);

- Powertrain (Diesel and Gas Engine Management Systems);

- Safety (Occupant Protection Systems and Safety Electronics); and

- Thermal (Climate Control & Powertrain Cooling).

These core businesses are where Delphi's technical strength can provide the greatest support and differentiation to its customers in automotive, aftermarket, and adjacent markets such as commercial vehicles, medical systems, computers and peripherals, military/aerospace, telecommunications, commercial, residential, and transportation products. Effective July 1, 2006, Delphi implemented changes to its organizational structure and management reporting to support the management of the core product lines.  As a result of the new structure, the Company changed its reporting segments in the third quarter of 2006 from three reportable segments to six reportable segments.  Delphi's businesses are arranged into natural product-focused groupings, supported by an electronics competency center that preserves Delphi's electronics expertise, scale, and scope.

The Company has also identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Exhaust, Power Products, Ride Dynamics, Steering, and Wheel Bearings.  The Company will continue its efforts to sell or wind down these non-core product lines (which include approximately one-third of its global manufacturing sites) and will consult with its customers, Unions, and other stakeholders to carefully manage the transition of such affected product lines.  The Company is in the process of selling and will continue to sell or wind-down the non-core product lines and manufacturing sites through 2008 and beyond.

In creating its current portfolio plan, Delphi examined the overall market attractiveness of each of its then existing divisions and product lines, including whether a manufacturing site or its technology was contemporary or outdated.  Delphi then considered each line of business with respect to its overall revenue and profitability, market share, and percentage of revenue attributable to GM business.

In considering market share, Delphi looked at the absolute share of the market possessed by the Delphi product as well as the share position of the Delphi product relative to all participants in the market.  This examination allowed Delphi to determine the extent to which Delphi possessed a leadership position within the product segment.  Delphi next examined the extent to which revenues were attributable to GM business.  Businesses that had demonstrated growth with non-GM customers provided concrete evidence of competitiveness and market

success.  Alternatively, those businesses that had not diversified beyond GM since the Separation provided evidence of some weakness in Delphi's competitive position.

Also on March 31, 2006, and as part of the Transformation Plan, Delphi identified eight manufacturing sites as its core automotive manufacturing facilities in the U.S.  The core facilities are:  (i) Brookhaven, Mississippi; (ii) Clinton, Mississippi; (iii) Grand Rapids, Michigan; (iv) Kokomo, Indiana; (v) Lockport, New York; (vi) Rochester, New York; (vii) Vandalia, Ohio; and (viii) Warren, Ohio.



| ● Continuing Sites | |
| --- | --- |
| Brookhaven, MS | Lockport, NY |
| Clinton, MS | Rochester, NY |
| Grand Rapids, MI | Vandalia, OH |
| Kokomo, IN | Warren, OH |

| Non-Continuing Sites | | |
| --- | --- | --- |
| Adrian, MI | Gadsen, AL | New Brunswick, NJ |
| Anaheim, CA | Home Avenue (Dayton, OH) | New Castle, IN |
| Anderson, IN | Irvine, CA | North Kansas City, MO |
| Athens, AL | Kettering, OH | Orion, MI |
| Columbus, OH | Landrum, SC | Saginaw, MI* |
| Coopersville, MI | Laurel, MS | Sandusky, OH |
| Cottondale, AL | Milwaukee, WI* | Spring Hill, TN |
| Fitzgerald, GA | Moraine, OH | Tulsa, OK |
| Flint, MI | Needmore Road (Dayton, OH) | Wichita Falls, TX |
| Foley, AL | Olathe, KS | |

* Indicates more than one site at location

During the course of these Chapter 11 Cases, the Debtors sold or received Bankruptcy Court authority to sell several facilities or business lines that do not fit into their future strategic framework including:

- The sale of substantially all of the assets of MobileAria, Inc. ("MobileAria") to Wireless Matrix USA, Inc., which was approved by the Bankruptcy Court on July 21, 2006;

- The sale of a New Brunswick, New Jersey, battery manufacturing facility to Johnson Controls, Inc., which was effective August 1, 2006;

- The wind-down of a Delphi Medical Texas facility in Houston, Texas, which was approved by the Bankruptcy Court on December 18, 2006;

- The consolidation of fuel injector production in Rochester, New York during 2006-2007, which allowed the Debtors to wind down a manufacturing facility in

Coopersville, Michigan, reducing losses and yielding improvements in terms of infrastructure utilization, value stream maximization, inventory reduction, and quality;

- The settlement of a social plan in the "Concurso," or Spanish insolvency proceeding, of Delphi Automotive Systems Espana S.L., the funding of which was approved by the Bankruptcy Court on July 19, 2007 and approved by the Spanish Concurso court on July 31, 2007;

- The sale of the brake components business, including a manufacturing plant in Saltillo, Mexico, to Robert Bosch LLC and its affiliate Frenados Mexicanos, S.A. de C.V., which was approved by the Bankruptcy Court on July 19, 2007;

- The sale of the brake hose manufacturing business in Dayton, Ohio to Harco Manufacturing Group, LLC, which was effective September 28, 2007;

- The sale of the Company's original equipment and aftermarket catalyst business to Umicore, which was effective September 30, 2007;

- The sale of certain assets to TRW Integrated Chassis Systems, LLC, which was approved by the bankruptcy Court on November 29, 2007;

- The sale of a facility located in Wichita Falls, Texas to SBP Enterprises, Inc., which closed in March 2008;

- The sale of the Company's Wheel Bearings business to Kyklos Bearing International, Inc., f/k/a Kyklos, Inc., which closed on April 30, 2008;

- The sale of certain assets located in Kettering, Ohio, and used in the Debtors' U.S. Damper business, which closed in mid-2008;

- The sale of the Company's Interiors and Closures business to Inteva Products, LLC, a subsidiary of the Renco Group Inc., which closed on February 29, 2008; and

- On February 21, 2008, the Bankruptcy Court entered an order approving the transfer of the Steering business to Steering Solutions (an affiliate of Platinum Equity).

In addition, on April 30, 2007, the Debtors closed a transaction whereby an investor purchased and leased to the Debtors a facility comprised of 347,800 square feet of office space and 90,000 square feet of lab space situated on approximately 35 acres located in Auburn Hills, Michigan.  Through this transaction, the Debtors expect to obtain significant economic advantages from the consolidation of six leased and owned facilities in Michigan and Illinois, and possibly other facilities over the next few years.  This transaction has allowed the Debtors to create a single, state-of-the-art technical center located in close proximity to the Debtors' major customers, and should accelerate the development of new products and innovations, foster better communications among employees, and properly project Delphi's image of technical and technological excellence.  The Debtors further believe that the consolidated facility will facilitate

creative dialogue among diverse groups and teams at Delphi, and that this dialogue will spark new innovation that should enable the Debtors to gain an edge on competitors in the industry.

In furtherance of the product portfolio and manufacturing footprint transformation, as an important aspect of the settlements reached with Delphi's Unions, certain provisions in the labor agreements that precluded Delphi from selling or closing facilities that did not figure into Delphi's planned core business operations were removed or modified.  The Company's business plan reflects the short-term reduction in revenue from divested businesses as well as the increased efficiency that will ultimately result from Delphi's focus on its core businesses.  In completing the realignment of its product portfolio, Delphi will continue to work diligently to assure that the transformation is seamless and transparent and that quality, delivery, and customer satisfaction are not negatively impacted.

**H.    Cost Structure Transformation**

*1.    As part of its organizational restructuring, the fourth element of Delphi's Transformation Plan, the Company announced in March 2006 that it expected to reduce its global salaried workforce by as many as 8,500 employees, including those reduced through dispositions of businesses.  The Company committed to these reductions following an analysis of the Company's SG&A cost saving opportunities and they are, in part, a result of the portfolio and product rationalizations and initiatives discussed above.  The Company believed that once its SG&A plan was fully implemented, the Company should realize savings of approximately $450 million per year including savings realized from competitive measures planned for its core businesses and the disposition of non-core assets.  As a result of changes in the automotive industry, as more fully described in Section VI.D. – Reaffirmation Of POR Business Plan, the Company is implementing further SG&A cost reduction actions. The Company now believes, that once fully implemented, it should realize savings of approximately $560 million.  In addition, as part of this transformation, the Company developed a competitive benchmark executive and non-executive compensation program.SG&A Realignment*

In furtherance of its SG&A realignment, the Company in May 2006 retained Booz Allen to assist the Company with designing and implementing the SG&A program.

Since that time, Booz Allen has worked closely with the Company to further Delphi's goal of achieving the approximately $450 million of savings: the creation of a finance transactional process, select human resources, and sales process shared service organization; the streamlining of divisional/product business units' SG&A in finance, human resources, and customer interaction processes; the streamlining of the corporate structure of the organization; the transformation of information technologies ("IT"), including the creation of IT shared services and exploration of other opportunities to reduce costs; and the implementation of new product organization.  To further this goal, the Company has taken several steps to begin the transformation of IT and streamlining finance services.  As previously mentioned, since the

initial commitment, the Company has committed to reducing the SG&A expense an additional $110 million, bringing the total savings to $560 million.

The transformation of IT is expected to reduce the IT operating budget by $256 million, much of which will be realized by the end of 2009. This reduction in cost is to be achieved through three transformation actions: outsourcing of IT services, reducing the number and type of unique, non-common systems, moving to common operating platforms, and running a streamlined IT shared service organization. Outsourcing of IT services, which is expected to achieve a portion of the $256 million in savings, has been proceeding in three phases. Delphi's shared service model calls for the outsourcing of the following IT services: (a) global infrastructure services, including desktops, service desk, and mainframe and server systems hosting, (b) system development, maintenance, and support, and (c) network services such as data networks and voice services.

The Debtors have received Court authority to proceed with each of these three phases. On October 19, 2006, the Debtors received Court authority to complete the first phase of IT outsourcing, the outsourcing of global IT infrastructure services. This relief permitted the Debtors to enter into and fully perform under (a) an agreement with Electronics Data Systems Corporation and EDS Information Services, LLC (together, "EDS") which provides for the outsourcing of global desktops, service desk, and hosting mainframe systems (the "EDS Agreement"), and (b) an agreement with Hewlett Packard Company, which provides for the outsourcing of hosting server systems. On April 23, 2007, the Bankruptcy Court granted the Debtors authority to enter into and fully perform under (a) an agreement between Computer Sciences Corporation ("CSC") and Delphi which provides for the system support for SAP, commercial, supply chain, and manufacturing services (the "CSC Agreement"), and (b) an amendment to the EDS Agreement which provides for engineering systems support. Finally, on May 31, 2007, the Bankruptcy Court entered an order permitting the Debtors to enter into an amendment to the agreement with CSC to provide for global network support services.

In addition, on April 23, 2007, the Debtors received Court authority to enter into a finance transactional processes outsourcing agreement with Genpact International, LLC, which provides for the outsourcing of certain of the Company's accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes. Through this agreement, the Company expects to reduce the number of internal employees performing these processes and improve productivity over time by reducing the number and type of unique, non-common systems, moving to common operating platforms, and running a streamlined shared service organization. This will help to ensure that the Debtors' organizational and cost structure is competitive following their emergence from chapter 11.

The outsourcing of certain IT and financial services has been conducted concurrently with the general realignment and reduction of the Debtors' salaried workforce. Part of this realignment was effected through Delphi's 2006 realignment of its business operations to focus its product portfolio on core technologies for which Delphi believes it has significant competitive and technological advantages. This realignment allowed the Debtors to improve processes and decrease administrative activities. As a result of these activities, the Debtors were able to reduce the number of salaried employees in 2006 by 7.4% from December 2005 levels. The current number of salaried employees is at a historic low for the Company.

2.      *Salaried Employee Compensation Program*

(a)      Competitively Benchmarked Salaried Employee Compensation
Program – Introduction – Compensation Committee Philosophy
And Strategy Statement

One of the fundamental tenets of the Company's transformation plan has been to become competitive in every aspect of its business including both hourly and salaried compensation programs.    To meet that objective with respect to the Company's salaried employee compensation program, the Company has developed competitively benchmarked executive and non-executive compensation programs.   For purposes of this section, "executives" means those global employees in Bands A through F, which is comprised of about 530 such employees including the Delphi Strategy Board ("DSB"), which is comprised of Delphi's 21 top policy-making decision makers (each, a "DSB Member").

These programs have been developed under the supervision of Delphi's Compensation and Executive Development Committee (the "Compensation Committee") which consists of three independent directors who joined the Board of Directors within the last three years:

| Name | Position | Term On Board |
|------|----------|---------------|
| Craig G. Naylor | Chairman of the Compensation Committee | Since 2005 |
| John D. Englar | Member of the Compensation Committee | Since 2006 |
| Raymond J. Milchovich | Member of the Compensation Committee | Since 2005 |

Since September, 2006, the Compensation Committee has met more than 20 times to thoroughly discuss, review, and refine the executive compensation and executive benefit programs.   These programs require written employment and change in control agreements to be signed by each DSB Member and short-form agreements to be signed by the remainder of the Company's executives.    These agreements are required to be signed and delivered to the Company by any executive prior to participation in the post-emergence salaried executive compensation program.

Among other matters, both the longer-form DSB agreements and the short-form agreements for other executives include voluntary waivers of claims against the Company as of the Effective Date by each executive with respect to all compensation and benefit related claims against the Company existing under prior programs.   In the case of DSB Members, these waivers will include waivers of the prepetition "change in control agreements."   As discussed below, the aggregate change in control liabilities arising under the prepetition change in control agreements are potentially substantial.   If all participants were to successfully assert claims under the change in control agreements, the resulting liability could total as much as $257.5 million.   The change in control agreements as described on Modified Plan Exhibit 8.1(a) will be rejected pursuant to the Modified Plan.    Accordingly, the Company's implementation of the new competitively benchmarked salaried executive compensation programs will not only fulfill the Company's transformation objective of achieving competitive salaried compensation programs but will also

benefit the Company and its stakeholders by eliminating up to $257.5 million of potential prepetition claims from the Company's unsecured claims pool.

In designing the executive compensation components for Reorganized Delphi, the Compensation Committee is committed to delivering a total compensation program for salaried executive employees that supports Delphi's business and personnel strategies and aligns with the interests of Delphi's key stakeholders. In particular, the Compensation Committee believes that Delphi must provide a target total reward opportunity sufficient to attract and retain high-caliber executives who can effectively manage Delphi's complex global businesses, taking into account the competitive marketplace, as well as each executive's experience and performance. In general, this involves developing and adjusting, in conjunction with the Compensation Committee's independent compensation consultant, a target pay structure that provides median total direct compensation opportunity at planned levels of performance and total direct compensation opportunity which can be above the median when Delphi achieves performance that exceeds the plan. In this regard, the Compensation Committee assesses both total direct compensation, which is the sum of salary plus annual incentive opportunity plus long-term incentive opportunity, and total compensation, which includes other aspects of pay, including retirement benefits. Market total direct compensation comparisons for the members of the DSB were developed from proxy data from a comparable group of large, diversified companies, as well as from manufacturing and auto industry survey data. Market total direct compensation comparisons for non-DSB executives were developed from survey data only.

Other material elements of the Compensation Committee's philosophy and strategy can be summarized as follows:

- Link the majority of the total compensation opportunities to performance-based incentives and the creation of shareholder value consistent with Delphi's long-term strategic goals
- Make stock-based incentives a core element of executives' compensation including stock holding requirements for senior executives
- Provide flexibility to recognize, differentiate, and reward individual performance

Exhibit 7.8 of the Modified Plan includes the full compensation philosophy statement adopted by the Compensation Committee, summaries of the major elements of the post-emergence compensation program (described in summary below), the form employment agreements and change in control agreements to be executed by DSB members and the form employment agreement and change in control agreement to be executed by the President and Chief Executive Officer.

The employment and change in control agreements that were included in Exhibit 7.8 of the Confirmed Plan were approved by the Bankruptcy Court on January 25, 2008. Those agreements will be modified at the closing to become effective as of the Effective Date and to eliminate references to the former Investment Agreement with the Plan Investors and to conform the agreements to Section 409A of the IRC.

(b)    Competitively Benchmarked Salaried Employee Compensation
Program – Summary Of Emergence Date Payments And The Post-
Emergence Salaried Executive Compensation Program

The following describes each component of the post-emergence salaried executive compensation program.  In entering the order confirming the Confirmed Plan, the Bankruptcy Court approved the adoption of the Delphi Corporation 2007 Short-Term Incentive Plan (the "STIP"), the Delphi Corporation 2007 Long-Term Incentive Plan (the "LTIP"), the Delphi Corporation Supplemental Executive Retirement Program (the "Approved SERP:"), the Delphi Corporation Salaried Retirement Equalization Savings Program (the "Approved SRESP"), the form employment agreement and change in control agreement to be executed by each DSB member, and the form employment agreement and change in control agreement to be executed by the President and Chief Executive Officer.  On September 23, 2008, the Bankruptcy Court entered an order authorizing the modification of the Approved SERP and Approved SRESP to account for the September 30 2008 freeze of the Delphi Retirement Program for Salaried Employees, the tax qualified pension plan (the "SRP"), and the implementation of Delphi contributions to the tax-qualified defined contribution plan (hereinafter, the "Amended SERP" and the "Amended SRESP" and collectively, the "new supplemental executive retirement program").

(i)    Claims Release Process

As a condition to entering into new employment or change-in-control agreements, eligibility to participate in certain new compensation and benefit arrangements, including the new supplemental executive retirement program and receipt of emergence cash and emergence equity grants, each DSB Member must contractually waive and release all pre-existing claims, including those arising from prepetition employment, change in control, or other employment-related agreements and/or benefits under certain compensation and benefit arrangements.  Each non-DSB executive will likewise be required to waive all pre-existing claims as a condition of eligibility to participate in certain new compensation and benefit arrangements, including the new supplemental executive retirement program, and to receive the emergence cash and emergence equity grants.

(ii)    DSB Member Employment Agreements

(1)    General

The Company will enter into employment agreements with each DSB Member, including the President and Chief Executive Officer, whose agreement is described under the heading "President and Chief Executive Officer Employment Agreement" below.  Each DSB Member will serve in an executive position reasonably consistent with his or her current position at the executive's work location prior to the Effective Date of the Modified Plan.

(2)    Term

The DSB Member employment agreements will become effective and the DSB Member's employment will commence upon the Effective Date of the Modified Plan and will end on December 31, 2010 (unless earlier terminated as provided in the applicable employment

agreement) and, commencing on January 1, 2011, will automatically renew each January 1 thereafter for additional one-year terms unless either party gives 60 days' advance written notice of non-renewal. The employment agreements will not become effective unless the post-emergence salaried executive compensation program is the same in all material respects to the compensation and benefit arrangements as approved by the Bankruptcy Court in connection with the approval of the Confirmed Plan.

(3)    Compensation

Each DSB Member will receive an annual base salary at a rate equal to his or her current salary, subject to annual review and increase, but not decrease, except that the annual base salary may be reduced pursuant to across-the-board salary reductions. In addition, the individual will be eligible to participate in incentive plans at levels comparable to similarly situated executives at peer group companies and will be eligible to participate in all employee benefit plans made available by Delphi to similarly situated executives at peer group companies, including supplemental executive retirement programs.

(4)    Termination Of Employment

A DSB Member's employment may be terminated at any time by the Company with or without Cause (as defined in the employment agreement) or by the DSB Member for Good Reason (as defined in the employment agreement).

If a DSB Member is terminated without Cause or resigns for Good Reason, subject to the execution of a release of claims by the executive in favor of Delphi and compliance with a perpetual non-disclosure provision, an invention assignment provision and non-competition and nonsolicitation provisions (covering customers and employees) for an 18-month period following the date of termination, the DSB Member generally will be entitled to the following amounts:

• cash severance equal to 18 months' base salary and 18 months' short-term incentive target, payable in installments over an 18-month period;

• a lump sum cash payment of any unvested amounts credited to the DSB Member's accounts under the Company's qualified and/or nonqualified supplemental or excess defined contribution plans; and

• accelerated vesting of all outstanding service-based equity or equity-based awards held by the DSB Member as of the date of termination (which awards will be exercisable for a period of nine months following the date of termination, but in no event beyond the remainder of their term).

The aggregate amount of severance, if, in the unlikely event, all U.S.-based DSB Members and executives in Bands A through F, or approximately 420 employees, were terminated by the Company without Cause, is estimated to be approximately $125 million (the aggregate severance for the Company's non-U.S.-based employees has not been estimated).

(iii)    President And CEO Employment Agreement

(1)    General

It is currently contemplated that the Company will enter into a new employment agreement with Mr. Rodney O'Neal pursuant to which he will serve as President and Chief Executive Officer of the Company and will be nominated for re-election to Delphi's Board of Directors (the "Board"), reporting directly to the Board and/or any Chairman of the Board.  The following is a summary of the new employment agreement that is expected to be entered into with Mr. O'Neal.

(2)    Term; Place Of Employment

Mr. O'Neal's employment agreement will have an initial term that will commence upon the Effective Date of the Modified Plan and will end on December 31, 2010 (unless earlier terminated) and, commencing on January 1, 2011, will automatically renew each January 1 thereafter for additional one-year terms unless either party gives 120 days' advance written notice of non-renewal.  Mr. O'Neal's employment agreement will not become effective unless the post-emergence salaried executive compensation program is the same in all material respects to the compensation and benefit arrangements as approved by the Bankruptcy Court in connection with the approval of the Confirmed Plan.

(3)    Compensation

Mr. O'Neal will receive an annual base salary of $1,500,000, subject to annual review and increase, but not decrease, except that the annual base salary may be reduced pursuant to across-the-board salary reductions (but in no event may such reductions cause his base salary to fall below $1,300,000).  In addition, Mr. O'Neal will be eligible to participate in short-term incentive plans, which plans will provide an opportunity to earn an annual incentive, at target, of not less than 125% of his base salary as in effect at the beginning of such annual period.  Commencing in 2009, Mr. O'Neal will also be eligible to participate in long-term incentive plans at levels comparable to similarly situated executives (generally defined as the Company's senior executive officers), but reflective of his position, which arrangements will provide for grants at an annual rate of not less than 445% of his base salary as in effect at the beginning of such annual period.  One-half of the value of these annual grants will be made in the form of stock options or stock appreciation rights and one-half of the value will be in the form of restricted stock or restricted stock units, with the exercise or vesting of one-half of the value of such annual grants based on time, and the other half based on performance.  Mr. O'Neal will also be eligible to participate in all employee benefit plans made available by Delphi to similarly situated executives, including supplemental executive retirement programs.

(4)    Emergence Awards

On or promptly after the Effective Date of the Modified Plan, Mr. O'Neal will receive (i) a lump sum cash emergence performance payment of $1,011,621 and (ii) long-term incentive compensation opportunities with a value of $10,000,000, of which he will receive restricted stock or restricted stock units with a value of $5,000,000 and stock options with a value of $5,000,000.  These awards will be subject to approval by the Board.

(5)    Termination Of Employment

Mr. O'Neal's employment may be terminated at any time by the Company with or without Cause (as defined in his employment agreement) or by the executive for Good Reason (as defined in his employment agreement). Upon termination of his employment with the Company under any circumstances, Mr. O'Neal will resign from the Board. If Mr. O'Neal is terminated without Cause or resigns for Good Reason, subject to the execution of a general release of claims in favor of the Company and compliance with a perpetual non-disclosure provision, an invention assignment provision and non-competition and non-solicitation provisions (covering customers and employees) for an 18-month period following the date of termination, he will be entitled to the following payments:

• a lump sum cash payment equal to 1.5 times the sum of (A) his highest base salary in effect during the one year period ending as of the date of termination plus (B) his annual target performance payment as required to be in effect for the year in which the date of termination occurs; and

• a lump sum cash payment of any unvested amounts credited to Mr. O'Neal's accounts under the Company's qualified and/or nonqualified supplemental or excess defined contribution plans.

In addition, any outstanding equity awards will be treated as follows:

• the vesting of all outstanding service-based equity or equity-based awards held by Mr. O'Neal as of the date of termination will accelerate (and such awards will be exercisable for a period of one year following the date of termination, but in no event beyond the remainder of their term);

• any unvested performance-based equity or equity-based awards held by Mr. O'Neal as of the date of termination will continue to vest on their terms and conditions as if Mr. O'Neal's employment continued through the end of the performance year in which the date of termination occurs; and

• each vested performance-based stock option and stock appreciation right will remain exercisable for a period of one year following the date of termination and each performance-based stock option and stock appreciation right that becomes vested will remain exercisable for a period from the date such stock option or stock appreciation right vests until the later of (x) 30 days following notice to Mr. O'Neal of such vesting, or (y) one year following the date of termination (but, in each case, in no event beyond the remainder of its term).

In no event shall anything in Mr. O'Neal's employment agreement be construed in a manner that would result in a duplication of benefits to him.

(6)    Forfeiture And Recoupment Of Benefits

The Company's obligations to provide the foregoing severance benefits will cease as of the date that Mr. O'Neal breaches any provisions of the non-disclosure, invention assignment, and non-competition and non-solicitation restrictive covenants.

        (7)    Directors And Officers Liability Coverage; Indemnification

Mr. O'Neal will be entitled to coverage under such directors and officers' liability insurance policies maintained from time to time by the Company or any subsidiary, or any indemnification agreements entered into by the Company or any subsidiary with its directors or similarly situated executives, for the benefit of its directors and officers.  In addition, the Company will indemnify and hold Mr. O'Neal harmless, to the fullest extent permitted by the laws of the State of Delaware, from and against all costs, charges, and expenses, in connection with any action, suit, or proceeding to which he may be made a party by reason of his being or having been a director, officer, or employee of the Company, any subsidiary, or any of their respective affiliates or employee benefit plans.

(iv)    Short-Term Incentive Plan

The purpose of the STIP is to motivate and reward performance and provide cash incentive awards, limited to an annual individual maximum of $7.5 million, to eligible employees who contribute to the success of the Company.  The STIP is available for incentive programs not to exceed a period of one year for eligible employees.  Awards may be made under the STIP until the tenth anniversary of the Effective Date of the Modified Plan.

The STIP is administered by the Compensation Committee.  The Compensation Committee generally may amend, modify, suspend, or terminate the STIP at any time although such actions may give rise to certain payment and other rights under the executive employment agreements.  The STIP is designed to permit the payment of compensation that qualifies as performance-based compensation under Section 162(m) of the IRC.

In general, receipt of an award is conditioned on continued employment with the Company.  In addition, if the Company's financial results are materially restated, the Compensation Committee may determine that certain employees will be required to forfeit the right to receive future payments and, in some events, may require these employees to repay any prior payments determined to have been inappropriately received.

On the effective date of any change in control (as defined in the STIP) of the Company, all awards will be paid in a single lump sum on a pro-rata basis based on the greater of target award or actual performance.

The aggregate annual short-term incentive opportunity for all DSB Members and Bands A through F (approximately 530 executives worldwide) at target is estimated to be approximately $46 million.

(v)    Long-Term Incentive Plan

The purpose of the LTIP is to provide incentive award programs to attract and retain exceptional employees, to align such employees with the long-term strategies of the Company, and to best align the employee interests with those of Delphi's stockholders.  The LTIP is designed to permit the payment of compensation that qualifies as performance-based compensation under Section 162(m) of the IRC and provides for the grant of various stock-based

and cash-based awards, including stock options, stock appreciation rights ("SARs"), restricted stock, and restricted stock units. Awards may be made under the plan until the tenth anniversary of the Effective Date of the Modified Plan.

The maximum number of shares of Delphi New Common Stock available for issuance under the LTIP will be a number of shares of New Common Stock equal to eight percent of the number of fully diluted shares of New Common Stock outstanding immediately following consummation of the Modified Plan and the transactions contemplated thereby. Awards of stock options and SARs are limited to an annual individual maximum of 1,000,000 shares and awards of restricted stock and restricted stock units are limited to an annual individual maximum of 500,000 shares. Cash awards are limited to an annual individual maximum of $10 million.

The Compensation Committee administers the LTIP. The Compensation Committee has the right to amend, modify, suspend, or terminate the LTIP although such actions may give rise to certain payment and other rights under executive employment agreements.

Stock options may be either non-qualified stock options or options intended to qualify as incentive stock options within the meaning of Section 422 of the IRC. Upon vesting of all or any portion of an award of restricted stock or restricted stock units, the awards will be paid in the form of shares of New Common Stock, in cash based on the fair market value of the corresponding shares on the vesting date, or a combination thereof as the Compensation Committee in its sole discretion may determine. The LTIP also provides for the grant of performance-based cash awards. Performance goals will be based on specified business criteria, including but not limited to return on assets, asset turnover, return on equity, return on capital, economic value added, total stockholder return, and capacity utilization.

Generally, awards are cancelled when an employee quits or is dismissed for any reason before the first anniversary of the grant date. In the case of retirement more than one year after the grant date, an employee may retain his or her stock options and SARs until the earlier of their expiration date or five years from the employee's retirement date. Awards of restricted stock and restricted stock units will vest immediately upon an employee's retirement, permanent disability, or death more than one year after the grant date, although cash performance awards may be pro-rated based on the number of eligible months during which the employee was employed over the total award period. Any employee or former employee who engages in misconduct before the second anniversary of his or her termination of employment will be required to forfeit outstanding awards, forfeit the right to receive any future awards, and repay any amounts received in connection with previous awards, including any profits realized on the sale of company stock received pursuant to an award.

Upon a change in control (as defined in the LTIP), all outstanding time-based equity awards will vest and any performance-based equity awards will vest upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale. Any performance-based cash awards will be paid on a pro-rata basis based on the greater of the target award and actual performance.

The initial target grant of equity under the LTIP will be awarded for Bands A through C in stock options, shares of restricted stock, cash, or a combination thereof and for Bands D and above, including DSB Members, one-half in shares of restricted stock and the other half in stock options. Further, one-half of the restricted stock and options awarded will be time-vested and one-half will be performance-vested. The initial target grant will cover an 18-month period during which no further awards will be made (other than for an executive's promotion). For certain executives, the initial target grant of equity will be supplemented with an additional one-time grant of equity awards to maintain their overall compensation levels at the median of competitive market practice considering the modifications being made to the supplemental retirement plans (as discussed under the new supplemental retirement program section below). The estimated lifetime total value of the supplemental grants is expected to be approximately $11.5 million. The aggregate long-term incentive opportunity, on an annualized basis, for all DSB Members and Bands A through F is estimated to be approximately $80 million. This amount represents the total estimated value of the service-vested equity awards and performance-based equity awards, assuming target performance levels are achieved.

(vi)    Chapter 11 Effective Date Executive Payments

Delphi will make Effective Date payments to DSB Members and executives in Bands A through F in the aggregate amount of $16.5 million in accordance with the Bankruptcy Court's ruling in approving the Confirmed Plan.

(vii)    Retirement Program For Executives

A new supplemental retirement program for executives will be implemented, consisting of two parts: (1) the Amended SERP which is a nonqualified defined benefit plan that applies to past service, and (2) the Amended SRESP which is a nonqualified defined contribution plan that will apply to future service.

(1)    Supplemental Executive Retirement Program

The Amended SERP is an unfunded, nonqualified defined benefit plan that provides a benefit coordinated with the SRP. The purpose of the Amended SERP is to assure that eligible retiring salaried executive employees of the Company are eligible to receive an overall level of retirement benefits that are competitive with the outside market. The Amended SERP has been effective since October 1, 2008, but benefits under the Amended SERP will not become vested or first payable until the Effective Date of the Modified Plan. The Company administers the Amended SERP separately and distinctly from the SRP.

The Amended SERP has been closed to new participants as of October 1, 2008. Benefits under the Amended SERP are frozen based solely on service accrued before such time and no new benefits accrue under the Amended SERP. Participants continue to be credited service following October 1, 2008 solely for eligibility purposes (i.e., permitting participants to "grow in" to retirement eligibility).

An executive employee will be entitled to a benefit under the Amended SERP if he or she is involuntarily separated from service without cause (or if he or she has entered into an employment agreement with the Company, leaves for "good reason" (as defined in an applicable

employment agreement)) on or after the Effective Date of the Modified Plan and has at least five years of service with the Company.

Benefits under the Amended SERP are paid under either the "Regular Formula" or the "Alternative Formula", both as calculated in the Amended SERP.  Benefits under the Amended SERP are paid as a five-year monthly annuity beginning on the latest of (A) the first day of the month at least 15 days after the employee's separation from service, except that distributions to "specified employees" (as defined under Section 409A of the IRC) will not be made before a date that is six months after the specified employee's separation from service (B) the first day of the first month following the employee's 55th birthday, or (C) the first day of the month following the Effective Date of the Modified Plan.

(2)    Salaried Retirement Equalization Savings Program

The Amended SRESP is a funded, non-qualified defined contribution plan that will replace the Company's pre-existing supplemental retirement programs and will be maintained primarily for the purpose of providing deferred compensation to certain executives, managers ,and other highly-compensated employees of the Company.  The purpose of this program is to supplement the Company's tax-qualified defined contribution savings plan (the Delphi Savings-Stock Purchase Program which has been renamed the "Delphi Salaried Retirement Savings Program") and allow participant contributions, Company non-elective contributions, and matching contributions to be made into a nonqualified defined contribution savings plan in situations in which legal limitations under the tax-qualified defined contribution savings plan have been reached.  The Amended SRESP will be effective on the Effective Date of the Modified Plan.

A participant is always 100% vested in the amounts credited to his or her account that are attributable to his or her deferrals.  Matching contributions will equal 50% of a participant's deferrals not to exceed 7% of his or her compensation.  For participants who have at least 25 years of continuous length of service as of September 30, 2008 will receive matching contributions, for a five-year period (from October 1, 2008 through September 30, 2013), equal to 50% his or her deferrals not to exceed 9% of compensation.  In addition, for eligible participants, Delphi will calculate and contribute on a one-time basis a Company non-elective contribution and a matching contribution for the period between October 1, 2008 and the Effective Date of the Modified Plan, as long as the participant is employed by Delphi as of the Effective Date of the Modified Plan and with respect to the matching contribution, as long as the participant contributes his or her deferral on an after-tax basis for such interim period.

(viii)    DSB Member Change In Control Agreements

(1)    General

The following is a summary of the form change in control agreement to be entered into with each DSB Member (the "CIC Agreement"), other than for the President and Chief Executive Officer whose agreement is described under the heading "President and Chief Executive Officer Change in Control Agreement" below.  The purpose of these new CIC Agreements is to reinforce and encourage the continued attention and dedication of the members

of the DSB to their assigned duties without distraction in the face of potentially disruptive circumstances arising from the possibility of a Change in Control (as defined below).

### (2)    Term

Each CIC Agreement will become effective on the Effective Date of the Modified Plan and will continue in effect through December 31, 2009, and will automatically renew for additional one-year terms beginning on January 1, 2009 and each January 1 thereafter, unless notice of non-renewal is given by either party before September 30th of the preceding year; provided, however, that if a Change in Control will have occurred during the term of the agreement, the term will expire no earlier than 12 months or 24 months (based on the executive's position) beyond the month in which such Change in Control occurred.

### (3)    Termination Of Employment

A DSB Member's employment will be deemed to constitute a termination following a Change in Control by the Company without Cause (as defined in the CIC Agreement) or by the DSB Member with Good Reason (as defined in the CIC Agreement) in the following circumstances: (i) the DSB Member's employment is terminated by the Company without Cause prior to a Change in Control and such termination was at the request or direction of a person who has entered into an agreement with the Company the consummation of which would constitute a Change in Control, (ii) the DSB Member terminates his employment for Good Reason prior to a Change in Control and the circumstance or event which constitutes Good Reason occurs at the request or direction of such person, or (iii) the DSB Member's employment is terminated by the Company without Cause or by the DSB Member for Good Reason and such termination or the circumstance or event which constitutes Good Reason is otherwise in connection with or in anticipation of a Change in Control (provided that the Change in Control actually occurs).

### (4)    Severance Payments Upon Termination Of Employment Following A Change In Control

In the event of a termination without Cause or by the DSB Member for Good Reason following a Change in Control, and subject to the execution of a release of claims in favor of Delphi, DSB Members generally will be entitled to the following severance payments and benefits:

• a lump sum cash severance payment equal to two or three times (based on the DSB Member's position) the sum of base salary and target bonus;

• 24 or 36 months (based on position) of benefit continuation coverage for the DSB Member and his or her dependents;

• a lump sum cash payment equal to the sum of (1) any unpaid cash incentive compensation allocated to the DSB Member for completed fiscal years and (2) a pro-rata portion of any unpaid cash incentive compensation for uncompleted periods (calculated assuming performance at target levels);

• a lump sum cash payment equal to the contributions that would have been made to any of the Company's qualified and/or nonqualified supplemental or excess defined contribution plans on behalf of the DSB Member in the two or three years (based on the DSB Member's position) following the date of termination (assuming maximum contribution levels); and

• outplacement services until the earlier of one year or the DSB Member's acceptance of employment.

(5)    Vesting Acceleration

Upon a Change in Control, the DSB Members will have vesting acceleration of service-based equity awards and vesting acceleration of performance-based equity awards upon a sale of more than 50% of the Company's then-outstanding shares or upon a sale of all or substantially all of the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale.

(6)    Gross-Up Payments

If any of these payments or benefits becomes subject to the excise tax imposed upon "golden parachute" payments, the DSB Member will be entitled to a gross-up payment, but only if the DSB Member's total payments and benefits exceed 110% of the greatest pre-tax amount the DSB Member could be paid without causing the DSB Member to be liable for any excise taxes in connection with the gross-up payment (the "Safe Harbor Amount").  If such payments do not equal or exceed 110% of the Safe Harbor Amount, then no gross-up will be paid and the severance payments and benefits listed above will be reduced to the extent necessary so that no portion of them will be subject to the excise tax.

(7)    Restrictive Covenants; Legal Fees

Receipt of severance is conditioned on the DSB Member's compliance with a perpetual non-disclosure provision, an invention assignment provision, a 12- to 18-month non-competition provision, and a 12- to 18-month non-solicitation provision (covering customers and employees).

(8)    Definition Of Change In Control

Generally, a Change in Control will be deemed to have occurred if: (i) any person (or entity) is or becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of the Company's then outstanding securities, (ii) the following individuals cease for any reason to constitute a majority of the number of directors then serving: individuals who constitute the Board on the Effective Date of the Modified Plan with any new director whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds of the directors then still in office who either were directors on the Effective Date of the Modified Plan or whose appointment, election, or nomination for election was previously so approved or recommended, (iii) a merger of the Company or any direct or indirect subsidiary of the Company with any other entity, other than a merger which results in the voting securities of the Company outstanding immediately prior to such merger continuing to represent more than 50% of the combined voting power of the securities of the Company or such surviving

entity or any parent thereof outstanding immediately after such merger or consolidation, or (iv) the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company or there is consummated an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets, other than a sale or disposition by the Company of all or substantially all of the Company's assets to an entity, more than 50% of the combined voting power of the voting securities of which are owned by stockholders of the Company in substantially the same proportions as their ownership of the Company immediately before the sale.  However, a Change in Control does not include the consummation of the Modified Plan or the transactions contemplated thereunder.

### (ix)   President And CEO Change In Control Agreement

#### (1)   General

It is currently contemplated that the Company will enter into a new CIC Agreement with Mr. O'Neal, the President and Chief Executive Officer of the Company.  The following is a summary of the CIC Agreement that is expected to be entered into with Mr. O'Neal.

#### (2)   Term

Mr. O'Neal's CIC Agreement will become effective on the Effective Date of the Modified Plan and will continue in effect through December 31, 2009, and will automatically renew for additional one-year terms beginning on January 1, 2009 and each January 1 thereafter, unless notice of non-renewal is given by either party before September 30th of the preceding year; provided, however, that if a Change in Control has occurred during the term of the agreement, the term will expire no earlier than twenty-four months beyond the month in which such Change in Control occurred.

#### (3)   Termination Of Employment

For purposes of Mr. O'Neal's CIC Agreement, his employment will be deemed to constitute a termination following a Change in Control by the Company without Cause (as defined in his CIC Agreement) or by Mr. O'Neal with Good Reason (as defined in his CIC Agreement) in the same circumstances as described under the heading "DSB Member Change in Control Agreements" above.

#### (4)   Severance Payments Upon Termination Of Employment Following A Change In Control

In the event of a termination without Cause or by Mr. O'Neal for Good Reason following a Change in Control, and subject to the execution of a release of claims in favor of Delphi, Mr. O'Neal will be entitled to the following severance payments and benefits:

• a lump sum cash severance payment equal to three times the sum of Mr. O'Neal's base salary and target bonus;

• 36 months of benefit continuation coverage for Mr. O'Neal and his dependents;

• a lump sum cash payment equal to the sum of (1) any unpaid cash incentive compensation allocated to Mr. O'Neal for completed fiscal years and (2) a pro-rata portion of any unpaid cash incentive compensation for uncompleted periods (calculated assuming performance at target levels);

• a lump sum cash payment equal to the contributions that would have been made to any of the Company's qualified and/or nonqualified supplemental or excess defined contribution plans on behalf of Mr. O'Neal in the three years following the date of termination (assuming maximum contribution levels); and

• outplacement services until the earlier of one year or Mr. O'Neal's acceptance of employment.

(5)    Vesting Acceleration

Upon a Change in Control, Mr. O'Neal will have vesting acceleration of service-based equity awards (which awards will remain exercisable for a one-year period following such Change in Control, but in no event beyond the remainder of its term) and vesting acceleration of performance-based equity awards (which awards will remain exercisable for a one-year period following a Sale of the Company (as defined in his CIC Agreement), but in no event beyond the remainder of its term) upon a sale of more than 50% of the Company's then outstanding shares or upon a sale of all or substantially all of the assets of the Company if certain targets relating to internal rate of return are achieved in connection with such sale.

(6)    Gross-Up Payments

Mr. O'Neal is entitled to a gross-up payment on the same terms and conditions as described under the heading "DSB Member Change in Control Agreements" above.

(7)    Restrictive Covenants; Legal Fees

Receipt of severance is conditioned on Mr. O'Neal's compliance with a perpetual non-disclosure provision, an invention assignment provision, an 18-month non-competition provision, and an 18-month non-solicitation provision (covering customers and employees).

(8)    Definition Of Change In Control

The definition of Change in Control has the same meaning as set forth above under the heading "DSB Member Change in Control Agreements" above.

(c)    Chapter 11 Salaried Employee Compensation Program – Summary Of Key Employee Compensation Program

The Debtors have implemented certain aspects of a key employee compensation program pursuant to which executive-level U.S. employees have the capability of receiving incentive-based compensation based on the Company's and individual performance. Upon commencement of the Debtors' Chapter 11 Cases, certain of the Debtors' salaried employees' compensation programs were terminated, including the annual incentive program and long-term incentive

program.  The Debtors also cancelled a retention awards program enacted before the Petition
Date.  As a result, upon the Debtors' entry into chapter 11, the Debtors' U.S. executives total
compensation opportunities decreased by approximately 50%, going from a total prepetition
compensation plan composed of base salary, an annual incentive program, a long-term incentive
program, and retention grants to a postpetition compensation package consisting solely of base
salary.

The Debtors' chapter 11 key executive compensation program consisted of three primary
parts: (i) a short-term at-risk performance payment compensation program, (ii) an emergence
award plan that provided limited cash compensation in lieu of chapter 11 long-term incentives
and an equity based award covering post-emergence long-term incentives for the 18-month
period following the Effective Date, and (iii) a prepetition severance plan that was modified in
the third quarter of 2005.  The overall program was designed, in part, to replace some of the
prepetition compensation programs for the Debtors' U.S. executives.  The overall program was
premised on the principle that the Company should provide market-competitive compensation
opportunities designed to motivate its executive workforce to perform for the Debtors.  Notably,
Delphi's chapter 11 compensation program was different from traditional employee
compensation and retention programs in at least two important ways.  First, the current Executive
Chairman (and former CEO) of Delphi opted not to participate in the program but is instead
eligible for a discretionary performance payment, which will be determined separately by the
Compensation Committee prior to the Effective Date.  Second, Delphi's program had no
"retention" payments ("pay to stay" vs. "pay for performance") within its design.

Indeed, the short-term at-risk incentive compensation programs ultimately proposed by
the Debtors during the Chapter 11 Cases have incorporated six-month performance cycles, as
opposed to the more traditional year-long periods, to closely monitor the Debtors' ongoing
financial progress and to ensure that executive performance remains linked to the evolving
demands of the Chapter 11 Cases.  Additionally, even if the Debtors achieve their corporate and
division-level performance targets, eligible employees also must maintain an acceptable level of
personal achievement to qualify for the at-risk incentive compensation payments.  Finally, the
Debtors implemented an EBITDAR-based metric to evaluate the corporate-wide performance of
the Debtors and agreed to extensive discretion of the Creditors' Committee in adjusting this
metric in several of the chapter 11 performance periods.  The Debtors also eliminated from their
analysis various variances in performance (i.e., gains from the steady state business plan early in
the Chapter 11 Cases and variances from the transformation business plan later in the Chapter 11
Cases) obtained during the applicable performance period as a result of agreements reached with
GM and the Unions.  By designing a short-term at-risk incentive compensation program in this
manner, the Debtors sought to maximize the performance of their executives, which in turn,
would increase the value of the Debtors' Estates.

During the Chapter 11 Cases, the Bankruptcy Court authorized the Debtors to implement
the short-term elements of the compensation program.  The longer term elements of the original
chapter 11 compensation program (i.e., cash performance payments on the Effective Date and
long-term equity incentive grants for post-emergence periods) were deferred to the plan
confirmation process and are incorporated into the overall salaried executive compensation
program developed by the Compensation Committee.  The Bankruptcy Court approved the

longer term elements, as modified to reflect a decrease in the amount of the cash performance payments, in connection with the Confirmation Order.

        (d)    Summary Of Certain Material Prepetition Executive Compensation Programs

        (i)    Supplemental Executive Retirement Program

Since the separation from GM, Delphi has had a Supplemental Executive Retirement Program (the "SERP") for certain employees. The SERP is a non-qualified plan under the IRC that is separate from, but is integrated with, the SRP. Pursuant to the authority granted by that certain Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107, And 1108 (i) Authorizing Debtors To Pay Prepetition Wages And Salaries To Employees And Independent Contractors; (ii) Authorizing Debtors To Pay Prepetition Benefits And Continue Maintenance Of Human Capital Benefit Programs In the Ordinary Course; And (iii) Directing Banks To Honor Prepetition Checks For Payment Of Prepetition Human Capital Obligations (Docket No. 198), the Debtors have, throughout the course of the Chapter 11 Cases, continued to make monthly SERP payments to eligible retirees, limited to $5,000 per month per retiree. On September 30, 2008, the SERP, along with the SRP, was frozen. Pursuant to the Modified Plan, however, the Debtors (i) will no longer honor their obligations under the SERP because the Debtors will reject, as of the Effective Date, or otherwise terminate the current SERP and (ii) will implement and have implemented a new supplemental executive retirement program, as discussed above, with respect to current eligible employees (subject to the execution of a waiver of claims) which, in effect, (a) has frozen the benefits under the SERP and modifies eligibility to the age of 55 years with ten years of service and (b) supplements the frozen SERP benefit with a new benefit under a separate plan. Accordingly, as of the Effective Date of the Modified Plan, the Debtors will no longer make monthly SERP payments to retirees, and retirees will have 30 days after the Effective Date of the Modified Plan to file a proof of claim for any claims arising under the SERP. Current eligible employees that were entitled to the SERP should not be penalized by the rejection, termination, and/or halting of benefits with respect to the SERP because these active employees should generally become eligible to participate in the Amended SERP.

Under the Modified Plan, all persons holding or wishing to assert Claims arising out of the SERP, and whose SERP Claims vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form Number 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date. All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates or the Reorganized Debtors and their property. Any Claims arising out of SERP after the Effective Date will be disallowed in their entirety. Allowed SERP Claims will receive the treatment afforded to Allowed General Unsecured Claims under the Modified Plan. Each such Allowed SERP Claim will receive a distribution on the earliest Distribution Date after such SERP Claim is allowed, if ever. For further details see Section IX.E – Treatment Of Claims And Interests Under The Plan and Section IX.H – Provisions Governing Distributions.

(ii)    Change In Control Agreements

In early 2000, Delphi modified certain terms of its change in control agreements (collectively, the "Change in Control Agreements") with its officers that had been in existence since the Separation.  The Change in Control Agreements provide certain benefits to each participant (each, a "Participant") upon the occurrence of a change in control of Delphi and additional benefits if the employment of a Participant is terminated for certain reasons after a change in control.  A change in control is defined under the Change in Control Agreements to include (i) the acquisition by any person, other than Delphi or any subsidiary of Delphi, of beneficial ownership of 25% or more of the outstanding common stock of Delphi; (ii) certain changes in the composition of Delphi's board of directors; (iii) certain mergers, consolidations, and other reorganizations of Delphi in which Delphi is not the surviving corporation; (iv) any sale, lease, exchange, or other transfer of 50% or more of the assets of Delphi; or (v) a liquidation or dissolution of Delphi.

Pursuant to the Change in Control Agreements, Participants are entitled to certain payments and benefits upon the occurrence of a change in control, including the immediate vesting of all unvested options and restricted stock units, and the full funding of all of the Participant's "target awards" and any compensation previously deferred at the election of the Participant, together with accrued interest or earnings thereon.  Additional payments and benefits are payable to Participants who cease to be employed by Delphi during the three years following a change in control if (i) Delphi terminates the Participant's employment other than for "cause" (as defined therein); (ii) the Participant terminates his or her employment if, without his or her consent, (a) his or her salary and other compensation or benefits are reduced for reasons unrelated to Delphi's or the Participant's performance, (b) his or her responsibilities are negatively and materially changed, (c) he or she must relocate his or her work location or residence more than 25 miles from its location as of the date of the change in control, or (d) Delphi fails to offer him or her a comparable position after the change in control; or (iii) during the one-month period following the first anniversary of the change in control, the Participant ceases to be employed by Delphi for any reason other than for cause.

The aggregate change in control liabilities arising from these and other rights granted to Participants under the Change in Control Agreements are potentially substantial.  Executives continuing their employment with Delphi after the Effective Date of the Modified Plan will be asked to waive benefits under the Change in Control Agreements and certain other programs in order to be eligible for Delphi's emergence compensation program and other related benefits.  To the extent a Participant does not waive such benefits, the Company intends to challenge any asserted claims under the Change in Control Agreements.  If all Participants were to successfully assert claims under the Change in Control Agreements, the resulting liability could total as much as $257.5 million.  All Change in Control agreements are listed on Modified Plan Exhibit 8.1(a), and will be rejected pursuant to the Modified Plan.

(iii)    Benefit Equalization Plan For Salaried Employees

The Benefit Equalization Plan for Salaried Employees ("BEP") is available to executives whose contribution and benefit levels in the Delphi Savings-Stock Purchase Program (which has since been renamed the Delphi Salaried Retirement Savings Program) exceed certain limits

under IRC Section 415.  The BEP is not funded, and since October 2004, contributions have been de minimis.  Amounts contributed to the BEP are separately accounted for.  Delphi froze the BEP on September 30, 2008 for all eligible employees except for those hired between 1993 and 2001 receiving an employer contribution of 1% of salary into the Delphi Salaried Retirement Savings Program in lieu of health care in retirement.  Distributions under the BEP are expected to aggregate approximately $160,000 and will be distributed to approximately 141 participants with an average distribution of $1,120 and a maximum individual distribution of approximately $10,000.  The BEP amounts will be distributed upon emergence, and the plan will be terminated.

### I.        Pension Transformation

As noted above, the final key tenet of the Transformation Plan was to devise a workable solution to the Debtors' current pension situation.  Delphi maintains two major separate defined benefit pension plans for employees, one for salaried workers (the "Salaried Plan") and one for hourly workers (the "Hourly Plan").  The Debtors' funding obligations under the U.S. pension plans are governed by the IRC and ERISA.

The Debtors' goal throughout these Chapter 11 Cases was to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce.  To do so, however, it was necessary for Delphi to freeze the current Hourly Plan and Salaried Plan.  Delphi had originally intended to freeze the Hourly Plan and the Salaried Plan upon emergence from chapter 11, but as a result of the Plan Investors' breach of the Investment Agreement and the attendant delay in emerging from chapter 11, the Debtors decided to implement certain cost-saving aspects of their pension transformation in the latter half of 2008 rather than wait for emergence.  The Debtors accordingly filed the Hourly And Salaried Pension Program Modification Motion on September 12, 2008, which sought authority to freeze the Salaried Plan effective September 30, 2008 and the Hourly Plan effective as soon as possible following Union consent.  The Court approved the motion on September 23, 2008 and the Salaried Plan was accordingly frozen on September 30, 2008.  The Debtors have obtained Union consent on the terms set forth in the implementation agreements and anticipate fulfilling statutory notice requirements so that the Hourly Plan can be frozen in November or December 2008.

Notwithstanding the freeze of the  pension plans, because of the size of the funding deficit prior to the October 1, 2007 plan valuation date, the Debtors previously needed to obtain relief from the IRS and the PBGC to avoid a potential excise tax assessment and to effectuate the IRC Section 414(l) transfer of underfunded pension liabilities to the GM Hourly Plan.  The Debtors required relief from the IRS and the PBGC because the pension plans had an accumulated funding deficiency of approximately $117 million from the plan year ended September 30, 2005.  Additionally, since the Petition Dates, the Debtors have been making only "normal cost" contributions to the pension plans, or contributions that reflect the amounts related to service provided by plan participants post-filing.  These "normal cost" contributions are less than the minimum funding requirements established by the IRC and ERISA.  The IRC imposes a 10% excise tax penalty on the amount of any resulting funding deficiency.  Under the IRC, an additional excise tax penalty of 100% may be assessed by the IRS if the funding deficiency is not timely corrected.  Although the Debtors believed that they had defenses against such penalties, the Debtors sought a consensual resolution.  Thus, as part of the solution to their pension issues,

the Debtors negotiated with the IRS and the PBGC for conditional waivers of their minimum funding requirements under the Hourly Plan and Salaried Plan for the pension plan year ended September 30, 2006 and for the Hourly Plan for the plan year ended September 30, 2007. Delphi did not seek extension of the waivers past May 9, 2008.

Delphi now expects to be able to meet its pension funding strategy without the benefit of the previously issued pension funding waivers. Instead, Delphi will meet the obligations through a combination of contributions to the pension plans and an IRC Section 414(l) transfer to GM. As previously discussed, on September 12, 2008, Delphi filed a motion for authorization to implement the Amended GSA and Amended MRA, a component of which is the effectuation of the Section 414(l) transfer in connection with the Hourly Plan. Under the Amended GSA and Amended MRA, to alleviate the Hourly Plan underfunding and resolve future contribution needs, the parties agreed that the Debtors would transfer the majority of the Hourly Plan to the Hourly GM Plan in two transfers totaling approximately $3.4 billion in net unfunded liabilities (the "414(l) Transfer"). Delphi completed the first step of the 414(l) Transfer effective on September 29, 2008. Consummating the first step of the 414(l) Transfer prior to September 30, 2008 prevented the potential assessment of significant excise tax penalties discussed above with respect to the Hourly Plan underfunding that the IRS could have imposed if the Debtors had not effectuated the 414(l) Transfer. Upon completion of both steps of the 414(l) Transfer, Delphi will be left with unfunded liabilities for the retained portion of the Hourly Plan of only approximately $100 million. Because the obligations under the Salaried Plan and certain of Delphi's subsidiary plans are not part of the 414(l) Transfer, Delphi will need to satisfy its funding obligation to the Salaried Plan upon emergence in cash or qualifying employer securities. This obligation is estimated to be $70 million as of October 1, 2008.

Pursuant to the Confirmed Plan, the following Debtors were to assume and continue the following plans on a frozen basis upon emergence: (i) Delphi Corporation: Delphi Hourly-Rate Employees Pension Plan and Delphi Retirement Program for Salaried Employees, (ii) Delphi Mechatronic Systems, Inc.: Delphi Mechatronic Systems Retirement Program (the "Mechatronic Plan"), (iii) ASEC Manufacturing: ASEC Manufacturing Retirement Program (the "ASEC Plan"), and (iv) Packard-Hughes Interconnect Company: Packard-Hughes Interconnect Bargaining Retirement Plan and Packard-Hughes Interconnect Non-Bargaining Retirement Plan (the "PHI Non-Bargaining Plan") (collectively, the "Pension Plans"). As set forth above, following the Court's approval of the Hourly And Salaried Pension Program Modification Motion on September 23, 2008, the Salaried Plan, the Mechatronic Plan, the ASEC Plan, and the PHI Non-Bargaining Plan were frozen effective September 30, 2008. By freezing the applicable plans on September 30, Delphi halted the accrual of normal cost payments going forward, thereby preserving liquidity. By freezing the Salaried Plan, normal cost contributions of approximately $27M per quarter, which have been required since commencement of the Chapter 11 Cases, were reduced to approximately $1M per quarter.

Nothing in the Modified Plan will be construed as discharging, releasing, or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from any liability for minimum funding under 26 U.S.C. § 412 and 29 U.S.C. § 1082 or liability under 29 U.S.C. § 1362 with respect to the Pension Plans or the PBGC. The PBGC and the Pension Plans will not be enjoined or precluded from seeking to enforce such liability as a result of any provision of the Modified Plan or the Confirmation Order.

## VI.    DELPHI'S BUSINESS PLAN

This section provides a discussion of:

- The historical development of Delphi's business plan for 2007-2011 in connection with the September 2007 Plan and the important elements and assumptions of the business plan

- Modifications made to the business plan in October 2007

- Delphi's reaffirmed business plan for 2008-2011

The important modifications to this section include:

- Discussion of development of reaffirmed business plan for 2008-2011 in connection with the Modified Plan

- Key modifications to the reaffirmed business plan

- Outlook from the reaffirmed business plan

### A.    Developing The Business Plan

The Transformation Plan described above is the framework under which the Company developed its business plan for 2007-2011 in connection with the September 2007 Plan (the "POR Business Plan").  The business planning process is an annual process undertaken by the Company to provide revenue and cost projections which assist the Company in managing its portfolio, planning its working capital needs, developing its capital structure, and planning for the supporting capital expenditures.  The Company developed the POR Business Plan in connection with the September 2007 Plan.  When developing the POR Business Plan, Delphi considered the impact that elements of the Transformation Plan would have on its operations, including the transformation of its hourly workforce, Delphi's relationship with its largest customer, GM, the impact of changes in Delphi's product portfolio and manufacturing footprint, cost reductions achieved as a result of SG&A restructuring, and pension funding strategies with the IRS and PBGC.

The Company underwent a particularly robust "bottom-up" development process in formulating the POR Business Plan.  Annually, Delphi undergoes a lengthy and detailed process to develop its business plan.  Because Delphi was in the process of restructuring during the planning process, elements of the business plan were changing as Delphi was developing the POR Business Plan.  Delphi began the 2007-2011 business planning process in the second half of 2006.  Because the Debtors were still in negotiations with the Unions and GM, Delphi's draft preliminary POR Business Plan reflected certain assumptions regarding the outcome of those negotiations.  As the Debtors have achieved milestones in these Chapter 11 Cases, Delphi updated the assumptions underlying the POR Business Plan with actual outcomes and thereby refined its projections and outlooks as illustrated below.



* Includes a confirmation/update of macroeconomic factors such as exchange rates,
  commodities, GMNA volumes as well as divisional input related to revenue plans and
  other cost items

** Relates to the outcomes of negotiations with GM and Unions which varied from the
   assumptions in the preliminary business plan

Over this time period, the POR Business Plan and certain of the financial data, projections, and assumptions imbedded in the POR Business Plan were analyzed and evaluated by numerous parties, including an external accounting firm that was engaged by Delphi and other external parties who closely reviewed the data and provided recommendations to Delphi. These findings were considered and taken into account when finalizing the POR Business Plan. In addition, Delphi provided drafts of the preliminary business plan to certain key stakeholders, including the Statutory Committees and their advisors, at various times during the plan development.   As discussed below, the POR Business Plan was amended in October 2007 to account for, among other things, an updated forecast for GMNA volumes in 2008.  The amended POR Business Plan was later reaffirmed for the years 2008-2011 in connection with the proposal of the Modified Plan (the reaffirmed POR Business Plan will be referred to as the "Reaffirmed Business Plan" or "RPOR").

### 1.    Creation Of The POR Business Plan

Delphi's annual business plan development process is comprehensive, requiring the analysis of a significant amount of data regarding various aspects of the business, as well as a vetting and review process at various levels of the organization for key aspects of the business plan.  At the time of the POR Business Plan planning process, the Company had seven divisions. Each division was comprised of several global product business units ("PBUs").  The business plan development process requires each of the Company's PBUs and, subsequently, divisions, to create a five-year business plan which becomes a component of the overall corporate business plan.  At the start of the planning period, Delphi develops macroeconomic assumptions that are used by each of its PBUs when developing their detailed business plans.  The use of common assumptions ensures that the business plan is based on consistent metrics.  Such assumptions include the following:

- expected customer production volumes;
- forecasted cost of significant commodities used in the business (e.g., the costs of copper and steel);
- estimated foreign exchange rates over the business plan period; and
- expected U.S. labor rates.

Delphi uses GI/DRI, a third-party forecasting service, as the basis of certain assumptions regarding anticipated customer production and vehicle line volumes.  When incorporating the forecasts produced by GI/DRI, Delphi uses its historical knowledge of the industry to further refine the forecasts related to GMNA production, in light of the fact that GMNA has historically been a significant component of Delphi's revenue plan.  Consistent with prior practice, Delphi evaluated the GI/DRI forecasts in creating the customer product volume assumptions underlying the POR Business Plan.

## 2.    *Development Of The Revenue Plan*

### (a)    Identifying Business Opportunities

Utilizing the macroeconomic assumptions developed by corporate management, each PBU develops its own five-year business plan.  A key component of each PBU's plan is its revenue plan.  In developing its revenue plan, each PBU undertakes a detailed assessment of future revenue opportunities with its customers.  Although the process of tracking sales opportunities is an ongoing activity that is continuously evaluated by Delphi sales account managers, once a year a complete evaluation of the revenue opportunities is completed during which a majority of the PBUs attribute confidence levels to each opportunity.

Certain of the identified revenue opportunities are known because they are derived from booked business – that is, business for which the Company already has a formal customer award or purchase order.  Other revenue opportunities are prospective, based on business for which the Company believes it may receive a contract (unbooked business).  To evaluate whether the revenue projections from prospective opportunities should be included in its revenue plan, PBUs engaged in the original equipment automotive business will review each individual opportunity in the Company's sales opportunity tracking system and make a determination as to how likely it is that Delphi will win the business.  The PBU will make its determination based on historical trends and industry knowledge, and will add the projected revenue from that business to its estimated revenue line if it is reasonably confident that it can achieve the resulting projected revenue stream.  For PBUs with a focus other than original equipment automotive sales, the revenue determinations are based primarily on historical trends and industry knowledge.

In addition to identifying which customer business it believes it will win, in the process of creating its revenue plan a PBU will also assess the percentage of the customer's business it believes it will acquire, such as whether it will supply all of the customer's needs for a particular part or whether the customer is likely to use multiple sources for the part.

For Delphi's original equipment automotive business, because of the nature of the original equipment automotive industry, in which there are long periods between the time when customers award business to their suppliers and the time when production begins, in any five-

year business plan, it is common for revenue projections for the earlier years of the business plan to be more certain than for those farther in the future. This certainty level arises from the nature of Delphi's business with its customers; in 2008, Delphi's business is essentially fully booked, although without volume guarantees, while in 2011, approximately 79% of the projected revenue stream comes from booked business. Because the revenue plan forms the basis for the business plan, prior to undertaking the next steps to complete its business plan, the PBU's revenue plan will undergo multiple levels of review, including approval by divisional management.

(b)    The Effect Of Price-downs

Also incorporated in a PBU's revenue plan is the effect of anticipated price-downs. In the automotive industry, contracts with suppliers often include predetermined annual reductions in the price a supplier will receive for a particular part. These reductions exist because it is assumed that the supplier will become more efficient in producing the product over time and that cost savings will be shared with the OEM purchaser. When estimating the price it will receive for a particular product, the PBUs will incorporate anticipated price-downs for booked business and an estimate of year-by-year pricing for prospective opportunities.

(c)    Assessing Costs Required To Produce Products

After creating a revenue plan, a PBU must estimate the costs associated with producing the products (both booked business and unbooked business) that it included in its revenue plan. The cost structure embedded in each of the PBU's business plans is influenced by labor, material, and manufacturing costs plus the costs of engineering and support. Much of the detail for determining the direct manufacturing costs and indirect costs to support the revenue in the early years of the plan is assessed in part by personnel at the manufacturing facilities where the products will be produced. Each PBU's plan comprehends the costs of designing, selling, engineering, and manufacturing the parts. The business plan process captures the financial impact of this activity.

When it has received the information it needs from its plants and engineering centers, each PBU incorporates into its business plan the capital requirements for machinery and product development to support the revenue plan and then submits its plan to the business unit's divisions. The divisions then incorporate the individual PBU plans, as well as other items that impact their cash flow, including anticipated income, capital spending, restructuring costs, and working capital needs, into the divisional business plans. Once complete, the divisional plans are reviewed and approved by senior corporate management prior to finalizing the overall Delphi plan and providing it to the Board of Directors for review and approval.

**B.    Key POR Business Plan Assumptions**

In addition to the macroeconomic assumptions described above, during the development of the POR Business Plan, Delphi took into consideration certain other key assumptions based specifically on expected and actual Transformation Plan accomplishments and Delphi's global restructuring plan. Specifically, Delphi accounted for the following:

- the changing global manufacturing footprint of Delphi and the financial impact of moving certain operations and engineering from high cost locations to low cost locations;
- the financial effect of exiting non-core business operations and refocusing efforts on core product lines;
- decreasing volumes of business from GM as the transformation of Delphi's portfolio causes certain business lines to be divested or wound-down, resulting in less GM business and a correlating smaller share of overall Delphi revenues;
- the reduction of SG&A expenditures;
- the reduction of material costs as a result of continuing materials cost management initiatives; and
- funding of U.S. pension plans upon emergence from chapter 11.

During the POR Business Plan development process, as Delphi made progress on each of the Transformation Plan goals, the impact of these accomplishments on the POR Business Plan was reevaluated and, where appropriate, new assumptions were reflected in the POR Business Plan. Two of the largest adjustments to the POR Business Plan came from the renegotiation of Delphi's labor agreements and the Settlement Agreement and Restructuring Agreement with GM.

As a result of increased costs for such products as copper, oil, and resin-based products, the POR Business Plan contemplated lower prices than those currently available. In connection with the POR Business Plan, Delphi stated that if the prices of commodities remained at their then-current levels, they could result in a negative impact to the Company's operating results.

### C.    Pre-Confirmation Amendments To POR Business Plan

Following the completion of the POR Business Plan appended to the Disclosure Statement filed on September 6, 2007, two events occurred which had an impact on the POR Business Plan. First, GI/DRI revised its projections for GMNA production volume for the period covered by the POR Business Plan. Second, because of the dislocation in the capital markets in the second half of 2007 and the resulting change in the distributions under the September 2007 Plan, the anticipated capital structure of Reorganized Delphi changed, which affected certain assumptions underlying the POR Business Plan.

In September 2007, GI/DRI revised its outlook for GMNA production volumes. Delphi reviewed the forecasts released by GI/DRI and discussed the basis of the predictions with GI/DRI and GM. GI/DRI adjusted its forecasts on the basis of a number of macroeconomic factors, some of which Delphi believed were overstated or would be mitigated in ways not contemplated by GI/DRI. Although GI/DRI predicted a significant decrease in GMNA production throughout the POR Business Plan period, after discussions with GM and based on its own historical experience with GI/DRI and GM, Delphi believed that GMNA would have a short-term adjustment period rather than the long-term downward sales reduction of the magnitude forecasted by GI/DRI. Thus, Delphi adjusted its projections for 2008 based on the new GMNA forecast but left the projections unchanged for 2009-2011.

Delphi also adjusted the POR Business Plan to reflect the revised capital structure of Reorganized Delphi and revisions to the currency used for the payment of claims under the

September 2007 Plan, which affected certain of the assumptions underlying the POR Business Plan.



#### D.    Reaffirmation Of POR Business Plan

As part of the Company's annual business plan process, and in preparation for Delphi's planned emergence from chapter 11 reorganization in early 2008, Delphi undertook and completed its annual business plan process and updated the POR Business Plan.  The updated business plan (the "2008-2011 Budget Business Plan" or "BBP") was prepared at a divisional level and was used by the Company in connection with the plan confirmation process to confirm the overall company performance set forth in the POR Business Plan.  While updates were made for changes to volume and commodity assumptions at that time along with specific operating performance updates, overall the updating process confirmed Delphi's commitment to the aggregate EBITDAR projections in the POR Business Plan based on macroeconomic and automotive sector conditions at that time.

When the closing on Delphi's Confirmed Plan was suspended on April 4, 2008, as part of Delphi's consideration of potential modifications to its Confirmed Plan in order to emerge from chapter 11 as soon as practicable, Delphi undertook a reaffirmation process with respect to the POR Business Plan.  That reaffirmation process involved review and reaffirmation of the BBP (which had been prepared as part of Delphi's annual business planning process and which had confirmed Delphi's prior commitment to the aggregate EBITDAR projections in the POR Business Plan.)  Among other changes, the RPOR includes revised actual and expected volumes for the North American automotive market, significant increases in commodities costs that are used as raw materials in certain of Delphi's products, and changes in the underfunded status of its pension plans as a result of negative plan asset returns.  Certain of these changes are discussed in more detail below.

## Development Of The RPOR



The RPOR has been revised to account for changes in commodity costs. Delphi's products and the sub-components used in its manufacturing processes consume a variety of commodities. Recently, prices for all commodities, including steel, copper, aluminum, oil, and oil-based resins that constitute the primary commodities used by Delphi, have increased significantly. Although there has been some retrenchment in commodity costs in recent months, virtually all of the commodities used by Delphi have increased in price since the Debtors formulated the POR Business Plan. The RPOR has also been revised to account for changes in OEM product mix. The increase in oil prices and the corresponding increase in gas prices have resulted in a significant shift in the mix of vehicles being manufactured and sold by OEMs (due to consumers shifting their vehicle purchases away from Sport Utility Vehicles and light trucks that generally have larger and less fuel-efficient engines). Finally, the RPOR has been revised to account for reduced sales volume. The weakening of the United States economy has resulted in consumers' deferring or avoiding altogether the purchase of new vehicles. As a result, 2008 United States light vehicle sales are currently projected to be the lowest since 1993.

The macroeconomic changes and automotive industry conditions outlined above have impacted virtually every OEM, including GM. Although approximately 70% of Delphi's revenue is not GM-related and non-North American revenue now constitutes approximately 55% of Delphi's revenue, shifts in GMNA's volume impact Delphi. Over the course of 2008, GI/DRI has lowered GMNA volumes for every year of the RPOR. In addition, GM has lowered its expectations for its North American production. The following diagram demonstrates the changes in projected GMNA production volumes over the 2008-2011 periods.



Delphi's RPOR has addressed the changes in the automotive industry described above and has incorporated the elements of GM support embodied in the Amended GSA and Amended MRA.  Overall, the 2008-2011 BBP Process affirmed that Delphi would meet the EBITDAR levels provided in the POR Business Plan.  The RPOR has been updated since the events of April 4 and reflects revised actual and expected volumes for the North American automotive market, significant increases in commodities costs that are used as raw materials in certain of Delphi's products, and changes in the underfunded status of its pension plans as a result of depressed asset performance.  The RPOR also reflects actual financial results for the first half of 2008, updated foreign exchange rates over the RPOR period, and other specific operational adjustments with respect to particular customer program volumes and timing, including the modifications embodied in the Amended GSA and Amended MRA.

**E.    Outlook From Reaffirmed Business Plan**

Delphi's financial projections for 2007-2011 as captured in the RPOR are attached hereto as Appendix C.  As described in greater detail in Appendix C, and described in only summary form here, the RPOR projects 2008 EBITDARP at approximately $0.58 billion improving to $1.74 billion in 2009.  The main contributors of this improvement are: (i) the reduction of traditional hourly U.S. OPEB expense (which has been assumed by General Motors), (ii) GM labor subsidy and keep site facilitation support, (iii) structural cost improvements in the areas of manufacturing, engineering, and SG&A, and (iv) increased profit related to new business wins outside of GM North America. Material cost improvements are also anticipated in the RPOR, offset by anticipated year-over-year price downs with normal anticipated customer price reductions and other items.

Cash flow from operating activities is projected to increase from an inflow of $0.5 billion in 2008 to an inflow of $1.3 billion in 2011. Significant sources and uses of cash from operations include:

- EBITDARPO improves from $1.0 billion in 2008 to $2.2 billion in 2011;
- Global restructuring cash outflows of approximately $0.3 billion, $0.5 billion, $0.2 billion and $0.2 billion in 2008, 2009, 2010, and 2011 respectively (the $0.3 billion included in 2008 is net of a $1.0 billion payment from GM);
- Projected net working capital monetization proceeds associated with the exit from certain Non-Continuing Businesses; and,
- Net Payments from GM of $1.7 billion in 2008 resulting from the implementation of the Amended MRA and Amended GSA (including $1.0 billion referred to above in global restructuring cash).

Improved operating cash flows are generally the result of the implementation of the Debtors' Transformation Plan, including product portfolio rationalization and migration, SG&A cost reduction initiatives, the freezing of U.S. legacy defined benefit pension plans and agreement with GM regarding future business commitments and financial support for certain legacy costs, including hourly OPEB, as well as maintaining revenue in the continuing businesses.

## VII.   EMERGENCE CAPITAL FUNDING

### A.   Emergence Capital

The Debtors are in the process of arranging for emergence capital, which they believe should enable them to emerge from chapter 11 and into successful operation post-emergence.

Despite the substantial uncertainty in the U.S. and global credit markets, in March 2008, Delphi was able to obtain exit financing commitments of $6.1 billion in connection with the Confirmed Plan. The commitments, which would have expired on April 15, 2008, were terminated in light of the Plan Investors' decision not to fund their $2.55 billion equity investment under the Investment Agreement.

Delphi anticipates raising approximately $3.75 billion of funded emergence capital through a combination of term bank debt and rights to purchase equity in Reorganized Delphi. Delphi anticipates raising at least $2.75 billion in funded first and second lien debt plus an unfunded asset-backed revolving credit facility up to $1.2 billion. Delphi anticipates raising the remaining funded emergence capital through a combination of a Discount Rights Offering with a backstop and a direct subscription for New Common Stock in Reorganized Delphi. The Debtors expect the principal sources of emergence capital to be their existing creditors and stakeholders. The Debtors anticipate supplementing their Emergence Capital Funding disclosures on or prior to the preliminary hearing on modifications to the Confirmed Plan. For GM to achieve the $2.055 billion preferred stock recovery required under the Amended GSA and for the holders of unsubordinated General Unsecured Claims to receive at least 20% in direct recoveries in the form of New Common Stock, Delphi will be required to achieve its projected $3.75 billion in funded emergence capital. The Discount Rights Offering exercise price will be at a discount not

to exceed 40% of Plan Equity Value on a fully diluted basis.  In the event that these metrics are not achieved, the Debtors would be required to procure GM's consent pursuant to the Amended GSA with respect to any modified recovery and the minimum recovery to holders of unsubordinated General Unsecured Claims would be proportionally reduced.

The Second Amended and Restated Credit Agreement (which consists of a $1.1 billion Tranche A DIP Revolver, a $500 million Tranche B DIP Term Loan and a $2.754 billion Tranche C DIP Term Loan) currently matures on December 31, 2008.  The Debtors anticipate seeking an extension of the December 31, 2008 maturity date.

**B.**     **Rights Offerings**

The Company will conduct two Rights Offerings:  a Discount Rights Offering to raise approximately $1.0 billion (of which approximately $100 million is expected to be sold through direct subscription) and a Post-emergence Rights Offering to raise funds to redeem up to 25% of GM's New Preferred Stock.

Pursuant to the Discount Rights Offering, holders of General Unsecured Claims (other than TOPrS Claims), Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims as of the date the Final Modification Approval Hearing commences (the "Rights Offering Record Date"), or transferees receiving such holders' Discount Rights, will receive transferable Rights to purchase up to approximately 75,000,000 shares of the New Common Stock of Reorganized Delphi at an exercise price of $12.00 per share, a 40% discount to Plan Equity Value on a fully diluted basis.  The discount of $12.00 per share implies a buy-in total enterprise value of $5.4 billion, on a fully diluted basis.  A direct subscription of 8,333,333 shares will also be a component of the Discount Rights Offering.

Pursuant to the Post-emergence Rights Offering, Delphi's common stockholders at the Rights Offering Record Date, or transferees receiving such holders' Post-emergence Rights, will receive transferable Rights to purchase up to 26,187,745 shares of New Common Stock of Reorganized Delphi at an exercise price of $17.00 per share, a 15% discount to Plan Equity Value.  The proceeds of the Post-emergence Rights Offering will be used to redeem a portion of GM's Preferred Stock.

*1.      Eligibility For Participation In Rights Offerings*

Each holder of a General Unsecured Claim (other than a TOPrS Claim), Section 510(b) Note Claim, Section 510(b) Equity Claim, and Section 510(b) ERISA Claim, as of the Rights Offering Record Date, or transferees receiving such holder's Discount Rights, will be entitled to participate in the Discount Rights Offering.  The Discount Rights will be freely transferable.  In addition, oversubscription privileges will be available to eligible holders of Discount Rights.

Each holder of Existing Common Stock as of the Rights Offering Record Date will be entitled to participate in the Post-emergence Rights Offering.  The Rights Offering Record Date will be the date on which the Confirmation Hearing commenced.  The Post-emergence Rights will be freely transferable.

### 2.    Issuance Of Rights

The Discount Rights will be issued after (i) the Bankruptcy Court has confirmed the Debtors' Plan and (ii) the SEC declares a registration statement for the Discount Rights Offering effective.

The Post-emergence Rights will be issued after (i) the Modified Plan has become effective and (ii) the SEC declares a registration statement for the Post-emergence Rights Offering effective.  Existing Common Stock holders that hold their shares through a brokerage account, bank, or other nominee will not receive an actual rights certificate.  If a holder wishes to obtain a separate rights certificate, the holder should promptly contact its broker, bank, or other nominee and request a separate rights certificate.  It will not be necessary to have a physical rights certificate to elect to exercise Rights.

### 3.    Rights Offering Period

The Discount Rights Offering will commence when the Rights are distributed following approval of the Modified Plan and effectiveness of a registration statement for the Discount Rights Offering, and conclude approximately 30 days later. After the Discount Rights expire, any and all unexercised Discount Rights will automatically terminate without further notice or order of the Bankruptcy Court, and any purported exercise of any such unexercised Discount Rights by any Person will be null and void.

The Post-emergence Rights Offering will commence when the Rights are distributed following the consummation of the Modified Plan and effectiveness of a registration statement for the Post-emergence Rights Offering, and conclude approximately 180 days later. After the Post-emergence Rights expire, any and all unexercised Post-emergence Rights will automatically terminate without further notice or order of the Bankruptcy Court, and any purported exercise of any such unexercised Post-emergence Rights by any Person will be null and void.

### 4.    Exercise Of Rights

The Rights Offering documents will set forth in detail how to exercise the Rights and such procedures should be carefully followed.

### 5.    Alternatives To Exercising The Rights

To realize value from the Rights Offerings, as an alternative to exercising the Rights, holders of the Rights may sell their unexercised Rights.

### 6.    Use Of Rights Offering Proceeds

Any net proceeds generated by the Discount Rights Offering will be used for general corporate purposes.

Any net proceeds generated by the Post-emergence Rights Offering will be used to redeem up to 25% of the New Preferred Stock issued to GM.

### 7.    *Distribution Of Rights Offering Shares*

On or as soon as reasonably practicable after the Effective Date, Reorganized Delphi will issue the New Common Stock to those holders of Discount Rights that properly exercised their Discount Rights.

As soon as reasonably practicable after the conclusion of the Post-emergence Rights Offering, Reorganized Delphi will issue the New Common Stock to those holders of Post-emergence Rights that properly exercised their Post-emergence Rights.

Delphi plans to file a registration statement with respect to each Rights Offering.  Each registration statement is expected to cover the subscription rights for the applicable Rights Offering and the underlying New Common Stock in Reorganized Delphi offered in the applicable Rights Offering.  This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy any such securities.  Any such offer or sale will be made solely by means of a prospectus relating to such securities which will be provided at such time as the applicable Rights Offering commences.

## VIII.   THE CHAPTER 11 CASES

This section provides information regarding:

- Significant events in the Debtors' Chapter 11 Cases, including significant orders that were entered, the appointment of Statutory Committees, the granting of postpetition financing, and the disposition of certain of the Debtors' assets

- The resolution of certain securities, ERISA, and shareholder derivative litigation and the related MDL Settlements

- Actions taken by the Debtors to preserve estate causes of action

- The claims reconciliation process and the resolution of key classes of claims

The key modifications to this section are as follows:

- The description of the reclamation claims program has been modified to reflect a change in how claims of reclamation claimants will be handled.  Previous elections made by holders of reclamation claims will be revoked and such holders now have the option to continue asserting administrative priority treatment for reclamation claims and litigate treatment of such claims after the effective date of the Modified Plan.

- Certain of the Debtors' statutory deadlines have been modified as follows: the Debtors' exclusive period in which to propose a plan of reorganization has been extended until 30 days after substantial consummation of the Confirmed Plan or any modified plan except as to the Statutory Committees; the Bankruptcy Code section 365(d)(4) deadline for assuming or rejecting the Debtors' unexpired leases of nonresidential real property is now 30 days after substantial consummation of the Confirmed Plan or any modified Plan; and the current deadline by which the Debtors would be required to serve a summons and complaint upon each defendant under the Avoidance Procedures Order is 30 days after the later of substantial consummation of the Confirmed Plan or any modified plan and

> December 31, 2008
>
> - The inclusion of a description of the investment agreement with certain plan investors that was the basis for the Confirmed Plan and the complaints that were filed after the Plan Investors refused to participate in the scheduled closing on April 4, 2008

### A.    Continuation Of Business; Stay Of Litigation

On October 8, 2005, Delphi and 38 of its U.S. subsidiaries and affiliates filed voluntary petitions in the Bankruptcy Court for reorganization relief under Chapter 11 of the Bankruptcy Code.  On October 14, 2005, three additional U.S. Delphi affiliates filed voluntary petitions. Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.  The Debtors are authorized to operate their businesses in the ordinary course, with transactions out of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors.  This relief provided the Debtors with the "breathing room" necessary to assess and reorganize their business. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of reorganization.

### B.    Chapter 11 Stakeholders

The following parties are current stakeholders in the Debtors' Chapter 11 Cases and/or have appeared or participated as parties-in-interest in one or more of these consolidated cases.



## C. Summary Of Certain Relief Obtained At The Outset Of The Chapter 11 Cases

### 1. First Day Orders

On October 8, 2005, the Debtors filed several motions seeking the relief provided by certain so-called "first day orders."  First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business conduct that may not be authorized specifically under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

The first day orders in the Chapter 11 Cases, which were entered over the course of several days after the October 8, 2005 petition date, authorized, among other things:

(a)    Administrative

- the joint administration of each of the Debtors' Chapter 11 Cases;

- the establishment of case management procedures and omnibus hearing dates;

(b)    Business Operations

- the maintenance of the Debtors' bank accounts and operation of their cash management systems substantially as such systems existed prior to the Petition Date (the "Cash Management Order");

- the payment of prepetition obligations to customers and continuation of customer programs;

- the payment of prepetition sales, use, trust fund, and other taxes and related obligations;

- the establishment of notification and hearing procedures for trading in claims and equity securities;

- the prohibition of utility companies from altering, refusing, or discontinuing service and establishing of procedures for adequate assurance;

(c)    Continuing Supplier Relations

- the continuation of the vendor rescue program and payment of prepetition claims of financially-distressed sole source suppliers and vendors without contracts;

- the payment of prepetition obligations to foreign creditors;

- the establishment of procedures for reclamation claims;

- the payment of shipping and delivery charges for goods in transit and customs duties;

- the payment of contractors and service providers in satisfaction of liens;

(d)    Human Capital

- the payment of prepetition wages, salaries, and certain benefits and continuation and maintenance of human capital benefit programs in the ordinary course, and the direction to banks to honor checks for prepetition human capital obligations;

- the notice procedures, briefing schedule, and hearing date for conditional applications to reject the collective bargaining agreements under 11 U.S.C. §§ 1113 and 1114;

- the appointment of unions as the authorized representatives for union-represented retirees under 11 U.S.C. § 1114(c) and 1114(d);

- the implementation of a protective order covering the dissemination of confidential information in connection with the section 1113 and 1114 processes;

      (e)     <u>Financing</u>

- the interim approval of DIP financing and the providing of adequate protection to prepetition secured lenders;

- the continued performance under derivative contracts;

      (f)     <u>Retention Of Professionals</u>

- the retention of the following professionals to serve on behalf of the Debtors:

    - FTI Consulting, Inc. (restructuring and financial advisors to the Debtors);

    - Groom Law Group Chartered (special employee benefits counsel to the Debtors);

    - Kurtzman Carson Consultants LLC (claims, noticing, and balloting agent for the Clerk of the Bankruptcy Court);

    - O'Melveny & Myers LLP (special labor counsel to the Debtors);

    - Rothschild Inc. (financial advisor and investment banker to the Debtors);

    - Shearman & Sterling LLP (special counsel to the Debtors);

    - Skadden, Arps, Slate, Meagher & Flom LLP (counsel to the Debtors); and

    - Togut, Segal & Segal LLP (conflicts counsel to the Debtors)

- the continued retention of professionals regularly employed by the Debtors in the ordinary course of their business.

### 2. *Appointment Of Statutory Committees.*

On October 17, 2005, the Office of the United States Trustee for the Southern District of New York (the "United States Trustee") appointed, pursuant to section 1102 of the Bankruptcy Code, a Creditors' Committee.

The following creditors were selected by the United States Trustee as members of the Creditors' Committee:  (i) Capital Research and Management Company; (ii) Electronic Data Systems Corp., (iii) Flextronics International Asia-Pacific, Ltd. ("Flextronics"), (iv) Freescale Semiconductor, Inc., (v) General Electric Company, (vi) IUE-CWA, and (vii) Wilmington Trust Company, as Indenture Trustee.  Flextronics and Electronic Data Systems Corp. subsequently resigned from the Creditors' Committee, and on or about March 6, 2006, the United States Trustee appointed Tyco Electronics Corporation to the Creditors' Committee.  On October 1, 2007, the United States Trustee filed an amended appointment of the Creditors' Committee incorporating the foregoing changes and also appointing SABIC Innovative Plastics (formerly GE Plastics, a part of General Electric Company).  In addition to these members, the UAW

participates as an ex-officio member of the Creditors' Committee (see Notice Of Withdrawal Of Motion And Memorandum Of International Union, UAW For An Order Directing Its Appointment To The Official Committee Of Unsecured Creditors, dated January 20, 2006 (Docket No. 1864)). Prior to the February 3, 2006 meeting of creditors, the PBGC was also granted ex-officio status.

The Creditors' Committee is represented by Latham & Watkins LLP. The Creditors' Committee's financial advisor is Mesirow Financial Consulting, LLC, and the Creditors' Committee financial advisor and investment banker is Jefferies & Company.

On April 28, 2006, the United States Trustee appointed an official Committee of Equity Holders pursuant to section 1102 of the Bankruptcy Code to represent the interests of all equity holders in these cases. The following seven equity holders were selected to serve as members of the Equity Committee: (i) James E. Bishop, Sr., (ii) Brandes Investment Partners, L.P. ("Brandes"), (iii) D.C. Capital Partners, L.P., (iv) Dr. Betty Anne Jacoby, (v) James H. Kelly, (vi) James N. Koury, trustee of the Koury Family Trust, and (vii) Luqman Yacub. On May 11, 2006, the United States Trustee amended the Equity Committee to include Pardus European Special Opportunities Master Fund, L.P. ("Pardus") in place of Dr. Betty Anne Jacoby. On October 3, 2006, D.C. Capital Partners, L.P. resigned from the Equity Committee. Subsequently, on June 4, 2007, Pardus resigned from the Equity Committee. Brandes has taken a leave of absence from the Equity Committee and is not currently active in Equity Committee matters.

The Equity Committee is represented by Fried, Frank, Harris, Shriver & Jacobson LLP. The Equity Committee's financial advisor is Houlihan Lokey Howard & Zukin Capital, Inc.

### 3.    *Postpetition Financing*

On October 12, 2005, the Debtors were granted interim approval, pursuant to an interim Bankruptcy Court order, to use up to $950 million of the $2 billion DIP credit facility. The original DIP credit facility was subsequently amended by the First Amendment to the DIP Credit Facility, dated October 27, 2005 (the "First Amended DIP Credit Facility"). The First Amended DIP Credit Facility enabled the Debtors to borrow up to $2.0 billion from a syndicate of lenders arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc., for which JPMorgan Chase Bank, N.A. was the administrative agent (the "Administrative Agent") and Citicorp USA, Inc. was syndication agent (together with the Administrative Agent, the "Agents"). Specifically, the First Amended DIP Credit Facility consisted of a $1.75 billion revolving facility and a $250 million term loan facility (collectively, the "Amended DIP Loans"). The Debtors sought approval of the First Amended DIP Credit Facility to ensure necessary liquidity during the Chapter 11 Cases. On October 28, 2005, the Bankruptcy Court granted final approval of the DIP financing order, which approved the First Amended DIP Credit Facility, providing the Debtors access to $2 billion in DIP financing subject to certain terms and conditions set forth in the DIP financing documents, as amended, and an adequate protection package for the lenders to the prepetition credit facilities as well as to those parties asserting rights of setoff against the Debtors.

In light of the favorable environment in the debt markets at the time, in December 2006, the Debtors determined to refinance their secured facilities. Thus, on January 5, 2007, the Bankruptcy Court granted Delphi's motion to obtain replacement postpetition financing of

approximately $4.5 billion to refinance both the $2.0 billion First Amended DIP Credit Facility and the approximate $2.5 billion outstanding on its $2.825 billion prepetition credit facility. On January 9, 2007, Delphi entered into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consists of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan ("Tranche B" or the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan ("Tranche C" or the "Tranche C Term Loan"). Borrowings under the Refinanced DIP Credit Facility were prepayable at Delphi's option without premium or penalty. As a result of the refinancing, the Debtors have saved approximately $8.9 million per month in financing costs.

On March 29, 2007, Delphi entered into the First Amendment to the Refinanced DIP Credit Facility (the "First Amendment"). The First Amendment provides for an amended definition of "Global EBITDAR," the addition of a two-week LIBOR interest election option, and amended monthly Global EBITDAR covenant levels. The amended definition of Global EBITDAR provides for the removal of cash payment limits in respect of restructuring costs for 2007 from the definition. On November 16, 2007, the Bankruptcy Court granted the Debtors' motion to extend the Refinanced DIP Credit Facility through June 30, 2008.

On October 5, 2007, the Debtors filed a motion, and the Bankruptcy Court entered an order dated as of October 25, 2007, confirming DASHI's authority under the Final Cash Management Order (Docket No. 882) to consummate an intercompany transfer to DAS LLC. Specifically, DASHI is accumulating cash balances from certain of its global affiliates in an amount expected to be up to $650 million and, subject to the requisite consent of the DIP Lenders, will transfer these funds to DAS LLC in accordance with Final Cash Management Order. As required by the Final Cash Management Order, in exchange for DASHI's transfer of funds to DAS LLC, DAS LLC will grant DASHI (a) a lien (in the priority permitted under the Refinanced DIP Credit Facility) on all assets and (b) an administrative claim (the "Intercompany Transaction"). The Intercompany Transaction, among other things, will provide a definitive source of liquidity on favorable terms to the Debtors. This additional liquidity will allow the Debtors to reduce their borrowings and thus reduce their funded interest expense, saving the Debtors millions of dollars of interest under their Refinanced DIP Credit Facility. In addition, the Intercompany Transaction may create certain tax efficiencies that will inure to the benefit of all of the Debtors' stakeholders. In connection with this transaction, the PBGC expressed certain concerns because they contend that the funds to be transferred by DASHI would be subject to pre-existing PBGC liens totaling $255 million. Although the Debtors dispute PBGC's position, the Debtors understand that the issue presented is an important policy matter for the PBGC that would likely compel the agency to appeal an adverse judicial determination of this issue. To resolve this issue, the Debtors incorporated an adequate protection mechanism granting replacement liens to the PBGC, but only to the extent that the PBGC does in fact have valid, perfected, enforceable, and non-avoidable liens in the funds to be transferred. In addition, the entered order makes clear that all parties-in-interest in these cases retain and reserve the right to challenge the PBGC's purported liens on any grounds and that all of PBGC's claims, defenses, and arguments with respect to any such challenges are expressly reserved and preserved.

On April 30, 2008, the Bankruptcy Court authorized the Debtors to enter into an amendment and restatement of the Refinanced DIP Credit Facility (the "Second Amended and Restated Credit Agreement"), which became effective on May 9, 2008.  The Second Amended and Restated Credit Agreement extends the term of the loan until December 31, 2008 and modifies the size of the facility by reducing the Revolving Facility to $1.1 billion from $1.75 billion and increasing the size of the Tranche B Term Loan to $500 million from $250 million and leaving the Tranche C Term Loan unchanged at approximately $2.5 billion.

Also on April 30, 2008, the Debtors received authority to enter into an arrangement with GM or its affiliate under which Delphi could receive advances of up to $650 million pursuant to the terms of the arrangement, in anticipation of the effectiveness of the Settlement Agreement and Restructuring Agreement, and pay any and all fees and expenses incurred thereunder.  As previously described, the agreement was subsequently amended to provide for an additional $300 million of availability.  An order approving this amendment was entered on September 26, 2008.  When the Amended GSA and Amended MRA became effective on September 29, 2008, the original $650 million commitment terminated but the additional $300 million commitment remains outstanding.

Due to a positive market response and oversubscription for the Tranche A, Tranche B, and Tranche C amounts that the Debtors anticipated borrowing under the Second Amended and Restated Credit Agreement, on May 9, 2008, the Debtors filed a motion seeking to increase the principal amount of the Tranche C Term Loan by approximately $254 million (the "Supplemental Second DIP Extension Motion").  The Second Amended and Restated Credit Agreement, including the revisions to Tranche A and Tranche B as well as the existing Tranche C, became effective on May 9, 2008; the increase in the principal amount of the Tranche C Term Loan of approximately $254 million was approved by the Bankruptcy Court on May 29, 2008.

As part of the Supplemental Second DIP Extension Motion, the Debtors stated that they anticipated transferring up to $750 million of repatriated funds from certain non-Debtor global affiliates to DASHI and ultimately to DAS LLC to reduce the borrowings on the DIP Financing Facility.  The Debtors believe that these funds are necessary for the Debtors to meet their liquidity needs.  To resolve the concerns of the PBGC, as summarized above, the Debtors reached an agreement with the PBGC to provide adequate protection to the PBGC in the form of conditional junior replacement liens in DASHI's assets that are already encumbered by the liens of the Debtors' DIP lenders in the amounts transferred from DASHI to DAS LLC up to $750 million.  The PBGC's replacement liens will be valid only to the extent that the PBGC has valid and perfected liens in the cash abroad before the repatriation of such funds.  Except as to the amount, the adequate protection that the Debtors propose to provide the PBGC is identical to the adequate protection that the Debtors agreed to provide the PBGC in connection with the 2007 intercompany transfers.  As was previously the case, all of PBGC's claims, defenses, and arguments with respect to any challenges of the PBGC's liens are expressly reserved and preserved.  The repatriation of funds was approved by the Bankruptcy Court on May 29, 2008, subject to the Creditors' Committee and Wilmington Trust Company's right to (i) object, 10 days prior to a scheduled omnibus hearing for consideration at the omnibus hearing, to the repatriation of funds scheduled to occur during the calendar month following the hearing date and (ii) review repatriation of funds for consistency with cash flow projections.

### D.    Other Significant Events During The Chapter 11 Cases

#### 1.    GM Matters

As discussed above, as a result of the Separation, the Debtors had numerous issues to resolve with GM.  At the time of the commencement of these Chapter 11 Cases, GM was Delphi's largest customer, accounting for nearly half of the Debtors' annual revenue.  The Debtors and GM were parties to numerous supply contracts and GM and the Debtors had agreed to indemnify each other for certain liabilities in connection with the Separation.  Therefore, addressing and resolving these and other issues with GM was a primary focus of the Debtors throughout these Chapter 11 Cases.

In addition to the issues encompassed by the Delphi-GM Definitive Documents, the Debtors and their advisors negotiated extensively with GM with respect to the application of various first-day orders in the period both before and after the Petition Dates.  This included addressing GM's concerns with respect to setoff rights under the order granting the Debtors' motion for approval of the DIP Financing Order, and customer and vendor matters.

On February 17, 2006, GM filed a motion seeking appointment to the Creditors' Committee.  Ultimately, in the face of objections from the U.S. Trustee, the Creditors' Committee, and others, on March 8, 2006, GM withdrew its motion.

#### 2.    Labor Unions And Collective Bargaining Agreements

At the commencement of the Chapter 11 Cases, nearly all of the Debtors' approximately 34,750 hourly employees in the United States were represented by three principal unions.  The UAW represented approximately 70% of the Debtors' hourly workforce, the IUE-CWA represented approximately 25% of the hourly workforce, and the United Steelworkers of America, Local 87, represented nearly 3% of the hourly workforce.  The Debtors had master collective bargaining agreements with each of these three unions as well as "local agreements" with affiliated local unions covering primarily local issues that are worksite or business specific.  The Debtors also had collective bargaining agreements with other unions representing a smaller segment of the U.S. hourly workforce, including the IAM, the IBEW, and the IUOE.

The Debtors, the Unions, and GM continued to discuss Delphi's labor transformation through the end of 2006 and the early months of 2007.  Those discussions led to the settlements described above in Section V – Delphi's Transformation Plan.

#### 3.    Investigations, MDL Proceedings, And Settlements

Prior to the Petition Date, Delphi restated earnings for fiscal years 2001-2003 which prompted, among other things, (a) formal investigations by several governmental agencies, (b) the commencement of certain class actions, including actions brought under ERISA and various securities laws, and (c) the review by a special committee of the Company's Board of Directors of certain shareholder derivative demands and related actions.  The resolution and settlement of these matters is discussed below.

(a)   SEC Investigation

The Company was the subject of an investigation by the SEC and other federal authorities involving its accounting for and the adequacy of its disclosures regarding a number of transactions dating from the Separation.  The government's investigations were not suspended as a result of the Debtors' commencement of the Chapter 11 Cases.  Delphi fully cooperated with the SEC's investigation and requests for information as well as the related investigation conducted by the Department of Justice.  The Company entered into an agreement with the SEC to suspend the running of the applicable statute of limitations until April 6, 2006 and subsequently agreed to extend the suspension until August 31, 2006.

On October 30, 2006, the SEC commenced and simultaneously settled with Delphi a lawsuit alleging violations of federal securities laws.  Delphi, without admitting or denying the SEC's allegations, agreed to a settlement with the SEC that provided for a permanent injunction in respect of Delphi's alleged violation of certain securities laws.  Due in part to Delphi's cooperation with the SEC throughout its investigation, the SEC did not impose a monetary fine or penalty on Delphi.  On November 10, 2006, the Debtors filed a motion seeking Bankruptcy Court authority to enter into the settlement with the SEC resolving investigations by the SEC into various prepetition acts of the Debtors.  On December 12, 2006, the Bankruptcy Court entered an order approving the Debtors' settlement with the SEC.  Even though Delphi settled with the SEC, the investigation being conducted by the SEC and the Department of Justice continues as to certain individuals previously employed by Delphi.  Delphi continues to fully cooperate with the government.

(b)   Securities, ERISA, And Shareholder Derivative Litigation

Delphi, along with Delphi Trust I and Delphi Trust II (subsidiaries of Delphi that issued the TOPrS), current and former directors of the Company, certain current and former officers of the Company or its subsidiaries, and others were named as defendants in several categories of lawsuits that were filed beginning in March 2005 following the Company's announced intention to restate certain of its financial statements.  The categories of lawsuits include: (i) class action lawsuits, purportedly brought by persons or entities who purchased or acquired publicly-traded Delphi securities during the period of March 7, 2000 through March 3, 2005 (the "Securities Actions"); (ii) class action lawsuits, purportedly brought by certain plaintiffs under ERISA on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock (the "ERISA Action"); and (iii) lawsuits comprised of shareholder derivative actions against certain current and former directors and officers of the Company (the "Shareholder Derivative Actions").  On December 12, 2005, the Judicial Panel on Multidistrict Litigation entered an order transferring each of the Securities Actions, ERISA Action, and Shareholder Derivative Actions to consolidated proceedings (the "Multidistrict Litigation" or "MDL") before the United States District Court for the Eastern District of Michigan (the "MDL Court").  The Company also received a demand (the "Demand") from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers of the Company made materially false and misleading statements in violation of federal securities laws and/or of their fiduciary duties.

(i)        Securities Actions

Beginning on March 7, 2005, several putative class actions were filed against Delphi and various other defendants in the United States District Court for the Eastern District of Michigan and the United States District Court for the Southern District of New York.  The plaintiffs in the Securities Actions alleged, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws.  On June 27, 2005, Judge Naomi Reice Buchwald of the United States District Court for the Southern District of New York appointed Teachers' Retirement System of Oklahoma, Public Employees' Retirement System of Mississippi, Raiffeisen Kapitalanlage-Geselleschaft m.b.H, and Sichting Pensioenfonds ABP as lead plaintiffs (the "Lead Plaintiffs") to prosecute the securities actions on behalf of all purchasers of Delphi securities during the putative class period of March 7, 2000 and March 3, 2005.

Moreover, on April 11, 2005, a putative class action was filed in the United States District Court for the Southern District of Florida against Delphi Trust I, certain current and former officers and directors, and certain underwriters, under the caption <u>Bernstein v. Delphi Trust I, et al.</u>, No. 9:05-CV-80307 (KLR) (the "Bernstein Action").  The complaint alleged violations of Sections 11 and 15 of the Securities Act in connection with the sale of securities of Delphi Trust I.  On July 20, 2005, upon unopposed motion, the Southern District of Florida appointed plaintiff Sidney Bernstein as lead plaintiff in the Bernstein Action and appointed his selection of counsel as co-lead counsel in the Bernstein Action.  On August 29, 2005, the Southern District of Florida stayed the Bernstein Action pending transfer of all related actions by the MDL.  On October 16, 2006, the MDL Court vacated the order appointing Bernstein a lead plaintiff, and affirmed the appointment of the Lead Plaintiffs in the Securities Action.  The MDL Settlements described herein are also in full and final disposition of the Bernstein Action in addition to that of the Securities Action.

On September 30, 2005, the Lead Plaintiffs filed a consolidated class action complaint (the "Complaint").  The Complaint asserted claims against Delphi; certain current and former officers; Delphi's board of directors; Deloitte & Touche, LLP ("Deloitte"), Delphi's auditor during the period at issue; third parties Bank One, SETECH, Inc. ("Setech"), and BBK, Ltd. ("BBK"); and the investment banks that underwrote Delphi's four bond offerings during the class period.  The Complaint alleged, among other things, that Delphi and/or other defendants concealed the true extent of GM's warranty claims, fraudulently accounted for funds relating to a settlement of certain of GM's warranty claims, improperly accelerated recognition of GM warranty credits; failed to recognize a warranty obligation to GM; engaged in sham inventory sales with BBK, Setech, and Bank One; recorded fictional inventory sales to BBK and Bank One; recorded a paper sale of indirect materials to Setech; and improperly accounted for certain rebates and credits from certain suppliers.

Delphi and the other defendants have denied each of the allegations in the Complaint.

On December 12, 2005, the Securities Actions were transferred to the Multidistrict Litigation for coordinated pretrial proceedings.  On March 10, 2006, certain of the defendants in the Securities Actions moved to dismiss the complaint filed by the Lead Plaintiffs.  On May 12, 2006, the Lead Plaintiffs filed papers in opposition to the motions to dismiss.  On June 12, 2006,

the defendants filed their reply papers in further support of the motions to dismiss. The motions to dismiss have not been ruled on by the MDL Court.

On February 15, 2007, the MDL Court partially granted the Lead Plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act of 1995, thereby allowing the Lead Plaintiffs to obtain certain discovery from the defendants. On April 16, 2007, by agreement of the parties, the Bankruptcy Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to the Lead Plaintiffs and other parties in the case.

(ii)    ERISA Action

Plaintiffs in the ERISA Action alleged, among other things, that the Company's and its subsidiaries' defined contribution employee benefit plans that invested in Delphi common stock suffered losses as a result of alleged breaches of fiduciary duties under ERISA during a class period of May 28, 1999 to November 1, 2005. The Company was not named as a defendant in certain of the amended complaints filed by the ERISA Action plaintiffs due to the automatic stay imposed by the Bankruptcy Code. The ERISA Action plaintiffs, however, indicated that they would seek to name the Company as a defendant in the ERISA Action if the bankruptcy stay is modified or lifted to permit such action. On May 31, 2007, by agreement between the Debtors and the ERISA Action plaintiffs, the Bankruptcy Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to the ERISA Action plaintiffs (just as Delphi provided to the Lead Plaintiffs in April).

(iii)    Shareholder Derivative Actions

A total of four shareholder derivative actions were filed against certain current and former directors and officers of the Company: two in federal courts (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court (Oakland County Circuit Court in Pontiac, Michigan). These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results. Following the commencement of the Chapter 11 Cases on October 8, 2005, all of the Shareholder Derivative Actions were administratively closed.

(c)    MDL And Related Settlements

(i)    MDL Settlements

On July 11, 2007, the MDL Court appointed the Honorable Layn R. Phillips, former United States District Judge, as a special master for settlement discussions. Through mediated settlement discussions, representatives of Delphi, Delphi's insurance carriers, the Creditors' Committee, the Equity Committee, and certain other named defendants involved in the MDL proceedings, with the assistance of Judge Phillips, were able to reach a settlement agreement with the Lead Plaintiffs and the ERISA Action plaintiffs resulting in a complete resolution as to Delphi, its subsidiaries, current and former directors and officers, and certain other defendants and related parties and settlement of the Multidistrict Litigation (the "MDL Settlements"). The MDL Settlements do not resolve claims against certain other defendants and potential defendants,

including but not limited to Deloitte, BBK, Setech, and JPMorgan Chase & Co.  The MDL Settlements are comprised of a settlement with the Lead Plaintiffs (the "Securities Settlement"), the ERISA Plaintiffs (the "ERISA Settlement"), and related agreement between Delphi, various insurance companies, and certain former directors and officers (the "Insurance Settlement").  The MDL Settlements were submitted on August 31, 2007 to the MDL Court for preliminary approval and for scheduling a final fairness hearing.  On September 5, 2007, the MDL Court granted preliminary approval of the MDL Settlements, and scheduled a final fairness hearing for November 13, 2007.  On November 13, 2007, the MDL Court conducted the fairness hearing and took the matter under advisement.

On September 7, 2007, the Debtors filed a motion seeking Bankruptcy Court approval of the MDL Settlements.  The motion was originally scheduled to be heard on September 27, 2007, but after consultation with a number of stakeholders, including counsel for the MDL plaintiffs and Creditors' Committee, the Debtors determined to use a two-step bifurcated approval process for the MDL Settlements in the Bankruptcy Court.  As the first step in the process, the Debtors sought and received preliminary approval of the MDL Settlements, including without limitation class certification and solicitation mechanics, at the October 25, 2007 omnibus hearing.  On January 25, 2008, the Bankruptcy Court issued an order approving the MDL Settlements.

On December 4, 2007, the MDL Court conducted a hearing to evaluate certain proposed modifications to the settlement as to the securities class.  All counsel for the Lead Plaintiffs in the securities class, as well as several of the Lead Plaintiffs themselves, took part in the hearing and expressed their agreement with the proposed modifications.  At the conclusion of the hearing, the MDL Court preliminarily approved the modifications, subject to entertaining any objections that might be raised after a reasonable notice to the securities class, such notice to be accomplished as prescribed by the MDL Court.  On January 10, 2008, the MDL Court issued an opinion and order (subsequently amended on January 11, 2008) granting final approval of the MDL Settlements (as modified in December 2007).

Under the terms of the MDL Settlements, which require the approval of both the MDL Court and the Bankruptcy Court, the Lead Plaintiffs and the ERISA Action plaintiffs will receive claims/interests that will be satisfied through the Debtors' Modified Plan.  The Lead Plaintiffs will be granted a single Allowed Claim/Interest in the face amount of $179 million (which was reduced from an earlier agreed amount of $204 million in consideration of the Debtors' agreement to cooperate with monetization of these claims by the Lead Plaintiffs as discussed below).  The Lead Plaintiffs' $179 million Allowed Claim will be classified in both the Section 510(b) Note Claim and Section 510(b) Equity Claim classes pursuant to the terms of the Securities Settlement.  The Lead Plaintiffs' claim/interest will be satisfied through consideration in the same form, ratio, and treatment as what will be used to satisfy holders of General Unsecured Claims under the Debtors' Plan.  If any class member opts out of the Securities Settlement, and ultimately receives an allowed claim in the Debtors' Chapter 11 Cases, the amount received by the holder of an allowed opt-out claim will be deducted from the amount used to satisfy the Lead Plaintiffs in the Securities Settlement.  A distribution made to a holder of an allowed opt-out claim will be in the same Plan currency as that distributed on account of the Securities Settlement.  The Debtors will object to any claims filed by members of the class in the Securities Action or individuals who opt out of the Securities Settlements in the Bankruptcy

Court, and will seek to have such claims disallowed and/or expunged. The ERISA Settlement is structured similarly to the Securities Settlement. The ERISA Plaintiffs' claim/interest will be allowed in the amount of $24.5 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to satisfy holders of General Unsecured Claims under the Debtors' Plan. Unlike the Securities Settlement, the ERISA Plaintiffs are not entitled, and thus will not be able, to opt out of their settlement.

In addition to the proceeds from the claims in the Chapter 11 Cases, the Lead Plaintiffs will also receive a distribution of insurance proceeds up to $88.6 million, including the remainder of any insurance proceeds (which proceeds could otherwise be used by directors and officers in connection with non-indemnifiable claims) that are not used by the eight former directors and officers as permitted in the MDL Settlements (as discussed further below), the amount of $15 million constituting a third party payment to the Debtors in connection with the Securities Settlement which the Debtors have agreed to redirect to the disbursing agent appointed by the MDL Court in partial monetization of the original agreed claim against the Debtors agreed to pursuant to the Securities Settlement, and a distribution of $1.5 million from certain underwriters named as defendants in the MDL proceedings. The ERISA Action Plaintiffs will also receive a distribution of insurance proceeds in the amount of $22.5 million. The additional proceeds from the MDL Settlements will be divided and distributed according to the terms of the MDL Settlements. The insurance proceeds are being held in escrow accounts pursuant to the MDL Settlements and subject to the direction of the MDL Court.

Pursuant to the MDL Settlements, none of the settling defendants in the MDL Actions admits any wrongdoing whatsoever and the MDL Settlements will in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the settling defendants with respect to any claim of any fault or liability or wrongdoing or damage whatsoever, or an infirmity in the defenses that the settling defendants have asserted or would assert in the MDL Actions.

(ii)      Indemnification Of Directors And Officers

In connection with the acts giving rise to the Multidistrict Litigation, certain current and former directors and officers of Delphi were named as defendants in various actions. To the extent that current or former directors and officers of Delphi were to incur expenses in connection with defending, or were to be found liable for, the asserted causes of action, Delphi would be required under its certificate of incorporation and bylaws to indemnify those directors and officers for their liabilities to the fullest extent permissible under the Delaware General Corporation Law. Delphi maintains insurance for its obligation to indemnify directors and officers.

With respect to the Demand regarding derivative actions against certain current and former directors and officers, a special committee (the "Special Committee") of the Board of Directors was established to determine whether the Company should pursue certain causes of action alleged in the Demand or any future demand for derivative action against certain current and former directors and officers. The Special Committee, with the assistance of independent legal counsel, conducted an independent investigation of the allegations, including a thorough review of the prior investigative material gathered by the Audit Committee regarding related

accounting matters and subsequent interviews of various individuals, including certain of the named defendants.  On August 7, 2007, the Special Committee of the Board of Directors determined that the Company would not pursue the actions alleged in the Demand against the current and former directors and officers.

Through the Company's waiver of any claims that it may have against certain current and former directors and officers, the Company's insurance providers have no contingent liability on account of these actions.  In connection with the Bankruptcy Court's approval of the MDL Settlements, all directors and officers who are insureds under the policies at issue will be barred from asserting any further claims against the policies.  In addition, in connection with the MDL Settlements, underwriters, Delphi's insurers, and certain directors and officers agreed to release claims against Delphi based on the MDL and certain government investigations.  In return, Delphi agreed to release claims against the directors and officers based on the same potential causes of action.  Thus, the waiver of the causes of action against certain current and former directors and officers freed insurance proceeds that otherwise would have been reserved for potential director and officer liability to be used for other purposes and was an instrumental element of the MDL settlement.  The Debtors will maintain, however, the ability to use certain causes of action as defenses to any affirmative claims which may be brought against them by the directors and officers.  If a director or officer asserts a claim against Delphi, Delphi will be able to use the claims it released against the director or officer as a defense or setoff to any of the directors' or officers' claims.  If the defenses asserted by Delphi are overcome by the director or officer (and if the director or officer submitted a timely proof of claim), the director or officer will be able to assert an indemnification claim for the legal fees and expenses the director or officer incurred in defending against Delphi's defenses.

In addition, the Special Committee of the Board of Directors determined that eight former officers or employees committed actions that were not in the best interests of the Company and therefore, under Delaware General Corporation Law, the Company is not required to provide indemnification to them.  Because the Company will not indemnify these individuals, the insurance providers could have contingent liability on account of their actions.  The MDL Settlements, however, on their terms will resolve this contingent liability arising from the actions of those eight individuals.

The Section 510(b) Note Claims, the Section 510(b) Equity Claims, and the Section 510(b) ERISA Claims are more likely than not junior in priority to unsubordinated general unsecured claims pursuant to section 510(b) of the Bankruptcy Code.  Certain creditors have claimed that the Section 510(b) Note Claims, Section 510(b) Equity Claims, and the Section 510(b) ERISA Claims are subordinated in all respects to the claims of the holders of Senior Debt, may be on par with the Debtors' existing common stock, and should not be afforded the treatment proposed under the Modified Plan.  Nevertheless, the Debtors believe that the MDL Settlements described in this Disclosure Statement and the distributions to be made pursuant to the Modified Plan are appropriate for several reasons including but not limited to the following:

•      First, the Section 510(b) Note Claims, Section 510(b) Equity Claims, and the Section 510(b) ERISA Claims to be allowed under the settlement of the MDL Proceedings are settlement amounts which are substantially discounted and less than the actual damages associated with such claims as estimated either by the Debtors or the plaintiffs in the MDL

Proceedings.  Accordingly, even though such claims may be ultimately determined to be subordinated to general unsecured claims, the actual amount of such claims if litigated to their conclusion or if estimated by the Bankruptcy Court may be substantially higher than the claims proposed to be allowed under the Modified Plan.  The Debtors believe that the reduced amounts of these claims proposed to be allowed under the Modified Plan make possible the distributions to creditors and equity holders proposed pursuant to the Modified Plan.  Litigation of these matters could have ramifications to the recoveries of junior stakeholders and the outcome of these Chapter 11 Cases.

•    Second, the settlements provide the Debtors with a resolution of the MDL Proceedings as well as related insurance claims arising from the MDL and certain government investigations and proceedings, which will allow the Debtors to avoid the costs of further litigation with respect to those matters.  Although it is possible that the Debtors could avoid liability altogether with respect to those matters if the litigation continued, or that the claims related to the MDL would be estimated at zero for purposes of a plan of reorganization, that is not a likely outcome, and in any event would most likely require the expenditure of significant time and money by the Debtors to achieve that result.  The Debtors accordingly concluded that the settlements offered the best opportunity to obtain a resolution of the MDL Proceedings and related matters while moving toward a successful emergence from chapter 11 protection.

•    Third, the MDL Settlements also resolve claims against certain current and former directors and officers of the Debtors, as well as certain underwriters of the Debtors' debt offerings.  Some of these other defendants have asserted or may assert indemnification claims against the Debtors based on the claims asserted against them in the MDL Proceedings, which may by subject to disallowance pursuant to section 502(e) of the Bankruptcy Code.  The MDL Settlements resolve these indemnification claims against the Debtors at no additional cost to the Estates.  In the absence of the MDL Settlements, the Debtors could be exposed to such indemnification claims by some of these other defendants.

•    Fourth, there is no doubt that the claims at issue in the MDL Proceedings are complex, and that resolving those claims other than through a settlement would involve protracted litigation involving, among other things, dispositive motions, extensive discovery, and, if necessary, trial.  Even an estimation process in this Court would unduly delay the resolution of the Chapter 11 Cases and deplete the assets of these estates.

•    Fifth, taking action with respect to the MDL Proceedings facilitated the payment of insurance proceeds and thereby made it easier to reach a settlement of the MDL Proceedings.

By voting to accept the Modified Plan, creditors will be resolving the issue of whether the Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims should receive the treatment proposed in the Modified Plan.  Thus, your vote on the Modified Plan in respect of the subordination of the Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims, is important.

### 4.    *Maintaining Relationships With Suppliers*

Throughout these Chapter 11 Cases, the Debtors have worked to maintain and improve their relationships with their suppliers to ensure an uninterrupted supply of goods to their customers, primarily OEMs.

(a)    Supplier Related Issues

To address the supplier-related issues discussed in Section III.B.2 – Delphi's Relationships With Its Suppliers, the Debtors at the commencement of these Chapter 11 Cases sought "first day" relief that provided for payments to those categories of suppliers that posed the greatest risk of interruption in the Debtors' supply chain had they failed to perform under contract with the Debtors.  These included suppliers that were financially distressed or providing goods or services without an enforceable contract as well as foreign suppliers and creditors which might otherwise have taken action against the Debtors in a foreign jurisdiction or refused to do business with the Debtors, resulting in disruption of the supply chain.

During the first months of these Chapter 11 Cases, the Debtors also addressed certain issues surrounding the expiration of more than 11,000 supplier contracts on or about December 31, 2005, unless they were extended.  This was particularly important to the Debtors' businesses because many of their suppliers are sole source suppliers and due to the prevalence of just-in-time inventory, the continuation of supply to customers was, and is, critical.  The Debtors and their advisors worked diligently to develop and implement procedures to effectively and rapidly address issues relating to expiring supply agreements, including implementing the relief granted by the Bankruptcy Court in the Order Under 11 U.S.C. §§ 363(b) And 365(a) And Fed. R. Bankr. P. 9019 Approving Procedures To Assume Certain Amended And Restated Sole Source Supplier Agreements, dated December 12, 2005 (Docket No. 1494), which provided procedures for the Debtors to assume certain contracts on specific terms and renew or otherwise enter into new supply contracts with other suppliers.

(b)    Reclamation Claims Program

On November 4, 2005, the Bankruptcy Court approved global procedures for receiving, reviewing, responding to, and resolving reclamation demands.  The Debtors received thousands of reclamation demands, including duplicate demands. Due to the high volume of reclamation demands received by the Debtors, the Bankruptcy Court granted the Debtors a 45-day extension of the deadline to reconcile all reclamation claims.  After reviewing these demands, the Debtors identified 855 non-duplicate reclamation demands with a total face amount of more than $285 million.

To facilitate the review process of these 855 reclamation demands and the requirement to respond to all reclamation demands within 135 days, the Debtors developed a comprehensive process for responding to all such reclamation demands, evaluating any disagreements, and reaching agreed reclamation claim amounts subject to certain reserved defenses.  Reclamation response statements were sent to all 855 claimants on February 21, 2006.  These statements, representing the results of many hours of review of invoices and billing records, identified total reclamation claims of approximately $18.4 million.  Since that time as a result of additional

negotiations and reconciliations, the current amount of reclamation claims has increased to approximately $22 million. As a result of almost continual negotiations with reclamation claimants since the Petition Date, more than 825 of the original 855 non-duplicate claims have now been resolved, subject to reservation of further defenses.

With respect to reclamation claims, the Debtors propose to allow each claimant to elect to take a general unsecured claim for the amount of its reclamation claim rather than have the Debtors seek a judicial determination that the reclamation claims are subject to the Debtors' reserved defense that reclamation claims are not entitled to administrative priority status on the grounds that the goods and/or the proceeds from the sale of the goods for which claimants are seeking a reclamation claim are or were subject to a valid security interest (the "Prior Lien Defense"). If a claimant elects to decline a general unsecured claim, then any hearing on the allowance of that claimant's reclamation claim will be automatically adjourned to a contested hearing to be held after the Debtors' emergence from chapter 11, which would determine whether the Prior Lien Defense applies to those claimants' reclamation claims. The Debtors would retain all other reserved defenses with respect to the reclamation claims.

To effect this election, the Debtors are sending the claimants a separate notice which will allow each claimant to choose the treatment for its reclamation claim (the "Reclamation Election Notice"). To select treatment of its reclamation claim as a general unsecured claim, the Seller must so mark and return the Reclamation Election Notice by the deadline to be established by the Bankruptcy Court for the submission of votes on the Plan. If the claimant makes no election on the Reclamation Election Notice, or affirmatively elects to continue asserting priority treatment for its reclamation claim, then any hearing on the allowance of that reclamation claim will be automatically adjourned to a contested hearing to be held after the effective date of the Modified Plan. Claimants electing to litigate the Prior Lien Defense will receive 20 days' written notice of the contested hearing. At that contested hearing, the Debtors will assert the Prior Lien Defense against the Reclamation Claim and will seek entry of an order holding that the Reclamation Claim is not entitled to priority treatment under the Modified Plan. Notwithstanding the treatment afforded reclamation claims under these procedures, reclamation claims will not receive any voting rights on the Modified Plan on account of their reclamation claims.

Under the Confirmed Plan, the Debtors had offered an election to claimants. Under the Modified Plan, the Debtors propose to revoke any election regarding a reclamation claim made pursuant to an election notice served upon a claimant pursuant to solicitation of the Confirmed Plan and instead will send claimants the Reclamation Election Notice described above.

## 5.    Disposition Of Assets

### (a)    Sale Of De Minimis Assets

On October 28, 2005, the Bankruptcy Court entered an order permitting the Debtors to sell certain assets of de minimis value. The order approved procedures for selling assets, outside the ordinary course of business, without further court approval provided that the purchase price is less than $10 million for each transaction or in the aggregate for a related series of transactions. In connection with this order, the Debtors formulated internal approval procedures to both

comply with closing conditions and satisfy the notice procedures set forth in the order.  During these Chapter 11 Cases, the Debtors have disposed of assets under the de minimis assets order.

> (b)    JCI Transaction

Prior to the commencement of these Chapter 11 Cases, the Debtors sold their global battery business to Johnson Controls, Inc. ("JCI"), with the limited exception of two U.S. facilities located in New Brunswick, New Jersey and the other in Fitzgerald, Georgia. Accordingly, although the transaction occurred prepetition, the Debtors needed to address several post-closing matters relating to the Debtors' disposition of the Company's money-losing battery manufacturing facility in New Brunswick, New Jersey and the planned transition to JCI of battery production in the Fitzgerald, Georgia facility.  Because JCI could not fill existing customer needs with its own manufacturing facilities, DAS LLC agreed to keep the Fitzgerald and New Brunswick facilities operating exclusively to sell batteries to JCI, even though the New Brunswick facility was losing approximately $3 million per month and the Fitzgerald facility was losing approximately $2 million per month.

To limit these losses, the Debtors negotiated a transfer agreement with JCI, which was approved by the Bankruptcy Court on June 26, 2006.  The approved transfer agreement provided for (a) the sale of the New Brunswick facility to JCI, (b) the continued supply of batteries as well as the orderly transition of production to JCI from the Fitzgerald facility, (c) the implementation of an attrition plan with the IUE-CWA with provisions included to encourage the consensual separation of approximately 200 of the New Brunswick facility's 300 hourly employees, (d) the payment of $12.5 million from JCI to mitigate a majority of the costs of that attrition plan, and (e) the IUE-CWA's waiver of the no-sale clause and certain neutrality obligations with respect to the New Brunswick facility.  The Debtors completed this sale on August 1, 2006.

> (c)    MobileAria, Inc.

On July 21, 2006, the Bankruptcy Court entered an order approving the sale of all of the assets of MobileAria, an Affiliate Debtor, through an auction process.  The auction for the assets of MobileAria was held on July 6, 2006 and the sale hearing was held on July 19, 2006.  On July 31, 2006, MobileAria and Wireless Matrix USA, Inc. closed the sale of substantially all of MobileAria's assets in accordance with the Bankruptcy Court's order dated July 21, 2006. MobileAria received cash proceeds of approximately $11 million in connection with the sale.

> (d)    Brake Hose

On March 27, 2007, the Bankruptcy Court entered an order approving the sale of certain of the Debtors' assets comprising substantially all of the assets exclusively used in the brake hose product and certain intellectual property related to the brake hose business to Harco Manufacturing Group, LLC ("Harco").  On September 28, 2007, the Debtors and Harco closed the sale in accordance with the Bankruptcy Court's March 27, 2007 order.  The Debtors received cash proceeds of approximately $9.8 million in connection with the sale.

(e)      Catalyst

On June 6, 2007, the Debtors announced that they had entered into a sale and purchase agreement with Belgium-based Umicore for the sale of assets of their global original equipment and aftermarket Catalyst Business.  Concurrently, the Debtors filed a motion requesting a hearing on June 26, 2007 to approve bidding procedures in connection with the sale and a hearing on August 16, 2007 to approve the sale.  On August 8, 2007, the Debtors, pursuant to bidding procedures approved by the Bankruptcy Court, held an auction for the Catalyst Business. At the conclusion of the auction, the Debtors determined that Umicore had submitted the highest and best bid, and on August 16, 2007, the Bankruptcy Court approved the sale of the Catalyst Business to Umicore for $75 million, subject to adjustments, and other consideration.  On September 30, 2007, the Debtors and Umicore closed the sale in accordance with the Bankruptcy Court's order dated August 16, 2007.  The Debtors received cash proceeds of approximately $66.0 million in connection with the sale.

(f)      Mexico Brake Plant Asset Sale

On June 14, 2007, Robert Bosch, DAS LLC, and two non-Debtor Mexican affiliates (including Delphi Sistemas de Energia, S.A. de C.V. ("DSE")), signed an asset sale and purchase agreement for the transfer by DAS LLC and DSE of most, but not all, of the material, equipment, and productive materials used for the production of brake products in a Saltillo, Mexico manufacturing plant for approximately $15 million.  On June 15, 2007, the Debtors filed a motion requesting a hearing on June 26, 2007 to approve bidding procedures in connection with the sale and a hearing on July 19, 2007 to approve the sale.  On July 19, 2007, the Bankruptcy Court entered an order approving the sale of assets.  The parties closed the sale during the fourth quarter of 2007.

(g)      Saginaw Chassis Asset Sale

On September 17, 2007, DAS LLC and Delphi Technologies, Inc. entered into an Asset Purchase Agreement with TRW Integrated Chassis Systems LLC (as amended, the "Saginaw Chassis Agreement") for the sale of certain of the assets, including, without limitation, manufacturing equipment and test and development equipment primarily used and located at the Company's chassis facility in Saginaw, Michigan, for approximately $42.6 million, comprised of approximately $27.6 million for the assets primarily used at the Saginaw chassis facility, approximately $15 million for useable and merchantable inventory existing as of the closing date, and up to $0.9 million for out-of-pocket costs and expenses incurred in relocating manufacturing equipment and related tooling from Saltillo, Mexico and Oshawa, Ontario, Canada.  Also on September 17, 2007, Delphi filed a motion with the Bankruptcy Court requesting approval of bidding procedures for the sale and requesting that a sale hearing be set.  The Bankruptcy Court approved bidding procedures in connection with the sale on November 16, 2007.  Delphi did not receive any other qualified bids under the bidding procedures, and the sale was approved by the Bankruptcy Court on November 29, 2007.  The sale was substantially completed in January 2008.

(h)     Interiors And Closures

On December 21, 2007, the Bankruptcy Court entered an order approving the sale of substantially all of the tangible assets primarily used in the Company's cockpits and interior systems business and integrated closures systems business (the "Interiors and Closures Business") to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group. On January 25, 2008, the Court entered an order approving the assumption and assignment of the executory contracts covered by certain objections, all of which were resolved prior to the January 25, 2008 hearing. On that date, the Court also approved a compromise with Inteva, which facilitates the closing of the sale of the Interiors and Closures Business with Inteva by modifying the payment structure under the Interiors and Closures Agreement in consideration for the waiver of certain of Inteva's conditions to closing. Delphi closed on the sale of the Interiors and Closures Business to Inteva on February 29, 2008. Delphi received proceeds from the sale of approximately $106 million consisting of $62.5 million of cash paid at closing (of which $35.1 million was paid to non-debtor foreign entities that participated in the sale)and notes at fair value for the remainder of the purchase price (none of which will be paid to non-debtor foreign entities).

(i)     Steering And Halfshaft

On February 19, 2008, the Bankruptcy Court entered an order approving the sale of the Debtors' steering and halfshaft business to Steering Solutions Corporation, a subsidiary of Platinum Equity, LLC, and a transaction facilitation agreement with GM  Subsequent orders of the Court approved the assumption and assignment of the executory contracts covered by certain objections.  Delphi is working to close the sale as soon as practicable.  Although the date on which a non-defaulting party can terminate the purchase and sale agreement because a transaction has not yet been consummated has passed, Delphi and the prospective purchaser remain in discussions with each other and GM.  Because of the implementation of the Amended GSA and Amended MRA, no material adverse impact on the Debtors' operations or business plan is expected, regardless of whether the transaction is consummated.

### 6.     *Real Property And Related Matters*

Pursuant to a Bankruptcy Court order dated November 30, 2005, the Bankruptcy Code section 365(d)(4) deadline for assuming or rejecting the Debtors' unexpired leases of nonresidential real property was extended to June 7, 2007.  On April 13, 2007, August 16, 2007, February 26, 2008, and April 30, 2008, the Bankruptcy Court entered orders further extending the 365(d)(4) deadline.  The current deadline is 30 days after substantial consummation of the Plan or any modified plan.

Separately, on March 27, 2007, the Bankruptcy Court entered an order authorizing the Debtors to effectuate a transaction that enabled the Debtors to consolidate, into one facility located in Auburn Hills, Michigan, six of their leased office and technical centers located in Michigan and Illinois and a portion of one owned site in Flint, Michigan.  The same order authorized the Debtors to reject certain leases for facilities that would be consolidated.  The Debtors believe that the consolidation of these facilities will enable to the Debtors to create a consolidated footprint in Southeast Michigan that is closer to key customers and will facilitate creative dialogue among diverse groups and teams at Delphi, that this dialogue will spark new

innovation that should enable the Debtors to gain an edge on competitors in the industry, and should generate net savings of over $100 million dollars over a ten-year period.

### 7.    Global Events

In February 2007 Delphi's indirect wholly owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), announced the planned closure of its sole operation at the Puerto Real site in Cadiz, Spain.  The closure of this facility is consistent with Delphi's Transformation Plan to optimize its manufacturing footprint and to lower its overall cost structure.  The facility, which has approximately 1,600 employees, is the primary holding of DASE.

On March 20, 2007, DASE filed a Concurso application for a Spanish insolvency proceeding and informed the Spanish court and the affected employees that Delphi Automotive Systems (Holding), Inc. ("DASHI"), Delphi's subsidiary and DASE's parent, would voluntarily provide funds sufficient to satisfy the minimum separation allowance to which the affected employees are entitled under applicable Spanish law.  In an order dated April 13, 2007, the Spanish court declared DASE to be in voluntary Concurso and appointed receivers for DASE.

In the course of the Concurso process, DASE commenced negotiations on a social plan and a collective layoff procedure related to a separation allowance with the unions representing the affected employees.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan to provide employees with €120 million for a separation allowance of approximately 45 days of salary per year of service to each employee.  On July 9, 2007, Delphi filed a motion seeking authority for DASHI to fund the €120 million DASE consensual social plan and authority to pay suppliers and other non-labor creditors of DASE up to €10 million, for a total cost not to exceed €130 million.  The funding provided by the Debtors to DASE was derived from dividends from overseas non-Debtor entities.  The Bankruptcy Court approved this funding motion on July 19, 2007.  On July 31, 2007, the Spanish Court presiding over the Concurso approved the consensual social plan.

In consideration for providing such funds and transferring certain fixed assets, upon satisfaction of certain requirements under Spanish law, Delphi, all of the Delphi affiliates, and each of their directors and officers will be released by operation of Spanish law from any liability related to DASE or arising out of its Concurso application. Additionally, each employee who accepts payment under the separation plan is required to confirm that such payment is in full satisfaction of any claims the worker may have against DASE, Delphi, or any Delphi affiliate. Notwithstanding the foregoing, Delphi and its affiliates deny any liability and reserve the right to challenge any and all such claims should this matter not be resolved consensually as anticipated.

### 8.    The Joint Interest Agreements

As discussed in more detail below, the Debtors are the subject of certain investigations including (a) the internal review conducted by the Audit Committee of Delphi's Board of Directors, (b) the formal ongoing investigations by several governmental agencies of certain previously employed individuals, (c) the Company's restatement of earnings for fiscal years 2001 through 2003, (d) the subject matter related to the commencement of certain class actions,

including, without limitation, actions brought under ERISA and various securities actions, and (e) the review by a special committee of Delphi's Board of Directors of certain shareholder derivative demands and related actions. The Bankruptcy Court approved separate joint interest agreements between the Debtors and the Creditors' Committee and between the Debtors and the Equity Committee, which allows the Debtors to share certain confidential, and sometimes privileged, information with the Creditors' Committee and Equity Committee, respectively. The Bankruptcy Court also approved fee procedures to protect the confidential time detail that discloses work conducted by the professionals working on matters related to these investigations.

### 9. *Exclusivity*

Pursuant to an order of the Bankruptcy Court dated January 6, 2006, the Bankruptcy Court extended the Debtors' exclusive period to propose a plan of reorganization (the "Filing Period") through August 5, 2006, and to solicit acceptances of such plan (the "Solicitation Period") to October 4, 2006. Pursuant to further orders of the Bankruptcy Court entered on June 19, 2006, January 23, 2007, July 29, 2007, December 20, 2007, March 19, 2007, and April 30, 2008, the current Filing Period, except as to the Statutory Committees, extends until 30 days after substantial consummation of the Confirmed Plan or any modified plan and the Solicitation Period until 90 days after substantial consummation of the Confirmed Plan or any modified plan. Pursuant to an agreement among the Debtors and the Statutory Committees, and a subsequent order entered on July 31, 2008, the Filing Period has been extended, solely as between the Debtors and the Statutory Committees, to October 31, 2008 and the Solicitation Period has been extended to December 31, 2008. The July 31 order preserves the rights of the Statutory Committees to contest the effect of section 1129(c) if any of the section 1121(d) exclusive periods vis-a-vis the Statutory Committees expires. On October 3, 2008, the Debtors filed a motion seeking to extend exclusivity, as between the Debtors and the Statutory Committees, to January 31, 2009 for the Filing Period and March 31, 2009 for the Solicitation Period.

### 10. *Preserving Estate Causes Of Action*

#### (a)    Avoidance Procedures Order

On August 16, 2007, the Bankruptcy Court entered an order (the "Avoidance Procedures Order") authorizing the Debtors to enter into tolling agreements with respect to avoidance and other causes of action, approving procedures to identify those causes of action that should be preserved or abandoned, authorizing the Debtors to abandon certain actions, and establishing adversary proceeding procedures for preserving causes of action. The Debtors sought this relief so that they could take steps to fulfill their fiduciary duties to preserve valuable estate assets in a manner that will not unnecessarily disrupt their prosecution of the Modified Plan or their existing business relationships with potential defendants that are necessary to the Debtors' ongoing operations.

Section 546(a)(1)(A) of the Bankruptcy Code provides that a debtor-in-possession may not commence a cause of action under section 544, 545, 547, 548, or 553 of the Bankruptcy Code more than two years after the Petition Date. Similarly, section 108(a)(2) of the Bankruptcy Code provides that a debtor-in-possession may not commence a cause of action under non-bankruptcy law—for which the applicable statute of limitations, but for the chapter 11 filing,

would have otherwise expired during the initial two years of a case—more than two years after the Petition Date.  Thus, to bring timely lawsuits on any of these causes of action, the Debtors needed to commence them no later than October 9, 2007 or October 15, 2007, as applicable.

Because of the Plan's treatment of unsecured creditors, the Debtors have determined that the affirmative pursuit of many if not all of these causes of action would be unlikely to benefit their estates and creditors.  As described in this Disclosure Statement, the Modified Plan will satisfy allowed claims through distributions of common stock.  Due to the nature of the Debtors' business, the Debtors have determined that the cost of pursuing litigation against their suppliers would be detrimental to their continuing operations.

The Debtors estimate that there may be more than 11,000 potential Preference Claims arising from transfers during the 90-day period before the Petition Date, which transfers total approximately $5.8 billion (without taking into account potential defenses such as transfers made in the ordinary course of business).  With respect to transfers subject to potential claims that the Debtors did not receive reasonably equivalent value in exchange (commonly known as constructive fraud claims), the reach-back period made applicable by section 544(b) of the Bankruptcy Code and state law (most likely Michigan and New York law with respect to most transactions in these cases) is generally the six years prior to the Petition Date.  Thus, with a company of Delphi's size, there are literally hundreds of thousands of transactions that occurred during that six-year period.

Although the Debtors do not intend to pursue these causes of action, as a precautionary measure they must identify and preserve the causes of action in some manner.  The Debtors explored various alternatives to commencing actions before the two-year deadline, such as executing tolling agreements with potential defendants.  The logistical challenges of circulating and executing tolling agreements with such a large number of potential defendants, however, made that solution impractical.  The Debtors, therefore, determined that to the extent they did not execute tolling agreements they needed to timely commence actions on most of these claims or risk losing them.

(b)      <u>Procedures To Identify And Preserve Causes Of Action</u>

To identify and preserve these claims, without disrupting the successful prosecution of the Plan and the Debtors' existing business relationships, the Avoidance Procedures Order established the following procedures:

(i)      Tolling Agreement

- *Approval Of Form*.  The Avoidance Procedures Order approved a form of stipulation which, without further order of the Bankruptcy Court, tolls the applicable statute of limitations on claims against any party with whom the Debtors seek to enter into such a stipulation.

- *Intercompany Tolling*. The Avoidance Procedures Order deemed all Debtors to have entered into a tolling stipulation with each of the other Debtors and affiliated non-Debtor entities controlled by the Debtors or that had actual notice of the Motion.

(ii)    Approval Of Avoidance Evaluation Procedures And
Authority To Abandon Claims

- *Preference Claims Below $250,000 In Value*. The Debtors are authorized (but not directed) to abandon these preference actions.  To the extent that any of these actions are against insiders or involve persons or transactions associated with the SEC investigation of the Debtors, the Debtors are authorized (but not directed) to abandon those actions after notice to the Statutory Committees.  If a Statutory Committee objects within ten days after service of any such notice, the Debtors may bring the matter before the Bankruptcy Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

- *Select Categories Of Preference Claims*. The Debtors are authorized (but not directed) to abandon the following categories of preference actions: (i) payments to parties with a secured or priority interest in such payment, (ii) union dues, (iii) pension plan contributions, (iv) payments required under the terms of collective bargaining agreements, (v) payments to reimburse employee business expenses, (vi) ordinary course wages, salaries, and benefits to employees, (vii) payments required by a garnishment to satisfy third-party judgments and obligations, (viii) contributions to charitable organizations, (ix) payments to foreign suppliers, (x) payments to the Debtors' shippers, (xi) payments to the Debtors' insurance providers, and (xii) payments to the Debtors' utilities.

- *Scope Of Fraudulent Transfer Review*.  The Avoidance Procedures Order provides that, for purposes of identifying and preserving potential fraudulent transfer claims, the Debtors need only review the following categories of transactions: merger and acquisition deals at or exceeding $20 million, transfers to Delphi's board of directors or strategy board members other than for compensation or ordinary-course expense reimbursement (if any), unusual securities transactions, dividend distributions to 5% shareholders, and Delphi's financially troubled supplier program.

- *Additional Authority For Abandonment After Notice To Statutory Committees*.  The Debtors are authorized (but not directed) to abandon, after notice to the Statutory Committees, and without further order of the Bankruptcy Court or further notice, claims (i) with insignificant value, (ii) where litigation costs would likely exceed expected recovery, (ii) where the potential harm to businesses outweighs expected recovery, or (iv) where valid defenses exist.  If a Statutory Committee objects within ten days after service of the notice, the Debtors may bring the matter before the Bankruptcy Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

(iii)    Commencement Of The Adversary Proceedings And
Service Of Process

- *Adversary Proceedings Subject To Procedures*.  The procedures apply to each adversary proceeding that the Debtors identify to the Clerk of Court as being subject to these procedures.

- *Deferral Of Issuance Of Summons*.  The Clerk of Court is directed to defer issuing a summons after the filing of a complaint, unless and until the Debtors intend to pursue the claims in the complaint.

- *Extension Of Fed. R. Civ. P. 4(m) Time Period*.  The Debtors have until March 31, 2008  to serve each defendant with the summons and the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.

- *Service Of Order With Summons And Complaint*.  The Debtors must serve a copy of the Avoidance Procedures Order upon each defendant in any adversary proceeding either if and when the Debtors serve process on the defendant or as soon thereafter as practicable.

    (iv)    Stay Of Adversary Proceedings Until Service Of Process And Interim Sealing

- *Stay of Adversary Proceedings*.  Each adversary proceeding is stayed until the Debtors have served the summons and complaint.

- *Activity During The Stay*. During the stay, the Debtors may (i) amend their complaint, and (ii) after notice to the Statutory Committees, dismiss it.

- *Expiration Of The Stay*. The stay will continue until the earlier of (i) service of process and (ii) further order of the Bankruptcy Court after application therefor.

- *Filing Of The Complaints Under Interim Seal*.  The Debtors filed under seal paper copies of the complaints in the adversary proceedings and the case docket for such adversary proceedings will not disclose the identity of any defendant in the adversary proceedings.

    (v)    General Motors Corporation

- As described above, Delphi has entered into a comprehensive settlement agreement with GM, which agreement became effective on September 29, 2008.  Nevertheless, because of GM's unique role in these Chapter 11 Cases, in addition to filing a sealed complaint governed by the procedures above, the Debtors and GM filed, under seal, a stipulation that contains tolling provisions, consistent with the Avoidance Procedures Order, and other agreements of the parties with respect to the sealed complaint involving GM, which stipulation will be deemed "so ordered" and will be sealed in accordance with the terms of the Avoidance Procedures Order. Pursuant to the terms of the Amended GSA and the Amended MRA, Delphi has agreed to withdraw this complaint with prejudice.

    (vi)    Additional Procedures

- The Avoidance Procedures Order is without prejudice to the Debtors' seeking additional procedures to govern the adversary proceedings.

(vii)    Reservation Of Rights

- With respect to any avoidance causes of action under section 544, 545, 547, 548, or 553 of the Bankruptcy Code that the Debtors abandon in accordance with the procedures described immediately above, the Debtors reserve all rights, including the right under section 502(d) of the Bankruptcy Code, to use defensively the abandoned avoidance cause of action as a ground to object to all or any part of a claim against any estate asserted by a creditor that remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

Although hundreds of actions subject to these procedures have been commenced, the Debtors will proceed no further and not use them for any purpose during the Confirmed Plan modification process. The procedures are designed to permit the Debtors to preserve these claims while otherwise maintaining the status quo with all parties-in-interest. The actions will remain dormant and become relevant again only in the unlikely event that the Debtors do not timely emerge from chapter 11. If the Modified Plan becomes effective, these actions will be dismissed.

In addition, under the Modified Plan the Reorganized Debtors will not retain the Preference Claims except those specifically listed on Exhibit 7.24 to the Plan. On March 27, 2008 and April 30, 2008, the Bankruptcy Court entered orders extending the deadline by which the Debtors would be required to serve a summons and complaint upon each defendant under the Avoidance Procedures Order. The current deadline is 30 days after the later of substantial consummation of the Confirmed Plan or any modified plan and December 31, 2008.

(c)    FICA Claimants' Estate Causes of Action

In 1999 and 2003, Delphi, a predecessor of DAS LLC, and Delphi Automotive Systems Services LLC (the "FICA Claimants") agreed to pay "ratification bonuses" shortly after the effective date of duly ratified collective bargaining agreements to certain union members who were classified in a specified status (i.e., active status, protected status, temporary layoff status, or various forms of short-term leave of absence). The FICA Claimants contend that the payments were not "wages" subject to taxation under the Federal Insurance Contributions Act ("FICA") because the payments were not in exchange for any services by the union members, but instead constituted payments in exchange for a promise by the union membership to be bound by the collective bargaining agreements. The FICA Claimants nevertheless withheld and paid FICA taxes to the IRS to avoid the possibility of becoming secondarily liable for the FICA taxes owed to the IRS by those union members. The FICA Claimants subsequently filed claims for refunds with the IRS. The IRS denied the refund claim for 1999 FICA taxes while these Chapter 11 Cases were pending, but the IRS has yet to act on the refund claim for 2003 FICA taxes. On January 18, 2008, the FICA Claimants filed an adversary proceeding against the United States to obtain a refund on their own behalf and on behalf of certain of their employees of certain payroll taxes paid to the Internal Revenue Service. The complaint seeks to recover the amount of FICA taxes paid, currently estimated to be $26,058,130, as well as interest. These estate causes of action are preserved under the Plan.

### 11.    *Investment Agreement And Plan Investor Litigation*

In connection with the Framework Discussions, the Debtors entered into an investment agreement with certain plan investors in January 2007.  Under the terms of the Original Investment Agreement, the Original Investors committed to purchase $1.2 billion of convertible preferred stock and approximately $220 million of common stock in the reorganized Company. The Original Investors also agreed to back-stop a discount rights offering of new common stock to the existing shareholders of Delphi.  On April 19, 2007, Delphi announced that the Debtors anticipated negotiating changes to the Original Investment Agreement and amendments to the PSA.  The primary reason for the negotiations was the differing views of Delphi, the Original Investors, GM, and the Statutory Committees as to the enterprise value of a reorganized Delphi. Delphi's expectation at that time was that all of the Original Investors except Cerberus would continue to participate as plan investors (possibly together with additional new plan investors), and that Cerberus might participate in Delphi's exit financing.  On July 7, 2007, Delphi sent a termination notice of the Original Investment Agreement to the other parties to the Original Investment Agreement pursuant to section 12(g) of the Original Investment Agreement.  As a result of the termination of the Original Investment Agreement, a Termination Event (as defined in the PSA) occurred, and all obligations of the parties to the PSA under the PSA were immediately terminated and were of no further force and effect.  On July 9, 2007, Delphi publicly disclosed that it had terminated the Original Investment Agreement and the PSA, and that it expected to enter into new framework agreements at some point in July 2007.

On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the Investment Agreement) with Plan Investors.  Under the terms and subject to the conditions of the Investment Agreement, the Plan Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion discount rights offering that was made available to unsecured creditors. The discount rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund the Investment Agreement, in April 2008 the Company cancelled the discount rights offering and returned all funds submitted.

During October and November 2007, Delphi negotiated potential amendments to the Investment Agreement.  On December 7, 2007, the Bankruptcy Court approved an amendment to the Investment Agreement.  On December 10, 2007, the Plan Investors and Delphi entered into the amendment to the Investment Agreement.

The Investment Agreement included certain corporate governance provisions for the reorganized Company, each of which was incorporated into Delphi's Confirmed Plan. The Investment Agreement also incorporated Delphi's earlier commitment to preserve its salaried and hourly defined benefit U.S. pension plans and to fund required contributions to the plans that were not made in full as permitted under the Bankruptcy Code.

The Investment Agreement was subject to the satisfaction or waiver of numerous conditions, including the condition that an affiliate of Appaloosa was reasonably satisfied with

the terms of certain material transaction documents (evidenced by the fact that an affiliate of Appaloosa did not deliver a deficiency notice), to the extent the terms thereof would have an impact on the Plan Investors' proposed investment in the Company and receipt of proceeds from the sale of preferred stock, exit financing, and the discount rights offering sufficient to fund the transaction contemplated by the Investment Agreement and certain related transactions. Other conditions to closing included release and exculpation of each Investor as set forth in the Investment Agreement Amendment; that the Company would have undrawn availability of $1.4 billion including a letter of credit carve out and reductions under a borrowing base formula; that the Company's pro forma interest expense during 2008 on the Company's indebtedness, as defined in the Investment Agreement, would not exceed $585 million; that scheduled Pension Benefit Guarantee Corporation liens would be withdrawn; and that the aggregate amount of trade and unsecured claims could be no more than $1.45 billion (subject to certain waivers and exclusions).

An affiliate of Appaloosa could terminate the Investment Agreement, including, at any time on or after April 5, 2008, if the Confirmed Plan had not become effective; if the Company had changed its recommendation or approval of the transactions contemplated by the Investment Agreement, the Confirmed Plan terms, or the settlement with GM in a manner adverse to the Investors or approved or recommended an alternative transaction; or if the Company had entered into any agreement or taken any action to seek Court approval relating to any plan, proposal, offer, or transaction that was inconsistent with the Investment Agreement, the settlement with GM, or the Confirmed Plan. In the event of certain terminations of the Investment Agreement pursuant to the terms thereof, the Company could be obligated to pay the Investors $83 million plus certain transaction expenses as described in the immediately following paragraph.

The Company would be required to pay the Plan Investors $83 million plus certain transaction expenses if (a) the Investment Agreement was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the Investment Agreement, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

In exchange for the Plan Investors' commitment to purchase common stock and the unsubscribed shares in the discount rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Plan Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million. In addition, the Company paid certain other fees and expenses as provided in the Investment Agreement.

The foregoing description of the Investment Agreement is a general description only.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its First Amended Joint Plan of Reorganization, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter dated April 4, 2008, stating it constituted "a notice of immediate termination" of the Investment Agreement. Appaloosa's April 4 letter

alleged that Delphi had breached certain provisions of the Investment Agreement, that Appaloosa was entitled to terminate the Investment Agreement, and that the Plan Investors were entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Plan Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Creditors' and Equity Committees in Delphi's Chapter 11 Cases were present and were prepared to move forward. All actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the Investment Agreement.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating that the letter constituted "a notice of an additional ground for termination" of the Investment Agreement. The April 5 letter stated that because the Investment Agreement had not become effective on or before April 4, 2008, that fact was grounds for the Investment Agreement's termination.

Delphi believes that Appaloosa wrongfully terminated the Investment Agreement and disputes the allegations that Delphi breached the Investment Agreement or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, including the commencement of legal action in the Court to seek all appropriate relief, including specific performance by the Investors of their obligations under the Investment Agreement.

On May 16, 2008, Delphi filed complaints in the Bankruptcy Court against Appaloosa Management, ADAH, Harbinger Del-Auto Investment Company, Ltd. ("Harbinger Del-Auto"), Pardus DPH Holding LLC ("Pardus DPH"), Merrill Lynch, Pierce, Fenner & Smith Incorporated, Goldman Sachs & Co., Harbinger Capital Partners Master Fund I, Ltd., Pardus Special Opportunities Master Fund L.P., and UBS Securities LLC, which on April 4, 2008 refused to honor their equity financing commitment of up to $2.55 billion and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11 at that time.

The Company asserts claims for breach of contract and fraud, and asks the Bankruptcy Court to enter a judgment of specific performance requiring the Plan Investors to provide equity funding in an amount up to $2.55 billion pursuant to the Investment Agreement and to pay compensatory and punitive damages in an amount to be determined at trial. The Company also seeks to equitably subordinate the claims and interests of the Plan Investors. On June 10, 2008, after denying Delphi's request for an expedited trial, the Court approved an agreed-upon case management plan, which included dates for non-binding mediation in August 2008 and a deadline of March 31, 2009 for the case to be trial-ready.

On July 28, 2008, the Bankruptcy Court ruled on the motion to dismiss. The motions were granted in part and denied in part. As to the motion filed by Appaloosa and ADAH, the motion was granted to the extent of dismissing, pursuant to Fed. R. Civ. P. 9(b), one part of Delphi's claim for fraud, and otherwise sustaining the claim for fraud, as well as the claims for

breach of contract (including for specific performance, for damages in excess of the cap, and veil piercing) and for equitable subordination.  As to the motions filed by Merrill Lynch, Goldman Sachs and UBS, the motions were granted to the extent of dismissing (i) that part of the breach of contract claim under the Investment Agreement to the extent it seeks monetary damages in excess of the cap on liability in section 11(b) of the Investment Agreement applicable to each such defendant, and (ii) the claim for equitable subordination and disallowance.  The Court thus sustained the breach-of-contract claim under the Investment Agreement, and left open the possibility that these defendants could be subject to a decree of specific performance.  As to the motion filed by Harbinger and Pardus (and their affiliates, Harbinger Del-Auto and Pardus DPH), the motion was granted to the extent of dismissing (i) the claim for breach of contract under the Investment Agreement to the extent it seeks monetary damages from Harbinger Del-Auto or Pardus DPH in excess of the cap on aggregate liability in section 11(b) of the Investment Agreement applicable to those defendants, (ii) the claim for breach of contract under the Commitment Letter Agreements to the extent it seeks relief from Harbinger or Pardus other than monetary damages up to the amount of the cap on aggregate liability applicable to each such defendant as set forth in its respective Commitment Letter Agreement, and (iii) the claim for equitable subordination and disallowance.  Because Harbinger Del-Auto and Pardus DPH are shell companies, and because the Court ruled that Harbinger and Pardus are subject to monetary damages only under the Commitment Letters (and only up to the caps), the Court effectively foreclosed the possibility of specific performance as to these defendants in the full amounts of their original commitments.

On August 5 and 6, 2008, the parties participated in confidential, non-binding mediation with Eric D. Green, a mediator with Resolutions LLC who had been jointly selected by the parties pursuant to the case management order governing the litigation.  The Debtors intend to retain this asset of the estate and the proceeds of any settlement or judgment will be retained by the Debtors.

### 12.   *Complaints Seeking Revocation Of Confirmation Order*

On July 23, 2008, the Creditors' Committee and Wilmington Trust, as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Bankruptcy Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's plan of reorganization on the grounds that it was procured by Appaloosa's and the other Plan Investors' fraud.  The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008.  The Creditors' Committee and Wilmington Trust have entered into a stipulation and consent order with Delphi whereby all activity in respect of the section 1144 complaints will be stayed until the earlier of (i) the service by the Creditors' Committee or Wilmington Trust upon the Debtors of a written notice terminating the stay with respect to the party's complaint or (ii) further order of the Bankruptcy Court.  Upon receipt of a notice of termination of stay, the Debtors will have thirty days, or such other period of time as the parties may agree or as may be ordered by the Bankruptcy Court, to answer or otherwise file a responsive pleading.

E.      **Summary Of Claims Process**

The Debtors' claims administration process in these Chapter 11 Cases is at an advanced stage compared to other large, complex Chapter 11 Cases.  The Debtors have made significant progress in reconciling and allowing claims, primarily because one of the conditions in the Confirmed Plan was that the allowed or estimated amount for certain "trade and other unsecured claims" would not exceed $1.45 billion, the dollar threshold negotiated among the Debtors and the Plan Investors.

1.      *Schedules Of Assets And Liabilities And Statements Of Financial Affairs*

On January 20, 2006, the Debtors filed with the Bankruptcy Court Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements"). In compliance with the requirements under the Bankruptcy Code, separate Schedules and Statements were filed for the 42 debtors in the jointly-administered Chapter 11 Cases.  The Debtors filed amendments to the Schedules and Statements on February 1, 2006, April 18, 2006, and amendments for ten Debtors on October 12, 2007.  The global notes and limitations with respect to the Schedules and Statements are incorporated by reference in, and comprise an integral component of, the Schedules and Statements, and should be referred to and reviewed in connection with the Schedules and Statements.

For financial reporting purposes, the Debtors, along with their subsidiaries which are not the subject of cases under the Bankruptcy Code, prepare consolidated financial statements that are filed with the SEC and that are audited annually.  Unlike the consolidated financial statements, the Schedules and Statements reflect the assets and liabilities of each individual Debtor, except as otherwise noted.  The Schedules and Statements do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles in the United States, nor are they intended to fully reconcile to the consolidated financial statements filed by Delphi.

2.      *Claims Bar Date*

On April 12, 2006, the Bankruptcy Court entered an order (the "Bar Date Order") establishing July 31, 2006 as the general deadline for filing proofs of claim against the Debtors (the "Bar Date").  Proofs of claim were not required to be filed by any person or entity who

- agreed with the nature, classification, and amount of its Claim as described in the Schedules and Statements and whose Claim against a Debtor was not listed as "disputed," "contingent," or "unliquidated" in the Schedules,

- already filed a proof of claim against the correct Debtor,

- asserted only an administrative expense claim and not a claim otherwise subject to the Bar Date Order,

- asserted a claim solely on the basis of future pension or other post-employment benefits,

- had a claim that had been allowed by or paid pursuant to a Bankruptcy Court order,

- was the holder of certain notes, or

- held Delphi common stock.

The Bar Date Order also provides for a new Bar Date for claimants who may be affected by two specific events which might have occurred before or may occur after the Bar Date. First, if the Debtors amend the Schedules and Statements to reduce the undisputed, non-contingent, and liquidated amounts or to change the nature or classification of a particular Claim against a Debtor reflected therein, then the affected claimant has until 30 calendar days after such claimant is served with notice that the Debtors have amended their Schedules to file a proof of claim or to amend any previously filed proof of claim in respect of such amended scheduled claim. Second, holders of claims based on the rejection of executory contracts and unexpired leases have until the later of (i) the Bar Date or (ii) 30 calendar days after the effective date of such rejection to file a claim.

Under the Bar Date Order, any person or entity which was required to file a proof of claim, but failed to do so in a timely manner on or before the applicable Bar Date, is forever barred, estopped, and enjoined from (a) asserting any claim that such person or entity has against the Debtors that (i) is in an amount that exceeds the amount set forth in the Schedules and Statements as undisputed, non-contingent, and unliquidated or (ii) is of a different nature or in a different classification than as set forth in the Schedules and Statements and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in these Chapter 11 Cases in respect of such a claim, and the Debtors and their property will be forever discharged from any and all indebtedness or liability with respect to such a claim.

The Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC, provided notice of the Bar Date by mailing to each person listed in the Schedules and Statements: (i) a notice of the Bar Date, (ii) a proof of claim form, and (iii) statements which indicated whether the claim of each recipient was listed in the Schedules and Statements as either unliquidated, contingent, and/or disputed.

The Debtors also published notice of the Bar Date on or before April 24, 2006 in the New York Times (national edition), the Wall Street Journal (national, European, and Asian editions), USA Today (worldwide), the Automotive News (national edition), and in local editions of the following: the Adrian Daily Telegram, the Arizona Daily Star, the Buffalo News, the Chicago Sun Times, the Clinton News, the Columbus Dispatch, the Daily Leader, the Dayton Daily News, the Detroit Free Press, the El Paso Times, the Fitzgerald Herald Leader, The Flint Journal, the Gadsden Times, the Grand Rapids Press, the Greensville News, the Indianapolis Star, the Kansas City Star, the Kokomo Tribune, the Lansing State Journal, the Laurel Leader, the Los Angeles Daily News, the Milwaukee Journal Sentinel, the Mobile Beacon, The Mobile Register, the Oakland Press, the Olathe Daily News, the Rochester Democrat and Chronicle, the Saginaw News, the Sandusky Register, the Tribune Chronicle, the Tulsa World, The Tuscaloosa News, and The Vindicator.

In total, the Debtors provided notice of the Bar Date to more than 500,000 persons and entities.

### 3.    Proofs Of Claim And Other Claims

As of September 30, 2008, the Debtors had received approximately 16,800 proofs of claim, some of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. Although the Debtors have not completed the process of reconciling these proofs of claim and thus, the ultimate amount of such liabilities is not determinable at this time, the Debtors believe that the aggregate amount of claims filed is likely to exceed the amount that will ultimately be allowed by the Bankruptcy Court.

### 4.    Claims Reconciliation Progress

The Debtors have sought to resolve their claims pool on an expedited basis. With $34 billion in liquidated amounts plus certain unliquidated amounts asserted against the Debtors as of September 30, 2008 in approximately 16,800 proofs of claim, and certain scheduled liabilities for which no proof of claim was filed, the Debtors faced a challenging task. Between September 19, 2006 and September 30, 2008, the Debtors filed 30 Omnibus Claims Objections (as defined below). As of September 30, 2008, the Debtors had objected to approximately 13,800 proofs of claim which asserted approximately $10.7 billion in aggregate liquidated amounts plus additional unliquidated amounts. The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,800 of those proofs of claim, which reduced the amount of asserted claims by approximately $9.7 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered orders modifying approximately 3,700 claims, reducing the aggregate amounts asserted on those claims by $294 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors and their advisors devoted a significant amount of time to the claims resolution process. For example, the Debtors gained court approval of certain claims objection procedures, which are discussed in more detail below, applicable to claims that become contested when claimants respond to an omnibus objection. Pursuant to these procedures, the Debtors scheduled multiple claims for adjudication in a hearing before the Bankruptcy Court, held multiple "meet-and-confer" discussions and mediations, and ultimately resolved several contested claims during the period from October 2006 through September 15, 2008 before they were scheduled for hearing.

As of September 30, 2008, there are approximately 21 proofs of claim of the approximately 16,800 proofs of claim which still require further reconciliation by the Debtors. The Debtors anticipate that some of these remaining proofs of claim will be withdrawn as they are reconciled and the Debtors intend to place all remaining proofs of claim that are not withdrawn on future omnibus claims objections.

**5.       *Claims Objection Procedures And Estimation Procedures Motion***

On May 22, 2006, the Debtors established a team of analysts whose primary duty was to reconcile all proofs of claim filed against the Debtors. The claim reconciliation process entails comparing the assertions in each proof of claim to the Debtors' books and records.  The reconciliation includes a validation of three basic claim components: Debtor, classification, and amount.  Once a discrepancy between an asserted claim and the Debtors' books and records is identified, the Debtors place the claim on an objection to be filed with the Bankruptcy Court and seek either to disallow and expunge or to modify the claim in accordance with their books and records (an "Omnibus Claims Objection"). The Debtors filed their first Omnibus Claims Objection on September 19, 2006 and to date have filed 30 Omnibus Claims Objections.

On December 7, 2006, the Bankruptcy Court entered an order (the "Claims Procedures Order") establishing (1) special hearings to consider contested claims matters, (2) certain procedures governing the filing and contents of claimants' responses to Omnibus Claims Objections, (3) certain procedures governing the adjudication of contested claims matters, and (4) certain procedures for the service of Omnibus Claims Objections.  The Claims Procedures Order provides that if a claimant files a response to an Omnibus Claims Objection and that response complies with the procedures set forth in that order, then the hearing on the Debtors' objection to the claim will be adjourned to a special claims hearing.  During the claims administration process, claimants have filed responses with respect to approximately 1,879 claims.  As of September 15, 2008, the Bankruptcy Court had conducted 25 claims hearings to adjudicate approximately 900 of those claims, resulting in those claims being disallowed and expunged.  A total of 629 claims have been resolved by signed settlement agreements and stipulations entered by the Bankruptcy Court.  The remaining claims have either been scheduled to be resolved at future claims hearings, are subject to further reconciliation, or are being negotiated in the hopes of reaching consensual agreements which would be presented at future claims hearings by the parties.

On September 28, 2007, the Bankruptcy Court entered an order ("Estimation Procedures Order") with respect to certain contingent or unliquidated claims establishing (1) a maximum cap amount for certain claims, solely for the purposes of tabulating votes on and setting appropriate reserves under any plan of reorganization of the Debtors, (2) that the Debtors may further object to, or seek to estimate, any and all of the unliquidated claims at lesser amounts for purposes of allowance and distribution, (3) that hearing dates scheduled pursuant to the Claims Procedures Order will also be used to consider the estimation of certain claims, and (4) certain expedited claims estimation procedures governing the filings and evidence that would be presented in conjunction with an estimation hearing.

**6.       *Key Classes Of Claims***

(a)       GM Claims

(i)       GM's Proof Of Claim

On July 31, 2006, GM filed an unliquidated amended proof of claim.  The claims asserted by GM included warranty/recall claims, overpricing and overpayment claims, short shipments claims, damaged goods claims, missed price reduction claims, lease and service contract claims,

flowback employee post employment benefits and relocation cost claims, claims arising under the special attrition programs, UAW benefit guarantee claims, personal injury indemnification claims, environmental claims, federal, state, and other tax claims, and intellectual property claims. For certain portions of its claim, GM provided documentation aggregating approximately $6 billion.  Under the Amended GSA, GM received a $2.5 billion allowed general unsecured claim.  In addition, certain GM claims will flow through the Chapter 11 Cases and be satisfied by the Reorganized Debtors in the ordinary course of business while certain of GM's warranty claims were settled by agreement of the parties as set forth more fully below.  Finally, GM will receive an administrative expense claim in an amount up to $2.055 billion arising from the IRC Section 414(l) Transfer.

(ii)   Settlement Of GM Warranty Claims

GM asserted that it incurred costs and suffered damages arising from certain customer warranty claims and/or recall campaigns related to allegedly non-conforming parts and systems supplied by Delphi to GM.  These claims were not subject to the general settlement with GM as documented in the Settlement Agreement and Restructuring Agreement.  During separate negotiations to resolve the warranty claims, GM advised Delphi that the amount of certain warranty claims had substantially increased from those asserted in GM's proof of claim.

On September 27, 2007, the Bankruptcy Court granted Delphi's motion to enter into and perform under a settlement agreement resolving the warranty claims (the "Warranty Settlement Agreement") with GM for a total estimated amount of approximately $200 million.  With certain limited exceptions, the agreement (i) settles all outstanding warranty claims and issues related to a component or assembly supplied by Delphi to GM that are (a) known by GM as of August 10, 2007, (b) determined by GM to be Delphi's responsibility in whole or in part, and (c) managed in GM's investigation process, and (ii) limits the liability related to certain other warranty claims that have become known by GM on or after June 5, 2007.  Under the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007 (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million as of the date of the Warranty Settlement Agreement or GM believed the claim would exceed $1 million, (iii) the claim, as of the date of the Warranty Settlement Agreement, was in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed as of the date of the Warranty Settlement Agreement, or reasonably should have believed at that time, that Delphi had some responsibility for the claim.  The Debtors estimate that the settlement saves their Estates hundreds of millions of dollars in potential liability which, absent this settlement, would likely receive Flow-Through Claim status.

Delphi elected to defer amounts due under the Warranty Settlement Agreement until it expected to receive payments from GM, on or about the time of its emergence from chapter 11. Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM. In conjunction with overall negotiations regarding potential amendments to the Confirmed Plan, GM agreed, on July 31, 2008, to forgive certain of the cash

amounts due under the Warranty Settlement Agreement, including any applicable interest, which favorably impacted Delphi's operating income in July 2008 by $112 million.

(b)     Labor Union Claims

In total, the Unions filed 663 proofs of claim against the Debtors, asserting approximately $11.8 billion plus additional unliquidated amounts.  Of the total Union claims, the UAW asserted a claim for $11 billion plus additional unliquidated amounts, the UAW GM Center for Human Resources asserted a claim for $145 million, the USW asserted a claim for $570 million, the IUE-CWA and affiliated unions asserted 441 claims asserting unliquidated amounts, the IUOE and affiliated unions asserted 127 claims asserting approximately $98,000 plus unliquidated amounts, the IBEW and affiliated unions asserted 45 claims asserting approximately $3.3 million plus unliquidated amounts, and the IAM and affiliated unions asserted 45 claims asserting approximately $225,000 plus unliquidated amounts.

A joint stipulation and agreed order entered by the Bankruptcy Court on February 26, 2007 between the Debtors and the IUE-CWA, IAM, IBEW, and IUOE resolved 481 claims, with those unions agreeing to withdraw those claims.  The remaining 182 claims, asserting approximately $11.72 billion plus additional unliquidated amounts, have been resolved pursuant to additional Bankruptcy Court orders or are expected to be resolved through stipulations reached with the Unions.

(c)     Environmental And Other Regulatory Claims And Investigations

Delphi is subject to the requirements of U.S. federal, state, local, and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating air emissions, water discharge, and waste management.  Delphi has an environmental management structure designed to facilitate and support its compliance with these requirements globally.  Although Delphi intends to comply with all such requirements and regulations, the Debtors cannot provide assurance that they are at all times in compliance.  The Debtors have made and will continue to make capital and other expenditures to comply with environmental requirements.  Although such expenditures were not material during the past three years, Delphi is preparing to spend $10.9 million to install pollution control equipment on coal-fired boilers at its Saginaw, Michigan Steering Division facility to meet U.S. and Michigan air emission regulations.  Environmental requirements are complex, change frequently, and have tended to become more stringent over time.  Accordingly, the Debtors cannot assure that environmental requirements will not change or become more stringent over time or that the Debtors' eventual environmental cleanup costs and liabilities will not be material.

Delphi is also subject to complex laws governing the protection of the environment and requiring investigation and cleanup of environmental contamination.  Delphi is in various stages of investigation and cleanup at its manufacturing sites where contamination has been discovered.  Additionally, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont  Barrel Fill  Site located in Tremont City, Ohio.  In September 2002, Delphi and other PRPs entered into a Consent Order with the Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the site.  The Remedial Investigation and Alternatives Array

Document were finalized in 2007.  A Feasibility Study and Record of Decision are expected to be completed in late 2008 or 2009.  Although Delphi believes that capping and future monitoring is a reasonably possible outcome, a different cleanup approach ultimately may be required for the site. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves. As of June 30, 2008, Delphi has recorded its best estimate of its share of the remediation based on the remedy described above. If that remedy is not accepted, however, Delphi's expenditures for remediation could increase by $20 million in excess of its existing reserves. Delphi will continue to reassess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

When it has been possible to provide reasonable estimates of Delphi's liability with respect to environmental sites, provisions have been made in accordance with U.S. GAAP. As of June 30, 2008, Delphi's reserve for such environmental investigation and cleanup was approximately $105 million.  Delphi cannot ensure that environmental requirements will not change or become more stringent over time or that Delphi's eventual environmental cleanup costs and liabilities will not exceed the amount of its current reserves.  Moreover, facility sales and/or closures relating to the restructuring process could trigger additional and perhaps material environmental remediation costs, as previously unknown conditions may be identified.

As was agreed to in connection with the Investment Agreement, and as is further outlined in the Modified Plan, Environmental Obligations have been classified as Flow-Through Claims and thus will be unimpaired by the Plan and will be satisfied in the ordinary course of Delphi's business (subject to the preservation and flow-through of all Estate rights, claims, and defenses with respect to those obligations).

(d)      State Of New York Workers' Compensation Board Claims

Under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain workers' compensation policies and to provide Employees with workers' compensation coverage for claims arising from or related to workplace illnesses or injuries arising during their employment with the Debtors.  Therefore, and in accordance with applicable requirements of local law, the Debtors maintain workers' compensation policies in all states in which they operate.

In the State of New York, the Debtors currently provide their Employees with self-insured workers' compensation.  Pursuant to workers' compensation policies, Employees seeking reimbursement for work-related injuries file their claims directly against the Debtors.  In connection with their self-insured workers' compensation, the Debtors are required by some of the states in which they operate as a self-insured, including New York, to post security such as cash, securities, irrevocable letters of credit, security deposits, or surety bonds for the benefit of the respective state.  Failure of the Debtors to pay their workers' compensation obligations can result in a draw down in the affected state of such letters of credit, security deposits, and/or surety bonds.  Further, failure to maintain the requisite security could give a state the right to revoke the Debtors' self-insured employer status.  By virtue of the provisions of a first day order

entered in the Chapter 11 Cases, the Debtors were authorized to pay all amounts related to workers' compensation claims and incurred but not reported claims.

To date, the Debtors have paid all workers' compensation obligations to their Employees arising in the State of New York.  Under the Plan, all workers' compensation obligations, regardless of whether they arise from prepetition or postpetition events, and regardless of whether a proof of claim has been filed, will flow through the Plan and continue to be paid by the Debtors in the ordinary course.

The Debtors have been advised by the State of New York Workers' Compensation Board ("NYSWCB") that because of recalculations by the NYSWCB based upon reports submitted by the Debtors, the amount of security currently posted by the Debtors with New York is substantially inadequate and would require a significant increase to be in compliance with the updated requirements.  The Debtors do not agree with the revised calculation and take issue with the conclusions of the NYSWCB.  As a result, representatives of the Debtors and the NYSWCB have been in continuing discussions to try to resolve this issue.  If this issue is not resolved to the satisfaction of the NYSWCB, it is likely that the State of New York will seek to terminate Delphi's ability to maintain self-insured status pursuant to provisions of the New York State's Workers' Compensation Law.  Delphi reserves its right to challenge any such effort.  In the event the Debtors' ability to maintain self-insured status is revoked, alternative arrangements for workers' compensation coverage would most certainly be more costly.

## F.    Professional Fees

At the commencement of these Chapter 11 Cases, the Bankruptcy Court entered an order establishing procedures for interim compensation and reimbursement of expenses of professionals (the "Compensation Order").  The Compensation Order requires professionals retained in these cases to submit monthly fee statements to the Debtors and requires the Debtors to pay 80% of the requested fees and 100% of the requested expenses pending interim approval by the Bankruptcy Court.  The remaining 20% of fees requested in such fee statements are paid only upon further order of the Bankruptcy Court (the "Holdback").  The Compensation Order requires the professionals retained in these Chapter 11 Cases to file applications for approval of their fees and expenses for the preceding four-month period approximately every four months.

To monitor costs to the Debtors' estates and avoid duplicative efforts in the review of fee applications filed in these Chapter 11 Cases, the Debtors, the Creditors' Committee, and the U.S. Trustee negotiated the formation of a joint fee review committee (the "Fee Review Committee") to review, comment on, and, if necessary, object to the various fee applications filed in these Chapter 11 Cases. On May 5, 2006, the Bankruptcy Court authorized the establishment of the Fee Review Committee and approved a protocol regarding the committee, its composition, mandate, and procedures.  The Fee Review Committee is comprised of representatives of each of: (a) the U.S. Trustee for this District, (b) the Debtors, and (c) the Creditors' Committee.  On August 17, 2006, the Bankruptcy Court entered an order authorizing the Fee Review Committee to retain Legal Cost Control, Inc. as a fee analyst to assist the Fee Review Committee.

The fees approved by the Bankruptcy Court through September 30, 2007 for the Debtors', Creditors' Committee's, and Equity Committee's professionals, and estimated fees and expenses

for the seventh interim fee application period (October 1, 2007 through January 25, 2008) are as follows:

| Period | Dates | Fees | Expenses |
|---|---|---|---|
| First Interim Fee Application Period | 10/8/2005 – 1/31/2006 | $40,116,406 | $2,295,873 |
| Second Interim Fee Application Period | 2/1/2006 – 5/31/2006 | $56,680,150 | $4,081,250 |
| Third Interim Fee Application Period | 6/1/2006 – 9/30/2006 | $49,362,582 | $4,307,390 |
| Fourth Interim Fee Application Period | 10/1/2006 – 1/31/2007 | $49,295,947 | $3,358,907 |
| Fifth Interim Fee Application Period | 2/1/2007 – 5/31/2007 | $62,762,634 | $4,479,310 |
| Sixth Interim Fee Application Period | 6/1/2007 – 9/30/2007 | $45,342,099 | $3,302,078 |
| Seventh Interim Fee Application Period (Estimated) | 10/1/2007-1/25/2008 | $52,605,998 | $4,021,795 |

All fee applications filed in these cases are subject to final approval by the Bankruptcy Court.  Pursuant to paragraph 33 of the Confirmation Order fee applications are not required to be filed for post-confirmation periods.  The amount of post-confirmation fees and expenses incurred and submitted for payment through July 31, 2008 is approximately $56 million.

## IX.    SUMMARY OF THE MODIFIED PLAN

This section provides a summary of the Modified Plan, including:

- A discussion of the settlements embodied in the Modified Plan

- The classification and treatment of claims and interests

- The operative provisions of the Modified Plan, including the means for electing the board of directors of the reorganized Company, claims reconciliation and distributions, and releases of the Debtors and certain third parties

Key modifications to this section include:

- Changes to plan consideration to be received by unsecured creditors and equity security holders, including the elimination of postpetition interest on unsecured claims

- The replacement of the rights offerings and Plan Investor contributions that were contemplated by the Confirmed Plan with the Discount Rights Offering and Post-emergence Rights Offering.

- Procedures for appointment of the initial board of directors of the reorganized Company

- Adjustments to the claims reconciliation, distribution, and cure mechanics

- The elimination of releases and exculpation for the Plan Investors

A.        Introduction

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its shareholders.  In addition to permitting rehabilitation of the debtor, chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtors and its assets.  In furtherance of these goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefore the obligations specified under the confirmed plan, and may terminate all rights and interests of equity security holders.

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE MODIFIED PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MODIFIED PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE MODIFIED PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE MODIFIED PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE MODIFIED PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE MODIFIED PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE MODIFIED PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES-IN-INTEREST.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, IN THE EVENT THERE ARE ANY CONFLICTS BETWEEN THE TERMS AND PROVISIONS OF THE MODIFIED PLAN OR THE CONFIRMATION ORDER (AND AS EACH MAY BE AMENDED) AND THE TERMS AND PROVISIONS OF THE AMENDED GSA AND THE AMENDED MRA, THE TERMS OF THE AMENDED GSA AND AMENDED MRA SHALL GOVERN.

### B.      Overall Structure Of The Modified Plan

If the modifications to the Confirmed Plan are approved by the Bankruptcy Court and consummated, (1) the Claims in certain Classes will be reinstated or modified and will receive distributions equal to the full amount of such Claims and (2) the Claims and Interests in other Classes will be modified or extinguished and will receive distributions in exchange for such Claims and Interests.  At certain times after the Effective Date, the Reorganized Debtors will distribute Cash, securities, and other property in respect of certain Classes of Claims and Interests as provided in the Modified Plan.  The Classes of Claims against and Interests in the Debtors created under the Modified Plan, the treatment of those Classes under the Modified Plan, and the securities and other property to be distributed under the Modified Plan are described below.

### 1.      Settlements During The Chapter 11 Cases

The foundation of Delphi's restructuring is a series of interdependent settlements (each, a "Settlement" and, collectively, the "Settlements") and compromises of various claims and disputes.  The Settlements, which are the product of protracted negotiations between and among various constituencies, including the Debtors, GM, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the Creditors' Committee, and the MDL Plaintiffs (collectively, the "Settlement Negotiation Parties"), and their respective financial and legal professionals, are reflected in the recoveries of the various holders of claims and interests under the Modified Plan and are designed to achieve a global, consensual resolution of these Chapter 11 Cases.  Although litigation could produce somewhat different absolute and relative recoveries than those embodied in the Modified Plan for some of the Settlement Negotiation Parties, those parties believe that any such litigation would be extraordinarily expensive and would not be finally resolved for a long period of time, which would consequently delay and materially reduce distributions to all holders of Claims and Interests.  The Debtors also believe that the recoveries provided to holders of Claims and Interests under the Modified Plan are substantially higher than the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements.

The claims and disputes being resolved by the Settlements include, among others:

- Delphi's potential claims and causes of action against GM, the Statutory Committees' request to prosecute such claims, and the resolution of GM's proof of claim.

- The claims asserted by the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE against the Debtors and the ratification of labor agreements with each of the Debtors' principal labor Unions.

- The claims and causes of action asserted by various plaintiffs against certain defendants including the Debtors in the Multidistrict Litigation in the United States District Court for the Eastern District of Michigan.

The substance of each of the Settlements is discussed at length previously in this Disclosure Statement.  Although the Settlement Negotiation Parties disagree over the relative strengths and weaknesses of the claims and potential defenses involved asserted by certain parties to the Settlements and, accordingly, disagree as to how those claims and defenses would fare if litigated to final judgment, they do agree that resolution of the claims and disputes is crucial to confirmation of any plan.  Clearly, any litigation concerning the settled matters would be exceptionally complicated and protracted, and given the magnitude of the values involved and the amount of claims at stake, would be hotly contested and expensive.  Such litigation would in turn substantially prolong these Chapter 11 Cases, which all constituencies believe is not in the best interests of the Estates or Delphi's long term business objectives.  For these reasons, the Debtors believe that the Settlements reached among the Settlement Negotiation Parties are in the best interests of the Estates and all stakeholders.

### C.    Substantive Consolidation Of Certain Debtors

The Modified Plan contemplates and is predicated upon entry of an order substantively consolidating certain of the Debtors' Estates for purposes of all actions associated with confirmation and consummation of the Modified Plan.  The Court may order substantive consolidation in the exercise of its general equitable discretionary powers under section 105(a) of the Bankruptcy Code to ensure the equitable treatment of creditors.  The effect of substantive consolidation will be the pooling of the assets and liabilities of the consolidated Debtors and the satisfaction of creditor claims from the resulting common fund.  The Debtors in a particular consolidated Debtor group will be substantively consolidated with each other but not with any other Debtor.

Specifically, under the Modified Plan, the groups of Debtors and individual non-consolidated Debtors are

| Number | Consolidated Debtor Group Or Debtor Name | Debtors In Group |
|---|---|---|
| 1 | Delphi-DAS Debtors | Delphi Corporation, Delphi Automotive Systems LLC, ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Services Solutions, Inc., Delphi Liquidation Holding Company, Delphi LLC, Aspire, Inc., Delphi NY Holding Corporation, Delphi Receivables LLC, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Exhaust Systems Corporation, and Environmental Catalysts, LLC |

| Number | Consolidated Debtor Group Or Debtor Name | Debtors In Group |
|---|---|---|
| 2 | DASHI Debtors | Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi International Holdings Corp., and Delphi International Services, Inc. |
| 3 | Connection System Debtors | Packard Hughes Interconnect Company and Delphi Connection Systems |
| 4 | Specialty Electronics Debtors | Specialty Electronics, Inc. and Specialty Electronics International Ltd. |
| 5 | Delco Electronics Overseas Corporation | Non-Consolidated Entity |
| 6 | Delphi Diesel Systems Corp. | Non-Consolidated Entity |
| 7 | Delphi Furukawa Wiring Systems LLC | Non-Consolidated Entity |
| 8 | Delphi Mechatronic Systems, Inc. | Non-Consolidated Entity |
| 9 | Delphi Medical Systems Corporation | Non-Consolidated Entity |
| 10 | Delphi Medical Systems Colorado Corporation | Non-Consolidated Entity |
| 11 | Delphi Medical Systems Texas Corporation | Non-Consolidated Entity |
| 12 | MobileAria, Inc. | Non-Consolidated Entity |

Set forth below is a diagram showing which groups of Debtors will be substantively consolidated with each other. Each Debtor entity is labeled in the appropriate Debtor group color according to the key on the diagram, and is identified by the number of the group to which it belongs as set forth in the chart above.



In considering whether substantive consolidation of any of the Estates was appropriate, Delphi evaluated whether creditors relied on the separate existence of a particular Debtor when extending credit to that Debtor and whether the financial affairs of any of the Debtors were hopelessly entangled.

Among other things, the Company assessed:

(i) the extent to which its creditors relied on consolidated financial statements when extending credit because financial information disseminated to the public was generally prepared and presented on a consolidated basis,

(ii) the extent to which certain prepetition inter-company transfers or "cross-charges" have historically been irreconcilable,

(iii) the extent to which the Debtors maintained separate trial balances,

(iv) the Debtors' ownership structure and substantial historical identity of interest, interrelationships, and interdependence,

(v) the extent to which corporate policy for the Debtors was formulated and implemented by the board of directors of Delphi Corporation,

(vi) the effect of the divisional structure of the Company's operations, the impact of such structure on operational and financial management, budgeting and financial reporting, and allocation of resources with respect to each Debtor,

(vii) the extent to which any Debtor was able to borrow money in its own right or obtain its own credit facilities without procuring guaranties of affiliate Debtors,

(viii) whether the Debtors correctly identified the proper legal entity name on contracts and business documents,

(ix) the Debtors' common cash management system and shared lockbox accounts, and the extent to which supervision of financial operations of the Company was traditionally conducted by Delphi Corporation officers and employees at Delphi's corporate headquarters,

(x) implications related to the extent to which the corporate governance of the various Debtors overlapped due to the substantial similarity of the respective boards of directors,

(xi) the fact that the Debtors filed consolidated federal income tax returns,

(xii) the existence of common sales teams among the Debtors and shared engineering and other services among the Debtors, and

(xiii) whether the Company's creditors filed proofs of claim against the correct Debtor entity in the Chapter 11 Cases.

Taking these and other factors into account, the Debtors determined that on balance, substantive consolidation of the Estates of the Delphi-DAS Debtors (Group 1), the DASHI Debtors (Group 2), the Connection Systems Debtors (Group 3), and the Specialty Electronics Debtors (Group 4) under the Modified Plan is appropriate and in the best interests of the Company's creditors. Moreover, the Debtors concluded that any harm their creditors may suffer from such substantive consolidation is negligible in light of the distributions that such creditors will receive under the Modified Plan.

Creditors of certain of the proposed substantively consolidated Debtors might contend that the Debtor against which their claims are asserted may have the financial ability to pay them a higher or more certain recovery than the recovery under the Modified Plan. For example, creditors of deconsolidated Delphi Corporation might claim that they would receive a recovery superior to creditors of deconsolidated DAS LLC because of Delphi's indirect ownership of the global non-Debtor businesses through Delphi's direct ownership of DASHI. In order to prevail under such a theory, the Debtors believe that these Delphi creditors would not only have to

successfully oppose the Modified Plan's proposed substantive consolidation in litigation but
would also have to prevail in the reallocation to DAS LLC or another Debtor of certain claims
that appear to be properly asserted against Delphi (such as the claims of GM and the Debtors' six
U.S. labor unions) and to prevail against DAS LLC in litigation where DAS LLC would likely
assert that Delphi and its non-Debtor affiliates could no longer have access to Delphi's global
technology which is substantially owned by a subsidiary of DAS LLC to which Delphi and its
non-Debtor affiliates are structurally isolated and subordinated.    Similarly, creditors of
deconsolidated DAS LLC might claim that they would receive a recovery superior to creditors of
deconsolidated Delphi because of DAS LLC's technology subsidiary and other factors.  In order
to prevail under such a theory, the Debtors believe that these DAS LLC creditors would not only
have to defeat the Modified Plan's proposed substantive consolidation in litigation but also
prevail on the issues that would be asserted by the Delphi Corporation creditors described above.
See Appendix E to this Disclosure Statement for liquidation analyses based on the consolidation
scenarios described above.

    In either of these alternate scenarios (or any other alternate substantive consolidation
litigation scenarios), the Modified Plan and the means by which it is to be funded would have to
be materially changed.   The Modified Plan is based on the substantive consolidation of the
Debtors' Estates in the limited manner described above and provides distributions in varying
amounts and of varying value to all of the Debtors' stakeholders.  The Debtors have sought to
resolve most material contingencies that were required to be resolved in the Debtors' judgment to
obtain the funding of the Modified Plan.  In addition to facilitating the structure of the Plan and
the various distributions proposed pursuant to the Modified Plan, the Debtors believe that
substantive consolidation of their Estates in the limited manner described above will result in
administrative cost savings in the Chapter 11 Cases.

    As a result of the substantive consolidation described above,

- all assets and third party liabilities of the Delphi-DAS Debtors, the DASHI Debtors,
  the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively,
  will, for voting and distribution purposes only, be treated as if they were merged,

- each Claim against the Delphi-DAS Debtors, the DASHI Debtors, the Connection
  Systems Debtors, and the Specialty Electronics Debtors, respectively, will be deemed
  a single Claim against and a single obligation of the Delphi-DAS Debtors, the DASHI
  Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors,
  respectively,

- all Intercompany Claims between and among the Delphi-DAS Debtors, the DASHI
  Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors,
  respectively, will be eliminated for voting and distribution purposes only, and

- any obligation of the Delphi-DAS Debtors, the DASHI Debtors, the Connection
  Systems Debtors, and the Specialty Electronics Debtors, respectively, and all
  guaranties thereof by one or more of the other Delphi-DAS Debtors, DASHI Debtors,
  Connection Systems Debtors, and Specialty Electronics Debtors, respectively, will be

deemed to be one obligation of all of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively.

On the Confirmation Date, and in accordance with the terms of the Modified Plan and the consolidation of the assets and liabilities for voting and distribution purposes of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, all Claims based upon guaranties of collection, payment, or performance made by the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, as to the obligations of another of the Delphi-DAS Debtors, the DASHI Debtors, the Connection Systems Debtors, and the Specialty Electronics Debtors, respectively, will be released and of no further force and effect.

Notwithstanding the foregoing, the Debtors reserve all rights with respect to their position on substantive consolidation as to any or all of the Debtors.

As part of the Confirmation Order, the Bankruptcy Court approved the Debtors' request for substantive consolidation as outlined above. The Debtors intend to seek the same approval of that substantive consolidation in connection with the Modified Plan. Thus, notwithstanding the fact that the Bankruptcy Court has approved by a prior order the substantive consolidation of certain of the Debtors' Estates, the Modified Plan will serve as, and will be deemed to be, a request for entry of an order confirming the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Modified Plan. If no proper objection to substantive consolidation of certain of the Debtors' Estates is timely filed and served as provided in the Modified Plan on or before the voting deadline or such other date as may be established by the Bankruptcy Court, the Modification Approval Order will serve as the order approving the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Modified Plan. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of certain of the Debtors' Estates, but only for purposes of voting on the Modified Plan and making distributions to holders of Claims and Interests under the Plan, and any objections thereto will be part of the Final Modification Hearing. The Bankruptcy Court will be apprised of and may consider the voting results, on a Debtor by Debtor basis, as part of such a hearing. **Thus, again, your vote on this Modified Plan is important.**

### D.   Classification Of Claims And Interests

#### 1.   *The Debtors*

There are a total of 42 Debtors. For the purposes of classifying and treating Claims against and Interests in each Debtor or consolidated group of Debtors, and for balloting purposes, each Debtor or consolidated group of Debtors has been assigned its own number, as set forth in the chart below. The Claims against and Interests in each Debtor, in turn, have been assigned to separate lettered Classes with respect to each Debtor, based on the type of Claim involved. Accordingly, the classification of any particular Claim or Interest in any of the Debtors depends on the particular Debtor against which such Claim is asserted (or in whom such Interest is held)

and the type of Claim or Interest in question. The numbers applicable to the various Debtors or consolidated groups of Debtors are as follows:

| Number | Consolidated Debtor Group Or Debtor Name |
|--------|------------------------------------------|
| 1 | Delphi-DAS Debtors |
| 2 | DASHI Debtors |
| 3 | Connection System Debtors |
| 4 | Specialty Electronics Debtors |
| 5 | Delco Electronics Overseas Corporation |
| 6 | Delphi Diesel Systems Corp. |
| 7 | Delphi Furukawa Wiring Systems LLC |
| 8 | Delphi Mechatronic Systems, Inc. |
| 9 | Delphi Medical Systems Corporation |
| 10 | Delphi Medical Systems Colorado Corporation |
| 11 | Delphi Medical Systems Texas Corporation |
| 12 | MobileAria, Inc. |

### 2.    *Classification Of Claims Against And Equity Interests In The Debtors*

Section 1122 of the Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims of such class. The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

Claims against and Interests in each of the Debtors are divided into lettered Classes. Not all of the Classes apply to every Debtor, and consequently not all of the lettered Classes appears in the case of each Debtor. For purposes of voting, claims within the Class will be counted for each applicable Debtor or group of consolidated Debtors. Whenever such a Class of Claims or Equity Interests is relevant to a particular Debtor, that class of Claims or Interests will be grouped under the appropriate lettered Class from the following list:

| | |
|---------|---|
| Class A | Class A consists of all Secured Claims against the applicable Debtor or consolidated group of Debtors. |
| Class B | Class B consists of all Flow-Through Claims against the applicable Debtor or consolidated group of Debtors. |
| Class C | Class C consists of all General Unsecured Claims against the applicable Debtor or consolidated group of Debtors. |
| Class D | Class D consists of all GM Claims against the applicable Debtor or consolidated group of Debtors. |
| Class E | Class E consists of all Section 510(b) Note Claims against Delphi Corporation. |

Class F        Class F consists of all Intercompany Claims against the applicable Debtor or consolidated group of Debtors.

Class G-1     Class G-1 consists of all Existing Common Stock of Delphi Corporation.

Class G-2     Class G-2 consists of all Section 510(b) Equity Claims against Delphi Corporation.

Class H       Class H consists of all Section 510(b) ERISA Claims against the applicable Debtors.

Class I         Class I consists of all Other Interests in Delphi Corporation.

Class J         Class J consists of all Interests in the Affiliate Debtors.

The Debtors believe that they have classified all Claims and Interests in compliance with the requirements of the Bankruptcy Code. If a Creditor or Interest holder challenges such classification of Claims or Interests and the Bankruptcy Court finds that a different classification is required for the Modified Plan to be confirmed, the Debtors, to the extent permitted by the Bankruptcy Court, intend to make reasonable modifications of the classifications of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation.

EXCEPT TO THE EXTENT THAT SUCH MODIFICATION OF CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE MODIFIED PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE MODIFIED PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS IN WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

**E.**     **Treatment Of Claims And Interests Under The Modified Plan**

The classification and treatment of Claims against and Interests in the various Debtors are set forth in detail in the Modified Plan. A summary is provided below.

**_1._**     **_Treatment Of Unclassified Claims_**

(a)     <u>Administrative Claims</u>

An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code, including, but not limited to, the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, the DIP Facility Second Priority Term Claim, the actual, necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the business of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date, Professional Claims, all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, and all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

Subject to the provisions of the Modified Plan, on the first Periodic Distribution Date occurring after the later of (a) the date when an Administrative Claim becomes an Allowed Administrative Claim or (b) the date when an Administrative Claim becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Administrative Claim, a holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such other less favorable treatment which the Debtors (or the Reorganized Debtors) and the holder of such Allowed Administrative Claim have agreed upon in writing; provided, however, that (x) holders of the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, and DIP Facility Second Priority Term Claim be deemed to have Allowed Administrative Claims as of the Effective Date in such amount as the Debtors and such holders of such DIP Facility Revolver Claim, DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim have agreed upon in writing or as determined by the Bankruptcy Court, which Claims will be paid in accordance with Article X of this Plan, and (y) liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or arising under contracts assumed during the Chapter 11 Cases prior to the Effective Date will be deemed Allowed Administrative Claims and paid by the Debtors or the Reorganized Debtors in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto; provided that any cure payments associated with an assumed contract will be paid in accordance with Article VIII of the Modified Plan.  For the avoidance of doubt, the GM Administrative Claim will receive the treatment set forth in Article 2.3 of the Modified Plan.

(b)      Priority Tax Claims

Commencing on the first Periodic Distribution Date occurring after the later of (a) the date a Priority Tax Claim becomes an Allowed Priority Tax Claim or (b) the date a Priority Tax Claim first becomes payable pursuant to any agreement between a Debtor (or a Reorganized Debtor) and the holder of such Priority Tax Claim, at the sole option of the Debtors (or the Reorganized Debtors), such holder of an Allowed Priority Tax Claim will be entitled to receive, on account of such Priority Tax Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim, (i) equal Cash payments during a period not to exceed six years after the assessment of the tax on which such Claim is based, totaling the aggregate amount of such Claim, plus simple interest at the rate required by applicable law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to by a particular taxing authority, (ii) such other treatment as is agreed to by the holder of an Allowed Priority Tax Claim and the Debtors (or the Reorganized Debtors), provided that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors) than the treatment set forth in clause (i) of this paragraph, or (iii) payment in full in Cash.

(c)      GM Administrative Claim

For good and valuable consideration provided by GM under the Delphi-GM Definitive Documents in connection with the IRC Section 414(l) Transfer described in Section 2.03(c) of the Amended GSA, has received and will receive an allowed administrative expense claims of no more in the aggregate than $2.055 billion.  The GM Administrative Claim will be satisfied in the manner set forth in Article IV of the Delphi-GM Global Settlement Agreement (including as

provided in Article 5.3(c) and Article 9.11 of the Modified Plan to effectuate the Delphi-GM Global Settlement Agreement).  Without limiting the generality of the foregoing, nothing in the Modified Plan will limit any rights of GM to refuse to consent to satisfaction of the GM Administrative Claim through distribution to GM of New Preferred Stock if either (x) all conditions to such satisfaction set forth in Section 4.04(c) of the Delphi-GM Global Settlement Agreement have not been satisfied or (y) the stated value of such New Preferred Stock distributed to GM, net of the aggregate stated value of any stock placed in the GM Administrative Claim Reserve pursuant to Article 9.11 of the Modified Plan, does not equal or exceed $2.055 billion.  In the event GM is not required under the terms of the Delphi-GM Global Settlement Agreement to accept New Preferred Stock in satisfaction of the GM Administrative Claim and GM does not otherwise consent to such satisfaction, the GM Administrative Claim will be deemed an Allowed Administrative Expense Claim as of the Effective Date and such claim will be treated pursuant to the terms of Article 2.1 of the Modified Plan, and holders of Allowed General Unsecured Claims (excluding TOPrS Claims) will be entitled to receive from Delphi their Pro Rata shares of distributions on account of such claim pursuant to the terms of Section 4.04(a) of the Delphi-GM Global Settlement Agreement.

## 2.    *Treatment Of Classified Claims And Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Interests in the Debtors.  A Claim or Interest is placed in a particular Class for the purposes of voting on the Modified Plan and of receiving distributions pursuant to the Modified Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth above.  The Modified Plan, though proposed jointly, constitutes a separate plan proposed by each of the consolidated groups of Debtors and each of the Debtors individually within each group.    Therefore, except as expressly specified herein, the classifications set forth below will be deemed to apply separately with respect to each plan proposed by each such consolidated Debtor group.

### (a)    <u>Classes Of Claims That Are Unimpaired</u>

(i)    Class A (Secured Claims).

Class A consists of All Secured Claims that may exist against the applicable Debtor.  A "Secured Claim" means a Claim, other than the DIP Facility Revolver Claim, DIP Facility First Priority Term Claim,  or  DIP Facility Second Priority Term Claim, secured by a security interest in or a lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or as otherwise agreed upon in writing by the Debtors and the holder of such Claim.

Except as otherwise provided in and subject to Article 9.8 of the Modified Plan, at the sole option of the Debtors or Reorganized Debtors, each Allowed Secured Claim will be satisfied in full in Cash or Reinstated. Notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all valid, enforceable, and perfected prepetition liens on property of the Debtors held by or on behalf of holders of Secured Claims with respect to such Claims will survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such holders of such Secured Claims and/or applicable law until, as to each such holder of an Allowed Secured Claim, such Secured Claim is satisfied.

(ii)     Class B (Flow-Through Claims).

Class B consists of all Flow-Through Claims that may exist against a particular Debtor. A "Flow Through Claim" means a claim arising from (a) an Ordinary Course Customer Obligation from a customer of Delphi as of the date of the commencement of the hearing on the Disclosure Statement, (b) Environmental Obligation (excluding those environmental obligations that were settled or capped during the Chapter 11 Cases (to the extent in excess of the capped amount)), (c) an Employee-Related Obligation (including worker compensation and unemployment compensation claims) asserted by an hourly employee that is not otherwise waived pursuant to the Union Settlement Agreements, (d) any Employee-Related Obligation asserted by a salaried, non-executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement, (e) any Employee-Related Obligation asserted by a salaried executive employee who was employed by Delphi as of the date of the commencement of the hearing on the Disclosure Statement and has accepted the Management Compensation Program as described in Section 7.8 of the Modified Plan, and (f) litigation exposures and other liabilities arising from litigation that are covered by insurance but only in the event that the party asserting the litigation ultimately agrees to limit its recovery to available insurance proceeds; provided, however, that all Estate Causes of Action and defenses to any Flow-Through Claim will be fully preserved.

The legal, equitable, and contractual rights of each holder of a Flow-Through Claim, if any, will be unaltered by the Modified Plan and will be satisfied in the ordinary course of business at such time and in such manner as the applicable Reorganized Debtor is obligated to satisfy each Flow-Through Claim (subject to the preservation and flow-though of all Estate Causes of Action and defenses with respect thereto, which will be fully preserved). The Debtors' failure to object to a Flow-Through Claim in their Chapter 11 Cases will be without prejudice to the Reorganized Debtors' right to contest or otherwise object to the classification of such Claim in the Bankruptcy Court.

(iii)     Class J (Interests In Affiliate Debtors).

Class J consists of all Interests in Affiliate Debtors. "Interests in Affiliate Debtors" means the legal, equitable, contractual, and other rights of any Person with respect to any equity securities of, or ownership interests in the Affiliate Debtors.

On the Effective Date, except as otherwise contemplated by the Restructuring Transactions, the holders of Interests in the Affiliate Debtors will retain such Interests in the Affiliate Debtors under the Modified Plan.

**(b)**   **Classes Of Claims That Are Impaired**

(i)   Class C (General Unsecured Claims).

Class C consists of all General Unsecured Claims that may exist against a particular Debtor.  The term "General Unsecured Claims" means any Claim, including a Senior Note Claim, TOPrS Claim, or a SERP Claim that is not otherwise an Administrative Claim, Priority Tax Claim, GM Administrative Claim, Secured Claim, Flow-Through Claim, GM Unsecured Claim, Section 510(b) Note Claim, Section 510(b) Equity Claim, Section 510(b) ERISA Claim, Section 510(b) Opt Out Claim, or Intercompany Claim.

Except as otherwise provided in and subject to Article 11.10 of the Modified Plan, on the commencement date of the Discount Rights Offering and pursuant to the Registration Statement and Article 7.15(a) of the Modified Plan, each holder of a General Unsecured Claim that is a Discount Rights Offering Eligible Holder will receive such holder's Pro Rata share (based upon the Face Amount of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims eligible to participate in the Discount Rights Offering pursuant to Article 7.15(a) of the Plan) of transferable Discount Rights.

Except as otherwise provided in and subject to Articles 9.8 and 11.10 of the Modified Plan, commencing on the Distribution Date or the first Periodic Distribution Date occurring after the later of (i) the date when a General Unsecured Claim becomes an Allowed General Unsecured Claim or (ii) the date a General Unsecured Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such General Unsecured Claim, each holder of a General Unsecured Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata share of General Unsecured Claimholder Shares.  In addition, on each Periodic Distribution Date, each holder of an Allowed General Unsecured Claim will receive its Pro Rata Share of General Unsecured Claimholder Shares held in the Supplemental Distribution Account, provided, however, that no distribution from the Supplemental Distribution Account will be made if, in the Reorganized Debtors' or the Disbursing Agent's sole discretion, the value of the property in the Supplemental Distribution Account is insufficient.

In connection with Section 4.04(c) of the Delphi-GM Global Settlement Agreement, except as otherwise provided in and subject to Article 11.10 of the Modified Plan, upon the conclusion of the final Periodic Distribution Date, if all conditions for the receipt by GM of the New Preferred Stock described in Section 4.04(c) of the Delphi-GM Global Settlement Agreement are satisfied, GM consented to the receipt of New Preferred Stock with a stated value of less than $2.055 billion, and the aggregate value, based on Plan Equity Value, of the General Unsecured Claimholder Shares is less than 20% of the aggregate amount of the Allowed General Unsecured Claims (excluding TOPrS Claims), then distributions will be made from the GM Administrative Claim Reserve (but with any shares of New Preferred Stock distributed to holders of Allowed General Unsecured Claims (excluding TOPrS Claims) pursuant to Article 5.3(c) of the Modified Plan automatically converting to shares of New Common Stock upon such distribution) to the extent necessary to permit each holder of an Allowed General Unsecured Claim to recover an aggregate value (inclusive of such holder's Pro Rata share of the General Unsecured Claimholder Shares, but exclusive of any value attributable to the Discount Rights),

based on Plan Equity Value, on account of its Allowed General Unsecured Claim equal to 20% of its Allowed General Unsecured Claim reduced by its Pro Rata (excluding for purposes of such calculation, the TOPrS Claims) share of the product of (a) the Allowed GUC Percentage and (b) the difference between (i) the sum of $2.055 billion and 20% of the aggregate amount of Allowed General Unsecured Claims (other than TOPrS Claims) and (ii) the aggregate value, based on Plan Equity Value, of the New Preferred Stock and General Unsecured Claimholder Shares.

(1)    Satisfaction Of TOPrS' Subordination Provisions

The Indenture with respect to the Trust Preferred Securities, or TOPrS, dated as of October 28, 2003 (the "TOPrS Indenture"), provides that the TOPrS are subordinated to "Senior Debt." "Senior Debt" is defined as any obligation of Delphi Corporation to its creditors other than (i) any obligation as to which, in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such obligation ranks equal or subordinate to the TOPrS, (ii) obligations evidenced by the TOPrS, and (iii) obligations that are expressly stated in the terms of the TOPrS (or in the TOPrS Indenture, any indenture supplement, or any Officers' Certificate delivered under Section 2.01 of the TOPrS Indenture with respect to such TOPrS) not to be Senior Debt.  In this regard, Delphi covenanted in the TOPrS Indenture that the TOPrS are subordinate and junior in right of payment to all Senior Debt to the extent provided therein, and each holder of the TOPrS covenanted and agreed to the subordination therein provided.

Article 17.01 of the TOPrS Indenture also provides that, in the event that Delphi shall default on any Senior Debt, no payments shall be made on account of the TOPrS until such default is cured, waived, or shall cease to exist and, in the event of a bankruptcy proceeding all Senior Debt (including any interest thereon accruing after the commencement of any such proceedings) shall first be paid in full before any payment or distribution, whether in cash, securities or other property (other than securities of Delphi or any other corporation provided for by a plan of reorganization or readjustment the payment of which is subordinate, at least to the extent provided in these subordination provisions with respect to the indebtedness evidenced by the TOPrS, to the payment of all Senior Debt at the time outstanding and to any securities issued in respect thereof under any such plan of reorganization or readjustment) which would otherwise (but for subordination) be payable or deliverable in respect of the TOPrS  shall be paid or delivered directly to the Holders of Senior Debt until all Senior Debt shall have been paid in full. This subordination provision essentially provides that, should any payment be made to the TOPrS holders prior to payment in full of Senior Debt (except for certain securities as set forth above), those assets paid shall be held in trust for and turned over to the Senior Debt holders.

The TOPrS Indenture provides that Senior Debt shall not be deemed to have been paid in full unless the holders thereof receive cash, securities, or other property equal to the amount of such Senior Debt then outstanding.  Once Senior Debt is paid in full, the holders of the TOPrS are subrogated to Senior Debt's rights to receive further distributions.  Distributions to holders of TOPrS Claims will be reallocated and redistributed to holders of other General Unsecured Claims, including Senior Debt.

An affirmative vote on the Modified Plan by Class C could constitute acceptance of the Modified Plan's proposed resolution of the TOPrS subordination provisions.  In connection with

the actual votes cast in Class C, the Bankruptcy Court will be apprised of the vote of the holders of the Senior Debt. **Again, therefore, your vote, including, in isolation, the votes of those creditors with claims contractually senior to TOPrS claims, is important in determining the acceptance of the proposed satisfaction of the TOPrS subordination provisions.**

(ii)    Class D (GM Unsecured Claim).

Class D consists of the GM Unsecured Claim that may exist against a particular Debtor. The phrase "GM Unsecured Claim" means any Claim of GM, excluding any Claim arising as a result of all Flow-Through Claims of GM, the GM Administrative Claim, and all other Claims and amounts to be treated in the normal course or arising, paid, or treated pursuant to the Delphi-GM Definitive Documents (including the "GM Surviving Claims" as defined in the Amended GSA), but will otherwise include all claims asserted in GM's proof of claim, and will be allowed in the amount of $2.5 billion upon the effectiveness of the Amended GSA.

For good and valuable consideration provided by GM under the Amended GSA and Amended MRA, and in full settlement and satisfaction of the GM Unsecured Claim, GM will receive all consideration set forth in the Amended GSA and Amended MRA (subject to the terms and conditions set forth in such documents), including, without limitation, (a) an allowed unsecured claim in the amount of $2.5 billion, subject to the terms and distribution provisions of Article IV of the Amended GSA, (b) retention of the GM Surviving Claims (as defined in the Amended GSA) as provided for in section 4.03 of the Amended GSA, and (c) the remaining releases provided for in section 4.01 of the Amended GSA.

(iii)    Class E (Section 510(b) Note Claims).

Class E consists of all Section 510(b) Note Claims that may exist against a particular Debtor. A "Section 510(b) Note Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Senior Notes, Subordinated Notes, or TOPrS, (b) for damages arising from the purchase of Senior Notes, Subordinated Notes, or TOPrS, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Senior Notes, Subordinated Notes, or TOPrS.

In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) Note Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Note Claims, New Common Stock and Discount Rights in the same proportion of the distribution of New Common Stock and Discount Rights made to the holders of General Unsecured Claims, as described in the Securities Settlement and as may be modified on a non-material basis by the order of the MDL Court in furtherance of the monetization of the distribution under the Modified Plan for distribution by the disbursing agent appointed by the MDL Court; provided, however, that if any Section 510(b) Opt Out Note Claim ultimately becomes an Allowed Section 510(b) Opt Out Note Claim, then the holder of such Allowed Section 510(b) Opt Out Note Claim will receive a distribution of New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of New Common Stock and Discount Rights distributed to holders of General Unsecured Claims; provided further, however, that with respect to any

distribution made to or reserved for a holder of an Allowed Section 510(b) Opt Out Note Claim, the Securities Settlement will be reduced by the same amount of New Common Stock and Discount Rights that the holder of such Allowed Claim will be entitled to receive.

(iv)     Class F (Intercompany Claims).

Class F consists of all Intercompany Claims that may exist against a particular Debtor. An "Intercompany Claim" means a Claim by a Debtor, an Affiliate of a Debtor, or a non-Debtor Affiliate against another Debtor, Affiliate of a Debtor, or non-Debtor Affiliate.

On the Effective Date, at the option of the Debtors or the Reorganized Debtors, the Intercompany Claims against any Debtor, including, but not limited to, any Intercompany Claims arising as a result of rejection of an Intercompany Executory Contract or Intercompany Unexpired Lease, will not receive a distribution on the Effective Date and instead will either be (a) Reinstated, in full or in part, and treated in the ordinary course of business, or (b) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion will be eliminated and the holders thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such portion under the Modified Plan; provided, however, that any Intercompany Claims against any Debtor held by a non-Debtor affiliate will be Reinstated.

(v)     Class G-1 (Existing Common Stock).

Class G-1 consists of all Existing Common Stock.  "Existing Common Stock" means shares of common stock of Delphi that are authorized, issued, and outstanding prior to the Effective Date.

On the Effective Date, the Existing Common Stock will be cancelled.  On the commencement date of the Post-emergence Rights Offering and pursuant to the Registration Statement and Article 7.15(b) of the Modified Plan, each record holder of an Allowed Interest pertaining to the Existing Common Stock as of the Rights Offerings Record Date will receive its Pro Rata portion of transferable Post-emergence Rights to purchase in the aggregate up to 26,187,745 shares of New Common Stock.

As more fully set forth on the record of the hearing held on December 6, 2007, a reservation of rights was placed on the record regarding the Equity Committee's assertion of claims, interests, defenses, and offsets against any and all holders of equity in these Chapter 11 Cases solely within Class 1G-1 with respect to the allocation of consideration among holders of Existing Common Stock based on the facts and circumstances in these Chapter 11 Cases and a reciprocal reservation of legal, equitable, contractual, and other rights, including rights under the Investment Agreement, was placed on the record regarding the rights reserved by the Plan Investors with respect to the reservation of rights by Equity Committee.

(vi)     Class G-2 (Section 510(b) Equity Claims).

Class G-2 consists of all Section 510(b) Equity Claims.  "Section 510(b) Equity Claim" means any Cause of Action consolidated in the MDL Actions related to any claim against the Debtors (a) arising from the rescission of a purchase or sale of any Existing Common Stock, (b)

for damages arising from the purchase or sale of Existing Common Stock, and (c) for alleged violations of the securities laws, misrepresentations, or any similar Claims related to the Existing Common Stock.

In accordance with the terms of the Securities Settlement, the Securities Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) Equity Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) Equity Claims, New Common Stock and Discount Rights, in the same proportion of the distribution of New Common Stock and Discount Rights made to the holders of General Unsecured Claims, as described in the Securities Settlement and as may be modified on a non-material basis by the order of the MDL Court in furtherance of the monetization of the distribution under the Modified Plan for distribution by the disbursing agent appointed by the MDL Court; provided, however, that if any Section 510(b) Opt Out Equity Claim ultimately becomes an Allowed Section 510(b) Opt Out Equity Claim, then the holder of such Allowed Section 510(b) Opt Out Equity Claim will receive a distribution of New Common Stock and Discount Rights solely from the Securities Settlement in the same proportion of New Common Stock and Discount Rights distributed to holders of General Unsecured Claims; provided further, however, that with respect to any distribution made to or reserved for a holder of an Allowed Section 510(b) Opt Out Equity Claim, the Securities Settlement will be reduced by the same amount of New Common Stock and Discount Rights that the holder of such Allowed Claim will be entitled to receive.

(vii)    Class H (Section 510(b) ERISA Claims).

Class H consists of all Section 510(b) ERISA Claims.  "Section 510(b) ERISA Claim" means any Cause of Action consolidated in the MDL Actions arising from the alleged violation of ERISA.

In accordance with the terms of the ERISA Settlement, the ERISA Settlement disbursing agent will receive, on behalf of all holders of Section 510(b) ERISA Claims, and in full satisfaction, settlement, and discharge of, and in exchange for, all Section 510(b) ERISA Claims, New Common Stock, and Discount Rights as described in the ERISA Settlement.

(viii)   Class I (Other Interests).

Class I consists of all Other Interests.  "Other Interests" means all options, warrants, call rights, puts, awards, or other agreements to acquire Existing Common Stock.

On the Effective Date, all Other Interests will be deemed cancelled and the holders of Other Interests will not receive or retain any property on account of such Other Interests under the Plan.

**F.    Means For Implementation Of The Modified Plan**

*1.    Continued Corporate Existence*

Subject to the Restructuring Transactions contemplated by the Modified Plan, each of the Debtors will continue to exist after the Effective Date as a separate entity, with all the powers of a corporation, limited liability company, or partnership, as the case may be, under applicable law

in the jurisdiction in which each applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organizational documents are amended and restated by the Modified Plan and the Certificate of Incorporation and Bylaws, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. There are certain Affiliates of the Debtors that are not Debtors in these Chapter 11 Cases. The continued existence, operation, and ownership of such non-Debtor Affiliates is a material component of the Debtors' businesses, and, as set forth in Article 11.1 of the Modified Plan, all of the Debtors' equity interests and other property interests in such non-Debtor Affiliates will revest in the applicable Reorganized Debtor or its successor on the Effective Date.

### 2.    *Restructuring Transactions*

The Debtors or Reorganized Debtors, as the case may be, are authorized to take such actions as may be necessary or appropriate to effect the relevant Restructuring Transactions described in the Restructuring Transaction Notice filed as Exhibit 7.3 to the Confirmed Plan, including, but not limited to, all of the transactions described in Exhibit 7.3 thereto. Such actions may include without limitation: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Confirmed Plan and Exhibit 7.3 thereto and that satisfy the requirements of applicable law, (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, guaranty, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Confirmed Plan and Exhibit 7.3 thereto, (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities under applicable law, and (d) all other actions that such Debtors and/or Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Restructuring Transactions. The form of each Restructuring Transaction is to be determined, as necessary, by the board of directors of a Debtor or Reorganized Debtor party to that Restructuring Transaction.

In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger will cease to exist as a separate corporate entity and thereafter the surviving Reorganized Debtor will assume and perform the obligations of each merged Debtor under the Plan. In the event a Reorganized Debtor is liquidated, the Reorganized Debtors (or the Reorganized Debtor which owned the stock of such liquidating Debtor prior to such liquidation) will assume and perform the obligations of such liquidating Debtor. Implementation of the Restructuring Transactions will not affect the distributions under the Plan.

As of the date of this Disclosure Statement, the Debtors believe that the following entities will be either dissolved, liquidated, or merged into other Debtor entities following the entry of the Final Plan Modification Approval Order or with other appropriate authority from the Bankruptcy Court on another date as determined by the Debtors. The Debtors may add or subtract from this list prior to filing a revised and updated Restructuring Transactions Notice, and the list is provided here solely for the purpose of relating the Debtors' current intention with

respect to Restructuring Transactions.   The revised and updated Restructuring Transactions Notice will provide greater detail with respect to the Restructuring Transactions.

- ASEC Manufacturing General Partnership
- ASEC Sales General Partnership
- Aspire Inc.
- Delphi Automotive Systems Services LLC
- Delphi Automotive Systems Tennessee, Inc.
- Delphi Connection Systems
- Delphi Electronics (Holding) LLC
- Delphi Foreign Sales Corporation
- Delphi Integrated Service Solutions, Inc.
- Delphi Mechatronic Systems, Inc.
- Delphi Medical Systems Texas Corporation
- Delphi NY Holding Corporation
- Delphi Receivables, LLC
- Delphi Services Holding Corporation
- Environmental Catalysts, LLC
- Exhaust Systems Corporation
- Mobile Aria, Inc.
- Packard Hughes Interconnect Company
- Specialty Electronics, Inc.
- Specialty Electronics International Ltd.

In addition to the transactions described above, certain transactions described in the Restructuring Transactions Notice that relate to the consolidation and restructuring of the ownership and capital structure of certain foreign subsidiaries have been consummated ("Foreign Restructuring Transactions").  In particular, DASHI, Delphi International Holdings Corporation ("DIHC"), and certain of their non-debtor subsidiaries were involved in various consolidation and/or restructuring transactions designed, among other things, to facilitate increased access to liquidity and to maximize structural efficiency.  As a result of these transactions, the equity interests of certain non-U.S. entities are now owned by an indirect subsidiary of DASHI that also owns the equity interests of many of the Debtors' European entities.  The Foreign Restructuring Transactions were structured as capital contributions and exchanges for various forms of consideration,                                 including                        debt                        and equity.

### 3.    *Certificate Of Incorporation And Bylaws*

The Certificate of Incorporation and Bylaws of the Reorganized Debtors will be adopted and amended as may be required so that they are consistent with the provisions of the Plan and the Bankruptcy Code.  The Certificate of Incorporation of Reorganized Delphi will, among other things, authorize a sufficient number of shares of New Common Stock and New Preferred Stock to satisfy the transactions contemplated by the Modified Plan and otherwise comply with section 1123(a)(6) of the Bankruptcy Code.  Each Affiliate Debtor unless otherwise dissolved, liquidated or merged into their parent entities as a result of restructuring transactions, will amend its

certificate of incorporation, charter, bylaws, or applicable organizational document to otherwise comply with section 1123(a)(6).

### 4.    Directors Of Reorganized Delphi

(a)    The Search Committee And The New Board of Directors

As a result of the method for choosing the Board of Directors of the reorganized Delphi (the "Reorganized Board of Directors"), the interests of numerous parties should be adequately represented by the Reorganized Board of Directors.

A four-member Search Committee will be appointed consisting of a current member of the board of directors of Delphi, two representatives of the Creditors' Committee (consisting of the Chairman of the Creditors' Committee and one other member of the Creditors' Committee), and one representative of the Equity Committee.  The Search Committee will appoint nine members of the board of directors of Reorganized Delphi, one of whom will be the CEO, at least two of whom will be current independent directors of Delphi's board, and one of whom will be the lead independent director and non-executive chairman.  Each member of the Search Committee will be entitled to require the Search Committee to interview any person to serve as a director unless such proposed candidate is rejected by a majority of the members of the Search Committee.  The entire Search Committee will be entitled to participate in such interview and in a discussion of such potential director following such interview.

The board of directors of Reorganized Delphi will consist of nine directors, which will be divided into three classes, each consisting of three directors.  Each director so selected will be appointed to the initial board of directors of Reorganized Delphi unless at least a majority of the Search Committee objects to the appointment of such individual.  Initially, the board will be comprised of seven of nine directors who satisfy all applicable independence requirements of the relevant stock exchange on which it is expected the New Common Stock will be traded.

The Reorganized Board of Directors will include various committees.  The Reorganized Board of Directors will appoint a governance committee which will determine by majority vote the committee assignments of the initial directors.

### 5.    Officers Of Reorganized Delphi

The existing senior officers of the Debtors in office on the Effective Date (except for the Executive Chairman) will serve in their current capacities after the Effective Date, subject to their employment contracts and subject to the authority of the boards of directors or similar governing bodies of the Reorganized Debtors.

### 6.    Directors And Officers Of Affiliate Debtors

The existing directors and officers of the Affiliate Debtors will continue to serve in their current capacities after the Effective Date, provided, however that Reorganized Delphi reserves the right to identify new officers and members of the boards of directors or similar governing bodies of each such Affiliate Debtor at any time thereafter.

7.      ***Employment, Retirement, Indemnification, And Other Agreements And Incentive Compensation Programs***

 As more fully set forth on Exhibit 7.8 attached to the Modified Plan, the Debtors will enter into employment, retirement, indemnification, and other agreements with the Debtors' respective active directors, officers, and employees who will continue in such capacities (or similar capacities) after the Effective Date, all as more fully stated on Exhibit 7.8 attached to the Modified Plan; provided, however, that to enter into or obtain the benefits of any employment, retirement, indemnification, or other agreement with the Debtors or Reorganized Debtors, an employee must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors.  The Management Compensation Plan, as more fully described on Exhibit 7.8, may include equity, bonus, and other incentive plans as components of compensation to be paid to executives after the Effective Date (including a long-term incentive plan that assumes 8% of the available shares of Reorganized Delphi's fully diluted New Common Stock will be reserved for future annual grants to executives, including but not limited to the initial target grant of equity awards).  The Cash and equity emergence awards issued on the Effective Date will be on market terms as determined by the Debtors' board of directors based on the advice of the independent outside advisor to the compensation committee of the Debtors' board of directors, which determination must be reasonably acceptable, on an aggregate basis, to the Creditors' Committee.

8.      ***Procedures For Asserting SERP Claims***

All persons holding or wishing to assert Claims solely on the basis of pension or other post-employment benefits arising out of the SERP, and whose SERP Claims vest or vested prior to the Effective Date, must file with the Bankruptcy Court and serve upon the Debtors a separate, completed, and executed proof of claim (substantially conforming to Form. No. 10 of the Official Bankruptcy Forms) no later than 30 days after the Effective Date; provided, however, that to the extent that (a) a SERP claimant's Original SERP Claim has already been Scheduled as non-disputed and non-contingent, and in a liquidated amount or (b) a SERP claimant timely and properly filed a proof of claim asserting his or her SERP Claim, then such SERP claimant need not file and serve an additional executed proof of claim.  All such Original SERP Claims not Scheduled or filed prior to the time set forth above as set forth in Article 7.9 of the Modified Plan will be forever barred from asserting such claims against the Debtors and their estates or the Reorganized Debtors and their property.  Any Claims arising out of the Original SERP after the Effective Date will be disallowed in their entirety regardless of whether a proof of claim has been filed for such contingent claim.  On the Effective Date, the Debtors will reject or otherwise terminate the SERP.  In accordance with that certain Order Authorizing Modification Of Benefits Under Hourly And Salaried Pension Programs And Modification Of Applicable Union Agreements In Connection Therewith, entered on September 23, 2008 (Docket No. 14258), on the Effective Date, the Amended SERP (as defined in the related order) and Amended SRESP (as defined in the related order) will be vested and payable in accordance with the terms of such order and the related non-qualified pension plans.

## 9.      *Cancellation Of Existing Securities And Agreements*

On the Effective Date, except as otherwise specifically provided for in the Modified Plan or as otherwise required in connection with any Cure, (a) the Existing Securities and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Modified Plan, will be cancelled; provided, however, that Interests in the Affiliate Debtors will not be cancelled, and (b) the obligations of, Claims against, and/or Interests in the Debtors under, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Existing Securities, and any other note, bond, indenture, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors, except such notes or other instruments evidencing indebtedness or obligations of the Debtors as are Reinstated under the Modified Plan, as the case may be, will be released and discharged; provided, however, that any agreement that governs the rights of a holder (including the Indentures) of a Claim and that is administered by an indenture trustee, agent, or servicer (each hereinafter referred to as a "Servicer") will continue in effect solely for purposes of (x) allowing such Servicer to make the distributions on account of such Claims under the Modified Plan as provided in Article IX of the Modified Plan and (y) permitting such Servicer to maintain any rights or liens it may have for fees, costs, and expenses under such indenture or other agreement; provided further, however, that the preceding proviso will not affect the discharge of Claims against or Interests in the Debtors under the Bankruptcy Code, the Confirmation Order, or the Modified Plan, or result in any expense or liability to the Reorganized Debtors.  The Reorganized Debtors will not have any obligations to any Servicer (or to any Disbursing Agent replacing such Servicer) for any fees, costs, or expenses incurred on and after the Effective Date of the Modified Plan except as expressly provided in Article 9.5 of the Modified Plan; provided further, however, that nothing in Section 7.10 of the Modified Plan will preclude any Servicer (or any Disbursing Agent replacing such Servicer) from being paid or reimbursed for prepetition or postpetition fees, costs, and expenses from the distributions being made by such Servicer (or any Disbursing Agent replacing such Servicer) pursuant to such agreement in accordance with the provisions set forth therein, all without application to or approval by the Bankruptcy Court.

## 10.      *Reserved*

## 11.      *Sources Of Cash For Modified Plan Distributions*

Except as otherwise provided in the Modified Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Modified Plan will be obtained from the Emergence Capital Arrangements, existing Cash balances, and the operations of the Debtors and the Reorganized Debtors.

### 12.     Establishment Of Cash Reserve

On the Effective Date, the Debtors will fund the Cash Reserve in such amounts as the Debtors determine are necessary to make the required future payments to Administrative Claims, Priority Tax Claims, and as otherwise provided by the Modified Plan.

### 13.     *Emergence Capital Funding*

On the Effective Date, the Reorganized Debtors will receive the proceeds of the Emergence Capital Arrangements in the aggregate amount necessary to implement the Modified Plan as described in the emergence capital funding disclosure to repay the DIP Facility Revolver Claims, the DIP Facility First Priority Term Claims, and the DIP Facility Second Priority Term Claims, make other payments required to be made on the Effective Date, and conduct their post-reorganization operations.  Under the terms of the Modified Plan, the Reorganized Debtors may execute all documents and enter into all agreements as may be necessary and appropriate in connection with the Emergence Capital Arrangements. A more detailed discussion of the Emergence Capital Arrangements is contained in Section VII.– Emergence Capital Funding above.

### 14.     Rights Offerings

(a)     Discount Rights Offering

(i)     Eligibility For Participation In Discount Rights Offering.

Pursuant to the Registration Statement, and under the terms of Article 5.3 of the Modified Plan, Delphi will commence a Discount Rights Offering to generate gross proceeds of up to $900 million.  Discount Rights Offering Eligible Holders will be offered Discount Rights to purchase up to an aggregate of 75,000,000 shares of New Common Stock, in exchange for a Cash payment equal to $12.00 per share of New Common Stock (a 40% discount to the Plan Equity Value, on a fully diluted basis).  Discount Rights will be distributed to the Discount Rights Offering Eligible Holders based on each Discount Rights Offering Eligible Holder's Pro Rata allocation of the Discount Rights as set forth in Article 5.3(b) of the Modified Plan.  If a Claim of a Discount Rights Offering Eligible Holder is not Allowed or otherwise reconciled by the Debtors by the date of commencement of the Confirmation Hearing, such Claim will be temporarily allowed, solely for purposes of participation in the Discount Rights Offering, in the amount agreed to by the holder of the claim and the Debtors.  Discount Rights distributed pursuant to the Discount Rights Offering will be freely transferable.  Oversubscription privileges will be available to Discount Rights Offering Eligible Holders.

(ii)     Use Of Proceeds Of Discount Rights Offering.

Net proceeds from the Discount Rights Offering will be used by Reorganized Delphi for general corporate purposes.

(iii)    Distribution Of New Common Stock.

All New Common Stock issued in connection with the exercise of Discount Rights pursuant to the Discount Rights Offerings will be issued and distributed on the Effective Date, or as soon as reasonably practicable thereafter.

(iv)    Exercise Of Discount Rights By Lead Plaintiffs.

Pursuant to the approval orders of the Bankruptcy Court and/or the MDL Court, as necessary and applicable, the Lead Plaintiffs in the Securities Settlement, in lieu of paying the cash exercise price for the Discount Rights at the time they are exercised, will have the right to exercise the Discount Rights by delivering to Delphi a notice prior to the expiration of the Discount Rights Offering stating (i) that the Lead Plaintiffs elect to participate in the Discount Rights Offering, (ii) the number of shares of New Common Stock that the Lead Plaintiffs are purchasing through the Discount Rights Offering, and (iii) that the Lead Plaintiffs elect to reimburse Delphi, subsequent to the Effective Date of the Securities Settlement (as defined in the Securities Settlement), the amount of the rights offering exercise price in connection with the number of shares of New Common Stock purchased through the Discount Rights Offering by the Lead Plaintiffs on behalf of the class (collectively, the "MDL Group").  In the event such notice is timely delivered, the Lead Plaintiffs will cause to be released and/or transferred to Delphi, subsequent to the Effective Date of the Securities Settlement, both (i) the cash proceeds obtained from parties (other than Delphi) to the Securities Settlement (which proceeds have already been received and escrowed pursuant to the terms of the Securities Settlement) up to an amount equal to the amount needed to reimburse Delphi for the rights offering exercise price for the MDL Group in connection with the number of shares of New Common Stock purchased pursuant to the Discount Rights Offering and (ii) if the amount delivered pursuant to clause (i) above does not fully cover the rights offering exercise price for the MDL Group, the cash proceeds from the sale of New Common Stock that the Lead Plaintiffs on behalf of the class are to receive on account of Section 510(b) Note Claims and Section 510(b) Equity Claims pursuant to the terms of the Securities Settlement to cover such shortfall.  Notwithstanding anything contained in the Modified Plan, no distribution of the New Common Stock underlying the Discount Rights or certificates therefor shall be made to the disbursing agent appointed by the MDL Court until Delphi has received the amount needed to reimburse Delphi for the rights offering exercise price of the New Common Stock purchased by the MDL Group in connection with the Discount Rights Offering.

(b)    Post-emergence Rights Offering.

(i)    Eligibility For Participation In Post-emergence Rights Offering.

Pursuant to the Registration Statement, and under the terms of Article 5.7 of the Modified Plan, Delphi will commence a Post-emergence Rights Offering pursuant to which each record holder of Existing Common Stock on the Rights Offering Record Date will be offered Post-emergence Rights to purchase their Pro Rata portion of up to an aggregate of 26,187,745 shares of New Common Stock, in exchange for a Cash payment equal to $17.00 per share of New Common Stock (a 15 % discount to the Plan Equity Value).

(ii)     Use Of Post-emergence Rights Offering Proceeds.

Net proceeds, if any, generated by the Post-emergence Rights Offering will be used to redeem up to 25% of the New Preferred Stock issued to GM.

(iii)     Distribution Of New Common Stock.

All New Common Stock issued in connection with the exercise of Post-emergence Rights pursuant to the Post-emergence Rights Offerings will be issued as soon as reasonably practicable after the conclusion of the Post-emergence Rights Offering.

**15.    Issuance Of Stock In Reorganized Delphi**

(a)     New Common Stock

On the Effective Date, Reorganized Delphi will authorize shares of  New Common Stock in an amount to be determined on or before the date of the Final Modification Hearing.  A summary of selected terms of the New Common Stock is attached to the Plan as Exhibit 7.16(a). On the Distribution Date, or as soon as reasonably practicable thereafter, Reorganized Delphi will issue a total number of shares of New Common Stock necessary to satisfy obligations on account of Claims and Interests under the Plan.  The issuance of the New Common Stock will be in compliance with the applicable registration requirements or exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

(b)     Registration Rights

Without limiting the effect of section 1145 of the Bankruptcy Code, as of the Effective Date, the Reorganized Debtors will enter into a Registration Rights Agreement, substantially in the form of Exhibit 7.16(b) attached to the Modified Plan, with GM.  The Registration Rights Agreement also provides that all Holders of General Unsecured Claims which, in connection with the Modified Plan, receive a distribution of 10% or more of the New Common Stock of Reorganized Delphi (each, a "10% Holder") as of the Effective Date will be granted, in the aggregate, one demand registration right; provided, that (i) in no event will Reorganized Delphi be required to grant more than one demand registration right to any and all 10% Holders, (ii) such demand registration right must not, in any way, conflict with the registration rights of GM and (iii) 10% Holders will not receive piggyback registration rights except with respect to a demand by another 10% Holder pursuant to this sentence.

(c)     Listing On Securities Exchange Or Quotation System

On the Effective Date, Delphi or Reorganized Delphi shall use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on a major New York based exchange.  Persons receiving distributions of more than 5% of New Common Stock, by accepting such distributions, must have agreed to cooperate with Reorganized Delphi's reasonable requests to assist Reorganized Delphi in its efforts to list the New Common Stock on a national securities exchange quotation system.

**16.    Issuance Of New Preferred Stock**

Pursuant to the terms of the Amended GSA, on the Effective Date, Reorganized Delphi will authorize, issue, and deliver the New Preferred Stock to GM, subject to Sections 2.3, 5.3(c), and 9.11 of the Modified Plan.  A summary of the terms of the New Preferred Stock is attached to the Modified Plan as Exhibit 7.17.  The issuance and delivery of the New Preferred Stock will be in accordance with the terms of the Amended GSA and section 1145(a) of the Bankruptcy Code.

### 17.    *Reserved*

### 18.    *MDL Settlements*

On January 25, 2008, the Bankruptcy Court entered an order approving **the Securities** Settlements.

### (a)    Securities Settlement

In accordance with the Securities Settlement, a copy of which is attached to the Modified Plan as Exhibit 7.19(a), Reorganized Delphi will distribute the New Common Stock in accordance with Articles 5.5, 5.8, and 7.16 of the Modified Plan to the disbursing agent appointed by the MDL Court.  Such distribution shall be made in accordance with such order entered by the MDL Court which modifies distributions under the Securities Settlement on a non-material basis in furtherance of the monetization of the distribution under the Modified Plan for distribution by the disbursing agent appointed by the MDL Court.

### (b)    ERISA Settlement

In accordance with the ERISA Settlement, a copy of which is attached to the Modified Plan as Exhibit 7.19(b), Reorganized Delphi will distribute the New Common Stock in accordance with Articles 5.9 and 7.16 of the Modified Plan to the disbursing agent appointed by the MDL Court.

### (c)    Insurance Settlement

In connection with the Securities Settlement and the ERISA Settlement, Delphi, certain defendants in the MDL Actions, and Delphi's insurers entered into the Insurance Settlement, a copy of which is attached to the Modified Plan as Exhibit 7.19(c).

### 19.    *GM Settlement*

In the event that there are any conflicts between the terms and provisions of the Modified Plan, Confirmation Order, or Modification Approval Order (and as each may be amended) and the terms and provisions of the Amended GSA and Amended MRA (solely as to the subject matters addressed in such agreements), the terms of the Amended GSA and Amended MRA will govern.

### 20.    Collective Bargaining Agreements

(a)    UAW

Pursuant to the Modified Plan and in accordance with the UAW 1113/1114 Settlement Approval Order, a copy of which is attached to the Modified Plan as Exhibit 7.21(a), on the Effective Date, the UAW-Delphi-GM Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 1 to the UAW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the UAW-Delphi-GM Memorandum of Understanding shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code.

(b)    IUE-CWA

Pursuant to the Modified Plan and in accordance with the IUE-CWA 1113/1114 Settlement Approval Order, a copy of which is attached to the Modified Plan as Exhibit 7.21(b), on the Effective Date, the IUE-CWA-Delphi-GM Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 1 to the IUE-CWA 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the IUE-CWA-Delphi-GM Memorandum of Understanding shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code.

(c)    USW

Pursuant to the Modified Plan and in accordance with the USW 1113/1114 Settlement Approval Order, a copy of which is attached to the Modified Plan as Exhibit 7.21(c), on the Effective Date, (i) the USW-Home Avenue Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 1 to the USW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the USW-Home Avenue Memorandum of Understanding and (ii) the USW-Vandalia Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 2 to the USW 1113/1114 Settlement Approval Order, and all documents described in Attachment E to the USW-Vandalia Memorandum of Understanding shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code.

(d)    IAM

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, a copy of which is attached to the Modified Plan as Exhibit 7.21(d), on the Effective Date, the IAM-Delphi Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 6 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IAM-Delphi Memorandum of Understanding shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code.

(e)    IBEW

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, a copy of which is attached to the Modified Plan as Exhibit 7.21(d), on the Effective Date, (i) the IBEW E&S Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 4 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IBEW E&S Memorandum of Understanding and (ii) the IBEW Powertrain Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 5 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IBEW Powertrain Memorandum of Understanding shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code.

(f)    IUOE

Pursuant to the Modified Plan and in accordance with the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, a copy of which is attached to the Modified Plan as Exhibit 7.21(d), on the Effective Date, (i) the IUOE Local 832S Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 1 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 832S Memorandum of Understanding, (ii) the IUOE Local 18S Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 2 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 18S Memorandum of Understanding, and (iii) the IUOE Local 101S Memorandum of Understanding, a copy of which is attached to the Modified Plan as Exhibit 3 to the IUOE, IBEW, and IAM 1113/1114 Settlement Approval Order, and all documents described in Attachment A to the IUOE Local 101S Memorandum of Understanding shall be automatically assumed by the applicable Reorganized Debtor under sections 365 and 1123 of the Bankruptcy Code.

### 21.    *Pension*

(a)    Pension Contribution Payment

No later than five days after the Effective Date, Reorganized Delphi will make contributions to the  (i) Delphi Corporation:  the Delphi Hourly Rate Employees Pension Plan and the Delphi Retirement Program for Salaried Employees; (ii) Delphi Mechatronic Systems, Inc.:  the Delphi Mechatronic Systems Retirement Program; (iii) ASEC Manufacturing:  the ASEC Manufacturing Retirement Program; and (iv) Packard-Hughes Interconnect Company:  the Packard-Hughes Interconnect Bargaining Retirement Plan and the Packard-Hughes Interconnect Non-Bargaining Retirement Plan (collectively, the "Pension Plans"), sufficient to satisfy any "unpaid contribution payments" (plus interest) within the meaning of IRC § 430(k) and ERISA § 303(k) which remain, if any, after the IRC Section 414(l) Transfer, and upon such contributions, (a) replacement liens, if any, granted to the PBGC on assets owned by any Debtor will be discharged as of the date of the contributions, and (b) any notices of liens filed by the PBGC against non-Debtor affiliates under IRC §§ 412(n) or 430(k) shall be withdrawn by the

PBGC within three business days after notice to PBGC of the contributions and the underlying liens discharged. During the period between the Effective Date and the date any such liens are discharged, such and any other assertable liens shall be junior and subordinate to the liens securing the Emergence Capital Arrangements.

(b)    PBGC

Nothing in the Modified Plan will be construed as discharging, releasing, or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from any liability for minimum funding under IRC § 412 and ERISA § 302 or liability under ERISA § 4062 with respect to the Pension Plans or the PBGC. The PBGC and the Pension Plans will not be enjoined or precluded from seeking to enforce such liability as a result of any provision of the Modified Plan or the Confirmation Order, except that the PBGC must not file any notices of liens under IRC § 430(k) or ERISA § 303(k) with respect to the Pension Plans or seek to enforce unpaid contribution payments against the Reorganized Debtors for five days after the Effective Date.

## 22.    *Reserved*

## 23.    *Preservation Of Causes Of Action*

On August 16, 2007, the Bankruptcy Court entered the Avoidance Procedures Order, authorizing the Debtors to enter into tolling agreements with respect to avoidance and other causes of action, approving procedures to identify those causes of action that should be preserved or abandoned, authorizing the Debtors to abandon certain actions, and establishing adversary proceeding procedures for preserving causes of action. The Debtors sought this relief so that they could take steps to fulfill their fiduciary duties to preserve estate assets in a manner that will not unnecessarily disrupt their prosecution of the Modified Plan or their existing business relationships with potential defendants that are necessary to the Debtors' ongoing operations.

With respect to preservation of causes of action, the Modified Plan provides that, in accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in the Modified Plan, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and will not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action. Notwithstanding the foregoing, Causes of Action against Persons arising under section 544, 545, 547, 548, or 553 of the Bankruptcy Code or similar state laws will not be retained by the Reorganized Debtors unless specifically listed on Exhibit 7.24 to the Modified Plan.

As described in Section IX – Summary Of The Reorganization Plan above, the Debtors have determined that the affirmative pursuit of many if not all of these causes of action would not benefit their estates and creditors.  Consequently, under the Modified Plan the Reorganized Debtors will not retain the Preference Claims except those specifically listed on Exhibit 7.24 to the Modified Plan.  In all other respects, the Reorganized Debtors will retain all rights, claims, and defenses, including as described immediately below.

### 24.    Reservation Of Rights

With respect to any avoidance causes of action under section 544, 545, 547, 548, or 553 of the Bankruptcy Code that the Debtors abandon in accordance with Article 7.24 of the Modified Plan (Preservation Of Causes Of Action), the Debtors reserve all rights, including the right under section 502(d) of the Bankruptcy Code to use defensively the abandoned avoidance cause of action as a ground to object to all or any part of a claim against any Estate asserted by a creditor that remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

### 25.    Exclusivity Period

The Debtors will retain the exclusive right to amend or modify the Modified Plan, and to solicit acceptances of any amendments to or modifications of the Modified Plan, through and until the Effective Date.

### 26.    Corporate Action

Each of the matters provided for under the Modified Plan involving the corporate structure of any Debtor or Reorganized Debtor or corporate action to be taken by or required of any Debtor or Reorganized Debtor will, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and will be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, creditors, or directors of any of the Debtors or the Reorganized Debtors.

### 27.    Effectuating Documents; Further Transactions

Each of the Chief Executive Officer, Chief Financial Officer, Chief Restructuring Officer, and General Counsel of the Debtors, or their respective designees, will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Modified Plan or to otherwise comply with applicable law.  The secretary or assistant secretary of the Debtors will be authorized to certify or attest to any of the foregoing actions.

### 28.    Consummation Of Divestiture Transaction

In the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing Debtor(s) to sell assets free and clear of liens, claims, and encumbrances, such Debtor(s) will be permitted to close on the sale of such assets subsequent to the Effective Date free and clear of liens, claims, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code.

### 29.    *Exemption From Certain Transfer Taxes And Recording Fees*

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Modified Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property will not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### G.    **Unexpired Leases And Executory Contracts**

#### 1.    *Assumed And Rejected Leases And Contracts*

##### (a)    Executory Contracts And Unexpired Leases

All executory contracts and unexpired leases as to which any of the Debtors is a party will be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (i) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) are the subject of a motion to reject filed on or before the Modification Approval Date, (iii) have expired or terminated on or prior to the Effective Date (and not otherwise extended) pursuant to their own terms, (iv) are listed on the schedule of rejected executory contracts or unexpired leases attached to the Modified Plan as Exhibit 8.1(a), or (v) are otherwise rejected pursuant to the terms of the Modified Plan.  Subject to the foregoing sentence and consummation of the Modified Plan, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of the rejections and assumptions contemplated hereby pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Upon the occurrence of the Effective Date, each executory contract or unexpired lease assumed pursuant to Article 8.l(a) of the Modified Plan will vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Modified Plan or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.  The Debtors reserve the right to file a motion on or before the Modification Approval Date to assume or reject any executory contract or unexpired lease.  Notwithstanding the foregoing or anything else in Article VIII, (i) all executory contracts or unexpired leases between GM and any of the Debtors will receive the treatment described in the Delphi-GM Definitive Documents, (ii) all agreements, and exhibits or attachments thereto, between the Unions and Delphi will receive the treatment described in Article 7.21 of the Modified Plan and the Union Settlement Agreements, and (iii) all executory contracts memorializing Ordinary Course Customer Obligations will receive the treatment described in Article 5.2 of the Modified Plan.

##### (b)    Real Property Agreements

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property will include (i) all modifications, amendments,

supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (ii) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court or is otherwise rejected as a part of the Modified Plan. In the event that the Effective Date does not occur, the Court will retain jurisdiction with respect to any request to extend the deadline for assuming any unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

(c)    Exhibits Not Admissions

Neither the exclusion nor the inclusion by the Debtors of a contract or lease on Exhibit 8.1(a) of the Modified Plan nor anything contained in the Modified Plan will constitute an admission by the Debtors that such lease or contract is an unexpired lease or executory contract or that any Debtor, or its respective Affiliates, has any liability thereunder.  The Debtors reserve the right, subject to notice, to amend, modify, supplement, or otherwise change Exhibit 8.1(a) on or before the Modification Approval Date.

***2.    Payments Related To Assumption Of Executory Contracts And Unexpired Leases***

(a)    Material Supply Agreements

The provisions (if any) of each Material Supply Agreement to be assumed under the Modified Plan which are or may be in default will be satisfied solely by Cure.  For the avoidance of any doubt, any monetary amounts by which each Material Supply Agreement to be assumed pursuant to the Modified Plan is in default will be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and will be paid to the non-Debtor counterparty to the Material Supply Agreement.  To the extent an Allowed Claim includes a claim for default of a Material Supply Agreement assumed under the Modified Plan, then any Cure distributed pursuant to section 8.2(a) of the Modified Plan on account of such Material Supply Agreement will offset or reduce the amount to be distributed to the holder of such related Allowed Claim (x) by the amount of the default under such Material Supply Agreement so recorded in the claim holder's proof of claim or documentation allowing such claim or (y) if such default amount is not definitively recorded, then by the amount of any Cure payments made on account of the assumption, pursuant to section 365 of the Bankruptcy Code.

(i)    Cure Amount Notices

Pursuant to the Solicitation Procedures Order and the Confirmation Order, the Debtors issued a notice of proposed Cure amount (the "Cure Amount Notice") to counterparties to Material Supply Agreements.  The proposed Cure amount set forth in such Cure Amount Notice was equal to the amount that the applicable Debtor believed it or the applicable Reorganized Debtor would be obligated to pay in connection with an assumption of such contract under section 365(b)(1) of the Bankruptcy Code (such amount, the "Cure Amount Proposal").  With

respect to reconciling the amount of Cure, the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order, and implemented in accordance therewith will control and accordingly, Cure will be equal to (i) the amount set forth on the Cure Amount Notice to the extent that no proper and timely objection was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable; or (ii) to the extent a proper and timely objection to the Cure Amount Notice and Cure Amount Proposal was filed in accordance with the Solicitation Procedures Order or was filed on or before the Omitted Material Supply Agreement Objection Deadline, as applicable, (a) the amount agreed to between the Debtors and the applicable counterparty or, (b) to the extent no such agreement was or is reached, such other amount as ordered by the Bankruptcy Court.

(ii)    Objections To Cure Amount Notices And Payment Of Cure

The Cure Amount Notice provided procedures for each counterparty to object to, among other things, the assumption or assumption and assignment of the applicable contract and to the Cure Amount Proposal.  If the counterparty responded to the Cure Amount Notice in accordance with the procedures set forth in the Solicitation Procedures Order, as modified by the Confirmation Order,  and the counterparty asserted a dispute regarding (x) the nature or amount of any Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract to be assumed, or (z) any other matter pertaining to assumptions, then the Cure will be paid, honored, or otherwise occur following the later of a reasonable period of time following the Effective Date if the dispute is resolved consensually between the applicable counterparty and the Debtors, a reasonable period of time following the consensual resolution of the dispute between the applicable counterparty and the Reorganized Debtors, and a reasonable period of time following the entry of a Final Order adjudicating the dispute and approving the assumption and assignment of such Material Supply Agreement; provided that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the applicable counterparty and the Debtors or Reorganized Debtors then notwithstanding anything to the contrary in the Modified Plan, in the Confirmation Order, or in the Modification Approval Order, the Debtors or Reorganized Debtors will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing a Cure amount in excess of that provided by the Debtors.  If the non-Debtor counterparty to the material supply agreement did not respond to the Cure Amount Notice in accordance with the Solicitation Procedures Order or did not dispute the Cure amount, then Cure will be paid in the amount set forth in the Cure Amount Notice within a reasonable period of time following the Effective Date.  The Creditors' Committee will be provided access to information regarding the Debtors' proposed Cure Proposal payments above a threshold amount to be reasonably agreed upon by the Creditors' Committee and the Debtors, after which the Creditors' Committee may object to a proposed Cure Proposal payment; provided, however, that any unresolved objection shall be determined by the Bankruptcy Court after notice and hearing.

(iii)    Form Of Cure Payments

Notwithstanding anything to the contrary in the Solicitation Procedures Order, as modified by the Confirmation Order, a Cure Amount Notice, the First Order Pursuant To

Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12899), the Second Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12900), and the Third Order Pursuant To Solicitation Procedures Order, Confirmation Order, Plan Of Reorganization, 11 U.S.C. § 105(a), And Fed. R. Bankr. P. 9010 Striking Certain Non-Conforming Cure Amount Notices And Objections Identified In Non-Conforming Cure Notice Motion (Docket No. 12901), absent a consensual agreement between the Debtors and the applicable counterparty, each counterparty to a Material Supply Agreement will be paid in cash for the Cure of monetary defaults under a Material Supply Agreement assumed pursuant to this Plan.

(b)    Other Executory Contracts And Other Unexpired Leases

The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed under the Modified Plan which are or may be in default will be satisfied solely by Cure. For the avoidance of doubt, any monetary amounts by which each Other Executory Contract or Other Unexpired Lease to be assumed pursuant to the Modified Plan is in default will be satisfied by Cure as required by section 365(b)(1) of the Bankruptcy Code and will be paid to the non-Debtor counterparty to the Other Executory Contract or Other Unexpired Lease. Any Cure distributed pursuant to this section will offset or reduce the amount distributed to the holder of any allowed claims entitled to receive distributions under the Modified Plan by the amount of any Cure payments made on account of the assumption, pursuant to section 365 of the Bankruptcy Code.

(i)    Cure Proposals

Pursuant to Article 8.2(b), as confirmed on January 25, 2008, any counterparty to an Other Executory Contract or Other Unexpired Lease who wished to assert that Cure is required as a condition to assumption must have filed and served a proposed Cure Proposal (a "Cure Proposal") so as to be received by the Debtors and their counsel at the address set forth in Article 14.8 of the Modified Plan by March 10, 2008 (the "Cure Proposal Submission Deadline"), after which the Debtors had until April 24, 2008, to file any objections thereto (the "Cure Proposal Objections").

(ii)    Cure Proposal Objections

Under the Modified Plan, the Debtors will have the right to amend, modify, or supplement the Cure Proposal Objections. Counterparties to an Other Executory Contract or Other Unexpired Lease which failed to file and serve a Cure Proposal by the Cure Proposal Submission Deadline in accordance with the procedures set forth in the Confirmed Plan, will each be deemed to have waived its right to assert a default requiring Cure and any default existing as of January 25, 2008 will be deemed cured as of the day following the Cure Proposal Submission Deadline. Such party will forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, a claim that arose on or prior to the Cure Proposal

Submission Deadline.  Counterparties will assert any claims for defaults of Other Executory Contracts or Other Unexpired Leases accruing after the Cure Proposal Submission Deadline as Administrative Claims and will file and serve such claims before the Administrative Claims Bar Date in accordance with Articles 1.3 and 10.5 of the Modified Plan.  If a counterparty included an assertion in its timely filed and served Cure Proposal disputing (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, or if there is a Cure Proposal Objection, then the disputed matter will be set for hearing in the Bankruptcy Court, which hearing will be scheduled for an available claims hearing date following 20 days' notice provided by the Debtors or the Reorganized Debtors, as applicable, to the applicable counterparty, or such other date as may be agreed upon, and Cure, if any, will occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, notwithstanding anything to the contrary in the Modified Plan or in the Confirmation Order, the Debtors will have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing a Cure amount in excess of that asserted by the Debtors.

(iii)    Payment Of Cure

If the Cure Proposal was timely filed and served and is not disputed, the Debtors or Reorganized Debtors, as the case may be, will pay the Cure Proposal, if any, to the counterparty as soon as reasonably practicable following the Effective Date, but in no event later than a reasonable period of time following the Effective Date.  Disputed Cure Proposals or any other disputes regarding Cure or the assumption or assumption and assignment of an Other Executory Contract or Other Unexpired Lease that are resolved by agreement or Final Order will be paid or otherwise honored by the Debtors or the Reorganized Debtors, as applicable, by the later of a reasonable period of time following the Effective Date and a reasonable period of time following such agreement or Final Order.

(c)    Intercompany Executory Contracts And Intercompany Unexpired Leases

Any Claim outstanding at the time of assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease will be Reinstated and will be satisfied in a manner to be agreed upon by the relevant Debtors and/or non-Debtor Affiliates.

(d)    Assignment Pursuant To Restructuring Transactions

To the extent the Debtor which is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease shall, upon assumption as contemplated herein, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

### 3.      Rejection Damages Bar Date

If the rejection by the Debtors (pursuant to the Modified Plan or otherwise) of an executory contract or unexpired lease results in a Claim, then such Claim will be forever barred and will not be enforceable against the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry of the Modification Approval Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Bankruptcy Court.

### 4.      Assumption and Assignment of Divestiture-Related Executory Contracts and Unexpired Leases

In connection with their efforts related to divestiture transactions, the Debtors may seek entry of an order that, among other things, approves the assumption and assignment of certain executory contracts or unexpired leases to the buyer of a certain business or product line.  The Debtors, however, would not consummate the assumption of such contracts and leases until the earlier of the closing of the related divestiture transaction or the Effective Date.  Thus, the Modified Plan provides that in the event that the Bankruptcy Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to assume and assign certain executory contracts or unexpired leases in connection with a divestiture transaction, but a Debtor(s) does not assume and assign such contracts and leases prior to the Effective Date: (a) notwithstanding anything to the contrary in the applicable sale order, such assumption will be consummated pursuant to Article VIII of the Modified Plan and service of notice and any cure payments owed to a non-Debtor counterparty under such contracts and leases will be made pursuant to Article 8.2 of the Modified Plan and (b) a Debtor(s) will be permitted to assign such assumed executory contracts and unexpired leases subsequent to the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the applicable sale order.  Because the assumption may be consummated in connection with either the closing of the divestiture transaction or the Modified Plan, the Debtors would provide each non-Debtor counterparty under the applicable contracts and leases with both a cure notice in connection with the divestiture transaction and the Cure Amount Notice.  If the closing of the divestiture transaction occurs before the Effective Date, then the Cure Amount Claim would be paid in cash.  If the closing of the divestiture transaction occurs after the Effective Date, then the Cure Amount Claim would be paid with the currency provided under the Modified Plan.

## H.      Provisions Governing Distributions

### 1.      Time Of Distributions

Except as otherwise provided for herein or ordered by the Bankruptcy Court, distributions under the Modified Plan will be made on a Periodic Distribution Date.

### 2.      No Interest On Disputed Claims

Unless otherwise specifically provided for in the Modified Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest will not accrue or be paid on Claims or Interests, and no holder of a Claim or Interest will be entitled to interest accruing on or

after the Petition Date on any Claim or Interest.  Additionally, and without limiting the foregoing, unless otherwise specifically provided for in the Modified Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest will not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

### 3.    Disbursing Agent

The Disbursing Agent will make all distributions required under the Modified Plan except with respect to any holder of a Claim or Interest whose Claim or Interest is governed by an agreement and is administered by a Servicer, which distributions will be deposited with the appropriate Servicer, as applicable, who will deliver such distributions to the holders of Claims or Interests in accordance with the provisions of the Modified Plan and the terms of any governing agreement.  If any such Servicer is unable to make such distributions, the Disbursing Agent, with the cooperation of such Servicer, will make such distributions.

### 4.    Surrender Of Securities Or Instruments

On or before the Distribution Date, or as soon as practicable thereafter, each holder of an instrument evidencing a Claim (a "Certificate") will be required to surrender such Certificate to the Disbursing Agent, or, with respect to indebtedness that is governed by an agreement and administered by a Servicer, the respective Servicer, and such Certificate will be cancelled solely with respect to the Debtors and such cancellation will not alter the obligations or rights of any non-Debtor third parties vis-a-vis one another to such instruments.  This requirement does not apply to any Claims Reinstated pursuant to the terms of the Modified Plan.  No distribution of property under the Modified Plan will be made to or on behalf of any such holder unless and until such Certificate is received by the Disbursing Agent or the respective Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Disbursing Agent or the respective Servicer.  Any holder who fails to surrender or cause to be surrendered such Certificate, or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to the Disbursing Agent or the respective Servicer prior to the second anniversary of the Effective Date, will be deemed to have forfeited all rights and Claims in respect of such Certificate and will not participate in any distribution hereunder, and all property in respect of such forfeited distribution, including any dividends or interest attributable thereto, will revert to the Reorganized Debtors notwithstanding any federal or state escheat laws to the contrary.

### 5.    Services Of Indenture Trustees, Agents, And Servicers

The Reorganized Debtors will reimburse any Servicer (including the Indenture Trustees) for reasonable and necessary services performed by it (including reasonable attorneys' fees and documented out-of-pocket expenses) in connection with the making of distributions under the Modified Plan to holders of Allowed Claims or Interests, without the need for the filing of an application with, or approval by, the Bankruptcy Court.  To the extent that there are any disputes that the reviewing parties are unable to resolve with the Servicers, the reviewing parties must report to the Bankruptcy Court as to whether there are any unresolved disputes regarding the reasonableness of the Servicers' (and their attorneys') fees and expenses.  Any such unresolved disputes may be submitted to the Bankruptcy Court for resolution.

**6.**    ***Claims Administration Responsibility***

(a)    Reorganized Debtors

The Reorganized Debtors will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests, except as otherwise described in Article IX of the Modified Plan.

(b)    Filing Of Objections

Unless otherwise extended by the Bankruptcy Court, any objections to Claims and/or Interests must be served and filed on or before the Claims/Interests Objection Deadline. Notwithstanding any authority to the contrary, an objection to a Claim or Interest will be deemed properly served on the holder of the Claim or Interest if the Debtors or Reorganized Debtors effect service by the following means:  (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (ii) to the extent counsel for a holder of a Claim or Interest is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified on the proof of claim or any attachment thereto (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), or (iii) by first class mail, postage prepaid, on any counsel that has appeared on behalf of the holder of the Claim or Interest in the Chapter 11 Cases and has not withdrawn such appearance.

(c)    Determination Of Claims Or Interests

Any Claim or Interest determined and liquidated pursuant to (i) the ADR Procedures, (ii) an order of the Bankruptcy Court, or (iii) applicable non-bankruptcy law (which determination has not been stayed, reversed, or amended and as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) will be deemed an Allowed Claim or an Allowed Interest in such liquidated amount and satisfied in accordance with the Modified Plan.  The Modified Plan will not constitute or be deemed a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.

(d)    Claims Bar Date

Any Claim (whether a newly filed Claim or an amendment to a previously filed Claim) filed after the later of (i) the Effective Date, (ii) with respect to Claims for rejection damages, the bar date established pursuant to Article 8.3 of the Modified Plan for the filing of such claims, or (iii) with respect to Claims that are Administrative Claims, the bar date established pursuant to Article 10.5 of the Modified Plan, will not be recognized, or recorded on the claims register, by the Claims Agent and will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors unless such untimely filing is expressly authorized by an order of the Bankruptcy Court.  Nothing in the Modified Plan will in any way alter, impair, or

abridge the legal effect of the Bar Date Order, and the Debtors', Reorganized Debtors', and other parties in interest's rights to object to such Claims on the grounds that they are time barred or otherwise subject to disallowance or modification.

### 7.   *Delivery Of Distributions*

#### (a)   Allowed Claims

Distributions to holders of Allowed Claims will be made by the Disbursing Agent or the appropriate Servicer (a) at the addresses set forth on the proofs of claim filed by such holders of Claims (or at the last known addresses of such holders of Claims if no proof of claim is filed or if the Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and the Disbursing Agent has not received a written notice of a change of address, or (d) in the case of a holder of a Claim whose Claim is governed by an agreement and administered by a Servicer, at the addresses contained in the official records of such Servicer.

#### (b)   Allowed Interests

For the purpose of making distributions (other than the Rights) to holders of Allowed Interests pertaining to Existing Common Stock, the transfer ledger in respect of the Existing Common Stock in Delphi will be closed as of the close of business on the Effective Date, and the Disbursing Agent and its respective agents will be entitled to recognize and deal for all purposes with only those holders of record stated on the transfer ledger maintained by the stock transfer agent for the Existing Common Stock in Delphi as of the close of business on the Effective Date.

#### (c)   Undeliverable Distributions

If any distribution to a holder of a Claim or Interest is returned as undeliverable, no further distributions to such holder of such Claim or Interest will be made unless and until the Disbursing Agent or the appropriate Servicer is notified of the then-current address of such holder of the Claim or Interest, at which time all missed distributions will be made to such holder of the Claim or Interest without interest. Amounts in respect of undeliverable distributions will be returned to the Reorganized Debtors until such distributions are claimed.  The Debtors will make reasonable efforts to locate holders of undeliverable distributions.  All claims for undeliverable distributions must be made on or before the later to occur of (i) the first anniversary of the Effective Date or (ii) six months after such holder's Claim or Interest becomes an Allowed Claim or an Allowed Interest, after which date all unclaimed property will revert to the Reorganized Debtors free of any restrictions thereon and the claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding federal or state escheat laws to the contrary.

### 8.   *Procedures For Treating And Resolving Disputed And Contingent Claims And Interests*

#### (a)   No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim or Disputed Interest unless and until all objections to such Disputed Claim or Disputed Interest have been settled or withdrawn or have been determined by a Final Order of the Bankruptcy Court, and the Disputed Claim or Disputed Interest has become an Allowed Claim or Allowed Interest.  All objections to Claims or Interests must be filed on or before the Claims Objection Deadline.

(b)    <u>Distribution Reserve</u>

<u>The Reorganized Debtors or Disbursing Agent will withhold the Distribution Reserves from the property to be distributed to particular classes under the Modified Plan based upon the Face Amount of Disputed Claims.  The Reorganized Debtors or Disbursing Agent will withhold such amounts or property as may be necessary from property to be distributed to such Classes of Claims or Interests under the Modified Plan on a Pro Rata basis based upon the Face Amount of such Claims or Interests.  The Reorganized Debtors will also place in the applicable Distribution Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property withheld as the applicable Distribution Reserve, to the extent that such property continues to be withheld as the applicable Distribution Reserve at the time such distributions are made or such obligations arise.  Nothing in the Modified Plan or this Disclosure Statement will be deemed to entitle the holder of a Disputed Claim to postpetition interest on such Claim.  The Disbursing Agent will be deemed to have voted any New Common Stock held in the Distribution Reserve in the same proportion as shares previously disbursed by the Disbursing Agent.  The Servicers will be deemed to have voted any New Common Stock held by such Servicers in the same proportion as shares previously disbursed by such Servicers.</u>

<u>(i)</u>    Estimation Of Claims For Distribution Reserves

To the extent that any Claims remain Disputed Claims as of the Effective Date, the Debtors or Reorganized Debtors will seek an order from the Bankruptcy Court establishing the amounts to be withheld as part of the Distribution Reserves.  Without limiting the foregoing, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim, including any such Claim arising from the Debtors' or Reorganized Debtors' rejection of an executory contract, pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Disputed Claim at any time during litigation concerning any objection to any Disputed Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may, as determined by the Bankruptcy Court, constitute either (a) the Allowed amount of such Disputed Claim, (b) a maximum limitation on such Disputed Claim, or (c) in the event such Disputed Claim is estimated in connection with the estimation of other Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Disputed Claims so estimated<u>; provided, however, that if</u> the estimate constitutes the maximum limitation on a Disputed Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors may elect to pursue supplemental proceedings to object to any ultimate allowance of any such Disputed Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the <u>Modified</u> Plan are cumulative and not necessarily exclusive

of one another.  Disputed Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### (c)    No Recourse To Debtors Or Reorganized Debtors

Any Disputed Claim or Disputed Interest that ultimately becomes an Allowed Claim or Allowed Interest, as the case may be, will be entitled to receive its applicable distribution under the Modified Plan solely from the Distribution Reserve established on account of such Disputed Claim or Disputed Interest.  In no event will any holder of a Disputed Claim or Disputed Interest have any recourse with respect to distributions made, or to be made, under the Modified Plan to any Debtor or Reorganized Debtor on account of such Disputed Claim or Disputed Interest, regardless of whether such Disputed Claim or Disputed Interest will ultimately become an Allowed Claim or Allowed Interest, as the case may be, or regardless of whether sufficient Cash, New Common Stock, or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim or Disputed Interest at the time such Claim or Interest becomes entitled to receive a distribution under the Modified Plan.

### (d)    Distributions After Allowance

Payments and distributions from the Distribution Reserve to each respective holder of a Claim or Interest on account of a Disputed Claim or Disputed Interest, to the extent that it ultimately becomes an Allowed Claim or an Allowed Interest, will be made in accordance with provisions of the Modified Plan that govern distributions to such holder of a Claim or Interest. On the first Periodic Distribution Date following the date when a Disputed Claim or Disputed Interest becomes undisputed, noncontingent, and liquidated, the Disbursing Agent will distribute to the holder of such Allowed Claim or  Allowed Interest any New Common Stock, or other property, from the Distribution Reserve that would have been distributed on the dates when distributions were previously made had such Allowed Claim or Allowed Interest been an Allowed Claim or Allowed Interest on such dates and will not be limited by the Disputed Claim Amounts previously reserved with respect to such Disputed Claim to the extent that additional amounts are available therefor, but only to the extent that such additional amounts have not yet been distributed to holders of Allowed Claims or Allowed Interests.  Upon such distribution, the Distribution Reserve will be reduced by an amount equal to the amount reserved with respect to such Disputed Claim.  To the extent the amount reserved for such Disputed Claim or Disputed Interest exceeds the Allowed amount, if any, of such Claim or Interest, the remainder will be deposited in the appropriate Supplemental Distribution Account and distributed to holders of Allowed Class C Claims in accordance with Section 5.3 of the Modified Plan or to holders of Allowed Class G-1 Interests in accordance with Section 5.7 of the Modified Plan.

### (e)    De Minimis Distributions

Neither the Disbursing Agent nor any Servicer will have any obligation to make a distribution on account of an Allowed Claim or Allowed Interest from any Distribution Reserve or otherwise if (i) the aggregate amount of all distributions authorized to be made from such Distribution Reserve or otherwise on the Periodic Distribution Date in question is or has a value less than $250,000; provided that the Debtors will make a distribution on a Periodic Distribution Date of less than $250,000 if the Debtors expect that such Periodic Distribution Date will be the

final Periodic Distribution Date or (ii) the amount to be distributed to the specific holder of the Allowed Claim or Allowed Interest on the particular Periodic Distribution Date does not both (x) constitute a final distribution to such holder and (y) have a value less than $50.00.

### 9.    Section 510(b) Opt Out Claims

No Section 510(b) Opt Out Claim will be an Allowed Claim unless and until such Claim has been allowed by Final Order of the Bankruptcy Court.  Any Section 510(b) Opt Out Claim that ultimately becomes an Allowed Claim will be entitled to receive its applicable distribution that would have been otherwise distributed under the Modified Plan solely from the applicable portion of the Securities Settlement.  In no event will any holder of a Section 510(b) Opt Out Claim have any recourse with respect to distributions made, or to be made, under the Securities Settlement to holders of such Claims or Interests to any Debtor or Reorganized Debtor on account of such Section 510(b) Opt Out Claim, regardless of whether such Claim will ultimately become an Allowed Claim or regardless of whether sufficient New Common Stock or Discount Rights remain available for distribution at the time such Claim is Allowed.

### 10.    Fractional Securities

Payments of fractions of shares of New Common Stock to holders of General Unsecured Claims will not be made.  Fractional shares of New Common Stock that would otherwise be distributed under the Modified Plan will be rounded to the nearest whole number of shares in accordance with the following method: (a) fractions of one-half (1/2) or greater will be rounded to the next higher whole number of shares and (b) fractions of less than one-half (1/2) will be rounded to the next lower whole number of shares.

### 11.    GM Administrative Claim Reserve

In connection with Section 4.04(c) of the Delphi-GM Global Settlement Agreement, on the Effective Date, if all conditions for the receipt by GM of the New Preferred Stock described in Section 4.04(c) of the Delphi-GM Global Settlement Agreement are satisfied, GM has consented to the receipt of New Preferred Stock with a stated value of less than $2.055 billion, and the aggregate value, based on Plan Equity Value, of the General Unsecured Claimholder Shares is less than 20% of the aggregate amount of the Face Amount of General Unsecured Claims (excluding TOPrS Claims and Disallowed Claims), then the Reorganized Debtors or Disbursing Agent shall withhold in the GM Administrative Claim Reserve an amount of New Preferred Stock, based on Plan Equity Value, equal to the product of (a) 1 less the GUC Percentage and (b) the difference between (i) the sum of $2.055 billion and 20% of the Face Amount of General Unsecured Claims (excluding TOPrS Claims and Disallowed Claims) and (ii) the aggregate value, based on Plan Equity Value, of the New Preferred Stock and General Unsecured Claimholder Shares.  In accordance with Section 4.04(c) of the Delphi-GM Global Settlement Agreement,, after giving effect to Article 5.3(c) of the Modified Plan, any New Preferred Stock remaining in the GM Administrative Claim Reserve will be distributed to GM.  The withholding of the New Preferred Stock pursuant to Article 9.11 of the Modified Plan and the distributions made therefrom pursuant to Article 5.03(c) of the Modified Plan will be in complete satisfaction of all obligations of GM under Section 4.04(c) of the Delphi-GM Global Settlement Agreement.

### 12.   *Allocation Of Plan Distributions Between Principal And Interest*

To the extent that any Allowed Claim entitled to a distribution under the Modified Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution will, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### I.   **Allowance And Payment Of Certain Administrative Claims**

### 1.   *DIP Facility Claims*

##### (a)   DIP Facility Revolver Claims

On the Effective Date, the DIP Facility Revolver Claim will be allowed in an amount to be agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder will be paid in full in Cash in accordance with the DIP Credit Agreement on the Effective Date.

##### (b)   DIP Facility First Priority Term Claim

On the Effective Date, the principal amount of the DIP Facility First Priority Term Claim will be allowed in an amount agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder will be paid in full in Cash in accordance with the DIP Credit Agreement on the Effective Date, except that with respect to letters of credit issued under the DIP Facility, such claims may be satisfied in full by the cash collateralization of such letters of credit, or by procuring back-up letters of credit, in each case in accordance with the DIP Credit Agreement or as otherwise agreed to by the DIP Agent.

##### (c)   DIP Facility Second Priority Term Claim

On the Effective Date, the principal amount of the DIP Facility Second Priority Term Claim will be allowed in an amount agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder will be paid in full in Cash in accordance with the DIP Credit Agreement on the Effective Date.

##### (d)   Cancellation Of Liens

Once the events described in the foregoing sections (a), (b), and (c) have occurred, all liens and security interests granted to secure the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim will be deemed cancelled and will be of no further force and effect.  To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may

be, will take any commercially reasonable steps requested by the Debtors that are necessary to cancel and/or extinguish such publicly-filed liens and/or security interests.

2.      *Reserved*

3.      *Professional Claims*

(a)      Final Fee Applications

All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Statutory Committees must be filed no later than the last day of the second full month after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims and expenses will be determined by the Bankruptcy Court.

(b)      Payment Of Interim Amounts

Subject to the Holdback Amount, on the Effective Date, the Debtors or Reorganized Debtors will pay all amounts owing to Professionals and members of the Statutory Committees for all outstanding amounts payable relating to prior periods through the Confirmation Date. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Confirmation Date, the Professionals must estimate fees and expenses due for periods that have not been billed as of the Confirmation Date and deliver such estimate to the Debtors, counsel for the Statutory Committees, and the United States Trustee for the Southern District of New York. Within 45 days after the Effective Date, a Professional receiving payment for the estimated period must submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order or the Ordinary Course Professional Order, as applicable. Should the estimated payment received by any Professional exceed the actual fees and expenses for such period, this excess amount will be credited against the Holdback Amount for such Professional or, if the award of the Holdback Amount for such matter is insufficient, disgorged by such Professional.

(c)    <u>Holdback Amount</u>

On the Effective Date, the Debtors or the Reorganized Debtors will fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals.  The Disbursing Agent will maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order.  Such funds will not be considered property of the Debtors, the Reorganized Debtors, or the Estates.  The remaining amount of Professional Claims owing to the Professionals will be paid to such Professionals by the Disbursing Agent from the Holdback Escrow Account when such claims are finally allowed by the Bankruptcy Court.  When all Professional Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, will be paid to the Reorganized Debtors.

(d)    <u>Post-Confirmation Date Retention</u>

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of business.

### *4.    Substantial Contribution Compensation And Expenses Bar Date*

Any Person (including the Indenture Trustees) who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must file an application with the clerk of the Bankruptcy Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve such application on counsel for the Debtors, the Statutory Committees, the United States Trustee for the Southern District of New York, and such other parties as may be decided by the Bankruptcy Court and the Bankruptcy Code on or before the 503 Deadline, or be forever barred from seeking such compensation or expense reimbursement.  Notwithstanding the foregoing, on or within 15 days after the Confirmation Date, the Indenture Trustees must deliver to the Debtors either (a) a statement indicating that such Indenture Trustee's prepetition fees and expenses are less than the amounts set forth on Exhibit 10.4 to the <u>Modified</u> Plan or (b) their invoices for their respective fees and expenses, and the Debtor will have the right to file an objection with the Bankruptcy Court, which objection must be filed with 15 days of receipt.  If an Indenture Trustee has delivered notice that its prepetition fees and expenses are less than the amounts set forth on Exhibit 10.4 of the <u>Modified</u> Plan or absent any such objection, the Indenture Trustees' invoice for its fees and expenses will be paid by the Debtors or Reorganized Debtors, as applicable, on the Effective Date, or as soon thereafter as practicable, without need to file an application for the payment of its fees and without need for further order of the Bankruptcy Court.

### *5.    Other Administrative Claims*

All other requests for payment of an Administrative Claim (other than as set forth in the <u>Modified</u> Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached to the <u>Modified</u> Plan as Exhibit 10.5, with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than 45 days after the Effective

Date.  Any request for payment of an Administrative Claim pursuant to the Modified Plan that is not timely filed and served will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 60 days after the Administrative Claims Bar Date unless such objection period is extended by the Bankruptcy Court, such Administrative Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court will determine the allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable in the ordinary course of business.

J.      **Effect Of The Modified Plan On Claims And Interests**

1.      *Revesting Of Assets*

Except as otherwise explicitly provided in the Modified Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) will revest in each of the Debtors which owned such property or interest in property as of the Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Modified Plan and the Confirmation Order.

2.      *Discharge Of Debtors*

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Modified Plan or in the Confirmation Order, the distributions and rights that are provided in the Modified Plan will be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Modified Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted the Modified Plan.  The Confirmation Order will be a judicial determination of

the discharge of all Claims against and Interests in the Debtors, subject to the occurrence of the Effective Date.

### 3.      Compromises And Settlements

In accordance with Article 9.6 of the Modified Plan, pursuant to Bankruptcy Rule 9019(a), the Debtors may compromise and settle various (a) Claims against, or Interests in, the Debtors and (b) Causes of Action that the Debtors have against other Persons up to and including the Effective Date.  After the Effective Date, any such right will pass to the Reorganized Debtors as contemplated in Article 11.1 of the Modified Plan, without the need for further approval of the Bankruptcy Court.  Notwithstanding the foregoing, Bankruptcy Court approval will be required after the Effective Date if the Joint Claims Oversight Committee objects to a proposed settlement based on criteria established by the board of directors of Reorganized Delphi.

### 4.      Release By Debtors Of Certain Parties

The releases provided in the Modified Plan and described below discharge and release certain  parties from claims arising from prepetition actions and claims (including claims held by third parties, such as creditors and shareholders) and limit the liability against certain parties for acts or omissions arising out of or in connection with these Chapter 11 Cases unless such actions are the result of willful misconduct or gross negligence.  The releases of each of the major constituencies in these cases, including the Debtors' officers, directors, and employees, the Creditors' Committee, the Equity Committee, the DIP Agent, the DIP Lenders, the Unions, and GM, allow the parties to participate in the Debtors' restructuring cases and protect individuals who have contributed to the restructuring process.  The parties for whom releases are provided have participated in complex negotiations with an unprecedented scope.  Moreover, the amounts contributed by each of these parties as part of settlements or other agreements are substantial.  The contributions made by some parties amount to billions of dollars invested in Delphi's reorganization.  Further, these parties conditioned their settlements and agreements on receiving the releases contemplated by the Modified Plan.  Thus, because of the value provided to the Debtors' estates as a result of these critical and necessary settlements and agreements, the Debtors believe it is appropriate to provide the releases described below.

**Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to Article 11.13 of the Modified Plan, effective as of the Effective Date, each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its respective Estate, will release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Modified Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases.  The Reorganized Debtors and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date will be bound, to the same extent the Debtors are bound, by the releases and discharges set forth**

above.  Notwithstanding the foregoing, nothing in the **Modified** Plan will be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, or _(iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.

The term "Released Parties" means, collectively, (a) all officers of each of the Debtors, all members of the boards of directors of each of the Debtors, and all employees of each of the Debtors, in each case in their respective capacities as of the date of the commencement of the hearing on the Disclosure Statement, (b) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such, (c) the Equity Committee and all current and former members of the Equity Committee in their respective capacities as such, (d) the DIP Agent in its capacity as such, (e) the DIP Lenders solely in their capacities as such, (f) all Professionals, (g) the Unions and current or former members, officers, and committee members of the Unions, (h) the Indenture Trustees, in their capacities as such, and (i) with respect to each of the above-named Persons, such Person's affiliates, advisors, principals, employees, officers, directors, representatives, financial advisors, attorneys, accountants, investment bankers, consultants, agents, and other representatives and professionals.

###### 5.    *Release By Holders Of Claims And Interests*

On the Effective Date, (a) each Person who votes to accept the **Modified** Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor), which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the obligations of the Debtors and the Reorganized Debtors under the **Modified** Plan and the Cash, New Common Stock, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the **Modified** Plan (each, a "Release Obligor"), will have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the **Modified** Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the **Modified** Plan, the Disclosure Statement, the **Modified** Plan Exhibits, the Union Settlement Agreements, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended, or entered into in connection with either the **Modified** Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements,

or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases; provided, however, that (A) Article 11.5 is subject to and limited by Article 11.13 of the Modified Plan and (B) Article 11.5 will not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other U.S. state, city, or municipal tax code, (ii) the environmental laws of the United States or any U.S. state, city, or municipality, (iii) any criminal laws of the United States or any U.S. state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any U.S. state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security. Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates will be as set forth in the Amended GSA and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

### 6.    Release By Unions

The releases provided for in (i) Section K.3 of the UAW-Delphi-GM Memorandum of Understanding, (ii) Section H.3 of the IUE-CWA-Delphi-GM Memorandum of Understanding, (iii) Section G.3 of the USW Memoranda of Understanding, (iv) Section F.3 of the IUOE Local 18S Memorandum of Understanding and IUOE Local 832S Memorandum of Understanding and Section E.3 of the IUOE Local 101S Memorandum of Understanding, (v) Section F.3 of the IBEW E&S Memorandum of Understanding and the IBEW Powertrain Memorandum of Understanding, and (vi) Section F.3 of the IAM Memorandum of Understanding are incorporated by reference in the Modified Plan in their entirety.

### 7.    Release Of GM By Debtors And Third Parties

On the Effective Date, GM will receive all releases provided for in Section 4.01 of the Amended GSA, which provisions are incorporated by reference herein in their entirety.

### 8.    *Reserved*

### 9.    Setoffs

Subject to Article 11.13 of the Modified Plan, the Debtors may, but will not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Modified Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against such holder of such Claim, but neither the failure to do so nor the allowance of any Claim will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder of such Claim.

### 10.    Subordination Rights

All Claims against the Debtors and all rights and claims between or among holders of Claims relating in any manner whatsoever to distributions on account of Claims against or Interests in the Debtors, based upon any claimed subordination rights, whether asserted or

unasserted, legal or equitable, will be deemed satisfied by the distributions under the Modified Plan to holders of Claims having such subordination rights, and such subordination rights will be deemed waived, released, discharged, and terminated as of the Effective Date; provided, further, that the subordination rights of Senior Debt (as such term is defined in the Subordinated Notes Indenture) will be deemed satisfied through the distributions described in Article 5.3 of the Modified Plan, and that as a result of the satisfaction of the subordination provisions of the Subordinated Notes Indenture, the holders of TOPrS Claims will not receive a distribution under the Modified Plan. Except as otherwise specifically provided for in the Modified Plan, distributions to the various Classes of Claims under the Modified Plan will not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any subordination rights or otherwise, so that each holder of a Claim will have and receive the benefit of the distributions in the manner set forth in the Modified Plan.

Except as otherwise provided in the Modified Plan (including any Modified Plan Exhibits) or the Confirmation Order, the right of any of the Debtors or Reorganized Debtors to seek subordination of any Claim or Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Interest that becomes a subordinated Claim or Interest at any time will be modified to reflect such subordination. Unless the Modified Plan (including Modified Plan Exhibits) or the Confirmation Order otherwise provide, no distributions will be made on account of a Claim subordinated pursuant to this Article 11.10(b) unless ordered by the Bankruptcy Court.

### 11. *Exculpation And Limitation Of Liability*

**Subject to Article 11.13 of the Modified Plan, the Debtors, the Reorganized Debtors, the Statutory Committees, the members of the Statutory Committees in their capacities as such, the UAW, the IUE-CWA, the USW, the IAM, the IBEW, the IUOE, the DIP Agent, the DIP Lenders in their capacities as such and as holders of Claims and Interests, GM, the Indenture Trustees in their capacities as such, and any of such parties' respective current or former members, officers, directors, committee members, affiliates, employees, advisors, attorneys, representatives, accountants, financial advisors, consultants, investment bankers, or agents and any of such parties' successors and assigns, will not have or incur, and are hereby released from, any claim, obligation, Cause of Action, or liability to any party, or any of its agents, employees, representatives, current or former members, financial advisors, attorneys or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Modified Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Modified Plan, the Disclosure Statement, the Modified Plan Exhibits, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended, or entered into in connection with either the Modified Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases, except for their willful misconduct and gross negligence and except with respect to obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, and**

**in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Modified Plan.  Other than as provided for in Article 11.11 of the Modified Plan and in Article 11.13 of the Modified Plan, no party or its agents, employees, representatives, current or former members, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, will have any right of action against the parties listed in Article 11.11 of the Modified Plan for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the formulation,    preparation,    negotiation,    dissemination,    filing,    implementation, administration, confirmation or consummation of the Modified Plan, the Disclosure Statement, the Union Settlement Agreements, any employee benefit plan, instrument, release or other agreement or document created, modified, amended or entered into in connection with either the Modified Plan or any agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases. For the avoidance of doubt, the exculpatory provisions of Article 11.11 of the Modified Plan, which apply to postpetition conduct, are not intended, nor will they be construed, to bar any governmental unit from pursuing any police or regulatory action.  Moreover, nothing in the Modified Plan will be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby, or (iv) any of the Debtors from their obligations under the Modified Plan or the transactions contemplated thereby.**

### *12.    Indemnification Obligations*

The Modified Plan contains provisions concerning the Indemnification Rights of Indemnitees.  The term "Indemnitee" means all current and former directors, officers, employees, agents, or representatives of the Debtors who are entitled to assert Indemnification Rights.  The term "Indemnification Rights" means obligations of the Debtors, if any, to indemnify, reimburse, advance, or contribute to the losses, liabilities, or expenses of an Indemnitee pursuant to the Debtor's certificate of incorporation, bylaws, policy of providing employee indemnification, applicable law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtors.  The term "Continuing Indemnification Rights" means those Indemnification Rights held by any Indemnitee who is a Released Party, together with any Indemnification Rights held by any Indemnitee on account of events occurring on or after the Petition Date.

Subject to Article 11.13 of the Modified Plan, in satisfaction and compromise of the Indemnitees' Indemnification Rights: (a) all Indemnification Rights will be released and discharged on and as of the Effective Date except for Continuing Indemnification Rights (which will remain in full force and effect to the fullest extent allowed by law or contract on and after the Effective Date and will not be modified, reduced, discharged, or otherwise affected in any way by the Chapter 11 Cases); (b) the Debtors or the Reorganized Debtors, as the case may be, will maintain directors' and officers' insurance providing coverage for those Indemnitees

currently covered by such policies for the remaining term of such policy and will maintain tail coverage under policies in existence as of the Effective Date for a period of six years after the Effective Date, to the fullest extent permitted by such provisions, in each case insuring such parties in respect of any claims, demands, suits, Causes of Action, or proceedings against such Persons based upon any act or omission related to such Person's service with, for, or on behalf of the Debtors in at least the scope and amount as currently maintained by the Debtors (the "Insurance Coverage") and hereby further indemnify such Indemnitees without Continuing Indemnification Rights solely to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy in an aggregate amount not to exceed $10 million; (c) the insurers who issue the Insurance Coverage will be authorized to pay any professional fees and expenses incurred in connection with any action relating to any Indemnification Rights and Continuing Indemnification Rights; and (d) the Debtors or the Reorganized Debtors, as the case may be, will indemnify Indemnitees with Continuing Indemnification Rights and agree to pay for any deductible or retention amount that may be payable in connection with any claim covered under either the foregoing Insurance Coverage or any prior similar policy.  Notwithstanding subclause (a) above, pursuant to the Stipulation and Agreement of Insurance Settlement (the "Insurance Stipulation," a copy of which is attached as Exhibit 7.19(c) to the Modified Plan) the Delphi Officers' and Directors' (as defined in the Insurance Stipulation) indemnification claims related to the MDL Actions and related government investigations and proceedings have been estimated at $0 for all purposes in these Chapter 11 Cases, and the Delphi Officers and Directors have released all such indemnification claims against Delphi, subject to the Delphi Officers' and Directors' right to assert an indemnification claim against Delphi for legal fees and expenses incurred in the defense of unsuccessful claims asserted as a defense or setoff by Delphi against the Delphi Officers and Directors related to the MDL Actions or related government investigations and proceedings, all as more particularly set forth in the Insurance Stipulation.

## 13.    *Exclusions And Limitations On Exculpation, Indemnification, And Releases*

Notwithstanding anything in the Modified Plan to the contrary, no provision of the Modified Plan or the Confirmation Order, including, without limitation, any exculpation, indemnification, or release provision, will modify, release, or otherwise limit the liability of any Person not specifically released under the Modified Plan, including, without limitation, any Person who is a co-obligor or joint tortfeasor of a Released Party or who is otherwise liable under theories of vicarious or other derivative liability.

## 14.    *Injunction*

**Subject to Article 11.13 of the Modified Plan, the satisfaction, release, and discharge pursuant to Article XI of the Modified Plan will act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Modified Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.**

## X.    GENERAL CONSIDERATIONS AND RISK FACTORS TO BE CONSIDERED

This section provides information regarding:

- Considerations that holders of Claims and Interests should carefully consider before deciding whether to vote to accept or reject the Modified Plan

The key modifications to this section include additional risk factors relating to the following:

- The current state of the capital markets

- Complaints seeking revocation of the Confirmation Order

- The Refinanced DIP Credit Facility expiration date of December 31, 2008 and necessary refinancing in connection therewith

Every holder of a Claim against or Interest in a Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Modified Plan.

### A.    General Considerations

The formulation of a reorganization plan is the principal purpose of a chapter 11 case. The Modified Plan sets forth the means for satisfying the holders of Claims against and Interests in the Debtors.  Certain Claims and Interests may receive partial distributions pursuant to the Modified Plan, and in some instances, no distributions at all.  The recapitalization of the Debtors realizes the going concern value of the Debtors for the holders of Claims and Interests. Moreover, reorganization of the Debtors' business and operations under the proposed Modified Plan also avoids the potentially adverse impact of a liquidation on the Debtors' employees and many of its customers and suppliers.

### B.    Certain Bankruptcy Considerations

If the Modified Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to a liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Interests as the terms of the Modified Plan.  If a liquidation or protracted and litigated reorganization were to occur, there is a substantial risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.  See Appendix E attached to this Disclosure Statement for liquidation analyses of the Debtors, showing hypothetical chapter 7 liquidation scenarios.

C.     **Business Factors And Competitive Conditions**

     *1.     The Cyclical Nature Of Automotive Sales And Production Can Adversely Affect Delphi's Business*

Delphi's business is directly related to automotive sales and automotive vehicle production by its customers. Automotive sales and production are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences as well as changes in interest rate levels, consumer confidence, and fuel costs. In addition, automotive sales and production can be affected by labor relations issues, regulatory requirements, trade agreements, and other factors. Any significant economic decline that results in a reduction in automotive sales and production by Delphi's customers will have a material adverse effect on the Company's business, results of operations, and financial condition.

Delphi's sales are also affected by inventory levels and OEM's production levels. Delphi cannot predict when OEMs will decide either to build or reduce inventory levels or whether new inventory levels will approximate historical inventory levels. This may result in variability in the Company's sales and financial condition. Uncertainty regarding inventory levels may be exacerbated by favorable consumer financing programs initiated by OEMs which may accelerate sales that otherwise would occur in future periods. Delphi also has historically experienced sales declines during the OEMs scheduled shut-downs or shut-downs resulting from unforeseen events. Continued uncertainty and other unexpected fluctuations could have a material adverse effect on the Company's business and financial condition.

     *2.     The Subprime Mortgage Crisis, Decline In Residential Real Estate Values, Any Changes In Consumer Credit Availability, Or Cost Of Borrowing Could Adversely Affect Delphi's Business*

Difficulties in the subprime mortgage market, declining home values, consumer credit availability, and consumer borrowing costs, individually or collectively, could negatively impact automotive sales and production.  Any significant decline in automotive sales and production by Delphi's customers will have a material adverse affect on the Company's business, results of operations, and financial condition.

     *3.     Drop In The Market Share And Changes In Product Mix Offered By Delphi's Customers Can Impact Delphi's Revenues*

The mix of vehicle offerings by Delphi's OEM customers also impacts the Company's sales. A decrease in consumer demand for specific types of vehicles for which Delphi has traditionally provided significant content could have a significant effect on the Company's business and financial condition. Delphi's sales of products in adjacent markets to its customers also depend on the success of these customers retaining their market share. In addition, Delphi may not be able to adapt its product offerings to meet changing consumer preferences and its customers' supply requirements on a timely, cost effective basis. The ability to respond to competitive pressures and react quickly to other major changes in the marketplace including in

the case of automotive sales, increased gasoline prices or consumer desire for and availability of vehicles using alternative fuels is also a risk to Delphi's future financial performance.

### 4. Delphi Depends On General Motors Corporation As A Customer, And Delphi May Not Be Successful At Attracting New Customers

GM is Delphi's largest customer and accounted for 37% of Delphi's total net sales from continuing operations in 2007, and a portion of Delphi's non-GM sales are to Tier 1 suppliers who ultimately sell Delphi's products to GM. In addition, GM accounts for an even greater percentage of Delphi's net sales in North America where Delphi has limited ability to adjust its cost structure to changing economic and industry conditions and where Delphi is faced with high wage and benefit costs. Additionally, Delphi's revenues may be affected by decreases in GM's business or market share. GM has reported a variety of challenges it is facing, including with respect to its debt ratings, its relationships with its unions and large shareholders and its cost and pricing structures. If GM is unable or unwilling to engage in a business relationship with Delphi on a basis that involves improved terms for Delphi, as set forth in the Amended MRA, the Company's sales, cost structure and profitability will be adversely affected. For these reasons, Delphi cannot provide any assurance as to the amount of Delphi's future business with GM. To the extent that Delphi does not maintain its existing level of business with GM, it will need to attract new customers or Delphi's results of operations and financial condition will be adversely affected. There can be no assurance that Delphi will be successful in expanding its existing customer base.

### 5. Delphi Operates In The Highly Competitive Automotive Supply Industry

The automotive component supply industry is highly competitive, both domestically and internationally. Competition is based primarily on price, technology, quality, delivery, and overall customer service. Many of Delphi's competitors operate with lower overall and/or more flexible cost structures than Delphi does. In particular, Delphi faces restrictions in its ability to adjust its cost structure to reduce OEM production volumes or demand for Delphi's products. This in turn may limit Delphi's ability to redeploy resources toward research and development of new technology or to quickly respond to changing market demand or consumer preferences. There can be no assurance that Delphi's products will be able to compete successfully with the products of its competitors. Furthermore, the rapidly evolving nature of the markets in which Delphi competes may attract new entrants, particularly in low cost countries. As a result, Delphi's sales levels and margins could be adversely affected by pricing pressures caused by such new entrants. These factors led to selective resourcing of future business to non-U.S. competitors in the past and may continue to do so in the future. In addition, any of Delphi's competitors may foresee the course of market development more accurately than Delphi, develop products that are superior to Delphi's products, have the ability to produce similar products at a lower cost than Delphi, or adapt more quickly than Delphi to new technologies or evolving customer requirements. As a result, Delphi's products may not be able to compete successfully with the products of Delphi's competitors.

**6.** ***Delphi May Not Be Able To Respond Quickly Enough To Changes In Technology And Technological Risks, And To Develop Its Intellectual Property Into Commercially Viable Products***

Changes in legislative, regulatory, or in competitive technologies, may render certain of Delphi's products obsolete or less attractive. Delphi's ability to anticipate changes in technology and regulatory standards and to successfully develop and introduce new and enhanced products on a timely basis will be a significant factor in the Company's ability to remain competitive. The Company cannot provide assurance that it will be able to achieve the technological advances that may be necessary for Delphi to remain competitive or that certain of Delphi's products will not become obsolete. The Company is also subject to the risks generally associated with new product introductions and applications, including lack of market acceptance, delays in product development, and failure of products to operate properly.

To compete effectively in the automotive supply industry, Delphi must be able to launch new products to meet its customers' demands in a timely manner. Delphi cannot provide assurance, however, that it will be able to install and certify the equipment needed to produce products for new product programs in time for the start of production, or that the transitioning of Delphi's manufacturing facilities and resources to full production under new product programs will not impact production rates or other operational efficiency measures at its facilities. In addition, Delphi cannot provide assurance that its customers will execute on schedule the launch of their new product programs, for which Delphi might supply products. Delphi's failure to successfully launch new products, or a failure by Delphi's customers to successfully launch new programs, could adversely affect the Company's results.

**7.** ***Continued Pricing Pressures, OEM Cost Reduction Initiatives, And Ability Of OEMs To Resource Or Cancel Vehicle Programs May Result In Lower Than Anticipated Margins, Or Losses, Which May Have A Significant Negative Impact On Delphi's Business***

Cost-cutting initiatives adopted by Delphi's customers generally result in increased downward pressure on pricing. Delphi's customer supply agreements generally require step downs in component pricing over the period of production. OEMs historically have had significant leverage over their outside suppliers because the automotive component supply industry is fragmented and serves a limited number of automotive OEMs.  As such, Tier 1 suppliers are subject to substantial continuing pressure from OEMs to reduce the price of their products. Delphi believes these pricing pressures may further intensify as OEMs pursue restructuring and cost cutting initiatives. If the Company is unable to generate sufficient production cost savings in the future to offset price reductions, the Company's gross margin and profitability would be adversely affected.

Furthermore, in most instances, Delphi's OEM customers are not required to purchase any minimum amount of products from Delphi. The contracts Delphi has entered into with most of its customers provide for supplying the customers for a particular vehicle model, rather than for manufacturing a specific quantity of products. Such contracts range from one year to the life of the model (usually three to seven years), typically are non-exclusive or permit the OEM to re-

source if Delphi does not remain competitive and achieve and pass through cost savings in the form of lower prices over the life of the contract, and do not require the purchase by the customer of any minimum number of parts from Delphi. Pricing and capital investment decisions are made by Delphi at the time the contract is entered into based on projected volumes. Therefore, a significant decrease in demand for certain key models or group of related models sold by any of Delphi's major customers or the ability of a manufacturer to resource and discontinue purchasing from Delphi, for a particular model or group of models, could have a material adverse effect on the Company.

**8.** ***Certain Disruptions In Supply Of And Changes In The Competitive Environment For Raw Materials Integral To Delphi's Products May Adversely Affect Delphi's Profitability***

Delphi uses a broad range of materials and supplies, including metals, castings, chemicals, and electronic components in its products. A significant disruption in the supply of these materials could decrease production and shipping levels, materially increase Delphi's operating costs, and materially adversely affect Delphi's profit margins. Shortages of materials or interruptions in transportation systems, labor strikes, work stoppages, or other interruptions to or difficulties in the employment of labor or transportation in the markets where Delphi purchases material, components, and supplies for the production of its products or where its products are produced, distributed, or sold, whether as a result of labor strife, war, further acts of terrorism, or otherwise, in each case may adversely affect Delphi's profitability. Significant changes in the competitive environment in the markets where Delphi purchases material, components, and supplies for the production of Delphi's products or where Delphi's products are produced, distributed, or sold also may adversely affect Delphi's profitability. In addition, Delphi's profitability may be adversely affected by changes in economic conditions or political stability in the markets where Delphi procures material, components, and supplies for the production of Delphi's principal products or where Delphi's products are produced, distributed, or sold (e.g., North America, Europe, South America, and Asia Pacific).

In recent periods there have been significant increases in the global prices of copper, aluminum, petroleum-based resin products, steel and steel scrap, and fuel charges, which have had and may continue to have an unfavorable impact on the Company's business, results of operations, or financial condition. Delphi anticipates that these increases along with any fluctuation in the availability of these commodities will continue to have an adverse effect on Delphi's business, results of operations, or financial condition throughout fiscal 2008. As the resin raw material market related cost pressure continues, the Company expects to see increasing costs in its resin as well as its plastic component supplier value streams. The Company will continue efforts to pass some of the supply and raw material cost increases onto its customers, although competitive and market pressures have limited its ability to do that, particularly with domestic vehicle manufacturers, and may prevent the Company from doing so in the future. In addition, in some cases there is a lapse of time before the Company is able to pass price increases through to the customer. Price reductions are often required pursuant to contracts or to remain competitive with Delphi's peers and are sometimes necessary to win additional business. In addition, Delphi's customers are generally not obligated to accept price increases that the Company may desire to pass along to them. This inability to pass on price increases to the Company's customers when raw material prices increase rapidly or to significantly higher than

historic levels could adversely affect the Company's operating margins and cash flow, possibly resulting in lower operating income and profitability.

Delphi also faces an inherent business risk of exposure to commodity price risks, and has historically offset a portion of its exposure, particularly to changes in the price of various non-ferrous metals used in its manufacturing operations, through commodity swaps and option contracts. The Company expects to be continually challenged as demand for its principal raw materials will be significantly impacted by demand in emerging markets, particularly in China and India. Certain commodity prices, particularly aluminum, copper, resins and steel, have markedly increased. Price reductions are often required pursuant to contracts or to remain competitive with Delphi's peers and are sometimes necessary to win additional business.The Company cannot provide assurance that fluctuations in commodity prices will not otherwise have a material adverse effect on its financial condition or results of operations, or cause significant fluctuations in quarterly and annual results of operations.

9. ***Delphi May Not Succeed In Its Attempts To Improve Its Cost Structure and Absent Significant Improvement, if the Modified Plan is not Consummated Delphi May Be Unable To Generate Sufficient Excess Cash Flow To Meet Increased U.S. Pension And OPEB Funding Obligations Upon Emergence.***

The Company may have difficulty in generating cost savings and operational improvements in the future and in adapting its cost structure, adequately to adjust for significant changes in vehicle production rates, and to offset price reductions and increases in raw material or labor costs. Modifications made to Delphi's collective bargaining agreements together with the comprehensive settlement agreements negotiated with GM improve Delphi's cost structure and its ability to adjust for changes in economic conditions at its legacy sites, however the Company must continue its transformation plan to realign its footprint and emerge from chapter 11 for these arrangements to be fully effective. Delphi's labor costs may include increased funding requirements for pensions or healthcare costs (some of which have been deferred during the Chapter 11 Cases). In addition, Delphi's cost structure may be adversely affected by changes in the laws, regulations, policies or other activities of governments, agencies and similar organizations where such actions may affect the production, licensing, distribution or sale of the Company's products, the cost thereof or applicable tax rates, or affect the cost of legal and regulatory compliance or the cost of financing.

Delphi has satisfied the majority of its U.S. pension funding obligations, including those which had been previously deferred during the Chapter 11 Cases, through completion of the first step of the 414(l) Transfer pursuant to the provisions of the comprehensive settlement agreements, the MRA and GSA. The second step of the 414(l) Transfer will allow Delphi to satisfy the remaining pension funding obligations to its hourly employees, however that second transfer is conditioned on Delphi's emergence from Chapter 11 under the Modified Plan. In addition, Delphi will still maintain responsibility for and need to meet U.S. pension funding obligations for those plans covering its salaried employees and maintained by certain of its subsidiaries. The Company may also require additional cash to meet increases in its remaining U.S. Pension funding obligations resulting from market volatility that adversely affects its asset return expectations, a declining interest rate environment, or other reasons. Assuming completion

of the second step of the 414(l) Transfer, the Company expects that its pension contributions due upon emergence from chapter 11 will approximate $131 million under current legislation, provided the emergence date is on or before June 15, 2009.

10.     *Delphi May Suffer Future Asset Impairment And Other Restructuring Charges, Including Write Downs Of Goodwill Or Intangible Assets*

From time to time in the past, Delphi has recorded asset impairment losses and closure, severance, and restructuring losses relating to specific plants and operations. Generally, Delphi records asset impairment losses when it determines that its estimates of the future undiscounted cash flows from an operation will not be sufficient to recover the carrying value of that facility's building, fixed assets, and production tooling. During 2007, 2006, and 2005, Delphi recorded substantial long-lived asset impairment losses. In light of the shifting nature of the competitive environment in which Delphi operates, it is possible that Delphi will incur similar losses and charges in the future, and those losses and charges may be significant.

11.     *The Company Anticipates The Need For Significant Borrowings Even After Emergence from Chapter 11 as it Completes its Transformation Plan.  The Significant Contraction of Credit Availability as a Result of the Current Difficult and Turbulent Capital Markets May Adversely Impact the Company's Ability to Obtain Exit Financing as Contemplated by the Modified Plan.  In addition, Delphi's Amended and Restated DIP Credit Facility Expires, Absent an Extension, on December 31, 2008.  The Company Is Negotiating an Extension to the Facility, However Further Disruption In The Capital Markets May Adversely Affect Delphi's Ability To Obtain A Timely Extension or  Secure Alternative Financing.  Should the Facility Become Unavailable To The Debtors, Then Absent Procurement Of Alternative Financing, The Company's Liquidity Would Be Severely Restricted Resulting In A Material Adverse Impact On The Company's Business, Financial Condition And Operating Results Which May, Among Other Things, Delay Completion Of The Company's Transformation Plan.*

Until such time as Delphi is able to successfully reorganize its capital structure and operations, fully implement its transformation plan and emerge from chapter 11, the Debtors expect that their operations will continue to use cash.  In addition, tight credit markets continue to delay the Debtors' emergence from chapter 11, making the Debtors particularly vulnerable to changes in the overall economic climate.    As a result Delphi expects that it will continue to require significant borrowings under its Amended and Restated DIP Credit Facility supplemented by advances from time to time under the GM Advance Agreement to maintain sufficient liquidity to fund its operations and that its operations will continue to use cash post-emergence as it fully implements its transformation plan.  Furthermore, in light of the current economic climate in the global automotive industry, the Company anticipates continued operating challenges due to lower North American production volumes, related pricing pressures stemming from increasingly competitive markets, and continued commodity price increases, which may place further pressures on Delphi's liquidity even after it has successfully reorganized.  Therefore, Delphi is seeking $  billion in exit financing to fund its operations post-emergence,

but there can be no assurances in the current capital market environment that Delphi will be able to raise the full amount it is seeking at the rates assumed in its business plan.

The covenants in the Amended and Restated DIP Credit Facility generally require Delphi to, among other things, maintain a rolling 12-month cumulative global earnings before interest, taxes, depreciation, amortization, reorganization and restructuring costs ("Global EBITDAR"), as defined, for Delphi and its direct and indirect subsidiaries, on a consolidated basis, at specified levels.  The Amended and Restated DIP Credit Facility contains certain defaults and events of default customary for debtor-in-possession financings of this type.  Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.  Failure to comply with this covenant could result in an event of default under the Amended and Restated DIP Credit Facility, which would permit the lender to cause the amounts outstanding to become immediately due and payable.  In addition, failure to comply could result in termination of the commitments under the Revolving Facility, which would result in Delphi being prohibited from borrowing additional amounts under such facility without the negotiation of an amendment or waiver.  As of August 31, 2008, the Company was in compliance with this and the other covenants in the facility.  However, the Company's margin of compliance with the Global EBITDAR covenant decreased significantly in the months of May and June 2008, primarily as a result of the work stoppages at American Axle, a Tier 1 supplier to GM based in Detroit, Michigan, and other reductions in customer production volumes, continuing unfavorable pricing pressures and increasing commodity prices.  Although the Company has been able to maintain compliance despite the continuation of some of these pressures, it has done so only with support from GM, including GM's agreement to forego cash payments of up to $112 million in warranty costs, which amount Delphi had agreed to pay GM upon emergence from chapter 11 pursuant to the previously reported Warranty, Settlement and Release Agreement and expects that continued compliance will in part be reliant on further support payments to be made pursuant to the terms of the MRA, which became effective in September 2008.  There can be no assurance that the Company will remain in compliance for the balance of 2008, particularly if further deterioration in its earnings or increases in its operating costs occurs.

The Company's Amended and Restated DIP Credit Facility has a current maturity date of December 31, 2008.  The Company cannot assure that it will emerge from chapter 11 prior to such date or be successful in obtaining an extension of such facility beyond its current maturity date. Failure to continue to operate pursuant to the terms of the Amended and Restated DIP Credit Facility or procure alternative financing would have a material adverse impact on the Company's business, financial condition and operating results by severely restricting its liquidity and force it, among other things, to delay completion of its transformation plan.

### *12.   Employee Strikes And Labor Related Disruptions May Adversely Affect Delphi's Operations*

Delphi's business is labor intensive and utilizes a large number of unionized employees with contracts that run through September and October 2011 for Delphi's two largest U.S. Unions. Approximately ninety-seven percent of Delphi's U.S. hourly workforce is represented by its two largest principal Unions, the UAW and the IUE-CWA. A strike or other form of

significant work disruption by the Unions would likely have an adverse effect on Delphi's ability to operate its business. Although Delphi has reached agreements with each of its U.S. labor Unions to settle its previously-filed motions under sections 1113 and 1114 of the Bankruptcy Code and to extend, with certain modifications, its collective bargaining agreements, any failure to consummate the Modified Plan and the transactions contemplated thereby may leave the Company with no choice but to reinitiate a process to reject its collective bargaining agreements. Rejection of Delphi's labor contracts could lead such Unions to call a strike or other form of significant work disruption.  In addition, even if the Debtors' employees do not strike, labor-related disruptions at the Debtors' customers or other suppliers may adversely affect the Debtors' operations.

### 13.    *Delphi May Lose Or Fail To Attract And Retain Key Salaried Employees And Management Personnel*

An important aspect of Delphi's competitiveness is the Company's ability to attract and retain key salaried employees and management personnel. The Company's ability to do so is influenced by a variety of factors, including the compensation Delphi awards, and could be adversely affected by Delphi's financial performance.

### 14.    *Delphi May Incur Material Losses And Costs As A Result Of Warranty Claims And Product Liability And Intellectual Property Infringement Actions That May Be Brought Against It*

The Company faces an inherent business risk of exposure to warranty and product liability claims in the event that its products fail to perform as expected and, in the case of product liability, such failure of its products results, or is alleged to result, in bodily injury and/or property damage. If any of the Company's products are or are alleged to be defective, the Company may be required to participate in a recall involving such products. Each OEM has its own practices regarding product recalls and other product liability actions relating to its suppliers. However, as suppliers become more integrally involved in the vehicle design process and assume more of the vehicle assembly functions, OEMs are increasingly looking to their suppliers for contribution when faced with recalls and product liability claims. A recall claim brought against Delphi, or a product liability claim brought against Delphi in excess of the Company's available insurance, may have a material adverse effect on the Company's business. OEMs are also increasingly requiring their suppliers to guarantee or warrant their products and bear the costs of repair and replacement of such products under new vehicle warranties. Depending on the terms under which Delphi supplies products to an OEM, an OEM may attempt to hold Delphi responsible for some or all of the repair or replacement costs of defective products under new vehicle warranties, when the OEM asserts that the product supplied did not perform as warranted. Although the Company cannot assure that the future costs of warranty claims by its customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements. The Company's warranty reserves are based on its best estimates of amounts necessary to settle future and existing claims. The Company regularly evaluates the level of these reserves and adjusts them when appropriate. However, the final amounts determined to be due related to these matters could differ materially from the Company's recorded estimates.

Further, as the Company actively pursues additional technological innovation in both automotive and non-automotive industries and enhances the value of the Company's intellectual property portfolio, the Company incurs ongoing costs to secure, enforce, and defend its intellectual property, and the Company faces an inherent risk of exposure to the claims of other suppliers and parties that the Company has allegedly violated their intellectual property rights. The Company cannot assure that it will not experience any material warranty, product liability, or intellectual property claim losses in the future or that it will not incur significant costs to defend such claims.

### 15.    *Delphi May Identify The Need For Additional Environmental Remediation Relating To Transformation Activities*

Delphi is undertaking substantial transformation activities including the sale, closure, and/or demolition of numerous facilities around the world. In the course of this process, environmental investigations and assessments will continue to be performed and we may identify previously unknown environmental conditions or further delineate known conditions that may require remediation or additional costs related to demolition or decommissioning. These findings could trigger additional and possibly material environmental remediation costs above existing reserves and for demolition and decommissioning costs.

### 16.    *Failure To Achieve And Maintain Effective Internal Controls In Accordance With Section 404 Of The Sarbanes-Oxley Act Of 2002 Could Have A Material Effect On Delphi's Business*

As a publicly traded company, Delphi is subject to rules adopted by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act of 2002. Section 404 requires Delphi to include an internal control report from management in Delphi's Annual Report on Form 10-K. The internal control report must include the following: (1) a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting, (2) a statement identifying the framework used by management to conduct the required evaluation of the effectiveness of Delphi's internal control over financial reporting, (3) management's assessment of the effectiveness of Delphi's internal control over financial reporting as of December 31 of each fiscal year, including a statement as to whether or not internal control over financial reporting is effective, and (4) a statement that Delphi's independent registered public accounting firm has issued an attestation report on management's assessment of internal control over financial reporting. A material weakness is defined as a significant deficiency or combination of significant deficiencies that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. Delphi's assessment as of December 31, 2007 identified material weaknesses in Delphi's internal controls over financial reporting, which also adversely impacted Delphi's disclosure controls and procedures. Each of Delphi's material weaknesses results in more than a remote likelihood that a material misstatement will not be prevented or detected. As a result, Delphi must perform extensive additional work to obtain reasonable assurance regarding the reliability of Delphi's financial statements. Given the nature of the material weaknesses identified, even with this additional work there is a risk of errors not being prevented or detected, which could result in further restatements.

Because of the material weaknesses referenced in the preceding paragraph, Delphi's management has concluded that, as of December 31, 2007, Delphi's internal controls over financial reporting were not effective based on those criteria. This failure and any failure in the future to achieve and maintain effective internal controls over financial reporting and otherwise comply with the requirements of Section 404 could have a material adverse effect on Delphi's business. Such noncompliance could result in perceptions of Delphi's business among customers, suppliers, rating agencies, lenders, investors, securities analysts, and others being adversely affected. Delphi may not be able to complete Delphi's remediation plans designed to address the identified material weaknesses in Delphi's internal controls over financial reporting and continue to attract additional qualified accountants and auditing and compliance professionals to assist in completing such plans and maintaining compliance programs. There will also continue to be a serious risk that Delphi will be unable to file future periodic reports with the SEC in a timely manner, that a default could result under the covenants governing its Refinanced DIP Credit Facility, and that Delphi's future financial statements could contain errors that will be undetected.

### *17.    Delphi Faces Risks Associated With Growing And Conducting Business In Non-U.S. Jurisdictions*

The Company's future growth is dependent on the Company making the right investments at the right time to support product development and manufacturing capacity in areas where Delphi can support its customer base. Delphi has identified the Asia Pacific region, China, and India in particular, as key markets and ones likely to experience substantial growth, and accordingly has made substantial investments, both directly and through participation in various partnerships and joint ventures, including numerous manufacturing operations, technical centers and other infrastructure to support anticipated growth in the region. If Delphi is unable to deepen existing and develop additional customer relationships in this region, Delphi may not only fail to realize expected rates of return on its existing investments, but it may incur losses on such investments and be unable to timely redeploy the invested capital to take advantage of other markets, potentially resulting in lost market share to Delphi's competitors.

Delphi has manufacturing and distribution facilities in many foreign countries, including countries in Asia, Eastern and Western Europe, and South America. Global operations are subject to certain risks inherent in doing business abroad, including:

- Exposure to local economic conditions;

- Expropriation and nationalization;

- Withholding and other taxes on remittances and other payments by subsidiaries;

- Investment restrictions or requirements; and

- Export and import restrictions.

Increasing the Company's manufacturing footprint in Asian markets and Delphi's business relationships with Asian automotive manufacturers are important elements of the Company's strategy. In addition, the Company's strategy includes expanding Delphi's European

market share and expanding the Company's manufacturing footprint in lower-cost regions. As a result, Delphi's exposure to the risks described above may be greater in the future. The likelihood of such occurrences and their potential impact on the Company vary from country to country and are unpredictable.

**18.    *Delphi's Substantial Global Operations Means The Company Is Exposed To Foreign Currency Fluctuations Which May Affect The Company's Financial Results***

Delphi has currency exposures related to buying, selling, and financing in currencies other than the local currencies in which the Company operates. Historically, the Company has reduced its exposure through financial instruments that provide offsets or limits to its exposures, which are opposite to the underlying transactions. Delphi cannot provide assurance that fluctuations in currency exposures will not otherwise have a material adverse effect on the Company's financial condition or results of operations, or cause significant fluctuations in quarterly and annual results of operations.

**19.    *Risks Related To Potential Restructuring Transactions:***

Subsequent to the entry of the Final Modification Approval Order, the Debtors may consummate Restructuring Transactions of Debtor entities that would result in the commingling of the assets of those Debtors. Many of the Debtors that may be subject to Restructuring Transactions have few or no third party creditors and the Debtors generally trace assets as they flow from one entity to another.  However, if the Modified Plan were not consummated following the Restructuring Transactions, the commingling of assets potentially could prejudice creditors of such entities for example, by possibly reducing such creditors' recoveries in some future plan of reorganization that did not contemplate substantive consolidation of the Debtors in the manner as set forth in the Modified Plan.

**D.    Inherent Uncertainty Of Financial Projections**

The Projections set forth in <u>Appendix C</u> annexed hereto cover the operations of the Reorganized Debtors on a consolidated basis through fiscal year 2011.  These Projections are based on numerous assumptions including the timing, confirmation, and consummation of the Modified Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Debtors' operations.

Critical assumptions underlie the Debtors' Reaffirmed Business Plan.  Events that may have a significant impact on the Reorganized Debtors' ability to achieve projections, and that correspondingly have a material impact on value, include:

- Capital Markets risk – availability and cost of funds (debt/equity);

- Pension Asset Returns below assumed rates of return resulting in additional future cash contributions to the Company's pension plans;

- Industry OEM volumes significantly below GI/DRI projections and GMNA volumes below projections in the Business Plan;

- Significant reductions in revenue if not able to "book" the "unbooked" revenue assumed in the plan;

- Customer/Supplier disruptions (e.g., labor strife, financial difficulties);

- Unknown significant product (warranty), environmental, or legal liability risk;

- Material commodity costs above projections, including the increasing prices of oil based products and copper (as discussed above);

- Inability to achieve material cost reduction initiatives, including supplier price reductions and engineering initiatives;

- Significant failure to execute restructuring initiatives on a timely basis or at estimated costs – e.g., Europe restructuring programs;

- Significant customer pricing reductions through marketplace pressures beyond those anticipated in the plan;

- Change in tax environment from that anticipated in the plan (legislative or execution of tax strategies to minimize cash taxes);

- Health care inflation significantly beyond estimated employee benefit costs and salaried retirement health care;

- Cash flow constraints from working capital if unsuccessful in supplier initiative to return to pre-bankruptcy payment terms; and

- Working capital liquidity pressures if customers are not timely in payments for accounts receivable.

If industry forecasts regarding the overall market or Delphi's expectations regarding GM's ability to retain market share and benefit from overall market growth is incorrect and Delphi is not able to reduce costs despite a more flexible cost structure resulting from Delphi's transformation, then there could be a material adverse impact to the Business Plan. Moreover, if volume assumptions are correct but the actual mix of anticipated products differs from Business Plan assumptions, there could be a material impact on the projections.

The foregoing variations and assumptions may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to post-Effective Date indebtedness and to achieve the Projections. Because the actual results achieved throughout the

periods covered by the Projections can be expected to vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance that the actual results will occur.

Except with respect to the Projections and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. Neither the Debtors nor the Reorganized Debtors intend to update the Projections for the purposes hereof; thus, the Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Projections.

### E.    Sources And Uses Of Cash For Plan Distributions

The Debtors' ability to fund Cash distributions under the Modified Plan, and therefore consummate the Modified Plan in its present form, is dependent, in part, upon the Debtors' ability to raise the emergence capital funding. Although the Debtors previously obtained the necessary financing in the first quarter of 2008, if the current credit conditions continue, the Debtors' ability to obtain a commitment for the emergence capital funding on acceptable terms may be limited. Accordingly, there can be no assurances that the Debtors will obtain emergence capital funding as contemplated by the Modified Plan. If the Debtors are unable to obtain such emergence capital funding, the Debtors may be unable to consummate the Modified Plan without substantial modifications.

### F.    Access To Financing And Trade Terms

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by suppliers and may be adversely affected by any shortage or increased cost of such financing and supplier support. The Debtors' postpetition operations have been financed from operating cash flow and borrowings pursuant to the DIP Facility. The Debtors believe that substantially all of their needs for funds necessary to consummate the Modified Plan and for post-Effective Date working capital financing will be met by projected operating cash flow, financings contemplated by the Emergence Capital Arrangements, and trade terms supplied by suppliers. If the Debtors or Reorganized Debtors have greater working capital needs, they may be required to either (a) obtain other sources of financing or (b) curtail their operations.

In addition, GM is one of the largest creditors and a significant stakeholder in these Chapter 11 Cases, and Delphi's ability to consummate the transactions contemplated by the Union Settlement Agreements, and the Modified Plan depends not only on GM's ability to meet its obligations under the Delphi-GM Definitive Documents, but also on GM's ability to fulfill certain financial obligations to Delphi's Union-represented employees and retirees comprehended in the Union Settlement Agreements. GM has reported a variety of challenges it is facing, including with respect to its debt ratings, its relationships with its unions and large shareholders, and its cost and pricing structures. If GM is unable or unwilling to fulfill these commitments, Delphi believes that the Company's cost structure and ability to operate will be adversely affected.

**G.      Value Of, And Market For, New Common Stock**

The assumed value of the New Common Stock distributed under the Modified Plan may change based on the ultimate amount of Allowed Claims.  In addition, the market value of the New Common Stock may increase or decrease from the assumed value of the New Common Stock after the Effective Date based on numerous factors, including fluctuations in the market and conditions extraneous to Delphi as well as other risk factors disclosed herein.

Following Delphi's delisting from the NYSE, price quotations for its common stock have been available on the Pink Sheets.  Delisting from the NYSE resulted in a reduction in the liquidity of Delphi's existing common stock.  The Company intends to apply to have the New Common Stock listed on a major New York-based exchange after the Effective Date of the Modified Plan if and when the Company meets the listing requirements.  Although the New York Stock Exchange granted a listing to Delphi for its new common stock as contemplated under the Confirmed Plan, before it was modified, the Company will need to reapply for listing as contemplated under the Modified Plan, and the shares of the New Common Stock may not qualify for listing at the time they are issued on the Effective Date of the Modified Plan.  In addition, Delphi cannot guarantee that the New Common Stock will ever be listed or quoted on any securities exchange or quotation system.  If Delphi is not able to list or quote the New Common Stock on any securities exchange or quotation system, the Company intends to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New Common Stock on the OTC Bulletin Board.

Trading on the OTC Bulletin Board is dependent on a broker-dealer being willing to make a market in the New Common Stock, which Delphi cannot predict will be initiated or, if initiated, will continue.  No assurance can be given that the New Common Stock will be quoted on the OTC Bulletin Board or that an active trading market will exist.  The nature of OTC Bulletin Board trading may limit a holder's ability to resell its shares of the New Common Stock if an active trading market for the New Common Stock does not emerge.  Even if an active market does develop for the New Common Stock, Delphi can give no assurance as to how long it will continue, the liquidity of the market, or at what price the New Common Stock will trade. Lack of liquidity of the New Common Stock also may make it more difficult for Delphi to raise additional capital, if necessary, through equity financings.

**H.      Potential Dilution Caused By Future Issuances Of Common Stock**

The Management Compensation Plan may reserve for certain members of management, directors, and other employees of Reorganized Delphi shares of New Common Stock of Reorganized Delphi, including options or warrants to acquire such Stock upon terms outlined in the Management Compensation Plan.  In addition, should future issuances of rights, warrants, options or additional New Common Stock occur, or equity interests be distributed to management as discussed above, the ownership percentage represented by the New Common Stock of Reorganized Delphi distributed on the Effective Date under the Modified Plan will be diluted.

**I.      Potential Ownership Change**

Because GM or another party may hold a significant equity position in the Reorganized Debtors following the consummation of the Modified Plan, if such party were to dispose of all or a significant amount of this position after the Effective Date, it could cause the Reorganized Debtors to undergo an ownership change (within the meaning of Internal Revenue Code section 382).  This would generally limit (or possibly eliminate) the Reorganized Debtors' ability to use net operating losses and other tax attributes.

**J.      Tax Planning**

Due to time and resource constraints resulting from the commencement of the Chapter 11 Cases, the Debtors have used and may continue to use certain estimating techniques in connection with their tax planning efforts (for example, in determining the existence and magnitude of built-in gains or losses).  The use of such estimating techniques, while cost-effective, necessarily results in lower confidence levels with respect to certain of the tax analyses.

**K.      Dividends**

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.

## XI.      SECURITIES LAW MATTERS

### A.      Issuance Of New Securities

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.  Except as noted below, the Debtors believe that the offer and sale of New Preferred Stock to GM and the offer and sale of New Common Stock to the holders of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b) ERISA Claims satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

Delphi plans to file a registration statement with respect to each Rights Offering.  Each registration statement is expected to cover the subscription rights for the applicable Rights Offering and the underlying New Common Stock in Reorganized Delphi offered in the applicable Rights Offering.  This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy any such securities.  Any such offer or sale will be made solely by means of a prospectus relating to such securities which will be provided at such time as the applicable Rights Offering commences.

### B.    Subsequent Transfers Of New Common Stock

The New Common Stock to be issued pursuant to the Modified Plan may be freely transferred by most recipients following the initial issuance under the Modified Plan, and all resales and subsequent transfers of the New Common Stock are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i)    persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii)    persons who offer to sell securities offered under a plan for the holders of such securities;

(iii)    persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

(A)    with a view to distributing such securities; and

(B)    under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv)    a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that persons who receive New Common Stock pursuant to the Modified Plan are deemed to be "underwriters," resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Persons deemed to be underwriters may, however, be permitted to sell such New Common Stock without registration pursuant to the provisions of Rule 144 under the Securities Act.  These rules permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Common Stock or other security to be issued pursuant to the Modified Plan would depend upon various facts and circumstances applicable to that person.  Accordingly, the Debtors express no view as to whether any particular person receiving New Common Stock or other securities under the Modified Plan would be an "underwriter" with respect to such New Common Stock or other securities.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION

CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE MODIFIED PLAN.  The Debtors recommend that potential recipients of the New Common Stock consult their own counsel concerning whether they may freely trade New Common Stock.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE MODIFIED PLAN

A summary description of certain United States federal income tax consequences of the Modified Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Modified Plan as discussed herein. Only the principal United States federal income tax consequences of the Modified Plan to the Debtors and to holders of Claims and Interests who are entitled to vote to accept or reject the Modified Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Modified Plan. No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Modified Plan, and the discussion below is not binding upon the IRS or such other authorities.  In addition, a substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Modified Plan.  Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the United States federal income tax consequences of the Modified Plan.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Modified Plan to the Debtors or any holder of Claims or Interests. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the IRC, Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state, or local tax consequences of the Modified Plan, nor does it purport to address the United States federal income tax consequences of the Modified Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims or Interests through, partnerships or other pass-through entities, persons whose functional currency is not the United States dollar, persons or groups that may be entitled to receive or acquire 5% or more of the stock of the Reorganized Debtor, foreign persons, dealers in securities or foreign currency, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, and persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes, and does not address the United States federal income tax consequences of the Modified Plan to holders that own Claims or Interests in more than one Class.

Each holder is strongly urged to consult its own tax advisor regarding the United States federal, state, and local and any foreign tax consequences of the transactions described herein and in the Modified Plan.

**IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims or Interests are hereby notified that: (i) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Interests for the purpose of avoiding penalties that may be imposed on them under the IRC, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Claims or Interests should seek advice based on their particular circumstances from an independent tax advisor.**

### A. United States Federal Income Tax Consequences To The Debtors

#### 1. Cancellation Of Indebtedness Income

Upon implementation of the Modified Plan, the amount of the Debtors' aggregate outstanding indebtedness will be reduced.  In general, the discharge of a debt obligation for no consideration or in exchange for an amount of cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt that is discharged gives rise to cancellation of indebtedness ("COD") income to the debtor. However, COD income is not taxable to the debtor if the debt discharge occurs in a title 11 bankruptcy case. Rather, under the IRC, such COD income instead will reduce certain of the debtors' tax attributes, generally in the following order: (a) net operating losses and net operating loss carryforwards ("NOLs"); (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the debtors' depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. A debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries). The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtors' taxable year). Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

Because some of the Debtors' outstanding indebtedness will be satisfied in exchange for New Common Stock and Discount Rights, the amount of COD income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the New Common Stock and Discount Rights.  This value cannot be known with certainty until after the Effective Date.  Thus, although it is expected that the Debtors may be required to reduce their tax attributes, the exact amount of such reduction cannot be predicted.

## 2.    *Net Operating Losses-Section 382*

The Debtors anticipate that they will experience an "ownership change" (within the meaning of IRC section 382) on the Effective Date as a result of the issuance of New Common Stock to holders of Claims and Interests and the issuance of New Preferred Stock to GM pursuant to the Modified Plan. As a result, the Debtors' ability to use any pre-Effective Date NOLs and other tax attributes to offset their income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryforward is made generally (subject to various exceptions and adjustments, some of which are described below) will be limited to the sum of (a) a regular annual limitation (prorated for the portion of the taxable year of the ownership change following the Effective Date), and (b) any carryforward of unused amounts described in (a) from prior years. IRC section 382 may also limit the Debtors' ability to use "net unrealized built-in losses" (i.e., losses and deductions that have economically accrued but are unrecognized as of the date of the ownership change) to offset future taxable income. Moreover, the Debtors' loss carryforwards will be subject to further limitations if the Debtors experience additional future ownership changes or if they do not continue their business enterprise for at least two years following the Effective Date.

The application of IRC section 382 will be materially different from that just described if the Debtors are subject to the special rules for corporations in bankruptcy provided in IRC section 382(l)(5). In that case, the Debtors' ability to utilize their pre-Effective Date NOLs would not be limited as described in the preceding paragraph. However, several other limitations would apply to the Debtors under IRC section 382(l)(5), including (a) the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the Claims that are exchanged pursuant to the Modified Plan, and (b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' IRC section 382 limitation with respect to that ownership change will be zero.  It is uncertain whether the provisions of IRC section 382(l)(5) would be available in the case of the ownership change that is expected to occur as a result of the confirmation of the Modified Plan. Even if IRC section 382(l)(5) were available, the Debtors have not yet determined whether they would seek to have the IRC section 382(l)(5) rules apply to the ownership change arising from the consummation of the Modified Plan (assuming IRC section 382(l)(5) would otherwise apply).

If the Debtors do not qualify for, or elect not to apply, the special rule under IRC section 382(l)(5) for corporations in bankruptcy described above, a different rule under IRC section 382 applicable to corporations under the jurisdiction of a bankruptcy court will apply in calculating the annual IRC section 382 limitation.  Under this rule, the limitation will be calculated by reference to the lesser of the value of the company's new stock (with certain adjustments) immediately after the ownership change or the value of such company's assets (determined without regard to liabilities) immediately before the ownership change.  Although such calculation may substantially increase the annual IRC section 382 limitation, the Debtors' use of any NOLs or other tax attributes remaining after implementation of the Modified Plan may still be substantially limited after an ownership change.

Because it is anticipated that certain persons and entities will hold a significant equity position in the Reorganized Debtors following the consummation of the Modified Plan, if such persons or entities dispose of all or a significant amount of this position after the Effective Date, it could cause the Reorganized Debtors to undergo an ownership change. This would generally limit (or possibly eliminate) the Reorganized Debtors' ability to use NOLs and other tax attributes.

**B.    United States Federal Income Tax Consequences To Holders Of Claims Against And Interests In The Debtors**

The following discusses certain United States federal income tax consequences of the transactions contemplated by the Modified Plan to holders of Claims or Interests that are "United States holders" as defined below. The United States federal income tax consequences of the transactions contemplated by the Modified Plan to holders of Claims or Interests (including the character, timing and amount of income, gain, or loss recognized) will depend upon, among other things, (1) whether the Claim or Interest and the consideration received in respect thereof are "securities" for United States federal income tax purposes; (2) the manner in which a holder acquired a Claim or Interest; (3) the length of time the Claim or Interest has been held; (4) whether the Claim or Interest was acquired at a discount; (5) whether the holder has taken a bad debt deduction or worthless stock deduction with respect to the Claim or Interest (or any portion thereof) in the current or prior years; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim or Interest; (7) the holder's method of tax accounting; and (8) whether the Claim or Interest is an installment obligation for United States federal income tax purposes. Therefore, holders of Claims or Interests should consult their own tax advisors for information that may be relevant based on their particular situations and circumstances regarding the particular tax consequences to them of the transactions contemplated by the Modified Plan. This discussion is written for holders that have not taken a bad debt deduction with respect to a Claim or Interest (or any portion thereof) in the current or any prior year and holders whose Claim or Interest did not become completely or partially worthless in a prior taxable year. Moreover, the Debtors intend to claim deductions to the extent they are permitted to deduct any amounts they pay in cash, stock or other property pursuant to the Modified Plan.

For purposes of the following discussion, a "United States holder" is a holder of Claims or Interests that is (1) a citizen or individual resident of the United States, (2) a corporation created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person.

*1.    Holders Of General Unsecured Claims Other Than TOPrS Claims*

Pursuant to the Modified Plan, the Debtors will issue New Common Stock and Discount Rights to holders of General Unsecured Claims to discharge such Claims. The United States federal income tax consequences arising from the Modified Plan to such holders of General

Unsecured Claims will vary depending upon, among other things, whether such Claims constitute "securities" for United States federal income tax purposes.  The determination of whether a debt instrument constitutes a "security" depends upon an evaluation of the nature of the debt instrument, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for United States federal income tax purposes.  Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities, and corporate debt instruments with maturities when issued of ten years or more are considered securities.  Each holder is urged to consult its own tax advisor regarding the status of its General Unsecured Claim.

If such General Unsecured Claims constitute "securities" for United States federal income tax purposes, the exchange of such Claims for New Common Stock and Discount Rights should constitute a "recapitalization" for United States federal income tax purposes.  As a result, except as discussed below with respect to Claims for accrued interest and accrued market discount, a holder of such Claims should not recognize gain or loss on the exchange of its General Unsecured Claims for New Common Stock and Discount Rights.  A holder's adjusted tax basis in a General Unsecured Claim should be allocated among the New Common Stock and Discount Rights received with respect to such Claim based upon the relative fair market values thereof (other than New Common Stock and Discount Rights received for accrued interest).  The holding period for the New Common Stock and Discount Rights will include the holder's holding period for the General Unsecured Claims.

Under the Modified Plan, the Debtors are required to allocate for United States federal income tax purposes the New Common Stock and Discount Rights distributed to holders of General Unsecured Claims first to the principal amount of the General Unsecured Claim and then to accrued but unpaid interest.  To the extent any New Common Stock and Discount Rights are allocated to accrued but unpaid interest, holders of such Claims may be required to recognize ordinary income equal to the amount of New Common Stock and Discount Rights received with respect to such Claims for accrued interest.

The market discount provisions of the IRC may apply to holders of General Unsecured Claims.  In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount.  A U.S. Holder should not be required to recognize any accrued but unrecognized market discount upon the disposition of its General Unsecured Claims for New Common Stock and Discount Rights pursuant to the Modified Plan, although it may be required to recognize any accrued but unrecognized market discount upon a subsequent taxable disposition of its New Common Stock and Discount Rights (including any New Common Stock received upon exercise of a Discount Right).  Although not free from doubt, the Company believes that a U.S. Holder should not be required to recognize any accrued but unrecognized market discount upon the exercise of a Discount Right received in exchange for its General Unsecured Claims.  However, the treatment of accrued market discount in a nonrecognition transaction is subject to the issuance of Treasury regulations that have not yet been promulgated.

In the absence of such regulations, the application of the market discount rules to the exercise of a Discount Right received in exchange for a General Unsecured Claim is uncertain. If a holder of a General Unsecured Claim was required under the market discount rules of the IRC to defer its deduction of all or a portion of the interest on indebtedness, if any, incurred or maintained to acquire or carry the Claim, continued deferral of the deduction for interest on such indebtedness may be required. Any such deferred interest expense would be attributed to the New Common Stock and Discount Rights received in exchange for the General Unsecured Claim, and would be treated as interest paid or accrued in the year in which the New Common Stock and Discount Rights are disposed.

If such General Unsecured Claims do not constitute "securities" for United States federal income tax purposes, the exchange of such Claims for New Common Stock and Discount Rights should constitute a taxable exchange for United States federal income tax purposes. As a result, a holder of Claims would generally recognize income, gain, or loss for United States federal income tax purposes in an amount equal to the difference between (1) the fair market value on the Effective Date of the New Common Stock and Discount Rights received in exchange for its General Unsecured Claim and (2) the holder's adjusted tax basis in its General Unsecured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the General Unsecured Claim in such holder's hands, whether the General Unsecured Claim constitutes a capital asset in the hands of the holder, whether the General Unsecured Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its General Unsecured Claim. Any such gain recognized would generally be treated as ordinary income to the extent that the New Common Stock and Discount Rights are received in respect of accrued but unpaid interest or accrued market discount that, in either case, have not been previously taken into account under the holder's method of accounting as discussed above in this Section XII.B.1 - Holders Of General Unsecured Claims Other Than TOPrS Claims. A holder of General Unsecured Claims recognizing a loss as a result of the Modified Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year. A holder's aggregate tax basis in the New Common Stock and Discount Rights received in exchange for its General Unsecured Claims would generally be equal to the aggregate fair market value of such New Common Stock and Discount Rights on the Effective Date. The holding period for the New Common Stock and Discount Rights received pursuant to the Modified Plan would begin on the day after the Effective Date.

### 2.    Holders of TOPrS Claims

Holders of TOPrS Claims will receive no distribution on account of such Claims. A holder who holds TOPrS Claims will generally recognize a loss for United States federal income tax purposes in an amount equal to the holder's adjusted tax basis in its TOPrS Claims cancelled under the Modified Plan. The character of such loss as capital or ordinary loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.

### 3.    *Existing Common Stockholders*

A holder of Delphi's Existing Common Stock generally will recognize capital gain or loss (subject to the wash sale rules discussed below) on the receipt of Post-Emergence Rights pursuant to the Modified Plan in an amount equal to the difference between the fair market value of the Post-Emergence Rights received and the holder's adjusted tax basis in the Existing Common Stock exchanged for such Post-Emergence Rights. Such capital gain or loss will be long-term capital gain or loss if the holding period for the Existing Common Stock exchanged for the Post-Emergence Rights exceeds one year at the time the Post-Emergence Rights are distributed. Capital gain of non-corporate holders may be eligible for reduced rates of taxation. The deductibility of capital loss is subject to limitations. Holders are urged to consult their own tax advisors regarding such limitations. The holder's tax basis in the Post-Emergence Rights will be equal to the fair market value of the Post-Emergence Rights at the time they are received. The holding period for the Post-Emergence Rights will commence on the day after the date of receipt.

To the extent a loss would otherwise be recognizable on the exchange, such loss may be deferred under the "wash sale" rules of the IRC. The wash sale rules provide for the disallowance of a loss on the sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the holder acquired, or has entered into a contract or option to acquire, "substantially identical" stock or securities. If the Existing Common Stock and the New Common Stock receivable upon exercise of the Post-Emergence Rights are considered substantially identical and the exchange of Existing Common Stock for Post-Emergence Rights results in a loss to the holder, such loss may be disallowed and added to the tax basis of the Post-Emergence Rights received. The extent to which such loss would be disallowed is unclear. Holders of Existing Common Stock are urged to consult their own tax advisors regarding how the "wash sale" rules apply to them in light of their particular circumstances.

### 4.    *Holders Of Section 510(b) Note Claims And Section 510(b) Equity Claims*

Pursuant to the Modified Plan, the Debtors will issue New Common Stock and Discount Rights to the holders of Section 510(b) Note Claims and Section 510(b) Equity Claims. The exchange of such Claims for New Common Stock and Discount Rights should constitute a taxable transaction for United States federal income tax purposes. Under this treatment, a holder of such Claims will generally recognize income, gain, or loss for United States federal income tax purposes in an amount equal to the difference between (1) the fair market value on the Effective Date of the New Common Stock and Discount Rights received in exchange for its Claim and (2) the holder's adjusted tax basis in its Claim. The character of such gain or loss as capital gain or loss or as ordinary income will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claims. Holders are urged to consult their own tax advisor regarding the character of such income, gain, or loss. A holder's aggregate tax basis in the New Common Stock and Discount Rights received in exchange for its Claims will generally be equal to the aggregate fair market value of such New Common Stock

and Discount Rights on the Effective Date.  The holding period for the New Common Stock and Discount Rights received pursuant to the Modified Plan will begin on the day after the Effective Date.

### 5.      Holders Of Section 510(b) ERISA Claims

To the extent that all or a part of the Claims pursuant to the ERISA Actions (the "ERISA Claims") are satisfied by a contribution to the respective defined contribution employee benefit pension Plans (the "DC Plans") (as provided for in the ERISA Settlement Agreement), it is intended that such contribution will not be included in the gross income of holders of ERISA Claims and will not be subject to tax withholding.  Such holders should consult their own tax advisors with respect to the U.S. federal income tax consequences of the receipt of amounts distributed from the DC Plans.

### 6.      Ownership And Disposition Of New Common Stock, Additional New Common Stock and Rights

(a)      Exercise Of Rights

A holder will not recognize gain or loss on the exercise of a Right.  The holder's tax basis in New Common Stock received as a result of the exercise of the Right (the "**Additional New Common Stock**") will equal the sum of the exercise price paid for the Additional New Common Stock and the holder's tax basis in the Right determined as described in the relevant section above.  The holding period for the Additional New Common Stock received as a result of the exercise of the Right will begin on the exercise date.

A holder of Existing Common Stock that exercises Post-Emergence Rights should be aware that, to the extent the wash sale rules did not apply to an exchange of Existing Common Stock for Post-Emergence Rights as described in Section XII.B.3 – Existing Common Stockholders above, the exercise of such Post-Emergence Rights could result in any loss that might otherwise be recognized by such holder upon receipt of Post-Emergence Rights or with respect to a holder's Existing Common Stock being disallowed under the wash sale rules if such exercise occurs within 30 days of the receipt of the Post-Emergence Rights.  If the wash sale rules apply to a holder's loss upon receipt of Post-Emergence Rights or with respect to its Existing Common Stock, the holder's tax basis in any Additional New Common Stock received as a result of the exercise of the Post-Emergence Rights would be increased to reflect the amount of the disallowed loss.  Holders of Existing Common Stock are urged to consult their own tax advisors regarding how the wash sale rules apply to them in light of their particular circumstances.

(b)      Sale, Exchange, Or Other Taxable Disposition Of Rights

If a holder sells, exchanges, or otherwise disposes of Rights in a taxable disposition, the holder generally will recognize capital gain or loss equal to the difference, if any, between the amount realized for the Rights and the holder's tax basis in the Rights. Capital gains of non-corporate holders derived with respect to a sale, exchange, or other disposition of Rights in which the holder has a holding period exceeding one year (determined as described in the relevant section above) may be eligible for reduced rates of taxation.  The deductibility of capital

loss is subject to limitations.  Holders are urged to consult their own tax advisors regarding such limitations.

(c)    <u>Expiration Of Rights</u>

A holder that allows a Right to expire generally should recognize capital loss equal to the holder's tax basis in the Right, which will be treated as long-term or short-term capital loss depending upon whether such holder's holding period in the Rights exceeds one year as of the date of the expiration (determined as described in the relevant section above).  The deductibility of capital losses is subject to limitations.  Holders are urged to consult their own tax advisors regarding such limitations.

(d)    <u>Distributions On New Common Stock And Additional New
Common Stock</u>

The gross amount of any distribution of cash or property made to a holder with respect to New Common Stock or Additional New Common Stock generally will be includible in gross income by a holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of Delphi as determined under United States federal income tax principles.  A distribution which is treated as a dividend for United States federal income tax purposes may qualify for the 70% dividends-received deduction if such amount is distributed to a holder that is a corporation and certain holding period and taxable income requirements are satisfied.  Any dividend received by a holder that is a corporation may be subject to the "extraordinary dividend" provisions of the IRC.

A distribution in excess of Delphi's current and accumulated earnings and profits will first be treated as a return of capital to the extent of the holder's adjusted tax basis in its New Common Stock or Additional New Common Stock and will be applied against and reduce such basis dollar-for-dollar (thereby increasing the amount of gain and decreasing the amount of loss recognized on a subsequent taxable disposition of the New Common Stock or Additional New Common Stock).  To the extent that such distribution exceeds the holder's adjusted tax basis in its New Common Stock or Additional New Common Stock, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such holder's holding period in its New Common Stock or Additional New Common Stock exceeds one year as of the date of the distribution.  Dividends received by non-corporate holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

(e)    <u>Sale, Exchange, Or Other Taxable Disposition Of New Common
Stock Or Additional New Common Stock</u>

For United States federal income tax purposes, a holder generally will recognize capital gain or loss on the sale, exchange, or other taxable disposition of any of its New Common Stock or Additional New Common Stock in an amount equal to the difference, if any, between the amount realized for the New Common Stock or Additional New Common Stock and the holder's adjusted tax basis in the New Common Stock or Additional New Common Stock. Capital gains of non-corporate holders derived with respect to a sale, exchange, or other disposition of New

Common Stock or Additional New Common Stock held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital loss is subject to limitations. Holders are urged to consult their own tax advisors regarding such limitations.

### *7.     Information Reporting And Backup Withholding*

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding (currently at a rate of 28%) under certain circumstances. Under the IRC's backup withholding rules, a United States holder may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Modified Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

### C.    Importance Of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE MODIFIED PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE MODIFIED PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

## XIII.   FEASIBILITY OF THE MODIFIED PLAN AND THE BEST INTERESTS TEST

### A.    Feasibility Of The Modified Plan

To confirm the Modified Plan, the Bankruptcy Court must find that confirmation of the Modified Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to timely perform all obligations described in the Modified Plan, and, therefore, that the Modified Plan is feasible.

To demonstrate the feasibility of the Modified Plan, the Debtors have prepared financial Projections through 2011, as set forth in Appendix C attached to this Disclosure Statement. The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund their operations. Accordingly, the Debtors believe that the Modified Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. As noted in the Projections, however, the Debtors caution that no representations can be made as to the accuracy of the Projections or as to the Reorganized Debtors' ability to achieve the projected results. Many of the assumptions upon which the Projections are based are subject to uncertainties outside the control of the Debtors. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtors' financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse. See Section X – General Considerations And Risk Factors To Be Considered for a discussion of certain risk factors that may affect financial feasibility of the Modified Plan.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.**

### B.     Acceptance Of The Modified Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept a plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Modified Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a Class of Interests has accepted the plan if holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the plan.

C.    **Best Interests Test**

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case was converted to a chapter 7 case under the Bankruptcy Code.  In the Delphi cases, this "liquidation value" would consist primarily of the proceeds from orderly wind-down of the Debtors' U.S. operations and a forced sale of the non-Debtor foreign operations by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.  The liquidation also could prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

D.    **Estimated Valuation Of The Reorganized Debtors**

A copy of the updated analysis of the total enterprise value of the Reorganized Debtors is attached to this Disclosure Statement as Appendix D.

**E.    Application Of The Best Interests Test To The Liquidation Analysis And The Valuation Of The Reorganized Debtors**

*1.    Overview*

A liquidation analysis (the "Liquidation Analysis") prepared with respect to the Debtors is attached as Appendix E to this Disclosure Statement, and has been updated from the December 2007 Disclosure Statement.  The Debtors' updated Liquidation Analysis reflects the Debtors' progress in transforming its business operations since the December 2007 Disclosure Statement was approved by the Bankruptcy Court.  The December 2007 Liquidation Analysis was prepared assuming a December 31, 2007 Liquidation Date and was based on the unaudited book values as of March 31, 2007.  The updated Liquidation Analysis assumes a Liquidation Date of December 31, 2008 and is based on the unaudited book values as of June 30, 2008.

Since the approval of the December 2007 Disclosure Statement, numerous events occurred that have impacted the Liquidation Analysis, including but not limited to following: (i) the continued wind-down of the AHG Division; (ii) the Debtors' divestitures of Catalyst, Interiors and Closures, North American Brake Product Assets, Brake Product Lines, Bearings Business Products, US Suspension Assets, and the anticipated divestiture of Steering; (iii) the effectiveness of the amended GSA and MRA agreement between Delphi and GM; (iv) the repatriation of dividends to DASHI under the DASHI Intercompany Transfer Order and subsequent loan of such monies to Delphi Automotive Systems LLC ("DAS LLC"); (v) Corporate Restructuring Transactions involving DASHI and certain of its non-debtor subsidiaries; (vi) refinements to the claim estimates; and, (vii) the continued decline of the U.S. automotive industry.

As more fully described in Appendix E, many factors have contributed to a degradation of the Net Proceeds Available for Distribution in a hypothetical liquidation scenario.  The decline in Net Proceeds Available for Distribution between the Liquidation Analyses in the Confirmed and Modified Plans is primarily attributable to a decline in estimated recoveries associated with the Debtors' investment in the foreign subsidiaries, as well as other net reductions to recoverable assets, offset by a decrease in projected wind-down costs, professional and trustee fees.  The following chart summarizes the changes in estimated Net Proceeds Available for Distribution in the Liquidation Analysis under the Confirmed Plan and the Modified Plan.

| *($Billions)* | Low Scenario | High Scenario |
|---|---|---|
| Net Proceeds Available for Distribution (Confirmed Plan) | $    7.5 | $    10.4 |
| Change in Recovery Values | | |
|    Reduction in Net Proceeds Related to Investment in Foreign Subsidiaries | (2.2) | (2.4) |
|    Other Net Reductions Including Cash Operating Losses | (1.7) | (1.9) |
| Sub-Total | (3.9) | (4.3) |
| Reduction in Wind-Down Costs and Professional and Trustee Fees | 0.6 | 0.5 |
| Total Change | (3.3) | (3.8) |
| Net Proceeds Available for Distribution (Modified Plan) | $    4.2 | $    6.6 |

The Debtors believe that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. In preparing the liquidation analysis, the Debtors have projected the amount of Allowed Claims based upon a review of their scheduled claims and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. In addition, as noted above, the valuation analysis of the Reorganized Debtors also contains numerous estimates and assumptions. For example, the value of the New Common Stock cannot be determined with precision due to the absence of a public market for the New Common Stock.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that, taking into account the liquidation analysis and the valuation analysis of the Reorganized Debtors, the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of each Impaired Class, including the creditors of the DASHI Debtors, will receive at least as much under the Plan as they would in a liquidation in a hypothetical chapter 7 case. The majority of the claims at the DASHI Debtors are held by the PBGC, which claims will be extinguished through the Debtors' Modified Plan. The remaining creditors of the DASHI Debtors will receive a distribution through the Modified Plan that equals or exceeds the amount such creditors would receive in a hypothetical liquidation. Holders of Claims and Interests will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as going concerns, supplemented by GM's support, rather than a forced liquidation, will allow the realization of more value for the Debtors' assets. In addition, the Debtors' pension plans would be terminated in a chapter 7 case, resulting in the assertion of significant claims by the PBGC. These events would increase general unsecured claims by billions of dollars, and the recovery on such claims would be further reduced by wind-down costs and would be subordinated to these claims. For example, salaried employees who supported the wind-down of the U.S. operations would be entitled to severance payments. The resulting increase in the general unsecured and administrative claims would decrease percentage recoveries to unsecured creditors of the Debtors. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and in many cases significantly greater, than the recoveries available in a chapter 7 liquidation.

The following chart summarizes the range of creditor recoveries under the Debtors' updated Liquidation Analysis consistent with Substantive Consolidation under the Plan as well as a Substantive Consolidation – All Debtors. Under Substantive Consolidation – All Debtors, the general unsecured creditors receive a 4% recovery in the high scenario and a 1% recovery in the low scenario as compared to the previous recoveries of 18% and 0%, respectively. The chart below also compares the hypothetical recoveries under the liquidation analysis included in the December 2007 Disclosure Statement.

($Millions)

| Debtor(s) | Net Proceeds Available For Distribution Lower $ | Higher $ | All Secured Recovery [1,2] Lower % | Higher % | DIP Recovery [2] Lower % | Higher % | Setoff and Other Secured Recovery Lower % | Higher % | Post IC Recovery [3] Lower % | Higher % | Admin & Priority Recovery Lower % | Higher % | General Unsecured [1] and PBGC Recovery Lower % | Higher % | GM GUC, TOPrS, and Equity Recovery Lower $ | Higher $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Substantive Consolidation Under The Plan** | | | | | | | | | | | | | | | | |
| **Delphi-DAS Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3,781 | 5,338 | 76% | 100% | 100% | 100% | 0% | 100% | 0% | 30% | 0% | 30% | 0% | 0% | - | - |
| Modified Plan | 2,007 | 3,014 | 54% | 64% | 100% | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| Variance | (1,774) | (2,324) | -22% | -36% | 0% | 0% | 0% | -100% | 0% | -30% | 0% | -30% | 4% | 4% | - | - |
| **DASHI Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3,564 | 5,036 | 100% | 100% | 100% | 100% | NA | NA | 100% | 100% | 100% | 100% | 55% | 83% | - | - |
| Modified Plan | 2,131 | 3,417 | 100% | 100% | 100% | 100% | NA | NA | 100% | 100% | 42% | 100% | 4% | 42% | - | - |
| Variance | (1,432) | (1,619) | 0% | 0% | 0% | 0% | NA | NA | 0% | 0% | -58% | 0% | -51% | -42% | - | - |
| **Delphi Medical Systems Colorado Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 15 | 20 | 100% | NA | 100% | 100% | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 16 | 22 | 62% | 70% | 100% | 100% | NA | NA | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| Variance | 1 | 2 | -38% | NA | 0% | 0% | NA | NA | 0% | -100% | 0% | -100% | 4% | 4% | - | - |
| **Delphi Medical Systems Texas Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 4 | 6 | 100% | NA | 100% | 100% | NA | NA | 0% | 78% | 0% | 78% | 0% | 0% | - | - |
| Modified Plan | 0 | 0 | 0% | 1% | 100% | 100% | NA | NA | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| Variance | (4) | (6) | -100% | NA | 0% | 0% | NA | NA | 0% | -78% | 0% | -78% | 4% | 4% | - | - |
| **Delphi Medical Systems Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 0 | 5 | 100% | NA | 100% | 100% | NA | NA | 0% | 19% | 0% | 19% | 0% | 0% | - | - |
| Modified Plan | 0 | 0 | 0% | 0% | 100% | 100% | NA | NA | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| Variance | 0 | (5) | -100% | NA | 0% | 0% | NA | NA | 0% | -19% | 0% | -19% | 4% | 4% | - | - |
| **Connection Systems Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 14 | 18 | 100% | NA | 100% | 100% | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 11 | 16 | 41% | 50% | 100% | 100% | NA | NA | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| Variance | (2) | (2) | -59% | NA | 0% | 0% | NA | NA | 0% | -100% | 0% | -100% | 4% | 4% | - | - |
| **Delphi Diesel Systems Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 105 | 137 | 100% | NA | 100% | 100% | NA | NA | 0% | 100% | 0% | 100% | 0% | 1% | - | - |
| Modified Plan | 70 | 97 | 48% | 56% | 100% | 100% | NA | NA | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| Variance | (35) | (40) | -52% | NA | 0% | 0% | NA | NA | 0% | -100% | 0% | -100% | 4% | 3% | - | - |
| **Delphi Mechatronic Systems, Inc.** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 22 | 29 | 100% | NA | 100% | 100% | NA | NA | 0% | 42% | 0% | 42% | 0% | 0% | - | - |
| Modified Plan | 16 | 23 | 11% | 15% | 100% | 100% | NA | NA | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| Variance | (6) | (6) | -89% | NA | 0% | 0% | NA | NA | 0% | -42% | 0% | -42% | 4% | 4% | - | - |
| **Specialty Electronics Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 6 | 7 | 100% | NA | 100% | 100% | NA | NA | 100% | 100% | 100% | 100% | 0% | 0% | - | - |
| Modified Plan | 6 | 7 | 98% | NA | 100% | 100% | NA | NA | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| Variance | 0 | 0 | -2% | NA | 0% | 0% | NA | NA | -100% | -100% | -100% | -100% | 4% | 4% | - | - |
| **Delco Electronics Overseas Corporation** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 42 | 47 | 100% | NA | 100% | 100% | NA | NA | 12% | 100% | 12% | 100% | 0% | 0% | - | - |
| Modified Plan | 51 | 56 | 88% | 100% | 100% | 100% | NA | NA | 0% | 100% | 0% | 23% | 4% | 4% | - | - |
| Variance | 9 | 10 | -12% | NA | 0% | 0% | NA | NA | -12% | 0% | -12% | -77% | 4% | 4% | - | - |
| **MobileAria Inc.** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 3 | 3 | 100% | NA | 100% | 100% | NA | NA | 0% | 100% | 0% | 100% | 0% | 0% | - | - |
| Modified Plan | 5 | 5 | 98% | 100% | 100% | 100% | NA | NA | 0% | 100% | 0% | 100% | 4% | 4% | - | - |
| Variance | 2 | 2 | -2% | NA | 0% | 0% | NA | NA | 0% | 0% | 0% | 0% | 4% | 4% | - | - |
| **Delphi Furukawa Wiring Systems LLC** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 5 | 6 | 100% | NA | 100% | 100% | NA | NA | 50% | 85% | 50% | 85% | 0% | 0% | - | - |
| Modified Plan | 34 | 38 | 77% | 90% | 100% | 100% | NA | NA | 74% | 90% | 0% | 0% | 4% | 4% | - | - |
| Variance | 30 | 32 | -23% | NA | 0% | 0% | NA | NA | 24% | 5% | -50% | -85% | 4% | 4% | - | - |
| **Substantive Consolidation - All Debtors** | | | | | | | | | | | | | | | | |
| Confirmed Plan | 7,459 | 10,434 | 100% | 100% | 100% | 100% | 100% | 100% | 65% | 100% | 65% | 100% | 0% | 18% | - | - |
| Modified Plan | 4,233 | 6,560 | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 8% | 76% | 1% | 4% | - | - |
| Variance | (3,226) | (3,875) | 0% | 0% | 0% | 0% | 0% | 0% | 35% | 0% | -57% | -24% | 1% | -14% | - | - |

NA - Not applicable due to $0 estimated allowed claims in the creditor class.

1 - Includes the allocated portion of recovery from the GM First Net Liability Transfer Claim.

2 - DIP claims receive a 100% recovery in all instances.

3 - The Confirmed Plan "All Secured Recoveries" reflect recoveries against DIP Facility and Setoff Claims, whereas the Modified Plan "All Secured Recoveries" represent recoveries against the DIP Facility, Setoff, and Other Secured Claims, which include postpetition intercompany claims as described in paragraph 14 of the Liquidation Analysis.  "Post IC Recoveries" reflect postpetition intercompany claims as Administrative Claims in the Confirmed Plan and as Junior Secured Claims in the Modified Plan.

## 2. *Comparison Of Liquidation Analysis And Valuation Analysis*

The liquidation analysis attached hereto as Appendix E contains two separate analyses – a "Substantive Consolidation – All Debtors" analysis, and "Substantive Consolidation Under The Plan" analysis based on the Debtors' proposed partially-consolidated substantive consolidation groupings.  The "Substantive Consolidation – All Debtors" analysis assumes that the Debtors are substantively consolidated and that creditors share in the proceeds of all of the Debtors' assets without regard to (a) the separate legal identity of each Debtor and (b) which Debtors are obligated on particular claims.   The "Substantive Consolidation Under The Plan" analysis assumes that only certain of the Debtors are consolidated, and that the Debtors are liquidated through those groupings or independently.  The PBGC is a primary creditor of Delphi and each

of its subsidiaries. The PBGC's claims arise out of joint and several liability of each of the Debtors to the PBGC under applicable non-bankruptcy law.

In a "Substantive Consolidation Under The Plan" liquidation (accounting for partial consolidation of Debtor entities), the PBGC would have a claim against each consolidated Debtor group or Debtor and would be entitled to receive a distribution from the proceeds of asset liquidations of each consolidated Debtor group or Debtor on account of such claim. Alternately, in a "Substantive Consolidation – All Debtors" liquidation, the PBGC's claims against Delphi's subsidiaries would be deemed a single claim against the consolidated Debtors' assets and would share in distributions with all other unsecured creditors of each of the other Debtors. As a consequence, the estimated recovery of the PBGC, based on the assumptions contained in the attached Liquidation Analysis, is higher in the "Substantive Consolidation Under The Plan" scenario – 4% to 42% for the PBGC – and lower in the "Substantive Consolidation – All Debtors" scenario – 1% to 4% for the PBGC. The recoveries of other unsecured creditors based on such assumptions in the "Substantive Consolidation Under The Plan" scenario – are 4% for general unsecured creditors (except for the DASHI Debtors) – and in the "Substantive Consolidation – All Debtors" scenario – are 1% to 4% for general unsecured creditors. Holders of existing common stock would receive no distribution under either liquidation scenario.

The valuation analysis attached hereto as Appendix D leads to the conclusion that recoveries under the Plan would be at least as much as the recoveries available in a chapter 7 liquidation, whether such liquidation was conducted on a Substantive Consolidation – All Debtors or Substantive Consolidation Under The Plan basis. In particular, the Debtors estimate that under the Plan, holders of General Unsecured Claims will receive a recovery equal to 20% of the holder's Allowed Claim. Furthermore, holders of existing common stock will also receive a distribution under the Plan.

## XIV.   CONFIRMATION

### A.    Confirmation Without Acceptance Of All Impaired Classes:  The "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims, without the consideration of votes of insiders, has accepted it.  The Court may confirm the Modified Plan at the request of the Debtors notwithstanding the Modified Plan's rejection (or deemed rejection) by impaired Classes as long as the Modified Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan,

of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of Other Interests in Delphi are not being solicited because such holders are not entitled to receive or retain under the Modified Plan any interest in property on account of their Claims and Interests. Such Classes therefore are deemed to have rejected the Modified Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, the Debtors are seeking confirmation of the Modified Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes, and may seek confirmation pursuant thereto as to other Classes if such Classes vote to reject the Modified Plan. Notwithstanding the deemed rejection by such Classes, the Debtors believe that such Classes are being treated fairly and equitably under the Bankruptcy Code. The Debtors therefore believe the Modified Plan may be confirmed despite its deemed rejection by these Classes.

### B.    Conditions To Confirmation And Consummation Of The Modified Plan

#### 1.    Confirmation

The Confirmation Order was entered on January 25, 2008 and became a final order on February 4, 2008.

#### 2.    Conditions To The Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.3 of the Modified Plan, as described in Section XIV.C. – Waiver Of Conditions To Confirmation And Consummation Of The Modified Plan below:

- The Bankruptcy Court must have entered one or more orders, in form and substance acceptable to the Debtors, granting relief under section 1127 of the Bankruptcy Code with respect to modifications of the Confirmed Plan. (Article 12.2(a) of the Modified Plan)

- The Reorganized Debtors must have entered into the Emergence Capital Arrangements and all conditions precedent to the consummation thereof must have been waived or satisfied in accordance with the terms thereof. (Article 12.2(b) of the Modified Plan)

- The Reorganized Debtors must have received the aggregate proceeds from the Discount Rights Offering and any backstop thereof in an amount of no less than $1 billion. (Article 12.2(c) of the Modified Plan)

- The Bankruptcy Court must have entered one or more orders, which may include the Confirmation Order, authorizing the assumption and rejection of unexpired leases and executory contracts by the Debtors as contemplated by Article 8.1 of the Modified Plan. (Article 12.2(d) of the Modified Plan)

- The request for revocation of the Confirmation Order made by the Creditors' Committee and Wilmington Trust must have been withdrawn by the parties or disposed of by the Bankruptcy Court. (Article 12.2(e) of the Modified Plan)

- Each Exhibit, document, or agreement to be executed in connection with the Modified Plan shall be in form and substance reasonably acceptable to the Debtors.
- (Article 12.2(f) of the Modified Plan)

**C.    Waiver Of Conditions Precedent**

The conditions set forth in 12.2(d) and 12.2(f) of the Modified Plan may be waived, in whole or in part, by the Debtors without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors in their sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors in their sole discretion).  The failure of the Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each such right will be deemed an ongoing right, which may be asserted at any time.

**D.    Retention Of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Modified Plan, including, among others, the following matters:

- to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of executory contracts or unexpired leases to which any of the Debtors are a party or with respect to which any of the Debtors may be liable,

and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid;

- to adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, the Modified Plan, or that were the subject of proceedings before the Bankruptcy Court prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims and Disputed Interests, and all controversies and issues arising from or relating to any of the foregoing;

- to adjudicate any and all disputes arising from or relating to the distribution or retention of the rights, New Common Stock, or other consideration under the Modified Plan;

- to ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished as provided herein;

- to hear and determine any and all objections to the allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest, and to allow or disallow any Claim or Interest, in whole or in part;

- to enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

- to issue orders in aid of execution, implementation, or consummation of the Modified Plan;

- to consider any modifications of the Modified Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- to hear and determine all applications for allowance of compensation and reimbursement of Professional Claims under the Modified Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

- to determine requests for the payment of Claims entitled to priority under section 507(a)(1) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Modified Plan or the Confirmation Order or the Modification Approval Order, including disputes arising under agreements, documents, or instruments executed in connection with this Modified Plan; provided that retention of jurisdiction as to disputes involving GM will be as set forth in Article XIII (u) of the Modified Plan;

- to hear and determine all suits or adversary proceedings to recover assets of any of the Debtors and property of their Estates, wherever located;

- to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- to resolve any matters relating to the pre- and post-confirmation sales of the Debtors' assets;

- to hear any other matter not inconsistent with the Bankruptcy Code;

- to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

- to enter a final decree closing the Chapter 11 Cases;

- to enforce all orders previously entered by the Bankruptcy Court;

- to hear and determine all matters relating to any Section 510(b) Note Claim, Section 510(b) Equity Claim, or Section 510(b) ERISA Claim and the implementation of the MDL Settlement for plan distribution purposes;

- to hear and determine all matters arising in connection with the interpretation, implementation, or enforcement of the Investment Agreement; and

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Delphi-GM Definitive Documents, except as provided in such documents.

Notwithstanding anything contained in the Modified Plan to the contrary, the Bankruptcy Court retains exclusive jurisdiction to adjudicate and to hear and determine disputes concerning Retained Actions and any motions to compromise or settle such disputes or Retained Actions. Despite the foregoing, if the Bankruptcy Court is determined not to have jurisdiction with respect to the foregoing, or if the Reorganized Debtors choose to pursue any Retained Actions in another court of competent jurisdiction, the Reorganized Debtors will have authority to bring such action in any other court of competent jurisdiction.

## XV.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE **MODIFIED** PLAN

The Debtors believe that the Modified Plan affords holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If the Modified Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases; (b) an alternative plan or plans of

reorganization; or (c) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.    Continuation Of The Bankruptcy Case

If the Debtors remain in chapter 11, they could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code.  It is not clear whether the Debtors could survive as a going concern in protracted Chapter 11 Cases.  In particular, the Debtors could have difficulty sustaining the high costs and the erosion of market confidence which may be caused if the Debtors remain chapter 11 debtors-in-possession.

### B.    Alternative Plans Of Reorganization

If the Modified Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, the Statutory Committees, could propose a different plan or plans.  Such plans might involve either a reorganization and continuation of the Debtors' businesses, or an orderly liquidation of their assets, or a combination of both.

### C.    Liquidation Under Chapter 7 Or Chapter 11

If no plan is confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.  In a chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

However, the Debtors believe that creditors would lose substantially higher going concern value if the Debtors were forced to liquidate.  In addition, the Debtors believe that in liquidation under chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority, which would arise by reason of the liquidation and the failure to realize the greater going concern value of the Debtors' assets.

The Debtors may also be liquidated pursuant to a chapter 11 plan.  In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation might result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed.  However, any distribution to holders of Claims and Interests under a chapter 11 liquidation plan probably would be delayed substantially.

The Debtors' liquidation analysis, prepared with their restructuring and financial advisors, is premised upon a hypothetical liquidation in a chapter 7 case and is attached as Appendix E to this Disclosure Statement.  In the analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate estimated realizable value of their assets, and the extent to which such assets are subject to liens and security interests.  The likely form of any liquidation would be the wind-down and sale of individual assets in the U.S. and a forced sale of going concern foreign businesses.  Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to creditors than that recoverable in each instance under the Modified Plan.  In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford holders of Claims and holders of Interests as great a realization potential as does the Modified Plan.

## XVI.   VOTING REQUIREMENTS

On [____, 2008], the Bankruptcy Court entered an order (the "Plan Modification Approval Order") approving, among other things, this Disclosure Statement, setting voting procedures, and scheduling the hearing on confirmation of the Modified Plan.  A copy of the Final Modification Hearing Notice is enclosed with this Disclosure Statement.  The Final Modification Hearing Notice sets forth in detail, among other things, the voting deadlines and objection deadlines with respect to the Modified Plan.  The Final Modification Hearing Notice and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

If you have any questions about (i) the procedure for voting your Claim or Interest, as applicable, with respect to the packet of materials that you have received, (ii) the amount of your Claim holdings or Interest, as applicable, or (iii) if you wish to obtain, at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d), an additional copy of the Modified Plan, this Disclosure Statement, or any exhibits to such documents, please contact:

| | |
|---|---|
| Voting Agent for All Creditors except Noteholders | Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, California 90245<br>Att'n: Delphi Corporation<br>Telephone: (888) 249-2691<br>Fax: (310) 751-1856<br>www.delphidocket.com |
| Voting Agent for Noteholders and Equity Interest Holders | Financial Balloting Group LLC<br>757 Third Avenue, 3rd Floor<br>New York, New York 10017<br>Att'n: Delphi Corporation Ballot Tabulation<br>Telephone: (866) 486-1727.<br>www.fbgllc.com |

The Bankruptcy Court may confirm the Modified Plan only if it determines that the Modified Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Modified Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Modified Plan and the Chapter 11 Cases. In addition, the Bankruptcy Court must determine that the Modified Plan has been proposed in good faith and not by any means forbidden by law, and under Bankruptcy Rule 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, and as described in more detail above, the Bankruptcy Code requires the Bankruptcy Court to find, among other things, that (a) the Modified Plan has been accepted by the requisite votes of all Classes of impaired Claims and Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes, (b) the Modified Plan is "feasible," which means that there is a reasonable probability that the Debtors will be able to perform their obligations under the Modified Plan and continue to operate their businesses without further financial reorganization or liquidation, and (c) the Modified Plan is in the "best interests" of all holders of Claims and Interests, which means that such holders will receive at least as much under the Modified Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code.

**THE BANKRUPTCY COURT MUST FIND THAT ALL CONDITIONS MENTIONED ABOVE ARE MET BEFORE IT CAN CONFIRM THE MODIFIED PLAN. THUS, EVEN IF ALL THE CLASSES OF IMPAIRED CLAIMS WERE TO ACCEPT THE MODIFIED PLAN BY THE REQUISITE VOTES, THE BANKRUPTCY COURT MUST STILL MAKE AN INDEPENDENT FINDING THAT THE MODIFIED PLAN SATISFIES THESE REQUIREMENTS OF THE BANKRUPTCY CODE, THAT THE MODIFIED PLAN IS FEASIBLE, AND THAT THE MODIFIED PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS.**

**UNLESS THE BALLOT (OR MASTER BALLOT ON BEHALF OF A NOTEHOLDER OR EQUITY INTEREST HOLDER) BEING FURNISHED IS TIMELY RECEIVED BY THE APPROPRIATE VOTING AGENT ON OR PRIOR TO DECEMBER 12, 2008 AT 7:00 P.M. (PREVAILING EASTERN TIME) TOGETHER WITH ANY OTHER DOCUMENTS REQUIRED BY SUCH BALLOT, THE DEBTORS MAY, IN THEIR SOLE DISCRETION, REJECT SUCH BALLOT AS INVALID AND, THEREFORE, DECLINE TO COUNT IT AS AN ACCEPTANCE OR REJECTION OF THE PLAN. IN NO CASE SHOULD A BALLOT OR ANY OF THE CERTIFICATES BE DELIVERED TO THE DEBTORS OR ANY OF THEIR ADVISORS.**

### A.    Parties-In-Interest Entitled To Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults

(other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (1) the claim or interest is "allowed," which means generally that no party-in-interest has objected to such claim or interest, and (2) the claim or interest is impaired by the plan.  If the holder of an impaired claim or impaired interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan.  If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan, and the plan proponent need not solicit such holder's vote.

The holder of a Claim or Interest that is Impaired under a plan is entitled to vote to accept or reject the plan if (1) the plan provides a distribution in respect of such Claim or Interest and (2) (a) the Claim has been scheduled by the respective Debtor (and such Claim is not scheduled as disputed, contingent, or unliquidated), (b) such Claimholder has  filed a Proof of Claim as to which no objection has been filed, or (c) such Claimholder has timely filed a motion pursuant to Federal Rule of Bankruptcy Procedure 3018(a) seeking temporary allowance of such Claim for voting purposes only and the Debtor has not opposed the Motion or objected to the Claim, in which case the holder's vote will be counted only upon order of the Court.

A vote may be disregarded if the Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.   The Solicitation Procedures Order also sets forth assumptions and procedures for tabulating Ballots, including Ballots that are not completed fully or correctly.

**B.    Classes Impaired Under The Modified Plan**

**1.    *Voting Impaired Classes Of Claims***

The following Classes of Claims and Interests are Impaired under, and are entitled to vote to accept or reject, the Modified Plan:

| | |
|---|---|
| **Class 1C through Class 12C** | (General Unsecured Claims) |
| **Class 1D through Class 12D** | (GM Claim) |
| **Class 1E** | (Section 510(b) Note Claims) |
| **Class 1G-1** | (Existing Common Stock) |
| **Class 1G-2** | (Section 510(b) Equity Claims) |
| **Class 1H, 8H** | (Section 510(b) ERISA Claims) |

**2.    *Unimpaired Classes Of Claims***

Classes A and B are Unimpaired under the Modified Plan and deemed under section 1126(f) of the Bankruptcy Code to have accepted the Modified Plan.  Their votes to accept or reject the Modified Plan will not be solicited.  Because all Debtors are proponents of the Modified Plan, Class F Intercompany Claims are deemed to have accepted the Modified Plan. The votes of holders of such Claims therefore will not be solicited.

3.    **Impaired Classes Of Claims And Interests Deemed To Reject The Modified Plan**

Holders of Interests in Class I are not entitled to receive any distribution under the Modified Plan on account of their Claims and Interests.  Pursuant to section 1126(g) of the Bankruptcy Code, Class I is conclusively presumed to have rejected the Modified Plan, and the votes of Interest holders in such Class therefore will not be solicited.

4.    **Presumed Acceptance By Certain Classes Of Interests**

Holders of Class J Interests in the Affiliate Debtors are conclusively presumed to have accepted the Modified Plan as such Interest holders are proponents of the Modified Plan and, as such, the votes of such Interest holders will not be solicited.

## XVII.  CONCLUSION

### A.    Hearing On And Objections To Confirmation

1.    ***Final Modification* Hearing**

The hearing on confirmation of the Modified Plan has been scheduled for December 17, 2008, 2008 at 10:00 a.m. (prevailing Eastern time).  Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Modified Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties-in-interest.

2.    ***Date Set For Filing Objections To Confirmation Of The Modified Plan***

The time by which all objections to confirmation of the Modified Plan must be filed with the Court and received by the parties listed in the Final Modification Hearing Notice has been set for December 12, 2008 at 4:00 p.m. (prevailing Eastern time).  A copy of the Final Modification Hearing Notice is enclosed with this Disclosure Statement.

### B.    Recommendation

The Modified Plan provides for an equitable and early distribution to creditors and shareholders of the Debtors, preserves the value of Delphi's business as a going concern, and preserves the jobs of employees.  The Debtors believe that any alternative to confirmation of the Modified Plan, such as liquidation or attempts by another party-in-interest to file a plan, could result in significant delays, litigation, and costs, as well as the loss of jobs by the Debtors' employees.  Moreover, the Debtors believe that their creditors and shareholders will receive greater and earlier recoveries under the Modified Plan than those that would be achieved in liquidation or under an alternative plan.

**FOR THESE REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.**

Dated: Troy, Michigan
         October 3, 2008

                                   DELPHI CORPORATION AND THE AFFILIATE
                                   DEBTORS


                                   By:_____
                                        John D. Sheehan
                                        Vice President, Chief Financial Officer

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
George N. Panagakis
Ron E. Meisler
Nathan L. Stuart


        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz


Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession


Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
David M. Sherbin
Sean P. Corcoran
Karen J. Craft