# EXHIBIT 2-C

**[Appendix B to Modified Disclosure Statement—Historical Financial Results]**

## APPENDIX B

## HISTORICAL FINANCIAL RESULTS

## APPENDIX B-1

Consolidated Financial Statements And Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-K For The Year Ended December 31, 2007,
Filed February 19, 2008

## DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENTS OF OPERATIONS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (in millions, except per share amounts) | | |
| **Net sales:** | | | |
| General Motors and affiliates | $ 8,301 | $ 9,344 | $ 10,496 |
| Other customers | 13,982 | 13,393 | 12,898 |
| Total net sales | 22,283 | 22,737 | 23,394 |
| **Operating expenses:** | | | |
| Cost of sales, excluding items listed below | 21,066 | 21,966 | 22,265 |
| U.S. employee workforce transition program charges (Note 15) | 212 | 2,706 | — |
| Depreciation and amortization | 914 | 954 | 1,010 |
| Long-lived asset impairment charges (Note 9) | 98 | 172 | 172 |
| Goodwill impairment charges (Note 10) | — | — | 390 |
| Selling, general and administrative | 1,595 | 1,481 | 1,534 |
| Securities & ERISA litigation charge (Note 17) | 343 | — | — |
| Total operating expenses | 24,228 | 27,279 | 25,371 |
| Operating loss | (1,945) | (4,542) | (1,977) |
| Interest expense (Contractual interest expense for 2007, 2006 and 2005 was $494 million, $577 million and $356 million, respectively) (Note 1) | (769) | (427) | (318) |
| Loss on extinguishment of debt | (27) | — | — |
| Other income, net (Note 19) | 110 | 40 | 55 |
| Reorganization items (Note 3) | (163) | (92) | (3) |
| Loss from continuing operations before income taxes, minority interest and equity income | (2,794) | (5,021) | (2,243) |
| Income tax benefit (expense) | 522 | (130) | 63 |
| Loss from continuing operations before minority interest and equity income | (2,272) | (5,151) | (2,180) |
| Minority interest, net of tax | (63) | (34) | (20) |
| Equity income, net of tax | 27 | 44 | 70 |
| Loss from continuing operations | (2,308) | (5,141) | (2,130) |
| Loss from discontinued operations (includes charge of $595 million related to the assets held for sale for the year ended December 31, 2007), net of tax | (757) | (326) | (210) |
| Cumulative effect of accounting change, net of tax (Note 1) | — | 3 | (17) |
| Net loss | $ (3,065) | $ (5,464) | $ (2,357) |
| **Basic and diluted loss per share** | | | |
| Continuing operations | $ (4.11) | $ (9.16) | $ (3.80) |
| Discontinued operations | (1.34) | (0.58) | (0.38) |
| Cumulative effect of accounting change | — | 0.01 | (0.03) |
| Basic and diluted loss per share | $ (5.45) | $ (9.73) | $ (4.21) |
| Dividends declared per share | $ — | $ — | $ 0.045 |

See notes to consolidated financial statements.

# DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED BALANCE SHEETS

| | December 31, 2007 | December 31, 2006 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,036 | $ 1,608 |
| Restricted cash | 173 | 146 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,257 | 1,817 |
| Other | 2,637 | 2,524 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 1,312 | 1,403 |
| Finished goods | 496 | 521 |
| Deferred income taxes (Note 8) | 58 | 68 |
| Other current assets | 530 | 378 |
| Assets held for sale (Note 5) | 720 | 1,451 |
| Total current assets | 8,219 | 9,916 |
| | | |
| Long-term assets: | | |
| Property, net (Note 9) | 3,863 | 4,066 |
| Investments in affiliates (Note 18) | 387 | 409 |
| Deferred income taxes (Note 8) | 43 | 96 |
| Goodwill (Note 10) | 397 | 378 |
| Other intangible assets, net | 40 | 51 |
| Other | 718 | 476 |
| Total long-term assets | 5,448 | 5,476 |
| | | |
| Total assets | $ 13,667 | $ 15,392 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Notes payable, current portion of long-term debt, and debt in default (Note 14) | $ 749 | $ 3,045 |
| Debtor-in-possession financing (Note 14) | — | 250 |
| Refinanced debtor-in-possession financing (Note 14) | 2,746 | — |
| Accounts payable | 2,904 | 2,585 |
| Accrued liabilities (Note 11) | 2,281 | 2,165 |
| Liabilities held for sale (Note 5) | 412 | 359 |
| Total current liabilities | 9,092 | 8,404 |
| | | |
| Long-term liabilities: | | |
| Long-term debt (Note 14) | 59 | 47 |
| Employee benefit plan obligations (Note 16) | 443 | 546 |
| Other (Note 11) | 1,185 | 852 |
| Total long-term liabilities | 1,687 | 1,445 |
| | | |
| Liabilities subject to compromise (Note 13) | 16,197 | 17,416 |
| | | |
| Total liabilities | 26,976 | 27,265 |
| | | |
| Commitments and contingencies (Note 17) | | |
| | | |
| Minority interest | 163 | 182 |
| | | |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued | 6 | 6 |
| Additional paid-in capital | 2,756 | 2,769 |
| Accumulated deficit | (14,976) | (11,893) |
| Accumulated other comprehensive income (loss): | | |
| Employee benefit plans (Note 16) | (1,679) | (3,041) |
| Other | 446 | 156 |
| Total accumulated other comprehensive income (loss) | (1,233) | (2,885) |
| Treasury stock, at cost (1.5 million and 3.2 million shares in 2007 and 2006, respectively) | (25) | (52) |
| Total stockholders' deficit | (13,472) | (12,055) |
| Total liabilities and stockholders' deficit | $ 13,667 | $ 15,392 |

See notes to consolidated financial statements.

## DELPHI CORPORATION
### (DEBTOR-IN-POSSESSION)
### CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | | (in millions) | |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (3,065) | $ (5,464) | $ (2,357) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization | 914 | 954 | 1,010 |
| Long-lived asset impairment charges | 98 | 172 | 172 |
| Goodwill impairment charges | — | — | 390 |
| Deferred income taxes | (638) | (55) | (142) |
| Pension and other postretirement benefit expenses | 905 | 1,392 | 1,439 |
| Equity income | (27) | (44) | (70) |
| Reorganization items | 163 | 92 | 3 |
| U.S. employee workforce transition program charges | 212 | 2,706 | — |
| Loss on extinguishment of debt | 27 | — | — |
| Securities & ERISA litigation charge | 343 | — | — |
| Loss on liquidation/deconsolidation of investment | 79 | — | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable and retained interests in receivables, net | (186) | 78 | 333 |
| Inventories, net | 29 | (242) | (22) |
| Other current assets | (38) | (71) | 273 |
| Accounts payable | 303 | 411 | (54) |
| Employee and product line obligations | — | — | (64) |
| Accrued and other long-term liabilities | 747 | 428 | 188 |
| Other, net | (42) | 39 | (110) |
| U.S. employee workforce transition program payments | (793) | (654) | — |
| U.S. employee workforce transition program reimbursement by GM | 265 | 405 | — |
| Pension contributions | (304) | (305) | (691) |
| Other postretirement benefit payments | (207) | (262) | (186) |
| (Payments) receipts for reorganization items, net | (142) | (70) | 6 |
| Dividends from equity investments | 45 | 19 | 56 |
| Discontinued operations (Note 5) | 1,023 | 480 | 9 |
| Net cash (used in) provided by operating activities | (289) | 9 | 183 |
| | | | |
| **Cash flows from investing activities:** | | | |
| Capital expenditures | (580) | (622) | (1,025) |
| Proceeds from sale of property | 47 | 61 | 62 |
| Cost of acquisitions, net of cash acquired | — | (5) | — |
| Proceeds from sale of non-U.S. trade bank notes | 191 | 173 | 152 |
| Proceeds from divestitures | 82 | 24 | 245 |
| Increase in restricted cash | (22) | (105) | (36) |
| Other, net | 1 | 8 | (44) |
| Discontinued operations | (58) | (88) | (148) |
| Net cash used in investing activities | (339) | (554) | (794) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Proceeds from refinanced debtor-in-possession facility, net of issuance cost | 2,691 | — | — |
| (Repayments) proceeds borrowings under debtor-in-possession facility | (250) | — | 218 |
| Net proceeds from term loan facility | — | — | 983 |
| Repayments of borrowings under prepetition term loan facility | (988) | — | (12) |
| (Repayments) borrowings under prepetition revolving credit facility | (1,508) | 2 | 1,484 |
| (Repayments) proceeds under cash overdraft | — | (29) | 29 |
| Net borrowings (repayments) under other agreements | 49 | (111) | (628) |
| Dividend payments | — | — | (64) |
| Dividend payments of consolidated affiliates to minority shareholders | (50) | (22) | (52) |
| Other, net | — | (4) | (4) |
| Discontinued operations | (2) | 42 | (2) |
| Net cash (used in) provided by financing activities | (58) | (122) | 1,952 |
| | | | |
| Effect of exchange rate fluctuations on cash and cash equivalents | 114 | 79 | (41) |
| | | | |
| (Decrease) increase in cash and cash equivalents | (572) | (588) | 1,300 |
| Cash and cash equivalents at beginning of year | 1,608 | 2,196 | 896 |
| Cash and cash equivalents at end of year | $ 1,036 | $ 1,608 | $ 2,196 |

See notes to consolidated financial statements.

## DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT) AND CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS

| | Common Stock | | Additional Paid-in Capital | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive Loss | | | Treasury Stock | Total Stockholders' Equity (Deficit) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | Employee Benefit Plans | Other | Total | | |
| | | | | | (in millions) | | | | |
| **Balance at December 31, 2004** | 565 | $6 | $2,730 | $(4,047) | $(2,507) | $254 | $(2,253) | $(61) | $(3,625) |
| Net loss | — | — | — | (2,357) | — | — | — | — | (2,357) |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | (299) | (299) | — | (299) |
| Net change in unrecognized gain on derivative instruments, net of tax | — | — | — | — | — | (74) | (74) | — | (74) |
| Minimum pension liability adjustment, net of tax | — | — | — | — | 112 | — | 112 | — | 112 |
| Total comprehensive loss | | | | | | | | | (2,618) |
| Share-based compensation expense, net of shares issued | — | — | 14 | — | — | — | — | 9 | 23 |
| Dividends | — | — | — | (25) | — | — | — | — | (25) |
| **Balance at December 31, 2005** | 565 | 6 | 2,744 | (6,429) | (2,395) | (119) | (2,514) | (52) | (6,245) |
| Net loss | — | — | — | (5,464) | — | — | — | — | (5,464) |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | 231 | 231 | — | 231 |
| Net change in unrecognized gain on derivative instruments, net of tax | — | — | — | — | — | 44 | 44 | — | 44 |
| Minimum pension liability adjustment, net of tax | — | — | — | — | 1,281 | — | 1,281 | — | 1,281 |
| Total comprehensive loss | | | | | | | | | (3,908) |
| Adoption of FASB Statement No. 158 | — | — | 25 | — | (1,927) | — | (1,927) | — | (1,927) |
| Share-based compensation expense | — | — | 25 | — | — | — | — | — | 25 |
| **Balance at December 31, 2006** | 565 | 6 | 2,769 | (11,893) | (3,041) (a) | 156 (b) | (2,885) | (52) | (12,055) |
| Net loss | — | — | — | (3,065) | — | — | — | — | (3,065) |
| Currency translation adjustments and other, net of tax | — | — | — | — | — | 294 | 294 | — | 294 |
| Net change in unrecognized gain on derivative instruments, net of tax | — | — | — | — | — | (4) | (4) | — | (4) |
| Employee benefit plans liability adjustment, net of tax | — | — | — | — | 1,362 (c) | — | 1,362 | — | 1,362 |
| Total comprehensive loss | | | | | | | | | (1,413) |
| Adoption of FIN 48 | — | — | — | (18) | — | — | — | — | (18) |
| Share-based compensation expense | — | — | 14 | — | — | — | — | — | 14 |
| Treasury shares issued | — | — | (27) | — | — | — | — | 27 | — |
| **Balance at December 31, 2007** | 565 | $ 6 | $ 2,756 | $(14,976) | $ (1,679) (a) | $ 446 (b) | $(1,233) | $ (25) | $(13,472) |

(a) Accumulated Other Comprehensive Loss –Employee Benefit Plans includes a loss for pension, postretirement and postemployment liabilities of $1,679 million, net of a $457 million tax effect and $3,041 million, net of a $1,213 million tax effect for 2007 and 2006, respectively.

(b) Accumulated Other Comprehensive Loss –Other includes a gain of $394 million and $100 million within currency translation adjustments and other for 2007 and 2006, respectively, and a gain of $52 million and $56 million within net change in unrecognized gain on derivative instruments for 2007 and 2006, respectively.

(c) Includes a tax benefit of $703 million related to $1.9 billion U.S. pre-tax other comprehensive income related to employee benefits. Refer to Note 8. Income Taxes for more information

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. SIGNIFICANT ACCOUNTING POLICIES

*Nature of Operations*—Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company") is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Delphi's most significant customer is General Motors Corporation ("GM") and North America and Europe are its most significant markets. Delphi is continuing to diversify its customer base and geographic markets.

*Consolidation*—The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary. Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated. All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included.

*Bankruptcy Filing*— On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code. However, Delphi's Board of Directors authorized Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), to file a petition for Concurso, or bankruptcy, under Spanish law, exclusively for that entity. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations in the years ended December 31, 2007, 2006 and 2005. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. Delphi adopted SOP 90-7 effective on October 8, 2005 and has segregated those items as outlined above for all reporting periods subsequent to such date.

*Going Concern*—The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability (i) to comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) to reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) to return to profitability; (iv) to generate sufficient cash flow from operations; and (v) to obtain financing sources to meet the Company's future obligations. These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007, and filed further amendments in November and December 2007, and January 2008. The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008. A confirmed plan of reorganization often materially changes the amounts reported in a company's consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of confirmation of a plan of reorganization.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*—Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until the third quarter of 2007 because the interest ceased being paid and was not determined to be

probable of being an allowed claim. During the third quarter of 2007, Delphi recorded $289 million of prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007. The plan of reorganization also provides that certain holders of allowed unsecured expected claims against Delphi will be paid postpetition interest on their claims calculated at the contractual non-default rate from the petition date through January 25, 2008. During the third quarter of 2007, Delphi recorded $80 million of interest expense with respect to such allowed unsecured claims. For the year ended December 31, 2007, Delphi recorded total interest related to prepetition debt and allowed unsecured claims of $411 million which is included in accrued liabilities on the accompanying balance sheet. This estimate is based on numerous factual and legal assumptions. Absent developments that alter Delphi's view of the likelihood of such amounts that may be paid under the plan of reorganization to holders of allowed unsecured claims, Delphi expects to accrue interest on such unsecured claims in future periods, to the extent required under applicable law. Such interest will be discharged at the emergence date under the provisions of the plan of reorganization discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy.

*Use of Estimates*—The preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein. During 2007, there were no material changes in the methods or policies used to establish accounting estimates. Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, worker's compensation accruals and healthcare accruals. Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

*Revenue Recognition*—Delphi's revenue recognition policy requires the recognition of sales when there is evidence of a sales agreement, the delivery of goods has occurred, the sales price is fixed or determinable and the collectibility of revenue is reasonably assured. Delphi generally records sales upon shipment of product to customers and transfer of title under standard commercial terms. In addition, if Delphi enters into retroactive price adjustments with its customers, these reductions to revenue are recorded when they are determined to be probable and estimable. From time to time, Delphi may enter into pricing agreements with its customers that provide for price reductions that are conditional upon achieving certain joint cost saving targets. In December 2004, Delphi entered into such an agreement with GM whereby Delphi committed to 2005 annual price reductions on GM's annual purchase value with Delphi. In return for this commitment, GM agreed, among other things, to accelerate its cooperation with certain sourcing and cost reduction initiatives of mutual benefit to the two companies and to source certain business to Delphi. In the fourth quarter of 2005, GM reimbursed Delphi for $35 million of the price reductions, which occurred earlier in 2005 for which GM did not meet its corresponding commitment to Delphi. This payment was received prior to December 31, 2005 and was recognized as revenue upon receipt.

Sales incentives and allowances are recognized as a reduction to revenue at the time of the related sale. In addition, from time to time Delphi makes payments to customers in conjunction with ongoing and in limited circumstances future business. Delphi recognizes these payments to customers as a reduction to revenue at the time Delphi commits to make these payments.

Shipping and handling fees billed to customers are included in net sales, while costs of shipping and handling are included in cost of sales.

*Discontinued Operations*—In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ("SFAS 144"), a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component. The results of discontinued operations are aggregated and presented separately in the consolidated statements of operations and consolidated statements of cash flows. Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the consolidated balance sheet. SFAS 144 requires the reclassification of amounts presented for prior years to effect their classification as discontinued operations.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities to be disposed of and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business"). The sale of the U.S. operations and certain of the non-U.S. operations of the Steering Business will be sales of assets and will include (i) all assets, except for cash, deferred tax assets, and intercompany accounts, and (ii) all liabilities, except for debt, deferred tax liabilities, intercompany accounts, U.S. pension and other postretirement benefit liabilities, accrued payroll, and certain employee benefit accounts. The sale of certain non-U.S. operations of the Steering Business will be stock sales and will include all assets and liabilities for the sites with purchase price adjustments for cash, debt, and certain other accounts. The majority of the Interiors and Closures Business are asset sales and the buyer will assume inventory, fixed assets, non-U.S. pension liabilities and the investment in a joint venture in Korea.

While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance,

and other services, no amounts for these general corporate retained functions have been allocated to the loss from discontinued operations in the statements of operations. Delphi expects to retain certain employee pension and other postretirement benefit liabilities for the Steering and Interiors and Closures Businesses and these liabilities were not allocated to liabilities held for sale in the balance sheets. Expenses related to the service cost of employee pension and other postretirement benefit plans, however, were allocated to discontinued operations in the statements of operations, because Delphi will not continue to incur such related expense subsequent to the divestiture of these businesses. Allocations have been made based upon a reasonable allocation method.

The assets held for sale were revalued based on the expected proceeds, resulting in a charge of $561 million to reduce these assets to their estimated fair value. Additionally, Delphi recorded a $34 million curtailment loss on pension benefits. Refer to Note 5. Discontinued Operations for more information.

*Research and Development*—Delphi incurs costs in connection with research and development programs that are expected to contribute to future earnings. Such costs are charged against income as incurred. Research and development expenses (including engineering) were $2.0 billion, $2.0 billion, and $2.1 billion for the years ended December 31, 2007, 2006, and 2005, respectively.

*Cash and Cash Equivalents*—Cash and cash equivalents are defined as short-term, highly liquid investments with original maturities of 90 days or less.

*Marketable Securities*—Delphi generally holds marketable securities with maturities of 90 days or less, which are classified as cash and cash equivalents for financial statement purposes. Delphi also has securities that are held for a period longer than 90 days. Debt securities are classified as held-to-maturity, and accordingly are recorded at cost in Delphi's consolidated financial statements. Equity securities are classified as available-for-sale and are recorded in the consolidated financial statements at market value with changes in market value included in other comprehensive income ("OCI"). At December 31, 2007 and 2006, Delphi had available-for-sale securities with a cost basis of $3 million and $5 million, respectively, and a carrying value of $3 million and $6 million, respectively. In the event that the Company's debt or equity securities experience an other than temporary impairment in value, such impairment is recognized as a loss in the Statement of Operations.

*Restricted Cash*— Delphi has restricted cash balances of which the majority represent cash for use for the pre-retirement portion of the U.S. employee workforce transition programs, refer to Note 15. U.S. Employee Workforce Transition Programs. Also included in restricted cash are balances on deposit at financial institutions that have issued letters of credit in favor of Delphi.

*Accounts Receivable*—Delphi enters into agreements to sell its accounts receivable. Since the agreements allow Delphi to maintain effective control over the receivable, these various accounts receivable factoring facilities were accounted for as short-term debt at December 31, 2007 and 2006. The Company generally does not require collateral related to its trade accounts receivable. The allowance for doubtful accounts is established based upon analysis of trade receivables for known collectibility issues and the aging of the trade receivables at the end of each period. As of December 31, 2007 and 2006, the allowance for doubtful accounts was $143 million and $144 million, respectively. The Company exchanges certain amounts of accounts receivable, primarily in China, for bank notes with original maturities greater than 90 days. The collection of such notes are reflected in the investing activities in the consolidated statement of cash flows.

*Inventories*— Inventories are stated at the lower of cost, determined on a first-in, first-out basis ("FIFO"), or market, including direct material costs and direct and indirect manufacturing costs.

From time to time, Delphi may receive payments from suppliers. Delphi recognizes these payments from suppliers as a reduction of the cost of the material acquired during the period to which the payments relate. In some instances, supplier rebates are received in conjunction with or concurrent with the negotiation of future purchase agreements and these amounts are amortized over the prospective agreement period.

*Property*—Property, plant and equipment, including internally-developed internal use software, is recorded at cost. Major improvements that materially extend the useful life of property are capitalized. Expenditures for repairs and maintenance are charged to expense as incurred. Depreciation is provided based on the estimated useful lives of groups of property generally using an accelerated method, which accumulates depreciation of approximately two-thirds of the depreciable cost during the first half of the estimated useful lives, or using straight-line methods. Leasehold improvements are amortized over the period of the lease or the life of the property, whichever is shorter, with the amortization applied directly to the asset account.

*Special Tools*— Special tools balances represent Delphi-owned tools, dies, jigs and other items used in the manufacture of customer components. At December 31, 2007 and 2006 the special tools balance was $461 million and $458 million, respectively, included within the property, net line item in the consolidated balance sheet. Special tools also includes unreimbursed pre-production tooling costs related to customer-owned tools for which the customer has provided a non-cancelable right to use the tool. Delphi-owned special tools balances are amortized over the expected life of the special tool or the life of the related vehicle program, whichever is shorter. The unreimbursed costs incurred related to customer-owned special tools that are not subject to reimbursement are capitalized and amortized over the

expected life of the special tool or the life of the related vehicle program, whichever is shorter.  Engineering, testing and other costs incurred in the design and development of production parts are expensed as incurred, unless the costs are reimbursable, as specified in a customer contract.

*Valuation of Long-Lived Assets*—Delphi periodically evaluates the carrying value of long-lived assets held for use including intangible assets when events or circumstances warrant such a review.  The carrying value of a long-lived asset held for use is considered impaired when the anticipated separately identifiable undiscounted cash flows from the asset are less than the carrying value of the asset.  In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset.  Fair value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved or our review of appraisals.  Impairment losses on long-lived assets held for sale are determined in a similar manner, except that fair values are reduced for the cost to dispose of the assets.  During 2007, 2006 and 2005, Delphi recorded asset impairment charges of $291 million, $215 million and $233 million, respectively, of which $98 million, $172 million and $172 million, respectively, were recorded in long-lived asset impairment charges from continuing operations and $193 million, $43 million and $61 million, respectively, were recorded in loss from discontinued operations.  Refer to Note 5. Discontinued Operations and Note 9. Property, Net for more information.

*Intangible Assets*—Delphi has definite-lived intangible assets of approximately $40 million and $51 million as of December 31, 2007 and 2006, respectively.  In general, these intangible assets are being amortized over their useful lives, normally 3-17 years.  During 2005, Delphi evaluated for impairment certain intangible assets that had been recorded in conjunction with previous acquisitions.  In 2005, based on the current fair value of these intangible assets, Delphi recognized an impairment of $6 million in depreciation and amortization related to intangible assets, related to the Powertrain Systems segment and the Product and Service Solutions business within the Corporate and Other segment.

*Goodwill*—Delphi reviews the recoverability of goodwill at least annually as of May 31 and any time business conditions indicate a potential change in recoverability.  Refer to Note 10. Goodwill.

*Environmental Liabilities*—Delphi recognizes environmental remediation liabilities when a loss is probable and can be reasonably estimated.  Such liabilities generally are not subject to insurance coverage.  The cost of each environmental remediation is estimated by engineering, financial, and legal specialists within Delphi based on current law and considers the estimated cost of investigation and remediation required and the likelihood that, where applicable, other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable.  The process of estimating environmental remediation liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remediation and technology will be required, and the outcome of discussions with regulatory agencies and other PRPs at multi-party sites.  In future periods, new laws or regulations, advances in remediation technologies and additional information about the ultimate remediation methodology to be used could significantly change Delphi's estimates.  Refer to Note 17. Commitments and Contingencies.

*Warranty*—Delphi recognizes expected warranty costs for products sold at the time of sale of the product based on Delphi estimates of the amount that will eventually be required to settle such obligations.  These accruals are based on factors such as past experience, production changes, industry developments and various other considerations.  Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.  Refer to Note 12. Warranty Obligations.

*Asset Retirement Obligations*—Delphi recognizes asset retirement obligations in accordance with SFAS No. 143 ("SFAS 143"), *Accounting for Asset Retirement Obligations,* and FASB Interpretation 47 ("FIN 47"), *Accounting for Conditional Asset Retirement Obligations, an interpretation of SFAS No. 143.*  Delphi identified conditional retirement obligations primarily related to asbestos abatement at certain of its sites.  To a lesser extent, Delphi also has conditional retirement obligations at certain sites related to the removal of storage tanks and polychlorinated biphenyl ("PCB") disposal costs.  Delphi recorded assets of $2 million with offsetting accumulated depreciation of $2 million, and an asset retirement obligation liability of $17 million.  In 2005, Delphi also recorded a cumulative effect charge against earnings of $17 million, after-tax.

A reconciliation of the asset retirement obligations for 2006 and 2007 is as follows:

|  | (in millions) |
|---|---|
| Asset retirement obligations at January 1, 2006 | $ 14 |
| Accretion | 2 |
| Liabilities incurred | — |
| Liabilities settled/adjustments | (3) |
| Asset retirement obligations at December 31, 2006 | 13 |
| Accretion | — |
| Liabilities incurred | 14 |
| Liabilities settled/adjustments | — |
| Asset retirement obligations at December 31, 2007 | $ 27 |

*Annual Incentive Plans*— On February 17, 2006, the Court entered a final order (the "AIP Order") granting the Debtors' motion to implement a short-term annual incentive plan (the "AIP"). The AIP Order initially covered the period commencing on January 1, 2006 and continuing through June 30, 2006. On July 21, 2006, March 29, 2007, and October 3, 2007, the Court authorized the Debtors to continue the AIP for subsequent six-month periods, through December 31, 2007 (each a "Supplemental AIP Order") under substantially the same terms and conditions outlined in the AIP order with specified corporate and divisional targets for each six-month period. The AIP provides the opportunity for incentive payments to executives provided that specified corporate and divisional financial targets are met. Such targets are based on Delphi's earnings or a division's operating income before interest, taxes, depreciation, amortization, restructuring costs and certain other non-recurring costs, but excluded earnings generated directly from agreements related to Delphi's transformation reached with Delphi's labor unions or with GM, such as the special attrition programs that reduced idled employee costs and enabled savings from the hiring of employees at a different wage and benefit package, refer to Note 15. U.S. Employee Workforce Transition Programs. The amounts paid to individual executives may be adjusted either upward or downward based upon individual levels of performance subject to certain maximums. In addition, under some circumstances, individual executives may not be entitled to receive or retain incentive compensation. An annual incentive plan consistent with the AIP applies to approximately 100 individuals holding executive positions at non-Debtor subsidiaries of Delphi.

During 2007 and 2006, Delphi recorded expense of $149 million and $167 million, respectively, related to executive and U.S. salaried employee incentive plans, including $18 million and $20 million, respectively, included in loss from discontinued operations. In conjunction with the February 17, 2006 approval of the AIP, certain incentive compensation plans previously in place for Delphi executives were cancelled resulting in the reduction of expense of approximately $21 million for incentive compensation in 2006. Delphi paid $100 million in the third quarter of 2006 for the period from January 1, 2006 to June 30, 2006 and during the year ended December 31, 2007, Delphi paid $155 million related to executive and U.S. salaried employee incentive plans.

*Postemployment Benefits*— Delphi accrues for costs associated with postemployment benefits provided to inactive employees throughout the duration of their employment. Delphi uses future production estimates combined with workforce geographic and demographic data to develop projections of time frames and related expense for postemployment benefits. For purposes of accounting for postemployment benefits, inactive employees represent those employees who have been other than temporarily idled. Delphi considers all idled employees in excess of approximately 10% of the total workforce at a facility to be other than temporarily idled. As a result of the U.S. employee special attrition programs, Delphi determined that certain previously recorded accruals for postemployment benefits, representing the future cash expenditures expected during the period between the idling of affected employees and the time when such employees are redeployed, retire, or otherwise terminate their employment, were no longer necessary and accordingly Delphi reduced such accruals by $108 million during 2006, which was recorded in cost of sales. At December 31, 2007 and 2006, the liability for postemployment benefits of other than temporarily idled employees was zero and $1 million, respectively.

Delphi also accrues for costs associated with extended disability benefits for its employees. Discounting of the future extended-disability expenditures is based on the nature of the obligation and the timing of the expected benefit payments. At December 31, 2007 and 2006, the short-term extended-disability liability balance of $10 million and $27 million, respectively, was included in accrued liabilities in the accompanying consolidated balance sheets. The long-term extended-disability liability balance included in other long-term liabilities in the accompanying consolidated balance sheets at December 31, 2007 and 2006 was $72 million and $95 million, respectively, calculated with a discount rate of 5.90% and 5.70%, respectively. During 2006, as a result of the U.S. workforce transition programs, Delphi recognized a curtailment gain of $59 million.

*Employee Termination Benefits and Other Exit Costs*— Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company. This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business. These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements. Voluntary termination benefits are accrued when an employee accepts the related offer. Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan. Contract termination costs are recorded when contracts are

11

terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract.   All other exit costs are accrued when incurred.  Refer to Note 7. Employee Termination Benefits and Other Exit Costs.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for employee termination benefits and other exit costs related to non-core product lines included in the amount above and refer to Note 15. U.S. Employee Workforce Transition Programs for employee termination benefits and other exit costs related to the 2007 U.S. labor agreements.

*Worker's Compensation Benefits*—Delphi's worker's compensation benefit accruals are actuarially determined and are subject to the existing worker's compensation laws that vary by state.  Accruals for worker's compensation benefits represent the discounted future cash expenditures expected during the period between the incidents necessitating the employees to be idled and the time when such employees return to work, are eligible for retirement or otherwise terminate their employment.  The discount rates at December 31, 2007 and 2006 was 5.90% and 5.80%, respectively, were selected by analyzing the results of matching the projected benefit payments with a portfolio of high quality fixed income investments rated AA- or higher by Standard and Poor's and with Citigroup Pension Discount Curve.  At December 31, 2007 and 2006, the short-term worker's compensation liability balance included in accrued liabilities in the accompanying consolidated balance sheets was $49 million and $77 million, respectively.  The long-term worker's compensation liability balance included in other long-term liabilities in the accompanying consolidated balance sheets at December 31, 2007 and 2006 was $328 million and $282 million, respectively.

*Foreign Currency Translation*—Assets and liabilities of non-U.S. subsidiaries are translated to U.S. dollars at end-of-period currency exchange rates.  The consolidated statements of operations of non-U.S. subsidiaries are translated to U.S. dollars at average-period currency exchange rates.  The effect of translation for non-U.S. subsidiaries is generally reported in OCI.  The effect of remeasurement of assets and liabilities of non-U.S. subsidiaries that use the U.S. dollar as their functional currency is primarily included in cost of goods sold.  Also included in cost of goods sold are gains and losses arising from transactions denominated in a currency other than the functional currency of a particular entity.  Net transaction gains and losses, as described above, decreased cost of sales by $13 million and $45 million in 2007 and 2006, respectively, and increased cost of sales by $54 million in 2005.

*Derivative Financial Instruments*— Delphi accounts for derivative financial instruments in accordance with SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities*, as amended, which requires that all derivative instruments be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria.

Delphi manages its exposure to fluctuations in currency exchange rates, interest rates and certain commodity prices by entering into a variety of forward contracts and swaps with various counterparties.  Such financial exposures are managed in accordance with Delphi's policies and procedures.  Delphi does not enter into derivative transactions for speculative or trading purposes.  As part of the hedging program approval process, Delphi identifies the specific financial risk which the derivative transaction will minimize, the appropriate hedging instrument to be used to reduce the risk and the correlation between the financial risk and the hedging instrument.  Purchase orders, letters of intent, capital planning forecasts and historical data are used as the basis for determining the anticipated values of the transactions to be hedged.  Delphi does not enter into derivative transactions that do not have a high correlation with the underlying financial risk.  The hedge positions entered into by Delphi, as well as the correlation between the transaction risks and the hedging instruments, are reviewed on an ongoing basis.

Foreign exchange forward and option contracts are accounted for as hedges of firm or forecasted foreign currency commitments to the extent they are designated and assessed as highly effective.  All other foreign exchange contracts are marked to market on a current basis.  Commodity swaps and options are accounted for as hedges of firm or anticipated commodity purchase contracts to the extent they are designated and assessed effective.  All other commodity derivative contracts that are not designated as hedges are either marked to market on a current basis or are exempted from mark to market accounting as normal purchases.  At December 31, 2007 and 2006, Delphi's exposure to movements in interest rates was not hedged with derivative instruments.

*Common Stock and Preferred Stock*—Delphi currently has one class of common stock outstanding.  There are 1,350 million shares of common stock authorized at both December 31, 2007 and 2006, of which 563,477,461 were outstanding (565,025,907 shares issued less 1,548,446 held as treasury stock) at December 31, 2007 and 561,781,590 were outstanding (565,025,907 shares issued less 3,244,317 shares held as treasury stock) at December 31, 2006.  Holders of Delphi common stock are entitled to one vote per share with respect to each matter presented to its shareholders on which the holders of common stock are entitled to vote.  Delphi did not pay dividends in 2007 and 2006 and paid $0.115 per share in 2005, of which $0.07 was declared in 2004 but was paid in 2005.  There are no cumulative voting rights.  As of December 31, 2007 and 2006, Delphi has no issued and outstanding preferred stock.

*Recently Issued Accounting Pronouncements*— In June 2006, the FASB issued FASB Interpretation 48 ("FIN 48"), *Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109*.  FIN 48 clarifies the accounting for uncertainty in income taxes recognized in an entity's financial statements in accordance with FASB Statement No. 109, *Accounting for Income Taxes*.  Delphi adopted FIN 48 effective January 1, 2007.  The impact of initially applying FIN 48 was recognized as a cumulative effect adjustment increasing the January 1, 2007 opening balance of accumulated deficit by $18 million.  Refer to Note 8. Income Taxes for more information regarding the impact of adopting FIN 48.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *Fair Value Measurements*. SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value. SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. Delphi does not believe the adoption of SFAS 157 will have a significant impact on its financial statements. Delphi expects to use the new definition of fair value upon adoption of SFAS 157 as of January 1, 2008 and apply the disclosure requirements of SFAS 157 for Delphi's 2008 financial statements.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R)*. SFAS 158 requires, among other things, an employer to measure the funded status of a plan as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Delphi currently measures the funded status of its U.S. other postretirement benefit plan for retiree health care and certain international pension plans as of September 30 of each year. Delphi expects to adopt the measurement date provisions of SFAS 158 as of January 1, 2008, which will result in an adjustment to accumulated deficit upon adoption.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 ("SFAS 159"), *The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115*. SFAS 159 permits entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently measured at fair value. Unrealized gains and losses on items for which the fair value option has been elected would be reported in earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements in order to facilitate comparisons between entities choosing different measurement attributes for similar types of assets and liabilities. SFAS 159 does not affect existing accounting requirements for certain assets and liabilities to be carried at fair value. SFAS 159 is effective as of the beginning of a reporting entity's first fiscal year that begins after November 15, 2007. Delphi does not believe the adoption of SFAS 159 will have a significant impact on its financial statements.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (Revised 2007) ("SFAS 141R"), *Business Combinations*. SFAS 141R requires an acquiring entity to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. SFAS 141R applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. Earlier adoption is prohibited. Accordingly, Delphi is required to record and disclose business combinations following existing U.S. GAAP until January 1, 2009. Delphi is currently evaluating the requirements of SFAS 141R, and has not yet determined the impact on its financial statements.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160 ("SFAS 160"), *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51*. SFAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. SFAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Earlier adoption is prohibited. Delphi is currently evaluating the requirements of SFAS 160, and has not yet determined the impact on its financial statements.

## 2. TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

On September 6, 2007, Delphi filed a proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") with the Court. The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, as detailed below, including agreements reached with each of Delphi's principal U.S. labor unions and GM. At a Court hearing on September 27, 2007, Delphi stated that the current dynamics of the capital markets prompted Delphi to consider whether amendments to the Plan filed on September 6 might be necessary. Delphi commenced its Disclosure Statement hearing on October 3, 2007, and after resolving certain objections, requested that the hearing continue on October 25, 2007. During October and November, the Court granted additional requests by Delphi to further continue the hearing on the adequacy of the Disclosure Statement to allow Delphi to negotiate potential amendments to the Plan and the related agreements with its stakeholders, including the comprehensive agreements reached with GM and the Equity Purchase and Commitment Agreement ("July EPCA") between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus") and Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"). On December 3, 2007, Delphi filed further potential amendments to the Plan, the comprehensive agreements reached with GM, the July EPCA, and the related Disclosure Statement and on December 4, 2007 Delphi announced that it had reached agreement in principle on these amendments with the Creditors' Committee, the Equity Committee, GM, and the Investors. After a hearing on the adequacy of the proposed Disclosure Statement on December 6 and 7, 2007, on December 10, 2007, Delphi filed its first amended joint Plan of Reorganization (the "Amended Plan") and its first amended Disclosure Statement with respect to the Amended Plan (the "Amended Disclosure Statement"). The Court entered an order approving the adequacy of the Amended

Disclosure Statement on December 10, 2007.  On December 10, 2007, Delphi and the Investors entered into an amendment to the July EPCA (together with the July EPCA, the "EPCA")).  After entry of the order approving the Amended Disclosure Statement, Delphi began solicitation of votes on the Amended Plan.  On January 16, 2008, Delphi filed further modifications to the Amended Plan.  Additional modifications are set forth in Exhibit A to the Confirmation Order which was entered on January 25, 2008.  On January 16, 2008, Delphi announced that the voting results, which are summarized below, had been filed with the Court.  A hearing on confirmation of the Amended Plan took place on January 17, 18, and 22, 2008.  The Court entered the order confirming the Amended Plan on January 25, 2008, and that order became final on February 4, 2008.

**Plan of Reorganization and Transformation Plan**

Elements of Transformation Plan

On March 31, 2006, we announced our transformation plan centered around five key elements, each of which is also addressed in our Amended Plan and the series of settlement agreements it embodies.  The progress on each element is discussed below.

Labor - Modify our labor agreements to create a more competitive arena in which to conduct business.

During the second quarter of 2007, Delphi signed an agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007.  Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject its U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion").  As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues.  The UAW settlement agreement includes extending, until March 31, 2008, our obligation to indemnify GM if certain GM-UAW benefit guarantees are triggered.  Portions of these agreements have already become effective, and the remaining portions will not become effective until the effectiveness of the GSA and the MRA with GM and upon substantial consummation of the Amended Plan as confirmed by the Court.  The Amended Plan incorporates, approves, and is consistent with the terms of each agreement.

Among other things, these agreements generally provided certain members of the union labor workforce options to either retire, accept a voluntary severance package or accept lump sum payments in return for lower future hourly wages.  Refer to Note 15. U.S. Employee Workforce Transition Programs for more information.

On September 4, 2007, the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, subject to the Court's prior settlement approval orders pertaining to each of Delphi's U.S. labor unions, as it relates to all parties and the intervening respondents, by entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g).

GM - Conclude negotiations with GM to finalize financial support for certain of our legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

Delphi and GM have entered into comprehensive settlement agreements consisting of a Global Settlement Agreement, as amended (the "GSA") and a Master Restructuring Agreement, as amended (the "MRA").  The GSA and the MRA comprised part of the Amended Plan and were approved in the order confirming the Amended Plan on January 25, 2008.  The GSA and MRA are not effective until and unless Delphi emerges from chapter 11.  Accordingly, the accompanying consolidated financial statements do not include any adjustments related to the GSA or the MRA.  These agreements will produce material reduction in Delphi's liabilities related to the workforce transition programs.  Delphi will account for the impact of the GSA or the MRA when the conditions of the agreements are satisfied, which will likely occur upon emergence from chapter 11.

- Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Amended Plan or as soon as reasonably possible thereafter.  By contrast, resolution of most of the matters addressed in the MRA will require a significantly longer period that will extend for a number of years after confirmation of the Amended Plan.

- GM's obligations under the GSA and MRA are conditioned upon, among other things, Delphi's consummation of the Amended Plan, including payment of amounts to settle GM claims as outlined below.

The GSA is intended to resolve outstanding issues between Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11, and will be implemented by Delphi and GM in the short term.  On November 14, 2007 and again on December 3, 2007, Delphi entered into restated amendments to both the GSA and the MRA.  Together, these agreements provide for a comprehensive

settlement of all outstanding issues between Delphi and GM, including (other than ordinary course matters): litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999; certain post-separation claims and disputes between Delphi and GM; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under Delphi's Amended Plan; and various other legacy issues.

In addition to establishing claims treatment, including specifying which claims survive and the consideration to be paid by Delphi to GM in satisfaction of certain claims, the GSA addresses, among other things, commitments by Delphi and GM regarding other postretirement benefit and pension obligations, and other GM contributions with respect to labor matters and releases.

- GM will assume approximately $7.3 billion of certain post-retirement benefits for certain of the Company's active and retired hourly employees, including health care and life insurance;

- Delphi will freeze its Delphi Hourly-Rate Employees Pension Plan as soon as practicable following the effective date of the Amended Plan, as provided in the union settlement agreements, and GM's Hourly Pension Plan will become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi will transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly-Rate Employee Pension Plan, as set forth in the union settlement agreements;

- Shortly after the effectiveness of the Amended Plan, GM will receive an interest bearing note from Delphi in the amount of $1.5 billion which is expected to be paid promptly following effectiveness;

- GM will make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the U.S. labor agreements; and

- GM and certain related parties and Delphi and certain related parties will exchange broad, global releases (which will not apply to certain surviving claims as set forth in the GSA).

The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11. The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM. Through the MRA, Delphi and GM have agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- GM will make significant, ongoing contributions to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and other postretirement benefit contributions provided under the Supplemental Wage Agreement, at specified UAW manufacturing facilities retained by Delphi;

- GM and Delphi have agreed to certain terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- GM and Delphi have agreed to certain additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by certain future dates (as defined in the MRA); and

- GM and Delphi have agreed to the treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

The GSA and MRA may be terminated by the Company or GM if the effective date of the Amended Plan has not occurred by March 31, 2008 and the EPCA has been terminated. However, if the effective date of the Amended Plan has not occurred by March 31, 2008 and the EPCA has not been terminated by such date the GSA and MRA may be terminated by the Company or GM on the earlier of the termination of the EPCA or April 30, 2008.

Portfolio - Streamline our product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with our new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics,

steering, halfshafts, and wheel bearings. Effective November 1, 2006, in connection with the Company's continuous evaluation of its product portfolio, it decided that the power products business no longer fit within its future product portfolio and that business line was moved to Delphi's Automotive Holdings Group. With the exception of the catalyst product line, included in the Powertrain Systems segment, and the steering and halfshaft product lines and interiors and closures product lines included in discontinued operations, these non-core product lines are included in the Company's Automotive Holdings Group segment, refer to Note 21. Segment Reporting.

Throughout 2007, Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites. The sale and wind-down process is being conducted in consultation with the Company's customers, unions and other stakeholders to carefully manage the transition of affected product lines. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

During 2007, Delphi either obtained Court approval to sell or closed on sales for the global steering and halfshaft businesses, our interiors and closures product line, catalysts product line and brake hose business. Refer to Note 5. Discontinued Operations and Note 6. Acquisitions and Divestitures for more information.

Costs recorded in 2007 and 2006 related to the transformation plan for non-core product lines in addition to the charge described above include impairments of long-lived assets as further described in Note 9. Property, Net, and employee termination benefits and other exit costs as further described in Note 7. Employee Termination Benefits and Other Exit Costs.

Cost Structure - Transform our salaried workforce and reduce general and administrative expenses to ensure that its organizational and cost structure is competitive and aligned with our product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services and information technology outsourcing activities, reduction in our global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of our salaried benefit programs to bring them in line with more competitive industry levels. Given the investment required to implement these initiatives, we do not expect to fully realize substantial savings until 2009 and beyond.

Pensions - Devise a workable solution to our current pension funding situation, whether by extending contributions to the pension trusts or otherwise.

Delphi's discussions with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM. On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers"). On May 31, 2007, the Court authorized Delphi to perform under the terms of those funding waivers. The IRS modified the 2006 Waivers by extending the dates by which Delphi is required to file its Amended Plan and emerge from chapter 11. On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver"). The 2007 Hourly Plan Waiver is necessary to make the transfer of hourly pension obligations to the GM plan economically efficient by avoiding redundant cash contributions that would result in a projected overfunding of the Hourly Plan. On October 26, 2007, the Court authorized Delphi to perform under the 2007 Hourly Plan Waiver. The conditional funding waivers will permit Delphi to defer funding contributions due under ERISA and the IRC until February 29, 2008.

The pertinent terms of the 2006 Waivers, as modified, include that the effective date of the Company's plan of reorganization must occur no later than February 29, 2008. Effective June 16, 2007, Delphi provided to the PBGC letters of credit in favor of the Hourly and Salaried Plans in the amount of $100 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan. Not later than five days after the effective date of the Company's plan of reorganization, the Company must either (1) effect a transfer under IRC § 414(l) to a GM plan, (2) make cash contributions to the Hourly Plan, or (3) make a combination thereof that reduces the net unfunded liabilities of the Hourly Plan by $1.5 billion as determined on a basis in accordance with FASB Statement No. 87, "*Employers' Accounting for Pensions.*"

Not later than five days after the effective date of the Company's plan of reorganization, the Company must contribute approximately $1.25 billion to the Hourly and Salaried Plans with approximately $1.05 billion in plan contributions and approximately $200 million into escrow. These contributions include additional contributions required by the conditional waivers as extended.

The Company has represented that it intends to meet the minimum funding standard under IRC section 412 for the plan years ended September 30, 2006 and 2007 upon emergence from chapter 11. The Company is seeking an extension of the waiver terms with the IRS

and the PBGC as they relate to the effective date of the Amended Plan. The foregoing description of the pension funding plan is a summary only and is qualified in its entirety by the terms of the waivers and the orders of the Court.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the Labor section, Delphi committed to freeze the Hourly and Salaried Plans effective upon emergence which resulted in curtailment charges of $59 million and $116 million, respectively, in 2007. Refer to Note 16. Pension and Other Postretirement Benefits for more information.

<u>The Amended Plan of Reorganization</u>

The Court entered an order approving the adequacy of the Amended Disclosure Statement on December 10, 2007.  After entry of the order approving the Amended Disclosure Statement, Delphi began solicitation of votes on the Amended Plan.  On January 16, 2008, Delphi filed further modifications to the Amended Plan.  Additional modifications are set forth in Exhibit A to the Confirmation Order entered on January 25, 2008.  On January 16, 2008, Delphi announced that the voting results had been filed with the Court.  Voting by classes of creditors and holders of interest (including shareholders) entitled to vote on the Amended Plan illustrates broad-based support for the Amended Plan.  Eighty-one percent of all voting general unsecured creditors voted to accept the Amended Plan (excluding ballots cast by GM, plaintiffs in the MDL, and holders of interests).  Of the total amount voted by all general unsecured creditors classes, seventy-eight percent voted to accept the Amended Plan.  One hundred percent of the ballots cast in the GM and MDL classes voted to accept the Amended Plan.  Seventy-eight percent of voting shareholders voted to accept the Amended Plan.

The recoveries, distributions, and investments pursuant to the confirmed Amended Plan are as follows:

| | **Confirmed Plan (1/25/2008)** |
|---|---|
| **Net Funded Debt** | $4.6 billion |
| **Plan Equity Value** | Total enterprise value of **$12.8 billion**, which after deducting net debt and warrant value results in distributable equity value of **$8.0 billion** (or approximately $59.61 per share  based on approximately 134.3 million shares) |
| **Plan Investors** | **Direct Investment**<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $10.2 billion (or 29.2% discount from Plan Equity Value)<br>- Purchase $400 million of preferred stock convertible at an assumed enterprise value of $10.3 billion (or 28.6% discount from Plan Equity Value)<br>- Purchase $175 million of New Common Stock at an assumed enterprise value of $9.7 billion (or 35.6% discount from Plan Equity Value)<br><br>**Backstop of Discount Rights Offering**<br> - Commit to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering to be made available to unsecured creditors (the "Discount Rights Offering") |
| **GM** | **Recovery of $2.48 billion at Plan value of $12.8 billion**<br>- At least $750 million in Cash<br>- Up to $750 million in a second lien note<br>- $1.073 billion (in liquidation value) in junior convertible preferred stock |
| **Unsecured Creditors** | **Par plus accrued recovery at Plan value of $12.8 billion**<br>- 78.4% in New Common Stock at Plan Equity Value<br>- 21.6% through pro rata participation in the Discount Rights Offering at an assumed enterprise value of $9.7 billion (or 35.6% discount from Plan Equity Value) |
| **TOPrS** | **90% of par recovery at Plan value of $12.8 billion**<br>-78.4% in New Common Stock at Plan Equity Value<br>- 21.6% through pro rata participation in the Discount Rights Offering at an assumed enterprise value of $9.7 billion (or 35.6% discount from Plan Equity Value) |

| | **Confirmed Plan (1/25/2008)** |
|---|---|
| **Existing Common Stockholders** | **Par Value Rights**<br>- Right to acquire approximately 21,680,996 shares of New Common Stock at a purchase price struck at Plan Equity Value |
| | **Warrants**<br>- Warrants to acquire 6,908,758 shares of New Common Stock (which comprises 5% of the fully diluted New Common Stock) exercisable for seven years after emergence struck at 20.7% premium to Plan Equity Value<br>- Warrants to acquire $1.0 billion of New Common Stock exercisable for six months after emergence struck at 9.0% premium to Plan Equity Value<br>- Warrants to acquire 2,819,901 shares of New Common Stock (which comprises 2% of the fully diluted New Common Stock) exercisable for ten years after emergence struck at Plan Equity Value |
| | **Common Stock**<br>461,552 shares of New Common Stock |

Delphi entered into a "best efforts" engagement letter and fee letter with JPMorgan Securities, Inc., JPMorgan Chase Bank, N.A., and Citigroup Global Markets Inc. in connection with an exit financing arrangement, with the goal of emergence from chapter 11 as soon as practicable.

Pursuant to an order entered by the Court on December 20, 2007, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization was extended to and including March 31, 2008, and the Debtors' exclusivity period for soliciting acceptances of the Amended Plan was extended to and including May 31, 2008.

Equity Purchase and Commitment Agreement

Delphi was party to (i) a Plan Framework Support Agreement (the "PSA") with Cerberus Capital Management, L.P. ("Cerberus"), Appaloosa, Harbinger, Merrill, UBS and GM, which outlined a framework for the Amended Plan, including an outline of the proposed financial recovery of the Company's stakeholders and the treatment of certain claims asserted by GM, the resolution of certain pension funding issues and the corporate governance of reorganized Delphi, and (ii) an Equity Purchase and Commitment Agreement (the "Terminated EPCA") with affiliates of Cerberus, Appaloosa and Harbinger (the "Investor Affiliates"), as well as Merrill and UBS, pursuant to which these investors would invest up to $3.4 billion in reorganized Delphi. Both the PSA and the Terminated EPCA were subject to a number of conditions, including Delphi reaching consensual agreements with its U.S. labor unions and GM.

On April 19, 2007, Delphi announced that it anticipated negotiating changes to the Terminated EPCA and the PSA and that it did not expect that Cerberus would continue as a plan investor. On July 7, 2007, pursuant to Section 12(g) of the Terminated EPCA, Delphi sent a termination notice of the Terminated EPCA to the other parties to the Terminated EPCA. As a result of the termination of the Terminated EPCA, a Termination Event (as defined in the PSA) occurred, and all obligations of the parties to the PSA under the PSA were immediately terminated and were of no further force and effect. Delphi incurred no fees under the Terminated EPCA as a result of this termination.

On July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "July EPCA") submitted by a group comprising a number of the original plan investors (Appaloosa, Harbinger, Merrill, and UBS) as well as Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. On August 2, 2007, the Court granted the Company's motion for an order authorizing and approving the July EPCA and on August 3, 2007, the Investors and the Company executed the July EPCA. Under the EPCA (as described below), the Investors may invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan announced on March 31, 2006 on the terms and subject to the conditions contained in the EPCA.

As noted above, during October and November 2007, Delphi negotiated potential amendments to the July EPCA. On December 10, 2007, the Investors and Delphi entered into an amendment to the July EPCA dated August 3, 2007 to reflect events and developments since then, including those relating to Court approvals in connection with negotiated amendments to the July EPCA (the "EPCA Amendment" and together with the July EPCA, the "EPCA"); delivery of a revised disclosure letter by the Company; delivery of a revised business plan by the Company; updates and revisions to representations and warranties; agreements with principal labor unions; the execution and amendment of certain settlement agreements with GM; and the execution of a best efforts financing letter and the filing of a

plan of reorganization and disclosure statement. Further, the EPCA Amendment amends provisions relating to the discount rights offering (including the replacement of existing common stockholders with unsecured creditors). Finally, the EPCA Amendment revised the July EPCA to reflect certain economic changes for recoveries provided under the plan of reorganization, and a post-emergence capital structure which includes Series C Preferred Stock to be issued to GM.

Under the terms and subject to the conditions of the EPCA, the Investors will commit to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, the Investors will commit to purchasing any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that will be made available to unsecured creditors subject to satisfaction of other terms and conditions. The rights offering would commence sometime following confirmation of the Company's Amended Plan and conclude approximately 20 days thereafter, prior to the Company's emergence from chapter 11.

The EPCA is subject to the satisfaction or waiver of numerous conditions, including the condition that an affiliate of Appaloosa is reasonably satisfied with the terms of certain material transaction documents (evidenced by an affiliate of Appaloosa not delivering a deficiency notice), to the extent the terms thereof would have an impact on the Investors' proposed investment in the Company and receipt of proceeds from the sale of preferred stock, exit financing and the discount rights offering sufficient to fund the transaction contemplated by the EPCA and certain related transactions. Other conditions to closing include release and exculpation of each Investor as set forth in the EPCA Amendment; that the Company will have undrawn availability of $1.4 billion including a letter of credit carve out and reductions under a borrowing base formula; that the Company's pro forma interest expense during 2008 on the Company's indebtedness, as defined in the EPCA, will not exceed $585 million; that scheduled Pension Benefit Guarantee Corporation liens are withdrawn; and that the aggregate amount of trade and unsecured claims be no more than $1.45 billion (subject to certain waivers and exclusions).

Delphi can terminate the EPCA in certain circumstances, including at any time on or after March 31, 2008 if the Amended Plan has not become effective. An affiliate of Appaloosa can terminate the EPCA, including, at any time on or after March 31, 2008, if the Amended Plan has not become effective; if the Company has changed its recommendation or approval of the transactions contemplated by the EPCA, the Amended Plan terms or the settlement with GM in a manner adverse to the Investors or approved or recommended an alternative transaction; or if the Company has entered into any agreement, or taken any action to seek Court approval relating to any plan, proposal, offer or transaction, that is inconsistent with the EPCA, the settlement with GM or the Amended Plan. In the event of certain terminations of the EPCA pursuant to the terms thereof, the Company may be obligated to pay the Investors $83 million plus certain transaction expenses in connection with an alternative investment transaction as described in the immediately following paragraph.

In exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million. In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA. Delphi has deferred the recognition of these amounts in other current assets as they will be netted against the proceeds from the EPCA upon issuance of the new shares. The Company is required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA is terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdraws its recommendation of the transaction or the Company willfully breaches the EPCA, and within the next 24 months thereafter, the Company then agrees to an alternative investment transaction. The Company also has agreed to pay out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. In no event, however, shall the Company's aggregate liability under the EPCA, including any liability for willful breach, exceed $250 million.

The EPCA also includes certain corporate governance provisions for the reorganized Company, each of which has been incorporated into Delphi's Amended Plan. The reorganized Company will be governed initially by a nine-member, classified Board of Directors consisting of the Company's Chief Executive Officer and President ("CEO"), and Executive Chairman, three members nominated by Appaloosa, three members nominated by the statutory creditors' committee, and one member nominated by the co-lead investor representative on a search committee with the approval of either the Company or the statutory creditors' committee. As part of the new corporate governance structure, the current Company's Board of Directors along with the Investors, mutually agreed that Rodney O'Neal will continue as CEO of the reorganized Company. Subject to certain conditions, six of the nine directors will be required to be independent from the reorganized Company under applicable exchange rules and independent of the Investors.

A five-member search committee will select the Company's post-emergence Executive Chairman, have veto rights over all directors nominated by the Investors and statutory committees, and appoint initial directors to the committees of the Company's Board of Directors. The search committee consists of a representative from the Company's Board of Directors, a representative of each of the Company's two statutory committees, a representative from Appaloosa and a representative of the other co-investors (other than UBS, Goldman and Merrill). Appaloosa, through its proposed preferred stock ownership, will have certain veto rights regarding extraordinary corporate actions, such as change of control transactions and acquisitions or investments in excess of $250 million in any twelve-month period after issuance of the preferred stock.

19

Executive compensation for the reorganized company must be on market terms, must be reasonably satisfactory to Appaloosa, and the overall executive compensation plan design must be described in the Company's disclosure statement and incorporated into the Plan.

The EPCA incorporates Delphi's earlier commitment to preserve its salaried and hourly defined benefit U.S. pension plans and to fund required contributions to the plans that were not made in full as permitted under the Bankruptcy Code. In particular, as more fully outlined in the agreement, the effectiveness and consummation of the transactions contemplated by the EPCA are subject to a number of conditions precedent, including, among others, agreement on certain key documents and those conditions relating to financing of the emergence transactions.

The foregoing description of the EPCA does not purport to be complete and is qualified in its entirety by reference to the July EPCA, which is filed as an exhibit to the quarterly report, for the quarter ended June 30, 2007, and the EPCA Amendment filed as an exhibit to the Company's Current Report on Form 8-K/A dated December 12, 2007.

There can be no assurances that the Debtors will be successful in achieving their objectives. Effectiveness of the Amended Plan is subject to a number of conditions, including the completion of the transactions contemplated by the EPCA (which are in turn subject to a number of conditions), the entry of certain orders by the Court and the obtaining of exit financing. There can be no assurances that such exit financing will be obtained or such other conditions will be satisfied, and we cannot assure that the Amended Plan will become effective on the terms described herein or at all. In accordance with U.S. GAAP, the cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Amended Plan, as the U.S. labor agreements, the GSA, and the MRA become effective. The Amended Plan and agreements will significantly impact Delphi's accounting for its pension plans, post-retirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

There are a number of risks and uncertainties inherent in the chapter 11 process, including those detailed in Part I, Item 1A. Risk Factors in this Annual Report. In addition, we cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding our future prospects will not materially hinder our ongoing business activities and our ability to operate, fund and execute our business plan by impairing relations with existing and potential customers; negatively impacting our ability to attract, retain and compensate key executives and associates and to retain employees generally; limiting our ability to obtain trade credit; and impairing present and future relationships with vendors and service providers.

**DASE Liquidation**

Delphi's Chapter 11 Filings related solely to its U.S. operations as Delphi's operations outside the United States generally have positive cash flow. Nevertheless, Delphi has been seeking and will continue to seek to optimize its global manufacturing footprint to lower its overall cost structure by focusing on strategic product lines where it has significant competitive and technological advantages and selling or winding down non-core product lines. In particular, in February 2007, Delphi's indirect wholly-owned Spanish subsidiary, Delphi Automotive Systems España, S.L. ("DASE"), announced the planned closure of its sole operation at the Puerto Real site in Cadiz, Spain. The closure of this facility is consistent with Delphi's transformation plan previously announced in March 2006. The facility, which had approximately 1,600 employees, was the primary holding of DASE.

On March 20, 2007, DASE filed a petition for Concurso, or bankruptcy under Spanish law, exclusively for that legal entity. In an order dated April 13, 2007, the Spanish court declared DASE to be in voluntary Concurso, which provides DASE support by managing the process of closing the Puerto Real site in Cadiz, Spain in accordance with applicable Spanish law. The Spanish court subsequently appointed three receivers of DASE (the "DASE Receivers"). During the Concurso process, DASE commenced negotiations on a social plan and a collective layoff procedure related to the separation allowance with the unions representing the affected employees. On July 4, 2007, DASE, the DASE Receivers, and the workers' councils and unions representing the affected employees reached a settlement on a social plan of €120 million (then approximately $161 million) for a separation allowance of approximately 45 days of salary per year of service to each employee (the "Separation Plan"). Delphi concluded that it was in its best interests to voluntarily provide the €120 million to DASE as well as additional funds to DASE in an amount not to exceed €10 million (then approximately $14 million) for the purpose of funding payment of the claims of DASE's other creditors.

As a result of the Spanish court declaring DASE to be in Concurso and the subsequent appointment of the DASE Receivers, Delphi no longer possesses effective control over DASE and has de-consolidated the financial results of DASE effective April 2007. The total expense in 2007 associated with the exit of the Puerto Real site in Cadiz, Spain is approximately $268 million ($107 million in discontinued operations and $161 million in the Automotive Holdings segment).

The financial statements of the Debtors are presented as follows:

**Basis of Presentation**

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements contained within this note represent the condensed combined financial statements for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet. The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein. Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements. Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors' Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors' Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements. During 2007, a non-Debtor entity repatriated $106 million to a Debtor entity in the form of a capital reduction. This transaction is reflected in the condensed combined statement of cash flows as a return on investment in non-Debtor affiliates.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*—Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt from the bankruptcy filing date until the third quarter of 2007 because the interest ceased being paid and was not determined to be probable of being an allowed claim. During the third quarter of 2007, Delphi recorded $289 million of prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007. The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims calculated at the contractual non-default rate from the petition date through January 25, 2008. During the third quarter of 2007, Delphi recorded $80 million of interest expense with respect to such allowed unsecured claims. For the year ended December 31, 2007, Delphi recorded total interest related to prepetition debt and allowed unsecured claims of $411 million which is included in accrued liabilities on the accompanying balance sheet..

*U.S. Employee Workforce Transition Programs*—The workforce transition programs offer buy-down payments for eligible traditional employees who do not elect the attrition or flowback options and continue to work for Delphi. The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability. At December 31, 2007, $80 million was recorded in other current assets and $221 million was recorded in other long-term assets in the accompanying balance sheet, net of $22 million of amortization expense recorded in 2007, of which $2 million was recorded in loss from discontinued operations. Refer to Note 15. U.S. Employee Workforce Transition Programs for more information.

*Assets Held for Sale*—The assets held for sale by the Debtors include the net assets held for sale of the Non-debtor affiliates of $294 million which was reclassified from investments in non-Debtor affiliates. In addition, the Debtor assets held for sale were revalued based on the expected proceeds, resulting in a charge related to the assets held for sale of $561 million. Additionally, Delphi recorded a $34 million curtailment loss on pension benefits.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Year Ended December 31, 2007 | Year Ended December 31, 2006 (in millions) | October 8, 2005 to December 31, 2005 |
|---|---|---|---|
| Net sales: | | | |
| General Motors and affiliates | $ 6,545 | $ 7,790 | $ 1,921 |
| Other customers | 4,885 | 5,777 | 1,493 |
| Affiliate non-Debtor affiliates | 548 | 582 | 104 |
| Total net sales | 11,978 | 14,149 | 3,518 |
| | | | |
| Operating expenses: | | | |
| Cost of sales, excluding items listed below | 12,453 | 14,645 | 3,495 |
| U.S. employee workforce transition program charges | 212 | 2,706 | — |
| Depreciation and amortization | 511 | 562 | 152 |
| Long-lived asset impairment charges | 84 | 102 | 69 |
| Goodwill impairment charges | — | — | 140 |
| Selling, general and administrative | 1,008 | 1,006 | 223 |
| Securities & ERISA litigation charge | 343 | — | — |
| Total operating expenses | 14,611 | 19,021 | 4,079 |
| | | | |
| Operating loss | (2,633) | (4,872) | (561) |
| Interest expense (contractual interest expense for the year ended December 31, 2007, 2006 and the period October 8 to December 31, 2005 was $444 million, $526 million and $118 million, respectively) | (722) | (378) | (80) |
| Loss on extinguishment of debt | (27) | — | — |
| Other income (expense), net | 36 | (11) | 15 |
| Reorganization items, net | (136) | (70) | 1 |
| Loss from continuing operations before income tax benefit and equity income | (3,482) | (5,331) | (625) |
| Income tax (expense) benefit | 691 | (1) | 30 |
| Loss from continuing operations before equity income | (2,791) | (5,332) | (595) |
| Equity income from non-consolidated affiliates, net of tax | 21 | 37 | 23 |
| Loss from continuing operations before discontinued operations and equity income from non-Debtor affiliates | (2,770) | (5,295) | (572) |
| Loss from discontinued operations (includes charge of $595 million related to the assets held for sale for the year ended December 31, 2007), net of tax | (695) | (326) | (26) |
| Equity income (loss) from non-Debtor affiliates, net of tax | 400 | 154 | (213) |
| Cumulative effect of accounting change | — | 3 | (15) |
| | | | |
| Net loss | $ (3,065) | $ (5,464) | $ (826) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | December 31, | |
|---|---|---|
|  | 2007 | 2006 |
|  | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 113 | $ 376 |
| Restricted cash | 125 | 107 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 972 | 1,521 |
| Other third parties | 623 | 858 |
| Non-Debtor affiliates | 250 | 328 |
| Notes receivable from non-Debtor affiliates | 278 | 346 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 652 | 797 |
| Finished goods | 171 | 225 |
| Other current assets | 385 | 283 |
| Assets held for sale | 475 | 1,225 |
| Total current assets | 4,044 | 6,066 |
| Long-term assets: | | |
| Property, net | 1,446 | 1,793 |
| Investments in affiliates | 331 | 358 |
| Investments in non-Debtor affiliates | 3,267 | 3,006 |
| Goodwill | 152 | 152 |
| Other intangible assets, net | 25 | 36 |
| Other | 487 | 293 |
| Total long-term assets | 5,708 | 5,638 |
| Total assets | $ 9,752 | $ 11,704 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Notes payable and secured debt in default | $ 2,782 | $ 2,492 |
| Debtor-in-possession financing | — | 250 |
| Accounts payable | 1,007 | 996 |
| Accounts payable to non-Debtor affiliates | 689 | 434 |
| Accrued liabilities | 1,328 | 1,234 |
| Liabilities held for sale | 167 | 133 |
| Total current liabilities | 5,973 | 5,539 |
| Debtor-in-possession financing | 24 | — |
| Employee benefit plan obligations and other | 951 | 732 |
| Total long-term liabilities | 975 | 732 |
| Liabilities subject to compromise | 16,276 | 17,488 |
| Total liabilities | 23,224 | 23,759 |
| Stockholders' deficit: | | |
| Total stockholders' deficit | (13,472) | (12,055) |
| Total liabilities and stockholders' deficit | $ 9,752 | $ 11,704 |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Year ended December 31, 2007 | Year ended December 31, 2006 (in millions) | October 8, 2005 to December 31, 2005 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net cash provided by (used in) operating activities | $ (114) | $ (572) | $ 657 |
| | | | |
| Cash flows from investing activities: | | | |
| Capital expenditures | (224) | (217) | (58) |
| Proceeds from sale of property | 13 | 21 | — |
| Proceeds from divestitures | 74 | — | — |
| Investment in joint ventures | (11) | — | — |
| Increase in restricted cash | (13) | (102) | — |
| Return on investment in non-debtor affiliates | 106 | — | — |
| Other, net | — | (7) | (33) |
| Discontinued operations | (28) | (69) | (31) |
| Net cash provided by (used in) investing activities | (83) | (374) | (122) |
| | | | |
| Cash flows from financing activities: | | | |
| Proceeds from Refinanced DIP Credit Facility, net of issuance costs | 2,691 | — | — |
| (Repayments) proceeds from debtor-in-possession facility, net | (250) | — | 218 |
| Repayments of borrowings under term loan | (988) | — | — |
| (Repayments) proceeds from prepetition secured revolving credit facility, net | (1,508) | 2 | 1 |
| (Repayments) proceeds under cash overdraft | — | (29) | 29 |
| Repayments of borrowings under other debt agreements | (11) | (12) | (2) |
| Net cash (used in) provided by financing activities | (66) | (39) | 246 |
| | | | |
| (Decrease) increase in cash and cash equivalents | (263) | (985) | 781 |
| Cash and cash equivalents at beginning of period | 376 | 1,361 | 580 |
| Cash and cash equivalents at end of period | $ 113 | $ 376 | $ 1,361 |

## 3. REORGANIZATION ITEMS

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, and provisions for losses resulting from the reorganization and restructuring of the business to be separately disclosed. Delphi's reorganization items consist of the following:

| | Year Ended December 31, 2007 | Year Ended December 31, 2006 | October 8, 2005 to December 31, 2005 |
|---|---|---|---|
| Professional fees directly related to reorganization | $ 169 | $ 150 | $ 28 |
| Interest income | (11) | (55) | (11) |
| Gain on settlement of prepetition liabilities | (2) | (3) | (8) |
| Other | 7 | — | (6) |
| Total Reorganization Items | $ 163 | $ 92 | $ 3 |

In 2007 and 2006, reorganization items resulted in approximately $11 million and $60 million, respectively, of cash received entirely related to interest income. Cash paid for professional fees was approximately $153 million and $122 million during 2007 and 2006, respectively. Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors and unions.

## 4. WEIGHTED AVERAGE SHARES AND DIVIDENDS

Basic and diluted loss per share amounts were computed using weighted average shares outstanding for each respective period. As Delphi incurred losses in 2007, 2006, and 2005 the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted loss per share were:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | (in thousands) | |
| Weighted average basic and diluted shares outstanding ............................................... | 561,884 | 561,782 | 560,045 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

| | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | (in thousands) | |
| Anti-dilutive securities ............................ | 74,310 | 83,904 | 94,592 |

On September 8, 2005, the Board of Directors announced the elimination of Delphi's quarterly dividend on Delphi common stock. In addition, the Refinanced DIP Credit Facility and the Amended DIP Credit Facility include a negative covenant prohibiting the payment of dividends by the Company. The Company does not expect to pay dividends prior to emergence or in the foreseeable future.

## 5. DISCONTINUED OPERATIONS

Delphi expects to dispose of its Interiors and Closures Business and the Steering Business. The Court approval of Delphi's plan to dispose of Interiors and Closures and the Steering Business triggered held for sale accounting under SFAS 144 in 2007.

### Steering and Halfshaft Business

On December 10, 2007, Delphi announced that it had filed a motion in the Court seeking authority to enter into a Purchase and Sale Agreement (the "Purchase Agreement") with a wholly-owned entity of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement"). On December 20, 2007, the Court approved bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code to dispose of the Steering Business. On January 25, 2008, the Debtors announced that they will seek final Court approval to sell the Steering Business to Platinum at a sale hearing on February 21, 2008. Delphi plans to conclude the sale as soon as Court approval and all regulatory approvals have been received. Upon the Debtors' review with GM, GM supported the Debtors' decision to seek final Court approval of the sale to Platinum. In 2007, Delphi recognized a charge of $507 million related to the assets held for sale of the Steering Business, including $26 million of curtailment loss on pension benefits for impacted employees. Delphi expects proceeds from the sale and related Transaction Agreement to approximate $250 million.

Prior to the assets of the Steering Business being classified as held for sale, Delphi recorded an impairment charge related to the Steering Business in 2007. Based on the ongoing sale and labor negotiations during March 2007, previous estimates of sale proceeds were reduced. Based on this development Delphi determined that an indicator of impairment was present for the U.S. long-lived assets of the Steering Business. Delphi tested the recoverability of the Steering Business U.S. long-lived assets by comparing the estimated undiscounted future cash flows from its use and anticipated disposition of those assets to their carrying value. Based on its recoverability assessment, Delphi determined that the carrying value of its Steering Business assets at its U.S. sites exceeded the undiscounted estimated future cash flows at those sites. Accordingly, Delphi determined the fair value of its held-for-use long-lived assets at those sites by applying various valuation techniques, including discounted cash flow analysis, replacement cost and orderly liquidation value. As a result of its fair value assessment, Delphi recognized asset impairment charges related to the valuation of long-lived assets held-for-use for its Steering Business of $152 million.

### Interiors and Closures Business

On February 20, 2007, Delphi announced that it had signed a non-binding term sheet with the Renco Group, Inc. for the sale of its interiors and closures product line. On October 15, 2007, Delphi and certain of its affiliates entered into the Interiors and Closures Agreement with Inteva, a wholly-owned subsidiary of the Renco Group, and certain of its affiliates for the sale of substantially all of the tangible assets primarily used in the Interiors and Closures Business. Concurrently, the Debtors filed a motion requesting a hearing on October 25, 2007 to approve bidding procedures in connection with the sale. On October 26, 2007, the Court approved those bidding procedures. On December 20, 2007, the Court approved the sale of the Interiors and Closures Business to Inteva and scheduled a hearing on the sale motion, as it pertains to certain proposed assigned contracts covered by unresolved objections. On January 25, 2008, the Court entered an order approving the assumption and assignment of the executory contracts covered by such objections, all of which were resolved prior to the January 25, 2008 hearing. On that date, the Court also approved a compromise with Inteva, which facilitates the closing of the sale of the Interiors and Closures Business with Inteva by modifying the payment structure under the Interiors and Closures Agreement in consideration for the waiver of certain of Inteva's conditions to closing. The sale is expected to close in the first quarter of 2008. In 2007, Delphi recognized a charge of $88 million related to the assets held for sale of the Interiors and Closures Business,

including $8 million of curtailment loss on pension benefits for impacted employees.  Delphi expects proceeds from the sale to approximate $100 million consisting of $63 million of cash and the remainder in notes at fair value.

As of December 31, 2007 Interiors and Closures and the Steering Business are reported as discontinued operations in the consolidated statement of operations and statement of cash flows.  The impairment charges recorded are included in the loss from discontinued operations during 2007.  The assets and liabilities of Interiors and Closures and the Steering Business are reported in assets and liabilities held for sale in the consolidated balance sheet.  The results of prior periods have been restated to reflect this presentation.

The results of the discontinued operations are summarized as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| Sales: | | | |
| Steering Business ....................................................... | 2,602 | 2,462 | 2,487 |
| Interiors and Closures Business ................................. | 1,275 | 1,193 | 1,066 |
| Total sales................................................. | $ 3,877 | $ 3,655 | $ 3,553 |
| | | | |
| Loss before income taxes (including minority interest and equity income, net of tax)........................................ | (749) | (320) | (202) |
| Provision for income taxes ........................................... | (8) | (6) | (8) |
| Loss from discontinued operations .............................. | $ (757) | $ (326) | $ (210) |
| *Steering Business* ..................................................... | *(677)* | *(281)* | *(193)* |
| *Interiors and Closures Business*................................ | *(80)* | *(45)* | *(17)* |

Assets and liabilities of the discontinued operations are summarized as follows:

| | December 31, | |
| --- | --- | --- |
| | 2007 | 2006 |
| | (in millions) | |
| Current Assets: | | |
| Cash............................................................... | $ 49 | $ 59 |
| Accounts receivable ................................................ | 411 | 428 |
| Inventory ................................................................. | 188 | 251 |
| Other current assets ................................................. | 8 | 12 |
| Long term assets: | | |
| Property, net............................................................. | 48 | 629 |
| Other long-term assets ............................................ | 16 | 72 |
| Assets held for sale ................................................ | $ 720 | $ 1,451 |
| *Steering Business*...................................................... | *594* | *1,220* |
| *Interiors and Closures Business* .............................. | *126* | *231* |
| | | |
| Current Liabilities: | | |
| Accounts Payable ..................................................... | $ 271 | $ 235 |
| Accrued Liabilities ................................................... | 53 | 46 |
| Short term debt......................................................... | 49 | 44 |
| Other long-term liabilities......................................... | 14 | 13 |
| Minority interest ...................................................... | 25 | 21 |
| Liabilities held for sale ............................................. | $ 412 | $ 359 |
| *Steering Business* ..................................................... | *392* | *341* |
| *Interiors and Closures Business*................................ | *20* | *18* |

Cash flows for discontinued operations are summarized as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2006 | 2005 |
| | (in millions) | | |
| Charge related to assets held for sale | $ 561 | $ — | $ — |
| Long lived asset impairment charges | 193 | 43 | 61 |
| Pension and other postretirement benefit expenses | 75 | 94 | 104 |
| Pension curtailment | 34 | — | — |
| U.S. employee workforce transition program charges | 32 | 249 | — |
| Changes in net operating assets | 128 | 94 | (156) |
| Total | $ 1,023 | $ 480 | $ 9 |
| *Steering Business* | 899 | 372 | (82) |
| *Interiors and Closures Business* | 124 | 108 | 91 |

## 6. ACQUISITIONS AND DIVESTITURES

The results of operations, including the gain or loss on divestitures, associated with Delphi's acquisitions and divestitures described below were not significant to the consolidated financial statements in any period presented.

### Catalyst Product Line Sale

On September 28, 2007, Delphi closed on the sale of its global original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore for approximately $67 million which included certain post-closing working capital adjustments. Delphi recorded the loss of $30 million on the sale of the Catalyst Business in cost of sales in 2007.

### North American Brake Product Asset Sale

On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for its North American brake components machining and assembly assets ("North American Brake Components") located at Saginaw, Michigan, Spring Hill, Tennessee, Oshawa, Ontario Canada and Saltillo, Mexico facilities for a purchase price of approximately $40 million. On November 16, 2007, Delphi received approval from the Court to proceed with the sale of the assets which closed in the first quarter of 2008.

### Battery Product Line Sale

In 2005, Delphi sold its battery product line, with the exception of two U.S. operations, to Johnson Control, Inc. ("JCI"). In 2006, Delphi sold certain assets related to one of the remaining facilities to JCI, and in 2007, Delphi ceased production at the remaining U.S. battery manufacturing facility, and closed the facility. In 2006, Delphi received approximately $10 million as agreed upon in the 2005 agreement between Delphi and GM, the principal battery customer, which was executed in connection with the sale of Delphi's battery business. In accordance with the 2005 agreement, upon completion of the transition of the supply of battery products to JCI, Delphi received a $6 million payment in 2007, which was recorded as a reduction to cost of sales.

### Brake Product Line Sales

On September 28, 2007, Delphi closed on the sale of substantially all of the assets exclusively used in the brake hose product line produced at one of Delphi's manufacturing sites located in Dayton, Ohio (the "Brake Hose Business"). The sales price for the Brake Hose Business was $10 million and the sale resulted in a gain of $2 million, which was recorded as a reduction to cost of sales in 2007. On July 19, 2007, Delphi received approval from the Court to proceed with the sale of certain assets used in the brake and chassis modules product lines manufactured in a plant located in Saltillo, Mexico (the "Mexico Brake Plant Business") for $15 million. The sale of the Mexico Brake Plant Business closed on October 1, 2007 and resulted in a gain of $4 million, which was recorded as a reduction to cost of sales in 2007.

### SDAAC Additional Investment

In 2006, Delphi's Thermal Systems segment made an additional investment in Shanghai Delphi Automotive Air Conditioning Co. ("SDAAC") for approximately $14 million, which increased its equity ownership interest in SDAAC from 34 percent to 50 percent. SDAAC's annual revenues for 2005 were approximately $133 million. In the third quarter of 2006 Delphi obtained a controlling

management interest in SDAAC and began consolidating the entity.  Prior to obtaining a controlling management interest, the entity was accounted for using the equity method.

**MobileAria Asset Sale**

In 2006, Delphi's Electronics and Safety division sold certain of its assets in MobileAria, a consolidated entity, which resulted in a gain of $7 million which has been recognized as a reduction of cost of sales in 2006.

## 7. EMPLOYEE TERMINATION BENEFITS AND OTHER EXIT COSTS

Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company.  Delphi's employee termination benefit and other exit costs are undertaken as necessary to execute management's strategy, streamline operations, take advantage of available capacity and resources, and ultimately achieve net cost reductions.  These activities generally fall in one of two categories:

(1)   Realignment of existing manufacturing capacity and closure of facilities and other exit or disposal activities, as it relates to executing the Company's strategy in the normal course of business.

(2)   Transformation plan activities, which support the Company's overall transformation initiatives announced in 2006, including selling or winding down non-core product lines, transforming its salaried workforce to reduce general and administrative expenses, and modifying labor agreements with its principal unions in the U.S.

The following table summarizes the employee termination benefit and other exit cost charges recorded for the years ended December 31, 2007, 2006 and 2005 by operating segment:

| Segment | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | (in millions) | |
| Electronics & Safety | $    36 | $    18 | $    14 |
| Powertrain Systems | 55 | 58 | 31 |
| Electrical/Electronic Architecture | 132 | 82 | 43 |
| Thermal Systems | 48 | 73 | 15 |
| Automotive Holdings Group | 239 | 27 | 33 |
| Corporate and Other | 30 | 11 | 7 |
| Continuing Operations | 540 | 269 | 143 |
| Discontinued Operations | 132 | 30 | 11 |
| Total | $   672 | $   299 | $   154 |
| *Costs of sales* | *493* | *253* | *143* |
| *Selling, general and administrative expenses* | *47* | *16* | *—* |
| *Loss from discontinued operations* | *132* | *30* | *11* |

Delphi has initiated several programs to streamline operations and lower costs.  The following are details of significant charges during 2007.

• *Realignment of existing manufacturing capacity and closure of facilities.* As part of Delphi's ongoing efforts to lower costs and operate efficiently, Delphi's Electrical / Electronic Architecture segment ("E&EA") transferred manufacturing operations from Germany, Portugal and Spain to lower cost markets in Eastern Europe and Asia Pacific during 2007.  As a result, E&EA significantly reduced the number of employees at these locations, and announced involuntary employee separation packages for approximately $66 million.  Additionally, E&EA and Thermal Systems executed initiatives to realign manufacturing operations within North America to lower cost markets, and incurred approximately $35 million of employee termination benefits and other related exit costs.

• *Transformation plan activities.* As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $268 million related to the closure of a manufacturing facility in Cadiz, Spain, of which $161 million related to the Automotive Holdings Group segment and $107 million, which related to the Steering Business, was recorded in loss from discontinued operations.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.  As a part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees, primarily in North America, during 2007 for involuntary separation, and incurred $63 million in related employee termination benefits in the Electronics & Safety, Powertrain Systems, E&EA, Thermal Systems, and Automotive Holdings Group segments.  Additionally, Delphi is implementing a plan for consolidation and outsourcing of certain administrative functions, including financial services and information technology.  During 2007, Delphi incurred $19 million related to the outsourcing plan in the Corporate and Other segment.  Finally, as part of Delphi's initiative to modify its labor agreements, Delphi signed agreements with the UAW and all of its other principal U.S. labor unions during 2007. The new

agreements offered certain eligible Delphi employees severance payments and supplemental unemployment benefits, among other options.  Delphi incurred $56 million of employee termination benefits related to these agreements, primarily in the Powertrain Systems, Electronics and Safety, Thermal Systems and Automotive Holdings Group segments.  Refer to Note 15. U.S. Employee Workforce Transition Programs.

The following are details of significant charges during 2006:

- *Realignment of existing manufacturing capacity and closure of facilities.*  During 2006, Delphi's Thermal Systems segment transferred certain operations in France to lower cost markets within Eastern Europe, and incurred related employee termination benefit and other exit costs of approximately $65 million.  Delphi's Powertrain Systems segment transferred operations from France and various other high cost markets within Europe to lower cost markets within Eastern Europe and Asia, and incurred employee termination benefit and other exit costs of approximately $50 million related to these activities.  Additionally, Delphi's E&EA segment transferred operations from Spain and Germany to lower cost markets in Europe, and also realigned operations within North America.  E&EA incurred approximately $49 million in employee termination benefits and other exit costs in these realignment and exit activities.

- *Transformation plan activities.*  Delphi incurred employee termination benefits and other exit costs of $15 million related to involuntary separation of salaried employees, primarily in North America, in its Electronics & Safety, Powertrain, E&EA, and Automotive Holdings Group segments.

The following are details of significant charges during 2005:

- *Realignment of existing manufacturing capacity and closure of facilities.*  During 2005, Delphi engaged in activities across all segments to realign its operations within Europe and North America, exiting high cost facilities and markets and transferring operations to lower cost markets.

## 8. INCOME TAXES

Loss from continuing operations before income taxes, minority interest and equity income for U.S. and non-U.S. operations was as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2007** | **2006** | **2005** |
|  | **(in millions)** | | |
| U.S. net loss | $(3,286) | $(5,331) | $(2,313) |
| Non-U.S. net income | 492 | 310 | 70 |
| Loss from continuing operations before income taxes, minority interest and equity income | $(2,794) | $(5,021) | $(2,243) |

The (benefit) provision for income taxes is comprised of:

| | Year Ended December 31, | | |
| | 2007 | 2006 (in millions) | 2005 |
|---|---|---|---|
| Current income tax (benefit) expense, net: | | | |
| U.S. federal | $ — | $ — | $ (67) |
| Non-U.S. | 166 | 124 | 77 |
| U.S. state and local | (4) | (17) | — |
| Total current income tax expense (benefit) | 162 | 107 | 10 |
| Deferred income tax (benefit) expense, net: | | | |
| U.S. federal | (649) | (2) | (11) |
| Non-U.S. | 8 | 18 | (66) |
| U.S. state and local | (54) | — | — |
| Total deferred income tax expense (benefit) | (695) | 16 | (77) |
| Investment tax credits | (1) | (1) | (2) |
| Subtotal before adjustment for minority interest | (534) | 122 | (69) |
| Income tax provision related to minority interest | 12 | 8 | 6 |
| Income tax (benefit) expense | $ (522) | $ 130 | $ (63) |

Cash paid for income taxes, primarily non-U.S., was $152 million, $159 million and $113 million in 2007, 2006 and 2005, respectively.

A reconciliation of the (benefit) provision for income taxes compared with the amounts at the U.S. federal statutory rate was:

| | Year Ended December 31, | | |
| | 2007 | 2006 (in millions) | 2005 |
|---|---|---|---|
| Tax at U.S. federal statutory income tax rate | $ (978) | $ (1,757) | $ (785) |
| U.S. income taxed at other rates | (97) | (62) | (29) |
| Non U.S. income taxed at other rates | (172) | (209) | 6 |
| Change in valuation allowance | 668 | 2,154 | 764 |
| Other changes in tax reserves | (3) | (26) | (14) |
| Withholding taxes | 30 | 21 | (6) |
| Other adjustments | 30 | 9 | 1 |
| Total income tax (benefit) provision | $ (522) | $ 130 | $ (63) |

Total income tax (benefit) provision above reflects $8 million, $6 million and $8 million expense included in loss from discontinued operations for the years ended December 31, 2007, 2006 and 2005, respectively.

Delphi accounts for income taxes and the related accounts under the liability method.  Deferred income tax assets and liabilities for 2007 and 2006 reflect the impact of temporary differences between amounts of assets and liabilities for financial reporting purposes and the bases of such assets and liabilities as measured by tax laws.  Significant components of Delphi's deferred tax assets and liabilities are as follows:

| | December 31, | | | |
| | 2007 | | 2006 | |
| | (in millions) | | | |
| | Deferred Tax Assets | Deferred Tax Liabilities | Deferred Tax Assets | Deferred Tax Liabilities |
|---|---|---|---|---|
| Other postretirement benefits | $ 3,669 | $ — | $ 3,701 | $ — |
| Pension benefits | 1,043 | — | 1,548 | — |
| Other employee benefits | 356 | — | 524 | 5 |
| Depreciation | 517 | 249 | 100 | 222 |
| Tax on unremitted profits | — | 46 | — | 64 |
| Net operating loss carryforwards | 782 | — | 641 | — |
| General business credit carryforwards | 435 | — | 393 | — |
| R&D capitalization | 1,864 | — | 1,541 | — |
| Prepetition liabilities | 329 | — | 113 | — |
| Inventory adjustments | 90 | — | 48 | — |
| Warranty accrual | 143 | — | 76 | — |
| Restructuring charges | 99 | — | — | — |
| Accrued interest | 65 | — | 12 | — |
| Foreign tax credit | 205 | — | 18 | — |
| Other U.S | 635 | 402 | 176 | 87 |
| Other non-U.S. | 369 | 75 | 328 | 232 |
| Total | 10,601 | 772 | 9,219 | 610 |
| Valuation allowances | (9,744) | — | (8,471) | — |
| Total deferred taxes | $ 857 | $ 772 | $ 748 | $ 610 |

Delphi has deferred tax assets for net operating loss ("NOL") carryforwards of $782 million, subject to a valuation allowance of $774 million.  This amount relates to U.S. and non-U.S. tax jurisdictions with expiration dates ranging from one year to an indefinite period. Delphi has previously elected to and expects for 2007 to capitalize U.S. research and development ("R&D") expenditures for U.S. tax purposes.  The effect of this capitalization is to substantially reduce the deferred tax asset with respect to U.S. NOL carryforwards and to create a deferred tax asset for capitalized R&D expenditures, which will be amortized and deducted over a period of ten years, beginning in the year of capitalization.  Delphi has recorded a deferred tax asset of $435 million, subject to a full valuation allowance, for general business credit carryforwards which expire in 2019 through 2027.

Realization of the net deferred tax assets is dependent on factors including future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing deductible temporary differences and tax loss or credit carryforwards. Valuation allowances are provided against deferred tax assets when, based on all available evidence, it is considered more likely than not that some portion or all of the recorded deferred tax assets will not be realized in future periods.  Due to Delphi's recent history of U.S. losses, Delphi has determined that it should provide a full valuation allowance for its U.S. net deferred tax assets.

SFAS No. 109, "*Accounting for Income Taxes*" generally requires that the amount of tax expense or benefit allocated to continuing operations be determined without regard to the tax effects of other categories of income or loss, such as other comprehensive income. However, an exception to the general rule is provided when there is a pretax loss from continuing operations and pretax income from other categories in the current year. In such instances, income from other categories must offset the current loss from operations, the tax benefit of such offset being reflected in continuing operations even when a valuation allowance has been established against the deferred tax assets. In instances where a valuation allowance is established against current year operating losses, income from other sources, including other comprehensive income, is considered when determining whether sufficient future taxable income exists to realize the deferred tax assets. In 2007, U.S. pretax other comprehensive income, primarily attributable to employee benefits, offset approximately $1.9 billion of U.S. pretax operating losses, reducing the Company's current year valuation allowance resulting in a benefit of $703 million allocated to the current year loss from continuing operations.

Due to continued losses in Spain, Portugal, Romania and France, Delphi determined that it was no longer more likely than not that the deferred tax assets in these jurisdictions will be realized, and accordingly, based on assessment, Delphi recorded a valuation allowance of $40 million in 2006.  Due to operational changes and changes in tax law, Delphi recorded a net valuation allowance decrease, based on reassessment, of $1 million in 2007.   Increases in valuation allowances due to current operations for non-U.S. net deferred tax assets were recorded in the amount of $172 million and $144 million for the years ended December 31, 2007 and 2006, respectively.

Provisions are made for estimated U.S. and non-U.S. income taxes, less available tax credits and deductions, which may be incurred on the remittance of Delphi's share of subsidiaries' undistributed cumulative earnings that are not deemed to be indefinitely reinvested. U.S. income taxes have not been provided on approximately $1.4 billion of cumulative undistributed earnings of non-U.S. subsidiaries as of December 31, 2007, as such amounts are deemed to be indefinitely reinvested.  It is not practicable to calculate the unrecognized tax provision on these earnings to the extent not indefinitely reinvested.

In addition, Delphi currently experiences tax holidays in various non-U.S. jurisdictions with expiration dates from 2007 through indefinite.  The income tax benefits attributable to these tax holidays are approximately $21 million ($0.04 per share) for 2007, $17 million ($0.03 per share) for 2006, and $26 million ($0.05 per share) for 2005.

Effective January 1, 2007, Delphi adopted the provisions of FIN 48, which prescribes a recognition threshold and measurement attribute for the accounting and financial statement disclosure of tax positions taken or expected to be taken in a tax return. The evaluation of a tax position is a two-step process. The first step requires an entity to determine whether it is more likely than not that a tax position will be sustained upon examination based on the technical merits of the position. The second step requires an entity to recognize in the financial statements each tax position that meets the more likely than not criteria, measured at the largest amount of benefit that has a greater than fifty percent likelihood of being realized. Guidance is also provided on the derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition.

As a result of the adoption of FIN 48 on January 1, 2007, Delphi recognized an $18 million increase in liabilities for unrecognized tax benefits, primarily in its long-term liabilities, with a corresponding increase to its accumulated deficit. As of the adoption date, Delphi had recorded liabilities for unrecognized tax benefits of $62 million ($92 million if interest and penalties were included) of which $71 million, if recognized, would impact the effective tax rate.   As of December 31, 2007, Delphi had recorded liabilities for unrecognized tax benefits of $60 million that, if recognized, would impact the effective tax rate. The majority of the additions for tax positions for prior years related to changes in the accumulated translation adjustments.

A reconciliation of the gross change in the unrecognized tax benefits balance, excluding interest and penalties, from January 1, 2007 to December 31, 2007 is as follows:

|  | Federal, State and Foreign Tax (in millions) |
|---|---|
| Balance at January 1, 2007 | $   62 |
| Additions for tax positions related to current year | 14 |
| Additions for tax positions related to prior year | 5 |
| Reductions for tax positions related to prior year | (8) |
| Reductions for tax positions related to expirations of statute of limitations | (3) |
| Settlements-cash | (7) |
| Balance at December 31, 2007 | $   63 |

Delphi recognizes interest and penalties accrued related to unrecognized tax benefits in tax expense.  During the year ended December 31, 2007, Delphi's reserves for interest and penalties decreased by approximately $4 million to approximately $26 million.

Delphi does not expect the overall change in unrecognized tax benefits over the next twelve months to be significant.

Delphi files U.S. and state income tax returns as well as income tax returns in several foreign jurisdictions. Foreign taxing jurisdictions significant to Delphi include China, Mexico, Germany, France and Brazil. In the U.S., federal income tax returns for years prior to 2007 have been effectively settled. It is anticipated that claims pending from prepetition periods will be settled upon emergence. With respect to foreign taxing jurisdictions significant to Delphi, Delphi's affiliates are no longer subject to income tax examinations by foreign tax authorities for years before 2001. In addition, open tax years related to various states remain subject to examination but are not considered to be material.

## 9. PROPERTY, NET

Property, net consisted of:

| | Estimated Useful Lives (Years) | December 31, 2007 | 2006 |
|---|---|---|---|
| | | (in millions) | |
| Land............................................................................ | — | $ 123 | $ 127 |
| Land and leasehold improvements........................................ | 3-31 | 217 | 226 |
| Buildings................................................................... | 29-40 | 1,818 | 1,832 |
| Machinery, equipment, and tooling....................................... | 3-27 | 6,180 | 6,946 |
| Furniture and office equipment.......................................... | 3-15 | 726 | 695 |
| Construction in progress ................................................ | — | 236 | 203 |
| Total..................................................................... | | 9,300 | 10,029 |
| Less: accumulated depreciation and amortization................ | | (5,437) | (5,963) |
| Total property, net..................................................... | | $ 3,863 | $ 4,066 |

Delphi evaluates the recoverability of certain long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable.  Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets.  Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets.  The fair value of the assets was determined based on the "held for use" classification.  Delphi may incur significant impairment charges or losses on divestitures upon these assets being classified as "held for sale."  The following table summarizes the impairment charges related to long-lived assets held for use for the years ended December 31, 2007, 2006 and 2005:

| Segment | 2007 | 2006 | 2005 |
|---|---|---|---|
| | | (in millions) | |
| Electronics & Safety............................................................ | $ 1 | $ 4 | $ 5 |
| Powertrain Systems ........................................................... | 13 | 12 | 9 |
| Electrical/Electronic Architecture........................................... | 6 | 1 | 35 |
| Thermal Systems .............................................................. | — | 11 | 23 |
| Automotive Holdings Group ................................................ | 78 | 144 | 100 |
| Continuing operations ................................................... | 98 | 172 | 172 |
| Discontinued operations ..................................................... | 193 | 43 | 61 |
| Total........................................................................ | $ 291 | $ 215 | $ 233 |

During 2007, Delphi reassessed its estimated net proceeds from the ultimate sale and disposition of its wheel bearing business in the Automotive Holdings Group segment, indicating an indicator of impairment.  Delphi determined that the carrying value of its wheel bearing business exceeded the undiscounted estimated future cash flows and consequently recognized impairment charges of $54 million in 2007.  These charges reduced the carrying value of the Sandusky site to approximately $37 million as of December 31, 2007.  Also during 2007, Delphi recognized $11 million of long-lived asset impairment related to a plant in Delphi's Automotive Holdings segment.  This impairment was caused by a deterioration in the expected net proceeds resulting from the use and ultimate sale of these assets.  In addition, Delphi recognized $7 million of long-lived asset impairment for the Catalyst Business in the Powertrain Systems segment in 2007, which was caused by a deterioration in the estimated future cash flows through the expected sale date.  The Catalyst Business was sold during the third quarter of 2007, refer to Note 6. Acquisitions and Divestitures.

During 2006 and 2005, Delphi experienced deteriorated financial performance including reduced profitability at certain sites and product lines resulting from flattening revenue together with higher commodity cost.  These factors resulted in substantial losses and an unfavorable outlook, which were indicators of potential impairment.  Delphi tested the recoverability of its long-lived assets using projected future undiscounted cash flows based on internal budgets, recent and forecasted sales data, independent automotive production volume estimates and customer commitments.  Based primarily on Delphi's review of fair value appraisals, Delphi recorded long-lived asset impairment charges of $215 million and $233 million for 2006 and 2005, respectively.  Refer to Note 5. Discontinued Operations for a discussion of the long-lived asset impairment charges recorded in loss from discontinued operations.

## 10. GOODWILL

The change in carrying amount of goodwill for the year ended December 31, 2007 and 2006 is as follows:

| | 2007 | 2006 |
|---|---|---|
| | (in millions) | |
| Balance at January 1, ............................................................. | $   378 | $   363 |
| Currency translation.............................................................. | 19 | 15 |
| Balance at December 31, ...................................................... | $   397 (a) | $   378 (b) |

    (a)   $165 million in Electrical/Electronic Architecture, $155 million in Electronics & Safety and $77 million in Corporate and Other
    (b)   $161 million in Electrical/Electronic Architecture, $143 million in Electronics & Safety and $74 million in Corporate and Other

Delphi reviews the recoverability of goodwill at least annually on May 31 and any other time business conditions indicate a potential change in recoverability.  The Company recorded approximately $390 million of goodwill impairment charges during 2005, of which $368 million related to the Powertrain Systems segment and $22 million related to the Automotive Holdings Group segment.  In conjunction with the realignment of the Company's business operations effective July 1, 2006, Delphi evaluated reported goodwill for indicators of impairment and concluded no indicators were present.

Delphi determined the goodwill impairment charges by comparing the carrying value of each of its reporting units to the fair value of the reporting unit.  In determining fair value of reporting units, Delphi utilized discounted cash flow analysis, where the carrying value exceeded the fair value for a particular reporting unit, goodwill impairment charges were recognized.  The goodwill impairment charges recognized were determined by stating all other assets and liabilities of a reporting unit at their fair values with the remaining fair value of the reporting unit attributed to goodwill.  The resulting goodwill impairment charges are the excess of the recorded goodwill balance over the calculated fair value of goodwill for the reporting unit.  Delphi's reporting units are the global businesses focused on product families.  The fair value of the reporting units was negatively impacted by the continued deterioration of business conditions, principally in the U.S., as previously described.

## 11. LIABILITIES

Accrued liabilities consisted of the following:

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| Payroll related obligations............................................................. | $   238 | $   258 |
| Employee benefits, including current pension obligations........... | 185 | 216 |
| Accrued income taxes .................................................................... | 92 | 144 |
| Taxes other than income ................................................................ | 157 | 140 |
| Warranty obligations (Note 12)..................................................... | 244 | 209 |
| U.S. employee workforce transition program (Note 15).............. | 234 | 626 |
| Manufacturing plant rationalization ............................................. | 259 | 154 |
| Interest .......................................................................................... | 421 | 29 |
| Other .............................................................................................. | 451 | 389 |
| Total ......................................................................................... | $ 2,281 | $ 2,165 |

Other long-term liabilities consisted of the following:

| | December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| Workers compensation................................................................... | $   328 | $   282 |
| Environmental................................................................................ | 112 | 114 |
| U.S. employee workforce transition program (Note 15).............. | 148 | 204 |
| Extended disability benefits .......................................................... | 72 | 95 |
| Warranty obligations (Note 12)..................................................... | 315 | — |
| Other .............................................................................................. | 210 | 157 |
| Total ......................................................................................... | $ 1,185 | $   852 |

## 12. WARRANTY OBLIGATIONS

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the years ended December 31, 2007 and 2006:

|  | December 31, | |
|  | 2007 | 2006 |
|  | (in millions) | |
| Accrual balance at beginning of year | $  383 | $  308 |
| Provision for estimated warranties accrued during the year | 291 | 206 |
| Settlements made during the year (in cash or in kind) | (128) | (140) |
| Foreign currency translation and other | 13 | 9 |
| Accrual balance at end of year | $  559 | $  383 |

Approximately $244 million and $209 million of the warranty accrual balance as of December 31, 2007 and 2006, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $315 million of the warranty accrual balance as of December 31, 2007 is included in other long-term liabilities and approximately $174 million of the warranty accrual balance as of December 31, 2006 is included in liabilities subject to compromise (refer to Note 13. Liabilities Subject to Compromise). During the third quarter of 2007 with the filing of Delphi's Plan on September 6, 2007, Delphi determined that the warranty claims previously included in liabilities subject to compromise would be resolved in the ordinary course of business outside of the Court and were therefore not subject to compromise, including amounts that were addressed in the warranty settlement agreement reached with GM discussed further in Note 17. Commitments and Contingencies, Ordinary Business Litigation. The 2007 provision for estimated warranties includes an increase of $83 million, net of an $8 million recovery, for a range of specific GM warranty claims, primarily in the Electronics and Safety (related to the instrument clusters product line which was transferred to the Electronics and Safety segment effective December 2007) and Powertrain Systems segments, and a $93 million increase for specific warranty claims related to the Powertrain Systems segment.

## 13. LIABILITIES SUBJECT TO COMPROMISE

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' plan of reorganization. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy. Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals. The following data regarding the number and amount of claims and proof of claims is unaudited.

The Debtors have been paying and intend to continue to pay undisputed postpetition claims in the ordinary course of business. In addition, pursuant to the Amended Plan, the Debtors assumed most of their executory contracts and unexpired leases with respect to the Debtors' operations, and rejected certain of them, with the approval of the Court. Damages resulting from rejection of executory contracts and unexpired leases are treated as general unsecured claims and will be classified as liabilities subject to compromise. The Court entered an order establishing July 31, 2006 as the bar date by which claims against the Debtors arising prior to the Debtors' Chapter 11 Filings were required to be filed if the claimants were to receive any distribution in the chapter 11 cases. To date, the Debtors' have received approximately 16,790 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. Many of these claims have been found to be duplicative, based on contingencies that have not occurred, or are otherwise overstated, and therefore have been determined to be invalid. As a result, the aggregate amount of claims filed with the Court exceeds the amount that has been to date allowed by the Court. As of February 1, 2008, the Debtors have filed twenty-five omnibus claims objections that objected to claims on procedural or substantive grounds. Pursuant to these claims objections, the Debtors have objected to approximately 13,400 proofs of claim which asserted approximately $10.1 billion in aggregate liquidated amounts plus additional unliquidated amounts. To date, the Court has entered orders disallowing and/or claimants have withdrawn approximately 9,600 of those claims, which orders reduced the amount of asserted claims by approximately $9.7 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order modifying approximately 3,460 claims reducing the aggregate amounts asserted on those claims from $720 million to $530 million, which amounts are subject to further objection by the Debtors at a later date on any basis. The Debtors anticipate that

additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled.  The determination of how these liabilities are to be settled and treated is set forth in the Amended Plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete.  Accordingly, the ultimate number and amount of allowed claims is not determinable at this time.  Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.  As of January 25, 2008, the total general unsecured claims, other than funded debt claims, against the Company had been reduced to an amount less than the $1.45 billion cap specified in the Amended Plan.  (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases).

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts.  The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.

Liabilities Subject to Compromise consist of the following**:**

| | December 31, | |
| | 2007 | 2006 |
| | (in millions) | |
| Pension obligations | $ 3,329 | $ 4,257 |
| Postretirement obligations other than pensions, including amounts payable to GM | 8,786 | 9,109 |
| Debt and notes payable | 1,984 | 2,054 |
| Accounts payable | 744 | 754 |
| Junior subordinated notes due 2033 | 391 | 391 |
| Prepetition warranty obligation (Note 12) | — | 174 |
| GM claim for U.S. employee workforce transition programs | 312 | 315 |
| Securities & ERISA litigation liability (Note 17) | 351 | 8 |
| Other | 300 | 354 |
| Total Liabilities Subject to Compromise | $ 16,197 | $ 17,416 |

Pursuant to the Plan filed on September 6, 2007, warranty obligations, environmental claims, capital lease and industrial development bond obligations were determined to be settled in the ordinary course of business and are no longer subject to compromise.  Such amounts were reclassified from liabilities subject to compromise to accrued liabilities and other long-term liabilities during the third quarter of 2007.  Refer to Note 11. Liabilities.

## 14. DEBT

Due to the Chapter 11 Filings (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy), prepetition long-term debt of the Debtors has been reclassified to the caption Liabilities Subject to Compromise (Refer to Note 13. Liabilities Subject to Compromise) on the consolidated balance sheet.  The following is a summary of Long-Term Debt, including current maturities, and unsecured long-term debt included in Liabilities Subject to Compromise as of December 31, 2007 and 2006:

| | Year ended December 31, | | | |
| | 2007 | | 2006 | |
| | Subject to Compromise | Debt | Subject to Compromise | Debt |
|---|---|---|---|---|
| 6.55%, unsecured notes, due 2006............................................. | $   500 (a)(b)(c) | $    — | $  500 (a)(b)(c) | $    — |
| 6.50%, unsecured notes, due 2009............................................. | 498 (a)(b)(c) | — | 498 (a)(b)(c) | — |
| 6.50%, unsecured notes, due 2013............................................. | 493 (a)(b)(c) | — | 493 (a)(b)(c) | — |
| 7.125%, debentures, due 2029 .................................................. | 493 (a)(b)(c) | — | 493 (a)(b)(c) | — |
| Junior subordinated notes due 2033 (d) .................................... | 391 (a)(b)(c) | — | 391 (a)(b)(c) | — |
| DIP term loan .......................................................................... | — | — | — | 250 |
| Refinanced DIP term loan ........................................................ | — | 2,746 | — | — |
| Prepetition term loan facility ................................................... | — | — | — | 985 (b)(c) |
| Prepetition revolving credit facility ......................................... | — | — | — | 1,507 (b)(c) |
| European securitization program .............................................. | — | 205 | — | 122 |
| Accounts receivable factoring .................................................. | — | 384 | — | 375 |
| Capital leases and other ........................................................... | — (c)(e) | 219(e) | 70 (c) | 103 |
| Total debt .......................................................................... | $2,375 | 3,554 | $2,445 | 3,342 |
| Less: current portion................................................................ | | (3,495) | | (3,295) |
| Long-term debt............................................................... | | $   59 | | $   47 |

(a)  Pursuant to the requirements of SOP 90-7 as of the Chapter 11 Filings, deferred financing fees related to prepetition debt are no longer being amortized and have been included as an adjustment to the net carrying value of the related prepetition debt at December 31, 2007 and 2006.
(b)  Debt in default as of December 31, 2007 and 2006.
(c)  The Chapter 11 Filings triggered defaults on substantially all debt and certain lease obligations.
(d)  In conjunction with the liquidation of the Delphi Trust I and Delphi Trust II on November 14, 2006, the interests of Delphi Trust I and Delphi Trust II in the junior subordinated notes were transferred to the holders of the trust preferred securities issued by the two Trusts.
(e)  During 2007, Delphi determined that capital lease and industrial development bond obligations were determined to be settled in the ordinary course of business and are no longer subject to compromise.

The stay of proceedings provisions of section 362 of the Bankruptcy Code apply to actions to collect prepetition indebtedness or to exercise control over the property of the Debtors' estate in respect of such defaults.  The rights of and ultimate payments by the Debtors under prepetition obligations will be addressed in any plan of reorganization and may be substantially altered.  This could result in unsecured claims being compromised at less, and possibly substantially less, than 100% of their face value.

### Current Capital Structure

*Refinanced DIP Term Loan* – On January 5, 2007, the Court granted Delphi's motion to obtain replacement postpetition financing of approximately $4.5 billion.  On January 9, 2007, Delphi refinanced its prepetition and postpetition credit facilities obligations by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders.  The Refinanced DIP Credit Facility consists of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan ("Tranche B" or the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan ("Tranche C" or the "Tranche C Term Loan").  The Refinanced DIP Credit Facility was obtained to refinance both the $2.0 billion Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement, dated as of November 21, 2005 (as amended, the "Amended DIP Credit Facility") and the approximate $2.5 billion outstanding on its $2.8 billion Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, the "Prepetition Facility").  As of January 9, 2007, both the Refinanced DIP Credit Facility $250 million Tranche B Term Loan and approximately $2.5 billion Tranche C Term Loan were funded.

Through a series of amendments over the course of the loan, the latest of which was entered into on November 20, 2007 (the "Third Amendment"), the Refinanced DIP Credit Facility now has a maturity date of July 1, 2008, Global EBITDAR covenants for the extension period, revised interest rates, and an amended definition of Global EBITDAR (as detailed below). In connection with the Third Amendment, Delphi paid amendment fees of 100 basis points, or approximately $45 million, to the lenders.  As of December 31, 2007, $37 million remains deferred in other current assets.

The Refinanced DIP Credit Facility now carries an interest rate at the option of Delphi of either the Administrative Agent's Alternate Base Rate plus (i) with respect to Tranche A borrowings, 2.50%, (ii) with respect to Tranche B borrowings, 2.50%, (iii) with respect to Tranche C borrowings, 3.00%, or LIBOR plus (x) with respect to Tranche A borrowings, 3.50%, (y) with respect to Tranche B borrowings 3.50%, and (z) with respect to Tranche C borrowings 4.00%. The interest rate period can be set at a two-week or one-, three-, or six-month period as selected by Delphi in accordance with the terms of the Refinanced DIP Credit Facility. Accordingly, the interest rate will fluctuate based on the movement of the Alternate Base Rate or LIBOR through the term of the Refinanced DIP Credit Facility. Borrowings under the Refinanced DIP Credit Facility are prepayable at Delphi's option without premium or penalty. As of December 31, 2007, total available liquidity under the Refinanced DIP Credit Facility was approximately $1.2 billion. Also as of December 31, 2007, there were no amounts outstanding under the Revolving Facility and the Company had $255 million in letters of credit outstanding under the Revolving Facility as of that date, including $150 million related to the letters of credit provided to the PBGC discussed further in Note 2. Transformation Plan and Chapter 11 Bankruptcy.

The Refinanced DIP Credit Facility provides the lenders with a perfected first lien (with the relative priority of each tranche as set forth above) on substantially all material tangible and intangible assets of Delphi and its wholly-owned domestic subsidiaries (however, Delphi is only pledging 65% of the stock of its first-tier non-U.S. subsidiaries) and further provides that amounts borrowed under the Refinanced DIP Credit Facility will be guaranteed by substantially all of Delphi's affiliated Debtors, each as debtor and debtor-in-possession.

The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Refinanced DIP Credit Facility. While the borrowing base computation excluded outstanding borrowings, it was less than the Refinanced DIP Credit Facility commitment at December 31, 2007. Borrowing base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion, with any changes in such standards to be effective ten days after delivery of a written notice thereof to Delphi (or immediately, without prior written notice, during the continuance of an event of default).

The Refinanced DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. The Company does not expect to pay dividends prior to emergence from chapter 11. So long as the Facility Availability Amount (as defined in the Refinanced DIP Credit Facility) is equal or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets do not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors).

The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR for Delphi and its direct and indirect subsidiaries, on a consolidated basis, at the levels set forth in the Refinanced DIP Credit Facility. The definition of Global EBITDAR provides for the exclusion of expenses arising out of, or in relation to, the MDL Settlements recorded in the second and third quarters of 2007.

The Refinanced DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Refinanced DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate. Delphi was in compliance with the Refinanced DIP Credit Facility covenants as of December 31, 2007.

The foregoing description of the Refinanced DIP Credit Facility and the amendments thereto is a general description only and is qualified in its entirety by reference to the underlying agreements, copies of which were previously filed with the SEC.

Concurrently with the entry into the Refinanced DIP Credit Facility, the Amended DIP Credit Facility (defined below) and the Prepetition Facility were terminated. The proceeds of the Tranche B Term Loan and Tranche C Term Loan were used to extinguish amounts outstanding under the Amended DIP Credit Facility and the Prepetition Facility. Delphi incurred no early termination penalties in connection with the termination of these agreements. However, as a result of changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $25 million of unamortized debt issuance and discount costs related to the Amended DIP Credit Facility and Prepetition Facility in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt as these fees relate to the refinancing of the term loans and $2 million was recognized as interest expense as these fees relate to the refinancing of the revolving credit facility.

***European Securitization Factoring*** – The Chapter 11 Filings triggered early termination events under the European accounts receivables securitization program (the "European Program"). On October 28, 2005, Delphi and the institutions sponsoring the European Program entered into a preliminary agreement, which was finalized on November 18, 2005 (the "Agreement"), permitting continued use of the European Program despite the occurrence of early termination events. The Agreement allows for continued use of the European Program and incorporates amendments resulting from the Agreement, including revised financial covenants and pricing. The program was extended on December 21, 2006 with a revised expiration date of December 20, 2007 and further extended on November 30, 2007 with a revised expiration date of December 18, 2008 with substantially the same terms and conditions. The renewed program has an

availability of €178 million ($262 million at December 31, 2007 foreign currency exchange rates) and £12 million ($24 million at December 31, 2007 foreign currency exchange rates).

Accounts receivable transferred under this program are accounted for as short-term debt.  As of December 31, 2007 and 2006, outstanding borrowings under this program were approximately $205 million and $122 million, respectively.

*Accounts Receivable Factoring* – Delphi also maintains various accounts receivable factoring facilities in Europe that are accounted for as short-term debt.  These uncommitted factoring facilities are available through various financial institutions.  As of December 31, 2007 and 2006, Delphi had $384 million and $375 million, respectively, outstanding under these accounts receivable factoring facilities.

*Capital Leases and Other* – As of December 31, 2007 and 2006, Delphi also had other debt outstanding and capital lease obligations of approximately $219 million (less than $1 million of which is included in Liabilities Subject to Compromise) and approximately $173 million ($70 million of which is included in Liabilities Subject to Compromise), respectively.  The balances include capital lease obligations and debt issued by certain international subsidiaries.

*Junior Subordinated Notes* - Delphi has outstanding junior subordinated debt with an aggregate principal value of $400 million.  The junior subordinated debt is represented by two global notes held by the Depository Trust Company or its nominee.  The first junior subordinated note, with an aggregate principal value of $250 million, bears interest at 8.25% per year and matures on November 15, 2033.  The second junior subordinated note bears interest at a fixed rate through November 15, 2008 and at an adjustable rate thereafter until it matures on November 15, 2033.  Delphi originally issued these notes to Delphi Trust I and Delphi Trust II, respectively, both of which were Delphi subsidiaries.  Delphi's chapter 11 filing constituted an "early termination event" pursuant to which both trusts were required to be dissolved in accordance with their respective trust declarations.  On November 14, 2006, both trusts were terminated.  In connection with the terminations, the interests of Delphi Trust I and Delphi Trust II in the subordinated notes were transferred to the holders of the trust preferred securities issued by the two Trusts.  Pursuant to the requirements of SOP 90-7, as of the Chapter 11 Filings, deferred financing fees related the Trusts were no longer being amortized and had been included as an adjustment of their net carrying value at December 31, 2005.  Delphi determined that both Trust I and Trust II were considered variable interest entities, of which Delphi was not the primary beneficiary.  As a result, although both Trust I and Trust II were 100% owned by Delphi, the Company did not consolidate them into its financial statements.  However, the Trust I and Trust II notes were reflected as liabilities subject to compromise on the consolidated balance sheet and the related contractual interest due was not recognized in accordance with the provisions of SOP 90-7.  If Trust I and Trust II had been consolidated by Delphi, there would have been no material impact in any of the periods presented.

*Interest* - Cash paid for interest related to amounts outstanding within Delphi's current capital structure totaled $377 million, $424 million and $272 million in 2007, 2006 and 2005, respectively.

In accordance with SOP 90-7, effective October 8, 2005, the Company ceased accruing and paying interest expense on its outstanding unsecured prepetition debt classified as subject to compromise.  In 2007, the Company recorded $411 million of interest expense related to prepetition debt and allowed unsecured claims, which in accordance with the Amended Plan became probable of payment.  The Company's contractual interest not paid in 2007 was $133 million and contractual interest not accrued or paid in 2006 was $148 million.  In accordance with the Court-approved first day motion, the Company continues to accrue and pay the contractual interest on the secured credit facilities.

The principal maturities of debt, net of applicable discount and issuance costs, and the minimum capital lease obligations not subject to compromise for the five years subsequent to 2007 are as follows:

| Year | Debt and Capital Lease Obligations (in millions) |
|---|---|
| 2008 ............................. | $ 3,495 |
| 2009 ............................. | 10 |
| 2010 ............................. | 15 |
| 2011 ............................. | 6 |
| 2012 ............................. | 4 |
| Thereafter.................... | 24 |
| Total ....................... | $ 3,554 |

**Indebtedness Throughout 2006**

The Refinanced DIP Credit Facility's terms and conditions are relatively consistent with the terms and conditions in the Amended DIP Credit Facility. The following paragraphs describe the capital structure throughout 2006.

On October 14, 2005, Delphi entered into a Revolving Credit, Term Loan and Guaranty Agreement (the "DIP Credit Facility"), as amended through November 13, 2006 (the "Amended DIP Credit Facility"), to borrow up to $2.0 billion from a syndicate of lenders arranged by J.P. Morgan Securities Inc. and Citigroup Global Markets, Inc., for which JPMorgan Chase Bank, N.A. was the administrative agent (the "Administrative Agent") and Citicorp USA, Inc., was syndication agent (together with the Administrative Agent, the "Agents"). The Amended DIP Credit Facility consisted of a $1.75 billion revolving facility and a $250 million term loan facility (collectively, the "Amended DIP Loans"). The Amended DIP Credit Facility carried an interest rate at the option of Delphi of either (i) the Administrative Agent's Alternate Base Rate (as defined in the Amended DIP Credit Facility) plus 1.75% or (ii) 2.75% above the Eurodollar base rate, which is LIBOR. Accordingly, the interest rate would fluctuate based on the movement of the Alternate Base Rate or LIBOR through the term of the Amended DIP Loans. The Amended DIP Credit Facility was to expire on the earlier of October 8, 2007 or the date of the substantial consummation of a reorganization plan that is confirmed pursuant to an order of the Court. Borrowings under the Amended DIP Credit Facility were prepayable at Delphi's option without premium or penalty.

On October 28, 2005, the Court granted the Debtors' motion for approval of the DIP financing order. The DIP financing order granted final approval of the DIP Credit Facility, as amended at the time, final approval of an adequate protection package for the Prepetition Facility (as described above) and the Debtors' access to $2 billion in DIP financing subject to the terms and conditions set forth in the DIP financing documents, as amended. The adequate protection package for the prepetition credit facilities included, among other things: (i) an agreement by Delphi to pay accrued interest on the loans under the prepetition credit facilities on a monthly basis, (ii) the right of Delphi to pay this interest based on LIBOR, although any lender may require that interest on its loans be based on the alternative base rate if such lender waives all claims for interest at the default rate and any prepayment penalties that may arise under the prepetition credit facilities and (iii) an agreement by Delphi to replace approximately $90 million of letters of credit outstanding under the prepetition credit facilities with letters of credit to be issued under the Amended DIP Credit Facility.

The Amended DIP Credit Facility provided the lenders with a first lien on substantially all material tangible and intangible assets of Delphi and its wholly-owned domestic subsidiaries (however, Delphi only pledged 65% of the stock of its first-tier non-U.S. subsidiaries) and further provided that amounts borrowed under the Amended DIP Credit Facility would be guaranteed by substantially all of Delphi's affiliated Debtors, each as debtor and debtor-in-possession. The amount outstanding at any one time was limited by a borrowing base computation as described in the Amended DIP Credit Facility. The borrowing base computation exceeded the Amended DIP Credit Facility availability at December 31, 2006. Borrowing base standards could be fixed and revised from time to time by the Administrative Agent in its reasonable discretion. The Amended DIP Credit Facility included affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. So long as the Facility Availability Amount (as defined in the Amended DIP Credit Facility) was equal to or greater than $500 million, the restrictions on investments, mergers and disposition of assets did not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors to the Amended DIP Credit Facility).

The covenants required Delphi to, among other things, (i) maintain a monthly cumulative minimum global earnings before interest, taxes, depreciation, amortization, reorganization and restructuring costs ("Global EBITDAR"), as defined, for each period beginning on January 1, 2006 and ending on the last day of each fiscal month through November 30, 2006, as described in the Amended DIP Credit Facility, and (ii) maintain a rolling 12-month cumulative Global EBITDAR for Delphi and its direct and indirect subsidiaries, on a consolidated basis, beginning on December 31, 2006 and ending on October 31, 2007, at the levels set forth in the Amended DIP Credit Facility. The Amended DIP Credit Facility contained certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended DIP Credit Facility, interest on all outstanding amounts was payable on demand at 2% above the then applicable rate. Delphi was in compliance with the Amended DIP Credit Facility covenants as of December 31, 2006.

As of November 21, 2005, the Amended DIP Credit Facility $250 million term loan was funded. As of December 31, 2006, there were no amounts outstanding under the Amended DIP Credit Facility revolving facility, but the Company had approximately $92 million in letters of credit outstanding under the Amended DIP Credit Facility revolving facility as of that date.

In addition to the Prepetition Facility refinanced by the Refinanced DIP Credit Facility, Delphi had outstanding publicly held unsecured term debt securities totaling approximately $2.0 billion. The unsecured debt included $500 million of securities bearing interest at 6.55% that matured on June 15, 2006 with interest payable semi-annually on June 15 and December 15 of each year. The next maturity of $500 million of securities was due on May 1, 2009 and bears interest at 6.50% with interest payable semi-annually on May 1 and November 1 of each year. Thereafter, Delphi had $500 million of securities bearing interest at 6.50% maturing on August 15, 2013 with interest payable semi-annually on February 15 and August 15 of each year, and $500 million of securities bearing interest at 7.125%

maturing on May 1, 2029 with interest payable semi-annually on May 1 and November 1 of each year.  None of the debt securities had sinking fund requirements.  The securities were all redeemable, in whole or in part, at the option of Delphi.  At December 31, 2007 and 2006, these securities were included in Liabilities Subject to Compromise.

## 15. U.S. EMPLOYEE WORKFORCE TRANSITION PROGRAMS

### 2007 Workforce Transition Programs

On June 22, 2007, Delphi, GM, and the UAW signed the UAW settlement agreement which included a workforce transition program for eligible UAW employees (the "UAW Workforce Transition Program").  Included in the UAW Workforce Transition Program is an attrition program similar to the U.S. employee special attrition programs offered in June 2006.  The attrition program in the UAW Workforce Transition Program offered certain eligible Delphi employees the following options:  (i) normal and early voluntary retirements with a lump sum incentive payment of $35,000, (ii) a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service are granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they will retire without additional incentives, and (iii) buyout payments which, depending on the amount of seniority or credited service, range from $70,000 to $140,000.  The UAW Workforce Transition Program also offers the following options: (i) flowback rights to eligible Delphi employees as of the date of the filing of Delphi's bankruptcy petition who do not elect the attrition options, including a relocation allowance of up to $67,000 in certain circumstances when plants cease production, (ii) buy-down payments totaling up to $105,000 for eligible traditional employees who do not elect the attrition option or flowback and continue to work for Delphi under the terms of the 2004 UAW-Delphi Supplemental Agreement applicable to employees hired after 2004, transferring those employees to Supplemental Employee Status as of October 1, 2007, (iii) conversion of temporary employees in UAW-Delphi plants to permanent employee status, and (iv) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to September 14, 2011.

On August 5, 2007, Delphi, GM and the IUE-CWA signed the IUE-CWA settlement agreement, which included a workforce transition program for eligible IUE-CWA employees (the "IUE-CWA Workforce Transition Program") and included an attrition program similar to the 2006 U.S. employee special attrition programs.  The attrition program in the IUE-CWA Workforce Transition Program is similar to the attrition program included in the UAW Workforce Transition Program except that the buyout payments based on seniority or credited service range from $40,000 to $140,000.  The IUE-CWA Workforce Transition Program also offers the following options: (i) special employee placement opportunities with GM for eligible Delphi employees who do not elect the attrition options, including relocation allowances of up to $67,000 in certain circumstances when specific plants cease production, (ii) provision of buy-down payments totaling up to $125,000 for eligible employees who do not elect the attrition option or become employed by GM and continue to work for Delphi under the terms of the IUE-CWA settlement agreement, and (iii) severance payments up to $40,000 or supplemental unemployment benefits to eligible employees who are permanently laid off prior to October 12, 2011.

On July 31 and August 1, 2007, Delphi and GM signed settlement agreements with the IAM, IBEW, IUOE Local 18S, IUOE Local 101S, and IUOE Local 832S (collectively the "Splinter Unions").  With the exception of the IUOE Local 101S Agreement, these Splinter Union settlement agreements included workforce transition programs (the "Splinter Unions Workforce Transition Program") and included attrition programs similar to the attrition program included in the IUE-CWA Workforce Transition Program.  The Splinter Unions Workforce Transition Program also offers options of buy-down payments totaling up to $10,000 for eligible employees or severance payments up to $40,000 to eligible employees who are permanently laid off prior to September 14, 2011.

On August 16, 2007, Delphi, GM and the USW signed the USW settlement agreements, which included certain workforce transition options for eligible USW employees at the Home Avenue and Vandalia operations similar to certain options presented in the IUE-CWA Workforce Transition Program.

As of December 31, 2007, approximately 310 of the 3,700 eligible UAW-represented employees, approximately 190 of the 1,300 eligible IUE-CWA-represented employees, approximately 710 of the 800 eligible USW-represented employees, and approximately 90 of the 100 eligible Splinter Union-represented employees elected to participate in the attrition programs.  During 2007, Delphi recorded charges for the attrition programs of approximately $52 million, which includes a reduction in the U.S. employee workforce transition program liability of $64 million due to a change in estimated future payments for both the 2006 and 2007 programs.  These charges are included in the U.S. employee workforce transition program liability included in current liabilities in the consolidated balance sheet.  The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability.  In accordance with EITF 88-23, "*Lump-Sum Payments under Union Contracts,*" the wage asset will be amortized over the life of the respective union agreements.  In 2007, Delphi recognized $22 million of wage asset amortization.  The corresponding wage liability will be reduced as buy-down payments are made, of which $120 million of payments were made as of December 31, 2007.  Based on the GSA with GM, Delphi expects reimbursement for certain costs related to the workforce transition programs, but given that the GSA is not effective until Delphi's emergence from chapter 11, reimbursement of these costs has not been recorded as of December 31, 2007.  GM's reimbursement for costs associated with incentivized retirements are included in the U.S. labor agreements, which as previously discussed have been approved by the Court and ratified by the respective unions.  Therefore, as of December 31, 2007, Delphi has recorded a receivable from GM in the amount of $2 million.  Delphi also

recorded pension curtailment losses of $175 million partially offset by a curtailment gain of $5 million related to other postretirement benefits. These curtailments are discussed further in Note 16. Pension and Other Postretirement Benefits. Total workforce transition program charges were $244 million for 2007, of which $212 million is recorded in U.S. workforce transition program charges and $32 million is recorded in loss on discontinued operations. Finally, costs related to severance payments and supplemental unemployment benefits for U.S. employees at sites that will be sold or wound down in accordance with the workforce transition programs was $56 million included in cost of sales.

### 2006 Attrition Programs

On March 22, 2006, Delphi, GM and the UAW agreed on a special attrition program (the "UAW Special Attrition Program"), and on May 12, 2006, the Court entered the final order approving Delphi's entry into the program with certain modifications. Delphi, GM, and the UAW agreed on a supplemental agreement on June 5, 2006 (the "UAW Supplemental Agreement") to the UAW Special Attrition Program which was approved by the Court by order entered on July 7, 2006 (collectively, the UAW Special Attrition Program and UAW Supplemental Agreement are referred to herein as the "UAW Attrition Programs"). The UAW Attrition Programs offered, among other things, certain eligible Delphi U.S. hourly employees represented by the UAW normal and early voluntary retirements with a $35,000 lump sum incentive payment paid by Delphi and reimbursed by GM. The programs also provided a pre-retirement program under which employees with at least 26 and fewer than 30 years of credited service were granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they would be eligible to retire without additional incentives. The programs also provided buyout payments which, depending on the amount of seniority or credited service, ranged from $40,000 to $140,000. GM has agreed to reimburse Delphi for one-half of these buyout payments and in exchange will receive an allowed prepetition general unsecured claim. In addition, employees who elected to participate in the UAW Attrition Programs were eligible to retire as employees of Delphi or flow back to GM and retire. During 2006, approximately 10,000 employees elected to flow back to GM and retire. Although GM agreed to assume the postretirement healthcare and life insurance coverages for these retirees, due to the volume of retirements, GM was unable immediately to transition these retirees to GM healthcare and life insurance plans. Delphi agreed to administer health and life insurance coverage for these retirees during the transition period and GM agreed to reimburse Delphi for the actual costs of providing such coverage. During 2007, GM overpaid Delphi, so as of December 31, 2007, Delphi owes GM approximately $10 million for these overpayments.

On June 16, 2006, Delphi, GM, and the IUE-CWA reached agreement on the terms of a special attrition program which mirrored in all material respects the UAW Attrition Programs. The lump sum incentive payments of $35,000 per eligible employee and one-half of the $40,000 to $140,000 buyout payments are being paid by Delphi and reimbursed by GM. GM will receive an allowed prepetition general unsecured claim equal to the amount it reimburses Delphi for the buyout payments. The IUE-CWA special attrition program (the "IUE-CWA Special Attrition Program") was approved by the Court by order entered on July 7, 2006.

Delphi recorded special termination benefit charges of approximately $1,117 million for the year ended December 31, 2006, for the pre-retirement and buyout portions of the cost of the U.S. employee special attrition programs. Since GM will receive an allowed prepetition general unsecured claim for its 50% share of the financial responsibility of the buyout payments, Delphi expensed 100% of the buyout payments. In addition, Delphi recorded net pension and postretirement benefit curtailment charges of approximately $1,897 million and a credit of $59 million due to a curtailment gain related to extended disability benefits for the year ended December 31, 2006. Total workforce transition charges were $2,955 million, of which $2,706 million is recorded in U.S. workforce transition charges and $249 million is recorded in loss on discontinued operations.

The following table represents the movement in the U.S. employee workforce transition program liability for 2006 and 2007:

### U.S. Employee Workforce Transition Program Liability

|  | (in millions) |
|---|---:|
| Balance at December 31, 2005 | $ — |
| U.S. employee workforce transition program charges | 1,117 |
| Lump sum incentive obligation | 363 |
| Payments | (654) |
| Pension and other postretirement benefits (Note 16) | (29) |
| Accretion and other | 33 |
| Balance at December 31, 2006 | $ 830 |
| U.S. employee workforce transition program charges (net of a decrease in previously recorded charges of $64 million due to a change in estimate) | 52 |
| Buy-down wage liability | 323 |
| Payments | (793) |
| Pension and other postretirement benefits (Note 16) | (48) |
| Accretion and other | 18 |
| Balance at December 31, 2007 | $ 382 |

Approximately $234 million and $626 million of the U.S. employee workforce transition program liability is included in accrued liabilities at December 31, 2007 and December 31, 2006, respectively, and approximately $148 million and $204 million is included in other long-term liabilities at December 31, 2007 and December 31, 2006, respectively, in the consolidated balance sheet.

The following table represents the movement in the U.S. employee workforce transition program buydown wage asset for 2007:

**U.S. Employee Workforce Transition Program Buydown
Wage Asset**

| | (in millions) |
|---|---|
| Balance at December 31, 2006 ..................................................... | $    — |
| Buy-down wage asset ........................................................ | 323 |
| Amortization expense ....................................................... | (22) |
| Balance at December 31, 2007 ..................................................... | $    301 |

As of December 31, 2007, approximately $80 million of the U.S. employee workforce transition program buydown wage asset is included in other current assets and approximately $221 million is included in other long-term assets in the consolidated balance sheet.

The following table details changes in the GM and affiliates accounts receivable balance attributable to the U.S. employee workforce transition program for 2007 and 2006, recorded in GM and affiliates accounts receivable in the accompanying consolidated balance sheet at December 31, 2007 and December 31, 2006:

**U.S. Employee Workforce Transition Program- GM
Accounts Receivable**

| | (in millions) |
|---|---|
| Balance at December 31, 2005 ......................................... | $    — |
| GM Obligation............................................................. | 677 |
| Receipts from GM ...................................................... | (405) |
| Balance at December 31, 2006 ......................................... | $    272 |
| GM Obligation............................................................. | 2 |
| Receipts from GM ...................................................... | (265) |
| Other................................................................... | (7) |
| Balance at December 31, 2007 ......................................... | $    2 |

## 16. PENSION AND OTHER POSTRETIREMENT BENEFITS

Pension plans covering unionized employees in the U.S. generally provide benefits of negotiated stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. The benefits provided by the plans covering U.S. salaried employees are generally based on years of service and salary history. Certain Delphi employees also participate in non-qualified pension plans covering executives, which are unfunded. Such plans are based on targeted wage replacement percentages. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code. Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, and the United Kingdom ("UK"). The UK and certain Mexican plans are funded.

Delphi also maintains other postretirement benefit plans, which provide covered U.S. hourly and salaried employees with retiree medical and life insurance benefits. Certain of Delphi's non-U.S. subsidiaries have other postretirement benefit plans; although most participants are covered by government sponsored or administered programs. The annual cost of such other postretirement benefit plans was not significant to Delphi. In addition, Delphi has defined benefit plans in Korea, Turkey and Italy for which amounts are payable to employees immediately upon separation. The obligations for these plans were $51 million and $38 million as of December 31, 2007 and 2006, respectively, and have been recorded based on the vested benefit obligation.

The 2007 and 2006 amounts shown below reflect the defined benefit pension and other postretirement benefit obligations for U.S. and non-U.S. salaried and hourly employees excluding the plans in Korea, Turkey and Italy discussed above.

| | **Pension Benefits** | | | | **Other Postretirement Benefits** | |
| | **U.S. Plans** | | **Primary Non-U.S. Plans** | | | |
| | **2007** | **2006** | **2007** | **2006** | **2007** | **2006** |
| | | | (in millions) | | | |
|---|---|---|---|---|---|---|
| Benefit obligation at beginning of year........................... | $ 14,910 | $ 13,764 | $ 1,635 | $ 1,306 | $ 9,055 | $ 9,589 |
| Service cost ................................................... | 170 | 268 | 47 | 42 | 81 | 171 |
| Interest cost .................................................. | 851 | 793 | 81 | 66 | 542 | 561 |
| Plan participants' contributions............................. | 5 | 6 | 5 | 5 | 3 | 3 |
| Actuarial losses (gains)..................................... | (589) | (696) | (176) | 70 | (471) | (1,617) |
| Benefits paid................................................. | (1,045) | (732) | (108) | (59) | (243) | (229) |
| Special termination benefits ................................ | — | — | — | 20 | 3 | — |
| Flowback net liability reclassification...................... | — | — | — | — | — | 944 |
| Impact of settlements ....................................... | — | — | 48 | 14 | — | — |
| Impact of curtailments ...................................... | (254) | 1,518 | 5 | — | (100) | (349) |
| Plan amendments and other................................... | 6 | (11) | 5 | 4 | (138) | (18) |
| Exchange rate movements ..................................... | — | — | 47 | 167 | — | — |
| Benefit obligation at end of year............................ | $ 14,054 | $ 14,910 | $ 1,589 | $ 1,635 | $ 8,732 | $ 9,055 |
| | | | | | | |
| Change in plan assets: | | | | | | |
| Fair value of plan assets at beginning of year............... | $ 10,722 | $ 9,712 | $ 1,025 | $ 799 | $ — | $ — |
| Actual return on plan assets................................. | 857 | 1,493 | 113 | 110 | — | — |
| Delphi contributions ........................................ | 209 | 243 | 95 | 62 | 240 | 226 |
| Plan participants' contributions............................. | 5 | 6 | 5 | 5 | 3 | 3 |
| Benefits paid................................................. | (1,045) | (732) | (108) | (59) | (243) | (229) |
| Exchange rate movements and other........................... | — | — | 16 | 108 | — | — |
| Fair value of plan assets at end of year .................... | $ 10,748 | $ 10,722 | $ 1,146 | $ 1,025 | $ — | $ — |
| | | | | | | |
| Underfunded status .......................................... | $ (3,306) | $ (4,188) | $ (443) | $ (610) | $ (8,732) | $ (9,055) |
| | | | | | | |
| Amounts recognized in the consolidated balance sheets consist of: | | | | | | |
| Noncurrent assets........................................... | $ — | $ — | $ 1 | $ 2 | $ — | $ — |
| Other noncurrent assets (flow-in receivable)................. | — | — | — | — | 97 | 101 |
| Current liabilities ......................................... | — | — | (13) | (11) | — | — |
| Noncurrent liabilities ...................................... | — | — | (406) | (532) | — | — |
| Liabilities subject to compromise ........................... | (3,306) | (4,188) | (25) | (69) | (8,829) | (9,156) |
| Total ....................................................... | $ (3,306) | $ (4,188) | $ (443) | $ (610) | $ (8,732) | $ (9,055) |
| | | | | | | |
| Amounts recognized in accumulated other comprehensive income consist of (pre-tax): | | | | | | |
| Actuarial loss............................................... | $ 1,330 | $ 2,261 | $ 311 | $ 545 | $ 1,176 | $ 1,822 |
| Prior service cost (credit).................................. | 112 | 353 | 33 | 34 | (736) | (700) |
| Net transition obligation ................................... | — | — | 6 | 6 | — | — |
| Total ....................................................... | $ 1,442 | $ 2,614 | $ 350 | $ 585 | $ 440 | $ 1,122 |

The projected benefit obligation ("PBO"), accumulated benefit obligation ("ABO"), and fair value of plan assets for pension plans with accumulated benefit obligations in excess of plan assets and with plan assets in excess of accumulated benefit obligations are as follows:

| | U.S. Plans | | Primary Non-U.S. Plans | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| | *(in millions)* | | | |
| | **Plans with ABO in Excess of Plan Assets** | | | |
| PBO ...................................................... | $14,054 | $14,910 | $ 1,499 | $ 1,559 |
| ABO ...................................................... | 14,051 | 14,531 | 1,284 | 1,340 |
| Fair value of plan assets at end of year.. | 10,748 | 10,722 | 1,055 | 947 |
| | **Plans with Plan Assets in Excess of ABO** | | | |
| PBO ...................................................... | $ — | $ — | $ 90 | $ 76 |
| ABO ...................................................... | — | — | 58 | 69 |
| Fair value of plan assets at end of year.. | — | — | 91 | 78 |
| | **Total** | | | |
| PBO ...................................................... | $14,054 | $14,910 | $ 1,589 | $ 1,635 |
| ABO ...................................................... | 14,051 | 14,531 | 1,342 | 1,409 |
| Fair value of plan assets at end of year.. | 10,748 | 10,722 | 1,146 | 1,025 |

Benefit costs presented below were determined based on actuarial methods and included the following components for U.S. and non-U.S. salaried and hourly employees:

| | Pension Benefits | | | | | | Other Postretirement Benefits | | |
|---|---|---|---|---|---|---|---|---|---|
| | U.S. Plans | | | Non-U.S. Plans | | | | | |
| | | | | *(in millions)* | | | | | |
| | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
| Service cost (a) ..................................... | $ 170 | $ 268 | $ 292 | $ 47 | $ 42 | $ 34 | $ 81 | $ 171 | $ 179 |
| Interest cost ......................................... | 851 | 793 | 724 | 81 | 66 | 65 | 542 | 561 | 542 |
| Expected return on plan assets ............. | (867) | (820) | (787) | (81) | (69) | (61) | — | — | — |
| Special termination benefits ................. | — | — | 2 | — | 20 | 13 | — | — | 3 |
| Curtailment loss (gain)-PBO ................. | 22 | 1,518 | — | 60 | — | — | — | (349) | — |
| Curtailment loss (gain)-prior service.... | 194 | 397 | — | — | — | — | (7) | 329 | — |
| Amortization of transition amount ........ | — | — | — | 1 | 1 | 1 | — | — | — |
| Amortization of prior service costs (credit) ............................................. | 52 | 107 | 140 | 4 | 3 | 3 | (99) | (99) | (56) |
| Amortization of actuarial losses ........... | 75 | 192 | 211 | 32 | 26 | 31 | 74 | 255 | 207 |
| Net periodic benefit cost.................. | $ 497 | $2,455 | $ 582 | $ 144 | $ 89 | $ 86 | $ 591 | $ 868 | $ 875 |

(a)  Includes $48 million and $29 million for the years ended December 31, 2007 and 2006, respectively, of costs previously accrued related to the U.S. employee workforce transition programs.

Net periodic benefit cost above reflects $147 million, $186 million and $104 million that was included in loss from discontinued operations for the years ended December 31, 2007, 2006 and 2005, respectively.

In 2007, Delphi recorded pension curtailment losses of approximately $216 million.  Of this amount, $175 million was recorded to recognize the effect of employees who elected to participate in the workforce transition programs and the effect of prospective plan amendments that will eliminate the accrual of future defined pension benefits for salaried and certain hourly employees on emergence from bankruptcy with $135 million included in U.S. employee workforce transition program charges and $40 million included in loss from discontinued operations.  In addition, $34 million of pension curtailment loss is included in loss from discontinued operations related to the divestiture of businesses.  The remaining $7 million of pension curtailment loss relates to U.S. employees at sites that will be sold or wound down and is included in cost of sales.  In addition, Delphi recorded other postretirement benefit curtailment gains of $7 million in 2007, of which $3 million was recorded in U.S. employee workforce transition program charges, $2 million was recorded in loss from

discontinued operations and $2 million was recorded in cost of sales, to recognize the effects of the workforce transition programs and the elimination of the accrual of retiree medical benefits for certain hourly employees. In 2006, Delphi recorded net pension and postretirement benefit curtailment charges of approximately $1.9 billion in the U.S. employee workforce transition program charges line item of the statement of operations related to UAW- and IUE-CWA-represented hourly employees who elected to participate in the U.S. employee special attrition programs discussed in Note 15. U.S. Employee Workforce Transition Programs.

Experience gains and losses, as well as the effects of changes in actuarial assumptions and plan provisions are amortized over the average future service period of employees. The estimated actuarial loss and prior service cost for the defined benefit pension plans that will be amortized from accumulated OCI into net periodic benefit cost in 2008 are $22 million and $26 million, respectively. The estimated actuarial loss and prior service credit for the other defined benefit postretirement plans that will be amortized from OCI into net periodic benefit credit in 2008 are $45 million and $110 million, respectively.

The principal assumptions used to determine the pension and other postretirement expense and the actuarial value of the projected benefit obligation for the U.S. and non-U.S. pension plan and postretirement plans were:

**Assumptions used to determine benefit obligations at December 31:**

| | Pension Benefits | | | | Other Postretirement Benefits | |
| | U.S. Plans | | Non-U.S. Plans | | | |
| | **2007** | **2006** | **2007** | **2006** | **2007** | **2006** |
|---|---|---|---|---|---|---|
| Weighted-average discount rate ........... | 6.35% | 5.90% | 5.30% | 4.96% | 6.40% | 6.10% |
| Weighted-average rate of increase in compensation levels ...................... | 4.04% | 4.12% | 4.16% | 3.67% | 3.31% | 3.94% |

**Assumptions used to determine net expense for years ended December 31:**

| | Pension Benefits | | | | | | Other Postretirement Benefits | | |
| | U.S. Plans | | | Non-U.S. Plans | | | | | |
| | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** | **2007** | **2006** | **2005** |
|---|---|---|---|---|---|---|---|---|---|
| Weighted-average discount rate .......... | 5.90% | 5.50% | 5.75% | 4.96% | 4.91% | 5.67% | 6.10% | 5.50% | 6.00% |
| Weighted-average rate of increase in compensation levels ..................... | 4.12% | 3.99% | 3.99% | 3.67% | 3.45% | 3.48% | 3.94% | 3.99% | 3.98% |
| Expected long-term rate of return on plan assets ...................................... | 8.75% | 8.75% | 9.00% | 8.05% | 8.20% | 8.25% | N/A | N/A | N/A |

Delphi selected discount rates for its U.S. pension and other postretirement benefit plans by analyzing the results of matching each plan's projected benefit obligations with a portfolio of high quality fixed income investments rated AA- or higher by Standard and Poor's and with the Citigroup Pension Discount Curve. Because high quality bonds in sufficient quantity and with appropriate maturities are not available for all years when benefit cash flows are expected to be paid, hypothetical bonds were imputed based on combinations of existing bonds, and interpolation and extrapolation reflecting current and past yield trends. The weighted-average pension discount rate determined on that basis increased from 5.90% for 2006 to 6.35% for 2007. This 45 basis point increase in the weighted-average discount rate decreased the underfunded status of the U.S. pension plans by approximately $0.6 billion. The weighted-average other postretirement benefits discount rate determined on that basis increased from 6.10% for 2006 to 6.40% for 2007. This 30 basis point increase in the weighted average discount rate decreased the underfunded status of the U.S. postretirement plans by approximately $0.5 billion. Delphi selected discount rates for its non-U.S. plans by analyzing the yields of high quality fixed income investments.

For 2006 and 2007 expense, Delphi assumed a U.S. long-term asset rate of return of 8.75%. In developing the 8.75% expected long-term rate of return assumption, Delphi evaluated input from its third party pension plan asset manager, including a review of asset class return expectations and long-term inflation assumptions. Delphi also considered its post-spin off and GM's pre-spinoff historical 10-year and 20-year compounded returns, which were consistent with its long-term rate of return assumption. The primary non-U.S. plans conduct similar studies in conjunction with local actuaries and asset managers. While the studies give appropriate consideration to recent fund performance and historical returns, the assumptions are primarily long-term, prospective rates.

Delphi's pension expense for 2008 is determined at the 2007 measurement date. For purposes of analysis, the following table highlights the sensitivity of the Company's pension obligations and expense to changes in key assumptions:

| Change in Assumption | Impact on Pension Expense | Impact on PBO |
|---|---|---|
| 25 basis point (bp) decrease in discount rate | + $20 million | + $340 million |

| | | |
|---|---|---|
| 25 bp increase in discount rate | - $5 million | - $340 million |
| 25 bp decrease in long-term return on assets | - $25 million | — |
| 25 bp increase in long-term return on assets | + $25 million | — |

The above sensitivities reflect the effect of changing one assumption at a time. It should be noted that economic factors and conditions often affect multiple assumptions simultaneously and the effects of changes in key assumptions are not necessarily linear. The above sensitivities also assume no changes to the design of the pension plans and no major restructuring programs.

Delphi's other postretirement benefit expense for 2008 is determined at the 2007 measurement date. For purposes of analysis, the following table highlights the sensitivity of the Company's postretirement obligations and expense to changes in assumptions:

| Change in Assumption | Impact on Postretirement Expense | Impact on Postretirement Benefit Obligation |
|---|---|---|
| 25 bp decrease in discount rate | + $15 - 25 million | + $300 – 350 billion |
| 25 bp increase in discount rate | - $5 - 15 million | - $300 – 350 billion |

For analytical purposes only, the following table presents the impact that changes in the Company's health care trend rate would have on its postretirement liability and postretirement service and interest cost:

| % Change | Impact on Service & Interest Cost | Impact on Postretirement Benefit Obligation (in millions) |
|---|---|---|
| +1% | $   82 | $   1,003 |
| -1% | $   (68) | $   (843) |

The above sensitivities reflect the effect of changing one assumption at a time. It should be noted that economic factors and conditions often affect multiple assumptions simultaneously and the effects of changes in key assumptions are not necessarily linear. The above sensitivities also assume no changes to the postretirement plan design and no major restructuring programs.

Delphi's pension plan asset allocation at December 31, 2007 and 2006, and target allocation for 2008 are as follows:

| Asset Category | Percentage of Plan Assets at December 31, | | | | Target Allocation U.S. Plans |
|---|---|---|---|---|---|
| | U.S. Plans | | Non-U.S. Plans | | |
| | 2007 | 2006 | 2007 | 2006 | 2008 |
| Equity Securities | 57% | 60% | 61% | 60% | 58% |
| Fixed Income | 25% | 26% | 24% | 25% | 24% |
| Private Equity | 6% | 4% | — | — | 6% |
| Real Estate | 8% | 6% | 14% | 14% | 8% |
| Other | 4% | 4% | 1% | 1% | 4% |
| Total | 100% | 100% | 100% | 100% | 100% |

Delphi invests in a diversified portfolio consisting of an array of asset classes that attempts to maximize returns while minimizing volatility. These asset classes include U.S. domestic equities, developed market equities, emerging market equities, private equity, global high quality and high yield fixed income, real estate, and absolute return strategies.

As permitted under chapter 11 of the Bankruptcy Code and pursuant to pension waivers, Delphi contributed only the portion of the contribution attributable to post-bankruptcy-petition service. During 2007 and 2006, Delphi contributed $209 million and $243 million, respectively, to its U.S. pension plans, representing the portion of the pension contribution attributable to services rendered by employees of the Debtors in the respective plan years ended September 30, 2007 and 2006. Under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), minimum funding payments of approximately $1.2 billion to the U.S. pension plans were due in 2007 and 2006.

Delphi did not meet the minimum funding standards of ERISA and the Code for its primary U.S. pension plans for the plan year ended September 30, 2005. The underfunded amount of approximately $173 million was due on June 15, 2006. The Company did not pay this amount and a related penalty was assessed by the Internal Revenue Service in the amount of approximately $17 million. The penalty was recorded in liabilities subject to compromise in 2006. Given the receipt of the funding waivers described below, it is no longer probable that Delphi will ultimately pay this penalty and therefore Delphi reversed the liability of $19 million (including $2 million of accrued interest). The unpaid portion of the minimum funding payments remains payable as a claim against Delphi and will be

determined in Delphi's plan of reorganization with other claims. Delphi has appointed an independent fiduciary for all of its qualified defined benefit pension plans who is charged with pursuing claims on behalf of the plans to recover minimum funding contributions. On May 1, 2007 and September 28, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan years ended September 30, 2006 and September 30, 2007, respectively. The conditional funding waivers will permit Delphi to defer funding contributions due under ERISA and the IRC until after Delphi emerges from chapter 11. The Company has represented that it intends to meet the minimum funding standard under IRC section 412 for the plan years ended September 30, 2006 and 2007 upon emergence from chapter 11. The Company is seeking an extension of the waiver terms with the IRS and the PBGC as they relate to the effective date of the Amended Plan. Refer to Note 2. Transformation Plan and Other Chapter 11 Bankruptcy for further information on Delphi's discussions with the IRS and the Pension Benefit Guaranty Corporation.

Although Delphi's 2008 minimum funding requirement is approximately $2.5 billion under current legislation and plan design, Delphi is in chapter 11 and its 2008 contributions to the U.S. pension plans prior to emergence will be limited to approximately $202 million, representing the normal service cost. Upon emergence from chapter 11, which is anticipated to be in 2008, the Company will be required to meet its past due funding obligations. These obligations will be the amount of the minimum funding requirement contributions that would have been due, less the amount of the normal service cost contributions actually paid to the pensions plus interest. The 2008 contributions to the non-U.S. pension plans will be approximately $44 million.

Agreements relating to union matters allow for some of Delphi's hourly employees in the U.S. being provided with certain opportunities to transfer to GM as appropriate job openings become available at GM and GM employees in the U.S. had similar opportunities to transfer to the Company, though those opportunities are currently suspended. If such a transfer occurs, in general, both Delphi and GM will be responsible for pension payments, which in total reflect such employee's entire eligible years of service. Allocation of responsibility between Delphi and GM will be on a pro-rata basis depending on the length of service at each company (although service at Delphi includes service with GM prior to Delphi's separation from GM). There will be no transfer of pension assets or liabilities between GM and Delphi with respect to such employees that transfer between the two companies. The company to which the employee transfers will be responsible for the related other postretirement obligation. An agreement with GM provides for a mechanism for determining a cash settlement amount for other postretirement obligations associated with employees that transfer between GM and Delphi. The consolidated balance sheets include approximately $3.1 billion as of December 31, 2007 and December 31, 2006 of postretirement obligations classified as liabilities subject to compromise reflecting an accumulated postretirement benefit obligation for benefits payable to GM for employees that transferred from Delphi to GM. Due to the Chapter 11 Filings, the Company has not made any payments in 2006 or 2007 to settle this obligation. Additionally, a $0.1 billion receivable for the cash settlement amount due from GM for postretirement obligations associated with employees transferring from GM to Delphi has been classified as an other long-term asset. Based on the terms of the GSA upon emergence, GM will assume certain of Delphi's hourly medical postretirement benefits, including amounts payable to GM related to Delphi employee that have transferred to GM. The following table reflects the movement of the other postretirement benefits obligation in 2007, including amounts payable to GM for employees that have transferred from Delphi to GM:

| | Other Postretirement Benefits | | | |
| | (in millions) | | | |
| | Delphi Hourly | Delphi Salaried | Payable to GM | Total |
|---|---|---|---|---|
| Benefit obligation at December 31, 2006 | $ 4,908 | $ 1,026 | $ 3,121 | $ 9,055 |
| Service cost | 65 | 16 | — | 81 |
| Interest cost | 293 | 61 | 188 | 542 |
| Plan participants' contributions | — | 3 | — | 3 |
| Actuarial gains | (313) | 73 | (231) | (471) |
| Benefits paid | (198) | (45) | — | (243) |
| Special termination benefits | 3 | — | — | 3 |
| Impact of curtailment | (133) | — | 33 | (100) |
| Plan amendments and other | (138) | — | — | (138) |
| Benefit obligation at December 31, 2007 | $ 4,487 | $ 1,134 | $ 3,111 | $ 8,732 |

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

| | Projected Pension Benefit Payments | | Projected Postretirement Benefit Payments |
| | U.S. Plans | Non-U.S. Plans | |
| | (in millions) | | |
|---|---|---|---|
| 2008 | $ 1,092 | $ 56 | $ 985 |
| 2009 | 1,133 | 63 | 919 |
| 2010 | 1,146 | 67 | 876 |
| 2011 | 1,144 | 72 | 782 |
| 2012 | 1,135 | 78 | 708 |
| 2013 – 2017 | 5,400 | 589 | 3,307 |

Delphi's annual measurement date for the U.S., France, Luxembourg, Mexico and Portugal pension plans and other postretirement life insurance benefits is December 31 and for the UK and Germany pension plans and other postretirement health benefits is September 30. Delphi will adopt the measurement date provisions of SFAS 158 as of January 1, 2008, which will result in the measurement of all pension and other postretirement benefit plans as of December 31, Delphi's fiscal year-end.

For postretirement plan measurement purposes, Delphi assumed an average 10% initial annual rate of increase in the per capita cost of covered health care benefits. The rate was assumed to decrease on a gradual basis through 2012, to the ultimate weighted-average trend rate of 5%.

Delphi also sponsors defined contribution plans for certain U.S. hourly and salaried employees. Delphi's expense related to the contributions for these plans was $10 million, $8 million and $9 million for 2007, 2006 and 2005, respectively.

## 17. COMMITMENTS AND CONTINGENCIES

### Shareholder Lawsuits

As previously disclosed, the Company, along with certain of its subsidiaries, current and former directors of the Company, and certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005. Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the securities actions, ERISA actions, and shareholder derivative actions in consolidated proceedings ("the "Multidistrict Litigation" or "MDL") reached an agreement with the lead plaintiffs in the Securities Actions as defined below (the "Lead Plaintiffs") and named plaintiffs in the Amended ERISA Action as defined below (the "ERISA Plaintiffs") resulting in a settlement of the Multidistrict Litigation (the "MDL Settlements"). Pursuant to the MDL Settlements, the class claimants will receive cash and allowed claims in the chapter 11 proceedings that, when valued at the face amount of the allowed claims, is equivalent to approximately $351 million. The MDL Settlements were approved by the District Court in which the actions are pending, and by the Court on January 25, 2008.

On September 5, 2007 the U.S. District Court for the Eastern District of Michigan (the "District Court") entered an order preliminarily certifying the class and approving the settlement and scheduled the matter for a fairness hearing on November 13, 2007. On November 13, the District Court conducted the fairness hearing and took the matter under advisement. On October 29, 2007, the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's plan of reorganization and the Court's consideration of certain objections that may be filed as to the MDL Settlements. On October 29, 2007, the Court lifted the automatic stay as to the discovery provided to the Lead Plaintiffs. On December 4, 2007, the District Court held another hearing to consider proposed modifications to the MDL Settlements (the "Modified MDL Settlements"), and tentatively approved the Modified MDL Settlements, after determining that the modifications were at least neutral to the Lead Plaintiffs and potentially provide a net benefit to the Lead Plaintiffs. The District Court approved the MDL Settlements in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered final orders and judgments dated January 23, 2008 with respect to the securities and ERISA actions. On January 25, 2008, the Court approved the MDL Settlements. As provided in the confirmation order, the MDL Settlements are contingent upon the effective date of the Amended Plan occurring, and if, for any reason, we cannot emerge as contemplated, the MDL Settlements will become null and void. A copy of an addendum setting forth the modification is attached as Exhibit 99(f) to the Company's Current Report on Form 8-K filed with the SEC on January 30, 2008.

The Multidistrict Litigation is comprised of lawsuits in three categories. One group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under ERISA (the "ERISA Actions"). Plaintiffs in the ERISA Actions allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA. The ERISA Actions were subsequently transferred to the Multidistrict Litigation. On March 3, 2006, plaintiffs filed a consolidated class action complaint (the "Amended ERISA Action") with a class period of May 28, 1999 to November 1, 2005. The Company, which was previously named as a defendant in the ERISA Actions, was not named as a defendant in the Amended ERISA Action due to the Chapter 11 Filings, but the plaintiffs stated that they intended to proceed with claims against the Company in the ongoing bankruptcy cases, and will seek to name the Company as a defendant in the Amended ERISA Action if the bankruptcy stay were modified or lifted to permit such action. On May 31, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi is providing certain discovery to the Lead Plaintiffs and other parties in the case.

A second group of class action lawsuits alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws. On September 30, 2005, the court-appointed Lead Plaintiffs filed a consolidated class action complaint (the "Securities Actions") on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly-traded securities of the Company, including securities issued by Delphi Trust I and Delphi Trust II, during a class period of March 7, 2000 through March 3, 2005. The Securities Actions name several

additional defendants, including Delphi Trust II, certain former directors, and underwriters and other third parties, and includes securities claims regarding additional offerings of Delphi securities. The Securities Actions consolidated in the United States District Court for Southern District of New York (and a related securities action filed in the United States District Court for the Southern District of Florida concerning Delphi Trust I) were subsequently transferred to the District Court as part of the Multidistrict Litigation. The action is stayed against the Company pursuant to the Bankruptcy Code, but is continuing against the other defendants. On February 15, 2007, the District Court partially granted the plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act of 1995, thereby allowing the plaintiffs to obtain certain discovery from the defendants. On April 16, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi is providing certain discovery to the Lead Plaintiffs and other parties in the case.

The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions"). A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court (Oakland County Circuit Court in Pontiac, Michigan). These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results. The federal cases were consolidated with the securities and ERISA class actions in the U.S. District Court. Following the filing on October 8, 2005 of the Debtors' petitions for reorganization relief under chapter 11 of the Bankruptcy Code, all the derivative cases were administratively closed.

The following is a summary of the principal terms of the MDL Settlements as they relate to the Company and its affiliates and related parties and is qualified in its entirety by reference to the complete agreements submitted to the Court for approval and which were filed as exhibits to the Company's Current Report on Form 8-K dated September 5, 2007.

Under the terms of the Modified MDL Settlements, the Lead Plaintiffs and the ERISA Plaintiffs will receive claims that will be satisfied through Delphi's Amended Plan as confirmed by the Court pursuant to the confirmation order described under Item 1.03 of the Company's Current Report on Form 8-K filed with the SEC on January 30, 2008. The Lead Plaintiffs will be granted an allowed claim in the face amount of $179 million, which will be satisfied by Delphi providing $179 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Amended Plan. Additionally, the Lead Plaintiffs will receive $15 million to be provided by a third party. Delphi has also agreed to provide the Lead Plaintiffs, on behalf of the class members, the ability to exercise their rights in the anticipated discount rights offering in connection with the Amended Plan through a notice mechanism and a pledge of cash collateral. If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the settlement reached with the Lead Plaintiffs. Delphi will object to any claims filed by opt-out plaintiffs in the Court, and will seek to have such claims expunged. The settlement with the ERISA Plaintiffs is structured similarly to the settlement reached with the Lead Plaintiffs. The ERISA Plaintiffs' claim will be allowed in the amount of approximately $25 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under the Plan. Unlike the settlement reached with the Lead Plaintiffs, the ERISA Plaintiffs will not be able to opt out of their settlement.

In addition to the amounts to be provided by Delphi from the above described claims in its chapter 11 cases, the Lead Plaintiffs will also receive a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer and director named defendants in defense of any future civil actions arising from the allegations raised in the securities cases. The ERISA Plaintiffs will also receive a distribution of insurance proceeds in the amount of approximately $22 million. Settlement amounts from insurers and underwriters were paid and placed in escrow by September 25, 2007 pending Court approval.

The MDL Settlements include a dismissal with prejudice of the ERISA and Securities Actions and a full release as to certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants. The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or their fiduciary duties. The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand. As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

As a result of the MDL Settlements, as of December 31, 2007, Delphi has a liability of $351 million recorded for this matter. The expense incurred for this matter was $343 million during 2007. Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible; and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million. As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage. Delphi had previously recorded an initial reserve in

the amount of its $10 million insurance deductible, and net of related payments, had an $8 million liability recorded as of December 31, 2006. Based on the modifications to the MDL Settlements discussed above, Delphi reduced its liability by approximately $10 million during December 2007. As discussed above, in conjunction with the MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

## Environmental Matters

Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations. For a discussion of matters relating to compliance with laws for the protection of the environment, refer to Item 1. Business – Environmental Compliance in this Annual report on Form 10-K.

As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont City Landfill Site (the "Site") located in Tremont, Ohio, which is alleged to involve ground water contamination. In September 2002, Delphi and other PRPs entered into a Consent Order with the U.S. Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the Site. The Remedial Investigation and Alternatives Array Document were finalized in 2007. A Feasibility Study and Record of Decision are expected to be completed in 2008. Although Delphi believes that capping and future monitoring is a reasonably possible outcome, a different cleanup approach ultimately may be required for the Site. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves. As of December 31, 2007, Delphi has recorded its best estimate of its share of the remediation based on the remedy described above. However, if that remedy is not accepted, Delphi's expenditures for remediation could increase by $20 million in excess of its existing reserves. Delphi will continue to re-assess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

As of December 31, 2007 and December 31, 2006, our reserve for environmental investigation and remediation was approximately $112 million and $118 million, respectively, including approximately $3 million within liabilities subject to compromise at December 31, 2006. The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the separation from GM in 1999 (the "Separation"). Delphi completed a number of environmental investigations during 2006 in conjunction with our transformation plan, which contemplates significant restructuring activity, including the sale, closure or demolition of numerous facilities. As part of developing and evaluating various restructuring alternatives, environmental assessments that included identification of areas of interest, soil and groundwater testing, risk assessment and identification of remediation issues were performed at nearly all major U.S. facilities. These assessments identified previously unknown conditions and led to new information that allowed us to further update our reasonable estimate of required remediation for previously identified conditions requiring an adjustment to our environmental reserve of approximately $70 million in 2006. The additional reserves are primarily related to 35 facilities and are comprised of investigation, remediation and operation and maintenance of the remedy, including postremediation monitoring costs. Addressing contamination at these sites is required by the Resource Conservation & Recovery Act and various other federal, state or local laws and regulations and represent management's best estimate of the cost to complete such actions. Management believes that its December 31, 2007 accruals will be adequate to cover the estimated liability for its exposure with respect to such matters and that these costs will be incurred over the next 20 years. However, as we continue the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified. We cannot ensure that environmental requirements will not change or become more stringent over time or that our eventual environmental remediation costs and liabilities will not exceed the amount of our current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

Delphi estimates environmental remediation liabilities based on the most probable method of remediation, current laws and regulations and existing technology. Estimates are made on an undiscounted basis and exclude the effects of inflation. If there is a range of equally probable remediation methods or outcomes, Delphi accrues at the lower end of the range. At December 31, 2007, the difference between the recorded liabilities and the reasonably possible maximum estimate for these liabilities was approximately $105 million.

## Other

As mentioned above, Delphi continues to pursue its transformation plan and continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity. These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future. In 2007, Delphi commissioned building demolition assessments for certain sites that may ultimately be demolished or sold in the next few years. These assessments provided detailed estimates of quantities of asbestos at these particular sites and detailed cost estimates for remediation of that asbestos, which resulted in a $14 million revision to the existing estimates increasing the related asset retirement obligations.

## Ordinary Business Litigation

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate.  Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization.  (Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases).

With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements.  However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates.  Additionally, in connection with the Separation, Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility.  Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof.

GM Warranty  Settlement Agreement

GM alleged that catalytic converters supplied by Delphi's Powertrain Systems segment to GM for certain 2001 and 2002 vehicle platforms did not conform to specifications.  In May 2007 GM informed Delphi that it has experienced higher than normal warranty claims with respect to certain 2003-2005 vehicle models due to instrument clusters previously supplied by Delphi's Automotive Holdings Group segment.  Effective December 2007, the responsibility for this product line was transferred to the Electronics and Safety segment. In 2007, Delphi reached a tentative agreement with GM to resolve these claims along with certain other known warranty matters.  Based on the agreement, Delphi recorded $83 million of additional warranty expense in cost of sales in 2007, net of an $8 million recovery, primarily related to the Electronics and Safety and Powertrain segments.  On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving these and certain other known warranty matters.  Under the terms of the Warranty Settlement Agreement, Delphi will pay GM up to an estimated $199 million, comprised of approximately $127 million to be paid in cash over time as noted below, and up to approximately $72 million to be paid in the form of delivery by Delphi to GM of replacement product.  The Warranty Settlement Agreement settles all outstanding warranty claims and issues related to any component or assembly supplied by Delphi to GM, which as of August 10, 2007 are (i) known by GM, subject to certain specified exceptions, (ii) believed by GM to be Delphi's responsibility in whole or in part, and (iii) in GM's normal investigation process, or which should have been within that process, but were withheld for the purpose of pursuing a claim against Delphi.  Included in the settlement are all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases ("GM's Proof of Claim").

In addition, the Warranty Settlement Agreement limits Delphi's liability related to certain other warranty claims that have become known by GM on or after June 5, 2007, and generally prohibits both GM and Delphi from initiating actions against the other related to any warranty claims settled in the agreement.  In accordance with the Warranty Settlement Agreement, Delphi's claims agent has reduced the liquidated component relating to warranty claims contained in GM's Proof of Claim by approximately $530 million (unaudited) which includes, among other things, those personal injury claims asserted in GM's Proof of Claim that relate to warranty claims settled in the agreement, and has expunged with prejudice the unliquidated component relating to warranty claims asserted in GM's Proof of Claim. Pursuant to the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007, (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million, or GM believed the claim would exceed $1 million, (iii) the claim is in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed or reasonably should have believed that Delphi had some responsibility for the claim.

Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from chapter 11.  As a result, GM will set off these payments against the amounts then payable to Delphi by GM. Since Delphi has elected to defer these payments, GM will receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts are paid by Delphi or set off against amounts payable by GM.

Other Warranty Matters

During 2007, Delphi observed higher than normal warranty claims on engine electronic control units supplied for certain 2005-2007 vehicle models by Delphi's Powertrain Systems segment and recorded $93 million of additional warranty expense in cost of sales in 2007.

During 2006, Delphi's Thermal Systems segment began experiencing quality issues regarding parts that were purchased from one of Delphi's affiliated suppliers and subsequently established warranty reserves of $59 million to cover the cost of various repairs that may be implemented.  As of December 31, 2007, the related warranty reserve is $41 million.  Delphi is actively negotiating with the affiliated supplier to determine if any portion of the liability is recoverable.

**Intellectual Property Matters**

In December 2007, the Company concluded patent license negotiations with Denso and reached a settlement agreement in connection with variable valve timing technology.  Under the settlement agreement, which is subject to the Court's approval, the Company is authorized to use the technology pursuant to a license agreement with Denso, and the Company will pay Denso a royalty based upon the sales of products containing the technology.  On February 5, 2008, the Company filed a motion with the Court seeking approval of the settlement agreement, and the Court hearing is scheduled for February 29, 2008.

Litigation is subject to many uncertainties, and the outcome of individual litigated matters is not predictable with assurance. After discussions with counsel, it is the opinion of Delphi that the outcome of such matters will not have a material adverse impact on the consolidated financial position, results of operations or cash flows of Delphi.

**Operating Leases**

Rental expense totaled $154 million, $147 million and $166 million for the years ended December 31, 2007, 2006 and 2005, respectively.  As of December 31, 2007, Delphi had minimum lease commitments under noncancelable operating leases totaling $414 million, which become due as follows:

| Year | Minimum Future Operating Lease Commitments |
|---|---|
| | (in millions) |
| 2008 | $   103 |
| 2009 | 72 |
| 2010 | 60 |
| 2011 | 52 |
| 2012 | 50 |
| Thereafter | 77 |
| Total | $   414 |

**Concentrations of Risk**

The Company's business is labor intensive and utilizes a large number of unionized employees.  A strike or other form of significant work disruption by the unions would likely have an adverse effect on the Company's ability to operate its business.  The majority of Delphi's U.S. hourly workforce is represented by two unions, the UAW (approximately 85%) and the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, Industrial Division of the Communication Workers of America, AFL-CIO, CLC ("IUE-CWA") (approximately 12%).  During the second quarter of 2007, Delphi signed an agreement with the UAW, and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007.  Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions, covering a four-year term with each union.

# 18. INVESTMENTS IN AFFILIATES

As part of our operations, we have investments in 17 non-consolidated affiliates.  These affiliates are not publicly traded companies and are located primarily in Korea, China, the U.S., Mexico, Japan, India, Spain, and Belgium.  Our ownership percentages vary generally from approximately 20% to 50%, with our most significant investments in Korea Delphi Automotive Systems Corporation (of which we own 50%), Daesung Electric Co. Ltd (of which we own 49.5%), PBR Knoxville, LLC (of which we own 49%), and Promotora de Partes Electricas Automotrices, S.A. de C.V. (of which we own 40%).  Our aggregate investment in non-consolidated affiliates was $396 million and $417 million at December 31, 2007 and 2006, respectively, of which $9 million and $8 million, respectively, was recorded in assets held for sale.  Delphi has received dividends of $45 million, $19 million and $56 million for the years ended December 31, 2007, 2006 and 2005, respectively, from non-consolidated affiliates.

The following is a summary of the combined financial information for our significant affiliates accounted for under the equity method as of December 31, 2007 and 2006 and for the years ended December 31, 2007, 2006 and 2005 (unaudited):

| | As of December 31, | |
|---|---|---|
| | 2007 | 2006 |
| | (in millions) | |
| Current assets | $   1,128 | $   1,017 |
| Noncurrent assets | 584 | 571 |
| Total assets | $   1,712 | $   1,588 |
| | | |
| Current liabilities | $   662 | $   567 |

| | | | | | |
|---|---|---|---|---|---|
| Noncurrent liabilities ............................................................ | | 240 | | 216 | |
| Stockholders' equity ............................................................ | | 810 | | 805 | |
| Total liabilities and stockholders' equity ......................... | $ | 1,712 | $ | 1,588 | |

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | **2007** | **2006** | | **2005** | |
| | | **(in millions)** | | | |
| Net sales ...................................................... | $ 2,926 | $ 2,595 | $ | 2,531 | |
| Gross profit.................................................... | $ 390 | $ 399 | $ | 451 | |
| Net income .................................................... | $ 99 | $ 122 | $ | 149 | |

A summary of transactions with affiliates is shown below:

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | **2007** | **2006** | | **2005** | |
| | | **(in millions)** | | | |
| Sales to affiliates............................................ | $ 72 | $ 71 | $ | 59 | |
| Purchases from affiliates ................................ | $ 323 | $ 281 | $ | 401 | |

## 19. OTHER INCOME, NET

Other income, net included:

|  | Year Ended December 31, | | |
|--|------|------|------|
|  | **2007** | **2006** | **2005** |
|  | | **(in millions)** | |
| Interest income | $ 68 | $ 50 | $ 43 |
| Other, net | 42 | (10) | 12 |
| Other income, net | $110 | $ 40 | $ 55 |

Other, net for the year ended December 31, 2007 includes $36 million received from GM pursuant to an intellectual property license agreement.

## 20. SHARE-BASED COMPENSATION

Delphi's share-based compensation programs include stock options, restricted stock units, and stock appreciation rights ("SAR"). The Company adopted SFAS No. 123 (Revised 2004), *Share-Based Payments* ("SFAS No. 123(R)"), effective January 1, 2006 using the modified-prospective method. This method does not require prior period amounts to be restated to reflect the adoption of SFAS No. 123(R). SFAS No. 123(R) requires compensation cost to be recognized for equity or liability instruments based on the grant-date fair value, with expense recognized over the periods that an employee provides service in exchange for the award. In conjunction with the adoption of SFAS No. 123(R), the Company evaluated the impact of a change in its prior accounting for forfeitures for restricted stock units. SFAS No. 123(R) requires the Company to estimate forfeitures at the grant date, while prior to the adoption of SFAS No. 123(R), the Company accounted for forfeitures as they occurred. The adjustment is a benefit of $3 million (there is no income tax effect due to the fact Delphi has a full valuation allowance for all of its U.S. net deferred tax assets) and has been presented separately as a cumulative effect of change in accounting principle in the financial statements. In addition, while the Company will recognize compensation cost for newly issued equity or liability instruments over the periods that an employee provides service in exchange for the award, the Company will continue to follow a nominal vesting approach for all awards issued prior to the adoption of SFAS No. 123(R).

Approximately $14 million, $28 million and $26 million of stock-based compensation cost was recognized during 2007, 2006 and 2005, respectively, of which $5 million, $5 million and $4 million are included in loss from discontinued operations for the years ended December 31, 2007, 2006 and 2005, respectively.

Prior to the adoption of SFAS No. 123(R), the Company accounted for share-based compensation using the intrinsic value method in accordance with APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations. Stock options granted during 2004 and 2003 were exercisable at prices equal to the fair market value of Delphi common stock on the dates the options were granted, accordingly, no compensation expense was recognized in 2005 for stock options. If Delphi accounted for all share-based compensation using the fair value recognition provisions of SFAS No. 123(R) and related amendments prior to December 31, 2005, its net loss from continuing operations and basic and diluted loss per share would have been as follows:

|  | **Year Ended December 31, 2005** **(in millions, except per share amounts)** |
|--|------|
| Loss from continuing operations | $   (2,130) |
| Add: Stock-based compensation expense recognized, net of related tax effects | 24 |
| Less: Total stock-based employee compensation expense determined under fair value method for all awards, net of related tax effects | (37) |
| Pro forma net loss from continuing operations | $   (2,143) |
| Continuing operations loss per share: | |
| Basic and diluted – as reported | $   (3.80) |
| Basic and diluted– pro forma | $   (3.83) |

*Share-Based Compensation Plans*

Delphi has no intention during bankruptcy to deliver approximately 22 million shares of stock for future grants under its Long Term Incentive Plan ("LTIP"). As a result, as of December 31, 2005, there were no shares available for future grants of options or restricted stock units. In addition, to date, Delphi has not issued common stock for any option that was granted but unvested at the time of the Chapter 11 Filings that subsequently vested.

A summary of activity for the Company's stock options is as follows:

|  | Stock Options (a) (in thousands) | Weighted Average Exercise Price |
|---|---|---|
| Outstanding as of January 1, 2007 ........... | 75,848 | $13.58 |
| Granted ................................................ | — | $N/A |
| Exercised ............................................. | — | $N/A |
| Forfeited............................................... | (7,880) | $14.33 |
| Outstanding as of December 31, 2007 ..... | 67,968 | $13.49 |
| Options exercisable December 31, 2007 | 67,968 | $13.49 |

(a)  Includes options that were granted and unvested at the time of the Chapter 11 Filings on October 8, 2005. The Company cancelled future grants of stock-based compensation under its long term incentive plan and will not issue any shares of common stock pursuant to previously granted stock option awards that had not vested prior to the commencement of reorganization cases.

The following is a summary of the range of weighted average remaining lives of options outstanding and exercisable as of December 31, 2007:

**Approved by Stockholders**

| Range of Exercise Prices | Outstanding Stock Options (in thousands) | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Stock Options Exercisable (in thousands) | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $0.00-$10.00 | 10,234 | 5.3 | $ 8.43 | 10,234 | $ 8.43 |
| $10.01-$20.00 | 39,664 | 3.2 | $ 13.43 | 39,664 | $ 13.43 |
| $20.01-$30.00 | 68 | 1.0 | $ 20.64 | 68 | $ 20.64 |
|  | 49,966 |  | $ 12.42 | 49,966 | $ 12.42 |

**Other Plans**

| Range of Exercise Prices | Outstanding Stock Options (in thousands) | Weighted Average Remaining Life | Weighted Average Exercise Price | Number of Stock Options Exercisable (in thousands) | Weighted Average Exercise Price |
|---|---|---|---|---|---|
| $0.00-$10.00 | 1 | 0.0 | $ 9.55 | 1 | $ 9.55 |
| $10.01-$20.00 | 16,053 | 1.6 | $ 15.95 | 16,053 | $ 15.95 |
| $20.01-$30.00 | 1,948 | 1.0 | $ 20.64 | 1,948 | $ 20.64 |
|  | 18,002 |  | $ 16.46 | 18,002 | $ 16.46 |

*Restricted Stock Units*

A summary of activity for the Company's restricted stock units is as follows:

|  | Restricted Stock Units (in thousands) | Weighted Average Grant Date Fair Value |
|---|---|---|
| Non-vested at January 1, 2007 ....................................... | 8,056 | $ 8.69 |
| Vested.......................................................................... | (1,225) | $ 9.88 |
| Forfeited ...................................................................... | (489) | $ 8.47 |
| Non-vested at December 31, 2007 ................................. | 6,342 | $ 8.47 |

One third of the restricted stock units granted in 2003 vested during the three months ended June 30, 2006. One third of the restricted stock units granted in 2004 vested during the three months ended June 30, 2007. Previously, Delphi determined not to issue common stock associated with restricted stock units granted but unvested at the time of the Chapter 11 Filings that subsequently vested. However, upon the filing of its Amended Plan and Amended Disclosure Statement with the Court, Delphi did issue shares in respect of such subsequently vested restricted stock units, which resulted in an issuance of approximately 2.5 million shares in December 2007. As of December 31, 2007, there was approximately $12 million of unrecognized compensation cost related to non-vested restricted stock units, which will be recognized over a weighted average period of 3.7 years.

## 21. SEGMENT REPORTING

Delphi's operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as the Automotive Holdings Group, consisting of business operations to be sold or wound down. An overview of Delphi's five reporting segments, which are grouped on the basis of similar product, market and operating factors, follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, displays, mechatronics and power electronics, as well as advanced development of software and silicon.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronics controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.

We also have non-core steering and halfshaft product lines and interiors and closures product lines that are reported in discontinued operations. Previously, the steering and halfshaft product line was a separate operating segment and the interiors and closures product line was part of our Automotive Holdings Group segment. Refer to Note 5. Discontinued Operations to the consolidated financial statements for more information.

The Corporate and Other category includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to U.S. employee workforce transition programs. Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

The accounting policies of the segments are the same as those described in Note 1. Significant Accounting Policies, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions. Generally, Delphi evaluates performance based on stand-alone segment operating income and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

Effective January 1, 2007, Delphi modified its methodology for allocating certain U.S. employee historical pension, postretirement benefit and workers' compensation benefit costs to the segments to directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions. Specifically, certain portions of U.S. employee historical pension, postretirement and workers' compensation benefit costs are now being allocated to Corporate and Other as opposed to the previous practice of allocating the majority of these costs to all reporting segments. The reporting segment results shown below reflect expense related to the estimated service cost portion only of the U.S. pension, postretirement and workers' compensation benefit plans for their respective workforces.

Additionally, as of December 31, 2007, Delphi transferred responsibility for certain product lines that are no longer considered non-core from the Company's Automotive Holdings Group segment to the Powertrain Systems, Thermal Systems and Electronics and Safety segments to more directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions. The reporting segment results and balance sheet data shown below have been reclassified to conform to current presentation for comparability with no effect on previously reported consolidated results of Delphi.

Included below are sales and operating data for Delphi's segments for the years ended December 31, 2007, 2006, and 2005 as well as balance sheet data for the periods ended December 31, 2007, 2006 and 2005.

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|
| **2007:** | | | | | | | |
| Net sales to GM and affiliates ... | $ 1,606 | $ 1,563 | $ 1,750 | $ 1,355 | $ 1,585 | $ 442 | $ 8,301 |
| Net sales to other customers ...... | 3,179 | 3,607 | 4,038 | 937 | 1,172 | 1,049 | 13,982 |
| Inter-segment net sales.............. | 250 | 493 | 180 | 120 | 189 | (1,232) | — |
| Total net sales..................... | $ 5,035 | $ 5,663 | $ 5,968 | $ 2,412 | $ 2,946 | $ 259 | $ 22,283 |
| Depreciation & Amortization .... | $ 267 | $ 266 | $ 175 | $ 61 | $ 63 | $ 82 | 914 |
| Long-lived asset impairment charges ...................................... | $ 1 | $ 13 | $ 6 | $ — | $ 78 | $ — | $ 98 |
| Operating income (loss) (b) ....... | $ 63 | $ (276) | $ (36) | $ (29) | $ (393) | $ (1,274) | $ (1,945) |
| Equity income (loss) .................. | $ 1 | $ 15 | $ (2) | $ 6 | $ (1) | $ 8 | $ 27 |
| Minority Interest ...................... | $ (1) | $ (28) | $ (22) | $ (3) | $ — | $ (9) | $ (63) |

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|
| **2006:** | | | | | | | |
| Net sales to GM and affiliates ... | $ 1,587 | $ 1,745 | $ 1,772 | $ 1,600 | $ 2,031 | $ 609 | $ 9,344 |
| Net sales to other customers ...... | 3,278 | 3,399 | 3,420 | 849 | 1,376 | 1,071 | 13,393 |
| Inter-segment net sales.............. | 228 | 421 | 173 | 158 | 231 | (1,211) | — |
| Total net sales..................... | $ 5,093 | $ 5,565 | $ 5,365 | $ 2,607 | $ 3,638 | $ 469 | $ 22,737 |
| Depreciation & Amortization .... | $ 268 | $ 260 | $ 175 | $ 67 | $ 100 | $ 84 | $ 954 |
| Long-lived asset impairment charges ...................................... | $ 4 | $ 12 | $ 1 | $ 11 | $ 144 | $ — | $ 172 |
| Operating income (loss) (c) ....... | $ 188 | $ (128) | $ (110) | $ (170) | $ (488) | $ (3,834) | $ (4,542) |
| Equity income (loss) .................. | $ 6 | $ 10 | $ 18 | $ (11) | $ 16 | $ 5 | $ 44 |
| Minority Interest ...................... | $ (6) | $ (28) | $ (17) | $ 9 | $ — | $ 8 | $ (34) |
| **2005:** | | | | | | | |
| Net sales to GM and affiliates ... | $ 1,790 | $ 2,022 | $ 1,910 | $ 1,700 | $ 2,264 | $ 810 | $ 10,496 |
| Net sales to other customers ...... | 3,249 | 3,152 | 3,195 | 725 | 1,206 | 1,371 | 12,898 |
| Inter-segment net sales.............. | 280 | 523 | 205 | 151 | 307 | (1,466) | — |
| Total net sales..................... | $ 5,319 | $ 5,697 | $ 5,310 | $ 2,576 | $ 3,777 | $ 715 | $ 23,394 |
| Depreciation & Amortization .... | $ 284 | $ 280 | $ 157 | $ 93 | $ 118 | $ 78 | $ 1,010 |
| Long-lived asset impairment charges ...................................... | $ 5 | $ 9 | $ 35 | $ 23 | $ 100 | $ — | $ 172 |
| Goodwill impairment charges....... | $ — | $ 368 | $ — | $ — | $ 22 | $ — | $ 390 |
| Operating income (loss) (d) ....... | $ 154 | $ (514) | $ 248 | $ (160) | $ (696) | $ (1,009) | $ (1,977) |
| Equity income ........................... | $ 3 | $ 20 | $ 16 | $ 13 | $ 12 | $ 6 | $ 70 |
| Minority Interest ...................... | $ (3) | $ (21) | $ (7) | $ 7 | $ — | $ 4 | $ (20) |

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group(e) | Corporate and Other(a) | Total |
|---|---|---|---|---|---|---|---|
| **Balance as of:** | | | | | | | |
| December 31, 2007 | | | | | | | |
| Investment in affiliates............. | $ 46 | $ 61 | $ 130 | $ 77 | $ 50 | $ 23 | $ 387 |
| Goodwill ..................................... | $ 155 | $ — | $ 165 | $ — | $ — | $ 77 | $ 397 |
| Capital expenditures................... | $ 161 | $ 149 | $ 182 | $ 66 | $ 3 | $ 19 | $ 580 |
| Segment assets .......................... | $ 3,610 | $ 3,450 | $ 4,001 | $ 1,288 | $ 1,261 | $ 57 | $ 13,667 |
| December 31, 2006 | | | | | | | |
| Investment in affiliates............. | $ 46 | $ 54 | $ 163 | $ 76 | $ 54 | $ 16 | $ 409 |
| Goodwill ..................................... | $ 143 | $ — | $ 161 | $ — | $ — | $ 74 | $ 378 |
| Capital expenditures................... | $ 180 | $ 157 | $ 182 | $ 25 | $ 53 | $ 25 | $ 622 |
| Segment assets .......................... | $ 3,701 | $ 3,735 | $ 3,822 | $ 1,210 | $ 1,833 | $ 1,091 | $ 15,392 |

(a)  Corporate and Other includes the elimination of inter-segment transactions and charges related to U.S. employee workforce transition programs in the amount of $212 million in 2007 and $2,706 million in 2006 (Refer to Note 15. U.S. Employee Workforce Transition Programs).  Corporate and Other also includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original

equipment service, consumer electronics and medical systems.  Additionally, Corporate and Other includes assets held for sale of $594 million and $1,220 million in relation to Segment assets for 2007 and 2006, respectively.
(b)  Includes charges recorded in 2007 related to long-lived asset impairments and costs associated with employee termination benefits and other exit costs with $37 million for Electronics & Safety, $68 million for Powertrain Systems, $138 million for Electrical/Electronic Architecture, $48 million for Thermal Systems, $317 million for Automotive Holdings Group and $30 million for Corporate and Other.
(c)  Includes charges recorded in 2006 related to long-lived asset impairments and costs associated with employee termination benefits and other exit costs with $22 million for Electronics & Safety, $70 million for Powertrain Systems, $83 million for Electrical/Electronic Architecture, $84 million for Thermal Systems, $171 million for Automotive Holdings Group and $11 million for Corporate and Other.
(d)  Includes charges recorded in 2005 related to long-lived asset impairments, contractual costs of other than temporarily idled employees and costs associated with employee termination benefits and other exit costs with $19 million for Electronics & Safety, $412 million for Powertrain Systems, $78 million for Electrical/Electronic Architecture, $38 million for Thermal Systems, $155 million for Automotive Holdings Group and $112 million for Corporate and Other.
(e)  Includes assets held for sale of $126 million and $231 million in relation to Segment assets for 2007 and 2006, respectively

Information concerning principal geographic areas is set forth below.  Net sales data reflects the manufacturing location and is for the years ended December 31.  Net property data is as of December 31.

| | Year Ended December 31, | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2007 | | | | 2006 | | | | 2005 | | | |
| | Net Sales | | | | Net Sales | | | | Net Sales | | | |
| (dollars in millions) | GM | Other Customers | Total | Net Property | GM | Other Customers | Total | Net Property | GM | Other Customers | Total | Net Property |
| North America | $ 6,782 | $ 4,975 | $11,757 | $ 1,906 | $ 8,040 | $ 5,881 | $13,921 | $ 2,024 | $ 9,223 | $ 6,094 | $15,317 | $ 2,450 |
| Europe, Middle East, & Africa | 1,002 | 6,396 | 7,398 | 1,476 | 879 | 5,463 | 6,342 | 1,539 | 860 | 5,381 | 6,241 | 1,507 |
| Asia Pacific | 76 | 2,105 | 2,181 | 341 | 71 | 1,700 | 1,771 | 367 | 80 | 1,111 | 1,191 | 328 |
| South America | 441 | 506 | 947 | 140 | 354 | 349 | 703 | 136 | 333 | 312 | 645 | 128 |
| Total | $ 8,301 | $13,982 | $22,283 | $ 3,863 | $ 9,344 | $13,393 | $22,737 | $ 4,066 | $10,496 | $12,898 | $23,394 | $ 4,413 |

## 22.  FAIR VALUE OF FINANCIAL INSTRUMENTS, DERIVATIVES AND HEDGING ACTIVITIES

Delphi's financial instruments include its Refinanced DIP Credit Facility, unsecured notes, junior subordinated notes, and other financing instruments.  The fair value of these financial instruments is based on quoted market prices for instruments with public market data or the current book value for instruments without a quoted public market price.  As of December 31, 2007 and 2006, the total of these financial instruments was recorded at $5.9 billion and $5.8 billion, respectively, and had estimated fair values of $4.9 billion and $6.1 billion, respectively.  For all other financial instruments recorded at December 31, 2007 and 2006, fair value approximates book value.

All derivative instruments are required to be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria.  The fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates.

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks.  To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets.  For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies.  Designation is performed on a transaction basis to support hedge accounting for most transactions.  The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged.  Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy.  Delphi does not hold or issue derivative financial instruments for trading purposes.

Delphi has foreign currency exchange exposure from buying and selling in currencies other than the local currencies of its operating units.  The primary purpose of the Company's foreign currency hedging activities is to manage the volatility associated with forecasted foreign currency purchases and sales.  Principal currencies hedged include the Mexican Peso, Chinese Yuan (Renminbi), Euro, Polish Zloty, and Turkish New Lira.  Delphi primarily utilizes forward exchange contracts with maturities of less than 24 months, which qualify as cash flow hedges.

Delphi has exposure to the prices of commodities in the procurement of certain raw materials.  The primary purpose of the Company's commodity price hedging activities is to manage the volatility associated with these forecasted inventory purchases.  Delphi primarily utilizes swaps with maturities of less than 24 months, which qualify as cash flow hedges.  These instruments are intended to offset the effect of changes in commodity prices on forecasted inventory purchases.

Delphi did not have any interest rate instruments outstanding at December 31, 2007 or 2006.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of December 31, 2007 and 2006 are as follows:

|  | December 31, 2007 | December 31, 2006 |
|---|---|---|
|  | (in millions) | |
| Current assets | $ 40 | $ 73 |
| Non-current assets | 13 | 3 |
| Total assets | $ 53 | $ 76 |
| Current liabilities | $ 24 | $ 61 |
| Non-current liabilities | — | — |
| Total liabilities | $ 24 | $ 61 |

The fair value of financial instruments recorded as assets decreased from December 31, 2006 to December 31, 2007 primarily due to the decrease in copper rates and unfavorable foreign currency contracts. The fair value of financial instruments recorded as liabilities decreased from December 31, 2006 to December 31, 2007 primarily due to foreign currency hedges put in place at favorable rates, and a reduction in natural gas forward contracts.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in OCI, to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period. Net gains included in OCI as of December 31, 2007, were $52 million pre-tax. Of this pre-tax total, a gain of approximately $39 million is expected to be included in cost of sales within the next 12 months and a gain of approximately $14 million is expected to be included in cost of sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Net gains of $56 million after-tax and pre-tax and $12 million after-tax and pre-tax were included in OCI as of December 31, 2006 and 2005, respectively. Cash flow hedges are discontinued when it is probable that the original forecasted transactions will not occur. The amount included in cost of sales related to hedge ineffectiveness was $2 million for the year ended December 31, 2007 and $7 million for the year ended December 31, 2006. The amount included in cost of sales related to the time value of options was not significant in 2007, 2006, and 2005. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was less than $1 million in 2007 and $14 million in 2006.

## 23. SUBSEQUENT EVENTS

Events have occurred subsequent to December 31, 2007 that, although they do not impact the reported balances or results of operations as of that date, are material to the Company's ongoing operations. These events are listed below.

### Bearings Product Line Sale

On January 15, 2008, the Debtors filed a motion in the Court seeking authority to enter into a sale and purchase agreement (the "Bearings Agreement") with a wholly owned entity of Resilience Capital Partners, LLC, ND Acquisition Corp ("Resilience Capital"), for the sale of Delphi's global bearings business (the "Bearings Business"). On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code to dispose of the Bearings Business. Following completion of the bidding procedures process, a final sale hearing is scheduled for February 21, 2008.

## 24. QUARTERLY DATA (UNAUDITED)

The following is a condensed summary of the Company's unaudited quarterly results of continuing operations for fiscal 2007 and 2006. These amounts have been restated for discontinued operations.

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | March 31, | June 30, | Sept. 30, | Dec. 31, | Total |
| | | | (in millions, except per share amounts) | | |
| **2007** | | | | | |
| Net sales | $ 5,682 | $ 6,000 | $ 5,279 | $ 5,322 | $22,283 |
| Cost of sales | 5,306 | 5,654 | 5,111 | 4,995 | 21,066 |
| Gross profit (a) | $ 376 | $ 346 | $ 168 | $ 327 | $ 1,217 |
| | | | | | |
| U.S. employee workforce transition program charges | $ (6) | $ — | $ 197 | $ 21 | $ 212 |
| Long lived asset impairment charges | $ 6 | $ 34 | $ 14 | $ 44 | $ 98 |
| Securities and ERISA litigation charge | $ — | $ 332 | $ 21 | $ (10) | $ 343 |
| Operating loss | $ (215) | $ (644) | $ (663) | $ (423) | $(1,945) |
| | | | | | |
| (Loss) income from continuing operations (b) | $ (391) | $ (808) | $(1,149) | $ 40 | $(2,308) |
| Loss from discontinued operations, net of tax (c) | (142) | (13) | (20) | (582) | (757) |
| Net loss | $ (533) | $ (821) | $(1,169) | $ (542) | $(3,065) |
| | | | | | |
| Basic and diluted (loss) income per share | | | | | |
| Continuing operations | $ (0.70) | $ (1.44) | $ (2.04) | $ 0.07 | $ (4.11) |
| Discontinued operations | (0.25) | (0.02) | (0.04) | (1.03) | (1.34) |
| Basic and diluted loss per share | $ (0.95) | $ (1.46) | $ (2.08) | $ (0.96) | $ (5.45) |
| | | | | | |
| Cash dividends declared per share | $ — | $ — | $ — | $ — | $ — |
| | | | | | |
| Common stock price | | | | | |
| High | $ 3.86 | $ 3.12 | $ 2.59 | $ 0.49 | $ 3.86 |
| Low | $ 2.25 | $ 1.46 | $ 0.44 | $ 0.10 | $ 0.10 |
| **2006** | | | | | |
| Net sales | $ 5,988 | $ 6,024 | $ 5,189 | $ 5,536 | $22,737 |
| Cost of sales | 5,618 | 5,647 | 5,296 | 5,405 | 21,966 |
| Gross profit (loss) (a) | $ 370 | $ 377 | $ (107) | $ 131 | $ 771 |
| | | | | | |
| U.S. employee workforce transition program charges | $ — | $ 1,775 | $ 947 | $ (16) | $ 2,706 |
| Long lived asset impairment charges | $ — | $ — | $ 13 | $ 159 | $ 172 |
| Operating loss | $ (223) | $(1,997) | $(1,657) | $ (665) | $(4,542) |
| | | | | | |
| Loss from continuing operations | $ (355) | $ (2,158) | $(1,839) | $ (789) | $(5,141) |
| Loss from discontinued operations, net of tax | (11) | (117) | (134) | (64) | (326) |
| Cumulative effect of accounting change | 3 | — | — | — | 3 |
| Net loss | $ (363) | $(2,275) | $(1,973) | $ (853) | $(5,464) |
| | | | | | |
| Basic and diluted loss per share | | | | | |
| Continuing operations | $ (0.64) | $ (3.84) | $ (3.27) | $ (1.41) | $ (9.16) |
| Discontinued operations | (0.02) | (0.21) | (0.24) | (0.11) | (0.58) |
| Cumulative effect of accounting change | 0.01 | — | — | — | 0.01 |
| Basic and diluted loss per share | $ (0.65) | $ (4.05) | $ (3.51) | $ (1.52) | $ (9.73) |
| | | | | | |
| Cash dividends declared per share | $ 0.000 | $ 0.000 | $ 0.000 | $ 0.000 | $ 0.000 |
| | | | | | |
| Common stock price | | | | | |
| High | $ 1.02 | $ 1.99 | $ 1.88 | $ 3.92 | $ 3.92 |
| Low | $ 0.03 | $ 0.60 | $ 1.07 | $ 1.35 | $ 0.03 |

a) Gross profit is defined as net sales less cost of sales (excluding U.S. employee workforce transition program charges, Depreciation and amortization, and Long-lived asset impairment charges).
b) (Loss) income from continuing operations include a tax benefit of $703 million in the fourth quarter of 2007 related to credits in other comprehensive income. Refer to Note 8. Income Taxes for more information.
c) Loss from discontinued operations is a charge of $595 million related to the assets held for sale for the Steering and Interiors and Closures Businesses, including the impact of curtailment loss on pension benefits for impacted employees.

**APPENDIX B-2**

Consolidated Financial Statements And Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-Q For The Quarter That Ended June 30, 2008

**PART I.  FINANCIAL INFORMATION**

**ITEM 1.   FINANCIAL STATEMENTS**

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| | (in millions, except per share amounts) | | | |
| Net sales: | | | | |
| General Motors and affiliates..................................... | $ 1,483 | $ 2,247 | $ 3,124 | $ 4,410 |
| Other customers ....................................................... | 3,751 | 3,753 | 7,362 | 7,272 |
| Total net sales....................................................... | 5,234 | 6,000 | 10,486 | 11,682 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales, excluding items listed below ............... | 4,821 | 5,654 | 9,718 | 10,960 |
| U.S. employee workforce transition program charges (credit)................................................................... | 18 | — | 54 | (6) |
| Depreciation and amortization .................................... | 210 | 230 | 429 | 457 |
| Long-lived asset impairment charges........................... | 5 | 34 | 8 | 40 |
| Goodwill impairment charges...................................... | 168 | — | 168 | — |
| Selling, general and administrative ............................. | 377 | 394 | 741 | 758 |
| Securities & ERISA litigation charge ......................... | — | 332 | — | 332 |
| Total operating expenses......................................... | 5,599 | 6,644 | 11,118 | 12,541 |
| | | | | |
| Operating loss............................................................. | (365) | (644) | (632) | (859) |
| Interest expense (contractual interest expense for the three and six months ended June 30, 2008 was $150 million and $279 million, respectively, and for the three and six months ended June 30, 2007 was $118 million and $242 million, respectively) .. | (109) | (84) | (219) | (174) |
| Loss on extinguishment of debt .................................. | (49) | — | (49) | (23) |
| Other income, net ....................................................... | 4 | 19 | 23 | 39 |
| Reorganization items................................................... | (29) | (42) | (138) | (81) |
| Loss from continuing operations before income taxes, minority interest and equity income ...................... | (548) | (751) | (1,015) | (1,098) |
| Income tax expense..................................................... | (10) | (55) | (73) | (101) |
| Loss from continuing operations before minority interest and equity income ...................................... | (558) | (806) | (1,088) | (1,199) |
| Minority interest, net of tax........................................ | (12) | (12) | (23) | (24) |
| Equity income, net of tax ........................................... | 11 | 10 | 22 | 24 |
| Loss from continuing operations ................................. | (559) | (808) | (1,089) | (1,199) |
| Income (loss) from discontinued operations, net of tax.......................................................................... | 8 | (13) | (51) | (155) |
| Net loss...................................................................... | $  (551) | $  (821) | $(1,140) | $(1,354) |
| | | | | |
| Basic and diluted loss per share: | | | | |
| Continuing operations................................................. | $ (0.99) | $ (1.44) | $ (1.93) | $ (2.14) |
| Discontinued operations.............................................. | 0.01 | (0.02) | (0.09) | (0.27) |
| Basic and diluted loss per share .................................. | $ (0.98) | $ (1.46) | $ (2.02) | $ (2.41) |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED BALANCE SHEETS**

| | June 30, 2008 (Unaudited) | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,054 | $ 1,036 |
| Restricted cash | 121 | 173 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,108 | 1,257 |
| Other | 3,024 | 2,637 |
| Inventories, net (Note 11) | 1,737 | 1,808 |
| Other current assets | 677 | 588 |
| Assets held for sale (Note 4) | 711 | 720 |
| Total current assets | 8,432 | 8,219 |
| Long-term assets: | | |
| Property, net | 3,811 | 3,863 |
| Investments in affiliates | 386 | 387 |
| Goodwill | 256 | 397 |
| Other | 784 | 801 |
| Total long-term assets | 5,237 | 5,448 |
| Total assets | $ 13,669 | $ 13,667 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Short-term debt (Note 15) | $ 4,421 | $ 3,495 |
| Accounts payable | 2,951 | 2,904 |
| Accrued liabilities (Note 12) | 2,343 | 2,281 |
| Liabilities held for sale (Note 4) | 451 | 412 |
| Total current liabilities | 10,166 | 9,092 |
| Long-Term liabilities: | | |
| Other long-term debt (Note 15) | 59 | 59 |
| Employee benefit plan obligations (Note 17) | 475 | 443 |
| Other (Note 12) | 1,160 | 1,185 |
| Total long-term liabilities | 1,694 | 1,687 |
| Liabilities subject to compromise (Note 14) | 16,244 | 16,197 |
| Total liabilities | 28,104 | 26,976 |
| Commitments and contingencies (Note 22) | | |
| Minority interest | 145 | 163 |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued in 2008 and 2007 | 6 | 6 |
| Additional paid-in capital | 2,747 | 2,756 |
| Accumulated deficit | (16,241) | (14,976) |
| Accumulated other comprehensive loss: | | |
| Employee benefit plans (Note 17) | (1,702) | (1,679) |
| Other | 616 | 446 |
| Total accumulated other comprehensive loss | (1,086) | (1,233) |
| Treasury stock, at cost (391 thousand and 1.5 million shares in 2008 and 2007, respectively) | (6) | (25) |
| Total stockholders' deficit | (14,580) | (13,472) |
| Total liabilities and stockholders' deficit | $ 13,669 | $ 13,667 |

See notes to consolidated financial statements.

## DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited)

| | Six Months Ended June 30, | |
|---|---|---|
| | 2008 | 2007 |
| | (in millions) | |
| **Cash flows from operating activities:** | | |
| Net loss | $ (1,140) | $ (1,354) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 429 | 457 |
| Long-lived asset impairment charges | 8 | 40 |
| Goodwill impairment charges | 168 | — |
| Deferred income taxes | (10) | 19 |
| Pension and other postretirement benefit expenses | 375 | 482 |
| Equity income | (22) | (24) |
| Reorganization items | 138 | 81 |
| U.S. employee workforce transition program charges (credit) | 54 | (6) |
| Loss on extinguishment of debt | 49 | 23 |
| Loss on assets held for sale | 32 | — |
| Securities & ERISA litigation charge | — | 332 |
| Loss on liquidation/deconsolidation of investment | — | 79 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (376) | (922) |
| Inventories, net | 36 | 4 |
| Other assets | 36 | (42) |
| Accounts payable | 151 | 399 |
| Accrued and other long-term liabilities | 53 | 389 |
| Other, net | (42) | (33) |
| U.S. employee workforce transition program payments | (100) | (526) |
| U.S. employee workforce transition program reimbursement by GM | — | 265 |
| Pension contributions | (310) | (156) |
| Other postretirement benefit payments | (131) | (87) |
| Net payments for reorganization items | (55) | (61) |
| Dividends from equity investments | 10 | 12 |
| Discontinued operations (Note 4) | 48 | 193 |
| Net cash used in operating activities | (599) | (436) |
| | | |
| **Cash flows from investing activities:** | | |
| Capital expenditures | (414) | (308) |
| Proceeds from sale of property | 47 | 20 |
| Cost of acquisitions | (15) | — |
| Proceeds from sale of non-U.S. trade bank notes | 117 | 95 |
| Proceeds from divestitures, net | 121 | — |
| Decrease (increase) in restricted cash | 52 | (10) |
| Other, net | (6) | (16) |
| Discontinued operations | (99) | (19) |
| Net cash used in investing activities | (197) | (238) |
| **Cash flows from financing activities:** | | |
| Proceeds from amended and restated debtor-in-possession facility, net of issuance cost of $92 million | 3,158 | — |
| Proceeds from refinanced debtor-in-possession facility, net of issuance cost of $7 million | — | 2,739 |
| Repayments of borrowings from refinanced debtor-in-possession facility | (2,746) | — |
| Repayments of borrowings under debtor-in-possession facility | — | (250) |
| Repayments of borrowings under prepetition term loan facility | — | (988) |
| Repayments of borrowings under prepetition revolving credit facility | — | (1,508) |
| Net borrowings under amended and restated debtor-in-possession facility | 311 | — |
| Net borrowings under refinanced debtor-in-possession facility | — | 410 |
| Net borrowings under other debt agreements | 29 | 83 |
| Dividend payments of consolidated affiliates to minority shareholders | (23) | (30) |
| Discontinued operations | 17 | (3) |
| Net cash provided by financing activities | 746 | 453 |
| | | |
| Effect of exchange rate fluctuations on cash and cash equivalents | 68 | 38 |
| | | |
| Increase (decrease) in cash and cash equivalents | 18 | (183) |
| Cash and cash equivalents at beginning of period | 1,036 | 1,608 |
| Cash and cash equivalents at end of period | $ 1,054 | $ 1,425 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS (Unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| | | (in millions) | | |
| Net loss | $ (551) | $ (821) | $(1,140) | $(1,354) |
| Other comprehensive income: | | | | |
| Currency translation adjustments, net of tax | 21 | 120 | 90 | 146 |
| Net change in unrecognized gain on derivative instruments, net of tax | (16) | 50 | 80 | 53 |
| Employee benefit plans adjustment, net of tax | 19 | (5) | (11) | (5) |
| Other comprehensive income | 24 | 165 | 159 | 194 |
| Comprehensive loss | $ (527) | $ (656) | $ (981) | $(1,160) |

See notes to consolidated financial statements.

4

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)**

## 1. BASIS OF PRESENTATION

*General*—Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company"), is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Delphi's largest customer is General Motors Corporation ("GM") and North America and Europe are its largest markets. Delphi is continuing to diversify its customer base and geographic markets. The consolidated financial statements and notes thereto included in this report should be read in conjunction with Delphi's consolidated financial statements and notes thereto included in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007 filed with the United States ("U.S.") Securities and Exchange Commission ("SEC").

*Consolidation*—The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary. Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated. All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included. The results for interim periods are not necessarily indicative of results that may be expected from any other interim period or for the full year and may not necessarily reflect the consolidated results of operations, financial position and cash flows of Delphi in the future.

*Bankruptcy Filing*—On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, will continue their business operations without supervision from the Court and are not subject to the requirements of the Bankruptcy Code.

American Institute of Certified Public Accountants ("AICPA") Statement of Position 90-7 ("SOP 90-7"), *Financial Reporting by Entities in Reorganization under the Bankruptcy Code*, which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. Delphi has segregated these items as outlined above for all reporting periods subsequent to October 8, 2005.

*Going Concern*—The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) return to profitability; (iv) generate sufficient cash flow from operations; and (v) obtain financing sources to meet the Company's future obligations, including an extension or replacement of their DIP financing agreement, which expires on December 31, 2008. These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007. The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008, but Delphi was unable to consummate the plan because certain investors under the plan refused to participate in the closing, which was commenced but not completed on April 4, 2008. Delphi subsequently filed complaints seeking redress for the breach of the investment agreement and damages related to the consequent delay of Delphi's emergence from chapter 11.

Delphi continues to work with its stakeholders, including GM, to further amend the plan.  On July 23, 2008, Delphi's Official Committee of Unsecured Creditors (the "Creditors' Committee") and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the Creditors' Committee, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's plan of reorganization. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not presently intend to prosecute such complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the previously confirmed plan of reorganization, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against Appaloosa Management L.P. and the other investors who were party to the Equity Purchase and Commitment Agreement dated as of August 3, 2007.  Pending confirmation and consummation of the plan of reorganization (as amended) or an alternative plan of reorganization, Delphi and certain of its U.S. subsidiaries will continue as "debtors-in-possession" in chapter 11.  Because discussions are ongoing, we can not provide any assurances as to when or if Delphi will confirm or consummate a modified plan or the extent or nature of any future amendments.  Consummation of a confirmed plan of reorganization often materially changes the amounts reported in a company's consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of consummation of a confirmed plan of reorganization (as amended).

*Contractual Interest Expense and Interest Expense on Unsecured Claims*— Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  Delphi did not record contractual interest expense on certain unsecured prepetition debt during the six months ended June 30, 2007.  In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007.  The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, the confirmation date of the plan of reorganization (as amended), when the Company ceased accruing interest on these claims.  Delphi recorded interest related to prepetition debt and allowed unsecured claims of $14 million through January 25, 2008.  Delphi reduced interest expense by $7 million during the three months ended June 30, 2008 due to changes in estimates of certain prepetition claim amounts.  At June 30, 2008, Delphi had accrued interest of $418 million in accrued liabilities in the accompanying balance sheet for prepetition claims.  This estimate is based on numerous factual and legal assumptions.  Upon consummation of the confirmed plan of reorganization discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, the interest accrued for prepetition claims will be discharged at the emergence date; however, as noted above, Delphi has not yet consummated its confirmed plan and is continuing to work with its stakeholders to further amend the plan or develop an alternative plan accordingly, and there can be no assurances that these estimates will not change.

*Use of Estimates*—Preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein.  During the second quarter of 2008, there were no material changes in the methods or policies used to establish accounting estimates.  Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, workers' compensation accruals and healthcare accruals.  Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

*Valuation of Long-Lived Assets*— Delphi periodically evaluates the carrying value of long-lived assets held for use, including intangible assets, when events or circumstances warrant such a review.  The carrying value of a long-lived asset held for use is considered impaired when the anticipated separately identifiable undiscounted cash flows from the asset are less than the carrying value of the asset.  In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset.  Fair value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved or Delphi's review of appraisals.  Impairment losses on long-lived assets held for sale are determined in a similar manner, except that fair values are reduced for the cost to dispose of the assets.  Refer to Note 4. Discontinued Operations and Note 7. Long-Lived Asset Impairment for more information.

*Discontinued Operations*—In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ("SFAS 144"), a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component.  The results of discontinued operations are aggregated and presented separately in the consolidated statements of operations and consolidated statements of cash flows.  Assets and liabilities of the discontinued operations are aggregated and

reported separately as assets and liabilities held for sale in the consolidated balance sheet.  SFAS 144 requires the reclassification of amounts presented for prior years to effect their classification as discontinued operations.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business").  The sale of the U.S. operation and certain of the non-U.S. operations of the Steering Business will be sales of assets and will include (i) all assets, except for cash, deferred tax assets, and intercompany accounts, and (ii) all liabilities, except for debt, deferred tax liabilities, intercompany accounts, U.S. pension and other postretirement benefit liabilities, accrued payroll, and certain employee benefit accounts.  The sale of certain non-U.S. operations of the Steering Business are stock sales and will include all assets and liabilities for the sites with purchase price adjustments for cash, debt, and certain other accounts.  The sale of the Interiors and Closures Business closed on February 29, 2008.  The majority of the Interiors and Closures Business sale was primarily accomplished through asset sales and the buyer assumed inventory, fixed assets, non-U.S. pension liabilities and an investment in a joint venture in Korea.

While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to the loss from discontinued operations in the statements of operations.  Delphi expects to retain certain employee pension and other postretirement benefit liabilities for the Steering Business and these liabilities were not allocated to liabilities held for sale in the balance sheets.  Expenses related to the service cost of employee pension and other postretirement benefit plans, however, were allocated to discontinued operations in the statements of operations, because Delphi will not continue to incur such related expense subsequent to the divestiture of these businesses.  Allocations have been made based upon a reasonable allocation method.  Refer to Note 4. Discontinued Operations.

***Recently Issued Accounting Pronouncements***—In September 2006, the Financial Accounting Standards Board (the "FASB") issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *Fair Value Measurements*.  SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value.  SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset.  SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years.  The Company utilized the fair value measures of SFAS 157 in accounting for its marketable securities and derivative net assets.  The adoption of the new definition of fair value pursuant to SFAS 157 did not have a significant impact on Delphi's financial statements.  Refer to Note 19. Fair Value Measurements for the disclosures required by SFAS 157.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R)*.  SFAS 158 requires, among other things, an employer to measure the funded status of its defined benefit pension and other postretirement benefits plans as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008.  Historically, Delphi has measured the funded status of its U.S. retiree health care benefit plans and certain international pension plans as of September 30 of each year.  Delphi adopted the measurement date provisions of SFAS 158 as of January 1, 2008, which resulted in adjustments that increased pension and other postretirement benefit liabilities by $139 million, the accumulated deficit by $129 million and accumulated other comprehensive loss by $10 million.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 ("SFAS 159"), *The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115*.  SFAS 159 permits entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently measured at fair value.  Unrealized gains and losses on items for which the fair value option has been elected would be reported in earnings at each subsequent reporting date.  SFAS 159 also establishes presentation and disclosure requirements in order to facilitate comparisons between entities choosing different measurement attributes for similar types of assets and liabilities.  SFAS 159 does not affect existing accounting requirements for certain assets and liabilities to be carried at fair value.  SFAS 159 is effective as of the beginning of a reporting entity's first fiscal year that begins after November 15, 2007.  Delphi adopted SFAS 159 as of January 1, 2008 and did not elect the fair value option for any financial instruments upon adoption of SFAS 159.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (Revised 2007) ("SFAS 141R"), *Business Combinations*.  SFAS 141R requires an acquiring entity to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions.  SFAS 141R applies prospectively to business combinations

for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008.  Earlier adoption is prohibited.  Accordingly, Delphi is required to record and disclose business combinations following existing U.S. GAAP until January 1, 2009.  Delphi is currently evaluating the requirements of SFAS 141R, and has not yet determined the impact on its financial statements.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160 ("SFAS 160"), *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51*.  SFAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary.  SFAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008.  Earlier adoption is prohibited.  Delphi is currently evaluating the requirements of SFAS 160, and has not yet determined the impact on its financial statements.

In March 2008, the FASB issued Statement of Financial Accounting Standards No. 161 ("SFAS 161"), *Disclosures about Derivative Instruments and Hedging Activities - an Amendment of FASB Statement 133*.  SFAS 161 enhances required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (a) an entity uses derivative instruments; (b) derivative instruments and related hedged items are accounted for under FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities;* and (c) derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows.  SFAS 161 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after November 15, 2008.  Earlier adoption is encouraged.  Delphi is currently evaluating the requirements of SFAS 161, and has not yet determined the impact on its financial statements.

In April 2008, the FASB issued FASB Staff Position SOP 90-7-1 ("FSP SOP 90-7-1"), *An Amendment of AICPA Statement of Position 90-7*. FSP SOP 90-7-1 resolves the conflict between the guidance requiring early adoption of new accounting standards for entities required to follow fresh-start reporting under SOP 90-7, and other authoritative accounting standards that expressly prohibit early adoption. Specifically, FSP SOP 90-7-1 will require an entity emerging from bankruptcy that applies fresh-start reporting to follow only the accounting standards in effect at the date fresh-start reporting is adopted, which include those standards eligible for early adoption if an election is made to adopt early.

## 2. TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

### Plan of Reorganization and Transformation Plan

Elements of Transformation Plan

On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") became final, but Delphi was unable to consummate the Plan because certain investors refused to participate in the closing, which was commenced but not completed on April 4, 2008.  The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, as detailed below, including agreements reached with each of Delphi's principal U.S. labor unions and GM.  The Plan incorporates, approves, and is consistent with the terms of each agreement.

*Labor* - Modify Delphi's labor agreements to create a more competitive arena in which to conduct business.

During the second quarter of 2007, Delphi signed an agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007.  Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject their U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion").  As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues.  Portions of these agreements have already become effective, and the remaining portions will not become effective until the effectiveness of the Global Settlement Agreement, as amended (the "GSA"), and the Master Restructuring Agreement, as amended (the "MRA"), with GM and upon substantial consummation of the Plan as confirmed by the Court.  However, as part of Delphi's overall discussions with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi and GM are negotiating modifications to the GSA and MRA, which if finalized and agreed to by both parties and approved by the Court, would provide for the agreements or certain portions of the agreements, including provisions related to the transfer of certain legacy pension and other postretirement benefit obligations, to become effective prior to substantial consummation of a plan of reorganization.  Among other things, early effectiveness of certain provisions of

the GSA and MRA would facilitate the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the U.S. Internal Revenue Code (the "Code") to GM in an economically efficient manner prior to September 30, 2008, see Pensions below.

Among other things, these agreements generally provided certain members of the union labor workforce options to either retire, accept a voluntary severance package or accept lump sum payments in return for lower hourly wages. Refer to Note 16. U.S. Employee Workforce Transition Programs for more information.

On September 4, 2007, the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, subject to the Court's prior settlement approval orders pertaining to each of Delphi's U.S. labor unions, as it relates to all parties and the intervening respondents, by entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g).

_GM_ - Conclude negotiations with GM to finalize financial support for certain of Delphi's legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

Delphi and GM have entered into comprehensive settlement agreements consisting of the GSA and the MRA. The GSA and the MRA comprised part of the Plan and were approved in the order confirming the Plan on January 25, 2008. The GSA and MRA currently provide that such agreements are not effective until and unless Delphi emerges from chapter 11. However, as noted above, Delphi and GM are considering potential amendments which would make the agreements or certain portions of the agreements effective prior to emergence. Given the ongoing nature of the discussions there can be no assurance that the parties will agree to potential amendments or that the Court will approve such amendments. Accordingly, the accompanying consolidated financial statements do not include any adjustments related to the GSA or the MRA and the following discussion does not consider the potential impact of any amendments. These agreements will result in a material reduction in Delphi's liabilities related to the workforce transition programs. Delphi will account for the impact of the GSA or the MRA when the conditions of the agreements are satisfied and Court approval, if required, has been obtained.

- Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Plan or as soon as reasonably possible thereafter. By contrast, the MRA addresses matters that will require a significantly longer period that will extend for a number of years after consummation of the Plan to complete.

- GM's obligations under the GSA and MRA are conditioned upon, among other things, Delphi's consummation of the Plan, including payment of amounts to settle GM claims as outlined below.

The GSA is intended to resolve outstanding issues between Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11, and will be implemented by Delphi and GM in the short term. During 2007, Delphi entered into amendments to both the GSA and the MRA. These agreements, as amended, provide for a comprehensive settlement of outstanding issues between Delphi and GM (other than ordinary course matters), including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999; certain post-separation claims and disputes between Delphi and GM; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under Delphi's Plan; and various other legacy issues.

In addition to establishing claims treatment, including specifying which claims survive and the consideration to be paid by Delphi to GM in satisfaction of certain claims, the GSA addresses, among other things, commitments by Delphi and GM regarding other postretirement benefit and pension obligations, and other GM contributions with respect to labor matters and releases.

- GM will assume approximately $7 billion of certain postretirement benefits for certain of the Company's active and retired hourly employees, including health care and life insurance;

- Delphi will freeze its Delphi Hourly-Rate Employees Pension Plan as soon as practicable following the effective date of the Plan, as provided in the union settlement agreements, and GM's Hourly-Rate Employees Pension Plan will become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi will transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the U.S. labor union settlement agreements;

- Shortly after the effectiveness of the Plan, GM will receive an interest bearing note from Delphi in the amount of $1.5 billion which is expected to be paid promptly following effectiveness;

- GM will make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the U.S. labor union settlement agreements; and

- GM and certain related parties and Delphi and certain related parties will exchange broad, global releases (which will not apply to certain surviving claims as set forth in the GSA).

The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11. The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM. Through the MRA, Delphi and GM have agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- GM will make significant, ongoing contributions to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and other postretirement benefit contributions provided under the Supplemental Wage Agreement, at specified UAW manufacturing facilities retained by Delphi;

- GM and Delphi have agreed to certain terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- GM and Delphi have agreed to certain additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by certain future dates (as defined in the MRA); and

- GM and Delphi have agreed to the treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

The GSA and MRA may be terminated by the Company or GM because the effective date of the Plan did not occur by March 31, 2008 and the EPCA (as defined below) was terminated. As of the date hereof, neither Delphi nor GM has terminated the GSA or the MRA.

*Portfolio* - Streamline Delphi's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with Delphi's new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, and wheel bearings. In connection with the Company's continuous evaluation of its product portfolio, effective November 1, 2006 Delphi decided that the power products business no longer fit within the Company's future product portfolio and that business line was moved to Delphi's Automotive Holdings Group and during the second quarter of 2008 Delphi decided that the global exhaust business no longer fit within the Company's future product portfolio. With the exception of the catalyst product line and the global exhaust business (included in the Powertrain Systems segment), and the steering and halfshaft product lines and interiors and closures product lines (included in discontinued operations), the Company's non-core product lines are included in the Automotive Holdings Group segment, refer to Note 21. Segment Reporting.

Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites. The sale and wind-down process is being conducted in consultation with the Company's customers, labor unions and other stakeholders to carefully manage the transition of affected product lines and manufacturing sites. The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable. The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

During the first six months of 2008, Delphi obtained Court approval of bidding procedures and sales agreements for the steering and halfshaft product line and closed on the sales of the interiors and closures product line, the North American brake components machining and assembly assets, the global bearings business and the U.S. suspensions business. Additionally, under an order providing Delphi with authority to sell certain assets that do not exceed $10 million without further Court approval,

10

Delphi entered into an agreement to sell its power products business. Refer to Note 4. Discontinued Operations and Note 5. Acquisitions and Divestitures for more information.

Costs recorded in the three and six months ended June 30, 2008 and 2007 related to the transformation plan for non-core product lines include impairments of long-lived assets, employee termination benefits and other exit costs and U.S. employee workforce transition program charges as further described in Note 4. Discontinued Operations, Note 7. Long-Lived Asset Impairment, Note 9. Employee Termination Benefits and Other Exit Costs and Note 9. U.S. Employee Workforce Transition Programs.

*Cost Structure* - Transform the salaried workforce and reduce general and administrative expenses to ensure that its organizational and cost structure is competitive and aligned with Delphi's product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services, information technology and certain sales administration outsourcing activities, reduction of its global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of certain salaried benefit programs to bring them in line with more competitive industry levels. Given the investment required to implement these initiatives, Delphi does not expect to fully realize substantial savings until 2009 and beyond.

*Pensions* - Devise a workable solution to the current pension funding situation, whether by extending contributions to the pension trusts or otherwise.

Delphi's discussions with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of emergence contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM.

On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers"). On May 31, 2007, the Court authorized Delphi to perform under the terms of those funding waivers. The IRS modified the 2006 Waivers by extending the dates by which Delphi is required to file its Plan and emerge from chapter 11. On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver"). The waivers were required, at that time, to facilitate the Debtors' option to effectuate the transfer of certain hourly pension obligations to GM in an economically efficient manner, and to remove uncertainty as to whether excise taxes would be assessed as a result of accumulated funding deficiencies relating to prepetition service. Absent the waivers, the transfer to GM could have triggered an obligation of the Debtors to make cash contributions to the Hourly Plan which would result in a projected overfunding of the Hourly Plan. On October 26, 2007, the Court authorized Delphi to perform under the 2007 Hourly Plan Waiver, which would have expired if Delphi did not emerge from chapter 11 by February 29, 2008. The Court authorized two additional funding waivers which authorized Delphi to defer funding contributions due under the Employee Retirement Income Security Act ("ERISA") and the Code until May 9, 2008. On April 4, 2008, the IRS and the PBGC modified the 2006 Waivers and the 2007 Hourly Plan Waiver by extending the date by which Delphi must emerge from chapter 11 to May 9, 2008.

Delphi did not seek extension of the 2006 Waivers or the 2007 Hourly Plan Waiver past May 9, 2008. Delphi believes that ERISA and the Code will still, under most circumstances, after June 15, 2008, permit the Company to be able to effect the planned transfer of the maximum amount of Delphi's hourly pension obligations permitted under the Code to GM in an economically efficient manner prior to September 30, 2008. However, by permitting the waivers to lapse Delphi is potentially exposed to excise taxes as a result of accumulated funding deficiencies for the plan years ended September 30, 2005 and 2006 of approximately $173 million and $1.22 billion, respectively. Accordingly, the IRS may assert against Delphi excise taxes in the approximate amounts of $17 million and $122 million for plan years ended September 30, 2005 and 2006, respectively. Because Delphi did not meet its minimum funding requirements on or before June 15, 2008, the accumulated funding deficiency without the effect of the waivers would be approximately $2.44 billion for the plan year ended September 30, 2007, which could lead to the IRS further asserting additional excise taxes of approximately $244 million. If the accumulated funding deficiency is not corrected after Delphi receives the assessments, an excise tax of up to 100% may be assessed at the discretion of the IRS. Assuming Delphi is assessed an excise tax for all plan years through 2007, the total range of exposure would approximate between $380 million and $3.8 billion. Delphi expects that the Hourly and Salaried Plans will have accumulated funding deficiencies for the plan year ending September 30, 2008, should Delphi not emerge from chapter 11. Any transfer of hourly pension obligations to a GM pension plan will mitigate such deficiency for the Delphi Hourly Plan.

As noted above, Delphi and GM are considering potential amendments to the GSA and MRA, which if agreed to by the parties and approved by the Court, would cause the agreements or certain portions of the agreements to become effective prior to substantial consummation of a plan of reorganization, including those relating to the transfer of certain assets and liabilities of Delphi's Hourly Plan to the GM Hourly-Rate Employees Pension Plan, as set forth in the U.S. labor union settlement agreements, thereby facilitating completion of such transfer in an economically efficient manner prior to September 30, 2008. However, there can be no assurances that Delphi and GM will reach final agreement on potential amendments or that the Court will approve the potential amendments such that the proposed transfer can be completed prior to September 30, 2008. In the event such transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits attributable to prepetition service while in chapter 11 and that it has made all required payments for postpetition service. Delphi further believes that as a result, it is not liable for any penalty excise taxes that may be assessed by the IRS. Delphi believes that its ultimate emergence from chapter 11 will result in a consensual resolution of its pension funding obligations, and given the significant uncertainty surrounding the outcome of the excise tax assessment and the potential for Delphi to litigate this matter, if necessary, management has concluded that an unfavorable outcome is not currently probable. Accordingly, as of June 30, 2008, no amounts have been recorded for any potential excise tax assessment.

Pursuant to the pertinent terms of the waivers, as modified, Delphi provided to the PBGC letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan. Due to the expiration of the waivers, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on May 16, 2008. The cash proceeds from the letters of credit have been recognized as Delphi funding contributions to the plans for the plan year ending September 30, 2008.

The Company has represented that it currently intends to meet the minimum funding standard under IRC section 412 upon emergence from chapter 11. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the ability to transfer certain assets and unfunded benefit liabilities from the Hourly Plan to a pension plan sponsored by GM, the date and size of such transfer, the funded status of the Hourly Plan and the date of emergence. As noted above, in the event the anticipated transfer is not completed prior to September 30, 2008, the ability to complete the proposed transfer will be dependent on the Company's ability to obtain certain third-party approvals of the transfer.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the Labor section, Delphi committed to freeze the Hourly and Salaried Plans effective at the end of the month following emergence from chapter 11. Refer to Note 17. Pension and Other Postretirement Benefits for more information.

<u>Equity Purchase and Commitment Agreement</u>

Under the terms and subject to the conditions of Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than

the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA.  The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination.  On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter.  Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16, 2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages.  No amounts related to this matter have been recorded in Delphi's financial statements.  The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions.  A trial on Delphi's complaint is currently scheduled to occur in March 2009, and the parties have agreed to participate in mediation in an attempt to settle the claims that were not dismissed.

During 2007, in exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million.  In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA.  The Company also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA.  Delphi had deferred the recognition of these amounts in other current assets as they were to be netted against the proceeds from the EPCA upon issuance of the new shares.  However, as a result of the events relating to the termination of the EPCA as described above, Delphi recognized $79 million of expense related to these fees and other expenses during the six months ended June 30, 2008.

<u>The Plan of Reorganization</u>

As noted above, due to the Investors failure to fund their commitments under the EPCA, Delphi has not yet consummated the Plan and is continuing discussions with its stakeholders regarding potential amendments to the Plan that will enable Delphi to emerge from chapter 11 as soon as practicable.  Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization is extended until 30 days after substantial consummation of the Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Plan (as modified) is extended until 90 days after substantial consummation of the Plan (as modified) or any modified plan.  On July 23, 2008, Delphi's Creditors' Committee and WTC, as Indenture Trustee and a member of the UCC, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not presently intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against Appaloosa and the other Investors.  Notwithstanding the foregoing, pursuant to an order entered by the court on July 31, 2008, the Debtors' exclusive period for filing a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including October 31, 2008 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including December 31, 2008.

The cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Plan (as modified), as the terms of any future confirmed plan of reorganization, as the U.S. labor agreements, and as the GSA, and the MRA become effective.  In the event the Debtors are unable to consummate the Plan (as modified), the cost will be recognized as the aforementioned agreements become effective as elements of any future confirmed plan of reorganization.  The Plan and agreements will significantly impact Delphi's accounting for its pension plans, postretirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others.  Such adjustments will have a material impact on Delphi's financial statements.

There are a number of risks and uncertainties inherent in the chapter 11 process, including those detailed in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007, Part I, Item 1A. Risk Factors, Part II, Item 1A. Risk Factors in the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2008 and Part II, Item 1A. Risk Factors in this Quarterly Report on Form 10-Q.  In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder Delphi's ongoing business activities and its ability to operate, fund and execute Delphi's business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers.

The financial statements of the Debtors are presented as follows:

**Basis of Presentation**

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements contained within this note represent the condensed combined financial statements for the Debtors only.  Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.  The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein.  Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements.  Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors' Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors' Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements.  As approved by the Court on January 25, 2008, the Debtors sold investments in non-Debtor affiliates in the amount of $1.4 billion to a non-Debtor affiliate and received a note receivable from non-Debtor affiliates.  As of March 31, 2008 approximately $0.2 billion was included in current assets and $1.2 billion was included in long-term assets.  However, during the second quarter of 2008, based on strategic tax planning changes in repatriation plans the timing of payment of the note receivable was re-evaluated and the full note receivable from non-Debtor affiliates balance of $1.4 billion is included in long-term assets as of June 30, 2008.  During the three and six months ended June 30, 2008, the Debtors received approximately $167 million of dividends from non-Debtor affiliates and during the three and six months ended June 30, 2007, the Debtors received approximately $26 million and $29 million, respectively, of dividends from non-Debtor affiliates.  Dividends from non-Debtor affiliates are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore were recorded in equity income from non-Debtor affiliates, net of tax.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*— Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  Delphi did not record contractual interest expense on certain unsecured prepetition debt during the six months ended June 30, 2007.  In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007.  The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, the confirmation date of the plan of reorganization, when the Company ceased accruing interest on these claims.  Delphi recorded interest related to prepetition debt and allowed unsecured claims of $14 million through January 25, 2008.  Delphi reduced interest expense by $7 million during the three months ended June 30, 2008 due to changes in estimates of certain prepetition claim amounts.  At June 30, 2008, Delphi had accrued interest of $418 million in accrued liabilities in the accompanying balance sheet for prepetition claims.  This estimate is based on numerous factual and legal assumptions.

*U.S. Employee Workforce Transition Programs*—The workforce transition programs offer buy-down payments for eligible traditional employees who do not elect the attrition or flowback options and continue to work for Delphi.  The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability in 2007.  In the first six months of 2008, the wage asset and liability were increased by $3 million to reflect the final terms of certain divestitures.  At June 30, 2008, $82 million was recorded in other current assets and $181 million was recorded in other long-term assets in the accompanying balance sheet, net of $20 million and $41 million of amortization expense recorded in the three and six months ended June 30, 2008, respectively, of which $2 million and $3 million, respectively, was recorded in loss from discontinued operations.  In addition, $16 million was recorded during the first quarter of 2008 in U.S. employee workforce transition program charges to reflect costs under the workforce transition

14

programs in excess of amounts previously estimated.  Refer to Note 16. U.S. Employee Workforce Transition Programs for more information.

*Goodwill Impairment Charges*—During the second quarter of 2008, Delphi experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, particularly related to GM, continuing unfavorable pricing pressures and increasing commodity prices.  This caused previously unanticipated projected revenue and operating income declines.  As a result of these changes, long-term projections showed declines in discounted future operating cash flows.  These revised cash flows and declining market conditions caused the implied fair value of Delphi's Electrical/Electronic Architecture segment to be less than its book value.  The fair value was also adversely affected by declining industry market valuation metrics.  Accordingly, the Debtors recorded $99 million of goodwill impairment charges in the Debtor financial statements during the three and six months ended June 30, 2008 related to the Electrical/Electronic Architecture segment. Refer to Note 8. Goodwill Impairment for more information.

*Income Tax Benefit*–Generally the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as other comprehensive income ("OCI"). However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year.

Accordingly, all items of current year income, including those in OCI, should be considered for purposes of determining the amount of tax benefit that results from a loss in continuing operations and that should be allocated to continuing operations.  In such instances, income from other categories must offset the current loss from operations, the tax benefit of such offset being reflected in continuing operations even when a valuation allowance has been established against the deferred tax assets.

For the three- and six-month periods ended June 30, 2008, Delphi had a $117 million pre-tax gain in OCI, primarily related to derivative contracts on copper and the Mexican Peso, thereby reducing the Company's current year valuation allowance and resulting in a benefit of $21 million allocated to the current year loss from continuing operations.

*Assets Held for Sale*—The assets held for sale by the Debtors include the net assets held for sale of the non-Debtor affiliates of $356 million which was reclassified from investments in non-Debtor affiliates.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENTS OF OPERATIONS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| | | (in millions) | | |
| Net Sales | $ 2,126 | $ 3,251 | $ 4,454 | $ 6,538 |
| Operating expenses: | | | | |
| Cost of sales, excluding items listed below | 2,238 | 3,428 | 4,691 | 6,750 |
| U.S. employee workforce transition program charges (credit) | 18 | — | 54 | (6) |
| Depreciation and amortization | 95 | 128 | 207 | 261 |
| Long-lived asset impairment charges | 4 | 33 | 7 | 37 |
| Goodwill impairment charges | 99 | — | 99 | — |
| Selling, general and administrative | 232 | 248 | 457 | 484 |
| Securities & ERISA litigation charge | — | 332 | — | 332 |
| Total operating expenses | 2,686 | 4,169 | 5,515 | 7,858 |
| Operating loss | (560) | (918) | (1,061) | (1,320) |
| Interest expense (contractual interest expense for the three and six months ended June 30, 2008 was $127 million and $241 million, respectively, and for the three and six months ended June 30, 2007 was $106 million and $219 million, respectively) | (86) | (73) | (181) | (152) |
| Loss on extinguishment of debt | (49) | — | (49) | (23) |
| Other (expense) income, net | (5) | (7) | (5) | 5 |
| Reorganization items | (13) | (35) | (113) | (66) |
| Loss from continuing operations before income taxes, minority interest and equity income | (713) | (1,033) | (1,409) | (1,556) |
| Income tax benefit (expense) | 18 | (20) | 15 | (24) |
| Loss from continuing operations before minority interest and equity income | (695) | (1,053) | (1,394) | (1,580) |
| Equity income from non-consolidated affiliates, net of tax | 12 | 8 | 19 | 22 |
| Loss from continuing operations | (683) | (1,045) | (1,375) | (1,558) |
| (Loss) income from discontinued operations, net of tax | (10) | 47 | (92) | (76) |
| Equity income from non-Debtor affiliates, net of tax | 142 | 177 | 327 | 280 |
| Net loss | $ (551) | $ (821) | $(1,140) | $(1,354) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | June 30, 2008 (Unaudited) | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 148 | $ 113 |
| Restricted cash | 58 | 125 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 768 | 972 |
| Other third parties | 654 | 623 |
| Non-Debtor affiliates | 313 | 250 |
| Notes receivable from non-Debtor affiliates | 41 | 278 |
| Inventories, net | 708 | 823 |
| Other current assets | 365 | 385 |
| Assets held for sale | 450 | 475 |
| Total current assets | 3,505 | 4,044 |
| Long-term assets: | | |
| Property, net | 1,317 | 1,446 |
| Investments in affiliates | 327 | 331 |
| Investments in non-Debtor affiliates | 2,075 | 3,267 |
| Goodwill | 53 | 152 |
| Notes receivable from non-Debtor affiliates | 1,429 | — |
| Other | 456 | 512 |
| Total long-term assets | 5,657 | 5,708 |
| Total assets | $ 9,162 | $ 9,752 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Short-term debt | $ 3,594 | $ 2,782 |
| Accounts payable | 821 | 1,007 |
| Accounts payable to non-Debtor affiliates | 654 | 689 |
| Accrued liabilities | 1,266 | 1,328 |
| Liabilities held for sale | 190 | 167 |
| Total current liabilities | 6,525 | 5,973 |
| Long-term liabilities not subject to compromise: | | |
| Debtor-in-possession financing | 22 | 24 |
| Employee benefit plan obligations and other | 870 | 951 |
| Total long-term liabilities | 892 | 975 |
| Liabilities subject to compromise | 16,325 | 16,276 |
| Total liabilities | 23,742 | 23,224 |
| Stockholders' deficit: | | |
| Total stockholders' deficit | (14,580) | (13,472) |
| Total liabilities and stockholders' deficit | $ 9,162 | $ 9,752 |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | Six Months Ended June 30, | |
|---|---|---|
|  | **2008** | **2007** |
|  | (in millions) | |
| Cash flows from operating activities: | | |
| Net cash used in operating activities | $ (960) | $ (648) |
| Cash flows from investing activities: | | |
| Capital expenditures | (161) | (104) |
| Proceeds from sale of property | 32 | 10 |
| Proceeds from divestitures | 119 | — |
| Decrease in restricted cash | 67 | — |
| Proceeds from notes receivable from non-Debtor affiliates | 265 | — |
| Other, net | 5 | 2 |
| Discontinued operations | (50) | (6) |
| Net cash provided by (used in) investing activities | 277 | (98) |
| Cash flows from financing activities: | | |
| Net borrowings under amended and restated debtor-in-possession facility | 3,469 | — |
| (Repayments of borrowings) net proceeds from refinanced debtor-in-possession facility | (2,746) | 3,149 |
| Repayments of borrowings from debtor-in-possession facility | — | (250) |
| Repayments of borrowings under prepetition term loan facility | — | (988) |
| Repayments of borrowings from prepetition revolving credit facility | — | (1,508) |
| Repayments of borrowings under other debt agreements | (5) | (7) |
| Net cash provided by financing activities | 718 | 396 |
| Increase (decrease) in cash and cash equivalents | 35 | (350) |
| Cash and cash equivalents at beginning of period | 113 | 376 |
| Cash and cash equivalents at end of period | $ 148 | $ 26 |

## 3. REORGANIZATION ITEMS

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed. Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors and unions. The Debtors' reorganization items consist of the following:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | **2008** | **2007** | **2008** | **2007** |
|  | (in millions) | | | |
| Professional fees directly related to reorganization | $ 30 | $ 44 | $ 59 | $ 87 |
| Interest income | (2) | (2) | (4) | (6) |
| Write off of previously capitalized fees and expenses related to the EPCA | — | — | 79 | — |
| Other | 1 | — | 4 | — |
| Total Reorganization Items | $ 29 | $ 42 | $ 138 | $ 81 |

For the six months ended June 30, 2008 and 2007, reorganization items resulted in $3 million and $6 million, respectively, of cash received entirely related to interest income. Cash paid for professional fees was approximately $58 million and $67 million, respectively, for the six months ended June 30, 2008 and 2007. Professional fees for the three and six months ended June 30, 2008 also includes arrangement and other fees paid to various lenders in conjunction with the bankruptcy exit financing that was commenced but not completed in April 2008.

## 4. DISCONTINUED OPERATIONS

The Court approval of Delphi's plan to dispose of the Interiors and Closures Business and the Steering Business triggered held for sale accounting under SFAS 144 in 2007.

**Steering and Halfshaft Business**

In the fourth quarter of 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement"). Delphi expects proceeds from the sale and related Transaction Agreement to approximate $250 million. In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business. Delphi is working to close the sale as soon as practicable. Any party in compliance with its obligations under the Purchase Agreement may terminate the Purchase Agreement if the transaction does not close by August 31, 2008, with certain exceptions. Delphi expects that it will have satisfied all of its conditions by this date. During the three and six months ended June 30, 2008, Delphi recorded income of $8 million and losses of $69 million, net of tax, respectively, due to the results of operations for the six months ended June 30, 2008, and adjustment of assets held for sale to fair value of the Steering Business as of June 30, 2008.

Prior to the assets of the Steering Business being classified as held for sale, Delphi recorded asset impairment charges related to the valuation of long-lived assets held-for-use for its Steering Business of $152 million during the first quarter of 2007.

**Interiors and Closures Business**

Delphi and certain of its affiliates closed on the sale of the Interiors and Closures Business to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group, on February 29, 2008. Delphi received proceeds from the sale of approximately $98 million consisting of $63 million of cash (less $23 million of cash at an overseas entity that was included in the sale) and the remainder in notes at fair value. During the first quarter of 2008, as a result of the operating results and sale of the Interiors and Closures Business, Delphi recorded income of $18 million, net of tax.

The Interiors and Closures Business, through the date of the sale, and the Steering Business are reported as discontinued operations in the consolidated statement of operations and statement of cash flows for the three and six months ended June 30, 2008 and 2007. The assets and liabilities of the Steering Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of June 30, 2008 and December 31, 2007. The assets and liabilities of the Interiors and Closures Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of December 31, 2007.

The results of the discontinued operations are summarized as follows:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | **2008** | **2007** | **2008** | **2007** |
|  | (in millions) | | | |
| Sales: |  |  |  |  |
| Steering Business ........................................... | $ 570 | $ 699 | $ 1,139 | $ 1,380 |
| Interiors and Closures Business ................................. | — | 322 | 241 | 634 |
| Total sales ................................................. | $ 570 | $ 1,021 | $ 1,380 | $ 2,014 |
|  |  |  |  |  |
| Income (loss) before income taxes (including minority |  |  |  |  |
| interest and equity income, net of tax) ...................... | $ 13 | $ (11) | $ (42) | $ (150) |
| Provision for income taxes............................................. | (5) | (2) | (9) | (5) |
| Income (loss) from discontinued operations ................... | $ 8 | $ (13) | $ (51) | $ (155) |
| *Steering Business*............................................... | 8 | (23) | (69) | (177) |
| *Interiors and Closures Business*................................. | — | 10 | 18 | 22 |

Assets and liabilities of the discontinued operations are summarized as follows:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| Current assets: | | |
| Cash | $ 79 | $ 49 |
| Accounts receivable | 425 | 411 |
| Inventory | 188 | 188 |
| Other current assets | 17 | 8 |
| Long-term assets: | | |
| Property, net | — | 48 |
| Other long-term assets | 2 | 16 |
| Assets held for sale | $ 711 | $ 720 |
| *Steering Business* (a) | *711* | *594* |
| *Interiors and Closures Business* | *—* | *126* |
| | | |
| Current liabilities: | | |
| Accounts payable | $ 268 | $ 271 |
| Accrued liabilities | 74 | 53 |
| Short-term debt | 66 | 49 |
| Other long-term liabilities | 23 | 14 |
| Minority interest | 20 | 25 |
| Liabilities held for sale | $ 451 | $ 412 |
| *Steering Business* (b) | *451* | *392* |
| *Interiors and Closures Business* | *—* | *20* |

(a) The increase in the Steering Business assets held for sale as of June 30, 2008 is due to increased cash at certain non-U.S. operations of the Steering Business that will be stock sales, as well as increased accounts receivable due to operational seasonality.

(b) The increase in the Steering Business liabilities held for sale as of June 30, 2008 is due to increased borrowings at certain non-U.S. operations of the Steering Business that will be stock sales, as well as an increase in employee termination benefit and other exit cost accruals related to the closure of a plant in accordance with the U.S. labor settlement agreements.

Cash flows from operating activities for discontinued operations are summarized as follows:

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2008 | 2007 |
|  | (in millions) | |
| Charge related to assets held for sale | $ 7 | $ — |
| Long-lived asset impairment charges | — | 159 |
| Pension and other postretirement benefit expenses | 20 | 38 |
| U.S. employee workforce transition program charges | 3 | — |
| Changes in net operating assets | 18 | (4) |
| Total | $ 48 | $ 193 |
| *Steering Business* | *18* | *170* |
| *Interiors and Closures Business* | *30* | *23* |

## 5. ACQUISITIONS AND DIVESTITURES

The results of operations, including the gain or loss on divestitures described below, were not significant to the consolidated financial statements in any period presented.

### North American Brake Product Asset Sale (Automotive Holdings Group Segment)

On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for Delphi's North American brake components machining and assembly assets ("North American Brake Components") primarily located at its Saginaw, Michigan; Spring Hill, Tennessee; Oshawa, Ontario, Canada; and Saltillo, Mexico facilities. The 2007 annual revenues for North American Brake Components were $568 million. The sale occurred in the first quarter of 2008 and resulted in a gain of $3 million which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $38 million in the first quarter of 2008.

### Bearings Business Product Sale (Automotive Holdings Group Segment)

On January 15, 2008, the Debtors filed a motion to sell Delphi's bearings business (the "Bearings Business"). On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code. On February 21, 2008, the Debtors announced that they had entered into a purchase agreement with Kyklos, Inc., a wholly owned subsidiary of Hephaestus Holdings, Inc. and an affiliate of KPS Special Situations Fund II, L.P. ("Kyklos"), which was the successful bidder at the auction held on February 19, and 20, 2008. The Court entered the order confirming the sale of the Bearings Business to Kyklos on March 19, 2008. The 2007 annual revenues for the Bearings Business were $280 million. During the first quarter of 2008, Delphi recognized a charge of $30 million, included in cost of sales, related to the assets held for sale of the Bearings Business. The sale occurred on April 30, 2008, and Delphi received net proceeds from this sale of approximately $15 million in the second quarter of 2008 with no net change to the loss on the sale.

### U.S. Suspensions Asset Sale (Automotive Holdings Group Segment)

On March 7, 2008, the Debtors filed a motion to sell certain assets of Delphi's U.S. suspensions business including the machinery, equipment and inventory primarily used and located at its suspension manufacturing facility in Kettering, Ohio (the "Kettering Assets"), to Tenneco Automotive Operating Company Inc. ("Tenneco") for approximately $19 million and other consideration. On March 20, 2008, the Court approved the bidding procedures for the Kettering Assets, but no further bids were submitted by the bid deadline. On April 30, 2008, the Court entered an order approving the sale of the Kettering Assets to Tenneco. The 2007 annual revenues for the Kettering Assets were $113 million. The sale occurred on May 30, 2008 and resulted in a gain of $9 million, which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $19 million in the second quarter of 2008.

### Catalyst Product Line Sale (Powertrain Systems Segment)

On September 28, 2007, Delphi closed on the sale of its original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore. The Catalyst Business revenues for the nine months ended September 30, 2007 were $249 million. During the first quarter of 2008, Delphi and Umicore agreed on final working capital adjustments and Delphi received a payment of $9 million, of which $6 million offset a receivable recognized during 2007 and $3 million was recorded as a reduction to cost of sales.

### Power Products Business Sale (Automotive Holdings Group Segment)

On May 27, 2008 and in accordance with the terms of an order authorizing the sale of certain assets for less than $10 million, Delphi served notice of its intention to sell its power products business (the "Power Products Business") to Strattec Security Corporation, Witte-Velvert GmbH & Co. KG, Vehicle Access Systems Technology LLC, and certain of their affiliates (collectively, the "Strattec Buyers") for approximately $8 million. On June 4, 2008, the Debtors filed a motion to assume and assign certain prepetition executory contracts related to the Power Products Business to the Strattec Buyers. On June 24, 2008, the Court entered an order authorizing the Debtors to assume and assign such contracts to the Strattec Buyers. The 2007 annual revenues for the Power Products Business were $59 million. Delphi recognized a charge of $3 million during the second quarter of 2008, included in cost of sales, related to the assets held for sale of the Power Products Business.

### Global Exhaust Business Sale (Powertrain Systems Segment)

On June 27, 2008, the Debtors announced their intention to sell Delphi's global exhaust business relating to the design and manufacture of the exhaust system front exhaust module including catalytic converters and exhaust manifolds (the "Exhaust Business"). Although Delphi intends to divest its Exhaust Business, the Company intends to continue to provide full engine management systems, including air and fuel management, and combustion and valve-train technology.

### Acquisition of Joint Venture (Electronics & Safety Segment)

In the second quarter of 2008, Delphi made an additional investment in a consolidated South American majority-owned subsidiary for approximately $35 million in cash and short term notes. As a result, the ownership interest is now 100 percent.

21

## 6. INCOME TAXES

Generally the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as OCI. However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year.

Accordingly, all items of current year income, including those in OCI, should be considered for purposes of determining the amount of tax benefit that results from a loss in continuing operations and that should be allocated to continuing operations. In such instances, income from other categories must offset the current loss from operations, the tax benefit of such offset being reflected in continuing operations even when a valuation allowance has been established against the deferred tax assets.

For the three- and six-month periods ended June 30, 2008, Delphi had a $117 million pre-tax gain in OCI, primarily related to derivative contracts on copper and the Mexican Peso, thereby reducing the Company's current year valuation allowance and resulting in a benefit of $21 million allocated to the current year loss from continuing operations.

## 7. LONG-LIVED ASSET IMPAIRMENT

Delphi evaluates the recoverability of long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets. Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets. The fair value of the assets was determined based on the "held for use" classification.

The following table summarizes the long-lived asset impairment charges recorded for the three and six months ended June 30, 2008 and 2007 by operating segment:

| Segment | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| | | (in millions) | | |
| Electronics & Safety | $ 4 | $ — | $ 5 | $ 1 |
| Powertrain Systems | — | 8 | — | 9 |
| Electrical/Electronic Architecture | 1 | — | 1 | 1 |
| Automotive Holdings Group | — | 26 | 2 | 29 |
| Continuing Operations | 5 | 34 | 8 | 40 |
| Discontinued Operations | — | 5 | — | 159 |
| Total | $ 5 | $ 39 | $ 8 | $ 199 |

Refer to Note 4. Discontinued Operations for more information on the long-lived asset impairment charges recorded in loss from discontinued operations.

Delphi's Bearings Business was a non-core product line that Delphi sold in the second quarter of 2008. In June 2007, Delphi had reassessed its estimated net proceeds from disposition and determined that the carrying value of the Bearings Business exceeded the undiscounted estimated future cash flows and consequently recognized an impairment charge of $26 million related to the valuation of long-lived assets held-for-use in the second quarter of 2007.

## 8. GOODWILL IMPAIRMENT

At June 30, 2008 and December 31, 2007, Delphi's goodwill balance was approximately $256 million and $397 million, respectively. The change in carrying amount of goodwill for the first six months of 2008 is as follows:

| | 2008 |
|---|---|
| | (in millions) |
| Balance at January 1, | $ 397 (a) |
| Acquisitions | 19 |
| Impairment | (168) |
| Currency translation | 8 |
| Balance at June 30, | $ 256 (b) |

(a)  $165 million in Electrical/Electronic Architecture, $155 million in Electronics & Safety and $77 million in Corporate and Other.

(b)  $177 million in Electronics & Safety and $79 million in Corporate and Other.

Delphi reviews the recoverability of goodwill annually on May 31 at any other time when business conditions indicate a potential change in recoverability.  In conjunction with Delphi's annual recoverability tests, the deterioration of Delphi's financial performance, combined with an unfavorable outlook, were indicators for potential impairment.  More specifically, during the second quarter of 2008, Delphi has experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, particularly related to GM, continuing unfavorable pricing pressures and increasing commodity prices.  This caused previously unanticipated projected revenue and operating income declines.  As a result of these changes, long-term projections showed declines in discounted future operating cash flows.  These revised cash flows and declining market conditions caused the implied fair value of Delphi's Electrical/Electronic Architecture segment to be less than its book value.  The fair value was also adversely affected by declining industry market valuation metrics.  Accordingly, the Company recorded $168 million of goodwill impairment charges during the three and six months ended June 30, 2008 related to the Electrical/Electronic Architecture segment.

Delphi performed its goodwill impairment test by comparing the carrying value of each of its reporting units to the fair value of the reporting unit.  In determining fair value of reporting units, Delphi utilized a number of methodologies, including discounted cash flow analysis and review of fair value appraisals.  Where the carrying value exceeded the fair value for a particular reporting unit, goodwill impairment charges were recognized.  The goodwill impairment charges recognized were determined by stating all other assets and liabilities of a reporting unit at their fair values with the remaining fair value of the reporting unit attributed to goodwill.  The resulting goodwill impairment charges are the excess of the recorded goodwill balance over the implied fair value of goodwill for the reporting unit.  Delphi's reporting units are the global businesses focused on product families.  The fair value of the reporting units was negatively impacted by the continued deterioration of business conditions, principally in North America, as previously described.

## 9. EMPLOYEE TERMINATION BENEFITS AND OTHER EXIT COSTS

Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company.  This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business.  These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements.  Voluntary termination benefits are accrued when an employee accepts the related offer.  Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan.  Contract termination costs are recorded when contracts are terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract.  All other exit costs are accrued when incurred.

Delphi's employee termination benefit and other exit costs are undertaken as necessary to execute management's strategy, streamline operations, take advantage of available capacity and resources, and ultimately achieve net cost reductions.  These activities generally fall into one of two categories:

(1)  Realignment of existing manufacturing capacity and closure of facilities and other exit or disposal activities, as it relates to executing the Company's strategy in the normal course of business.

(2)  Transformation plan activities, which support the Company's overall transformation initiatives announced in 2006, including selling or winding down non-core product lines, transforming its salaried workforce to reduce general and administrative expenses, and modifying labor agreements with its principal unions in the U.S.

The following table summarizes the employee termination benefit and other exit cost charges recorded for the three and six months ended June 30, 2008 and 2007 by operating segment:

| Segment | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2008 | 2007 | 2008 | 2007 |
| | | (in millions) | | |
| Electronics & Safety ................................................ | $    11 | $    1 | $    39 | $    3 |
| Powertrain Systems........................................... | 6 | 18 | 10 | 19 |
| Electrical/Electronic Architecture ................................. | 19 | 34 | 32 | 65 |
| Thermal Systems.................................................. | 6 | 7 | 9 | 10 |
| Automotive Holdings Group........................................ | 15 | 145 | 58 | 189 |
| Corporate and Other............................................. | 1 | 18 | 1 | 22 |

| | | | | |
|---|---|---|---|---|
| Continuing Operations............................................... | 58 | 223 | 149 | 308 |
| Discontinued Operations........................................... | 9 | 78 | 44 | 112 |
| Total ...................................................................... | $ 67 | $ 301 | $ 193 | $ 420 |
| Cost of sales............................................................ | 53 | 202 | 139 | 284 |
| *Selling, general and administrative expenses*............ | 5 | 21 | 10 | 24 |
| *Loss from discontinued operations* ........................... | 9 | 78 | 44 | 112 |

Delphi has initiated several programs to streamline operations and lower costs. The following are details of significant charges during the three and six months ended June 30, 2008.

- *Realignment of existing manufacturing capacity and closure of facilities.* As part of Delphi's ongoing efforts to lower costs and operate efficiently, Delphi's Electronics & Safety and Automotive Holdings Group segments plan to transfer core products manufactured at a shared location in Portugal to a lower cost market and exit non-core products from that facility and recognized employee termination benefits of $44 million during the six months ended June 30, 2008. Additionally, Electronics & Safety, Electrical/Electronic Architecture ("E/EA"), Thermal Systems and the Automotive Holdings Group segments executed initiatives to realign manufacturing operations within North America to lower cost markets, and incurred approximately $18 million and $41 million of employee termination benefits and other related exit costs during the three and six months ended June 30, 2008, respectively.

- *Transformation plan activities.* As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $6 million and $37 million related to the closure of a manufacturing facility in Athens, Alabama during the three and six months ended June 30, 2008, respectively, which related to the Steering Business and was recorded in loss from discontinued operations. As part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees in North America during the three and six months ended June 30, 2008 for involuntary separation and incurred $24 million and $42 million, respectively, in related employee termination benefits in the Electronics & Safety, Powertrain Systems, E/EA and Automotive Holdings Group segments.

The following are details of significant charges during the three and six months ended June 30, 2007.

- *Realignment of existing manufacturing capacity and closure of facilities.* As part of Delphi's ongoing efforts to lower costs and operate efficiently, the E/EA segment transferred manufacturing operations in Germany and Portugal to lower cost markets in Eastern Europe and Asia Pacific. As a result, E/EA significantly reduced the number of employees at these locations, and announced involuntary employee separation packages for approximately $26 million during the three and six months ended June 30, 2007. Additionally, E/EA announced an involuntary employee separation package due to a planned closure of a manufacturing facility in France for approximately $11 million during the six months ended June 30, 2007.

- *Transformation plan activities.* As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $207 million and $268 million related to the closure of a manufacturing facility in Cadiz, Spain during the three and six months ended June 30, 2007, respectively, of which $130 million and $161 million, respectively, related to the Automotive Holdings Group segment and $77 million and $107 million, respectively, related to the Steering Business, which is recorded in loss from discontinued operations. As a part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees, primarily in North America, during the three and six months ended June 30, 2007 for involuntary separation, and incurred $19 million and $42 million, respectively, in related employee termination benefits in the Powertrain Systems, E/EA, and Automotive Holdings Group segments. During the three and six months ended June 30, 2007, Delphi incurred $19 million related to the financial services and information technology outsourcing activities related to the transformation of our salaried workforce to reduce general and administrative expenses in the Corporate and Other segment.

## 10. WEIGHTED AVERAGE SHARES

Basic and diluted loss per share amounts were computed using weighted average shares outstanding for each respective period. As Delphi incurred losses in the three and six months ended June 30, 2008 and 2007, the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted loss per share were:

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2008 | 2007 | 2008 | 2007 |
|  | (in thousands) | | | |
| Weighted average shares outstanding | 564,519 | 561,782 | 564,083 | 561,782 |
| Effect of dilutive securities | — | — | — | — |
| Diluted shares outstanding | 564,519 | 561,782 | 564,083 | 561,782 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

|  | Three and Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2008 | 2007 |
|  | (in thousands) | |
| Anti-dilutive securities | 60,922 | 78,652 |

## 11. INVENTORIES, NET

Inventories are stated at the lower of cost, determined on a first-in, first-out basis ("FIFO"), or market, including direct material costs and direct and indirect manufacturing costs. A summary of inventories, net is shown below:

|  | June 30, 2008 | December 31, 2007 |
| --- | --- | --- |
|  | (in millions) | |
| Productive material | $  916 | $  926 |
| Work-in-process and supplies | 331 | 386 |
| Finished goods | 490 | 496 |
| Total | $ 1,737 | $ 1,808 |

## 12. LIABILITIES

Accrued liabilities consisted of the following:

|  | June 30, 2008 | December 31, 2007 |
| --- | --- | --- |
|  | (in millions) | |
| Payroll-related obligations | $  303 | $  238 |
| Employee benefits, including current pension obligations | 156 | 185 |
| Accrued income taxes | 132 | 54 |
| Taxes other than income | 245 | 195 |
| Warranty obligations (Note 13) | 242 | 244 |
| U.S. employee workforce transition program (Note 16) | 167 | 234 |
| Manufacturing plant rationalization | 207 | 259 |
| Interest on prepetition claims | 418 | 411 |
| Other | 473 | 461 |
| Total | $ 2,343 | $ 2,281 |

Other long-term liabilities consisted of the following:

|  | June 30, 2008 | December 31, 2007 |
| --- | --- | --- |
|  | (in millions) | |
| Workers compensation | $  325 | $  328 |
| Environmental | 87 | 112 |
| U.S. employee workforce transition program (Note 16) | 122 | 148 |
| Extended disability benefits | 74 | 72 |
| Warranty obligations (Note 13) | 302 | 315 |
| Other | 250 | 210 |
| Total | $ 1,160 | $ 1,185 |

## 13. WARRANTY OBLIGATIONS

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations. These accruals are based on factors such as past experience, production changes, industry developments and various other considerations. Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the six months ended June 30, 2008:

|  | June 30, 2008 |
|---|---|
|  | (in millions) |
| Accrual balance at beginning of year | $   559 |
| Provision for estimated warranties issued during the period | 31 |
| Provision for changes in estimate for preexisting warranties | 19 |
| Settlements made during the period (in cash or in kind) | (79) |
| Foreign currency translation and other | 14 |
| Accrual balance at end of period | $   544 |

Approximately $242 million and $244 million of the warranty accrual balance as of June 30, 2008 and December 31, 2007, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $302 million and $315 million of the warranty accrual balance as of June 30, 2008 and December 31, 2007, respectively, is included in other long-term liabilities.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases. Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from chapter 11. Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM. In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in our Amended and Restated DIP Credit Facility, GM agreed, on July 31, 2008 to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, and as a result Delphi expects to record the extinguishment of this liability as a reduction of warranty expense in cost of sales, which will have a corresponding favorable impact on operating income of $112 million in July 2008. As of June 30, 2007, Delphi expected to settle obligations with GM for approximately $199 million and recorded $91 million of additional warranty expense in costs of sales in the second quarter of 2007, primarily related to the Automotive Holdings Group and Powertrain Systems segments. Refer to Note 22. Commitments and Contingencies, Ordinary Business Litigation for additional disclosure regarding warranty matters and Note 23. Subsequent Events.

## 14. LIABILITIES SUBJECT TO COMPROMISE

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' plan of reorganization. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy. Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals. The following data regarding the number and amount of claims and proof of claims is unaudited.

The Debtors have been paying and intend to continue to pay undisputed postpetition obligations in the ordinary course of business. In addition, pursuant to the Plan, the Debtors assumed most of their executory contracts and unexpired leases with respect to the Debtors' operations, and rejected certain of them, with the approval of the Court. Damages resulting from rejection of executory contracts and unexpired leases are treated as general unsecured claims and will be classified as liabilities subject to compromise. The Court entered an order establishing July 31, 2006 as the bar date by which claims against the Debtors arising prior to the Debtors' Chapter 11 Filings were required to be filed if the claimants were to receive any distribution in the chapter 11 cases. As of June 30, 2008, the Debtors' have received approximately 16,800 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the

aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.  As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. Many of these claims have been found to be duplicative, based on contingencies that have not occurred, or are otherwise overstated, and therefore have been determined to be invalid.  As a result, the aggregate amount of claims filed with the Court exceeds the amount that has been to date allowed by the Court.  As of June 30, 2008, the Debtors have filed thirty omnibus claims objections that objected to claims on procedural or substantive grounds.  Pursuant to these claims objections, the Debtors have objected to approximately 13,500 proofs of claim which asserted approximately $10.1 billion in aggregate liquidated amounts plus additional unliquidated amounts.  As of June 30, 2008, the Court has entered orders disallowing and/or claimants have withdrawn approximately 9,700 of those claims, which orders reduced the amount of asserted claims by approximately $9.7 billion in aggregate liquidated amounts plus additional unliquidated amounts.  In addition, the Court has entered an order allowing or modifying approximately 3,650 claims reducing the aggregate amount on those claims by $260 million, which amounts are subject to further objection by the Debtors at a later date on any basis.  The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled.  The determination of how these liabilities are to be settled and treated is set forth in the Plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete.  Accordingly, the ultimate number and amount of allowed claims is not determinable at this time.  Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.  As of January 25, 2008, the total general unsecured claims, other than funded debt claims, against the Company had been reduced to an amount less than the $1.45 billion cap specified in the Plan.  Delphi was unable to consummate the Plan because certain Investors under the Plan refused to participate in the closing, which was commenced but not completed on April 4, 2008.  Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts.  The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.

Liabilities subject to compromise consist of the following:

| | June 30, 2008 | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| Pension obligations | $ 3,132 | $ 3,329 |
| Postretirement obligations other than pensions, including amounts payable to GM | 9,073 | 8,786 |
| Debt and notes payable | 1,984 | 1,984 |
| Accounts payable | 737 | 744 |
| Junior subordinated notes due 2033 | 391 | 391 |
| GM claim for U.S. employee workforce transition programs | 312 | 312 |
| Securities & ERISA litigation liability (Note 22) | 351 | 351 |
| Other | 264 | 300 |
| Total Liabilities Subject to Compromise | $ 16,244 | $ 16,197 |

## 15. DEBT

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders.  The Refinanced DIP Credit Facility consisted of a $1.75 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $250 million first priority term loan (the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan (the "Tranche C Term Loan").

The Refinanced DIP Credit Facility had a maturity date of July 1, 2008.  On May 9, 2008, Delphi entered into an amended and restated DIP credit facility (the "Amended and Restated DIP Credit Facility").  The Amended and Restated DIP Credit Facility extends the term until December 31, 2008 and modifies the size of the facility by reducing the Revolving Facility to $1.1 billion from $1.75 billion and increasing the size of the Tranche B Term Loan to $500 million from $250 million and leaving the Tranche

C Term Loan unchanged at approximately $2.5 billion. On May 30, 2008, the Court entered an order authorizing Delphi to increase the Tranche C Term Loan to $2.75 billion from approximately $2.5 billion with funding in June 2008. The Amended and Restated DIP Credit Facility includes certain covenants and restrictions on Delphi's financial and business operations that mirror those imposed by the Refinanced DIP Credit Facility, with the exception of the modifications listed below. The Amended and Restated DIP Credit Facility:

- Increases the interest rate on the facilities at the option of Delphi of either the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent or LIBOR plus a specified percent as follows:

|  | ABR plus | | LIBOR plus | |
|---|---|---|---|---|
|  | Amended and Restated DIP Credit Facility | Refinanced DIP Credit Facility | Amended and Restated DIP Credit Facility | Refinanced DIP Credit Facility |
| Tranche A ........................... | 3.00% | 2.50% | 4.00% | 3.50% |
| Tranche B ........................... | 3.00% | 2.50% | 4.00% | 3.50% |
| Tranche C ........................... | 4.25% | 3.00% | 5.25% | 4.00% |

As LIBOR borrowings are less costly than ABR borrowings, Delphi seeks to maximize the amount of loans outstanding on a LIBOR basis.

- Increases the undrawn revolver fees from 50 basis points to 100 basis points,
- Adds a LIBOR and ABR floor to the Tranche B and Tranche C Term Loans of 3.25% and 4.25%, respectively,
- Sets rolling 12-month cumulative Global EBITDAR covenant levels for the extension period as follows:

| Period Ending | Global EBITDAR (in millions) |
|---|---|
| June 30, 2008 .................................. | $600 |
| July 31, 2008 .................................. | $575 |
| August 31, 2008 .............................. | $550 |
| September 30, 2008 ......................... | $625 |
| October 31, 2008 ............................ | $600 |
| November 30, 2008 ......................... | $675 |

- Modifies the borrowing base definition and limits availability to draw additional amounts under the Revolving Facility, under certain conditions as defined, and modifies the allowable junior liens, and
- Allows Delphi to enter into an agreement with GM as described below.

In connection with the Amended and Restated DIP Credit Facility, Delphi paid a total of approximately $75 million to consenting lenders on the Revolving Facility, the Tranche B facility and the Tranche C facility. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Amended and Restated DIP Credit Facility and the bankruptcy exit financing that was commenced but not completed.

In conjunction with the entry into the Amended and Restated DIP Credit Facility, the Refinanced DIP Credit Facility was terminated. Delphi incurred no early termination penalties in connection with the termination of this agreement. However, as a result of significant changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $49 million of unamortized debt issuance costs related to the Amended and Restated DIP Credit Facility and the Refinanced DIP Credit Facility in the second quarter of 2008, which was recognized as loss on extinguishment of debt. As of June 30, 2008, $40 million of debt issuance costs remains deferred in other current assets and is being amortized over the term of the Amended and Restated DIP Credit Facility.

In 2007, concurrently with the entry into the Refinanced DIP Credit Facility, Delphi expensed $25 million of unamortized debt issuance costs related to the Revolving Credit, Term Loan and Guaranty Agreement Delphi entered into on October 14, 2005, as amended through November 13, 2006, and the Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt, as these fees relate to the refinancing of the term loans, and $2 million was recognized as interest expense, as these fees relate to the refinancing of the revolving credit facility.

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement"). The original GM Advance Agreement has a maturity date of the earlier of December 31, 2008, when $650 million has been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. GM will receive an administrative claim for its advances. The original GM Advance Agreement provides for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement. The amounts advanced will accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The interest on the advances will be cancelled if the GSA and MRA become effective on or prior to the expiration date of the agreement. Advances will be set off against the GSA and MRA upon effectiveness of those agreements or any remaining administrative claims in Delphi's chapter 11 cases. As of June 30, 2008, no amounts were outstanding pursuant to the GM Advance Agreement. However, during the second quarter of 2008 Delphi received and subsequently repaid amounts up to approximately $190 million under the GM Advance Agreement. GM has agreed, subject to Court approval, to expand the availability under the GM Advance Agreement, see Note 23. Subsequent Events.

Borrowings under the Amended and Restated DIP Credit Facility are prepayable at Delphi's option without premium or penalty. As of June 30, 2008, total available liquidity under the Amended and Restated DIP Credit Facility was approximately $613 million. At June 30, 2008, there was $500 million outstanding under the Tranche B Term Loan at LIBOR plus 4.00% (or 7.25%), $2.75 billion outstanding under the Tranche C Term Loan at LIBOR plus 5.25% (or 8.50%), and $311 million outstanding under the Revolving Facility, of which $300 million was at LIBOR plus 4.00% (or 6.625%) and $11 million was at ABR plus 3.00% (or 8.00%). Additionally, the Company had $102 million in letters of credit outstanding under the Revolving Facility as of that date. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Amended and Restated DIP Credit Facility. While the borrowing base computation excluded outstanding borrowings, it was less than the Amended and Restated DIP Credit Facility commitment at June 30, 2008. Under the Amended and Restated DIP Credit Facility, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate regardless of availability levels.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. The Company does not expect to pay dividends prior to emergence from chapter 11. So long as the Facility Availability Amount (as defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors). The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility) for Delphi and its direct and indirect subsidiaries, on a consolidated basis, at the levels set forth in the Amended and Restated DIP Credit Facility. The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate. Delphi was in compliance with the Amended and Restated DIP Credit Facility covenants as of June 30, 2008.

## 16. U.S. EMPLOYEE WORKFORCE TRANSITION PROGRAMS

As previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2007, Delphi, GM, and Delphi's principal labor unions in the U.S. signed settlement agreements during 2007 which included workforce transition programs for eligible union employees (the "Workforce Transition Programs"). During the second half of 2007, Delphi recorded charges for the attrition programs included in the Workforce Transition Programs of approximately $52 million. During the six months ended June 30, 2008, Delphi recorded additional charges of $16 million to reflect costs under the Workforce Transition Programs in excess of amounts previously estimated. The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability during 2007. In accordance with EITF 88-23, "*Lump-Sum Payments under Union Contracts,*" the wage asset is being amortized over the life of the respective union agreements. The corresponding wage liability will be reduced as buy-down payments are made. Based on the GSA with GM, Delphi expects reimbursement for certain costs related to the workforce transition programs, but given that the GSA is not effective until Delphi's emergence from chapter 11, reimbursement of these costs has not been recorded as of June 30, 2008. GM's reimbursement for costs associated with incentivized retirements are included in the U.S. labor agreements, which as previously discussed have been approved by the Court and ratified by the respective unions. Therefore, as of June 30, 2008, Delphi has recorded a receivable from GM in the amount of $7 million included in GM and affiliates accounts receivable in the accompanying consolidated balance sheet.

The following table represents the activity in the U.S. employee workforce transition program liability for the six months ended June 30, 2008:

#### U.S. Employee Workforce Transition Program Liability

|  | (in millions) |
|---|---:|
| Balance at December 31, 2007 | $   382 |
| U.S. employee workforce transition program charges | 16 |
| Buy-down wage liability adjustment | 3 |
| Payments | (100) |
| Pension and other postretirement benefits (Note 17) | (17) |
| Accretion and other | 5 |
| Balance at June 30, 2008 | $   289 |

At June 30, 2008 and December 31, 2007, $167 million and $234 million, respectively, of the U.S. employee workforce transition program liability is included in accrued liabilities, and $122 million and $148 million, respectively, is included in other long-term liabilities in the consolidated balance sheet.

The following table represents the activity in the U.S. employee workforce transition program buydown wage asset for the six months ended June 30, 2008:

#### U.S. Employee Workforce Transition Program Buydown Wage Asset

|  | (in millions) |
|---|---:|
| Balance at December 31, 2007 | $   301 |
| Buy-down wage asset adjustment | 3 |
| Amortization expense | (41) |
| Balance at June 30, 2008 | $   263 |

As of June 30, 2008 and December 31, 2007, $82 million and $80 million, respectively, of the U.S. employee workforce transition program buydown wage asset is included in other current assets and $181 million and $221 million, respectively, is included in other long-term assets in the consolidated balance sheet.

## 17. PENSION AND OTHER POSTRETIREMENT BENEFITS

The Debtors sponsor pension plans covering unionized employees in the U.S., which generally provide benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age.  The Debtors also sponsor defined benefit plans covering U.S. salaried employees, with benefits generally based on years of service and salary history.  Certain Delphi employees also participate in nonqualified pension plans covering executives, which are based on targeted wage replacement percentages and are unfunded.  Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code.  Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, and the United Kingdom ("UK"). The UK and certain Mexican plans are funded. In addition, Delphi has defined benefit plans in Korea, Turkey and Italy for which amounts are payable to employees immediately upon separation. The obligations for these plans are recorded based on the vested benefit obligation.

Delphi also maintains other postretirement benefit plans, which provide covered U.S. hourly and salaried employees with retiree medical and life insurance benefits. Certain of Delphi's non-U.S. subsidiaries have other postretirement benefit plans; although most participants are covered by government sponsored or administered programs. The annual cost of such non-U.S. other postretirement benefit plans was not significant to Delphi.

The amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three- and six-month periods ended June 30, 2008 and 2007 for U.S. and non-U.S. salaried and hourly employees excluding the plans in Korea, Turkey and Italy discussed above.  The settlements recorded in the six months ended June 30, 2007 were primarily due to renegotiated labor contracts in Mexico.  Benefit costs presented below were determined based on actuarial methods and included the following components for U.S. and non-U.S. salaried and hourly employees:

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | | | Three Months Ended June 30, | | | |
|  | **2008** | **2007** | **2008** | **2007** | **2008** | **2007** |

|  | (in millions) |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Service cost (a) | $ 41 | $ 47 | $ 11 | $ 11 | $ 8 | $ 21 |
| Interest cost | 214 | 213 | 24 | 20 | 137 | 136 |
| Expected return on plan assets | (218) | (216) | (23) | (20) | — | — |
| Settlements | — | — | 13 | 3 | — | — |
| Curtailment loss | — | — | — | 5 | — | — |
| Amortization of prior service costs | 4 | 14 | 3 | 1 | (26) | (25) |
| Amortization of actuarial losses | 6 | 26 | 2 | 9 | 11 | 19 |
| Net periodic benefit cost | $ 47 | $ 84 | $ 30 | $ 29 | $ 130 | $ 151 |

|  | Pension Benefits | | | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
|  | U.S. Plans | | Non-U.S. Plans | | | |
|  | | | Six Months Ended June 30, | | | |
|  | **2008** | **2007** | **2008** | **2007** | **2008** | **2007** |
|  | | | (in millions) | | | |
| Service cost (a) | $ 82 | $ 95 | $ 22 | $ 23 | $ 15 | $ 42 |
| Interest cost | 427 | 425 | 47 | 40 | 274 | 271 |
| Expected return on plan assets | (436) | (432) | (46) | (40) | — | — |
| Settlements | — | — | 24 | 33 | — | — |
| Curtailment loss | — | — | — | 5 | — | — |
| Amortization of prior service costs | 11 | 28 | 4 | 2 | (53) | (50) |
| Amortization of actuarial losses | 11 | 51 | 8 | 17 | 22 | 38 |
| Net periodic benefit cost | $ 95 | $ 167 | $ 59 | $ 80 | $ 258 | $ 301 |

(a) Includes $8 million and $17 million for the three and six months ended June 30, 2008, respectively, and $13 million and $28 million for the three and six months ended June 30, 2007, respectively, of costs previously accrued related to the U.S. employee workforce transition programs.

Net periodic benefit cost above reflects $9 million and $20 million for the three and six months ended June 30, 2008, respectively, and $19 million and $38 million for the three and six months ended June 30, 2007, respectively, that were included in loss from discontinued operations.

In September 2006, the FASB issued SFAS 158, which requires, among other things, an employer to measure the funded status of its defined benefit pension and other postretirement benefit plans as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Historically, Delphi has measured the funded status of its U.S. retiree health care benefit plans and certain international pension plans as of September 30 of each year. Delphi adopted the measurement date provisions of SFAS 158 as of January 1, 2008, and utilized the second transition approach provided under SFAS 158. Under this approach, net periodic benefit cost related to these plans for the period between the most recent measurement date of September 30, 2007 and December 31, 2008, was allocated proportionately between an adjustment of accumulated deficit as of January 1, 2008 and amounts to be recognized as net periodic benefit cost during 2008. The following table summarizes the impact of the adoption of the measurement date provisions of SFAS 158:

|  | U.S Retiree Medical Plans | Non-U.S. Pension Plans | Total |
|---|---|---|---|
|  | Increase / (Decrease) | | |
|  | (in millions) | | |
| Pension and other postretirement benefit liabilities | $ 132 | $ 7 | $ 139 |
| Accumulated deficit as of January 1, 2008 | $ 117 | $ 12 | $ 129 |
| Accumulated other comprehensive loss as of January 1, 2008 | $ 15 | $ (5) | $ 10 |

As permitted under chapter 11 of the Bankruptcy Code, Delphi contributed only the portion of the contribution attributable to service after the Chapter 11 Filings. During the six months ended June 30, 2008, Delphi contributed approximately $264 million to its U.S. pension plans, of which $45 million and $46 million related to services rendered during the fourth quarter of 2007 and first quarter of 2008, respectively, and the remaining $172.5 million related to the PBGC draw against the letters of credit in favor of the Hourly and Salaried Plans discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy. On July 14 and 15, 2008, Delphi contributed approximately $435 thousand to its U.S. subsidiary pension plans related to services rendered during the second quarter of 2008. Approximately $46 million of the proceeds from the letters of credit were applied to the July 15, 2008

quarterly contribution to the Hourly and Salaried plans related to services rendered during the second quarter of 2008. Under ERISA and the Code, minimum funding payments to the U.S. pension plans of $739 million were due during the first six months of 2008 and a minimum funding payment of approximately $333 million to the U.S. pension plans was due in July 2008.

Delphi did not meet the minimum funding standards of ERISA and the Code for its primary U.S. pension plans for the plan year ended September 30, 2005. The under-contributed amount of approximately $173 million was due on June 15, 2006. The Company did not pay this amount and a related penalty was assessed by the IRS in the amount of approximately $17 million. The penalty was recorded in liabilities subject to compromise in 2006. Given the receipt of the pension waivers described in Note 2. Plan of Reorganization and Transformation Plan, Delphi determined it was no longer probable that it would ultimately pay this penalty and Delphi reversed the liability of $19 million (including $2 million of accrued interest) during the second quarter of 2007.

## 18. DERIVATIVES AND HEDGING ACTIVITIES

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks. To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies. Designation is performed on a transaction basis to support hedge accounting. The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged. Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy. Delphi's policy prohibits holding or issuing derivative financial instruments for trading purposes.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of June 30, 2008 and December 31, 2007 are as follows:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| Current assets | $ 113 | $ 40 |
| Non-current assets | 17 | 13 |
| Total assets | $ 130 | $ 53 |
| Current liabilities | $ 12 | $ 24 |
| Non-current liabilities | 1 | — |
| Total liabilities | $ 13 | $ 24 |

The fair value of financial instruments recorded as assets increased from December 31, 2007 to June 30, 2008 primarily due to the increase in copper prices and related increase in copper forward rates. The fair value of financial instruments recorded as liabilities decreased from December 31, 2007 to June 30, 2008, primarily due to certain favorable foreign currency contracts involving the Mexican Peso with the U.S. Dollar, which offset unfavorable contracts involving the Euro with the U.S. Dollar, Turkish New Lira, and South African Rand.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in OCI, to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period. Net gains included in accumulated OCI as of June 30, 2008, were $176 million pre-tax. Of this pre-tax total, a gain of approximately $140 million is expected to be included in cost of sales within the next 12 months and a gain of approximately $37 million is expected to be included in cost of sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Cash flow hedges are discontinued when it is no longer probable that the originally forecasted transactions will occur. The amount included in cost of sales related to hedge ineffectiveness was a $3 million gain for the six months ended June 30, 2008 and a less than $1 million loss for the six months ended June 30, 2007. The amount included in cost of sales related to the time value of options was not significant in the six months ended June 30, 2008 and 2007. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was not significant for the six months ended June 30, 2008 and was $1 million for the six months ended June 30, 2007.

## 19. FAIR VALUE MEASUREMENTS

In September 2006, the FASB issued SFAS 157, which defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value.

In February 2008, the FASB issued FASB Staff Position No. 157-2 ("FSP 157-2"), *Effective Date of FASB Statement No. 157*, which partially defers the effective date of SFAS No. 157 for one year for nonfinancial assets and nonfinancial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis.  The FSP does not defer recognition and disclosure requirements for financial assets and liabilities or for nonfinancial assets and nonfinancial liabilities that are remeasured at least annually.  Delphi adopted SFAS No. 157 as of January 1, 2008 for assets and liabilities not subject to the deferral and expects to adopt the provisions of SFAS No. 157 as of January 1, 2009 for nonfinancial assets and liabilities that are subject to the deferral.

SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS No. 157 also establishes a fair value hierarchy to prioritize inputs used in measuring fair value as follows:

- *Level 1:* Observable inputs such as quoted prices in active markets;
- *Level 2:*  Inputs, other than quoted prices in active markets, that are observable either directly or indirectly; and
- *Level 3:*  Unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

Assets and liabilities measured at fair value are based on one or more of the following three valuation techniques noted in SFAS 157:

a. *Market approach:* Prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities.
b. *Cost approach:* Amount that would be required to replace the service capacity of an asset (replacement cost).
c. *Income approach:* Techniques to convert future amounts to a single present amount based upon market expectations (including present value techniques, option-pricing and excess earnings models).

As of June 30, 2008, Delphi had the following assets measured at fair value on a recurring basis:

| | | Fair Value Measurements Using: | | |
| | Total as of June 30, 2008 | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
|---|---|---|---|---|
| | | (in millions) | | |
| Available-for-sale securities | $ 2 | $ 2 | $ — | $ — |
| Commodity derivatives | 80 | — | 80 | — |
| Foreign currency derivatives | 50 | — | 50 | — |
| Total | $ 132 | $ 2 | $ 130 | $ — |

As of June 30, 2008, Delphi had the following liabilities measured at fair value on a recurring basis:

| | | Fair Value Measurements Using: | | |
| | Total as of June 30, 2008 | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
|---|---|---|---|---|
| | | (in millions) | | |
| Commodity derivatives | $ 3 | $ — | $ 3 | $ — |
| Foreign currency derivatives | 10 | — | 10 | — |
| Total | $ 13 | $ — | $ 13 | $ — |

All derivative instruments are required to be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge

accounting criteria. The fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates. Delphi values its derivative contracts using an income approach based on valuation techniques to convert future amounts to a single, discounted amount. Delphi also considers the risk of non-performance in its determination of fair value of derivative instruments.

## 20. OTHER INCOME (EXPENSE), NET

Other income (expense), net included:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2008** | **2007** | **2008** | **2007** |
| | (in millions) | | | |
| Interest income | $    8 | $    16 | $    21 | $    31 |
| Other, net | (4) | 3 | 2 | 8 |
| Other income, net | $    4 | $    19 | $    23 | $    39 |

## 21. SEGMENT REPORTING

Delphi's operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as the Automotive Holdings Group, consisting of business operations to be sold or wound down. An overview of Delphi's five reporting segments, which are grouped on the basis of similar product, market and operating factors follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, displays, mechatronics and power electronics, as well as advanced development of software and silicon.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronic controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.

Delphi also has non-core steering and halfshaft product lines and interiors and closures product lines that are reported in discontinued operations. Previously, the steering and halfshaft product line was a separate operating segment and the interiors and closures product line was part of Delphi's Automotive Holdings Group segment. Refer to Note 4. Discontinued Operations for more information.

The Corporate and Other category includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to the U.S. employee workforce transition programs. Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

The accounting policies of the segments are the same as those described in Note 1. Basis of Presentation, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions. Generally, Delphi evaluates performance based on stand-alone segment operating income and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

As of December 31, 2007, Delphi transferred responsibility for certain product lines that are no longer considered non-core from the Company's Automotive Holdings Group segment to the Powertrain Systems, Thermal Systems and Electronics and

Safety segments to more directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions.  The reporting segment results shown below have been reclassified to conform to current presentation for comparability with no effect on previously reported consolidated results of Delphi.

Included below are sales and operating data for Delphi's segments for the three and six months ended June 30, 2008 and 2007.

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| **For the Three Months Ended:** | | | | | | | |
| June 30, 2008 | | | | | | | |
| Net sales to GM and affiliates ... | $ 296 | $ 298 | $ 365 | $ 287 | $ 156 | $ 81 | $ 1,483 |
| Net sales to other customers ...... | 812 | 923 | 1,216 | 291 | 232 | 277 | 3,751 |
| Inter-segment net sales............... | 37 | 117 | 38 | 20 | 34 | (246) | — |
| Total net sales.................... | $ 1,145 | $ 1,338 | $ 1,619 | $ 598 | $ 422 | $ 112 | $ 5,234 |
| Depreciation and amortization... | $ 64 | $ 63 | $ 46 | $ 19 | $ 5 | $ 13 | $ 210 |
| Long-lived asset impairment charges ..................................... | $ 4 | $ — | $ 1 | $ — | $ — | $ — | $ 5 |
| Goodwill impairment charges..... | $ — | $ — | $ 168 | $ — | $ — | $ — | $ 168 |
| Operating (loss) income............. | $ (75) | $ 7 | $ (183) | $ (11) | $ (27) | $ (76) | $ (365) |
| Equity income .......................... | $ — | $ 2 | $ 6 | $ 3 | $ (1) | $ 1 | $ 11 |
| Minority interest ...................... | $ — | $ (6) | $ (5) | $ (1) | $ — | $ — | $ (12) |
| June 30, 2007 | | | | | | | |
| Net sales to GM and affiliates ... | $ 435 | $ 441 | $ 461 | $ 362 | $ 434 | $ 114 | $ 2,247 |
| Net sales to other customers ...... | 857 | 1,021 | 1,032 | 245 | 325 | 273 | 3,753 |
| Inter-segment net sales............... | 60 | 132 | 53 | 30 | 58 | (333) | — |
| Total net sales.................... | $ 1,352 | $ 1,594 | $ 1,546 | $ 637 | $ 817 | $ 54 | $ 6,000 |
| Depreciation and amortization... | $ 67 | $ 65 | $ 42 | $ 17 | $ 17 | $ 22 | $ 230 |
| Long-lived asset impairment charges ..................................... | $ — | $ 8 | $ — | $ — | $ 26 | $ — | $ 34 |
| Operating income (loss)............. | $ 9 | $ (16) | $ 44 | $ 16 | $ (177) | $ (520) | $ (644) |
| Equity income .......................... | $ — | $ 4 | $ 3 | $ 2 | $ — | $ 1 | $ 10 |
| Minority interest ...................... | $ (1) | $ (7) | $ (6) | $ (3) | $ — | $ 5 | $ (12) |

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| | | | | (in millions) | | | |
| **For the Six Months Ended:** | | | | | | | |
| June 30, 2008 | | | | | | | |
| Net sales to GM and affiliates ... | $ 645 | $ 606 | $ 768 | $ 583 | $ 351 | $ 171 | $ 3,124 |
| Net sales to other customers ...... | 1,630 | 1,789 | 2,353 | 542 | 512 | 536 | 7,362 |
| Inter-segment net sales............... | 85 | 226 | 82 | 47 | 76 | (516) | — |
| Total net sales.................... | $ 2,360 | $ 2,621 | $ 3,203 | $ 1,172 | $ 939 | $ 191 | $ 10,486 |
| Depreciation and amortization... | $ 127 | $ 131 | $ 91 | $ 34 | $ 17 | $ 29 | $ 429 |
| Long-lived asset impairment charges ..................................... | $ 5 | $ — | $ 1 | $ — | $ 2 | $ — | $ 8 |
| Goodwill impairment charges..... | $ — | $ — | $ 168 | $ — | $ — | $ — | $ 168 |
| Operating (loss) income............. | $ (155) | $ (6) | $ (189) | $ 15 | $ (97) | $ (200) | $ (632) |
| Equity income .......................... | $ — | $ 6 | $ 9 | $ 5 | $ (2) | $ 4 | $ 22 |
| Minority interest ...................... | $ — | $ (12) | $ (9) | $ (2) | $ — | $ — | $ (23) |
| June 30, 2007 | | | | | | | |
| Net sales to GM and affiliates ... | $ 842 | $ 855 | $ 903 | $ 731 | $ 857 | $ 222 | $ 4,410 |
| Net sales to other customers ...... | 1,682 | 1,926 | 2,001 | 472 | 670 | 521 | 7,272 |
| Inter-segment net sales............... | 127 | 259 | 98 | 66 | 109 | (659) | — |
| Total net sales.................... | $ 2,651 | $ 3,040 | $ 3,002 | $ 1,269 | $ 1,636 | $ 84 | $ 11,682 |
| Depreciation and amortization... | $ 136 | $ 136 | $ 86 | $ 30 | $ 27 | $ 42 | $ 457 |
| Long-lived asset impairment charges ..................................... | $ 1 | $ 9 | $ 1 | $ — | $ 29 | $ — | $ 40 |
| Operating income (loss)............. | $ 56 | $ (50) | $ 39 | $ 17 | $ (240) | $ (681) | $ (859) |
| Equity income .......................... | $ — | $ 8 | $ 7 | $ 3 | $ 2 | $ 4 | $ 24 |
| Minority interest ...................... | $ (1) | $ (16) | $ (13) | $ (1) | $ — | $ 7 | $ (24) |

**22. COMMITMENTS AND CONTINGENCIES**

**Shareholder Lawsuits**

As previously disclosed, the Company, along with certain of its subsidiaries, current and former directors of the Company, and certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005.  These lawsuits (the "Multidistrict Litigation") were coordinated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and assigned to Hon. Gerald E. Rosen in the United States District Court for the Eastern District of Michigan (the "District Court").  Set forth below is a description of the Multidistrict Litigation and a summary of a settlement concerning the Multidistrict Litigation.

The Multidistrict Litigation is comprised of lawsuits in three categories.  One group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under ERISA.  On October 21, 2005, the District Court appointed interim lead plaintiffs for the putative class.  On March 3, 2006, these plaintiffs filed a consolidated class action complaint (the "ERISA Action") with a class period of May 28, 1999 to November 1, 2005.  Plaintiffs in the ERISA Action allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA.  The Company, which was initially named as a defendant in these lawsuits, was not named as a defendant in the ERISA Action due to its chapter 11 filing, but the plaintiffs stated that they intended to proceed with claims against the Company in the ongoing bankruptcy cases, and would seek to name the Company as a defendant in the ERISA Action if the bankruptcy stay were modified or lifted to permit such action.  On May 31, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to plaintiffs' counsel and other parties in the case.

A second group of class action lawsuits alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws.  On September 30, 2005, the court-appointed Lead Plaintiffs filed a consolidated class action complaint (the "Securities Action") on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly-traded securities of the Company, including securities issued by Delphi Trust I and Delphi Trust II, during a class period of March 7, 2000 through March 3, 2005.  The Securities Action names several additional defendants, including Delphi Trust I and Delphi Trust II, certain former directors, and underwriters and other third parties, and includes securities claims regarding additional offerings of Delphi securities.  The Securities Action, which had been consolidated in the United States District Court for Southern District of New York, was subsequently transferred to the District Court as part of the Multidistrict Litigation (as was a related securities action filed in the United States District Court for the Southern District of Florida concerning Delphi Trust I, which was subsequently consolidated into the Securities Action).  The Securities Action was stayed against the Company pursuant to the Bankruptcy Code, but continued against the other defendants.  On February 15, 2007, the District Court partially granted the Lead Plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act of 1995, thereby allowing the Lead Plaintiffs to obtain certain discovery from the defendants.  On April 16, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to the Lead Plaintiffs and other parties in the case.

The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions").  A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court.  These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results.  The federal cases were coordinated with the securities and ERISA class actions in the Multidistrict Litigation.  Following the filing on October 8, 2005 of the Debtors' petitions for reorganization relief under chapter 11 of the Bankruptcy Code, all the Shareholder Derivative Actions were administratively closed.

Following mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi named as defendants, and certain other defendants involved in the Multidistrict Litigation reached agreements with the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action to settle the claims asserted against them in those actions (the "MDL Settlements").

On September 5, 2007 the District Court entered an order preliminarily certifying a class in the Securities Action and the ERISA Action, preliminarily approving the MDL Settlements, and scheduling a fairness hearing on November 13, 2007.  On November 13, 2007, the District Court conducted the fairness hearing and took the matter under advisement.  Separately, on

October 29, 2007, the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's plan of reorganization and the Court's consideration of certain objections that may be filed as to the MDL Settlements.  On October 29, 2007, the Court lifted the automatic stay as to the discovery provided to the Lead Plaintiffs.  On December 4, 2007, the District Court held another hearing to consider proposed modifications to the proposed settlement of the Securities Action (as modified, the "Securities Settlement"), and tentatively approved the Securities Settlement, after determining that the modifications were at least neutral to the class and may potentially provide a net benefit to the class.

The District Court approved the MDL Settlements (including the Securities Settlement) in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered an Order and Final Judgment dated January 23, 2008 in both the Securities Action and ERISA Action.  One security holder appealed certain aspects of the District Court's opinion and order, as amended, approving the MDL Settlements.  That appeal is pending before the United States Court of Appeals for the Sixth Circuit.

On January 25, 2008, the Court approved the MDL Settlements.  As provided in the confirmation order, the MDL Settlements are contingent upon the effective date of the Plan occurring, and if, for any reason, Delphi cannot emerge as contemplated, the MDL Settlements will become null and void.  A copy of an addendum setting forth the modification is attached as Exhibit 99(f) to the Company's Current Report on Form 8-K filed with the SEC on January 30, 2008.

Under the terms of the MDL Settlements, the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action will receive claims that will be satisfied through Delphi's Plan as confirmed by the Court pursuant to the confirmation order.  Under the Securities Settlement, the Lead Plaintiffs will be granted an allowed claim in the face amount of $179 million, which will be satisfied by Delphi providing $179 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Plan.  Additionally, the class in the Securities Action will receive $15 million to be provided by a third party.  Delphi has also agreed to provide the Lead Plaintiffs, on behalf of the class members, the ability to exercise their rights in the discount rights offering in connection with the Plan through a notice mechanism and a pledge of cash collateral.  If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the amount received by the class in the Securities Action.  Delphi will object to any claims filed by opt-out plaintiffs in the Court, and will seek to have such claims expunged.

The settlement of the ERISA Action is structured similarly to the settlement reached with the Lead Plaintiffs.  The claim of the named plaintiffs in the ERISA Action will be allowed in the amount of approximately $25 million and will be satisfied with consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under the Plan.  Unlike the settlement of the Securities Action, no member of the class in the ERISA Action can "opt-out" of the settlement.

In addition to the amounts to be provided by Delphi from the above described claims in its chapter 11 cases, the class in the Securities Action will also receive a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer and director named defendants in defense of any future civil actions arising from the allegations raised in the securities cases.  The class in the ERISA Action will also receive a distribution of insurance proceeds in the amount of approximately $22 million.  Settlement amounts from insurers and underwriters were paid and placed in escrow by September 25, 2007, pending the effective date of the MDL Settlements.

The MDL Settlements also provide for the dismissal with prejudice of the ERISA Action and Securities Action and a release of certain claims against certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants.  If the MDL Settlements are terminated according to their terms, the parties will proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or their fiduciary duties.  The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand.  As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the

right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

As a result of the MDL Settlements, as of June 30, 2008 and December 31, 2007, Delphi has a liability of $351 million recorded for this matter. Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million. As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage. In conjunction with the MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

As of June 30, 2007, Delphi's best estimate of the liability for these matters was $340 million. Delphi had earlier recorded an initial reserve in the amount of its $10 million insurance deductible, and net of related payments, had an $8 million liability recorded as of March 31, 2007 as at such date no other amount was deemed probable and estimable. Accordingly, Delphi recognized Securities and ERISA litigation charges of $332 million in the second quarter of 2007.

**Ordinary Business Litigation**

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases.

With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements. However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates. Additionally, in connection with the Separation, Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility. Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof.

During the six months ended June 30, 2008, Delphi recovered $28 million from an affiliated supplier and recorded it as a reduction of warranty expense. Delphi began experiencing quality issues regarding parts purchased by Delphi's Thermal Systems segment during the third quarter of 2006 and established warranty reserves of approximately $60 million to cover the cost of various repairs that may be implemented. The reserve has subsequently been adjusted for payments, settlements and the impact of foreign currency exchange rate fluctuations. As of June 30, 2008 and December 31, 2007, the related reserve was $43 million and $41 million, respectively.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases. Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from chapter 11. Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM. In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in our Amended and Restated DIP Credit Facility, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, and as a result Delphi expects to record the extinguishment of this liability as a reduction of warranty expense in cost of sales, which will have a corresponding favorable impact on operating income, of $112 million in July 2008. As of June 30, 2007, Delphi expected to settle obligations with GM for approximately $199 million and recorded $91 million of additional warranty expense in costs of sales in the second quarter of 2007, primarily related to the Automotive Holdings Group and Powertrain Systems segments.

**Environmental Matters**

Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating air emissions, water discharge and waste management. Delphi has an

environmental management structure designed to facilitate and support its compliance with these requirements globally. Although it is Delphi's intent to comply with all such requirements and regulations, it cannot provide assurance that it is at all times in compliance. Delphi has made and will continue to make capital and other expenditures to comply with environmental requirements. Environmental requirements are complex, change frequently and have tended to become more stringent over time. Accordingly, Delphi cannot assure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not be material.

Delphi establishes reserves for environmental cleanup liabilities when a loss is probable and can be reasonably estimated. Such liabilities generally are not subject to insurance coverage. The cost of each environmental cleanup is estimated by engineering, financial, and legal specialists within Delphi based on current law and considers the estimated cost of investigation and remediation required and the likelihood that, where applicable, other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable. The process of estimating environmental cleanup liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remediation and technology will be required, and the outcome of discussions with regulatory agencies and other PRPs at multi-party sites. In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remediation methodology to be used could significantly change Delphi's estimates.

As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a PRP in proceedings at various sites, including the Tremont City Landfill Site (the "Site") located in Tremont, Ohio, which is alleged to involve ground water contamination. In September 2002, Delphi and other PRPs entered into a Consent Order with the U.S. Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the Site. The Remedial Investigation and Alternatives Array Document were finalized in 2007. A Feasibility Study and Record of Decision are expected to be completed in late 2008 or 2009. Although Delphi believes that capping and future monitoring is a reasonably possible outcome, a different cleanup approach ultimately may be required for the Site. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves. As of June 30, 2008, Delphi has recorded its best estimate of its share of the remediation based on the remedy described above. However, if that remedy is not accepted, Delphi's expenditures for remediation could increase by $20 million in excess of its existing reserves. Delphi will continue to reassess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

Delphi received a Notice of Intent to File Civil Administrative Complaint ("Notice") from the EPA on May 30, 2008 regarding a June 2007 chlorine gas cylinder leak that occurred at the Saginaw, Michigan Delphi Steering facility. The Notice alleges that Delphi failed to properly notify agency officials about the leak or the presence of chlorine gas at the site, and describes EPA's intent to seek approximately $130 thousand in civil penalties relating to the incident. Delphi has sent a preliminary response to the Notice, and has commenced discussions with EPA concerning the matter. No formal complaint has been filed by EPA to date.

Delphi is in various stages of investigation and cleanup at its manufacturing facilities where contamination has been discovered. As previously disclosed, Delphi completed a number of environmental investigations during 2006 in conjunction with its transformation plan, which contemplates significant restructuring activity, including the sale, closure or demolition of numerous facilities. These assessments identified previously unknown conditions and resulted in Delphi recording an adjustment to its environmental reserves. As Delphi continues the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified. Delphi cannot assure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not exceed the amount of its current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

As of June 30, 2008 and December 31, 2007, Delphi's reserve for environmental investigation and remediation was approximately $105 million and $112 million, respectively. Approximately $18 million of the environmental reserve balance as of June 30, 2008 is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $87 million and $112 million of the environmental reserve balance as of June 30, 2008 and December 31, 2007, respectively, is included in other long-term liabilities.

**Other**

As mentioned above, Delphi continues to pursue its transformation plan and continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity. These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future.

**23. SUBSEQUENT EVENTS**

Certain events have occurred subsequent to June 30, 2008 that do not impact the reported balances or results of operations as of that date, but are material to the Company's ongoing operations.  These events are listed below.

On July 31, 2008, GM agreed to forgive certain of the cash amounts due under the Warranty Settlement Agreement entered into on September 27, 2007, including any applicable interest, and as a result Delphi expects to record the extinguishment of this liability as a reduction of warranty expense in cost of sales, which will have a corresponding favorable impact on operating income, of $112 million in July 2008.  Refer to Note 13. Warranty Obligations and Note 22. Commitments and Contingencies for more information.

In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding short-term liquidity support until confirmation of the Plan or an alternative plan of reorganization, on August 7, 2008 GM agreed to amend the GM Advance Agreement to provide for an additional $300 million availability above the existing $650 million, as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement.  The amendment provides that the outside maturity date with respect to the original $650 million may be extended in connection with an extension of Delphi's existing Amended and Restated DIP Credit Facility, if GM and Delphi agree, to the earlier of June 30, 2009, and the termination of Delphi's Amended and Restated DIP Credit Facility, and that the maturity date with respect to the additional $300 million is the earlier of December 31, 2008 (subject to potential extension through June 30, 2009, on the same terms as apply to the original $650 million), such date as Delphi files any motion seeking to amend the Plan in a manner that is not reasonably acceptable to GM, the termination of Delphi's Amended and Restated DIP Credit Facility and such date as a plan of reorganization becomes effective.  The additional $300 million of advances is also conditioned upon Delphi filing modifications to its Plan which are reasonably acceptable to GM by October 31, 2008 (or such later date as GM may agree in its sole discretion), and certain other conditions.  Interest on advances above the original facility amount of $650 million will be cancelled if certain conditions are met.  The advances will remain administrative claims in Delphi's chapter 11 cases.  The proposed amendment to expand the facility under the GM Advance Agreement is subject to Court approval.  On August 6, 2008, Delphi filed a motion requesting approval and expects such motion to be considered later this month.  The executed agreement is filed as an exhibit to this quarterly report.

**APPENDIX B-3**

Consolidated Financial Statements And Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-Q For The Quarter That Ended March 31, 2008

**PART I.  FINANCIAL INFORMATION**

**ITEM 1.   FINANCIAL STATEMENTS**

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | **2008** | **2007** |
| | (in millions, except per share amounts) | |
| Net sales: | | |
| General Motors and affiliates...................................... | $ 1,641 | $ 2,163 |
| Other customers ......................................................... | 3,611 | 3,519 |
| Total net sales............................................................ | 5,252 | 5,682 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below ................ | 4,897 | 5,306 |
| U.S. employee workforce transition program charges (credit)........................................................................ | 36 | (6) |
| Depreciation and amortization .................................... | 222 | 233 |
| Selling, general and administrative ............................. | 364 | 364 |
| Total operating expenses ......................................... | 5,519 | 5,897 |
| | | |
| Operating loss.................................................................. | (267) | (215) |
| Interest expense (contractual interest expense for the three months ended March 31, 2008 and 2007 was $129 million and $124 million, respectively).......... | (110) | (90) |
| Loss on extinguishment of debt .................................. | — | (23) |
| Other income, net ....................................................... | 19 | 20 |
| Reorganization items.................................................... | (109) | (39) |
| Loss from continuing operations before income taxes, minority interest and equity income ........................ | (467) | (347) |
| Income tax expense...................................................... | (63) | (46) |
| Loss from continuing operations before minority interest and equity income ................................................. | (530) | (393) |
| Minority interest, net of tax......................................... | (11) | (12) |
| Equity income, net of tax ............................................ | 11 | 14 |
| Loss from continuing operations .................................... | (530) | (391) |
| Loss from discontinued operations, net of tax ............ | (59) | (142) |
| Net loss........................................................................... | $ (589) | $ (533) |
| | | |
| Basic and diluted loss per share: | | |
| Continuing operations.................................................. | $ (0.94) | $ (0.70) |
| Discontinued operations............................................... | (0.10) | (0.25) |
| Basic and diluted loss per share .................................. | $ (1.04) | $ (0.95) |

See notes to consolidated financial statements.

# DELPHI CORPORATION
## (DEBTOR-IN-POSSESSION)
## CONSOLIDATED BALANCE SHEETS

| | March 31, 2008 (Unaudited) | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,310 | $ 1,036 |
| Restricted cash | 175 | 173 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 1,226 | 1,257 |
| Other | 2,991 | 2,637 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 1,341 | 1,312 |
| Finished goods | 503 | 496 |
| Other current assets | 592 | 588 |
| Assets held for sale (Note 4) | 655 | 720 |
| Total current assets | 8,793 | 8,219 |
| Long-term assets: | | |
| Property, net | 3,820 | 3,863 |
| Investments in affiliates | 387 | 387 |
| Goodwill | 406 | 397 |
| Other | 798 | 801 |
| Total long-term assets | 5,411 | 5,448 |
| Total assets | $ 14,204 | $ 13,667 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Short-term debt (Note 11) | $ 4,212 | $ 3,495 |
| Accounts payable | 2,960 | 2,904 |
| Accrued liabilities (Note 8) | 2,401 | 2,281 |
| Liabilities held for sale (Note 4) | 426 | 412 |
| Total current liabilities | 9,999 | 9,092 |
| Long-Term liabilities: | | |
| Other long-term debt (Note 11) | 62 | 59 |
| Employee benefit plan obligations (Note 13) | 475 | 443 |
| Other (Note 8) | 1,201 | 1,185 |
| Total long-term liabilities | 1,738 | 1,687 |
| Liabilities subject to compromise (Note 10) | 16,363 | 16,197 |
| Total liabilities | 28,100 | 26,976 |
| Commitments and contingencies (Note 18) | | |
| Minority interest | 164 | 163 |
| Stockholders' deficit: | | |
| Common stock, $0.01 par value, 1,350 million shares authorized, 565 million shares issued in 2008 and 2007 | 6 | 6 |
| Additional paid-in capital | 2,748 | 2,756 |
| Accumulated deficit | (15,690) | (14,976) |
| Accumulated other comprehensive loss: | | |
| Employee benefit plans (Note 13) | (1,721) | (1,679) |
| Other | 611 | 446 |
| Total accumulated other comprehensive loss | (1,110) | (1,233) |
| Treasury stock, at cost (850 thousand and 1.5 million shares in 2008 and 2007, respectively) | (14) | (25) |
| Total stockholders' deficit | (14,060) | (13,472) |
| Total liabilities and stockholders' deficit | $ 14,204 | $ 13,667 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (in millions) | |
| Cash flows from operating activities: | | |
| Net loss | $ (589) | $ (533) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 222 | 233 |
| Deferred income taxes | (4) | 3 |
| Pension and other postretirement benefit expenses | 185 | 249 |
| Equity income | (11) | (14) |
| Reorganization items | 109 | 39 |
| U.S. employee workforce transition program charges (credit) | 36 | (6) |
| Loss on extinguishment of debt | — | 23 |
| Loss on assets held for sale | 30 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (395) | (574) |
| Inventories, net | (50) | (3) |
| Other assets | 18 | (55) |
| Accounts payable | 176 | 304 |
| Accrued and other long-term liabilities | 108 | 131 |
| Other, net | 37 | (21) |
| U.S. employee workforce transition program payments | (71) | (481) |
| U.S. employee workforce transition program reimbursement by GM | — | 264 |
| Pension contributions | (68) | (92) |
| Other postretirement benefit payments | (66) | (40) |
| Net payments for reorganization items | (16) | (30) |
| Dividends from equity investments | 5 | — |
| Discontinued operations (Note 4) | 54 | 189 |
| Net cash used in operating activities | (290) | (414) |
| | | |
| Cash flows from investing activities: | | |
| Capital expenditures | (255) | (178) |
| Proceeds from sale of property | 21 | 10 |
| Proceeds from sale of non-U.S. trade bank notes | 62 | 36 |
| Proceeds from divestitures, net | 87 | — |
| Increase in restricted cash | (2) | — |
| Other, net | 3 | (10) |
| Discontinued operations | (70) | (14) |
| Net cash used in investing activities | (154) | (156) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from refinanced debtor-in-possession facility, net of issuance cost | — | 2,739 |
| Repayments of borrowings under debtor-in-possession facility | — | (250) |
| Repayments of borrowings under prepetition term loan facility | — | (988) |
| Repayments of borrowings under prepetition revolving credit facility | — | (1,508) |
| Net borrowings under refinanced debtor-in-possession facility | 452 | 327 |
| Net borrowings under other debt agreements | 210 | 62 |
| Dividend payments of consolidated affiliates to minority shareholders | (7) | (7) |
| Discontinued operations | 11 | — |
| Net cash provided by financing activities | 666 | 375 |
| | | |
| Effect of exchange rate fluctuations on cash and cash equivalents | 52 | 12 |
| | | |
| Increase (decrease) in cash and cash equivalents | 274 | (183) |
| Cash and cash equivalents at beginning of period | 1,036 | 1,608 |
| Cash and cash equivalents at end of period | $ 1,310 | $ 1,425 |

See notes to consolidated financial statements.

**DELPHI CORPORATION**
**(DEBTOR-IN-POSSESSION)**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS (Unaudited)**

|  | Three Months Ended March 31, | |
|---|---|---|
|  | __2008__ | __2007__ |
|  | (in millions) | |
| Net loss........................................................................ | $ (589) | $ (533) |
| Other comprehensive income: | | |
|     Currency translation adjustments, net of tax............... | 69 | 26 |
|     Net change in unrecognized gain on derivative | | |
|         instruments, net of tax ......................................... | 96 | 3 |
|     Employee benefit plans adjustment, net of tax ............ | (30) | — |
|         Other comprehensive income.................................. | 135 | 29 |
| Comprehensive loss....................................................... | $ (454) | $ (504) |

See notes to consolidated financial statements.

DELPHI CORPORATION
(DEBTOR-IN-POSSESSION)
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)

## 1. BASIS OF PRESENTATION

*General*—Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company"), is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Delphi's most significant customer is General Motors Corporation ("GM") and North America and Europe are its most significant markets. Delphi is continuing to diversify its customer base and geographic markets. The consolidated financial statements and notes thereto included in this report should be read in conjunction with Delphi's consolidated financial statements and notes thereto included in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007 filed with the United States ("U.S.") Securities and Exchange Commission ("SEC").

*Consolidation*—The consolidated financial statements include the accounts of Delphi and domestic and non-U.S. subsidiaries in which Delphi holds a controlling financial or management interest and variable interest entities of which Delphi has determined that it is the primary beneficiary. Delphi's share of the earnings or losses of non-controlled affiliates, over which Delphi exercises significant influence (generally a 20% to 50% ownership interest), is included in the consolidated operating results using the equity method of accounting. All significant intercompany transactions and balances between consolidated Delphi businesses have been eliminated. All adjustments, consisting of only normal recurring items, which are necessary for a fair presentation, have been included. The results for interim periods are not necessarily indicative of results that may be expected from any other interim period or for the full year and may not necessarily reflect the consolidated results of operations, financial position and cash flows of Delphi in the future.

*Bankruptcy Filing*—On October 8, 2005 (the "Petition Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the filings, will continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However, it does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Revenues, expenses, realized gains and losses, and provisions for losses that can be directly associated with the reorganization and restructuring of the business must be reported separately as reorganization items in the statements of operations. The balance sheet must distinguish prepetition liabilities subject to compromise from both those prepetition liabilities that are not subject to compromise and from postpetition liabilities. Liabilities that may be affected by a plan of reorganization must be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. In addition, reorganization items must be disclosed separately in the statement of cash flows. Delphi has segregated those items as outlined above for all reporting periods subsequent to October 8, 2005.

*Going Concern*—The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability (i) to comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) to reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) to return to profitability; (iv) to generate sufficient cash flow from operations; and (v) to obtain financing sources to meet the Company's future obligations. These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007. The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008; however, Delphi has not yet consummated its confirmed plan of reorganization and is continuing to work with its stakeholders to further amend the plan. Depending on the extent and nature of any further proposed amendments, the plan of reorganization may not be consummated necessitating Delphi and certain of its U.S. subsidiaries to continue as "debtors-in-possession" in chapter 11 longer than initially anticipated. Consummation of a confirmed

plan of reorganization often materially changes the amounts reported in a company's consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of consummation of a confirmed plan of reorganization.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*— Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. Delphi did not record contractual interest expense on certain unsecured prepetition debt during the quarter ended March 31, 2007. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007. The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008. Delphi recorded interest related to prepetition debt and allowed unsecured claims of $14 million during the quarter ended March 31, 2008. This interest expense was calculated through January 25, 2008, the confirmation date of the plan of reorganization. This estimate is based on numerous factual and legal assumptions. At March 31, 2008, Delphi had accrued interest of $425 million in accrued liabilities in the accompanying balance sheet for prepetition claims. Upon consummation of the confirmed plan of reorganization discussed in Note 2. Transformation Plan and Chapter 11 Bankruptcy, the interest accrued for prepetition claims will be discharged at the emergence date; however, as noted above, Delphi has not yet consummated its confirmed plan and is continuing to work with its stakeholders to further amend the plan accordingly, and there can be no assurances that these estimates will not change as a result of changes to the plan.

*Use of Estimates*—Preparation of consolidated financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires Delphi to make estimates and assumptions that affect amounts reported therein. During the first quarter of 2008, there were no material changes in the methods or policies used to establish accounting estimates. Generally, matters subject to Delphi's estimation and judgment include amounts related to accounts receivable realization, inventory obsolescence, asset impairments, useful lives of intangible and fixed assets, deferred tax asset valuation allowances, income taxes, pension and other postretirement benefit plan assumptions, accruals related to litigation, warranty costs, environmental remediation costs, workers' compensation accruals and healthcare accruals. Due to the inherent uncertainty involved in making estimates, actual results reported in future periods may be based upon amounts that differ from those estimates.

*Valuation of Long-Lived Assets*— Delphi periodically evaluates the carrying value of long-lived assets held for use including intangible assets when events or circumstances warrant such a review. The carrying value of a long-lived asset held for use is considered impaired when the anticipated separately identifiable undiscounted cash flows from the asset are less than the carrying value of the asset. In that event, a loss is recognized based on the amount by which the carrying value exceeds the fair value of the long-lived asset. Fair value is determined primarily using the anticipated cash flows discounted at a rate commensurate with the risk involved or Delphi's review of appraisals. Impairment losses on long-lived assets held for sale are determined in a similar manner, except that fair values are reduced for the cost to dispose of the assets. During the first quarter of 2008 and 2007, Delphi recorded asset impairment charges of $3 million and $160 million, respectively, of which $3 million and $6 million, respectively, were recorded in depreciation and amortization and included in loss from continuing operations and $154 million was recorded in loss from discontinued operations for the first quarter of 2007. Refer to Note 4. Discontinued Operations for more information.

*Discontinued Operations*—In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, ("SFAS 144"), a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component. The results of discontinued operations are aggregated and presented separately in the consolidated statements of operations and consolidated statements of cash flows. Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the consolidated balance sheet. SFAS 144 requires the reclassification of amounts presented for prior years to effect their classification as discontinued operations.

    Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities to be disposed of and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business"). The sale of the U.S. operations and certain of the non-U.S. operations of the Steering Business will be sales of assets and will include (i) all assets, except for cash, deferred tax assets, and intercompany accounts, and (ii) all liabilities, except for debt, deferred tax liabilities, intercompany accounts, U.S. pension and other postretirement benefit liabilities, accrued payroll, and certain employee benefit accounts. The sale of certain non-U.S. operations of the Steering Business will be stock sales and will include all assets and liabilities for the sites with purchase price adjustments for cash, debt, and certain other accounts. The sale of the Interiors and

Closures Business closed on February 29, 2008. The majority of the Interiors and Closures Business sale were asset sales and the buyer assumed inventory, fixed assets, non-U.S. pension liabilities and an investment in a joint venture in Korea.

While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to the loss from discontinued operations in the statements of operations. Delphi expects to retain certain employee pension and other postretirement benefit liabilities for the Steering Business and these liabilities were not allocated to liabilities held for sale in the balance sheets. Expenses related to the service cost of employee pension and other postretirement benefit plans, however, were allocated to discontinued operations in the statements of operations, because Delphi will not continue to incur such related expense subsequent to the divestiture of these businesses. Allocations have been made based upon a reasonable allocation method.

***Recently Issued Accounting Pronouncements***—In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *Fair Value Measurements*. SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value. SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS 157 is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. The Company utilized the fair value measures of SFAS 157 in accounting for its marketable securities and derivative net assets. The adoption of the new definition of fair value pursuant to SFAS 157 did not have a significant impact on Delphi's financial statements. Refer to Note 15. Fair Value Measurements for the disclosures required by SFAS 157.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R)*. SFAS 158 requires, among other things, an employer to measure the funded status of its defined benefit pension and other postretirement benefits plans as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Historically, Delphi has measured the funded status of its U.S. retiree health care benefit plans and certain international pension plans as of September 30 of each year. Delphi adopted the measurement date provisions of SFAS 158 as of January 1, 2008, which resulted in adjustments that increased pension and other postretirement benefit liabilities by $139 million, the accumulated deficit by $129 million and increased accumulated other comprehensive loss by $10 million.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159 ("SFAS 159"), *The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115*. SFAS 159 permits entities to choose, at specified election dates, to measure many financial instruments and certain other items at fair value that are not currently measured at fair value. Unrealized gains and losses on items for which the fair value option has been elected would be reported in earnings at each subsequent reporting date. SFAS 159 also establishes presentation and disclosure requirements in order to facilitate comparisons between entities choosing different measurement attributes for similar types of assets and liabilities. SFAS 159 does not affect existing accounting requirements for certain assets and liabilities to be carried at fair value. SFAS 159 is effective as of the beginning of a reporting entity's first fiscal year that begins after November 15, 2007. Delphi adopted SFAS 159 as of January 1, 2008 and did not elect the fair value option for any financial instruments upon adoption of SFAS 159.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 141 (Revised 2007) ("SFAS 141R"), *Business Combinations*. SFAS 141R requires an acquiring entity to recognize all the assets acquired and liabilities assumed in a transaction at the acquisition-date fair value with limited exceptions. SFAS 141R applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. Earlier adoption is prohibited. Accordingly, Delphi is required to record and disclose business combinations following existing U.S. GAAP until January 1, 2009. Delphi is currently evaluating the requirements of SFAS 141R, and has not yet determined the impact on its financial statements.

In December 2007, the FASB issued Statement of Financial Accounting Standards No. 160 ("SFAS 160"), *Noncontrolling Interests in Consolidated Financial Statements – An Amendment of ARB No. 51*. SFAS 160 establishes new accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. SFAS 160 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. Earlier adoption is prohibited. Delphi is currently evaluating the requirements of SFAS 160, and has not yet determined the impact on its financial statements.

In March 2008, the FASB issued Statement of Financial Accounting Standards No. 161 ("SFAS 161"), *Disclosures about Derivative Instruments and Hedging Activities - an Amendment of FASB Statement 133*. SFAS 161 enhances required disclosures regarding derivatives and hedging activities, including enhanced disclosures regarding how: (a) an entity uses derivative instruments; (b) derivative instruments and related hedged items are accounted for under FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities;* and (c) derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows. SFAS 161 is effective for fiscal years, and interim periods within those fiscal years, beginning on or after November 15, 2008. Earlier adoption is encouraged. Delphi is currently evaluating the requirements of SFAS 161, and has not yet determined the impact on its financial statements.

In April 2008, the FASB issued FASB Staff Position SOP 90-7-1 ("FSP SOP 90-7-1"), *An Amendment of AICPA Statement of Position 90-7*. FSP SOP 90-7-1 resolves the conflict between the guidance requiring early adoption of new accounting standards for entities required to follow fresh-start reporting under American Institute of Certified Public Accountants Statement of Position 90-7, *Financial Reporting by Entities in Reorganization under the Bankruptcy Code*, and other authoritative accounting standards that expressly prohibit early adoption. Specifically, FSP SOP 90-7-1 will require an entity emerging from bankruptcy that applies fresh-start reporting to follow only the accounting standards in effect at the date fresh-start reporting is adopted, which include those standards eligible for early adoption if an election is made to adopt early.

## 2. TRANSFORMATION PLAN AND CHAPTER 11 BANKRUPTCY

On September 6, 2007, Delphi filed a proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") with the Court. The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, as detailed below, including agreements reached with each of Delphi's principal U.S. labor unions and GM. Through November 2007, the Court granted additional requests by Delphi to further continue the hearing on the adequacy of the Disclosure Statement to allow Delphi to negotiate potential amendments to the Plan and the related agreements with its stakeholders, including the comprehensive agreements reached with GM and the Equity Purchase and Commitment Agreement ("July EPCA") between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus") and Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively the "Investors"). On December 3, 2007, Delphi filed further potential amendments to the Plan, the comprehensive agreements reached with GM, the July EPCA, and the related Disclosure Statement and on December 4, 2007 Delphi announced that it had reached agreement in principle on these amendments with the Creditors' Committee, the Equity Committee, GM, and the Investors. After a hearing on the adequacy of the proposed Disclosure Statement in December of 2007, Delphi filed its first amended joint Plan of Reorganization (the "Amended Plan") and its first amended Disclosure Statement with respect to the Amended Plan (the "Amended Disclosure Statement"). The Court entered an order approving the adequacy of the Amended Disclosure Statement on December 10, 2007. On December 10, 2007, Delphi and the Investors entered into an amendment to the July EPCA (the "EPCA Amendment" and together with the July EPCA and all schedules and exhibits thereto, the "EPCA"). After entry of the order approving the Amended Disclosure Statement, Delphi began solicitation of votes on the Amended Plan. On January 16, 2008, Delphi filed further modifications to the Amended Plan. Additional modifications are set forth in Exhibit A to the Confirmation Order which was entered on January 25, 2008 and that order became final on February 4, 2008.

### Plan of Reorganization and Transformation Plan

Elements of Transformation Plan

On March 31, 2006, Delphi announced its transformation plan centered around five key elements, each of which is also addressed in its Amended Plan and the series of settlement agreements it embodies. The progress on each element is discussed below.

*Labor* - Modify Delphi's labor agreements to create a more competitive arena in which to conduct business.

During the second quarter of 2007, Delphi signed an agreement with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and during the third quarter of 2007, Delphi signed agreements with the remainder of its principal U.S. labor unions, which were ratified by the respective unions and approved by the Court in the third quarter of 2007. Among other things, as approved and confirmed by the Court, this series of settlement agreements or memoranda of understanding among Delphi, its unions, and GM settled the Debtors' motion under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject their U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As applicable, these agreements also, among other things, modify, extend or terminate provisions of the existing collective bargaining agreements among Delphi and its unions and cover issues such as site plans, workforce transition and legacy pension and other postretirement benefits obligations as well as other comprehensive transformational issues. Portions of these agreements have already become effective, and the remaining portions will not become effective until

the effectiveness of the Global Settlement Agreement, as amended (the "GSA"), and the Master Restructuring Agreement, as amended (the "MRA"), with GM and upon substantial consummation of the Amended Plan as confirmed by the Court. The Amended Plan incorporates, approves, and is consistent with the terms of each agreement.

Among other things, these agreements generally provided certain members of the union labor workforce options to either retire, accept a voluntary severance package or accept lump sum payments in return for lower hourly wages. Refer to Note 12. U.S. Employee Workforce Transition Programs for more information.

On September 4, 2007, the Court confirmed that the 1113/1114 Motion was withdrawn without prejudice, subject to the Court's prior settlement approval orders pertaining to each of Delphi's U.S. labor unions, as it relates to all parties and the intervening respondents, by entry of an Order Withdrawing Without Prejudice Debtors' Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Authorizing Modification Of Retiree Welfare Benefits Under 11 U.S.C. § 1114(g).

_GM_ - Conclude negotiations with GM to finalize financial support for certain of Delphi's legacy and labor costs and to ascertain GM's business commitment to Delphi going forward.

Delphi and GM have entered into comprehensive settlement agreements consisting of the GSA and the MRA. The GSA and the MRA comprised part of the Amended Plan and were approved in the order confirming the Amended Plan on January 25, 2008. The GSA and MRA are not effective until and unless Delphi emerges from chapter 11. Accordingly, the accompanying consolidated financial statements do not include any adjustments related to the GSA or the MRA. These agreements will result in a material reduction in Delphi's liabilities related to the workforce transition programs. Delphi will account for the impact of the GSA or the MRA when the conditions of the agreements are satisfied, which will likely occur upon emergence from chapter 11.

- Most obligations set forth in the GSA are to be performed upon the occurrence of the effective date of the Amended Plan or as soon as reasonably possible thereafter. By contrast, resolution of most of the matters addressed in the MRA will require a significantly longer period that will extend for a number of years after confirmation of the Amended Plan.

- GM's obligations under the GSA and MRA are conditioned upon, among other things, Delphi's consummation of the Amended Plan, including payment of amounts to settle GM claims as outlined below.

The GSA is intended to resolve outstanding issues between Delphi and GM that have arisen or may arise before Delphi's emergence from chapter 11, and will be implemented by Delphi and GM in the short term. On November 14, 2007 and again on December 3, 2007, Delphi entered into amendments to both the GSA and the MRA. These agreements, as amended, provide for a comprehensive settlement of all outstanding issues between Delphi and GM, including (other than ordinary course matters): litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999; certain post-separation claims and disputes between Delphi and GM; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under Delphi's Amended Plan; and various other legacy issues.

In addition to establishing claims treatment, including specifying which claims survive and the consideration to be paid by Delphi to GM in satisfaction of certain claims, the GSA addresses, among other things, commitments by Delphi and GM regarding other postretirement benefit and pension obligations, and other GM contributions with respect to labor matters and releases.

- GM will assume approximately $7 billion of certain post-retirement benefits for certain of the Company's active and retired hourly employees, including health care and life insurance;

- Delphi will freeze its Delphi Hourly-Rate Employees Pension Plan as soon as practicable following the effective date of the Amended Plan, as provided in the union settlement agreements, and GM's Hourly Pension Plan will become responsible for certain future costs related to the Delphi Hourly-Rate Employees Pension Plan;

- Delphi will transfer certain assets and liabilities of its Delphi Hourly-Rate Employees Pension Plan to the GM Hourly-Rate Employee Pension Plan, as set forth in the union settlement agreements;

- Shortly after the effectiveness of the Amended Plan, GM will receive an interest bearing note from Delphi in the amount of $1.5 billion which is expected to be paid promptly following effectiveness;

- GM will make significant contributions to Delphi to fund various special attrition programs, consistent with the provisions of the U.S. labor agreements; and

- GM and certain related parties and Delphi and certain related parties will exchange broad, global releases (which will not apply to certain surviving claims as set forth in the GSA).

The MRA is intended to govern certain aspects of Delphi and GM's commercial relationship following Delphi's emergence from chapter 11.  The MRA addresses, among other things, the scope of GM's existing and future business awards to Delphi and related pricing agreements and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing labor costs, the disposition of certain Delphi facilities, and the treatment of existing agreements between Delphi and GM. Through the MRA, Delphi and GM have agreed to certain terms and conditions governing, among other things:

- The scope of existing business awards, related pricing agreements, and extensions of certain existing supply agreements, including GM's ability to move production to alternative suppliers, and reorganized Delphi's rights to bid and qualify for new business awards;

- GM will make significant, ongoing contributions to Delphi and reorganized Delphi to reimburse the Company for labor costs in excess of $26 per hour, excluding certain costs, including hourly pension and other postretirement benefit contributions provided under the Supplemental Wage Agreement, at specified UAW manufacturing facilities retained by Delphi;

- GM and Delphi have agreed to certain terms and conditions concerning the sale of certain of Delphi's non-core businesses;

- GM and Delphi have agreed to certain additional terms and conditions if certain of Delphi's businesses and facilities are not sold or wound down by certain future dates (as defined in the MRA); and

- GM and Delphi have agreed to the treatment of certain contracts between Delphi and GM arising from Delphi's separation from GM and other contracts between Delphi and GM.

The GSA and MRA may be terminated by the Company or GM because the effective date of the Amended Plan did not occur by March 31, 2008 and the EPCA was terminated.  As of the date hereof, neither Delphi nor GM has terminated the GSA or the MRA.

*Portfolio* - Streamline Delphi's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with Delphi's new focus.

In March 2006, Delphi identified non-core product lines and manufacturing sites that do not fit into Delphi's future strategic framework, including brake and chassis systems, catalysts, cockpits and instrument panels, door modules and latches, ride dynamics, steering, halfshafts, and wheel bearings.  Effective November 1, 2006, in connection with the Company's continuous evaluation of its product portfolio, it decided that the power products business no longer fit within the Company's future product portfolio and that business line was moved to Delphi's Automotive Holdings Group.  With the exception of the catalyst product line (included in the Powertrain Systems segment), and the steering and halfshaft product lines and interiors and closures product lines (included in discontinued operations), the Company's non-core product lines are included in the Automotive Holdings Group segment, refer to Note 17. Segment Reporting.

Delphi has continued sale and wind-down efforts with respect to non-core product lines and manufacturing sites.  The sale and wind-down process is being conducted in consultation with the Company's customers, unions and other stakeholders to carefully manage the transition of affected product lines and manufacturing sites.  The disposition of any U.S. operation is also being accomplished in accordance with the requirements of the Bankruptcy Code and union labor contracts as applicable.  The Company also has begun consultations with the works councils in accordance with applicable laws regarding any sale or wind-down of affected manufacturing sites in Europe.

During the first quarter of 2008, Delphi obtained Court approval of bidding procedures and sales agreements for the steering and halfshaft product line, the global bearings business and the U.S. suspensions business and closed on the sales of the interiors and closures product line and the North American brake components machining and assembly assets.  Refer to Note 4. Discontinued Operations and Note 5. Divestitures for more information.

Costs recorded in the first quarter of 2008 and 2007 related to the transformation plan for non-core product lines include impairments of long-lived assets and employee termination benefits and other exit costs as further described in Note 4. Discontinued Operations and Note 6. Employee Termination Benefits and Other Exit Costs.

*Cost Structure* - Transform the salaried workforce and reduce general and administrative expenses to ensure that its organizational and cost structure is competitive and aligned with Delphi's product portfolio and manufacturing footprint.

Delphi is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services and information technology outsourcing activities, reduction in its global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of certain salaried benefit programs to bring them in line with more competitive industry levels. Given the investment required to implement these initiatives, Delphi does not expect to fully realize substantial savings until 2009 and beyond.

*Pensions* - Devise a workable solution to the current pension funding situation, whether by extending contributions to the pension trusts or otherwise.

Delphi's discussions with the Internal Revenue Service ("IRS") and the Pension Benefit Guaranty Corporation ("PBGC") regarding the funding of the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan") and the Delphi Retirement Program for Salaried Employees (the "Salaried Plan") upon emergence from chapter 11 culminated in a funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of emergence contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM.

On May 1, 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan with respect to the plan year ended September 30, 2006 (the "2006 Waivers"). On May 31, 2007, the Court authorized Delphi to perform under the terms of those funding waivers. The IRS modified the 2006 Waivers by extending the dates by which Delphi is required to file its Amended Plan and emerge from chapter 11. On September 28, 2007, the IRS issued a second conditional waiver for the Hourly Plan for the plan year ended September 30, 2007 (the "2007 Hourly Plan Waiver"). The waivers were required, at that time, to facilitate the Debtors' option to effectuate the transfer of certain hourly pension obligations to GM in an economically efficient manner, and to remove uncertainty as to whether excise taxes would be assessed as a result of accumulated funding deficiencies relating to prepetition service. Absent the waivers, the transfer to GM could have triggered an obligation on the part of the Debtors to make cash contributions to the Hourly Plan which would result in a projected overfunding of the Hourly Plan. On October 26, 2007, the Court authorized Delphi to perform under the 2007 Hourly Plan Waiver, which would have expired if Delphi did not emerge from chapter 11 by February 29, 2008. The Court authorized two additional funding waivers which authorized Delphi to defer funding contributions due under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code") until May 9, 2008. On April 4, 2008, the IRS and the PBGC modified the 2006 Waivers and the 2007 Hourly Plan Waiver by extending the date by which Delphi must emerge from chapter 11 to May 9, 2008.

Delphi did not seek extension past May 9, 2008 of the 2006 Waivers or the 2007 Hourly Plan Waiver. Delphi believes that ERISA and the Code will still, under most circumstances, post June 15, 2008, permit the Company to be able to effect the planned transfer of hourly pension obligations to GM in an economically efficient manner. However, by permitting the waivers to lapse Delphi is exposed to excise taxes as a result of accumulated funding deficiencies for the plan years ended September 30, 2005 and 2006 of approximately $170 million and $1.2 million, respectively. Accordingly, the IRS may assert against Delphi excise taxes in the approximate amounts of $17 million and $122 million for plan years ended September 30, 2005 and 2006, respectively. Also, should Delphi not meet its minimum funding requirements on or before June 15, 2008, the accumulated funding deficiency would be approximately $2.4 billion for the plan year ended September 30, 2007, which could lead to the IRS further asserting additional excise taxes of approximately $244 million. If the accumulated funding deficiency is not corrected after Delphi receives the assessments, an excise tax of up to 100% may be assessed at the discretion of the IRS. Assuming Delphi is assessed an excise tax for all plan years through 2007, the total range of exposure would approximate between $380 million and $3.8 billion.

Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits attributable to prepetition service while in chapter 11 and that it has made all required payments for postpetition service. Delphi further believes that as a result, it is not liable for any penalty excise taxes that may be assessed by the IRS. Delphi believes that its ultimate emergence from chapter 11 will result in a consensual resolution of its pension funding obligations, and given the significant uncertainty surrounding the outcome of the excise tax assessment and the potential for Delphi to litigate this matter, if necessary, management has concluded that an unfavorable outcome is not currently probable. Accordingly, as of March 31, 2008, no amounts have been recorded for any excise tax assessment.

Pursuant to the pertinent terms of the waivers, as modified, Delphi provided to the PBGC letters of credit, effective June 16, 2007, in favor of the Hourly and Salaried Plans in the amount of $100 million to support funding obligations under the Hourly Plan (increased to $112.5 million pursuant to the waiver extension granted March 28, 2008) and $50 million to support funding obligations under the Salaried Plan. In exchange for extension of the waivers on April 4, 2008, the Company extended the term of the previously issued letters of credit to May 23, 2008, and increased the face amount of the letter of credit in favor of the Hourly Plan by $10 million to $122.5 million effective April 16, 2008. Due to the expiration of the waivers, the PBGC has informed

Delphi that it intends to draw against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans. The cash proceeds from the letters of credit will be recognized as Delphi funding contributions to the plans.

The Company has represented that it currently intends to meet the minimum funding standard under IRC section 412 for the plan years ended September 30, 2006 and 2007 upon emergence from chapter 11. Assuming a consensual funding plan is achieved, the Company currently expects that its pension contributions due upon emergence from chapter 11 will approximate $1 billion under current legislation and plan design, after giving effect to an anticipated transfer of at least a net of $1.5 billion of unfunded benefit liabilities from the Hourly Plan to a pension plan sponsored by GM.

In addition to the funding strategy discussed above and the changes to the Hourly Plan discussed in the Labor section, Delphi committed to freeze the Hourly and Salaried Plans effective at the end of the month following emergence from chapter 11. Refer to Note 13. Pension and Other Postretirement Benefits for more information.

<u>The Amended Plan of Reorganization</u>

On April 4, 2008, Delphi announced that although the Debtors had met the conditions required to substantially consummate the Amended Plan (as modified by the Court's final confirmation order), including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed and refused to fund the EPCA. The Debtors are prepared to pursue any and all available equitable and legal remedies with respect to the Investors that are in the best interests of the Debtors and their stakeholders, and are working with their stakeholders to achieve their goal of emergence from chapter 11 as soon as practicable.

Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization is extended until 30 days after substantial consummation of the Amended Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Amended Plan (as modified) is extended until 90 days after substantial consummation of the Amended Plan (as modified) or any modified plan. Notwithstanding the foregoing, the Debtors' exclusive period for filing a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including August 31, 2008 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, as between the Debtors and the Creditors' Committee and the Equity Committee, collectively, is extended through and including October 31, 2008.

<u>Equity Purchase and Commitment Agreement</u>

Under the terms and subject to the conditions of the EPCA, the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund the EPCA, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

The EPCA also included certain corporate governance provisions for the reorganized Company, each of which was incorporated into Delphi's Amended Plan. The EPCA also incorporated Delphi's earlier commitment to preserve its salaried and hourly defined benefit U.S. pension plans and to fund required contributions to the plans that were not made in full as permitted under the Bankruptcy Code.

The EPCA was subject to the satisfaction or waiver of numerous conditions, including the condition that an affiliate of Appaloosa was reasonably satisfied with the terms of certain material transaction documents (evidenced by an affiliate of Appaloosa not delivering a deficiency notice), to the extent the terms thereof would have an impact on the Investors' proposed investment in the Company and receipt of proceeds from the sale of preferred stock, exit financing and the discount rights offering sufficient to fund the transaction contemplated by the EPCA and certain related transactions. Other conditions to closing included release and exculpation of each Investor as set forth in the EPCA Amendment; that the Company would have undrawn availability of $1.4 billion including a letter of credit carve out and reductions under a borrowing base formula; that the Company's pro forma interest expense during 2008 on the Company's indebtedness, as defined in the EPCA, would not exceed $585 million; that scheduled Pension Benefit Guarantee Corporation liens were withdrawn; and that the aggregate amount of trade and unsecured claims could be no more than $1.45 billion (subject to certain waivers and exclusions).

An affiliate of Appaloosa could terminate the EPCA, including, at any time on or after April 5, 2008, if the Amended Plan had not become effective; if the Company had changed its recommendation or approval of the transactions contemplated by the EPCA, the Amended Plan terms or the settlement with GM in a manner adverse to the Investors or approved or recommended an

alternative transaction; or if the Company had entered into any agreement, or taken any action to seek Court approval relating to any plan, proposal, offer or transaction, that was inconsistent with the EPCA, the settlement with GM or the Amended Plan.  In the event of certain terminations of the EPCA pursuant to the terms thereof, the Company could be obligated to pay the Investors $83 million plus certain transaction expenses as described in the immediately following paragraph.

The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its First Amended Joint Plan of Reorganization, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date.  Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter dated April 4, 2008, stating that such letter "constitutes a notice of immediate termination" of the EPCA.  Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts.  At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, GM, and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA.  The April 5 letter stated that because the EPCA had not become effective on or before April 4, 2008 it was grounds for its termination.

Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter.  Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, including the commencement of legal action in the Court to seek all appropriate relief, including specific performance by the Investors of their obligations under the EPCA.

In exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million.  In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA.  The Company has also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA.  Delphi had deferred the recognition of these amounts in other current assets as they were to be netted against the proceeds from the EPCA upon issuance of the new shares.  However, as a result of the events relating to the termination of the EPCA as described above, Delphi recognized $79 million of expense related to these fees and other expenses during the first quarter of 2008.

The cost related to the transformation plan will be recognized in the Company's consolidated financial statements as elements of the Amended Plan (as modified), as the terms of any future confirmed plan of reorganization, as the U.S. labor agreements, and as the GSA, and the MRA become effective.  In the event the Debtors are unable to consummate the Amended Plan (as modified), the cost will be recognized as the aforementioned agreements become effective as elements of any future confirmed plan of reorganization.  The Amended Plan and agreements will significantly impact Delphi's accounting for its pension plans, post-retirement benefit plans, other employee related benefits, long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others.  Such adjustments will have a material impact on Delphi's financial statements.

There are a number of risks and uncertainties inherent in the chapter 11 process, including those detailed in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007, Part I, Item 1A. Risk Factors and Part II, Item 1A. Risk Factors in this Quarterly Report on Form 10-Q.  In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder Delphi's ongoing business activities and its ability to operate, fund and execute Delphi's business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and associates and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers.

The financial statements of the Debtors are presented as follows:

**Basis of Presentation**

*Condensed Combined Debtors-in-Possession Financial Statements* – The financial statements contained within this note represent the condensed combined financial statements for the Debtors only.  Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements and as such their net income is included as "Equity income (loss) income from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.  The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

*Intercompany Transactions* – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein.  Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements.  Therefore, reorganization items, net included in the Debtors Statement of Operations, liabilities subject to compromise included in the Debtors' Balance Sheet, and reorganization items and payments for reorganization items, net included in the Debtors' Statement of Cash Flows are different than Delphi Corporation's consolidated financial statements.  As approved by the Court on January 25, 2008, the Debtors sold investments in non-Debtor affiliates in the amount of $1.4 billion to a non-Debtor affiliate and received a note receivable from non-Debtor affiliates, of which $0.2 billion is included in current assets and $1.2 billion is included in long-term assets.

*Contractual Interest Expense and Interest Expense on Unsecured Claims*— Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  Delphi did not record contractual interest expense on certain unsecured prepetition debt during the quarter ended March 31, 2007.  In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007.  The plan of reorganization also provides that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008.  Delphi recorded interest related to prepetition debt and allowed unsecured claims of $14 million during the quarter ended March 31, 2008.  This interest expense was calculated through January 25, 2008, the confirmation date of the plan of reorganization.  This estimate is based on numerous factual and legal assumptions.  At March 31, 2008, Delphi had accrued interest of $425 million in accrued liabilities in the accompanying balance sheet for prepetition claims.

*U.S. Employee Workforce Transition Programs*—The workforce transition programs offer buy-down payments for eligible traditional employees who do not elect the attrition or flowback options and continue to work for Delphi.  The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability in 2007.  In the first quarter of 2008, the wage asset and liability were increased by $3 million to reflect the final terms of certain divestitures.  At March 31, 2008, $84 million was recorded in other current assets and $199 million was recorded in other long-term assets in the accompanying balance sheet, net of $21 million of amortization expense recorded in the first quarter of 2008, of which $1 million was recorded in loss from discontinued operations.  In addition, $16 million was recorded in U.S. employee workforce transition program charges to reflect costs under the workforce transition programs in excess of amounts previously estimated.  Refer to Note 12. U.S. Employee Workforce Transition Programs for more information.

*Assets Held for Sale*—The assets held for sale by the Debtors include the net assets held for sale of the Non-debtor affiliates of $335 million which was reclassified from investments in non-Debtor affiliates.

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENTS OF OPERATIONS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

|  | Three Months Ended March 31 | |
|---|---|---|
|  | **2008** | **2007** |
|  | (in millions) | |
| Net sales | $ 2,328 | $ 3,287 |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 2,453 | 3,322 |
| U.S. employee workforce transition program charges (credit) | 36 | (6) |
| Depreciation and amortization | 115 | 137 |
| Selling, general and administrative | 225 | 236 |
| Total operating expenses | 2,829 | 3,689 |
| Operating loss | (501) | (402) |
| Interest expense (contractual interest expense for the three months ended March 31, 2008 and 2007 was $113 million and $112 million, respectively) | (95) | (79) |
| Loss on extinguishment of debt | — | (23) |
| Other income, net | — | 12 |
| Reorganization items, net | (100) | (31) |
| Loss from continuing operations before income tax expense and equity income | (696) | (523) |
| Income tax expense | (3) | (4) |
| Loss from continuing operations before equity income | (699) | (527) |
| Equity income from non-consolidated affiliates, net of tax | 7 | 14 |
| Loss from continuing operations before discontinued operations and equity income from non-Debtor affiliates | (692) | (513) |
| Loss from discontinued operations, net of tax | (82) | (123) |
| Equity income from non-Debtor affiliates, net of tax | 185 | 103 |
| Net loss | $ (589) | $ (533) |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | March 31, 2008 (Unaudited) | December 31, 2007 |
|---|---|---|
| | (in millions) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 47 | $ 113 |
| Restricted cash | 125 | 125 |
| Accounts receivable, net: | | |
| General Motors and affiliates | 900 | 972 |
| Other third parties | 708 | 623 |
| Non-Debtor affiliates | 245 | 250 |
| Notes receivable from non-Debtor affiliates | 449 | 278 |
| Inventories, net: | | |
| Productive material, work-in-process and supplies | 639 | 652 |
| Finished goods | 156 | 171 |
| Other current assets | 342 | 385 |
| Assets held for sale | 422 | 475 |
| Total current assets | 4,033 | 4,044 |
| Long-term assets: | | |
| Property, net | 1,347 | 1,446 |
| Investments in affiliates | 329 | 331 |
| Investments in non-Debtor affiliates | 2,067 | 3,267 |
| Goodwill | 152 | 152 |
| Notes receivable from non-Debtor affiliates | 1,172 | — |
| Other | 487 | 512 |
| Total long-term assets | 5,554 | 5,708 |
| Total assets | $ 9,587 | $ 9,752 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities not subject to compromise: | | |
| Notes payable and secured debt in default | $ 3,231 | $ 2,782 |
| Accounts payable | 898 | 1,007 |
| Accounts payable to non-Debtor affiliates | 654 | 689 |
| Accrued liabilities | 1,275 | 1,328 |
| Liabilities held for sale | 193 | 167 |
| Total current liabilities | 6,251 | 5,973 |
| Debtor-in-possession financing | 23 | 24 |
| Employee benefit plan obligations and other | 932 | 951 |
| Total long-term liabilities | 955 | 975 |
| Liabilities subject to compromise | 16,441 | 16,276 |
| Total liabilities | 23,647 | 23,224 |
| Stockholders' deficit: | | |
| Total stockholders' deficit | (14,060) | (13,472) |
| Total liabilities and stockholders' deficit | $ 9,587 | $ 9,752 |

**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS (Unaudited)**
**(Non-filed entities, principally non-U.S. subsidiaries, excluded from consolidated Debtor group)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (in millions) | |
| Cash flows from operating activities: | | |
| Net cash used in operating activities | $ (555) | $ (513) |
| Cash flows from investing activities: | | |
| Capital expenditures | (105) | (64) |
| Proceeds from sale of property | 11 | 5 |
| Proceeds from divestitures | 85 | — |
| Proceeds from notes receivable from non-Debtor affiliates | 100 | — |
| Other, net | (12) | (4) |
| Discontinued operations | (38) | (3) |
| Net cash provided by (used in) investing activities | 41 | (66) |
| Cash flows from financing activities: | | |
| Proceeds from refinanced debtor-in-possession facility, net of issuance cost | — | 2,739 |
| Repayments of borrowings from debtor-in-possession facility | — | (250) |
| Repayments of borrowings under prepetition term loan facility | — | (988) |
| Repayments of borrowings from prepetition revolving credit facility | — | (1,508) |
| Net borrowings under refinanced debtor-in-possession facility | 452 | 327 |
| Repayments of borrowings under other debt agreements | (4) | (4) |
| Net cash provided by financing activities | 448 | 316 |
| Decrease in cash and cash equivalents | (66) | (263) |
| Cash and cash equivalents at beginning of period | 113 | 376 |
| Cash and cash equivalents at end of period | $ 47 | $ 113 |

## 3. REORGANIZATION ITEMS

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed. Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors and unions. The Debtors' reorganization items consist of the following:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2008 | 2007 |
| | (in millions) | |
| Professional fees directly related to reorganization | $ 29 | $ 43 |
| Interest income | (2) | (4) |
| Write off of previously capitalized fees or expenses related to the EPCA | 79 | — |
| Other | 3 | — |
| Total Reorganization Items | $ 109 | $ 39 |

For the three months ended March 31, 2008 and 2007, reorganization items resulted in $2 million and $4 million, respectively, of cash received entirely related to interest income. Cash paid for professional fees was approximately $18 million and $34 million, respectively, for the three months ended March 31, 2008 and 2007.

## 4. DISCONTINUED OPERATIONS

The Court approval of Delphi's plan to dispose of the Interiors and Closures Business and the Steering Business triggered held for sale accounting under SFAS 144 in 2007.

**Steering and Halfshaft Business**

In the fourth quarter of 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement"). Delphi expects proceeds from the sale and related Transaction Agreement to approximate $250 million. After the conclusion of the sale hearing on February 21, 2008, on February 25, 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business. Also on February 21, 2008, the Court scheduled a hearing on the sale motion as it pertained to certain proposed contracts to be assumed and/or assigned that were covered by unresolved objections. After the hearing on March 19, 2008 the Court entered an order resolving the certain adjourned objections and applying the terms of the sale order to the parties whose objections had been resolved. A further hearing is scheduled for May 29, 2008, when the Court is anticipated to rule on any outstanding objections relating to certain additional contracts proposed to be assumed and/or assigned in connection with the sale. During the first quarter of 2008, Delphi recorded additional losses of $77 million related to the operations and assets held for sale of the Steering Business. Delphi is working to close the sale as soon as practicable. Any party in compliance with its obligations under the Purchase Agreement may terminate the Purchase Agreement if the transaction does not close by August 23, 2008, with certain exceptions. Delphi expects the transaction to be completed before this date.

Prior to the assets of the Steering Business being classified as held for sale, Delphi recorded asset impairment charges related to the valuation of long-lived assets held-for-use for its Steering Business of $152 million during the first quarter of 2007.

**Interiors and Closures Business**

Delphi and certain of its affiliates entered into the Interiors and Closures Agreement with Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group, and certain of its affiliates for the sale of substantially all of the tangible assets primarily used in the Interiors and Closures Business. On January 25, 2008, the Court entered an order approving the assumption and assignment of the executory contracts covered by certain objections, all of which were resolved prior to the January 25, 2008 hearing. On that date, the Court also approved a compromise with Inteva, which facilitates the closing of the sale of the Interiors and Closures Business with Inteva by modifying the payment structure under the Interiors and Closures Agreement in consideration for the waiver of certain of Inteva's conditions to closing. Delphi closed on the sale of the Interiors and Closures Business to Inteva on February 29, 2008. Delphi received proceeds from the sale of approximately $98 million consisting of $63 million of cash (less $23 million of cash at an overseas entity that was included in the sale) and the remainder in notes at fair value. During the first quarter of 2008, as a result of the operations and sale of the Interiors and Closures Business, Delphi recorded a favorable adjustment of $18 million to the overall loss on the sale of the Interiors and Closures Business due to the results of operations and changes in working capital through the sale closing date of February 29, 2008.

The Interiors and Closures Business, through the date of the sale, and the Steering Business are reported as discontinued operations in the consolidated statement of operations and statement of cash flows for the quarters ended March 31, 2008 and 2007. The assets and liabilities of the Steering Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of March 31, 2008 and December 31, 2007. The assets and liabilities of the Interiors and Closures Business are reported in assets and liabilities held for sale in the consolidated balance sheet as of December 31, 2007, but are not included in assets and liabilities held for sale as of March 31, 2008 as a result of the sale to Inteva on February 29, 2008.

The results of the discontinued operations are summarized as follows:

|  | Three Months Ended March 31, | |
|  | 2008 | 2007 |
|  | (in millions) | |
| Sales: | | |
|     Steering Business ........................................................ | $ 569 | $ 681 |
|     Interiors and Closures Business ................................. | 241 | 312 |
|       Total sales ................................................................. | $ 810 | $ 993 |
| | | |
| Loss before income taxes (including minority interest and | | |
|     equity income, net of tax)............................................. | $ (55) | $ (139) |
| Provision for income taxes............................................... | (4) | (3) |
| Loss from discontinued operations ................................. | $ (59) | $ (142) |
|     *Steering Business*......................................................... | *(77)* | *(154)* |
|     *Interiors and Closures Business*................................. | *18* | *12* |

18

Assets and liabilities of the discontinued operations are summarized as follows:

| | March 31, 2008 | December 31, 2007 |
|---|---|---|
| | **(in millions)** | |
| Current assets: | | |
| Cash | $ 45 | $ 49 |
| Accounts receivable | 444 | 411 |
| Inventory | 155 | 188 |
| Other current assets | 10 | 8 |
| Long term assets: | | |
| Property, net | — | 48 |
| Other long-term assets | 1 | 16 |
| Assets held for sale | $ 655 | $ 720 |
| *Steering Business* | *655* | *594* |
| *Interiors and Closures Business* | *—* | *126* |
| | | |
| Current liabilities: | | |
| Accounts payable | $ 265 | $ 271 |
| Accrued liabilities | 63 | 53 |
| Short term debt | 57 | 49 |
| Other long-term liabilities | 22 | 14 |
| Minority interest | 19 | 25 |
| Liabilities held for sale | $ 426 | $ 412 |
| *Steering Business* | *426* | *392* |
| *Interiors and Closures Business* | *—* | *20* |

Cash flows from operating activities for discontinued operations are summarized as follows:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2008 | 2007 |
| | **(in millions)** | |
| Charge related to assets held for sale | $ 7 | $ — |
| Long lived asset impairment charges | — | 154 |
| Pension and other postretirement benefit expenses | 11 | 20 |
| U.S. employee workforce transition program charges | 1 | — |
| Changes in net operating assets | 35 | 15 |
| Total | $ 54 | $ 189 |
| *Steering Business* | *24* | *181* |
| *Interiors and Closures Business* | *30* | *8* |

## 5. DIVESTITURES

The results of operations, including the gain or loss on divestitures described below, were not significant to the consolidated financial statements in any period presented.

### North American Brake Product Asset Sale

On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for Delphi's North American brake components machining and assembly assets ("North American Brake Components") primarily located at its Saginaw, Michigan, Spring Hill, Tennessee, Oshawa, Ontario Canada and Saltillo, Mexico facilities. On November 16, 2007, Delphi received Court approval to proceed with the sale of the assets. The sale occurred in the first quarter of 2008. Delphi received proceeds from this sale of approximately $38 million in the first quarter of 2008.

**Bearings Business Product Sale**

On January 15, 2008, the Debtors filed a motion to sell Delphi's bearings business (the "Bearings Business").  On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code.  On February 21, 2008, the Debtors announced that they had entered into a purchase agreement with Kyklos, Inc., a wholly owned subsidiary of Hephaestus Holdings, Inc. and an affiliate of KPS Special Situations Fund II, L.P. ("Kyklos"), which was the successful bidder at the auction held on February 19, and 20, 2008.  The Court entered the order confirming the sale of the Bearings Business to Kyklos on March 19, 2008.  The 2007 annual revenues for the Bearings Business were $280 million.  During the first quarter of 2008, Delphi recognized a charge of $30 million, included in cost of sales, related to the assets held for sale of the Bearings Business. The sale occurred on April 30, 2008 and Delphi expects proceeds from this sale to approximate $13 million.

**U.S. Suspensions Asset Sale**

On March 7, 2008, the Debtors filed a motion to sell certain assets of Delphi's U.S. suspensions business including the machinery, equipment and inventory primarily used and located at its suspension manufacturing facility in Kettering, Ohio (the "Kettering Assets"), to Tenneco Automotive Operating Company Inc. ("Tenneco") for approximately $19 million and other consideration.  On March 20, 2008, the Court approved the bidding procedures for the Kettering Assets, but no further bids were submitted by the bid deadline.  On April 30, 2008, the Court entered an order approving the sale of the Kettering Assets to Tenneco.  The 2007 annual revenues for the Kettering Assets were $113 million.

**Catalyst Product Line Sale**

On September 28, 2007, Delphi closed on the sale of its original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore.  During the first quarter of 2008, Delphi and Umicore agreed on final working capital adjustments and Delphi received a payment of $9 million, of which $6 million offset a receivable booked during 2007 and $3 million was recorded as a reduction to cost of sales.

## 6. EMPLOYEE TERMINATION BENEFITS AND OTHER EXIT COSTS

Delphi continually evaluates alternatives to align its business with the changing needs of its customers and to lower the operating costs of the Company.  This includes the realignment of its existing manufacturing capacity, facility closures, or similar actions in the normal course of business.  These actions may result in voluntary or involuntary employee termination benefits, which are mainly pursuant to union or other contractual agreements.  Voluntary termination benefits are accrued when an employee accepts the related offer.  Involuntary termination benefits are accrued when Delphi commits to a termination plan and the benefit arrangement is communicated to affected employees, or when liabilities are determined to be probable and estimable, depending on the circumstances of the termination plan.  Contract termination costs are recorded when contracts are terminated or when Delphi ceases to use the facility and no longer derives economic benefit from the contract.  All other exit costs are accrued when incurred.

Delphi's employee termination benefit and other exit costs are undertaken as necessary to execute management's strategy, streamline operations, take advantage of available capacity and resources, and ultimately achieve net cost reductions.  These activities generally fall into one of two categories:

(1)    Realignment of existing manufacturing capacity and closure of facilities and other exit or disposal activities, as it relates to executing the Company's strategy in the normal course of business.

(2)    Transformation plan activities, which support the Company's overall transformation initiatives announced in 2006, including selling or winding down non-core product lines, transforming its salaried workforce to reduce general and administrative expenses, and modifying labor agreements with its principal unions in the U.S.

The following table summarizes the employee termination benefit and other exit cost charges recorded for the three months ended March 31, 2008 and 2007 by operating segment:

| Segment | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2008** | **2007** |
| | (in millions) | |
| Electronics & Safety | $ 28 | $ 2 |
| Powertrain Systems | 4 | 1 |
| Electrical/Electronic Architecture | 13 | 31 |
| Thermal Systems | 3 | 3 |
| Automotive Holdings Group | 43 | 44 |
| Corporate and Other | — | 4 |
| Continuing Operations | 91 | 85 |
| Discontinued Operations | 35 | 34 |
| Total | $ 126 | $ 119 |
| *Cost of sales* | *86* | *82* |
| *Selling, general and administrative expenses* | *5* | *3* |
| *Loss from discontinued operations* | *35* | *34* |

Delphi has initiated several programs to streamline operations and lower costs. The following are details of significant charges during the first quarter of 2008.

- *Realignment of existing manufacturing capacity and closure of facilities.* As part of Delphi's ongoing efforts to lower costs and operate efficiently, Delphi's Electronics & Safety and Automotive Holdings Group segments plan to transfer core products manufactured at a shared location in Portugal to a lower cost market and exit non-core products from that facility and recognized employee termination benefits of $44 million. Additionally, Electronics & Safety, Electrical / Electronic Architecture segment ("E&EA"), Thermal Systems and the Automotive Holdings Group executed initiatives to realign manufacturing operations within North America to lower cost markets, and incurred approximately $23 million of employee termination benefits and other related exit costs.

- *Transformation plan activities.* As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $31 million related to the closure of a manufacturing facility in Athens, Alabama during the first quarter of 2008, which related to the Steering Business and was recorded in loss from discontinued operations. As part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees in North America during the first quarter of 2008 for involuntary separation and incurred $18 million in related employee termination benefits in the Electronics & Safety, Powertrain Systems, E&EA and Automotive Holdings Group segments.

The following are details of significant charges during the first quarter of 2007.

- *Realignment of existing manufacturing capacity and closure of facilities.* As part of Delphi's ongoing efforts to lower costs and operate efficiently, the E&EA segment announced an involuntary employee separation package due to a planned closure of a manufacturing facility in France for approximately $11 million.

- *Transformation plan activities.* As part of an initiative to sell or wind down non-core product lines, Delphi incurred employee termination benefits and other exit costs of $61 million related to the closure of a manufacturing facility in Cadiz, Spain during the first quarter of 2007, of which $31 million related to the Automotive Holdings Group segment and $30 million related to the Steering Business, which is recorded in loss from discontinued operations. As a part of an effort to transform its salaried workforce and reduce general and administrative expenses, Delphi identified certain salaried employees, primarily in North America, during the first quarter of 2007 for involuntary separation, and incurred $23 million in related employee termination benefits in the Powertrain Systems, E&EA, and Automotive Holdings Group segments.

## 7. WEIGHTED AVERAGE SHARES

Basic and diluted loss per share amounts were computed using weighted average shares outstanding for each respective period. As Delphi incurred losses in the three months ended March 31, 2008 and 2007, the effect of potentially dilutive securities has been excluded from the calculation of loss per share as inclusion would have had an anti-dilutive effect.

Actual weighted average shares outstanding used in calculating basic and diluted loss per share were:

|  | Three Months Ended March 31, | |
|  | 2008 | 2007 |
|  | (in thousands) | |
| Weighted average shares outstanding ....... | 563,646 | 561,782 |
| Effect of dilutive securities ...................... | — | — |
| Diluted shares outstanding ...................... | 563,646 | 561,782 |

Securities excluded from the computation of diluted loss per share because inclusion would have had an anti-dilutive effect:

|  | Three Months Ended March 31, | |
|  | 2008 | 2007 |
|  | (in thousands) | |
| Anti-dilutive securities.............................. | 66,696 | 81,206 |

## 8. LIABILITIES

Accrued liabilities consisted of the following:

|  | March 31, 2008 | December 31, 2007 |
|  | (in millions) | |
| Payroll related obligations ............................................................. | $    278 | $    238 |
| Employee benefits, including current pension obligations ........... | 172 | 185 |
| Accrued income taxes..................................................................... | 155 | 92 |
| Taxes other than income ................................................................. | 204 | 157 |
| Warranty obligations (Note 9) ....................................................... | 240 | 244 |
| U.S. employee workforce transition program (Note 12)................ | 192 | 234 |
| Manufacturing plant rationalization.............................................. | 253 | 259 |
| Interest on prepetition claims........................................................ | 425 | 411 |
| Other .............................................................................................. | 482 | 461 |
| Total ...................................................................................... | $ 2,401 | $ 2,281 |

Other long-term liabilities consisted of the following:

|  | March 31, 2008 | December 31, 2007 |
|  | (in millions) | |
| Workers compensation ................................................................... | $    326 | $    328 |
| Environmental ................................................................................ | 88 | 112 |
| U.S. employee workforce transition program (Note 12)................ | 131 | 148 |
| Extended disability benefits........................................................... | 73 | 72 |
| Warranty obligations (Note 9) ....................................................... | 314 | 315 |
| Other .............................................................................................. | 269 | 210 |
| Total ...................................................................................... | $ 1,201 | $ 1,185 |

## 9. WARRANTY OBLIGATIONS

Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations.  These accruals are based on factors such as past experience, production changes, industry developments and various other considerations.  Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

The table below summarizes the activity in the product warranty liability for the three months ended March 31, 2008:

|  | March 31, 2008 |
|---|---|
|  | (in millions) |
| Accrual balance at beginning of year.......................................................................... | $  559 |
| Provision for estimated warranties issued during the period ............................. | 17 |
| Provision for changes in estimate for preexisting warranties ............................ | 13 |
| Settlements made during the period (in cash or in kind) .................................... | (45) |
| Foreign currency translation and other................................................................. | 10 |
| Accrual balance at end of period .............................................................................. | $  554 |

Approximately $240 million and $244 million of the warranty accrual balance as of March 31, 2008 and December 31, 2007, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $314 million and $315 million of the warranty accrual balance as of March 31, 2008 and December 31, 2007, respectively, is included in other long-term liabilities.

## 10. LIABILITIES SUBJECT TO COMPROMISE

As a result of the Chapter 11 Filings, the payment of prepetition indebtedness is subject to compromise or other treatment under the Debtors' plan of reorganization. Generally, actions to enforce or otherwise effect payment of prepetition liabilities are stayed. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy. Although prepetition claims are generally stayed, at hearings held in October and November 2005, the Court granted final approval of the Debtors' "first day" motions generally designed to stabilize the Debtors' operations and covering, among other things, human capital obligations, supplier relations, customer relations, business operations, tax matters, cash management, utilities, case management, and retention of professionals. The following data regarding the number and amount of claims and proof of claims is unaudited.

The Debtors have been paying and intend to continue to pay undisputed postpetition obligations in the ordinary course of business. In addition, pursuant to the Amended Plan, the Debtors assumed most of their executory contracts and unexpired leases with respect to the Debtors' operations, and rejected certain of them, with the approval of the Court. Damages resulting from rejection of executory contracts and unexpired leases are treated as general unsecured claims and will be classified as liabilities subject to compromise. The Court entered an order establishing July 31, 2006 as the bar date by which claims against the Debtors arising prior to the Debtors' Chapter 11 Filings were required to be filed if the claimants were to receive any distribution in the chapter 11 cases. As of April 30, 2008, the Debtors' have received approximately 16,813 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts. As is typical in reorganization cases, differences between claim amounts listed by the Debtors in their Schedules of Assets and Liabilities (as amended) and claims filed by creditors will be investigated and resolved in connection with the claims reconciliation process or, if necessary, the Court will make the final determination as to the amount, nature, and validity of claims. Many of these claims have been found to be duplicative, based on contingencies that have not occurred, or are otherwise overstated, and therefore have been determined to be invalid. As a result, the aggregate amount of claims filed with the Court exceeds the amount that has been to date allowed by the Court. As of April 30, 2008, the Debtors have filed twenty-nine omnibus claims objections that objected to claims on procedural or substantive grounds. Pursuant to these claims objections, the Debtors have objected to approximately 13,400 proofs of claim which asserted approximately $10.1 billion in aggregate liquidated amounts plus additional unliquidated amounts. As of April 30, 2008, the Court has entered orders disallowing and/or claimants have withdrawn approximately 9,700 of those claims, which orders reduced the amount of asserted claims by approximately $9.7 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order modifying approximately 3,500 claims reducing the aggregate amounts asserted on those claims from $803 million to $561 million, which amounts are subject to further objection by the Debtors at a later date on any basis. The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled. The determination of how these liabilities are to be settled and treated is set forth in the Amended Plan. In light of the number of creditors of the Debtors, the claims resolution process may take considerable time to complete. Accordingly, the ultimate number and amount of allowed claims is not determinable at this time. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court. As of January 25, 2008, the total general unsecured claims, other than funded debt claims, against the Company had been reduced to an amount less than the $1.45 billion cap

specified in the Amended Plan. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events.

Liabilities subject to compromise consist of the following:

| | March 31, 2008 | | December 31, 2007 | |
|---|---|---|---|---|
| | (in millions) | | | |
| Pension obligations | $ | 3,319 | $ | 3,329 |
| Postretirement obligations other than pensions, including amounts payable to GM | | 9,002 | | 8,786 |
| Debt and notes payable | | 1,984 | | 1,984 |
| Accounts payable | | 738 | | 744 |
| Junior subordinated notes due 2033 | | 391 | | 391 |
| GM claim for U.S. employee workforce transition programs | | 312 | | 312 |
| Securities & ERISA litigation liability (Note 18) | | 351 | | 351 |
| Other | | 266 | | 300 |
| Total Liabilities Subject to Compromise | $ | 16,363 | $ | 16,197 |

## 11. DEBT

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities obligations by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders. The Refinanced DIP Credit Facility consists of a $1.75 billion first priority revolving credit facility (the "Revolving Facility"), a $250 million first priority term loan (the "Tranche B Term Loan" and, together with the Revolving Facility, the "First Priority Facilities"), and an approximate $2.5 billion second priority term loan (the "Tranche C Term Loan"). As of January 9, 2007, both the Refinanced DIP Credit Facility $250 million Tranche B Term Loan and approximately $2.5 billion Tranche C Term Loan were funded. The Refinanced DIP Credit Facility had a maturity date of July 1, 2008. On May 9, 2008, Delphi entered into an amended and restated DIP credit facility. Refer to Note 19. Subsequent Events for additional information about the amended and restated DIP credit facility. The following describes the terms of the Refinanced DIP Credit Facility as it was in effect during the first quarter of 2008.

Borrowings under the Refinanced DIP Credit Facility were prepayable at Delphi's option without premium or penalty. As of March 31, 2008, total available liquidity under the Refinanced DIP Credit Facility was approximately $504 million. Also as of March 31, 2008, there was $452 million outstanding under the Revolving Facility and the Company had $270 million in letters of credit outstanding under the Revolving Facility as of that date, including approximately $162.5 million related to the letters of credit provided to the PBGC discussed further in Note 2. Transformation Plan and Chapter 11 Bankruptcy. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Refinanced DIP Credit Facility. While the borrowing base computation excluded outstanding borrowings, it was less than the Refinanced DIP Credit Facility commitment at March 31, 2008. During the first quarter of 2008, Delphi's availability, as determined by the Borrowing Base Certificate (as defined in the Refinanced DIP Credit Facility), dropped below $500 million. As a result, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate.

The Refinanced DIP Credit Facility included affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. The Company does not expect to pay dividends prior to emergence from chapter 11. So long as the Facility Availability Amount (as defined in the Refinanced DIP Credit Facility) is equal or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except in respect of investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors). The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR for Delphi and its direct and indirect subsidiaries, on a consolidated basis, at the levels set forth in the Refinanced DIP Credit Facility. The Refinanced DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Refinanced DIP Credit Facility, interest on all outstanding amounts is payable on demand at 2% above the then applicable rate. Delphi was in compliance with the Refinanced DIP Credit Facility covenants as of March 31, 2008. Refer to Note 14. Debt, to the

consolidated financial statements in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007 for additional information on the Refinanced DIP Credit Facility.

Delphi entered into a series of amendments over the course of the loan, and paid amendment fees of 100 basis points, or approximately $45 million, to the lenders in the third quarter of 2007. As of March 31, 2008, $19 million remains deferred in other current assets.

Concurrently with the entry into the Refinanced DIP Credit Facility, the Revolving Credit, Term Loan and Guaranty Agreement (the "DIP Credit Facility") Delphi entered into on October 14, 2005, as amended through November 13, 2006 (the "Amended DIP Credit Facility"), and the Five Year Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, the "Prepetition Facility") were terminated. Delphi incurred no early termination penalties in connection with the termination of these agreements. However, as a result of changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $25 million of unamortized debt issuance and discount costs related to the Amended DIP Credit Facility and Prepetition Facility in the first quarter of 2007, of which $23 million was recognized as loss on extinguishment of debt as these fees relate to the refinancing of the term loans and $2 million was recognized as interest expense as these fees relate to the refinancing of the revolving credit facility.

## 12. U.S. EMPLOYEE WORKFORCE TRANSITION PROGRAMS

As previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2007, Delphi, GM, and Delphi's principal labor unions signed settlement agreements during 2007 which included workforce transition programs for eligible union employees (the "Workforce Transition Programs"). Included in certain Workforce Transition Programs were attrition programs similar to the U.S. employee special attrition programs offered in June 2006, which offered certain eligible Delphi employees the following options: (i) normal and early voluntary retirements with lump sum incentive payments, (ii) a pre-retirement program under which certain eligible employees with less than 30 years of credited service were granted the ability to cease working and to receive monthly payments and benefits until they accrue 30 years of credited service at which time they will retire without additional incentives, and (iii) buyout payments in amounts dependant upon the amount of seniority or credited service. Certain Workforce Transition Programs also offered the following options in addition to the attrition programs: (i) flowback rights or special employee placement opportunities with GM to certain eligible Delphi employees who do not elect the attrition options, including a relocation allowance in certain circumstances when plants cease production, (ii) buy-down payments for certain eligible employees who do not elect the attrition option, flowback option, or become employed by GM, and continue to work for Delphi under specified terms, (iii) conversion of temporary employees in Delphi plants to permanent employee status, and (iv) severance payments or supplemental unemployment benefits to eligible employees who are permanently laid off prior to a specified date.

During 2007, Delphi recorded charges for the Workforce Transition Programs of approximately $52 million, which are included in the U.S. employee workforce transition program liability included in current liabilities in the consolidated balance sheet. In the first quarter of 2008, Delphi recorded additional charges of $16 million to reflect costs under the Workforce Transition Programs in excess of amounts previously estimated. The estimated payments to be made under the buy-down arrangements within the UAW and IUE-CWA Workforce Transition Programs totaled $323 million and were recorded as a wage asset and liability during 2007. In accordance with EITF 88-23, "*Lump-Sum Payments under Union Contracts,*" the wage asset is being amortized over the life of the respective union agreements. The corresponding wage liability will be reduced as buy-down payments are made. Based on the GSA with GM, Delphi expects reimbursement for certain costs related to the workforce transition programs, but given that the GSA is not effective until Delphi's emergence from chapter 11, reimbursement of these costs has not been recorded as of March 31, 2008. GM's reimbursement for costs associated with incentivized retirements are included in the U.S. labor agreements, which as previously discussed have been approved by the Court and ratified by the respective unions. Therefore, as of March 31, 2008, Delphi has recorded a receivable from GM in the amount of $2 million included in GM and affiliates accounts receivable in the accompanying consolidated balance sheet.

The following table represents the activity in the U.S. employee workforce transition program liability for the three months ended March 31, 2008:

### U.S. Employee Workforce Transition Program Liability

| | (in millions) |
|---|---|
| Balance at December 31, 2007.................................................. | $ 382 |
| U.S. employee workforce transition program charges......... | 16 |
| Buy-down wage liability adjustment ................................... | 3 |
| Payments ............................................................................ | (71) |
| Pension and other postretirement benefits (Note 13)........... | (9) |
| Accretion and other .............................................................. | 2 |
| Balance at March 31, 2008...................................................... | $ 323 |

At March 31, 2008 and December 31, 2007, $192 million and $234 million, respectively, of the U.S. employee workforce transition program liability is included in accrued liabilities, and $131 million and $148 million, respectively, is included in other long-term liabilities in the consolidated balance sheet.

The following table represents the activity in the U.S. employee workforce transition program buydown wage asset for the three months ended March 31, 2008:

**U.S. Employee Workforce Transition Program Buydown Wage Asset**

|  | (in millions) |
|---|---|
| Balance at December 31, 2007 | $ 301 |
| Buy-down wage asset adjustment | 3 |
| Amortization expense | (21) |
| Balance at March 31, 2008 | $ 283 |

As of March 31, 2008 and December 31, 2007, $84 million and $80 million, respectively, of the U.S. employee workforce transition program buydown wage asset is included in other current assets and $199 million and $221 million, respectively, is included in other long-term assets in the consolidated balance sheet.

Approximately 10,000 employees elected to flow back to GM and retire as part of the 2006 U.S. employee special attrition program. Although GM agreed to assume certain postretirement healthcare and life insurance coverages for these retirees, due to the volume of retirements, GM was unable immediately to transition these retirees to GM healthcare and life insurance plans. Delphi agreed to administer health and life insurance coverage for these retirees during the transition period and GM agreed to reimburse Delphi for the actual costs of providing such coverage. During 2007, GM overpaid Delphi, and, as of March 31, 2008, Delphi owed GM approximately $10 million for these overpayments. This amount was paid in April 2008.

## 13. PENSION AND OTHER POSTRETIREMENT BENEFITS

The Debtors sponsor pension plans covering unionized employees in the U.S., which generally provide benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. The Debtors also sponsor defined benefit plans covering U.S. salaried employees, with benefits generally based on years of service and salary history. Certain Delphi employees also participate in nonqualified pension plans covering executives, which are based on targeted wage replacement percentages and are unfunded. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code. Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, and the United Kingdom ("UK"). The UK and certain Mexican plans are funded. In addition, Delphi has defined benefit plans in Korea, Turkey and Italy for which amounts are payable to employees immediately upon separation. The obligations for these plans are recorded based on the vested benefit obligation.

Delphi also maintains other postretirement benefit plans, which provide covered U.S. hourly and salaried employees with retiree medical and life insurance benefits. Certain of Delphi's non-U.S. subsidiaries have other postretirement benefit plans; although most participants are covered by government sponsored or administered programs. The annual cost of such non-U.S. other postretirement benefit plans was not significant to Delphi.

The amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three-month periods ended March 31, 2008 and 2007 for U.S. and non-U.S. salaried and hourly employees excluding the plans in Korea, Turkey and Italy discussed above. The settlements recorded in the first quarter of 2007 were primarily due to renegotiated labor contracts in Mexico. Benefit costs presented below were determined based on actuarial methods and included the following components for U.S. and non-U.S. salaried and hourly employees:

| | Pension Benefits | | | | Other Postretirement Benefits | |
| | U.S. Plans | | Non-U.S. Plans | | | |
| | | | (in millions) | | | |
| | | | Three Months Ended March 31, | | | |
| | **2008** | **2007** | **2008** | **2007** | **2008** | **2007** |
|---|---|---|---|---|---|---|
| Service cost (a) | $ 41 | $ 48 | $ 11 | $ 12 | $ 7 | $ 21 |
| Interest cost | 213 | 212 | 23 | 20 | 137 | 135 |
| Expected return on plan assets | (218) | (216) | (23) | (20) | — | — |
| Settlements | — | — | 11 | 30 | — | — |
| Amortization of prior service costs | 7 | 14 | 1 | 1 | (27) | (25) |
| Amortization of actuarial losses | 5 | 25 | 6 | 8 | 11 | 19 |
| Net periodic benefit cost | $ 48 | $ 83 | $ 29 | $ 51 | $ 128 | $ 150 |

(a) Includes $9 million and $15 million for the three month periods ended March 31, 2008 and 2007, respectively, of costs previously accrued related to the U.S. employee workforce transition programs.

Net periodic benefit cost above reflects $11 million and $20 million that were included in loss from discontinued operations for the month periods ended March 31, 2008 and 2007, respectively.

In September 2006, the FASB issued SFAS 158, which requires, among other things, an employer to measure the funded status of its defined benefit pension and other postretirement benefit plans as of the date of its year-end statement of financial position, with limited exceptions, effective for fiscal years ending after December 15, 2008. Historically, Delphi has measured the funded status of its U.S. retiree health care benefit plans and certain international pension plans as of September 30 of each year. Delphi adopted the measurement date provisions of SFAS 158 as of January 1, 2008, and utilized the second transition approach provided under SFAS 158. Under this approach, net periodic benefit cost related to these plans for the period between the most recent measurement date of September 30, 2007 and December 31, 2008, was allocated proportionately between an adjustment of accumulated deficit as of January 1, 2008 and amounts to be recognized as net periodic benefit cost during 2008. The following table summarizes the impact of the adoption of the measurement date provisions of SFAS 158:

| | U.S Retiree Medical Plans | Non-U.S. Pension Plans | Total |
| | Increase / (Decrease) | | |
| | (in millions) | | |
|---|---|---|---|
| Pension and other postretirement benefit liabilities | $ 132 | $ 7 | $ 139 |
| Accumulated deficit as of January 1, 2008 | $ 117 | $ 12 | $ 129 |
| Accumulated other comprehensive loss as of January 1, 2008 | $ 15 | $ (5) | $ 10 |

As permitted under chapter 11 of the Bankruptcy Code, Delphi contributed only the portion of the contribution attributable to service after the Chapter 11 Filings. In January 2008 and April 2008, Delphi contributed approximately $45 million and $46 million, respectively, to its U.S. pension plans related to services rendered during the fourth quarter of 2007 and first quarter of 2008, respectively. Under ERISA and the Code, minimum funding payments to the U.S. pension plans of $369 million were due in January and April 2008.

Delphi has been in discussions with the IRS and the PBGC regarding the funding of the Hourly Plan and the Salaried Plan upon emergence from chapter 11. These discussions are meant to achieve a consensual funding plan that would enable the Company to satisfy its pension funding obligations upon emergence from chapter 11 through a combination of cash contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM. In addition, during 2006 and 2007, the IRS issued conditional waivers for the Hourly Plan and Salaried Plan which were intended to facilitate the Debtors' option to effectuate the transfer of certain hourly pension obligations to GM in an economically efficient manner, and to remove uncertainty as to whether excise taxes would be assessed as a result of accumulated funding deficiencies relating to prepetition service. The waivers were conditioned on Delphi emerging from chapter 11 and contributing funds to its pension plans on or before May 9, 2008. Delphi did not seek extension past May 9, 2008 of the waivers, and as a result, Delphi may be exposed to an excise tax penalty. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for more information.

Assuming a consensual funding plan is achieved, the Company currently expects that its pension contributions due upon emergence from chapter 11 will approximate $1 billion under current legislation and plan design, after giving effect to an

anticipated transfer of at least a net of $1.5 billion of unfunded benefit liabilities from the Hourly Plan to a pension plan sponsored by GM.

## 14. DERIVATIVES AND HEDGING ACTIVITIES

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks. To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies. Designation is performed on a transaction basis to support hedge accounting. The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged. Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy. Delphi does not hold or issue derivative financial instruments for trading purposes.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of March 31, 2008 and December 31, 2007 are as follows:

|  | March 31, 2008 | December 31, 2007 |
| --- | --- | --- |
|  | (in millions) | |
| Current assets | $    85 | $    40 |
| Non-current assets | 18 | 13 |
| Total assets | $   103 | $    53 |
| Current liabilities | $    35 | $    24 |
| Non-current liabilities | 7 | — |
| Total liabilities | $    42 | $    24 |

The fair value of financial instruments recorded as assets increased from December 31, 2007 to March 31, 2008 primarily due to the increase in copper prices which have increased copper forward rates. The fair value of financial instruments recorded as liabilities increased from December 31, 2007 to March 31, 2008, primarily due to certain unfavorable foreign currency contracts involving the Euro with the U.S. Dollar, Turkish New Lira, and South African Rand.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in other comprehensive income ("OCI"), to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period. Net gains included in OCI as of March 31, 2008, were $148 million pre-tax. Of this pre-tax total, a gain of approximately $120 million is expected to be included in cost of sales within the next 12 months and a gain of approximately $29 million is expected to be included in cost of sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Cash flow hedges are discontinued when it is no longer probable that the originally forecasted transactions will occur. The amount included in cost of sales related to hedge ineffectiveness was $1 million gain for the three months ended March 31, 2008 and $2 million loss for the three months ended March 31, 2007. The amount included in cost of sales related to the time value of options was not significant in the three months ended March 31, 2008 and 2007. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was not significant for the three months ended March 31, 2008 and $3 million for the three months ended March 31, 2007.

## 15. FAIR VALUE MEASUREMENTS

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157 ("SFAS 157"), *Fair Value Measurements*. SFAS 157 defines fair value, establishes a framework for measuring fair value in U.S. GAAP, and expands the disclosure requirements regarding fair value measurements. The rule does not introduce new requirements mandating the use of fair value.

In February 2008, the FASB issued FASB Staff Position No. 157-2, "Effective Date of FASB Statement No. 157" ("FSP 157-2") which partially defers the effective date of SFAS No. 157 for one year for nonfinancial assets and nonfinancial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis. The FSP does not defer recognition and disclosure requirements for financial assets and liabilities or for nonfinancial assets and nonfinancial liabilities that are remeasured at least annually. Delphi adopted SFAS No. 157 as of January 1, 2008 for assets and liabilities not subject to the

deferral and expects to adopt the provisions of SFAS No. 157 as of January 1, 2009 for nonfinancial assets and liabilities that are subject to the deferral.

SFAS 157 defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The definition is based on an exit price rather than an entry price, regardless of whether the entity plans to hold or sell the asset. SFAS No. 157 also establishes a fair value hierarchy to prioritize inputs used in measuring fair value as follows:

- *Level 1:* Observable inputs such as quoted prices in active markets;
- *Level 2:* Inputs, other than quoted prices in active markets, that are observable either directly or indirectly; and
- *Level 3:* Unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

Assets and liabilities measured at fair value are based on one or more of the following three valuation techniques noted in SFAS 157:

a. *Market approach:* Prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities.
b. *Cost approach:* Amount that would be required to replace the service capacity of an asset (replacement cost).
c. *Income approach:* Techniques to convert future amounts to a single present amount based upon market expectations (including present value techniques, option-pricing and excess earnings models).

As of March 31, 2008, Delphi had the following assets measured at fair value on a recurring basis:

| | Total as of March 31, 2008 | Fair Value Measurements Using: | | |
| --- | --- | --- | --- | --- |
| | | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
| | | (in millions) | | |
| Available for sale securities | $  2 | $  2 | $  — | $  — |
| Commodity derivatives | 83 | — | 83 | — |
| Foreign currency derivatives | 20 | — | 20 | — |
| Total | $  105 | $  2 | $  103 | $  — |

As of March 31, 2008, Delphi had the following liabilities measured at fair value on a recurring basis:

| | Total as of March 31, 2008 | Fair Value Measurements Using: | | |
| --- | --- | --- | --- | --- |
| | | Quoted Prices in Active Markets Level 1 | Significant Other Observable Inputs Level 2 | Significant Unobservable Inputs Level 3 |
| | | (in millions) | | |
| Foreign currency derivatives | $  42 | $  — | $  42 | $  — |

All derivative instruments are required to be reported on the balance sheet at fair value with changes in fair value reported currently through earnings unless the transactions qualify and are designated as normal purchases or sales or meet special hedge accounting criteria. The fair value of foreign currency and commodity derivative instruments are determined using exchange traded prices and rates. Delphi values its derivative contracts using an income approach based on valuation techniques to convert future amounts to a single, discounted amount. Delphi also considers the credit-worthiness of its derivative counterparties in its determination of fair value.

Equity securities are classified as available-for-sale and are recorded in the consolidated financial statements at market value with changes in market value included in OCI.

## 16. OTHER INCOME (EXPENSE), NET

Other income (expense), net included:

|  | Three Months Ended March 31, | |
|  | 2008 | 2007 |
|  | (in millions) | |
| Interest income | $  13 | $  15 |
| Other, net | 6 | 5 |
| Other income, net | $  19 | $  20 |

## 17. SEGMENT REPORTING

Delphi's operating structure consists of its core business within four segments that support its previously identified strategic product lines, as well as the Automotive Holdings Group, consisting of business operations to be sold or wound down.  An overview of Delphi's five reporting segments, which are grouped on the basis of similar product, market and operating factors follows:

- Electronics and Safety, which includes audio, entertainment and communications, safety systems, body controls and security systems, displays, mechatronics and power electronics, as well as advanced development of software and silicon.
- Powertrain Systems, which includes extensive systems integration expertise in gasoline, diesel and fuel handling and full end-to-end systems including fuel injection, combustion, electronic controls, exhaust handling, and test and validation capabilities.
- Electrical/Electronic Architecture, which includes complete electrical architecture and component products.
- Thermal Systems, which includes Heating, Ventilating and Air Conditioning ("HVAC") systems, components for multiple transportation and other adjacent markets, and powertrain cooling and related technologies.
- Automotive Holdings Group, which includes various non-core product lines and plant sites that do not fit Delphi's future strategic framework.

Delphi also has non-core steering and halfshaft product lines and interiors and closures product lines that are reported in discontinued operations (the sale of the interiors and closures product line closed on February 29, 2008).  Previously, the steering and halfshaft product line was a separate operating segment and the interiors and closures product line was part of Delphi's Automotive Holdings Group segment.  Refer to Note 4. Discontinued Operations for more information.

The Corporate and Other category includes the expenses of corporate administration, other expenses and income of a non-operating or strategic nature, elimination of inter-segment transactions and charges related to the U.S. employee workforce transition programs. Additionally, Corporate and Other includes the Product and Service Solutions business, which is comprised of independent aftermarket, diesel aftermarket, original equipment service, consumer electronics and medical systems.

The accounting policies of the segments are the same as those described in Note 1. Basis of Presentation, except that the disaggregated financial results for the segments have been prepared using a management approach, which is consistent with the basis and manner in which management internally disaggregates financial information for the purposes of assisting internal operating decisions.  Generally, Delphi evaluates performance based on stand-alone segment operating income and accounts for inter-segment sales and transfers as if the sales or transfers were to third parties, at current market prices.

Certain segment assets, primarily within the Electronics and Safety segment, are utilized for operations of other core segments. Income and expense related to operation of those assets, including depreciation, are allocated to and included within the measures of segment profit or loss of the core segment that sells the related product to the third parties.

As of December 31, 2007, Delphi transferred responsibility for certain product lines that are no longer considered non-core from the Company's Automotive Holdings Group segment to the Powertrain Systems, Thermal Systems and Electronics and Safety Systems segments to more directly correspond with management's internal assessment of each segment's operating results for purposes of making operating decisions.  The reporting segment results shown below have been reclassified to conform to current presentation for comparability with no effect on previously reported consolidated results of Delphi.

Included below are sales and operating data for Delphi's segments for the three months ended March 31, 2008 and 2007.

| | Electronics and Safety | Powertrain Systems | Electrical/ Electronic Architecture | Thermal Systems (in millions) | Automotive Holdings Group | Corporate and Other | Total |
|---|---|---|---|---|---|---|---|
| **For the Three Months Ended**: | | | | | | | |
| March 31, 2008 | | | | | | | |
| Net sales to GM and affiliates ... | $ 349 | $ 308 | $ 403 | $ 296 | $ 195 | $ 90 | $ 1,641 |
| Net sales to other customers ...... | 818 | 866 | 1,137 | 251 | 280 | 259 | 3,611 |
| Inter-segment net sales............... | 48 | 109 | 44 | 27 | 42 | (270) | — |
| Total net sales..................... | $ 1,215 | $ 1,283 | $ 1,584 | $ 574 | $ 517 | $ 79 | $ 5,252 |
| Depreciation and amortization... | $ 64 | $ 68 | $ 45 | $ 15 | $ 14 | $ 16 | $ 222 |
| Operating (loss) income............. | $ (80) | $ (13) | $ (6) | $ 26 | $ (70) | $ (124) | $ (267) |
| Equity income ......................... | $ — | $ 4 | $ 3 | $ 2 | $ (1) | $ 3 | $ 11 |
| Minority interest ........................ | $ — | $ (6) | $ (4) | $ (1) | $ — | $ — | $ (11) |
| March 31, 2007 | | | | | | | |
| Net sales to GM and affiliates ... | $ 407 | $ 414 | $ 442 | $ 369 | $ 423 | $ 108 | $ 2,163 |
| Net sales to other customers ...... | 825 | 905 | 969 | 227 | 345 | 248 | 3,519 |
| Inter-segment net sales............... | 67 | 127 | 45 | 36 | 51 | (326) | — |
| Total net sales..................... | $ 1,299 | $ 1,446 | $ 1,456 | $ 632 | $ 819 | $ 30 | $ 5,682 |
| Depreciation and amortization... | $ 70 | $ 72 | $ 45 | $ 13 | $ 13 | $ 20 | $ 233 |
| Operating income (loss)............. | $ 47 | $ (34) | $ (5) | $ 1 | $ (63) | $ (161) | $ (215) |
| Equity income ......................... | $ — | $ 4 | $ 4 | $ 1 | $ 2 | $ 3 | $ 14 |
| Minority interest ........................ | $ — | $ (9) | $ (7) | $ 2 | $ — | $ 2 | $ (12) |

## 18. COMMITMENTS AND CONTINGENCIES

### Shareholder Lawsuits

As previously disclosed, the Company, along with certain of its subsidiaries, current and former directors of the Company, and certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005. These lawsuits (the "Multidistrict Litigation") were coordinated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and assigned to Hon. Gerald E. Rosen in the United States District Court for the Eastern District of Michigan (the "District Court"). Set forth below is a description of the Multidistrict Litigation and a summary of a settlement concerning the Multidistrict Litigation.

The Multidistrict Litigation is comprised of lawsuits in three categories. One group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under ERISA. On October 21, 2005, the court appointed interim lead plaintiffs for the putative class. On March 3, 2006, these plaintiffs filed a consolidated class action complaint (the "ERISA Action") with a class period of May 28, 1999 to November 1, 2005. Plaintiffs in the ERISA Action allege, among other things, that the plans suffered losses as a result of alleged breaches of fiduciary duties under ERISA. The Company, which was initially named as a defendant in these lawsuits, was not named as a defendant in the ERISA Action due to its chapter 11 filing, but the plaintiffs stated that they intended to proceed with claims against the Company in the ongoing bankruptcy cases, and would seek to name the Company as a defendant in the ERISA Action if the bankruptcy stay were modified or lifted to permit such action. On May 31, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to plaintiffs' counsel and other parties in the case.

A second group of class action lawsuits alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws. On September 30, 2005, the court-appointed Lead Plaintiffs filed a consolidated class action complaint (the "Securities Action") on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly-traded securities of the Company, including securities issued by Delphi Trust I and Delphi Trust II, during a class period of March 7, 2000 through March 3, 2005. The Securities Action names several additional defendants, including Delphi Trust I and Delphi Trust II, certain former directors, and underwriters and other third parties, and includes securities claims regarding additional offerings of Delphi securities. The Securities Action, which had been consolidated in the United States District Court for Southern District of New

York, was subsequently transferred to the District Court as part of the Multidistrict Litigation (as was a related securities action filed in the United States District Court for the Southern District of Florida concerning Delphi Trust I, which was subsequently consolidated into the Securities Action).  The Securities Action was stayed against the Company pursuant to the Bankruptcy Code, but continued against the other defendants.  On February 15, 2007, the District Court partially granted the Lead Plaintiffs' motion to lift the stay of discovery provided by the Private Securities Litigation Reform Act of 1995, thereby allowing the Lead Plaintiffs to obtain certain discovery from the defendants.  On April 16, 2007, by agreement of the parties, the Court entered a limited modification of the automatic stay, pursuant to which Delphi provided certain discovery to the Lead Plaintiffs and other parties in the case.

The third group of lawsuits is comprised of shareholder derivative actions against certain current and former directors and officers of the Company ("Shareholder Derivative Actions").  A total of four complaints were filed: two in the federal court (one in the Eastern District of Michigan and another in the Southern District of New York) and two in Michigan state court.  These suits alleged that certain current and former directors and officers of the Company breached a variety of duties owed by them to Delphi in connection with matters related to the Company's restatement of its financial results.  The federal cases were coordinated with the securities and ERISA class actions in the Multidistrict Litigation.  Following the filing on October 8, 2005 of the Debtors' petitions for reorganization relief under chapter 11 of the Bankruptcy Code, all the Shareholder Derivative Actions were administratively closed.

Following mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi named as defendants, and certain other defendants involved in the Multidistrict Litigation reached agreements with the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action to settle the claims asserted against them in those actions (the "MDL Settlements").

On September 5, 2007 the District Court entered an order preliminarily certifying a class in the Securities Action and the ERISA Action, preliminarily approving the MDL Settlements, and scheduling a fairness hearing on November 13, 2007.  On November 13, 2007, the District Court conducted the fairness hearing and took the matter under advisement.  Separately, on October 29, 2007, the Court entered an order preliminarily approving the MDL Settlements subject to final consideration at the confirmation hearing on Delphi's plan of reorganization and the Court's consideration of certain objections that may be filed as to the MDL Settlements.  On October 29, 2007, the Court lifted the automatic stay as to the discovery provided to the Lead Plaintiffs.  On December 4, 2007, the District Court held another hearing to consider proposed modifications to the proposed settlement of the Securities Action (as modified, the "Securities Settlement"), and tentatively approved the Securities Settlement, after determining that the modifications were at least neutral to the class and may potentially provide a net benefit to the class.

The District Court approved the MDL Settlements (including the Securities Settlement) in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered an Order and Final Judgment dated January 23, 2008 in both the Securities Action and ERISA Action.  One security holder appealed certain aspects of the District Court's opinion and order, as amended, approving the MDL Settlements.  That appeal is pending before the United States Court of Appeals for the Sixth Circuit.

On January 25, 2008, the Court approved the MDL Settlements.  As provided in the confirmation order, the MDL Settlements are contingent upon the effective date of the Amended Plan occurring, and if, for any reason, Delphi cannot emerge as contemplated, the MDL Settlements will become null and void.  A copy of an addendum setting forth the modification is attached as Exhibit 99(f) to the Company's Current Report on Form 8-K filed with the SEC on January 30, 2008.

Under the terms of the MDL Settlements, the Lead Plaintiffs in the Securities Action and the named plaintiffs in the ERISA Action will receive claims that will be satisfied through Delphi's Amended Plan as confirmed by the Court pursuant to the confirmation order.  Under the Securities Settlement, the Lead Plaintiffs will be granted an allowed claim in the face amount of $179 million, which will be satisfied by Delphi providing $179 million in consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under its Amended Plan.  Additionally, the class in the Securities Action will receive $15 million to be provided by a third party.  Delphi has also agreed to provide the Lead Plaintiffs, on behalf of the class members, the ability to exercise their rights in the discount rights offering in connection with the Amended Plan through a notice mechanism and a pledge of cash collateral.  If an individual plaintiff opts out of the settlement reached with the Lead Plaintiffs and ultimately receives an allowed claim in Delphi's chapter 11 cases, the amount received by the opt-out plaintiff will be deducted from the amount received by the class in the Securities Action.  Delphi will object to any claims filed by opt-out plaintiffs in the Court, and will seek to have such claims expunged.

The settlement of the ERISA Action is structured similarly to the settlement reached with the Lead Plaintiffs.  The claim of the named plaintiffs in the ERISA Action will be allowed in the amount of approximately $25 million and will be satisfied with

consideration in the same form, ratio, and treatment as that which will be used to pay holders of general unsecured claims under the Plan.  Unlike the settlement of the Securities Action, no member of the class in the ERISA Action can "opt out" of the settlement.

In addition to the amounts to be provided by Delphi from the above described claims in its chapter 11 cases, the class in the Securities Action will also receive a distribution of insurance proceeds of up to approximately $89 million, including a portion of the remainder of any insurance proceeds that are not used by certain former officers and directors who are named defendants in various actions, and a distribution of approximately $2 million from certain underwriters named as defendants in the Securities Actions. In addition, Delphi's insurance carriers have also agreed to provide $20 million to fund any legal expenses incurred by certain of the former officer and director named defendants in defense of any future civil actions arising from the allegations raised in the securities cases.  The class in the ERISA Action will also receive a distribution of insurance proceeds in the amount of approximately $22 million.  Settlement amounts from insurers and underwriters were paid and placed in escrow by September 25, 2007, pending the Effective Date of the MDL Settlements.

The MDL Settlements also provide for the dismissal with prejudice of the ERISA Action and Securities Action and a release of certain claims against certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants.  If the MDL Settlements are terminated according to their terms, the parties will proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

The Company also received a demand from a shareholder that the Company consider bringing a derivative action against certain current and former directors and officers premised on allegations that certain current and former directors and officers made materially false and misleading statements in violation of federal securities laws and/or of their fiduciary duties.  The Company appointed a committee of the Board of Directors (the "Special Committee") to evaluate the shareholder demand.  As a component of the MDL Settlements, the Special Committee determined not to assert these claims; however, it has retained the right to assert the claims as affirmative defenses and setoffs against any action to collect on a proof of claim filed by those individuals named in the demand for derivative action should the Company determine that it is in its best interests to do so.

As a result of the MDL Settlements, as of March 31, 2008 and December 31, 2007, Delphi has a liability of $351 million recorded for this matter.  Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million.  As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage.  In conjunction with the MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

**Ordinary Business Litigation**

Delphi is from time to time subject to various legal actions and claims incidental to its business, including those arising out of alleged defects, breach of contracts, product warranties, intellectual property matters, and employment-related matters.

Under section 362 of the Bankruptcy Code, the filing of a bankruptcy petition automatically stays most actions against a debtor, including most actions to collect prepetition indebtedness or to exercise control over the property of the debtor's estate. Absent an order of the Court, substantially all prepetition liabilities are subject to settlement under a plan of reorganization. Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy for details on the chapter 11 cases.

With respect to warranty matters, although Delphi cannot assure that the future costs of warranty claims by customers will not be material, Delphi believes its established reserves are adequate to cover potential warranty settlements.  However, the final amounts required to resolve these matters could differ materially from the Company's recorded estimates.  Additionally, in connection with the Separation, Delphi agreed to indemnify GM against substantially all losses, claims, damages, liabilities or activities arising out of or in connection with its business post-Separation for which it is determined Delphi has responsibility. Due to the nature of such indemnities, Delphi is not able to estimate the maximum amount thereof.

During the first quarter of 2008, Delphi recovered $28 million from an affiliated supplier and recorded it as a reduction of warranty expense.  Delphi began experiencing quality issues regarding parts purchased by Delphi's Thermal Systems segment during the third quarter of 2006 and established warranty reserves of approximately $60 million to cover the cost of various repairs that may be implemented.  The reserve has subsequently been adjusted for payments and settlements.  As of March 31, 2008 and December 31, 2007, the related reserve was $41 million.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases. Delphi elected to defer amounts due under the Warranty Settlement Agreement until it receives payments from GM, on or about the time of its emergence from chapter 11. Since Delphi has elected to defer these payments, GM will receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts are paid by Delphi or set off against amounts payable by GM.

**Environmental Matters**

Delphi is subject to the requirements of U.S. federal, state, local and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating air emissions, water discharge and waste management. Delphi has an environmental management structure designed to facilitate and support its compliance with these requirements globally. Although it is Delphi's intent to comply with all such requirements and regulations, it cannot provide assurance that it is at all times in compliance. Delphi has made and will continue to make capital and other expenditures to comply with environmental requirements. Although such expenditures were not material during the past three years, Delphi expects to spend $11 million to install pollution control equipment on coal-fired boilers at its Saginaw, Michigan Steering Division facility, to meet U.S. and State of Michigan air emission regulations. Environmental requirements are complex, change frequently and have tended to become more stringent over time. Accordingly, Delphi cannot assure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not be material.

Delphi establishes reserves for environmental cleanup liabilities when a loss is probable and can be reasonably estimated. Such liabilities generally are not subject to insurance coverage. The cost of each environmental cleanup is estimated by engineering, financial, and legal specialists within Delphi based on current law and considers the estimated cost of investigation and remediation required and the likelihood that, where applicable, other potentially responsible parties ("PRPs") will be able to fulfill their commitments at the sites where Delphi may be jointly and severally liable. The process of estimating environmental cleanup liabilities is complex and dependent primarily on the nature and extent of historical information and physical data relating to a contaminated site, the complexity of the site, the uncertainty as to what remediation and technology will be required, and the outcome of discussions with regulatory agencies and other PRPs at multi-party sites. In future periods, new laws or regulations, advances in cleanup technologies and additional information about the ultimate cleanup remediation methodology to be used could significantly change Delphi's estimates.

As previously disclosed, with respect to environmental matters, Delphi has received notices that it is a PRP in proceedings at various sites, including the Tremont City Landfill Site (the "Site") located in Tremont, Ohio, which is alleged to involve ground water contamination. In September 2002, Delphi and other PRPs entered into a Consent Order with the U.S. Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the Site. The Remedial Investigation and Alternatives Array Document were finalized in 2007. A Feasibility Study and Record of Decision are expected to be completed in late 2008 or 2009. Although Delphi believes that capping and future monitoring is a reasonably possible outcome, a different cleanup approach ultimately may be required for the Site. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures for remediation, possibly over an extended period of time and possibly in excess of existing reserves. As of March 31, 2008, Delphi has recorded its best estimate of its share of the remediation based on the remedy described above. However, if that remedy is not accepted, Delphi's expenditures for remediation could increase by $20 million in excess of its existing reserves. Delphi will continue to reassess any potential remediation costs and, as appropriate, its environmental reserve as the investigation proceeds.

Delphi is in various stages of investigation and cleanup at its manufacturing facilities where contamination has been discovered. As previously disclosed, Delphi completed a number of environmental investigations during 2006 in conjunction with its transformation plan, which contemplates significant restructuring activity, including the sale, closure or demolition of numerous facilities. These assessments identified previously unknown conditions and resulted in Delphi recording an adjustment to its environmental reserves. As Delphi continues the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified. Delphi cannot assure that environmental requirements will not change or become more stringent over time or that its eventual environmental remediation costs and liabilities will not exceed the amount of its current reserves. In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

As of March 31, 2008 and December 31, 2007, Delphi's reserve for environmental investigation and remediation was approximately $107 million and $112 million, respectively. Approximately $19 million of the environmental reserve balance as of March 31, 2008 is included in accrued liabilities in the accompanying consolidated balance sheets. Approximately $88 million and $112 million of the environmental reserve balance as of March 31, 2008 and December 31, 2007, respectively, is included in other long-term liabilities. The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the separation from GM in 1999 (the "Separation").

**Other**

As mentioned above, Delphi continues to pursue its transformation plan and continues to conduct additional assessments as the Company evaluates whether to permanently close or demolish one or more facilities as part of its restructuring activity. These assessments could result in Delphi being required to recognize additional and possibly material costs or demolition obligations in the future.

## 19. SUBSEQUENT EVENTS

Certain events have occurred subsequent to March 31, 2008 that do not impact the reported balances or results of operations as of that date, but are material to the Company's ongoing operations. These events are listed below.

The Refinanced DIP Credit Facility had a maturity date of July 1, 2008. Delphi received Court approval to amend and extend its Refinanced DIP Credit Facility on April 30, 2008. Delphi has received the required commitments from its lenders and the amended and restated DIP credit facility (the "Amended and Restated DIP Credit Facility") became effective on May 9, 2008. The Amended and Restated DIP Credit Facility extends the tenor until December 31, 2008 and modifies the size of the facility by reducing the Revolving Facility to $1.1 billion from $1.75 billion and increasing the size of the Tranche B Term Loan to $500 million from $250 million and leaving the Tranche C Term Loan unchanged at approximately $2.5 billion. On May 9, 2008, Delphi filed a motion with the Court to increase the Tranche C Term Loan to $2.75 billion from approximately $2.5 billion and expects the Court to approve the motion by the end of May 2008 with funding in June 2008. The Amended and Restated DIP Credit Facility includes certain covenants and restrictions on Delphi's financial and business operations that mirror those imposed by the Refinanced DIP Credit Facility with the exception of the modifications listed below. The Amended and Restated DIP Credit Facility:

- Increases the interest rate on the facilities,
- Increases the undrawn revolver fees,
- Adds a LIBOR floor to the Tranche B and Tranche C Term Loans,
- Modifies the borrowing base definition and limits availability to draw additional amounts under the Revolving Facility, under certain conditions as defined,
- Sets Global EBITDAR covenant levels for the extension period,
- Modifies the allowable junior liens, and
- Allows Delphi to enter into an agreement with GM as described below.

In connection with the Amended and Restated DIP Credit Facility, Delphi paid a total of approximately $75 million to consenting lenders on the Tranche A facility, the Tranche B facility and the Tranche C facility. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Amended and Restated DIP Credit Facility and the previously arranged bankruptcy exit financing that was commenced but not completed.

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM will advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA. The agreement has a maturity date of the earlier of December 31, 2008 or when $650 million has been paid under the GSA and MRA. GM will receive an administrative claim for its advances. The agreement provides for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as defined in the Amended and Restated DIP Credit Facilitiy. The amounts advanced will accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The interest on the advances will be cancelled if the GSA and MRA become effective on or prior to the expiration date of the agreement. Advances will be set off against the GSA and MRA upon effectiveness of those agreements or any remaining administrative claims in Delphi's chapter 11 case.

## APPENDIX B-4

Consolidated Financial Statements And Notes To
Consolidated Financial Statements Included In The Delphi Corporation
Form 10-Q For The Quarter Ended September 30, 2008

[To be included in Solicitation Package]