Hearing Date And Time: October 23, 2008 at 10:00 a.m.
Objection Deadline: October 16, 2008 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :
    In re                          :      Chapter 11
                                        :
DELPHI CORPORATION, et al.,      :      Case No. 05-44481 (RDD)
                                        :
                      Debtors.    :      (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION TO PERMIT STATUTORY COMMITTEE MEMBERS TO
PARTICIPATE IN EMERGENCE FUNDING STRUCTURE

("EMERGENCE FUNDING PARTICIPATION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order permitting the Debtors' statutory committee members to participate in the Debtors' emergence funding structure. In support of this Motion, the Debtors respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.  On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on

2

December 10, 2007 (Docket No. 11389).  On January 11, 2008, the Court entered the Order Granting Expedited Motion to Permit Opportunity for Statutory Committee Members to Participate in Exit Financing Syndication (Docket No. 11966) (the "Exit Financing Participation Order"), which allowed Statutory Committee members to participate in the Debtors' then-proposed exit financing under certain circumstances.  On January 25, 2008, the Court entered an order (Docket No. 12359) (the "Confirmation Order") confirming the Plan (as modified) (the "Confirmed Plan"), which order became final on February 4, 2008.  Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Confirmed Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.

4. On October 3, 2008, the Debtors filed a motion (the "Plan Modification Approval Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and related modifications to the December 10 Disclosure Statement and (ii) approving related procedures for re-soliciting votes on the Confirmed Plan as modified (the "Modified Plan").

5. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6. The statutory predicate for the relief requested herein is section 105(a) of the Bankruptcy Code.

B.   Current Business Operations Of The Debtors

7.   Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

8.   The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

9.   Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective

---

[1]   The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]   On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C. Events Leading To The Chapter 11 Filing

10. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

11. The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

    12. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. <u>The Debtors' Transformation Plan</u>

    13. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.      <u>Plan Confirmation And Postconfirmation Matters</u>

14.      The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases.  The Confirmation Order approved the Global Settlement Agreement (the "Original GSA") and the Master Restructuring Agreement (the "Original MRA"), which provided for a comprehensive settlement with GM.  After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Confirmed Plan to become effective.  The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees.

15.      The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement.  Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Confirmed Plan's effective date to occur by April 4, 2008.  On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11.

F.      <u>Background Of The Modified Disclosure Statement And Modified Plan</u>

16.      The Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.  On September 12, 2008, Delphi announced steps that they were taking to complete the successful restructuring of their U.S. operations, transformation of the company on a global basis, and emergence from chapter 11.  Those

7

steps included reaching agreements with GM to amend the GSA and MRA, taking action to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan (the "2008-2011 RPOR Business Plan").  Among other changes, the 2008-2011 RPOR Business Plan includes revised actual and expected volumes for the North American automotive market, significant increases in commodities costs that are used as raw materials in certain of Delphi's products, and changes in the underfunded status of its pension plans as a result of negative plan asset return.

17.    On September 23, 2008, this Court entered an order authorizing Delphi to take certain actions with respect to its pension plans and to implement replacement pension plans.  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the amended GSA (the "Amended GSA") and the amended MRA (the "Amended MRA"), which agreements became effective on September 29, 2008.  Delphi estimates the value of the consideration received under those agreements to be approximately $10.6 billion (increased from approximately $6.0 billion in the Original GSA/MRA), which includes an increase of nearly $2 billion in connection with the amount of Delphi's net hourly pension liabilities transferred and to be transferred to GM pursuant to section 414(l) of the Internal Revenue Code (increased from $1.5 billion under the Original GSA to approximately $3.4 billion under the Amended GSA).

18.    The Amended GSA and Amended MRA allowed the Debtors to carry out their transformation goals of (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

forward and (ii) devising a workable solution to Delphi's pension funding situation. Implementation of the Amended GSA and Amended MRA also allowed the Debtors to move forward on the basis of their reaffirmed emergence business plan to enter the capital markets and to be in a position to negotiate with their stakeholders regarding funding of, and modifications to, the Confirmed Plan.

19.    The Debtors have accordingly formulated certain modifications to the Confirmed Plan which are set forth in the Plan Modification Approval Motion filed on October 3, 2008.  Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

20.    By this Motion, the Debtors respectfully request that this Court enter an order similar to its prior Exit Financing Participation Order, but based on present facts and circumstances, permitting members of the Statutory Committees to participate in the Debtors' contemplated emergence capital funding.

<u>Basis For Relief</u>

21.    Contemporaneously with the filing of this Motion, the Debtors are filing proposed modifications to the confirmed Plan that they believe should enable them to proceed toward emergence from chapter 11.  An indisputable prerequisite to the Debtors' emergence under the Modified Plan is obtaining debt and equity funding in the

9

net funded amount of approximately $3.75 billion.  The Debtors' Modified Plan currently contemplates $2.75 billion in net funded debt (reduced from $4.7 billion of net funded debt under the Confirmed Plan) and an equity offering of $1.0 billion (reduced from $2.55 billion of equity funding under the Confirmed Plan).  To facilitate their ability to achieve a successful equity offering and complete their overall emergence funding package, the Debtors will be seeking participation in all elements of their emergence funding, including obtaining prospective equity commitments to participate in the discount rights offering contemplated by the Modified Plan.  In addition to outside parties, the Debtors also intend to seek these commitments from certain of their stakeholders including, potentially, members of the Statutory Committees.

