**Hearing Date And Time: October 23, 2008 at 10:00 a.m.**
**Objection Deadline: October 16, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE , MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
George N. Panagakis
Ron E. Meisler

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

MOTION FOR ORDER, SOLELY AS TO STATUTORY COMMITTEES, EXTENDING
DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE AND SOLICIT
ACCEPTANCES OF REORGANIZATION PLAN UNDER 11 U.S.C. § 1121(d)

("SECOND § 1121(d) STATUTORY COMMITTEE EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this precautionary motion (the "Motion") for an order under 11 U.S.C. § 1121(d) further extending the Debtors' exclusive periods, solely as between the Debtors and the Statutory Committees (as defined below), within which to file and solicit acceptances of a plan of reorganization, and respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.  On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure

Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order (Docket No. 12359) (the "Confirmation Order") confirming the Plan (as modified) (the "Confirmed Plan"), which order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Confirmed Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.[1]

    4.    On October 3, 2008, the Debtors filed a motion (the "Plan Modification Approval Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and related modifications to the December 10 Disclosure Statement and (ii) approving related procedures for re-soliciting votes on the Confirmed Plan as modified.

    5.    The Debtors have obtained an extension, subject to certain exceptions described below, of their exclusive right under section 1121 of the Bankruptcy Code to file one or more reorganization plans until 30 days after substantial consummation

---

[1] Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors. In addition, at the confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order, (see Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the product of an abuse of process in the bankruptcy court.

3

of the Confirmed Plan or any modified plan and the exclusive right to solicit and obtain acceptances for those plans until 90 days after substantial consummation of the Confirmed Plan or any modified plan.[2] The Debtors' exclusive right to file a plan, solely as between the Debtors and the Statutory Committees (the "Plan Proposal Period"), has been extended through and including October 31, 2008, and the right to solicit a plan, solely as between the Debtors and the Statutory Committees (the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods"), through and including December 31, 2008.[3]

6. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

7. The statutory predicate for the relief requested herein, solely as between the Debtors and the Statutory Committees, is section 1121(d) of the Bankruptcy Code, as amended and in effect on October 8, 2005.

B. Current Business Operations Of The Debtors

8. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global

---

[2] See Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan, dated April 30, 2008 (Docket No. 13483) (the "Postconfirmation Exclusivity Order").

[3] See Order, Solely As To Statutory Committees, Extending Under 11 U.S.C. § 1121(d) Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan, dated July 31, 2008 (Docket No. 14009) (together with the Postconfirmation Exclusivity Order, the "Postconfirmation Exclusivity Orders").

assets of approximately $13.7 billion.[4] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[5]

9.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

10. Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi

---

[4] The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[5] On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

11.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[6] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

12.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor

---

[6]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

6

vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

    13. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. The Debtors' Transformation Plan

    14. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E. Plan Confirmation And Postconfirmation Matters

    15. The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization

cases. The Confirmation Order approved the Global Settlement Agreement (the "Original GSA") and the Master Restructuring Agreement (the "Original MRA"), which provided for a comprehensive settlement with GM. After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Confirmed Plan to become effective. The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees.

16. The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement. Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Confirmed Plan's effective date to occur by April 4, 2008. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11.

F.  Background Of The Plan Modification Approval Motion

17. The Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable. On September 12, 2008, Delphi announced the steps that they had taken and were taking to complete the successful restructuring of their U.S. operations, transformation of the company on a global basis, and emergence from chapter 11. Those steps included reaching agreements with GM to amend the Original GSA and Original MRA, taking action to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of

Reorganization Business Plan (the "2008-2011 RPOR Business Plan").  Among other changes, the 2008-2011 RPOR Business Plan includes revised actual and expected volumes for the North American automotive market, significant increases in commodities costs that are used as raw materials in certain of Delphi's products, and changes in the underfunded status of its pension plans as a result of negative plan asset return.

        18.      On September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to its pension plans and to implement replacement pension plans.  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the amended GSA (the "Amended GSA") and the amended MRA (the "Amended MRA"), which agreements became effective on September 29, 2008.  Delphi estimates the value of the consideration received under those agreements to be approximately $10.6 billion (increased from approximately $6.0 billion in the original GSA/MRA), which includes an increase of nearly $2 billion in connection with the amount of Delphi's net hourly pension liabilities transferred and to be transferred to GM pursuant to section 414(l) of the Internal Revenue Code (increased from $1.5 billion under the Original GSA to approximately $3.4 billion under the Amended GSA).

