**Hearing Date and Time:  November 24, 2008 at 10:00 a.m.**
**Objection Deadline:  November 20, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                   :

In re                  :    Chapter 11
                   :

DELPHI CORPORATION, et al.,  :    Case No. 05-44481 (RDD)
                   :

           Debtors.  :    (Jointly Administered)
                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER (I) SUPPLEMENTING JANUARY 5, 2007 DIP REFINANCING
ORDER (DOCKET NO. 6461) AND AUTHORIZING DEBTORS TO ENTER INTO AND
IMPLEMENT ACCOMMODATION AGREEMENT WITH AGENT AND PARTICIPATING
LENDERS AND (II) AUTHORIZING DEBTORS TO (A) ENTER INTO RELATED DOCUMENTS
AND (B) PAY FEES IN CONNECTION THEREWITH

("ACCOMMODATION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Expedited Motion For Order (I) Supplementing January 5, 2007 DIP

Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement

Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing

Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith (the

"Motion"), and respectfully represent as follows:

<u>Preliminary Statement</u>

1.    Through this Motion, the Debtors seek the authority to continue their use

of the proceeds from their DIP Facility[1] through June 30, 2009 (as described more fully in

paragraph 37) by entering into an accommodation agreement with the Agent and certain lenders.

This agreement reflects the support of the Agent and the anticipated support of the Participating

Lenders for the Debtors' turnaround efforts, despite the current economic downturn and the

unprecedented turmoil in the capital markets.  The Accommodation Agreement implements

provisions of the DIP Facility previously negotiated by the Debtors to be used in the event that

extension of the DIP Facility was not practical, available, or desirable.  The Debtors believe that

it is necessary and appropriate to enter into the Accommodation Agreement and pay the fees

associated with the agreement to preserve their liquidity while they seek sufficient emergence

capital funding so that they can emerge from chapter 11 as soon as practicable.

2.    The Debtors' accomplishments (including those which have been

implemented so far this year) in connection with the Transformation Plan have been significant

and the Accommodation Agreement will support the Debtors' continued transformative progress

---

[1]    Defined terms used in this Preliminary Statement are defined below.

and the Debtors' efforts to emerge from chapter 11.[2]  By way of illustration, on September 26,

2008, following negotiations with the Creditors' Committee, the Debtors received the authority

to implement the Amended GSA and the Amended MRA.  The Amended GSA and Amended

MRA, among other things, produced $4.6 billion in incremental net contributions to Delphi from

GM (resulting in an expected net contribution from GM in the approximate amount of $10.6

billion), pulled forward GM's financial obligations under the Original GSA and Original MRA to

the effective date of the Amended GSA and Amended MRA, made all of GM's incremental

financial contributions in the Amended GSA and Amended MRA immediately and

unconditionally effective on the effective date of the Amended GSA and Amended MRA (except

with respect to the acceleration of payment terms and the Second Net Liability 414(l) transfer

which will occur upon the GSA Consummation Date), eliminated substantially all of GM's

termination rights, and eliminated substantial conditional aspects of the Original GSA and

Original MRA (including GM's consent rights over the Plan, the Confirmation Order, and any

modifications thereto).  The agreements became effective on September 29, 2008, and the

Debtors and GM executed the first step of the section 414(l) transfer on that date, transferring

approximately $2.1 billion of the Debtors' net unfunded hourly pension liabilities to GM's

pension plan.

3.      Following the implementation of the Amended GSA and the Amended

MRA, the Debtors continued to take steps toward emergence from chapter 11.  On October 3,

2008, the Debtors filed the Plan Modification Approval Motion, which included the Debtors'

revised emergence business plan and enterprise valuation.  That same day, the United States

---

[2]    The Plan Modification Approval Motion (Docket No. 14310) and the modified Disclosure Statement
accompanying that motion explain in great detail the progress the Debtors have made in implementing their
transformation plan (the "Transformation Plan").  The Debtors have continued to implement portions of their
Transformation Plan notwithstanding the Plan Investors' refusal to fund their Investment Agreement with
Delphi and close the confirmed Plan on April 4, 2008.

House of Representatives approved the federal bailout plan, now known as the Troubled Asset Relief Program or "TARP." However, on the following Monday, and for much of the rest of the month of October, the global credit markets seized up and the global capital markets experienced one of the five worst bear markets in their history. Despite the efforts of the federal government to provide stability to the capital markets and banks, the markets have remained extremely volatile and liquidity in the capital markets has been nearly frozen, resulting in an unprecedented challenge for the Debtors to successfully attract emergence capital funding for their Modified Plan. Nevertheless, assuming that this Court approves this Motion and the companion GM Arrangement Second Amendment Agreement Approval Motion,[3] the Debtors will continue to work with their stakeholders in an effort to emerge from chapter 11 as quickly as practicable despite the difficult economic environment.

4.        The Debtors believe that the relief requested in the Motion is appropriate and in the best interests of their stakeholders. Through the Accommodation Agreement, certain Tranche A Lenders and Tranche B Lenders would agree to, among other things, allow the Debtors to continue using the proceeds of the DIP Facility notwithstanding, among other things, the DIP Facility's maturity date of December 31, 2008. As discussed in further detail, under the terms of the Second Amended and Restated DIP Credit Agreement, the Debtors are not required to seek an accommodation agreement with the Tranche C Lenders, but for the reasons set forth below, the Debtors are nevertheless seeking this Court's approval of certain incentives for the Tranche C Lenders to participate in the Accommodation Agreement. The Debtors believe that

---

[3]        Contemporaneously herewith, the Debtors are filing the Expedited Motion For Order Authorizing Debtors to Enter (I) Second Amendment To Arrangement With General Motors Corporation Approved Pursuant To Second DIP Extension Order (Docket No. 13489) And (II) Partial Temporary Accelerated Payment Agreement With General Motors (the "GM Arrangement Second Amendment Agreement Approval Motion"), which seeks, among other things, authorization for the Debtors to amend their current arrangement with GM to (i) extend the terms of GM's commitment to provide to Delphi $300 million of liquidity enhancement and (ii) provide up to an additional $300 million of additional liquidity during the second quarter of 2009 through a temporary acceleration of GM's accounts payable to the Debtors.

the Accommodation Agreement is critical in these chapter 11 cases, and expect to have the

consent of the requisite Tranche A Lenders and Tranche B Lenders at or prior to the hearing on

the Motion.

Background

A.    The Chapter 11 Filings

   5.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

   6.    No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders (together with the official committee of unsecured creditors, the

"Statutory Committees").

   7.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court

entered an order approving the adequacy of the Disclosure Statement and granting the related

solicitation procedures motion on December 10, 2007 (Docket No. 11389).  On January 25,

2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the

"Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors

on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as

5

confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.  On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11.  On October 3, 2008 the Debtors filed a motion (Docket No. 14310) (the "Plan Modification Approval Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and related modifications to the December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.  However, given the current crisis in the global debt and equity markets, the Debtors plan to continue the hearing on the Plan Modification Motion pending further discussions with emergence capital funding parties and an assessment of which supplemental plan modifications are warranted in the current conditions to enable the Debtors to emerge from chapter 11 as soon as practicable.

8.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

9.      The statutory predicates for the relief requested herein are sections 361, 362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001, and 6004(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

10.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately

6

$13.7 billion.[4]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.[5]

11.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

12.    Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

---

[4]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its
worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[5]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

C.    Events Leading To The Chapter 11 Filing

13.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[6] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

14.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

15.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

---

[6]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

D.    The Debtors' Transformation Plan

16.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

17.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM. After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Confirmed Plan to become effective. On April 4, 2008, having satisfied those conditions, the Debtors began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees. The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement. Following April 4, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

9

18.     On September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations, transformation of the company on a global basis, and emergence from chapter 11.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

19.     Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

20.     Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan: (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimates the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA), which includes an increase of nearly $2 billion in connection with the amount of Delphi's net hourly pension liabilities transferred and to be transferred to GM pursuant to section 414(l) of the Internal Revenue Code (increased from $1.5 billion under the Original GSA to approximately $3.4 billion under the Amended GSA).  As

part of the approval process of the Amended GSA and Amended MRA, Delphi, GM, and the Creditors' Committee negotiated a consensual first amendment to the Amended GSA which sets forth the circumstances under which GM would allocate a portion of its recovery to unsubordinated general unsecured creditors.

21.    Through the transfer of pension assets and liabilities to GM described above and the freezing of Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's U.S. unions), Delphi has substantially achieved its pension funding strategy objectives for hourly employees.  In addition, on  September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to certain of its pension plans and to implement replacement pension plans (the "Pension Order").  With respect to its salaried employees, pursuant to the Pension Order, on September 30, 2008, Delphi froze the applicable salaried pension plans and implemented replacement plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

22.    As a result of all the factors described above, the Debtors were able to formulate certain modifications to the Confirmed Plan, which are set forth in the Plan Modification Approval Motion filed on October 3, 2008, and which are currently under review in light of the current conditions of the global capital markets and global automotive industry.

23.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

11

F.    The DIP Facility

24.    Prior to commencing these chapter 11 cases, the Debtors' secured bank debt arose under that certain Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as amended, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement").  The Prepetition Credit Agreement provided for revolving loans, term loans, swingline loans, and the issuance of letters of credit up to an aggregate principal amount of $2.825 billion.  As of the Petition Date, Delphi was indebted to a syndicate of lenders (the "Prepetition Secured Lenders") in the aggregate amount of approximately $2,579,783,051.85 (the "Prepetition Credit Facility").

25.    After the Debtors commenced these chapter 11 cases, on October 28, 2005, this Court authorized the Debtors to enter into a $2 billion postpetition credit facility pursuant to the Final Order Under 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 9014 (I) Authorizing Debtors To Obtain Postpetition Financing, (II) To Utilize Cash Collateral And (III) Granting Adequate Protection To Prepetition Secured Parties (Docket No. 797) (the "Original DIP Order").  The Original DIP Order authorized the Debtors to obtain a $1.75 billion revolving line of credit and a $250 million term loan (the "Original DIP Facility") from a syndicate of lenders (the "Original DIP Lenders").  The Original DIP Facility was secured by (a) a perfected first priority lien on substantially all of the Debtors' otherwise unencumbered assets (subject to certain exclusions), (b) a perfected junior lien on substantially all of the Debtors' previously encumbered assets (subject to certain exclusions), (c) superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the Original DIP Facility, and (d) a first priority senior priming lien (the "Priming Lien") under section 364(d)(1) of the Bankruptcy Code on substantially all of the Debtors' property.  Pursuant to the Original

12

DIP Order, the result of the Priming Lien was that the Prepetition Secured Lenders' liens were
subordinated to those liens securing the Original DIP Lenders' claims under the Original DIP
Facility.  Because the Prepetition Secured Lenders were being primed, the Original DIP Order
granted them an adequate protection package (the "Adequate Protection Package") which
included, in addition to other relief, adequate protection liens, superpriority administrative claims
under 11 U.S.C. § 507(b), and a higher rate of interest as contemplated under the Prepetition
Credit Agreement.

        26.     In late 2006, in light of the then-favorable environment in the capital
markets, the Debtors determined that they could replace their existing Prepetition Credit Facility
and Original DIP Facility with a new facility combining the two on more favorable terms.  The
Debtors made this decision during the same period when the Debtors were (i) seeking approval
of an equity purchase and commitment agreement under which the Plan Investors agreed to
invest up to $3.4 billion in preferred and common equity in reorganized Delphi and (ii) finalizing
the framework of a plan of reorganization that would provide substantial recoveries for creditors.

        27.     In that context, on December 18, 2006, the Debtors sought an order from
this Court authorizing them to refinance the Prepetition Credit Facility and Original DIP
Facility.[7]  On January 5, 2007, pursuant to the Order Under 11 U.S.C. §§ 105, 361, 362, 363,
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And
6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors
To Refinance Secured Post-Petition Financing And Prepetition Secured Debt (Docket No. 6461)
(the "DIP Refinancing Order"), this Court authorized the Debtors to refinance their secured debt

---

[7]     Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),
        And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Postpetition
        Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured
        Debt (Docket No. 6180).

by entering into the current postpetition financing facility (the "DIP Facility") governed by the

Revolving Credit, Term Loan, and Guaranty Agreement (the "DIP Credit Agreement") with

JPMorgan Chase Bank, N.A. ("JPMorgan" or the "Agent") serving as administrative agent.

28.    The DIP Facility was essentially a $4.5 billion replacement financing

facility, the proceeds of which the Debtors used to repay the $2.0 billion Original DIP Facility

and the approximately $2.5 billion outstanding on the Debtors' $2.825 billion Prepetition Credit

Facility.  The terms of the DIP Credit Agreement were specifically negotiated to maintain in all

material respects the relative priority between the Prepetition Secured Lenders and the Original

DIP Lenders (together, the "DIP Lenders").  The DIP Facility replaced the Original DIP Loan

with a replacement $1.75 billion first priority revolving credit facility ("Tranche A") and a $250

million first priority term loan ("Tranche B").  The Prepetition Credit Facility was rolled into the

DIP Facility as an approximately $2.495 billion second priority term loan ("Tranche C").  The

Debtors estimate that as a result of the refinancing effected by the DIP Credit Agreement, since

the effective date of the refinancing they have saved approximately $143 million in interest

expenses that would have been owed to the Prepetition Secured Lenders under the Prepetition

Credit Facility.

29.    Like the Original DIP Facility, the DIP Facility is secured by (a) a

perfected first priority lien on substantially all of the Debtors' otherwise unencumbered assets

(subject to certain exclusions), (b) a perfected junior lien on substantially all of the Debtors'

previously encumbered assets (subject to certain exclusions), (c) superpriority administrative

expense claims under section 364(c)(1) of the Bankruptcy Code in respect of the Debtors'

obligations under the DIP Facility, and (d) a first priority senior priming lien under section

364(d)(1) of the Bankruptcy Code on substantially all of the Debtors' property.[8]  Borrowings

under the DIP Facility may be prepaid at the Debtors' option without premium or penalty.

        30.     In negotiating the DIP Credit Agreement, the Debtors, the Agent, and the

DIP Lenders agreed to certain provisions to protect the Debtors and their stakeholders, including

the Original DIP Lenders and the Agent, from the potential consequences of a downturn in the

credit markets, and incorporated those provisions into the agreement.  For example, the parties

agreed that, if an Event of Default (as defined in the DIP Credit Agreement) were to occur, the

Agent may, and upon the request of "Required Lenders" shall, exercise the various rights

provided for under section 7.01 of the DIP Credit Agreement.  Required Lenders were defined

generally in the DIP Credit Agreement as DIP Lenders holding more than 50% of the Tranche A

and Tranche B commitments and exposure by amount.  Accordingly, the DIP Credit Agreement

gave the Tranche A lenders (the "Tranche A Lenders") and the Tranche B lenders (the "Tranche

B Lenders") the right to vote to direct the Agent to take certain actions in response to an Event of

Default.  The Tranche C lenders (the "Tranche C Lenders") did not receive such voting rights.

Nevertheless, refinancing of the debt under the Prepetition Credit Facility, the payment of fees to

the Tranche C Lenders, and granting administrative claim status, among other things, were

sufficient incentives to garner lender support, including holders of the Prepetition Credit Facility,

to consummate the refinancing.  Moreover, by limiting the number of participants from whom

the Debtors would have to receive consent in certain situations,[9] the Debtors minimized the

---

[8]    A more detailed description of the terms of the DIP Facility is contained in the Expedited Motion For Order
Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R.
Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II)
Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt dated
December 18, 2006 (Docket No. 6180) (the "DIP Motion"), the DIP Order, and the form of DIP Credit
Agreement attached thereto.

[9]    At the time of the refinancing there were approximately 272 Prepetition Secured Lenders holding positions in
the Prepetition Credit Facility.

"hold-up" risk inherent in unanimous voting provisions.  This foresight provided the Debtors

with more flexibility in their ability negotiate certain amendments to the DIP Facility and

maintain liquidity in a distressed credit market.

        31.     On November 16, 2007, as the Debtors were preparing for a hearing on

their Disclosure Statement, the Debtors sought and the Court entered an Order Supplementing

January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To (I)

Extend Maturity Date Of DIP Facility, (II) Enter Into Related Documents, And (III) Pay Fees In

Connection Therewith (the "DIP Extension Order") (Docket No. 10957), authorizing the Debtors

to enter into an amendment to the DIP Credit Agreement (the "First Amended and Restated DIP

Credit Agreement"), among other things, to extend the term of the DIP Facility from December

31, 2007 to July 1, 2008.  Because this extension occurred during the early stages of the current

downturn in the credit markets, interest rates payable to the DIP Lenders were increased under

the First Amended and Restated DIP Credit Agreement.

        32.     On April 30, 2008, following the Plan Investors' refusal to participate in

the closing or fund their obligations under the Investment Agreement, this Court entered the

Second DIP Extension Order,[10] which authorized the Debtors to enter into an amendment and

restatement of the First Amended and Restated DIP Credit Agreement (the "Second Amended

and Restated DIP Credit Agreement").[11]  This extension was necessary to ensure that the Debtors

had sufficient liquidity during the second half of 2008 to negotiate and obtain approval of the

Amended GSA and the Amended MRA and continue on their path towards emergence.  Among

---

[10]   Order (I) Supplementing January 5, 2007 DIP Order (Docket No. 6461) And Authorizing Debtors To (A)Extend Maturity Date Of DIP Facility, (B) Enter Into Related Documents, And (C) Pay Fees In Connection Therewith And (II) Authorizing Debtors To Enter Into Arrangement With General Motors Corporation Or An Affiliate (Docket No. 13489).

[11]   A copy of the Second Amended and Restated DIP Credit Agreement is attached as <u>Exhibit A</u> hereto.  Neither the First Amended and Restated DIP Credit Agreement nor the Second Amended and Restated DIP Credit Agreement, as supplemented, altered the relative voting rights among the DIP Lenders as described above.

other things, the Second Amended and Restated DIP Credit Agreement extended the maturity of

the DIP Facility to December 31, 2008 and reconfigured the size of the first priority revolving

loan and the first priority term loan.  In fact, at the time of the April 30, 2008 hearing, the

Debtors anticipated that the DIP Facility would consist of a Tranche A first priority revolving

credit facility of up to $1 billion and a Tranche B first priority term loan of up to $600 million,

and that the principal amount of the Tranche C second priority term loan of approximately $2.5

billion would remain unchanged.  As the syndication effort proceeded, however, investor interest

in participating in the Debtors' DIP Facility proved to be significantly stronger than previously

expected.  Indeed, interest in the Debtors' DIP Facility was so high that it resulted in an

oversubscription for the Tranche A, Tranche B, and Tranche C amounts that the Debtors had

anticipated borrowing.  As a result, the Debtors and the DIP Lenders were able to use the

opportunity afforded by the market support at that time to make several improvements to the

structure of the second DIP extension.

        33.      Consequently, the Debtors sought a supplemental order and on May 29,

2008, this Court entered the Supplemental Second DIP Extension Order,[12] which authorized

several adjustments to the DIP Facility in response to market interest.  First, the Debtors

increased the amount of availability under the Tranche A revolving credit facility from $1 billion

to $1.1 billion and decreased the amount of the Tranche B term loan from a maximum amount of

$600 million to $500 million.  In addition, as a result of the then-greater market interest, the

Debtors were able to increase the principal amount of the Tranche C Loan by approximately

$254 million to a total of $2.75 billion.  The maturity date of the DIP Facility under the

Supplemental Second DIP Extension Order remained December 31, 2008 (the "Maturity Date").

---

[12]    Order Supplementing Second DIP Extension Order (Docket No. 13489) Authorizing Increase In Financing
    Commitments In Response To Oversubscription Of Debtors' Syndication Of Second DIP Extension (Docket
    No. 13699) (the "Supplemental Second DIP Extension Order").

Relief Requested

34.     By this Motion, the Debtors seek entry of an order (i) supplementing the

DIP Refinancing Order and authorizing the Debtors to enter into and implement the

Accommodation Agreement (as defined below) with the Agent and Participating Lenders (as

defined below) and (ii) authorizing the Debtors to (a) enter into related documents and (b) pay

fees in connection therewith.

Basis For Relief

35.     As stated above, the DIP Facility currently matures on December 31,

2008.  The Debtors are working to emerge from chapter 11 and believe that they have taken all

appropriate steps to facilitate emergence as quickly as possible in the face of the current

unprecedented turbulence in the credit markets and uncertainty in the automobile industry.  The

Debtors nonetheless believe that it is prudent to take steps at this time to preserve liquidity

because they do not anticipate emerging from chapter 11 prior to the current Maturity Date and

do not believe that all of the DIP Lenders would agree to a further extension of the Maturity Date

on terms that would be reasonably acceptable to the Debtors and their other stakeholders.

Indeed, it is unclear whether certain DIP Lenders would grant a further six-month maturity

extension under any conditions.  The Debtors have negotiated an agreement whereby the Agent

and the requisite Tranche A Lenders and Tranche B Lenders as set forth in the Second Amended

and Restated DIP Credit Agreement (the "Required Lenders") would agree to, among other

things, accommodate the Debtors by allowing the Debtors to continue use the proceeds of the

DIP Facility, to the extent already drawn by the Maturity Date, notwithstanding the passing of

the Maturity Date of December 31, 2008 (the "Accommodation Agreement").  Entry into the

Accommodation Agreement is necessary to enable the Debtors to operate with sufficient and

uninterrupted liquidity to continue to work towards emergence while the capital markets

stabilize.  Further, the protections and incentives that the Accommodation Agreement (together with the agreements to be entered into with GM contemporaneously with the Accommodation Agreement) should provide substantial assurance to the Debtors' stakeholders and should help facilitate the Debtors' efforts to satisfy their emergence capital funding needs as contemplated under the Modified Plan.

G.      The Accommodation Agreement

        36.      To extend the Maturity Date of the DIP Facility, the Debtors are required to obtain the unanimous consent of the DIP Lenders.  Due to the ongoing, unprecedented turbulence in the capital markets and automobile industry, the Debtors do not believe that such consents would be forthcoming from certain of the DIP Lenders.  Indeed, in response to the downturn in the capital markets, certain lenders have implemented or are anticipated to implement institutional restrictions on participation in debtor-in-possession financing facilities or continuing maturities on such existing facilities past the end of the calendar year.  Moreover, the unanimity required to obtain an extension provides individual lenders with disproportionate influence and encourages opportunistic economic behavior in the current environment.  Thus, to protect the Debtors and their stakeholders, as described above, the Debtors negotiated an accommodation agreement that will allow them to preserve liquidity under the DIP Facility without the unanimous consent of all of the DIP Lenders.  As described above, the Debtors bargained for this right under the DIP Facility and are now utilizing it for the benefit of the Debtors and their stakeholders.  The Debtors have begun the process to obtain the necessary consents to consummate the Accommodation Agreement attached in substantially the form of

<u>Exhibit B</u> appended hereto and anticipate receiving consents from the Participating Lenders prior to the hearing on this Motion.[13]

37.    The term of the Accommodation Agreement would be from January 1, 2009 through and including June 30, 2009, unless certain milestones are not satisfied (the "Accommodation Period").[14]  Specifically, the Accommodation Period may be shortened to May 5, 2009 if the Debtors have not met one of the following conditions.  The Debtors must either (a) have received binding commitments, subject to customary conditions, on or prior to February 27, 2009, for debt and equity financing sufficient for them to emerge from chapter 11 pursuant to the Modified Plan or any other plan of reorganization that provides the DIP Lenders with the same treatment as that set forth in the Modified Plan or (b) have (i) filed, on or prior to February 27, 2009, modifications to the Modified Plan or any other plan of reorganization with respect to which the Agent does not submit a notice, within ten business days of such filing, informing the Debtors that the Required Lenders affirmatively oppose such modifications or plan of reorganization (a "Notice"), and (ii) on or prior to March 31, 2009, the Debtors must have obtained entry of this Court's order approving modifications to the disclosure statement with respect to the Modified Plan, as may have been further modified, or such other plan of reorganization as described above.  For the avoidance of doubt, the Agent would submit a Notice only if more than 50% in amount of the holders of Tranche A and Tranche B commitments and exposure vote, within ten business days after the filing of the modifications to the Modified Plan

---

[13]    Any material modifications to the terms of the DIP Accommodation Agreement agreed to subsequent to the filing of this Motion will be filed on the docket and served in the same manner as this Motion.

[14]    The Accommodation Period may be terminated earlier (i) upon the occurrence and continuance for more than five business days of an Automatic Accommodation Termination Default (as defined in the Accommodation Agreement) or (ii) at the direction of Participating Lenders constituting Required Lenders upon the occurrence and during the continuance of any Accommodation Default or Automatic Accommodation Default (both as defined in the Accommodation Agreement), delivery of a written notice terminating the Accommodation Period from the Agent to the Debtors.

or the new plan of reorganization, to oppose such plan modifications (or any such other filed

plan of reorganization) on the grounds that such plan was not acceptable to them.  During the

Accommodation Period, the Debtors would be obligated to continue to comply with all of the

terms and conditions of the Second Amended and Restated DIP Credit Agreement, subject to the

specific amendments provided for by the Accommodation Agreement.

38.    Significantly, during the Accommodation Period, the Debtors would have

continued ability to use the already-drawn proceeds of the DIP Facility (except to the extent such

drawings exceed a specific formula relating to the borrowing base) and there could be no

exercise of remedies available to the DIP Lenders as a result of the occurrence and continuance

of a Specified Default.[15]  The Accommodation Agreement also provides, as a precondition to its

effectiveness, that GM waive its setoff rights and related adequate protection liens with respect

to GM's prepetition claims granted by the current DIP Refinancing Order.  A summary of the

Accommodation Agreement is set forth below:[16]

---

[15]    A Specified Default is defined in Schedule II to the Accommodation Agreement as "[a]ny Event of Default
occurring under the Credit Agreement solely as a result of the failure by the Borrower to pay the principal of the
Loans pursuant to Section 2.13(a) or 2.13(c) of the Credit Agreement, but excluding any other act or omission
by the Borrower or any other Person, or any other event or condition, which exclusion includes, without
limitation, those acts, omissions, events and conditions specifically set forth in the Credit Agreement."

[16]    The chart below is intended only as an illustrative summary.  To the extent the description contained in this
chart is inconsistent with the DIP Accommodation Agreement or the Second Amended and Restated DIP Credit
Agreement, the applicable document controls.

| Accommodation Agreement[17] | |
|---|---|
| **Accommodation** | The Participating Lenders agree to forbear from exercising certain remedies (including with respect to Hedging Agreements subject to certain conditions) that arise from any Specified Default |
| **Interest Rate On Drawn Amounts** | From the effective date of the Accommodation Agreement through the Maturity Date, the following interest rates apply to amounts drawn under the DIP Facility:<br>• Tranche A Borrowings: Increased from L+400 to L+600<br>• Tranche B Borrowings: Increased from L+400 to L+600<br>• Tranche C Borrowings: Increased from L+525 to L+725<br>After the Maturity Date, default interest rates apply, increasing otherwise currently-existing applicable interest rates by 200 basis points |
| **Pledge Of Foreign Stock** | Pledge of 100% equity interests in first-tier Foreign Subsidiaries (subject to certain perfection restrictions). Under the Second Amended and Restated DIP Credit Agreement, pledges of equity in first-tier Foreign Subsidiaries were capped at 65%[18] |
| **Fees** | • The Debtors would pay Participating Lenders an accommodation fee in consideration for entering into the Accommodation Agreement (the "Accommodation Fee"). Specifically, those Participating Lenders that submit a consent to the Accommodation Agreement by November 14, 2008 (or such later deadline as indicated by the Agent) would receive an Accommodation Fee equal to 200 basis points of such Participating Lender's loan<br>• Other fee provisions would be contained in a separate fee letter, which the parties have agreed will be kept confidential[19] |
| **Covenants** | <u>Accommodation Agreement Covenants</u><br>• Minimum Global EBITDAR in the amounts set forth in Section 3(c) of the Accommodation Agreement[20]<br>• Minimum Borrower Liquidity Availability of $100 million<br>• Mandatory prepayment for Borrowing Base insufficiency<br><u>Changes to Covenants in Second Amended and Restated DIP Credit Agreement</u><br>• Cap on permitted Liens on assets of Foreign Subsidiaries reduced from $1.5 billion to $1.25 billion<br>• Added lien basket for non-speculative hedging obligations of Foreign Subsidiaries<br>• Added lien basket for cash collateral of Hedging Agreements up to $350 million<br>• Added lien basket for cash collateral of letters of credit of up to $135 million.<br>• Added debt basket of up to $125 million for letters of credit to replace outstanding letters of credit<br>• Secured Hedging Obligations basket increased from $150 million to $350 million. Secured Hedging Obligations up to $350 million rank *pari passu* with liens created in favor of the Agent, Tranche A Lenders, and Tranche B Lenders under the Loan Documents. Secured Hedging Obligations in excess of $350 million permitted but subordinated to liens created in favor of the Tranche C Lenders under the Loan Documents. |

---

[17]  Defined terms in the following chart that are not specifically defined in this Motion have the meanings ascribed to them in the Accommodation Agreement.

[18]  Such additional pledges of security are to be effectuated through the Debtors' and the Agent's entry into an Amended and Restated Security And Pledge Agreement, which agreement will be provided, upon request, to counsel to the Statutory Committees (on a professionals' eyes only basis) and the U.S. Trustee and will be made available to this Court for review.

[19]  The fee letter will be provided, upon request, to counsel to the Statutory Committees (on a professionals' eyes only basis) and the U.S. Trustee and will be made available to this Court for review.

| Accommodation Agreement[17] | |
|---|---|
| Borrowing Base | If the holders of more than two-thirds of the Tranche A and Tranche B debt execute the Accommodation Agreement, the Borrowing Base is reduced by aggregate Secured Domestic Hedging Obligations of up to $75 million, with no reduction for the first $75 million of Secured Domestic Hedging Obligations.  Currently, reduction is on a dollar-for-dollar basis for Secured Domestic Hedging Obligations in excess of $75 million |
| Events Of Default | New Events of Default under the DIP Facility added, including:<br>• Amendment, waiver, supplement, or modification to the Amended GSA or the Amended MRA for which Bankruptcy Court approval is required that, taken as a whole, materially impairs the rights of the Borrower or Guarantor thereunder, materially reduces the amount, or decelerates the timing, of any material payments under either such agreement, if Required Lenders object<br>• Repudiation in writing or termination of the Amended GSA or the Amended MRA by any party thereto, or a failure to perform any obligation thereunder, which failure materially impairs the rights of the Borrower<br>• Amendment, waiver, modification, or supplementation of any term of the GM-Delphi Agreement or the GM-Delphi Pull-Forward Agreement in certain respects or in a manner that is otherwise materially adverse to the DIP Lenders (specific aspects set forth in the Accommodation Agreement)<br>• Advances not funded by GM due to a Funding Default under Section 4.03 of the GM-Delphi Agreement, which Funding Default shall be continuing for more than three business days from the proposed date of such Advance, and the Required Lenders shall have subsequently declared such Funding Default an Event of Default<br>• Sale or disposition by Borrower or Guarantor for which Bankruptcy Court approval is required under section 363(b) of the Bankruptcy Code of assets with a fair market value equal to or greater than $25 million (other than sales or dispositions listed on Schedule 6.10 to the Second Amended and Restated DIP Credit Agreement or such sales, the proceeds of which are sufficient to repay and will be used to repay in full the DIP Loans and cash-collateralize letters of credit) if Required Lenders object<br>• Judgment or order shall been rendered against any Global Entity with respect to any DIP Loan and enforcement has been successful or enforcement has not been stayed within five business days after entry thereof |
| Automatic Accommodation Termination Defaults | • An Event of Default occurring under Section 7.01(b) (except as a result of a default in required payment of principal of the Loans for Borrowing Base insufficiency and upon maturity), (e), (g), (i), and (j) of the Second Amended and Restated DIP Credit Agreement<br>• Any breach of mandatory prepayment requirements under Section 3(e) of the Accommodation Agreement |
| Lenders' Meeting | Delphi to host meeting of DIP Lenders within five business days of delivering financial statements and reports to update DIP Lenders on the matters set forth in section 5.01 of the Second Amended and Restated DIP Credit Agreement and the chapter 11 cases, the plan of reorganization, and the bankruptcy exit process |
| Financial Advisors | Agent and DIP Lenders have ability to hire additional financial advisors, with fees and expenses to be reimbursed by the Borrower |
| Release | The Debtors provide a release of certain claims and causes of action that arise out of or are related to actions or omissions which occurred on or prior to the date of the Accommodation Agreement with respect to the Obligations, the Accommodation Agreement, the DIP Credit Agreement, and any other Loan Document |
| Assignments | Participating Lenders are only permitted to assign their DIP Loans to another Participating Lender or any other person who agrees to be bound by the Accommodation Agreement |

[20]   To reflect recent modifications achieved through the Amended GSA and Amended MRA, the Accommodation Agreement also modifies the definition of Global EBITDAR to add back pension expenses attributable to Delphi's hourly retirement plan and deducting income attributable to Delphi's hourly retirement plan.

39.     As described above, to implement the Accommodation Agreement, the Second Amended and Restated DIP Credit Agreement requires consent only from the Agent and the Required Lenders.  This arrangement was carefully designed to permit the Required Lenders to grant the Debtors flexibility in the event of unanticipated downside scenarios such as those existing today in the global capital markets and the global automobile industry.

40.     This Accommodation Agreement should preserve and maximize value for all of the Debtors' stakeholders by giving the Debtors an opportunity to complete their reorganization taking into account the current environment.  DIP Lenders' interests continue to be protected by the Bankruptcy Code, which provides that a chapter 11 plan must provide that, unless otherwise agreed by the claimant, holders of administrative claims, such as those held by the DIP Lenders, "on the effective date of the plan . . . receive on account of such claim cash equal to the allowed amount of such claim."  11 U.S.C. § 1129(a)(9)(A).

41.     Notwithstanding the fact that the consent of the Tranche C Lenders is not required to consummate the Accommodation Agreement, the Debtors are seeking this Court's approval to permit the Tranche C Lenders to affirmatively participate in the Accommodation Agreement (including without limitation, execute the agreement) and receive Accommodation Fees (collectively with the Required Lenders, the "Participating Lenders") as an added incentive to assist the Debtors with their emergence capital funding during the current challenging and turbulent times in the credit markets and the auto industry.  This fee is no different than what the Debtors would have expected to pay to all of the Tranche C Lenders had the Debtors procured an extension of the Maturity Date.  In fact, because not all Tranche C Lenders are expected to consent, the aggregate fee paid under the Accommodation Agreement would be less than the fee paid under an extension.  The Debtors, in exercising their business judgment, believe that the long-term benefit of encouraging as many Tranche C Lenders as possible to align their interests

24

and incentives with the Debtors as they work towards emergence outweighs any short-term costs of paying fees to the Tranche C Lenders under the Accommodation Agreement.

42.    The Debtors accordingly propose that they be authorized, but not directed, to perform, and take all actions necessary to make, execute, and deliver the Accommodation Agreement, together with all other documentation executed in connection therewith (the "Accommodation Agreement Documents"), and to pay the related fees contemplated thereby. The Debtors seek a ruling that upon execution and delivery of each of the Accommodation Agreement Documents and such other instruments and documents as may be necessary to effectuate the Accommodation Agreement, such instruments and documents would constitute valid and binding obligations of the Debtors, the Agent, and the Participating Lenders, enforceable against each party thereto in accordance with their respective terms.

43.    The Debtors propose that the DIP Refinancing Order, the DIP Extension Order, the Second DIP Extension Order, and the Supplemental Second DIP Extension Order (the "Prior DIP Orders") be deemed supplemented by the order approving this Motion, and that the Prior DIP Orders continue in full force and effect as supplemented hereby.

<u>Applicable Authority</u>

H.    <u>This Court Should Authorize Accommodation Agreement</u>

(a)    The Accommodation Agreement Is An Appropriate Use
       <u>Of Estate Property Under Section 363(b)(1) Of The Bankruptcy Code</u>

44.    The Debtors submit that entry of an order authorizing the implementation Accommodation Agreement, including the payment of Accommodation Fees, is necessary and appropriate and in the best interests of the Debtors' estates. Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Use of estate property outside the

ordinary course of business may be authorized if the debtor demonstrates a sound business

justification for it.  See Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business

reason exists to grant debtor's application under section 363(b)); see also In re Delaware &

Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).

   45. Based on the foregoing, the Debtors submit that entry of an order

approving the proposed Accommodation Agreement is necessary and appropriate to maintain the

Debtors' liquidity as they continue to work to reorganize.  The proposed Accommodation

Agreement was negotiated in good faith, at arm's length, and in the exercise of the Debtors'

business judgment.  Bankruptcy courts routinely defer to the debtor's business judgment on most

business decisions, including the decision to borrow money.  See Group of Institutional Investors

v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko

Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering whether a debtor has

exercised its business judgment, a court is not free to second-guess particular provisions but

rather must determine whether the proposed action "as a whole is within reasonable business

judgment."  In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

   46. The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a

presumption arises that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated

Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation

omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment

have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not

enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to

produce some evidence respecting its objections."  In re Lionel Corp., 722 F.2d at 1071.

    47.  The Debtors have exercised sound business judgment in determining that

it is appropriate and necessary to enter into the Accommodation Agreement to ensure that the

Debtors have the necessary liquidity to continue to work to complete their reorganization.  The

Debtors have determined that, in light of the current unprecedented turbulence in the capital

markets, it is not practicable to emerge from chapter 11 prior to the Maturity Date.  Accordingly,

the Debtors determined it necessary to negotiate the Accommodation Agreement to ensure that

the Debtors have access to the proceeds of the DIP Facility after the Maturity Date.  The Debtors

have also determined that the proposed fees payable under the Accommodation Agreement are

commercially reasonable under current market conditions.  Moreover, the Debtors in the exercise

of their business judgment have determined that allowing Tranche C DIP Lenders to participate

in the Accommodation Agreement and receive Accommodation Fees would ultimately enhance

the Debtors' emergence capital funding and outweigh the short-term costs.  Indeed, in light of the

current state of the capital markets, the proposed terms of the Accommodation Agreement are

fair, reasonable, and necessary and are in the best interests of the Debtors' estates.  Accordingly,

the Debtors should be granted authority to enter into the Accommodation Agreement, and take

the other actions contemplated by the Accommodation Agreement and as requested herein.

      (b)     The Accommodation Agreement Should Be
                  <u>Approved Under Section 364(c) Of The Bankruptcy Code</u>

        48.     The Debtors believe that section 364 of the Bankruptcy Code is implicated by the Accommodation Agreement because the agreement relates to, incorporates by reference, waives certain provisions of, and materially enhances the provisions of the DIP Facility.  To the extent that section 364 is implicated by the Accommodation Agreement, the agreement is fully appropriate under that statutory provision.  The requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).  This Court already made this finding in the DIP Refinancing Order, which approved the Debtors' DIP Facility.  This finding is even more justified today because the credit markets have deteriorated precipitously from the strong credit environment that existed in January 2007 when the Court entered the DIP Refinancing Order.  Because the DIP Facility will remain in place, subject to the terms of the Accommodation Agreement, the Debtors should be permitted to continue to grant the liens in accordance with section 364(c) of the Bankruptcy Code.

        49.     Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  <u>See</u> <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

50.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether

(a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met when it entered the DIP Refinancing Order.  Because the DIP Facility will remain in place, subject to the provisions of the Accommodation Agreement, this Court's prior findings should continue to apply.

(c)     The Accommodation Agreement Should Be
        Approved Under Section 364(d) Of The Bankruptcy Code

51.     To the extent that section 364(d) of the Bankruptcy Code is implicated by the Accommodation Agreement, the agreement is appropriate and should be approved under that provision.  Section 364(d)(1) provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

(a)     the trustee is unable to obtain such credit otherwise; and

(b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its

29

application is left to the vagaries of each case . . . but its focus is protection of the secured

creditor from diminution in the value of its collateral during the reorganization process.'" Id.

(quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  In this case, the

Debtors have already established that they are unable to obtain credit without priming liens.  The

Accommodation Agreement will not impair the priming lien structure under the DIP Facility, as

amended, including the adequate protection provided to parties whose liens are primed.  Indeed,

the Debtors are confident that by pledging additional equity interests in their first-tier foreign

subsidiaries in favor of the Agent and the DIP Lenders through the Accommodation Agreement,

they have provided more than adequate protection to the DIP Lenders.  Accordingly, to the

extent that the Accommodation Agreement provides for an extension of credit, the Debtors

submit that such extension of credit meets the requirements of section 364(d)(1).

        (d)      The Amended DIP Facility Should
                Be Accorded The Benefits Of Section 364(e)

        52.      Section 364(e) of the Bankruptcy Code provides that the "reversal or

appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a

lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an

entity that extended such credit in food faith, whether or not such entity knew of the pendency of

the appeal, unless such authorization and the incurring of such debt, or the granting of such

priority or lien, were stayed pending appeal."  The Accommodation Agreement was negotiated in

good faith and no consideration is being provided to any party to, or guarantor of, obligations

arising under the amended DIP Facility, other than as disclosed in the Accommodation

Agreement.  Accordingly, the amended DIP Facility should be accorded the benefits of section

364(e) of the Bankruptcy Code for all the reasons set forth herein.

    (e)    <u>Compliance With General Order No. M-274</u>

    53.    The Debtors believe that the relief requested in this Motion and the notice to be provided are in compliance with the Guidelines for Financing Requests (the "Guidelines"), adopted under General Order No. M-274 of the Board of Judges for the Southern District of New York. The Debtors do not believe that entering into the Accommodation Agreement creates any incremental right that would trigger the application of the Extraordinary Provision (as defined in the Guidelines) requirements beyond that which was already satisfied in the DIP Motion and approved by this Court pursuant to the DIP Refinancing Order. Accordingly, the Debtors submit that they have satisfied the Guidelines.

I.    <u>Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004</u>

    54.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that this Court waive this ten-day stay because it is a condition to the effectiveness under section 30(a)(iv) of the Accommodation Agreement that this Court enter an order authorizing the Debtors to implement the Accommodation Agreement no later than November 26, 2008 and that such order not have been stayed. This Court previously granted similar relief from Bankruptcy Rule 6004(g) in approving each of the Prior DIP Orders. Other courts in this district have waived this ten-day stay upon a showing of business need. <u>See</u> <u>In re Adelphia Commc'ns Corp.</u>, 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); <u>In re PSINet Inc.</u>, 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(g)).

## Notice Of Motion

55.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Twelfth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered July 23, 2008 (Docket No. 13965).  In addition, the Debtors have served, among other parties, the setoff claimants and objectors to the Debtors' motion to enter into its original $2 billion postpetition credit facility and the DIP Motion and the DIP Extension Motion.  The Debtors have also provided notice to counsel to the agent for the Debtors' former prepetition credit facility.  Furthermore, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[21]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

[21]    The Debtors have noticed this Motion for hearing on November 24, 2008.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Creditors' Committee has consented to this Motion's being heard on fewer than 20 days' notice.  Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until November 20, 2008 to file an objection to this Motion.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) supplementing the January 5, 2007 DIP Refinancing Order (Docket No. 6461) and authorizing the Debtors to enter into and implement the Accommodation Agreement with the Agent and Participating Lenders, (ii) authorizing the Debtors to (a) enter into related documents, and (b) pay fees in connection therewith, and (iii) granting the Debtors such other and further relief as is just.

Dated:     New York, New York
           November 7, 2008

                        SKADDEN, ARPS, SLATE, MEAGHER
                        & FLOM LLP

                        By:    /s/ John Wm. Butler, Jr.
                               John Wm. Butler, Jr.
                               John K. Lyons
                               Ron E. Meisler
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois 60606
                        (312) 407-0700

                                    - and -

                        By:    /s/ Kayalyn A. Marafioti
                               Kayalyn A. Marafioti
                               Thomas J. Matz
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                                    - and -

                        SHEARMAN & STERLING LLP

                        By:    /s/ Douglas P. Bartner
                               Douglas P. Bartner
                               Andrew V. Tenzer
                               Michael S. Baker
                        599 Lexington Avenue
                        New York, New York  10022
                        (212) 848-4000

                        Attorneys for Delphi Corporation, et al.,
                               Debtors and Debtors-in-Possession