**Hearing Date And Time:  November 24, 2008 at 10:00 a.m.**
**Objection Deadline:  November 20, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER AUTHORIZING DEBTORS
TO ENTER INTO (I) SECOND AMENDMENT TO ARRANGEMENT WITH
GENERAL MOTORS CORPORATION APPROVED PURSUANT TO SECOND DIP
EXTENSION ORDER (DOCKET NO. 13489) AND (II) PARTIAL TEMPORARY
ACCELERATED PAYMENT AGREEMENT WITH GENERAL MOTORS CORPORATION

("GM ARRANGEMENT SECOND AMENDMENT AGREEMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Expedited Motion (the "Motion") For Order Authorizing Debtors To Enter Into (I) Second Amendment To Arrangement With General Motors Corporation Approved Pursuant To Second DIP Extension Order (Docket No. 13489) And (II) Partial Temporary Accelerated Payment Agreement With General Motors Corporation, and respectfully represent as follows:

<u>Preliminary Statement</u>

1.    By this Motion, the Debtors seek authority to enhance their liquidity through June 30, 2009 by entering into two agreements with GM.  First, the Debtors seek authority to amend and extend, through June 30, 2009, their current arrangement with GM pursuant to which GM has agreed to provide up to $300 million of liquidity enhancement. Second, the Debtors seek authority to enter into a new agreement with GM whereby GM would provide an additional aggregate $300 million during the second quarter of 2009 through a temporary acceleration of its accounts payable to the Debtors.  The relief requested in this Motion will afford the Debtors additional liquidity of up to $600 million through the end of the second quarter of 2009.  Coupled with the relief sought in the Accommodation Motion,[1] the relief requested in this Motion should allow the Debtors the time to seek sufficient emergence funding capital to allow them to emerge from chapter 11 as soon as practicable.

2.    The Debtors believe that the relief requested in the Motion is appropriate and in the best interests of their stakeholders.  Through the Second Amendment Agreement and

---

[1]    The Debtors are contemporaneously filing a motion seeking the authority to continue to use the proceeds of their DIP Facility through June 30, 2009 by entering into an accommodation agreement (the "Accommodation Agreement") with the DIP Agent and certain lenders (the "Accommodation Motion").

the Partial Temporary Accelerated Payment Agreement (both as defined below), GM would

provide additional liquidity to the Debtors through the second quarter of 2009, during the period

covered by the accommodation agreement with certain of the DIP Lenders (the "Accommodation

Period").[2]  The Debtors believe that the liquidity provided by the agreements with GM should

help facilitate their plan modifications and emergence strategy while addressing the concerns of

Delphi's customers and suppliers.

3.    The relief sought in this Motion reflects GM's further support for the

Debtors' reorganization efforts.  GM has already made significant and substantial contributions

to the Debtors' reorganization efforts.  On September 26, 2008, the Debtors received the

authority to implement the Amended GSA and the Amended MRA, which agreements became

effective on September 29, 2008.  The Amended GSA and Amended MRA, among other things,

produced $4.6 billion in incremental net contributions to Delphi from GM (resulting in an

expected net contribution from GM in the approximate amount of $10.6 billion), pulled forward

GM's financial obligations under the global settlement agreement and master restructuring

agreement approved as part of the Plan (the "Original GSA" and "Original MRA") to the

effective date of the Amended GSA and Amended MRA, made all of GM's incremental financial

contributions in the Amended GSA and Amended MRA immediately and unconditionally

effective on the effective date of the Amended GSA and Amended MRA (except with respect to

the acceleration of payment terms and the Second Net Liability 414(l) Transfer which will occur

upon the GSA Consummation Date), eliminated substantially all of GM's termination rights, and

eliminated substantial conditional aspects of the Original GSA and Original MRA (including

---

[2]    As described in further detail in the Accommodation Motion, the Accommodation Agreement sets forth certain
milestones, which, if not met, would result in termination of the Accommodation Period on May 5, 2009 rather
than June 30, 2009, as set forth more fully in the Accommodation Agreement.

GM's consent rights over the Plan, the Confirmation Order, and any modifications thereto).  The

agreements became effective on September 29, 2008, and the Debtors and GM executed the first

step of the section 414(l) transfer on that date, transferring approximately $2.1 billion of the

Debtors' net unfunded hourly pension liabilities to GM's pension plan.

4.    Following the implementation of the Amended GSA and the Amended

MRA, the Debtors continued to take steps toward emergence from chapter 11.  On October 3,

2008, the Debtors filed the Plan Modification Approval Motion which included the Debtors'

revised emergence business plan and enterprise valuation.  That same day, the United States

House of Representatives approved the federal bailout plan, now known as the Troubled Asset

Relief Program or "TARP."  However, on the following Monday, and for much of the rest of the

month of October, the global credit markets seized up and experienced one of the five worst bear

markets in history.  Despite the efforts of the federal government to provide stability to the

capital markets and banks, the markets have remained extremely volatile and liquidity in the

capital markets has been nearly frozen, resulting in an unprecedented challenge for the Debtors

to successfully attract emergence capital funding for their Modified Plan, particularly in light of

the current conditions in the global automotive industry.  Nevertheless, assuming that this Court

approves this Motion and the Accommodation Motion, the Debtors will continue to work with

their stakeholders in an effort to emerge from chapter 11 as quickly as practicable despite the

difficult economic environment.

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

5.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

6.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders (together with the official committee of unsecured creditors, the

"Statutory Committees").

7.      On December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court

entered an order approving the adequacy of the Disclosure Statement and granting the related

solicitation procedures motion on December 10, 2007 (Docket No. 11389).  On January 25,

2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the

"Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors

on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as

confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit

financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a

closing that was commenced but not completed and refused to fund their Investment Agreement

(as defined in the Confirmed Plan) with Delphi.  On May 16, 2008, Delphi filed complaints for

damages and specific performance against the Plan Investors and related parties who refused to

honor their equity financing commitments and refused to participate in the closing that would

have led to Delphi's successful emergence from chapter 11.  On October 3, 2008, the Debtors

filed a motion (Docket No. 14310) (the "Plan Modification Approval Motion") under 11 U.S.C.

§ 1127 for an order approving (i) certain modifications to the Confirmed Plan and related

modifications to the December 10 Disclosure Statement and (ii) related procedures for re-

soliciting votes on the Confirmed Plan, as modified.  However, given the current crisis in the

global debt and equity markets, the Debtors plan to continue the hearing on the Plan

Modification Motion pending further discussions with emergence capital funding parties and an

assessment of which supplemental plan modifications are warranted in the current conditions to

enable the Debtors can emerge from chapter 11 as soon as practicable.

8.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

9.      The statutory predicates for the relief requested herein are sections 361,

362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001, and 6004 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

10.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately

$13.7 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

---

[3]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its
worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.[4]

11.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology. The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

12.    Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries. Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM. In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications. Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

13.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income. Every year thereafter, however,

---

[4]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31,
2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[5]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

14.    The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

15.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

---

[5]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
calendar year 2004 was $482 million.

D.    The Debtors' Transformation Plan

16.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

17.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Confirmed Plan to become effective.  On April 4, 2008, having satisfied those conditions, the Debtors began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees.  The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement.  Following April 4, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

18.    On September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations, transformation of the company on a global basis, and emergence from chapter 11.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

19.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

20.    Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan: (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimates the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA), which includes an increase of nearly $2 billion in connection with the amount of Delphi's net hourly pension liabilities transferred and to be transferred to GM pursuant to section 414(l) of the Internal Revenue Code (increased from

10

$1.5 billion under the Original GSA to approximately $3.4 billion under the Amended GSA).  As

part of the approval process of the Amended GSA and Amended MRA, Delphi, GM, and the

Creditors' Committee negotiated a consensual first amendment to the Amended GSA which sets

forth the circumstances under which GM would allocate a portion of its recovery to

unsubordinated general unsecured creditors.

       21.    Through the transfer of pension assets and liabilities to GM described

above and the freezing of Delphi's hourly pension plan (which was also approved as part of the

Amended GSA with the consent of Delphi's U.S. unions), Delphi has substantially achieved its

pension funding strategy objectives for hourly employees.  In addition, on  September 23, 2008,

this Court entered an order authorizing the Debtors to take certain actions with respect to certain

of its pension plans and to implement replacement pension plans (the "Pension Order").  With

respect to its salaried employees, pursuant to the Pension Order, on September 30, 2008, Delphi

froze the applicable salaried pension plans and implemented replacement plans that will be more

cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

       22.    As a result of all the factors described above, the Debtors were able to

formulate certain modifications to the Confirmed Plan, which are set forth in the Plan

Modification Approval Motion filed on October 3, 2008, and which are currently under review in

light of the current condition of the global capital markets and global automotive industry.

       23.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will seek to preserve and continue the strategic growth of its non-U.S. operations

and maintain its prominence as the world's premier auto supplier.

F.      The DIP Facility

        24.    Concurrently with this Motion, the Debtors have filed the Expedited

Motion For Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461)

And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent

And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents

And (B) Pay Fees In Connection Therewith in which the Debtors request authorization to

continue their use of the proceeds from their DIP Facility through June 30, 2009 by entering into

an accommodation agreement with the Agent and certain lenders thereunder (the

"Accommodation Agreement").  The Accommodation Agreement implements provisions

previously negotiated by the Debtors to permit the Debtors to maintain liquidity beyond any DIP

maturity with the agreement of the holders of more than 50% of the tranche A and tranche B DIP

commitments by amount.  Although under the terms of the Second Amended and Restated DIP

Credit Agreement[6] the Debtors are not required to seek an accommodation agreement with the

tranche C lenders, the Debtors are nevertheless seeking this Court's approval under the

Accommodation Motion of certain incentives for those tranche C lenders which participate in the

Accommodation Agreement.

G.      The GM Arrangement And First Amendment Agreement

        25.    Pursuant to various orders entered by this Court during these chapter 11

cases, and in anticipation of entering into the Original GSA and the Original MRA, the Debtors

---

[6]     On April 30, 2008, this Court entered an order (Docket No. 13489) ("the Second DIP Extension Order")
        authorizing the Debtors to enter into an amendment and restatement of its credit agreement (the "Second
        Amended and Restated DIP Credit Agreement") which extended the maturity of the postpetition financing
        facility (the "DIP Facility") to December 31, 2008 and reconfigured the size of the first priority revolving loan
        and the first priority term loan.

expended significant sums that would otherwise have been paid or reimbursed by GM following

the effectiveness of the Original GSA and the Original MRA.  In connection with the Debtors'

efforts to secure lender support for the amendments to the DIP Facility reflected in the Second

Amended and Restated DIP Credit Agreement, certain of the Debtors entered into an agreement

with GM dated as of May 9, 2008, a copy of which is attached hereto as <u>Exhibit A</u> (the "GM

Arrangement"), pursuant to which GM agreed to make specified accommodations to enhance the

Debtors' liquidity through the second half of 2008.[7]

        26.    Following the entry into the GM Arrangement, and to further enhance the

Debtors' liquidity, GM and the Debtors entered into a first amendment to the GM Arrangement

effective as of October 6, 2008, a copy of which is attached hereto as <u>Exhibit B</u>[8] (the "First

Amendment Agreement," and together with the GM Arrangement, the "Amended GM

Arrangement").   This Court entered an order authorizing the Debtors to enter into the First

Amendment Agreement on September 26, 2008 (Docket No. 14289) (the "First Amendment

Agreement Order").

        27.    Under the Amended GM Arrangement, GM agreed to continue to make

loans to the Debtors in an aggregate amount of up to $650,000,000, subject to the terms set forth

therein (the "GM Tranche A Commitment").  Amounts advanced under the GM Tranche A

Commitment accrued interest at the same rate as the tranche C term loan under the DIP Facility

on a paid-in-kind basis.  When the Amended GSA and Amended MRA became effective on

September 29, 2008, the GM Tranche A Commitment terminated, the accrued interest on the

---

[7]    This Court approved the GM Arrangement as part of the Second DIP Extension Order, which was subsequently supplemented by the First Amendment Agreement Order (Docket No. 14289).

[8]    Pursuant to this Court's Order Under 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 Authorizing Debtors to File Schedule to Amendment to Arrangement with General Motors Corporation Under Seal, dated August 11, 2008 (Docket No. 14055), the Debtors have not included Schedule 1 as part of <u>Exhibit B</u> attached hereto.

advances was cancelled, and the advancements were set off against amounts to be paid by GM or

its affiliates for the benefit of the Debtors under the Amended GSA and the Amended MRA.

28.    Under the Amended GM Arrangement, GM has made available to the

Debtors an additional $300 million in advances pursuant to section 364(b) of the Bankruptcy

Code and the terms of the First Amendment Agreement (the "GM Tranche B Commitment").

The GM Tranche B Commitment remains available to the Debtors notwithstanding the

effectiveness of the Amended GSA and Amended MRA.  The maturity date for the GM Tranche

B Commitment under the First Amendment Agreement is the earliest of (i) December 31, 2008,

except that if this Court has entered a final and non-appealable order approving the extension of

the DIP Credit Agreement on substantially the same terms (other than pricing) as the DIP Credit

Agreement in effect as of October 6, 2008, or on terms otherwise reasonably acceptable to GM,

upon request by Delphi, and if mutually agreed by GM and Delphi, such date may be extended to

the earlier of (x) June 30, 2009 and (y) the Termination Date (as defined in the DIP Credit

Agreement and as such Termination Date may be amended, replaced, or otherwise modified

pursuant to such order), (ii) the date on which Delphi or any guarantor of the GM Arrangement

files any motion or other pleading seeking to amend the Plan or Disclosure Statement in a

manner not reasonably acceptable to GM,[9] (iii) the termination of the DIP Facility, and (iv) the

occurrence of the effective date of the Plan.

29.    Pursuant to the Amended GM Arrangement, Delphi agreed to pay certain

fees and expenses and to indemnify certain parties under specified conditions.  In addition, the

Debtors, other than Delphi, that are parties to the Amended GM Arrangement guaranteed

---

[9]    Pursuant to the Amended GM Arrangement, GM also had the right to terminate the Amended GM Arrangement
if the Debtors had not filed amendments to the Plan and Disclosure Statement with this Court that were
reasonably satisfactory to GM on or prior to October 31, 2008.  It is the Debtors' position that due to the filing
of the modifications to the Plan and Disclosure Statement on October 3, 2008, GM no longer has a termination
right on account of this provision.

14

Delphi's obligations thereunder.  The Amended GM Arrangement also provides that the Debtors'

obligations thereunder are entitled to administrative expense priority under section 503(b)(1) of

the Bankruptcy Code, subject to the terms of the Amended GM Arrangement and the Second

DIP Extension Order.

<u>Relief Requested</u>

30.    By this Motion, the Debtors seek entry of an order authorizing the Debtors

to enter into a second amendment to the GM Arrangement (the "Second Amendment

Agreement"), a copy of which is attached hereto as <u>Exhibit C</u>, which allows Delphi to continue

to maintain access to the $300 million of liquidity provided by the GM Tranche B Commitment

through June 30, 2009.  Concurrently, the Debtors seek authorization to enter into an accelerated

payment agreement with GM (the "Partial Temporary Accelerated Payment Agreement" or

"PTAPA") substantially in the form attached hereto as <u>Exhibit D</u>, through which the Debtors will

gain access to an additional aggregate $300 million during the second quarter of 2009.

<u>Basis For Relief</u>

31.    The Debtors have determined that it would be prudent to further enhance

their liquidity through the first half of 2009 as they continue to work towards emergence from

chapter 11.  To achieve the maximum liquidity available given the current state of the capital

markets, Delphi has developed a liquidity strategy comprised of three parts: the Accommodation

Agreement with the DIP Lenders (which is the subject of the Accommodation Motion filed

concurrently herewith), the Second Amendment Agreement, and the Partial Temporary

Accelerated Payment Agreement.  Although they are separate agreements, each of the three

agreements contemplates the existence and effectiveness of the other two agreements and each

utilizes certain terminology and measurements used by the other agreements.  Collectively, the

agreements are designed to provide the Debtors with liquidity while the capital markets stabilize.

15

All three agreements are necessary to facilitate the Debtors' continued efforts to work towards emergence from chapter 11 as soon as possible.

32.     As explained above, the Debtors and GM initially entered into the GM Arrangement to provide a means by which GM could advance amounts paid by the Debtors that would have been paid or reimbursed to the Debtors had the Original GSA and the Original MRA become effective.  At the time that the Amended GSA and Amended MRA became effective on September 29, 2008 (and the $650 million GM Tranche A Commitment terminated), market conditions had deteriorated significantly, thereby limiting the Debtors' access to the credit markets.  As set forth in further detail below, the Second Amendment Agreement would extend the aggregate $300 million GM Tranche B Commitment to June 30, 2009, subject to certain additional terms and conditions.  In addition, under the Partial Temporary Accelerated Payment Agreement, GM would provide an additional aggregate $300 million liquidity enhancement to the Debtors during the second quarter of 2009 through a temporary acceleration of their accounts payable to the Debtors.

H.      The Second Amendment Agreement

33.     The Amended GM Arrangement, as modified by the Second Amendment Agreement (the "Second Amended GM Arrangement"), functions as an adjunct to the DIP Facility, effectively providing Delphi with $300 million in additional unsecured, subordinated advancements from GM, thereby continuing a definite and reliable source of liquidity during an extended period of uncertainty in the capital markets generally and the automotive industry in particular.

34.     Under the terms of the Second Amendment Agreement, GM has agreed, subject to this Court's approval, to make available to the Debtors up to $300 million through the maturity date of the Second Amendment Agreement, subject to certain modified borrowing

16

mechanics and provided that certain conditions are met.  The maturity date for the Second

Amendment Agreement will be the earliest of (i) June 30, 2009, (ii) the date on which Delphi or

any guarantor of the GM Arrangement files any motion or other pleading seeking to amend the

Plan or Disclosure Statement filed by the Debtors on October 3, 2008 in a manner not reasonably

acceptable to GM, (iii) the DIP Termination Date (as defined in the Second Amended GM

Arrangement, (iv) on or after January 1, 2009, the expiration or termination of the

Accommodation Agreement or the Accommodation Period, and (v) the occurrence of the

effective date of the Plan.  In addition, certain modifications were made to the Amended GM

Arrangement that protects GM in the event the Accommodation Agreement is modified in a

manner adverse to GM.  In such circumstance, to the extent that Delphi seeks continued access to

the Second Amended GM Arrangement, GM would have approval rights with respect to such

modifications to the Accommodation Agreement.  Other proposed modifications to the Amended

GM Arrangement are largely technical and conforming changes.

       35.    Effectiveness of the Second Amendment Agreement is conditioned on,

among other things, (i) the Debtors having no Automatic Accommodation Termination Default

and no Accommodation Default (each as defined in the Accommodation Agreement) and (ii)

entry of a final, non-appealable order by this Court approving the Accommodation Agreement

and the Second Amendment Agreement on or prior to December 31, 2008.

       36.    Further, upon the effectiveness of the Second Amendment Agreement, the

terms and conditions of the Amended GM Arrangement will remain in full force and effect,

including the provisions that GM and its relevant Affiliates (as defined in the GM Arrangement,

the "GM Affiliates") will have (a) allowed claims with administrative expense priority pursuant

to section 503(b)(1) of the Bankruptcy Code against Delphi and the GM Guarantors under and as

17

defined in the DIP Credit Agreement (the "GM Guarantors") for all Obligations (as defined in

the GM Arrangement, the "GM Arrangement Obligations") owing to GM or any applicable GM

Affiliates and (b) all other rights under the Amended GM Arrangement and the Second

Amendment Agreement, including, without limitation, the ability to exercise the right to set off

and apply, subject to the terms of the Amended GM Arrangement and the Second Amendment

Agreement, any indebtedness or liabilities owing by GM or the GM Affiliates to or for the credit

or the account of Delphi or the GM Guarantors against any and all GM Arrangement Obligations

of Delphi or the GM Guarantors without the need to seek additional modification of the

automatic stay imposed pursuant to section 362 of the Bankruptcy Code and without further

order of this Court.

        37.      Pursuant to a side letter (the "Side Letter") between Delphi and GM, a

copy of which is attached hereto as Exhibit E, GM has agreed that prior to the earlier of (i) the

occurrence of the DIP Termination Date, (ii) the effectiveness of the Debtors' plan of

reorganization, or (iii) the receipt of DIP Agent consent, GM will not assert or exercise against

any of the GM GSA Claims any setoff of any amounts payable by GM or any of its Affiliates to

Delphi or any of its affiliates.  The GM GSA Claims are the First Net Liability Transfer Claim,

the Second Net Liability Transfer Claim, and the GM Unsecured Claim (each as defined in the

Amended GSA).  The Side Letter does not prejudice other parties' rights to contest GM's setoff

rights if (a) the Side Letter does not become effective or (b) one of the events set forth in clauses

(i)-(iii) above has occurred.  The Side Letter will become effective on the date when all of the

conditions precedent set forth in section 3 of the Second Amendment Agreement have been

satisfied or waived.[10]

I.      The Partial Temporary Accelerated Payment Agreement

        38.     Pursuant to the Partial Temporary Accelerated Payment Agreement, GM

will accelerate the payment of up to an additional $300 million in trade accounts payable to

Delphi Automotive Systems LLC ("DAS LLC") over the three-month period constituting the

second quarter of 2009.  This acceleration of payment is conditioned on, among other things (the

"Acceleration Conditions"), (i) the ongoing effectiveness of the Second Amended GM

Arrangement, (ii) at least $100 million having been drawn and remaining outstanding under the

Second Amended GM Arrangement, and (iii) the absence of a default under the DIP Agreement

(except for one arising from the failure to pay the principal amount of the DIP loans).

        39.     Under the PTAPA, if the Acceleration Conditions are satisfied on the date

when GM's April 2009 MNS-2 payment is to be made to DAS LLC, GM also will make a $100

million payment to DAS LLC, representing a partial temporary acceleration of accounts payable

to DAS LLC for component parts supplied to GMNA and GMSPO by DAS LLC (the "April

Pull-Forward Payment," and, together with similar payments to be made in May and June 2009,

the "Pull-Forward Payments") with the effect of decreasing the GM payables to DAS by the

amount paid.  In each of May and June 2009, assuming the same conditions are met, GM will

make an additional $100 million accelerated accounts payable payment to DAS LLC.  If the

Acceleration Conditions are not satisfied at the time that the MNS-2 payments are otherwise due,

---

[10]    The Accommodation Agreement also provides, as a precondition to effectiveness, that GM waive its setoff
        rights and related adequate protection liens with respect to GM's prepetition claims granted by paragraph 16 of
        the Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And
        Fed. R. Bankr. P. 2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II)
        Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt, entered
        January 5, 2007 (Docket No. 6461).

accelerated payments may be made by GM on the 15th day of any month from April through
June 2009 if the Acceleration Conditions are satisfied at that time. Thereafter, on the first three
MNS-2 payment dates on or after the Tranche B Termination Date (as defined in the PTAPA),
subject to certain conditions, GM may offset up to $100 million from its MNS-2 payment to
DAS LLC that is due on such date until the full balance of accelerated payments made by GM to
DAS LLC under the PTAPA is offset thereunder; provided however that on the Tranche B
Termination Date, to the extent that the outstanding balance of the Tranche B Obligations (as
defined in the PTAPA) is less than $300 million, a portion of the outstanding balance of the Pull-
Forward Payments, if any, in an amount up to the difference between $300 million and the
outstanding balance of the Tranche B Obligations will be deemed to be outstanding advances
under the Second Amended GM Arrangement. The effectiveness of the Partial Temporary
Accelerated Payment Agreement, itself, is conditioned on, among other things, the satisfaction of
the conditions precedent to the Second Amendment Agreement, including the absence of a
default under the DIP Agreement, as modified by the Accommodation Agreement.

<u>Applicable Authority</u>

J.    This Court Should Authorize The Debtors To Enter Into The Second Amendment
      Agreement And Partial Temporary Accelerated Payment Agreement

     (a)    The Second Amendment Agreement And Partial Temporary Accelerated Payment
       Agreement Should Be Approved Under 11 U.S.C. § 364(b)

     40.    The Debtors propose to enter into the Second Amendment Agreement,
which amends the Amended GM Arrangement primarily by extending its maturity date to June
30, 2009. Thus, under the Second Amendment Agreement, Delphi will retain access to the $300
million in liquidity provided under the Amended GM Arrangement. Moreover, through the
Partial Temporary Accelerated Payment Agreement, the Debtors will further increase their
liquidity through the partial temporary acceleration of payments provided thereunder.

41.    Under section 364(b) of the Bankruptcy Code, a debtor may obtain

unsecured credit outside the ordinary course of business and provide the lender extending such

credit with an administrative priority claim for such amounts under section 503(b)(1) of the

Bankruptcy Code.  11 U.S.C. § 364(b).  Bankruptcy courts have discretion in determining

whether to approve such transactions, although such "discretion is not unbridled."  In re Ames

Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).  In making such determinations,

"courts have focused their attention on proposed terms that would tilt the conduct of the

bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code

confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions

by parties-in-interest from being decided on their merits."  Id. (citations omitted).

42.    This Court determined that these standards were met when it approved the

GM Arrangement and the First Amendment Agreement pursuant to the Second DIP Extension

Order and the First Amendment Agreement Order.  Because the Amended GM Arrangement will

remain in place, as supplemented by the Second Amendment Agreement, this Court's prior

findings should apply to the relief sought here as well.

43.    In addition, the Partial Temporary Accelerated Payment Agreement inures

to the benefit of the Debtors, providing the Debtors access to additional liquidity with no

corresponding interest expense.  By accelerating the accounts payable in this manner, the

Debtors simply receive payment for component parts at an earlier time than such payments

would otherwise be made.  The corresponding offset that would be made by GM from payments

in later periods is appropriate under the circumstances.

(b)    Application Of The Business Judgment Standard

21

44.      Based on the foregoing, the Debtors submit that entry of an order authorizing the Second Amendment Agreement and the Partial Temporary Accelerated Payment Agreement is necessary and appropriate to enable the Debtors to reorganize successfully.  The Second Amendment Agreement and the Partial Temporary Accelerated Payment Agreement were negotiated in good faith, at arm's length, and in the exercise of the Debtors' business judgment.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering whether a debtor has exercised its business judgment, a court is not free to second-guess particular provisions but rather determines whether the proposed action "as a whole is within reasonable business judgment." In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

45.      The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a presumption arises that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id.  To satisfy its burden, it is not

22

enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections."  Comm. Of Equity Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

46.     The Debtors have exercised sound business judgment in determining that entering into the Second Amendment Agreement and the Partial Temporary Accelerated Payment Agreement is appropriate.  Indeed, the proposed terms of the Second Amendment Agreement and the Partial Temporary Accelerated Payment Agreement are fair, reasonable, and necessary and are in the best interests of the Debtors' estates because they provide necessary liquidity to the Debtors at a cost, if any, lower than the Debtors could achieve from other sources.  Accordingly, the Debtors should be granted authority to enter into the Second Amendment Agreement and the Partial Temporary Accelerated Payment Agreement, and receive advances on the basis set forth therein, pursuant to sections 363 and 364 of the Bankruptcy Code.

K.    The Second Amended GM Arrangement And The Partial Temporary Accelerated
      Payment Agreement Should Be Accorded The Benefits Of Section 364(e)

47.     Section 364(e) of the Bankruptcy Code provides that the "reversal or appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in food faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."  The Second Amendment Agreement and the Partial Temporary Accelerated Payment Agreement were negotiated in good faith and no consideration is being provided to any party to, or guarantor of, obligations arising under the Second Amended GM Arrangement or the Partial Temporary Accelerated Payment Agreement other than as disclosed therein.  Accordingly, the Second Amended GM Arrangement and the

23

Partial Temporary Accelerated Payment Agreement should be accorded the benefits of section

364(e) of the Bankruptcy Code for all the reasons set forth herein.

L.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

48.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-

day stay because it is a condition to the effectiveness of the Accommodation Agreement under

section 30(a)(vi) thereof that this Court enter an order authorizing the Second Amendment

Agreement no later than November 26, 2008 and that such order not have been stayed.  This

Court previously granted similar relief from Bankruptcy Rule 6004(g) in approving the previous

DIP orders.  Other courts in this district have waived this ten-day stay upon a showing of

business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005)

("As I find that the required business need for a waiver has been shown, the order may provide

for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc.,

268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for

a waiver of the ten-day stay under Bankruptcy Rule 6004(g)).  With a waiver of the ten-day stay

period, the Debtors will be able to consummate the Second Amendment Agreement and the

Partial Temporary Accelerated Payment Agreement promptly upon this Court's approval of the

Motion and continue to take the steps necessary to emerge from chapter 11.

Notice Of Motion

49.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Twelfth

24

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered July 23, 2008 (Docket No. 13965).  In addition, the Debtors have served, among other parties, the setoff claimants and objectors to the Debtors' motion to enter into its original $2 billion postpetition credit facility and the DIP Motion and the DIP Extension Motion.  The Debtors have also provided notice to counsel to the agent for the Debtors' former prepetition credit facility.  Furthermore, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[11]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

[11]    The Debtors have noticed this Motion for hearing on November 24, 2008.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Creditors' Committee has consented to this Motion's being heard on less than 20 days' notice.  Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until November 20, 2008 to file an objection to this Motion.

WHEREFORE, the Debtors respectfully request that the Court enter an order (i)

authorizing the Debtors to enter into the Second Amendment Agreement and the Partial

Temporary Accelerated Payment Agreement and (ii) granting the Debtors such other and further

relief as is just.

Dated:        New York, New York
              November 7, 2008

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                          & FLOM LLP

                                        By:    /s/ John Wm. Butler, Jr.
                                            John Wm. Butler, Jr.
                                            John K. Lyons
                                            Ron E. Meisler
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                                - and -

                                        By:    /s/ Kayalyn A. Marafioti
                                            Kayalyn A. Marafioti
                                            Thomas J. Matz
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                                - and -

                                        SHEARMAN & STERLING LLP


                                        By:    /s/ Douglas P. Bartner
                                            Douglas P. Bartner
                                            Andrew V. Tenzer
                                        599 Lexington Avenue
                                        New York, New York  10022
                                        (212) 848-4000

                                        Attorneys for Delphi Corporation, et al.,
                                            Debtors and Debtors-in-Possession

26