# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

**Debtors:**  Delphi Corporation, et al. [1]
**Case Number:**  Jointly Administered 05-44481 (RDD)

**Quarterly Operating Report for the Period Ended:**
September 30, 2008

**Debtors' Address:**
5725 Delphi Drive
Troy, Michigan 48098

**Operating Loss for the Three Months Ended September 30, 2008:**  $121 million

**Debtors' Attorneys:**
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Suite 2100
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

And

Kayalyn A. Marafioti
Thomas J. Matz
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

**Report Preparer:**

The undersigned, having reviewed the attached report and being familiar with the Debtors' financial affairs, verifies under penalty of perjury that the information contained therein is complete, accurate, and truthful to the best of my knowledge. [2]

**Date:** November 11, 2008          /s/: THOMAS S. TIMKO_____
                                     Thomas S. Timko
                                     Chief Accounting Officer and Controller

(1)   See next page for a listing of Debtors by case number.
(2)   All amounts herein are unaudited and subject to revision. The Debtors reserve all rights to revise this report.

**DELPHI CORPORATION, <u>et al.</u>
QUARTERLY OPERATING REPORT**

[1] The Debtors in these jointly administered cases are as follows:

| Debtor Name | Case Number |
|---|---|
| Delphi NY Holdings Corporation | 05-44480 |
| Delphi Corporation | 05-44481 |
| ASEC Manufacturing General Partnership | 05-44482 |
| ASEC Sales General Partnership | 05-44484 |
| Environmental Catalysts, LLC | 05-44503 |
| Delphi Medical Systems Colorado Corporation | 05-44507 |
| Delphi Medical Systems Texas Corporation | 05-44511 |
| Delphi Medical Systems Corporation | 05-44529 |
| Specialty Electronics International Ltd. | 05-44536 |
| Specialty Electronics, Inc. | 05-44539 |
| Delphi Liquidation Holding Company | 05-44542 |
| Delphi Electronics (Holding) LLC | 05-44547 |
| Delphi Technologies, Inc. | 05-44554 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 |
| Delphi Mechatronic Systems, Inc. | 05-44567 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 |
| Exhaust Systems Corporation | 05-44573 |
| Delphi China LLC | 05-44577 |
| Delphi Automotive Systems Korea, Inc. | 05-44580 |
| Delphi International Services, Inc. | 05-44583 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 |
| Delphi Automotive Systems International, Inc. | 05-44589 |
| Delphi International Holdings Corporation | 05-44591 |
| Delphi Automotive Systems Overseas Corporation | 05-44593 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 |
| Delco Electronics Overseas Corporation | 05-44610 |
| Delphi Diesel Systems Corporation | 05-44612 |
| Delphi LLC | 05-44615 |
| Aspire, Inc. | 05-44618 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 |
| Delphi Connection Systems | 05-44624 |
| Packard Hughes Interconnect Company | 05-44626 |
| DREAL, Inc. | 05-44627 |
| Delphi Automotive Systems Services LLC | 05-44632 |
| Delphi Services Holding Corporation | 05-44633 |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 |
| Delphi Foreign Sales Corporation | 05-44638 |
| Delphi Automotive Systems Human Resources LLC | 05-44639 |
| Delphi Automotive Systems LLC | 05-44640 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 |
| Delphi Receivables LLC | 05-47459 |
| MobileAria, Inc. | 05-47474 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**INDEX**

| Description | Page |
|---|---|
| Condensed Combined Debtors-in-Possession Statement of Operations for the three and eight months ended September 30, 2008 | 4 |
| Condensed Combined Debtors-in-Possession Balance Sheet as of September 30, 2008 | 5 |
| Condensed Combined Debtors-in-Possession Statement of Cash Flows for the three months ended September 30, 2008 | 6 |
| Notes to Quarterly Operating Report | 7 |
| Schedule of Payroll and Payroll Taxes Withheld and Incurred | 23 |
| Schedule of Payroll Taxes Paid | 24 |
| Schedule of Other Taxes Collected, Incurred and Paid | 26 |
| Schedule of Disbursements | 31 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

| | Three Months Ended September 30, 2008 | Eight Months Ended September 30, 2008 |
|---|---|---|
| | (in millions) | |
| Net sales: | | |
| General Motors and affiliates | $ 973 | $ 2,750 |
| Other customers | 871 | 2,595 |
| Non-Debtor affiliates | 90 | 273 |
| Total net sales | 1,934 | 5,618 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 1,995 | 5,876 |
| U.S. employee workforce transition program charges | 22 | 69 |
| GM settlement (Note 1 – MRA) | (254) | (254) |
| Depreciation and amortization | 99 | 270 |
| Long-lived asset impairment charges | — | 7 |
| Goodwill impairment charges | — | 99 |
| Selling, general and administrative | 193 | 563 |
| Total operating expenses | 2,055 | 6,630 |
| | | |
| Operating loss | (121) | (1,012) |
| Interest expense (contractual interest expense was $127 million and $327 million, respectively) | (94) | (232) |
| Loss on extinguishment of debt | — | (49) |
| Other income, net | 30 | 27 |
| Reorganization items: | | |
| GM settlement (Note 1– GSA) | 5,332 | 5,332 |
| Professional fees and other, net | (8) | (110) |
| Income tax expense | (18) | (3) |
| Equity income from non-consolidated affiliates, net of tax | (17) | (4) |
| Income from continuing operations | 5,104 | 3,949 |
| Income from discontinued operations, net of tax | 72 | 2 |
| Equity income from non-Debtor affiliates, net of tax | 42 | 290 |
| | | |
| Net income | $ 5,218 | $ 4,241 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | September 30, 2008 (in millions) |
|---|---|
| **ASSETS** | |
| Current assets: | |
| Cash and cash equivalents | $ 1,136 |
| Restricted cash | 50 |
| Accounts receivable, net: | |
| General Motors and affiliates | 850 |
| Other third parties | 583 |
| Non-Debtor affiliates | 273 |
| Notes receivable from non-Debtor affiliates | 65 |
| Inventories, net | 667 |
| Other current assets | 257 |
| Assets held for sale | 397 |
| Total current assets | 4,278 |
| Long-term assets: | |
| Property, net | 1,302 |
| Investments in affiliates | 281 |
| Investments in non-Debtor affiliates | 1,831 |
| Goodwill | 53 |
| Notes receivable from non-Debtor affiliates | 1,429 |
| Other | 203 |
| Total long-term assets | 5,099 |
| Total assets | $ 9,377 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | |
| Current liabilities not subject to compromise: | |
| Short-term debt | $ 3,728 |
| Accounts payable | 747 |
| Accounts payable to non-Debtor affiliates | 621 |
| Accrued liabilities | 1,278 |
| Liabilities held for sale | 186 |
| Total current liabilities not subject to compromise | 6,560 |
| Long-term liabilities not subject to compromise: | |
| Long-term debt | 20 |
| Employee benefit plan obligations and other | 888 |
| Total long-term liabilities not subject to compromise | 908 |
| Liabilities subject to compromise | 11,204 |
| Total liabilities | 18,672 |
| Stockholders' deficit: | |
| Total stockholders' deficit | (9,295) |
| Total liabilities and stockholders' deficit | $ 9,377 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, <u>et al.</u>**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Three Months Ended September 30, 2008 (in millions) |
|---|---|
| Cash flows from operating activities: | |
| Net cash provided by operating activities | 876 |
| Cash flows from investing activities: | |
| Capital expenditures | (67) |
| Proceeds from sale of property | 10 |
| Proceeds from sale of investment | 8 |
| Proceeds from divestitures | 1 |
| Decrease in restricted cash | 8 |
| Return of investments from non-Debtor affiliates | 20 |
| Other, net | 11 |
| Discontinued operations | (11) |
| Net cash used in investing activities | (20) |
| Cash flows from financing activities: | |
| Net borrowings under amended and restated DIP facility | 154 |
| Other | (22) |
| Net cash provided by financing activities | 132 |
| Increase in cash and cash equivalents | 988 |
| Cash and cash equivalents at beginning of period | 148 |
| Cash and cash equivalents at end of period | $ 1,136 |

The accompanying notes are an integral part of the financial statements.

**1. Background and Organization**

  *General* – Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company") is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.

  *Chapter 11 Reorganization Cases* – On October 8, 2005, Delphi and certain of its United States ("U.S.") subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively, the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the Chapter 11 Filings, will continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code.

  *Equity Purchase and Commitment Agreement* –  Under the terms and subject to the conditions of the Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively, the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

  The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA were terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

  On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, General Motors Corporation ("GM"), and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

  On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination. On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

  Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16,

2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages. No amounts related to this matter have been recorded in Delphi's financial statements. The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions. A trial on Delphi's complaint is currently scheduled to occur in March 2009, and the parties have agreed to participate in mediation in an attempt to settle the claims that were not dismissed.

During 2007, in exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million. In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA. The Company also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA. Delphi had deferred the recognition of these amounts in other current assets because they were to be netted against the proceeds from the EPCA upon issuance of the new shares. However, as a result of the events relating to the termination of the EPCA as described above, Delphi recognized $79 million of expense related to these fees and other expenses during the eight months ended September 30, 2008.

*U.S. Labor Agreements* – On March 31, 2006, the Debtors filed a motion with the Court under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion"). As approved and confirmed by the Court, a series of settlement agreements or memoranda of understanding (each, a memorandum of understanding or "MOU") among Delphi, its unions, and GM settled the 1113/1114 Motion with respect to each of Delphi's unions.

*Plan of Reorganization* – On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") became final, but Delphi was unable to consummate the Plan because, as noted above, the Investors refused to participate in the closing, which was commenced but not completed on April 4, 2008. The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, including agreements reached with each of Delphi's principal U.S. labor unions and GM. The Plan incorporates, approves, and is consistent with the terms of each agreement.

Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization was extended until 30 days after substantial consummation of the Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Plan (as modified) was extended until 90 days after substantial consummation of the Plan (as modified) or any modified plan. On July 23, 2008, Delphi's Official Committee of Unsecured Creditors (the "Creditors' Committee") and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the UCC, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against Appaloosa and the other Investors. Notwithstanding the foregoing, pursuant to an order entered by the Court on October 27, 2008, the Debtors' exclusive period for filing a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee is extended through and including January 31, 2009 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee is extended through and including March 31, 2009.

On October 3, 2008, Delphi filed modifications to the Plan and related modifications to the Disclosure Statement with the Court. As detailed below, in order to facilitate its emergence from chapter 11, Delphi anticipates it will need to raise approximately $3.75 billion of funded emergence capital through a combination of term debt and rights to purchase equity, comprised of at least $2.75 billion in funded first and second lien debt, plus up to $1.2 billion of unfunded debt through an asset-backed revolving credit facility. Delphi anticipates obtaining the remaining $1.0 billion funded emergence capital through a rights offering and direct subscription for new common stock in reorganized Delphi.

To achieve the recoveries contemplated in the modifications to the Plan, Delphi will be required to achieve its target of $3.75 billion in funded emergence capital and the discount rights offering will be backstopped or fully subscribed at a discount not to exceed 40% of Plan Equity Value.  In the event that these targets are not achieved, then, pursuant to the Company's agreements with GM, Delphi would be required to procure GM's consent regarding any modification to GM's recovery, and the minimum recovery to holders of unsubordinated general unsecured claims would be proportionally reduced.

The preliminary Plan modification hearing was originally scheduled for October 23, 2008, and has been adjourned to November 21, 2008.  The modifications to the Plan currently provide for the following recoveries:

- All senior secured debt will be refinanced and paid in full and all allowed administrative and priority claims will be paid in full.

- Trade and Other Unsecured Claims, including senior notes, but not including the subordinated notes which are contractually subordinated to the senior notes, will be satisfied with $1.238 billion in a combination of rights and common stock of reorganized Delphi, at a midpoint per share total enterprise value of $20.00.

- GM will receive $2.1 billion of Series D Convertible Preferred Stock in satisfaction of its allowed administrative claim of $2.1 billion and its allowed general unsecured claim of $2.5 billion.

- Holders of Delphi's existing equity securities will receive Post-Emergence Rights exercisable to purchase up to 26,187,745 shares of common stock of reorganized Delphi at an exercise price of $17.00 per share. To the extent that any Post-Emergence Rights are exercised, the gross proceeds generated from the exercise thereof will be used to repurchase up to 25% of the shares of Series D Convertible Preferred Stock held by GM.

Delphi will not emerge from bankruptcy as a going concern unless and until the modified Plan becomes effective. There can be no assurances that the terms of the modified Plan will not change due to market conditions, the Court's requirements or otherwise. Moreover, the effectiveness of the Plan is subject to a number of conditions, including the entry of certain orders by the Court and the obtaining of necessary emergence capital. Delphi is currently seeking $2.75 billion of funded emergence capital in addition to the emergence capital Delphi is seeking to raise through a rights offering. There can be no assurances that such emergence capital will be obtained (or, if obtained, the terms thereof) or such other conditions will be satisfied.

The Amended GSA and the Amended MRA, as defined below, became effective during the third quarter of 2008.  For costs and benefits and timing of recognition related to these agreements, refer to the detailed discussion under GM Settlement below.  The cost related to the remaining components of the transformation plan will be recognized in the Company's consolidated financial statements as each other element of the Plan (as modified), including the remaining portions of the U.S. labor agreements, or as the terms of any future confirmed plan of reorganization, become effective.  The Plan (as modified) and the agreements incorporated therein will significantly impact Delphi's accounting for long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others.  Such adjustments will have a material impact on Delphi's financial statements.

If the modified Plan becomes effective, Delphi expects to emerge from chapter 11 as a stronger, more financially sound business with viable U.S. operations positioned to advance global enterprise objectives. There can be no assurances, however, that Delphi will be successful in achieving its objectives. There are a number of risks and uncertainties inherent in the chapter 11 process, including those detailed in Delphi's Annual Report on Form 10-K for the year ended December 31, 2007, Part I, Item 1A. Risk Factors, Part II, Item 1A. Risk Factors in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008 and September 30, 2008.  In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder its ongoing business activities and its ability to operate, fund and execute its business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers.

***GM Settlement*** – Delphi and GM have entered into comprehensive settlement agreements consisting of the Global Settlement Agreement, as amended (the "GSA") and the Master Restructuring Agreement, as amended (the "MRA").  The GSA and the MRA, as amended through January 25, 2008, comprised part of the Plan and were

approved in the order confirming the Plan on January 25, 2008. The GSA and the MRA as approved provide that such agreements were not effective until and unless Delphi emerges from chapter 11. However, as part of Delphi's overall negotiations with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi agreed with GM and filed further amendments to the GSA and MRA (the "Amended MRA") with the Court on September 12, 2008 and subsequently entered into an additional amendment to the GSA as of September 25, 2008 (as so amended, the "Amended GSA"). On September 26, 2008, Delphi received the consent of its labor unions to implement certain aspects of the agreements as described in more detail below. The Court approved such amendments on September 26, 2008 and the Amended GSA and Amended MRA became effective on September 29, 2008. These amended agreements include provisions related to the transfer of certain legacy pension and other postretirement benefit obligations and became effective independent of and in advance of substantial consummation of an amended plan of reorganization. The effectiveness of these agreements resulted in a material reduction in Delphi's liabilities and future expenses related to U.S. hourly workforce benefit programs.

The Amended GSA resolves outstanding issues between Delphi and GM including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999, including certain post-separation claims and disputes; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under a Delphi plan of reorganization; and various other legacy U.S. hourly workforce benefit issues. Except for the second step of the transfer of a substantial portion of the assets and liabilities under the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan"), the obligations under the Amended GSA are not conditioned on the effectiveness of an amended plan of reorganization.

The Amended GSA addresses commitments by Delphi and GM regarding other U.S. hourly workforce postretirement health care benefits and employer-paid postretirement basic life insurance benefits ("OPEB"), pension obligations, and other GM contributions with respect to labor matters and releases. In the third quarter of 2008, Delphi recorded a net reorganization gain of $5.3 billion. In addition, under the Amended GSA, Delphi received net cash from GM totaling $641 million on September 30, 2008, principally related to reimbursement of hourly OPEB benefit payments since January 1, 2007 and amounts paid by Delphi under special attrition programs.

The Amended MRA is intended to govern certain aspects of Delphi and GM's commercial relationship since filing for chapter 11 and following Delphi's emergence from chapter 11. The Amended MRA addresses the scope of GM's existing and future business awards to Delphi and related pricing and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing U.S. hourly workforce labor costs, the disposition of certain Delphi facilities, and the treatment of existing commercial agreements between Delphi and GM. The obligations under the Amended MRA generally are not conditioned on the effectiveness of an amended plan of reorganization. Upon effectiveness of the Amended MRA in the third quarter of 2008, Delphi received net cash from GM totaling $559 million and recognized related pre-tax earnings of $355 million, of which $254 million was recorded in GM settlement in operating expenses and $101 million was recorded in discontinued operations. GM's obligations under the Amended MRA will not be subject to termination until December 31, 2015 (provided that certain obligations of GM with respect to legacy International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") employees would survive any such termination).

Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy to the consolidated financial statements of the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2008 for more information on the effectiveness of the Amended GSA and the Amended MRA.

## 2. Basis of Presentation

***Condensed Combined Debtors-in-Possession Financial Statements*** – The financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects. In addition, the financial statements and supplemental information contained within this note represent the condensed combined financial statements for the Debtors only. Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements, and as such, their net income is included as "Equity income (loss) from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared. However it

does require, among other disclosures, that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.  The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

The unaudited combined financial statements have been derived from the books and records of the Debtors.  This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures (such as tests for asset impairment), the Debtors believe that the financial information could be subject to changes, and these changes could be material.  The information furnished in this report includes primarily normal recurring adjustments but does not include all of the adjustments that would typically be made for quarterly financial statements in accordance with U.S. GAAP.  Included in these financial statements is the impact of Delphi's adoption of Financial Accounting Standards Board ("FASB") Statement No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R),* which resulted in adjustments that increased pension and other postretirement benefit liabilities by $139 million, the beginning accumulated deficit by $129 million and other comprehensive loss by $10 million.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted.  Therefore, this report should be read in conjunction with the Company's consolidated financial statements and notes thereto included in its Annual Report on Form 10-K for the year ended December 31, 2007 and the Company's quarterly periodic reports for the subsequent periods filed with the U.S. Securities and Exchange Commission ("SEC").

The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the consolidated results of operations, financial position, and cash flows of the Debtors in the future.

***Going Concern*** – The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) return to profitability; (iv) generate sufficient cash flow from operations; and (v) obtain financing sources to meet the Company's future obligations, including an accommodation agreement allowing the Debtors to retain the proceeds of, or an extension or replacement of their DIP financing agreement, which otherwise matures on December 31, 2008.  Although Delphi considered seeking an extension of its existing DIP financing agreement (the "Amended and Restated DIP Credit Facility"), due to the ongoing, unprecedented turbulence in the capital markets and automotive industry, Delphi does not believe it would have been able to obtain the necessary consent of 100% of its lenders to such an extension at this time, though it may consider seeking an extension in the future.  Instead, on November 7, 2008, Delphi filed a motion with the Court seeking authority to enter into an Accommodation Agreement (the "Accommodation Agreement").  Refer to Note 3.  Debtor-in-Possession ("DIP") Financing for more information regarding the Accommodation Agreement.  Although the Accommodation Agreement will not be entered into by each lender under the Amended and Restated DIP Credit Facility, it is expected to be entered into by the administrative agent under the facility and the requisite majority of holders of Tranche A and Tranche B commitments and exposure by amount (the "Required Lenders") as defined in the facility.  The Company has been informed that the administrative agent supports the Accommodation Agreement.  Delphi has begun seeking the necessary consents to consummate the Accommodation Agreement, which would enable the Accommodation Agreement and anticipates receiving consents from the Required Lenders prior to November 24, 2008, the scheduled hearing date of the motion, though there can be no assurances it will obtain the required consents or Court approval.  Absent receipt of the necessary consents and Court approval of the Accommodation Agreement or the ability to obtain an extension or other amendment to the Amended and Restated DIP Credit Facility, Delphi does not anticipate having sufficient cash to pay the outstanding balances upon expiration on December 31, 2008 and still continue to fund its operations.  These matters create substantial uncertainty relating to the Company's ability to continue as a going concern.  The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties.  In addition, the Company filed its proposed plan of reorganization with the Court in September 2007.  The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008, but Delphi was unable to consummate the plan because certain investors under the plan refused to participate in the closing, which was commenced but not completed on April 4, 2008.  Delphi subsequently filed complaints seeking redress for the breach of the investment agreement and damages related to the consequent delay of Delphi's emergence from chapter 11. On October 3, 2008, Delphi filed a motion seeking Court approval of proposed modifications to its confirmed plan of reorganization.  There can be no assurances as to when Delphi will confirm or consummate a modified plan.

***Intercompany Transactions*** – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein. Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements. As approved by the Court on January 25, 2008, the Debtors sold investments in non-Debtor affiliates in the amount of $1.4 billion to a non-Debtor affiliate and received a note receivable from non-Debtor affiliates. During the three and eight months ended September 30, 2008, the Debtors received approximately $177 million and $285 million, respectively, of dividends from non-Debtor affiliates. Dividends from non-Debtor affiliates are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore were recorded in equity income from non-Debtor affiliates, net of tax.

***General Motors and Affiliates*** – Includes activity with GM and its consolidated subsidiaries. Activity with GM's non-consolidated affiliates (such as GM Shanghai) and activity with other Tier 1 suppliers which sell directly to GM is classified as other (non-GM) customer activity.

***Restricted Cash*** – Primarily includes balances restricted for use for the pre-retirement portion of the special attrition program.

***Property*** – Includes property, plant, and equipment and is recorded at cost net of accumulated depreciation.

***Goodwill Impairment Charges*** – Delphi reviews the recoverability of goodwill annually on May 31 and at any other time when business conditions indicate a potential change in recoverability. In conjunction with Delphi's annual recoverability tests, the deterioration of Delphi's financial performance, combined with an unfavorable outlook, were indicators for potential impairment. More specifically, during the second quarter of 2008, Delphi experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, particularly related to GM, continuing unfavorable pricing pressures and increasing commodity prices. This caused previously unanticipated projected revenue and operating income declines. As a result of these changes, long-term projections showed declines in discounted future operating cash flows. These revised cash flows and declining market conditions caused the implied fair value of Delphi's Electrical/Electronic Architecture segment to be less than its book value. The fair value was also adversely affected by declining industry market valuation metrics. Accordingly, the Debtors recorded $99 million of goodwill impairment charges during the eight months ended September 30, 2008.

Delphi performed its goodwill impairment test by comparing the carrying value of each of its reporting units to the fair value of the reporting unit. In determining fair value of reporting units, Delphi utilized a number of methodologies, including discounted cash flow analysis and review of fair value appraisals. Where the carrying value exceeded the fair value for a particular reporting unit, goodwill impairment charges were recognized. The goodwill impairment charges recognized were determined by stating all other assets and liabilities of a reporting unit at their fair values with the remaining fair value of the reporting unit attributed to goodwill. The resulting goodwill impairment charges are the excess of the recorded goodwill balance over the implied fair value of goodwill for the reporting unit. Delphi's reporting units are the global businesses focused on product families. The fair value of the reporting units was negatively impacted by the continued deterioration of business conditions, principally in North America, as previously described.

***Discontinued Operations*** – In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component. The results of discontinued operations are aggregated and presented separately in the condensed combined statement of operations and condensed combined statement of cash flows. Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the condensed combined balance sheet. Refer to Note 7. Divestitures for more information.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business"). The sale of the U.S. operation and certain of the non-U.S. operations of the Steering Business will be sales of assets and will include (i) all assets, except for cash, deferred tax assets, and intercompany accounts, and (ii) all liabilities, except for debt, deferred tax liabilities, intercompany accounts, U.S. pension and other postretirement benefit liabilities, accrued payroll, and certain employee benefit accounts. The sale of certain

non-U.S. operations of the Steering Business are stock sales and will include all assets and liabilities for the sites with purchase price adjustments for cash, debt, and certain other accounts.  The sale of the Interiors and Closures Business closed on February 29, 2008.  The majority of the Interiors and Closures Business sale was primarily accomplished through asset sales and the buyer assumed inventory, fixed assets, non-U.S. pension liabilities and an investment in a joint venture in Korea.

While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to discontinued operations in the statements of operations.  Delphi expects to retain certain employee pension and other postretirement benefit liabilities for the Steering Business and these liabilities were not allocated to liabilities held for sale in the balance sheets.  Expenses related to the service cost of employee pension and other postretirement benefit plans, however, were allocated to discontinued operations in the statements of operations, because Delphi will not continue to incur such related expense subsequent to the divestiture of these businesses.  Allocations have been made based upon a reasonable allocation method.

***Securities and ERISA Litigation Charges*** – Delphi, along with certain of its subsidiaries, current and former directors of the Company, certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005.  Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the securities actions, Employee Retirement Income Security Act ("ERISA") actions, and shareholder derivative actions in consolidated proceedings (the "Multidistrict Litigation" or "MDL") reached an agreement with the lead plaintiffs in the Securities Actions (the "Lead Plaintiffs") and named plaintiffs in the amended ERISA Action (the "ERISA Plaintiffs") resulting in a settlement of the Multidistrict Litigation (the "MDL Settlements").  Pursuant to the MDL Settlements, the class claimants will receive cash and allowed claims in the chapter 11 cases that, when valued at the face amount of the allowed claims, is equivalent to approximately $351 million.  On December 4, 2007, the U.S. District Court for the Eastern District of Michigan (the "District Court") held a hearing to consider proposed modifications to the MDL Settlements (the "Modified MDL Settlements") and tentatively approved the Modified MDL Settlements, after determining that the modifications were at least neutral to the Lead Plaintiffs and potentially provide a net benefit to the Lead Plaintiffs.  The District Court approved the Modified MDL Settlements in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered final orders and judgments dated January 23, 2008 with respect to the securities and ERISA actions.  On January 25, 2008, the Court approved the Modified MDL Settlements.  As provided in the confirmation order, the Modified MDL Settlements are contingent upon the effective date of the Plan occurring, and if, for any reason, Delphi cannot emerge from chapter 11 as contemplated, the Modified MDL Settlements will become null and void.

As a result of the Modified MDL Settlements, as of September 30, 2008, Delphi has a liability of $351 million recorded for this matter.  Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million.  As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage.  In conjunction with the Modified MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

***Warranty Matters*** – Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations.  These accruals are based on factors such as past experience, production changes, industry developments, and various other considerations.  Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases.  Delphi elected to defer amounts due under the Warranty Settlement Agreement until it received payments from GM, on or about the time of its emergence from chapter 11.  The amount due under the Warranty Settlement Agreement accrued interest at the rate of 6% per annum from November 1, 2007 until the amounts were paid by Delphi or set off against amounts payable by GM.  In conjunction with overall negotiations regarding

potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in our Amended and Restated DIP Credit Facility, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest. As a result Delphi recorded the extinguishment of this liability as a reduction of warranty expense in the three and eight months ended September 30, 2008, of which $107 million was included in cost of sales, which had a corresponding favorable impact on operating income, and $5 million was included in discontinued operations.

   ***Contractual Interest Expense and Interest Expense on Unsecured Claims*** – Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7. In September 2007, Delphi began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on January 25, 2008. The confirmed plan of reorganization also provided that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, when the Company ceased accruing interest on these claims. At September 30, 2008, Delphi had accrued interest of $415 million in accrued liabilities in the accompanying balance sheet for prepetition claims. As discussed in Note 1. Background and Organization, on October 3, 2008, Delphi filed modifications to its confirmed plan of reorganization that, if approved by the Court, would eliminate postpetition interest on prepetition debt and allowed unsecured claims. Accordingly, Delphi anticipates that it will be relieved of this liability if and when the plan modifications are approved.

   ***Taxes*** – Delphi recognizes current and deferred income tax assets and liabilities based upon all events that have been recognized in the consolidated financial statements as measured by the enacted tax laws. Due to the Company's history of U.S. losses over the past years, combined with the deterioration in its current U.S. operating outlook, Delphi has a 100% valuation allowance against all of its U.S. deferred tax assets, and as a result does not recognize income tax benefits for net operating losses for its U.S. entities.

   The Debtors have received Court authorization, but not direction, to pay sales, use, trust fund, and certain other taxes in the normal course. Accordingly, the Debtors have paid the applicable taxes when due. See the schedules of payroll and other taxes paid for additional information regarding taxes paid.

   Generally, the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as OCI. However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year. The intraperiod tax allocation rules in Statement of Financial Accounting Standards No. 109, *Accounting for Income Taxes*, ("SFAS 109") related to items charged directly to OCI can result in disproportionate tax effects that remain in OCI until certain events occur.

   As of June 30, 2008, Delphi had disproportionate tax effects in OCI related to the hourly pension and OPEB obligations of a $533 million tax benefit and a $311 million tax expense, respectively. During the three and eight months ended September 30, 2008, Delphi accounted for its hourly pension and OPEB transfer to GM as settlements. Delphi eliminated the disproportionate tax effect in OCI related to the hourly pension and OPEB obligations on a pro rata basis to the amount of the obligation that was settled. Accordingly, Delphi has recorded a net $9 million tax benefit in continuing operations for the eight months ended September 30, 2008, comprised of a $320 million tax benefit and $311 million tax expense related to the hourly pension and OPEB obligation settlement, respectively.

   During the second quarter of 2008, because Delphi projected a loss in continuing operations for 2008 and generated a gain in OCI for the five months ended June 30, 2008, the intraperiod tax allocation exception contained in SFAS 109 was applied and Delphi recorded a tax benefit of $21 million in continuing operations related to a pre-tax gain in OCI, primarily related to derivative contracts on copper and the Mexican Peso. As Delphi had pre-tax income during the eight months ended September 30, 2008, principally due to the reorganization gain, the intraperiod tax allocation exception referred to above ceased to apply, and accordingly Delphi reversed $21 million of intraperiod tax allocation benefit during the three months ended September 30, 2008.

   Also impacting the annual effective tax rate in the three and eight months ended September 30, 2008 was the effectiveness of the Amended MRA and the Amended GSA in September of 2008, which did not generate a U.S. tax

expense due to a full valuation allowance on our U.S. deferred tax assets.  Delphi continues to maintain a full valuation allowance in the U.S. as it is more likely than not that the benefits will not be recognized.

*Pension and OPEB Matters*– Since entering chapter 11, Delphi has limited its contributions to the Hourly Plan, the Delphi Retirement Program for Salaried Employees (the "Salaried Plan"), the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan (together, the "Pension Plans") to amounts necessary to fund benefits accrued on account of postpetition service.

Pursuant to the pertinent terms of certain pension funding waivers secured from the Internal Revenue Service ("IRS") in 2006 and 2007, Delphi provided to the Pension Benefit Guaranty Corporation ("PBGC") letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan.  Due to the expiration of the waivers earlier this year, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on May 16, 2008.  The cash proceeds from the letters of credit were deposited into the Hourly and Salaried Plans and recognized as Delphi funding contributions to the respective plans for the plan year ended September 30, 2008.  The proceeds funded all postpetition benefits accrued under the Hourly Plan for the third quarter of 2008 and all but approximately $7 million of the postpetition benefits accrued under the Salaried Plan during the third quarter of 2008.  Approximately $395,000 of postpetition benefits were accrued but unpaid during the third quarter of 2008 for the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan. No contribution for postpetition or prepetition service was due for the ASEC Manufacturing Retirement Program. As permitted under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), Delphi elected to defer quarterly contributions necessary to satisfy these remaining obligations until no later than the due date for minimum contributions, which is June 15, 2009 for the Salaried Plan and September 15, 2009 for the subsidiary plans.  Delphi may continue to defer quarterly contributions in this manner until emergence from chapter 11 and will periodically consider whether or not to make future quarterly payments; however due to the freeze of the Pension Plans and pending freeze of the Hourly Plan discussed below, Delphi does not expect future accruals for postpetition benefits to be material.

Delphi froze the Salaried Plan, the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program and the PHI Non-Bargaining Retirement Plan effective as of September 30, 2008. Delphi reached agreement with its labor unions to allow Delphi to freeze the Hourly Plan effective as of November 30, 2008 for those with traditional benefits.

Also, Delphi's negotiations with its labor unions and GM regarding the Hourly Plan culminated in agreements that Delphi believes will enable the Company to satisfy its pension funding obligations to the Hourly Plan upon emergence from chapter 11 through a combination of emergence contributions and a transfer of certain unfunded liabilities to a pension plan sponsored by GM to avoid any accumulated funding deficiency in the Delphi Hourly Plan at September 30, 2008.  Pursuant to these agreements, Delphi transferred approximately $2.1 billion in net unfunded pension liabilities, including approximately $500 million in assets, of its Hourly Plan to the GM Hourly-Rate Employees Pension Plan on September 29, 2008, and will transfer substantially all of the remaining assets and liabilities of the Hourly Plan upon emergence from chapter 11.  With respect to pension liabilities that remain in the Hourly Plan, as well as pension liabilities under the other Delphi Pension Plans, the Company intends to meet the minimum funding standard under section 412 of the Code upon emergence from chapter 11.

Delphi has not made contributions on account of prepetition services and as a result, the IRS has asserted against Delphi excise taxes in the approximate amounts of $17 million and $18 million for plan years ended September 30, 2005 and September 30, 2007, respectively, and may assert additional excise taxes up to an additional $122 million and $226 million for plan years ended September 30, 2006 and September 30, 2007, respectively.  If these asserted assessments are not paid, the IRS could increase the assessments that relate to the Salaried Plan to 100% of any Salaried Plan contributions considered by the IRS to be due and unpaid. Assuming Delphi is assessed excise taxes for all plan years through 2007, the total exposure could approximate $383 million.  The transfer of certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employee Pension Plan, pursuant to section 414(l) of the Internal Revenue Code (the "Code"), avoided an accumulated funding deficiency in the Delphi Hourly Plan for the plan year ended September 30, 2008.  As such, the exposure to the 100% excise tax for the Delphi Hourly Plan has been eliminated.

Although the IRS could assert the excise tax assessments described above, Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits while in chapter 11 and that, as a result, the Company would not be liable for any such assessments.  Accordingly, management has

concluded that an unfavorable outcome is not currently probable and, as of September 30, 2008, no amounts have been recorded for any potential excise tax assessment.

Upon emergence from chapter 11, the Company intends to meet the minimum funding standards under section 412 of the Code applicable to the Pension Plans.  The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the date of emergence, and the funded status of the Pension Plans at the date of emergence.

*Pension and OPEB Settlements and Curtailment* – As noted above, the Amended GSA includes provisions related to the transfer of certain legacy pension and other postretirement benefit obligations.  On September 26, 2008, Delphi received the consent of its labor unions and approval from the Court to transfer certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employee Pension Plan pursuant to section 414(l) of the Internal Revenue Code (the "414(l) Net Liability Transfer") as agreed under the Amended GSA.  The 414(l) Net Liability Transfer is to occur in two separate steps and is sufficient to avoid an Hourly Plan accumulated funding deficiency for the plan year ended September 30, 2008.  On September 29, 2008, Delphi completed the first step of the 414(l) Net Liability Transfer, transferring approximately $2.1 billion in net unfunded pension liabilities from the Hourly Plan to the GM Hourly-Rate Employees Pension Plan.  The first step of the 414(l) Net Liability Transfer was accounted for as a partial settlement of the Hourly Plan under Statement of Financial Accounting Standards No. 88, *Employer's Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefit* ("SFAS 88").  Delphi recognized a SFAS 88 settlement loss of $494 million included in reorganization items in the consolidated statements of operations for the three and eight month periods ended September 30, 2008, which reflects the recognition of $494 million of previously unrecognized actuarial losses recorded in OCI.  The second step of the 414(l) Net Liability Transfer will occur upon the effectiveness of an amended plan of reorganization which must satisfy certain requirements as set forth in the Amended GSA.

Under the terms of the Amended GSA and union labor agreements, GM assumed $6.8 billion of traditional hourly OPEB liabilities related to plan participants with prior GM service.  GM's assumption of these traditional hourly OPEB liabilities constitutes a settlement under Statement of Financial Accounting Standards No. 106, *Employer's Accounting for Postretirement Benefits Other Than Pensions.*  Delphi recognized a settlement gain of $7.1 billion included in reorganization items in the consolidated statements of operations for the three and eight month periods ended September 30, 2008, which reflects the assumption by GM of the net unfunded liability of $6.8 billion and the recognition of $266 million of previously unrecognized actuarial gains.

As a result of the salaried workforce transformation plan activities in North America discussed in Note 9. Employee Termination Benefits and Other Exit Costs to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2008, salaried separations in 2008 have resulted in significant reductions in expected future service, or curtailments, of the Salaried Plan, OPEB and supplemental executive retirement plans.  Delphi recorded net salaried pension curtailment losses of $38 million and salaried OPEB curtailment gains of $36 million for the three and eight month periods ended September 30, 2008.

Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy and Note 17. Pension and Other Postretirement Benefits to the consolidated financial statements of the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2008 for more information on pension and OPEB matters.

**Other Income, Net** – During the three and eight months ended September 30, 2008 Delphi recognized a $32 million gain from the sale of an investment accounted for under the cost method that had been previously fully impaired.

### 3.  Debtor-in-Possession ("DIP") Financing

#### Debtor-in-Possession Credit Facility

During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders.  During the second quarter of 2008, Delphi received Court approval and the required commitments from its lenders to amend and extend its Refinanced DIP Credit Facility (the "Amended and Restated DIP Credit Facility"), which amendments and extension became effective in May 2008.  As a result of the amendment and restatement, the aggregate size of the facility was reduced from $4.5 billion to $4.35 billion, consisting of a $1.1 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $500 million first priority term loan (the "Tranche B Term Loan") and a $2.75 billion second priority term loan (the

"Tranche C Term Loan").  The Amended and Restated DIP Credit Facility otherwise matures on December 31, 2008.  On November 7, 2008, Delphi filed a motion with the Court seeking authority to enter into the the Accommodation Agreement whereby the administrative agent under the facility and the requisite majority of holders of the Tranche A and Tranche B commitments and exposure by amount (the "Required Lenders") would agree to, among other things, allow Delphi to continue using  the proceeds of the Amended and Restated DIP Credit Facility, to the extent already drawn prior to December 31, 2008, notwithstanding the passing of the maturity date or the failure to comply with certain mandatory prepayment provisions until the earlier to occur of (i) June 30, 2009 (or May 5, 2009 if Delphi does not achieve certain specified milestones in its reorganization cases), (ii) the date on which a plan of reorganization becomes effective, (iii) Delphi's failure to comply with its covenants under the Accommodation Agreement or (iv) an event of default under the Amended and Restated DIP Credit Facility (other than the failure to repay the loans under the facility on the maturity date or comply with mandatory prepayment provisions). Delphi has begun seeking the necessary consents to consummate the Accommodation Agreement and anticipates receiving consents from the Required Lenders prior to November 24, 2008, the scheduled hearing date of the motion, though there can be no assurances it will obtain the required consents or Court approval. Absent receipt of the necessary consents and Court approval of the Accommodation Agreement or the ability to obtain an extension or other amendment to the Amended and Restated DIP Credit Facility, Delphi does not anticipate having sufficient cash to pay the outstanding balances upon expiration on December 31, 2008 and still continue to fund its operations.  For more information regarding the terms of the Accommodation Agreement, refer to Note 23. Subsequent Events to the consolidated financial statements of the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2008.  The following describes the terms of the Amended and Restated DIP Credit Facility currently in effect.

The facilities currently bear interest at the option of Delphi at either the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent or LIBOR plus a specified percent as follows:

|  | ABR plus | LIBOR plus |
|---|---|---|
| Tranche A............................. | 3.00% | 4.00% |
| Tranche B (a)........................ | 3.00% | 4.00% |
| Tranche C (a)........................ | 4.25% | 5.25% |

(a)   Facilities include ABR and LIBOR floor of 4.25% and 3.25%, respectively

Delphi monitors ABR and LIBOR rates and evaluates the interest selection at each rate reset period.

Borrowings under the Amended and Restated DIP Credit Facility are prepayable at Delphi's option without premium or penalty.  As of September 30, 2008, total available liquidity under the Amended and Restated DIP Credit Facility was approximately $138 million, net of a $200 million liquidity block when Available Liquidity, as defined in the Amended and Restated DIP Credit Facility, is less than $500 million.  At September 30, 2008, there was $500 million outstanding under the Tranche B Term Loan at LIBOR plus 4.00% (or 7.25%), $2.75 billion outstanding under the Tranche C Term Loan at LIBOR plus 5.25% (or 8.50%), and $465 million outstanding under the Revolving Facility, of which $275 million was at LIBOR plus 4.00% ($75 million at 7.69% and $200 million at 7.75%) and $190 million was at ABR plus 3.00% (or 8.00%).  Additionally, the Company had $97 million in letters of credit outstanding under the Revolving Facility as of that date.  The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Amended and Restated DIP Credit Facility.  While the borrowing base computation excluded outstanding borrowings, it was less than the Amended and Restated DIP Credit Facility commitment at September 30, 2008.  Under the Amended and Restated DIP Credit Facility, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate regardless of availability levels.  Based on its current borrowing base computation, as defined in the Amended and Restated DIP Credit Facility, Delphi's borrowing base was reduced by the maximum deduction of $75 million for unrealized losses related to Delphi's hedging portfolio as further described in Note 18. Derivatives and Hedging Activities to the consolidated financial statements of the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2008.  As of November 7, 2008, Delphi had drawn down substantially all of the remaining available amounts under the Revolving Facility.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock.  The Company does not expect to pay dividends prior to emergence from chapter 11.  As long as the Facility Availability Amount (as

defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except with respect to investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors). Delphi's Facility Availability Amount fell below $500 million for seven consecutive days in September 2008, but was greater than $500 million at September 30, 2008.

The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility) for Delphi and its direct and indirect subsidiaries, on a consolidated basis as follows:

| Period Ending | Global EBITDAR |
|---|---|
| | (in millions) |
| September 30, 2008 ........................ | $625 |
| October 31, 2008 ........................... | $600 |
| November 30, 2008........................ | $675 |

Delphi was in compliance with the Amended and Restated DIP Credit Facility covenants as of September 30, 2008.

In connection with the Amended and Restated DIP Credit Facility, Delphi paid a total of approximately $75 million to participating lenders on the Revolving Facility, the Tranche B facility and the Tranche C facility. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Amended and Restated DIP Credit Facility and the bankruptcy exit financing that was commenced but not completed.

In conjunction with the entry into the Amended and Restated DIP Credit Facility, the Refinanced DIP Credit Facility was terminated. Delphi incurred no early termination penalties in connection with the termination of this agreement. However, as a result of significant changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $49 million of unamortized debt issuance costs related to the Amended and Restated DIP Credit Facility and the Refinanced DIP Credit Facility in the second quarter of 2008, which was recognized as loss on extinguishment of debt. As of September 30, 2008, $20 million of debt issuance costs remains deferred in other current assets and is being amortized over the term of the Amended and Restated DIP Credit Facility.

**Advance Agreement and Liquidity Support from General Motors and Related Matters**

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into an agreement with GM whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA (the "GM Advance Agreement"). The original GM Advance Agreement had a maturity date of the earlier of December 31, 2008, when $650 million was to have been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. The original GM Advance Agreement provided for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement. The amounts advanced accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis.

On September 26, 2008, the Court granted Delphi's motion to amend the GM Advance Agreement to provide for an additional $300 million availability above the existing $650 million, as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement signed on August 7, 2008. The amendment provided that the outside maturity date with respect to the original $650 million may be extended in connection with an extension of Delphi's existing Amended and Restated DIP Credit Facility, if GM and Delphi agree, to the earlier of June 30, 2009, and the termination of Delphi's Amended and Restated DIP Credit Facility. The accrued interest on the advances made through the effectiveness of the Amended GSA and Amended MRA was cancelled due to the effectiveness of the Amended GSA and Amended MRA, and Delphi may not redraw the original $650 million facility amount. The amendment also provided that the maturity date with respect to the additional $300 million is December 31, 2008 (subject to potential extension through June 30, 2009, on the same terms as apply to the original $650 million). The additional $300 million of advances was also conditioned upon Delphi filing a plan of reorganization and related disclosure statement in form and substance materially consistent with Section 5 of the Amended GSA and Section 7.01 of the Amended MRA which condition was satisfied with Delphi's filing of proposed modifications to its previously confirmed plan of reorganization with the Court on October 3, 2008, and certain other conditions. GM received an administrative claim for all advances made under the GM Advance Agreement, however those advances have been set off against the payments that were

owed to Delphi upon the effectiveness of the Amended GSA and Amended MRA.  As of September 30, 2008, no amounts were outstanding pursuant to the GM Advance Agreement.  Any future advances under the GM Advance Agreement of the remaining $300 million in availability will remain administrative claims in Delphi's chapter 11 cases.

In support of Delphi's efforts to obtain the Accommodation Agreement, GM agreed, subject to Court approval and subject to the Accommodation Agreement becoming effective, to extend the term of the GM Advance Agreement, pursuant to the terms set forth in an amendment thereto filed with the Court on November 7, 2008, through the earlier of June 30, 2009, such date as Delphi files any motion seeking to amend the Plan in a manner that is not reasonably acceptable to GM, the termination of Delphi's Amended and Restated DIP Credit Facility, the termination of the standstill period in the Accommodation Agreement or the Accommodation Agreement in its entirety, and such date as a plan of reorganization becomes effective.  The Court is expected to hear Delphi's motion to amend and extend the GM Advance Agreement concurrently with Delphi's motion seeking authority to enter into the Accommodation Agreement.  Additionally, subject to the amendment to the GM Advance Agreement becoming effective, GM has agreed, subject to certain conditions, to accelerate payment of certain payables to Delphi, pursuant to a Partial Temporary Accelerated Payments Agreement, dated as of November 7, 2008 (the "Partial Temporary Accelerated Payments Agreement"), which could result in an additional $100 million of liquidity to Delphi in each of April, May and June of 2009.  The Partial Temporary Accelerated Payments Agreement provides that GM will generally recoup these accelerated payments over its three subsequent monthly payments on or after the date that GM's obligation to advance funds under the GM Advance Agreement terminates or advances made become due and payable in accordance with the GM Advance Agreement.  The effectiveness of the Partial Temporary Accelerated Payments Agreement is conditioned on Court approval and, among other things, the satisfaction of the conditions precedent to the proposed amendment to the GM Advance Agreement filed with the Court on November 7, 2008, including the absence of default under the Amended and Restated DIP Credit Facility, as modified by the Accommodation Agreement  There can be no assurances, however that the Court will approve the Accommodation Agreement, the extension of the GM Advance Agreement or the Partial Temporary Accelerated Payments Agreement, that such agreements will actually become effective or that GM will have sufficient liquidity to accelerate payables to Delphi at such time.  For additional information, refer to Note 23. Subsequent Events to the consolidated financial statements of the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2008, and for risks and uncertainties related to our business relationship with GM, refer to Part II, Item 1A. Risk Factors of the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2008.

## 4.  Reorganization Items

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed.  Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors, and unions.  The Debtors' reorganization items consist of the following:

|  | Three Months Ended September 30, 2008 | | Eight Months Ended September 30, 2008 | |
| --- | --- | --- | --- | --- |
|  | (in millions) | | | |
| GM Amended GSA settlement (Note 1) | $ | 5,332 | $ | 5,332 |
| Professional fees directly related to reorganization | | (24) | | (72) |
| Interest income | | 17 | | 44 |
| Write off of previously capitalized fees and expenses related to the EPCA | | — | | (79) |
| Other | | (1) | | (3) |
| Total Reorganization Items | $ | 5,324 | $ | 5,222 |

Delphi recorded a net reorganization gain of $5.3 billion in the three and eight months ended September 30, 2008 and received $641 million on September 30, 2008 as a result of the effectiveness of the Amended GSA, as described in Note 1. Background and Organization.  Professional fees directly related to the reorganization ("Professional Fees") include fees and reimbursable expenses associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Debtors' debtor-in-possession credit facility and prepetition credit facility (for fees and expenses incurred on or prior to the effective date of the refinancing), and the unions.  Professional Fees also include $6 million during the eight months ended

September 30, 2008, including $2 million recorded during the three months ended September 30, 2008, for certain legal advisors to GM. Professional fees for the eight months ended September 30, 2008 also includes arrangement and other fees paid to various lenders in conjunction with the bankruptcy exit financing that was commenced but not completed in April 2008. Professional Fees for the three months ended September 30, 2008 were estimated by the Debtors and will be reconciled to actual invoices when received.

## 5. Liabilities Subject to Compromise

The Debtors have received approximately 16,800 proofs of claim, some of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.

Although the Debtors have not completed the process of reconciling these proofs of claim and thus the ultimate amount of such liabilities is not determinable at this time, as of September 30, 2008, the Debtors had objected to approximately 13,400 proofs of claim which asserted approximately $10.0 billion in aggregate liquidated amounts plus additional unliquidated amounts. The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,800 of those claims, which orders reduced the amount of asserted claims by approximately $9.7 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order allowing or modifying approximately 3,700 claims, reducing the aggregate amount on those claims by $294 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled, and that as a result of such objections, the aggregate amount of claims ultimately allowed by the Court will be further reduced. The determination of how these liabilities are to be settled and treated is set forth in the Plan, which was approved by the Court on January 25, 2008. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events. Liabilities subject to compromise consist of the following:

|  | September 30, 2008 (in millions) |
|---|---|
| Pension obligations | $ 2,085 |
| Postretirement obligations other than pensions | 946 |
| Allowed GM general unsecured claim | 1,628 |
| Allowed GM administrative claim | 2,500 |
| Allowed IUE-CWA and USW claims | 129 |
| Debt and notes payable | 2,375 |
| Accounts payable | 813 |
| Securities and ERISA litigation liability | 351 |
| Other | 377 |
| Total Liabilities Subject to Compromise | $ 11,204 |

The decrease in liabilities subject to compromise as of September 30, 2008 from $16,325 million at June 30, 2008 is due to the reductions of pension obligations, postretirement obligations and the GM claim for the U.S. employee workforce transition programs resulting from the effectiveness of the Amended GSA and the Amended MRA during the third quarter of 2008. The remaining other postretirement benefit obligations are primarily for salaried employees.

## 6. Postpetition Accounts Payable

To the best of the Debtors' knowledge, all undisputed postpetition accounts payable have been and are being paid under agreed-upon payment terms.

Case Number: 05-44481 (RDD) (Jointly Administered)

**7.  Divestitures**

<u>**Discontinued Operations**</u>

*Steering and Halfshaft Business* - In December 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of its global steering and halfshaft business (the "Steering Business") and a Transaction Facilitation Agreement with GM (the "Transaction Agreement").  Delphi expects proceeds from the sale and related Transaction Agreement to approximate $250 million.  In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business.  Delphi is working to close the sale as soon as practicable.  Pursuant to the terms of the Purchase Agreement, any party in compliance with its obligations under the Purchase Agreement may terminate the Purchase Agreement since the transaction did not close by August 31, 2008, with certain exceptions.  Negotiations continue between GM and Platinum on a supply agreement and Delphi does not expect the sale to close prior to January 1, 2009.  GM agreed that ownership of the Steering Business will transfer to GM if it is not sold to a third party by August 31, 2010.  During the three months ended September 30, 2008, Delphi recorded income of $74 million, net of tax, and losses of $10 million, net of tax, for the eight months ended September 30, 2008, due to the results of operations for the three and eight months ended September 30, 2008, and adjustment of assets held for sale to fair value of the Steering Business as of September 30, 2008.

*Interiors and Closures Business* - Delphi and certain of its affiliates closed on the sale of the Interiors and Closures Business to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group, on February 29, 2008.  Delphi received proceeds from the sale of approximately $98 million consisting of $63 million of cash (less $23 million of cash at an overseas entity that was included in the sale) and the remainder in notes at fair value.  As a result of the operating results and sale of the Interiors and Closures Business, Delphi recorded income of $12 million, net of tax, in the eight months ended September 30, 2008.

<u>**Automotive Holdings Group Segment**</u>

*Power Products Business Sale* – On May 27, 2008 and in accordance with the terms of an order authorizing the sale of certain assets for less than $10 million, Delphi served notice of its intention to sell its power products business (the "Power Products Business") to Strattec Security Corporation, Witte-Velvert GmbH & Co. KG, Vehicle Access Systems Technology LLC, and certain of their affiliates (collectively, the "Strattec Buyers") for approximately $8 million.  On June 4, 2008, the Debtors filed a motion to assume and assign certain prepetition executory contracts related to the Power Products Business to the Strattec Buyers.  On June 24, 2008, the Court entered an order authorizing the Debtors to assume and assign such contracts to the Strattec Buyers.  The 2007 annual revenues for the Power Products Business were $59 million.  Delphi recognized a charge of $3 million during the second quarter of 2008, included in cost of sales, related to the assets held for sale of the Power Products Business.  On November 7, 2008, Delphi and the Strattec Buyers agreed to an amendment to the purchase and sale agreement, which among other things, reduced the consideration to be received by Delphi to approximately $5 million.

*U.S. Suspensions Asset Sale* - On March 7, 2008, the Debtors filed a motion to sell certain assets of Delphi's U.S. suspensions business, including the machinery, equipment and inventory primarily used and located at its suspension manufacturing facility in Kettering, Ohio (the "Kettering Assets") to Tenneco Automotive Operating Company Inc. ("Tenneco") for approximately $19 million and other consideration.  On March 20, 2008, the Court approved the bidding procedures for the Kettering Assets, but no further bids were submitted by the bid deadline.  On April 30, 2008, the Court entered an order approving the sale of the Kettering Assets to Tenneco.  The 2007 annual revenues for the Kettering Assets were $113 million.  The sale occurred on May 30, 2008 and resulted in a gain of $9 million, which was recorded as a reduction to cost of sales during the eight months ended September 30, 2008.  Additionally, Delphi received proceeds from this sale of approximately $19 million in the eight months ended September 30, 2008.  During the third quarter of 2008, Delphi and Tenneco agreed on final working capital adjustments and Delphi paid $1 million to Tenneco.

*Bearings Business Product Sale* - On January 15, 2008, the Debtors filed a motion to sell Delphi's bearings business (the "Bearings Business").  On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code.  On February 21, 2008, the Debtors announced that they had entered into a purchase agreement with Kyklos, Inc., a wholly owned subsidiary of Hephaestus Holdings, Inc. and an affiliate of KPS Special Situations Fund II, L.P. ("Kyklos") which was the successful bidder at the auction held on February 19, and 20, 2008.  The Court entered the order confirming the sale

of the Bearings Business to Kyklos on March 19, 2008.  The 2007 annual revenues for the Bearings Business were $280 million.  During the first quarter of 2008, Delphi recognized a charge of $30 million, included in cost of sales, related to the assets held for sale of the Bearings Business.  The sale occurred on April 30, 2008 and Delphi received net proceeds from this sale of approximately $15 million in the eight months ended September 30, 2008 with no net change to the loss on the sale.

***North American Brake Product Asset Sale -*** On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for Delphi's North American brake components machining and assembly assets ("North American Brake Components") primarily located at its Saginaw, Michigan, Spring Hill, Tennessee, Oshawa, Ontario, Canada and Saltillo, Mexico facilities.  The 2007 annual revenues for North American Brake Components were $568 million.  The sale occurred in the eight months ended September 30, 2008 and resulted in a gain of $3 million which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $38 million in the eight months ended September 30, 2008.

### Powertrain Systems Segment

***Global Exhaust Business Sale -*** On June 27, 2008, the Debtors announced their intention to sell Delphi's global exhaust business relating to the design and manufacture of the exhaust system front exhaust module including catalytic converters and exhaust manifolds (the "Exhaust Business").  Although Delphi intends to divest its Exhaust Business, the Company intends to continue to provide full engine management systems, including air and fuel management, and combustion and valve-train technology.

***Catalyst Product Line Sale -*** On September 28, 2007, Delphi closed on the sale of its original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore.  The Catalyst Business revenues for the nine months ended September 30, 2007 were $249 million.  During the eight months ended September 30, 2008, Delphi and Umicore agreed on final working capital adjustments and Delphi received a payment of $9 million, of which $6 million offset a receivable recognized during 2007 and $3 million was recorded as a reduction to cost of sales.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL AND PAYROLL TAXES WITHHELD AND INCURRED**
**THREE MONTHS ENDED SEPTEMBER 30, 2008**

| Gross Wages Paid | Employee Payroll Taxes Withheld | Employer Payroll Taxes Owed |
|---|---|---|
| $        436,776,726 | $        120,703,163 | $        32,018,430 |

Note:    As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly
employees represented by the UAW and the IUE-CWA received lump sum incentive payments or buyout
payments.  These payments were made by Delphi and are wholly or partially reimbursed by GM, and are
included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL TAXES PAID**
**THREE MONTHS ENDED SEPTEMBER 30, 2008**

| Payee | Payroll Taxes Paid |
|---|---|
| Internal Revenue Service | $ 130,329,461 |
| State of Michigan | 6,156,436 |
| City of Flint, MI | 84,225 |
| City of Saginaw, MI | 83,481 |
| City of Detroit, MI | 21,496 |
| City of Grand Rapids, MI | 9,446 |
| City of Pontiac, MI | 1,694 |
| City of Walker, MI | 1,356 |
| City of Lapeer, MI | 284 |
| City of Lansing, MI | 71 |
| State of Indiana | 3,931,749 |
| State of New York | 3,558,166 |
| State of Ohio | 2,969,321 |
| City of Dayton, OH | 352,896 |
| City of Kettering, OH | 290,877 |
| City of Warren, OH | 55,986 |
| City of Vandalia, OH | 50,874 |
| City of Moraine, OH | 47,844 |
| City of Rita, OH | 31,602 |
| Ohio School District | 30,410 |
| City of Niles, OH | 15,726 |
| City of Elyria, OH | 14,721 |
| City of Hubbard, OH | 7,531 |
| City of Norwalk, OH | 4,948 |
| City of Columbus, OH | 4,150 |
| City of Trotwood, OH | 3,170 |
| City of Port Clinton, OH | 2,671 |
| City of Lordstown, OH | 2,637 |
| City of Huron, OH | 1,646 |
| City of Canton, OH | 1,082 |
| City of Lorain, OH | 1,060 |
| City of Ontario, OH | 898 |
| City of Hamilton, OH | 891 |
| City of Dublin, OH | 866 |
| City of Newton Falls, OH | 841 |
| City of Toledo, OH | 641 |
| City of Springfield, OH | 637 |
| City of Parma, OH | 590 |
| City of West Carrollton, OH | 402 |
| City of Troy, OH | 384 |
| City of Xenia, OH | 333 |
| City of Akron, OH | 256 |
| City of Cincinnati, OH | 116 |
| State of Alabama | 906,769 |
| City of Gadsden, AL | 8 |
| State of Wisconsin | 532,639 |
| State of Mississippi | 387,897 |
| State of California | 88,252 |
| State of Colorado | 71,900 |
| City of Denver, CO | 4,011 |
| State of Illinois | 46,469 |
| State of Pennsylvania | 37,038 |
| City of Towamencin, PA | 93 |
| State of Georgia | 25,380 |
| State of South Carolina | 23,369 |

| Payee | Payroll Taxes Paid |
|---|---|
| State of Kansas | $ 15,219 |
| State of North Carolina | 8,709 |
| State of Virginia | 8,645 |
| State of Oregon | 7,751 |
| State of Arizona | 7,466 |
| State of Texas | 5,085 |
| State of Missouri | 3,970 |
| City of Kansas City, MO | 20 |
| State of New Jersey | 3,642 |
| State of Iowa | 3,133 |
| State of Louisiana | 2,844 |
| State of Kentucky | 2,628 |
| City of Elizabethtown, KY | 395 |
| City of Bowling Green, KY | 386 |
| State of Arkansas | 2,330 |
| State of Maryland | 1,285 |
| State of New Mexico | 1,189 |
| State of Connecticut | 1,143 |
| State of Oklahoma | 1,098 |
| State of Utah | 1,082 |
| State of Massachusetts | 1,041 |
| State of Washington | 128 |
| State of West Virginia | 84 |
| State of Delaware | 17 |
| State of Florida | 3 |
| Inland Revenue Service (UK) | 1,884,563 |
| Country of Switzerland | 21,742 |
| Total | $ 152,183,295 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED SEPTEMBER 30, 2008**

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---:|---:|
| Howard County, Indiana | Personal Property | $ 2,186,873 | $ 2,186,873 |
| Buena Vista Township, Michigan | Personal Property | 1,453,489 | 1,453,489 |
| Montgomery County, Ohio | Personal Property | 877,105 | 877,105 |
| Wyoming, Michigan | Personal Property | 804,041 | 804,041 |
| Flint, Michigan | Personal Property | 423,443 | 423,443 |
| Erie County, Ohio | Personal Property | 405,764 | 405,764 |
| Adrian, Michigan | Personal Property | 279,951 | 279,951 |
| Saginaw, Michigan | Personal Property | 239,153 | 239,153 |
| Trumbull County, Ohio | Personal Property | 232,663 | 232,663 |
| Troy, Michigan | Personal Property | 166,766 | 166,766 |
| Orange County Tax Collector | Personal Property | 107,810 | 107,810 |
| Franklin County, Ohio | Personal Property | 89,474 | 89,474 |
| Bay City, Michigan | Personal Property | 53,061 | 53,061 |
| Henry County, Indiana | Personal Property | 43,171 | 43,171 |
| Shelby Township, Michigan | Personal Property | 40,031 | 40,031 |
| Portage County, Ohio | Personal Property | 37,598 | 37,598 |
| Charter Township of Orion, Michigan | Personal Property | 22,466 | 22,466 |
| Lenawee County, Michigan | Personal Property | 13,931 | 13,931 |
| Alma, Michigan | Personal Property | 13,433 | 13,433 |
| Los Angeles County, California | Personal Property | 10,597 | 10,597 |
| Charter Township of Shelby, Michigan | Personal Property | 9,978 | 9,978 |
| Riverside County, California | Personal Property | 9,058 | 9,058 |
| Allen County, Indiana | Personal Property | 7,979 | 7,979 |
| Novi, Michigan | Personal Property | 7,676 | 7,676 |
| Butler County, Ohio | Personal Property | 6,619 | 6,619 |
| Dearborn, Michigan | Personal Property | 5,451 | 5,451 |
| Charter Township of Brighton, Michigan | Personal Property | 5,206 | 5,206 |
| Livonia, Michigan | Personal Property | 5,155 | 5,155 |
| Waterbury, Connecticut | Personal Property | 5,134 | 5,134 |
| Prince Georges County, Maryland | Personal Property | 5,064 | 5,064 |
| Burton, Michigan | Personal Property | 4,972 | 4,972 |
| Santa Clara County, California | Personal Property | 4,819 | 4,819 |
| Coopersville, Michigan | Personal Property | 4,108 | 4,108 |
| Orange County, California | Personal Property | 4,027 | 4,027 |
| Oxford Township, Michigan | Personal Property | 3,594 | 3,594 |
| Grand Blanc Charter Township, Michigan | Personal Property | 3,149 | 3,149 |
| Wixom, Michigan | Personal Property | 2,984 | 2,984 |
| Starpoint, Ohio | Personal Property | 2,305 | 2,305 |
| Warren, Michigan | Personal Property | 2,258 | 2,258 |
| St. Clair Shores, Michigan | Personal Property | 2,184 | 2,184 |
| Lake County, Ohio | Personal Property | 2,127 | 2,127 |
| Wayne County, Indiana | Personal Property | 2,085 | 2,085 |
| Monitor Township, Michigan | Personal Property | 2,065 | 2,065 |
| Torrington, Connecticut | Personal Property | 1,603 | 1,603 |
| Dekalb County, Indiana | Personal Property | 1,545 | 1,545 |
| Cleveland County, North Carolina | Personal Property | 1,374 | 1,374 |
| Madison Heights, Michigan | Personal Property | 1,248 | 1,248 |
| Franklin County, Indiana | Personal Property | 1,237 | 1,237 |
| Ann Arbor, Michigan | Personal Property | 1,226 | 1,226 |
| San Joaquin County, California | Personal Property | 1,204 | 1,204 |
| Contra Costa County, California | Personal Property | 1,147 | 1,147 |
| Green Oak Township, Michigan | Personal Property | 1,138 | 1,138 |
| Auburn Hills, Michigan | Personal Property | 1,128 | 1,128 |
| Muscogee County, Georgia | Personal Property | 1,085 | 1,085 |

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Wake County, North Carolina | Personal Property | $ 1,066 | 1,066 |
| Sandstone Charter Township, Michigan | Personal Property | 1,039 | 1,039 |
| Alameda County, Georgia | Personal Property | 935 | 935 |
| Bristol, Connecticut | Personal Property | 935 | 935 |
| Taylor, Michigan | Personal Property | 929 | 929 |
| Ripley County, Indiana | Personal Property | 922 | 922 |
| Milford Township, Michigan | Personal Property | 902 | 902 |
| Medina County, Ohio | Personal Property | 842 | 842 |
| Watertown Township, Connecticut | Personal Property | 793 | 793 |
| Davison, Michigan | Personal Property | 779 | 779 |
| Thomastown, Connecticut | Personal Property | 736 | 736 |
| Norwich, Connecticut | Personal Property | 701 | 701 |
| Cass City, Michigan | Personal Property | 658 | 658 |
| Salisbury, Connecticut | Personal Property | 639 | 639 |
| Charter Township of Fenton, Michigan | Personal Property | 596 | 596 |
| Zilwaukee, Michigan | Personal Property | 580 | 580 |
| Cabarrus County, North Carolina | Personal Property | 576 | 576 |
| Scott County, Indiana | Personal Property | 522 | 522 |
| Pontiac, Michigan | Personal Property | 502 | 502 |
| Traverse City, Michigan | Personal Property | 487 | 487 |
| Dubois County | Personal Property | 449 | 449 |
| Marshall County, Indiana | Personal Property | 393 | 393 |
| Jackson, Michigan | Personal Property | 385 | 385 |
| Ottawa County, Ohio | Personal Property | 358 | 358 |
| Hawes Township, Michigan | Personal Property | 317 | 317 |
| Memphis, Tennessee | Personal Property | 294 | 294 |
| Whitley County, Indiana | Personal Property | 293 | 293 |
| Spaulding Township, Michigan | Personal Property | 283 | 283 |
| Stanley County, North Carolina | Personal Property | 283 | 283 |
| Sturgis, Michigan | Personal Property | 276 | 276 |
| Commerce Township, Michigan | Personal Property | 274 | 274 |
| Summit County, Ohio | Personal Property | 250 | 250 |
| Charter Township of Clinton, Michigan | Personal Property | 248 | 248 |
| Burlington, Massachusetts | Personal Property | 239 | 239 |
| Newton County, Indiana | Personal Property | 229 | 229 |
| Logan County, Ohio | Personal Property | 192 | 192 |
| San Bernardino County, California | Personal Property | 189 | 189 |
| Hamilton County, Indiana | Personal Property | 189 | 189 |
| Lenox, Michigan | Personal Property | 177 | 177 |
| Charter Township of Plymouth, Michigan | Personal Property | 163 | 163 |
| Charter Township of Van Buren, Michigan | Personal Property | 156 | 156 |
| Monroe County, Ohio | Personal Property | 147 | 147 |
| Tawas City, Michigan | Personal Property | 145 | 145 |
| Darke County, Ohio | Personal Property | 131 | 131 |
| Licking County, Ohio | Personal Property | 130 | 130 |
| Rogers County, Oklahoma | Personal Property | 127 | 127 |
| Addison, Michigan | Personal Property | 119 | 119 |
| New Haven, Michigan | Personal Property | 118 | 118 |
| South Windsor, Connecticut | Personal Property | 107 | 107 |
| Chester, Connecticut | Personal Property | 101 | 101 |
| Warren County, Ohio | Personal Property | 98 | 98 |
| Southington, Connecticut | Personal Property | 94 | 94 |
| Bridgeport Township, Michigan | Personal Property | 88 | 88 |
| Johnston County, North Carolina | Personal Property | 88 | 88 |
| Huron County, Ohio | Personal Property | 77 | 77 |
| Cuyahoga County, Ohio | Personal Property | 62 | 62 |
| Macon County, North Carolina | Personal Property | 60 | 60 |
| Watertown Township, Michigan | Personal Property | 55 | 55 |

Case Number:  05-44481 (RDD) (Jointly Administered)

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Lawrence County, Indiana | Personal Property | $        50 | 50 |
| Vassar, Michigan | Personal Property | 46 | 46 |
| Lee County, North Carolina | Personal Property | 42 | 42 |
| Monroe County, Indiana | Personal Property | 37 | 37 |
| Dearborn County, Indiana | Personal Property | 34 | 34 |
| Jay County, Ohio | Personal Property | 28 | 28 |
| Blissfield, Michigan | Personal Property | 26 | 26 |
| Genesee Township, Michigan | Personal Property | 26 | 26 |
| Blissfield Township, Michigan | Personal Property | 20 | 20 |
| Wabash County, Indiana | Personal Property | 15 | 15 |
| Derby, Connecticut | Personal Property | 15 | 15 |
| Guilford County, North Carolina | Personal Property | 14 | 14 |
| Stark County, Ohio | Personal Property | 12 | 12 |
| Ashtabula County, Ohio | Personal Property | 10 | 10 |
| Oak Park, Michigan | Personal Property | 7 | 7 |
| Vigo County, Indiana | Personal Property | 7 | 7 |
| Gaston County, North Carolina | Personal Property | 6 | 6 |
| Howard County, Indiana | Real Property | 1,427,578 | 1,427,578 |
| Montgomery County, Ohio | Real Property | 841,532 | 841,532 |
| Troy, Michigan | Real Property | 785,056 | 785,056 |
| Lockport, New York | Real Property | 695,420 | 695,420 |
| Flint, Michigan | Real Property | 553,477 | 553,477 |
| Wyoming, Michigan | Real Property | 465,665 | 465,665 |
| Trumbull County, Ohio | Real Property | 446,311 | 446,311 |
| Saginaw, Michigan | Real Property | 334,558 | 334,558 |
| Henrietta, New York | Real Property | 228,937 | 228,937 |
| Rochester, New York | Real Property | 227,311 | 227,311 |
| Coopersville, Michigan | Real Property | 140,956 | 140,956 |
| Henry County, Indiana | Real Property | 34,442 | 34,442 |
| Portage County, Ohio | Real Property | 22,989 | 22,989 |
| State of Michigan | Use | 741,612 | 741,612 |
| State of Ohio | Use | 735,819 | 735,819 |
| State of Indiana | Use | 448,568 | 448,568 |
| State of New York | Use | 222,770 | 222,770 |
| State of Texas | Use | 69,186 | 69,186 |
| Limestone County, Alabama  (Pay to: Alabama Department of Revenue) | Use | 56,666 | 56,666 |
| State of Mississippi | Use | 46,133 | 46,133 |
| State of Wisconsin | Use | 28,348 | 28,348 |
| Colorado Dept of Revenue | Use | 8,285 | 8,285 |
| Ohio Treasurer of State | Commercial Activity | 429,494 | 429,494 |
| State of Ohio | Kilowatt Hour | 125,708 | 125,708 |
| Texas Comptroller of Public Accounts | Texas Margin Tax | 100,000 | 100,000 |
| Kentucky Department of Revenue | Franchise | 57,000 | 57,000 |
| Delaware Secretary of State | Franchise | 33,000 | 33,000 |
| State of Alabama | Consumer Use | 60,870 | 60,870 |
| State of Alabama | Seller's Use | 22,212 | 22,212 |
| Department of Treasury | Withholding (non-payroll) | 10,500 | 10,500 |
| Colorado Dept of Revenue | Sales | 5,712 | 5,712 |
| State of Washington | Business & Occupation | 5,200 | 5,200 |
| Virginia Department of Taxation | Income | 2,041 | 2,041 |
| Oregon Department of Revenue | Income | 10 | 10 |
| Department of Treasury | Heavy Highway Vehicle Use | 1,794 | 1,794 |
| Colorado Dept of Revenue | Utility | 698 | 698 |

Case Number:  05-44481 (RDD) (Jointly Administered)

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| South Carolina Department of Revenue | Sales & Use | $ 251 | 251 |
| Texas Comptroller of Public Accounts | Surplus Lines Insurance | 126 | 126 |
| Colorado Division of Insurance | Surplus Lines Insurance | 55 | 55 |
| Total | | $ 17,061,960 | $ 17,061,960 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED September 30, 2008**

Note 1:    The amounts listed above for tax due and tax paid include postpetition taxes and only those prepetition taxes for which the Debtors have received Court authorization to pay.  Accordingly, certain prepetition taxes (primarily on real and personal property) that the Debtors do not have authority to pay are not included in the schedule above.  Such prepetition taxes are included in the balance sheet as part of "Liabilities Subject to Compromise."

Note 2:    Certain Debtors also pay transaction taxes such as value added tax ("VAT") to certain foreign countries based upon the purchase or supply of goods or services within the country and the importation of goods into the country from outside the country.  For the purchase of goods or services in certain foreign countries, VAT may either be collected by the supplier from the Debtors or paid directly by the Debtors through self-assessment.  For the supply of goods or services in certain foreign countries, the Debtors may collect VAT from the customers and remit the tax to the foreign governments.  Upon importation in certain countries, VAT may be paid by the Debtors.  In most cases, VAT is recoverable either as an input VAT credit or as a refund.  The process of calculating VAT owed or refundable is a complex process of netting VAT paid, collected, and remitted.  To the best of the Company's knowledge, all VAT has been paid and is being paid when due.  In addition, certain Debtors incur foreign withholding taxes on certain payments from various foreign non-Debtor affiliates.  These foreign withholding taxes generally apply to interest, royalties, dividends, and service payments received from certain foreign non-Debtor affiliates.  The foreign withholding taxes are required to be withheld by the foreign non-Debtor affiliates and paid over to the foreign tax authorities on behalf of the Debtors.  To the best of the Company's knowledge, all foreign withholding taxes have been withheld by the foreign non-Debtor facilitates when required to be withheld and paid over to the appropriate foreign tax authorities when due.  These foreign tax payments have not been included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF DISBURSEMENTS**
**THREE MONTHS ENDED SEPTEMBER 30, 2008**

| Debtor Name | Case Number | Amount [1] |
|---|---|---:|
| Delphi NY Holdings Corporation | 05-44480 | $ |
| Delphi Corporation | 05-44481 | 862,190 |
| ASEC Manufacturing General Partnership | 05-44482 | — |
| ASEC Sales General Partnership | 05-44484 | — |
| Environmental Catalysts, LLC | 05-44503 | — |
| Delphi Medical Systems Colorado Corporation | 05-44507 | 8,446,605 |
| Delphi Medical Systems Texas Corporation | 05-44511 | — |
| Delphi Medical Systems Corporation | 05-44529 | 3,141,894 |
| Specialty Electronics International Ltd. | 05-44536 | — |
| Specialty Electronics, Inc. | 05-44539 | 1,810,704 |
| Delphi Liquidation Holding Company | 05-44542 | — |
| Delphi Electronics (Holding) LLC | 05-44547 | — |
| Delphi Technologies, Inc. | 05-44554 | 5,505,010 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 | — |
| Delphi Mechatronic Systems, Inc. | 05-44567 | 22,843,956 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 | — |
| Exhaust Systems Corporation | 05-44573 | 9,437 |
| Delphi China LLC | 05-44577 | — |
| Delphi Automotive Systems Korea, Inc. | 05-44580 | 335,280 |
| Delphi International Services, Inc. | 05-44583 | 23,839,814 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 | — |
| Delphi Automotive Systems International, Inc. | 05-44589 | — |
| Delphi International Holdings Corporation | 05-44591 | — |
| Delphi Automotive Systems Overseas Corporation | 05-44593 | 1,645 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 | 2,981,640 |
| Delco Electronics Overseas Corporation | 05-44610 | 24,200,868 |
| Delphi Diesel Systems Corporation | 05-44612 | 85,153,131 |
| Delphi LLC | 05-44615 | — |
| Aspire, Inc. | 05-44618 | 1,102,956 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 | 217,698 |
| Delphi Connection Systems | 05-44624 | 17,184,762 |
| Packard Hughes Interconnect Company | 05-44626 | — |
| DREAL, Inc. | 05-44627 | — |
| Delphi Automotive Systems Services LLC | 05-44632 | 208,920,153 |
| Delphi Services Holding Corporation | 05-44633 | — |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 | — |
| Delphi Foreign Sales Corporation | 05-44638 | — |
| Delphi Automotive Systems Human Resources LLC | 05-44639 | 368,918,595 |
| Delphi Automotive Systems LLC | 05-44640 | 2,287,199,225 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 | 32,360,510 |
| Delphi Receivables LLC | 05-47459 | — |
| MobileAria, Inc. | 05-47474 | — |

(1) Operating expenses for the three months ended September 30, 2008 were used as a proxy for disbursements.