1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


      Debtor.


- - - - - - - - - - - - - - - - - - - -x


         U.S. Bankruptcy Court

         One Bowling Green

         New York, New York


         November 6, 2008

         10:09 a.m.


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1

2   HEARING re Motion of AMLP and ADAH to Reargue and Strike (in re

3   Delphi Corporation v. Appaloosa Management L.P. et al.)

4

5   HEARING re Motion of AMLP and ADAH to Reargue and Strike (in re

6   Delphi Corporation v. UBS Securities LLC)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2    A P P E A R A N C E S :

3    FRIEDMAN KAPLAN SEILER & ADELMAN LLP

4         Attorneys for Debtor

5         1633 Broadway, 46th Floor

6         New York, NY 10019

7

8    BY:   EDWARD A. FRIEDMAN, ESQ.

9          WILLIAM P. WEINTRAUB, ESQ.

10

11

12   WHITE & CASE LLP

13        Attorneys for Appaloosa Management L.P.

14        1155 Avenue of the Americas

15        New York, NY 10036

16

17   BY:   GLENN M. KURTZ, ESQ.

18

19

20

21

22

23

24

25

4

1          P R O C E E D I N G S

2          THE COURT:  Be seated.  Okay, I've -- oh, I'm sorry.

3   We're, first, on the record in Delphi v. Appaloosa Management

4   L.P., et al. on Appaloosa and ADAH's motion to reargue and

5   vacate a portion of my order granting, in part, and denying, in

6   part, the defendant's motions to dismiss.

7          And I know I didn't suggest to you all that I would

8   contemplate oral argument on this additional issue but I did

9   have a couple of questions of each of you, and let me ask those

10  now.  And then I'll give you all a brief time for oral

11  argument.

12         The Appaloosa briefs and the case law point out that

13  one of the elements of a fraudulent omission claim is that the

14  defendant have a duty to disclose.  Appaloosa and ADAH contend

15  that there is no duty to disclose set forth in the complaint

16  that I have sustained and, in particular, point out that I

17  found that the parties acknowledged that they were dealing with

18  each other at arm's length and disavowed any fiduciary duty

19  that either would have to the other.

20         But my question for Appaloosa is why wouldn't 6(d) of

21  the EPCA, which has the reasonable best efforts language in it

22  to implement the transaction, constitute the duty?  I.e., given

23  that undertaking and given the allegations of behind-the-scenes

24  efforts to subvert the deal, why wouldn't that provision impose

25  a duty to disclose?

5

1          I don't know if you or Mr. Shore -- whoever wants to

2     handle that.

3          MR. KURTZ:  Should I take --

4          THE COURT:  Wherever you're comfortable.

5          MR. KURTZ:  Glenn Kurtz, on behalf of ADAH and AMLP.

6     Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. KURTZ:  Your Honor's already determined that the

9     applicable law here is Michigan law.  And Michigan law

10    recognizes a duty to disclose under fairly limited

11    circumstances, unlike New York and some of the other

12    jurisdictions that have been cited by Delphi.  And,

13    specifically, it's not enough to not omit.  There has to be an

14    active concealment.  It requires a specific inquiry as to a

15    subject matter, a response to the subject matter which is

16    misleading and is a misrepresentation, and then you look at it.

17          The duty issue, Your Honor, is that under Michigan --

18          THE COURT:  Isn't that based on cases where there

19    specifically were facts where there wasn't this type of

20    contractual obligations?  And weren't they situations where

21    people were dealing with each other and it's just a question of

22    dealing with each other in good faith as opposed to a specific

23    undertaking?

24          MR. KURTZ:  But there's no specific undertaking in

25    the EPCA to make disclosures as to matters that I would like to

6

1   address at some point today.  The duty has to rise independent

2   of the contract.  That's what the law says.

3              THE COURT:  Well, what --

4              MR. KURTZ:  Otherwise it's a breach of contract.  A

5   breach of the best efforts provision is a breach of contract

6   claim.  It can't become a tort claim by simply saying well, by

7   breaching the best efforts provisions you've breached the

8   contract and therefore you've breached a duty and therefore

9   you've committed fraud.  It's specifically prohibited, right?

10  You've got -- and New York law is clear on this as well when it

11  comes to the limitation on liability, that you can't have tort

12  claims arising out of a specific breach of contract.

13             Now, I know Your Honor left that open with respect to

14  an intent to perform with respect to matters that occurred

15  prior to execution, post-execution.  Best efforts to take

16  action in connection with the EPCA doesn't say you have to

17  disclose.  And it's important to focus on what the disclosure

18  would be here because Your Honor upheld all of the claims at

19  issue on the basis of allegations that there had been some

20  affirmative effort to chill the financing.

21             THE COURT:  And I don't want to get into that --

22             MR. KURTZ:  Okay.

23             THE COURT:  -- at this point.  I just want to deal

24  with this --

25             MR. KURTZ:  But that is --

7

1          THE COURT:  -- this particular issue.

2          MR. KURTZ:  But then what, Your Honor, would be

3    disclosed?  Because the only allegations that they have, that

4    they claim they can particularize, which is footnote 7 of their

5    last submission, involves the consideration of whether or not

6    to breach a contract as if consideration is actionable, as if

7    there is supposed to be --

8          THE COURT:  I've already dealt with that.  I'm asking

9    you a specific question, and I want to pursue that before

10   you --

11         MR. KURTZ:  Okay.

12         THE COURT:  -- go off on other tangents.

13         MR. KURTZ:  I apologize, Your Honor.

14         THE COURT:  Paragraph 6(d) says, "Each investor shall

15   use his reasonable best efforts to take all actions and do all

16   things reasonably necessary, proper or advisable on its part

17   under the agreement to cooperate with the company and to

18   consummate and make effective the transactions contemplated by

19   this agreement."  And the allegation is that rather than trying

20   to consummate the agreement, Appaloosa discussed with the

21   initial -- I'm sorry, with the other investors, the additional

22   investors, in various contexts, and we can get into those in a

23   moment, but I just want to focus on this point first, the

24   opposite, i.e., not consummating the agreement, not making the

25   transactions effective but doing just the opposite and not

8

1   disclosing such information to Delphi, which suggests to me

2   that the obligation was not lived up to.

3           MR. KURTZ:  But, Your Honor, that is a contract

4   provision.  Every contract has a requirement that a party

5   consummate the contract.  That's what the agreement is; it's

6   the purchase of goods.

7           THE COURT:  No, but this is beyond that.  This is a

8   specific duty to cooperate.

9           MR. KURTZ:  Well, it's a duty to cause the

10  occurrence, perhaps, of the closing.  And the allegation is

11  there was a consideration by the parties that they wouldn't

12  close and that they would share in some way any breakup fee

13  that was required on the basis of a willful breach.  That's no

14  different than any contract claim where you simply don't close.

15  That doesn't give rise to a tort duty.  It's not independent of

16  the contract; it is the contract.

17          THE COURT:  Well, except this is a specific

18  provision, separate and apart from just an undertaking to

19  perform the contract, which is that the investors will work

20  with Delphi to consummate and make effective the transaction.

21  It was clearly under the agreement.  It's set forth in 5(q).

22  Delphi was aware of the additional investors because it

23  provided that the information be funneled to them through ADAH.

24  So it was clearly contemplated.  The additional investors were

25  important in that ADAH had some role as the leader, in essence,

9

1    of that effort to get them to perform.

2         I guess I don't see why the alleged nondisclosure of

3    the contrary isn't a breach of a duty.  Now, I understand you

4    say it's a breach of a contract, I understand that, but the

5    duty requirement is not limited to a fiduciary duty, is it?

6         MR. KURTZ:  Well, under Michigan law, which is

7    applicable, it is effectively limited to a fiduciary duty.

8         THE COURT:  Well, but even -- but Michigan law

9    recognizes that if one party expects the other party --

10   reasonably expects the other party to make a disclosure, then

11   the other party should do so, right?  I mean, that's underlying

12   those cases, isn't it, that the question needs to be asked?

13   But if you ask the question of someone and they don't answer

14   it, then your reasonable expectations are undercut.  Clearly,

15   the cases say that, without more, the defendant doesn't have to

16   volunteer superior information.  But here, in 6(d), didn't

17   Delphi actually bargain for more?

18        MR. KURTZ:  No, I --

19        THE COURT:  And didn't the investors actually take on

20   that additional duty?

21        MR. KURTZ:  Your Honor, if there is a breach of the

22   duty of best efforts, it's a contract provision; it's a breach

23   of contract.  There's not a case I'm aware of anywhere,

24   Michigan or otherwise, that would suggest that a breach of the

25   contract term would independently be a duty that would support

10

1    a fraud claim.

2         THE COURT:  No, but I'm not saying that the breach

3    itself is the fraud claim.  I'm saying that that's the duty and

4    that, of course, you have to have the other aspects too.

5         MR. KURTZ:  Your Honor, a best efforts provision is

6    not more than a contract provision to close; it's, in fact,

7    less, right?  The most you can get is "you shall pay me money

8    on a date served."  When you can't get that for some reason, or

9    to supplement that you add in a best efforts provision, which

10   is -- you're not obligated to do it no matter what, you're not

11   in breach, but you do have to use efforts to try to get there.

12   It's a lesser obligation.

13        When people are negotiating transactions, they try to

14   get "you shall obtain regulatory approval".  Everybody pushes

15   and says well, it should be a best efforts provision because

16   what if I'm not successful?  It's not more; it's less.

17        THE COURT:  All right.  Well, let's use that

18   hypothetical.  You enter into a best efforts agreement with me

19   that we'll use our mutual best efforts to get HSR approval.

20        MR. KURTZ:  Yes.

21        THE COURT:  Unbeknownst to me, you go to the

22   regulatory authorities and say, you know, this agreement was

23   really a restrain in trade and it's going to create a monopoly

24   and, you know, I don't know why we entered into it but you

25   better disapprove it.  You don't think that you would have an

11

1    obligation to disclose to me that you -- a duty to disclose to

2    me that you did that --

3              MR. KURTZ:  Your Honor, I think that would be a --

4              THE COURT:  -- so that I could correct it, so I could

5    go to the -- I could go to the regulators and say you know why

6    they're doing this?  It's because they want to get out of the

7    deal.  It's not because of your job but because there's

8    something secret going on.  I don't have the ability to do

9    that --

10             MR. KURTZ:  Well, I --

11             THE COURT:  -- even though you've said you'd use your

12   best efforts to go get regulatory approval.

13             MR. KURTZ:  Yeah, I think you're articulating a

14   breach of the best efforts provision, not a fraud claim.  I

15   would point out that in these circ -- well, let me modify your

16   hypothetical just a bit to be a little closer to the facts

17   here.  Then the FTC turns around and says you're wrong and I'm

18   going to approve it, and they satisfy that condition.  And then

19   you don't close.  There'd be no causation, obviously, between

20   what you've articulated and what the breach is.  You can't have

21   a fraud claim based on an unsuccessful effort to --

22             THE COURT:  No, I understand, but all I'm focusing on

23   is the duty aspect.

24             MR. KURTZ:  I understand.  I wanted to keep it in

25   context, but --

12

1          THE COURT:  And I'm just -- I've just --

2          MR. KURTZ:  Yeah.

3          THE COURT:  -- I'm --

4          MR. KURTZ:  I don't believe there are any cases which

5     suggest that you can have a duty for purposes of a fraud claim

6     in silent fraud, under Michigan law, arise by reason of a

7     contract term.  I think that is precisely a contract breach,

8     and I don't think it turns on anything else.  And, in fact,

9     Your Honor, when I have a moment to grab a case, I'd like to

10    cite it to you.  It's a Michigan Appellate Court case.  It

11    speaks -- it basically adopts Briefstein and tells you that you

12    can always breach and you don't impact the measure of damages

13    by that; it's still a contract claim.  So it might be relevant

14    to your thinking to the extent that you're going to permit

15    anybody to lever a contract term to create a duty, I think,

16    that has to be outside of the contract to satisfy fraud claims.

17         THE COURT:  Okay.  All right.  Let me hear from the

18    debtors on this point.  I think the argument that I want you to

19    address is whether Michigan's somewhat more nebulous version of

20    Bridgestone/Firestone means that, in addition to one not being

21    able to sue for an intent to breach of contract, except in very

22    limited circumstances, one cannot assert a duty under a

23    contract as a basis for an obligation to disclose.  It has to

24    be some noncontractual duty.

25         MR. FRIEDMAN:  I don't see anything, Your Honor, in

13

1   Michigan law that would alter this aspect of the analysis as to

2   duty.  What I mean by that is in cases that were discussed on

3   the record on October 8th, those cases make clear that there

4   are a number of circumstances which can give rise to a duty to

5   speak.  As I understand the Michigan case law that's cited by

6   Appaloosa, Michigan seems to be more restrictive in terms of

7   whether there can be a duty merely based on the superior

8   knowledge --

9          THE COURT:  A duty to volunteer.

10         MR. FRIEDMAN:  Yes, exactly.  Exactly.  Merely based

11  on the superior knowledge of the defendant.  The Michigan cases

12  cited by Appaloosa do not seem to change, in any way, my

13  understanding of the law in New York and other jurisdictions

14  that where a party has made partial or ambiguous statements,

15  the duty to speak can arise from the misleading impression

16  created by those statements.

17         So in this case, even before we come to the

18  reasonable best efforts provision in the EPCA, we have, whether

19  it's New York law or Michigan law, we have David Tepper's sworn

20  testimony and his commitment to the deal that was relied upon

21  by all of the stakeholders in this case and formed the basis

22  for the Court's approval of the EPCA and Delphi's entry into

23  the EPCA.

24         Then at about that same time, or within weeks

25  thereafter, that is, at about the same time Appaloosa is

14

1    committing to the transaction, we learn, and it is alleged in

2    the complaint, that Appaloosa was engaged in efforts with the

3    additional investors to avoid a closing and subvert a closing

4    under the EPCA and consummation of the plan.

5        So we would argue that under Michigan law or under

6    any law, having made the affirmative misrepresentations that

7    are alleged in the complaint, when Appaloosa embarks on a

8    course of conduct with the additional investors, that's

9    directly contrary to the affirmative representations that were

10   made.  The duty to speak can be predicated on what would be

11   viewed as partial or misleading affirmative representations.

12       So to the extent that Michigan law says merely having

13   superior knowledge does not give rise to a duty to speak, I do

14   not believe that that undermines the sufficiency of Delphi's

15   allegations here.

16       In addition, we believe that paragraph 6(d) of the

17   EPCA, which is an agreement entered into by the parties and

18   approved by this Court, imposes an obligation on Appaloosa to

19   use its reasonable best efforts to consummate the transaction.

20   That means, we would submit, that there's no -- let me say it

21   this way, Your Honor, if I may.  There's no specific

22   enumeration in 6(d) as to what particular steps or actions

23   Appaloosa is required --

24       THE COURT:  No, but I think the point that Mr. Kurtz

25   is making is that this is a contract provision.  If we breached

1    it by not revealing actions taken to the contrary of this

2    provision, then sue us for breach, but you can't sue us for

3    fraud for having to -- for not revealing or for omitting to

4    reveal the communications.

5            MR. FRIEDMAN:  Well, I understand their argument,

6    Your Honor, but Delphi is not suing for fraud based on the

7    breach of the best efforts provision.  There are certain

8    elements of a fraudulent omission claim, which we believe we've

9    alleged sufficiently, and one of those elements is is there a

10   relationship giving rise to a duty to speak?  That relationship

11   can be found here independent of the EPCA.  The provision in

12   6(d) just reinforces what would be the case in any event.  What

13   I mean by that is that the provision in 6(d) imposes an

14   obligation and a duty on Appaloosa to speak.  That does not

15   mean that a breach of contract claim is being converted into a

16   fraud claim.  Under these circumstances, there would be a fraud

17   claim based on the fraudulent omission even if Section 6(d) did

18   not exist in the EPCA.  The duty to speak would arise from the

19   affirmative representations that were made by Appaloosa and

20   David Tepper that create a misleading impression when Appaloosa

21   embarks on a course of conduct to subvert the EPCA.

22           So we submit that the duty to speak is established

23   based on the allegations of the complaint independent of the

24   EPCA.  In addition, we think when the provisions of 6(d) are

25   read, that dispels any possible question about the conclusion

16

 1    because this is a situation where Appaloosa affirmatively

 2    undertook an obligation to use best efforts, which, in these

 3    circumstances, we submit --

 4             THE COURT:  Well, let me ask you this.  How is this

 5    different from the following situation, which we know doesn't

 6    give rise under Michigan law to a fraud claim?  Parties enter

 7    into an agreement.  At the time they enter it, they do intend

 8    to perform.  I'm leaving aside the testimony by Tepper here.

 9    I'm just focusing on this provision that's giving rise to a

10    duty.  Parties enter into an agreement at time X, and at that

11    time they both intend to perform.  Two months later, there's a

12    material change in circumstances.  One party loses a lot of

13    money and isn't really able to perform.  Rather than telling

14    its contract party that fact, it just goes along towards the

15    date of the closing and on the date of the closing fails to

16    close.  Now, they have an agreement, and it's been breached,

17    but it would seem to me that that would not give rise to a

18    fraud claim.  How is this different than that?

19             MR. FRIEDMAN:  As I understand Your Honor's

20    hypothetical, we're now talking about a situation where we're

21    assuming --

22             THE COURT:  Let's assume for the moment that at the

23    time of entering into the agreement, or shortly, very shortly,

24    thereafter, there was no optionality, the parties intended to

25    perform, both sides, but then one party formed the intention

1   later not to perform, didn't tell the other party and

2   eventually breached.  And the other party says, well, not only

3   is there a breach but you defrauded me by not telling me.  How

4   is that different than having a reasonable best efforts

5   provision, forming an intention later not to perform and not

6   performing and not disclosing it?

7           MR. FRIEDMAN:  I think that merely forming an

8   intention not to perform and keeping that secret is different

9   from the present case in two respects.  The first is, in the

10  present case, we have affirmative representations --

11          THE COURT:  Okay.  Well, leave that aside, though.

12          MR. FRIEDMAN:  -- which we're excluding in this

13  hypothetical.

14          THE COURT:  In my hypothetical I'm excluding that.

15          MR. KURTZ:  And also in the present case we don't

16  have merely a change in the state of mind; we have a concerted

17  course of activity.

18          THE COURT:  Okay, but it's still -- it would still --

19  either one would give rise to damages.  Either one, the

20  contract party is relying upon the deal happening, taking steps

21  in reliance thereon, including cutting other deals with people,

22  incurring money to finance other aspects of the business in

23  reliance on this deal, all of that sort of thing.  So the

24  information is important in each case.

25          MR. FRIEDMAN:  Well, I would think what Your Honor's

18

1    hypothetical illustrates is the importance to a party in

2    Delphi's position of the best efforts clause and the relevance

3    of it in this situation, because from the perspective of Delphi

4    I do not agree with Mr. Kurtz that the best efforts clause is

5    simply something less than the obligation to perform.  It is a

6    contractual obligation.

7         So with respect to Your Honor's hypothetical, if

8    there's a breach of the best efforts clause along the way, for

9    example, with respect to the example of the FTC, the failure to

10   honor the best efforts clause deprives the plaintiff of the

11   ability to take action that might address what otherwise is a

12   harm being suffered.  And then we get into issues of causation

13   and damages, which I think are separate from the simple

14   question -- I shouldn't say simple, which are distinct from the

15   question of whether there is a duty to speak.  So --

16        THE COURT:  Okay.  Okay.  I'm going to let you come

17   back to this, Mr. Kurtz, but the other question I had is really

18   one of the debtors since they're up at the podium.  Since

19   Mr. Friedman's up at the podium, let me ask it of you.

20   Paragraph 78 of the complaint says that Appaloosa remains

21   legally responsible for the misconduct of the additional

22   investors.  What in the -- what is the basis for that statement

23   that's either in the complaint itself or incorporated in it by

24   reference to the underlying documents?

25        MR. FRIEDMAN:  In the agreements, that is, the EPCA

19

1   and the additional investor agreements, Appaloosa has the right

2   to bring in additional investors.  Delphi does not have a

3   direct relationship with the additional investors.  Our

4   assertion is that from this structure, that when Appaloosa

5   brings in additional investors to take on part of Appaloosa's

6   financial obligation and these additional investors commit as

7   they do in the additional investor agreement to -- and I don't

8   remember the exact provision but it's something in the nature

9   of honoring the obligations in the EPCA, as I recall it,

10  Appaloosa cannot walk away from its obligations in the EPCA by

11  transferring financial responsibility to the additional

12  investors.

13          So we would argue that if Appaloosa lays off, as it

14  did, a substantial part of its financial commitment, Appaloosa

15  cannot then say, well, whatever these additional investors do,

16  Delphi, you don't have a claim against them and it's not our

17  problem if they engage in conduct that subverts the closing of

18  the EPCA and the consummation of the plan.

19          THE COURT:  Well, I understand that the documents

20  keep Appaloosa -- well, ADAH and then Appaloosa on the hook for

21  the investment even if the additional investors don't perform,

22  but I don't see how one can extrapolate from that to the

23  proposition that Appaloosa is also on the hook for the

24  misconduct of the additional investors as opposed to just being

25  on the hook for the amount that it agreed to invest.

20

1      MR. FRIEDMAN:  I would say to that, Your Honor, the

2   extent to which Appaloosa is on the hook for the misconduct of

3   the additional investors will depend on the extent to which the

4   allegations are proved where we have alleged that Appaloosa was

5   engaged in active --

6      THE COURT:  No, I understand, and we'll talk some

7   about how much the complaint says Appaloosa knew about this,

8   but this statement seemed to make sort of a separate point,

9   which is that even if -- I inferred from it the statement that

10   even if Appaloosa didn't know about any of this, it would be

11   legally responsible for it.  And I couldn't see anything in the

12   agreements other than misuse of information, which, in 5(q),

13   would potentially impose that type of liability on Appaloosa.

14      MR. FRIEDMAN:  And I understand that, Your Honor, and

15   I'm also not sure at all if there's anything in the agreement

16   that would say if an additional investor engages in bad conduct

17   that Appaloosa has no involvement in or no knowledge of, that

18   Appaloosa is, in effect, absolutely liable for what an

19   additional investor does.  So I would agree with that.

20      THE COURT:  Okay.  But -- so you're not aware of any

21   provision of the agreement that makes Appaloosa the additional

22   investor's agent or proxy or anything like that?

23      MR. FRIEDMAN:  For the purposes we're discussing

24   here, Your Honor, that is, if the additional investor engages

25   in bad conduct, then Appaloosa has no knowledge or

21

1       participation.

2               THE COURT:  Okay.  All right.  Well, I'm not sure you

3       have to respond on that point then, but if you want to, you

4       can.

5               MR. KURTZ:  Your Honor, as you point out, it's not

6       necessary.  I would just add one proposition of law into that,

7       which is if you bring a fraud claim or a tort claim, the law is

8       a hundred percent clear that you have to identify the fraud by

9       each individual actor.  You don't get a contract principle of

10      liability.  You have to -- in fact, you have all those cobbling

11      cases where they say you have to identify each defendant and

12      what each defendant did and said and it's insufficient to use a

13      legal conclusion like legally responsible.

14              Going back to the duty issues, Your Honor, I thought

15      it made sense, and I think it's sort of cleanest, to cite and

16      quote from some of the Michigan cases because I don't think

17      that there's anything open to Michigan law on this concept.

18      It's -- Michigan law doesn't recognize failures to speak;

19      Michigan law recognizes misleading statements in response to a

20      specific inquiry.

21              So, for instance, in the McConkey case, which was

22      specifically cited as the correct law by the Michigan Supreme

23      Court in the Hord case, it says that in an action of deceit

24      it's true that silence as to a material fact is not

25      necessarily, as a matter of law, equivalent to a false

22

1    misrepresentation, but mere silence is quite different from

2    concealment.  The gist of the action is fraudulently producing

3    a false impression upon the mind of the others.  And it goes on

4    to say what's required is that there be a specific inquiry and

5    a specific response.

6              In the Hutasari (ph.) case --

7              THE COURT:  No, but Michigan law does recognize the

8    concept of fraudulent omission, right?

9              MR. KURTZ:  Fraudulent concealment, not fraudulent

10   omission.  They say there must be -- here's a quote, Your

11   Honor, from the Hutasari case, which we've quoted:  "There must

12   be some type of misrepresentation, whether by words or action,

13   in order to establish a claim of silent fraud."

14             If you look at the Buntaya (ph.) case, which is the

15   Eastern District of Michigan, it tells you that the

16   misrepresentation occurs when a party suppresses part of the

17   trust when asked, not by mere nondisclosure.

18             And if you look at the Hord case --

19             THE COURT:  Do any of those cases deal with a

20   situation where there's a contractual duty?

21             MR. KURTZ:  As I was trying to say before, I think

22   all cases have a contractual duty.  They all have a duty to

23   close.  And when somebody decides they're not going to close,

24   they're not --

25             THE COURT:  I'm not -- I don't buy your logic on that

23

1    one.

2           MR. KURTZ:  But it then --

3           THE COURT:  If that were the case, why would you even

4    bother with a reasonable best efforts provision?

5           MR. KURTZ:  Because there are some aspects of

6    performance that can't be identified with particularity in a

7    contract, like in regulatory approval where you say, well, I

8    want you to return my calls, I want you to make sure you know

9    what I'm doing.

10          I will say, Your Honor, that there's a real question

11   as to the enforceability of a best efforts provision where it

12   lacks objective criteria against which to measure performance,

13   like the Timberline case in New York.  There's some issue here

14   as to when it's just void for vagueness.  And what it's there

15   to do is to make sure there's a cooperation, but it's not as

16   strong a duty as there is to simply close, right?  If you owe

17   money and you don't provide the money at the time of the close,

18   you have a breach.  You can try to articulate it's a breach of

19   best efforts, but it's no different whether you don't close

20   because you don't give the money or you don't close because you

21   didn't use your best efforts to give the money.  I don't see

22   why there's a difference in those principles.

23          THE COURT:  Because there may be a fairly long time

24   between the time you contract and the time you close when the

25   other party may want to cover, may want to do something else if

24

1   you're not going to -- if you know you're not going to -- if

2   you know you're not living up to the deal anymore.

3              MR. KURTZ:  Understood, but that -- well, first, I

4   mean, factually, Your Honor, the complaint itself pleads

5   deficiency notices.  Your Honor knows there was an 1142 motion.

6   This whole idea that there was some expectation and statements

7   and representations that haven't been identified with

8   particularity, and I think Your Honor already so held that

9   there would be a closing no matter what, sort of runs afoul of

10  their own allegations in the complaint where they were saying

11  that they had real questions as to whether there would be a

12  closing.  More significantly --

13             THE COURT:  Where's that said in the complaint?

14             MR. KURTZ:  Paragraph 85.

15             THE COURT:  This is the argument over whether the

16  financing is compliant?

17             MR. KURTZ:  Well -- and the allegations of fraudulent

18  omission are based on some alleged effort to chill and prevent

19  that financing condition from being satisfied.  They're now

20  saying they've refrained from other -- what Your Honor just

21  raised yourself was somebody has to have some notice that

22  perhaps you're not going to perform.  Well, they've pled that

23  notice.

24             In either case, though, it becomes a breach of

25  contract issue and it becomes a damages issue.  It doesn't

25

1   become a fraud issue.  And in that respect, Your Honor, I would

2   cite you to another case, which I don't think we had otherwise

3   brought to your attention, which is the Huron Tool case v.

4   Precision.  The cite for that is 532 N.W.2d 541.  And in this

5   case the Michigan Court of Appeals said that "[w]e hold that

6   plaintiff may only pursue a claim for fraud in the inducement

7   extraneous to the alleged breach of contract.  Our holding

8   heeds with the Supreme Court's admonition to avoid confusing

9   contract and tort law.  Damages of allowing contract law to

10  drown in a sea of tort exists only where fraud and breach of

11  contract claims are factually indistinguishable."

12          So I don't see how one can turn a breach of a best

13  efforts provision, alleged, into some kind of tort.  And, in

14  fact, if that were the law, Your Honor, then I don't know what

15  case and what contract wouldn't give rise to tort claims.

16  Certainly everyone with a best efforts provision would.  If you

17  breached your best efforts provision and did not tell anybody

18  you were breaching, it's fraud.  And I don't know why that

19  wouldn't apply to claims without best efforts because you're

20  still breaching your obligation to close.

21          THE COURT:  What's your response to that,

22  Mr. Friedman?

23          MR. FRIEDMAN:  We're not alleging, Your Honor, that a

24  breach of the best efforts provision is fraud.  We're alleging

25  that in a case where, as here, there's been a sufficient

26

1    allegation of fraud based on an affirmative misrepresentation,

2    when that is followed by a course of conduct to subvert the

3    EPCA, the reasonable best efforts provision makes clear what

4    the law would provide in any event, whether it's Michigan law

5    or any other law, that, having that made that affirmative

6    representation, there's a fraudulent concealment claim that --

7            THE COURT:  So it's not really -- the duty doesn't

8    really come from 6(d) then.

9            MR. FRIEDMAN:  My view, Your Honor, is that 6(d)

10   confirms that there's a duty.  I don't think we need to reach

11   the question of whether 6(d), in and of itself, would impose a

12   duty in the absence of affirmative misrepresentations or half-

13   truths.  I think we would have a good argument that it does,

14   but I don't think the Court has to reach that argument here.

15           THE COURT:  Okay.

16           MR. KURTZ:  Your Honor, I would suggest that that's a

17   tacit admission as to what Michigan law says, which is you have

18   to base it off of a misstatement in response to an inquiry.

19   And then the problem with this -- and bear in mind the

20   allegations are a failure to disclose consideration of the

21   potential for breaching, perhaps, if need be.  There's no such

22   thing, as far as I know, in commercial circles of a spontaneous

23   breach.  There is always some consideration as to whether you

24   will perform or whether you will not perform, and that

25   consideration is not actionable as fraud, and it doesn't add

27

1    anything to a breach of contract claim.

2         With respect to Mr. Friedman's effort to tie the

3    omission to a misstatement, now, Your Honor has already found

4    that the conclusory and unparticularized allegations in the

5    fraudulent omission claim itself, that there was some kind of

6    repeated representation about a commitment to close, was

7    insufficient.  I believe you reiterated that at the hearing on

8    October 8th.  And what Delphi is trying instead to attach

9    itself to would be matters and statements that were made prior

10    to the execution of the EPCA.

11         And I think Your Honor has already correctly ruled

12    that you can't have a fraud claim on the basis of statements

13    made after execution, and the obvious reason for that is you'll

14    never get anywhere near causation or damages, in addition to

15    the fact that you're restating contract and tort law.  You're

16    in a position where there's one -- there's no logic.  What is

17    there to disclose at the time that you've made the

18    misstatement, the alleged misstatement, that you haven't had

19    the subsequent consideration of a breach?  So there was nothing

20    to disclose.  So if you're saying --

21         THE COURT:  I'm sorry.  I don't understand.

22         MR. KURTZ:  At the time of the misstatement, you

23    can't have -- you get an inquiry perhaps, which isn't even

24    alleged here.  Are you going to close?  You get a response.

25         THE COURT:  No, the inquiry was when I asked

28

1    Mr. Tepper are you behind this deal?  That's what the debtor's

2    relying on.

3            MR. KURTZ:  Okay, but --

4            THE COURT:  There's no other specific statement in

5    the complaint that says -- that's been identified by a speaker

6    or a place or time saying we still intend to close.  So I think

7    the debtor's relying on that.

8            MR. KURTZ:  But I don't think the debtor has ever

9    alleged that there was anything that was -- and certainly not

10   with Rule 9 particularity, that there was anything that was

11   going on at that time which would have rendered that

12   misleading.  In fact, debtors had already executed the EPCA,

13   had already had board approval with respect to the EPCA and

14   continued to move forward with the EPCA, notwithstanding their

15   own pled deficiency notices with respect to Appaloosa's --

16           THE COURT:  No, they're saying that it gave rise to a

17   duty to disclose later something that was completely contrary

18   to that stated.

19           MR. KURTZ:  A consideration of a breach.  In every

20   case where there's a contract and there is a breach, somebody

21   considers that before they actually move forward and effect a

22   breach.  In every case, there's never a spontaneous breach, or

23   certainly not frequently and certainly not in commercial

24   circles.  So does that mean every time that somebody to a

25   contract starts to consider do I want to close or do I not want

1   to close that there's a fraud claim on that basis?  Because

2   every contract contains an absolute statement that you're going

3   to close.  They all say on this date I will fund this money, I

4   will buy this asset.  There are commitments.  There are

5   statements.  They are written down.  They are particularized.

6   But they don't give rise to a fraud claim simply because you

7   start to think about the prospect of breaching.

8          And the case that -- the Huron case that I've just

9   read makes clear --

10          THE COURT:  No, I've dealt with all the Michigan

11   cases.  I understand --

12          MR. KURTZ:  Okay.

13          THE COURT:  -- the basis, under Michigan law, for

14   when you can raise a fraud claim.

15          MR. KURTZ:  Okay, but there was two alleged frauds.

16   The one was the one Your Honor dealt with in --

17          THE COURT:  At the time that he made the statement.

18          MR. KURTZ:  Yeah.  That's right.  And then I have a

19   move to reargue that.  We have our views, and --

20          THE COURT:  All right.

21          MR. KURTZ:  -- we'll take it up at summary judgment,

22   but --

23          THE COURT:  So your point is that that statement

24   didn't give rise to a duty later to inform Delphi that this was

25   going on?

30

1          MR. KURTZ:  Correct, any more so than any other

2    contract representation that I'm going to perform gives rise to

3    a duty to disclose your internal considerations and

4    deliberations about whether you will breach or not breach.

5    That is far -- that is merging the law of fraud and contract

6    far more than the other issue with respect to a present intent

7    not to perform and whether that can be recharacterized as a

8    present intent and therefore a misstatement.  This is just

9    simply saying when somebody in a normal commercial context

10   starts to think about breaching and they don't come right out

11   and say by the way, I'm thinking about breaching, I haven't

12   made a decision but I'm thinking about it, that is fraudulent.

13   It's a fraudulent omission claim.  And under Michigan law, the

14   law is basically crystal clear that silent fraud doesn't --

15   isn't -- can't be based on an omission.  It has to be based on

16   an inquiry and a specific response that's misleading, and I

17   don't know how it can be misleading in light of their own

18   affirmative allegations here that they knew there was issues

19   with respect to Appaloosa's ability or willingness to close.

20   And they brought that to Your Honor's attention, so it's a bit

21   wasteful in this context.

22          And what I really -- if Your Honor has any questions

23   on the duty, I'd be happy to respond.  There were a couple of

24   points, I thought, that were more dispositive of the issues

25   here that I wanted to try to address.

31

1          THE COURT:  Well, okay.  I guess this leads to my

2     final question, which is, other than the contentions that deal

3     with actual fraud, particularly given the law here as to the

4     aspects of a fraud claim under Michigan law, why does Rombach

5     v. Chang lead to the dismissal of the other claims?

6          MR. KURTZ:  Rombach makes clear what I think is made

7     clear in many, many other cases as well, which is that Rule

8     9(b) applies to all averments of fraud irrespective of the

9     claim in which they are advanced, right?

10         THE COURT:  No, I understand that.

11         MR. KURTZ:  And so the question is are these fraud

12    allegations?  And as insufficient as they are, they are fraud

13    allegations.  And I think the reason that that's clear is

14    because they're --

15         THE COURT:  Why aren't they just allegations of

16    egregious misconduct?

17         MR. KURTZ:  I think 1) because Delphi pled them as a

18    scheme, 2) that Delphi specifically referred to that conduct

19    only in connection with this fraud claim and not in connect --

20    specifically by subject matter, where it described efforts to

21    circumvent the EPCA.  It only included that in its fraudulent

22    omission, Count IV.  And then, dispositively, Your Honor

23    specifically held that those were fraud averments in your

24    decision.

25         THE COURT:  Where did I say that?

32

1          MR. KURTZ:  Well, by -- well, there was an argument

2    as to whether these are fraud averments, and Your Honor said

3    yes, they are and I don't want to hear it, it's not a point if

4    you --

5          THE COURT:  I didn't say that.  I said, as to fraud,

6    you haven't pled with particularity.

7          MR. KURTZ:  Well, I think --

8          THE COURT:  I didn't say all these other -- in fact,

9    I said just the opposite as far as the other contentions.

10         MR. KURTZ:  No, there was a discussion between you

11   and Mr. Shore at the time where you said these allegations

12   really go to the ability to satisfy a financing condition in

13   the EPCA, and you said no, they're not, they're referenced and

14   it may not be specific, but by saying I reallege I through CXX,

15   or whatever it was at the time, that's fraud, and don't tell me

16   or ask me to limit the use of those allegations.  And when

17   Mr. Shore tried to suggest it again, you said don't go there,

18   that's not a point.

19         THE COURT:  But that's to establish a particular

20   claim.  It doesn't mean that they're limited to saying that

21   they're fraud claims for everything else.

22         MR. KURTZ:  No, but they are an alleged fraudulent

23   scheme, and I think the fact that Delphi is, in its last two

24   briefs and here today, telling you you ought to reinstate the

25   fraud claim on the basis of those allegations tells you that

33

1    they're trying to plea them as fraud allegations, if there's

2    supposed to be some scheme.

3            THE COURT:  Well, they want those too.  Yeah, they

4    want to establish fraud too but that doesn't mean that they --

5    I guess my point is, in the case law on equitable subordination

6    and Kalisch-Jarcho and the like, it doesn't require fraud and

7    veil piercing; it requires wrongful and egregious misconduct.

8    Why wouldn't that be the case here?

9            MR. KURTZ:  Well, in other words, for purposes of

10    fraudulent omission, do I need to address that there would need

11    to be a particularity as to what these omissions were, these

12    contacts with AIs?  Because there's a Rule 9(b) issue --

13            THE COURT:  I don't -- I -- frankly, I think you lose

14    on that point, but I think you probably do win on the duty

15    point.  So as far as fraudulent omission is concerned, I think

16    in terms of particularity they probably crossed the line, but

17    as far as duty they don't.  Remember, the fraud here, as

18    alleged, was the failure to disclose these problems, not --

19    they don't have to plead in detail what all those problems are

20    because that's -- I think that goes to scienter.  So they had

21    to plead enough to establish or lead to a strong inference of

22    opportunity and motive.

23            But I think that you've persuaded me that, as far as

24    a duty in December, January, February, there's not a

25    separate -- there's no basis under Michigan law for that duty.

34

1    But, to me, that highlights, I think, the difference between a

2    fraud claim and rights under 510 or veil piercing or Kalisch-

3    Jarcho --

4         MR. KURTZ:  I understand.

5         THE COURT:  -- which, to my mind, go more to a more

6    amorphous concept that recognizes rights extraneous --

7    specifically recognizes rights extraneous to a contract when

8    it's alleged people do really bad things.

9         MR. KURTZ:  I understand, and let me address it this

10   way.  And I think you phrased this at the last hearing as,

11   absent secrecy, would these allegations give rise to these

12   claims or permit you to sustain them?  And I think the answer

13   is they did not and they cannot.  And I say they did not

14   because we're not on --

15        THE COURT:  But, yes, I think it's somewhat important

16   that their case is vitiated -- their case is strengthened by

17   the fact that this was kept secret, it's allegedly kept secret,

18   but it would seem to me that egregiousness can have in it an

19   element of secrecy without saying that that's fraud.

20        MR. KURTZ:  No, what I was saying by "it didn't" is

21   that Your Honor sustained these claims on the basis of what you

22   characterized as, quote, "jaw-dropping behavior", behavior that

23   you said was potentially a bankruptcy crime.

24        THE COURT:  But that included in it an element of

25   secrecy.

35

1         MR. KURTZ:  And I'm not quarreling with the secrecy

2    element; I'm quarreling with the under -- right, when you have

3    a secrecy-based claim, what you have is some underlying conduct

4    and then you have a failure to talk about that underlying -- or

5    disclose or actively concealing --

6         THE COURT:  Right.

7         MR. KURTZ:  -- depending upon what law applies.

8         THE COURT:  Right.

9         MR. KURTZ:  And I'm trying to focus, at this

10   juncture, on the underlying conduct, not on whether it was

11   disclosed or not disclosed, whether there was a duty or not a

12   duty.  And what I'm saying is that Your Honor said there was

13   jaw-dropping behavior, and you identified that specifically --

14        THE COURT:  Right.

15        MR. KURTZ:  -- as the effort to circumvent the EPCA

16   by chilling the financing and --

17        THE COURT:  Right.

18        MR. KURTZ:  -- and causing the short-selling, which

19   in turn chilled the financing.  It was the effort to prevent

20   the occurrence of a condition, of a financing condition.  And

21   there are no allegations.  That's the legally --

22        THE COURT:  But this is not your motion.  I've

23   already dealt with this issue.  Your motion was to say that I

24   should reconsider my ruling because the elements of it that

25   dealt with equitable subordination and veil piercing and

36

1    Kalisch-Jarcho all were premised upon an integral fraud

2    component.  And I've looked at that and considered that, and I

3    just don't see that they are premised on an integral fraud

4    component.

5         MR. KURTZ:  But at this juncture, and it's important,

6    obviously, for the orderly administration of the case and how

7    we can all move forward here, is you have now a footnote 7

8    before Your Honor which purports to tell you what we could

9    particularize.

10        THE COURT:  No, this -- I don't -- the orderly

11   administration of the case is that people make motions and I

12   consider them.  Your motion was based on Rombach v. Chang.  It

13   wasn't based on "Judge, you read the complaint wrong."

14        MR. KURTZ:  Well, what I was -- the conduct at

15   issue -- Your Honor looked at under Rule 8.  So if you want me

16   to go back and say why I think it's Rule 9, even for these --

17   going back to Rombach, then, Your Honor, these are -- they're

18   fraud allegations.  They're made in connection with fraud

19   allegations.  It's a fraudulent omission claim.  A fraudulent

20   omission claim requires that the plaintiff identify what the

21   omissions were, and I've cited a number of cases in this

22   jurisdiction and outside of this jurisdiction that says what

23   that means.  That means the what, who, how and why, who was

24   participating.  The law with respect to Rule 9(b) is that you

25   protect defendants from improvident charges of wrongdoing.

37

1          THE COURT:  The who is addressed to who was not

2     making the disclosure.

3          MR. KURTZ:  Well, the who, Your Honor -- technically,

4     some of the cases would require you to say exactly what meeting

5     was a particular person.  But I'm not focusing on that, right?

6     I'm focusing on what's the conduct at issue.  The conduct at

7     issue, and Your Honor called this the "back and forth", that's

8     your language, between Appaloosa and the additional investors,

9     that would have been this chilling conduct.

10          So just saying they are legally responsible for --

11          THE COURT:  No, I'm not -- I could tell you right

12     now, and it's confirmed by Mr. Friedman's response to me, which

13     was pretty candid, that phrase has no bearing in my ruling.

14     It's not --

15          MR. KURTZ:  Okay, but there are no other factual

16     allegations under Rule 9.

17          THE COURT:  Well, I disagree with you on that.

18          MR. KURTZ:  Well, maybe I could address them with

19     more specificity if I was aware -- I'm aware of allegations

20     that there was some consideration about whether or not to

21     perform, whether to breach in the event that there was a

22     satisfaction of the conditions.  What -- the behavior that has

23     supported these claims was an affirmative effort to circumvent

24     their ability to get the financing, which --

25          THE COURT:  I guess -- again, I come back to this

38

1    basic point, which is what is it that confines my ruling

2    necessarily to a fraud-based claim on these three points:

3    equitable subordination, veil piercing and Kalisch?  First, the

4    law doesn't require it.  The law doesn't require fraud to

5    establish any of those three points.

6              MR. KURTZ:  Correct.

7              THE COURT:  So it has to be some other -- it has to

8    be --

9              MR. KURTZ:  That's right.

10             THE COURT:  -- a factual thing in the complaint.

11             MR. KURTZ:  Well, what it is is averments of fraud

12    have to be pled with particularity no matter what the claim is.

13    That's the fundamental basis for the motion, and that's

14    Rombach.  So the question then becomes, well, are these

15    averments of fraud?

16             THE COURT:  But only if the claim depends upon it.

17             MR. KURTZ:  No.  That's exactly what Rombach says is

18    not the law, right?  Rombach tells you that it doesn't matter

19    if it's a part of a constituent element of the claim; it just

20    matters that it's an averment of fraud.  So that's why it

21    applies in negligence claims, Section 11 claims, breach of

22    fiduciary claims.

23             THE COURT:  No, but only if the negligence is

24    dependent upon the fraud.

25             MR. KURTZ:  No, if it has a fraud character, if it is

39

1    a fraud averment and --

2              THE COURT:  A fraud-based averment, yes.

3              MR. KURTZ:  Exactly, and --

4              THE COURT:  But this -- why are these fraud-based

5    averments?

6              MR. KURTZ:  Because they've been alleged as fraud-

7    based averments, right?

8              THE COURT:  Okay.

9              MR. KURTZ:  They've been alleged as a scheme, as a

10   plan, as a fraud, and --

11             THE COURT:  Well, why are schemes and plans frauds?

12             MR. KURTZ:  Well, because in this case that's what

13   the plaintiff alleged.  In this case, Your Honor upheld and

14   ruled, in the first instance, on those claims on the basis of

15   fraud, and at this point Delphi is trying to reinstate the

16   claim on the basis of fraud.

17             THE COURT:  Well, if I had done that, then these

18   claims wouldn't have been -- they would have been dismissed

19   because I said the fraud claims are dismissed.  I didn't --

20             MR. KURTZ:  You said the fraud --

21             THE COURT:  -- I didn't say they've established a

22   fraud here in connection with 510, did I?

23             MR. KURTZ:  But you described, as two alleged frauds,

24   the fraud that related to the concealment and the fraud that

25   related to the intent --

40

1          THE COURT:  Right.

2          MR. KURTZ:  -- not to perform, and it was with --

3          THE COURT:  But that's when I was talking about

4     fraud.

5          MR. KURTZ:  But the cases tell you that it's not just

6     what you're talking about; it's the part of the fraud.  If you

7     have a fraud that says -- and you've got a standard on this

8     fraud that tells you you have to have bad conduct, right?  You

9     need to have somebody -- you have to have the information.  The

10    information is somebody went and spoke to somebody else and

11    said this is a bad company, don't give them financing and, by

12    the way, go short your stock because that'll hurt their stock

13    price and they won't be able to raise financing.  Then you have

14    to have a duty to disclose and a failure to disclose, all of

15    that subject to particularity, including the first element.

16          I don't see how you can say, well, these are the

17    necessary elements of a fraud claim, they've been pled as

18    fraud, they've been described as fraud, but somehow when you

19    pull them out of the fraud claim and you've realleged them in a

20    claim that doesn't require fraud that you don't have to apply

21    the same standard for particularity.  And that's what

22    Rombach -- that's what all the cases we've cited -- these cases

23    have been applied in negligence and in Section 11 and in breach

24    of fiduciary duty in all these types of claims, even though

25    they don't have a fraud element and even though they weren't

41

1    advancing them as fraud.

2           And also, Your Honor, it's a fraud -- a scheme is an

3    element of fraud.  You have fraudulent schemes and activities,

4    you have fraudulent misrepresentation claims and you have

5    fraudulent omissions.  They're alleging all of that.  And in

6    the end, I just don't see how an allegation that somebody -- a

7    conclusory assertion about legal responsibility, which I think

8    you're not crediting, is -- maybe Your Honor can -- is it

9    possible that the Court could explain to me which -- what

10   factual allegation you think there is with respect to

11   circumventing the EPCA so I could try to address it?  Because

12   I've been through that complaint, and I'm aware of nothing

13   other than meetings where there were discussions about the

14   prospect of not closing, whether that was a breach or not and

15   how you'd finance the breakup fee to the extent that there was

16   a willful breach.  I'm not aware of any allegation that --

17   except an exculpatory one in paragraph 78, in which Delphi says

18   yeah, of course, Appaloosa's too smart to do this but they're,

19   quote, "legally responsible", the consummate legal conclusion.

20   I'm not aware of a factual allegation to support the claims.

21   And I'm not aware they have a good faith basis to make one.

22   There's no allegation different as to Appaloosa than any other

23   defendant in this case.  There's been a lot of inflammatory

24   allegations about securities law violations and bankruptcy law

25   crimes, chilling financing, preventing the consummation of a

42

1    condition, the satisfaction of a condition, but all we see from

2    the discovery and from the actual factual --

3              THE COURT:  No, no, no.

4              MR. KURTZ:  -- allegations in the complaint --

5              THE COURT:  Don't get into that.

6              MR. KURTZ:  Well, okay.

7              THE COURT:  Don't get into that.

8              MR. KURTZ:  But it was put before Your Honor by

9    Delphi, not by us.

10             THE COURT:  Not the whole record, and I didn't read

11   that because it wasn't what people are supposed to do.  And so

12   I didn't read what you said in response to it either --

13             MR. KURTZ:  Okay.  I mean we --

14             THE COURT:  -- because that's not -- I don't take

15   snippets of depositions and make rulings on motions to dismiss

16   based on snippets of depositions.

17             MR. KURTZ:  Understood, but in a practical sense,

18   when trying to determine whether something that has already got

19   significant defects should continue to be alive -- I don't see

20   a complaint factual allegation against Appaloosa that would

21   support the conclusory assertion about an effort to circumvent

22   the EPCA.  All I've seen in the factual allegations relates to

23   thinking about not closing, which is not actionable.

24             So all these claims would be sustained on the basis

25   of all I can see, the, quote, "legal responsibility", which I

43

1   think Your Honor has already determined wouldn't be sufficient.

2           THE COURT:  I'm sorry.  What about responsibility?

3   I'm sorry.

4           MR. KURTZ:  The legal -- the --

5           THE COURT:  Oh, right.  The duty.

6           MR. KURTZ:  -- language of legal responsibility.

7           THE COURT:  The duty.

8           MR. KURTZ:  Well, I was making the point under

9   paragraph 78 where they say Appaloosa wasn't involved in this

10  bad conduct but is, quote --

11          THE COURT:  Well, no.  They alleged that Appaloosa

12  knew about this.  They alleged that Appaloosa knew what the

13  investors were up to.

14          MR. KURTZ:  Well -- but they don't allege how

15  Appaloosa was aware.  They don't give you any particularity,

16  that it's just a -- it's a boilerplate --

17          THE COURT:  Where do they -- Appaloosa knew.  What

18  more particularity do they need to give on that?

19          MR. KURTZ:  How?  How did --

20          THE COURT:  They knew.

21          MR. KURTZ:  But, Your Honor, I think the cases, and

22  we can -- we're probably about to be shot to say that we would

23  put in an eleventh or a twelve brief here, but the cases are

24  pretty clear that you can't just say somebody had knowledge.

25  You're going to have to have some basis for knowledge, like you

44

1   met with this person and they told you.  You can't just --

2   anybody can say of course you knew.  Well, how?  How does

3   Appaloosa know what --

4          THE COURT:  I don't --

5          MR. KURTZ:  -- an independent third party is doing?

6          THE COURT:  I don't see that.  I don't see that in

7   the cases.

8          MR. KURTZ:  In the cases or the --

9          THE COURT:  Yeah.

10          MR. KURTZ:  Because I think we can cite you the cases

11   that would tell you that conclusory assertion of knowledge,

12   without providing any factual basis to assert how you became

13   aware, because anybody can claim -- why not just -- you know,

14   the allegation is that Delphi knew.  I mean, you have to say

15   how.  You're a third party; you're not privy to the activity.

16   So you don't have a basis for knowing.

17          THE COURT:  Well, they certainly say that they were

18   meeting with these investors over a lengthy period, and they

19   identified various meetings.

20          MR. KURTZ:  But they've never identified that at a

21   particular meeting an additional investor turned --

22          THE COURT:  But where do they need that?

23          MR. KURTZ:  Well, certainly under Rule 9.

24          THE COURT:  Where do they need it under the case law?

25          MR. KURTZ:  Certainly under Rule 9.

45

1          THE COURT:  No.  Not under Rule 9.

2          MR. KURTZ:  Yeah, well, you --

3          THE COURT:  I don't see that.

4          MR. KURTZ:  Your Honor, Rule 9 requires particularity

5     as to knowledge.

6          THE COURT:  As to what?  As to what?

7          MR. KURTZ:  As to knowledge.  As to knowledge.

8          THE COURT:  No.

9          MR. KURTZ:  As to --

10          THE COURT:  As to -- it, in fact, does not on its

11    plain terms.  It says, as to scienter, you don't need

12    particularity.  You need facts enough to create -- to raise an

13    inference, and that includes motive and opportunity.  And they

14    certainly allege motive and opportunity up the wazoo in this

15    complaint.

16          MR. KURTZ:  Motive and opportunity, in itself,

17    without any factual allegations creating the strong inference

18    of scienter, is insufficient.  Anybody can say you would have

19    benefited, although God knows how they would have.  Anybody

20    would benefit --

21          THE COURT:  The motive would -- they allege lengthy

22    and concerted discussions with people about -- and, again,

23    these are the investors that Appaloosa has brought into the

24    deal and is funneling the information to about the concerns

25    about the deal and wanting to blow it up.  But, to me, that's

46

1    fairly particular as far as the lesser requirement under Rule

2    9(b) with regard to scienter.

3              MR. KURTZ:  Your Honor, all I can submit on this

4    is --

5              THE COURT:  You're assuming that it applies here as

6    opposed to just having to show egregiousness.

7              MR. KURTZ:  Well, yeah, I mean, I'm assuming that,

8    for purposes of this discussion, that it's a fraud averment and

9    that as a fraud averment you would be required to demonstrate

10   some basis for knowledge other than you met.  You would have to

11   say you met and they disclosed something to you.  You have to

12   make that in good faith under Rule 11.

13             We're trying to resolve all of this.

14             THE COURT:  Well, they'd say you didn't know it.  I

15   mean, yes, you do have Rule 11 but that's what they say.  They

16   say in the complaint --

17             MR. KURTZ:  But we've been trying --

18             THE COURT:  -- that Appaloosa did know that these

19   people were up to this bad stuff, bad conduct.  Appaloosa knew

20   it.

21             MR. KURTZ:  I'm not --

22             THE COURT:  They didn't -- they'd say Appaloosa

23   didn't do it itself but they also say it didn't need to do it

24   itself to blow up the deal.

25             MR. KURTZ:  But being an alleged third-party

47

1    beneficiary is a far cry from tortious conduct, right?  I don't

2    see anything where they've said you knew it because they told

3    it to you, as opposed to just telling you that we'd like to not

4    close because it's a bad investment.  I see allegations of

5    knowledge as to that.  I don't see allegations of knowledge

6    that we are shorting and we are chilling the financing and we

7    have told you --

8              THE COURT:  Isn't that what lawsuits are about is to

9    decide whether it's one or the other?

10             MR. KURTZ:  No.  I think lawsuits and a motion to

11   dismiss is about making good faith factual allegations that we

12   can respond to, and that's not in there that they're --

13             THE COURT:  Well, can't you respond to say we didn't

14   know since that's what this is premised upon in paragraph 130?

15             MR. KURTZ:  Only after --

16             THE COURT:  That's pretty easy for you to do.

17             MR. KURTZ:  -- only after engaging in how much more

18   discovery.  We have been singled out among defendants to be

19   subject to --

20             THE COURT:  Right.

21             MR. KURTZ:  -- a different set of claims with

22   different liabilities without any basis for the allegations.  I

23   think there are allegations of knowledge that the AIs had

24   questions about the transaction.

25             THE COURT:  They don't say that the other investors

48

1    knew this.

2         MR. KURTZ:  Well, they actually do, right, Your

3    Honor?  They say "and other additional investors".

4    Everybody -- they just use one name and all the names, but the

5    conduct is no different.

6         THE COURT:  No.  No.  In paragraph 130, they say

7    Appaloosa concealed from Delphi.  They don't say the other

8    investors.

9         MR. KURTZ:  Yeah, but if you look at paragraph 78,

10   they say additional investors.  They brought the fraud claim

11   against Appaloosa, but the --

12        THE COURT:  Well, all right.  I'm reading the whole

13   complaint, including paragraph 130.

14        MR. KURTZ:  But --

15        THE COURT:  I understand what they say in paragraph

16   78.

17        MR. KURTZ:  -- but all these allegations, you're

18   suggesting, support these other three claims at issue, and that

19   was brought against each of the defendants, and these same

20   allegations were made.  And the knowledge allegation is that

21   you had knowledge of shorting or that you had knowledge of

22   active misconduct in an effort to prevent the satisfaction of a

23   financial condition, is knowledge, effectively, that the AIs

24   don't want to close if they don't have to close because it's a

25   bad investment, which is a far cry from fraud, egregious

49

1    misconduct.

2            And, in fact, Your Honor, we're talking about the

3    Solo claim effectively, the Jarcho-Kalisch (sic) claim, and

4    that case tells you breach of contract is insufficient, right?

5    You're entitled to breach.

6            THE COURT:  No, it doesn't say that.  It says that

7    you don't even need to breach the contract.  It says all you

8    need to do is act badly.

9            MR. KURTZ:  It says you have to -- let me read it so

10   that I don't end up misquoting.  What it says, though, Your

11   Honor, is that you have a right to breach the contract, and

12   that'll never give rise to liability --

13           THE COURT:  You're never going to convince me that

14   people just have rights to breach contracts.  I'm sorry.  You

15   didn't buy an option here.  Your clients didn't get an option,

16   all right?  They may think that getting out of the deal was the

17   best money they ever spent, but that doesn't --

18           MR. KURTZ:  I understand.  I --

19           THE COURT:  It's neither here nor there.

20           MR. KURTZ:  -- I'm not suggesting it's an option; I'm

21   suggesting that whether or not it's a defense to the viability

22   of a liability limitation.  And if you look at Solo, where it

23   required conduct that approximated economic duress, it says,

24   quote, "The option to breach a contract and pay damages is

25   always available even where the breaching party had no

50

1    intention of performing its obligations when it entered into

2    the agreement."  It went on to say that the operative

3    distinction is -- talking about Noble Lounge (ph), which I'll

4    get to, is it didn't breach the contract.  It goes on to say,

5    "Solo's economic self-interest, the pertinent inquiry is

6    whether the fee sought from BAS is a matter of Solo's

7    legitimate economic self-interest or, alternatively, whether it

8    evinces the intent to inflict economic harm."

9              THE COURT:  We're getting very far afield here.  This

10   is way beyond your motion, and I think I've heard enough on

11   this point.  Do you have anything that addresses the motion

12   itself?

13             MR. KURTZ:  Well, Your Honor, what I guess I'm trying

14   to establish is I think you've asked us whether those -- we've

15   made a motion that we had to be treated identically with

16   respect to all these claims and what the allegations have to be

17   to sustain these common law claims, and what I'm suggesting is,

18   under Solo and the New York Court of Appeals decision in

19   Metropolitan Life v. Noble Lounge, is that you have got to have

20   conduct which is outside and is not a breach of contract, that

21   a self-motivated economic interest in breaching cannot

22   undermine the efficacy of a liability cap and that the

23   plaintiffs can't have their cake and eat it too.  They can't

24   bring a Solo claim and then ignore that Solo says that a simple

25   breach won't suffice.  You have to bring economic duress that's

51

1   intended to inflict harm, not for your own self-interest but to

2   harm the other party, which -- because that was just a hold-up

3   case.

4          So I think if you have a Solo case, you've got to

5   look at the Solo law, and the allegations in this complaint

6   can't support.

7          THE COURT:  Okay.  Do the debtors have anything to

8   say?

9          MR. FRIEDMAN:  No, Your Honor.

10         THE COURT:  Okay.

11     (Pause)

12         THE COURT:  Okay.  I have before me a motion by two

13  of the defendants in this adversary proceeding, Appaloosa and

14  ADAH, for reargument, which I granted, and to vacate a portion

15  of my prior order in this case dated August 11, 2008 granting,

16  in part, and denying, in part, motions by all the defendants to

17  dismiss the complaint and for related relief.

18         The premise of the motion is that in my order I

19  dismissed one of the two fraud claims raised by Delphi in its

20  complaint, and that fraud claim went to alleged

21  misrepresentations and fraudulent omissions made, or failed to

22  be made, as the case may be, after the entry by Delphi and

23  Appaloosa and ADAH into the EPCA agreement and the related

24  funding agreement on Appaloosa's part.

25         I concluded that that latter type of fraud claim did

52

1   not pass muster under Rule 9(b) in that it did not set forth

2   with particularity the who, what, where, when, why elements of

3   the fraud claim.

4        It's clear to me, from my review of the complaint,

5   that the complaint does not allege with any specificity any

6   affirmative representation that Appaloosa or ADAH intended to

7   close following or after Mr. Tepper's testimony, that is, for

8   the period from early December through the scheduled closing

9   date, April 4, 2008.

10        In light of that finding and that ruling, Appaloosa

11  and ADAH moved to have the Court reconsider its rulings that

12  all were premised upon portions of the complaint that also

13  underlie the fraud claim.  Those were paragraphs 71 through 84

14  as well as 130 of the complaint.

15        The Court, in light of those paragraphs, concluded

16  that it would not dismiss other claims against Appaloosa and

17  ADAH, in particular, that it would not dismiss an equitable

18  subordination cause of action, that it would not dismiss a veil

19  piercing cause of action and that it would not dismiss or limit

20  the damages claim and not dismiss the specific performance

21  claim or cap the damages claim, as had been argued.

22        On the basis of what the parties have been referring

23  to as the Kalisch-Jarcho doctrine, citing Rombach v. Chang,

24  355 F.3d 164, 171 (2d Cir. 2004), Appaloosa contended that the

25  foregoing three rulings, again, on equitable subordination,

53

1   veil piercing and Kalisch-Jarcho, all were premised upon fraud

2   allegations and, therefore, that my ruling that the fraud

3   allegation was insufficiently particularized and therefore

4   should be dismissed also should apply to the other three

5   rulings.

6        Rombach v. Chang clearly stands for the proposition

7   that under Rule 9(b) of the Federal Rules, which is

8   incorporated by Bankruptcy Rule 7009, where a party has alleged

9   fraud, whether or not as part of a fraud cause of action, Rule

10  9(b) must be complied with.

11       The next step in the course of this motion was my

12  having some concern that I had too easily lumped together the

13  dismissal of the affirmative misrepresentation claim and the

14  fraudulent omission claim in light of the recognized difficulty

15  of pleading certain elements, in particular, the time and

16  nature of the alleged misstatement when the fraud is based not

17  upon a misstatement but an omission.

18       Consequently, I directed the parties to brief that

19  issue and as to whether, in fact, the complaint did set forth

20  sufficiently, under Rule 9(b), a fraudulent omission claim,

21  since the primary element or the primary basis for the fraud

22  claim was not statements made by Appaloosa or ADAH to the

23  debtor but rather the failure to reveal information.

24       The parties have done that, and I am satisfied, based

25  on that briefing and oral argument, that, contrary to my

54

1  concern, the complaint does not set forth a fraudulent omission

2  claim in this area either.  I reach that conclusion, however,

3  not because of my views as to the deficiency or alleged

4  deficiency of the complaint as far as compliance with Rule 9(b)

5  but rather under the applicable law here, which is the law of

6  Michigan, my belief that with regard to these particular

7  omissions, which, again, are omissions that allegedly took

8  place between the date that the Court authorized Delphi's entry

9  into the EPCA and the date of the closing, were omissions that

10  Appaloosa and ADAH had a duty to disclose.

11       As stated in a number of cases, which the parties

12  have both cited, Rule 9(b) does, in fact, of course, apply to

13  allegations of fraudulent omissions.  However, given that there

14  is no speaker, the requirements of pleading are somewhat

15  different for fraudulent omissions than affirmative

16  misstatements or affirmatively fraudulent statements.  For

17  claims of fraudulent concealment, the complaint must specify:

18  1) what the omissions were, 2) the person responsible for the

19  failure to disclose, 3) the context of the omissions and the

20  manner in which they misled the plaintiff, and 4) what

21  defendant obtained through the fraud.  And that's T.L.O. v.

22  Monsanto Company, 522 F.Supp.2d 524 (S.D.N.Y. 2007).

23       Then, additionally, a concealment of facts supports a

24  cause of action for fraud only if the nondisclosing party has a

25  duty to disclose, id. citing Remington Rand Corporation v.

55

1   Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 143 (2d Cir.

2   1995).  Normally, such a duty arises where the parties are in a

3   fiduciary or other relationship, signifying a heightened level

4   of trust.  Under Michigan law, a duty to disclose arises where

5   there is a half-truth or the allegedly nondisclosing party with

6   superior knowledge has been pressed for the truth and has not

7   responded in a truthful fashion.

8        I conclude that since neither of those two

9   circumstances apply, the only two bases for a duty here would

10  be either a continuing duty based on Mr. Tepper's alleged --

11  I'm sorry, Mr. Tepper's testimony at the hearing on whether I

12  should approve, or not, Delphi's entry into the EPCA and/or

13  paragraph 6(d) of the EPCA, which I quoted earlier, which

14  requires each investor, including ADAH, to use its reasonable

15  best efforts to cooperate with Delphi and to consummate and

16  make effective the transactions contemplated by the EPCA.

17       Based on the allegations in the complaint, it seems

18  to me that the Tepper testimony is not sufficiently linked to

19  or tied to the allegations in paragraphs 1 through 84 and 130

20  of the complaint.  It also appears to me that the contractual

21  duty to use best efforts is just that, a contractual duty, and

22  should not give a basis independent from a breach of contract

23  claim for a duty to disclose that could give rise to a fraud

24  claim.

25       So I don't believe that I erred in dismissing the

56

1    fraudulent omission cause of action on that basis.  I do

2    believe, however, that the allegations in paragraphs 71 through

3    84 and 130 do have sufficient particularity with regard to

4    setting forth, as set forth in the case law, what the omissions

5    were, the person responsible, the context of the omissions and

6    the manner in which they misled the plaintiff and what

7    defendant obtained thereby.

8           First, I should note that the complaint does set

9    forth a self-concealing set of communications between Appaloosa

10   and the so-called additional investors.  And under the Second

11   Circuit case law, I believe that is sufficient to establish the

12   first prong, which is that these were indeed omissions.

13   Moreover, what was kept from Delphi, as alleged in the

14   foregoing paragraphs, was a series of discussions pursuant to

15   which it is alleged Appaloosa and the additional investors

16   gamed out nonperformance of the agreement and nonperformance of

17   the additional investors' funding of the agreement, including

18   discussions of how they would protect each other or mitigate

19   their own losses for failure to perform.

20          The complaint also alleges, in paragraph 130, that

21   Appaloosa knew of the efforts of the additional investors to

22   thwart the agreement and, as pled in the earlier paragraphs,

23   those efforts concluded efforts to defeat the third party bank

24   financing either directly or through depressing the value in

25   the marketplace of Delphi.

57

1          The complaint says that Appaloosa, as the corporate

2     entity, was the entity responsible for not making the

3     disclosure.  And I believe that is sufficient under the case

4     law, although given Mr. Tepper's role, I believe that Appaloosa

5     has sufficient notice to assume that it was Mr. Tepper who

6     should have disclosed these alleged facts.  See Skydell v.

7     Ares-Serono S.A., 892 F.Supp 498 (S.D.N.Y. 1995).  See,

8     generally, Nine West Shoes Antitrust Litigation, 80 F.Supp.2d

9     181 (S.D.N.Y. 2000), as well as International Telecom, Inc. v.

10    Generadora Electrica del Oriente S.A., S.D.N.Y. -- I'm sorry,

11    2002 WL 465291 (S.D.N.Y. 2002).

12         The context of the omissions, I believe, is clear

13    from the complaint.  The complaint sets forth in detail

14    Delphi's decision to pursue an integrated series of

15    transactions, all necessary to the consummation of its Chapter

16    11 plan, premised in large measure upon the consummation of the

17    EPCA and the related third-party financings.  And the

18    complaint, with some specificity, including covering the period

19    in question as well as individual meetings, sets forth the

20    alleged efforts by Appaloosa and the additional investors to

21    thwart that result.

22         The complaint also sets forth the harm to Delphi from

23    the efforts, and I believe that although Delphi alleges it was

24    ready, willing and able to close, which assumes, of course,

25    that it had in hand the third-party financing, clearly the

58

1   investors, other than Goldman Sachs, were not ready to close.

2   And, in addition, one can certainly infer reasonably that the

3   efforts to thwart the closing had damaged Delphi going forward.

4       As far as what defendant obtained by not revealing

5   this information, again, I believe the complaint sets forth --

6   it alleges, first, that Delphi paid substantial fees to

7   Appaloosa and, secondly, that Appaloosa, by not revealing this

8   information, kept to itself and therefore obtained the

9   optionality, if you will, of this alternative course of not

10  closing, which, if it had been revealed, could have been

11  something that Delphi would have gone to the Court or directly

12  to the parties, the third parties, to nip in the bud.

13      What does not need to be pled with particularity

14  under Rule 9(b) are allegations of scienter, or knowledge on

15  Appaloosa's part that these omissions would be fraudulent.  But

16  I believe that, given the context, Delphi has sufficiently

17  alleged facts establishing scienter, namely motive and

18  opportunity, which is what's required under Beck v.

19  Manufacturer's Hanover Trust Company, 820 F.2d 46, 50 (2d Cir.

20  1987).  See, generally, Drexel Burnham Lambert Group, Inc. v.

21  Microgenesys, Inc., 775 F.Supp 660 (S.D.N.Y. 1991), and In re

22  Paine Webber Securities Litigation, 1992 U.S. Dist LEXIS 22855

23  (S.D.N.Y. 1992).  And see, generally, Powers v. British Vita,

24  P.L.C., 57 F.3d 176 at 185 (2d Cir. 1995).

25      I reach these conclusions not based on any belief

59

1    that there should be a looser standard given that Delphi is a

2    debtor in Chapter 11.  That concept, generally speaking,

3    applicable to trustees in bankruptcy, has been recognized by

4    some of the cases, including cases cited by Delphi.  But I

5    believe, under the circumstances here, where what is involved

6    is a post-petition transaction, it would be inapplicable.

7           However, even under the normal standard, which,

8    again, I believe should apply here, I believe that Delphi has

9    pled with sufficient particularity, under the authorities I've

10   cited, the allegations of fraud in paragraphs 71 through 84 as

11   well as 130, and has also adequately pled knowledge or

12   scienter.  See also Nisselson v. Ford Motor Company, In re

13   Monahan Ford Corporation, 340 B.R. (Bankr. E.D.N.Y. 2006).

14          That somewhat begs the question as to whether the

15   second part of my inquiry even matters, which is whether, in

16   fact, allegations of fraud are necessary to sustain the causes

17   of action of veil piercing and equitable subordination as well

18   as to sustain my conclusion that the complaint should not be

19   dismissed on those counts as against Appaloosa.  Clearly, a

20   fraud allegation is not necessary to establish subordination on

21   an equitable basis under Section 510, although it clearly has

22   to be egregious and severely unfair to other creditors, given

23   that Appaloosa is not an insider.  Similarly, fraud is not

24   necessary to establish veil piercing.

25          And finally, under Kalisch-Jarcho, fraud is not

60

1    necessary.  As the Court of Appeals stated, as I quoted in the

2    August order, "An exculpatory clause is unenforceable when, in

3    contravention of acceptable notions of morality, the misconduct

4    for which it would grant immunity smacks of intention of

5    wrongdoing.  This can be explicit, as when it is fraudulent,

6    malicious or prompted by the sinister intention of one acting

7    in bad faith.  Or, when, as in gross negligence, it betokens a

8    reckless indifference to the rights of others, it may be

9    implicit."  58 NY2d 377, 385 (1983).

10            The allegations are clearly strengthened by the fact

11    that the course of communications between the additional

12    investors and Appaloosa are alleged to have been kept secret by

13    Delphi as well as the allegation that Appaloosa knew and did

14    not reveal to Delphi the efforts of the additional investors to

15    subvert the transaction.  I do not believe that they are

16    necessary to sustain any of the three legal conclusions that I

17    previously reached.  The conduct, while potentially conduct

18    that Delphi could have addressed and perhaps corrected, would

19    have been just as bad if disclosed.  So it seems to me that

20    even if Delphi had not pled the maintenance of the secrecy of

21    this conduct with sufficient particularity, it would still have

22    set forth causes of action under 510 and veil piercing law as

23    well as sufficient facts under the Kalisch-Jarcho line of cases

24    to sustain my ruling.

25            Again, as stated in my August ruling, the complaint

61

1    need not state a specific legal theory.  It may even

2    incorrectly state it if it alleges sufficient facts to support

3    a claim.  Whether or not Appaloosa's correct that it misstated

4    its legal theory or incorrectly stated it, the complaint did

5    set forth, in addition to incorporating the relevant documents,

6    in matters of which I can take judicial notice, sufficient

7    facts to support the three contentions that I've just

8    described.

9         So for those reasons, I will deny Appaloosa's and

10   ADAH's motion, and counsel for the debtors should submit an

11   order consistent with my ruling.  I don't believe the order

12   needs to address the fraudulent representation point since that

13   was a matter that I had brought up sua sponte, and I've reached

14   the conclusion that my initial ruling denying the fraudulent

15   transfer claim -- I'm sorry, the fraudulent omission claim or a

16   fraudulent concealment claim was correct, albeit on a somewhat

17   different rationale.

18        So, Mr. Friedman, you should submit that order.  You

19   don't need to settle it, but you should provide -- advance a

20   copy of it to Mr. Kurtz.

21        MR. FRIEDMAN:  I will do that, Your Honor.

22        THE COURT:  Okay.  Thank you.

23        MR. FRIEDMAN:  Your Honor?

24        THE COURT:  Yes.

25        MR. FRIEDMAN:  Just a quick scheduling issue on

62

1    setting a time that's convenient for Your Honor to deal with

2    discovery issues.  Discovery is progressing.  We've ended up, I

3    think everybody, back-loading depositions.  So hopefully we can

4    all meet the deadlines that are set out.  But there are some

5    limited disputes that have arisen regarding the sequencing of

6    depositions, the extent to which attorneys who worked on the

7    drafting of the various contracts or were in meetings can

8    testify, the disclosure to clients of the identities of the

9    confidential informants and some other issues.

10            I think -- we've been discussing it.  We haven't been

11   able to reach resolution.  I think we can discuss it more, and

12   I think both sides would be able to submit letters to Your

13   Honor.  But would you want to set a conference for that?  Would

14   you like to set a conference call?  And when would you like to

15   do that?

16            THE COURT:  Well, let me -- this is just -- I'm not

17   sure we have all the -- I see some of the other defendants'

18   counsel here.  Is this just an issue that affects Appaloosa and

19   Delphi or does it affect the other defendants as well?

20            MR. FRIEDMAN:  I think it affects the other

21   defendants, but I'm pretty confident -- actually, I think we

22   probably have everyone here, but as far as just setting a date

23   when people would submit letters to the Court and a time when

24   we could discuss it.

25            THE COURT:  All right.  Are you really at an impasse

63

1    on -- have you identified the issues that you are at an impasse

2    on?

3         MR. WEINTRAUB:  We've identified some issues.  We're

4    still talking.  So I think -- I don't have a problem with --

5         THE COURT:  All right.

6         MR. WEINTRAUB:  -- setting a schedule for submission

7    of the dispute.

8         THE COURT:  All right.  My practice in discovery

9    disputes is to push the parties as hard as I can to resolve as

10   many issues as they can between themselves.  And sometimes when

11   I set a date, people tend to put down their pens and stop

12   calling each other.  So I'm going to give you a date, but I'm

13   going to give you a date but I'm going to preface it by saying

14   I really expect you all to try to work out as much as you can

15   reasonably do in advance, and then give me letters on things

16   that clearly are legitimate areas of dispute.

17        Is there -- have you agreed on a discovery cut-off

18   date?

19        MR. FRIEDMAN:  Yes, Your Honor.

20        THE COURT:  Are we working back from a certain date

21   here?

22        MR. FRIEDMAN:  Fact discovery cut-off date is

23   December 31.

24        THE COURT:  December 31?

25        MR. FRIEDMAN:  Yes.

64

1        THE COURT:  Okay.  So I could give you -- you could

2   give me letters on the 12th, and I can do something

3   telephonically on the 14th.  My guess is that that will

4   probably narrow down three-quarters of the issues.  There may

5   be something I'll have to actually have a hearing on, for

6   example, counsel testifying and the like --

7        MR. FRIEDMAN:  Right.

8        THE COURT:  -- my guess, although maybe you'll be

9   able to resolve that since there are people on both sides.

10       MR. FRIEDMAN:  Your Honor, could I ask -- I'm not

11  available on November -- you're talking November, correct?

12       THE COURT:  Yeah.

13       MR. FRIEDMAN:  I'm not available November 14th.

14  Could it go to Monday, November 17th?

15       THE COURT:  Yes.  And then why don't you give me

16  letters on the 13th then?  It'll give you an extra day, give me

17  an extra day.  If you could do it by 4 so I can focus on them

18  on Friday.  And then we'll have a call -- let's tentatively

19  schedule it for Monday at 3.  But you should check with the

20  other parties to see if they're available for that.

21       MR. FRIEDMAN:  Certainly.

22       THE COURT:  If they're not but they're available in

23  the morning, then I could do it in the morning.

24       MR. FRIEDMAN:  Very good.

25       THE COURT:  Okay.

65

1          MR. FRIEDMAN:  Your Honor, just so we're clear, on

2     Monday, the 17th, are we having a telephone call at 3?

3          THE COURT:  A conference call, so --

4          MR. FRIEDMAN:  A conference call.

5          THE COURT:  -- one of you should set that up.

6          MR. FRIEDMAN:  Okay.

7          THE COURT:  I hope that I won't need to have a full

8     hearing on any of these, I may, but I'm hopeful that I'll be

9     able to, with your help, narrow down most of the issues and

10    that if we need a hearing it would be shortly thereafter.  It'd

11    just be two or three days thereafter, is my guess.

12         MR. FRIEDMAN:  All right.  We'll set -- plaintiff

13    will set up the call, Your Honor.

14         THE COURT:  Okay.

15         MR. KURTZ:  Thank you, Your Honor.

16         THE COURT:  Okay.

17    (Proceedings concluded at 12:04 p.m.)

18

19

20

21

22

23

24

25

1

2                                  I N D E X

3

4                                  RULINGS

5                          Page      Line

6    Motions denied          61        9

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

67

1

2                        C E R T I F I C A T I O N

3

4       I, Clara Rubin, court approved transcriber, certify that the

5       foregoing is a correct transcript from the official electronic

6       sound recording of the proceedings in the above-entitled

7       matter.

8

9       _____  November 7, 2008

10      Signature of Transcriber              Date

11

12      Clara Rubin

13      typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25