**Bidding Procedures Hearing Date And Time:  November 24, 2008 at 10:00 a.m.**
**Bidding Procedures Objection Deadline:  November 20, 2008 at 4:00 p.m.**
**Sale Hearing Date And Time:  December 17, 2008 at 10:00 a.m.**
**Sale Hearing Objection Deadline:  December 10, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -   -    x
                                                            :
    In re                                 :    Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :    Case No. 05-44481 (RDD)
                                                            :
                                                            :    (Jointly Administered)
                  Debtors.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

EXPEDITED MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363, 365, 1123, AND 1146 AND FED. R.
BANKR. P. 2002, 6004, 6006, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING
CERTAIN BID PROTECTIONS, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV)
SETTING SALE HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF DEBTORS'
ASSETS COMPRISING DEBTORS' EXHAUST EMISSIONS BUSINESS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
<u>CONTRACTS AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES</u>

("EXHAUST BUSINESS SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for orders under 11 U.S.C. §§ 363, 365, 1123, and 1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a) (i) approving the bidding procedures set forth herein and attached hereto as Exhibit A (the "Bidding Procedures"), (ii) granting certain bid protections, (iii) approving the form and manner of sale notices (the "Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of certain of the Selling Debtor Entities' (defined below) assets (the "Acquired Assets") exclusively used in the Selling Debtor Entities' exhaust emissions business (the "Exhaust Business") to the Buyer or the Successful Bidder (both as hereinafter defined) submitting a higher or otherwise better bid, as the case may be, free and clear of liens, claims, and encumbrances, (ii) the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Assumed U.S. Contracts") and the assignment of certain postpetition executory contracts and unexpired leases (the "Postpetition Contracts," and collectively with the Assumed U.S. Contracts, the "Assumed and Assigned Contracts") to the Buyer or the Successful Bidder, as the case may be, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Buyer or the Successful Bidder, as the case may be.  In support of this Motion, the Selling Debtor Entities (as defined below) respectfully represent as follows:

Background

A.    The Chapter 11 Filings

   1. On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

   2. No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

   3. On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment

Agreement (as defined in the Confirmed Plan) with Delphi.  On May 16, 2008, Delphi filed

complaints for damages and specific performance against the Plan Investors and related parties

who refused to honor their equity financing commitments and refused to participate in the

closing that would have led to Delphi's successful emergence from chapter 11.  On October 3,

2008, the Debtors filed a motion (Docket No. 14310) (the "Plan Modification Approval

Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the

Confirmed Plan and related modifications to the December 10 Disclosure Statement and (ii)

related procedures for re-soliciting votes on the Confirmed Plan, as modified.  However, due to

the current crisis in the global debt and equity markets, the Debtors have adjourned the hearing

on the Plan Modification Motion pending further discussions with emergence capital funding

parties and an assessment of which supplemental plan modifications are warranted in the

current conditions to enable the Debtors to emerge from chapter 11 as soon as practicable.

       4.       This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§

157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

       5.       The statutory predicates for the relief requested herein are sections 363,

365, 1123, and 1146 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      <u>Current Business Operations Of The Debtors</u>

       6.       Delphi and its subsidiaries and affiliates (collectively, the "Company")

as of December 31, 2007 had global net sales of $22.3 billion and global assets of

approximately $13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and have continued their business operations without supervision from

the Court.[2]

7.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems

and modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

8.    Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted

the Company's business through various divisions and subsidiaries.  Effective January 1, 1999,

the assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM (the

"Spin-Off").  In connection with these transactions, Delphi accelerated its evolution from a

North American-based, captive automotive supplier to a global supplier of components,

integrated systems, and modules for a wide range of customers and applications.  Although

---

[1]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its
worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its
Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the
funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan
on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its
manufacturing footprint and to lower its overall cost structure.

GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

9.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

10.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

6

product portfolio, operational issues, and forward-looking revenue requirements.  Because

discussions with its major stakeholders had not progressed sufficiently by the end of the third

quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to

complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business;

second, concluding their negotiations with GM to finalize GM's financial support for the

Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;

third, streamlining their product portfolio to capitalize on their world-class technology and

market strengths and make the necessary manufacturing alignment with their new focus;

fourth, transforming their salaried workforce to ensure that the Company's organizational and

cost structure is competitive and aligned with its product portfolio and manufacturing footprint;

and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases,

including Delphi's labor unions and GM.  After the Plan was confirmed, the Debtors focused

their efforts on satisfying the conditions for the Confirmed Plan to become effective.  On April

4, 2008, having satisfied those conditions, the Debtors began a formal closing process attended

by representatives of GM, the exit lenders, and the Statutory Committees.  The Plan Investors,

however, refused to participate in the closing or fund their obligations under the Investment

Agreement.  Following April 4, the Debtors nevertheless continued working with their

stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon

as reasonably practicable.

14.     On September 12, 2008, Delphi announced steps that it was taking to

complete the successful restructuring of its U.S. operations, transformation of the company on

a global basis, and emergence from chapter 11.  Those steps included implementing amended,

comprehensive settlement agreements with GM, taking action to fund and preserve Delphi's

hourly and salaried pension plans, and completing the reaffirmation process for Delphi's

August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.     Concurrently with the announcement on September 12, 2008, the

Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended

and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and

Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008,

this Court entered an order authorizing the Debtors' implementation of the Amended GSA and

the Amended MRA, the provisions of which became effective on September 29, 2008.

16.     Through the Amended GSA and Amended MRA, the Debtors addressed

two fundamental tenets of their Transformation Plan: (i) obtaining financial support from GM

for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the

Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to

the Debtors and eliminate significant elements of conditionality to the performance of GM's

obligations.  Delphi estimates the value of the net consideration received under the Amended

GSA and Amended MRA to be approximately $10.6 billion (increased from approximately

8

$6.0 billion under the Original GSA and Original MRA), which includes an increase of nearly $2 billion in connection with the amount of Delphi's net hourly pension liabilities transferred and to be transferred to GM pursuant to section 414(l) of the Internal Revenue Code (increased from $1.5 billion under the Original GSA to approximately $3.4 billion under the Amended GSA). As part of the approval process of the Amended GSA and Amended MRA, Delphi, GM, and the Creditors' Committee negotiated a consensual first amendment to the Amended GSA which sets forth the circumstances under which GM would allocate a portion of its recovery to unsubordinated general unsecured creditors.

17. Through the transfer of pension assets and liabilities to GM described above and the freezing of Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's U.S. unions), Delphi has substantially achieved its pension funding strategy objectives for hourly employees. In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to certain of its pension plans and to implement replacement pension plans (the "Pension Order"). With respect to its salaried employees, pursuant to the Pension Order, on September 30, 2008, Delphi froze the applicable salaried pension plans and implemented replacement plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18. As a result of all the factors described above, the Debtors were able to formulate certain modifications to the Confirmed Plan, which are set forth in the Plan Modification Approval Motion filed on October 3, 2008, and which are currently under review in light of the current condition of the global capital markets and global automotive industry.

19.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

20.     By this Motion, Delphi and the selling Debtor entities described in the Agreement (as defined below) (the "Selling Debtor Entities")[4] seek approval for the sale of the Exhaust Business to Bienes Turgon S.A. de C.V. (the "Buyer"),[5] subject to additional competitive bidding pursuant to the proposed Bidding Procedures.  To effect the Sale, the Selling Debtor Entities seek two types of relief.  First, at the omnibus hearing to be held on November 24, 2008, the Selling Debtor Entities will seek entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding Procedures Order") approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided to the Buyer pursuant to the Agreement (as defined below) and as described more fully herein.  Second, subject to the terms of the Bidding Procedures Order, at the omnibus hearing to be held on December 17, 2008, the Selling Debtor Entities will seek entry of an order substantially in the

---

[4]     Under the Agreement, the Selling Debtor Entities are comprised of Delphi Automotive Systems LLC, Delphi Technologies, Inc., and Delphi Corporation.  For the purpose of convenience, references to the "Sellers" herein (including in all exhibits) means, as the context requires, (i) the Selling Debtors Entities to the extent such references implicates assets of the Selling Debtor Entities or (ii) non-Debtor affiliates to the extent such reference implicates assets of the non-Debtor affiliates.  Certain assets will be sold under the Agreement by non-Debtor affiliates of the Selling Debtor Entities listed on Schedule 1 to the Agreement.  For convenience, use of the term "Selling Debtor Entities" means, as the context requires, the specific Debtor entity undertaking the transaction referenced to the extent such transaction affects the assets of such entity.

[5]     This Motion will refer to Bienes Turgon S.A. de C.V., together with any affiliates it identifies in Schedule 1 of the Agreement, as the "Buyer," which, as the context requires, means the specific Buyer entity undertaking the transaction.

form attached hereto as <u>Exhibit C</u> (the "Sale Approval Order") authorizing and approving the Sale to the Buyer or the Successful Bidder, as the case may be, including, without limitation, the assumption and assignment of the Assumed U.S. Contracts to the Buyer, and the assumption by the Buyer of the Assumed Liabilities.

Basis For Relief

21.    The Company has stated that to achieve the necessary cost savings and operational effectiveness envisioned in its transformation plan, it must streamline its product portfolio to capitalize on its world-class technology and market strengths and make the necessary manufacturing realignment consistent with its new focus.  As part of the Company's transformation plan, the Company has identified the Exhaust Business as a non-core business subject to disposition.

22.    Accordingly, following broad marketing efforts, on November 10, 2008, the Sellers and the Buyer entered into a Master Sale and Purchase Agreement, a copy of which is attached hereto as <u>Exhibit D</u> (the "Agreement").  The Agreement contemplates a global divestiture of the Exhaust Business to the Buyer for a purchase price (the "Purchase Price") of $17 million, subject to certain adjustments.  The divestiture, as memorialized in the Agreement, contemplates that the vast majority of the assets will be sold by non-Debtor affiliates.  In fact, only $150,000 of the purchase price will be allocated to the Selling Debtor Entities.  The transactions to be undertaken by the non-Debtor affiliates, although memorialized in the Agreement and the attachments thereto, are generally not the subject of this Motion because those entities are not under the supervision of this Court.  The discussion in this Motion is generally (but not exclusively) limited to transactions to be undertaken by the Selling Debtor Entities, which require Court approval.

11

F.    The Exhaust Business

23.    Delphi's global exhaust emissions business produces a broad array of catalytic converters and related assemblies that are sold globally and used in a variety of gas and diesel emissions control applications.  The Company began making catalytic converters in 1974 as the AC Spark Plug division of GM and at the time of the Spin-Off, the operations became part of Delphi.  The Exhaust Business is part of Delphi's Powertrain business, a core business of the Company.  The Exhaust Business has a global platform with operations at six primary manufacturing sites in Australia, China, India, Mexico, Poland, and South Africa, all of which (other than the Mexican and South African sites) also manufacture other Delphi products.  Except for the Mexican site where the Sellers hold a minority interest in one joint venture, Katcon S.A. de C.V. ("Katcon"),[6] all sites are wholly-owned or controlled by the Sellers.  In addition to certain engineering capabilities at the manufacturing sites, the Exhaust Business also has engineering resources located at technical centers in Luxembourg and Michigan where engineering personnel carry out their responsibilities to develop and test the Exhaust Business' products and associated processes.  The dedicated workforce for the Exhaust Business is comprised of approximately 135 salaried and 158 hourly employees.  Of these employees, 23 are U.S. employees, all of whom are salaried employees (primarily engineers).

24.    The Exhaust Business is benefiting because of increasingly stringent regulatory exhaust emission requirements in the global market which aim to reduce noxious emissions. For the year ended December 31, 2007, the Exhaust Business achieved revenue of $294.4 million and EBITDA of $19.1 million on a pro-forma basis, excluding certain Delphi

---

[6]    Sixty percent of Katcon is owned by the Buyer and 40% is owned by a non-Debtor affiliate, Delphi Controladora, S.A. de C.V. ("DCSA").  Delphi Automotive Systems (Holding), Inc. ("DASHI") owns 99.99% of DCSA, and Delphi International Holdings Corp. ("DIH") owns .01% of DCSA. Both DASHI and DIH are Debtors.  Pursuant to this transaction, the applicable non-Debtor Seller will be selling its equity interest in Katcon.

SG&A and allocated costs which are not included in the offering (also excluding revenue and

EBITDA of the Katcon joint venture).  Because of the increasingly stringent environmental

requirements, the Company believes that with the right Buyer, the Exhaust Business has strong

growth prospects.  The revenue from the Exhaust Business is comprised of two different value

streams: (i) 76% is through a customer-directed purchase process through which the Sellers

obtain catalyst material from a specified supplier and pass it to the customer, receiving a

handling fee but not otherwise adding value to the product and (ii) 24% is generated from sale

of product to which Delphi has added content, thereby increasing its value.  Nearly two-thirds

of the Exhaust Business sales are to GM and its affiliates, virtually all of which is sold outside

of the U.S.  In addition to its customer relationship with GM, the Exhaust Business has

customer relationships with many other leading original equipment manufacturers, including

AvtoVAZ, Brilliance, Ford, and Renault.

G.    Factors Leading To The Sale

25.    In March 2006, as part of its transformation plan, the Company

identified non-core product lines and manufacturing sites that do not fit into the Company's

future strategic framework.  In connection with the Company's continuous evaluation of its

product portfolio, during the second quarter of 2008 Delphi decided that the global exhaust

business no longer fit within the Company's future product portfolio.  In particular, after an

intensive product portfolio review, the Company determined that although Powertrain remains

a core business for Delphi, the Exhaust Business is not a critical component of the Powertrain

business line.  The Company does intend to continue to provide to its customers full engine

management systems, including air and fuel management, and combustion and valve-train

technology.

26.    The Company believes, however, that as a standalone business, the Exhaust Business could become more profitable and competitive.  The Company has therefore determined that the value of the Exhaust Business would be maximized through its divestiture, and is seeking to achieve that goal in a manner that will balance the needs of its customers.  By effectuating the sale and moving the Exhaust Business assets out of the Sellers' global sites, Delphi will be able to expand its operations at those locations, gaining much-needed space for its continuing businesses.  The Company, including the Selling Debtor Entities, will carefully manage the transition of the Exhaust Business and the Sale will be completed in coordination with the Company's customers, employees, unions, and other stakeholders.

27.    The Company has actively marketed the Exhaust Business since June 2008.  As part of this process, the Company contacted more than 200 potential global buyers, distributed over 50 confidential information memorandums, and provided a number of parties with additional information about the Exhaust Business.  To facilitate an efficient diligence process, the management of the Sellers established a virtual data room to permit interested parties to conduct due diligence.

28.    The Sellers evaluated the terms and benefits of the Buyer's proposal, as well as the benefits of other alternatives to divesting the Exhaust Business.  In their business judgment the Sellers concluded that the proposal from the Buyer, which formed the basis of the Agreement, offered the most advantageous terms and the greatest economic benefit.  This decision was based in part on the Sellers' ability to maximize the value of the business line as a going concern and their belief that the Buyer would continue to provide quality products to the Company's customers, many of whom buy other products from Delphi.  The Buyer is a well-established private investment company based in Mexico.  Among its portfolio companies, the

14

Buyer is currently partnered with a non-debtor affiliate of Delphi in the Katcon joint venture, a manufacturer of catalytic converters (the 40% non-Debtor ownership interest of which is being sold pursuant to the Agreement). Importantly, the Buyer has enough available cash to close the transaction and has required no financing conditions in the Agreement.

H.    The Agreement

29.    Pursuant to the Agreement, (a) the Selling Debtor Entities would (i) sell the Acquired Assets owned by the Selling Debtor Entities free and clear of any Interests and/or Claims,[7] except for Permitted Encumbrances as defined in the Agreement, in consideration for the Purchase Price, subject to adjustments and other consideration, and (ii) assume (if applicable) and assign the Assumed and Assigned Contracts to the Buyer and (b) the Buyer will assume the Assumed Liabilities.

30.    The significant terms of the Agreement are as follows:[8]

(a)    General Terms.  The Buyer would acquire the Acquired Assets, which comprise substantially all of the assets primarily used by the Exhaust Business through an asset sale, which include managed working capital, intellectual property, contracts, customer accounts, and certain non-U.S. manufacturing facilities.  The Buyer would also acquire certain non-Debtor Sellers' 40% interest in the joint venture Katcon and 100% interest in Delphi South Africa (Proprietary) Ltd., as well as engineering resources in Michigan and Luxembourg.  The portion of the Acquired Assets being sold by the Selling Debtor Entities is

---

[7]    "Interests and/or Claims" means any and all liens, claims, interests, and encumbrances (including, without limitation, Encumbrances (as defined in the Agreement) on Selling Debtor Entities' assets, but excluding Permitted Encumbrances and Assumed Liabilities, each as defined in the Agreement) of any type whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the Petition Date, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including but not limited to those (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Selling Debtor Entities' or the Buyer's interest in the Acquired Assets, or any similar rights, and (ii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Exhaust Business prior to the Closing Date, including the transfer of the Acquired Assets to the Buyers.

[8]    In the event of any discrepancy between the Agreement and this summary, the provisions of the Agreement control.

comprised of intellectual property, including patents and trademarks, and certain engineering resources including equipment used by the engineers to develop and test products.

(b)    <u>Bankruptcy Court Approval</u>.  The Sale of the Acquired Assets would be subject to competitive bidding pursuant to the Bidding Procedures and approval by this Court.

(c)    <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.[9]  Prior to or at the closing, certain of the Sellers and the Buyer would enter into, among others, the following ancillary agreements (collectively, the "Ancillary Agreements"):[10] (i) the Patent Assignment, (ii) the Trademark Assignment, (iii) the Transfer Agreements (South Africa, Poland, China, Australia, Mexico, India, and Luxembourg), (iv) the Bills of Sale, (v) the Assignment and Assumption Agreements, (vi) any applicable non-U.S. subleases, and (vii) the Deposit Escrow Agreement.  The Ancillary Agreements would be delivered to the Sellers on terms reasonably satisfactory to the Sellers on or before the closing and would be performed in all material respects. The closing of the Transfer Agreements would take place simultaneously with the closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

(d)    <u>Purchase Price</u>.  The Purchase Price to be paid by the Buyer to the Sellers would be $17 million, subject to certain adjustments.  As set forth on Schedule 3.5.1 to the Agreement, the portion of the Purchase Price to be allocated to the Selling Debtor Entities would be $150,000.

(e)    <u>Deposit Amount</u>.  The Buyer has delivered to an escrow agent pursuant to the Deposit Escrow Agreement the sum of $1,700,000 (10% of the Preliminary Purchase Price) to be held as an earnest money deposit (such amount, together with the interest accrued thereon prior to closing less any escrow fees, the "Deposit Amount").  Upon closing or upon any breach by a Buyer  of the Agreement or the Bidding Procedures, regardless of whether such breach results in termination of the Agreement, the Sellers would receive the Deposit Amount.  If the Agreement is terminated for any reason other than a breach by the Buyer, then, on: (i) the date which is 60 days after such termination or (ii) in the event that an Alternative Transaction (defined below) is completed, the Return Date (defined below) (whichever would be earlier), the Deposit Amount would be returned to the Buyer.

(f)    <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Selling Debtor Entities would provide representations and warranties relating to the Sale and the Acquired Assets generally standard in a transaction of this type[11] and the Buyer would

---

[9]    Copies of the schedules to the Agreement and the Ancillary Agreements (as defined above) are available upon request to parties-in-interest who execute a confidentiality agreement acceptable to the Debtors and who show that they would be affected by the relief requested in this Motion.

[10]    Capitalized terms used in the summary of terms but not otherwise defined herein have the meanings ascribed to them in the Agreement.

[11]    One of the representations to be made by the Sellers is that the equity interest of Katcon, a non-Debtor asset to be sold as part of the transaction, is subject to the preemptive right of the joint venture partner in Katcon, which is a Buyer under the Agreement.  Pursuant to a translated version of Article 11 of the Katcon bylaws,

provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Selling Debtor Entities would not survive closing.

(g)    Covenants And Non-Compete.  Subject to the terms of the Bidding Procedures, between the date of signing the Agreement and the closing, the Selling Debtor Entities would be required to refrain from doing any of the following, among other things, without prior written consent of the Buyer (which consent would not be unreasonably withheld or delayed): (i) sell or otherwise dispose of Acquired Assets having an aggregate value exceeding $50,000, excluding sales of inventory and sales of receivables to financial institutions or credit collection agencies, in each case in the ordinary course of business, (ii) incur, assume, or guarantee any Debt Obligation that would become an Assumed Liability, (iii) incur any encumbrance on any material Acquired Assets, in each case other than the Permitted Encumbrances as defined in the Agreement, (iv) increase the compensation of any of the Selling Debtor Entities' Exhaust Business employees other than: (A) in the ordinary course of business or (B) as required by any agreement in effect as of the date of the Agreement or as required by law, (v) make any material change in the accounting methods or practices followed by the Exhaust Business (other than such changes as are required by law, made in conformity with GAAP, or required in connection with the preparation of certain financial statements), (vi) terminate or make any material amendment to a Material Contract, (vii) enter into or renew any collective bargaining agreements, companywide collective agreement, severance agreements, social plans, special works contracts or compensation arrangements (including any such contracts or agreements that provide for benefits or compensation in the event of a reduction in force or relocation of work) covering Selling Debtor Entities' Exhaust Business employees, except for renewals in the ordinary course of business on terms not materially inconsistent with prior practice, (viii) fail to maintain insurance in a manner consistent with the Selling Debtor Entities' past practice, or (ix) agree or commit to do any of the foregoing.  For a period of four years after the closing, subject to certain exclusions, the Selling Debtor Entities would be required not to take certain actions which would compete with the Exhaust Business.

(h)    Indemnity.  Under the Agreement, the Buyer would be obligated to indemnify the Selling Debtor Entities as well as all other Sellers on account of certain losses resulting from or arising out of (i) a breach of any representation or warranty made by any Buyer contained in the Agreement, (ii) the Assumed Liabilities or the Acquired Assets, (iii) a breach of any agreement or covenant of any Buyer contained in the Agreement or any Ancillary Agreements, or (iv) the conduct of the Exhaust Business or the ownership of the Acquired Assets after closing.  The Selling Debtor Entities (jointly and severally with Delphi)

---

"[s]hould any of the shareholders wish to sell or transfer the shares he owns to a third party other than an affiliate company or a parent of the shareholders must give thirty days written notice to the [Katcon] Board of Directors in order than this administrative body may inform other shareholders so that when sold, in equal circumstances, said shares shall be sold with a right preference to any other person alien to the firm.  The shareholders who wish to act upon the preferred shares in question, will have the right to acquire the respective shares proportionate to those which they already own."  The Sellers intend to send a notice to Katcon's board of directors within two business days of the filing of this Motion informing the board of the Sellers' intention to sell their interest in Katcon.  The Bidding Procedures are sufficiently flexible to permit a bidder to submit an offer that excludes any assets or equity interests, enabling a bidder to include or exclude the equity interest in Katcon – or even provide for both alternatives subject to purchase price adjustments.

would indemnify the relevant Buyer for indemnifiable losses to the extent that the Sale Order
or other applicable provisions of the Bankruptcy Code fails to discharge Liability with
respect to any claims relating to Products shipped by a Filing Affiliate prior to closing.  In
addition, the non-Debtor Sellers would be obligated to indemnify the Buyer on account of (a)
breach of certain representations or warranties made by such Seller contained in the
Agreement, (b) Retained Liabilities that are retained by such Seller, (c) a breach of certain
agreements or covenants of such Seller contained in the Agreement or any Ancillary
Agreements, or (d) the failure by such Seller to pay certain amounts owing.  However, the
Sellers' indemnification obligations would be limited to indemnification claims of which the
Sellers are notified on or before the first anniversary of the closing, except for
indemnification claims made with respect to certain intellectual property matters, of which
claims the Sellers would have to be notified on or before the third anniversary of the closing.
Further, the Sellers would not be obligated to the Buyer for indemnifiable losses until (y) an
individual claim exceeded $25,000.00 and (z) the amount of all indemnifiable losses
(exceeding the individual claim amount) exceeded $200,000.00 (the "Deductible Amount").
The indemnification obligations in no event would exceed the "Cap Amount" which is
defined under the Agreement for the Sellers as the lesser of (A) 25% of the Preliminary
Purchase Price for aggregate indemnifiable losses paid by all the Sellers or (B) 100% of the
Purchase Price for an individual Seller's Acquired Assets calculated in accordance with the
Purchase Price allocation amongst the Sellers for indemnifiable losses paid or payable by
such Seller.  With respect to environmental matters, (i) the Sellers would indemnify the
Buyer for environmental damages arising from pre-closing environmental contamination (for
three years) and pre-closing environmental compliance (for 18 months) matters and (ii) the
Buyer would indemnify the Sellers for environmental damages arising from post-closing
environmental contamination and post-closing environmental compliance matters.  With
respect to environmental damages arising from circumstances that may be considered both
pre- and post-closing, the damages would be allocated between the parties in proportion to
the extent that the releases of, or noncompliance underlying, such damages arose pre- or
post-closing.  Environmental claims would also be subject to the Cap Amount and
Deductible Amount and to additional limitations as set forth in section 11.4.2 of the
Agreement.

(i)    Closing Conditions. In addition to certain other customary closing
conditions relating to bankruptcy court approvals and regulatory matters (including certain
competition filings), the respective obligations of each party to effect the transactions
contemplated by the Agreement would be subject to the satisfaction or waiver of the
condition that since the date of the Agreement, no Material Adverse Effect[12] would have

---

[12]    Under the Agreement, "Material Adverse Effect" is defined as "any change, occurrence or development that
has a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by
Sellers' hereunder), results of operations or financial condition of the Exhaust Business, taken as a whole,
including (notwithstanding anything to the contrary contained in this definition) any change, occurrence or
development: (a) resulting from a bankruptcy or Chapter 11 filing of GM, unless cured or lifted before
Closing, or (b) GM notifying Delphi in writing of a loss of business from GM, awarded to Delphi South
Africa as of the date of the Agreement, of greater than five hundred thousand (500,000) catalytic converters,
on an annualized basis, for 2009 or 2010; but excluding any change, occurrence or development: (i) resulting
from general economic or business conditions; (ii) resulting from strikes or acts of God (e.g. flooding,
earthquake, volcano), (iii) resulting from material increases in raw materials or other operating costs that

18

occurred and be continuing at closing.  In addition, the obligation of the Buyer to consummate the transactions contemplated by the Agreement would be subject to the satisfaction, or waiver by the Buyer, at or prior to the closing, of the following conditions: (a) the truth and correctness, as of the closing date, of certain representations and warranties of the Sellers contained in the Agreement except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect on the Sellers' ability to consummate the transactions contemplated by the Agreement, (b) the performance and compliance by the Sellers in all material respects with all agreements and obligations required by the Agreement to be performed or complied with by the Selling Debtor Entities at or prior to the closing, and (c) the delivery by the Selling Debtor Entities of duly executed copies of each of the Ancillary Agreements.  Finally, the obligation of the Sellers to consummate the transactions contemplated by the Agreement would be subject to the fulfillment at or prior to the closing of the following conditions, which could be waived by the Sellers: (i) the truth and correctness, as of the closing date, of certain representations and warranties of the Buyer contained in the Agreement, except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on the Buyer's ability to consummate the transactions contemplated by the Agreement, (ii) the performance and compliance by the Buyer in all material respects with all agreements and obligations required by the Agreement to be performed or complied with at or prior to the closing, (iii) the delivery by the Buyer of duly executed copies of each of the Ancillary Agreements, and (iv) the establishment by the Buyer of a legal entity in every jurisdiction required by law for such entity to buy the Acquired Assets or ownership interests in the joint ventures that are the subject of the Sale.

(j)    <u>Termination</u>.  The Agreement could be terminated prior to closing in the following circumstances: (i) upon mutual written consent of the Sellers and the Buyer, (ii) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if closing does not occur within 120 days after entry of the Sale Approval Order for any reason other than (a) a law, governmental order, or third-party proceeding prohibits the consummation of the transaction or (b) if, in the Sellers' reasonable discretion, additional time is needed for transition planning required to facilitate the consummation of the Agreement, (iii) by either party, if the Selling Debtor Entities consummate an Alternative Transaction (defined below), (iv) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if consummation of the Sale would violate any final non-appealable order of any governmental authority (other than this Court),

---

cannot be passed through to customers; (iv) affecting companies in the industry or markets of the Exhaust Business generally;(v) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (vi) resulting from any existing event, occurrence or circumstance with respect to the Exhaust Business to which the Buyers have Knowledge as of the date of the Agreement; (vii) that is cured or for which an offer to cure has been made by the Sellers before the date of any termination of the Agreement by Buyer Parent pursuant to Section 9.1 of the Agreement; (viii) resulting from the negotiation, announcement or performance of this Agreement or the transactions contemplated by the Agreement, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of the Exhaust Business; (ix) resulting from any act or omission of any Seller taken with the prior consent of any Buyer; (x) resulting from any actions required under this Agreement to obtain any Consent; (xi) resulting from the filing of the Bankruptcy Cases or from any action approved by the Bankruptcy Court; (xii) resulting from the regulatory status of any Buyer, or (xiii) resulting from acts of war or terrorism, whether or not directed at the Exhaust Business or Buyer."

(v) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, if this Court has not entered the Sale Approval Order on or before 120 days after the date of the Agreement, or if such Sale Approval Order, as of the date that is 120 days after the date of the Agreement, is subject to a stay or injunction, (vi) by either party, provided the terminating party is not in material breach of its obligations under the Agreement, within ten business days after becoming aware of the occurrence of a Material Adverse Effect if such event is continuing at the time of such termination and not reasonably capable of being cured within 90 days after entry of the Sale Approval Order, or the Agreement, whichever is later.  In addition, the Buyer Parent could terminate upon written notice to the Sellers, provided the Buyer Parent was not in material breach of any of its obligations under the Agreement, if (A) a Material Adverse Effect has occurred, so long as such event is continuing at the time of any such termination or (B) the Sellers had breached or failed to perform any of their obligations under the Agreement and such material breach or failure to perform was (y) not cured within 30 days after written notice thereof, or promptly after written notice thereof if the time for performance has lapsed, or (z) incapable of being cured by the Sellers.  Finally, the Sellers could terminate upon written notice to the Buyer Parent, provided the Sellers were not in material breach of any of their obligations under the Agreement, if the Buyer had breached or failed to perform in any material respect any of its obligations contained in the Agreement, which breach was not cured within 30 days after written notice thereof, or was incapable of being cured by the Buyer.

       (k)     Break-Up Fee.  If the Agreement were terminated under certain circumstances and the Sellers sold, transferred, leased, or otherwise disposed of all or substantially all of the Exhaust Business or the Acquired Assets in a transaction or a series of related transactions with a party other than the Buyer (an "Alternative Transaction"), then the Sellers would, upon consummation of the Alternative Transaction, be required to pay the Buyer an amount equal to 3% of the Preliminary Purchase Price (the "Break-Up Fee").  If the Buyer became entitled to receive the Break-Up Fee, then it would not be entitled to receive the Expense Reimbursement (as defined below) or any portion thereof.  The Company intends to allocate the Break-Up Fee to the Selling Debtor Entities and the non-Debtor Sellers in proportion to the purchase price allocation.  Under such circumstances, the Selling Debtor Entities would pay approximately 1% of the Break-Up Fee.  The Break-Up Fee would not be payable if (i) the Buyer was in breach of the Agreement or the Bidding Procedures, (ii) the Sale would violate any final non-appealable order of any regulatory governmental entity, or (iii) the failure to close under specified conditions resulted solely from the status or conduct of Delphi or the Sellers.

       (l)     Expense Reimbursement.  If the Agreement were terminated because the closing had not occurred 120 days after the entry of the Sale Approval Order then, subject to certain exceptions, the Selling Debtor Entities would be required to reimburse the Buyer's reasonable, actual out-of-pocket fees and expenses incurred in connection with the investigation or negotiation of the transactions contemplated by the Agreement (the "Expense Reimbursement") up to a maximum of $600,000 (3.5% of the Preliminary Purchase Price), provided that the Buyer was not then in breach of the Agreement or the Bidding Procedures.  The Company intends to allocate the Expense Reimbursement to the Selling Debtor Entities and the non-Debtor Sellers in proportion to the purchase price allocation; provided however, that in instances in which one or more of the Sellers are responsible for the act or event

giving rise to the Expense Reimbursement, the Company would intend to allocate the Expense Reimbursement based on the responsibility of the respective Sellers.  The Expense Reimbursement would be immediately earned upon termination and payable promptly after invoiced by the Buyer, except that if the Selling Debtor Entities in good faith believed that the amount of the Expense Reimbursement sought was not reasonable, then the Selling Debtor Entities would have the right to seek the review of this Court before paying such amount.  If the Buyer would become entitled to the Expense Reimbursement, then they would not be entitled to receive the Break-Up Fee or any portion thereof.  The Break-Up Fee or the Expense Reimbursement would be the sole remedy of the Buyer for the breach by the Sellers of the terms of the Agreement or the Deposit Escrow Agreement.

(m)    Transfer Taxes.  The Selling Debtor Entities and the Buyer would use commercially reasonable efforts and cooperate in good faith to exempt the Sale from any transfer, documentary, sales, use, registration, recording, stamp, value-added, and other such taxes and related fees ("Transfer Taxes") as might be payable in connection with the Sale.  In the event that an exemption(s) were unavailable, Transfer Taxes that arise would be borne by the party upon whom the applicable law, regulation or custom of the jurisdiction imposes the obligation to pay or, where no law, regulation or custom exists, would be borne by the Buyer.

I.    Workforce Provisions

31.    As of the closing, the Buyer would offer employment to certain of the

Selling Debtor Entities' active employees related to the Exhaust Business.  As stated above, the

employees of the Selling Debtor Entities are all salaried employees.  Employees would be

offered compensation and benefits that are substantially comparable in the aggregate to the

compensation and benefits offered prior to closing.  Prior to tendering such offers, the Buyer

would provide the Selling Debtors Entities information to satisfy the Selling Debtor Entities

that this "substantially comparable in the aggregate" requirement is met, which satisfaction

would not be unreasonably withheld by the Selling Debtor Entities.  If not satisfied, the Buyer

would have the opportunity to cure any deficiency.  The Buyer would maintain this requisite

level of compensation and benefits for a minimum of one year from the closing.

32.    The significant terms of the Agreement with respect to employees are as

follows:

(a)    Inactive Employees.  Employees not active as of the closing due to disability, family medical leave, or other approved leaves of absence (the "Inactive

21

Employees") would remain the Selling Debtor Entities' responsibility until the Inactive Employees returned to active employment in accordance with the Selling Debtor Entities' leave policies. The Buyer would offer employment to Inactive Employees who, within one year after the closing date, return to active status.

(b)   <u>Employee Benefit Plans</u>. All employees transferred to the Buyer as of the closing, and such employees' dependents and beneficiaries, would cease to participate in and would no longer be eligible for benefits under the Selling Debtor Entities' benefit plans, but would commence participation in and become eligible for benefits under the Buyer's employee benefits plans. Inactive Employees who became employees of the Buyer, and their dependents and beneficiaries, would cease to participate in and would no longer be eligible for benefits under the Selling Debtor Entities' benefit plans as of the date when such Inactive Employee became an employee of the Buyer. The Buyer would recognize an employee's pre-closing credit service with the Selling Debtor Entities for eligibility and vesting purposes but not benefit accrual purposes with respect to the Buyer's employee benefit plans, but only to the extent recognized under Sellers' comparable employee benefit plan. In no case would credited service be recognized if such recognition would cause a duplication of compensation or benefits as between the Selling Debtor Entities and the Buyer.

(c)   <u>Severance</u>. The Selling Debtor Entities would retain all obligations and liabilities relating to claims (if any) for severance, termination (actual or constructive), redundancy or change in control agreements by U.S. Employees to whom the Buyer is not offering employment triggered by, arising in connection with, or resulting from the transactions contemplated under the Agreement and by U.S. Employees who are offered employment by the Buyer on terms substantially comparable in the aggregate to those in place immediately prior to Closing but who do not accept such employment (provided that under the Selling Debtor Entity's severance plan applicable as of the Closing Date, no severance liability is triggered in connection with a transfer if an employee is offered employment on terms substantially comparable in the aggregate to those in place immediately prior to Closing). Except as stated in the previous sentences, the Buyer would assume all obligations and liabilities relating to any claims for severance, termination (actual or constructive), redundancy, or change in control agreements by U.S. Employees who are offered employment by the Buyer arising after Closing. If a Buyer terminates the employment of a transferred U.S. Employee during the one year period following the Closing Date under circumstances that would have rendered such U.S. Employee eligible for severance benefits had such termination occurred prior to Closing Date, Buyer will provide such employee the greater of (a) the severance benefits provided for under the terms of Seller's severance plan applicable as of the Closing Date, taking into account such U.S. Employee's combined service with Seller and Buyer or (b) the severance benefits under any applicable Buyer's severance plan or policy. After the Closing, neither Delphi nor any Seller or any of their Affiliates will have any liability for severance, redundancy, termination or otherwise for U.S. Employees who accept employment with Buyer in connection with the transactions contemplated herein, except as required by applicable law, in which case Buyer would indemnify and hold Seller harmless for any claims or liabilities.

(d)   <u>COBRA</u>. The Selling Debtor Entities would retain responsibility for all liabilities for claims of employees transferred to the Buyer related to compliance with the

22

requirements of continuation coverage under certain sections of the Internal Revenue Code and ERISA.

J.      Bidding Procedures

33.     The Sale of the Exhaust Business would be subject to higher or otherwise better offers pursuant to the Bidding Procedures.  The  Selling Debtor Entities believe that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Exhaust Business for the benefit of the Sellers, including the Selling Debtor Entities, their estates, their stakeholders, and other interested parties. Accordingly, the Selling Debtor Entities seek approval of the Bidding Procedures for the Sale of the Exhaust Business.

34.     The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and this Court's approval thereof (collectively, the "Bidding Process").  As set forth below, the Debtors are seeking to set a Bid Deadline (as defined below) of December 8, 2008.  In light of the short timeframe between the Bidding Procedures hearing and the proposed Bid Deadline (and recognizing the intervening holiday), upon the filing of this Motion, the Sellers are commencing the process of contacting potential bidders and will open the virtual data room to such parties even prior to the Bidding Procedures hearing to allow such parties the time necessary to conduct due diligence and submit competing bids.

35.    The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> provide,

in relevant part, as follows:[13]

(a)    <u>Participation Requirements</u>:  To ensure that only bidders with
financial ability and a serious interest in the purchase of the Acquired Assets participate in
the Bidding Process, the Bidding Procedures provide for certain requirements for a potential
bidder to become a "Qualified Bidder":  (i) executing a confidentiality agreement in form and
substance satisfactory to Delphi, (ii) providing the Sellers with certain financial assurances,
including current audited financial statements or such other form of financial disclosure and
credit-quality support or enhancement acceptable to the Sellers and their financial advisors as
to such bidder's ability to close, and (iii) submitting a preliminary (non-binding) written
proposal reflecting (A) the purchase price range, (B) any assets and/or equity interests
expected to be excluded, (C) the structure and financing of the transaction, (D) any
anticipated regulatory approvals, (E) the anticipated time frame and any anticipated
impediments to obtaining such approvals, (F) any additional conditions to closing the
qualified bidder may wish to impose, and (G) the nature and extent of any due diligence the
qualified bidder may wish to conduct and the date by which such due diligence would be
completed.

(b)    <u>Due Diligence</u>:  All Qualified Bidders would be afforded an
opportunity to participate in the diligence process.  The Sellers would coordinate the
diligence process and provide due diligence access and additional information as reasonably
requested by any Qualified Bidders.

(c)    <u>Bid Deadline</u>:  All bids would have to be received not later than
11 a.m. (prevailing Eastern time) by December 8, 2008 (the "Bid Deadline").  The Sellers
could extend the Bid Deadline once or successively, but would not be obligated to do so.

(d)    <u>Bid Requirements</u>:  All bids would be required to include the
following documents: (i) a letter stating that the bidder's offer would be irrevocable for the
period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement, together
with all schedules, marked to show amendments and modifications to the agreement,
purchase price, and proposed schedules, (iii) a good faith deposit in the amount of 10% of the
preliminary purchase price, and (iv) satisfactory written evidence of a commitment for
financing or other ability to consummate the proposed transaction.

(e)    <u>Qualified Bids</u>: To be deemed a "Qualified Bid," among other
things, would be required to (i) be on terms and conditions (other than the amount of the
consideration and the particular liabilities being assumed) that are similar to, and are not
materially more burdensome or conditional than those contained in the Agreement, (ii) have
a value of the Purchase Price plus the amount of the Break-Up Fee, plus $650,000 in the case
of an initial Qualified Bid, plus $250,000 in the case of any subsequent Qualified Bids over

---

[13]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the
provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this
summary have the meanings ascribed to them in the Bidding Procedures.

the immediately preceding highest Qualified Bid, (iii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iv) not be conditioned on bid protections or such bid being deemed the Successful Bid by the Sellers, (v) contain acknowledgements and representations that the bidder (A) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, (B) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (C) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the marked agreement, (vi) include a commitment to consummate the purchase of the Acquired Assets within not more than 15 days after entry of the Sale Approval Order, subject to the receipt of any governmental approvals, which would have to be obtained 60 days after entry of such order, and (vii) be received by the Bid Deadline.  The Selling Debtor Entities would retain the sole right to deem a bid a Qualified Bid even if such bid does not conform to one or more of the bid requirements described herein.  Notwithstanding the foregoing, the Buyer would be deemed a Qualified Bidder, and the Agreement would be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale.  A Qualified Bid would be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than the Agreement would be referred to as a "Subsequent Bid."

       (f)   <u>Conduct Of Auction</u>: If the Selling Debtor Entities receive at least one Qualified Bid in addition to that of the Buyer, they would conduct an auction (the "Auction") of the Acquired Assets at 10:00 a.m. (prevailing Eastern time) on December 11, 2008 or such later time as the Sellers notify all Qualified Bidders who have submitted Qualified Bids in accordance with the procedures outlined in the Bidding Procedures, which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two Business Days prior to the Auction, each Qualified Bidder with a Qualified Bid would inform the Selling Debtor Entities whether it intends to participate in the Auction and at least one Business Day prior to the Auction, the Selling Debtor Entities would provide such bidders with copies of the Qualified Bid which the Selling Debtor Entities then believe would be the highest or otherwise best offer for the Acquired Assets, (iii) all Qualified Bidders would be entitled to be present for all Subsequent Bids, (iv) the Sellers would be able to employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of this Court entered in connection with the Sale, and (v) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $250,000 higher than the previous bid or bids, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

       (g)   <u>Selection Of Successful Bid</u>:  As soon as practicable after the conclusion of the Auction, the Sellers, in consultation with their advisors, would review each Qualified Bid and identify the highest or otherwise best offer for the Acquired Assets (the

"Successful Bid") and the bidder making such bid (the "Successful Bidder").  The Selling Debtor Entities would sell the Acquired Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by this Court after the Sale Hearing.

(h)  <u>Sale Hearing</u>: Selling Debtor Entities request that the Sale Hearing be scheduled for December 17, 2008, at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing could be adjourned or rescheduled in Delphi's sole discretion, subject to Bankruptcy Court approval, as necessary, without further notice by an announcement of the adjourned date at the Sale Hearing.  If the Sellers do not receive any Qualified Bids (other than the Qualified Bid of the Buyer), the Selling Debtor Entities will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to the Buyer following entry of the Sale Order.  If the Sellers do receive additional Qualified Bids, then, at the Sale Hearing, the Selling Debtor Entities will seek approval of the Successful Bid, and, at the Sellers' election, one or more next highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale because of:  (i) failure of a condition precedent beyond the control of either the Sellers or the Successful Bidder or (ii) a breach or failure to perform on the part of such Successful Bidder, then the Alternate Bid would be deemed to be the Successful Bid and the Sellers would be authorized, but not directed, to effectuate a sale to the Alternate Bidder subject to the terms of the Alternate Bid of such alternate Bidder without further order of the Court.

(i)  <u>Return Of Good Faith Deposits</u>:  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two Business Days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, will be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).  If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Sellers will not have any obligation to return the Good Faith Deposit, and such Good Faith Deposit will irrevocably become property of the Sellers.  On the Return Date, the Sellers will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

(j)  <u>Reservation Of Rights</u>:  The Sellers, after consultation with the agents for their secured lenders and the Committee:  (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject, at any time any bid (other than the Buyer's bid) that is determined to be:  (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Sellers, their estates, and stakeholders as determined by the Sellers in their sole discretion.

K. Bid Protections

 36. At various times over the course of the last few months, the Buyer has expended, and likely would continue to expend, considerable time, money, and energy pursuing the purchase of the Exhaust Business.  Moreover, the Buyer has engaged in extended arm's length and good faith negotiations regarding a possible sale.  The Agreement is the culmination of these efforts.

 37. In recognition of this expenditure of time, energy, and resources, the Selling Debtor Entities have agreed to provide certain bid protections to the Buyer (the "Bid Protections").  Specifically, the Agreement provides for, and the Selling Debtor Entities respectfully request that this Court approve, a Break-Up Fee payable by the Sellers to the Buyer in the amount of $510,000 (which is approximately 3% of the Purchase Price) if the Sellers (i) consummate an Alternative Transaction in accordance with the Bidding Procedures or (ii) consummate an Alternative Transaction within six months after termination of the Agreement.

 38. In addition but mutually exclusive of the granting of the Break-Up Fee, the Selling Debtor Entities respectfully request this Court's approval of the term in the Agreement providing for reimbursement of the Buyer's reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement under certain circumstances.

 39. If the Buyer becomes entitled to receive any Break-Up Fee or Expense Reimbursement, as applicable, then such Break-Up Fee or Expense Reimbursement would be the sole and exclusive remedy of the Buyer, whether at law or in equity, for any breach by Delphi or any of its affiliates of the terms and conditions of the Agreement or the Deposit Escrow Agreement.  Moreover, the Expense Reimbursement is capped at $600,000.

40.     The Bid Protections were a material inducement for, and a condition of, the Buyer's entry into the Agreement.  The Selling Debtor Entities believe that the Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Buyer in connection with the Sale and (b) the fact that the Buyer's efforts have increased the chances that the Selling Debtor Entities would receive the highest or otherwise best offer for the Acquired Assets.

41.     The Buyer is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement without the approval of the Bid Protections and the Bidding Procedures Order.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, the Selling Debtor Entities would lose the opportunity to obtain what they believe to be the highest and best offer for the Acquired Assets.

42.     Moreover, payment of the Break-Up Fee would not diminish the value of the Selling Debtor Entities' estates.  The Sellers would not expect to pay the Break-Up Fee unless they do so to accept an alternative Successful Bid, which must exceed the price offered by the Buyer by an amount sufficient to pay the Break-Up Fee.  Committing to the Expense Reimbursement pursuant to the terms of the Agreement is a necessary cost of obtaining a binding commitment from the Buyer for the sale of the Exhaust Business.  Moreover, because it is the Company's intention that the portion of the Break-Up Fee and Expense Reimbursement attributable to the Selling Debtor Entities' assets would be in proportion to the allocation of the Purchase Price to such Debtors, the Bid Protections should not unduly burden the estates as under such allocation, the Selling Debtor Entities would only be responsible for approximately 1% of the Break-Up Fee and Expense Reimbursement, or approximately $5,100 or $6,000 (at the capped Expense Reimbursement amount), respectively.  The Selling Debtor Entities thus

request that this Court authorize payment of the Bid Protections, to the extent triggered,

pursuant to the terms and conditions of the Agreement.

L.      Assumption And Assignment Of Contracts

        43.     The Selling Debtor Entities seek authority under section 365 of the

Bankruptcy Code to assume and assign the Assumed U.S. Contracts to the Buyer or the

Successful Bidder, as the case may be.  As set forth on Exhibit E hereto on a contract-by-

contract basis, no cure amounts are believed to be owed on account of the Assumed U.S.

Contracts.  In connection with the proposed Sale, the Selling Debtor Entities also seek

authority under section 363 of the Bankruptcy Code to assign the Postpetition Contracts to the

Buyer or the Successful Bidder, as the case may be.  There are no past due obligations under

the Postpetition Contracts.

        44.     In addition, at least 20 days prior to the Sale Hearing, the Selling Debtor

Entities propose to file with this Court and serve on each non-Debtor party to an Assumed U.S.

Contract a notice substantially in the form attached hereto as Exhibit F (the "Buyer

Assumption/Assignment Notice").  The Buyer Assumption/Assignment Notice would identify

the Buyer as the party that would be assigned all of the Selling Debtor Entities' right, title, and

interest in the Assumed U.S. Contracts, subject to completion of the bidding process provided

under the Bidding Procedures.  The Selling Debtor Entities may serve the Buyer

Assumption/Assignment Notice and the Qualified Bidder Assumption/Assignment Notice (as

defined below) upon each non-Debtor counterparty to the Postpetition Contracts as a means of

fulfilling any requirement under the applicable contract to provide notice of assignment.  Non-

Debtor parties to any Assumed U.S. Contract would be required to file an objection to the

assumption and/or assignment of the Assumed U.S. Contract within ten days of service of the

Buyer Assumption/Assignment Notice, and such parties would be required to state, with

specificity, the legal and factual basis of their objection, unless otherwise ordered by this Court.

45.    Under article 8.2 of the Confirmed Plan, the deadline to seek payment of Cure for a particular executory contract or object to the Debtors' proposed cure amounts for executory contracts has passed.  Pursuant to this Court's orders, this Court has approved the Debtors' determination that there are no prepetition monetary defaults on account of the Assumed U.S. Contracts.  Because a party has no basis on which to object to the cure amounts proposed by the Debtors given the earlier opportunity to do so, the Selling Debtor Entities propose to send notices of assumption and assignment to only counterparties to the Assumed U.S. Contracts and submit that no other notice is necessary.  Moreover, the Selling Debtor Entities do not believe there are any postpetition defaults with respect to each Assumed U.S. Contract.  However, to the extent a counterparty disputes the Selling Debtor Entities' belief that there are no postpetition defaults, the counterparty to the Assumed U.S. Contract may include such claim in its objection to the assumption and assignment of its contract.

46.    On the later to occur of 20 days prior to the Sale Hearing or on the business day following the Bid Deadline, the Selling Debtor Entities propose to send a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as Exhibit G, to each non-Debtor counterparty to an Assumed U.S. Contract identifying any Qualified Bidders as potential parties to which the Assumed U.S. Contracts would be assigned.  The Qualified Bidder Assumption/Assignment Notice would give the Selling Debtor Entities the ability to address promptly any adequate assurance issues that counterparties may have with any of the Qualified Bidders.  Non-Debtor counterparties to any Assumed U.S. Contract would be required to file an objection to the assumption and/or assignment of the

Assumed U.S. Contract within ten days from the service of the Qualified Bidder

Assumption/Assignment Notice, and such counterparties would be required to state, with

specificity, the legal and factual basis of its objection, unless otherwise ordered by this Court.

M.    Notice Of Sale Hearing

47.    Within one business day after entry of the Bidding Procedures Order

(the "Mailing Date"), the Selling Debtor Entities (or their agent) propose to serve the Motion,

the Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the

Bidding Procedures Order by overnight mail, postage prepaid, upon (i) the U.S. Trustee, (ii)

counsel for the Buyer, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity

Committee, (v) counsel for the Debtors' postpetition credit facility, (vi) all entities known to

have expressed an interest in a transaction with respect to the Acquired Assets during the past

six months,[14] (vii) all entities known to have asserted any lien, claim, interest, or encumbrance

in or upon the Acquired Assets, (viii) all federal, state, and local regulatory or taxing

authorities or recording offices, including but not limited to environmental regulatory

authorities, which have a reasonably known interest in the relief requested by the Motion, (ix)

all parties to Assumed and Assigned Contracts, (x) the United States Attorney's office, (xi) the

United States Department of Justice, (xii) the Securities and Exchange Commission, (xiii) the

Internal Revenue Service, (xiv) all entities on the Master Service List (as defined by the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case

---

[14]    All such entities would be served by electronic mail, in addition to overnight mail, to the extent the Debtors
have electronic mail addresses for such parties.

Management Order")), and (xv) such other entities as are required to be served with notices

under the Supplemental Case Management Order.

N.    Publication Notice

48.    The Selling Debtor Entities also propose, pursuant to Fed. R. Bankr. P.

2002(l) and 2002(d), that publication of a notice of the Sale in a form substantially similar to

the form annexed hereto as Exhibit H in the Wall Street Journal (U.S. and International

Editions) and the Detroit Free Press within five business days following entry of the Bidding

Procedures Order or as soon as practicable thereafter, be deemed proper notice to any other

interested parties whose identities are unknown to the Selling Debtor Entities.

Applicable Authority

O.    Approval Of Bidding Procedures

49.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to

use property of the estate "other than in the ordinary course of business" after notice and a

hearing.  11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business

may be authorized if the debtor demonstrates a sound business justification for it.  See Comm.

of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir.

1983) (business judgment rule requires finding that good business reason exists to grant

debtor's application under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124

B.R. 169, 178-179 (D. Del. 1991).

50.    The Second Circuit has held that, although the bankruptcy court sits as

an "overseer of the wisdom with which the bankruptcy estate's property is being managed by

the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between

creditors and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion

Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).  This Court's consideration of a debtor's

section 363(b) motion is a "summary proceeding," intended merely as a means "to efficiently

review the . . . debtor's decision[s] . . . in the course of the swift administration of the

bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with

disputed issues."  Id. at 1098-99.

51.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action taken was in the best interests of the

company.'"  Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res.), 147 B.R. 650, 656 (S.D.N.Y. 1992)(citations omitted).  Thereafter, "[p]arties

opposing the proposed exercise of a debtor's business judgment have the burden of rebutting

the presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector simply

to raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections."  Lionel Corp., 722 F.2d at 1071.

52.    As a rule, the debtor's business judgment "should be approved by the

court unless it is shown to be "so manifestly unreasonable that it could not be based upon

sound business judgment, but only on bad faith, or whim or caprice."  In re Aerovox, Inc., 269

B.R. 74, 80 (Bankr. D. Mass. 2001) (citations omitted).

53.    As set forth above, the Selling Debtor Entities have sound business

justifications for pursuing a sale process at this time.  Although the Selling Debtor Entities

believe that the Exhaust Business is strong, the Exhaust Business does not fit the Debtors'

anticipated product portfolio under their transformation plan.  Thus, the Selling Debtor Entities

have determined that the Exhaust Business' value would be maximized through its divestiture.

Moreover, delaying the sale of the Acquired Assets could result in the erosion of the Exhaust

Business' value.  Accordingly, there is a sound business purpose for pursuing the sale process promptly and in accordance with the Bidding Procedures.

54.    Moreover, a prospective purchaser of assets from a chapter 11 debtor may be reluctant to make an offer because it knows that even if it reaches agreement with the debtor, its offer will be subject to a higher bid by another party.  Pre-approved bidding procedures address these concerns by assuring initial bidders that any auction procedure would be reasonable.  Thus, the Selling Debtor Entities submit that the use of the Bidding Procedures also reflects sound business judgment.

P.    Approval Of The Bid Protections

55.    Bidding incentives encourage potential bidders to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.  See In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled . . . to reject it.");  United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), No. 02 Civ. 2854, 2003 WL 21738964, at *8 n.13 (S.D.N.Y. July 28, 2003) (the court should approve agreements providing bidding incentives "unless they are unreasonable or appear more likely to chill the bidding process than to enhance it").  One court, explaining the force of the business judgment rule in

this context, stated that "the business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large." Integrated Resources, 147 B.R. at 660.

56.     In this district, the three questions for a court to consider when assessing a break-up fee are: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price." Id. at 657-58.

57.     Here, the Selling Debtor Entities seek authority to utilize the Bidding Process and Bid Protections in the event that the Buyer is not ultimately the Successful Bidder or must increase the Buyer's bid price to become the Successful Bidder.  The Bid Protections are fair and reasonable in amount, particularly in view of the efforts previously made and to be made by the Buyer and the risk to the Buyer of being used as a stalking horse.  Moreover, the maximum payment under the proposed Bid Protections – the Expense Reimbursement up to $600,000 (3.5%) or the $510,000 Break-Up Fee (3%) – not only constitutes a fair and reasonable percentage of a proposed purchase price, but is within the range that is customary for similar transactions of this type in the bankruptcy context.  See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior transaction); In re Genuity Inc., Case No. 02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if court approved alternative transaction); In re PSINet, Inc., Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001) (permitting 4.28% break-up fee in the event that seller consummated transaction with alternative bidder); In re Teligent, Inc., Case No. 01-12974

(SMB) (Bankr. S.D.N.Y. 2001) (allowing break up fee ranging from 1.3% to 4.25% depending on value of alternative transaction).  In addition, the payment of the Break-Up Fee or the Expense Reimbursement, as the case may be, is reasonable in light of the significant investment in time and resources that the Buyer would have contributed as the stalking horse bidder.

58.    The Selling Debtor Entities submit that the Bidding Procedures and the Bid Protections have encouraged competitive bidding because the Buyer would not have entered into the Agreement without such provisions.  The Bidding Procedures and the Bid Protections have thus induced a bid that otherwise would not have been made.  Finally, the mere existence of the Bidding Procedures and Bid Protections permits the Selling Debtor Entities to insist that competing bids be materially higher or otherwise better than the Agreement, which would produce a clear benefit to the Sellers, including the Selling Debtor Entities, their estates, and their stakeholders.

Q.    Sale Of The Acquired Assets Free And
       Clear Of Liens, Claims, Encumbrances, And Interests

59.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

36

11 U.S.C. § 363(f).

60.     Here, section 363(f) of the Bankruptcy Code permits the Selling Debtor

Entities to sell the Acquired Assets free and clear of all liens, claims (including successor

liability claims), and encumbrances, other than the Permitted Encumbrances.  See, e.g., In re

Trans World Airlines, Inc., No. 01-0056, 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27,

2001) ("Authorizing the sale [of debtor's assets] free and clear of . . .successor liability claims

achieves the purpose of [Bankruptcy Code] section 363 intended by Congress."), aff'd, 332

F.3d 283 (3d Cir. 2003).  This Court and other courts in the Second Circuit have approved sale

approval orders authorizing the sale of assets free and clear of all interests and claims,

including successor liability claims.  See In re Refco, Inc., Case No. 05-60006 (Nov. 15, 2006)

(authorizing certain debtors to sell customer lists free and clear of interests and claims,

including successor liability claims); In re Refco, Inc., Case No. 05-60006  (Nov. 14, 2005)

(authorizing debtors to sell regulated commodities futures merchant business free and clear of

interests and claims, including successor liability claims); In re PSINet Inc., Case No. 01-

13213 (Jan. 15, 2002) (authorizing debtors to sell certain shares free and clear of liens and

claims, including claims otherwise arising under doctrines of successor liability).  Because the

Buyer is not a successor to the Selling Debtor Entities, successor liability claims should not

follow the Acquired Assets of the Selling Debtor Entities.

61.     Excluding Permitted Encumbrances, each lien, claim, or encumbrance

that is not the result of an assumed liability satisfies at least one of the five conditions of

section 363(f), and the Selling Debtor Entities submit that any such lien, claim, or

encumbrance would be adequately protected by attachment to the net proceeds of the Sale,

subject to any claims and defenses that the Selling Debtor Entities may possess with respect

thereto.  Accordingly, except for the liens resulting from the Assumed Liabilities or the

Permitted Encumbrances, the Selling Debtor Entities request that the Acquired Assets be

transferred to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances,

with such liens, claims, and encumbrances to attach to the proceeds of the Sale of the Acquired

Assets.

R.     The Buyer Is A Good Faith Purchaser Pursuant To
       Section 363(m) Of The Bankruptcy Code And The Transaction
       Contemplated By The Agreement Should Carry The
       Protections Of Section 363(n) Of The Bankruptcy Code

       62.     The Selling Debtor Entities note that, as a result of Delphi's indirect

interest in the Katcon joint venture, the Buyer may fall within the definition of "insider" under

section 101(31)(E) of the Bankruptcy Code.  The Selling Debtor Entities' ownership of Katcon

is as follows:



63.    To the extent that the Sale qualifies as an insider transaction, the Court

should nonetheless grant the Motion and approving the Sale or the Bid Protections because the

transaction satisfies the heightened scrutiny standard to be applied when selling assets to an

insider pursuant to section 363 of the Bankruptcy Code.  Indeed, the Sellers retained an outside

investment bank that marketed the Exhaust Business to dozens of parties before the Sellers

accepted the Buyer's offer.  In addition, after receipt of the Buyer's offer, the parties heavily

negotiated the terms of the Agreement and these negotiations with the Buyer were conducted at

arm's-length and in good faith.  See In re Enron, 335 B.R. 22, 28 (Bankr. S.D.N.Y. 2005)

(observing that "[c]ourts have held that transactions that benefit insiders must withstand

heightened scrutiny before they can be approved under § 363(b)"); In re Med. Software

Solutions, 286 B.R. 431, 445 (Bankr. D. Utah 2002) (observing that sales to insiders are

subject to heightened scrutiny "to show that the sale is proposed in good faith and for fair

value").  Moreover, the Sellers will conduct a public auction to ensure that the Sellers receive

the highest or otherwise best value for the Acquired Assets.  Finally, the Buyer's potential

insider status should not preclude the Buyer from being good-faith purchasers for purposes of

section 363(m).  In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (finding that the

court's decision that the buyer was a good-faith purchaser under section 363(m) rendered

argument that the buyer was an insider moot).

> 64.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b)
> or (c) of this section of a sale or lease of property does not affect the validity of
> a sale or lease under such authorization to an entity that purchased or leased
> such property in good faith, whether or not such entity knew of the pendency of
> the appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci has held that the:

> good faith of a purchaser is shown by the integrity of his conduct during the
> course of the sale proceedings; where there is a lack of such integrity, a good
> faith finding may not be made.  A purchaser's good faith is lost by "fraud,
> collusion between the purchaser and other bidders or the trustee, or an attempt
> to take grossly unfair advantage of other bidders."

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d. Cir. 1997) (quoting In

re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting former

Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen Int'l Airlines Inc.

v. Pan Am Corp. (In re Pan Am Corp.), No. 91 Civ. 8319, 1992 WL 154200, at *4 (S.D.N.Y.

June 18, 1992); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

> 65.    Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

11 U.S.C. § 363(n).

66.     The Selling Debtor Entities submit, and will present evidence at the Sale Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction. Throughout the negotiations, the Buyer has at all times acted in good faith.  Moreover, to the extent that the Acquired Assets are sold to a Successful Bidder, it will be because of a well-planned competitive process and intense negotiations at arm's length to be conducted at an Auction.  As a result of the foregoing, the Selling Debtor Entities request that the court make a finding that the Purchase Price to be paid by the Buyer constitutes reasonably equivalent value and fair consideration under any applicable law and that the Buyer or the Successful Bidder, as the case may be, has purchased the Acquired Assets and assumed the Assigned Contracts and Assumed Liabilities in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Because a key element of a good faith finding is that the Buyer's successful bid is not the product of fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders, the Selling Debtor Entities further request that this Court make a finding that the transactions contemplated by the Agreement are not avoidable under section 363(n) of the Bankruptcy Code.  Moreover, as noted above, even if this Court were to determine that the Buyer is an "insider" as that term is defined under the Bankruptcy Code, for the reasons stated above, this Court should nonetheless determine that the Buyer is a good-faith purchaser for purposes of section 363(m).

S.        The Assumption And Assignment Of The Assumed U.S. Contracts

     67.        Section 365(f)(2) of the Bankruptcy Code provides that:

The trustee may assign an executory contract or unexpired lease of the debtor
only if –

(A)        the trustee assumes such contract or lease in accordance with the
provisions of this section; and

(B)        adequate assurance of future performance by the assignee of such
contract or lease is provided, whether or not there has been a default in such
contract or lease.

11 U.S.C. § 365(f)(2).

     68.        Under section 365(a) of the Bankruptcy Code a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the

debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the

requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

(b)(1)   If there has been a default in an executory contract or unexpired lease of
the debtor, the trustee may not assume such contract or lease unless, at the time
of the assumption of such contract or lease, the trustee –

    (A)        cures, or provides adequate assurance that the trustee will
promptly cure, such default;

    (B)        compensates, or provides adequate assurance that the trustee will
promptly compensate, a party other than the debtor to such contract or lease, for
any actual pecuniary loss to such party resulting from such default; and

    (C)        provides adequate assurance of future performance under such
contract or lease.

11 U.S.C. § 365(b)(1).

     69.        Courts give the phrase "adequate assurance of future performance" a

"practical, pragmatic construction."  EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g

Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d

300 (2d Cir. 1993) (presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds).  Courts have consistently held that the phrase does not require total assurances.  See In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (although no single solution will satisfy every case, the required assurance will fall "considerably short of an absolute guaranty of performance").  In fact, adequate assurance has been provided by demonstrating the Buyer's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

70.    To the extent that any defaults exist under any prepetition executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Acquired Assets or any portion thereof, the Selling Debtor Entities would cure any such default.  The Buyer has the financial resources to perform under the Assumed U.S. Contracts and are contractually required under the Agreement to provide adequate assurance of future performance under each Assumed U.S. Contract.  Moreover, if necessary, the Selling Debtor Entities and/or the Buyer or Successful Bidder, as the case may be, will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Buyer or the Successful Bidder, as the case may be, their experience in the industry, and their willingness and ability to perform under the contracts to be assumed and assigned to them.

71.    The Sale Hearing therefore will provide this Court and other parties-in-interest ample opportunity to evaluate and, if necessary, challenge the ability of the Buyer or the Successful Bidder(s) to provide adequate assurance of future performance under the contracts to be assumed.  This Court therefore should have a sufficient basis to authorize the Selling Debtor Entities to assume and assign the Assumed U.S. Contracts as set forth in the Agreement.

T.    Divestiture Authority And Relief From Transfer Taxes Pursuant to Articles 7.29 And 7.30 Of The Plan And Sections 363, 1123, And 1146 Of The Bankruptcy Code

72.    As set forth above, the Debtors decided to sell or wind-down their non-core product lines that do not fit into the Company's future strategic framework as part of their transformation plan.  Accordingly, Article 7.29 of the Plan contemplates that the Debtors might enter into transactions to continue to divest their non-core businesses and that the Bankruptcy Court could enter an order, on or prior to the effective date of the Plan, authorizing the Debtor(s) to sell assets free and clear of liens, claims, and encumbrances, pursuant to section 363 and 1123 of the Bankruptcy Code.  As described above, section 363(b) of the Bankruptcy Code permits debtors to sell property of the estate outside of the ordinary course of business upon notice and a hearing.  Correspondingly, section 1123(a)(5)(D) allows a confirmed plan of reorganization to provide for the sale of property of the estate free and clear of any lien.  The Selling Debtor Entities are, therefore, authorized pursuant to the Plan to seek the relief requested in the Motion.

73.    Furthermore, Article 7.30 of the Plan provides that:

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, shall not be subject to any stamp taxes and any other similar tax or governmental assessment to the fullest extent contemplated by section 1146(c) of the Bankruptcy Code, and the Confirmation

44

> Order shall direct the appropriate state or local governmental officials or agents
> to forego the collection of any such tax or governmental assessment and to
> accept for filing and recordation any of the foregoing instruments or other
> documents without the payment of any such tax or governmental assessment.

74.     Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(c).  In a recent case, the Supreme Court held that transfers pursuant to a plan of reorganization must occur after confirmation of such plan to avoid transfer taxes.  Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2339 (2008). Likewise, it is well established in the Second Circuit that the section 1146(c) transfer-tax exemption applies to property sold postconfirmation.  In re Jacoby-Bender, Inc., 758 F.2d 840, 841 (2d Cir. 1985).  In light of the foregoing, the Selling Debtor Entities submit that the Sale should be exempt under section 1146(c) of the Bankruptcy Code from any stamp, transfer, sales, recording, or similar taxes.

U.     Waiver Of The Ten-Day Stays Provided By Bankruptcy Rule 6004

75.     Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."

76.     Courts in this district have waived these ten-day stays upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for waiver of ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).

In general, courts will grant waivers when doing so is important to the Debtor's financial health. See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving ten-day stay because "time was of the essence"); In re Decora Industries, Inc., No. 00-4459, 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

77.     The Selling Debtor Entities expect to continue to market the Exhaust Business to prospective buyers immediately after the Court enters the Bidding Procedures Order. During this time, however, Bankruptcy Rule 6004(g) would preclude the Buyer from receiving the protections afforded by the Bidding Protections. In recognition of the time and effort expended by the Buyer in connection the Sale and to reduce the Buyer's risk that the Selling Debtor Entities might obtain a higher and better offer for the Exhaust Business during those ten days, the Buyer should receive the protections afforded by the Bid Protections. The Selling Debtor Entities therefore respectfully request that the Bidding Procedures Order include a waiver of the ten-day stay provided under Bankruptcy Rule 6004(g).

78.     Because the Selling Debtor Entities have demonstrated a need requiring the immediate effectiveness of the Bidding Procedures Order, this Court should exercise its authority under Bankruptcy Rule 6004(g) and waive the ten-day stay as it otherwise would apply to the Bidding Procedures Order.

V.     Conclusion

79.     The Selling Debtor Entities submit that the granting of the Bidding Procedures, Bid Protections, and Notice Procedures, the setting of a Sale Hearing, and the entry of an order approving the Sale of the Acquired Assets free and clear of liens, claims, and

encumbrances, the assumption and/or assignment of the Assumed and Assigned Contracts, and the assumption of the Assumed Liabilities by the Buyer or the Successful Bidder (as the case may be) are in the best interests of the Selling Debtor Entities' estates and will maximize value for all stakeholders.

## Notice

80.    Notice of this Motion has been provided in accordance with the Supplemental Case Management Order, and the Twelfth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered July 23, 2008 (Docket No. 13965).  Specifically, the Selling Debtor Entities have provided notice of this Motion on the Master Service List (as defined in the Supplemental Case Management Order), each party who filed a notice of appearance or request for documents in accordance with Bankruptcy Rule 2002, and all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months.  Further, after entry of the Bidding Procedures Order, notice with respect to the Motion and Sale would be provided in accordance with the Notice Procedures described herein.  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[15]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

[15]    The Debtors have noticed this Motion for the omnibus hearing on November 24, 2008.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on November 24, 2008.  Because this Motion is being filed on fewer than 20 days' notice, parties-in-interest will have until November 20, 2008 to file an objection to entry of the Bidding Procedures Order.

WHEREFORE the Selling Debtor Entities respectfully request that this Court enter an order (a) (i) approving the Bidding Procedures, (ii) granting the Bid Protections, (iii) approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) approving (i) the Sale of the Acquired Assets free and clear of liens, claims, and encumbrances to the Buyer or to the Successful Bidder, (ii) the assumption and/or assignment of the Assumed and Assigned Contracts to the Buyer or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the Buyer or the Successful Bidder, and (c) granting them such other and further relief as is just.

Dated:  New York, New York
        November 14, 2008

                             SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP

                             By:   /s/ John Wm. Butler, Jr.
                                   John Wm. Butler, Jr.
                                   John K. Lyons
                                   Ron E. Meisler
                             333 West Wacker Drive, Suite 2100
                             Chicago, Illinois 60606
                             (312) 407-0700

                                          - and -

                             By:   /s/ Kayalyn A. Marafioti
                                   Kayalyn A. Marafioti
                                   Thomas J. Matz
                             Four Times Square
                             New York, New York 10036
                             (212) 735-3000

                             Attorneys for Delphi Corporation, et al.,
                               Debtors and Debtors-in-Possession