## **Exhibit D**

**Master Sale And Purchase Agreement**

**EXECUTION COPY**

**MASTER SALE AND PURCHASE AGREEMENT**

**AMONG**

**DELPHI CORPORATION**

**AND**

**BIENES TURGON S.A. DE C.V.**

**DATED AS OF**

**NOVEMBER 10, 2008**

# TABLE OF CONTENTS

**PAGE NO.**

| | | |
|---|---|---|
| 1. | Definitions | 1 |
| | 1.1 Certain Defined Terms | 1 |
| | 1.2 Other Interpretive Provisions | 16 |
| | | |
| 2. | Purchase and Sale | 16 |
| | 2.1 Transfers by Sellers and their Affiliates | 16 |
| | 2.1.1 Purchase and Sale of the Sale Securities | 16 |
| | 2.1.2 Purchase and Sale of the Acquired Assets | 16 |
| | 2.1.3 Excluded Assets | 17 |
| | 2.1.4 Post-Closing Asset deliveries | 19 |
| | 2.2 Assumption of Liabilities | 19 |
| | 2.3 Retained Liabilities | 21 |
| | 2.4 Deferred Items | 22 |
| | 2.4.1 Non-Assignability | 22 |
| | 2.4.2 Efforts to Obtain Necessary Consents | 22 |
| | 2.4.3 If Consents Cannot be Obtained | 22 |
| | 2.4.4 Obligation of Buyer to Perform | 22 |
| | 2.4.5 Standard of Care | 22 |
| | | |
| 3. | Purchase Price; Adjustment; Allocation | 23 |
| | 3.1 Deposit Amount | 23 |
| | 3.2 Preliminary Purchase Price | 23 |
| | 3.3 Preparation of Closing Working Capital Statement | 24 |
| | 3.4 Purchase Price Adjustments | 26 |
| | 3.5 Allocation of Purchase Price | 26 |
| | | |
| 4. | Representations and Warranties of Sellers | 27 |
| | 4.1 Organization | 27 |
| | 4.2 Authorization; Enforceability | 27 |
| | 4.3 Capital Stock of Delphi South Africa and Katcon | 27 |
| | 4.4 No Conflicts or Approvals | 28 |
| | 4.5 Sufficiency of Acquired Assets | 28 |
| | 4.6 Compliance with Law; Permits | 28 |
| | 4.7 Proceedings | 29 |
| | 4.8 Absence of Certain Changes | 29 |
| | 4.9 Tax Matters | 29 |
| | 4.10 Employment; Employee Benefits | 29 |
| | 4.11 Intellectual Property | 31 |
| | 4.12 Contracts | 32 |
| | 4.13 Personal Property; Inventory | 33 |
| | 4.14 Real Property | 33 |
| | 4.14.1 Leased Properties | 33 |
| | 4.14.2 Owned Properties | 34 |
| | 4.15 No Brokers' Fees | 34 |
| | 4.16 No Other Representations or Warranties | 34 |
| | 4.17 Fair Disclosure | 34 |

i

| | | | |
|---|---|---|---|
| 5. | | Representations and Warranties of Buyers | 34 |
| | 5.1 | Organization | 34 |
| | 5.2 | Authorization; Enforceability | 35 |
| | 5.3 | No Conflicts or Approvals | 35 |
| | 5.4 | Proceedings | 35 |
| | 5.5 | Solvency | 35 |
| | 5.6 | Anti-Money Laundering | 36 |
| | 5.7 | Investment Representations | 36 |
| | 5.8 | No Inducement or Reliance; Independent Assessment | 37 |
| | 5.9 | Financial Ability | 37 |
| | 5.10 | Adequate Assurance of Future Performance | 37 |
| | 5.11 | No Brokers' Fees | 37 |
| | 5.12 | Compliance with Laws | 38 |
| | 5.13 | Buyer Entities | 38 |
| 6. | | Covenants and Agreements | 38 |
| | 6.1 | Conduct of Business between Signing and Closing | 38 |
| | 6.2 | Bankruptcy Actions | 39 |
| | 6.3 | Assumed U.S. Contracts; Cure Amount | 40 |
| | 6.4 | Non-Competition | 40 |
| | 6.5 | Tax Matters; Cooperation; Preparation of Returns | 41 |
| | 6.6 | Employees; Benefit Plans; Labor Matters | 43 |
| | | 6.6.1    U.S. Employees | 43 |
| | | 6.6.2    European Employees | 46 |
| | | 6.6.3    Asia Pacific Employees | 50 |
| | | 6.6.4    South Africa Employees | 53 |
| | | 6.6.5    Contact with Employees | 53 |
| | 6.7 | Contact with Customers and Suppliers | 54 |
| | 6.8 | Technical Documentation | 54 |
| | 6.9 | Books and Records and Litigation Assistance from and after Closing | 54 |
| | 6.10 | Corporate Names | 55 |
| | 6.11 | Intellectual property Licences | 56 |
| | | 6.11.1    License to Buyers | 56 |
| | | 6.11.2    License to Sellers | 56 |
| | | 6.11.3    Right to Sublicense | 57 |
| | 6.12 | Competition Clearance | 57 |
| | 6.13 | Further Actions | 58 |
| | 6.14 | Further Assurances | 58 |
| | 6.15 | Guarantee by Buyer Parent | 59 |
| | 6.16 | Government Subsidies | 59 |
| | | 6.16.1    India Capital Subsidy | 59 |
| | | 6.16.2    Other Government Subsidies | 59 |
| | 6.17 | Customs Duties | 59 |
| | 6.18 | Buyers' Financing Activities | 60 |
| | 6.19 | Personal Property | 60 |
| | 6.20 | Transition Services | 60 |
| | 6.21 | Reimbursement for Pre-Closing Matters | 60 |
| | 6.22 | China Share Sale | 61 |
| | 6.23 | Milwaukee Asset Sale | 61 |

7.    Conditions to Closing                                                    61
      7.1    Conditions to Obligations of Seller and Buyer                      61
             7.1.1    Sale Approval Order and Bidding Procedures Order          61
             7.1.2    No Law, Judgment, etc                                     61
             7.1.3    Governmental Approvals                                    61
             7.1.4    No Material Adverse Effect                                61
      7.2    Conditions to Obligations of Buyer                                 61
             7.2.1    Accuracy of Warranties                                    61
             7.2.2    Performance of Covenants                                  62
             7.2.3    Delivery of Ancillary Agreements                          62
      7.3    Conditions to Obligations of Sellers                               62
             7.3.1    Accuracy of Warranties                                    62
             7.3.2    Performance of Covenants                                  62
             7.3.3    Delivery of Ancillary Agreements                          62
             7.3.4    Local Legal Entity                                        62

8.    Closing                                                                  62
      8.1    Closing time and Date                                             62
      8.2    Ancillary Agreements                                             63
      8.3    Seller's Deliveries at Closing                                    63
      8.4    Buyer's Deliveries at Closing                                     64

9.    Termination                                                              64
      9.1    Termination                                                       64
      9.2    Break-Up Fee, Expense Reimbursement                               66
      9.3    Procedure and Effect of Termination                               67

10.   Bidding Procedures                                                       67
      10.1   Delphi Initial Bankruptcy Actions                                 67
      10.2   Qualified Bidder                                                   67
      10.3   Bid Deadline                                                       68
      10.4   Due Diligence                                                      69
      10.5   Bid Requirements                                                   69
      10.6   Qualified Bids                                                     69
      10.7   Bid Protection                                                     70
      10.8   Auction, Bidding Increments and Bids Remaining Open               71
      10.9   Acceptance of Qualified Bids                                       72
      10.10  Sale Hearing                                                       72
      10.11  Return of Good Faith Deposit                                       72
      10.12  Reservation of Rights                                             73

11.   Liability, Indemnification                                               73
      11.1   Limitations of Liability                                          73
      11.2   Survival                                                          73
      11.3   Indemnification                                                   73
             11.3.1    Buyers' Indemnification of Delphi                       73
             11.3.2    Sellers' Indemnification of Buyers                      74
             11.3.3.   Limitations                                             74
      11.4   Environmental Matters                                             75
             11.4.1    Indemnification of Seller and Buyer                     75
             11.4.2    Limitations on Liability                                76

|  |  |  |  |
|---|---|---|---|
|  | 11.4.3 | Exclusion for Katcon Facilities | 76 |
|  | 11.4.4 | Remediation of Environmental Damage | 77 |
| 11.5 | Indemnification Procedure |  | 78 |
| 11.6 | Mitigation |  | 79 |

| 12. | Miscellaneous |  | 79 |
|---|---|---|---|
|  | 12.1 | Fees and Expenses | 79 |
|  | 12.2 | Bulk Sales Laws | 79 |
|  | 12.3 | Payments in Dollars | 79 |
|  | 12.4 | Amendment | 79 |
|  | 12.5 | Assignment | 79 |
|  | 12.6 | Waiver | 79 |
|  | 12.7 | Notices | 80 |
|  | 12.8 | Entire Agreement | 81 |
|  | 12.9 | Counterparts | 81 |
|  | 12.10 | Publicity | 81 |
|  | 12.11 | Headings | 81 |
|  | 12.12 | Severability | 81 |
|  | 12.13 | Third Parties | 81 |
|  | 12.14 | Governing Law | 81 |
|  | 12.15 | Dispute Resolution | 81 |
|  | 12.16 | No Right of Setoff | 82 |
|  | 12.17 | Risk of Loss | 82 |
|  | 12.18 | Prorations | 82 |
|  | 12.19 | Enforcement of Agreement | 83 |

## MASTER SALE AND PURCHASE AGREEMENT

**THIS MASTER SALE AND PURCHASE AGREEMENT**, dated as of November 10, 2008 between DELPHI CORPORATION, a Delaware corporation ("**Delphi**") on behalf of itself and the other entities set forth on Schedule 1 (each a "**Seller**," and, collectively with Delphi, the "**Sellers**"), and BIENES TURGON S.A. DE C.V., a Mexican corporation ("**Buyer Parent**"), on behalf of itself or a company to be formed and the other buyers set forth on Schedule 1 (each a "**Buyer**," and, collectively with Buyer Parent, the "**Buyers**"):

**WHEREAS,** Delphi, through its Affiliates referred to in this Agreement, is engaged in the Business (as hereinafter defined);

**WHEREAS,** the Sellers own the Acquired Assets and, directly or indirectly, the Sale Securities (each as hereinafter defined);

**WHEREAS,** on October 8, 2005 (the "**Petition Date**"), the Filing Affiliates (as hereinafter defined) filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§ 101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

**WHEREAS,** as contemplated by Sections 363, 365 and 1146 of the Bankruptcy Code and pursuant to Section 7.29 and 8.5 of the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, as modified, the Sellers desire to sell to the Buyers all of their right, title and interest in and to the Acquired Assets, and Buyers desire to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises and the representations, warranties, covenants and agreements contained in this Agreement and other good and valuable consideration, and intending to be legally bound, the Parties agree as follows:

## 1. DEFINITIONS:

### 1.1 Certain Defined Terms.

As used in this Agreement, the following terms have the meanings set forth below or in the sections referred to below:

"**Accounts Payable**" means all trade accounts payable and other obligations to pay suppliers and third parties to the extent arising exclusively from the conduct of the Business, including intercompany payables, to the extent not settled prior to the Closing Date.

"**Accounts Receivable**" means all trade accounts receivable and other rights to payment from customers to the extent arising from the conduct of the Business or relating to the Acquired Assets, including accounts or notes receivable and the full benefit of all security for such accounts or notes, including intercompany receivables, to the extent not paid prior to the Closing Date.

"**Acquired Assets**" – Section 2.1.2.

"**Acquired Intellectual Property**" means Sellers' right, title and interest in Owned Intellectual Property that is used or held for use exclusively for the Business, including the Intellectual Property listed in Schedule 4.11.1.

"**Administrative Assets**" mean books, records and other administrative assets exclusively used or held for use in the Business, including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, bill of materials, personnel records of employees, billing records, accounting records, other financial records and sale order files; provided, however, that Administrative Assets does not include Intellectual Property or Technical Documentation.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person. For purposes of this definition, "control" means ownership of more than fifty percent (50%) of the shares or other equity interest and having power to elect a majority of the members of the board of directors or similar body governing the affairs of such Person.

"**Agreement**" means this Master Sale and Purchase Agreement (including the Schedules and Exhibits referred to herein, each of which is incorporated herein by reference), as amended, modified or supplemented from time to time.

"**Allocation**" – Section 3.5.1.

"**Alternate Bid(s)**" – Section 10.10.

"**Alternate Bidder(s)**" – Section 10.10.

"**Alternative Transaction**" – Section 9.2.1.

"**Ancillary Agreement(s)**" – Section 8.2.

"**Asia Pacific Employees**" means the employees who are employed by Sellers primarily in the Business in Australia, India or China immediately prior to the Closing Date.

"**Asset Seller(s)**" means Sellers listed as Assets Sellers on Schedule 1, with respect to the Acquired Assets located at the Manufacturing Facilities described on such Schedule.

"**Assumed Liabilities**" – Section 2.2.

"**Assumed U.S. Contracts**" – Section 6.3.

"**Auction**" – Section 10.8.

"**Australia Employee**" – Section 6.6.3(A)(i).

"**Bankruptcy Cases**" – Recitals.

"**Bankruptcy Code**" – Recitals.

2

"**Bankruptcy Court**" – Recitals.

"**Bankruptcy Rules**" mean the U.S. Federal Rules of Bankruptcy Procedure.

"**Benchmark Working Capital**" means twenty Million dollars ($20,000,000).

"**Bid Deadline**" – Section 10.3.

"**Bidding Procedures**" – Section 10.1.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures and certain provisions of this Agreement, including, but not limited to, Buyers' right, under the terms and conditions set forth hereafter, to a Break-Up Fee or Expense Reimbursement.

"**Bidding Process**" – Section 10.1.

"**Break-Up Fee**" – Section 9.2.1.

"**Business**" means the global exhaust emission systems business segment consisting of (i) the Sellers' catalytic converter product line; and (ii) the design, testing, manufacture, development, marketing and sale of the Products by the Sellers at the Manufacturing Facilities and Technical Centers; in each instance, (a) except for the Excluded Assets; (b) as of the Closing Date; and (c) to the extent carried out, either directly or indirectly through Delphi South Africa, Katcon and/or the Asset Sellers as more fully detailed in this Agreement.

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in the City of New York.

"**Buyer Employee Benefit Plans**" means Buyers' pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written statements of policies, practices or understandings relating to employment.

"**Buyer Parent**" – Recitals.

"**Buyer(s)**" – Recitals.

"**Cap Amount**" – Section 11.3.2.B.

"**Cash**" means the sum of cash, cash equivalents and liquid investments plus all deposited but uncleared bank deposits and less all outstanding checks and electronic payments of the Business.

"**China Employee**" – Section 6.6.3(A)(i).

"**Claims**" mean all Losses, Liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses)

3

whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" – Section 8.1.

"**Closing Date**" – Section 8.1.

"**Closing Working Capital Statement**" means the statement of Working Capital of the Business (as adjusted in accordance with this Agreement) as of 11:59 P.M. (Eastern Standard Time) on the Closing Date, which statement shall be prepared and delivered in accordance with Section 3.3, and will separately set forth the Working Capital for the Business.

"**Closing Date Payment**" – Section 3.2.1.

"**Collective Bargaining Agreements**" mean all collective bargaining agreements with any labor union, works council or other representative of Global Sale Employees (including material local agreements, individual workplace agreements, amendments, supplements, letters and memoranda of understanding of any kind).

"**Committee**" – Section 10.3.

"**Competent Authority**" means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

"**Competition/Investment Law**" means any Law that is designed or intended to prohibit, restrict or regulate: (i) foreign investment; or (ii) antitrust, monopolization, restraint of trade or competition.

"**Competitive Business**" – Section 6.4.1.

"**Compliance Matter**" means an event, condition, activity, practice, action or omission at the Manufacturing Facility which gives rise to a breach or violation of an Environmental Law.

"**Confidential Information Memorandum**" means the Confidential Information Memorandum dated Summer, 2008, furnished by Lincoln International Advisors LLC, relating to the Business.

"**Confidentiality Agreement**" means the confidentiality agreement between Buyer Parent and Delphi relating to the Sale, dated May 7, 2008.

"**Consent**" means any consent, approval, authorization, waiver, permit, agreement, license, certificate, exemption, order, registration, declaration, filing or notice of, with or to any Person, or the expiration or termination of the waiting period under any Competition/Investment Law, in each case required to permit the consummation of any of the transactions contemplated by this Agreement.

"**Contracts**" mean purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases, product warranty or service agreements and other binding commitments, agreements, arrangements and undertakings of any nature.

4

"**Controlled Group**" – Section 4.10.8.

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein provided by international treaties or conventions; (ii) moral rights (including rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications therefor; and (v) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Corporate Trademark Rights**" means Trademark Rights used both in the Business and in other businesses conducted directly or indirectly by Delphi.

"**CPA Firm**" – Section 3.3.3.

"**Cure Amounts**" mean all cure amounts payable in order to cure any monetary defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by Asset Sellers and assignment to (and assumption by) Buyers of the Assumed U.S. Contracts under the Sale Approval Order.

"**Data Room**" means the data room(s) (including virtual data rooms) in which the documents and information related to the Business and the Acquired Assets were disclosed to Buyer Parent and its representatives and counsel.

"**Debt Obligations**" - as applied to any Person, mean obligations for borrowed money as evidenced by bonds, debentures, notes, financing or capital (as opposed to operating) leases and other similar instruments, and all guaranties of such obligations.

"**Deductible Amount**" - Section 11.3.2.B.

"**Defending Party**" – Section 12.15.1.

"**Deferred Item(s)**" – Section 2.4.1.

"**Delphi**" – Recitals.

"**Delphi India**" – Section 6.16.1.

"**Delphi South Africa**" means Delphi South Africa (Proprietary) Ltd., a company registered in accordance with the laws of the Republic of South Africa under registration number 2005/030075/07.

"**Demanding Party**" – Section 12.15.1.

"**Deposit Amount**" – Section 3.1.

"**Deposit Escrow Agreement**" means the Deposit Escrow Agreement dated as of the date hereof, executed by and among Buyer Parent, Delphi and Escrow Agent concurrently with this Agreement.

"**EC Merger Regulation**" means Council Regulation (EEC) 4064/89 of the European Community, as amended.

"**Encumbrance**" means with respect to (i) the Sale Securities or any other shares of capital stock owned by Sellers, Buyers or their respective Affiliates: any voting trust, shareholder agreement, proxy or other similar restriction; and (ii) any property or asset (including the Acquired Assets, Sale Securities or any other shares of capital stock owned by Sellers, Buyers or their respective Affiliates): any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or a similar law relating to security interests in and over personal property).

"**Environment**" means the following media (whether individually or commingled): air, water, surface water, groundwater (whether an aquifer or water below the surface of the ground), and ground (whether at the surface or below the surface) and all organisms, ecosystems, flora, and natural resources.

"**Environmental Claim**" means a Proceeding by any Person alleging Liability arising from the existence of or a Release of Hazardous Materials, or a noncompliance with any Environmental Law.

"**Environmental Contamination**" means the presence, in excess of applicable clean-up standards or in violation of applicable Environmental Laws, of a Hazardous Material at, in, under, on or about the Environment at the Manufacturing Facility.

"**Environmental Damages**" means losses, liabilities, costs, damages, fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Contamination, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Agreement.

"**Environmental Law**" means all Laws applicable to the conduct and the operation of the Business in force on or prior to the Closing Date, and relating to pollution or the protection of the Environment.

"**Environmental Permits**" mean any licenses, permits, authorizations and approvals issued by any Governmental Authority and required to be obtained by the Business in respect of the Acquired Assets under Environmental Laws material to the conduct and the operation of the Business.

"**Equityholders' Committee**" – Section 10.3.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Escrow Agent**" means the escrow agent under the Deposit Escrow Agreement.

"**European Employees**" means the employees who are employed by Sellers primarily in the Business in Poland or Luxembourg immediately prior to the Closing Date.

6

"**Excluded Assets**" – Section 2.1.3.

"**Excluded Intellectual Property**" – Section 2.1.3.C.

"**Excluded Software**" means the Software identified on Schedule 2.1.3.N.

"**Expense Reimbursement**" – Section 9.2.2.

"**Filing Affiliates**" mean Delphi and the following Affiliates of Delphi, each of which are included in the Bankruptcy Cases and operate certain portions of the Business or are Sellers: Delphi Automotive Systems LLC and Delphi Technologies, Inc.

"**Final Statement of Working Capital**" – Section 3.3.3.

"**GAAP**" means United States generally accepted accounting principles and practices as in effect from time to time.

"**Global Sale Employees**" means all U.S. Employees, European Employees, Asia Pacific Employees and South Africa Employees who are employees of any Asset Seller-listed on Schedule 1 or of Delphi South Africa, except for Inactive U.S. Employees unless and until they transfer to Buyer.

"**GM**" means General Motors Corporation.

"**Good Faith Deposit**" – Section 10.5.3.

"**Governmental Approval**" means any Consent of, with or to any Governmental Authority.

"**Governmental Authority**" means any United States or foreign federal, state, provincial or local government or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of any such government or political subdivision, and any supranational organization of sovereign states exercising such functions for such sovereign states.

"**Governmental Order**" means, with respect to any Person, any judgment, order, writ, injunction, decree, stipulation, agreement, determination or award entered or issued by or with any Governmental Authority and binding on such Person.

"**Hardware Contracts**" – Section 2.1.2.I.

"**Hazardous Materials**" means any element, mixture, chemical, material, constituent, waste, pollutant, contaminant, or material including petroleum or petroleum-based or petroleum-derived, polychlorinated biphenyls, noxious, radioactive, flammable, corrosive or caustic compound (whether solid, liquid or gaseous) which are regulated or can give rise to Liabilities or Losses under an Environmental Law or an Environmental Permit.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

7

"**Inactive U.S. Employees**" – Section 6.6.1.B.

"**Indemnifiable Losses**" – All Losses actually incurred by the Party or their Affiliates and their respective directors, officers, employees, advisors, representatives and agents, including in connection with any actions, suits, demands, assessments, judgments, lawsuits and settlements, and any such case reduced by the amount of insurance proceeds recovered by said Party from any Person or entity with respect thereto.

"**Indemnification Claim**" – Section 11.5.

"**India Capital Subsidy**" – Section 6.16.1.

"**Individual Claim Amount**" – Section 11.3.2.B.

"**Intellectual Property**" means Patent Rights, Trademark Rights, Copyrights, Software, Trade Secrets and Know-How.

"**Inventory**" means finished goods, raw materials, work-in-process, packaging, stores, stock, supplies and other inventory, exclusively used or held for use in the Business, wherever located.

"**IRC**" means the Internal Revenue Code, as amended, and the rules and regulations promulgated thereunder.

"**KDAC**" means Korea Delphi Automotive Systems Corporation, a Korean company.

"**Katcon**" means Katcon S.A. de C.V., a Mexican company.

"**Know-How**" means proprietary technical and business knowledge and information, regardless of whether recorded and, if recorded, regardless of the media in which it is recorded, such knowledge and information including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Knowledge of Buyers**" or "**Buyers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.A with respect to the matters specified for such individuals on Schedule 1.1.A.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" (or a similar phrase) means the actual, conscious knowledge of the individuals listed on Schedule 1.1.B with respect to the matters specified for such individuals on Schedule 1.1.B.

"**Law**" means any and all applicable laws, rules, regulations, directives, decrees, treaties, statutes, provisions of any constitution and principles (including principles of the common law) of any Governmental Authority, as well as any applicable Governmental Order.

"**Leased Real Property**" – Section 4.14.1.

"**Liabilities**" mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet, including those arising under any Law, Claim, Governmental Order, Contract or otherwise.

"**Licensed Intellectual Property**" means Sellers' rights with respect to Intellectual Property licensed or sublicensed to Sellers from a third party, and that is exclusively used or held for use by the Business.

"**Losses**" mean any and all claims, Liabilities, losses, damages, fines, penalties and costs (in each case including reasonable out-of-pocket expenses (including reasonable attorneys', accountants', technical consultants', engineers' and experts' fees and expenses)).

"**Management Presentations**" mean the presentations, expert meetings, site visits and question and answer sessions, provided by Delphi and Sellers (and their advisers and counsel) to Buyer Parent and the other Buyers (and their advisers and counsel), with respect to the Business, in view of the transactions contemplated herein.

"**Manufacturing Cost**" means costs incurred within the Manufacturing Facilities in carrying out the manufacturing and assembly of replacement Products, including direct material and labor, inbound freight, outbound freight, where applicable,  as well as manufacturing overhead directly attributable to the manufacture and assembly of Products, such as utilities, but excluding indirect costs that may be allocated to but are not directly related to the manufacturing and assembly of Products.

"**Manufacturing Facilities**" means the Business' manufacturing assembly facilities located at Blonie, Poland; Shanghai, China; Clayton, Australia; Gurgaon, India; Port Elizabeth, South Africa; and the Katcon locations in Monterrey, Mexico (Santa Catarina and Guadalupe) and Valencia, Venezuela, each of which is singly referred to as a "**Manufacturing Facility**."

"**Marked Agreement**" – Section 10.5.2.

"**Material Adverse Effect**" means any change, occurrence or development that has a material adverse effect on the business, assets, Liabilities (except to the extent assumed or retained by Sellers' hereunder), results of operations or financial condition of the Business, taken as a whole, including (notwithstanding anything to the contrary contained in this definition) any change, occurrence or development: (a) resulting from a bankruptcy or Chapter 11 filing of GM, unless cured or lifted before Closing, or (b) GM notifying Delphi in writing of a loss of business from GM, awarded to Delphi South Africa as of the date of this Agreement, of greater than five hundred thousand (500,000) catalytic converters, on an annualized basis, for 2009 or 2010; but excluding any change, occurrence or development: (i) resulting from general economic or business conditions; (ii) resulting from strikes or acts of God (e.g. flooding, earthquake, volcano), (iii) resulting from material increases in raw materials or other operating costs that cannot be passed through to customers; (iv) affecting companies in the industry or markets of the Business generally;(v) resulting from any changes in any Law, or in GAAP or any foreign generally accepted accounting principles; (vi) resulting from any existing event, occurrence or circumstance with respect to the Business to which the Buyers have Knowledge as of the date hereof; (vii) that is cured or for which an offer to cure has been made by the Sellers before the date of any termination of this Agreement by Buyer Parent pursuant to Section 9.1 hereof; (viii) resulting from the negotiation, announcement or performance of this

Agreement or the transactions contemplated hereby, including by reason of the identity of any Buyer or communication by any Buyer or its Affiliates of its plans or intentions regarding operation of the Business; (ix) resulting from any act or omission of any Seller taken with the prior consent of any Buyer; (x) resulting from any actions required under this Agreement to obtain any Consent; (xi) resulting from the filing of the Bankruptcy Cases or from any action approved by the Bankruptcy Court; (xii) resulting from the regulatory status of any Buyer, or (xiii) resulting from acts of war or terrorism, whether or not directed at the Business or Buyer.

"**Material Contracts**" – Section 4.12.1.

"**Notice**" – Section 12.15.1.

"**Non-Filing Sellers**" means Sellers not subject to the Bankruptcy Cases.

"**Objection**" – Section 3.3.2.

"**OEM**" means automotive original equipment manufacturer.

"**OFAC**" – Section 5.6.

"**Ordinary Course of Business**" means, in all material respects, the usual, regular and ordinary course of a business consistent with the past practice thereof, provided that where the Sellers' past practices were modified following filing of the Bankruptcy Cases, such term means the ordinary course consistent with custom and practice of the Sellers' from and after the Petition Date to the extent consistent with orders issued in the Bankruptcy Cases.

"**Organizational Document**" means, as to any Person, its certificate or articles of incorporation, its regulations or by-laws or any equivalent documents under the law of such Person's jurisdiction of incorporation or organization.

"**Owned Intellectual Property**" means Intellectual Property in and to which Sellers hold, or have a right to hold, in whole or in part, any right, title and interest.

"**Owned Real Property**" – Section 4.14.2.

"**Party(ies)**" means any Seller or Sellers and any Buyer, Buyers or Buyer Parent.

"**Patent Rights**" mean: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including any invention disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents and patent applications (including provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions; and (iv) rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Permits**" – Section 4.6.

"**Permitted Encumbrance**" means: (i) purchase money security interests arising in the

10

Ordinary Course of Business; (ii) security interests relating to progress payments created or arising pursuant to government contracts; (iii) security interests relating to vendor tooling arising in the Ordinary Course of Business; (iv) Encumbrances in favor of any Sellers' pre-Petition Date secured lenders and post-Petition Date secured lenders which, upon Closing, will attach to the proceeds of the Sale attributable to the sale of the assets of the Filing Affiliates in the same order and priority that the Encumbrances attached to the assets of the Filing Affiliates, subject to all existing defenses and other objections; (v) any Encumbrance that may be created by or on behalf of Buyers; and (vi) in relation to Real Property: (a) Encumbrances relating to any current real estate or ad valorem taxes or assessments not yet delinquent or being contested in good faith by appropriate Proceedings; (b) mechanic's, materialmen's, laborer's and carrier's liens and other similar liens arising by operation of law or statute in the Ordinary Course of Business for obligations which are not delinquent and which will be paid or discharged in the Ordinary Course of Business; (c) matters which an ALTA survey, or a similar survey in any other country, would disclose; (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Real Property; (e) easements, covenants, restrictions and other encumbrances of public record; and (f) such other Encumbrances, the existence of which, in the aggregate, would not materially interfere with or materially affect the use of the respective underlying asset to which such Encumbrances relate as used on the Closing Date.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization, joint venture, limited liability company, Governmental Authority or other entity.

"**Personal Property**" means tangible personal property other than Inventory, owned by an Asset Seller and exclusively used in or held for use in the Business, including production machinery, dunnage, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, related spare parts, business machines, computer hardware and other information technology assets, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures and other tangible personal property, whether located on the Real Property, at the place of business of a vendor or elsewhere; provided, however, that Personal Property does not include personal property owned by any third party or that is part of Shared Assets, Intellectual Property or Technical Documentation.

"**Petition Date**" – Recitals.

"**PGM**" means precious group metals, including platinum, palladium and rhodium.

"**Post-Closing Compliance Matter**" means a Compliance Matter occurring after the Closing Date.

"**Post-Closing Environmental Contamination**" means Environmental Contamination occurring after the Closing Date and any subsequent migration.

"**Post-Petition Contracts**" mean the Contracts of the Filing Affiliates relating to the Business entered into by such Filing Affiliates on or after the Petition Date.

"**Potential Bidder**" – Section 10.2.

"**Pre-Closing Compliance Matter**" means a Compliance Matter occurring at prior to the Closing Date.

11

"**Pre-Closing Environmental Contamination**" means Environmental Contamination occurring prior to the Closing Date and any subsequent migration.

"**Pre-Petition Contracts**" mean the Contracts of the Filing Affiliates relating to the Business entered into by such Filing Affiliates before the Petition Date.

"**Preliminary Purchase Price**" means the Deposit Amount, the Closing Date Payment and the SDECSC Closing Date Payment.

"**Price Adjustment**" – Section 3.2.3.

"**Proceeding**" means any action, claim, demand, suit, proceeding, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, by or before any Governmental Authority.

"**Product(s)**" means catalytic converter and exhaust assemblies and components, except for assemblies and components related to selective NOx reduction in diesel exhaust aftertreatment systems such as diesel fuel reformation and urea injection distribution.

"**Product Warranty Claims**" means Liabilities arising out of, resulting from or relating to product warranty or product return, including all Liabilities arising from, caused by or related to any obligation to implement any replacement, field fix, retrofit, modification or recall campaign with respect to any Product.

"**Property Taxes**" – Section 6.5.1.

"**Purchase Price**" – Section 3.4.4.

"**Qualified Bid**" – Section 10.6.

"**Qualified Bidder**" – Section 10.2.

"**Real Property**" means the Owned Real Property and the Leased Real Property.

"**Release**" means any spill, emission, leaking, placement, burial or discharge of any Hazardous Materials at, in, onto, under or through the Real Property or the Environment.

"**Relevant Items**" – Section 3.3.2.

"**Relevant Transfer**" means a relevant transfer under the Transfer Regulations.

"**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Agreement.

"**Remediation Standards**" means standards which are: (i) the minimum standards based on a risk assessment permitted under Environmental Laws; (ii) applicable to the industrial use and operations at the Real Property as carried out at the Closing Date; (iii) reasonable; and (iv) would be reasonably anticipated to be acceptable (or is acceptable), to a relevant Competent Authority lawfully exercising its powers under Environmental Laws, in each case as in existence as of the Closing Date.

"**Remedy**" - Section 11.4.4.

"**Required Bid Documents**" – Section 10.5.

"**Retained Liabilities**" – Section 2.3.

"**Return Date**" – Section 10.11.

"**Sale**" means the sale, assignment and transfer of the Acquired Assets and Sale Securities from Sellers to Buyers in accordance with this Agreement and the relevant Transfer Agreements.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court entered pursuant to Sections 363 and 365 of the Bankruptcy Code, the form and substance of which is reasonably satisfactory to Buyer, authorizing and approving, among other things, the Sale free and clear of all Encumbrances on Acquired Assets sold by a Filing Affiliate, other than Permitted Encumbrances

"**Sale Hearing**" – Section 10.9.

"**Sale Motion**" means the motion filed by Delphi with the Bankruptcy Court for entry of the Sale Approval Order.

"**Sale Securities**" mean the shares of the Delphi South Africa and Katcon, respectively, as set forth in more detail on Schedule 4.3 to this Agreement.

"**SDECSC**" means Shanghai Delphi Emission Control Systems Company Limited, a Chinese company.

"**SDECSC Closing Date Payment**" – Section 3.2.1.

"**SDN List**" – Section 5.6.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securities Seller**" means Sellers listed as Securities Sellers on Schedule 1, with respect to the Sale Securities described on such Schedule.

"**Security Purchase and Transfer Agreement(s)**" means the agreement(s) for the transfer and sale of the Sale Securities, substantially in the form attached as Exhibit 8.2.2.A and Exhibit 8.2.2.E.

"**Seller Employee Benefit Plans**" means Asset Sellers' and Delphi South Africa's pension, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, severance, vacation, sick leave, paid or unpaid time off, jubilee awards, fringe or welfare benefits, any employment or consulting Contracts, collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or

understandings relating to employment.

"**Seller(s)**" – Recitals.

"**Shared Assets**" means the Personal Property that is not exclusively used by the Business but shared with other business of Asset Sellers.

"**Shared Intellectual Property**" means Intellectual Property (other than Corporate Trademark Rights and Excluded Software) owned by Delphi or any of its Affiliates that is used in the Business and used or held for use in one or more other businesses conducted directly or indirectly by Delphi or an Affiliate but is not used exclusively in the Business.

"**Software**" means computer software and programs, including source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**South Africa Employees**" means the employees who are employed by Delphi South Africa immediately prior to the Closing and identified on Schedule 4.10.1.

"**Straddle Period**" – Section 6.5.4.

"**Subsequent Bid**" – Section 10.6.

"**Successful Bid(s)**" – Section 10.8.6.

"**Successful Bidder(s)**" – Section 10.8.6.

"**Tax**" or "**Taxes**" means any taxes of any kind, including but not limited to those measured on, measured by or referred to as, income, alternative or add-on minimum, gross receipts, escheat, capital, capital gains, sales, use, *ad valorem*, franchise, profits, license, privilege, transfer, withholding, payroll, employment, social, excise, severance, stamp, occupation, premium, goods and services, value added, property, environmental or windfall profits taxes, customs, duties or similar fees, assessments, charges or recapture of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Governmental Authority.

"**Tax Claim**" means any Claim related to Tax or Taxes.

"**Tax Return**" means any return, report, declaration, form, election letter, statement or other information required to be filed with any Governmental Authority with respect to Taxes, including any schedule or attachment thereto or amendment thereof.

"**Taxing Authority**" means, with respect to any Tax, the Governmental Authority thereof that imposes such Tax and the agency, court or other body (if any) charged with the interpretation, administration or collection of such Tax for such Governmental Authority.

"**Technical Centers**" means the prototype, technical, application engineering, and customer support centers used by the Business and which are located at Luxembourg, Luxembourg; Flint, Michigan; and Auburn Hills, Michigan.

14

"**Technical Documentation**" means all documented technical information owned by Sellers that is currently in the files of the Business or primarily used in the Business, in each case pertaining to the design or manufacture of the Products.

"**Third Party**" means any person not a Party or a Competent Authority.

"**Trade Secrets**" mean: (i) all forms and types of financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and regardless of whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and (ii) confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); and (iii) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" mean: (i) trademarks, trade names and service marks; (ii) the goodwill associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; and (iv) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transfer Agreement(s)**" – Section 8.2.2.

"**Transfer Regulation**" means any Law pursuant to which the employment of any employee of an Asset Seller (or any employee of any other Affiliate of Delphi, except for Delphi South Africa and Katcon) who is dedicated to the Business will transfer to a Buyer in connection with the transactions contemplated by this Agreement, including pursuant to Directive 77/187/EC as amended by Council Directive 98/50 EEC and consolidated in Council Directive 2001/23/EEC of the European Parliament and Council and any Law adopted pursuant thereto, as well as the Indian Industrial Disputes Act of 1948, and any Law, works council or union agreement otherwise relating to such transfer of employment and the delivery of information to or consultation with employees or their representatives in connection with the transactions contemplated by this Agreement.

"**Transfer Taxes**" – Section 6.5.5.

"**Transferred Asia Pacific Employee**" means any Transferred Australia Employee, Transferred China Employee and Global Sale Employee in India, and "**Transferred Asia Pacific Employees**" means all Transferred Australia Employees, Transferred China Employees and Global Sale Employees in India.

"**Transferred Australia Employee**" means any Australia Employee who accepts an offer of employment from the local Buyer pursuant to Section 6.6.3(A)(ii).

"**Transferred China Employee**" means any China Employee who accepts an offer of employment from the local Buyer pursuant to Section 6.6.3(A)(ii).

"**U.S. Employees**" means the employees who are employed by Sellers primarily in the Business in the United States immediately prior to the Closing and identified on <u>Schedule 4.10.1</u>.

"**USA PATRIOT Act**" – Section 5.6.

"**Working Capital**" means the addition of usable and marketable Inventory (net of applicable reserves for obsolete or slow moving inventories) from the Manufacturing Facilities located at Blonie, Poland; Shanghai, China; Clayton, Australia; Gurgaon, India; and Port Elizabeth, South Africa plus Accounts Receivable (net applicable allowances for doubtful accounts) from the Manufacturing Facilities located at Blonie, Poland; Clayton, Australia; Gurgaon, India; and Port Elizabeth, South Africa less Accounts Payable from the Manufacturing Facilities located at Blonie, Poland; Clayton, Australia; Gurgaon, India; and Port Elizabeth, South Africa. All Working Capital calculations shall be determined in accordance with GAAP, except for PGM components in SDECSC's Inventory which will be valued based on pass through cost to customers. For the avoidance of doubt, Accounts Receivable and Accounts Payable from the Shanghai, China Manufacturing Facility, as well as Accounts Receivable, Accounts Payable, and Inventory from Katcon will be excluded.

**1.2    Other Interpretive Provisions**. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified. The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation." The meanings given to terms defined herein are equally applicable to both the singular and plural forms of such terms. Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms. Except as otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the lawful money of the United States of America, and all references to "euros" or "€" are deemed references to the lawful money of the European Economic and Monetary Union. References to undertakings by the "Buyer(s)" or the "Seller(s)" are understood to be undertakings by Delphi and Buyer Parent to cause the relevant Buyer to perform, and the relevant Seller to perform, as the case may be; provided, however, that for Katcon and SDECSC undertakings by the "Seller(s)" are understood to be undertakings by Delphi to use best efforts to cause Katcon or SDECSC, respectively, to perform.

**2.    PURCHASE AND SALE**:

**2.1    Transfers by Sellers and their Affiliates**:

**2.1.1    Purchase and Sale of the Sale Securities**. With respect to Delphi South Africa and Katcon, upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, on the Closing Date, the Sellers will sell, transfer, assign, convey and deliver to the Buyers the Sale Securities; and the Buyers will purchase, accept and acquire such Sale Securities, in each case as set forth in Schedule 1.

**2.1.2    Purchase and Sale of the Acquired Assets**. Upon the terms and subject to the conditions set forth in this Agreement as modified or supplemented by any applicable Transfer Agreement, on the Closing Date the Asset Sellers will sell, transfer, assign,

16

convey and deliver to the Buyers, and the Buyers will purchase, accept and acquire from the Asset Sellers, free and clear of all Encumbrances except Permitted Encumbrances, all of the assets and properties described below (collectively, the "Acquired Assets"), subject in each case to Section 2.1.3. Except for the Acquired Assets, the Asset Sellers will retain all other assets, properties, rights and interests owned, used or held by the Asset Sellers. The Acquired Assets consist of all of Asset Sellers' right, title and interest in and to the assets exclusively used or held for use in the Business (other than the Excluded Assets), including:

A.    Administrative Assets.

B.    Personal Property, the machinery and equipment portion of which is set forth on Schedule 2.1.2.B;

C.    Permits.

D.    Inventory.

E.    Contracts.

F.    Real Property set forth on Schedule 2.1.2.F.

G.    Acquired Intellectual Property and Technical Documentation (provided that, with respect to the Technical Centers, the Acquired Assets will consist only of the assets specifically set forth in Schedule 2.1.2.G), including all rights to receive royalties and fees from parties under licenses and technical assistance agreements for the Acquired Intellectual Property.

H.    Accounts Receivable.

I.    Notwithstanding Section 2.1.3.N of this Agreement, individual IT hardware leases primarily relating to the Business, including the leases for the hardware identified on Schedule 2.1.2.G as Acquired Assets, are Contracts included in the Acquired Assets in accordance with the terms of this Agreement (the "**Hardware Contracts**"), although the master or regional lease agreements relating to such hardware are Excluded Assets. Sellers shall be responsible for the transfer of such Hardware Contracts to Buyers.

2.1.3    **Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreements, the following properties and assets will not be included in the Acquired Assets (the "**Excluded Assets**"):

A.    **Third Party Assets.**  Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by an OEM or any other third party, including third party bailed assets, provided, however, that any Contracts or other rights the Sellers have pertaining to such bailed assets will be transferred as part of the Acquired Assets.

B.    **Shared Assets**.

C.    **Excluded Intellectual Property.**  All Intellectual Property not

17

exclusively used, exclusively arising from, or exclusively relating to the Business as currently conducted, including Corporate Trademark Rights (collectively, "**Excluded Intellectual Property**") (subject to the limited rights granted to the Buyers pursuant to Sections 6.10 and 6.11).

   **D.**    **Insurance.**  Insurance coverage and insurance policies relating to the operations of the Business, including any and all claims and rights thereunder and the proceeds thereof and all prepaid insurance premiums.

   **E.**    **Records.**  Any books, records and other materials that any Seller is required by Law to retain, all Tax Returns of any Seller for time periods prior to Closing, and related work papers, and all "Delphi" marked sales and promotional materials and brochures.

   **F.**    **Claims.**  All rights, claims, defenses, causes of action or claims of any kind relating to either Excluded Assets or Retained Liabilities or any business of the Sellers other than the Business as well as all rights and causes of action against third parties arising out of events occurring before or in connection with the Closing to the extent such rights and causes of action relate to the ownership of the Acquired Assets or the operation of the Business prior to or arising out of Closing, but excluding any of the foregoing which are related to any Assumed Liabilities.

   **G.**    **Tax Refunds; Duties.**  All tax refunds, credits, prepayments or deferrals and any duty, VAT, or other similar refunds or rights to such refunds relating to any customs transactions occurring prior to the Closing.

   **H.**    **Bankruptcy Rights.**  All of the rights and claims of the Filing Affiliates available to Filing Affiliates under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, 553, 558 and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

   **I.**    **Personnel Records.**  All work histories, personnel and medical records of employees of any Seller who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, the appropriate Buyer(s) will be provided the originals of all personnel and medical records of all Global Sale Employees after posted written notice or other appropriate notice to such Global Sale Employees if legally required or if Sellers so elects.  All such personnel and medical records of Global Sale Employees are books and records governed by Section 6.9 of this Agreement.  Upon written request of Sellers (or an Affiliate of Sellers), Buyer will promptly return or cause to be returned any and all of these records to Sellers (or an Affiliate of Sellers as directed) at which time Sellers, so far as legally permissible under applicable data protection, medical confidentiality or similar Laws, will provide the appropriate Buyer(s) with copies of the personnel and medical records of such employees.  If an employee objects to provision of personnel or medical records to any Buyer, the records will not be provided, except to the extent Sellers determine that provision of the records to such Buyer

18

over the objections by the employee is permitted by the applicable local law without adverse consequences to Sellers or to any Affiliate of Sellers.

**J.** **Privileged Information and Materials.** Information and materials protected by the attorney-client privilege (or its equivalent in jurisdictions outside the United States), or that, in the case of environmental-related documents, Sellers consider to be proprietary information.

**K.** **Technical Centers.** All real property (including any improvements located thereon) and Personal Property located at the Technical Centers, other than those assets which are specifically set forth on Schedule 2.1.2.G.

**L.** **Certain Real Property.** Real property not set forth on Schedule 2.1.2.F.

**M.** **Common Delphi Services.** Common Delphi services and agreements, including legal, human resources, purchasing, customs, insurance, assets management, finance, tax, and information technology and support.

**N.** **Inventory and Other Assets.** (i) All Inventory, products, rights, properties, assets and businesses of the Business which will have been transferred or disposed of by Sellers prior to Closing in the Ordinary Course of Business; (ii) any document, information, Permit, Contract, Intellectual Property or other asset the transfer of which is prohibited by any Law; (iii) equipment, Excluded Software and other assets listed on Schedule 2.1.3.N; and (iv) Global Sale Employee vehicles of any engineering pool.

**O.** **Permits.** Any and all permits, licenses and utilities and other Contracts currently used which are non-transferable, or that are shared with other businesses within the legal entity that currently operates the local portion of the Business.

**P.** **SDECSC Excluded Net Assets.** Accounts Payable and Accounts Receivable of SDECSC that cannot be included in Acquired Assets per local Law and Tax regulations, along with associated Accounts Receivable and Accounts Payable between SDECSC and other Sellers.

**Q.** **KDAC Excluded Assets.** Any and all assets, properties, rights and interests of, in or to KDAC, whether or not relating to the Business.

**2.1.4** **Post-Closing Asset Deliveries**. Should Sellers, in their reasonable discretion, determine after the Closing that books, records or other materials constituting Acquired Assets are still in the possession of Sellers or any of its Affiliates, Sellers will or will cause such Affiliates to promptly deliver them to Buyers at no cost to Buyers. Should Sellers or Buyers, in their reasonable discretion, determine after the Closing that books, records or other materials constituting Excluded Assets were delivered to Buyers, Buyers will promptly return them to Sellers at no cost to Sellers.

**2.2** **Assumption of Liabilities**. The Buyers will assume, and will thereafter pay, perform and discharge as and when due, and will be liable with respect to only the following Liabilities of the Asset Sellers, exclusively arising out of the Business on an arm's length basis

and any Liabilities otherwise assumed by Buyers pursuant to the terms of this Agreement, a Transfer Agreement, any other Ancillary Agreement, or by operation of Law in the course of acquiring the Business (collectively, the "**Assumed Liabilities**"):

      **2.2.1**    All Liabilities of the Asset Sellers arising on or after Closing under any Contracts, licenses, Permits, leases and other agreements included in the Acquired Assets and assigned or otherwise transferred to Buyers or any relevant Buyer Affiliate pursuant to the terms of this Agreement or the Transfer Agreements and other obligations relating to any Buyer's ownership or use of the Acquired Assets;

      **2.2.2**    All Liabilities relating to the Acquired Assets arising on or after the Closing Date, including Claims and other obligations relating to any Buyer's ownership or use of the Acquired Assets;

      **2.2.3**    Obligations to pay for assets, goods or services relating to the Business which are ordered in the Ordinary Course of Business by any Asset Seller on or prior to the Closing that are received by the relevant Buyer, Delphi South Africa or Katcon after Closing;

      **2.2.4**    All Product Warranty Claims and Liabilities in the nature of product liability, including any Liability for Claims made for injury to persons and/or property arising from, caused by or arising out of the design, manufacture or assembly of any Product manufactured, assembled or shipped on or after Closing (regardless of whether any such Products are designed before or after Closing), and any Liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products; provided, however, that after Closing the relevant Buyer will supply replacement parts to the relevant Seller on a Manufacturing Costs basis with respect to pre-closing Product Warranty Claims if and to the extent Buyer at such time has the capability to make such replacement parts without design, manufacturing or other changes not paid for by Seller. Until the earlier of Closing or when Delphi shall have determined pursuant to Section 10.9 that Buyer Parent has not submitted the highest or otherwise best Qualified Bid, Buyer shall have access to all Manufacturing Facilities and may have a representative of Buyer, at Buyer's expense, monitor the manufacturing process and quality control process regarding the manufacture of Products to be included in the Inventory.

      **2.2.5**    Any and all Environmental Claims, Losses or Liabilities relating to (i) the existence of or a Release of Hazardous Materials at, on, in, or under the Environment at any Real Property arising on or after Closing or (ii) compliance with or failure to comply with any Environmental Laws or any Environmental Permit related to the operation of the Business arising on or after Closing in respect of the Acquired Assets, whether in effect prior to or after the Closing Date;

      **2.2.6**    All obligations to fulfill orders relating to Products of the Business outstanding on the Closing Date;

      **2.2.7**    Any and all Tax Claims, to the extent that they arise out of or relate to the period after Closing;

**2.2.8** Liabilities with respect to Global Sale Employees except as otherwise set forth in Section 6.6;

**2.2.9** All Liabilities that any Buyer assumes or agrees to pay for or be responsible for pursuant to the terms of this Agreement or any Ancillary Agreement or as required by Law due to the transfer of the Business to the Buyers.

**2.2.10** Tax Liabilities related to the debonding or other change in customs status of the Acquired Assets resulting from the Buyer not establishing the required legal entities and obtaining the necessary authorizations from the relevant Governmental Authority to receive the Acquired Assets in their customs status.

**2.2.11** Accounts Payable.

**2.2.12** All Liabilities and obligations of Seller, arising on or after the Closing, with respect to any license rights granted to third parties under the Acquired Intellectual Property, including but not limited to license rights granted to Katcon and KDAC, and any Contracts granting such license rights that relate exclusively to the Acquired Intellectual Property shall be included among the Contracts acquired by Buyer pursuant to Section 2.1.2.E.

**2.3**    **Retained Liabilities.**  Except as referred to in Section 2.2, Buyer will not assume or be deemed to have assumed, and will have no Liability with respect to, any Liabilities of any Asset Seller and such Asset Seller will continue to be responsible for such Liabilities (collectively, "**Retained Liabilities**") including the following:

**2.3.1**    All Product Warranty Claims and Liabilities in the nature of product liability, including any Liability for Claims made for injury to persons and/or property, arising from, caused by or arising out of the manufacture or assembly of any Product manufactured or assembled before Closing, and any liability arising from, caused by or arising out of any defective or insufficient warnings, labeling or instructions contained on or provided in connection with any such Products;

**2.3.2**    Any and all Environmental Claims, Environmental Contamination, Environmental Damages or Liabilities for which Asset Sellers have indemnification obligations to Buyers pursuant to Section 11.4 of this Agreement, including the liabilities referred to in Schedule 2.3.2.

**2.3.3**    Liabilities in respect of employment performed prior to the Closing, except as provided in Section 6.6;

**2.3.4**    Tax Liabilities for periods ending on or before the Closing Date;

**2.3.5**    Subject to Section 2.2.3, any Liability of Asset Sellers arising prior to the Closing Date for administrative fees and expenses that are "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code;

**2.3.6**    Liabilities related to the Excluded Assets;

**2.3.7**    Any Liability arising out of any Proceeding pending as of the Closing Date, relating to a Retained Liability; and

21

**2.3.8**  Except as expressly provided in Section 2.2, any Liability of the Asset Sellers arising out of, relating to, or incurred in connection with the businesses retained by the Asset Sellers and which are not arising out of, relating to or incurred exclusively in connection with the Business.

## 2.4    Deferred Items:

**2.4.1    Non-Assignability.**   To the extent that any Contract or Permit included in the Acquired Assets is not capable of being assigned (whether pursuant to Section 365 of the Bankruptcy Code or, if inapplicable, then pursuant to the terms of such Contract or other applicable law) to Buyer at the Closing without the Consent of the issuer thereof or the other party thereto or any third party (including a Governmental Authority), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law ("**Deferred Item(s)**"), this Agreement will not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained.

**2.4.2    Efforts to Obtain Necessary Consents.**  At the applicable Buyer's request, the applicable Seller will, at its expense, use commercially reasonable efforts, and the applicable Buyer will, at its expense, cooperate with Sellers, to obtain the necessary Consents and to resolve the impracticalities of assignment referred to in Section 2.4.1 before or after the Closing.

**2.4.3    If Consents Cannot be Obtained.**  To the extent that the Consents referred to in Section 2.4.1 are not obtained by the applicable Seller, or until the impracticalities of assignment referred to therein are resolved, Sellers' sole responsibility with respect to such matters, notwithstanding Section 2.1.2, will be to use, during the twelve (12) month period commencing with the Closing, commercially reasonable efforts, at no cost to Sellers, to: (i) provide to Buyer the benefits of any Deferred Item; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyer, without incurring any financial obligation to Buyer; and (iii) enforce for the account of Buyer and at the cost of Buyer (including attorneys' fees) any rights of Sellers arising from any Deferred Item referred to in Section 2.4.1 against such issuer thereof or other party or parties thereto; <u>provided</u>, that Buyer shall not incur fees or expenses for services performed by Seller under this Section 2.4.3.

**2.4.4    Obligation of Buyer to Perform.**  To the extent that any Buyer is provided the benefits pursuant to Section 2.4.3 of any Deferred Item, such Buyer will perform, on behalf of Sellers, for the benefit of the issuer thereof or the other party or parties thereto (including payment obligations) the obligations of Sellers thereunder or in connection therewith and if such Buyer fails to perform to the extent required herein, Sellers, without waiving any rights or remedies that they may have under this Agreement or applicable Laws, may suspend their performance under Section 2.4.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or Sellers may perform at Buyer's sole cost and expense, in which case Buyer will reimburse Sellers' costs of such performance immediately upon receipt of an invoice therefor.

**2.4.5    Standard of Care.**  Sellers will have no Liability to any Buyer arising

out of the provision of the benefits of the Deferred Items other than for gross negligence or willful misconduct and will have no Liability for actions taken in accordance with the request or direction of Buyer Parent or its Affiliates. Buyers will reimburse Sellers and will hold Sellers harmless from and against all Liabilities, incurred or asserted as a result of Sellers' post-Closing direct or indirect ownership, management or operation of the Deferred Items.

3.      **PURCHASE PRICE; ADJUSTMENT; ALLOCATION:**

      **3.1      Deposit Amount.**  Buyer Parent has delivered to the Escrow Agent pursuant to the terms of the Deposit Escrow Agreement One Million Seven Hundred Thousand dollars ($1,700,000) (ten (10%) percent of the Preliminary Purchase Price) in immediately available funds (such amount, together with the interest accrued thereon prior to the Closing less any escrow fees, the "**Deposit Amount**"), to be held by the Escrow Agent in an interest bearing account reasonably acceptable to Buyer Parent to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures (which procedures will be set forth in the Deposit Escrow Agreement):

            **3.1.1**  Delphi and Buyer Parent will jointly instruct the Escrow Agent to deliver the Deposit Amount on the Closing Date, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement;

            **3.1.2**  Upon any breach by a Buyer of this Agreement or the Bidding Procedures, whether or not such breach results in termination of this Agreement, Delphi and Buyer Parent will jointly instruct the Escrow Agent to deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Delphi in the Deposit Escrow Agreement, to be retained by Delphi; or

            **3.1.3**  Upon termination of this Agreement in accordance with the termination provisions set forth in Article 9 for any reason other than a Buyer breach, then, on: (i) the date which is sixty (60) days after such termination; or (ii) in the event that an Alternative Transaction is completed, the Return Date (which ever is earlier) Delphi and Buyer Parent will jointly instruct the Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Buyer Parent in the Deposit Escrow Agreement, to be retained by Buyer Parent.

    **3.2      Preliminary Purchase Price:**

        **3.2.1**  On the Closing Date and subject to the terms and conditions of this Agreement, the Preliminary Purchase Price shall be paid as follows:

        **A.**      Buyer Parent, on behalf of Buyers, will pay to Delphi or the Sellers designated by Delphi an amount equal to Seventeen Million dollars ($17,000,000), less the Deposit Amount and less the SDECSC Closing Date Payment (the "**Closing Date Payment**") by wire transfer of immediately available funds, to one or more accounts designated by Delphi.

        **B.**      Buyer or Buyer Affiliate of the Acquired Assets of SDECSC

located in Shanghai, China shall pay directly to SDECSC an amount equal to Four Million Two Hundred Thousand dollars ($4,200,000) reflecting the part of the Preliminary Purchase Price allocated to such Acquired Assets, by wire transfer of immediately available funds, to an account designated by SDECSC, in local currency of China, Renminbi, or US Dollars and in accordance with the foreign exchange control Law applicable to legal entities in WGQ Free Trade Zone and the China Sale Agreement entered into between such Buyer or Buyer Affiliate and SDECSC, substantially in the form set forth in Exhibit 8.2.2.C (the "**SDECSC Closing Date Payment**").

**C.**    Subject to the terms and conditions of the Deposit Escrow Agreement, the Deposit Amount shall be released to Delphi or the Sellers designated by Delphi pursuant to Section 3.1.1.

**3.2.2**    The Preliminary Purchase Price shall be subject only to an adjustment equal to the difference between the amount of the Benchmark Working Capital and the Final Statement of Working Capital pursuant to Section 3.4 (the "**Price Adjustment**").

## 3.3    Preparation of Closing Working Capital Statement:

**3.3.1**    Within forty (40) days after the Closing Date, Delphi will prepare and deliver to Buyer Parent a Closing Working Capital Statement.  The Closing Working Capital Statement shall be prepared in accordance with Schedule 3.3.1, applied on a basis consistent with the financial statements of the Sellers.  In addition, the Closing Working Capital Statement will be based on a physical inventory of the Inventory of the Business, and utilizing a methodology, and accounting therefor, in accordance with GAAP, except for PGM components in SDECSC's Inventory which would be valued based on pass through cost to customers, within thirty (30) days before or after the Closing Date.  Each Party's out-of-pocket costs associated with such physical inventory count will be borne separately by such Party.  Buyers will, after Closing and pending agreement or final determination of the Closing Working Capital Statement, allow Delphi and its Affiliates and their accountants, agents and advisers such access to the Business, all relevant employees and all relevant records, information and other documentation (and will, upon request, provide copies thereof) as is reasonably necessary to enable Sellers to prepare the Closing Working Capital Statement and to settle the Final Closing Working Capital Statement, including access to and the services of key personnel.

**3.3.2**    Buyer Parent will, within thirty (30) days after the delivery by Delphi of the Closing Working Capital Statement, complete its review of such statement. If Buyer Parent disagrees with the Closing Working Capital Statement, Buyer Parent will, on or before the last day of such thirty (30) day period, inform Delphi in writing (the "**Objection**") of disagreements which, on an item by item basis (individually) or in relation to a series of related items, in the aggregate exceed $100,000 (collectively, "**Relevant Items**").  The Parties agree that the Objection will not include objections to the valuation process used to arrive at the Closing Working Capital Statement unless Buyer can demonstrate that the valuation process used was inconsistent with the methodology referenced in Section 3.3.1. Any Objection will specify in reasonable detail the nature of any disagreement so

24

asserted, and include all supporting schedules, analyses, working papers and other documentation. If: (i) no such Objection has been timely provided to Seller; or (ii) the sum of all Relevant Items fails to exceed $100,000, then: (a) the Closing Working Capital Statement will be deemed to be the Final Working Capital Statement; and (b) Sellers' calculations will be final and binding on the Parties of all items therein.

**3.3.3** If Buyer Parent delivers an Objection set forth in Section 3.3.2, then Delphi will have thirty (30) days following the date it receives the Objection to review and respond to the Objection. If Delphi and Buyer Parent are unable to resolve all of their disagreements with respect to the determination of the foregoing items by the fifteenth (15th) day following Delphi's response thereto, after having used their good faith efforts to reach a resolution, they will refer their remaining differences to a mutually agreed accounting firm (the "**CPA Firm**"), who will, acting as experts in accounting and not as arbitrators, determine on a basis consistent with the requirements of Section 3.3, and only with respect to the specific Relevant Items remaining disputed, whether and to what extent, if any, the Closing Working Capital Statement requires adjustment. Delphi and Buyer Parent will request the CPA Firm to use its commercially reasonable efforts to render its determination within thirty (30) days. In resolving any disputed item, the CPA Firm: (i) will be bound by the principles set forth in this Section 3.3 and Schedule 3.3.1; (ii) will limit its review to matters specifically set forth in the Objection that remain disputed; and (iii) will not assign a value to any item greater than the greatest value for such item claimed by either Party or less than the smallest value for such item claimed by either Party. The CPA Firm's determination will be conclusive and binding upon Delphi and Buyers. Delphi and Buyers will make reasonably available to the CPA Firm all relevant books and records, any work papers (including those of the Parties' respective accountants subject to any conditions such accountants may impose) and supporting documentation relating to the Closing Working Capital Statement, and all other items reasonably requested by the CPA Firm. The "**Final Statement of Working Capital**" shall be: (i) the Closing Working Capital Statement if the Parties so agree or if so determined in accordance with Section 3.3.2; or (ii) if an Objection is made under Section 3.3.2, the Closing Working Capital Statement, as adjusted pursuant to the agreement of the Parties, or as adjusted by the CPA Firm. The fees, costs and expenses of the CPA Firm under this Section 3.3.3: (i) will be borne by Buyer Parent in the proportion that the aggregate dollar amount of such disputed items so submitted that are unsuccessfully disputed by Buyer Parent (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted; and (ii) will be borne by Delphi in the proportion that the aggregate dollar amount of such disputed items so submitted that are successfully disputed by Buyers' Parent (as finally determined by the CPA Firm) bears to the aggregate dollar amount of such items so submitted. Whether any dispute is resolved by agreement among the Parties or by the CPA Firm, changes to the Closing Working Capital Statement may be made only for items as to which Buyer Parent has taken exception in the Objection. Except as set forth above, each Party will bear its own expenses incurred in this dispute resolution process, including fees of its accountants, attorneys and other agents.

**3.4**    **Purchase Price Adjustments:**

**3.4.1**    If the Final Statement of Working Capital is less than the amount of the Benchmark Working Capital, Delphi will pay to Buyer Parent an amount equal to such deficiency. If the Final Statement of Working Capital is greater than the amount of the Benchmark Working Capital, Buyer Parent will pay to Delphi an amount equal to such excess. Such deficiency or excess payment will be paid in immediately available funds within three (3) Business Days after the ultimate determination of the Final Statement of Working Capital as provided in this Section 3.4.

**3.4.2**    Notwithstanding the foregoing provisions of this Article 3, if any assets or businesses of Delphi South Africa or Katcon or any Acquired Assets are divested or sold in order to secure the Governmental Approvals contemplated by Section 6.12.1 (Competition Clearance) in one or more transactions that, had such transactions occurred prior to Closing, would have impacted the amount of the Benchmark Working Capital, then the amount of the Benchmark Working Capital shall be reduced to give effect to such divestiture or sale as if such divestiture or sale occurred prior to Closing and the Purchase Price shall be adjusted accordingly. In that event, all calculations pursuant to this Section 3.4 will be effected using such adjusted amount of the Benchmark Working Capital.

**3.4.3**    Notwithstanding the foregoing provisions of this Article 3, any adjustment referred to in this Section 3.4 which is allocated to the Acquired Assets of SDECSC located in Shanghai, China shall be paid to, or refunded by, SDECSC directly according to Section 3.4.1. The China Sale Agreement shall reflect such adjustment of the SDECSC Closing Date Payment.

**3.4.4**    The Preliminary Purchase Price plus or minus the Price Adjustment pursuant to Section 3.4 is referred to as the "**Purchase Price**."

**3.5**    **Allocation of Purchase Price:**

**3.5.1**    The Parties agree to allocate the Purchase Price among the Business and the agreements provided herein for transfer of the Business to Buyers and their Affiliates, for all purposes (including financial, accounting and tax purposes) (the "**Allocation**") in a manner consistent with the Allocation Schedule attached as Schedule 3.5.1.

**3.5.2**    Buyer Parent and Delphi will each report the federal, state and local income and other Tax consequences of the purchase and sale contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the IRC (or any successor form or successor provision of any future tax law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable law. Delphi will provide Buyer Parent and Buyer Parent will provide Delphi with a copy of any information required to be furnished to the Secretary of the Treasury under IRC Section 1060.

26

**4.      REPRESENTATIONS AND WARRANTIES OF SELLERS:**

Each Seller represents and warrants, as of the date hereof, severally, to Buyers with respect to the Acquired Assets being sold by such Seller, Delphi South Africa or Katcon, as the case may be (except that the Filing Affiliates represent and warrant, jointly and severally, with respect to the Acquired Assets of the Filing Affiliates), as follows:

**4.1      Organization.**  Each Asset Seller, Delphi South Africa and Katcon is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.  Each Seller, Delphi South Africa and Katcon has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, and is duly qualified or licensed to do business and in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed: (i) would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect on the ability of Sellers to consummate the transactions contemplated by this Agreement; or (ii) with respect to Delphi South Africa or Katcon, would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

**4.2      Authorization; Enforceability.**  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, as applicable, each Seller has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and the Ancillary Agreements to which such Seller is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements.  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, if applicable, the execution and delivery of this Agreement and the Ancillary Agreements by each Seller that is a party to any of such agreements, and the performance by each of them of their respective obligations under any of such agreements, in the case of Delphi have been, and in the case of the other Sellers, prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Seller.  This Agreement has been duly executed and delivered by Delphi, and the Ancillary Agreements will be duly executed and delivered by Delphi and each Seller, as applicable, and, assuming due authorization, execution and delivery by Buyer Parent and Buyers, constitutes, or will constitute, a valid and binding agreement of Delphi and each Seller, as applicable, enforceable against each of them in accordance with their respective terms, except: (a) as enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting the enforcement of creditors' rights generally from time to time in effect and by general equitable principles relating to enforceability; (b) that enforceability of the provisions of this Agreement requiring consummation of the Sale is subject to entry and effectiveness of the Sale Approval Order; and (c) that enforceability of all other provisions of this Agreement is subject to entry and approval of the Bidding Procedures Order.

**4.3      Capital Stock of Delphi South Africa and Katcon.**

**4.3.1**   Except as set forth on Schedule 4.3: (i) Sellers' one hundred percent (100%) equity stake in Delphi South Africa is owned, directly or indirectly, by the relevant Seller as set forth on Schedule 1 to the Agreement; (ii) the Sale Securities of Delphi South Africa are duly authorized, validly issued, fully paid up and non-assessable and are not subject to any preemptive rights; and (iii) there are no voting trust agreements or other contracts, agreements or arrangements, to

which any Seller is a party, restricting voting or dividend rights or transferability with respect to the Sale Securities of Delphi South Africa.

    **4.3.2**   Except as set forth on <u>Schedule 4.3</u>: (i) Sellers' forty percent (40%) equity stake in Katcon is owned, directly or indirectly, by the relevant Seller as set forth on <u>Schedule 1</u> to the Agreement; (ii) the Sale Securities of Katcon held by the relevant Seller are duly authorized, validly issued, fully paid up and non-assessable and are only subject to the preemptive right of the joint venture partner in Katcon as set forth in <u>Schedule 4.3</u>; and (iii) there are no voting trust agreements or other contracts, agreements or arrangements, to which any Seller is a party, restricting voting or dividend rights or transferability with respect to the Sale Securities of Katcon.

    **4.3.3**   Except as set forth on <u>Schedule 4.3</u>, there is no outstanding security, right, subscription, warrant, option, privilege or other agreement, commitment or contract, preemptive, contractual or otherwise that gives the right to: (i) purchase or otherwise receive or be issued any share capital of Delphi South Africa and Katcon or any security of any kind convertible into or exchangeable or exercisable for any share capital of Delphi South Africa or Katcon; or (ii) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to a holder of share capital of Delphi South Africa or Katcon, including any rights to participate in the equity or income of Delphi South Africa or Katcon, or to participate in or direct the election of any directors of Delphi South Africa or Katcon or the manner in which any share capital of Delphi South Africa or Katcon are voted.

    **4.4**    <u>**No Conflicts or Approvals.**</u>  Subject to entry and effectiveness of the Bidding Procedures Order and the Sale Approval Order, except as set forth on <u>Schedule 4.4</u>, the execution, delivery and performance of this Agreement and the Ancillary Agreements by Delphi and each Seller that is a party thereto do not: (i) violate the Organizational Documents of any of the Sellers; (ii) violate any Governmental Order or Law applicable to any of the Sellers or Delphi South Africa, or any of their respective properties or assets; or (iii) require any Governmental Approval, except as set forth in this Agreement and in each case for consents, approvals, authorizations of, declarations or filings with the Bankruptcy Court, except: (x) as would not, individually or in the aggregate, have a Material Adverse Effect or a material adverse effect on the ability of Sellers to consummate the transactions contemplated by this Agreement; or (y) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

    **4.5**    <u>**Sufficiency of Acquired Assets.**</u>  The Acquired Assets, the assets of Delphi South Africa and Katcon and the Intellectual Property rights to be licensed from Sellers to Buyers pursuant to Section 6.11.1, together with the Excluded Assets set forth on Schedule 4.5, which Sellers will provide within 10 days from signing this Agreement, comprise all of the assets reasonably necessary to carry on the Business in all material respects as it is now being conducted. Buyer acknowledges and agrees that the Sellers have prepared Schedule 4.5 to the best of Sellers' Knowledge and Sellers have included all Excluded Assets they deem material.

    **4.6**    <u>**Compliance with Law; Permits.**</u>  Except as set forth on <u>Schedule 4.6</u> to the Knowledge of Sellers, the Business is currently in material compliance with all Laws, except where noncompliance would not reasonably be expected to have a Material Adverse Effect. To the Knowledge of Sellers, the Sellers possess all material licenses, consents, approvals,

permits and other Governmental Approvals ("**Permits**") necessary to own, lease and operate the Acquired Assets and Delphi South Africa, except where the failure to have such Permits would not have a Material Adverse Effect.

**4.7**    **Proceedings**. Except for claims raised in connection with the pendency of the Bankruptcy Cases, and for the Claims and other items set forth in Schedule 4.7 (and except with respect to compliance with Environmental Laws, which is covered by Section 4.13), there are no material Proceedings pending or, to the Knowledge of Sellers, threatened in writing against any of the Acquired Assets or Delphi South Africa.

**4.8**    **Absence of Certain Changes**. Except as set forth in Schedule 4.8 or as otherwise contemplated or expressly permitted by this Agreement, since September 10, 2008: (i) the Business has been conducted only in the Ordinary Course of Business; and (ii) there has not been any change or development in or affecting the Business that has had, or would reasonably be expected to have, a Material Adverse Effect.

**4.9**    **Tax Matters**:

     **4.9.1**    Delphi South Africa has duly and timely filed with the appropriate federal, state, local and foreign authorities or governmental agencies, all material Tax Returns required to be filed with respect to Delphi South Africa and, when filed, to Seller's Knowledge were true, correct and complete.

     **4.9.2**    Delphi South Africa is not a party to any tax allocation, tax sharing agreement or tax indemnity arrangement, except as provided in this Agreement, under which Buyer Parent could be subject to tax or other Liability after the Closing.

     **4.9.3**    Except as disclosed in Schedule 4.9, or as reflected in the financial statements of Delphi South Africa, Delphi South Africa has not received any: (i) notice of underpayment of Taxes or other deficiency that has not been paid with respect to, in connection with, associated with or related to, Delphi South Africa; or (ii) any objection to any Tax Return, with respect to, in connection with, associated with or related to, Delphi South Africa. Except as disclosed in Schedule 4.9, all deficiencies asserted or assessments made as a result of any examinations with respect to, in connection with, associated with or related to, Delphi South Africa have been fully paid or are fully reflected as a liability in the financial statements of Delphi South Africa.

     **4.9.4**    The Sellers have withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any Global Sale Employee.

**4.10**    **Employment; Employee Benefits**. Regarding the Global Sale Employees:-

     **4.10.1** Schedule 4.10.1 contains a true and complete list of all Global Sale Employees, including: (i) each such person's title or job/position/job code; (ii) each such person's job designation (i.e., salaried or hourly); (iii) each such person's location of employment; (iv) each such person's employment status (i.e., actively employed or not actively at work (due to, e.g., illness, short-term disability, sick leave, authorized leave or absence, etc.)); (v) each such person's current annual

29

base rate of compensation; (vi) each person's date of hire; (vii) employee number/identifier; (viii) name of employer/division; (ix) date of birth; (x) gender; (xi) variable pay; (xii) hours of work and (xiii) any material, individual specific provisions relating to such person's employment (e.g., non-compete agreement, separation pay agreement, etc.) to the extent permitted to be disclosed under applicable Law (including local privacy laws).

**4.10.2** Schedule 4.10.2 sets forth a list of each Seller Employee Benefit Plan.

**4.10.3** Copies of the following materials have been delivered or made available to Buyer Parent with respect to each Seller Employee Benefit Plan to the extent applicable: (i) current plan documents; (ii) the most recent determination letter from the Internal Revenue Service; (iii) the most recent summary plan description and summary of material modifications to the extent not included in the summary plan description in each case distributed to employees; (iv) current agreements and other documents relating to the funding or payment of benefits; and (v) the most recent actuarial valuation report, if applicable.

**4.10.4** Except as set forth in Schedule 4.10.4, or where the failure to comply would not reasonably be expected to have a Material Adverse Effect, the Seller Employee Benefit Plans are in substantial compliance with their terms and applicable requirements of ERISA, the IRC and other Laws (if applicable). Each Seller Employee Benefit Plan and related trust which is intended to be qualified within the meaning of Section 401 or 501, as applicable, of the IRC has received a favorable determination letter as to its qualification and, to the Knowledge of Sellers, nothing has occurred that could reasonably be expected to adversely affect such determination.

**4.10.5** Except: (i) as set forth in Schedule 4.10.5 and (ii) routine claims for benefits by participants and beneficiaries, there are no pending or, to the Knowledge of Sellers, threatened Proceedings with respect to any Seller Employee Benefit Plans that would result in a Liability that would have a Material Adverse Effect.

**4.10.6** Except as set forth in Schedule 4.10.6, no event or condition has occurred in connection with which any of the Sellers could be subject to any Liability or Encumbrance under Title IV of ERISA that would have a Material Adverse Effect.

**4.10.7** None of the Filing Affiliates currently have or for the past five (5) years have had an obligation to contribute to a "multiemployer plan" as defined in Section 3(37) of ERISA or Section 414(f) of the IRC.

**4.10.8** With respect to each group health plan that is subject to Section 4980B of the IRC maintained by any entity described in this Section 4.10.8, each member of the Controlled Group (as defined below) have complied with the continuation coverage requirements of Section 4980B of the IRC and Part 6 of Subtitle B of Title I of ERISA, except where the failure to so comply would not reasonably be expected to have a Material Adverse Effect. For purposes of this Agreement, "**Controlled Group**" means any trade or business (whether or not

30

incorporated): (i) under common control within the meaning of Section 4001(b)(1) of ERISA with any of the Sellers; or (ii) which together with any of the Sellers is treated as a single employer under Section 414(t) of the IRC.

**4.10.9** Schedule 4.10.9 lists all or substantially all Collective Bargaining Agreements. Seller has given access or delivered to Buyer true, correct and complete copies of each of the Collective Bargaining Agreements. Except as disclosed on Schedule 4.10.9, Seller is in material compliance with each Collective Bargaining Agreement.

**4.10.10** Except as disclosed on Schedule 4.10.10, or as reflected in the Collective Bargaining Agreements, with respect to the Business: (i) there is no labor strike, dispute, slowdown or stoppage actually pending or, to Sellers' Knowledge, threatened against or involving any Asset Seller or Delphi South Africa; (ii) no Asset Seller nor Delphi South Africa has in the past three (3) years experienced any work stoppage or other labor difficulty or organizational activity; (iii) no labor grievance is pending as of the date of Schedule 4.10.10; and (iv) no Asset Seller nor Delphi South Africa has any labor negotiations in process with any labor union or other labor organization, in each case relating to the Global Sale Employees. Except as set forth on Schedule 4.10.10, or as would not have a Material Adverse Effect, there are no pending claims with respect to the Business against any Asset Seller or Delphi South Africa whether under applicable Laws, employment agreements or otherwise asserted by any Global Sale Employee, including claims on account of or for: (a) overtime pay, other than overtime pay for work done during the current payroll period; (b) wages or salary for any period other than the current payroll period; (c) any amount of vacation pay or pay in lieu of vacation or time off; or (d) any violation of any statute, ordinance or regulation relating to minimum wages or maximum hours at work, and, to Sellers' Knowledge, there are no such claims which have yet to be asserted.

## 4.11    Intellectual Property:

**4.11.1** Schedule 4.11.1 lists all patents and patent applications and all trademark registrations and applications therefor included in the Acquired Intellectual Property. Except: (i) as set forth in Schedule 4.11.1; (ii) instances in which such patents or patent applications are jointly owned with a third party; or (iii) rights retained by employee-inventors pursuant to Law, and subject to Permitted Encumbrances and the rights and limitations established by the Material Contracts, Sellers own the entire right, title and interest in such patents, trademark registrations and applications, and have the right to transfer Sellers' right, title and interest in them as set forth in this Agreement.

**4.11.2** Schedule 4.11.2 lists all internet domain names, registrations, mask work registrations, copyright registrations and all software development agreements and technology development agreements exclusively used in the Business.

**4.11.3** Subject to Permitted Encumbrances and the rights and limitations established by the Material Contracts, Sellers own or otherwise have the right to transfer all other Acquired Intellectual Property and license the Shared Intellectual Property as set forth in this Agreement.

31

**4.11.4** Except as set forth in <u>Schedule 4.11.4</u>, Sellers have no Knowledge of any written claim or notice of or by any third party of infringement or misappropriation arising out of Seller's use of the Acquired Intellectual Property, resulting from the operation of the Business during the last three (3) years, that would have a Material Adverse Effect.

**4.11.5** Except as set forth in <u>Schedule 4.11.5</u>, there is no third-party software utilized by the Business.

**4.12    Contracts:**

**4.12.1** <u>Schedule 4.12.1</u> sets forth a list as of the dates set forth therein of each of the following Contracts, which are included in the Acquired Assets or to which Delphi South Africa is party and bound as of the date of this Agreement, other than Seller Employee Benefit Plans (collectively, the "**Material Contracts**"):

**A.**    Partnership, joint venture agreements or other agreements involving a sharing of profits or expenses by Delphi South Africa or the relevant Seller party thereto with respect to the Business;

**B.**    Indentures, mortgages, loan agreements, capital leases, security agreements or other agreements for the incurrence of Debt Obligations, other than letters of credit, overdrafts and other current-account credit facilities entered into in the Ordinary Course of Business, in each case exceeding $250,000;

**C.**    Guarantees of the obligations of other Persons involving the potential expenditure by the Sellers in respect of the Business after the date of this Agreement of more than $250,000 in any instance;

**D.**    Contracts under which any Seller has licensed material Acquired Intellectual Property to, or material Licensed Intellectual Property from, any other Person;

**E.**    Contracts involving the expenditure by the Sellers or Delphi South Africa in respect of the Business of more than $250,000 in any instance for the purchase of materials, supplies, equipment or services, excluding any such Contracts that are terminable by the Sellers without penalty on not more than one hundred eighty (180) days notice; and

**F.**    Contracts providing that Delphi South Africa or any Seller in respect of the Business will receive future payments aggregating more than $250,000 per annum or $1,000,000 in the aggregate prior to the expiration of such Contract.

**4.12.2** Except as set forth in <u>Schedule 4.12.2</u>, and other than with respect to monetary defaults by Sellers under Material Contracts that are curable by payment of all Cure Amounts, if applicable, to the Knowledge of Sellers: (i) no event has occurred that constitutes (or with notice or lapse of time would constitute) a default (except with respect to defaults that need to be cured under Section 365 of the Bankruptcy Code for Sellers to assume and assign such

32

Material Contracts to Buyer, if applicable) that would reasonably be expected to have a Material Adverse Effect on: (a) Delphi South Africa or any Seller under any Material Contract; or (b) to the Knowledge of Sellers, any other party to any Material Contract; (ii) there are no material unresolved disputes under any of the Material Contracts; and (iii) the assignment of any Material Contract pursuant to this Agreement will not result in termination of, or result in a right of termination under, any such Material Contract, except where such termination of, or right of termination thereunder, would not have a Material Adverse Effect.

**4.12.3** Except as set forth on Schedule 4.12.3, Sellers have no contracts with any United States Governmental Authority or to Seller's Knowledge, any government contractor, with regard to any Products sold by the Business.

**4.12.4** No Material Contract was entered into on other than an arm's length basis. Except as set forth on Schedule 4.12.4, Sellers have not assigned any of their rights under any of the Material Contracts to any person or entity.

**4.13    Personal Property.**

**4.13.1** Except as set forth on Schedule 4.13.1, the Asset Sellers and Delphi South Africa have good title to, or hold by valid and existing lease or license, all Personal Property reflected in the Businesses' books of account, except with respect to assets disposed of in the Ordinary Course of Business.

**4.13.2** Delphi South Africa and the Asset Sellers, with respect to the Acquired Assets, will own, or have valid leasehold interests in, all Personal Property and Inventory being transferred to Buyers under this Agreement, and to Sellers' Knowledge, all transferred Personal Property used by the Business are in such condition (considering age and purpose for which they are used) as to enable the Business to be conducted as currently conducted without material disruption.

**4.13.3** Schedule 4.13.3 sets forth a list of substantially all machinery, equipment and capitalized tools with a book value greater than $100,000 included in the Acquired Assets or owned by Delphi South Africa.

**4.14    Real Property:**

**4.14.1    Leased Properties.**  Schedule 4.14.1 lists all real property leased or subleased by Delphi South Africa or any Asset Seller constituting Acquired Assets (the "**Leased Real Property**").  Delphi has made available to Buyer Parent true and complete copies of the leases and subleases covering the Leased Real Property (as amended to the date of this Agreement).  With respect to each lease and sublease and except as otherwise specified on Schedule 4.14.1 or where the failure of any of the following to be true and correct would not reasonably be expected to have a Material Adverse Effect:

**A.**    Such lease or sublease is, to the Knowledge of Sellers, in all material respects, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether

considered in a Proceeding in equity or at law);

**B.**       (i) None of Delphi South Africa or the Asset Sellers is in material breach under any such lease or sublease and, to the Knowledge of Sellers, no event has occurred which, with the passage of time or expiration of any grace period would constitute a material breach of Delphi South Africa's or any Asset Seller's obligations under such lease or sublease (except with respect to breaches that need not be cured under Section 365 of the Bankruptcy Code for the Filing Affiliates to assume and assign such leases or subleases to Buyer, if applicable); and (ii) none of Delphi South Africa or the Asset Sellers has received a notice of material breach with respect to such lease or sublease; and

**4.14.2 Owned Properties.**   Schedule 4.14.2 lists all real property owned by an Asset Seller, which constitutes Acquired Assets, or of Delphi South Africa (the "**Owned Real Property**").

**4.15**    **No Brokers' Fees.**   Sellers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Buyers would be liable.

**4.16**    **No Other Representations or Warranties.**   Except for the representations and warranties contained in this Article 4, neither Delphi nor any other Person makes any other express or implied representation or warranty to Buyers, and in particular (but without limitation) no Seller is making any representations with respect to any plan(s) of Buyers for the future conduct of the Business, or any implied warranties of merchantability or fitness for a particular purpose.  For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence or with respect to the information contained in the Confidential Information Memorandum, Data Room, Management Presentations, reports or any financial forecasts or projections or other information furnished by Delphi or any Seller or their officers, directors, employees, agents or representatives or in any other documents or other information not contained in this Agreement or the Ancillary Agreements.

**4.17**    **Fair Disclosure.**   Any matter disclosed in any Schedule to this Agreement will be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations, warranties or Schedules contain a reference to such Schedule.   Any information obtained by any Buyer or any of its advisers during the course of any investigation by or on behalf of Buyer into the affairs of the Business, the Acquired Assets or Delphi South Africa or Katcon shall be deemed to have been disclosed to Buyer Parent as if set forth in the relevant Schedule(s) to this Agreement.

## 5.    **REPRESENTATIONS AND WARRANTIES OF BUYERS:**

Each Buyer hereby represents and warrants, severally, to each of the Sellers, as of the date hereof and of the Closing Date, as follows:

**5.1**    **Organization.**   Each Buyer is a legal entity duly incorporated or organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization.   Each Buyer has the requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted and is duly qualified or licensed to do business and is in good standing in the jurisdictions in which the ownership of its property or the conduct of its business requires such

qualification or license, except where the failure to be so qualified or licensed would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the ability of Buyers to consummate the transactions contemplated by this Agreement.

      **5.2**    **Authorization; Enforceability.**  Each Buyer has the requisite corporate or other organizational power and authority to: (i) execute and deliver this Agreement and each Ancillary Agreement to which such Buyer is a party; (ii) perform its obligations hereunder and thereunder; and (iii) consummate the transactions contemplated by this Agreement and the applicable Ancillary Agreements. The execution and delivery of this Agreement and the Ancillary Agreements by each Buyer that is a party to any of such agreements, and the performance by each of them of their respective obligations under any such agreements, in the case of Buyer Parent have been, and in the case of the other Buyers prior to the Closing Date will be, duly authorized by all necessary corporate action on the part of such Buyer.  This Agreement has been duly executed and delivered by Buyer Parent, and the Ancillary Agreements will be duly executed and delivered by the applicable Buyers and, assuming due authorization, execution and delivery by Sellers, constitutes, or will constitute, a valid and binding agreement of the applicable Buyers, enforceable against each of them in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

      **5.3**    **No Conflicts or Approvals.**  The execution, delivery and performance by Buyers of this Agreement and each Ancillary Agreement to which such Buyer is a party and the consummation by Buyers of the transactions contemplated hereby and thereby do not and will not: (i) violate, conflict with or result in a breach by any Buyer of the Organizational Documents of any Buyer; (ii) violate, conflict with or result in a breach of, or constitute a default by any Buyer (or create an event which, with notice or lapse of time or both, would constitute a default) or give rise to any right of termination, cancellation or acceleration under, any note, bond, mortgage, indenture, deed of trust, license, franchise, permit, lease, contract, agreement or other instrument exclusively related to the Business to which any Buyer or any of their properties or assets may be bound; (iii) violate or result in a breach of any Governmental Order or Law applicable to any Buyer or any of their respective properties or assets; or (iv) except for applicable requirements of the HSR Act, the EC Merger Regulation and other applicable Competition/Investment Law, require any Governmental Approval, except, with respect to the foregoing clauses (ii), (iii) and (iv) above, as would not, individually or in the aggregate, have a Material Adverse Effect on the ability of Buyers to consummate the transactions contemplated by this Agreement.

      **5.4**    **Proceedings.**  There are no Proceedings pending or, to the Knowledge of Buyers, threatened against any of the Buyers that could reasonably be expected to restrain, delay or inhibit the ability of Buyers to consummate the transactions contemplated by this Agreement.  None of the Buyers is subject to any Governmental Order that could reasonably be expected to restrain, delay or otherwise inhibit the ability of Buyers to consummate the transactions contemplated by this Agreement.

      **5.5**    **Solvency.**  Upon the consummation of the transactions contemplated by this Agreement: (i) none of the Buyers will be insolvent; (ii) none of the Buyers or the other legal entities constituting the Business will be left with unreasonably small capital; (iii) none of the Buyers or the Business will have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of Buyers and the other legal entities constituting the Business will not be

impaired; and (v) immediately following Closing, Buyers individually and in the aggregate will have sufficient capital to continue the Business as a going concern.

**5.6    Anti-Money Laundering.**  Buyers are in compliance with: (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which any Buyer operates or does business.  Neither any Buyer nor any of its directors, officers or affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and no Buyer is affiliated in any way with, or providing financial or material support to, any such persons or entities.  Buyer Parent agrees that should it or any other Buyer, or any of their directors, officers or affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Buyer Parent will inform Delphi in writing immediately.

**5.7    Investment Representations.**

**5.7.1**    Each Buyer who is acquiring Sale Securities is acquiring such Sale Securities for such Buyer's own account solely for investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or the applicable securities Laws of any other jurisdiction.  Each Buyer agrees that it will not transfer any of the Sale Securities, except in compliance with the Securities Act and with the applicable securities Laws of any other jurisdiction.

**5.7.2**    Each Buyer who is acquiring Sale Securities is an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act.

**5.7.3**    Each Buyer who is acquiring Sale Securities understands that the acquisition of the Sale Securities to be acquired by it pursuant to the terms of this Agreement involves substantial risk.  Each such Buyer and its officers have experience as an investor in securities and equity interests of companies such as the ones being transferred pursuant to this Agreement and acknowledges that it can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that such Buyer is capable of evaluating the merits and risks of its investment in the Sale Securities to be acquired by it pursuant to the transactions contemplated hereby.

**5.7.4**    Each Buyer further understands and acknowledges that the Sale Securities have not been registered under the Securities Act or under the applicable securities Laws of any other jurisdiction and agrees that the Sale Securities may not be transferred unless such transfer is pursuant to an effective registration statement under the Securities Act or under the applicable securities Laws of any other jurisdiction, or, in each case, an applicable exemption therefrom.

36

**5.7.5** Each Buyer who is acquiring Sale Securities acknowledges that the offer and sale of the Sale Securities has not been accomplished by the publication of any advertisement.  Neither Buyer Parent nor any other Buyer has any plan or intent to sell any of the Acquired Assets or the assets of Delphi South Africa or Katcon outside the Ordinary Course of Business.

**5.8** <u>No Inducement or Reliance; Independent Assessment</u>:

**5.8.1** With respect to the Sale Securities, the Acquired Assets, the Business or any other rights or obligations to be transferred hereunder or under the Transfer Agreements or pursuant hereto or thereto, Buyers have not been induced by and have not relied upon any representations, warranties or statements, whether express or implied, made by Delphi, any of its Affiliates, or any agent, employee, attorney or other representative of Delphi representing or purporting to represent Delphi or any Seller that are not expressly set forth herein or in the Transfer Agreements (including the Schedules and Exhibits hereto and thereto), whether or not any such representations, warranties or statements were made in writing or orally, and none of Delphi, any Affiliate of Delphi, or any agent, employee, attorney, other representative of Delphi or other Person will have or be subject to any Liability to Buyer Parent, any Buyer or any other Person resulting from the distribution to Buyer Parent, or Buyer Parent's use of, any such information, including the Confidential Information Memorandum and any information, documents or material made available in the Data Room or any Management Presentations or in any other form in expectation of the transactions contemplated by this Agreement.

**5.8.2** Each Buyer acknowledges that it has made its own assessment of the present condition and the future prospects of the Business and is sufficiently experienced to make an informed judgment with respect thereto.  Each Buyer acknowledges that neither Delphi nor any of its Affiliates has made any warranty, express or implied, as to the prospects of the Business or its profitability for any Buyer, or with respect to any forecasts, projections or business plans prepared by or on behalf of Delphi and delivered to any Buyer in connection with Buyers' review of the Business and the negotiation and the execution of this Agreement.

**5.9** **Financial Ability.**  Buyers have the financial ability and will have available at Closing sufficient Cash in immediately available funds to pay the Preliminary Purchase Price and thereafter to pay the Purchase Price if greater than the Preliminary Purchase Price, and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement.  In particular, Buyer Parent has provided to Sellers evidence of its financial ability to consummate this Agreement and the transactions contemplated hereby.

**5.10** **Adequate Assurance of Future Performance.**  Each Buyer has provided or will be able to provide, at or prior to Closing, adequate assurance of its future performance under each Assumed U.S. Contract to the parties thereto (other than Sellers) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance will be necessary thereunder with respect to any Assumed U.S. Contract.

**5.11** **No Brokers' Fees.**  Buyers have employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the

transactions contemplated hereby for which Sellers would be liable.

     **5.12    Compliance with Laws.**  Buyers are in compliance with all Laws applicable to Buyers, except with respect to those violations that could not reasonably be expected to result in the issuance of an order restraining, enjoining or otherwise prohibiting Buyer from consummating the transactions contemplated by this Agreement.

     **5.13    Buyer Entities**. Buyers have existing legal entities in place at each of the jurisdictions where the assets of the Business will be acquired, or if legal entities do not exist in one or more jurisdictions, Buyers will have formed legal entities such that the representations in Sections 5.1, 5.2, and 5.3, above, are accurate with respect to such Buyer affiliated entities within sixty (60) days after this Agreement is signed (but in no event later than ten (10) business days before Closing) for all jurisdictions other than China. The parties recognize that the establishment of an entity in China may take longer than sixty (60) days.  Buyer shall use its best efforts to establish an entity in China as soon as reasonably possible, but no later than ten (10) business days before Closing.  Anything contained herein to the contrary notwithstanding, the parties acknowledge that the Closing on the purchase of the Acquired Assets of SDECSC may occur at a date later than the Closing set forth in Section 8.

**6.    COVENANTS AND AGREEMENTS:**

     **6.1    Conduct of Business between Signing and Closing:** Except as: (i) contemplated by this Agreement; (ii) disclosed on Schedule 6.1; (iii) required by, arising out of, relating to or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iv) required by or resulting from any changes of applicable Laws; or (v) set forth in the disclosure of this Agreement or the transactions contemplated hereby, from and after the date of this Agreement and until the Closing, Delphi will cause the Asset Sellers and Delphi South Africa to conduct the operations of the Business in the Ordinary Course of Business, or, if applicable, in accordance with orders entered by the Bankruptcy Court, and use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relationships with the Business.  During the period from the date of this Agreement until Closing or until Delphi shall have determined pursuant to Section 10.9 that Buyer Parent has not submitted the highest or otherwise best Qualified Bid, whichever is earlier, upon reasonable advance notice, the Sellers shall afford to the Buyers, their officers, employees and authorized representatives reasonable access during normal business hours to the offices, properties, employees and business and financial records of the Sellers exclusively with respect to the Business and to the extent Buyers and Sellers shall mutually agree to be reasonably necessary for the purpose of, and in order that Buyers may begin to provide for, the transition of the Business from Sellers to Buyers after the Closing Date.  Except: (x) as contemplated by this Agreement or as disclosed on Schedule 6.1; or (y) as required by, arising out of, relating to or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court, from and after the date of this Agreement and until the Closing, Delphi will cause the Sellers and Delphi South Africa, with respect to the Business, to refrain from doing any of the following without the prior written consent of Buyer Parent (which consent will not be unreasonably withheld or delayed):

          **6.1.1**  Purchase or sell any capital stock or other equity interests of Delphi South Africa or grant or make any option, subscription, warrant, call, commitment or agreement of any character in respect of any such capital stock or other equity interests; provided, however, that this shall not limit the ability of Delphi South Africa to issue new capital stock or other equity interests or pay cash dividends or

distributions to Delphi or any of its Affiliates, or to repurchase or redeem capital stock or other equity interests held by Delphi or any of its Affiliates, between the date hereof and the Closing Date in accordance with this Agreement in order to make Delphi South Africa cash- and debt-free as of Closing;

6.1.2    Sell or otherwise dispose of Acquired Assets or assets of Delphi South Africa having an aggregate value exceeding $50,000, excluding sales of Inventory and sales of receivables to financial institutions or credit collection agencies, in each case in the Ordinary Course of Business;

6.1.3    Merge or consolidate Delphi South Africa with or into any other Person or enter into any agreement requiring any such merger or consolidation;

6.1.4    Incur, assume or guarantee any Debt Obligation that would become an Assumed Liability;

6.1.5    Incur any Encumbrance on any material assets of Delphi South Africa or any material Acquired Assets, in each case, other than Permitted Encumbrances;

6.1.6    Increase the compensation of the Global Sale Employees other than: (i) in the Ordinary Course of Business; or (ii) as required by any agreement in effect as of the date hereof or as required by Law;

6.1.7    Make any material change in the accounting methods or practices followed by the Business (other than such changes that are: (i) required by Law; (ii) made in conformance with GAAP; or (iii) required in connection with the preparation of the financial statements of Delphi South Africa);

6.1.8    Terminate or make any material amendment to a Material Contract;

6.1.9    Enter into or renew any collective bargaining agreements, companywide collective agreements, severance agreements, social plans, special works contracts or compensation arrangements (including any such contracts or agreements that provide for benefits or compensation in the event of a reduction in force or relocation of work) covering Global Sale Employees, except for renewals in the Ordinary Course of Business on terms not materially inconsistent with prior practice;

6.1.10    Fail to maintain insurance in a manner consistent with Sellers' past practice; or

6.1.11    Agree or commit to do any of the foregoing.

6.2    **Bankruptcy Actions:**

6.2.1    As soon as practicable after the execution of this Agreement, Delphi will, and will cause the other Sellers that are Filing Affiliates to, file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures Order and entry of a Sale Approval Order, each such order in form and content reasonably acceptable to Buyers.

39

**6.2.2**   Delphi will use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets under the Agreement, including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Motion, the Sale Hearing (as hereinafter defined) and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as modified by orders of the Bankruptcy Court), the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**6.3     Assumed U.S. Contracts; Cure Amount**.  No later than as soon as practicable after the Auction, Delphi will, pursuant to a motion (which motion may be incorporated into the Sale Motion), move to assume and assign to Buyers the Pre-Petition Contracts listed on Schedule 6.3 (collectively, the "**Assumed U.S. Contracts**") and will provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. To the extent Cure Amounts exist, Delphi will pay such Cure Amounts as agreed to by Delphi and each party to an Assumed U.S. Contract or, absent such agreement, by order of Bankruptcy Court in the time and manner specified by the Sale Approval Order.

**6.4     Non-Competition:**

**6.4.1**   Delphi undertakes and agrees with Buyer Parent that for a period of four (4) years after the Closing Date, except with the consent of Buyer Parent, Delphi will not, and will cause each Affiliate of Delphi to not, either on its own account or in conjunction with or on behalf of any person, firm or company, whether by sales, marketing or other activities, carry on or be engaged, whether as a shareholder, director, employee, investor, partner or agent in carrying on any business which is engaged in the design, development, manufacture, remanufacture or sale of Products as carried on by the Business at the Closing Date (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 6.4.1 will not prohibit, in any way: (i) the acquisition of a controlling interest or merger with any Person, or a division or business unit thereof, which is not primarily engaged in a Competitive Business, provided that Delphi will use commercially reasonable efforts to divest, as soon as practicable after such acquisition or merger, any portion of the Business of such Person that constitutes a Competitive Business, if the Competitive Business accounts for more than fifteen (15%) percent of the sales of the acquired business; (ii) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of a non-controlling ownership interest in any Person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen (15%) percent or less of the sales or fifteen (15%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater); (iii) the acquisition by Delphi or any of its Affiliated companies, directly or indirectly, of less than five (5%) percent of the publicly traded stock of any Person engaged in a Competitive Business; (iv) provision of consulting services to, the license of any technology that Delphi or any Delphi Affiliate owns or has license to use to, or the financing (on its own behalf or on behalf of any other Person) of any Person, for the purpose of designing or manufacturing on behalf of Delphi or any Delphi Affiliate or selling to Delphi or any

Delphi Affiliate components and parts for automotive applications other than the Business; (v) consistent with Delphi's troubled supplier practices, any direct or indirect activities of Delphi or any Delphi Affiliate to advise, operate, manage or finance a troubled supplier of Delphi or its Affiliates; or (v) any business or activity conducted by Delphi or any Affiliate, joint venture, subsidiary or division of Delphi (excluding the Business) and any natural extensions thereof as of the Closing Date (each of which will be deemed not to breach this Section 6.4.1), including (a) any activity conducted using the Excluded Assets, and (b) any activity performed by KDAC.

**6.4.2**   In the event that the covenants contained in Section 6.4.1 are more restrictive than permitted by Law, the Parties agree that the covenants contained in Section 6.4.1 will be enforceable and enforced to the extent permitted by Law.

**6.5**    **Tax Matters; Cooperation; Preparation of Returns:**

**6.5.1**   Except for Tax Returns related to real and personal property Taxes or other similar ad valorem obligations (collectively "**Property Taxes**"), each Security Seller will be responsible for the preparation and filing of all Tax Returns relating to the Sale Securities for all Tax Returns due on or prior to the Closing Date, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Each Security Seller will make all payments required with respect to any such Tax Returns, except as may be prohibited by the Bankruptcy Code. Sellers shall not file any amended or supplements to Tax Returns which would cause a Material Adverse Effect to Buyers without the advance written consent of Buyers. Sellers shall provide copies of Tax Returns at least one (1) week in advance of filing of such Tax Returns to Buyer.

**6.5.2**   Except for Tax Returns relating to Property Taxes, Buyers will be responsible for the preparation and filing of all Tax Returns for the Acquired Assets for all periods beginning after the Closing Date, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds. Buyers will make all payments required with respect to any such Tax Returns.

**6.5.3**   **Delphi South Africa.**

**A.**     Sellers will prepare or cause to be prepared and filed all Tax Returns that are required to be filed for Delphi South Africa for all taxable periods ending on or prior to the Closing Date that are required to be filed on or prior to the Closing Date. Sellers will cause Delphi South Africa to make any Tax payments due with these Tax Returns.

**B.**     Buyers will prepare or cause to be prepared and file or cause to be filed all Tax Returns that are required to be filed for Delphi South Africa for all taxable periods ending on or prior to the Closing Date that are required to be filed after the Closing Date. Buyers will cause Delphi South Africa to make any Tax payments due with these Tax Returns.

**C.**     Each Buyer acknowledges and agrees that Delphi South Africa is sold AS IS, WHERE IS for all Tax purposes.

41

**6.5.4**    Buyer shall prepare and file all Tax Returns relating to Property Taxes levied with respect to the Acquired Assets for any taxable period that begins before the Closing Date and ends after the Closing Date (each such taxable period, a "**Straddle Period**"), whether imposed or assessed before or after the Closing Date, other than Straddle Period Tax Returns that Seller is required to file by applicable Law.  Seller shall be liable for and shall indemnify Buyer, its Affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives against all Liability for the entire amount of Property Taxes levied for the Straddle Period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period.  Buyer shall be liable for and shall indemnify Seller, its Affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives against all Liability for the entire amount of Property Taxes levied for the Straddle Period multiplied by a fraction the numerator of which is the number of days in the Tax period beginning on the day following the Closing Date and the denominator of which is the number of days in the entire Tax period.  Any credits relating to a Straddle Period shall be taken into account as though the relevant Straddle Period ended on the Closing Date.  All determinations necessary to give effect to the foregoing allocations shall be made in a manner that does not accelerate deductions or defer income.  With respect to any such Straddle Period returns or filings, the non-filing party shall pay to the filing party, not later than five (5) Business Days before the due date for payment of such Property Taxes levied for the Straddle Period, provided that the non-filing Party has received notice of the allocation at least thirty (30) Business Days prior to the due date for payment under this Section 6.5.4, an amount equal to the portion of such Property Taxes levied for the Straddle Period for which the non-filing party is liable under this Section 6.5.4, and the filing party shall, promptly following the filing thereof, provide the non-filing party with a copy of such return or other filing and a copy of a receipt showing payment of any such Property Taxes levied for the Straddle Period.  If notice of the allocation is not provided to the non-filing party at least fifteen (15) Business Days prior to the due date for payment under this Section 6.5.4, the non-filing party shall pay fifteen (15) days after receipt of notice, but shall have no additional liability if the payment is not made at least five (5) Business Days before the due date for payment of such Property Taxes levied for the Straddle Period.  For any Tax Returns relating to Property Taxes for the Straddle Period which the Seller was required by Law to file prior to the Closing Date, the Seller shall provide an allocation between Seller and Buyer of the Property Taxes reflected on such returns, applying this Section 6.5.4 and taking into account all payments made as of the Closing Date, as soon as practicable following Closing.  The Party with a net liability to the other Party shall make a payment in settlement of the net liability within thirty (30) days following the date on which the allocation is provided.  Any payments under this Section 6.5.4 shall be treated as Price Adjustments under Section 3.4.

**6.5.5    <u>Transfer Taxes</u>.**

**A.**    Sellers and Buyers will use commercially reasonable efforts and cooperate in good faith to exempt the sale, conveyance, assignments, transfers, and deliveries to be made to the Buyers hereunder from any transfer, documentary, sales, use, registration, recording, stamp, value-added, recapture (such as Chinese VAT and duty recapture on the sale of assets) and other such

taxes (including all applicable real estate transfer taxes, but excluding any taxes based on or attributable to income or gains) and related fees (including notarial fees as well as any penalties, interest and additions to tax) ("**Transfer Taxes**") payable in connection with such sale, conveyance, assignments, transfers and, deliveries, to the extent provided in the Sale Approval Order, in accordance with Section 1146(c) of the Bankruptcy Code. If Bankruptcy Court approval is granted for such exemption, then any instrument transferring the Acquired Assets to the Buyers will contain the following endorsement:

> *Because this [indicate instrument] has been authorized pursuant to Order of the United States Bankruptcy Court for the Southern District of New York relating to a chapter 11 plan of [indicate Seller], it is exempt from transfer taxes, stamp taxes, or similar taxes pursuant to 11 U.S.C. § 1146(c).*

**B.**    To the extent not exempt under Section 1146 of the Bankruptcy Code and approved in the Sale Approval Order, all Transfer Taxes arising out of or incurred in connection with this Agreement will be borne by the party upon whom the applicable law, regulation or custom of the jurisdiction imposes the obligation to pay or, where no law, regulation or custom exists, shall be borne by the Buyer. The party that is legally required to file a Tax Return relating to Transfer Taxes will be responsible for preparing and timely filing such Tax Return.

**6.5.6**    Delphi and Buyer Parent will cooperate in connection with: (i) the preparation and filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets; provided that, Buyer Parent shall not be obligated to agree to a Tax election, consent or certification or amendment or supplement to a Tax Return which would cause a Material Adverse Effect. Such cooperation includes, but is not limited to, direct access to accounting and finance personnel.

**6.6**    **Employees; Benefit Plans; Labor Matters:**

**6.6.1**    **U.S. Employees:** Schedule 6.6.1 sets forth the U.S. Employees to which Buyer will offer employment pursuant to this Section 6.6.

**A.**    **Transfer of U.S. Employees.**

(i)    Subject to Section 6.6.1.A(ii), effective as of the Closing, the relevant Buyer will offer employment to all Active U.S. Employees set forth on Schedule 6.6.1 with such new employment to commence (if accepted, whether by reporting to work or otherwise) with effect from the Closing. For purposes of this Section 6.6, "**Active U.S. Employees**" means those salaried or hourly Employees who are actively employed as of the Closing Date. "**Inactive U.S. Employees**" means those U.S. Employees set forth on Schedule 6.6.1 who, as of the Closing Date, are on a leave of absence, sick leave, or short term disability or otherwise not actively performing their work during all normally scheduled business

hours. The relevant Buyer will offer employment to all Inactive U.S. Employees who, within one year following the Closing Date, return to active status in accordance with Seller's policies and procedures.

(ii)    For all Active U.S. Employees and, when appropriate, Inactive U.S. Employees set forth on Schedule 6.6.1 (i) Buyers' offer of employment shall be on terms substantially comparable in the aggregate to those in place immediately prior to Closing (provided, however, that only those of Seller's Employee Benefit Plans in which U.S. Employees set forth on Schedule 6.6.1 are eligible to participate in and that have been in effect for at least one year and have not been suspended, delayed or terminated in any way, shall be included in the comparison) and shall include a waiver and release by the U.S. Employee with respect to any and all severance payments by any Seller and (ii) Buyer will maintain Sellers' vacation policy in effect as of the Closing Date for a minimum period of one (1) year following the Closing Date provided, however, that Buyer assumes no liability for unpaid vacation or other benefits accrued prior to the Closing Date. Prior to tendering such offers, Buyers will provide Sellers with information sufficient to satisfy Sellers (not to be unreasonably withheld) that such offers meet the "substantially comparable in the aggregate" requirement. For all such U.S. Employees, Buyers will maintain the requisite level of compensation and benefits (including the vacation policy described above) for a minimum of one (1) year following the Closing Date.

(iii)    Sellers will retain responsibility for all Liabilities for workers' compensation benefits related to injuries or illnesses incurred by U.S. Employees set forth on Schedule 6.6.1 prior to the Closing.

(iv)    Seller will remain responsible for all employment rights of U.S. Employees set forth on Schedule 6.6.1 incurred or vesting prior to the Closing.

**B.    Employee Benefit Plans:**

(i)    U.S. Employees' (set forth on Schedule 6.6.1) and their dependents' and beneficiaries' participation in and eligibility for benefits under the Seller Employee Benefit Plans (other than vested pension benefits) will cease as of the Closing. Notwithstanding the preceding sentence, the Seller Employee Benefit Plans which are welfare plans as defined under ERISA will retain liability for all claims incurred by the U.S. Employees set forth on Schedule 6.6.1 and their dependents and beneficiaries prior to the Closing, including claims which are not submitted until after the Closing. A claim will be deemed incurred, as applicable:

(1)    On the date of the occurrence of death or dismemberment in the case of claims under life insurance and accidental death and dismemberment Seller Employee Benefit Plans;

(2)    On the date on which the service or treatment is

provided in the case of claims under medical, hospital, dental and similar Seller Employee Benefit Plans; or

(3)    On the date immediately following a U.S. Employee's last day worked on which a physician legally licensed to practice medicine certifies to total disability under the applicable disability Seller Employee Benefit Plans.

(ii)    Active U.S. Employees who accept employment with Buyer and Inactive U.S. Employees when they accept employment with Buyer (set forth on Schedule 6.6.1) and their dependents' and beneficiaries' participation in and eligibility for benefits under the Buyer Employee Benefit Plans will commence as of the date they are first employed by Buyer.

(iii)    Buyer will recognize each U.S. Employee's (set forth on Schedule 6.6.1) pre-closing length of service and credited service with Seller or its Affiliates for eligibility and vesting purposes but not benefit accrual purposes with respect to Buyer's Employee Benefit Plans but only to the extent recognized under Seller's comparable Employee Benefit Plan. In no case, however, would credited service be recognized under this provision if such recognition would cause a duplication of compensation or benefits as between Buyer and Seller.

(iv)    Except as provided in Section 6.6.1C(ii), Seller retains all liabilities and obligations arising under or pursuant to Seller's Employee Benefit Plans. Seller shall indemnify and hold Buyer harmless from and against any and all liabilities arising under or pursuant to Seller's Employee Benefit Plans.

## C.    Severance.

(i)    Sellers will retain all obligations and liabilities relating to any claims for severance, termination (actual or constructive), redundancy or change in control agreements by U.S. Employees not set forth on Schedule 6.6.1 triggered by, arising in connection with or resulting from the transactions contemplated under this Agreement and by U.S. Employees listed in Schedule 6.6.1 who are offered employment by Buyer on terms substantially comparable in the aggregate to those in place immediately prior to Closing as more fully provided in Section 6.6.1A(ii) but who do not accept such employment.

(ii)    Except as provided in Section 6.6.1C(i) Buyer will assume all obligations and liabilities relating to any claims for severance, termination (actual or constructive), redundancy, or change in control agreements by U.S. Employees set forth on Schedule 6.6.1 arising after Closing. If a Buyer terminates the employment of a U.S. Employee set forth on Schedule 6.6.1 during the one (1) year period following the Closing Date under circumstances that would have rendered such U.S. Employee eligible for severance benefits had such termination occurred prior to Closing Date, provide such employee the greater of (a) the severance benefits provided for under the terms of Seller's severance

45

plan applicable as of the Closing Date, taking into account such U.S. Employee's combined service with Buyer or (b) the severance benefits under any applicable Buyers' severance plan or policy. After the Closing, neither Delphi nor any Seller or any of their Affiliates will have any liability for severance, redundancy, termination or otherwise for U.S. Employees set forth on <u>Schedule 6.6.1</u> who accept employment with Buyer in connection with the transactions contemplated herein, except as required by applicable law, in which case Buyer will indemnify and hold Seller harmless for any claims or liabilities.

**D.**   **COBRA.**   Seller retains all obligations relating to compliance with the continuation health care coverage requirements of Code Section 4980B and Sections 601 through 608 of ERISA regarding qualifying events in regard to U.S. Employees set forth on <u>Schedule 6.6.1</u> arising from the transactions contemplated under this Agreement. Sellers will retain responsibility for all Liabilities, obligations, commitments, costs and expenses for claims of the U.S. Employees (or dependents thereof who become a "qualified beneficiary" within the meaning of Section 4980B(g)(1) of the Code) related to compliance with the requirements of continuation coverage under Section 4980B of the Code or Section 601 of ERISA or as the result of any "qualifying event" within the meaning of Section 4980B(f)(3) of the Internal Revenue Code which occurs prior to the Closing.

**E.**   **WARN Act.**   Buyers will assume all obligations and liabilities relating to the WARN Act or other similar notice Laws, if any, related to any post-Closing actions of the Buyer. Sellers will retain all obligations and liabilities relating to the WARN Act or other similar notice Laws, if any, related to any pre-Closing actions of the Seller.

**F.**   **Cooperation.**   Sellers and Buyers will provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 6.6.1.

**G.**   **401(k) Plans.**   To the extent allowed under applicable Law, U.S. Employees set forth on <u>Schedule 6.6.1</u> who become eligible for a distribution of their account balances in the Seller's Savings-Stock Purchase Plan (a 401(k) plan) will be permitted, at their discretion, to transfer such account balances to Buyer's defined contribution plan. The manner of such transfer will be a direct rollover.

**6.6.2   European Employees:**   Except as otherwise provided in the relevant Transfer Agreement, the Parties agree as follows:

**A.**   **Transfer of European Employees:**

(i)   Delphi and Buyer Parent intend and acknowledge that the transfer of the relevant Business to the relevant local Buyer on Closing shall, with respect to the European Employees, constitute a Relevant Transfer, and agree that as a consequence of that Relevant Transfer, the contracts of employment made between the relevant local Sellers and the

relevant European Employees and the Collective Bargaining Agreements listed in <u>Schedule 4.10.9</u>, if applicable, (save insofar as such contracts relate to benefits for old age, invalidity or survivors under any occupational pension scheme) will have effect from and after Closing as if originally made between the relevant local Buyer and the relevant European Employees.

(ii)   The relevant local Buyer shall treat the period of continuous service of each relevant European Employee employment with the relevant local Seller or its Affiliates up to Closing as continuous with such relevant European Employee's service with the relevant local Buyer after Closing.  All employee benefits of each relevant European Employee shall transfer to the Buyer by operation of Law.  To the extent contemplated by applicable Law and local agreements setting forth specific benefits for employees, all current employment terms and conditions of the European Employees will continue with the relevant local Buyer.

**B.      Union and/or Works Council Notifications**

(i)   The relevant local Buyers and relevant local Sellers shall comply with their obligations to notify and consult with the relevant employees, employees' representatives, works councils, unions, labour boards and relevant governmental agencies and governmental officials in accordance with applicable laws, concerning the transactions contemplated by this Agreement and the relevant Transfer Agreement, if applicable.

(ii)   The relevant local Buyers shall cooperate and provide to the relevant local Sellers the documents and information required in the course of the works council and union notifications. The relevant local Buyers and relevant local Sellers shall also attend meetings with employees, employees' representatives, works councils, unions, labour boards when required.

**C.      European Employees Remaining Employed by the Relevant Local Sellers.** If it is found or alleged that any of the European Employees remains an employee of the relevant local Seller after Closing due to the fact that the Transfer Regulations are not applicable for any reason to such European Employees:

(i)   The relevant local Seller shall notify the relevant local Buyer of that finding or allegation as soon as reasonably practicable after becoming aware of it;

(ii)   in consultation with the relevant local Seller, the relevant local Buyer shall within seven (7) days of becoming aware of the finding or allegation make that person a written offer of employment to commence immediately on the same terms and conditions as the relevant local Buyer would be obligated to provide to that person if his employment had transferred pursuant to the Transfer Regulations and under which the

47

relevant local Buyer agrees to recognise that person's period of service with the relevant local Seller, and the relevant local Seller shall give all reasonable assistance requested by the relevant local Buyer to persuade that person to accept the offer;

(iii)    if the offer of employment made by the relevant local Buyer is accepted by that person, the relevant local Seller agrees to permit that person to leave the relevant local Seller's employment without having worked his full notice period, if that person or the relevant local Buyer so requests;

(iv)    the relevant local Seller may within twenty eight (28) days after becoming aware of that allegation or finding, if that person is still or still claims to be an employee of the relevant local Seller and has not accepted an offer of employment with the relevant local Buyer, dismiss that person with immediate effect in accordance with applicable law; and

(v)    in accordance with Section 11.5, the relevant local Buyer shall indemnify and keep indemnified the relevant local Seller against all costs, claims, liabilities and expenses (including reasonable legal expenses) which the relevant local Seller may suffer or incur in respect of that dismissal provided that the relevant local Seller takes all reasonable steps to minimize such costs, claims, liabilities and expenses (including, for the avoidance of doubt, by following the statutory dispute resolution procedures where applicable).

**D.**    **Other Transferring European Employees.** If as a result of the sale of the relevant Business and/or the Transfer Regulations, it is found or alleged that the employment of any person other than the European Employees, or any liability associated with the employment of such persons or their termination, have transferred to the relevant local Buyers on or after Closing pursuant to the Transfer Regulations:

(i)    the relevant local Buyer shall notify the relevant local Seller of that finding or allegation as soon as reasonably practicable after becoming aware of it;

(ii)    in consultation with the relevant local Buyer, the relevant local Seller shall within seven (7) days of becoming aware of that allegation or finding make that person a written offer of employment, to commence immediately, on the same terms and conditions as that person was employed prior to the transfer (actual or alleged), and under which the relevant local Seller agrees to recognise that person's seniority status and prior service with the relevant local Seller and any Affiliate of Seller, and relevant local Buyer shall give all reasonable assistance requested by the relevant local Seller to persuade that person to accept the offer, provided however, at least ten (10) Business Days  before such offers are to be given to any such employees, the Buyer shall present the draft offer letter to Delphi for examining the terms and conditions contained therein in order to verify the compliance by the relevant Buyer with the terms and conditions of this Section 6.6.2.D;

48

(iii)    the relevant local Buyer may within twenty eight (28) days after becoming aware of that allegation or finding, if that person is still or still claims to be an employee of the relevant local Buyer and has not accepted an offer of employment with the relevant local Seller, dismiss that person with immediate effect; and

(iv)    in accordance with Section 11.5, the relevant local Seller shall indemnify and keep indemnified the relevant local Buyer against all costs, claims, liabilities and expenses (including reasonable legal expenses) which the relevant local Buyer may suffer or incur in respect of that dismissal and the employment of that person at any time up to the date of the dismissal and any other claim brought by that person (or any representative of that person), in each case:

(1)    provided that the relevant local Buyer takes all reasonable steps to minimise such costs, claims, liabilities and expenses (including, for the avoidance of doubt, by following the statutory dispute resolution procedures where applicable); and

(2)    save to the extent that the relevant local Buyer is able to claim successfully in respect of any such costs, claims, liabilities and expenses under the terms of an employer's liability insurance policy transferring by operation of law from the relevant local Seller to the relevant local Buyer.

E.    **Buyer Employee Benefit Plans**. The Buyer shall retain and shall not change the Seller Employee Benefit Plans offered to the European Employees by the relevant Sellers prior to the Closing for a period contemplated by applicable Law and local agreements setting forth specific benefits for employees.

F.    **Workers' Compensation**. Sellers will retain responsibility for Liabilities for all workers' compensation benefits related to injuries or illnesses incurred by the European Employees prior to the Closing, provided that claims for such Liabilities are filed within twelve (12) months of the Closing Date. All other such Liabilities will be the responsibility of the Buyer.

G.    **Vacation, Holiday Pay and Social Fund**. Buyer will assume Seller's outstanding obligations in respect of accrued holiday entitlements and accrued holiday remuneration of the European Employees at Closing. In addition the relevant Buyer will assume the relevant part of the social fund from the relevant Seller if it is required by Law.

H.    **Severance and Redundancy**. Except with respect to the European Employees who are terminated by the relevant local Seller or any of its Affiliates prior to the Closing Date, neither Seller nor any of its Affiliates shall have any liability to any European Employees for severance, redundancy, termination, or otherwise after Closing. Buyer shall be responsible for any liability to any European Employees in connection with the transactions contemplated by this Agreement. When Seller is required to pay severance to the European Employees who reject an offer of employment from the relevant local Buyer in situations where the Transfer Regulations do not apply or the employees object

49

to the transfer of their employment to the relevant Buyer when permitted by applicable law, the Buyers are restricted from recruiting or hiring such employees until the first anniversary of the Closing. The relevant Buyer shall reimburse the relevant Seller for any and all such severance pay paid by relevant Seller immediately but not less than ten (10) Business Days after any such employee is hired by the relevant Buyer in violation of the preceding sentence.

**6.6.3   Asia Pacific Employees:** Schedule 6.6.3.1 sets forth a table listing the aggregate actual annual costs to Sellers for the benefits provided to the Global Sale Employees in Australia.   Schedule 6.6.3.2 sets forth a table listing the aggregate actual annual costs to Sellers for the benefits provided to the Global Sale Employees in China.   Each of Schedules 6.6.3.1 and 6.6.3.2 provides the total aggregate liability of Sellers for severance costs associated with the termination of each Global Sale Employee in Australia and China, and shall be updated to reflect any attrition as of the day prior to Closing (the "Total Australia/China Severance Liability").

**A.      Transfer of Asia Pacific Employees.**

(i)      No later than forty-five (45) days after the date hereof, the Buyer Parent will determine and notify Delphi as to which Global Sale Employees in Australia (the "**Australia Employees**") and China (the "**China Employees**"), respectively, it will make an offer of employment.

(ii)      No later than thirty (30) days prior to Closing, the relevant local Buyers will make an offer of employment to the Australia Employees, the China Employees and all Global Sale Employees in India with such new employment to commence (if accepted, whether by reporting to work or otherwise) with effect from the Closing Date; provided however, that (a) the offer shall include a waiver and release by the Transferred Asia Pacific Employee with respect to any and all severance payments by any Seller and (b) at least ten (10) Business Days before such offers are to be given to any of the Asia Pacific Employees, the Buyer shall present the draft offer letter to Delphi for examining the terms and conditions contained therein in order to verify the compliance by the relevant Buyer with the terms and conditions of this Section 6.6.3.   The offer of employment shall be in accordance with the governing Law in the jurisdiction where such Asia/Pacific Employee is located.   If applicable, the relevant local Buyer will assume the employment contracts of any Transferred Asia Pacific Employees in accordance with the Transfer Regulations and the relevant Transfer Agreement.   Buyers will comply with all requirements of the Transfer Regulations, if applicable, and will, in any event, assume and recognize the seniority status and prior service of all Transferred Asia Pacific Employees for the entire period of each employee's accumulated service years with the respective Seller and any Affiliate of the Seller for all purposes of the continued employment with the relevant local Buyer, including with respect to any Buyer Employer Benefit Plan as if every benefit or entitlement had been accrued by the respective Transferred Asia/Pacific Employee while in the employment of the relevant local Buyer.

(iii)   For all Asia Pacific Employees, Buyer's offer of employment (or assumption of employment contract as applicable) will be on the same terms, at the same level of compensation and with the same benefits in place immediately prior to Closing and all employment terms and conditions existing as of the Closing Date shall remain unchanged for one (1) year after the Closing Date.  The specific terms governing the offer of employment to any Asia/Pacific Employee will be agreed between the parties and set forth in the applicable Transfer Agreements and/or in compliance with applicable Transfer Regulations.

(iv)   SDECSC shall take no action intended to cause any China Employee to not accept employment with the local Buyer.

(v)   Effective from the Closing Date, the Buyer will assume and will be solely responsible for:

(1)   all accrued, unpaid and untaken long service leave, sick/personal leave and rostered day off leave entitlements of the Transferred Asia Pacific Employees attributable to the period prior to Closing and the liability balance sheet provisions set out in Schedule 6.6.3; and

(2)   all wages and salary, long service leave, sick/personal leave, rostered day off leave and contributions to personal pension schemes to which any Transferred Asia Pacific Employees are entitled, all statutory contributions and all income tax and national insurance contribution deductibles and all other entitlements of the Transferred Asia Pacific Employees from and after the Closing Date.

(vi)   For Asia Pacific Employees employed by a Seller in India, the assets and associated liabilities of the Delphi Provident Trust Funds, the Delphi Employees Gratuity Trust Fund and the Delphi Superannuation Fund shall be transferred to Buyer as set forth in the India Sale Agreement.

**B.**   **Severance and Redundancy Payments.**

(i)   Neither Seller nor any of its Affiliates shall have any liability to any Transferred Asia Pacific Employee for severance, redundancy, termination or otherwise (i) after Closing or (ii) before Closing so long as such liability is triggered in any way by the transactions contemplated by this Agreement.  For the avoidance of doubt, Buyer shall be responsible for any liability to any Transferred Asia/Pacific Employee in connection with the transactions contemplated by this Agreement.

(ii)   To the extent that Australia Employees and China Employees shall accept fewer offers by the relevant local Buyers to absorb, in the aggregate, sixty percent (60%) of the Total Australia/China Severance Liability, Buyers shall indemnify and hold Sellers harmless for any Shortfall (as hereinafter defined) through the payment of cash within ten (10) days of invoice.  For the avoidance of doubt, if an Australia Employee or a China Employee rejects an offer from Buyer, Buyer shall indemnify and hold Seller harmless from and against any severance or

51

redundancy Losses as if Buyer had not made an offer to such Australia Employee or China Employee (i.e. to the extent that Transferred Australia Employees and Transferred China Employees absorb, in the aggregate, less than sixty percent (60%) of the Total Australia/China Severance Liability). For the purposes of this Section, "Shortfall" shall mean the difference between the amount absorbed based on offer acceptance and sixty percent (60%) of the Total Australia/China Severance Liability, as exemplified in Schedule 6.6.3.B(ii).

(iii)    Seller shall retain responsibility for any liability to any Global Sale Employee listed on <u>Schedules 6.6.3.1 and 6.6.3.2</u> to which Buyer shall not make an offer. In the event Seller shall be required to pay severance to Asia Pacific Employees, Buyers are restricted from recruiting or hiring such employees until the first (1st) anniversary of the Closing unless Buyer shall reimburse Seller for any and all such severance paid by it to any of such subsequently recruited or hired Asia/Pacific Employee.

C.    **Buyer Employee Benefit Plans**.  Buyer shall retain and shall not change the Seller Employee Benefit Plans offered to the Asia Pacific Employees by the relevant Seller prior to Closing for a period of one (1) year after the Closing Date.  If required by law, the relevant local Buyer will offer the Transferred Asia Pacific Employees a choice of superannuation fund in accordance with local Law.

D.    **Workers' Compensation**. Except with respect to Transferred Australia Employees, Liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illness incurred by Transferred Asia Pacific Employees on or after the Closing or filed more than twelve (12) months after the Closing (even if related to a pre-Closing injury or illness), shall be the responsibility of the relevant local Buyer.  In the case of Transferred Australia Employees, only Liabilities, obligations, commitments, costs and expenses for workers' compensation benefits related to injuries or illness incurred on or after the Closing shall be the responsibility of the relevant local Buyer.

E.    **Cooperation.**  Sellers and Buyers shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 6.6.3.

F.    **Collective Bargaining Agreements**.  Buyers will assume the terms and conditions of all of the Collective Bargaining Agreements (or their equivalent under applicable Law) applicable to the Transferred Asia Pacific Employees.

G.    **Union and Works Council Notifications.**  Sellers and Buyers will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, work councils, unions, labor boards and relevant government agencies and governmental officials concerning the

transactions contemplated by this Agreement.

### 6.6.4   South Africa Employees:

**A.      Continued Employment of South Africa Employees.**   Seller and Buyer will collectively update Schedule 4.10.1 as of the day prior to Closing with respect to the South Africa Employees.

(i)      All South Africa Employees shall remain employed by Delphi South Africa.  Buyer will, in any event, assume and recognize the seniority status and prior service of all South Africa Employees for the entire period of each employee's accumulated service years with Delphi South Africa and any Affiliate of Delphi South Africa for all purposes of the continued employment with Delphi South Africa, including with respect to any Buyer Employer Benefit Plan, if applicable, in accordance with local law.

(ii)      For all Global Sale Employees designated on Schedule 4.10.1 as South Africa Employees, their continued employment will be on the same terms, at the same level of compensation and with the same benefits in place immediately prior to Closing and all employment terms and conditions existing as of the Closing Date shall remain unchanged for one (1) year after the Closing Date (save for increases in or adjustments to remuneration in the Ordinary Course of Business).

**B.      Severance and Redundancy Payments**.  Neither Seller nor any of its Affiliates shall have any liability to any South Africa Employees for severance, redundancy, termination or otherwise after Closing. Buyer shall be responsible for any liability to any South Africa Employees in connection with the transactions contemplated by this Agreement or otherwise required by Law.

**C.      Employee Benefit Plans**.  Save as required by and subject to local Law, Buyer shall retain and shall not change any Employee Benefit Plans offered at Delphi South Africa prior to Closing for a period of one (1) year after the Closing Date.

**D.      Collective Bargaining Agreements**.  Subject to the terms of any applicable Collective Agreement, Buyer shall retain and shall not change any Collective Bargaining Agreement (or its equivalent under applicable Law) applicable to the South Africa Employees.

**E.      Union and Works Council Notifications.**  Sellers and Buyers will reasonably cooperate in connection with any notification required by Law to, or any required consultation with, or the provision of documents and information to, the employees, employee representatives, work councils, unions, labor boards and relevant government agencies and governmental officials concerning the transactions contemplated by this Agreement.

### 6.6.5   Contact with Employees.   With respect to any Global Sale Employee, no Party shall take any action or make any statement that is intended to discourage the employees attributable to the Business to transfer their employment

relationship. No Party shall send any written communication to or otherwise communicate with any Global Sale Employee regarding such employee's post-Closing status with the Buyer without first submitting to the other Party for pre-approval (which approval shall not be unreasonably withheld or delayed) (i) copies of all written documents to be delivered to employees; and (ii) a summary of all talking points.

**6.7    Contact with Customers and Suppliers.**  Prior to the Closing, except in the Ordinary Course of Business as a supplier to certain customers and without discussing the Sale, Buyer Parent and its Affiliates and their respective representatives will contact and communicate with the Global Sale Employees, customers, suppliers and licensors of the Business in connection with the transactions contemplated by this Agreement only with the prior written consent of Delphi, which consent may be conditioned upon a designee of Delphi being present at any such meeting or conference.

**6.8    Technical Documentation.**  Sellers have delivered, or will deliver on or before the Closing, to the Buyer, a copy of all Technical Documentation included in the Acquired Assets.  For a period of not less than ten (10) years commencing at the Closing, Buyers will use reasonable efforts to maintain all Technical Documentation applicable to Product design, test, release and validation at a location at which it will be reasonably accessible to Delphi upon request.  During such ten (10) year period, Buyers will not destroy or give up possession of the final copy of such Technical Documentation without offering Delphi the opportunity to obtain a copy of such documentation at Delphi's expense but without any payment to Buyers.

**6.9    Books and Records and Litigation Assistance From and After Closing:**

**6.9.1**    Buyer Parent will preserve and keep all books, records, computer files, software programs and any data processing files delivered to Buyer by Seller and its Affiliates pursuant to the provisions of this Agreement for a period of not less than five (5) years from the Closing Date, or for any longer period as may be required by any Law, Governmental Order or in connection with any litigation, audit or appeal of Taxes, or Tax examination, at Buyer's sole cost and expense.  During such period, Buyer will: (i) provide Seller with such documents and information as necessary to complete the accounting books and records of each facility included within the Business, consistent with past practice; and (ii) make such books and records available to Seller and its Affiliates as may be reasonably required by Seller and its Affiliates in connection with any legal proceedings against or governmental investigations of Seller and its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Seller and its Affiliates, the Business or the Acquired Assets.  Seller or its Affiliates will reimburse Buyer for the reasonable out-of-pocket expenses incurred in connection with any request by Seller to make available records pursuant to the foregoing sentence.  In the event Buyer wishes to destroy or dispose of such books and records after five (5) years from the Closing Date, it will first give not less than ninety (90) days' prior written notice to Seller, and Seller will have the right, at its option, upon prior written notice given to Buyer within sixty (60) days of receipt of Buyer's notice, to take possession of said records within ninety (90) days after the date of Buyer's notice to Seller hereunder.

**6.9.2**    Buyers will, at the reasonable request of Sellers, cooperate fully with Sellers in providing Sellers and their Affiliates (as appropriate) (to the extent

possible through Global Sale Employees) with technical assistance and information in respect of any claims brought by or against Sellers and their Affiliates involving the conduct of the Business prior to Closing, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings.  Sellers will reimburse Buyers and their Affiliates for their reasonable out-of-pocket costs (travel, hotels, etc.) of providing such services and reasonable, actual direct employee time costs for any appearances.  Buyers, for themselves and on behalf of their Affiliates, agree to: (i) retain all documents required to be maintained by Law and all documents that may be reasonably required to establish due care or to otherwise assist Sellers and their Affiliates in pursuing, contesting or defending such claims; (ii) make available their documents and records in connection with any pursuit, contest or defense, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Buyers and their Affiliates must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Buyers must notify Sellers of the existence of such privileged documents); and (b) Sellers and their Affiliates will agree to keep confidential documents and records that are confidential or are subject to trade secret protection); (iii) promptly respond to discovery requests in connection with such claim, understanding and acknowledging that the requirements of discovery in connection with litigation require timely responses to interrogatories, requests to produce and depositions and also understanding and acknowledging that any delays in connection with responses to discovery may result in sanctions; (iv) make available, as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Buyers' business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Sellers and their Affiliates in connection with such claim, including investigation into claims and occurrences described in this section and preparing for and giving factual and expert testimony at depositions, court proceedings, inquiries, hearings and trial; and (v) make available facilities and exemplar parts for the sole and limited use of assisting Sellers and their Affiliates in the contest or defense.

**6.10**   **Corporate Names:**

      **6.10.1**  Buyers will have the right (including the right to authorize its relevant Affiliates) to continue to sell or dispose of any existing inventories or service materials of the Business in existence at the Closing and bearing any trademark, service mark, trade name or related corporate name of Delphi or any Affiliate of Delphi for a period of no more than ninety (90) days after the Closing Date in a manner consistent with past practice of the Business and the name and reputation associated therewith, provided that Buyers and their Affiliates will clearly indicate on all written materials related to such sale or disposition, including business cards, stationery, purchase orders, invoices and the like, that the Business is owned by Buyers and their Affiliates and is no longer affiliated with, and Buyer and its Affiliates do not represent, the Sellers or any Affiliate of Seller.

      **6.10.2**  After such ninety (90) day period, Buyers will neither use nor permit any of Delphi South Africa or Katcon, or the Business, to use the name "Delphi" and any trademarks, trade names, brandmarks, brand names, trade dress or logos

relating or confusingly similar (including on any signs, billboards, advertising materials, telephone listings, web sites, labels, stationery, office forms, packaging or other materials of Delphi South Africa or Katcon) in connection with the Business or otherwise.

**6.10.3** Immediately following the Closing, Buyers shall cause Delphi South Africa to amend its certificate of incorporation, partnership agreement, limited liability company agreement and other applicable documents, in order to change its name to a name not containing the word "Delphi," such change to take effect pursuant to the terms of the respective transfer deed governing the sale of Delphi South Africa. Buyer shall make all required filings with Governmental Authorities to effect such amendments.

**6.10.4** Each of the Parties acknowledges and agrees that the remedy at Law for any breach of the requirements of this Section 6.10 would be inadequate, and agrees and consents that without intending to limit any additional remedies that may be available, temporary and permanent injunctive and other equitable relief may be granted without proof of actual damage or inadequacy of legal remedy in any Proceeding which may be brought to enforce any of the provisions of this Section 6.10.

## 6.11 <u>Intellectual Property Licenses</u>:

**6.11.1 <u>License to Buyers.</u>** Delphi, on behalf of itself and its Affiliates, hereby grants to Buyers, as of the Closing Date, a worldwide, perpetual, fully paid, royalty free, non-exclusive license to use the Shared Intellectual Property to develop, manufacture, use, import, export, offer to sell and sell Products and services and future products and services of the type provided by the Business prior to Closing and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, subject to any restrictions arising from rights granted to third parties prior to the Closing Date. Further, Delphi, on behalf of itself and its Affiliates, hereby grants to Buyers, as of the Closing Date, a sub-license to the extent permitted by and subject to the terms and conditions of the agreements listed in <u>Schedule 6.11.1</u>, to develop, manufacture, import, export, offer to sell and sell Products and services and to use, reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith. The license and any sub-license granted to Buyer under this Section 6.11.1 is not assignable in whole or in part except to a purchaser of all or substantially all of the Business to which the license pertains.

**6.11.2 <u>License to Sellers.</u>** Buyer Parent, on behalf of itself and its Affiliates, hereby grants to Seller as of the Closing Date, (i) a worldwide, perpetual, paid-up, royalty free, non-exclusive license to develop, manufacture, use, import, export, offer to sell and sell products and services of the type provided by Sellers and their Affiliates as of the Closing Date (other than the Products), and to reproduce, prepare derivative works, distribute copies, perform and display copyrighted works in connection therewith, using any Acquired Intellectual Property, subject to any restrictions existing prior to the Closing Date, and (ii) a non-exclusive, world-wide, irrevocable license (including the right to grant sublicenses to GM Affiliates) under the Acquired Intellectual Property to make,

56

have made, use, have used, offer to sell, sell, import, export, reproduce, copy, prepare derivative works, and distribute products, subject to any restrictions existing prior to the Closing Date, solely for and limited to the purpose of sublicensing to the licensees of Seller according to the terms and conditions of the agreements listed in Schedule 6.11.2. Buyer and its Affiliates shall provide for continuation of Seller's license rights under this Section 6.11.2 in the terms and conditions of any sale or other assignment of the Acquired Intellectual Property to a third party.

      **6.11.3 <u>Right to Sublicense</u>**. The licenses granted above in this Section 6.11: (i) include the right for the licensed party to sub-license to any of its Affiliates, to its and their successors, and to suppliers, customers to the extent of the license granted in this Section 6.11; (ii) do not include any right to use any Trademark Rights; and (iii) are subject to any restrictions existing prior to the Closing Date.

**6.12   <u>Competition Clearance</u>:**

      **6.12.1** Subject to the terms hereof, Buyers and Delphi agree to cooperate and to use their reasonable best efforts to obtain, as promptly as practicable following the date hereof, any Governmental Approvals required for the Closing under the HSR Act, EC Merger Regulation and any other applicable Competition/Investment Law, to respond to any government requests for information thereunder, to contest and resist in good faith any action thereunder, and to have lifted or overturned any Governmental Order that restricts, prevents or prohibits the consummation of the transactions contemplated by this Agreement. In this respect, Buyers will make (or continue to prosecute, if made previously) all the competition filings set forth in Schedule 6.12.1 no more than five (5) Business Days after the date hereof, and Buyer Parent will: (i) promptly inform Delphi of all oral and written communications with any Governmental Authority in respect of any required Governmental Approval; (ii) give Delphi the opportunity to comment on all filings and any response prepared by Buyers prior to Buyers' submitting such response to the relevant Governmental Authority; and (iii) afford Delphi or any Seller designated by Delphi the opportunity to attend any meetings, telephone conferences or video conferences organized with the Governmental Authorities in relation to any required Governmental Approval. Notwithstanding the foregoing, the Parties agree that neither of them will make any voluntary filing under applicable foreign antitrust laws or regulations unless advised by legal counsel in such jurisdiction that the failure to make a filing could result in a Material Adverse Effect or otherwise be in violation of applicable Law. Each party hereto will promptly inform the other of any oral or other communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement and the Ancillary Agreements. If the competition authority in any such country: (i) imposes conditions upon its approval of the transactions contemplated by this Agreement; or (ii) files a Proceeding before a Governmental Agency seeking to restrain or prohibit, or to obtain damages or other relief in connection with, the consummation of the transactions contemplated by this Agreement, the Parties will take commercially reasonable steps to negotiate with the competition authority regarding, and comply with, any conditions or modifications requested by such competition authority, consistent with the general intention of this Agreement (that ownership of the Business will be vested in the Buyers). Such compliance may require modifications in structure, economic and other relationships. Each

Party will bear its own costs and expenses incurred in negotiating and agreeing to the required conditions or modifications with the competition authorities.

**6.12.2** Buyers will not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement or the Transfer Agreements or the expiration or termination of any applicable waiting period; (ii) increase the risk of any Governmental Authority entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the Transfer Agreements; (iii) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated by this Agreement or the Transfer Agreements.

**6.13    Further Actions:**

**6.13.1** Buyer will use commercially reasonable efforts to facilitate a Closing not more than sixty (60) days after the entry of the final Sale Approval Order by taking actions which include but are not limited to establishing legal entities, securing tax payer identification numbers, procuring DUNS numbers and securing employees sufficient in expertise and number to run the Business after Closing.

**6.13.2** Within three (3) Business Days after the entry of an unstayed Sale Approval Order by the Bankruptcy Court, the Parties will use commercially reasonable efforts to take all actions and to do all things necessary, proper or advisable under Law to consummate the transactions contemplated hereby and by the Transfer Agreements.  In furtherance of the foregoing, the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with the transactions contemplated by this Agreement.

**6.13.3** At all times prior to the Closing: (i) Delphi will notify Buyer Parent in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon any Seller becoming aware of the same; and (ii) Buyer Parent will notify Delphi in writing of any fact, condition, event or occurrence that will result in the failure of any of the conditions contained in Article 7 to be satisfied, promptly upon Buyer becoming aware of the same.

**6.14    Further Assurances.**  If at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, the parties hereto shall take or cause to be taken all such necessary action, including, without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the

other party for such purposes or otherwise to consummate and make effective the transactions contemplated hereby; provided that, to the extent not indemnified or required hereunder the cost of such action or of such instruments and documents related thereto shall be borne by the party requesting them.    The foregoing covenant will survive the Closing of the transactions contemplated herein.

**6.15    Guarantee by Buyer Parent.**    Buyer Parent unconditionally guarantees all obligations of each Buyer pursuant to the terms of this Agreement, including payment of the Purchase Price and any indemnification obligations.  Buyer Parent will also reimburse Sellers for all fees and expenses (including reasonable fees of counsel) incurred in successfully enforcing the guarantee obligations set forth in this Section 6.15.

**6.16    Government Subsidies.**

### 6.16.1 India Capital Subsidy.

**A.**    Buyer agrees and covenants to abide by all the conditions under Rule 28C of the Haryana General Sales Tax Rules, 1975, under which the Government of Haryana, India has granted to Delphi Automotive Systems Pvt. Ltd. ("**Delphi India**") a capital subsidy of INR 16.64 million (approx. $0.41million) from January 2002 until September 2004 (the "**India Capital Subsidy**"), including the conditions that (i) the relevant local Buyer shall continue the production of converters at a manufacturing facility located in the State of Haryana from the Closing Date through 30 September 2009; (ii) the goods manufactured at such manufacturing facility shall not be stock transferred, stored or consigned to a place outside the State of Haryana until after 30 September 2009; (iii) the relevant local Buyer shall sell all goods directly from such manufacturing facility in the State of Haryana; (iv) the relevant local Buyer shall be VAT registered in State of Haryana; and (v) the relevant local Buyer shall pay central sales tax or state VAT in State of Haryana on sales made by it.  Buyer acknowledges that it is aware in the event it does not comply with such conditions that the capital subsidy received by Delphi India would need to be fully refunded to the Government authorities.

**B.**    If Buyer fails to comply with the conditions of the India Capital Subsidy set forth above, then Buyer shall be liable to repay the amount of India Capital Subsidy which Delphi India is obliged to repay the government along with all costs, interests, penalties and expenses which Delphi India may incur on refunding the India Capital Subsidy to the Government authorities.

**6.16.2 Other Government Subsidies.**  Buyer agrees and covenants to abide by any and all of the conditions of any other subsidy of any Governmental Authority listed in Schedule 6.16.2.

**6.17    Customs Duties.**  Buyers expressly agree to reimburse Sellers for all customs-related duties, fees, and associated costs incurred by Sellers on behalf of Buyers following the Closing which are exclusive to the Business, including all such duties, fees, and costs incurred in connection with co-loaded containers that clear customs intentionally or unintentionally under Sellers' importer/exporter identification numbers and bonds/guarantees post-Closing.

**6.18**    __Buyers' Financing Activities__.  Buyers acknowledge and agree that: (i) Sellers and their Affiliates have no responsibility for any financing that Buyers may raise in connection with the transactions contemplated hereby including with respect to any offering materials and other documents prepared by or on behalf of or utilized by Buyers or their Affiliates, or Buyers' financing sources, in connection with Buyers' financing activities in connection with the transactions contemplated hereby which include any information provided by Sellers or any of their Affiliates; and (ii) Buyers' obligations to consummate and to cause to be consummated the transactions contemplated by this Agreement and the Transfer Agreements are not subject to any condition or contingency with respect to the financing, except that, upon reasonable requests from Buyers, Sellers will provide reasonable assistance to Buyers in the compilation of any information concerning the Business and the Acquired Assets that is required to be disclosed in any financing documents.

**6.19**    __Personal Property.__  Prior to Closing, each Asset Seller shall use commercially reasonable efforts to monitor and control the Personal Property held by such Asset Seller.

**6.20**    __Transition Services.__  Buyer acknowledges that Seller is not prepared to provide any transition services for any of the Manufacturing Facilities.  Anything contained herein to the contrary notwithstanding, except for the Manufacturing Facility in Shanghai, China, Seller may consider providing certain transition services post-Closing at Buyer's request and on a case-by-case basis for a period of up to six (6) months; provided, that Buyer will reimburse Sellers for any fees, costs and expenses incurred in connection therewith, including without limitation any one-time set up costs and monthly service costs.

**6.21**    __Reimbursement for Pre-Closing Matters.__

**6.21.1** Seller will provide Buyer with __Schedule 6.21__ setting forth the open customer reimbursement obligations as of Closing for any machinery, equipment and tooling that was delivered prior to Closing.  Buyer shall be obligated to pursue collection of any customer reimbursements set forth on __Schedule 6.21__, if and when due, and will pay and transmit to Seller within ten (10) days of receipt any and all funds collected.  Until all customer reimbursements set forth on __Schedule 6.21__ are collected, Buyer shall inform Seller periodically and shall assign and transfer, upon Seller's request, any collectable rights and interests to Seller.  For the avoidance of doubt, customer reimbursements subject to this Section 6.21.1 shall not include any Accounts Receivables that have been recorded and are reflected in the Closing Working Capital Statement.

**6.21.2** Seller shall reimburse Buyer for the following:

**A.**    accrued annual leave for Transferred Australia Employees;

**B.**    accrued long service leave for Transferred Australia Employees; and

**C.**    any unfunded supplementary pension plan book reserve or other pension obligation for Global Sale Employees in Luxembourg;

in each case to the extent earned by the respective Global Sale Employees during their employment with any Seller prior to Closing.

60

**6.22    China Share Sale**.  Delphi agrees to consider structuring the China Sale Agreement referred to in Section 8.2.2(C) hereof as a sale of the securities in SDECSC held by Delphi or its Affiliates.

**6.23    Milwaukee Asset Sale**.  Buyer Parent acknowledges and agrees, on its behalf and on behalf of Katcon, that Katcon remains obligated to make, and Buyer Parent will cause Katcon to make, payments in the amounts of $743,500 and $2,221,763 due to Delphi Automotive Systems LLC for the assets acquired pursuant to that certain Asset Sale Agreement (RFTD) between Katcon, Delphi Automotive Systems LLC and Delphi Technologies, Inc.

## 7.    CONDITIONS TO CLOSING:

**7.1    Conditions to Obligations of Seller and Buyer.**  The respective obligations of each Party to effect the transactions contemplated by this Agreement will be subject to the satisfaction or waiver by both Parties at or prior to the Closing Date of the following conditions precedent:

**7.1.1    Sale Approval Order and Bidding Procedures Order.**  The Sale Approval Order and Bidding Procedures Order will be entered by the Bankruptcy Court and will not be subject to a stay or injunction or, if the Sale Approval Order is not received prior to the Filing Affiliates'' emergence from the Bankruptcy Cases, then written affirmation of this Agreement by the reorganized or reconstituted Filing Affiliates shall satisfy this condition.

**7.1.2    No Law, Judgments, etc.**  No provisions of any applicable Law, Governmental Order or any third party legal proceeding that restrains, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement will be in effect, or significantly modifies the terms thereof (each Party taking any and all steps required by Sections 6.12 and 6.13 of this Agreement).

**7.1.3    Governmental Approvals.**  All required Governmental Approvals (including approvals under any Competition/Investment Law, as identified on Schedule 6.12.1) regarding the Sale will have been granted in writing by the appropriate Governmental Authorities or, as applicable by Law, the waiting period with respect to any such filings will have expired or been terminated.  The lack of response or clearance from the competent antitrust Governmental Authority after the waiting period provided by the applicable Law shall not be deemed a failure to meet a condition to Closing under this Agreement and the Parties shall proceed with Closing unless a preliminary ruling prohibiting the transaction contemplated hereby is issued by such competent antitrust Governmental Authority.

**7.1.4    No Material Adverse Effect.**  Since the date of this Agreement, no Material Adverse Effect shall have occurred and is continuing at Closing.

**7.2    Conditions to Obligations of Buyer.**  The obligation of Buyers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Buyer):

**7.2.1    Accuracy of Warranties.**  Except as otherwise permitted by this Agreement or a Transfer Agreement, and after giving effect to the Sale Approval

Order, the representations and warranties of Sellers contained in Article 4 of this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein) will be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time) except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

       **7.2.2    Performance of Covenants.**  Each Seller will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing.

       **7.2.3    Delivery of Ancillary Agreements.**  Sellers will have delivered duly executed copies of each of the Ancillary Agreements.

**7.3**    **Conditions to Obligations of Sellers.**  Except as otherwise permitted by this Agreement or a Transfer Agreement, the obligation of Sellers to consummate the transactions contemplated by this Agreement will be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Sellers):

       **7.3.1    Accuracy of Warranties**.  The representations and warranties of Buyer contained in Article 5 of this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein), will be true and correct as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which will be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

       **7.3.2    Performance of Covenants.**  Each Buyer and each of its Affiliates will have performed and complied in all material respects with all agreements and obligations required by this Agreement to be performed or complied with by it at or prior to the Closing.

       **7.3.3    Delivery of Ancillary Agreements.**  Buyers will have delivered duly executed copies of each of the Ancillary Agreements.

       **7.3.4    Local Legal Entity.**  Buyers have, or will have set up, a legal entity in every jurisdiction required by Law, including in China and Mexico, in order for such entity to buy the Acquired Assets or Sale Securities, as the case may be, located in such jurisdiction.

**8.**    **CLOSING:**

**8.1**    **Closing Time and Date.**  Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of the transactions contemplated by this Agreement will take place at the offices of Delphi at 10:00 a.m. on the second Business Day after the conditions set forth in Article 7 will have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree (the "**Closing Date**").   For tax and accounting purposes, the effective time of the transaction will be 11:59 p.m. Eastern time on the Closing Date.  The Closing of the Transfer

Agreements will take place simultaneously with the Closing or on a later date if mutually agreed by the relevant Seller and relevant Buyer.

**8.2     Ancillary Agreements.**  At or prior to the Closing, the Sellers will duly execute and deliver to the Buyers, and the Buyers will duly execute and deliver to Sellers, each of the following agreements (each, an "**Ancillary Agreement**" and collectively, "**Ancillary Agreements**") to which they are to be a party:

**8.2.1**   A Patent Assignment substantially in the form of Exhibit 8.2.1.A and a Trademark Assignment substantially in the form of Exhibit 8.2.1.B, as well as any other instruments necessary to transfer the Acquired Intellectual Property.

**8.2.2**   The following Transfer Agreements (each a "**Transfer Agreement**" and collectively, "**Transfer Agreements**"):

**A.**     South Africa Sale Agreement, substantially in the form set forth in Exhibit 8.2.2.A
.

**B.**     Poland Sale Agreement, substantially in the form set forth in Exhibit 8.2.2.B.

**C.**     China Sale Agreement, substantially in the form set forth in Exhibit 8.2.2.C.

**D.**     Australia Sale Agreement, substantially in the form set forth in Exhibit 8.2.2.D.

**E.**     Mexico Sale Agreement, substantially in the form set forth in Exhibit 8.2.2.E.

**F.**     India Sale Agreement, substantially in the form set forth in Exhibit 8.2.2.F.

**G.**     Luxembourg Sale Agreement, substantially in the form set forth in Exhibit 8.2.2.G.

**8.2.3**   Bills of Sale, substantially in the form set forth in Exhibit 8.2.3.

**8.2.4**   Assignment and Assumption Agreements, substantially in the form set forth in Exhibit 8.2.4.

**8.2.5**   Poland Sublease, if applicable, substantially in the form set forth in Exhibit 8.2.5.

**8.2.6**   Deposit Escrow Agreement, substantially in the form set forth in Exhibit 8.2.6.

**8.3     Seller's Deliveries at Closing.**  At or prior to the Closing, the appropriate Sellers will deliver or cause to be delivered to the relevant Buyer:

**8.3.1**   Where required by applicable Law in the jurisdiction concerned,

63

copies of the resolutions (or local equivalent) of the boards of directors of each Seller and, where required, the stockholders/owners of each Seller, authorizing and approving this Agreement, Ancillary Agreements and the transactions contemplated hereby and thereby;

**8.3.2**  Certified copies of all orders of the Bankruptcy Court pertaining to the transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order;

**8.3.3**  An officer's certificate, dated as of the Closing Date, executed on behalf of Sellers, certifying that the conditions specified in Section 7.2 applicable to Sellers have been fulfilled; and

**8.3.4**  All other documents and papers reasonably requested by Buyer to transfer title to the Acquired Assets and Sale Securities in accordance with this Agreement or to otherwise effect the transactions contemplated by this Agreement or the Ancillary Agreements.

**8.4**    **Buyer's Deliveries at Closing.** At or prior to the Closing, Buyer will deliver or cause to be delivered to Delphi and each Seller designated by Delphi the following:

**8.4.1**  The balance of the Preliminary Purchase Price by wire transfer of immediately available funds to an account or accounts designated by Delphi and acceptable to Buyers not less than two (2) Business Days prior to the Closing;

**8.4.2**  Where required by applicable Law in the jurisdiction concerned, copies of the resolutions (or local equivalent) of the boards of directors of each Buyer and, where required, the stockholders/owners of each Buyer, authorizing and approving this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby; and

**8.4.3**  An officer's certificate, dated as of the Closing Date, executed on behalf of Buyers, certifying that the conditions specified in Section 7.3 have been fulfilled.

## 9.    TERMINATION:

**9.1**    **Termination.**  This Agreement may be terminated at any time prior to the Closing:

**9.1.1**  By the mutual written consent of Delphi and Buyer Parent.

**9.1.2**  By either Delphi or Buyer Parent:

**A.**    Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Closing will not have occurred within one hundred twenty (120) days after entry of the Sale Approval Order for any reason other than (i) a failure of the conditions set forth in Section 7.1.2 or (ii) if, in Seller's reasonable discretion, additional time is needed for transition planning required to facilitate the consummation of this Agreement.

      **B.**     If Seller consummates an Alternative Transaction.

      **C.**     Provided the terminating Party is not in material breach of its obligations under this Agreement, if any Governmental Authority of competent jurisdiction (other than the Bankruptcy Court) will have issued a Governmental Order or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby and such Governmental Order or other action has become final and nonappealable, or in the reasonable opinion of the terminating Party is likely to become final and nonappealable.

      **D.**     Provided the terminating Party is not in material breach of its obligations under this Agreement, if the Bankruptcy Court has not entered the Sale Approval Order, on or before the date that is one hundred twenty (120) days after the date of this Agreement, or if such Sale Approval Order is subject to a stay or injunction on such date.

      **E.**     Provided the terminating Party is not in material breach of its obligations under this Agreement, at any time prior to Closing, if a Material Adverse Effect has occurred, either Party may terminate within ten (10) Business Days after becoming aware of such event so long as such event is continuing at the time of any such termination and not reasonably capable of being cured within ninety (90) days after entry of the Sale Approval Order or the date of this Agreement, whichever is later.

      **9.1.3**  By Buyer Parent, upon written notice to Delphi and provided that Buyer Parent is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if Delphi has breached or failed to perform in any respect any of its representations, warranties, covenants or other agreements contained in this Agreement, the result of which has been or will be a Material Adverse Effect, or if a Material Adverse Effect has otherwise occurred provided that: (i) if a Material Adverse Effect has occurred, such termination occurs while such effect is continuing; and (ii) in the case of a Delphi breach where no Material Adverse Effect has actually occurred, then Buyer Parent will only be entitled to terminate if such material breach or failure to perform: (y) is not cured within thirty (30) days after written notice thereof or, in the case where the date or period of time specified for performance has lapsed, promptly following written notice thereof from the non-breaching party; or (z) is incapable of being cured by Delphi or any Seller;

      **9.1.4**  By Delphi, upon written notice to Buyer Parent and provided that Delphi is not then in material breach of any representation, warranty, covenant or other agreement contained in this Agreement, if the Buyer Parent or any Buyer has breached or failed to perform in any material respect any of its obligations or covenants contained in this Agreement, and such breach or failure to perform: (i) is not cured within thirty (30) days after written notice thereof or, in the case where the date or period of time specified for performance has lapsed, promptly following written notice thereof from the non-breaching party; or (ii) is incapable of being cured by Buyer Parent or any Buyer.

**9.2      Break-Up Fee, Expense Reimbursement:**

9.2.1   In the event this Agreement is terminated prior to Closing (i) pursuant to Section 9.1.2.B, in the event that Delphi sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, of all or substantially all of the Business or the Acquired Assets in a transaction or a series of transactions with one or more parties other than Buyer Parent or its Affiliates (such event being an "**Alternative Transaction**") in accordance with the Bidding Procedures, or (ii) pursuant to Sections 9.1.2.A, 9.1.2.D, or 9.1.3 and an Alternative Transaction is consummated within six (6) months after termination of this Agreement, Delphi will, upon the consummation of the Alternative Transaction(s), pay to Buyer Parent an amount equal to three percent (3%) of the Preliminary Purchase Price (the "**Break-Up Fee**"), provided that: (x) Buyer is not in breach of this Agreement or the Bidding Procedures; (y) this Agreement is not terminable under Section 9.1.2.C, and (z) in the case of Sections 9.1.2.A and 9.1.2.D, the failure or occurrence of the event giving rise to any such termination results solely from the status of Delphi  or Sellers or any action or conduct of Delphi or Sellers and not from the status of Buyer Parent or its Affiliates or any action or conduct or market position of Buyer Parent or any of its Affiliates.

9.2.2   In the event this Agreement is terminated pursuant to Section 9.1.2.A prior to Closing and, provided that Buyer Parent is not then in breach of this Agreement, in the case of Section 9.1.2.D, the failure or occurrence of the event giving rise to any such termination results solely from the status of Delphi or Sellers or any action or conduct of Delphi or Sellers and not from the status of Buyer Parent or any action or conduct of Buyers, then Delphi shall be obligated to pay Buyer Parent an amount equal to Buyers' reasonable, actual out-of-pocket fees and expenses (including, without limitation, reasonable attorneys' fees, expenses of its financial advisors, and expenses of other consultants) incurred in connection with the transactions contemplated by this Agreement (the "**Expense Reimbursement**") up to a maximum of US $600,000.    Any Expense Reimbursement payable upon termination of this Agreement shall be immediately earned upon such termination and payable by Delphi to Buyer Parent promptly upon the delivery of an invoice related to such Expense Reimbursement to Delphi by Buyer Parent to be delivered to Delphi within ten (10) Business Days of termination of this Agreement; provided, however, that if Delphi believes, in good faith, that the amount of the Expense Reimbursement sought by Buyer Parent is not reasonable, then Delphi shall have the right to seek Bankruptcy Court review thereof prior to paying such amount.   Delphi shall seek court review following receipt of such Expense Reimbursement invoice from Buyer and shall pay to Buyer all portions of the Expense Reimbursement not in dispute, and shall pay the balance within ten (10) business days following entry of an appropriate order from the Bankruptcy Court.

9.2.3   Buyer Parent acknowledges and agrees that, in the event that it terminates this Agreement prior to Closing or Delphi terminates this Agreement prior to Closing and Buyer Parent becomes entitled to receive or receives any Expense Reimbursement, Buyer Parent shall not be entitled to receive nor shall it receive the Break-Up Fee or any portion thereof, and, conversely, that in the event that Buyer Parent becomes entitled to receive or receives any Break-Up Fee, it

shall not be entitled to receive nor shall it receive the Expense Reimbursement or any portion thereof. If Buyer Parent becomes entitled to receive any Break-Up Fee or Expense Reimbursement, then such Break-Up Fee or Expense Reimbursement shall be the sole and exclusive remedy of Buyers, whether at law or in equity, for any breach by Delphi or any of its Affiliates of the terms and conditions of this Agreement or the Deposit Escrow Agreement. The parties agree that the amounts payable pursuant to this Section shall be in the nature of liquidated damages.

**9.3    Procedure and Effect of Termination.**  In the event of the termination of this Agreement and the abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof will forthwith be given to all other Parties. If this Agreement is terminated and the transactions contemplated by this Agreement are abandoned as provided herein:

**9.3.1**   Buyers will redeliver to Sellers all documents, work papers and other material of any of Sellers relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof;

**9.3.2**   The provisions of the Confidentiality Agreement and any supplemental agreements relating to sensitive data will continue in full force and effect as stated therein;

**9.3.3**   The following sections of this Agreement will survive any termination of this Agreement and remain in full force and effect: (i) Article 9 (Termination); and (ii) Sections 3.1 (Deposit Amount), 12.1 (Fees and Expenses), 12.5 (Assignment), 12.6 (Waiver), 12.7 (Notices), 12.8 (Entire Agreement), 12.10 (Publicity), 12.14 (Governing Law) and 12.15 (Dispute Resolution); and

**9.3.4**   No party to this Agreement will have any Liability under this Agreement to any other except: (i) that nothing herein will relieve any party from any Liability for any breach of any of the representations, warranties, covenants and agreements set forth in this Agreement occurring before such termination, and, except as provided by Section 9.2.3 above, no Party waives any Claim with respect thereto; and (ii) as contemplated by Section 9.3.3 above.

## 10.    BIDDING PROCEDURES:

**10.1    Delphi Initial Bankruptcy Actions.**   This Article 10 sets forth the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the Agreement and the Sale of the Acquired Assets. The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order. The following overbid provisions and related bid protections are designed to compensate Buyers for their efforts and agreements to date and to facilitate a full and fair process (the "**Bidding Process**") designed to maximize the value of the Acquired Assets for the benefit of Sellers' and their Affiliates' creditors, shareholders and bankruptcy estate.

**10.2    Qualified Bidder.** Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by Sellers in their sole discretion, in order to participate in the Bidding Process, each Person (a "**Potential Bidder**"), other than Buyer, must deliver (unless previously delivered) to Delphi, its counsel, its in-house counsel, and its financial advisors at the addresses provided in Section 10.3:

**10.2.1** An executed Confidentiality Agreement in form and substance satisfactory to Delphi.

**10.2.2** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Business, current audited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Delphi and its financial advisors; and

**10.2.3** A preliminary (non-binding) written proposal regarding: (i) the purchase price range; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and all requisite financial assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale and perform post-Closing, if selected as a successful bidder, and that Delphi determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement will be deemed a "**Qualified Bidder**." As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Delphi will determine, and will notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder. At the same time that Delphi notifies the Potential Bidder that it is a Qualified Bidder, Delphi will allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets and the Business as provided in Section 10.4 below. Buyer Parent will be deemed a Qualified Bidder for purposes of the Bidding Process.

**10.3**    **Bid Deadline.**  A Qualified Bidder that desires to make a bid will deliver written copies of its bid to: Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098 Attention: Steve Olsen, M&A, with copies to: (i) Delphi's counsel,  Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60601-1285, Attention: John K. Lyons and Ron E. Meisler; (ii) Delphi's in-house counsel, Delphi European Headquarters – Legal Department, ZAC Paris Nord II, 64, avenue de la Plaine de France, BP 65059 – Tremblay en France, 95972 Roissy CDG Cedex, France, Attn: General Counsel Europe; (iii) Delphi's financial advisor, Lincoln International Advisors LLC, 500 West Madison Street, Suite 3900, Chicago, Illinois 60661, Attn: Robert Satow; (iv) counsel to the official committee of unsecured creditors appointed in the Bankruptcy Cases (the "**Committee**"), Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Mark A. Broude; and (v) counsel for the agent under Delphi's postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald S. Bernstein and Brian Resnick; so as to be received not later than 11:00 A.M. (EST), on a date to be determined by Delphi that is at least five (5) Business Days before date of Sale Hearing (the "**Bid Deadline**").  Delphi may extend the Bid Deadline once or successively, but is not obligated

to do so. If Delphi extends the Bid Deadline, it will promptly notify all Qualified Bidders of such extension. As soon as reasonably practicable following receipt and qualification of each Qualified Bid, Sellers will deliver complete copies of all items and information enumerated in the section below entitled "Bid Requirements" to counsel for the Official Committee of Equity Security Holders (the "**Equityholders' Committee**").

**10.4    Due Diligence.** Delphi will afford each Qualified Bidder due diligence access to the Acquired Assets and the Business. Due diligence access may include Management Presentations as may be scheduled by Delphi, access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Delphi, in its sole discretion, may agree. Delphi will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline. Delphi may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at Management Presentations or site inspections. Neither Delphi nor any of its Affiliates (nor any of their respective representatives) will be obligated to furnish any information relating to Acquired Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

**10.5    Bid Requirements.** All bids must include the following documents (the "**Required Bid Documents**"):

**10.5.1** A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the Closing of the Sale of the Acquired Assets.

**10.5.2** An executed copy of this Agreement, together with all Schedules and Exhibits to this Agreement (a "**Marked Agreement**"), marked to show those amendments and modifications to such agreement that the Qualified Bidder proposes, including the Preliminary Purchase Price (as defined in this Agreement).

**10.5.3** A good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Delphi in its sole discretion) payable to the order of Delphi (or such other party as Delphi may determine) in an amount equal to ten percent (10%) of the Preliminary Purchase Price.

**10.5.4** Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Delphi and its advisors.

**10.6    Qualified Bids.** A bid will be considered only if the bid:

**10.6.1** Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**10.6.2** Proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that Delphi determines, in its sole discretion, are similar to, and are not materially more burdensome or conditional than the terms of the Agreement and that has a value, either individually or, when evaluated in conjunction with any other Qualified Bid,

greater than or equal to the sum of the Preliminary Purchase Price plus the amount of the Break-Up Fee, plus: (i) in the case of the initial Qualified Bid, $650,000; and (ii) $250,000 in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**10.6.3** Is not conditioned upon (i) any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment; and (ii) or such bid being deemed the Successful Bid by the Sellers.

**10.6.4** Includes an acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**10.6.5** Includes a commitment to consummate the purchase of the Acquired Assets (including the receipt of any required Governmental Approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any Governmental Approvals which must be obtained within sixty (60) days after entry of such order.

**10.6.6** Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements; provided, however, that Delphi will have the right, in its sole discretion, to entertain bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids. Notwithstanding the foregoing, Buyer Parent will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the Sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of Buyer Parent is referred to as a "**Subsequent Bid**." If Delphi does not receive any Qualified Bids other than the Agreement received from Buyer Parent, Delphi will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of this Agreement.

**10.7** **Bid Protection.** Recognizing Buyer Parent's expenditure of time, energy and resources, Delphi has agreed to provide certain bidding protections to Buyer Parent. Specifically, Delphi has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor that all other Potential Bids must exceed. As a result, Delphi has agreed that if Delphi does not close with Buyer Parent because Delphi consummates an Alternative Transaction and Buyer Parent and/or Buyer Parent's Affiliates are not in breach of the Agreement or the Bidding Procedures, Delphi will pay to Buyer Parent the Break-Up Fee to the extent required under Section 9.2.1 hereof. The payment of the Break-Up Fee will be governed by the provisions of the Agreement and the order of the Bankruptcy Court approving the Bidding Procedures.

**10.8**    **Auction, Bidding Increments and Bids Remaining Open.**  If Delphi receives at least one (1) Qualified Bid in addition to the Agreement, Delphi will conduct an auction (the "**Auction**") of the Acquired Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or before the second (2nd) Business Day prior to the Sale Hearing, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60601-1285 or Four Times Square, New York, New York 10036 (at Delphi's election) or such later time or other place as Delphi will notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

**10.8.1**  Only Delphi, Buyer Parent, any representative of the Committee and the Equityholders' Committee, any representative of Delphi's secured lenders (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid will be entitled to attend the Auction, and only Buyer Parent and the other Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

**10.8.2**  At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Delphi whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Delphi will provide copies of the Qualified Bid or combination of Qualified Bids which Delphi believes is the highest or otherwise best offer going into the Auction to all Qualified Bidders who have informed Delphi of their intent to participate in the Auction.  Notwithstanding such determination, Delphi reserves the right, in its sole discretion, to determine which bid, or subsequent bid, is the Successful Bid (as defined below), following the conclusion of the Auction based upon a number of factors and other considerations.

**10.8.3**  All Qualified Bidders will be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

**10.8.4**  Sellers may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

**10.8.5**  Bidding at the Auction will begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $250,000 higher than the previous bid or bids. The Auction will continue in one or more rounds of bidding and will conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Buyer Parent), Delphi may give effect to any Break-Up Fee that may be payable to Buyer Parent under the Agreement as well as any assets and/or equity interests to be retained by any Seller.

71

**10.8.6** At the conclusion of the Auction, or as soon thereafter as practicable, Sellers, in consultation with its financial advisors, will: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Business received at the Auction (the "**Successful Bid(s)**" the bidder(s) making such bid, the "**Successful Bidder(s)**").

**10.9    Acceptance of Qualified Bids.**  Sellers will sell the Acquired Assets for the highest or otherwise best Qualified Bid, as determined by Delphi, upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**"). If, after an Auction in which Buyer Parent: (i) will have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it will, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee.  Delphi's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Delphi's acceptance of the bid.  Delphi will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

**10.10    Sale Hearing.**  The Sale Hearing will be held before the Honorable Judge Robert Drain on December 17, 2008 at 10.00 a.m. (prevailing Eastern Time) at the United States Bankruptcy Court for the Southern District of New York, located in New York, New York, but may be adjourned or rescheduled in Delphi's sole discretion, subject to Bankruptcy Court Approval, as necessary, without further notice by an announcement of the adjourned date at the Sale Hearing.  If Delphi does not receive any Qualified Bids (other than the Qualified Bid of Buyer Parent), Delphi will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to Buyer Parent following entry of the Sale Order.  If Delphi does receive additional Qualified Bids, then, at the Sale Hearing, Delphi will seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Delphi or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) will be deemed to be the Successful Bid(s) and Delphi will effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**10.11    Return of Good Faith Deposit.**  The Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the Closing of the Sale (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, will be applied against the payment of the Purchase Price upon Closing of the Sale to the Successful Bidder(s).  If a Successful Bidder breaches its obligations under the Bidding Procedures Order or any agreement entered into with respect to its Successful Bid or fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, Delphi will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit will irrevocably become property of Delphi.  On the Return Date, Delphi will return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**10.12**  **Reservation of Rights.**  Delphi, after consultation with the agents for its secured lenders and the Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than Buyer Parent's initial bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of  the Sale; or (c) contrary to the best interests of Sellers, its estate and creditors as determined by Delphi in its sole discretion.

**11.**    **LIABILITY, INDEMNIFICATION:**

**11.1**  **LIMITATIONS OF LIABILITY.**  SELLERS AND BUYERS SHALL NOT UNDERTAKE OR BE RESPONSIBLE FOR ANY LIABILITY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES; DELPHI WILL NOT BE LIABLE FOR ANY, AND BUYERS ASSUME LIABILITY FOR ALL, PERSONAL INJURY AND PROPERTY DAMAGE CONNECTED WITH BUYERS INVESTIGATION AND EXAMINATION OF THE ACQUIRED ASSETS, THE HANDLING, TRANSPORTATION, POSSESSION, PROCESSING, FURTHER MANUFACTURE OR OTHER USE OR RESALE OF ANY OF THE ACQUIRED ASSETS AFTER THE CLOSING DATE, WHETHER SUCH ACQUIRED ASSETS ARE USED OR RESOLD ALONE OR IN COMBINATION WITH OTHER ASSETS OR MATERIALS; AND BUYERS ACKNOWLEDGE THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE ACQUIRED ASSETS ARE BEING SOLD IN THEIR PRESENT STATE AND CONDITION, "AS IS, WHERE IS," WITH ALL FAULTS, AND BUYERS' ARE PURCHASING AND ACQUIRING SUCH ACQUIRED ASSETS ON THAT BASIS PURSUANT TO BUYERS' OWN INVESTIGATION AND EXAMINATION AFTER HAVING BEEN PROVIDED WITH AN ADEQUATE OPPORTUNITY AND ACCESS TO SUCH ACQUIRED ASSETS TO COMPLETE SUCH INVESTIGATION OR EXAMINATION.

**11.2**  **Survival.**  Except for Section 4.9 (Tax Matters) which will expire at Closing, the representations and warranties of Sellers will survive until the first (1st) anniversary of the Closing Date; provided, however that the representations and warranties set forth in Section 4.11 (Intellectual Property) will survive until the third (3rd) anniversary of the Closing Date. Notwithstanding anything to the contrary, the representations and warranties of Delphi and the Filing Affiliates shall not survive Closing.  The representations and warranties of Buyers will survive Closing until the first (1st) anniversary of the Closing Date.  The covenants and agreements of the Parties in this Agreement will survive the Closing in accordance with their terms.

**11.3**  **Indemnification.**  Except as may be expressly set forth in this Agreement (including Section 11.4 Environmental Matters) or in an Ancillary Agreement, no Seller or Buyer will be required to indemnify any other party to any of such agreements.

**11.3.1 Buyer's Indemnification of Delphi.**  From and after the Closing, Buyers will, severally and not jointly indemnify, defend and hold harmless Sellers and their Affiliates and their respective directors, officers, employees, advisors, representatives and agents from and against all Indemnifiable Losses relating to, resulting from or arising out of: (i) a breach of any representation or warranty made by any Buyer contained in this Agreement (ii) the Assumed Liabilities or the Acquired Assets; (iii) a breach of any agreement or covenant of any Buyer contained in this Agreement or any Ancillary Agreements; or (iv) the conduct of the Business or the ownership of the Acquired Assets after Closing.

**11.3.2 <u>Sellers' Indemnification of Buyers</u>**.  Subject to the limitations set forth in this Article 11, from and after the Closing, (i) each Non-Filing Seller of Acquired Assets will (solely with respect to the Retained Liabilities and representations, warranties, and covenants related to such Acquired Assets), severally and not jointly, indemnify, defend and hold harmless Buyers and their Affiliates and their respective directors, officers, employees, partners, advisors, representatives and agents from and against all Indemnifiable Losses relating to, resulting from or arising out of**:** (a) a breach of any representation or warranty made by such Seller contained in this Agreement (other than with respect to Inventory for which a Price Adjustment is made) (b) the Retained Liabilities that are retained by such Seller (to the extent arising out of the operation of the Business at and from each applicable Manufacturing Facility), (c) a breach of any agreement or covenant of such Seller contained in this Agreement or any Ancillary Agreements; or (d) the failure by such Seller to pay any amount owing with respect to any purchase money security interests, that are Permitted Encumbrances, with respect to the Acquired Assets; and (ii) to the extent that the Sale Approval Order or other applicable provisions of the Bankruptcy Code fails to discharge Liability with respect to any claims relating to Products shipped by a Filing Affiliate prior to Closing, the Sellers that are Filing Affiliates (jointly and severally with Delphi) agree to indemnify the relevant Buyer for Indemnifiable Losses.

**11.3.3 <u>Limitations</u>**.  The following limitations shall apply to both Buyers' and Sellers' indemnification obligations under Sections 11.3.1 and 11.3.2 above.

**A.**  Either Party's obligation to indemnify for Indemnifiable Losses shall apply only to those Claims which are notified to the indemnifying Party on or before the date that is twelve (12) months after the Closing Date with the exception of (i) any claims for indemnification made for a breach of Section 4.11 (Intellectual Property), which must be notified to a Seller on or before the third (3rd) anniversary of the Closing Date and (ii) any claim for environmental indemnification which is addressed in Section 11.4.2.

**B.**  No Party shall be liable for Indemnifiable Losses pursuant to this Section 11.3.2 or otherwise until: (i) an individual claim or occurrence is greater than Twenty-Five Thousand Dollars ($25,000.00) ("**Individual Claim Amount**"); and (ii) the amount of all Indemnifiable Losses (which exceeds the Individual Claim Amount) in the aggregate exceeds Two Hundred Thousand Dollars ($200,000.00) ("**Deductible Amount**"), after which point the indemnifying Party will be obligated to indemnify the indemnified Party from and against Indemnifiable Losses exceeding the Individual Claim Amounts that are in excess of the Deductible Amount; <u>provided</u>, <u>however</u>, that no Party shall in any event be obligated to indemnify the other Party for more than the Cap Amount.  The term "**Cap Amount**" means (x) for Sellers the lesser of (a) twenty five percent (25%) of the Preliminary Purchase Price for Indemnifiable Losses paid or payable by all Sellers, in the aggregate, and (b) one hundred percent (100%) of the Purchase Price for the Acquired Assets sold by an individual Seller calculated in accordance with the Purchase Price allocation amongst the Sellers for Indemnifiable Losses paid or payable by such Seller; and (y) for Buyers twenty five percent (25%) of the Preliminary Purchase Price for Indemnifiable Losses paid or payable by all Buyers, in the aggregate; <u>provided</u>, <u>however</u>, that no Cap

Amount shall apply to claims relating to any fraud or intentional breach by a Party or its Affiliates.

     **C.**     The indemnification provided in this Section 11.3.2 is the exclusive remedy for a breach by any Party of any representations or warranties contained in this Agreement, a breach by any Party of any agreement or covenant contained in this Agreement or any Ancillary Agreements, that, by its terms, is intended to be performed by a Party after the Closing Date, arising from any Retained Liabilities, or the failure by such Party to pay any amount owing with respect to any purchase money security interests that are Permitted Encumbrances, with respect to the Acquired Assets, and that there shall be no remedy for any breach by any Party of any breach of a covenant or agreement that, by its terms, is intended to be performed by such Party on or prior to the Closing Date.

     **D.**     In calculating amounts payable hereunder, the amount of any Indemnifiable Losses shall be determined without duplication of any other Losses for which a Claim has been made by a Party or could be made under any other representation, warranty, covenant or agreement included herein, i.e., an indemnified Party may not recover more than once for a particular Indemnifiable Loss.

**11.4**     **Environmental Matters:**

     **11.4.1 Indemnification of Seller and Buyer:**

     **A.**     Subject to the provisions of this Agreement, and solely with respect to the Manufacturing Facilities, each Seller shall indemnify the appropriate Buyer for Environmental Damages arising solely from Pre-Closing Environmental Contamination and Pre-Closing Compliance Matters at the Manufacturing Facility operated by such Seller.

     **B.**     Subject to the provisions of this Agreement, and solely with respect to the Manufacturing Facilities, Buyer shall indemnify the appropriate Seller for Environmental Damages arising solely from Post-Closing Environmental Contamination and Post-Closing Compliance Matters at the respective Manufacturing Facility.

     **C.**     Subject to the provisions of this Agreement, including, without limitation, the next sentence, for those Environmental Damages arising from circumstances that may be considered both: (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination; or (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Closing due to Sellers' or Buyers' actions or omissions, and each Party shall indemnify the other for its share as determined by such allocation.

     **D.**     Section 12.15 shall apply to any disputes between the parties as to environmental matters.

**11.4.2**   **Limitations on Liability.**   Claims relating to environmental matters are subject to the limitations of this Section 11.4.2 and to the Deductible Amounts and Cap Amounts of Sections 11.3.2.  Sellers shall not be liable under this Agreement for Environmental Claims or Environmental Damages:

**A.**   Arising from Pre-Closing Compliance Matters, unless written notice of such claim has been served on the Sellers on or before eighteen (18) months following the Closing Date.

**B.**   Arising from Pre-Closing Environmental Contamination, unless written notice of such claim has been served on the non-claiming Party on or before three (3) years following the Closing Date.

**C.**   Arising from Pre-Closing Environmental Contamination, unless the claiming Party discovers the facts and circumstances giving rise to such claim through the conduct of a environmental investigation in order to comply with a binding order from the Competent Authority or an investigation required by law.

**D.**   Where the indemnified party uses the Manufacturing Facility for a use other than or more sensitive than the industrial use in effect at the Closing, or seeks to or changes the zoning or land use classification of the Manufacturing Facility to a classification more sensitive than the industrial classification in effect at Closing.

**E.**   Where such Environmental Claims or Environmental Damages would not have arisen or were increased or made more costly as a result of the Buyers or any of their respective employees, agents or contractors volunteering or disclosing information to any Competent Authority or third party without the prior written consent of the Seller.

The following shall not be deemed to be or to have been volunteering or disclosing of information for the purpose of Section 11.4.2.E:

(i)   Where the disclosure is required by any law (including any Environmental Law);
(ii)   Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated;
(iii)   Where the information is clearly in the public domain through no fault of the claiming Party; or
(iv)   Where the Seller has given prior written approval to the disclosure.

**F.**   To the extent the Buyers did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner.

**11.4.3 Exclusion for Katcon Facilities**.  Notwithstanding anything to the contrary contained in this Agreement, in no event shall Sellers be liable for, and Buyers shall indemnify, defend and hold harmless from and against, Environmental Claims or Environmental Damages arising from Pre-Closing Compliance Matters or

Pre-Closing Environmental Contamination incurred in respect of or related to any of the Manufacturing Facilities of Katcon.

### 11.4.4 <u>Remediation of Environmental Damage</u>:

**A.**    Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter ("**Remedy**") to no less but no more than the Remediation Standards allowed by applicable Environmental Laws; such Remedial Works may be determined, in compliance with applicable Environmental Laws using risk assessment and related risk evaluation methods. Remedial work may be conducted using the most cost-effective and reasonable methods of investigation, corrective measures, remediation, abatement, and/or containment including, to the extent reasonably necessary, the use of institutional and engineering controls or deed restrictions for industrial purposes only, provided that such controls or restrictions do not unreasonably prevent or inhibit any uses of the Manufacturing Facilities that occurred as of the Closing Date, including any construction or expansion for industrial use and operations.

**B.**    Where a Remedy is required pursuant to this Agreement, the non-claiming Party shall conduct such Remedy.

**C.**    The conduct of a Remedy shall be as follows:

(i)    The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party may elect to adopt where such comments do not significantly increase any cost or liability of the Remedy;

(ii)    When requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority;

(iii)    Where the Seller is the non-claiming Party, Seller shall undertake the Remedy promptly, Seller will take all reasonable steps to avoid interfering with Buyer's operation or use of the Manufacturing Facility, and Buyer will reasonably cooperate with Seller including providing access to the Manufacturing Facility and the use of utilities in the conduct of the Remedy;

(iv)    Where applicable the non-claiming Party shall provide to the claiming party copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

(v)    The conduct of the Remedy shall be deemed complete when, as the case may be:

77

(1)     The non-claiming Party has received approval at the completion of the Remedy by an applicable Competent Authority; or

(2)     Subject to Section 11.4.4.A of this Agreement, the remedy meets the Remediation Standards which are allowed by applicable Environmental Laws.

**11.5     Indemnification Procedure.**   The obligations of any indemnifying party to indemnify any indemnified party under Sections 11.3.1 or 11.3.2 with respect to Indemnifiable Losses   resulting from the assertion of liability by third parties (including Governmental Authorities) (an "**Indemnification Claim**"), shall be subject to the following terms and conditions:

**11.5.1** Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of this Section 11.5.1), and the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party.  Failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Article 11, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice.  Any written notice delivered by the indemnified party to the indemnifying party seeking indemnification pursuant to this Agreement with respect to Indemnifiable Losses shall set forth, with as much specificity as is reasonably practicable, the basis of the claim for Indemnifiable Losses, the sections of this Agreement which form the basis for the claim, copies of all material written materials relating to such claim and, to the extent reasonably practicable, a reasonable estimate of the amount of the Losses that have been or may be sustained by the indemnified party.  The indemnified party shall, and shall cause its employees and representatives to, cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within ninety (90) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party, subject to the right of the indemnifying party to assume the defense of such Indemnification Claim at any time prior to settlement, compromise or final determination thereof upon written notice to the indemnified party.

**11.5.2** Anything in this Section 11.5 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne by the

78

indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

   **11.5.3 <u>Indemnification Payments</u>.** All payments under this Article 11 shall be treated as adjustments to the Purchase Price.

  **11.6** **<u>Mitigation</u>.** Notwithstanding any other provision of this Agreement, in no event shall a Party be entitled to indemnification pursuant to this Agreement to the extent any Indemnifiable Losses were attributable to such Party's own gross negligence or willful misconduct or to the extent such Indemnifiable Losses could have reasonably been avoided by an indemnified party, or the damage to such indemnified party from such Indemnifiable Losses reasonably could have been mitigated.

## 12. <u>MISCELLANEOUS</u>:

  **12.1** **<u>Fees and Expenses</u>.** Delphi, on behalf of Sellers, on the one hand, and Buyer Parent, on behalf of Buyers, on the other hand, will each bear its own expenses and the expenses of its Affiliates in connection with the preparation and negotiation of this Agreement and the consummation of the transactions contemplated hereby, including their respective brokers' or finders' fees and all fees and expenses of their respective counsel, auditors, consultants and other representatives. Buyer Parent, on behalf of each Buyer, will be solely responsible for: (i) all expenses in connection with its due diligence review of the Business, including, without limitation, surveys, title work, title inspections, title searches, environmental testing or inspections, building inspections, UCC lien and other searches; and (ii) any cost in connection with notarization, registration or recording of this Agreement or an Ancillary Agreement required by applicable Law.

  **12.2** **<u>Bulk Sales Laws</u>.** Buyer Parent on behalf of each Buyer waives compliance by Delphi and Sellers with any applicable bulk sales Law.

  **12.3** **<u>Payments in Dollars</u>.** Except as otherwise provided in this Agreement or an Ancillary Agreement, all payments pursuant hereto will be made by wire transfer in U.S. Dollars in same day or immediately available funds.

  **12.4** **<u>Amendment</u>.** This Agreement may not be amended, modified or supplemented except upon the execution and delivery of a written agreement executed by the duly authorized representative or officer of the Parties.

  **12.5** **<u>Assignment</u>.** This Agreement will be binding on and inure to the benefit of the successors and assigns of each Party, <u>provided</u>, that no assignment of any rights or obligations hereunder will be made by any Seller or Buyer without the written consent of the other Party, except the assignment of this Agreement by a Filing Affiliate to a succeeding entity following such Filing Affiliate's emergence from Chapter 11 (which assignment will not require the other Party's consent).

  **12.6** **<u>Waiver</u>.** Any waiver by Sellers or Buyers of any breach or of a failure to comply with any provision of this Agreement: (i) will be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) will not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement. At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties; (b)

waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided in this Agreement, any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

**12.7    Notices.**   Any notice, request, consent or other communication required or permitted to be given under this Agreement will be in writing and will be deemed to have been sufficiently given or served for all purposes: (i) when personally delivered; (ii) on the first (1st) Business Day after sent by a nationally or internationally recognized overnight courier service with signature to the recipient at the address below indicated; (iii) on the third (3rd) Business Day after sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) when sent if sent by facsimile with confirmation of receipt:

| | |
|---|---|
| **If to any Buyer:** | **BIENES TURGON S.A. de C.V.**<br>Manuel Ordonez<br>Santa Catarina, Nuevo Leon, Mexico 66350<br>Attn:  Carlos Turner<br>Tel.:  (52) 81 80 44 40 24<br>Fax: (52) 81 83 90 90 97 |
| **With a copy to:** | **BUTZEL LONG**<br>Stoneridge West<br>41000 Woodward Avenue<br>Bloomfiled Hills, Michigan 48304<br>Attn: Michael F. Golab<br>Tel.:  (248) 258-7854<br>Fax.: (248) 258-1439 |
| **If to Delphi:** | **DELPHI CORPORATION**<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:  Steve Olsen, M&A<br>Fax No.:  +1 248-813-2599 |
| **With a copy to:** | **DELPHI CORPORATION**<br>European Headquarters – Legal Department<br>ZAC Paris Nord II<br>64, avenue de la Plaine de France<br>BP 65059 – Tremblay en France<br>95972 Roissy CDG Cedex<br>France<br>Attn: General Counsel Europe<br>Fax No.: +33 1-5648-6939 |

provided, however, if either Party will have designated a different addressee by notice, then to the last addressee so designated.

**12.8    Entire Agreement.**  This Agreement, together with the Ancillary Agreements and the Confidentiality Agreement contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof and thereof.

**12.9    Counterparts.**  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures will be treated as originals.

**12.10    Publicity.**  Except as required by Law (and then only after prior consultation with the other Party) or in connection with the Bankruptcy Cases, neither Party (nor any of the other Buyers and Sellers) will issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party (not to be unreasonably withheld, delayed or conditioned).  Any press release or public announcement will take into account the obligation to provide prior information to Sellers' relevant works council and union representatives, in accordance with applicable law and past practice of Seller.

**12.11    Headings.**  The headings contained in this Agreement are for convenience only, do not constitute a part of this Agreement and will not be deemed to limit or affect any of the provisions hereof.

**12.12    Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable: (i) a suitable and equitable provision will be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**12.13    Third Parties.**  Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give to any Person, other than the Parties, their Affiliates (whether incorporated or yet to be incorporated after this Agreement) and their respective permitted successors or assigns, any Claims, rights or remedies under or by reason of this Agreement.

**12.14    Governing Law.**  This Agreement will in all respects be governed by and construed in accordance with the laws of the State of Michigan, and to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**12.15    Dispute Resolution:**

**12.15.1**  Seller and Buyer will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for

such negotiation by either party to the other, either party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute.  Within fifteen (15) business days after receipt of the Notice, the receiving party (the "**Defending Party**") shall submit to the other a written response.  The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties.  Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly. All negotiations pursuant to this Section 12.15.1 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

12.15.2  To the extent they remain unresolved through the procedure set forth in Section 12.15.1 above, all disputes arising out of or in connection with this Agreement or any of the Ancillary Agreements shall be submitted to the Bankruptcy Court.  The Parties agree that the Bankruptcy Court retains exclusive jurisdiction to interpret, construe, enforce, and implement the terms and provisions of this Agreement and of each of the Ancillary Agreements.  Notwithstanding anything in this Agreement or any Ancillary Agreement to the contrary, to the extent (i) both parties agree or (ii) the Bankruptcy Court refuses to hear any case arising out of or in connection with this Agreement or any Ancillary Agreement, such dispute shall then be finally settled under the Rules of Arbitration of the International Chamber of Commerce by three (3) arbitrators appointed in accordance with the said Rules.  The place of arbitration shall be in Detroit, Michigan and the proceedings shall be conducted in English.

**12.16  No Right of Setoff.**  Neither Party nor any of its Affiliates may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it under this Agreement or any Ancillary Agreement against any amounts owed under this Agreement or any Ancillary Agreement by such Person to the other Party or any of such other Party's Affiliates.

**12.17  Risk of Loss**.  Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business will be borne exclusively by Sellers.

**12.18  Prorations.**

12.18.1  To the extent that any Seller makes any payment relating to the Business prior to, on or after the Closing Date with respect to any item listed in Section 12.18.2 below relating to periods on or after the Closing Date, Buyer will reimburse such Seller for a portion of such payment equal to the amount paid by such Seller multiplied by a fraction the numerator of which is the number of days in the applicable billing period from and including the Closing Date to the end of the billing period and the denominator of which is the entire number of days in the applicable billing period; and

12.18.2  To the extent Buyer is required to make any payment relating to

82

the Business following the Closing Date with respect to any item listed below relating to periods prior to the Closing Date, Seller will reimburse such Buyer for a portion of such payment equal to the amount paid by such Buyer multiplied by a fraction the numerator of which is the number of days in the applicable billing period ending on the Closing Date and the denominator of which is the entire number of days in the applicable billing period:

> **A.** Water, wastewater treatment, sewer charges and other similar types of charges with respect to the Business;

> **B.** Electric, fuel, gas, telephone and other utility charges;

> **C.** Regarding Global Sale Employees, payroll expenses (excluding vacation pay) and other employee-related payments (of whatsoever kind) or assessments and installments on special benefit assessments;

> **D.** Reimbursable employee business expenses of Global Sale Employees ; and

> **E.** Payments and charges due under any Contract (other than pursuant to Collective Bargaining Agreements, Employee Benefit Plans and employee payroll-related items except as set forth in Sections 6.6), Permit, commitment or other binding arrangement to which any Seller is a party or is obligated and which are being assigned to a Buyer pursuant to this Agreement.

**12.19** **Enforcement of Agreement.** The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

*[Remainder of the page left intentionally blank.]*

83

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**DELPHI CORPORATION**

By: _Steph H. Olsen_
Name: Stephen H. Olsen
Title: M+A Director

**BIENES TURGON S.A. de C.V.**

By: _____
Name:
Title:

The following U.S. Persons sign this Agreement solely with respect to the Acquired Assets being bought or sold by such Person.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By: _Steph H. Olsen_
Name: : Stephen H. Olsen
Title: M+A Director

**DELPHI TECHNOLOGIES, INC.**

By: _Steph H. Olsen_
Name: Stephen H. Olsen
Title: M+A Director

84

**IN WITNESS WHEREOF,** each of the Parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

**DELPHI CORPORATION**

By: _____
Name:
Title:

**BIENES TURGON S.A. de C.V.**

By: _____
Name:          CARLOS TURNER
Title:          DIRECTOR, BUSINESS DEVELOPMENT

The following U.S. Persons sign this Agreement solely with respect to the Acquired Assets being bought or sold by such Person.

**DELPHI AUTOMOTIVE SYSTEMS LLC**

By: _____
Name: :
Title:

**DELPHI TECHNOLOGIES, INC.**

By: _____
Name:
Title:

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Detail of Sellers and Buyers |
| Schedule 1.1.A | Buyers Knowledge |
| Schedule 1.1.B | Sellers Knowledge |
| Schedule 2.1.2.B | Acquired Assets - Machinery and Equipment |
| Schedule 2.1.2.F | Real Property |
| Schedule 2.1.2.G | Technical Center Assets |
| Schedule 2.1.3.N | Excluded Computer Hardware, Equipment, Software and Other Assets |
| Schedule 2.3.2 | Retained Environmental Liabilities |
| Schedule 3.3.1 | Closing Working Capital Statement |
| Schedule 3.5.1 | Allocation of Preliminary Purchase Price |
| Schedule 4.3 | Shares of Sale Companies |
| Schedule 4.4 | No Conflicts or Approvals |
| Schedule 4.5 | Sufficiency of Acquired Assets |
| Schedule 4.6 | Compliance with Laws; Permits |
| Schedule 4.7 | Proceedings against Sellers |
| Schedule 4.8 | Absence of Certain Changes |
| Schedule 4.9 | Tax Notices/Deficiencies |
| Schedule 4.10.1 | Global Sale Employees |
| Schedule 4.10.2 | Seller Employee Benefit Plans |
| Schedule 4.10.4 | ERISA, IRC and Other Laws Compliance |
| Schedule 4.10.5 | Proceedings relating to Sellers Employee Benefit Plans |
| Schedule 4.10.6 | ERISA Liabilities |
| Schedule 4.10.9 | Collective Bargaining Agreements |
| Schedule 4.10.10 | Labor Matters |
| Schedule 4.11.1 | Patents and Trademarks |
| Schedule 4.11.2 | Internet Domain Names |
| Schedule 4.11.4 | Infringement Claims by 3rd Parties |
| Schedule 4.11.5 | Third-Party Software |
| Schedule 4.12.1 | Material Contracts |
| Schedule 4.12.2 | Default/Post-Petition Contracts |
| Schedule 4.12.3 | Government Contracts |
| Schedule 4.12.4 | Assignment of Rights |
| Schedule 4.13.1 | Defects in Title for Personal Property Assets |
| Schedule 4.13.3 | Machinery, Equipment, Tools |
| Schedule 4.14.1 | Leased Real Property |
| Schedule 4.14.2 | Owned Real Property |
| Schedule 6.1 | Exceptions to Covenants Regarding Conduct of Business prior to the Closing |
| Schedule 6.3 | Assumed U.S. Contracts |
| Schedule 6.6.1 | U.S. Employees Selected by Buyer |
| Schedule 6.6.3 | Liability Balance Sheet Provisions |
| Schedule 6.6.3.1 | Employee Benefit and Severance Costs Australia |
| Schedule 6.6.3.2 | Employee Benefit and Severance Costs China |
| Schedule 6.6.3B(ii) | Shortfall |
| Schedule 6.11.1 | Intellectual Property Licensed Contracts to be Sub-Licensed to Buyers |
| Schedule 6.11.2 | License Grant From Buyer to Seller |
| Schedule 6.12.1 | Competition Filings |
| Schedule 6.16.2 | Other Government Subsidies |
| Schedule 6.21 | Open Customer Reimbursement Obligations as of Closing |

1

## SCHEDULE 1

## DETAILS OF SELLERS AND BUYERS

| | ASSET/ SHARE | ASSET SELLER | SECURITIES SELLER | SALE COMPANY | BUYER |
|---|---|---|---|---|---|
| **MANUFACTURING FACILITIES** | | | | | |
| Mexico:<br>  Santa Catarina District, Monterrey<br>  Guadalupe District, Monterrey<br><br>-------------------------------------------<br>Valencia, Venezuela | Share | n/a | Delphi Controladora, S.A. de C.V. (40% JV) | Katcon, S.A. de C.V. | To be provided 10 days prior to Closing |
| Port Elizabeth, South Africa | Share | n/a | Delphi Holdings Luxembourg S.àr.l. (100%) | Delphi South Africa (Proprietary) Ltd. | To be provided 10 days prior to Closing |
| Shanghai, China | Asset | Shanghai Delphi Emission Control Systems Co., Ltd. | n/a | n/a | To be provided 10 days prior to Closing |
| Clayton, Australia | Asset | Delphi Automotive Systems Australia Limited | n/a | n/a | To be provided 10 days prior to Closing |
| Gurgaon, India | Asset | Delphi Automotive Systems Private Ltd. | n/a | n/a | To be provided 10 days prior to Closing |
| Blonie, Poland | Asset | Delphi Poland S.A. | n/a | n/a | To be provided 10 days prior to Closing |
| | | | | | |
| **TECHNICAL CENTERS:** | | | | | |
| Bascharage, Luxembourg | Asset | Delphi Automotive Systems Luxembourg S.A. | n/a | n/a | To be provided 10 days prior to Closing |
| Flint/Auburn Hills, Michigan | Asset | Delphi Automotive Systems LLC | n/a | n/a | To be provided 10 days prior to Closing |
| | | | | | |
| **TECHNOLOGY:** | | | | | |
| Troy, Michigan | Asset | Delphi Technologies, Inc. | n/a | n/a | To be provided 10 days prior to Closing |

**SCHEDULE 3.5.1**

**ALLOCATION OF PRELIMINARY PURCHASE PRICE**

The Preliminary Purchase Price shall be allocated as follows`

| | | Purchase Price Allocation $ USD MM |
|---|---|---|
| 1. | Katcon, S.A. de C.V.  -  Sale of Shares | 2.4 |
| 2. | Delphi South Africa (Proprietary) Ltd. Sale of Shares | 2.0 |
| 3. | Shanghai Delphi Emission Control Systems Company, Ltd. (China) Sale of Assets | 4.2 |
| 4. | Delphi Automotive Systems Australia Ltd. Sale of Asset | 3.3 |
| 5. | Delphi Automotive Systems Pvt. Ltd. Maharashtra, India Sale of  Assets | 0.2 |
| 6. | Delphi Poland S.A. | 4.7 |
| 7. | Delphi Automotive Systems Luxembourg S.A. | 0.05 |
| 8. | All Acquired Assets of Filing Affiliates. | 0.15 |
| | **Total** | 17.0 |