**QUINN EMANUEL URQUHART**
**OLIVER & HEDGES, LLP**
Susheel Kirpalani (SK-8926)
James C. Tecce (JT-5910)
Scott C. Shelley (SS-1013)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Hearing Date: November 24, 2008
Objections Due: November 20, 2008

*Counsel To The Collective Of Tranche C DIP Lenders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
In re:                                                  :
                                                        :  Chapter 11
DELPHI CORP., ET AL.,                                   :  Case No.  05-44481 (RDD)
                                                        :  Jointly Administered
                                        Debtors.        :
------------------------------------------------------- x

### TRANCHE C COLLECTIVE'S (I) RESPONSE TO DEBTORS' MOTION TO SUPPLEMENT DIP FINANCING ORDER AND APPROVE ACCOMMODATION AGREEMENT, (II) CROSS-MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 361, 363(e), AND 1107(a) FOR ENTRY OF ORDER PROVIDING ADEQUATE PROTECTION IN EXCHANGE FOR FORBEARANCE, AND (III) MOTION PURSUANT TO 11 U.S.C. § 105(d) FOR CHAMBERS CONFERENCE

A collective of Tranche C Lenders under the Credit Agreement[1] (together, the "Tranche

C Collective"),[2] by and through their undersigned counsel, submit this (I) response to the

---

[1]     Amended and Restated Revolving Credit Agreement, Term Loan and Guaranty Agreement among Delphi Corporation, as Borrower, and JPMorgan Chase Bank, N.A., as Administrative Agent (the "Administrative Agent"), dated May 9, 2008 (the "Credit Agreement").  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

[2]     The members of the Tranche C Collective appear on Schedule 1 hereto.  As set forth in the Statement Pursuant to Rule 2019 filed contemporaneously herewith, the formation of the Tranche C Collective is solely for certain Tranche C Lenders to share common expenses through joint representation and to enhance the possibility of a coordinated effort on behalf of similarly situated parties for so long as its members wish to do so.  No party in interest in the Bankruptcy Cases should construe the term "Tranche C Collective" as being an official or unofficial committee, or acting in any representative or fiduciary capacity, and no third party should consider the Tranche C Collective as protecting their interests.

Emergency Motion For Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith (the "Accommodation Agreement Motion"), dated November 7, 2008 and filed by Delphi Corp. and its affiliated debtors and debtors in possession in the above-captioned cases (the "Debtors" or the "Company"), (II) cross-motion, pursuant to sections 105(a), 361, and 363(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), for entry of an order providing adequate protection for the use of collateral in which Tranche C Lenders have an interest, in exchange for forbearance, and (III) motion, pursuant to section 105(d) of the Bankruptcy Code, for a chambers conference at the Court's earliest convenience.  In support hereof, the Tranche C Collective respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.      ***The Simple Truth.***  Members of the Tranche C Collective have been among the Debtors' most supportive parties in interest, since even before the bankruptcy filing.  When capital and flexibility have been needed, the Company always found a haven in these lenders.  As Tranche C Lenders, they fully understood that certain limitations exist within the Credit Agreement.  The situation facing these estates, however, is not that simple.  The DIP Loan is approaching its final maturity, and the Tranche C Lenders were entitled to rely upon that.  While the Tranche C Collective supports forbearance under appropriate conditions, the Company seeks broad latitude to continue incurring administrative expenses without any regard for its long-standing Lenders whose interests are not being protected at all, *and whose maturity is not being honored.*

2

2.        The Tranche C Collective remains committed to the Company and would agree to forbear, even when the market value of its members' claims has dropped precipitously.[3]  What is problematic about the Company's motion is that the Company has been forced into a corner by its supposed "relationship banks," and by concerns over the long-term viability of the Company's single-largest customer, GM.  In late October, the Debtors initially solicited unanimous Lender consent to an extension of the maturity date.  That effort failed.  Reeling from that rejection, the Debtors' launched the Accommodation Agreement Motion relying only upon the anticipated approval by the Required Lenders (a majority of Tranche A and B Loans) to forbear.  After many days, nights, and weekends of trying to decipher what was being provided in exchange for the senior-most Lenders' forbearance, the Tranche C Collective learned that several of these Lenders would forbear only if their unrelated hedging exposure (currently an unsecured administrative claim) were secured by first-priority liens ahead of the Tranche C Loans.  While the Company permitted the Tranche C Collective to propose an alternative forbearance agreement that would not trample the rights of Tranche C Lenders, the Tranche A Lenders that are hedging counterparties have been unwilling to support such a proposal, and the Company apparently feels compelled to urge an agreement that at least has a stronghold in significant Tranche A votes.[4]

---

[3]        As of the date hereof, bids to purchase Tranche C Loans have dropped to the mid-30s.

[4]        In just two business days, the Tranche C Collective obtained written support of Lenders holding in excess of $1.6 billion of Tranche C Loans and nearly $500 million of Tranche A and B Loans for an accommodation agreement that left hedging counterparties without collateral above what is permitted by the Credit Agreement.  The Tranche C Collective ceased active solicitation for such an alternative when it became clear that the Company and the Agent were continuing to work at cross purposes by urging their form of Accommodation Agreement, with deadlines designed to force Lenders to vote or risk losing the accommodation fees being offered.

3.    *Fundamental Tenets Of Bankruptcy Law Are At Issue.*  Although the Debtors would have this Court believe that the Accommodation Agreement Motion is merely an exercise of the Debtors' prescient, bargained-for rights, the real issue for the Court is whether the Bankruptcy Code provides protections for debtor-in-possession (DIP) lenders post-maturity.  At a time when credit markets have been frozen to the point of chilling even the sanctity of DIP financing (long believed to be the most sacrosanct lending arrangement available), the Debtors are asking the Court to subvert the rights of secured DIP lenders while their own publicly filed forecasts would have the estates consuming $1.3 billion of cash as the Debtors venture down a yet-to-be-determined path to emergence.  In addition, although difficult to glean from the Accommodation Agreement Motion, the Debtors seek to elevate $200 million of *pre-existing* unsecured hedging obligations to first-priority lien status, thereby diluting the liens held by all first-lien lenders and priming holders of Tranche C Loans.[5]  All of this is being done to the Lenders at a time when macroeconomic conditions, and the automotive industry in particular, are at their weakest point in decades.[6]

---

[5]    The Court may question why the Debtors would seek to prime their existing DIP Lenders by securing pre-existing administrative expense claims.  The answer is that *all* of these claims are held by certain Tranche A Lenders whose votes are being solicited by the Debtors, including the DIP credit facility agent, JP Morgan Chase.  Even more unfair is that, contrary to the assurances contained in the Accommodation Agreement Motion, the Debtors have since determined that they will *not* be able to pay cash interest to holders of Tranche C Loans from and after the effectiveness of the Accommodation Agreement, notwithstanding the fact that ordinary administrative expense claims held by Tranche A Lenders are being secured and will continue to be paid in the ordinary course.  In contrast, GM's junior revolving credit facility (which is subordinate to the Tranche C loans) will continue to be paid cash interest.

[6]    Although by no means dispositive, the trading value of Tranche C Loans is indicative of the value placed on the Collateral by the marketplace.  Although priced at par just months ago, the automotive industry's disproportionate injury from the global economic crisis has had a proportionate impact on the Company's perceived ability to repay its DIP Loans.

4

4.      ***Accommodation Agreement Seeks De Facto Maturity Extension.***  On April 30, 2008, the Debtors obtained their second extension of the Maturity Date under the Credit Agreement through December 31, 2008[7] (the "Final Maturity Date") in order to have additional time to consummate a consensual plan of reorganization that would, among other things, satisfy the DIP Lenders' super-priority administrative expense claims in full, in cash.  As more fully explained below, members of the Tranche C Collective have been supportive of the Debtors' need for flexibility and, indeed, facilitated the unanimous consent required for extending the July 1, 2008 maturity by purchasing dissenting Lenders' loans and voting in favor.  With the Final Maturity Date fast approaching, however, the Debtors have been unable to provide any assurance of emergence, and the Debtors find themselves in need of additional time.

5.      Recognizing that obtaining unanimous consent to extend is impossible given the prevailing headwinds, the Debtors seek approval of an agreement with a subset of their Tranche A and Tranche B Lenders to forbear against exercising remedies upon the occurrence of the Final Maturity Date.  What the Debtors cannot do directly -- obtain a duly authorized extension supported by all Lenders -- they are trying to do through the back-door of forbearance, offering fees and preferential treatment for any Lender that consents.[8]

---

[7]      See Order (I) Supplementing January 5, 2007 DIP Order (the "DIP Order") (Docket No. 6461) And Authorizing Debtors To (A) Extend Maturity Date Of DIP Facility, (B) Enter Into Related Documents, And (C) Pay Fees In Connection Therewith And (II) Authorizing Debtors To Enter Into Arrangement With General Motors Corporation Or An Affiliate, dated April 30, 2008 (Docket No. 13489) (the "Supplemental DIP Order"). The  Court approved the Debtors' first extension (from December 31 2007 through July 1, 2008) on November 16, 2007.  See Order Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To (I) Extend Maturity Date Of DIP Facility, (II) Enter Into Related Documents And (III) Pay Fees In Connection Therewith (Docket No. 10957).

[8]      As further evidence that the Accommodation Agreement Motion is truly an end run around the Final Maturity Date, the Debtors are even seeking to alter the definition of the Carve-Out for professionals to effectively waive the default of nonpayment upon maturity and reserving the $35 million professional fee basket for a future default.

6.      ***Bridge To Nowhere Amidst Deteriorating Collateral Position.***  The Debtors' own publicly disclosed projections demonstrate that forbearance without a cogent exit strategy destroys value.  The Debtors' business plan results in a near depletion of the Debtors' cash resulting from the burn of $1.3 billion from September 30, 2008 through the end of the forbearance period.  Moreover, the Debtors have failed to provide greater assurance of emergence at the end of the forbearance period (after the cash has been burned) than there is today.  The Accommodation Agreement is not a routine matter of "buying time" for a clear path to emergence.  The Debtors are seeking to march Tranche C Lenders down a dangerous path that ends with de minimis cash and potentially no light at the end of the tunnel.

7.      ***Lack Of Disclosure, Preferential Treatment, And Inherent Conflicts Require Certain Consents To Be Disregarded.***  The Accommodation Agreement not only circumvents the Credit Agreement's requirement that all Lenders must approve an extension of the Final Maturity Date, but it also effects a surreptitious priming of the Tranche C Lenders by a select subset of Tranche A Lenders, including the Agent, whose unsecured claims are to be elevated in exchange for their votes.  The Accommodation Agreement Motion neglects to inform the Court of this improper manipulation of the consent process.  Specifically, the Credit Agreement permits a maximum of $150 million of secured hedging obligations to prime the Tranche C Lenders with first-priority liens.  The Accommodation Agreement seeks to *increase that amount of first-lien debt by $200 million*, to a total of $350 million.[9]

---

[9]      Hedging counterparties that currently hold only unsecured administrative expense claims will now enjoy the benefit of not only first-lien collateral, but *cash* collateral, *plus* periodic payments over time -- while holders of Tranche C Loans' super-priority administrative expense receive nothing.  And, at the conclusion of the forbearance period, to the extent the obligations are not fully paid, these hedging counterparties will still have access to first-lien collateral.

8.      The first question is how, in the face of declining Collateral value, could the

Debtors *prime* the Tranche C Lenders without any modicum of adequate protection.[10]  The

second question is why would the Debtors seek to elevate otherwise unsecured hedging exposure

to first-priority lien status at this turbulent time.[11]  To the extent that the Debtors obtain votes of

a subset of Tranche A Lenders (including JP Morgan Chase as the Agent) that are counterparties

to hedging agreements by elevating such parties' hedging obligations from unsecured to first-

priority lien status, the Court should disregard such votes as not having been cast in their

capacities as Lenders (or an Agent for the Lenders).  At a minimum, the Debtors should be

required to disclose the identities of all Lenders voting in favor of the Accommodation

Agreement, and whether such Lenders (or their affiliates) also hold unsecured claims as hedging

counterparties.  In this way, the Court can ensure that the Credit Agreement's voting mechanics

vis-a-vis the Lenders are not being manipulated.[12]

---

[10]    See 11 U.S.C. § 364(d)(1)(B) ("[t]he court, after notice and a hearing, may authorize the
obtaining of credit or the incurring of debt secured by a senior lien or equal lien on
property of the estate that is subject to a lien only if -- … (B) there is adequate protection
of the interest holder of the lien on the property or the estate on which such senior or
equal lien is proposed to be granted").

[11]    While the Debtors undoubtedly will assert business rationales why they do not want out-
of-the-money hedging contracts to be terminated and crystallized into an administrative
expense claim on January 1, 2009, in the absence of the Accommodation Agreement, that
claim would not be entitled to payment until after the DIP Loans are paid in full.  The
business rationale serves only to disguise the real motivation -- the vote.  Moreover, the
Debtors failed to disclose in their motion that there could be a blatant conflict of interest
for certain Tranche A Lenders in requesting an elevation of unsecured hedging
obligations.  It was only after intensive due diligence that the Tranche C Collective
learned of the conflict.

[12]    These same Tranche A Lenders would also be the beneficiaries of the inflated consent fee
structure, which is based on the size of previous Commitments -- including unused and
*unusable* Commitments (i.e., ignoring the anticipated termination of unused
Commitments).  Given the Debtors' proposal to immediately terminate unusable Tranche
A Commitments after receipt of the forbearance, it seems inappropriate for the Debtors to
pay a 2% fee for the forbearance of $884 million of Commitments ($1.1 billion total
current Tranche A Commitments less $216 million of anticipated remaining
Commitments) that will be retired irrespective of the Tranche A Lenders' vote.  This

9.      ***Fees Should Be Disclosed.***  In addition, the Debtors must disclose the amount

and proposed beneficiaries of the allegedly "confidential" fee letter referenced in the

Accommodation Motion.  <u>See</u> Accommodation Agreement at p. 25 (§ 30(x)) (referring to fees).

This type of information does not qualify for any protection from disclosure pursuant to Section

107 of the Bankruptcy Code or Rule 9018 of the Bankruptcy Rules, particularly in the

circumstances when every dollar spent on fees is a dollar that violates the absolute priority of the

Tranche C Lenders' super-priority administrative expense claims.  At a minimum, the fees must

be disclosed to all Lenders whose Collateral is being used to pay for them.  Furthermore, the

Court should be troubled by the payment of fees to an Agent that did nothing more than arrange

a sweetheart deal for itself (on account of its unsecured hedging exposure) at the expense of all

Lenders.

10.      ***Tranche C Collective Remains Supportive Of The Debtors' Operations.***

Consistent with prior practice at every turn of these cases, the Tranche C Collective remains very

supportive of the Debtors' need for flexibility and efforts to maximize value.  However, the

Accommodation Agreement Motion is an improper way to operate in the face of a DIP maturity.

Indeed, the Debtors are putting the Court in the position of overseeing the continued incurrence

of administrative expenses with no meaningful milestones.  Moreover, in their zeal for

forbearance, the Debtors' trample the rights of secured creditors and offer $200 million of

---

amounts to an $18 million cash drain that could easily be avoided if the Debtors
terminated the unusable portion of the Tranche A Commitment prior to the vote.  If the
Court is asked to rely upon consents obtained by Lenders to forbear post-maturity, the
Court should require the vote to be taken *without* the votes of those Tranche A
Commitments that will be immediately retired and *without* the preferential treatment
being offered to select Tranche A Lenders who have unsecured hedging exposure.
Indeed, the forbearance for wholly-unrelated hedging claims should never have been
intertwined by the Debtors and the Agent in this solicitation to begin with; if the Debtors
feel they need to provide consideration of some sort to hedging counterparties (each of
which is a substantial and supposed "relationship bank" of the Debtors), that should be
the subject of a separate motion where all Lenders can evaluate the issue free of coercion.

priming liens to obtain votes from certain holders of Tranche A Loans.

11.     The Tranche C Collective respectfully requests that the Court protect the interests of all DIP Lenders.  Specifically, the Tranche C Collective proposes a sound common-sense adequate protection package (the "Adequate Protection Package") that is better designed to ensure the Debtors are making only prudent, necessary expenditures towards a viable exit strategy, while balancing the rights of Lenders to be paid upon maturity.  In addition to the various forms of adequate protection proposed by the Accommodation Agreement, as amended, the Court should impose the following:

a.     the Court should, at its earliest convenience, hold a Chambers conference to be advised of the true cash needs of the Debtors post-maturity and to understand the various ways the Debtors are protecting all stakeholders and enhancing the prospects for emergence;

b.     no payments or cash collateralization (or granting of liens, including the creation of rights of setoff) in respect of any currently unsecured hedging obligations should be permitted;

c.     all cash in excess of that required to operate the business should be applied to pay down the Tranche A Loans and Tranche B Loans (this would amount to a cash pay down of at least $381 million, including the $200 million that will no longer be used to secure hedging counterparties and assuming $397 million of current draws on the Tranche A Commitment are reduced, by $181 million, to $216 million drawn in accordance with the November 8-K (as defined below));

d.     the Court should impose additional milestones (beyond merely the filing of a plan on February 27th) that are appropriate in light of the myriad interests while ensuring treatment for all stakeholders that is consistent with the Bankruptcy Code;

e.     the Court should require the Debtors and the Agent to provide full access (at reasonable times and places) to any Lenders wishing to perform due diligence on the Company's prospects, and the Debtors should be required to advance the costs of at least one legal and financial advisor to assist Tranche C Lenders in undertaking this diligence[13]; and

---

[13]     Section 10.05(a)(i)(B) of the Credit Agreement provides for the payment of expenses of the Lenders "in connection with the enforcement of the Loan Documents."  Given the inherent conflict of interest of the Agent in simultaneously negotiating for its own

    f.      the Court should require the Debtors to provide periodic status conferences (with no longer intervals than monthly) where the Debtors and their stakeholders, including General Motors Corporation ("GM"), will have the opportunity to be heard on the Debtors' plans and prospects for emergence.

12.      The Adequate Protection Package is consistent with the support for the Debtors displayed by certain members of the Tranche C Collective since the inception of these cases, and even pre-bankruptcy, as these Lenders have stood behind the Debtors through volatile markets to pursue constructive resolutions.  In a post-maturity default scenario, however, it is not unreasonable to request greater oversight by the Court to ensure the protection of the DIP Loans.  Indeed, it is the access to, and protection of the bankruptcy court forum that underpins the sanctity of debtor-in-possession financing in all chapter 11 cases.  The Tranche C Collective is not demanding default, foreclosure, or preferential treatment.  Instead, it seeks protection of Tranche C Lenders' interests principally through a pay-down of senior DIP Loans from excess cash and Court-imposed definitive milestones for prompt emergence, taking into account the estates' multitude of interests in a manner consistent with the Bankruptcy Code.

## II.      RESPONSE TO FORBEARANCE MOTION

**A.**    **FACTUAL BACKGROUND**

    **1.**    **CREDIT AND SECURITY AGREEMENTS**

13.      The Credit Agreement contains three tranches of indebtedness (collectively, the "DIP Loan"), specifically the Tranche A Commitments (totaling $1.1 billion), the Tranche B Commitment (totaling $500 million) and the Total Tranche C Commitment (totaling approximately $2.75 billion).[14]  The lenders in each tranche are defined in the Credit Agreement as the "Tranche A Lenders," the "Tranche B Lenders" and the "Tranche C Lenders," respectively

---

    unsecured hedging exposure as well as the fairest terms of forbearance for the Tranche A, B, and C Lenders, this request is presumably not controversial.

[14]    Credit Agreement at 31-32.

(collectively, the "Lenders, and each, a "Lender").[15]  Each Lender is also a "Secured Party" under the related Security and Pledge Agreement (the "Security Agreement") pursuant to which the Debtors pledged virtually all their tangible and intangible assets (the "Collateral") to secure the Credit Agreement Obligations.[16]

14.     The Credit Agreement matures on December 31, 2008.[17]  It also requires that amendments to effectuate Maturity Date extensions *must be approved by all Lenders*.[18]

### 2.     TRANCHE C COLLECTIVE'S CONSISTENT SUPPORT CAN BE TRACED BACK TO INCEPTION OF THESE CASES

15.     Members of the Tranche C Collective have a proven track record of working cooperatively and constructively with the Debtors that began years ago and has remained steady during the recent crises.  Notably, in the Spring of 2008, certain members of the Tranche C Collective were significant participants in the proposed exiting financing committed for the first attempted chapter 11 exit.  A $1.7 billion exit facility was successfully completed during a turbulent time for the capital markets and the automotive industry in particular, and the

---

[15]     Id.

[16]     See Security Agreement at 6 (§ 2) ("This Security Agreement and the Collateral secure the payment of (i) the Obligations, (ii) any obligations of each of the Grantors in respect of Indebtedness owed to JPMCB, CUSA *or any other Lender* or any of their respective banking Affiliates (or any Person that was a Lender or a banking Affiliate of a Lender at the time such obligation was incurred …").

[17]     See Credit Agreement at 24 ("'Maturity Date' shall mean December 31, 2008'").

[18]     See Credit Agreement at 97-98 (§ 10.09(a) ("No modification, amendment or waiver of any provision of this Agreement … shall in any event be effective unless the same shall be in writing and signed by the Required Lenders …. provided, however, *that no such modification or amendment shall without the written consent of …. (ii) the Lender affected thereby …. (B) … extend the final maturity of the Borrower's obligations hereunder* ….") (emphasis added).  See also Credit Agreement at 28 ("'Required Lenders' shall mean at any time Lenders having Tranche A Commitments at such time … and Lenders holding a portion of the Tranche B Loan at such time … representing in excess of 50% of the sum of (x) the Total Tranche A Commitment at such time … plus (y) the Total Tranche B Commitment at such time").

availability of this financing placed the Debtors in a position to emerge successfully.  In addition,

when the Debtors' failed to consummate their chapter 11 plan, they found themselves under

intense pressure to meet the July 1, 2008 Maturity Date.  Several members of this collective

worked with the Debtors to meet that challenge by agreeing to increase their commitments.  This

permitted the Debtors to refinance holdout Lenders.  Moreover, certain members of this group

engaged in productive discussions with the Debtors and their advisors to suggest amendments

and other structural changes to the currently proposed chapter 11 plan designed to improve the

Debtors' ability to raise sufficient capital to exit chapter 11 once it became apparent that the

minimum capital requirements under the plan were unlikely to be raised.  Simply put, the

Tranche C Collective consists of some of the most supportive creditors of the Debtors' efforts to

date, Lenders who provided nearly one billion dollars of capital to the Debtors on the

understanding that this capital would be used prudently to enable a timely emergence from

chapter 11.

**B.    ACCOMMODATION AGREEMENT IS IMPROPER**

    **1.    DEBTORS WILL CONSUME MASSIVE
        AMOUNTS OF CASH DURING FORBEARANCE**

    16.    The Debtors do nothing to explain why value degradation through greater delay

with no committed exit strategy present the estates' best option.[19]  On October 27, 2008, the

---

[19]    The Debtors fail to provide any substantive update on their efforts to obtain requisite
financing for their Modified Plan.  See Accommodation Mot. at 4 (¶ 3) (noting only that
"[d]espite the efforts of the federal government to provide stability to the capital markets
and banks, the markets have remained extremely volatile and liquidity in the capital
markets has been nearly frozen, resulting in an unprecedented challenge for the Debtors
to successfully extract emergence capital funding for their Modified Plan.  Nevertheless,
assuming that this Court approves this Motion and the companion GM Arrangement
Second Amendment Approval Motion, the Debtors will continue to work with their
stakeholders in an effort to emerge from chapter 11 as quickly as practicable despite the
difficult economic environment").  While these significant headwinds are well known to
all stakeholders, the Debtors have provided no clues as to what their plan is to combat
these headwinds and transform the Debtors into a cash-flow positive business capable of

Debtors filed public disclosures projecting their liquidity over the next several months which were subsequently revised in public disclosures on November 17, 2008.  A copy of the Debtors' current report on Form 8-K filed with the Securities and Exchange Commission on October 27, 2008 is attached hereto as Exhibit A (the "October Form 8-K") and the Debtors' current report on Form 8-K filed with the Securities and Exchange Commission on November 17, 2008 is attached hereto as Exhibit B (the "November Form 8-K").  The financial information disclosed by the Debtors in those filings confirms that value will be lost by delay absent a definitive solution and value-stabilizing event.

17.    Specifically, the Debtors' projections show their U.S. operations losing over $1.3 billion in cash during the period from September 30, 2008 through their requested forbearance date of June 30, 2009 (excluding draws on the DIP revolver, GM's liquidity facility, and GM's agreement to fast-pay in the second quarter of 2009).  See November Form 8-K, Ex. 99(a), at 2 (Financial Overview).  This amounts to an average cash usage of approximately $150 million per month and does not include a single month in which the U.S. operations are expected to generate cash from sources other than financing or accelerated receivable payments from GM.  Moreover, the Debtors' projections take the U.S. operations from $1.3 billion of cash at the end of September 2008 to only $25 million at the end of June 2009.  See November Form 8-K, Ex. 99(a), at 2 (Financial Overview).  Incrementally, $300 million of GM receivables are eliminated under the fast-pay arrangement in April 2009 through June of 2009.  See November Form 8-K, Ex. 99(a), at 2, footnote 3 and October Form 8-K,  Item 7.01, clause (v) and Ex. 99(a), at 5.

---

emerging despite the current macroeconomic environment.  With no guidance from the Debtors, stakeholders are left to wonder why the Debtors should be enabled to exclusively pursue a business plan that burns cash in every month of the forecast period and leaves the Debtors with a paltry $25 million of cash at the end of the forecast.

18.     Despite the efforts of the Debtors to transform their U.S. operations, the most recent GSA/MRA with GM has not eliminated uncertainty during the proposed forbearance period, thereby imposing undue and unfair risks upon the Tranche C Lenders.  The Tranche C Collective shares the Debtors' hope that their U.S. operations will stabilize as its largest customer, GM, works through its current challenges.  However, there can be no assurance of such outcomes, which are beyond the control of the Debtors.  As such, the Debtors are attempting to force the DIP Lenders into a position where the value of their Collateral is subject to significant diminution, while the Company clings to an optimistic hope that the economic climate will improve, representing a direct value transfer from the DIP Lenders to the Company's more junior stakeholders.  At bottom, the Company is asking its DIP Lenders to bear 100% of the collateral diminution risk (without adequate protection) in any scenario where the domestic automotive industry remains status quo or deteriorates.  The DIP Lenders should not be forced to bear this unreasonable risk particularly after the Final Maturity Date.

**2.     SURREPTITIOUS PRIMING TO OBTAIN VOTES FROM HEDGING COUNTERPARTIES**

19.     Although not disclosed in the Accommodation Agreement Motion, certain of the Debtors' Tranche A Lenders (including the Agent, which has been central to the forbearance process)[20] also have significant unsecured hedging exposure to the Debtors.  The Accommodation Agreement seeks to elevate these unsecured claims to first-priority lien status as part of the solicitation of Tranche A Lender votes.

---

[20]     The exculpation for the Agent in the Credit Agreement does not cover actions taken without the consent or direction of the Required Lenders.  It is inconceivable that the Required Lenders insisted on having the singular option of forbearance conditioned upon granting pari passu liens to hedging counterparties, such as the Agent.  Pushing its own economic interests ahead of the Lenders is precisely what the Agent receives no exculpation for doing.

20.     The Credit Agreement currently permits a maximum of $150 million of secured hedging obligations to rank *pari passu* with the Tranche A and B Lenders, ahead of the Tranche C Lenders.[21]  The Accommodation Agreement seeks to increase that amount *by a staggering $200 million*, to a total of $350 million.[22]  It strains credulity to assert that elevating $200 million of unsecured claims to first-priority lien status provides any benefit to the Debtors' estates.  The only logical conclusion is that the Debtors have no choice but to offer this special treatment to creditors that also hold significant Tranche A Loans in order to convince them to vote their Tranche A Loans in support of the Accommodation Agreement.  If so, these consents should be disregarded through the Court's equitable powers because they are not being cast as a Tranche A Lender, but rather as an unsecured creditor seeking to obtain collateral to secure its escalating mark-to-market hedging exposure.  Elevating unsecured claims to first-priority lien DIP Loan status in exchange for votes would constitute a patent abuse of the bankruptcy process.  Moreover, the Debtors have made no showing whatsoever on how they can prime the Tranche C

---

[21]     See Credit Agreement at 19 (defining "Hedging Agreements" as "(x) foreign exchange contracts, currency swap agreements, currency future or option contracts and other similar agreements designed to hedge against fluctuations in foreign interest or exchange rates, (y) interest rate swap, cap or collar agreements and interest rate future or option contracts designed to hedge against fluctuations in interest rates and (z) commodity price protection agreements or other commodity price hedging arrangements"); at 75 (§ 6.02 (xvi) (permitting "(A) Liens securing indebtedness in respect of Hedging Agreements … so long as the aggregate amount of Indebtedness so secured (determined on a marked-to-market basis) does not exceed $150,000,000 and (B) … such Liens rank pari passu with the Liens created under the Loan Documents in favor of the Administrative Agent, the Tranche A Lenders and the Tranche B Lenders")).

[22]     See Accommodation Agreement at 18 (¶ 18) ("Section 6.01(xvi) of the Credit Agreement is hereby amended by amending and restating such section to read as follows '(xvi) (A) Liens securing Indebtedness in respect of Hedging Agreements … (of which (I) an aggregate amount of such Indebtedness so secured (determined on a marked-to-market basis) of up to $350,000,000 shall rank pari passu with the Liens created under the Loan Documents in favor of the Administrative Agent, the Tranche A Lenders and the Tranche B Lenders …").

Lenders by $200 million without any modicum of adequate protection.[23]

21.     The Tranche C Lenders have a legitimate expectation of being repaid on the maturity date of their loan.  As the Court knows, relying upon the maturity of a loan is fundamental to the way a lender makes its credit decision.  Moreover, the granting of first priority liens to elevate unsecured hedging obligations violates the DIP Order (¶ 13(a)), which provided comfort to Tranche C Lenders that at least their priority position would be preserved until paid:

> No claim or lien having a priority superior to or *pari passu* with those granted by this Order to the Agent and the DIP Lenders ... shall be granted or allowed while any portion of the Financing ... or the DIP Obligations remain outstanding, and the DIP Liens ... shall not be ... subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise (other than as specifically provided for in this Order).

22.     The Debtors find themselves between a rock and a hard place because no debtor in possession would choose to attempt to prime DIP lenders post-maturity and elevate lower rank unsecured administrative expense claims, when more than $2.75 billion of DIP Loans are not receiving any payments.  The purported business rationale of wanting to avoid termination of these out-of-the-money hedging contracts (and the crystallization of contingent administrative expenses) is simply not convincing under the circumstances.  Nor is it compelling that the Debtors would prefer not to operate without hedge protection for pesos and copper in 2009.  While it is possible (though far from certain) that the counterparties might seek to terminate these hedges, the true consequences of such action are not as grave as the Debtors portray.  The Debtors fail to acknowledge that there are far cheaper methods to preserve the existing hedging economics.  Put simply, the proposed priming of the Tranche C Lenders simply is not the cheapest or best (let alone fairest) means of preserving the economics of these hedges (which are detrimental to the estates in any event, *i.e.,* the reason these contracts are out-of-the-money is

---

[23]     <u>See</u> 11 U.S.C. § 364(d)(1)(B).

that the Debtors could purchase the needed commodities more cheaply on the open market).[24]

While there are sound long-term business reasons for having hedging contracts in place, if the

Debtors propose filing a chapter 11 plan within just two months of the commencement of

forbearance, these hedging agreements should be dealt with in that context.

### C.    ACCOMMODATION AGREEMENT MOCKS TRANCHE C LENDERS' RIGHTS TO PARTICIPATE

23.    The Accommodation Agreement Motion is replete with opaque statements

suggesting the Tranche C Lenders are important constituents but, ultimately, they have no

audible voice to question the wisdom of the Debtors' path for emergence.  On the one hand, the

Debtors pay lip service to the continued protection for all DIP Lenders:  "a chapter 11 plan must

provide that, unless otherwise agreed by the claimant, holders of administrative expense claims,

such as those held by the DIP Lenders, 'on the effective date of the plan receive on account of

such claim cash equal to the allowed amount of such claim.'"[25]  At the same time, however, if the

chapter 11 plan that the Debtors propose to file by February 27, 2009 is objectionable to Tranche

C Lenders, the Tranche C Lenders can do nothing to change course.

---

[24]    Just by way of one example, a far less expensive alternative that provides the Debtors with protection nearly identical to the existing hedges is for the Debtors to purchase out-of-the-money call options.  By way of illustration, if the Debtors are concerned about the risk that in 2009 and 2010 the price of copper may rise from the current spot price of $1.66/lb. above what is likely an over-$3.00/lb. price locked in under the current hedges, a simple solution would be to buy inexpensive, out-of-the-money call options on copper. The call options can be purchased relatively cheaply (and in any case for far less money than the mark-to-market loss on existing hedges), and will protect the Debtors in the event that their hedges are terminated and copper prices dramatically rise.  Based the Tranche C Collective's estimation of notional exposure, locked-in levels and current prices, the Debtors could potentially lock in the economics of their existing peso and copper hedges by buying approximately $30 million of options.  At a time when collateral is so precious, sound business judgment demands that the Debtors use $30 million of cash collateral to purchase options, rather than disposing of $200 million to cash collateralize unsecured claims.

[25]    See Accommodation Mot. p. 24 (¶ 40) (citing 11 U.S.C. § 1129(a)(9)(A)).

24.     This is significant because the Accommodation Agreement Motion provides no description of the proposed plan, especially whether it will attempt to coerce Tranche C Lenders to accept a treatment of less than full payment in cash. Were the Debtors truly concerned about stabilizing the estates, they could have stated expressly that any chapter 11 plan will pay the Tranche C Lenders in cash, in full, unless the plan is otherwise acceptable to the Tranche C Lenders. The Debtors' hard-ball tactics at a time when they should be garnering broad Lender support are not well received.

### III.     CROSS-MOTION FOR ADEQUATE PROTECTION

**A.     RELIEF REQUESTED**

25.     The Tranche C Collective requests the entry of an order providing the Adequate Protection Package under sections 361 and 363(e) of the Bankruptcy Code in exchange for the Debtors' continued use of the Collateral in these chapter 11 cases. Such relief is narrowly tailored to the harms to be avoided, and is warranted in light of the fact that (a) traditional means of adequate protection (replacement liens, super-priority administrative claims) are not available based on the unique facts of these cases and (b) the Accommodation Agreement ensures the Collateral's trend toward decline will continue at an alarming rate. In addition, in operating the Debtors' businesses post-maturity, the Court should take measures, pursuant to section 1107(a) of the Bankruptcy Code, to establish a closer watch over the estates and ensure that the rights of all parties in interest are continuously monitored consistent with the Bankruptcy Code, including the priority provisions therein and pursuant to this Court's prior DIP financing orders.

**B.     JURISDICTION AND VENUE**

26.     The Court has jurisdiction over the subject matter of this motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this motion is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested are 11 U.S.C. §§ 105(a), 361, 363(e), and 1107(a).

C.    **BASES FOR RELIEF REQUESTED**

    1.    **ADEQUATE PROTECTION STANDARDS**

27.    Bankruptcy Code section 363(e) mandates adequate protection of a creditor's interest if the debtor seeks to use property in which the creditor claims an interest:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used ... or proposed to be used ... by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code outlines -- in a non-exclusive manner -- examples of different forms of adequate protection available to interest holders, and provides, in part, that when adequate protection is required under section 363 of the Bankruptcy Code, it may be provided by (i) periodic cash payments; (ii) additional or replacement liens; and (iii) such other relief as will result in the realization by such entity of the indubitable equivalent of its interest in the debtor's property.  See 11 U.S.C. § 361.[26]

    2.    **EXERCISE OF COURT'S BROAD DISCRETION TO DETERMINE APPROPRIATE FORMS OF ADEQUATE PROTECTION IS MARKED BY FLEXIBILITY**

28.    The Bankruptcy Code affords creditors with interests in property being used by the debtor with the *right* to adequate protection.  See 3 Collier on Bankruptcy ¶361.02 (15th rev. ed. 2005) ("An entity is entitled to adequate protection *as a matter of right, not merely as a matter of discretion* ... when the estate proposes to use, sell or lease property in which the entity has an interest") (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 340, 343-44 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 52-53 (1978) (emphasis added).

---

[26]    While courts typically afford adequate protection to pre-petition creditors, the Bankruptcy Code makes no distinction between pre-petition and post-petition creditors like the Tranche C Lenders.  See 11 U.S.C. § 363(e) (a Court may grant adequate protection "on request of *an entity* that has an interest in property...") (emphasis added).

29.    Nonetheless, the Court has considerable flexibility in determining the appropriate form of adequate protection and the discretion to make case-by-case determinations.  See MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987) (adequate protection is a "concept which is to be decided flexibly on the proverbial 'case-by-case' basis"); In re Briggs Transp. Comp., 780 F.2d 1339, 1350 (8th Cir. 1985) (noting courts exercise "maximum flexibility in structuring a debtor's proposal for adequate protection" and "what constitutes adequate protection in a particular case is a question whose resolution is best left to the knowledge and expertise of the Bankruptcy Court"); Bankers Life. Ins. Co. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.), 12 B.R. 803, 813 (Bankr. D. Utah 1981) ("The facts of each case, thoughtfully weighed, not formularized, define adequate protection"); Collier on Bankruptcy ¶ 363.05 (noting examples in section 361 of Bankruptcy Code of forms of adequate protection "are not intended to be limiting").

### 3.    ADEQUATE PROTECTION THROUGH PAY-DOWN OF SENIOR LENDERS, COURT SUPERVISION, AND MILESTONES IS PROPERLY TAILORED TO CIRCUMSTANCES PRESENTED BY THESE CASES

30.    While the Adequate Protection Package does not present the typical form of adequate protection, consistent with the absence of any language suggesting the forms of protection identified in section 361 of the Bankruptcy Code are exclusive, courts have displayed a willingness to require analogous non-monetary forms of adequate protection.  See, e.g., In re Westpoint Stevens, Inc., No. 03-13532-13536 (RDD) (Docket No. 93) (adequate protection included, inter alia, affording agent financial reports, limiting capital expenditures, prohibiting inter-company transfers); In re 5877 Poplar, L.P., 268 B.R. 140, 150 (Bankr. W.D. Tenn. 2001) (adequate protection included requirement that debtor turn over books and records, provide secured creditor with inspection rights, and reinvest revenues); In re Heatron, Inc., 6 B.R. 493, 496-97 (Bankr. W.D. Mo. 1980) (adequate protection included, inter alia, periodic financial and operational reporting); In re Fruit of the Loom, Inc., No. 99-4497 (PJW) (Bankr. D. Del.)

(adequate protection requirement that debtors deliver financial information and reports to lenders, grant advisors access to documents, and comply with financial covenants); In re Sun TV and Appliances, Inc., No. 98-2107 (MJW) (Bankr. D. Del.) (adequate protection requirement that debtors timely file motion for approval of liquidator engagement and finalize agreement to conduct store closings).

31.    This is especially true with respect to the milestones set forth in the Adequate Protection Package.  Indeed, imposing milestones on chapter 11 debtors in an effort to mitigate lending parties' risk is nothing novel.  DIP lenders frequently include milestones as specific terms and conditions of their post-petition financing agreements.  While they typically appear as events of default (i.e., the failure to meet the deadlines constitutes an event of default) rather than as a form of adequate protection, the same considerations (to protect the DIP lenders) militate in favor of their application here.  See, e.g., In re Granite Broadcasting Corp., et al., No. 06-12984 (ALG) (Bankr. S.D.N.Y.) (Final DIP Order at 29 (¶ 10(e)) (Docket No. 88) (requiring, as a form of adequate protection for the debtor's pre-petition lenders, that the debtors remain in compliance with the DIP credit agreement covenants, which included milestones); In re Silicon Graphics, Inc., No. 06-10977 (BRL) (Bankr. S.D.N.Y.) (Final DIP Order) (Docket No. 297) (approving DIP Credit Agreement (Docket No. 22) which contained milestones (§ 8.12)).  See also In re Summit Global Logistics, No. 08-11566 (DHS) (Bankr. D.N.J.) (same).

32.    According to the Debtors' public disclosures in the November Form 8-K, at the end of February 2009, the Company projects to have $76 million of U.S. cash and $216 million drawn under its DIP Revolver for a total of approximately $716 million outstanding under the Tranche A and B Commitments exclusive of undrawn letters of credit and secured hedging obligations.  See November Form 8-K, Ex. 99(a), at 2 (Financial Overview).  Reducing this $716 million obligation to $516 million through an optional prepayment would require $200 million to be drawn on the GM Agreement, leaving $100 million of availability as a liquidity cushion under

the GM Agreement.  Additionally, the Debtors' proposal to include this $200 million cash

amount in the Borrowing Base is a tacit admission that the Debtors are able to reserve up to $200

million in cash without materially impairing its liquidity cushion.[27]  Thus, based upon the

Debtors' public financial disclosures, the Adequate Protection Package's permanent reduction of

Tranche A and B Commitments is feasible, appropriate, and properly balances the needs of the

Debtors with the requirements of the Bankruptcy Code to provide protection to the Tranche C

Lenders.

## IV.    <u>MOTION FOR CHAMBERS CONFERENCE</u>

33.    The Tranche C Collective submits the Debtors are proposing steps that are

inconsistent with their fiduciary duties to preserve asset value, gambling the current value of

their assets on the hope of hitting a home run for junior stakeholders.  While the Debtors

undeniably owe duties to the entirety of their estates, those duties are not without conditions.

One such condition is to act with appropriate stewardship to protect against value diminution,

unless the Debtors can provide adequate protection against such diminution, which they have not

demonstrated an ability to do.  If these mature chapter 11 cases are to move towards an

"expeditious and economical resolution," as is contemplated by section 105(d) of the Bankruptcy

Code, the Debtors (as trustees in bankruptcy) need to meet their standards of care.  <u>See</u> 11 U.S.C.

§ 105(d) ("The court ... on the request of a party in interest ... shall hold such status conferences

as are necessary to further the expeditious and economically resolution of the case").

---

[27]    While the Debtors could assert they will be able to recover a portion of this cash
collateral from the borrowing base if working capital increases after a seasonal low in
January and hedge contracts are settled and paid at maturity, if (i) production trends
continued to overwhelm seasonal factors and the borrowing base failed to increase from
its seasonal low, and/or (ii) hedge contracts continued to move against the Debtors, then
the $200 million of cash would not be available to the Debtors as liquidity.  In other
words, the Debtors are already willing to bear realistic risk that this $200 million of cash
becomes permanently restricted.

34.     The path chosen by the Debtors leads directly toward litigious factions who may not have the same level of support for the Debtors as has been demonstrated by Lenders within the Tranche C Collective.  The Tranche C Collective is willing to offer additional solutions for the Debtors as part of an emergence plan.  The Debtors cannot properly discharge their duties without considering all alternatives, and Court's intervention is required to encourage the Debtors to seek broader support for a permanent solution from all Lenders which will enhance the prospects of emergence as expeditiously as possible, and not merely a forbearance from a subset of Lenders.  The deadline for submitting consents to the revised Accommodation Agreement is currently set for Thursday, November 20, 2008, and there is no option for Lenders to consent to a forbearance that excludes the improper elevation of hedging counterparty obligations.

## V.      NOTICE

35.     No previous request for the relief sought herein has been made to this or any other court.  The Tranche C Collective has served notice of this Motion on:  (i) the Debtors; (ii) the Administrative Agent; (iii) the Official Committee of Unsecured Creditors; (iv) the Official Committee of Equity Security Holders; (v) GM; and (vi) the United States Trustee.  In light of the relief requested herein, and the Bankruptcy Code's authority that adequate protection may be granted "with or without a hearing," the Tranche C Collective submits that no other or further notice is required.

## VI.     WAIVER OF MEMORANDUM OF LAW

36.     The Tranche C Collective submits that no new or novel issue of law is presented with respect to the matters contained herein and therefore requests that the requirement of service and filing of a memorandum of law under Local Bankruptcy Rule 9013-1(b) be deemed satisfied as the relevant authority in support of the relief requested in this Motion is cited herein.

## VII.    <u>CONCLUSION</u>

WHEREFORE the Tranche C Collective respectfully requests that the Court enter an order:  (i) denying the Accommodation Agreement Motion; (ii) conditioning the Debtors' continued use of the Collateral on provision of the Adequate Protection Package; (iii) requiring a chambers conference as soon as practicable with counsel for the Debtors, the official committees, JPMorgan Chase as Agent, and counsel for any Lender; and (iv) granting such other relief as the Court finds just and proper.

Respectfully submitted,

Dated: November 18, 2008         **QUINN EMANUEL URQUHART**
       New York, New York         **OLIVER & HEDGES, LLP**

By:    /s/ Susheel Kirpalani
       Susheel Kirpalani
       James C. Tecce
       Scott C. Shelley

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7199
Facsimile: (212) 849-7100

*Counsel To The Collective Of Tranche C DIP Lenders*

# SCHEDULE I

## (TRANCHE C COLLECTIVE)

Aberdeen Loan Funding Ltd.
Anchorage Capital Master Offshore, Ltd.
Anchorage Crossover Credit Offshore Master Fund, Ltd.
Carlson Capital, L.P.
Geer Mountain Financing Ltd.
Highland Credit Opportunities CDO Ltd.
Hillmark Funding Ltd.
Luxor Capital, LLC
Mariner LDC
Mariner Tricadia Credit Strategies Master Fund Ltd
Monarch Alternative Capital LP
OHP CBNA Funding LLC
Pentwater Credit Partners, Ltd.
RiverSource Investments, LLC
Silver Point Capital Fund, L.P.
Spectrum Investment Partners, L.P.
Stoney Lane Funding Ltd.
Tricadia Distressed and Special Situations Master Fund Ltd.
West Gate Horizon Advisors
WhiteHorse I, Ltd.
WhiteHorse II, Ltd.
WhiteHorse III, Ltd.
WhiteHorse IV, Ltd.