Judith Elkin (JE-4112)  
**HAYNES AND BOONE, LLP**  
1221 Avenue of the Americas  
26th Floor  
New York, NY 10020  
Telephone: (212) 659-7300  
Facsimile:  (212) 918-8989  

Hearing Date and Time: November 24, 2008 at 10:00 a.m.  
Objection Deadline: November 20, 2008 at 4 p.m.

Attorneys for Calyon New York Branch

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
                                                                        :
In re:                                                                  :    Chapter 11
                                                                        :
DELPHI CORPORATION, *et al.*,                                           :    Case No.  05-44481 (RDD)
                                                                        :
        Debtors.                                                        :    (Jointly Administered)
-----------------------------------------------------------------------X

**OBJECTION OF CALYON NEW YORK BRANCH TO DEBTORS' EXPEDITED MOTION FOR ORDER (I) SUPPLEMENTING JANUARY 5, 2007 DIP REFINANCING ORDER AND AUTHORIZING DEBTORS TO ENTER INTO AND IMPLEMENT ACCOMMODATION AGREEMENT WITH AGENT AND PARTICIPATING LENDERS AND (II) AUTHORIZING DEBTORS TO (A) ENTER INTO RELATED DOCUMENTS AND (B) PAY FEES IN CONNECTION THEREWITH**

Calyon New York Branch ("Calyon"), in its capacity as a Tranche A Lender under the DIP Credit Agreement,[1] submits the following *Objection to the Debtors' Expedited Motion For Order (I) Supplementing January 5, 2007 DIP Refinancing Order And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith* (the "Motion"), and for such would show the Court as follows:

---

[1] Amended and Restated Revolving Credit Agreement, Term Loan and Guaranty Agreement among Delphi Corporation as Borrower and JPMorgan Chase Bank, N.A. as Administrative Agent (the "Agent"), dated May 9, 2008, (the "DIP Credit Agreement").  Capitalized terms not otherwise defined herein will have the meaning ascribed to them in the DIP Credit Agreement or in the Motion.

1

**PRELIMINARY STATEMENT**

1. Calyon is sympathetic to the plight of the Debtors. Industry turmoil and bad credit markets, however, do not absolve the Debtors from their post-petition contractual obligations. In an attempt to foist form over substance, the Debtors seek to (i) extend the Maturity Date of the DIP Credit Agreement without obtaining the consent of 100% of the Lenders; (ii) modify the payment priorities between the A, B, and C Tranche Lenders by converting unsecured administrative claims to superpriority senior secured claims, (iii) dilute the collateral of the Tranche A and B Lenders by collateralizing an additional $200 million of hedging claims; and (iv) disenfranchise Lenders with significant exposure unless they consent to the proposed Accommodation Agreement.

2. Calyon is a Tranche A Lender, and while certain provisions of the proposed Accommodation Agreement are financially attractive, the approval of the Accommodation Agreement will significantly modify and impair the rights of Lenders who relied on the DIP Credit Agreement and the Order of this Court approving it in providing significant post-petition financing to the Debtors.

3. The DIP Credit Agreement was approved by this Court and this Court has the sole jurisdiction to interpret it and insure that it is enforced in accordance with its terms, such that the Lenders who relied on it are given the benefit of their bargain. The integrity of the process requires that debtor-in-possession credit agreements only be modified only when contractually permitted and with the consent of the lenders impacted by the proposed modifications.

**BACKGROUND FACTS**

4. The current DIP Credit Agreement was approved by Order of the Court entered on January 5, 2007 (the "1/5/07 DIP Order").

2

5.      The DIP Credit Agreement contains three tranches of debt: (i) the Tranche A Commitments (totaling $1.1 billion); (ii) the Tranche B Commitments (totaling $500 million); and (iii) the Tranche C Commitments (totaling approximately $2.75 billion).  Each Lender is also a Secured Party under the related Security and Pledge Agreement pursuant to which the Debtors pledged virtually all their tangible and intangible assets (the "Collateral") to secure the obligations under the DIP Credit Agreement.

6.      The DIP Credit Agreement is a complex and detailed document.  In general terms, as set out more specifically in the DIP Credit Agreement, the rights of the Tranche A and B Lenders in the Collateral is superior to the rights of the Tranche C Lenders.  Additionally, Section 2.25 of the DIP Credit Agreement and Paragraph 13(a) of the 1/5/07 DIP Order clearly provide that the Lenders shall have superpriority secured administrative expense claims and that no claim or lien will be granted having a priority superior to or *pari passu* with the claims of the Lenders so long as any portion of the DIP Loans remain outstanding.

## OBJECTIONS

**A.      The Accommodation Agreement is a Disguised Extension of the Maturity Date.**

7.      The DIP Credit Agreement matures on December 31, 2008.  As a preliminary matter, the proposed Accommodation Agreement operates to extend the Maturity Date to June 30, 2009.  Section 10.09 of the DIP Credit Agreement requires the consent of 100% of the Lenders to effectuate an extension of the Maturity Date.  In fact, other extensions of the DIP Credit Agreement have been effectuated in just this manner.  Here, the Debtors and the Agent know they cannot obtain the consent of 100% of the Lenders.  Therefore, they have constructed the Accommodation Agreement as a disguised forbearance agreement, and sought to get the extension approved by the vote of the Required Lenders – which is a simple majority of the

3

Tranche A and B Lenders. Such a gross violation of the DIP Credit Agreement should not be sanctioned by the Court.

**B.    The Accommodation Agreement Constitutes an Impermissible Modification of the Contractual Rights of the Lenders.**

8.    The DIP Credit Agreement can be modified with the consent of the Lenders. However, it <u>cannot</u> be modified to include the substantive provisions set forth in the proposed Accommodation Agreement with <u>only</u> the consent of the Required Lenders. The nature of the modifications sought by the Debtors – modifications that vary the negotiated and relied upon Collateral allocation and priorities of payment – require the consent of at least a Super-majority of the Lenders (66-2/3%), if not 100% of the Lenders.

9.    The DIP Credit Agreement permits the Debtors to enter into hedging transactions with appropriate counterparties, and provides that up to $150 million of hedging transactions are entitled to share *pari passu* with the Collateral of the A and B Tranche Lenders. The A, B and C Tranche Lenders relied upon this provision, among others, in acquiring their respective portions of the DIP loan. Hedges in excess of $150 million are unsecured administrative claims, subordinate in priority to the DIP Lenders. Each and every hedging counterparty, many of which are Lenders under the DIP Credit Agreement, was aware of this limitation on the collateralization and priority of hedging claims, and knew they were a subordinated unsecured creditor for amounts in excess of $150 million.

10.    Notwithstanding the express provisions of the DIP Credit Agreement in this regard, the proposed Accommodation Agreement seeks to modify these contractual provisions by elevating an additional $200 million of unsecured administrative hedging claims to superpriority senior secured status, *pari passu* with the rights and Collateral of the Tranche A and B Lenders. In a market where the value of the Lenders' Collateral is already deteriorating,

4

the effect of the proposed Accommodation Agreement is to dilute the Collateral securing the Tranche A and B Lenders and impair the relative priority rights of all the Lenders *vis a vis* unsecured hedge claim creditors.  The DIP Credit Agreement does not permit the Debtor or the hedge claim creditors to force the Lenders to share their losses.

11.    Section 10.09 of the DIP Credit Agreement expressly deals with the type of modifications that may be effectuated by a vote of the Lenders and the applicable percentage of Lenders that must approve certain types of modifications.  Section 10.09(a)(iii)(C) specifically requires the consent of 100% of the Lenders to any modification of the Superpriority Claim status contemplated by Section 2.25 of the DIP Credit Agreement, yet the Agent and the Debtors are attempting to do just that in the proposed Accommodation Agreement with the consent of the Required Lenders only.

12.    Why are the Debtors and the Agent willing to do this?  The Debtors, for some reason, permitted their hedging losses to get out of control.  The Debtors' primary hedges are copper and the Mexican Peso.  Notwithstanding the falling currency and commodity markets, the Debtors chose to keep their current hedges in place, thereby incurring huge potential losses in the event the hedges were terminated by the counterparties.  Because a default under the DIP Credit Agreement is a default under the hedges, these counterparties have indicated that unless their claims are further collateralized, they will terminate their hedging contracts with the Debtors resulting in the crystallization of large unsecured administrative claims against the Debtors.

13.    The hedge counterparties are also Tranche A Lenders under the DIP Credit Agreement.  These Lenders have refused to consent to any extension or modification of the DIP Credit Agreement unless their hedge claims are further collateralized.  Thus, in a perfect example of self-dealing, the hedge Lenders, which upon information and belief, include the Agent, but are

5

otherwise unknown to the rest of the Lenders, are pushing through the proposed Accommodation Agreement which benefits their interests to the detriment of all other Lenders.

14. In violation of both the spirit and intent of the DIP Credit Agreement and the 1/5/07 DIP Order, the Debtor and the Agent seek to have this Court sign off on the Accommodation Agreement by getting the consent of the Required Lenders only. But the Credit Agreement cannot be twisted in such a manner. The modifications of the DIP Credit Agreement sought by the Accommodation Agreement require more than just the consent of the Required Lenders.

15. Even if this Court were to determine that the consent of 100% of the Lenders was not required under the DIP Credit Agreement to effectuate the modifications set out in the proposed Accommodation Agreement, certain actions require the consent of a Super-majority (66 2/3%) of the impacted Lenders. Under Section 10.09 of the DIP Credit Agreement, the vote of the Super-majority First Priority Lenders is required to increase the Borrowing Base advance rates, add new asset categories to the Borrowing Base or otherwise cause the Borrowing Base or availability under it to increase. Section 3(e)(ii) of the proposed Accommodation Agreement makes certain changes to the Borrowing Base during the Accommodation period. At a minimum, a new asset category is being added to the Borrowing Base (the "Borrowing Base Cash Collateral"). There are also various other changes to the Borrowing Base formula and calculation which may result in an increase of the Borrowing Base over that which would otherwise be calculated under the existing DIP Credit Agreement. These changes should require the consent of the Super-majority First Priority Lenders (2/3's of Tranches A and B).

16. The vote of the Super-majority First Priority Lenders is also required to release liens. The dilution caused by increasing the *pari passu* lien basket for hedging obligations is

6

equivalent to a lien release which would require the consent of the Super-majority First Priority Lenders.

17. The DIP Credit Agreement requires accrued interest to be paid currently on all Tranches. The purported forbearance terminates under the Accommodation Agreement if accrued interest on Tranche A and B is not paid currently. The Debtors can continue to default on paying current interest on Tranche C without consequence, however, so long as they deposit the amount they would have otherwise had to pay as Tranche C interest under the existing DIP Credit Agreement into a separate cash collateral account. These payments remain as cash collateral until the earlier of the full payoff of Tranches A and B or six months after the Agent begins to exercise remedies, at which time such funds are applied to the remaining DIP loans in accordance with the existing DIP Credit Agreement. While couched as a "forbearance" coupled with a deposit of cash collateral to be held and applied at some future date, the substance of these provisions is that the remaining scheduled interest payment dates for the Tranche C loans are being extended which, under Section 10.09 of the DIP Credit Agreement, would require the consent of each Lender affected thereby (namely, all the Tranche C Lenders). Such consent does not appear to have been obtained.

18. At the very least, the identity of the Lenders who are hedge counterparties should be disclosed and their votes discounted in determining whether there has been actual consent to the terms of the proposed Accommodation Agreement. Just as members of a board of directors who have an interest in a proposed transaction do not get to vote on the approval of the transaction, those Lenders who are hedge counterparties should not get to vote on the proposed Accommodation Agreement which elevates their unsecured claims to senior secured status to the detriment of the remaining Lenders.

7

**C.      The Accommodation Agreement Disenfranchises Non-Consenting Lenders Even Though such Lenders are Significant Secured Creditors of the Debtors.**

19.     The Accommodation Agreement, if approved, would disenfranchise any Tranche A or B Lender, notwithstanding such Lenders continuing exposure and existence as a superpriority post-petition secured creditor of the Debtors.  All significant voting rights of Lenders under the DIP Credit Agreement are modified to now only permit Participating Lenders, as defined in the Accommodation Agreement to vote.  Such disenfranchisement of a secured lender is not sanctioned by the Bankruptcy Code nor the DIP Credit Agreement.

**D.      To the Extent the Court Deems it Appropriate to Have the Debtors Pay the Fees and Expenses of the Tranche C Lenders, Such Rights Should Inure to All Lenders.**

20.     In its Response to the Motion, a group of Tranche C Lenders denominated the "Tranche C Collective" requests that the Debtors advance the costs for a legal and financial advisor to diligence the Debtors' prospects and defend the rights of the Tranche C Lenders.  The basis for this request is Section 10.05(a)(i)(B) of the DIP Credit Agreement which provides for payment of the expenses of the Lenders (not just the Agent) "in connection with the enforcement of the Loan Documents."

21.     While this section of the DIP Credit Agreement presumes that most enforcement actions will be performed by the Agent and that the Agent will retain one set of counsel and advisors for the benefit of all Lenders (which has been the case to date), a conflict has arisen between various Tranches of Lenders and the Agent, and among the Lenders themselves.

22.     Thus, to the extent it is appropriate for other Lenders or groups of Lenders to have their fees and expenses reimbursed by the Debtors, the terms of the DIP Credit Agreement should be uniformly applied to all Lenders.

8

**CONCLUSION**

23.     The Debtors, in their Motion, do not even discuss the provisions of the DIP Credit Agreement that prohibit modifications of the type sought in the proposed Accommodation Agreement. The Debtors simply cite one reference to the section which permits the Agent to exercise remedies on default at the request of the Required Lenders, and conclude that this is sufficient to justify any modifications they want. The Credit Agreement, however, contains extensive and specific provisions that either expressly prohibit the relief requested or required that consents be obtained from more than just the Required Lenders.

24.     The Debtors argument that the Accommodation Agreement is permitted by the post-petition financing provisions of the Bankruptcy Code and the business judgment rule is equally without merit. Neither the Bankruptcy Code nor the business judgment rule permits a debtor to unilaterally violate a post-petition contract and the court order that approved the contract.

25.     The Accommodation Agreement should not be approved in its current form. Calyon has no desire to impair the ability of these Debtors to exit bankruptcy if at all possible. Numerous other objecting Lenders have tendered proposals to the Debtors and the Agent which would effectuate both the desired extension of the DIP Credit Agreement and accommodate the desires of the hedging counterparties to reduce their (albeit known and bargained for) risk, without trampling the rights of the other Lenders. For reasons which have never been articulated, these proposals have been rejected, and instead, the Debtors seek to cram down on their most senior secured creditors untenable and impermissible modifications to the DIP Credit Agreement upon which they relied.

**WHEREFORE**, based on the foregoing, Calyon prays that the relief requested in the Motion be denied, or in the alternative, that the Court order the Debtors and the Agents to count votes for or against the proposed Accommodation Agreement in accordance with the voting rules set out in the DIP Credit Agreement, and that Calyon be granted such other and further relief as the Court deems appropriate.

Respectfully submitted this 20th day of November, 2008.

**HAYNES AND BOONE, LLP**

*s/ Judith Elkin*
Judith Elkin (JE-4112)
1221 Avenue of the Americas, 26th Floor
New York, NY 10020
(212) 659-7300

**ATTORNEYS FOR CALYON NEW YORK BRANCH**

N-21718_1.DOC