Hearing Date & Time: November 24, 2008 at 10:00 a.m. (prevailing Eastern Time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan
John K. Lyons
Ron E. Meisler

       - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                  :
       In re                      :    Chapter 11
                                  :
DELPHI CORPORATION, et al.,       :    Case No. 05-44481 (RDD)
                                  :
                                  :    (Jointly Administered)
             Debtors.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS REPLY IN SUPPORT OF ACCOMMODATION MOTION
AND RESPONSE TO TRANCHE C COLLECTIVE'S CROSS-MOTION PURSUANT
TO 11 U.S.C. §§ 105(a), 361, 363(e), AND 1107(a) FOR ADEQUATE PROTECTION

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this omnibus reply (the "Reply") in support of Debtors' Expedited Motion for Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith (Docket No. 14408) (the "Accommodation Motion" or the "Motion")[1] And In Response To Tranche C Collective's Cross-Motion Pursuant To 11 U.S.C. §§ 105(a), 361, 363(e), And 1107(a) For Entry Of Order Providing Adequate Protection In Exchange For Forbearance (Docket No. 14459) (the "Cross-Motion").  In further support of the Accommodation Motion and in opposition to the Cross-Motion, the Debtors respectfully represent as follows:

<u>Preliminary Statement</u>

1.      Notwithstanding the various objections filed in opposition to the Accommodation Motion, nearly all of the Objecting Lenders actually agree that an accommodation is the preferred outcome here.[2]  Thus, there appears to be virtually unanimous support for the fundamental proposition that the continuity of the Debtors' access to the DIP proceeds and the secure and stable operation of the Debtors' business going forward represent the best course in

---

[1]    Two of the objecting parties incorrectly characterize Debtors' Motion as an "emergency" motion when, in fact, the Motion was filed on an expedited basis with the consent of the Creditors' Committee pursuant to the Case Management Order.

[2]    <u>See</u> Tranche C Collective Obj. ¶ 1 ("[T]he Tranche C Collective supports forbearance under appropriate conditions . . . ."); Calyon Obj. ¶ 25 ("Calyon has no desire to impair the ability of these Debtors to exit bankruptcy if at all possible."); A/B Lender Group Obj. ¶ 1 ("The A/B Lender Group supports the Debtors' efforts to enter into any accommodation agreement in aid of the Debtors' reorganization.").  Although Greywolf "does not consent" to what it perceives to be an extension of the DIP Facility's maturity date (Greywolf Obj. ¶ 1), it does not go so far as to suggest that foreclosure is preferable to forbearance.  By contrast, MD Sass apparently is the sole DIP Lender purporting to demand payment in full on the Final Maturity Date.

the Debtors' ongoing efforts to maximize value for all stakeholders. The Accommodation

Agreement should facilitate this objective, because it it provides a transparent "liquidity runway"

that is necessary to assure all of Delphi's stakeholders – including its suppliers, customers,

employees, and other administrative creditors who conduct business with Delphi in the normal

course – of the Debtors' continued access to the funding necessary to support Delphi's

operations.[3] The Accommodation Agreement sufficiently safeguards the DIP Lenders' collateral

and should provide stakeholders with the clear understanding that Delphi should have sufficient

liquidity – without further actions – to make supply payments through June 30, 2009, or, even if

the accommodation period were to terminate for failure to satisfy milestones, the May 5, 2009,

MNS-2 payment date, for all goods shipped through the first quarter of 2009.

2.        Even though the Accommodation Agreement achieves this important objective,

five objections to its implementation have been filed and remain unresolved. These include

substantive objections from the Tranche C Collective (Docket No. 14459), comprised of a

consortium of 23 Tranche C Lenders, Greywolf Capital Management, LP ("Greywolf") ("Docket

No. 14460), a Tranche C Lender, and M.D. Sass Re/Enterprise Portfolio Company, L.P. ("MD

Sass") (Docket No.14464), a Tranche C Lender (collectively, the "Tranche C Objectors"), as

well as a substantive objection from Calyon New York Branch ("Calyon") (Docket No. 14467), a

Tranche A Lender, and a limited objection from the Ad Hoc Group of Tranche A and Tranche B

---

[3]    The Debtors originally filed the Accommodation Agreement as an exhibit to the November 7, 2008 Motion. On
November 18, 2008, the Debtors filed the Notice Of Filing Of Accommodation Agreement Modifications
(Docket No. 14456). Since that time, further consensual discussions among the DIP Lenders have resulted in
additional modifications to the Accommodation Agreement, which will be filed with a notice of filing as soon
as available.

Lenders (the "A/B Lender Group") (Docket No. 14472) (collectively, the "Tranche A and Tranche B Objectors" and, together with the Tranche C Objectors, the "Objecting Lenders").[4]

3.       The Objecting Lenders argue, in large part, that the Motion must be denied (or, more accurately, that the Accommodation Agreement must be modified to their liking under the guise of a request for "adequate protection") because the Accommodation Agreement constitutes a de facto extension of the Maturity Date under the Credit Agreement without the required unanimous consent of all DIP Lenders.  The Objecting Lenders also oppose the Motion because they contend that the Accommodation Agreement improperly elevates unsecured hedging obligations to first-priority lien status.  Finally, the Tranche A and Tranche B Objectors assert that various provisions of the Accommodation Agreement constitute improper modifications to the Credit Agreement.  All of these arguments lack merit.

4.       The express terms of the Credit Agreement unequivocally authorize the Accommodation Agreement.  Pursuant to one of the most fundamental agreements struck between Delphi and the Lenders in the Credit Agreement, each DIP Lender appointed the Administrative Agent to act on its behalf and *irrevocably* delegated to the Administrative Agent the exclusive power to exercise remedies upon default.  (Credit Agreement §§ 7.01, 8.01.)  The DIP Lenders further agreed that only the Required Lenders – defined as a simple majority of the Tranche A and Tranche B Lenders – could direct the Administrative Agent to take remedial action.  (Id. § 7.01.)  Moreover, as a general rule, only the consent of the Required Lenders is required to effectuate most modifications to the Credit Agreement (Id. §10.09.)[5]  Subject to final

---

[4]     The objections filed by the Objecting Lenders and the Debtors' responses thereto are summarized in the charts attached hereto as Exhibit 1 and Exhibit 2.  The Debtors address some of the Objecting Lenders' less substantive objections in these charts.

[5]     A Glossary Of Key Contractual Provisions Of Second Amended And Restated DIP Agreement and Security and Pledge Agreement is attached hereto as Exhibit 3.

documentation, the Debtors have received sufficient affirmation from their Lenders such that they expect to have the requisite consents by the commencement of the hearing to effectuate the Accommodation Agreement.

5.      The structure of "collective action" under the Credit Agreement, and in particular the limitation on junior Lenders or Lenders in the minority to exert unwarranted leverage, is purposeful and common.  See, e.g., Beal Savings Bank v. Sommer, 865 N.E.2d 1210 (N.Y. 2007).  The Debtors' failsafe right to obtain forbearance on terms acceptable to the Required Lenders, as opposed to all Lenders, was a critical protection that was bargained for and then paid for, over the term of these DIP facilities, to the tune of hundreds of millions of dollars in interest and fees.

6.      Now, at a time in these cases when the Debtors need to exercise this bargained-for protection, the contractual mechanisms have worked just as envisioned.  The Required Lenders have agreed to forbear under the terms of the Accommodation Agreement.  The Tranche A and Tranche B Objectors are dissatisfied with being on the short side of the vote, and the Tranche C Objectors are dissatisfied that they had no vote in the first place.  But, the Credit Agreement provides for exactly this solution.  Thus, this Court should reject the Objecting Lenders' improper attempt to obtain rights and remedies that they simply did not get in their arms-length, post-petition bargaining over the Credit Agreement.

7.      Most notably, all of the Objecting Lenders' dissatisfaction concerning the increase in hedging liens under the Credit Agreement (from $150 million to $350 million) is simply an attempt to write into the contract a new protection that does not now exist.  Subject to limited enumerated exceptions, the Required Lenders are authorized to modify the terms of the Credit Agreement when they comprise the requisite simple majority in Tranches A and B, without

needing the consent of the Tranche C Lenders. There is absolutely nothing in the Credit Agreement preventing the Required Lenders from modifying the amount of the hedging liens. As sophisticated post-petition bargainers, the Lenders could have created an enumerated exception concerning the manner in which the hedging liens could be changed, but they did not.[6] Furthermore, the Company has sound reasons to support the proposed amendment to protect against crystallizing more than $300 million in unrealized losses under the Company's hedges. The support of the Required Lenders is all that is necessary to facilitate this significant objective.

8.      In paradoxical fashion, the Tranche C Collective freely acknowledges that "[a]s Tranche C Lenders, they fully understood that certain limitations exist within the Credit Agreement." (Tranche C Collective Obj. ¶ 1.) Similarly, Greywolf acknowledges that "the Debtors and DIP Lenders carefully negotiated their respective rights under the DIP Credit Agreement, including significantly narrowing the voting rights of the Tranche C Lenders." (Greywolf Obj. ¶ 6.) Nevertheless, the Tranche C Objectors are asking this Court to create greater protections for them than they were able to secure under the post-petition Credit Agreement that they freely negotiated and executed.

9.      By releasing their pre-petition liens for post-petition liens and by being elevated to DIP lenders under the Credit Agreement, the Tranche C Lenders obtained administrative and superpriority claims and superpriority liens and, accordingly, the right to avoid having their claims subjected to compromise without their consent under a chapter 11 plan of reorganization. However, the price they knowingly paid for this transformation in the status of their claims was the acceptance of the terms of the Credit Agreement, including the right of the Required Lenders

---

[6]     The fact that the hedging liens *existed* in the Credit Agreement in the amount of $150 million and yet there is no limitation on the Required Lenders' ability to amend the *amount* of those liens strongly suggests that, rather than an omission, this structure was the best the parties could obtain during negotiations.

to authorize an accommodation without consideration for the views of the Tranche C Lenders, and to modify the Credit Agreement without their consent, unless explicitly prevented from doing so.

10.    Finally, the Objecting Lenders' request for adequate protection is yet another attempt to obtain non-existent contractual rights under the Credit Agreement.  But, as post-petition lenders, the Objecting Lenders lack the legal authority to make this request.  "Adequate Protection" is a concept that provides relief from the automatic stay, and protects pre-existing contractual rights that are being modified by the bankruptcy process.  Here, in contrast, the Lenders had the ability to bargain, post-petition, for all of their lender protections in the Credit Agreement.  The Lenders are entitled to precisely those protections (vis-à-vis each other, as well as the Debtors) that they negotiated, but nothing more.  If the Accommodation Agreement is proper under the Credit Agreement – which it is – then the Lenders' contractual rights are being fully preserved, and the entire basis for adequate protection is absent.

11.    Nonetheless, in this case, the Debtors have negotiated for provisions in the Accommodation Agreement that actually provide the protection that the Objectors seek.  Most notably, the Accommodation Agreement is being implemented in tandem with a fresh wave of support from General Motors, as provided for in the uncontested GM Arrangement Second Amendment Agreement Approval Motion (Docket No. 14409).  GM is providing up to $300 million in cash liquidity to the Debtors, on terms that subordinate their recovery of this support to the DIP Lenders.  In addition, GM is accelerating payment terms in a manner that adds an additional $300 million in liquidity.

12.    The Accommodation Agreement should be approved by this Court because it provides the Debtors with the clear liquidity runway that is critical to the Debtors' stable business

operations and maximizes Delphi's business enterprise, and it does so on terms that are consistent with the rights of all parties in interest.

Argument

## I.     The Unambiguous Terms Of The Credit Agreement Enable Forbearance Upon The Consent Of The Required Lenders.

13.     From the outset of these cases, the Debtors have paid more than $1.1 billion in interest and fees to the Administrative Agent, the DIP Lenders, and the Prepetition Secured Lenders on account of their secured loans.  This amount includes over $375 million in interest paid to the Tranche C Lenders under the Credit Agreement, over $370 million in interest paid to the pre-petition lenders  under the predecessor facility (now the Tranche C Lenders), as well as fees.  The Debtors are gratified that the Tranche C Collective remains supportive of and committed to the Debtors' transformation efforts.[7]  Indeed, the Tranche C Collective makes clear that it "supports forbearance" and claims that it is "not demanding default, foreclosure, or preferential treatment." (Tranche C Collective Obj. ¶¶ 1, 10.)

14.     The Debtors very much desire the continued support of the Tranche C Lenders[8] and have repeatedly revised the Accommodation Agreement since it was first filed on November 8, 2008, and since modifications were filed on November 18, 2008, in an effort to maximize the participation of lenders in Tranches A, B, and C.  However, the consent of the Tranche C

---

[7]     See Tranche C Collective Obj. ¶ 1 ("Members of the Tranche C Collective have been among the Debtors' most supportive parties in interest . . . ."); id. ¶ 4 ("[T]he Tranche C Collective have been supportive of the Debtors' need for flexibility . . . ."); id. ¶ 12 ("[C]ertain members of the Tranche C Collective [have displayed support for the Debtors] since the inception of these cases, and even pre-bankruptcy, as these Lenders have stood behind the Debtors through volatile markets to pursue constructive resolutions."); id. ¶ 15 ("Simply put, the Tranche C Collective consists of some of the most supportive creditors of the Debtors' efforts to date . . . .").

[8]     Although the Tranche C Collective touts its members' "long-standing" support of Delphi, dating back "even before the bankruptcy filing" (Tranche C Collective Obj. ¶ 1), nineteen of the twenty-three lenders comprising the Tranche C Collective were not prepetition lenders.  (As of the filing at Docket No. 14458.)  Notably, these nineteen lenders hold approximately 93 percent of the debt owned by the Tranche C Collective.

Lenders is not required to forbear under the Credit Agreement.  In an effort to persuade this

Court otherwise, the Tranche C Objectors are forced to take a contractually and legally

unsupportable position that the Accommodation Agreement seeks de facto extension of the

December 31, 2008 Maturity Date,[9] and thus requires the consent of more than 200 DIP Lenders.

This position is fatally flawed, however, because the Accommodation Agreement does not

purport in any respect to extend the maturity date of the DIP Facility.[10]  Rather, as stated in the

Motion, the purpose of the Accommodation Agreement is to enable the Debtors to continue to

operate their business notwithstanding the occurrence and continuance of certain events of

default through, among other things, an agreement by the Administrative Agent and the Required

Lenders to forbear from exercising rights and remedies that might otherwise be available to

them.  This type of accommodation was contemplated by the parties to the Credit Agreement,

each of whom irrevocably delegated powers to the Administrative Agent.[11]

---

[9]   See, e.g., Tranche C Collective Obj. ¶ 4 ("[The] Accommodation Agreement Seeks De Facto Maturity
      Extension."); Greywolf Obj. ¶ 11 ("Irrespective of its title, the so-called Accommodation Agreement is an
      agreement to extend the Maturity Date."); MD Sass Obj. ¶ ("By the Accommodation Agreement and the
      Motion, the Debtors seek to accomplish indirectly—an extension of the DIP Loan's maturity—what they cannot
      do directly without the unanimous consent of lenders."); see also Calyon Obj. ¶ 7 ("[T]he proposed
      Accommodation Agreement operates to extend the Maturity Date . . . .").

[10]  To the contrary, the Accommodation Agreement provides for forbearance during default rather than an
      extension of the maturity date.  For example, under the Accommodation Agreement, the Tranche A
      Commitment terminates and interest begins to accrue at default rates under the Credit Agreement.  Section 10 of
      the Accommodation Agreement provides that "the Total Tranche A Commitment shall automatically terminate,
      and the Borrower hereby acknowledges that no more Loans shall be made or Letters of Credit issued after such
      date."  (Accommodation Agreement § 10.)  As a result of the termination, the Tranche A Loans will become
      due and payable upon the effectiveness of the Accommodation Agreement, the Debtors will cash-collateralize
      all outstanding letters of credit, and all outstanding Loans (including the Tranche C Loans) will, as if the
      maturity date occurred, commence accruing interest at the rate for overdue amounts provided in Section 2.09 of
      the Credit Agreement (this rate is 2% higher than the rate of interest that would otherwise be applicable).  In
      addition, as would be the case if the maturity date occurred, the interest rates on the loans will further increase
      as a result of their required conversion pursuant to Section 8 of the Accommodation Agreement from LIBOR
      loans to base rate loans.

[11]  It is disingenuous, then, for the Tranche C Collective to claim it is "entitled to rely" on the final maturity of the
      DIP Loan.  (Tranche C Collective Obj. ¶ 1.)  Although the Tranche C Collective is entitled to rely on the terms
      of the Credit Agreement, those terms expressly provide that the Administrative Agent may, upon default –

*(cont'd)*

9

15.    Specifically, as evident from the Glossary of Key Contractual Provisions (Ex. 3), the Credit Agreement establishes a collective enforcement scheme under which each individual Lender agreed that the Administrative Agent would act on its behalf.  Pursuant to Section 8.01 of the Credit Agreement, the Lenders irrevocably appointed the Administrative Agent as their agent:

> Each of the Lenders and the Issuing Lender hereby irrevocably appoints each Agent as its agent and authorizes such Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto. . . . The general administration of the Loan Documents shall be by the Administrative Agent. . . .

16.    Moreover, the Lenders surrendered the power to exercise remedies upon default to the Administrative Agent.  Section 7.01 of the Credit Agreement reads, in relevant part:

> In the case of the happening of any of the following events and continuance thereof . . . then . . . the Administrative Agent may, and at the request of the Required Lenders, shall, . . . take one or more of the following actions . . .: (i) terminate or suspend forthwith the Total Commitment; (ii) declare the Loans or any portion thereof then outstanding to be forthwith due and payable . . . (iv) set-off amounts in the Letter of Credit Account or any other accounts maintained with the Administrative Agent . . . and (v) exercise any and all remedies under the Loan Documents and under applicable law available to the Administrative Agent and the Lenders.

This language unambiguously conveys that, although the Administrative Agent is vested with the discretion to exercise remedies, the Administrative Agent need not exercise such remedies unless directed to so by the Required Lenders — a defined group comprised solely of Tranche A and Tranche B Lenders.[12]

_____

(cont'd from previous page)
including a default related to the maturity date, exercise remedies or forbear from doing so as directed by the Required Lenders.

[12]    Pursuant to Section 1.01 of the Credit Agreement, the Required Lenders are "Lenders having Tranche A Commitments as such time . . . and Lenders holding a portion of the Tranche B Loan at such time . . .
(cont'd)

17.    By imparting the Administrative Agent with the exclusive discretion to act, the parties to the Credit Agreement clearly contemplated a situation where the Administrative Agent could choose to forbear despite an event of default.  In such circumstances, only the Required Lenders can force the Administrative Agent to foreclose or exercise other remedies.  This reading of the Credit Agreement is in accord with New York law.  In Beal Savings Bank v. Sommer, 865 N.E.2d 1210 (N.Y. 2007), an individual lender in a syndicated credit agreement sued the borrower to enforce payment obligations upon a default after a majority of the lenders agreed to forbear from taking enforcement action.  Interpreting a credit agreement with a provision nearly identical to Section 7.01 of the Credit Agreement here, the Beal court found that the administrative agent had the exclusive right to enforce the individual lenders' rights and remedies.  Id. at 1216 (reasoning that any contrary interpretation would render meaningless a provision enabling the majority of lenders to direct the administrative agent to enforce remedies upon a default); see also Chase Manhattan Bank v. Motorola, Inc., 136 F. Supp. 2d 265, 271 (S.D.N.Y. 2001) (finding that credit agreement gave agent exclusive enforcement rights); Mizuho Corp. Bank, Ltd. v. Enron Corp. (In re Enron Corp.), 302 B.R. 463, 472-77 (Bankr. S.D.N.Y. 2003) (same).

18.    This Court should reach the same conclusion here. A contrary conclusion would permit more than 200 lenders to act independently of each other – a course of action that would be destructive to business enterprise value.  Any reading of the Credit Agreement that would equate an accommodation to an extension of the maturity date, and thereby require the approval of each Tranche C Lender, would render meaningless the rights and discretion granted the

_____
(cont'd from previous page)
        representing in excess of 50% of the sum of (x) the Total Tranche A Commitment at such time . . . plus (y) the Total Tranche B Commitment at such time."

Administrative Agent and the Required Lenders under Section 7.01 of the Credit Agreement. Moreover, a finding that the Administrative Agent has the exclusive right to resort to remedial measures is consistent with the collective enforcement scheme evidenced in various provisions of the Credit Agreement.

19.    For example, as discussed above, each Lender irrevocably authorized the Administrative Agent to act on its behalf pursuant to Section 8.01 of the Credit Agreement. Compare Beal, 865 N.E.2d at 1216 (citing a provision substantially similar to Section 8.01 as evidence of a collective enforcement scheme). Additionally, Section 8.03 of the Credit Agreement permits the Administrative Agent to forebear from exercising discretionary rights and powers unless directed to the contrary by the Required Lenders.  This provision further underscores that the Lenders vested the Administrative Agent with the discretion to act, or refrain from acting, on behalf of the collective, unless otherwise directed by Tranche A and Tranche B Lenders comprising the Required Lenders.  Finally, a finding that the Administrative Agent and the Required Lenders have the right to control the exercise of rights and remedies following any event of default is supported by the clear intent of the parties at the time the Tranche C Lenders rolled their prepetition secured claims into the Credit Agreement – i.e., that the rights and remedies of the Tranche C Lenders in respect of the collateral be subordinate to the rights of the preexisting DIP lenders.

20.    The unequivocal right of the Required Lenders to direct forbearance is similarly fatal to the Tranche A and Tranche B Objectors' arguments with respect to conditions in the Accommodation Agreement that they perceive to be "modifications" to the Credit Agreement. Most prominently, the Tranche A and Tranche B Objectors argue that the Debtors amended the Credit Agreement's Borrowing Base provisions without seeking the super-majority consent of

the Tranche A and Tranche B Lenders as required by Section 10.09(a)(i) of the Credit

Agreement. This is simply untrue. The Debtors are not purporting to amend the Borrowing

Base provisions of the Credit Agreement. The Required Lenders, however, have agreed to

forbear from enforcing remedies upon default, as is their right. Their agreement is conditioned

on the Debtors' maintenance of the alternative borrowing base specified in the Accommodation

Agreement.[13]

## II.   The Amendment to the Quantum of Hedging Liens Under the Credit Agreement Requires Only the Consent of the Required Lenders.

21.    All of the Objecting Lenders object to the provision of the Accommodation

Agreement that would amend the Credit Agreement to raise the amount of the liens securing

indebtedness in respect of the Company's hedging agreements from $150 million to $350 million

in the event all of the hedging counterparties elect to forbear from closing out their positions and

crystallizing over $300 million in unrealized losses under the Company's hedges. The loan

documents clearly permit the amendment, however, with the consent of the Required Lenders

(i.e., more than 50% of the Tranche A and B Lenders). The Tranche C Lenders have no right to

vote on or otherwise contest the provision.

22.    Consistent with the design of Credit Agreement favoring Administrative Agent

action on behalf of the syndicate and limiting the voting rights of the subordinated Tranche C

Lenders, the Credit Agreement generally provides – unless otherwise specified – that only the

---

[13]    The Tranche A and Tranche B Objectors similarly argue that certain protections of Tranche C interests embodied in the Accommodation Agreement effectively constitute impermissible amendments to the Credit Agreement. See, e.g., A/B Lender Obj. ¶ 13 (objecting to voting rights specified in the Accommodation Agreement); Calyon Obj. ¶ 17 and A/B Lender Obj. ¶ 16 (objecting to payment in respect of Tranche C interest into a cash collateral account). None of these provisions purports to amend the Credit Agreement, however. Nothing prevents the Required Lenders from conditioning their agreement to forbear, and the Objectors do not provide support for their implicit argument to the contrary.

consent of the Required Lenders is required to modify, amend or waive any provision of the

Credit Agreement.  Section 10.09(a) of the Credit Agreement provides, in relevant part:

> No modification, amendment or waiver of any provision of this Agreement or the
> Security and Pledge Agreement, and no consent to any departure by the Borrower
> or any Guarantor therefrom, shall in any event be effective unless the same shall
> be in writing and signed by the Required Lenders . . . .

23.     The Credit Agreement provides only discrete exceptions to this general rule,

including requiring the consent of the Tranche C Lenders in certain limited circumstances

(including extensions of the maturity date).  Contrary to the unsubstantiated assertions of the

Objecting Lenders, however, those discrete exceptions are inapplicable to the amendments to the

Credit Agreement that are set forth in the Accommodation Agreement.  Specifically, and without

limitation, consent of the Tranche C Lenders is not required to effect the changes in Section 20

of the Accommodation Agreement regarding the amount of hedge agreement exposure that may

be secured by liens on assets of the Debtors.  To the contrary, the general rule applies and,

pursuant to the unambiguous terms of the Credit Agreement, only the consent of the Required

Lenders is necessary.[14]

24.     This conclusion is further demonstrated by the exceptions to the general rule that

do exist in the Credit Agreement.  In particular, the Credit Agreement requires the consent of "all

of the Lenders . . . [to] release all or substantially all of the Liens granted to the Administrative

Agent . . . ."  (Id. § 10.09(a)(iii)(D).)  In particular, the Credit Agreement requires (a) the consent

---

[14]    For the same reason, the provision in Section 6(b) of the Accommodation Agreement amending the definition
of "Carve-Out" in the Credit Agreement requires only the consent of the Required Lenders.  (See  Tranche C
Collective Obj. ¶ 5 n.8.)  The fact the Credit Agreement requires super-majority consent in order to effectuate
amendments to certain other definitions, including the definitions of "Super-majority First-Priority Lenders,"
and "Super-majority Class Lenders" (Credit Agreement § 10.09(a)(iv)-(v)) supports the view that the parties
chose to omit "Carve-Out" as a defined term requiring additional consents.

of the "Super-majority First Priority Lenders"[15] to any amendment that would "release any of the

Liens granted to the Administrative Agent . . . "; and (b) the consent of all of the Lenders to any

amendment that would "release all or substantially all of the Liens granted to the Administrative

Agent . . . ." (Id. §§ 10.09(a)(i)(B) and 10.09(a)(iii)(D).)  Accordingly, the Required Lenders,

must have the ability to approve amendments that would have a less drastic effect on the Liens

than a release —including the extension of the Liens to an additional $200 million of hedge

obligations.  Any contrary interpretation renders meaningless the provision requiring a greater

threshold vote for the release of liens.[16]

25.    The Objecting Lenders claim that the votes in favor of the Accommodation

Agreement by Tranche A Lenders who are also hedging counterparties should not count because

they are improperly "selling their consents" to the Accommodation Agreement in exchange for

elevating $200 million of their post-petition hedging-related claims against the Debtors from

unsecured status to senior secured claims that are pari passu with the Tranche A and Tranche B

Loans.  (See, e.g., Tranche C Collective Obj. ¶ 20.)  This allegation is unfounded.

26.    First, despite intimations to the contrary, there is nothing sinister about the fact

that all of the Company's Hedge Lenders are affiliated with Tranche A Lenders.  The Credit

Agreement requires that the Company enter into hedging agreements only with counterparties

who are also Lenders under the Credit Agreement.  Section 6.03 of the Credit Agreement

provides that "the Borrower and each of the Guarantors will not . . . incur . . . Indebtedness,

---

[15]    "Super-majority First Priority Lenders" is defined in Section 10.09(a) of the Credit Agreement as "at any time,
Lenders having Tranche A Commitments at such time…and Lenders holding the Tranche B Loan at such
time…representing in excess of 66-2/3% of the sum of the Total Tranche A Commitment at such time…plus
the Total Tranche B Commitment at such time."

[16]    Section 6(d) of the DIP Order expressly allows new liens to arise after entry of DIP Order so long as such liens
are permitted under the Credit Agreement:  "The DIP Liens . . . shall not be subject or subordinate to  . . . (ii)

*(cont'd)*

15

except for . . . (x) Indebtedness incurred after the Filing Date by the Borrower or any Guarantor in connection with Hedging Agreements, in each case to the extent that (A) <u>the counterparty to such agreement is a Lender</u> or a banking affiliate of a Lender . . . ." (emphasis added).

27.    Second, the Company has sound business reasons for requesting this amendment to the Credit Agreement.  The Company uses a hedging strategy that attempts to minimize its exposure to fluctuations in foreign exchange rates and commodity values.  This strategy is intended to reduce uncertainty in Delphi's budgeting process by protecting the foreign exchange rates and commodity values utilized in the Company's budgeting forecasts.  Delphi customarily enters into individual hedging transactions under primary hedge agreements ("<u>Master Agreements</u>") with various hedging counterparties, many of whom provide other cash management or credit services to the Debtors' global operations.  This includes certain Tranche A DIP Facility Lenders.  The Credit Agreement specifically provides that obligations under any Master Agreement between a Debtor and a DIP Lender (or an affiliate of a DIP Lender) (the "Hedge Lenders") constitute Secured Obligations under the DIP Security Agreement.  Moreover, pursuant to decretal paragraphs 3(e) and 5(a) of the DIP Order, the hedging obligations of the Debtors as permitted under the Credit Agreement are granted superpriority status pursuant to section 364(c)(1).  The Hedge Lenders currently are permitted under the Loan Documents to share in the DIP Collateral in an amount up to an aggregate of $150 million in hedge obligations. The Loan Documents further allow the aggregate amount of Secured Hedge Obligations to be amended with the consent of the Required Lenders.

_____
*(cont'd from previous page)*
     any liens arising after the Refinancing Date . . . other than with respect to any liens or security interests arising
     after the Refinancing Date and permitted under the DIP Credit Agreement to be senior to the DIP Liens."

28.    In light of the ongoing dislocations in the capital markets, the Debtors currently have over $300 million in unrealized losses in connection with their hedging agreements. These current losses are the result of unprecedented volatility in the commodities and currencies markets. The hedging agreements at issue here permit the counterparties to unwind their hedges on the maturity date or in the event of a default under the Credit Agreement. When such a default occurs, and if a hedging counterparty has not consented to the Accommodation Agreement, then the non-defaulting counterparty may have the right to exercise its remedies under the hedging agreement, which, if exercised, could reduce the Debtors' liquidity.[17] Conversely, should the Company's hedging counterparties maintain their hedges until the maturity date, the Debtors' exposure to out-of-the-money hedges would decrease over time and be balanced against offsetting purchases of unhedged commodities, preserving liquidity and preventing immediate realization of a large loss.

## III.    The Objecting Lenders Waived the Ability to Contest Adequate Protection and the Cross-Motion for Adequate Protection Must Be Denied.

29.    The Objection Lenders waived both legal and contractual authority to contest adequate protection. In the first instance, the Bankruptcy Code's provisions with respect to adequate protection do not apply to the Objecting Lenders because they are post-petition lenders. Moreover, the Objecting Lenders waived authority to contest adequate protection under the terms of the Credit Agreement.

30.    The Objecting Lenders take the indefensible position that they are entitled to adequate protection under the Bankruptcy Code even though they are a post-petition DIP lenders.

---

[17]    Another remedy potentially available to certain of the Debtors' hedging counterparties is the right of set-off. Because the Debtors or their affiliates maintain bank accounts with certain of their hedging counterparties or their affiliates, this right of set-off could become an immediately enforceable remedy resulting in a near term liquidity drain.

As many cases and the legislative history of section 361 of the Bankruptcy Code have noted, however, the concept of adequate protection is derived from the Fifth Amendment protection of property interests as enunciated by the Supreme Court.  See, e.g., Wright v. Union Cent. Life Ins. Co., 311 U.S. 273 (1940).  The automatic stay imposed by section 362 of the Bankruptcy Code prevents prepetition secured creditors from, among other things, taking action to realize the value of collateral given by a debtor.  To compensate a prepetition secured creditor for its inability under law to collect on its collateral, the Bankruptcy Code requires a trustee to provide "adequate protection" in certain instances.  See 11 U.S.C. §§ 362, 363, 364.  The legislative history with respect to adequate protection and section 361 notes that:

> this section and the concept of adequate protection are based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the policy of the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest where such steps are a necessary part of the rehabilitative process. Though the creditor might not be able to retain his lien upon the specific collateral held at the time of filing, the purpose of the section is to insure that the secured creditor receives the value for which he bargained.

S. Rep. No. 95-598, at 53 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5840 (emphasis added).

31.      In this case, the Objecting Lenders waived the right to contest adequate protection upon entering the Credit Agreement and securing post-petition lender status.  Indeed, the adequate protection that this Court had earlier granted to the Tranche C Lenders was terminated by this Court once the Tranche C Lenders signed on to the Credit Agreement and thereby waived the prepetition right to adequate protection (Docket No. 6461).  In short, the Objecting Lenders are not holders of prepetition liens that have been primed – which is precisely the scenario in which Congress intended for a creditor to be entitled to adequate protection.  The Objecting

Lenders are post-petition DIP Lenders whose rights are governed by the Credit Agreement and the DIP Order.[18] The Accommodation Agreement, including the increased sharing of DIP Collateral with hedging counterparties, is merely the result of giving effect to the terms of the DIP Credit Agreement.[19] The Objecting Lenders are receiving all of the benefits of their bargain under the DIP Credit Agreement that they willingly committed to (and, as to the Tranche C Lender, in April 2008, oversubscribed to) and consequently, consistent with Congressional intent, they are simply not entitled to additional adequate protection under the Bankruptcy Code.

32.    Moreover, by ceding authority to the Administrative Agent, the Objecting Lenders contractually waived any legal ability otherwise available to contest adequate protection. In Section 8.01 of the Credit Agreement, each Lender, including the Objecting Lenders, irrevocably appointed the Administrative Agent as its agent. Pursuant to this agency relationship, under Section 1 of the Security and Pledge Agreement, the liens securing the Credit Agreement were granted exclusively to the Administrative Agent "for its benefit and the ratable benefit of the Lenders."

33.    Furthermore, the Administrative Agent is the exclusive entity empowered to exercise remedies in respect of the collateral. Section 15 of the Security and Pledge Agreement provides, in relevant part:

> If any Event of Default shall have occurred and be continuing, and subject to the provisions of Section 7 of the Credit Agreement and the priorities and other terms set forth in Section 2.25 of the Credit Agreement and the Approval Order: . . . The [Administrative] Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided herein or otherwise available to it, and without

---

[18]    Nor are the DIP loans prepetition claims that can be compromised, without a lenders' consent, under a chapter 11 plan.

[19]    As set forth in Section II of this Omnibus Reply, the Credit Agreement permits the Required Lenders to amend the negative pledge in the Credit Agreement to increase the amount of secured hedge obligations, and Section 6(d) of the DIP Order expressly allows the Credit Agreement to permit liens that are senior to the Liens.

application to or order of the Bankruptcy Court all the rights and remedies of a
secured party on default under the Uniform Commercial Code . . . .

This provision emphasizes further the exclusive authority of the Administrative Agent to take

remedial action in respect of the collateral, including contesting the adequate protection of the

liens. As such, the Tranche C Collective's Cross-Motion for adequate protection should be

denied on its face.

## IV.    The Accommodation Agreement Provides Adequate Protection.

34.    Assuming arguendo that the Objecting Lenders have the authority to challenge

adequate protection, such challenge has no basis in fact.  First, GM's Agreement to provide new

money – subordinate to Tranche C – under the second amendment to the GM Arrangement

mitigates potential dilution in the collateral.  In addition, though not required to do so under the

Credit Agreement, the Company negotiated numerous separate provisions of the

Accommodation Agreement that go directly to the adequate protection of Tranche C interests,

including, but not limited to:

- Higher Accrued Interest.  Although interest may not be paid to Tranche C Lenders
  during the accommodation period, the Company will pay accrued interest into a
  segregated account at default rate of interest (i.e., +2%) during the forbearance
  period.  The value of the 2% bump would exceed $25 million over six months.  Also
  all loans would be converted from LIBOR loans to ABR loans resulting in even
  further increases to the interest payable to all Lenders.

- Fees.  Participating Tranche C Lenders participate in a 200 basis point fee ($55
  million if all participate.)

- Hedging Party Forbearance.  Hedging parties already have first lien security of $150
  million.  The proposed increase to $350 million is expressly contingent on unanimous
  written forbearance elections from hedging parties.

- Tranche A Paydown.  The Company is paying down Tranche A by approximately
  $200 million and eliminating undrawn availability in connection with the
  Accommodation Agreement.

20

- **New Consenting Tranche C Voting Rights.**  Notwithstanding the restrictions on voting rights to which the Tranche C Lenders agreed in connection with the Credit Agreement, the Accommodation Agreement gives voting rights to the Tranche C Lenders relating to the following Accommodation Agreement matters (i) satisfaction of Accommodation Period milestones; (ii) termination of the Accommodation Period upon certain Accommodation Agreement defaults; and (iii) and certain amendments and waivers with respect to the Accommodation Agreement.

- **Protection of Foreign Assets.**  The Accommodation Agreement reduces the Company's existing ability to lien up foreign assets from $1.5 billion to $1 billion. The Accommodation Agreement also eliminates the Company's ability to have foreign hedges.

- **Pledge of Additional Stock of Foreign Subs.**  The Accommodation Agreement raises the pledge of stock in first tier foreign subs from 65% to 100%.

- **No Repatriation of Cash.**  Cash may only be repatriated from foreign non-debtors subsidiaries to repay DIP Loans.

- **Paydown with Plan Investor Litigation Proceeds.**  The Accommodation Agreement provides that cash litigation proceeds will be used to pay down loans.

- **Company Agrees to Oppose PBGC Assertion of Foreign Liens.**  If the PBGC obtains any valid foreign liens, the Company agrees that the Accommodation Agreement can be terminated, subject to materiality.

- **Luxembourg Intercompany Note ($1.4 billion) Is Secured.**

35.    Together with GM's contributions, these provisions of the Accommodation

Agreement clearly provide adequate protection of the Tranche C interests, and more than offset

any dilution in collateral caused by the increase in the amount of secured hedging liens.[20]  The

Tranche C Collective also exaggerates the Company's cash usage during the Accommodation

Period.  The Company currently anticipates net cash usage to be just over $50 million per month

during the period from December 1, 2008 to June 30, 2009.  Indeed, the Tranche C Collective

---

[20]    Contrary to the Tranche C Collective's characterization, the Accommodation Agreement does not "mock" Tranche C Lenders' rights to participate or prevent them from objecting to a proposed plan of reorganization. (Tranche C Collective Obj. ¶ 23.)  In the first instance, Tranche C Lenders' voting rights under the Accommodation Agreement are more substantial than their voting rights under the Credit Agreement. Moreover, Tranche C Lenders still have all of the rights available to them under the law and the contracts to contest a plan of reorganization.

concedes that non-monetary forms of adequate protection are appropriate in the circumstances.[21] As such, this Court should also deny the Tranche C Lenders' Cross-Motion for adequate protection on the merits.

## V.    Waiver of the Ten-Day Stay Is Necessary and Appropriate.

36.    Greywolf argues in its objection that the Debtors have not demonstrated a "business exigency" requiring a waiver of the ten-day stay imposed by Bankruptcy Rule 6004(g) and requests that, to the extent this Court grants the relief requested in the Accommodation Motion, it decline to waive the ten-day stay.  (See Greywolf Obj. ¶ 15.).  Contrary to Greywolf's assertions, the Accommodation Motion sufficiently articulates business exigencies demonstrating the necessity of immediate effectiveness of an order approving the Accommodation Agreement.

37.    As first explained in the Accommodation Motion, entry of an order approving the Accommodation Agreement and such order not having been stayed is a condition to the effectiveness of the Accommodation Agreement.[22]  (Accommodation Motion ¶ 54.).  Moreover, the second amendment to the GM Arrangement—which is unopposed—becomes effective only upon effectiveness of the Accommodation Agreement.  (Am. No. 2 to GM-Delphi Arrangement § 3(c).)  Accordingly, any stay of the Court's ruling on this Motion effectively stays implementation of the second amendment (which all stakeholders apparently unanimously

---

[21]    See Tranche C Collective Obj. ¶ 30 (collecting cases supporting the proposition that "courts have displayed a willingness to require . . . non-monetary forms of adequate protection").

[22]    Section 35 of the Accommodation Agreement provides as a "Condition to Effectiveness" that "the Bankruptcy Court shall have entered, on or before November 26, 2008, one or more orders reasonably satisfactory in form and substance to the Administrative Agent (I) authorizing (A) the Accommodation Agreement and the amendment of each Existing Agreement as set forth herein and (B) the payment by the Borrower to the Administrative Agent of all fees referred to herein or in that certain Fee Letter dated as of November 5, 2008, and (II) providing for the waiver of certain setoff rights, liens and claims by GM, and such order or orders shall not have been reversed, stayed or vacated."

support) and the concomitant infusion of additional cash GM agreed to provide pursuant to that amendment. Furthermore, the Accommodation Agreement should provide assurance to the Debtors' stakeholders, including their suppliers, that the Debtors will have continued access to the proceeds of the DIP Facility after the Maturity Date. (See Id. at ¶ 35.) For these reasons, it is important that an order approving the Accommodation Agreement become immediate effective so that Debtors can continue to meet their operating and emergence capital funding needs.

38.    In its objection, Greywolf attempts to analogize the relief sought in the Accommodation Motion to the relief sought in In re PSINet Inc., 268 B.R. 358 (Bankr. S.D.N.Y. 2001), a case in which this Court denied a request to waive the ten-day stay due to the debtor's failure to show a business exigency requiring waiver of such stay. The facts and circumstances of the PSINet case are wholly inapposite to those here. In PSINet, the debtors obtained Court approval to sell certain equipment free and clear of liens and encumbrances. The Court approved the sale over the objection of a creditor, however, it denied the debtor's request to waive the ten-day stay, ruling that the debtors "made no evidentiary showing of a business exigency requiring a closing within 10 days of an approval order . . . ." Id. at 379. By comparison, unlike the asset sale at issue in PSINet, a condition to the effectiveness of both the second amendment to the GM Arrangement and the Accommodation Agreement is an unstayed order approving the latter. Moreover, also unlike the PSINet transaction, the relief Debtors seek in the Motion is crucial to preserving liquidity, furthering their efforts to emerge from chapter 11, and maximizing value for their stakeholders. Accordingly, the Debtors' request for a waiver of the ten-day stay of an order approving the Accommodation Agreement is appropriate and necessary in this instance and should be granted.

WHEREFORE, for the reasons set forth above, and in the Accommodation Motion, the Debtors respectfully request that this Court enter an order (i) supplementing the January 5, 2007 DIP Refinancing Order (Docket No. 6461) and authorizing the Debtors to enter into and implement the Accommodation Agreement with the Agent and Participating Lenders, (ii) authorizing the Debtors to (a) enter into related documents, and (b) pay fees in connection therewith, (iii) denying the Tranche C Collective's cross-motion for entry of an order providing adequate protection, and (iv) granting the Debtors such other and further relief as is just.

Dated: New York, New York
      November 21, 2008

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP


By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr.
    Albert L Hogan III
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti
    Thomas J. Matz
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession