# Exhibit 1

***OBJECTIONS TO THE ACCOMMODATION MOTION***
***ORGANIZED BY OBJECTION*** [1]

| | **OBJECTION ASSERTED** | **DOCKET NOS.** | **RESOLUTION, RESPONSE, OR PROPOSAL** |
|---|---|---|---|
| 1. | The Accommodation Agreement is a <u>de facto</u> extension of the maturity date that requires unanimous consent of all DIP Lenders. | 14459, 14460, 14464, 14467 | • The Accommodation Agreement does not purport in any respect to extend the maturity date of the DIP Facility. Rather, the purpose of the Accommodation Agreement is to enable the Debtors to continue to operate their business notwithstanding the occurrence and continuance of certain events of default through, among other things, an agreement with the Administrative Agent and the Required Lenders whereby the Administrative Agent would forbear from exercising rights and remedies that would otherwise be available to them. This type of forbearance was contemplated by the parties to the Credit Agreement, each of whom irrevocably delegated powers to the Administrative Agent, including the discretionary power to foreclose.<br>• By imparting the Administrative Agent with the exclusive discretion to act, the parties to the Credit Agreement clearly contemplated a situation in which the Administrative Agent could choose to forbear despite an event of default. In such circumstances, only the Required Lenders can force the Administrative Agent to foreclose.<br>• Any reading of the Credit Agreement that would equate a forbearance to an extension of the maturity date, and thereby require the approval of each Tranche C Lender, would render meaningless the rights and discretion granted the Administrative Agent and the Required Lenders under Section 7.01 of the Credit Agreement. |
| 2. | The Accommodation Agreement is too risky for the DIP Lenders in light of the projections set forth in the Debtors' public disclosures and the current macroeconomic environment. | 14459, 14460 | Despite the unprecedented volatility in the capital markets and the automobile industry, there still is virtually unanimous support for the proposition that forbearance is preferable to foreclosure. Indeed, none of the objecting parties that argued that the Accommodation Agreement is too risky stated that they preferred foreclosure.[2] In fact, the Tranche C Collective stated that it supported forbearance, albeit on more favorable terms to its members. This objection is nothing more than an attempt to obtain from the Court rights that the objecting parties did not negotiate during their lengthy, arms-length, postpetition bargaining over the Credit Agreement. |

---

[1] This chart reflects all objections received as of November 21, 2008 at 10:00 a.m. (prevailing Eastern time).

[2] MD Sass apparently is the sole DIP Lender purporting to demand payment in full on the Final Maturity Date.

| | **OBJECTION ASSERTED** | **DOCKET NOS.** | **RESOLUTION, RESPONSE, OR PROPOSAL** |
|---|---|---|---|
| 3. | The Accommodation Agreement improperly elevates unsecured Hedging Obligations to first-priority lien status. | 14459, 14460, 14464, 14467, 14472 | There is absolutely nothing in the Credit Agreement preventing the Required Lenders from modifying the amount of the hedging liens. As sophisticated postpetition bargainers, the Lenders could have created an exception that required unanimous consent to alter the amounts of the hedging liens, but they did not.<br>• Pursuant to Section 10.09(a) of the Credit Agreement, only the consent of the Required Lenders is required to modify, amend, or waive any provision of the Credit Agreement or the Security and Pledge Agreement.<br>• Specifically, and without limitation, consent of the Tranche C Lenders is not required to effect the changes in Section 20 of the Accommodation Agreement regarding the amount of hedge agreement exposure that may be secured by liens on assets of the Debtors.<br>The Tranche A and Tranche B Objectors are simply dissatisfied because they could persuade the requisite number of Tranche A and B Lenders of their positions, and the Tranche C Objectors are dissatisfied because they had no vote in the first place. |
| 4. | The Debtors are not providing adequate protection for priming the Tranche C Loans by elevating unsecured hedging obligations. | 14459, 14460, 14464 | The Tranche C Lenders waived both legal and contractual authority to contest adequate protection.<br>• The Bankruptcy Code's provisions with respect to adequate protection do not apply to the Tranche C Lenders because they are holders of secured debt incurred <u>postpetition</u>. Accordingly, the Tranche C Lenders waived the right to contest adequate protection upon entering the Credit Agreement and securing postpetition lender status.<br>• By ceding authority to the Administrative Agent, the Tranche C Lenders contractually waived any legal ability otherwise available to contest adequate protection. |
| 5. | Tranche A Lenders who are also hedging counterparties are improperly "selling their consents" to the Accommodation Agreement in exchange for the elevation of $200 million of their postpetition hedging-related claims against the Debtors from unsecured status to senior secured claims that are pari passu with the Tranche A and Tranche B Loans. | 14459, 14467 | This allegation is unfounded.<br>• There is nothing sinister about the fact that all of the Company's Hedge Lenders are affiliated with Tranche A Lenders. The Credit Agreement requires that the Company enter into hedging agreements only with counterparties who are also Lenders under the Credit Agreement.<br>• The Company has sound reasons to support this amendment in order to protect against crystallizing over $300 million in unrealized losses for the Company for under the hedging agreements. The support of the Required Lenders is all that is necessary to facilitate this important objective. |

2

| | **OBJECTION ASSERTED** | **DOCKET NOS.** | **RESOLUTION, RESPONSE, OR PROPOSAL** |
|---|---|---|---|
| 6. | Debtors have not met their burden of proving that the DIP Lenders are adequately protected with respect to liens granted to unsecured hedging obligations. | 14472 | Assuming <u>arguendo</u> that the Tranche C Collective has the authority to challenge adequate protection, such challenge has no basis in fact because the provisions of the Accommodation Agreement clearly provide adequate protection of the collateral, and more that offset any dilution in collateral cause by the increase in the amount of secured hedging liens. Specifically, the Accommodation Agreement provides adequate protection in the form of:<br>• GM's agreement to provide new money subordinate to Tranche C<br>• Higher accrued interest<br>• No repatriation of cash<br>• Fees for Participating Lenders<br>• Hedging party forbearance from terminating hedging agreements, which is a condition precedent to increase of secured hedging basket<br>• Tranche A paydown of approximately $200 million<br>• New Tranche C voting rights<br>• Protection of foreign assets through reduced ability for the Company to grant liens on foreign assets from $1.5 billion to $1 billion and elimination of the Company's ability to have foreign hedges<br>• Pledge of additional stock of foreign subs<br>• Paydown with Plan Investor litigation proceeds<br>• Improved asset sale sweep provision<br>• Company's agreement to oppose PBGC assertion of foreign liens<br>• Luxembourg intercompany note ($1.4 billion) secured locally<br>• Escrow of Tranche C Interest<br>• Minimum Borrower liquidity covenant.<br>• Increased reporting requirements.<br>• Additional events of default |
| 7. | The Debtors' business justification for elevating unsecured hedging obligations is not sound because there are cheaper and better methods for preserving the economics of these hedges. | 14459 | The Debtors' business reasons for requesting this amendment to the Credit Agreement are sound. As a result the Debtors have unrealized losses of approximately $300 million in connection with their hedging agreements. The hedging agreements at issue permit the counterparties to unwind their hedges on the maturity date or in the event of a default under the Credit Agreement. When such a default occurs, and if a hedging counterparty has not consented to the Accommodation Agreement, then the non-defaulting counterparty may have the right to exercise its remedies under the hedging agreement, which, if exercised, would reduce the Debtors' liquidity. Conversely, should the Company's hedging counterparties maintain their hedges until the maturity date, the capital markets may stabilize and Debtors' exposure to the hedges would materially decrease, perhaps even diminishing to a nominal amount. Either way, the Company's liquidity is better preserved. |

3

| | **OBJECTION ASSERTED** | **DOCKET NOS.** | **RESOLUTION, RESPONSE, OR PROPOSAL** |
|---|---|---|---|
| 8. | The Accommodation Agreement is an impermissible reformation of the Credit Agreement because there was no mutual mistake or fraud. | 14460 | This objection is without merit. The Debtors are not reforming the Credit Agreement but are instead exercising bargained-for protections. The type of forbearance effectuated by the Accommodation Agreement was contemplated by the parties to the Credit Agreement, each of whom irrevocably delegated powers to the Administrative Agent, subject to the direction of the Required Lenders, including the discretionary power to foreclose. |
| 9. | The Debtors seek to change the Borrowing Base to allow for cash collateralization of Hedging Obligations without seeking the super-majority consent of the Tranche A and Tranche B Lenders. | 14467 | The Debtors are not purporting to amend the Borrowing Base provisions of the Credit Agreement. Rather, the Debtors acknowledge that they are in default of those provisions. The Required Lenders, however, have agreed to forbear from enforcing remedies upon default, as is their right. Their agreement is conditioned on the Debtors' maintenance of the separate borrowing base specified in the Accommodation Agreement. Because GM is contributing cash collateral to the borrowing base, there can be no incremental dilution in the collateral. |
| 10. | The ten-day stay provided by Bankruptcy Rule 6004 should not be waived because the Debtors have not made an evidentiary showing of business exigency. | 14460 | The Accommodation Motion sufficiently articulates business exigencies demonstrating the necessity of immediate effectiveness of an order approving the Accommodation<br>• The effectiveness of both the second amendment to the GM Arrangement and the Accommodation Agreement is conditioned upon the Court's entry of an unstayed order approving the latter.<br>• The relief the Debtors seek in the Motion is crucial to preserving liquidity, furthering their efforts to emerge from chapter 11, and maximizing value for their stakeholders. |
| 11. | If the chapter 11 plan that the Debtors propose to file by February 27, 2009 is objectionable to Tranche C Lenders, the Tranche C Lenders can do nothing to change course. | 14459 | This objection is without merit. The Tranche C Lenders have all of the protections of the Bankruptcy Code available to them if they not be satisfied with any plan of reorganization that the Debtors file. As administrative claimants, under 11 U.S.C. § 1129(a)(9)(A), unless they agree otherwise, any plan of reorganization that the Debtors propose must provide that Tranche C Lenders receive on the effective date cash equal to the allowed amount of their claims. |

4

| | **OBJECTION ASSERTED** | **DOCKET NOS.** | **RESOLUTION, RESPONSE, OR PROPOSAL** |
|---|---|---|---|
| 12. | The Court should exercise its discretion and implement the Adequate Protection Package that the Tranche C Collective proposes. | 14459 | As postpetition lenders, the members of the Tranche C Collective lack both the legal and contractual authority to contest adequate protection.<br>• The so-called Adequate Protection Package is an unworkable alternative to the Accommodation Agreement that provides neither the absolute transparency nor the liquidity runway necessary to adequately assure stakeholders of Delphi's continued access to capital.<br>• The Accommodation Agreement sufficiently safeguards the DIP Lenders' collateral. Moreover, the Accommodation Agreement should provide stakeholders with the clear understanding that Delphi should have sufficient liquidity -- without further actions -- to make supply payments through the May 5, 2009, MNS-2 payment date, for all goods shipped through the first quarter of 2009. This is the sort of absolute transparency into Delphi's available liquidity that is necessary in order to enable Debtors' continued operations. |
| 13. | The Accommodation Agreement should be amended to provide for the adequate protection package that the A/B Lender Group proposes. | 14472 | As postpetition lenders, the members of the A/B Lender Group lack both the legal and contractual authority to contest adequate protection. |
| 14. | The Court should require the Debtors to permanently pay down the Tranche A and B Commitments. | 14459, 14464 | The Accommodation Agreement does provide for a paydown of approximately $200 million of Tranche A debt. In addition, the Accommodation Agreement provides for paydown of the DIP facility with the proceeds of the Plan Investor litigation and certain asset sales. The Debtors submit that these provisions sufficiently safeguard the DIP Lenders' collateral. |
| 15. | The Debtors are proposing steps inconsistent with their fiduciary duties to preserve asset value. | 14459 | This allegation is false. There is virtually unanimous support for the fundamental proposition that the continuity of the Debtors' access to the DIP proceeds, and the secure and stable operation of the Debtors' business going forward represents the best course in the Debtors' ongoing efforts to maximize value for all stakeholders. The Accommodation Agreement should facilitate this objective, because it it provides a transparent "liquidity runway" that is necessary to assure all of Delphi's stakeholders -- including its suppliers, customers, employees, and other administrative creditors who conduct business with Delphi in the normal course -- of the Debtors' continued access to the funding necessary to support Delphi's operations. |
| 16. | The Debtors' businesses should be sold or another transaction completed to pay the DIP Loans in full on the maturity date. | 14464 | The objecting party provides no basis to support its contention that foreclosure is preferable to the Accommodation Agreement. There is overwhelming consensus that some form of accommodation is the best option for maximizing value for the Debtors' stakeholders. Indeed, MD Sass apparently is the sole DIP Lender purporting to demand payment in full on the Final Maturity Date. |
| 17. | The Accommodation Agreement disenfranchises non-consenting Lenders by limiting voting rights to Participating Lenders. | 14467 | This argument lacks merit. Only consent of the Required Lenders is necessary to effectuate the proposed modifications to the voting provisions of the Credit Agreement. The objecting Lenders are merely dissatisfied with the bargain they struck. |

| | OBJECTION ASSERTED | DOCKET NOS. | RESOLUTION, RESPONSE, OR PROPOSAL |
|---|---|---|---|
| 18. | Deposit of interest payable to Tranche C Lenders into a segregated account requires during the Accommodation Period consent of all of the Tranche C Lenders. | 14467 | The deposit of Tranche C interest into a segregated account is not an amendment to the Credit Agreement that requires consent of all affected Lenders. |

| DOCKET # | OBJECTING PARTY |
|---|---|
| 14459 | Tranche C Collective |
| 14460 | Greywolf Capital Management, LP |
| 14464 | M.D. Sass Re/Enterprise Portfolio Company, L.P. |
| 14467 | Calyon New York Branch |
| 14472 | A/B Lender Group represented by Winston & Strawn LLP |