# **<u>EXHIBIT A</u>**

(i) the Borrower or any Guarantor shall breach any covenant, condition or agreement contained in this Accommodation Agreement (except to the extent constituting an Automatic Accommodation Termination Default), after giving effect to any applicable grace periods contained in (x) the Credit Agreement (in the case of any covenant, condition, or agreement set forth in the Loan Documents (other than in the Accommodation Agreement) required to be complied with pursuant to Section 3(a)) or (y) this Accommodation Agreement;

(ii) any Event of Default other than a Specified Default or an Automatic Accommodation Termination Default shall have occurred and be continuing; or

(iii) the Borrower or any Guarantor shall have made payments outside the ordinary course of business on account of terminated Hedging Agreements (including any "Transactions" under and defined in any such Hedging Agreement) on or after the Accommodation Effective Date in excess of $175,000,000 in the aggregate.

"Accommodation Period" shall mean the period beginning on the Accommodation Effective Date and ending on the earliest to occur of:

(i) June 30, 2009; provided, that if the Borrower shall not have either (a) received, on or prior to February 27, 2009, binding commitments, subject to customary conditions, for debt and equity financing sufficient for the Borrower and the Guarantors to emerge from Chapter 11 pursuant to a Qualifying Reorganization Plan or (b) (x) filed with the Bankruptcy Court, on or prior to February 27, 2009, a Reorganization Plan that becomes a Satisfactory Reorganization Plan within 10 Business Days after such filing and (y) obtained entry by the Bankruptcy Court of a Plan Order, on or prior to March 31, 2009, with respect to such Satisfactory Reorganization Plan, then the date set forth in this clause (i) shall be May 5, 2009;

(ii) the occurrence of an Automatic Accommodation Termination Default and the continuance of such Automatic Accommodation Termination Default for more than five (5) Business Days; and

(iii) the delivery by the Administrative Agent to the Borrower of a written notice terminating the Accommodation Period pursuant to Section 2(b) hereof.

"Borrowing Base Cash Collateral Account" shall mean any Full Control Deposit Account or Full Control Securities Account into which Borrowing Base Cash Collateral shall have been deposited, over which the Administrative Agent shall have sole and exclusive dominion and control, including the exclusive right of withdrawal.

"Borrowing Base Cash Collateral" shall mean cash collateral (but excluding any cash collateral in the Letter of Credit Account) and Permitted Investments of the types specified in clauses (a), (b) and (c) of the definition thereof, in an aggregate amount not to exceed $~~275,000,000~~ 200,000,000, pledged to the Administrative Agent by the Borrower or any Guarantor for the benefit of the Lenders and held on the Accommodation Effective Date in one or more Borrowing Base Cash Collateral Accounts, as reduced from time to time pursuant to Section 3(e)(iii).

2

"Borrower Liquidity Availability" shall mean, at any time, an amount equal to the sum of (i) the unrestricted cash and cash equivalents of the Borrower and the Guarantors (as reflected on a consolidated balance sheet of the Borrower and the Guarantors) at such time and (ii) the amount of GM Undrawn Availability at such time.

"Existing Reorganization Plan" shall mean the Borrower's and the Guarantors' First Amended Joint Plan of Reorganization substantially in the form filed with the Bankruptcy Court on October 3, 2008.

"Foreign PBGC Lien" shall mean any Lien held by the PBGC on any assets of a Foreign Subsidiary, which Lien is filed, valid and enforceable in a non-U.S. jurisdiction.

"GM Advances"  shall mean "Tranche B Loans" as defined under the GM-Delphi Agreement.

"GM Undrawn Availability" shall mean, at any time, the amount by which the GM Commitment then in effect exceeds the aggregate amount of all outstanding GM Advances at such time; provided that the GM Undrawn Availability shall be deemed to be zero at any time that any condition to funding under the GM Commitment set forth in Section 4.03 of the GM-Delphi Agreement (other than the condition set forth in Section 4.03(a) thereof as in effect on the Accommodation Effective Date), is not satisfied at such time.

"GSA Side Letter" shall mean a letter in form and substance substantially in the form attached as Exhibit E to the Borrower's motion to approve the GM-Delphi Agreement Second Amendment, filed with the Bankruptcy Court on November 7, 2008.

"Hedging Agreement Termination Forbearance Election" shall mean a written notice by a Person that is party to a Hedging Agreement with a Loan Party, delivered by such Person to the Borrower and the Administrative Agent on or prior to the Accommodation Effective Date, in form and substance substantially in the form attached hereto as Annex I.

"Hedging Certification" shall mean a certificate delivered by the Borrower to the Administrative Agent on the Accommodation Effective Date pursuant to Section 35(xiii) stating either that (a) each Person that is party to a Hedging Agreement with any Loan Party is party to this Accommodation Agreement and has executed and delivered to the Borrower a Hedging Agreement Termination Forbearance Election or (b) at least one Person that is party to a Hedging Agreement with a Loan Party is not party to this Accommodation Agreement or has not executed and delivered to the Borrower a Hedging Agreement Termination Forbearance Election.

"Hedging Requirement" shall be satisfied if the Hedging Certification delivered by the Borrower to the Administrative Agent on the Accommodation Effective Date pursuant to Section 35(xiii) states that each Person that is party to a Hedging Agreement with any Loan Party is party to this Accommodation Agreement and has executed and delivered to the Borrower a Hedging Agreement Termination Forbearance Election.

"Participant Lender" shall mean (a) any Lender and (b) any Person that is owed any Secured Domestic Hedging Obligations or Cash Management Obligations, in each case that

3

executes this Accommodation Agreement and any of such Lender's or other Person's successors and assigns that execute a Joinder to this Accommodation Agreement. For the avoidance of doubt, any party may, by so indicating on its signature page, execute this Accommodation Agreement solely in its capacity as a Participant Lender under clause (b) of this definition, and not as a Lender for any purposes of this Accommodation Agreement.

"Plan Order" shall mean an order, inter alia, approving a disclosure statement or modifications to a disclosure statement and authorizing re-solicitation or solicitation, as the case may be, of votes.

"Qualifying Reorganization Plan" shall mean any Reorganization Plan that provides for the same treatment of the Loans, the Commitments, the Administrative Agent and the DIP Lenders as the treatment provided in the Existing Reorganization Plan.

"Required First Priority Participant Lenders" shall mean, at any time, Participant Lenders holding Tranche A Loans, LC Exposure and a portion of the Tranche B Loan in each case at such time representing in excess of 50% of the sum of (x) the Tranche A Total Commitment Usage held by all Participant Lenders at such time plus (y) the Total Tranche B Commitment held by all Participant Lenders at such time.

"Required Total Participant Lenders" shall mean, at any time, Participant Lenders holding Tranche A Loans, LC Exposure, a portion of the Tranche B Loan and a portion of the Tranche C Loan, in each case at such time representing in excess of 50% of the sum of (x) the Tranche A Total Commitment Usage held by all Participant Lenders at such time plus (y) the Total Tranche B Commitment held by all Participant Lenders at such time plus (z) the Total Tranche C Commitment held by all Participant Lenders at such time.

"Satisfactory Reorganization Plan" shall mean any new Reorganization Plan or modifications to the Existing Reorganization Plan, unless within 10 Business Days after such Reorganization Plan or modifications to the Existing Reorganization Plan have been filed with the Bankruptcy Court, the Administrative Agent shall have notified the Borrower in writing that such Reorganization Plan or modifications to the Existing Reorganization Plan are not satisfactory to either (a) the Required Lenders or (b) the Required Total Participant Lenders.

"Segregated Account" shall mean any Borrowing Base Cash Collateral Account, any Segregated Tranche C Interest Account and the Letter of Credit Account.

"Specified Defaults" shall mean any Event of Default listed on Schedule II hereto.

"Specified Litigation Proceeds" shall mean in connection with any final award or settlement in whole or in part of the litigation between the Borrower and its Affiliates and the "Investors" and/or "Commitment Parties" (as each such term is defined in the Equity Purchase and Commitment Agreement, dated as of August 3, 2007 (as amended by the Second Restated First Amendment approved by the Bankruptcy Court on December 7, 2007 and as further amended, supplemented or otherwise modified from time, the "EPCA") in connection with the EPCA (including, without limitation, the litigation bearing the caption Delphi Corp. v. Appaloosa Mgmt. L.P., et al. (In re Delphi Corp.), Adv. Proc. 08-1232 (RDD) (Bankr. S.D.N.Y.) and Delphi Corp. v.

4

the Borrower, certifying in reasonable detail that the amount of Borrower Liquidity Availability is greater than or equal to $100,000,000.

(e) (i)  If at any time during the Accommodation Period, the aggregate principal amount of the outstanding Tranche A Loans plus the aggregate principal amount of the outstanding Tranche B Loan plus the Uncollateralized LC Exposure exceeds the amount (the "Maximum Amount") equal to (A) the Accommodation Period Borrowing Base, minus (B) $200,000,000 (any such excess amount, the "Excess Drawn Amount"), the Borrower will within the Prepayment Period repay Obligations pursuant to Section 2.19(b) of the Credit Agreement and/or Cash Collateralize Letters of Credit pursuant to Section 2.19(b) of the Credit Agreement in an aggregate amount, if any, necessary to cause the aggregate principal amount of the outstanding Tranche A Loans plus the aggregate principal amount of the outstanding Tranche B Loan plus the Uncollateralized LC Exposure to be equal to or less than the Maximum Amount.

(ii)  For purposes hereof, (A) "Prepayment Period" shall mean within one Business Day or, if a Qualifying GM Borrowing Notice has been delivered by the Borrower to General Motors Corporation, within three Business Days, (B) a "Qualifying GM Borrowing Notice" shall mean a notice of borrowing delivered by the Borrower to General Motors Corporation requesting a borrowing under the GM-Delphi Agreement in accordance with the terms of the GM-Delphi Agreement in an amount at least equal to the Excess Drawn Amount so long as, at such time, such amount shall then be fully available and permitted to be drawn by the Borrower under the GM-Delphi Agreement and (C) "Accommodation Period Borrowing Base" shall mean, on any date, an amount (calculated based on the most recent Borrowing Base Certificate delivered to the Administrative Agent in accordance with the Credit Agreement) that is equal to the sum of (i) Available Receivables, plus (ii) Available Inventory, plus (iii) the Fixed Asset Component, plus (iv) the value of Borrowing Base Cash Collateral in an amount not to exceed $275,000,000,200,000,000, minus (v) the Carve-Out, minus (vi) an amount (not less than zero) equal to (A) the aggregate amount of Swap Exposure of all Pari Secured Hedging Obligations, minus (B) $75,000,000, minus (vii) the GM Prepayment Reserve outstanding on such date; provided that the aggregate amount of the Fixed Asset Component shall at no time account for more than thirty percent (30%) of the aggregate amount of the Borrowing Base (it being understood that, solely for purposes of this proviso, the aggregate amount of the Borrowing Base shall be calculated without giving effect to the addition described in clause (iv) and the deductions described in clauses (v) and (vi) above).  For the avoidance of doubt, for purposes of this definition, (A) the amount described in clause (iii) of the definition of Carve-Out shall be deemed at all times to be equal to $35,000,000 and (B) the amount described in clause (iv)(y) of the definition of Carve-Out shall be deemed at all times to be equal to $10,000,000.  Borrowing Base standards may be fixed and revised from time to time by the Administrative Agent in its reasonable discretion; provided that any change that increases the advance rates set forth in the definition of the term Accommodation Period Borrowing Base, adds new asset categories to the Accommodation Period Borrowing Base or otherwise causes the Accommodation Period Borrowing Base to be increased, shall be subject to the written consent of the Required First Priority Participant Lenders.

(iii)  Upon the request of the Borrower, the Administrative Agent shall transfer to the Borrower any Borrowing Base Cash Collateral included in the Accommodation Period Borrowing Base out of the applicable Borrowing Base Cash Collateral Account; provided that, after giving effect to such transfer, (1) the Borrower shall be in compliance with Section 3(e)(i) of this

8

Accommodation Agreement and (2) no Event of Default or any event (including any default under the Accommodation Agreement) which upon notice or lapse of time or both would constitute an Event of Default, other than a Specified Default, shall have occurred and be continuing; and provided further, that any amounts transferred out of any Borrowing Base Cash Collateral Account (other than to another Borrowing Base Cash Collateral Account) shall permanently reduce the value of the Borrowing Base Cash Collateral by a corresponding amount and once transferred out of such Borrowing Base Cash Collateral Account, the balances in such account shall not be reinstated.  Investments of funds deposited in any Borrowing Base Cash Collateral Account may be selected by the Borrower but shall consist only of Permitted Investments of the types specified in clauses (a), (b) and (c) of the definition thereof and shall be at the Borrower's risk and reasonable expense.

(f)    Accrued interest (including default interest under Section 2.09 of the Credit Agreement) on all Tranche A Loans and the Tranche B Loan shall be payable in arrears on each Interest Payment Date applicable thereto (it being understood that such interest shall not, pursuant to this Section 3(f), be paid on demand during the Accommodation Period).

(g)    On the Accommodation Effective Date, the Borrower shall establish the Segregated Tranche C Interest Account.  On each date on which the Borrower would otherwise be obligated to pay interest in respect of the Tranche C Loan pursuant to Section 2.08(c) of the Credit Agreement, the Borrower shall deposit the amount of interest that it would otherwise be required to pay to the Tranche C Lenders into the Segregated Tranche C Interest Account.

(h)    The Borrower shall not repatriate cash from its Foreign Subsidiaries during the Accommodation Period through the payment of cash dividends in respect of, or cash otherwise distributed in redemption of or in exchange for, the Equity interestsInterests of the Foreign Subsidiaries (other than joint ventures), or through the repayment of notes (other than any notes owed by joint ventures), in each case except to the extent such cash is used to repay Obligations pursuant to Section 2.19(b) of the Credit Agreement and/or Cash Collateralize Letters of Credit pursuant to Section 2.19(b) of the Credit Agreement.

(i)    If on any date (a "Specified Litigation Proceeds Receipt Date") during the Accommodation Period, the Borrower or any Guarantor shall receive Specified Litigation Proceeds, the Borrower shall, on or prior to the date that is the earlier of ten days after such Specified Litigation Proceeds Receipt Date and the Consummation Date, repay Obligations pursuant to Section 2.19(b) of the Credit Agreement and/or Cash Collateralize Letters of Credit pursuant to Section 2.19(b) of the Credit Agreement in an aggregate amount equal to 100% of such Specified Litigation Proceeds received on such Specified Litigation Proceeds Receipt Date.

(j)    The Borrower shall use commercially reasonable efforts to diligently contest and cause the Foreign Subsidiaries to contest any action by the PBGC in a non-U.S. jurisdiction in which the PBGC seeks to obtain a Foreign PBGC Lien.

(k)    So long as the applicable officers, managers or directors, as the case may be, shall have determined that there exists a sufficient corporate benefit under applicable law, the Loan Parties shall use their commercially reasonable efforts to cause Delphi International Holdings Corporation Luxembourg S.C.S. ("Luxembourg Holdco I") to grant security interests in the

9

intercompany loans made by Luxembourg Holdco I in favor of Delphi Holdings Luxembourg Sarl ("Luxembourg Holdco II") and evidenced by one or more promissory notes (the "Luxembourg Intercompany Notes"), on terms to be reasonably agreed between the Borrower and the Administrative Agent, to secure any intercompany loans made by the Loan Parties in favor of Luxembourg Holdco I existing on the date hereof and evidenced by one or more promissory notes; it being understood that no grant of any security interest pursuant to the foregoing shall be required to the extent that such grant would be reasonably likely to result in (i) a breach of applicable law or applicable corporate or managers' or directors' duties or require a prior consent or approval from a Governmental Authority or a third party which has neither been obtained nor can reasonably be obtained or (ii) a material adverse effect on the tax, cash management and/or other operating arrangements of Luxembourg Holdco I and its Subsidiaries.

(l)  On each date set forth in the table below, the Borrower shall repay Obligations pursuant to Section 2.19(b) of the Credit Agreement in an aggregate amount, if any, necessary to cause the sum of the aggregate principal amount of the outstanding Tranche A Loans plus the principal amount of the outstanding Tranche B Loan to be equal to or less than the amount set forth below appearing opposite such date:

| Date | Amount |
|---|---|
| January 31, 2009 | $857,000,000 |
| February 28, 2009 | $847,000,000 |
| March 31, 2009 | $837,000,000 |
| April 30, 2009 | $827,000,000 |
| May 31, 2009 | $817,000,000 |

4.    **Amendment of Existing Agreements**.  The parties hereto hereby agree that upon their execution and delivery of this Accommodation Agreement and subject to the other terms and conditions set forth herein, including the terms and conditions set forth in Section 35 hereof with respect to the effectiveness of this Accommodation Agreement, (i) the Existing Agreements shall be amended as set forth herein and shall be binding upon all parties thereto, subject to the terms hereof and (ii) each reference to "hereof", "hereunder", "herein" and "hereby" and each other similar reference and each reference to "this Agreement" and each other similar reference contained in the Existing Agreements shall, after the Accommodation Effective Date, refer to such agreements as amended by this Accommodation Agreement.

5.    **Addition of Certain New Definitions to Credit Agreement**.  Section 1.01 of the Credit Agreement is hereby amended by adding the following definitions in alphabetical order to said Section 1.01:

"Accommodation Agreement Order" shall mean order of the Bankruptcy Court dated [_____], 2008 approving, *inter alia*, the Borrower's entry into the Accommodation Agreement.

"Accommodation Agreement" shall mean the Accommodation Agreement, dated as of [_____], 2008, among the Borrower, the Guarantors, the Lenders and other Persons party thereto and the Administrative Agent, as amended, restated, or otherwise modified from time to time.

10

Permitted Investments of the type set forth in clauses (a), (b) or (c) of the definition of Permitted Investments and shall be at the Borrower's risk and reasonable expense. Interest or profits, if any, on such investments shall accumulate in such account. The Administrative Agent shall not transfer any funds on deposit in ~~the~~any Segregated Tranche C Interest Account (except to another Segregated Tranche C Interest Account) prior to the earlier to occur of the First-Priority Tranches Payout Date and the date that is six months after the Remedies Exercise Date (the earlier to occur, the "Tranche C Interest Payment Date"). On the Tranche C Interest Payment Date, the Administrative Agent shall apply all funds then on deposit in the Segregated Tranche C Interest ~~Account~~Accounts to the Obligations in accordance with the applicable priorities set forth in the Loan Documents. For purposes hereof, the term "Remedies Exercise Date" shall mean the date, which date shall be determined by the Administrative Agent in its sole and absolute discretion, on which the Administrative Agent shall commence the exercise of any remedies pursuant to Section 15 of the Security and Pledge Agreement or the Borrower shall commence any action to sell all or substantially all of its and its Subsidiaries' assets (excluding, for the avoidance of doubt, any Dispositions described on Schedule 6.10)."

17. **Amendments to Section 3 of the Credit Agreement**. (a) Section 3.01 of the Credit Agreement is hereby amended by deleting the references to "the Fourth Amendment Approval Order, and, in the case of the Borrower's obligations with respect to the Subsequent Tranche C Loan and the Total Subsequent Tranche C Fees, the Supplemental Approval Order" and replacing them with "the Accommodation Agreement Order".

(b) Section 3.02 of the Credit Agreement is hereby amended by deleting the reference to "the Fourth Amendment Approval Order, and, in the case of the Borrower's obligations with respect to the Subsequent Tranche C Loan and the Total Subsequent Tranche C Fees, the Supplemental Approval Order" and replacing it with "the Accommodation Agreement Order".

(c) Section 3.04 of the Credit Agreement is hereby amended by amending and restating such section to read as follows:

"**Financial Statements**. The Borrower has furnished the Lenders with copies of (a) the audited consolidated financial statements of the Global Entities for the fiscal year ended December 31, 2007, and, (b) the unaudited consolidated financial statements of the Global Entities for the fiscal quarter and six month period ended June 30, 2008. Such financial statements present fairly in all material respects, in accordance with GAAP, the financial condition and results of operations of the Global Entities on a consolidated basis as of such date and for such period; such balance sheets and the notes thereto disclose all liabilities, direct or contingent, of the Global Entities as of the date thereof required to be disclosed by GAAP; such financial statements were prepared in a manner consistent with GAAP (subject, in the case of the financials described in clause (b) above, to

19

relate to Loans to be made hereunder shall be replaced by the terms of this Agreement and the Accommodation Agreement (except as otherwise expressly provided in the Commitment Letter, the fee letters referred to therein and in Section 10.13, the Fee Letter referenced in Section 2.21 and the Fee Letter referenced in Section 35 of the Accommodation Agreement)."

32. **Amendments to Security and Pledge Agreement**. (a) The Security and Pledge Agreement is hereby amended and restated by inserting each of the provisions which appear with computerized underscoring and by deleting each of the provisions which appear with computerized strike-through in the document annexed hereto as Exhibit A (the Security and Pledge Agreement as so amended and restated, the "Amended and Restated Security and Pledge Agreement").

33. **Addition and Updating of Schedules to the Credit Agreement and Schedules to the Security and Pledge Agreement**. (a) The Credit Agreement is hereby amended by adding the document annexed hereto as Annex 2 as Schedule 5.12 to the Credit Agreement.

(b) Each of Schedule 3.05 and Schedule 6.10 of the Credit Agreement and Schedules 1, 2, 3, 4, 5 and 6 of the Security and Pledge Agreement is hereby replaced in its respective entirety by Schedule 3.05 and Schedule 6.10 of the Credit Agreement and Schedules 1, 2, 3, 4, 5, 6 and 7, attached as Annexes 3 through ~~10~~9 respectively hereto.

34. **Representation and Warranty**. The Borrower and the Guarantors hereby represent and warrant that (i) all representations and warranties in the Credit Agreement and the other Loan Documents are true and correct in all material respects on and as of the Accommodation Effective Date except to the extent such representations and warranties expressly relate to an earlier date and (ii) after giving effect to the amendment set forth in Section 25 above as if such amendment had been in effect on November 30, 2008, no Event of Default has occurred and is continuing on the date hereof.

35. **Conditions to Effectiveness**. This Accommodation Agreement, the amendments to the Credit Agreement contained herein, and the Amended and Restated Security and Pledge Agreement shall become effective in accordance with their terms on the date (the "Accommodation Effective Date") on which each of the following shall have occurred and the Administrative Agent shall have received evidence reasonably satisfactory to it of such occurrence:

(i) this Accommodation Agreement shall have been executed by the Borrower, the Guarantors and the Required Lenders;

(ii) the Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each of the Borrower and the Guarantors, the authorization of the transactions under the Loan Documents and any other legal matters relating to each of the Borrower and the Guarantors, the Loan Documents or the transactions contemplated under the Loan

29

Documents, all in form and substance satisfactory to the Administrative Agent and its counsel;

(iii)    the Administrative Agent shall have received the favorable written opinion of (A) Shearman & Sterling, LLP, counsel to the Loan Parties and (B) in-house counsel to the Borrower, in each case, dated the Accommodation Effective Date and in form and substance reasonably satisfactory to the Administrative Agent and its counsel;

(iv)    the Bankruptcy Court shall have entered, on or before ~~November 26,~~December 4, 2008, one or more orders reasonably satisfactory in form and substance to the Administrative Agent (I) authorizing (A) the Accommodation Agreement and the amendment of each Existing Agreement as set forth herein and (B) the payment by the Borrower to the Administrative Agent of all fees referred to herein or in that certain Fee Letter dated as of November 5, 2008, and (II) providing for the waiver of certain setoff rights, liens and claims by GM substantially as set forth in paragraph 10 of the proposed order exhibited to the motion to approve this Accommodation Agreement, filed with the Bankruptcy Court on November 7, 2008, and such order or orders shall not have been reversed, stayed or vacated;

(v)    an amendment to the GM-Delphi Agreement that is in form and substance satisfactory to each Participant Lender (the "<u>GM-Delphi Agreement Second Amendment</u>") shall have become effective pursuant to the terms thereof;

(vi)    the Bankruptcy Court shall have entered, on or before ~~November 26,~~December 4, 2008, an order reasonably satisfactory in form and substance to the Administrative Agent authorizing the GM-Delphi Agreement Second Amendment, and such order shall not have been reversed, stayed or vacated;

(vii)    the GM-Delphi Pull-Forward Agreement, in form and substance satisfactory to each Participant Lender, shall have become effective pursuant to the terms thereof;

(viii)   the Administrative Agent shall have received a fully executed copy of the GSA Side Letter, which shall have become effective pursuant to the terms thereof;

(ix)    the Borrower shall have executed and delivered a letter of credit reimbursement agreement in form and substance satisfactory to the Issuing Lender;

(x)    the Administrative Agent shall have received an amendment fee (an "<u>Amendment Fee</u>") for the account of each Lender that has executed and delivered a signature page hereto to the Administrative Agent no later than ~~10~~5:00 ~~a~~p.m. (New York City time) on November ~~24, 2008 (or such later deadline as may be indicated by the Administrative Agent for receipt of signature)~~26, 2008 in an

30

amount equal to 200 basis points of the Tranche A Commitments, Tranche B Loans and Tranche C Loans of each Participant Lender as of such date;

(xi)    the Administrative Agent shall have received payment in cash in full of any fees owing to the Administrative Agent or any other person pursuant to, or referenced in, that certain Fee Letter dated as of November 5, 2008;

(xii)    the aggregate outstanding principal amount of Tranche A Loans shall not exceed, on the Accommodation Effective Date, $~~216,000,000;~~ 377,000,000;

(xiii)    immediately prior to the effectiveness of this Accommodation Agreement, but after giving effect to the amendment set forth in Section 25 above as if such amendment had been in effect on November 30, 2008, no Event of Default shall have occurred and be continuing;

(xiv)    the Borrower shall have delivered to the Administrative Agent a Hedging Certification; and

(~~xiv~~xv) the Borrower shall have paid any accrued but unpaid interest and Fees owing to the Lenders and the Administrative Agent as of the Accommodation Effective Date.

36.    **Release**.  To the fullest extent permitted by applicable law, in consideration of the Agents' and the Participant Lenders' execution of this Accommodation Agreement, the Borrower and the Guarantors each, on behalf of itself and each of its successors and assigns (including, without limitation, any receiver or trustee, collectively, the "Releasors"), does hereby forever release, discharge and acquit the Agents, each Participant Lender and each of their respective parents, subsidiaries and affiliate corporations or partnerships, and their respective officers, directors, partners, trustees, shareholders, agents, attorneys and employees, and their respective successors, heirs and assigns, in the case of each of the foregoing solely in their capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, rights, responsibilities, disputes, causes of action (whether at law or equity), indebtedness and obligations (collectively, "Claims"), of every type, kind, nature, description or character, and irrespective of how, why or by reason of what facts, whether such Claims have heretofore arisen, are now existing or hereafter arise, or which could, might, or may be claimed to exist, of whatever kind or name, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, each as though fully set forth herein at length, which in any way arise out of, are connected with or in any way relate to actions or omissions which occurred on or prior to the date hereof with respect to the Obligations, this Accommodation Agreement, the Credit Agreement or any other Loan Document. This Section 36 shall survive (i) the expiration or termination of the Accommodation Period and of this Accommodation Agreement and (ii) the termination of the Credit Agreement, the payment in full of all Obligations and the termination of all Commitments.

37.    **Assignments.**  Each Participant Lender hereby agrees not to assign or otherwise transfer, during the Accommodation Period, all or a portion of its rights and obligations under the Credit Agreement (including all or a portion of its Loans at the time owing to it) except to a Person

31

(e)     By delivery of its signature page hereto, each Participant Lender acknowledges and agrees that each of the GM-Delphi Agreement Second Amendment and the GM-Delphi Pull-Forward Agreement, substantially in the form most recently provided to such Participant Lender prior to the Accommodation Effective Date, is in form and substance satisfactory to such Participant Lender.

(f)     No Person other than the parties hereto and any other Lender, and, in the case of Section 36 hereof, the Releasees, shall have any rights hereunder or be entitled to rely on this Accommodation Agreement, and all third-party beneficiary rights (other than the rights of the Releasees under Section 36 hereof and any other Lender) are hereby expressly disclaimed.

(g)     The Borrower agrees that its obligations set forth in Section 10.05 of the Credit Agreement shall extend to the preparation, execution and delivery of this Accommodation Agreement, including the reasonable fees and disbursements of special counsel to the Administrative Agent and the Arrangers.

(h)     The parties hereto hereby agree that Section 8 of the Credit Agreement shall apply to this Accommodation Agreement and each other Loan Document and all actions taken or not taken by the Administrative Agent or any Participant Lender contemplated hereby.

(i)     Nothing in this Accommodation Agreement shall be deemed, asserted or construed to impair or prejudice the rights of the Administrative Agent and the Participant Lenders to appear and be heard on any issue, or to object to any relief sought, in the Bankruptcy Court, except to the extent that such actions would constitute a breach of the Administrative Agent's or any Participant Lender's obligations under this Accommodation Agreement.

(j)     Any provision of this Accommodation Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

(k)     Section headings used herein are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Accommodation Agreement.

(l)     This Accommodation Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument. A facsimile or .pdf copy of a counterpart signature page shall serve as the functional equivalent of a manually executed copy for all purposes.

(m)     THIS ACCOMMODATION AGREEMENT SHALL IN ALL RESPECTS BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND (TO THE EXTENT APPLICABLE) THE BANKRUPTCY CODE.

(n)     EACH OF THE BORROWER, THE GUARANTORS, THE AGENTS AND EACH PARTICIPANT LENDER HEREBY IRREVOCABLY WAIVES ALL RIGHT TO

**Schedule I**

**Automatic Accommodation Termination Defaults**

1. Any Event of Default occurring under Section 7.01(b) (except as a result of a default in the payment of (a) principal of the Loans pursuant to Section 2.13(a) or, on the Maturity Date, pursuant to 2.11(a), 2.13(c) or 2.28 of the Credit Agreement, (b) interest on the Tranche C Loan pursuant to Section 2.08 or 2.09 of the Credit Agreement or (c) interest on any Tranche A Loans or the Tranche B Loan, solely to the extent such interest is not paid on demand pursuant to Section 2.08 or Section 2.09 of the Credit Agreement (but for the avoidance of doubt this exception is not intended to exclude a failure to pay interest under Section 3(f) of the Accommodation Agreement which shall be governed by Item 2 below)), (e), (g), (i) and (j) of the Credit Agreement.

2. Any breach of Section 3(e), (f), (g), (i) or (l) of the Accommodation Agreement.

3. The PBGC shall have obtained any Foreign PBGC Lien, and either the Required Lenders or the Required Total Participant Lenders shall have notified the Borrower that they have determined that such Foreign PBGC Lien materially impairs the Lenders' interest in the Collateral.