**QUINN EMANUEL URQUHART**  
**OLIVER & HEDGES, LLP**  
Susheel Kirpalani (SK-8926)  
James C. Tecce (JT-5910)  
Scott C. Shelley (SS-1013)  
51 Madison Avenue, 22nd Floor  
New York, New York 10010  
Telephone: (212) 849-7000  
Facsimile: (212) 849-7100  

Adjourned Hearing Date: December 1, 2008

*Counsel To The Collective Of Tranche C DIP Lenders*

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
-------------------------------------------------------- x  
In re:                                                              :  
                                                                         :    Chapter 11  
DELPHI CORP., ET AL.,                                  :    Case No.  05-44481 (RDD)  
                                                                         :    Jointly Administered  
                                              Debtors.       :  
-------------------------------------------------------- x  

### SUPPLEMENTAL OBJECTION OF TRANCHE C COLLECTIVE IN RESPONSE TO DEBTORS' REVISED ACCOMMODATION AGREEMENT

The Tranche C Collective DIP Lenders,[1] by and through their undersigned counsel, submit this supplemental objection in response to the revised Accommodation Agreement filed by the Debtors on November 26, 2008 (the "Revised Accommodation Agreement")[2] and, in support hereof, respectfully represent as follows:

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Tranche C Collective's (I) Response To Debtors' Motion To Supplement DIP Financing Order And Approve Accommodation Agreement, (II) Cross-Motion Pursuant To 11 U.S.C. §§ 105(a), 361, 363(e), And 1107(a) For Entry Of Order Providing Adequate Protection In Exchange For Forbearance, And (III) Motion Pursuant To 11 U.S.C. § 105(d) For Chambers Conference, dated November 19, 2008 (the "Tranche C Response").  The Lenders comprising the Tranche C Collective appear on Schedule 1 to the Tranche C Response and in the Amended Verified Statement of the undersigned pursuant to Fed. R. Bankr. P. 2019.

[2]    Counsel for the Debtors permitted the undersigned to file this supplemental objection to respond to the Revised Accommodation Agreement, provided it was filed no later than Friday, November 28, 2008.

## PRELIMINARY STATEMENT

1.      ***Ends Do Not Justify Means -- And It Keeps Getting Worse.***  The Tranche C Collective fully appreciates that the Debtors are balancing myriad interests, at times walking on a high wire.  To be clear, the Tranche C Collective agrees that preserving value and maintaining "business as usual" in the face of trying macroeconomic conditions are critical to the Debtors' prospects.  It is for these reasons that the Tranche C Collective supports a standstill by all claimants (including hedging counterparties asserting unsecured administrative expenses) while the Debtors and their stakeholders can work towards a new consensual chapter 11 plan or other strategic alternatives.[3]  Regrettably, not all stakeholders are willing to maintain the status quo ante.  Indeed, as a condition to consenting to the Accommodation Agreement, a handful of "relationship banks" (led by the one that negotiated the agreement with the Debtors) have demanded preferential treatment of unrelated claims and gargantuan fees in exchange for their support.  The Tranche C Collective is confident the Court will not countenance such over-reaching abuses, no matter how desperately the Debtors may ask the Court to look the other way.[4]

2.      Putting aside the process abuses, the Court is being asked to ignore fundamental principles of contract interpretation and the statutory rights of secured creditors because the Debtors are in need of a judicial bail-out.  Unable to obtain the requisite unanimous votes to extend the maturity, the Debtors have resorted to selectively reading the DIP Credit Agreement

---

[3]     Indeed, members of the Tranche C Collective have spent countless hours performing due diligence and meeting with representatives of the Debtors and GM to try to forge a beneficial outcome for all stakeholders.

[4]     It bears emphasizing that the Debtors' posted the Revised Accommodation Agreement at 4:00 p.m. on the Wednesday before Thanksgiving with a deadline of 5:00 p.m. *the same day* for any new Lenders to deliver their consents.  The Debtors thereafter posted additional revisions to the Accommodation Agreement hours after this deadline expired (at 1:35 a.m. on Thanksgiving Day).

2

to push an interpretation in which the maturity of the loan has no meaning. Indeed, resting their entire case on this flawed (and very recent) interpretation, the Court is being asked to adopt a contractual reading that leads to absurd results, and the absurdity keeps getting worse with every revision to the Accommodation Agreement.

3. The *Revised* Accommodation Agreement -- through which the Debtors address last-minute demands made by General Motors Corporation, while keeping their "relationship banks" in tow -- tramples the rights of every single DIP Lender that is neither receiving elevation of unsecured hedging exposure nor a secret fee disproportionate to its DIP exposure. The Revised Accommodation Agreement may be acceptable to those who negotiated it (the banks seeking to secure their larger unsecured exposure and/or obtain exorbitant fees, and GM which wishes to force the Debtors to abdicate their contractual commitment to make mandatory prepayments of the DIP under the Credit Agreement so as to delay GM's need to contribute liquidity), but it runs roughshod over Lenders who are merely treated as Lenders. The Tranche C Collective submits that (i) unanimity is required to approve the Revised Accommodation Agreement (which goes beyond merely deferring the exercise of remedies by waiving the mandatory and automatic payment of super-priority administrative claims at maturity), (ii) a vote of "Super-majority First Priority Lenders" is required to make the requested changes to the Borrowing Base, (iii) the votes obtained by promising preferential treatment and truly excessive fees must be disregarded, (iv) the Debtors have not met their burden of providing adequate protection, and (v) the only fair result is to respect the super-priority administrative expense claim status of the DIP Lenders, while the Debtors retain their "liquidity runway" to negotiate a new chapter 11 plan or strategic alternative for emergence.[5]

---

[5] Of course, the Debtors should continue to operate in the ordinary course of business and pay all "ordinary course" claims that are actually necessary and beneficial to the estates, such as all trade and employee-related payments. But these would not include any termination claims that are accelerated by hedging counterparties as a result of a "cross-default" due to the DIP Loan's maturity. It stands the principles of priority on their head

3

**SUPPLEMENTAL OBJECTION**

A.     **INADEQUATE PROTECTION IS EVEN MORE INADEQUATE**

    4.      ***Paydown of Tranche A and B Has Materially Decreased.*** The Tranche C Collective has consistently maintained that a necessary component of adequate protection for continued use of the Collateral is application of excess cash to pay down senior DIP Loans. Just days ago, the Accommodation Agreement provided for a $181 million pay down immediately (to a maximum Tranche A Loan level of $216 million), consistent with the requirement to pay down senior DIP Loans to the level of the Accommodation Period Borrowing Base. Under the Revised Accommodation Agreement, however, that $181 million *is decreased to a mere $20 million (a maximum Tranche A Loan level of $377 million)*. There are periodic installment payments of $10 million a the end of each month in 2009, but this is materially worse for Lenders because less of the Debtors' excess cash (previously stipulated to be required to pay down Tranche A consistent with the Borrowing Base reduction) is being applied to retire DIP Loans, and more is being used in a manner to avoid drawing on GM's liquidity facility.[6]

    5.      The Revised Accommodation Agreement now seeks to undermine the contractual

---

to suggest a junior stakeholder (unsecured hedging claimant) can leapfrog a secured super-priority DIP Lender post-maturity by threatening to accelerate their administrative termination claims. In a post-DIP-maturity world, the Court can easily prohibit non-ordinary course payments on account of non-beneficial administrative expenses when it is not requiring payment on even more senior super-priority administrative expense claims that already matured. This is the type of balancing required to preserve the Debtors' estates while respecting the priority guaranteed by this Court's prior orders. No member of the Tranche C Collective is urging liquidation of the Debtors, despite any aspersions that have been or may be made by the Debtors or Lenders who disproportionately benefit from the Revised Accommodation Agreement.

[6]   The fact that drastic changes are being made up front to the Accommodation Agreement in exchange for potential subsequent benefits to be provided by GM will not be lost on the Court. The Debtors are thwarting the DIP Lenders' current rights as an accommodation to GM, in the hope that GM is a worthy credit risk (hardly a certainty in light of the fact that GM's unsecured notes trade at a fraction of the dollar). Significant to the Court's consideration is that GM is *not* funding its commitments up front.

4

provisions that all Lenders rely upon that limit the Maximum Amount of Borrowing Base availability for Tranche A and Tranche B Loans in two respects. First, the Revised Accommodation Agreement seeks to add cash collateral to the Borrowing Base in an amount up to the incremental Secured Domestic Hedging Obligations added under the Revised Accommodation Agreement. The addition of up to $200 million of additional Secured Domestic Hedging Obligations (or $179 million forecasted by the end of December as certain hedges roll-off at maturity) would otherwise require up to $200 million of reduction in Tranche A and B Exposure per the Credit Agreement save for the fact that the Debtors propose to add cash collateral to the Accommodation Period Borrowing Base. Second, the Revised Accommodation Agreement proposes to amend the Maximum Amounts of Tranche A and B Loans permissible under the Borrowing Base by counting only Uncollateralized LC Exposure as opposed to the Credit Agreement's requirement to count all LC Exposure (whether or not collateralized). See Credit Agreement, § 2.13(a). This similarly enables the Debtors to increase availability under the credit facilities by cash collateralizing LC Exposure such that it will not count against the Borrowing Base.

      6.      To illustrate the foregoing, as of December 31, 2008, the amount proposed to remain outstanding under the Revised Accommodation Agreement would be $377 million of Tranche A Loans plus $500 million of Tranche B Loans, for a total of $877 million of senior DIP Loan Obligations. The Debtors propose to accomplish this through complex manipulations of the Credit Agreement definitions and provisions, and the result is at odds with the Section 2.13(a) of the Credit Agreement's mandatory prepayment requirements as follows:

5

**Bridge of Proposed Accommodation Borrowing Base to Actual Credit Agreement Borrowing Base**
  *(at 12/31/08, $ in millions)*

| | |
|---|---:|
| Proposed Maximum 1st Priority Tranche A and Tranche B Loans Outstanding under Accommodation Agreement Borrowing Base (12/31/08): | |
|     Tranche A Loans | $377 |
|     Tranche B Loans | 500 |
|         Total | 877 |
| (-) Less: Incremental Cash to Borrowing Base to allow for elevation of Secured Hedging Obligations | (179) |
| (-) Less: Letter of Credit Exposure | (117) |
| Bridge to Actual Credit Agreement Borrowing Base | (296) |
| Maximum 1st Priority Tranche A and Tranche B Loans Outstanding under Actual Credit Agreement Borrowing Base (12/31/08): | $581 |
| Amount of Tranche A and B Loans Outstanding under Revised Accommodation Agreement | $877 |

7. ***Debtors Are Burning More Cash, Not Less.*** Exacerbating the insufficient pay down and violation of the Borrowing Base, the Debtors' forecasted cash burn has accelerated in an alarming manner over the last nine days. The Debtors' Form 8-K, filed on November 26, 2008, shows $1,027 million at March 2009 being drawn under Tranches A and B of the DIP Loan, and the GM liquidity facility, compared with $778 million projected under the November 17th Form 8-K. This represents an incremental cash burn of approximately $250 million over a five-month period compared to a forecast from nine days ago. This is the third time the Debtors have amended their projections since the beginning of November and each time the picture (and lack of adequate protection) is worse. While the Tranche C Collective is sensitive to the Debtors' need to maintain a "liquidity runway" while the Debtors negotiate a transformation to profitability and emergence, preservation of this runway cannot come at the expense of violating the ex-ante priority of creditors and the carefully-negotiated Maximum Amounts of First Priority obligations permitted by the Borrowing Base.

6

8.     ***Cash Interest Could Always be Deferred for Up to Six Months.***    Sections 2.04, 2.06, and 2.09 of the Credit Agreement contemplate the Debtors making elections as to how frequently interest will be paid to holders of Tranche A and B Loans and stipulate the Lenders' rights to be paid interest on demand during a default period.  The Revised Accommodation Agreement requires all Lenders to waive their right to be paid interest on demand during the default period, and this further sharpens the lack of adequate protection for Tranche C Lenders. The Accommodation Agreement theoretically allows the Borrower to elect a six-month interest period, thereby not paying current interest through nearly the entire Accommodation Period. Any interest payments deferred up to six months (as contemplated by the Credit Agreement) would merely build up the amount of senior DIP Loans ahead of Tranche C Lenders, at a time when the amounts should be paid on demand.  The Administrative Agent may be willing to permit this because they are receiving disproportionate benefits, but no informed Lender would be willing to waive such rights.  A disinterested agent for lenders would not have allowed this as part of any forbearance, and certainly would not have allowed it to be put into a coercive forbearance agreement.

B.     BORROWING BASE AMENDMENTS REQUIRE SUPER-MAJORITY VOTE

9.     ***Adding "Cash" to Borrowing Base Violates Section 10.09.***    The Debtors have added creative writing to complement their repertoire of selective reading skills when they assert that a mere "Required Lenders" vote is needed to add a new category of assets (namely, cash) to the Borrowing Base so that the Borrowing Base can be inflated at a level required to counterbalance the incremental first-lien debt imposed by previously unsecured hedging exposure.  Section 10.09 of the Credit Agreement clearly requires a vote by the "Super-majority First Priority Lenders" (or 66-2/3 of Tranches A and B) to make this change.  It is simply fiction to assert that the Debtors are not adding new asset categories or are not otherwise increasing the availability under the Credit Agreement when the only purpose of adding cash as a category to

7

the Borrowing Base (or the creative addition of an "Accommodation Period Borrowing Base") is to avoid triggering mandatory pay downs upon increasing the size of first-priority debt.

10.     ***Deducting Only Uncollateralized L/Cs Artificially Inflates Availability.*** In addition to the new asset category being added to the Borrowing Base, under the Revised Accommodation Agreement, the Debtors seek to reduce what is counted as outstanding letter-of-credit obligations for purposes of making the calculations required by the Credit Agreement to determine availability. Whereas the Maximum Amount of outstanding obligations justified by the Borrowing Base includes LC Exposure under the existing Credit Agreement (see Section 2.13(a)), the Revised Accommodation Agreement proposes to include only *Uncollateralized* LC Exposure (see Section 3(e)(i)). This change effectively increases the availability under the Credit Agreement by allowing the Debtors to cash collateralize $117 million of undrawn LC obligations and maintain a $117 million higher level of outstanding Tranche A and Tranche B Loans during the Accommodation Period than would otherwise be allowed by the Credit Agreement.

C.    SUPPORT FOR REVISED ACCOMMODATION AGREEMENT MUST BE SCRUTINIZED

11.     The Debtors have set out to meet GM's demands by entering into last-minute three-way negotiations with GM and JPMorgan Chase, as Administrative Agent for the Lenders. A flawed process, however, necessarily leads to a flawed outcome. Simply put, the Lender who negotiated the Revised Accommodation Agreement continued to use its status as Administrative Agent to lend credence to the process when all the while they were indifferent to the outcome for Lenders because they were promised personal benefits that grossly exceed any DIP Loan exposure they could have. As the largest unsecured hedging counterparty of the Debtors, and proposed recipient of excessive "arranging" fees, JPMorgan Chase has been unwilling to protect the rights of Lenders as Lenders. The economic benefits to be received by the Administrative Agent (and a sub-set of Tranche A Lenders) in respect of priming liens for hedging exposure and

8

fees are multiples of any benefits to be received by any Lender.

## CONCLUSION

WHEREFORE the Tranche C Collective respectfully requests that the Court enter an order: (i) denying the Accommodation Agreement Motion, as amended by the Revised Accommodation Agreement; (ii) conditioning the Debtors' continued use of the Collateral on provision of the Adequate Protection Package; and (iii) granting such other relief as the Court finds just and proper.

Respectfully submitted,

Dated: November 28, 2008
New York, New York

**QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP**

By: /s/ Susheel Kirpalani
Susheel Kirpalani
James C. Tecce
Scott C. Shelley

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Counsel To The Collective Of Tranche C DIP Lenders*

9