Hearing Date & Time: December 1, 2008 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Albert L. Hogan
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' SUPPLEMENTAL REPLY IN SUPPORT OF ACCOMMODATION MOTION

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Supplemental Reply in support of the Debtors' Accommodation Motion[1] (Docket No. 14408). This Supplemental Reply supplements the Debtors' Omnibus Reply filed on November 21, 2008 (Docket No. 14481) by addressing (a) the events that have taken place since the Court adjourned the hearing on this matter from November 24, 2008 to December 1, 2008 and (b) the single supplemental objection that was filed by the Tranche C Collective on November 28, 2009 (Docket No. 14501). The Debtors respectfully represent as follows:

Preliminary Statement

Delphi has achieved an Accommodation Agreement that should provide the Debtors' stakeholders – including suppliers, customers, employees, and other administrative creditors who conduct business with Delphi in the normal course – a transparent "liquidity runway" for the Debtors' continued access to necessary funds to support continuation of ordinary course business relationships during the Accommodation Period. The indisputable fact is that more than two-thirds of the Tranche A and Tranche B Lenders (a simple majority of which constitutes the Required Lenders) have consented to the Accommodation Agreement. Furthermore, GM supports the revised Accommodation Agreement, which support is a prerequisite to the Debtors' access to as much as $600 million of additional liquidity during the Accommodation Period under the GM Agreements.

---

[1] Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Accommodation Motion and documents described therein.

2

The Debtors sought to react as favorably as possible to the concerns of the members of the Tranche C Collective and other Lenders with disparate interests, but it was not possible to achieve the broad consensus of all Lenders that the Debtors would have liked.  Nevertheless, the Accommodation Agreement retains many of the provisions the Debtors offered in an attempt to allay the concerns of Lenders who ultimately did not support the Accommodation Agreement.

Although the Tranche C Collective insists on mischaracterizing the Accommodation Agreement as an extension of the Maturity Date under the Credit Agreement, in fact the Accommodation Agreement is a directive by the Required Lenders to the Administrative Agent regarding acts that the Administrative Agent should take or refrain from taking during the Accommodation Period so long as the Debtors comply with all of the terms of the Accommodation Agreement.  This type of relief was contemplated at the time the Credit Agreement was entered into and is comprehended by its express terms.  Although the members of the Tranche C Collective may wish for greater input they are not entitled to it.

The Required Lenders, GM, and the Debtors have struck a deal that is well within the bounds of the Debtors' business judgment and should be authorized by the Court.

I.      Negotiation Of The Revised Accommodation Agreement

On November 21, 2008, the Debtors filed the Second Notice Of Modifications To The Accommodation Agreement (Docket No. 14483) showing revisions to the Accommodation Agreement that had been negotiated since it was originally filed with the Debtors' Accommodation Motion on November 7, 2008.  Thereafter, the Administrative Agent informed the Company that it had received, subject to final documentation, signature pages for consents to the Accommodation Agreement (as revised) from the Required Lenders and Hedging Agreement Termination Forbearance Elections from each of the parties necessary to satisfy the Hedging Requirement

3

specified in the Accommodation Agreement. In its effort to achieve consensus among Lenders after November 7, 2008, however, Delphi had agreed to certain additional concessions that Delphi came to understand were unacceptable to GM. In particular, in GM's view, the cumulative effect of revisions to the Accommodation Agreement that required the Company to pay certain fees, pay down borrowings, and provide additional cash collateral increased the risk that Delphi would accelerate its need for GM's liquidity support much earlier than the parties had previously projected.

The effectiveness of GM's liquidity support to the Debtors under the GM Agreements is conditioned up GM's reasonable satisfaction with the terms of the Accommodation Agreement. Although the form of Accommodation Agreement filed with the Bankruptcy Court on November 7, 2008 had been acceptable to GM, GM requested that Delphi reconsider some of the subsequent changes to the Accommodation Agreement, and Delphi agreed to do so. To provide time to attempt to achieve consensus among the Debtors, GM, and the Required Lenders, at Delphi's request, the Court adjourned the hearings on approval of the Accommodation Agreement and the GM-Delphi Agreements from November 24, 2008 to December 1, 2008.

On Wednesday, November 26, 2008, after subsequent negotiations, the Debtors filed the Third Notice Of Filing Of Accommodation Agreement Modifications (Docket No. 14500). In addition, the Debtors prepared revised liquidity forecasts both for public filing and for private side lenders. Based on the revised forecasts contained in these documents[2] as well as the revisions to the Accommodation Agreement, the Required Lenders consented to the revised Accommodation Agreement.

---

[2]  As discussed below (see p. 6), the Tranche C Collective attempts to use these forecasts to make exaggerated claims about changes in the Debtors' projected cash usage during the Accommodation Period.

4

The revised Accommodation Agreement includes the following principal changes:

(a) <u>Reduced Paydown</u>.  In an attempt to reach a broader consensus that included more Tranche C Lenders, Delphi had agreed subsequent to filing the Accommodation Agreement on November 7, 2008 that it would pay down the outstanding Tranche A Loans by $181 million, so that the amount outstanding would be $216 million on the Accommodation Effective Date.  This amount was calculated by estimating the amount of contraction expected to occur in the Borrowing Base under the Credit Agreement between October 30, 2008, and December 31, 2008, and pulling these amounts forward.  Subsequently, the Debtors concluded that the calculation used to arrive at this figure artificially suppressed liquidity by approximately $100 million due to the fact that as of December 31, 2008, Delphi's outstanding letters of credit were required to be both cash collateralized and deducted from the Borrowing Base under the Credit Agreement.  In addition, the Company's short-term liquidity outlook now shows (a) the Accommodation Period Borrowing Base being approximately $60 million higher on December 31, 2008 than previously forecast and (b) the benefit of $21 million of Borrowing Base Cash Collateral being retained under the Accommodation Agreement despite an expected $21 million reduction in ordinary course mark-to-market hedge exposure between now and December 31, 2008.  Based on these factors, the Debtors received the Required Lenders' support to reduce the amount of prepayment required on the Accommodation Effective Date from $181 million to $20 million.

(b) <u>Reduced Cash Collateral</u>.  As a result of the reduced paydown and revised liquidity forecast, the Company projects that it can maintain compliance with the Accommodation Period Borrowing Base covenant through the rest of 2008.  The Company has therefore agreed with GM and the Required Lenders that it will not post more than $200 million

5

in Borrowing Base Cash Collateral (as defined in the Accommodation Agreement) on the Accommodation Effective Date, versus $275 million under the prior version of the Accommodation Agreement.

(c) <u>New Paydown Covenant</u>. In connection with the favorable changes to Delphi described above, Delphi agreed to a new covenant in the revised Accommodation Agreement under which it will pay down at least $60 million of Tranche A and Tranche B debt during the Accommodation Period to a level no greater than $857 million as of January 31, 2009, $847 million as of February 28, 2009, $837 million as of March 31, 2009, $827 million as of April 30, 2009, and $817 million as of May 31, 2009.

II. <u>The Supplemental Objection Of The Tranche C Collective Is Meritless</u>

The Tranche C Collective filed a supplemental objection (Docket No. 14501) that largely rehashes arguments made in its original objection, such as its arguments that the Accommodation Agreement is really an agreement to extend the Maturity Date under the Credit Agreement; that the vote of the Tranche A and B Lenders is unfair because of alleged conflicts of interest; and that the Tranche C interests are not adequately protected. These issues are addressed in the Omnibus Reply and in the testimony of John Sheehan to be offered at the hearing. None of the Tranche C Collective's more specific objections have merit for the reasons discussed below.

<u>Cash Usage</u>. The Tranche C Collective claims that the Debtors' November 26, 2008 forecast documents shows a deterioration in cash usage during the period through March 2009 of $250 million versus the November 17, 2008 projections. (<u>See</u> Suppl. Obj., ¶ 7.) Although the Debtors are currently approximately $100 million behind in forecasted liquidity versus the prior forecast, this amount principally represents working capital reductions that the Debtors have not yet been able to realize, but which the Debtors are committed to recovering. The Debtors have

6

not re-timed the recovery of this working capital into future months for forecasting purposes. The Tranche C Collective's claim is further exaggerated because the Debtors' current forecast of cash collateral at March 31, 2009 is $150 million higher than in the prior forecast. This additional cash collateral does not reflect usage of cash for operations.

<u>Fees</u>.  The Tranche C Collective claims that "a handful of relationship banks" is receiving "gargantuan fees" in exchange for the banks' support. (See Suppl. Obj., ¶ 1.) Under the Accommodation Agreement, Lenders who become parties to the Accommodation Agreement – including Tranche C Lenders – receive an Accommodation Fee of 2% of the applicable commitment or loan outstanding. In addition to the Accommodation Fee, the Company agreed in a separate fee letter to pay certain arrangement fees to the Administrative Agent and other banks referenced in the letter. These fees and the fee letters have been disclosed to the Court and will be discussed in the testimony of John Sheehan at the hearing on this matter. The Company believes that total fees (including the Accommodation Fee and the arrangement fees) are reasonable under the circumstances of this case and in proportion to the amount of capital that remains available to the Debtors during the Accommodation Period.

<u>Deadline For Consents</u>.  The Tranche C Collective also implies that the process for obtaining consents to the Accommodation Agreement was unfair because the Debtors posted additional changed pages to the Accommodation Agreement shortly before the deadline for new Lenders to deliver their consents on Wednesday, November 26, 2008 at 5:00 p.m. (Eastern time). However, the Company did provide a reaffirmation period that was extended to Monday, December 1, 2008, at 9:00 a.m. (Eastern time) for Lenders to reaffirm signature pages previously submitted. It is true that the Company did determine in its business judgment not to pay fees to new Lenders submitting consents for the first time after the 5:00 p.m. November 26 deadline,

because the revisions posted on November 26 were less favorable to Lenders generally than the prior version of the Accommodation Agreement.  However, any Lender who did not submit a signature page prior to the November 26 5:00 p.m. deadline still could become a party to the revised Accommodation Agreement by submitting a signature page during the reaffirmation period.  Although any such Lender would be ineligible to receive a participation fee, it would be considered a Participant Lender under the Accommodation Agreement and would receive the benefit of future voting rights under the Accommodation Agreement.

Borrowing Base.  The Tranche C Collective is also mistaken in its objection that the Accommodation Agreement amends the Borrowing Base under the Credit Agreement without the vote of the Super-majority First Priority Lenders (i.e., 66-2/3 percent of Tranches A and B).  (See Suppl. Obj., ¶¶ 9-10.)  That objection should be moot because the Accommodation Agreement ultimately received the affirmative vote of more than 66-2/3 percent of the total Tranche A and Tranche B Lenders.  More importantly, as explained in the Reply, the Accommodation Agreement in no way amends the Borrowing Base in the Credit Agreement.  (See Omnibus Reply, ¶ 20.)

Payment Of Interest.  The Tranche C Collective also incorrectly argues the Debtors could choose to defer interest for up to six months on the Tranche A and Tranche B Loans under the Credit Agreement and that the payment of interest on demand during the Accommodation Period has been improperly waived on behalf of all Lenders. (See Suppl. Obj., ¶ 8.)  Prior to the Termination Date under the Credit Agreement (i.e., the date on which the commitments under the Credit Agreement are terminated), pursuant to Section 2.08 of the Credit Agreement (and the definition of "Interest Payment Date" therein), the Debtors must make monthly interest payments, even with respect to any outstanding Loans that bear interest at the Eurodollar Rate and for which the Debtors have elected an Interest Period that is greater than one month.  The Accommodation

8

Agreement does not change this construct and requires that the Debtors maintain current monthly interest payments over the Accommodation Period. (In any event, even if the Debtors could defer payment of interest under a Eurodollar Loan for more than one month, the Accommodation Agreement does not permit the Debtors access to Eurodollar Rate interest after the Accommodation Effective Date.)

Nor does the Accommodation Agreement improperly waive Tranche A and Tranche B Lenders' rights to interest on demand. After the Termination Date under the Credit Agreement, interest (including default interest) is payable on demand. Having to pay interest on demand during the Accommodation Period would be unduly burdensome to the Debtors from both an administrative and cash management perspective, however, because the Debtors would be subject to interest payment requests at all times during the Accommodation Period. Therefore, so long as the Debtors are making current monthly interest payments during the Accommodation Period, the Required Lenders have agreed to forbear from exercising remedies resulting from the Debtors' failure to pay interest on demand.

III.     The Court Should Approve The Revised Accommodation Agreement

The revised Accommodation Agreement improves the Debtors' liquidity in comparison to the prior version of the Accommodation Agreement. It has been approved by more than a two-thirds majority of the Tranche A and Tranche B Lenders even though a simple majority constitutes the Required Lenders, and is also supported by GM, as is necessary for the Debtors to obtain up to $600 million in liquidity under the GM Agreements. Moreover, the Debtors believe that the approval of the Accommodation Agreement should provide transparency to Delphi's stakeholders – including its suppliers, customers, employees, and other administrative creditors who conduct business with Delphi in the normal course – of the Debtors'

9

continued access to the necessary liquidity to support Delphi's operations and to continue ordinary course business relationships during the Accommodation Period.  The Debtors' entry into the Accommodation Agreement is in the best interests of the Debtors' estates, is well within the bounds of the Debtors' business judgment, and is consistent with the carefully negotiated rights of all parties to the Credit Agreement.  The Court should therefore approve the Debtors' entry into and implementation of the Accommodation Agreement.

WHEREFORE, for the reasons set forth above, in the Omnibus Reply, and in the Accommodation Motion, the Debtors respectfully request that this Court enter an order (i) supplementing the January 5, 2007 DIP Refinancing Order (Docket No. 6461) and authorizing the Debtors to enter into and implement the Accommodation Agreement with the Agent and Participating Lenders, (ii) authorizing the Debtors to (a) enter into related documents and (b) pay fees in connection therewith, (iii) denying the Tranche C Collective's cross-motion for entry of an order providing adequate protection, and (iv) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       December 1, 2008

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By: _____/s/ John Wm. Butler, Jr._____
    John Wm. Butler, Jr.
    Albert L Hogan III
    John K. Lyons
    Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: _____/s/ Kayalyn A. Marafioti_____
    Kayalyn A. Marafioti
    Thomas J. Matz
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

11