**Hearing Date And Time: December 17, 2008 at 10:00 a.m.**
**Objection Deadline: December 15, 2008 at 4:00 p.m.**

SKADDEN, ARPS, SLATE , MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
George N. Panagakis
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :
      In re                      :    Chapter 11
                           :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                           :
                           :    (Jointly Administered)
                  Debtors.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER, SOLELY AS TO STATUTORY COMMITTEES,
EXTENDING DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE AND SOLICIT
ACCEPTANCES OF REORGANIZATION PLAN UNDER 11 U.S.C. § 1121(d)

("THIRD § 1121(d) STATUTORY COMMITTEE EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this expedited motion (the "Motion") for an order under 11 U.S.C. § 1121(d) further extending, solely as between the Debtors and the Statutory Committees (as defined below), the Debtors' exclusive periods within which to file and solicit acceptances of a plan of reorganization, and respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure

2

Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure

Statement").  The Court entered an order approving the adequacy of the Disclosure

Statement and granting the related solicitation procedures motion on December 10, 2007

(Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan

(as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final

on February 4, 2008.  Although the Debtors on April 4, 2008 had satisfied the conditions

required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed

Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as

defined in the Confirmed Plan) refused to participate in a closing that was commenced but

not completed and refused to fund their Investment Agreement (as defined in the

Confirmed Plan) with Delphi.[1]  On May 16, 2008, Delphi filed complaints for damages

and specific performance against the Plan Investors and related parties who refused to

honor their equity financing commitments and refused to participate in the closing that

would have led to Delphi's successful emergence from chapter 11.  On October 3, 2008,

the Debtors filed a motion (Docket No. 14310) (the "Plan Modification Approval Motion")

under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed

Plan and related modifications to the December 10 Disclosure Statement and (ii) related

procedures for re-soliciting votes on the Confirmed Plan, as modified.  However, due to

the current crisis in the global debt and equity markets, the Debtors have adjourned the

---

[1]   Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture
trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been
stayed indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the
confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order, (see
Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is
either fundamentally unfair or is the product of an abuse of process in the bankruptcy court.

3

hearing on the Plan Modification Motion to December 17, 2008, pending further

discussions with emergence capital funding parties and an assessment of which

supplemental plan modifications are warranted in the current conditions to enable the

Debtors to emerge from chapter 11 as soon as practicable.

        4.      On April 30, 2008, the Debtors obtained an extension, subject to

certain exceptions described below, of their exclusive right under section 1121 of the

Bankruptcy Code to file one or more reorganization plans until 30 days after substantial

consummation of the Confirmed Plan or any modified plan and the exclusive right to

solicit and obtain acceptances for those plans until 90 days after substantial consummation

of the Confirmed Plan or any modified plan.[2] The Debtors' exclusive right to file a plan,

solely as between the Debtors and the Statutory Committees (the "Plan Proposal Period"),

has been extended through and including January 31, 2008, and the right to solicit a plan,

solely as between the Debtors and the Statutory Committees (the "Solicitation Period,"

and, together with the Plan Proposal Period, the "Exclusive Periods"), has been extended

through and including March 31, 2008.[3]

_____

[2]   See Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And
Solicit Acceptances Of Reorganization Plan, dated April 30, 2008 (Docket No. 13483) (the
"Postconfirmation Exclusivity Order").

[3]   See Order, Solely As To Statutory Committees, Extending Under 11 U.S.C. § 1121(d) Debtors'
Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan, dated
July 31, 2008 (Docket No. 14009) (the "First § 1121(d) Statutory Committee Exclusivity Extension
Order"); Order, Solely As To Statutory Committees, Extending Debtors' Exclusive Periods With Which
To File And Solicit Acceptances Of Reorganization Plan Under 11 U.S.C. § 1121(d), dated October 27,
2008 (Docket No. 14373) (the "Second § 1121(d) Statutory Committee Exclusivity Extension Order,"
and together with the Postconfirmation Exclusivity Order and the First § 1121(d) Statutory Committee
Exclusivity Extension Order, the "Posconfirmation Exclusivity Orders").

5.        This Court has jurisdiction over this motion pursuant to 28 U.S.C.

§§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is

a core proceeding under 28 U.S.C. § 157(b)(2).

6.        The statutory predicate for the relief requested herein, solely as

between the Debtors and the Statutory Committees, is section 1121(d) of the Bankruptcy

Code, as amended and in effect on October 8, 2005.

B.        Current Business Operations Of The Debtors

7.        Delphi and its subsidiaries and affiliates (collectively, the

"Company") as of December 31, 2007 had global net sales of $22.3 billion and global

assets of approximately $13.7 billion.[4]  At the time of its chapter 11 filing, Delphi ranked

as the fifth largest public company business reorganization in terms of revenues and the

thirteenth largest public company business reorganization in terms of assets.  Delphi's non-

U.S. subsidiaries are not chapter 11 debtors and have continued their business operations

without supervision from the Court.[5]

8.        The Company is a leading global technology innovator with

significant engineering resources and technical competencies in a variety of disciplines,

and is one of the largest global suppliers of vehicle electronics, transportation components,

---

[4]    The aggregated financial data used herein generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February
19, 2008.

[5]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-
core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish
insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007,
DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a
social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court
approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's
transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

9.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[6]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the

---

[6]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

11.    The Debtors believe that the Company's financial performance deteriorated from the spin-off to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

13.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the

7

Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.      Plan Confirmation And Postconfirmation Matters

14.     The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Confirmed Plan to become effective.  On April 4, 2008, having satisfied those conditions, the Debtors began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees.  The Plan Investors, however, refused to participate in the closing or fund their obligations under the Investment Agreement.  Following April 4, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

15.     On September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations, transformation of the company on a global basis, and emergence from chapter 11.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

16.     Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

17.     Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their transformation plan: (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimates the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA), which includes an increase of nearly $2 billion in connection with the amount of Delphi's net hourly pension liabilities transferred and to be transferred to GM pursuant to section 414(l) of the Internal Revenue Code (increased from $1.5 billion under the Original GSA to approximately $3.4 billion under the Amended GSA).  As part of the approval process of the Amended GSA and Amended MRA, Delphi, GM, and the Creditors' Committee negotiated a consensual first amendment to the Amended GSA

9

which sets forth the circumstances under which GM would allocate a portion of its recovery to unsubordinated general unsecured creditors.

18.    Through the transfer of pension assets and liabilities to GM described above and the freezing of Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's U.S. unions), Delphi has substantially achieved its pension funding strategy objectives for hourly employees.  In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to certain of its pension plans and to implement replacement pension plans (the "Pension Order").  With respect to its salaried employees, pursuant to the Pension Order, on September 30, 2008, Delphi froze the applicable salaried pension plans and implemented replacement plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

19.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

20.    The Debtors seek to extend the Exclusive Periods (solely as to the Statutory Committees) under section 1121(d) of the Bankruptcy Code to prevent any lapse in exclusivity as between the Debtors and the Statutory Committees.  The Debtors seek

entry of an order further extending (a) the Plan Proposal Period, solely as between the Debtors and the Statutory Committees, through and including March 31, 2009 and (b) the Solicitation Period, solely as between the Debtors and the Statutory Committees, through and including May 31, 2009.  Although the Debtors are requesting a further extension of the Exclusive Periods solely as between the Debtors and the Statutory Committees, the Debtors nonetheless anticipate emerging from chapter 11 as soon as reasonably practicable.  As explained above, the Exclusive Periods as to all other parties-in-interest are currently extended until after substantial consummation of the Confirmed Plan or any modified plan.

Basis For Relief

21.    As noted above, the Debtors filed a reorganization plan, solicited acceptances of that plan, obtained confirmation of it, and, after the Confirmation Order became final, commenced a formal closing process that was suspended on April 4, 2008 pending the Debtors' pursuit of their remedies against the Plan Investors in ongoing litigation and exploration with their stakeholders of possible modifications to the Confirmed Plan.  The Debtors have now implemented the Amended GSA and Amended MRA and filed proposed modifications to the Confirmed Plan as part of the Plan Modification Approval Motion.  The Debtors' next steps will include negotiating and finalizing modifications to the Plan and obtaining emergence capital funding necessary to emerge from chapter 11.

22.     The requested extension of the Exclusive Periods is consistent with the milestones set forth in the accommodation agreement.[7]  Specifically, as set forth in the accommodation agreement, by February 27, 2009 the Debtors anticipate filing modifications to the Modified Plan.  Thereafter, the Debtors anticipate obtaining approval of modifications to the disclosure statement with respect to those plan modifications by March 31, 2009.  Since this is a highly complex case, the Debtors would expect to use the intervening time period between now and March 31, 2009 to negotiate with their constituents to facilitate consensual modifications, if possible.  Accordingly, the Debtors need this extension of the Exclusive Periods to continue their efforts to emerge from chapter 11.

23.     As a policy matter, the Exclusive Periods are intended to afford chapter 11 debtors a full and fair opportunity to rehabilitate their businesses and to negotiate, propose, confirm, and consummate a reorganization plan without the deterioration and disruption of their businesses that might be caused by the filing of competing reorganization plans by non-debtor parties.  In re Dow Corning Corp., 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) (stating that primary consideration in determining whether to terminate exclusive periods "should be whether or not doing so would facilitate moving the case forward").  The Debtors are using the time to facilitate emergence from

---

[7]     As this Court is aware, the Debtors sought to extend the maturity date of their DIP credit facility, however, due to the current unprecedented turmoil in the global capital markets and in the global automotive industry, the Debtors were unable to secure the required unanimous consent of their lenders to do so.  The Debtors obtained Court approval on December 1, 2008 to implement the protections contained in the DIP credit facility and entered into an accommodation agreement with approximately 68.2% of the Tranche A and Tranche B lenders (comprised of 77.5% of Tranche A and 47.8% of Tranche B loans) and approximately 24.3% of the most junior tranche of lenders.  Pursuant to that accommodation agreement and subject to the terms thereof, the Debtors can continue to use the proceeds of the DIP credit facility through June 30, 2009.

chapter 11 and further its transformation plan, which is consistent with the policy

described in Dow Corning. Therefore a further extension of the Exclusive Periods is

justified. Moreover, the significant progress the Debtors have made towards

reorganization since they last sought an extension of the Exclusive Periods further supports

this request. Specifically, in addition to operating their business and achieving the other

accomplishments described below, the Debtors have continued to make progress in their

reorganization in three major areas:

- First, as already described above, the Debtors, with the support of the agent to the Debtors' DIP credit facility and certain lenders, including the majority of holders by amount of Delphi's two most senior tranches of its DIP credit facility, have entered into a Court approved accommodation agreement, which permits the continued use of the proceeds from its DIP credit facility through June 30, 2009, subject to the achievement of certain milestones set forth in the accommodation agreement.

- Second, the Debtors have obtained Court authority to amend and extend, through June 30, 2009, their current arrangement with GM, pursuant to which GM has agreed to make specific accommodations to provide up to $300 million of liquidity enhancement.

- Third, the Debtors have obtained Court authority to enter into a new agreement with GM whereby GM will provide up to an additional aggregate $300 million in early 2009 by temporarily accelerating certain accounts payable to Delphi.

24.    An extension is further justified because the markets have remained

extremely volatile and liquidity in the capital markets has been nearly frozen, resulting in

an unprecedented challenge for the Debtors to successfully attract emergence capital

funding for their Modified Plan. As reflected in the accommodation agreement, the agent

to the DIP credit facility and the lenders party to the accommodation agreement support the

Debtors' efforts to seek emergence capital funding and to use this time to facilitate progress

towards emergence from chapter 11.

13

25.       Moreover, the Debtors continue to litigate against the Plan Investors and related parties with respect to their refusal to honor their commitments under the Investment Agreement.  Combined with the other accomplishments detailed below, the unresolved contingencies relating to emergence, and the size and complexity of the Debtors' cases, the Debtors' continued progress toward emergence justifies a further extension of the Exclusive Periods solely as between the Debtors and the Statutory Committees.

<u>Applicable Authority</u>

26.       Under the Bankruptcy Code, a bankruptcy court may confirm only one plan of reorganization.  <u>See</u> 11 U.S.C. § 1129(c).  Because the Plan was confirmed on January 25, 2008 pursuant to the Confirmation Order that became final on February 4, 2008, and because that order cannot be revoked unless "procured by fraud," <u>see</u> 11 U.S.C. § 1144, no other plan of reorganization may now be filed or solicited in these cases. Instead, unless the Confirmed Plan is withdrawn by the Debtors in accordance with the discretion granted to them by § 14.7(a) of the Confirmed Plan, only modifications to the Confirmed Plan proposed and prosecuted by the Debtors in accordance with section 1127 of the Bankruptcy Code may be considered by the Court.  Thus, section 1129(c) of the Bankruptcy Code operates to extend the exclusive periods until the Confirmed Plan (as modified or otherwise) becomes effective.  The Debtors and the Statutory Committees, however, have expressly reserved in the Postconfirmation Exclusivity Orders their rights to address, if any of the Exclusive Periods expires, whether 11 U.S.C. § 1129(c) prevents the Statutory Committees from filing and soliciting a competing plan of reorganization.

14

27.     Nevertheless, section 1121(d) of the Bankruptcy Code permits the

court to extend a debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective
> periods specified in subsections (b) and (c) of this section
> and after notice and a hearing, the court may for cause
> reduce or increase the 120-day period or the 180-day period
> referred to in this section.

11 U.S.C. § 1121(d).  The court in In re McLean Industries, Inc., 87 B.R. 830 (Bankr.

S.D.N.Y. 1987), identified the following factors as relevant to the determination of "cause"

to extend a debtor's Exclusive Periods:

(a)     the existence of good-faith progress toward reorganization;

(b)     existence of an unresolved contingency;

(c)     the size and complexity of the debtor's case;

(d)     a finding that the debtor is not seeking to extend exclusivity
        to pressure creditors "to accede to [the debtor's]
        reorganization demands"; and

(e)     the fact that the debtor is paying its bills as they come due.

Id. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003)

(stating that not all factors "are relevant in every case" and court has discretion to "decide

which factors are relevant and give the appropriate weight to each").

28.     At least one court has noted that "cause may be measured by a more

lenient standard in the determination to grant an enlargement of time in which to gain

acceptances to a filed plan."  Gaines v. Perkins (In re Perkins), 71 B.R. 294, 299 (W.D.

Tenn. 1987) (emphasis added); see also In re Express One Int'l, Inc., 194 B.R. 98 (Bankr.

E.D. Tex. 1996) (denying motion to terminate and granting motion to extend exclusivity

based in part on debtors' filing of plan and disclosure statement and imminent hearing on

15

disclosure statement).  The same standard should apply when a debtor has confirmed a
plan and has moved for approval of modifications to the confirmed plan in accordance with
section 1127.

29.    In other cases of similar size and complexity to Delphi's, courts have
extended the debtors' exclusive rights to propose a plan of reorganization for periods
similar to those requested by the Debtors.  See, e.g., In re Solutia Inc., No. 03-17949
(Bankr. S.D.N.Y. May 1, 2007) (extending periods for more than 43 months); In re W.R.
Grace & Co., No. 01-01139 (Bankr. D. Del. Oct. 3, 2006) (extending exclusive periods for
more than six years); In re Kaiser Aluminum Corp., No. 02-10429 (Bankr. D. Del. Nov. 2,
2005) (extending periods for approximately 43 months).  In these cases, based upon the
preceding factors and in line with other cases of similar size and complexity, sufficient
cause exists for a prophylactic extension of the Exclusive Periods as between the Debtors
and the Statutory Committees.

F.    The Debtors Have Made Good-Faith Progress Toward Reorganization

30.    An extension of a debtor's exclusive periods is justified by a debtor's
progress in resolving issues facing its creditors and estates.  McLean Indus., 87 B.R. at
834; In re AMKO Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996).  The Debtors'
progress in these cases thus far is significant and compels a further extension of the
Exclusive Periods, should it be necessary.

31.    Implementation of Amended GSA and Amended MRA.  The
Debtors' good-faith progress towards reorganization is most convincingly demonstrated by
the completion and implementation of the Amended GSA and Amended MRA and the
filing of the Plan Modification Approval Motion.  Moreover, since the implementation of

16

Amended GSA and Amended MRA on September 29, 2008,[8] the Debtors have continued

their discussions with their key stakeholders in an effort to secure support for the proposed

modifications to the Confirmed Plan that would allow the Debtors to implement a new

path to emergence and maximize value for all their stakeholders.

32.    Claims reconciliation.  Although creditors have filed more

than 16,824 proofs of claim asserting approximately $34.0 billion in liquidated amounts

plus certain unliquidated amounts, the Debtors have made significant strides in the claims

reconciliation process. As of November 15, 2008, the Debtors have objected to

approximately 13,400 claims asserting nearly $10.1 billion (plus additional unliquidated

amounts) and this Court has granted relief with respect to approximately $10.4 billion in

asserted liquidated claims (plus additional unliquidated claims).

33.    Other key accomplishments.  In addition to obtaining approval of

the accommodation agreement, the Debtors' and GM's agreement to amend and extend

their current arrangement with GM to provide up to $300 million in liquidity enhancement,

and obtaining approval to enter into a new agreement with GM whereby GM would

provide an additional $300 million in liquidity support during the second quarter of 2009,

the Debtors, since they last sought an extension of the Exclusivity Periods, have also:

(a)    obtained an order sustaining the 31st omnibus claims
objection;

(b)    filed the 32nd omnibus claims objection;

---

[8]    As a result of implementing the Amended GSA and Amended MRA, Delphi reported one-time gains for
the third quarter of 2008 totaling $5.7 billion, including a net reorganization gain of $5.3 billion.

(c)     obtained an order authorizing the Statutory Committee members to participate in the Debtors' emergence funding structure;

(d)     obtained approval of procedures to sell its exhaust business to Bienes Turgon S.A. de C.V. for approximately $17 million;

(e)     completed the sale of its power products division to Strattec for $6.6 million; and

(f)     advanced the Plan Investor litigation by continuing to engage in deposition discovery and by obtaining a Court order denying Appaloosa's motion to reconsider the Court's August 11, 2008 ruling on Appaloosa's motion to dismiss Delphi's equitable subordination and veil-piercing claims and Delphi's claim for damages in excess of the liability cap.

In summary, the Debtors have continued to make significant, good faith progress in their chapter 11 cases.

G.      Unresolved Contingencies Still Exist

34.     Courts have also cited the need to resolve an important contingency as justification for extending a debtor's exclusive periods.  The tasks of negotiating plan modifications, securing exit financing, and obtaining Court approval remain significant for both their magnitude and complexity and amply satisfy the contingency component described in the McLean Industries test.

H.      These Cases Are Large And Complex

35.     The size and complexity of the Debtors' chapter 11 cases alone constitute sufficient cause to extend the Exclusive Periods as between the Debtors and the Statutory Committees.  See, e.g., In re Texaco Inc., 76 B.R. 322, 324-25, 326-27 (Bankr. S.D.N.Y. 1987) (granting extension of exclusive periods based on debtor's size in $28.5 billion asset case with over 300,000 creditors and stockholders); In re United Press

18

Int'l, Inc., 60 B.R. 265, 270 (Bankr. D.D.C. 1986) (granting $40 million company extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan.").  These and other authorities show that in large, complex chapter 11 cases, courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, formulate a long-term business plan, and obtain confirmation of a reorganization plan.

36.    The Debtors' cases are indisputably large and multi-dimensional. The scope of actions that have been taken, and must be taken, to address Delphi's restructuring requirements is exceedingly complex.  A review of certain basic statistics noted above makes the foregoing conclusion self-evident.  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods, as between the Debtors and Statutory Committees, under the authorities cited above.  Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous challenges that are unique to the distressed automobile industry and some that affect most large businesses that rely on the capital markets.  The extension of the exclusive periods is necessary to continue progress in addressing these complexities.

I.    The Debtors Are Using Exclusivity For A Proper Purpose

37.    Courts have denied extensions of exclusive periods when plan negotiations among parties-in-interest have broken down and the continuation of

19

exclusivity would merely give the debtor unfair bargaining leverage over the other parties-in-interest.  See Teachers Ins. & Annuity Ass'n of Am. v. Lake in the Woods (In re Lake in the Woods), 10 B.R. 338, 345 (E.D. Mich. 1981).  Here, however, the Debtors' request for an extension of the Exclusive Periods as between the Debtors and the Statutory Committees is not a negotiation tactic.  The Debtors negotiated with their stakeholders and obtained their acceptance of the Confirmed Plan.  The Debtors have continued to negotiate with their stakeholders, most recently by reaching an accommodation agreement with the administrative agent and the majority of the Tranche A Lenders and Tranche B Lenders whereby the Debtors can continue to use the proceeds of the DIP credit facility through June 30, 2009 (or May 5, 2009 if Delphi does not achieve certain milestones in its reorganization cases).  Accordingly, the Debtors' next steps will include negotiating and finalizing modifications to the Plan and obtaining emergence capital funding necessary to emerge from chapter 11.

J.      The Debtors Are Paying Their Bills As They Come Due

        38.     Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency.  See In re Ravenna Indus., Inc., 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982).  The Debtors have satisfied this test, as they are paying their bills as they come due, including the statutory fees paid quarterly to the United States Trustee.

K.      The Debtors Have Shown Cause To Further Extend The Exclusive Periods

        39.     As described above, the Debtors have made significant and productive strides in these chapter 11 cases.  Based on this progress and all the other applicable factors, sufficient cause exists to extend the Exclusive Periods as between the Debtors and the Statutory Committees.  Accordingly, the Debtors submit that the relief

20

requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

<u>Notice</u>

40.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Twelfth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered July 23, 2008 (Docket No. 13965).  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion and the need for expedited relief.[9]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

---

[9]    The Debtors have noticed this Motion for the omnibus hearing on December 17, 2008.  In compliance with the terms of the Supplemental Case Management Order, the Debtors have consulted with counsel to the Creditors' Committee regarding the relief sought in this Motion as well as the timing of its filing.  The Debtors have been informed that the Creditors' Committee has consented to this Motion being heard on December 17, 2008.  Because this Motion is being filed on fewer than 20 days' notice, the Statutory Committees will have until December 15, 2008 to file an objection to entry of the Third § 1121(d) Statutory Committee Exclusivity Extension Order.

WHEREFORE the Debtors respectfully request that the Court enter an

order (a) extending the Debtors' exclusive periods, solely as between the Debtors and the

Statutory Committees, (i) to file a plan of reorganization through and including March 31,

2009 and (ii) to solicit acceptance of a plan of reorganization through and including

May 31, 2009 and (b) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          December 5, 2008

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                      & FLOM LLP

                              By:    /s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr.
                                    George N. Panagakis
                                    Ron E. Meisler
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                          - and –

                              By:    /s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti
                                    Thomas J. Matz
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession