1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.,


       Debtors.


- - - - - - - - - - - - - - - - - - - -x


          U.S. Bankruptcy Court

          One Bowling Green

          New York, New York


          December 1, 2008

          10:56 a.m.


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1   EXPEDITED Motion for Order Authorizing Debtors to Enter Into

2   (I) Second Amendment to Arrangement With General Motors

3   Corporation Approved Pursuant to Second DIP Extension Order,

4   and (II) Partial Temporary Accelerated Payment Agreement With

5   General Motors Corporation

6

7   EXPEDITED Motion for Order (I) Supplementing January 5, 2007

8   DIP Refinancing Order and Authorizing Debtors to Enter Into and

9   Implement Accommodation Agreement With Agent and Participating

10  Lenders, and (II) Authorizing Debtors to (a) Enter Into Related

11  Documents, and (b) Pay Fees in Connection Therewith

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed By:  Esther Accardi

3

1

2    A P P E A R A N C E S :

3    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

4         Attorneys for Debtors

5         333 West Wacker Drive

6         Chicago, Illinois 60606

7

8    BY:    JOHN WM. BUTLER, JR., ESQ.

9         ALBERT HOGAN, ESQ.

10

11

12    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

13         Attorneys for Debtors

14         Four Times Square

15         New York, New York 10036

16

17    BY:    KAYALYN A. MARAFIOTI, ESQ.

18

19

20    LATHAM & WATKINS, LLP

21         Attorneys for Creditors' Committee

22         885 Third Avenue

23         New York, New York 10022

24

25    BY:    ROBERT J. ROSENBERG, ESQ.

4

1        MICHAEL RIELA, ESQ.

2    A P P E A R A N C E S : (continued)

3    FRIED FRANK HARRIS SHRIVER & JACOBSON, LLP

4        Attorneys for Official Committee of

5         Equity Security Holders

6        One New York Plaza

7        New York, New York 10004

8

9    BY:   BONNIE STEINGART, ESQ.

10

11

12   COOLEY GODWARD KRONISH, LLP

13       Attorneys for Greywolf Capital Management

14       1114 Avenue of the Americas

15       New York, New York 10036

16

17   BY:   RONALD R. SUSSMAN, ESQ.

18

19

20   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

21       Attorneys for Tranche C Collective

22       51 Madison Avenue

23       New York, New York 10010

24

25   BY:   SUSHEEL KIRPALANI, ESQ.

5

1    RICHARD I. WERDER, JR., ESQ.

2    A P P E A R A N C E S : (continued)

3    HAYNES AND BOONE, LLP

4        Attorneys for Calyon NY Branch

5        1221 Avenue of the Americas

6        New York, New York 10020

7

8    BY:   JUDITH ELKIN, ESQ.

9

10

11   WINSTON & STRAWN, LLP

12       Attorneys for Certain A and B Lenders

13       200 Park Avenue

14       New York, New York 10166

15

16   BY:   DAVID NEIER, ESQ.

17

18

19   ANDREWS KURTH, LLP

20       Attorneys for M.D. Sass

21       450 Lexington Avenue

22       New York, New York 10017

23

24   BY:   PAUL SILVERSTEIN, ESQ.

25

6

1

2    A P P E A R A N C E S : (continued)

3    DAVIS POLK & WARDWELL

4         Attorneys for JPMorgan Chase

5         450 Lexington Avenue

6         New York, New York 10017

7

8    BY:   BRIAN M. RESNICK, ESQ.

9         DONALD S. BERNSTEIN, ESQ.

10        MICHAEL S. FLYNN, ESQ.

11        KARIN S. DAY, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.  Okay.  Delphi

3   Corporation.

4          MR. BUTLER:  Your Honor, good morning.  Jack Butler,

5   Kayalyn Marafioti and Al Hogan here on behalf of Delphi

6   Corporation for the continuation of it's thirty-seventh omnibus

7   hearing.  This hearing commenced on November 24th.  We disposed

8   with the first three items on the agenda at that time and Your

9   Honor continued items 4 and 5 to today's hearing.  So with Your

10  Honor's permission we'll just continue with the agenda.

11         THE COURT:  That's fine.

12         MR. BUTLER:  Your Honor, the next matter on the

13  agenda is item number 4.  This is the GM arrangement second

14  amendment agreement approval motion.  This is filed at docket

15  number 14409.  No objections have been filed to this matter and

16  it's on the uncontested docket.

17         Your Honor, this is an agreement that -- two

18  agreements.  We're asking for approval of two agreements that

19  would provide up to 600 million dollars of additional liquidity

20  to the debtors through the second quarter of 2009.

21         The first of these agreements is an amendment to the

22  existing arrangement between the debtors and GM, pursuant to

23  which GM has extended significant liquidity to the debtors.

24  This is the second amendment to that arrangement that we

25  brought before this Court.  The arrangement was originally

8

1    approved by the Court as part of the second DIP extension order

2    entered on April 30, 2008 at docket number 13489.  And, again,

3    a first amendment to the arrangement was approved on September

4    26th at docket number 14289.

5           The second agreement, Your Honor, that is part of

6    this motion, covers a partial temporary acceleration of certain

7    trade payable accounts by GM in early 2009.  Your Honor, in

8    terms of the record in this case, we do have thirteen items

9    that are in the exhibit book.  They include a declaration of

10   Keith Stipp  in support of the arrangement.  The court

11   documents concerning the approval of the motion has been

12   approved and the prior arrangements.  There are no objections,

13   Your Honor, I'd like to move admission of Exhibits 1 through

14   13.

15          THE COURT:  Okay.  Any objection to their admission?

16          All right, they're admitted.

17          MR. BUTLER:  Your Honor, I don't know whether Your

18   Honor had any questions of Mr. Stipp in connection with his

19   declaration?

20          THE COURT:  No, I don't.

21          MR. BUTLER:  Your Honor, in terms of the merits of

22   the relief that's requested, I'm going to rely on the papers

23   that we had submitted in connection with these two matters.  I

24   would point out to Your Honor, if Your Honor approves this,

25   that one of the conditions for this becoming effective would be

9

1    GM's satisfaction with the outcome of the accommodation

2    agreement hearing.  GM has approved the accommodation agreement

3    as it was posted on November 26th.  But they will not deliver

4    their signatures pages and close this agreement until they're

5    satisfied that the accommodation agreement, if approved by Your

6    Honor, is in the form that they have approved.

7              THE COURT:  Okay.  But that's the only way that this

8    motion is contingent upon the other motion?

9              MR. BUTLER:  That is correct, Your Honor.

10             THE COURT:  Okay.  Does anyone have anything to say

11   in connection with this motion, the GM motion?  All right.  And

12   do you have anything more to say on it?

13             MR. BUTLER:  I have nothing else, Your Honor.

14             THE COURT:  In light of the averments in the motion

15   and its supporting declaration, as well as the absence of any

16   objection to the relief sought in the motion, then my

17   conclusion that the debtor has set forth good business reasons

18   for entry into this agreement with GM, I'll approve the motion.

19             MR. BUTLER:  Thank you, Your Honor.

20             Your Honor, the other matter on the docket today is

21   on a contested docket.  It is the debtors' accommodation

22   motion, filed at docket number 14408.

23             There are five objectors that are before the Court

24   today intending to pursue objections.  They are the Tranche C

25   Collective objections, Mr. Kirpalani is here in Court.  For

10

1    Greywolf Capital -- their original docket number was 14459 and

2    they have submitted a supplemental objection as well over the

3    weekend.  Greywolf Capital Management, LP, at docket number

4    14460 is represented by Mr. Sussman.  M.D. Sass Re/Enterprise

5    Portfolio Company, LP at docket number 14464 is represented by

6    Mr. Silverman.  Calyon New York Branch at docket number 14467

7    is represented by Ms. Elkin.  And, finally, there is an A & B

8    lender group represented by Mr. Neier, and they're objection is

9    at docket number 14472.

10            Your Honor, since last week, last Monday, we have

11   done what we have indicated to the Court we would do, which is

12   continue discussions between the Tranche A and B lenders and

13   GM, and the company, and the administrative agent, sorting out

14   what modifications ought to be made to the accommodation

15   agreement in order to have support from those groups.  That

16   form of accommodation agreement was filed on November 26th.

17   The parties had until this morning at 9 a.m. to reaffirm their

18   position with respect to the administrative agent.  The debtors

19   were advised, immediately prior to the commencement of this

20   hearing, that 68.37 percent, more than two-thirds of the

21   Tranche A and B lenders, have both submitted signature pages

22   and reaffirmed those signature pages, based on the

23   accommodation agreement that was filed on November 26th on

24   Interlink with the banks and filed here in the Bankruptcy Court

25   that evening.

11

1          Your Honor, I also understand that certain of the

2     objectors that were in either the Tranche A/B objector group or

3     in the Tranche C objector group have, in fact, submitted

4     signature pages and reaffirmations indicating their support of

5     the agreement.  I'll not name them on the record.  I don't

6     think it's -- I just indicate that to Your Honor.  There are

7     remaining members of those two groups that are pursuing their

8     objections today.  And, therefore, I don't think that a change

9     is the ability of those groups to move forward.  They're just

10    moving forward with slightly fewer members as we sit here

11    today.

12          Your Honor, because this is a contested matter and

13    based on our past practice, I'm going to move to the

14    evidentiary portion of the hearing and reserve comments until

15    later unless the Court has any questions.

16          THE COURT:  No, that's fine.

17          MR. BUTLER:  Your Honor, normally what we would do is

18    deal with the revised -- the joint exhibit list index.  I'll

19    address that now.  I don't believe there are any objections to

20    it.  There are 129 exhibits that are part of the joint exhibit

21    list.  They include Mr. Sheehan's original and supplemental

22    declarations, the accommodation agreement documents, various

23    presentations to Delphi's board of directors and statutory

24    committees, documents related to the commodity financial

25    hedging agreements between the debtors -- the debtors have,

12

1    certain SEC filings and agreements with General Motors, and

2    various court documents that apply to the debtor-in-possession

3    facility.  We also have noted, as Exhibit 56, Mr. Sheehan's

4    deposition transcript, which has been submitted.  There is a

5    series of designations that have been designated by the

6    objectors.  And demonstrative exhibits from both parties as

7    well as additional designations and supplemental exhibits that

8    were designated over the last week since the past hearing.

9         Your Honor, I believe there are no objections to

10   those.  Obviously, the demonstratives and the presentations to

11   committees and so forth come in as they have before, not for

12   the truth asserted in those, but rather as evidence of what was

13   presented at that time.

14        THE COURT:  Okay.  Does anyone have any objection to

15   the admission of those exhibits?

16        MR. KIRPALANI:  No, Your Honor.

17        THE COURT:  All right. I'll admit them in.

18   (Debtors' Exhibit 1 through 130 were hereby received into

19   evidence, as of this date.)

20        MR. BUTLER:  Your Honor, then the only witness --

21   there are no declarations from any of the objectors.  The only

22   declaration is that of Mr. Sheehan, the company's chief

23   financial officer.  His declaration's Exhibit Number 1, is his

24   original declaration dated November 11, 2008.  And Exhibit 111

25   is his supplemental declaration dated November 30, 2008.  And,

13

1    Your Honor, I'd move -- those have been admitted, but subject

2    to cross examination any questions Your Honor may have.  So I'd

3    make Mr. Sheehan available for any cross examination.

4             THE COURT:  Okay.  Does anyone want to cross examine

5    Mr. Sheehan?

6             MR. WERDER:  Yes, Your Honor.  Rick Werder from Quinn

7    Emanuel for the Tranche C Collective.

8             THE COURT:  Okay.  Why don't you take a seat up here,

9    Mr. Sheehan.

10            MR. KIRPALANI:  Your Honor, can I also just clarify

11   one thing?  It's Susheel Kirpalani from Quinn Emanuel for the

12   record.

13            Pursuant to discussions with Mr. Hogan, dating back

14   over a week ago, we reserve the right to call one or two

15   rebuttal witnesses to the extent that it is necessary following

16   cross examination, based on deposition testimony that we have,

17   Your Honor.

18            THE COURT:  Okay.

19       (Witness is sworn)

20            THE COURT:  For the record, would you spell you name?

21            THE WITNESS:  John, J-O-H-N, Sheehan, S-H-E-E-H-A-N.

22            THE COURT:  You can go ahead.

23            MR. WERDER:  Thank you, Your Honor.

24   DIRECT EXAMINATION

25   BY MR. WERDER:

14

1    Q.    Good morning, Mr. Sheehan.  Good to see you again.

2    A.    Good morning.

3    Q.    How are you today?

4    A.    Very good, thanks.

5    Q.    This hearing was originally scheduled for last Monday, was

6    it not?

7    A.    Yes, it was.

8    Q.    And it was postponed because General Motors asked Delphi

9    to reconsider certain provisions of the accommodation

10   agreement, correct?

11   A.    Yes, sir.

12   Q.    When did GM request that postponement?

13   A.    Over the course of the weekend, prior to last Monday.

14   Q.    And at the time that GM requested the postponement, had it

15   received the debtor projections that you and your counsel

16   delivered to us at the start of your deposition on November

17   23rd?

18   A.    Yes, sir.

19   Q.    And what did those projections show with respect to when

20   GM would be required to start funding its commitments under the

21   then existing language of the accommodation agreement?

22   A.    I don't have it in front of me, but I believe it may have

23   required as early as December of 2008.

24   Q.    I think there's a set of exhibits behind you.  Can you see

25   if you can find Exhibit 97?

15

1     (Pause)

2   Q.   Do you have that exhibit now?

3   A.   Yes, I do.

4   Q.   And can you identify that as the set of projections that

5   were prepared over the weekend of November 23rd and 24th and

6   delivered to the objectors at the start of your deposition on

7   the 24th?

8   A.   Yes, sir.  Although, I think the deposition was on the

9   23rd.

10  Q.   Oh, correct.  It was the 22nd and the 23rd, you're

11  absolutely right.  It was Sunday the 23rd that you were

12  deposed, correct?

13  A.   Yes, sir.

14  Q.   And these are the projections that GM had access to over

15  the weekend when it advised you that it wanted to reopen

16  discussions of the accommodation agreement?

17  A.   Yes, sir.

18  Q.   And if we look at the page that -- the first page of data,

19  there are three columns there, you see that?

20  A.   Yes, sir.

21  Q.   And talking about the middle column which is labeled

22  accommodation model, is that the November 17, 2008

23  accommodation model prepared by the debtors?

24  A.   Yes, sir.

25  Q.   And that was the model that was being used prior to the --

16

1    prior to some revisions that were done over the weekend of the

2    22nd and 23rd, correct?

3    A.    Yes, sir.

4    Q.    And does the first column reflect the changes to the

5    projections that were made over the weekend of 22nd and 23rd?

6    A.    It represents a reforecasting that we did that weekend,

7    yes.

8    Q.    And just focusing on a few of the lines of the exhibit,

9    the reforecasting indicated -- does it indicate a change in

10    October opening cash?

11    A.    Yes, sir.

12    Q.    Does it also indicate a change in the cash required by the

13    debtors' operations during October of 2008?

14    A.    Yes, sir.

15    Q.    And it indicates several other changes from the original

16    model that was used on November 17th, as well, does it not?

17    A.    Yes, sir.

18    Q.    And the net result of the changes is to significantly

19    increase the cash outflows during October of 2008, correct?

20    A.    It increases the cash flows by 108 of eighty-five million

21    dollars.

22    Q.    And the result of all the changes that occurred between

23    November 17th and November 23rd was that October closing cash

24    and November opening cash dropped by 230 million dollars,

25    correct?

17

1    A.    Yes, sir.

2    Q.    And if we look down to December, December has a line that

3    is labeled GM draw, do you see that?

4    A.    Yes, sir.

5    Q.    And the GM draw, is that a draw under the 300 million

6    dollar facility that was just presented to the Court and

7    approved in Mr. Butler's presentation?

8    A.    Yes, sir.  I believe that there's an existing facility in

9    place.  The facility that was just approved by the Court is the

10   one for January 1 through June 30th of 2009.  But there is a

11   similar facility that's in place in December -- today and

12   through December 31.

13   Q.    Regardless of which facility it's under they're both 300

14   million dollar facilities, correct?

15   A.    Yes, sir.  I was just trying to be --

16   Q.    Okay.  And the original model that was presented on

17   November 17th showed no draw on that facility in December of

18   2008, correct?

19   A.    Yes, sir.

20   Q.    And the projections that were prepared approximately a

21   week later showed a requirement of approximately 102 million

22   dollars in December of '08 from General Motors, did it not?

23   A.    Yes, sir.

24   Q.    When GM received this revised set of projections showing a

25   requirement for funding from GM of 102 million in December of

18

1  2008, did they raise issues with you concerning that

2  projection?

3  A.    Yes, sir.

4  Q.    And in particular, did they raise issues concerning the

5  aspect of the projection that indicated that their funding

6  obligation would kick in in December of 2008?

7  A.    Yes, sir.

8  Q.    Were there concerns raised in those discussions concerning

9  GM's ability to provide that funding at that time?

10  A.    General Motors indicated to us that they were concerned

11  about -- given the state of the industry and all that was going

12  on that Delphi needed to be preserving all of the liquidity it

13  possibly could and to be delaying the use of their facility as

14  long as possible, yes.

15  Q.    And in connection with that indication from GM were there

16  issues discussed concerning GM's own liquidity and GM's ability

17  or willingness to provide that funding on that schedule?

18  A.    GM pointed out to us that their own liquidity issues were

19  well publicized in the public.

20  Q.    And so GM's liquidity issues were raised as a concern with

21  respect to this revised forecast for November 23rd, were they

22  not?

23  A.    It was one aspect of the discussions, yes.

24  Q.    And there was an issue that was raised concerning whether

25  or not GM would, in fact, have available the liquidity to

19

1    provide that 102 million dollars that was projected to be

2    needed in December of 2008, correct?

3    A.    GM indicated to us that their own liquidity planning had

4    not contemplated providing this liquidity to us in December.

5    Q.    And did they also indicate in addition to the fact that

6    their planning had not contemplated it, that their liquidity

7    position did not permit it, or that it would be problematic to

8    their liquidity position to provide it?

9    A.    I would agree with your second statement that it would be

10   problematic.

11   Q.    At the very least they indicated that it would be

12   problematic for them to provide 102 million dollars of funding

13   under the agreement in December of 2008, correct?

14   A.    I think that's consistent with the fact that their

15   statement to me that their, General Motors' liquidity --

16   current liquidity issues are well publicized.

17   Q.    And the agreement that you were discussing with them at

18   the same time that you were discussing the accommodation

19   agreement, calls for them to provide 300 million of liquidity,

20   does it not?

21   A.    I'm sorry, I didn't understand that question.

22   Q.    You have an agreement with GM that you were discussing at

23   the same time that you were discussing the accommodation

24   agreement that calls for GM to provide 300 million dollars --

25   up to 300 million dollars of liquidity, correct?

20

1    A.   Yes, sir.

2    Q.   And your current projections based upon the amended or

3    revised accommodation agreement show the first payment being

4    made -- projected to be made under that facility in February of

5    2009, correct?

6    A.   Yes, sir.

7    Q.   And that's eight-five million dollars that's projected to

8    be drawn under the GM facility in February of '09, correct?

9    A.   It's approximately that.  I don't have it in front of me,

10   but it's in that ballpark.

11   Q.   And there's another 105 million projected to be drawn,

12   approximately, in March of '09, correct?

13   A.   Yes, sir.

14   Q.   So that by March 31st of 2009 your current projections

15   call for you to be drawing approximately 190 million dollars

16   under the GM 300 million dollar facility, correct?

17   A.   Yes, sir.

18   Q.   Is Delphi, as a result of its negotiations with General

19   Motors, is Delphi getting any collateral or security to secure

20   GM's obligation to provide that 300 million dollars of

21   liquidity?

22   A.   No, sir.

23   Q.   And can you tell us -- can you tell the Court what due

24   diligence Delphi has performed to verify that GM's liquidity

25   position which was problematic as to 102 million dollars in

21

1    December of 2008 will, in fact, allow it to provide that 190

2    million dollars of liquidity by the end of the first quarter of

3    2009?

4    A.    Make that General Motors is -- through our discussions

5    with General Motors, we understand that they are taking all

6    actions that they can to preserve liquidity.  I think that it's

7    been well documented in the public that those actions include

8    discussions in Washington.  And we have -- we understand that

9    they are working to preserve liquidity and to honor the

10   obligations that they have to all parties, including Delphi.

11   Q.    Was there any formal due diligence effort that was

12   commenced by Delphi on GM in connection with assuring Delphi

13   and its stakeholders that the 300 million dollars would, in

14   fact, be available?

15   A.    Nothing specific, no.

16   Q.    Okay.  Let me ask you if you could get in front of you

17   Exhibit 111, which is your revised declaration.

18        (Pause)

19   Q.    I should say your supplemental declaration, not your

20   revised declaration.  Do you have that?

21   A.    Yes, sir.

22   Q.    And the copy that we received had an electronic signature

23   and it's dated November 30th of 2008.  When did you, in fact,

24   sign off on this declaration?

25   A.    Yesterday afternoon.

22

1    Q.    Okay.  If I could direct your attention to paragraph 11 of

2    the supplemental declaration.  And paragraph 11 says, among

3    other things, and it describes the signature pages and your

4    procedures with respect to that.  But it says that the -- in

5    about the middle of the paragraph it has a phrase "the changes

6    were less favorable to the lenders than the accommodation

7    agreement as it previously existed," do you see that?

8    A.    Yes, sir.

9    Q.    And that's a true statement, is it not?

10   A.    Yes, sir.

11   Q.    The accommodation agreement that's currently being

12   proposed is less favorable to the lenders than the

13   accommodation agreement that was tentatively before the Court

14   last week, correct?

15   A.    Yes, sir.

16   Q.    And among other things -- and it's less favorable to the

17   Tranche C lenders, who are my clients, is it not?

18   A.    I don't know that I distinguish between one category of

19   lenders versus another.

20   Q.    Well, you had some negotiations with the Tranche C -- with

21   representatives of the Tranche C lenders in the weeks leading

22   up to this hearing, did you not?

23   A.    Yes, sir.

24   Q.    And you understood that one of the things that the Tranche

25   C lenders wanted to see happen was to have the Tranche A and

23

1    Tranche B paid down to the maximum extent possible, correct?

2    A.    Yes, sir.

3    Q.    And, in fact, under the amended -- the revised

4    accommodation agreement that's presently before the Court, the

5    Tranche A and the Tranche B balances remain at higher levels

6    than they would have remained under the agreement that was

7    tentatively before the Court last week, correct?

8    A.    Yes, sir.

9    Q.    Have you calculated what the difference is in terms of the

10    amount of the A and B balances that remains outstanding?

11    A.    Upon the effectiveness of the accommodation agreement?

12    Q.    Well, upon the effectiveness or -- let's say at December

13    31st of 2008, it's true, is it not, that under the old model

14    there would have been 716 million dollars of Tranche A and

15    Tranche B loans outstanding -- loan balance outstanding as of

16    December 31st, correct?

17    A.    Yes, sir.

18    Q.    And under the new model you leave 877 million dollars of

19    Tranche A and Tranche B outstanding, correct?

20    A.    Yes, sir.

21    Q.    And that's a difference of 161 million dollars, right?

22    A.    Yes, sir.

23    Q.    And looking at March 31st of 2009 under the old model

24    there would have been 716 million dollars of Tranche A and

25    Tranche B outstanding, correct?

24

1    A.    Yes, sir.

2    Q.    And under the new model there's a 837 million dollars of

3    Tranche A and Tranche B, correct?

4    A.    Yes, sir.

5    Q.    For a difference of a 121 million dollars?

6    A.    Yes, sir.

7    Q.    And it's true, is it not, that under the forecast that

8    reflects the revised accommodation agreement, more available

9    cash of the debtors is used for purposes other than paying down

10   the DIP facility?

11   A.    Yes, sir.

12   Q.    And it's true, is it not, that the ending cash -- the

13   ending cash on hand is projected to be the same -- or

14   approximately the same, under, both the old model accommodation

15   agreement and the new model accommodation agreement, that's a

16   true statement, is it not?

17   A.    Yes, sir.

18   Q.    And do you know offhand what the ending cash is projected

19   to be at March 31st under the new model?

20   A.    It's approximately twenty-five million dollars, in that

21   vicinity.

22   Q.    As of March 31st?

23   A.    Yes, sir.

24   Q.    Okay.  There are other provisions -- in addition to not

25   paying down the DIP loan as quickly as it would have been paid

25

1   down, there are other provisions of the accommodation agreement

2   that the Tranche C lenders have objected to that have not been

3   changed in the revised agreement, correct?

4   A.   Yes, sir.

5   Q.   And that would include the provisions of the agreement

6   that relate to the priming of certain presently unsecured

7   hedging obligations of Delphi, right?

8        MR. BUTLER:  Objection, requires a legal conclusion.

9   A.   Well --

10        MR. WERDER:  I'll withdraw the "presently unsecured."

11   Q.   It includes the provision that put 200 million dollars of

12   hedging obligations on a pari passu basis with the Tranche A

13   DIP tranche, correct?

14   A.   Yes, sir.

15   Q.   That provision hasn't been changed from the prior

16   agreement, has it?

17   A.   No, sir.

18   Q.   All right.  Let me just ask you a few questions about the

19   vote.  Your supplemental declaration speaks to the voting on

20   the accommodation agreement, does it not?

21   A.   Yes, sir.

22   Q.   And as of the time that your deposition was taken on the

23   23rd of November, the debtors didn't have a two-thirds vote in

24   favor of the accommodation agreement, did they?

25   A.   I don't believe they did, no.

26

1    Q.    Okay.  And it was, in fact, approximately sixty-three

2    percent, was it not?

3    A.    That's my understanding.

4    Q.    All right.  And your new declaration I believe indicates

5    that the percentage is 68.2 percent, it sounds like it might

6    have crept up slightly to 68.37 percent this morning, is that

7    correct?

8    A.    I'm not aware of that fact, but it may have.

9    Q.    Okay.  In any event, the percentage that is presently

10   reflected in the vote, is approximately sixty-eight percent,

11   correct?

12   A.    Yes, sir.

13   Q.    And that includes approximately 77.5 percent of Tranche A?

14   A.    I think that's correct.

15   Q.    If you could look at paragraph 14 of your declaration?

16   A.    Right.

17   Q.    It's approximately 77.5 percent of Tranche A, correct?

18   A.    Yes, sir.

19   Q.    And slightly less than half of Tranche B, 47.8 percent,

20   correct?

21   A.    Yes, sir.

22   Q.    And 24.3 percent of the Tranche C, right?

23   A.    Yes, sir.

24   Q.    The Tranche C tranche has overwhelmingly rejected the

25   accommodation agreement, has it not?

27

1    A.   75.7 percent did not vote in favor it, that's correct.

2    Q.   Now --

3    A.   Did not submit signature pages, excuse me.

4    Q.   Okay.  And focusing on the 68.2 percent, do you have at

5    your disposal the -- either the percentage of that or the

6    dollar value of that that was provided by parties -- by lending

7    parties that were also hedging counterparties or affiliates of

8    hedging counterparties?

9    A.   I don't have that exactly.

10   Q.   You could approximate it, if you could?

11   A.   I believe it's approximately thirty-five percent, in that

12   ballpark.

13   Q.   Approximately thirty-five percent of the vote in favor of

14   the accommodation agreement was provided by parties who are

15   also either hedging counterparties, who are benefiting from the

16   security that they're getting, or have affiliates who are such

17   hedging counterparties, correct?

18   A.   That is my understanding.

19   Q.   Okay.  Do you have at your disposal the approximate

20   percentage or dollar value of the 68.2 percent that was

21   provided by parties that got some enhanced fee agreements with

22   the debtors beyond the two percent that lenders would get for

23   voting in favor of the agreement?

24   A.   I do not.

25   Q.   Okay.  The new agreement was posted on the Interlinks at

28

1    approximately 4 o'clock on the Wednesday before Thanksgiving,

2    correct?

3    A.    The new account -- the accommodation agreement that's

4    before the Court?

5    Q.    That's correct.

6    A.    Yes, sir.

7    Q.    And there was a reference to a 9 o'clock this morning

8    deadline for reaffirmations of prior votes, and you heard that

9    referenced, correct?

10   A.    Yes, sir.

11   Q.    There also was a 5 o'clock p.m. deadline on Wednesday for

12   new votes in favor of the accommodation agreement, was there

13   not?

14   A.    Yes, sir.

15   Q.    Was that deadline extended at all?

16   A.    That deadline was extended to Monday morning, today, at 9

17   o'clock.

18   Q.    For new votes to come in?

19   A.    Yes, sir.  Reaffirmation of votes.  Both reaffirmation of

20   existing votes as well as new votes.

21   Q.    Okay.  Well, you got some new votes between the weekend of

22   the 22nd and 23rd and today, correct?

23   A.    Yes, sir.

24   Q.    When did those new votes come in, do you know?

25   A.    I believe that some of the came in prior to Wednesday

29

1    evening.  And some of them came in over the course of the

2    period since Wednesday to today.

3    Q.    Okay.  I don't want you to identify them at this point,

4    but are you aware of who the additional lenders are that voted

5    in favor of the accommodation agreement, between Wednesday --

6    between the time that the hearing was extended last Monday and

7    today?

8    A.    No, I'm not.

9    Q.    And did you have any discussions concerning voting with

10   lenders between the time that the hearing was extended last

11   Monday and the 4 o'clock time Wednesday that the new agreement

12   was posted?

13   A.    I'm sorry, can you clarify the question?  Did I have any

14   conversations with them about voting?

15   Q.    Did you have discussions with lenders who were still

16   deciding how they wanted to vote between last Monday and 4

17   o'clock on Wednesday afternoon when the new -- when the amended

18   agreement was posted?

19   A.    The only lenders that I spoke to between Monday and

20   Wednesday, I only spoke with the administrative agent and one

21   other lender.

22   Q.    And who was that lender?

23   A.    Sorry, two other lenders.

24   Q.    Who were those lenders?

25   A.    I spoke with the administrative agent and I spoke with GE

30

1    Capital, and I spoke with another lender by the name of PSAM,

2    P-S-A-M.

3    Q.    Okay.  And I wanted to ask you about PSAM.  If you refer

4    to paragraph 17 of your supplemental declaration, there's a

5    reference there to a lender with approximately 21.7 -- I think

6    21.7 million dollars of loans?

7    A.    Yes, sir.

8    Q.    Is that referring to PSAM?

9    A.    Yes, sir.

10   Q.    Okay.  And we discussed PSAM in your deposition on

11   November 23rd, did we not?

12   A.    Yes, we did.

13   Q.    And I think you told us in your deposition on November

14   23rd that PSAM had submitted a vote, but that that vote had not

15   been counted, correct?

16   A.    That is correct.

17   Q.    Has that situation changed since November 23rd?

18   A.    I do not believe that it has.

19   Q.    It has not changed?

20   A.    The vote has not changed -- situation has not changed.

21   Q.    And the 68.2 percent of the vote voting in favor of the

22   accommodation agreement does that include PSAM's vote or does

23   it not include PSAM's vote?

24   A.    My understanding would be that it does not.

25   Q.    Okay.  Despite the fact that PSAM did not provide a vote

31

1    in favor of the accommodation agreement, the debtors have

2    agreed to -- apparently agreed to pay them some fee, is that

3    correct?

4    A.    Yes, sir.

5    Q.    And can you explain why it is that if PSAM is not

6    providing a vote in favor of the agreement, the debtors are

7    providing them with a fee?

8    A.    We're providing PSAM with an arranger fee as they were

9    supportive of us -- supported us in conjunction with getting

10   the accommodation agreement approved by supporting the

11   agreement in discussions with other lenders.

12   Q.    And you called that an arranger fee?

13   A.    Yes, sir.

14   Q.    Okay.  And what did you do to determine what discussions

15   PSAM had with other lenders in support of the accommodation

16   agreement?

17   A.    I discussed with PSAM and with GE Capital the positions

18   that PSAM would be taking in conjunction with the discussions

19   within the group that GE Capital was representing.

20   Q.    And did you determine whether PSAM's activities had had

21   any affect on any party's vote?

22   A.    It is my understanding that it did.

23   Q.    Okay.  You're familiar with the terms of the accommodation

24   agreement, are you not?

25   A.    Yes, sir.

32

1   Q.   And, in fact, you were intimately involved in negotiating

2   that agreement, weren't you?

3   A.   I was very involved, yes.

4   Q.   All right.  I'm not asking you this question as a lawyer,

5   but from your perspective, as chief financial officer and

6   negotiator, did you negotiate a provision in the accommodation

7   agreement that would prevent a lender who doesn't vote in favor

8   of the agreement from exercising whatever rights it might have

9   at law, following the maturity date of the DIP facility?

10           MR. BUTLER:  Objection, that sounds like a legal

11  argument to me, Your Honor, even though he says it's not.

12           THE COURT:  Do you understand the question?

13           THE WITNESS:  Your Honor, there's been significant

14  discussion among the lawyers on this subject over the last

15  twenty-four hours.  And there is a provision --

16           THE COURT:  I'm just asking you do you understand the

17  question?

18           THE WITNESS:  Not entirely.  You know, I'm not sure

19  that I'm the right person to be addressing the subject.

20           MR. WERDER:  I'll withdraw the question.

21  Q.   The DIP agreement provides for a maturity date, does it

22  not?

23  A.   The DIP agreement has a maturity date, yes, sir.

24  Q.   And that maturity date was negotiated between the parties

25  that are signatories to the DIP agreement, was it not?

33

1    A.   Yes, sir.

2    Q.   And you would agree with me that in a matter of ordinary

3    course, lenders generally expect that they're going to be

4    repaid on their maturity date?

5    A.   Yes, sir.

6    Q.   All right.  And the maturity date is an important part

7    of -- it's an important term of the DIP agreement, is it not?

8    A.   Yes, sir.

9    Q.   And currently the maturity date is December 31st of 2008,

10   correct?

11   A.   Yes, sir.

12   Q.   That's the result of a couple of a prior extensions of the

13   maturity date under the DIP agreement, correct?

14   A.   Yes, sir.

15   Q.   And, in fact, there were two prior extensions of the

16   maturity date, weren't there?

17   A.   At least two.

18   Q.   Okay.  And those extensions were all negotiated

19   extensions, were they not?

20   A.   Yes, sir.

21   Q.   And your declaration uses the phrase "liquidity runway,"

22   and we discussed that phrase in your deposition.  But you would

23   agree with me, would you not, that the length of the liquidity

24   runway provided by the DIP facility was a key negotiating term

25   for the various amendments to the DIP facility, correct?

34

1    A.    Yes, sir.

2    Q.    And that the prior extensions of the maturity date under

3    the DIP facility were done with the unanimous consent of all of

4    the lenders, correct?

5    A.    Yes, sir.

6    Q.    And you're familiar with Section 10.09 of the DIP

7    facility, are you not?

8    A.    I don't know that I know exactly what that provision says.

9    Q.    Okay.  Let me ask that you have exhibit 3 in front of you.

10        (Pause)

11   Q.    Actually, I'm not sure we even need the provision.  You're

12   aware that there's a provision of the DIP agreement that

13   requires unanimous consent for an extension of the maturity

14   date, correct?

15   A.    Yes, sir.

16   Q.    Without regard to what that provision is, you know that

17   that is a provision of the agreement?

18   A.    Yes, sir.  I just didn't know it was 10.09.

19   Q.    We may come back to Section 10.09.  In connection with the

20   accommodation agreement, it's true, is it not, that sometime

21   around October -- maybe a little earlier than October of 2008,

22   the debtors concluded that they were going to be unable to exit

23   Chapter 11 by the maturity date?

24   A.    Yes, sir.

25   Q.    And they also concluded, did they not, that they would

35

1    require continued access to proceeds of the DIP facility beyond

2    the December 31, 2008 maturity date?

3    A.    Yes, sir.

4    Q.    And that's because the debtors are presently unable to

5    secure new commitments to lend them money, correct?

6    A.    Yes, sir.

7    Q.    There may be other reasons as well, but one of the reasons

8    that the debtors require continued access to the proceeds of

9    the DIP facility beyond the maturity date, is that there aren't

10   any lenders out there willing to extend new credit at this

11   point in time, correct?

12   A.    That is unfortunately correct.

13   Q.    And I think your declaration says that that's the reason

14   why the debtors sought what you called a transparent liquidity

15   runway beyond the maturity date, correct?

16   A.    Yes, sir.

17   Q.    And, in fact, what the debtors are seeking is a

18   transparent liquidity runway through June 30th of 2009, right?

19   A.    That is correct.

20   Q.    And, initially, the debtors sought that transparent

21   liquidity runway through a formal extension of the maturity

22   date under the DIP facility, didn't they?

23   A.    Yes, sir.

24   Q.    And there was a -- the debtors went out seeking lender

25   agreement to an extension of the maturity date through June

36

1    30th of 2009, correct?

2    A.    Yes, sir.

3    Q.    And based upon JPMorgan's advice the debtors concluded

4    that they weren't going to be able to get unanimous consent for

5    that extension, did they not?

6    A.    Yes, sir.

7    Q.    And it was at that point in time that the debtors revised

8    their strategy and decided to seek the accommodation agreement,

9    right?

10   A.    That is correct.

11   Q.    The effect of the accommodation agreement is to permit the

12   debtors to keep using DIP proceeds after the maturity date,

13   isn't it?

14   A.    That is an effect, yes.

15   Q.    And that's the goal of the accommodation agreement, is it

16   not?

17   A.    The goal is to provide stability of the business while we

18   seek to resolve Delphi's Chapter 11 process.  Therefore, it is

19   to preserve liquidity past December 31st.

20   Q.    And the way that the accommodation agreement seeks to

21   implement that goal is to permit the debtors -- purportedly

22   permit the debtors to continue using the DIP proceeds after

23   December 31st despite the occurrence of the maturity date,

24   correct?

25   A.    Yes, sir.

37

1    Q.    All right.  And the -- you participated in a November 17th

2    presentation to lenders concerning the accommodation agreement,

3    did you not?

4    A.    Yes, sir.

5    Q.    And one of the points that was made in that presentation

6    was that the economic terms of the accommodation agreement are

7    consistent with the previous -- were consistent with the

8    previous extension request, right?

9    A.    That is correct.

10   Q.    And that was a true statement, wasn't it?

11   A.    Yes, sir.

12   Q.    All right.  Let me address your attention -- or let me get

13   in front of you Exhibit 1, which is your original declaration.

14       (Pause)

15   Q.    That's the declaration that you originally submitted in

16   support of the accommodation agreement, is it not?

17   A.    Yes, sir.

18   Q.    I direct your attention to paragraph 16.

19       (Pause)

20   Q.    Are you with me?

21   A.    Paragraph 16.

22   Q.    Paragraph 16, right.  So paragraph 16 says "moreover the

23   debtors intentionally limited the number of participants from

24   which the debtors required consents in certain circumstances in

25   order to minimize what you call holdup risk inherent in

38

1    unanimous voting provisions in a widely syndicated facility

2    involving hundreds of institutions," correct?

3    A.    Yes, sir.

4    Q.    And then you go on to say "in the exercise of our

5    collective business judgment, I and other members of Delphi

6    management, negotiated certain provisions in the credit

7    agreement to provide the debtors with greater flexibility in

8    their ability to negotiate, if and as necessary, potential

9    amendments to the DIP facility, including the debtors' ability

10   to maintain and preserve liquidity in the event of aggravated

11   disruptions in the credit markets," correct?

12   A.    Yes, sir.

13   Q.    And that was the point that you were making in support of

14   the accommodation agreement, right?

15   A.    Yes, sir.

16   Q.    And it's true, is it not, that the debtors did not

17   negotiate the ability to get amendments to the DIP facility to

18   extend the maturity date without unanimous consent of all of

19   the lenders?

20   A.    I'm sorry, ask your question again, please?  I'm sorry.

21   Q.    Yeah.  The debtors did not negotiate the ability to amend

22   the DIP facility to extend the final maturity date without

23   unanimous consent?

24   A.    We can only extend the maturity date with unanimous

25   consent.

39

1    Q.    Okay.  And so when the -- when this paragraph 16 refers to

2    what you negotiated to provide you with flexibility the

3    flexibility that was provided did not include the ability to

4    amend the agreement to extend final maturity with less than all

5    of the lenders voting in favor, did it?

6    A.    No.  An extension required 100 percent request.

7    Q.    And that's true despite what you say in paragraph 16,

8    correct?

9    A.    I think that paragraph 16 is referring to a situation

10   where we are not extending but rather dealing with the

11   forbearance or accommodation situation.

12   Q.    All right.  I want to direct your attention to Exhibit 8.

13   If you can get Exhibit 8 in front of you?  This is the JPMorgan

14   fee letter that relates to the fees that JPMorgan has the

15   potential to earn in connection with the accommodation

16   agreement, correct?

17   A.    Yes, sir.

18   Q.    And if you look at page 3 of the letter the fee structure

19   provides for a DIP modification arrangement fee and a separate

20   extension fee, does it not?

21   A.    That is correct.

22   Q.    And the separate extension fee is a fee that is earned in

23   the event that there is an agreement that extends the maturity

24   date of the DIP to June 30th of 2009, correct?

25   A.    Yes, sir.

40

1  Q.   And we discussed that provision of the agreement in your

2  deposition, didn't we?

3  A.   We did.

4  Q.   And your testimony at the deposition was that the second

5  fee -- that both of those fees would be paid upon the approval

6  of the accommodation agreement, correct?

7  A.   That was my testimony.  And I subsequently determined that

8  that answer is probably not correct.

9  Q.   Well, your -- let's just talk about what your testimony --

10  what your understanding was on November 23rd at your

11  deposition.

12          MR. WERDER:  May I approach the witness, Your Honor,

13  to hand him a copy of the transcript?

14          THE COURT:  Yes, that's fine.  This is in the exhibit

15  book?

16          MR. WERDER:  It's not an exhibit, Your Honor.  I'll

17  hand up a copy for the Court.

18          MR. BUTLER:  I don't know what the purpose of it is,

19  he just agreed to what the testimony was.  He said he

20  determined subsequently it was incorrect, what are you trying

21  to impeach him?

22          THE COURT:  I thought you were going to something

23  else.

24          MR. WERDER:  No, I'm going to continue on this, Your

25  Honor.  I'll ask it without the deposition.

1    Q.   Your understanding as of November 23rd was that the --

2    that both of the fees would be paid to JPMorgan upon the

3    approval of the accommodation agreement, correct?

4    A.   You're correct that that's what I told you at the

5    deposition.

6    Q.   Okay.

7    A.   But I also want to make sure that I'm clear with you that

8    upon further discussions that isn't true.

9    Q.   And when did those further discussions occur?

10   A.   After the deposition.

11   Q.   How soon after the deposition?

12   A.   Last week.

13   Q.   And when did you first bring to our attention that your

14   understanding was incorrect?

15   A.   I'm not aware whether anybody brought it to your

16   attention.  I apologize about that.

17   Q.   Are you aware of anytime, prior to your declaration being

18   submitted yesterday, when that mistake, which you say now was a

19   mistake, was brought to your attention -- was brought to our

20   attention I should say?

21   A.   I'm not aware.

22   Q.   Okay.  Let me direct you back to Exhibit 3, if I could.

23        (Pause)

24   Q.   And I said we might return to Section 10.09 of the

25   agreement.  That is, in fact, the section that I want to direct

42

1    your attention to.

2        (Pause)

3    Q.    Are you with me?

4    A.    Yes, sir.

5    Q.    Now, in addition to negotiating the accommodation

6    agreement you were involved in the negotiation of this DIP

7    agreement, were you not?

8    A.    The DIP agreement?

9    Q.    Yes.

10   A.    Sorry, I thought you said stip, yeah.

11   Q.    The credit agreement?

12   A.    Yes, sir.

13   Q.    The one that was executed in May of 2008, right?

14   A.    Yes, sir.

15   Q.    You participated in the negotiations over that agreement,

16   correct?

17   A.    Yes, sir.

18   Q.    From the business perspective of Delphi were you the chief

19   business person who was involved in negotiating that agreement?

20   A.    I was one of the persons, yes.

21   Q.    All right.  Do you recall whether or not Section 10.09 of

22   the agreement was discussed across the bargaining table in any

23   negotiations that you participated in?

24   A.    I don't recall any negotiations over that.

25   Q.    Okay.  Section 10.09 deals with modifications, amendments

43

1    or waivers, does it not?

2    A.    Entitled amendments, etcetera.

3    Q.    Okay.  And the first lien of it says -- talks about no

4    modification, amendment or waiver and then it goes on, correct?

5    A.    Yes, sir.

6    Q.    And we referred earlier to the provision of the agreement

7    that would require unanimous consent for an extension of the

8    maturity date, this is, in fact, the provision that does that,

9    is it not?

10         MR. BUTLER:  Objection, Your Honor.  The documents

11   speaks for itself.

12         THE COURT:  You just want to lay a foundation for

13   your next question?

14         MR. WERDER:  That's just a predicate for the next

15   question.

16         THE COURT:  All right.  So we can move on then.

17   Sustained.

18         MR. WERDER:  Okay.

19   Q.    In the discussions that you had with lenders concerning

20   the accommodation agreement, was the accommodation agreement

21   characterized as an amendment of the DIP facility?

22   A.    The accommodation agreement represents an agreement

23   whereby the participating lenders are agreeing that the -- to

24   the terms of the accommodation agreement.  Including that the

25   administrative agent will not exercise remedies.

44

1   Q.   And the agreement has a provision, that I think we

2   discussed in your deposition, under which the proceeds of the

3   DIP facility are due on maturity, correct?

4   A.   Yes, sir.

5   Q.   And they're due on maturity automatically without any

6   other application to or action by the Court, correct?

7   A.   Yes, sir.

8   Q.   Okay.  And the affect of the accommodation agreement is to

9   waive that provision, is it not?

10          MR. BUTLER:  Objection, that's a legal conclusion.

11          THE COURT:  Sustained.

12  Q.   Well, did you have any discussions in your negotiations of

13  the accommodation agreement concerning whether or not the

14  effect of the accommodation agreement was to waive that

15  provision of the DIP facility?

16          MR. BUTLER:  Objection, Your Honor.  The document

17  speaks for itself.  We'll be dealing with this in legal

18  argument.

19          MR. WERDER:  The question is whether it was

20  negotiated.

21          THE COURT:  What was negotiated?

22          MR. WERDER:  Whether the use of the word "waiver" was

23  part of the discussions that he had with other parties

24  concerning the accommodation agreement.  I'll withdraw the

25  question.

45

1    Q.   In discussing the accommodation agreement with parties

2    outside of Delphi was there any discussion about whether or not

3    the accommodation agreement affected a waiver of that automatic

4    payment provision of the DIP facility?

5         MR. BUTLER:  Objection, document speaks for itself.

6    It does whatever it does, we'll be able to argue what that is.

7    I don't know --

8         THE COURT:  Are you arguing that the document is

9    somehow ambiguous?

10        MR. WERDER:  Well, Your Honor their argument is that

11   the -- that somehow the accommodation agreement evades a

12   provision of the credit agreement.  And what I'm trying to

13   determine is whether there was any discussion that occurred in

14   the course of negotiating the accommodation agreement.

15        THE COURT:  Unless there's a dispute that's relevant

16   as to whether the agreements ambiguous, the agreement speaks

17   for itself.  I'm not supposed to look beyond the four corners

18   of the agreement.

19        MR. WERDER:  Okay.  I'll move on then.

20        THE COURT:  Okay.

21   Q.   Let me direct your attention to your declaration which is

22   Exhibit 1, if you can get that in front of you?

23        (Pause)

24   A.   Yes, sir.

25   Q.   I want to direct your attention, if I could, to paragraph

46

1    21.

2        (Pause)

3    Q.    Paragraph 21.

4    A.    Okay.

5    Q.    And in paragraph 21 you say, among other things, that the

6    accommodation -- you describe the accommodation agreement as

7    implementing the terms of the credit agreement, is that

8    correct?

9        (Pause)

10    Q.    I'm looking at the bottom of page 13 -- the bottom of page

11    12, the top of page 13.

12    A.    Yes, sir.

13    Q.    And in terms of implementing the terms of the credit

14    agreement, what provision of the credit agreement is it that

15    you assert is being implemented by the accommodation agreement?

16    A.    It is a provision, as I understand it.  I cannot tell you

17    the exact reference in the credit agreement that permits the

18    required lenders, meaning the A and the B lenders, by a

19    majority vote to direct the administrative agent not to

20    exercise remedies.

21    Q.    And I think we established in your deposition that that

22    was paragraph or Section 7.01 of the DIP facility, correct?

23    A.    I believe that's correct.

24    Q.    That's the provision that you're referring to when you

25    assert that the accommodation agreement implements the terms of

47

1    the DIP agreement, right?

2    A.   Yes, sir.

3    Q.   Okay.  And paragraph 7.01 -- in negotiating the DIP

4    agreement, it's true, is it not, that you didn't participate in

5    any meetings where that provision was discussed with either the

6    agent or the lenders?

7    A.   I did not personally, no.

8    Q.   And you did not participate in any calls with the agent or

9    the lenders where that provision was discussed, correct?

10   A.   I did not personally.

11   Q.   And you didn't exchange any correspondence where the

12   interpretation of that provision that's set forth in the

13   debtors' motion papers was put forth, did you?

14   A.   I did not personally, no.

15   Q.   In fact, you don't recall any negotiations at all

16   concerning Section 7.01 of the agreement, right?

17   A.   I do not.

18   Q.   And it's true, is it not, that in the course of the

19   negotiations over the DIP agreement you never advised the

20   lenders that the debtors were seeking to give themselves the

21   ability to continue using the DIP proceeds beyond the maturity

22   date?

23   A.   I didn't read -- in my deposition I indicated that I

24   didn't recall any discussions.

25   Q.   Okay.  And the first time that you heard of any

48

1    interpretation of the DIP facility that permitted the

2    lenders -- that could be asserted to permit the lenders to

3    continue using the DIP facility proceeds beyond the maturity

4    date was in October of 2008, is that correct?

5    A.    I don't believe that I had a reason to be discussing the

6    subject before then.

7    Q.    And, in fact, the first time that you heard that the

8    debtors could claim to have a right to continue using DIP

9    facilities beyond -- proceeds beyond the maturity date was in

10   October of 2008, wasn't it?

11   A.    That's the first time that I had reason to discuss the

12   subject.

13   Q.    And the first draft of the accommodation agreement was

14   prepared by JPMorgan, was it not?

15   A.    I believe that's what I testified in my deposition about.

16   Q.    And the accommodation agreement has various provisions

17   that deal with the hedging collateral basket, doesn't it?

18   A.    Yes, sir.

19   Q.    And those provisions were first proposed by JPMorgan,

20   weren't they?

21   A.    I believe that's the case.

22   Q.    And JPMorgan, in addition to being the administrative

23   agent is the largest counterparty on hedging transactions that

24   the debtor has, correct?

25   A.    I believe so.

49

1    Q.    And among other things, the provisions that deal with the

2    hedging collateral basket allow -- provide a benefit to those

3    hedging counterparties by increasing the security that they

4    have, correct?

5    A.    Yes, sir.

6    Q.    And, in fact, the accommodation agreement gives the

7    hedging counterparties 200 million dollars as additional

8    security that's pari passu with Tranche A of the DIP facility,

9    right?

10   A.    Tranche A and Tranche B, yes.

11   Q.    And it puts an additional 200 million dollars ahead of

12   Tranche C, does it not?

13   A.    Yes, sir.

14   Q.    Now, I think that -- we talked about this provision in

15   your deposition and your explanation for this is that you

16   wanted these hedging provisions in the accommodation agreement

17   because of something having to do with cross defaults, possible

18   cross defaults, is that correct?

19   A.    Yes, sir.

20   Q.    Can you explain that, please?

21   A.    Delphi has entered into foreign currency and commodity

22   contracts which have a provision in them.  Those contracts have

23   a provision in them that if we were in default on the DIP would

24   permit the counterparty to terminate the contracts.  As a

25   result of current dislocation that's taking place in the

50

1    capital markets those contracts are currently in a loss

2    position.  And those contracts hedge -- they hedge operational

3    foreign currency and commodity purchases that Delphi would make

4    in the normal course of its business in 2009 and 2010.  My

5    concern, as the chief financial officer of the company, is that

6    if those contracts are terminated upon the effectiveness of the

7    accommodation agreement, that we will crystallize an

8    administrative liability to the estate and then the estate

9    would be exposed to subsequent changes in foreign currency and

10   commodity costs which would -- could have the impact of

11   doubling our issue.  One, having crystallized the liability and

12   then the market recovers, and when the operational --

13   underlying operational transaction takes place I have to pay

14   more for the foreign currency or for the commodities.

15   Q.   And just to break that down a little bit, am I

16   understanding you correctly that your concern relates -- your

17   stated concern relates to the fact that accommodation agreement

18   leaves a -- what I think you previously described as a

19   technical breach of the DIP agreement in place?

20   A.   The accommodation agreement results in a breach of -- a

21   default under the DIP, right?

22   Q.   And was it then your concern, as you're stating it now,

23   that default under the DIP agreement could cross default these

24   hedging agreements?

25   A.   Yes, sir.

51

1    Q.   Okay.  And that's, in fact, what you claimed to be your

2    principal reason for wanting the hedging provisions in the

3    accommodation agreement, correct?

4    A.   Yes, sir.

5    Q.   Prior to proposing the accommodation agreement, the

6    debtors proposed an amendment to the DIP agreement, did they

7    not?

8    A.   I'm sorry, ask your question again, please?

9    A.   Before you adopted your new strategy and sought the

10   accommodation agreement, you first sought an amendment to the

11   DIP facility, correct?

12   A.   An extension of the DIP facility.

13   Q.   And the reason for seeking that extension would be to

14   eliminate the potential for a breach upon the December 31, 2008

15   maturity date, correct?

16   A.   Yes, sir.

17   Q.   If the amendment strategy had been accepted and had won

18   the support of the lenders, then there wouldn't have been even

19   a technical breach of the DIP agreement based upon the December

20   31st maturity date because that date would have been extended,

21   correct?

22   A.   That is correct.

23   Q.   Okay.  And so your stated concern over a technical breach

24   of the DIP facility triggering cross defaults under the hedging

25   agreements wouldn't have existed in an environment where the

52

1    debtors were successful in obtaining the amendment to the DIP

2    agreement, correct?

3    A.    That situation would not have existed, that's correct.

4    Q.    Nevertheless, when you proposed the amendment to the DIP

5    facility, you also proposed increasing the hedging collateral

6    basket in connection with that amendment, did you not?

7    A.    Yes, sir.

8    Q.    Okay.  And that proposal wasn't motivated, was it, by any

9    concern over cross default?

10   A.    It was not.

11   Q.    All right.  Those hedging provisions were included in the

12   accommodation agreement in order to encourage hedging

13   counterparties, who were also lenders, to vote in favor of the

14   accommodation agreement, isn't that true?

15   A.    That would be another reason, yes.

16   Q.    And, in fact, that is, in fact, one of the reasons why the

17   hedging provisions that provides security to 200 million

18   dollars of presently unsecured hedging obligations, were

19   included in the accommodation agreement, correct?

20   A.    It is one reason, yes.

21   Q.    You did that because you wanted to get certain parties,

22   who were both lenders and hedging counterparties, or affiliates

23   of hedging counterparties, to vote in favor of the

24   accommodation agreement, correct?

25              MR. BUTLER:  Objection, answered twice already.

53

1          THE COURT:  Sustained.

2    **Q.  And, in fact, you participated in a call with the -- an**

3    **all lender call on November 17th of 2008, did you not?**

4    **A.  I did.**

5    **Q.  And you were asked in that call whether you were granting**

6    **the priming liens to the hedging counterparties because you**

7    **needed to get their votes, weren't you?**

8    **A.  I don't recall every single conversation, every question**

9    **in that call.  So I think we went through this in my**

10   **deposition.  I may have been asked that question.**

11   **Q.  Okay.  You don't recall that question being asked?**

12         MR. BUTLER:  Objection, relevance.  The witness has

13   already testified that one of the reasons that Delphi exercised

14   its business judgment was in connection with getting sufficient

15   Tranche A and B votes.  I don't know what the relevance is to

16   the rest of this line of questioning.

17         THE COURT:  Well, I'm assuming you're leading up to

18   another question?  This is a foundation also?

19         MR. WERDER:  I think I can withdraw that question,

20   Your Honor.

21         THE COURT:  Okay.

22         MR. WERDER:  Give me one moment, please.

23         THE COURT:  Okay.

24   BY MR. WERDER:

25   **Q.  We talked a few minutes ago about Exhibit 8 which was the**

54

1    JPMorgan fee letter.  Delphi has also entered into fee

2    agreements with various other Tranche A lenders, has it not?

3    A.    Yes, sir.

4    Q.    Let me ask you if you could get in front of you Exhibit

5    105.

6    A.    105?

7    Q.    You have Exhibit 105?

8    A.    Yes, sir.

9    Q.    That's the fee agreement that Delphi entered into with GE

10   on November 20th, correct?

11   A.    Yes, sir.

12   Q.    Has this agreement been modified in any way since November

13   20th?

14   A.    Not to the best of my knowledge.

15   Q.    Okay.  And it provides for a two million dollar

16   arrangement --

17          MR. BUTLER:  Objection.  You're reading from a

18   confidential document, counsel.

19          MR. WERDER:  I thought we established that the fee

20   numbers were fair game?

21          MR. KIRPALANI:  I think they --

22          MR. BUTLER:  I don't think they've been disclosed --

23          MR. KIRPALANI:  I think they gave them the aggregate.

24          MR. WERDER:  Oh, okay.

25          MR. BUTLER:  I don't think they've been disclosed

55

1    publicly at all actually --

2            MR. KIRPALANI:  No.  I think --

3            MR. BUTLER:  -- other than the aggregate amounts.

4    The --

5            MR. WERDER:  Withdrawn.

6            MR. BUTLER:  Your Honor, can we have just one moment,

7    please?

8            MR. WERDER:  I won't use the numbers.

9            THE COURT:  Okay.

10   BY MR. WERDER:

11   **Q.   The agreement provides provide for an arrangement fee to**

12   **be paid to GE, does it not?**

13   **A.   Yes, sir.**

14   **Q.   And if I can direct your attention to the top of --**

15           MR. WERDER:  I apologize for that, Mr. Butler.  I

16   thought we had an agreement on that.

17   **Q.   If I could direct your attention to the top of page 2, it**

18   **states that "it shall be a condition to the effectiveness of GE**

19   **signature page to the accommodation agreement that (i) GE**

20   **Capital shall have received the arrangement fee" and then it**

21   **goes on, correct?**

22   **A.   Yes, sir.**

23   **Q.   And it is, in fact, the condition to the effectiveness**

24   **that GE's vote in favor of the accommodation agreement that**

25   **they be paid the arrangement fee set forth in Exhibit 105,**

56

1    correct?

2    A.    Yes, sir.

3    Q.    All right.  Direct your attention to Exhibit 103.

4            MR. BUTLER:  Your Honor, can we have just one moment?

5            THE COURT:  Okay.

6        (Pause)

7    Q.    Without regard to the specifics of this agreement, there

8    were various fees beyond the two percent fee that the debtors

9    agreed to pay to various parties in connection with the

10   discussions seeking their approval of the accommodation

11   agreement, correct?

12   A.    There were other fees that we agreed to pay, yes.

13   Q.    And those fees were paid in order to encourage or induce

14   those parties to vote in favor of the agreement, correct?

15   A.    That is one reason.

16   Q.    Okay.

17           MR. WERDER:  No further questions, Your Honor.

18           THE COURT:  Okay.  Does anyone else want to cross

19   examine Mr. Sheehan?

20   CROSS EXAMINATION

21   BY MR. NEIER:

22   Q.    I guess good afternoon, Mr. Sheehan.  David Neier, on

23   behalf of certain A and B lenders.  Very briefly, Mr. Sheehan,

24   as of November 23, 2008, you estimated that the hedging

25   exposure for Delphi was approximately 400 million dollars, do

57

1    you recall saying that?

2    A.    I do.

3    Q.    And can you tell me, has that amount changed since

4    November 23 now that we're at the end of the month?

5    A.    Yes, sir.

6    Q.    And what is approximately the exposure as of today?

7    A.    It's a little bit less than 350 million dollars.

8    Q.    350 million?  And when we say "exposure", it's not as if

9    there's a claim today, correct, for that amount?

10   A.    No.  There is not a claim today, that's --

11   Q.    It would only be if the swap were terminated, is that

12   right?

13   A.    That's correct but they're not all swaps.

14   Q.    If the hedging obligations were terminated --

15   A.    I apologize.

16   Q.    -- is that right?

17   A.    That is correct.

18   Q.    And what happens under the accommodation agreement if this

19   hedging obligation amount were to exceed 500 million dollars?

20   A.    The counterparties would have the right to terminate.

21   Q.    And then you would have your double issues, is that right?

22   You would have both a terminated hedging obligation or

23   potentially a terminated hedging obligation and you would have

24   the obligation, correct?

25   A.    Yes, sir.

58

1    Q.    And so, you would have the issue you just spoke about as

2    being very damaging to the company if, at any time, the

3    exposure under the accommodation agreement between now and June

4    30th, 2009 were to exceed 500 million dollars, correct?

5    A.    That is correct.

6    Q.    And I think you may have covered this with Mr. Werder, so

7    I'll be very brief.  And I think you may have also covered it

8    in your declaration.  Would you say that there is some turmoil

9    and uncertainty in the automotive industry at this stage?

10   A.    Some --

11   Q.    Turmoil and uncertainty in the --

12   A.    -- turmoil.  Sorry.  I didn't --

13   Q.    -- automotive industry at this stage?

14   A.    It is an uncertain time in the U.S. economy as a whole and

15   obviously, the automotive industry is -- it's well publicized

16   the challenges it's currently going through.

17   Q.    And a lot of things can happen between now and June 2009,

18   is that right?

19   A.    Positive and negative, yes.

20   Q.    The government could provide support to GM and other OEMs,

21   is that correct?

22   A.    They could.

23   Q.    The government could also decide not to support those

24   companies?

25   A.    I hope not.

59

1   Q.   And there could be a bankruptcy of one of the OEMs, is

2   that possible, between now and June 2009?

3   A.   I would also hope not.

4   Q.   But it's possible?

5   A.   It's possible.

6            MR. NEIER:  No further questions, Your Honor.

7            THE COURT:  Okay.  Anyone else want to cross examine

8   Mr. Sheehan?  Okay.  Do you have any redirect?

9            MR. BUTLER:  Your Honor, I may.  Could we take a five

10   minute recess before that?

11            THE COURT:  Sure, that's fine.

12            MR. BUTLER:  Thank you.

13       (Recess from 12:17 p.m. until 12:25 p.m.)

14            THE COURT:  Please be seated.  Okay.  We're back on

15   the record in Delphi and, Mr. Sheehan, you're still under oath.

16            THE WITNESS:  Yes, sir.

17            MR. BUTLER:  Your Honor, the debtors have no

18   redirect.

19            THE COURT:  All right.  I had a couple of questions,

20   Mr. Sheehan.  First, are there any separate notes in connection

21   with the DIP or is it just the DIP agreement and the DIP order?

22            THE WITNESS:  I'm not aware of any separate notes,

23   Your Honor.

24            THE COURT:  Okay.

25            THE WITNESS:  But -- I'm not aware of any separate

60

1    notes.

2          THE COURT:  Okay.  There are none in the exhibit

3    books, right?

4          MR. KIRPALANI:  I believe they're permitted under the

5    credit agreement.  I'm not sure if any have been issued.

6          THE COURT:  I know that.  But I have not seen any in

7    the exhibit books.  Okay.  You mentioned the arrangement fee

8    that was agreed to be paid to PSAM -- or, is that how you

9    pronounce it?  PSAM?

10         THE WITNESS:  PSAM --

11         THE COURT:  Okay.

12         THE WITNESS:  -- is how I understand they pronounce

13   it.

14         THE COURT:  And then there was some testimony about

15   arrangement fees or other fees in addition to the two percent

16   upfront before certain other parties -- and you testified as to

17   the agent having a fee and GE having a fee.  Leave aside the

18   agent, what was it that, in the debtors' mind, merited an

19   arrangement fee for GE?

20         THE WITNESS:  What -- they provided us substantive

21   input associated with the accommodation agreement.  They also

22   then organized a set -- a group of lenders who voted in

23   accord -- who submitted signature pages to the accommodation

24   agreement.  And it was that support by relaying the company's

25   messages to those lenders and getting the signature pages in.

61

1          THE COURT:  Had they syndicated a portion of the loan

2     or what was their connection to this group or was it just based

3     on their own expertise that they had a connection to this

4     group?

5          THE WITNESS:  It was their own -- I'm not aware of

6     any syndication to this group, Your Honor.  They organized a

7     group of lenders who they -- I'll use the word represented to

8     us and brought along as part of the negotiations.

9          THE COURT:  And there are other parties that you

10    discuss not by name but --

11         THE WITNESS:  Yes, sir.

12         THE COURT:  -- generically in your declaration and

13    they're referenced in fee letters in the exhibits.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Did they provide the same type of benefit

16    to the debtor that you just described GE provided?

17         THE WITNESS:  Yes, generally, although the other

18    parties that are referenced in the -- in my declaration or

19    supplemental declaration represent, in addition to providing

20    the support to the company, also provide us with advice and --

21    with respect to the market, the ability to get transactions

22    done not -- this transaction done, the terms of the

23    transaction, etcetera.  I'm not -- they were not organizing

24    groups the same way that GE Capital was.

25         THE COURT:  So what did they do then?  They advised

62

1    you on the terms of the accommodation agreement and what

2    might --

3            THE WITNESS:  Be acceptable, not acceptable, what --

4    what -- what they were hearing in the marketplace with respect

5    to the transaction, etcetera.

6            THE COURT:  Okay.

7        (Pause)

8            THE COURT:  Okay.  I have no further questions.

9    Unless either side has a question on what I've just asked.

10           MR. BUTLER:  I do, Your Honor.

11           THE COURT:  Okay.

12   REDIRECT EXAMINATION

13   BY MR. BUTLER:

14   **Q.   Mr. Sheehan, just so the record's clear here, has Delphi**

15   **paid similar arrangement fees to lenders at other points in**

16   **this Chapter 11 case?**

17   **A.   Yes, sir.**

18   **Q.   When were those arrangement fees paid?**

19   **A.   In conjunction with the previous extensions of the DIP**

20   **facility.**

21   **Q.   How about the original DIP facility?  Were there**

22   **arrangements fees paid in connection with that?**

23   **A.   Yes, sir.**

24   **Q.   So, in fact, Mr. Sheehan, there have been arrangement fees**

25   **paid in each of these DIP transactions, is that correct?**

63

1   A.   Yes, sir.

2           MR. BUTLER:  No further questions.

3           THE COURT:  Okay.  All right.  You can step down,

4   sir.  Okay.  Do the debtors have any additional evidence?

5           MR. BUTLER:  Your Honor, we don't.  We'll rely on Mr.

6   Sheehan's testimony and on all the exhibits that have been

7   admitted.

8           THE COURT:  Okay.  Mr. Kirpalani, did you want to

9   call your witnesses in light of that --

10          MR. KIRPALANI:  No.  I think the point is

11  sufficiently made, Your Honor.

12          THE COURT:  Okay.  So I take it, given that these are

13  joint exhibit books, that there's no additional evidence?  All

14  right.  So I'll hear brief oral argument from the parties.  I

15  guess I -- well, I guess I should probably hear from the

16  objectors first since I have a pretty good idea of the debtors'

17  argument.

18          MR. KIRPALANI:  Thank you, Your Honor.  Your Honor,

19  may I approach?  I have some demonstrative slides I'd like to

20  give the Court so I can walk you through some points?

21          THE COURT:  That's fine.  Do you have copies for --

22          MR. KIRPALANI:  Oh, sure.  All of these were

23  previously shared with debtors' counsel as well, Your Honor.

24          THE COURT:  Okay.

25          MR. KIRPALANI:  Your Honor, for the record, Susheel

64

1   Kirpalani of Quinn Emmanuel Urquhart Oliver & Hedges, counsel

2   for the consortium of DIP lenders, known as the Tranche C

3   Collective.  Your Honor, members of the Tranche C Collective

4   hold over a billion dollars of the Tranche C DIP loans as well

5   as Tranche A and B loans under Delphi's DIP facility.  Your

6   Honor may recall that Delphi's DIP has three distinct tranches.

7   Tranche A is the revolver of up to 1.1 billion dollars of which

8   less than half is drawn.  Tranche B is the 500 million dollar

9   term loan and Tranche C is by far the largest.  It's a 2.75

10  billion dollar term loan.

11       Your Honor, the debtors' motion to approve the

12  accommodation agreement is not at all as advertised.  From the

13  opening motion to the reply papers to the new and improved

14  revised accommodation agreement from over the long weekend, the

15  debtors have done everything possible to avoid saying what they

16  are really doing to the DIP facility, namely, extending the

17  maturity, which they have done twice before properly with

18  unanimous consent but were unable to do this time.

19       Your Honor, despite the debtors' mantra that they are

20  seeking forbearance, they are seeking an extension of the

21  maturity date through the back door and you really need, Your

22  Honor, to parse the text of the accommodation agreement but it

23  is there.

24       First, Section 2(a) of the accommodation agreement

25  says "the participant lenders are directing the agent not to

65

1    exercise remedies provided for in the credit agreement and the

2    security agreement."  That's clear as far as it goes.  Section

3    2(a) also says that "participant lenders are themselves each

4    agreeing", and they can't bind any other lenders in making that

5    agreement, but for themselves "not to make any demand for

6    repayment or seek other remedies under the credit agreement or

7    under applicable law".  But this distinction is very important

8    because the credit agreement does not require any collective

9    action by the required lenders or the agent to require payment

10   of the DIP loans at maturity.  It is, by definition and under

11   the letter of the credit agreement, automatic.

12        Your Honor, the language of Section 2.28 of the

13   credit agreement could not be more clear.  If you just take a

14   look at the first slide, we blew up Section 2.28, Your Honor.

15   It says very clearly that, "Upon the maturity, the lenders

16   shall be entitled to immediate payment of such obligations

17   without further application to or order of the bankruptcy

18   court."  Mr. Sheehan acknowledged as much.

19        What the debtors say is the intent of this

20   forbearance, the full amount of the DIP obligations, whatever

21   the debtors' say is the intent of the forbearance, Your Honor,

22   the full amount of the DIP obligations are automatically due

23   and payable as superpriority administrative expense claims on

24   December 31st, 2008.  That's an absolute obligation and we do

25   not even have to make a demand.  And as the Court well knows,

66

1    and as Mr. Sheehan testified, the maturity date of the DIP

2    facility cannot be extended without unanimous consent.

3         If Your Honor would take a look at Section 10.09,

4    which is the next slide, it's quite clear where it says "No

5    modification, amendment or waiver of any provision of this

6    agreement shall be effective unless signed by the required

7    lenders provided, however, that no such modification or

8    amendment shall without the written consent of the lender

9    affected thereby" -- and that's important because under Section

10   2.01 of the credit agreement, each lender severally agreed to

11   make loans, not jointly.  They cannot without each "lender

12   affected thereby extend the final maturity of the borrower's

13   obligations hereunder."

14        So, Your Honor, having tried and failed to get a

15   third unanimous extension, the debtors came up with plan B in

16   October.  Leave the maturity technically at December 31st, 2008

17   but just don't pay it.  And when the lenders complain, tell

18   them we aren't extending maturity but the required lenders have

19   decided to exercise any remedies, not to foreclose on

20   collateral, etcetera.  But exercising remedies under Section

21   7.01, Your Honor, has nothing to do with the debtors'

22   obligations to pay its superpriority administrative DIP claims

23   upon maturity.  We should just take a look at it.  Section 7.01

24   deals with all events of default and its application at final

25   maturity is limited to foreclosure which we aren't trying to do

67

1    here today, Your Honor.  Section 7.01 says that "the agent may

2    or, at the direction of the required lenders, shall" -- I'm

3    paraphrasing but the first one is "terminate or suspend the

4    total commitment".  Your Honor, this is irrelevant at final

5    maturity because payment is due under Section 2.28 regardless

6    and the total commitment automatically terminates under

7    2.13(c).  So, so far 7.01 is irrelevant.  "Declare the loans

8    due and payable".  Again, that is not needed at final maturity

9    in the face of Section 2.13(c) and 2.28.  The debtors are very

10   careful not to try and amend 2.13(c).  They added in Section 10

11   of the accommodation agreement a new 2.13(d).  But they had to

12   leave 2.13(c) alone.  2.13(c) says "Upon the maturity date",

13   which is the termination date, "the debtors shall pay."

14        The third is to cash collateralize unsecured letters

15   of credit.  You've got to go through the hoops of the

16   collective action in order to cash collateralize unsecured

17   letters of credit.  I don't think that's really in dispute.

18        The fourth is to set off amounts held by

19   administrative agent for the benefit of all lenders.  And the

20   fifth is to exercise other remedies available under applicable

21   law.

22        THE COURT:  It doesn't say that.  It says "exercise

23   any and all remedies under the loan documents and under

24   applicable law available to the administrative agent and the

25   lenders."

1    MR. KIRPALANI:  Okay.  Yes, Your Honor.  It's any and

2    all remedies under the loan documents or under applicable law

3    available to the agent or the lenders.  This is what the agent

4    may do or, at the direction of the required lenders, shall do.

5    It doesn't eviscerate the absolute obligation of the debtors

6    upon maturity.

7         So what is really going on here, Your Honor, is that

8    the motion is seeking an extension of maturity.  It is the very

9    same liquidation runway.

10        THE COURT:  What about the introductory clause to

11   2.28?

12        MR. KIRPALANI:  That says "subject to 7.01?"

13        THE COURT:  Right.

14        MR. KIRPALANI:  Your Honor, the items in 7.01 are not

15   required to make this an absolute payable obligation.  2.13(c)

16   makes that abundantly clear.  It says "Upon the termination

17   date" which is the maturity date.  It is defined as "the

18   earliest to occur of", and maturity date is early enough, "the

19   debtors shall pay the entirety of the loans".

20        THE COURT:  7.01 covers defaults where the principal

21   of the loans becomes due and payable, right?

22        MR. KIRPALANI:  That is correct, Your Honor.

23        THE COURT:  Including whether it's based on a fixed

24   date or not.

25        MR. KIRPALANI:  I'm not sure it specifically talks

69

1    about it upon maturity.

2        THE COURT:  Well, it says that at the top of page 79.

3        MR. KIRPALANI:  Um-hmm.

4        THE COURT:  "When and as the same shall become due

5    and payable whether at the due date thereof".  So I guess I'm

6    having a hard time seeing how 7.01 doesn't govern 2.28.

7        MR. KIRPALANI:  Well, I guess it depends on what it

8    is being requested.  If, Your Honor, we were sitting here

9    trying to ask the agent to foreclose, we would have to comply

10   with 7.01.  But that's not what we're arguing.  We're not here,

11   Your Honor -- and that's what really takes this case outside of

12   some of the other case law that the debtors do rely on

13   including Beal Savings Bank.  We are not here trying to take

14   action against the debtors or trying to invoke any kind of

15   collective action.  Even if you accept arguendo that that

16   collective action is what is the only remedy available to the

17   lenders, even if you were to accept that, Your Honor, we are

18   not here trying to take action.  What we are here, Your Honor,

19   is defending against an action by the debtors who are saying

20   notwithstanding there are numerous provisions in the credit

21   agreement that require payment in full at maturity, nothing is

22   going to happen.  That's what they're trying to get Your Honor

23   to do.  That is exactly what they're trying to get Your Honor

24   to do.  And, Your Honor, that is why they are paying the fees.

25   Otherwise, I would imagine they're not paying the fees just for

70

1    the sake of having some sort of a comfort from certain lenders.

2    They are trying to effectively prevent the debtors from being

3    required to pay their obligations at maturity.  And that flies

4    directly in the face of the maturity date and Section 2.13(c),

5    Your Honor, which they have not even tried to amend because

6    they know they can't.

7          Your Honor, all of the prior --

8          THE COURT:  But I don't understand why the Beal Bank

9    case and the other cases that deal with situations where a

10   creditor who doesn't fall within whatever the requisite voting

11   authority is, is held not to have standing to enforce a right

12   or a remedy.

13         MR. KIRPALANI:  Well, I think Beal Bank is a very

14   distinguishable case, Your Honor.  First of all, Beal Bank

15   dealt with a bank trying to take action independently to pursue

16   a keep-well agreement because thirty-seven out of the thirty-

17   eight lenders decided not to do that and they wanted to settle

18   instead.  That is not what's before the house, Your Honor.

19   It's not before the Court.  We're not here seeking to take --

20   we're not asking for an advisory opinion today on what actions

21   we could take on January 1st.  All we are asking Your Honor to

22   do is, as bankruptcy courts always do, look to the substance of

23   what transaction is being brought before the Court.  The

24   substance of this transaction is to extend the maturity date to

25   provide Delphi with the exact same transparent liquidity runway

71

1    that they negotiated for in the past and obtained with a

2    unanimous consent.  There is no substantive difference to what

3    is happening, Your Honor.  We would not need to exercise

4    remedies.  It is an absolute obligation of the estate on

5    January 1st unless they can get it waived.  And they are saying

6    on one side, Your Honor, they're not trying to waive it.  But

7    on the other side, they're saying effectively, it will have no

8    meaning.

9         Your Honor, Section 2.13(c) provides for "mandatory

10   prepayments and automatic commitment terminations upon the

11   termination date.  Again, the termination date is expressly

12   defined as the maturity date.  That section plainly says what

13   has to happen upon final maturity.  And that is exactly what is

14   not going to happen if Your Honor approves the accommodation

15   agreement.  The relief the debtor seeks leads to an absurd

16   interpretation of the credit agreement.  It cannot be

17   reconciled or squared with Section 2.13(c) which clearly

18   provides no further action is even needed by the lenders as a

19   precondition to the debtors' obligation to pay and that the

20   debtors shall pay.

21        But perhaps the greatest evidence, Your Honor, of the

22   substance of the accommodation agreement, is Mr. Sheehan's own

23   characterization of requiring the very same liquidity runway he

24   had obtained before through unanimous extensions of the

25   maturity.  And during his own testimony at deposition that he

72

1   believed, as the chief architect of the accommodation agreement

2   that the success fee to JPMorgan Chase for obtaining an

3   extension was actually due and payable.  And I know, Your

4   Honor, that on the stand today, he's changed his answer.  But

5   this was not a passing comment, Your Honor.  If you'd look at

6   the next slide and see exactly the type of thought that went

7   into his answer, it's right there.  The question was "And it

8   also provides for a second fee in addition to that fee if there

9   were an extension of the maturity date to June 30th of 2009,

10  correct?"

11  "A.  Correct.

12  "Q.  Would that fee be earned pursuant to the effectiveness of

13  the accommodation agreement?

14  "A.  Yes, sir."

15          He had the JPMorgan fee letter right in front of him,

16  Your Honor.  The final question:  "So if the accommodation

17  agreement is approved then they also earn the fee of blank?"

18  "A.  Yes, because it extends to June."

19          The accommodation agreement extends to June 30th,

20  2009.  The admission is there, Your Honor.  Whether he changes

21  his mind after the deposition and realizes this is damaging to

22  the case, it shouldn't be ignored.  But you considered in light

23  of other things, in light of his testimony, that it is the same

24  transparent liquidity runway that he tried to obtain through an

25  extension.  It is the same economic terms he tried to obtain

1    through the extension, Your Honor.  Uncoached and unadulterated

2    with the fee letter in front of him, Mr. Sheehan testified as

3    to what the debtors were really trying to accomplish.

4            Indeed, Your Honor, Section 2(f) of the accommodation

5    agreement goes to great lengths to say even though this looks

6    like a waiver, it walks like a waiver and it quacks like a

7    waiver, the one thing we are not doing is waiving the maturity

8    date.

9            Your Honor, on the basis of the foregoing, the motion

10   should be denied.  And we have heard, and I heard Your Honor's

11   comments about Beal Bank.  And if I understand the proposition

12   if lenders agree to collective action mechanics then one lender

13   cannot object and seek action.  I'm sure Your Honor studied the

14   case more carefully than I did.  Although I agree it has some

15   superficial appeal, the case itself does not discuss what's

16   before the Court today.  Beal Savings wanted to sue.  There

17   were thirty-six out of thirty-seven lenders saying we don't

18   want to sue.  Beal violated that provision and sued anyway.

19   There is no request here by any lender seeking to exercise

20   remedies or do anything that the credit agreement requires

21   collective action to do.

22           Beal was also, Your Honor -- and this really should

23   not be ignored.  It was an historic case where there was a very

24   persuasive dissent.  There was a footnote in the majority

25   opinion.  The decision came out in 2007 and there's a footnote

74

1   in the majority opinion, and I'm sure Your Honor read it, that

2   says "If parties intend to preclude rights" -- and again,

3   that's not before the Court today.  Maybe it'll be in January -

4   - "they should say so explicitly."  The Court even says -- this

5   is the majority opinion:  "For the future, parties should

6   expressly state their intention in this regard".  That was to

7   deal with the argument, Your Honor, well, it doesn't actually

8   say that a lender gives up a right.  It says that remedies are

9   cumulative.  It says that every lender is several.  And it says

10   that -- in that case two-thirds -- the required lenders can

11   direct the agent to do certain things.

12        But this was the court of appeals in 2007 saying "For

13   the future, parties should expressly state their intention in

14   this regard."  It was an historic case.

15        This credit agreement was amended and restated in its

16   entirety in May of 2008.  And the same counsel that represented

17   the defendants in Beal Savings Bank represents the debtors

18   here, Your Honor.  So they can't say they didn't know about it.

19   If they intended to make this clear, they should have.  But

20   while Beal Savings Bank is  inapposite, Your Honor, what is

21   squarely before the Court is an attempt by the debtors to do

22   exactly what the four corners of the credit agreement prohibit:

23   extend the maturity.  The debtors are looking for a backdoor

24   way to prevent lenders from being paid at maturity without

25   unanimous consent.  The parties were very clear in Section

75

1    10.09 that the maturity date is sacrosanct.

2           If Your Honor could just look at Section 10.09, which

3    is the next demonstrative.  Again, it's really important to

4    look at how carefully these provisions were drafted.  In

5    Romanette ii of the proviso, it talks about you need the lender

6    affected thereby's "consent to (a) increase the commitment of

7    the lender, it being understood that a waiver of an event of

8    default shall not constitute an increase in the commitment of a

9    lender".  But then, Your Honor, when it talks about extending

10   the final maturity of the borrower, there is no parenthetical.

11   There's no parenthetical that says it being understood that

12   forbearance of remedies shall not constitute an extension of a

13   maturity.  It's not there because it would be absurd to say

14   that, Your Honor.  Of course that is what it's doing.

15          And, Your Honor, if this is not designed to

16   eviscerate, cause a waiver of and eliminate the debtors'

17   obligation to pay upon maturity then I don't know what it is.

18          Even the language of Section 7.01 of the credit

19   agreement, Your Honor, I would posit does not fit what the

20   debtors are trying to do.  What it says is that upon an event

21   of default, the agent may and at the direction of the required

22   lenders, shall exercise remedies.  The notion, Your Honor, that

23   the debtors specifically reserved and negotiated for the right

24   to get the required lenders to forbear and thereby avoid paying

25   at final maturity is completely at odds with the more specific

76

1    provisions which expressly mention maturity, that's 2.13(c),

2    2.28 and 10.09.

3            As the Court in Beal Savings Bank did hold, Your

4    Honor, "the Court should construe agreements to give full

5    meaning and effect to those material provisions".  And it's

6    hard to imagine a more material provision than the maturity

7    date in a loan, Your Honor.

8            The Court should not adopt an interpretation of 7.01

9    that would render any other portion of the credit agreement

10   meaningless.  And essentially, they're asking you to do that

11   when they can't touch Section 2.13(c) but they're trying to

12   touch everything around it.  Your Honor, tell me, if the

13   debtors are not urging an interpretation of the credit

14   agreement that renders Section 2.13(c), 2.28 and 10.09

15   meaningless, what are they doing?

16           But putting aside, Your Honor, our position that this

17   is a de facto extension of maturity, because it could be

18   nothing else, we are not here, as we've said, trying to

19   exercise remedies.

20           THE COURT:  Well, before we get to that, the

21   provision you're relying on primarily, I think, is 2.13(c)

22   which says that the debtors shall pay.  It puts the onus on the

23   debtor to pay.  The -- let me just play out what I think your

24   argument is.  Assume for the moment hypothetically that I

25   approve the debtors' entry into the accommodation agreement.

77

1  And December 31 comes, or January 1st comes, and the debtor

2  doesn't pay, what is the consequence at that point?

3          MR. KIRPALANI:  I think, Your Honor, I think there's

4  a variety of things that lenders do have the right to do.  The

5  first, they have the right to again come before the Court and

6  seek adequate protection.  That's not waived in the credit

7  agreement.  We've seen plenty of second lien deals, Your Honor,

8  where it is waived.  This is not one.

9          THE COURT:  But those are prepetition agreements,

10  right?

11          MR. KIRPALANI:  They are but --

12          THE COURT:  But leave aside adequate protection.

13          MR. KIRPALANI:  Okay.  But that is one thing.

14          THE COURT:  We can deal with that in a minute.

15          MR. KIRPALANI:  The second thing, Your Honor, is they

16  could file an objection to the payment of any junior

17  administrative expense claims or nonessential junior

18  administrative expense claims.  I don't think Your Honor's

19  prior DIP orders would permit the payment of junior

20  administrative expense claims or rank and file administrative

21  expense claims in the face of an unpaid superpriority

22  administrative expense claim, Your Honor.

23          THE COURT:  No.  But I guess the point -- I mean, if

24  the debtor doesn't pay on December 31, under your argument,

25  wouldn't your clients have to take remedial action?

78

1          MR. KIRPALANI:  I don't know if it's remedial, Your

2     Honor.

3          THE COURT:  Well, wouldn't they have to take action?

4          MR. KIRPALANI:  They would have to -- they could

5     object to various other things that are happening in the

6     bankruptcy case as a creditor, Your Honor.

7          THE COURT:  But --

8          MR. KIRPALANI:  Remedial, to me, means foreclosing on

9     collateral.

10          THE COURT:  Well, you've also sued to collect on a

11     judg -- you can sue, right?

12          MR. KIRPALANI:  Right.  But 7.01 talks about other

13     things.  It doesn't say about bring lawsuits.

14          THE COURT:  Well, it says "any remedy."  The best

15     remedy I know of is suing on a judgment.

16          MR. KIRPALANI:  But, Your Honor, we don't need to sue

17     on a judgment because Your Honor already has a Court order that

18     requires them to comply with the credit agreement.

19          THE COURT:  But you still have to enforce it, right?

20          MR. KIRPALANI:  Well, I guess, Your Honor, if we

21     don't enforce it -- I think we do have the right to enforce it,

22     Your Honor, just to be clear.  But if you're asking me to

23     assume for a minute that the collective action, the way it's

24     drafted in this credit agreement, even though it ignores

25     footnote 3 in Beal Bank, is supposed to preclude all actions by

1    all lenders, I don't think the remedy is limited to suing to

2    enforce.  I think there's still --

3              THE COURT:  No.  Of course it's not limited.  But

4    there's --

5              MR. KIRPALANI:  I think the remedy that's more

6    likely, Your Honor, because no lender, at least that I

7    represent, wants to seek the liquidation of this company on

8    January 1st.  But there are certain things, Your Honor, that we

9    do want.  And one of them is to avoid payment of administrative

10   expenses of hedging counterparties that seek to terminate their

11   contracts.  Those are nonessential payments that don't benefit

12   the estate, Your Honor.  If there's money for them, they'll

13   have their administrative expense claims.

14             THE COURT:  But my question really goes to this

15   point, which is there's a remedy section of the operative

16   document here, 7.01.  It deals with remedies.  As far as I can

17   see, it's the only remedial section in the document.  And it

18   seems to me, 2.28 has a cross-reference to that section.  So

19   the only other provision that I think you can hang your hat on

20   is 2.13(c).  And I think what you're saying there is that's

21   self-executing.  You don't need to assert a remedy.

22             MR. KIRPALANI:  A DIP order that's approved by this

23   Court makes it self-executing.

24             THE COURT:  But the DIP order itself provides that it

25   won't be amended subject to the written consent of the agent.

80

1    So, you know, there are -- the DIP order, again, is subject to

2    the consensual arrangements here.  So I --

3            MR. KIRPALANI:  Well, Your Honor, we can go through

4    those points.

5            THE COURT:  But all I'm saying is, it seems to me

6    ultimately your point is that the debtors cannot contract

7    around an obligation to pay on maturity.

8            MR. KIRPALANI:  I think that's correct.

9            THE COURT:  But it does seem to me, however, that the

10   agreement permits the required lenders to contract around

11   enforcement.

12           MR. KIRPALANI:  I'm not sure it does say that, Your

13   Honor.  In fact, I don't think it does say that.  I think it

14   says that the agent may and, at the direction of the required

15   lenders, the agent shall.  There's nothing in the agreement

16   that says the required lenders shall tell the agent not to do

17   certain things.  There's nothing in there that says that.

18   That's an interpretation that the debtors are proposing along

19   with the interpretation that that remedial provision is

20   exclusive.

21           THE COURT:  But that was the argument my former

22   partner made and was outvoted on in Beal Bank.

23           MR. KIRPALANI:  But, Your Honor, Beal was very clear

24   that this case is an historic case and that in the future,

25   remedies should be more spelled out --

81

1          THE COURT:  You don't think that was --

2          MR. KIRPALANI:  -- than what they were in that case.

3          THE COURT:  Well, that cuts both ways, doesn't it?  I

4    mean --

5          MR. KIRPALANI:  I don't think -- no.  I think it cuts

6    against the debtors, Your Honor.

7          THE COURT:  I mean, the case law on these types of

8    issues goes back a long way.  It goes back to the 30s and most

9    of it's in the indenture context.  But there, the onus

10   generally is on the party trying to get around the limitations

11   on remedy provisions.

12         MR. KIRPALANI:  I'm glad you mentioned the indenture

13   context, Your Honor, because I think that all of these cases

14   deal with issues such as the no-action provisions in

15   indentures, such as accelerating, such as taking actions that

16   are really collective actions.  None of them, including Beal,

17   involves nonpayment at maturity by the borrower.  None of them.

18   This is an interpretation that is strained to the logical --

19   the illogical extent, Your Honor, that a loan agreement can

20   remain unpaid, a superpriority DIP loan agreement, to boot, can

21   remain unpaid in a bankruptcy court in this district while the

22   debtors continue to operate using DIP proceeds and cash

23   collateral without unanimous extent -- without unanimous

24   consent, Your Honor.

25         THE COURT:  But the agreement --

82

1          MR. KIRPALANI:  There's nothing that supports that.

2          THE COURT:  But the agreement says what it says.  I

3     mean, people put these provisions in here.

4          MR. KIRPALANI:  But, Your Honor, the agreement also

5     says what shall happen on the maturity date.  And that isn't

6     happening.  So what's left grey, I would argue completely grey,

7     is what happens to this estate on January 1st.  There's nothing

8     in there that says that the debtors cannot pay that, be in

9     breach of the agreement simultaneously seek to enforce the

10    agreement and amend it.  There's nothing that talks about this

11    radical, never-before-happened situation, Your Honor.  This is

12    a first time for this to happen.  And I think, Your Honor,

13    you're making the first decision on it.

14         THE COURT:  But I guess -- you certainly get into the

15    collective action issue immediately at that point.  It only

16    takes one -- how many people are lenders under this agreement

17    at this point?

18         MR. KIRPALANI:  I believe -- don't know, Your Honor.

19    I assume many.

20         MR. BUTLER:  Several hundred.

21         THE COURT:  It just takes one out of a hundred to

22    start putting liens on the assets.

23         MR. KIRPALANI:  Well, everything's already pledged to

24    them, Your Honor.

25         THE COURT:  They could start -- it doesn't matter.

83

1    They can start enforcing.  That's collective action written in

2    spades, isn't it?

3              MR. KIRPALANI:  But Your Honor keeps talking about in

4    terms of enforcing.  I haven't said that lender can come to

5    court, file a demand for payment.  What I've said is that in

6    the absence of payment of the superpriority administrative

7    claim in this court, a lender could object to the payment of

8    junior claims.  And I don't think there's anything in that

9    credit agreement that would prevent that.

10             THE COURT:  But I think you're mixing apples and

11   oranges, though.  There is the issue of granting the liens on

12   the hedging.  But I don't see how you get away from the

13   collective action issue on remedies because if you don't read

14   the DIP agreement under 7.01 as saying that this is how the

15   agreement is enforced upon an event of default, including a

16   payment default upon maturity, then your one out of several

17   hundred can do pretty much whatever they want to do or be

18   bought off.

19             MR. KIRPALANI:  Well, Your Honor, those several

20   hundred superpriority administrative expense claims that are

21   unpaid at maturity.

22             THE COURT:  I understand.

23             MR. KIRPALANI:  So --

24             THE COURT:  But it seems to me a reasonable

25   interpretation of the agreement to say that the parties who

84

1    drafted this didn't want that to happen.  They didn't want to

2    have hedge fund X holding up the debtor.

3            MR. KIRPALANI:  But, Your Honor, there is no

4    qualifier in Section 2.13(c).

5            THE COURT:  Well, it says the debtor shall pay, I

6    understand.  But the debtor has pretty well said they're not

7    going to pay under the accommodation agreement.  So at that

8    point, there has to be some form of enforcement action, doesn't

9    there?

10           MR. KIRPALANI:  I mean, there can be all sorts of

11   actions.

12           THE COURT:  In the event of default -- there's an

13   event of default.  7.01 says what happens when there's an event

14   of default.  The event of default is the debtor hasn't paid on

15   maturity.  So, at that point, it seems 7.01 kicks in.

16           MR. KIRPALANI:  Again, there are many things that

17   creditors can do in bankruptcy cases that, I think, would not

18   amount to remedial action under a credit agreement such as

19   objecting to the payment of other claims.

20           THE COURT:  That's fine but --

21           MR. KIRPALANI:  Such as making motions to the Court.

22           THE COURT:  -- it strikes me that the argument you're

23   making, though, is one that says that the remedies provision

24   doesn't apply at all on the maturity date.

25           MR. KIRPALANI:  Well, because I think, Your Honor,

85

1 what I believe is happening is that they are extending the

2 maturity date.  And I think they are trying to do that by

3 saying everything but extending the maturity date.  And I think

4 it is for this Court to determine whether or not the substance

5 of what they're doing is actually to do that because that is

6 the liquidity runway they're seeking.  They've sought it and

7 they've done exactly the same thing that they've done twice

8 before, tried this time and couldn't get it.  And they are

9 relying on reading, I guess, provisions that, frankly, deal

10 with acceleration events contrary --

11    THE COURT:  But right under its terms it's not

12 limited to an acceleration event.

13    MR. KIRPALANI:  I didn't say it's limited, Your

14 Honor.  It's not limited.  But there are provisions in this

15 credit agreement that simply cannot be reconciled.  I know Your

16 Honor believes that it can be, or at least you're arguing to me

17 it can be, because 2.13(c) just says the debtors shall pay but

18 doesn't say how can you make them pay.  And then you go to 7.01

19 and say well, the only way to make them pay -- I'm just saying,

20 Your Honor, I think there are other ways to make the debtors

21 either pay or change the way they operate their business.  But

22 none of my clients, I'm suggesting, are interested any of those

23 things.  There may be others who are and I'm not sure this

24 credit agreement can stop them from doing that.  I think what's

25 happening here, Your Honor, is very ill advised.  And I'm not

86

1      saying it's going to be by my hand.

2             THE COURT:  Okay.

3             MR. KIRPALANI:  But I'd like to continue, if I can,

4      Your Honor.

5             THE COURT:  Yeah.  Why don't we move to the other

6      points?

7             MR. KIRPALANI:  Because I do want to talk about the

8      priming issue.  It's very central and it's very important.  The

9      debtors are telling all lenders to stand still on December 31st

10     but at the same time, Your Honor, they're seeking to give away

11     200 million dollars of our collateral to currently unsecured

12     hedging counterparties.  If Your Honor would just look at your

13     own DIP order of January 5th, 2007, which is the next slide,

14     Your Honor, it has a number 4 on the bottom, we read your DIP

15     order, Your Honor, as protecting us from being primed.  It says

16     "No claim or lien having a priority superior to or pari passu

17     with those granted by this order to this agent and the DIP

18     lenders shall be granted or allowed while any portion of the

19     financing or any refinancing thereof or the commitments

20     thereunder or the DIP obligations remain outstanding."

21            We submit, Your Honor, that even if the Court does

22     not deny the motion outright as a disguised maturity extension

23     request, the Tranche C lenders undeniably had a right to rely

24     on Your Honor's DIP order that no other liens would be granted

25     until they were paid in full.  It is the type of provision --

87

1          THE COURT:  What about 13(b)?

2          MR. KIRPALANI:  Coming to it, Your Honor.

3          THE COURT:  Okay.

4          MR. KIRPALANI:  If I can just have one minute, Your

5    Honor.

6       (Pause)

7          MR. KIRPALANI:  I'm sorry.  I thought you were going

8    to ask me about the provision the debtors cite, which was 6(d)

9    which I think is irrelevant to the issue, but I was going to

10   tell you why.  But I'll take a look at 13 --

11         THE COURT:  Well, 13(b) provides for modifications or

12   extenses of the order with the prior written consent of the

13   agent where it says "It shall not be modified or extended

14   without the prior written consent of the agent."

15         MR. KIRPALANI:  Well, I think what this -- I think,

16   Your Honor, when you read this provision along with the

17   provision that says there shall be no liens, the only way to

18   reconcile them, Your Honor, is that if the Court were to grant

19   that, there does have to be an analysis as to whether or not

20   the liens being primed are adequately protected.  And I know

21   Your Honor mentioned that you thought that was a prepetition

22   concept and I talked to lots of practitioners in the last few

23   weeks about whether, in fact, it is a prepetition concept, and

24   I've been researching it extensively.  I think if it was a

25   prepetition concept and if a case had so held it was, the

88

1    debtors would have cited that.

2            THE COURT:  No.  I don't --

3            MR. KIRPALANI:  They didn't.

4            THE COURT:  I think what I said was the case is -- or

5    the agreements you were citing to me were all in the

6    prepetition context.

7            MR. KIRPALANI:  Oh, yes.

8            THE COURT:  My issue with the adequate protection

9    point is that the parties sat down and negotiated a DIP

10   agreement.  And they're certainly very sophisticated.  They

11   dealt with each other at arm's length.  There were extensive

12   fees paid in connection with it.  And it strikes me as odd that

13   the parties would go through that exercise, which spells out

14   exactly what the respective rights are, if then they were to

15   have overlaid on it the vagaries of adequate protection.  I

16   mean, isn't the DIP agreement itself a consent as to what the

17   debtor can and cannot do with the collateral?  It spells out

18   what the debtor can do and what the debtor can't do.  And, of

19   course, you'd never need to get the adequate protection if the

20   secured lender consents.  You don't even need to provide

21   adequate protection of the cash collateral if the secured

22   lender consents.

23           MR. KIRPALANI:  I think while that's true, Your

24   Honor, the situation we have here is different because this is

25   not a situation where this DIP is in compliance, coasting

89

1    along, paying all of its obligations as and when they come due

2    with no anticipatory repudiation of the same.  This is a

3    situation where the debtors are announcing that they will be in

4    breach of this agreement and, at the same time, trying to

5    enforce the very same agreement against lenders by saying we're

6    entitled to amend this agreement now and prime you.  I think

7    the Court does have the power, and I think the DIP lenders do

8    have the right to request that the Court take a look at what is

9    happening to their lien position and do they or do they not

10   have an interest in property that's protected.  And did they or

11   did they not expressly waive any rights to request that.  And I

12   think the answers to those questions, Your Honor, are in favor

13   of the DIP lenders and not in favor of the borrower.  Not under

14   the circumstances that we have here, Your Honor.  And it may be

15   that these circumstances will never come up again but these are

16   circumstances that for three, four billion dollars of DIP

17   lenders are very serious because those credit markets that

18   everyone talks about affects all of them as well, not just the

19   industry.

20          Your Honor, just to make sure I cover it, the debtors

21   cite Section 6(d) of the DIP order that purports to state that

22   the unsecured hedging obligations are permitted under the DIP

23   credit agreement under Section 6(d).  That's what they rely on

24   in their papers.  And all I would point out, Your Honor, is

25   that that's incorrect.  It's an incorrect reading of 6(d).

1    6(d) says "other than with respect to" -- this is the next

2    slide, by the way, Your Honor -- "other than with respect to

3    any liens or security interests arising after the refinancing

4    date and permitted under the DIP credit agreement to be senior

5    to the DIP liens".  The hedging agreement liens are not senior

6    to the DIP liens.  The reason why it's simply a square peg in a

7    round hole is 'cause the provision that that paragraph relates

8    to is 6.01 of the credit agreement which talks about things

9    that Your Honor has seen many times, state law, mechanics'

10   liens, warehousemen liens, etcetera.  That has nothing to do

11   with what is happening to the DIP lenders in this motion, Your

12   Honor.

13          I think it's clear, I don't need to belabor it, that,

14   in fact, what is happening is there is 200 million dollars more

15   of secured claims being put ahead of the DIP lenders or ahead

16   of the Tranche C lenders in pari passu with the A and the B

17   lenders, Your Honor.

18          Now, with respect to this issue, and this is

19   important, the debtors have created what I would call an

20   elaborate rationale after the fact.

21          THE COURT:  Well, before we get to that, is this an

22   amendment issue or is this an adequate protection issue?

23          MR. KIRPALANI:  I think it's both, Your Honor.  I

24   think in the first instance, it's an adequate protection issue.

25   If Your Honor believes that implicitly that the lenders have

91

1    consented to be primed to the tune of as many billions of

2    dollars as the agent and the borrower shall determine or the

3    required lenders shall determine over and above the C lenders

4    without regard to their interest in the collateral and what it

5    does to them, then, Your Honor, I would attack that this is

6    judgment of it because I think it's after the fact and I think

7    it's fabricated, Your Honor.

8            THE COURT:  All right.  But is it -- does the DIP

9    credit agreement prohibit the imposition of these liens?

10           MR. KIRPALANI:  There's nothing expressly in the DIP

11   credit agreement that prohibits or permits these liens, Your

12   Honor.  There's a general amendment provision, which is what

13   the debtor is relying on, that says the debtors may amend this

14   credit agreement with the required lenders.  But elsewhere in

15   the agreement and in this order and in your DIP orders, Your

16   Honor, that amount was 150 million dollars.  And so our

17   position is if that amount is getting increased, it needs to be

18   clear that we are adequately protected.

19           THE COURT:  But again, the -- okay.  So it sounds to

20   me, then, it is an adequate protection issue and not a --

21           MR. KIRPALANI:  I think in the first instance it is.

22   And if Your Honor believes that we're not entitled to adequate

23   protection because the credit agreement, as Your Honor was

24   suggesting, may have impliedly consented to this basket being

25   upgraded, expanded to how ever much the debtors ask and receive

1    required A/B lender consent for, then we do have to look at

2    what is the business judgment rationale because I'm not sure

3    the debtors really disagree that we need to be adequately

4    protected, Your Honor.  The debtors' opening motion suggests

5    that they are providing adequate protection to the DIP lenders.

6    They cite Section 361 in paragraph 51, they cite a litany of

7    things that they believe are adequately protecting the DIP

8    lenders and those are things that are their burden.

9            But to the extent that -- the debtors also try to

10   argue, which they do repeatedly, that there is a business

11   judgment reason why they should be granting priming liens to

12   hedging banks that also happen to be Tranche A lenders.  They

13   will tell you, Your Honor -- Mr. Butler will tell you that

14   these six so-called relationship banks would otherwise have

15   used the maturity date of the DIP as a cross-default and

16   immediately terminated their out-of-the-money hedging contracts

17   and crystallized 350 million dollars of accelerated

18   administrative expense claims against the debtors.  These

19   purported justifications, Your Honor, do not withstand the

20   slightest scrutiny.  The notion that the debtors are concerned

21   about a 350 million dollar administrative expense claim going

22   unpaid on January 1st when a three and a half billion dollar

23   DIP superpriority administrative claim is going to be unpaid at

24   January 1st and is senior in payment unless this accommodation

25   agreement is entered, to any of those hedging obligations

93

1    doesn't even pass what I would call common sense scrutiny, Your

2    Honor.  In fact, even if the debtors were to try and pay the

3    350 million dollars -- unclear why they would do that for an

4    outside the ordinary course of business claim like that in the

5    face of DIP defaulted maturity.  But if they tried to, I am

6    sure, Your Honor, there would be objections to that and Your

7    Honor would look at your own orders in the absence of this lien

8    being granted and say they simply are not entitled to be paid

9    until the superpriority claims have been paid.  And even if

10   Your Honor were to allow the payment, these six banks are good

11   for the money in the event, Your Honor, that there had to be

12   some adjustments made because the superpriority administrative

13   claims were not paid in full.  That would still be a better and

14   more fair result, Your Honor, than giving them liens just a

15   month before their so-called threatened termination.  Giving

16   them liens would trump us.

17          THE COURT:  But in terms of the business judgment,

18   doesn't it all come down to who has a limitation on collective

19   action and who doesn't?

20          MR. KIRPALANI:  Well, I would argue, Your Honor, that

21   if they don't have a limitation on collective action, we can

22   play out that stream.  What would they do?  Right, Your Honor?

23   They would come to Your Honor and they would say, aha, here's

24   my motion for payment of an administrative expense claim

25   returnable on twenty days' notice.  I'm due -- JPMorgan Chase

1    says I'm due X hundreds of millions of dollars.  And I believe,

2    Your Honor, there would be a couple of hundred, to use Mr.

3    Butler's words, of objections to that.  And I think that Your

4    Honor would look at the DIP orders and say I don't think I can

5    pay this because it violates the priority scheme that I

6    carefully set out to protect those couple of hundred of DIP

7    lenders putting aside collective action remedies.  That's what

8    I was trying to get at at the outset.

9            And, Your Honor, in addition, again, if they're not

10   liened up and that money does go out the door to them, it may

11   be subject to disgorgement in the event that it has to be.  And

12   I think the case law on that is clear, Your Honor.  At least

13   it's better than having them prime us, get first liens, and so

14   that they can never be seen from again.

15           THE COURT:  But what is the next step --

16           MR. KIRPALANI:  I think --

17           THE COURT:  -- after the Court says I deny your

18   motion to be paid because there's not enough money to go

19   around?

20           MR. KIRPALANI:  I think they'd seek to lift the

21   automatic stay.  If you're thinking, Your Honor -- if you're

22   suggesting that they would be able to take some sort of action

23   or foreclosure type action or judgment type action in this

24   court, which would be the exclusive place they could do that,

25   they would need to move to lift the automatic stay and I think

95

1   Your Honor could dispose of that rather quickly.  These are six

2   banks, Your Honor.  This is not going to be, you know, some

3   earth shattering event.

4           And, Your Honor, these are amounts that the debtors

5   would pay in the ordinary course as they run off.  It's about

6   seventeen million dollars a month as they run off.  We're

7   talking about going from, Your Honor, from January 1st to

8   February 27th when the debtors propose to have a plan on file.

9           THE COURT:  Doesn't that cut the other way?

10          MR. KIRPALANI:  It doesn't, Your Honor, because if

11  that plan fails, they just leapfrogged us.  They just

12  leapfrogged us by the tune of 200 million dollars whereas what

13  is the harm to them?  If Your Honor were to balance the harms

14  as to whether to grant their motion or grant their lift of the

15  automatic stay, I think Your Honor would say the debtors are in

16  the middle of trying to negotiate a plan which would pay

17  administrative claims in full and your request to lift the

18  automatic stay is denied.  These six banks should stand still

19  the same way that hundreds of lenders have agreed to stand

20  still and let this debtor do what it needs to do.

21          The business judgment, Your Honor, is nothing but an

22  afterthought.  The debtors offered this preferential treatment

23  to hedging banks in order to get their vote for the Tranche A

24  of the DIP.  Mr. Sheehan himself stated on the lender call --

25  oh, I'm sorry I can't -- he doesn't recall stating that he was

96

1  asked and gave that answer.  But, Your Honor, silence sometimes

2  speaks volumes when you read the debtors' motion papers.  If

3  this was unchallenged by us and other lenders, query whether it

4  would ever have come to light in this Court, if you read the

5  motion papers, it doesn't talk at all about this grand

6  difficult challenging situation they have with these hedging

7  counterparties that if this would not have happened, as part of

8  their affirmative motion, Your Honor, they have told Your Honor

9  nothing about why this is important.

10          The common sense challenge that I've talked about

11  before, I think, really does ring true, Your Honor, when you

12  think about it.  I still believe, Your Honor, the business

13  judgment standard is the wrong standard because I think it is

14  an adequate protection issue.  But again, I think that, since

15  the debtors are going to come before you and argue that no,

16  this is something that they need to be able to do in their

17  business judgment and not pursuant to Section 364(d), even

18  though they do cite Section 364(d) in paragraph 51 of their

19  motion, I think Your Honor needs to look to what are the

20  justifications for doing it.  And the justifications for doing

21  it are only one because, if Your Honor recalls, Mr. Sheehan

22  testified, and it's Exhibit 26 in the exhibit binder, pages 29

23  and 31.  This was JPMorgan's original request for an extension

24  of the maturity date, an outright extension, which would have

25  accelerated no hedging counterparties.  And on page 31, it says

97

1    "We seek to give additional collateral to hedging

2    counterparties" as part of this extension.  So for the debtors

3    to stand here before you today and say this is exactly why

4    we're doing it, Your Honor.  We're doing it because we're

5    worried about the cross-default and

6              THE COURT:  Well, under either scenario, when you're

7    negotiating an extension, you're playing against the fact that

8    there otherwise will be a default.  I mean, they -- it's no

9    secret to JPMorgan that the alternative to agreeing to an

10   extension of the maturity date is that the maturity date comes

11   and goes.  And in addition to being able to exercise the

12   remedies under the DIP agreement, each counterparty of the

13   hedge has a cross-default provision.

14             MR. KIRPALANI:  No.  I'm not following you, Your

15   Honor.  I'm saying that when they were going to extend the

16   maturity date, that would have eliminated any cross-default --

17             THE COURT:  But it's all with the --

18             MR. KIRPALANI:  -- and they still said here, take

19   some liens.

20             THE COURT:  But it's all with the backdrop of there

21   otherwise being a cross-default.  So, of course, you're going

22   to say we're getting you off the hook of not only a default

23   under the credit agreement, the DIP agreement, but also a

24   default of the hedge agreement.  So we want to get compensated

25   for that.

98

1          MR. KIRPALANI:  Well, Your Honor, I'm saying that

2   that was an afterthought, that that rationale --

3          THE COURT:  It wasn't an afterthought by JPMorgan.

4   They knew exactly what they were doing.  They said --

5          MR. KIRPALANI:  JPMorgan asked for it even though

6   they had no right to it.

7          THE COURT:  But they --

8          MR. KIRPALANI:  -- even though they had no ability to

9   cross-default.

10          THE COURT:  But they would.  They would as of --

11          MR. KIRPALANI:  No, they would not.

12          THE COURT:  -- December 31.

13          MR. KIRPALANI:  Not if the DIP had been extended.

14          THE COURT:  But it's only extended if they agree.

15   And they're not --

16          MR. KIRPALANI:  Oh, okay.  So Your Honor is saying

17   that it is absolutely prudent and okay for the debtors to give

18   collateral on account of one lender's position somewhere in the

19   capital structure.

20          THE COURT:  No, no.  I'm not saying that.  I'm saying

21   that the notion that there was no cross-default under the

22   original scenario really begs the question because the original

23   scenario was to avoid a cross-default.  It was just to avoid a

24   cross-default in respect of an extension as opposed to an

25   enforce -- a forbearance issue.

1          MR. KIRPALANI:  Sure, Your Honor.  The only point I'm

2     trying to make, though maybe I'm not making it clearly, is that

3     there is no need to pledge and give additional collateral to a

4     hedging bank unless there's going to be a cross-default.

5          THE COURT:  Right.

6          MR. KIRPALANI:  That's on --

7          THE COURT:  But under either scenario --

8          MR. KIRPALANI:  And then JPMorgan has filed papers --

9     JPMorgan has filed papers saying we would not require the

10    collateral in order to forbear.  I mean, Your Honor, this whole

11    thing -- and I know it's difficult because Your Honor is only

12    hearing whatever is brought before the Court.  But the entirety

13    of this process has been truly eye-opening for me.

14         THE COURT:  No, but it seems perfectly reasonable for

15    JPMorgan wearing their hedging hat to say, you know, we want

16    collateral for that.  I don't understand why they wouldn't say

17    it.  It's a -- clearly, a business call -- we didn't decide the

18    adequate protection issue.  It's clearly a business call on

19    whether you want to play chicken with those five or six parties

20    on that issue or not.  I understand that issue.  And you're

21    saying the debtor should play chicken with them.

22         MR. KIRPALANI:  Well, because they're playing with

23    our money, Your Honor.

24         THE COURT:  Well --

25         MR. KIRPALANI:  They're playing with our 200 million

1    dollars.

2          THE COURT:  Ultimately, they're playing with the fate

3    of the case.  They're --

4          MR. KIRPALANI:  I'm not sure the fate of the case is

5    going to hinge on 300 million dollars of administrative

6    expenses.

7          THE COURT:  It very well might.  Under the case law

8    in this circuit, if the debtor is faced with an active creditor

9    who has the right to be active, in asserting the payment of a

10   large administrative claim, the debtor faces a real risk of

11   conversion.  It's that simple.  Now, maybe what you're saying

12   is that would be a minimal risk because the counterparties to

13   these hedges at the end of the day wouldn't do that because it

14   wouldn't be in their interest.

15         MR. KIRPALANI:  It wouldn't be in their economic

16   interest because they're behind the superpriority

17   administrative expenses.

18         THE COURT:  Well, I don't -- you know, at the same

19   time, ostensibly, it's not in any of the people's interest who

20   didn't vote for an extension because it's not great for them to

21   have a liquidation, as you guys have said.  But there's that

22   risk.

23         MR. KIRPALANI:  Agreed, Your Honor.

24         THE COURT:  And I guess what the debtor is saying is

25   of the two risks, the risk that the collateral will ever end up

1    going to the hedging counterparties is a more manageable risk

2    because they hope it'll run off and they hope they'll be able

3    to confirm their plan.  And I understand your point.  You're

4    basically saying that there's a risk that that plan won't be

5    confirmed and then you'll be primed.

6         MR. KIRPALANI:  Well, we are primed now.

7         THE COURT:  Well, but I mean as a --

8         MR. KIRPALANI:  You're saying that the teeth of it --

9    the teeth of it.

10        THE COURT:  In terms of actually

11        MR. KIRPALANI:  Having to suffer the fate of the

12   priming.

13        THE COURT:  -- crystallizing the claim --

14        MR. KIRPALANI:  Right.

15        THE COURT:  -- I mean, one would hope (a) that the

16   debtors would be able to manage their hedging exposure; and (b)

17   that they would never get to the point where people are

18   latching on to the collateral, because that means a

19   liquidation.

20        MR. KIRPALANI:  Yeah.  I also don't think they could

21   latch on to collateral in this court with the DIP

22   obligations --

23        THE COURT:  Well, that's --

24        MR. KIRPALANI:  -- being first priority liens.

25        THE COURT:  But what I'm saying is the -- if the

102

1    accommodation agreement is approved --

2         MR. KIRPALANI:  Yeah.

3         THE COURT:  -- they're saying that the odds of having

4    a continuing large hedging exposure and the odds of there being

5    a meltdown scenario, those two odds together is what the

6    debtors are saying are smaller and more manageable than going

7    into January with every single party to the DIP credit

8    agreement having a right to pursue remedies.

9         MR. KIRPALANI:  I think, Your Honor, what I was

10   suggesting is that every single party to the DIP credit

11   agreement would not pursue remedies if they were not being

12   primed.  You know, this is --

13        THE COURT:  Well, that's --

14        MR. KIRPALANI:  -- you know --

15        THE COURT:  In terms of -- in terms of --

16        MR. KIRPALANI:  -- that this opportunity was never

17   given to us because JPMorgan wrote the document and circulated

18   it.

19        THE COURT:  I've never seen the temptation to be a

20   holdout be a stronger situation than this one.  I mean --

21        MR. KIRPALANI:  We're not holdouts, Your Honor.  All

22   we're saying is --

23        THE COURT:  No, I'm not talking about your clients,

24   necessarily.

25        MR. KIRPALANI:  All we're saying, Your Honor, is that

1    we are being primed by 200 million dollars.  The debtors have

2    said they can use business judgment as the standard for

3    priming, we don't think so.  That's what Section 364(d)

4    provides.  If that were the case, the debtors would say I know

5    that the greater good is here and the greater good really must

6    come before those few that have interests in property.  And my

7    business judgment is, we should prime those few that have

8    interests in property for the benefit of the estate.

9            But unless they can really show, Your Honor, that

10   this is a case and that that result is truly likely, and I

11   don't think I've heard anything that talks about how truly

12   likely it is, to result in greater value for the Tranche C

13   lenders who are being primed they can't meet that burden, Your

14   Honor.

15           THE COURT:  Okay.  But again, 10(b) of the DIP order

16   makes it pretty clear, I think, that the order, including the

17   provisions on priming, can be amended with the prior written

18   consent of the agent.  And we've already established that as

19   far as the DIP agreement is concerned, which is the only place

20   of authority for the agent to give its prior written consent,

21   it can be amended as to these hedging obligations because

22   there's a very limited number of things where the DIP agreement

23   can't be amended.  I don't think this is one of them.  I

24   haven't heard you tell me otherwise.

25           MR. KIRPALANI:  No, no.  That's true, Your Honor.

104

1    I'm not telling you otherwise.

2         THE COURT:  So the same order that giveth, can taketh

3    away.

4         MR. KIRPALANI:  I think it can taketh away but, Your

5    Honor, still look to see what damage is being done to creditors

6    with interest in property.

7         THE COURT:  Even if they agree to this ahead of time

8    and gave their agent and negotiated a specific set of

9    provisions that permitted the agent to amend the agreement?

10         MR. KIRPALANI:  I think, Your Honor, that that right

11   to insure that your interests are adequately protected in the

12   bankruptcy court is a right that's sacrosanct.  I don't think

13   there's anything there that accepts a waiver.

14         THE COURT:  It's not sacrosanct if you give it up,

15   right?

16         MR. KIRPALANI:  If you give it up, that's correct.  I

17   don't believe that provision gives it up.

18         THE COURT:  Okay.

19         MR. KIRPALANI:  Your Honor, what the debtors have

20   said in their testimony today --

21         THE COURT:  I'm sorry.

22         MR. KIRPALANI:  Sure, I'm sorry.

23         THE COURT:  The very thing that you're saying creates

24   a need for adequate protection -- the priming -- is something

25   that the agreement permits, right?  You're just relying on the

105

1   order here.  So it's, sort of, a general condition that's

2   creating the right to adequate protection.  But it's a specific

3   thing that the parties permitted to be amended.

4         I'm not sure it would work the other way, too: if you

5   have a whole set of defaults would that really give the DIP

6   lender an ability to come in and say well I need another 200

7   million dollars in cash collateral when there's no provision in

8   the agreement that gives you the right to that?  It's just

9   based on a sense that you need adequate protection?

10        Leaving that aside, it seems to me here the very

11  thing that your clients are saying establishes a right to

12  adequate protection is something that the DIP agreement permits

13  to occur.

14        MR. KIRPALANI:  I think, Your Honor, that they have

15  sought to demonstrate to the Court that what they're doing

16  meets their business judgment.  I think they've also pled to

17  the Court in their motion that what they're doing does

18  adequately protect the DIP lenders.

19        THE COURT:  Well, I know.  I told them I had problems

20  with that because I thought they were giving away too much

21  money.

22        MR. KIRPALANI:  We would prefer that no money goes

23  out, Your Honor.

24        THE COURT:  No, I mean too much money to the

25  people --

1          MR. KIRPALANI:  None of my clients still get.

2          THE COURT:  -- whose votes weren't necessary.

3          MR. KIRPALANI:  We would prefer to take all of those

4    fees and apply it to the senior debt, Your Honor.  That would

5    be a better use of that money, Your Honor.

6          But what's happening here, Judge, is Mr. Sheehan

7    testified that the reason the original proposal before the

8    Court was modified to provide less pay down was to give, not

9    really Delphi a greater liquidity runway, but to give GM a

10   greater liquidity runway.  And it is that same liquidity call

11   that Delphi is so proudly putting before us as saying this is

12   your adequate protection.  You are going to have additional

13   liquidity below you some time in February or March.  Your

14   Honor, this is not something that, I think, any lender could

15   rely on when the money -- the priming is occurring today and

16   the adequate protection is being provided in February.  If that

17   were adequate protection, Your Honor, then Wimpy would be

18   adequately protecting Popeye every week.

19         I think Your Honor, with respect to the issue of the

20   fees I believe, Your Honor, it is one of the slides in front of

21   you, it is the very last slide Your Honor, and I won't talk

22   about the numbers out loud.

23         THE COURT:  Uh-huh.

24         MR. KIRPALANI:  But the debtors are telling you, and

25   will tell you, that these fees are also part of their business

1    judgment.  When you look at the size of the DIP facility the

2    fees that are being paid are really not that extraordinary.  I

3    would say for one month's worth of work, Your Honor, JPMorgan's

4    fee is quite extraordinary.

5         I would say that the purported evidence from Mr.

6    Sheehan of what some of these other arrangers did in order to

7    obtain a fee, such as give comments back and forth on the

8    accommodation agreement, Mr. Sheehan also testified in his

9    deposition that the Tranche C collective, and in particular

10   some of the larger holders of Tranche C loans gave much more

11   extensive comments and spent much more time trying to reach an

12   accommodation.  Many of those comments is what did garner

13   additional support from other parties.  And yet we requested no

14   fee.

15        The concern that we have, Your Honor, is about

16   process.  It is about, one, granting hedging counterparties

17   collateral in exchange for their vote.  Two, granting fees,

18   truly, in exchange for their vote.  I understand this is

19   extraordinary, Your Honor, but the Court is the arbiter of what

20   is extraordinary and what is impermissible, Your Honor.  And we

21   believe what's happened here is impermissible.  Nothing

22   further, Your Honor.

23        THE COURT:  Okay.

24        MR. KIRPALANI:  Thank you, Judge.

25        THE COURT:  Thank you.

108

1            MR. SUSSMAN:  May I approach, Your Honor?

2            THE COURT:  Sure.

3        (Pause)

4            MR. SUSSMAN:  Ronald Sussman, Cooley Godward Kronish

5    on behalf of Greywolf Capital Management, Your Honor.

6            As always, Susheel Kirpalani being his articulate

7    self I'm not going to reiterate all of the things that he said,

8    I'm just going to let you know that Greywolf joins in the

9    objection.  And the one additional comment I'll make is that if

10   the Court were to decide to overrule the objection and grant

11   the debtors' motion, we'd ask you to strike any provision of an

12   order that gives up our ten days to appeal.  Thank you, Judge.

13           THE COURT:  Okay.

14       (Pause)

15           MS. ELKIN:  Good afternoon, Your Honor.  Judy Elkin

16   for Calyon.  I too am not going to repeat everything

17   Mr. Kirpalani said but I do want to answer one question that

18   the Court had that I disagree with Mr. Kirpalani on.

19           The Court asked if there was any provision in the

20   credit agreement that prevented changing the amounts of the

21   hedging that was given pari passu and to allowing a bump of the

22   lien amounts.  And, Your Honor, I think it's a pretty general

23   rule of contract construction that the specific overrides the

24   general.  So I'd like to point out to the Court two other

25   sections of the credit agreement that we haven't really

1    discussed.

2        One is the part of Section 10.09 which -- 10.09 is

3    not it's (iii).  It's on page 95 of the credit agreement.  And

4    it specifically says that the consent of all the lenders is

5    required.  And (iii)(C) to amend or modify the superpriority

6    claim status of the lenders contemplated by Section 2.25.

7        And then I would ask the Court to look at 2.25.

8    Because the way I read 2.25 the superpriority claim status that

9    was granted to the A and B lenders included those liens that

10   existed on the closing date, which are those liens that are set

11   out in the credit agreement which are a limitation on the

12   hedging to 150 million.  It is not this additional 200 million.

13       And while we can go back and forth to say that there

14   are some general provisions in the credit agreement or in the

15   order that lets the agent modify 10.09 of the credit agreement

16   and 2.25 require a modification of superpriority claim status

17   and the liens being granted to the A and B lenders to only be

18   done with a hundred percent consent.

19       THE COURT:  But isn't "superpriority claim" defined

20   as a superpriority administrative expense claim?  It's not

21   talking about collateral.

22       MS. ELKIN:  If you read through all of 2.25, which

23   I'm not going to do right now, I read it to include -- it

24   includes the collateral, it includes the lien status and it

25   includes the superpriority administrative claims.

1        THE COURT:  Okay.  But (C) on page 95, in 10.09, the

2    language that requires unanimous consent, it says amend or

3    modify and then it uses, in uppercase terms, "superpriority

4    claim" status.

5        MS. ELKIN:  Right.

6        THE COURT:  The definition of "superpriority claim,"

7    on page 29, just refers to administrative expense claims under

8    503 and 507.  It doesn't cover collateral.

9        MS. ELKIN:  It doesn't cover collateral but it also

10    covers -- it doesn't necessarily cover collateral but it covers

11    the superpriority liens.

12        THE COURT:  It doesn't under the definition.  It just

13    refers to a claim, against the borrower orany guarantor, which

14    is an administrative expense claim.

15        MS. ELKIN:  Right.  But the administrative expense

16    claims that are granted superpriority status, the priority

17    structure of 2.25 gives that priority to the A and B lenders

18    over the hedging lenders except for 150 million dollars.  It

19    doesn't have in there that at any time you can increase that

20    amount.  Because if you're doing that you're, in effect,

21    modifying 2.25 superpriority status.  You're diluting it.

22    You're basically diluting the claims of the A and B lenders and

23    you're diluting their collateral pool.

24        THE COURT:  Okay.

25        MS. ELKIN:  Your Honor, I think it's important

1    that -- I mean, I understand the concern that everybody has

2    here, which is what happens if we don't approve this, does this

3    debtor go into liquidation.  And that's not anybody's goal

4    here.  But I don't think that you can use that threat to

5    abrogate a contract which clearly requires that certain things

6    be done with the consent of a certain amount of the lenders.

7    And I know there's been a lot of talk about the Beal case.  And

8    I think the Beal case is distinguishable.  I'd also point the

9    Court out to another case that held that lenders -- that you

10   cannot modify the terms of a credit agreement that require a

11   hundred percent without the hundred percent, notwithstanding

12   that you can use waiver language and try to get around it.  And

13   that's Citadel Equity Fund vs. Aquila.  It's 371 F. Supp. 2d

14   510, 516 (S.D.N.Y. 2005), which is the District Court opinion.

15   It was affirmed by the Second Circuit.

16        Your Honor, we think that it's important in this

17   district that DIP lenders be given the benefit of their bargain

18   and that includes being able to rely on a credit agreement that

19   provided that they had certain claims and that only certain

20   other amounts of claims were to be treated equal with them or

21   junior to them and not to have those claims elevated every time

22   the business judgment.  Because if you can use the business

23   judgment to get around a DIP credit agreement then there's no

24   sanctity in DIP credit agreements.

25        THE COURT:  But that's not what the debtors are

112

1    purporting to do here.  They say they have a contractual right

2    to do it.

3         MS. ELKIN:  I agree they say they have contractual

4    rights to do what they're doing, but I think that the terms of

5    the credit agreement require -- this is not just a forbearance

6    agreement.  You asked Mr. Kirpalani a question but you can

7    really turn that on your head.  Which is these five or six,

8    whatever number they are, of the hedging lenders said we won't

9    agree to an extension unless you agree to cover our potential

10   trading and give us additional collateral.  So you have, here

11   again, the potentiality for five or six holdout lenders.  But

12   if this was just a simple forbearance agreement it would simply

13   say we agree, the required lenders because that's all that's

14   required, we agree we're not going to exercise remedies,

15   period.  And those five lenders, so what?  So they wouldn't be

16   out there.  The other lenders would agree not to exercise

17   remedies.  They would declare a default under their hedging

18   agreements and they would try to come to this court.  And as

19   Mr. Kirpalani said, we would have to deal with that in court.

20        But now instead of just dealing with a  pure

21   forbearance agreement which, under New York law is simply an

22   agreement not to exercise remedies.  It's not tacked on to an

23   agreement to elevate unsecured debt to secured debt and to

24   dilute the priority --

25        THE COURT:  Well, forbearance agreements frequently

113

1   have provisions providing for payments, pay downs, liens, all

2   sorts of things.

3            MS. ELKIN:  They do, Your Honor, but they're also

4   within the bounds of the credit agreement that permits a

5   certain number of lenders to vote on this.

6            THE COURT:  But that's what we keep coming back to.

7   I think in terms of the issues here, it just seems to me that

8   clearly if the debtor were able to compel other groups of

9   creditors to stand still, like the hedging lenders, they would

10  do that.  But the issue is, do they have the right, given the

11  votes that they've gotten, to compel this group, right?

12           MS. ELKIN:  That is the issue, Your Honor.  Whether

13  under this credit agreement the actions they are seeking to

14  take, which as Mr. Kirpalani said at length, is form over

15  substance an extension of the maturity date and in our mind a

16  dilution of the liens and the collateral pool that we signed up

17  for,  that that has to be done with more than sixty-eight

18  percent of the lenders.

19           THE COURT:  Okay.

20           MS. ELKIN:  Thank you.

21           MR. NEIER:  David Neier, Your Honor.  I'll be very

22  brief.  We would join in the comments of the other objectors,

23  Mr. Kirpalani, Ms. Elkin and just add two thoughts.

24           First, with respect to voting, on the same page that

25  Ms. Elkin was referring to that is page 95 of the DIP credit

114

1    agreement, the way we read it, and it's about half way down the

2    page under (iv), it's actually (E)(iv).  You require all of the

3    Tranche A lenders and Tranche B lenders to amend the definition

4    of required lenders or the definition of supermajority first

5    priority lenders.  We think the accommodation agreement does

6    amend the voting provisions under the DIP credit agreement in a

7    way that's not permissible.

8         The debtors' argument is that they're simply creating

9    this alternate reality under the accommodation agreement where

10   you have different voting, which will be just those lenders who

11   consented to the accommodation agreement.  And then at the end

12   of the accommodation period you'll snap back to the voting

13   provisions under the DIP credit agreement.  We think that's

14   really inappropriate.

15        Under all circumstances voting provisions should

16   remain the same.  That was something that was agreed to and all

17   lenders, all A and B lenders, have not allowed the debtors to

18   amend the DIP credit agreement standards with respect to

19   voting.

20        THE COURT:  Let me make sure I understand this,

21   though, and maybe I'm wrong about this.  It seemed to me that

22   the changes in the voting definitions in the accommodation

23   agreement dealt only with specific provisions of the

24   accommodation agreement.

25        MR. NEIER:  That's correct, Your Honor.

115

1          THE COURT:  So that, for example, if --

2          MR. NEIER:  They would be --

3          THE COURT:  -- Delphi proposed next week to extend

4    the maturity date it would have to still get unanimous consent.

5    It couldn't say we caught you, now we've modified the

6    definitions in the accommodation agreement, and we only need

7    the accommodation agreement.

8          MR. NEIER:  That's absolutely correct, Your Honor.

9    What I think is problematic is to have a loan document out

10   there that doesn't respect "required lenders."  And I think

11   that's inappropriate and I see no reason for it.  They're doing

12   this in two ways.  One, they're saying only consenting lenders

13   can vote with respect to anything in the accomodation period,

14   such as the milestones that have to be met by the debtors.

15   And, two, they're adding hedging obligations as a participating

16   lender and I can't really see how that really affects anything

17   in the accommodation period but I think it's unwise and

18   inappropriate to do so.  I think the vote should always be

19   "required lenders" and we shouldn't create this alternate

20   reality for the next six months under the accommodation

21   agreement.  We should leave everything at required lenders.

22   That's the first point.

23          The second point, Your Honor, is we had -- as

24   somebody who has a 401K that's really a .401K at this point --

25   we had an extraordinary rise in the stock market last week.  We

116

1    had a seventeen percent rise in the stock market.  We had

2    commodities rising for the first time in a long time.  We had

3    the dollar falling against most major currencies, including the

4    Mexican Peso.  And so what happened to the debtors' exposure,

5    in one week, the exposure went -- their hedging exposure went

6    down from 400 million to 300 million.  But we've all learned

7    our lessons, okay.  There can be a reversal of that trend

8    almost overnight if not overnight.

9            And as a result, to have the hedging banks allowed to

10   terminate the accommodation agreement if their exposure exceeds

11   500 million dollars when they're already at 350 million

12   dollars, I think is also an inappropriate grant to the hedging

13   obligations.  I think if we're going to have an accommodation

14   period it shouldn't matter what their exposure is.  They're

15   getting liens up to 350 million dollars, with the additional

16   250 million dollars.  And I join in my colleagues' objections

17   with respect to that.  But I think it's unwise and

18   inappropriate to have, then, a termination of the accommodation

19   agreement with respect to the hedging obligations if their

20   exposure exceeds 500 million.  Then they will have a 350

21   million dollar A/B lien -- the same pari passu with the A/B

22   liens.  And they will have additional exposure that will all

23   become crystallized.

24           Yes, they can't move to foreclose on their rights

25   during the accommodation period, but that's not enough.  They

1    shouldn't have this additional right to terminate the hedging

2    obligations if their exposure exceeds 500 million dollars at

3    any one time.  Thank you, Your Honor.

4         THE COURT:  I guess you're up, Mr. Butler.  Before

5    you start, I have a basic question, which is what is different

6    under this accommodation agreement, which acknowledges that the

7    maturity date will come on the 31st?  What is different under

8    that set of facts then from an extension?

9         MR. BUTLER:  There are a number of things that are

10   different, Your Honor.  We've called some of them out in

11   footnote 10 of our original omnibus reply.

12        The accommodation agreement provides for forbearance

13   during a default rather than an extension of the maturity date.

14   The maturity date is not extended, the loans are due, there are

15   defaults.  And what we deal with under the accommodation

16   agreement are the terms and conditions under which the required

17   lenders have directed the administrative agent not to act.  And

18   candidly the agreement itself could have been simply a two-page

19   agreement had we been able to extract that from the required

20   lenders which simply had said I direct the administrative agent

21   not to act pursuant to the credit agreement.  We couldn't do

22   that because the required lenders and the administrative agent

23   required a number of conditions, which is commonplace in those

24   kinds of agreements as the Court acknowledged, in doing it.

25   But that agreement, the accommodation agreement, just deals

118

1    with post-default remedies and other matters.

2           The fact is that the maturity date will occur on

3    December 31st and there are a number of consequences to the

4    debtors as a result of that.  For example, the Tranche A

5    commitment will terminate.  We will no longer be able to borrow

6    under our DIP credit agreement.  Number two, interest will

7    begin to accrue at a higher rate of interest, pursuant to the

8    credit agreement, an additional 200 basis points.

9           Number three, we will no longer be able to borrow or

10   to accrue interest on a LIBOR basis but instead we'll have to

11   deal with base rate loans.  Number four, we'll be required to

12   cash collateralize outstanding letters of credit as we go

13   through and deal with those issues.  Those are four major

14   examples.

15          THE COURT:  These are things that are required by the

16   credit agreement?  They're not impositions in return for

17   getting forbearance?

18          MR. BUTLER:  Correct.  These are the operation of the

19   credit agreement.  When the credit agreement -- when you are

20   post-maturity there are things you cannot do under the credit

21   agreement and things that you have to do.  So these are -- I'm

22   giving you just some examples of it.  So the fact of the matter

23   is this company will be dealing with a DIP agreement which has

24   matured but which we have received and entered into

25   accommodations by the required lenders.

119

1          At the front end of this presentation, Your Honor, in

2      trying to be responsive to the objections that have been raised

3      I want to be clear, because this hearing is being widely

4      covered and there was something not discussed at all by the

5      objectors during the course of this presentation today.  And

6      that is that what we're dealing with here is an inter-creditor

7      dispute.  And the real question that is before the Court, as

8      the Court points out, is what are the contractual rights of the

9      parties under the post-petition DIP credit agreement?

10          And the liquidity runway that Mr. Sheehan has talked

11      about here, and having transparency that we are able to use the

12      contractual terms of the credit agreement in a manner that will

13      continue to provide a liquidity runway, is important not just

14      for the people in this courtroom, but the fact of the matter is

15      that there are many, many parties outside of this courtroom who

16      are waiting to hear the published reports of whether this is

17      approved because the fact is that there are hundreds and indeed

18      thousands of parties that are extending hundreds of millions of

19      dollars of post-petition, unsecured trade credit to this

20      company on a continuing basis.

21          And there's General Motors who's offered to make

22      available another 600 million dollars worth of liquidity, just

23      as they funded the extraordinary needs of the company during

24      the course of 2008, on the basis that this accommodation

25      agreement is approved.

120

1          And so, what we need to be able to convince our

2    administrative creditors, our suppliers, employees, other

3    contract parties, our customers, we need to be able to

4    demonstrate to them that we have an interim solution pending an

5    ultimate disposition of this case through a plan of

6    reorganization, that we are able to, in this extraordinary

7    economic and automotive environment, that we're able to provide

8    them, those administrative creditors, the transparency of a

9    liquidity runway.  If the debtors are unsuccessful in that goal

10   and can't satisfy those creditors then they will stop

11   supporting the company.

12         And that's really what this is about.  The company

13   would have preferred that there had been a third extension of

14   the DIP.  The reality is, over the last six months a lot of

15   this DIP has traded, people have bought in at substantial

16   discounts to the DIP, it's in different hands -- many aspects

17   of the DIP.  And when it came through to seeking, again, a

18   unanimous concurrence of an extension which would have allowed

19   us to continue to borrow under the DIP, to continue to have

20   LIBOR loans, to continue to do LCs in the normal course and all

21   of the other benefits you have under a credit agreement that is

22   continuing to operate, we could not get it.  With the

23   administrative agent we tried to get it; we fell short of a

24   unanimous view.  And therefore we moved to implement the

25   provisions of the credit agreement that would allow us to enter

1    an accommodation agreement with respect to remedies and with

2    respect to how and under what circumstances the required

3    lenders would direct the administrative agent to seek to have

4    the loans paid over to the DIP lenders.

5         And so, I recognize and I respect the inter-creditor

6    dispute that is here but I think it's extremely important when

7    you talk about business judgment here, we're not coming to the

8    Court, and I think the Court recognizes, the debtors aren't

9    coming to the Court saying Judge, we have a really good

10   business reason why you should rewrite the contract.  That's

11   not why we're here.  We have a really good business reason to

12   enter into an accommodation agreement that is contemplated by

13   and authorized by the credit agreement, that does not do

14   violence of the terms of the agreement but in fact implements

15   it so that we have the ability to provide this liquidity runway

16   for all of our stakeholders.  And hopefully over the next six

17   months be able to bring resolution to this case.  And that is,

18   I think, fundamental to why we are here.

19        The liquidity that's going to fund this case over the

20   next six months are the continued support of our administrative

21   creditors who have, when it's approved, that transparency and

22   through the 600 million dollar facility approved by Your Honor

23   previously this morning.

24        In terms of looking at the objections, and I'm not

25   going to go through them all in detail, Your Honor.  We wrote

122

1     but a reply and then a supplemental reply.  And Mr. Sheehan's

2     declarations have been pretty exhaustive on the views here.

3     But I do think that fundamental to this is Your Honor

4     determining whether or not the views of the administrative

5     agent, more than two-thirds of the required lenders under the

6     DIP agreement and the debtors; whether our mutual

7     interpretation of the agreement is in fact the Court's

8     interpretation.  Which is, can the debtors and the

9     administrative agent and more than two-thirds of the required

10    lenders under that agreement reach agreement about how and

11    under what circumstances the remedies under that agreement will

12    be pursued?  To me that seems to me it's a yes or a no.

13          If the answer is yes, and we believe it absolutely

14    is.  We think it's absolutely crystal clear under the

15    documents.  If the answer is yes, then the question is, under

16    the accommodation agreement, have the concessions or

17    accommodations that the debtors have made in connection with

18    that fundamental accommodation from the DIP lenders, are those

19    agreements justified as a matter of business judgment?  Did we

20    have a rational business purpose for making the agreements that

21    we made?  And I would submit to Your Honor that the answer to

22    that question is absolutely yes.

23          We have a legitimate business purpose for each and

24    every item that we have undertaken here.  And we are, as

25    Mr. Sheehan testified, we are balancing, every day, in a very

1    complex situation the competing interests and demands of many

2    stakeholders, including the differing competing interests and

3    demands of our DIP lenders themselves who do not speak as a

4    homogenous group but have very different views among themselves

5    and disparate views of both how we should proceed here and what

6    the ultimate resolution of this case ought to be.  And it's our

7    job, during this accommodation period, to bring all of those

8    views together and we hope to do that through filing further

9    plan modifications at the end of February.  That is our goal

10   and we have agreed with the participating lenders in the

11   accommodation agreement, which any DIP lender could have signed

12   up to be one of, we've agreed that they will have a look at the

13   end of February and that they will be able to redirect the

14   administrative agent if we are not able to satisfy them that

15   we've accomplished that goal.

16        And Your Honor, I think, as you pointed out, but just

17   to say it, while I respect Mr. Kirpalani in his advocacy, the

18   fact is it's just not accurate that nothing is going to happen

19   here on December 31st.  There are material things that will

20   happen.  But if Your Honor approves this agreement, because we

21   have obtained the contractual group of lenders under the DIP

22   credit agreement to support us in the accommodation agreement,

23   one thing that won't happen is there will not be a broken

24   highway here which will cause people not to continue to support

25   the company financially.

124

1          With respect to the interpretation of the agreements,

2     I won't go through that in great detail but we believe that

3     Section 2.28 and Section 7.01 are clear in their

4     interpretation.  And you do need to look at the context. Your

5     Honor presided over this, you approved the rollup of Tranche C

6     lenders, which were, in fact, the prepetition secured lenders,

7     who, in the middle of this case, got rolled up from prepetition

8     status to post-petition status.  And that was, from their

9     perspective, an extremely important event because it prevents,

10    for example, the debtors from classifying and modifying that

11    debt as part of a reorganization plan.  They have significant

12    benefits they got for that rollup in addition to us having paid

13    over a billion dollars in fees, expenses and interest to the

14    post-petition lenders since we filed Chapter 11.  They've had

15    that benefit as well.

16         What they don't have is the benefit of being able to

17    vote on everything.  What they don't have is the ability to

18    complain when the "required lenders," which they knew from the

19    outset, excluded them when the required lenders have decided to

20    amend the agreement, have decided to forbear on remedies, have

21    decided to take other action authorized and relegated to them

22    under the terms of the DIP credit agreement, they simply don't

23    have a voice.

24         That does not mean, Your Honor, that their views are

25    not important to us.  And as the testimony and this record

125

1    indicates, we have spent weeks trying to negotiate concessions

2    and accommodations that would make our Tranche C lenders as

3    comfortable as they could be in going forward.  We weren't

4    fully successful in that, as is obvious by some of the

5    objections that have been filed here today.  But the reality

6    is, we're going to be continuing to work with them during the

7    accommodation period, if Your Honor approves this, towards a

8    consensual plan of reorganization.  And therefore trying to be

9    transparent to them, trying to consider their views and

10   incorporate those which we believe we could while balancing the

11   interests of other stakeholders, the A/B lenders, General

12   Motors, the administrative agent, the company, other parties

13   who are providing post-petition unsecured credit to the

14   company, balancing all those things trying to make sure that we

15   reached an appropriate balance.

16           That's why, Your Honor, and Mr. Sheehan has

17   testified, we believe that the payment of fees, for example,

18   consent fees, to Tranche C lenders who submitted their pages by

19   the deadline last week ought to be on and is an appropriate use

20   of the fees.  It represents somewhere in the neighborhood of

21   about twenty percent of the total fees that are being paid if

22   Your Honor approves this transaction.

23           But I think, Your Honor, in terms of the basic

24   construct, if Your Honor agrees with our view of the DIP credit

25   agreement, which, as I said, I think is the appropriate view

1    here -- one that the required lenders and the administrative

2    agent support as well as, by the way, both statutory committees

3    believe that's what the deal is here as well -- once you reach

4    that conclusion, then I believe the rest of the agreements here

5    follow from that.  And I think that the record is

6    uncontroverted on the business judgment that the company used.

7           Now a word about adequate protection --

8           THE COURT:  Before you get to that, what the

9    objectors contend is that, particularly with regard to

10   providing the additional collateral for another 200 million of

11   hedging obligations, that that is not an appropriate exercise

12   of business judgment because, I gather, the belief that it's

13   not in the economic best interest of the hedging parties to do

14   anything about a cross default.

15          MR. BUTLER:  I think, frankly, that is pure

16   speculation on behalf of the objectors.  In the economic world

17   that I live in, right now that we all live in, and the

18   negotiations I've been involved in, this and other

19   transactions, the fact of the matter is that people -- that

20   parties are crystallizing obligations and trying to mitigate

21   against them as quickly as they possibly can.  And I have every

22   reason to believe that there is a significant risk that one or

23   more of the hedge lenders, if left to their individual action,

24   which they would be entitled to do, and I believe, by the way,

25   in the issue of transparency I think JPMorgan filed a

1   supplemental reply today reiterating again, because it wants to

2   be transparent to this Court.  It's not trying to mislead

3   anybody.  It's operating as an administrative agent, as a

4   lender and as a hedge provider which it's authorized to do.

5          In fact, as much as we've been criticized about the

6   hedge lending thing, the reality is the contracts among all of

7   these lenders are that the hedge lenders have to be Tranche A

8   and B lenders, the credit agreement requires it.  It's not a

9   surprise or a secret that they have the hedge exposure because

10  that's the only way you can have it under the agreement.  It

11  was contracted for in that matter.  And they, I think, have

12  been completely transparent to this Court and to the parties

13  that while they are prepared to meet the requirements we have

14  asked for in this accommodation agreement that they forbear

15  from termination even though they're otherwise to do so on

16  December 31st.  Because that, by the way, is another element of

17  the fact that the maturity date comes due.  When the maturity

18  dates occurs they will have that right.  And it is an

19  individual decision not a collective action issue.

20         We were able to obtain, and it was difficult to

21  obtain, this agreement among all six lenders because each of

22  them had the individual rights.  We were able to negotiate a

23  scenario in which all six hedge providers have agreed not to

24  crystallize whatever may be due and would otherwise be due and

25  owing if they terminated on December 31st.

128

1           The arguments or what Your Honor acknowledged to be

2     the case law in this district, I have spent a lot of time

3     talking with the objectors about because I do not believe this

4     company ought to be getting in the business, these debtors, of

5     not paying their administrative obligations as and when they

6     become due in the ordinary course of business unless they have

7     reached agreements permitted under contracts that allow them to

8     do that.  And this DIP agreement allows us to do it; the hedge

9     agreements did not.  And we're otherwise paying our

10    administrative expenses as they become due and that's important

11    to continue to be able to enjoy the support of our

12    administrative creditors and our suppliers and customers and

13    others.  We have to be able to continue to do that.

14          So Your Honor, I think that we're doing precisely

15    what the agreement allows us to do.  I believe that we have

16    made -- it's easy when you're sitting in a particular chair

17    that's not the fiduciary chair to say why don't you bet the

18    ranch.  We're trying to make the most careful, most calculated

19    decisions as possible as this management team is navigating

20    through this extraordinary economy right now.  And we think we

21    are on a course here that is appropriate and that will provide

22    the, as we said, the appropriate liquidity runway to our other

23    administrative creditors.

24          Does that answer your question, Your Honor?  Can I go

25    on to the cash collateral?

129

 1          THE COURT:  Yes.  You were going to adequate

 2    protection.

 3          MR. BUTLER:  Adequate protection?

 4          THE COURT:  Yeah.

 5          MR. BUTLER:  We make it clear in our papers that we

 6    do not believe that the Tranche C lenders are entitled to

 7    adequate protection for at least two reasons.  One of them is

 8    that this is a post-petition agreement and we were not able to

 9    find, and Mr. Kirpalani's quite correct if I could have found a

10    case that addressed post-petition adequate protection I would

11    have cited it.  I think he would have cited as well if he could

12    have found one going his way.  The fact of the matter is, I

13    don't think either of us found cases on this point that

14    indicated that post-petition interests are subject to adequate

15    protection.

16          I think the reason for that is that they're subject

17    to contract.  The fact of the matter is that the contract

18    provides, quite clearly, the consent of the lenders for us to

19    be able to use our collateral and operate our business pursuant

20    to the terms of the credit documents.  And in our view no

21    individual DIP creditor or DIP lender -- no individual lender

22    is entitled to seek adequate protection independently, that has

23    to be done through the administrative agent as directed by the

24    required lenders, or, absent such a direction, in the

25    discretion of the administrative agent.

1          So we don't believe that it's available on a post-

2     petition basis.  And secondly, we believe the contract that has

3     been approved by this Court represents a consent which would,

4     even if it were available on a theoretical basis post-petition,

5     in this case under these circumstances it would not be

6     available.

7          Even so, Your Honor, we recognize and we said in one

8     of our reply papers we recognize that we spent five weeks

9     negotiating with our Tranche A, B and C lenders a whole series

10    of concessions by the company that look a lot like adequate

11    protection, in terms of all the things we've agreed to do.  And

12    they're spelled out quite clearly in the accommodation

13    agreement, quite clearly in the papers.  I'm not going to

14    recite them all here.  And so if by chance Your Honor disagrees

15    with the debtors' views on adequate protection, I think you can

16    still find that we have, in fact, provided adequate protection.

17    Seeing as if you decided that way that would be our burden, but

18    we think it's pretty clear, frankly, under the contract that

19    these DIP lenders -- the changes we're proposing and the things

20    we're proposing to do, the amendment of the basket under the

21    DIP credit agreement which has been approved by the required

22    lenders today that's all done as a matter of contract.  And we

23    believe it's pretty clear.

24          So on that point I don't know if Your Honor has any

25    other questions.

131

1           THE COURT:  On the topic of the concessions that the

2       debtors have provided to the Tranche C lenders, in terms of the

3       actual out-of-pocket cost, that's now severely lower than it

4       was before, right?

5           MR. BUTLER:  Yes, Your Honor.  The actual amount that

6       will be paid is probably twenty-five percent of what could have

7       been paid, something in that neighborhood.

8           THE COURT:  The other things are, like, granting

9       additional liens and agreeing to some foreign liens, is that

10      correct?

11          MR. BUTLER:  Correct.  I mean, I think one of the

12      basic ones, Your Honor, under the terms of the waterfall; again

13      another effect, post maturity date, is that interest isn't paid

14      to the Tranche C lenders under the terms of the agreement.

15      We've agreed not only to increase the interest rate, because

16      that is -- I won't call it an agreement, we think that's an

17      operation of the credit agreement.  But at an additional 200

18      basis points we have agreed to deposit that into a segregated

19      account with the administrative agent.  Granted, the A's and

20      B's have to get paid off before that would go to the C's, but

21      it would be sitting there in an accruing account and accrued

22      under the terms of the accommodation agreement.

23           That, I think, is one of the most fundamental issues.

24      But in addition to that we've agreed to limitations on

25      repatriation from global affiliates.  We've been able to obtain

132

1    the forbearance of hedge parties under independent agreements

2    that they have with us.  There is a provision for paying down,

3    irrespective of the borrowing base, I believe it's at least

4    eighty million dollars during the term of the accommodation

5    agreement, if I recall correctly.  We have reduced the amount

6    of permissible secured indebtedness on the debtors' foreign

7    subsidiaries by 500 million dollars, from 1.5 billion to a

8    billion.  We have pledged all of the balance of the equity

9    interests of our foreign subsidiaries through a new collateral

10   pledge of a hundred percent, up from sixty-five percent.  We

11   have agreed that if we settle the current plan investor

12   litigation that under the terms described in the accommodation

13   agreement that proceeds would be used to repay the DIP

14   facility.

15           We have provided changes to the thresholds for asset

16   sale sweeps.  We have entered into a mechanism that requires us

17   to use commercial and reasonable efforts to contest and cause

18   our foreign subsidiaries to contest any efforts for certain

19   regulatory claims to be made in non-U.S. jurisdiction.  We have

20   provided that an inter-company note that exists will be secured

21   -- obligation will be secured by one of the foreign holding

22   companies under the terms specified in the accommodation

23   agreement.  And we've also established a new minimum liquidity

24   covenant, among other things.  There are other agreements set

25   forth in the accommodation agreement about how we will perform

1    and conduct our business.

2          All of those agreements by us, which have been

3    carefully negotiated by the administrative agent and voted on

4    and approved by the required lenders, inured to the benefits of

5    all of the lenders.

6          The other point I'd simply make, and I know

7    Mr. Kirpalani and his clients don't like my arithmetic

8    sometimes because they say GM would have to do it anyways.  But

9    as we put these transactions together and our papers indicate

10   that the motion Your Honor already approved and this motion, in

11   some respects, are companion motions because we've been able to

12   negotiate with General Motors to provide up to 600 million

13   dollars of additional liquidity.  Three hundred million of that

14   is through a change in payment timing in the first and second

15   quarters of next year.  The balance is subordinated funding

16   from General Motors, up to 300 million dollars of it.

17         And so even if you believed, somehow, that the 200

18   million dollar basket in the A's was being crystallized and

19   that it was actually going to be used, and we provided -- in

20   the evidentiary record there are charts that show how that

21   trails off over time and just the passage of time reduces this

22   exposure -- If you look at that, even if you assume that was

23   going to be crystallized for the full amount worst-case basis,

24   we provided during this period 300 million dollars worth of

25   subordinated funding to the estate which is going to be used

134

1    for the benefit of maintaining this estate and maintaining the

2    value in this estate, which inures, first, to the DIP lenders.

3         And so while the arithmetic may not be perfect, in

4    Mr. Kirpalani's view or his client's views as he urges us to

5    do, the substance of the transaction, as a whole view, the

6    substance of this transaction is, I think, again compelling.

7    It provides a liquidity runway.  The liquidity is coming from

8    people other than the DIP lenders.  And it provides a series of

9    very specified agreements that during this accommodation period

10   the debtors would be obligated to do in order to continue to

11   earn the forbearance from the Tranche A and B lenders, the

12   required lenders, that have voted in favor of this.

13        And from a voting perspective, as Your Honor pointed

14   out, we have not altered the DIP credit voting mechanism.  We

15   have, as to accommodation matters only, indicated, like for

16   example the milestone in February, we have adopted some

17   different voting mechanics which we're entitled, we believe, to

18   do under the construct of the agreement.

19        Your Honor, I think the only other matter that I

20   wanted to address today, briefly, and we did it in the cross

21   examination or the redirect of Mr. Sheehan is the subject of

22   somehow that the company is not using appropriate business

23   judgment in authorizing the payment of fees.  And the fees that

24   we're paying in connection with this accommodation agreement

25   are about half, a little less than half, of what we had been

1    paid in the context of an extension.  The truth is --

2              THE COURT:  You mean what you've previously paid?

3              MR. BUTLER:  Yes.  The truth is that we have paid

4    hundreds of millions of dollars to our DIP lenders, including

5    the Tranche C members, over the course of the last two and

6    half, three years as we have entered into the DIP and then

7    continued to extend the DIP, we have paid substantial fees.

8    And in each of those cases we have paid arranger fees.  I think

9    arranger fees, from my experience Your Honor in this district

10   and elsewhere, are usual and customary in these large

11   transactions.  They tend to go to the folks at the top of the

12   book in terms of -- and they are negotiated.  We typically --

13   what we do is sit down with the lead arranger and we negotiate

14   a fee for the lead arranger and then a bucket or basket of fees

15   to be used as needed in connection with the syndication and

16   with procuring consents or whatever else needs to be done to

17   affect the transaction.  And we worked with the agent about how

18   we should in fact spend the money.

19             As Your Honor knows from the record here,

20   particularly Mr. Sheehan's supplemental declaration, we did not

21   spend all the money we agreed to spend with the lead arranger

22   here, in terms of arranger fees.  We were able to negotiate

23   what we needed to get done to be able to get this agreement

24   completed and presented to Your Honor for less than the amount

25   we originally had estimated.  But there is nothing that is

1    unusual or not customary or somehow undue, inappropriate, in

2    connection with the payment of arranger fees in these economic

3    transactions.  They're done all the time.

4         I guess, on behalf of a company and an issuer I'd

5    love to have a market where they weren't.  I would, as an

6    issuer's counsel, applaud that market, but I haven't found it

7    yet.  And while Mr. Kirpalani made some comments about the fees

8    that his clients did not request, and I'm certainly not going

9    to discuss settlement negotiations on this record, but I

10   suspect before we are done in this case Mr. Kirpalani's clients

11   will be seeking fee compensation from this Court.  But that, I

12   think, today is not for today but I did note Mr. Kirpalani's

13   statement on the record about that.

14        Unless Your Honor has specific questions, I think

15   we'd otherwise rely on our papers.

16        THE COURT:  What in the record would support my not -

17   - I'm sorry.  What in the record would support my ordering that

18   the ten day stay, under 6004(g) shouldn't apply?

19        MR. BUTLER:  There are two reasons, Your Honor, in

20   the record.  One, and they're both in Mr. Sheehan's declaration

21   and in the record.  One is that the accommodation agreement

22   itself requires an unstayed order be entered and be done by

23   December 4th.  We were able to extend that date.

24        THE COURT:  But an unstayed -- I read that to mean

25   it's not been enjoined as opposed to -- I mean the Rules say

137

1    what they say.

2         MR. BUTLER:  I understand.  I'm not sure that's what

3    was intended, Your Honor, by that provision because we tried to

4    negotiate a later date.  And the other point of it is, and the

5    one that I think is important I made it in my comments at the

6    beginning, and that is that we are here, primarily, to provide

7    stability for this case and a record upon which our

8    administrative creditors can continue to support the company.

9         We already have, right now we're dealing with our

10   trade creditors who have shipped goods to us who have payments

11   due later this month and who we're asking to ship goods to us

12   now that will have payments due in January.  My own belief,

13   Your Honor, is that there is a substantial risk to the estate,

14   and Mr. Sheehan, I think, discussed in his declaration, that we

15   need to have this order affective and be able to get it out to

16   our administrative creditors who provide ordinary course

17   commercial credit to the company in order to not have a

18   destabilization of that support.

19        THE COURT:  Well I guess the question I have on that

20   is, as you pointed out, the DIP lenders are not providing the

21   liquidity here.  What's happening is forbearance.  So it's not

22   as if you're waiting for a slug of credit to come in tomorrow.

23   I would think that if a --

24        MR. BUTLER:  But we are.

25        THE COURT:  Well --

                                                                    138

1              MR. BUTLER:  I mean, that's the point.  What's

2      happening here is we have an environment where our suppliers --

3              THE COURT:  Oh no, I understand your suppliers are

4      providing the credit.

5              MR. BUTLER:  Right.

6              THE COURT:  But they would see that I've entered the

7      order, if I choose to enter the order.  They'll see that I've

8      approved it.  Congress said there should be a ten day waiting

9      period unless the Court, for cause, orders otherwise but the

10     order's there.

11             MR. BUTLER:   Right.

12             THE COURT:  And to be actually stayed on appeal, for

13     example, the appellants would have to establish the basis for a

14     stay, which would probably include a bond.  So it just seems to

15     me that the message that would be sent to the suppliers is that

16     you would have a forbearance agreement that's actually been

17     approved.

18             MR. BUTLER:  And you would have people ship to the

19     company during the stay period in the hopes that --

20             THE COURT:  Yes.

21             MR. BUTLER:  -- it all works out?

22             THE COURT:  But when you say it all works out, it's

23     not as if the order isn't entered and doesn't exist.  It's that

24     Congress has put -- the whole point of 6004(g) is to end some

25     of the pressure because of mootness in connection with sales

139

1   and the like.  Here it's forbearance as opposed to providing

2   new credit.  So I'm just not sure why they shouldn't be allowed

3   to have their ten days to take a more reasoned approach to

4   whatever rights they have as the people who lost on a contested

5   matter.

6           MR. BUTLER:  Your Honor, first of all I think the

7   accommodation agreement, as you indicated, has a number of

8   agreements.  It's not just forbearance; I might have wished

9   that it would have been.  But it has a variety of transactions

10  that we need to undertake as a result of implementing the

11  accommodation agreement.  But it's tied --

12          THE COURT:  Well, what are they?

13          MR. BUTLER:  There's a whole bunch of things we do

14  when we close the accommodation agreement, Your Honor.  There's

15  a whole bunch of covenants we have to provide.  We have to

16  start putting up cash collateral.  We have to start doing a

17  series of things that we will have to do.  The Tranche A

18  commitments expire immediately.

19          Under the terms of the accommodation agreement, what

20  we negotiated with the required lenders, is that the Tranche A

21  commitments expire as soon as the agreement becomes effective.

22          THE COURT:  Well, what does that mean under 6004(g)?

23          MR. BUTLER:  Well, Your Honor, as I've always read

24  6004(g) all the debtor is required to do is to demonstrate

25  cause.  Having someone say please don't do it, Judge, is in

140

1  opposition to the case the debtors have put on.

2  　　　　THE COURT:  Generally speaking, unless it's an

3  emergency, people who put up an objection should have the right

4  of that ten days, I think.  Maybe I'm missing something in the

5  agreement but this does not seem to me to be the type of

6  situation where the debtor is facing a business deadline that

7  requires a closing of a transaction to get cash in or to get

8  rid of a white elephant.

9  　　　　MR. BUTLER:  Your Honor, I think it's accurate to say

10  that the transactions under the accommodation agreement can be

11  implemented ten days from today as opposed to tomorrow.  I also

12  believe that the value of the estate will be maximized if the

13  order is entered tomorrow.  And I have always read 6004(g)

14  cause to be broadly defined, not transactionally limited.  And

15  it seems to me that the Court, in light of the uncontroverted

16  testimony that Mr. Sheehan has given in his declarations, it

17  seems to me that the company has demonstrated very good cause

18  about getting this liquidity runway out there and clear and

19  something people can rely upon in order to be able to provide

20  us the support we need right now.

21  　　　　THE COURT:  I wouldn't create -- I don't think one

22  should have the impression that you can't rely upon it.  If I

23  issue an order, it's an order.  I don't think Congress meant

24  that you can't rely upon something; it just said that you have

25  to have ten days to --

1          MR. BUTLER:  I think I've said all I can say about

2     this without creating more of a problem.

3          THE COURT:  All right.

4          MR. BUTLER:  I think I've described the exigencies

5     that the company has and it seems to me that if Your Honor is

6     inclined to grant the relief, the estate is best served by

7     granting the relief immediately.

8          THE COURT:  Okay.

9          MR. BUTLER:  Thank you, Your Honor.

10          THE COURT:  Any brief response?  Nothing that shocked

11     you that you feel you have to --

12          MR. KIRPALANI:  I can do it from here, Your Honor,

13     just to save time.

14          THE COURT:  Okay.

15          MR. KIRPALANI:  It's not that anything shocked me,

16     but a couple of things.  First, I think this is important to

17     Your Honor's ruling, 7.01, and I know we've talked about this

18     during my argument but I'm not sure I made the point clearly

19     enough,  7.01 by its plain terms does not permit the required

20     lenders to direct the agent not to exercise remedies.  What

21     7.01 says is that upon an event of default the agent may or the

22     required lenders shall -- I'm sorry, or at the direction of the

23     required lenders the agent shall exercise each one of them is a

24     punishment to the debtor.  Each one of them does something

25     damaging to the debtor, right?  The first one to cash

142

1    collateralize LC's, I'm going from memory but Your Honor gets

2    the point.

3           The forbearance concept, although Mr. Butler very

4    eloquently talks about how this was all part of the grand

5    scheme of the credit agreement actually is missing.  Now, I

6    think Your Honor understands this to be more of an argument as

7    to what's implicit as opposed to explicit, but I think that's

8    an important thing because I want to make sure Your Honor

9    understands our position.  Which is, 7.01, to the extent it's a

10   limitation on remedies or a limitation on the lenders' rights

11   in Section 10.07 says all rights are cumulative, it should be

12   construed narrowly not broadly as Mr. Butler prefers.

13          And Your Honor, the other thing is with respect to

14   the DIP order.  I took another look at it.  Your Honor had

15   asked about 13(b) as a purge to 13(a).  And 13(b), Your Honor,

16   if we just take a look at it, all it says is unless all DIP

17   obligations have been paid in full the debtor shall not seek,

18   and it shall be an event of default and a termination of the

19   right to use cash collateral to seek, modifications or

20   extensions unless permitted by the administrative agent.  It's

21   not a provision that confers rights.

22          THE COURT:  What about their "unless" language:

23   Unless the administrative agent says otherwise?

24          MR. KIRPALANI:  All that says is that that does not

25   cause an immediate event of default and termination of cash

143

1  collateral usage.  It doesn't confer rights on the agent.  All

2  it says is this will -- if the debtor does X, Y or Z it's an

3  immediate event of default or it's an immediate termination of

4  the use of cash collateral unless the agent has agreed to it.

5  And we're not arguing that this is an immediate event of

6  default.  We're not arguing that this is a termination of cash

7  collateral.  That is happening anyway on December 31st, Your

8  Honor.  We're not arguing that that's what applies here.

9         Those are the only two points I wanted to make,

10 Judge.

11        THE COURT:  Isn't it implicit that if the debtors are

12 contemplating an event of default that they get the prior

13 written consent of their agent or try to, to modify the order?

14        MR. KIRPALANI:  They are not -- they're specifically

15 not waiving the event of default.

16        THE COURT:  But they are seeking a modification of

17 the order.

18        MR. KIRPALANI:  All I'm saying is this is not -- in

19 my reading, Your Honor, it's not an empowering provision of the

20 DIP order it's a restricting provision of the DIP order as to

21 what the debtors can and can't do.  It says the debtors cannot

22 -- it will automatically cause an event of default and

23 termination of cash collateral usage if it seeks to do

24 something without the consent of the administrative agent.

25 That to me does not mean that the administrative agent and the

144

1    debtors can write the prior paragraph, (a), out of the order.

2           THE COURT:  You don't think that it means, in that

3    clause, "any modifications or extensions of this order without

4    prior written consent of the agent," you don't think that means

5    that the prior written consent of the agent can lead to a

6    modification of the order?

7           MR. KIRPALANI:  I think, Your Honor, it has to be

8    read next to (a).  It is a conferring right.  The whole Section

9    (b) is what the debtors can't do and shall not seek to do

10   because if they do it will be an event of default and an

11   immediate termination of cash collateral.

12          THE COURT:  I agree with that, but, again, there's an

13   exception.

14          MR. KIRPALANI:  I understand, Your Honor.  Our

15   interpretation of this is that that exception does not swallow

16   paragraph (a).

17          THE COURT:  So what is the agent supposed to be

18   consenting to?

19          MR. KIRPALANI:  It is things that are otherwise

20   permitted by the order, Your Honor or permitted by the credit

21   agreement.

22          THE COURT:  Well why would you need their consent

23   then?

24          MR. KIRPALANI:  Your Honor, it is written with "any

25   modifications or extensions of this order."  I don't read any

145

1    modifications or extensions of this order to mean priming liens

2    and things of that nature.

3         THE COURT:  But that's the most important provision

4    of the order.  I mean, that's what you're relying on, is that

5    provision.

6         MR. KIRPALANI:  My reading of it, Judge, and I

7    understand if you're disagreeing with me but for the record my

8    reading of this -- this is not carte blanche to the agent to go

9    ahead and prime.

10        THE COURT:  Oh no.  The agent has to still comply

11   with the credit agreement, obviously.

12        MR. KIRPALANI:  Okay.

13        THE COURT:  The agent's not going to willy-nilly just

14   say you can change the order.  The agent only exists pursuant

15   to the authority given to it under the credit agreement.  Its

16   powers are only found there.

17        MR. KIRPALANI:  I appreciate your explanation, Your

18   Honor.  I just think that (a) and (b) read together, (a) is a

19   much stronger right and (b) is just a limitation on what the

20   debtor can do.

21        THE COURT:  Okay.

22        MR. KIRPALANI:  Thank you, Your Honor.

23        THE COURT:  Well, I'm going to take a brief break.

24   Do you have something to say?

25        MR. FLYNN:  No, Your Honor.

146

1          THE COURT:  You're not going to waive one of those

2     fees?

3          MR. FLYNN:  No, I just wanted to talk to Mr. Butler

4     about something, if we can just have one minute.

5          MR. KIRPALANI:  Judge, I'm sorry.  One thing I wanted

6     to mention, I don't think any of the objectors has seen a

7     proposed form of the order.  And that's something, depending on

8     how Your Honor rules, we certainly want to --

9          THE COURT:  I think there was a fairly plain vanilla

10    form that was attached to the original motion.

11         MR. KIRPALANI:  Okay.

12         THE COURT:  Yes, there was one.  It's DIP

13    accommodation order.

14         MR. KIRPALANI:  Okay.  Thank you, Your Honor.

15         THE COURT:  It's fairly brief, eight pages.

16         MR. FLYNN:  Your Honor, I thought maybe Mr. Butler

17    and I could settle something outside.

18         THE COURT:  You should state who you are for the

19    record.

20         MR. FLYNN:  My apologies Your Honor.  I'm Michael

21    Flynn on behalf of the administrative agent, from Davis Polk &

22    Wardwell.

23         I rise only, Your Honor, to address the issue of the

24    stay that you were discussing with Mr. Butler.  If you look at

25    paragraph 35 of the accommodation agreement there is a

147

1   provision in there, conditions to effectiveness, that talks

2   about the accommodation agreement becoming affective under

3   certain conditions.  And (iv) deals with the entry of this

4   Court's order and it also mentions that that order shall not

5   have been "reversed, stayed or vacated."  So I just wanted to

6   point that provision out to Your Honor.  The administrative

7   agent hasn't had a chance to look at the Rule and consider the

8   operation of that.

9        THE COURT:  I view those types of provisions as

10  things where someone has actually persuaded a Court to stay, as

11  opposed to a statutory stay, which is in the Bankruptcy Rules.

12       MR. FLYNN:  Understood.  That was the point, Your

13  Honor.  I just rise to say the administrative agent hasn't

14  decided whether it views that the same way and whether or not

15  it would require a waiver from the people who have agreed to

16  enter the --

17       THE COURT:  When you look at the other words that are

18  in that string, they all have to do with some court taking an

19  action: vacating, staying, etcetera.

20       MR. FLYNN:  I appreciate Your Honor's interpretation

21  of it.  I just wanted the administrative agent's position to be

22  clear on the record, that we haven't yet formed a view as to

23  whether or not the conditions to effectiveness will have been

24  met if the operation of the Rule applies and you do not grant

25  Mr. Butler's request to waive that application of the Rule.

1          THE COURT:  Okay.

2          MR. FLYNN:  All right.

3          THE COURT:  I'm going to take a break until --

4  effectively with all these people five minutes doesn't really

5  work so until 3:00 and then I'll rule.

6          (Recess from 2:38 p.m. until 3:03 p.m.)

7          THE COURT:  All right.  I have before me a motion by

8  the debtors-in-possession for approval of their entry into an

9  accommodation agreement, which, in its original form, was

10  attached as an exhibit to the debtors' motion but that has

11  since been modified so that what I am currently asked to

12  approve is the form of the accommodation agreement that was

13  filed with the Court on November 26th.

14          The accommodation agreement is clearly an agreement

15  entered into by the debtor with respect to the use of its

16  property that is out of the ordinary course of business and

17  therefore requires approval under Section 363(b) of the

18  Bankruptcy Code.

19          In addition, as the five objectors to the debtors'

20  motion have argued, the debtors' entry into the accommodation

21  agreement raises the issue of the debtors' contractual

22  authority to enter into the agreement and the objectors'

23  rights, even assuming that the debtors have authority to enter

24  into the agreement as secured debtor-in-possession lenders.

25          The Court issued an order approving post-petition

1    financing and authorizing the debtors to refinance secured

2    post-petition financing and prepetition secured debt on January

3    5, 2007, and I'll refer to that as the "DIP order".  Among

4    other things, the DIP order provided for, as its title stated,

5    a roll-up of the debtors' prepetition secured debt facility, in

6    the context of a refinancing of the debtors' post-petition

7    facility, into a third-priority so-called "Tranche C" post-

8    petition facility.  In other words, the prepetition rights of

9    the debtors' secured lenders were altered by the DIP order,

10   which, pursuant to its terms, turned them into -- or turned

11   their claims into -- post-petition superpriority unsecured

12   claims.

13        The DIP order authorized the debtors' entry into a

14   DIP facility agreement, and both the agreement and the order

15   have subsequently been amended twice.  The primary amendment,

16   or at least the amendment that is most relevant to the matter

17   before the Court this afternoon, is an extension -- or was an

18   extension of the maturity date of the DIP loans, including the

19   rolled-up Tranche C loans.  Most recently, that maturity date

20   was extended to December 31, 2008, as required by Section 10.09

21   of the amended and restated DIP facility agreement.  That

22   extension of the maturity date required the lenders' unanimous

23   consent, that is, the unanimous consent of the Tranche A,

24   Tranche B and Tranche C lenders.

25        Because of, it appears to me, the turmoil in the

1    credit markets, the debtors have not been able over the last

2    few months to obtain either commitments for exit financing that

3    would enable them to emerge from Chapter 11 before the December

4    31st maturity date or to obtain a refinancing of the existing

5    DIP agreement.  This is, I imagine, not only somewhat

6    mysterious to me but to most of the debtors' constituents since

7    it appears to be undisputed that the debtor makes critical

8    parts for a critical product, meaning the automobiles

9    manufactured by OEMs throughout the world, including in the

10   United States.  Nevertheless, the credit markets appear to

11   remain seized up and unable to evaluate the underlying credit

12   characteristics of companies like Delphi, and, consequently,

13   the debtors have had to consider their options in the light of

14   the oncoming maturity of their DIP loan.

15        They attempted to obtain unanimous consent, again,

16   for an extension of the maturity date, which would take them

17   into a time when they would reasonably hope that the credit

18   markets would be functioning rationally or smoothly and/or that

19   some other source of credit support for their key customer or

20   customers would become available.  However, they were advised

21   by the agent for the DIP facility, JPMorgan Chase, that it was

22   unlikely that they would receive, this time around, unanimous

23   consent for an extension of a maturity date.  The debtors have

24   therefore, instead, negotiated the accommodation agreement,

25   which, in effect, acknowledges the forthcoming maturity of the

1    debtor-in-possession loan facility but provides for, under the

2    conditions stated therein, forbearance from exercising remedies

3    under the DIP credit agreement and DIP order.

4          Pursuant to their interpretation of the DIP credit

5    agreement, which was also an intercreditor agreement setting

6    forth the agreements between and among the three tranches

7    covered by the DIP credit agreement and the DIP order, as to

8    their priorities and rights in the event of a default -- the

9    debtors contend that they have the contractual right to enter

10   into the accommodation agreement provided that the so-called

11   "required lenders" vote in favor of the accommodation

12   agreement.  It is uncontroverted that, as of the applicable

13   voting date on the modified accommodation agreement, 68.37

14   percent of the Tranche A and B lenders have confirmed or

15   reaffirmed their agreement to abide by the terms of the

16   accommodation agreement, which percentage not only equals,

17   under the definition section, the defined term "required

18   lenders", but also exceeds the two-thirds amount necessary,

19   arguably, for certain amendments to the DIP credit agreement.

20         There have been five objections to the motion, four

21   on behalf of various Tranche C lenders, although it has been

22   represented to me that some of the members of the so-called

23   "Tranche C collective" have since consented to the

24   accommodation agreement, as well as one group of Tranche A and

25   B lenders, although, again, it's been represented that some

1   parties within that group have consented to the accommodation

2   agreement.  The objections essentially raise three points.  The

3   first is that the debtors and the required lenders lack the

4   contractual authority to enter into the accommodation agreement

5   and thereby limit the remedies and rights of DIP lenders who

6   have not agreed to the accommodation agreement; secondly, that

7   the DIP order and secured lenders' right to adequate

8   protection, under Sections 361 and 363 of the Bankruptcy Code,

9   preclude the debtors' entry into and performance under certain

10  aspects of the accommodation agreement.  And the third

11  objection is that even if the debtors have authority,

12  contractually and legally, to enter into the accommodation

13  agreement, the debtors' particular exercise of that authority

14  here is not a valid and legitimate and proper exercise of their

15  business judgment.

16       Let me address those objections in order.  The

17  agreement, that is, the DIP credit agreement, was negotiated at

18  arm's length by sophisticated parties who not only were

19  negotiating with the debtor but also negotiating mindful of the

20  intercreditor aspects of the agreement.  Under Section 10.06,

21  the agreement is governed by the law of New York, except where

22  federal bankruptcy law applies.  The parties also submitted to

23  the Court an extensive forty-page DIP order in January, which

24  has subsequently been modified by orders of fewer pages but

25  that reflect an equally sophisticated and arm's length

153

1   negotiation and documentation of the lender parties' rights,

2   both against the debtor and inter se.

3          I have reviewed the DIP agreement carefully in light

4   of the parties' arguments, and I conclude that the debtors do

5   have the authority under the DIP agreement to enter into the

6   accommodation agreement.  I say that first in light of Section

7   7.01 of the DIP agreement, which covers and prescribes the

8   parties' rights upon the happening and continuance of an event

9   of default.  Specifically, it covers not only events which

10  become events of default for occurrences where the amount due

11  under the agreement may be accelerated but also specifically

12  default in the principal -- in the payment of the principal --

13  of the loans or reimbursement obligations or cash

14  collateralization and respective letters of credit when and as

15  the same shall become due and payable, whether at the due date

16  thereof or at a date fixed for prepayment thereof or by

17  acceleration thereof or otherwise.  I.e., the default

18  provision, Section 7.01, covers an event of default upon the

19  expiration of the maturity date when, as provided in Sections

20  2.13 and 2.28, the loans become due and payable in full.

21  Section 2.28 expressly subjects the payment provision upon

22  maturity, among other payment obligations, to the provisions of

23  Section 7.01.  Section 2.13 does not.  However, there is no

24  other provision of the agreement dealing with rights in respect

25  of an event of default, including a payment default upon the

154

1    maturity of the loan, except Section 7.01.

2         Section 7.01 then goes on to specify that, "Under

3    such circumstances, the administrative agent may and, at the

4    request of the required lenders, shall", skipping ahead to (v),

5    "exercise any and all remedies under the loan documents and

6    under applicable law available to the administrative agent and

7    the lenders."  I believe that under New York law, having been

8    given the right that I just quoted, the administrative agent,

9    in its discretion and mandatorily at the request of the

10   "required lenders," has the right to exercise such remedies or

11   forbear in respect of such remedies as a matter of contract

12   under the DIP credit agreement, which, I believe, is what it is

13   doing, having been so instructed, in the accommodation

14   agreement.

15        The objectors contend that, given the anticipated

16   maturity of the loans at the end of this month, they

17   individually have the right to act to enforce Delphi's payment

18   obligation, but I conclude that the agreement itself does not

19   provide them with that right.  And under New York law, the

20   remedy provision of the agreement provides, instead, that right

21   to be exercised by the agent, either in its discretion or at

22   the direction of the required lenders.  Therefore, I believe

23   that, in entering into the credit agreement or by purchasing

24   Tranche C or A or B loans, each DIP lender agreed or knew that

25   it would be subject to such a limitation on its right to act

1     unilaterally to, for example, sue the debtor for breach of the

2     DIP agreement.  I believe this conclusion is directly supported

3     by the recent decision of the New York Court of Appeals in Beal

4     Savings Bank v. Sommer, 8 N.Y.3d 318, where a particular lender

5     sought to sue for breach of contract, and the Court of Appeals,

6     construing a remedies provision quite similar to Section 7.01,

7     concluded that that provision precluded the individual

8     creditor's exercise of its breach of contract remedy.  The

9     Court so held even though the forbearance by the required

10    lenders in that case had a "similar effect" to an action under

11    the credit agreement that would have required unanimous

12    approval.  Clearly, the Court of Appeals was aware of the

13    argument, which is also made here by the objectors, that the

14    remedies provision did not expressly state that individual

15    lenders were prohibited or precluded from exercising their own

16    remedies.  I say that because the dissent of Judge Smith makes

17    that very point and states, in dissent, that "a bank that lends

18    money to a borrower and is not repaid is entitled to sue to

19    gets it money back."  Notwithstanding that view, argued

20    cogently by Judge Smith, the majority concluded that the remedy

21    provision, in light of the intercreditor nature of the

22    underlying agreement, did, in fact, do just that, i.e.,

23    precluded the individual lender from suing to get its money

24    back.

25            The objectors have pointed to a footnote, footnote 3,

156

1   in the Beal Bank decision, which suggests that, for the future,

2   parties should expressly state their intention with regard to

3   whether remedies are to be precluded or not.  But just as the

4   parties in Beal Bank did not do so, and the Court concluded

5   that under the law of New York the agreement should be read to

6   have that preclusive effect, it seems to me that, in the

7   absence of declaring their intention, the same logic would

8   apply here.

9           It also appears to me that, having been accorded the

10  right to exercise remedies, including in respect of a default

11  of payment on the maturity date, the agent, at the direction of

12  the required lenders, also has the authority either to

13  compromise or to forbear in respect of those remedies, except

14  as expressly precluded by the agreement, and that the

15  forbearance here is not expressly precluded by the agreement.

16  See In re Delta Airlines, Inc., 370 B.R. 537, 548 through 9

17  (Bankr. S.D.N.Y. 2007), affirmed 374 B.R. 516 (S.D.N.Y. 2007).

18          The objectors point to Section 10.09 of the DIP

19  credit agreement, which is the provision dealing with

20  amendments, modification and waivers, and note, which the

21  debtor does not dispute, that under that provision, although

22  most provisions of the DIP credit agreement may be amended,

23  modified or waived at the instruction of the required lenders,

24  an extension of the final maturity date requires unanimity.

25  They state that, for all practical purposes, the final maturity

1   date is being extended here by the forbearance on exercising

2   remedies and, therefore, that the debtors' entry into the

3   accommodation agreement and the agent's and the required

4   lenders' agreement to forbear is unavailing.  I believe there

5   are two problems with this argument.  First, the accommodation

6   agreement does not, by its terms, extend the maturity date --

7   and this is not mere verbiage.  The consequences of the

8   nonextension of the maturity date have a material economic

9   effect on the debtor.  The Tranche A commitment terminates,

10  interest accrues at a higher rate and the debtors lose their

11  LIBOR interest option, and the debtor must cash-collateralize

12  letters of credit that would otherwise not require such cash

13  collateralization.  Secondly, as Chief Judge Kaye pointed out

14  in Beal Bank, the fact that forbearance has a similar effect to

15  extension is insufficient to override the parties' agreements

16  with regard to collective action to enforce their respective

17  rights under the DIP credit agreement.

18          It's also suggested that, in addition to having the

19  effect of extending the date by which the debtors would

20  actually have to pay under the DIP agreement, the accommodation

21  agreement also violates the DIP credit agreement and the DIP

22  order by recognizing the debtors' grant of an additional 200

23  million dollars of -- or acknowledgment of an additional 200

24  million dollars of secured debt for outstanding hedging

25  obligations.  The debtors have argued that they have the right,

1    in fact, the duty, to extend the lien under the DIP order at a

2    Tranche A priority to cover such obligations.  But whether or

3    not they do have such right or duty, I believe that under

4    Section 10.09, with the consent of the required lenders, they

5    have the ability to amend the DIP credit agreement to do so.

6    It is not -- such action is not within the limited group of

7    actions that require either unanimous or additional consent.

8    It is argued that the provision (v) -- I'm sorry, in (iii)(c)

9    requires such consent to amend or modify the uppercase

10   "superpriority claim" status of the lenders contemplated by

11   Section 2.25 of the DIP credit agreement.  However, the defined

12   term "superpriority claim" expressly, in the definitions

13   section of the DIP credit agreement, pertains to just that, the

14   administrative claim priority, and does not refer to the lien

15   priority or the lien rights of any particular DIP lender.

16        It was argued also that modifications of the

17   borrowing base are provided for in the accommodation agreement

18   and accordingly require the consent of a supermajority class.

19   However, I believe it is acknowledged that the 68.37 percent

20   vote gets over that hurdle, if such a hurdle, in fact, exists.

21        Consequently, I believe that, as I said before, the

22   debtors, in fact, do have the right, assuming they get the

23   requisite consents that they have received, in fact, here, to

24   enter into the accommodation agreement and obtain the

25   forbearance of the DIP lenders.  This is a different situation

1   than, again, an amendment of the extension date -- I'm sorry,

2   an extension of the maturity date by amendment or modification

3   or waiver.  I, therefore, do not find applicable or relevant

4   Citadel Equity Fund Ltd. v. Aquila, Inc., 371 F.Supp.2d 510

5   (S.D.N.Y. 2005), which involved a waiver.  Indeed, it seems to

6   me that, just as in that case, the existence of a payment date

7   that could not be waived triggered certain rights, the

8   existence of that date here triggers certain rights, i.e., the

9   right to default interest at a non-LIBOR rate and the other

10  rights that I have specified, where there is no forbearance,

11  nor could there be forbearance, as well as rights upon which

12  there can be forbearance, including the right to demand and

13  obtain, either by foreclosure or by simple pursuit of a breach

14  of contract action, payment through judgment and enforcement.

15         It's also argued that the DIP order precludes the

16  debtors from including within the Tranche A priority lien the

17  additional 200 million of potential hedging liabilities.  The

18  DIP order clearly provides that no claim or lien having a

19  priority superior to or pari passu with those granted by this

20  order to the agent of the DIP lenders shall be granted or

21  allowed only while any portion of the financing or the

22  commitments or the DIP obligations remain outstanding.  That's

23  in paragraph 13(a).

24         However, it also provides, in paragraph 13(b), that

25  the debtors shall not seek, and it shall constitute an event of

160

1    default, or if there is entered, any modification of this

2    order, without the prior written consent of the agent.  It

3    seems clear to me that by including the phrase "without the

4    prior written consent of the agent", the DIP order acknowledged

5    the ability of the agent, and the requirement that the agent,

6    in fact, honor the instructions of the required lenders, under

7    the DIP agreement if they choose to amend the DIP agreement and

8    that parties entering into the DIP agreement or purchasing a

9    DIP loan were reasonably on notice of that possibility.

10           That also, I believe, addresses the second objection

11   by the objectors, which is that the Bankruptcy Code entitles

12   them to adequate protection of their lien interests  given the

13   fact that they, as Tranche C lenders, and, I suppose, those

14   Tranche B lenders in the A/B lender group, as well, of

15   objectors, would be primed by the additional amount of hedging

16   debt included within the priority of the Tranche A lien.  One

17   can certainly read Sections 361 and 363 of the Bankruptcy Code

18   as providing for a requirement of adequate protection not only

19   to a prepetition lender but also to a post-petition lender.

20   However, in this circumstance, where an agreement which

21   includes, as among its primary features, an intercreditor

22   agreement contemplates the very thing that is argued to me as

23   giving a right to adequate protection and contemplates that

24   thing being done, notwithstanding the desire of a lender that

25   it not be done, I don't see how that lender can state that it

161

1    has not consented in advance to such action and, therefore,

2    that it cannot contend that it is therefore entitled,

3    notwithstanding its earlier consent, to adequate protection.

4         The debtors also point out that they have,

5    notwithstanding their belief that they don't need to, included

6    in the accommodation agreement various provisions that, in

7    effect, offset the potential risk to the objectors entailed by

8    being primed by the extra 200 million of hedging obligations

9    and, in fact, arguably do more than offset that risk.  Those

10   include various commitments with regard to increasing the

11   collateral package for all the lenders to cover equity in

12   foreign subsidiaries, agreements on the limitation of liens on

13   foreign collateral, a lien on litigation proceeds, various

14   covenants, approximately eighty million dollars in pay-downs,

15   and the like.  In addition, the debtors point out that hand in

16   glove with the accommodation agreement is an agreement by GM,

17   their largest customer, pursuant to which GM would be providing

18   an additional 300 million of funding subordinate to the

19   lenders' claims, as well as acceleration of trade payments to

20   the tune of 300 million, and that, were I to conclude that

21   adequate protection was required here, such concessions in the

22   accommodation agreement would be more than sufficient to equate

23   to adequate protection for the impairment of the objectors'

24   liens.

25        The objectors have disputed the actual value of the

162

1    GM commitment but have not really addressed the other issues in

2    any detail, or the other concessions in any detail, or their

3    value.  It does appear to me, though, that these concessions

4    have considerable value and are perhaps as difficult to value

5    in this context as the ultimate risk that the collateralization

6    of the extra 200 million of hedging obligations will ever have

7    an actual economic effect to the detriment of the objectors.

8    It does appear to me, however, that the blow of the amendment

9    has been considerably softened by the concessions and the

10   context of the accompanying GM agreement.  However,

11   fundamentally I conclude that, given the specified rights of

12   the lenders, both against the debtor and among themselves under

13   the DIP credit agreement, it would not be appropriate to accord

14   to the objectors additional rights, which they had not

15   previously bargained for, when, in fact, they agreed in the DIP

16   credit agreement, and more specifically in the intercreditor

17   provisions of it, that this type of amendment could be entered

18   into.

19         That, I believe, leaves the last issue before me,

20   which is the issue of whether the debtors have exercised

21   appropriate business judgment in entering into the

22   accommodation agreement and, in particular, agreeing to the

23   concessions that they have agreed to in the agreement.

24   Fundamentally, the agreement is objected to on this ground on

25   the theory that, first, the debtors, if they stood up more

1    firmly to the counterparties to the hedging obligations, would

2    not have to provide for an additional 200 million of those

3    obligations to be subject to the Tranche A lien.  The

4    consequences of the debtors being wrong on that decision,

5    however, i.e., playing chicken with the hedge fund

6    counterparties -- I'm sorry, the hedging counterparties, to my

7    mind, are very serious.  Unlike the objectors, the hedge

8    fund -- the hedging counterparties -- cannot be locked in

9    place.  They have not agreed in advance to accept limitations

10   on the exercise of their remedies to be paid a hundred cents on

11   the dollar in respect of an administrative claim, which is what

12   they would have, I believe, upon the maturity of the loan

13   occurring.  In that event, they could demand payment and pursue

14   their rights against the debtors, just as any other

15   administrative creditor who has not limited its remedies can

16   do.  Not only would the debtors' failure to make such payment

17   send exactly the wrong message to all of the parties who are

18   providing it with trade credit, but also it would, I believe,

19   start in motion a very risky set of events that could easily

20   lead to the conversion of this case in light of the failure to

21   pay administrative claims that are sought to be paid.  Again,

22   the debtors could have played chicken with the hedging

23   counterparties, but the risks of doing so were quite large.  In

24   contrast, they did not have to play chicken with the objectors

25   because of the provisions of the DIP credit agreement and DIP

164

1    order that I've already discussed.

2         Moreover, while it is true that the existence of 200

3    million dollars more of secured debt poses a risk to those who

4    are below that level, that risk is crystallized only ultimately

5    in a liquidation and, moreover, I believe, is subject to

6    considerable reduction with time through the actual maturity

7    date of the hedge contracts as opposed to the accelerated date

8    that would ensue if the hedging counterparties did not waive

9    their right based on the cross default provisions to terminate

10   the hedge or the swap.

11        Faced, then, with that choice and those potential

12   branches on the decision tree, I cannot fault the debtors'

13   business judgment for agreeing, as they have in the

14   accommodation agreement, with the parties whose agreement is

15   necessary to them.  Frankly, I had more of an issue with the

16   accommodations that the debtors have extended to the parties

17   whose agreement, I believe, was not necessary, i.e., those who

18   don't fall into the "required lender" basket, including the

19   objectors.  But I'm satisfied, given the amendments to the

20   accommodation agreement, which considerably reduced the out-of-

21   pocket accommodations or cash flow accommodations to such

22   parties, that were made in light of negotiations with GM and

23   others leading up to the amendment on the 26th, that I believe

24   the current concessions to all the lenders, including those

25   whose consent is not necessary, fall within the debtors'

1    business judgment.

2           I have also considered what I believe to be the last

3    business judgment issue raised by the objectors, which is the

4    amount of the fees paid for the negotiation of entry into the

5    accommodation agreement.  Obviously, a debtor-in-possession

6    wants to pay as few fees as it can get away with.  Similarly

7    obviously, I believe that in return for forbearance, as in

8    return for an amendment, a debtor-in-possession, or any

9    borrower but certainly a debtor-in-possession, will face the

10   need to pay fees to those who are, in fact, forbearing.  Here,

11   the fees are consistent with fees that I approved in connection

12   with the prior amendments to the DIP facility.  In fact, it is

13   represented to me, and without dispute, that they are

14   approximately one-half of the fees that were paid in connection

15   with the prior two amendments.

16          I conclude that fees not only for agreeing to an

17   extension but for assisting in persuading parties to forbear

18   and agree to forbearance are warranted.  Indeed, more work is

19   needed for forbearance, in my mind, than for an extension.

20   Consequently, I believe that the fee for those who have agreed

21   to forbear is appropriate and also that the fees for those

22   parties who facilitated the accommodation agreement by

23   assisting the debtors in obtaining the requisite consents are

24   also warranted.

25          The last point covered by the parties is whether, in

166

1    fact, the debtors have shown sufficient cause for a waiver of

2    the automatic ten-day stay under Bankruptcy Rule 6004(g) of --

3    and I guess now it's (h), an order authorizing the use, sale or

4    lease of property.  I am normally quite reluctant to authorize

5    the waiver of such provision where there has been any

6    meaningful objection to a request for the use of property out

7    of the ordinary course.  Normally, I do so in cases where there

8    is an objection only where the debtor is expecting an infusion

9    of funds and seriously requires such an infusion.  This

10   agreement is rather in the nature of a forbearance, as I've

11   said, instead of a new extension of credit or an agreement to

12   purchase, and, consequently, I don't see that fact pattern

13   here.  The debtors have argued that it's important for their

14   other admin creditors, those who provide them on a day-to-day

15   basis with trade credit, to see that they very clearly have a

16   path well into 2009 to emerge from Chapter 11, notwithstanding

17   the maturity of the DIP loan at the end of this year.  I

18   believe that my approval of their motion, as well as the

19   companion GM motion, does that and that limiting the objectors'

20   rights under Section -- or under Rule 6004 is not warranted in

21   light of that fact.

22          I have reviewed the provision of the accommodation

23   agreement that sets forth the conditions to its effectiveness,

24   and I note that in Section 33(iv) it provides that the order be

25   entered by the Bankruptcy Court in a form reasonably

167

1    satisfactory to the administrative agent on or before December

2    4th and that such order shall not have been "reversed, stayed

3    or vacated."   I would have an issue with parties trying to

4    force the Court's hand by a provision to get around Rule

5    6004(g) absent a true showing of cause, but I don't need to

6    have those issues here because I simply don't construe the

7    language that I've just read as applying to Rule 6004(g).

8    Again, the phrase is "reversed, stayed or vacated".   To my

9    mind, that very clearly contemplates an action by a court,

10   either reversing, staying, i.e., issuing an injunction to

11   prevent, or vacating the Bankruptcy Court order.   That's

12   clearly not what 6004(g) does.   Rather, I believe, it's

13   implicit in the entry of the order.

14          So, consequently, I don't find cause here to deem

15   Rule 6004(g) waived.   I believe that the Court's approval of

16   the accommodation agreement provides a level of assurance to

17   the debtor's various constituents, including those providing it

18   with trade credit, that, in fact, the DIP lenders will not be

19   enforcing their rights under the DIP credit agreement, except

20   under the conditions that the debtor has negotiated in the

21   accommodation agreement, and that the debtor accordingly has

22   achieved the opportunity that it sought to access financing to

23   emerge from Chapter 11 in 2009.

24          The original motion had attached to it a form of the

25   order approving the accommodation agreement, and there were

168

1    some provisions of it that specifically referred to the DIP

2    order.  I don't know if you've modified it in light of

3    modifications to the accommodation agreement since then, but

4    other than that, it seemed to me to be fine.

5            MR. BUTLER:  Your Honor, we're reviewing the final

6    form of it with the administrative agent, counsel of the

7    administrative agent, okay, and I guess Mr. Bernstein wants to

8    make a comment.

9            MR. BERNSTEIN:  Don Bernstein from Davis Polk &

10   Wardwell, on behalf of JPMorgan Chase.  Your Honor, in light of

11   your ruling on 6004(g), we would like to include a decretal

12   paragraph in the order which says that the conditions to

13   closing in the document shall not be construed to have applied

14   to the stay under Rule 6004(g) unless the stay is extended

15   beyond that period --

16           THE COURT:  Okay.

17           MR. BERNSTEIN:  -- in 6004(g).

18           THE COURT:  That's what I would have ruled if someone

19   raised that issue, so --

20           MR. BERNSTEIN:  Okay.

21           THE COURT:  -- that's fair.

22           MR. BERNSTEIN:  Thank you, Your Honor.

23           THE COURT:  Okay.

24           MR. SILVERSTEIN:  Your Honor, may I be heard?

25           THE COURT:  Yes.

169

1          MR. SILVERSTEIN:  Paul Silverstein for M.D. Sass.  We

2    obviously objected.  Paragraph 13 of the proposed order

3    contains a 364(e) finding, which I think should be stricken

4    because this is not a loan.  It's not an advancement of funds.

5    It's a forbearance agreement, as Your Honor characterized it.

6          MR. BUTLER:  I think the objectors themselves

7    indicated in their argument in their papers that 364 was

8    implicated here.

9          MR. SILVERSTEIN:  I didn't.

10         MR. BUTLER:  And this is --

11         MR. SILVERSTEIN:  I didn't, Mr. Butler.

12         MR. BUTLER:  Maybe one of five.

13         MR. SILVERSTEIN:  That's okay.  It's the important

14   one that counts.

15         THE COURT:  I'm looking for it.  What paragraph did

16   you say?

17         MR. SILVERSTEIN:  13, Your Honor.

18         THE COURT:  Well, my paragraph 12.

19         MR. SILVERSTEIN:  Okay.  I may not have the most

20   recent.

21      (Pause)

22         THE COURT:  I don't know.  I'll have to think about

23   that.

24         MR. SILVERSTEIN:  Thank you.

25         THE COURT:  Okay.  As I often do when I give a fairly

170

1    lengthy bench ruling, I'll go over the transcript of the ruling

2    not only for typos but in case I mangled my grammar or I wanted

3    to say something else.  And if that's the case and I change it,

4    I'll attach the amendment to my order or file it separately,

5    and that'll be my ruling as opposed to the transcript.  But the

6    ruling won't change.

7           I will consider Mr. Silverstein's 364(e) point.  As

8    often happens in these orders, it's said three different ways

9    in that paragraph, and it may be that a couple of the ways are

10   right and one of the ways is wrong.  I don't know.  I have to

11   look at it more carefully.

12          MR. BUTLER:  Your Honor, we'll also submit the

13   proposed language for the decretal paragraph.

14          THE COURT:  Okay, and you don't need to settle that

15   order, but you should copy the objectors in your e-mail to the

16   Court as well as the committee.

17          MR. BUTLER:  We will.  Thank you very much, Your

18   Honor.

19          THE COURT:  Okay.  Thank you.

20          ALL:  Thank you.

21       (Proceedings concluded at 4:16 p.m.)

22

23

24

25

171

```
1
2                          I N D E X
3
4                     T E S T I M O N Y
5    WITNESS               EXAMINATION BY            PAGE
6    John Sheehan          Mr. Werder               13
7    John Sheehan          Mr. Neier                56
8    John Sheehan          Mr. Butler               62
9
10                      E X H I B I T S
11   DEBTORS'                                        PAGE
12   1 through 130                                   12
13
14                     R U L I N G S
15                                              PAGE LINE
16   Motion to Approve GM Arrangement Second     9    18
17   Amendment Agreement Approved
18
19   Motion by Debtors-In-Possession for Approval 167  10
20   of Their Entry Into an Accommodation Agreement
21   Granted
22
23
24
25
```

172

1            C E R T I F I C A T I O N

2

3      I, Esther Accardi, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5

6      _____

7      ESTHER ACCARDI

8

9      Veritext LLC

10     200 Old Country Road

11     Suite 580

12     Mineola, New York 11501

13

14     Date: December 3, 2008

15

16

17

18

19

20

21

22

23

24

25