**Bidding Procedures Hearing Date And Time: February 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Bidding Procedures Objection Deadline: February 17, 2009 at 4:00 p.m. (prevailing Eastern time)**
**Sale Hearing Date And Time: March 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Sale Hearing Objection Deadline: March 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :
            In re                             :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
                        Debtors.              :        (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363, 365, 1123, AND 1146 AND FED. R. BANKR. P.
2002, 6004, 6006, AND 9014 (A) (I) APPROVING BIDDING PROCEDURES, (II) GRANTING CERTAIN
BID PROTECTION, (III) APPROVING FORM AND MANNER OF SALE NOTICES, AND (IV) SETTING
SALE HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE BY DELPHI AUTOMOTIVE
SYSTEMS LLC OF CERTAIN REAL PROPERTY LOCATED IN ANAHEIM, CALIFORNIA AND
(II) ASSUMPTION AND ASSIGNMENT OF RELATED EXECUTORY CONTRACT

("ANAHEIM SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this motion (the "Motion") for orders under 11 U.S.C. §§ 363, 365, 1123, and

1146 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (a)(i) approving the bidding procedures

set forth herein and attached hereto as <u>Exhibit A</u> (the "Bidding Procedures"), (ii) granting certain

Bid Protection (as hereinafter defined), (iii) approving the form and manner of sale notices (the

"Notice Procedures"), and (iv) setting a date for the sale hearing (the "Sale Hearing") and (b)

authorizing and approving (i) the sale (the "Sale") of an asset of Delphi Automotive Systems

LLC ("DAS LLC" or the "Selling Debtor Entity") comprising a certain improved parcel of real

property of approximately 21.6 acres and located in Anaheim, California (the "Anaheim

Property" or "Acquired Asset") and (ii) the assumption and assignment of an executory contract

relating to the Anaheim Property (the "Assumed Contract").  The Anaheim Property is to be sold

free and clear of liens, claims, encumbrances, and interests either to (a) Birtcher Anaheim

Magnolia Avenue, LLC (the "Purchaser") for $20 million pursuant to the Real Property Purchase

Agreement And Escrow Instructions dated December 18, 2008 and the Reinstatement and First

Amendment To Real Property Purchase Agreement And Escrow Instructions dated January 5,

2009 (together, the "Agreement") by and between the Purchaser and the Selling Debtor Entity or

(b) the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid.[1]  In

support of this Motion, the Selling Debtor Entity respectfully represents as follows:

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this
Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.
§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their
businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections
1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17,
2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official
committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.
Trustee appointed an official committee of equity holders (together with the Creditors'
Committee, the "Statutory Committees").

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of
Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-
Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with
respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court
entered an order approving the adequacy of the December 10 Disclosure Statement and granting
the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).  On
January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No.
12359) (the "Confirmation Order"), and the order became final on February 4, 2008.  Although
the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate
the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of
exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate
in a closing that was commenced but not completed and refused to fund their Investment

Agreement (as defined in the Confirmed Plan) with Delphi.[2]  On May 16, 2008, Delphi filed

complaints for damages and specific performance against the Plan Investors and related parties

who refused to honor their equity financing commitments or participate in the closing that would

have led to Delphi's successful emergence from chapter 11.  The Debtors nevertheless have

continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as

soon as practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan

Modification Approval Motion") under 11 U.S.C. § 1127 for an order approving (i) certain

modifications to the Confirmed Plan and related modifications to the December 10 Disclosure

Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.

In light of the unprecedented decline in global automotive production volumes and the deepening

of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan

Modification Approval Motion to March 24, 2009 (Docket No. 14580).  The adjournment has

facilitated the Debtors' consideration of further supplemental plan modifications required by the

current economic environment.

        4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

        5.      The statutory predicates for the relief requested herein are sections 363,

365, 1123, and 1146 of the Bankruptcy Code and rules 2002, 6004, 6006, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[2]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture
trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed
indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing
the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17,
2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the
product of an abuse of process in the bankruptcy court.

B.    Current Business Operations Of The Debtors

6.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[3]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[4]

7.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and

---

[3]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[4]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[5]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

10.     The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

11.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

---

[5]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
        valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
        calendar year 2004 was $482 million.

portfolio, operational issues, and forward-looking revenue requirements. Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

         12.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations. The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable

solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

         13.    The Confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases,

including Delphi's labor unions and GM. The effectiveness of certain of these agreements,

including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the

"Original MRA"), was conditioned on consummation of the Confirmed Plan. After the Plan

Investors refused to fund their obligations under the Investment Agreement, the Debtors

nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.    On September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

16.    Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

17.    By transferring nearly $2 billion of pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's North American unions), Delphi has made substantial progress towards achieving its pension funding strategy objectives for hourly employees.  In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to its pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18.    As a result of all the factors described above, the Debtors were able to formulate certain modifications to the Confirmed Plan, which are set forth in the Plan Modification Approval Motion filed on October 3, 2008.  Since October 3, 2008, however, the automotive industry has suffered dramatic declines.  The Debtors are working to make appropriate changes to their business plan and supplemental modifications to the Confirmed Plan in furtherance of their reorganization efforts.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

19.    By this Motion, the Selling Debtor Entity seeks approval for the sale of the Anaheim Property to the Purchaser, subject to additional competitive bidding pursuant to the proposed Bidding Procedures attached as <u>Exhibit A</u> hereto.  To effect the Sale, the Selling Debtor Entity seeks entry of two types of relief.  First, at the omnibus hearing to be held on February 24, 2009, the Selling Debtor Entity will seek entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding Procedures Order") approving the Bidding

Procedures, certain Notice Procedures, and certain Bid Protection to be provided to the Purchaser

pursuant to the Agreement and as described more fully herein.  Second, subject to the terms of

the Bidding Procedures Order, at the omnibus hearing to be held on March 24, 2009, the Selling

Debtor Entity will seek entry of an order substantially in the form attached hereto as <u>Exhibit C</u>

(the "Sale Approval Order") authorizing and approving the Sale to the Purchaser or Successful

Bidder, as the case may be, including, without limitation, the assumption and assignment of the

Assumed Contract.

        20.    As more fully set forth below, after a comprehensive review, the Selling

Debtor Entity believes that the Sale represents its best opportunity under the circumstances to

maximize the underlying core value of the Anaheim Property.  Therefore, the Sale is in the best

interests of its estate and its stakeholders.

Basis For Relief

F.    <u>The Anaheim Property</u>

        21.    The Selling Debtor Entity owns a parcel of real property of approximately

21.6 acres in Anaheim, California.  The address of the Anaheim Property is 1201 North

Magnolia, Anaheim, California.  The Anaheim Property is currently vacant and is not being used

by the Debtors.  Nor do the Debtors contemplate using the Anaheim Property in connection with

their businesses.  The Debtors have no operations at the site and seek to sell the real property to

increase liquidity.  Moreover, the Debtors seek to avoid continuing future maintenance

obligations, such as property taxes, relating to the site.  Accordingly, the Selling Debtor Entity

has determined to divest the Anaheim Property and, to that end, has worked with its listing

broker, Colliers International, to market the property for sale.

        22.    Following broad marketing efforts, the Selling Debtor Entity and the

Purchaser executed the Agreement on December 18, 2008.  The Agreement contemplates the

sale of the Anaheim Property and the assumption and assignment of an executory contract related to the Anaheim Property for $20 million.  The Selling Debtor Entity executed the Agreement because it represented the highest and best offer that the Selling Debtor Entity received for the Anaheim Property.

23.    The Selling Debtor Entity, in its business judgment, concluded that the proposal from the Purchaser, which formed the basis of the Agreement, a copy of which is attached hereto as <u>Exhibit D</u>, offered the most advantageous terms and the greatest economic benefit to the Selling Debtor Entity for the Anaheim Property.  The Selling Debtor Entity believes that the Purchaser's offer is currently the highest and best offer, providing the highest amount of consideration for the Anaheim Property which the Selling Debtor Entity believes to constitute reasonably equivalent value and fair consideration for the Anaheim Property.

G.    <u>The Assumed Contract</u>

24.    As part of the overall transaction, the Selling Debtor Entity anticipates assuming and assigning to the Purchaser or Successful Bidder, as the case may be, an agreement relating to the Anaheim Property that concerns a licensing arrangement between the owners of the Anaheim Property and the local utility company.  On October 2, 1953, General Motors Corporation ("General Motors") and Southern California Edison Company executed a License and Permit that essentially provides Southern California Edison Company or its successors a qualified license to construct, operate, and maintain electrical lines and necessary fixtures on the Anaheim Property on the terms specified in the License and Permit.  On December 10, 1998, General Motors and the Selling Debtor Entity executed an agreement that assigned General Motors' rights and obligations under the License and Permit to Delphi Automotive Systems LLC. The 1998 agreement also contained mutual indemnification provisions:  General Motors agreed

to indemnify the Selling Debtor Entity for claims in connection with General Motors' obligations under the License and Permit arising out of any occurrence in, upon, or at the property before January 1, 1999; and the Selling Debtor Entity agreed to indemnify General Motors for claims in connection with the Selling Debtor Entity's obligations under the License and Permit arising out of any occurrence in, upon, or at the property after January 1, 1999. A copy of these agreements is attached collectively as Exhibit H to the Agreement (the "Assumed Contract").

25.    The Selling Debtor Entity is not in default under the Assumed Contract and therefore does not believe any cure amount is required to assume it. Because the Selling Debtor Entity's assignment of the Assumed Contract forms part of the overall consideration supporting the Agreement, the Selling Debtor Entity believes that it is in the best interests of the Selling Debtor Entity's estate to allow the Selling Debtor Entity to assume and assign the Assumed Contract to the Purchaser or Successful Bidder, as the case may be, as part of the overall sale of the Anaheim Property.

H.    The Agreement

26.    Pursuant to the Agreement, the Selling Debtor Entity would sell the Anaheim Property to the Purchaser for $20 million (the "Purchase Price") and assume and assign the Assigned Contract to the Purchaser. The Anaheim Property would be sold free and clear of all liens (including tax liens and any statutory or common law liens, possessory or otherwise), charges, pledges, security interests, conditional sale agreements or other title retention agreements, leases, mortgages, security interests, options, or other encumbrances (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction) and any monetary amounts which are secured by any lien (collectively, the "Liens").

27.    The significant terms of the Agreement are as follows:[6]

(a)    <u>General Terms</u>.  The Purchaser would acquire the Anaheim Property, on an "as is" basis, consisting solely of the approximately 21.6 acres along with any related property agreements and all rights, easements, and entitlements, including the Assumed Contract, which as part of the sale, would be assigned to the Purchaser.

(b)    <u>Bankruptcy Court Approval</u>.  The Sale of the Anaheim Property would be subject to approval by this Court and subject to competitive bidding pursuant to the Bidding Procedures.

(c)    <u>Purchase Price</u>.  The purchase price to be paid by the Purchaser would be $20,000,000.00 for the Anaheim Property (the "Purchase Price").

(d)    <u>Deposit Escrow</u>.  Simultaneously with the expiration of the Purchaser's Inspection Period, the Purchaser placed $1,500,000.00 in an escrow account.  Upon Closing, or if the Agreement is terminated prior to Closing for certain reasons specified in the Agreement other than Purchaser's default (on the terms as provided in the Agreement), the Purchaser would be entitled to the funds in the escrow account.  Of the amount of the deposit, $100,000 would be nonrefundable, except in the event of a default of the Selling Debtor Entity or the failure of certain conditions to closing.  Moreover, if the Sale does not close solely because of the Purchaser's default (on the terms as provided in the Agreement), then the deposit would be paid to Selling Debtor Entity as full compensation and liquidated damages under and in connection with the Agreement as the Selling Debtor Entity's sole and exclusive remedy.

(e)    <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Selling Debtor Entity would provide certain standard representations and warranties relating to the Sale of the Anaheim Property, and the Purchaser would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Selling Debtor Entity and Purchaser would be true and correct as of the date of the Agreement and through and at Closing.  In addition, the Selling Debtor Entity's representations would survive for a period of six months after Closing.

(f)    <u>Release</u>.  The Purchaser would release and forever discharge the Selling Debtor Entity and its agents for claims arising out of any condition of the Anaheim Property.

(g)    <u>Environmental Matters</u>.  The Purchaser would assume all responsibility for the operation of the Property, including compliance with certain agreements concerning the site with state and local governments.  The Purchaser would waive and release any

---

[6]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of the Agreement are controlling.

environmentally-related claims pertaining to the property that it may now have or that it has against General Motors or its successors or assigns.

(h)    Insurance.  The Purchaser would be required to obtain and maintain consistent with the provisions of the Agreement, at its sole expense, the following types of insurance coverage:  (i) Commercial General Liability covering liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury, and blanket contractual liability ($1 million for each occurrence) to remain in force during the period of time the Purchaser owns the Property or ten years, which ever is later, and (ii) Pollution Legal Liability covering claims arising from environmental conditions, whether preexisting or not ($10 million per occurrence and in the aggregate) to remain in force for ten years.

(i)    License.  As contemplated in the Agreement, by this Motion, the Selling Debtor Entity is seeking an order approving its assumption and assignment to Purchaser of the Assumed Contract entered into by the Selling Debtor Entity prior to the Petition Date, listed on Exhibit H to the Agreement (an "Assumption Order").  Such order may be included as part of the Sale Order.  The Selling Debtor Entity would pay the Cure Amounts, if any, as agreed to by Selling Debtor Entity and the party to the Assumed Contract or, absent such agreement, by order of the Bankruptcy Court.

(j)    Closing Conditions.  The obligation of the parties to close the Sale would be subject to the satisfaction of the following remaining conditions: (i) all necessary approvals from the Bankruptcy Court, including the entry of the Sale Order, the Sale Order becoming final and non-appealable, and a final and non-appealable Assumption Order, (ii) the Title Company's unconditional commitment to issue an extended coverage owner's title policy in the amount of the Purchase Price showing title to the Property vested in Purchaser, (iii) the Purchaser's providing the certificates of insurance evidencing the Insurance Policies as described in the Agreement, (iv) the Purchaser's and Selling Debtor Entity's performing all of the obligations required by the terms of the Agreement to be performed by each, and (v) both of their representations and warranties shall be true and correct in all material respects on the date of Closing.

(k)    Termination.  The Agreement could be terminated prior to closing in the following circumstances: (i) by mutual written consent of Purchaser and Selling Debtor Entity, (ii) by Selling Debtor Entity if Purchaser fails to pay the Deposit in accordance with the provisions of the Agreement, (iii) by Selling Debtor Entity or Purchaser if a condition to Closing for such party's benefit is not satisfied or waived on or prior to the date of Closing, (iv) by Purchaser or Selling Debtor Entity if the Bankruptcy Court has not entered the Sale Order and Assumption Order on or before 150 days after the date of the Agreement unless such failure resulted from Selling Debtor Entity's failure to use its commercially reasonable best efforts to obtain Bankruptcy Court approval of the Sale Order, or (v) by Purchaser or Selling Debtor Entity if Selling Debtor Entity enters into an agreement to sell the Property pursuant to a Superior Offer, but only following the entry of a Superior Offer Sale Order.

(l)    Expense Reimbursement.  Upon a termination of the Agreement as the result of a Superior Offer Termination Event or upon a material default by Selling Debtor Entity that is not remedied within ten days of receiving written notification of such default, the Selling Debtor Entity would, as consideration for Purchaser's due diligence efforts in pursuit of the Sale, pay to Purchaser an amount equal to Purchaser's documented out-of-pocket due diligence expenses and other costs incurred by Purchaser (including attorneys' fees) up to $450,000 (the "Expense Reimbursement").  The Purchaser would not be entitled to the Expense Reimbursement if Purchaser was, at that time, in material default of the Agreement and Selling Debtor Entity had provided written notice of such material default prior to such termination and such default was not remedied within the cure period set forth in the Agreement.

(m)    Brokerage Fees.  To market the Anaheim Property, the Selling Debtor Entity entered into a separate brokerage agreement with Colliers International dated July 8, 2008. Brokerage fees under the agreement (the "Brokerage Fees") would be paid by the Selling Debtor Entity.  The Brokerage Fees would be 2.5% of the actual sale price.  Of that amount, 35% would be remitted by the broker to the Debtors' real estate brokerage entity, DREAL, Inc.[7]

I.    Bidding Procedures

28.    The Sale of the Anaheim Property would be subject to higher or otherwise better offers pursuant to the Bidding Procedures.  The Selling Debtor Entity believes that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Anaheim Property for the benefit of the Selling Debtor Entity's estate.  Accordingly, the Selling Debtor Entity seeks approval of the Bidding Procedures for the Sale of the Anaheim Property.

29.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and this Court's approval thereof (collectively, the "Bidding Process").

---

[7]    The broker agreement will be provided, upon request, to counsel to the Statutory Committees, counsel for the DIP lenders, and the U.S. Trustee, and it will be made available to this Court for review.  In their discretion, the Debtors also may provide copies of the broker agreement to other parties, subject to the terms of an appropriate confidentiality agreement.

30.    The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> are as follows:[8]

(a)    <u>Assets To Be Sold</u>:  The asset proposed to be sold would be the Anaheim Property.

(b)    <u>Free Of Any And All Liens</u>: The Anaheim Property would be sold free and clear of any Liens.

(c)    <u>Participation Requirements</u>:  To ensure that only bidders with a serious interest in the purchase of the Anaheim Property participate in the Bidding Process, minimal requirements for a potential bidder to become a "Qualified Bidder" would be: (i) executing a confidentiality agreement in form and substance satisfactory to the Selling Debtor Entity, (ii) providing the Selling Debtor Entity with certain financial assurances as to such bidder's ability to close a transaction, (iii) submitting a preliminary proposal reflecting the purchase price range, any property expected to be excluded, the structure and financing of the transaction, any anticipated regulatory approvals, the anticipated time frame and any anticipated impediments to obtaining such approvals, any additional conditions to closing that the qualified bidder may wish to impose, and the nature and extent of any due diligence it may wish to conduct and the date by which such due diligence would be completed, and (iv) delivering a good faith deposit in the amount of $1,500,000 (the "Good Faith Deposit") .

(d)    <u>Due Diligence</u>:  All Qualified Bidders would be afforded an opportunity to participate in the diligence process.  The Selling Debtor Entity would coordinate the diligence process and provide due diligence access and additional information as reasonably requested by any Qualified Bidders.  Any additional due diligence would not continue after the Bid Deadline.

(e)    <u>Bid Deadline</u>:  A bid deadline of 10:00 a.m. (prevailing Eastern time) on March 9, 2009 (the "Bid Deadline") would be established.  The Selling Debtor Entity could extend the Bid Deadline once or successively, but would not be obligated to do so.  If the Selling Debtor Entity extends the Bid Deadline, it would promptly notify all Qualified Bidders of such extension.

(f)    <u>Expense Reimbursement</u>:  In the event that the Selling Debtor Entity terminates the Agreement to close an alternative transaction and sell the Anaheim Property to a Successful Bidder other than the Purchaser, the Selling Debtor Entity would, in certain circumstances, be obligated to pay the Purchaser an Expense Reimbursement of up to $450,000.  The payment of the Expense Reimbursement would be governed by the provisions of the Agreement and the Bidding Procedures Order.  Notwithstanding the foregoing, the Purchaser would not be entitled to Expense Reimbursement if the Purchaser were in material breach of the Agreement or the Bidding Procedures.

---

[8]    In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary have the meanings ascribed to them in the Bidding Procedures.

(g)    Bid Requirements:  All bids would be required to include the following documents: (i) a letter stating that the bidder's offer would be irrevocable until two business days after the Closing, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules (including the deletion of the section relating to inspection period which will be substituted for the due diligence provided under these Bidding Procedures), (iii) the Good Faith Deposit, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(h)    Qualified Bids:  To be deemed a "Qualified Bid," a bid would be required to be received by the Bid Deadline and, among other things, would be required to (i) be on terms and conditions that are substantially similar to, and are not materially more burdensome or conditional to the Selling Debtor Entity than those contained in the Agreement, (ii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) have a value greater than the purchase price reflected in the Agreement, and the amount of the Expense Reimbursement, plus $500,000.00 initially, and in increments of $250,000.00 for any subsequent bid, (iv) not be conditioned on any bid protection, such as a break-up fee, termination fee, expense reimbursement, or similar type of payment, (v) contain acknowledgements and representations as set forth in the Bidding Procedures, and (vi) include a commitment to consummate the purchase of the Anaheim Property within not more than ten days after entry of this Court's order approving such purchase.  The Selling Debtor Entity would have the right, in its sole discretion, to entertain bids for the Anaheim Property that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.

(i)    Conduct Of Auction:  If the Selling Debtor Entity receives at least one Qualified Bid in addition to that of the Purchaser, it would conduct an auction (the "Auction") of the Anaheim Property at 10:00 a.m. (prevailing Eastern time) on or before March 13, 2009, or such later time as the Selling Debtor Entity notifies all Qualified Bidders who have submitted Qualified Bids, in accordance with the procedures outlined in the Bidding Procedures, which include: (i) attendance at the Auction would be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two business days prior to the Auction, each Qualified Bidder with a Qualified Bid would be required to inform the Selling Debtor Entity whether it intends to participate in the Auction and at least one business day prior to the Auction, the Selling Debtor Entity would be required to provide such bidders attending the auction with copies of the Qualified Bid or combination of Qualified Bids which the Selling Debtor Entity then believes is the highest or otherwise best offer for the Anaheim Property, (iii) all Qualified Bidders would be entitled to be present for all subsequent bids, (iv) the Selling Debtor Entity would be able to employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with the Bidding Procedures, the Bankruptcy Code, or any order of this Court entered in connection with the Sale, and (v) bidding at the Auction would begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $250,000.00, and conclude after each participating bidder has had the opportunity to submit one or more additional subsequent bids.

(j)    Selection Of Successful Bid:  As soon as practicable after the conclusion of the Auction, the Selling Debtor Entity would review each Qualified Bid and

identify the highest or otherwise best offer(s) for the Anaheim Property (the "Successful Bid")
and the bidder making such bid (the "Successful Bidder").  The Selling Debtor Entity would sell
the Anaheim Property for the highest or otherwise best Qualified Bid or combination of
Qualified Bids and the transaction would be consummated as soon as reasonably practicable
following the approval of such Qualified Bid by this Court.

      (k)    <u>Sale Hearing</u>: The Selling Debtor Entity would request that the Sale
hearing be scheduled for March 24, 2009 at 10:00 a.m. (prevailing Eastern time), and the Sale
Hearing could be adjourned or rescheduled by the Selling Debtor Entity without notice other
than by an announcement of the adjourned date at the Sale Hearing.  If the Selling Debtor Entity
does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Selling
Debtor Entity would report the same to the Bankruptcy Court at the Sale Hearing and proceed
with a sale of the Anaheim Property to the Purchaser following entry of the Sale Order.  If the
Selling Debtor Entity does receive additional Qualified Bids, then, at the Sale Hearing, the
Selling Debtor Entity would seek approval of the Successful Bid, and, at the Selling Debtor
Entity's election, one or more next highest or best Qualified Bids (each an "Alternate Bid," and
such bidder, an "Alternate Bidder").  A bid would not be deemed accepted by the Selling Debtor
Entity unless and until approved by this Court.  Following approval of the sale to the Successful
Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the
Alternate Bid would be deemed to be the Successful Bid and the Selling Debtor Entity would be
permitted to effectuate a sale to the Alternate Bidder without further order of this Court.

      (l)    <u>Return Of Good Faith Deposits</u>:  The Good Faith Deposits of all
Qualified Bidders (except for the Successful Bidder) would be held and all Qualified Bids would
remain open until two business days following the Closing of the Sale (the "Return Date").
Notwithstanding the foregoing, the Good Faith Deposit submitted by the Successful Bidder,
together with interest thereon, if any, would be applied against the payment of the Purchase Price
upon Closing of the Sale to the Successful Bidder.  If a Successful Bidder breaches its
obligations under the Bidding Procedures Order or any agreement entered into with respect to its
Successful Bid or fails to consummate an approved sale because of a breach or failure to perform
on the part of such Successful Bidder, the Selling Debtor Entity would not have any obligation to
return the Good Faith Deposit, and such Good Faith Deposit will irrevocably become property of
the Selling Debtor Entity.  Subject to the preceding sentence, on the Return Date, the Selling
Debtor Entity would return the Good Faith Deposits of all other Qualified Bidders, together with
the accrued interest thereon if any.

      (m)    <u>Reservation Of Rights</u>:  The Selling Debtor Entity, after
consultation with, among others, the Creditors' Committee, could: (i) determine which Qualified
Bid, if any, would be the highest or otherwise best offer and (ii) reject, at any time, any bid
(other than the Purchaser's bid) that is (a) inadequate or insufficient, (b) not in conformity with
the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of
the Sale, or (c) contrary to the best interests of the Selling Debtor Entity, its estate, and its
stakeholders, as determined by the Selling Debtor Entity in its sole discretion.

J.       Bid Protection

31.      At various times over the course of the preceding months, the Purchaser
has expended, and likely will continue to expend, considerable time, money, and energy
pursuing the Sale and has engaged in extended arm's length and good faith negotiations
regarding a possible sale.  The Agreement is the culmination of these efforts.

32.      In recognition of this expenditure of time, energy, and resources, the
Selling Debtor Entity has agreed to provide certain bid protection (the "Bid Protection").
Specifically, the Agreement provides for, and the Selling Debtor Entity respectfully requests that
the Bidding Procedures Order approve, the Expense Reimbursement payable by the Selling
Debtor Entity to the Purchaser in the amount of $450,000 if, in certain circumstances, the Selling
Debtor Entity terminates the Agreement in order to close an alternative transaction with a
Successful Bidder.

33.      The Selling Debtor Entity believes that the proposed Bid Protection is fair
and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation
undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's
efforts would maximize the value of the Anaheim Property for the benefit of all stakeholders,
whether as a result of consummating the Sale pursuant to the Agreement or eliciting the highest
or otherwise best offer to be submitted at any Auction.

34.      The Purchaser is unwilling to keep open its offer to purchase the Anaheim
Property under the terms of the Agreement unless this Court authorizes payment of the Bid
Protection.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid
Protection, the Selling Debtor Entity may lose the opportunity to obtain what it believes to be the
highest and best offer for the Anaheim Property. Approving the Bid Protection will commit the
Purchaser to serve as the stalking horse bidder under the Agreement, and the Purchaser's bid

would serve to start any additional bidding for the Anaheim Property at a fair and reasonable purchase price.

35.     Payment of the Expense Reimbursement will not diminish the Selling Debtor Entity's estate.  The Selling Debtor Entity would not expect to pay the Expense Reimbursement unless it does so to accept an alternative Successful Bid, which would result in even greater value to the Selling Debtor Entity's estate and its stakeholders.  The Selling Debtor Entity thus requests that this Court authorize payment of the Expense Reimbursement pursuant to the terms and conditions of the Agreement.

K.     Assumption And Assignment Of Contract

36.     The Selling Debtor Entity seeks authority under section 365 of the Bankruptcy Code to assume and assign the Assumed Contract to the Purchaser or the Successful Bidder, as the case may be.  The Selling Debtor Entity is not in default under the Assumed Contract and therefore does not believe any cure amount is required to assume it.  With respect to the Assumed Contract, at least 20 days prior to the Sale Hearing, the Selling Debtor Entity proposes to file with this Court and serve on each non-Debtor party to the Assumed Contract a cure notice substantially in the form attached hereto as Exhibit E (the "Cure Notice").  The Cure Notice would state, with respect to the Assumed Contract, the cure amount that the Selling Debtor Entity believes is necessary to assume the Assumed Contract pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and would notify the contract party that its contract would be assumed and assigned to the Purchaser to be identified at the conclusion of the Auction.  In addition, such Cure Amounts would be listed on a schedule to the Sale Approval Order.

37.     The Debtors propose that any objection to the Cure Amount would be required to be filed within ten days of the date of the Cure Notice and served as set forth in the

Cure Notice.  Any objection to the Cure Amount would be required to state with specificity what cure amount the party to the Assumed Contract believes is required, including appropriate documentation thereof.  If no objection is timely received, the Cure Amount set forth in the Cure Notice would be controlling notwithstanding anything to the contrary in the Assumed Contract or other document, and the non-Debtor party to the Assumed Contract would be forever barred from asserting any other claims against the Selling Debtor Entity, the Purchaser, or the Successful Bidder (as the case may be) or the property of any of them, as to such Assumed Contract.

38.    In addition, at least 20 days prior to the Sale Hearing, the Selling Debtor Entity proposes to file with this Court and serve on the non-Debtor party to the Assigned Contract a notice substantially in the form attached hereto as Exhibit F (the "Purchaser Assumption/Assignment Notice").  The Purchaser Assumption/Assignment Notice would identify the Purchaser as the party that would be assigned all of the Selling Debtor Entity's right, title, and interest in the Assigned Contract, subject to completion of the bidding process provided under the Bidding Procedures.[9]  The non-Debtor party to the Assumed Contract would be required to file an objection to the assumption and/or assignment of the Assumed Contract within ten days of service of the Purchaser Assumption/Assignment Notice, and such party would be required to state, with specificity, the legal and factual basis of their objection, unless otherwise ordered by this Court.

39.    On the later to occur of 20 days prior to the Sale Hearing or on the business day following the Bid Deadline, the Selling Debtor Entity proposes to send a notice (the

---

[9]    The Selling Debtor Entity proposes to serve the Purchaser Assumption/Assignment Notice and the Qualified Bidder Assumption/Assignment Notice (as defined below) upon the non-Debtor counterparty to the Assumed Contract as a means of fulfilling any requirement under the applicable contract to provide notice of assignment.

"Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as

Exhibit G, to each non-Debtor party to the Assigned Contract identifying any Qualified Bidders

as potential parties to which the Assigned Contract would be assigned.  The Qualified Bidder

Assumption/Assignment Notice would give the Selling Debtor Entity the ability to address

promptly any adequate assurance issues that the non-Debtor party has with any of the Qualified

Bidders.  The non-Debtor party to the Assumed Contract would be required to file an objection

to the assumption and/or assignment of the Assumed Contract within ten days from the service

of the Qualified Bidder Assumption/Assignment Notice, and such party would be required to

state, with specificity, the legal and factual basis of its objection, unless otherwise ordered by this

Court.

L.      Notice Of Sale Hearing

            40.      Within five days after entry of the Bidding Procedures Order (the "Mailing

Date"), the Selling Debtor Entity (or its agent) proposes to serve the Motion, the Agreement, the

proposed Sale Approval Order, the Bidding Procedures, and a copy of the Bidding Procedures

Order by first-class mail, postage prepaid, upon (i) the U.S. Trustee, (ii) counsel for the

Purchaser, (iii) counsel for the Creditors' Committee, (iv) counsel for the Equity Committee, (v)

counsel for the Debtors' postpetition credit facility, (vi) all entities known to have expressed an

interest in a transaction with respect to the Anaheim Property during the past six months,[10] (vii)

all entities known to have asserted any lien, claim, interest, or encumbrance in or upon the

Anaheim Property, (viii) all federal, state, and local regulatory or taxing authorities or recording

offices, including but not limited to environmental regulatory authorities, which have a

reasonably known interest in the relief requested by the Motion, (ix) the United States Attorney's

---

[10]     All such entities would be served by electronic mail, in addition to overnight mail, to the extent the Debtors
have electronic mail addresses for such parties.

office, (x) the United States Department of Justice, (xi) the Securities and Exchange

Commission, (xii) the Internal Revenue Service, (xiii) all entities on the Master Service List (as

defined by the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P.

2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures (Docket No. 2883) (the "Supplemental Case

Management Order")), (xiv) the party to the Assumed Contract, and (xv) such other entities as

are required to be served with notices under the Supplemental Case Management Order.

M.    Publication Notice

        41.    The Selling Debtor Entity also proposes pursuant to Fed. R. Bankr. P.

2002(l) and 2002(d) to publish a notice of the Sale in a form substantially similar to the form

annexed hereto as Exhibit H in the Wall Street Journal, the New York Times, and the Los

Angeles Times within five days of entry of the Bidding Procedures Order or as soon as

practicable thereafter.  The Selling Debtor Entity requests that such publication notice be deemed

proper notice to any other interested parties whose identities are unknown to the Selling Debtor

Entity.

Applicable Authority

N.    Approval Of Bidding Procedures

        42.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See Comm. Of Equity

Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business

judgment rule requires finding that good business reason exists to grant debtor's application

under section 363(b)); see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).

43.     The Second Circuit has held that, although the bankruptcy court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." Orion Pictures Corp. v. Showtime Network, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993). This Court's consideration of a debtor's section 363(b) motion is a "summary proceeding," intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Id. at 1098-99.

44.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

45.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

46.    As set forth above, the Selling Debtor Entity has sound business justifications for pursuing a sale process at this time.  The Anaheim Property is currently vacant and is not being used by the Debtors.  Nor do the Debtors contemplate using the Anaheim Property in connection with their businesses.  The Debtors have no operations at the site and seek to sell the real property to increase liquidity.  Moreover, the Debtors seek to avoid continuing future maintenance obligations relating to the site, including the payment of property taxes.

47.    The Selling Debtor Entity submits that the Bidding Procedures would encourage competitive bidding.  Such procedures would also permit the Selling Debtor Entity to insist that competing bids be materially higher or otherwise better than the Agreement, which would produce a clear benefit to the Selling Debtor Entity, its estate, its stakeholders, and all other parties-in-interest.  A prospective purchaser of assets from a chapter 11 debtor may be reluctant to make an offer because it knows that even if it reaches agreement with the debtor, its offer will be subject to a higher bid by another party.  Pre-approved bidding procedures address these concerns by assuring initial bidders that any auction procedure will be predictable and reasonable.  Thus, the Selling Debtor Entity submits that the use of the Bidding Procedures also reflects sound business judgment.

O.    Sale Of The Anaheim Property Free And Clear Of Liens

48.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

49.    Therefore, section 363(f) permits the Selling Debtor Entity to sell the Anaheim Property free and clear of Liens.  Any Lien that is not the result of an assumed liability satisfies at least one of the five conditions of 11 U.S.C. § 363(f), and the Selling Debtor Entity submits that any such Lien will be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and defenses the Selling Debtor Entity may possess with respect thereto.  Accordingly, the Selling Debtor Entity requests that the Anaheim Property be transferred to the Purchaser or the Successful Bidder, as the case may be, free and clear of all Liens.

P.    The Purchaser Is A Good Faith Purchaser Pursuant To Section 363(m) Of The Bankruptcy Code And The Transaction Contemplated By The Agreement Should Carry The Protections Of Section 363(n) Of The Bankruptcy Code

50.    Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in <u>In re Gucci</u> held that the

> good faith of a purchaser is shown by the integrity of his conduct during
> the course of the sale proceedings; where there is a lack of such integrity,
> a good faith finding may not be made.  A purchaser's good faith is lost by
> 'fraud, collusion between the purchaser and other bidders or the trustee, or
> an attempt to take grossly unfair advantage of other bidders.'

126 F.3d 380, 390 (2d Cir. 1997) (quoting <u>In re Rock Industries Machinery Corp.</u>, 572 F.2d

1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m)));

<u>see</u> <u>also</u> <u>Evergreen Int'l Airlines Inc. v. Pan Am Corp.</u> (In re Pam Am Corp.), Case Nos. 91 Civ.

8319 (LMM) to 91 Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); <u>In re

Sasson Jeans, Inc.</u>, 90 B.R. 608, 610 (S.D.N.Y. 1988).

51.    Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

> The trustee may avoid a sale under this section if the sale price was
> controlled by an agreement among potential bidders at such sale, or may
> recover from a party to such agreement any amount by which the value of
> the property sold exceeds the price at which such sale was consummated,
> and may recover any costs, attorneys' fees, or expenses incurred in
> avoiding such sale or recovering such amount.

11 U.S.C. § 363(m).

52.    The Selling Debtor Entity submits, and will present evidence at the Sale

Hearing, that the Agreement reflects an intensely negotiated, arm's length transaction.

Throughout the negotiations, the Purchaser has at all times acted in good faith.  Moreover, to the

extent that the assets are sold to a Successful Bidder, it will be because of a well-planned

competitive process and intense negotiations at arm's length to be conducted at an Auction.  As a

result of the foregoing, the Selling Debtor Entity requests that this Court make a finding that the

Purchase Price to be paid by the Purchaser constitutes reasonably equivalent value and fair

consideration under applicable law for the Anaheim Property.

53.    The Selling Debtor Entity, therefore, requests that this Court make a
finding that the Purchaser has purchased the Anaheim Property and been assigned the Assigned
Contract in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Further,
the Selling Debtor Entity requests that this Court make a finding that the asset purchase
agreement reached as a result of the Bidding Procedures necessarily will comprise an arm's
length, intensely-negotiated transaction entitled to the protections of section 363(m) of the
Bankruptcy Code.  Because the Selling Debtor Entity has shown that the Purchaser's successful
bid is not the product of fraud or collusion between the Purchaser and other bidders or the
trustee, or an attempt to take grossly unfair advantage of other bidders, the Selling Debtor Entity
further requests that this Court make a finding that the transactions contemplated by the
Agreement are not avoidable under section 363(n) of the Bankruptcy Code.

Q.    Approval Of The Bid Protection

54.    Bidding incentives encourage potential bidders to invest the requisite time,
money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to
the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11
process.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992)
(bidding incentives may "be legitimately necessary to convince a white knight to enter the
bidding by providing some form of compensation for the risks it is undertaking") (citation
omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.
In re Global Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has
seriously argued the inapplicability of the business judgment test, and if any such argument had
been made, the Court would be compelled . . . to reject it."); In re Bethlehem Steel Corp., Case
No. 02 Civ. 2854 (MBM), 2003 WL 21738964 at *8 n.13 (S.D.N.Y. July 28, 2003) (the court

should approve agreements providing bidding incentives "unless they are unreasonable or appear more likely to chill the bidding process than to enhance it").  One court, explaining the force of the business judgment rule in this context, stated "the business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large."  In re Integrated Resources, 147 B.R. at 660.

55.    In this district, courts have established a three part-test for determining when to permit bidding incentives.  The three factors are: "whether (i) the relationship of parties who negotiated breakup fee is tainted by self-dealing or manipulation, (ii) the fee hampers, rather than encourages, bidding, and (iii) the amount of the fee is unreasonable relative to purchase price." Id.

56.    Here, the Selling Debtor Entity seeks authority to utilize the Bidding Process and Bid Protection in the event that the Purchaser is not ultimately the Successful Bidder or must increase its price to become the Successful Bidder.  The Bid Protection is fair and reasonable in amount, particularly in view of the efforts previously made and to be made by the Purchaser and the risk to the Purchaser of being used as a stalking horse.  Moreover, any payment under the proposed Expense Reimbursement – $450,000 or 2.25% of the initial $20 million purchase price – not only constitutes a fair and reasonable percentage of a proposed purchase price, but is within the range that is customary for similar transactions of this type in the bankruptcy context.  See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closed superior transaction); In re Genuity Inc., Case No. 02-43558 (PCB)(Bankr. S.D.N.Y. 2002) (allowing 4.13% break-up fee if court approved

alternative transaction); <u>In re PSINet, Inc.</u>, Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001)

(permitting 4.28% break-up fee in the event that seller consummated transaction with alternative

bidder); <u>In re Teligent, Inc.</u>, Case No. 01-12974 (SMB) (Bankr. S.D.N.Y. 2001) (allowing break

up fee ranging from 1.3% to 4.25% depending on value of alternative transaction).  In addition,

the payment of the Expense Reimbursement is reasonable in light of the significant investment in

time and resources that the Purchaser would have contributed as the stalking horse bidder.

       57.     The Selling Debtor Entity submits that the Bidding Procedures would

encourage competitive bidding because the Purchaser would not have entered into the

Agreement without such provisions.  Such procedures also permit the Selling Debtor Entity to

insist that competing bids be materially higher or otherwise better than the Agreement, which

will produce a clear benefit to the Selling Debtor Entity, its estate, its stakeholders, and all other

parties-in-interest.

R.      <u>The Assumption And Assignment Of The Assumed Contract</u>

       58.     Section 365(f)(2) of the Bankruptcy Code provides that:

The trustee may assign an executory contract or unexpired lease of the debtor
only if –

(A)    the trustee assumes such contract or lease in accordance with the
provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract
or lease is provided, whether or not there has been a default in such contract or
lease.

11 U.S.C. § 365(f)(2).

       59.     Under section 365(a) of the Bankruptcy Code a debtor, "subject to the

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements

for assuming an unexpired lease or executory contract of a debtor.  It provides:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of
> the debtor, the trustee may not assume such contract or lease unless, at the time of
> the assumption of such contract or lease, the trustee –
>
>> (A)      cures, or provides adequate assurance that the trustee will promptly
>> cure, such default;
>
>> (B)      compensates, or provides adequate assurance that the trustee will
>> promptly compensate, a party other than the debtor to such contract or lease, for
>> any actual pecuniary loss to such party resulting from such default; and
>
>> (C)      provides adequate assurance of future performance under such
>> contract or lease.

11 U.S.C. § 365(b)(1).

60.     Courts give the phrase "adequate assurance of future performance" a

"practical, pragmatic construction."  EBG Midtown S. Corp. v. Mcharen/Hart Envtl. Eng'g Corp.

(In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d

Cir. 1993) (presence of adequate assurance should be "determined under the facts of each

particular case"); see also In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983)

(holding that adequate assurance was furnished on two separate grounds).  Courts have

consistently held that the phrase does not require total assurances.  See In re Natco Indus., Inc.,

54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor

will thrive and make a profit."); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D.

Fla. 1994) (although no single solution will satisfy every case, the required assurance will fall

"considerably short of an absolute guaranty of performance").  In fact, adequate assurance has

been provided by demonstrating the purchaser's financial health and experience in managing the

type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr.

S.D.N.Y. 1986) (adequate assurance of future performance existed when prospective assignee of lease from debtor had financial resources and had expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

61.    To the extent that any defaults exist under the prepetition executory contract that is to be assumed and assigned in connection with the sale of the Anaheim Property, the Selling Debtor Entity would cure any such default.  Moreover, the Purchaser or Successful Bidder, as the case may be, will have the financial resources to perform under the Assumed Contract.  If necessary, the Selling Debtor Entity and/or the Purchaser or Successful Bidder, as the case may be, will adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Purchaser or the Successful Bidder, as the case may be, their experience in the industry, and their willingness and ability to perform under the contract to be assumed and assigned to them.

62.    The Sale Hearing therefore will provide this Court and other parties-in-interest ample opportunity to evaluate and, if necessary, challenge the ability of the Purchaser or the Successful Bidder, as the case may be, to provide adequate assurance of future performance under the contract to be assumed.  This Court therefore should have a sufficient basis to authorize the Selling Debtor Entity to assume and assign the Assumed Contract as set forth in the Agreement.

S.    Divestiture Authority And Relief From Transfer Taxes Pursuant to Articles 7.29 And
       7.30 Of The Plan And Sections 363, 1123, And 1146 Of The Bankruptcy Code

63.    The Debtors decided to sell or wind-down their non-core product lines that do not fit into the Company's future strategic framework as part of their transformation plan. Article 7.29 of the Plan contemplates that the Debtors might enter into transactions to continue to divest their non-core businesses and assets and that the Bankruptcy Court may enter an order, on or prior to the effective date of the Plan, authorizing the Debtor(s) to sell assets free and clear of

liens, claims, and encumbrances, pursuant to section 363 and 1123 of the Bankruptcy Code. As

described above, section 363(b) of the Bankruptcy Code permits debtors to sell property of the

estate outside of the ordinary course of business upon notice and a hearing. Correspondingly,

section 1123(a)(5)(D) of the Bankruptcy Code allows a confirmed plan of reorganization to

provide for the sale of property of the estate free and clear of any lien. The Selling Debtor Entity

is, therefore, authorized pursuant to the Plan to seek the relief requested in the Motion.

   64.  Furthermore, Article 7.30 of the Plan provides that:

> Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from a Debtor
> to a Reorganized Debtor or to any other Person or entity pursuant to this Plan, or
> any agreement regarding the transfer of title to or ownership of any of the
> Debtors' real or personal property, shall not be subject to any stamp taxes and any
> other similar tax or governmental assessment to the fullest extent contemplated by
> section 1146(c) of the Bankruptcy Code, and the Confirmation Order shall direct
> the appropriate state or local governmental officials or agents to forego the
> collection of any such tax or governmental assessment and to accept for filing and
> recordation any of the foregoing instruments or other documents without the
> payment of any such tax or governmental assessment.

   65.  Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer, or

exchange of a security, or the making or delivery of an instrument of transfer under a plan

confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax

or similar tax." 11 U.S.C. § 1146(c). In a recent case, the Supreme Court held that transfers

pursuant to a plan of reorganization must occur after confirmation of such plan to avoid transfer

taxes. Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2339 (2008).

Likewise, it is well established in the Second Circuit that the section 1146(c) transfer-tax

exemption applies to property sold postconfirmation. In re Jacoby-Bender, Inc., 758 F.2d 840,

841 (2d Cir. 1985). In light of the foregoing, the Selling Debtor Entity submits that the Sale

should be exempt under section 1146(c) of the Bankruptcy Code from any stamp, transfer, sales,

recording, or similar taxes.

T.    Conclusion

66.    The Selling Debtor Entity submits that the relief requested in this Motion, including the Bidding Procedures, Bid Protection, Notice Procedures, the setting of a Sale Hearing, and the entry of an order approving the Sale of the Anaheim Property free and clear of Liens to the Purchaser or to the Successful Bidder, as the case may be, and assuming and assigning the Assumed Contract, are in the best interests of the Selling Debtor Entity's estate and will maximize value for all stakeholders.

Notice

67.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Thirteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered December 4, 2008 (Docket No. 14534).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

68.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Selling Debtor Entity respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Selling Debtor Entity respectfully requests that this Court enter an order (a)(i) approving the Bidding Procedures, (ii) granting certain Bid Protection, (iii) approving the Notice Procedures, and (iv) setting the Sale Hearing, (b) authorizing and approving (i) the Sale of the Anaheim Property by the Selling Debtor Entity free and clear of Liens to the Purchaser or to the Successful Bidder, as the case may be, and (ii) the assumption and assignment of the Assumed Contract, and (c) granting the Selling Debtor Entity such other and further relief as is just.

Dated:  New York, New York
        February 4, 2009

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP

By:  */s/ John Wm. Butler*
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

        - and -

By:  */s/ Kayalyn A. Marafioti*
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession