**Hearing Date and Time:  February 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline:  February 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

MOTION FOR ORDER AUTHORIZING DEBTORS TO
(I) ENTER INTO AMENDMENT TO ACCOMMODATION AGREEMENT WITH
CERTAIN PARTICIPATING DIP LENDERS AND (II)(A) ENTER INTO
RELATED DOCUMENTS AND (B) PAY FEES AND EXPENSES IN CONNECTION THEREWITH

("ACCOMMODATION AMENDMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion For Order Authorizing Debtors To (I) Enter Into Amendment To Accommodation Agreement With Certain Participating DIP Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses In Connection Therewith (the "Motion"), and respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

3.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court entered an order approving the adequacy of the December 10 Disclosure Statement and granting

the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).  On

January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No.

12359) (the "Confirmation Order"), and the order became final on February 4, 2008.  Although

the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate

the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of

exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate

in a closing that was commenced but not completed and refused to fund their Investment

Agreement (as defined in the Confirmed Plan) with Delphi.[1]  On May 16, 2008, Delphi filed

complaints for damages and specific performance against the Plan Investors and related parties

who refused to honor their equity financing commitments or participate in the closing that would

have led to Delphi's successful emergence from chapter 11.  The Debtors nevertheless have

continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as

soon as practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan

Modification Approval Motion") under 11 U.S.C. § 1127 for an order approving (i) certain

modifications to the Confirmed Plan and related modifications to the December 10 Disclosure

Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified.

In light of the unprecedented decline in global automotive production volumes and the deepening

of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan

Modification Approval Motion to March 24, 2009 (Docket No. 14580).  The adjournment has

---

[1]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture
trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed
indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing
the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17,
2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the
product of an abuse of process in the bankruptcy court.

facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are sections 363 and 364 of the Bankruptcy Code and rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

6.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[3]

7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and

---

[2]   The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[3]   On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

8.       Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.       <u>Events Leading To The Chapter 11 Filing</u>

9.       In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee

special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

---

[4]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
calendar year 2004 was $482 million.

10.    The Debtors believe that the Company's financial performance

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production

environment for domestic OEMs resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (iii) increasing

commodity prices.

11.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

6

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.    On September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

16.    Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

17.    By transferring nearly $2 billion of pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's North American unions), Delphi has made substantial progress towards achieving its pension funding strategy objectives for hourly employees.  In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to its pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18.    As a result of all the factors described above, the Debtors were able to formulate certain modifications to the Confirmed Plan, which are set forth in the Plan Modification Approval Motion filed on October 3, 2008.  Since October 3, 2008, however, the automotive industry has suffered dramatic declines.  The Debtors are working to make appropriate changes to their business plan and supplemental modifications to the Confirmed Plan in furtherance of their reorganization efforts.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the

8

Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.    The Accommodation Agreement

19.    In the fourth quarter of 2008, facing frozen global credit markets and one of the worst bear markets in the history of the global capital markets, the Debtors negotiated an accommodation agreement (the "Accommodation Agreement")[5] with the administrative agent (the "Agent") and the requisite percentage of lenders from tranche A and tranche B (the "Required Lenders")[6] of the Debtors' approximately $4.35 billion DIP facility (the "DIP Facility").[7] Under the Accommodation Agreement, and subject to the terms and conditions set forth therein, the Debtors could continue using the proceeds of the DIP Facility to the extent already drawn by the effective date of the Accommodation Agreement, through June 30, 2009 (the "Accommodation Period") notwithstanding the occurrence of certain events of default under the DIP Facility, including the passing of the Maturity Date on December 31, 2008.  This Court authorized the Debtors to enter into the Accommodation Agreement by order entered on December 3, 2008 (the "Accommodation Order") (Docket No. 14515) and the parties subsequently effectuated the agreement on December 12, 2008.[8]

---

[5]    A copy of the Accommodation Agreement is attached as Exhibit A to the Accommodation Order.

[6]    Although under the terms of the Second Amended and Restated DIP Credit Agreement the Debtors were not required to seek the tranche C lenders' consent to the Accommodation Agreement, to encourage tranche C lenders to assist the Debtors with their emergence capital funding efforts, the Debtors nevertheless sought and obtained this Court's approval of certain incentives for those tranche C lenders which consented to the Accommodation Agreement.

[7]    The history of the DIP Facility is described in detail in the Debtors' Expedited Motion For Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, filed on November 7, 2008 (Docket No. 14408) (the "Accommodation Motion").

[8]    As described more fully in the Accommodation Motion, under the terms of the Accommodation Agreement, the Accommodation Period may be shortened to May 5, 2009 if the Debtors do not meet certain milestones in connection with the Debtors' plan of reorganization.

20.     When the Debtors received this Court's authorization to enter into and consummate the Accommodation Agreement, they believed that they had secured a transparent liquidity runway that would be sufficient to allow them to weather the ongoing economic recession, negotiate further modifications to the Confirmed Plan to maximize value for all stakeholders, and emerge from chapter 11 as soon as practicable.

G.     Subsequent Challenges To The Global Economy, Capital Markets, And Auto Industry

21.     In December 2008 and January 2009, the outlook for the global automotive industry took a dramatic turn for the worse, with volumes, both domestic and global, plummeting to historic lows.  On December 2, 2008, GM projected production of 600,000 vehicles for the first quarter of 2009, a 32% reduction from its first quarter 2008 production.  Just ten days later on December 12, however, GM reduced that projection by another 30% to 420,000 vehicles, resulting in a 53% reduction from the same period in 2008.  On February 3, 2009, however, GM further reduced projected production for the first quarter of 2009 to 380,000 vehicles, down approximately 57% from the same period in 2008.  Further, GM announced on January 12, 2009 that it was reducing its forecast for 2009 North American vehicle sales to 10.5 million units for North American vehicle sales, a staggering 3.2 million fewer units than were sold in 2008 and 6 million fewer than were sold in 2007.

22.     As a result of these unprecedented volume declines, certain of the provisions and covenants contained in the Accommodation Agreement are no longer practical.  Accordingly, to remain in compliance with the Accommodation Agreement and maximize available liquidity, the Debtors and the Amendment Participant Lenders (as defined below) negotiated, and on January 30, 2009 executed, an agreement to amend the Accommodation Agreement as described below.

10

Relief Requested

23.    By this Motion, the Debtors seek entry of an order authorizing them to (i)
enter into the Accommodation Amendment (as defined below) with the Amendment Participant
Lenders (as defined below) and (ii)(a) enter into related documents and (b) pay fees and
expenses in connection therewith.  Although the Debtors, the Agent, and the Amendment
Participant Lenders do not otherwise believe that the Accommodation Amendment requires
Court approval prior to becoming effective, the Debtors agreed to seek such approval for the
avoidance of doubt.  Under the terms of the Accommodation Amendment, this Court's approval
of the agreement and the payment of related fees and expenses are conditions subsequent to the
effectiveness of the Accommodation Amendment.

Basis For Relief

24.    On January 30, 2009 the Debtors entered into an agreement with the
requisite percentage of DIP lenders (the "DIP Lenders") to amend certain provisions of the
Accommodation Agreement (the "Accommodation Amendment").[9]  The Accommodation
Amendment, which reflects overwhelming support from the DIP Lenders party to the
Accommodation Agreement (the "Participant Lenders"), provides for (i) a new cash collateral
basket of up to $117 million to be included in the Debtors' Accommodation Period borrowing
base that may, as described below, be permanently released to the Debtors if they meet certain
conditions, (ii) resetting the EBITDAR covenant to take into account the current global
economic and automotive environment, and (iii) if certain conditions are met, reducing the
liquidity covenant from $100 million to $50 million, as described more fully below.[10]  Entry into

---

[9]    A copy of the Accommodation Amendment is attached hereto as Exhibit A.

[10]    In addition, concurrently herewith, the Debtors have filed a Motion For Order Authorizing Debtors To Enter
Into (I) Third Amendment To Arrangement With General Motors Corporation And (II) First Amendment To
Partial Temporary Accelerated Payment Agreement With General Motors Corporation, by which they seek

11

the Accommodation Amendment not only demonstrates the DIP Lenders' support for the

Debtors' ongoing restructuring efforts, but also is a necessary step to enable the Debtors to

maintain operations during the Accommodation Period with sufficient and uninterrupted

liquidity.

H.    The Accommodation Amendment

25.    As this Court recognized in granting the Accommodation Order, the

Debtors and the DIP Lenders incorporated a collective action concept into the DIP Credit

Agreement whereby a certain percentage of DIP Lenders from specific tranches could direct the

Agent to take or not take certain actions in response to an Event of Default thereunder.  This

collective action concept was incorporated in a modified form into the Accommodation

Agreement, allowing the Debtors and a certain percentage of DIP Lenders to negotiate changes

to the Accommodation Agreement without needing the unanimous consent of the individual DIP

Lenders.[11]

26.    With the support of the Agent and a recently-formed steering committee

consisting of members from all three tranches of the DIP Facility (the "DIP Steering

Committee"), the Debtors have reached an agreement to amend the Accommodation Agreement

with approximately 97% of the Participant Lenders (the "Amendment Participant Lenders"),

significantly more than the percentage required under the Accommodation Agreement.  These

amendments are necessary to preserve liquidity for all stakeholders as the Debtors continue their

_____

approval of two agreements with GM, executed on January 30, 2009, which provide for (i) further acceleration
of GM's pull-forward payments, subject to certain conditions (the "Pull-Forward Amendment") and (ii)
technical amendments necessary to align Delphi's liquidity support agreement with GM (as amended from time
to time, the "GM Arrangement") with the terms of the Accommodation Amendment and the Pull-Forward
Amendment.

[11]    Under section 38 of the Accommodation Agreement, modifications, amendments, or waiver of any of the
provisions of the Accommodation Agreement require the consent of (i) Participant Lenders holding more than
50% of the sum of tranche A, tranche B, and tranche C commitments and exposure by amount (the "Required
Total Participant Lenders") and (ii) Participant Lenders holding more that 50% of the sum of tranche A and
tranche B commitments and exposure by amount.

restructuring efforts in the face of unprecedented North American vehicle production volume
declines, a global slowdown in vehicle sales, and the ongoing deep economic recession.  The
Debtors and the Amendment Participant Lenders have agreed to amend the Accommodation
Agreement as follows.

    27. First, the parties have agreed to create a new cash collateral basket
whereby the Debtors would be able to deposit up to an aggregate of $117 million in cash and/or
certain permitted securities (the "Accommodation Amendment Cash Collateral") in an account or
accounts controlled by the Agent, with the amount of these deposits being included in the
Debtors' Accommodation Period borrowing base.  By including this cash collateral basket in the
Accommodation Period borrowing base, the Debtors would preserve critical liquidity by not
having to make mandatory prepayments to the tranche A and B DIP Lenders of up to $117
million pursuant to section 3(e)(i) of the Accommodation Agreement.  Upon the Debtors'
request, the Accommodation Amendment Cash Collateral may subsequently be released to the
Debtors permanently, if at the time of such request the Debtors (i) have satisfied the
Accommodation Agreement milestone of having filed modifications to the Confirmed Plan or a
new plan of reorganization that has become a Satisfactory Reorganization Plan, as defined in the
Accommodation Agreement and (ii) have an effective agreement with GM for the commitment
of no less than $450 million in liquidity support under the GM Arrangement by March 24, 2009.
Further, after giving effect to such a transfer of Accommodation Amendment Cash Collateral (i)
there can be no continuing default or event of default under the Second Amended and Restated
DIP Credit Agreement or the Accommodation Agreement (other than "Specified Defaults" as
defined in the Accommodation Agreement) and (ii) the Debtors must be in compliance with the
Accommodation Period borrowing base covenant set forth in section 3(e)(i) of the
Accommodation Agreement.  The Debtors would be required to apply the Accommodation

13

Amendment Cash Collateral to repayment of the tranche A and tranche B loans within one

business day after any of the following events not occurring:

> (i) by February 17 and February 20, respectively, Delphi has delivered to the Agent certain reports containing the information set forth on Schedule I to the Accommodation Amendment (the "February 17 and 20 Reports");[12]

> (ii) a majority of the Amendment Participant Lenders have not notified Delphi that the February 17 and 20 Reports are not satisfactory by March 6, 2009;

> (iii) by no later than February 27, 2009, in accordance with the Accommodation Agreement milestones, the Debtors have filed a Reorganization Plan, as defined in the Accommodation Agreement, or modifications to the Confirmed Plan;

> (iv) the Administrative Agent has not notified Delphi within ten business days of filing such Reorganization Plan or modifications to the Confirmed Plan that such plan or modifications are not satisfactory to either the Required Lenders or the Required Total Participant Lenders; and

> (v) the Debtors have an effective agreement with GM for the commitment of no less than $450 million in liquidity support under the GM Arrangement by March 24, 2009.

28.     Second, the Accommodation Amendment provides that the global

EBITDAR covenant in section 3(c) of the Accommodation Agreement would be reset to provide

the Debtors with a sufficient cushion necessary to remain in compliance with the

Accommodation Agreement based on forecast global EBITDAR for January through May 2009.

29.     Third, the minimum liquidity availability that the Debtors must maintain

under section 3(d) of the Accommodation Agreement would be reduced from $100 million to

---

[12]    The subject matter of Schedule I to the Accommodation Amendment is highly sensitive and confidential. Accordingly, a copy of  Schedule I will be provided, upon request, to counsel to the Statutory Committees (on a professionals' eyes only basis) and the U.S. Trustee and will be made available to this Court for review.  In their discretion, the Debtors may provide copies of Schedule I to other parties, subject to the terms of an appropriate confidentiality agreement.

$50 million on February 28, 2009 if, by February 27, 2009, GM has agreed to increase its commitments to $350 million under the GM Arrangement with the only conditions to the effectiveness of such agreement being obtaining Bankruptcy Court approval and approval of the President's Designee appointed in connection with the Department of Treasury's loan of TARP funds to GM and Chrysler (the "GM First Condition").[13]  The minimum liquidity availability would revert to $100 million, however, on the earlier of (i) the date when the President's Designee notifies GM that the amendment to the GM Arrangement contemplated by the GM First Condition is not permitted under the terms of GM's loan agreement with the Department of Treasury and (ii) March 25, 2009, unless the amendment contemplated by the GM First Condition has become effective prior to such date.

30.    The Accommodation Amendment also contains certain fee and expense provisions, including the payment of a 75 basis points amendment fee to the Amendment Participant Lenders.  Other fee provisions are contained in a separate fee letter, which the parties have agreed will be kept confidential.[14]

31.    The Accommodation Amendment also contains a condition subsequent that provides for termination of the Accommodation Amendment if, within 28 days of the effective date of the Accommodation Amendment, the Court has not approved the Accommodation Amendment, the GM-Delphi Agreement Third Amendment, and the GM-Delphi Pull-Forward Agreement First Amendment (both as defined in the Accommodation Amendment).

---

[13]    The amendment to the GM Arrangement contemplated by the GM First Condition must be in form and substance satisfactory to the Agent to satisfy this condition.

[14]    The fee letter will be provided, upon request, to counsel to the Statutory Committees (on a professionals' eyes only basis) and the U.S. Trustee and will be made available to this Court for review.

15

32.     The Debtors accordingly propose that their execution and delivery of the

Accommodation Amendment as of January 30, 2009, together with all other documentation

executed in connection therewith (the "Amendment Documents"), be ratified and approved and

that they be authorized, but not directed, to perform and take all actions necessary to effectuate

the Accommodation Amendment and to pay the related fees and expenses contemplated thereby.

The Debtors also seek a ruling that each of the Amendment Documents and such other

instruments and documents as may be necessary to effectuate the Accommodation Amendment

constitute valid and binding obligations of the Debtors, the Agent, and the Participant Lenders,

enforceable against each party thereto in accordance with their respective terms.

33.     The Debtors propose that the DIP Refinancing Order, the DIP Extension

Order, the Second DIP Extension Order, the Supplemental Second DIP Extension Order, and the

Accommodation Order (the "Prior DIP Orders") be deemed supplemented by any order

approving this Motion but otherwise continue in full force and effect.

<u>Applicable Authority</u>

I.      <u>This Court Should Authorize Accommodation Amendment</u>

(a)     The Accommodation Amendment Is An Appropriate Use
        <u>Of Estate Property Under Section 363(b)(1) Of The Bankruptcy Code</u>

34.     The Debtors submit that entry of an order authorizing the entry into and

implementation of the Accommodation Amendment, including the payment of Accommodation

Amendment Fees, is necessary and appropriate and in the best interests of the Debtors' estates.

Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate

"other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).

Use of estate property outside the ordinary course of business may be authorized if the debtor

demonstrates a sound business justification for it.  <u>See</u> <u>Comm. Of Equity Sec. Holders v. Lionel</u>

16

Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires

finding that good business reason exists to grant debtor's application under section 363(b)); see

also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).

35.     Based on the foregoing, the Debtors submit that entry of an order

approving the proposed Accommodation Amendment is necessary and appropriate to maintain

liquidity as they continue to work to reorganize.  The proposed Accommodation Amendment

was negotiated in good faith, at arm's length, and in the exercise of the Debtors' business

judgment.  Bankruptcy courts routinely defer to a debtor's business judgment on most business

decisions, including the decision to borrow money.  See Group of Institutional Investors v.

Chicago,  Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod.

Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering whether a debtor has exercised its

business judgment, a court is not free to second-guess particular provisions but rather must

determine whether the proposed action "as a whole is within reasonable business judgment."  In

re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

36.     The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a

presumption arises that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated

Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation

omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment

17

have the burden of rebutting the presumption of validity." Id.  To satisfy its burden, it is not

enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to

produce some evidence respecting its objections."  In re Lionel Corp., 722 F.2d at 1071.

        37.    The Debtors have exercised sound business judgment in determining that

it is appropriate and necessary to enter into the Accommodation Amendment to (i) protect

liquidity during the Accommodation Period that would otherwise be required to be repaid to the

DIP Lenders under the Accommodation Agreement and (ii) facilitate the Debtors' ability to

comply with the Accommodation Agreement financial covenants in one of the most challenging

periods in the history of the automotive industry.  The Debtors have also determined that the

proposed fees payable under the Accommodation Agreement are commercially reasonable under

current market conditions.  Indeed, in light of the current state of the economy and the global

automotive industry, the proposed terms of the Accommodation Amendment are fair, reasonable,

and necessary and are in the best interests of the Debtors' estates.  Accordingly, the Debtors

should be granted authority to enter into the Accommodation Amendment, and take the other

actions contemplated by the Accommodation Amendment and as requested herein.

        (b)    The Accommodation Amendment Should
               Be Approved Under Section 364(c) Of The Bankruptcy Code

        38.    To the extent that section 364 is applicable, the agreement is fully

appropriate under that statutory provision.  The requirement for obtaining postpetition credit

under section 364(c) is a finding, made after notice and a hearing, that the debtors are "unable to

obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."  11

U.S.C. § 364(c).  This Court already made this finding in the DIP Refinancing Order, which

approved the Debtors' DIP Facility.  This finding is even more justified today because the credit

markets have deteriorated precipitously from the strong credit environment that existed in

18

January 2007 when the Court entered the DIP Refinancing Order.  Because the DIP Facility will

remain in place, subject to the terms of the Accommodation Agreement, as amended by the

Accommodation Amendment, the Debtors should be permitted to continue to grant the liens in

accordance with section 364(c) of the Bankruptcy Code.

        39.     Section 364(c) financing is appropriate when the trustee or debtor-in-

possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.

See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show

that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

(b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

        40.     Courts have articulated a three-part test to determine whether a debtor is

entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether

      (a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

      (b)     the credit transaction is necessary to preserve the assets of the estate; and

      (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met

when it entered the DIP Refinancing Order.  Because the DIP Facility will remain in place,

subject to the provisions of the Accommodation Agreement, as amended by the Accommodation

Amendment, this Court's prior findings should continue to apply.

      (c)      The Accommodation Amendment Should
               Be Approved Under Section 364(d) Of The Bankruptcy Code

      41.     To the extent that section 364(d) of the Bankruptcy Code is implicated by the Accommodation Amendment, the agreement is appropriate and should be approved under that provision.  Section 364(d)(1) provides that the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

      (a)     the trustee is unable to obtain such credit otherwise; and

      (b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'"  Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).  In this case, the Debtors have already established that they are unable to obtain credit without priming liens.  The Accommodation Amendment will not impair the priming lien structure under the DIP Facility, as amended, including the adequate protection provided to parties whose liens have been primed. Accordingly, to the extent that the Accommodation Amendment provides for an extension of credit, the Debtors submit that such extension of credit meets the requirements of section 364(d)(1).

      (d)     The Amended DIP Facility Should
                Be Accorded The Benefits Of Section 364(e)

      42.     Section 364(e) of the Bankruptcy Code provides that the "reversal or appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in food faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."  The Accommodation Amendment was negotiated in good faith and no consideration is being provided to any party to, or guarantor of, obligations arising under the amended DIP Facility, other than as disclosed in the Accommodation Amendment.  Accordingly, the amended DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

      (e)     Compliance With General Order No. M-274

      43.     The Debtors believe that the relief requested in this Motion and the notice to be provided are in compliance with the Guidelines for Financing Requests (the "Guidelines"), adopted under General Order No. M-274 of the Board of Judges for the Southern District of New York.  The Debtors do not believe that entering into the Accommodation Amendment creates any incremental right that would trigger the application of the Extraordinary Provision (as defined in the Guidelines) requirements beyond that which was already satisfied in the DIP Motion and approved by this Court pursuant to the DIP Refinancing Order.  Accordingly, the Debtors submit that they have satisfied the Guidelines.

J.       Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

      44.       Bankruptcy Rule 6004(h)[15] provides:  "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-day stay because the Accommodation Amendment will provide immediate liquidity relief necessary to facilitate the Debtors' ability to negotiate further Modifications to its Confirmed Plan within the confines of the Accommodation Milestones.  Although the Court did not grant similar relief from Bankruptcy Rule 6004(h) in granting the Accommodation Order, the Debtors submit that the ability to effectuate the Accommodation Amendment immediately would further the Debtors' complex restructuring efforts, which they are pursuing within tight time constraints. The Court did grant similar relief in entering each of the Prior DIP Orders other than the Accommodation Order, and other courts in this district have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(h)).

Notice Of Motion

      45.       Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Thirteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

---

[15]    Formerly Bankruptcy Rule 6004(g).

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered December 4, 2008 (Docket No. 14534).  In addition, the Debtors have served, among other parties, the setoff claimants and objectors to the Debtors' motion to enter into its original $2 billion postpetition credit facility and the DIP Motion and the DIP Extension Motion.  The Debtors have also provided notice to counsel to the agent for the Debtors' former prepetition credit facility as well as counsel to the parties that objected to the Accommodation Motion.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to enter into the Accommodation Amendment with the Amendment Participant Lenders, (ii) authorizing the Debtors to (a) enter into related documents and (b) pay fees and expenses in connection therewith, and (iii) granting the Debtors such other and further relief as is just.

Dated:        New York, New York
              February 4, 2009

                                          SKADDEN, ARPS, SLATE, MEAGHER
                                          & FLOM LLP

                                          By:    /s/ John Wm. Butler, Jr.
                                                 John Wm. Butler, Jr.
                                                 John K. Lyons
                                                 Ron E. Meisler
                                          333 West Wacker Drive, Suite 2100
                                          Chicago, Illinois 60606
                                          (312) 407-0700

                                                    - and -

                                          By:    /s/ Kayalyn A. Marafioti
                                                 Kayalyn A. Marafioti
                                                 Thomas J. Matz
                                          Four Times Square
                                          New York, New York 10036
                                          (212) 735-3000

                                                    - and -

                                          SHEARMAN & STERLING LLP

                                          By:    /s/ Douglas P. Bartner
                                                 Douglas P. Bartner
                                                 Andrew V. Tenzer
                                                 Michael S. Baker
                                          599 Lexington Avenue
                                          New York, New York  10022
                                          (212) 848-4000

                                          Attorneys for Delphi Corporation, et al.,
                                              Debtors and Debtors-in-Possession

24