**Hearing Date and Time: February 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
                                   **Objection Deadline: February 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER<br>   & FLOM LLP<br>333 West Wacker Drive, Suite 2100<br>Chicago, Illinois 60606<br>(312) 407-0700<br>John Wm. Butler, Jr.<br>John K. Lyons<br>Ron E. Meisler | SHEARMAN & STERLING LLP<br>599 Lexington Avenue<br>New York, New York 10022<br>(212) 848-4000<br>Douglas P. Bartner<br>Andrew V. Tenzer<br>Michael S. Baker |
| SKADDEN, ARPS, SLATE, MEAGHER<br>   & FLOM LLP<br>Four Times Square<br>New York, New York 10036<br>(212) 735-3000<br>Kayalyn A. Marafioti<br>Thomas J. Matz | |

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :
    In re                                     :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,         :        Case No. 05-44481 (RDD)
                                              :
                            Debtors.     :        (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                   MOTION FOR ORDER AUTHORIZING DEBTORS TO ENTER INTO
                (I) THIRD AMENDMENT TO ARRANGEMENT WITH GENERAL MOTORS
                   CORPORATION AND (II) AMENDMENT TO PARTIAL TEMPORARY
     ACCELERATED PAYMENT AGREEMENT WITH GENERAL MOTORS CORPORATION

                       ("GM ARRANGEMENT THIRD AMENDMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion For Order Authorizing Debtors To Enter Into (I) Third Amendment To Arrangement With General Motors Corporation And (II) First Amendment To Partial Temporary Accelerated Payment Agreement With General Motors Corporation (the "Motion"), and respectfully represent as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.  No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

3.  On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). The Court entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On

2

January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.[1] On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable. On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Approval Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and related modifications to the December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified. In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Approval Motion to March 24, 2009 (Docket No. 14580). The adjournment has facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

---

[1] Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors. In addition, at the confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the product of an abuse of process in the bankruptcy court.

3

4.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.  The statutory predicates for the relief requested herein are sections 363 and 364 of the Bankruptcy Code and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.  Current Business Operations Of The Debtors

6.  Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[3]

7.  The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

---

[2]  The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[3]  On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

10.     The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which

---

[4] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

5

had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. <u>The Debtors' Transformation Plan</u>

12. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.      <u>Plan Confirmation And Postconfirmation Matters</u>

13.      The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.      On September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.      Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

16.      Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going

7

forward and (ii) devising a workable solution to Delphi's pension funding situation. Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations. Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

17.    By transferring nearly $2 billion of pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's North American unions), Delphi has made substantial progress towards achieving its pension funding strategy objectives for hourly employees. In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to its pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18.    As a result of all the factors described above, the Debtors were able to formulate certain modifications to the Confirmed Plan, which are set forth in the Plan Modification Approval Motion filed on October 3, 2008. Since October 3, 2008, however, the automotive industry has suffered dramatic declines. The Debtors are working to make appropriate changes to their business plan and supplemental modifications to the Confirmed Plan in furtherance of their reorganization efforts. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.  The Accommodation Agreement, GM Arrangement, And Pull-Forward Agreement

19. In the fourth quarter of 2008, facing frozen global credit markets and one of the worst bear markets in the history of the global capital markets, the Debtors negotiated the Accommodation Agreement with the DIP administrative agent and certain required DIP lenders. Under the Accommodation Agreement, and subject to the terms and conditions set forth therein, the Debtors could continue using the proceeds of their approximately $4.35 billion DIP credit facility (to the extent already drawn by the effective date of the Accommodation Agreement) through June 30, 2009, notwithstanding the occurrence of certain events of default under the DIP credit facility, including the passing of the December 31, 2008 maturity date.  This Court authorized the Debtors to enter into the Accommodation Agreement by order granted on December 3, 2008 (Docket No. 14515) and the parties subsequently effectuated the agreement on December 12, 2008.

20. Concurrently with its approval of the Accommodation Agreement, the Court also entered an order approving a second amendment ("Amendment No. 2") to Delphi's liquidity support agreement with GM (as amended from time to time, the "GM Arrangement") (Docket No. 14514).  Amendment No. 2 extended the availability of the existing $300 million liquidity support from December 31, 2008 to June 30, 2009, subject to certain conditions and provisions for earlier termination upon the occurrence of specified events.[5]

---

[5] Under the original GM Arrangement, GM had provided up to $650 million in advances to Delphi in respect of payments GM would make upon the effectiveness of the GSA and MRA.  Upon the effectiveness of the Amended GSA and Amended MRA on September 29, 2008, this commitment terminated and the amounts advanced were set off against amounts to be paid by GM or its affiliates for the benefit of the Debtors under the Amended GSA and the Amended MRA.  GM and the Debtors entered into Amendment No. 1 to the GM Arrangement as of October 6, 2008.  (Docket No. 14289.)  Pursuant to Amendment No. 1, GM agreed to make available to the Debtors an additional $300 million in advances under the terms and conditions set forth therein and pursuant to section 364(b) of the Bankruptcy Code.  As part of the GM Arrangement, Delphi agreed to pay certain fees and expenses and to indemnify certain parties under specified conditions.  In addition, other Debtors guaranteed Delphi's obligations thereunder.  The GM Arrangement also provides that the Debtors' obligations

21.     As part of the order approving Amendment No. 2 to the GM Arrangement, the Court also approved Delphi's entry into the Partial Temporary Accelerated Payment Agreement with GM (the "Pull-Forward Agreement"), which provides for GM to accelerate the payment of up to $300 million in trade accounts payable to Delphi over the three-month period beginning in March 2009.  Under the Pull-Forward Agreement, if certain conditions are satisfied on the date when GM's March 2009 MNS-2 payment is to be made to DAS LLC, GM would also make a $100 million payment to DAS LLC, representing a partial temporary acceleration of accounts payable to DAS LLC for component parts supplied to GMNA and GM's service parts organization, with the effect of decreasing GM's payables to DAS LLC by the amount paid.  In each of April and May 2009, assuming the same conditions are met, GM would make an additional $100 million accelerated accounts payable payment to DAS LLC.  Thereafter, GM could offset up to $100 million from each of the first three MNS-2 payments due to DAS LLC after GM's commitment under the GM Arrangement terminates.[6]

22.     When the Debtors received this Court's authorization to enter into and consummate the Accommodation Agreement, Amendment No. 2 to the GM Arrangement, and the Pull-Forward Agreement, the Debtors believed that they had secured a transparent liquidity runway that would be sufficient to allow them to weather the ongoing economic recession, negotiate further modifications to the Confirmed Plan to maximize value for all stakeholders, and emerge from chapter 11 as soon as practicable.

---

thereunder are entitled to administrative expense priority under section 503(b)(1) of the Bankruptcy Code, subject to the terms of the GM Arrangement and the Second DIP Extension Order (Docket No. 13489).

[6]   In addition, the March, April, and May pull-forward payments are deemed advances under the GM Arrangement under certain circumstances to the extent the outstanding balance under the GM Arrangement is less than $300 million on the date that GM's commitment under the GM Arrangement terminates.

G.     Subsequent Challenges Facing The Global Automotive Industry

23.    In December 2008 and January 2009, the outlook for the global automotive industry took a dramatic turn for the worse, with volumes, both domestic and global, plummeting to historic lows. On December 2, 2008, GM projected production of 600,000 vehicles for the first quarter of 2009, a 32% reduction from its first quarter 2008 production. Just ten days later on December 12, however, GM reduced that projection by another 30% to 420,000 vehicles, resulting in a 53% reduction from the same period in 2008. On February 3, 2009, however, GM further reduced projected production for the first quarter of 2009 to 380,000 vehicles, down approximately 57% from the same period in 2008. Further, GM announced on January 12, 2009 that its was reducing its forecast for 2009 North American vehicle sales to 10.5 million units for North American vehicle sales, a staggering 3.2 million fewer units than were sold in 2008 and 6 million fewer than were sold in 2007.

24.    As a result of these unprecedented volume declines, and to remain in compliance with the Accommodation Agreement and maximize their available liquidity, the Debtors negotiated and, on January 30, 2009, executed, amendments to the Accommodation Agreement, the GM Arrangement, and the Pull-Forward Agreement.

Relief Requested

25.    By this Motion, the Debtors seek entry of an order approving (i) Amendment No. 3 to the GM Arrangement, which generally contains amendments that conform the GM Arrangement to the amended terms of the Pull-Forward Agreement and the amended terms of the Accommodation Agreement, and (ii) the amendment to the Pull-Forward Agreement (the "Pull-Forward Amendment"), which further accelerates from the second quarter to the first quarter of 2009 GM's prepayment of up to $100 million of the $300 million in pull-forward

11

payments covered by the Pull-Forward Agreement.[7]  A copy of Amendment No. 3 to the GM Arrangement is attached hereto as <u>Exhibit A</u>.  A copy of the Pull-Forward Amendment is attached hereto as <u>Exhibit B</u>.  Although the Debtors and GM do not otherwise believe that either Amendment No. 3 to the GM Arrangement or the Pull-Forward Amendment requires Court approval prior to becoming effective, the Debtors agreed to seek such approvals for the avoidance of doubt.  Moreover, the Court's approval of each agreement is a condition subsequent to Amendment No. 3 to the GM Arrangement.  (<u>See</u> Exh. A, § 4.)

<center>Basis For Relief</center>

26.     Amendment No. 3 to the GM Arrangement became effective on January 30, 2009, and is a necessary adjunct to the Accommodation Amendment.  It contains mostly technical amendments necessary to align the GM Arrangement with the terms of the Accommodation Amendment and the Pull-Forward Amendment.  For example, Section 1(a) of the Accommodation Amendment defines "Minimum Liquidity Amount" to mean $100,000,000 (in line with the covenant at section 3(d) of the original Accommodation Agreement), but further provides for a reduction in Minimum Liquidity Amount required under the Accommodation Agreement to $50,000,000 in the event that GM and Delphi execute an agreement increasing GM's commitment under the GM Arrangement from $300 million to $350 million on or prior to February 27, 2009.  Section 2(a)(iv) of Amendment No. 3 to the GM Arrangement accordingly adopts the definition of Minimum Liquidity Amount from the Accommodation Amendment.

27.     Amendment No. 3 to the GM Arrangement also effectively increases by $25 million (from $25 million to $50 million) the amount by which Delphi's borrowings under

---

[7] The Debtors are seeking approval of the amendment to the Accommodation Agreement (the "Accommodation Amendment") by separate motion.  The amendments to each of these agreements also contemplate possible future amendments to the GM Arrangement by which GM may increase its total commitment from $300 million to $350 million by February 27, 2009, and to $450 million by March 24, 2009.

<center>12</center>

the GM Arrangement can exceed its projection of net cash usage during times when the Minimum Liquidity Amount is $50 million.

   28. The Pull-Forward Amendment also became effective on January 30, 2009, and added as a new Section 12 of the Pull-Forward Agreement the following principal substantive terms designed to immediately enhance the Debtors' liquidity by further accelerating up to $100 million of trade payments from May 2009 to the current quarter:

> 12. <u>Accelerated Pull-Forward Payments</u>.  Notwithstanding anything in this Agreement to the contrary:
>
>  (a) <u>Initial Payables Advance</u>.  (i) On the Effective Date, GM will pay to DAS $50,000,000 of the Third Pull-Forward Payment[8] (irrespective of whether the Acceleration Conditions are satisfied on such date) (the "<u>First Earlier PFP</u>") and (ii) the balance of the Pull-Forward Payments will be paid in accordance with Section 3(a) of this Agreement.
>
>  (b) <u>February 27, 2009 Condition</u>.  If GM and Delphi have not, on or before February 27, 2009, irrevocably executed and delivered an amendment to the GM-Delphi Agreement that increases the Tranche B Commitment[9] to an aggregate amount no less than $350,000,000 (the "<u>GM-Delphi Agreement Commitment Increase Amendment</u>"), then (i) on February 27, 2009, GM will pay to DAS an additional $50,000,000 of the Third Pull-Forward Payment) (irrespective of whether the Acceleration Conditions are satisfied on such date) (the "<u>Second Earlier PFP</u>") and (ii) the balance of the Pull-Forward Payments will be paid in accordance with Section 3(a) of this Agreement.
>
>  (c) <u>March 25, 2009 Condition</u>.  If GM and Delphi have irrevocably executed and delivered the GM-Delphi Agreement Commitment Increase Amendment on or before February 27, 2009, then GM will pay to DAS the Second Earlier PFP (with the balance of the Pull-Forward Payments to be paid in accordance with Section 3(a) of this Agreement) on the earlier of (x) the date, if any, on which the President's Designee has notified GM that the GM-Delphi Agreement Amendment is not permitted, in accordance with the terms of the GM-Treasury LSA and (y) March 25, 2009, unless the GM-Delphi Agreement Commitment Increase Amendment shall have become effective prior to such date.

---

[8] The Third Pull-Forward Payment is otherwise payable in connection with GM's May 2009 MNS-2 payment.

[9] GM's "Tranche B Commitment" refers to GM's current $300 million commitment under the GM Arrangement. The Accommodation Amendment contemplates possible future amendments to the GM Arrangement by which GM may increase its total commitment from $300 million to $350 million by February 27, 2009, and to $450 million by March 24, 2009.

    (d)  <u>Conversion of Advance Payments</u>. GM may, at its option and in its sole discretion, convert the First Earlier PFP and/or the Second Earlier PFP referenced in Sections 12(a), (b) and (c) above that have been paid to DAS into Tranche B Advances under the GM-Delphi Agreement; <u>provided</u> that the Tranche B Commitment under the GM-Delphi Agreement is simultaneously increased by any amount of the First Earlier PFP and the Second Earlier PFP so converted. Upon any such conversion of the First Earlier PFP or the Second Earlier PFP to Tranche B Advances, the GM payables owing to DAS shall automatically be reinstated by the aggregate amount of the First Earlier PFP and the Second Earlier PFP so converted and GM shall remain obligated to make Pull Forward Payments pursuant to Section 3(a) as if the First Earlier PFP or the Second Earlier PFP, as applicable, had never been accelerated pursuant to Sections 12(a), (b) and/or (c), as the case may be.

    29.  As contemplated in Section 3 of the Pull-Forward Amendment, GM paid Delphi the $50,000,000 First Earlier PFP on January 30, 2009.

    30.  The GM Arrangement contains a condition subsequent that provides for termination of Amendment No. 3 if, within 28 days of the effective date of Amendment No. 3, the Court has not approved Amendment No. 3, the Pull-Forward Amendment, and the Accommodation Amendment.

    31.  The Debtors accordingly propose that their execution and delivery of Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment be ratified and approved and that they be authorized, but not directed, to perform and take all actions necessary to effectuate Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment, together with all other documentation executed in connection therewith.

<center>Applicable Authority</center>

H.  <u>The Court Should Authorize Amendment No. 3 To GM Arrangement
And Pull-Forward Amendment</u>

  (a)  <u>Amendment No. 3 To GM Arrangement And Pull Forward Amendment
Should Be Approved Under 11 U.S.C. § 364(b)If Applicable</u>

    32.  The Debtors seek approval of Amendment No. 3 to the GM Arrangement, which generally aligns the GM Arrangement with concurrent amendments to the

<center>14</center>

Accommodation Agreement and the Pull-Forward Agreement. To further increase their liquidity, the Debtors also seek approval of the Pull-Forward Amendment, which further accelerates GM's accelerated payment of up to $100 million of the $300 million in accelerated trade payments from the second quarter of 2009 to the current quarter.

33. Under section 364(b) of the Bankruptcy Code, a debtor may obtain unsecured credit outside the ordinary course of business and provide the lender extending such credit with an administrative priority claim for such amounts under section 503(b)(1) of the Bankruptcy Code. 11 U.S.C. § 364(b). Bankruptcy courts have discretion in determining whether to approve such transactions, although such "discretion is not unbridled." In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). In making such determinations, "courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits." Id. (citations omitted).

34. With respect to the GM Arrangement, the Court determined that these standards were met when it approved the $300 million commitment from GM in Amendment No. 1 to the GM Arrangement and the extension of that commitment in Amendment No. 2 to the GM Arrangement. Because that commitment remains in place under Amendment No. 3 to the GM Arrangement, the Court's prior findings should apply to the extent section 364(b) is implicated at all.

35. In addition, the Court approved the Pull-Forward Agreement because it inures to the benefit of the Debtors by providing the Debtors access to additional liquidity with no corresponding interest expense. Through acceleration of payments, the Debtors simply receive payment for component parts at an earlier time than such payments would otherwise be

15

made, subject to corresponding offsets in later periods. Because the Pull-Forward Amendment merely further accelerates a portion of these payments from the second quarter of 2009 to the first quarter, the Court should similarly approve the Pull-Forward Amendment under section 364(b) to the extent applicable.

      (b)    <u>Application Of The Business Judgment Standard</u>

      36.    Based on the foregoing, the Debtors submit that entry of an order approving Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment is necessary and appropriate to further the Debtors' reorganization efforts. The agreements were negotiated in good faith, at arm's length, and in the exercise of the Debtors' business judgment. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. See <u>Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.</u>, 318 U.S. 523, 550 (1943); <u>In re Simasko Prod. Co.</u>, 47 B.R. 444, 449 (Bankr. D. Colo. 1985). In considering whether a debtor has exercised its business judgment, a court is not free to second-guess particular provisions but rather determines whether the proposed action "as a whole is within reasonable business judgment." <u>In re Crowthers McCall Pattern, Inc.</u>, 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

      37.    The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." <u>Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)</u>, 4 F.3d 1095, 1099 (2d Cir. 1993). Once the debtor articulates a valid business justification, a presumption arises that "'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" <u>Official Comm. Of Subordinated Bondholders v. Integrated</u>

16

Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Comm. Of Equity Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

38. The Debtors have exercised sound business judgment in entering into Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment. Indeed, the proposed terms of the agreements are fair, reasonable, and necessary and are in the best interests of the Debtors' estates because they provide necessary liquidity to the Debtors at a cost, if any, lower than the Debtors could achieve from other sources. Accordingly, the Court should approve Amendment No. 3 to the GM Arrangement, the Pull-Forward Amendment, and the advances set forth therein, pursuant to sections 363 and 364 of the Bankruptcy Code.

I. Amendment No. 3 To GM Arrangement And The First Amendment To The Pull-Forward Agreement Should Be Accorded The Benefits Of Section 364(e)

39. Section 364(e) of the Bankruptcy Code provides that the "reversal or appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in food faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment were negotiated in good faith and no consideration is being provided to any party to, or guarantor of, obligations arising under these agreements other than

as disclosed therein. Accordingly, each of these agreements should be accorded the benefits of section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

J.      Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

40.     Bankruptcy Rule 6004(h) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that this Court waive this ten-day stay because Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment provide immediate liquidity relief. The Court granted the Debtors' request for relief from Bankruptcy Rule 6004(h)[10] in connection with the original GM Arrangement and each of the subsequent amendments thereto. Other courts in this district have waived this ten-day stay upon a showing of business need. See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(h)).

Notice Of Motion

41.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Thirteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered December 4, 2008 (Docket No. 14534). In addition, the

---

[10]     Then Bankruptcy Rule 6004(g).

Debtors have served, among other parties, the setoff claimants and objectors to the Debtors' motion to enter into its original $2 billion postpetition credit facility and the DIP Motion and the DIP Extension Motion.  The Debtors have also provided notice to counsel to the agent for the Debtors' former prepetition credit facility.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to enter into Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment and (ii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          February 4, 2009

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr.
      John K. Lyons
      Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti
      Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

- and -

SHEARMAN & STERLING LLP

By:   /s/ Douglas P. Bartner
      Douglas P. Bartner
      Andrew V. Tenzer
      Michael S. Baker
599 Lexington Avenue
New York, New York  10022
(212) 848-4000

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession