**Hearing Date And Time: February 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline: February 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE , MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 327(a), 328(a), 329, 363,
AND 504 TO CONFIRM ENGAGEMENT AND RETENTION OF SPECIAL COUNSEL
IN CONNECTION WITH PLAN INVESTOR LITIGATION

("SPECIAL COUNSEL RETENTION CONFIRMATION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order pursuant to sections 327(a), 328(a), 329, 363, and 504 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2014-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), to the extent applicable as described in further detail below, confirming the Debtors' prior retention and employment of Friedman Kaplan Seiler & Adelman LLP ("FKSA") and Susman Godfrey LLP ("SG") (collectively referred to as "Special Counsel") as special counsel for the Debtor as of April 4, 2008,[1] and respectfully represent as follows:

## Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under

---

[1]    The Debtors have obtained disclosure statements from each of their special counsel as follows: (i) the Affidavit of William P. Weintraub and Disclosure Statement on Behalf of Friedman Kaplan Seiler & Adelman LLP Pursuant to 11 U.S.C. §§ 327(a), 328(a), 329 and 504, Federal Rules of Bankruptcy Procedure 2014(a) and 2016(b), and Rule 2014-1 of the Local Bankruptcy Rules for the Southern District of New York, sworn to February 4, 2009 (the "Weintraub Affidavit"), is attached hereto as Exhibit A and (ii) the Affidavit of Jacob W. Buchdahl and Disclosure Statement on Behalf of Susman Godfrey LLP In Support Of Motion Pursuant To 11 U.S.C. §§ 327(a), 328, 329, 363, and 504, To Confirm Engagement And Retention Of Special Counsel In Connection With Plan Investor Litigation, sworn to February 3, 2009 (the "Buchdahl Affidavit"), is attached hereto as Exhibit B.

2

Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

        2.      No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

        3.      On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement"). The Court entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who

3

refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11.[2] The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable. On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Approval Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and related modifications to the December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified. In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Approval Motion to March 24, 2009 (Docket No. 14580). The adjournment has facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

        4.        The filing of this Motion is precautionary. Pursuant to the Confirmation Order, upon the Confirmation Date (as defined in the Plan), any requirement that professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for such services rendered after the Confirmation Date terminated and thereafter professionals may be retained and paid in the ordinary course of business. See Confirmation Order, ¶ 33. The Confirmation Order is a final order and it

---

[2] Delphi asked SG to file the complaint against UBS Securities LLC (as described in paragraph 37 below) because, due to existing client relationships, FKSA was unable to do so.

4

has not been revoked, modified, or rescinded and remains in full force and effect.[3]  This same provision can be found in Article 10.3(d) of the Plan.  Although Delphi believes that a confirmatory retention order for either FKSA or SG is unnecessary, it makes this Motion out of an abundance of caution.  FKSA and SG have advised the Debtors that they are prepared to comply with whatever reporting requirements may be imposed by the Court.

       5.       The statutory predicates for the relief requested herein are sections 327(a), 328(a), 329, 363, and 504 of the Bankruptcy Code.

B.      <u>Current Business Operations Of The Debtors</u>

       6.       Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[4]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[5]

---

[3]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing the Court reserved for itself the remedy of vacating the Confirmation Order (<u>see</u> Hr'g Tr., 45, 67-68, Jan. 17, 2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the product of an abuse of process in the bankruptcy court.

[4]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[5]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court

7. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8. Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.   Events Leading To The Chapter 11 Filing

9. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net

---

approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

sales.[6]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

          10.      The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

          11.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

---

[6]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

7

D.   The Debtors' Transformation Plan

12.   On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.   Plan Confirmation And Postconfirmation Matters

13.   The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM. The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan. After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.   On September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the

8

Company on a global basis. Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15. Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA"). On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

16. Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan: (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation. Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations. Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

17. By transferring nearly $2 billion of pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's North American unions), Delphi has made substantial progress towards achieving its pension funding strategy objectives for hourly employees. In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to its pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18. As a result of all the factors described above, the Debtors were able to formulate certain modifications to the Confirmed Plan, which are set forth in the Plan Modification Approval Motion filed on October 3, 2008. Since October 3, 2008, however, the automotive industry has suffered dramatic declines. The Debtors are working to make appropriate changes to their business plan and supplemental modifications to the Confirmed Plan in furtherance of their reorganization efforts. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

19. For the avoidance of doubt, the Debtors seek an order confirming the Debtors' retention and employment of FKSA and SG as Special Counsel for the Debtors, as of April 4, 2008, pursuant to sections 327(a), 328(a), 329, 363, and 504 of the

05-44481-rdd Doc 14706 Filed 02/04/09 Entered 02/04/09 21:25:46 Main Document
Pg 11 of 19

Bankruptcy Code to the extent applicable to the Debtors' engagement of such firms.[7] To the extent applicable in this post-confirmation period, Delphi seeks this Court's confirmation that Special Counsel have been properly retained pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014, and Local Rule 2014-1 as special counsel to represent the Debtors with respect to the matters described in this Motion and the attachments hereto relating to the EPCA and to the prosecution of causes of action with respect thereto pursuant to the terms of that certain retention letter between Delphi and FKSA, dated April 9, 2008, and that certain retention letter between Delphi and SG, dated April 15, 2008.

The Debtors' Engagement Of FKSA

20.   The Debtors have selected FKSA as their attorneys because of the firm's extensive litigation experience, knowledge, and expertise, and the recognized experience and knowledge of its attorneys in handling complex litigation matters inside and outside the context of bankruptcy cases.  FKSA's responsibility will be with respect to the Plan Investors other than UBS.

21.   The Debtors are compensating FKSA on an hourly basis, and reimbursing all actual, necessary expenses and other charges incurred by FKSA in connection with its representation of the Debtors.  FKSA has asked the Debtors to file this

---

[7]   The Debtors note that, notwithstanding the provisions of the Confirmation Order, Delphi's Statutory Committees have also obtained similar relief with respect to certain professionals employed by the committees. See Order Under Sections 328 and 1103 of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Employment and Retention Nunc Pro Tunc from August 5, 2008 of Farrell Fritz, P.C. as Conflicts Counsel to the Official Committee of Equity Holders (Docket No. 14190, September 16, 2008) and Final Order Under 11 U.S.C. §§ 328 and 1103 Authorizing Employment and Retention of Moelis & Company LLC as Co-Investment Banker to the Official Committee of Unsecured Creditors Nunc Pro Tunc to July 1, 2008 (Docket No. 14488, November 24, 2008).

Motion as a precaution because this litigation is significant and complex, and FKSA wanted to ensure that the Debtors' retention and compensation of FKSA would be approved both pursuant to the Confirmation Order and by separate confirmatory order.

22. The principal attorneys and paralegals at FKSA presently designated to represent Delphi and their current standard hourly rates are:

| | | |
|---|---|---|
| a. | Edward A. Friedman (partner) | $850 |
| b. | William P. Weintraub (partner) | $750 |
| c. | Andrew W. Schilling (partner) | $595 |
| d. | Jessica Murzyn (associate) | $460 |
| e. | Sira D. Weiner (associate) | $435 |
| f. | Danya S. Reda (associate) | $390 |
| g. | Kevin Haeberle (associate) | $350 |
| h. | Christopher Wimmer (associate) | $350 |
| i. | Jordan Brackett (associate) | $325 |
| j. | Cynthia Starr (paralegal) | $150 |
| k. | Zach Torres-Fowler (paralegal) | $150 |
| l. | Jessica Pevzner (paralegal) | $150 |

23. The hourly rates set forth above are subject to periodic adjustments to reflect economic and other conditions. Other attorneys and paralegals may from time to time serve the Debtors in connection with the matters herein described.

24. The hourly rates set forth above are FKSA's standard hourly rates for work of this nature. These rates are set at a level designed to fairly compensate FKSA

12

for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses. The Debtors believe that such rates are reasonable under the circumstances of the engagement.

25. It is FKSA's policy to charge its clients in all areas of practice for all other expenses incurred in connection with the client's case. The expenses charged to clients include, among other things, telephone and telecopier toll and other charges, mail and express mail charges, special or hand delivery charges, document retrieval, photocopying charges, travel expenses, expenses for "working meals," computerized research, and transcription costs, as well as other non-ordinary overhead expenses When travel is required, FKSA will charge the client for its travel and lodging expenses. FKSA will charge the Debtors for these expenses in a manner and at rates consistent with charges made generally to FKSA's other clients as modified by the expense reimbursement guidelines adopted by the Debtors in these chapter 11 cases.

26. The professional services that FKSA has rendered, and will continue to render, to the Debtors includes, but shall not be limited to, the following:

    a. Analysis and, as appropriate, pursuit of claims (other than any claims against UBS arising out of or relating to the EPCA or any related agreement, including, without limitation the commitment letters executed in connection therewith (the "Commitment Letters");

    b. Analysis and, as appropriate, pursuit of claims (other than any claims against UBS) arising out of or relating to the Commitment Letters;

13

c.  Analysis and, as appropriate, pursuit of any other claims relating to actions or inactions, conduct or misconduct, by the parties to the EPCA or the Commitment Letters (other than claims against UBS) including, without limitation, claims for equitable subordination; and

d.  Related matters concerning the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates confirmed by this Court on January 25, 2008.[8]

27.  The Debtors have retained various professionals during the pendency of these chapter 11 cases. FKSA will communicate with such professionals to ensure that there is no unnecessary duplication of services performed for or charged to the Debtors.

28.  To the best of the Debtors' knowledge, FKSA does not hold or represent any interest adverse to the Debtors' estates, FKSA is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and FKSA's employment is necessary and in the best interests of the Debtors, their estates, and creditors.

29.  To the best of the Debtors' knowledge, the members, counsel to, and associates of FKSA do not have any connection with or any interest adverse to the

---

[8] On May 16, 2008, FKSA filed, and continues to prosecute, an adversary proceeding in this Court on behalf of the Debtors against the Plan Investors (other than UBS) styled <u>Delphi Corp. v. Appaloosa Management L.P., A-D Acquisition Holdings, LLC, Harbinger Del-Auto Investment Company, Ltd., Pardus DPH Holding LLC, Merrill Lynch, Pierce, Fenner & Smith Incoporated, Goldman Sachs & Co., Harbinger Capital Partners Master Fund I, Ltd., Pardus Special Opportunities Master Fund L.P.</u> (Adversary Proceeding No. 08-1232).

14

Debtors, their creditors, or any other party in interest, or their respective attorneys or accountants, except as set forth in the Weintraub Affidavit.

    30. The Debtors have been informed that FKSA will conduct an ongoing review of its files to ensure that no disqualifying circumstances arise, and if any new relevant facts or relationships are discovered, FKSA will supplement its disclosure to the Court.

The Debtors' Engagement Of SG

    31. The Debtors have selected SG as their attorneys because of the firm's extensive litigation experience, knowledge, and expertise, and the recognized experience and knowledge of its attorneys in handling complex litigation matters inside and outside the context of bankruptcy cases. SG's responsibility will be with respect to UBS.

    32. The Debtors are compensating SG on an hourly basis, and reimbursing all actual, necessary expenses and other charges incurred by SG in connection with its representation of the Debtors. SG has asked the Debtors to file this Motion as a precaution because this litigation is significant and complex, and SG wanted to ensure that the Debtors' retention and compensation of SG would be approved both pursuant to the Confirmation Order and by separate confirmatory order.

    33. The principal attorneys and paralegals at SG presently designated to represent Delphi and their current standard hourly rates are:

    a. Jacob W. Buchdahl (partner)  $625

    b. Kenneth S. Marks (partner)  $700

    c. Martin Powers (paralegal)  $250

34. The hourly rates set forth above are subject to periodic adjustments to reflect economic and other conditions. Other attorneys and paralegals may from time to time serve the Debtors in connection with the matters herein described.

35. The hourly rates set forth above are SG's standard hourly rates for work of this nature. These rates are set at a level designed to fairly compensate SG for the work of its attorneys and paralegals and to cover fixed and routine overhead expenses. The Debtors believe that such rates are reasonable under the circumstances of the engagement.

36. It is SG's policy to charge its clients in all areas of practice for all other expenses incurred in connection with the client's case. The expenses charged to clients include, among other things, telephone and telecopier toll and other charges, mail and express mail charges, special or hand delivery charges, document retrieval, photocopying charges, travel expenses, expenses for "working meals," computerized research, and transcription costs, as well as other non-ordinary overhead expenses. When travel is required, SG will charge the client for its travel and lodging expenses. SG will charge the Debtors for these expenses in a manner and at rates consistent with charges made generally to SG's other clients as modified by the expense reimbursement guidelines adopted by the Debtors in these chapter 11 cases.

37. The professional services that SG has rendered, and will continue to render, to the Debtors includes, but shall not be limited to, the following:

    a. Analysis and, as appropriate, pursuit of claims against UBS arising out of or relating to the EPCA or any related agreement;

     b. Analysis and, as appropriate, pursuit of any other claims relating to actions or inactions, conduct or misconduct, by UBS under the EPCA, including, without limitation, claims for equitable subordination; and

     d. Related matters concerning the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates confirmed by this Court on January 25, 2008.[9]

  38. The Debtors have retained various professionals during the pendency of these chapter 11 cases and will communicate with such professionals to ensure that there is no unnecessary duplication of services performed for or charged to the Debtors. The Debtors have advised FKSA and SG that they expect both law firms to coordinate efforts so as to not duplicate services or cause added expense to the Debtors. FKSA and SG have agreed to work together, and the Debtors believe the firms have been working together, in an efficient and well-coordinated manner to avoid duplication and to deliver service at a cost that is as close as reasonably possible to that of a single law firm.

  39. To the best of the Debtors' knowledge, SG does not hold or represent any interest adverse to the Debtors' estates, SG is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and SG's employment is necessary and in the best interests of the Debtors, their estates and creditors.

---

[9] On May 16, 2008, FKSA filed, and continues to prosecute, an adversary proceeding in this Court on behalf of the Debtors against UBS styled <u>Delphi Corp. v. UBS Securities LLC</u> (Adversary Proceeding No. 08-1233).

40. To the best of the Debtors' knowledge, the members, counsel to and associates of SG do not have any connection with or any interest adverse to the Debtors, their creditors, or any other party in interest, or their respective attorneys or accountants, except as set forth in the Buchdahl Affidavit.

41. The Debtors have been informed that SG will conduct an ongoing review of its files to ensure that no disqualifying circumstances arise, and if any new relevant facts or relationships are discovered, SG will supplement its disclosure to the Court.

## Notice

42. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Thirteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered December 4, 2008 (Docket No. 14534). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

43. No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) confirming the Debtors' retention and employment of FKSA and SG as Special Counsel for the Debtors, as of April 4, 2008, pursuant to sections 327(a), 328(a), 329, 363, and 504 of the Bankruptcy Code to the extent applicable to the Debtors' engagement of such firms and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         February 4, 2009

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP


By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr.
      Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti
      Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

VERIFIED AND AGREED:

Delphi Corporation on behalf of all
Debtors and Debtors-in-Possession

 /s/ David M. Sherbin
Name:  David M. Sherbin
Title: Vice President, General Counsel and
Chief Compliance Officer