UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                  :
        In re                                     :
                                                  :
        DELPHI CORPORATION, et al.,               :                              :
                                                  :
                                                  :
-------------------------------------------------------x

OBJECTION TO MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND
1108 CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID
POSTRETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID
POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED
EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES

**EXHIBIT A**

## LIST OF DELPHI RETIREES REQUESTING
## OBJECTION BE FILED ON THEIR BEHALF[1]

Steve Weflen
Darrel W. O'Neil
Jeannie Thomas
Randall R. Grimm
Jean A. Mize
Peggy Allan
Ken Haima
Jill G. Hersberger
Jim Frost
Scott Auble
Marilyn Shirley
Larry Massie
Terri Lynn Andujal
Frank Sandor
James G. McMillen
John A. Kirchgraber
David Nelson
Steven Groves
Lawrence W. Drozan
Diana L. Grider
Marybeth & Chuck Cunningham
Edward A. Golick
Michelle Troxell
Melvyn Floyd
Ben Lewis
James Kines
Christine M. Hankley
Fred J. Horner
James Erickson
Ann Terry
John A. Laitala
Mark B. Kearney
W. Lloyd Piper
Jeff M. Gloudemans
Larry Van De Wege
John L. Martel
Gary L. Walls
Glenda K. Magee
James Crouse
Charles E. Stone III

---

[1] A few of the abovenoted retirees also filed separate Objections but expressed their request to be included
in this Objection.

Mike Middleton
Lawrence F. Croisdale
Gene R. Miller
Rick Cruse
Hank Verwohlt
Pat Rosa
Phil Webber
Terrence M. Dawson
James A. Tkach
Timothy C. Tinch
Douglass L. Cole
Paul V. Palovich
Thomas Schaeff
George E. Brand
Robert & Debra von Schwedler
Jim Buczkowski
Richard Chandler
Daniel Lee McMillon
Gwenndolyn Mullee
Kathy Murphy
Michael H. Froning
James Money
Michael Schuplin
Lydia G. Ferris
Douglas A. Kittle
David Jones
Robert A. Catron
Alex C. Demetruk
John Drabison
Jean McMillion
Patricia Harris
Ronald R. Malanga
Ken Jelley
Denise Mote
Daniel Sliwinski
Joan K. Walls
James Finley
Thomas E. McLain
Dale Johnson
Patricia D. Lott
Nancy W. Kondzich
James K. Conlee
Michael S. Daniel
Donald E. Sherman
James R. Test
Charles E. Brewster

Edward Gallagher
John Klomp
Lawrence Richards
Richard Kornoelje
Lowell Shaffer
Dilbert L. Sahr
Charles A. Stiver
Richard D. Brach
Marilyn J. Thomas
Brian M. Miller
Ted Roberts
Donald R. Wheelock
Nick M. Loprire
Jeanette O. Scott
Michael R. Perry
Duane Church
Dominic & Patricia Raia
Ronald L. Mock
John Tabor
Robert Falgiano
John A. Sandberg
T. Michael Wilkinson
Barbara Burns
Janet M. Yocum
Robert E. Formaker
Guy A. Andonian
John DeCaro
Patrick Stesiak
William H. Gillespie III
Charles Chen
Dennis L. Farley
David Janowski
Glenn Branscome
James Flint
Michael J. Barker
Douglas R. Schafer
Peggy R. Chaney
Roy Smith
Bruce Gump
Marion G. Innis
Lawrence B. Smith
Paton M. Zimmerman, Jr.
James M. Alexander
Donald Gibb
James Eberhart
Jeff J. Brenske

Robert E. Dettinger
James R. Emeott
Michael Secora
Mary Miller
Frank Ventura
Raymond R. Dolney
John R. Costello
Peter Gawronski
Carl Reddersen
Ronald & Josephine Chalker
John F. Wiechart
Douglas R. Park
Patrick J. Straney
Sandra A. Tracy
Richard Benner
Edward E. Seidel
Mike Deneut
Thomas E. Hatcher
Alan William O'Grady
Virginia Frances O'Grady
Andrew Verbosky
William Mazzola
Gerald Hurayt
James W. Vause II
Richard P. Gurniak
Richard Montpas
Ruth Anne LaPort
William H. Capito
Bruce Kirkham
Thomas J. Sosnowchik
Beverly B. Austin
Raymond Polinko
Jeff & Karen Thatcher
David Trapasso
Patrick O'Laughlin
Steve Erickson
Linda K. Smith
Mark Baranski
Kenneth C. Stevens
Ronald L. Saltzman
Andrea Wright
Reid B. Lesser
James W. Stubbs
James W. Russell
Kenneth Graham
Michael Jurkiw

Elizabeth Stover
Douglas A. Rose
David M. Anderson
Anna Kimmel
Sharon A. Rauch
Arnold W. Burt
James F. Harrell
Richard K. Ross
Kathleen S. Sanford
Thomas P. Lucas
Wayne C. Brewer
Tom Lubert
Paul Talley
James B. Johnson, Jr.
Lawrence J. Lubeski
Anthony Brian Rutkowski
William J. Pipenur
Gary Robertson
Thomas D. Karvonen
Raymond Grant
Christine P. Wolcott
David Nelson
John Rasmussen
Michael Niemiec

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


-------------------------------------------------------x
                                                       :
        In re                                          :
                                                       :
        DELPHI CORPORATION, et al.,                    :                                    :
                                                       :
                                                       :
-------------------------------------------------------x


OBJECTION TO MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND
1108 CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID
POSTRETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID
POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED
EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES


**EXHIBIT B**

**RETIREE SERVICING CENTER**
P.O. Box 5113
Southfield, Michigan 48086-5113
1-800-828-9236
1-800-872-8682
TELECOMMUNICATION DEVICE FOR THE DEAF

February 05, 2001

As a retiree of Delphi Automotive Systems with 10 or more years of participation in the Life and Disability Benefits Program, you are eligible for Continuing Life Insurance.

Our insurance records, as of the date of this letter, show the Continuing Life Insurance has now fully reduced to the ultimate amount of ▮▮▮▮▮▮ This ultimate amount will remain in effect for the rest of your life and is provided by Delphi at no cost to you.

**IMPORTANT:   YOU   SHOULD   KEEP   THIS   NOTICE   WITH   YOUR   OTHER   VALUABLE   PAPERS.**

If you have any questions regarding this letter, you may call toll-free, 1-800-828-9236 (Telecommunication Device for the Deaf 1-800-872-8682), during normal business hours, or write to the address above.

Always include this Social Security number ▮▮▮▮▮▮ in all your correspondence.

Retiree Servicing Center

UA01

RETIREE SERVICING CENTER
P.O. Box 5113
Southfield, Michigan  48086-5113
**1~800-828-9236**
1~800-872-8682
TELECOMMUNICATION DEVICE FOR THE DEAF

June 04, 2001

Robert J Straub
1723 Executive Dr.
Kokomo, IN  46902-3277

Dear Robert J Straub:

As a retiree of Delphi Automotive Systems with 10 or more years of participation in the Life and Disability Benefits Program, you are eligible for Continuing Life Insurance.

Our insurance records, as of the date of this letter, show the Continuing Life Insurance has now fully reduced to the ultimate amount of $▆▆▆▆▆▆. This ultimate amount will remain in effect for the rest of your life and is provided by Delphi at no cost to you.

IMPORTANT:  YOU SHOULD KEEP THIS NOTICE WITH YOUR OTHER VALUABLE PAPERS.

If you have any questions regarding this letter, you may call toll-free, 1-800-828-9236 (Telecommunication Device for the Deaf 1-800-872-8682), during normal business hours, or write to the address above.

Always include this Social Security number, ▆▆▆▆▆▆▆▆▆ in all your correspondence.

Retiree Servicing Center

UA01

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                                   :
     In re                               :
                                   :
     DELPHI CORPORATION, et al.,   :                         :
                                   :
                                   :
-----------------------------------------------------x

OBJECTION TO MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND
1108 CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID
POSTRETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID
POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED
<u>EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES</u>

**EXHIBIT C**



# YOUR GM BENEFITS
A Handbook for Salaried Employes
in the United States



# When You Retire

## YOUR GM RETIREMENT PROGRAM IS MADE UP OF TWO PARTS

### Part A . . .

is non-contributory. General Motors pays the entire cost. Benefits provided under Part A of the Program are comparable to those provided under the Hourly Pension Plan. This assures salaried employes that they will receive monthly retirement benefits at least equal to those provided to hourly employes. Part A provides monthly benefits for all employes who have 10 or more years of credited service and retire under the Program, or leave General Motors before age 70. There is no 10 year minimum credited service requirement if you retire at age 70. Part A consists of:

- basic benefits;
- temporary benefits; and
- supplements.

### Part B . . .

is contributory. To receive full Part B benefits, you must contribute at all times while eligible and leave your contributions in the Program until retirement. Part B provides you with an opportunity to build up substantial additional monthly benefits, consisting of

- supplementary benefits, which are based on your years of credited service, your average monthly base salary over the highest 60 months during the 120 months immediately preceding retirement, or age 65 if earlier, and
- primary benefits, which are based on the amount you contribute.

While you must contribute to participate in Part B of the Program, General Motors pays the entire cost of supplementary benefits, and most of the cost of primary benefits.

## YOU ARE ELIGIBLE TO PARTICIPATE . . .

in Part A automatically when you become a GM salaried employe.

You are eligible to contribute under Part B when you have:

- attained age 25, and
- have 6 months of continuous service.

Your Part B contribution is 2% of monthly base salary in excess of $1,000. When you elect to participate in Part B, your contribution is deducted from your salary each month.

## YOU ARE ELIGIBLE TO RETIRE . . .

under normal retirement provisions when you attain age 65. Retirement is automatic at age 70.

You may retire at any age if you have 30 or more years of credited service.

If you have 10 or more years of credited service, you may retire:

- as early as age 55, or
- at any age in case of total and permanent disability.

11

# CREDITED SERVICE

Your credited service is used in determining your Part A benefits and any Part B supplementary benefit.

## Before October 1, 1950 . . .

your credited service includes all periods of employment with General Motors and certain periods of absence as explained in the Program.

## After October 1, 1950 . . .

your credited service includes all periods of employment for which you are paid.

If you are on an approved military leave, or on a disability leave and receive workers compensation, you may receive credited service for such absence.

If you were on layoff at any time during 1951 through 1967, upon application you may receive credited service for all or part of such absence. The amount of credited service you will receive will depend on your years of credited service as of December 31, 1967, December 31, 1973, or October 1, 1979, as may be applicable.

Commencing with the calendar year 1968, you are eligible for credited service for each calendar month of disability leave or layoff in a year during which you receive pay for periods totaling at least one month. After 1970, up to eleven months may be credited for a disability leave or layoff which continues into the following year.

If you were on a special leave of absence because of pregnancy between October 1, 1950

and before January 1, 1968, upon application you may receive four months credited service for each such absence.

After age 65, credited service will accrue only until you acquire 10 years of credited service.

## Foundry/Asbestos Service

An employe with credited service on or after October 1, 1979 who at retirement has more than 10 years of credited service accrued in certain salaried positions in foundry or asbestos operations at designated GM locations will receive additional credited service.

## Annual Statement

Each year you will be given a statement showing your total credited service and contributions up to the end of the preceding calendar year.

If you have any question concerning the correctness of your statement, contact your personnel department.

## Loss of Credited Service

You will lose all credited service under the Retirement Program if you quit, are discharged, or are separated for any other reason. However, if you are reemployed by General Motors, your credited service may be reinstated upon proper application. If you have prior credited service which has not been reinstated, you should make application for its reinstatement. Application forms are available at the personnel department.

# ALTERNATIVE "SERVICE" TO DETERMINE VESTED BENEFIT

If you lose credited service before age 70 and have less than 10 years of credited service but have 10 years of "service" as determined below, you would be eligible for a vested Part A basic benefit. For example, if you have only 8 years of credited service but have 10 years of "service", the 10 years' "service" would provide you a vested Part A basic benefit. The monthly amount of the benefit would be based on 8 years of credited service, however.

You first become eligible to be covered for the "service" provision when you attain age 25, or complete 1 year of "service", whichever is later. You get 1 year of "service" when you complete 750 hours of "service" in a 12 consecutive month period, beginning with your employment date. You complete an hour of "service" for each hour for which you are paid by General Motors, for working or for having been entitled to work. No "service" is granted for any period of

12

employment prior to age 22, or for any year in which you are paid by General Motors for working fewer than 750 hours.

A 1-year break in "service" will occur if you do not complete 375 hours of "service" in any 12 consecutive month period. Hours paid for vacation and sickness or disability which are not worked may be counted to prevent a break in "service". You will lose your years of "service" if the number of consecutive 1-year breaks equals or exceeds the years of "service" before such break.

# RETIREMENT AT AGE 62 OR LATER

If you retire at or after age 62, you may receive the following benefits.

## Part A Basic Benefit

Your monthly Part A basic benefit is determined by your basic benefit rate times your years of credited service.

Your basic benefit rate depends on your benefit class code (which is based on the maximum monthly base salary rate for your salaried position) and your retirement date, as follows:

| Benefit Class Code | Retirement Date and Monthly Basic Benefit Rate Per Year of Credited Service | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 10-1-79 through 1-1-80 | 2-1-80 through 7-1-80 | 8-1-80 through 9-1-80 | 10-1-80 through 1-1-81 | 2-1-81 through 7-1-81 | 8-1-81 through 9-1-81 | 10-1-81 through 1-1-82 | 2-1-82 through 7-1-82 | 8-1-82 and after |
| A | $ 15.75 | $ 15.95 | $ 16.20 | $ 16.55 | $ 16.85 | $ 17.15 | $ 17.55 | $ 17.85 | $ 18.20 |
| B | 16.00 | 16.20 | 16.45 | 16.80 | 17.10 | 17.40 | 17.80 | 18.10 | 18.45 |
| C | 16.25 | 16.45 | 16.70 | 17.05 | 17.35 | 17.65 | 18.05 | 18.35 | 18.70 |
| D | 16.50 | 16.70 | 16.95 | 17.30 | 17.60 | 17.90 | 18.30 | 18.60 | 18.95 |

Most salaried employes have the "D" benefit class code. For example, if you retire October 1, 1981, at age 65 with a basic benefit rate of $18.30 and have 30 years of credited service, your monthly Part A basic benefit will be $549.00 ($18.30 × 30 = $549.00).

## After-Retirement Increases In Part A Basic Benefit

Your monthly Part A basic benefit rate will be increased periodically after your retirement. The dates and amounts of these increases are shown in the following table:

| Date and Amount of Increase in Monthly Basic Benefit Rate Per Year of Credited Service | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2-1-80 | 8-1-80 | 10-1-80 | 2-1-81 | 8-1-81 | 10-1-81 | 2-1-82 | 8-1-82 |
| $ 0.20 | $ 0.25 | $ 0.25 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.30 | $ 0.35 |

13

## Special Benefit

In addition, at age 65, or earlier if you are en-
rolled for Part B of Medicare under Social Secu-
rity, you will receive a monthly special benefit as
described on pages 17 and 18.

## Part B Primary Benefit

Your Part B primary benefit will be based on your
contributions in the Program. This monthly bene-
fit will equal 5% of your contributions made be-
fore July 1, 1977, plus 6¼% of your contributions
made between July 1, 1977, and October 1, 1979,
plus 8½% of your contributions made thereafter.

For example, if you retire October 1, 1981, and
you had contributed $8,800 before July 1, 1977,
$900 between July 1, 1977, and October 1, 1979,
and $700 through September 30, 1981, your
monthly Part B primary benefit would be:

$$\$8,800 \times 5\% \ = \$440.00$$
$$\$ 900 \times 6\tfrac{1}{4}\% = \ \ 56.25$$
$$\$ 700 \times 8\tfrac{1}{2}\% = \ \ 58.31$$

Monthly Part B
Primary Benefit  $554.56

No Part B contributions will be permitted under
the Program after the first day of the month coin-
ciding with or next following your 65th birthday.

## Part B Supplementary Benefit

You also may receive a monthly Part B
supplementary benefit. This benefit will equal
1% of the amount by which your average
monthly base salary exceeds the applicable
amount shown in the following table, multiplied
by your years of credited service. Average
monthly base salary is calculated over the high-
est 60 months during the 120 months preceding
the earlier of age 65 or date of retirement.

| Retirement Date | Applicable Amount |
|---|---|
| | $ |
| 10-1-79 through 1-1-80 | 1,650 |
| 2-1-80 through 7-1-80 | 1,670 |
| 8-1-80 through 9-1-80 | 1,695 |
| 10-1-80 through 1-1-81 | 1,730 |
| 2-1-81 through 7-1-81 | 1,760 |
| 8-1-81 through 9-1-81 | 1,790 |
| 10-1-81 through 1-1-82 | 1,830 |
| 2-1-82 through 7-1-82 | 1,860 |
| 8-1-82 and after | 1,895 |

For example, if you retire October 1, 1981, at age
65 with an average monthly base salary of
$2,100 and have 30 years of credited service,
your monthly Part B supplementary benefit
would be $81.00:

60 Month Average Base Salary ........ $2,100.00
Less Applicable Amount ............... 1,830.00
$  270.00

Times Part B Supplementary
Benefit Rate ............. ×  1%
$  2.70

Times Years of Credited Service ... ×  30

Equals Monthly Part B
Supplementary Benefit .... ..... $  81.00

Summarizing the examples shown for an em-
ploye retiring October 1, 1981, at age 65 with 30
years of credited service, the total monthly bene-
fits at retirement would be:

Part A Basic Benefit ......... ....$549.00
Part B Primary Benefit ....... ... 554.56
Part B Supplementary Benefit .. .. 81.00
Special Benefit .................. 9.70
Total Monthly Benefit ......... ...$1194.26

# RETIREMENT PRIOR TO AGE 62 WITH UNREDUCED BENEFITS

Your benefits will not be reduced if you have 10
or more years of credited service and you retire
prior to age 62 under one of the following types
of retirement:

- Mutually Satisfactory Retirement—as early as
age 60. Retirement must be agreeable to you
and General Motors.

- Special Early Retirement—as early as age 55
and prior to age 60. Retirement must be

initiated by General Motors and must be
agreeable to you.

- Corporation Option Retirement—as early as
age 55. If retirement is before age 60, it is
subject to certain conditions and approval by
the applicable Corporation Committee.

- Disability Retirement—at any age. Retirement
can commence after you are disabled for at
least 5 months.

## Part A Basic Benefit

For any of the preceding types of retirement, your monthly Part A basic benefit, as shown on page 13, will be determined as if you had retired at age 62, but based on your credited service at the time you retire.

## Part A Temporary Benefit

In addition, you may receive a monthly Part A temporary benefit until you reach age 62, or if earlier, until you become eligible for Social Security disability insurance benefits.

The amount of your monthly temporary benefit will be based on your years of credited service, up to 25, and your retirement date, as follows:

| Retirement Date | Monthly Temporary Benefit Per Year of Credited Service | Maximum |
|---|---|---|
|  | $ | $ |
| 10-1-79 through 9-1-80 | 13.00 | 325.00 |
| 10-1-80 through 9-1-81 | 14.00 | 350.00 |
| 10-1-81 and after | 15.00 | 375.00 |

If you retire because of total and permanent disability, the temporary benefit will be paid only if you submit evidence that you are not eligible for Social Security disability insurance benefits.

## Part A Supplements

You also may receive a monthly Part A early retirement supplement. This supplement is reduced by any monthly Part B supplementary benefit payable to you. This supplement is described on page 16.

## Special Benefit

In addition, at age 65, or earlier if you are enrolled for Part B of Medicare under Social Security, you will receive a monthly special benefit as described on pages 17 and 18.

## Part B Primary Benefit

If you have contributions in the Program, you also will receive a monthly Part B primary benefit, determined as if you had retired at age 62, but based upon the actual amount of contributions you made. An example of this benefit is shown on page 14.

## Part B Supplementary Benefit

Any monthly Part B supplementary benefit will be based on your average monthly base salary over the highest 60 months during the 120 months immediately preceding retirement and credited service at the time you retire. An example of this benefit is shown on page 14.

# RETIREMENT PRIOR TO AGE 62 WITH REDUCED BENEFITS

You may retire voluntarily with reduced benefits

* at any age if you have 30 or more years of credited service, or

* as early as age 55 and prior to age 62 if you have 10 or more years of credited service.

## Part A Basic Benefit

Your monthly Part A basic benefit as shown on page 13 will be determined as if you had retired at age 62, but based on your credited service at the time you retire. This benefit then will be reduced based on your age at retirement if you elect to have it commence before you attain age 62. However, if you have 30 or more years of credited service or your years of age and credited service total 85 or more, such reduction will apply only until you attain age 62.

## Part A Supplements

You also may receive a monthly Part A "early retirement", or an "interim" supplement. These supplements are reduced by any monthly Part B supplementary benefit payable to you. Part A supplements are described on pages 16 and 17.

15

## Special Benefit

In addition at age 65, or earlier if you are enrolled for Part B of Medicare under Social Security, you will receive a monthly special benefit as described on pages 17 and 18.

## Part B Benefits

Any monthly Part B primary and supplementary benefits, as described on page 14, will be determined just as for other types of retirement. Monthly Part B benefits will be reduced permanently, however, if you elect to have them commence prior to age 62.

### Important Note

If you retire voluntarily as early as age 55 and prior to age 60, and your combined years of age and credited service total less than 85, other GM benefit programs as well as your benefits under the Retirement Program will be affected. For example:

- You will forfeit unearned GM contributions under the Savings-Stock Purchase Program;
- You must pay the full cost of any insurance coverages you may wish to continue; and
- Your retirement benefits will be further reduced.

## PART A SUPPLEMENTS FOR RETIREMENT WITH 30 OR MORE YEARS OF SERVICE

### An "Early Retirement Supplement". . .

may be payable to you each month if you retire before age 62 with 30 or more years of credited service. This supplement is an amount which, when added to the sum of all other Part A and any Part B supplementary benefits payable to you, prior to reduction for any survivor option, will raise the total of these benefits, payable prior to your attaining age 62, to the amount shown in the following table:

| Retirement Date and Total Monthly Benefit Amount for Determining Early Retirement Supplement Prior to Age 62 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10-1-79 through 1-1-80 | 2-1-80 through 7-1-80 | 8-1-80 through 9-1-80 | 10-1-80 through 1-1-81 | 2-1-81 through 7-1-81 | 8-1-81 through 9-1-81 | 10-1-81 through 1-1-82 | 2-1-82 through 7-1-82 | 8-1-82 and after |
| $800 | $810 | $825 | $845 | $860 | $875 | $895 | $915 | $935 |

## After Retirement Increases in Total Monthly Benefit Amount

Your total monthly benefit amount will be increased periodically after your retirement. The dates and amounts of these increases are shown in the following table:

| Retirement Date | Date and Amount of Increase in Total Monthly Benefit Amount | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2-1-80 | 8-1-80 | 10-1-80 | 2-1-81 | 8-1-81 | 10-1-81 | 2-1-82 | 8-1-82 |
| 10-1-79/9-1-80 | $10 | $15 | $15 | $15 | $15 | $15 | $15 | $15 |
| 10-1-80/9-1-81 | | | | $15 | $15 | $15 | $15 | $20 |
| 10-1-81 and after | | | | | | | $20 | $20 |

# PART A SUPPLEMENTS FOR RETIREMENT WITH LESS THAN 30 YEARS OF SERVICE

## An "Interim" Supplement . . .

may be payable to you each month until you attain age 62 if you retire *voluntarily* before age 62 with less than 30 years of credited service. If you retire as early as age 55 and prior to 60, your age plus credited service must total 85 or more to be eligible for this supplement. The table to the right shows the amount of this supplement, which is based on your age at retirement. The amount of this supplement is reduced by the amount of any monthly Part B supplementary benefit payable to you prior to reduction for any survivor option.

| Age at Retirement | Monthly Amount of "Interim" Supplement Per Year of Credited Service | | |
|---|---|---|---|
| | 10-1-79 | 10-1-80 | 10-1-81 |
| | $ | $ | $ |
| 55 | 4.75 | 5.00 | 5.25 |
| 56 | 5.75 | 6.00 | 6.25 |
| 57 | 7.00 | 7.25 | 7.50 |
| 58 | 8.25 | 8.50 | 8.75 |
| 59 | 9.00 | 9.50 | 10.00 |
| 60 | 10.50 | 11.00 | 11.50 |
| 61 | 10.50 | 11.00 | 11.50 |

Note: Amounts are prorated for intermediate ages.

# PART A SUPPLEMENTS—LIMITATIONS

* Supplements are not payable to you if you retire *voluntarily* as early as age 55 and prior to age 60 and the sum of your age and years of credited service is less than 85, or if you are discharged.

* If your total monthly Part A and Part B supplementary benefits at retirement prior to age 62 would be more than 70% of your final monthly base salary plus cost of living allowance, any supplement will be reduced by the amount over 70%.

* If you retire voluntarily and become eligible for a Social Security disability insurance benefit, your supplement will be reduced by the temporary benefit in effect at the time of your Social Security disability insurance benefit award.

* If, after retirement, you earn more in a calendar year than the following amounts, any supplement payable prior to age 62 will be reduced by $2 for each $1 of your excess earnings:

| Calendar Year | Annual Earnings Limitation Amount |
|---|---|
| | $ |
| 1980 | 4,500 |
| 1981 | 5,000 |
| 1982 | 5,500 |

# WORKERS COMPENSATION OFFSET

Workers compensation benefits paid to retired employes will be deducted from GM retirement benefits otherwise payable, unless such workers compensation payments are paid under a claim filed not later than two years after the employe lost credited service.

# SPECIAL BENEFIT

Each retired employe and surviving spouse who is age 65 or older and receiving a GM monthly Part A retirement benefit or a retirement survivor benefit will receive an additional monthly benefit amount, provided under the Insurance Program, but included in the monthly retirement check, as follows:

| 10-1-79 through 9-1-80 | 10-1-80 through 9-1-81 | 10-1-81 and after |
|---|---|---|
| $ | $ | $ |
| 8.70 | 9.20 | 9.70 |

17

This benefit also is payable upon application to a retiree or surviving spouse receiving GM monthly Part A retirement benefits who is under age 65 and enrolled in Part B of Medicare. It is not payable to former employes receiving deferred vested retirement benefits or to the surviving spouses of such former employes. Not more than one such special benefit is payable to any individual for any one month.

## SURVIVOR BENEFITS

In the event of your death, either before or after you retire, monthly benefits may be provided for the lifetime of your survivor.

Refer to pages 38, 39 and 40 for an explanation of these important benefits, including the optional pre-retirement surviving spouse benefit available at no cost to you if you contribute under Part B of the Program.

## SOCIAL SECURITY BENEFITS . . .

are in addition to your GM retirement benefits. You and General Motors contribute equally to the cost of Social Security benefits. Your share of the cost is deducted from your pay. Social Security old age benefits may begin as early as age 62 in a permanently reduced amount. Benefits are payable in full if they begin at or after age 65.

Social Security disability insurance benefits may begin at any age.

Your spouse's Social Security benefit at age 65 will be equal to one-half of your unreduced Social Security benefit, unless your spouse is eligible for a higher benefit based on his or her own earnings. Your spouse may receive a permanently reduced benefit as early as age 62, or age 60 if a widow or a widower.

The following table may help you estimate your monthly Social Security benefit. The table is based on the Social Security provisions in effect on January 1, 1980:

| If You Retire At Age | ESTIMATED MONTHLY SOCIAL SECURITY OLD AGE BENEFITS FOR RETIREMENT IN 1980 | | | | | |
|---|---|---|---|---|---|---|
| | And Social Security Commences When You and Your Spouse Are | | | | | |
| | Age 65 | | | Age 62 | | |
| | Retiree | Spouse | Total | Retiree | Spouse | Total |
| | $ | $ | $ | $ | $ | $ |
| 65 | 570 | 285 | 855 | | | |
| 62 | 503 | 251 | 754 | 402 | 189 | 591 |
| 60 | 491 | 245 | 736 | 393 | 184 | 577 |
| 55 | 460 | 230 | 690 | 368 | 172 | 540 |

NOTE: Amounts are rounded to nearest dollar. In all instances, you and your spouse are assumed to be the same age. You and your spouse may receive lower benefits from Social Security than those shown above if you earned less than the maximum amount subject to Social Security taxes. These amounts are based on assumptions which were reasonable at the time estimates were made. Because Social Security benefits actually payable reflect individual and national average earnings as well as fluctuations in the consumer price index, you may wish to obtain an estimate based on your personal earnings history from your local Social Security office before retiring.

## EXAMPLES—RETIREMENT AT AGE 65

Assume you have participated fully in Part B of the Program and retire June 1, 1980 at age 65 with 30 years of credited service.

| YOUR COMBINED MONTHLY GM AND SOCIAL SECURITY BENEFITS ESTIMATED FOR RETIREMENT ON JUNE 1, 1980 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Contri-butions to age 65 | Assumed Average Monthly Base Salary Highest 60 of 120 Months Before Retirement | Monthly Benefit Amounts | | | | | |
| | | | Part B | | Social Security (Maximum) | | |
| | | Part A | Primary | Supple-mentary | Self | Spouse | Total |
| $ 8,400 | $ 1,800 | $ 501 | $ 335 | $ 39 | $ 570 | $ 285 | $ 1,730 |
| 9,930 | 2,100 | 501 | 415 | 129 | 570 | 285 | 2,001 |
| 10,650 | 2,400 | 501 | 554 | 219 | 570 | 285 | 2,129 |
| 11,840 | 2,700 | 501 | 590 | 309 | 570 | 285 | 2,255 |

NOTE: Amounts are rounded to the nearest dollar. Increases in both Part A and Part B benefits which are scheduled to become effective subsequent to June 1, 1980 would be added to the amounts shown in all cases. You and your spouse are assumed to be the same age. You and your spouse may receive lower benefits from Social Security than the estimated amounts shown above if you earned less than the maximum amount subject to Social Security taxes.

## MORE INFORMATION ABOUT YOUR RETIREMENT BENEFITS

Additional information about Salaried Retirement Program benefits appears elsewhere in this booklet under applicable headings. For more information about your retirement, you should contact your personnel department.

## OTHER BENEFIT PROGRAM COVERAGES—AFTER RETIREMENT

### Savings-Stock Purchase Program

You may receive a lump sum distribution of your account, including full earn-out of GM contributions (except for voluntary retirement as early as age 55 and prior to age 60 when your combined years of age and credited service total less than 85—in which case you will receive earned-out GM contributions).

Deferral of Distribution—If you retire during a year in which you will not reach or exceed age 65, you may defer the receipt of your account until the next year.

Lifetime Annuity Contract—In lieu of receiving your account in a lump sum at retirement or deferring receipt of your account, you may elect to convert all or part of your eligible assets to an annuity which will provide a monthly income after retirement. The conversion would be made through an insurance carrier selected by General Motors, at favorable group rates.

Individual Retirement Account—Another alternative available at retirement, outside the Savings-Stock Purchase Program, is the conversion or "roll over" of certain assets to an Individual Retirement Account (IRA). Similar to the Annuity Option, an IRA will provide for deferred income. The "roll over" of assets is arranged

19

between you and a bank or investment company of your choice.

Refer to page 21 for additional information on the Savings-Stock Purchase Program.

## Employe Stock Ownership Plan

You will receive two distributions of your account following your retirement. The first distribution will be in February following the year of retirement. It will consist of your entire balance at that time. In February of the second year following the year of termination, the amount allocated to your account for the year in which you retired will be distributed. Refer to page 25 for additional information about the Employe Stock Ownership Plan.

## Health Care Coverages

Your basic Health Care coverages (except vision prior to October 1, 1980) will be provided at GM expense for your lifetime (except for voluntary retirement as early as age 55 and prior to age 60 when combined years of age and credited service total less than 85, or for retirement as early as age 60 and prior to 65 without retirement benefits).

If you retire voluntarily as early as age 55 and prior to age 60 when your combined years of age and credited service total less than 85, or retire as early as age 60 and prior to 65 without retirement benefits, you may continue your basic Health Care coverages for your lifetime provided you pay the full monthly cost.

During periods that basic coverages are in effect, you also may continue your comprehensive medical expense insurance coverage by making the monthly contributions applicable to retirees (see page 6) or by paying the full monthly cost if applicable.

## Life Insurance

Your basic life, extra accident, and survivor income benefit insurance will be continued at GM expense until age 65 (except for voluntary retirement as early as age 55 and prior to age 60 when your combined years of age and credited service total less than 85). At age 65, extra accident and survivor income benefit insurance ceases.

If you retire voluntarily as early as age 55 and prior to age 60 when your combined years of age and credited service total less than 85, you may continue your basic life, extra accident, and survivor income benefit insurance to age 65, provided you pay 50 cents per month for each $1,000 of basic life insurance in force.

Refer to page 36 for an explanation of continuing life insurance protection after age 65.

If you have at least 5 years of participation at age 60 and cease active work for any reason, you may continue basic life, extra accident, and survivor income benefit insurance to the end of the month in which you attain age 65. If you are eligible for retirement benefits, General Motors will pay the full cost of such insurance. If you are not eligible for retirement benefits, you must contribute 50 cents per month for each $1,000 of basic life insurance in force.

Optional and dependent group life insurance may be continued to age 70 provided that your basic life insurance remains in force and you pay the required monthly contributions. See page 37 for further explanation of these coverages after age 65.

## Personal Accident Insurance

You may continue this insurance on yourself and any eligible dependents for your lifetime, by paying the required premiums. However, after you are age 70, insurance in force on any person insured may not exceed $50,000.



S-200M-8-80

Litho in USA

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


---------------------------------------------------x
                                                   :
        In re                                      :
                                                   :
        DELPHI CORPORATION, et al.,                :                                    :
                                                   :
                                                   :
---------------------------------------------------x

OBJECTION TO MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND
1108 CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID
POSTRETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID
POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED
EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES


**EXHIBIT D**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Jayant Tambe (JT 0118)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

|  |  |
|---|---|
| In re | : Chapter 11 |
|  | : |
| Dana Corporation, *et al.*, | : Case No. 06-10354 (BRL) |
|  | : |
|  | : (Jointly Administered) |
| Debtors. | : |
|  | : |

------------------------------------------------------------x

**MEMORANDUM OF LAW OF DEBTORS AND DEBTORS IN POSSESSION
IN SUPPORT OF MOTION FOR AN ORDER, PURSUANT TO 11 U.S.C. § 363,
AUTHORIZING DEBTORS TO TERMINATE UNVESTED NON-PENSION BENEFITS
OF (I) NON-UNION RETIREES AND (II) NON-UNION ACTIVE EMPLOYEES**

NYI-3964062v3

The Debtors have determined, after an exhaustive search of records, that *none* of the plans identified in the Declaration of Robert Arquette dated February 13, 2007 (the "Arquette Declaration") contain "clear and express" language purporting to vest retiree welfare benefits. Indeed, as detailed below, all but one of the plans expressly reserve the unilateral right of the Debtors to modify or terminate the plans at any time. Accordingly, under applicable contract and non-bankruptcy law, the Non-Pension Retiree Benefits are not vested and such plans can be terminated immediately with the aim of reducing significantly the Debtors' current and future cash expenditures for Non-Pension Retiree Benefits to their Non-Union Retirees and Active Employees, thereby enhancing the prospects of a successful reorganization.

Because (a) the Debtors have the contractual right to terminate the Non-Pension Retiree Benefits for Non-Union Retirees and (b) Non-Union Active Employees are not yet eligible for retiree benefits, the Debtors wish to exercise the rights they have under the applicable agreements and non-bankruptcy law to terminate the benefits currently being provided and the plans under which active employees might otherwise expect to receive such benefits in the future.[2] As described in more detail herein and in the Section 1113/1114 Motion, the Debtors have determined, in their reasonable business judgment, that termination is desirable and in the best interests of the Debtors' estates.

For the Debtors' Non-Union Retirees, particularly in light of this Court's cautions on this topic in the *Bethlehem Steel* chapter 11 cases and earlier in these cases, the Debtors seek relief

---

(continued...)

*Grain Millers, AFL-CIO v. Int'l Multifoods Corp.*, 116 F.3d 976, 979 (2d Cir. 1997) ("the benefits provided by a welfare plan generally are not vested and an employer can amend or terminate a welfare plan at any time").

[2] Such termination does not require approval under the procedures of section 1114 of the Bankruptcy Code because section 1114 does not confer benefits, or create rights, that do not otherwise exist. Moreover, section 1114 has no applicability whatsoever with respect to the active, non-union retirees that are also the subject of this Motion.

- 3 -

• <u>Wix Filtrator Products Division</u>

Approximately 257 Non-Union Retirees formerly affiliated with the Debtors' Wix

Filtrator products division receive (there are also approximately 150 Non-Union Active

Employees with an expectation of potentially receiving benefits upon retirement, but who are not

yet receiving any benefits from the Debtors under this plan) Non-Pension Retiree Benefits under

the Wix retiree benefits plan for Wix salaried retirees ("<u>Wix Filtrator Plan</u>").

C.    **Plans Applicable to Non-Union Active Employees**

As of January 1, 2006, there were approximately 7,674 Non-Union Active Employees

who potentially in the future may be covered under one of the Debtors' Non-Pension Retiree

Benefit plans (with the overwhelming majority covered under one of the Debtors' Retiree Flex

plans), but who may or may not be eligible to receive retiree benefits from the Debtors upon

retirement depending on whether such Non-Union Active Employees have satisfied the

eligibility requirements for coverage. If these employees were to retire while the plans under

which they are covered were in effect and such employees satisfied all eligibility requirements

for coverage, they would be entitled to receive Non-Pension Retiree Benefits as described in

Exhibit A to the Arquette Declaration.

D.    **Provisions Of The Relevant Documents**

Significantly, *none* of the Plan documents identified above contains any "clear and

express" provision for the vesting of Non-Pension Retiree Benefits. Indeed, with one exception,

discussed below, the plans identified above all contain express language preserving Debtors'

right to modify or terminate Non-Pension Retiree Benefits. For example, the 2003 Brown Book

and the Benefit Plans for Management People both contain the following express reservation of

rights provisions:

> Dana reserves the right (provided it isn't inconsistent with state or
> federal legislation) to change, reduce, or terminate the Plan's
> benefits, or to charge a fee for them, without prior consent of any
> employee, retiree, or beneficiary. Any such action would be in the
> form of a written instrument executed or approved by the Director
> of Dana Benefits and Payroll Service, and would be taken only
> after careful consideration.

(2003 Brown Book, (Arquette Decl. Ex. D at 1)).

The 2003 Blue Book contains a reservation of rights provision that is virtually identical to

that in the 2003 Brown Book. (*See* 2003 Blue Book (Arquette Decl. Ex. F at 1)). The 1988-

1992 Retiree Flex Plan, which covers most of the 1988-1992 Non-Union Retirees, contains the

following express reservation of rights provision:

> It is hoped that the plans and policies described in this summary
> will continue indefinitely. However, the company reserves the
> right (provided it is not inconsistent with state or federal legislation)
> to change, reduce or terminate plans, policies or benefits, or to
> charge a fee for them, without prior consent of any employee,
> retiree or beneficiary. Any such action will be taken only after
> careful consideration.

(*See* 1988-1992 Retiree Flex plan (Arquette Decl. Ex. G at 1.). The Dana Corporation Retiree

Flex Program SPD (printed in May 1995) and the Dana Corporation Retiree Flex SPD (printed in

March 2001) both contain reservation of rights language, as follows:

> Although not anticipated, Dana reserves the right (provided it isn't
> inconsistent with state or federal legislation) to change, reduce, or
> terminate the program's benefits, or to charge a fee for them,
> without prior consent of any employee, retiree, or beneficiary.
> Any such action would be taken in the form of a written instrument
> executed or approved by Dana's Director of Dana Benefits Service,
> and would be taken only after careful consideration.

> Participation in the program described in this summary doesn't
> infer or imply any rights to continued benefits except as outlined in
> the plan document. Your benefits cannot be assigned, transferred,
> or sold for any reason. This summary is not a legal contract
> between you and Dana.

(Dana Corporation Retiree Flex Program SPD (printed in May 1995) (Arquette Decl. Ex. H at 3)).

> Although not anticipated, Dana reserves the right (provided it isn't inconsistent with state or federal legislation) to change, reduce, or terminate the Plan's benefits, or to charge a fee for them, without prior consent of any employee, retiree, or beneficiary. Any such action would be taken only after careful consideration.

(Dana Corporation Retiree Flex Program SPD (printed in March 2001) (Arquette Decl. Ex. H at 1)).

Finally, each of the plan documents applicable to specific facilities or divisions contains a reservation of rights provision that is virtually identical to the provisions set forth above. In aggregate, the plans at issue in the Motion concern a total of 13,203 persons – comprised of 5,823 Non-Union Retirees covered by these plans, and 7,380 Non-Union Active Employees that have some expectation of coverage under one of the plans upon retirement and satisfaction of all eligibility requirements.[19] Terminating the plans will reduce the APBO for both Non-Union Retirees and Non-Union Active Employees by approximately $404 million.

---

[19] The 5,823 Non-Union Retirees represents current retirees for which the Debtors have located plans or summary plan descriptions, copies of which are attached to the Arquette Declaration. The Debtors are still investigating whether they have any plans or summary plan descriptions with respect to the remaining 507 Non-Union Retirees and reserve their rights to come back to this Court at a later time for relief with respect to these remaining Non-Union Retirees or, alternatively, deal with these Non-Union Retirees as part of the Section 1113/1114 Motion. With respect to Non-Union Active Employees, although the plans or summary plan descriptions attached to the Arquette Declaration cover only 7,380 of the 7,674 Non-Union Active Employees referenced on page 4 hereof, the Debtors believe that they are entitled to terminate any expectation to Non-Pension Retiree Benefits that any eligible Non-Union Active Employee may have, and, therefore, have filed the Motion with respect to all 7,674 Non-Union Active Employees.

NYI-3964062v3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
                                        :
        In re                           :
                                        :
        DELPHI CORPORATION, et al.,     :                              :
                                        :
                                        :
-------------------------------------------------------x
```

OBJECTION TO MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND
1108 CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID
POSTRETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID
POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED
<u>EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES</u>

**EXHIBIT E**

Hearing Date: March 12, 2007 at 10:00 a.m. E.S.T.
Response Deadline: February 26, 2007 at 4:00 p.m. E.S.T.

STAHL COWEN CROWLEY LLC
Jon D. Cohen (IL 6206666), *Pro Hac Vice*
Trent P. Cornell (IL 6242712), *Pro Hac Vice*
55 West Monroe Street, Suite 1200
Chicago, Illinois 60603
(312) 641-0060
(312) 641-6959 facsimile

Counsel for the Official Committee
of Non-Union Retirees of Dana Corporation, Inc.
and its Debtor Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | x |
| **DANA CORPORATION, et al.,** | **Chapter 11** |
| | **Case No. 06-10354 (BRL)** |
| | **(Jointly Administered)** |
| **Debtors.** | |
| | x |

**THE RETIREE COMMITTEE'S OBJECTION TO THE MOTION OF DEBTORS
AND DEBTORS IN POSSESSION FOR AN ORDER, PURSUANT TO 11 U.S.C. §
363, AUTHORIZING DEBTORS TO TERMINATE UNVESTED NON-PENSION
BENEFITS OF (i) NON-UNION RETIREES AND
(ii) NON-UNION ACTIVE EMPLOYEES**

TO:   **THE HONORABLE BURTON R. LIFLAND,**
      **UNITED STATES BANKRUPTCY JUDGE**

The Official Committee of Non-Union Retirees (the "Retiree Committee") of

Debtor Dana Corporation ("Dana") and its Affiliated Debtors (collectively, the

"Debtors"), Objects to the Debtors' Motion for an Order Pursuant to 11 U.S.C. § 363,

Authorizing Debtors to Terminate Unvested Non-Pension Benefits of (i) Non-Union

employees and retirees health care and welfare plans through various programs (Dana was highly de-centralized, so the programs varied by location to some degree). Dana consistently strived to provide somewhat under-market pay, but made up for that deficiency with what it sold to its employees as superior employment and retirement benefits. As a result of ERISA requirements providing that employee welfare benefit plans be written with simplified terms provided to employees, Dana created and distributed formalized Summary Plan Descriptions starting in 1977. (See Declaration of Larry Kolhorst[4], ¶¶ 2-4.)

Dana's longest standing retiree benefit plan was called the Dana Management Benefit Plan, or, informally, the "Brown Book." The Brown Book applied to all non-union employees at its home grown divisions (and those acquired during the 1970's).[5] (See Kolhorst Dec., ¶ 4 and Exhibit A attached thereto; *see also* Declaration of R. Arquette attached to Debtors' Unilateral Termination Motion at ¶¶ 9, 11).

Starting in or about July of 1977, Dana provided its current employees and new hires with the Brown Book. (Kolhorst Dec., ¶ 4.) These SPDs were brown vinyl three-ring binders entitled "Benefit Plans for Dana Management" (hereinafter "Management Plan SPD"), hence the moniker "Brown Book". (*Id.; see also* Ex. 1 attached hereto.) The Management Plan SPD described the healthcare and insurance benefits applicable to

---

[4] The declarations of Larry Kolhorst ("Kolhorst Dec."), Janice Konoff ("Konoff Dec."), Jack Slupecki ("Slupecki Dec.") and Wanda Maroney ("Maroney Dec.") are filed contemporaneously herewith in support of this Objection and are incorporated herein. The Declarations of W. Watkins, B. Boston and R. Smith were filed in conjunction with the Retiree Committees' Opposition to Motions of Debtor in Possession to Reject their Collective Bargaining Agreements and to Modify Their Retiree Benefits Pursuant to Sections 1113 and 1114 of the Bankruptcy Code and are adopted and wholly incorporated herein.

[5] At various time, Dana grew through acquisition. In its earlier years, it would sometimes fold the new employees into its Dana Benefit Management Plan. In later years it would allow the divisions it purchased to maintain their own and/or the benefit plans previously in place before the acquisition. These will be addressed separately later in this Objection.

4

active employees and it also contained a tabbed section titled "Retiree Insurance" that

described: (1) how long an employee would have to work to be eligible for retiree

benefits (the "Vesting Requirements"); and (2) a detailed description of the healthcare

and insurance benefits that would be maintained after retirement. (See Kohlhorst Dec., ¶

8 and Exhibit A thereto at p. 25; the "Retiree Insurance" tab, is also attached hereto as

Exhibit 2 for purposes of convenience.)

Larry Kohlhorst was the chief author of the Management Plan SPD. (Kohlhorst

Dec., ¶ 2 and Ex. A thereto). It was Mr. Kohlhort's job to translate the welfare benefit

plan into language that could be understood by Dana's employees and its retirees as

required by ERISA. The Management Plan SPD had *no* language reserving any right to

terminate, amend or alter the retiree benefits reflected therein. (Kohlhorst Dec., ¶¶ 10-12

and Exhibit A thereto).[6] Prior to distributing the Management Plan SPD, it was reviewed

by numerous people at Dana, including Dana's legal department.

The Management Plan SPD contained language affirmatively providing for the

vesting of retiree benefits in several different respects. First, the Management Plan SPD

expressly required that an employee must "retire with at least 30 years of service, or be at

least age 60 at retirement and eligible for pension benefits from the Retirement Income

---

[6] The Debtors' Motion is supported by the declaration of Robert Arquette. Mr. Arquette admits
that more than one version of the 1980 Brown Book was located, but includes them both as
exhibits to his declaration. He asserts that one copy of a 1980 Brown Book located appears to
contain unilateral termination language. (See ¶ 10 and footnote No. 2 of R. Arquette Declaration
filed in support of Motion For An Order, Pursuant to 11 U.S.C. § 363, Authorizing Debtors to
Terminate Unvested Non-Pension Benefits of (I) Non Union Retirees and (II) Non-Union Active
Employees.) As amplified in greater detail herein, the exhibit referred to by Mr. Arquette is not
an accurate copy of what actually existed in 1980. First, it should be noted that every other page
in the 1980 Brown Book Exhibit attached by Debtors is dated *except* for the page containing the
unilateral termination language. Second, as demonstrated through sworn testimony in
declarations filed in support of this Objection, the undated unilateral termination language was
not added until April 1983 at the earliest—because Mr. Kohlhorst had not written it until then.
*See also* Decl. of W. Watkins at ¶ 16.

Plan [(requiring a minimum of 10 years of service plus]" (Kohlhorst Dec., ¶ 8 and Ex. A

thereto at p. 25; see also Ex. 2.)  The "eligibility" requirements in the Management Plan

SPD further stated that "terminated employees with *vested* rights are not eligible." (*Id.* at

¶ 9.)  Thus, employees were informed that by meeting the eligibility requirements they

were "vested" and Dana asserted that these "vested" rights could only be lost if they were

fired.

The Management Plan SPD specifically stated that if the Vesting Requirements

were met:

All healthcare coverage except Vision Care continue for:
- You and your eligible dependants
- The surviving spouse and eligible dependants of deceased retirees, and
- The surviving spouse and eligible dependants of deceased employees who
  were eligible for early retirement benefits at the date of death.

(Kohlhorst Dec., Ex. A, p. 25)

The Management Plan SPD also affirmatively provided that life insurance

(pursuant to a specific formula) would be provided throughout a retiree's life by Dana.

(*Id.*; Exhibit 2.)  With respect to life insurance, the Management Plan SPD provided that:

"Your full life insurance amount is continued for the first year of retirement.  It is then

reduced by 10% the second year and by the same amount each succeeding year until 50%

of the original amount remains." *Id.*  Some Management Plan SPDs had language further

stating that life insurance "stays in effect for your lifetime." (*See* Ex. 2 and Ex. 15.)

When read as a whole, the Management Plan SPD gave Dana's employees a

unilateral offer that if they met the Vesting Requirements by the time that they retired,

then they had earned vested health and life insurance for their lifetimes. (See Kohlhorst

Dec., ¶ 12.).  Accordingly, the Management Plan SPD consisted of an offer (or promise)

6

of future retirement benefits if an employee would either start work for Dana or forgo

other employment opportunities and continue working for Dana for a *very* long period of

time.  These benefits further represented part of the earned compensation that was

provided to its employees in lieu of additional salary. (*See* Kohlhorst Dec., ¶ 8; *see also*

explanation of purpose by Debtors when they utilized identical eligibility requirements in

a different plan, reflected in Konoff Dec., Exhibit A thereto, "Overhead" No. 4).

      2.      **Dana's Efforts to Hide Its Vesting Obligations**

      The Management Plan SPD was offered to Dana's non-union workforce and

remained largely unchanged until—at the earliest—1983. The first inclusion of an

asserted right to unilaterally modify or terminate the Management Plan SPD arose out of

an internal review of Dana's benefit plans in late 1982 or early 1983. (Kohlhorst Dec., ¶

12).  Mr. Kohlhorst was told by Dana's in-house legal counsel that the Management Plan

SPD was going to be changed because it provided for vested retiree benefits and the

company decided that it wanted to reserve the right to make changes later. (Kohlhorst

Dec., ¶ 12).  In an attempt to avoid "vesting" obligations, Mr. Kohlhorst was instructed to

engage in several distinct activities to revise the benefit plan. (*Id*. at ¶¶. 13-14.)  As

explained below, however, these efforts by Dana, could be effective only with respect to

employees starting their employment *after* these changes were implemented.

      To avoid further vesting obligations, Mr. Kohlhorst was instructed to draft inserts

to the Management Plan SPD. (*Id*., at ¶13). Dana refers to this amended plan as the

"Salaried B Plan" or the "Blue Book" (See Declaration of R. Arquette attached to Motion

to Unilaterally Terminate at ¶ 13.)  There were very few changes to the "Salaried B

Plan," "Blue Book," or post-April 1983 Management Plan SPD, except that it added, *for*

7

(Intra-Company Memo dated 10/86, attached as hereto Exhibit 3.)  The replacement page

attached to the Intra-Company Communication is an *undated* replacement "Introduction"

page for the "Brown Book", adding the asserted right to unilaterally amend or terminate

the plan.  This communication highlights that even years after Dana attempted to change

its SPDs, many of its current employees had not became aware of the changes.

Additionally, it reflects that some participants of the original Management Benefit Plan

had not received *any* unilateral termination language for their "Brown Books" until the

end of 1986.

     The post-1983 Management Plan (and/or the "Salaried B" or "Blue Book")

remained in place[8] until 1993, when Dana implemented its third materially different

retiree welfare plan, called Retiree Flex.[9]  This program ostensibly applied to employees

retiring after 1993 who again were required to meet certain stringent eligibility or Vesting

requirements.  (Kohlhorst Dec., ¶¶ 24-25 and Ex. D thereto at p. 4.)  Because of its

eligibility requirements, Retiree Flex was imposed upon many employees who had

started to work before Dana had added in any unilateral termination language—

employees who all along had the right to enforce the terms of the pre-1983 Management

Plan. (*Id.*)

---

[8] There were some changes to this plan started in approximately 1988 relating to the healthcare benefits for active employees (referred to as a "Beneflex" program), but that was solely applicable to active workers.  The healthcare offered to retirees largely remained the same except for changes mostly relating to decreasing the amount of life insurance with respect to employees who retired after January 1, 1998. (L. Kohlhorst Dec., Ex. 1, ¶ 16.)

[9] For a small number of select employees, Retiree Flex was provided to certain retirees as early as 1991 and 1992 as an alternative to the Salaried B plan if they so choose.

language *capable of reasonably being interpreted as creating a promise on the part of the employer to vest the recipient's benefits.*" Here, the pre-1983 Benefit Management SPDs certainly meet that criteria. As such, viewing those SPDs as constituting unilateral offers, the terms of that offer could *not* be changed by Dana once an employee started to work before that date or continued to work thereafter, the terms of the Benefit Management SPD must be held as vested with respect to said employees. See *Id.* at 84-84.

This result is buttressed by a declaration filed in support of this Objection by the benefit specialist/human resource officer at Dana who: (1) wrote the original Benefit Management Plan SPD; (2) drafted all of its updates; (3) has first hand knowledge that there was no unilateral termination language in the Benefit Management Plans until at least April 1983; (4) knew that Dana added the unilateral termination language for the express reason of avoiding its vesting obligations; and (5) understood other employees to believe that said plan would vest after meeting its eligibility requirements (even after modified by Dana). (Kohlhorst Dec., *passim.*). This is in addition to the understanding and belief of two other high ranking human resource managers who likewise thought and understood those benefits to have been vested. As such, Dana's attempt to change the terms of that plan to retroactively eliminate the vesting of pre-1983 employees was not only ineffectual, but it could be characterized as fraudulent, or at a minimum, in gross breach of the fiduciary duties Dana owed to its plan participants. (*See* Konoff Dec., ¶¶ 18, 25, 26 & 29; Maroney Dec., ¶ 15).[18]

---

[18] The implications of the vesting of all pre-1983 employees are varied and extraordinary in scope. It means not only that the Retirees who worked for Dana prior to April of 1983 are vested with respect to their welfare retiree benefits, but by necessary implication so are all of the active employees who were also pre-1983 employees who have yet to retire. Separately, as will be fully addressed if and to the extent any Retirees' benefits are reduced, the resulting unsecured claim will be much higher than conceived of by the Debtors. In this respect, it can and will be proved

19

6.    **Other Writings Given By Dana Further Constitute Independent
Written Promises to Vest Retiree Benefits**

In addition to the written materials described above, Dana also sent other

information that is reasonably capable of being understood by its employees as creating

promises of vested retiree benefits, Dana has, throughout the entire relevant period,

provided other writings to employees considering retirement and/or to its retirees

evidencing vesting for participants in all of Dana's various welfare plans.

a.    **Yearly Personal Benefit Statements**

With respect to all employees who were part of the Management Benefit Program

and for other divisions that were covered under different Retiree Plans,[19] from

approximately 1975 through 1987, Dana sent its employees Yearly Personal Benefit

Statements that expressly implied, if not stated, that the retiree benefits at issue were

vested. In this respect, the Yearly Benefit Statements provided, in relevant part that:

- On a page entitled "Your Future Security" in bold print, it was confirmed that

   "Full Basic-Medical Benefits will be continued until you are eligible for

   Medicare. Thereafter Basic Benefits will be reduced by the Medicare benefits.

   The Prescription Drug benefits, Dental Plan and Hearing Aid Program will be

   continued. These benefits are provided at Company Expense." (*See* Group

   Exhibit 4 attached hereto, "Your Future Security" section of Statement sent to M.

   Ertel in 1978.)

---

that a majority of the retirees whose OPEB liability has been calculated under the Retiree Flex
plan were actually entitled to vesting under the pre-1983 Management Benefit Plan. As such,
when their OPEB liability is computed correctly (i.e. entitlement to the Management Benefit Plan
benefits) the OPEB liability previously calculated by the Debtors is likely to double, as would any
resulting unsecured claim arising from the elimination or reduction of Retiree benefits.
[19] Including, but not limited, to Dana's Weatherhead division.

- "Fringe Benefits? Your Dana benefits are much more. Today those benefits are worth about 40% of your salary...The days of tacked on fringes are gone....Your Dana programs provide healthcare protection, financial security and future security for your retirement years." (*Id.*, Statement sent to D.L. Benedict in 1982.)

- In section entitled "Your Medical Care Benefits"

    > After Retirement Medical Protection: Retirement Medical Benefits include over age 65 Blue Cross and Blue Shield lifetime coverage. Full coverage is provided at retirement between the ages of 55 and 65 with 10 or more years of continuous service. At 65 supplemental coverage is provided for you and your spouse for the balance of your life.

    (*Id.*, Statement sent to G. Soroka in 1983.)

- In section entitled "Normal Retirement Benefits" it states that "If you are eligible for Early or Normal Retirement the following benefits are also part of your retirement package:

    o $5,000 in Company paid life insurance

    o Full Medical Benefits will be continued until you are eligible for Medicare. Thereafter, Basic Benefits will be reduced by Medicare Benefits.

    (*Id.*, Statement sent to B. Livingston in 1986.)

- In section entitled "To: Dana Management People," Dana told its employees that "Your benefits are an important part of your total compensation from Dana"

21

affirming that the benefits at issue were earned, were provided as part of an

overall compensation package. While affirmatively promising lifetime benefits,

they contain no reservation of rights to terminate or modify the benefits described

therein. (*Id.*, Statement sent to K. Ensley in 1986.)

      b.     Other Language Confirming Lifetime Coverage

The Retiree Committee engaged in efforts to collect materials from the many

retiree constituents that it represents. While by no means representing the totality of

written materials provided by Debtors evidencing promises of lifetime coverage relating

to retiree benefits, many examples of such writings were located. These including the

following:

- "Quick References to My Dana Retirement Benefits"- reflecting in relevant part

  the following questions and answers: (a) "Does my group life insurance policy

  remain in effect after my retirement? <u>Yes</u>"; (b) If so, does the benefit payment

  decrease? Yes"; (c) "How much? <u>10% yr/5 yrs.</u>"; (d) Does my group insurance

  coverage for hospital, surgical and medical continue after my retirement? <u>Yes</u>";

  (e) "Is the cost of drugs included? <u>$2 deductible</u>"; (f) Will this protection be

  extended to my wife or other beneficiary in the event of my prior death? <u>Spouse-

  Yes</u>"; (g) How long? <u>**For Life**</u>"; (Examples are attached hereto as Group Exhibit

  5, emphasis added.)

- Letters from human resource employees to retiring employees affirming that: (a)

  "All group life insurance will be continued at company expense," (b) "All group

  insurance will be continued as company expense. The Basic Hospital Medical-

  Surgical Plan and Major Medical, Dental and Drug Plans will also be continued

after your retirement…at company expense" (An example dated January 1979 is attached hereto as Exhibit 6). Such letters make no references to any asserted right by Dana to modify or terminate any retiree benefits.

⚬ Benefit summaries to employees of Superior Electric providing in relevant part that:

> Medical retirement benefits include "over 65 Blue Cross/Blue Shield benefits as long as you life. If you retire between the ages of 55 and 65 and have at least 10 years of continuous service, you full Blue Cross/Blue Shield benefits are continued until you reach the normal retirement age of 65. An extra benefit is the continued Blue Cross/Blue Shield protection for your spouse until the age of 65 and then "over 65" benefits thereafter as long as you live.

(*See* Misc. Summary Plan description language attached hereto as Group Exhibit 7 relating to Superior Electric dated 1978 and 1980)

• Handwritten notes initialed by Robert Griffith, a Dana human resource employees confirming "Hosp-Med-Surg Pres. Drugs… provided "*for lifetime*" (See Exhibit 8 hereto, emphasis added).

### c.    Vested Benefits Provided Through Early Retirement Agreements

While none were produced by the Debtors, at least one early retirement agreement sent in by a Retiree reflected vesting of benefits in return for early retirement and/or in return for 30 years of service. As reflected in a "Retirement Income Plan Application for Retirement," Dana stated that "Continuation of Group Insurance is automatic for employees retiring at age 60 or who have at least 30 years of service or who are retiring at Company request." (*See* Exhibit 9 attached hereto, dated 1984.) Such agreements

23

have been found to vest retiree benefits, as well as entitling benefits on the equitable

theory of promissory estoppel.  See, *Devlin, supra.*

      d.      **Life Insurance Certificates Evidencing "Lifetime" Coverage**

In conjunction with the retirement of its employees, Dana caused life insurance

certificates to be provided to all (or at least a majority) of its retirees.  These life

insurance certificates affirmatively confirmed that the policies issued were "permanent,"

"for life" and/or "until death." (Accurate examples of Life Insurance Certificates caused

to be issued by Dana are attached hereto as Group Exhibit 10.)[20]  As in *Devlin,*

certificates evidencing lifetime coverage is sufficient to create a reasonable expectation

of vesting by retirees.

      7.      **Dana Provided More Than Sufficient Writings To Mandate A Finding
That The Retiree Benefits Are Vested**

For all of the above noted reasons, given the totality of writings provided to the

Pre-1983 employees, in the SPDs, Life Insurance Certificates and through Yearly

Personal Statement of Benefits, there is more than sufficient evidence for this Court to

conclude that any pre-1983 (or 1986 as the case may be) employee who eventually met

the eligibility requirements described in the pre-April 1983 SPD are entitled to vested

benefits that are not subject to unilateral termination.[21] *See Schonholz*, 87 F.3d at 78;

---

[20] A retiree having such certificates would have no other alternative than to believe the
lifetime nature of such insurance coverage.  Cancellation or loss of life insurance
coverage, moreover, is often not replaceable for the cost typically paid for group policies
by an employer.  As such, it is further worth noting that in computing the resulting claim
for the loss of life insurance if cancelled would likely be approximately 300 times the
value currently reflected by Dana in its OPEB calculations.  (See Declaration of Thomas
Levy filed in support of Retiree Committee's Opposition to Section 1113/1114 Motion).

[21] An additional group of retirees (numbering approx. 704) working at the Superior Electric
division is entitled to vesting on the same basis.  The Superior Electric Company merged with
Dana in 1989.  (An accurate copy of the merger agreement is attached hereto as Exhibit 11.)
Prior to said merger, since at least 1980 (if not earlier) there was an SPD provided to Superior

Reimbursement Accounts would roll over from year to year——funded with amounts "deposited" into them. (Konoff Dec., ¶ 24 and Exhibit E thereto at p. 13.) Not surprisingly, because of this separation between annuity and benefit plan, buttressed by the ability to rollover unused funds into a "bank account", the Retirees believed that the annuity and the bank account were untouchable (vested) by Dana. The Retirees did understand that the healthcare plans offered by Dana could be modified, as stated in the plan documents, but this was somewhat irrelevant since the annuities could be used for health insurance from any insurance company or plan, not just Dana's.

Dana also provided its human resource department personnel with software designed, in part, to assist employees in considering when to retire and/or to assist employees in choosing which of the nine annuity choices would be best for them. (*Id*. at 25.) This software allowed print-outs to be created which were given and/or shown to employees considering retirement. (*Id*. at 25 and Exhibit D thereto.) As the example attached to the Declaration of Janice Konoff reflects, the annuities were graphically and numerically demonstrated to continue through the lives of each retiree, and no language ever appeared on these print-outs wherein Dana reserved the right to reduce or eliminate any annuities after retirement. (*Id*.)

Based on the totality of *written* information provided by Dana to its employees, the "annuities" and "Retiree Reimbursement" accounts were clearly described and reasonably understood by Dana's employees as being vested benefits. (Kohlhorst Dec., ¶¶ 21-23, Konoff Dec., ¶¶ 27-29; Maroney Dec., ¶ 15; Suplicki Dec., ¶¶ 6-8; Watkins Dec. ¶ 12.)

> **2.     The Reservation of Rights Language In the Retiree Flex SPD Is Ambiguous and Misleading**

Even if all of the writings provided by Dana to its employees outside of the SPD were ignored, when the SPD language relating to Dana's reservation of rights to terminate is construed against Dana, the "benefits" Dana referenced do not include the annuities, Retiree Reimbursement Accounts and lifetime life insurance that were affirmatively implied as vested in the SPD. *See Feifer*, 306 F.3d at 1212; *Perreca*, 295 F.3d 215, 223 (2d Cir. 2002). When looking at both the ambiguities in the SPD in conjunction with the substance of the many written documents (scripts, power point presentations, and printed overheads), provided by Dana to its employees over the years, there can be no doubt that together they were *more* that "capable of reasonably being interpreted as creating a promise on the part of the employer to vest the recipient's benefits." *See Feifer,* 306 F.3d at 1211; *Devlin*, 274 F.3d at 76. This conclusion, moreover, is confirmed by three high ranking former Dana human resource department employees who themselves believed that the annuities, Retirement Reimbursement Accounts and lifetime life insurance were vested. (See Declarations of L. Kohlhorst, J. Konoff and W. Maroney). These former employees, whose responsibility it was to explain Retiree Flex (and who collectively explained Retiree Flex to hundreds or thousands of employees and retirees) also confirmed that they said that the annuities, Retirement Reimbursement Accounts and lifetime life insurance were vested and that the employees of Dana understood them to be vested too. (*Id.*). These former human resource employees were not looking to mislead anyone—they too believed that the benefits were vested.

35