Neil A. Goteiner (NG 1644)
Dean M. Gloster (*Pro Hac Vice* Application Pending)
Nan E. Joesten (*Pro Hac Vice* Application Pending)
FARELLA BRAUN & MARTEL LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

Attorneys for Delphi Salaried Retirees Association

Hearing Date and Time
  February 24, 2009 at 10:00 a.m.
  (prevailing Eastern time)
Objection Deadline:
  February 17, 2009 at 4:00 p.m.
  (prevailing Eastern time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case No. 05-44481 (RDD) |
| DELPHI CORPORATION, et. al., | (Jointly Administered) |
| Debtor. | |

**OPPOSITION TO MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1) AND 1108 CONFIRMING DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID POST-RETIREMENT HEALTH CARE BENEFITS AND EMPLOYER-PAID POST-RETIREMENT LIFE INSURANCE BENEFITS FOR CERTAIN (A) SALARIED EMPLOYEES AND (B) RETIREES AND THEIR SURVIVING SPOUSES**

07345\1866664.2

TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

II. PROCEDURAL BACKGROUND ............................................................................... 3

III. FACTUAL BACKGROUND ...................................................................................... 4

IV. LEGAL ARGUMENT .................................................................................................. 4

    A.    SECTION 1114 PROTECTS EVEN RETIREE BENEFITS THAT ARE AMENDABLE AND REQUIRES NEGOTIATION WITH AN APPOINTED RETIREE COMMITTEE AND COMPLIANCE WITH THE OTHER STATUTORY REQUIREMENTS BEFORE THESE CRITICAL RETIREE BENEFITS MAY BE MODIFIED OR TERMINATED ........................................................................................................ 4

        1.    Section 1114(a)'s Definition of "Retirees Benefits" It Protects Does Not Exclude Benefits which Debtors Reserved the Right to Amend. ............................................................................................. 5

        2.    Congress' 2005 Amendment to the Statute Adding Section 1114(l) Confirmed that Section 1114 Must Apply to Benefits that the Debtor Reserved the Right to Amend Outside Bankruptcy. ..................... 6

        3.    Coupled With Section 1129(a)(13), Section 1114 Demonstrates Congress' Intent that a Debtor Must Negotiate Over Termination of any Retiree Medical and Life Insurance Benefits During the Pendency of the Bankruptcy Case ............................................................ 6

        4.    Debtors' Few Authorities Do Not Undermine Section 1114's Broad Protection for Amendable Benefits ................................................. 9

    B.    DEBTORS HAVE NOT ESTABLISHED THAT THE BENEFITS THEY SEEK TO TERMINATE CAN BE CANCELLED AT WILL. ......................... 10

    C.    IT IS UNFAIR, INEQUITABLE, PREJUDICIAL AND DISPROPORTIONATELY HARMFUL TO PERMIT THE DEBTOR TO TERMINATE THESE CRITICAL RETIREE BENEFITS ON THIS SHORT NOTICE ........................................................................................... 12

    D.    GRANTING THE DEBTORS' MOTION COULD CREATE IMMENSE ADMINISTRATIVE CLAIMS AGAINST THE ESTATE ............................... 13

V. CONCLUSION ........................................................................................................... 14

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

American Federation of Grain Millers, AFL-CIO v. International Multifoods Corp.,
    116 F.3d 976 (2d Cir. 1997)..................................................................................................11

Ames Department Stores, Inc.,
    1992 WL. 373492 (S.D.N.Y. Nov. 30, 1992)..........................................................................9

In re CF&I Fabricators,
    163 B.R. 858 (Bankr. D. Utah 1994).....................................................................................10

In re Chateaugay Corp.,
    111 B.R. 399 (S.D.N.Y. 1990)..............................................................................................10

Devlin v. Empire Blue Cross and Blue Shield,
    274 F.3d 76 (2d Cir. 2001)....................................................................................................11

In re Farmland Industrial, Inc.,
    294 B.R. 903 (Bankr. W.D. Mo. 2003)...................................................................................9

In re Federated Department Stores, Inc.,
    132 B.R. 572 (Bankr. S.D. Ohio 1991).................................................................................10

Feifer v. Prudential Insurance Co. of America,
    306 F.3d 1202 (2d Cir. 2002)................................................................................................11

INS v. Cardoza-Fonseca,
    480 U.S. 421 (1987)................................................................................................................5

In re New York Trap Rock Corp.,
    126 B.R. 19 (S.D.N.Y. 1991).......................................................................................8, 9, 14

Lamie v. U.S. Trustee,
    540 U.S. 526 (2004)................................................................................................................5

In re Speco Corp.,
    195 B.R. 674 (S.D. Ohio 1996) ..........................................................................................6, 9

### FEDERAL STATUTES

11 U.S.C. § 1114(a) .................................................................................................................5, 6, 14

11 U.S.C. § 1129(a)(13) ................................................................................................................ 7

26 U.S.C. §§ 35(a), 35(c)(1) ........................................................................................................ 13

I.     **INTRODUCTION AND SUMMARY OF ARGUMENT**

This Court should deny Debtors' Motion to rule that Section 1114 does not apply to the sweeping proposed termination of medical and insurance benefits for its retired Eligible Salaried employees. Without evidence, Debtors assert that these retirees' benefits are only "amendable," even though longer term commitments were made to many of the affected retirees. Whether the benefits are actually amendable outside bankruptcy depends on the specifics of the plan documents and disclosures originally made to retirees. Here Debtors' plan documents were sent to employees over many years at least three different retiree groups, from at least six different entities. At least with respect to some of those retirees, early communications provided that they would receive retiree health and insurance benefits without including any disclaimer that the Debtors (and their predecessor employer) retained a right to terminate the benefits. There were also numerous different plans, none of which Debtors provided in connection with this motion, and some retirees may have left the company under specific contractual early retirement or disability programs with different benefits that were not amendable.

In any event, Bankruptcy Code Section 1114 clearly protects even benefits that <u>are</u> amendable in the employer's discretion. The Debtors need to reduce costs, of course, and retiree benefits defined in Bankruptcy Code Section 1114(a) are not immune to those agonizing cuts. But Congress, in Section 1114, clearly included anti-termination protections for "amendable" benefits during a Chapter 11 case, until the Debtors provide information, go through the negotiating process and meet the other Section 1114 standards. Retiree medical and life insurance benefits are desperately necessary for the thousands of impacted retirees who depend on them, and eliminating those benefits, particularly on short notice, will cause "real hardship" as the Debtors concede. (Motion, p. 6, ¶ 8.)

Further, both basic due process considerations and the balance of the harms weigh heavily against Debtors' unnecessarily breathless termination of all retiree medical and life insurance benefits for 15,000 former salaried employees. Debtors have had nearly four years to have an 1114 committee appointed to negotiate cuts and other modifications to retiree benefits, and actually delayed the appointment of such a committee, asserting that they would provide sufficient advanced notice before proposing changes to retiree benefits. (Docket #1486.) But now they seek, on less than three weeks notice, to terminate all future health and life insurance benefits for 15,000 largely unorganized retirees, effective April 1, 2009, all with no disclosure of the specifics of the programs terminated and with no appointed group representation for retirees on these critical benefits issues. The Debtors' tactic, and the resulting harm to unrepresented retirees, is exactly what Congress sought to prevent with Section 1114.

In addition, terminating the retirees' medical benefits now creates an avoidable risk of another serious retiree hardship. There is substantial risk that the Delphi pensions will be terminated in the future and turned over to the Pension Benefit Guaranty Corporation ("PBGC") in connection with this proceeding. Prematurely terminating the retirees' medical benefits <u>before</u> the PBGC takes over the pensions could make many retirees ineligible for the Health Coverage Tax Credit, which otherwise would pay 65% of the qualifying health care premiums for retirees aged 55-65 going forward.

Finally, if these benefits are not amendable at will, or if it is ultimately determined, even on appeal, that Section 1114 protects these amendable benefits (as the statute clearly provides) then Debtors' improper benefit termination would create an immense administrative claim (particularly since the injury to some affected retirees from the loss of benefits may be much greater than the cost of the benefits themselves).

07345\1866664.2                                        2

The Debtors' motion should therefore be denied. If the Debtors wish to modify health care and insurance benefits for salaried employee-retirees during this proceeding, then this Court should first appoint a Section 1114 retiree committee to represent those retirees' interests and to negotiate any changes to benefits.

## II.  PROCEDURAL BACKGROUND

This bankruptcy began when Debtors petitioned for reorganization in October, 2005. (Mot. at ¶11.) Despite a variety of problems precluding consummation of a plan in April, 2008 and deteriorating market conditions,[1] Debtors maintained medical and insurance benefits for their salaried retirees and continued to work with their stakeholders to develop and file in October, 2008 modifications to the Confirmed Plan. (Mot. at ¶2). Early in the case, the Debtors opposed appointment of a retiree committee under Bankruptcy Code Section 1114 as premature, on the grounds that they did not currently plan to modify retiree benefits and would provide adequate notice in advance of future benefit changes. (Docket #1486.) Yet suddenly, on February 4, 2009, with no other advanced notice and no retiree committee in place, Debtors filed the instant Motion to cancel benefits for salaried retirees and their surviving spouses, and to do so as soon as possible after March 31, 2009. Specifically, they seek to: (1) stop company contributions to post-retirement health care benefits; (2) cancel Retiree Health Reimbursement Accounts ("RHRAs"); (3) terminate the Medicare Part B benefit, and (4) cease company contributions to life insurance benefits (collectively "Medical and Insurance Benefits"). (Mot. at 2.) They seek to do this quickly, which will make it more difficult for impacted retirees to obtain replacement coverage and benefits.

---

[1] Debtors' Motion contains various charts and graphics showing the steady deterioration of North American light vehicle sales from September 2007 through October 2008. (Mot. at ¶5).

### III.  FACTUAL BACKGROUND

Debtors admit that Delphi currently provides approximately 15,000 Eligible Salaried Retirees with Medical and Insurance Benefits.  Although the hastily organized Delphi Salaried Retirees Association now has many hundreds of members (perhaps thousands by the time of the hearing on this motion) this large group is widely dispersed and until this week did not have group representation.  That's only one of several reasons Debtors' notice for this vast elimination of benefits is singularly and inappropriately short.  Debtors do not identify precisely how many of the 15,000 retirees fall within each of the three classes of salaried retirees: (1) pre-1993 hires of General Motors, (2) retired salary employees hired by GM or Delphi between 1993 and 2000, and (3) retired post-2000 salaried employees hired by Delphi.  Nor have the Debtors either provided to representatives of the class of Eligible Salaried Retirees the plan documents that set out the Medical and Insurance Benefits that pertain to each class of salaried retirees, or considered the controlling language of each plan that described the Medical and Insurance Benefits offered to each of these groups at the various points in time.  According to Debtors' Motion, the Eligible Salaried Retirees may come from at least five different prior employers, in addition to Delphi:  Packard Hughes Interconnect Company, Delphi Mechatronic Systems, Inc., ASEC Manufacturing General Partnership, ASEC Sales General Partnership, and Delphi Diesel Systems Corporation.  (Mot. at p.3 n.2)

### IV.  LEGAL ARGUMENT

    **A.  SECTION 1114 PROTECTS EVEN RETIREE BENEFITS THAT ARE AMENDABLE AND REQUIRES NEGOTIATION WITH AN APPOINTED RETIREE COMMITTEE AND COMPLIANCE WITH THE OTHER STATUTORY REQUIREMENTS BEFORE THESE CRITICAL RETIREE BENEFITS MAY BE MODIFIED OR TERMINATED.**

Debtors' Motion is wrongly predicated on the premise that because the salaried retirees' Medical and Insurance Benefits are amendable, Section 1114 does not apply.  From this premise,

Debtors assert that they can therefore terminate benefits worth more than $1 billion within six weeks, without complying with the statutory requirements of Section 1114. That is not the case.

### 1. Section 1114(a)'s Definition of "Retirees Benefits" It Protects Does Not Exclude Benefits which Debtors Reserved the Right to Amend.

Under Section 1114, retiree benefits subject to its protection are those payments made, "under *any* plan, fund, or program . . . maintained or established . . . by the debtor prior to filing a petition commencing a case under this title" for the purpose of providing retired employees non-pension benefits. 11 U.S.C. § 1114(a) (emphasis added.). Section 1114(e)(1) provides that notwithstanding any other provision of Title 11, a debtor, "shall timely pay and shall not modify *any* retiree benefits" except if the court, after notice and hearing, orders such modification or the debtor and authorized representative agree to the modification of benefits. 11 U.S.C. § 1114(e)(1) (emphasis added).

Nowhere does the statute purport to recognize, much less carve out, an exception for so-called "amendable benefits." On the contrary, "the statute makes no distinction whatsoever about the basis on which retiree benefits are paid" – including "whether the employer has the power to modify such agreement or plan outside of bankruptcy" – "but rather includes 'any plan, fund, or program' maintained or established by the debtor prior to filing." Susan J. Stabile, Protecting Retiree Medical Benefits In Bankruptcy: The Scope Of Section 1114 Of The Bankruptcy Code, 14 Cardozo L. Rev. 1911, 1932 (1993).

Where the language of a statute is clear, the language must be deemed conclusive and applied according to its ordinary meaning.[2] Application of the plain meaning rule here means

---

[2] See, e Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'"); INS v. Cardoza-Fonseca, 480 U.S. 421, 433 n.12 (1987) (explaining that "the plain language of this statute appears to settle the question before us" and noting the "strong presumption that Congress expresses its intent through the language it chooses").

that Section 1114 reaches "any retiree benefit," amendable or not.  Thus: "[T]he language of the statute makes it quite clear that – absent the occurrence of two statutory conditions – the debtor in possession is required to continue the payment of retirement benefits at prepetition levels …. *The statute contains no other basis for debtors to modify or cease the payment of retiree benefits*."  In re Speco Corp., 195 B.R. 674, 678 (S.D. Ohio 1996) (emphasis added).

> **2.    Congress' 2005 Amendment to the Statute Adding Section 1114(*l*) Confirmed that Section 1114 *Must* Apply to Benefits that the Debtor Reserved the Right to Amend Outside Bankruptcy.**

The changes in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 confirm that Congress intended Section 1114 to protect amendable retiree benefits.  In Section 1114(*l*) Congress expanded Section 1114's protection to benefits the debtor had modified in the 180 days prior to the bankruptcy filing when the debtor was insolvent.  11 U.S.C. § 1114(*l*). Thus, Congress confirmed that the protections of the statute must, in accordance with its plain language, apply to benefits that the debtor reserved the right to amend, outside bankruptcy. (Section 1114(*l*), of course, only applies to benefits the debtor actually did amend outside bankruptcy, prior to the commencement of the case.)

> **3.    Coupled With Section 1129(a)(13), Section 1114 Demonstrates Congress' Intent that a Debtor Must Negotiate Over Termination of *any* Retiree Medical and Life Insurance Benefits During the Pendency of the Bankruptcy Case.**

If a debtor truly reserved the right to modify or terminate retiree medical and life insurance benefits outside of bankruptcy, the protections of Section 1114 are of limited duration—they only apply during the pendency of the bankruptcy case, unless the debtor commits, as part of the 1114 negotiation process, to preserve some benefits for a post-confirmation period (as, of course, a debtor might do in return for agreed cuts during the case.) Section 1129(a)(13) provides, as one of the requirements for confirmation, only that a debtor

must, post-confirmation of the plan, preserve benefits it agreed to as part of the 1114 process "for the duration of the period the debtor has obligated itself." 11 U.S.C. § 1129(a)(13).

The statute thus sets up a framework to encourage negotiated changes to even amendable retiree benefits that the debtor wants to modify during the Chapter 11 case. In return for cuts the 1114 Committee agrees to during the bankruptcy case, the debtor may agree to limited protections for some of the benefits going forward.

This is consistent with the clear Congressional purpose to provide protections for critical retiree medical and life insurance benefits during the pending bankruptcy case. "Congress responded to the particular vulnerability of retirees by passing a statutory provision that gives all retirees a protection they would not otherwise have had but for the fact that their former employer filed for bankruptcy." Stabile, supra, at 1946.

Not only are retirees especially vulnerable as a class, but "they also are in a very weak negotiating position with the debtor, and therefore less able than others to protect their interests." Id. at 1947. Having already made their contribution to the company, sometimes decades ago, "there is nothing that retirees have that the company needs." Retiree Benefits Security Act of 1987: Hearings on S.548 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary, 100th Cong., 1st Sess. 16 (statement of Senator Heinz). As a result, their benefits are seen as the first cost that can be cut without endangering the debtor's ongoing business.

In response to the complex predicament of retirees, Congress passed Section 1114 to give retirees substantive and procedural protections to allow for negotiation on a level playing field, and to allow courts to weigh the harm and fairness of deep cuts to retiree medical, disability, and survivor benefits. See S. Rep. No. 119, 100th Cong., 2d Sess. 7, reprinted in 1988 U.S.C.C.A.N.

683, 689 ("the Committee recognizes that the special treatment of retiree benefits [is] created by section 1114"); see Stabile, at 1949 ("special protection really means allowing retirees to stand on a more equal footing with other creditors … fair and equitable treatment does not necessarily mean treating all parties equally").  Moreover, the negotiation provision of Section 1114 allows for win-win agreements, as retirees have the potential to negotiate current benefit cuts in return for the debtor's commitment that amendable benefits won't be cut further for a specific time frame – a commitment which will be enforceable post-confirmation under Section 1129(a)(13).

As Senator Hefflin explained, Section 1114: "would also provide with respect to *all* retirees that the employers can modify retiree insurance benefits in the absence of a negotiated settlement *only* if the court authorizes such modifications and when such modifications are necessary to enable the company to continue its business fairly and equitably to all parties." Retiree Benefits Security Act of 1987:  Hearings on S.548 Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary, 100th Cong., 1st Sess. 1 (1987) (statement of Senator Hefflin).

Moreover, the legislative history of Section 1114 must be understood against the backdrop of events leading to the statute's enactment.  As the Bankruptcy Court for the Southern District of New York explained in In re New York Trap Rock Corp., 126 B.R. 19 (S.D.N.Y. 1991), "[t]his legislation was enacted in response to the termination of the health and life insurance benefits of approximately 79,000 retirees in the LTV Corporation Chapter 11 case. Pursuant to this legislation, a trustee in bankruptcy or a debtor in possession is required to continue to pay retiree benefits throughout reorganization under a 'plan, fund, or program' and at the levels maintained prior to the filing of the bankruptcy case, until or unless a modification is agreed to by the parties or ordered by the court." Id. at 21-22.  This backdrop confirms that

Congress intended that changes to retiree medical and insurance benefits be negotiated once a debtor has sought Chapter 11 relief.

### 4. Debtors' Few Authorities Do Not Undermine Section 1114's Broad Protection for Amendable Benefits.

The clear statutory language, clarifying amendment in Section 1114(*l*), and legislative history all trump Debtors' interpretation that Section 1114 does not mean what it says and that Debtors can impose these cuts to critical benefits without complying with the statute. But even if the Court looks beyond the statutory language and legislative history, the case law Debtors cite to justify sudden and sweeping elimination of retiree health benefits, does not support that result. As the court in In re Farmland Indus., Inc., 294 B.R. 903 (Bankr. W.D. Mo. 2003) concluded: "There is nothing in the language of the statute to suggest that Congress intended to allow the termination of retiree benefits in those instances where the debtor has the right to unilaterally terminate those benefits under the language of the plan or program at issue." Id. at 917. "In this Court's view, § 1114 prohibits a debtor from terminating or modifying any retiree benefits (as defined in that section) during a Chapter 11 case unless the debtor complies with the procedures and requirements of § 1114, regardless of whether the debtor has a right to unilaterally terminate the benefits." Id. at 914.

Numerous cases hold that Section 1114 applies to amendable benefits. See In re Farmland Indus., supra; In re Speco Corp., supra; In re New York Trap Rock Corp., 126 B.R. 19 (S.D.N.Y. 1991), and In re Ames Dept. Stores, Inc., 1992 WL 373492 (S.D.N.Y. Nov. 30, 1992), rev'd on other grounds, 76 F.3d 66 (2d Cir. 1996) (finding "the Debtor's cavalier attempt to unilaterally terminate the Retired Employees' insurance benefits produces a drastic and most undeserving result" and ordering the Debtor to follow the requirements of Section 1114).

Debtors' authorities either did not deal with retiree medical benefits, or were not decided under Section 1114. The decision in In re Wellman Inc., No. 08-10595, slip op. at 6, (Bankr. S.D.N.Y. Jan. 23, 2009), for example, was decided under ERISA, and does not even mention Section 1114. In re CF&I Fabricators, 163 B.R. 858 (Bankr. D. Utah 1994), like In re Chateaugay Corp., 111 B.R. 399 (S.D.N.Y. 1990), merely concluded that where the union workers ended up with no collective bargaining agreement, there was no contractual right to benefits to enforce. In re CF&I, 163 B.R. at 874. Other courts have picked up on the distinction that Debtors do not acknowledge, the difference between a right that naturally expires by its own terms (as in the expired collective bargaining agreement in Chateaugay), and a right which a debtor affirmatively seeks to terminate upon entering bankruptcy. See In re Federated Dept. Stores, Inc., 132 B.R. 572, 574 (Bankr. S.D. Ohio 1991) (concluding that "[t]he cases of In re Doskocil and In re Chateaugay Corp stand simply for the proposition that expiration of old contract rights involving retiree benefits may operate to short-circuit the modification process [of Section 1129(a) and 1114]"). Further, to the extent that the cases relied on predate the 2005 BAPCPA amendments, their interpretation has been disapproved by Congressional action.

  **B. DEBTORS HAVE NOT ESTABLISHED THAT THE BENEFITS THEY SEEK TO TERMINATE CAN BE CANCELLED AT WILL.**

According to Debtors' Motion, the Eligible Salaried Retirees may come from at least five different prior employers, in addition to Delphi: Packard Hughes Interconnect Company, Delphi Mechatronic Systems, Inc., ASEC Manufacturing General Partnership, ASEC Sales General Partnership, and Delphi Diesel Systems Corporation. (Mot. at p.3 n.2.) In addition, many of the affected retirees may have retired under permanent disability retirement packages or specific contractual early retirement packages that provided incentives for leaving.

Even where the debtor did retain discretion to modify benefits—changing annual health plan options, etc.—it is a much different thing to terminate all benefits for affected retirees while preserving a program for its active employees. Whether a retiree has a vested contractual benefit turns on whether, under the wording of the plan document, the disclosures made to the employee, and any contractual commitments made at various times in connection with the benefits, there is a reasonable interpretation that the employer has promised a specific contractual benefit. Devlin v. Empire Blue Cross and Blue Shield, 274 F.3d 76, 84 (2d Cir. 2001); American Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp., 116 F.3d 976, 980 (2d Cir. 1997). Once a benefit has been promised and the employee has worked in reliance on that promise, the employer cannot convert the resulting vested benefit into one that can be cancelled just by adding later disclosure language preserving the right to terminate or modify benefits. Devlin, supra, 274 F.3d at 85 ("lifetime" benefit language); Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1211 (2d Cir. 2002) ("if the Program Summary promised rights that would vest before…later documents purporting to describe different plan terms, then these later documents cannot diminish those rights with regard to these plaintiffs.")

Here, Debtors have not provided the original plan documents or even a listing of all the plan documents and different programs for the retiree benefits it seeks to terminate.[3] With respect to at least some of the retirees, Debtors' predecessors made earlier commitments that did not include a reservation of the right to terminate the benefits. Before the Debtors are allowed to terminate many different benefits for 15,000 retirees, they must demonstrate the factual basis to permit that termination, identify the documents providing the benefits, and provide the representatives of the retirees an opportunity to review the plan and disclosure documents to

---

[3] Nor have they provided contact information for the 15,000 retirees and dependants receiving benefits, so that the Delphi Salaried Retirees Association or prospective counsel could reasonably contact the affected retirees to obtain benefit documents from them.

verify whether they provide vested benefits under ERISA or benefits the Debtors did preserve the right to terminate outside bankruptcy.[4]

Without reviewing all the plan and disclosure documents, the Eligible Salaried Retirees cannot know if: (a) the benefits are actually amendable, as opposed to vested under plan documents, communications or ERISA; (b) the benefits are amendable in the sense that the options can change, but not be canceled completely; or (c) are amendable, but only in the sense that they are tied to the same benefits for active workers that are amendable, but have not been similarly amended.

### C. IT IS UNFAIR, INEQUITABLE, PREJUDICIAL AND DISPROPORTIONATELY HARMFUL TO PERMIT THE DEBTOR TO TERMINATE THESE CRITICAL RETIREE BENEFITS ON THIS SHORT NOTICE.

This bankruptcy has been pending since 2005, and Debtors have had almost 4 years to have an 1114 committee appointed to represent the interests of its retirees in connection with proposed cuts or changes to these over $1 billion of benefits. Indeed, early in the case, the Debtors opposed the formation of an 1114 committee for the salaried retirees it now targets, claiming that it was premature because Delphi was not considering (at that time) any benefit reductions for this group. (Docket #1486.) Instead, Debtors now want to terminate all the benefits on three weeks' notice, effective March 31, 2009, in a way that will severely harm thousands of retirees, suddenly left without medical coverage, some of whom under 65 may be practically uninsurable. It is unfair, inequitable, and improper for the Debtors to make these changes without even making the plan documents available to retirees' counsel to review, or to give the affected retirees reasonable advanced notice to make other arrangements for health care

---

[4] To the extent that Debtors are seeking, under Section 105, injunctive or equitable relief relieving them of the obligation to honor vested benefit obligations, (1) that remedy is preempted by the explicit statutory provisions of Section 1114, and (2) they must proceed by adversary proceeding, rather than motion, under Bankruptcy Rule 7001(7).

coverage. Those in the greatest need, with pre-existing medical problems, may have the most difficulty in obtaining replacement health and life insurance.

For those retirees under 65, there may also be other unfair prejudice from premature termination of their health coverage, because they will lose possible eligibility for the Health Coverage Tax Credit, which would otherwise be available to pay 65% of their health care premiums if their pensions are later terminated and turned over to the Pension Benefit Guaranty Corporation.

Briefly summarized, the Health Coverage Tax Credit is an unusual federal tax credit that pays—on a monthly basis—65% of the health care premiums for "qualifying coverage" for eligible retirees aged 55-65 whose pensions have been taken over by the PBGC. 26 U.S.C. §§ 35(a), 35(c)(1)(C) . Many states do not have plans that have been set up as "qualified health insurance" under Internal Revenue Code section 35(e), but COBRA continuation coverage is qualified coverage entitled to the subsidy, as is a health plan negotiated by a Section 1114 Committee in bankruptcy and in lieu of COBRA continuation coverage. See IRS Private Letter Ruling 200432012. Where there is no continuing coverage, if the pension plans are terminated and turned over to the PBGC in the future without a follow-on plan negotiated with a Section 1114 committee, many affected retirees could lose their Health Coverage Tax Credit subsidies, which would otherwise pay for almost two-thirds of their health care premium costs.

### D. GRANTING THE DEBTORS' MOTION COULD CREATE IMMENSE ADMINISTRATIVE CLAIMS AGAINST THE ESTATE.

If the Debtors are in error that the benefits they seek to terminate are amendable at will, or if a court ultimately determines, even on appeal, that the amendable benefits are protected by Section 1114 (as the statute clearly provides) then the Debtors' improper termination of those benefits through this Motion will create an immense administrative claim. The claim may be

vastly larger than the benefit cost savings, because the damages to some affected retirees from the loss of benefits may be many times the cost of the benefits lost—death from loss of medical care, coupled with the loss of life insurance payout, for example, instead of the cost a couple of months of additional premiums.

## V. CONCLUSION

Debtors' Motion should be denied. Should Debtors maintain an interest in terminating the Eligible Salaried Retirees Medical and Insurance Benefits, Section 1114 provides the path for doing so: Prior to moving to modify retiree benefits, debtors in possession must make a proposal to the retirees' authorized representative, considering the most complete information at that point, which "provides for those modifications necessary to permit the debtor's reorganization, with the assurance that all affected parties are treated equitably and fairly." 11 U.S.C. § 1114(f)(1)(A). Under Section 1114, debtors must comply with the provisions of the employee benefit plan that was in effect at the time the case under the Bankruptcy Code was commenced, and "[i]f a trustee or a debtor in possession seeks to modify or terminate retiree benefits, the court is required to appoint an 'authorized representative' in accordance with 11 U.S.C. § 1114(c)(2)." See In re New York Trap Rock Corp, at 22 (Bankr. S.D.N.Y. 1991).

Dated: San Francisco, California
February 17, 2009

FARELLA BRAUN & MARTEL LLP

By: ___/s/ Neil A. Goteiner_____
Neil A. Goteiner
Dean M. Gloster

235 Montgomery Street
San Francisco, California 94104
(415) 954-4400

Attorneys for Delphi Salaried Retirees Association

07345\1866664.2                                14