Hearing Date:  February 24, 2009 at 10:00 a.m.  (prevailing Eastern time)
Objection Date: February 23, 2009 at 1:00 p.m. (prevailing Eastern time)

Trent P. Cornell, Esq. (IL 6242712), *Pro Hac Vice* (pending)
Jon D. Cohen, Esq. (IL 6206666), *Pro Hac Vice* (to be filed)
STAHL COWEN CROWLEY ADDIS LLC
55 West Monroe Street, Suite 1200 Chicago, Illinois 60603
(312) 641-0060
(312) 641-6959 facsimile

Barry R. Lax, Esq.
Brent A. Burns, Esq.
LAX & NEVILLE LLP
1412 Broadway, Ste 1407
New York, NY 10018
(212) 696-1999 x220
(212) 566-4531 facsimile

Counsel for Paul Higgins, James Conger, Doug Kittle
and Joni Walls and on behalf of other Delphi Non-Union
Salaried Retirees

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                                       :
In re                                                  :        Chapter 11
                                                       :
DELPHI CORPORATION, et al.,          :        Case No. 05-444481 (RDD)
                                                       :
                        Debtors.                :        (Jointly Administered)
-------------------------------------------------------x

## MOTION TO APPOINT OFFICIAL RETIREE COMMITTEE
## PURSUANT TO 11 U.S.C. § 1114(d)

Paul M. Higgins, James Conger, Doug A. Kittle, Joni Walls (the "Named

Retirees") and other Non-Union Salaried Retirees of Delphi Corporation and its affiliated

Debtor entities ("Debtors"),[1] respectfully request that the Court authorize and instruct the United States Trustee for the Southern District of New York to appoint an Official Non-Union Retiree Committee pursuant to 11 U.S.C. §1114(d)[2], and in support thereof state as follows:

**Preliminary Statement**

1.      On February 4, 2009, the Debtors filed their Motion to Terminate Employer-Paid Postretirement Healthcare Benefits and Employer-Paid Post-Retirement Life Insurance Benefits for Certain (A) Salaried Employees and (B) Retirees and their Surviving Spouses ("Motion to Terminate Benefits").   If granted, the Debtors will permanently eliminate retiree benefits for approximately *15,000* salaried retirees (the "Affected Retirees").

2.      The Debtors' motion is a transparent attempt to steamroll a group that Congress and courts have consistently defined as the most vulnerable in a bankruptcy—non-union retirees.  This group gave their human capital to the Debtors and as part of their employment consideration they were promised retirement benefits, often in lieu of other direct benefits, such as increased salaries.   Indeed, as set forth below, while employed, the Affected Retirees were told that these benefits were a "significant part of your total compensation."

---

[1] Attached as Exhibit A is a list of salaried Delphi retirees that have contacted this law firm as of the date of filing and expressed support for the formation of an Official Retiree Committee.  This list literally grows by the minute and it, along with the impact letters sent directly to the Court, plainly illustrates the need for an Official Committee to speak for them in this proceeding.

[2] The Affected Retirees submit that the Court also has the authority to appoint a Retiree Committee *sua sponte* pursuant to 11 U.S.C. §1114(d).

3.    Despite the incredible gravity of their requested relief and their own acknowledgment of the "real hardship" that their actions will cause, the Debtors are trying to evade their statutory obligations to form an Official Committee to represent the Affected Retirees ("Retiree Committee").  The basis for the Debtors' position is their own self-interested conclusion that they retained a right of unilateral termination in their benefit plan documents.  To support that conclusion, the Debtors cite to two sentences from two unattached and undated benefit plans that may or may not have been distributed to the Affected Retirees.  (See Motion to Terminate Benefits, pp. 23-24).

4.    This is nothing more than an attempt to end-run the protections congressionally enacted to protect retirees in bankruptcies, 11 U.S.C. §1114 ("Section 1114").  If the Debtors' position is accepted, then there will be no more need for Section 1114, because it will have been gutted.  All a debtor would have to do is point to what it defines as unilateral termination language in some purported benefit plan (and ignore any other plans or writings that show lifetime vested benefits).  Then—according to the Debtors' position—the story is over and benefits can be cut at the will of a debtor without any recourse under Section 1114.

5.    Tellingly, the Debtors are treating their Motion to Terminate Benefits itself as a mere formality because they did not even bother to wait for the Court to hear argument or rule on their requested relief.  On February 5, 2009—*one day after the Motion to Terminate Benefits was filed*—Delphi sent letters to the Affected Retirees informing them that it was eliminating their benefits on April 1, 2009.  This was purposefully presented to the Affected Retirees as a "done deal."

6.      The February 5, 2009 letter unequivocally states that "effective April 1, 2009, Delphi will no longer provide health care and life insurance in retirement to salaried employees and retirees."  To make sure the point was not missed, Delphi's letter goes on to state (in the format presented here) that, "effective April 1, 2009:

**Health Care Coverages**

■      Delphi will no longer provide Corporation contribution towards health care coverages;

■      You may continue health care coverages on a self-pay basis by paying the full cost of any coverages continued (attached is a chart showing the estimated cost of the various coverages);

■      Retiree Health Reimbursement Accounts will be discontinued; and

■      Delphi will no longer provide the Medicare Special Benefit.

**Life Insurance Coverages**

■      Retiree Basic Life Insurance coverage currently in effect will be terminated and will you be given the opportunity to convert this coverage to a personal policy without proof of your good health."

7.      The letter goes on to state several more times that all retiree benefits end on April 1, 2009.  Nowhere in the letter does it mention in any way that the Court must rule on Delphi's actions before any retiree benefits can be eliminated.  Apparently judicial approval is merely an afterthought; to the Debtors at least.  (A copy of the full letter from Delphi is attached hereto as Exhibit B).

8.      On February 13, 2009, the Affected Retirees filed their objection to the Debtors' Motion to Terminate Benefits (Docket No. 14765) (the "Objection").[3]  The Objection points out that the Debtors purported bases to (a) seek termination based on unilateral termination and (b) to evade formation of a Retiree Committee are legally and factually untenable.  Not surprisingly, inclusion of two sentences from a two undated and unattached benefit plans is not the end of the story.

9.      In the days between the Debtors' Motion to Terminate Benefits and the Objection, the Affected Retirees were able to locate documents contradicting the Debtors' purported right of unilateral termination.  (See, Exhibits B and C to Objection).  Since that time, even more documents bereft of unilateral termination language have been located, as will be explained below.  There is absolutely no doubt that many more documents like these will be located if the Affected Retirees are able to organize through a statutory Retiree Committee.

10.      It is patently unfair and contrary to the legislative intent and plain language of Section 1114 to proceed this way, *i.e.* to force the retirees to try to assemble themselves, locate counsel, determine their legal rights, locate documents to support their positions and to file a legally reasoned opposition—all in twelve days or less from the time they first learned of the Debtors' Motion to Terminate Benefits, and all without the protections that Congress specifically granted them under Section 1114.

11.      The Debtors' intent is clear.  They want to move as rapidly as possible and to avoid their requirements under Section 1114 in order to eliminate $1.1 billion from

---

[3] The Objection and all exhibits thereto are adopted as if fully restated herein.

their books before the Affected Retirees know what hit them.   Among other things, Section 1114 requires that the Debtors negotiate with the Retiree Committee in good faith and put forth a proposal "based on the most complete and reliable information available at the time of such proposal."  (Section 1114 (f)(1)).  Of course, this would require the examination of the actual retiree benefit plans at issue throughout many years of the retirees' employment to determine if benefits vested.  The Debtors current position would not pass muster under that standard as set forth below, so they simply want to ignore it. The Court must not allow this result.

12.      It is critical to keep the scope of this motion in mind.  At this stage of the process the Affected Retirees are simply seeking the ability to have their voices heard in a meaningful way; a protection specifically envisioned when Section 1114 was enacted. The hearing on this motion should not be used as an opportunity for the Debtors to argue ultimate termination issues as though the Section 1114 process has been followed.  That result would also prejudice the Affected Retirees ability to meaningfully participate in this process.

13.      Section 1114 is neither optional nor imposed at the discretion of the Debtors.  It is a statutory right that was specifically enacted by Congress to curtail the type of cavalier and heavy-handed tactics that are being used in this case.[4]  For these reasons, as more fully set forth herein, the Affected Retirees respectfully submit that the

---

[4] In another case where the Debtor's current counsel represented a debtor, the Hon. Kevin Duffy appointed a Retiree Committee over that that debtor's objection, stating that "I find that the Debtor's cavalier attempt to unilaterally terminate the Retired Employees' insurance benefits produces a drastic and most undeserving result."  *In re Ames Department Stores, Inc. v. Employees' Committee of Ames Department Stores*, 1992 U.S. Dist. LEXIS 18275 *4 (S.D.N.Y. 1992).

Court should appoint a Retiree Committee pursuant to Section 1114(d) to allow this particularly vulnerable group to at least defend itself.

## **Background**

14.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in these cases.

15.    On October 17, 2005, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the United States Trustee appointed an official committee of equity holders.

16.    On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession and the First Amended Disclosure Statement. The Court entered an order approving the adequacy of the First Amended Disclosure Statement and granted the solicitation procedures motion on December 10, 2007.  On January 25, 2008, the Court entered an order confirming the Plan (as modified) and the order became final on February 4, 2008.

17.    On February 4, 2009, the Debtors filed their Motion to Terminate Benefits, and the Affected Retirees objected to that motion on February 13, 2009.

## **Statutory Basis to Form The Retiree Committee**

18.    The rights of retirees in chapter 11 bankruptcies has been governed by Section 1114 since its enactment as part of the Retiree Benefits Bankruptcy Protection Act of 1988.  Section 1114 provides a framework to ensure that a debtor seeking to modify or eliminate retiree benefits in a bankruptcy follows a process that compels it to provide a verifiable basis for the relief it seeks, as well as a framework for negotiation or court action if a consensual resolution cannot be reached.  Most germane to this motion is Section 1114(d), which sets out the criteria for the formation of a Retiree Committee.

19.    Section 1114(d) provides that:

The court, upon a motion by any party in interest, and after notice and a hearing, *shall order the appointment of a committee of retired employees if the debtor seeks to modify or not pay retiree benefits* or if the court otherwise determines that it is appropriate, to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement.  The United States trustee shall appoint any such committee.

11 U.S.C. §1114(d) (emphasis supplied).

20.    More generally, Section 1114 provides that a debtor must:

(A) make a proposal to the…retirees, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assures that all creditors, the

8

debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (k)(3), the representative of the retirees

with such relevant information as is necessary to evaluate the proposal.

Section 1114 (f)(1).

21.    The Debtors are also required to meet and "confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits." (*Id.*) Further, the Court may enter an order modifying retiree benefits under Section 1114 if it finds that "(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f); (2) the authorized representative for the retirees has refused to accept such proposal without good cause; and (3) such modifications are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities." Section 1114 (g), *see also Nelson v. Stewart*, 422 F.3d 463, 471-472 (7th Cir. 2005).

22.    A failure to meet its burden of proof as to *any* one of Section 1114 requirements is sufficient to deny a debtor's Section 1114 motion.  *In re Garafalo's Finer Foods, Inc.*, 117 B.R 363, 370 (Bankr. N.D. Ill. 1990).   Indeed, "[o]nly after the foregoing requirements have been met, and such good-faith negotiations have occurred, is the court empowered to grant the modification motion, if, among other things, modification is necessary to permit reorganization of the debtor."   *In re General Datacomm Ind., Inc. v. Acara*, 407 F.3d 616, 620 (3d Cir. 2005).

23.     One of the key components of Section 1114 is that the Estate is responsible for paying legal and other professional fees.  This protection is immeasurably vital to retirees.  In this case, the Affected Retirees are living on modest and often fixed incomes.  Moreover, they have been acutely affected by the fortunes of Delphi and General Motors ("GM").  Over the course of their employment, the Affected Retirees were strongly encouraged to purchase stock in GM, and even more so in Delphi when it was spun-off.  As these stocks have plummeted, so to have the nest-eggs, if any, that many Affected Retirees were able to put together over many years of service to the Debtors and GM.  The Court can look to the volume of letters from retirees and surviving spouses to get a full picture of this situation.

24.     Stated more bluntly, it is simply not possible for the Affected Retirees to afford to mount a sustained legal defense to the Debtors' onslaught.  Of course, it is for precisely this reason that the Estate is responsible for paying the Retiree Committee's legal fees under Section 1114.  As noted in the Objection, affording the Affected Retirees a right to the representation they are entitled to is an extremely modest price for the Estate to pay when it is looking to eliminate $1.1 billion dollars from its books (the purported actuarial OPEB liability for the Affected Retirees).

**Legislative History and Case Law Interpretation of Section 1114**

25.     It is well established that when interpreting a statute, "Courts must determine 'congressional intent' and give effect to it."  *In re Patrick Cudahy Inc*., 88 B.R. 895, 898 (E.D. Wisc. 1988).  Section 1114's legislative history is an "authoritative guide"

to the statute's construction.  *In re Garofalo's Finer Foods, Inc.*, 117 B.R. 363, 370 (Bankr. N.D. Ill 1990).

26.     There can be no real dispute that Congress intended Section 1114 to afford "retirees special treatment" in bankruptcy proceedings. S. Rep. 100-119.  The legislative record makes absolutely clear that the protections addressed by Section 1114 are qualitatively more essential than those addressed by other sections of the bankruptcy code because retirees' lives literally depend on the benefits protected by Section 1114. Retirees are unlike other creditors of corporate debtors in a chapter 11 proceeding, such as lenders, leasors, bond holders, vendors and financial institutions. From the perspective of these creditors, the Debtors are but one of many entities with whom they do business. Retirees, in sharp contrast, cannot absorb the loss of their retiree benefits through accounting adjustments, cannot write off the loss of benefits, cannot pass along costs to other customers or count on future business with the debtor.  Even as opposed to active employees retirees are completely at the mercy of the company because "unlike active workers…there is nothing the retirees have that the company needs." Hearing at 16 (Statement of Sen. Heinz).  Most critically, because retirees are often living on low and fixed incomes, any disruption or reduction of their retiree benefits can have dire and immediate impacts on their lives.[5]

27.     The case law has uniformly picked up these congressional directives.  The "statutory scheme and Congress' expressed intent indicates that [Section 1114] was

---

[5] Sec. 134 Cong. Rec. H3488 (daily ed. May 23, 1988) (statement of Rep. Edwards); Retiree Benefits Security Act of 1987 on S.548 Before Subcomm. On Courts and Admin. Practice of the Senate Comm on the Judiciary, 100th Cong., 1st Sess. 103-109 (testimony of G. Kirtland), 188-189 (testimony of J. Heisler).

enacted to achieve the very specific and focused objective of protecting retiree rights from unilateral termination."  *Nelson v. Stewart*, 422 F.3d 463, 474 (7th Cir. 2005). Indeed, in one of the earliest Section 1114 cases, Judge Lifland stated that "[i]t is inescapable that through § 1114, Congress has sought to establish a priority for retirees in bankruptcy cases that assures that they receive a measure of enhanced treatment that is consistent with a bankruptcy court's role as a court of equity."  *In re Ionosphere Clubs*, 134 B.R. 515, 527 (S.D.N.Y. 1991).

28.    Stated another way, Congress's purpose in enacting Section 1114 was to ensure that the debtors did not seek to effect reorganization "on the backs of the retirees" for the benefit of other parties in interest.  *See In re Tower Automotive Inc.*, 2006 U.S. Dist. LEXIS 91958, *12 (S.D.N.Y. December 15, 2006) (Section 1114 "clearly evidences Congress's special concern for the rights of retirees."), *citing to Ionosphere*.  This policy was poignantly explained in yet another Section 1114 case: "retirees are particularly vulnerable when their former employer goes bankrupt, because of their ages, their reduced incomes and their inability to replace the benefits . . . that are being terminated." *In re Farmland Industries, Inc.*, 294 B.R. 903, 918 (Bankr. W.D. Mo. 2003).

### The Fate Of 15,000 Retirees Should Not Be Determined By The Debtors' Self-Interested <u>Conclusion</u> that They Posses A Right of Unilateral Termination

29.    The Debtors have stated that they want to completely eliminate all retiree benefits for the Affected Retirees in less than 45 days from date of this filing.  That is plainly set out in the Debtors' Motion to Terminate Benefits and the letter that they sent

to the Affected Retirees on February 4, 2009.  That fact alone mandates the formation of a Retiree Committee under the plain language of Section 1114.  (See Section 1114(d)).

30.     The Debtors, however, hope to circumvent Section 1114 by citing to cases where the issue of unilateral termination was addressed.  The Debtors are mistaken, both legally and factually.

31.     First and foremost, while it is acknowledged that a debtor can, under some limited circumstances, terminate retiree benefits without a resulting unsecured claim, that can only happen when it has been fully and finally established that the benefit plans at issue "*unambiguously*" allow for termination (s*ee In re Ionosphere*, 134 B.R. 515, 517 (S.D.N.Y. 1991), emphasis supplied).  Such a conclusion cannot be reached by the Debtors' mere assertion of that right.  This is the crux of the dispute with the Debtors at this stage of the process.  The Debtors want to reach the ultimate conclusion on the basis of their own assertion of a unilateral termination right, and that assertion comes solely from two sentences from unattached and undated documents purportedly given to all 15,000 Affected Retirees.  Notably, the Debtors offered no evidence or affidavits to support the assertion that the plans quoted from were even distributed to the Affected Retirees.

32.     A debtors' conclusion of a unilateral termination right should be viewed with the utmost scrutiny.  It is commonplace in these proceedings for the debtor to make, or at least reserve, a purported right of unilateral termination.  As set out in the Objection, undersigned counsel represented the Retiree Committee for Dana Corporation, another

13

large automotive supplier, in the Southern District of New York and this exact scenario played out there. *See, In re Dana Corporation* (Case No. 06-10354, S.D.N.Y.).

33.    In that case, like here, the Debtors asserted that Section 1114 did not create any substantive rights for the Non-Union Retirees.    There, based on their own "exhaustive search of records," the Debtors claimed to have the "contractual right to terminate" the salaried retiree benefits at issue. (Objection, exhibit D).

34.    Because an Official Retiree Committee was formed and investigation undertaken, however, the Retiree Committee was able to locate many documents that demonstrated that the Debtors had actually used language in many of their plans and other writings to retirees indicating that retiree benefits were vested, and therefore not subject to unilateral termination.   (Objection, exhibit E)   These efforts formed a strong defense against the Debtors' earlier *conclusion* that they possessed a unilateral termination ability.   This is but one example, but suffice it to say that the unilateral termination argument is often made, but not often successful because of the evolution of retiree benefit plans over time and the temporally late inclusion of unilateral termination language.

35.    Even if the Debtors had attached the full retiree plan(s) they cite to in their Motion to Terminate Benefits, that would constitute only one fact out of a universe of evidence that must be considered by the Court before reaching the legal conclusion that Debtors have the right of unilateral termination.

36.    As set out in the Objection, in cases where claims of unilateral termination have been substantively addressed, it has been repeatedly held that the mere inclusion of

unilateral termination language in recent retiree benefit plans documents does not trump other writings previously provided to retirees.  *See e.g., Devlin* v. *Empire Blue Cross and Blue Shield,* 274 F.3d 76, 80 & 84 (2nd Cir. 2001) (the court rejected the use of recent summary plan documents argued by Debtor as controlling, looking instead to prior plan documents that did not contain unilateral termination language); *Feifer v. Prudential Insurance Company,* 306 F.3d 1202, 1211 (2nd Cir. 2002) (noting that if an employee was promised future benefits that would vest in the future before the introduction of later documents purporting to provide the right of unilateral termination, the later documents *cannot* diminish the rights of the employees who accepted the earlier terms by continuing in the employ of their employer) (emphasis supplied); *Abbruscato v. Empire Blue Cross and Blue Shield*, 2004 U.S. Dist. LEXIS 18286 *21 (S.D.N.Y. September 10, 2004) (language in plan documents pre-1987 reflected vested benefits that could not be un-vested by inclusion in unilateral termination language in subsequent retiree plan documents);  *Aleo v. Keyspan Corp*., 2006 U.S. Dist. LEXIS 55049 at *18 (E.D.N.Y. Aug. 7, 2006) (finding that documents external to retiree plan implying a lifetime or vested benefit made unilateral termination reservation in plan documents inapplicable).

    37.    Accordingly, the Debtors' citation to what is certainly a recent retiree plan document does not trump other promises and/or documents given by Debtors' to their employees or retirees.  Indeed, any language found in the same plan documents or in other writings provided by Debtors (and/or other extrinsic evidence) reflecting communications that would have given Debtors' employees a reasonable belief that their

future benefits would vest—usurps any right to unilateral termination.  *See Feifer,* 306

F.3d at 1211; *Devlin*, 274 F.3d at 76.

### Documents Illustrating Vesting and/or No Unilateral Termination Right

38.     Despite the fundamental unfairness of the process thus far, the Affected

Retirees have been able to (barely) band together and communicate with one another

enough to engage in the process of trying to find evidence to show the Court that they are

statutorily entitled to the appointment of a Retiree Committee.  They have been able to do

this only because of the herculean efforts of individual retirees (like the ones named in

the motion and many others) and because they were able to find counsel familiar with

Section 1114 and this process.  This is exactly the scenario that Section 1114 was

supposed to prevent.

39.     In this abbreviated and hectic timeframe the Affected Retirees have

answered the call to the best of their abilities and have started to locate documents that

squarely rebut the Debtors' asserted right of unilateral termination.  There is absolutely

no doubt that this is just the tip of the iceberg, but these documents already evidence that

the Debtors' bald assertion of a right of unilateral termination is dubious at best, and that

it must be examined far more closely under the rubric of Section 1114.

40.     In their Objection the Affected Retirees provided documents that showing

lifetime benefit language.  For example, with respect to Life Insurance, in 2001 *the*

*Debtors* sent letters to Affected Retirees stating that "Our insurance records, as of the

date of this letter, show the Continuing Life Insurance has now fully reduced to the

ultimate amount of [].  **This ultimate amount will remain in effect for the rest of your**

**life and is provided by Delphi at no cost to you**." (Objection, exhibit B, emphasis supplied).

41.    Additionally, by the Debtors' own acknowledgment, when Delphi was spun-off from GM, it contractually agreed to recognize the years of service earned by the GM employees toward retiree benefits and to assume all of GM's accrued obligations to these retirees. (See Motion to Terminate, p. 19). In recognition of that assumption, Delphi was paid considerable monies by GM.

42.    Also in their Objection the Affected Retirees attached a GM plan document from 1980 stating that GM was providing "Basic healthcare coverages…**for your lifetime.**" (Objection, exhibit C, emphasis supplied).

43.    As stated previously, additional documents have already been located. It is plainly emerging that throughout their employment with GM the Affected Retirees received "Personal Benefit Summaries," Plan Documents and myriad other writings that expressly state that the retiree benefits they would receive in the future were *vested*. For example, the Personal Benefit Summaries sent to all salaried employees in 1983 provided, in relevant part that:

- On a page entitled "Your Share of GM Benefit Program" the employees were told that "**The benefit program coverages represent a significant part of your total compensation**….I hope that you will see how the Corporation's investment in you translates to opportunity and protection for you and your family" (A copy is attached hereto as Exhibit C, p. 1).

- On a page section entitled "Retirement Benefits" (in large bold type), there is a laundry list of retiree benefits reflected that includes the language " "**Your health care coverage will be continued for your lifetime.**" (Emphasis supplied.) (*Id*. at p. 2)

- In the same plan document, it was promised that "GM will pay for health care coverages for your spouse and eligible children if you die while actively employed…."[6]

Nowhere in these comprehensive writings is there any language reserving the right to terminate, amend or modify any provisions therein.

44.    As another example, in 1984 GM sent its employees continued promises of lifetime healthcare benefits, noting at that time that "As partners in GM's Success, those profits now have been shared with our salaried employees." (A copy is attached hereto as Exhibit C, p. 1) and, therefore, **Your health care coverage will be continued for your lifetime.**" *Id.* p. 2 under "Retirement Benefits," emphasis supplied.

45.    Setting the vesting standard for employees low, the Second Circuit has clarified that "it is not necessary that a commitment to vest be in precise language denying the right to withdraw benefits." *Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 77-78 (2nd Cir. 1996) citing *Bidlack v. Wheelabrator Corp.*, 993 F.3d 603 F.3d 603, 604-05 (7th Cir. 1993) (en bank), cert denied, 510 U.S. 909 (1993).  Rather, an employee must merely be able to "point to written language capable of reasonably

---

[6] Part of the Affected Retiree group is Surviving Spouses.

being interpreted as creating a promise on the part [of the employer] to vest…benefits."

*Id*.

46.    The aforementioned exhibits serve as preliminary examples of writings that are capable of being interpreted as creating vested benefits, and thus cast significant factual and legal doubt as to the eventual application of "unilateral termination" here. *See Id*.  It is expected that formal discovery, as allowed through the Section 1114 process, would no doubt yield even more evidence to dispute Debtors' claims. Accordingly, the formation of a Retiree Committee is absolutely required before this Court substantively considers any claims by Debtors to reduce or eliminate retiree benefits.

### The Cases Cited By The Debtors Are Not Factually Relevant

47.    In their Motion to Terminate Benefits the Debtors cite caselaw for the proposition that "where the terms of a plan unambiguously state that benefits can be modified or terminated at any time, the committee appointment procedure provided in [Section 1114] is not applicable."  (Motion to Terminate, p. 25.).  These cases, however, are factually distinguishable and present a misleading conclusion.

48.    For example, the Debtors prominently cite a 1991 case from the Bankruptcy Court for the District of Kansas, *In re: Doskocil Companies Inc.*, 130 B.R. 870 (Bankr. D. Kan. 1991).  The *Doskocil* case is factually inapplicable.  In that case, the court declined to form a retiree committee because there was *no dispute* over whether the debtors had unilateral termination provisions in their relevant benefit plan documents or other writings proffered to the retirees.  In fact, both sides agreed that the debtors possessed a right of unilateral termination.

49.     The retirees in *Doskocil*, however, were making the argument that despite their acknowledgement of the unilateral termination language that there should still be a retiree committee.  The court noted that the retirees' objection:

> concedes that the matter before Court is a question of law with no genuine issue of material fact.  The objection identifies the Committee's membership by attaching an exhibit listing the 181 members' names.  All are said to be salaried non-union employees not covered by a collective bargaining agreement at the time of their retirement.  *No other exhibits are presented and no affidavits are offered*.

(*Id*. at 130 B.R. 870, 872) (emphasis supplied).

50.     The Affect Retirees make no such concession here, and they have already located and attached exhibits the raise far more than an issue of material fact under the law of the Second Circuit.

51.     The Debtors also cite other cases for the general rule that under ERISA employers are "generally free" to amend welfare plans.  The Debtors' problem here is two-fold.  First, these cases cite to a general rule that is not disputed in the context of those cases (*i.e.* that employers are generally free to amend welfare plans; a separate and distinct issue from what retiree rights may have vested based on performance under earlier plans).  Second, and far more relevant, the Debtors do not cite a single case that is binding upon this Court.  There are *no* cases cited from the Second Circuit, and only a single case from the U.S. Supreme Court is cited, and it has no relevance other than to state the non-disputed general rule.

52.    In stark contrast, the Affected Retirees have provided the Court with binding precedent from the Second Circuit that directly relates to legal interpretation and standards to be applied when a benefit plan is changed over time and the corresponding affect on the rights of the retirees.  *See e.g., Devlin*; *Feifer.*

### A Retiree Committee Should Be Formed Even If There Is An Alleged Termination Right

53.    Given the confluence of Section 1114, binding case law, and retiree benefit plans that evidence vested and lifetime rights the Affected Retirees do not believe any further inquiry is warranted on the issue of the necessity of forming a Retiree Committee.

54.    Nevertheless, even if these factors did not exist as plainly as they do in this case, Section 1114 prohibits a debtor from modifying retiree benefits during a chapter 11 case unless a debtor complies with Section 1114—even if Debtor appears to have a right of unilateral termination (something that is not the case here.)  *In re Farmland Indus., Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003).

55.    The requirement of complying with Section 1114 and the formation of an Official Retiree Committee was squarely affirmed in *Ames Department Stores, Inc. v. Employees' Committee of Ames Department Stores*, 1992 U.S. Dist. LEXIS 18275 (S.D.N.Y. 1992), a case where Debtors' current legal counsel unsuccessfully made the *same* legal arguments with respect to the inapplicability of Section 1114 on behalf of another debtor.

56.    In *Ames,* the Bankruptcy Court granted a motion for an order appointing an Official Retiree Committee over the objections of the Debtor. *Id.* at *2-3.  The Debtor

asserted that Section 1114 was not applicable on the basis that it had language in its retiree plan documents giving it the right to unilaterally terminate the retiree benefits at issue. *Id*. When Debtor appealed the order granting the formation of an Official Retiree Committee, the District Court upheld the bankruptcy court ruling indicating that the debtor "must follow the requirements of § 1114 of the Bankruptcy Code if it seeks to terminate…" retiree benefits. *Id*. at 4.[7] This precedent has not been overturned in this District and Debtors have cited no controlling or compelling authorities to the contrary.

57.    Without the protections provided by Section 1114, including the appointment of an Official Retiree Committee, there will be no basis to look behind the curtain constructed by Debtors' to terminate the rights of the retirees and to "relieve" themselves of a $1.1 billion liability.  Accordingly, the Affected Retirees respectfully request that the Court deny the Debtors' Motion to Terminate Benefits and that it appoint an Official Retiree Committee as soon as practicable.

### Proposed Selection Criteria

58.    The Affected Retirees submit that it is paramount for the U.S. Trustee to appoint a Retiree Committee that reflects, to the highest degree possible, the geographic breadth of the Affected Retirees, the different divisions of the Debtors, and the interests of retirees both over and under age 65 (*i.e*. Medicare eligible retirees).  Those concerns must also be balanced with the need to select a Retiree Committee that is not so large as

---

[7] The District Court was so taken aback by the lack of merits in Debtors' argument (that unilateral termination language would wholly trump the Section 1114 process) that the Court twice ordered that Debtors' counsel reduce its legal fees associated with such arguments. (*See Id* at 5; *In re Ames Department Stores, Inc.*, 1995 U.S. Dist. LEXIS 7761 *4-7 (S.D.N.Y. June 7, 1995).  While the order disgorging these fees was subsequently reversed, the Court of Appeals carefully noted that it was not overturning the orders that found Section 1114 to be applicable.

to be inefficient.  As such, it is respectfully suggested that the Court appoint a seven member Retiree Committee.  In addition to the Named Representatives, the undersigned counsel has also been contacted other Affected Retirees that indicated a desire to serve on the Retiree Committee, as well as Affected Retirees who have voiced support and confidence in proposed members of a Retiree Committee.  The undersigned counsel will tender the names of all Affected Retirees who have expressed an interest in serving on a Retiree Committee directly to the U.S. Trustee.  In addition, it is known that other retirees have organized and will certainly be able to proffer the names of individuals who would be willing and able to serve on the Retiree Committee.

59.     To effectuate the formation of a Retiree Committee as expeditiously as possible, and to account for the concerns set forth above, it is respectfully suggested that the U.S. Trustee contact these retirees to determine their ability to represent the Affected Retirees as soon as practicable.

60.     Alternatively, if, and only if the U.S. Trustee determines that time does not allow for a more formal vetting process, seven retirees that meet the varied criteria set forth above have volunteered to serve as members of the Retiree Committee.  Each of these individuals has been advised of the fiduciary and other responsibilities attendant to servicing on a Retiree Committee.  Further, these individuals represent varying divisions of Delphi, varying geographical areas and the group has members both over and under age 65.  Moreover, each of these individuals held leadership positions during their careers at GM and then Delphi and have been given the support of other retirees based on those qualities.  These Proposed Committee Members are James    Conger,    James    Conlee,

Michael Gallagher, W. Ben Gifford, Patricia Lott, Dan Pitcock and Joni Walls.  Again, information relating to the qualifications and contact information for these and <u>all</u> other retirees who have expressed an interest in serving on the Retiree Committee will be transmitted to the U.S. Trustee's office for review and it is suggested that the U.S. Trustee take input as practicable from other retirees, retiree groups and their counsel.

## Relief Requested

61.    The Affected Retirees respectfully request that the Court grant authorize and instruct the United States Trustee for the Southern District of New York to appoint a Retiree Committee to represent all Salaried Retirees, their Spouses and Dependents who receive benefits from the Debtors and all Surviving Spouses.

## Notice

62.    Notice of this motion has gone out in the form set forth in the contemporaneously filed Notice of Motion to Shorten Notice with respect to this motion. As more fully set forth in that filings, Notice of this motion has been made by electronic filing and overnight delivery in accordance with the Case Management Order entered on December 4, 2008.  The Affected Retirees submit that Notice is sufficient based on the hearing of the same termination issues that are set forth in the Debtors' Motion to Terminate which is also set to be heard on February 24, 2009.

## Memorandum Of Law

63.     It is respectfully requested that the Court waive the requirement contained in Local Bankruptcy Rule 9013-1(b) that a separate memorandum of law be submitted.

**Conclusion**

64.     The formation of a Section 1114 Retiree Committee does not guarantee any result or recovery for retirees.  When Congress enacted Section 1114, however, it did so to make sure that the retirement benefits that retirees worked their lives for are not simply cut-off at the whim of a debtor.  The retirees must have a voice to speak for them, and it must be through an Official Committee that is sanctioned by the Court.

65.     Application of Section 1114 would merely provide a mechanism to ensure that the Debtors' asserted right of unilateral termination is not based on a fiction, nor a selective review of self-serving materials proffered by a party with the intent to shed $1.1 billion dollars of obligations.   Application of Section 1114 would also ensure that the retirees are provided access to paid professionals with the experience and ability to represent their interests before the Bankruptcy Court, a critical factor for individuals living on a fixed income.  Finally, under Section 1114 it would be incumbent on the Debtors to demonstrate the "necessity" of their proposed actions; as opposed to simply wanting to eliminate a liability—especially when that "liability" directly affects the lives of thousands of people, some of whom will be left uninsurable and without access to the healthcare they need.  To state these benefits are "life or death" is not hyperbole, as the Court itself can see from the letters that have already come in from retirees.

WHEREFORE, the Affected Retirees respectfully request that the Court grant this motion and Order the appointment of an Official Committee of Salaried Retirees pursuant to 11 U.S.C. §1114(d) and for such other relief as the Court deems appropriate. A draft Order is attached for the Court's review and consideration.

Dated: New York, New York
     February 17, 2009

On behalf of Paul Higgins, James Conger, Doug Kittle & Joni Walls and other Delphi Non-Union Salaried Retirees

/s/ Barry R. Lax
Local Counsel

Local Counsel
Barry R. Lax, Esq.
Brent A. Burns, Esq.
LAX & NEVILLE LLP
1412 Broadway, Ste 1407
New York, NY 10018
(212) 696-1999 x220
(212) 566-4531 facsimile
blax@laxneville.com


Lead Counsel
Trent P. Cornell, Esq. (IL 6242712), *Pro Hac Vice* (pending)
Jon D. Cohen, Esq. (IL 6206666), *Pro Hac Vice* (to be filed)
STAHL COWEN CROWLEY ADDIS LLC
55 West Monroe Street, Suite 1200
Chicago, Illinois 60603
(312) 641-0060
(312) 641-6959 facsimile
tcornell@stahlcowen.com