

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
                                    :

                                    :

      in re                           :     Chapter 11

                                    :

DELPHI CORPORATION, et al…     :     Case No. 05-44481 (RDD)

                                    :

                  Debtors.    :     (Jointly Administered)

                                    :

-------------------------------------------------------

THIS IS AN OBJECTION TO THE MOTION THAT DELPHI CORPORATION HAS
BEFORE THE COURT OF THE HONORABLE JUDGE ROBERT DRAIN, REQUESTING
PERMISSION TO END SALARIED EMPLOYEE RETIREMENT BENEFITS.

      Regarding the motion that is to be heard on February 24, 2009, I am requesting that Your
Honor deny the motion to discontinue health and life insurance benefits for the retired salaried
employees proposed to be effective April 1, 2009. (Ex. 1) I am also requesting that you freeze
any action by Delphi Corporation to discontinue any salaried retiree's benefits of any kind until
an independent, Court-appointed group of qualified individuals can make an accounting of the
actual figures, provide proof of projected savings, and ascertain if other moneys are being non-
productively expended that could be better used to satisfy Delphi's assurance of employee
retirement benefits to its salaried retirees. Delphi should be required to substantiate its reasons
and verify its figures. This request is based on the following information.

      The retired salaried employees are the minority in the Delphi Corporation scenario.
Salaried employees are the least in number as reported in the October 3, 2008's Proposed
Modification DS-9 & DS-10. (Ex. 2)  As shown in these documents, for December 2007, out of
169,500 total employees, only 36,100 were salaried employees.  (DS-9) This was worldwide.
However, on page DS-10, in the US, the total number of employees was quoted as being 28,400.
Union-represented hourly employees made up 16,700 of that number. The drafters do not list the
actual number of salaried employees in paragraph two, but left the math computation up to the
reader and included management in that number. (Ex. 2 at DS-10).  Simple subtraction shows
approximately 11,700 salaried and management employees in the US.

      Over the last 35 years, I have had personal experience of Delphi Corp.'s treatment of its
salaried employees. My husband, Theodore Kustas, has been a loyal and trusted employee from
February 25, 1973, when it was known as Rochester Products, until November 30, 2008, when
his "strongly-encouraged" retirement was affected by management. Salaried employees are
expected to work overtime without monetary reimbursement when corporate money needs to be
saved. Union-representation ensures that hourly workers are compensated for overtime and

provided with more generous employee welfare benefits. The salaried employees at Delphi had their health plans reduced to ever-increasing co-pay percentages as years went by, paying more and more. Conversely, the hourly workers had 100% of their employee welfare benefits covered until the last decade. Salaried workers seem to have little voice and no representation. I am asking that you protect the rights of the salaried employee, especially the retiree. My husband has been an exemplary employee at Delphi. Up until his retirement, Ted reported at 6:30 a.m. each morning and came home late every day, usually after 6 or 6:30p.m.. He was not paid overtime. He never complained. He loved his job and was responsible for monitoring and making the computers perform and manufacture the product in three areas of the plant at Delphi Automotive, in its Rochester, NY plant. Whenever he took a vacation day, Ted was constantly on the phone with the plant answering questions in order to solve a problem. There were times when he would go to the plant after hours, or go in on his day off to fix a problem. Over the last decade, he never used all of his annual vacation time. He told me that he was too busy. If one could go back and check the electronic data that records who goes in and out daily with badge-swipes, the hours he worked would speak for themselves. Ted and his co-workers, both salaried and hourly, were making a real effort to help Delphi become more productive and to emerge from bankruptcy.

I noticed in the Wikipedia article regarding Delphi (auto parts) on page 3 of 6 under the section covering the section on "Chapter 11," it lists "the consolidation of fuel injector production in Rochester, NY during 2006-2007 which allowed the debtors to wind down a manufacturing facility in Coopersville, Michigan." (Ex. 3). On that same page, it states further that, "the company will continue with its stated plans to sell or wind-down additional non-core product lines and manufacturing sites through 2008." (Id.) Delphi Automotive is not part of the Automotive Holdings Group. It is part of the Power Train Division, which has been a large asset during this time and was not scheduled for closing. (See Ex. 2, DS-9 Automotive Holdings Group and closure sections) The employees at the Rochester, NY plant, salaried and hourly, are vital to Delphi's ongoing production requirements. It was my impression that the purpose of Chapter 11 bankruptcy was to permit the distressed corporation to protect its assets and to pay off its debt by selling its product. It appears as though Delphi is not just selling product, it is simply selling-out its employees and their benefits, especially its salaried employees.

The history of Delphi and its "amazing" recordings of its income and bookkeeping records has been described by the US Securities and Exchange Commission's Litigation Release No. 19891, dated October 30, 2006. (Ex. 4) The SEC charges Delphi with engaging in a pattern of fraudulent conduct between 2000 and 2004. The SEC charges that thirteen individuals engaged in the fraudulent conduct and/or in reporting and books-and-record violations by Delphi . . . ." (Ex. 4, pg. 1 ¶.3) On Page 2 of the same Release, it states, "The Commission's Complaint alleges that between 2000 and 2004, Delphi engaged in multiple schemes that resulted in Delphi materially misstating its financial condition and operating results in filings with the Commission . . . ." (Ex. 4, pg. 2 of 5) Overstating its income by $202 million dollars, inflating its cash flow, improperly reporting net income of $80 million dollars, soliciting a $20 million dollar payment from a company. The report also states that "from 2003 to 2004 , Delphi hid up to $325 million in factoring or sales of accounts receivable in order to improperly boost non-GAAP pro forma measures of Delphi's financial performance that were relied upon by investors . . . ." (Ex. 4, pg. 3 of 5) The Release states further that, "Delphi settled the charges, without admitting nor denying the Commission's allegations . . . ." (Id.) All of management did not disappear from Delphi after this occurred. (See Ex.2 DS-15 showing list of people on board).

Delphi filed for bankruptcy the year before this Release was published on October 8, 2005. Wikipedia stated in its article about Delphi that the bankruptcy filing was due to the lack of money to pay its employees. (Ex.3, pg.4) Looking at the Consolidated Class Action Complaint filed with the SEC regarding Delphi's practices, especially sections 554,555,556 pgs 177,178,179& 180 (Ex 5) The senior managers and executives were getting up to one-hundred per cent of their pay as incentives or bonuses at a time when the automotive industry was declining, yet no one questioned or sought any verification. In Section VII THE FRAUD COMES TO LIGHT''#205 "Delphi's fraudulent accounting practices and use of fictitious transactions to improve its financials were undetected for years by investors"...(Ex.5, pg 71) The 2006 SEC findings raise serious questions about Delphi's corporate credibility. Given this history, how can the Court ensure that Delphi's disclosures are accurate, especially where the retired salaried employees are concerned? This group has minimal legal and financial recourses with which to protect its interests. They enjoy no union representation.

In my husband's case, we are talking about a $853.26/month health care premium, from which Delphi receives 2 or 3% as a processing fee. (Ex.1, pg3) My husband's retirement income will be about $ 3300/ month, gross. We haven't received a check yet. It is supposed to be coming on Tuesday 2/17. If you subtract the $853.26 from his $3300 check (I do not know how much income tax is taken out of the check yet, either) but let's say it is $3300, minus the $853.26 premium, that leaves us with $2446.74, minus taxes and loans (of approximately $1000 per month), which cut deeply into his earned benefits, leaving us with $1446.74 to live on, which is just about equal to our mortgage payment. It was our life's plan was to have paid off the mortgage by the time Ted reached retirement age.

At the end of the summer of 2008, Ted called me and said that Delphi's Human Resources was calling employees into the office with 30 years or more of company service. They were offered one year's pay as a severance package, along with their health insurance for life, and life insurance to end per their program. Ted was told on a Tuesday and he had to accept the "offer" by that Friday at 4 p.m, or it would expire. We requested, but did not receive necessary benefit calculations and summary plan descriptions. Either you took the package, unseen, or you took your chances. My husband emailed his boss, and explained that he just could not accept an employee welfare benefit without being furnished even the most rudimentary plan information. As a possible alternative, Ted requested plan information concerning disability benefits. Ted was diagnosed with Multiple Sclerosis when he was in college. He walks with a cane right now, and can become tired. The disease has never hindered his work performance. Ted did not use it as an excuse for special treatment. He did not want to retire at this point in his career, especially without health benefits for himself and for his family. It is difficult to obtain new health insurance if you have a pre-existing condition. Ted was fifty-eight years' old, and had almost 7 years until his planned retirement, when he was first approached about voluntary retirement. He had no choice, but to decline. At that time, only a few Delphi employees took the proffered package. DELPHI TOLD THEM TO RETIRE + LET SOMEONE ELSE KEEP THEIR JOB.

In addition to being kept uninformed about the terms of the retirement plan(s), Ted had to grapple with the Delphi Stock issue. A lot of employees, salaried and hourly, lost their 401k plans after buying Delphi stock at $17 per share in the beginning 1999. When the stock's value plummeted in the fall of 2001, Ted lost thousands of dollars in stock value in his 401k. This reduced the equity value of his 401k, preventing him from borrowing against it to finance our three children's college educations without incurring considerable, and unplanned, outside debt. Two of our three children had certified learning disabilities in the processing area, resulting in

3

extra time and expense to complete their educations. We had to use other means of funding and credit to educate our children.

Reading the SEC report regarding the stock and Delphi's "creative" financial reporting was very disheartening, yet, enlightening. We just received a letter from General Motors dated February 4, 2009, concerning litigation against it. (Ex.6) Ted never signed up to be part of the class action suit, so I do not know why he received the letter, but according to them, he definitely did not meet the "$25 minimum threshold" per their formula.

There is no recourse for the people who lost a majority of their 401k, and simply could not afford to retire. They trusted their employer and invested their earnings in, losing their investments and putting themselves in serious financial jeopardy. Now, Delphi is forcing salaried employees of 30 years to retire, promising insurance for life while they are retiring, and at the same time planning to end their health insurance within weeks of acceptance. Having said that, I also know the hourly workers of 26 years or more were being bought out with severance packages and health insurance per the union contract. Delphi is scrambling to create deceptively-positive numbers. I understand that Delphi's corporate officers were not happy with the small number of salaried people who accepted the buy-out.

So, in September of 2008, even though few salaried workers wanted to take the voluntary retirement, Human Resources renewed its efforts. They were STRONGLY suggesting that people take the retirement package, which contained health insurance for life, stating that if you did not take the retirement now with the one year severance, then the next time the separation terms may be reduced. Ted was assured that he would have his health care for life and his life insurance, per his plan. The health insurance is worth about $10,239.12 per year. That amount was to be provided as a benefit. Making him retire before 65 cost him $553,000 in earned income and $ 71,673.84 in health benefits (which will increase in amount every year while retirement increases minimally) or about $316,000 in earned income, plus $40,956.48 + in health benefits, if he had been able to retire at 62. Ted would have his life insurance, also, and been able to pay off the debt incurred from the stock loss and expenses I mentioned above. Ted felt that he had no choice. He took the package. Delphi did not mention the income tax problems. Ted had to take payment this year on December 15, 2008. Delphi refused to pay it on January 1, 2009. This puts us in a tax situation that reduces the value of the package by 40%. He was then told to wait for a call regarding his retirement and applying for the benefits. Things got delayed. As I stated, we are supposed to get the first payment on February 17, 2009. Ted officially retired December 1, 2008.   Delphi eliminated his job. Other experienced employees were pushed to retire. Then some with less than 30 years were let go. These people had families and needed to earn a living. People who were experienced were discharged and replaced by cheaper, inexperienced employees. How does that help increase production and profit?  It appears that reducing the cost of payroll is the easiest way to show a "different type of profit" in order to show a decrease in liability and produce cash.  It produces little, if any, long-term gain.

Delphi contends that by cutting the retired salaried health care, it will save them $70 Million per year from 15,000 retirees.  Yet, in early 2007, Delphi paid their management half that amount ($37 million) in bonuses.(Ex.7). In a The N.Y. Times an article, written by Gretchen Morgenson, "Royal Pay at Delphi, Reined in by a Judge" (Ex. 8) reported Delphi's request of $87 Million for 500 management and corporate people was totally unrealistic and reduced by Your Honor to $16.7 Million. What percentage of these retirees are in the US, where health care cost is at a premium?  Delphi combined the numbers of management and salaried employees in the October 3rd Plan (Ex. 2) without really breaking it down. What is the actual

4

cost for the health care for Delphi, per employee? Delphi should be made to prove the actual costs. How many of the retirees were just pressured to retire over the last year due to Delphi's free spending on management, while misrepresenting assets to their employees and investors? Appaloosa's withdrawal of funding rendered Delphi unable to emerge from bankruptcy in April of 2008. This put Delphi in "crunch mode" again and made more downsizing the quickest answer to the immediate money crisis. Is this health care termination for salaried retirees another ruse on Delphi's part to allow them more time to crunch numbers and present themselves as more profitable, at the expense of the salaried employee? What will be the next sacrifice required of the salaried employee? How many salaried employees felt they had no choice but to retire, or to lose everything? How many salaried people would have taken the retirement package over the last year (especially over the last 6 months) if they had known that 12 weeks after they retired, they would lose their health benefit and life insurance at the cost of $10,239.12/year. Yet, Delphi expects Appaloosa to follow through on its promise to bail them out in April 2008 (Ex. 9) The salaried employees contributed more than their share to Delphi's alleviating financial woes. Please note the two retirement portfolios Ted received. One is dated January 9, 2009. The other is dated January 29, 2009. (Ex. 10) What will the next letter take away? What is going to happen if Delphi is allowed to further erode employee welfare and retirement benefits to the preference of executive compensation? There is a difference of a $10 Million executive income reduced to $1 Million, versus a retiree going from an $80,000 annual income to a $39000 annual income, less $10,239.12 for health care (without mentioning taxes and loans). Hold Delphi accountable. Managements' high salaries seem to be outside of the purview of the Bankruptcy Law. Here is my suggestion: using five per cent (5%) as a reasonable interest rate, require Delphi to deposit the assets earmarked for future executive compensation into interest-bearing accounts, resulting in a projected income of $50,000 per $1 Million of deposit. This interest income would off-set the erosion of retired salaried employees' health care benefits. Verifiable accounting of Delphi's figures by independent Court-appointed accountants would avoid a repetition of Delphi's history of "unusual" accounting

    I am concerned also for the future of Delphi's pension plans. Stated in documents of Delphi's Remodification plan, Delphi reports that they were unable to make the 2005 ERISA payment for the employee pensions (Ex. 11). They reversed a $17 Million IRS penalty as a liability in their asset computations due to waivers.(Id.) Delphi was, however, able to pay out $37 million in executive compensation in 2007. Did they ever pay penalties (or pension obligations)? Are they paying the pension plans each year as they are required? Please do not let them to be allowed to destroy the pension funds, as well. The salaried employee is entitled to his or her retirement benefits, too. How many of the settlements and payouts are a result of just eliminating jobs, sacrificing the employee not the company management?

    Based on the foregoing, please deny this motion in its entirety.

Respectfully submitted,

*Carol A. Kustas*

Carol Ann Kustas
22 Crystal Springs Lane
Fairport NY 14450
585-377-3044

# DELPHI

February 5, 2009

To Delphi Health and Life Program Participants:

The challenges created by a weakened global economy continue to have a dramatic impact on the automotive industry and on Delphi, with customer volumes at levels not likely to recover in the short term. We have and will continue to support our customers and manage our supply chain through this turbulent time. All of us are working on cost-reduction initiatives that have helped make a difference. However, it is essential that we take significant and immediate actions to further address the current challenges.

After consideration of factors including declining revenue and challenging market forecasts, effective April 1, 2009, Delphi will no longer provide health care and life insurance in retirement to salaried employees and retirees. In these extraordinary economic times, it is necessary for Delphi to discontinue these benefits in order to work towards further modifications to its plan of reorganization that will enable the company to emerge from Chapter 11 reorganization as soon as practicable. Delphi acknowledges these actions will impose a real hardship on former beneficiaries of these programs. However, the company's recognition of this hardship, which allowed Delphi to continue these benefits in a more robust economic environment, regretfully does not support continuing these programs in the current economic environment.

Current retirees participating in the Delphi Health Care Program for Salaried Employees and the Delphi Life & Disability Benefits Program for Salaried Employees will be affected as noted below. Specifically, effective April 1, 2009:

## Health Care Coverages

- Delphi will no longer provide Corporation contributions towards health care coverages ;

- You may continue health care coverages on a self-pay basis by paying the full cost of any coverages continued (attached is a chart showing the estimated cost of the various coverages);

- Retiree Health Reimbursement Accounts will be discontinued; and

- Delphi will no longer provide the Medicare Special Benefit.

## Life Insurance Coverages

- Retiree Basic Life Insurance coverage currently in effect will be terminated and you will be given the opportunity to convert this coverage to a personal policy without proof of your good health.

- Any Optional Life, Dependent Life and/or Personal Accident Insurance currently in effect will not be cancelled as long as you continue to make the required premium payments which remain the same.

- Retirees affected by the termination of Basic Life Insurance will have a one-time opportunity to increase Optional Life Insurance coverage by one level or elect coverage at the first level. Proof of your good health will be required.

By the end of February, you will be mailed an election kit that will allow you to elect continuation of Health Care coverages. An election must be made no later than March 27, 2009 in order to avoid any break in coverage. The ability to continue Health Care coverages on a self-pay basis is contingent upon you making a timely election (i.e., by March 27, 2009). Elections postmarked after March 27, 2009 will not be accepted. Additionally, if you discontinue coverage for any reason (e.g., non-payment, late payment) Health Care coverages will not be reinstated.

Also, by the end of February, a separate election kit will be mailed with the necessary forms and instructions regarding the special Optional Life Insurance enrollment opportunity. You will have 31 days from the date of that election kit to make an enrollment decision. Elections post marked after this 31-day period will not be processed.

The attached Question & Answer document provides additional information concerning these changes. Specific questions about health care and life insurance should be addressed to the National Benefit Center by calling 1-866-335-7444 or at www.delphinbc.com.

On February 4, 2009, Delphi filed a motion with the US Bankruptcy court concerning these changes. The impacted benefits are generally referred to as Other Post Employment Benefits (OPEB). You will receive a copy of the motion in the mail at your home address. A copy of the motion can also be found on www.delphidocket.com. Any responses to the motion will need to be filed with the Bankruptcy Court no later than February 17, 2009.

The state of the global economy, market changes in response to these challenges and our business plan to exit bankruptcy in the U.S. create a very dynamic situation with respect to salaried employee plans and policies. We regret that these changes are necessary, please understand that recommended changes are only implemented after careful consideration of market conditions, affordability and the impact on employees,with the intent of maintaining a viable global business now and in the future.

Delphi Corporation

## Estimated 2009 Retiree Self-Pay Rates

| Rates shown below are Monthly Rates | | | | | | | |
|---|---|---|---|---|---|---|---|
| Health Plan Name | Employee Only | Employee and Spouse | Employee and Child(ren) | Family | Spouse Only | Child(ren) Only | Spouse & Child(ren) |
| Enhanced Medical Plan | $666.00 | $1,332.00 | $1,198.80 | $1,864.80 | $666.00 | $666.00 | $1,198.80 |
| Point-of-Service Plan | $636.00 | $1,272.00 | $1,144.80 | $1,780.80 | $636.00 | $636.00 | $1,144.80 |
| Comprehensive Health Savings Plan | $332.00 | $664.00 | $597.60 | $929.60 | $332.00 | $332.00 | $597.80 |
| Health Net (Southern CA) | $520.99 | $1,094.08 | $989.88 | $1,458.77 | N/A | N/A | N/A |
| Advantage Health Plan (IN) | $502.72 | $1,055.77 | $955.17 | $1,407.62 | N/A | N/A | N/A |
| HAP (MI) | $333.43 | $700.21 | $633.52 | $933.60 | N/A | N/A | N/A |
| Priority Health West (MI) | $507.89 | $1,066.57 | $965.02 | $1,422.20 | N/A | N/A | N/A |
| Blue Care Network (Southeast Michigan) | $312.81 | $656.90 | $594.34 | $875.87 | N/A | N/A | N/A |
| Priority Health East (MI) | $377.92 | $793.67 | $718.07 | $1,058.22 | N/A | N/A | N/A |
| Health Plus of Michigan (MI-Flint) | $386.05 | $810.70 | $733.49 | $1,080.93 | N/A | N/A | N/A |
| Health Plus of Michigan (MI-SE Mich) | $304.99 | $640.48 | $579.48 | $853.97 | N/A | N/A | N/A |
| Health Plus of Michigan (MI-Saginaw) | $399.75 | $839.49 | $759.54 | $1,119.32 | N/A | N/A | N/A |
| Blue Care Network (MI-East/Saginaw) | $404.59 | $849.64 | $768.73 | $1,132.85 | N/A | N/A | N/A |
| Blue Care Network (Mid-Michigan) | $404.59 | $849.64 | $768.73 | $1,132.85 | N/A | N/A | N/A |
| Blue Care Network (East/Flint Michigan) | $368.60 | $774.06 | $700.34 | $1,032.08 | N/A | N/A | N/A |
| Blue Point 2 (NY-Rochester) | $370.98 | $853.26 | $934.13 | $983.10 | N/A | N/A | N/A |
| United HealthCare (Dayton/Cinci) | $600.59 | $1,261.24 | $1,141.12 | $1,681.64 | N/A | N/A | N/A |
| Kaiser Permanente (OH) | $419.44 | $880.82 | $796.94 | $1,174.43 | N/A | N/A | N/A |
| Health Assurance - Warren/Youngstown (OH) | $550.38 | $1,155.79 | $1,045.72 | $1,541.06 | N/A | N/A | N/A |
| Dental | $44.00 | $88.00 | $79.20 | $123.20 | N/A | N/A | N/A |
| Vision | $3.00 | $6.00 | $5.40 | $8.40 | N/A | N/A | N/A |
| Extended Care Coverage | $11.00 | $22.00 | $19.80 | $30.80 | N/A | N/A | N/A |

Notes: Rates are evaluated on an annual basis and are subject to change.

Spouse Only, Child(ren) Only, Spouse & Child(ren) are available only to retirees who are Medicare eligible and age 65 or older.





PRESORTED
FIRST CLASS

THEODORE KUSTAS
22 CRYSTAL SPRINGS LN
FAIRPORT, NY 14450-1904

**DELPHI**
P.O. BOX 5140
SOUTHFIELD, MI 48086-5140

EXHIBIT 2





> Adversary Proceedings

> Case Management Orders

> Court Documents

> Creditors' Committee

> Delphi-GM Settlement

> Disclosure Statement

> Equity Security Holders' Committee

> First Day Motions

> First Day Orders

> Monthly/Quarterly Operating Reports

> Notice Lists

> Omnibus Hearing Dates

> Omnibus Hearing Orders

> Plan of Reorganization

> Presentations: First Day, Organizational, 341

> Press Releases

> Schedules/ Statements

> Voluntary Petitions

Home | Bankruptcy Industry Links | Proof Of Claim Form | Claims/Creditor Search | Submit an Inquiry

## Delphi Corporation, et al.

In re Delphi Corporation, et al., Case No. 05-44481 (RDD) Jointly Administered
United States Bankruptcy Court, Southern District of New York (http://www.nysb.uscour

**Attention:** On October 3, 2008, Delphi filed modifications to its confir Amended Joint Plan of Reorganization and related modifications to it Amended Disclosure Statement with the Bankruptcy Court. The Prelir Plan Modification Hearing was originally scheduled for 10:00 a.m. ED 23, 2008 and has been adjourned to 10:00 a.m. on March 24, 2009. Foi the related press release, click here.

For a copy of the Plan Modification Approval Motion, click here. For a the proposed Preliminary Plan Modification Approval Order, click her

For a copy of the Modified Disclosure Statement marked only to show to the December 10, 2007 Disclosure Statement, click here. For a copy Modified Disclosure Statement marked to show all changes from the 10, 2007 Disclosure Statement, click here.

**Appendix A to Modified Disclosure Statement:** For a copy of the Modi marked only to show additions to the Confirmed Plan (as confirmed b Bankruptcy Court on January 25, 2008), click here. For a copy of the I Plan marked to show all changes from the Confirmed Plan, click here

**Appendix B to Modified Disclosure Statement:** For a copy of Delphi's Financial Statements, click here.

**Appendix C to Modified Disclosure Statement:** For a copy of Delphi's Reaffirmed 2008-2011 Financial Projections, click here.

**Appendix D to Modified Disclosure Statement:** For a copy of the Upda Valuation Analysis, click here.

**Appendix E to Modified Disclosure Statement:** For a copy of the Upda Liquidation Analysis, click here.

**Attention:** On September 26, 2008, the Bankruptcy Court entered an c granting Delphi's motion to approve an Amended and Restated Globa Settlement Agreement (the "Amended GSA") and Amended and Resta Restructuring Agreement (the "Amended MRA") with General Motors to which the Debtors will receive support from GM estimated to be va

approximately $10.6 billion for its transformation (increased from app
$6.0 billion in the January 2008 settlement). The Amended GSA and th
Amended MRA became effective on September 29, 2008. For a copy o
related Delphi press release, click here.

For a copy of the GSA and MRA Amendment Motion, click here. For a
the GSA and MRA Amendment Order, click here.

For a copy of the Amended and Restated Global Settlement Agreemer
GM, click here. For a copy of the Amended GSA blacklined against th
GSA, click here. For a copy of the First Amendment to the Amended (
related notice of filing, click here.

For a copy of the Amended and Restated Master Restructuring Agree
GM, click here. For a copy of the Amended MRA blacklined against th
MRA, click here.

* Attention:  On September 23, 2008, the Bankruptcy Court entered an (
granting Delphi's Hourly and Salaried Pension Program Modification
freeze its hourly and salaried defined benefit pension plans and provi
applicable, replacement cash balance or defined contribution pensioi
a salaried retirement and equalization savings program, and a supple
executive retirement plan. For a copy of the Hourly and Salaried Pens
Program Modification Order, click here.

* **Resources:**

| Delphi Corporation Information | Contact Information | |
|---|---|---|
| ▪ Press Releases and Media Information | Delphi Legal Information Hotline: | To |
| ▪ About Chapter 11 | | Intern: |
| ▪ Supplier Information | | |
| ▪ Customer Information | Supplier Support Center: | To |
| ▪ Investor Information | | Intern: |
| ▪ Case Information | Claims and Noticing Agent: | To |

HVAC modules with evaporator and heater core components, compressors, and controls. Delphi's principal competitors in the thermal automotive segment include Behr GmbH & Co. KG, Denso Corporation, Valeo Inc., and Visteon Corporation.

 *Automotive Holdings Group.* The Automotive Holdings Group ("AHG"), accounted for $2,946 million, $3,638 million, and $3,777 million of Delphi's 2007, 2006, and 2005 sales, respectively. AHG is comprised of select plant sites and non-core product lines that Delphi will seek to sell or wind down. Examples of AHG manufactured products include suspension components and brake components. AHG's sales are predominantly to GM or Tier 1 suppliers that ultimately sell Delphi's products to GM.

*Discontinued Operations.* Delphi also has non-core steering and halfshaft product lines and interiors and closures product lines that are now reported in discontinued operations for accounting purposes. Previously, the steering and halfshaft product line was a separate operating segment and interiors and closures product line was part of the AHG segment.

Delphi's world headquarters is in Troy, Michigan. Delphi also maintains regional headquarters in Shanghai, China; Bascharage, Luxembourg; and Sao Paulo, Brazil. Excluding Delphi's joint ventures and other investments, as of December 31, 2007, Delphi maintained 290 sites in 34 countries throughout the world, including manufacturing facilities, technical centers, customer centers and sales offices. Delphi's business segments share many of the manufacturing facilities throughout the world. Delphi has owned its headquarters since June 2005. Of the remaining 289 sites, 26 were owned and 40 were leased in the U.S. and Canada, 32 were owned and 21 were leased in Mexico, 33 were owned and 80 were leased in Europe/Middle East/Africa, 10 were owned and 8 were leased in South America, and 10 were owned and 29 were leased in Asia/Pacific.

As of December 31, 2007, Delphi employed approximately 169,500 people, of whom approximately 36,100 were salaried employees and approximately 133,400 were hourly employees. On a comparable basis, as of December 31, 2006, Delphi employed approximately 171,400 people, of whom approximately 36,700 were salaried employees and approximately 134,700 were hourly employees and as of December 31, 2005, Delphi employed approximately 184,200 people, of whom approximately 37,200 were salaried employees and approximately 147,000 were hourly employees.

When the Chapter 11 Cases commenced, nearly all of the Debtors' approximately 34,750 hourly employees in the United States were represented by three principal unions. The United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") represented approximately 70% of the Debtors' hourly workforce, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA") represented approximately 25% of the hourly workforce, and the United Steelworkers of America, Local 87 (the "USW") represented nearly 3% of the hourly workforce. The Debtors had master collective bargaining agreements with each of these three unions, as well as "local agreements" with affiliated local unions covering primarily local issues that are worksite or business-specific. The Debtors also had collective bargaining agreements with four other unions representing a smaller segment of the U.S. hourly workforce -- the International

Association of Machinists and Aerospace Workers (the "IAM"), the International Brotherhood of Electrical Workers (the "IBEW"), the International Union of Operating Engineers (the "IUOE"), and the Electronic and Space Technicians (the "EAST") (six of the foregoing seven unions (the UAW, IUE-CWA, USW, IAM, IBEW, and IUOE) being referred to herein collectively as the "Unions").

Within the United States, as of December 31, 2007, Delphi had approximately 28,400 employees. Approximately 16,700 of these are production and skilled employees represented primarily by the UAW, IUE-CWA, and USW at Delphi's manufacturing sites. The remainder are primarily salaried and management employees, including engineers, management employees, and employees who perform Delphi's sales, general, and administration ("SG&A") functions.

Since the commencement of these Chapter 11 Cases, the Debtors have continued to operate their businesses. Despite a challenging environment, the Company has not only maintained its important and vital relationships with its customers, which have been a component of its positive financial performance during these Chapter 11 Cases, but also has continued to book new business critical to its future. During 2007, Delphi's new business bookings consistently increased during the year and were above Delphi's 2007 business plan target.

The Company attributes its ability to meet and exceed its financial projections, in part, to its disciplined budgeting/forecasting process whereby the corporation's product business unit leaders, divisional heads, and corporate staff heads are asked to "own" the commitments they make in the budget business plan, coupled with the dependence of executive incentive compensation on meeting those commitments. In addition, the Company's revenue plans incorporated within its financial plans are developed with input from third party econometric forecasts to help ensure the validity of certain assumptions, particularly vehicle sales volumes inherent in Delphi's business plans. These bottom-up budget and forecast plans are also used to establish the targets against which the Debtors measure performance under the short-term at risk performance incentive programs that were approved by the Bankruptcy Court. The compensation plans generally provide performance rewards only if the short-term financial performance targets are met or exceeded. The Debtors' recent historical financial results are attached to this Disclosure Statement as Appendix B. There can be no assurance that Delphi's performance to date during these Chapter 11 Cases is indicative of future performance.

The financial projections attached to this Disclosure Statement as Appendix C were prepared using the same process by which the Company prepared its short-term budget/forecast plans during the Chapter 11 Cases.

Upon the conclusion of the reorganization process, the Company expects to emerge as a stronger, more financially sound business and maintain its prominence as one of the world's premier auto suppliers. In addition, Delphi anticipates that through its unwavering commitment to its customers, it will continue to win new business and achieve or exceed the financial projections and targets it has established. However, there can be no assurances that this will be the case given the risks and uncertainties inherent in Delphi's business, see Section X—General Considerations And Risk Factors To Be Considered.

affiliates. With the exception of one of Delphi's wholly-owned, indirect Spanish subsidiaries, none of Delphi's affiliates located outside the United States sought reorganization relief either in the United States or in its domicile.

### 1.      Board Of Directors Of Delphi Corporation

Delphi's Board of Directors (the "Board of Directors" or the "Board") is comprised of 9 individuals, two of whom are also part of Delphi's management and the remaining seven of whom are independent directors. Five of the seven independent directors have joined Delphi's Board during the last three years. The Board of Directors of Delphi Corporation is comprised of the following persons:

| Name | Position | Term |
|------|----------|------|
| Robert S. Miller | Executive Chairman | Since 2005 |
| Rodney O'Neal | President & CEO | Since 2005 |
| Craig G. Naylor | Lead Independent Director | Since 2005 |
| Oscar de Paula Bernardes Neto | Director | Since 1999 |
| John D. Englar | Director | Since 2006 |
| David N. Farr | Director | Since 2002 |
| Raymond J. Milchovich | Director | Since 2005 |
| John H. Walker | Director | Since 2005 |
| Martin E. Welch | Director | Since 2006 |

*Mr. Miller* was named executive chairman of Delphi Corporation effective January 2007 after serving as chairman and chief executive officer of Delphi Corporation since July 2005. Prior to joining Delphi, Mr. Miller had been non-executive chairman of Federal-Mogul Corporation, a global automotive component supplier, from January 2004 until June 2005. Mr. Miller served in various positions with Federal-Mogul since 1993, including a previous term as non-executive chairman from January to October 2001, and three times in a transitional role as chief executive officer in 1996, again in 2000, and again from July 2004 until February 2005. From September 2001 until December 2003, Mr. Miller was the chairman and chief executive officer of Bethlehem Steel Corporation, a steel manufacturing company. Mr. Miller is also a director of United Airlines Corporation, Reynolds American, Inc., Symantec Corporation, and Waste Management, Inc.

*Mr. O'Neal* was named president and chief executive officer of Delphi Corporation effective January 2007. He was president and chief operating officer of Delphi Corporation from January 2005. Prior to that position, Mr. O'Neal served as president of Delphi's former Dynamics, Propulsion, and Thermal sector from January 2003 and as executive vice president and president of Delphi's former Safety, Thermal, and Electrical Architecture sector from January 2000. Mr. O'Neal is also a director of Goodyear Tire & Rubber Company and Sprint Nextel Corporation.

*Mr. Naylor* retired in December 2006 from E.I. du Pont de Nemours and Company, a science company offering a wide range of innovative products and services for markets including agriculture, nutrition, electronics, communications, safety and protection, home and construction, transportation, and apparel, where he served in various capacities since joining that company in

EXHIBIT 3

# Delphi (auto parts)

From Wikipedia, the free encyclopedia
(Redirected from Delphi Corporation)

**Delphi** is an automotive parts company headquartered in Troy, Michigan, USA. Delphi is one of the world's largest automotive parts manufacturers and has approximately 169,500 employees (50,000 in the United States).

With offices worldwide, the company operates 156 wholly owned manufacturing sites, 44 joint ventures, 53 customer centers and sales offices, and 33 technical centers in 38 countries.

## Contents

- 1 History
- 2 Corporate structure and leadership
- 3 Chapter 11 Reorganization
- 4 Environmental record
- 5 Corporate issues
- 6 Consumer electronics
- 7 Manufacturer products
- 8 Joint ventures
- 9 References
- 10 External links

**Delphi Corp.**



| | |
|---|---|
| **Type** | Public Pink Sheets: DPHIQ |
| **Founded** | 1997 in Troy, Michigan, USA |
| **Headquarters** | Troy, Michigan, USA |
| **Key people** | Rodney O'Neal,CEO, COO<br>Robert S. Miller,Chairman<br>Robert J. Dellinger,CFO |
| **Industry** | Automotive industry |
| **Products** | vehicle electronics, systems, modules, & components |
| **Revenue** | ▼ US$22.3 Billion (2007) |
| **Employees** | 169,500 |
| **Website** | Delphi.com |

## History

- 1994: General Motors forms **Automotive Components Group**.
- 1995: ACG is renamed **Delphi Automotive Systems**.
- 1997: GM and Hughes Electronics Corporation spin-off of **Hughes Defense** electronics business and transfer Delco Electronics from Hughes to Delphi.
- 1999: Delphi Automotive Systems becomes fully independent publicly held corporation.
- 2001: 11,500 jobs were cut worldwide (Bischoff 1A).
- 2002: Delphi Automotive Systems is renamed **Delphi Corporation** reflecting its diversified business direction.
- 2004: Delphi is subpoenaed by the Securities & Exchange Commission (SEC) in July for irregular accounting practices and financial transactions.
- 2005: Delphi discloses irregular accounting practices. A number of executives, including CFO Alan Dawes, resign. Delphi Chairman J.T. Battenberg III retires. Delphi files for Chapter 11 bankruptcy protection to reorganize its struggling U.S. operations. As a result of this action, the Securities and Exchange Commission granted an application by the New York Stock Exchange to delist Delphi's common stock and bonds.[1] The stock now trades over the counter on the Pink Sheets electronic exchange.
- 2005: Twenty-four plants closed down in the U.S.

- 2006: Delphi announced it would sell off or close 21 of its 29 plants in the United States. The eight plants it intends to keep are located in Brookhaven, Mississippi; Clinton, Mississippi; Grand Rapids, Michigan; Kokomo, Indiana; Lockport, New York; Rochester, New York; Warren, Ohio; and Vandalia, Ohio, though even these plants will endure wage cuts and suffer workforce reductions.

# Corporate structure and leadership

Delphi is structured into the following groups:

- Consumer Products
- Manufacturer Products
- Aftermarket & Dealer Products

The company is focusing the organization on the following core strategic product lines:

• **Controls & Security** (Body Security, Mechatronics, and Displays);

• **Electrical/Electronic Architecture** (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers);

• *Entertainment & Communications* (Audio, Navigation, and Telematics);

• **Powertrain** (Diesel and Gasoline Engine Management Systems);

• **Safety** (Occupant Protection and Safety Electronics); and

• **Thermal** (Climate Control & Powertrain Cooling).

# Chapter 11 Reorganization

During the Chapter 11 cases, Delphi has made substantial progress in identifying and implementing the sale (or receiving Bankruptcy Court approval to sell) or wind down of those facilities and business lines that do not support the company's future strategic framework, including:

• The sale of the brake hose manufacturing business in Dayton, Ohio to Harco Manufacturing Group, announced in January 2007.[2]

• The settlement of a social plan in the "Concurso," or Spanish insolvency proceeding, of Delphi Automotive Systems Espana S.L.

• The sale of the Mexican brake components business, including a manufacturing plant in Saltillo, Coahuila, Mexico, to Robert Bosch LLC and its affiliate Frenados Mexicanos, S.A. de C.V., announced in June 2007.[3]

• The sale of substantially all of the assets of MobileAria, Inc. to Wireless Matrix USA, Inc.;

• The sale of the U.S. Battery operations in New Brunswick, New Jersey to Johnson Controls, Inc. in 2006.[4]

• The wind-down of a **Delphi Medical** Texas facility in Houston, Texas

• The consolidation of fuel injector production in Rochester, New York during 2006-2007, which allowed the Debtors to wind down a manufacturing facility in Coopersville, Michigan

• The sale of the catalyst business to Umicore Group, completed in October, 2007.[5]

• The sale of the Wheel bearings business based in Sandusky, Ohio to Kyklos, Inc., which is a wholly owned subsidiary of Hephaestus Holdings, Inc., in February 2008.[6]

• The sale of the Global Steering and Halfshaft Business to **Steering Solutions Corporation**, a wholly owned subsidiary of Platinum Equity, LLC, announced in December 2007. The Steering business was based in Saginaw, Michigan, and was formerly known as the **Saginaw Steering** Division of General Motors.[7]

• The sale of the Interiors and Closures business was announced in October, 2007, to The Renco Group. This includes facilities in: Gadsden, Alabama, Cottondale, Alabama, North Kansas City, Missouri, Orion, Michigan, Adrian, Michigan, Woerth, Germany, Matamoros, Mexico, the SDADS Joint Venture in Shanghai, China and the KDS Joint Venture in Daegu, South Korea.[8]

• The sale of certain North American Brake Component Machining and Assembly Assets to TRW Automotive Holdings, which includes sites in Saginaw, Michigan, Springhill, Tennessee, and Oshawa, Canada, announced in September 2007.[9]

• The company will continue with its stated plans to sell or wind-down additional non-core product lines and manufacturing sites through 2008.

Current members of the board of directors of Delphi are: Martin E. Welch, John H. Walker, Craig G. Naylor, Raymond J. Milchovich, David N. Farr, John D. Englar, Robert H. Brust, Oscar De Paula Bernardes Neto, John D. Opie, Rodney O'Neal, and Robert S. Miller (chairman).

Rodney O'Neal is also the chief executive officer of the company (since January 1, 2007), replacing Robert S. "Steve" Miller.

• The investment bank, Rothschild, Inc., is currently advising Delphi in its Chapter 11 restructuring

# Environmental record

Researchers at the University of Massachusetts Amherst identified Delphi corp. as the 21st-largest corporate producer of air pollution in the United States in 2002.[10] According to the study, the manufacturer's most toxic emissions include asbestos (542 lb/yr), chromium compounds (1,082 lb/yr), lead compounds (8,466 lb/yr), and sulfuric acid (17,600 lbs/year), while the most massive emissions are glycol ethers (111,520 lbs/year) and hydrochloric acid (80,000 lb/yr).[11]

# Corporate issues

In February 2007 the multinational Delphi Automotive Systems Holding Inc. announced the closure of

its plant in Puerto Real, Cádiz, Spain, with a loss of 1600 direct jobs and more than 2500 indirect jobs.
[12] despite having agreed to continue its manufacturing operations until 2010 and receiving more than
EUR 25 million from various public administrations in order to guarantee its workers' jobs.[13]

The Andalusian autonomous government announced it would begin legal action against the company for
breach of local labor laws. [14]

On October 8, 2005 Delphi filed for bankruptcy due to the lack of money to pay the employees. Slowly,
cutting jobs and shutting down many plants around the Dayton area and nationally (Roberson). The
increased competition between the U.S. and other countries in the automobile industry has been a factor
in Delphi's bankruptcy (Wehrman D1). Due to the economic slump, all but five of the plants in the
Dayton area have closed.

In May 2008, Delphi filed a lawsuit against investors. The lawsuit seeks to impose payment by investors
in the amount of $2.55 billion in securities to aid Delphi as it seeks to come out of bankruptcy. U.S.
Bankruptcy Judge Robert Drain in New York ruled to allow Delphi to seek payments through a contract
against Appaloosa Management LP as well as denying investors' request for a cap of $250 million for
damages. [15]

# Consumer electronics

Delphi is a major player in the XM Satellite Radio and GPS market. Among their most widely
recognized (and advertised) products are:

- Mobile Navigation
  - NAV200 (*portable GPS*)
  - TNR800 (*in-dash GPS*)
- Mobile Video
- Satellite Radio

**Myfi family**

- 
  - MyFi (*portable XM*)
  - Myfi 2 (*3rd generation of XM2go*)

**Roady Family**

- 
  - Roady (*XM*)
  - Roady 2 (*XM*)
  - Roady XT (*XM*)
  - Roady XT 2 (*XM*)

**Skyfi Family**

- 
  - Skyfi (*XM*)
  - SkyFi2 (*XM*)

EXHIBIT 4



## U.S. Securities and Exchange Commission

**U.S. SECURITIES AND EXCHANGE COMMISSION**

Litigation Release No. 19891 / October 30, 2006

Accounting and Auditing Enforcement Release No. 2504 / October 30, 2006

*SEC v. Delphi Corporation, J.T. Battenberg, III, Alan Dawes, Paul Free, John Blahnik, Milan Belans, Catherine Rozanski, Judith Kudla, Scot McDonald, B.N Bahadur, Atul Pasricha, Laura Marion, Stuart Doyle and Kevin Curry, United States District Court for the Eastern District of Michigan, SEC v. Delphi Corporation, et al., Civil Action No. 2:06-cv-14891 (AC) (E.D. Mich. Oct. 30, 2006)*

**SEC Charges Delphi Corporation and Nine Individuals, Including Former CEO, CFO, Treasurer and Controller, in Wide-Ranging Financial Fraud; Four Others Charged with Aiding and Abetting Related Violations; Delphi and Six Individuals Settle**

The Securities and Exchange Commission today filed settled financial fraud charges in federal court in Detroit against Delphi Corporation, a Troy, Mich. auto parts supplier. In its complaint, the Commission charges Delphi with engaging in a pattern of fraudulent conduct between 2000 and 2004. The Commission also charges thirteen individuals for their alleged roles in the fraudulent conduct and/or in related reporting and books-and-records violations by Delphi.

The complaint charges seven former Delphi employees and two others with participating in or aiding and abetting Delphi's fraud.

1. J.T. Battenberg, III of Bloomfield Hills, Mich., and Naples, Fla., the former Chief Executive Officer of Delphi and Chairman of its Board of Directors;

2. Alan Dawes of Palm Beach Gardens, Fla., the former Chief Financial Officer of Delphi;

3. Paul Free of Oakland, Mich., a former Controller and Chief Accounting Officer of Delphi;

4. John Blahnik of Bloomfield Hills, Mich., a former Treasurer and Senior Vice President of Delphi;

5. Milan Belans of Farmington Hills, Mich., a former Director of Capital Planning and Pension Analysis at Delphi;

6. Catherine Rozanski of Troy, Mich., a former Director of Financial Accounting and Reporting at Delphi;



7.  Judith Kudla of Bloomfield Hills, Mich., a former Director of Finance in Delphi's information technology department;

8.  Scot McDonald of Carrollton, Texas, who is employed by a Texas-based information technology company and formerly served as its Manager of U.S. GAAP Consulting and Reporting; and

9.  B.N. Bahadur of West Bloomfield, Mich., who, in the relevant period, was the founder, sole owner and principal of a Michigan-based private management consulting company.

The complaint also charges four individuals with aiding and abetting Delphi's reporting and books-and-records violations.

1.  Atul Pasricha of Bloomfield Hills, Mich., a former Assistant Treasurer at Delphi;

2.  Laura Marion of Rochester Hills, Mich., a former Director of Financial Accounting and Reporting at Delphi;

3.  Stuart Doyle of Rochester Hills, Mich., a former client executive supporting the Texas IT company's relationship with Delphi; and

4.  Kevin Curry of Hilton Head, S.C., also a former client executive supporting the Texas IT company's relationship with Delphi.

The Commission's complaint alleges that, between 2000 and 2004, Delphi engaged in multiple schemes that resulted in Delphi materially misstating its financial condition and operating results in filings with the Commission, offering documents, press releases, and other documents and statements. The allegations include the following.

- In 2000, Delphi engaged in two fraudulent accounting and disclosure schemes, which had the purpose of and ultimately resulted in Delphi hiding a $237 million warranty claim asserted by its former parent company and inflating its net income by $202 million.

- In the fourth quarter of 2000, Delphi entered into two improper inventory schemes, through which it agreed to sell approximately $270 million of metals, automotive batteries and generator cores to two third parties at year end, while simultaneously agreeing to repurchase the inventory in the following quarter for the original sales price, plus interest charges and structuring fees. The purpose and result of the schemes was for Delphi to inflate its cash flow from operations by $200 million, engineer $270 million in inventory reductions and improperly report $80 million in net income.

- In the fourth quarter of 2001, Delphi solicited a $20 million lump sum payment from an IT company in return for Delphi providing new business to the IT company. Delphi agreed to repay the $20 million over five years, with interest, which made the payment, in substance, a loan to the IT company. However, in order to meet earnings forecasts for the quarter, Delphi improperly accounted for the $20 million payment as if it was a nonrefundable rebate on past business, rather than a liability.

from 2000 to 2001, Delphi did up to $325 million in factoring, or sales of accounts receivable, in order to improperly boost non-GAAP, pro forma measures of Delphi's financial performance that were relied upon by investors, analysts and rating agencies. Hiding this factoring allowed Delphi to overstate materially its "Street Net Liquidity," a pro forma measure, during that two-year period. In addition, in one quarter, Delphi also manipulated the hidden factoring to create a false $30 million boost in its "Street Operating Cash Flow," another pro forma measure.

Delphi simultaneously settled the charges, without admitting or denying the Commission's allegations, by consenting to the entry of a final judgment permanently enjoining it from violating Section 17(a) of the Securities Act of 1933 and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 and Rules 10b-5, 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

The Commission simultaneously settled with six individuals, who also neither admitted nor denied the Commission's allegations.

- Dawes agreed to a five-year officer-and-director bar and to pay disgorgement of $253,000 plus prejudgment interest of $134,000, and a penalty of $300,000. He also consented to the entry of a final judgment permanently enjoining him from violating Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1 and 13b2-2 thereunder, and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

- Pasricha agreed to pay a penalty of $55,000. He also consented to the entry of a final judgment permanently enjoining him from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

- In connection with the civil action, Bahadur agreed to pay disgorgement of $350,000 with prejudgment interest of $139,257 and a penalty of $80,000, Marion and Doyle each agreed to pay penalties of $40,000, and Curry agreed to pay a penalty of $25,000. Additionally, Bahadur, Marion, Doyle and Curry have each agreed to the institution of settled administrative cease-and-desist proceedings against them. The Commission's Order as to Bahadur orders him to cease and desist from committing or causing violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. In addition, the Commission's orders as to Bahadur, Marion, Doyle and Curry, order each of them to cease and desist from causing violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder.

Each of the settlements is subject to court approval, and Delphi's settlement is also subject to approval by the U.S. Bankruptcy Court overseeing Delphi's bankruptcy.

The Commission's complaint alleges that the non-settling defendants

EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE DELPHI CORP. SECURITIES LITIGATION | : | MASTER FILE NO. |
|  | : | 1:05-CV-2637 (NRB) |
| This Document Relates to: | : | JURY TRIAL DEMANDED |
|  | : |  |
| ALL ACTIONS | : |  |
|  | : |  |
|  | : |  |

## CONSOLIDATED CLASS ACTION COMPLAINT

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
John P. Coffey (JC-3832)
Hannah E. Greenwald (HG-5180)
Mark D. Debrowski (MD-3968)
1285 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 554-1400

**GRANT & EISENHOFER  P.A.**
Jay W. Eisenhofer (JE-5503)
45 Rockefeller Center
650 Fifth Avenue
New York, NY 10111
Telephone:    (212) 755-6501
Facsimile:    (212) 755-6503
- and -
Geoffrey C. Jarvis
Sharan Nirmul
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone:    (302) 622-7000
Facsimile:    (302) 622-7100

**NIX, PATTERSON & ROACH, L.L.P.**
Bradley E. Beckworth
Jeffrey J. Angelovich
Susan Whatley
205 Linda Drive
Daingerfield, TX 75638
Telephone:    (903) 645-7333
Facsimile:    (903) 645-4415

**SCHIFFRIN & BARROWAY, LLP**
Michael Yarnoff
Sean M. Handler
Jodi Murland
280 King of Prussia Road
Radnor, PA 19087
Telephone:    (610) 667-7056
Facsimile:    (610) 667-7706

*Co-Lead Counsel for Lead Plaintiffs Teachers' Retirement System of Oklahoma, Public Employees' Retirement System of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP and the Prospective Class*

## VII.    THE FRAUD BEGINS TO COME TO LIGHT

205.    Delphi's fraudulent accounting practices and use of fictitious transactions to improve its financials went undetected by investors for years, and even the Company's series of disclosures over the past year (including the Restatement) has yet to illuminate the full nature and extent of the fraud.  The first public acknowledgement that something might be amiss with Delphi's accounting came on September 29, 2004, when Delphi announced that the SEC had served a subpoena on Delphi in July 2004 seeking information about certain transactions between Delphi and its suppliers of information technology services, including EDS.  According to Delphi's September 29, 2004 press release, filed with the SEC on a Form 8-K:

> In late July 2004, [Delphi] received a subpoena from the [SEC] requesting information regarding the Company's agreements with Electronic Data Systems Corporation ("EDS"), a long time supplier of information technology services to the Company.  In August 2004, the Company received a copy of the formal order of investigation from the Commission indicating that the staff of the Commission (the "Staff") had commenced a non-public fact-finding inquiry regarding transactions between Delphi and EDS, including the accounting treatment of payments made and credits given by EDS to Delphi during 2000 and 2001, and certain payments made by Delphi to EDS for system implementation services in 2002 and in early 2003.  The Staff has subsequently advised that they are also reviewing the accounting treatment of payments received by Delphi and from other suppliers of information technology services.  The payments and credits the SEC has identified involve $46 million Delphi received from EDS in 2000 and 2001, and $3.5 million Delphi received from another information technology provider in 2001.  The amount Delphi paid to EDS in 2002 and in early 2003 for system implementation services was $40.5 million.  The Company is reviewing the accounting for these and other transactions, including contracts for information technology services and products from the same and other periods.  There can be no assurance that the Staff will not expand the scope of their review.  The Company is fully cooperating with the Staff's requests for information.  Until the Staff's investigation and our review is complete, we are not able to predict the potential effect they will have on Delphi.

standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Delphi as of December 31, 2003 and 2002 and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2003, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements of Delphi taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 1 to the consolidated financial statements, in 2003 Delphi changed its method of determining the cost of certain inventories from the last-in, first-out method to the first-in, first-out method. The consolidated financial statements presented for 2002 and 2001 have been adjusted to give retroactive effect to the change.

542. In issuing unqualified audit opinions on Delphi's financial statements despite Delphi's consistent GAAP violations throughout the Class Period, Deloitte either acted knowingly, or was reckless, in failing to comply with the professional standards dictated by GAAS (AU § 150) including:

a.  General Standard No. 1, which requires an audit be performed by a person or persons having adequate technical training and proficiency as an auditor;

b.  General Standard No.2, that requires that an auditor possess an independence in mental attitude in all matters related to the assignment;

173

    c.    General Standard No. 3, which requires that due professional care is to be exercised in the performance of the audit and the preparation of the report;

    d.    Standard of Field Work No. 1, which requires that the auditor's work be adequately planned and audit staff properly supervised;

    e.    Standard of Field Work No. 2, which requires the auditor gain a sufficient understanding of internal controls in order to plan the audit, including accounting, financial and managerial controls, to determine whether reliance thereon is justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied;

    f.    Standard of Field Work No. 3, which requires sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;

    g.    Standard of Reporting No. 1 which requires an audit report to state whether the financial statements are presented in accordance with GAAP;

    h.    Standard of Reporting No. 3 which requires informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report; and

    i.    Standard of Reporting No. 4 which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated.

543. Delphi's has admitted that its financial statements during the Class Period did not comply with GAAP. Indeed, the June Restatement establishes a pervasive dereliction by the

174

Delphi's management in complying with the basic requirements of GAAP.    Therefore,

Deloitte's unqualified opinions during the Class Period, stating that Delphi's financial

statements did comply with GAAP, were simply false and violations of GAAS Standard of

Reporting No. 1.  As shown below, Deloitte's failure to detect Delphi's rampant accounting

manipulations can only be the product of severe recklessness as to whether Delphi's financial

statements complied with GAAP, or a total disregard of its duty to perform a proper audit of

the Company's financial statements.

544. Delphi failed to take any reasonable steps to ensure that its audit opinion was

accurate.  Deloitte failed to consider the sufficiency of Delphi's internal controls, did not take

notice of red flags that warned of potential problems with Delphi's accounting, and failed to

plan its audits and review necessary evidential matter to detect instances of fraud.  For these

severely reckless and/or knowing failures, Deloitte violated the securities laws.

### 1.    Deloitte's Utter Failure to Assess the Sufficiency of Delphi's Internal Controls Rendered its Unqualified Audits Severely Reckless

545. Delphi's Audit Committee investigated Delphi's internal controls as part of its

investigation into Delphi's fraudulent accounting practices and concluded that, during the

Class Period, Delphi's internal controls were rife with "material weaknesses."   The Audit

Committee concluded that:

> The Company's controls over the selection and application of
> GAAP are ineffective as a result of insufficient resources and
> technical accounting expertise within the organization to resolve
> accounting matters in a timely manner.  Furthermore, accounting
> for transactions is performed across multiple business units and
> functions that are not adequately staffed or are staffed with
> individuals that do not have the appropriate level of GAAP
> knowledge.

546. In addition, the Audit Committee stated that during the Class Period:

175

> The Company's accounting policies were inadequate or insufficiently comprehensive to ensure proper and consistent application throughout the organization and did not have effective controls related to the administration and accounting for contracts. In particular, the Company does not have adequate controls to identify and analyze the terms and conditions, both written and unwritten, of new contracts, or procedures to identify, analyze, and properly record the impact of amendments, supplement letters, or other agreements related to existing contracts.

547. Most damning was the Audit Committee's conclusion that Delphi's management did not set an effective "tone" within the organization "related to the discouragement, prevention or detection of management override, as well as inadequate emphasis on thorough and proper analysis of accounts and financial transactions."

548. This lack of internal controls at Delphi is evidenced by the blatant and obvious accounting manipulations that were rampant at the Company during the Class Period. For example, Delphi's senior management were able to blatantly misclassify a $237 million warranty payment to GM as an adjustment a pension obligation to circumvent the immediate reduction to income rather than record a warranty expense. The millions of dollars in expenses that Delphi failed to accrue, improper deferrals of expenses, and improper income recognition, through various schemes, further underscore the lack of controls over Delphi's accounting.

549. Indeed, Delphi management's ability to manipulate inventory through fictitious asset and inventory disposal transactions and record millions of dollars in illusory income evidences further deficiencies in internal controls at Delphi and the ease with which senior management was able to circumvent what little internal controls existed. A simple review of the contracts underlying these disposal transactions would have revealed that the accounting for these transactions was entirely manipulative.

550. Deloitte's reckless indifference to Delphi's utter lack of internal controls violated GAAS. Under GAAS, an independent auditor is obligated to gain a sufficient understanding of

176

an entity's internal control structure in order to adequately plan the audit and to determine the nature, timing and extent of tests to be performed. *See* AU § 150.02. In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure: the control environment, the accounting system, and control procedures. AU § 319.02. The control environment, which includes management's integrity and ethical values, is the foundation of internal control and provides discipline, structure and sets the tone of an organization. After obtaining an understanding of an entity's internal control structure, the auditor must assess the entity's control risk. AU § 319.02. The control risk is the risk that a material misstatement in an assertion by management contained in a company's financial statements will not be prevented or detected on a timely basis by an entity's internal control structure policies or procedures. AU §319.29. The ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements. AU § 319.61.

551. Under AU § 722.10, the auditor needs to have sufficient knowledge of a client's internal control as it relates to the preparation of both annual and interim financial information to: identify types of potential material misstatements in the interim information and consider the likelihood of their occurrence, select inquiries and procedures that will provide a basis for reporting whether material modifications should be made for the information to conform with GAAP.

552. Deloitte failed to adequately test internal controls at Delphi. This prevented it from having a sufficient knowledge of Delphi's internal controls to allow Deloitte to assess the likelihood and type of potential misstatement in the interim financial statements. Additionally, Deloitte failed to develop and perform adequate analytical procedures and inquiries (AU

177

Section 722.13) designed to identify the need for material modifications to the interim financial statements.

553. It is apparent from the conclusions by Delphi's Audit Committee that any scrutiny of Delphi's internal controls would have revealed that such controls were wholly lacking at the Company.    Yet, Deloitte, in the course of auditing Delphi's 1999 through 2003 financial statements, knowingly or recklessly disregarded weaknesses and deficiencies in Delphi's internal control structure.    Had Deloitte complied with GAAS, it should have discovered that there were (a) insufficient numbers of personnel having appropriate knowledge, experience and training in the application of GAAP at the divisional level, and insufficient personnel at the Company's headquarters to provide effective oversight and review of financial transactions; (b) ineffective or inadequate accounting policies to ensure the proper and consistent application of GAAP throughout the organization; (c) ineffective or inadequate controls over the administration and related accounting treatment for contracts; and (d) ineffective "tone" within the organization related to the discouragement, prevention or detection of management override, as well as (e) inadequate emphasis on thorough and proper analysis of accounts and financial transactions.

### 2.    Numerous "Red Flags" Should Have Alerted Deloitte to Delphi's False and Misleading Financial Statements

554. Had Deloitte conducted its audits in accordance with GAAS, it would have discovered that Delphi's financial statements were materially false and misleading and failed to comply with GAAP.  AU Section 316 requires auditors to consider and evaluate the risks that a company's audited financial statements are free of material misstatements, whether by fraud or by error, and identifies various "red flags" that the auditors need to consider in determining audit risk relating to misstatements arising from fraudulent reporting.  In addition to the lack of

internal controls, described above, other red flags, should have alerted Deloitte to the potential
of material misstatement arising from fraudulent financial reporting at the Company:    These
red flags included:

    a.  Management compensation incentives specifically tied to the Company' financial
metrics and huge annual bonuses for achieving these measures of success;

    b.  Delphi's publicized adoption of an "aggressive inventory management" program
in 2000 and other cost-cutting initiatives that allowed Delphi to meet earnings
estimates in the face of a declining economy;

    c.  A failure of Delphi's management to display and communicate an appropriate
attitude regarding internal controls and the financial reporting process;

    d.  The lack of effective accounting, information technology, or internal auditing
staff;

    e.  Large transactions not in the ordinary course of business, such as Delphi's
inventory and asset disposal transactions with Setech, BBK and Bank One, all of
which were reversed in relatively short periods of time (as short as one month)
that contributed a significant portion of Delphi's quarterly income and helped
meet earnings estimates;

    f.  Intentional misapplication of accounting principles in connection with an entity,
GM, where the same Deloitte office audited both ends of the transaction, but saw
different accounting treatment applied to the parties treatment of the transaction.

555.  Each of these red flags should have alerted Deloitte to Delphi's fraudulent
accounting practices.

556. Delphi's senior executives received huge bonuses, usually more than 100% of their annual income if the Company met or exceeded certain targeted financial metrics, including levels of earnings, earnings per share, operating income and numerous other metrics. The strong incentive for Delphi's management to meet or exceed these goals at all costs, and Delphi's consistent ability to meet earnings targets, should have served as a red flag to Deloitte to scrutinize the accounting supporting these indicators. This was particularly true because, from at least 2000 onwards, the auto industry was in decline and Delphi was facing a number of hurdles, which are described in detail above, that should have made it difficult or impossible for management to obtain the full compensation called for under the plan. Management's unwavering ability to do so is a substantial red flag.

557. Delphi's public filings and earnings reports touted new "aggressive" inventory management initiatives and other cost-cutting efforts that were allowing Delphi to meet financial targets despite a slowing economy. As revealed by Lead Plaintiffs' investigation and the restatement, much of this so-called aggressive inventory management and cost-cutting was achieved through fraudulent transactions—in which inventories were temporarily disposed—manipulating the receipt and recording of inventories, and by failing to accrue expenses in the proper reporting periods, or in some cases, at all. These transactions, involving hundreds of millions of dollars with counterparties BBK and Setech, all were reversed within a relatively short period of time (usually less than a year). The number and significance of these transactions, and the fact that they were quickly reversed, served as a substantial red flag to Deloitte that there were issues in Delphi's accounting.

558. Significantly, at the very end of the fourth quarter of 2000, Delphi engaged in a enormous, illicit inventory disposal with Bank One involving precious metals that had the

EXHIBIT 6



February 4, 2009

To: Class Members in the General Motors ERISA Litigation

Re: General Motors ERISA Litigation, Civil Action No. 05-71085

Class Period: March 18, 1999 through May 26, 2006

The settlement of the class action lawsuit, General Motors ERISA Litigation, Civil Action No. 05-71085 *(the "ERISA Litigation")*, involving the General Motors Savings-Stock Purchase Program for Salaried Employees and the General Motors Personal Savings Plan for Hourly Employees (the "Plans") was finalized on September 19, 2008, and settlement proceeds have now been allocated to the Plans. Per the allocation formula approved by the Court, you did not qualify for a portion of the settlement as your allocation did not meet the $25 minimum threshold for distributions to class members.

You will, however, be eligible to take advantage of two other benefits of the settlement, the Ayco "Money in Motion" financial advisory services and the retirement modeler tool. These benefits will be available to class members beginning January 1, 2010. You will be receiving another communication regarding these two programs in August 2009.

If you have any questions regarding this communication, please call the GM Benefits & Services Center at 1-800-489-4646 to speak with a GM Savings Plans Customer Service Associate. Customer Service Associates are available business days from 8:30 a.m. to midnight Eastern time.


General Motors Corporation

3.GM-C-190L.100

Presorted
First Class Mail
U.S. Postage
PAID
Fidelity Investments
45277

THEODORE G KUSTAS
22 CRYSTAL SPRINGS LANE
FAIRPORT, NY 14450-1904

**For undeliverable mail only, please return to:**
Fidelity Investments
PO Box 145429, Cincinnati, OH 45250-5429

**Important Information**

EXHIBIT 7

 REUTERS

LATEST NEWS  ⚫ U.S. INVESTIGATORS SIFT SITE OF DEADLY P  ⚫

Quotes, News, Pictures & Video  SEARCH    Login



Deals Today
The latest Reuters
articles on M&A, IPOs,
hedge funds and more
Subscribe Now

TAKE IBFX FOR A
SPIN INSTEAD

Award-Winning Platform
Award-Winning Customer Support
Up to $100,000 in Virtual Cash

IBFX

You are here:  Home > Business & Finance > Article

DJIA : 7850.41  ▼ | Nasdaq : 1534.36  ▼

HOME
BUSINESS & FINANCE
Markets
Deals
Small Business
Industries
Industry Summits
Stocks
Funds
ETFs
Currencies
Commodities
Options
Economy
Bonds
Analyst Research
Portfolio
NEWS

# Judge OKs Delphi first half '07 executive bonuses

Thu Mar 22, 2007 3:09pm EDT

Email | Print | Share| Reprints | Single Page    [-] Text [+]

By Nick Zieminski



1 of 1                    Full Size

MARKET NEWS

Wall St. slides as banks eclipse
housing optimism | Video

U.S. oil jumps 10 percent on
stimulus hopes

Risk appetite returns despite
banking fears | Video

More Business & Investing
News ›

NEW YORK (Reuters) - A U.S. bankruptcy
judge ruled on Thursday that Delphi Corp.
(DPHIQ.PK) may pay up to $37.4 million in
bonuses to executives for the first six
months of 2007, despite objections from
the auto parts maker's unions.

"It's not the case that every dollar that
goes into an executive's pocket is a dollar
out of a (worker's) pocket," Judge Robert
Drain said in ruling that the payments
clearly are a part of the salary plan and not
a "handout."

Delphi, which filed for bankruptcy
protection in October 2005, remains in
talks with its unions over proposed wage
and benefit cuts and other issues necessary
to complete its reorganization.

Some 440 executives could receive
payments ranging from a total $20.1 million if Delphi met operating
targets to a maximum of $37.4 million under the plan Drain approved in a
hearing at the U.S. Bankruptcy Court for the Southern District of New
York.

It is "necessary (for the) executive team to be compensated at least
somewhat comfortably," said Drain, who approved Delphi's requests for
similar payments in 2006.

Union lawyers argued the incentive plan was a "distraction" or
"impediment" to the unions' negotiations with Delphi.

A lawyer representing the United Steelworkers union, Lowell Peterson,
reported a high "frustration level" among the rank and file that
negotiations have not advanced in six months.

Judge Drain said he "strongly urged" Delphi and the unions to "put every
effort" into negotiations.

Delphi lawyer Jack Butler declined to comment on the status of union
negotiations.

"I think the judge has an expectation that the principal stakeholders in
this case will be actively negotiating 24/7 to resolve the barriers to
emergence from Chapter 11," Butler said. "That message was heard loud
and clear."

Delphi has delayed consideration of a key employee compensation plan,
which would include payments to executives for completing the
reorganization, until later in the process.

Troy, Michigan-based Delphi plans to cut about four-fifths of its U.S.
hourly workers and thousands of salaried workers worldwide to restructure
its operations. It also plans to exit several businesses.

Private equity firms have proposed a $3.4 billion equity investment to
support Delphi's emergence from bankruptcy, contingent on the company
reaching agreements with its unions and former parent General Motors
Corp. (GM.N)

In afternoon Pink Sheets trading, Delphi shares were off 8 cents, or 2.8
percent, at $2.79.

EDITOR'S CHOICE



A selection of our best photos
from the past 24 hours.
Slideshow



MetaStock
science for traders

FIGHT
THE
GOOD
FIGHT



Get your
FREE
30-day
trial



MOST POPULAR ON REUTERS

Articles    Video

1.  Chris Brown's father
    says singer
    "remorseful"

2.  GM considering Chapter 11
    filing, new company: report

3.  Congress sends $787 billion stimulus to
    Obama |  Video

4.  Kissing: It really is all about
    chemistry |  Video

5.  U.S. missile strike kills 25 militants in Pakistan

6.  Nude Madonna photo sells for $37,500 at
    auction

7.  Obama vows to act fast on economic stimulus

8.  Funds boost gold ETFs to record

9.  U.S. mortgage rescue plan cheers some, angers
    others

10. U.S. links Moscow help on Iran to missile shield

Most Popular Articles RSS Feed

THE GREAT DEBATE

HOME
BUSINESS & FINANCE
Markets
Deals
Small Business
Industries
Industry Summits
Stocks
Funds
ETFs
Currencies
Commodities
Options
Economy
Bonds
Analyst Research
Portfolio
NEWS

Tight security for
Parbold gathering

Do More With Reuters
RSS
Widgets
Mobile
Podcasts
Newsletters
Your View
Make Reuters My
Homepage

Partner Services
CareerBuilder
Affiliate Network

Professional Products
Support (Customer Zone)
Reuters Media
Financial Products

About Thomson Reuters

EXHIBIT 8



Welcome to TimesPeople        TimesPeople Lets You Share and Discover the Best of NYTimes.com        12:51 PM    Get Started    No, thanks
What's this?

HOME PAGE    MY TIMES    TODAY'S PAPER    VIDEO    MOST POPULAR    TIMES TOPICS                    Get Home Delivery    Log In    Register Now

The New York Times

# Business

Business
All NYT        Search

WORLD    U.S.    N.Y. / REGION    BUSINESS    TECHNOLOGY    SCIENCE    HEALTH    SPORTS    OPINION    ARTS    STYLE    TRAVEL    JOBS    REAL ESTATE    AUTOS

MEDIA & ADVERTISING    WORLD BUSINESS    SMALL BUSINESS    YOUR MONEY    DEALBOOK    MARKETS    RESEARCH    MUTUAL FUNDS    MY PORTFOLIO    ALERTS

Do you know your 2009 Credit Score? See your score in seconds!    FREEscore.com

| Excellent | 750 - 840 | Fair | 620 - 659 | I Don't Know | ??? |
| Good | 660 - 749 | Poor | 400 - 619 | Find out INSTANTLY! | |

Advertise on NYTimes.com

FAIR GAME

More Articles in Business »

## Royal Pay at Delphi, Reined in by a Judge

By GRETCHEN MORGENSON
Published: January 27, 2008

MORE than two years ago, the Delphi Corporation, an automotive parts giant, filed for bankruptcy protection. Even as it asked workers, creditors and owners to accept big losses, Delphi requested a lush executive pay package that included $87 million in cash bonuses to be paid to top managers upon the company's exit from bankruptcy. It was a wonderful example of unshared sacrifice that has become deplorably common in corporate America.

SIGN IN TO E-MAIL OR
SAVE THIS

PRINT

REPRINTS

SHARE

ARTICLE TOOLS
SPONSORED BY
THE WRESTLER
2 ACADEMY AWARD NOMINEES

**Related**

Columnist Page: Gretchen Morgenson

Last week, Robert D. Drain, a federal bankruptcy judge in the Southern District of New York overseeing the Delphi bankruptcy, held a hearing to approve the company's reorganization plan. Delphi hopes to exit bankruptcy this spring.

During the hearing, Judge Drain, who spent roughly an hour on the terms of the payouts and the compensation consultant who devised them, said he would approve Delphi's bankruptcy exit plan only if the $87 million in incentive pay slated for management was reduced sharply, to $16.5 million. Delphi agreed to the cuts.

Judge Drain's ruling is a service to every shareholder who feels ripped off by executives and the compensation consultants who serve them. His discussion of the packages brings a pragmatism to the topic of executive pay that is sorely lacking in corporate boardrooms. Let's hope it is also noted by the compensation committees of public companies' boards.

The pay packages came up in court because two unions representing Delphi workers in the bankruptcy objected to them. One, the United Automobile Workers, was represented by Peter D. DeChiara at Cohen, Weiss & Simon in New York. The other was the International Union of Electronic Workers-Communication Workers of America, represented by Tom Kennedy, lead partner at Kennedy, Jennik & Murray, also in New York.

"We believe it is the largest reduction in proposed management compensation ever imposed by a bankruptcy court," Mr. Kennedy said last week. "The management compensation package was admittedly over market in many respects, and the judge concluded that Delphi did not support the proposed compensation plan with adequate demonstration that it was typical or appropriate."

The consultant used by Delphi's board to design the pay plan and defend it in court was Nick Bubnovich, of Watson Wyatt Worldwide. Mr. Bubnovich said that the $87 million reward was justified if managers were able to bring Delphi out of bankruptcy.

## Rochester?

ZIP Code where you park at night:

14601

Calculate New Payment

Advertise on NYTimes.com

**MOST POPULAR - BUSINESS**

E-MAILED    BLOGGED

1. In Japan's Stagnant Decade, Cautionary Tales for America
2. News Analysis: Ailing Banks May Require More Aid to Keep Solvent
3. Your Money: What's in the Bill for You
4. Ethanol, Just Recently a Savior, Is Struggling
5. Nearly 700 at Merrill in Million-Dollar Club
6. Ex-G.M. Workers Try to Reboot Their Lives
7. U.S. Agents Scrutinize Texas Firm
8. Advertising: A Fashionable Lift for the Everywoman
9. Wife Withdrew Millions Before Madoff's Arrest
10. Fed Calls Gain in Family Wealth a Mirage

Go to Complete List »



The New York Times        TECH
nytimes.com/tech

Twitterers worldwide gather for Twestival

Also in Tech:
  David Pogue on Twitter
  Amazon's new Kindle
  'Smart' streetlights hit the streets

05-44481-rdd    Doc 16235    Filed 02/17/09    Entered 02/23/09 10:28:20    Main Document
Pg 43 of 55

But in court, Judge Drain undressed Mr. Bubnovich's position. He noted that the consultant could provide no explanation for why he tied the $87 million to the sole criterion of Delphi's emergence from bankruptcy protection.

"The question raised by the unions, and frankly by me, is whether that analytical process bears any relation to reality," the judge said in the hearing, according to a court transcript. "Mr. Bubnovich was candid in saying that the approach was a 'novel one.' He had not seen it before in his lengthy experience in Chapter 11 cases. To the contrary, he testified that as far as emergence cash bonus awards were concerned, such rewards were rare or not the norm in Chapter 11 cases and in far lower amounts."

Through a spokesman, Mr. Bubnovich declined to comment.

IT was not that the executives operating Delphi in Chapter 11, led by the chief executive, Robert S. Miller, did not deserve an award, the judge said. Rather, it was the amount of the cash award and the matter of an "equivalence of sacrifice" that led Judge Drain to his conclusion.

"I should note, finally, that we are talking about actual dollars here in a debtor that is seeking to raise exit financing and can use every dollar that it has, another reason to be skeptical with regard to the asserted reasonableness of the $87 million cash emergence bonus," the judge said.

Brian Foley, an expert in executive pay and the owner of an independent compensation consulting firm in White Plains, studied the Delphi plan in late 2005 and found it excessive. "It is truly refreshing to see a bankruptcy court judge carving one of these management exit packages back," Mr. Foley said. "It doesn't happen as often as it should."

A Delphi spokesman said the company was pleased that the judge approved the emergence plan. He said the compensation committee of the board would decide how to allocate the $16.5 million.

Each company is different, of course. But the Delphi ruling shows that, in the rarefied air of the corporate boardroom, the amount of money thrown at hired hands is often ridiculous and baseless. In Judge Drain's courtroom, where common sense appears to reign, the payouts shrank significantly. The judge's ruling benefited almost all the stakeholders in Delphi.

If he retires from the bench, Judge Drain is not likely to be asked to lead a compensation committee of a company's board. That's a shame, because his judiciousness would serve shareholders well.

More Articles in Business »

Click here to enjoy the convenience of home delivery of The Times for less than $1 a day.

Ads by Google                  what's this?

Compensation Whitepaper
Implement Effective Compensation Practices During an Economic Crunch
SumTotalSystems.com/Compensation

Liz claiborne executives
View top company executives and access biographies and salary info.
www.Hoovers.com/Executives

Don't Declare Chapter 11
Keep Your Business Open and Get Out of Debt Without Chapter 11.
www.DontDeclare.com

**Tips**
To find reference information about the words used in this article, double-click on any word, phrase or name. A new window will open with a dictionary definition or encyclopedia entry.

**Past Coverage**
Labor Pact Is Approved By a Union At Delphi (August 20, 2007)
New Delphi Financing Plan Is $1 Billion Less Generous (July 19, 2007)
Delphi Drops Finance Plan But Expects Another Soon (July 10, 2007)

EXHIBIT 9

  

Tuesday, February 10, 2:36 pm

Home    Dealscape    Magazine    Corporate Dealmaker    Deal Video    Deal Events    Pipeline

# Dealscape

· Qualify for The Deal Magazine
· Subscribe/Login to TheDeal.com

SYNDICATE

Dealscape Home    Hedge Clipper    International    M&A    Private Equity    Bankruptcy    Regulatory    The Deal Career Center

## Delphi may make Appaloosa pay for buyer's remorse

[Posted on April 10, 2008 at 2:39 pm]
E-mail | Leave a Comment                                    SHARE
Filed under: Autos | Bankruptcy



How much does buyer's remorse cost? Possibly millions, possibly billions, depending on where Delphi Corp. goes from here. As we reported Thursday morning, Delphi is forming a special litigation committee and an independent legal counsel that will pursue some type of legal action against Appaloosa Management LP that will pursue some type of legal action against Appaloosa Management LP that pulled the rug out from under the auto parts maker on April 4.

The litigation is likely to be filed with the U.S. Bankruptcy Court for the Southern District of New York in Manhattan. Just what, exactly, does Delphi plan to do? And how much will it cost David Tepper and the rest of the firms that nixed their $2.55 billion investment deal?

Delphi hinted Wednesday that it may try to ask the court to essentially cram the investment deal down on investors through a legal proceeding. That, apparently, would cost the $2.55 billion that the group seemingly had no interest in giving up, in the end. Or will Delphi run to General Motor Corp. for more financing help, create a new deal, and save its fight with Tepper and the rest of them for later?

We've already seen one group with cold feet -- the exit lenders for Solutia Inc. -- end up back at the table because of the threat of legal action. Will pressure from Delphi cause us to see another? *- Ben Fidler*

See story about Delphi potentially taking legal action from TheDeal.com
See story about Appaloosa pulling out of the investment from TheDeal.com

Tags:

- Appaloosa Management
- bankruptcy
- Delphi
- General Motors
- GM



### Also From Dealscape

- Crisis Dashboard: LIBOR, VIX, TED Spread, Dow
- Chip update: SiRF, Spansion, Intel
- Wall Street just not that into Geithner's plan
- GM readies paring knife again
- Full text of Geithner's speech

**Dealscape Home Page**

### From The Deal Blogs Network

- Alaska Air calls Virgin America un-American
- Marley licensing deal confirms: Global capitalism alive and well
- Fortune Brands hires veteran dealmaker, maps strategy
- Genentech wanted $112 a share, Roche claims
- Delta trims domestic airport rent post-merger

**The Deal Blogs Home**

Search

[Enter keyword]

Editor's Choice

Post a comment

Name:

Email Address:

URL:

Remember personal info?

Comments: (you may use HTML tags for style)

EXHIBIT 10

# DELPHI

4.DE-B-8M ENV# DE01097047001000002

THEODORE G KUSTAS
22 CRYSTAL SPRINGS LN
FAIRPORT, NY 14450-1904

**Fidelity Benefit Center**
http://netbenefits.fidelity.com
1-877-389-2374
**International Access**
Dial AT&T Direct® Service Access Code, then
877-389-2374
**TTY Service for Hearing or Speech Impaired**
1-877-322-0706

January 8, 2009

RE:    Retirement Election Confirmation Statement
       Plan Name:    Delphi Retirement Program for Salaried Employees "the Program"

DEAR THEODORE G KUSTAS:

Enclosed is your *Retirement Election Confirmation*. Please review it carefully to ensure that it accurately reflects the information that you provided to the Customer Service Associate.

Please complete the following next steps:

- Complete the additional requested forms
- Make any necessary updates to the attached information
- Sign and date the confirmation
- Sign and date the *Supplemental Information to Your Benefits Statement/Authorization of Monthly Benefits* form
- Make a copy of the confirmation for your records
- Attach and return all required documents and forms in the enclosed postage-paid envelope

If the forms or documents are submitted incomplete, illegible or late, benefit payment(s) may be delayed, but will be paid retroactive to your Retirement Date.

This statement contains important information, so please review it carefully. Your Summary Plan Description ("Your Delphi Benefits"), found online at http://netbenefits.fidelity.com, can provide further details about your benefit programs. If you have any questions, please call the Fidelity Benefit Center toll-free at 1-877-389-2374, Monday through Friday, between 7:30 A.M. and 6:00 P.M., Eastern Time zone, to speak with a Customer Service Associate. From outside the U.S., dial your country's toll-free AT&T Direct® access number then enter 877-389-2374. In the U.S., call 1-800-331-1140 to obtain AT&T Direct access numbers. From anywhere in the world, access numbers are available online at www.att.com/traveler or from your local operator. You may also access benefit information online at http://netbenefits.fidelity.com.

Social Security benefits may supplement your retirement income. For more information about Social Security benefits, contact the Social Security Administration at 1-800-772-1213 or online at www.ssa.gov.

**Please Keep This Statement with Your Records For Future Reference**

# DELPHI

4.DE-B-4A ENV# DE02027276001000001

THEODORE G KUSTAS
22 CRYSTAL SPRINGS LN
FAIRPORT, NY 14450-1904

**Fidelity Benefit Center**
http://netbenefits.fidelity.com
1-877-389-2374
**International Access**
Dial AT&T Direct® Service Access Code, then
877-389-2374
**TTY Service for Hearing or Speech Impaired**
1-877-322-0706

January 29, 2009

RE:                      Benefit Modeling Statement
Confirmation Number:     ▓▓▓▓▓▓▓▓▓
Plan Name:               Delphi Retirement Program for Salaried Employees "the Program"

DEAR THEODORE G KUSTAS:

*Effective 11:59 P.M.(EST) 09/30/2008, benefits accrued under the Delphi Retirement Program for Salaried Employees are frozen. Your average base pay, Part B contributions, and Part A and Part B credited service have stopped accruing for the purposes of benefit calculation. Your accrued benefit is frozen at this time. Credited service for eligibility, including credited service used to determine eligibility for Supplementary benefits, will continue to accrue for each month worked after September 30, 2008. If you are not fully vested in your benefits under the Program, you will continue to earn vesting service after September 30, 2008 for as long as you are working for Delphi. As always, you become fully vested in your Program benefit after five years of credited service or ERISA service.*

As you requested, we have estimated your benefits payable from the Program. This statement is based on certain detailed assumptions and information we have in our records. Efforts have been made to be accurate; however, circumstances may impact the benefit for which you may be eligible.

## Initiating Your Benefits

If you are eligible and would like to initiate your benefit payment(s) within the next 180 days, you may do so by calling the Fidelity Benefit Center toll-free at 1-877-389-2374, Monday through Friday, between 7:30 A.M. and 6:00 P.M., Eastern Time zone, to speak with a Customer Service Associate. Please use the checklist provided at the back of this package to assist you in preparation for this call.

## Changing Your Personal Information

Contact the Fidelity Benefit Center any time your personal information changes (e.g., address change, name change, etc.). This will help you get all future correspondence from us in a timely manner.

## Additional Information

This statement contains important information, so please review it carefully. Your Summary Plan Description ("Your Delphi Benefits"), found online at http://netbenefits.fidelity.com, can provide further details about your benefit program. If you have any questions, please call the Fidelity Benefit Center toll-free at 1-877-389-2374, Monday through Friday, between 7:30 A.M. and 6:00 P.M., Eastern Time zone, to speak with a Customer Service Associate. From outside the U.S., dial your country's toll-free AT&T Direct® access number then enter 877-389-2374. In the U.S., call 1-800-331-1140 to obtain AT&T Direct access numbers. From anywhere in the world, access numbers are available online at www.att.com/traveler or from your local operator. You may also access benefit information online at http://netbenefits.fidelity.com.

Social Security benefits may supplement your retirement income. For more information about Social Security benefits, contact the Social Security Administration at 1-800-772-1213 or online at www.ssa.gov.

If you enroll in Medicare Part B, you may be eligible for a Special Benefit reimbursement at age 65. The Special Benefit amount is subject to change.

**Please Keep This Statement with Your Records For Future Reference**

EXHIBIT 11

quarterly contribution to the Hourly and Salaried plans related to services rendered during the second quarter of 2008. Under ERISA and the Code, minimum funding payments to the U.S. pension plans of $739 million were due during the first six months of 2008 and a minimum funding payment of approximately $333 million to the U.S. pension plans was due in July 2008.

Delphi did not meet the minimum funding standards of ERISA and the Code for its primary U.S. pension plans for the plan year ended September 30, 2005. The under-contributed amount of approximately $173 million was due on June 15, 2006. The Company did not pay this amount and a related penalty was assessed by the IRS in the amount of approximately $17 million. The penalty was recorded in liabilities subject to compromise in 2006. Given the receipt of the pension waivers described in Note 2. Plan of Reorganization and Transformation Plan, Delphi determined it was no longer probable that it would ultimately pay this penalty and Delphi reversed the liability of $19 million (including $2 million of accrued interest) during the second quarter of 2007.

## 18. DERIVATIVES AND HEDGING ACTIVITIES

Delphi is exposed to market risk, such as fluctuations in foreign currency exchange rates, commodity prices and changes in interest rates, which may result in cash flow risks. To manage the volatility relating to these exposures, Delphi aggregates the exposures on a consolidated basis to take advantage of natural offsets. For exposures that are not offset within its operations, Delphi enters into various derivative transactions pursuant to risk management policies. Designation is performed on a transaction basis to support hedge accounting. The changes in fair value of these hedging instruments are offset in part or in whole by corresponding changes in the fair value or cash flows of the underlying exposures being hedged. Delphi assesses the initial and ongoing effectiveness of its hedging relationships in accordance with its documented policy. Delphi's policy prohibits holding or issuing derivative financial instruments for trading purposes.

The fair value of derivative financial instruments recorded in the consolidated balance sheets as assets and liabilities as of June 30, 2008 and December 31, 2007 are as follows:

|  | June 30, 2008 | December 31, 2007 |
|---|---|---|
|  | (in millions) | |
| Current assets | $ 113 | $ 40 |
| Non-current assets | 17 | 13 |
| Total assets | $ 130 | $ 53 |
| Current liabilities | $ 12 | $ 24 |
| Non-current liabilities | 1 | |
| Total liabilities | $ 13 | $ 24 |

The fair value of financial instruments recorded as assets increased from December 31, 2007 to June 30, 2008 primarily due to the increase in copper prices and related increase in copper forward rates. The fair value of financial instruments recorded as liabilities decreased from December 31, 2007 to June 30, 2008, primarily due to certain favorable foreign currency contracts involving the Mexican Peso with the U.S. Dollar, which offset unfavorable contracts involving the Euro with the U.S. Dollar, Turkish New Lira, and South African Rand.

Gains and losses on derivatives qualifying as cash flow hedges are recorded in OCI, to the extent that hedges are effective, until the underlying transactions are recognized in earnings. Unrealized amounts in OCI will fluctuate based on changes in the fair value of open hedge derivative contracts at each reporting period. Net gains included in accumulated OCI as of June 30, 2008, were $176 million pre-tax. Of this pre-tax total, a gain of approximately $140 million is expected to be included in cost of sales within the next 12 months and a gain of approximately $37 million is expected to be included in cost of sales in subsequent periods and a loss of approximately $1 million is expected to be included in depreciation and amortization expense over the lives of the related fixed assets. Cash flow hedges are discontinued when it is no longer probable that the originally forecasted transactions will occur. The amount included in cost of sales related to hedge ineffectiveness was a $3 million gain for the six months ended June 30, 2008 and a less than $1 million loss for the six months ended June 30, 2007. The amount included in cost of sales related to the time value of options was not significant in the six months ended June 30, 2008 and 2007. The amount included in cost of sales related to natural gas hedges that no longer qualified for hedge accounting due to changes in the underlying purchase contracts was not significant for the six months ended June 30, 2008 and was $1 million for the six months ended June 30, 2007.

**U.S. Employee Workforce Transition Program Liability**

| | (in millions) |
|---|---|
| Balance at December 31, 2007................................................ | $ 382 |
| U.S. employee workforce transition program charges......... | 16 |
| Buy-down wage liability adjustment..................................... | 3 |
| Payments ................................................................................. | (100) |
| Pension and other postretirement benefits (Note 17)........... | (17) |
| Accretion and other ............................................................... | 5 |
| Balance at June 30, 2008........................................................ | $ 289 |

At June 30, 2008 and December 31, 2007, $167 million and $234 million, respectively, of the U.S. employee workforce transition program liability is included in accrued liabilities, and $122 million and $148 million, respectively, is included in other long-term liabilities in the consolidated balance sheet.

The following table represents the activity in the U.S. employee workforce transition program buydown wage asset for the six months ended June 30, 2008:

**U.S. Employee Workforce Transition Program**
**Buydown Wage Asset**

| | (in millions) |
|---|---|
| Balance at December 31, 2007................................................ | $ 301 |
| Buy-down wage asset adjustment......................................... | 3 |
| Amortization expense............................................................. | (41) |
| Balance at June 30, 2008........................................................ | $ 263 |

As of June 30, 2008 and December 31, 2007, $82 million and $80 million, respectively, of the U.S. employee workforce transition program buydown wage asset is included in other current assets and $181 million and $221 million, respectively, is included in other long-term assets in the consolidated balance sheet.

## 17. PENSION AND OTHER POSTRETIREMENT BENEFITS

The Debtors sponsor pension plans covering unionized employees in the U.S., which generally provide benefits of stated amounts for each year of service, as well as supplemental benefits for employees who qualify for retirement before normal retirement age. The Debtors also sponsor defined benefit plans covering U.S. salaried employees, with benefits generally based on years of service and salary history. Certain Delphi employees also participate in nonqualified pension plans covering executives, which are based on targeted wage replacement percentages and are unfunded. Delphi's funding policy with respect to its qualified plans is to contribute annually, not less than the minimum required by applicable laws and regulations, including the Bankruptcy Code. Certain of Delphi's non-U.S. subsidiaries also sponsor defined benefit pension plans, which generally provide benefits based on negotiated amounts for each year of service. Delphi's primary non-U.S. plans are located in France, Germany, Luxembourg, Mexico, Portugal, and the United Kingdom ("UK"). The UK and certain Mexican plans are funded. In addition, Delphi has defined benefit plans in Korea, Turkey and Italy for which amounts are payable to employees immediately upon separation. The obligations for these plans are recorded based on the vested benefit obligation.

Delphi also maintains other postretirement benefit plans, which provide covered U.S. hourly and salaried employees with retiree medical and life insurance benefits. Certain of Delphi's non-U.S. subsidiaries have other postretirement benefit plans; although most participants are covered by government sponsored or administered programs. The annual cost of such non-U.S. other postretirement benefit plans was not significant to Delphi.

The amounts shown below reflect the defined benefit pension and other postretirement benefit expense for the three- and six-month periods ended June 30, 2008 and 2007 for U.S. and non-U.S. salaried and hourly employees excluding the plans in Korea, Turkey and Italy discussed above. The settlements recorded in the six months ended June 30, 2007 were primarily due to renegotiated labor contracts in Mexico. Benefit costs presented below were determined based on actuarial methods and included the following components for U.S. and non-U.S. salaried and hourly employees:

| | Pension Benefits | | | | Other Postretirement Benefits | |
|---|---|---|---|---|---|---|
| | U.S. Plans | | Non-U.S. Plans | | | |
| | Three Months Ended June 30, | | | | | |
| | **2008** | **2007** | **2008** | **2007** | **2008** | **2007** |

February 16, 2009
Honorable Judge Robert Drain
US Bankruptcy Court
Southern District of New York
Court Room 610
One Bowling Green
New York, NY 10004-1408



Dear Judge Drain,

    Enclosed please find a letter regarding the motion before you February 24, 2009 RE Delphi Bankruptcy Case No, 05-44481 (RDD). Thank you for your time and consideration in this matter.

Respectively Submitted

Carol Ann Kustas
22 Crystal Springs Lane
Fairport, New York 14450
585-377-3044

February 16, 2009
Clerk of Court
US Bankruptcy Court
Southern District of NY
One Bowling Green
New York, New York 10004-1408

Dear Clerk of Court,

Please find enclosed a letter to Judge Drain with exhibit package, an additional cover of the same letter with a self addressed, stamped envelope from me. Please time/date stamp the documents for the judge, and also stamp the cover sheet of the same, returning it to me in the SASE. Thank you very much. I have also enclosed proof of service on Delphi's attorneys. Again, thank you for your help and prompt attention to this matter.

Respectfully,

Carol Ann Kustas
22 Crystal Springs Lane
Fairport, NY 14450
585-377-3044

# FedEx Express US Airbill

FedEx Tracking Number **8683 2021 5647**

0200   Sender's Co

**1 From** Please print and press hard.

Date 2/16/09

Sender's FedEx Account Number    SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name Carol Ann Kustas    Phone (585) 377-3044 / 585 406-1871

Company

Address 22 Crystal Spring Lane

City Fairport    State NY    ZIP 14450

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.    OPTIONAL

**3 To**

Recipient's Name Skadden Arps State Meagher + Flom
Attention John William Butler
George N. Panagakis    Phone (312) 407-0700

Company

Recipient's Address 333 West Wacker Drive Suite 2100
We cannot deliver to P.O. boxes or P.O. ZIP codes.    Dept./Floor/Suite/Room

Address

To request a package be held at a specific FedEx location, print FedEx address here.

City Chicago    State Ill    ZIP 60606

**4a Express Package Service**    Packages up to 150

- ☑ FedEx Priority Overnight
- ☐ FedEx Standard Overnight
- ☐ FedEx First Overnight
- ☐ FedEx 2Day
- ☐ FedEx Express Saver

**4b Express Freight Service**    Packages over 150

- ☐ FedEx 1Day Freight
- ☐ FedEx 2Day Freight
- ☐ FedEx 3Day Freight

**5 Packaging**

- ☐ FedEx Envelope*
- ☐ FedEx Pak*
- ☐ FedEx Box
- ☐ FedEx Tube

**6 Special Handling**    Include FedEx address in Section 3.

- ☐ SATURDAY Delivery NOT Available
- ☐ HOLD Weekday at FedEx Location
- ☐ HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?

- ☐ No
- ☐ Yes As per attached Shipper's Declaration
- ☐ Yes Shipper's Declaration not required.
- ☐ Dry Ice

☐ Cargo Aircraft Only

**7 Payment** Bill to:

- ☐ Sender
- ☐ Recipient
- ☐ Third Party
- ☐ Credit Card
- ☐ Cash/C

Total Packages    Total Weight    Total Declared Value†

**8 Residential Delivery Signature Options**

- ☐ No Signature Required
- ☐ Direct Signature
- ☐ Indirect Signature

520

---

# FedEx Express US Airbill

FedEx Tracking Number **8683 2021 5647**

0200   Sender's Co

**1 From** Please print and press hard.

Date 2/16/09

Sender's FedEx Account Number    SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name Carol Ann Kustas    Phone (585) 377-3044 / 585 406 1871

Company

Address 22 Crystal Spring Lane

City Fairport    State NY    ZIP 14450

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.    OPTIONAL

**3 To**

Recipient's Name Skadden Arps State Meagher + Flom    Phone (212) 735-3000
Kayalyn A Marafioti
Thomas J Matz

Company

Recipient's Address FOUR TIMES Square
We cannot deliver to P.O. boxes or P.O. ZIP codes.    Dept./Floor/Suite/Room

Address

To request a package be held at a specific FedEx location, print FedEx address here.

City New York    State NY    ZIP 10036

**4a Express Package Service**    Packages up to 150

- ☑ FedEx Priority Overnight
- ☐ FedEx Standard Overnight
- ☐ FedEx First Overnight
- ☐ FedEx 2Day
- ☐ FedEx Express Saver

**4b Express Freight Service**    Packages over 150

- ☐ FedEx 1Day Freight
- ☐ FedEx 2Day Freight
- ☐ FedEx 3Day Freight

**5 Packaging**

- ☐ FedEx Envelope*
- ☐ FedEx Pak*
- ☐ FedEx Box
- ☐ FedEx Tube

**6 Special Handling**    Include FedEx address in Section 3.

- ☐ SATURDAY Delivery NOT Available
- ☐ HOLD Weekday at FedEx Location
- ☐ HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?

- ☐ No
- ☐ Yes As per attached Shipper's Declaration
- ☐ Yes Shipper's Declaration not required.
- ☐ Dry Ice

☐ Cargo Aircraft Only

**7 Payment** Bill to:

- ☐ Sender
- ☐ Recipient
- ☐ Third Party
- ☐ Credit Card
- ☐ Cash/C

Total Packages    Total Weight    Total Declared Value†

**8 Residential Delivery Signature Options**

- ☐ No Signature Required
- ☐ Direct Signature
- ☐ Indirect Signature

520

February 16, 2009
Skadden, Arps, Slate, Meagher and Flom
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312)407-0700
John William Butler, Jr
George N. Panagakis
Ron E. Meisler
Nathan L.Stuart

and

Skadden, Arps, Slate, Meagher, and Flom
Four Times Square
New York, New York 10036
(212)735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et.al.,
    Debtors and Debtors-in-Possession


Dear Attorneys,
    Enclosed please find a copy of a letter Federal Expressed to Judge Drain on
February 16th, 2009 regarding Case No. 05-44481 (RDD). Proof of service to court is
enclosed. Thank you for your time.

            Respectfully,

            Carol A Kustas

            Carol Ann Kustas
            22 Crystal Springs Lane
            Fairport, New York 14450
            (585) 377-3044