**Hearing Date And Time: February 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline: February 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
        In re                             :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :     Case No. 05-44481 (RDD)
                                          :
                                          :     (Jointly Administered)
              Debtors.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DEBTORS' OMNIBUS REPLY IN SUPPORT OF SALARIED OPEB
TERMINATION MOTION AND OBJECTION TO MOTIONS TO
APPOINT OFFICIAL COMMITTEE OF RETIRED EMPLOYEES

      Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), hereby (i) reply

to the objections (the "Objections") to the Salaried OPEB Termination Motion (Docket No.

14705) and (ii) object to the three motions to appoint an official committee of retired employees

pursuant to 11 U.S.C. § 1114 (Docket Nos. 14882, 14886, and 15283) (the "Reply").[1]

Preliminary Statement

1.      Delphi acknowledges and recognizes the hardships that terminating

Salaried OPEB as proposed in the Motion will impose on the former beneficiaries of these

programs.  Indeed, the Court has received more than 1,500 individual objections filed by

approximately 10% of the Eligible Salaried Retirees (both active and retired) who will be

affected by this Motion and are who are understandably concerned about their ability to

continue or replace these benefits.  Delphi's recognition of such hardships was a motivating

factor in Delphi's effort and success in maintaining these programs throughout Delphi's

restructuring while Delphi's go-forward business plan provided a reasonable basis for doing so.

2.      As the Debtors explained in the Motion, however, the total enterprise

value associated with the Debtors' business plan declined from a negotiated $12.8 billion in

January 2008 under the confirmed plan of reorganization to a mid-point of $7.2 billion in

business plan associated with proposed modifications to the confirmed plan that the Debtors

filed in October 2008.  Thereafter, during the fourth quarter of 2008, the outlook for the global

automotive industry took a dramatic turn for the worse, with volumes, both domestic and

---

[1]      Renewed Motion Of Retirees For Order Under 11 U.S.C. § 1114(d) For Appointment Of An Official
Committee Of Retired Employees Receiving Benefits Not Covered By A Collective Bargaining Agreement,
filed by Robert T. Nicholson, et al. (the "Nicholson Group") (Docket No. 14882).

Motion to Appoint Official Retiree Committee Pursuant To 11 U.S.C. § 1114(d), filed by Paul M. Higgins, et
al. (the "Higgins Group") (Docket No. 14886) and Motion To Shorten Notice (Docket No. 14885).

Motion For The Court To Appoint Legal Counsel To Represent The Salaried Employees, Retirees And
Surviving Spouses And A Stay Of Termination Of Benefits And Related Proceedings, filed by William R.
Stevens, pro se (Docket No. 15283).

2

global, plummeting to the lowest levels in recent history.  The Debtors are currently in

discussions with their stakeholders who have a continuing economic interest in their

reorganization regarding further plan modifications.  Although no formal valuation of the

revised business plan has been completed, the Debtors anticipate that the total business

enterprise value associated with the revised plan will be substantially below that associated with

the October 2008 proposed plan modifications.  Regrettably, Delphi can no longer justify

maintaining these programs in the current economic climate.

        3.      Many of the objectors affirmatively recognize Delphi's current financial

situation and none seriously contests Delphi's evidence regarding the state of Delphi's business,

the automotive industry, or the general economic climate.  And while some objectors assert that

the cost of continuing Salaried OPEB for retirees is not so great as to be material to the Debtors'

restructuring, none seriously contests Delphi's showing that providing Salaried OPEB to 15,000

Eligible Salaried Retirees carries an annual cash cost of approximately $70 million and that the

balance sheet liability associated with those costs exceeds $1 billion.

        4.      The Debtors believe that section 1114 of the Bankruptcy Code does not

apply to the Debtors' determination to terminate Salaried OPEB because, contrary to assertions

made by various objectors, Delphi expressly reserved the right to modify or terminate each of

the employee benefit plans at issue.  Although there is a split of authority on this issue of law,

and no controlling authority, this Court[2] and "[t]he majority of courts addressing the issue have

found that a debtor in possession need not comply with the procedures and requirements of

section 1114 if it has a right to unilaterally terminate retiree benefits under the retirement plan in

---

[2]    In re Delphi Corporation, Hr'g Tr. at 25, Aug. 16, 2007.

question and applicable nonbankruptcy law." 7 <u>Collier on Bankruptcy</u> ¶ 1114.03[1], at p. 1114-15 (15th rev. ed. 2008).

5.    Many objectors further contend that section 1114 applies, notwithstanding the reservation-of-rights language contained in each of the Delphi plans at issue, because Salaried OPEB benefits allegedly were promised for life and therefore "vested" under ERISA.  With very few exceptions, however, the objectors rely on communications between GM and its employees in the decades prior to the separation of Delphi from GM in 1999.  In doing so, the objectors are attempting to replay the <u>Sprague</u> case in hopes of achieving a different outcome.  In <u>Sprague</u>, the Sixth Circuit Court of Appeals considered the exact same GM documents and arguments about GM's conduct that are being put forward here and concluded that GM's salaried benefit plans and programs unambiguously reserved GM's right to modify its employee welfare benefit plans.  See <u>Sprague v. General Motors Corporation</u>, 133 F.3d 388, 398 (6th Cir. 1998).

6.    <u>Sprague</u>, decided in 1998, conveys the status of the GM plans when, on or about January 1, 1999, Delphi created the plans at issue here and modeled them so as to be substantially identical to the GM plans – including preserving the express right to modify or terminate benefits under the plans.  Thus, contrary to assertions made in various objections, no benefits have "vested" under Delphi's Salaried OPEB plans and programs because the initial and each subsequent plan document and Summary Plan Description ("SPD") expressly reserved Delphi's right to modify or terminate such benefits.

7.    For the reasons set forth herein and in the Motion, the Objections should be overruled, the motions to appoint an official committee of retired employees should be

4

denied, and the Debtors should be permitted to terminate Salaried OPEB as soon as practicable

after March 31, 2009.[3]

Argument

A.    The Plan Documents Unambiguously Reserve The Debtors' Right To Amend Or
Terminate Salaried OPEB

8.    As the Debtors argued in the Motion and address further in Section B of

this Reply, section 1114 is inapplicable where, as here, a chapter 11 debtor retains the right to

modify or terminate retiree welfare plans under applicable nonbankruptcy law.  If the Court

agrees with that rule of law, then the most important issue here is whether Delphi in fact retained

and continues to retain that right or whether, as various objectors contend, the Salaried OPEB

benefits Delphi offers to retirees have "vested" under ERISA and cannot be changed unilaterally

by Delphi.

9.    As set forth in the Motion, the Delphi Salaried Health Care Program, the

Delphi Salaried Life and Disability Benefits Program, and the Salaried Retirement Savings

Program each expressly reserves Delphi's right to amend or terminate the plans at any time:

---

[3]    For convenience, the Debtors have prepared and attached as Exhibit A a chart that summarizes by subject
matter the objections received to date and summarizes the Debtors' responses thereto.  This Reply incorporates
those responses.

| Current Plan<br>Affected By Motion | Provision Permitting<br>Modification Or Termination |
| --- | --- |
| Delphi Salaried Health Care Program | "The Corporation reserves the right to amend, modify, suspend or terminate the Program in whole or in part, at any time, by action of its Board of Directors or other committee expressly authorized by the Board to take such action." (Gebbia Decl., Exh. 2, Art. I, Sec. 1(b)(1).) [4] |
| Delphi Salaried Life and Disability Benefits Program | "The Corporation reserves the right to amend, modify, suspend or terminate the Program in whole or in part, at any time, by action of its Board of Directors or other committee expressly authorized by the Board to take such action."  (Gebbia Decl., Exh. 3, Art. III, Sec. 3.05(b)(1).) |
| Salaried Retirement Savings Program | "The Corporation reserves the right to amend, modify, suspend, or terminate the Program in whole or in part, at any time, by action of its Board of Directors or other individual or committee expressly authorized by the Board to take such action." (Gebbia Decl., Exh. 4, Art. III, Sec. 2.) |

Moreover, as demonstrated below, Delphi has consistently communicated its reservation of rights to Eligible Salaried Retirees in its SPDs as well as in other communications.

(a)    ERISA Controls The Question Of Vesting

10.    The Employee Retirement Income Security Act of 1974, as amended ("ERISA") governs the construction, administration, and interpretation of employer-provided medical and life insurance benefit plans.  ERISA defines an "employee welfare benefit plan" as one "maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ."  29 U.S.C. § 1002(1).

---

[4]    This language, quoted verbatim in the Motion, is not "purportedly lifted from some unattached and unspecified benefit plan documents" (see Higgins Group Obj., Docket No. 14765 ¶ 3), but rather is the applicable language from each of the three Salaried OPEB plans at issue.  The Debtors have also included the documents as exhibits to the Declaration of Steven Gebbia.  In addition, SPDs and other benefits information is and has been available for years to employees, retirees, and the public through the Delphi National Benefit Center website.  See, e.g., Forms – Salaried Retiree, at https://www.delphinbc.com/pagesforms/Forms.asp?type=SR (retrieved February 21, 2009).

11.     Unlike ERISA's provisions respecting pension plans, ERISA does <u>not</u> require that employer-provided welfare-benefit plans contain vesting procedures.  To the contrary, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 78 (1995); <u>Joyce v. Curtiss-Wright Corp.</u>, 171 F.3d 130, 133 (2d Cir. 1999) (stating general rule that welfare benefit plans are not vested and that employers have right to unilaterally modify or terminate such plans at any time).  Congress specifically rejected the automatic vesting of welfare benefit plans because costs associated with such plans are subject to fluctuation and unpredictable variables, such as changes in medical practice and technology, which "prevent accurate predictions of future needs and costs." <u>Moore v. Metro. Life Ins. Co.</u>, 856 F.2d 488, 492 (2d Cir. 1988).

12.     Although employers are generally free to modify or terminate welfare benefit plans, they may of course <u>choose</u> to provide welfare benefit plans that do vest.  "All courts agree that if a document unambiguously indicates whether retiree . . . benefits are vested, the unambiguous language should be enforced." <u>Am. Fed'n of Grain Millers, AFL-CIO v. Int'l Multifoods Corp.</u>, 116 F.3d 976, 980 (2d Cir. 1997) (citations omitted) (hereafter "<u>Multifoods</u>").  Thus, if an employer promises vested benefits it is not free to terminate them unilaterally. <u>See Devlin v. Empire Blue Cross & Blue Shield</u>, 274 F.3d 76, 82 (2d Cir. 2001).  Delphi has not done so here.

13.     ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1).  ERISA also sets forth with specificity information that the plan must contain, such as procedures for establishing the funding policy consistent with the objectives of the plan and the requirements of ERISA,

descriptions of allocation of responsibilities for administration of the plan, procedures for amending the plan, and the bases on which payments are made to and from the plan.  29 U.S.C. § 1102(b).  ERISA also requires the provision of SPDs and sets forth the distribution methods and plain language requirements applicable to SPDs. 29 U.S.C. § 1022(a).  The statute also details the information that an SPD must contain, including, for example, whether the insurance issuer is responsible for administration, the requirements for participant eligibility, the source of financing of the plan, the procedures for presenting claims, and the remedies available for redress of claims which are denied.  29 U.S.C. § 1022(b).

14.    The Second Circuit has recognized that ERISA's requirement for a written instrument is central to analyzing welfare benefit plans because the requirement "'serves two of the primary goals of ERISA: informing employees of the benefits to which they are entitled, and providing some degree of certainty in the administration of benefits.'"  See Fiefer v. Prudential Ins. Co. of America, 306 F.3d 1202, 1208 (2d Cir. 2002) (quoting Wentworth v. Digital Equip. Corp., 933 F. Supp. 123, 127 (D.N.H. 1996)).

15.    Thus, in analyzing whether benefits have vested, all documents are not created equal.  The required written documents – the plan and SPD – control.  Where, as here, the plans and SPDs unambiguously reserve the right to modify or terminate the plans, "the unambiguous provisions of the plan must govern, because altering a welfare benefit plan on the basis of non-plan documents and communications, absent a particularized showing of conduct tantamount to fraud, would undermine ERISA."  Moore, 856 F.2d at 489 (2d Cir. 1988).[5]

---

[5]    The Higgins Group also cites Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 77-78 (2d Cir. 1996) incorrectly as "[s]etting the vesting standard for employees low [in] the Second Circuit . . ." (Docket No. 14886, ¶ 45.)  Schonholz is inapposite, however, because the Second Circuit's consideration of informal

8

          (b)      <u>Delphi's Plans And SPDs Are Unambiguous</u>

16.     The Debtors' Salaried OPEB plans are clear and unambiguous with regard to the Debtors' reservation of rights to unilaterally modify or terminate those plans.

17.     Prior to Delphi's spin-off from GM on January 1, 1999, GM offered the following Salaried OPEB plans: (i) the Salaried Health Care Program, (ii) the Life and Disability Benefits Program, and (iii) the Savings-Stock Purchase Program (collectively, the "1998 GM Plans"). At the time of the spin-off, Delphi established plans that were substantially identical to the 1998 GM Plans (the "1999 Delphi Plans"). Each of the 1998 GM Plans and the 1999 Delphi Plans included an express reservation of the right to modify or terminate the respective benefit programs.

18.     Also around that time, in early 1999, Delphi sent to Eligible Salaried Retirees a letter stating that the terms of Delphi's plans would be substantially the same as the terms of the plans that GM had in place at the time of Delphi's spin-off from GM. The letter enclosed a booklet containing general information about Eligible Salaried Retirees' benefits. As with the 1998 GM Plans and 1999 Delphi Plans, the booklet expressly noted Delphi's reservation of the right to "amend, modify, suspend, increase, decrease, or terminate any of its employee benefits plans."[6]

---

communications in that case was expressly based on the fact that formal plan documents were not required for the severance plan at issue in that case. The Court recognized the general rule from <u>Moore</u>.

[6]   <u>See</u> Gebbia Decl., Exh. 2, at p. 6:

> Delphi reserves the right to amend, modify, suspend, increase, decrease or terminate any of its employee benefits plans or programs by action of its Board of Directors (Board) or other committee or individuals expressly delegated by the Board to take such action. The benefits to which an employee is entitled are determined solely by the provisions of the applicable benefit plan or program. Absent an express delegation of authority from the Board of Directors, no one has the authority to commit the Corporation to any benefit or benefit provisions not provided for under the applicable benefit program, or to change the eligibility criteria or any other provisions of such program.

19.    In fall 1999, Delphi mailed annual enrollment forms for the 2000 benefit enrollment period to retirees and active employees.  These enrollment materials contained the same reservation-of-rights language as had been set forth in the 1998 GM Plans and the 1999 Delphi Plans.[7]  Since that time, Delphi has consistently included a substantially similar reservation of rights in the annual enrollment materials it provided to Eligible Salaried Retirees.

20.    In addition, in early 2000 through early 2004, Delphi annually sent active salaried employees a Personal Benefits Summary concerning their benefits for the preceding calendar year, which included then-existing Salaried OPEB benefits.  These Personal Benefits Summaries again consistently reflected Delphi's express reservation of the right to modify or terminate welfare benefits programs, including Salaried OPEB.  (See Gebbia Decl., Exh. 8 at p. 5 (1999),  p. 15 (2000), p. 25 (2001), p. 34 (2002), and p. 43 (2003).)

21.    In 2001, Delphi issued new SPDs to all Eligible Salaried Retirees.  One SPD covered Post-2000 Salaried Employees and a separate SPD covered Pre-1993 Salaried Employees as well as 1993 to 2000 Salaried Employees.  Both 2001 SPDs contain the same express reservation-of-rights.[8]

---

[7]    See Gebbia Decl., Exh. 6 at p. 27 and Exh. 7 at p. 43:

> Delphi Automotive Systems reserves the right to amend, modify, suspend or terminate any of its benefits plans or programs by the action of its Board of Directors, or individual or other committee expressly authorized by the Board to take such action. . . .  Absent an express delegation of authority from the Board of Directors, no one has the authority to commit the Corporation to any benefit or benefit provisions not provided for under the applicable benefit program, or to change the eligibility criteria or any other provisions of such program.

[8]    See Gebbia Decl., Exh. 9 at pp. (ii) and 91 and Exh. 10 at pp. (ii) and 128:

> Delphi Automotive Systems reserves the right to amend, change, or terminate the Plans and Programs described in this booklet. The Plans and Programs can be amended only in writing by an appropriate committee or individual as expressly authorized by the Board of Directors. No other oral or written statements can change the terms of a benefit Plan or Program.

*        *        *

10

22.    In March 2005, the Company decided to modify its Delphi Heath Care Program effective as of January 1, 2007, to provide that Medicare eligible retirees would no longer receive health insurance through Delphi.  Delphi's implementation of such a material modification to its medical plan again demonstrates that medical benefits under its plan are not vested.  Moreover, to communicate and explain the changes, Delphi mailed all Eligible Salaried Retirees a bulletin entitled "Changes In 2007 Post-Retirement Health Care Coverage U.S. Salaried Health Care Program," which again stated that "Delphi reserves the right to amend, modify, suspend, increase, decrease or terminate any of its salaried employee benefit plans or programs, including the Salaried Health Care Program, at any time."  (See Gebbia Decl., Exh. 11 at p. 12.)  Over the next year-and-a-half, Delphi communicated regularly with Eligible Salaried Retirees regarding this material modification through web postings, mailings, and presentations that also included the express reservation of Delphi's right to modify or terminate benefits.  (See Gebbia Decl., Exhs. 12 – 16.)

23.    In sum, Delphi has consistently maintained its express reservation of rights to modify or terminate the Salaried OPEB plans that are the subject of the Motion.  The reservation-of-rights language was part of the 1998 GM Plans, was continued by Delphi in the 1999 Delphi Plans, and has continued to be included in the plans and SPDs to the present.

---

*Right to Amend, Modify, Suspend or Terminate.*  Delphi Automotive Systems reserves the right to amend, modify, suspend, increase, decrease or terminate any of its employee benefit plans or programs by action of its Board of Directors (Board) or other committee or individual expressly authorized by the Board to take such action. The benefits to which an employee is entitled are determined solely by the provisions of the applicable benefit plan or program. Absent an express delegation of authority from the Board of Directors, no one has the authority to commit the Corporation to any benefit or benefit provisions not provided for under the applicable benefit plan or program, or to change the eligibility criteria or any other provisions of such plan or program.

(c)    Isolated Non-Plan Documents Do Not Amend Plans

24.    Against this backdrop many objectors seem to suggest that any piece of paper over an employee's entire career is capable of creating a vested benefit under ERISA, and that an informal summary of benefits can trump the formal plan documents.  Under this theory, an employer's clear reservation of its right to change its welfare benefit plans – repeated over and over, year after year – can be rendered meaningless by a single document that, in isolation, could be read differently.  For example, the Higgins Group claims that "any language found in the same plan documents or in other writings provided by Debtors (and/or other extrinsic evidence) reflecting communications that would have given Debtors' employees a reasonable belief that their future benefits would vest – usurps any right to unilateral termination."  (Docket No. 14765 ¶ 22 (emphasis added).)  That is not the law.

25.    Multiple objectors cite to half-page form letters sent to retirees by a third-party benefit administrator, the Retiree Servicing Center, regarding life insurance.  (See, e.g., Higgins Obj., Docket No. 14765, Ex. B (2001 letters).)  Under the terms of the life insurance program in place at the time of these letters, the amount of the Company-paid life insurance as a percentage of final base salary "stepped down" at retirement and again thereafter.  The purpose of letters such as these was to convey to Eligible Salaried Retirees that the last "step down" had occurred under the terms of the then-existing program.  The letters say "[t]his ultimate amount will remain in effect for the rest of your life and is provided by Delphi at no cost to you."  These objectors rely on these letters to claim that they have a vested contractual right to life insurance benefits for life, despite Delphi's reservation of rights in the plan documents.  These informal communications are not plans or SPDs under ERISA, however, because they do not meet the

12

requirements discussed above under 29 U.S.C. §§ 1102 and 1022.  Given that the right to modify

or terminate benefits is unambiguous in the plan documents, those documents govern.[9]

26.    Under applicable Second Circuit law, these letters did not vest any rights

under the life insurance plan.  See, e.g., Moore, 856 F.2d at 492.  In Moore, the defendant

company clearly reserved in the plan documents and in the SPDs the right to amend or terminate

the plans at issue.  However, over decades of plan administration a brochure, filmstrips, and

certain presentations failed to include the reservation-of-rights language.  The plaintiff-

employees argued that the "contract" between them and the company "consist[ed] of the totality

of the representations made to the employees by the [c]ompany, and the actions of the employees

in accepting those representations by remaining with the [c]ompany." Moore, 856 F.2d at 491-

92.  The Second Circuit rejected this argument.

> Congress intended that plan documents and the SPDs exclusively govern an
> employer's obligations under ERISA plans. This intention was based on a sound
> rationale. Were all communications between an employer and plan beneficiaries
> to be considered along with the SPDs as establishing the terms of a welfare plan,
> the plan documents and the SPDs would establish merely a floor for an
> employer's future obligations. Predictability as to the extent of future obligations
> would be lost, and, consequently, substantial disincentives for even offering such
> plans would be created.

Id. at 492.  The court concluded that "absent a showing tantamount to proof of fraud, an ERISA

welfare plan is not subject to amendment as a result of informal communications between an

employer and plan beneficiaries." Id.  Recognizing that the use of language such as "'lifetime' or

---

[9]    The reservation-of-rights language in Delphi's plans also typically included additional language notifying
participants that it would be unreasonable to rely on informal communications as modifying plan terms.  For
example, the Delphi Salaried Life and Disability Benefits Program provides:

> The benefits available to employees are defined solely by the terms of this Program.  Absent an
> express delegation of authority from the Board of Directors, no one has the authority to commit
> the Corporation to any benefit or benefit provisions not provided for under the terms of this
> Program.

Gebbia Decl., Exh. 3, Art. III, Sec. 3.05(b)(1).

'at no cost' might conceivably create [] triable issue[s] of fact on a contract theory," the court

nevertheless held that they did not "constitute the kind of misleading behavior that would cause

us to override plan documents and SPDs created pursuant to ERISA."  Id. at 493; see also

Multifoods, 116 F.3d at 981 ("the terms of the CBA unambiguously establish that Multifoods

had no obligation to provide medical insurance to its retirees after the CBAs expired, and

therefore, plaintiffs' extrinsic evidence cannot change the result.").

(d)    Cherry-Picked Documents From GM Do Not Establish Vesting

27.    The Higgins Group attaches a portion of a GM document from 1980

entitled "Your GM Benefits A Handbook For Salaried Employees In The United States."

(Docket No. 14765, Ex. C.)  This Higgins Group implies, falsely, that this document provides

that retiree health and insurance benefits are "'Vested'" (see Docket No. 14765 ¶ 6), when in fact

that handbook's use of that word on page 12 related to pension benefits, not health and insurance

benefits.  Furthermore, each of the three retiree groups[10] fails to acknowledge that the Sixth

Circuit Court of Appeals, sitting en banc, considered this very same document and found that it

did not overcome GM's express reservation of its right to modify or terminate retiree health

benefits going back all the way to 1964, when GM first began offering health care coverage to

retirees.  See Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998).

28.    Although the 1980 GM Handbook allegedly fails to reserve GM's right to

terminate or modify its benefit plans, the Sixth Circuit noted that most of the SPDs

"unambiguously reserved GM's rights to amend or terminate the plan."  Id. at 401.  The plaintiff

employees in Sprague argued, however, that statements in these same SPDs that health coverage

---

[10]    In addition to the Higgins and Nicholson Groups, the Delphi Salaried Retirees Association filed an objection on
behalf of a group of Eligible Salaried Retirees.  (Docket No. 14819.)

14

would be paid "'at no cost to' them and 'for [their] lifetime[s]'" created an ambiguity within the summaries themselves that must be resolved by extrinsic evidence. Id. The Sixth Circuit rejected this argument and saw no "ambiguity in a [SPD] that tells participants both that the terms of the current plan entitle them to health insurance at no cost throughout retirement and that the terms of the current plan are subject to change." Id.

29.    Furthermore, although not all of the SPDs (including the 1980 GM Handbook) set forth the reservation of rights, the Sixth Circuit held that this failure "did not prejudice GM's right, clearly stated in the plan itself, to change the plan's terms." Id.   First, the Sixth Circuit found that an omission from an SPD does not alter the terms of the plan because, by definition, a summary will not include every plan term. Id.   Second, the court said that GM was not required to disclose in the SPDs that the benefits were not vested because the information requirement for SPDs under 29 U.S.C. § 1022(b) does not require information on vesting for a welfare benefit plan. Id.   Accordingly, the Sprague Court held that neither GM's plan nor any of the SPDs, including the 1980 GM Handbook, "states or implies that the plaintiff's benefits were vested." Id.

30.    The Court should reject certain objectors' invitation to relitigate the Sprague court's analysis of 30-year-old GM documents.[11]

---

[11]    In addition to the 1980 GM Handbook, the Higgins Group proffers as exhibits certain individualized Personal Benefits Statements sent to various plan participants in the 1970s and 1980s.  These are not plan documents or SPDs.  Presumably, these are offered to show instances in which the documents say "[y]our healthcare coverages will be continued for your lifetime."  (See, e.g., Joint Exh. Index No. 75, at p. AR0144.)  However, even these informal documents or portions of documents selected by counsel almost invariably contain a disclaimer referring back to the legal plan documents.  (See, e.g., 1983, Joint Exh. Index No. 73, at p. AR0136 ("Eligibility for benefits and the actual amount of payment under all of GM's plans that make up your benefit program must be determined under the legal documents that apply to each plan."); 1975, Joint Exh. Index No. 68 at p. AR099 ("This statement cannot be considered a promise to pay benefits not authorized by the specific employe [sic] benefit programs.  The detailed provisions of each plan determine the actual benefits payable.").)

15

(e)    The Objectors' Promissory Estoppel Argument Fails Under ERISA

31.    Certain objectors appear to argue for application of the legal theory of promissory estoppel.  These objectors state that, but for Delphi's alleged promise of vested health care and life insurance benefits until the age of 65, they would not have participated in early retirement programs.  (See e.g., Docket Nos. 14723, 14746 and 14763). "'[P]rinciples of estoppel can apply in ERISA cases under extraordinary circumstances.'"  Devlin, 274 F.3d at 85 (quoting Schonholz, 87 F.3d at 78).  A plaintiff must satisfy not only the four elements of promissory estoppel – "'(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced'" – but must also "satisfy an 'extraordinary circumstances' requirement as well."  Devlin, 274 F.3d at 85-86 (internal citations omitted).

32.    Although Schonholz indicates that the Second Circuit may find extraordinary circumstances or an injustice when an employer used promised severance benefits to induce a plaintiff to retire, the objectors cannot show that the Debtors promised that the welfare benefits under the Salaried OPEB plan were vested – the first requirement under the promissory estoppel analysis.  Moreover, when Delphi has offered Eligible Salaried Retirees the opportunity to participate in various early retirement incentive programs over the years, Delphi's general practice has been to condition the employee's eligibility on signing a form agreement that expressly reserved Delphi's unilateral right to modify or terminate benefit programs, including Salaried OPEB.[12]

---

[12]    Form agreements for each of the following Salaried Retirement Incentive Programs are attached to the Declaration of Steven Gebbia: (a) 1999 Delphi Window Retirement Program, effective January 1, 1999; (b) 1999 Delphi Window Retirement Program, effective February 1, March 1, or April 1, 1999; (c) 2001 Delphi Salaried Retirement Incentive Program, effective February 1, 2001; (d) 2001 Delphi Delco Salaried Retirement Incentive Program Agreement, effective April 1, 2001; (e) 2002 Delphi U.S. Salaried Retirement Incentive Program, effective January 1, February 1, or March 1, 2002; (f) 2004 Delphi U.S. Targeted Salaried Retirement Incentive Program, effective February 1 or March 1, 2004; (g) 2004 Delphi U.S. IT Targeted Salaried

B.    Section 1114 Does Not Apply Because The Salaried OPEB Plans And SPDs
Unambiguously Preserve The Termination Rights Of The Debtors

33.    As this Court is well aware, a split of authority exists regarding whether

section 1114 of the Bankruptcy Code is implicated where a debtor seeks to exercise its reserved

right to terminate a welfare benefit plan.  As explained in the Motion, under the majority rule, if

this Court finds that the Debtors reserved the right under the plan documents to terminate

Salaried OPEB at will, then section 1114 of the Bankruptcy Code does not apply.  In that

scenario no retiree committee need be appointed under section 1114(d) and no claims arise

against the estates from such termination.[13]  In response to the authority cited in the Motion, the

objectors rely primarily on the discredited district court opinion in the Ames Dep't Stores case

and on the 2005 BAPCPA amendment regarding reinstatement of prepetition benefit reductions

taken by a debtor during the 180-day period prior to filing a chapter 11 petition.

(a)    The Minority Rule Cases Are Contrary To The Bankruptcy Code

34.    The retiree groups rely heavily on Ames Dep't Stores, an unreported case

from the district court in this district, to assert that section 1114 of the Bankruptcy Code applies

and that an official committee of retired employees should be appointed.  (See, e.g., Higgins

---

Retirement Incentive Program, effective April 1 or May 1, 2004; and (h) 2005 Delphi Packard Special Salaried
Transitional Retirement Opportunity, effective July 1 or August 1, 2005.  (See Gebbia Decl., Exh. 17.)

[13]    The legislative history of section 1114 of the Bankruptcy Code supports the Debtors' position that this section is
inapplicable to welfare plans which are terminable at will.  See S. Rep. No. 119, 100th Cong., 1st Sess. 1, 6 n.2,
reprinted in 1988 U.S. Code Cong. & Admin. News 683, 688 n. 2 (stating that welfare plan modification
pursuant to section 1114 gives rise to unsecured claims for amount of lost benefits).  The cancellation of a
benefit provided on an at will basis does not give rise to a "claim" as defined in section 101(5) of the
Bankruptcy Code because the retiree has no "right to payment."  See, e.g., In re Ionosphere Clubs, Inc., 134
B.R. 515, 519 n. 4 (noting without deciding creditors' committee's argument that under Doskocil and
Chateaugay terminating plans which are terminable at will gave rise to no claims whatsoever); In re Wellman,
Inc., No. 08-10595, slip op. at 6, (Bankr. S.D.N.Y. Jan. 23, 2009) (sustaining debtors' objection to disallow
portion of claims for modified severance benefits that exceeded amounts owed under amended severance plan,
reasoning that because old severance plan was terminable at will, claims under old severance plan were not
enforceable).  Given the clear legislative history explaining that modification pursuant to section 1114 gives rise
to an unsecured claim, the better reading is that the plain meaning of section 1114 of the Bankruptcy Code is
inapplicable to welfare plans which are terminable at will.

Group Obj., Docket No. 14765 ¶ 7 (citing Ames Dep't Stores, Inc. v. Employees' Committee of

Ames Dep't Stores, Inc. (In re Ames), 1992 WL 373492 (S.D.N.Y. 1992).)  On appeal, the

Second Circuit heavily criticized the reasoning of both the bankruptcy court and the district court

in Ames, citing the string of contrary authority on the issue and observing that "[n]ot one of the

foregoing authorities was discussed or even mentioned by the bankruptcy court or the district

court.  More importantly, neither court cited any interpretive authority that conflicted . . . ."  In re

Ames Dep't Stores, Inc., 76 F.3d 66, 71 (2d Cir. 1996) (citing In re Doskocil Companies, Inc.,

130 B.R. 870 (Bankr. D. Kan. 1991) and In re Chateaugay, Corp., 945 F.2d 1205 (2d Cir. 1991),

among other authorities), overruled on other grounds, Lamie v. U.S. Trustee, 540 U.S. 526

(2004).[14]  Although the court did not have to decide the question, it further noted that "[a]t the

time the bankruptcy court made its ruling . . . [s]uch authority as existed on the question favored

the interpretation urged by [the debtor's counsel]."  Id.[15]

      35.    This Court too has already rejected the approach taken in the Ames case

and the Farmland case[16] discussed in the Motion, which are the only two written opinions that

deviate from the majority rule.  See In re Delphi Corporation, Hr'g Tr. at 25, Aug. 16, 2007.  The

---

[14]    Following the district court opinion in Ames, both Doskocil and Chateaugay were cited with approval in In re
Drexel Burnham Lambert Group, 138 B.R. 723, 763 (Bankr. S.D.N.Y. 1992).

[15]    The Nicholson Group blatantly misstates the Second Circuit's opinion in a parenthetical, purporting to quote
that opinion as standing for the proposition that a "debtor must comply with § 1114 despite the fact that 'the
plan contains unambiguous language reserving the right to unilaterally terminate. . . .'"  (Docket No. 14872 at p.
9.)  No such holding appears in the Second Circuit's opinion.

[16]    See In re Farmland Indus., Inc., 294 B.R. 903 (Bankr. W.D. Mo. 2003) (holding that § 1114 prohibits debtor
from terminating or modifying any retiree benefits during chapter 11 case unless debtor complies with section
1114, regardless of whether debtor has prepetition non-bankruptcy right to unilaterally terminate or modify
benefits).

objectors provide no controlling or compelling authority to the contrary.[17]  Moreover, adopting

the minority rule would frustrate the goals of both ERISA and chapter 11 of the Bankruptcy

Code by creating substantive rights in bankruptcy for persons to whom the Debtors are not liable

under ERISA or other non-bankruptcy law.

>    (b)    Section 1114(*l*) Has No Bearing On The Relief Requested

36.    Some objectors assert that the amendment to section 1114(*l*) of the

Bankruptcy Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of

2005 ("BAPCPA") "appears to be increasing the breadth of [s]ection 1114," making section 1114

of the Bankruptcy Code applicable to apply to all retiree welfare plans, notwithstanding a

unilateral right of termination.  (See, e.g., Higgins Group Obj., Docket No. 14765 ¶ 28.)  This

analysis fails for two reasons.

37.    First, amended section 1114(*l*) of the Bankruptcy Code applies only to

prepetition modifications of retiree benefits.  Second, and equally important, the BAPCPA

amendment does not lead to a different result.  Congress did not amend the sections relevant to

appointment of a retiree committee and was presumed to know the prevailing interpretation of

those sections.  See, e.g., 11 U.S.C. § 1114(a), (d) (discussing definition of "employee benefits"

and appointment of retiree committee, respectively).  Indeed, the objectors refer to Collier on

Bankruptcy, but overlook that treatise's observation that "[t]he majority of courts addressing the

---

[17]    The Delphi Salaried Retirees Association cites In re Speco Corp., 195 B.R. 674 (Bankr. S.D. Ohio 1996) and In
re New York Trap Rock Corp., 126 B.R. 19 (Bankr. S.D.N.Y. 1991) as holding that section 1114 applies to
amendable benefits (see Docket No. 14819 at p. 9), but those cases involved a collective bargaining agreement
and a contractual obligation, respectively.  The Nicholson Group attaches a two-page form of order from In re
Solutia Inc., et al., in which Judge Beatty states that "changes to retiree benefits pursuant to the terms of an
existing plan that are permitted by the terms of such existing plan nonetheless require court approval of such
changes under Bankruptcy Code section 1114." (Docket No. 14872, Ex. 2.)  However, the transcript from the
hearing reveals that Judge Beatty was concerned that the benefits at issue were covered in part by a settlement
agreement, and that the Debtors had made the modifications without seeking any court approval.  In re Solutia
Inc., et al., Case No. 03-17949 (PCB) Sept. 24, 2004 Tr. at p. 27 (Docket No. 1947).

issue have found that a debtor in possession need not comply with the procedures and

requirements of section 1114 if it has a right to unilaterally terminate retiree benefits under the

retirement plan in question and applicable nonbankruptcy law." See 7 Collier on Bankruptcy ¶

1114.03[1], at p. 1114-15 (15th rev. ed. 2008).[18]

   38.  The Debtors are unaware of any case holding that the BAPCPA

amendments to section 1114 of the Bankruptcy Code undermine the authority for the relief

sought in the Motion.  See, e.g., In re Anchor Glass Container Corp., 342 B.R. 878 (Bankr. M.D.

Fla. 2005) (noting that whether Debtor can modify or terminate welfare benefits was not before

court and denying motion to appoint retiree committee under section 1114(*l*), noting that the

section "does not require, nor does it contemplate, the appointment of a committee.")  It remains

the case that the better reading of section 1114 of the Bankruptcy Code is that termination of a

contract, "as allowed by the terms of the contract, should not be treated as a modification that can

be accomplished only by following the procedures of section 1114."  In re North American

Royalties, Inc., 276 B.R. 860, 866 (Bankr. E.D. Tenn. 2002).

C. Appointing A Retiree Committee Under 1114(d) Wastes Estate Resources

   39.  As discussed above, because the Salaried OPEB plans and SPDs reserve

the right to terminate benefits, the Debtors and their estates should not be required to pay for a

committee to search for evidence that is insufficient to overcome unambiguous plan language.

   40.  "If the salaried retirees have no rights to future benefits under the plan,

and if the debtor has no duty to pay those benefits to the salaried retirees, there is nothing to

---

[18] Collier also notes that "[i]t remains to be seen whether courts will apply new subsection (*l*) in a manner that
restores benefits that have been modified pursuant to a reserved right in a prebankruptcy contract."  See 7
Collier on Bankruptcy ¶ 1114.03[2], at p. 1114-20 (15th rev. ed. 2008).  But even if section 1114(*l*) did
supersede contract rights with respect to a prepetition modification, "the fact that the debtor reserved a right to
terminate such rights unilaterally might be considered by the court as a factor in 'balancing the equities' under
section 1114(l)."  Id.

negotiate in this elaborate procedure" and a retiree committee serves no purpose but to drain

estate resources by making the Debtors jump through unnecessary hoops.  See, e.g., In re

Doskocil Cos., 130 B.R. at 876; In re North American Royalties, Inc., 276 B.R. at 876

("compliance with section 1114 is irrelevant to the issue of termination in accordance with the

contract's terms.").

41.    A retiree committee would "hire attorneys and incur unnecessary expense"

to negotiate with respect to rights that are nonexistent under ERISA.  In re Doskocil Cos., 130

B.R. at 877.  Unlike the Dana bankruptcy case cited by the Higgins Group (see Docket No.

14765 ¶¶ 9-11), the Debtors have provided the underlying Salaried OPEB Plans and SPDs

establishing their unilateral right to terminate.

42.    Appointment of a retiree committee notwithstanding the unambiguous

language in the Salaried OPEB Plans and SPDs would accomplish nothing but prolonged

discovery with its attendant expense.  The objectors' request for the appointment of a retiree

committee under section 1114(d) of the Bankruptcy Code should therefore be denied.

D.    The Creditors Committee Proposes An Unnecessary And Burdensome Claims Process

43.    The Creditors' Committee supports the Debtors' business judgment and

supports the relief requested in the Motion.  (See Docket No. 14881.)  The Creditors' Committee

asks, however, that the Court waive the bar date for claims to allow Eligible Salaried Retirees a

reasonable amount of time to file proofs of claim solely for the purpose of asserting claims

stemming from the termination of Salaried OPEB.  First, the proposed claims procedure is

unnecessary.  Because the plan documents unambiguously reserve Delphi's right to terminate

Salaried OPEB, no claims arise from such termination under section 1114 or otherwise.  See

generally In re Doskocil Cos., 130 B.R. 870, 876-78 (Bankr. D. Kan. 1991) (section 1114 does

not operate with respect to "claims for which the debtor has no contractual or other legal

liability").  Second, the proposed procedure calls for the filing of potentially thousands of

individual claims, which would waste judicial resources and the resources of the estates and

create unrealistic expectations on the part of affected retirees.  Accordingly, the request of the

Creditors' Committee should be denied.

E.    The UAW's Limited Objection Does Not Affect Outcome of Motion

44.    The UAW generally argues that if section 1114 applies to the Debtors'

termination of Salaried OPEB, then four salaried employees who are covered by the 2003 UAW-

Delphi Salaried Master Agreement ("CBA") currently in effect should also be entitled to the

protections of section 1114.  (See Docket No. 14882.)  The UAW then makes the same legal

argument as the retiree groups with respect to application of section 1114 to a debtor's

modification of a welfare benefit plan pursuant to a reserved right.  Accordingly, the objection of

the UAW should be overruled for the reasons discussed above.[19]

F.    The Debtors' Decision To Terminate Salaried OPEB Shows Reasonable Business
      Judgment

45.    The Court should grant the relief requested in the Motion because the

basis for relief articulated by the Debtors is clearly compliant with section 363(b)(1) of the

Bankruptcy Code, which requires that "there must be some articulated business justification for

using, selling, or leasing the property outside the ordinary course of business."  Institutional

Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines,

---

[19]    The UAW states that the terms of Salaried OPEB for future retirees are not considered conditions of
employment subject to the applicable collective bargaining agreement. To the extent the agreement applies,
however, paragraph 68 expressly provides that the Company may, in its sole discretion, revoke, terminate,
suspend, modify, or change any and all applicable salaried benefits.

Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) (citing In re Lionel Corp., 722 F.2d 1063, 1071 (2d

Cir. 1983)).

46.    The projected cash costs associated with these programs that would be

saved if these programs were eliminated exceeds $70 million per year.  The balance sheet

liability that would be eliminated from the Debtors' reorganization balance sheet if these

programs were eliminated exceeds $1.1 billion.  (See Miller Declaration ¶¶ 9, 19.)  The Debtors'

reasonable business judgment no longer permits them to maintain discretionary liabilities of that

magnitude that do not directly benefit the reorganized company.  The Debtors' short-term

liquidity needs require marshaling available cash as quickly as possible.  Indeed, the worsening

economic and automotive industry outlook has forced Delphi to negotiate and seek approval of

liquidity-enhancing modifications to its liquidity support agreements with GM and to the

Accommodation Agreement with its DIP Lenders just two months after those agreements were

put in place.  Beyond short-term liquidity issues, moreover, it has become clear to the Debtors

that it will not be possible to create a fundable reorganized capital structure with a discretionary

balance sheet liability in excess of $1 billion.  The objectors do not seriously challenge the

Debtors' acute need to conserve cash and restructure their balance sheet.

47.    The Delphi Strategy Board and the Board of Directors carefully

considered the decision to terminate Salaried OPEB and fully recognized the hardships that

terminating Salaried OPEB will impose on the former beneficiaries of these programs.  Although

the Debtors fully supported continuation of these programs when Delphi's go-forward business

plan provided a reasonable basis for doing so,[20] they can no longer justify doing so in the current economic climate.

48.    One objector, the Delphi Salaried Retirees Association, asserts that terminating Salaried OPEB now could further prejudice retirees under age 65 if the Debtors later terminate their pension plans, because those retirees would have lost possible eligibility for the Health Care Coverage Tax Credit (the "HCTC") which pays 65% of the health care premiums for "qualifying coverage" for eligible retirees aged 55-65 whose pensions have been taken over by the PBGC.  (Docket No. 14819, at p. 13 (citing 26 U.S.C. §§ 35(a), 35(c)(1)(C)).)  Because Eligible Salaried Retirees are not currently receiving payments from the PBGC, however, they are not "eligible individuals" for the purposes of receiving the HCTC.  See  6 U.S.C. § 35(c)(a)(C).  Although it is unfortunate that, absent a change to the tax laws, Eligible Salaried Retirees will not qualify for this particular credit, that does not affect the Debtors' business judgment to terminate the Salaried OPEB plans at this time.

G.    Notice Of The Motion Complied With The Case Management Order

49.    Various objectors assert (i) that notice of the Motion was insufficient and (ii) that the time between the receipt of the Motion and the February 17, 2009 objection deadline (the "Objection Deadline") was too short and therefore deprived parties of the right to be heard. These objections are without merit.  The Motion was served in accordance with this Court's Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Case

---

[20]    The Debtors considered the total global value of Delphi when determining to terminate Salaried OPEB. Calculations of total enterprise value are based on a valuation of "Reorganized Delphi" and include the value of global non-Debtor subsidiaries.  (See Disclosure Statement Ex. D.)

Management Order"), and the Thirteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And

105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates

And Certain Notice, Case Management, And Administrative Procedures, entered December 4,

2008 (Docket No. 14534).

        50.     In accordance with paragraph 10 of the Case Management Order, the

Motion was filed twenty days prior to the February 24, 2009 Omnibus Hearing Date and was

served in accordance with the Notice Procedures set forth in the Case Management Order. <u>See</u>

Affidavit of Service of Darlene Calderon re: Motion for Order Under 11 U.S.C. §§ 105,

363(b)(1), and 1108 Confirming Debtors' Authority to Terminate Employer-Paid-Post-

Retirement Health Care Benefits and Employer-Paid Post-Retirement Life Insurance Benefits for

Certain (A) Salaried Employees and (B) Retirees and Their Surviving Spouses ("Salaried OPEB

Termination Motion") (Docket No. 14705) (the "Affidavit of Service").  As set forth in the

Affidavit of Service, a complete copy of the Motion and the Notice of Motion were served via

overnight mail upon each Eligible Salaried Retiree in full compliance with paragraph 17(d) of

the Case Management Order.  (Affidavit of Service <u>Exhibit A</u>.)  Likewise, the Objection

Deadline was properly set for the seventh calendar day before the applicable Omnibus Hearing

Date.  (<u>See</u> Case Management Order ¶ 13.)  Accordingly, objections regarding the noticing of the

Motion and the calculation of the Objection Deadline are without merit and must be denied.

        51.     The Higgins Group also complains that the letter sent by the Debtors on

February 5, 2009, allegedly was "purposefully presented to the Affected Retirees as a 'done

deal'" and "does [not] mention in any way that the Court must rule on Delphi's actions before any

retiree benefits can be eliminated."  (Docket No. 14886 ¶¶ 5-6.)  If the Higgins Group means to

suggest that Delphi gave inadequate notice to retirees, or led them to believe that filing an

objection would be futile, that contention is false.  First, the letter expressly states that "[o]n

February 4, 2009, Delphi filed a motion with the U.S. Bankruptcy court concerning these

changes. . . .  You will receive a copy of the motion in the mail at your home address.  A copy of

the motion can also be found on www.delphidocket.com.  Any responses to the motion will need

to be filed with the Bankruptcy Court no later than February 17, 2009."  Second, as discussed

above, a complete copy of the Motion and the Notice of Motion were served via overnight mail

upon each Eligible Salaried Retiree.  The more than 1,500 objections the Court has received

belie any suggestion of inadequate notice.

H.    The Court Should Deny Motions For Appointment Of An
      Official Committee Of Retired Employees In Any Event

52.    Although many of the objectors state that Delphi should not be allowed to

terminate Salaried OPEB unless a retiree committee is formed pursuant to section 1114, the

Higgins Group and the Delphi Salaried Retirees Association separately filed affirmative motions

for appointment of a retiree committee.  In addition, a pro se objector, William R. Stevens, filed

a motion for appointment of counsel which the Debtors also construe as a motion for

appointment of a retiree committee.  Because Section 1114 of the Bankruptcy Code is

inapplicable, as discussed above, the Court should not appoint a retiree committee.

53.    Even if the Court should find section 1114 applicable, however, the Court

nonetheless should not appoint a retiree committee because the motions are premature.  First, the

Debtors clearly have not sought relief under section 1114.  Because they believe section 1114 to

be inapplicable, the Debtors have – as the objectors point out – made no effort to comply with

the procedures or standards set forth in section 1114.  If the Court were to find section 1114

applicable, therefore, the correct action would be to deny the Debtors' motion.  The Debtors

would then have to reevaluate whether and when to proceed with a motion under section 1114.

26

There would be no benefit to the estates from paying fees to another statutory committee in the meantime.

54.    Second, none of the motions seeking the appointment of a retiree committee complies with the Case Management Order because each was filed with less than the required 20 days' notice.[21]  Nor can the relief requested in the motions to appoint a retiree committee be seen as ancillary to the relief sought by the Debtors because the Debtors are not moving under section 1114 of the Bankruptcy Code.  Therefore, the Court should deny or adjourn the motions to appoint a retiree committee even if the court determines that section 1114 of the Bankruptcy Code is applicable.

---

[21]    The Higgins Group filed a Motion To Shorten Notice (Docket No. 14885.)

27

WHEREFORE, for the reasons set forth above and in the Motion, the Debtors

respectfully request that the Court enter an order (a) confirming the Debtors' authority (or,

alternatively, authorizing, but not directing, the Debtors) to terminate Salaried OPEB as set forth

in the Motion, (b) denying or adjourning the motions to appoint an official committee of retired

employees, and (c) granting the Debtors such other further relief as is just.

Dated:      New York, New York
            February 23, 2009

                              SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP
                              By:    /s/ John Wm. Butler, Jr.
                                     John Wm. Butler, Jr.
                                     Ron E. Meisler
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                        - and –

                              By:    /s/ Kayalyn A. Marafioti
                                     Kayalyn A. Marafioti
                                     Thomas J. Matz
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                 Debtors and Debtors-in-Possession