Daniel D. Doyle  (DD 2500)
Nicholas A. Franke  (NF 6764)
David M. Brown    (DB 2065)
SPENCER FANE BRITT & BROWNE, LLP
1 North Brentwood Boulevard, Tenth Floor
St. Louis, MO 63105
(314) 863-7733 – telephone
(314) 862-4656 – facsimile

J. Brian McTigue (JT 2422)
Bryan T. Veis (*pro hac* pending)
McTIGUE & PORTER LLP
4530 Wisconsin Ave. N.W., Suite 300
Washington, DC 20016
(202) 364-6900 - telephone
(202) 364-9960 - fax



COUNSEL FOR ROBERT T. NICHOLSON, VINCENT WILSON, MICHAEL BEARD,
RUSSELL DETWILER, FLOYD JONES, JOHN M. MCGRATH, JAMES J. BRODI JR.,
EDWIN B. HUBBARD, PAULETTE J. KILDOW, RAYMOND KRAEMER, ROBERT TODD
NICHOLSON, GARY PORTER, JOHN R. SMITH, CARL VISCONTI, ROBERT WELLENS,
and JUDE KOWALEWSKI, as retirees not covered by the Debtors' collective bargaining
agreements.

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | CASE No. 05-44481 (RDD) |
| | ) | Jointly Administered |
| DELPHI CORPORATION, et al., | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |

385400.2

**OBJECTION AND MEMORANDUM OF LAW (A) IN SUPPORT OF RENEWED
MOTION FOR APPOINTMENT OF A COMMITTEE OF RETIRED EMPLOYEES
PURSUANT TO 11 U.S.C. § 1114(D); AND (B) IN SUPPORT OF OBJECTIONS TO
MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363(b)(1), AND 1108 CONFIRMING
DEBTORS' AUTHORITY TO TERMINATE EMPLOYER-PAID POST-RETIREMENT
HEALTH CARE BENEFITS AND EMPLOYER-PAID POST-RETIREMENT LIFE
INSURANCE BENEFITS FOR CERTAIN (A) SALARIED EMPLOYEES AND (B)
THEIR SURVIVING SPOUSES (THE "SALARIED OPEB TERMINATION MOTION")**

Robert T. Nicholson, Vincent Wilson, Michael Beard, Russell Detwiler, Floyd Jones, John

M. McGrath, James J. Brodi Jr., Edwin B. Hubbard, Paulette J. Kildow, Raymond Kraemer, Robert

Todd Nicholson, Gary Porter, John R. Smith, Carl Visconti, Robert Wellens, and Jude Kowalewski

("Objectors"), non-hourly retirees of Delphi Corporation or one of its subsidiaries or affiliates that

have filed for relief in these Chapter 11 proceedings (collectively, "Delphi" or the "Debtors"),

through their attorneys, Spencer Fane Britt & Browne LLP and McTigue & Porter LLP, submit this

Memorandum of Law in support of (A) their Renewed Motion for Appointment of an Official

Committee of Retired Employees Pursuant to 11 U.S.C. § 1114(d) (the "Committee Motion"); and

(B) in support of their Objections to the Salaried OPEB Termination Motion (the "Termination

Motion").

Objectors Beard, Detwiler, Jones, and McGrath previously moved this Court for the

appointment of an Official Committee of Retirees on November 4, 2005.[1]  Objectors Beard,

Detwiler, Jones, and McGrath withdrew their Motion on November 29, 2005 in reliance on the

statement of the Debtors that "[i]f and when the Debtors seek Bankruptcy Court approval to

eliminate or modify the retiree medical and life insurance benefits of their non-union retired

---

[1] *See* Motion for Appointment of Official Committee of Retirees Pursuant to 11 U.S.C. § 1114(d) Consisting of
Persons Receiving Retiree Benefits Not Covered by a Collective Bargaining Agreement.  Docket Entry 874 .

employees, the Debtors will provide Movants notice of those proceedings."[2] Objectors Beard,

Detwiler, Jones, and McGrath, joined by new Objectors James J. Brodi Jr., Edwin B. Hubbard,

Paulette J. Kildow, Raymond Kraemer, Robert Todd Nicholson, Gary Porter, John R. Smith, Carl

Visconti, and Robert Wellens, now renew the prior motion and seek the appointment of an Official

Committee of Retirees pursuant to 11 U.S.C. § 1114(d).

This Memorandum is submitted in support of both the Committee Motion and the Objections

to the Termination Motion.

## INTRODUCTION

The Debtors filed the Termination Motion seeking to "confirm their authority to terminate

their applicable employee benefit plans and program as soon as practicable after March 31, 2009."

Termination Motion at 2. The Motion seeks a comfort order from this Court to approve the Debtors'

already-announced termination (as of April 1, 2009)[3] of all post-retirement benefits now provided to

its former employees – without the retirees having the benefit of the retirees committee required

under 11 U.S.C. § 1114(d). The Debtors' notice is premature and unauthorized and is a blatant

violation of the Section 1114 procedures mandated to protect retiree benefits.

Delphi asserts that it has a unilateral pre-petition right to modify non-union retiree benefits as

a matter of contract – although an investigation into the basis for that assertion would be far too

expensive for any one retiree or group of fixed-income retirees to afford. The Debtors argue that

eliminating retiree benefits would save $70 million per year and help Debtors to finance their

---

[2] Notice of Withdrawal of Motion for Appointment of Official Committee of Retirees Pursuant to 11 U.S.C. §
1114(d) Consisting of Persons Receiving Retiree Benefits Not Covered by a Collective Bargaining Agreement. Docket
Entry 1295 (incorporating by reference the statements set forth in Objectors' Notice of Withdrawal of Motion to Vacate
or Amend Order (I) Appointing Unions as Authorized Representatives for Union-Represented Retirees under 11 U.S.C.
§§ 1114(c ) or 1114(d) or, in the Alternative, (II) Establishing Procedures for Solicitation, Nomination, and Appointment
of Committee of Retired Employees (The Retiree Committee Order). Docket Entry 1294.

[3] *See* Exhibit 1 (Letter of February 5, 2009, addressed to Delphi Health and Life Program Participants).

3

consummation of its modified Chapter 11 plan. Delphi's attempt to secure the Court's after-the-fact

approval for the cut-back or elimination of benefits for an estimated unrepresented 15,000 retirees

violates the procedural requirements of Section 1114, which mandates the appointment of a retirees

committee to first investigate the proposal in conjunction with Debtors' financial disclosures, and

negotiate appropriate benefit modifications with the Debtor.  Only after that, and barring a

negotiated settlement, is the Court to entertain a benefits modification motion, and may only approve

a benefit reduction or elimination if fair and equitable to all affected parties and if necessary to

permit an effective reorganization.  11 U.S.C. 1114(f), (g).

Despite Delphi's allegations, a substantial effort is required to determine whether retiree

benefits may have vested under ERISA in accordance with older plans for long-retired employees,

for example.  Such investigation would clearly be beyond the means of any individual retiree, whose

retirement income probably has dwindled with the receding stock market.  Adding to the cost and

complexity of verifying Delphi's broad assertion of a reservation of rights is that retirees may have

rights under a variety of documents stemming from employment with divested business units and

business units that operate as wholly owned subsidiary corporations.  Termination Motion at 3 n.2.

Accordingly, the Court should appoint an Official Committee of Retired Employees pursuant to 11

U.S.C. § 1114(d) to represent the interests of unrepresented employees and order Debtors'

compliance with Section 1114, prior to deciding the Termination Motion.

The Termination Motion asserts that Section 1114 applies only if the affected benefit plans

do not contain reservations of the employer's rights to terminate or modify the plans at will.  Delphi

argues that it has broad pre-petition reservations of rights as to each of the benefit plans affecting the

15,000 retirees who would be affected by cutback or termination of benefits.  In making the

argument and alleging these facts, Delphi seeks to avoid the essential function of Section 1114, the

4

preservation of the rights retirees, collectively through a statutory committee, to investigate and challenge the legal and factual allegations behind Delphi's proposed actions.

The Termination Motion simply presumes that Delphi is not bound by Section 1114. Consequently, the Motion fails to address any of the considerations required by that Code section. Delphi fails to address (1) why the elimination of these retiree benefits would be necessary to permit the Debtors' reorganization; (2) whether the modifications treat all affected parties fairly and equitably; or (3) whether the balance of equities favors Section 1114 relief, and other factors to be considered before retiree benefits may be modified under Section 1114. *See* 11 U.S.C. § 1114(g)(3). Delphi's Motion is an attempt to supplant Section 1114 procedures with the business judgment rule, a rule which may have been the standard before, but not after, Congress' passage of Section 1114.

This Court should deny the Termination Motion because, as a matter of law, Chapter 11 debtors must comply with Section 1114 if they seek to modify or eliminate unrepresented retirees benefits, regardless of whether a debtor has a pre-petition reservation of rights. Otherwise, debtors could avoid retiree committee investigation altogether, including an investigation of the threshold issue of whether such a reservation of rights actually exists and is legally enforceable.

## ARGUMENT

### I.    THE PLAIN MEANING OF SECTION 1114 REQUIRES DEBTORS' COMPLIANCE WITH SECTION 1114 AND THE APPOINTMENT OF A COMMITTEE OF RETIREES.

The Debtors contend that plan changes allegedly permitted under pre-petition benefit plans do not require prior approval under Section 1114. There is nothing in the language, structure or purpose of the statute, however, that supports, or even suggests, that employers with pre-petition reservations of rights are exempted from Section 1114 compliance.

5

A plain reading of Section 1114 requires that all Chapter 11 debtors, including Delphi, follow

its procedures for the modification or elimination of retiree welfare benefits.    The pertinent

provision of the statute provides:

> (e)(1) Notwithstanding any other provision of this title, *the debtor in possession ...*
> (hereinafter in this section "trustee" shall include a debtor in possession)*, shall timely pay
> and shall not modify **any** retiree benefits,* except that –

> (A) the court, on motion of the trustee or authorized representative, and after notice
> and a hearing, may order modification of such payments, pursuant to the provisions of
> subsections (g) and (h) of this section; or

> (B) the trustee and the authorized representative of the recipients of those benefits
> may agree to modification of such payments, after which such benefits as modified shall
> continue to be paid by the trustee.

11 U.S.C. § 1114(e)(1) (emphasis added).

On its face, Section 1114 does not excuse any Chapter 11 debtor from compliance with its

mandatory terms or exempt any "retiree benefits" (as defined in 11 U.S.C. § 1114(a)) from its

coverage.    The statute unambiguously requires Chapter 11 debtors to negotiate in good faith to an

agreement with the retirees' "authorized representative"[4] if the debtors seek to reduce or eliminate

benefit payments to or on behalf of retirees.    Only if the debtor and the authorized representative are

unable to agree may the debtor seek an order under Section 1114(g).

A.    *Section 1114 is Unambiguous in Meaning and Intent.*

Section 1114, through the words enacted by Congress, expressly restrains a Chapter 11

debtor from unilaterally modifying retirement benefits.    Nothing within Section 1114 suggests a

debtor may, on its own initiative, modify or terminate retiree benefits outside the 1114 process and

eventual scrutiny of the Bankruptcy Court.    Indeed, Section 1114 "makes it clear that when a

Chapter 11 petition is filed, retiree benefit payments must be continued without change until and

---

[4] "Authorized Representative" is defined as the collective bargaining agent for represented employees; or, in the
case of unrepresented employees, an official committee of retirees, see 11 U.S.C. § 1114(b).

6

unless a modification is agreed to by the parties or ordered by the court. *Section 1114(e)(1) rejects any other basis for trustees to cease or modify retiree benefit payments.*" S. Rep. No. 100-119 at 5 (1988). (Emphasis added.)

"[T]he language of the statute makes it quite clear that – absent the occurrence of two statutory preconditions – the debtor in possession is required to continue the payment of retirement benefits at prepetition levels. ... The statute contains no other basis for debtors to modify or cease the payment of retiree benefits."[5] When a statute's language is plain, the court's function is to enforce the law according to its terms, unless the result required by the text is absurd.[6] Accordingly, the Court should require the Debtors to comply with the requirements of Section 1114.

The procedures mandated by Section 1114 prevent Chapter 11 debtors from implementing unfair and unilateral reductions or eliminations of retiree benefit payments after the bankruptcy petition is filed. The temptation for a debtor to do precisely that would otherwise be nearly irresistible in many Chapter 11 cases: retiree benefit cuts implemented shortly after the bankruptcy petition date would be seen as a quick method to reduce operating expenses and long-term debt, provide future cash for a conceptual business reorganization, mollify unsecured and secured creditors, and free up cash to pay other creditors. All of this would be virtually unstoppable, absent Section 1114. Retirees cannot go on strike against the debtor, can no longer leave the debtor's employ, and cannot directly affect the debtor's ongoing business reorganization. In addition, a significant number of unrepresented retirees and their dependents likely are incapacitated, disabled, or too financially constrained to object. Absent Section 1114, the debtor could easily take advantage

---

[5] *In re SPECO Corp.*, 195 B.R. 674, 678 (Bankr. S.D. Ohio 1996) (nothing in § 1114 anticipates that retirees should give up benefits while the debtor decides whether to reorganize or liquidate its assets); *see* 11 U.S.C. § 1114(i) (post-bankruptcy retiree benefits cannot be set off or subject to deduction); *id.* § 1114(j) (unpaid post-bankruptcy retiree benefits are administrative claims not capped by section 502(b)(7)).

[6] *Till v. SCS Credit Corp.*, 541 U.S. 465, 486 (2004) (quoting *Lamie v. United States Trustee*, 540 U.S. 526 (2004)).

7

of retirees, denying payments promised during employment, but paid in retirement, and paying it instead to other favored creditors or to secure more favorable exit loan facilities. This would be true even if an official retiree committee, if appointed, could show that reduction or elimination was either not needed for the debtor's reorganization, or was unfair and unjust in light of the equities.[7]

The legislators who drafted and sponsored 11 U.S.C. § 1114 intended to protect retirees by preventing unilateral changes of retiree benefits after the filing of a Chapter 11 bankruptcy. The legislators recognized a strong federal interest in protecting retirees.[8] The 2005 revisions to Bankruptcy Code reinforce that modifications that would be permitted outside of bankruptcy must nonetheless be made, if at all, through the Section 1114 procedures. Those revisions leave no doubt that Congress intended to suspend the ability of employers to modify retiree benefits during Chapter 11 cases absent compliance with Section 1114.

The Bankruptcy Abuse Prevention Act and Consumer Protection Act added Section 1114(*l*), which authorizes bankruptcy courts to reverse any pre-petition modification of retiree benefits within 180 days of the bankruptcy filing. 11 U.S.C. § 1114(*l*). Congress thus intended to allow bankruptcy courts to reinstate retiree benefits notwithstanding the debtor's pre-petition rights to unilaterally eliminate retiree benefits. Congressional intent is repeated in BAPCPA's legislative history:

---

[7] In contrast, Section 1114 provides for subsequent benefit restorations if reductions made earlier in the case later seem too severe. 11 U.S.C. § 1114(g)(3).

[8] *See, e.g.*, 134 Cong. Rec. H3486-02 (statement of Rep. Fish, Member, House Comm. on the Judiciary) ("These retiree benefits…should receive special Bankruptcy Code protection because a just society has an interest in trying to effectuate the legitimate expectations of former workers – and vulnerable retirees may suffer enormously from benefit terminations."); *H.R. 2969, Retiree Benefits Protection Act of 1987: Hearing Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary*, 100th Cong. 27 (1987) (statement of Rep. Stokes) ("We as a society, have a moral obligation to care for and protect our elderly – those who built this nation;…"); *S. 548, A Bill to Amend Title 11, United States Code, the Bankruptcy Code, Regarding Benefits of Certain Retired Employees: Hearing Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. on the Judiciary*, 100th Cong. 15 (1987) (statement of Sen. Metzenbaum, Member, Senate Comm. on the Judiciary) ("[Retirees] deserve the protection S. 548 affords them. If we are a caring nation, if we believe that our laws should reflect a sense of justice and compassion, then we can do no less.").

8

> *Current bankruptcy law prevents a chapter 11 debtor from unilaterally modifying
> certain retiree benefits, such as health insurance, during the pendency of the bankruptcy
> case* unless an authorized retiree representative is appointed and agrees to the modification,
> or the court authorizes the modification. Section 1403 [of the 2005 Act] amends Bankruptcy
> Code section 1114 to prevent debtors from evading these requirements by terminating retiree
> benefit plans on the eve of bankruptcy.

H. Rep. No. 109-31, Pt. 1 (109th Cong. 1st Sess. 154 2005) (emphasis added).

Furthermore, courts have specifically rejected the Debtors' argument that the requirements of

§1114 do not apply if a debtor has a right to unilaterally terminate benefits; they have noted that such

an argument is unsupported by the statutory text as well as the legislative history. *See, e.g., Ames

Dept. Stores, Inc. v. Employees' Comm. of Ames Dept. Stores, Inc. (In re Ames Dept. Stores, Inc.)*,

1992 WL 373492 at*1 (S.D.N.Y. 1992) , *rev'd in part on other grounds*, 76 F.3d 66 (2d Cir.

1996)(debtor must comply with §1114 despite the fact that "the Plan contains unambiguous language

reserving the right to unilaterally terminate the Retired Employees' insurance benefits " prohibiting

the debtor from post-bankruptcy exercise of contractual right to modify retiree benefits without

compliance with §1114); *In re Farmland Indus., Inc.*, 294 B.R. 903 (Bankr. W.D. Mo. 2003)

(extensively reviewing legislative history and agreeing that plain language of §1114 prohibits

debtor's actions to modify retiree benefits regardless of any reserved right to terminate benefits).

Delphi relies heavily upon *In Re Doskocil Cos.*, 130 B.R. 870 (Bankr. D. Kan. 1991) (no

congressional intent in section 1114 to create new rights not contained in retiree benefit plan) to

support its argument that it is purported right to unilaterally terminate benefits relieves it from the

requirements of §1114. *See* Termination Motion at 25, ¶ 47. This decision should carry little

weight. Not only because it is an old decision from another circuit, but also because it was

effectively legislatively overruled by the 2005 BAPCPA. **Notably, the Termination Motion cites**

no authority subsequent to the enactment of BAPCPA construing § 1114 and its application to

non-collectively bargained benefits.[9]

At least one Bankruptcy Court in the Southern District of New York has found that alleged

rights to unilaterally modify retiree benefit payments can be exercised only in compliance with

Section 1114.[10] On a motion brought by Spencer Fane Britt & Browne LLP on behalf of the Official

Committee of Retirees appointed in the recent Solutia Inc. bankruptcy case, Judge Beatty ruled the

debtor must comply with Section 1114 procedures notwithstanding Solutia's alleged pre-petition

plan right to unilaterally eliminate or amend its retiree benefit plans. The Court ruled that "changes

to retiree benefit plans pursuant to the terms of an existing plan that are permitted by the terms of

such existing plan nonetheless require court approval of such changes under Bankruptcy Code

section 1114." *Solutia* Order at 2.

The *Solutia* case ultimately resulted in an effective reorganization, with future retiree benefit

payments funded by a Voluntary Employees' Beneficiary Association ("VEBA") trust qualified

under section 115 of the Internal Revenue Code, ensuring those retirees who were uninsurable due to

serious illness or disability continued to have access to health care and life insurance benefits for the

rest of their lives. The funding of the VEBA trust, consisting of $175 million and more than a

million shares in reorganized Solutia, was negotiated by Spencer Fane Britt & Browne, the debtor,

and other stakeholders as foreseen by the drafter of Section 1114. The Court should compel Delphi

to follow the same path as Solutia with regard to its efforts to alter retiree benefits.

---

[9] Delphi's citation to *In re Wellman, Inc.*, No. 08-10595, slip op. at 6 (Bankr. S.D.N.Y. Jan. 23, 2009) is not to
the contrary. The objectors in *Wellman* apparently did not raise, and the Court did not consider, the applicability of 11
U.S.C. § 1114 in determining whether to allow the debtor to terminate a severance plan. The citation to this Court's
comments in the hearing of August 16, 2007, is inapposite since the hearing concerned the resolution of matters relating
to collectively bargained retiree benefits, not unrepresented retirees' benefits. *See* Hr'g Tr. at 11-12 (Aug. 16, 2007).

[10] *See* Order Granting Motions of Official Committee of Retirees to Shorten Time for Hearing and to Compel
Debtors to Comply with 11 U.S.C. § 1114, ("Solutia Order") entered Oct. 26, 2004, in *In re Solutia Inc.*, Case No. 03-
17948 (PCB), attached as Exhibit 2.

10

Similarly, commentators have argued that compliance with Section 1114 should be a broad prerequisite to any modifications:

> [T]he focus of section 1114 is on the procedure under which decisions about the ultimate distribution of a debtor's limited assets will be made. Recognizing that the Chapter 11 debtor is not in a position to take a long-range impartial view and faces pressures to make decisions from creditors who possess bargaining power that retirees do not have, Congress imposed a framework to allow a more impartial decision about what to do with retiree benefits.

Susan J. Stabile, *Protecting Retiree Medical Benefits in Bankruptcy: The Scope of Section 1114 of the Bankruptcy Code*, 14 CARDOZO L. REV. 1911, 1956 (1993).

In short, there is no support in the statutory language, legislative history, or bankruptcy policy for the Debtors' position. The Termination Motion should be denied.

**B.      *Section 1114 Requires the Appointment of and Negotiations with a Committee of Retirees.***

Delphi seeks the Court's blessing to end-run the procedures in Section 1114, which are designed to protect life insurance, disability, health, medical, and prescription drug benefits for some 15,000 retirees, spouses, and dependents. Delphi seeks to avoid even having a committee appointed to investigate the *bona fides* of Delphi's assertion it has a reservation of rights as to all retirees. Absent section 1114 compliance, Delphi could unfairly reduce retiree benefits to unjustly increase payments to another creditor or entity in this bankruptcy case, while retirees are unable to determine whether the benefit reduction is necessary, fair, and equitable or to negotiate and advocate a more just solution – the very situation that Congress sought to avoid by enacting Section 1114.

Section 1114(d) states in pertinent part:

> The Court, upon motion by any party in interest, and after notice and hearing, shall order the appointment of a committee of retired employees if the debtor seeks to modify or not pay the retiree benefits ... to serve as the authorized representative, under this section, of those persons receiving any retiree benefits not covered by a collective bargaining agreement. The United States Trustee shall appoint any such committee.

11

11 U.S.C. § 1114(d). Section 1114(e), 11 U.S.C. § 1114(e), prohibits the Debtor from modifying

any retiree benefits without the consent of the Court, after notice and hearing, or the agreement of

the authorized representative of the recipients of such retiree benefits.

Section 1114(f)(1) *requires* the Debtor to make a proposal to the authorized representative of

the retirees, *i.e.*, a committee of retirees, prior to filing an application seeking to modify any retiree

benefits and to provide the authorized representative "with such relevant information as is necessary

to evaluate the proposal."[11]  11 U.S.C. § 1114(f)(1). The Debtors' proposal is to provide for

modifications "that are necessary to permit the reorganization of the debtor and assures [*sic*] that all

creditors, the debtor, and all of the affected parties are treated fairly and equitably. *Id.* §

1114(f)(1)(A). Further, section 1114(f)(2) *requires* the Debtor to meet with the authorized

representative "to confer in good faith in attempting to reach mutually satisfactory modifications of

such retirement benefits." 11 U.S.C. § 1114(f)(2).

Section 1114 prescribes the process by which, if the Debtors and the authorized

representative are unable to agree to a modification, the Court may then, and only then, enter an

order providing for the modification in the payment of retiree benefits. 11 U.S.C. § 1114(g). In

entering such an order, however, the Court must find that the proposed modification is "necessary to

permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the

affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities."

11 U.S.C. § 1114(g)(3). The Debtors' motion ignores and supplants this required statutory process.

Here, the Delphi has failed to make any gesture toward compliance with the requirements of

Section 1114. Delphi has provided no information to any retiree who would be affected by the

---

[11] Such relevant information would include, but not be limited to, the master separation agreement and all other
documents relevant to the spinoff of Delphi from General Motors Corp.

proposed modification (or termination) or to any representative of such retirees, except for a premature and unauthorized notice that such benefits will cease effective April 1, 2009. *See* Exhibit 1 (Letter of February 5, 2009, addressed to Delphi Health and Life Program Participants). Delphi has provided to the Court in its Motion summary assertions as to the savings to the Debtor from any proposed modification, but has omitted any discussion of whether the proposed modification would be fair and equitable to all of the affected parties. Delphi has also failed to show that the proposed termination is "clearly favored by the balance of the equities."[12] *See* 11 U.S.C. § 1114(g)(3). The Motion must be denied and the matter should be resolved through the appointment of, and consultation with, a committee of retirees appointed pursuant to 11 U.S.C. § 1114(d).

By evading the Section 1114 process and acting unilaterally to modify retiree benefits, the Debtors would deny the retirees of the benefit of an impartial, reasoned, and supported decision as to whether the benefit modifications are necessary for an effective reorganization and would be fair and equitable to all affected parties. The Debtors must show the retirees committee and the Court the actual necessity for proposed benefit cuts in the context of an anticipated reorganization of its business – not merely that the debtor wants to, and might, save money quickly. Any other interpretation would make the entire statute meaningless and render its attempt at a modicum of fairness a nullity.

**C.     *Debtors' Motion Must Be Denied Because It Has Not Been Established That The Plans Are Unilaterally Terminable.***

_____

[12] Juxtaposition of the proposed termination of retiree benefits to non-union retirees in the present Motion with the funding of collectively bargained retiree benefits in connection with the negotiated settlement approved on August 16, 2007, serves to accentuate the serious questions the Objectors have concerning the equities of the Debtors' proposal. Retirees represented by various labor unions succeeded in obtaining funding in the amount of approximately $126 million for such retirees. The objectors and others similarly situated would receive nothing under the Debtor's proposal.

As discussed above, Section 1114 is not limited to solely non-terminable, vested retiree benefits, as Debtors' Motion assumes. Nevertheless, even if Debtors' assumption regarding section 1114 were correct, their Motion should nevertheless be denied because Debtors have not established that they possess the unilateral right to terminate the Plans pursuant to which retiree benefits are paid.[13]

In their Motion, Debtors make unsubstantiated, global assertions that the *current* versions of the several of Plans contain an express reservation of Debtors' right to terminate the Plans. Motion, ¶¶ 1, 44 & 45. Debtors also make unsubstantiated, global assertions that "… Debtors have *always* retained the authority to modify or terminate these discretionary programs …." *Id.* at ¶¶ 2, 34 (emphasis supplied). Debtors' have failed, however, to attach to their motion even a single Plan document substantiating their assertions.

Welfare benefits plans are considered unilateral contracts and the benefits thereunder can vest, under the terms of the plan, if the employer fails to clearly and unambiguously reserve its rights to amend or terminate the benefits at or before the time the employee has accepted the offer by commencing employment.[14] Moreover, once an employee's rights have vested, an employer's subsequent unilateral modification or termination *cannot defeat the employees vested rights.*[15] Accordingly, the determination of the vested or terminable nature of a welfare benefit is specific to the Plan version in effect at the time a participant commenced employment. Thus, *each* version of each Plan must be reviewed to determine if the Plan's themselves vested the benefits.

---

[13] Indeed, in the chart set forth on page 22 of their Motion, Debtors assert that insurance benefits are subsidized for life, which directly conflicts with their argument that all Plans are terminable.

[14] *Fiefer v. Prudential Ins. Co. of Am.,* 306 F.3d 1202, 1211 (2d Cir. 2002).

[15] *Id.* (emphasis added); *see also Am. Fed. of Grain Millers v. Int'l Multifoods Corp.,* 116 F.3d 976, 980 (2d Cir. 1997) ("if an employer promises vested benefits that promise will be enforced.").

14

Even if Debtors' assertions with respect to all the versions of the Plan documents turn out to be correct, that fact would not establish that the Plans are unilaterally terminable by the Debtors. The critical determination as to the vested or terminable nature of a welfare benefits is dependent upon whether the reservation of the right to amend or terminate the Plans was *clearly and consistently communicated* to the Plans' participants and beneficiaries.[16]    Thus, as with the core Plan documents, each version of each SPD for each Plan must be reviewed to determine if any version of the SPDs can be reasonably construed as promising vested benefits.

Finally, "[i]n this Circuit, to reach a trier of fact, an employee does not have to 'point to unambiguous language to support a claim. It is enough to point to written language capable of reasonably being interpreted as creating a promise on the part of the employer to vest the recipient's . . . benefits.'"[17]  Moreover, under the doctrine of *contra proferentem* any ambiguous term will be construed against the employer and participants and beneficiaries can introduce extrinsic evidence that supports a finding of vested benefits.[18]

In light of the above, Debtors' assertions in their Motion fail to establish that the Plans are, as the Debtors assert, unilaterally terminable by Debtors. As such, Debtors' Motion must be denied – even under Debtors' misguided interpretation of section 1114 of the Code. Moreover, Debtors sole practical rationale for not appointing a retiree committee is that it would result in an "administrative expense to the Debtors estates and ... **could** delay the Debtors' efforts to preserve liquidity and to

---

[16] *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 84 (2d Cir. 2001) (holding that employees vested in their benefit when an early version of SPD omitted a reservation of rights clause and contained language that could be construed as vesting benefits, even where later version of SPD contained a clear reservation of rights clause (citing *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 135 (2d Cir.1999)).

[17] *Devlin*, 274 F.3d at 82.

[18] *See, e.g., Gibbs v. CIGNA Life Ins. Co.*, 440 F.3d 571, 576-77 (2d Cir. 2006) (holding that an ambiguous term is to be construed against drafter); and *Devlin*, 274 F.3d at n. 7 (noting that exit letters provided to retirees were introduced to resolve an ambiguity and supported a holding that the benefits had vested). In addition, some or all Delphi retirees and their spouses may have vested in the Plan benefits under the theory of promissory estoppel.

15

reorganize." Motion ¶ 49. As noted above, engaging in a comprehensive disclosure and review of all the relevant documents in order to make a determination as to whether the Plans' benefits are vested or terminable is a significant endeavor. An endeavor of this magnitude would be overwhelming for any single individual, and significantly more burdensome for an individual retiree – who will most likely live on a fixed income with dwindling financial resources. When measured in this manner, Debtors referencing the administrative expense as a reason not to appoint a committee appears ridiculous.[19] Accordingly, the Court should deny Debtors' Motion and grant the retirees renewed motion to appoint a special committee of retirees.

### D. Debtors' Business Judgment Is Manifestly Unreasonable.

Debtors assert that their decision to amend or terminate the Plans (as applicable) is based on "sound business judgment" (Motion ¶ 44) and admit that they cannot amend or terminate the Plans if their judgment is "manifestly unreasonable, [because it is] ... based upon ... bad faith or whim or caprice." *Id.* at ¶ 52. Debtors dedicate a substantial portion of their Motion describing effect of the economic downturn in the economy.[20] Motion pp. 4-9. Nevertheless, Debtors fail to address whether they have attempted to obtain bailout funds from the federal government – or even explored that possibility – as an alternative to forcing the retirees to shoulder the financial burden of the Debtors' reorganization.

---

[19] Indeed, the Debtors appear to have delivered notices in the form of Exhibit 1 by Federal Express to all 15,000 affected retirees. Presumably the cost of such delivery was well in excess of $100,000.

[20] Debtors fail to recognize — or simply ignore — that the financial downturn has also had substantial negative impact on the retirees. Retirees' 401(k) plans and personal investments are declining, and each year retirees will experience greater health issues and their increasing costs. An example can be found among the spouses of those moving for the creation of the Retirees Committee. She has been diagnosed with cancer, and has had several operations including a double mastectomy and removal of lymph nodes. She expects the ongoing treatment to be very expensive, with periodic CAT scans, and a variety of prescription drugs for up to 10 years. Obviously, replacement health insurance would be very expensive, and the prospect of pre-existing condition exclusion for the cancer looms. This scenario is not atypical of this age cohort, which makes Debtors' concern about administrative expenses of the benefit plans more inconsequential.

With respect to the availability of bailout funds, it has been reported that "[t]he U.S. government will release $4 billion . . . in additional aid to General Motors Corp. on Tuesday [(today)] as planned .... To date, GM has received $9.4 billion in federal aid that has allowed it to stay in operation since the start of the year."[21] "Chrysler ... has been granted $4 billion in federal and is seeking an additional $3 billion."[22] In light of the apparent ability to obtain bailout funds, Debtors' silence on the subject calls into question the reasonableness of Debtors' business judgment. Moreover, as discussed above, Debtors have not established that the Plans at issue are unilaterally terminable. In light of these facts, Debtors' business judgment is, at best, based upon a whim, wish, or expedience, and, at worst, springs from bad faith or gross negligence.

## CONCLUSION

Based on these factual and legal arguments, this Court should deny the Termination Motion; grant the Committee Motion and order the appointment of an official committee of retirees; and require Delphi to negotiate with the committee of retirees and otherwise comply with Section 1114.

Dated: February 17, 2009.                    Respectfully submitted,

                                             **SPENCER FANE BRITT & BROWNE LLP**

                                             By  /s/ Daniel D. Doyle
                                                 Daniel D. Doyle
                                                 Nicholas Franke
                                                 David M. Brown
                                                 1 North Brentwood Boulevard, Tenth Floor
                                                 St. Louis, MO 63105
                                                 (314) 863-7733 – telephone
                                                 (314) 862-4656 – facsimile

                                                 ddoyle@spencerfane.com

---

[21] *See e.g.*, (http://uk.reuters.com/article/UKNews1/idUKTRE51G07D20090217).

[22] *Id.*

nfranke@spencerfane.com
dbrown@spencerfane.com

and

**McTIGUE & PORTER LLP**

By   /s/ J. Brian McTigue
J. Brian McTigue
Bryan T. Veis (*pro hac pending*)
McTigue & Porter LLP
4530 Wisconsin Ave. N.W., Suite 300
Washington, DC  20016
mctigue@mctiguelaw.com
(202) 364-6900 - telephone
(202) 364-9960 - fax

bmctigue@mctiguelaw.com
bveis@mctiguelaw.com

ATTORNEYS FOR OBJECTORS

18

# DELPHI

February 5, 2009

To Delphi Health and Life Program Participants:

The challenges created by a weakened global economy continue to have a dramatic impact on the automotive industry and on Delphi, with customer volumes at levels not likely to recover in the short term. We have and will continue to support our customers and manage our supply chain through this turbulent time. All of us are working on cost-reduction initiatives that have helped make a difference. However, it is essential that we take significant and immediate actions to further address the current challenges.

After consideration of factors including declining revenue and challenging market forecasts, effective April 1, 2009, Delphi will no longer provide health care and life insurance in retirement to salaried employees and retirees. In these extraordinary economic times, it is necessary for Delphi to discontinue these benefits in order to work towards further modifications to its plan of reorganization that will enable the company to emerge from Chapter 11 reorganization as soon as practicable. Delphi acknowledges these actions will impose a real hardship on former beneficiaries of these programs. However, the company's recognition of this hardship, which allowed Delphi to continue these benefits in a more robust economic environment, regretfully does not support continuing these programs in the current economic environment.

Current retirees participating in the Delphi Health Care Program for Salaried Employees and the Delphi Life & Disability Benefits Program for Salaried Employees will be affected as noted below. Specifically, effective April 1, 2009:

## Health Care Coverages

- Delphi will no longer provide Corporation contributions towards health care coverages ;

- You may continue health care coverages on a self-pay basis by paying the full cost of any coverages continued (attached is a chart showing the estimated cost of the various coverages);

- Retiree Health Reimbursement Accounts will be discontinued; and

- Delphi will no longer provide the Medicare Special Benefit.

## Life Insurance Coverages

- Retiree Basic Life Insurance coverage currently in effect will be terminated and you will be given the opportunity to convert this coverage to a personal policy without proof of your good health.

EXHIBIT

05-44481-rdd   Doc 16357-1   Filed 02/20/09   Entered 02/25/09 14:47:44   Objection
and Memorandum of Law (A) In Support of Renewed Motion for Appointmen   Pg 20 of 27

Page 2 of 3

■ Any Optional Life, Dependent Life and/or Personal Accident Insurance currently in effect
will not be cancelled as long as you continue to make the required premium payments which
remain the same.

■ Retirees affected by the termination of Basic Life Insurance will have a one-time opportunity
to increase Optional Life Insurance coverage by one level or elect coverage at the first level.
Proof of your good health will be required.

By the end of February, you will be mailed an election kit that will allow you to elect
continuation of Health Care coverages. An election must be made no later than March 27, 2009
in order to avoid any break in coverage. The ability to continue Health Care coverages on a self-
pay basis is contingent upon you making a timely election (i.e., by March 27, 2009). Elections
postmarked after March 27, 2009 will not be accepted. Additionally, if you discontinue coverage
for any reason (e.g., non-payment, late payment) Health Care coverages will not be reinstated.

Also, by the end of February, a separate election kit will be mailed with the necessary forms and
instructions regarding the special Optional Life Insurance enrollment opportunity. You will have
31 days from the date of that election kit to make an enrollment decision. Elections post marked
after this 31-day period will not be processed.

The attached Question & Answer document provides additional information concerning these
changes. Specific questions about health care and life insurance should be addressed to the
National Benefit Center by calling 1-866-335-7444 or at www.delphinbc.com.

On February 4, 2009, Delphi filed a motion with the US Bankruptcy court concerning these
changes. The impacted benefits are generally referred to as Other Post Employment Benefits
(OPEB).You will receive a copy of the motion in the mail at your home address. A copy of the
motion can also be found on www.delphidocket.com. Any responses to the motion will need to
be filed with the Bankruptcy Court no later than February 17, 2009.

The state of the global economy, market changes in response to these challenges and our
business plan to exit bankruptcy in the U.S. create a very dynamic situation with respect to
salaried employee plans and policies. We regret that these changes are necessary, please
understand that recommended changes are only implemented after careful consideration of
market conditions, affordability and the impact on employees with the intent of maintaining a
viable global business now and in the future.


Delphi Corporation

## Health Care and Life Insurance
## Questions and Answers
## February 2009


## Health Care

**Why has Delphi decided at this late stage of its Chapter 11 reorganization to discontinue Corporation-paid health coverage with less than two months notice to employees and retirees?**

Delphi continues to face serious challenges created by a weakened global economy and its effect on the automotive industry. Volumes are at levels we have never experienced as an independent company. U.S. light vehicle sales for 2009 are down roughly 22% from an already slower 2008, and down nearly 40% from volumes experienced at the beginning of this decade. At current forecasts, 2009 U.S. light vehicle sales will reach their lowest level since 1982 This reduced industry activity has a direct impact on Delphi's operations, reducing revenues in our primary automotive supply businesses. In these extraordinary economic times, it is necessary for Delphi to discontinue these benefits in order to work towards further modifications to its plan of reorganization that will enable the company to emerge from Chapter 11 reorganization as soon as practicable.

**What are my options following the cancellation of my health care coverages on April 1, 2009?**

Retirees may:
1. Elect to continue their health care coverages through Delphi by paying the full cost of coverages continued; or
2. Make arrangements for coverage independently of Delphi and pay an independent insurance carrier for the coverages you choose


**What coverages will I be able to continue through Delphi?**

You may continue all the coverages you currently have. This includes Medical (includes hospital, medical, prescription drugs, mental health/substance abuse and hearing), Dental, Vision and Extended Care Coverages (if currently enrolled). You can determine which type of the four coverages you want to elect in any combination. However, once you opt out of any of the options, you cannot elect to go back in at some future date.

**If I want to continue coverages through Delphi, what must I do and when?**

You will be mailed an election kit by the National Benefit Center (NBC) by the end of February that will provide you with the necessary information to make your elections. Your plan options and monthly rates will be included in the kit. Elections to continue coverages must be post marked no later than March 27, 2009. The NBC will not process any kits postmarked after that date and you will lose your ability to self pay for any coverages.

**If I elect to continue coverages through Delphi, how will my health care premiums be paid?**

If you currently authorize deductions for your health care from your pension check, those deductions will continue. If the amount of your pension check is less than your premium, then you must submit a payment through a monthly billing process. The National Benefits Center will mail a monthly premium statement to your address of record. The invoice will be mailed mid-month for the following month's coverages. Payment is due the last day of the month in which you receive your bill.

I currently have my health care premiums deducted from my pension check and now want to be set up for direct billing. How do I go about doing this?

Contact the National Benefit Center at 1-866-335-7444, or 1-866-DELPHI4.

I am a retiree who has currently waived health care coverages. Do I have the option to enroll for self-pay?

You have a one-time option to elect coverages as self-pay. As noted above, you will receive an election kit by the end of February with the necessary instructions to make an election.

I am a retiree who is Medicare eligible. Do I have the option to self pay for my Medical coverages?

No, the ability to continue Medical coverages under the Delphi Health Care Plans after becoming eligible for Medicare in the normal course was discontinued on January 1, 2007. You may however, continue Dental, Vision and Extended Care Coverages (if enrolled).

I am a retiree on Medicare but have a spouse and/or dependent who still has Delphi health care coverages. Can they continue to be covered?

Yes, their coverage can continue on a self pay basis as long as the spouse or dependent is not Medicare eligible.

Will there be any additional health care plans made available that might be more affordable given that retirees now must self pay?

Currently, the plans available remain the same. There has not been any decision made regarding future years' health care plans.

I am not currently retired, how do I maintain my health care coverage at the point of retirement?

The National Benefit Center will mail you an enrollment kit. The plan options and monthly rates will be included in the kit. You can elect at that time to be set up for direct billing or with monthly pension check deductions.

What happens to my Medicare Special Benefit?

If eligible, you will receive your last Medicare Special benefit in the March 2009 pension check. Delphi will no longer provide the Medicare Special Benefit after that payment is made.

What happens to my Retiree Health Reimbursement Account (RHRA)?

The RHRA will be discontinued as of April 1, 2009. WageWorks will not process or reimburse any claims that were not submitted prior to April 1, 2009. Any claims received after March 31, 2009 will be denied.

If I choose not to continue coverages through Delphi, what other coverages might be available to me?

There are various sources for health care coverages in the individual market. You may wish to consult your current insurance agent because many are able to arrange health care and life insurance coverages in addition to automobile and homeowners insurance. In most states the local Blue Cross or Blue Shield plan usually has individual policies available. Organizations of which you are a member (e.g., AARP) sometimes offer health and life coverages to their members. And, finally, many states have information available on their government websites about insurance available in their jurisdiction.

## Life Insurance

**What happens to my life insurance coverage?**

Effective April 1, 2009, your Basic Life Insurance will no longer be provided in retirement. However, contributory coverages (Optional Life, Dependent Life and Personal Accident Insurance) you have in effect at that time will continue as long as you make the required premium payments.

**What are my options following the cancellation of my Basic Life Insurance?**

Current retirees will have three choices:

1. If you are under age 75, you will be given a one-time opportunity to increase your Optional Life Insurance by one level or to elect Optional Life Insurance at the first level. You will be required to submit proof, satisfactory to the Insurance Company, of your good health. You pay the full cost of this coverage; or
2. You may convert, at your expense, all or part of your Basic Life Insurance to an individual policy without proof of good health. This new coverage will be one of the policies issued by MetLife, except term insurance; or
3. You may choose to do nothing.

**What are the amounts of Optional Life Insurance available?**

Optional Life Insurance amounts range from one to eight times your annual base salary at the time of your retirement. If the amount elected is not an even multiple of $100, it will be rounded to the next higher multiple of $100.

**How do I find out what, if any, amount of Optional Life Insurance I currently have?**

You should refer to your online Options! 2009 confirmation, located on www.delphinbc.com. Also, your current coverage amount will be contained in the enrollment kit being mailed to you by the end of February.

**How do I elect to enroll or increase in Optional Life Insurance?**

An enrollment kit will be mailed to you by the end of February which will contain all of the necessary forms and instructions you will need to make an election. You will have 31 days from the date of the mailing of the enrollment kit to submit your election and the required Statement of Health form. Elections postmarked after this 31 day period will not be processed, and you will not have another opportunity to enroll in, or increase Optional Life Insurance.

Please note that if you are already enrolled in Optional Life Insurance at eight times your annual base salary, you will not be able to increase your coverage.

**When will the coverage, or increased coverage, become effective?**

Elected coverage will become effective the first of the month following the date the evidence of your good health is approved by the Insurance Company. If evidence of your good health is not approved, any coverage amount currently in effect will not be impacted.

**How much does Optional Life Insurance cost?**

Contributions for Optional Life Insurance coverage are based on your age on December 31st of the Plan year and are for each $1,000 of coverage. The 2009 monthly rate for ages 55-59 is $0.354, ages 60-64 is $0.579, and ages 65-69 is $1.191. For example, if your age at the end of 2009 will be 57 and you have coverage in the amount of $80,000, your cost will be $28.32 per month ($0.354 x 80). These rates were effective January 1, 2009 and are subject to change.

**Will the amount of the coverage I elect ever change?**

The amount of Optional Life Insurance you elect or increase will be reduced depending on your age. If you are currently under the age of 66, the amount of Optional Life Insurance you elect will reduce by ten percent (10%) on the first day of the month following your 66th birthday and each year thereafter on the anniversary of such date.

If you are currently age 66 or older, the amount of Optional Life Insurance you elect will immediately reduce on the effective date of coverage to the amount based on your age as if you retired prior to age 66. Following this reduction, a ten percent (10%) reduction will occur on the first day of the month following your birthday and each year thereafter on your birthday

If you are currently enrolled in Optional Life Insurance and you elect to increase coverage, reductions will apply to the total amount of coverage in effect.

**How long can I continue Optional Life Insurance?**

Optional Life Insurance can be continued until the end of the month in which you attain age 75, at which time coverage cancels.

**What is conversion and what does it cost?**

When the amount of coverage you were provided is terminated under certain circumstances, you are allowed to convert all or a portion of that coverage to a private policy, paid by you. The cost will depend on the amount and type of policy you convert to and your class of risk and age at the time.

**How do I convert my cancelled Basic Life Insurance?**

There will be information contained in the kit being mailed to you by the end of February which will explain your right to conversion. You will need to contact Metropolitan Life Insurance Company (MetLife) at 1-877-ASK-MET7.

**Will I have the opportunity to purchase Optional Life Insurance when I retire?**

Generally, retirees are not able to increase or enroll for Optional Life coverage after retirement. They may continue the level of coverage they have in effect at the time they retire or they may continue a reduced level of coverage. The options available to current retirees who's Basic Life Insurance will cancel April 1, 2009 represent a one time opportunity for retirees only. However, if you retire before January 1, 2010 and would otherwise be eligible for continuing Basic Life Insurance in retirement, this same one time opportunity will be available to you. Active employees have the opportunity during the annual Options! enrollment period or due to a qualifying life event to elect or increase their Optional Life Insurance coverage.

## Estimated 2009 Retiree Self-Pay Rates

| Rates shown below are Monthly Rates | | | | | | | |
|---|---|---|---|---|---|---|---|
| Health Plan Name | Employee Only | Employee and Spouse | Employee and Child(ren) | Family | Spouse Only | Child(ren) Only | Spouse & Child(ren) |
| Enhanced Medical Plan | $666.00 | $1,332.00 | $1,198.80 | $1,864.80 | $666.00 | $666.00 | $1,198.80 |
| Point-of-Service Plan | $636.00 | $1,272.00 | $1,144.80 | $1,780.80 | $636.00 | $636.00 | $1,144.80 |
| Comprehensive Health Savings Plan | $332.00 | $664.00 | $597.60 | $929.60 | $332.00 | $332.00 | $597.60 |
| Health Net (Southern CA) | $520.99 | $1,094.08 | $989.88 | $1,458.77 | N/A | N/A | N/A |
| Advantage Health Plan (IN) | $502.72 | $1,055.77 | $955.17 | $1,407.62 | N/A | N/A | N/A |
| HAP (MI) | $333.43 | $700.21 | $633.52 | $933.60 | N/A | N/A | N/A |
| Priority Health West (MI) | $507.89 | $1,066.57 | $965.02 | $1,422.20 | N/A | N/A | N/A |
| Blue Care Network (Southeast Michigan) | $312.81 | $656.90 | $594.34 | $875.87 | N/A | N/A | N/A |
| Priority Health East (MI) | $377.92 | $793.67 | $718.07 | $1,058.22 | N/A | N/A | N/A |
| Health Plus of Michigan (MI-Flint) | $386.05 | $810.70 | $733.49 | $1,080.93 | N/A | N/A | N/A |
| Health Plus of Michigan (MI-SE Mich) | $304.99 | $640.48 | $579.48 | $853.97 | N/A | N/A | N/A |
| Health Plus of Michigan (MI-Saginaw) | $399.75 | $839.49 | $759.54 | $1,119.32 | N/A | N/A | N/A |
| Blue Care Network (MI-East/Saginaw) | $404.59 | $849.64 | $768.73 | $1,132.85 | N/A | N/A | N/A |
| Blue Care Network (Mid-Michigan) | $404.59 | $849.64 | $768.73 | $1,132.85 | N/A | N/A | N/A |
| Blue Care Network (East/Flint Michigan) | $368.60 | $774.06 | $700.34 | $1,032.08 | N/A | N/A | N/A |
| Blue Point 2 (NY-Rochester) | $370.98 | $853.26 | $934.13 | $983.10 | N/A | N/A | N/A |
| United HealthCare (Dayton/Cinci) | $600.59 | $1,261.24 | $1,141.12 | $1,681.64 | N/A | N/A | N/A |
| Kaiser Permanente (OH) | $419.44 | $880.82 | $796.94 | $1,174.43 | N/A | N/A | N/A |
| Health Assurance - Warren/Youngstown (OH) | $550.38 | $1,155.79 | $1,045.72 | $1,541.06 | N/A | N/A | N/A |
| Dental | $44.00 | $88.00 | $79.20 | $123.20 | N/A | N/A | N/A |
| Vision | $3.00 | $6.00 | $5.40 | $8.40 | N/A | N/A | N/A |
| Extended Care Coverage | $11.00 | $22.00 | $19.80 | $30.80 | N/A | N/A | N/A |

Notes: Rates are evaluated on an annual basis and are subject to change.

Spouse Only, Child(ren) Only, Spouse & Child(ren) are available only to retirees who are Medicare eligible and age 65 or older.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                    :        Chapter 11

                                                          :
SOLUTIA INC., et al.,                                     :        Case No. 03-17949 (PCB)

                                                          :
                        Debtors.                          :        (Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - x

**THIS SUBMISSION RELATES TO:**

| | | | |
|---|---|---|---|
| __X__ | All Debtors | _____ | Axio Research Corporation |
| _____ | Solutia Business Enterprises Inc. | _____ | Solutia Investments, LLC |
| _____ | Solutia Inc. | _____ | Beamer Road Management Company |
| _____ | Solutia Systems, Inc. | _____ | Monchem, Inc. |
| _____ | Solutia Overseas, Inc. | _____ | Solutia Inter-America, Inc. |
| _____ | CPFilms Inc. | _____ | Solutia International Holding Inc. |
| _____ | Solutia Management Company, Inc. | _____ | Solutia Taiwan, Inc. |
| _____ | Monchem International, Inc. | _____ | Solutia Greater China, Inc. |

**ORDER GRANTING MOTIONS OF OFFICIAL COMMITTEE OF RETIREES TO**
**SHORTEN TIME FOR HEARING AND TO COMPEL THE DEBTORS TO COMPLY**
**WITH 11 U.S.C. § 1114**

Upon the Motion of the Official Committee of Retirees for Hearing on Shortened Time and Motion to Compel Debtors to Comply with 11 U.S.C. § 1114, after notice and hearing adequate under the circumstances, for good cause shown as orally stated in the record of the September 28, 2004, hearings, it is hereby

ORDERED that the Motion for Shortened Time for Hearing is granted;

FURTHER ORDERED that the Debtors, during the pendency of these cases, shall restore and maintain all benefits for retirees (including spouses and dependents) as of January 1, 2004, including co-payment amounts, deductibles, coverage and benefit limits, and retiree Medical Expense Contributions, unless and until the Debtors seek and obtain relief pursuant to 11 U.S.C. § 1114; and



EXHIBIT
a

FURTHER ORDERED that changes to retiree benefits pursuant to the terms of an existing plan that are permitted by the terms of such existing plan nonetheless require court approval of such changes under Bankruptcy Code section 1114; and

FURTHER ORDERED that Debtors may, however, change third party administrators and other providers of goods and services related to the provision of retiree medical benefits.

Dated: October 26, 2004
New York, New York

/s/ Prudence Carter Beatty
Honorable Prudence Carter Beatty
United States Bankruptcy Judge

2

160687.1