Warehouse Lease/Delphi Lessee
Former GMC876.DOC - Revised 8/99

## WAREHOUSE LEASE

**THIS LEASE,** made as of the 2*nd* day of *December* 1999, between DASCO, INC., a Tennessee corporation, with its principal address at 214 Admiral Circle, Lawrenceburg, Tennessee 33464, hereinafter referred to as Lessor, and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, with its principal address at 5725 Delphi Drive, Troy, Michigan 48098, hereinafter referred to as Lessee,

## W I T N E S S E T H:

1.  **BASIC LEASE PROVISIONS:**  This Section contains or refers to certain basic provisions of this Lease (the "Basic Lease Provisions").  Other Sections of this Lease explain, define, and are to be read in conjunction with the Basic Lease Provisions.

    1.1  <u>Lessor</u>:  

    DASCO, INC.
    214 Admiral Circle
    Lawrenceburg, Tennessee  33464

    1.2  <u>Lessee</u>:  

    DELPHI AUTOMOTIVE SYSTEMS LLC
    5725 Delphi Drive
    Troy, MI  48098

    1.3  <u>Premises</u>  (See Section 2):

    (a)  Address:  **[To Be Determined]** Ridgecrest Drive
    Columbia, Tennessee

    (b)  Legal Description of real property (the "Land") to be improved with the building to be constructed by Lessor in accordance with this Lease (the "Building"):  See Exhibit "A"

    (c)  Physical Description:  A 36,000 square foot warehouse and light manufacturing building to be constructed on a tract containing approximately five (5) acres located on Ridgecrest Drive, Columbia, Tennessee. See Exhibit "B".

    (d)  Use:  A warehouse and light manufacturing facility requiring loading and unloading, outside parking, and storage, or any purpose not inconsistent with the character of the Premises.

{W0045099.DOC;9}

1.4    Term:

(a)    Primary Term (See Section 3.1):

(i)    Phase I Premises:  Eight (8) years, from the Commencement Date, through the end of the ninety-sixth (96th) calendar month following the Commencement Date (the "Expiration Date").    The "Commencement Date" shall be  such date as Lessor has delivered possession of the "Phase I Premises" (as defined in Section 2 of this Lease) to Lessee with the "Lessor's Improvement Work" (as defined in Section 7 of this Lease) with respect to the Phase I Premises "Substantially Complete" (as defined in Exhibit C to this Lease) and otherwise in accordance with the requirements of this Lease, provided that (i) Lessee shall not be required to accept delivery of possession of the Phase I Premises prior to the Anticipated Phase I Commencement Date and (ii) the Phase I Commencement Date shall not occur prior to such date as Lessee accepts or is required to accept delivery of possession of the Phase I Premises.  The "Anticipated Phase I Possession Date" is July 1, 2000.

(ii)    Phase II Premises:  From the Phase II Commencement Date until the Expiration Date.  The Phase II Commencement Date shall be the later of (i) the date which is seven (7) months following the Phase I Commencement Date and (ii) such date as Lessor has delivered possession of the Phase II Premises to Lessee with the Lessor's Improvement Work with respect to the "Phase II Premises" (as defined in Section 2 of this Lease) Substantially Complete and otherwise in accordance with the requirements of this Lease, provided that (a) Lessee shall not be required to accept delivery of possession of the Phase II Premises prior to the Phase II Commencement Date and (b) the Phase II Commencement Date shall not occur prior to such date as Lessee accepts or is required to accept delivery of possession of the Phase II Premises.  The "Anticipated Phase II Possession Date" is January 15, 2001.

(b)    Option(s) to Extend (See Section 3.2):

(i)    Extension Terms:  Two (2), three (3) year renewal options, from:

1st option:    Month 97 through Month 132
2nd option:    Month 133 through Month 168

(ii)    Exercise Date(s):  One hundred eighty (180) days prior to the expiration of the Primary Term and each Extension Term.

1.5    Rent:

    (a)    Monthly installments of one-twelfth of the product of the square footage of the Building and the amount per square foot set forth below:

| Period | Rent Per Square Foot |
| --- | --- |
| Phase I Commencement Date - Phase II Commencement Date | $3.93 per square foot (Phase I only) |
| Phase II Commencement Date - end of Initial Term | $4.00 per square foot (Phase I and Phase II) |
| First Extension Term | $4.35 per square foot |
| Second Extension Term | $4.61 per square foot |

    Notwithstanding anything contained herein, until such time as the "Phase II Commencement Date" (as defined in Section 1.4) occurs, Lessee shall only pay Rent with respect to (and based upon) the square footage within the Phase I Premises and the Premises shall not include the Phase II Premises.

1.6    Broker(s) (See Section 19.6): Eakin & Smith (Lessee)
                                          CB Richard Ellis (Lessor)

**2.    PREMISES:**  In consideration of the undertakings of Lessor and Lessee set forth in the Lease, Lessor hereby leases the Premises to Lessee and Lessee leases the Premises from Lessor for the Term.  Lessee shall have the right to use the roof of the Building for the purpose of installing an antenna for Lessee's communication system (the "Roof Antenna").  The "Premises" consist of the Building and the Land, including all improvements to be constructed by Lessor on the Land in accordance with this Lease (the "Improvements").  The "Phase I Premises" consist of the approximately 21,600 square foot portion of the Building depicted on Exhibit B to this Lease and the "Phase II Premises" consist of the approximately 14,400 square foot portion of the Building depicted on Exhibit B to this Lease.

**3.    TERM:**

3.1    Primary Term:  The primary term of this Lease shall be for the period specified in Section 1.4 (the "Primary Term") unless this Lease shall be earlier terminated as hereinafter provided.

3.2    Extension Terms:  Lessee shall have the right and option to extend the Primary Term for extension terms as set forth in Section 1.4 (the "Extension Terms"), upon the same terms and conditions of this Lease, except as otherwise provided in Section 1.5.  Lessee shall deliver to Lessor notice of its election so to extend the Primary Term on or before the respective Exercise Dates set forth in Section 1.4.

3.3   Term of this Lease:  The Primary Term and all Extension Terms elected by Lessee sometimes shall be referred to collectively hereinafter as the "Term of this Lease".

4.   RENT:  During the Term of this Lease, Lessee shall pay rent to Lessor at the address set forth in Section 1.1, or at such other address as Lessor may designate in writing at any time or from time to time, in monthly installments as set forth in Section 1.5 (the "Rent"). Such monthly installments of Rent shall be payable in advance on or before the Commencement Date and on or before the first business day of each calendar month thereafter, without demand, offset or deduction (except as otherwise set forth herein). Rent for partial months at the inception or the termination of the Term shall be prorated.

5.   REAL ESTATE TAXES AND ASSESSMENTS:  (a)  During the Term of this Lease, Lessee shall pay, as the same may become due and payable and before any fine, penalty, interest, or other charge may be added for nonpayment, all real estate taxes and assessments, general and special, against the Premises ("Real Estate Taxes"). Lessee shall pay all such Real Estate Taxes prior to delinquency and shall provide Lessor a paid receipt therefor no later than thirty (30) days after the date on which the taxes would be delinquent. Lessee shall not be responsible for any special assessments or other taxes or assessments imposed for the construction of improvements on or off the Premises which have been imposed prior to the date of this Lease or that are imposed in connection with the initial development of the Premises, and all such special assessments and other taxes and assessments shall be paid by Lessor prior to delinquency. Real Estate Taxes for the year in which the Term commences and expires shall be prorated between Lessor and Lessee, with Lessee being responsible for its pro rata share, determined on a due date basis, and Lessor being responsible for the remainder of the Real Estate Taxes for the applicable year.

(b)   Lessor shall send to Lessee copies of all notices of assessment of Real Estate Taxes for the Premises within five (5) days after Lessor receives them. Lessee shall have the right to contest any Real Estate Taxes with respect to the Building and Land by appropriate proceedings diligently contested in good faith.  Notwithstanding any contest of the Real Estate Taxes, the contested Real Estate Taxes shall be promptly paid and discharged, unless the proceedings (and where necessary the posting of an appropriate bond or other security) prevents or stays the collection of the taxes and secures any accruing penalties or interest.   Upon Lessee's request, Lessor shall execute any documents Lessee reasonably requires in order to prosecute any contest of Real Estate Taxes and join Lessee in any contest, provided that Lessee pays all reasonable costs and expenses incurred by Lessor directly as a result of Lessor's participation in the contest. If Lessor receives any refund of Real Estate Taxes which are attributable to the Term, Lessor shall promptly pay such refund (or the portion attributable to the Term) to Lessee.

6.   UTILITIES:  During the Term of this Lease, Lessee shall pay for all utility services consumed by Lessee upon the Premises, including without limitation gas and electricity, sanitary and storm sewer, water, and telephone services.  To the extent that any utility services supplied to the Premises are billed directly to Lessor, Lessee shall reimburse Lessor, within thirty (30) days after Lessor's delivery to Lessee of an invoice therefor, for such utility services.  Lessor shall not be liable for any interruption, discontinuance or failure of any utility service furnished to the Premises unless the interruption, discontinuance or failure has been caused by Lessor's negligent acts or willful

misconduct. In the event any utility services to the Premises are interrupted due to any negligent act or omission of Lessor or as a result of Lessor's breach of its obligations under this Lease and Lessee cannot conduct business operations at the Premises, Lessee shall be entitled to an abatement of Rent during the period Lessee's utility services are so interrupted.

7.    **LESSOR'S IMPROVEMENT WORK:**  Prior to the Anticipated Phase I Possession Date, Lessor shall at its sole cost and expense confirm that all utility lines required for the use and occupancy of the Phase I Premises by Lessee are connected or shall cause such connections to be made and shall Substantially Complete performance of the work with respect to the Phase I Premises (including all work that is necessary or desirable for the full use and enjoyment of the Phase I Premises, whether such work is within or outside of the Phase I Premises) set forth in Exhibit "C" (all of the work referred to in this Section 7 and Exhibit C being collectively referred to as "Lessor's Improvement Work"). Prior to the Anticipated Phase II Possession Date, Lessor shall at its sole cost and expense confirm that all utility lines required for the use and occupancy of the Phase II Premises by Lessee are connected or shall cause such connections to be made and shall Substantially Complete all of Lessor's Improvement Work with respect to the Phase II Premises. Lessor shall perform Lessor's Improvement work in accordance with Section 19.1(a).

8.    **POSSESSION OF PREMISES:**

8.1    <u>Delivery of Possession; Condition</u>:  Lessor shall use its best efforts to deliver possession of the Phase I Premises to Lessee in the condition required under this Lease no later than the Anticipated Phase I Possession Date and to deliver possession of the Phase II Premises to Lessee in the condition required under this Lease no later than the Anticipated Phase II Possession Date. Prior to such delivery (a) Lessor's Improvement Work with respect to the Phase I Premises, or Phase II Premises, as applicable, shall have been Substantially Completed in accordance with Section 7 and Exhibit C and the Premises shall be in broom-swept, tenantable condition with all mechanical and utility systems and overhead doors in fully operable condition. If possession of the Phase I Premises is not thus delivered to Lessee on the Anticipated Phase I Possession Date or possession of the Phase II Premises is not thus delivered on the Anticipated Phase II Possession Date [as the same may be delayed for a reasonable period of time not to exceed sixty (60) days but only because of acts of God, riots, labor strikes or other matters beyond Lessor's control, including, but not limited to, delays caused by Tenant], Lessee shall be entitled to two (2) days of abatement of Rent after the Commencement Date per day for each day of delay (excluding delays caused by Lessee), as liquidated damages and not as a penalty; provided, however, that in the event the Commencement Date does not occur because this Lease is terminated by Lessee or if Lessee terminates this Lease with respect to the Phase II Premises, in each case as set forth in the next sentence, then Lessor shall pay to Lessee, promptly following the applicable termination, a sum equal to the amount of abated Rent that Lessee would otherwise have received. If Lessor does not deliver possession of the Phase I Premises to Lessee within ninety (90) days following the Anticipated Phase I Possession Date, Lessee may at its option terminate this Lease upon fifteen (15) days' notice to Lessor during which time Lessor does not deliver possession as required herein and if Lessor does not

deliver possession of the Phase II Premises to Lessee in the condition required under this Lease within ninety (90) days following the Anticipated Phase II Possession Date, Lessee may terminate this Lease with respect to the Phase II Premises upon fifteen (15) days' notice to Lessor during which time Lessor does not deliver possession as required herein.

8.2    <u>Punchlist Inspection</u>:  Within thirty (30) days after delivery of possession of the Phase I Premises , representatives of Lessor and Lessee shall make a joint inspection of the Phase I Premises and the Phase II Premises, and the results of such inspection shall be reduced to a written memorandum, which memorandum shall be approved and executed on behalf of each party and then shall constitute a part of this Lease and be conclusive with respect to the condition of the Premises on such date, except with respect to latent defects of which Lessee delivers notice to Lessor within one (1) year following the Commencement Date or defects which arise as a result of Lessor's failure to construct the Premises in accordance with the requirements of this Lease.    Immediately upon execution of such memorandum (or Lessee's delivery to Lessor of notice of the latent defects, if applicable), Lessor, at its sole cost and expense and in a manner so as not to interfere unreasonably with the use and occupancy of the Premises by Lessee for the conduct of its business operations, shall remedy those matters or defects set forth in such memorandum or notice which constitute a breach of Lessor's warranties and representations regarding the condition of the Premises.  If Lessor fails to so remedy such matters or defects within a reasonable period of time, then upon ten (10) days' notice to Lessor, during which time Lessor does not remedy the same, Lessee shall have the remedies referred to in Section 18.

8.3    <u>Lessee's Right of Entry</u>:  Lessee, at its sole cost and expense, shall have the right prior to the Commencement Date, to enter upon the Premises to perform certain work, including without limitation Lessee's Improvement Work and the installation of trade fixtures and personal property such as, without limitation, the equipment more particularly described in Section 10, provided that Lessee shall perform such work in a manner such that there shall be no material delay in the performance of Lessor's Improvement Work. Such entry shall be at Lessee's sole risk, and shall be upon all of the terms and conditions set forth herein (including but not limited to Lessee's submission of insurance), but Lessee shall not be obligated to pay any Rent or any other amount to Lessor prior to the Commencement Date.  Lessor agrees to cooperate with Lessee and use reasonable efforts to schedule Lessor's Improvement Work so that Lessee can install its furnishings, equipment and any Lessee's Improvement Work in the Phase I Premises at least thirty (30) days before the Anticipated Phase I Commencement Date and in the Phase II Premises at least thirty (30) days before the Anticipated Phase II Commencement Date.

9.    <u>LESSEE IMPROVEMENTS</u>:  Except as to structural improvements, for which Lessor's written consent (not to be unreasonably withheld) is required, Lessee, at its sole cost and expense, shall have the right but shall not be obligated prior to and during the Term of this Lease to improve, alter, and renovate the Premises in any manner which Lessee deems necessary or desirable to make the same fit and suitable for the conduct of its business operations, including without limitation painting, decorating, redecorating, and installing partitions, floor coverings, wall coverings, drop ceilings, light fixtures, and the work set

forth in Exhibit "D" as Lessee's Improvement Work" (the "Lessee's Improvement Work"). Lessee shall perform all work described in this Section according to the standards set forth in Section 19.1(b).   Unless otherwise agreed in writing by the parties and subject to Section 10 below, any improvements, alterations, and renovations to the Premises by Lessee pursuant to this Section shall remain on the Premises upon the expiration or earlier termination of this Lease.  Any Lessee Improvement Work that would diminish the value of the Premises or materially alter the use thereof shall require Lessor's prior written consent.  Lessee shall have no authority, express or implied, to create or place any lien or encumbrance on the interest of Lessor in the Premises.  Lessee agrees that it shall pay or cause to be paid all sums due and payable by Lessee on account of any labor performed or materials furnished in connection with any work performed on the Premises by or at the direction of Lessee and that it will save and hold Lessor harmless from and against any and all claims and demands based on or arising out of liens or claims for liens against the Premises or the right, title and interest of Lessor in the Premises arising out of work performed on the Premises by or at the direction of Lessee and any actions, suits and proceedings in connection with any such claim or demand and any and all loss, cost, damage, liability and expense incurred by Lessor in connection therewith, including reasonable attorney's fees and costs of litigation.

10.    <u>TRADE FIXTURES; PERSONAL PROPERTY</u>:  Lessee, at its sole cost and expense, shall have the right, without Lessor's consent, but shall not be obligated during the Term of this Lease to install, use, replace, substitute, and remove its trade fixtures and personal property such as, without limitation, telephone, teletype and other equipment, machinery, conveyor systems, modular docks, dock levelers, task lights, office furniture, and its Roof Antenna (subject to Lessor's right to approve any contractor performing work on the roof so as to ensure that the warranty is not violated or impaired).  Upon the expiration of the Term or the earlier termination of this Lease, Lessee shall have the right to remove its trade fixtures and personal property from the Premises, provided that Lessee shall repair all damage to the Premises resulting from such removal.

11.    <u>MAINTENANCE AND REPAIRS BY LESSOR</u>:

11.1    <u>General Requirements</u>:  Lessor, at its sole cost and expense, shall perform during the Term of this Lease all necessary maintenance, repairs, and replacements with respect to all of the following portions of the Premises in accordance with the standards set forth in Section 19.1 and shall have no other maintenance, repair, and replacement obligations hereunder except as otherwise set forth herein:

(a)    The structure and the exterior of the Building, including without limitation the roof and roof membranes, walls, floors, foundations, supports, skylights and roof vents, drains and downspouts, and landscaping, but excluding any repairs necessitated by Lessee alterations (unless the requirement for the repair arises as a result of a defect in Lessor's Improvement Work) or any acts or omissions of Lessee which are not insurable under a policy of Causes of Loss, "Special Form" Property Insurance (it being understood that if Lessee carries the property insurance on the Building, said repairs shall be at Lessee's expense if the damage would have been insurable under a Causes of Loss, "Special Form" Property Insurance policy) all of which may be repaired by Lessor at Lessee's reasonable expense;

      (b)      Lessor shall maintain, repair, and replace the HVAC system serving the Premises.

11.2    <u>Additional Lessor Repairs</u>:  Lessor shall also perform routine maintenance and repairs to the overhead doors, the compressors and the HVAC units serving the Premises at Lessee's cost, provided that the charges for such maintenance and repair work shall be competitive with the charges that would be incurred by Lessee from an independent third-party contractor. In addition, Lessor shall perform any replacements and repairs, the cost of which should be capitalized in accordance with generally accepted accounting principles ("Capital Replacement") and Lessee shall be responsible for the portion of the cost of the Capital Replacement which is attributable to the remainder of the Term of this Lease. The portion of the cost of the Capital Replacement which is attributable to the remainder of the Term of this Lease shall be deemed to be equal to the total cost of the Capital Replacement multiplied by a fraction, the numerator of which is the remainder of the Term of this Lease and the denominator of which is equal to the useful life of the Capital Replacement. If Lessee extends the term of this Lease, then Lessee shall also be responsible for the portion of the cost of the Capital Replacement which is attributable to the extended Term.

11.3    <u>Timely Performance</u>:  In the event of an emergency (defined as any condition other than damage or destruction described in Section 15 or eminent domain described in Section 16 which materially impairs Lessee's ability to use and occupy the Premises for the conduct of its business operations) and Lessor's failure to perform promptly any of Lessor's maintenance, repair, and replacement obligations as described in Sections 11.1 and 11.2, or in the event of no emergency and Lessor's failure to perform such maintenance and repair obligations within thirty (30) days after Lessee's delivery to Lessor of notice of the need for any such maintenance or repairs or such additional period as is reasonably necessary to effect cure if Lessor has commenced to cure within such thirty (30) day period and is diligently pursuing completion of such cure, Lessee shall have the rights and remedies to which Lessee may be entitled under Section 18. In no event, however, shall Lessee perform any work on the roof except in an emergency; it being understood that the same may violate or void the warranty thereon, and if any work performed in an emergency voids the roof warranty, Landlord shall no longer have responsibility for maintenance, repair or replacement of the roof unless Lessee can cause the roof warranty to be reinstated (at Lessee's expense).

12.    <u>MAINTENANCE AND REPAIRS BY LESSEE</u>:  Lessee, at its sole cost and expense during the Term of this Lease, shall keep all portions of the Premises except for items specifically Lessor's obligation under Sections 11.1 and 11.2, in a clean and orderly condition, and shall perform all maintenance and repair to the Premises occasioned by Lessee's negligence or misconduct. If Lessee fails to perform its maintenance and repair obligations within fifteen (15) days after Lessor's delivery to Lessee of notice of the need for any such maintenance and repairs, the Lessor shall have the right, upon delivery of three (3) business days notice to Lessee, to perform all or part of such maintenance and repairs, at the sole cost and expense of Lessee, and Lessee shall reimburse Lessor for

such costs and expenses within thirty (30) days after Lessor's delivery to Lessee of an invoice therefor.

13.     **INSURANCE:** (a) <u>Lessee's Obligations</u>: Lessee shall, at its sole cost and expense, obtain and maintain during the Term of the Lease, Commercial General Liability Insurance, including Blanket Contractual Liability coverage, with limits of not less than Two Million Dollars ($2,000,000) Combined Single Limit for Personal Injury and Property Damage; Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit for Personal Injury and Property Damage; and Statutory Workers Compensation and Employers Liability coverage with limits of not less than $250,000. Prior to entry onto the Premises, and thereafter at least thirty (30) days prior to the expiration of the then current certificate, Lessee shall deliver to Lessor a certificate evidencing such coverages and naming Lessor as an additional insured thereunder. Such insurance policies shall provide for no cancellation or material alteration without thirty (30) days prior written notice to Lessor; (b) <u>Lessor's Obligations</u>: Lessor shall, at Lessee's sole cost and expense, obtain and maintain during the Term of the Lease, Causes of Loss, "Special Form" Property Insurance for the Building upon a full replacement cost basis, with no co-insurance requirement, together with, at Lessor's option, twelve (12) months rent loss insurance (at competitive costs), and such other property insurance (at competitive costs) as a commercially reasonable landlord would carry on similar property, or as may be reasonably required by Lessor's lender. Lessor shall also obtain and maintain during the Term of this Lease, at Lessee's sole cost and expense (to the extent attributable to the Premises), Commercial General Liability Insurance, including Blanket Contractual Liability coverage, with limits of not less than Two Million Dollars ($2,000,000) Combined Single Limit for Personal Injury and Property Damage; Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit for Personal Injury and Property Damage; and Statutory Workers Compensation and Employers Liability coverage with limits of not less than $250,000. Lessor shall deliver to Lessee upon request a certificate evidencing such coverages. Such insurance policies shall provide for no cancellation or material alteration without thirty (30) days prior written notice to Lessee. Lessor shall have the right to bill Lessee for the estimated cost of Lessor's insurance in monthly installments, in advance. At Lessee's option, exercisable upon thirty (30) days' notice to Lessor after the Phase II Commencement Date, Lessee shall have the right to maintain the Causes of Loss, "Special Form" property insurance for the Building, in which event Lessor and Lessor's lender shall be named as an additional insured and a loss payee, and Lessee shall have no further obligation to reimburse Lessor for the cost of the property insurance unless Lessee thereafter elects to discontinue maintaining such property insurance on the Building upon at least sixty (60) days' notice to Lessor, in which case Lessor shall again purchase the property insurance required hereunder. If Lessee elects to carry such insurance, the issuer of the insurance and any deductibles thereunder shall be subject to the reasonable approval of Lessor and Lessor's lender. Furthermore, Lessee shall maintain certificates of insurance with Lessor in the same manner as required for Lessee's liability insurance.; (c) <u>Waiver of Subrogation</u>: Lessor shall cause each insurance policy carried by Lessor insuring the Premises against loss by fire and causes covered by Causes of Loss, "Special Form" property insurance , and Lessee shall cause each insurance policy carried by Lessee and insuring Lessee's property (and, if applicable, the Premises) against loss by fire and causes covered by Causes of Loss, "Special Form"

property insurance to be written in a manner so as to provide that the insurance company waives all right of recovery by way of subrogation against Lessor or Lessee in connection with any loss or damage covered by any such policies. Neither party shall be liable to the other for any loss or damage caused by fire or any of the risks enumerated in Causes of Loss, "Special Form" Property Insurance, provided such insurance was obtainable at the time of such loss or damage.

14.    **FIRE AND UNSAFE BUILDING CLAUSE:**  [INTENTIONALLY OMITTED].

15.    **DAMAGE OR DESTRUCTION:**

15.1    Repair and Restoration:  In the event that the Premises shall be damaged or destroyed by fire, explosion, or other casualty, or by any risk required to be insured against pursuant to Section 13 or at law, Lessee shall promptly deliver to Lessor notice thereof.  Unless terminated pursuant to Section 15.2, this Lease shall remain in full force and effect, and Lessor, to the extent of the insurance proceeds available thereof or which would be available if Lessor were maintaining the insurance required by this Lease (plus any deductibles thereunder not to exceed Ten Thousand Dollars ($10,000), which shall be funded by Lessee), shall exercise good faith and diligent efforts promptly to repair the damage or destruction and restore the Premises to substantially that condition existing immediately prior to such damage or destruction (excluding any leasehold improvements made by Lessee that are not insured under Lessor's property insurance, it being understood and agreed that upon Lessee's request and delivery to Lessor of sufficient information regarding Lessee's leasehold improvements, Lessor shall cause such leasehold improvements to be insured under its property insurance policy).  If Lessee remains in occupancy of the Premises, Lessor shall exercise such repair and restoration efforts in a manner so as not to interfere unreasonably or materially with the use and occupancy of the Premises by Lessee for the conduct of its business operations.  If Lessee has elected to carry the property insurance on the Building, Lessee shall make the proceeds of such insurance available (plus any deductibles thereunder, which shall be funded by Lessee) available to Lessor for such repair and restoration pursuant to disbursement procedures reasonably acceptable to Lessor and Lessor's lender.  Until the completion of Lessor's repair and restoration pursuant to this Section, Lessee's obligation to pay Rent and other amounts payable by Lessee hereunder shall be abated as of the date of the damage or destruction in proportion to the extent that the Premises are rendered unusable by Lessee for the conduct of its business operations; provided that Lessee shall not be entitled to such abatement if Lessee has elected to carry the property insurance on the Premises, except to the extent Lessor is carrying rental interruption insurance with respect to the Premises.

15.2    Rights of Termination:  Lessor's and Lessee's respective rights to terminate this Lease upon the occurrence of certain damage or destruction shall be governed as follows:

(a)    If the Premises shall be damaged or destroyed to the extent of more than fifty percent (50%) of the full replacement cost thereof, then either Lessor

or Lessee may elect to terminate this Lease by delivery of notice to the other within thirty (30) days after the date of such damage or destruction; or

(b)    If all or any portion of the Premises shall be rendered unusable by Lessee for the conduct of its business operations as a result of any damage or destruction and if the repair and restoration of any such damage or destruction shall not be completed within one hundred eighty (180) days after the date of the damage or destruction, then Lessee may elect to terminate this Lease by delivery of notice within thirty (30) days after the date of such damage or destruction;

(c)    Lessor may terminate this Lease if the Premises are damaged to the extent of twenty-five percent (25%) or more of the value thereof during the last year of the Term unless Lessee extends the Term by the exercise of any then available renewal option or the repair can be completed in sixty (60) days; and

(d)    Upon delivery of any notice pursuant to Section 15.2(a), 15.2(b) or 15.2(c), this Lease shall terminate as of the date of the damage or destruction unless otherwise provided in such notice, and Lessee shall have no further liabilities or obligations hereunder other than to pay Rent accrued hereunder as of the date of such termination, and, if Lessee has elected to carry the property insurance on the Building, to disburse the proceeds thereof, along with any deductible thereunder, to Lessor.

## 16.   EMINENT DOMAIN:

16.1   Repair and Restoration:  In the event that all or any portion of the Premises shall be taken or threatened to be taken under the power of eminent domain or settlement in lieu thereof for any public or quasi-public use, Lessor promptly shall deliver to Lessee notice thereof.  Unless terminated pursuant to Section 16.2, this Lease shall remain in full force and effect, and, Lessor, to the extent the award allocable to the Building is sufficient therefor , shall exercise good faith and diligent efforts promptly to repair the damage and restore the Premises so as to constitute the remaining portion thereof a complete architectural unit.  If Lessee remains in occupancy of the Premises, Lessor shall exercise such repair and restoration efforts in a manner so as not to interfere unreasonably or materially with the use and occupancy of the Premises by Lessee for the conduct of its business operations.  Until the completion of Lessor's repair and restoration pursuant to this Section, Lessee's obligation to pay Rent and other amounts payable by Lessee hereunder shall be abated as of the date on which possession of the Premises or portion thereof shall be required by the public or quasi-public body in proportion to the extent that the Premises are rendered unusable by Lessee for the conduct of its business operations.  Lessee shall be entitled to seek from the condemning authority the value of any Lessee fixtures and improvements, but not the value of Lessee's unexpired leasehold estate.

16.2   Rights of Termination:  Lessee shall have the right to terminate this Lease upon the occurrence of a taking or a threatened taking under the power of eminent

domain or settlement in lieu thereof, if, as a result thereof, the Premises no longer shall be fit and suitable for the use and occupancy thereof by Lessee for the conduct of its business operations, in which event Lessee may elect to terminate this Lease by delivery of notice to Lessor within thirty (30) days after the earlier of (i) Lessor's delivery to Lessee of notice regarding such taking or threatened taking; or (ii) the date on which possession of the Premises or portion thereof shall be required by the public or quasi-public body.  Upon delivery of any such notice, this Lease shall terminate as of the date on which such possession shall be required by the public or quasi-public body unless otherwise provided in such notice, and Lessee shall have no further liabilities or obligations hereunder other than to pay Rent accrued hereunder as of such date of termination.

17.    **DEFAULT; REMEDIES:**

17.1    <u>Lessee's Default</u>:  Each of the following events shall constitute a default of this Lease by Lessee (a "Lessee Default"):

(a)    The failure of Lessee to pay any Rent or other amount payable by Lessee hereunder within five (5) days after the date on which Lessee receives from Lessor notice specifically describing such failure, provided Lessor shall not be required to deliver such notice more than two (2) times in any twelve (12) month period for base Rent;

(b)    Subject to Section 12, the failure of Lessee to perform any other term, condition, covenant, or obligation of this Lease on the part of Lessee to be performed within thirty (30) days after the date on which Lessee receives notice from Lessor specifically describing such failure; provided, however, that if Lessee shall exercise in good faith diligent efforts within such thirty (30) day period to cure the failure specified in the notice but shall not be able to do so because of a cause or causes beyond the control of Lessee, then any such failure shall not be considered a Lessee Default so long as Lessee shall continue to exercise in good faith such diligent efforts to cure such failure and shall do so within a reasonable period of time;

(c)    Lessee shall be declared bankrupt or insolvent, or shall file or assent to any petition filed against Lessor under any federal or state bankruptcy or insolvency laws; and

(d)    Lessee shall abandon the Premises and fail to maintain the Premises in accordance with the requirements of this Lease.

17.2    <u>Lessor's Remedies</u>: If a Lessee Default occurs, Lessor may:

(a)    Terminate this Lease, in which event Lessee shall immediately surrender possession of the Premises to Lessor.

(b)    Terminate Lessee's right to possession of the Premises without terminating this Lease, in which event this Lease will continue in effect and Lessor shall have the right to collect Rent when due.  Lessor may

relet the Premises for the benefit of Lessee, and Lessee shall be liable immediately to Lessor for all costs Lessor incurs in reletting the Premises, including without limitation, reasonable attorneys fees, brokers' commissions, expenses of remodeling the Premises and like costs. Reletting can be for a period shorter or longer than the remaining Lease term. Lessee shall pay to Lessor the Rent under this Lease on the dates the same is due, less any Rent the Lessor receives from any reletting. Lessee shall have no right to any rent received by Lessor from such reletting in excess of the Rent hereunder, provided such excess rent shall be credited against any future obligations of Lessee hereunder in reverse order of when due. No act by Lessor with respect to the Premises shall terminate this Lease, including but not limited to acceptance of the keys, institution of an action for detainer or other dispossessory proceedings, it being understood that this Lease may only be terminated by express written notice from Lessor to Lessee, and any reletting of the Premises shall be presumed to be for and on behalf of Lessee, and not Lessor, unless Lessor expressly provides otherwise in writing to Lessee.

(c)    In addition to Lessor's rights of self-help set forth elsewhere in this Lease, if Lessee at any time fails to commence and diligently pursue perform any of its obligations under this Lease in a manner reasonably satisfactory to Lessor, within applicable notice and cure periods, Lessor shall have the right, but not the obligation, to perform such obligations on behalf of and for the account of Lessee and to take all such action to perform such obligations. In such event, Lessor's reasonable costs and expenses incurred therein shall be paid for by Lessee forthwith as additional rent, upon demand therefor, with interest thereon from the date Lessor performs such work at the highest lawful rate.

(d)    In any action to enforce either party's rights hereunder or in any litigation concerning this Lease, the prevailing party shall be entitled to collect court costs, reasonable attorneys fees and all costs of collection, including but not limited to costs of depositions and expert witnesses.

(e)    The rights given to each party in this Lease are cumulative and shall be in addition and supplemental to all other rights or remedies that either party may have under this Lease, under laws then in force or in equity.

If Lessor elects to terminate this Lease under the provisions of the preceding Section, Lessor may recover from Lessee damages computed in accordance with the following formula in addition to its other remedies:

(a)    the worth at the time of judgment of any unpaid Rent which has been earned at the time of such termination; plus

(b)    the worth at the time of judgment of the amount by which the unpaid Rent which would have been earned after termination until the time of judgment exceeds the amount of such rental loss Lessee proves could have been reasonably avoided; plus

(c)    the worth at the time of judgment of the amount by which the unpaid Rent for the balance of the Term after the time of judgment exceeds the amount of such rental loss that Lessee proves could have been reasonably avoided; plus

(d)    any other amount necessary to compensate Lessor for all the detriment proximately caused by Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would likely to result therefrom including but not limited to, the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees; plus

(e)    at Lessor's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable state law. Damages shall be due and payable from the date of termination.

As used in subsections (a) and (b), the phrase "worth at the time of judgment" shall be computed by adding interest on all such sums from the date when originally due at the lesser of fourteen percent (14%) per annum or the maximum interest rate permissible by law (the "Default Rate"). As used in subsection (c), the phrase "worth at the time of judgment" is computed by discounting the sum in question at the federal reserve rate promulgated by the federal reserve office for the district in which the Premises is located.

18.    **LESSOR DEFAULT AND LESSEE'S REMEDIES:**  In the event of any failure by Lessor to perform any term, condition, covenant, or obligation of this Lease on the part of Lessor to be performed within thirty (30) days after the date on which Lessor receives from Lessee notice by certified or registered mail specifically describing such failure [provided, however, that if Lessor shall exercise in good faith diligent efforts within such thirty (30) day period to cure the failure specified in the notice but shall not be able to do so because of a cause or causes beyond the control of Lessor, then any such failure shall not be considered a default of this Lease by Lessor so long as Lessor shall continue to exercise in good faith such diligent efforts to cure such failure and shall do so within a reasonable period of time], Lessee (in addition to all other rights and remedies to which Lessee may be entitled under this Section, elsewhere hereunder or at law or in equity) after five (5) days' additional notice to Lessor may cure such default by Lessor on behalf of, and at the sole cost and expense of Lessor, and Lessor shall reimburse Lessee for its reasonable costs and expenses in connection therewith within thirty (30) days after Lessee's delivery to Lessor of an invoice therefor, failing which Lessee may offset such costs and expenses against any Rent and other amounts payable by Lessee hereunder.

19.    **WARRANTIES AND REPRESENTATIONS:**

19.1    **Compliance with Laws:**

(a)    Lessor warrants and represents for the benefit of Lessee that, during construction and as of the Commencement Date, Lessor's Improvement Work and the improvements located within the Premises or within the

Building housing a portion of the Premises as well as Lessor's maintenance and repairs under Sections 11.1 and 11.2 shall be done in a good and workmanlike manner and comply with all laws, ordinances, and requirements, including without limitation the procuring of all building and other permits, licenses, approvals, and certificates of occupancy and the observance of applicable building, zoning, and other code requirements of governmental authorities with competent jurisdiction.    Notwithstanding Section 19.1(b) or any other provision of this Lease to the contrary, if (i) any improvements, alterations, or renovations to the Premises shall be required by any law, ordinance, or requirement of any governmental authority with competent jurisdiction (but not solely as a result of the use and occupancy of the Premises by Lessee for the conduct of its particular business operations) and the useful life of the improvement, alteration or renovation will extend beyond the expiration of the Term, then Lessor shall perform such improvements, alterations, or renovations in a timely manner and Lessee shall reimburse Lessor for the portion of the cost attributable to the Term and to any Extension Terms with respect to which Lessee exercises its option (in each case, as determined in accordance with Section 11.2 above).    Lessor further warrants and represents for the benefit of the Lessee that Lessor shall obtain all permits and authorizations necessary for the construction of the Lessor's Improvement Work no later than thirty (30) days after Lessee's approval of the final plans and specifications (the "Permit Deadline").  If Lessor has not delivered evidence to Lessee that Lessor has obtained all permits and approvals required for the performance of Lessor's Improvement Work by the Permit Deadline , then, in addition to all other rights and remedies available to Lessee hereunder or at law or in equity, Lessee shall have the right to terminate this Lease upon five (5) days' notice to Lessor during which period Lessor does not provide such evidence.

(b)    Lessee represents and warrants for the benefit of Lessor that Lessee's Improvement Work, its maintenance  and repairs, and its use and occupancy of the Premises for the conduct of its business operations shall comply with all applicable laws, ordinances, and requirements of governmental authorities with competent jurisdiction; provided, however, that Lessor represents and warrants to Lessee that use of the Premises for warehouse and light manufacturing purposes is permitted under all applicable laws, ordinances and requirements of governmental authorities; and, provided further, that no alleged violation by Lessee of any such law, ordinance, or requirement shall be deemed to constitute a Lessee Default so long as Lessee shall contest, in good faith, the validity of such law, ordinance, or requirement or the existence of the alleged violation thereof. If required by any law, ordinance, or requirement in effect at the time, Lessor shall join in any proceedings initiated by Lessee pursuant to this Section 19.1(b)(i) or permit the same to be brought in its name, as applicable, provided that Lessee shall pay all costs and expenses in connection therewith, including reasonable costs and expenses incurred by Lessor.

19.2    Warranty of Title: Lessor warrants and represents for the benefit of Lessee that (a) Lessor is or shall, no later than January 31, 2000 (the "Condition Date"), be the fee simple owner of the Premises and has the full authority to execute, deliver, and perform this Lease; and (b) as of the Condition Date, no third party will have any right, title, or interest adverse to Lessee's right, title, and interest hereunder in or to the Premises. No later than January 20, 2000 Lessor shall deliver to Lessee a commitment for policy of title insurance, together with copies of all underlying exceptions referenced therein, and an ALTA survey of the Land. If Lessee determines within ten (10) days following Lessee's receipt of the title insurance commitment, copies of the exceptions referenced therein and ALTA survey of the Land that there is any condition affecting the Land which may adversely affect Lessee's full use and enjoyment of the Premises, then Lessee shall have the right to terminate this Lease upon written notice delivered to Lessor within such ten (10) business day period. Lessee acknowledges that the closing date for Lessor's acquisition of the Land must occur by January 31, 2000, and that if Lessee does not object to any matters within the period set forth herein, any such objection shall be deemed waived.

If Lessor does not deliver to Lessee written evidence that Lessor is the owner of fee simple title to the Land by the Condition Date, then, in addition to any other rights and remedies available to Lessee, Lessee shall have the right to terminate this Lease upon five (5) days notice to Lessor during which period Lessor does not deliver such evidence.

19.3    Fuel Tanks: Lessor warrants and represents that to Lessor's actual knowledge the Land does not presently contain any underground or aboveground fuel storage tanks and related piping, venting, and dispensing systems (collectively, "Fuel Tanks") and Lessor agrees that it shall not install, cause to be installed, or permit the installation of any Fuel Tanks within the physical boundaries of the Premises during the Term of this Lease. Lessee covenants that it shall not install or cause to be installed any Fuel Tanks within the Premises during the Term of this Lease.

19.4    Hazardous and Toxic Conditions: Lessor warrants and represents for the benefit of Lessee that to Lessor's actual knowledge the Land does not contain any material classified as toxic or hazardous under applicable federal, state, and local laws, ordinances, and requirements of governmental authorities with competent jurisdiction, except as disclosed to Lessee on Exhibit "F". If a toxic or hazardous condition is discovered on the Premises that (i) arose prior to the Commencement Date and was not due to the acts or omissions of Lessee or results from the acts or omissions of Lessor or its agents, employees or contractors or migration from any property outside of the Premises, then (i) Lessor shall (a) promptly give Lessee written notice of such condition; and (b) immediately cause such toxic or hazardous condition to be cleaned up and brought into compliance with applicable laws, ordinances, and requirements of governmental authorities with competent jurisdiction; and (ii) Lessor shall indemnify Lessee pursuant to the provisions of Section 21 hereof against any Losses as defined in Section 21 incurred by Lessee arising out of any such toxic or hazardous condition if the condition arose due to the acts or omissions of Lessor, its agents, employees or contractors. Lessee has performed its own environmental audit of the Land and shall supply a copy of the

same to Lessor prior to January 15, 2000. Lessee acknowledges that Lessee is satisfied with the condition of the Land as disclosed in such report and is not relying upon Lessor to perform any other environmental due diligence.

19.5   <u>Prior Usage of Premises</u>:   Lessor warrants and represents for the benefit of Lessee that to Lessor's actual knowledge   the past uses of the Land are as disclosed in Exhibit "F" and that to Lessor's actual knowledge there has not been any storage, treatment, recycling, or disposal of waste on the Land, except for storage of trash in containers in compliance with applicable federal, state, and local laws, ordinances, and other requirements of governmental authorities with competent jurisdiction, which containers have been removed from the Land and from which there has been no release of Hazardous Substances.

19.6   <u>Broker's Commission</u>:   Lessor and Lessee each warrant and represent for the benefit of the other, that it has not dealt with any real estate broker, finder, or agent in connection with this Lease other than the broker, finder, or agent identified in Section 1.6, for whose commission Lessor shall be responsible.

20.   <u>LESSOR'S RIGHT OF ENTRY:</u>   Following reasonable notice to Lessee, Lessor may enter upon the Premises as often as Lessor reasonably may deem necessary for the purposes of performing such maintenance and repairs as Lessor may reasonably deem necessary or may lawfully be required to perform, inspecting the Premises, offering the Premises for lease (but only during the period which commences six (6) months prior to the expiration of the then existing Primary Term or Extension Term in the event that Lessee shall not have elected further to extend the Term of this Lease) or offering the Premises for sale. Lessor's right of entry shall be exercised in a manner and during reasonable hours at times such that there shall be no unreasonable or material interference with the use and occupancy of the Premises by Lessee for the conduct of its business operations.

21.   <u>MUTUAL INDEMNIFICATION:</u>   Lessor and Lessee each agree to indemnify and hold the other harmless from and against any and all losses, damages, claims, suits, actions, judgments, liabilities, and expenses, including without limitation reasonable attorneys' fees (collectively, "Losses"), arising out of or with respect to (a) any breach of any warranty or representation or any covenant or agreement of Lessor or Lessee, respectively, under this Lease; or (b) any injury to or death of persons and/or any damage to or destruction of property on or about the Premises and attributable to the negligence or misconduct of Lessor or Lessee, respectively, or their respective officers, employees, agents, contractors, or invitees, except for any such breach, any injury or death, or any damage or destruction arising out of or with respect to the negligence or misconduct of the indemnified party or any of its officers, employees, agents, contractors, or invitees, or as otherwise specifically provided in this Lease; provided, however, that the indemnification obligation created by this Section shall be expressly conditioned upon the party seeking indemnification (i) delivering to the other party prompt notice of any event giving rise to such indemnification obligation and (ii) providing such other party the opportunity to defend itself from and against any losses.

22.  **TRANSFERS:**

    22.1  Assignment and Subletting:  Except as provided in this Section, Lessee shall not assign this Lease nor sublet all or any portion of the Premises without the consent of Lessor, which consent shall not be unreasonably withheld or delayed; provided, however, that Lessee shall have the right, without the consent of Lessor, to assign this Lease or sublet all or any portion of the Premises to DELPHI AUTOMOTIVE SYSTEMS LLC or any of its wholly-owned subsidiaries or to any successor to the ownership of the business unit that conducts operations at the Premises, provided such business unit does not conduct operations solely at the Premises.  Absent the written agreement of Lessor, no assignment of this Lease or subletting of all or any portion of the Premises shall relieve Lessee of any of the terms, conditions, covenants, and obligations of this Lease on the part of Lessee to be performed. Any assignment or subletting in violation of this provision shall be void.  Consent to any one assignment or sublease shall not be deemed a waiver of any right to consent to future assignments or sublettings.

    22.2  Notice of Sale:  In the event that Lessor, at any time on or before the expiration of the Term of this Lease or the earlier termination of this Lease, shall transfer, assign, or otherwise convey to a third party all or any portion of its right, title, and interest in and to the Premises, Lessor shall deliver to Lessee notice of the name and address of the purchaser of such right or title and Lessor shall be relieved of all obligations of Lessor under this Lease thereafter accruing, provided the purchaser expressly assumes all such obligations and notifies Lessee of such assumption in writing.

23.  **HOLDING OVER:**  If Lessee shall continue to occupy the Premises after the expiration of the Term of this Lease or the earlier termination of this Lease, then Lessee shall be deemed to be occupying the Premises as a tenant from month-to-month at a rental rate equal to one hundred fifty percent (150%) of the then current base rental rate, and subject to the other terms and conditions of this Lease; provided, however, that either party shall have the right to terminate such month-to-month tenancy upon delivery of thirty (30) days notice to the other.

24.  **QUIET ENJOYMENT:**  Lessor covenants and agrees that Lessee shall have the peaceful and quiet possession and enjoyment of the Premises (subject to all mortgages and other matters to which this Lease is or shall become subordinate in accordance with the provisions of Section 25) for the conduct of its business operations during the Term of this Lease without hindrance by Lessor.

25.  **SUBORDINATION AND ATTORNMENT/ESTOPPEL:**  (a)  Lessee covenants and agrees, on the terms and conditions provided in this Section, that this Lease shall be subordinate to any institutional mortgage or deed of trust that now or hereafter shall encumber the Premises, provided that each named mortgagee or beneficiary shall execute and deliver to Lessee a non-disturbance, attornment and subordination agreement stating (in addition to other reasonable terms, if any) in substance that (i) if Lessee is not in default hereunder, the right of possession of Lessee to the Premises shall not be affected or disturbed by any mortgagee in the exercise of any of its rights under a mortgage or the note secured thereby, and any sale of the Premises pursuant to the

exercise of any rights and remedies under a mortgage or otherwise shall be made subject to Lessee's rights under this Lease; and (ii) Lessee shall attorn to any mortgagee or purchaser at a foreclosure sale (a "Purchaser) upon acquisition of title to the Premises by a mortgagee or Purchaser and notice to Lessee thereof and the mortgagee or purchaser's assumption of Lessee's thereafter accruing obligations, and this Lease shall continue in full force and effect between Lessee and such mortgagee or Purchaser. Upon Lessee's receipt and approval of such a non-disturbance/attornment agreement from a mortgagee or beneficiary from time to time, Lessee covenants and agrees to attorn to such mortgagee or beneficiary upon foreclosure. Without limiting the generality of the foregoing, within thirty (30) days after the date of this Lease, Lessor shall deliver to Lessee such a non-disturbance/attornment agreement from the mortgagee and beneficiary of each mortgage and deed of trust, respectively, including without limitation all mortgages and deeds of trust set forth in Exhibit "E", now encumbering the Premises. If Lessor shall fail to obtain any such non-disturbance/attornment agreement within such thirty (30) day period, or if the form thereof shall not be reasonably acceptable to Lessee, then Lessee may, at its option, terminate this Lease. Lessee shall execute reasonable documentation to evidence the subordination required hereunder within thirty (30) days of request.

(b)    In the event that estoppel certificates now or hereafter may be required by any mortgagee or beneficiary of any mortgage or deed of trust, respectively, encumbering the Premises, Lessee further covenants and agrees to execute, within thirty (30) days following Lessor's request, certificates containing the substance of the following statements (together with other reasonable terms, if any):  (i) that the copy of the Lease attached to the certificate is a true and complete copy of the Lease and there are no amendments, modifications, or alterations of the Lease, except as stated; (ii) that the Premises required to be furnished under the Lease have been completed in accordance therewith, the date on which Lessee accepted possession of such Premises and that Lessee now occupies the same; (iii) that Lessee began paying monthly installments of rent under the Lease on a given date and no such installment has been paid more than one month in advance; and (iv) that the Lease is in full force and effect, and, except as noted, there exists to Lessee's knowledge no defense or offset to enforcement of the Lease by Lessor, and to Lessee's knowledge Lessor is not in default under the Lease.

(c)    Lessee agrees to give any ground lessors or mortgage and/or deed of trust holders, as to all or a portion of the Premises, by registered mail, a copy of any notice of default served upon Lessor, provided that prior to such notice Lessee has been notified in writing (by way of notice or assignment of rents and leases, or otherwise) of the addresses of such parties. Lessee agrees not to exercise any remedies available by virtue of a Lessor's failure to cure a default within thirty (30) days after receipt of notice of default (or such additional time as may be reasonably necessary to cure such default) unless Lessee has also given such parties a reasonable opportunity to cure such default).

26.    <u>SURRENDER OF PREMISES</u>:  Upon the expiration of the Term of this Lease or the earlier termination of this Lease, Lessee shall deliver up and surrender the Premises to Lessor in as good order and condition as upon the Lessee possession date, subject to (a) Lessee's improvements, alterations, and renovations to the Premises, including without limitation Lessee's Improvement Work; (b) normal wear and tear; (c) damage by fire, explosion, or other insurable casualty; (d) repairs and restoration for which Lessee shall

not be responsible hereunder; and (e) Lessee's removal of its trade fixtures (with any damage occasioned by such removal to be repaired). Any property of Lessee remaining on the Premises for thirty (30) days after the termination of this Lease shall be deemed abandoned.

27.    **NOTICES; COMPUTATION OF TIME:** For the purposes of payments of Rent and other amounts payable by Lessee to Lessor hereunder and notices and other communications between the parties, the addresses of Lessor and Lessee shall be as follows:

Lessor:        At the address shown in Section 1.1

Lessee:        At the address shown in Section 1.2

With a copy to:        Delphi Automotive Systems LLC
c/o Facilities Services Group
1450 West Long Lake
Mail Code: 480-414-250
Troy, MI 48098
Attention: Real Estate Services Manager

Any notices and other communications to be delivered by either party to the other pursuant to this Lease shall be in writing and shall be deemed delivered as follows, except as otherwise specifically provided in this Lease: (a) One (1) business day after mailing by Federal Express or other overnight courier service; or (b) three (3) business days after deposit (or, in the case of any notices sent by Lessee to Lessor for the purpose of exercising rights of first refusal and rights and options to extend the Primary Term or any Extension Term, to lease any additional portion of the Premises or to purchase any portion of the Premises or Lessor's right, title, and interest therein, upon deposit) in the United States mail by certified mail, postage prepaid, return receipt requested, addressed to the party to be charged with notice at the above-recited address or the above-recited telecopier number or such other address or telecopier number as either party from time to time may designate by notice delivered to the other; provided, however, that no notice of change of address or telecopier number shall be deemed given until received by the party to be notified.

28.    **ENTIRE AGREEMENT; AMENDMENTS:** This Lease contains the entire agreement between the parties and no promise, representation, warranty, covenant, agreement, or understanding not specifically set forth in this Lease shall be binding upon or inure to the benefit of either party. This Lease may not be amended, altered, modified, or supplemented in any manner except by an instrument in writing duly executed by the parties.

29.    **GOVERNING LAW; INTERPRETATION:** This Lease shall be construed and enforced in accordance with the laws of the state in which the Premises shall be located. The fact that this Lease shall have been prepared by the attorney for either Lessor or Lessee shall not be used to construe or interpret this Lease for or against either party; the parties intend that the provisions of this Lease shall be given their fair meaning and no court shall construe this Lease more stringently against one party than against the other.

30.    AUTHORITY; BINDING EFFECT:    If Lessor or Lessee shall be a corporation, trust, or general or limited partnership, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of such entity.    The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties and their respective heirs, executors, administrators, personal and legal representatives, successors, and assigns.

31.    NO WAIVER:    The failure of Lessor or Lessee to insist upon strict performance of any of the terms, conditions, covenants, and obligations contained in this Lease shall not be deemed a waiver of any rights or remedies for any subsequent breach or default in the terms, conditions, covenants, and obligations herein contained.

32.    RECORDING:    If Lessor or Lessee requests, the parties shall execute and acknowledge a short form of lease in the form attached as Exhibit "G" for recording purposes, which short form of lease shall be recorded at the expense of the party requesting the same, which party shall pay any documentary transfer tax or other special tax or assessment associated with or triggered by such recording.

33.    SIGNS:    Lessee shall have exclusive sign rights for the Premises, exterior and interior, and shall have the right to erect and display signs on the Premises as Lessee reasonably may request, subject only to compliance with applicable laws, ordinances, and requirements of governmental authorities with competent jurisdiction.

34.    INCORPORATION OF EXHIBITS:    Each of the attached Exhibits hereby is incorporated in and made a part of this Lease as if set forth herein.    In the event of any conflict between the body of this Lease and the provisions set forth in the Exhibits, the provisions set forth in the Exhibits shall be deemed to control.

35.    SECTION HEADINGS:    The section headings hereof are intended for convenience and reference purposes only and shall not be used to construe or interpret this Lease.

36.    SEVERABILITY:    If any provision of this Lease shall be determined by any court to be invalid, illegal, or unenforceable to any extent, then the remainder of this Lease shall not be affected, and this Lease shall be construed as if the invalid, illegal, or unenforceable provision had never been contained in this Lease.

37.    TRANSMITTAL:    Submission of this Lease for examination, even though executed by Lessor or Lessee, shall not bind the other party in any manner, and no lease or other obligation on the part of either party shall arise until this Lease shall be executed and delivered by the parties, each to the other.

38.    COUNTERPARTS:    This Lease may be executed in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

39.    YEAR 2000:    Lessor represents and warrants to Lessee that the computer systems serving the building systems (including without limitation the mechanical, electrical, security, and parking systems) are compatible with and shall not be adversely affected by the year 2000 and dates thereafter.    In the event that access to or use of the

premises is interrupted or delayed by such reason, Lessor shall be liable to Lessee for all loss or damage which Lessee may suffer, including without limitation consequential damages.

40.    **LIMITATION OF LESSOR LIABILITY.**  Except for Lessor's obligation to complete construction and deliver possession of the Premises to Lessee in accordance with the requirements of this Lease, Lessor shall have no personal liability with respect to any of the provisions of this Lease during Lessor's period of ownership of the Premises, and if Lessor is in default with respect to its obligations under this Lease, Lessee shall look solely to Lessor's equity in the Premises and the rents, profits and proceeds thereof for the satisfaction of Lessee's remedies.   In the event of the sale or transfer of the Premises by Lessor all obligations of Lessor hereunder arising after the date of such transfer shall be transferred and assumed by the new owner and the transfer of this Lease and the assignor Lessor shall have no obligation or liability, as Lessor, from and after the date of the transfer of this Lease with respect to any obligations arising after the date of such transfer, provided Lessee shall have received written notice from the new owner that it has assumed the obligations of Lessor under this Lease.

41.    **TIME OF ESSENCE.**  Time is of the essence with respect to this Lease.

42.    **NO WAIVER.**  The waiver by either party of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition on any subsequent breach of the same or any other term, covenant or condition herein contained.  The acceptance of rent hereunder by Lessor shall not be deemed to be a waiver of any breach by Lessee of any term, covenant or condition of this Lease.

43.    **FORCE MAJEURE.**  Whenever a day is appointed herein on which, or a period of time is appointed within which, either party hereto is required to do or complete any act, matter or thing, the time for the doing or completion thereof shall be extended by a period of time equal to the number of days on or during which such party is prevented from, or is interfered with, the doing or completion of such act, matter or thing because of strikes, lock-outs, embargoes, unavailability of labor or materials, wars, insurrections, rebellions, civil disorder, declaration of national emergencies, acts of God, or other causes beyond such party's reasonable control (financial inability excepted); provided however, nothing contained in this Section shall excuse Lessee from the prompt payment of any rent except as may be expressly provided elsewhere in this Lease or delay Lessee's rights under Section 8.1 of this Lease (except as expressly set forth therein).

44.    **INTEREST**.   In the event Lessor or Lessee fails to pay any amount due to the other party on the date such payment is due, the unpaid amount shall bear interest at the Default Rate .

45.    **CONSTRUCTION FINANCING COMMITMENT**.  Within five (5) business days following Lessor's execution of this Lease, Lessor shall deliver to Lessee (i) a firm commitment for construction financing with respect to the acquisition of the Land and performance of the Lessor's Improvement Work and (ii) evidence of Lessor's ability to satisfy any conditions under such commitment for construction financing.  If Lessor does not deliver such commitment for construction financing and evidence of ability to satisfy conditions to

Lessee within the required period, Lessee shall have a right to terminate this Lease prior to January 5, 2000.

IN WITNESS WHEREOF, Lessor has signed and sealed this instrument this _2nd_ day of _December_, _1999_, and Lessee has signed and sealed this instrument this _____ day of _____, _____.

In the presence of:

_____

_____

DASCO, INC.

BY _____

President

ATTEST _____

Secretary

In the presence of:

_____

_____

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By:    Delphi Automotive Systems Inc.,
       a Delaware corporation

Its:    Managing Member

       By: _____

       Manager, Real Estate Services

Its:    Authorized Signatory

LEGAL APPROVED for execution
Miro Weiner & Kramer
By: Sean P. Corcoran

## EXHIBIT "A"

## LEGAL DESCRIPTION

Lessor shall provide the legal description of the Land to Lessee no later than January 20, 2000, for Lessee's review and approval.  Once reviewed and approved by Lessee, the legal description of the Land shall be incorporated in this Lease as Exhibit A.



**EXHIBIT "B"**

SITE PLAN

Lessor shall deliver to Lessee, no later than January 20, 2000, a site plan showing the Land and the Building and all Lessor" Improvement Work outside of the Building.  Once such site plan is approved by Lessee, it shall be incorporated in this Lease as Exhibit B.

EXHIBIT "C"

LESSOR'S IMPROVEMENT WORK

Lessor shall, at its expense, commence and Substantially Complete the construction of the Lessor's Improvement Work in accordance with the final drawings, plans and specifications approved by Lessee, which drawings and specifications shall be prepared by an architect and engineer licensed in the State in which the Premises is located and retained by Lessor at its sole cost and expense.  Lessor's Improvement Work shall be completed in a good and workmanlike manner, in compliance with all laws, codes, ordinances, regulations and other requirements of any governmental authority that has jurisdiction over the Land, and in accordance with the other requirements of this Lease.

Lessor shall submit a site plan showing the Land, the location of the Building and all other components of Lessor's Improvement Work which are located outside of the Building to Lessee no later than January 20, 2000.  If Lessee shall not have received such site plan by January 20, 2000, then Lessee shall have the right to terminate this Lease no later than January 30, 2000.

Lessor shall submit full, complete and detailed working drawings and plans and specifications to Lessee for Lessee's approval as soon as practicable and, in any event, not later than January 31, 2000.  If Lessee shall require any changes to such plans, Lessor shall make the changes and resubmit the revised plans to Lessee within five (5) business days. Lessee shall submit its approval or comments to Lessor within five (5) business days of submission by Lessor.  This process shall be repeated until Lessee has approved the working drawings and specifications.  After the working drawings and specifications are approved by Lessee, they shall constitute the "Construction Plan."  The Construction Plan shall be consistent in every way with the Facility Requirements Delphi Chassis Systems Delta – Saturn 315 Sequence Facility attached to this Lease as Exhibit C-1, and any work which is reasonably inferable therefrom (the "Design Criteria").  Subject to the foregoing, the approval by Lessee of the Construction Plan shall not be unreasonably withheld or delayed.  Lessor and Lessee agree to cooperate in good faith to complete the Construction Plan as promptly as possible.  In connection with the approval of the Construction Plan, Lessee shall not require Lessor to incur any cost for work that is inconsistent with the Design Criteria unless Lessor and Lessee agree to an equal or greater cost savings on another item or Lessee issues a change order, as hereinafter set forth.  In no event shall Lessee have the right to decrease the size of the Building.

If Lessor or Lessee fail to satisfy their obligations to deliver or respond to plans within the required time period, and such failure continues for a period of ten (10) business days following written notice to the other party, then the non-defaulting party shall have the right to terminate this Lease, in addition to all other remedies that may be available under this Lease or at law or in equity upon written notice delivered within five (5) business days after the expiration of such ten (10) business day period.

Within ten (10) days following the date of this Lease, Lessor shall submit to Lessee a schedule setting forth the date by which all components of Lessor's Improvement Work shall be completed.  Such schedule shall contain such details as Lessee reasonably requires and shall

be subject to Lessee's reasonable approval.   After such schedule has been approved by Lessee, it shall constitute the "Approved Construction Schedule."   Lessor shall cause all of Lessor's Improvement Work to be completed within the time frames set forth in the Approved Construction Schedule, subject to delays of the nature set forth in Section 42 of the Lease or otherwise caused by Tenant.   If Lessor and Lessee do not agree upon the construction schedule within ten (10) business days after Lessee receives the schedule prepared by Lessor, Lessee shall have the right to terminate this Lease.

Upon Substantial Completion of the Phase I Premises and Phase II Premises, as applicable, and the Lessor's Improvement Work in accordance with the Construction Plan, Lessee agrees to accept and take possession of the applicable portion of the Premises, subject to Lessor's obligation to promptly complete such construction and any remaining punch list items indicated on a punch list to be delivered to Lessor not later than thirty (30) days after Lessee takes possession of the Premises.   "Substantial Completion" of the applicable portion of the Premises shall be deemed to have occurred at such time as (i) Lessor's Improvement Work has been completed in accordance with the Construction Plan, and only minor punch-list items which will not interfere with Lessee's use and enjoyment of the applicable portion of the Premises remain to be completed, (ii) Lessor has delivered to Lessee a certificate of occupancy from the applicable governing body and (iii) Lessor has delivered to Lessee a certificate of substantial completion by the architect of record.   (The phrases "Substantially Complete" and "Substantially Completed" shall have correlative meanings.)

Lessor hereby guarantees Lessor's Improvement Work against defects in workmanship, design or materials for one (1) year following the Commencement Date and shall assign to Lessee the benefit of all warranties covering portions of the Premises which Lessee is responsible for maintaining.   In addition, without limitation of the foregoing, Lessor shall also obtain the following guarantees from its subcontractors (i) the roof of the Building against leaks and need for resurfacing, for a period of 20 years, (ii) the concrete floor slab against cracks and need for replacement for a period of 3 years, (iii) the parking lots and driveways against cracking, and required resurfacing for a period of 1 year (provided that concrete work shall be warranted for a period of 3 years), (iv) that the HVAC system shall be in good working order for a period of 1 year, (v) that the plumbing system serving the Building shall be in good working order for a period of at least 1 year, (vi) that the sewer system serving the Building shall be in good working order for a period of at least 10 years, and (vii) that the electrical system serving the Building shall be in good working order for a period of at least 1 year, in each case following the completion of the applicable work.   These warranties shall not apply to repairs which are required as a result of the misuse of the Premises by Lessee.

In the event Lessee elects to take or accept possession of the Premises prior to the Substantial Completion of Lessor's Improvement Work, Lessee agrees that prior to such taking of possession it shall deliver to Lessor the certificate of insurance or duplicate original of all policies of insurance required to be carried by Lessee pursuant to the terms of this Lease. Lessee agrees that it shall not interfere with or delay Lessor, its agents or employees, in the completion of the Lessor's Improvements.   Lessee shall hold Lessor harmless from and against any claim or demand arising out of any injury to or death by any person or damage to property occurring in, on or about the Premises due to Lessee's negligent acts or omissions during the period of Lessee's possession of the Premises prior to the date that Lessor's Improvement Work has been substantially completed.

Lessee shall have the right to issue written change orders to Lessor.  Lessor shall competitively bid any change orders; and, if Lessee approves of a bid for any change order, the change order shall be implemented by Lessor.   Lessee shall pay for any change orders resulting in a net increase in the cost of the Premises fifty percent (50%) within thirty (30) days of approval of the change order by Lessee and fifty percent (50%) upon Substantial Completion of the Premises.   Notwithstanding the foregoing, if the Lessor has construction financing available to cover the net increase resulting from any change orders (which the Lessor hereby agrees to use reasonable efforts to obtain), then the net cost of the change order (and incremental costs of the financing) shall be amortized over the initial term of the Lease and base rent under the Lease shall be increased by an amount equal to the annual amortization of such cost, together with interest on such cost at a rate equal to 12 % per annum.

EXHIBIT "C-1"

THE DESIGN CRITERIA


The Design Criteria consists of Pages 1 through 25 of the Facility Requirements and Lease Hold Improvements New Delphi Chassis System's Delta – Saturn 315 Sequence Facility Spring Hill, Tennessee attached hereto.  For the purposes of incorporation of the Design Criteria into the Lease, all references to the "Owner" shall be deemed to refer to "Lessee" and all references to the "Developer" and "Contractor" shall be deemed to refer to "Lessor."


Notwithstanding references to canopies and a trash building in the Design Criteria, Lessor shall not be required to construct such improvements.

## FIRST AMENDMENT TO WAREHOUSE LEASE

THIS FIRST AMENDMENT TO WAREHOUSE LEASE, made as of the 1st day of February, 2001 ("Effective Date"), between DASCO, INC., a Tennessee corporation ("Lessor") and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company ("Lessee").

WHEREAS, Lessor and Lessee entered into that certain Warehouse Lease dated as of December 22, 1999 (the "Lease"); and

WHEREAS, construction of the Phase II Premises was completed and became part of the Premises prior to the Anticipated Phase II Possession Date; and

WHEREAS, the parties desire to confirm the Commencement Date and Phase II Commencement Date; and

WHEREAS, the address of the Premises is now known; and

WHEREAS, Lessor and Lessee desire to attach the final forms of Exhibits A, B and E to the Lease as provided in the Lease; and

WHEREAS, in order for Lessor to obtain financing to construct improvements on the portion of the Premises described on Schedule 1, attached hereto and incorporated herein, (the "1.87 Acre Tract") should Lessee desire for such improvements to be constructed, Lessor and Lessee desire to amend the Lease to, among other things, exclude the 1.87 Acre Tract from the Premises; and

WHEREAS, simultaneously herewith, Lessor and Lessee have entered into a Lease Agreement for the 1.87 Acre Tract (the "1.87 Acre Tract Lease").

NOW THEREFORE, for and in consideration of the Premises and other good and valuable consideration, the receipt and sufficiency of which the parties both hereby acknowledge, the parties hereby agree as follows:

1.    Commencement Date.  Notwithstanding anything to the contrary contained in the Lease, the Commencement Date and Phase II Commencement Dates are November 1, 2000. As provided in the Lease, effective as of such date, the Rent is $4.00 per square foot or One Hundred Forty Four Thousand and No/100 Dollars ($144,000.00) per annum, payable in advance monthly installments of Twelve Thousand and No/100 Dollars ($12,000.00) per month.

2.    Address.  The address of the Premises is 1974 Ridgecrest Drive, Columbia, Tennessee 48303.

3.    Legal Description.  The parties hereby agree to exclude the 1.87 Acre Tract from the Premises as of the Effective Date.  Accordingly, the parties hereby agree to substitute the legal description set forth on Schedule 2 for the diagram currently attached to the Lease as Exhibit A.

4.    Site Plan/Mortgages/Encumbrances/Restrictions.  As provided in the Lease, the parties hereby agree that Schedules 3 and 4 shall be substituted for Exhibits B and E to the Lease, respectively.  In addition, Lessee acknowledges that it has approved the status of title to the Land as shown

0676484-06
0932I9-000 02/01/2001

on the Lawyers Title Insurance Corporation Title Commitment No.49171 and the survey of the Land, as shown on the survey by Jim Webb, RLS# 596 dated January 18, 2001, as required by Section 19.2 of the Lease.

5.     Additional Amendments to Lease.

a.     Notwithstanding anything to the contrary contained in the Lease, (i) if the 1.87 Acre Tract Lease terminates as a result of Lessee's default thereunder, then this Lease shall terminate automatically; and (ii) Lessee may not assign this Lease or sublet all of the Premises unless it also assigns the 1.87 Acre Tract Lease or sublets all of the premises subject thereto to the same person or entity to which the Lease is assigned or the Premises sublet.

b.     A default under the 1.87 Acre Tract Lease which continues beyond applicable notice and cure periods shall be a Lessee Default under this Lease.

c.     Insert the words "or all or any portion of the premises subject to the 1.87 Acre Tract Lease" after the word "Premises" on line three (3) of subsection 25(b) and on line two (2) of subsection 25(c) of the Lease.

6.     Defined Terms. All capitalized terms used herein not expressly defined shall have the ascribed thereto in the Lease.

7.     Schedules. The parties hereby acknowledge and agree that all schedules referenced herein are attached hereto and incorporated herein by reference.

8.     Ratification. Except as modified herein, all of the provisions of the Lease shall continue in full force and effect and are hereby ratified and affirmed.

[Signatures Appear on the Following Page]

D676484.06
093219-D00 02/01/2001

- 2 -

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first set forth above.

LESSOR:

DASCO, INC.,
a Tennessee corporation

By: _____

Title: _____

LESSEE:

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By:    Delphi Automotive Systems Corporation
       a Delaware corporation

Its:   Managing Member

       By: _____  2-13-01

       Its: Authorized Signatory

Execution Recommended
Fquis Corporation
By: _____
By: _____

APPROVED / LEGAL
MIRO WEINER & KRAMER

APPROVED for execution by DELPHI LEGAL
By: Cren M. Cavenfs

0676484.06
093219-000 02/01/2001

- 3 -

## SCHEDULE 1

### LEGAL DESCRIPTION OF 1.87 ACRE TRACT

Tract 2B on the plat of record in Book 13, page 140, Register's Office for Maury County, Tennessee.

Being a portion of the property conveyed to D & S Contractor's, Inc. d/b/a DASCO, Inc. by deed of record in Deed Book R1468, Page 982, Register's Office of Maury County, Tennessee.

## SCHEDULE 2

### LEGAL DESCRIPTION

Tract 2A on the plat of record in Book 13, page 140, Register's Office for Maury County, Tennessee.

Being a portion of the property conveyed to D & S Contractor's, Inc. d/b/a DASCO, Inc. by deed of record in Deed Book R1468, Page 982, Register's Office of Maury County, Tennessee.

0676484.06
093219-000 02/01/2001

**SCHEDULE 3**

SITE PLAN

(Attached)

## SCHEDULE 4

### MORTGAGES/ENCUMBRANCES/RESTRICTIONS

1.      Utility and Drainage Easements, building setback lines and other matters as shown on the plats of record in Plat Book 12, Page 212, and Plat Book 13, page 140, Register's Office of Maury County, Tennessee, which among other things, show a 20' Sewer Easement along the western boundary of the Premises, the natural flow of Rutherford Creek and a portion of the property being in a flood plain.

2.      Easements set forth in the Declaration of Easements of record in Book ___, page ___, said Register's Office.

3.      Commercial Deed of Trust, Financing Statement, Security Agreement, Assignment of Lease and Rents and Fixture Filing of record in Book ___, page ___, said Register's Office and related filings.

## SECOND AMENDMENT TO WAREHOUSE LEASE

THIS SECOND AMENDMENT TO WAREHOUSE LEASE (this "Amendment"), is made and entered into this __5 th__ day of ~~June,~~ *August* 2002, between DONALD R. SWEETON AND SARAH E. SWEETON (collectively, "Lessor"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company ("Lessee"), based upon the following:

    A.    DASCO, Inc. (the "Original Lessor"), and Lessee entered into a Warehouse Lease dated December 22, 1999 (the "Original Lease"), with respect to Premises located at 1974 Ridgecrest Drive, in the City of Columbia, County of Maury, State of Tennessee.

    B.    The Original Lease was amended by a First Amendment to Warehouse Lease between Original Lessor and Lessee dated February 1, 2001, and was assigned by Original Lessor to Lessor by an Assignment of Leases dated February 23, 2001. (The Original Lease, as so assigned and amended is referred to in this Amendment as the "Lease.")

    C.    Lessor and Lessee desire to further amend the Lease to reflect their agreement that Lessor shall construct new loading docks and related improvements (the "Loading Dock Improvements") as specified in Exhibit H-1 to this Amendment and as shown on Exhibit H-2 to this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Lessor and Lessee agree as follows:

    1.    Defined Terms. Terms used with initial capital letters and not otherwise defined in this Amendment have the meaning ascribed to them in the Lease.

    2.    Completion of Loading Dock Improvements. (a) Lessor agrees to complete the Loading Dock Improvements no later than *August 31*, 2002. The Loading Dock Improvements shall be completed in accordance with the standards that applied to Lessor's Improvement Work under Section 19.1(a) of the Lease, and shall be guaranteed by Lessor in accordance with the guaranty applicable to Lessor's Improvement Work under Exhibit C to the Lease.

All materials to be as specified. All work to be completed in a professional manner according to standard industry practices. Any alteration or deviation from above specifications involving extra costs will be executed only upon written orders, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents or delays beyond our control. Owner to carry fire, tornado, and other necessary insurance. Our workers are fully covered by Workers Compensation insurance.

DASCO, INC.

Sarah E. Sweeton

07/10/2003  11:03       9317624944

# EXHIBIT H-2

## DEPICTION OF LOADING DOCK IMPROVEMENTS



# Spring Hill, TN LOC Site

Additional Loading Docks
Date: 6/3/2002

## ASSIGNMENT OF LEASES

THIS ASSIGNMENT OF LEASES, made as of the 23ʳᵈ day of February, 2001, between D & S CONTRACTORS, INC., d/b/a DASCO, INC., a Tennessee corporation ("Assignor") and DONALD R. SWEETON and SARAH E. SWEETON (collectively, "Assignee").

WHEREAS, Assignor and Delphi Automotive Systems LLC entered into that certain Warehouse Lease dated as of December 22, 1999, as amended by that certain First Amendment to Warehouse Lease dated as of February 1, 2001 (collectively, the "Warehouse Lease") regarding those certain premises described on Exhibit A, attached hereto and incorporated herein by reference; and

WHEREAS, Assignor and Delphi Automotive Systems LLC entered into that certain Lease dated February __, 2001 (the "1.87 Acre Tract Lease") regarding those certain premises described on Exhibit B, attached hereto and incorporated herein by reference; and

WHEREAS, the Warehouse Lease and 1.87 Acre Tract Lease are collectively referred to herein as the Leases; and

WHEREAS, Assignor desires to assign the Leases to Assignee on the following terms and conditions and Assignee desires to accept such assignment from Assignor on such terms and conditions.

NOW THEREFORE, for and in consideration of Ten and No/100 dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which the parties both hereby acknowledge, the parties hereby agree as follows:

1.    Assignor does hereby sell, assign, transfer, convey and set over unto Assignee, Assignee's successors and assigns, all of Assignor's right, title and interest in, to and under the Leases.  TO HAVE AND TO HOLD the Leases to the Assignee, Assignee's successors and assigns, forever.

2.    Assignor agrees to indemnify and hold Assignee harmless from and against all claims arising out of the failure of Assignor to perform and discharge any of Assignor's obligations with respect to the Leases on or before the date hereof.

3.    Assignee hereby accepts this Assignment and, from and after the date hereof, assumes and agrees to perform and discharge all of Assignor's obligations arising from, in connection with, or related to the Leases from and after the date hereof.  Assignee further agrees to indemnify and hold Assignor harmless from and against all claims arising out of the failure of Assignee to perform and/or discharge all of Assignor's obligations with respect to the Leases from and after the date hereof.

0676485.02
093219-000 02/13/2001

IN WITNESS WHEREOF, the parties have signed and sealed this assignment on the date first set forth above.

ASSIGNOR:

D & S Contractors, Inc., d/b/a DASCO, Inc.

By: _____
Name: _____
Its: _____

ASSIGNEE:

_____
Donald R. Sweeton

_____
Sarah E. Sweeton

<u>Exhibit A</u>

Description of Warehouse Lease Premises

Tract 2A on the plat of record in Book 13, page 140, Register's Office for Maury County, Tennessee.

## Exhibit B

Description of 1.87 Acre Tract Lease Premises

Tract 2B on the plat of record in Book 13, page 140, Register's Office for Maury County, Tennessee.

## THIRD AMENDMENT TO WAREHOUSE LEASE

**THIS THIRD AMENDMENT TO WAREHOUSE LEASE** (this "Amendment"), is made and entered into this _17th_ day of July, 2003, between DONALD R. SWEETON AND SARAH E. SWEETON (collectively, "Lessor"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company ("Lessee"), based upon the following:

A.    DASCO, Inc. (the "Original Lessor"), and Lessee entered into a Warehouse Lease dated December 22, 1999 (the "Original Lease"), with respect to Premises located at 1974 Ridgecrest Drive, in the City of Columbia, County of Maury, State of Tennessee (the "Original Premises").

B.    The Original Lease was amended by a First Amendment to Warehouse Lease between Original Lessor and Lessee dated February 1, 2001, was assigned by Original Lessor to Lessor by an Assignment of Leases dated February 23, 2001, and was further amended by a Second Amendment to Warehouse Lease dated August 5, 2002.  (The Original Lease, as so assigned and amended is referred to in this Amendment as the "Lease.")  The current expiration date of the Lease is October 31, 2008.

C.    Lessor and Lessee desire to further amend the Lease to reflect their agreement that Lessor shall expand the Building which is a part of the Premises by 23,280 square feet (consisting of an 18,000 square foot, six bay warehouse area on the north side of the Building, a 1,680 square foot one-story auxiliary warehouse area on the east side of the Building and a 3,600 square foot open air storage area on the north side of the Building, which are collectively referred to in this Amendment as the "Expansion Premises") and construct additional parking areas and other improvements as shown on the drawing attached as Exhibit I-1 to this Amendment and in accordance with the Facility Requirements attached as Exhibit I-2 to this Amendment.  (Exhibits I-1 and I-2 are referred to as the "Requirements Drawings and Specifications" in this Amendment and the improvements contemplated under the Requirements Drawings and Specifications are referred to as the "Expansion Improvements" in this Amendment.)

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Lessor and Lessee agree as follows:

1.    Defined Terms.  Terms used with initial capital letters and not otherwise defined in this Amendment have the meaning ascribed to them in the Lease.

2.    Completion of Expansion Improvements.  (a)  Subject to delays caused by Lessee and Section 43 of the Lease, Lessor agrees to complete the Expansion Improvements no later than ninety (90) days following execution of this Amendment.  The Expansion Improvements shall be completed substantially in accordance with Exhibit I-3 attached hereto.

(b)    Lessor shall use reasonable efforts to construct the Expansion Improvements in a manner that does not result in any material interference with Lessee's use of the Premises, and shall coordinate the timing of Lessor's construction work with Lessee.  Lessor shall not be required to perform work after hours, pay overtime wages or otherwise increase the cost of constructing the Expansion Improvements on account of this subsection.

3.    Expansion of Premises.  On the date of Substantial Completion (as defined in Exhibit I-3 attached to this Amendment) of the Expansion Improvements (the "Expansion Premises Commencement Date"), the Expansion Premises shall be added to the Premises under the Lease, except to the extent inconsistent with the provisions of Paragraph 6 of this Amendment..  The anticipated Expansion Premises Commencement Date is November 1, 2003.

4.    Term.  The Term of the Lease with respect to the Expansion Premises shall commence on the Expansion Premises Commencement Date and shall expire on the day immediately preceding the eighth (8th) anniversary of the Expansion Premises Commencement Date (the "Expansion Premises Expiration Date").

5.    Expansion Premises Rent.  The rent with respect to the Expansion Premises will be One Hundred Thirty-Six Thousand Five Hundred Eighty-Four and 00/100ths Dollars ($136,584.00) per annum, payable in monthly installments of Eleven Thousand Three Hundred Eighty-Two and 00/100ths Dollars ($11,382.00), commencing on the Expansion Premises Commencement Date.

6.    <u>Renewal Option</u>.

a.  If Lessee elects to renew the Lease with respect to the Original Premises for the first Extension Term, as provided in Section 1.4(b) of the Lease, and if the Expansion Premises Expiration Date would otherwise occur prior to October 31, 2011, the Term of the Lease with respect to the Expansion Premises shall be extended through October 31, 2011, such that the Term of the Lease with respect to the Expansion Premises shall be coterminous with the Term for the Original Premises.  The rent payable with respect to the Expansion Premises following the original Expansion Premises Expiration Date through October 31, 2011 (if applicable) shall be Eight Thousand Nine Hundred Forty-Three and 40/100ths Dollars ($8,943.40) per month, which is Four and 61/100ths Dollars ($4.61) per square foot, per annum, subject to adjustment based on the actual square footage.

b.  If Lessee exercises the option to renew the Lease for the second Extension Term, as provided in Section 1.4(b) of the Lease, the Rent for the Expansion Premises during such renewal term shall be Eight Thousand Nine Hundred Forty-Three and 40/100ths Dollars ($8,943.40) per month, which is Four and 61/100ths Dollars ($4.61) per square foot, per annum, subject to adjustment based on the actual square footage.

c.  If Lessee does not elect to renew the Lease with respect to the Original Premises for the first Extension Term, as provided in Section 1.4(b) of the Lease, then:

i.   Lessee shall continue to lease the Expansion Premises through the Expansion Premises Expiration Date.

ii.  Upon the expiration of the Lease with respect to the Original Premises, Lessee shall (A) surrender the Original Premises in the condition required by the Lease; (B) install a demising wall or other means of dividing of the Original Premises from the Expansion Premises, to the extent required by applicable code in order to allow the Original Premises and the Expansion Premises to be leased to different parties;

and (C) make such alterations to the Expansion Premises as necessary to allow Lessee to occupy the Expansion Premises in compliance with applicable code.

d.  If Lessee elects to renew the Lease with respect to the Original Premises for the second Extension Term, as provided in Section 1.4(b) of the Lease, but not the Expansion Premises, then upon the expiration of the Lease with respect to the Expansion Premises, Lessee shall (i) surrender the Expansion Premises in the condition required by the Lease; (ii) install a demising wall or other means of dividing of the Original Premises from the Expansion Premises, to the extent required by applicable code in order to allow the Original Premises and the Expansion Premises to be leased to different parties; and (iii) make such alterations to the Original Premises as necessary to allow Lessee to occupy the Original Premises in compliance with applicable code.

7.    Insurance.  Lessee hereby confirms that it has elected to carry property insurance on the Building, as provided in Section 13(c) of the Lease.

8.    No Defenses.  Lessee affirms that, as of the date of execution of this Amendment, to Lessee's actual knowledge no default or breach by Lessor exists under the Lease and Lessee has no actual knowledge of defenses, offsets or counterclaims that could be asserted in an action by Lessor to enforce Lessor's remedies under the Lease.  Lessor affirms that, as of the date of execution of this Amendment, to Lessor's actual knowledge no default or breach by Lessee exists under the Lease and Lessor has no actual knowledge of defenses, offsets or counterclaims that could be asserted in an action by Lessee to enforce Lessee's remedies under the Lease.

9.    Broker.  Lessor and Lessee represent to each other that neither of them has dealt with any real estate broker, salesperson or finder in connection with this Amendment, and no other such person initiated or participated in the negotiation of this Amendment or is entitled to any commission in connection herewith, except for Equis Corp., for which Lessee is responsible for payment of any compensation.  Each party hereby agrees to indemnify, defend and hold the other harmless from and against any and all liabilities, claims, demands, actions, damages, costs and expenses (including attorneys fees) arising from a claim for a fee or commission made by any broker claiming to have acted by or on behalf of the indemnifying party in connection with this Amendment.

10.    <u>Notices</u>.    Section 27 of the Lease is hereby amended by changing Lessee's address for notices to the following:

> Delphi Automotive Systems LLC
> M/C: 480-410-172
> 5825 Delphi Drive
> Troy, Michigan  48098
> Attn:  Executive Director, Facilities Services Group
>
> with a copy to:
>
> Delphi Corporation
> M/C: 483-400-603
> 5725 Delphi Drive
> Troy, Michigan  48098
> Attn:  Assistant General Counsel, Commercial & Transactional

11.    <u>Entire Agreement</u>.  This Amendment represents the entire understanding between the parties with respect to the subject matter of this Amendment, and all prior agreements and understandings between the parties with respect to the subject matter of this Amendment are merged in this Amendment.  The exhibits attached to this Amendment are made a part of and incorporated in this Amendment.

12.    <u>Facsimile Execution</u>.  Delivery by facsimile of this Amendment or an executed counterpart shall be deemed a good and valid execution and delivery of this Amendment.

13.    <u>Ratification and Confirmation</u>.  To the extent of any inconsistency between the terms and provisions of this Amendment and the Lease, the terms and provisions of this Amendment shall control.  Except as amended by this Amendment, all of the terms, covenants and conditions of the Lease are in full force and effect and the Lease is hereby ratified and confirmed.

**IN WITNESS WHEREOF**, Lessor and Lessee are entering into this Third Amendment to Warehouse Lease as of the day and year first above written.

In the presence of:

_Windy Marleu Knight_     _Donald R. Sweeton_    7-23-03
                                     DONALD R. SWEETON

_Lindsay E. Winters_     _Sarah E. Sweeton_    7-23-03
                                     SARAH E. SWEETON

In the presence of:

                                    DELPHI AUTOMOTIVE SYSTEMS LLC,
                                    a Delaware limited liability company

                                    By:    Delphi Corporation,
                                             a Delaware corporation

                                    Its:    Sole Member

                                    By:    _John A. Saffurs_
                                               John A. Saffurs

                                    Its:    Authorized Signatory

rev.10/00

Execution Recommended
Equis Corporation
By: _____
By: _____

EXHIBIT I-1

## EXPANSION IMPROVEMENTS SPECIFICATIONS

FACILITY REQUIREMENTS

1. Add (6) bays or 18,000 sq ft floor space per drawing.

2. Add one story structure approximately 56' x 30' or 1,680 sq ft on the north side of the building per drawing.

3. Convert approx. 1000 sq ft existing floor space to add to office area including data, phone, and electric outlets per drawing.

4. Convert approx. 200 sq ft existing floor space to add to existing break room per drawing.

5. Add one grade door (12' W x 14' H) with electric (and wireless capable) opener and a pedestrian door per drawing.

6. No new bathroom capacity unless code requires (see size of work force and shifts below)

    In 2005:  105 people worst case (Salary & Hourly)
    Crew 1 - 41 people  Male = 36  Female = 12
    Crew 2 - 32 people  Male = 25  Female = 9
    Crew 3 - 32 people  Male = 25  Female = 9

    Plant Operation
    Days                    Nights
    6:00AM - 4:30PM    4:30PM - 3:00AM
    M   Crew 1          Crew 2
    T    Crew 1          Crew 2
    W   Crew 3          Crew 2
    TH  Crew 3          Crew 2
    F    Crew 1          Crew 3
    S    Crew 1          Crew 3

7. Add (5) loading docks same as existing per drawing.

8. Add approx. 60' x 60' concrete pad on north end of facility per drawing. Pad will have canopy with lighting suitable for night storage and retrieving use.

9. Add 25 additional parking spaces.

10. Move and add to exterior fence per drawing.

11. No new compressed air capacity but lines will be added to new facility expansion.

12. No new compressed air dryer capacity but lines will be added to new facility expansion.

13. Verify gas flow for additional heating requirements.

14. No new electric capacity but lines will be added to new facility expansion.

15. Add new electrical panel for equipment per drawing.

E X H I B I T  I-1 [continued]

16. Add rear truck pad light facing toward the facility.

17. Move 220v & 480v power from existing tool room area to new tool room per drawing.

18. Add security system (exactly like existing) to all new doors and openings.

19. All Pinkerton security system wiring should be included. Delphi will purchase any non wire/contact equipment for security system.

20. Data (CAT 6e) and telephone lines as marked on drawing.

21. Run wire for second RF unit and connect RF to facility. Delphi to supply RF unit and connect to system.

22. Extend fire protection system to provide with a sprinkler density of .30 gpm / sq ft over 4,000 sq ft area using heads with a K-factor of 11.2 or larger in the (6) bays. This will limit the Solid-Piled and Palletized Storage of Non-Expanded Exposed Plastic dunnage to 10 ft and maximum pile sizes 500 sq ft with minimum 10 ft wide aisles.

23. For the 1680 ft2 Tool Room and Red Tag storage area, the sprinklers should be designed on an ordinary hazard group 2 basis.

24. For the 60 X 60 ft Canopy, the sprinklers should be fed by a dry pipe valve since the system will be exposed to the weather. Designs with a sprinkler density of .60 gpm / sq ft over 2,600 sq ft area using heads with a K-factor of 11.2 or larger (add 30% to the area for the dry system). Bulk and palletized strorage could be stored to 20 ft with 2500 ft$^2$ pile sizes and 10 ft aisles.

25. Provide gravel fire lane for Fire Department access per NFPA and local code requirements.

File: HL-TN_PlantExpansionN051303

## EXHIBIT I-2

### DEPICTION OF EXPANSION IMPROVEMENTS



EXHIBIT I-3

**EXPANSION IMPROVEMENTS**

Lessor shall, at its expense, commence and Substantially Complete the construction of the Expansion Improvements in accordance with the final drawings, plans and specifications approved by Lessor, which drawings and specifications shall be prepared by an architect and engineer licensed in the State in which the Expansion Premises is located and retained by Lessor at its sole cost and expense. The Expansion Improvements shall be completed in a good and workmanlike manner, in compliance with all laws, codes, ordinances, regulations and other requirements of any governmental authority that has jurisdiction over the Land, and in accordance with the other requirements of this Lease.

Lessor shall submit full, complete and detailed working drawings and plans and specifications to Lessee which satisfy the requirements of the Requirements Drawings and Specifications for Lessee's approval as soon as practicable and, in any event, not later than seven (7) days following execution of this Amendment. For the purposes of determining the requirements for the Expansion Improvements, any work which is necessary or reasonably inferable from the Requirements Drawings and Specifications shall be deemed to be included therein. If Lessee shall require any changes to the working drawings and plans, Lessor shall promptly make the changes and resubmit the revised plans to Lessee within five (5) business days. Lessee shall submit its approval or comments to Lessor within five (5) business days of submission by Lessor. This process shall be repeated until Lessee has approved the working drawings and specifications. After the working drawings and specifications are approved by Lessee, they shall constitute the "Construction Plan." Subject to the foregoing, the approval by Lessee of the Construction Plan shall not be unreasonably withheld or delayed. Lessor and Lessee agree to cooperate in good faith to complete the Construction Plan as promptly as possible. In connection with the approval of the Construction Plan, Lessee shall not require Lessor to incur any cost for work that is inconsistent with the Expansion Improvements unless Lessor and Lessee agree to an equal or greater cost savings on another item or Lessee issues a change order, as hereinafter set forth.

Within ten (10) days following the date of this Lease, Lessor shall submit to Lessee a schedule setting forth the date by which all components of the Expansion Improvements shall be completed. Such schedule shall contain such details as Lessee reasonably requires and shall be subject to Lessee's reasonable approval. After such schedule has been approved by Lessee, it shall constitute the "Approved Construction Schedule." Lessor shall cause each component of the Expansion Improvements to be completed within the time frames set forth in the Approved Construction Schedule, subject to delays of the nature set forth in Section 43 of the Lease or otherwise caused by Lessee.

Upon Substantial Completion of the Expansion Premises in accordance with the Construction Plan, Lessee agrees to accept and take possession of the Expansion Premises, subject to Lessor's obligation to promptly complete such construction and any remaining punch list items indicated on a punch list to be delivered to Lessor not later than thirty (30) days after Lessee takes possession of the Expansion Premises. "Substantial Completion" of the Expansion Premises shall be deemed to have occurred at such time as (i) the Expansion Improvements have been completed in accordance with the Construction Plan, and only minor punch-list items which will not interfere with Lessee's use and enjoyment of the Expansion

- 9 -

Premises remain to be completed; (ii) Lessor has delivered to Lessee a certificate of occupancy from the applicable governing body, and (iii) Lessor has delivered to Lessee a certificate of substantial completion by the architect of record. (The phrases "Substantially Complete," "Substantial Completion" and "Substantially Completed" shall have correlative meanings.)

Lessor hereby guarantees the Expansion Improvements against defects in workmanship, design or materials for one (1) year following the Expansion Premises Commencement Date and shall assign to Lessee the benefit of all warranties covering portions of the Expansion Premises which Lessee is responsible for maintaining. In addition, without limitation of the foregoing, Lessor shall also obtain the following guarantees from its subcontractors (i) the roof of the Expansion Premises against leaks and need for resurfacing, for a period of 20 years; (ii) the concrete floor slab against cracks and need for replacement for a period of 3 years, (iii) the parking lots and driveways against cracking, and required resurfacing for a period of 1 year (provided that concrete work shall be warranted for a period of 3 years, (iv) that the HVAC systems shall be in good working order for a period of 1 year, (v) that the plumbing system serving the Expansion Premises shall be in good working order for a period of at least 1 year, (vi) that the sewer system serving the Expansion Premises shall be in good working order for a period of at least 10 years, and (vii) that the electrical system serving the Expansion Premises shall be in good working order for a period of 1 year, in each case following the completion of the applicable work. These warranties shall not apply to repairs which are required as a result of the misuse of the Expansion Premises by Lessee.

Lessee shall have the right to issue written change orders to Lessor. Lessor shall competitively bid any change orders, and, if Lessee approves of a bid for any change order, the change order shall be implemented by Lessor. Lessee shall pay for any change orders resulting in a net increase in the cost of the Expansion Premises fifty percent (50%) within thirty (30) days of approval of the change order by Lessee and fifty percent (50%) upon Substantial Completion of the Expansion Premises.

## FOURTH AMENDMENT TO WAREHOUSE LEASE

THIS FOURTH AMENDMENT TO WAREHOUSE LEASE (this "Amendment"), is made and entered into this ___*10*___ day of ___*December*___, 2004, between DONALD R. SWEETON AND SARAH E. SWEETON (collectively, "Lessor"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company ("Lessee"), based upon the following:

A.      DASCO, Inc. (the "Original Lessor"), and Lessee entered into a Warehouse Lease dated December 22, 1999 (the "Original Lease"), with respect to Premises located at 1974 Ridgecrest Drive, in the City of Columbia, County of Maury, State of Tennessee (the "Original Premises").

B.      The Original Lease was amended by a First Amendment to Warehouse Lease between Original Lessor and Lessee dated February 1, 2001, was assigned by Original Lessor to Lessor by an Assignment of Leases dated February 23, 2001, and was further amended by a Second Amendment to Warehouse Lease dated August 5, 2002 and by a Third Amendment to Warehouse Lease dated July 23, 2003 (the "Third Amendment").  (The Original Lease, as so assigned and amended is referred to in this Amendment as the "Lease.")

C.      The Third Amendment contemplated that Lessor would expand the Building which was a part of the Original Premises by 23,280 square feet of floor area and construct additional parking areas and other improvements, and that Lessee would lease that entire expanded floor area of the Building and additional parking areas and other improvements.

D.      Lessor has actually expanded the Building which was a part of the Original Premises by 31,680 square feet of floor area, consisting of a 30,000 square foot, ten bay warehouse area on the north side of the Building and a 1,680 square foot one-story auxiliary warehouse area on the east side of the Building and has constructed the parking areas and other improvements that are depicted on the site plan attached to this Amendment as Exhibit I-4 (the "Revised Site Plan").

E.      Lessor and Lessee desire to amend the Lease to (i) provide that Lessee will lease 25,680 square feet of floor area in the expanded portion of the Building (rather than the 23,280 square feet referenced in the Third Amendment), consisting of 24,000 square feet and eight bays in the warehouse area and the 1,680 square foot one-story auxiliary warehouse area (collectively,

the "Expansion Premises"), (ii) provide that the "Land" shall be expanded to include all of the land depicted on the Revised Site Plan other than the land which is depicted as "COMMON AREA" or "DASCO ONLY" on the Revised Site Plan (the "Delphi Land") and (iii) confirm that the portion of the expansion of the Building which is not included in the Expansion Premises (the "Additional Expansion Area"), the driveway on the portion of the Land depicted on the Revised Site Plan as "DASCO ONLY" (the "Driveway") and the areas inside and outside of the Building which are depicted on the Revised Site Plan as "COMMON AREA" are not included in the Premises.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Lessor and Lessee agree as follows:

1.    <u>Defined Terms</u>.  Terms used with initial capital letters and not otherwise defined in this Amendment have the meaning ascribed to them in the Lease.

2.    <u>Completion of Expansion Improvements</u>.  Lessee acknowledges that Lessee has no actual knowledge (based solely upon the knowledge of William Snyder, Lessee's Plant Manager at the Premises) that Lessor has failed to complete the Expansion Improvements in accordance with the Lease.

3.    <u>Term</u>.  The actual Expansion Premises Commencement Date was January 1, 2004, rather than November 1, 2003, as contemplated under the Third Amendment and the Expansion Premises and land which is a part of the Delphi Land but was not previously a part of the Land have been added to the Premises under the Lease, effective as of the Expansion Premises Commencement Date.  The Additional Expansion Area, Driveway and Common Area are not included in the Premises.  The Term of the Lease with respect to the Expansion Premises commenced on the Expansion Premises Commencement Date and expires on December 31, 2011, which is the Expansion Premises Expiration Date.

4.    <u>Expansion Premises Rent</u>.  The rent with respect to the Expansion Premises will be One Hundred Thirty-Six Thousand Five Hundred Eighty-Four and 00/100ths Dollars ($136,584.00) per annum, payable in monthly installments of Eleven Thousand Three Hundred Eighty-Two and 00/100ths Dollars ($11,382.00), commencing on the Expansion Premises Commencement Date.

5.    <u>Further Amendments to the Lease</u>.  The Lease shall be further amended, effective as of the Expansion Premises Commencement Date, as follows:

(a)    Section 2 of the Lease shall be amended by adding the following at the end of Section 2:

"In addition to the Premises, Lessee shall have the right to use, in common with Lessor and any other tenants of the Building, the Common Area. Lessor shall not make any changes in the Common Area that would materially impair Lessee's access to or use of the Premises without Lessee's consent.  Lessor shall not interfere or permit any other occupant of the Building to interfere with Lessee's use of the Common Area which interfere with Lessee's use or enjoyment of the Premises."

(b)    Section 6 of the Lease shall be amended by deleting the first two sentences of that Section and inserting the following in their place:

"At Lessee's request, Lessor shall promptly cause all utility services to be separately metered to the Premises, at Lessor's sole cost and expense. To the extent that any utility services supplied to the Premises are not separately metered, they shall be billed directly to Lessor, and Lessee shall reimburse Lessor, within thirty (30) days after Lessor's delivery to Lessee of an invoice, for the portion of the cost of the applicable utility service which is attributable solely to Lessee's use.  The portion of the cost of the non-separately metered utility services which is attributable to Lessee's use shall equal the product of (x) a fraction, the numerator of which is the number of square feet of floor area in the Premises and the denominator of which is the entire number of square feet of floor area which share the applicable utility service and (y) the total cost for the applicable utility charged by the public utility provider, less any costs attributable to consumption of the applicable utility by any users whose consumption on a square foot basis exceeds that of Lessee.  If Lessor and Lessee disagree regarding the portion of any non-separately metered utilities which are attributable to Lessee's use, then, at Lessee's election, Lessee's portion may be determined by sub-metering, by an evaluation of Lessee's consumption performed by a professional consultant that is reasonably acceptable to Lessor or by any other reasonable means selected by Lessee and approved by Lessor in its reasonable discretion.  Lessor and Lessee shall share equally in the cost of any determination of Lessee's portion of the cost of any utilities, unless the initial determination of Lessor or Lessee is determined to be accurate, in which case the costs shall be paid by the party whose initial determination is determined to be inaccurate."

(c)    Section 5 of the Lease is amended by deleting subsection (a) in its entirety and inserting the following in place of that deleted subsection:

"(a)    Commencing on the Expansion Premises Commencement Date, Lessee shall be responsible for reimbursing Lessor for Lessee's Proportionate Share of all Real Estate Taxes which are attributable to the Term, within thirty (30) days after Lessee receives an invoice from Lessor, together with a copy of the applicable tax bills but in no event more than sixty (60) days before the Real Estate Taxes or assessments are due to the taxing authority. 'Real Estate Taxes' means all real estate taxes and assessments, general and special, against the Building and the Land (collectively, the 'Project'), excluding special assessments or other taxes or assessments imposed for the construction of improvements on or off the Land which have been imposed prior to the date of this Lease or that are imposed in connection with the initial development of the Project or the expansion of the Building. All such special assessments and other taxes that are excluded from the definition of Real Estate Taxes shall be paid by Lessor prior to delinquency. 'Lessee's Proportionate Share' means a fraction, the numerator of which is the number of square feet of floor area in the Premises and the denominator of which is the total number of square feet of floor area in the Building."

(d)    Section 11 of the Lease is supplemented by adding the following new Section 11.4:

"11.4  Common Area:  Lessor shall cause the Common Area to be maintained in accordance with the standards set forth in Section 19.1 of the Lease. Lessor shall cause the Common Area to be well lighted and otherwise operated in a manner which is consistent with a first-class industrial development."

(e)    Section 13 of the Lease shall be amended by inserting the following at the end of that Section:

"Notwithstanding the provisions of this Section 13 in the Original Lease, Lessee shall only be responsible for reimbursing Lessor for Lessee's Proportionate Share of the cost of Lessor's property insurance on the Building."

6.    Insurance. Effective as of the date of this Amendment, Lessee revokes its election to carry property insurance on the Premises (as made in the Third Amendment). From and after the date of this Amendment Lessor shall carry property insurance on the Building, as provided in Section 13(b) of the Lease.

7.    <u>No Defenses</u>.  Lessee affirms that, as of the date of execution of this Amendment, to Lessee's actual knowledge no default or breach by Lessor exists under the Lease and Lessee has no actual knowledge of defenses, offsets or counterclaims that could be asserted by Lessee in an action by Lessor to enforce Lessor's remedies under the Lease.  Lessor affirms that, as of the date of execution of this Amendment, to Lessor's actual knowledge no default or breach by Lessee exists under the Lease and Lessor has no actual knowledge of defenses, offsets or counterclaims that could be asserted by Lessor in an action by Lessee to enforce Lessee's remedies under the Lease.

8.    <u>Broker</u>.  Lessor and Lessee represent to each other that neither of them has dealt with any real estate broker, salesperson or finder in connection with this Amendment, and no other such person initiated or participated in the negotiation of this Amendment or is entitled to any commission in connection herewith.  Each party hereby agrees to indemnify, defend and hold the other harmless from and against any and all liabilities, claims, demands, actions, damages, costs and expenses (including attorneys fees) arising from a claim for a fee or commission made by any broker claiming to have acted by or on behalf of the indemnifying party in connection with this Amendment.

9.    <u>Entire Agreement</u>.  This Amendment represents the entire understanding between the parties with respect to the subject matter of this Amendment, and all prior agreements and understandings between the parties with respect to the subject matter of this Amendment are merged in this Amendment.  The exhibits attached to this Amendment are made a part of and incorporated in this Amendment.

10.    <u>Facsimile Execution</u>.  Delivery by facsimile of this Amendment or an executed counterpart shall be deemed a good and valid execution and delivery of this Amendment.

11.    <u>Ratification and Confirmation</u>.  To the extent of any inconsistency between the terms and provisions of this Amendment and the Lease, the terms and provisions of this Amendment shall control.  Except as amended by this Amendment, all of the terms, covenants and conditions of the Lease are in full force and effect and the Lease is hereby ratified and confirmed.

**IN WITNESS WHEREOF**, Lessor and Lessee are entering into this Fourth Amendment to Warehouse Lease as of the day and year first above written.

In the presence of:

_Whitney Hood_

DONALD R. SWEETON

_June Cox_

SARAH E. SWEETON

In the presence of:

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By:     Delphi Corporation,
a Delaware corporation

Its:     Sole Member

By:

Its:     Authorized Signatory