# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

**Debtors:** Delphi Corporation, et al. [1]
**Case Number:** Jointly Administered 05-44481 (RDD)

**Quarterly Operating Report for the Period Ended:**
December 31, 2008

**Debtors' Address:**
5725 Delphi Drive
Troy, Michigan 48098

**Operating Loss for the Three Months Ended December 31, 2008:** $444 million

**Debtors' Attorneys:**
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Suite 2100
Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

And

Kayalyn A. Marafioti
Thomas J. Matz
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

**Report Preparer:**

The undersigned, having reviewed the attached report and being familiar with the Debtors' financial affairs, verifies under penalty of perjury that the information contained therein is complete, accurate, and truthful to the best of my knowledge. [2]

**Date:** March 4, 2009        /s/: THOMAS S. TIMKO
                              Thomas S. Timko
                              Chief Accounting Officer and Controller

(1)   See next page for a listing of Debtors by case number.
(2)   All amounts herein are unaudited and subject to revision. The Debtors reserve all rights to revise this report.

**DELPHI CORPORATION, <u>et al.</u>**
**QUARTERLY OPERATING REPORT**

[1] The Debtors in these jointly administered cases are as follows:

| Debtor Name | Case Number |
|---|---|
| Delphi NY Holdings Corporation | 05-44480 |
| Delphi Corporation | 05-44481 |
| ASEC Manufacturing General Partnership | 05-44482 |
| ASEC Sales General Partnership | 05-44484 |
| Environmental Catalysts, LLC | 05-44503 |
| Delphi Medical Systems Colorado Corporation | 05-44507 |
| Delphi Medical Systems Texas Corporation | 05-44511 |
| Delphi Medical Systems Corporation | 05-44529 |
| Specialty Electronics International Ltd. | 05-44536 |
| Specialty Electronics, Inc. | 05-44539 |
| Delphi Liquidation Holding Company | 05-44542 |
| Delphi Electronics (Holding) LLC | 05-44547 |
| Delphi Technologies, Inc. | 05-44554 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 |
| Delphi Mechatronic Systems, Inc. | 05-44567 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 |
| Exhaust Systems Corporation | 05-44573 |
| Delphi China LLC | 05-44577 |
| Delphi Automotive Systems Korea, Inc. | 05-44580 |
| Delphi International Services, Inc. | 05-44583 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 |
| Delphi Automotive Systems International, Inc. | 05-44589 |
| Delphi International Holdings Corporation | 05-44591 |
| Delphi Automotive Systems Overseas Corporation | 05-44593 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 |
| Delco Electronics Overseas Corporation | 05-44610 |
| Delphi Diesel Systems Corporation | 05-44612 |
| Delphi LLC | 05-44615 |
| Aspire, Inc. | 05-44618 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 |
| Delphi Connection Systems | 05-44624 |
| Packard Hughes Interconnect Company | 05-44626 |
| DREAL, Inc. | 05-44627 |
| Delphi Automotive Systems Services LLC | 05-44632 |
| Delphi Services Holding Corporation | 05-44633 |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 |
| Delphi Foreign Sales Corporation | 05-44638 |
| Delphi Automotive Systems Human Resources LLC | 05-44639 |
| Delphi Automotive Systems LLC | 05-44640 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 |
| Delphi Receivables LLC | 05-47459 |
| MobileAria, Inc. | 05-47474 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**INDEX**

| Description | Page |
|---|---|
| Condensed Combined Debtors-in-Possession Statement of Operations for the three and eleven months ended December 31, 2008 | 4 |
| Condensed Combined Debtors-in-Possession Balance Sheet as of December 31, 2008 | 5 |
| Condensed Combined Debtors-in-Possession Statement of Cash Flows for the three months ended December 31, 2008 | 6 |
| Notes to Quarterly Operating Report | 7 |
| Schedule of Payroll and Payroll Taxes Withheld and Incurred | 30 |
| Schedule of Payroll Taxes Paid | 31 |
| Schedule of Other Taxes Collected, Incurred and Paid | 33 |
| Schedule of Disbursements | 37 |

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF OPERATIONS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Three Months Ended December 31, 2008 | Eleven Months Ended December 31, 2008 |
|---|---|---|
|  | (in millions) | |
| Net sales: | | |
| General Motors and affiliates | $ 864 | $ 3,614 |
| Other customers | 675 | 3,270 |
| Non-Debtor affiliates | 61 | 334 |
| Total net sales | 1,600 | 7,218 |
| | | |
| Operating expenses: | | |
| Cost of sales, excluding items listed below | 1,718 | 7,594 |
| U.S. employee workforce transition program charges | 2 | 71 |
| GM settlement (Note 1 – MRA) | — | (254) |
| Depreciation and amortization | 99 | 369 |
| Long-lived asset impairment charges | 2 | 9 |
| Goodwill impairment charges | 16 | 115 |
| Selling, general and administrative | 207 | 770 |
| Total operating expenses | 2,044 | 8,674 |
| | | |
| Operating loss | (444) | (1,456) |
| Interest expense (contractual interest expense was $142 million and $470 million, respectively) | (111) | (343) |
| Loss on extinguishment of debt | — | (49) |
| Other (expense) income, net | (23) | 4 |
| Reorganization items: | | |
| GM settlement (Note 1– GSA) | — | 5,332 |
| Professional fees and other, net | (8) | (118) |
| Income tax expense | (11) | (14) |
| Equity income from non-consolidated affiliates, net of tax | — | (4) |
| (Loss) income from continuing operations | (597) | 3,352 |
| Loss from discontinued operations, net of tax | (42) | (40) |
| Equity loss from non-Debtor affiliates, net of tax | (402) | (112) |
| | | |
| Net (loss) income | $ (1,041) | $ 3,200 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION BALANCE SHEET**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | December 31, 2008 |
|---|---|
|  | (in millions) |

### ASSETS

| | |
|---|---|
| Current assets: | |
| Cash and cash equivalents | $ 231 |
| Restricted cash | 355 |
| Accounts receivable, net: | |
| General Motors and affiliates | 670 |
| Other third parties | 385 |
| Non-Debtor affiliates | 249 |
| Notes receivable from non-Debtor affiliates | 77 |
| Inventories, net | 493 |
| Other current assets | 204 |
| Assets held for sale | 333 |
| Total current assets | 2,997 |
| | |
| Long-term assets: | |
| Property, net | 1,182 |
| Investments in affiliates | 251 |
| Investments in non-Debtor affiliates | 1,104 |
| Goodwill | 37 |
| Notes receivable from non-Debtor affiliates | 1,429 |
| Other | 183 |
| Total long-term assets | 4,186 |
| | |
| Total assets | $ 7,183 |

### LIABILITIES AND STOCKHOLDERS' DEFICIT

| | |
|---|---|
| Current liabilities not subject to compromise: | |
| Short-term debt | $ 3,635 |
| Accounts payable | 551 |
| Accounts payable to non-Debtor affiliates | 535 |
| Accrued liabilities | 1,318 |
| Liabilities held for sale | 149 |
| Total current liabilities not subject to compromise | 6,188 |
| | |
| Long-term liabilities not subject to compromise: | |
| Long-term debt | 20 |
| Employee benefit obligations and other | 736 |
| Total long-term liabilities not subject to compromise | 756 |
| | |
| Liabilities subject to compromise | 14,664 |
| | |
| Total liabilities | 21,608 |
| | |
| Stockholders' deficit: | |
| Total stockholders' deficit | (14,425) |
| Total liabilities and stockholders' deficit | $ 7,183 |

The accompanying notes are an integral part of the financial statements.

**DELPHI CORPORATION, et al.**
**QUARTERLY OPERATING REPORT**
**CONDENSED COMBINED DEBTORS-IN-POSSESSION STATEMENT OF CASH FLOWS**
**(Non-filed entities, principally non-U.S. affiliates, excluded from Debtor group)**

|  | Three Months Ended December 31, 2008 (in millions) |
|---|---|
| Cash flows from operating activities: | |
| Net cash used by operating activities | (397) |
| | |
| Cash flows from investing activities: | |
| Capital expenditures | (51) |
| Proceeds from sale of property | 8 |
| Proceeds from divestitures | 8 |
| Increase in restricted cash | (305) |
| Return of investments from non-Debtor affiliates | (4) |
| Other, net | (48) |
| Discontinued operations | 35 |
| Net cash used in investing activities | (357) |
| | |
| Cash flows from financing activities: | |
| Repayments from amended and restated DIP facility | (95) |
| Net borrowings under amended and restated DIP facility | 2 |
| Other | (58) |
| Net cash used by financing activities | (151) |
| | |
| Decrease in cash and cash equivalents | (905) |
| Cash and cash equivalents at beginning of period | 1,136 |
| Cash and cash equivalents at end of period | $    231 |

The accompanying notes are an integral part of the financial statements.

**1. Background and Organization**

    *General* – Delphi Corporation, together with its subsidiaries and affiliates ("Delphi" or the "Company") is a supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.

    *Chapter 11 Reorganization Cases* – On October 8, 2005, Delphi and certain of its United States ("U.S.") subsidiaries (the "Initial Filers") filed voluntary petitions for reorganization relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code (collectively, the Debtors' October 8, 2005 and October 14, 2005 filings are referred to herein as the "Chapter 11 Filings"). The reorganization cases are being jointly administered under the caption "In re Delphi Corporation, et al., Case No. 05-44481 (RDD)." The Debtors continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court. Delphi's non-U.S. subsidiaries were not included in the Chapter 11 Filings, will continue their business operations without supervision from the U.S. Courts and are not subject to the requirements of the Bankruptcy Code.

    *Equity Purchase and Commitment Agreement* – Under the terms and subject to the conditions of the Equity Purchase and Commitment Agreement between Delphi and certain affiliates of lead investor Appaloosa Management L.P. ("Appaloosa"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Pardus Capital Management, L.P. ("Pardus"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), UBS Securities LLC ("UBS"), and Goldman Sachs & Co. ("Goldman") (collectively, the "Investors"), dated as of August 3, 2007, as amended (and together with all schedules and exhibits thereto, the "EPCA"), the Investors committed to purchase $800 million of convertible preferred stock and approximately $175 million of common stock in the reorganized Company. Additionally, subject to satisfaction of other terms and conditions, the Investors committed to purchase any unsubscribed shares of common stock in connection with an approximately $1.6 billion rights offering that was made available to unsecured creditors. The rights offering commenced on March 11, 2008 and expired on March 31, 2008. In light of the Investors' refusal to fund pursuant to the EPCA, as described below, in April 2008, the Company cancelled the rights offering and returned all funds submitted.

    The Company would be required to pay the Investors $83 million plus certain transaction expenses if (a) the EPCA was terminated as a result of the Company's agreeing to pursue an alternative investment transaction with a third party or (b) either the Company's Board of Directors withdrew its recommendation of the transaction or the Company willfully breached the EPCA, and within the next 24 months thereafter, the Company then agreed to an alternative investment transaction.

    On April 4, 2008, Delphi announced that although it had met the conditions required to substantially consummate its Plan, including obtaining $6.1 billion of exit financing, the Investors refused to participate in a closing that was commenced but not completed on that date. Several hours prior to the scheduled closing on April 4, 2008, Appaloosa delivered to Delphi a letter, stating that such letter "constitutes a notice of immediate termination" of the EPCA. Appaloosa's April 4 letter alleged that Delphi had breached certain provisions of the EPCA, that Appaloosa is entitled to terminate the EPCA and that the Investors are entitled to be paid the fee of $83 million plus certain expenses and other amounts. At the time Appaloosa delivered its letter, other than the Investors, all the required parties for a successful closing and emergence from chapter 11, including representatives of Delphi's exit financing lenders, General Motors Corporation ("GM"), and the Unsecured Creditors and Equity Committees in Delphi's chapter 11 cases were present, were prepared to move forward, and all actions necessary to consummate the plan of reorganization were taken other than the concurrent closing and funding of the EPCA.

    On April 5, 2008, Appaloosa delivered to Delphi a letter described as "a supplement to the April 4 Termination Notice," stating "this letter constitutes a notice of an additional ground for termination" of the EPCA. The April 5 letter stated that the EPCA's failure to become effective on or before April 4, 2008 was grounds for its termination. On June 30, 2008, Merrill, Goldman, UBS and affiliates of Pardus and Harbinger delivered to Delphi letters of termination relating to the EPCA.

    Delphi believes that Appaloosa wrongfully terminated the EPCA and disputes the allegations that Delphi breached the EPCA or failed to satisfy any condition to the Investors' obligations thereunder as asserted by Appaloosa in its April 4 letter. Delphi's Board of Directors formed a special litigation committee and engaged independent legal counsel to consider and pursue any and all available equitable and legal remedies, and on May 16,

2008, Delphi filed complaints against the Investors in the Court to seek specific performance by the Investors of their obligations under the EPCA as well as compensatory and punitive damages.  No amounts related to this matter have been recorded in Delphi's financial statements.  The Investors filed motions to dismiss Delphi's complaints, and on July 28, 2008, the Court denied in part and granted in part the Investors' motions.  A trial on Delphi's complaint is currently scheduled to occur in May 2009.

During 2007, in exchange for the Investors' commitment to purchase common stock and the unsubscribed shares in the rights offering, the Company paid an aggregate commitment fee of $39 million and certain transaction expenses and in exchange for the Investors' commitment to purchase preferred stock the Company paid an aggregate commitment fee of $18 million.  In addition, the Company paid an arrangement fee of $6 million to Appaloosa to compensate Appaloosa for arranging the transactions contemplated by the EPCA.  The Company also paid certain out-of-pocket costs and expenses reasonably incurred by the Investors or their affiliates subject to certain terms, conditions and limitations set forth in the EPCA.  Delphi had deferred the recognition of these amounts in other current assets because they were to be netted against the proceeds from the EPCA upon issuance of the new shares.  However, as a result of the events relating to the termination of the EPCA as described above, Delphi recognized $79 million of reorganization expense related to these fees and other expenses during the eleven months ended December 31, 2008.

*U.S. Labor Agreements* – On March 31, 2006, the Debtors filed a motion with the Court under sections 1113 and 1114 of the Bankruptcy Code seeking authority to reject U.S. labor agreements and to modify retiree benefits (the "1113/1114 Motion").  As approved and confirmed by the Court, a series of settlement agreements or memoranda of understanding (each, a memorandum of understanding or "MOU") among Delphi, its unions, and GM settled the 1113/1114 Motion with respect to each of Delphi's unions.

*Plan of Reorganization* – On February 4, 2008, the Confirmation Order entered by the Court on January 25, 2008 with respect to Delphi's proposed plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") became final, but Delphi was unable to consummate the Plan because, as noted above, the Investors refused to participate in the closing, which was commenced but not completed on April 4, 2008.  The Plan and Disclosure Statement outlined Delphi's transformation centering around five core areas, including agreements reached with each of Delphi's principal U.S. labor unions and GM.  The Plan incorporates, approves, and is consistent with the terms of each agreement.

Pursuant to an order entered by the Court on April 30, 2008, the Debtors' exclusivity period under the Bankruptcy Code for filing a plan of reorganization was extended until 30 days after substantial consummation of the Plan (as modified) or any modified plan and the Debtors' exclusivity period for soliciting acceptance of the Plan (as modified) was extended until 90 days after substantial consummation of the Plan (as modified) or any modified plan.  On July 23, 2008, Delphi's Official Committee of Unsecured Creditors (the "Creditors' Committee") and Wilmington Trust Company ("WTC"), as Indenture Trustee and a member of the UCC, filed separate complaints in the Court seeking revocation of the Court order entered on January 25, 2008 confirming Delphi's Plan. The Creditors' Committee had earlier advised Delphi that it intended to file the complaint to preserve its interests with regard to a 180-day statutory period that would have otherwise expired on July 23, 2008. The Creditors' Committee and WTC also advised Delphi that they do not intend to schedule a hearing on the complaints pending developments on (i) the continuation of stakeholder discussions concerning potential modifications to the Plan, which would permit Delphi to emerge from chapter 11 as soon as practicable, and (ii) Delphi's litigation against an affiliate of lead investor, Appaloosa, and the other Investors.  Notwithstanding the foregoing, pursuant to an order entered by the Court on December 17, 2008, the Debtors' exclusive period for filing a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee is extended through and including March 31, 2009 and the Debtors' exclusive period for soliciting acceptance of a plan of reorganization, solely as to the Creditors' Committee and the Equity Committee is extended through and including May 31, 2009.  The Debtors expect to file a motion on or about March 4, 2009 seeking an extension, solely as to the Creditors' Committee and the Equity Committee, to the exclusivity periods.

On October 3, 2008, Delphi filed proposed modifications to the Plan and related modifications to the Disclosure Statement with the Court which contained an updated business plan associated with a mid-point total enterprise business valuation of $7.2 billion, and contemplated that Delphi would need to raise approximately $3.75 billion of emergence capital through a combination of term debt and rights to purchase equity.  However since the filing of the proposed modifications, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization.  Delphi continues to be engaged in comprehensive discussions with all of its stakeholders that have a

continuing economic interest in its reorganization cases to formulate further plan modifications. In connection with those discussions, Delphi has been making further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. Although no formal valuation of the revised business plan has been completed, it is anticipated that the total business enterprise value associated with the revised plan will be substantially below the valuation range contained in the modifications filed in October 2008 and may be equivalent to, or even less than, the amount of Delphi's postpetition obligations, including its borrowings under its debtor-in-possession financing facility. These factors also continue to delay Delphi's emergence from chapter 11 and its ability to refinance its debtor-in-possession credit facility.

Delphi will not emerge from bankruptcy as a going concern unless and until Delphi is able to obtain approval of necessary modifications to the Plan that recognize the existing market conditions. There can be no assurances that such emergence capital will be obtained (or, if obtained, the terms thereof) or such other conditions will be satisfied. For a discussion of certain risks and uncertainties related to the Debtors' chapter 11 cases and reorganization objectives refer to Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2008. In addition, Delphi cannot assure that potential adverse publicity associated with the Chapter 11 Filings and the resulting uncertainty regarding its future prospects will not materially hinder its ongoing business activities and its ability to operate, fund and execute its business plan by impairing relations with existing and potential customers; negatively impacting its ability to attract, retain and compensate key executives and to retain employees generally; limiting its ability to obtain trade credit; and impairing present and future relationships with vendors and service providers. Accordingly, no assurance can be given as to what values, if any, will be ascribed in the chapter 11 cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. If certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by a company's equity security holders and notwithstanding the fact that such equity security holders do not receive or retain any property on account of their equity interests under the plan. Accordingly, the Company urges that appropriate caution be exercised with respect to existing and future investments in its common stock or other equity securities, or any claims relating to prepetition liabilities.

The Amended GSA and the Amended MRA, as defined below, became effective during the third quarter of 2008. For costs and benefits and timing of recognition related to these agreements, refer to the detailed discussion under GM Settlement below. The cost related to the remaining components of the transformation plan will be recognized in the Company's consolidated financial statements as each other element of the Plan (as modified), including the remaining portions of the U.S. labor agreements, or as the terms of any future confirmed plan of reorganization, become effective. The Plan (as modified) and the agreements incorporated therein will significantly impact Delphi's accounting for long-lived asset impairments and exit costs related to the sites planned for closure or consolidation, compensation costs for labor recognized over the term of the U.S. labor agreements, and the fair values assigned to assets and liabilities upon Delphi's emergence from chapter 11, among others. Such adjustments will have a material impact on Delphi's financial statements.

***GM Settlement*** – Delphi and GM have entered into comprehensive settlement agreements consisting of the Global Settlement Agreement, as amended (the "GSA") and the Master Restructuring Agreement, as amended (the "MRA"). The GSA and the MRA, as amended through January 25, 2008, comprised part of the Plan and were approved in the order confirming the Plan on January 25, 2008. The GSA and the MRA as approved provide that such agreements were not effective until and unless Delphi emerges from chapter 11. However, as part of Delphi's overall negotiations with its stakeholders to further amend the Plan and emerge from chapter 11 as soon as practicable, Delphi agreed with GM and filed further amendments to the GSA and MRA (the "Amended MRA") with the Court on September 12, 2008 and subsequently entered into an additional amendment to the GSA as of September 25, 2008 (as so amended, the "Amended GSA"). On September 26, 2008, Delphi received the consent of its labor unions to implement certain aspects of the agreements as described in more detail below. The Court approved such amendments on September 26, 2008 and the Amended GSA and Amended MRA became effective on September 29, 2008. These amended agreements include provisions related to the transfer of certain legacy pension and other postretirement benefit obligations and became effective independent of and in advance of substantial consummation of an amended plan of reorganization. The effectiveness of these agreements resulted in a material reduction in Delphi's liabilities and future expenses related to U.S. hourly workforce benefit programs.

The Amended GSA resolves outstanding issues between Delphi and GM including: litigation commenced in March 2006 by Delphi to terminate certain supply agreements with GM; all potential claims and disputes with GM arising out of the separation of Delphi from GM in 1999, including certain post-separation claims and disputes; the proofs of claim filed by GM against Delphi in Delphi's chapter 11 cases; GM's treatment under a Delphi plan of reorganization; and various other legacy U.S. hourly workforce benefit issues. Except for the second step of the

transfer of a substantial portion of the assets and liabilities under the Delphi Hourly-Rate Employees Pension Plan (the "Hourly Plan"), the obligations under the Amended GSA are not conditioned on the effectiveness of an amended plan of reorganization.

The Amended GSA addresses commitments by Delphi and GM regarding other U.S. hourly workforce postretirement health care benefits and employer-paid postretirement basic life insurance benefits ("OPEB"), pension obligations, and other GM contributions with respect to labor matters and releases.  In the eleven months ended December 31, 2008, Delphi recorded a net reorganization gain of $5.3 billion.  In addition, upon the effectiveness of the Amended GSA, Delphi received net cash from GM totaling $641 million, principally related to reimbursement of hourly OPEB benefit payments since January 1, 2007 and amounts paid by Delphi under special attrition programs.  During the three months ended December 31, 2008, Delphi received net cash from GM totaling $119 million related to the additional reimbursement of hourly OPEB benefit payments and amounts paid by Delphi under special attrition programs.

The Amended MRA is intended to govern certain aspects of Delphi and GM's commercial relationship since filing for chapter 11 and following Delphi's emergence from chapter 11.  The Amended MRA addresses the scope of GM's existing and future business awards to Delphi and related pricing and sourcing arrangements, GM commitments with respect to reimbursement of specified ongoing U.S. hourly workforce labor costs, the disposition of certain Delphi facilities, and the treatment of existing commercial agreements between Delphi and GM. The obligations under the Amended MRA generally are not conditioned on the effectiveness of an amended plan of reorganization.  Upon effectiveness of the Amended MRA, Delphi received net cash from GM totaling $559 million and recognized related pre-tax earnings of $355 million, of which $254 million was recorded in GM settlement in operating expenses and $101 million was recorded in discontinued operations.  GM's obligations under the Amended MRA will not be subject to termination until December 31, 2015 (provided that certain obligations of GM with respect to legacy International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") employees would survive any such termination).

During the three months ended December 31, 2008, Delphi refunded $5 million of the labor reimbursement received upon effectiveness of the Amended MRA to GM based on agreed upon revisions to the estimates paid for retroactive labor costs.  Additionally, Delphi received an additional $35 million of production cash burn breakeven and labor costs reimbursement from GM and an additional $64 million is recorded as a receivable from GM as of December 31, 2008, of which $75 million was recorded as a reduction to cost of sales and $20 million was recorded in discontinued operations during the three months ended December 31, 2008.

Delphi continues to be engaged in comprehensive discussions with GM related to GM's role in a modified plan of reorganization, including potential modifications to the Amended MRA as part of the April 2 milestone for Delphi's filing of modifications to its previously confirmed plan of reorganization, as contemplated by the Supplemental Amendment (refer to Note 2. Basis of Presentation, Going Concern). Delphi and GM are discussing pulling forward elements of GM's previously agreed support for Delphi into one payment at emergence in combination with the transfer to GM of certain of Delphi's U.S. manufacturing sites dedicated principally to supplying product to GM. This potential arrangement or modifications to existing agreements are designed to facilitate Delphi's emergence from chapter 11, notwithstanding the current state of the global economy, the automotive market and the capital markets. Discussions among the parties are ongoing.

Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy, to the consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 for more information on the effectiveness of the Amended GSA and the Amended MRA.

## 2.  Basis of Presentation

***Condensed Combined Debtors-in-Possession Financial Statements*** – The financial statements and supplemental information contained herein are unaudited, preliminary, and may not comply with generally accepted accounting principles in the United States of America ("U.S. GAAP") in all material respects.  In addition, the financial statements and supplemental information contained within this note represent the condensed combined financial statements for the Debtors only.  Delphi's non-Debtor subsidiaries are treated as non-consolidated affiliates in these financial statements, and as such, their net income is included as "Equity loss from non-Debtor affiliates, net of tax" in the statement of operations and their net assets are included as "Investments in non-Debtor affiliates" in the balance sheet.

American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization under the Bankruptcy Code" ("SOP 90-7"), which is applicable to companies in chapter 11 of the Bankruptcy Code, generally does not change the manner in which financial statements are prepared.  However, among other disclosures, it does require that the financial statements for periods subsequent to the filing of the chapter 11 petition distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business.  The Debtors' financial statements contained herein have been prepared in accordance with the guidance in SOP 90-7.

The unaudited combined financial statements have been derived from the books and records of the Debtors.  This information, however, has not been subject to procedures that would typically be applied to financial information presented in accordance with U.S. GAAP, and upon the application of such procedures (such as tests for asset impairment), the Debtors believe that the financial information could be subject to changes, and these changes could be material.  The information furnished in this report includes primarily normal recurring adjustments but does not include all of the adjustments that would typically be made for quarterly financial statements in accordance with U.S. GAAP.  Included in these financial statements is the impact of Delphi's adoption of Financial Accounting Standards Board ("FASB") Statement No. 158 ("SFAS 158"), *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans-an amendment of FASB Statements No. 87, 88, 106, and 132(R),* which resulted in adjustments that increased pension and other postretirement benefit liabilities by $139 million, the beginning accumulated deficit by $129 million and other comprehensive loss by $10 million.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with U.S. GAAP have been condensed or omitted.  Therefore, this report should be read in conjunction with the Company's consolidated financial statements and notes thereto included in its Annual Report on Form 10-K for the year ended December 31, 2008 filed with the U.S. Securities and Exchange Commission ("SEC").

The results of operations contained herein are not necessarily indicative of results which may be expected from any other period or for the full year and may not necessarily reflect the consolidated results of operations, financial position, and cash flows of the Debtors in the future.

***Going Concern*** – The Debtors are operating pursuant to chapter 11 of the Bankruptcy Code and continuation of the Company as a going concern is contingent upon, among other things, the Debtors' ability to (i) comply with the terms and conditions of their debtor-in-possession ("DIP") financing agreement; (ii) reduce wage and benefit costs and liabilities during the bankruptcy process; (iii) return to profitability; (iv) generate sufficient cash flow from operations; and (v) obtain financing sources to meet the Company's future obligations, including an accommodation agreement allowing the Debtors to retain the proceeds of, or an extension or replacement of their DIP financing agreement, which otherwise matured on December 31, 2008.  Prior to expiration of the DIP financing agreement (the "Amended and Restated DIP Credit Facility"), Delphi entered into an accommodation agreement (the "Accommodation Agreement") allowing Delphi to continue using the proceeds of the Amended and Restated DIP Credit Facility (to the extent already drawn by December 12, 2008) until the earlier of June 30, 2009 (or May 5, 2009 if Delphi does not achieve certain milestones in its reorganization cases), provided Delphi continues to remain in compliance with all applicable covenants under the Accommodation Agreement and the Amended and Restated DIP Credit  Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions) as described further in Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation, Liquidity and Capital Resources in the Company's Annual Report on Form 10-K for the year ended December 31, 2008.

Delphi also has the ability to draw down amounts pursuant to an agreement with GM whereby GM agreed to advance payments to be made by GM to Delphi following the effectiveness of the GM settlement and restructuring agreements (the "GM Advance Agreement"), which agreement was later extended and amended during the second half of 2008 to provide up to $300 million in advances through June 30, 2009. In addition, GM has agreed to accelerate payment of certain payables to Delphi, which could result in an additional $300 million of liquidity to Delphi to be provided through May of 2009 (the "Partial Temporary Accelerated Payments Agreement").

On January 30, 2009, Delphi reached agreement with its lenders to amend (the "Amendment") the Accommodation Agreement.  In support of Delphi's efforts to develop a modified reorganization plan adapted to the current global economic environment, the lenders agreed to modify certain financial covenants and pay-down requirements contained in the Accommodation Agreement.  In addition, GM agreed to immediately accelerate payment of $50 million in payables to Delphi under the Partial Temporary Accelerated Payments Agreement and to, no later than February 27, 2009, either accelerate payment of an additional $50 million in payables under such agreement or increase from $300 million to $350 million the amount which it is committed to advance under the GM Advance Agreement. The Amendment and GM's agreement to accelerate payments were effective January 30,

2009; however, both agreements were subject to satisfaction of certain post-closing conditions, including Court approval and in the case of the Amendment, the payment of fees to the consenting lenders. The Company filed motions with the Court seeking approval of these agreements and authority to pay the applicable fees. Just prior to the hearing on such motions, the lenders and Delphi agreed to a further supplemental amendment to the Accommodation Agreement (the "Supplemental Amendment"), to further extend certain milestone dates, and on February 24, 2009 the Court approved the Amendment, the Supplemental Amendment and the amendment to the Partial Temporary Accelerated Payments Agreement. Accordingly, absent changes to the GM Advance Agreement, Delphi believes it has access to sufficient liquidity to fund its operations and remain in compliance with the covenants in the Amended and Restated DIP Credit Facility and Accommodation Agreement into April 2009. In addition, Delphi projects it will have sufficient additional liquidity support to manage its U.S. operations into May 2009 as it continues discussions with its stakeholders on proposed modifications to the Plan, subject to satisfaction of certain specified milestones in its reorganization cases and the conditions necessary to consummate the agreement reached with GM on March 3, 2009 described below whereby GM would increase the amounts available under the GM Advance Agreement to a total of $450 million. The Debtors expect to file a motion on or about March 4, 2009 seeking approval of subsequent amendments to the GM Advance Agreement to reflect the conditions pursuant to which GM will agree to increase the amounts available under such agreement.

On February 27, 2009, as provided for under the January 30, 2009 amendment to the Partial Temporary Accelerated Payments Agreement, GM opted to increase from $300 million to $350 million the amounts available under the GM Advance Agreement, subject to (i) the President's Designee in accordance with the provisions of GM's federal loans not having notified GM prior to March 24, 2009 that the increase is not permitted, and (ii) Court approval of the increase prior to March 25, 2009. Additionally, on March 3, 2009 GM committed to further increase from $350 million to $450 million the amounts available under the GM Advance Agreement, subject to (i) the President's Designee in accordance with the provisions of GM's federal loans not having notified GM prior to March 24, 2009 that the increase is not permitted, (ii) Court approval of the further increase prior to March 25, 2009, (iii) approval by GM's board of directors, (iv) execution of a definitive transaction agreement relating to the sale of Delphi's Steering Business to GM prior to March 24, 2009, and (v) Court approval of the Steering Business Option Exercise Agreement (the "Option Exercise Agreement") between Delphi and GM prior to March 25, 2009. The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement. Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed by GM and Delphi. The Option Exercise Agreement is subject to conditions described in Note 8. Divestitures. In addition, the Amendment and Supplemental Amendment to the Accommodation Agreement will allow Delphi to access additional liquidity through the periodic release of amounts currently in a cash collateral basket of up to $117 million, provided (i) that all of the above conditions necessary to increase amounts available under the GM Advance Agreement to $450 million are satisfied, (ii) Delphi remains in compliance with all mandatory prepayment provisions and other covenants in the Accommodation Agreement, including the borrowing base calculation after giving effect to such release, and (iii) Delphi has achieved the remaining specified milestones in its reorganization cases, including the filing of a plan of reorganization or modifications to the Plan meeting the conditions specified in the Accommodation Agreement by April 2. Delphi believes receipt of GM's commitment is a significant step toward Delphi being able to secure such additional liquidity. Refer to Note 3. Debtor-in-Possession ("DIP") Financing for more information.

Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, Delphi is no longer able to make additional draws under the facility after December 12, 2008, (the effective date of the Accommodation Agreement). However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement, as amended). There can be no assurance the outside termination date of the Accommodation Agreement will not be shortened from June 30, 2009 to May 5, 2009 or that Delphi will continue to comply with the terms and conditions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement). These matters create substantial uncertainty relating to the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability of assets and classification of liabilities that might result from the outcome of these uncertainties. In addition, the Company filed its proposed plan of reorganization with the Court in September 2007. The Court confirmed Delphi's plan of reorganization, as amended, on January 25, 2008, but Delphi was unable to consummate the plan because certain investors under the plan refused to participate in the closing, which was commenced but not completed on April 4, 2008. Delphi subsequently filed complaints seeking redress for the breach of the investment agreement and damages related to the consequent delay of Delphi's emergence from chapter 11. On October 3, 2008, Delphi filed a motion seeking Court

approval of proposed modifications to its confirmed plan of reorganization.  There can be no assurances as to when Delphi will confirm or consummate a modified plan.  Consummation of a confirmed plan of reorganization often materially changes the amounts reported in a company's consolidated financial statements, which do not give effect to any adjustments to the carrying value of assets or amounts of liabilities that might be necessary as a consequence of consummation of a confirmed plan of reorganization (as amended).

**Intercompany Transactions** – Intercompany transactions between Debtors have been eliminated in the financial statements contained herein.  Intercompany transactions between the Debtors and non-Debtor affiliates have not been eliminated in the Debtors' financial statements.  As approved by the Court on January 25, 2008, the Debtors sold investments in non-Debtor affiliates in the amount of $1.4 billion to a non-Debtor affiliate and received a note receivable from non-Debtor affiliates.  During the three and eleven months ended December 31, 2008, the Debtors received approximately $7 million and $292 million, respectively, of dividends from non-Debtor affiliates.  Dividends from non-Debtor affiliates are not eliminated in the Condensed Combined Debtors-in-Possession Statements of Operations and therefore were recorded in equity income from non-Debtor affiliates, net of tax.

**General Motors and Affiliates** – Includes activity with GM and its consolidated subsidiaries.  Activity with GM's non-consolidated affiliates (such as GM Shanghai) and activity with other Tier 1 suppliers which sell directly to GM is classified as other (non-GM) customer activity.

**Restricted Cash** – At December 31, 2008, the Debtors had $355 million in restricted cash, primarily due to $323 million in cash collateral as required under the debtor-in-possession credit facility, including $123 million related to outstanding letters of credit at December 31, 2008.  Additionally, restricted cash includes cash for use for the pre-retirement portion of the U.S. employee workforce transition programs.

**Property** – Includes property, plant, and equipment and is recorded at cost net of accumulated depreciation.

**Long-Lived Asset Impairment Charges** – In accordance with Financial Accounting Standards Board ("FASB") Statement No. 144 ("SFAS 144"), "*Accounting for the Impairment or Disposal of Long-Lived Assets*," Delphi evaluates the recoverability of long-lived assets whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Estimates of future cash flows used to test the recoverability of long-lived assets include separately identifiable undiscounted cash flows expected to arise from the use and eventual disposition of the assets. Where estimated future cash flows are less than the carrying value of the assets, impairment losses are recognized based on the amount by which the carrying value exceeds the fair value of the assets. Delphi recognized asset impairment charges of $9 million for the eleven months ended December 31, 2008.

**Goodwill Impairment Charges** – Delphi reviews the recoverability of goodwill annually on May 31 and at any other time when business conditions indicate a potential change in recoverability.  Delphi recorded $16 million and $115 million of goodwill impairment charges during the three and eleven months ended December 31, 2008.  In conjunction with Delphi's annual recoverability tests, the deterioration of Delphi's financial performance, combined with an unfavorable outlook, were indicators for potential impairment.  More specifically, during the second and fourth quarters of 2008, Delphi experienced deteriorated financial performance primarily due to significant reductions in North American customer production volumes, particularly related to GM North America, continuing unfavorable pricing pressures and increasing commodity prices.  This caused previously unanticipated projected revenue and operating income declines.  As a result of these changes, long-term projections showed declines in discounted future operating cash flows.  These revised cash flows and declining market conditions caused the implied fair value of Delphi's Electrical/Electronic Architecture segment and the Electronics and Safety segment to be less than their respective book values.  The fair value was also adversely affected by declining industry market valuation metrics.  Accordingly, the Debtors recorded $99 million and $16 million of goodwill impairment charges related to the Electrical/Electronic Architecture segment and the Electronics and Safety segment, respectively, during the eleven months ended December 31, 2008.

Delphi performed its goodwill impairment test by comparing the carrying value of each of its reporting units to the fair value of the reporting unit.  In determining fair value of reporting units, Delphi utilized a number of methodologies, including discounted cash flow analysis and review of fair value appraisals.  Where the carrying value exceeded the fair value for a particular reporting unit, goodwill impairment charges were recognized.  The goodwill impairment charges recognized were determined by stating all other assets and liabilities of a reporting unit at their fair values with the remaining fair value of the reporting unit attributed to goodwill.  The resulting goodwill impairment charges are the excess of the recorded goodwill balance over the implied fair value of goodwill for the reporting unit.  Delphi's reporting units are the global businesses focused on product families.  The fair value of the

reporting units was negatively impacted by the continued deterioration of global business conditions as previously described.

***Discontinued Operations*** – In accordance with Statement of Financial Accounting Standards No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, a business component that is disposed of or classified as held for sale is reported as discontinued operations if the cash flows of the component have been or will be eliminated from the ongoing operations of the Company and the Company will no longer have any significant continuing involvement in the business component.  The results of discontinued operations are aggregated and presented separately in the condensed combined statement of operations and condensed combined statement of cash flows.  Assets and liabilities of the discontinued operations are aggregated and reported separately as assets and liabilities held for sale in the condensed combined balance sheet.  Refer to Note 8. Divestitures for more information.

Amounts have been derived from the consolidated financial statements and accounting records of Delphi using the historical basis of assets and liabilities held for sale and historical results of operations related to Delphi's global steering and halfshaft businesses (the "Steering Business") and its interiors and closures product line (the "Interiors and Closures Business").  The sale of the U.S. operation and certain of the non-U.S. operations of the Steering Business are expected to be sales of assets and are expected to include (i) all assets, except for cash, deferred tax assets, and intercompany accounts, and (ii) all liabilities, except for debt, deferred tax liabilities, intercompany accounts, U.S. pension and other postretirement benefit liabilities, accrued payroll, and certain employee benefit accounts.  The sale of certain non-U.S. operations of the Steering Business are expected to be stock sales and are expected to include all assets and liabilities for the sites with purchase price adjustments for cash, debt, and certain other accounts.  The sale of the Interiors and Closures Business closed on February 29, 2008.  The majority of the Interiors and Closures Business sale was primarily accomplished through asset sales and the buyer assumed inventory, fixed assets, non-U.S. pension liabilities and an investment in a joint venture in Korea.

While the historical results of operations of the Steering Business and the Interiors and Closures Business include general corporate allocations of certain functions historically provided by Delphi, such as accounting, treasury, tax, human resources, facility maintenance, and other services, no amounts for these general corporate retained functions have been allocated to discontinued operations in the statements of operations.  Delphi expects to retain certain employee pension and other postretirement benefit liabilities for the Steering Business and these liabilities were not allocated to liabilities held for sale in the balance sheets.  Expenses related to the service cost of employee pension and other postretirement benefit plans, however, were allocated to discontinued operations in the statements of operations, because Delphi will not continue to incur such related expense subsequent to the divestiture of these businesses.  Allocations have been made based upon a reasonable allocation method.

***Securities and ERISA Litigation Charges*** – Delphi, along with certain of its subsidiaries, current and former directors of the Company, certain current and former officers and employees of the Company or its subsidiaries, and others are named as defendants in several lawsuits filed following the Company's announced intention to restate certain of its financial statements in 2005.  One consolidated class action complaint alleges, among other things, that the Company and certain of its current and former directors and officers and others made materially false and misleading statements in violation of federal securities laws (the "Securities Action").  Another group of class action lawsuits, which is purportedly brought on behalf of participants in certain of the Company's and its subsidiaries' defined contribution employee benefit pension plans that invested in Delphi common stock, is brought under Employee Retirement Income Security Act ("ERISA").  On March 3, 2006, these plaintiffs filed a consolidated class action complaint (the "ERISA Action").  Through mediated settlement discussions, on August 31, 2007, representatives of Delphi, Delphi's insurance carriers, certain current and former directors and officers of Delphi, and certain other defendants involved in the Securities Action, the ERISA Action, and shareholder derivative actions in consolidated proceedings (the "Multidistrict Litigation" or "MDL") reached an agreement with the lead plaintiffs in the Securities Actions (the "Lead Plaintiffs") and named plaintiffs in the amended ERISA Action (the "ERISA Plaintiffs") resulting in a settlement of the Multidistrict Litigation (the "MDL Settlements").  Pursuant to the MDL Settlements, the class claimants will receive cash and allowed claims in the chapter 11 cases that, when valued at the face amount of the allowed claims, is equivalent to approximately $351 million.  On December 4, 2007, the U.S. District Court for the Eastern District of Michigan (the "District Court") held a hearing to consider proposed modifications to the MDL Settlements (the "Modified MDL Settlements") and tentatively approved the Modified MDL Settlements, after determining that the modifications were at least neutral to the Lead Plaintiffs and potentially provide a net benefit to the Lead Plaintiffs.  The District Court approved the Modified MDL Settlements in an opinion and order issued on January 10, 2008 and amended on January 11, 2008, and the District Court entered final orders and judgments dated January 23, 2008 with respect to the securities and ERISA actions.  On January 25, 2008, the Court approved the Modified MDL Settlements.  As provided in the confirmation order, the Modified

MDL Settlements are contingent upon the effective date of the Plan occurring, and if, for any reason, Delphi cannot emerge from chapter 11 as contemplated, the Modified MDL Settlements will become null and void.  The MDL Settlements also provide for the dismissal with prejudice of the ERISA Action and Securities Action and a release of certain claims against certain named defendants, including Delphi, Delphi's current directors and officers, the former directors and officers who are named defendants, and certain of the third-party defendants.  If the MDL Settlements are terminated according to their terms, the parties will proceed in all aspects as if the MDL Settlements had not been executed and any related orders had not been entered.

As a result of the Modified MDL Settlements, as of December 31, 2008, Delphi has a liability of $351 million recorded for this matter.  Delphi maintains directors and officers insurance providing coverage for indemnifiable losses of $100 million, subject to a $10 million deductible, and a further $100 million of insurance covering its directors and officers for nonindemnifiable claims, for a total of $200 million.  As part of the settlement, the insurers contributed the entire $100 million of indemnifiable coverage, and a portion of the nonindemnifiable coverage.  In conjunction with the Modified MDL Settlements, Delphi expects recoveries of $148 million for the settlement amounts provided to the plaintiffs from insurers, underwriters, and third-party reimbursements and will record such recoveries upon Delphi's emergence from chapter 11.

*Warranty Matters* – Delphi recognizes expected warranty costs for products sold principally at the time of sale of the product based on Delphi's estimate of the amount that will eventually be required to settle such obligations.  These accruals are based on factors such as past experience, production changes, industry developments, and various other considerations.  Delphi's estimates are adjusted from time to time based on facts and circumstances that impact the status of existing claims.

On September 27, 2007, the Court authorized Delphi to enter into a Warranty, Settlement, and Release Agreement (the "Warranty Settlement Agreement") with GM resolving certain warranty matters, including all warranty claims set forth in GM's amended proof of claim filed on July 31, 2006 in connection with Delphi's chapter 11 cases.  Delphi elected to defer amounts due under the Warranty Settlement Agreement until it received payments from GM, on or about the time of its emergence from chapter 11.  In conjunction with overall negotiations regarding potential amendments to the Plan to enable Delphi to emerge from chapter 11 as soon as practicable, including discussions regarding support assisting Delphi in remaining compliant with the Global EBITDAR covenants in our Amended and Restated DIP Credit Facility, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, and as a result Delphi recorded the extinguishment of this liability as a reduction of warranty expense in the eleven months ended December 31, 2008, of which $107 million was included in cost of sales and $5 million was included in discontinued operations.

*Environmental Matters* – Delphi is subject to the requirements of U.S. federal, state and local environmental and occupational safety and health laws and regulations.  As of December 31, 2008 our reserve for environmental investigation and remediation was approximately $95 million.  The amounts recorded take into account the fact that GM retained the environmental liability for certain inactive sites as part of the separation of Delphi from GM in 1999.  Addressing contamination at various sites, including facilities designated as non-core and slated for closure or sale, is required by the Resource Conservation & Recovery Act and various other federal, state or local laws and regulations and represent management's best estimate of the cost to complete such actions.  Management believes that its December 31, 2008 accruals will be adequate to cover the estimated liability for its exposure with respect to such matters and that these costs will be incurred over the next 20 years.  However, as we continue the ongoing assessment with respect to such facilities, additional and perhaps material environmental remediation costs may require recognition, as previously unknown conditions may be identified.  We cannot ensure that environmental requirements will not change or become more stringent over time or that our eventual environmental remediation costs and liabilities will not exceed the amount of our current reserves.  In the event that such liabilities were to significantly exceed the amounts recorded, Delphi's results of operations could be materially affected.

Delphi estimates environmental remediation liabilities based on the most probable method of remediation, current laws and regulations and existing technology.  Estimates are made on an undiscounted basis and exclude the effects of inflation.  If there is a range of equally probable remediation methods or outcomes, Delphi accrues at the lower end of the range.  At December 31, 2008, the difference between the recorded liabilities and the reasonably possible maximum estimate for these liabilities was approximately $82 million.

*Contractual Interest Expense and Interest Expense on Unsecured Claims* – Contractual interest expense represents amounts due under the contractual terms of outstanding debt, including debt subject to compromise for which interest expense is not recognized in accordance with the provisions of SOP 90-7.  In September 2007, Delphi

began recording prior contractual interest expense related to certain prepetition debt because it became probable that the interest would become an allowed claim based on the provisions of the plan of reorganization filed with the Court in September 2007 and confirmed, as amended, on January 25, 2008. The confirmed plan of reorganization also provided that certain holders of allowed unsecured claims against Delphi will be paid postpetition interest on their claims, calculated at the contractual non-default rate from the petition date through January 25, 2008, when the Company ceased accruing interest on these claims. At December 31, 2008, Delphi had accrued interest of $415 million in accrued liabilities in the accompanying balance sheet for prepetition claims. As discussed in Note 1. Background and Organization, on October 3, 2008, Delphi filed modifications to its confirmed plan of reorganization that, if approved by the Court, would eliminate postpetition interest on prepetition debt and allowed unsecured claims. Accordingly, Delphi anticipates that it will be relieved of this liability if and when the plan modifications are approved.

*Taxes* – Delphi recognizes current and deferred income tax assets and liabilities based upon all events that have been recognized in the consolidated financial statements as measured by the enacted tax laws. Due to the Company's history of U.S. losses over the past years, combined with the deterioration in its current U.S. operating outlook, Delphi has a 100% valuation allowance against all of its U.S. deferred tax assets, and as a result does not recognize income tax benefits for net operating losses for its U.S. entities.

The Debtors have received Court authorization, but not direction, to pay sales, use, trust fund, and certain other taxes in the normal course. Accordingly, the Debtors have paid the applicable taxes when due. See the schedules of payroll and other taxes paid for additional information regarding taxes paid.

Generally, the amount of tax expense or benefit allocated to continuing operations is determined without regard to the tax effects of other categories of income or loss, such as other comprehensive income ("OCI"). However, an exception to the general rule is provided when there is a pre-tax loss from continuing operations and pre-tax income from other categories in the current year. The intraperiod tax allocation rules in Statement of Financial Accounting Standards No. 109, *Accounting for Income Taxes*, ("SFAS 109") related to items charged directly to OCI can result in disproportionate tax effects that remain in OCI until certain events occur.

As of June 30, 2008, Delphi had disproportionate tax effects in OCI related to the hourly pension and OPEB obligations of a $533 million tax benefit and a $311 million tax expense, respectively. During the eleven months ended December 31, 2008, Delphi accounted for its hourly pension and OPEB transfer to GM as settlement of liabilities. As a result, Delphi eliminated the disproportionate tax effect in OCI related to the hourly pension and OPEB obligations on a pro rata basis to the amount of the obligation that was settled. Accordingly, Delphi recorded a tax benefit of $9 million in continuing operations for 2008, comprised of a $320 million tax benefit and $311 million tax expense related to the hourly pension and OPEB obligation settlement, respectively. Delphi continues to maintain a full valuation allowance for its deferred tax assets in the U.S. as it is more likely than not that the benefits will not be recognized.

Additionally, Delphi's annual effective tax rate was impacted by withholding tax expense of $21 million in the eleven months ended December 31, 2008. Delphi had a tax contingency reserve expense of $7 million as of December 31, 2008 which also impacted the annual effective tax rate.

Also impacting the annual effective tax rate in the eleven months ended December 31, 2008 was the effectiveness of the Amended MRA and the Amended GSA in September of 2008, which did not generate a U.S. tax expense due to the impact of a related change to U.S. deferred tax assets for which a full valuation allowance is recorded. Delphi continues to maintain a full valuation allowance in the U.S. as it is more likely than not that the benefits will not be recognized.

*Pension and OPEB Matters*– Since entering chapter 11, Delphi has limited its contributions to the Hourly Plan, the Delphi Retirement Program for Salaried Employees (the "Salaried Plan"), the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan (together, the "Pension Plans") to amounts necessary to fund benefits accrued on account of postpetition service.

Pursuant to the pertinent terms of certain pension funding waivers secured from the Internal Revenue Service ("IRS") in 2006 and 2007, Delphi provided to the Pension Benefit Guaranty Corporation ("PBGC") letters of credit in favor of the Hourly and Salaried Plans in the amount of $122.5 million to support funding obligations under the Hourly Plan and $50 million to support funding obligations under the Salaried Plan. Due to the expiration of the waivers, the PBGC drew against the $172.5 million of letters of credit in favor of the Hourly and Salaried Plans on

May 16, 2008. The cash proceeds from the letters of credit were deposited into the Hourly and Salaried Plans and initially recognized as Delphi funding contributions to the respective plans for the plan year ended September 30, 2008. However, on January 16, 2009, Delphi filed amended Forms 5500 (Annual Return Report of Employee Benefit Plan) with the IRS that applied all contributions made to the Hourly and Salaried Plans in 2008, including the proceeds from the letters of credit, back to the plan year ended September 30, 2007. This contribution carry back, together with the 414(l) Net Liability Transfer discussed above, had the effect that no contributions were due under the Hourly Plan for the plan year ended September 30, 2008. Approximately $56 million remains due as a minimum funding contribution under the Salaried Plan for the plan year ended September 30, 2008, and approximately $13 million remains due as minimum funding contribution under the Delphi Mechatronics Retirement Program, the PHI Bargaining Retirement Plan and the PHI Non-Bargaining Retirement Plan. As permitted under the Employee Retirement Income Security Act ("ERISA") and the U.S. Internal Revenue Code (the "Code"), Delphi elected to defer the contribution necessary to satisfy this remaining obligation until no later than the due date for minimum contributions, which is  June 15, 2009 for the Salaried Plan and September 15, 2009 for the subsidiary plans. On December 15, 2008, Delphi applied to the IRS for a waiver of the obligation to make the minimum funding contribution to the Salaried Plan by June 15, 2009, and permission to instead pay the amount due in installments over the next five years. That application remains pending.

Delphi froze the Salaried Plan, the ASEC Manufacturing Retirement Program, the Delphi Mechatronics Retirement Program and the PHI Non-Bargaining Retirement Plan effective as of September 30, 2008. Delphi reached agreement with its labor unions which allowed Delphi to freeze the accrual of traditional benefits under the Hourly Plan effective as of November 30, 2008. Certain collectively bargained hourly employees remain covered by the Hourly Plan's Individual Retirement Plan formula (a cash balance benefit providing an annual pay credit accrual of 5.4% of base wages).

As discussed in Note 1. Background and Organization, GM Settlement, on September 26, 2008, Delphi received the consent of its labor unions and approval from the Court to transfer certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employees Pension Plan. The 414(l) Net Liability Transfer is to occur in two separate steps. The First Pension Transfer occurred on September 29, 2008. The Second Pension Transfer will transfer substantially all of the remaining assets and liabilities of the Hourly Plan upon Delphi's emergence from chapter 11 if the terms of the Amended GSA are met.

As reflected above, Delphi has not made certain minimum required contributions to the Pension Plans and as a result, the IRS has asserted against Delphi excise taxes in the approximate amounts of $17 million and $18 million for plan years ended September 30, 2005 and September 30, 2007, respectively, and may assert additional excise taxes up to an additional $122 million and $226 million for plan years ended September 30, 2006 and September 30, 2007, respectively. If these asserted assessments are not paid, the IRS could increase the assessments that relate to the Salaried Plan to 100% of any Salaried Plan contributions considered by the IRS to be due and unpaid. However, because the 414(l) Net Liability Transfer to the GM hourly plan avoided an accumulated funding deficiency in the Delphi Hourly Plan for the plan year ended September 30, 2008, exposure to the 100% excise tax related to the Delphi Hourly Plan has been eliminated. Assuming Delphi is assessed excise taxes for all plan years through 2007, the total exposure to date could approximate $383 million, plus interest and penalties which could be substantial. In addition, if the IRS does not agree to waive the minimum required funding contribution under the Salaried Plan for the plan year ended September 30, 2008, the IRS may assess an additional excise tax of approximately $6 million if Delphi does not remit $56 million to the Salaried Plan by June 15, 2009. Additional excise taxes could be assessed with respect to the subsidiary plans if the minimum required contributions to those plans for the plan year ended December 31, 2008, are not remitted by September 15, 2009. To the extent not promptly paid by Delphi, any such excise tax assessments might be increased to 100% of any Salaried Plan and subsidiary plan contributions considered by the IRS to be due and unpaid.

Although the IRS has asserted certain of the excise tax assessments described above and might seek to assess additional excise taxes, plus interest and penalties, related to the Pension Plans, Delphi believes that under the Bankruptcy Code, the Company is not obligated to make contributions for pension benefits while in chapter 11 and that, as a result, the Company would not be liable for any such assessments. Accordingly, management has concluded that an unfavorable outcome is not currently probable and, as of December 31, 2008, no amounts have been recorded for any potential excise tax assessment.

Upon emergence from chapter 11, the Company intends to meet the minimum funding standards under section 412 of the Code applicable to the Pension Plans. If completed, the second step of the 414(l) Net Liability Transfer will allow us to satisfy substantially all of the pension funding obligations to our hourly employees, however that second transfer is conditioned on our emergence from chapter 11 under a modified plan of reorganization that meets

the terms of the Amended GSA. If the conditions to the second step of the 414(l) Net Liability Transfer are not satisfied, and the second step does not take place, we do not believe we will be able to fund those U.S. pension obligations.

In addition, we still maintain responsibility for and need to meet our U.S. pension funding obligations for those plans covering our remaining hourly employees, salaried employees and certain subsidiary employees. We may be unable to satisfy our U.S. pension funding obligations for those plans covering our remaining hourly employees, salaried employees or certain subsidiary employees. Due to the impact of the global economic recession, including reduced global automotive production, capital markets volatility that has adversely affected our pension asset return expectations, a declining interest rate environment, or other reasons, our funding requirements have substantially increased since September 30, 2008. Should we be unable to obtain funding from some other source to resolve these pension funding obligations, either Delphi or the PBGC may initiate plan terminations. The PBGC would seek termination, if in its view, the risk of loss with respect to the plans may increase unreasonably if the plans are not terminated. The amount of pension contributions due upon emergence from chapter 11 will be dependent upon various factors including, among other things, the date of emergence, and the funded status of the Pension Plans at the date of emergence. Refer to Note 17. Pension and Other Postretirement Benefits, to the consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 for further information.

*Pension and OPEB Settlements and Curtailment* – As noted above, the Amended GSA includes provisions related to the transfer of certain legacy pension and other postretirement benefit obligations. On September 26, 2008, Delphi received the consent of its labor unions and approval from the Court to transfer certain assets and liabilities of the Hourly Plan to the GM Hourly-Rate Employees Pension Plan pursuant to section 414(l) of the Internal Revenue Code (the "414(l) Net Liability Transfer") as agreed under the Amended GSA. The 414(l) Net Liability Transfer is to occur in two separate steps and is sufficient to avoid an Hourly Plan accumulated funding deficiency for the plan year ended September 30, 2008. On September 29, 2008, Delphi completed the first step of the 414(l) Net Liability Transfer, transferring approximately $2.1 billion in net unfunded pension liabilities from the Hourly Plan to the GM Hourly-Rate Employees Pension Plan. The first step of the 414(l) Net Liability Transfer was accounted for as a partial settlement of the Hourly Plan under Statement of Financial Accounting Standards No. 88, *Employer's Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefit* ("SFAS 88"). Delphi recognized a SFAS 88 settlement loss of $494 million included in reorganization items in the consolidated statements of operations for the eleven month period ended December 31, 2008, which reflects the recognition of $494 million of previously unrecognized actuarial losses recorded in OCI. The second step of the 414(l) Net Liability Transfer will occur upon the effectiveness of an amended plan of reorganization which must satisfy certain requirements as set forth in the Amended GSA.

Under the terms of the Amended GSA and union labor agreements, GM assumed $6.8 billion of traditional hourly OPEB liabilities related to plan participants with prior GM service. GM's assumption of these traditional hourly OPEB liabilities constitutes a settlement under Statement of Financial Accounting Standards No. 106, *Employer's Accounting for Postretirement Benefits Other Than Pensions.* Delphi recognized a settlement gain of $7.1 billion included in reorganization items in the consolidated statements of operations for the eleven month period ended December 31, 2008, which reflects the assumption by GM of the net unfunded liability of $6.8 billion and the recognition of $266 million of previously unrecognized actuarial gains.

As a result of the salaried workforce transformation plan activities in North America discussed in Note 7. Employee Termination Benefits and Other Exit Costs, to the consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2008, salaried separations in 2008 have resulted in significant reductions in expected future service, or curtailments, of the Salaried Plan, OPEB and supplemental executive retirement plans. Delphi recorded net salaried pension curtailment losses of $75 million and salaried OPEB curtailment gains of $82 million for the eleven month period ended December 31, 2008.

On February 4, 2009, Delphi filed a motion with the Court seeking the authority to cease providing health care and life insurance benefits in retirement to salaried employees, retirees, and surviving spouses as soon as practicable after March 31, 2009. On February 24, 2009, the Court provisionally approved Delphi's motion to modify salaried health care and life insurance benefits in retirement to eliminate Company funding effective April 1, 2009. The Court also authorized Delphi to immediately begin the administrative process to implement these modifications. The provisional approval was based on the Court's finding that the Company had met its evidentiary burdens, subject to the appointment of a Retirees' Committee to review whether it believes that any of the affected programs involved vested benefits (as opposed to "at will" or discretionary, unvested benefits). The Court scheduled a hearing to review the committee's findings for March 11, 2009. Delphi's termination of health care and life insurance

benefits in retirement to salaried employees, retirees, and surviving spouses will enable Delphi to settle the related accumulated pension benefit obligation of more than $1.1 billion and conserve projected annual cash expenditures of approximately $70 million.  On March 4, 2009, the Delphi Salaried Retirees Association and other non-union salaried retirees of Delphi filed a notice of appeal from the February 24, 2009 order described above.

   Refer to Note 2. Transformation Plan and Chapter 11 Bankruptcy and Note 17. Pension and Other Postretirement Benefits, to the consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 for more information on pension and OPEB matters.

   ***Other Income, Net*** – During the eleven months ended December 31, 2008 Delphi recognized a $32 million gain from the sale of an investment accounted for under the cost method that had been previously fully impaired, offset by $16 million of expense related to an allowance recorded against a note receivable recognized during the three and eleven months ended December 31, 2008.

### 3.  Debtor-in-Possession ("DIP") Financing

**Debtor-in-Possession Credit Facility and Accommodation Agreement**

   During the first quarter of 2007, Delphi refinanced its prepetition and postpetition credit facilities by entering into a Revolving Credit, Term Loan, and Guaranty Agreement (the "Refinanced DIP Credit Facility") to borrow up to approximately $4.5 billion from a syndicate of lenders.  During the second quarter of 2008, Delphi received Court approval and the required commitments from its lenders to enter into the Amended and Restated DIP Credit Facility, which amendments and extension became effective in May 2008.  As a result of the amendment and restatement, the aggregate size of the facility was reduced from $4.5 billion to $4.35 billion, consisting of a $1.1 billion first priority revolving credit facility ("Tranche A" or the "Revolving Facility"), a $500 million first priority term loan (the "Tranche B Term Loan") and a $2.75 billion second priority term loan (the "Tranche C Term Loan").

   On November 7, 2008, Delphi filed a motion with the Court seeking authority to enter into the Accommodation Agreement allowing Delphi to continue using the proceeds of its Amended and Restated DIP Credit Facility, (to the extent already drawn by December 12, 2008), which otherwise matured on December 31, 2008.  On December 3, 2008, the Court entered an order approving Delphi's motion and authorizing Delphi to enter into the Accommodation Agreement following the expiration of the applicable appeal period, assuming resolution of any objections filed in the interim.  On December 12, 2008, Delphi satisfied the closing conditions set forth in the Accommodation Agreement and the Accommodation Agreement became effective.  On January 30, 2009, Delphi reached agreement with its lenders to amend (the "Amendment") the Accommodation Agreement.  In support of Delphi's efforts to develop a modified reorganization plan adapted to the current global economic environment, the lenders agreed to modify certain financial covenants and pay-down requirements contained in the Accommodation Agreement.  In addition, GM agreed to immediately accelerate payment of $50 million in payables to Delphi under the Partial Temporary Accelerated Payments Agreement and to, no later than February 27, 2009, either accelerate payment of an additional $50 million in payables under such agreement or increase from $300 million to $350 million the amount which it is committed to advance under the GM Advance Agreement.  The Amendment and GM's agreement to accelerate payments were effective January 30, 2009; however, both agreements were subject to satisfaction of certain post-closing conditions, including Court approval and in the case of the Amendment, the payment of fees to the consenting lenders.  The Company filed motions with the Court seeking approval of these agreements and authority to pay the applicable fees.  Just prior to the hearing on such motions, the lenders and Delphi agreed to a further supplemental amendment to the Accommodation Agreement (the "Supplemental Amendment"), to further extend certain milestone dates, and on February 24, 2009 the Court approved the Amendment, the Supplemental Amendment and the amendment to the Partial Temporary Accelerated Payments Agreement.

   *Termination Date of the Accommodation Agreement*
   Under the Accommodation Agreement (as amended by the Amendment and Supplemental Amendment), Delphi may continue using the proceeds of the Amended and Restated DIP Credit Facility and the lenders have agreed, among other things, to forbear from the exercise of certain default-related remedies, in each case until the earlier to occur of :

- June 30, 2009, but subject to the satisfaction of certain conditions;
- Delphi's failure to comply with its covenants under the Accommodation Agreement or the occurrence of certain other events set forth in the Accommodation Agreement; and

- An event of default under the Amended and Restated DIP Credit Facility (other than the failure to repay the loans under the facility on the maturity date or comply with certain other repayment provisions).

There can be no assurance that the outside termination date of the Accommodation Agreement will not be shortened from June 30, 2009 to May 5, 2009 because there can be no assurance that we will meet the required conditions. Refer to Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation, Liquidity and Capital Resources in Delphi's Annual Report on Form 10-K for the year ended December 31, 2008 for more information on the termination date of the Accommodation Agreement.

### Requirements of the Accommodation Agreement

Notwithstanding the Accommodation Agreement, Delphi is in default of the terms of its Amended and Restated DIP Credit Facility and as a result, Delphi is no longer able to make additional draws under the facility after December 12, 2008, (the effective date of the Accommodation Agreement). However, under the Accommodation Agreement, Delphi is required to continue to comply with the provisions of the Amended and Restated DIP Credit Facility (as amended and modified by the Accommodation Agreement). Prior to the effectiveness of the Accommodation Agreement, Delphi was permitted to and did provide cash collateral, in an aggregate amount of $200 million, which was pledged to the administrative agent for the benefit of the lenders ("Borrowing Base Cash Collateral"). Upon Delphi's request, portions or all of the Borrowing Base Cash Collateral will be transferred back to Delphi provided that Delphi is in compliance with the borrowing base calculation in the Accommodation Agreement and no event of default has occurred. In addition, under certain conditions included in the Accommodation Agreement, Delphi increased its pledge of the equity interests in Delphi's first-tier foreign subsidiaries from 65% to 100%, which triggered a deemed dividend for tax purposes (no additional cash taxes were incurred). Refer to Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation, Liquidity and Capital Resources in Delphi's Annual Report on Form 10-K for the year ended December 31, 2008 for more information on the requirements of the Accommodation Agreement.

### Terms of the Amended and Restated DIP Credit Facility and Accommodation Agreement

The facilities currently bear interest at the Administrative Agent's Alternate Base Rate ("ABR") plus a specified percent, as detailed in the table below, and the amounts outstanding (in millions) and rates effective as of December 31, 2008 were:

| | ABR plus | Borrowings as of December 31, 2008 | Rates effective as of December 31, 2008 |
|---|---|---|---|
| Tranche A | 5.00% | $370 | 9.25% |
| Tranche B | 5.00% | $500 | 9.25% |
| Tranche C | 6.25% | $2,750 | 10.50% |

Tranche A, Tranche B and Tranche C facilities include an ABR floor of 4.25%

The Company had $117 million in letters of credit outstanding under the Revolving Facility as of December 31, 2008. The Debtors except to file a motion on or about March 4, 2009, seeking certain relief relating to a reimbursement agreement between Delphi and JPMorgan Chase Bank, N.A. ("JPMorgan") relating to letters of credit issued by JPMorgan outside of the Amended and Restated DIP Credit Facility. The relief sought in this motion is expected to facilitate continued access to letters of credit from JPMorgan on an ongoing basis. The amount outstanding at any one time under the First Priority Facilities is limited by a borrowing base computation as described in the Accommodation Agreement. Under the Accommodation Agreement, Delphi is required to provide weekly borrowing base calculations to the bank lending syndicate. Based on the current borrowing base computation in effect at December 31, 2008, as defined in the Accommodation Agreement, Delphi's borrowing base was reduced by the maximum deduction of $275 million for unrealized losses related to Delphi's hedging portfolio, which as of December 31, 2008 resulted in net losses included in OCI of $194 million pre-tax, primarily related to copper and Mexican Peso hedges, as further described in Note 23. Fair Value of Financial Instruments, Derivatives and Hedging Activities, to the consolidated financial statements in Delphi's Annual Report on Form 10-K for the year ended December 31, 2008.

The Amended and Restated DIP Credit Facility includes affirmative, negative and financial covenants that impose restrictions on Delphi's financial and business operations, including Delphi's ability, among other things, to incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. As long as the

Facility Availability Amount (as defined in the Amended and Restated DIP Credit Facility) is equal to or greater than $500 million, compliance with the restrictions on investments, mergers and disposition of assets does not apply (except with respect to investments in, and dispositions to, direct or indirect domestic subsidiaries of Delphi that are not guarantors). Delphi's Facility Availability Amount was less than $500 million at December 31, 2008 as all commitments were cancelled with the effectiveness of the Accommodation Agreement on December 12, 2008.

The Accommodation Agreement also contains additional covenants, amends certain of the existing covenants in the Amended and Restated DIP Credit Facility and includes additional events of default under the Amended and Restated DIP Credit Facility. Additional covenants under the Accommodation Agreement include (i) a prescribed minimum borrower liquidity level, (ii) a requirement to repay obligations under the Amended and Restated DIP Credit Facility pursuant to an Accommodation Agreement borrowing base covenant (approximately $131 million was repaid during January 2009 as a result of the borrowing base calculation), (iii) a requirement to repay obligations under the Amended and Restated DIP Credit Facility to the extent any specified litigation proceeds are received in cash, (iv) a prohibition on the repatriation of cash from foreign subsidiaries as cash dividends, cash otherwise distributed in redemption of or in exchange for equity interests in foreign subsidiaries or through the repayment of notes unless used to repay obligations under the Amended and Restated DIP Credit Facility and (v) a requirement to repay $60 million in obligations under the Amended and Restated DIP Credit Facility in accordance with the schedule set forth in the Accommodation Agreement.

Changes to covenants under the Amended and Restated DIP Credit Facility include (i) a reduction in the cap on permitted debt and liens on assets of foreign subsidiaries, (ii) a reduction in the cap on net cash proceeds from asset sales before such proceeds must be utilized to repay the obligations under the Amended and Restated DIP Credit Facility, (iii) modifications to certain debt and lien baskets, including permitting cash collateralization of letters of credit and an increase in secured hedging obligations and (iv) enhanced monthly financial reporting.

The covenants require Delphi, among other things, to maintain a rolling 12-month cumulative Global EBITDAR (as defined in the Amended and Restated DIP Credit Facility and Accommodation Agreement) for Delphi and its direct and indirect subsidiaries, on a consolidated basis. Prior to the Amendment the Global EBITDAR covenant was $450 million for the period ended December 31, 2008.

The covenants also impose restrictions on Delphi's derivative contracts. Refer to Note 23. Fair Value of Financial Instruments, Derivatives and Hedging Activities, to the consolidated financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2008 for more information.

Delphi was in compliance with the Amended and Restated DIP Credit Facility and Accommodation Agreement covenants as of December 31, 2008. However, during December 2008 as a result of reduced vehicle production cuts, particularly in North America, the amount of outstanding accounts receivable and inventory declined, thus requiring periodic repayments of amounts outstanding under Tranches A and B of the Amended and Restated DIP Credit Facility to maintain compliance with the borrowing base computation. As of January 31, 2009 there was approximately $314 million outstanding under Tranche A and approximately $425 million outstanding under the Tranche B Term Loan. Reduced volume projections were expected to result in a significant decline in rolling 12-month cumulative Global EBITDAR at the end of January 2009, which without the Amendment might have put Delphi's ability to comply with the Global EBITDAR covenants at risk. In addition, this deterioration reduced the amount of outstanding receivables, potentially requiring Delphi to repay significant additional amounts currently outstanding under the Revolving Facility in the months of January and February 2009, further reducing liquidity in its North American operations. However, pursuant to the Amendment, the lenders have agreed to modify certain covenants contained in the Accommodation Agreement. Specifically the Amendment provides for:

–  Revised rolling 12-month cumulative Global EBITDAR covenant levels based upon the current economic and automotive environment as follows:

| Period Ending | Global EBITDAR (in millions) |
|---|---|
| January 31, 2009 | $185 |
| February 28, 2009 | $(50) |
| March 31, 2009 | $(150) |
| April 30, 2009 | $(250) |
| May 31, 2009 | $(350) |

–  An additional cash collateral basket of up to $117 million (the "Basket"), which solely for purposes of the prepayment provisions in the Accommodation Agreement is considered an offset to amounts outstanding

under the Revolving Facility (provided during February 2009).  The Basket may be released to Delphi (and each such release may not be restored) upon the satisfaction of certain conditions described below.

By February 27, 2009 GM agreed that it would either (a) convert, subject to obtaining the approval of the Court and obtaining any required approvals from the President's Designee pursuant to its loan agreement with the U.S. Treasury, the $50 million acceleration of payment terms referred to above to increase the amount available under the GM Advance Agreement to an aggregate of $350 million or (b) accelerate an additional $50 million in advances. The Amendment further provided that if GM chose option (a), the prescribed minimum borrower liquidity level in the Accommodation Agreement would be reduced to $50 million and the target cash balance in the GM Advance Agreement (as described below) would be increased to $50 million, provided that all necessary approvals to amend the GM Advance Agreement were received, before March 25, 2009.  On February 27, 2009, GM chose option (a) and committed to increase from $300 million to $350 million the amounts available under the GM Advance Agreement, subject to receipt prior to March 24, 2009, of required approvals of the President's Designee in accordance with the provisions of GM's federal loans and prior to March 25, 2009, approval of the Court.

To provide additional liquidity support, the Amendment (as modified by the Supplemental Amendment) further provides that the amounts in the Basket may be released to Delphi if each of the following conditions is satisfied at the time of the release (a) by April 2, 2009 Delphi has filed a plan of reorganization or modifications to Delphi's existing plan of reorganization meeting the conditions specified in the Accommodation Agreement and the 10 business day notice period after April 2, 2009 has elapsed without the majority of Tranche A and Tranche B lenders or majority of all lenders who signed the Accommodation Agreement having delivered notice that such plan of reorganization or modifications to Delphi's existing Plan of Reorganization are not satisfactory,  (b) after giving effect to the release, Delphi is compliant with the mandatory prepayment provisions in the Accommodation Agreement and all other covenants in the Amended and Restated DIP Credit Facility as modified by the Accommodation Agreement and the Amendment, and (c) prior to March 25, 2009 GM has agreed and has obtained all required approvals to increase the available amounts under the GM Advance Agreement to $450 million (which includes any conversion by GM of the previously accelerated payables described above into advances under the GM Advance Agreement).  As noted above, GM has committed to increase to $450 million the amounts available under the GM Advance Agreement, subject to (i) GM not being notified by the President's Designee that such increase is not permitted in accordance with the provisions of GM's federal loans, (ii) Court approval, (iii) the GM board of directors' approval, (iv) Delphi and GM executing a definitive transaction agreement relating to the sale of Delphi's Steering Business, and (v) Court approval of the Steering Business Option Exercise Agreement.  The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement.  Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed by GM and Delphi.  The Option Exercise Agreement is subject to conditions described in Note 8. Divestitures.  Delphi believes GM's commitment to increase availability under the GM Advance Agreement is a significant step toward Delphi being able to access amounts in the Basket.

Notwithstanding the above, Delphi will be required to apply all amounts in the Basket to pay down the Amended and Restated DIP Credit Facility under the following circumstances:  (i) Delphi has not delivered to the agent under the Amended and Restated DIP Credit Facility a proposal to GM regarding Delphi's North American sites and the related GM plan to support Delphi's overall emergence plan by February 17, 2009 (the "Proposal"); (ii) Delphi has not delivered to the agent under the Amended and Restated DIP Credit Facility a business plan incorporating the Proposal by February 20, 2009 (the "Business Plan") and shall have delivered a supplement to such proposal by March 24, 2009; (iii) a majority of lenders executing the Amendment direct the agent under the Amended and Restated DIP Credit Facility on or before March 6, 2009 that the Proposal or the Business Plan is not satisfactory, (iv) a majority of lenders executing the supplement to the First Amendment shall direct the agent under the Amended and Restated DIP Credit Facility on or prior to April 7, 2009 that the March 24, 2009 supplement referred to in clause (ii) is not satisfactory, (v) if Delphi fails to file a plan of reorganization or modifications to its existing plan of reorganization meeting the conditions specified in the Accommodation Agreement by April 2, 2009 or if within 10 business days of such filing the majority of Tranche A and Tranche B lenders or majority of all lenders who signed the Accommodation Agreement deliver notice that such filing is not satisfactory, or (vi) if on March 24, 2009 there is less than $450 million of aggregate availability committed under the GM Advance Agreement.  Delphi did timely deliver the Proposal and Business Plan to the agent as provided in clauses (i) and (ii) above and to date has not received any indication that such items were not satisfactory.  In addition, Delphi will be required to apply an amount equal to twenty percent of the aggregate amount in the Basket to pay down the Amended and Restated DIP Credit Facility in the event that (A) Delphi does not deliver certain analyses on or before March 4, 2009, or (B) a majority of lenders executing the Supplemental Amendment shall direct the agent

under the Amended and Restated DIP Credit Facility on or prior to March 18, 2009 that such certain analyses are not satisfactory.

The Amended and Restated DIP Credit Facility also contains certain defaults and events of default customary for debtor-in-possession financings of this type. Upon the occurrence and during the continuance of any default in payment of principal, interest or other amounts due under the Amended and Restated DIP Credit Facility, and interest on all outstanding amounts is payable on demand at 2% above the then applicable rate.

New events of default under the Amended and Restated DIP Credit Facility include (i) any amendment, waiver, supplement or modification to the Amended GSA or the Amended MRA requiring Court approval that, taken as a whole, materially impairs the rights of Delphi or its affiliated debtors as borrowers or guarantors, materially reduces the amount, or decelerates the timing of, any material payments under either such agreement, if the Required Lenders object, (ii) any repudiation in writing or termination of the Amended GSA or the Amended MRA by any party thereto, or a failure to perform any obligation thereunder, which failure materially impairs the rights of Delphi thereunder, (iii) certain amendments, waivers, modifications, or supplementations of any term of the GM Advance Agreement or the Partial Temporary Accelerated Payments Agreement (as defined below), (iv) any event or condition that results in GM not funding amounts requested under the GM Advance Agreement and (v) the enforcement or failure to stay enforcement of a judgment or order against any borrower or guarantor with respect to any amounts advanced under the Amended and Restated DIP Credit Facility.

In connection with the Accommodation Agreement, Delphi has paid fees to the consenting lenders of 200 basis points, or approximately $37 million. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Accommodation Agreement. The Company also received authority to pay applicable fees to various lenders in conjunction with the Amendment and the Supplemental Amendment, and has paid approximately $11 million in fees to the consenting lenders for both amendments.

In connection with the entry into the Amended and Restated DIP Credit Facility in May 2008, Delphi paid a total of approximately $75 million to participating lenders on the Revolving Facility, the Tranche B facility and the Tranche C facility. Delphi also received approval from the Court to pay arrangement and other fees to various lenders in conjunction with the Amended and Restated DIP Credit Facility and the bankruptcy exit financing that was commenced but not completed.

In conjunction with the entry into the Amended and Restated DIP Credit Facility, the Refinanced DIP Credit Facility was terminated. Delphi incurred no early termination penalties in connection with the termination of this agreement. However, as a result of significant changes in the debt structure and corresponding cash flows related to the refinancing, Delphi expensed $49 million of unamortized debt issuance costs related to the Amended and Restated DIP Credit Facility and the Refinanced DIP Credit Facility in the second quarter of 2008, which was recognized as loss on extinguishment of debt. As of December 31, 2008, $56 million of debt issuance costs remains deferred in other current assets and is being amortized over the term of the Amended and Restated DIP Credit Facility, as modified by the Accommodation Agreement.

**Advance Agreement and Liquidity Support from General Motors and Related Matters**

Concurrently with the Amended and Restated DIP Credit Facility, Delphi entered into the GM Advance Agreement whereby GM agreed to advance Delphi amounts anticipated to be paid following the effectiveness of the GSA and MRA. The original GM Advance Agreement had a maturity date of the earlier of December 31, 2008, when $650 million was to have been paid under the GSA and MRA and the date on which a plan of reorganization becomes effective. The original GM Advance Agreement provided for availability of up to $650 million, as necessary for Delphi to maintain $500 million of liquidity, as determined in accordance with the GM Advance Agreement. The amounts advanced accrue interest at the same rate as the Tranche C Term Loan on a paid-in-kind basis. The accrued interest on the advances made through the effectiveness of the Amended GSA and Amended MRA was cancelled due to the effectiveness of the Amended GSA and Amended MRA, as more fully described in Note 1. Background and Organization, GM Settlement, and Delphi was not able to redraw the original $650 million facility amount.

On September 26, 2008, the Court granted Delphi's motion to amend the GM Advance Agreement to provide for an additional $300 million facility, which could be drawn against from time to time as necessary for Delphi to maintain $300 million of liquidity, as determined in accordance with the amendment to the GM Advance Agreement signed on August 7, 2008 and to give GM an administrative claim for all unpaid advances under such additional facility. Continued availability to draw against the additional $300 million facility was conditioned upon Delphi

filing a plan of reorganization and related disclosure statement in form and substance materially consistent with Section 5 of the Amended GSA and Section 7.01 of the Amended MRA which condition was satisfied with Delphi's filing of proposed modifications to its previously confirmed plan of reorganization with the Court on October 3, 2008, and certain other conditions.

In support of Delphi's efforts to obtain the Accommodation Agreement, GM agreed to extend the term of the GM Advance Agreement, pursuant to the terms set forth in an amendment thereto filed with the Court on November 7, 2008 (as supplemented) (the "GM Advance Agreement Amendment"), through the earlier of (i) June 30, 2009, (ii) such date as Delphi files any motion seeking to amend the plan of reorganization in a manner that is not reasonably satisfactory to GM, (iii) the termination of the Accommodation Agreement or the accommodation period therein, or (iv) such date when a plan of reorganization becomes effective.  The Court approved Delphi's motion to amend and extend the GM Advance Agreement concurrently with the approval of Delphi's motion seeking authority to enter into the Accommodation Agreement.  Additionally, GM has agreed, subject to certain conditions, to accelerate payment of certain payables to Delphi, pursuant to the Partial Temporary Accelerated Payments Agreement, which could result in an additional $300 million of liquidity through May 2009.  The Partial Temporary Accelerated Payments Agreement provides that GM will generally recoup these accelerated payments over its three subsequent monthly payments on or after the date that GM's obligation to advance funds under the GM Advance Agreement terminates or advances made become due and payable in accordance with the GM Advance Agreement. Both the amendment to the GM Advance Agreement and the Partial Temporary Accelerated Payments Agreement were effective concurrent with the Accommodation Agreement, on December 12, 2008.  Conforming amendments were made to the GM Advance Agreement and Partial Temporary Accelerated Payments Agreement contemporaneously with Court approval of the Amendment and Supplemental Amendment to the Accommodation Agreement as described above.  Additionally, Delphi expects to file a motion on or about March 4, 2009 seeking approval of subsequent amendments to the GM Advance Agreement to reflect the conditions pursuant to which GM will agree to increase the amounts available under such agreement, see the immediately preceding section under "Debtor-in-Possession Credit Facility and Accommodation Agreement."

There can be no assurances, however that GM will have sufficient liquidity to accelerate payables to Delphi or advance amounts under the GM Advance Agreement. Refer to Item 1A. Risk Factors in Delphi's Annual Report on Form 10-K for the year ended December 31, 2008, for risks and uncertainties related to our business relationship with GM.

The GM Advance Agreement currently has a targeted cash balance amount of $25 million and Delphi is required to use any free cash flow above the targeted cash balance amount (as determined in accordance with the GM Advance Agreement) to repay from time to time any amounts outstanding thereunder.  As noted above, provided all necessary approvals are received and all conditions are satisfied to increase the amounts available under the GM Advance Agreement to $450 million prior to March 25, 2009, the targeted cash balance amount will be increased to $50 million.  As of December 31, 2008, no amounts were outstanding pursuant to the GM Advance Agreement and $300 million was available for future advances.

## 4.  Reorganization Items

SOP 90-7 requires reorganization items such as revenues, expenses such as professional fees directly related to the process of reorganizing the Debtors under chapter 11 of the Bankruptcy Code, realized gains and losses, provisions for losses, and interest income resulting from the reorganization and restructuring of the business to be separately disclosed.  Professional fees directly related to the reorganization include fees associated with advisors to the Debtors, unsecured creditors, secured creditors, and unions.  The Debtors' reorganization items consist of the following:

| | Three Months Ended December 31, 2008 | Eleven Months Ended December 31, 2008 |
|---|---|---|
| | (in millions) | |
| GM Amended GSA settlement (Note 1) | $        — | $     5,332 |
| Professional fees directly related to reorganization | (25) | (97) |
| Interest income | 18 | 62 |
| Write off of previously capitalized fees and expenses related to the EPCA | — | (79) |
| Other | (1) | (4) |
| Total Reorganization Items | $        (8) | $     5,214 |

Case Number:  05-44481 (RDD) (Jointly Administered)

Delphi recorded a net reorganization gain of $5.3 billion in the eleven months ended December 31, 2008 and received $641 million on September 30, 2008 as a result of the effectiveness of the Amended GSA, as described in Note 1. Background and Organization, GM Settlement. Professional fees directly related to the reorganization ("Professional Fees") include fees and reimbursable expenses associated with advisors to the Debtors, the official committee of unsecured creditors, the official committee of equity holders, the agents to the Debtors' debtor-in-possession credit facility and prepetition credit facility (for fees and expenses incurred on or prior to the effective date of the refinancing), and the unions. Professional Fees also include $10 million during the eleven months ended December 31, 2008, including $4 million recorded during the three months ended December 31, 2008, for certain legal advisors to GM. Professional fees for the eleven months ended December 31, 2008 also includes arrangement and other fees paid to various lenders in conjunction with the bankruptcy exit financing that was commenced but not completed in April 2008. Professional Fees for the three months ended December 31, 2008 were estimated by the Debtors and will be reconciled to actual invoices when received.

## 5. Liabilities

Accrued liabilities consisted of the following:

| | December 31, 2008 (in millions) |
|---|---|
| Payroll related obligations | $ 39 |
| Employee benefits, including current pension obligations | 84 |
| Taxes other than income | 36 |
| Warranty obligations | 74 |
| U.S. employee workforce transition program | 115 |
| Employee termination benefits and other exit costs | 81 |
| Interest on prepetition claims | 415 |
| Working capital backstop – Steering Business | 210 |
| Other | 264 |
| Total | $1,318 |

Employee benefit obligations and other consisted of the following:

| | December 31, 2008 (in millions) |
|---|---|
| Workers compensation | $ 325 |
| Environmental | 90 |
| Extended disability benefits | 60 |
| Warranty obligations | 130 |
| Other | 131 |
| Total | $ 736 |

## 6. Liabilities Subject to Compromise

The Debtors have received approximately 16,800 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims. In addition, the Debtors have compared proofs of claim they have received to liabilities they have already scheduled and determined that there are certain scheduled liabilities for which no proof of claim was filed. In the aggregate, total proofs of claim and scheduled liabilities assert approximately $34 billion in liquidated amounts, including approximately $900 million in intercompany claims, and additional unliquidated amounts.

Although the Debtors have not completed the process of reconciling these proofs of claim and thus the ultimate amount of such liabilities is not determinable at this time, as of December 31, 2008, the Debtors had objected to approximately 13,400 proofs of claim which asserted approximately $10.0 billion in aggregate liquidated amounts plus additional unliquidated amounts. The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,900 of those claims, which orders reduced the amount of asserted claims by approximately $9.8 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered an order allowing or modifying approximately 3,910 claims, reducing the aggregate amounts asserted on those claims by $342 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors anticipate that additional proofs of claim will be the subject of future objections as such proofs of claim are reconciled, and that as a result of such objections, the aggregate amount of claims ultimately allowed by the Court will be further reduced. The determination of how these liabilities are to be settled and treated is set forth in the Plan, which was approved by the Court on January 25, 2008. Classification for purposes of these financial statements of any prepetition liabilities on any basis other than liabilities subject to compromise is not an admission against interest or a legal conclusion by the Debtors as to the manner of classification, treatment, allowance, or payment in the Debtors' chapter 11 cases, including in connection with any plan of reorganization that may be confirmed by the Court and that may become effective pursuant to an order of the Court.

SOP 90-7 requires prepetition liabilities that are subject to compromise to be reported at the amounts expected to be allowed, even if they may be settled for lesser amounts. The amounts currently classified as liabilities subject to compromise may be subject to future adjustments depending on Court actions, further developments with respect to disputed claims, determinations of the secured status of certain claims, the values of any collateral securing such claims, or other events. Liabilities subject to compromise consist of the following:

|  | December 31, 2008 |
|---|---|
|  | (in millions) |
| Pension obligations | $  5,321 |
| Postretirement obligations other than pensions | 1,201 |
| Allowed GM general unsecured claim | 1,628 |
| Allowed GM administrative claim | 2,500 |
| Allowed IUE-CWA and USW claims | 129 |
| Debt and notes payable | 2,375 |
| Accounts payable | 813 |
| Securities and ERISA litigation liability | 351 |
| Other | 346 |
| Total Liabilities Subject to Compromise | $    14,664 |

The decrease in liabilities subject to compromise as of December 31, 2008 from $16,325 million at June 30, 2008 is due to the reductions of postretirement obligations and the GM claim for the U.S. employee workforce transition programs resulting from the effectiveness of the Amended GSA and the Amended MRA during the third quarter of 2008. The remaining other postretirement benefit obligations are primarily for salaried employees. On February 4, 2009, Delphi filed a motion with the Court seeking the authority to cease providing health care and life insurance benefits in retirement to salaried employees, retirees, and surviving spouses as soon as practicable after March 31, 2009. Refer to Note 2. Basis of Presentation, Pension and OPEB Matters for more information.

## 7.  Postpetition Accounts Payable

To the best of the Debtors' knowledge, all undisputed postpetition accounts payable have been and are being paid under agreed-upon payment terms.

## 8.  Divestitures

### Discontinued Operations

***Steering and Halfshaft Business*** - In the fourth quarter of 2007, Delphi executed a Purchase and Sale Agreement (the "Purchase Agreement") with an affiliate of Platinum Equity, LLC, Steering Solutions Corporation ("Platinum"), for the sale of the Steering Business and a Transaction Facilitation Agreement with GM (the "Transaction Agreement"). In February 2008, the Court issued an order authorizing Delphi to dispose of its Steering Business. Pursuant to the terms of the Purchase Agreement, any party in compliance with its obligations under the Purchase Agreement may terminate the Purchase Agreement since the transaction did not close by August 31, 2008. Prior to entry into the agreements described below in March 2009, neither party had terminated the Purchase Agreement. Pursuant to the Amended MRA, GM agreed that ownership of the Steering Business will transfer to GM if it is not sold to a third party by December 31, 2010. On March 3, 2009, however, Delphi and Platinum reached an agreement under which the Purchase Agreement would be terminated (the "Termination Agreement") and Delphi and GM reached an agreement (the "Option Exercise Agreement"), subject to GM receiving U.S. Treasury and GM board of directors approval and Delphi receiving Court approval, under which GM will exercise its option to purchase the Steering Business as contemplated under the Amended MRA to allow a wholly-owned subsidiary of GM  to purchase the Steering Business free and clear of all liens and encumbrances other than certain permitted encumbrances (the "Steering Purchase"). GM has agreed to guarantee the payment and performance of its

wholly-owned subsidiary's obligations under the definitive transaction agreements to be entered into pursuant to the Option Exercise Agreement.

The Option Exercise Agreement contains a procedure for completing the definitive transaction agreement relating to the sale of the Steering Business to GM which, among other things, takes into account the terms of the Amended MRA and certain modifications set forth in the Option Exercise Agreement. Based on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which the Steering Business will be sold to GM have been substantially agreed to by GM and Delphi. In addition to certain other milestones, Delphi has agreed to use its reasonable best efforts to obtain Court approval of the Option Exercise Agreement on or before March 24, 2009, and Delphi and GM have agreed to use their reasonable best efforts to obtain Court approval of the Steering Purchase and assignment and assumption of contracts on or before April 23, 2009 and to close the Steering Purchase on or before April 30, 2009. The parties have agreed to file a motion seeking such required approvals of the Steering Purchase and the assignment and assumption of contracts with the Court. The Debtors expect to file a motion on or about March 4, 2009 seeking approval of the Option Exercise Agreement.

Delphi and GM will enter into a transition services agreement on reasonable and customary terms pursuant to which Delphi will provide, among other things, general transition services with GM through mid-2011 and information technology transition services through December 2012. Other material terms of the Option Exercise Agreement include, but are not limited to, the following: (a) at the closing of the Steering Purchase, the parties will forego the working capital true-up set forth in the Amended MRA; (b) GM will not exercise certain of GM's rights under the Amended MRA; (c) GM will pay all cure costs, with respect to all prepetition contracts which it requests be assumed and assigned to it; (d) GM will assume all postpetition trade payables with respect to the contracts included within the definition of the Steering Business (provided that Delphi will pay all trade payables prior to the closing in the ordinary course of business); (e) in lieu of an additional labor reimbursement contemplated under the Amended MRA, at closing GM will assume certain of Delphi's labor and workers' compensation obligations; and (f) GM will assume responsibility, and waive any obligations of Delphi relating to, warranty, recall, and products liability with respect to products manufactured for, or sold to, GM by the Steering Business, whether before or after the closing and Delphi will retain responsibility for such liability with respect to products sold to non-GM customers prior to closing. Pursuant to the Termination Agreement, Delphi and Platinum have agreed to return the deposit amount under the Purchase Agreement to Platinum.

The closing of the Steering Purchase is conditioned on GM paying to the administrative agent under Delphi's Amended and Restated DIP Credit Facility, for the benefit of the lenders thereunder, a non-refundable amount equal to the reduction in available receivables, available inventory, and fixed asset component of the borrowing base caused directly by the consummation of such purchase. In the event Delphi and GM reach an agreement for the sale of any of Delphi's other businesses and manufacturing sites in the U.S. to GM, then, upon the closing of such sale, such payment would constitute partial prepayment of the consideration for the sale of such facilities. The above summary is qualified by reference to the terms and provisions of any final agreement filed with the Court.

On September 30, 2008, in conjunction with the effectiveness of the Amended MRA, Delphi received and recorded as a deferred liability a $210 million advance on working capital recovery from GM related to the Steering Business. In conjunction with the proceeds of this working capital advance from GM, as well as entering into the Termination Agreement and the Option Exercise Agreement for the Steering Purchase, Delphi has adjusted its estimate of assets held for sale to $210 million and continues to account for the business as a discontinued operation. During the three and eleven months ended December 31, 2008, Delphi recorded losses of $42 million, net of tax, and $52 million, net of tax, respectively, due to the results of operations, adjustment of assets held for sale to fair value of the Steering Business as of December 31, 2008 and the effectiveness of the Amended MRA.

***Interiors and Closures Business -*** Delphi and certain of its affiliates closed on the sale of the Interiors and Closures Business to Inteva Products, LLC ("Inteva"), a wholly-owned subsidiary of the Renco Group, on February 29, 2008. Delphi received proceeds from the sale of approximately $98 million consisting of $63 million of cash (less $23 million of cash at an overseas entity that was included in the sale) and the remainder in notes at fair value. As a result of the operating results and sale of the Interiors and Closures Business, Delphi recorded income of $12 million, net of tax, in the eleven months ended December 31, 2008.

### Automotive Holdings Group Segment

***Power Products Business Sale*** –On May 27, 2008 and in accordance with the terms of an order authorizing the sale of certain assets for less than $10 million, Delphi served notice of its intention to sell its power products business (the "Power Products Business") to Strattec Security Corporation, Witte-Velvert GmbH & Co. KG, Vehicle

Access Systems Technology LLC, and certain of their affiliates (collectively, the "Strattec Buyers") for approximately $8 million. On June 4, 2008, the Debtors filed a motion to assume and assign certain prepetition executory contracts related to the Power Products Business to the Strattec Buyers. On June 24, 2008, the Court entered an order authorizing the Debtors to assume and assign such contracts to the Strattec Buyers. The 2007 annual revenues for the Power Products Business were $59 million. Delphi recognized a loss of $2 million and $5 million in cost of sale during the three and eleven months ended December 31, 2008, related to the assets held for sale of the Power Products Business. An initial loss of $3 million was recognized during the second quarter of 2008. On November 7, 2008, Delphi and the Strattec Buyers agreed to an amendment to the purchase and sale agreement, which among other things, reduced the consideration to be received by Delphi to approximately $5 million. The sale occurred on November 30, 2008 and resulted in an additional loss of approximately $2 million, which was recorded to cost of sales. Delphi received final consideration of approximately $7 million during the three and eleven months ended December 31, 2008, which includes final working capital adjustments.

**U.S. Suspensions Asset Sale -** On March 7, 2008, the Debtors filed a motion to sell certain assets of Delphi's U.S. suspensions business including the machinery, equipment and inventory primarily used and located at its suspension manufacturing facility in Kettering, Ohio (the "Kettering Assets"), to Tenneco Automotive Operating Company Inc. ("Tenneco") for approximately $19 million and other consideration. On March 20, 2008, the Court approved the bidding procedures for the Kettering Assets, but no further bids were submitted by the bid deadline. On April 30, 2008, the Court entered an order approving the sale of the Kettering Assets to Tenneco. The 2007 annual revenues for the Kettering Assets were $113 million. The sale occurred on May 30, 2008 and resulted in a gain of $8 million during the eleven months ended December 31, 2008, which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $18 million in the eleven months ended December 31, 2008.

**Bearings Business Product Sale -** On January 15, 2008, the Debtors filed a motion to sell Delphi's bearings business (the "Bearings Business"). On January 25, 2008, the Court approved the bidding procedures authorizing Delphi to commence an auction under section 363 of the Bankruptcy Code. On February 21, 2008, the Debtors announced that they had entered into a purchase agreement with Kyklos, Inc., a wholly owned subsidiary of Hephaestus Holdings, Inc. and an affiliate of KPS Special Situations Fund II, L.P. ("Kyklos"), which was the successful bidder at the auction held on February 19, and 20, 2008. The Court entered the order confirming the sale of the Bearings Business to Kyklos on March 19, 2008. The 2007 annual revenues for the Bearings Business were $280 million, which included $108 million of intra-segment sales. During the eleven months ended December 31, 2008, Delphi recognized a charge of $30 million, included in cost of sales, related to the assets held for sale of the Bearings Business. The sale occurred on April 30, 2008, and Delphi received net proceeds from this sale of approximately $15 million during the eleven months ended December 31, 2008.

**North American Brake Product Asset Sale -** On September 17, 2007, Delphi and TRW Integrated Chassis Systems, LLC signed an Asset Purchase Agreement for the sale of certain assets for Delphi's North American brake components machining and assembly assets ("North American Brake Components") primarily located at its Saginaw, Michigan; Spring Hill, Tennessee; Oshawa, Ontario, Canada; and Saltillo, Mexico facilities. The 2007 annual revenues for North American Brake Components were $568 million. The sale occurred in the eleven months ended December 31, 2008 and resulted in a gain of $5 million, which was recorded as a reduction to cost of sales. Additionally, Delphi received proceeds from this sale of approximately $40 million during the eleven months ended December 31, 2008.

### Powertrain Systems Segment

**Global Exhaust Business Sale -** On June 27, 2008, the Debtors announced their intention to sell Delphi's global exhaust business relating to the design and manufacture of the exhaust system front exhaust module including catalytic converters and exhaust manifolds (the "Exhaust Business"). On December 17, 2008 Delphi received approval from the Court for the sale of assets related to the Exhaust Business to Bienes Turgon S.A. de C.V. for $17 million (subject to adjustments). The sale is expected to close during the first half of 2009 and Delphi recognized a charge of $14 million in cost of sales during the three and eleven months ended December 31, 2008 related to the assets held for sale of the Exhaust Business. Although Delphi intends to divest its Exhaust Business, the Company intends to continue to provide full engine management systems, including air and fuel management, and combustion and valve-train technology.

**Catalyst Product Line Sale -** On September 28, 2007, Delphi closed on the sale of its original equipment and aftermarket catalyst business (the "Catalyst Business") to Umicore. The Catalyst Business revenues for the nine months ended September 30, 2007 were $249 million. During the eleven months ended December 31, 2008, Delphi

and Umicore agreed on final working capital adjustments and Delphi received a payment of $9 million, of which $6 million offset a receivable recognized during 2007 and $3 million was recorded as a reduction to cost of sales.

**DELPHI CORPORATION, <u>et al.</u>**
**SCHEDULE OF PAYROLL AND PAYROLL TAXES WITHHELD AND INCURRED**
**THREE MONTHS ENDED DECEMBER 31, 2008**

| Gross Wages Paid | Employee Payroll Taxes Withheld | Employer Payroll Taxes Owed |
|---|---|---|
| $        546,747,133 | $        157,138,506 | $        32,588,567 |

Note:    As previously disclosed, as part of the special attrition program certain eligible Delphi U.S. hourly employees represented by the UAW and the IUE-CWA received lump sum incentive payments or buyout payments.  These payments were made by Delphi and are wholly or partially reimbursed by GM, and are included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF PAYROLL TAXES PAID**
**THREE MONTHS ENDED DECEMBER 31, 2008**

| Payee | Payroll Taxes Paid |
|---|---|
| Internal Revenue Service | $ 164,650,756 |
| State of Michigan | 7,527,916 |
| City of Saginaw, MI | 118,621 |
| City of Flint, MI | 96,371 |
| City of Detroit, MI | 10,419 |
| City of Grand Rapids, MI | 9,817 |
| City of Pontiac, MI | 1,456 |
| City of Walker, MI | 1,014 |
| City of Lansing, MI | 74 |
| State of Ohio | 2,924,638 |
| City of Kettering, OH | 189,834 |
| City of Dayton, OH | 162,071 |
| City of Vandalia, OH | 147,156 |
| City of Warren, OH | 45,237 |
| City of Moraine, OH | 42,704 |
| Ohio School District | 25,433 |
| City of Niles, OH | 17,885 |
| City of Elyria, OH | 15,101 |
| City of Hubbard, OH | 11,088 |
| City of Columbus, OH | 4,983 |
| City of Lordstown, OH | 3,573 |
| City of Huron, OH | 3,435 |
| City of Canton, OH | 1,699 |
| City of Norwalk, OH | 1,318 |
| City of Trotwood, OH | 1,183 |
| City of Port Clinton, OH | 998 |
| City of Dublin, OH | 944 |
| City of Newton Falls, OH | 878 |
| City of Toledo, OH | 663 |
| City of Springfield, OH | 591 |
| City of West Carrollton, OH | 298 |
| City of Akron, OH | 265 |
| City of Troy, OH | 252 |
| City of Xenia, OH | 79 |
| City of Hamilton, OH | 28 |
| City of Lorain, OH | 24 |
| City of Cincinnati, OH | 21 |
| City of Ontario, OH | 6 |
| State of New York | 6,314,873 |
| State of Indiana | 5,192,875 |
| State of Alabama | 1,299,477 |
| City of Gadsden, AL | 277 |
| State of Mississippi | 526,135 |
| State of Wisconsin | 476,846 |
| State of California | 136,247 |
| State of Colorado | 63,855 |
| City of Denver, CO | 5,405 |
| State of Pennsylvania | 43,348 |
| City of Towamencin, PA | 112 |
| City of Philadelphia, PA | 6 |
| State of Georgia | 26,591 |
| State of South Carolina | 23,296 |
| State of Illinois | 20,228 |
| State of Kansas | 17,074 |
| State of Oregon | 14,562 |

| Payee | Payroll Taxes Paid |
|---|---|
| State of Virginia | $ 8,436 |
| State of North Carolina | 7,715 |
| State of Arizona | 7,167 |
| State of Kentucky | 5,073 |
| City of Elizabethtown, KY | 412 |
| City of Bowling Green, KY | 395 |
| State of Missouri | 3,972 |
| City of Kansas City, MO | 27 |
| State of New Jersey | 3,889 |
| State of Connecticut | 2,825 |
| State of Louisiana | 2,590 |
| State of Arkansas | 1,804 |
| State of Maryland | 1,665 |
| State of Iowa | 1,169 |
| State of Texas | 1,075 |
| State of Utah | 1,043 |
| State of Massachusetts | 1,010 |
| State of West Virginia | 434 |
| State of Washington | 216 |
| Inland Revenue Service (UK) | 1,312,642 |
| Country of Switzerland | 19,243 |
| Total | $ 191,562,838 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED DECEMBER 31, 2008**

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Howard County, Indiana | Personal Property | $ 2,186,837 | $ 2,186,837 |
| Flint, Michigan | Personal Property | 423,443 | 423,443 |
| Etowah County, Alabama | Personal Property | 193,859 | 193,859 |
| Limestone County, Alabama | Personal Property | 165,416 | 165,416 |
| Ben Hill County, Georgia | Personal Property | 122,058 | 122,058 |
| Johnson County, Missouri | Personal Property | 89,442 | 89,442 |
| Fitzgerald, Georgia | Personal Property | 41,615 | 41,615 |
| Tuscaloosa County, Alabama | Personal Property | 41,573 | 41,573 |
| Clay County, Missouri | Personal Property | 39,239 | 39,239 |
| Marion County, Indiana | Personal Property | 22,167 | 22,167 |
| Columbia, Missouri | Personal Property | 19,611 | 19,611 |
| Monroe County, Missouri | Personal Property | 15,894 | 15,894 |
| Pima County, Arkansas | Personal Property | 10,493 | 10,493 |
| Fulton County, Georgia | Personal Property | 8,494 | 8,494 |
| Johnson County, Indiana | Personal Property | 7,359 | 7,359 |
| Augauga County, Alabama | Personal Property | 7,100 | 7,100 |
| St. Charles County, Missouri | Personal Property | 6,299 | 6,299 |
| Nemaha County, Kansas | Personal Property | 6,228 | 6,228 |
| Allen County, Indiana | Personal Property | 6,125 | 6,125 |
| Hardin County, Kentucky | Personal Property | 5,981 | 5,981 |
| Dearborn, Michigan | Personal Property | 5,292 | 5,292 |
| Clark County, Arizona | Personal Property | 4,814 | 4,814 |
| St Louis County, Missouri | Personal Property | 3,888 | 3,888 |
| Jackson, Tennessee | Personal Property | 3,804 | 3,804 |
| Clinton County, Indiana | Personal Property | 3,330 | 3,330 |
| Henderson County, Kentucky | Personal Property | 3,065 | 3,065 |
| Pottawatomie County, Oklahoma | Personal Property | 3,063 | 3,063 |
| Detroit, Michigan | Personal Property | 3,022 | 3,022 |
| Noble County, Indiana | Personal Property | 2,966 | 2,966 |
| Logan County, Kentucky | Personal Property | 2,807 | 2,807 |
| McDonald County, Missouri | Personal Property | 2,419 | 2,419 |
| Monroe, Missouri | Personal Property | 2,306 | 2,306 |
| Russell County, Virginia | Personal Property | 2,072 | 2,072 |
| Troup County, Georgia | Personal Property | 2,005 | 2,005 |
| Wayne County, Indiana | Personal Property | 1,826 | 1,826 |
| Campbell County, Virginia | Personal Property | 1,701 | 1,701 |
| Roswell, Georgia | Personal Property | 1,653 | 1,653 |
| Radford, Virginia | Personal Property | 1,519 | 1,519 |
| Elkhart County, Indiana | Personal Property | 1,248 | 1,248 |
| Tipton County, Indiana | Personal Property | 1,136 | 1,136 |
| Jackson County, Missouri | Personal Property | 1,048 | 1,048 |
| Lebanon, Virginia | Personal Property | 942 | 942 |
| Cobb County, Georgia | Personal Property | 920 | 920 |
| Kosciosko County, Indiana | Personal Property | 907 | 907 |
| Pinal County, Arkansas | Personal Property | 854 | 854 |
| Montgomery County, Virginia | Personal Property | 835 | 835 |
| Madison County, Alabama | Personal Property | 693 | 693 |
| Lynchburg, Virginia | Personal Property | 669 | 669 |
| Delaware County, Indiana | Personal Property | 597 | 597 |
| Tippecanoe County, Indiana | Personal Property | 596 | 596 |
| Screven County, Georgia | Personal Property | 591 | 591 |
| Terrell County, Georgia | Personal Property | 550 | 550 |
| Wells County, Indiana | Personal Property | 472 | 472 |
| Daviess County, Kentucky | Personal Property | 392 | 392 |

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---|---|
| Washington County, Oregon | Personal Property | $ 389 | $ 389 |
| Borough of Naugatuck, Connecticut | Personal Property | 370 | 370 |
| Franklin County, Alabama | Personal Property | 341 | 341 |
| Wayne Township, Michigan | Personal Property | 337 | 337 |
| Cass County, Indiana | Personal Property | 284 | 284 |
| Prairie County, Arizona | Personal Property | 278 | 278 |
| Dekalb County, Alabama | Personal Property | 231 | 231 |
| Ann Arbor, Michigan | Personal Property | 222 | 222 |
| Washington County, Indiana | Personal Property | 189 | 189 |
| St Louis, Missouri | Personal Property | 185 | 185 |
| Rogers County, Oklahoma | Personal Property | 159 | 159 |
| Warren County, Georgia | Personal Property | 130 | 130 |
| Taylor County, Georgia | Personal Property | 117 | 117 |
| Blackford County, Indiana | Personal Property | 101 | 101 |
| Pope County, Arkansas | Personal Property | 91 | 91 |
| Madison County, Kentucky | Personal Property | 91 | 91 |
| Jefferson County, Kentucky | Personal Property | 82 | 82 |
| Bartholomew County, Indiana | Personal Property | 70 | 70 |
| LaGrange County, Indiana | Personal Property | 67 | 67 |
| Fulton County, Indiana | Personal Property | 61 | 61 |
| Washington County, Kentucky | Personal Property | 55 | 55 |
| Yuma County, Arkansas | Personal Property | 54 | 54 |
| Logan County, Arkansas | Personal Property | 49 | 49 |
| Lenoir County, North Carolina | Personal Property | 46 | 46 |
| New Hanover County, North Carolina | Personal Property | 44 | 44 |
| Clayton County, Georgia | Personal Property | 43 | 43 |
| Forsyth County, North Carolina | Personal Property | 33 | 33 |
| Fayette County, Alabama | Personal Property | 33 | 33 |
| Jasper County, Indiana | Personal Property | 31 | 31 |
| Dyersburg, Tennessee | Personal Property | 30 | 30 |
| Grant County, Kentucky | Personal Property | 27 | 27 |
| Butler County, Missouri | Personal Property | 18 | 18 |
| Elmore County, Alabama | Personal Property | 17 | 17 |
| Butler County, Kentucky | Personal Property | 15 | 15 |
| Coosa County, Alabama | Personal Property | 15 | 15 |
| Fayette County, Indiana | Personal Property | 12 | 12 |
| Morgan County, Alabama | Personal Property | 10 | 10 |
| Lake City, Georgia | Personal Property | 9 | 9 |
| Laclede County, Missouri | Personal Property | 9 | 9 |
| Springfield, Tennessee | Personal Property | 8 | 8 |
| Poplar Bluff, Missouri | Personal Property | 4 | 4 |
| Dry Ridge, Kentucky | Personal Property | 3 | 3 |
| Marshall County, Alabama | Personal Property | 2 | 2 |
| Howard County, Indiana | Real Property | 1,427,543 | 1,427,543 |
| Flint, Michigan | Real Property | 548,062 | 548,062 |
| Etowah County, Alabama | Real Property | 159,983 | 159,983 |
| Ben Hill County, Georgia | Real Property | 78,776 | 78,776 |
| Inteva Product LLC | Real Property | 50,945 | 50,945 |
| Johnson County, Kansas | Real Property | 43,175 | 43,175 |
| Tuscaloosa County, Alabama | Real Property | 39,869 | 39,869 |
| Fitzgerald, Georgia | Real Property | 26,859 | 26,859 |
| Orange County, California | Real Property | 17,343 | 17,343 |
| State of Michigan | Use | 691,538 | 691,538 |
| State of Indiana | Use | 338,570 | 338,570 |
| State of Ohio | Use | 336,487 | 336,487 |
| State of New York | Use | 286,336 | 286,336 |
| State of Texas | Use | 93,207 | 93,207 |

| Taxing Jurisdiction | Tax Type | Tax Due | Tax Paid |
|---|---|---:|---:|
| Limestone County, Alabama (Pay to: Alabama Department of Revenue) | Use | 27,081 | 27,081 |
| State of Mississippi | Use | 13,726 | 13,726 |
| State of Wisconsin | Use | 12,564 | 12,564 |
| Colorado Dept of Revenue | Use | 9,950 | 9,950 |
| Ohio Treasurer of State | Commercial Activity | 497,967 | 497,967 |
| Delaware Secretary of State | Franchise | 33,000 | 33,000 |
| Kentucky Department of Revenue | Franchise | 25,000 | 25,000 |
| New Mexico Taxation and Revenue Department | Franchise | 50 | 50 |
| Kentucky State Treasurer | Income | 32,020 | 32,020 |
| California | Income | 17,979 | 17,979 |
| Minnesota Revenue | Income | 1,300 | 1,300 |
| NC Department of Revenue | Income | 1,000 | 1,000 |
| Wisconsin Department of Revenue | Income | 75 | 75 |
| Louisiana Department of Revenue | Income | 10 | 10 |
| Spartanburg County Tax Collector | Property | 47,344 | 47,344 |
| State of Ohio | Kilowatt Hour | 46,558 | 46,558 |
| State of Alabama | Seller's Use | 15,210 | 15,210 |
| Alabama Department of Revenue | Seller's Use | 13,729 | 13,729 |
| State of Alabama | Consumer Use | 17,234 | 17,234 |
| Alabama Department of Revenue | Consumer Use | 9,193 | 9,193 |
| US Treasury/IRS | Withholding (non-payroll) | 17,518 | 17,518 |
| Treasurer, State of Ohio | Surplus Lines Insurance | 4,178 | 4,178 |
| NYS Corporation Tax | Surplus Lines Insurance | 3,817 | 3,817 |
| State of Michigan Surplus Lines OFIS | Surplus Lines Insurance | 3,507 | 3,507 |
| Wisconsin Commissioner of Insurance | Surplus Lines Insurance | 1,207 | 1,207 |
| Georgia Insurance Department | Surplus Lines Insurance | 237 | 237 |
| US Treasury/IRS | Federal Excise | 12,480 | 12,480 |
| Alabama Department of Revenue | Business Privilege | 4,588 | 4,588 |
| State of Washington | Business & Occupation | 4,297 | 4,297 |
| Colorado Dept of Revenue | Utility | 698 | 698 |
| Colorado Dept of Revenue | Sales | 690 | 690 |
| State of California Board of Equalization | Sales & Use | 356 | 356 |
| South Carolina Department of Revenue | Sales & Use | 217 | 217 |
| Total | | $ 8,501,070 | $ 8,501,070 |

**DELPHI CORPORATION, et al.**
**SCHEDULE OF OTHER TAXES COLLECTED, INCURRED AND PAID**
**THREE MONTHS ENDED December 31, 2008**

Note 1:    The amounts listed above for tax due and tax paid include postpetition taxes and only those prepetition taxes for which the Debtors have received Court authorization to pay.  Accordingly, certain prepetition taxes (primarily on real and personal property) that the Debtors do not have authority to pay are not included in the schedule above.  Such prepetition taxes are included in the balance sheet as part of "Liabilities Subject to Compromise."

Note 2:    Certain Debtors also pay transaction taxes such as value added tax ("VAT") to certain foreign countries based upon the purchase or supply of goods or services within the country and the importation of goods into the country from outside the country.  For the purchase of goods or services in certain foreign countries, VAT may either be collected by the supplier from the Debtors or paid directly by the Debtors through self-assessment.  For the supply of goods or services in certain foreign countries, the Debtors may collect VAT from the customers and remit the tax to the foreign governments.  Upon importation in certain countries, VAT may be paid by the Debtors.  In most cases, VAT is recoverable either as an input VAT credit or as a refund.  The process of calculating VAT owed or refundable is a complex process of netting VAT paid, collected, and remitted.  To the best of the Company's knowledge, all VAT has been paid and is being paid when due.  In addition, certain Debtors incur foreign withholding taxes on certain payments from various foreign non-Debtor affiliates.  These foreign withholding taxes generally apply to interest, royalties, dividends, and service payments received from certain foreign non-Debtor affiliates.  The foreign withholding taxes are required to be withheld by the foreign non-Debtor affiliates and paid over to the foreign tax authorities on behalf of the Debtors.  To the best of the Company's knowledge, all foreign withholding taxes have been withheld by the foreign non-Debtor facilitates when required to be withheld and paid over to the appropriate foreign tax authorities when due.  These foreign tax payments have not been included in the schedule above.

**DELPHI CORPORATION, et al.**
**SCHEDULE OF DISBURSEMENTS**
**THREE MONTHS ENDED DECEMBER 31, 2008**

| Debtor Name | Case Number | Amount [1] |
|---|---|---|
| Delphi NY Holdings Corporation | 05-44480 | $        — |
| Delphi Corporation | 05-44481 | 1,379,174 |
| ASEC Manufacturing General Partnership | 05-44482 | — |
| ASEC Sales General Partnership | 05-44484 | — |
| Environmental Catalysts, LLC | 05-44503 | — |
| Delphi Medical Systems Colorado Corporation | 05-44507 | 14,326,863 |
| Delphi Medical Systems Texas Corporation | 05-44511 | — |
| Delphi Medical Systems Corporation | 05-44529 | 2,965,243 |
| Specialty Electronics International Ltd. | 05-44536 | — |
| Specialty Electronics, Inc. | 05-44539 | 1,704,906 |
| Delphi Liquidation Holding Company | 05-44542 | — |
| Delphi Electronics (Holding) LLC | 05-44547 | — |
| Delphi Technologies, Inc. | 05-44554 | 13,691,225 |
| Delphi Automotive Systems Tennessee, Inc. | 05-44558 | — |
| Delphi Mechatronic Systems, Inc. | 05-44567 | 20,508,169 |
| Delphi Automotive Systems Risk Management Corporation | 05-44570 | — |
| Exhaust Systems Corporation | 05-44573 | — |
| Delphi China LLC | 05-44577 | — |
| Delphi Automotive Systems Korea, Inc. | 05-44580 | 616,845 |
| Delphi International Services, Inc. | 05-44583 | 28,017,058 |
| Delphi Automotive Systems Thailand, Inc. | 05-44586 | — |
| Delphi Automotive Systems International, Inc. | 05-44589 | — |
| Delphi International Holdings Corporation | 05-44591 | — |
| Delphi Automotive Systems Overseas Corporation | 05-44593 | 5,363 |
| Delphi Automotive Systems (Holding), Inc. | 05-44596 | 11,639,361 |
| Delco Electronics Overseas Corporation | 05-44610 | 14,997,951 |
| Delphi Diesel Systems Corporation | 05-44612 | 62,776,195 |
| Delphi LLC | 05-44615 | — |
| Aspire, Inc. | 05-44618 | 702,572 |
| Delphi Integrated Service Solutions, Inc. | 05-44623 | 217,698 |
| Delphi Connection Systems | 05-44624 | 14,050,184 |
| Packard Hughes Interconnect Company | 05-44626 | — |
| DREAL, Inc. | 05-44627 | — |
| Delphi Automotive Systems Services LLC | 05-44632 | 208,920,153 |
| Delphi Services Holding Corporation | 05-44633 | — |
| Delphi Automotive Systems Global (Holding), Inc. | 05-44636 | — |
| Delphi Foreign Sales Corporation | 05-44638 | — |
| Delphi Automotive Systems Human Resources LLC | 05-44639 | 368,918,595 |
| Delphi Automotive Systems LLC | 05-44640 | 2,265,192,432 |
| Delphi Furukawa Wiring Systems LLC | 05-47452 | 31,556,321 |
| Delphi Receivables LLC | 05-47459 | — |
| MobileAria, Inc. | 05-47474 | — |

(1) Operating expenses for the three months ended December 31, 2008 were used as a proxy for disbursements.