**Hearing Date and Time:  March 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline:  March 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
        In re                               :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                         Debtors.           :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 6004
AUTHORIZING AND APPROVING OPTION EXERCISE AGREEMENT
WITH GENERAL MOTORS CORPORATION

("STEERING OPTION EXERCISE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Motion For Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 6004

Authorizing And Approving Option Exercise Agreement With General Motors Corporation (the

"Motion"), and respectfully represent as follows:

<u>Preliminary Statement</u>

1.      By this Motion, the Debtors seek approval of an agreement under which

GM will exercise its option to purchase Delphi's global Steering business, as contemplated under

the Amended Master Restructuring Agreement between Delphi and GM dated September 12,

2008 (the "Amended MRA").  The sale of the Steering business is a strategic element of Delphi's

transformation strategy as announced in March 2006.  Delphi previously entered into a Purchase

and Sale Agreement with an affiliate of Platinum Equity, LLC ("Platinum") which the parties

have mutually terminated.  The Debtors believe that in the context of their current discussions

with GM and other stakeholders, the sale to GM of the Steering business under the Option

Exercise Agreement (as defined below) is in the best interests of the Debtors' estates and

stakeholders.  It should, together with other contemplated actions, facilitate the Debtors'

emergence from chapter 11 with the Company's portfolio transformation having been

substantially completed through the sale of this non-core business on terms which are more

advantageous to Delphi and provide more value to the estates than under both the terminated

deal with Platinum and the Amended MRA.

2.      In addition, the Option Exercise Agreement should facilitate another $100

million of GM support.  Specifically, the approval of the Option Exercise Agreement and

execution of a definitive agreement for the sale of the Steering business to GM are conditions to

the effectiveness of the fifth amendment to the GM liquidity agreement, under which GM has

2

committed to provide an additional $100 million in incremental liquidity to Delphi (for a total of $450 million under that agreement). Delphi believes that GM's commitment of additional liquidity coupled with the support Delphi has received from its lenders under the accommodation agreement, as amended and supplemented, should allow Delphi to manage its liquidity into May 2009 as it continues discussions with its stakeholders on proposed modifications to Delphi's First Amended Plan of Reorganization and Delphi's emergence from chapter 11 as soon as practicable. Finally, by reaching agreement with GM on the terms of the Option Exercise Agreement and securing GM's commitment to provide aggregate liquidity support in the amount of $450 million, Delphi has taken a significant step to assuring that the Company retains access to amounts up to $117 million in a cash collateral basket as provided by the Debtors' accommodation agreement.

Background

A.      The Chapter 11 Filings

                3.       On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

                4.       No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

                5.       On December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

3

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court

subsequently entered an order approving the adequacy of the December 10 Disclosure Statement

and granting the related solicitation procedures motion (Docket No. 11389).  On January 25,

2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the

"Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors

on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as

confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit

financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a

closing that was commenced but not completed and refused to fund their Investment Agreement

(as defined in the Confirmed Plan) with Delphi.[1]  On May 16, 2008, Delphi filed complaints for

damages and specific performance against the Plan Investors and related parties who refused to

honor their equity financing commitments or participate in the closing that would have led to

Delphi's successful emergence from chapter 11.  The Debtors nevertheless have continued to

work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as

practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan

Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications

to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-

soliciting votes on the Confirmed Plan, as modified.  In light of the unprecedented decline in

global automotive production volumes and the deepening of the crisis in global debt and equity

---

[1]    Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture
trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed
indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing
the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17,
2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the
product of an abuse of process in the bankruptcy court.

markets, the Debtors adjourned the hearing on the Plan Modification Motion to April 23, 2009

(Docket No. 16403).  The adjournment has facilitated the Debtors' consideration of further

supplemental plan modifications required by the current economic environment.

6.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

7.    The statutory predicates for the relief requested herein are sections 363 of

the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

8.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately

$10.3 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and have continued their business operations without supervision from the Court.[3]

9.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

---

[2]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its
worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[3]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core
automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency
proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso
receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of
which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31,
2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing
footprint and to lower its overall cost structure.

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer ("OEM").

10.    Delphi was incorporated in Delaware in 1998 as a wholly owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than two-thirds of Delphi's revenue is generated from non-

GM sources.

C.    Events Leading To The Chapter 11 Filing

11.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered net operating losses.  In calendar year

2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net

sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net

losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors

incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S.

employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded

---

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
calendar year 2004 was $482 million.

gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.

12.    The Debtors believe that the Company's financial performance was deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

13.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

14.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their

7

salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

15.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

16.    In connection with those discussions, on September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

17.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

8

18.      Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

19.      By transferring nearly $2 billion of hourly pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's U.S. unions), Delphi made substantial progress towards achieving its pension funding strategy objectives for hourly employees.  In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to certain of their pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

20.      As a result of all the factors described above, during the fall of 2008 the Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth in the Plan Modification Motion.  Since the filing of the proposed modifications, however, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally, and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization.  Delphi, therefore, continues to engage in

9

discussions with certain of its stakeholders to formulate further plan modifications.  Moreover, as

a result of the market turbulence, the Debtors were unable to extend the maturity date of their

DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders.

Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the

Debtors entered into an accommodation agreement which allows the Debtors, among other

things, to continue using certain of the proceeds of the postpetition financing facility through

June 30, 2009.  In addition, to further support the Debtors' liquidity, GM agreed to make certain

advances and to accelerate payment of certain payables to the Debtors.

        21.     At the same time, consistent with the plan modifications being negotiated,

the Company has been making further revisions to its business plan consistent with the extremely

low volume production environment in the global automotive industry and depressed global

capital and equity markets.  As part of the Debtors' efforts to achieve sufficient emergence

capital funding, Delphi and GM are constructively working together to pull forward elements of

GM's previously agreed-upon support for Delphi into one payment at emergence in combination

with the transfer of certain of Delphi's U.S. sites to GM.  This arrangement is designed to

facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the global

economy, the automotive industry, and the capital markets.  In the meantime, Delphi will

marshal all of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will seek to preserve and continue the strategic growth of its non-

U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

F.      <u>Events Leading To Execution Of The Option Exercise Agreement</u>

        22.     In December 2007, Delphi executed an agreement (the "Platinum Steering

MSPA") with Steering Solutions Corporation ("SSC"), an affiliate of Platinum, for the sale of

substantially all of the assets comprising Delphi's global steering and halfshaft businesses (the

"Steering Business") and a transaction facilitation agreement with GM.  This Court approved the

sale of the Steering Business to SSC on February 25, 2008.  The sale of the Steering Business

pursuant to the Platinum Steering MSPA was not completed due to a number of factors,

including the deterioration of the global automotive industry and the need for Platinum and GM

to reach terms on an amended supply agreement.  The Platinum Steering MSPA was mutually

terminated by the parties thereto on March 3, 2009.

> 23.     Concurrently with the negotiations surrounding the closing of the Steering

Business sale to SSC, Delphi and GM were negotiating certain agreements whereby GM agreed

to provide advances to Delphi in amounts up to $650 million in respect of payments GM would

make upon the effectiveness of the Original GSA and Original MRA (the "GM Arrangement").

Following the consummation of the Amended GSA and Amended MRA in September 2008, GM

and the Debtors entered into an amendment to the GM Arrangement pursuant to which GM

committed to make an additional $300 million in advances pursuant to section 364(b) of the

Bankruptcy Code, which advances were coterminous with the term of the Debtors'

approximately $4.35 billion DIP credit facility (the "DIP Facility").

> 24.     In the fourth quarter of 2008, facing frozen global credit markets and one

of the worst bear markets in the history of the global capital markets, the Debtors negotiated an

accommodation agreement with the DIP administrative agent and certain required DIP lenders

(the "Accommodation Agreement").  Under the Accommodation Agreement, and subject to the

terms and conditions set forth therein, the Debtors could continue using certain of the proceeds

of their DIP Facility through June 30, 2009.[5]  Concurrently with its approval of the

Accommodation Agreement, the Court also entered an order approving a second amendment to

---

[5]    This Court authorized the Debtors to enter into the Accommodation Agreement by order entered on December 3, 2008 (Docket No. 14515) and the parties subsequently effectuated the agreement on December 12, 2008.

the GM Arrangement which extended the availability of the existing $300 million liquidity

support from December 31, 2008 to June 30, 2009, subject to certain conditions and provisions

for earlier termination upon the occurrence of specified events.[6]

   25.  In December 2008 and January 2009, the outlook for the global

automotive industry took a dramatic turn for the worse as the global industry experienced

unprecedented volume declines.   As a result and to remain in compliance with the

Accommodation Agreement and maximize available liquidity, the Debtors negotiated and, on

January 30, 2009, executed, amendments to the Accommodation Agreement, the GM

Arrangement, and the Pull-Forward Agreement.

   26.  One of the terms of the amendment to the Accommodation Agreement (as

supplemented on February 24, 2009, the "Accommodation Amendment") was that Delphi must

secure an additional $150 million in liquidity support from GM (for an aggregate commitment of

$450 million under the GM Arrangement, as amended) by March 24, 2009.  Achieving this

increased support would result in Delphi avoiding mandatory permanent prepayments to the

tranche A and B DIP Lenders of up to $117 million, which cash and/or certain permitted

securities would otherwise be included certain covenant calculations under the Accommodation

Agreement (the "Accommodation Amendment Cash Collateral"), preserving critical liquidity.  It

was contemplated that the support from GM support might come in two parts, with $50 million

provided by February 27, 2009 and the remaining $100 million by March 24, 2009.  On February

27, 2009, GM and Delphi reached an agreement for GM to increase its commitment under the

GM Arrangement to $350 million, which satisfied the condition under the Accommodation

---

[6] As part of the order approving the second amendment to the GM Arrangement, the Court also approved
Delphi's entry into the Partial Temporary Accelerated Payment Agreement with GM (the "Pull-Forward
Agreement"), which provides for GM to accelerate the payment of up to $300 million in trade accounts payable
to Delphi over the three-month period beginning in March 2009.

Amendment to reduction of the minimum liquidity covenant from $100 million to $50 million. At that time, GM conditioned the further $100 million increase in the GM Arrangement commitment on finalizing an agreement whereby GM could exercise its option under the Amended MRA to purchase the Steering Business.

27.    Pursuant to section 4.06(c) to the Amended MRA, which became effective on September 29, 2008, GM agreed that ownership of the Steering Business would transfer to GM if it is not sold to a third party by December 31, 2010.  In addition, section 4.06(a)(i) of the Amended MRA provides that upon the occurrence of particular conditions prior to December 31, 2010, including a written agreement between Delphi and GM stating that Delphi's marketing efforts have concluded with respect to the Steering Business, GM would have the option to purchase such businesses on the terms generally set forth in the Amended MRA.  To maximize available liquidity to the Company under the terms of the Accommodation Amendment and in consideration of the benefits Delphi expects to receive as a result of the divestiture of the Steering Business, on March 3, 2009, Delphi and GM executed an agreement pursuant to which the parties agreed that the conditions to GM's exercise of the MRA option were satisfied in consideration for (and subject to) revised and supplemented terms of the sale of the Steering Business.  Having reached agreement on the sale of the Steering Business, also on March 3, 2009, Delphi and GM reached an agreement, subject to certain conditions, to increase GM's commitment under the GM Arrangement to $450 million.[7]

---

[7]    Concurrently with this Motion, the Debtors have filed a motion seeking entry of an order approving a fourth amendment and fifth amendment (respectively, "Amendment No. 4" and "Amendment No. 5") to the GM Arrangement.  As contemplated by the amendments to the Accommodation Agreement, GM Arrangement, and Pull-Forward Agreement that this Court approved on February 25, 2009, (i) Amendment No. 4 contains amendments that provide for an increase of GM's Tranche B Commitments under the GM Arrangement from $300 million $350 million and (ii) Amendment No. 5 contains amendments that provide for a further increase of GM's Tranche B Commitments under the GM Arrangement to $450 million.

<u>Relief Requested</u>

28.      By this Motion, the Debtors seek authorization and approval of the

Debtors' entry into an option exercise agreement with GM, dated March 3, 2009 (the "Option

Exercise Agreement"), a copy of which is attached hereto as <u>Exhibit A</u>, through which GM will

exercise the "Unsold Business Option" referred to in Section 4.06(a)(i) of the Amended MRA

with respect to the Steering Business, with certain enhancements to the terms provided under the

Amended MRA that inure to Delphi's benefit, to allow a wholly-owned subsidiary of GM (the

"Business Optionee") to purchase the Steering Business free and clear of all liens and

encumbrances other than certain permitted encumbrances (the "Steering Option Purchase").

Pursuant to the terms of the Option Exercise Agreement, the Debtors and GM have agreed that

the definitive Master Sale and Purchase Agreement, together with the assumption and

assignment of applicable executory contracts, will occur pursuant to a separate motion with that

approval hearing to be held at the April 23, 2009 omnibus hearing.

<u>Basis For Relief</u>

29.      By executing and performing under the terms of the Option Exercise

Agreement, the Debtors are implementing certain of the terms of the Amended MRA, which they

initially negotiated with GM in September 2007 and amended in September 2008, together with

additional enhanced benefits for the Debtors.  Because (i) Delphi is agreeing with GM that its

marketing efforts have concluded with respect to the Steering Business at this time and the

Steering Business is now anticipated to be transferred to GM prior to the effective date of

Delphi's modified plan of reorganization, (ii) the Option Exercise Agreement contains certain

modifications to the terms by which GM will exercise its option, which generally inure to the

Debtors' benefit, and (iii) it is required by the Option Exercise Agreement and is a condition to

the effectiveness of Amendment No. 5 to the GM Arrangement (which provides an additional

14

$100 million in liquidity support to the Debtors), the Debtors are seeking this Court's approval of the Option Exercise Agreement.

G.     Terms Of The Option Exercise Agreement

    30.    <u>Marketing Process Concluded</u>.  Pursuant to the Option Exercise Agreement, Delphi and GM have agreed that the marketing of the Steering Business has concluded.  Like most other provisions of the Option Exercise Agreement, this agreement with respect to marketing cessation is conditioned expressly on Bankruptcy Court approval.  Thus, if the Option Exercise Agreement becomes effective, GM may exercise the Unsold Business Option referred to in Section 4.06(a)(i) of the Amended MRA with respect to the Steering Business to allow the Business Optionee to purchase the Steering Business free and clear of all liens and encumbrances other than certain permitted encumbrances.  The Steering Business was extensively marketed for more than one and a half years prior to the Company's reaching an agreement in December 2007 to sell the Steering Business to SSC, an affiliate of Platinum. During that time, a number of parties expressed interest in the Steering Business, but no party provided as much value as was included in the Platinum Steering MSPA.  The sale to SSC was subject to a competitive bidding process from December 2007 to January 2008, during a much more favorable time in both in the automotive industry and in the global credit markets and again no other qualified bidder came forth with a higher or otherwise better offer.  In light of the long marketing process, the inability to close the transaction with Platinum, and current market and automotive industry conditions, the Debtors believe that, assuming the Option Exercise Agreement becomes effective, it is reasonable to agree with GM that the marketing process has concluded.  In addition, as described below, the value being received by Delphi pursuant to the Option Exercise Agreement is greater than that provided under either the Platinum Steering MSPA or the terms of the Amended MRA.  However, in the event that this Court were to

15

determine that the Option Exercise Agreement should not be approved and implemented, and

therefore the agreement did not become effective, Delphi's negotiated marketing cessation

understanding with GM would not become effective, Delphi would not consider its marketing

efforts to be concluded, and the Debtors would evaluate and pursue appropriate next steps in the

marketing process.

   31. <u>Timing</u>.  The parties have agreed to use their respective reasonable best

efforts to close the Steering Option Purchase on or prior to April 30, 2009 as well as to use

reasonable best efforts to achieve certain other milestones.  These include (i) delivery by Delphi

of a complete copy of the Platinum Steering MSPA in native electronic formats (where

available) by March 3, 2009,[8] (ii) delivery by Delphi of a draft proposed Master Sale and

Purchase Agreement, which is consistent with the sale transaction contemplated under the

Amended MRA, as modified by the Option Exercise Agreement, by March 6, 2009, (iii)

execution of a definitive Master Sale and Purchase Agreement (the "GM Steering MSPA") on or

prior to March 23, 2009, (iv) Bankruptcy Court approval of the Option Exercise Agreement on

or prior to March 24, 2009, (v) filing of a motion seeking to approve the Steering Option

Purchase and assume and assign the applicable contracts on or before April 3, 2009, and (vi)

receipt of Bankruptcy Court approval of the Steering Option Purchase and assumption and

assignment of contracts on or before April 23, 2009.  GM and the Debtors have committed to

utilize the Platinum Steering MSPA as a baseline for documenting the Steering Option Purchase,

modified to reflect provisions of the Amended MRA and the Option Exercise Agreement.  Based

on the terms of the Option Exercise Agreement and the Amended MRA, the terms upon which

the Steering Business will be sold to GM, and will be documented in the GM Steering MSPA,

have been in large part agreed to by GM and Delphi.  Finally, GM and Delphi have also

---

[8] Delphi timely complied with this milestone on March 3, 2009.

affirmatively committed to reaching an agreement on a term sheet covering the transfer of certain

other Delphi facilities on or prior to March 9, 2009, which will be a fundamental part of the

Debtors' Plan modifications.

32.    This expedited timeline should be advantageous to Delphi for several

reasons.  First, the Option Exercise Agreement and the sale of the Steering Business to GM

allows Delphi to complete a strategic element of its transformation strategy as announced in

March 2006 which, together with other contemplated actions, should facilitate the Debtors'

emergence from chapter 11.  Second, it is projected that during the second quarter of 2009, the

Steering Business will consume $72 million of cash.  Thus, by closing the Steering Option

Purchase on April 30, 2009, Delphi will save approximately $50 million in cash it would

otherwise have to expend.

33.    <u>Transition Services</u>.  To accomplish the Steering Option Purchase as soon

as practicable, Delphi and its relevant affiliates would enter into a transition services agreement

(the "Transition Services Agreement") on reasonable and customary terms with the Business

Optionee in accordance with Section 4.06(a)(x) of the Amended MRA.  The Transition Services

Agreement would provide, among other things, customarily available transition services and

licenses necessary to permit Business Optionee with the ability to operate the Steering Business

from and after the Closing consistent with Delphi's past practices for a sufficient time to allow

the Business Optionee to implement replacement resources.  Delphi has committed to provide

such general transition services through mid-2011 and information technology transition services

through December 2012 with the cost of such services to be borne by the Business Optionee at a

rate equal to or greater than 100% of Delphi's cost to provide such services.

34.    <u>Enhanced Value For The Steering Business</u>.  The Option Exercise

Agreement should provide the Company many financial benefits beyond those that were

17

contemplated in the Amended MRA and/or the Platinum Steering MSPA, including the following material terms:[9]

(a)    Delphi and GM have agreed that at the closing of the Steering Option Purchase, the parties will forego the working capital true-up set forth in Section 4.04(g)(iii) of the Amended MRA, which would require that payments be made from one party to another to reflect the change in Net Working Capital (as defined in the Amended MRA).  In September 2008 when the Amended MRA became effective, GM made a payment to Delphi of $210 million, two-thirds of the required working capital for the Steering Business.  Under the terms of the Amended MRA, Delphi was to have made a payment to GM to reflect the decreased value of the Net Working Capital, which it will not be required to pay under the Steering Option Purchase and which Delphi believes will result in a substantial net benefit to the Debtors.

(b)    Neither GM nor the Business Optionee will exercise any of GM's rights under Section 4.06(a)(ix) of the Amended MRA,[10] which gave GM rights to lease certain of the Delphi's real property.  Because GM has agreed to forgo these leasing options, GM will acquire certain real estate of the Steering Business and Delphi will not be subject to the economic risks of being a landlord.

---

[9]    Although not a term of the Option Exercise Agreement, an additional financial benefit of the Option Exercise Agreement is GM's agreement to provide an additional $100 million in advances under the GM Arrangement.

[10]   Section 4.06(a)(ix) of the Amended MRA provides, in part, "If, in connection with a Business Transaction, a Business Optionee determines to lease an Unsold Business facility, such lease or leases (A) shall be "triple net", (B) shall provide for no rent payments, (C) shall include an option exercisable at any time prior to the termination of such lease by the Business Optionee or its assignee, to purchase the such facility for $1.00 and (D) shall have a lease term until December 31, 2015 with two (2) four (4) year renewal options and contain such other terms which shall be reasonably acceptable to Delphi and the Business Optionee, and provided that the Business Optionee shall have the right to terminate the applicable lease at any time without liability directly related to such termination on six (6) month's prior written notice to Delphi.  The Business Optionee shall remain responsible for any liabilities that arose under such lease prior to the termination thereof. …With respect to any facility and machinery and equipment owned by an entity, the equity interests of which were transferred, directly or indirectly, to a Business Optionee, the Business Optionee shall have the right to transfer, no later than December 31, 2023, the applicable facility and machinery and equipment to the applicable Business Optionor or its designee for $1 upon six (6) months notice."

18

(c)       The parties have agreed that the Business Optionee will pay all cure costs with respect to all prepetition contracts which the Business Optionee requests be assumed and assigned to the Business Optionee.  In addition, the Business Optionee will pay all postpetition trade payables with respect to the contracts included within the definition of the Global Steering Business.  Delphi will continue, however, to pay all trade payables scheduled to be paid in the ordinary course of business prior to the closing.

(d)       At closing, the Business Optionee will assume certain of Delphi's labor obligations, including liabilities for disability, sickness and accident coverage, supplemental unemployment benefits, severance, and certain workers' compensation after January 1, 2009 for Delphi's UAW represented hourly active and inactive (current and former) employees at the Global Steering Business's UAW facilities, regardless of when such liability arose.  This assumption is in lieu of the Additional Labor Reimbursement, which as defined under the Amended MRA, generally provides that Delphi would be reimbursed for the actual cost of such labor obligations.[11]

(e)       The Business Optionee will assume responsibility, and waive any obligations of Delphi relating to, warranty, recall, and products liability with respect to products manufactured for, or sold to, GM by the Global Steering Business, whether before or after the closing, allowing Delphi to avoid such risk.  Delphi will retain responsibility for such liability with respect to products sold to non-GM customers prior to closing.

35.       Most significantly, the closing of the Steering Option Purchase is conditioned on GM's paying to the administrative agent under Delphi's DIP Facility, for the

---

[11]    The Option Exercise Agreement provides that the treatment of U.S. salaried employees will be subject to a further agreement between GM and Delphi.

benefit of the lenders thereunder, a non-refundable amount[12] equal to the reduction in available receivables, available inventory, and fixed asset component of the Delphi DIP borrowing base caused directly by the Steering Option Purchase.  This amount is estimated to between $150 million to $200 million as of the projected closing date.  This incremental cash benefit provides superior value to Delphi than was available under the Platinum Steering MSPA or the Amended MRA and mitigates what otherwise would be an adverse liquidity event for the Company.

36.    <u>Additional Terms</u>.  GM has also agreed to irrevocably and unconditionally guaranty the payment and performance of the Business Optionee's obligations under the GM Steering MSPA.  In addition, the Debtors have agreed to seek this Court's approval to transfer the Steering Business to the Business Optionee free and clear of all liens, claims, and encumbrances, other than permitted encumbrances.  Finally, so long as a party is not in material default of the Option Exercise Agreement or the GM Steering MSPA, either party may terminate the Option Exercise Agreement or the GM Steering MSPA if the closing has not occurred by the earlier of six months following the execution of the GM Steering MSPA and December 31, 2009.

37.    Obligations of the parties under the Option Exercise Agreement are also contingent on GM's receiving U.S. Treasury, corporate, and other necessary approvals and Delphi's receiving Bankruptcy Court approvals.  Delphi has committed to use its reasonable best efforts to obtain requisite approvals of its obligations under the Option Exercise Agreement on or before March 24, 2009.

38.    Finally, the Option Exercise Agreement provides that upon Platinum meeting certain covenants, GM will pay $5.5 million to SSC, subject to U.S. Treasury

---

[12]    In the event Delphi and GM reach an agreement for the sale of any of Delphi's other non-core businesses and manufacturing sites in the U.S. to GM, then, upon the closing of such sale, such payment would constitute partial prepayment of the consideration for the sale of such facilities.

Department approval.  Significantly, although the deposit amount was returned to Platinum from

the escrow account on March 3, 2009, the termination agreement among Delphi, Platinum, and

certain of Platinum's affiliates (the "Termination Agreement"), which is appended to the Option

Exercise Agreement as Exhibit A, provides for a mutual release of all claims between the parties.

Thus, under the terms of the Termination Agreement, Delphi is not required to pay any break up

fee or expense reimbursement to Platinum and has no further liability to Platinum of any kind or

nature.

Applicable Authority

H.    The Court Should Authorize The Debtors To
      Enter Into The Option Exercise Agreement

      39.    Based on the foregoing, the Debtors submit that entry of an order

approving the Option Exercise Agreement is necessary and appropriate to further the Debtors'

reorganization efforts.  The Option Exercise Agreement was negotiated in good faith, at arm's

length, and in the exercise of the Debtors' business judgment.  In addition, the Option Exercise

Agreement implements and enhances certain provisions of the Amended MRA, which was

previously approved by this Court.  In light of the anticipated benefits under the Option Exercise

Agreement and the context in which it has been executed, the Company has exercised sound

business judgment in agreeing, subject to effectiveness of the Option Exercise Agreement, that

its marketing efforts with respect to the Steering Business will have concluded.  Moreover, the

Option Exercise Agreement ensures that Delphi will achieve the sale of the Steering Business in

an expedited timeframe, by April 30, 2009, which should also benefit the Debtors' estates.

      40.    Bankruptcy courts routinely defer to the debtor's business judgment on

most business decisions, including the decision to borrow money.  See Group of Institutional

Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re

21

Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985). In considering whether a debtor

has exercised its business judgment, a court is not free to second-guess particular provisions but

rather determines whether the proposed action "as a whole is within reasonable business

judgment." In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

       41.    The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993). Once the debtor articulates a valid business justification, a

presumption arises that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'" Official Comm. Of Subordinated Bondholders v. Integrated

Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation

omitted). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment

have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not

enough for an objector simply to raise and argue an objection. Rather, an objector "is required to

produce some evidence respecting its objections." Comm. Of Equity Holders v. Lionel Corp. (In

re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

       42.    The Debtors have exercised sound business judgment in entering into the

Option Exercise Agreement. Indeed, the proposed terms of the agreement are fair, reasonable,

and necessary and are in the best interests of the Debtors' estates. First, the sale of the Steering

Business to GM as provided in the Option Exercise Agreement substantially completes Delphi's

portfolio transformation, which was a strategic element of Delphi's transformation strategy as

announced in March 2006. Second, the value to be provided to the Company as a result of the

transaction, including the $150-200 million reduction in borrowing base to be provided by GM

to the DIP Lenders, is superior to that received under the Amended MRA and the terminated

Platinum Steering MSPA in the context of facilitating the Debtors' emergence from chapter 11.

In addition, this Court's approval of the Option Exercise Agreement is a condition to the

effectiveness of the Amendment No. 5 to the GM Arrangement, which increases the amount that

GM has committed to advance to Delphi from $350 million to $450 million.  Thus, together the

Option Exercise Agreement and Amendment No. 5 provide the Company with the liquidity

runway that should enable it to complete discussions with stakeholders and obtain this Court's

approval of reorganization plan modifications.  Accordingly, the Court should approve the

Option Exercise Agreement pursuant to section 363 of the Bankruptcy Code.

I.      Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

43.      Bankruptcy Rule 6004(h) provides:  "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  The Debtors request that this Court waive this ten-

day stay because this Court's approval of the Option Exercise Agreement is a condition

precedent to the effectiveness of Amendment No. 5 to the GM Arrangement, which provides an

additional $100 million in liquidity to Delphi.  This increase in $100 million of GM support

(bringing the total GM commitment to $450 million) is itself a condition under the

Accommodation Amendment, which requires that by March 24, 2009, GM and Delphi shall have

irrevocably executed and delivered amendments to the GM Arrangement increasing the

commitment thereunder to an amount no less than $450 million, which commitment must be

effective as of the same date.  If Delphi fails to meet this condition, it will be required to apply

the Accommodation Amendment Cash Collateral to repay the tranche A and tranche B loans.  To

ensure that the Debtors have met all these milestones and can document and complete the sale of

the Steering Business to GM by April 30, 2009, the Debtors request that this Court waive the

ten-day stay as it has done in certain other instances in these cases.  Other courts in this district

have waived this ten-day stay upon a showing of business need.  See In re Adelphia Commc'ns

Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for

a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under

Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001)

(requiring demonstration of "a business exigency" for a waiver of the ten-day stay under

Bankruptcy Rule 6004(h)).

Notice Of Motion

44.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Thirteenth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered December 4, 2008 (Docket No. 14534).  The Debtors

have also provided notice to counsel to the agent for the Debtors' former prepetition credit

facility and certain parties that have expressed interest in the Debtors' Steering Business during

the Debtors' past marketing efforts.  In light of the nature of the relief requested, the Debtors

submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to enter into the Option Agreement and (ii) granting the Debtors such other and further relief as is just.

Dated:      New York, New York
             March 4, 2009

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr.
       John K. Lyons
       Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti
       Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession