# EXHIBIT A

**EXECUTION COPY**

**Global Steering Business
Option Exercise Agreement**

Delphi Corporation ("<u>Delphi</u>") and General Motors Corporation ("<u>GM</u>") enter into this Global Steering Business Option Exercise Agreement (this "<u>Agreement</u>") on March 3, 2009.

**1.     Defined Terms.**

Capitalized terms used herein have the meanings given to them in the Amended and Restated Master Restructuring Agreement between Delphi and GM dated September 12, 2008 (the "<u>MRA</u>").

**2.     Unsold Business Option.**

The parties agree that Delphi's marketing efforts have concluded with respect to the Global Steering Business.  Accordingly, the Unsold Business Option referred to in Section 4.06(a)(i) of the MRA is exercisable with respect to the Global Steering Business.

**3.     Exercise of Unsold Business Option.**

GM, on behalf of the Business Optionee to be designated (which will be a wholly-owned subsidiary of GM), hereby exercises the Unsold Business Option with respect to the Global Steering Business.  As used herein, "<u>Option Purchase</u>" means the sale of the Global Steering Business to the Business Optionee pursuant to the terms of this Agreement and the definitive agreements to be entered into between the parties.  The parties will use their respective reasonable best efforts to close the sale of the Global Steering Business to the Business Optionee on or before April 30, 2009, and to achieve the following milestones:

(a)     Delphi's delivery of a complete copy of the Master Sale and Purchase Agreement between Delphi Corporation, et al., and Steering Solutions Corporation ("<u>SSC</u>"), et al., dated December 10, 2007 (the "<u>Steering MSPA</u>"), including all schedules, exhibits, addendums, attachments and amendments thereto, in MS Word or MS Excel to the extent available in such format, by March 3, 2009.

(b)     Delphi's delivery, on or before March 6, 2009, of a draft of a proposed Master Sale and Purchase Agreement between Delphi Corporation and certain of its affiliates and subsidiaries and the Business Optionee, which is consistent with the sale transaction contemplated under the MRA as modified by this Agreement.  In the case of the Master Sale and Purchase Agreement itself, the document will be delivered in MS Word format;

(c)     Bankruptcy Court approval of this Agreement on or before March 24, 2009;

(d)     Execution of a definitive Master Sale and Purchase Agreement on or before March 23, 2009;

(e) Filing on or before April 3, 2009 of a motion seeking to (i) assume and assign the applicable contracts, and (ii) approve the Option Purchase, free and clear of all liens and encumbrances other than Permitted Encumbrances; and

(f) Bankruptcy Court approval of the Option Purchase and assignment and assumption of contracts on or before April 23, 2009.

The parties will utilize the Steering MSPA as a baseline for documenting the Option Purchase, modified as appropriate to reflect the provisions of the MRA as modified by this Agreement.

**4.     Transition Services.**

(a) In order to accomplish the sale as soon as practicable, Delphi and its relevant affiliates will enter into a transition services agreement on reasonable and customary terms with Business Optionee in accordance with Section 4.06(a)(x) of the MRA, which will provide, among other things, all customarily available transition services and licenses necessary to permit Business Optionee with the ability to operate the Global Steering Business from and after the closing consistent with Delphi's past practices for a period of time sufficient to allow Business Optionee to put into place replacement resources which permit Business Optionee to operate the Business in accordance with Delphi's past practices, including, without limitation, cash management transition services and information technology transition services.

(b) Delphi agrees that separation of information technology systems is not a requirement for Closing. Business Optionee and Delphi will work in good faith to establish fire walls and other protections from access to confidential or proprietary information of each other, however under no circumstances will the foregoing delay Closing.

(c) Such transition services agreement will provide:

(i) that Business Optionee will pay 100% of cost for all IT transition services, provided that Delphi will have no obligation to provide IT transition services after December 31, 2012, and

(ii) with respect to all non-IT related transition services, Business Optionee will pay 100% of cost for the first 18 months, 125% of cost for the first 90 day extension, and 150% of cost for the next 90 day extension, after which Delphi will have no further obligation to provide non-IT transition services unless otherwise agreed by the parties.

**5.     Platinum Break Up Fees.**

At such time as SSC has transferred to GM the Steering Interests and Materials and its interest in the China Entities (as both are defined in the form of Termination Agreement attached hereto as Exhibit A (the "Termination Agreement")), as contemplated under Sections 3, 4 and 5

2

of the Termination Agreement, subject to U.S. Treasury Department approval, GM will pay $5.5 million to SSC as contemplated under the Termination Agreement.  Delphi hereby consents to SSC's and/or Platinum Equity's disclosure and transfer to GM and/or the Business Optionee of the Steering Interests and Materials and the China Entities as set forth in Sections 3, 4, and 5 and Exhibit 2 of the form Termination Agreement, provided such materials shall be subject to the existing Confidentiality Agreement between Delphi and GM to the same extent such materials were subject to a Confidentiality Agreement between Delphi and Platinum Equity, LLC or any of its affiliates or subsidiaries.

**6.    Additional Terms regarding Unsold Business Option.**

In addition to the other matters set forth in this Agreement and the MRA, GM and Delphi agree as follows with respect to the sale of the Global Steering Business to the Business Optionee:

(a)    At the closing of the Option Purchase, the parties will forego the working capital true-up set forth in Section 4.04(g)(iii) of the MRA and the parties will have no further rights to receive payments or obligations to make payments under Sections 4.04(g) and 4.04(h) of the MRA.

(b)    Neither GM nor the Business Optionee will exercise any of GM's rights under Section 4.06(a)(ix) of the Amended MRA.

(c)    The Business Optionee will pay all cure costs, with respect to all pre-petition contracts which the Business Optionee requests be assumed and assigned to the Business Optionee.  If Business Optionee does not request that a pre-petition contract be assumed and assigned it will not be deemed part of the Global Steering Business.

(d)    For the avoidance of doubt, GM confirms that the Business Optionee will assume all post-petition trade payables with respect to the contracts included within the definition of the Global Steering Business; provided that Delphi will pay all trade payables prior to the closing in the ordinary course of business.

(e)    In lieu of Additional Labor Reimbursement with respect to the Global Steering Business, the Business Optionee will, at the closing, assume all of Delphi's liabilities for Disability/Sickness & Accident, Supplemental Unemployment Benefits, Severance and Post 2009 Workers' Compensation incurred (including all payments due) after January 1, 2009 for Delphi's UAW represented hourly active and inactive (current and former) employees at the Global Steering Business's UAW facilities, regardless of when such liability arose.

(f)    The Business Optionee will assume responsibility, and waive any obligations of Delphi relating to, warranty, recall and products liability with respect to products manufactured for, or sold to, GM by the Global Steering Business, whether before or after the closing.  Delphi will retain responsibility for such liability with respect to products sold to non-GM customers prior to closing.

3

    (g)    GM will irrevocably and unconditionally guaranty the due and punctual payment or performance, as the case may be, of the obligations of the Business Optionee under the Master Sale and Purchase Agreement (and ancillary agreements) contemplated under this Agreement. Such guaranty will be in a form consistent with the guaranty of Delphi contemplated under Sections 8.03 of the MRA.

    (h)    The Global Steering Business will be transferred to Business Optionee free and clear of all liens, claims and encumbrances other than Permitted Encumbrances.

    (i)    The treatment of U.S. salaried employees will be subject to a further agreement between GM and Delphi.

    (j)    If the closing has not occurred by the earlier of six months following the execution of definitive documentation and December 31, 2009, either party will have the right to terminate this Agreement (or the definitive documentation, if executed), provided that the terminating party will not have the right to terminate this Agreement (or the definitive documentation) if it is in material default hereunder (or thereunder).

## 7. DIP Paydown.

The closing of the Option Purchase will be conditioned upon GM paying to JPMorgan Chase Bank, N.A., as administrative agent for Delphi's DIP Lenders on behalf of Delphi a non-refundable amount equal to the reduction in available receivables, available inventory and fixed asset component of the Delphi DIP borrowing base caused directly by the Option Purchase. In the event Delphi and GM reach an agreement for the sale of any of Delphi's subsidiary's U.S. facilities to GM, then, upon the closing of such sale, the above payment under this Paragraph 7 shall constitute partial prepayment of the consideration for the sale of such facilities.

## 8. Overall Term Sheet.

GM and Delphi will continue in their efforts to reach an agreement on a term sheet covering the transfer of certain other Delphi facilities and will target reaching such agreement on or before March 9, 2009; provided that reaching such agreement is not a condition to any of the parties' rights or obligations under this Agreement or the MRA.

## 9. Specific Performance.

The parties acknowledge and agree that the covenants and undertakings contained in this Agreement relate to matters which are of a special, unique and extraordinary character and that a violation of any of the terms of this Agreement will cause irreparable injury to the other parties and that the amount of such injury will be extremely difficult, if not impossible, to estimate or determine and may not be adequately compensated by monetary damages alone. Therefore, each party acknowledges that the other party will be entitled, in addition to all other rights and remedies available under this Agreement and applicable law, as a matter of course, to an injunction, order of specific performance, restraining order or other equitable relief from any court of competent jurisdiction, restraining any violation or threatened violation of any terms of this Agreement.

4

**10.     MRA Continues.**

As modified by this Agreement, the MRA continues in full force and effect.  In the event of any inconsistencies between this Agreement and the MRA, this Agreement will control.

**11.     Confidentiality/Publicity.**

Until March 3, 2009 or such earlier time as Delphi publicly announces this Agreement or the transactions contemplated hereby, GM will maintain as confidential information and not disclose the existence of this Agreement or issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby except as agreed by the parties .  Delphi and GM will consult with each other in connection with the preparation and issuance of any press release announcing the execution of this Agreement or the transactions contemplated under this Agreement.

**12.     China Entities.**

GM acknowledges Delphi's beneficial ownership of the China Entities until the closing of the Option Purchase and agrees that until the closing it shall have no rights other than to hold legal title with respect to the China Entities.  GM agrees to not encumber the China Entities or interfere with Delphi's operation of the business conducted by the China Entities until the closing of the Option Purchase.  Upon the closing of the Option Purchase, Delphi shall convey to GM all such beneficial ownership and/or other interest in the China Entities; provided, however, that in the event the Option Purchase does not close on or before December 31, 2009, or in the event this Agreement does not become effective in accordance with Paragraph 13 below or this Agreement or the definitive documentation contemplated under this Agreement is thereafter terminated, GM shall, upon Delphi's request, take all steps and actions necessary to promptly transfer to Delphi any and all legal ownership rights GM may have with respect to the China Entities or, at Delphi's election, Steering Holding Pte. Ltd.

**13.     Approvals.**

Other than the obligations set forth in the last sentence of Paragraph 5 and as set forth in Paragraphs 11 through 14 (which are binding and enforceable upon execution hereof), the obligations of the parties hereunder are contingent upon GM receiving U.S. Treasury and GM Board approval, and Delphi receiving Bankruptcy Court approval.  Delphi will use its reasonable best efforts to obtain Bankruptcy Court approval of its obligations under this Agreement on or before March 24, 2009.  No provision of this Agreement (other than the last sentence of Paragraph 5 and Paragraphs 11 through 14) shall be effective prior to the receipt of Bankruptcy Court approval.

**14.     Counterparts; Facsimile Execution.**

This Agreement may be signed in counterparts and facsimile copies of signatures will constitute originals of all purposes.  The individuals executing this Agreement represent and warrant that they have authority to bind their respective entities.

5

**15.** **Governing Law; Jurisdiction; Venue.**

This Agreement shall be governed and construed in accordance with the internal laws of the State of New York, the forum state in which the Bankruptcy Court sits, without regard to any conflict of law provision that could require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each party hereby irrevocably and unconditionally agrees that the Bankruptcy court shall retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement. Each party further agrees to waive any objection based on forum non conveniens.

**16.** **Waiver; Modification; Amendment.**

Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by each party. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

**17.** **Binding Effect; Assignments.**

This Agreement is intended to bind and inure to the benefit of the parties and their respective successors, assigns, administrators and representatives. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be sold, assigned or otherwise transferred by any party without the prior written consent of the other party. Notwithstanding the foregoing, GM may assign its rights hereunder to the Business Optionee.

**18.** **Notices.**

All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given (and shall be deemed to have been duly given upon receipt) if delivered personally, mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties as set forth in Section 8.19 of the MRA.

**19.** **Entire Agreement; Parties' Intentions; Construction.**

This Agreement and the MRA constitute the entire agreement of the parties with respect to the subject matter hereof. This Agreement is the product of negotiations between the parties and represents the parties' intentions. In any action to enforce or interpret this Agreement, this Agreement shall be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as a whole, shall be construed more or less favorably to any party.

**20.** **Severability.**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nonetheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal

or unenforceable in any respect, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the fullest extent possible.

**21.    Headings.**

The headings of the sections herein are inserted for convenience of reference only and are not intended to be apart of, or to affect the meaning or interpretation of, this Agreement.

**22.    Time of the Essence.**

Time is of the essence with respect to all provisions of this Agreement.

[Signatures appear on the next page.]

This agreement may be signed in counterparts and facsimile copies of signatures will constitute originals of all purposes. The individuals executing this agreement represent and warrant that they have authority to bind their respective entities.

| Delphi Corporation | General Motors Corporation |
|---|---|
| By _[signature]_ | By _____ |
| Its VP & Chief Financial Officer | Its _____ |

8

This agreement may be signed in counterparts and facsimile copies of signatures will constitute originals of all purposes. The individuals executing this agreement represent and warrant that they have authority to bind their respective entities.

| Delphi Corporation | General Motors Corporation |
|---|---|
| By _____ | By _____/s/ Walter G. Borst_____ |
| | WALTER G. BORST |
| Its _____ | Its _____TREASURER_____ |

DETROIT.3533205.15

8

## Termination Agreement

This Termination Agreement (this "**Agreement**"), dated as of _March 3_, 2009, by and among Delphi Corporation, on behalf of itself and its affiliates (collectively, "**Delphi**"), Project Rhodes Holding Corporation, on behalf of itself and its affiliates ("**Holdings**"), Platinum Equity Advisors LLC, on behalf of itself and its affiliates ("**Platinum LLC**"), and Steering Solutions Corporation, on behalf of itself and its affiliates ("**SSC**," and, together with Holdings and Platinum LLC, "**Platinum**"). Delphi and Platinum are referred to herein individually as a "**Party**" and collectively as "**Parties**."

Whereas, Delphi and SSC entered into that certain Master Sale and Purchase Agreement, dated as of December 10, 2007, as amended (the "**MSPA**"), pursuant to which SSC, on behalf of itself and other buyers to be identified prior to closing, agreed to purchase substantially all of the assets comprising Delphi's global steering and halfshaft businesses (the "**Steering Business**"); and

Whereas, the Parties desire to terminate the MSPA and address certain ancillary matters by entering into this Agreement.

Now, therefore, for good and valuable consideration, the receipt and adequacy of which the Parties acknowledge, the Parties agree as follows:

1. All capitalized terms used, but not defined, in this Agreement shall have the meaning set forth in the MSPA.

2. Pursuant to Section 9.1.1 of the MSPA, Delphi and SSC hereby terminate the MSPA on the date of this Agreement (subject to Paragraph 13 below). Delphi and SSC shall promptly jointly instruct the Escrow Agent (the "**Joint Escrow Instructions**") to (i) return the Deposit Amount to SSC in accordance with the terms of the Deposit Escrow Agreement, dated as of December 10, 2007, and (ii) terminate the Deposit Escrow Agreement. Upon execution of this Agreement, Delphi shall have no further liability to Platinum of any kind or nature under the MSPA and Delphi shall be absolutely and unconditionally relieved of any obligation to pay SSC the Break-Up Fee and/or Expense Reimbursement under the MSPA.

3. Pursuant to the terms of an Agreement to Fund Break-Up Fee and Transfer Due Diligence and Acquisition Structure Agreement, dated on or around the date of this Agreement, between Platinum and GM (the "**Break-Up Agreement**"), Platinum shall transfer to GM or its designee, free and clear of all liens, claims and encumbrances: (i) its entire interest in all of the legal entities that it established to facilitate the transactions contemplated by the MSPA, but excluding the China Entities (hereinafter defined) and (ii) all dividends or other benefits payable to Platinum or any other Buyer with respect to such legal entities (excluding the China Entities, which dividends or other benefits, if any, shall promptly be paid as directed by Delphi to the extent Platinum has actually receives such dividends); and (iii) certain materials relating to such legal entities or the Steering Business that Platinum has received from Delphi (collectively, the

1

"**Steering Interests and Materials**"), provided that information relating to Platinum's post-closing business plan for the Steering Business (the "**Business Plan**") shall be excluded from the Steering Interests and Materials. Notwithstanding the foregoing, Platinum acknowledges that certain employees of the Steering Business may have knowledge of the Business Plan and nothing herein shall restrict such employees, Delphi, General Motors or their respective designees from implementing any or all of the Business Plan or otherwise using such information.

4. In accordance with the terms of the Break-Up Agreement, Platinum will transfer to GM all permits, licenses, and other governmental approvals and qualifications, bank accounts and identification numbers obtained with respect to the acquisition of the assets or equity interests of Sellers and the Steering Business, each to the extent transferable, free and clear of all liens, claims and encumbrances, other than regarding the China Entities.

5. Pursuant to Section 4.2 of each of the three (3) Equity Interest Transfer Agreements ("**LTAs**") relating to the China legal entities set forth on Exhibit 1 ("**China Entities**") and executed between local China Sellers and Steering Holding Pte. Ltd., each of the LTAs is hereby terminated. In order to effectuate the transfer of the China Entities to GM or its designee, Platinum will execute such documents as may be necessary for Platinum to transfer (i) the parent company of the China Entities, namely Steering Holding Pte. Ltd., which is incorporated in Singapore, or, if requested by GM, (ii) the parent company of Steering Holding, namely Rhodes Holding II Sarl, to GM or its designee, free and clear of all liens and encumbrances; provided, however that all dividends or other benefits (net of China withholding Taxes), if any, payable to Steering Holding Pte. Ltd. with respect to the China Entities shall promptly be paid to Delphi to the extent actually received by Platinum. Platinum represents, warrants and covenants (a) that Steering Holding Pte. Ltd. is a holding company without any other assets or liabilities of whatsoever kind or nature other than its equity holdings of the China Entities, and (b) that Platinum has not created any liabilities of whatsoever kind or nature affecting the China Entities (with the parties acknowledging that liabilities may have been created in the context of their operating business). Upon termination of the LTAs, neither any of the China Buyers nor any of the China Sellers will have any obligation to any other party thereunder except under Section 4.3 of each of the LTAs; and, upon transfer of the equity of Steering Holding Pte. Ltd. or Rhodes Holding II Sarl, then the obligations set forth in such Section 4.3 shall be deemed to apply to GM and Platinum and the "Transferred Equity Interest" and "Company" shall be deemed to refer to Steering Holding Pte. Ltd. In any case, Platinum will cause Steering Holding Pte. Ltd. (while it is owned by Platinum) to take all actions that may be required under Section 4.3 of the LTAs. Delphi hereby consents to the disclosures and conveyances required under Sections 3, 4 and 5 above under the terms of its existing confidentiality agreement with GM.

6. **[Intentionally deleted.]**

7. Platinum agrees to cooperate with Delphi and GM, at the requesting party's expense, in connection with any necessary approvals of this Agreement and any sale of the Steering Business to GM, including, without limitation, by complying with Sections 3, 4, and 5 of this Agreement, and cancelling any prior competition or other Governmental Approvals received in connection with the transactions contemplated by the MSPA, and any assignments or other Closing

2

documents previously executed by any Buyer. Without limiting the foregoing, in connection with the transfer of the legal entities referred to in Sections 3, 4 and 5, at the requesting party's expense, Platinum agrees to cause to be executed all such instruments and documents, obtain all such governmental or other approvals, and take all such other actions as may be necessary or desirable under all applicable laws or regulations to effect the transfers referred to in Sections 3, 4 and 5.

8. The Parties acknowledge and agree that (i) the Confidentiality Agreement, dated June 29, 2006, between Platinum Equity Advisors LLC and Delphi Corporation (as amended, the "**Confidentiality Agreement**") is unaffected by this Agreement and remains in full force and effect in accordance with its terms, and (ii) Delphi may assign the Confidentiality Agreement or any of Delphi's rights thereunder to any purchaser of the Steering Business, including GM or its designee, and such purchaser will be entitled to enforce the Confidentiality Agreement against Platinum.

9. Upon execution of this Agreement, Platinum on its behalf, and on behalf of its parent and subsidiary and affiliated companies, and their respective predecessors and successors in interest, officers, directors, employees, shareholders, trustees, administrators, and any and all other persons acting or purporting to act on behalf of any of the foregoing, hereby releases, discharges and acquits Delphi and its predecessors and successors in interest, officers, directors, employees, shareholders, trustees, administrators, and any and all other persons acting or purporting to act on behalf of any of the foregoing from any and all claims, damages, actions, demands, costs, and obligations relating in any way to, or arising from, (i) the transactions contemplated by the MSPA or (ii) a breach or claimed breach of the provisions of MSPA; provided that such release shall not apply to Delphi's obligations under this Agreement.

10. Upon execution of this Agreement, Delphi on its behalf, and on behalf of its parent and subsidiary and affiliated companies, and their respective predecessors and successors in interest, officers, directors, employees, shareholders, trustees, administrators, and any and all other persons acting or purporting to act on behalf of any of the foregoing, hereby releases, discharges and acquits Platinum and its predecessors and successors in interest, officers, directors, employees, shareholders, trustees, administrators, and any and all other persons acting or purporting to act on behalf of any of the foregoing from any and all claims, damages, actions, demands, costs, and obligations relating in any way to, or arising from, (i) the transactions contemplated by the MSPA or (ii) a breach or claimed breach of the provisions of MSPA; provided that such release shall not apply to Platinum's obligations under this Agreement or the Confidentiality Agreement.

11. Each Party represents and warrants that it has full power and authority to enter into and perform this Agreement, and the person signing this Agreement on behalf of each party has been properly authorized and empowered to enter into this Agreement.

12. THE PARTIES ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH AGREEMENT WITHOUT DURESS OR

COERCION AND WITHOUT RELIANCE ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN THIS AGREEMENT.

13. Notwithstanding Section 9.3.3 of the MSPA, only the following Sections of the MSPA shall survive its termination and such terms shall apply to this Agreement, in each case as modified by the terms of this Agreement: 12.1 (Fees and Expenses – excluding any exceptions relating to Section 9.2 of the MSPA), 12.5 (Assignment), 12.7 (Waiver), 12.8 (Notices), 12.10 (Publicity), 12.14 (Governing Law), and 12.15 (Venue and Retention of Jurisdiction).

14. This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on the Parties, notwithstanding that the Parties do not execute the same counterpart. This Agreement may also be executed by signing a counterpart and transmitting the executed counterpart by facsimile (telecopier) to the other party. Once all parties have signed, such telecopied executed counterpart shall be fully effective and binding on the Party so signing, but an original of said counterpart shall be provided as soon as possible following the facsimile transmission.

15. Time is of the essence to this Agreement.

**[Remainder of Page Left Intentionally Blank]**

IN WITNESS WHEREOF the Parties have caused this Termination Agreement to be executed in duplicate originals by their duly authorized representatives.

**PROJECT RHODES HOLDING CORPORATION LLC**

By: _____
Name: JOHNNY O. LOPEZ
Date: 3-3-09

**DELPHI CORPORATION**

By: _____
Name: JOHN P. ARLE
Date: 3/3/09

**STEERING SOLUTIONS CORPORATION**

By: _____
Name: JOHNNY O. LOPEZ
Date: 3-3-09

**PLATINUM EQUITY ADVISORS LLC**

By: _____
Name: JOHNNY O. LOPEZ
Date: 3-3-09

5

# EXHIBIT 1

Saginaw Steering (Suzhou) Co., Ltd. (Suzhou) (100%)

Delphi Saginaw Lingyun Drive Shaft Co. Ltd. (Hebei) (60%)

Saginaw Lingyun Driveshaft (Wuhu) Co., Ltd. (Wuhu) (60%)