**Hearing Date and Time:  March 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline:  March 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                            :
      In re                      :    Chapter 11
                            :
DELPHI CORPORATION, et al.,      :    Case No. 05-44481 (RDD)
                            :
                Debtors.   :    (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MOTION FOR ORDER AUTHORIZING DEBTORS TO
ENTER INTO FOURTH AMENDMENT AND FIFTH AMENDMENT TO
<u>ARRANGEMENT WITH GENERAL MOTORS CORPORATION</u>

("GM ARRANGEMENT FOURTH AND FIFTH AMENDMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Motion For Order Authorizing Debtors To Enter Into Fourth Amendment

And Fifth Amendment To Arrangement With General Motors Corporation (the "Motion"), and

respectfully represent as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (together with the Creditors'

Committee, the "Statutory Committees").  On February 26, 2009, the U.S. Trustee appointed an

official committee of retired employees to represent certain of the Debtors' current active salaried

employees, retirees, and their spouses for certain limited purposes.

3.      On December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court

subsequently entered an order approving the adequacy of the December 10 Disclosure Statement

2

and granting the related solicitation procedures motion (Docket No. 11389).  On January 25,

2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the

"Confirmation Order"), and the order became final on February 4, 2008.  Although the Debtors

on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as

confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit

financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a

closing that was commenced but not completed and refused to fund their Investment Agreement

(as defined in the Confirmed Plan) with Delphi.[1]  On May 16, 2008, Delphi filed complaints for

damages and specific performance against the Plan Investors and related parties who refused to

honor their equity financing commitments or participate in the closing that would have led to

Delphi's successful emergence from chapter 11.  The Debtors nevertheless have continued to

work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as

practicable.  On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan

Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications

to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-

soliciting votes on the Confirmed Plan, as modified.  In light of the unprecedented decline in

global automotive production volumes and the deepening of the crisis in global debt and equity

markets, the Debtors adjourned the hearing on the Plan Modification Motion to April 23, 2009

(Docket No. 16403).  The adjournment has facilitated the Debtors' consideration of further

supplemental plan modifications required by the current economic environment.

---

[1]  Although two parties-in-interest (the Creditors' Committee and Wilmington Trust Company, as indenture
trustee) commenced actions to revoke the Confirmation Order, those adversary proceedings have been stayed
indefinitely by stipulated orders between those parties and the Debtors.  In addition, at the confirmation hearing
the Court reserved for itself the remedy of vacating the Confirmation Order (see Hr'g Tr., 45, 67-68, Jan. 17,
2008), which is a power available to the Court to address a result that is either fundamentally unfair or is the
product of an abuse of process in the bankruptcy court.

4.        This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.        The statutory predicates for the relief requested herein are sections 363 and 364 of the Bankruptcy Code and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.        Current Business Operations Of The Debtors

6.        Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately $10.3 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[3]

7.        The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

---

[2]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[3]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.  Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.

---

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

10.    The Debtors believe that the Company's financial performance was deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive

6

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases, including Delphi's labor unions and GM.  The effectiveness of certain of these agreements, including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan.  After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.    In connection with those discussions, on September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis.  Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA").  On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

16.      Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan:  (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation.  Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations.  Delphi estimated the value of the net consideration received under the Amended GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

17.      By transferring nearly $2 billion of hourly pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's U.S. unions), Delphi made substantial progress towards achieving its pension funding strategy objectives for hourly employees.  In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to certain of their pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18.      As a result of all the factors described above, during the fall of 2008 the Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth in the Plan Modification Motion.  Since the filing of the proposed modifications, however, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally, and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization.  Delphi, therefore, continues to engage in

discussions with certain of its stakeholders to formulate further plan modifications. Moreover, as a result of the market turbulence, the Debtors were unable to extend the maturity date of their DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders. Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the Debtors entered into an accommodation agreement which allows the Debtors, among other things, to continue using certain of the proceeds of the postpetition financing facility through June 30, 2009. In addition, to further support the Debtors' liquidity, GM agreed to make certain advances and to accelerate payment of certain payables to the Debtors.

19.     At the same time, consistent with the plan modifications being negotiated, the Company has been making further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets. As part of the Debtors' efforts to achieve sufficient emergence capital funding, Delphi and GM are constructively working together to pull forward elements of GM's previously agreed-upon support for Delphi into one payment at emergence in combination with the transfer of certain of Delphi's U.S. sites to GM. This arrangement is designed to facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the global economy, the automotive industry, and the capital markets. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

F.     The Accommodation Agreement, GM Arrangement, And Pull-Forward Agreement

20.     In the fourth quarter of 2008, facing frozen global credit markets and one of the worst bear markets in the history of the global capital markets, the Debtors negotiated an accommodation agreement (the "Accommodation Agreement") with the DIP administrative

agent and certain required DIP lenders.  Under the Accommodation Agreement, and subject to

the terms and conditions set forth therein, the Debtors could continue using certain of the

proceeds of their approximately $4.35 billion DIP credit facility through June 30, 2009 (the

"Accommodation Period").  This Court authorized the Debtors to enter into the Accommodation

Agreement by order entered on December 3, 2008 (Docket No. 14515) and the parties

subsequently effectuated the agreement on December 12, 2008.

21.    Concurrently with its approval of the Accommodation Agreement, the

Court also entered an order approving a second amendment ("Amendment No. 2") to Delphi's

liquidity support agreement with GM (as amended from time to time, the "GM Arrangement")

(Docket No. 14514).  Amendment No. 2 extended the availability of the existing $300 million

liquidity support from December 31, 2008 to June 30, 2009, subject to certain conditions and

provisions for earlier termination upon the occurrence of specified events.[5]

22.    As part of the order approving Amendment No. 2 to the GM Arrangement,

the Court also approved Delphi's entry into the Partial Temporary Accelerated Payment

Agreement with GM (the "Pull-Forward Agreement"), which provides for GM to accelerate the

payment of up to $300 million in trade accounts payable to Delphi over the three-month period

beginning in March 2009.  Under the Pull-Forward Agreement, if certain conditions are satisfied

on the date when GM's March 2009 MNS-2 payment is to be made to DAS LLC (and certain

---

[5]    Under the original GM Arrangement, GM had provided up to $650 million in advances to Delphi in respect of
payments GM would otherwise have made upon the effectiveness of the GSA and MRA.  Upon the
effectiveness of the Amended GSA and Amended MRA on September 29, 2008, this commitment terminated
and the amounts advanced were set off against amounts to be paid by GM or its affiliates for the benefit of the
Debtors under the Amended GSA and the Amended MRA.  GM and the Debtors entered into a first amendment
("Amendment No. 1") to the GM Arrangement as of October 6, 2008 (Docket No. 14289).  Pursuant to
Amendment No. 1, GM agreed to make available to the Debtors an additional Tranche B consisting of $300
million in advances under the terms and conditions set forth therein and pursuant to section 364(b) of the
Bankruptcy Code.  As part of the GM Arrangement, Delphi agreed to pay certain fees and expenses and to
indemnify certain parties under specified conditions.  In addition, other Debtors guaranteed Delphi's obligations
thereunder.  The GM Arrangement also provides that the Debtors' obligations thereunder are entitled to
administrative expense priority under section 503(b)(1) of the Bankruptcy Code, subject to the terms of the GM
Arrangement and the Second DIP Extension Order (Docket No. 13489).

other dates specified in the Pull-Forward Agreement), GM would also make a $100 million

payment to DAS LLC, representing a partial temporary acceleration of accounts payable to DAS

LLC for component parts supplied to GMNA and GM's service parts organization, with the

effect of decreasing GM's payables not yet due to DAS LLC by the amount paid.  In each of

April and May 2009, assuming the same conditions are met, GM would make an additional $100

million accelerated payment in respect of GM's accounts payable to DAS LLC.  Thereafter, GM

could offset up to $100 million against each of the first three MNS-2 payments due to DAS LLC

after GM's commitment under the GM Arrangement terminates.[6]

23.      To remain in compliance with certain covenants in the Accommodation

Agreement and to maximize their available liquidity in the face of severe volume declines in the

global automotive industry, during January 2009 the Debtors negotiated and, on January 30,

2009, executed three related agreements.  Each of these three agreements was designed to enable

the Debtors to maintain operations during the Accommodation Period with sufficient and

uninterrupted liquidity as they continue their reorganization efforts.

24.      First, with respect to the Accommodation Agreement, the Debtors and the

requisite percentage of DIP lenders that participated in the Accommodation Agreement agreed to

a First Amendment to Accommodation Agreement on January 30, 2009 (the "First

Accommodation Amendment") and a Supplemental Amendment to Accommodation Agreement

on February 24, 2009 (the "Supplemental Accommodation Amendment" and, together with the

First Accommodation Amendment, the "Accommodation Amendments").[7]  Generally, the

---

[6]      In addition, the March, April, and May pull-forward payments are deemed advances under the GM
Arrangement under certain circumstances to the extent that the outstanding balance under the GM Arrangement
is less than $300 million on the date when GM's commitment under the GM Arrangement terminates.

[7]      A copy of the First Accommodation Amendment and a copy of the Supplemental Accommodation Amendment
is attached as Exhibits A and B, respectively, to the Accommodation Amendment Order (as defined below)
(Docket No. 16377).

Accommodation Amendments (a) provide for a new cash collateral basket of up to $117 million to be included in the Debtors' Accommodation Period borrowing base that could be permanently released to the Debtors if certain conditions are met, (b) reset the EBITDAR covenant to take into account the current global economic and automotive environment, (c) provide for a reduction of the minimum liquidity covenant from $100 million to $50 million if certain conditions are met, and (d) reschedule certain of the milestone deadlines that the Debtors are subject to under the Accommodation Agreement.  The Accommodation Amendments also contain certain additional milestones with respect to reporting and obtaining additional liquidity support from GM, which milestones the Debtors would have to satisfy to continue to benefit from certain provisions of the Accommodation Amendments.

25.    Second, Delphi and GM agreed to a third amendment ("Amendment No. 3") to the GM Arrangement, which generally contains amendments that conform the GM Arrangement to the amended terms of the Pull-Forward Agreement (as described below) and the amended terms of the Accommodation Agreement.  Amendment No. 3 to the GM Arrangement also effectively increases by $25 million (from $25 million to $50 million) the amount by which Delphi's borrowings under the GM Arrangement may exceed its projection of net cash usage during times when the Minimum Liquidity Amount (as defined in the First Accommodation Amendment) is reduced from $100 million to $50 million.

26.    Third, Delphi and GM agreed to an amendment to the Pull-Forward Agreement (the "Pull-Forward Amendment") designed to immediately enhance the Debtors' liquidity by further accelerating up to $100 million of trade payments from May 2009 to the current quarter.  GM paid Delphi the first $50 million further accelerated payment on January 30, 2009.  The Pull-Forward Amendment provides that GM may convert that payment (and, if made, the second $50 million further accelerated payment) into Tranche B advances under the GM

Arrangement, provided that GM's total Tranche B commitment is simultaneously increased by any amount so converted.  Upon such conversion, the GM payables owing to Delphi that correspond to the accelerated payment or payments so converted are reinstated so that GM remains obligated to make such payments as if they had never been accelerated.

27.     Each of these amendments became effective when it was executed but was subject to Court approval as a condition subsequent.  On February 25, 2009, the Court entered an order authorizing the Debtors to enter into the Accommodation Amendments (the "Accommodation Amendment Order") (Docket No. 16377) and a separate order authorizing the Debtors to enter into Amendment No. 3 to the GM Arrangement and the Pull-Forward Amendment (Docket No. 16379).  The amendments to each of these agreements also contemplated possible future amendments to the GM Arrangement by which GM would increase its total commitment thereunder from $300 million to $350 million by February 27, 2009 and from $350 to $450 million by March 24, 2009.  Under the Accommodation Amendments, the achievement of increased liquidity from GM is one of the Accommodation Agreement milestones.  Specifically, the failure to increase GM's commitment, in amount and in the chronology set forth above, would result in diminished liquidity for the Debtors.

Relief Requested

28.     By this Motion, the Debtors seek entry of an order approving a fourth amendment and fifth amendment to the GM Arrangement (respectively, "Amendment No. 4" and "Amendment No. 5").  A copy of each of Amendment No. 4 and Amendment No. 5 is attached hereto as Exhibit A and Exhibit B, respectively.  As discussed below, Amendment No. 4 and Amendment No. 5, taken together, increase GM's total commitment under the GM Arrangement from $300 million to $450 million subject to the terms and conditions of those amendments.

Basis For Relief

29.    As noted above, to continue to benefit from certain provisions of the

Accommodation Amendments, the Debtors must meet certain milestones with respect to

receiving additional liquidity support from GM.   The Debtors and GM have negotiated and

executed Amendment No. 4 and Amendment No. 5 for the purpose of satisfying those milestones

and enhancing the Debtors' liquidity.   As contemplated by the amendments to the

Accommodation Agreement, GM Arrangement, and Pull-Forward Agreement that this Court

approved on February 25, 2009, (i) Amendment No. 4 contains amendments that provide for an

increase of GM's Tranche B Commitments under the GM Arrangement from $300 million $350

million and (ii) Amendment No. 5 contains amendments that provide for a further increase of

GM's Tranche B Commitments under the GM Arrangement from $350 million to $450 million.

The effectiveness of each of these amendments is conditioned on this Court's approval of each

respective amendment on or before March 24, 2009 and also on GM's not having received on or

before March 23, 2009 notification from the President's Designee (as such term is defined in

GM's loan agreement with the United States Department of the Treasury, dated as of December

31, 2008) that such increases in GM's Tranche B Commitments are not permitted.   Amendment

No. 5 is further conditioned on approval by GM's board of directors and on Delphi's and GM's

execution of a definitive transaction agreement relating to the sale of Delphi's global steering and

halfshaft business to GM on or before March 23, 2009 and the Court's approval of that certain

Option Exercise Agreement[8] on or before March 24, 2009.   Both of these amendments represent

significant steps forward as the Debtors continue their negotiations with stakeholders, including

---

[8]    Concurrently with this Motion, the Debtors have filed a motion seeking approval of an agreement under which
GM will exercise its option to purchase Delphi's Steering business, as contemplated under the Amended MRA
(the "Option Exercise Agreement").

GM and the DIP lenders, with respect to further modifications to the Confirmed Plan and emergence from chapter 11.

G.    Amendment No. 4

30.    Under Amendment No. 4 to the GM Arrangement, GM has agreed to increase the aggregate principal amount under the GM Arrangement from $300 million to $350 million.  Delphi and GM executed Amendment No. 4 to the GM Arrangement on February 27, 2009, which was the date by which the Debtors were required to reach such an agreement so that the Accommodation Agreement minimum liquidity covenant would be reduced from $100 million to $50 million (see the definitions of "GM-Delphi Agreement Amendment First Condition" and "Minimum Liquidity Amount" in the First Accommodation Amendment).

31.    This $50 million increase in GM's total commitment under the GM Arrangement was accomplished by GM's conversion of the $50 million further accelerated trade payment it paid to the Debtors on January 30, 2009 into a Tranche B commitment under the GM Arrangement.  As a result, under the terms of the Pull-Forward Amendment, the trade payments payable by GM to the Debtors that were associated with the $50 million payment will be reinstated and paid as if they had never been accelerated.

H.    Amendment No. 5

32.    Under the Accommodation Amendment, the Debtors were required to meet the additional milestone of further increasing GM's commitments under the GM Arrangement to $450 million so that the $117 million cash collateral basket would be released back to the Debtors (subject to certain other milestones set forth in the Accommodation Amendment) instead of their having to apply it to repayment of Tranche A and Tranche B loans under the DIP Facility.  To achieve this result with respect to the $117 million cash collateral basket, the Debtors are required to have executed and delivered on or prior to March 24, 2009 an

15

irrevocable and effective agreement with GM to increase GM's commitments under the GM

Arrangement to $450 million (see the definition of "GM-Delphi Agreement Amendment Second

Condition" and section 1(f), (g) of the First Accommodation Amendment).

33.     Accordingly, on March 3, 2009 the Debtors and GM executed and

delivered Amendment No. 5 to the GM Arrangement, which provides for GM's further

increasing its commitments under the GM Arrangement from $350 million to $450 million.  This

$100 million increase has been made in conjunction with GM's exercising the "Unsold Business

Option" referred to in Section 4.06(a)(i) of the Amended MRA with respect to Delphi's global

steering and halfshaft business, which is the subject of the Option Exercise Agreement.

<u>Applicable Authority</u>

I.      The Court Should Authorize Amendment No. 4 And
        Amendment No. 5 To GM Arrangement

        (a)     Amendment No. 4 And Amendment No. 5 To GM Arrangement
                Should Be Approved Under 11 U.S.C. § 364(b) If Applicable

34.     The Debtors seek approval of Amendment No. 4 and Amendment No. 5 to

the GM Arrangement.  Taken together, these amendments increase GM's unsecured obligations

under the GM Arrangement from $300 million to $450 million.  According to the terms of the

GM Arrangement, Delphi is to grant GM an administrative claim for such increased amounts

under section 503(b) of the Bankruptcy Code.

35.     Under section 364(b) of the Bankruptcy Code, a debtor may obtain

unsecured credit outside the ordinary course of business and provide the lender extending such

credit with an administrative priority claim for such amounts under section 503(b)(1) of the

Bankruptcy Code.  11 U.S.C. § 364(b).  Bankruptcy courts have discretion in determining

whether to approve such transactions, although such "discretion is not unbridled."  <u>In re Ames

Dep't Stores, Inc.</u>, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).  In making such determinations,

"courts have focused their attention on proposed terms that would tilt the conduct of the

bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code

confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions

by parties-in-interest from being decided on their merits."  Id. (citations omitted).

      36.     With respect to the GM Arrangement, the Court determined that these

standards were met when it approved (i) the GM Arrangement,[9] (ii) the additional $300 million

commitment from GM in Amendment No. 1,[10] (iii) the extension of that commitment in

Amendment No. 2,[11] and (iv) to the extent section 364(b) was applicable, the modifications

accomplished by Amendment No. 3.[12]  Because the GM Arrangement will remain in place, as

supplemented by Amendment No. 4 and Amendment No. 5, the Court's prior findings should

apply.

      (b)    <u>Application Of The Business Judgment Standard</u>

      37.     Based on the foregoing, the Debtors submit that entry of an order

approving Amendment No. 4 and Amendment No. 5 to the GM Arrangement is necessary and

appropriate to further the Debtors' reorganization efforts.  The agreements were negotiated in

good faith, at arm's length, and in the exercise of the Debtors' business judgment.  Bankruptcy

courts routinely defer to the debtor's business judgment on most business decisions, including the

---

[9]    Order (I) Supplementing January 5, 2008 DIP Order (Docket No. 6461) and Authorizing Debtors to (A) Extend
    Maturity Date of DIP Facility, (B) Enter into Related Documents, and (C) Pay Fees in Connection Therewith
    and (II) Authorizing Debtors to Enter into Arrangement with General Motors Corporation or an Affiliate
    (Docket No. 13489).

[10]   Order Authorizing Amendment to Arrangement with General Motors Corporation Approved Pursuant to
    Second DIP Extension Order [Docket No. 13489] (Docket No. 14289).

[11]   Order Authorizing Debtors to Enter (I) Second Amendment to Arrangement with General Motors Corporation
    Approved Pursuant to Second Dip Extension Order (Docket No. 13489) and (II) Partial Temporary Accelerated
    Payment Agreement (Docket No. 14514).

[12]   Order Authorizing Debtors to Enter into (I) Third Amendment to Arrangement with General Motors
    Corporation Approved Pursuant to Second DIP Extension Order (Docket No. 13489) and (II) First Amendment
    to Partial Temporary Accelerated Payment Agreement (Docket No. 16379).

decision to borrow money.  See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul
& Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr.
D. Colo. 1985).  In considering whether a debtor has exercised its business judgment, a court is
not free to second-guess particular provisions but rather determines whether the proposed action
"as a whole is within reasonable business judgment."  In re Crowthers McCall Pattern, Inc., 114
B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

38.    The Second Circuit has held that, although the Bankruptcy Court sits as an
"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .
debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors
and the estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4
F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a
presumption arises that "'in making a business decision the directors of a corporation acted on an
informed basis, in good faith and in the honest belief that the action taken was in the best
interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated
Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation
omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment
have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not
enough for an objector simply to raise and argue an objection. Rather, an objector "is required to
produce some evidence respecting its objections."  Comm. Of Equity Holders v. Lionel Corp. (In
re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).

39.    The Debtors have exercised sound business judgment in entering into
Amendment No. 4 and Amendment No. 5 to the GM Arrangement.  Indeed, the proposed terms
of the agreements are fair, reasonable, and necessary and are in the best interests of the Debtors'
estates because they provide necessary liquidity to the Debtors at a cost, if any, lower than the

Debtors could achieve from other sources.  Accordingly, the Court should approve Amendment

No. 4 and Amendment No. 5 to the GM Arrangement, and the commitments from GM set forth

therein, pursuant to sections 363 and 364 of the Bankruptcy Code.

J.    Amendment No. 4 and Amendment No. 5 To GM Arrangement
      Should Be Accorded The Benefits Of Section 364(e)

40.    Section 364(e) of the Bankruptcy Code provides that the "reversal or

appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a

lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an

entity that extended such credit in food faith, whether or not such entity knew of the pendency of

the appeal, unless such authorization and the incurring of such debt, or the granting of such

priority or lien, were stayed pending appeal."  Amendment No. 4 and Amendment No. 5 to the

GM Arrangement were negotiated in good faith and no consideration is being provided to any

party to, or guarantor of, obligations arising under these agreements other than as disclosed

therein.  Accordingly, each of these agreements should be accorded the benefits of section 364(e)

of the Bankruptcy Code for all the reasons set forth herein.

K.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

41.    Bankruptcy Rule 6004(h)[13] provides:  "An order authorizing the use, sale,

or lease of property other than cash collateral is stayed until the expiration of 10 days after entry

of the order, unless the court orders otherwise."  The Debtors request that this Court waive this

ten-day stay because Delphi needs the immediate liquidity relief that Amendment No. 4 and

Amendment No. 5 to the GM Arrangement provide.  Moreover, the milestones set forth in the

Accommodation Agreement, as amended, require that Amendment No. 4 and Amendment No. 5

each be effective by March 24, 2009.  Finally, the Court granted the Debtors' request for relief

---

[13]    Formerly Bankruptcy Rule 6004(g).

from Bankruptcy Rule 6004(h) in connection with the original GM Arrangement and each of the

subsequent amendments thereto.  Other courts in this district have waived this ten-day stay upon

a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr.

S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the

order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g).");

In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of "a

business exigency" for a waiver of the ten-day stay under Bankruptcy Rule 6004(h)).

Notice Of Motion

42.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Thirteenth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered December 4, 2008 (Docket No. 14534).  In light of the

nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing the Debtors to enter into Amendment No. 4 and Amendment No. 5 to the GM Arrangement and (ii) granting the Debtors such other and further relief as is just.

Dated:      New York, New York
            March 4, 2009

                        SKADDEN, ARPS, SLATE, MEAGHER
                         & FLOM LLP

                    By:     /s/ John Wm. Butler, Jr.
                            John Wm. Butler, Jr.
                            John K. Lyons
                            Ron E. Meisler
                    333 West Wacker Drive, Suite 2100
                    Chicago, Illinois 60606
                    (312) 407-0700

                            - and -

                    By:     /s/ Kayalyn A. Marafioti
                            Kayalyn A. Marafioti
                            Thomas J. Matz
                    Four Times Square
                    New York, New York 10036
                    (212) 735-3000

                            - and -

SHEARMAN & STERLING LLP

                    By:
                            Douglas P. Bartner
                            Andrew V. Tenzer
                            Michael S. Baker
                    599 Lexington Avenue
                    New York, New York  10022
                    (212) 848-4000

                    Attorneys for Delphi Corporation, et al.,
                        Debtors and Debtors-in-Possession

21