**Hearing Date and Time:  March 24, 2009 at 10:00 a.m. (prevailing Eastern time)**
**Objection Deadline:  March 17, 2009 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner
Andrew V. Tenzer
Michael S. Baker

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

MOTION FOR ORDER (I) AUTHORIZING DEBTORS' ENTRY INTO
AMENDED AND RESTATED REIMBURSEMENT AGREEMENT
WITH ISSUING BANK RELATING TO LETTERS OF CREDIT AND
(II) PROVIDING CERTAIN PROTECTIONS WITH RESPECT THERETO

("REIMBURSEMENT AGREEMENT APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Motion For Order (I) Authorizing Debtors' Entry Into Amended And Restated

Reimbursement Agreement With Issuing Bank Relating To Letters Of Credit And (II) Providing

Certain Protections With Respect Thereto (the "Motion"), and respectfully represent as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.      No trustee or examiner has been appointed in these cases.  On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders (together with the Creditors'

Committee, the "Statutory Committees").  On February 26, 2009, the U.S. Trustee appointed an

official committee of retired employees to represent certain of the Debtors' current active salaried

employees, retirees, and their spouses for certain limited purposes.

3.      On December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-

Possession (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan (Docket No. 11388) (the "December 10 Disclosure Statement").  The Court

subsequently entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), and the order became final on February 4, 2008. Although the Debtors on April 4, 2008 had satisfied the conditions required to substantially consummate the Plan, as confirmed by this Court (the "Confirmed Plan"), including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi. On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments or participate in the closing that would have led to Delphi's successful emergence from chapter 11. The Debtors nevertheless have continued to work with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable. On October 3, 2008, Delphi filed a motion (Docket No. 14310) (the "Plan Modification Motion") under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and December 10 Disclosure Statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified. In light of the unprecedented decline in global automotive production volumes and the deepening of the crisis in global debt and equity markets, the Debtors adjourned the hearing on the Plan Modification Motion to April 23, 2009 (Docket No. 16403). The adjournment has facilitated the Debtors' consideration of further supplemental plan modifications required by the current economic environment.

        4.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are sections 105, 362, and 363 of the Bankruptcy Code.

B.      Current Business Operations Of The Debtors

6.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2008 had global net sales of $18.1 billion and global assets of approximately $10.3 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

---

[1]     The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on March 3, 2009.

[2]     On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

4

connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than two-thirds of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered net operating losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.  Although the Debtors recorded a net gain of $3.0 billion in 2008, which incorporated a recorded gain of $5.3 billion in connection with the effectiveness of the Amended GSA (as defined below), the Company's net operating loss for the year was $1.5 billion.

10.      The Debtors believe that the Company's financial performance was deteriorating from the spinoff to the petition date because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

number of motor vehicles that GM produces annually in the United States and related pricing

pressures, and (iii) increasing commodity prices.

11.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major stakeholders had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its

transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

12.    On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the

Company's labor agreements to create a competitive arena in which to conduct business; second,

concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy

and labor costs and to ascertain GM's business commitment to the Company; third, streamlining

their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their

salaried workforce to ensure that the Company's organizational and cost structure is competitive

and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable

solution to their pension situation.

E.    Plan Confirmation And Postconfirmation Matters

13.    The Confirmed Plan is based upon a series of global settlements and

compromises that involve nearly every major constituency in the Debtors' reorganization cases,

including Delphi's labor unions and GM.  The effectiveness of certain of these agreements,

including the Debtors' two comprehensive agreements with GM (the "Original GSA" and the "Original MRA"), was conditioned on consummation of the Confirmed Plan. After the Plan Investors refused to fund their obligations under the Investment Agreement, the Debtors nevertheless continued working with their stakeholders to evaluate their options to move forward to emerge from chapter 11 as soon as reasonably practicable.

14.    In connection with those discussions, on September 12, 2008, Delphi announced steps that it was taking to complete the successful restructuring of its U.S. operations and transformation of the Company on a global basis. Those steps included implementing amended, comprehensive settlement agreements with GM, taking action then intended to fund and preserve Delphi's hourly and salaried pension plans, and completing the reaffirmation process for Delphi's August 2008 Reaffirmed Plan Of Reorganization Business Plan.

15.    Concurrently with the announcement on September 12, 2008, the Debtors filed a motion for approval of two comprehensive agreements with GM: the Amended and Restated Global Settlement Agreement (the "Amended GSA") and the Amended and Restated Master Restructuring Agreement (the "Amended MRA"). On September 26, 2008, this Court entered an order authorizing the Debtors' implementation of the Amended GSA and the Amended MRA, the provisions of which became effective on September 29, 2008.

16.    Through the Amended GSA and Amended MRA, the Debtors addressed two fundamental tenets of their Transformation Plan: (i) obtaining financial support from GM for certain of Delphi's legacy and labor costs and GM's business commitments to Delphi going forward and (ii) devising a workable solution to Delphi's pension funding situation. Under the Amended GSA and Amended MRA, GM agreed to contribute substantial additional value to the Debtors and eliminate significant elements of conditionality to the performance of GM's obligations. Delphi estimated the value of the net consideration received under the Amended

7

GSA and Amended MRA to be approximately $10.6 billion (increased from approximately $6.0 billion under the Original GSA and Original MRA).

17.    By transferring nearly $2 billion of hourly pension liabilities to GM through the Amended GSA and Amended MRA and freezing Delphi's hourly pension plan (which was also approved as part of the Amended GSA with the consent of Delphi's U.S. unions), Delphi made substantial progress towards achieving its pension funding strategy objectives for hourly employees.  In addition, on September 23, 2008, this Court entered an order authorizing the Debtors to take certain actions with respect to certain of their pension plans for salaried employees and to implement replacement pension plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

18.    As a result of all the factors described above, during the fall of 2008 the Debtors were able to formulate certain modifications to the Confirmed Plan which are set forth in the Plan Modification Motion.  Since the filing of the proposed modifications, however, substantial uncertainty and a significant decline in capacity in the credit markets, the global economic downturn generally, and the current economic climate in the automotive industry, have adversely impacted Delphi's ability to develop a revised recapitalization plan and successfully consummate a confirmed plan of reorganization.  Delphi, therefore, continues to engage in discussions with certain of its stakeholders to formulate further plan modifications.  Moreover, as a result of the market turbulence, the Debtors were unable to extend the maturity date of their DIP credit facility on terms reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, with the support of the agent and the requisite lenders to the DIP credit facility, the Debtors entered into an accommodation agreement which allows the Debtors, among other things, to continue using certain of the proceeds of the postpetition financing facility through

8

June 30, 2009.  In addition, to further support the Debtors' liquidity, GM agreed to make certain advances and to accelerate payment of certain payables to the Debtors.

19.    At the same time, consistent with the plan modifications being negotiated, the Company has been making further revisions to its business plan consistent with the extremely low volume production environment in the global automotive industry and depressed global capital and equity markets.  As part of the Debtors' efforts to achieve sufficient emergence capital funding, Delphi and GM are constructively working together to pull forward elements of GM's previously agreed-upon support for Delphi into one payment at emergence in combination with the transfer of certain of Delphi's U.S. sites to GM.  This arrangement is designed to facilitate Delphi's emergence from chapter 11 notwithstanding the current state of the global economy, the automotive industry, and the capital markets.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will seek to preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as one of the world's premier auto suppliers.

F.    The Accommodation Agreement

20.    In the fourth quarter of 2008, facing frozen global credit markets and one of the worst bear markets in the history of the global capital markets, the Debtors negotiated an accommodation agreement (as amended, the "Accommodation Agreement")[4] with the administrative agent (the "Agent") under the Debtors' approximately $4.35 billion DIP facility (the "DIP Facility")[5] and obtained consent to this agreement from the requisite lenders.[6]  Under

---

[4]    A copy of the Accommodation Agreement is attached as Exhibit A to the DIP Accommodation Order.

[5]    The history of the DIP Facility is described in detail in the Debtors' Expedited Motion For Order (I) Supplementing January 5, 2007 DIP Refinancing Order (Docket No. 6461) And Authorizing Debtors To Enter Into And Implement Accommodation Agreement With Agent And Participating Lenders And (II) Authorizing Debtors To (A) Enter Into Related Documents And (B) Pay Fees In Connection Therewith, filed on November 7, 2008 (Docket No. 14408) (the "Accommodation Motion").

9

the Accommodation Agreement, and subject to the terms and conditions set forth therein, the

Debtors could continue using certain of the proceeds of the DIP Facility through June 30, 2009

(the "Accommodation Period").[7]  This Court authorized the Debtors to enter into the

Accommodation Agreement by order entered on December 3, 2008 (the "DIP Accommodation

Order") (Docket No. 14515) and the parties subsequently effectuated the agreement on

December 12, 2008.

21.     The Debtors and the requisite percentage of DIP lenders who participated

in the Accommodation Agreement agreed to certain modifications to the Accommodation

Agreement by amendments effectuated on January 30, 2009[8] and February 24, 2009[9] (the

"Accommodation Agreement Amendments").  The Court authorized the Debtors' entry into the

Accommodation Agreement Amendments by order entered on February 25, 2009 (the

"Accommodation Amendment Order") (Docket No. 16377).[10]

<u>Relief Requested</u>

22.     By this Motion, the Debtors seek entry of an order (i) authorizing the

Debtors to enter into an amended and restated reimbursement agreement (the "Amended and

---

[6]    Although under the terms of the Second Amended and Restated DIP Credit Agreement the Debtors were not
required to seek the tranche C lenders' consent to the Accommodation Agreement, to encourage tranche C
lenders to assist the Debtors with their emergence capital funding efforts, the Debtors nevertheless sought and
obtained this Court's approval of certain incentives for those tranche C lenders which consented to the
Accommodation Agreement.

[7]    As described more fully in the Accommodation Motion, under the terms of the Accommodation Agreement, the
Accommodation Period may be shortened to May 5, 2009 if the Debtors do not meet certain milestones in
connection with the Debtors' plan of reorganization.

[8]    <u>See</u> Motion For Order Authorizing Debtors To (I) Enter Into Amendment To Accommodation Agreement With
Certain Participating DIP Lenders And (II)(A) Enter Into Related Documents And (B) Pay Fees And Expenses
In Connection Therewith (Docket No. 14703).

[9]    <u>See</u> Notice Of Supplemental Amendment To Accommodation Agreement (Docket No. 13629).

[10]   A copy of the First Amendment to Accommodation Agreement and the Supplemental Amendment to
Accommodation Agreement are attached as Exhibits A and B to the Accommodation Amendment Order,
respectively (Docket No. 16377).

Restated Reimbursement Agreement") with respect to L/Cs (as defined below) with JPMorgan

Chase Bank, N.A. (in such capacity, the "Issuing Bank") in the form attached hereto as <u>Exhibit</u>

<u>A</u>[11] and (ii) providing certain protections with respect thereto.

<u>Basis For Relief</u>

23.    The Debtors require letters of credit to fund certain short-term obligations

incurred in the ordinary course of their businesses.  Prior to the effectiveness of the

Accommodation Agreement, the Debtors could request the issuance of letters of credit as part of

their DIP Facility subject to the terms and conditions set forth in the Second Amended and

Restated DIP Credit Agreement[12] (as amended by the Accommodation Agreement, the

"Amended DIP Credit Agreement").  Pursuant to Paragraph 10 of Accommodation Agreement,

section 2.13 of the Second Amended and Restated DIP Credit Agreement was amended to

provide that, upon the effective date of the Accommodation Agreement (the "Accommodation

Effective Date"), the Debtors were no longer able to obtain additional Loans or Letters of Credit

(both as defined in the Amended DIP Credit Agreement) under the DIP Facility.  Instead, the

Accommodation Agreement allows the Debtors to replace or continue outstanding Letters of

Credit that existed on the Accommodation Effective Date as they expire in the maximum

aggregate amount of $125 million (the "L/Cs"), which L/Cs may be secured by first priority liens

on cash collateral in an aggregate amount of up to $135 million (the "L/C Liens").

24.    Since the Accommodation Effective Date the Debtors have obtained or

continued L/Cs through the Issuing Bank for use in the ordinary course of their businesses.  As

---

[11]    Attached hereto as <u>Exhibit B</u> is a copy of the Amended and Restated Reimbursement Agreement marked to
show changes against the prior Reimbursement Agreement (as defined below) (changed pages only).

[12]    Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement dated as of May 9, 2008,
attached as Exhibit A to the Order Supplementing Second DIP Extension Motion (Docket No. 13489)
Authorizing Increase In Financing Commitments In Response To Oversubscription Of Debtors' Syndication Of
Second DIP Extension Debtors To Complete Subsequent Tranche C Loan And Related Transactions (Docket
No. 13699).

of the date of this Motion, these L/Cs aggregate $13.55 million.  Furthermore, as of the date of

this Motion, there are approximately $93 million of letters of credit outstanding under the DIP

Facility.  The Debtors anticipate needing to obtain additional L/Cs during the second quarter of

this year and beyond.  Each of these L/Cs is subject to the terms and conditions of an entirely

discretionary reimbursement agreement between the Debtors and the Issuing Bank (the

"Reimbursement Agreement").  Further, pursuant to the terms of the Reimbursement Agreement,

the Debtors have provided cash collateral equal to 105% of the face amount of all unmatured and

contingent L/Cs issued or continued thereunder as security for the Debtors' obligations under the

Reimbursement Agreement.

        25.     The Issuing Bank has requested certain protections with respect to the

enforcement of the Amended and Restated Reimbursement Agreement that generally would have

been available to a lender who had issued letters of credit under the DIP Facility prior to the

Accommodation Effective Date.  Specifically, in the context of an event of default under the DIP

Facility, the automatic stay would have immediately been vacated and modified to the extent

necessary to permit the Agent to exercise remedies available to it under the DIP Facility. [13]

Because the Debtors' letter of credit facility is now separate from the DIP Facility, the Agent

would not exercise remedies on behalf of the letter of credit bank and accordingly, such bank

would first have to obtain relief from the stay in the event of a default before it could exercise

remedies.

---

[13]    The Agent could exercise rights and remedies against Collateral (as defined in the DIP Order (defined below))
only after giving the Debtors five business days' prior written notice.  See Paragraph 7(b) of the Order Under 11
U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P.
2002, 4001 And 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing
Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt (Docket No. 6461) (the
"DIP Refinancing Order") (as supplemented by (i) the DIP Extension Order (Docket No. 10957), (ii) the Second
DIP Extension Order (Docket No. 13489) (as supplemented by the Supplemental Second DIP Extension Order
(Docket No. 13699)), (iii) the DIP Accommodation Order (Docket No. 14515), and (iv) the Accommodation
Amendment Order (Docket No. 16377), hereinafter referred to as the "DIP Order")).

26.     Currently, the Issuing Bank is the only bank issuing L/Cs on the Debtors' behalf.  The Debtors' current letter of credit facility is discretionary and the Issuing Bank has informed the Debtors that it would only issue L/Cs if it were granted the relief sought in this Motion, including, without limitation, springing relief from the automatic stay, as was granted to the Agent under the DIP Facility.  So that the Debtors may continue to obtain L/Cs through the Issuing Bank for use in their business operations on a going-forward basis, the Debtors and the Issuing Bank have agreed to amend the Reimbursement Agreement to modify the parties' respective rights with respect to such agreement or any similar future agreement between the parties (a "Future Reimbursement Agreement").  These modifications would provide comparable protections to the Issuing Bank with respect to enforcing its rights and remedies under the Amended and Restated Reimbursement Agreement and any Future Reimbursement Agreement.  The only potentially notable difference is that the Issuing Bank can act individually as opposed to pursuant to the collective action structure under the DIP Facility.

27.     Accordingly, the Issuing Bank and the Debtors have agreed that should there be an event of default under the Amended and Restated Reimbursement Agreement or a Future Reimbursement Agreement (a "Reimbursement Agreement Event of Default"[14]), (i) the Issuing Bank would have the right to immediately exercise the applicable default-related remedies available under such agreement without having to first seek relief from the automatic stay from this Court, provided that the Issuing Bank gives the Debtors five business days' prior written notice before exercising any rights or remedies against the collateral securing the Debtors' obligations under such agreement, and (ii) the only argument that could be raised in

---

[14]    Under the Amended and Restated Reimbursement Agreement, included as Reimbursement Events of Default are the entry by this Court of an order (i) "reversing, staying for a period in excess of 10 days, or vacating" any order granting the relief sought herein or (ii) "without the written consent of the [Issuing Bank], otherwise amending, supplementing or modifying such order in a manner that is reasonably determined by the [Issuing Bank] to be adverse to [Issuing Bank]."

opposition to such exercise of remedies would be to dispute that an event of default had occurred and is continuing under the agreement. These terms are the same as the rights afforded to the Agent in similar circumstances.

28.     The proposed revisions to the Reimbursement Agreement and any order approving this Motion would not affect letters of credit issued prior to the Accommodation Effective Date because those letters of credit were issued under the DIP Facility. Accordingly, only the Agent can enforce the respective rights of the issuers of such letters of credit. To the extent that the Issuing Bank agrees to permit such letters of credit to continue beyond their expiration dates that were in effect on the Accommodation Effective Date, however, then upon such extension those letters of credit would become L/Cs under the Reimbursement Agreement.

29.     In light of the foregoing change, the parties further agreed to revise the Reimbursement Agreement to clarify the Issuing Bank's obligations with respect to returning cash to Delphi when the Issuing Bank's exposure under the L/Cs is reduced. Specifically, upon the occurrence of a Reimbursement Agreement Event of Default under the Reimbursement Agreement, the Issuing Bank would be permitted, among other things, to apply such cash collateral to the payment of all obligations thereunder (including at the option of the Issuing Bank, unmatured contingent obligations in respect of the issued and outstanding L/Cs thereunder). Under the Amended and Restated Reimbursement Agreement, in the event that the Issuing Bank has so foreclosed on such cash collateral, as the aggregate face amount of the L/Cs issued under the Amended and Restated Reimbursement Agreement is reduced due to the expiration or termination of the L/Cs or otherwise, the Issuing Bank has agreed that, after applying cash to the payment of drawn letters of credits, it will hold only up to 105% of the aggregate face amount of the L/Cs remaining. Accordingly, excess funds will be returned to the Debtors periodically.

14

30.    As an added protection for the Debtors, the parties have also agreed to carve the Amended and Restated Reimbursement Agreement out of the definition of "Loan Document" under the DIP Facility, thus removing the risk of a DIP Facility cross-default should there be a Reimbursement Agreement Event of Default.  The DIP Accommodation Order authorized and approved the "Accommodation Documents," which included "any reimbursement agreement relating to letters of credit issued after the Accommodation Effective Date . . . for the account of the Debtors or any of their subsidiaries to replace Letters of Credit issued under and as defined in the DIP Credit Agreement."  See DIP Accommodation Order at ¶ 3 and the definition of "Accommodation Documents" on page 2.  The DIP Accommodation Order also provides that "[f]or the avoidance of doubt, each Accommodation Document shall constitute a 'Loan Document' under and as defined in the Amended DIP Credit Agreement."  DIP Accommodation Order at ¶ 18.  Accordingly, because the Reimbursement Agreement is an "Accommodation Document," it is also a DIP Facility "Loan Document"  and any event of default with respect to the Reimbursement Agreement that continues unremedied for more than ten days would constitute an Event of Default under section 7.01(d) of Amended DIP Credit Agreement.  This was not intended by the Issuing Bank or the Debtors.  Accordingly, the Debtors are seeking an order of this Court confirming that the Amended and Restated Reimbursement Agreement and any Future Reimbursement Agreement are not deemed to be Loan Documents under the DIP Facility.

31.    The relief sought by this Motion will not have any impact on the seniority or priority of liens granted under the DIP Order.  For the avoidance of doubt, the proposed order granting the relief sought by this Motion provides that, as provided in Section 6.01(xxi) of the

Amended DIP Credit Agreement[15] and Section 6(d) of the DIP Order,[16] the L/C Liens in favor of

the Issuing Bank in an aggregate amount of up to $135,000,000 shall be first priority liens

(senior to the liens created under the Loan Documents (as defined in the Amended DIP Credit

Agreement) in favor of the Agent and the DIP Lenders).

       32.     Further, as contemplated under the Amended DIP Credit Agreement and

the DIP Order, the Issuing Bank has requested clarification that the L/C Cash Collateral is not

subject to the Carve Out (as defined in the Amended DIP Credit Agreement and Paragraph 5(b)

of the DIP Order).  Section 2.25(a)(z) of the Amended DIP Credit Agreement provides that

"following the Termination Date, amounts in the Letter of Credit Account shall not be subject to

the Carve Out."  Similarly, Paragraph 5(b) of the DIP Order provides that "following the

Termination Date (as Defined in the DIP Credit Agreement), cash or other amounts on deposit in

the Letter of Credit Account (as defined in the DIP Credit Agreement), shall not be subject to the

Carve Out."  The Termination Date of the DIP Facility passed on December 31, 2008, which was

the DIP Facility's maturity date.  The Issuing Bank wants the flexibility to have the Debtors

deposit the L/C Cash Collateral in an account that may not technically comport with the defined

term "Letter of Credit Account."  This is the case because L/Cs are no longer covered under the

DIP Facility and therefore would be deposited into an account that was separate from other DIP

Facility collateral.  This is particularly important to the Issuing Bank since it wants to take

precautionary steps to ensure no party could confuse it's role as Agent with its separate role as

Issuing Bank.  Moreover, Issuing Bank's request is consistent with the parties' agreement and the

---

[15]   Section 6.01(xxi) was added to the Amended DIP Credit Agreement pursuant to Paragraph 22(c) of the Accommodation Agreement.

[16]   Paragraph 10 of the DIP Accommodation Order amended Paragraph 6(d) of the DIP Order to provide that the liens on cash collateral permitted by newly-added clauses 6.01(xxi) and (xxii) of Section 6.01 of the Amended DIP Credit Agreement are permitted to be senior to the DIP Liens (as defined in the DIP Order).

intent of the DIP Order.  Accordingly, the L/C Cash Collateral should not be subject to the Carve

Out and the proposed order granting the relief sought herein seeks such clarification.

33.    The proposed Amended and Restated Reimbursement Agreement and the

parties' respective rights and remedies with respect to reimbursement agreements are reasonable,

justifiable, and necessary under the circumstances.  Absent these proposed changes, the Debtors

would face significant challenges in obtaining new letters of credit when the current L/Cs expire

because the issuance of L/Cs is completely discretionary.  Moreover, without the relief sought

herein, the Debtors would continue to be exposed to the risk of the occurrence of a cross-default

under the DIP Facility for any technical default under the Reimbursement Agreement.

34.    Because the Debtors' ongoing and uninterrupted access to L/Cs and the

limitation of risk with respect to its DIP Facility are crucial to its business operations and, by

extension, to its ability to reorganize effectively, the Debtors seek this Court's approval of the

Amended and Restated Reimbursement Agreement and any Future Reimbursement Agreement

as set forth above.

<u>Applicable Authority</u>

G.    <u>This Court Should Approve The Amended and Restated Reimbursement Agreement</u>

(a)    The Amended And Restated Reimbursement
       Agreement Is An Appropriate Use Of Estate
       <u>Property Under Section 363(b)(1) Of The Bankruptcy Code</u>

35.    To the extent that section 363(b) applies, the Debtors submit that entry of

an order authorizing the Debtors' entry into the Amended and Restated Reimbursement

Agreement is necessary and appropriate and in the best interests of the Debtors' estates.

Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate

"other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).

Use of estate property outside the ordinary course of business may be authorized if the debtor

demonstrates a sound business justification for it.  See Comm. Of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires

finding that good business reason exists to grant debtor's application under section 363(b)); see

also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 178-79 (D. Del. 1991).

36.    Based on the foregoing, the Debtors submit that entry of an order

authorizing the Debtors' entry into the Amended and Restated Reimbursement Agreement is

necessary and appropriate to maintain access to L/Cs to fund ongoing operations as they continue

to work to reorganize.  The Amended and Restated Reimbursement Agreement was negotiated in

good faith, at arm's length, and in the exercise of the Debtors' business judgment.  Bankruptcy

courts routinely defer to a debtor's business judgment on most business decisions, including the

decision to borrow money.  See Group of Institutional Investors v. Chicago,  Milwaukee, St. Paul

& Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr.

D. Colo. 1985).  In considering whether a debtor has exercised its business judgment, a court is

not free to second-guess particular provisions but rather must determine whether the proposed

action "as a whole is within reasonable business judgment."  In re Crowthers McCall Pattern,

Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

37.    The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4

F.3d 1095, 1099 (2d Cir. 1993).  Once the debtor articulates a valid business justification, a

presumption arises that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'"  Official Comm. Of Subordinated Bondholders v. Integrated

Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  Id.  To satisfy its burden, it is not enough for an objector simply to raise and argue an objection.  Rather, an objector "is required to produce some evidence respecting its objections."  In re Lionel Corp., 722 F.2d at 1071.

38.    The Debtors have exercised sound business judgment in determining that it is appropriate and necessary to enter into the Amended and Restated Reimbursement Agreement to maintain uninterrupted access to L/Cs issued by the Issuing Bank, which are crucial to the Debtors' ability to fund ongoing business operations.  Indeed, the proposed terms of the Amended and Restated Reimbursement Agreement are fair, reasonable, and necessary and are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the Amended and Restated Reimbursement Agreement.

(b)    Request For Modification Of Automatic Stay

39.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition pursuant to the Bankruptcy Code.  As mentioned above, the proposed changes to the treatment of the Amended and Restated Reimbursement Agreement contemplates a modification of the automatic stay (to the extent applicable), to permit the Issuing Bank to immediately exercise its rights and remedies available to it upon a Reimbursement Agreement Event of Default.  The Issuing Bank, however, could exercise rights and remedies against collateral securing the Debtors' obligations under the Amended and Restated Reimbursement Agreement, including setoff rights, only after giving the Debtors five business days' prior written notice of the occurrence and continuance of a Reimbursement Agreement Event of Default.  Pursuant to the DIP Order, similar stay modification provisions are currently available to the DIP Lenders and were available to DIP Lenders which issued letters of credit to

the Debtors prior to the Accommodation Effective Date.  Further, such stay modification

provisions are ordinary and standard features of postpetition debtor-in-possession financing

facilities and, in the Debtors' business judgment, are reasonable under the current circumstances.

(c)    Compliance With General Order No. M-274

40.    The Debtors believe that the relief requested in this Motion and the notice

to be provided are in compliance with the Guidelines for Financing Requests (the "Guidelines"),

adopted under General Order No. M-274 of the Board of Judges for the Southern District of New

York.  The Debtors do not believe that entering into the Amended and Restated Reimbursement

Agreement or any Future Reimbursement Agreement creates any incremental right that would

trigger the application of the Extraordinary Provision (as defined in the Guidelines) requirements

beyond that which was already satisfied in the DIP Motion and the Accommodation Motion,

both of which were approved by this Court pursuant to the DIP Order and the DIP

Accommodation Order, respectively.  Accordingly, the Debtors submit that they have satisfied

the Guidelines.

Notice Of Motion

41.    Notice of this Motion has been provided in accordance with the

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Thirteenth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered December 4, 2008 (Docket No. 14534).  The Debtors

have also provided notice to counsel to the agent for the Debtors' former prepetition credit

facility as well as counsel to the parties which objected to the Accommodation Motion.  In light

of the nature of the relief requested, the Debtors submit that no other or further notice is

necessary.

     WHEREFORE the Debtors respectfully request that the Court (i) enter an order in the

form attached hereto (a) authorizing Debtors' entry into the Amended and Restated

Reimbursement Agreement and (b) providing certain protections with respect to reimbursement

agreements as described above and (ii) grant the Debtors such other and further relief as is just.

Dated:      New York, New York
           March 4, 2009

              SKADDEN, ARPS, SLATE, MEAGHER
               & FLOM LLP

           By:    /s/ John Wm. Butler, Jr.
                 John Wm. Butler, Jr.
                 John K. Lyons
                 Ron E. Meisler
           333 West Wacker Drive, Suite 2100
           Chicago, Illinois 60606
           (312) 407-0700

                     - and -

           By:    /s/ Kayalyn A. Marafioti
                 Kayalyn A. Marafioti
                 Thomas J. Matz
           Four Times Square
           New York, New York 10036
           (212) 735-3000

                     - and -

           SHEARMAN & STERLING LLP

           By:    /s/ Douglas P. Bartner
                 Douglas P. Bartner
                 Andrew V. Tenzer
                 Michael S. Baker
           599 Lexington Avenue
           New York, New York  10022
           (212) 848-4000

           Attorneys for Delphi Corporation, et al.,
             Debtors and Debtors-in-Possession