                22.      Although the Court previously authorized Statutory Committee members to participate in the Debtors' exit financing with respect to the Confirmed Plan, the Debtors believe that circumstances have sufficiently changed to seek renewed and expanded authority for Statutory Committee members to participate in the Debtors' emergence funding.  The Debtors believe that it is necessary to secure participation commitments as soon as practicable to facilitate their negotiations with respect to their proposed exit funding, particularly in light of the current state of the capital markets.  The Debtors believe that it would not be prudent to ignore Statutory Committee members as potential participants as they seek to complete their emergence capital funding structure. Accordingly, the Debtors believe that it would be advantageous for the Court to confirm to members of the Statutory Committees that they are permitted to participate in the Debtors' emergence capital funding.

23. Such approval is necessary because, although the Debtors' creditors and interest holders are free to make whatever commitments for potential investments in a reorganized Delphi they feel are appropriate, without Court approval, the propriety of such commitments by members of the Statutory Committees may be questioned. With appropriate disclosure and related procedures in place, there should not be any reason why a Statutory Committee member should be required to resign from either of the Statutory Committees to participate in Delphi's emergence capital funding.

24. As described above, this Court previously approved such participation in connection with the Debtors' then-proposed exit financing, and imposed several conditions that were appropriate at that time to safeguard the ongoing disinterestedness of the members of the Statutory Committees. The Debtors propose to implement appropriate procedures in respect of the participation by members of the Statutory Committees in the emergence capital funding now under consideration; however, the Debtors believe certain of the procedures established in the Exit Financing Participation Order, which were based on a syndicated exit facility to be put in place simultaneously with the Company's emergence from chapter 11, should be modified to match the current circumstances. Specifically, the fact that the Debtors, GM, and the Creditors' Committee have negotiated significant aspects of potential creditor recoveries in connection with the Amended GSA, when combined with increased complexity in the capital markets, render essential the cooperation and involvement of the Statutory Committee members in obtaining and even participating in the requisite emergence funding.

25.  The Debtors accordingly propose that first, prior to any participation in the emergence funding structure, any Statutory Committee member would be required to make written disclosure of such potential participation to the Debtors, counsel to each of the Statutory Committees, and the U.S. Trustee.  Second, the Debtors propose that any such Statutory Committee member also be prohibited from discussing or sharing any information with his or her institution, or any lender or other party involved in the emergence funding structure, relating to the Debtors' or the Statutory Committees' strategy regarding the emergence funding structure, other than as already publicly disclosed by the Debtors.  Finally, the Debtors propose that any order granting this Motion make clear that nothing in the order would relieve any member of the Statutory Committees of its obligations under any applicable securities laws.

26.  Importantly, the Debtors do not seek any limitation on the U.S. Trustee's authority to fulfill her statutory responsibilities.  The Debtors are not requesting, and will not request, that any Statutory Committee member who participates in the emergence funding structure be exempted from any future actions that the U.S. Trustee may take in exercising her duty to monitor committees.  The proposed order would merely permit a Statutory Committee member wishing to do so to participate in the Debtors' proposed exit funding.  The Debtors believe that these procedures would be appropriate and practical means for Statutory Committee members to participate in any element of Delphi's emergence funding.

### Applicable Authority

27.  The case law makes clear that even though committee members have fiduciary duties to their respective constituents, membership on a committee does

12

not automatically preclude committee members from pursuing their own interests, so long as this can be done without running afoul of their fiduciary duties. Cf. In re Schatz Fed. Bearings Co., 5 B.R. 543, 548 (Bankr. S.D.N.Y. 1980) (court appointed union with substantial claim against debtor for unpaid pension benefits to creditors' committee over objections by debtor and creditors' committee; held, potential clash between union's goal of preserving jobs for its members and debtor's efforts to preserve assets through employee reductions was no basis to disqualify union from membership); In re Barney's, Inc., 197 B.R. 431, 442-44 (Bankr. S.D.N.Y. 1996) (court noted that members of committee need not have parallel interest with other committee members to qualify for committee membership, and that disagreements among committee members must be resolved through committee's decision-making process); In re Penn-Dixie Indus., Inc., 9 B.R. 936, 940 (S.D.N.Y. 1981) (district court, noting importance of review of facts of each particular case, concluded that speculative charges of potential future misconduct were insufficient to overturn bankruptcy court's finding that shareholder's participation on equity committee was appropriate, particularly where protective measures to prevent such conduct were available).  Here, the Debtors are proposing appropriate conditions that would prevent even the specter of potential future misconduct.  Any Statutory Committee members who wish to participate in the emergence capital funding would only participate in an environment of full disclosure.  In light of these particular facts, the Debtors believe that the relief requested by the Motion is appropriate and supported by applicable case law.

## Notice Of Motion

28.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) and the Twelfth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered July 23, 2008 (Docket No. 13965).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) granting this Motion and (b) granting them such other and further relief as is just.

Dated:   New York, New York
         October 3, 2008

                                            SKADDEN, ARPS, SLATE, MEAGHER
                                             & FLOM LLP

                                            By:    /s/ John Wm. Butler, Jr.
                                                   John Wm. Butler, Jr.
                                                   John K. Lyons
                                                   Ron E. Meisler
                                            333 West Wacker Drive, Suite 2100
                                            Chicago, Illinois 60606
                                            (312) 407-0700

                                                         - and -

                                            By:    /s/ Kayalyn A. Marafioti
                                                   Kayalyn A. Marafioti
                                                   Thomas J. Matz
                                            Four Times Square
                                            New York, New York 10036
                                            (212) 735-3000

                                            Attorneys for Delphi Corporation, et al.,
                                              Debtors and Debtors-in-Possession