        19.      The Amended GSA and Amended MRA allowed the Debtors to carry out their transformation goals of (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Implementation of the Amended GSA and Amended MRA also allowed the Debtors to move forward on the basis of their reaffirmed emergence business plan to enter the capital

markets and to be in a position to negotiate with their stakeholders regarding funding of, and modifications to, the Confirmed Plan.

20.     The Debtors have accordingly formulated certain modifications to the Confirmed Plan which are set forth in the Plan Modification Approval Motion filed on October 3, 2008.  Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

21.     The Debtors seek to extend the Exclusive Periods (solely as to the Statutory Committees) under section 1121(d) of the Bankruptcy Code to prevent any lapse in exclusivity as between the Debtors and the Statutory Committees.  The Debtors seek, and the Debtors are advised that the Statutory Committees do not oppose the relief sought herein, entry of an order further extending (a) the Plan Proposal Period, solely as between the Debtors and the Statutory Committees, through and including January 31, 2009 and (b) the Solicitation Period, solely as between the Debtors and the Statutory Committees, through and including March 31, 2009.  Although the Debtors are requesting a further extension of the Exclusive Periods solely as between the Debtors and the Statutory Committees, the Debtors nonetheless anticipate emerging from chapter 11 as soon as reasonably practicable.  As explained above, the Exclusive Periods as to all other parties-

in-interest are currently extended until after substantial consummation of the Confirmed Plan or any modified plan.

## Basis For Relief

22.  As noted above, the Debtors filed a reorganization plan, solicited acceptances of that plan, obtained confirmation of it, and, after the Confirmation Order became final, commenced a formal closing process that was suspended on April 4, 2008 pending the Debtors' pursuit of their remedies against the Plan Investors in ongoing litigation and exploration with their stakeholders of possible modifications to the Confirmed Plan.  The Debtors have now implemented the Amended GSA and Amended MRA and filed proposed modifications to the Confirmed Plan as part of the Plan Modification Approval Motion.

23.  The Exclusive Periods are intended to afford chapter 11 debtors a full and fair opportunity to rehabilitate their businesses and to negotiate, propose, confirm, and consummate a reorganization plan without the deterioration and disruption of their businesses that might be caused by the filing of competing reorganization plans by non-debtor parties.  A further extension of the Exclusive Periods is justified by the significant progress the Debtors have made toward reorganization since they last sought an extension of the Exclusive Periods.

24.  In addition to operating their business and achieving the other accomplishments described below, the Debtors have continued to make progress in their reorganization in four major areas.  First, the Debtors completed their reaffirmation process for their 2008-2011 RPOR Business Plan.

25.     Second, the Debtors reached agreement with GM and implemented the Amended GSA and the Amended MRA and effected the first of two transfers of U.S. hourly pension liabilities to the GM hourly pension plan in the net amount of approximately $2.1 to $2.4 billion.

26.     Third, the Debtors obtained Court authority to freeze their existing hourly and salaried pension plans and will provide, as applicable, replacement cash balance or defined contribution pension benefits, a salaried retirement and equalization savings program, and a supplemental executive retirement plan.

27.     Fourth, the Debtors filed the Plan Modification Approval Motion to implement modifications to the Confirmed Plan that should enable Delphi to emerge from chapter 11 as soon as reasonably practicable.

28.     Moreover, the Debtors continue litigation against the Plan Investors and related parties with respect to their refusal to honor their commitments under the Investment Agreement. Combined with the other accomplishments detailed below, the unresolved contingencies relating to emergence, and the size and complexity of the Debtors' cases, the Debtors' continued progress toward emergence justifies a further extension of the Exclusive Periods solely as between the Debtors and the Statutory Committees. Finally, the Statutory Committees have informed the Debtors that they will not oppose the relief requested herein.

<u>Applicable Authority</u>

29.     Under the Bankruptcy Code, a bankruptcy court may confirm only one plan of reorganization. <u>See</u> 11 U.S.C. § 1129(c). Because the Plan was confirmed on January 25, 2008 pursuant to the Confirmation Order that became final on February 4,

2008, and because that order cannot be revoked unless "procured by fraud," see 11 U.S.C. § 1144, no other plan of reorganization may now be filed or solicited in these cases. Instead, unless the Confirmed Plan is withdrawn by the Debtors in accordance with the discretion granted to them by § 14.7(a) of the Confirmed Plan, only modifications to the Confirmed Plan proposed and prosecuted by the Debtors in accordance with section 1127 of the Bankruptcy Code may be considered by the Court. Thus, section 1129(c) of the Bankruptcy Code operates to extend the exclusive periods until the Confirmed Plan (as modified or otherwise) becomes effective. The Debtors and the Statutory Committees, however, have expressly reserved in the Postconfirmation Exclusivity Orders their rights to address, if any of the Exclusive Periods expires, whether 11 U.S.C. § 1129(c) prevents the Statutory Committees from filing and soliciting a competing plan of reorganization.

30. Nevertheless, section 1121(d) of the Bankruptcy Code permits the court to extend a debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

11 U.S.C. § 1121(d). The court in In re McLean Industries, Inc., 87 B.R. 830 (Bankr. S.D.N.Y. 1987), identified the following factors as relevant to the determination of "cause" to extend a debtor's Exclusive Periods:

(a) the existence of good-faith progress toward reorganization;

(b) existence of an unresolved contingency;

(c) the size and complexity of the debtor's case;

(d)     a finding that the debtor is not seeking to extend exclusivity to pressure creditors "to accede to [the debtor's] reorganization demands"; and

(e)     the fact that the debtor is paying its bills as they come due.

Id. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) (stating that not all factors "are relevant in every case" and court has discretion to "decide which factors are relevant and give the appropriate weight to each").

31.     At least one court has noted that "cause may be measured by a more lenient standard in the determination to grant an enlargement of time in which to gain acceptances to a filed plan." Gaines v. Perkins (In re Perkins), 71 B.R. 294, 299 (W.D. Tenn. 1987) (emphasis added); see also In re Express One Int'l, Inc., 194 B.R. 98 (Bankr. E.D. Tex. 1996) (denying motion to terminate and granting motion to extend exclusivity based in part on debtors' filing of plan and disclosure statement and imminent hearing on disclosure statement). The same standard should apply when a debtor has confirmed a plan and has moved for approval of modifications to the confirmed plan in accordance with section 1127.

32.     In other cases of similar size and complexity to Delphi's, courts have extended the debtors' exclusive rights to propose a plan of reorganization for periods similar to those requested by the Debtors. See, e.g., In re Solutia Inc., No. 03-17949 (Bankr. S.D.N.Y. May 1, 2007) (extending periods for more than 43 months); In re W.R. Grace & Co., No. 01-01139 (Bankr. D. Del. Oct. 3, 2006) (extending exclusive periods for more than six years); In re Kaiser Aluminum Corp., No. 02-10429 (Bankr. D. Del. Nov. 2, 2005) (extending periods for approximately 43 months). In these cases, based upon the preceding factors and in line with other cases of similar size and complexity, sufficient

14

cause exists for a prophylactic extension of the Exclusive Periods as between the Debtors and the Statutory Committees.

G.    The Debtors Have Made Good-Faith Progress Toward Reorganization

33.    An extension of a debtor's exclusive periods is justified by a debtor's progress in resolving issues facing its creditors and estates. McLean Indus., 87 B.R. at 834; In re AMKO Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). The Debtors' progress in these cases thus far is significant and compels a further extension of the Exclusive Periods, should it be necessary.

34.    Proposed modifications to the Confirmed Plan. The Debtors' good-faith progress towards reorganization is most convincingly demonstrated by the completion and implementation of the Amended GSA and Amended MRA and the filing of the Plan Modification Approval Motion. Moreover, since the implementation of Amended GSA and Amended MRA on September 29, 2008, the Debtors have continued their discussions with their key stakeholders in an effort to secure support for the proposed modifications to the Confirmed Plan that would allow the Debtors to implement a new path to emergence and maximize value for all their stakeholders.

35.    Claims reconciliation. Although creditors have filed more than 16,819 proofs of claim asserting approximately $34.0 billion in liquidated amounts plus certain unliquidated amounts, the Debtors have made significant strides in the claims reconciliation process. As of September 30, 2008, the Debtors have objected to approximately 13,800 claims asserting nearly $10.7 billion (plus additional unliquidated amounts) and this Court has granted relief with respect to approximately $10.3 billion in asserted liquidated claims (plus additional unliquidated claims).

15

36.     <u>Other key accomplishments</u>.  In addition to completing their 2008-2011 RPOR Business Plan, obtaining approval to freeze certain pension plans and implement replacement plans, implementing the Amended GSA and Amended MRA, and filing the Plan Modification Approval Motion, the Debtors, since they last sought an extension of the Exclusivity Periods, have also:

(a) obtained Court approval for increasing the amount of advances available from GM, from $650 million to $950 million, by an amendment to the GM Arrangement,[7] an adjunct to their debtor-in-possession financing facility;

(b) obtained approval for entry into a restructuring and exchange agreement with Ener1, Inc. relating to restructuring the ownership interests of Delphi Automotive Systems LLC ("DAS LLC") in EnerDel, Inc., a joint venture between DAS LLC and Ener1, Inc.;

(c) obtained an order sustaining the 30th omnibus claims objection;

(d) obtained approval of a settlement among the Debtors, Furukawa Electronic North America APD, and Furukawa Electric Co., Ltd. under which the Debtors reduced certain claims against the estates by approximately $2.7 million and recovered $16.5 million on behalf of the estates; and

(e) advanced the Plan Investor litigation by substantially completing document production, commencing deposition discovery, serving subpoenas for documents on multiple third parties, and participating in mediated settlement discussions.

In summary, the Debtors have continued to make significant, good-faith progress in their chapter 11 cases.

---

[7]   <u>See</u> Order Authorizing Amendment To Arrangement With General Motors Corporation Approved Pursuant To Second DIP Extension Order, dated September 26, 2008 (Docket No. 14289).

H.     Unresolved Contingencies Still Exist

       37.     Courts have also cited the need to resolve an important contingency as justification for extending a debtor's exclusive periods. Although the Debtors have filed proposed modifications to their Confirmed Plan, the Debtors need to obtain Court approval of procedures to solicit acceptance of those modifications and Court approval of the modifications. The tasks of securing exit financing and obtaining approval of the modified Confirmed Plan remain significant for both their magnitude and complexity and amply satisfy the contingency component described in the McLean Industries test.

I.     These Cases Are Large And Complex

       38.     The size and complexity of the Debtors' chapter 11 cases alone constitute sufficient cause to extend the Exclusive Periods as between the Debtors and the Statutory Committees. See, e.g., In re Texaco Inc., 76 B.R. 322, 324-25, 326-27 (Bankr. S.D.N.Y. 1987) (granting extension of exclusive periods based on debtor's size in $28.5 billion asset case with over 300,000 creditors and stockholders); In re United Press Int'l, Inc., 60 B.R. 265, 270 (Bankr. D.D.C. 1986) (granting $40 million company extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan."). These and other authorities show that in large, complex chapter 11 cases, courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, formulate a long-term business plan, and obtain confirmation of a reorganization plan.

       39.     The Debtors' cases are indisputably large and multi-dimensional. The scope of actions that have been taken, and must be taken, to address Delphi's

17

restructuring requirements is exceedingly complex. A review of certain basic statistics noted above makes the foregoing conclusion self-evident. At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods, as between the Debtors and Statutory Committees, under the authorities cited above. Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous significant issues that are unique to the distressed automobile industry and some that affect most large businesses that rely on the capital markets. The extension of the exclusive periods is necessary to continue progress in addressing these complexities.

J.  The Debtors Are Using Exclusivity For A Proper Purpose

40. Courts have denied extensions of exclusive periods when plan negotiations among parties-in-interest have broken down and the continuation of exclusivity would merely give the debtor unfair bargaining leverage over the other parties-in-interest. See Teachers Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in the Woods), 10 B.R. 338, 345 (E.D. Mich. 1981). Here, however, the Debtors' precautionary request for an extension of the Exclusive Periods as between the Debtors and the Statutory Committees is not a negotiation tactic. The Debtors negotiated with their stakeholders and obtained their acceptance of the Plan. The Debtors have continued to negotiate with their stakeholders, most recently by obtaining the Creditors' Committee's withdrawal of its opposition to the Debtors' entry into the Amended GSA and Amended MRA with GM as approved by the Court.

K.      The Debtors Are Paying Their Bills As They Come Due

41.     Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency. See In re Ravenna Indus., Inc., 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982). The Debtors are paying their bills as they come due, including the statutory fees paid quarterly to the United States Trustee.

L.      The Debtors Have Shown Cause To Further Extend The Exclusive Periods

42.     As described above, the Debtors have made significant and productive strides in these chapter 11 cases. Based on this progress and all the other applicable factors, sufficient cause exists to extend the Exclusive Periods as between the Debtors and the Statutory Committees. Accordingly, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

Notice

43.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Twelfth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered July 23, 2008 (Docket No. 13965). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) extending the Debtors' exclusive periods, solely as between the Debtors and the Statutory Committees, (i) to file a plan of reorganization through and including January 31, 2009 and (ii) to solicit acceptance of a plan of reorganization through and including March 31, 2009 and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
October 3, 2008

      SKADDEN, ARPS, SLATE, MEAGHER
      & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr.
     George N. Panagakis
     Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By:   /s/ Kayalyn A. Marafioti
     Kayalyn A. Marafioti
     Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession